IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>MOUNTAIN EXPRESS OIL COMPANY, et al.,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-90147 (DRJ)<br><br>(Jointly Administered) |

**DECLARATION OF GEOFFREY RICHARDS IN SUPPORT OF
DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION
FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND
PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
(III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED
PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING
A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

I, Geoffrey Richards, hereby declare under penalty of perjury as follows:

1. I submit this declaration (the "Declaration") in support of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion"), filed concurrently herewith, of the above-captioned debtors and debtors in possession (the "Debtors") for entry of interim and final orders: (a) authorizing the Debtors to obtain postpetition financing, (b) authorizing the Debtors' use of cash

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/mountainexpressoil. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these cases is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022.

DOCS_NY:47250.7 58614/001

collateral, (c) granting liens and superpriority administrative claims, and (d) granting adequate protection to certain prepetition secured parties, among other relief.

2. Unless otherwise indicated, the statements set forth in this Declaration are based on (a) my personal knowledge or views based on my experience; (b) information I have received from the Debtors, my colleagues at Raymond James working directly with me or under my supervision, direction, or control, or other advisors of the Debtors; and/or (c) my review of relevant documents.

3. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors. I am not being specifically compensated for this testimony other than through payments received by Raymond James & Associates, Inc. ("Raymond James"), as engaged by the Debtors; none of those payments are specifically payable on account of this testimony. If I were called upon to testify, I would testify competently to the facts and views set forth herein.

## Professional Background and Qualifications

4. I am a Senior Managing Director and Head of the Capital Structure Advisory Group at Raymond James, which has its principal office at 880 Carillon Parkway, St. Petersburg, Florida 33716. The Debtors retained Raymond James as its investment banker prepetition and intend to file a motion to retain Raymond James as its investment banker in these chapter 11 cases. Raymond James has a dedicated 22-person Capital Structure Advisory investment banking group with extensive experience advising companies, creditors' committees, and other constituents in complex situations involving underperforming businesses facing difficult financing conditions, liquidity crises, out-of-court restructurings, and chapter 11 cases. Investment bankers at Raymond James have advised on, or been involved with, numerous restructuring-related or distressed transactions, both out-of-court and in chapter 11 cases, including, without limitation, sale, restructuring, financing, financial opinion, and special advisory transactions.

5. I have more than 25 years of investment banking and restructuring experience. During my career, I have personally led an investment banking team or otherwise been involved in the sale of over 125 companies as a going concern, many of which had been experiencing financial distress. I have also personally led an investment banking team or otherwise been involved in approximately 100 chapter 11 cases over the past 25 years. I have provided investment banking expertise and distressed mergers and acquisitions and financing advice to companies, lenders, and investors in both in- and out-of-court restructurings. Prior to joining Raymond James, I was head of North America debt finance and restructuring at Canaccord Genuity Group Inc., head of special situations and restructuring at William Blair & Company, and a partner in the Kirkland & Ellis LLP restructuring practice. In each role, my primary responsibilities included advising companies and investors in restructuring, distressed mergers and acquisitions, distressed financing, and special situations. Since 2001, I have taught the class Corporate Restructuring at Northwestern Pritzker School of Law as an Adjunct Professor.

## General Background

6. A detailed description of the Debtors' business and facts precipitating the filing of the Debtors' chapter 11 proceedings are set forth in the *Declaration of Michael Healy in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 57] (the "First Day Declaration"), incorporated herein by reference.[2]

7. Founded in 2000 and based in Alpharetta, Georgia, the Debtors are a recognized leader in the fuel distribution and retail convenience industry. As one of the largest fuel distributors in the southern United States, the Debtors serve 828 fueling centers and 27 travel

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration and/or the DIP Motion, as applicable.

centers across 27 states. The Debtors have historically enjoyed strong relationships with many of the major oil companies including ExxonMobil, BP, Shell, Chevron, Texaco, and Sunoco. Since 2013, the Debtors have distributed over 1.1 billion gallons of fuel.

### Retention of Raymond James

8.      The Debtors engaged Raymond James in February 2023 as their investment banker to provide advice regarding obtaining financing and pursuing strategic alternatives, including initiating Chapter 11 Cases, in the midst of an increasingly difficult liquidity situation. In a short period of time prior to the Petition Date, it became increasingly clear that the Debtors would likely need to file these Chapter 11 Cases to obtain a breathing spell and pursue restructuring options to maximize value, including an orderly sale of their businesses through an in-court process.

