```
              UNITED STATES BANKRUPTCY COURT
           SOUTHERN DISTRICT OF TEXAS (HOUSTON)

                                    .
IN RE:                              .  Case No. 23-90147
                                    .  Chapter 11
MOUNTAIN EXPRESS OIL COMPANY,       .
et al.,                             .  515 Rusk Street
                                    .  Houston, TX 77002
                                    .
                   Debtors.         .  Wednesday, March 22, 2023
                                    .  3:30 p.m.
. . . . . . . . . . . . . . . . . . .
```

                     TRANSCRIPT OF FIRST DAY HEARING
                  BEFORE THE HONORABLE DAVID R. JONES
                   UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES:

For the Debtor:                Pachulski Stang Ziehl & Jones LLP
                               By:  MICHAEL WARNER, ESQ.
                                    BENJAMIN WALLEN, ESQ.
                               440 Louisiana Street, Suite 900
                               Houston, TX 77002
                               (713) 691-9385

                               Pachulski Stang Ziehl & Jones LLP
                               By:  STEVEN GOLDEN, ESQ.
                               780 Third Avenue, 34th Floor
                               New York, NY 10017-2024
                               (212) 561-7700

TELEPHONIC APPEARANCES CONTINUED.

Audio Operator:                Courtroom ECRO Personnel

Transcription Company:         Access Transcripts, LLC
                               10110 Youngwood Lane
                               Fishers, IN 46048
                               (855) 873-2223
                               www.accesstranscripts.com


     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
TELEPHONIC APPEARANCES (Continued):


For the Debtor:              Pachulski Stang Ziehl & Jones LLP
                             By:  JEFFREY DULBERG, ESQ.
                                  JEFFREY POMERANTZ, ESQ.
                                  CIA H. MACKLE, ESQ.
                             10100 Santa Monica Boulevard
                             13th Floor
                             Los Angeles, CA 90067-4003
                             (310) 277-6910

                             Pachulski Stang Ziehl & Jones LLP
                             By:  HENRY KEVANE, ESQ.
                                  MAXIM LITVAK, ESQ.
                             One Sansome Street, Suite 3430
                             San Francisco, CA 94104
                             (415) 263-7000

For First Horizon            Greenberg Traurig, LLP
Bank, as                     By:  JOHN D. ELROD, ESQ.
Administrative Agent:        Terminus 200
                             3333 Piedmont Road Northeast
                             Suite 2500
                             Atlanta, GA 30305
                             (678) 553-2100

                             Greenberg Traurig, LLP
                             By:  SHARI L. HEYEN, ESQ.
                                  EMILY D. NASIR, ESQ.
                             1000 Louisiana Street, Suite 6700
                             Houston, TX 77002
                             (713) 374-3500

For Spirit SPE               Reed Smith LLP
Portfolio CA C-Stores        By:  MICHAEL COOLEY, ESQ.
LLC:                         2850 N. Harwood Street, Suite 1500
                             Dallas, TX 75201
                             (469) 680-4213

For HF Sinclair              Clark Hill PLLC
Refining & Marketing         By:  ANDREW G. EDSON, ESQ.
LLC and Sinclair Oil         901 Main Street, Suite 6000
LLC:                         Dallas, TX 75202
                             (214) 659-4084
```

```
TELEPHONIC APPEARANCES (Continued):

For the United States
Trustee:                  Office of the United States Trustee
                          By:  JAYSON RUFF, ESQ.
                          515 Rusk Street, Suite 3516
                          Houston, TX 77002
                          (713) 718-4640


For Pooler Ventures,
LLC:                      Busch Reed Jones & Leeper
                          By:  CORY C. CLOSE, ESQ.
                          639 Whitlock Avenue Southwest
                          Marietta, GA 30064
                          (770) 629-0154


For Sunoco:               Katten Muchin Rosenman LLP
                          By:  MICHAELA CROCKER, ESQ.
                          2121 North Pearl Street, Suite 1100
                          Dallas, TX 75201-2591
                          (469) 627-7070


For BFM Operations,
LLC:                      Locke Lord LLP
                          By:  PHILIP EISENBERG, ESQ.
                          JPMorgan Chase Tower
                          600 Travis, Suite 2800
                          Houston, TX 77002
                          (713) 226-1304

                          Locke Lord LLP
                          By:  OMER F. "RICK" KUEBEL III, ESQ.
                          601 Poydras Street, Suite 2660
                          New Orleans, LA 70130
                          (504) 558-5155


For SASS Petroleum,
LLC:                      Fellows LaBriola LLP
                          By:  STEVEN KUSHNER, ESQ.
                          233 Peachtree Street Northeast
                          Suite 2400, Harris Tower
                          Atlanta, GA 30303
                          (404) 586-9200


For Interested
Parties:                  DLA Piper LLP (US)
                          By:  DENNIS O'DONNELL, ESQ.
                               OKSANA LASHKO, ESQ.
                               GREGORY JUELL, ESQ.
                          1251 Avenue of the Americas
                          New York, NY 10020-1104
                          (212) 335-4500
```

```
TELEPHONIC APPEARANCES (Continued):

For Interested          DLA Piper LLP (US)
Parties:                By:  ROBERT MOSKALEWICZ, ESQ.
                        444 West Lake Street, Suite 900
                        Chicago, IL 60606-0089
                        (312) 368-4000


For Oak Street Real
Estate Capital, LLC:    Kirkland & Ellis
                        By:  ASHLEY L. SURINAK, ESQ.
                        300 North LaSalle
                        Chicago, IL 60654
                        (312) 862-4073


Also Present:           MARCUS HELT, ESQ.
                        McDermott Will & Emergy LLP

