```
                    UNITED STATES BANKRUPTCY COURT
                  SOUTHERN DISTRICT OF TEXAS (HOUSTON)

                                        .
IN RE:                                  .  Case No. 23-90147
                                        .  Chapter 11
MOUNTAIN EXPRESS OIL COMPANY,           .
et al.,                                 .  515 Rusk Street
                                        .  Houston, TX 77002
                                        .
                          Debtor.       .  Monday, March 20, 2023
                                        .  12:00 p.m.
. . . . . . . . . . . . . . . .         .
```

```
   TRANSCRIPT OF DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM
   AND FINAL ORDERS (A) AUTHORIZING THE USE OF CASH COLLATERAL,
  (B) PROVIDING ADEQUATE PROTECTION, (C) MODIFYING THE AUTOMATIC
          STAY, AND (D) SCHEDULING A FINAL HEARING [7]
                BEFORE THE HONORABLE DAVID R. JONES
                UNITED STATES BANKRUPTCY COURT JUDGE
```

TELEPHONIC APPEARANCES:

For the Debtor:
Pachulski Stang Ziehl & Jones LLP
By:  MICHAEL WARNER, ESQ.
     BENJAMIN WALLEN, ESQ.
440 Louisiana Street, Suite 900
Houston, TX 77002
(713) 691-9385

Pachulski Stang Ziehl & Jones LLP
By:  STEVEN GOLDEN, ESQ.
780 Third Avenue, 34th Floor
New York, NY 10017-2024
(212) 561-7700

TELEPHONIC APPEARANCES CONTINUED.

Audio Operator:          Courtroom ECRO Personnel

Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46048
                         (855) 873-2223
                         www.accesstranscripts.com


     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
TELEPHONIC APPEARANCES  (Continued):


For the Debtor:             Pachulski Stang Ziehl & Jones LLP
                            By:  JEFFREY DULBERG, ESQ.
                                 JEFFREY POMERANTZ, ESQ.
                                 CIA H. MACKLE, ESQ.
                            10100 Santa Monica Boulevard
                            13th Floor
                            Los Angeles, CA 90067-4003
                            (310) 277-6910

                            Pachulski Stang Ziehl & Jones LLP
                            By:  HENRY KEVANE, ESQ.
                                 MAXIM LITVAK, ESQ.
                            One Sansome Street, Suite 3430
                            San Francisco, CA 94104
                            (415) 263-7000

For First Horizon           Greenberg Traurig, LLP
Bank, as                    By:  JOHN D. ELROD, ESQ.
Administrative Agent:        Terminus 200
                            3333 Piedmont Road Northeast
                            Suite 2500
                            Atlanta, GA 30305
                            (678) 553-2100

                            Greenberg Traurig, LLP
                            By:  SHARI L. HEYEN, ESQ.
                            1000 Louisiana Street, Suite 6700
                            Houston, TX 77002
                            (713) 374-3500

For Oak Street Real         Kirkland & Ellis
Estate Capital, LLC:        By:  STEVEN SERAJEDDINI, ESQ.
                            601 Lexington Avenue
                            New York, NY 10022
                            (212) 446-5984

                            Kirkland & Ellis
                            By:  ASHLEY L. SURINAK, ESQ.
                                 BENJAMIN T. KURTZ, ESQ.
                            300 North LaSalle
                            Chicago, IL 60654
                            (312) 862-4073
```

```
TELEPHONIC APPEARANCES (Continued):

For the United States
Trustee:                    Office of the United States Trustee
                            By:  JAYSON RUFF, ESQ.
                            515 Rusk Street, Suite 3516
                            Houston, TX 77002
                            (713) 718-4640


For Bank of Hope:
                            Buchalter
                            By:  WILLIAM BRODY, ESQ.
                            1000 Wilshire Boulevard, Suite 1500
                            Los Angeles, CA 90017-1730
                            (213) 891-5015


For Sunoco:                 Katten Muchin Rosenman LLP
                            By:  MICHAELA CROCKER, ESQ.
                            2121 North Pearl Street, Suite 1100
                            Dallas, TX 75201-2591
                            (469) 627-7070


For BFM Operations,         Locke Lord LLP
LLC:                        By:  PHILIP EISENBERG, ESQ.
                            JPMorgan Chase Tower
                            600 Travis, Suite 2800
                            Houston, TX 77002
                            (713) 226-1304


