**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| MOUNTAIN EXPRESS OIL COMPANY, et al., | Case No. 23-90147 (DRJ) |
| Debtors. [1] | (Jointly Administered) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF AN ORDER
(I) AUTHORIZING AND APPROVING A NON-INSIDER
KEY EMPLOYEE RETENTION PLAN AND (II) GRANTING RELATED RELIEF**

> **Emergency relief has been requested.  Relief is requested not later than Friday April 21, 2023.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") state the following in support of this motion (this "<u>Motion</u>"):

**<u>RELIEF REQUESTED</u>**

1.      Following the commencement of these Chapter 11 cases, the Debtors have suffered unexpected attrition among their rank and file employees working at their corporate headquarters. Prepetition, the Debtors had already been stretched thin by key losses in their accounting, finance and operations departments and cannot suffer further reductions without adversely impacting the conduct of these cases.  In order to alleviate the detrimental effect that this attrition, if unabated,

---

[1] A complete list of each of the Debtors in these Chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/mountainexpressoil. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 cases is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022.

would have on the Debtors' ongoing operations, the Debtors have formulated a cash-based retention program to keep their employees during the sale process contemplated over the initial stages of the case. The program applies to non-insider employees working at the Debtors' headquarters facilities (and at certain regional, field locations) and not to retail, store-level employees.

2.      Accordingly, the Debtors seek entry of an order (the "Order"), substantially in the attached form, hereto: (a) approving the Debtors' non-insider key employee retention program (the "Non-Insider KERP") in an amount not to exceed $522,000; and (b) granting related relief. In support of this Motion, the Debtors submit the *Declaration of Michael Healy Debtors' Emergency Motion for Entry of an Order (I) Authorizing and Approving the Debtors' Non-Insider Key Employee Retention Plan, et seq.*, attached hereto as **Exhibit A** (the "Healy Declaration").

## BACKGROUND

3.      On March 18, 2023 (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these chapter 11 cases.

4.      On April 4, 2023, the Office of the United States Trustee (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Committee"), consisting of the following three members: (i) The Necessity Retail REIT, Inc.; (ii) Total Image Solutions, LLC; and (iii) Coca-Cola Bottling Company United, Inc. *See* Docket No. 202.

5.      Founded in 2000 and based in Alpharetta, Georgia, the Debtors are a recognized leader in the fuel distribution and convenience store and travel center industry. As one of the

largest fuel distributors in the American South, the Debtors serve 828 retail stores and 27 travel centers across 27 states.  The Debtors enjoy trusted relationships with every major oil company including ExxonMobil, BP, Shell, Chevron, Texaco, and Sunoco and have obtained Regal Status with Chevron, Platinum Status with ExxonMobil, and entered a Joint Venture with Pilot/Flying J to become the largest Pilot Dealer in the United States.  Since 2013, the Debtors have distributed over 1.1 billion gallons of fuel.

6.    Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Michael Healy in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 57] (the "First Day Declaration").[2]

## PRELIMINARY STATEMENT

7.    The Debtors operate a vertically-integrated fuel supply and distribution network. As described in the First Day Declaration, the Debtors are parties to fuel purchase agreements with virtually every major domestic oil company.  The acquired fuel is then distributed by the Debtors across their network of service stations, convenience stores and travel centers.  These points-of-sale are comprised both of controlled-locations (i.e., where the Debtors hold a leasehold interest in the subject premises), and non-controlled locations (i.e., where third parties own the business premises).  The Debtors' controlled locations are partly operated in-house and partly by dealers. The complex, detailed and daily process of matching fuel purchase and supply commitments requires a highly skilled and dedicated workforce.  The Debtors operate in numerous states, each with varying logistics, permitting and payment stream requirements.

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

8.      To maintain their high standards and ensure their fuel supply system continues to perform as anticipated, it is vital the Debtors retain their specialized workforce while in chapter 11.  Replacing these employees cannot occur without substantial costs, delays and disruptions in the Debtors' carefully synchronized wholesale and retail operations.  Since the commencement of these case, the Debtors have lost the services of eight key employees, including a permit and licensing specialist, a retail controller and several district and territory managers.

9.      Retaining the Debtors' key non-insider employees is also critical as the Debtors embark on a sale process.   By implementing a retention based program for a limited number of non-insider employees (each, a "<u>KERP Participant</u>"), the Debtors seek to acknowledge the extraordinary work their team has been doing since the cases were commenced and to assure employees that their continued, focused efforts will be recognized.