### The Debtors' Need for the DIP Facility and Access to Cash Collateral

9.      As part of the Debtors' preparation for these Chapter 11 Cases, Raymond James assisted the Debtors with the evaluation of their immediate financing needs and funding alternatives. Raymond James also assisted the Debtors in their assessment of the current DIP financing market. As part of the foregoing evaluation, Raymond James worked with the Debtors and their chief restructuring officer (the "CRO") in analyzing the Debtors' immediate and long term financing needs. Among other things, this evaluation focused on the Debtors' anticipated cash receipts and disbursements during the projected period, the necessary funding required to continue operations, the effect of potential chapter 11 filings on the operations of the businesses, the expenses of administration of chapter 11 cases, as well as the fees and interest expense associated with the proposed DIP Facility.

10.     Based on discussions with the Debtors' management and the CRO, I understand that the Debtors lack sufficient liquidity and do not generate sufficient cash from operations to

fund their businesses through a chapter 11 bankruptcy process. Accordingly, without the DIP Facility and the ability to use cash collateral, the Debtors will not have the liquidity needed to operate their businesses, fund their ordinary course expenditures, or pay the expenses necessary to administer these Chapter 11 Cases. Absent increased funding in the form of the DIP Facility, the Debtors could be forced to terminate their businesses as going concerns to the detriment of the Debtors, their estates, and all stakeholders.

11.     The Debtors also believe that the DIP Facility and access to cash collateral will provide a clear message to their customers, vendors, employees, and contract counterparties that the Debtors have sufficient liquidity to meet their current and future obligations based on how they have historically conducted business. The financing will demonstrate the Debtors' ability to continue meeting the needs of their customers, provide compensation to their employees, and operate their businesses in the ordinary course based on how they have historically conducted business.

### The Debtors' Efforts to Obtain Postpetition Financing

12.     Recognizing the need to move quickly while also securing the best available financing under the circumstances, the Debtors sought financing from numerous third-party sources as well as from the Prepetition Secured Parties beginning shortly after Raymond James was engaged.

13.     Raymond James, together with the Debtors' other advisors, held multiple conversations with the Prepetition Agent and, once they were engaged, the advisors for the Prepetition Secured Parties, over a number of weeks. As part of these conversations, the Debtors' advisors educated the Prepetition Agent and the advisors for the Prepetition Secured Parties about the Debtors' liquidity needs in the context of a chapter 11 process and emphasized the necessity

of DIP financing. Discussions involved detailed estimates for a potential DIP loan sizing, potential alternatives available to the Debtors, and the adverse impact to the Debtors' estates in the absence of such financing.

14. In parallel, Raymond James initially identified and contacted 12 potential lenders regarding a junior DIP loan and/or a potential refinancing of the Prepetition Secured Parties. The parties were selected utilizing Raymond James' proprietary databases and were chosen because they provide capital solutions, primarily in the form of credit, to distressed middle market businesses and have expressed interest in providing financing to debtors-in-possession. Raymond James held introductory diligence discussions with 10 of the potential lenders contacted.

15. All 12 parties contacted declined to submit a junior DIP financing and/or refinancing proposal. Common reasons cited for declining included: (i) lack of available collateral, (ii) inability to provide funding on a junior/unsecured basis, (iii) amount of debt outstanding to the Prepetition Secured Parties, and (iv) investment size.

16. Following the initial outreach and further discussions with the Prepetition Secured Parties about their inability to provide adequate DIP financing in an amount necessary to complete a sale process, Raymond James notified the Prepetition Agent of its intent to explore a priming DIP loan. Raymond James promptly reengaged with all 12 parties that were previously contacted as well as eight additional lenders to discuss the prospect of a priming DIP loan. Inclusive of all potential lenders contacted, 14 of the 20 parties declined to provide a proposal for a priming DIP loan. Key considerations included (i) the complexity of promptly valuing the Prepetition Secured Parties' collateral, (ii) conducting diligence on collateral in more than 800 locations in 27 states on a compressed timeline, (iii) concerns about the Prepetition Secured Parties consenting to a priming DIP loan, and (iv) the relatively small size and short duration of the DIP loan.