                        TURJO WADUD
                        Mountain Express Oil Company

                        LAMAR FRADY
                        Mountain Express Oil Company

                        DUSTIN MARTIN
                        Mountain Express Oil Company

                        NEIL LANSING, ESQ.
                        Mountain Express Oil Company

                        LAWRENCE PERKINS
                        SierraConstellation

                        CRAIG BARBAROSH

                        MICHAEL HEALY

                        GEOFF RICHARDS
```

1      (Proceedings commence at 3:30 p.m.)

2           THE COURT:  All right.  Good afternoon, everyone.

3   This is Judge Jones.  The time is 3:30 Central.  Today is March

4   the 22nd, 2023.  This is the docket for Houston, Texas.  On the

5   3:30 docket, we have the jointly administered cases under Case

6   Number 23-90147, Mountain Express Oil Company.

7           Folks, please don't forget to record your electronic

8   appearance.  That's a quick trip to my website, a couple mouse

9   clicks.  You can do that at any time prior to the conclusion of

10  this afternoon's hearing.

11          First time that you speak, if you would, please state

12  your name and who you represent.  That really does give the

13  court reporters a good point of reference and doing what is a

14  very difficult job these days.

15          We are recording this afternoon using CourtSpeak.

16  We'll get the audio up on the docket shortly after the

17  conclusion of the hearing.  If you haven't tried it, I

18  encourage you to do so.  It's a quick way to review what has

19  happened, and also, it's a nice thing to be able to forward to

20  your respective clients if they want to know what occurred

21  today.

22          And with that -- oh -- if you came in right at 3:30,

23  I previously made an announcement.  I have activated the hand

24  raising feature.  If you know you're going to be speaking this

25  afternoon, go ahead and give me a "five star" on your

1    telephone, I'll get you unmuted.  Obviously, you can change

2    your mind at any time.

3            And with that, Mr. Pomerantz, are you starting us off

4    this afternoon?

5            MR. POMERANTZ:  Yes.  I am, Your Honor.  Just wanted

6    to let the Court know that at least on my screen and, I think,

7    others', we can't see the names of any of the attendees.  We

8    see the pictures.

9            THE COURT:  Hmm.

10           MR. POMERANTZ:  I'm not sure if the others do.  It

11   doesn't affect me, I'm getting to know people's faces, but just

12   wanted to alert Your Honor to that.

13           THE COURT:   No.  Thank you.  That should be easy

14   enough to do.

15           MR. POMERANTZ:  Ah, there you go.

16           THE COURT:  See, all you have to do is ask, and I can

17   deliver.  It's my second career as an IT professional in case

18   the whole judge thing doesn't work out.

19           MR. POMERANTZ:  Thank you very much, Your Honor.

20   Jeff Pomerantz of Pachulski, Stang, Ziehl & Jones, proposed

21   counsel for the debtors in possession.

22           And in the virtual courtroom with me from the company

23   today are Turjo Wadud and Lamar Frady, the debtors' co-founders

24   and co-CEOs; Dustin Martin, who's the debtors' chief operating

25   officer; Neil Lansing, who is the debtors' general counsel;

1    Lawrence Perkins, the managing director of SierraConstellation,

2    one of the debtors' two independent directors; and I believe on

3    the phone is Craig Barbarosh, a 30-year restructuring lawyer

4    with Katten Muchin Pillsbury.  He's the other independent

5    director.

6            Also in the virtual courtroom are Michael Healy, the

7    proposed chief restructuring officer and managing director of

8    FTI and the witness at today's hearing, and Geoff Richards, the

9    managing director of Raymond James, the debtors' proposed

10   investment banker.

11           Ben Wallen, Steve Golden, and Henry Kevane of my firm

12   will be presenting the various first day motions to the Court.

13   Apparently, Mr. Wallen said all I could do was the opening and

14   they would take the rest.

15           I wanted to extend appreciation to the Office of the

16   United States Trustee for their availability over the weekend

17   and the last couple of days, and I'm pleased to report to the

18   Court that I believe we've worked through all of their comments

19   and that we have fully consensual orders.

20           Ditto with respect to First Horizon and the team at

21   Greenberg Traurig, and we believe they have signed off on all

22   the first day orders that we will present today for Your

23   Honor's consideration.

24           Also, as a result of the lag between the petition

25   date and now, we have had several conversations with major fuel

1  suppliers which, as Your Honor knows, are critical to this
2  business, and we have incorporated their comments into the
3  proposed order.
4          So we're hoping today could be as fully consensual of
5  a first day hearing and will go smoothly after what was
6  otherwise a little bit of a rocky start to this case.
7          But before I proceed with the overview of the
8  debtors' operations, the capital structure, and the reason why
9  we're here, I thought I would provide the Court with a little
10 update on the debtor-in-possession financing discussions with
11 First Horizon.  We continue to make substantial progress in
12 negotiating the terms of a four-month DIP financing facility
13 that will provide funding for operations and for the cost of
14 administration of the case.
15         We have exchanged a debtor in possession credit
16 agreement, we've exchanged a DIP motion, and we have also
17 exchanged a proposed DIP order.  They are in advanced stages of
18 negotiation.  I believe we have reached agreements on all the
19 principal terms.  But while we still have some wood to chop,
20 including the mechanics and requirements for initial funding to
21 occur, we are optimistic that we will get there.
22         Your Honor was kind enough to give us tomorrow at one
23 o'clock Central Time for a hearing on the DIP financing.  And
24 given that clients and lawyers like deadlines, I would like
25 Your Honor to give us a deadline by which you would like to see

1  those documents so that you will have a sufficient opportunity

2  to review them in advance of the hearing.

3          THE COURT:  I -- thank you.  That was going to be a

4  topic of discussion.  I also want other parties who may have an

5  interest in reviewing those documents to have adequate time.  I

6  would like them filed by nine o'clock Central Time tomorrow

7  morning.

8          MR. POMERANTZ:  That will be fine, Your Honor.  We

9  will endeavor to get final drafts.  I know, from appearing

10  before Your Honor in cases before, that if we have advanced

11  drafts, then we have to follow it up with incremental redlines

12  that will at least give everyone advance opportunities to

13  review the majority of the documents before.  What we will do,

14  we will endeavor to make that happen.

15          I also would like to report to the Court we were in

16  advanced stages of negotiating potential priming loans with

17  lenders.  I think the debtors' view is that proceeding with a

18  consensual DIP loan is better, and hopefully we'll get there.

19  But just so Your Honor knows, we are always contingency

20  planners, and we have a Plan B if we cannot.

21          THE COURT:  All right.  Let me --

22          MR. POMERANTZ:  Your Honor --

23          THE COURT:  Sorry.

24          MR. POMERANTZ:  That's all right.

25          THE COURT:  I was just going to tell you, I have had

1    -- only if it's helpful, I am not trying to move tomorrow's one

2    o'clock hearing -- if it turns out that you have stumbling

3    blocks, and I hope that you don't, but I've had a nine o'clock

4    slot on Friday morning open.  I realize that's incredibly early

5    for all of our colleagues that are on the West Coast.  I just

6    simply wanted to tell you that that slot has now opened up

7    based upon an announced settlement.  So -- and I don't intend

8    on filling that space until we actually have a DIP hearing.

9         MR. POMERANTZ:  I appreciate that, Your Honor.  I'm

10   -- part of me, and I hope the lenders also will forget you said

11   that, because I think what the -- what the case needs, what the

12   creditors need, is liquidity quickly, and if we have a deadline

13   tomorrow, I'm confident that all the parties will work towards

14   it.  But we appreciate that, and in the unfortunate

15   circumstances we're there, it's good to know that that's

16   available.

17        THE COURT:  But the other comment --

18        Mr. POMERANTZ:  Your --

19        THE COURT:  The other comment I wanted to make

20   because, again, I've been down this road a couple of times and

21   I do understand how nervous your fuel suppliers can get at the

22   early stages of a bankruptcy case, I'm hoping that I can

23   provide some certainty today, even though we're not having a

24   DIP hearing.  But what I was going to encourage you to do, to

25   the extent that they're not yet represented and to the extent

1  that they're not yet on the line viewing the hearings, is that

2  one of the things you might consider is having one of your team

3  members actually send the CourtSpeak audio.  It really is a

4  handy tool.  And I promise you, they can -- you can email it to

5  them, they can hit a button, and then they can actually listen

6  for themselves as to what occurred, and they can make their own

7  decisions.  Again, not requiring it, just pointing out to it,

8  that it's intended to be a helpful tool and, in fact, does fill

9  that void sometimes.

10       MR. POMERANTZ:  Your Honor, that's an excellent

11  point, and Mr. Golden, who's "Mr. Fuel Supplier" for the case,

12  he will, I'm sure, take you up on that, if there's anything we

13  can do to alleviate their concerns, and I know you have a way

14  of making comments that have the ability to alleviate people's

15  concern.

16       With that, Your Honor, I would ask if you could

17  please provide our paralegal, Patricia Jeffries, with screen

18  sharing privileges so that she could put up our PowerPoint

19  presentation.

20       MR. WALLEN:  And, Judge, one point of clarification,

21  while you're doing that, it -- only you provided us 2 p.m.

22  tomorrow as the potential DIP hearing instead of nine o'clock.

23       MR. POMERANTZ:  Oh, that's right.  I apologize.

24       MR. WALLEN:  Ben Wallen, Pachulski, Stang, Ziehl &

25  Jones, proposed for debtors.

1              THE COURT:  Thank you, Mr. Wallen.

2              All right, Ms. Jeffries now has control.

3              MR. WALLEN:  Okay.

4         (Pause)

5              MR. POMERANTZ:  Okay.  We might be having some

6    technical difficulties.

7              Ms. Jeffries are -- you wanted to hear us?

8              THE COURT:  She actually just got off of GoTo

9    Meeting, so let's wait until she comes back.

10        (Pause)

11             THE COURT:  Ms. Jeffries, if you're on the line and

12   you've come back as someone different, if you could raise your

13   hand for me.  If you come back as Patricia Jeffries, I will see

14   you.

15        (Pause)

16             MR. GOLDSMITH:  Your Honor, Steve Golden at

17   Pachulski, Stang, Ziehl & Jones.  I have it up on my screen as

18   well, and I'm hoping my computer will cooperate.  So in the

19   spirit of contingency planning, I'm happy to give it a go.

20             THE COURT:  Always love folks that have a Plan B.

21   All right, so you now have control.  All right, there we go.

22             MR. POMERANTZ:  Are you able to see, Your Honor?

23             THE COURT:  That is your ready to go.

24             UNIDENTIFIED:  All right.

25             UNIDENTIFIED:  (Indiscernible).

1           MR. POMERANTZ:  Okay, Your Honor.  What we'd like to

2    cover during our presentation, some of the information which

3    you heard before, is to provide Your Honor with an overview of

4    Mountain Express Oil Company, go through the circumstances

5    leading to the filing of these Chapter 11 cases, talk a little

6    bit about the debtors' plan of action, and then I'm going to

7    turn it over to my team to present first day motions to Your

8    Honor.

9           THE COURT:  Okay.

10          MR. POMERANTZ:  Next slide.  Next slide.

11          Your Honor, the debtors are a vertically integrated

12   market leader in the fuel supply business.  Mountain Express

13   was originally founded in 2000 by the Bierenbaums as a

14   distributor of fuel and lubricants.  Mr. Wadud and Mr. Frady

15   joined the company back in 2003, and the company soon grew to

16   supply 180 fuel stations.  The business was sold to Empire

17   Petroleum in 2010.  Mountain Express, we entered the market in

18   2013 by re-acquiring 33 of the sites from Empire Petroleum.

19          In 2015, Mr. Wadud and Mr. Frady, who served as --

20   served management positions with the company for over a decade

21   became equity holders in the company, and in 2020, they became

22   co-owners of the business.  Together, they own 97 percent of

23   Mountain Express Oil Company, which is the parent, with the

24   remaining 3 percent owned by third parties.  Next slide,

25   please.

 1          The debtors operate in 27 states, as reflected on the
 2    map, mostly in the central and eastern United States.  Next
 3    slide, please.
 4          The debtors control -- and this is a little small to
 5    see, but the debtors control the ground leases at 550 sites;
 6    352 of those sites are convenience stores that are operated by
 7    the dealers in the debtors' network, and 171 are operated --
 8    are convenience stores that are operated by the debtors.  In
 9    addition, the debtors operate 27 travel centers.  The debtors
10    distribute fuel to 855 sites, which include the 550 controlled
11    sites that I mentioned, plus another 305 noncontrolled sites.
12    Next slide, please.
13          The debtors' model, as you can see there on the left,
14    has been to acquire the real estate containing convenience
15    stores, fuel centers, and travel centers, and to sell such
16    properties to investment vehicles, who would then lease the
17    properties back to the debtor under long-term leases.
18          Oak Street controls 286 of the debtors' 550
19    properties.  The remaining landlords largely consist of REITs
20    and other ones and twos, moms and pops, and a handful of the
21    properties are owned by non-debtor affiliates.
22          The debtors, essentially, rebrand the acquired
23    location with a major national fuel supplier that it has a
24    relationship with, and the debtors then either operate the
25    convenience store or lease the location to a third party,

1  requiring that third-party dealer to purchase fuel from the

2  debtors under long-term supply contracts.  Next slide.

3        The debtors' fuel distribution business is at the

4  heart of its business operations.  The debtor have long-term

5  supply agreements with many of the largest companies of oil

6  distribution -- oil companies in the world, as reflected on the

7  slide.  The debtors are Exxon's second largest customer

8  nationwide and the largest customer in the Southeast.  82

9  percent of the debtor's fuel is transported by third-party fuel

10 trucking companies.  And because of the national shortage of

11 drivers in 2020 and 2021 due to the pandemic, the debtors'