Also Present:               SPENCER KUSHNER
```

1      (Proceedings commence at 12:00 p.m.)

2           THE COURT:  All right.  Are we ready?

3           THE CLERK:  Yes, Judge.

4           THE COURT:  Good afternoon, everyone.  This is Judge

5  Jones.  The time is 12 noon.  Today is March the 20th, 2023.

6  This is the docket for Houston Texas.  We have on the noon

7  docket the jointly administered cases under the primary Case

8  Number 23-90147, Mountain Express Oil Company.

9           Folks, you will make your appearance electronically

10  this afternoon.  If this is new for you, it's a very quick trip

11  to my website, a couple of mouse clicks.  You can do that at

12  any time prior to the conclusion of the hearing.  If you speak,

13  the first time that you speak, if you would please state your

14  name and who you represent.  That really does help the court

15  reporters do what is a very difficult job these days.

16           Finally, we are recording using CourtSpeak this

17  afternoon.  I will have the audio of today's hearing up on the

18  docket, available for your download shortly after the

19  conclusion this afternoon.

20           If you are one of those folks who wants to try and

21  make sure that everything got caught up with the joint

22  administration and that it is all working, I will tell you that

23  we are not yet there.  I've obviously entered the order, but

24  it's not yet been implemented.  We are only about halfway

25  through, but that will get done this afternoon.

1          For those of you that came in late, I have activated

2    the hand raising feature.  If you know you're going to be

3    speaking -- and you can change your mind at any time -- five

4    star on your telephone, that will alert me, and I will get you

5    unmuted.  All right.

6          Who is taking the lead this afternoon for the

7    debtors?

8          MR. POMERANTZ:  Good afternoon, Your Honor.  Jeff

9    Pomerantz of Pachulski Stang Ziehl & Jones.  We are proposed

10   counsel for Mountain Express Oil and its related affiliates,

11   which commenced the cases on Saturday, March 18th.

12         THE COURT:  All right.  Thank you.  Good afternoon to

13   the entire team.  I see a number of familiar faces.

14         MR. POMERANTZ:  It's good to be in Your Honor's court

15   again.

16         THE COURT:  All right, Mr. --

17         MR. POMERANTZ:  May I proceed, Your Honor?

18         THE COURT:  Please.

19         MR. POMERANTZ:  Your Honor, before I introduce you to

20   the debtor, and my team who are in the virtual courtroom, I

21   wanted to express my deepest gratitude for the Court's

22   availability yesterday to set today's expedited hearing.  We

23   have been in negotiations with the bank group over the last

24   week to obtain a debtor in possession financing facility to

25   fund operations and the administration of these cases, and hope

1   to finalize those discussions over the weekend, and file a DIP

2   motion today.  To deliver the best message to the marketplace,

3   we wanted to come to the Court at the first day hearing with a

4   committed financing facility, rather than simply use cash

5   collateral.  I believe we could have waited until the first day

6   hearing that Your Honor originally scheduled for Wednesday.

7           When it appeared yesterday that it would take a

8   little more time to complete negotiations with the bank group,

9   we pivoted to a short-term use of cash collateral so that we

10  could have immediate access to funds today to make post-

11  petition fuel purchases, which along with employees, is the

12  lifeline of the debtor's businesses.

13          In the virtual courtroom today are Turjo Wadud and

14  Lamar Frady, the debtor's cofounders and co-CEOs; Dustin

15  Martin, the debtor's chief operating officer; Neil Lansing, the

16  debtor's general counsel; as well as Lawrence Perkins, a

17  managing director of SierraConstellation, one of the two

18  independent directors who were retained prepetition.  I expect

19  that the other director, Craig Barbarosh, a 30-year

20  restructuring lawyer with Katten, Munchin, and Pillsbury, will

21  join the hearing in progress.

22          THE COURT:  Okay.  Thank you.

23          MR. POMERANTZ:  Also in the courtroom -- you're

24  welcome.  Also in the Courtroom are Michael Healy of FTI

25  Consulting, the debtor's proposed chief restructuring officer,

1  who will be the witness for today's hearing; as well Geoffrey

2  Richards, a managing director of Raymond James, the debtor's

3  proposed investment banker.  And finally, Your Honor, from my

4  firm, my colleagues, Jeff Dulberg, Steven Golden, Max Litvak,

5  Ben Wallen, and Henry Kevane are also appearing, as well as

6  Mr. Litvak will be examining Mr. Healy at the appropriate time.

7          Your Honor, I do not intend today to go through the

8  comprehensive first day presentation that I planned to do when

9  we come back to the Court for a hearing on the full suite of

10  our first day motion.  We expect to file our first day motions

11  later today, along with a declaration of Michael Healy in

12  support thereof.

13          Rather, what I intended to do, Your Honor, today, was

14  to provide Your Honor with a brief description of the debtor's

15  business operations, the circumstances that led the debtor to

16  commence these Chapter 11 cases, and the relief being sought

17  pursuant to the emergency cash collateral motion we filed this

18  morning.  I would then turn the podium over to Mr. Litvak to

19  examine Mr. Healy and provide the Court with the evidentiary

20  support -- basis to support our emergency request.  May I

21  proceed in that manner, Your Honor?

22          THE COURT:  Absolutely.  And I do want to carve out

23  time between your, what I'll take as an opening statement, and

24  I do what to hear from any of the other parties that wanted to

25  just make general comments before we proceed with the

1    evidentiary presentation.

2            MR. POMERANTZ:  Very well, Your Honor.  The debtors

3    consist of 144 separate legal entities, and are a vertically

4    integrated market leader in the fuel supply business,

5    headquartered in Alpharetta, Georgia.  The debtors acquired the

6    real property underlying fueling centers, which consists of

7    convenience stores and travel centers, and sell them to third-

8    party investment vehicles, who lease them back to the debtors

9    under long term agreements.  The debtors supply fuel to

10   approximately 855 fueling centers throughout 27 different

11   states, and the debtors control the real estate underlying the

12   fueling centers in approximately 550 of those fueling centers

13   through master leases.

14           The debtor's largest landlord is Oak Street, which

15   owns 286, or over 50 percent of the underlying properties.  352

16   of the fueling centers controlled by the debtors are operated

17   by third-party dealers under sub-leases for the debtors.  And

18   the debtors themselves operate the remaining fueling centers,

19   although they are in the process of extricating themselves from

20   the majority of the retail business by finding additional

21   third-party operators.

22           Its fuel business is at the heart of its business

23   operation, and consists of supply agreements with major oil