10.      This Motion therefore seeks approval of the Debtors' Non-Insider KERP, which is designed to cover 29 KERP Participants.  The KERP Participants are mostly employed in the Debtors' accounting, finance, treasury and operations departments.  The Non-Insider KERP is based on the Debtors' current compensation program and is intended to provide a meaningful reward for employees to remain with the Debtors during the chapter 11 process.  The KERP Participants perform a variety of important business functions for the Debtors that are vital to the Debtors' ability to preserve and enhance stakeholder value.  Many of them have developed deep institutional knowledge regarding the Debtors' business operations that would be difficult and expensive to replace on an expedited basis.  In addition, the KERP Participants have provided important support to the Debtors' advisors in meeting the additional demands imposed by the chapter 11 process.

11.     The Debtors, with input from their advisors, including the Chief Restructuring Officer and his firm, FTI, have crafted the Non-Insider KERP to motivate the KERP participants to remain with the Debtors through the sale process.  The program consists of a cash pool for retention payments to 29 non-insiders in an aggregate amount of approximately $522,000.  Each participant would be entitled to receive a retention payment not to exceed 20% of such person's base annual salary (with the average payout being approximately $16,268).[3]  Payments to each participant will be structured as two equal cash payments, with half payable following the approval of the KERP program and the balance paid following the consummation of a sale of substantially all of the Debtors' asserts.  If a KERP Participant who receives the first installment under the KERP program voluntarily ceases his or her employment prior to the consummation of a sale (or is terminated "for cause"), such installment would be subject to recapture by the Debtors.

12.     At present, the Approved Budget under the Debtors' DIP financing does not reflect the cost of the Non-Insider KERP, nor have the DIP Lenders approved the proposed KERP program.  The Debtors intend to amend the current Approved Budget to reflect the cost of the Non-Insider KERP and will submit the amended budget for review by the DIP Lenders in accordance with the provisions of the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-2 (i) Authorizing the Debtors to Use Cash Collateral and Obtain Post-Petition Financing, et seq.* that was entered on March 23, 2023 [Docket No. 117].

---

[3]   The KERP also contemplates a modest supplemental cash pool of $50,000 for the purpose of rewarding extraordinary contributions to the Debtors' efforts to consummate a sale or other restructuring transaction.  The supplemental cash pool will be available to other non-insider, non-executive employees who are not otherwise KERP Participants.  No more than $15,000 will be awarded to any single employee.  The amount and recipient of any award will be determined by the Debtors' management team, in their discretion.  An award from the supplemental cash pool would be payable at the time the final payment under the KERP program.

13.     Importantly, the Non-Insider KERP complies with the Bankruptcy Code.  Retention payments will only be made to non-insider employees. As set forth in the Healy Declaration, the KERP program is reasonable, within the range of comparable plans, and reflects a sound exercise of the Debtors' business judgment. Accordingly, the Debtors respectfully request the Court authorize the Debtors to implement the Non-Insider KERP.

## JURISDICTION AND VENUE

14.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

15.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

16.     The bases for the relief requested herein are sections 105(a), 363(b), 363(c), 503(c)(1), and 503(c)(3) of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and rules 4001 and 9014 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

17.     The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On March 20, 2023, the Court entered an order [Docket No. 33] authorizing procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

DOCS_NY:47341.7

## NON-INSIDER KEY EMPLOYEE RETENTION PLAN

**A.      Overview of the Non-Insider KERP.**

18.      The KERP Participants are 29 key non-insider employees whose knowledge and experience are essential to preserving operational stability as the Debtors commence a sale process. The KERP program also has a supplemental cash pool of $50,000 to reward dedicated efforts in furtherance of the sale process for persons (also non-insider, non-executive positions) who are not KERP Participants.  These employees include highly trained and specialized personnel that would be extremely difficult, if not nearly impossible to replace (especially under the sale milestones imposed by the Debtors' DIP financing arrangements).  Given the increasing demands placed upon the potential KERP Participants during the chapter 11 cases, providing compensation designed to motivate key employees to remain with the Debtors through completion of the sale process is critical.

19.      Due to the importance of the KERP Participants to the success of the Debtors' businesses, the Debtors and their advisors developed a compensation plan designed to offer competitive, fair compensation that motivates the KERP Participants to remain with the Debtors. The key terms of the Non-Insider KERP are summarized as follows:

- *Eligible Participants.* The Non-Insider KERP awards will be provided to 29 non-insider, non-executive employees. Although some of the potential KERP Participants have titles like "manager", "controller," or "director," none is an "insider" of the Debtors.  Specifically, the KERP Participants do not include any employee who (a) is appointed or hired directly by the Board; (b) reports directly to the Board or CEO; (c) regularly attends Board meetings; (d) exercises managerial control over, or has responsibility for, the Debtors' operations as a whole; or (e) dictates the Debtors' overall corporate policy, governance, or disposition of corporate assets.