DOCS_NY:47250.7 58614/001

17. At a point in time when it was uncertain whether the Prepetition Secured Parties would provide sufficient liquidity and time for a sale process through a DIP loan, the Debtors also engaged in discussions with a party affiliated with the Debtors to provide the necessary financing. The Prepetition Agent rejected this as a potential priming DIP loan option.

18. Raymond James has held multiple diligence discussions with the remaining six potential lenders who have expressed interest in providing a priming DIP loan. These parties (i) received background on the Debtors and these Chapter 11 Cases, (ii) received access to a virtual data room with diligence information, and (iii) conducted discussions with the Debtors and their advisors in order to evaluate the priming DIP loan opportunity. Raymond James has received several priming DIP loan term sheets and other parties are continuing their diligence.

19. After numerous discussions with the Prepetition Agent and advisors to the Prepetition Secured Parties and the feedback received from the market with respect to junior DIP loan proposals, the Debtors continued to pursue obtaining postpetition financing from the Prepetition Secured Parties, alongside efforts to solicit priming DIP loan proposals from additional lenders. The Prepetition Secured Parties continue to reject a potential priming DIP loan, but the existence of this option has assisted the Prepetition Secured Parties and Debtors in bridging the gap and reaching an agreement on the proposed DIP Facility.  The Debtors and Prepetition Secured Parties engaged in extensive, good faith, arm's-length negotiations concerning the economics, milestones, covenants, and other provisions typical in debtor in possession financings with each of the existing constituencies comprising the Prepetition Secured Parties.  In a compressed period of time leading up to and after the Petition Date, the Debtors and the Prepetition Secured Parties have meaningfully improved the terms of the DIP Facility.

7

DOCS_NY:47250.7 58614/001

### The DIP Facility[3]

20. The Debtors are now seeking secured post-petition financing and the use of Cash Collateral of the Prepetition Secured Parties subject to the terms and conditions of a proposed interim financing order.

21. While the terms and conditions of the DIP Facility are more particularly described in the DIP Motion, I note that certain of the prepetition indebtedness of the Prepetition Secured Parties is contemplated to be subject to a roll-up (the "Roll-Up") converting such prepetition indebtedness into indebtedness under the DIP Facility. The Roll-Up was a topic of significant negotiation and disagreement between the Debtors and the Prepetition Secured Parties and was a necessary condition to obtaining the DIP Facility. Based on my observations, I believe the Debtors would not have access to DIP financing from the Prepetition Secured Parties without the proposed Roll-Up, which is subject to the entry of a final order approving the DIP Facility.

### The DIP Financing Is the Best Postpetition Financing Arrangement Available to the Debtors

22. Based on my experience as a restructuring professional and involvement in the process described above, I believe the DIP Facility represents the best available and most expedient postpetition financing under the circumstances. As noted above, no party that Raymond James is aware of was interested in providing, or willing to provide, DIP financing to the Debtors on an unsecured or junior basis. Additionally, the Debtors have concerns that the parties who submitted priming DIP loan proposals to Raymond James and/or continue to conduct diligence with respect to a priming DIP loan will require additional time to complete the required diligence and

---

[3] The material terms of the proposed DIP Facility are set forth in detail in the DIP Motion. For the avoidance of doubt, any description of the proposed terms of the DIP Facility herein or in the DIP Motion is qualified in its entirety by reference to the proposed interim order approving the borrowing contemplated by the DIP Facility.

DOCS_NY:47250.7 58614/001

documentation to provide the necessary funding. The Debtors and the Prepetition Secured Parties, moreover, agreed to terms that will provide the Debtors with access to much-needed liquidity and an opportunity to maximize value during the pendency of these Chapter 11 Cases.

## Conclusion

23. Given the financing efforts and process described above and based on my experience as a restructuring professional and involvement in other financing transactions, I believe that the DIP Facility is the best financing option presently available to the Debtors and that the terms of the DIP Facility are in the best interests of the estates.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: March 23, 2023

/s/ *Geoffrey Richards*
Geoffrey Richards
Senior Managing Director and Head of
Capital Structure Advisory
Raymond James & Associates, Inc.