12 principals formed Adelphi Transport, a non-debtor entity, to

13 shore up the debtors' fuel distribution business.  And Adelphi

14 distributes 18 percent of the debtor's fuel, pursuant to market

15 rate contracts and also distributes fuel to nonaffiliated third

16 parties.  Next slide, please.

17       Mountain Express is the parent of 143 entities, not

18 all of them which are reflected on this chart, but generally

19 speaking, the MEX RE entity, which is in the green box, which

20 is in the center right of the page.  It is a tenant under a

21 prime lease and the sublandlord under a sublease.  Each of the

22 MEX RE entities, the ones in green at the end of the chart, are

23 further subdivided into state and even regional subsidiaries.

24       The retail entities, which are in the blue box to the

25 left of the green, are subtenants of the MEX RE entities, in

1  instances where the debtors operate the fueling center or

2  travel center.  And each of the retail entities are also

3  subdivided state or regionally, just like the MEX RE entities.

4       When the debtors are operating a convenience store,

5  the tenant is WHRGOPS entity, on the left, and where the

6  debtors are operating a travel center, it is the WHRG TC

7  entity, on the right of that blue box.

8       As part of a larger corporate reorganization, the

9  debtors intended to use the MEX fuel entities, which are to the

10  right of the MEX RE entities, as the contracting parties to the

11  oil companies or, largely, as of the petition date, so the oil

12  company agreements, are still with the parent, Mountain Express

13  Oil Company and the MEX fuel entities are largely inactive.

14       Finally, Your Honor, the Brothers entities, circled

15  in purple to the right of those entities, as the debtor

16  acquired in connection with the acquisition of Brothers

17  Petroleum (indiscernible) Louisiana.  Those operations and

18  leases were consolidated with the debtors' other leases and

19  operations in the MEX RE and retail entities like I described.

20  Next slide, please.

21       The Mountain Express Oil Company board currently

22  consists of four individuals who I briefly mentioned before:

23  Mr. Wadud and Mr. Frady, who are also co-CEOs, and Mr.

24  Barbarosh and Mr. Perkins, who are two independent directors

25  brought in who have significant experience in the construction

1    world, both on the business side, Mr. Perkins, and on the legal

2    side, Mr. Barbarosh.  Next slide, please.

3           Dustin Martin is the chief operating -- operations

4    officer, Neil Lansing is the general counsel, and Mr. Doug

5    Blankenship is the chief people officer.  Next slide, please.

6           The debtors' professionals, which were all retained,

7    essentially, in the last three or four weeks, include our firm

8    as proposed restructuring counsel, FTI as chief restructuring

9    officer through Mr. Healy, Raymond James, and KCC.  Next page,

10   please.

11          And really the key constituents, Your Honor, that you

12   will hear from and we will be looking at for this case are,

13   number one, first and foremost, the 971 people around the

14   country who depend upon this debtor and its related entities

15   for gainful employment; the fuel suppliers who comprise 25

16   million of the approximately 26 million in liquidated unsecured

17   claims; the dealers, who are 352 third-party operators, usually

18   family-owned businesses who are operating the fueling centers;

19   there's First Horizon, who is agent for the prepetition secured

20   creditor parties under a couple of different lending

21   facilities, which is owed approximately $171 million; and

22   there's Oak Street, as I mentioned, who's a landlord in 286 of

23   the 552 sites; as well as there are other landlords I mentioned

24   before.

25          So, Your Honor, why are we here?  And we talked about

1   this at the first day hearing, but everyone may not have been

2   there, so forgive me for repeating a little bit of myself.

3          From July 2021 to October 2022, Oak Street funded the

4   debtors' acquisition of 286 properties for an aggregate

5   purchase price of over $825 million through 60 separate sale

6   leaseback transactions.

7          An Oak -- an Oak Street designee, Mr. Schweiker, was

8   appointed to the board as a condition for the financing program

9   on December 31st, 2021, and he sat on the debtors' board of

10  directors until January '23, when the relationship between the

11  debtors and Oak began to sour.

12         In connection with the sale-leaseback, the parties

13  entered into 46 side letters with respect to environmental

14  assessment and remediation code compliance and related matters

15  to be completed at some of the properties post closing.

16  Normal, routine type of stuff that you would expect to occur at

17  a gas station.  So much so that they were so routine that,

18  basically, their completion did not hold up closing of any of

19  the transactions.

20  ***

21         In October 2022, the debtors, with Oak Street's

22  support, began to transition away from the owned and operated

23  convenience stores to focus on their fuel supply business.  And

24  that was occurring over the next two, three months when things

25  between Oak Street and the debtor started to sour in early

1   2023.

2            Oak Street and the debtors entered into amendments to

3   their master lease agreements to facilitate Oak Street's

4   advancement of $10 million to the debtor to cover its January

5   and February rent obligation to Oak Street under the master

6   leases.  And soon thereafter, Oak Street started to demand that

7   the debtors relinquish properties from the master lease --

8   leases to allow Oak Street to sell them or re-tenant them to

9   third parties who would not be required and would essentially

10  not sign on to the debtors' fuel supply agreements.  When the

11  debtors refused to do so, it caused the loss of the fuel supply

12  agreements, caused them to breach their minimum purchase

13  obligations with the fuel supplier, and thereby decimate the

14  value of the debtors' businesses and threaten their existence.

15           Oak Street started to become hostile.  They sent the

16  debtors three separate notices of default on February 17th,

17  2023, each raising only nonmonetary defaults, principally

18  relating to the alleged failure to complete the post-closing

19  work with respect to the acquired properties.  Prior to the

20  notice of the default, Oak Street had never complained to the

21  debtors regarding the pace at which post-closing work was being

22  completed.  And in fact, the debtors have been diligent in

23  completing the work; the vast majority of which is done pending

24  governmental and regulatory approval.  And Oak Street surely

25  knew this as its representative sat on the board of directors

1  until resigning in January of 2023.  Nor did Oak Street raise

2  any concerns about the post-closing work when it amended and

3  restated, the master leases in January 2023.

4        Next slide, please.  This is an example.  On July

5  22nd, 2021, next closed a sale-leaseback transaction that

6  included five properties in North Carolina and entered into

7  side letters with respect to these properties.  The letters --

8  side letters contemplated that certain work, including

9  completion of Phase IIs, would be completed by September of

10 2021.  But it was only on February 17th, 2023, 515 days after

11 the listed completion date in the side letters, did Oak Street

12 transmit the default letter alleging that the debtors were in

13 default.   It never was mentioned before February 17th, 2023.

14 This is one example, Your Honor, of many, many, many examples

15 in the group of 44 side letters, which would be the same.

16        The debtors retained restructuring advisors, trying

17 to negotiate a forbearance to -- with Oak Street to avoid a

18 Chapter 11 filing.  They weren't really immaterial past due

19 with any of their suppliers.  With respect to all their

20 landlords except one, they were continuing to pay rent.  And

21 while they were in nonmonetary default with the lenders, the

22 relationship was cordial, was working toward -- forward, and it

23 was not the lenders who were pushing the debtors into a Chapter

24 11.

25        So as our first of course of business, we approached

1    Oak Street to obtain a 30-day forbearance agreement, just to

2    bring down the temperature and to allow the parties to sit and

3    try to sit down, talk about each other's interests, get them

4    comfortable that the work was being completed, and discuss what

5    type of overall restructuring could occur outside of the bank.

6            In response to that, the Oak Street demanded that the

7    debtors relinquish 150 properties, more than 50 percent of

8    their entire portfolio.  And what would the debtors get in

9    exchange?  They would get a 30-day forbearance.  The debtors

10   told Oak that that would decimate their business, result in a

11   significant loss of employment for employees throughout the

12   country, and was simply not acceptable.  While the parties

13   continued to talk about terms of a forbearance agreement, it

14   wasn't until March 15th, despite repeated requests, that Oak

15   Street finally provided the debtors with a form forbearance

16   agreement for that 30-day extension.  And in that forbearance

17   agreement, while they reduced their demand to 75 properties

18   from the 150, they also asked for a payment of $8.5 million and

19   access to all the debtors' creditors and lenders, again, as a

20   condition for a 30-day forbearance.

21           Acceding to Oak Street's demands, which we believe

22   the facts will demonstrate at the appropriate time as we know

23   this is not before the Court today, it was a clear power play,

24   trying to exploit nonmonetary defaults that existed for months

25   and months, when we had them completed or awaiting governmental

1    approval, just to give them their property back.  This would

2    have been value destructive, and a breach of the debtors'

3    fiduciary duty to its stakeholders.  And left with no choice,

4    the debtors filed bankruptcy on March 18th.  And here we are.

5            Now that the debtors -- next slide, please.  Next

6    slide, please.  Now that the debtors in Chapter 11, they intend

7    to use the process to pursue a restructuring that maximizes the

8    value for all constituents.  First, the debtors will continue

9    to transfer and to transition from their operated sites to

10   dealer sites.  From October 20 -- October 2022 until the

11   petition date, the debtors converted 104 of those sites.  We're

12   presently under contract to convert 55 of those fueling

13   centers.  I'm sure we will be back to court for authority.  And

14   we are marketing the remaining 45 fueling centers.  We expect

15   the process to be completed by June 2023.

16           Thereafter, the company will be able to focus on its

17   core fuel distribution business, which is a very profitable

18   business.  And at the same time, within the timeframe agreed to

19   with the lenders, we'll pursue a now-value maximizing

20   transaction, which will likely be a sale, but which under

21   certain circumstances, could be a plan of reorganization.

22           Your Honor, if you have -- Your Honor has no

23   questions, I would turn the podium over to Mr. Wallen, who is

24   going to, as I said, handle several of the first day motions.

25           THE COURT:  All right, thank you.  I -- very helpful

1    and I appreciate the detail and preparation that went into the

2    presentation.

3              Before I go to Mr. Wallen, is there anyone else that

4    would like to make, again, what I'll just take as opening

5    comments about the case.  So Ms. Surinak, I've -- you don't

6    need to raise your hand.  You can just tell me, hey, I'd like

7    to talk.  That's all just fine.  But thank you for the

8    courtesy.

9              MS. SURINAK:  Thank you, Your Honor.  Can you hear me

10   okay?

11             THE COURT:  Loud and clear.

12             MS. SURINAK:  Excellent.  For the record, Your Honor,

13   Ashley Surinak of Kirkland & Ellis, LLC, on behalf of Oak

14   Street Real Estate Capital, LLC.  And Your Honor, before I jump

15   into some remarks regarding the relationship between the

16   debtors and Oak Street, I would like to just make a few

17   comments about Oak Street generally to introduce them to the

18   Court.

19             THE COURT:  Okay.

20             MS. SURINAK:  Since 2009, Oak Street has closed

21   approximately 22.1 billion of deal volume with 129 tenants,

22   approximately 25 percent of which are recent partners.  Until

23   Mountain Express, none of Oak Street's other tenants have filed

24   for bankruptcy.  The debtors' situation is an outlier, and

25   where we find ourselves today is based on the unique

1  circumstances at play that led to the debtors' Chapter 11

2  filing on March 18th.

3         Oak Street is not the cause of these Chapter 11

4  cases, but rather these Chapter 11 cases are the result of the

5  debtors' actions or lack of actions thereof.  As the debtors

6  set forth in their first day declaration, Oak Street has been a

7  key collaborative player in the growth of the debtors'

8  business.  By Oak Street's count, they participated in 38 total

9  sale lease bank -- sale-leaseback transactions rather, over the

10  course of nearly two years, since May 2021, involving a total

11  of 277 properties and a total capital contribution of

12  approximately $880 million.

13         Now, in addition to the capital contribution, Oak

14  Street has always been a very willing and committed general

15  partner to the debtors, often closing these transactions on

16  expedited timelines, sometimes in 30 days or less, in an

17  attempt to help the debtors close the transactions quickly and

18  also honor commitments to third (audio interference)

19  transactions.

20         Now as Mr. Pomerantz has flagged, the debtors and Oak

21  Street have entered into several side letter agreements as well

22  to remedy property level issues on a post-closing basis.  While

23  most buyers would not agree to this, Oak Street, again, has

24  been very committed to be working with the debtors to support

25  the business and was more than happy to enter into those

1    agreements.

2         Additionally, and as stated in the first day

3    declaration, Oak Street in January 2023, provided the debtors

4    with an additional $10 million in incremental funding to assist

5    with liquidity when the debtors made Oak Street aware that they

6    would be unable to make January rent payments under the master

7    lease agreements, the additional capital made available by

8    virtue of Oak Street's belief in the debtors' business and

9    trust in the debtors' management team.

10         Additionally, Oak Street did not send the events of

11   default on February 17th in a vacuum, and Oak Street's attempts

12   to remedy the events of default did not come out of the blue.

13   In fact, Oak Street did make multiple efforts to remedy the

14   shortfalls under the letter agreements and corresponding master

15   lease agreements on multiple occasions, on an informal basis,

16   in advance of sending those notices on February 17th.  By way

17   of example, and not hashing this out in great detail at this

18   time, while negotiating the terms of the first amendment -- the

19   amended and restated master lease agreements in early January