24   producers, which allow the debtors to distribute fuel to both

25   to the controlled and third-party fueling centers.

1           The debtors are privately owned by Turjo Wadud and

2    Lamar Frady, who acquired the debtors in 2020.  And the

3    debtor's board consist of Mr. Wadud and Mr. Frady, and the two

4    independent directors who were appointed prepetition that I

5    mentioned, Mr. Perkins and Mr. Barbarosh.

6           As I mentioned, in addition to retaining our firm,

7    the debtors appointed Michael Healy, chief restructuring

8    officer, and is seeking to retain Raymond James as its

9    investment banker.

10           Mountain Express Oil is the ultimate parent of the

11    debtor, and is the borrower under a secured term loan and a

12    revolving credit facility with a group of banks agented by

13    First Horizon Bank.  Under the prepetition loan documents,

14    Mountain Express Oil owes the bank group approximately $175

15    million as of the petition date, exclusive of accrued interest,

16    fees, and costs.  And certain of Mountain Express's direct

17    subsidiaries are guarantors under the lending facility.  The

18    debtors are not in payment default to the bank group, but the

19    bank group asserted certain nonmonetary defaults in December of

20    2022.

21           The debtors owe approximately $26 million to general

22    unsecured creditors, over 90 percent of whom are claims by

23    parties who provide fuel to the debtors pursuant to supply

24    agreements, and which will become due during the first 21 days

25    of the case, and which will be subject of a critical vendor

1    motion that will be heard at the time of our full suite of

2    first day motions.

3              THE COURT:  So, Mr. --

4              MR. POMERANTZ:  As I mentioned --

5              THE COURT:  Mr. Pomerantz --

6              MR. POMERANTZ:  Yes.

7              THE COURT:  -- my apologies for interrupting.  So the

8    $6 million is for new fuel purchases, not to pay anything that

9    had previously been ordered and delivered.  Is that correct?

10             MR. POMERANTZ:  That is totally correct, Your Honor.

11             THE COURT:  Okay.

12             MR. POMERANTZ:  The six million in the budget is

13   post-petition fuel purchases.  We have been in contact with

14   many of the fuel suppliers who are, you know, fortunately or

15   unfortunately, knowledgeable about the bankruptcy world, and

16   they have indicated that they intend to shut off their

17   automatic debits for the prepetition.  They have asked, and I

18   will get to it when I present the order, for certain language

19   to be included in the order that we will hope will facilitate

20   the flow of fuel.  The debtor's 550 controlled sites, as I

21   mentioned, are leased from landlords with Oak Street

22   controlling 286 of those.

23             The first day declaration, which we'll file, of

24   Michael Healy, will go into great detail will go into great

25   detail regarding the deterioration of the debtor's relationship

1   with Oak Street, which directly led to the debtor needing to

2   seek relief by commencing these cases.  The debtor's

3   relationship with Oak Street will be a significant focus in

4   these Chapter 11 cases, and I will plan to make my full

5   presentation to the Court when we reconvene for our complete

6   first day hearings.  However for now, I will briefly highlight

7   a few key facts.

8          Commencing in 2021, Oak Street began to fund the

9   debtor's acquisition of 286 properties for an aggregate

10  purchase price of an excess of $825 million through 60 separate

11  sale-leaseback transactions.  An Oak Street designee sat on the

12  debtor's board of directors until January, 2023.  In connection

13  with the sale-leaseback, and at the time of the acquisition of

14  the properties, the parties entered into 44 separate side

15  letters with respect to environmental assessments and

16  remediation, code compliance, and related matters needed by the

17  debtors post-closing; additional things that you would expect

18  when you acquire an oil (indiscernible) a convenience store.

19  Things changed, Your Honor, between the debtor and Oak in 2023.

20          THE COURT:  Mr. Pomerantz --

21          MR. POMERANTZ:  The debtor and Oak Street -- yes.

22          THE COURT:  My apologies, I'm picking up some noise.

23  Is it possible, so I -- you do have a headset on.  So, Mr.

24  Pomerantz, the -- I think that was your number, the 310 number.

25  Did it just tell you that I had muted you?  I just wanted to

1    see if that would take away the noise.  It you'd hit five star

2    again, because we can't hear you.  Got it.  So the noise, Mr.

3    Pomerantz, is coming from your phone.  Is there any way perhaps

4    you could switch ear pieces, maybe --

5            MR. POMERANTZ:  Let me put it on speaker and see if

6    that's better, Your Honor?

7            THE COURT:  All right.  Sure.

8            MR. POMERANTZ:  Your Honor, is this better?

9            THE COURT:  It is, it took away the noise.

10           MR. POMERANTZ:  Okay.  I apologize.

11           THE COURT:  No, no, no.

12           MR. POMERANTZ:  (Indiscernible).

13           THE COURT:  Maybe batteries just getting old or

14   something, but it's just fine.

15           MR. POMERANTZ:  Your Honor, things started to change

16   between the debtor and Oak Street in 2023.  The debtors and Oak

17   Street entered into amendments to their master lease agreements

18   to facilitate Oak Street's advancement of $10 million over the

19   debtor's January and February rent obligations to Oak Street

20   under their master leases.

21           Soon thereafter, Oak Street started to demand that

22   the debtor relinquish properties from the master leases to

23   allow Oak Street to sell them, or re-tenant them to third

24   parties who would not sign on to the debtor's fuel supply

25   agreement.  When the debtors refused to do so because the loss

1  of the fuel supply agreement, which caused them to breach their

2  minimum purchase obligations to their fuel suppliers, and

3  decimate the value of the debtor's business and threatened

4  their existence, Oak Street became hostile.

5              Oak Street sent the debtors three notices of default

6  in February 17th of 2023, each raising only nonmonetary

7  defaults, principally relating to the alleged failure to

8  complete the post-closing work at the acquired locations.

9  Prior to the notice in the default, Oak Street never complained

10  to the debtors regarding the pace at which the post-closing

11  work was being completed.  And in fact the debtors have been

12  diligently completing the work, the vast majority of which is

13  pending governmental and regulatory approval.  Oak Street

14  surely knew this, as its representative sat on the debtor's

15  board of directors.  Nor did Oak Street raise concerns about

16  the post-closing work, when it amended and restated the master

17  leases in January 2023.  In connection with the assumption and

18  or assignment of the Oak Street leases during the course of

19  these cases, we will demonstrate to the Court that the debtors

20  have, and can satisfy any remaining cure obligation.

21              The debtors retained restructuring advisors

22  immediately, and tried to negotiate a forbearance with Oak