- *Non-Insider KERP Structure*. The Non-Insider KERP will be immediately implemented following approval by the Court.

- ***Form of Non-Insider KERP Awards***. All payments made pursuant to the Non-Insider KERP will be cash payments. No participant will be entitled to receive more than 20% of his annual base salary under the plan (nor, in the case of any discretionary awards from the supplemental cash pool of $50,000 available for persons who are not otherwise KERP Participants, more than $15,000).

- ***Performance Criteria***. The Non-Insider KERP has no performance criteria, but any payment is dependent on a participant's continued employment with the Debtors' during the plan period. If a KERP Participant who receives the first installment under the KERP program voluntarily ceases his or her employment with the Debtors prior to the consummation of a sale (or is terminated "for cause"), such installment shall be recoverable by the Debtors.

- ***Maximum Amount of Non-Insider KERP***. The total amount of the Non-Insider KERP will not exceed $522,000 (inclusive of the supplemental cash pool), which will be funded by the Debtors' existing operations and, pursuant to an amended budget, anticipated DIP loan and sale proceeds.

- ***Payment Dates***. The Non-Insider KERP distributions will be payable in two installments following, respectively, the approval of the KERP and the closing of a sale.

- ***Termination of Employment***. If a participant's employment is terminated by the Debtors without "cause," or due to death or disability, then the full amount of the Non-Insider KERP award that would have been payable based on the participant's continued employment during the plan period would be accelerated and paid.

**B.      Reasonableness of the KERP.**

20.      The Debtors and their advisors evaluated whether the KERP's design, structure, and cost are reasonable and consistent with market practice, keeping in mind the goals of maximizing the estates' value and ensuring operations are conducted in an effective, safe, and stable manner during the chapter 11 cases. In particular, FTI analyzed twelve (12) non-insider plans approved in recent chapter 11 cases during the period from June 2016 through March 2022 (the "KERP Peer Group"). The KERP Peer Group was comprised of comparable non-insider plans (mostly in the oil and gas, and energy industries) with an average total cost of approximately $2.8

8

million.  Among the KERP Peer Group, the average number of non-insider participants was 60 and the average cost per participant was approximately $51,000.  Here, the total cost of the proposed Non-Insider KERP pool is under $522,000 with an average payment per participant of approximately $16,000, well-beneath the costs of comparable retention plans in the KERP Peer Group. In addition, among the few plans in the KERP Peer Group that featured a supplemental cash pool, the amount of the pool was $300,000 – here, the Debtors propose a supplemental cash pool of $50,000.

21.     FTI also looked at the Debtors' historical compensation practices as a gauge for the reasonableness of the KERP program.  Although the Debtors have not historically offered discretionary bonuses to supplement an employee's annual compensation, this is one reason that I believe the proposed KERP will have a meaningful retentive effect

22.     The Non-Insider KERP contemplates an installment payout feature that corresponds to the anticipated sale process in the chapter 11 cases.  The second of the Non-Insider KERP's two installments is distributed at closing of a sale, which provides a retentive effect on the KERP Participants that is directly tied to maintaining the Debtors' current operations through the consummation of a transaction.

## **BASIS FOR RELIEF**

23.     The Debtors respectfully request that the Court grant this Motion for two primary reasons. ***First***, the Non-Insider KERP is an ordinary-course improvement to the Debtors' existing compensation practices that represents a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors' estates.  *See*, *e.g.*, *In re Dana Corp.*, 358 B.R. 567, 581 (Bankr. S.D.N.Y. 2006).  ***Second***, the Non-Insider KERP complies with the requirements of sections

9

503(b) and (c) of the Bankruptcy Code.  For these reasons, the Non-Insider KERP is justified by the facts and circumstances of the Debtors' chapter 11 cases and should be approved.

**A.      The Non-Insider KERP Is an Ordinary Course Transaction Under Section 363(c) of the Bankruptcy Code.**

24.      Under section 363(c)(1) of the Bankruptcy Code, a debtor in possession may "enter into transactions…in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). Courts in the Fifth Circuit and elsewhere apply a two-prong test to determine if a transaction is in the ordinary course of a debtor's business. *See*, *e.g.*, *In re Patriot Place, Ltd.*, 486 B.R. 773, 793 (Bankr. W.D. Tex. 2013) (applying the "horizontal" and "vertical" tests); *In re Dana Corp.*, 358 B.R. at 576–77; *In re Johns-Manville Corp.*, 60 B.R. 612, 616, 618 (Bankr. S.D.N.Y. 1986).