20   2023, which was the subject of the $10 million capital

21   contribution and also Oak Street's forbearance of certain rent

22   obligations -- Oak Street was in touch with Allen & Overy,

23   which was the debtors' counsel handling those lease amendments,

24   almost daily.  Kirkland had reached out to Allen and Overy on

25   multiple occasions throughout January 2023, requesting certain

1  documentation and information that it was entitled to under

2  those master lease agreements.  Those emails went largely

3  unanswered.  And in addition to these efforts of counsel, Oak

4  Street's business team was in regular communication with the

5  debtors and their advisors, including meetings with the

6  debtors' management.

7      We'd also like to address just a few remarks with

8  regards to the events of default themselves.  The debtors

9  assert that the defaults under the master lease agreements

10  represent a quote, "low level of technical noncompliance," just

11  by virtue of being nonmonetary and ongoing for months prior to

12  Oak Street sending the notices of default.  While the defaults

13  were nonmonetary in nature, they were not insignificant to Oak

14  Street's ongoing business nor the relationship between the

15  debtors and Oak Street.

16      In addition, the timing of the events of default, in

17  the sense that they were ongoing for multiple months, does not

18  represent Oak Street's belief that the events of default were

19  insignificant, if anything, a representation of Oak Street's

20  willingness to allow the debtors ample time to remedy the

21  events of default under the master lease agreement.

22  Specifically, the events of default involved closing at least

23  17 of the stores, which the debtors were required to keep open

24  for business; failure to construct a gas station or convenience

25  store at one location; failure to provide required quarterly

1    financials for three fiscal quarters leading up to the notices

2    sent on February 17th; and failure to honor the post-closing

3    obligations set forth in the side letter agreements, which as

4    Mr. Pomerantz stated, were primarily regarding environmental

5    cleanup; and also obtaining various licenses, permits, and

6    easements necessary to continue to operate at those locations.

7            Oak Street's decision to send the notices of default

8    were largely driven by the debtors' inability to continue

9    meeting rent obligations under the master lease agreements.

10   And considering the duration and the substance of the defaults,

11   and the impact of the lack of information, financial reports,

12   and other requirements on Oak Street's ability to conduct its

13   ongoing business and continue doing business with the debtors,

14   Oak Street felt it had no choice but to pursue such action and

15   disagrees with the characterization of the default as a low-

16   level of noncompliance, or technical in nature.

17           Regarding the forbearance discussions, briefly:  The

18   debtors have made several assertions that Oak Street did not

19   engage constructively and made several unreasonable demands in

20   the actual forbearance proposal itself and in discussions

21   regarding the forbearance.  After sending the notices of

22   default, Oak Street had initially offered the debtors a seven-

23   day forbearance with very few conditions attached, including

24   the condition to relinquish the properties, which from Oak

25   Street's perspective, the request to relinquish the properties

1    was more so to address Oak Street's concerns that perhaps the

2    debtors' business had grown too quickly, and that paring back

3    the footprint would be a positive development and not value

4    destructive.  After these initial discussions broke down, and

5    as Mr. Pomerantz flagged, the debtors' counsel has circulated a

6    form of extension and waiver agreement of the master release

7    agreements to Kirkland.  And following the receipt of that

8    form, Oak Street's management team met on multiple occasions to

9    discuss the terms of a forbearance under which it would be

10   comfortable.

11          We sent the draft to debtors' counsel on March 16th,

12   2023.  And following us sending this draft, we did not receive

13   a response from debtors' counsel regarding our proposed changes

14   to the forbearance agreement or a request for further

15   engagement or negotiation, or which terms were unworkable from

16   the debtors' perspective.  The next correspondence we received

17   was to inform counsel to Oak Street that the debtors did intend

18   to file for Chapter 11, and then did so on March 18th.

19          Briefly to address the point of Mr. Schweiker's board

20   terms, as Mr. Pomerantz stated and not to rehash everything

21   that Mr. Pomerantz has stated, Mr. Schweiker -- or -- and Mr.

22   Schweiker being the principal and chief of staff of Oak Street,

23   served briefly on the debtors' board and the debtors asserted

24   by virtue of the short tenure of Mr. Schweiker, had had access

25   to certain information regarding the debtors' remediation

1  efforts.  But Mr. Schweiker is unaware of any information he

2  received during his board's tenure that he otherwise wouldn't

3  have received by virtue of certain rights of Oak Street under

4  the master lease agreements.

5       Ultimately, Oak Street appreciates the debtors'

6  intent as expressed in the first day declarations to meet their

7  rent obligations in full, under the master lease agreements

8  during the pendency of these Chapter 11 cases.  And although we

9  were unwilling to reach the terms of a -- unwilling -- unable

10 to reach the terms of a forbearance prior to these Chapter 11

11 cases, we are supportive of the debtors' restructuring efforts

12 and look forward to meaningful, productive engagements during

13 this Chapter 11.

14       THE COURT:  All right.  Thank you, Ms. Surinak.  So

15 let me just -- I'm a fairly practical person.  Can we all get

16 along and have economic conversations or do I have a bigger

17 problem?

18       MS. SURINAK:  Oh, Your Honor, we are more than

19 willing to engage constructively with the debtors during this

20 process.

21       THE COURT:  All right.  Thank you.

22       MR. POMERANTZ:  And as are we, Your Honor, and we've

23 found that with a court process, maybe that could aid in

24 facilitating that.

25       THE COURT:  No, I got it, just trying to understand.

1    I appreciate the candor.

2              Anyone else wish to make, again, what I'll just take

3    as opening comments before we turn the podium over to

4    Mr. Wallen?

5              All right.  Mr. Wallen?

6              MR. WALLEN:  Good afternoon, Judge Jones.  Ben

7    Wallen, Pachulski Stang Ziehl & Jones, proposed counsel to the

8    debtors.  Judge, before we turn into the motions, a couple of

9    housekeeping matters if that works for you?

10             THE COURT:  Of course.

11             MR. WALLEN:  Judge, the debtors did file a witness

12   and exhibit list at Docket Number 61.  The declaration of

13   Michael Healy, the debtors' chief restructuring officer is

14   attached thereto as Exhibit 1.  So at this time, the debtors

15   would move, solely for purposes of today's first day hearing,

16   of the declaration of Michael Healy into evidence, which

17   appears on the docket as Docket Number 61-1.

18             THE COURT:  Thank you.  Any objections?

19             All right.  Then it is admitted for purposes of

20   today.  Anyone wish to cross-examine Mr. Healy?  Well,

21   Mr. Healy, you escape for one more day.

22             All right.  Then I -- declaration is in.  No cross.

23        (ECF Number 61-6 admitted into evidence)

24             MR. WALLEN:  Thank you, Judge.  So, unless you'd

25   prefer a different order, the debtors propose to proceed

1    through the presentation of their first day motions as they're

2    listed on the agenda, filed at Docket Number 63.

3              THE COURT:  I have it in front of me and that's just

4    fine.

5              MR. WALLEN:  Thank you, Judge.  So first up today, we

6    have the debtors' personal information and notice of

7    commencement motion filed at Docket Number 43.  Pursuant to

8    that motion, the debtors seek authority to redact certain

9    personally identifiable information for individuals pursuant to

10   Section 107 of the Bankruptcy Code, as well as to approve the

11   form and matter -- manner, excuse me, of notice of parties

12   to -- in interest, of the commencement of these Chapter 11

13   cases.  Section 107 of the Bankruptcy Code provides the Court

14   may, for cause, authorize the redaction of certain personally

15   identifiable information.  The debtors believe that ample cause

16   exists here, in particular because of the size and prominence

17   of these cases.  If this information were publicly available,

18   it could be used to perpetrate phishing or other fraud or scans

19   on those individuals, and also to locate the survivors of

20   domestic abuse such as the incident that occurred in the

21   Charlie -- Charming Charlie cases.

22             In addition, Judge, Rule 2002 requires the debtors

23   to, among other things, provide notice of their 341(a) meeting

24   of creditors as well as of the commencement of the cases.

25   Attached as Exhibit A to the proposed order is a proposed form

1  notice of commencement with that information included.  The

2  debtors believe that that form notice satisfies the

3  requirements of Rule 2000.  The debtors have had a chance to

4  visit with the United States Trustee, as Mr. Pomerantz

5  indicated earlier, and understand that they've signed off on

6  the proposed form of order.

7          So unless, Judge, you have any questions for me, the

8  debtors would respectfully request entry the proposed order

9  filed on a docket as Docket Number 43-1.

10          THE COURT:  All right.  Thank you.  Anyone else wish

11  to be heard?

12          All right.  Again, I think that I've been pretty

13  consistent in the past couple of hearings about being overly

14  protective, given -- of these folks who come to the bankruptcy

15  case involuntarily.  And I have erred on the side of caution.

16  I, again, don't believe that this is the right landing place.

17  But until I can get great minds, like the folks who are on a

18  GoToMeeting this afternoon to come up with a solution, what I

19  am going to do -- and Mr. Ruff, I know you're going to object

20  to this and I -- your objection is noted -- I am going to take

21  where it says in Paragraph 2 -- it's not just the home

22  addresses of customers who are individuals, and all personally

23  identifiable information of minors.  Number one, I appreciate

24  protection of our children.  But I think that this, the

25  necessity, extends to the individual customers as well, and

1   especially given the language that allows folks to get the

2   information, if they demonstrate a proper purpose, I am going

3   to alter the document to provide that the same information is

4   included in 2(a) as well as 2(b).

5           And Mr. Ruff, again, you need to voice your

6   objection.  I want you to do that.  Again, I fully recognize

7   this is not the right landing place.  I -- and I fully

8   understand that.  But until I come up or until somebody comes

9   up with a solution that I think is appropriately protective,

10  I'm just going to err on the side of going too far on this one.

11          MR. RUFF:  Thank you, Your Honor.  Jayson Ruff for

12  the U.S. Trustee's Office.  I will just note our objection for

13  the record and but we understand Your Honor comments as well,

14  so --

15          THE COURT:  All right.  Thank you.

16          So, Mr. Wallen, what I'm just going to do, because I

17  think it will fit -- let me show you this.  Okay.  So,

18  Mr. Wallen, if you will take a look at 2(a), it's a bit

19  duplicative, but I -- it just always hard to go in and start

20  editing PDFs without causing all sorts of unintended issues.

21  But the language that I've changed is in Paragraph 2(a).

22          MR. WALLEN:  Judge, that language is acceptable,

23  excuse me, to the debtors.

24          THE COURT:  All right, thank you.  Anyone else have

25  an issue?  Again, noting the U.S. Trustee's objection which I

1    agree with.  It's just -- but I'm going to be overly protective

2    until we figure out the right scheme to have this work for

3    everybody going forward.

4            With that change as noted on the record, I, again, I

5    appreciate the request.  I appreciate it's the very first

6    motion that we take up today.  I will grant the relief

7    requested using the order submitted at 43-1, again with the

8    interlineation that we have made on the record this afternoon.

9    And that is off the docketing.

10           Mr. Wallen, what's next?

11           MR. WALLEN:  Judge, up next, we have the schedules

12    extension motion, which appears on the docket at Docket Number

13    51.  Under Section 521 of the Bankruptcy Code, each of the 144

14    debtors must file their individual schedules and statements

15    within 14 days of their March 18th, 2023, petition date.

16    However, under Bankruptcy Rule 1007 and 9006, the Court may

17    extend this period for cause.  So by this motion, the debtors

18    request a 46-day extension of that 14-day deadline for a total

19    of 60 days through and including May 17th, 2023, to file their

20    schedules and statements.

21           Here, Judge, there are numerous debtors, as I say,

22    144, who have historically maintained their records on a

23    consolidated basis, or excuse me -- many of their records on a

24    consolidated basis.  Moreover, Judge, prepetition, the debtors

25    lost their former chief financial officer and comptroller who

1    had extensive institutional knowledge regarding the details of

2    the debtors' operations, assets, and records.  And I can tell

3    you in preparing the schedules and statements, they're going to

4    be missed.

5            And so while the debtors believe they have the right

6    team and advisors in place to prepare accurate schedules and

7    statements, they believe that the extension is appropriate.

8    The debtors wish to avoid a situation where they file

9    inherently inaccurate schedules because folks are looking at

10   those to rely on them in these cases.  And so the debtors

11   believe that the extension requested is reasonable without

12   prejudice to the right to seek further extension from the

13   Court.

14           So, Judge, as with the earlier motion, the debtors

15   have conferred with the United States Trustee's Office.  They

16   are signed off on the form of order.  So unless Your Honor has

17   any questions for me, the debtors respectfully request entry of

18   the proposed order filed at Docket 51-1.

19           THE COURT:  All right.  Thank you.  Anyone else wish

20   to be heard?

21           All right.  Again, I read the motion again.  Again,

22   you know, how important it is to me to -- for the first version

23   of these that come out to be as close to perfect as they can

24   possibly be.  Don't like placeholders.  I can only imagine that

25   certain members of the team, probably you included, not going

1    to get a lot of sleep over the next 40 days.  And again, I --

2    this is a huge undertaking.  I don't have any concerns.  I

3    think the requested extension is appropriate.

4           Mr. Ruff, I assume this doesn't interfere with any of