23  Street to avoid a Chapter 11 filing, which as you heard, we

24  don't have a lot of trade debt.  It wasn't a judgment that

25  forced us in.  And while we are in nonmonetary default from the

1  bank, they weren't forcing us in.

2          We immediately approached Oak Street to obtain a 30-
3  day forbearance to allow the debtors newly-minted professionals
4  to get their footing in the case, and to sit down and discuss
5  with Oak Tree an overall restructuring to demonstrate how the
6  debtors have substantially completed their environmental work,
7  and how their transition away from owned convenience store
8  operations was going to make the company financially stronger.
9  In response, Oak Street first demanded that the debtor
10 relinquish approximately 150 properties, more than 50 percent
11 of the entire portfolio, in exchange for a mere 30-day
12 forbearance.  The debtors told Oak Street that would decimate
13 their business, result in significant loss of employment for
14 employees throughout the country, and was not acceptable.

15         Oak Street did not provide the debtors with a draft
16 forbearance agreement until March 15th, only a couple of days
17 before the expiration of the cure period.  In the forbearance
18 agreement, Oak Street demanded release of 75 properties,
19 payment of $8.5 million, and access to all of the debtor's
20 creditors and lenders for a mere 30-day continuance.  Acceding
21 to Oak Street's demands, which was clearly a power play, trying
22 to exploit nonmonetary defaults that had existed for months,
23 and were either completed, or awaiting governmental approvals,
24 or in the process of being completed, would have been value
25 destructive, and a breach of the debtor's fiduciary duty to its

1   stakeholders.  Left with no choice, the debtors filed Chapter

2   11 on March 18th.

3          Now that the debtors are in Chapter 11, they will use

4   the process to pursue a restructuring path that maximizes value

5   for all stakeholders.  As I mentioned, Your Honor, the debtors

6   hope to enter Chapter 11 with a committed DIP financing

7   facility from the First Horizon-led bank group, which would

8   provide sufficient liquidity to sustain operations throughout

9   the restructuring process, and funding for the administration

10   of the estate.  The debtors and First Horizon have engaged in

11   significant negotiations over the last several days, and are

12   hopeful that an agreement can be reached soon.

13          And as I mentioned, when we initially scheduled the

14   first-day hearing on these cases for Wednesday, we wanted to

15   provide the parties with sufficient time to complete the

16   negotiations, document the DIP facility, and seek Court

17   approval so that we could deliver the one message to the

18   marketplace, that committed financing was possible.  That would

19   have been the best way to launch these Chapter 11 cases.

20          Unfortunately, unable to complete the negotiations

21   over the weekend, the debtor felt it was critical to obtain the

22   authority to use cash collateral for the limited purpose of

23   being able to purchase fuel, without which they could not

24   preserve operations while the DIP negotiations continued.

25   Without use of cash collateral on an emergency basis, the

1    debtor will suffer irreparable harm, and their businesses will

2    be adversely and permanently affected.  The bank group is the

3    only party whom the debtors believe have an interest in cash

4    generated from its business operations.

5            Accordingly, Your Honor, this morning we filed a

6    motion for use of cash collateral on a nonconsensual basis,

7    which appears at Docket Number 7.  The motion seeks use of cash

8    collateral, pursuant to Section 363 of the Bankruptcy Code, for

9    one week to avoid irreparable harm that will result if the

10   debtors do not have cash to fund operations.  The motion

11   attaches a one-week budget, which contains the minimum cash

12   required until longer-term financing can be hopefully put in

13   place; and principally consists of funds to purchase fuel post-

14   petition.  One of the debtor's three cyclical payrolls will

15   occur Friday, but the debtors prefunded such payments

16   prepetition.  Our first day motions will of course include the

17   standard prepetition payroll motion so that employees can and

18   will be protected throughout these Chapter 11 cases.

19           This morning we exchanged drafts of the proposed

20   order with the bank group, and as a result, we have filed a

21   revised version in which we accepted many of the changes that

22   were requested by the bank group, but not all of them.  As of

23   the time of this hearing, the bank group has not indicated to

24   us whether the proposed order is acceptable or not.

25           In addition, as I alluded to before, since the filing

1  we have had numerous discussions with oil suppliers who have

2  requested certain information -- certain language in the order,

3  specifically naming them as the -- as a recipient of this post-

4  petition use of cash collateral, and providing that it would be

5  payable to them for post-petition fuel purchases.  That is in

6  Paragraph 10 of the revised order.  And the red line and the

7  new order can be found at Docket Number 21.

8          Your Honor, we believe, and we believe the evidence

9  will show that the bank group is adequately protected in the

10 use of its cash collateral, because without which -- without

11 the use, the debtors will not be able to continue operating as

12 going concern, and the value of the bank group's collateral,

13 which permit -- primarily consist of fuel supply agreements,

14 will evaporate.  Moreover, the bank group's working capital

15 will not decrease during the course of the next week, as the

16 vast majority of funds will be used to purchase new inventory,

17 which the debtors will be able to turn over for a profit.

18         That concludes my initial presentation, Your Honor.

19 I'm happy to answer any questions you may have.

20         THE COURT:  Oh, thank you.  I think I got it.  I

21 appreciate the thoroughness of the presentation.

22         Let me ask, do we have counsel on the line for First

23 Horizon -- for the First Horizon group?

24         MS. HEYEN:  Yes, Your Honor.  Good afternoon.  This

25 is Shari Heyen and John Elrod of Greenberg Traurig for First

1    Horizon.

2          THE COURT:  Sure thing, thank you.  Ms. Heyen -- and

3    again, not trying to upset the status of ongoing

4    negotiations -- do you think we're moving in a positive

5    direction?

6          MS. HEYEN:  I think so.  Mr. Elrod may want to

7    comment that.  He's sitting in our Atlanta, Georgia Office.

8          THE COURT:  My apologies.  Mr. Elrod, good afternoon.

9          MR. ELROD:  Good afternoon, Your Honor.  It's a

10   pleasure to appear in front of you today.

11         Your Honor, we have made some progress in

12   negotiating, as Mr. Pomerantz indicated in his presentation.

13   The parties have exchanged drafts of the cash collateral order.

14   Moreover, the parties continue to discuss a DIP financing

15   facility which would fund the debtor's cash needs during these

16   Chapter 11 cases.

17         With that being said, Your Honor, again, as Mr.