25.      Under the horizontal dimension test, the Court analyzes if the "transaction was of the sort commonly undertaken by companies in the industry."  *Patriot Place*, 486 B.R. at 793;  *In re Cowin*, 2014 WL 1168714, at *40 n.55 (Bankr. S.D. Tex. 2014) (noting the "horizontal dimension test" is also known as the "comparable businesses" test).  Under the vertical dimension test, the Court analyzes if a hypothetical creditor would view the transaction as an ordinary or unusual business practice. *Cowin*, 2014 WL 1168714, at *41, 40 n.55 (noting the "vertical dimension test" is also known as the "creditor expectation test"). If the "transaction is an ordinary one in the debtor's business operation" looking at the debtor's prepetition practices, a hypothetical creditor would not expect notice and a hearing with the opportunity to object.  *Id.*

26.      Here, the Non-Insider KERP satisfies the horizontal dimension test because it is consistent with such plans within the Debtors' industry.  The fuel supply and distribution business is highly competitive and employers often reward employees for continuous service.  *See In re*

10

*Blitz U.S.A. Inc.*, 475 B.R. 209, 215 (Bankr. D. Del. 2012) (approving incentive bonus plans under Section 363(c)(1) where the debtor sought to continue prepetition plans and incentive-based bonus plans that were common in the industry). As discussed above, to establish a reference point for the competitiveness of the Non-Insider KERP, the Debtors examined non-insider compensation plans approved in twelve recent chapter 11 cases for various oil and gas and energy companies. Against that KERP Peer Group, the Non-Insider KERP proposed by the Debtors falls within, and in fact is at the low end of the range of, industry practice.

27. Second, the Non-Insider KERP meets the vertical dimension test because it represents an expected and ordinary improvement to the Debtors' prepetition compensation practices in light of the exigencies attendant a chapter 11 case and a compressed sale process. *See also Dana Corp.*, 358 B.R. 567, 579 (Bankr. S.D.N.Y. 2006) (finding debtor's postpetition incentive program was a "refinement" of historical practices and therefore within the ordinary course of debtor's business). Although the Debtors have not historically offered discretionary bonuses to supplement an employee's salary compensation, the Debtors believe that – for that very reason – the KERP awards will have a meaningful retentive effect.

28. Because the Non-Insider KERP is consistent with industry practice, the Debtors respectfully request that the Court approve the Non-Insider KERP as an ordinary course transaction pursuant to section 363(c) of the Bankruptcy Code.

**B.     Implementing the Non-Insider KERP Is a Proper Exercise of the Debtors' Sound Business Judgment Under Section 363(b) of the Bankruptcy Code.**

29. Section 363(b)(1) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A debtor must show that the decision to use the property outside of the ordinary course of business was based on the debtor's business judgment. *See In re Cont'l*

*Air Lines*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("For a debtor in possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Viking Offshore (USA), Inc.*, 2008 WL 1930056, at *2 (Bankr. S.D. Tex. Apr. 30 2008) (applying the business judgment rule to determine whether the debtors' proposed bonuses were justified outside the ordinary course of business); *see also In re Mesa Air Grp., Inc.*, 2010 WL 3810899, at *3 (Bankr. S.D.N.Y. Sept. 24, 2010) (employee bonus programs can be approved as "valid exercise of their business judgment" under section 363(b)).

30.     Courts give great deference to a debtor's business judgment. "The business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992). "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Johns-Manville*, 60 B.R. at 616; *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task."). That is because courts are "loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence." *In re Integrated Res., Inc.*, 147 B.R. at 656.

31.     There is little doubt the Debtors possess an articulable business purpose to implement the Non-Insider KERP.  The KERP Participants are integral to the day-to-day operations of the Debtors' business and are faced with increasing demands as a result of recent attrition and the Debtors' filing for chapter 11.  The Non-Insider KERP applies to only a core sub-

set of the Debtors' employees, but the Debtors cannot easily replace the KERP Participants without adversely affecting the Debtors' operations or restructuring efforts.

32.     Further, the Non-Insider KERP, developed in consultation with the Debtors' restructuring advisors and key stakeholders, was reviewed and approved by Mr. Healy, the Chief Restructuring Officer, and the Debtors' Executive Vice President/Chief Operations Officer, neither of whom are current or prospective KERP Participants.  The Non-Insider KERP is a valid exercise of the Debtors' business judgment that, respectfully, the Court should approve.