5    your investigative and regulatory issues.

6           MR. RUFF:  It does not, Your Honor.  And we think it

7    strikes the right balance, at least at the outset of these

8    cases, of giving the debtors some time given the circumstances,

9    and then also giving them, if need be, you know, need to come

10   back to the Court to get additional time so --

11          THE COURT:  All right.  Thank you.  Then, with that I

12   will grant the motion.  I've signed the order that was attached

13   as 51-1.

14          Let me ask this, and again, I'm not trying to start

15   something that's not teed up for today:  Is there a discussion

16   ongoing about MORs at this point or is that for another day?  I

17   want folks to pay particular attention to this because I know

18   how expensive this is going to be.

19          MR. WALLEN:  There are ongoing discussions.  Your

20   Honor, there are ongoing discussions.  It's for another day.

21   We, as with many debtors, this is, you know, an issue given the

22   change in the rules back in 2001.  And to date, we have not had

23   an issue where we were not able to work through it so --

24          THE COURT:  Fair enough.  I just -- this one's sort

25   of accentuated a bit given how the corporate structure works,

1    so I'll just wait until someone decides to bring it to me.

2    Just wanted to know that it was being talked about.

3              Mr. Wallen, what's next?

4              MR. WALLEN:  Judge, next we have the insurance motion

5    filed at Docket Number 50.  As set forth in the motion, the

6    debtors have approximately 56 insurance policies, which are

7    identified in Exhibit 1 to the proposed order approving the

8    insurance motion.  Of these, Judge, the debtors make

9    installment payments to Federal Mutual Insurance Company [sic]

10   for 11 of the policies.  Those monthly payments are

11   approximately 430,000 -- 439, excuse me, thousand dollars, each

12   month.  Additionally, Judge, the debtors did enter into a

13   premium financing agreement with respect to one policy, but

14   that was paid off before the petition date.

15             And so, by the insurance motion, the debtors request

16   authority to continue their insurance program on a post-

17   petition basis, including renewing, extending, amending,

18   supplementing, replacing any of those insurance policies,

19   including entry into premium financing arrangements as may be

20   needed.

21             In addition, Judge, I'll flag for Your Honor that

22   certain of the insurance policies identified in the motion have

23   deductibles and self-insured retention provisions.  The debtors

24   don't believe that they have any amounts outstanding with

25   respect to those provisions, but out of abundance of caution,

1   request approval in their discretion to pay any prepetition

2   amounts with respect to those provisions.  Similarly, Judge,

3   the debtors don't think they owe any broker fees with respect

4   to their insurance policies, but of course, out of an abundance

5   of caution, to pay any accrued but unpaid broker fees.

6          The debtors believe that maintaining an adequate

7   insurance program is an important part of any business and a

8   particular one in Chapter 11.  In addition, Judge, as you know,

9   the United States Trustee's guidelines also provide that the

10  debtors are required to maintain adequate insurance.  And so as

11  a result, the debtors believe in their reasonable business

12  judgment that the relief requested in the motion is

13  appropriate.

14         Similar to the other motions, Judge, we did confer

15  with the United States Trustee's Office.  They've had an

16  opportunity to look at the proposed form order before we filed

17  and I understand that they've signed off.  So unless you have

18  any questions for me, the debtors would respectfully request

19  entry of the requested order at Docket 50-1.

20         THE COURT:  All right, thank you.  Anyone else wish

21  to be heard?

22         All right.  I do want to make sure, Mr. Wallen, as I

23  work my way through the things you brought to my attention --

24  and I very much appreciate it.  I saw in the order where you

25  were seeking authority to effectively -- if you owed something

1  to an insurance carrier or an insurance broker with respect to

2  a particular policy where you sought permission to pay those.

3  I got that.  That makes sense to me.

4         I did not see -- and maybe I just missed it.  I did

5  not see language regarding the payment of a self-insured

6  retention.  And that's -- I want you to come back to me for,

7  because I want to have a greater understanding of what the

8  claim is and how parties are viewing the self-insured

9  retention.  Is it truly a self-insured retention?  Is it a

10  deductible?  Is there some language that you were actually

11  focused on when you made that statement?  I just didn't see it.

12  I looked for it.

13         MR. WALLEN:  Judge, none of that language comes to

14  mind specifically authorizing that as I review my notes to the

15  order.  I don't see that in there.  But given Your Honor's

16  comments, I think I agree with your suggestion of coming back

17  to you to the extent we need further relief from the Court.

18         THE COURT:  I just -- a lot of things are going to

19  change in the case and again, how people view self-insured

20  retentions.  And I have some pretty well-formed views on what

21  that entails.  And again, not that I can't be persuaded in a

22  different direction, but I think that we -- I think everyone

23  involved ought to have the benefit of understanding where we

24  currently are at the point in time where the debtor decides

25  that it's appropriate to pay a self-insured retention or the

1    like.  Other than that, I don't have any conditions or

2    comments.

3            Mr. Ruff, any objection to anything I've said?  I --

4    again, I haven't changed the order.  I just wanted it

5    understood that we come back and have a discussion should there

6    be a self-insured retention that's applicable.

7            MR. RUFF:  Your Honor, no issues with the form of

8    order, and we appreciate Your Honor's comments and we agree

9    with them as well.

10           THE COURT:  All right.  Thank you.  Then with that, I

11   will grant the motion.  I've signed the order submitted at

12   50-1, and that is off the docketing.

13           Mr. Wallen, what's next?

14           MR. WALLEN:  Thank you, Judge.  Up next we have a tax

15   motion filed at Docket 49.  By the tax motion, the debtors seek

16   authority to continue to pay taxes and related fees and amounts

17   to the relevant taxing authorities in the ordinary course,

18   including amounts which accrued or became due prepetition.

19   Among these taxes are sales and use taxes, franchise taxes, a

20   whole host of fuel taxes, ad valorem taxes, income taxes

21   related taxes, and permits and fees.

22           In addition, Judge, the debtors collect and remit

23   mounts -- amounts -- excuse me, excuse me -- related to the

24   sale of lottery tickets to the relevant authorities in the

25   ordinary course.  In the aggregate, the debtors estimate that

1   they have at least 32 million in the aggregated and accrued,

2   but unpaid taxes and related fees and amounts as of the

3   petition date and request authority to pay such amounts post-

4   petition.  The debtors believe that paying these amounts makes

5   good sense because certainly these amounts are not property of

6   the estate or they're otherwise entitled to priority and must

7   be paid in any event.  Paying these taxes now will -- as they

8   come due, will prevent the accrual of additional penalties and

9   fees that will not inure to the benefit of other stakeholders.

10  In addition, Judge, the authorities could launch an action

11  against the debtors, which will needlessly distract against the

12  administration of the estates as the debtors move forward with

13  their sale and marketing process.  So as a result, the debtors

14  believe the relief in the request is appropriate.

15          As with your earlier motions and orders, Judge, the

16  debtors did confer with the Office of the United States

17  Trustee, who I understand signed off on the proposed form of

18  order.  So unless you have any questions for me, the debtors

19  will respectfully request entry of the proposed order filed

20  this time at Docket Number 49-2.

21          THE COURT:  All right.  Thank you.  Anyone else wish

22  to be heard?

23          All right.  I do think that the requested relief is

24  part of simply being a good corporate citizen and avoids the

25  incurrence of needless penalties and, in some instances, post-

1  petition interest.  Again, it also recognizes that a number of

2  the monies that the debtor collects aren't in fact estate

3  property.  So I appreciate the thought that went into this.

4         Only because of the time that you spent with me in

5  chambers, do I not get you to tell me what an ad valorem tax is

6  because I know that you know the answer to it.  So I'm not

7  going to give you a chance to shine today.

8         I will grant the motion using the form of order

9  submitted at 49-2.  That has been signed, and it's on its way

10  to docketing.  What's next?

11         MR. WALLEN:  Thank you, Judge.  Next up, we have the

12  utility motion filed at Docket Number 53.  In connection with

13  the operation of their business, as Your Honor might imagine,

14  the debtors obtain electricity, water, internet, and similar

15  such services in the ordinary course.  The debtors pay

16  approximately $70,000 each week and believe that they are

17  current or substantially current on all utility obligations.

18  The debtors assert to use cash on hand, use of cash collateral,

19  as well as a deposit of $150,000 to be placed in a segregated

20  account, which represents a little over two weeks of utility

21  payments, looking at a 14-month lookback, will satisfy the

22  adequate assurance of future performance obligations under the

23  Bankruptcy Code.

24         In addition, Judge, the debtors do seek procedures

25  clarifying certain requirements for utility providers to seek

1    additional adequate assurance or to make an assurance request

2    if the debtors' post-petition obligations remain unpaid as of

3    their applicable due dates.  The procedures which the debtors

4    are seeking approval of are typical for cases of these size in

5    this jurisdiction and provide additional clarity to utility

6    providers.  Approving these procedures will not unduly

7    prejudice the rights of utility providers, and in fact, Judge,

8    they can enhance those rights by provided much needed clarity

9    for those utility providers to make an adequate assurance

10   demand or request.  And they do not also prohibit the utility

11   providers from seeking relief from Your Honor.

12          The debtors believe that the relief is appropriate

13   and important to maintaining uninterrupted operations and

14   utility services as they go through this Chapter 11 process,

15   which will help maximize value for all parties in interest.

16   The debtors again have confirmed with the United States Trustee

17   and understand that they're supportive of the relief requested.

18   So, Judge, unless you have any comments for me, the debtors

19   would respectfully request entry of the proposed order granting

20   the motion as filed at Docket 53-1.

21          THE COURT:  All right.  Thank you.  Anyone else wish

22   to be heard?

23          All right.  I've looked at the process.  I don't have

24   any concerns.  It's consistent with other forms of adequate

25   assurance that I've approved.  In other cases, I'll also find,

1    as I typically do, that I don't think that there is any

2    substantive prejudice to any party in this.  In fact, this -- I

3    look at this as a procedural motion, as establishing an easy

4    protocol to resolve any disputes that might come up with

5    respect to any utility provider.  I think this actually

6    benefits all parties concerned.

7              I've had a chance to review the proposed motion [sic]

8    that was filed at Docket 53-1.  I have signed it.  And it is on

9    its way to docketing.  Mr. Wallen?

10             MR. WALLEN:  Thank you, Judge.  At this time, I'm

11   going to cede the podium to my colleague, Mr. Golden, who will

12   be turning to the wage motion.

13             THE COURT:  All right.  Thank you.  Nice job.

14             Mr. Golden?

15             MR. WALLEN:  Thank you.

16             MR. GOLDEN:  Thank you, Your Honor.  I was about to

17   say, that was a very tough act to follow, but I'm going to try

18   and do it because Mr. Wallen has given me the next four

19   motions.

20             So as we noted, I'll start with the wage motion,

21   which is, as I know Your Honor would agree, one of the most

22   important first day motions out there, or if not the most

23   important first day motion, because the debtors seek to honor

24   our prepetition obligations to our 971 employees all over the

25   United States in the ordinary course, and to continue the wages

1   and benefit -- benefits, we offer them post-petition in the

2   ordinary course of business.

3          Your Honor, I -- I'm going to, rather than recite

4   chapter and verse of the motion, which I'm sure Your Honor

5   reviewed, I'm going to take my mother's advice and talk less

6   and instead highlight a couple of the prepetition employee

7   obligation things that I think bear a little bit of emphasis,

8   and also just disclosure.

9          The first is that, as I think Mr. Pomerantz noted in

10  his introduction, there are two non-debtor Adelphi entities,

11  which are affiliated with the debtors through the majority

12  equity owners.  They separately employ 102 employees, but

13  the -- those employees' payroll is consolidated through the

14  debtors' payroll system and as was prepetition.  But prevent

15  the unnecessary disruption to those employees' payroll, who

16  just like the debtors' employees, rely on our payroll, we seek

17  to continue the practice in the ordinary course of business

18  provided just for the avoidance of all doubt that Adelphi will

19  be paying the debtors, making them whole for any amounts the

20  debtors pay.

21  ***

22  (4:30 p.m.)

23          MR. GOLDEN:  They separately employ 102 employees,

24  but the -- those employees' payrolls get consolidated through

25  the debtors' payroll system and as was prepetition to prevent

1   the unnecessary disruption to those employees' payroll who,

2   just like the debtors' employees, rely on payroll, we seek to

3   continue the practice in the ordinary course of business

4   provided just for the avoidance of all doubt that Adelphi will

5   be paying the debtors, making them whole for any amount the

6   debtors pay.  So just continuing that system post-petition and,

7   you know, no loss to the debtors and the debtors' estates.

8           In addition, as we flag, I think, in the motion,

9   certain of the 47 American Express corporate cards have been

10   issued to Adelphi employees, I think perhaps most notably

11   truckers who use that while they're on the road to transport.

12   Just as with employee payroll, Your Honor, in order to prevent

13   any disruption post-petition, the debtors are seeking authority

14   to continue that, again, subject to that reimbursement process,

15   so the debtors are not out money to a non-debtor affiliate. And