18   Pomerantz indicated, the drafts of the proposed order have been

19   going back and forth pretty rapidly this morning and early this

20   afternoon.  We would indicate -- we believe -- we do -- we will

21   reach a deal on the use of cash collateral for the one-week

22   period, and would anticipate following up with the DIP

23   financing proposal to the company in the very near future.  I

24   would ask, however, the Court's indulgence as we review the

25   terms of the revised proposed order and get our consent to the

1    Court as quickly as possible so that we can have the order

2    entered and the debtor can use cash.

3              THE COURT:  So let me ask you this:  How long do you

4    think that will take?  And I -- I'm not trying to hold you to

5    it --

6              MR. ELROD:  Less than --

7              THE COURT:  -- just trying to be realistic.

8              MR. ELROD:  Less than 30 minutes, Your Honor.

9              THE COURT:  Less than 30 minutes.

10             MR. ELROD:  For the review of the proposed order.

11             THE COURT:  So I have got a fairly packed afternoon,

12   but this is important.  Obviously, I want to make sure that we

13   have a path to explore whether or not, you know, we're going to

14   go forward on a consensual basis or preserve the fight for

15   later.

16             And I was going to suggest if we were making

17   progress, I -- if you had no objections, I was intending to,

18   again, subject to your comments, to try and put you in a

19   position where you didn't have to be defensive about anything.

20   And that if we were really looking at a seven-day cash

21   collateral usage with the budget that at least that I -- the

22   budget that was attached -- and I haven't heard anybody tell me

23   that that budget was going to change materially -- is that we -

24   - I give you a hearing date for next Monday, and then we either

25   really tee it up or not.  But if you want to have that

1   substantive hearing today, I'm obviously willing to do that.  I

2   was just trying to give you as easy a path as possible.

3              MR. ELROD:  Your Honor, I think the hearing on Monday

4   would be sufficient for the agent's purposes.

5              THE COURT:  And --

6              MR. ELROD:  In the interim we will obviously review

7   the proposed order as circulated and filed on the docket by the

8   company.

9              THE COURT:  And so are you -- and I want to make sure

10  we're on the same page.  So that was really to avoid -- because

11  Mr. Pomerantz is going to put on a presentation that is -- that

12  you're probably going to have to respond to.  Just -- that's a

13  guess.  And that's what I was trying to avoid.

14             I'm -- if you're telling me that you're consenting to

15  use of cash collateral pursuant to that budget, then that order

16  gets really simple.  If you're telling me that you want a

17  little bit of time to look at the latest draft of the order and

18  then come back this afternoon, I've got to figure out how to

19  slot you in, but we will absolutely do that.

20             MR. ELROD:  It's the latter, Your Honor, we do want a

21  chance to review the terms of the proposed order prior to the

22  debtor's use of the cash collateral.  Again, it would not take

23  much time, but we would ask for the Court's indulgence in that

24  regard.  And I understand the Court has hearings this

25  afternoon, and I appreciate the Court's time on it.

1          THE COURT:  Let me ask you this.  It's 12:24, if we

2  came back -- it's 12:25 my time.  If we came back at 12:50 my

3  time, do you think that would be enough time?

4          MR. ELROD:  I do, Your Honor.

5          THE COURT:  Then, Mr. Pomerantz, would you have any

6  objection to temporarily adjourning to 12:50?  That's 15

7  minutes from now.  Actually, my fault --

8          MR. POMERANTZ:  No, Your Honor.

9          THE COURT:  Said that wrong, that's 25 minutes from

10 now.  And I thought I was a math guy.  Then let me do this

11 before we take a quick adjournment -- and again, everyone is

12 going to have an opportunity to weigh in to the extent that

13 they wish.

14         Anyone else want to make opening comments?  All

15 right.  Then what we'll do --

16         MR. EISENBERG:  Your Honor?

17         THE COURT:  Yes?

18         MR. EISENBERG:  Your Honor?

19         THE COURT:  Yes, Mr. Eisenberg?

20         MR. EISENBERG:  Philip Eisenberg on behalf of BFM

21 Operations LLC and various subsidiaries and affiliates.  We

22 will have comments on the language in the cash collateral

23 order.

24         THE COURT:  Okay.

25         MR. EISENBERG:  And so we also want that opportunity

1  to review and also discuss it with these folks.  But there are

2  provisions in there that we think are inappropriate for the

3  type of relief that they're looking for for this week.

4        THE COURT:  All right.  So you've seen it, you're

5  plugged into the circulation process?

6        MR. EISENBERG:  Well, I have not pulled up the latest

7  one at Docket Number 21 because it hadn't appeared before I got

8  online, Your Honor, but we'll look at that --

9        THE COURT:  All right.

10       MR. EISENBERG:  -- in the next 20 minutes.  But our

11 client has various dealings with the debtors, and this is a

12 little bit of a surprise for them.  We're still trying to sort

13 things out.  We're not sure that every dollar that's coming in

14 is their dollars, and maybe some of our dollars, and that's one

15 of the issues you'll hear about.  Mr. Peeble (phonetic) is on

16 the line, he's got the background.  But we do need to be heard

17 on that so that we can at least start the dialog there.

18       I think this order can be put in place with the

19 proper reservations, Your Honor, and so we want to be a -- we

20 want to keep the business going for the next week and -- but

21 they're buying gas with it.  The gas is going to increase in

22 value.  I don't see the estate diminishing by staying as going

23 concern and by buying product that's going to sell at a profit.

24 But that's what the -- our questions are is the scope of the

25 replacement lease that they're trying to get here, Your Honor.

1  And if there is anything that they're trying to get a

2  replacement security on, it can only be property of the estate.

3  They're not gaining anything by getting this, and we just need

4  to make sure that the words (indiscernible).

5         THE COURT:  No, and I don't think anybody disputes

6  any of the basic bankruptcy principles that you espoused.

7         Let me -- Mr. Pomerantz, so you know you need to plug

8  Mr. Eisenberg into this discussion.

9         Ms. Surinak, I saw you raise your hand.  Did you have

10  something you needed to address before we break?

11         MR. POMERANTZ:  Just one question, Mr. -- Judge, Your

12  Honor.  Mr. Eisenberg, who do you represent?  Because we have

13  not been in touch during this case, and I'd like to understand

14  who you represent.

15         MR. EISENBERG:  Right, my understanding, and we got

16  contact this morning, it's BFM Operations LLC.  They're the

17  folks that were doing business in Louisiana, and there's 36

18  stores that you have and 8 that we have.  And there's a

19  trucking business and Golden Gallons [sic], and there is credit