**C.     The Non-Insider KERP Is Justified by the Facts and Circumstances of These Chapter 11 Cases.**

33.     Section 503(c)(3) of the Bankruptcy Code prohibits certain transfers made to managers, consultants, and others that are not justified by the facts and circumstances of a bankruptcy case. *See* 11 U.S.C. § 503(c)(3).  Certain courts have held that section 503(c)(3)'s "facts and circumstances" justification test "creates a standard no different that the business judgment standard under section 363(b) of the Bankruptcy Code." *In re Velo Holdings, Inc.*,  472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012); *In re Alpha Nat. Res., Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va. 2016) ("a majority of courts … agree that the 'facts and circumstances' test of 503(c)(3) is identical to the business judgment standard under 363(b)(1)"); *In re Patriot Coal Corp.*, 492 B.R. 518, 530–31 (Bankr. E.D. Mo. 2013) (using the business judgment test to analyze an incentive plan under section 503(c)(3)); *Dana Corp.*, 358 B.R. at 576–77 (describing six factors to evaluate if a compensation plan meets the "sound business judgment test" under section 503(c)(3)). Other courts have determined that section 503(c)(3) requires the court "to make its own determination that the transaction will serve the interests of creditors and the debtor's estate." *In re Pilgrim's Pride Corp.*, 401 B.R. 229, 237 (Bankr. N.D. Tex. 2009). A court should make this determination based on whether the proposed compensation plan is justified on the facts of a particular case.  *Id.*

34.    Under either the business judgment standard or the standard proposed by *Pilgrim's Pride*, courts have analyzed compensation plans using the six factors identified in *Dana Corp.* to determine whether a compensation proposal is permitted by 503(c)(3).  *See*, *e.g.*, *In re FirstEnergy Sol. Corp.*, 591 B.R. 688, 698 (Bankr. N.D. Ohio 2018) (analyzing a proposed KERP using the *Dana Corp.* factors without deciding whether section 503(c)(3) modifies the business judgment standard); *Patriot Coal*, 492 B.R. at 531 (applying the business judgment standard and analyzing an insider incentive plan and a non-insider retention plan using the *Dana Corp.* factors). The six factors ask:

- Is there a reasonable relationship between the plan proposed and the results to be obtained?

- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities, and earning potential?

- Is the scope of the plan fair and reasonable, does it apply to all employees, or does it discriminate unfairly?

- Is the plan or proposal consistent with industry standards?

- What were the due diligence efforts of the debtor in investigating the need for a plan, analyzing which key employees need to be incentivized, what is available, and what is generally applicable in a particular industry?

- Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*Dana Corp.*, 358 B.R. at 576–77; *see also In re Residential Capital, LLC*, 491 B.R. 73, 85–86 (Bankr. S.D.N.Y. 2013) (applying the *Dana Corp.* factors to the debtors' retention plan for non-insiders and approving the plan as an exercise of sound business judgment).

35.    The Debtors respectfully submit that the Non-Insider KERP satisfies the standards set forth above.

14

i.     **The Non-Insider KERP is Calculated to Achieve the Desired Performance**. The Non-Insider KERP was designed by the Debtors and their advisors to ensure that key non-insider employees are fairly compensated and remain with the Debtors through the conclusion of the sale process.  By providing for two installments, the Non-Insider KERP will encourage KERP Participants to remain employed with the Debtors while the sale process is launched and consummated.  Accordingly, the Non-Insider KERP and the desired retention outcome are strongly correlated.

ii.    **The Cost of the Non-Insider KERP is Reasonable**. The Non-Insider KERP's estimated total program cost will not exceed $522,000 (inclusive of the supplemental cash pool of $50,000 for non-KERP Participants). The KERP Participant pool includes several highly skilled, highly experienced employees that are indispensable to the Debtors' success while in chapter 11.

iii.   **The Scope of the Non-Insider KERP is Fair and Reasonable**. The 29 KERP Participants represent a core group of the Debtors' headquarters and field employees.  The scope of the Non-Insider KERP is fair and reasonable because the participants' retention is necessary to the Debtors' restructuring process.

iv.    **The Non-Insider KERP is Consistent with Industry Standards**. The Debtors and their advisors undertook a benchmarking analysis examining non-insider compensation plans of 12 comparable employers.  This analysis has validated that the Non-Insider KERP is consistent with market practices.

v.     **The Debtors Performed Due Diligence in Developing the Non-Insider KERP**.  The Debtors sought the advice of their advisors in designing an appropriate retention plan for their non-insider employees. The Debtors also engaged their advisors in the selection process to ensure that no KERP Participant was an "insider" and that each KERP Participant was essential to the Debtors' ongoing business restructuring processes.

vi.    **The Debtors Worked with Independent Counsel in Developing the Non-Insider KERP**. The Debtors also worked with their legal advisors regarding the development and implementation of the Non-Insider KERP.