16   then --

17           THE COURT:  No truck --

18           MR. GOLDEN:  Sorry, Your Honor.  Go ahead.

19           THE COURT:  No trucks on the side of the road.

20           MR. GOLDEN:  I -- absolutely not, Your Honor.  That's

21   never a good thing.

22           And finally, with two possible exceptions which I'll

23   note in a second, the debtors don't believe that the wage cap

24   is implicated here.  We did note in there that there are two --

25   excuse me -- $20,000 incentive payments that the debtors will

1    owe, just by matter of timing, to individuals who were -- who

2    worked for Brothers Petroleum prior to that acquisition and who

3    were basically given an incentive payment if they would work

4    through the -- through -- I guess this was in 2021, so through

5    March of 2023.  As far as I'm aware, those individuals are

6    still employed, and if they are still employed by the end of

7    this month, they're entitled to that payment which is, again, I

8    think from 2021 is when it was established.

9           So those are the three matters I wanted to highlight

10   for the Court and for all the parties.  We also -- as

11   Mr. Wallen has said, we've consulted with the United States

12   Trustee.  Mr. Ruff spent a nice amount of time with Mr. Wallen

13   and I.  I believe the proposed form of order incorporates all

14   of their comments.  Happy to defer him to confirm, but absent

15   that, Your Honor, we would ask that you enter the proposed form

16   of order.

17           THE COURT:  All right.  Thank you.

18           Anyone else wish to be heard?

19           All right.  And Mr. Golden's exactly right.  This is

20   the most important motion that I look at all day.  Mr. Wadud, I

21   know that you are Mr. Super CEO or something to that effect,

22   which I hope means that you realize the value of those thousand

23   people that you employ because without those folks, this

24   enterprise has zero value.  I want them to know that they're

25   going to get paid, I want them to know that I want 110 percent

1    effort from those folks, and I will make sure that nobody with

2    a coat and a tie ever comes and says you have to give your

3    payroll check back.  All right?

4         All right.  With that -- and again, Mr. Ruff, I

5    appreciate the practicality of it.  I appreciate your working

6    through what could be technical objections.  I don't have any

7    concerns.  Again, I think it's just a practical approach to

8    ensuring business as usual.

9         I do want to make sure, Mr. Healy, you're going to

10   have a little bit of time, but I want to make sure that you

11   think about a way, once we get a committee engaged or even any

12   of the other folks who are already involved who want to take a

13   look, is that you come up with a transparent way to give a

14   glimpse into how the funds are flowing with respect to the

15   non-debtor entities.  And, again, I know you'll work that out.

16   I just want you to give some thought to it and have a

17   transparent way of reflecting what has occurred on a historical

18   basis.

19        I have signed the order submitted at 44-1.  It is on

20   its way to docketing.

21        Mr. Golden, what's next?

22        MR. GOLDEN:  Thank you, Your Honor.  And I believe I

23   was recently given the title by Mr. Pomerantz of Mr. Fuel

24   Supplier, so I'd like to turn to Docket Number 45, what we're

25   calling the fuel supplier motion or the very critical vendor

1   motion.  You know, here, Your Honor -- just like the employee
2   motion, they're the life blood of the business -- the fuel
3   supplier motion really represents the business itself, and it
4   really does go to life blood -- another part of lifeblood of
5   the debtors' operations is its relationships with its fuel
6   suppliers.  And I see some of the counsel on the line right
7   now.  I've had the opportunity to speak with many of them over
8   the past several days, as has the company.  And, Your Honor, as
9   I think the motion references, but for the bankruptcy filing,
10  the debtors would essentially be current with their fuel
11  suppliers.  These are not old and cold amounts.  These are, you
12  know, based off of the three -- usually three- to ten-day
13  payment terms.  You know, these accrued basically three to ten
14  days before the petition date.

15          And the intent of this motion is really to, pardon
16  the pun, turn the pumps back on and return everything to the
17  status quo, and so therefore we seek authority to pay these
18  prepetition amounts due to the fuel suppliers and then continue
19  this relationship in the ordinary course.  We are not seeking
20  to prejudice any fuel suppliers' rights under existing
21  agreements.  Many of them have existing agreements with the
22  debtors.  We are -- nor are we seeking to condition treatment
23  on, you know, signing any sort of definite form.  There's
24  obviously flexibility built into the order, Your Honor, and
25  I'll get to that in just a moment.

1          And I don't want to leave anybody out because this

2  does cover our fuel transporters, as well, who, Your Honor, I

3  think, further your previous comment, we don't want them on the

4  side of the road because if they're on the side of the road,

5  our dealers are not getting fuel.  So this also covers them.

6  They may also have lien rights, and so we are seeking authority

7  to pay our fuel transporters, again, subject to that aggregate

8  cap, basically in the ordinary course.

9          We did file an updated proposed form of order --

10         THE COURT:  76.

11         MR. GOLDEN:  -- which did get revoked.  And then a

12  second one -- yeah, 76, which clarifies a number of different

13  things but I think it really -- I think it takes a normal

14  critical vendor, which normally does not have any underlying

15  contract, and makes clear that sometimes there are contracts,

16  sometimes it's thought just a little bit broader, and so we

17  just wanted to clarify that after conversations with a lot of

18  our fuel supply constituency.

19         So, Your Honor I see a number of our fuel suppliers'

20  counsel on the line.  I have nothing further unless Your Honor

21  has any questions but would certainly cede the podium to them.

22         THE COURT:  All right, thank you.

23         Anyone else wish to be heard?

24         MS. WILLIAMSON:  Your Honor, Deborah Williamson for

25  Valero --

1           THE COURT:  THE COURT:  Yes, ma'am.

2           MS. WILLIAMSON:  -- Marketing and Supply Company.

3           THE COURT:  Good afternoon.

4           MS. WILLIAMSON:  Yes, sir.  Good afternoon, Your

5   Honor.

6           To reaffirm what's been stated by Mr. Golden, we --

7   Valero Marketing and Supply Company is one of the fuel

8   suppliers that's supporting the debtor in this effort, and

9   we've reached an agreement to continue the prepetition advance.

10  It's a three -- for us it's a three-day advance.  Payments are

11  dated three days after being made, and we will continue to do

12  that.

13          And Mr. Golden doesn't know this yet because it just

14  happened.  We are willing to do that for the branded and the

15  unbranded fuel, and we've agreed to increase the credit line to

16  1.2 million from 1 million, which is our earlier discussions,

17  Your Honor, and we hope that this helps the debtor succeed, and

18  we fully support the motion.

19          THE COURT:  Ms. Williamson, thank you for the

20  statement.

21          Anyone else?  All right.  Let's --

22          MR. GOLDEN:  Your Honor, may I respond to

23  Ms. Williamson?  I just want to thank Ms. Williamson.  I saw

24  our COO and our CEO nod and smile when she made that statement,

25  and I just want to reaffirm that the debtors really appreciate

1    the partnership that we have with Valero and all of our fuel

2    suppliers.  Mr. Wadud, I saw him just mouth the words "thank

3    you."  And so we really do thank them.  And thank you,

4    Ms. Williamson, for your accommodations to the debtor.

5              THE COURT:  All right.  Thank you.  I likewise

6    recognize how -- what an important part of the success to the

7    enterprise that the fuel suppliers constitute, and I want them

8    to rest assured that to the extent that I have any input on it,

9    I recognize how important they are, and to the extent that

10   there needs to be further discussions, all someone has to do is

11   ask.  I -- again, I don't have any issues at all with the

12   proposed relief that's been requested.  I've got -- I've had a

13   chance to go through the revised order at Docket 76.  I've

14   signed it, and all done.  It wants to know that it's actually

15   me.  All right.  It is off to docketing.

16             MR. GOLDEN:  Thank you very much, Your Honor.

17             The next motion I'll turn to is Docket Number 48,

18   which I'm calling the dealer reconciliation motion.  And in

19   some respects, this is kind of our customer program motion.

20   The dealers really are our customers.  And just as with the

21   previous motion, really the intent here is to preserve the

22   status quo with our dealers that are all over the United

23   States.  Really, at a high level, the debtors -- there are

24   actually many different arrangements, I am learning -- but at a

25   high level, the debtors will collect credit card receipts and

1    other amounts for the benefit of the dealers which are

2    sometimes held as a deposit pending periodic reconciliation

3    due.  You know, under the reconciliation, debtors might remit

4    overpayments or, again, pursuant to various different

5    agreements with the dealers might continue to hold as security

6    perhaps for dealers that are not so prompt with their payment

7    obligations to the debtors.  And really, ultimately, this is

8    seeking authority to continue the prepetition practice under

9    the existing agreements with our dealers, just in the ordinary

10   course of business.

11          We did file an updated order at Docket Number 77.  I

12   spoke with, you know, with my old friend, Mr. Eisenberg, and he

13   raised a concern that I thought made some sense, which was that

14   it could -- the order, as previously read, could have been read

15   to prejudice dealers and to say, you know, how we can amend or

16   modify or change the obligations of the party.  That's not the

17   intent.  The intent is just to keep the status quo, and

18   obligations are what they are under the agreement.

19          So we also did receive a request from Ms. Williamson

20   which was also added into the proposed form of order regarding

21   -- I think, that's perhaps a relationship that may be a little

22   bit more unique to Valero.  But in any event, we were happy to

23   include that because it was consistent with our practice.

24          So, Your Honor, I would, of course, answer any

25   questions you have or turn the podium over to any of counsel

1   that may have comments.

2               THE COURT:  Thank you.

3               First, let me confirm, Mr. Eisenberg, you just

4   happen to be nearer the top than Ms. Williamson, did the

5   revisions to Order 77 resolve your concerns?

6               MR. EISENBERG.  It did with regard to this interim

7   order, Your Honor.  Your Honor put your finger on it earlier in

8   the tax motion, is that the debtors are receiving funds that

9   are not estate properties.  They're being collected on behalf

10  of third parties, and so it's important that -- that nature and

11  character that's maintained because that's the adequate

12  protection that these people have.  And so with the edits that

13  they made, it allows for the interim cash collateral -- I mean,

14  the cash management motion to also work because the accounts

15  with these funds in them are being swept.  And so this is an

16  ongoing, real-time issue, and we obviously reserve our rights

17  with regard to a final order here with regard to adequate

18  protection.  But with the modifications that Mr. Golden was

19  kind enough to include, it certainly addresses our concerns on

20  the first day.

21              THE COURT:  Thank you.

22              Ms. Williamson, the language that was added with --

23  to the order in 77, did that resolve your concerns?

24              MS. WILLIAMSON:  Yes, Your Honor.  It specifically

25  addressed the issue raised by Mr. Eisenberg.  Most, if not all,

1    of the credit card receivables that biller processes really

2    should be paid to the dealers, and we just wanted to make sure

3    that Valero is protected by paying those receipts over to the

4    debtor, which will then engage in a reconciliation process.

5              THE COURT:  Got it.  Thank you.

6              Again, I appreciate everybody working through this.

7    The business model itself is unique.  It needs some

8    flexibility.  I recognize that.  And I am just comfortable, at

9    least for now until I learned something different, that it just

10   makes sense.

11             Just want to make sure, Mr. Ruff, you had a chance --

12   or did you have a chance to look at the revisions that were

13   contained in Number 77?

14             MR. RUFF:  I  did, Your Honor.  Thank you for asking.

15   I don't have -- no objections from the U.S. Trustee's Office to

16   those revisions.

17             THE COURT:  All right.  Thank you.

18             Anyone else wish to be heard?

19             All right.  Then with that, I will grant the motion

20   using the revised form of order submitted at Docket Number 77.

21   And, again, I always appreciate the redlines.  That order has

22   been signed.  It's on its way to docketing.

23             Mr. Golden?

24             MR. GOLDEN:  Thank you, Your Honor.  Thank you, Your

25   Honor.  You're almost done with me.  I've only got one more to

1   go, and that is the more critical vendor motion which is the

2   more traditional critical vendor motion and covers two groups.

3   One is kind of your normal run-of-the-mill critical vendors

4   that are essential to the continued operations, and also lien

5   claimants.  The traditional critical vendors, these are very

6   important to the debtors' operations.  They are parties like

7   environmental remediation providers, specialized industry

8   software and technology, and other single-source or limited-use

9   -- so sorry -- single-source or limited-source providers of

10  goods and services, rather run-of-the-mill in that respect.

11       And the second bucket are statutory lien claimants, and

12  pursuant to that, Your Honor, we are not currently aware of any

13  presently asserted liens.  But as is the nature of operating

14  fee stores and travel centers, the debtors sometimes have to do

15  work, and sometimes that work is performed by parties that

16  might be able to assert M&M liens.  And I speak from multiple

17  bits of recent past experiences that sometimes cases are filed

18  against our landlords which may cause a default under the

19  leases, and the last thing we want to do is get off on the

20  wrong foot for relatively de minimis ordinary course

21  obligations that, but for the bankruptcy, we would've paid.

22          So we're asking, Your Honor, for the flexibility to

23  also pay those, again, subject to the caps provided in the

24  ordinary course, if they do arrive, to avoid those liens being

25  asserted.

1          So I'm happy to answer any questions, but we also

2    did, as with everything else, work with Mr. Ruff on this one.

3    I do not believe they have -- I believe they are fine with the