20  card receipts that I understood that were ours that were

21  received in a system that were not distributed back to my

22  client, and that's as far as I could get.

23         MR. POMERANTZ:  We are happy to work with you.  Just

24  to alleviate some of your concerns, one of our first day

25  motions we planned to file later today will deal with our

1  relationships with our dealers and the credit card receipts

2  issue for which we acknowledge the issue and concern.  But

3  we're happy to consider any language you have to reserve your

4  rights to a pending hearing on that motion, which we think

5  you'll find in your best interests -- your client's interests.

6          MR. EISENBERG:  We appreciate that very much.  There

7  is one other small issue, Your Honor.  There is an injunction

8  that got issued out of a state court for information from the

9  accounting systems that they had because our clients have to

10  pay their taxes.  And the injunction ordered the debtors to

11  supply information that's our information.  And we need to kind

12  of make sure that we're not doing anything that makes the

13  debtors or the Court uncomfortable at this point.

14          THE COURT:  So, Mr. Eisenberg, I'm going to let you

15  have that conversation with Mr. Pomerantz, perhaps later on

16  today.  It think issue number one is making sure that we have

17  operations intact, and then we can start to deal with some of

18  those issues.

19          But as you well know -- and I'll say this to

20  everybody:  I know this came in, using the colloquial, this

21  came in hot, I got that.  I'm prepared to allocate whatever

22  time and resources that we need to over the next couple weeks

23  to make sure we get -- or to get as stabilized as we possibly

24  can.  So if you need time, just work that out with Mr. Alonzo.

25          MR. EISENBERG:  Thank you, Your Honor.

1          THE COURT:  Let me go back to Ms. Surinak, if I'm

2   pronouncing that right.   I think your hand was raised.

3          MS. SURINAK:  Yes, thank you, Your Honor.  Can you

4   hear me okay?

5          THE COURT:  Loud and clear, thank you.

6          MS. SURINAK:  Thank you.  Ashley Surinak of Kirkland

7   & Ellis LP on behalf of Oak Street Real Estate Capital.  We

8   just wanted to make a few brief remarks, if Your Honor has time

9   before (indiscernible)

10          THE COURT:  Let's do this:  I know what you're going

11   to say, and we will absolutely have that conversation at some

12   point in time.  I obviously realize that you are an important

13   constituent.  I didn't think -- I didn't take anything that

14   Mr. Pomerantz said as indicative of your client's character or

15   anything else.  Those things will be the subject of future

16   hearings.  No need to -- we will note that you disagree with

17   everything negative that was said about your client, and let's

18   see if we can focus on trying to make sure we can use cash.

19   And then when that comes up, I promise you I'll give you all

20   the time in the world.  Can I ask you to do that?

21          MS. SURINAK:  Understood, Your Honor.  And of course,

22   thank you.

23          THE COURT:  All right.  Thank you.  Then let's do

24   this:  back at 12:50 my time.  And again, if we have to skip

25   throughout the afternoon, you know, I -- we will.  I'll --

1   we're not going to leave today until we get this issue

2   resolved.  But you may have to do some popping in and popping

3   out while I have other things, all right?

4           MR. POMERANTZ:  Thank you, Your Honor.

5           MR. EISENBERG:  Thank you, Your Honor.

6           THE COURT:  See everybody back in 20 minutes.

7       (Recess taken at 12:31 p.m.)

8       (Proceedings resumed at 12:50 p.m.)

9           THE COURT:  (Audio starts mid-sentence) the record in

10  the jointly-administered cases under Case Number 23-90147,

11  Mountain Express Oil Company.

12          Let me -- Mr. Pomerantz, let me just start with you.

13  Did we have enough time?

14          MR. POMERANTZ:  So Your Honor, first of all, I don't

15  see Mr. Elrod on the screen, so --

16          THE COURT:  I didn't either.

17          MR. POMERANTZ:  -- maybe we need to wait a moment.

18          THE COURT:  All right.  I didn't know if you were

19  coming back on to make an announcement, or --

20          MR. POMERANTZ:  Well, we have communicated, and

21  there's still one sticky (indiscernible) I'd like to let the

22  Court know of.

23          THE COURT:  Okay.

24          MR. POMERANTZ:  And we can (indiscernible).

25          THE COURT:  Ah, there he is.  Mr. Elrod, are you back

1  on?  You'll need to hit five star again if you are dialing back

2  in.  Actually, I don't see an Atlanta number.  Mr. Elrod, when

3  you are connected back up, you'll need to hit five star again

4  so I can hear you.

5           Mr. Elrod, can you hear me?  So I can't hear you.  I

6  need for you to hit five star again because you got off the

7  line and then back on.  There you are.

8           MR. ELROD:  Thank you, Your Honor, for the reminder.

9           THE COURT:  Oh, quite all right.  So I just was

10  checking in to see if we'd had enough time.  What do we need to

11  do to be efficient?

12           MR. ELROD:  Thank you, Your Honor, we --

13           UNIDENTIFIED:  (Indiscernible) --

14           MR. POMERANTZ:  Your Honor, if I may?

15           THE COURT:  Certainly.

16           MR. POMERANTZ:  Thank you, Your Honor.  So in the

17  interim Mr. Elrod sent to me two requested changes to the

18  proposed form of order.  One I think is okay with some

19  explanation to make sure we're all on the same page.  And that

20  request was a change to Paragraph 3 regarding the potential for

21  other parties to have a challenge right with respect to the

22  stipulation that the debtors are agreeing to in connection with

23  this motion.  The language he has requested was subject to

24  appropriate challenge provisions for parties in interest other

25  than the debtors.  Of course, nobody knows what appropriate is.

1  Obviously, Your Honor will be the arbiter of that.  But

2  obviously it's the intent of the debtor, which I hope the Court

3  shares, that we are not going to be binding any other parties,

4  and the appropriate challenge provisions, if there is any

5  dispute, Your Honor will implement appropriate challenge

6  procedures so that other parties' rights are not waived.

7          THE COURT:  So let me propose -- I think I can make

8  this easier on everyone.  So as I understand it, we were going

9  to do this for a week.  I have -- I've created a block of time

10 March the 27th at noon central time.  And if that works for

11 everyone, why don't we just write in that provision, you know,

12 subject to a challenge period to be established at the

13 continued hearing on March the 27th.  Would that work for

14 everybody?

15         MR. POMERANTZ:  That would work for the debtors.

16         THE COURT:  Mr. Elrod, would that work for you?  It

17 gives you time to sort of figure everything out.  And it also

18 gives --

19         MR. ELROD:  That's --

20         THE COURT:  Sorry.

21         MR. ELROD:  Yes, Your Honor.  So it's -- so I'm

22 clear, that's the 22nd?

23         THE COURT:  27th.  I thought you'd wanted a --

24         MR. ELROD:  27th.

25         THE COURT:  I thought you had wanted a week.