36.     Because implementing the Non-Insider KERP will motivate the Debtors' employees to the benefit of all parties in interest, the Non-Insider KERP reflects a sound exercise of the Debtors' business judgment, and is justified by the facts and circumstances of these chapter 11 cases.  Hence, the Non-Insider KERP satisfies section 503(c)(3) of the Bankruptcy Code.

**D.      Section 503(c)(1) Is Inapplicable to the Non-Insider KERP.**

37.      Section 503(c)(1) of the Bankruptcy Code generally prohibits payments to "insiders" made for the sole or primary purpose of inducing the "insider" to remain with a debtor's business—*i.e.*, those insider plans that are essentially "pay to stay" plans. *See*, *e.g.*, *Borders Grp.*, 453 B.R. at 471.  The Non-Insider KERP is not barred under section 503(c)(1).

38.      Section 101(31) of the Bankruptcy Code provides that where a debtor is a corporation, insiders include any "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor … or (iv) relative of a … director, officer or person in control of the debtor." 11 U.S.C. § 101(31)(B).  An employee may be an "insider" if such employee has "at least a controlling interest in the debtor or … exercises sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets." *Velo Holdings*, 472 B.R. at 208 (citations omitted). An employee's job title, alone, does not make that employee an "insider." *See Borders Grp.*, 453 B.R. at 469 (noting "companies often give employees the title 'director' or 'director- level,' but do not give them decision-making authority akin to an executive" and concluding certain "director level" employees in that case were not insiders).

39.      Here, none of the KERP Participants are "insiders" under section 101(31) of the Code. The KERP Participants lack discretionary control over substantial budgetary amounts as well as significant control with respect to the Debtors' corporate policies or governance. None of these employees was hired or appointed by the Debtors' Board or reports directly to the Board. Thus, although certain KERP Participants hold supervisorial titles, none is an "insider" of the Debtors, which renders section 503(c)(1) inapplicable to the Non-Insider KERP.

40.      Accordingly, the Debtors submit that the Non-Insider KERP should be approved.

## EMERGENCY CONSIDERATION

41.     The Debtors request emergency consideration of the Motion no later than Friday, April 21, 2023.  As set forth above, the Debtors experienced attrition prepetition, which losses were compounded through the departure of additional key employees following the Petition Date. Without prompt assurances provided the Non-Insider KERP, the Debtors risk losing additional key employees, in particular the KERP Participants, who possess skillsets and institutional knowledge vital to the Debtors efforts to maximize value in these Chapter 11 Cases for the benefit of all stakeholders.  Accordingly, emergency consideration of the Motion as requested herein is warranted under the circumstances.

## NOTICE

42.     The Debtors will provide notice of this Motion to the following: (a) the U.S. Trustee for the Southern District of Texas; (b) proposed counsel to the Committee; (c) the DIP Agent and its counsel; (d) the Prepetition Agent and its counsel; (e) Oak Street and its counsel; (f) the parties holding secured claims against the Debtors; (g) the United States Attorney's Office for the Southern District of Texas; (h) the Internal Revenue Service; (i) the United States Securities and Exchange Commission; (j) the state attorneys general  for states in which the Debtors conduct business; (k) governmental agencies having a regulatory or statutory interest in these cases; (l) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business, and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Bankruptcy Local Rule 9013-1(d).  No other or further notice is needed in light of the nature of the relief requested.

*[Remainder of Page Intentionally Left Blank]*

DOCS_NY:47341.7

**CONCLUSION**

**WHEREFORE**, the Debtors request that the Court enter the Order granting the relief requested herein and such other and further relief as may be just and proper under the circumstances.

Dated:   April 11, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Michael D. Warner*
Michael D. Warner (SBT 00792304)
Steven W. Golden (SBT 24099681)
440 Louisiana Street, Suite 900
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile:  (713) 691-9407
mwarner@pszjlaw.com
sgolden@pszjlaw.com

-and-

Jeffrey N. Pomerantz (admitted *pro hac vice*)
Jeffrey W. Dulberg (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
jpomerantz@pszjlaw.com
jdulberg@pszjlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

18

## **CERTIFICATE OF SERVICE**

I certify that on April 11, 2023, I caused a copy of the foregoing document to be served via the Court's CM/ECF noticing system on all parties registered to receive electronic notice in the above cases.