4    form of order, and we incorporated all of their comments.

5          THE COURT:  All right.  I -- number one, it's --

6    critical vendors are to be viewed narrowly, and I -- and not

7    that I don't think you have, just wanted to correct something

8    that you said.  No such thing as an ordinary critical vendor.

9    They all -- they are all, again, special and unique to the

10   circumstances that the debtor is facing.

11         I don't have any concerns with the way that you've

12   gone about this.  I think it's practical.  I think it is as

13   close to returning things to business in the ordinary course as

14   you can possibly do under these circumstances.  I appreciate

15   the fact that there's a cap, at which point, we'll revisit this

16   again.  I don't have any concerns.

17         I will grant the motion using the order submitted at

18   46-2.  It's off to docketing.

19         All right.  Mr. Golden?

20         MR. GOLDEN:  Thank you, Your Honor.  That's it for

21   me, and I will pass the podium over to my partner, Mr. Kevane,

22   to present the cash management motion.

23         THE COURT:  All right.  Thank you.  I appreciate the

24   presentation and the preparation.  Thank you.

25         MR. GOLDEN:  Thank you, Your Honor.

1          THE COURT:  Thanks.

2          MR. KEVANE.  Good afternoon, Your Honor.

3          THE COURT:  Ah, Mr. Kevane, thank you.

4          MR. KEVANE:  Can you hear me?

5          THE COURT:  I can.  I was trying to find you on my

6    screen.  I now have you.  Good afternoon.

7          MR. KEVANE:  Henry Kevane with Pachulski, Stang,

8    Ziehl & Jones.  I'm here to talk about the cash management

9    motion, which is docketed at Number 52.  Essentially, this

10   motion, like many other similar cash management motions, seeks

11   customary relief, keeping our existing cash management systems

12   in place, authorizing the continued payment of bank fees that

13   are assessed against the deposit accounts that the debtor owns,

14   and perhaps most importantly, authorizing the continued

15   processing of intercompany transactions.

16          We're also asking for a limited waiver and extension

17   of the time to comply with our Section 345(b) requirement as to

18   certain depository institutions who are not approved depository

19   institutions.  Those deposit accounts, in any event, carry

20   relatively small balances well below FDIC limits, even the

21   current limits.  So we think that the extension and the waiver

22   that we've worked out with the Office of the United States

23   Trustee is appropriate in these circumstances.

24          The evidentiary basis for the cash management motion

25   is set forth in Mr. Healy's declaration.  I think it would be

1   helpful perhaps if I could ask Patricia Jeffries to put up the

2   exhibit showing the account schematic, and I'll briefly give

3   some highlights on that.  It'd be easier, I think, to see the

4   accounts in a visual format as opposed to me describing them.

5          THE COURT:  All right.  Let's see --

6          MR. GOLDEN:  Your Honor.

7          THE COURT:  Yes.

8          MR. GOLDEN:  Your Honor, Steve Golden again.  I'm

9   subbing in for Ms. Jeffries.  If you could give me the ability

10  to share my screen.

11         THE COURT:  Of course.  Don't want to --

12         MR. KEVANE:  Thank you, Mr. Golden.

13         THE COURT:  Don't want to frighten her off.  That's

14  -- want to see her next time.

15         MR. KEVANE:  Now, these -- this is Exhibit 1 to the

16  cash management motion.  There are two pages to Exhibit 1.  The

17  first page, the one that's on your screen right now, is a --

18  kind of a master schematic, and it generally lines up with the

19  nature of the debtors' business that Mr. Pomerantz explained.

20  First, we have a fuel distribution business, and second, the

21  operation of convenience stores and travel centers.

22         If I can perhaps call the Court's attention to the

23  cluster of accounts on the left side that are called the

24  wholesale deposit accounts.  These 11 accounts are organized by

25  fuel brand, although there are a couple at the bottom that

1  encompass a variety of fuel suppliers, and these are the main

2  source of all of the charges that are incurred by the debtors,

3  so fuel purchases from the major oil suppliers, as well as the

4  corresponding recipts for the retail of that fuel to either a

5  controlled retail center, a third-party retail center, or the

6  dealer-operated retail centers.  So all 855 sites, whatever

7  they are categorized as, their payments for fuel flow into

8  these accounts by brand.

9        So if all of the inbound and outbound purchases

10  related to our fuel purchases are aggregated by brand, by

11  account, and virtually every day if there's a positive balance

12  in those accounts, they're swept up to the master operating

13  account that's just above.  Sometimes due to a clause that are

14  made by the major suppliers, there's an overdraft position, in

15  which case the master operating account will make up that

16  shortfall.

17        This account schematic also shows some debt service

18  accounts with Iberia Bank, now First Horizon, and also has our

19  main corporate disbursement accounts.  The rent that we receive

20  from our dealers and the other operated locations all passes

21  through these accounts and is commingled in the master account

22  and then paid out to the primary source.

23        Lastly, there is a shaded purple account, which is

24  titled the Retail Master Operating Account.  That account

25  aggregates all the many accounts on the next page of the

1  exhibit that are organized by the debtors' various retail

2  siloes.  So where the debtor operates, for instance, a quick

3  check store, the Fox Fuel Stores, the Fresh Pantry stores,

4  they're all organized in their own color-coded silo.  They

5  each, by silo, have their own concentration accounts, but

6  they're all linked upstream to that prior account on that prior

7  page.  I'm not going to go into a lot of detail here, but these

8  -- all these retail accounts, in turn, handle all of the

9  various purchases of sundries and services that are provided at

10  the retail level.

11            If I could go back, Mr. Golden, to the prior page.

12            We are asking, as part of this motion, to keep all of

13  these accounts intact.  As the Court may have gleaned from my

14  explanation of the wholesale deposit accounts, the intercompany

15  transactions and the speed at which they're made is absolutely

16  vital to the smooth operation of the debtors.  As I explained,

17  all the inbound payments for fuel, whether from in-house

18  locations, dealer sites, or true third-party sites, all (audio

19  interference) those deposit accounts by fuel brand, so any

20  interruption in the ongoing intercompany debiting and crediting

21  would bring operations to a standstill.  So that is the basis,

22  I think, for our -- primary basis for our relief requested to

23  maintain intercompany transactions in the ordinary course of

24  business.

25            And finally, as I mentioned at the outset, although

1  the majority of our accounts are maintained at depository

2  institutions that have executed a uniform depository agreement,

3  some, mostly on the retail page, are not approved institutions.

4  But as we explained in the chart, I think it was Exhibit 3 of

5  our motion, the balances in the majority of those accounts, if

6  not all of them, are well below current FDIC-insured limits.

7           Nonetheless, we have (audio interference) with the

8  Office of the United States Trustee.  If there are any further

9  steps that the Office of the U.S. Trustee would like us to take

10 to bring any of those non-approved depository institutions into

11 compliance, we will work with U.S. Trustee through May 4,

12 subject to extension, to comply with those requests.

13          And I do believe that the U.S. Trustee has seen the

14 form of order and that the language that we've inserted therein

15 is satisfactory to the Office of the U.S Trustee.  And with

16 that, I have nothing further to add to my presentation.

17          THE COURT:  All right.  Thank you.

18          Anyone else wish to be heard?  All right.

19          MR. RUFF:  Your Honor --

20          THE COURT:  Yes.

21          MR. RUFF:  -- if I may very briefly.  Again, Jayson

22 Ruff for the U.S. Trustee's Office.  Just one, I guess, slight

23 correction to what Mr. Kevane represented.  We're not agreeing

24 to -- in light of recent history, to any waiver of 345.  We

25 are agreeing to allow for time because we recognize that no

1 debtor comes into a bankruptcy case automatically in compliance

2 with 345.

3          THE COURT:  Sure.

4          MR. RUFF:  And so I think, the -- you know, the order

5 strikes the balance of allowing the debtor the time to be able

6 to do that.  The debtors are -- their main banks are in

7 authorized depositories, so I think we'll be able get that as

8 DIP accounts and get with the debtors in a reasonable amount of

9 time.  And then, as was represented, the vast majority of these

10 local accounts that the stores deposit into are far, far below

11 the $250,000 FDIC limit, so no concerns there.

12          I just want to -- we're very sensitive to the 345

13 waiver.  So just so that the record is clear, we're -- there's

14 no waiver of 345 here, just that we are giving the debtors some

15 time to comply.

16          THE COURT:  Oh, absolutely.  And as we've seen over

17 the past couple of weeks, being on the approved list may not

18 mean all that much, and so we all need to be very diligent.

19 `          Mr. Healy, my request of you is, one, trying to

20 unwind this thing would be impossible, so figure out what you

21 can do to make this work.  Also, urge you -- and as I know you

22 do, you watch the news, you listen to the radio, you do

23 whatever it is you do to stay informed -- if you need relief,

24 and I'm going to tell you this, once a regulatory agency takes

25 over, I can't do a thing.  However, before that, I can do an

1    awful lot.  I spent some time a couple of weeks ago signing

2    emergency orders.  And, again, it's -- all I'm telling you is

3    stay vigilant, watch this.  It's just one more thing on your

4    plate, but it is one that we need to pay attention to.  And if

5    you need something, as I told you yesterday, I want you to ask

6    and ask quickly, as I want to do everything -- we all have an

7    obligation to do whatever we can do to make sure that this has

8    the greatest chance of success as it can possibly have under

9    the circumstances.

10           Mr. Ruff, I appreciate the clarification.  I agree,

11   and I appreciate the practical approach because, again, trying

12   to -- if there was ever an attempt to unwind this, quite

13   frankly I'm not sure it's possible, but we hopefully will find

14   some middle ground on that one.

15           Let me ask, did the parties talk about a continued

16   hearing date?

17           MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

18           THE COURT:  Mm-hmm.

19           MR. POMERANTZ:  We internally were talking about it.

20   We haven't been able to communicate with any other

21   constituents, but we would seek either April 12th or April

22   13th, if it's acceptable to Your Honor.

23           THE COURT:  Got it.

24           Let me propose -- let me ask, Mr. Ruff, could you

25   live with April 27th?

1          MR. RUFF:  Yes, I could, Your Honor.

2          THE COURT:  Mr. Pomerantz, could you live with

3   April 27th?

4          MR. POMERANTZ:  You know, I don't think so, Your

5   Honor, because we are going to need our second (indiscernible)

6   of financing on the final.  So unless Mr. Healy tells me I'm

7   wrong, I would think we were looking at something around about

8   the 12th.  But if Your Honor -- if those dates don't work,

9   we're happy to figure out an alternative date to it.

10          THE COURT:  Okay.

11          And, Mr. Elrod, do you have thoughts about this?

12          MR. ELROD:  Yes, Your Honor.  My views are consistent

13   with Mr. Pomerantz's.  We would like a second day hearing

14   sooner than the 27th.

15          THE COURT:  It was actually not that you didn't have

16   a second day hearing, it was just a continued hearing date on

17   this particular motion.

18          MR. ELROD:  Oh.

19          THE COURT:  I was fully prepared to segregate this

20   out because this is complicated.  You're going to do your best

21   never to have to address this issue, and Mr. Ruff is trying to

22   help you in that regard.  But if I'm misreading things, again,

23   I'll do my best to give you what you think you need.

24          MR. RUFF:  Your Honor, I just -- if it's helpful you

25   know, the 27th sounds good to the U.S. Trustee's Office.  And

1    if it's helpful, as we've done in other cases in the past, if

2    we work that we don't have to come before Your Honor, we can

3    always submit a proposed order, Your Honor, and advise chambers

4    that there's no objection.

5         THE COURT:  That was sort of the thought process.

6    But, Mr. Elrod, again, I'm not trying to get in the middle of

7    anything that you're involved in.  I was actually just trying

8    to make it easier, and I -- if I'm not, please feel free to

9    tell me.

10        MR. ELROD:  No, Your Honor, I appreciate that, and

11   certainly I'll let the debtor proceed with that as it may.

12        THE COURT:  Mr. Pomerantz, with that clarification do

13   you still have --

14        MR. POMERANTZ:  Yes, I --

15        THE COURT:  -- you still have a different preference?

16        MR. POMERANTZ:  No.  For the cash management motion,

17   I think the extra time is prudent.  I jumped the gun.  I've

18   been always told I shouldn't assume, I should ask questions,

19   and I violated that rule.  So since it's only cash management,

20   I would just ask if it could be heard early in the day, and

21   notwithstanding -- I'm on Pacific Time -- do you have an early

22   -- do you have a morning hearing?

23        THE COURT:  I certainly can.  What I had done, and I

24   can change this, I had picked April the 27th at 1 p.m. Central

25   Time.  I'm happy to make it 1 p.m.-- I'm sorry -- nine o'clock

1  Central Time if that's what you want.

2         MR. POMERANTZ:  That would be better for me, Your

3  Honor.

4         THE COURT:  Okay.  And again, I don't think --

5  Mr. Ruff has always been able to work through these, and I

6  think everything's been done on a certificate of counsel thus

7  far, but if we need to have a hearing, we certainly will.  So

8  we'll set a continued hearing on just the cash management

9  motion for April the 27th, 2023, at 9 a.m.

10        And everybody okay with an objection deadline of the

11  20th?

12        MR. POMERANTZ: Yes, Your Honor.

13        UNIDENTIFIED:  Works for us, Your Honor.

14        THE COURT:  All right.  Then with that, I think last

15  shot.  Anyone else wish to be heard?

16        All right.  I have signed the order as we have

17  modified it on the record this afternoon.  It has been signed

18  and is off to docketing.

19        All right.  Mr. Pomerantz --

20        MR. KEVANE:  Thank you, Your Honor.

21        THE COURT:  Yes, sir.  Thank you, Mr. Kevane.

22        Mr. Pomerantz?

23        MR. POMERANTZ:  Your Honor, we need a second day

24  hearing, but that could wait until tomorrow since, Your Honor,

25  hopefully we'll be taking up DIP tomorrow.