```
 1              MR. ELROD:  Your Honor, I -- we -- I think we're very

 2   close to a form of an interim order on the interim use of cash.

 3   So I don't know that we'd necessarily need that at this point,

 4   provided that the debtor's team is on board with that language.

 5              THE COURT:  So different --

 6              MR. POMERANTZ:  Your Honor --

 7              THE COURT:  Different comment.  The 27th would be

 8   your hearing for continued use of cash collateral; hopefully a

 9   final, but maybe a further interim.  And if you made progress

10   over the week and you got a DIP done, you've got a time slot

11   already there.  I was trying to provide you maximum

12   flexibility.  Would that work with that added explanation?

13              MR. ELROD:  It will, Your Honor.  Thank you.

14              THE COURT:  Thank you.  And Mr. Ruff --

15              MR. POMERANTZ:  Your Honor?

16              THE COURT:  Yes, sir?

17              MR. POMERANTZ:  Your Honor, if I may?

18              THE COURT:  Sure.

19              MR. POMERANTZ:  Just to -- and I'd like to come back

20   to where we go from here in terms of dates, because I know

21   there have been a lot of dates swirling.  I will have some

22   comments at the end with respect to where we are on DIP

23   financing.  But we don't think we can wait for DIP financing --

24              THE COURT:  Okay.

25              MR. POMERANTZ:  -- until next Monday.  We are willing
```

1  to have a next Monday on continued use of cash collateral if in

2  fact we can use that hearing, and operations haven't been so

3  decimated before then.  So I would keep that as a placeholder,

4  but at the end, after we get through the cash collateral

5  issues, I would like to sort of address to the Court as in a

6  sense a status report on the DIP financing, and then make a

7  proposal.

8         THE COURT:  Certainly.  I will also tell you, again,

9  because I would rather have -- I would rather have parties

10 negotiating without the influence of anything that I might

11 inadvertently say.  So you'll have March the 27th at noon for

12 your continued cash collateral hearing.  If it works for

13 something else, feel free to use the time.  I'll also commit to

14 everyone that if you need time earlier because you get a DIP

15 done, you just need to coordinate with that -- with Mr. Alonzo,

16 and I will make the time.

17        MR. POMERANTZ:  Thank you, Your Honor.

18        MR. ELROD:  Thanks, Your Honor.

19        THE COURT:  All right.  And Mr. Ruff, I did --

20        MR. POMERANTZ:  Your Honor, I did --

21        THE COURT:  Sorry, let me go just one question.

22 Mr. Ruff, with respect to reserving the issue of the

23 appropriate challenge period, because I know that's important

24 to you, are you okay with just language that says we're going

25 to take -- we're all going to take a deep breath and figure out

1    what this ought to look like between now and next week?

2            MR. RUFF:  I am, Your Honor.  I view this motion

3    really as a stopgap just to get the debtor so it can operate.

4    And I think all parties are -- their rights are reserved, so

5    we're happy with that.

6            THE COURT:  All right.  Thank you.  All right.

7    Mr. Pomerantz, issue two?

8            MR. POMERANTZ:  Issue two, Your Honor, is an issue

9    that is always in cash collateral orders, very rarely I guess

10   gets actually disputed, but it's the variance, as Your Honor

11   knows, and we heard today, because we desperately need the cash

12   to fund the fuel purchases.  And while we have presented the

13   best budget we can -- Mr. Healy will provide that evidentiary

14   basis -- we are concerned that we have the flexibility, if in

15   fact the receipts don't materialize, given the fragile nature o

16   the debtor's business.

17           So we have asked for a 15 percent variance.  In the

18   scheme of things, given the size of this company, given the

19   limited use of cash collateral, and given the disastrous

20   results that would occur if we exceeded that, we think that is

21   more than fair.  And the lenders have only agreed to a 10

22   percent.  But we are prepared to put on our case of Mr. Healy's

23   testimony.  Mr. Elrod can cross examine on why 15 percent is

24   necessary as opposed to 10 percent.

25           THE COURT:  So let me -- gentlemen, let me ask this:

1  As I look at the budget, you've only got about $300,000, give

2  or take, of leeway anyway before you run out of cash.  Am I

3  reading the budget wrong?

4          MR. POMERANTZ:  No, that's correct, Your Honor.

5          THE COURT:  So let me tell you, and again, what I'm

6  trying to do -- and again, if anybody wants their hearing, I'm

7  going to give it to them.

8          But given where we are, given what the company looks

9  like, given sort of your automatic variance stopgap -- I mean,

10  you can't spend money you don't have -- I'm inclined to again,

11  for seven days without this being precedential in any shape,

12  way, or form, is I would -- I am inclined to grant the 15

13  percent variance subject to the understanding that the debtor

14  does not finance the case on the back of vendors, it does not

15  spend money it doesn't have.  I don't want any -- I don't want

16  commitments made about anticipation.  Spend the money you got

17  in the -- that you got in the bank account, but nothing more.

18  And I know that that sounds ridiculously basic, but I've been

19  through this business a couple of times before, and I want to

20  make sure everybody understands we don't spend money we don't

21  have.

22          MR. POMERANTZ:  That is correct, Your Honor.  I teach

23  my children that all the time, and my debtor clients as well.

24          THE COURT:  Mr. Elrod, with the understanding we're

25  going to have a much different conversation when I get some

 1  better numbers and things get stabilized, if you want the

 2  evidence to be put on because you just need it, I'm happy to

 3  require Mr. Pomerantz to do that.  What I really am trying to

 4  do is I'm trying to avoid putting my finger on the scale with

 5  respect to the ongoing negotiations on cash collateral, DIP,

 6  whatever else may be out there.  But I'm looking to you for

 7  guidance as to what you need for your client.

 8          MR. ELROD:  I understand, Your Honor.  And given the

 9  debtor's limited cash on hand, there is no problem with that.

10  We certainly respect the Court's views on it.

11          One point of clarification that I intended to raise

12  in my initial comments:  There was, in the debtor's cash

13  collateral motion, reference to a hedge termination fee or

14  proceeds.  Those amounts are not being held in suspense, they

15  were applied prepetition to the indebtedness.  I want to be

16  clear that nothing in the order prejudices that issue or

17  otherwise gives the debtor rights to any fees in that regard,

18  or use of cash in that regard.

19          THE COURT:  I think it doesn't move the needle either

20  direction.  Agreed, Mr. Pomerantz?

21          MR. POMERANTZ:  Yes, Your Honor.  And I'm sure the

22  committee that would be appointed reserves its rights with

23  respect to that drawdown if they believe it's actionable.

24          THE COURT:  Absolutely.  Not on the table today,

25  don't have anything before me, we'll -- whenever that becomes

1   an issue, then we'll learn about the ins and outs.

2          Mr. Eisenberg, let me ask you:  Did you -- would --

3   did you get comfortable at least for the next seven days?  Ah,

4   and Mr. Eisenberg, you'll need to hit five star for me.

5          MR. EISENBERG:  Thank you, Your Honor.  Philip

6   Eisenberg on behalf of BFM Operations, also known as Brothers,

7   if that is the confusion.  We appreciate the inclusion of the

8   challenge period and the reservations.  It's one of the points

9   we did raise to Mr. Golden, he was kind enough to call Mr.

10   (indiscernible) and I.  And we have no problem with the

11   variance issues that they have.

12          There was some language that we discussed with Mr.

13   Golden for including in there, and I don't know whether he's on

14   the line right now so that he can discuss what he's included in

15   there.  I -- so we sent him that.  And it had to do with cash

16   receipts, credit card receipts, and carving that out.  And so I

17   was hoping to hear back.

18          THE COURT:  Mr. Golden, did you -- have you had time

19   to consider the language that Mr. Eisenberg sent you?

20          MR. GOLDEN:  Your Honor, Steve Golden, Pachulski

21   Stang Ziehl & Jones for the debtors.  I was pleased to have a

22   nice little blast from the past with Mr. Eisenberg and

23   Mr. Keubel beforehand.  I haven't had the opportunity to

24   socialize the language with my partners or the bank, but the

25   language that we had spoken about, I'm happy to read it and

1    folks can react in real time.  But I think it should be

2    uncontroversial and consistent with Your Honor's comments.

3              THE COURT:  So let's do this -- again, because

4    sometimes reading things just creates more ambiguity than it

5    solves.  Why don't we do this:  It sounds like to me again, for

6    the next seven days without any prejudice to anyone, we've got

7    a path forward.  And what I would suggest we do is circulate

8    that final order.  If there remains an outstanding dispute,

9    I'll get everybody back on the line at five o'clock central

10   time.  If the parties have an agreed order with respect for the

11   next seven days, again, with a hearing date March the 27th at

12   12 noon, then just upload that, let Mr. Alonzo know, and I'll

13   take care of it, no need to appear.  Does that work for

14   everybody?

15             MR. EISENBERG:  Philip Eisenberg, Your Honor.  Yes,

16   Your Honor.

17             THE COURT:  All right.  Mr. Pomerantz --

18             MR. ELROD:  It does for the --

19             THE COURT:  Thank you, Mr. Elrod.  I'll get the order

20   right eventually.  And, Mr. Pomerantz, does that work for you

21   as well?

22             MR. POMERANTZ:  Yes, it does, Your Honor.

23             THE COURT:  All right.

24             MR. POMERANTZ:  If I may be briefly heard?

25             THE COURT:  No, of course.  I, again, just so

1   everybody -- if you want to see that final version of the

2   order, you need to reach out to Mr. Golden and let him know

3   that he wants -- that you want to see that final version before

4   it gets filed.  But I'll look to see an agreed form of order

5   granting, essentially by agreement, the use of cash collateral

6   for the next seven days without prejudice to any issue that

7   needs to be raised -- excuse me -- at a continued order final.

8   And if there is a dispute, then we'll all reconvene at five

9   o'clock central this afternoon.

10          All right.  Mr. Pomerantz, you had other issue you

11  need to raise?

12          MR. POMERANTZ:  Yes, Your Honor.  In the spirit of

13  transparency, and of course with efforts in respect to Your

14  Honor's comments before about DIP negotiations, one other

15  sticking point:  We have steadfastly maintained our position

16  that any DIP financing needs to be sufficient to sustain

17  operations and fund the administration of the case.  Thus far,

18  we have received significant pushback, and the amount of DIP

19  financing being proposed will not even last four weeks, let

20  alone pay any administration of the case.

21          So, Your Honor, if that in fact is the ultimate

22  position of the lenders, and we do not believe that we can

23  sufficiently administer this case and have it paid, we may be

24  back to Your Honor with quite-striking-different relief.  And

25  we understand the bank group is meeting today.  So rather than

1  wait until Monday -- I know Your Honor had previously agreed, I

2  know Your Honor has a big day tomorrow.  But I would request a

3  status conference at seven o'clock central time just to bring

4  the Court up to speed with the discussions.  If this company

5  cannot last through the week without sufficient DIP financing,

6  and I am extremely loath as of the debtor to agree to any DIP

7  financing that will not be sufficient to sustain operations and

8  administer these Chapter 11 cases.

9          THE COURT:  So let me just make -- a couple of

10  observations is number one, I question all the time the size of

11  DIPs because I don't think they're big enough.  Again, having

12  been through this business a couple of times on multiple

13  different sides, this is a business that requires adequate

14  capital to fully realize value potential.  I've also never been

15  in a case where I haven't paid the reasonable fees and expenses

16  of counsel because I think that having good counsel at the helm

17  is -- drives value.  And so I -- and that's -- I'm just telling

18  everybody the way I look at it.

19          I don't know what the proposals are.  If you need to

20  be looking at other DIP proposals and we need to have a priming

21  fight, I think priming fights are fun, happy to have them.  But

22  I'm going to look to the professionals to represent their

23  constituency appropriately.  I mean, debtors shouldn't be in

24  agree -- shouldn't be agreeing to anything that it thinks is

25  not in its best interests, same for the lender group.