*/s/ Michael D. Warner*
Michael D. Warner

## **CERTIFICATE OF ACCURACY**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Michael D. Warner*
Michael D. Warner

# **<u>EXHIBIT A</u>**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| MOUNTAIN EXPRESS OIL COMPANY, et al., | Case No. 23-90147 (DRJ) |
| Debtors. [1] | (Jointly Administered) |

**DECLARATION OF MICHAEL HEALY IN SUPPORT OF**
**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER**
**(I) AUTHORIZING AND APPROVING A NON-INSIDER**
**KEY EMPLOYEE RETENTION PLAN AND (II) GRANTING RELATED RELIEF**

I, Michael Healy, declare that the following is true to the best of my knowledge, information, and belief:

1.       I am the Chief Restructuring Officer (the "CRO") of Mountain Express Oil Company ("MEX") and its affiliates (collectively, the "Company").  In addition to serving as the Company's CRO, I am a Senior Managing Director at FTI Consulting, Inc. ("FTI"), a leading global business advisory firm with 121 offices worldwide and over 7,600 professionals.  I have more than 20 years of restructuring experience and have advised companies, lenders, creditors, corporate boards and equity sponsors across a diverse range of industries both domestically and internationally.

2.       I submit this declaration (the "Declaration") in support of the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing and Approving a Non-Insider Key Employee*

---

[1]  A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/moutainexpressoil.  The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 Cases is 3650 Mansell Road, Suite 250, Alpharetta, Georgia 30022.

*Retention Plan and (II) Granting Related Relief* (the "KERP Motion"),[2] filed concurrently herewith, of the above-captioned debtors and debtors in possession (the "Debtors").  The KERP Motion requests an order authorizing the Debtors to implement a retention program for a small group of non-insider, non-executive employees.  The program would apply to 29 employees and the total cost of the program would not exceed $522,000 (inclusive of a $50,000 supplemental cash pool for certain non-insider employees that are not otherwise included in the program).

3.      Unless otherwise indicated, the statements set forth in this Declaration are based on (a) my personal knowledge or views based on my experience; (b) information I have received from the Debtors and my colleagues at FTI who are assisting me in my role as CRO, as well as other advisors of the Debtors; and/or (c) my review of relevant documents.  If I were called upon to testify, I would testify competently to the facts and views set forth herein.

4.      Following the commencement of these Chapter 11 cases, the Debtors have suffered unexpected attrition among their rank and file employees working at their corporate headquarters and in certain regional field offices.  Prepetition, the Debtors had already been stretched thin by losses in their accounting, finance and operations departments and cannot suffer further reductions without adversely impacting the conduct of these cases.  Since the petition date alone, the Debtors have lost the services of eight key employees, including a permit and licensing specialist, a retail controller and several district and territory managers.

5.      In order to alleviate the detrimental effect that continued attrition would have on the Debtors' ongoing operations, I worked with the Debtors' management team to formulate a cash-based retention program to retain certain vital employees over the course of the sale process contemplated during the case.  The program applies only to non-insider, non-executive employees

---

[2]  A capitalized term used but not defined herein shall have the meaning ascribed to it in the KERP Motion.

working at the Debtors' headquarters facilities (and a handful of key field employees) but not to retail, store-level employees.   In my view, each of the KERP participants serves a vital role at the Company and cannot be readily replaced.  The KERP program, and each of its 29 participants, has also been vetted and approved by the Debtors' Executive Vice President/Chief Operations Officer.

6.       As described in my First Day Declaration, the Debtors operate a vertically-integrated fuel supply and distribution network.  The Debtors are parties to fuel purchase agreements with virtually every major domestic oil company.  The acquired fuel is then distributed by the Debtors across their network of convenience stores, fuel stations and travel centers.  Some of these are controlled-locations (*i.e.,* where the Debtors hold a leasehold interest in the subject premises), and the remainder are non-controlled locations (*i.e.,* where third parties own the business premises).  The Debtors' controlled locations are partly operated in-house and partly by dealers. The complex, detailed and daily process of tracking and matching fuel purchase and supply commitments requires a highly skilled and dedicated workforce.  The Debtors operate in numerous states, each with varying logistics, permitting and payment stream requirements.

7.       To maintain their high standards and ensure their fuel supply system continues to perform as anticipated, it is vital the Debtors retain their specialized workforce while in chapter 11.  Replacing these employees cannot occur without substantial costs, delays and disruptions in the Debtors' carefully synchronized wholesale and retail operations.