```
1                  THE COURT:  So --

2                  MR. POMERANTZ:  Just for planning purposes

3   (indiscernible) --

4                  THE COURT:  Sure.

5                  MR. POMERANTZ:  -- we wanted to know if we do come

6   back the 12th to the 13th, if that's something that's available

7   if that works for the parties.

8                  THE COURT:  Yeah.  I will find the time.  The

9   question is, do you want to wait and see what those final

10  documents look like and then get a date tomorrow, or do you

11  want me to give it to you today.

12                 MR. POMERANTZ:  No, that's fine.  But it was helpful

13  to hear what Your Honor said that we could look at those dates,

14  and that'll give us a plan so we could formally set that up

15  tomorrow when we --

16                 THE COURT:  Yeah.  We'll figure it out.  We'll figure

17  out as many options as we can and simply let you choose.  But,

18  I -- you know, I will have to do -- on those days, I'll have to

19  do some moving, but I'm a good mover and a shaker, so I will

20  find time.

21                 MR. POMERANTZ:  Thank you, Your Honor, and to that

22  end, while it's certainly been enjoyable setting hearings with

23  Your Honor every day, we are sincerely hopeful that after

24  tomorrow, that will stop.  We'll let you go on to your other

25  business, and we'll go hopefully reorganize or sell this
```

1   company and maximize value.

2            THE COURT:  Well, I'm hoping that everybody that's

3   listening can leave with the understanding that we are going to

4   stabilize the business, and folks who are going to continue to

5   have business relationships can do that with confidence, and if

6   they need access to me, they have access to me, and that we all

7   get focused on figuring out what the future of the company is,

8   whatever that might be.  So that's the goal.  I hope that I've

9   done my small part in giving that assurance, and I'll see

10  everybody tomorrow.  And, again, if you get late tonight and

11  something happens, just communicate with Mr. Alonzo and let him

12  know.  Okay?

13           MR. POMERANTZ:  Thank you very much, Your Honor.

14           THE COURT:  Thank you everyone.  Have a wonderful

15  evening, and we'll be adjourned.

16           MR. GOLDEN:  Thank you, Your Honor.

17       (Proceedings concluded at 5:02 p.m.)

18

19

20

21

22

23

24

25

<u>**C E R T I F I C A T I O N**</u>

I, Alicia Jarrett, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____

ALICIA JARRETT, AAERT NO. 428      DATE: March 27, 2023

ACCESS TRANSCRIPTS, LLC