```
 1            So that's all I'm going to say.  If you want a status
 2   conference tomorrow morning, more than happy to give you one.
 3            MR. EISENBERG:  Your Honor, I think having that would
 4   be helpful to the process.  So --
 5            THE COURT:  MR --
 6            MR. EISENBERG:  So, you know it -- that's at 5 a.m.
 7   Pacific time.  As long as Your Honor -- and I know Your Honor
 8   has dogs, if my dogs are barking in the background, you'll
 9   permit me to take the hearing from home, I'm happy to get up at
10   that time.
11            THE COURT:  Okay.  Mr. Elrod, let me ask you:  Do you
12   think a status conference tomorrow morning would be helpful?
13            MR. ELROD:  Your Honor, I'd -- I'm happy to have a
14   status conference any time the Court pleases.  I don't know
15   that it would necessarily be helpful, given the limited amount
16   of time between now and then, and the Court's grant of the use
17   of cash collateral for the next week.  All I -- we believe that
18   would do is serve to turn up the heat on negotiations that
19   quite frankly are already fairly heated.
20            THE COURT:  Fair enough.
21            MR. ELROD:  So, we would ask for a bit more time --
22            THE COURT:  Sure.
23            Mr. ELROD:  -- to give the parties time to work
24   things out.
25            THE COURT:  What about a status conference --
```

```
 1              UNIDENTIFIED:  Your Honor --

 2              THE COURT:  -- at the end of the day, or lunch time?

 3  I mean, I'm looking to you all, and I got it that you're not in

 4  the best -- you don't have the best working relationship yet.

 5  But I want to give everybody an opportunity to be heard.  So,

 6  Mr. Elrod, if you -- if I said I'm going to have a status

 7  conference tomorrow, just because I want to understand that

 8  we're headed in the right direction, what do you think would be

 9  the best time?  Do you think it would be lunch time?  5 in the

10  afternoon?  Or if you think it ought to be Wednesday and that

11  would be productive, I'm happy to hear that argument as to why.

12              MR. ELROD:  Your Honor, I think in the afternoon

13  tomorrow would be the most appropriate.  That would give the

14  parties time to discuss the terms of any proposed DIP financing

15  facility.

16              THE COURT:  Mr. Pomerantz, it means that you get to

17  sleep in the morning.  Tell me, what is prejudicial between

18  seven o'clock in the morning, and let's say 4:30 central time?

19              MR. POMERANTZ:  Nothing, Your Honor.  We think having

20  the status conference will move the process, and we think that

21  is acceptable.

22              THE COURT:  All right.  Then we'll set a status

23  conference for tomorrow afternoon at 4:30 central time.  And

24  Mr. Elrod, Mr. Pomerantz, I am perfectly happy for an email to

25  get sent to Mr. Alonzo, obviously with copies to the other
```

1  professionals that are engaged, saying that you don't need it.

2  Don't feel like you have to have it just because we set it.

3  All right?

4          MR. ELROD:  Thank you very much, Your Honor.

5          THE COURT:  All right.

6          MR. POMERANTZ:  Thanks, Your Honor.

7          THE COURT:  Anything else I can do to help move the

8  process along?

9          MR. POMERANTZ:  I think again, I want to thank Your

10  Honor for being so accessible.  It think this is a good first

11  step.  We have a long road to hoe, but I think we all have our

12  work cut out for us, and know what to do, and hopefully can do

13  what restructuring lawyers do best.

14          THE COURT:  All right.  Then I will see everybody

15  tomorrow afternoon if we need to.  Everyone have a good day,

16  and get to work.  Thank you.

17          MR. POMERANTZ:  Thank you, Your Honor.

18          THE COURT:  Thank you.

19          MS. CROCKER:  Your Honor?

20          THE COURT:  Yes, ma'am?  I'm so sorry, who is that?

21  Ah, Ms. Crocker.

22          MS. CROCKER:  That was Michaela Crocker on behalf of

23  Sunoco.

24          THE COURT:  Ms. Crocker, I am so sorry.

25          MS. CROCKER:  I hope too many people -- sorry.  It

1    looks like we still have debtor's counsel on the line.  I just

2    had a couple of points on the order that I'd like to raise now.

3    I would normally raise them with counsel, but it seems like a

4    lot is going on, and orders are being submitted.  But my

5    clients holds various lines of credit, and also we have some

6    setoff recoupment rights, things of that nature, which I'm sure

7    the other gas suppliers also hold.  And we'd just like to see

8    language in this order, or just verification from Counsel that

9    those rights aren't going to be affected with the ongoing

10   negotiations with the lenders.

11             THE COURT:  So, Mr. Wallen, Mr. Golden, could I ask

12   the two of you -- obviously coordinate with your team.  But can

13   I ask the two of you to make sure there is a specific reach out

14   to Ms. Crocker, just so you understand her issues?  And I don't

15   want her, obviously, to be overlooked.  And I certainly didn't

16   mean, Ms. Crocker, to not see you.

17             MR. GOLDEN:  Your Honor --

18             MS. CROCKER:  Thank you, Your Honor.

19             MR. GOLDEN:  Your Honor, this is Steve Golden.

20   Absolutely, Ms. Crocker.  I will reach out to you immediately

21   after this hearing, and we can speak right afterwards.  Thank

22   you.

23             MS. CROCKER:  Thank you.

24             THE COURT:  All right.  Sure thing.  Thank you,

25   everybody.

1        For folks who are on the line for court, give me just

2   a moment and let me get reset, and we'll get started.  Thank

3   you.

4        UNIDENTIFIED:  Thank you, Your Honor.

5      (Proceedings concluded at 1:11 p.m.)

6                          *  *  *  *  *

7

8

9

10

11

12

13

14              **C E R T I F I C A T I O N**

15

16        I, Alicia Jarrett, court-approved transcriber, hereby

17   certify that the foregoing is a correct transcript from the

18   official electronic sound recording of the proceedings in the

19   above-entitled matter.

20

21

22

23   _____

24   ALICIA JARRETT, AAERT NO. 428     DATE: March 24, 2023

25   ACCESS TRANSCRIPTS, LLC