8.       Retaining the Debtors' key non-insider employees is also critical as the Debtors embark on a sale process.  By implementing the KERP program, the Debtors seek to acknowledge the extraordinary work that the headquarters team has been doing since the cases were commenced and to assure these employees that their continued, focused efforts will be recognized.

9.      The KERP program covers 29 KERP Participants.  The program is based on the Debtors' current compensation program (the KERP payments are based on 20% of the employee's annual base salary) and is intended to provide a meaningful reward for employees to remain with the Debtors during the chapter 11 process.  The KERP Participants perform a variety of important business functions for the Debtors that are vital to the Debtors' ability to preserve and enhance stakeholder value.  Most of the KERP Participants are employed in the Debtors' accounting, finance, treasury and operations departments.  Many of them have developed deep institutional knowledge regarding the Debtors' business operations that would be difficult and expensive to replace on an expedited basis.  In addition, the KERP Participants have provided important support to the Debtors' advisors in meeting the additional demands imposed by the chapter 11 process.

10.     The Non-Insider KERP consists of a cash pool for retention payments to 29 non-insiders in an aggregate amount of approximately $521,000.  Each participant is entitled to receive a retention payment not to exceed 20% of such person's base annual salary (with the average payout being approximately $16,268).[3]  Payments to each participant will be structured as two equal cash payments, with half payable shortly following the approval of the KERP program and the balance paid following the consummation of a sale of substantially all of the Debtors' asserts. If a KERP Participant who receives the first installment under the KERP program voluntarily ceases his or her employment prior to the consummation of a sale, such installment would be subject to recapture by the Debtors.  The Non-Insider KERP contemplates an installment payout feature that corresponds to the anticipated sale process in the chapter 11 cases.  The second of the

---

[3]   The KERP also contemplates a modest supplemental cash pool of $50,000 for the purpose of rewarding extraordinary contributions to the Debtors' sale effort.  The supplemental cash pool will be available to those non-insider, non-executive employees who are not KERP Participants.  No more than $15,000 will be awarded to any single employee.  The amount and recipient of any award will be determined by the Debtors' management team, in their discretion.  An award from the supplemental cash pool would be payable at the time the final payment under the KERP program.

Non-Insider KERP's two installments would be distributed at closing of a sale, which provides a retentive effect on the KERP Participants that is directly tied to maintaining the Debtors' current operations through the consummation of a transaction.

11.     Although I have raised the need for a KERP program with advisors to the DIP Lenders, the Approved Budget under the Debtors' DIP financing does not, at present, reflect the cost of the Non-Insider KERP, nor have the DIP Lenders agreed to the proposed KERP program. The Debtors intend to amend the current Approved Budget to reflect the cost of the Non-Insider KERP and will submit the amended budget for review by the DIP Lenders in accordance with the interim order approving the DIP financing that was entered on March 23, 2023.

12.     In formulating the KERP program, we evaluated whether the KERP's design, structure, and cost are reasonable and consistent with market practices.  FTI analyzed twelve (12) non-insider plans approved in recent chapter 11 cases during the period from June 2016 through March 2022 (the "KERP Peer Group").  The KERP Peer Group was comprised of comparable non-insider plans (mostly in the oil and gas, and energy industries) with an average total cost of approximately $2.8 million.  Among the KERP Peer Group, the average number of non-insider participants was 60 and the average cost per participant was approximately $51,000.  Here, the total cost of the proposed Non-Insider KERP pool is under $522,000 with an average payment per participant of approximately $16,000, well-beneath the costs of comparable retention plans in the KERP Peer Group. (In addition, among the few plans in the KERP Peer Group that featured a supplemental cash pool, the amount of the pool was $300,000 – here, the Debtors propose a supplemental cash pool of $50,000.)  FTI also looked at the Debtors' historical compensation practices as a gauge for the reasonableness of the KERP program.  Although the Debtors have not

historically offered discretionary bonuses to supplement an employee's annual compensation, this is one reason that I believe the proposed KERP will have a meaningful retentive effect.

13.     The KERP Participants include highly trained and specialized personnel that would be extremely difficult to replace without a negative effect on the Debtors' business.  Given the increasing demands placed upon the potential KERP Participants during the chapter 11 cases, providing compensation designed to motivate key employees to remain with the Debtors through completion of the sale process is critical.  It is my opinion that the proposed KERP program will serve its intended purpose of maintaining the Debtors' key non-insider workforce intact and engaged through the consummation of a sale.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 11th day of April, 2023, at New York, NY

*/s/ Michael Healy*
Michael Healy