## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re:<br><br>MOUNTAIN EXPRESS OIL COMPANY, et al.,<br><br>Debtors. [1] | Chapter 11<br><br>Case No. 23-90147 (DRJ)<br><br>(Jointly Administered)<br><br>**Related Docket Nos. 117 and 247** |

### WITNESS AND EXHIBIT LIST

Mountain Express Oil Company and certain of its affiliates (collectively, the "Debtors") hereby submits the following *Witness and Exhibit List* (the "Witness and Exhibit List") with respect to the hearing scheduled on April 25, 2023 at 11:00 a.m. (CT), in the above-captioned bankruptcy cases (the "Cases"), pending before the Honorable David R. Jones, United States Bankruptcy Judge, Courtroom 400, 515 Rusk, Houston, Texas 77002.

### WITNESS LIST

The Debtors may call the following witnesses:

1.      Michael Healy, Chief Restructuring Officer.

2.      Geoffrey Richards, Raymond James & Associates, Inc. (proposed Investment Banker)

3.      Any witness listed, offered, or called by any other party.

4.      Any witness required for rebuttal or impeachment.

---

[1]      A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/mountainexpressoil. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 Cases is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022.

**EXHIBIT LIST**

| Exhibit No. | Description | Offered | Objection | Admitted | Disposition After Hearing |
|---|---|---|---|---|---|
| 1. | Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement [Docket No. 117] | | | | |
| 2. | Updated DIP Budget – To be Filed. | | | | |
| 3. | Declaration Of Michael Healy In Support Of Debtors' Chapter 11 Petitions And First Day Relief [Docket No. 57] | | | | |
| 4. | Declaration Of Geoffrey Richards In Support Of Debtors' Emergency Motion For Entry Of Interim And Final Orders (I) Authorizing The Debtors To (A) Obtain Postpetition Financing And (B) Use Cash Collateral, (II) Granting Liens And Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection To Prepetition Secured Parties, (IV) Modifying The Automatic Stay, (V) Scheduling A Final Hearing, And (VI) Granting Related Relief [Docket No. 106] | | | | |
| 5. | Declaration Of Michael Healy In Support Of Debtors' Emergency Motion For Entry Of Interim And Final Orders (I) Authorizing The Debtors To (A) Obtain Postpetition Financing And (B) Use Cash Collateral, (II) Granting Liens And Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection To Prepetition Secured Parties, (IV) Modifying The Automatic Stay, (V) Scheduling A Final Hearing, And (VI) Granting Related Relief [Docket No. 107] | | | | |
| 6. | Declaration of Michael Healy in Support of Debtors' Emergency Motion for Entry of an Order (I) Authorizing and Approving a Non9Insider Key Employee Retention Plan and (II) Granting Related Relief [Docket No. 247] | | | | |
| 7. | Any exhibits listed, designated, or offered by any other party. | | | | |
| 8. | Any exhibits necessary for rebuttal. | | | | |
| 9. | Any pleading or other document filed with the Court on the docket of the above-captioned chapter 11 cases and related adversary proceedings | | | | |

DOCS_NY:47396.1 58614/002

The Debtors reserve the right to modify, amend or supplement this Witness and Exhibit List at any time.  The Debtors reserve the right to ask the Court to take judicial notice of pleadings, orders, transcripts and/or documents filed in or in connection with these Cases, to offer rebuttal exhibits, and to supplement or amend this Witness and Exhibit List at any time prior to the April 25, 2023 hearing.  Designation of any exhibit above does not waive any objections the Debtors may have to any exhibit listed on any other party's exhibit list.

Dated:  April 21, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Michael D. Warner*
Michael D. Warner (TX Bar No. 00792304)
Steven W. Golden (TX Bar No. 24099681)
440 Louisiana Street, Suite 900
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile:  (713) 691-9407
mwarner@pszjlaw.com
sgolden@pszjlaw.com

-and-

Jeffrey N. Pomerantz (admitted *pro hac vice*)
Jeffrey W. Dulberg (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
jpomerantz@pszjlaw.com
jdulberg@pszjlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of April, 2023, a true and correct copy of the above and foregoing has been served on all parties that are registered to receive electronic transmission through this Court's CM/ECF filing system in these cases.

*/s/ Michael D. Warner*
Michael D. Warner

# EXHIBIT 1

EXECUTION VERSION

**SENIOR SECURED, SUPER-PRIORITY**

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

among

**MOUNTAIN EXPRESS OIL COMPANY**,
*as Borrower*,

**THE GUARANTORS FROM TIME TO TIME PARTY TO THIS AGREEMENT**,

**FIRST HORIZON BANK**,
*as Administrative Agent and LC Issuer*,

and

**THE LENDERS FROM TIME TO TIME PARTY HERETO**

**Dated: March 23, 2023**

# TABLE OF CONTENTS

1.1    Definitions ........................................................................................ 2
1.2    Other Definitional Provisions ......................................................... 30
1.3    [Reserved] ....................................................................................... 31
1.4    Accounting Terms ........................................................................... 31
1.5    UCC Terms ...................................................................................... 31
1.6    Rounding ......................................................................................... 31
1.7    References to Agreement and Laws ................................................. 32
1.8    Time ................................................................................................ 32
1.9    Divisions ......................................................................................... 32
1.10   [Reserved] ....................................................................................... 32
1.11   Superpriority Administrative Expense Claim .................................. 32
1.12   Waiver of Any Priming Rights ....................................................... 32
1.13   Waiver of Claims to Surcharge ....................................................... 32

ARTICLE 2 COMMITMENTS, LOANS, AND LCS .................................................33

2.1    [Reserved] ....................................................................................... 33
2.2    [Reserved] ....................................................................................... 33
2.3    Facility ............................................................................................ 33
2.4    Method of Borrowing, Funding of Loans, and Minimum Amounts.... 34
2.5    Subfacility for Letters of Credit ..................................................... 34
2.6    Cash Collateral ............................................................................... 37
2.7    Defaulting Lenders ......................................................................... 38
2.8    Acknowledgement and Consent to Bail-In of Affected Financial
       Institutions ...................................................................................... 40

ARTICLE 3 INTEREST, FEES, AND PAYMENTS ................................................41

3.1    Interest Rates .................................................................................. 41
3.2    Payment of Principal and Interest .................................................. 41
3.3    Prepayments .................................................................................... 41
3.4    Computations of Interest and Fees .................................................. 43
3.5    General Payment Terms .................................................................. 43
3.6    Pro Rata Treatment and Sharing of Payments ................................ 45
3.7    Right of Setoff ................................................................................ 47
3.8    Fees ................................................................................................. 47

ARTICLE 4 TAXES, YIELD PROTECTION AND ILLEGALITY ...........................48

4.1    Taxes .............................................................................................. 48
4.2    Increased Costs ............................................................................... 53
4.3    [Reserved] ....................................................................................... 54
4.4    [Reserved] ....................................................................................... 54
4.5    [Reserved] ....................................................................................... 54
4.6    Requests for Compensation ............................................................ 54

i

4.7     Mitigation of Obligations; Replacement of Lenders ........................................... 54
4.8     [Reserved] ........................................................................................................ 55
4.9     Survival ............................................................................................................ 56

ARTICLE 5 COLLATERAL AND GUARANTIES ......................................................56

5.1     Collateral ......................................................................................................... 56
5.2     [Reserved] ........................................................................................................ 56
5.3     Perfection; Financing Statements ..................................................................... 56
5.4     Grants, Rights, and Remedies ........................................................................... 56
5.5     Further Assurances – Collateral ........................................................................ 56
5.6     Liens Granted to the Administrative Agent ....................................................... 56

ARTICLE 6 CONDITIONS PRECEDENT .................................................................57

6.1     Initial Credit Extension .................................................................................... 57
6.2     Conditions to All Credit Extensions ................................................................. 58

ARTICLE 7 REPRESENTATIONS AND WARRANTIES............................................59

7.1     Existence and Power ......................................................................................... 59
7.2     Authorization and No Conflicts ........................................................................ 59
7.3     Enforceability ................................................................................................... 59
7.4     Subsidiaries ...................................................................................................... 59
7.5     Debt .................................................................................................................. 60
7.6     Liens ................................................................................................................. 60
7.7     Ownership and Location of Assets .................................................................... 60
7.8     Intellectual Property ......................................................................................... 60
7.9     Place of Business .............................................................................................. 60
7.10    Financial Information ........................................................................................ 61
7.11    Compliance with Laws ..................................................................................... 61
7.12    Material Agreements ......................................................................................... 61
7.13    Litigation .......................................................................................................... 61
7.14    Taxes ................................................................................................................ 61
7.15    Environmental Matters ..................................................................................... 62
7.16    Insurance .......................................................................................................... 62
7.17    Margin Regulations .......................................................................................... 62
7.18    Trade Names ..................................................................................................... 62
7.19    Transactions with Affiliates .............................................................................. 62
7.20    ERISA .............................................................................................................. 62
7.21    Labor Matters ................................................................................................... 62
7.22    Investment Company Act .................................................................................. 63
7.23    Anti-Corruption Laws and Sanctions ............................................................... 63
7.24    Patriot Act ........................................................................................................ 63
7.25    [Reserved] ........................................................................................................ 63
7.26    No Restrictive Agreement ................................................................................. 63
7.27    Approved Budget .............................................................................................. 63

7.28     Financing Orders ......................................................................... 63
7.29     Super-Priority Claims ................................................................. 64

ARTICLE 8 AFFIRMATIVE COVENANTS ...................................................... 64

8.1      Reporting Requirements ............................................................. 64
8.2      Keeping Books and Records ...................................................... 66
8.3      Inspection; Collateral Examinations ......................................... 66
8.4      Maintenance of Existence .......................................................... 66
8.5      Maintenance of Properties .......................................................... 66
8.6      Insurance .................................................................................... 67
8.7      Compliance with Laws .............................................................. 67
8.8      Compliance with Agreements ................................................... 67
8.9      Payment of Taxes ....................................................................... 67
8.10    Payment of Obligations ............................................................. 67
8.11    [Reserved] .................................................................................. 67
8.12    ERISA ........................................................................................ 68
8.13    Conduct Business ....................................................................... 68
8.14    Banking Relationship ................................................................. 68
8.15    Proceeds ...................................................................................... 68
8.16    Preserve Collateral ..................................................................... 68
8.17    [Reserved] .................................................................................. 68
8.18    Further Assurances ..................................................................... 69
8.19    Budget Compliance .................................................................... 69
8.20    Milestones .................................................................................. 69
8.21    Roll-Up Amount ........................................................................ 69

ARTICLE 9 NEGATIVE COVENANTS ............................................................. 69

9.1      Debt ............................................................................................ 69
9.2      Limitation on Liens .................................................................... 70
9.3      Acquisitions, Mergers, and Other Fundamental Changes ......... 70
9.4      Disposition of Assets ................................................................. 70
9.5      Restricted Payments ................................................................... 71
9.6      Investments ................................................................................ 71
9.7      Compliance with Environmental Laws ..................................... 71
9.8      Accounting ................................................................................. 71
9.9      Change of Business .................................................................... 71
9.10    Transactions With Affiliates ...................................................... 71
9.11    Hedge Agreements ..................................................................... 71
9.12    Compliance with Government Regulations ................................ 72
9.13    Organizational Documents; Material Agreements ..................... 72
9.14    Prepayment of Debt; Payment of Subordinated Debt ............... 72
9.15    Restrictive Agreement ............................................................... 72
9.16    Sale and Leaseback Transactions .............................................. 72
9.17    Financing Orders; Administrative Priority; Lien Priority; Payment of
        Claims ........................................................................................ 73

iii

ARTICLE 10 [RESERVED] ...........................................................................................73

ARTICLE 11 DEFAULT ................................................................................................73

    11.1   Default.............................................................................................. 73
    11.2   Remedies Upon Default .................................................................... 77
    11.3   Cash Collateral ................................................................................. 78
    11.4   Performance by Administrative Agent ............................................... 78
    11.5   Application of Liquidation Proceeds .................................................. 78

ARTICLE 12 THE ADMINISTRATIVE AGENT ...........................................................79

    12.1   Appointment and Authority ............................................................... 79
    12.2   Rights as a Lender............................................................................. 79
    12.3   Exculpatory Provisions ..................................................................... 79
    12.4   Reliance by Administrative Agent ..................................................... 80
    12.5   Delegation of Duties ......................................................................... 81
    12.6   Resignation of Administrative Agent ................................................ 81
    12.7   Non-Reliance on Administrative Agent and Other Lenders................. 82
    12.8   No Other Duties, etc ......................................................................... 82
    12.9   Administrative Agent May File Proofs of Claim................................. 82
    12.10  Collateral and Guaranty Matters ...................................................... 83
    12.11  Other Agents .................................................................................... 84
    12.12  Lender ERISA Representations ......................................................... 84

ARTICLE 13 GUARANTY ............................................................................................87

    13.1   Guaranty ........................................................................................... 87
    13.2   Obligations Unconditional ................................................................ 87
    13.3   Reinstatement ................................................................................... 88
    13.4   Certain Additional Waivers .............................................................. 88
    13.5   Remedies.......................................................................................... 88
    13.6   Rights of Contribution ...................................................................... 89
    13.7   Guarantee of Payment; Continuing Guarantee ................................... 90

ARTICLE 14 MISCELLANEOUS .................................................................................90

    14.1   Notices ............................................................................................. 90
    14.2   No Deemed Waiver; Cumulative Remedies ....................................... 92
    14.3   Expenses; Indemnity; Damage Waiver; Costs and Expenses............... 93
    14.4   Survival ........................................................................................... 95
    14.5   Governing Law and Jurisdiction ....................................................... 95
    14.6   Waiver of Jury Trial.......................................................................... 96
    14.7   Successors and Assigns...................................................................... 96
    14.8   Amendments, Consents, and Waivers ................................................ 100
    14.9   Limitation of Liability....................................................................... 102
    14.10  Survival ........................................................................................... 102
    14.11  Patriot Act; KYC Information ........................................................... 103

14.12   Foreign Lender Reporting Requirements.................................................... 104

14.13   Document Imaging............................................................................... 104

14.14   Counterparts; Integration; Effectiveness; Electronic Execution...................... 104

14.15   Treatment of Certain Information; Confidentiality...................................... 104

14.16   Severability ...................................................................................... 105

14.17   Erroneous Payments............................................................................ 105

14.18   Waiver of Effect of Corporate Seal ........................................................ 108

14.19   [Reserved]........................................................................................ 108

14.20   ENTIRE AGREEMENT ...................................................................... 108

14.21   Agent and Lenders as Party-in-Interest.................................................... 108

14.22   Waiver of Right to Obtain Alternative Financing....................................... 109

14.23   Releases........................................................................................... 109

14.24   Conflict of Terms .............................................................................. 109

DOCS_SF:108642.3 58614/002

## SCHEDULES AND EXHIBITS

Schedule 1            Lenders and Commitments
Schedule 2            Prepetition LCs



Exhibit A             Form of Loan Note
Exhibit B             Borrowing Request
Exhibit C             [Reserved]
Exhibit D             Assignment and Assumption Agreement
Exhibit E-1 – E-4     Form of U.S. Tax Compliance Certificate
Exhibit F             Approved Budget

vi

**Error! Unknown document property name.**

**SENIOR SECURED, SUPER-PRIORITY**

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

THIS SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of March 23, 2023 (this "Agreement"), is among MOUNTAIN EXPRESS OIL COMPANY, a Georgia corporation (the "Company" or the "Borrower"), the Guarantors from time to time party to this Agreement (together with the Borrower, the "Loan Parties"), the Lenders from time to time party to this Agreement, and FIRST HORIZON BANK, as Administrative Agent and the LC Issuer.

**RECITALS:**

WHEREAS, on March 18, 2023 (the "Petition Date"), the Loan Parties commenced jointly administered voluntary cases under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") (each a "Case" and, collectively, the "Cases");

WHEREAS, as of the Petition Date, certain of the Loan Parties and the Prepetition Lenders (each as defined below) are parties to that certain First Amended and Restated Credit Agreement, dated as of March 12, 2020 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Credit Agreement"), pursuant to which the Prepetition Lenders provided financing to the Borrower and the obligations under which were secured by security interests in the Prepetition Collateral (as defined below);

WHEREAS, since the Petition Date, the Loan Parties have continued, and intend to continue to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Loan Parties need financing in order to fund their respective business operations during the course of the Cases and have asked the Lenders to make loans and advances to the Borrower in a principal amount not to exceed **$28,600,000.00** (the "Maximum Advance Amount") in the aggregate pursuant to sections 364(c) and 364(d) of the Bankruptcy Code which shall consist of (a) an Initial Advance in the amount of **$20,000,000.00**, plus (b) from and after the Final DIP Order Entry Date, the Roll-up Amount (as defined herein) plus (c) after the Final DIP Order Entry Date, a further advance in an aggregate amount of **$8,600,000.00** in accordance with the Approved Budget;

WHEREAS, the Lenders are willing to extend credit to the Borrower, subject to the terms and conditions set forth herein, in the other Loan Documents, and the proposed orders of the Bankruptcy Court approving the proposed financing, and in accordance with sections 364(c) and 364(d) of the Bankruptcy Code, including that all of the Obligations (i) are secured by Liens on the Collateral granted by the Loan Parties, subject in priority only to certain Permitted Liens and the Carve-Out, as hereinafter provided, and (ii) constitute allowed superpriority administrative expense claims pursuant to sections 364(c) and 364(d)(1) of the Bankruptcy Code, subject in

1

priority only to the Carve-Out, in each case as set forth herein and in the Interim DIP Order and the Final DIP Order, as applicable; and

WHEREAS, the Loan Parties have agreed to provide such collateral security, superpriority claims and adequate protection, subject to the approval of the Bankruptcy Court.

NOW THEREFORE, in consideration of the premises, the mutual benefits to be derived from this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

DEFINITIONS

1.1     **Definitions**.  As used in this Agreement, the following terms have the following meanings:

"Acceptable Form" means in form and substance satisfactory to the Administrative Agent in its Permitted Discretion.

"Acquisition" means, as to any Person, the purchase or other acquisition (in one transaction or a series of transactions, including through a merger or division) of more than 50% the Equity Interests of another Person or all or substantially all of the property, assets or business of another Person or of the assets constituting a business unit, line of business or division of another Person.

"Acquisition Cost" means, with respect to any Acquisition, as of the date of entering into any agreement therefor, the sum of the following (without duplication): (a) the value of the Equity Interests of any Loan Party or any of its Subsidiaries to be transferred in connection with such Acquisition; (b) the amount of any cash and the fair market value of other property (excluding property described in *clause (a)* and the unpaid principal amount of any instrument evidencing Debt) given as consideration in connection with such Acquisition; (c) the amount (determined by using the face amount or the amount payable at maturity, whichever is greater) of any Debt incurred, assumed or acquired by any Loan Party or any of its Subsidiaries in connection with such Acquisition; (d) all additional purchase price amounts in the form of earnouts and other contingent obligations that should be recorded on the financial statements of the Borrower and its Subsidiaries in accordance with GAAP in connection with such Acquisition; (e) all amounts paid in respect of covenants not to compete and consulting agreements that should be recorded on the financial statements of the Borrower and its Subsidiaries in accordance with GAAP in connection with such Acquisition; and (f) the aggregate fair market value of all other consideration given by any Loan Party or any of its Subsidiaries in connection with such Acquisition.  For purposes of determining the Acquisition Cost for any transaction, the Equity Interests of any Loan Party or any of its Subsidiaries shall be valued in accordance with GAAP.

"Administrative Agent" or "Agent" means FIRST HORIZON BANK (formerly known as IBERIABANK, a division of First Horizon Bank), or any successor administrative agent appointed pursuant to Section 12.6.

2

"Administrative Agent's Office" means the Administrative Agent's address as set out in Section 14.1, or such other address as the Administrative Agent may from time to time provide notice to Borrower and the Lenders.

"Administrative Questionnaire" means an administrative questionnaire in a form supplied by the Administrative Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, with respect to a specified Person, (a) another Person that directly or indirectly, through one or more intermediaries, Controls or is Controlled by or is under common Control with the specified Person, (b) another Person that directly or indirectly owns or holds (i) ten percent (10%) or more of any class of Equity Interests with voting power in the specified Person or (ii) ten percent (10%) or more of the Equity Interests in the specified Person, or (c) any officer, director, manager, or partner of the specified Person.

"Agent Assignee" is defined in Section 14.17(d).

"Agreement" means this Senior-Secured Super-Priority Debtor-In-Possession Credit Agreement together with all schedules and exhibits, in each case, as amended, restated, increased, or supplemented.

"Anti-Corruption Laws" means all laws, rules, and regulations of any Governmental Authority applicable to the Borrower and its Subsidiaries from time to time concerning or relating to bribery, money laundering or corruption.

"Applicable Law" means all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority (whether or not such orders, requests, licenses, authorizations, permits or agreements have the force of law) including all Environmental Laws.

"Approved Appraiser" means an appraiser with expertise in the appraisal of real estate in the applicable jurisdiction and that is acceptable to Administrative Agent in its Permitted Discretion.

"Approved Budget" means a rolling 13-week cash flow budget, an initial form of which is attached hereto as Exhibit F, prepared by CRO and approved by the Borrower, on a consolidated and consolidating basis, showing projected weekly cash receipts and cash disbursements for the Borrower and its Subsidiaries, in form and substance acceptable to Lenders, which shall be updated in accordance with Section 8.1(c).

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 14.7), and accepted by the Administrative Agent, in substantially the form of Exhibit D or any other form approved by the Administrative Agent.

"Attributable Debt" means, as of any date of determination, (a) in respect of any Capital Lease Obligation of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a capital lease.

"Auto-Renewal LC" is defined in Section 2.5(a)(iv).

"Avoidance Actions" means any and all actions to avoid or recover a transfer of property of the Loan Parties' bankruptcy estate or an interest of any Loan Party in property, which any such Loan Party, a trustee, debtor in possession or other appropriate party in interest may assert on behalf of such Loan Party's estate under Chapter 5 of the Bankruptcy Code, including actions under one or more provisions of Section 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code or under any other similar applicable federal, state or common law, and any and all other causes of action, grievances, arbitrations, actions, suits, demands, demand letters, claims, complaints, notices of non-compliance or violation, enforcement actions, investigations or proceedings that a Loan Party may assert under Chapter 5 of the Bankruptcy Code or any similar Applicable Law.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers of the applicable EEA Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, rule, regulation or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bank Product Agreement" means an agreement or other arrangement under which Bank Products are provided.

"Bank Product Liabilities" means the indebtedness, obligations and liabilities of any Loan Party to any Bank Product Provider which provides any Bank Products to such Loan Party (including all obligations and liabilities owing in respect of any returned items deposited with such Bank Product Provider).

"Bank Products" means the following products or services, (a) credit cards, (b) credit card processing services, (c) debit cards and stored value cards, (d) commercial cards, (e) ACH

4

transactions, and (f) Bank Product and treasury management services and products, including controlled disbursement accounts or services, lockboxes, automated clearinghouse transactions, return items, overdrafts, and interstate depository network services.

"Bank Product Provider" means any Lender, or any Affiliate of any Lender, which provides Bank Products to any Loan Party under a Bank Product Agreement.

"Bankruptcy Code" has the meaning ascribed to it in the Recitals to this Agreement.

"Bankruptcy Court" has the meaning ascribed to it in the Recitals to this Agreement.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and is subject to Section 4975 of the Code or (c) any Person whose assets include the assets of any such "employee benefit plan" or "plan".

"BHC Act Affiliate" is defined in Section 2.9(b).

"Borrowing" means Term Loans.

"Borrowing Request" means a written request substantially in the form of Exhibit B, which is fully completed and executed by a Responsible Officer of Borrower.

"Building" has the meaning assigned to such term in the applicable Flood Insurance Regulation.

"Business Day" means any day that is not a Saturday, Sunday or a day on which commercial banks in New York, New York, or the jurisdiction in which the Administrative Agent's Office is located, are authorized or required by law to close.

"Capital Expenditure" means, for any Person, any expenditure or commitment to expend money for any purchase or other acquisition of any asset which would be classified as a fixed or capital asset on a consolidated balance sheet of any such Person in accordance with GAAP.

"Capital Lease Obligation" means, for any Person, the obligations required to be classified and accounted for as a capital lease on a balance sheet of any such Person in accordance with GAAP.

"Carve-Out" has the meaning ascribed to it in the Financing Orders.

"Case" has the meaning ascribed to it in the Recitals to this Agreement.

"Cash Collateral" means cash and Cash Equivalents pledged as Collateral to the Administrative Agent and deposited into a cash collateral account maintained with (or on behalf

of) the Administrative Agent, and under the sole dominion and control of the Administrative Agent, pursuant to documentation in Acceptable Form.

"Cash Collateralize" means to pledge and deposit Cash Collateral (or other credit support pursuant to documentation in Acceptable Form) in an amount equal to at least 105% of the applicable credit exposure, for the benefit of one or more of the (a) LC Issuer, as collateral for LC Exposure, or (b) Lenders as collateral for the obligations of Lenders to purchase participations in respect of LC Exposure.

"Cash Equivalents" means, collectively, (a) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the U.S. (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the U.S.), in each case maturing within one year from the date of acquisition thereof, (b) investments in commercial paper maturing within 270 days after the date of acquisition thereof and currently having the highest rating obtainable from a Credit Rating Agency, (c) investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the U.S. of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000, (d) fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above, and (e) money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA and Aaa (or equivalent rating) by at least two Credit Rating Agencies and (iii) have portfolio assets of at least $5,000,000,000.

"Cash Management Order" means the order of the Bankruptcy Court entered in the Cases after the "first day" hearing, together with all extensions, modifications and amendments thereto, in form and substance reasonably satisfactory to the Administrative Agent, which among other matters authorizes the Loan Parties to maintain their existing cash management and treasury arrangements (as set forth in the Prepetition Credit Agreement and the Financing Orders) or such other arrangements as shall be reasonably acceptable to the Administrative Agent in all material respects.

"CFTC" means the Commodity Futures Trading Commission or any successor thereto.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided that* notwithstanding anything in this Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the U.S. or foreign regulatory authorities, in

each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or "group" (within the meaning of Exchange Act) of 15% or more of the voting Equity Interests of Borrower; (b) a majority of the seats (other than vacant seats) of the Governing Body of Borrower shall be occupied by Persons who are neither (i) nominated by the Governing Body of Borrower nor (ii) appointed by directors so nominated; (c) the acquisition of direct or indirect Control of Borrower by any Person or "group" (within the meaning of Exchange Act); or (d) any sale, lease, exchange, transfer, or other Dispositions (in a single transaction or in a series of related transactions) of any Loan Party or any of its Subsidiaries, or all or substantially all of the assets of any Loan Party or any of its Subsidiaries, except pursuant to a transaction expressly permitted under this Agreement.

"Claim" has the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code.

"Closing Certification" is defined in Section 8.1(l).

"Closing Date" means the date on which this Agreement has been executed and delivered by the parties hereto and the conditions set out in Section 6.1 have been satisfied or waived in writing in accordance with this Agreement.

"Collateral" means any and all property owned, leased, or operated by a Person covered by the Security Documents and any and all other property of any Loan Party, now existing or hereafter acquired, that may at any time be, become or intended to be, subject to a security interest or Lien in favor of the Administrative Agent, on behalf of itself and the Lenders and other Secured Parties, to secure the Obligations, including, without limitation, (a) the Collateral (as such term is defined in the Prepetition Credit Agreement), (b) all property of any Loan Party in which a Lien is granted to the Agent under the Financing Orders, (c) all other property that is subject to any Lien in favor of Agent or any sub-agent for the benefit of Lenders pursuant to any Security Document, and (d) all of the proceeds (as such term is defined in the UCC) and products, whether tangible or intangible, of any of the foregoing, money, or other tangible or intangible property resulting from the sale, lease, license, exchange, collection, or other disposition of any of the foregoing, the proceeds of any award in condemnation with respect to any of the foregoing, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and the proceeds thereof, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, or guaranty payable by reason of loss or damage to, or otherwise with respect to any of the foregoing; provided that the Collateral shall not include Avoidance Actions or the proceeds thereof prior to the entry of the Final DIP Order.

"Collateral Access Agreement" means a landlord waiver or subordination agreement, bailee letter, or acknowledgment agreement of any lessor, warehouseman, processor, consignee, or other Person in possession of, having a Lien upon, or having rights or interests in any Loan Party's or any of its Subsidiaries' books and records, equipment, or inventory, in each case, in form and substance acceptable to the Administrative Agent.

"Collateral Examination" means audits, verifications and inspections of (a) the Collateral, (b) the accounting and financial processes and procedures of Borrower and the other Loan Parties pertaining to the Collateral, and (c) the books, records and documents of Borrower and the other Loan Parties pertaining to the Collateral, in each case conducted by a Person (which may be an employee of Administrative Agent or any Lender, or may be an independent third party) satisfactory to Required Lenders.

"Commitment" means (a) as to all Lenders, the aggregate commitment of all Lenders to make the Term Loan in an aggregate amount not to exceed the Committed Amount, and (b) as to any Lender, the obligation of such Lender to make a portion of the Term Loan under this Agreement in an aggregate principal amount not to exceed the Committed Amount for such Lender (inclusive of such Lender's share of the Roll-up Amount).

"Committed Amount" means (a) as to all Lenders, the aggregate amount set out for the Lenders on Schedule 1 (inclusive of the Roll-up Amount) (as such amount may be modified at any time or from time to time pursuant to any Assignment and Assumption or otherwise pursuant to the terms of this Agreement) and (b) as to any Lender, the amount set out opposite such Lender's name on Schedule 1 as its Committed Amount (inclusive of such Lender's share of the Roll-up Amount) (as such amount may be modified at any time or from time to time pursuant to the terms of this Agreement).

"Commitment Percentage" means, as to any Lender, (a) prior to the entry of the Final DIP Order, the *ratio of* (i) the Committed Amount of such Lender to (ii) the Committed Amount of all the Lenders, and (b) after the funding of the Term Loan, the *ratio of* (i) the Term Principal Amount of such Lender to (ii) the Term Principal Amount of all Lenders.

"Committee" means any official committee of unsecured creditors appointed by the United States Trustee in relation to any of the Cases.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 *et seq*.), as amended, and all related rules, regulations and published interpretations.

"Communications" is defined in Section 14.1(d)(ii).

"Company" has the meaning given such term in the Preamble to this Agreement.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Contribution Share" is defined in Section 13.6.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract, or otherwise, and the terms Controls, Controlling, and Controlled have meanings analogous thereto.

8

"Control Account Agreement" means any tri-party agreement by and among a Loan Party, the Administrative Agent and a depositary bank or securities intermediary at which such Loan Party maintains a Controlled Account, in each case in form and substance satisfactory to the Administrative Agent.

"Controlled Account" is defined in Section 8.14(a).

"Covered Party" is defined in Section 2.9(a).

"Credit Extension" means the making, conversion, or continuation of a Loan or the issuance, amendment, renewal, or increase of an LC.

"Credit Rating Agency" means (a) S&P, (b) Moody's, or (c) another nationally recognized credit rating agency that evaluates the financial condition of issuers of debt instruments and then assigns a rating that reflects its assessment of the issuer's ability to make debt payments.

"CRO" means Michael Healy of FTI Consulting.

"Current Financials" means, when determined, the consolidated financial statements of Borrower most recently delivered to the Administrative Agent in accordance with Section 8.1.

"Debt" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP (a) all Funded Debt and all other obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments, (b) all direct or contingent obligations of such Person arising under (i) letters of credit (including standby and commercial), bankers' acceptances and bank guaranties and (ii) surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person, (c) all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business; provided that, for purposes of Section 11.1(h), trade payables overdue by more than 120 days shall be included in this definition and shall constitute Debt except to the extent that any of such trade payables are being disputed in good faith and by appropriate proceedings and as to which reserves have been established in accordance with GAAP), (d) indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse, (e) all Attributable Debt, (f) all obligations of such Person in respect of Disqualified Equity Interests, (g) all other obligations required by GAAP to be classified upon such Person's balance sheet as liabilities and (h) all Guarantees of such Person in respect of any of the foregoing.  For all purposes hereof, the Debt of any Person shall include the Debt of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Debt is expressly made non-recourse to such Person.  The amount of any Debt of any Person for purposes of *clause (e)* that is expressly made non-recourse or limited-recourse (limited solely to the assets securing such Debt) to such Person shall be deemed to be equal to the lesser of (i) the aggregate principal amount of such Debt and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

9

"Debtor Relief Laws" means the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, fraudulent transfer, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, suspension of payments, or similar debtor relief laws of the U.S.  or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" has the meaning specified in Section 11.1.

"Default Rate" means the *lesser of* (a) the Maximum Rate and (b) a rate per annum of five percent (5%) in excess of the rate then applicable to Loans.

"Default Right" is defined in Section 2.9(b).

"Defaulting Lender" means any Lender that

(a)      has failed to (i) fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded under this Agreement unless such Lender notifies the Administrative Agent and Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable Default or Potential Default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent, the LC Issuer or any other Lender any other amount required to be paid by it under this Agreement (including in respect of its participation in LCs) within two (2) Business Days of the date when due,

(b)      has notified Borrower, the Administrative Agent or the LC Issuer in writing that it does not intend to comply with its funding obligations under this Agreement, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan under this Agreement and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable Default or Potential Default, shall be specifically identified in such writing or public statement) cannot be satisfied),

(c)      has failed, within three (3) Business Days after written request by the Administrative Agent or Borrower, to confirm in writing to the Administrative Agent and Borrower that it will comply with its prospective funding obligations under this Agreement (*provided that*, such Lender shall cease to be a Defaulting Lender pursuant to this *clause (c)* upon receipt of such written confirmation by the Administrative Agent and Borrower), or

(d)      has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the FDIC or any other state or federal regulatory authority acting in such a capacity, or (iii) become the subject of a Bail-In Action;

*provided that*, a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof

by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the U.S. or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of *clauses (a) through (d)* above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to Borrower, the LC Issuer, and each Lender.

"DIP Financing Motion" means the motion of Loan Parties filed with the Bankruptcy Court seeking approval of this Agreement, the other Loan Documents, the financing and other transactions provided for herein, and entry of the Financing Orders.

"Disclosure Schedules" means the Loan Parties' disclosure schedules to the Bankruptcy Court.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition of any property by any Person (including any Sale and Leaseback Transaction and any issuance of Equity Interests by a Subsidiary of such Person), including (a) any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith, and (b) the granting of any option or other right to do any of the foregoing.

"Disqualified Equity Interest" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interest into which it is convertible or for which it is exchangeable) or upon the happening of any event or condition, (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (b) is redeemable at the option of the holder thereof, (c) provides for the scheduled payment of dividends in cash, or (d) is or becomes convertible into or exchangeable for Debt or any other Equity Interests that would constitute a Disqualified Equity Interest, in each case, prior to the date that is 180 days after the Maturity Date, *provided that*, if such Equity Interests are issued pursuant to a plan for the benefit of employees of any Loan Party or any of its Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by the Loan Party or any of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability.

"Distribution" means (a) any dividend, distribution, or other payment (whether in cash, securities, or other property) in respect of the Equity Interests of a Person, (b) any redemption, purchase, retirement or other acquisition by a Person of any of its Equity Interests, including under any put option or call option, or (c) the establishment of any fund for any such distribution, dividend, payment, redemption, purchase, retirement, or acquisition, including any sinking fund or similar arrangement.

11

"Dollar," "Dollars" and "$" means currency of the U.S. which is at the time of payment legal tender for the payment of public and private debts in the U.S.

"Domestic Subsidiary" means, when determined, each subsidiary of Borrower which is organized under Applicable Law of the U.S. in a state of the U.S. or the District of Columbia.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country that is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in *clause (a)* of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in *clauses (a)* or *(b)* of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Electronic Applications" is defined in Section 2.5(g).

"Eligible Assignee" means (a) a Lender, (b) an Affiliate of a Lender, (c) a commercial bank having a combined capital and surplus of at least $100,000,000, (d) a finance company, insurance company or any other financial institution or fund, in each case reasonably acceptable to Required Lenders and regularly engaged in making, purchasing, or investing in loans and having net worth, determined in accordance with GAAP, in excess of $100,000,000, (e) an Approved Fund, and (f) subject to the provisions of Section 14.7, any other Person approved by Required Lenders. Neither Borrower nor any Subsidiary or Affiliate of Borrower shall qualify as an Eligible Assignee.

"Eligible Contract Participant" means an "eligible contract participant" as defined in the Commodity Exchange Act and regulations thereunder.

"Eminent Domain Event" means any Governmental Authority, or any Person acting under, for, or on behalf of, a Governmental Authority, institutes proceedings to condemn, seize or appropriate all or part of any asset of a Loan Party.

"Eminent Domain Proceeds" means all amounts received by any Loan Party as a result of any Eminent Domain Event.

"Environmental Law" means any Applicable Law that relates to the preservation or reclamation of natural resources, pollution or protection of the environment, the Release of any materials into the environment, including those related to Hazardous Materials, air emissions and discharges to waste or public systems, or to health and safety.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Loan Party directly or indirectly resulting from or based upon (a) violation of any Environmental

12

Law, (b) the generation, use, handling, transportation, storage, treatment, or disposal of any Hazardous Material, (c) exposure to any Hazardous Material, (d) the Release or threatened Release of any Hazardous Material into the environment, or (e) any contract, agreement or other consensual arrangement pursuant to which liabilities are assumed or imposed to any of the foregoing.

"Equity Interests" means, as to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with Borrower, is treated as a single employer under Section 414(b) or (c) of the Tax Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Tax Code, is treated as a single employer under Section 414 of the Tax Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to an ERISA Plan (other than an event for which the 30-day notice period is waived); (b) the failure to satisfy the "minimum funding standard" (as defined in Section 412 of the Tax Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(c) of the Tax Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any ERISA Plan; (d) the incurrence by Borrower or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any ERISA Plan; (e) the receipt by Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any ERISA Plan or Plans or to appoint a trustee to administer any ERISA Plan; (f) the incurrence by Borrower or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal of Borrower or any ERISA Affiliate from any ERISA Plan; or (g) the receipt by Borrower or any ERISA Affiliate of any notice, or the receipt by any ERISA Plan from Borrower or any ERISA Affiliate of any notice, concerning the imposition upon Borrower or any ERISA Affiliate of Withdrawal Liability or a determination that an ERISA Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"ERISA Plan" means any employee pension benefit plan (other than a multiemployer plan) subject to the provisions of Title IV of ERISA or Section 412 of the Tax Code or Section 302 of ERISA, and in respect of which Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) (a) an "employer" as defined in Section 3(5) of ERISA, (b) a multiemployer plan as defined in Section 4001(a)(3) of ERISA, and (c) a pension, profit-sharing, or stock bonus plan intended to qualify under Section 401(a) of

the Tax Code, maintained or contributed to by Borrower or any ERISA Affiliate, including any multiemployer plan within the meaning of Section 4001(a)(3) of ERISA.

"Erroneous Payment" is defined in Section 14.17(a).

"Erroneous Payment Deficiency Assignment" is defined in Section 14.17(d).

"Erroneous Payment Impacted Class" is defined in Section 14.17(d).

"Erroneous Payment Return Deficiency" is defined in Section 14.17(d).

"Erroneous Payment Subrogation Rights" is defined in Section 14.17(d).

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Excess Payment" is defined in Section 13.6.

"Exchange Act" means the Securities Exchange Act of 1934 and the rules of the Securities Exchange Commission thereunder as in effect on the Closing Date.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes; (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by Borrower under Section 4.7) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to Section 4.1, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office; (c) Taxes attributable to such Recipient's failure to comply with Section 4.1(g) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Extraordinary Receipts" means any payments received by any Loan Party or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds described in Section 3.3(b)(iii)(E) of this Agreement) including, without limitation (a) proceeds of judgments, proceeds of settlements, or other consideration of any kind received in connection with any cause of action or claim (and not consisting of proceeds described in Section 3.3(b)(iii)(E) of this Agreement), but including proceeds of business interruption insurance, (b) indemnity payments (other than to the extent such indemnity payments are immediately payable to a Person that is not an Affiliate of any Loan Party or any of its Subsidiaries), (c) any purchase price adjustment received in connection with any purchase agreement, (d) tax refunds and pension plan reversions.

"Facility" means the delayed draw term loan facility established pursuant to Section 2.3.

"FATCA" means Sections 1471 through 1474 of the Tax Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, and any agreements entered into pursuant to Section 1471(b)(1) of the Tax Code, and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Tax Code.

"FCPA" means the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"FDIC" means the U.S. Federal Deposit Insurance Corporation or any successor thereto.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it; *provided that*, if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the U.S.

"FEMA" means the Federal Emergency Management Agency, a component of the U.S. Department of Homeland Security that administers the National Flood Insurance Program.

"Final DIP Order" means the order entered by the Bankruptcy Court in the Cases pursuant to Sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code approving this Agreement and the other Loan Documents and the making of the Term Loans in an amount not to exceed the Commitments (taking into account the Roll-up Amounts), authorizing on a final basis the incurrence by the Loan Parties of permanent post-petition secured and superpriority indebtedness in accordance with this Agreement, authorizing the use of cash collateral, granting Liens and providing superpriority administrative expense status, authorizing conversion of the Roll-up Amounts, granting adequate protection, and modifying the automatic stay, to be entered on the docket of the Cases within thirty-five (35) days of the Petition Date, which order shall be in substantially the form of the Interim DIP Order (with only such modifications thereto as are necessary to convert the Interim DIP Order to a Final DIP Order and such other modifications as are satisfactory in form and substance to the Agent and Lenders in their reasonable discretion).

"Final DIP Order Entry Date" means the date on which the Bankruptcy Court enters the Final DIP Order in the Cases.

"Final Hearing" means a hearing held by the Bankruptcy Court regarding the approval of the Final DIP Order.

"Final Order" means an order, judgment, ruling or other decree (or any revision, modification or amendment thereto) issued and entered by the Bankruptcy Court or by any state or other federal court as may have jurisdiction over any proceeding in connection with the Cases for the purpose of such proceeding, which order, judgment, ruling or other decree has not been reversed, vacated, stayed, modified or amended and as to which (i) no appeal, petition for review, reargument, rehearing, reconsideration or certiorari has been taken and is pending and the time for the filing of any such appeal, petition for review, reargument, rehearing, reconsideration or certiorari has expired, or (ii) such appeal or petition has been heard and dismissed or resolved and the time to further appeal or petition has expired with no further appeal or petition pending.

"Finance Code" is defined in the definition of "Maximum Rate."

"Financing Orders" means the Interim DIP Order, the Final DIP Order and such other interim, final, permanent and/or supplemental orders entered by the Bankruptcy Court after notice pursuant to Section 364 of the Bankruptcy Code relating thereto or authorizing the granting of credit by the Agent and the Lenders to the Borrower or Borrower's use of Lender's "cash collateral" (within the meaning of Bankruptcy Code § 363(a)).

"First Tier Foreign Subsidiary" means any Foreign Subsidiary that is a "controlled foreign corporation" within the meaning of Section 957 of the Tax Code and the Equity Interests of which are owned directly by any Loan Party.

"Flood Insurance" means, for any owned real property located in a Special Flood Hazard Area, Federal Flood Insurance or private insurance that meets or exceeds the requirements set forth by FEMA in its "Mandatory Purchase of Flood Insurance Guidelines".

"Flood Insurance Regulations" means (a) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (b) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (c) the National Flood Insurance Reform Act of 1994 (amending 42 USC § 4001, et seq.), as the same may be amended or recodified from time to time, and (d) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto, and in each case, any rules and regulations promulgated thereunder.

"Foreign Lender" means (a) if Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which Borrower is resident for tax purposes.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary (and includes any Canadian Subsidiary).

"Fronting Exposure" means, at any time there is a Defaulting Lender, with respect to the LC Issuer, such Defaulting Lender's Commitment Percentage of the outstanding LC Exposure with respect to LCs issued by the LC Issuer other than LC Exposure as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or Cash Collateralized in accordance with the terms of this Agreement.

"Fund" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course of its activities.

"Funded Debt" means, when determined, for any Person (a) all Debt for borrowed money, whether or not evidenced by notes, bonds, debentures or similar instruments, (b) all Capital Lease Obligations, and (c) the LC Exposure and liabilities related to other letters of credit.

"GAAP" means generally accepted accounting principles in the U.S. set out in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and the Financial Accounting Standards Board as in effect from time to time.

"Governing Body" means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person, (b) in the case of any limited liability company, the board of managers, sole member, managing member, or other governing body of such Person, (c) in the case of any partnership, the Governing Body of the general partner of such Person, and (d) in any other case, the functional equivalent of the foregoing.

"Governmental Authority" means the government of the U.S. or any other nation or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank) and any group or body charged with setting financial accounting or regulatory capital rules or standards (including, without limitation, the Financial Accounting Standards Board, the Bank for International Settlements or the Basel Committee on Banking Supervision or any successor or similar authority to any of the foregoing).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Debt or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Debt or other obligation of the payment or performance of such Debt or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Debt or other obligation or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Debt or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (b) any Lien on any assets of such Person securing any Debt or other obligation of any other Person, whether or not such Debt or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Debt to obtain any such Lien); *provided that* the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability

17

in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor" means (a) each Subsidiary of the Borrower party hereto as a Guarantor as of the Closing Date, (b) any other Person which executed a Joinder Agreement and joins this Agreement as a Guarantor, and (c) any other Person which executes a Guaranty Agreement in favor of the Administrative Agent.

"Guaranty Agreement" means (a) the guaranty under Article 13, or (b) a guaranty in Acceptable Form executed by a Loan Party or other Person in favor of Administrative Agent to, directly or indirectly, guarantee the Obligations, as such Guaranty Agreement may be amended, restated, supplemented or modified from time to time.

"Hazardous Material" means (a) any explosive or radioactive substance or waste, all hazardous or toxic substances, waste, or other pollutants, and any other substance the presence of which requires removal, remediation or investigation under any applicable Environmental Law, (b) any substance that is defined or classified as a hazardous waste, hazardous material, pollutant, contaminant, or toxic or hazardous substance under any applicable Environmental Law, or (c) petroleum, petroleum distillates, petroleum products, oil, polychlorinated biphenyls, radon gas, infectious medical wastes, and asbestos or asbestos-containing materials.

"Honor Date" is defined in Section 2.5(b)(i).

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in *clause (a)*, Other Taxes.

"Indemnitee" is defined in Section 14.3(a).

"Information" is defined in Section 14.15(b).

"Insurance Proceeds" means all cash and non-cash proceeds in respect of any insurance policy maintained by any Loan Party or any of its Subsidiaries, including any key-man life insurance proceeds and business interruption proceeds.

"Interest Expense" means for any Person on a consolidated basis, for any period, the sum of all cash interest expense paid or required by its terms to be paid during such period (including interest expense attributable to Capital Lease Obligations and Synthetic Lease Obligations), as determined in accordance with GAAP consistently applied in accordance with historical practices.

"Interest Period" means (a) initially, the period from the Closing Date to the last day of the month in which the Closing Date occurs, and (b) thereafter, monthly from the first (1st) day of each month to, but excluding the first (1st) day of the following month thereafter; *provided that*, (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (ii) no Interest Period with respect to any Term Loan may extend beyond the Maturity Date.  Borrower and the Administrative Agent may agree that the initial Interest Period

18

may begin on the date of the initial Borrowing and end on the last Business Day of a calendar month.

"Interim DIP Order" means an interim order entered by the Bankruptcy Court in the Cases pursuant to Sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code approving this Agreement and the other Loan Documents, and authorizing on an interim basis the incurrence by the Loan Parties of post-petition secured and superpriority indebtedness in accordance with this Agreement, authorizing the use of "cash collateral" (within the meaning of Bankruptcy Code § 363(a)), granting Liens and providing superpriority administrative expense status, granting adequate protection, and modifying the automatic stay, to be entered on the docket of the Cases within three (3) days of the Petition Date, which order shall be in the form attached to the DIP Financing Motion or otherwise in form and substance satisfactory to the Agent and the Lenders in their reasonable discretion.

"Interim DIP Order Entry Date" means the date on which the Bankruptcy Court enters the Interim DIP Order in the Cases.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor incurs Debt of the type referred to in *clause (g)* of the definition of "Debt" in respect of such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment but giving effect to any returns or distributions of capital or repayment of principal actually received in case by such Person with respect thereto.

"ISP98" means the International Standby Practices (1998 revision, effective January 1, 1999), International Chamber of Commerce Publication No. 590.

"Joinder Agreement" means an agreement in Acceptable Form under which a Person becomes a Loan Party under this Agreement and assumes all of the applicable duties and obligations of a Loan Party under this Agreement.

"LC" means any letter of credit issued by the LC Issuer for the account of any Loan Party under the terms of this Agreement (and the applicable LC Application), including, without limitation, each Prepetition LC.

"LC Application" means the standard form of letter of credit application and agreement for the issuance or amendment of LCs which is from time to time in use by the LC Issuer.

"LC Credit Extension" means, with respect to any LC, the issuance, amendment, renewal, or increase of LC.

19

"<u>LC Credit Extension Date</u>" means the date on which an LC Credit Extension occurs.

"<u>LC Disbursement</u>" means an extension of credit resulting from a drawing under any LC which has not been reimbursed or refinanced as a Loan under the Facility.

"<u>LC Exposure</u>" means, when determined and without duplication, the sum of (a) the aggregate undrawn maximum face amount of each LC at such time, *plus* (b) the aggregate unpaid obligations of the Borrower to reimburse the LC Issuer for amounts paid by the LC Issuer under LCs (including all LC Disbursements and excluding any Loans to fund such reimbursement obligations under <u>Section 2.5</u>).    The LC Exposure of any Lender at any time shall be its Commitment Percentage of the total LC Exposure at such time.

"<u>LC Issuer</u>" means First Horizon Bank (formerly known as IBERIABANK, a division of First Horizon Bank), in its capacity as issuer of LCs under this Agreement, or any successor issuer of LCs hereunder.

"<u>Lenders</u>" means the Persons listed on <u>Schedule 1</u> and any other Person that becomes party to this Agreement pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party to this Agreement pursuant to an Assignment and Assumption.

"<u>Lending Office</u>" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify Borrower and the Administrative Agent.

"<u>Lien</u>" means any lien (including statutory liens), mortgage, security interest, financing statement, collateral assignment, pledge, negative pledge assignment, charge, encumbrance, hypothecation, deposit arrangement, preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, the interest of a lessor under a capital lease and any synthetic or any financing lease having substantially the same economic effect as any of the foregoing), or encumbrance of any kind, and any other right of or arrangement with any creditor (whether based on common law, constitutional provision, statute or contract) to have its claim satisfied out of any property or assets, or their proceeds, before the claims of the general creditors of the owner of the property or assets.

"<u>Litigation</u>" means any action by or before any Governmental Authority, arbitrator, or arbitration panel.

"<u>Loan</u>" or "<u>Loans</u>" means the Term Loans.

"<u>Loan Documents</u>" means (a) this Agreement, all certificates and requests delivered under this Agreement, and all exhibits and schedules to this Agreement, (b) the Notes, (c) all Guaranty Agreements, (d) the Security Documents, (e) all Subordination Agreements (if any), (f) all LCs and LC Applications, (g) all Collateral Access Agreements, (h) each Financing Order, (i) all other agreements, documents, and instruments in favor of Administrative Agent, any Lender, the LC Issuer, ever delivered in connection with or under this Agreement, and (j) all renewals, extensions, amendments, modifications, supplements, restatements, and replacements of, or substitutions for, any of the foregoing; provided, that the Loan Documents shall not include any Prepetition Loan Documents.

"Loan Parties" means, collectively, Borrower and the Guarantors (including any other Person who becomes a party to this Agreement pursuant to a Joinder Agreement) and their respective successors and assigns, and "Loan Party" means any one of them or all of them individually, as the context may require.

"Manufactured (Mobile) Home" has the meaning assigned to such term in the applicable Flood Insurance Regulation.

"Material Adverse Effect" means (a) the material impairment of the ability of the Loan Parties (taken as a whole) to perform any of their payment or other material obligations under any Loan Document, (b) the material impairment of the ability of Administrative Agent to enforce any Loan Party's material obligations, or Administrative Agent's rights, under any Loan Document, (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Loan Parties (taken as a whole) of any Loan Document to which they are a party, or (d) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent), or condition (financial or otherwise) of the Loan Parties, taken as a whole, as represented in the initial financial statements delivered to the Administrative Agent on or about the Closing Date; provided that changes, events, effects or circumstances which, directly or indirectly, to the extent that relate to or result from the following, shall be excluded from the determination of a Material Adverse Effect: (i) the filing of the Cases (and any defaults or claims under pre-petition agreements so long as the exercise of remedies as a result of such defaults or claims are stayed under the Bankruptcy Code or such agreements are voided or invalidated by the Bankruptcy Court); (ii) any litigation or claim threatened or initiated by creditors of the Loan Parties against the Loan Parties or any of their officers or directors, in each case, arising out of the filing of the Cases or the transactions contemplated thereby; and (iii) the existence of any claims or liability from the period prior to the commencement of the Cases, which is unsecured and junior in priority to the Obligations.

"Material Adverse Event" means any circumstance or event that, individually or collectively with other circumstances or events, could reasonably be expected to have a Material Adverse Effect.

"Material Agreement" means (a) all agreements, indentures or notes governing the terms of any Material Indebtedness (other than the Obligations), (b) [reserved], (c) each Supply Contract under which the total amount payable by any party thereto in any period of twelve consecutive months exceeds the Threshold Amount, (d) the Oil Company Agreements, and (e) all other agreements, documents, contracts, indentures and instruments pursuant to which (i) any Loan Party or any of its Subsidiaries are obligated to make payments in any twelve month period in excess of the Threshold Amount, (ii) any Loan Party or any of its Subsidiaries expects to receive revenue in any period of twelve consecutive months in excess of the Threshold Amount, and (iii) a default, breach or termination thereof could reasonably be expected to result in a Material Adverse Effect.

"Material Indebtedness" means Debt of Borrower or any other Loan Party or any of its Subsidiaries in an aggregate committed or outstanding principal amount in excess of the Threshold Amount.

"Maturity Date" the earliest of (i) the date on which the Administrative Agent (acting at the written direction of the Required Lenders) provides written notice to the Borrower, counsel for the Loan Parties and counsel for any Committee of the occurrence of any Event of Default, (ii) the date of acceleration of the Obligations under Section 11.2, (iii) the effective date of a confirmed plan of reorganization or liquidation in the Cases, (iv) the entry of an order converting any of the Cases to a case or cases under Chapter 7 of the Bankruptcy Code, (v) the entry of an order dismissing any of the Cases, (vi) the entry of an order appointing a chapter 11 trustee or examiner with expanded powers in any of the Cases, (vii) the failure of the Borrower to obtain entry of the Interim DIP Order within five (5) Business Days following the Petition Date, (viii) the failure of the Borrower to obtain entry of the Final DIP Order within thirty-five (35) days following the Petition Date, or (ix) the date that is 120 days following the Petition Date.

"Maximum Rate" means the maximum rate of nonusurious interest permitted from day-to-day by Applicable Law, including Chapter 303 of the Texas Finance Code (the "Finance Code") (and as the same may be incorporated by reference in other Texas statutes).  To the extent that Chapter 303 of the Finance Code is relevant to Lenders for the purposes of determining the Maximum Rate, Lenders may elect to determine such applicable legal rate pursuant to the "weekly ceiling," from time to time in effect, as referred to and defined in Chapter 303 of the Finance Code; subject, however, to the limitations on such applicable ceiling referred to and defined in the Finance Code, and further subject to any right any Lender may have subsequently, under Applicable Law, to change the method of determining the Maximum Rate.

"Milestones" has the meaning ascribed to it in Section 8.20.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage" means each mortgage, deed of trust, deed to secure debt, leasehold mortgage, leasehold deed of trust, and other similar instruments, in each case in Acceptable Form and executed by any Loan Party for the benefit of Administrative Agent, to secure the Obligations.

"National Flood Insurance Program" means the program created by any Governmental Authority of the U.S. pursuant to the Flood Insurance Regulations that mandates the purchase of flood insurance to cover real property improvements located in Special Flood Hazard Areas in participating communities and provides protection to property owners through a federal insurance program.

"Net Proceeds" means (a) with respect to any Disposition of any asset by any Person, the aggregate amount of cash and non-cash proceeds from such Disposition received by, or paid to or for the account of, such Person, net of customary and reasonable out-of-pocket costs, fees, and expenses, (b) with respect to the issuance of Equity Interests or Subordinated Debt or the making of any cash capital contributions, the cash and non-cash proceeds received from such issuance, incurrence, or contribution net of attorneys' fees, investment banking fees, accountants fees, underwriting discounts and commissions and other customary fees and expenses incurred in connection with such issuance, (c) with respect to Insurance Proceeds, all cash proceeds received by any Loan Party or any of its Subsidiaries, Administrative Agent, or any Lender from an insurer under any insurance policy maintained by any such Loan Party or any of its Subsidiaries, and (d) with respect to Eminent Domain Proceeds, all cash proceeds received by any Loan Party or

22

any of its Subsidiaries from any Governmental Authority net of attorney's fees and other customary and reasonable out of pocket costs, fees, and expenses. Non-cash proceeds include any cash proceeds received by way of deferred payment of principal pursuant to a note, installment receivable, purchase price adjustment receivable, or otherwise, but only as and when received.

"Non-Consenting Lender" means any Lender that does not approve any consent, waiver or amendment that (a) requires the approval of all affected Lenders in accordance with the terms of Section 14.8 and (b) has been approved by the Required Lenders.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Non-Qualifying Party" means Borrower or any Guarantor that on the Eligibility Date fails for any reason to qualify as an Eligible Contract Participant.

"Nonrenewal Notice Date" is defined in Section 2.5(a)(iv).

"Notes" means the Term Loan Notes.

"Obligations" means the collective reference to:

(a)     all present and future Debt, liabilities and obligations (including the Loans, the LC Exposure, and indemnity obligations), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, and all renewals, increases and extensions thereof, or any part thereof, now or in the future owed to the Administrative Agent, any Lender, the LC Issuer, by any Loan Party under this Agreement or any of the other Loan Documents, together with all interest accruing thereon, reasonable fees, costs and expenses payable under the Loan Documents or in connection with the enforcement of rights under the Loan Documents, including (i) fees and expenses under this Agreement, (ii) interest and fees that accrue after the commencement of any proceeding under any Debtor Relief Law naming any Loan Party or any Affiliate thereof as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, and (iii) any obligation to pay, discharge, and satisfy the Erroneous Payment Subrogation Rights; and

(b)     Bank Product Liabilities;

provided, that the Obligations shall not include any Prepetition Obligations (other than the Roll-Up Amount).

"Off-Balance Sheet Liabilities" means, for any Person, (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (b) any liability of such Person under any sale and leaseback transactions that do not create a liability on the balance sheet of such Person, (c) any Synthetic Lease Obligations, or (d) any obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person.

"Oil Company Agreements" shall mean all agreements entered into now and hereafter by and between Borrower, as purchaser, and various oil companies for the purchase, distribution and marketing by Borrower of oil, gasoline and petroleum products, together with all amendments now or hereafter entered into by the parties thereto.

"Organizational Documents" means, for any Person, (a) the articles of incorporation or certificate of formation and bylaws of such Person if such Person is a corporation, (b) the articles of organization or certificate of formation and regulations or limited liability company agreement (or other similar governing document) of such Person if such Person is a limited liability company, (c) the certificate of limited partnership or certificate of formation and the limited partnership agreement of such Person if such Person is a limited partnership, or (d) the documents under which such Person was created and is governed if such person is not a corporation, limited liability company or limited partnership.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 4.7).

"Participant" is defined in Section 14.7(d).

"Participant Register" is defined in Section 14.7(d).

"Patriot Act" means USA Patriot Act (Title III of Pub.L107-56 (signed into law October 26, 2001)).

"Payment Recipient" is defined in Section 14.17(a).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Debt" means Debt permitted in Section 9.1.

"Permitted Discretion" means a determination made in the exercise of reasonable business judgment (from the perspective of a senior secured lender).

"Permitted Liens" means Liens permitted in Section 9.2.

"Permitted Third Party Bank" shall mean (a) a Lender and (b) any bank or other financial institution with whom any Loan Party maintains a deposit account or lockbox in a state in which First Horizon Bank does not accept deposits, in each case, with whom a Control Account Agreement has been executed.

"Person" means any natural person, partnership, limited partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, syndicate, Governmental Authority or other entity or organization.

"Petition Date" has the meaning ascribed to it in the Recitals to this Agreement.

"Platform" is defined in Section 14.1(d)(i).

"Potential Default" means the occurrence of any event or the existence of any circumstance that would, with the giving of notice or lapse of time or both, become a Default.

"Prepetition Agent" means FIRST HORIZON BANK (formerly known as IBERIABANK, a division of First Horizon Bank), in its capacity as administrative agent for the benefit of the Prepetition Lenders.

"Prepetition Collateral" means the collateral described and defined in the Prepetition Loan Documents, which includes "cash collateral" (within the meaning of Bankruptcy Code § 363(a)), as applicable.

"Prepetition Credit Agreement" has the meaning set forth in the Recitals.

"Prepetition LCs" means the "LCs" as defined in and issued pursuant to the Prepetition Credit Agreement as of the Closing Date and described on Schedule 2 to this Agreement.

"Prepetition Lenders" means the financial institutions from time to time parties to the Prepetition Credit Agreement as lenders.

"Prepetition Liens" means the first priority liens and security interests granted to the Prepetition Agent for the benefit of the Prepetition Lenders by certain of the Prepetition Loan Documents to secure the Prepetition Obligations to the Prepetition Lenders.

"Prepetition Loan Documents" means the "Loan Documents" as described and defined in the Prepetition Credit Agreement.

"Prepetition Obligations" means obligations of certain of the Loan Parties for unpaid principal, accrued and unpaid interest, fees, costs, expenses, indemnities and other amounts arising under the Prepetition Loan Documents and shall include all "Obligations" under the Prepetition Credit Agreement.

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor (or any successor agency), as any such exemption may be amended from time to time.

"QFC" is defined in Section 2.9(b).

"QFC Credit Support" is defined in Section 2.9.

"Qualified Equity Interests" means any Equity Interests that are not Disqualified Equity Interests.

"Ratable Share" is defined in Section 13.6.

"Recipient" means (a) the Administrative Agent, (b) any Lender, and (c) the LC Issuer, as applicable.

"Register" is defined in Section 14.7(c).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Release" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing, or dumping of any substance into the environment.

"Removal Effective Date" is defined in Section 12.6(b).

"Required Lenders" means, at any time, Lenders having Total Credit Exposure representing more than 50% of the Total Credit Exposure of all Lenders; *provided that*, (a) the Total Credit Exposure of any Defaulting Lender shall be disregarded in determining Required Lenders at any time, and (b) while there are only two Lenders, Required Lenders means all Lenders.

"Resignation Effective Date" is defined in Section 12.6(a).

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means (a) the president, chief executive officer, chief financial officer, controller, chief accounting officer, or chief operating officer of Borrower, or (b) any other individual who is designated in writing to the Administrative Agent by Borrower as a Person authorized to take specific actions on behalf of Borrower.

"Restricted Payment" means with respect to any Person, (a) any Distribution or other payment in respect of the Equity Interests of such Person, (b) any Distribution or other payment with respect to any option, warrant, or other right to acquire any Equity Interests of such Person, (c) any payment or prepayment of principal of, premium, or interest on, or the redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), establishment of a sinking fund, or similar payment with respect to, any Subordinated Debt, or (d) any management or similar fees.

"Restrictive Agreement" means any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of any Loan Party or any of its Subsidiaries

to create, incur or permit to exist any Lien upon any of its property or assets, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any Equity Interests or to make or repay loans or advances to any Loan Party or any of its Subsidiaries or to guarantee Debt of any Loan Party or any of its Subsidiaries; *provided that* the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured debt permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Debt and *clause (a)* shall not apply to customary provisions in leases and other contracts restricting the assignment thereof.

"Roll-up Amount" means the portion of the outstanding Prepetition Obligations in an amount equal to **$85,800,000.00** (as such amount may be reduced in accordance with Section 8.22), to be converted into the Term Loans hereunder plus all "LC Exposure" with respect to the Prepetition LCs as of the Closing Date to be converted into LC Exposure and LCs hereunder.

"S&P" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business.

"Sale and Leaseback Transaction" means any arrangement with any Person providing for the leasing by Borrower or any Subsidiary of Borrower of any property (except for temporary leases for a term, including any renewal thereof, of not more than one year and except for leases between Borrower and a Subsidiary or between Subsidiaries), which property has been or is to be sold or transferred by Borrower or such Subsidiary to such Person.

"Sanctioned Country" means, at any time, a country or territory which is itself the subject or target of any Sanctions.

"Sanctioned Person" means, at any time, (a) any Person currently the subject or target of Sanctions or listed in any Sanction-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State or by the United Nations Security Council, the European Union or any European Union member state, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person or Persons described in the foregoing *clauses (a) or (b)*.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom.

"Secured Party" means each of and "Secured Parties" means all of, the Administrative Agent, the Lenders, the LC Issuer and the Bank Product Providers.

"Security Agreement" means each Security Agreement in Acceptable Form executed by any Loan Party, as debtor, and by Administrative Agent, as secured party.

"Security Documents" means all Financing Orders, Security Agreements, Mortgages, pledge agreements, Control Account Agreements, and all other documents executed in connection

therewith, in each case to create or perfect a Lien in favor of Administrative Agent on the assets of the Loan Parties.

"Special Flood Hazard Area" means an area that FEMA's current flood maps indicate has at least a one percent (1%) chance of a flood equal to or exceeding the base flood elevation (a 100-year flood) in any given year.

"Subordinated Debt" means Debt which is contractually subordinated in right of payment, collection, enforcement and lien rights to the prior payment in full of the Obligations on terms satisfactory to the Administrative Agent.

"Subordination Agreement" means a subordination agreement in Acceptable Form.

"Subsidiary" of a Person means a corporation, partnership, limited liability company, association or joint venture or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of the Governing Body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time owned or the management of which is controlled, directly, or indirectly through one or more intermediaries, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower. For the avoidance of doubt, United States Fueling Company, LLC, a Georgia limited liability company, shall not be deemed to be a Subsidiary for purposes of this Agreement or any of the other Loan Documents.

"Super-Priority Claims" has the meaning ascribed to it in Section 1.11.

"Supply Contracts" shall mean all agreements entered into now and hereafter by and between Borrower, as seller, and an operator of a filling station/convenience store, as purchaser, for the supply and sale by Borrower of agreed-upon minimum quantities of gasoline and related petroleum products to such purchaser over a term of years, together with all amendments now or hereafter entered into by the parties thereto.

"Supported QFC" is defined in Section 2.9.

"Synthetic Lease Obligations" means the obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but, upon the insolvency or bankruptcy of such Person, would be characterized as the Debt of such Person (without regard to accounting treatment).

"Tax Code" means the Internal Revenue Code of 1986, as amended, and related rules, regulations and published interpretations.

"Tax Liability Amount" means, when determined, with respect to a Person taxed as a partnership, S corporation, or disregarded entity for U.S. federal income tax purposes, the excess (if any) of (a) the product of (i) the net amount of cumulative taxable income and gain (net of losses and deductions, and in all cases excluding allocations under Section 704(c) of the Code) currently and previously allocated to such Person's owners (or the owners' predecessors-in-interest) in accordance with the Person's Organizational Documents since the inception of the

Person through the end of the applicable period, and (ii) the combined (A) maximum prevailing U.S. federal income tax rate applicable to individuals and (B) if any owners of such Person are subject to state or local income tax on the amounts determined under *clause "(i)"* for or with respect to the applicable period, the highest state and local income tax rates applicable to such owners with respect to such amounts for or with respect to such applicable period (taking into account for purposes of this *clause (ii)* the deductibility of state and local taxes for U.S. federal income tax purposes and the character of income and loss allocated as it effects the applicable tax rate), over (b) the cumulative amount of Distributions by such Person to its current and prior owners (or the owners' predecessors-in-interest) since the inception of the Person through the end of the applicable period.

"<u>Taxes</u>" means, for any Person, all present and future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority upon that Person, its income, or any of its properties, franchises or assets (including any applicable interest, additions to tax, or penalties).

"<u>Term Loan</u>" means any Loan made (or deemed made) to Borrower in accordance with <u>Section 2.3</u>.

"<u>Term Loan Note</u>" means a promissory note made by Borrower in favor of a Lender evidencing the portion of the Term Loan made by such Lender, substantially in the form attached as <u>Exhibit A-3</u>, and any amendments, supplements and modifications thereto, any substitutes therefor, and any replacements, restatements, renewals or extension thereof, in whole or in part.

"<u>Term Loan Percentage</u>" means, as to any Lender, (a) prior to the entry of the Final DIP Order, the *ratio of* (i) the Committed Amount of such Lender to (ii) the Committed Amount of all the Lenders, and (b) after the funding of the Term Loan, the *ratio of* (i) the Term Principal Amount of such Lender to (ii) the Term Principal Amount of all Lenders.

"<u>Term Principal Amount</u>" means, when determined, (a) for all Lenders, the aggregate outstanding principal balance of the Term Loan (including the Roll-up Amount), and (b) for any Lender, such Lender's Term Loan Percentage of the aggregate outstanding principal balance of the Term Loan (including the Roll-up Amount).

"<u>Termination Date</u>" means the date that all Obligations (other than contingent Obligations with respect to indemnity and reimbursement of expenses as to which no claim has been made as of the time of determination) have been paid in full in cash, all LCs have been terminated or expired (or been Cash Collateralized), and all Commitments shall have terminated.

"<u>Threshold Amount</u>" means $5,000,000.

"<u>Total Credit Exposure</u>" means, when determined for any Lender, (a) Term Principal Amount of such Lender at such time, *plus* (b) without duplication, the LC Exposure of such Lender at such time and the unused Committed Amount of such Lender at such time.

"<u>Trade Date</u>" is defined in <u>Section 14.7(b)(1)(B)</u>.

"UCC" means the Uniform Commercial Code in effect from time to time in the State of Texas or any other applicable jurisdiction.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Uniform Customs" means the Uniform Customs and Practice for Documentary Credits (2007 revision) effective July, 2007, International Chamber of Commerce Publication No. 600.

"Unreimbursed Amount" is defined in Section 2.5(b)(1).

"U.S." means United States of America.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Tax Code.

"Withdrawal Liability" means liability to an ERISA Plan as a result of a complete or partial withdrawal from such ERISA Plan.

"Withholding Agent" means any Loan Party and the Administrative Agent.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.2    **Other Definitional Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified in this Agreement or in such other Loan Document:

(a)    the definitions of terms in this Agreement shall apply equally to the singular and plural forms of the terms defined, and whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms, and any reference in this Agreement to any Person shall be construed to include such Person's successors and assigns;

(b)　　the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", the words "herein", "hereof" and "under this Agreement", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, and all references in this Agreement to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement;

(c)　　the word "will" shall be construed to have the same meaning and effect as the word "shall", the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights, the word "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form;

(d)　　in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including";

(e)　　any conflict or ambiguity between this Agreement and any other Loan Document is controlled by the terms and provisions of this Agreement;

(f)　　Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears, unless otherwise indicated; and

(g)　　section headings in this Agreement and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

1.3　　**[Reserved]**.

1.4　　**Accounting Terms**.  All accounting terms not specifically or completely defined in this Agreement shall be construed in conformity with, and all financial data required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, applied on a consistent basis, as in effect from time to time and in a manner consistent with that used in preparing the audited financial statements required by Section 8.1(a), except as otherwise specifically prescribed in this Agreement and, in the case of unaudited statements, without footnotes and year-end adjustments.

1.5　　**UCC Terms**.  Terms defined in the UCC in effect on the Closing Date and not otherwise defined in this Agreement shall, unless the context otherwise indicates, have the meanings provided by those definitions.  Subject to the foregoing, the term "*UCC*" refers, as of any date of determination, to the UCC then in effect.

1.6　　**Rounding**.  Any financial ratios required to be maintained by the Loan Parties pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio or percentage is expressed in this Agreement and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

1.7 **References to Agreement and Laws**.  Unless otherwise expressly provided herein, (a) references to Organizational Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are not prohibited by any Loan Document; and (b) references to any Applicable Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Applicable Law.

1.8 **Time**.  Unless otherwise specified, all references in this Agreement to times of day shall be references to Eastern time (daylight or standard, as applicable).

1.9 **Divisions**.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws):  (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

1.10 **[Reserved]**.

1.11 **Superpriority Administrative Expense Claim**.  Subject to and subordinate only to the Carve-Out, the Obligations of the Loan Parties arising hereunder shall constitute allowed super-priority administrative claims in accordance with Sections 364(c)(1) and 507(b) of the Bankruptcy Code, which claims shall have priority in right of payment over any and all other obligations, liabilities and indebtedness of the Loan Parties, now in existence or hereafter incurred by the Loan Parties and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia, Bankruptcy Code §§ 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), or 726 (to the extent permitted by Applicable Law), and/or 364(c)(1), and any other provision of the Bankruptcy Code (including, subject to entry of the Final DIP Order, section 506(c)) (the "<u>Super-Priority Claims</u>"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre- and post-petition property of the Loan Parties and all proceeds thereof (excluding proceeds of Avoidance Actions until the Final DIP Order Entry Date).

1.12 **Waiver of Any Priming Rights**.  Each Loan Party agrees on behalf of itself and its bankruptcy estate, that for so long as any Obligations shall be outstanding, such Loan Party and such Loan Party's bankruptcy estate hereby irrevocably waive any right pursuant to Section 364(c) or 364(d) of the Bankruptcy Code or otherwise to grant any Lien or Security Interest of equal or greater priority than the Liens and Security Interest securing the Obligations or to approve a Claim of equal or greater priority than the Obligations.

1.13 **Waiver of Claims to Surcharge**.  Subject to entry of the Final DIP Order, each Loan Party and such Loan Party's bankruptcy estate hereby waive any claims to surcharge the Collateral under Section 506(c) of the Bankruptcy Code.

## ARTICLE 2

## COMMITMENTS, LOANS, AND LCS

2.1     **[Reserved]**.

2.2     **[Reserved]**.

2.3     **Facility**.

(a)     Subject to the terms and conditions of this Agreement, each Lender agrees to make Loans to Borrower ratably in accordance with its Term Loan Percentage and in an aggregate principal amount which shall not cause (i) such Lender's Term Principal Amount to exceed its Committed Amount or (ii) the Term Principal Amount of all Lenders to exceed the Committed Amount for all Lenders.  Each Term Loan, once it has been advanced and then paid or prepaid, may not be reborrowed.

(b)     Each Term Loan shall be made by a Lender ratably in accordance with its Term Loan Percentage of such Borrowing.

(c)     The Term Loans shall be made as follows:

(i)     Upon the Interim DIP Order Entry Date, the Lenders shall make initial Term Loans in an aggregate amount not to exceed **$20,000,000.00** (collectively, the "Initial Advance"); and

(ii)     from the Final DIP Order Entry Date to and until (but not including) the Maturity Date, the Lenders shall make subsequent Term Loans in an aggregate amount not to exceed **$8,600,000.00**, which shall not be requested or made more than one time after the Final DIP Order Entry Date; provided that the aggregate amount of all Term Loans to be made by the Lenders hereunder shall not exceed the Maximum Advance Amount at any time.  Term Loans shall be used by the Borrower only to make disbursements in accordance with Section 8.15 hereof. Term Loans shall be made upon delivery of a Notice of Borrowing by the Borrower in accordance with Section 2.4.

(d)     Roll-Up Facility Loans. Upon entry of the Final DIP Order, the amount of the outstanding Prepetition Obligations of the Lenders equal to the Roll-up Amount shall be deemed to have been refinanced by and/or converted into Term Loans hereunder and shall be deemed to be part of the Obligations.  On the Closing Date, all LC Exposure with respect to Prepetition LCs on the Closing Date shall be "rolled up" and constitute LC Exposure hereunder and all Prepetition LCs shall be deemed to be LCs issued hereunder and shall be deemed to be part of the Obligations.

(e)     Single Loan.  All Term Loans to the Borrower and all of the other Obligations of the Loan Parties (including, upon the entry of the Final DIP Order, the Roll-Up Amount) arising under this Agreement and the other Loan Documents shall constitute one general obligation of the Loan Parties secured by all of the Collateral.

33

2.4     **Method of Borrowing, Funding of Loans, and Minimum Amounts**.

(a)     Except for the Initial Advance, by no later than 10:00 a.m. at least five (5) Business Days prior to the date of the requested Borrowing of Loans, Borrower shall notify the Administrative Agent electronically as well as submit a written Borrowing Request to the Administrative Agent (A) specifying the amount of the Loans requested, (B) specifying the date of the requested Borrowing, and (C) certifying that Borrower has complied in all respects with Section 6.2.

(b)     Each Borrowing shall be in a minimum amount of the lesser of $1,000,000 (and in integral multiples of $10,000 in excess thereof) or the remaining amount available to be borrowed.

(c)     Upon receipt of a Borrowing Request, the Administrative Agent shall promptly inform the Lenders as to the terms thereof.  Each Lender shall make its Commitment Percentage of the requested Borrowing available to the Administrative Agent in Dollars and in immediately available funds at the Administrative Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Borrowing Request.

(d)     Upon satisfaction of the conditions set out in ***Section 6.2***, the amount of the requested Loans will then be made available to Borrower by the Administrative Agent either by (i) crediting the account of Borrower on the books of the Administrative Agent with the amount of such funds, or (ii) wire transfer of such funds, in each case in accordance with instructions provided by Borrower to (and reasonably acceptable to) the Administrative Agent.

2.5     **Subfacility for Letters of Credit**.

(a)     The LC Commitment.

(i)     The Borrower, the Administrative Agent, and the Lenders hereby acknowledge and agree that all Prepetition LCs shall constitute LCs under this Agreement as of the Closing Date with the same effect as if such Prepetition LCs were issued by LC Issuer at the request of Borrower on the Closing Date.  Borrower shall not request, and LC Issuer shall not have any obligation to issue any LC or make any LC Credit Extension after the Closing Date.

(ii)     Each LC Credit Extension for an amendment of any outstanding LC shall be made upon the request of Borrower delivered to the LC Issuer in the form of an LC Application, appropriately completed and signed by a Responsible Officer of Borrower.  Such LC Application must be received by the LC Issuer not later than 10:00 a.m. at least five (5) Business Days prior to the proposed LC Credit Extension Date.  Such LC Application shall specify in form and detail satisfactory to the LC Issuer (1) the LC to be amended, (2) the proposed date of the amendment (which shall be a Business Day), (3) the nature of the proposed amendment, and (4) such other matters as the LC Issuer may reasonably require.

34

(iii)     Promptly after receipt of any LC Application, the LC Issuer will confirm that the requested LC Credit Extension is permitted in accordance with the terms of this Agreement, and, if so, then, subject to the terms and conditions hereof, the LC Issuer may, on the requested date enter into the applicable amendment in each case in accordance with the LC Issuer's usual and customary business practices

(iv)     If Borrower so requests in any applicable LC Application, the LC Issuer may, in its sole and absolute discretion, agree to issue an LC that has automatic renewal provisions (each, an "Auto-Renewal LC"); *provided that*, any such Auto-Renewal LC must permit the LC Issuer to prevent any such renewal at least once in each twelve-month period (commencing with the date of issuance of such LC) by giving prior notice to the beneficiary thereof not later than a day (the "Nonrenewal Notice Date") in each such twelve-month period to be agreed upon at the time such LC is issued.  Unless otherwise directed by the LC Issuer, Borrower shall not be required to make a specific request to the LC Issuer for any such renewal.  The LC Issuer may elect not to renew any auto-renewal LC for any reason and the LC Issuer may not permit any such Credit Extension if, (A) the LC Issuer has determined that such Credit Extension would not be permitted or the LC Issuer would have no obligation at such time to issue such LC in its renewed form under the terms hereof (by reason of the provisions of Section 2.5(a)(i)) or otherwise, or (B) it has received notice (which may be by telephone or in writing) on or before the day that is two (2) Business Days before the Nonrenewal Notice Date (1) that beneficiary has elected not to permit such renewal or (2) from the Administrative Agent or the Borrower that one or more of the applicable conditions specified in Section 6.2 is not then satisfied.

(b)     Drawings and Reimbursements.

(i)     Upon receipt from the beneficiary of any LC of any notice of a drawing under such LC, the LC Issuer shall notify Borrower thereof.  Not later than 11:00 a.m. on the date of any payment by the LC Issuer under an LC (each such date, an "Honor Date"), Borrower shall reimburse the LC Issuer in an amount equal to the amount of such drawing.  If Borrower fails to so reimburse the LC Issuer by such time, Borrower shall be deemed to have requested a Loan under the Facility to be disbursed on the Honor Date in an amount equal to the amount of the unreimbursed drawing (the "Unreimbursed Amount"), without regard to the minimum amount specified in Section 2.4 for the principal amount of Loans, but subject to the conditions set out in Section 6.2.  Any notice given by the LC Issuer pursuant to this Section 2.5(b)(i) may be given by telephone if immediately confirmed in writing; *provided that*, the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(ii)     With respect to any Unreimbursed Amount that is not fully refinanced by a Loan because the conditions set out in **Section 6.2** cannot be satisfied, sufficient funds are not available under the Facility, or for any other reason, Borrower shall be deemed to have incurred from the LC Issuer an LC

Disbursement in the amount of the Unreimbursed Amount, which LC Disbursement shall accrue interest at the Default Rate and be due and payable on demand (together with accrued and unpaid interest).

(iii)    If the LC Issuer shall make an LC Disbursement, then, unless the Borrower shall reimburse such LC Disbursement in full on the date such LC Disbursement is made, the unpaid amount thereof shall accrue interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrower reimburse such LC Disbursement, at the Default Rate.

(c)    <u>Obligations Absolute</u>.  The obligation of Borrower to reimburse the LC Issuer for each drawing under each LC and to repay each LC Disbursement shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances.  Borrower shall promptly examine a copy of each LC and each amendment thereto that is delivered to it and, Borrower will immediately notify the LC Issuer of any claim of noncompliance with Borrower's instructions or of any other irregularity, Borrower shall be conclusively deemed to have waived any such claim against the LC Issuer and its correspondents unless such notice is timely given.

(d)    <u>[Reserved]</u>.

(e)    <u>Applicability of ISP98 and UCP</u>.  Unless otherwise expressly agreed by the LC Issuer and Borrower when an LC Credit Extension is made (including any such agreement applicable to a Prepetition LC), (i) the rules of ISP98 shall apply to each standby LC, and (ii) the rules of Uniform Customs shall apply to each documentary LC.

(f)    <u>Reserved</u>.

(g)    <u>Provisions Regarding Electronic Issuance of Letters of Credit</u>.  The LC Issuer may adopt procedures pursuant to which Borrower may request the issuance of LCs by electronic means and the LC Issuer may issue LCs based on such electronic requests.  Such procedures may include the entering by Borrower into the LC Applications electronically.  All the procedures, actions and documents referred to in the two preceding sentences are referred to as "<u>Electronic Applications</u>".  Borrower holds the LC Issuer harmless with respect to actions taken by the LC Issuer based upon Electronic Applications.  Borrower further agrees to be bound by all the terms and provisions contained in the LC Applications, including, the terms and provisions of the LC Applications contained on the reverse side of the paper copies thereof, the release and indemnification provisions contained therein, provided that, in the event of any conflict between any term in this Agreement and any term in such LC Application or otherwise, this Agreement shall control.

(h)    <u>Participation by Lenders</u>.  By the issuance of any LC and without any further action on the part of the LC Issuer or any Lender in respect thereof, the LC Issuer hereby grants to each Lender, and each Lender hereby agrees to acquire from the LC Issuer, a participation in each such LC and the related LC Exposure, effective upon the issuance

36

thereof without recourse or warranty, equal to such Lender's Commitment Percentage of such LC and the LC Exposure related to such LC.  The LC Issuer shall provide a copy of each LC to the Administrative Agent promptly after issuance thereof.  This agreement to grant and acquire participations is an agreement between the LC Issuer and Lenders, and neither Borrower nor any beneficiary of an LC shall be entitled to rely thereon.  Borrower agrees that each Lender purchasing a participation from the LC Issuer pursuant to this *Section 2.5(h)* may exercise all of its rights to payment against Borrower including the right of setoff, with respect to such participation as fully as if such Lender were the direct creditor of Borrower in the amount of such participations.

2.6     **Cash Collateral**.  At any time that there shall exist a Defaulting Lender, within one (1) Business Day following the written request of the Administrative Agent or the LC Issuer (with a copy to the Administrative Agent) Borrower shall Cash Collateralize the LC Issuer's Fronting Exposure solely with respect to such Defaulting Lender (determined after giving effect to Section 2.7(a)(iv) and any Cash Collateral provided by such Defaulting Lender).

(a)     Grant of Security Interest.  Borrower, and to the extent provided by any Defaulting Lender, such Defaulting Lender, hereby grants to the Administrative Agent, for the benefit of the LC Issuer, and agrees to maintain, a first priority security interest in all such Cash Collateral as security for the Defaulting Lenders' obligation to fund participations in respect of LCs.  If at any time the Administrative Agent determines that Cash Collateral is subject to any right or claim of any Person other than the Administrative Agent and the LC Issuer as herein provided, or that the total amount of such Cash Collateral is less than the amount required, Borrower will, promptly upon demand by the Administrative Agent, pay or provide to the Administrative Agent additional Cash Collateral in an amount sufficient to eliminate such deficiency (after giving effect to any Cash Collateral provided by the Defaulting Lender).

(b)     Application.  Notwithstanding anything to the contrary contained in this Agreement, Cash Collateral provided under this Section 2.6 or under Section 2.5 in respect of LCs shall be applied to the satisfaction of the LC Exposure, of the Defaulting Lender's obligation to fund participations in respect of LC Exposure (including, as to Cash Collateral provided by a Defaulting Lender, any interest accrued on such obligation) and other obligations for which the Cash Collateral was so provided, prior to any other application of such property as may otherwise be provided for herein.

(c)     Termination of Requirement.  Cash Collateral (or the appropriate portion thereof) provided to reduce the LC Issuer's Fronting Exposure shall no longer be required to be held as Cash Collateral pursuant to this Section 2.6 following (i) the elimination of the applicable Fronting Exposure (including by the termination of Defaulting Lender status of the applicable Lender), or (ii) the determination by the Administrative Agent and the LC Issuer that there exists excess Cash Collateral; *provided that*, subject to Section 2.5 the Person providing Cash Collateral and the LC Issuer may agree that Cash Collateral shall be held to support future anticipated Fronting Exposure or other obligations and *provided that* to the extent that such Cash Collateral was provided by Borrower, such Cash Collateral shall remain subject to the security interest granted pursuant to the Loan Documents.

37

2.7     **Defaulting Lenders**.

(a)     Defaulting Lender Adjustments.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by Applicable Law:

(i)     Waivers and Amendments.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set out in the definition of Required Lenders.

(ii)     Defaulting Lender Waterfall.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article 11 or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 3.7 shall be applied at such time or times as may be determined by the Administrative Agent as follows:  first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent under this Agreement; second, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the LC Issuer under this Agreement; third, to Cash Collateralize the Fronting Exposure with respect to such Defaulting Lender in accordance with Section 2.6; fourth, as Borrower may request (so long as no Default or Potential Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; fifth, if so determined by the Administrative Agent and Borrower, to be held in a deposit account and released pro rata in order to (A) satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement and (B) Cash Collateralize the LC Issuer's future Fronting Exposure with respect to such Defaulting Lender with respect to future LCs issued under this Agreement, in accordance with Section 2.6; sixth, to the payment of any amounts owing to the Lenders or the LC Issuer, as a result of any judgment of a court of competent jurisdiction obtained by any Lender, or the LC Issuer against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; seventh, so long as no Default or Potential Default exists, to the payment of any amounts owing to Borrower as a result of any judgment of a court of competent jurisdiction obtained by Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and eighth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided that* if (1) such payment is a payment of the principal amount of any Loans or LC Disbursements in respect of which such Defaulting Lender has not fully funded its appropriate share, and (2) such Loans were made or the related LCs were issued at a time when the conditions set out in Section 6.2 were satisfied or waived, such payment shall be applied solely to pay the Loans of, and LC Exposure owed to, all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or LC Exposure owed to, such Defaulting Lender until such time as all Loans and funded and unfunded

38

participations in LC Exposure are held by the Lenders pro rata in accordance with the Commitments under the Facility without giving effect to <u>Section 2.7(a)(iv)</u>. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this <u>Section 2.7(a)(ii)</u> shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    <u>Certain Fees</u>.

(A)    No Defaulting Lender shall be entitled to receive any commitment fee for any period during which that Lender is a Defaulting Lender (and Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(B)    Each Defaulting Lender shall be entitled to receive LC fees under <u>Section 3.8</u> for any period during which that Lender is a Defaulting Lender only to the extent allocable to its Commitment Percentage of the stated amount of LCs for which it has provided Cash Collateral pursuant to <u>Section 2.6</u>.

(C)    With respect to any LC fee not required to be paid to any Defaulting Lender pursuant to *clause (B)* above, the Borrower shall (1) pay to each Non-Defaulting Lender that portion of any such fee otherwise payable to such Defaulting Lender with respect to such Defaulting Lender's participation in LC Obligations or that has been reallocated to such Non-Defaulting Lender pursuant to *clause (iv)* below, (2) pay to the LC Issuer the amount of any such fee otherwise payable to such Defaulting Lender to the extent allocable to the LC Issuer's Fronting Exposure to such Defaulting Lender, and (3) not be required to pay the remaining amount of any such fee.

(iv)    <u>Reallocation of Participations to Reduce Fronting Exposure</u>.  All or any part of such Defaulting Lender's participation in LC Exposure shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Commitment Percentages (calculated without regard to such Defaulting Lender's Commitment) but only to the extent that (A) the conditions set out in <u>Section 6.2</u> are satisfied at the time of such reallocation (and, unless Borrower shall have otherwise notified the Administrative Agent at such time, Borrower shall be deemed to have represented and warranted that such conditions are satisfied at such time), and (B) such reallocation does not cause the aggregate Total Credit Exposure of any Non-Defaulting Lender to exceed such Non-Defaulting Lender's Committed Amount.  No reallocation under this Agreement shall constitute a waiver or release of any claim of any party under this Agreement against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a

39

Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

        (v)    <u>Cash Collateral</u>.  If the reallocation described in <u>Section 2.7(a)(iv)</u> above cannot, or can only partially, be effected, Borrower shall, without prejudice to any right or remedy available to it under this Agreement or under Applicable Law, Cash Collateralize the LC Issuer's Fronting Exposure in accordance with the procedures set out in <u>Section 2.6</u>.

        (b)    <u>Letters of Credit</u>.  So long as any Lender is a Defaulting Lender, no LC Issuer shall be required to issue, extend, renew or increase any LC unless it is satisfied that it will have no Fronting Exposure after giving effect thereto.

        (c)    <u>Defaulting Lender Cure</u>.  If Borrower, the Administrative Agent, and LC Issuer agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in LCs to be held pro rata by the Lenders in accordance with the Commitments (without giving effect to *paragraph (a)(iv)* above), whereupon, such Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of Borrower while that Lender was a Defaulting Lender; and *provided, further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

    2.8    **<u>Acknowledgement and Consent to Bail-In of Affected Financial Institutions</u>**.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

        (a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

        (b)    the effects of any Bail-in Action on any such liability, including, if applicable:

        (i)    a reduction in full or in part or cancellation of any such liability;

        (ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred

on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

## ARTICLE 3

## INTEREST, FEES, AND PAYMENTS

3.1    **Interest Rates**.

(a)    <u>Interest</u>.  Each Loan shall accrue interest at a rate per annum equal to 10%.

(b)    <u>Default Rate</u>.  Upon the occurrence and during the continuance of a Default, interest on the Term Principal Amount, and any other amounts owing under this Agreement or under the other Loan Documents, shall accrue interest at a per annum rate equal to the Default Rate.

3.2    **Payment of Principal and Interest**.

(a)    <u>Interest Payments</u>.  Accrued and unpaid interest on the Term Principal Amount shall be due and payable in arrears on the first day of each month, commencing with the first such date to occur after the Closing Date.

(b)    <u>Payment of Default Rate Interest</u>.  Notwithstanding the foregoing, any interest that is payable at the Default Rate shall be payable from time to time on written demand from Administrative Agent to Borrower.

(c)    <u>Payment in Full at Maturity</u>.   On the Maturity Date, Borrower unconditionally promises to pay in full, and there shall become due and payable in full, the entire outstanding Term Principal Amount, together with accrued and unpaid interest and all fees and other sums then owing under the Loan Documents.

3.3    **Prepayments**.

(a)    <u>Voluntary Prepayment</u>.  Borrower may prepay all or any part of the Term Principal Amount at any time without premium or penalty upon notice to the Administrative Agent.  Each voluntary prepayment is subject to the following conditions:

(i)    Administrative Agent must receive Borrower's written or telephonic prepayment notice not later than 10:00 a.m. on the date of prepayment;

(ii)    Borrower's prepayment notice shall (A) specify the prepayment date, (B) specify the amount of the Loan to be prepaid, and (C) constitute an

41

irrevocable and binding obligation of Borrower to make a prepayment in such amount on the designated prepayment date;

(iii)      each such partial prepayment shall be in the minimum principal amount of $1,000,000 and integral multiples of $500,000 or, if less than such minimum amounts, the entire principal amount thereof then outstanding; and

(iv)      if all or any portion of the Term Principal Amount is being prepaid, all accrued and unpaid interest on the portion of the Term Principal Amount prepaid must also be paid in full on the prepayment date.

(b)      <u>Mandatory Prepayment</u>. Subject to the terms of the Financing Orders:

(i)      [Reserved].

(ii)      [Reserved].

(iii)      On the date such amounts are received by, or for the account of, any Loan Party or any of its Subsidiaries, the following amounts shall be paid to the Administrative Agent for the ratable benefit of the Lenders in the form received with any necessary endorsement or assignment:

(A)      [Reserved];

(B)      [Reserved];

(C)      100% of any Net Proceeds from insurance in respect of any casualty event affecting any Collateral;

(D)      100% of all Net Proceeds from an Eminent Domain Event affecting any Collateral;

(E)      100% of the Net Proceeds from the Disposition of any Collateral (other than (1) Dispositions of inventory and other assets in the ordinary course of business permitted under <u>Sections 9.4(a)</u> and <u>(c)</u>); and

(F)      100% of the Net Proceeds of any Extraordinary Receipts.

(c)      <u>[Reserved]</u>.

(d)      <u>Application of Prepayments</u>.

(i)      Subject to the terms of the Financing Orders, all prepayments under <u>Sections 3.3</u> shall be (A) applied (1) first, to the Term Principal Amount until the Term Principal Amount is paid in full, (2) second, to Cash Collateralize the LC Exposure until all the LC Exposure is Cash Collateralized, (3) third, to the Bank Product Liabilities, and (4) [reserved] and (B) accompanied by the interest on the principal amount prepaid through the date of prepayment.

(ii)     Amounts prepaid pursuant to this <u>Section 3.3</u> shall be applied based on the Lender's respective Term Loan Percentages.

3.4     <u>**Computations of Interest and Fees**</u>.

(a)     <u>Calculation of Interest</u>.  All computations of interest and fees under this Agreement shall be made on the basis of the actual number of days elapsed over a year of 360 days.  Interest shall accrue from and including the Closing Date or from the first date of Borrowing to but excluding the last day occurring in the period for which such interest is payable.

(b)     <u>Maximum Rate</u>.  It is the intent of the Lenders and Borrower to conform to and contract in strict compliance with applicable usury law from time to time in effect.  All agreements between the Lenders and Borrower are hereby limited by the provisions of this <u>Section 3.4</u> which shall override and control all such agreements, whether now existing or hereafter arising and whether written or oral.  In no way, nor in any event or contingency (including but not limited to prepayment or acceleration of the maturity date of the Obligations), shall the interest taken, reserved, contracted for, charged, or received under this Agreement, under the Notes or otherwise, exceed the Maximum Rate.  If, from any possible construction of any of the Loan Documents or any other document, interest would otherwise be payable in excess of the Maximum Rate, any such construction shall be subject to the provisions of this paragraph and interest owing pursuant to such documents shall be automatically reduced to the Maximum Rate without the necessity of execution of any amendment or new document.  If any Lender shall ever receive anything of value which is characterized as interest on the Loans under Applicable Law and which would, apart from this provision, be in excess of the Maximum Rate, an amount equal to the amount which would have been excessive interest shall, without penalty, be applied to the reduction of the principal amount owing on the Loans and not to the payment of interest, or refunded to Borrower or the other payor thereof if and to the extent such amount which would have been excessive exceeds such unpaid principal amount of the Loans.  The right to demand payment of the Loans or any other Debt evidenced by any of the Loan Documents does not include the right to receive any interest which has not otherwise accrued on the date of such demand, and the Lenders do not intend to charge or receive any unearned interest in the event of such demand.  All interest paid or agreed to be paid to the Lenders with respect to the Loans shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full stated term (including any renewal or extension) of the Loans so that the amount of interest on account of the Loans does not exceed the Maximum Rate.

(c)     [Reserved].

3.5     <u>**General Payment Terms**</u>.

(a)     <u>Payments by Borrower</u>.  Except as otherwise expressly provided in this Agreement (i) all payments by Borrower under this Agreement shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds

not later than 1:00 p.m. on the date specified herein, (ii) the Administrative Agent will promptly distribute to each Lender its Commitment Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office, and (iii) all payments received by the Administrative Agent after 1:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  All payments to be made by Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.

(b)  <u>Payment Dates</u>.  If any payment or prepayment to be made by Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(c)  <u>Advances by Administrative Agent</u>.  Unless Borrower or any Lender has notified the Administrative Agent, prior to the time any payment is required to be made by it to the Administrative Agent under this Agreement, that Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto.  If and to the extent that such payment was not in fact made to the Administrative Agent in Dollars and in immediately available funds, then:

(i)  if Borrower fails to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in Dollars and in immediately available funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in immediately available funds at the greater of Federal Funds Effective Rate from time to time in effect and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing; and

(ii)  if any Lender fails to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in Dollars and in immediately available funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to Borrower to the date such amount is recovered by the Administrative Agent at a rate per annum equal to the greater of the Federal Funds Effective Rate from time to time in effect and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing.  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in the applicable Borrowing.  If such Lender does not pay such amount

forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon Borrower, and Borrower shall pay such amount to the Administrative Agent, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to Borrower to the date such amount is recovered by the Administrative Agent at a rate per annum equal to the rate of interest applicable to such Borrowing. Nothing in this Agreement shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or Borrower may have against any Lender as a result of any default by such Lender under this Agreement.

A notice of the Administrative Agent to any Lender or Borrower with respect to any amount owing under this ***Section 3.5(c)*** shall be conclusive, absent manifest error.

(d)   <u>Several Obligations</u>. The obligations of the Lenders under this Agreement to make Loans and to fund or purchase participation interests in LCs are several and not joint. The failure of any Lender to make any Loan or to fund or purchase any participation interest on any date required under this Agreement shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or fund its participation interest.

(e)   <u>Funding Offices</u>. Nothing in this Agreement shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)   <u>Notes</u>. To the extent requested by any Lender, the obligation of Borrower to repay the Term Loans owed to such Lender shall be evidenced by a Term Loan Note executed by Borrower and payable to such Lender.

(g)   <u>Defaulting Lender</u>. If any Lender shall fail to make any payment required to be made by it pursuant to <u>Section 3.5(c)</u> or <u>Section 3.6</u>, then the Administrative Agent may, in its discretion and notwithstanding any contrary provision hereof (and subject to <u>Section 2.7(a)(ii)</u>), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

3.6   <u>**Pro Rata Treatment and Sharing of Payments**</u>.

(a)   Except to the extent otherwise provided herein, each Borrowing, each payment or prepayment of principal of any Loan, each payment of interest, each payment of fees (other than fees paid to the Administrative Agent for its own account), each reduction in the Committed Amount, shall be allocated pro rata among the relevant Lenders in accordance with their Term Loan Percentages; *provided that*, if any Lender shall have failed to pay its Commitment Percentage of any Loan or purchase or fund its participation interest in any LC, then any amount to which such Lender would otherwise be entitled pursuant to this <u>Section 3.6</u> shall instead be payable to the Administrative Agent until the

share of such Loan or such participation interest not purchased or funded by such Lender has been purchased or funded unless such Lender's obligations are the subject of a good faith dispute.

(b)      In the event any principal, interest, fee or other amount paid to any Lender pursuant to this Agreement or any other Loan Document is rescinded or must otherwise be returned by the Administrative Agent, (i) such principal, interest, fee or other amount that had been satisfied by such payment shall be revived, reinstated and continued in full force and effect as if such payment had not occurred and (ii) such Lender shall, upon the request of the Administrative Agent, repay to the Administrative Agent the amount so paid to such Lender, with interest for the period commencing on the date such payment is returned by the Administrative Agent until the date the Administrative Agent receives such repayment at a rate per annum equal to the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, if repaid within two (2) Business Days after such request, and thereafter at a rate per annum equal to the greater of the Federal Funds Effective Rate from time to time in effect and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing.

(c)      The Lenders agree among themselves that, except to the extent otherwise provided in this Agreement, in the event that any Lender shall obtain payment in respect of any Loan or any other obligation owing to such Lender under this Agreement or any other Loan Document through the exercise of a right of setoff, banker's lien or counterclaim, or pursuant to a secured claim under Section 506 of the Bankruptcy Code or other security or interest arising from, or in lieu of, such secured claim, received by such Lender under any applicable Debtor Relief Law or other similar law or otherwise, or by any other means,

(i)      in excess of its Term Loan Percentage of such payment as provided for in this Agreement, such Lender shall promptly pay in cash or purchase from the other Lenders a participation in such Loans and other obligations in such amounts, and make such other adjustments from time to time, as shall be equitable to the end that all Lenders share such payment in accordance with their respective Term Loan Percentages; or

(ii)      such payment shall be rescinded or must otherwise be returned, each Lender which shall have shared the benefit of such payment shall, by payment in cash or a repurchase of a participation theretofore sold, return its share of that benefit (together with its share of any accrued interest payable with respect thereto) to each Lender whose payment shall have been rescinded or otherwise returned.

Borrower agrees that (A) any Lender so purchasing such a participation may, to the fullest extent permitted by Applicable Law, exercise all rights of payment, including setoff,

46

banker's lien or counterclaim, with respect to such participation as fully as if such Lender were a holder of such Loan or other obligation in the amount of such participation and (B) the Obligations that have been satisfied by a payment that has been rescinded or otherwise returned shall be revived, reinstated and continued in full force and effect as if such payment had not occurred.

(d)     Except as otherwise expressly provided in this Agreement, if any Lender or the Administrative Agent shall fail to remit to any other Lender or the Administrative Agent an amount payable by such Lender or the Administrative Agent to such other Lender or the Administrative Agent pursuant to this Agreement on the date when such amount is due, such payments shall be made together with interest thereon for each date from the date such amount is due until the date such amount is paid to the Administrative Agent or such other Lender at a rate per annum equal to the Federal Funds Effective Rate.  If under any applicable Debtor Relief Law or other similar law, any Lender receives a secured claim in lieu of a setoff to which this <u>Section 3.6</u> applies, such Lender shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the Lenders under this <u>Section 3.6</u> to share in the benefits of any recovery on such secured claim.

3.7     **<u>Right of Setoff</u>**.  If any Default shall have occurred and be continuing, each Lender, the LC Issuer, and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held, and other obligations (in whatever currency) at any time owing, by such Lender, the LC Issuer or any such Affiliate, to or for the credit or the account of Borrower or any other Loan Party against any and all of the obligations of Borrower or such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender or the LC Issuer or their respective Affiliates, irrespective of whether or not such Lender, the LC Issuer or Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of Borrower or such Loan Party may be contingent or unmatured or are owed to a branch, office or Affiliate of such Lender or the LC Issuer different from the branch, office or Affiliate holding such deposit or obligated on such Debt; *provided that* in the event that any Defaulting Lender shall exercise any such right of setoff, (a) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of <u>Section 2.7</u> and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, the LC Issuer, and the Lenders, and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender, the LC Issuer and their respective Affiliates under this <u>Section 3.7</u> are in addition to other rights and remedies (including other rights of setoff) that such Lender, the LC Issuer or their respective Affiliates may have.  Each Lender and the LC Issuer agrees to notify Borrower and the Administrative Agent promptly after any such setoff and application; *provided that*, the failure to give such notice shall not affect the validity of such setoff and application.

3.8     **<u>Fees</u>**.

(a)     Certain Fees.  Borrower agrees to pay to the Administrative Agent, for its own account or for the account of the Lenders, as applicable, such other fees as may separately be agreed upon in writing by Borrower and the Administrative Agent and authorized by the Bankruptcy Court.

(b)     Closing Fee.  The Borrower shall pay to each Lender its pro-rata share of a closing fee equal to **$1,430,000.00** (the "Facility Fee"), which such Facility Fee shall be fully earned on the Closing Date but shall be due and payable in full in cash on the Termination Date.

(c)     LC Fees.

(i)     Borrower shall pay to the Administrative Agent, for the ratable benefit of the Lenders, a letter of credit fee for each LC equal to the rate per annum then applicable to the Loans multiplied by the daily maximum amount available to be drawn under such LC (whether or not such maximum amount is then in effect under such LC), provided that, the letter of credit fee for any LC may not be less than $500.  Such LC fees shall be computed on a quarterly basis in arrears and be due and payable on the last day of each March, June, September, and December on the first such date to be occur after the Closing Date, and are nonrefundable.

(ii)     In addition to the foregoing fees, Borrower shall pay to the LC Issuer for its own account, an issuance fee with respect to each LC in the amount equal to the daily amount available to be drawn under such LC times 0.125%; *provided that*, the amount of such issuance fee may not be less than $500.  Such issuance fee shall be payable on the date of issuance (and renewal, extension, amendment, or increase, as applicable) of such LC.

(iii)     In addition, Borrower shall pay directly to the LC Issuer the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of the LC Issuer relating to letters of credit as from time to time in effect.  Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable.

## ARTICLE 4

## TAXES, YIELD PROTECTION AND ILLEGALITY

4.1     **Taxes**.

(a)     Lender and Applicable Law.  For purposes of this Section 4.1, the term "Lender" includes the LC Issuer, and the term "Applicable Law" includes FATCA.

(b)     Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law.  If any Applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a

48

Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and, if the withholding or deduction is made on account of an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this <u>Section 4.1</u>) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)     <u>Payment of Other Taxes by the Loan Parties</u>.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)     <u>Indemnification by the Loan Parties</u>.  The Loan Parties shall jointly and severally indemnify each Recipient, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 4.1</u>) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any penalties, interest, and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)     <u>Indemnification by the Lenders</u>.  Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of <u>Section 14.7</u> relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this <u>Section 4.1</u>.

(f)     <u>Evidence of Payments</u>.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this <u>Section 4.1</u> such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt

49

issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)     Status of Lenders.

(i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to Borrower and the Administrative Agent, at the time or times reasonably requested by Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by Borrower or the Administrative Agent as will enable Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 4.1(g)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the U.S. is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an

exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed copies of IRS Form W-8ECI;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Tax Code, (x) a certificate substantially in the form of Exhibit E-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Tax Code, a "10-percent shareholder" of Borrower within the meaning of Section 871(h)(3)(B) of the Tax Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Tax Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, or IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-2 or Exhibit E-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided that* if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-4 on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if

51

such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Tax Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by Applicable Law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Tax Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this *clause (D)*, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h)    Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 4.1 (including by the payment of additional amounts pursuant to this Section 4.1), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 4.1 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this *paragraph (h)* (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this *paragraph (h)*, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this *paragraph (h)* the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This *paragraph (h)* shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)    Survival.  Each party's obligations under this Section 4.1 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

52

4.2    **Increased Costs**.

(a)    <u>Increased Costs Generally</u>.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender or the LC Issuer;

(ii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in *clauses (b)*, *(c)* and *(d)* of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or the LC Issuer any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or any LC or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to increase the cost to such Lender, the LC Issuer or such other Recipient of participating in, issuing or maintaining any LC (or of maintaining its obligation to participate in or to issue any LC), or to reduce the amount of any sum received or receivable by such Lender, the LC Issuer or other Recipient under this Agreement from any Loan Party (whether of principal, interest or any other amount) then, upon written request of such Lender, the LC Issuer or other Recipient that reasonably details the basis for such request, Borrower will pay to such Lender, the LC Issuer or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender, the LC Issuer or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)    <u>Capital Requirements</u>.  If any Lender or the LC Issuer determines that any Change in Law affecting such Lender or the LC Issuer or any Lending Office of such Lender or such Lender's or the LC Issuer's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's or the LC Issuer's capital or on the capital of such Lender's or the LC Issuer's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or participations in LCs held by, such Lender, or the LC issued by the LC Issuer, to a level below that which such Lender or the LC Issuer or such Lender's or the LC Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the LC Issuer's policies and the policies of such Lender's or the LC Issuer's holding company with respect to capital adequacy), then from time to time Borrower will pay to such Lender or the LC Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or the LC Issuer or such Lender's or the LC Issuer's holding company for any such reduction suffered.

(c)     Certificates for Reimbursement.  A certificate of a Lender or the LC Issuer setting out the amount or amounts necessary to compensate such Lender or the LC Issuer or its holding company, as the case may be, as specified in Sections 4.2(a) or (b) above, and delivered to Borrower, shall be conclusive absent manifest error.  Borrower shall pay such Lender or the LC Issuer, as the case may be, the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)     Delay in Requests.  Failure or delay on the part of any Lender or the LC Issuer to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's or the LC Issuer's right to demand such compensation; *provided that* Borrower shall not be required to compensate a Lender or the LC Issuer pursuant to this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender or the LC Issuer, as the case may be, notifies Borrower of the Change in Law giving rise to such increased costs or reductions, and of such Lender's or the LC Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine (9) month period referred to above shall be extended to include the period of retroactive effect thereof).

4.3     **[Reserved]**.

4.4     **[Reserved]**.

4.5     **[Reserved]**.

4.6     **Requests for Compensation**.  A certificate of a Lender claiming compensation under this Article 4 and setting out the additional amount or amounts to be paid to it under this Agreement shall be conclusive in the absence of manifest error.  In determining such amount, a Lender may use any reasonable averaging and attribution methods.  Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

4.7     **Mitigation of Obligations; Replacement of Lenders**.

(a)     Designation of a Different Lending Office.  If any Lender requests compensation under Section 4.2, or requires Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 4.1, then such Lender shall (at the request of Borrower) use reasonable efforts to designate a different Lending Office for funding or booking its Loans under this Agreement or to assign its rights and obligations under this Agreement to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 4.1 or Section 4.2, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     Replacement of Lenders.  If any Lender requests compensation under Section 4.2, or if Borrower is required to pay any Indemnified Taxes or additional amounts

to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 4.1 and, in each case, such Lender has declined or is unable to designate a different Lending Office in accordance with Section 4.7(a), or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then Borrower may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 14.7), all of its interests, rights (other than its existing rights to payments pursuant to Section 4.1 or Section 4.2) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided that*:

      (i)     Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 14.7;

      (ii)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in LC Exposure, accrued interest thereon, accrued fees and all other amounts payable to it under this Agreement and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or Borrower (in the case of all other amounts);

      (iii)   in the case of any such assignment resulting from a claim for compensation under *Section 4.2* or payments required to be made pursuant to *Section 4.1*, such assignment will result in a reduction in such compensation or payments thereafter;

      (iv)   such assignment does not conflict with Applicable Law; and

      (v)    in the case of any assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver, or consent.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrower to require such assignment and delegation cease to apply.

Notwithstanding anything in this Section 4.7 to the contrary, (A) any Lender that acts as an LC Issuer may not be replaced hereunder at any time it has any LC outstanding hereunder unless arrangements satisfactory to such Lender (including the furnishing of a backstop standby letter of credit in form and substance, and issued by an issuer, reasonably satisfactory to such LC or the depositing of cash collateral into a cash collateral account in amounts and pursuant to arrangements reasonably satisfactory to such LC Issuer) have been made with respect to such outstanding LC, and (B) the Lender that acts as the Administrative Agent may not be replaced hereunder except in accordance with the terms of Section 12.6.

4.8     **[Reserved]**.

4.9     **Survival**.   All of Borrower's obligations under this Article 4 shall survive termination of the Commitments and repayment of all Obligations.

## ARTICLE 5

## COLLATERAL AND GUARANTIES

5.1     **Collateral**.   To secure full and complete payment and performance of the Obligations (including all Term Loans, LCs, and Bank Product Liabilities), each Loan Party shall execute and deliver, or cause to be executed and delivered, a Security Agreement prior to the Final Hearing under which each shall grant to the Administrative Agent a first priority security interest in and Lien on all of its Collateral described therein.

5.2     **[Reserved]**.

5.3     **Perfection; Financing Statements**.   The Liens and Security Interest securing the Obligations, as granted pursuant to the Security Documents, shall be deemed valid and perfected by the entry of relevant Financing Orders; provided, that each Loan Party hereby authorizes Administrative Agent to file, and agrees to execute, if requested, financing statements, continuation statements, or termination statements (each in Acceptable Form), or take other action reasonably requested by Administrative Agent relating to the Collateral, including any Lien search required by Administrative Agent.

5.4     **Grants, Rights, and Remedies**.   The Liens and the administrative priority granted pursuant to the Financing Orders may be independently granted by the Loan Documents. This Agreement, the Interim DIP Order, the Final DIP Order and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Agent hereunder and thereunder are cumulative.

5.5     **Further Assurances – Collateral**.   Each Loan Party (at its expense) shall obtain, or cooperate with Administrative Agent to obtain, agreements, documents, instruments, and papers (all in Acceptable Form) as Administrative Agent may from time to time reasonably request to attach or preserve the attachment, and to perfect or preserve the perfection and priority, of Administrative Agent's security interests granted under the Loan Documents (including, landlord subordination agreements, creditor and mortgagee subordination agreements, and Lien release documents).  Borrower hereby appoints and empowers Administrative Agent or its representatives, as its attorney-in-fact, to execute and/or endorse (and file, as appropriate) on its behalf any documents, agreements, papers, checks, financing statements and other documents which, in Administrative Agent's sole judgment, are necessary to be executed, endorsed and/or filed in order to (a) perfect or preserve the perfection and priority of Administrative Agent's security interests granted under the Loan Documents and (b) collect or realize upon the Collateral or otherwise exercise its rights and remedies under any of the Loan Documents or Applicable Law.

5.6     **Liens Granted to the Administrative Agent**.   Liens granted to the Administrative Agent under the Loan Documents are granted to the Administrative Agent for the ratable benefit of the Secured Parties.

# ARTICLE 6

## CONDITIONS PRECEDENT

6.1     **Initial Credit Extension**.  This Agreement shall be effective once it is executed and delivered by each of the parties thereto.  The obligations of the Lenders to make Loans under this Agreement shall not become effective until the date on which Administrative Agent has received each of the following in Acceptable Form (or has waived the requirement in accordance with Section 14.8):

(a)     Executed Loan Documents.  Duly executed copies of this Agreement and, prior to the Final Hearing, the Notes in favor of each Lender requesting same, and all other Loan Documents and Security Documents required by Administrative Agent to be executed and delivered on the date hereof, each in Acceptable Form;

(b)     Security Interest.  The Administrative Agent and each Lender shall be satisfied that the Loan Documents and the Interim DIP Order shall be effective to create in favor of the Administrative Agent for the benefit of the Secured Parties a legal, valid, perfected and enforceable security interest and Lien upon the Collateral, with the priority set forth in the Interim DIP Order and the terms thereof.

(c)     [Reserved].

(d)     [Reserved].

(e)     Budget.  The Administrative Agent shall have received the initial Approved Budget.

(f)     Cases.  The Bankruptcy Court shall have approved and entered all "first day" orders, including, without limitation, the Interim DIP Order and the Cash Management Order, in form and substance satisfactory to the Lenders, within five (5) Business Days of the Petition Date, and such orders shall be in full force and effect and shall not have been modified or amended (unless otherwise approved by the Lenders), reversed, or stayed;

(g)     Consents and Approvals. The Agent and the Lenders shall have received evidence, in form and substance reasonably satisfactory to the Lenders, that the Loan Parties have obtained all requisite consents and approvals in connection with the filing of the Cases and the execution, delivery, and performance of this Agreement and the other Loan Documents;

(h)     No Adverse Proceedings.  No action, proceeding, investigation, regulation or legislation shall have been instituted or threatened before any Governmental Authority to enjoin, restrain or prohibit, or to obtain damages in respect of, or which is related to or arises out of this Agreement or any of the other Loan Documents or the consummation of the transactions contemplated hereby and thereby and which, in Lenders' reasonable judgment, would make it inadvisable to consummate the transactions contemplated by this Agreement or any of the other Loan Documents;

DOCS_SF:108642.3 58614/002

(i)      Cases.  The Loan Parties shall have filed the Cases in the Bankruptcy Court on or before March 18, 2023, and the Loan Parties shall be debtors and debtors in possession under Chapter 11 of the Bankruptcy Code;

(j)      [Reserved].

(k)      Milestones.  The Borrower shall have timely and fully satisfied any and all applicable Milestones required to be satisfied under Section 8.20 on or prior to the date the Borrower requests the Initial Advance to be made;

(l)      [Reserved].

(m)      Fees and Expenses.  To the extent permitted under the Approved Budget, payment by Borrower of all fees and expenses invoiced by, and owed by it to, the Administrative Agent or any Lender, including any fees payable on the Closing Date pursuant to any written agreement between Borrower and the Administrative Agent, and evidence that the costs and expenses (including reasonable attorneys' fees) of the Administrative Agent have been paid in full by Borrower; and

(n)      Other.  Such other documents, instruments, agreements or information as reasonably requested by any Lender.

6.2    **Conditions to All Credit Extensions**.  The obligation of the Lenders to make any Term Loan is subject to: (a) all of the representations and warranties contained in Article 7 hereof and the other Loan Documents being true and correct on and as of the date of such Credit Extension, with the same force and effect as if such representations and warranties had been made on and as of such date (except to the extent any such representation and warranty specifically relates to an earlier date in which case such representation and warranty shall have been true and correct as of such earlier date); (b) no Material Adverse Event has occurred; (c) no Default or Potential Default is existing and continuing; (d)(x) prior to the Final DIP Order Entry Date, the Interim DIP Order shall have been entered and be in full force and effect, (y) prior to the Final DIP Order Entry Date, any "second day orders" approving on a final basis any first day orders intended to be entered on or prior to the date of entry of the Final DIP Order shall have been entered by the Bankruptcy Court, shall be acceptable to the Administrative Agent, in its sole and exclusive discretion, shall be in full force and effect, shall not have been vacated or reversed, shall not be subject to a stay and shall not have been modified or amended other than as acceptable to the Administrative Agent in its sole and exclusive discretion, and (z) on and after the Final DIP Order Entry Date, the Final DIP Order shall have been entered and be in full force and effect; (e) the Loan Parties shall have timely and fully satisfied any and all applicable Milestones required to be satisfied under Section 8.20 on or prior to the date of the requested Term Loan; (f) the Agent shall have received a Notice of Borrowing with respect to such Term Loan; (g) the Approved Budget shall be in form and substance satisfactory to the Agent and the Lenders; (h) the Agent and the Lenders shall have received such other approvals or documents as the Agent and the Lenders may reasonably request; (i) no injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the extending of such credit shall have been issued and remain in force by any Governmental Authority against the Loan Parties or the Lenders; and (j) the Lenders shall have received a certificate signed by the CRO certifying the Loan Parties'

satisfaction of each of the foregoing conditions set forth in this Section 6.2 as of the date of each requested credit extension.

Each Borrowing Request delivered to the Administrative Agent constitutes a representation and warranty by Borrower that the conditions in this <u>Section 6.2</u> are true and correct in all material respects.

# ARTICLE 7

## REPRESENTATIONS AND WARRANTIES

To induce Administrative Agent, the LC Issuer, and Lenders to enter into this Agreement, Borrower represents and warrants to the Administrative Agent, the LC Issuer, and Lenders that:

7.1    **Existence and Power**.  Each Loan Party and each of its Subsidiaries (a) is duly organized, validly existing, and in good standing under the Applicable Laws of the jurisdiction in which it is organized, (b) is qualified to do business and is in good standing in all jurisdictions where such qualification is required (except where failure to so qualify could not reasonably be expected to have a Material Adverse Effect), (c) has the necessary power and authority, and all necessary permits, licenses, franchises, patents, copyrights, trademarks and trade names, or rights, to conduct its business, (except where the failure to possess any such permit, license, franchise, patent, copyright, trademark and trade name or right would not reasonably be expected to have a Material Adverse Effect), and (d) has the requisite power and authority to execute, deliver and perform this Agreement and the other Loan Documents to which it is a party.

7.2    **Authorization and No Conflicts**.  The execution and delivery by each Loan Party of the Loan Documents to which it is a party, and each Loan Party's performance of its obligations under the Loan Documents, (a) have been duly authorized by such Loan Party, (b) do not conflict with any of its Organizational Documents, (c) do not conflict with any Applicable Law or Material Agreement by which such Loan Party is bound, (d) do not require any material consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except the entry of the Interim DIP Order and the Final DIP Order and except such as have been obtained or made and are in full force and effect, and (e) will not result in the creation or imposition of any Lien on any of its assets or any of its Subsidiaries, except those in favor of Administrative Agent.

7.3    **Enforceability**.  Each Loan Document has been duly executed and delivered to the Administrative Agent by each Loan Party which is a party to it, and each such Loan Document constitutes a legal, valid, and binding obligation of the Loan Party thereto and is enforceable against such Loan Party in accordance with its respective terms, except as enforceability may be limited by applicable Debtor Relief Laws, other laws of general application relating to the enforcement of creditors' rights, and general principles of equity.

7.4    **Subsidiaries**.

(a)    For Borrower and each Subsidiary, the Disclosure Schedules set out such Person's name, address, U.S. taxpayer identification number, entity type and jurisdiction of organization, the amount of issued and outstanding Equity Interests of such Person, and the names of the owners of its Equity Interests.

(b)      (i) Borrower and its Subsidiaries owns, free and clear of Liens, and has the unencumbered right to vote, all outstanding Equity Interests in each Person shown to be held by it in said Schedule, (ii) all of the issued and outstanding Equity Interests of each such Person is validly issued, fully paid, and nonassessable, and (iii) there are no outstanding options, warrants or other rights with respect to such Person's rights in such Equity Interests.

(c)      There are no restrictions on the right or ability of Borrower's Subsidiaries to pay dividends or make Distributions to Borrower except as contemplated by this Agreement and the other Loan Documents.

7.5      **Debt**.  No Loan Party nor any of its Subsidiaries has any Debt except Permitted Debt.

7.6      **Liens**.  No Lien exists on any asset of any Loan Party or any of its Subsidiaries, other than Permitted Liens.

7.7      **Ownership and Location of Assets**.

(a)      The Disclosure Schedules set out (i) a complete and correct list of all real property interests held by the Borrower and its Subsidiaries indicating in each case whether the respective property is owned or leased, the identity of the owner or lessee, and the location of the respective property, (ii) the location of all of the inventory, equipment or goods for each Loan Party and each of its Subsidiaries (other than goods on consignment, in transit, or in the possession of a Person under the terms of a contract with a Loan Party), and (iii) a complete and correct list of deposit accounts, lockbox accounts, disbursement accounts, investments accounts, and other similar accounts as of the Closing Date, specifying the name of each applicable financial institution, the owner of each such account, and the complete account number therefor.

(b)      Each Loan Party and each of its Subsidiaries has (i) indefeasible title to its owned real property, (ii) a vested leasehold interest in all of its material leased properties, and (iii) good and marketable title to its personal property, except, in each case, for (A) minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes and (B) Permitted Liens.

7.8      **Intellectual Property**.  Each Loan Party and each of its Subsidiaries owns, or is licensed to use, all trademarks, trade names, copyrights, patents and other intellectual property material to its business and its use thereof does not infringe on the rights of any Person (and no claim of infringement has been made), other than infringements or claims which, if successfully asserted against or determined adversely to any Loan Party or any of its Subsidiaries, could not, individually or collectively, reasonably be expected to have a Material Adverse Effect.

7.9      **Place of Business**.  The Disclosure Schedules set out the location of each Loan Party's and each of its Subsidiaries' place of business or chief executive office.  The books and records of each Loan Party and each of its Subsidiaries are located at its place of business or chief executive office.

7.10  **Financial Information**.

(a)     With respect to all financial statements delivered by the Loan Parties to the Agent, in each case (i) such financial statements (including the Current Financials) are true and correct in all material respects, have been prepared in accordance with GAAP, and fairly and accurately present, on a consolidated basis, the financial condition of Borrower and its Subsidiaries as of the respective dates indicated therein, (ii) since the date of such financial statements (including the Current Financials) there has been no material adverse change in the business condition (financial or otherwise), operations, or properties of the Borrower and its Subsidiaries, and (iii) no Loan Party nor any of its Subsidiaries has any material contingent liabilities, liabilities for Taxes, material forward or long-term commitments, or unrealized or anticipated losses from any unfavorable commitments not reflected in such financial statements (including the Current Financials).

(b)     Other than arising as the result of the commencement of the Cases, there has been no Material Adverse Event since the Petition Date.

(c)     Each material fact or material condition relating to the Loan Documents, the Collateral, and the Borrower and its Subsidiaries' (taken as a whole) financial condition, business, or property has been disclosed to the Administrative Agent in writing.

7.11  **Compliance with Laws**.  Each Loan Party is in compliance with all Applicable Laws applicable to it or to its property except where the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

7.12  **Material Agreements**.  As of the Closing Date, no Loan Party is a party to any Material Agreement, other than the Loan Documents and the Material Agreements set forth in the Disclosure Schedules, and each such Material Agreement is in full force and effect.  No Loan Party (a) is in violation of, or default under, any Material Agreement or (b) has knowledge of any pending amendments or pending or threatened termination of any Material Agreement.  As of the Closing Date, Borrower has delivered to the Administrative Agent a true, complete and correct copy of each Material Agreement (including all schedules, exhibits, amendments, supplements, modifications, assignments and all other documents delivered pursuant thereto or in connection therewith).

7.13  **Litigation**.  For each Loan Party, there is no Litigation pending, or to such Loan Party's knowledge, threatened in writing, involving any Loan Party which (a) purports to affect or pertain to this Agreement, any other Loan Document, or any of the transactions contemplated by the Loan Documents, or (b) would reasonably be expected to have a Material Adverse Effect. There are no outstanding judgments, arbitration awards or unpaid settlement agreements against any Loan Party.

7.14  **Taxes**.  All tax returns of each Loan Party required to be filed have been timely filed (or extensions have been granted) and all Taxes imposed upon any Loan Party that are due and payable have been paid in accordance with the requirements of the Bankruptcy Code and other applicable insolvency laws to the extent permitted under the Financing Orders.

61

7.15   **Environmental Matters**.   There is no pending or, to Borrower's knowledge, threatened investigation or inquiry by any Governmental Authority of any Loan Party, or any of their respective properties pertaining to any Hazardous Material.   Except in the ordinary course of business and in compliance with all Environmental Laws, (a) there are no Hazardous Materials located on or under any of the properties of any Loan Party, and (b) no Loan Party has caused or permitted any Hazardous Material to be disposed of on or under or released from any of its properties that could reasonably be expected to have a Material Adverse Effect.   Each Subsidiary has obtained all permits, licenses, and authorizations which are required under and by all Environmental Laws, except for such permits, licenses, and authorizations which, if not obtained, would result in a Material Adverse Effect.

7.16   **Insurance**.   The Loan Parties maintain insurance required under Section 8.6.

7.17   **Margin Regulations**.   No Loan Party is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T, U, or X of the Federal Reserve Board), and no part of the proceeds of any Credit Extension will be used to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying margin stock.

7.18   **Trade Names**.   Each Loan Party is in compliance with all applicable trade name or "d/b/a" statutes in each state in which such Loan Party does business and except as disclosed in the Disclosure Schedules, no Loan Party has used or transacted business under any other corporate name, d/b/a, or trade name in the five-year period preceding the Closing Date (including names of all Persons with which any Loan Party has merged or consolidated, or from which any Loan Party has acquired all or a substantial portion of such Person's assets).

7.19   **Transactions with Affiliates**.   Except as set forth in the Disclosure Schedules, no Loan Party is a party to an agreement or transaction with any of its Affiliates other than transactions in the ordinary course of business and upon fair and reasonable terms not materially less favorable than it could obtain or could become entitled to in an arm's-length transaction with a Person that was not its Affiliate.

7.20   **ERISA**.   Each Loan Party has complied with all applicable minimum funding requirements and all other applicable and material requirements of ERISA, and there are no existing conditions that would reasonably be expected to give rise to material liability thereunder. No ERISA Event has occurred in connection with any employee benefit plan that might constitute grounds for the termination thereof by the PBGC or for the appointment by the appropriate U.S. District Court of a trustee to administer such plan.

7.21   **Labor Matters**.   There are no collective bargaining agreements covering the employees of any Loan Party or any of their respective Subsidiaries and there is not pending, nor (to the knowledge of Borrower) is there threatened, any strike, walkout, slowdown or work stoppage, or any unfair labor practice complaint or grievance or arbitration proceeding arising out of or under any collective bargaining agreement covering the employees of any Loan Party or any of their respective Subsidiaries that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

7.22 **Investment Company Act**. No Loan Party is, or is affiliated with, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

7.23 **Anti-Corruption Laws and Sanctions**. Each Loan Party has implemented and maintains in effect policies and procedures designed to ensure compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and such Loan Party, its Subsidiaries and their respective officers and employees and to the knowledge of such Loan Party its directors, managers, officers and employees, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in any Loan Party being designated as a Sanctioned Person. None of (a) any Loan Party, any Subsidiary or any of their respective directors, managers, officers or employees, or (b) to the knowledge of any such Loan Party or Subsidiary, any agent of such Loan Party or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Borrowing or LC, use of proceeds, or other transaction contemplated by this Agreement or the other Loan Documents will violate Anti-Corruption Laws or applicable Sanctions.

7.24 **Patriot Act**. No Loan Party (a) is a Person described or designated in the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control or in Section 1 of the Anti-Terrorism Order or (b) engages in any dealings or transactions with any such Person. Each Loan Party and its Subsidiaries is in compliance, in all material respects, with the Patriot Act.

7.25 **[Reserved]**.

7.26 **No Restrictive Agreement**. No Loan Party is a party to any Restrictive Agreement.

7.27 **Approved Budget**. Attached hereto as Exhibit F is a true and complete copy of the Approved Budget, in form and substance satisfactory to the Lenders. The Approved Budget has been prepared on a reasonable basis and represents (and as of the date on which any other Approved Budget is delivered to Lenders, such additional Approved Budget represents) the Loan Parties' good faith estimate, based on diligent investigation, on the date such Approved Budget is delivered, of the Loan Parties' future performance for the periods covered thereby based upon the Loan Parties' good faith assumptions believed by the Borrower to be reasonable at the time of the delivery thereof to the Lenders or their advisors. The Loan Parties are not aware of any information that would lead them to believe that such Approved Budget is not attainable and the Loan Parties have not failed to disclose any material assumptions with respect to such Approved Budget.

7.28 **Financing Orders**. The Interim DIP Order and, at all times after its entry by the Bankruptcy Court, the Final DIP Order, has been duly entered, is valid, subsisting and continuing (and provides for, among other things, a valid, perfected, continuing, enforceable, non-avoidable first priority priming Lien on the Collateral of each Loan Party in favor of the Agent) and except as otherwise expressly consented to by the Lenders, has not been vacated, modified, reversed on appeal, or vacated or modified by any bankruptcy or district court judge and is not subject to any pending stay. On and after the date any other Financing Order is entered by the Bankruptcy Court,

63

such other Financing Order shall have been duly entered, valid, subsisting and continuing and except as otherwise expressly consented to by the Lenders, shall not have been vacated, modified, reversed on appeal, or vacated or modified by any bankruptcy or district court judge and shall not be subject to any pending stay.

7.29     **Super-Priority Claims**.  All Obligations of the Loan Parties incurred during the pendency of the Cases, in addition to being secured by the Collateral, constitute Super-Priority Claims, as more fully set forth in the Financing Orders, subject to the Carve-Out and any other Super-Priority Claims to the extent set forth in the Financing Orders.

# ARTICLE 8

# AFFIRMATIVE COVENANTS

So long as Lenders are committed to make any Credit Extension under this Agreement, and thereafter until the Termination Date, Borrower covenants and agrees as follows:

8.1     **Reporting Requirements**.  Borrower will (i) hold weekly telephonic conference calls with their advisors, the Lenders and advisors to the Lenders during which the Borrower and their advisors shall report on, among other things, any material developments in the Cases, (ii) allow the Administrative Agent to have direct access to senior management and the CRO from time to time in its discretion to discuss the plan, sale, and the marketing process and other business and affairs of the Loan Parties, and (iii) deliver, or cause to be delivered, to the Agent and the Lenders those reports and other information set forth in the Financing Orders.

(a)     [Reserved].

(b)     [Reserved].

(c)     [Reserved].

(d)     [Reserved].

(e)     [Reserved].

(f)     Supply Contract Valuation.  No later than the date of the Final Hearing, a valuation of the Supply Contracts, which shall be prepared by acceptable to the Administrative Agent and addressed to the Administrative Agent on behalf of the Lenders, and otherwise acceptable in form, methodology and substance to the Administrative Agent.

(g)     [Reserved].

(h)     Tax Returns.  As soon as available, and in any event within 30 days after filing, (i) complete copies of all state and federal income tax returns (including all schedules and statements) of the Borrower and its Subsidiaries, and (ii) complete copies of all extensions filed in connection with such state and federal tax returns, if applicable.

64

(i)     <u>Material Agreements, Etc</u>.  After the consummation of any amendment, renewal or extension of any Material Agreement, certified copies of any such amendment, extension or renewal of any such Material Agreement.

(j)     <u>Notice of Litigation, Defaults, and Other Material Events</u>.  Notice, immediately after any Loan Party receives notice of, or otherwise becomes aware of, (i) the commencement of any Litigation involving any Loan Party for which the monetary amount at issue is greater than the Threshold Amount, individually or in the aggregate, (ii) the commencement of any Litigation involving any Loan Party, other than claims, litigation or proceedings under the Cases, (iii) any material liability or alleged material liability under any Environmental Law arising out of, or directly affecting, the properties or operations of such Loan Party, (iv) any dispute with any Governmental Authority, (v) the occurrence of any default or event of default, or the receipt by the Borrower or any of its Subsidiaries or any other Loan Party of any written notice of an alleged default or event of default, with respect to any Material Indebtedness, (vi) the occurrence of any default or event of default, or the receipt by any Loan Party of any written notice of an alleged default or event of default, with respect to any Material Indebtedness, (vii) any claim, action or proceeding challenging a Lien granted by a Loan Party to the Administrative Agent or affecting title to all or any material portion of the Collateral, (viii) any Default, specifying the nature thereof and what action each Loan Party has taken, is taking, or proposes to take, (ix) [reserved], (x) any amendment or modification to any Material Agreement (together with a copy thereof), and prompt notice of any termination, expiration or loss of any Material Agreement, and (xi) any material default (or receipt of notice of any claimed default) under any Material Agreement (including Oil Company Agreements).

(k)     <u>Notice of Changes by a Loan Party</u>.  Prior written notice on or before the occurrence of (i) any proposed relocation of any Loan Party's chief executive office or principal place of business, (ii) any proposed relocation of the place where a Loan Party's books and records relating to accounts and general intangibles are kept, (iii) a change of any Loan Party's name, Organizational Documents, jurisdiction of organization, or type of organizational structure, (iv) any proposed relocation of any of the Collateral to a location other than those set out on the Disclosure Schedules, or as approved by the Bankruptcy Court and the Agent, and (v) any Acquisition, division, or creation of a Subsidiary by any Loan Party, or that any Person has become a Subsidiary of any Loan Party.  Nothing in this <u>Section 8.1(k)</u> shall be construed as permitting the Acquisition, division, or creation of a Subsidiary.

(l)     <u>Beneficial Ownership</u>.  Prompt notification (i) of any change in 25% or more of the direct or indirect ownership interests in Borrower as reported in the Beneficial Ownership Certification or other similar certification provided to Lender on or prior to the Closing Date (the "<u>Closing Certification</u>"), and (ii) if the Person or Persons with significant managerial responsibility identified in the Closing Certification cease to have that responsibility or if the information reported about any such Person changes.  Borrower hereby agrees to provide such information and documentation as Lender may reasonably request in order to confirm or update the continued accuracy of the information provided in connection with the Closing Certification, any other Beneficial Ownership Certification delivered in connection herewith, and any updates or supplements to any of the foregoing.

(m)   <u>Chapter 11 Case Pleadings</u>.  Advance copies of all material financing and sale applications, motions, and pleadings to be filed by any Loan Party in the Cases not later than two days prior to the filing thereof (or upon such lesser notice acceptable to the Agent in its sole discretion).

(n)   [Reserved].

(o)   <u>General Information</u>.  Promptly, upon reasonable request by the Administrative Agent or any Lender, such other information and documents not otherwise required to be furnished under the Loan Documents respecting the business affairs, assets and liabilities of the Borrower and its Subsidiaries.

8.2   **Keeping Books and Records**.  Borrower will maintain, and will cause each other Loan Party to maintain, proper books of record and account in which full, true, and correct entries in conformity with GAAP shall be made of all dealings and transactions in relation to its business and activities.

8.3   **Inspection; Collateral Examinations**.  Borrower will permit, and will cause each Loan Party to permit, representatives of Administrative Agent:

(a)   to examine and make copies of the books and records of, and visit and inspect the properties or assets of Borrower and any Subsidiary and to discuss the business, operations, and financial condition of any such Persons with their respective officers and employees and with their independent certified public accountants, all during normal business hours at such reasonable times and as often as the Administrative Agent or any Lender may request after prior notice to the Borrower; *provided that*, if a Default has occurred and is continuing, no prior notice shall be required and Borrower shall also permit representatives of any Lender to take such actions; and

(b)   upon the request of the Administrative Agent, to conduct Collateral Examinations once during each fiscal year of Borrower, unless a Default or a Potential Default exists (in which case Administrative Agent may conduct additional Collateral Examinations at its discretion), and the cost of each such Collateral Examination shall be paid by Borrower.

8.4   **Maintenance of Existence**.  Each Loan Party will do all things necessary to preserve, renew, and keep in effect (a) its existence and good standing in its jurisdiction of organization and its authority to transact business and good standing in all other jurisdictions where the nature and extent of its business and properties require due qualification and good standing, and (b) all permits, licenses, franchises, patents, copyrights, trademarks and trade names, or rights material to the conduct of its business where failure to do so could reasonably be expected to result in a Material Adverse Event.

8.5   **Maintenance of Properties**.  Borrower will maintain, and will cause each other Loan Party to maintain, its assets and properties material to the conduct of its business in good working order, condition and repair (ordinary wear and tear excepted) and make all necessary repairs and replacements.

8.6    **Insurance**.  Borrower will maintain, and will cause each other Loan Party to maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks, and with such deductibles, as in each case are customarily maintained by companies engaged in the same or similar businesses, owning similar properties and operating in the same or similar locations.  Without limiting the foregoing, such insurance shall include (a) property, casualty, or physical hazard insurance on an "all risk" basis, (b) commercial general liability insurance against claims for bodily injury, death or property damage covering any and all insurable claims, and (c) such other insurance as the Administrative Agent may from time to time require (such policies to be in Acceptable Form).  Each casualty insurance policy and each insurance policy covering Collateral shall by endorsement name Administrative Agent as lender loss payee or mortgagee, as applicable, and each policy of liability insurance shall by endorsement name Administrative Agent as an additional insured and provide that such policy will not be cancelled without thirty (30) days' prior written notice to the Administrative Agent.  Each insurance policy shall include a waiver of subrogation and shall be primary and non-contributory.  With respect to each portion of any real property of the Loan Parties which constitutes Collateral and on which any Building or Manufactured (Mobile) Home is located, if at any time such Building or Manufactured (Mobile) Home is located on any such real property in a Special Flood Hazard Area, Borrower shall, and shall cause each other Loan Party to, obtain Flood Insurance in such total amount as the applicable Flood Insurance Regulations may require and otherwise in Acceptable Form, and otherwise comply with Flood Insurance Regulations.

8.7    **Compliance with Laws.**  Borrower and each other Loan Party will comply (a) (i) with all applicable Anti-Corruption Laws and Sanctions, (ii) with the Patriot Act, (iii) with the Beneficial Ownership Regulation, (iv) with the Financing Orders, and (v) in all material respects, with any other Applicable Laws which are applicable to it or its assets and (b) will maintain in effect policies and procedures designed to promote compliance by Borrower, each Subsidiary, and their respective directors, managers, partners, officers, employees, and agents with applicable Sanctions, Patriot Act requirements, Beneficial Ownership Regulation, the FCPA, and any other applicable Anti-Corruption Laws.

8.8    **Compliance with Agreements**.  Borrower will comply, and will cause each other Loan Party to comply, in all material respects, with the terms and provisions of all Material Agreements (including, but not limited to, Oil Company Agreements) of the Borrower or any Loan Party except as may otherwise be excused or permitted under the Bankruptcy Code.

8.9    **Payment of Taxes**.  Borrower will pay or discharge, and will cause each other Loan Party to pay or discharge, all Taxes, levies, assessments, and governmental charges imposed on it or its income or profits or any of its property in accordance with the requirements of the Bankruptcy Code to the extent permitted under the Financing Orders and the Approved Budget.

8.10    **Payment of Obligations**.  Borrower unconditionally and irrevocably covenants that it will promptly pay the principal of, interest on and any other amount due on the Notes and the other Obligations in the amounts, on the dates and in the manner provided herein, in the Notes, and each other document evidencing the Obligations to the extent permitted by the Financing Orders and the Approved Budget.

8.11    **[Reserved]**.

8.12   **ERISA**.  Borrower will comply, and will cause each other Loan Party to comply, with all minimum funding requirements, and all other material requirements, of ERISA, if applicable, so as not to give rise to any ERISA Event, and shall, if an ERISA Event occurs, pay the amount of the liability promptly.

8.13   **Conduct Business**.  Borrower will continue to conduct, and will cause each other Loan Party to continue to conduct, its primary business as conducted as of the Closing Date.

8.14   **Banking Relationship**.  Borrower shall establish and maintain, and shall cause each other Loan Party to, establish and maintain, its banking depository and disbursement relationships consistent with the Cash Management Order.

8.15   **Proceeds**.  The proceeds of the Loans will be used (a) to fund the operating expenses of the Loan Parties, (b) for payment of the costs and expenses of the Cases, and (c) for the payment of such other expenses as the Lenders shall reasonably agree and the Bankruptcy Court shall approve, in each case, limited to and in accordance with the Approved Budget or as may otherwise be consented to by the Lenders.  Except as specifically set forth in the Financing Orders, no proceeds of any credit extension may be utilized to finance in any way professional fees, disbursements, costs, or expenses incurred by any person in connection with asserting, investigating, preparing, prosecuting, or joining in any claims, counterclaims, causes of action, contested matter, objection, defense or other proceeding, the purpose of which is to seek a judgment, order, declaration, or similar relief (i) against the Agent, any of the Lenders, or their respective counsel or advisors, on account of any claim arising on, before, or after the Petition Date, including, without limitation, a claim for lender liability or pursuant to Section 105 or chapter 5 of the Bankruptcy Code; (ii) invalidating, setting aside, avoiding, challenging, avoiding, subordinating, or raising any defenses to (A) any of the Obligations, and/or Liens under this Agreement or other Loan Documents, (B) any of the Prepetition Obligations and/or Prepetition Liens under the Prepetition Loan Documents; (iii) declaring any of the Loan Documents or Prepetition Loan Documents to be invalid, not binding or unenforceable in any respect; (iv) attempting to modify or restrict any of the rights or remedies granted to any of the Lenders under any of the Loan Documents, the Financing Orders, any other order of the Court, or Applicable Law; (v) paying any amount on account of any claims or equity interests arising before the commencement of the Cases unless such payments are approved by an order of the Bankruptcy Court; or (vi) after the occurrence and during the continuance of an Event of Default, paying any success, completion, back-end or similar fees (other than the Facility Fee) that is not covered by the Carve-Out.

8.16   **Preserve Collateral**.  In the event any claim is asserted in respect of any Collateral or Lender's Lien on such Collateral, the applicable Loan Party shall appear in and defend any such action or proceeding at Borrower's reasonable expense.  In the event of any default by any Loan Party or any other party under or in connection with any material portion (individually or collectively) of the Collateral, the Loan Parties will immediately use commercially reasonable efforts to remedy the same or immediately demand that the same be remedied.

8.17   **[Reserved]**.

8.18    **Further Assurances**.  The Financing Orders shall be sufficient and conclusive evidence of the validity, perfection and priorities of the Agent's Liens upon the Collateral, without the necessity of filing or recording any financing statement, assignment, mortgage, leasehold mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Liens of the Agent in and to the Collateral or to entitle the Agent to the priorities granted herein; <u>provided</u>, Borrower will execute and deliver, and will cause each other Loan Party to, promptly upon the request of the Administrative Agent, (a) correct any defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) to the fullest extent permitted by Applicable Law, subject any Loan Party's properties, assets, rights or interest to the Liens now or hereafter intended to be covered by any of the Security Documents, (iii) perfect and maintain the validity, effectiveness, and priority of any of the Security Documents and any of the Liens intended to be created thereunder, and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Administrative Agent and the Lenders the rights granted or hereafter intended to be granted to the Administrative Agent and the Lenders under any Loan Documents or under any other instrument executed in connection with the Loan Documents to which any Loan Party is or is to be a party.

8.19    **Budget Compliance**.  The Loan Parties deliver, or cause to be delivered, to the Agent and the Lenders those reports and other information relating to the Approved Budget as set forth in the Financing Orders.

8.20    **Milestones**.  The Loan Parties shall ensure that each of the milestones set forth in the Financing Orders (the "<u>Milestones</u>") are achieved in accordance with the applicable timing set forth below (or such later dates as approved by the Lenders).

8.21    **Roll-Up Amount**.  The Loan Parties will use their best efforts to ensure that the Final DIP Order provides for the full Roll-Up Amount of **$85,800,000.00** (the "<u>Requested Roll-Up Amount</u>"); provided that the entry of the Final DIP Order in an amount less than the Requested Roll-Up Amount, in and of itself shall not constitute a default or an Event of Default under the Financing Orders or this Agreement.

## ARTICLE 9

## NEGATIVE COVENANTS

So long as Lenders are committed to make any Credit Extension under this Agreement, and thereafter until the Termination Date, Borrower covenants and agrees as follows:

9.1    **Debt**.  No Loan Party will incur, create, guarantee, assume or permit to exist, and no Loan Party will permit any Subsidiary to incur, create, assume, guarantee, or permit to exist, any Debt, except for the following (but, in any case of the following that arise after the Petition Date, only to the extent set forth in the Approved Budget and consented to by Agent) (collectively, the "<u>Permitted Debt</u>"); (a) the Obligations; (b) trade accounts payable in the ordinary course of

business that are not more than 120 days past due, except to the extent that such trade accounts payable are being disputed in good faith and by appropriate proceedings and as to which reserves have been established in accordance with GAAP; (c) [Reserved]; (d) [Reserved]; (e) Debt arising from the endorsement of instruments for collection in the ordinary course of business; (f) Debt of a Loan Party to another Loan Party; *provided that*, such Debt is subordinate to the Obligations; and (g) Debt existing on the Closing Date and disclosed in the Disclosure Schedules (including Debt of the Loan Parties under the Prepetition Credit Agreement).

9.2 **Limitation on Liens**. No Loan Party will incur, create, assume or permit to exist, and no Loan Party will permit any Subsidiary to incur, create, assume or permit to exist, any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, except for the following (collectively, the "Permitted Liens"): (a) Liens in favor of Administrative Agent; (b) encumbrances consisting of minor easements, zoning restrictions, or other restrictions on the use of real property that do not (individually or in the aggregate) secure any indebtedness, materially affect the value of the assets encumbered thereby, or materially impair the ability of a Loan Party to use such assets in its business, and none of which is violated in any material respect by existing or proposed structures or land use; (c) Liens for Taxes which (i) are not delinquent, or (ii) for which (A) no Lien has been filed of record with respect to such Tax, (B) no Collateral or any portion thereof or interest therein would be in any danger of sale, forfeiture or loss by reason of the contest for such Taxes, and (C) such Loan Party has set aside on its books adequate reserves against such Taxes; (d) Liens of mechanics, materialmen, warehousemen, carriers or other similar statutory Liens securing obligations that are not yet due (or are being contested in good faith, for which adequate reserves have been established) and are incurred in the ordinary course of business; (e) to the extent set forth in the Approved Budget, pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance or other social security, old age pension or public liability obligations; (f) to the extent set forth in the Approved Budget, Liens on cash or securities pledged to secure performance of tenders, surety and appeal bonds, government contracts, performance and return of money bonds, bids, trade contracts, leases, statutory obligations, regulatory obligations and other obligations of a like nature incurred in the ordinary course of business; (g) Liens in favor of the agent and the lenders under the Prepetition Credit Agreement, and any replacement Liens and super-priority adequate protection claims in connection therewith; and (h) Liens securing Debt permitted under Section 9.1(g).

9.3 **Acquisitions, Mergers, and Other Fundamental Changes**. No Loan Party may, and no Loan Party may permit any Subsidiary to, (whether in one transaction or a series of transactions) without consent of the Bankruptcy Court and the Administrative Agent: (a) acquire all or any substantial portion of the Equity Interests issued by any other Person, (b) acquire all or any substantial portion of the assets of any other Person or the line of business of another Person, (c) merge, combine, divide, or consolidate with any other Person, (d) liquidate, wind up or dissolve (or suffer any liquidation or dissolution), (e) suspend operations, (f) create, divide, or acquire any Subsidiaries, or (g) acquire any real property.

9.4 **Disposition of Assets**. No Loan Party may, and no Loan Party may permit any Subsidiary to, (whether in one transaction or a series of transactions) make any Disposition, or enter into any agreement to make any Disposition, except (a) Dispositions of assets in the ordinary course of business which (i) are obsolete or worn out, or (ii) are no longer used in such Loan

70

Party's business and which such Loan Party has decided to replace, (b) Disposition of delinquent accounts in the ordinary course of business for purposes of collection, (c) Dispositions of inventory in the ordinary course of business, and (d) other Dispositions of assets, subject to the approval of the Bankruptcy Court and the Agent.

9.5     **Restricted Payments**.  No Loan Party may, and no Loan Party may permit any Subsidiary to, make any Restricted Payment.

9.6     **Investments**.  No Loan Party may make or hold (or agree to make or hold), and no Loan Party may permit any Subsidiary to make or hold (or agree to make or hold), any Investments, except:    (a) Investments by such Loan Party in the form of cash or Cash Equivalents; (b) Investments by any Loan Party or any Subsidiary in any Loan Party; (c) to the extent constituting Investments, transactions permitted under Sections 9.1 and 9.3; (d) Investments consisting of extensions of trade credit in the nature of accounts receivable or notes receivable arising from the sale or lease of goods or services in the ordinary course of business and solely to the extent set forth in the Approved Budget to Persons which are not Affiliates, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors; (e) Investments in the ordinary course of business consisting of endorsements for collection or deposit; (f) each Loan Party may own the Equity Interests of such Loan Party's Subsidiaries; and (g) Investments existing on the Closing Date and disclosed in the Disclosure Schedules.

9.7     **Compliance with Environmental Laws**.  No Loan Party may, and no Loan Party will permit any Subsidiary to, (a) use (or permit any tenant to use) any of their respective properties or assets for the handling, processing, storage, transportation, or disposal of any Hazardous Material, except in the ordinary course of business and in compliance with all Environmental Laws, or (b) generate any Hazardous Material in violation of any Environmental Law, (c) conduct any activity which is likely to cause a Release or threatened Release of any Hazardous Material in violation of any Environmental Law, or (d) otherwise conduct any activity or use any of their respective properties or assets in any manner that is likely to violate any Environmental Law.

9.8     **Accounting**.  No Loan Party may make, and no Loan Party will permit any Subsidiary to make, any change in accounting treatment or reporting practices, except as required or permitted by GAAP.  No Loan Party will change its fiscal year end from December 31.

9.9     **Change of Business**.  No Loan Party may enter into, and no Loan Party will permit any Subsidiary to enter into, any type of business which is materially different from the business in which such Loan Party is engaged as of the Closing Date.

9.10     **Transactions With Affiliates**.  Except as expressly permitted by the Administrative Agent and the Bankruptcy Court, no Loan Party will enter into or permit to exist, and no Loan Party will permit any Subsidiary to enter into or permit to exist, any transaction, arrangement or contract (including any lease or other rental agreement) with any of its Affiliates on terms which are less favorable than are obtainable from any Person who is not an Affiliate of such Loan Party or such Subsidiary.

9.11     **Hedge Agreements**.  No Loan Party will, and no Loan Party will permit any Subsidiary to, enter into any hedge agreement or hedge transaction.

71

9.12    **Compliance with Government Regulations**.  No Loan Party will, and no Loan Party will permit any Subsidiary to, (a) at any time be in violation of any Applicable Law if such Loan Party's violation of such Applicable Law would result in (i) any Lender being prohibited from making any Credit Extension to any Loan Party, (ii) any limitation on the ability of any Lender to make a Credit Extension to any Loan Party, or (iii) any Lender being prohibited from otherwise conducting business with any Loan Party, or (b) fail to provide documentary and other evidence of any Loan Party's identity as may be requested by Administrative Agent or any Lender at any time to enable Administrative Agent or such Lender to verify such Loan Party's identity or to comply with any Applicable Law, including Section 326 of the Patriot Act.

9.13    **Organizational Documents; Material Agreements**.  No Loan Party may, and no Loan Party may permit any Subsidiary to:

(a)    modify, repeal, replace or amend any provision of its Organizational Documents in any manner, other than (i) minor modifications, supplements, or waivers that do not in any material respect increase the obligations, or limit the rights of, such Loan Party, and (ii) nonmaterial modifications that could not reasonably be expected to be materially adverse to the interests of the Lenders.  If as of the Closing Date a Loan Party has not "opted in" to Article 8 of the applicable Uniform Commercial Code and thereby elected to have its Equity Interests treated as securities for purposes of the applicable Uniform Commercial Code, such Loan Party may not "opt in" to Article 8 of the applicable Uniform Commercial Code without the prior written consent of Required Lenders; or

(b)    terminate, amend, replace, or otherwise modify any Material Agreement (including, but not limited to, Oil Company Agreements) except for (i) any replacement, modification or amendment of a Material Agreement made in the ordinary course of business consistent with past practice and which replacement, amendment or modification is not materially adverse to the Loan Parties, the Administrative Agent, or the Lenders, (ii) replacements, renewals or extensions (A) on either substantially the same terms as the applicable existing Material Agreements (excluding rental payments or other pricing which shall be at then market rates), as applicable, or (B) as otherwise approved by the Administrative Agent in writing.

9.14    **Prepayment of Debt; Payment of Subordinated Debt**.

(a)    No Loan Party, or Subsidiary, may voluntarily prepay principal of, or interest on, any Debt (*other than* the Obligations).

(b)    No Loan Party, or Subsidiary, may make scheduled payments, payments due at maturity, voluntary or mandatory repayments, or any other prepayment, redemption, retirement, repurchase, or defeasance in respect of any Subordinated Debt.

9.15    **Restrictive Agreement**.  No Loan Party may enter into any Restrictive Agreement.

9.16    **Sale and Leaseback Transactions**.    Unless otherwise consented to by the Bankruptcy Court and the Agent, Borrower will not, and will not permit any other Loan Party to, enter into or suffer to exist, any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereinafter

acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred.

9.17 **Financing Orders; Administrative Priority; Lien Priority; Payment of Claims**. No Loan Party will:

(a) at any time, seek, consent to or suffer to exist any reversal, modification, amendment, stay or vacation of any Financing Order, except for modifications and amendments agreed to by the Lenders in their sole discretion in advance and in writing;

(b) at any time, suffer to exist a priority for any administrative expense or unsecured Claim against a Loan Party (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 503(b), 506(c), 507(a), 507(b), 546(c) 726 and 1114 of the Bankruptcy Code) equal or superior to the priority of the Agents and the Lenders in respect of the Obligations;

(c) at any time, suffer to exist any Lien on the Collateral having a priority equal or superior to the Liens in favor of the Agent for the benefit of the Lenders in respect of the Collateral with respect to the Obligations, except for Permitted Liens; and

(d) prior to the date on which all Obligations (other than contingent indemnification and reimbursement obligations in respect of which no claim for payment has been asserted) have been fully and indefeasibly paid and satisfied, pay any administrative expense claims except (i) Obligations due and payable hereunder, (ii) administrative expenses incurred in the ordinary course of such Loan Party's business as contemplated by this Agreement and the Approved Budget, and (iii) as may otherwise be authorized or ordered by the Bankruptcy Court in accordance with the Approved Budget.

## ARTICLE 10

## [RESERVED]

## ARTICLE 11

## DEFAULT

11.1 **Default**. The term "*Default*" means the occurrence of any one or more of the following events:

(a) Default in Payment. Borrower shall fail to pay (i) any principal of or interest on the Obligations when due, (ii) any reimbursement obligation in respect of any LC, or (iii) any other amount due under this Agreement or any Loan Document when due and such failure under this *clause (iii)* shall continue unremedied for three (3) Business Days.

(b) Breach of Covenants. Any Loan Party shall fail to perform, observe or comply with (i) any covenant, agreement or term contained in Section 8.1, 8.4, 8.6, 8.13,

8.14, 8.17, 8.19, 8.20, 8.21, or Article 9 of this Agreement, (ii) any covenant, agreement or term contained in the Financing Orders, or (iii) any covenant, agreement or term in this Agreement or any other Loan Document (other than Section 11.1(a) or the preceding *clause (i)*) and, with respect to this *clause (iii)*, such failure shall have continued unremedied for a period of seven (7) Business Days.

(c)     Inaccuracy of Representations.  Any representation or warranty made or deemed made by any Loan Party (or any of their respective officers) in this Agreement, any other Loan Document, or in any amendment of this Agreement or any other Loan Document, or in any certificate, report, notice, or financial statement furnished at any time in connection with this Agreement, any other Loan Document, or in any amendment of this Agreement or any other Loan Document, shall prove to have been incorrect in any material respect when made or deemed to have been made.

(d)     [Reserved].

(e)     [Reserved].

(f)     [Reserved].

(g)     [Reserved].

(h)     [Reserved].

(i)     [Reserved].

(j)     Invalidity of Loan Documents.  This Agreement or any other Loan Document shall cease to be in full force and effect or shall be declared null and void or the validity or enforceability thereof shall be contested or challenged by any Loan Party or any of their respective owners, or any Loan Party shall deny that it has any further liability or obligation under any of the Loan Documents, or any Lien or security interest created by the Loan Documents shall for any reason cease to be a valid, first priority perfected security interest in and Lien upon any of the Collateral purported to be covered thereby.

(k)     Change of Control.  A Change of Control occurs.

(l)     ERISA.  An ERISA Event occurs with respect to an ERISA Plan that has resulted or could reasonably be expected to result in liability of Borrower under Title IV of ERISA to the ERISA Plan or the PBGC in an aggregate amount in excess of the Threshold Amount.

(m)     [Reserved].

(n)     [Reserved].

(o)     Material Adverse Event.  Any event or other conditions shall occur and be continuing that is reasonably likely to result in a Material Adverse Event.

74

(p)     Additional Events of Default.  The occurrence of any of the following in any of the Cases:

(i)     The Loan Parties shall fail to file the DIP Financing Motion within five Business Days after the Petition Date in form and substance acceptable to the Agent and the Lenders, in their reasonable discretion;

(ii)     Any of the Cases shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

(iii)     The filing of a proposed plan of reorganization or liquidation by any Borrower, which plan does not provide for the indefeasible payment in full in cash of the Obligations and the Prepetition Obligations as of the effective date of such plan or which plan is not acceptable to the Agent and the Lenders in their reasonable discretion;

(iv)     The entry of an order confirming a plan of reorganization that does not require repayment in full of the Obligations and the Prepetition Obligations in cash as of the effective date of such plan or which plan is not acceptable to the Agent and the Lenders in their discretion;

(v)     The appointment in any of the Cases of a trustee under section 1104 of the Bankruptcy Code or an examiner with enlarged powers (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code;

(vi)     The Borrower's termination of the engagement of the CRO of the Borrower or the material impairment or reduction of the responsibilities and activities of the CRO by the Borrower;

(vii)     The Interim DIP Order ceasing to be in full force and effect, or the entry of an order amending, supplementing, staying, vacating, revoking, reversing or otherwise modifying this Agreement, the Financing Orders, or any agreement relating to the Loan Documents, without the prior written consent of the Lenders;

(viii)     The entry of an order permitting any claim against, or obligation of, any Loan Party (now existing or hereafter arising, of any kind or nature whatsoever), to have priority equal or superior to the priority of the Agent or the Lenders in respect of this Agreement and the Liens granted in favor of the Agent hereunder, other than the Carve-Out;

(ix)     Any attempt by either a Loan Party, or any officer, director or affiliate thereof, or any party related thereto, to invalidate, reduce, or otherwise impair any of the rights, claims, or liens of the Agent or the Lenders under this Agreement, the Financing Orders or other Loan Documents, or any such rights, claims, or liens shall, for any reason, cease to be valid;

75

(x)     Any Loan Party's engagement in or support of any investigation or assertion of any claims or causes of action (or directly or indirectly support assertion of the same) against the Administrative Agent or the Lenders;

(xi)     The assertion by any Loan Party of a surcharge right or claim or the entry of an order that subjects the Collateral to assessment pursuant to section 506(c) of the Bankruptcy Code;

(xii)     The filing of any pleading by any Loan Party seeking or otherwise consenting to or supporting any of the matters set forth in clauses (ii) or (viii) this clause (p);

(xiii)     the entry of an order by the Bankruptcy Court in favor of the Committee, if any, appointed in the Cases, any ad hoc committee, or any other party in interest, (A) granting such party standing to pursue any claims against the Secured Parties and/or Prepetition Lenders, (B) sustaining an objection to claims of the Secured Parties or the Prepetition Lenders, (C) avoiding any liens held by the Secured Parties, (D) sustaining an objection to claims of the Prepetition Lenders or the Prepetition Agent, or (E) avoiding any liens held by the Prepetition Lenders or the Prepetition Agent except as otherwise agreed by the Prepetition Agent in writing (provided, that the foregoing shall not be deemed to prohibit the investigation by any such committee of any such claims or liens in respect of the Prepetition Obligations);

(xiv)     The Loan Parties' exclusivity period under Section 1121 of the Bankruptcy Code for the filing of a chapter 11 plan terminates for any reason;

(xv)     Any material payment (in excess of $250,000) is made on, or application for authority to pay (which is supported, directly or indirectly, by any Loan Party, or is not being actively contested by each Loan Party in good faith), any material prepetition claim without the Agent's consent, except as authorized by the Bankruptcy Court;

(xvi)     An order is entered granting any creditor relief from the automatic stay to exercise rights with respect to property of the estate having a value of more than $250,000 or which has a material effect on the ability of any Loan Party to operate its business consistent with current practice, maintain any material license or privilege, or dispose of the Collateral as an enterprise or going concern;

(xvii)     Any Term Loan or other extension of credit hereunder or any portion of the Carve-Out is utilized to prosecute actions, claims, demands, or causes of action against the Lenders or to object to or contest in any manner or to raise any defense in any pleading to the entry of the Financing Orders, the validity, perfection, priority, or enforceability of this Agreement, or the rights, claims, liens, and security interests granted to the Agent or the Lenders under this Agreement or the Financing Orders;

(xviii) The entry of an order authorizing or approving any Loan Party's assumption, assignment, and/or rejection of any material executory contract or unexpired lease without the Agent's prior written consent;

(xix) The sale by any Loan Party, or the entry of an order approving the sale by any Loan Party, of any material assets outside of the ordinary course of business without the Agent's prior written consent;

(xx) A motion or application for any of the orders or actions described in clauses (b), (p)(ii), or (p)(v) through (p)(xv) shall be made by any person, including any Committee appointed in the Cases, without the Agent' prior written consent, and such motion or application either is in collusion with or supported, directly or indirectly, by any Loan Party, or is not actively contested by each Loan Party in good faith within the applicable objection period;

(xxi) Without prior written consent of the Administrative Agent, any Loan Party shall have failed to satisfy any of the Milestones set forth in <u>Section 8.20</u> (provided that any such Milestones may be extended upon prior written consent of the Agent in its sole and absolute discretion);

(xxii) The occurrence and notice of default of (i) a Material Adverse Effect, recognizing that the Loan Parties have filed the Cases, (ii) the material impairment of the ability of any Loan Party to meet its obligations substantially as set forth in the Approved Budget or to otherwise perform its obligations in connection with this Agreement, (iii) the imposition of any obligation on the Agent or the Lenders, compliance with which would materially impair the Agent's or the Lenders' ability to receive its contemplated economic benefits hereunder, (iv) the material impairment of the validity or enforceability of, or the rights, claims, liens, remedies, or benefits available to the Agent and the Lenders under the Financing Orders, or any Loan Document or (v) the material impairment of the validity, perfection, or priority of the Security Interest or any lien granted in favor of the Agent or the Lenders; or

(xxiii) Without the prior written consent of the Lenders, a Borrower shall have made any disbursement not permitted under Section 8.15 hereof, except for the permitted deviations in amounts set forth in Section 8.19 hereof.

11.2    **Remedies Upon Default**.  If any Default shall occur, Administrative Agent may, and, upon the direction of the Required Lenders, shall, do any one or more of the following: (a) declare the outstanding principal of and accrued and unpaid interest on the Notes and the Obligations or any part thereof to be immediately due and payable, and the same shall thereupon become immediately due and payable, without notice, demand, presentment, notice of dishonor, notice of acceleration, notice of intent to accelerate, notice of intent to demand, protest, or other formalities of any kind, all of which are hereby expressly waived by Borrower, (b) terminate the Commitments without notice to Borrower, (c) foreclose or otherwise enforce any Lien granted to the Administrative Agent to secure payment and performance of the Obligations, (d) demand payment from the Guarantors, (e) exercise any and all rights and remedies afforded by the laws of

the State of Texas or any other jurisdiction, by any of the Loan Documents, by equity or otherwise; (f) upon five (5) business days' written notice to the Borrower and any Committee and the filing of such written notice with the Bankruptcy Court, (i) the Agent may exercise any or all of the following rights and remedies and (ii) relief from the automatic stay provided under Section 362 of the Bankruptcy Code shall be deemed automatically lifted or modified to the extent necessary to allow the Lender to take the actions described in this Section 11.2 or under any other Loan Document without further notice or a hearing, (provided that the Loan Parties, the United States Trustee and Committee may seek an emergency hearing before the Bankruptcy Court to be heard in connection herewith), (g) exercise and enforce its rights and remedies under the Interim DIP Order, the Final DIP Order and/or the Security Documents, and (h) seek the appointment of a Chapter 11 trustee and have an expedited hearing with respect to such request, subject to the Bankruptcy Court's calendar.

11.3    **Cash Collateral**.  If any Default shall occur, Borrower shall, if requested by any Lender, immediately Cash Collateralize the LC Exposure as security for the Obligations.

11.4    **Performance by Administrative Agent**.  If any Loan Party shall fail to perform any covenant, duty, or agreement contained in any of the Loan Documents, Administrative Agent may perform or attempt to perform such covenant, duty, or agreement on behalf of such Loan Party.  In such event, the applicable Loan Party shall, at the request of Administrative Agent, promptly pay any amount expended by Administrative Agent in such performance or attempted performance to the Administrative Agent, together with interest thereon at the Default Rate from the date of such expenditure until paid.  Notwithstanding the foregoing, it is expressly agreed that neither Administrative Agent nor any Lender shall have any liability or responsibility for the performance of any obligation of any Loan Party under this Agreement or any other Loan Document.

11.5    **Application of Liquidation Proceeds**.  All monies received by Administrative Agent from the exercise of remedies under this Agreement or the Loan Documents shall, unless otherwise required by Applicable Law and subject to the Financing Orders, be applied in the following order:  (a) first, to the payment of all fees, expenses, indemnities, and other amounts payable to the Administrative Agent, in its capacity as such, including in connection with the exercise of such rights and remedies, together with all reasonable costs and expenses of collection, attorneys' fees, financial advisor fees, court costs and foreclosure expenses; (b) second, to the payment of all fees, expenses, indemnities and other amounts (other than principal, interest, reimbursement obligations, and LC fees) then due to the Lenders from Borrower (other than in connection with Bank Product Liabilities) until paid in full; (c) third, to the payment of all accrued and unpaid interest on the outstanding principal amount of the Obligations (including the remaining Term Principal Amount) (other than in connection with Bank Product Liabilities) on a ratable and pari passu basis until paid in full; (d) fourth, to the payment of all LC Disbursements until paid in full and to Cash Collateralize all outstanding LC Exposure; (e) fifth, to the payment of all interest, fees, and expenses with respect to Bank Product Liabilities on a ratable and pari passu basis until paid in full; (f) sixth, to the payment of the outstanding principal amount of the Obligations (including the remaining Term Principal Amount, Bank Product Liabilities, on a ratable and pari passu basis until paid in full; (g) seventh, to the payment of any other Obligations on a ratable and pari passu basis until paid in full; (h) [reserved]; and (i) [reserved].  The provisions

of this <u>Section 11.5</u> shall govern and control over any conflicting provisions in this Agreement or any Loan Document.

## ARTICLE 12

## THE ADMINISTRATIVE AGENT

12.1 **Appointment and Authority**. Each of the Lenders and the LC Issuer hereby irrevocably appoints First Horizon Bank to act on its behalf as the Administrative Agent under this Agreement and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Administrative Agent, the Lenders and the LC Issuer, and neither Borrower nor any other Loan Party shall have rights as a third-party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any Applicable Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

12.2 **Rights as a Lender**. The Person serving as the Administrative Agent under this Agreement shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "<u>Lender</u>" or "<u>Lenders</u>" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent under this Agreement in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent under this Agreement and without any duty to account therefor to the Lenders.

12.3 **Exculpatory Provisions**.

(a) The Administrative Agent shall not have any duties or obligations except those expressly set out in this Agreement and in the other Loan Documents, and its duties under this Agreement shall be administrative in nature. Without limiting the generality of the foregoing, the Administrative Agent:

(i) shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for

herein or in the other Loan Documents); *provided that* the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or Applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may affect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(iii)    shall not, except as expressly set out in this Agreement and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

(b)    The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in ***Sections 14.8*** and ***11.2***), or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent in writing by Borrower, a Lender, or the LC Issuer.

(c)    The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered under this Agreement or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set out herein or therein or the occurrence of any Potential Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set out in Article 6 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

12.4    **Reliance by Administrative Agent**.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition under this Agreement to the making of a Credit Extension that by its terms must be fulfilled to the satisfaction of a Lender, or the LC Issuer, the Administrative Agent may presume that such condition is satisfactory to such Lender or the LC Issuer unless the Administrative Agent shall have received notice to the contrary from such Lender or the LC Issuer

80

prior to the making of such Credit Extension. The Administrative Agent may consult with legal counsel (who may be counsel for Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

12.5    **Delegation of Duties**.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers under this Agreement or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Facility as well as activities as Administrative Agent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

12.6    **Resignation of Administrative Agent**.

(a)    The Administrative Agent may at any time give notice of its resignation to the Lenders, the LC Issuer, and Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with Borrower, to appoint a successor, which shall be a bank with an office in Houston, Texas, or an Affiliate of any such bank with an office in Houston, Texas.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, and the LC Issuer, appoint a successor Administrative Agent meeting the qualifications set out above;  provided that in no event shall any such successor Administrative Agent be a Defaulting Lender.  Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)    If the Person serving as Administrative Agent is a Defaulting Lender pursuant to *clause (d)* of the definition thereof, the Required Lenders may, to the extent permitted by Applicable Law, by notice in writing to Borrower and such Person remove such Person as Administrative Agent and, in consultation with Borrower, appoint a successor.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days (or such earlier day as shall be agreed by the Required Lenders) (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c)    With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (i) the retiring or removed Administrative Agent shall be discharged

from its duties and obligations under this Agreement and under the other Loan Documents (except that in the case of any Collateral security held by the Administrative Agent on behalf of the Lenders, or the LC Issuer under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such Collateral security until such time as a successor Administrative Agent is appointed) and (ii) except for any indemnity payments owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender, and the LC Issuer directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above. Upon the acceptance of a successor's appointment as Administrative Agent under this Agreement, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring or removed Administrative Agent (other than any rights to indemnity payments owed to the retiring or removed Administrative Agent), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations under this Agreement or under the other Loan Documents. The fees payable by Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrower and such successor. After the retiring or removed Administrative Agent's resignation or removal under this Agreement and under the other Loan Documents, the provisions of this Article 12 and Section 14.3 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Administrative Agent was acting as Administrative Agent.

12.7 **Non-Reliance on Administrative Agent and Other Lenders**. Each Lender and the LC Issuer acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender and the LC Issuer also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished under this Agreement or thereunder.

12.8 **No Other Duties, etc.** Anything in this Agreement to the contrary notwithstanding, no titles listed on the cover page hereof shall provide any Person with any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in such Person's capacity, as applicable, as the Administrative Agent, a Lender or the LC Issuer under this Agreement.

12.9 **Administrative Agent May File Proofs of Claim**. In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan or LC Exposure shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

82

(a)     to file a proof a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, LC Exposure, and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the LC Issuer and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the LC Issuer and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the LC Issuer, and the Administrative Agent under Sections 3.8 and 14.3) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the LC Issuer to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the LC Issuer, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 3.8 and 14.3.

12.10   **Collateral and Guaranty Matters**.

(a)     The Lenders and the LC Issuer irrevocably authorize the Administrative Agent, at its option and in its discretion,

(i)     to release any Lien granted to or held by Administrative Agent under any Loan Document (A) upon the Termination Date; (B) on property sold or to be sold or disposed of as part of or in connection with any Disposition permitted under this Agreement or the other Loan Documents; or (C) subject to Section 14.8, if approved, authorized or ratified in writing by the Required Lenders.  Upon request by Administrative Agent at any time, Lenders will confirm in writing Administrative Agent's authority to release, or subordinate its interest in, particular types or items of collateral pursuant to this Section 12.10;

(ii)    to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Permitted Lien on such property which secures Funded Debt;

(iii)   to negotiate and enter into Subordination Agreements, Control Account Agreements, Collateral Access Agreements, and other Loan Documents; and

(iv)    to release any Guarantor from its obligations under the Guaranty Agreement if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Loan Documents.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty Agreement pursuant to this <u>Section 12.10</u>.

(b)     THE ADMINISTRATIVE AGENT SHALL NOT BE RESPONSIBLE FOR OR HAVE A DUTY TO ASCERTAIN OR INQUIRE INTO ANY REPRESENTATION OR WARRANTY REGARDING THE EXISTENCE, VALUE OR COLLECTABILITY OF THE COLLATERAL, THE EXISTENCE, PRIORITY OR PERFECTION OF THE ADMINISTRATIVE AGENT'S LIEN THEREON, OR ANY CERTIFICATE PREPARED BY ANY LOAN PARTY IN CONNECTION THEREWITH, NOR SHALL THE ADMINISTRATIVE AGENT BE RESPONSIBLE OR LIABLE TO THE LENDERS, THE LC ISSUER, OR THE BANK PRODUCT PROVIDERS FOR ANY FAILURE TO MONITOR OR MAINTAIN ANY PORTION OF THE COLLATERAL.

(c)     <u>Credit Bidding</u>.

(i)     The holders of the Obligations authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid and purchase for the benefit of the Administrative Agent and the Lenders all or any portion of Collateral at any sale thereof conducted by the Administrative Agent under the provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the U.S. Bankruptcy Code, including Section 363 thereof, or a sale under a plan of reorganization, or at any other sale or foreclosure conducted by the Administrative Agent (whether by judicial action or otherwise) in accordance with Applicable Law.

(ii)     Each Lender hereby agrees that, except as otherwise provided in any Loan Documents or with the written consent of the Administrative Agent and the Required Lenders, it will not take any enforcement action, accelerate obligations under any Loan Documents, or exercise any right that it might otherwise have under Applicable Law to credit bid at foreclosure sales, UCC sales or other similar dispositions of Collateral.

12.11   **Other Agents**.  Aside from the Administrative Agent, no other syndication agent, documentation agent, bookrunner, arranger, or other agent shall have any right, power, obligation, liability, responsibility or duty under this Agreement other than those applicable to all Lenders as such, and shall not be deemed to have any fiduciary relationship with any Lender.  Each Lender acknowledges that it has not relied, and will not rely, on any such Person in deciding to enter into this Agreement.

12.12   **Lender ERISA Representations**.

(a)     Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of,

the Administrative Agent, the arrangers, and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)     such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans, the LCs, or the Commitments,

(ii)     the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the LCs, the Commitments and this Agreement,

(iii)     (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the LCs, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the LCs, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14, and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the LCs, the Commitments and this Agreement, or

(iv)     such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)     In addition, unless Section 12.12(a)(i) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in Section 12.12(a)(iv), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the arrangers and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that:

(i)     none of the Administrative Agent, the arrangers or any of their respective Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the

Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto),

(ii)     the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the LCs, the Commitments and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E),

(iii)     the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the LCs, the Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

(iv)     the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the LCs, the Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, the LCs, the Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v)     no fee or other compensation is being paid directly to the Administrative Agent, or any of its Affiliates for investment advice (as opposed to other services) in connection with the Loans, the LCs, the Commitments or this Agreement.

(c)     The Administrative Agent and the arrangers hereby inform the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the LCs, the Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans, the LCs, or the Commitments for an amount less than the amount being paid for an interest in the Loans, the LCs, or the Commitments by such Lender, or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

86

# ARTICLE 13

# GUARANTY

13.1 **Guaranty**.

(a) Each of the Guarantors hereby jointly and severally guarantees to each Lender, the LC Issuer, and each other holder of the Obligations as hereinafter provided, as primary obligor and not as surety, the prompt and complete payment and performance of the Obligations when due (whether at stated maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise) strictly in accordance with the terms thereof. The Guarantors hereby further agree that if any of the Obligations are not paid in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise), the Guarantors will, jointly and severally, promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Obligations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise) in accordance with the terms of such extension or renewal.

(b) Notwithstanding any provision to the contrary contained herein or in any other of the Loan Documents or the other documents relating to the Obligations, the obligations of each Guarantor under this Agreement and the other Loan Documents shall not exceed an aggregate amount equal to the largest amount that would not render such obligations subject to avoidance under applicable Debtor Relief Laws.

13.2 **Obligations Unconditional**. The obligations of the Guarantors under Section 13.1 are joint and several, absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of any of the Loan Documents or other documents relating to the Obligations, or any substitution, release, impairment or exchange of any other Guarantee of or security for any of the Obligations, and, to the fullest extent permitted by Applicable Laws, irrespective of any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 13.2 that the obligations of the Guarantors hereunder shall be absolute and unconditional under any and all circumstances. Each Guarantor agrees that such Guarantor shall have no right of subrogation, indemnity, reimbursement or contribution against Borrower or any other Loan Party for amounts paid under this Article 13 until such time as the Obligations have been indefeasibly paid in full (other than contingent indemnification obligations under the Loan Documents which by their terms expressly survive payment of the Obligations and termination of the Loan Documents and for which no claim has been made as of the date of determination) and the Commitments have expired or have irrevocably terminated. Without limiting the generality of the foregoing, it is agreed that, to the fullest extent permitted by Applicable Laws, the occurrence of any one or more of the following shall not alter or impair the liability of any Guarantor hereunder, which shall remain absolute and unconditional as described above:

(a)     at any time or from time to time, without notice to any Guarantor, the time for any performance of or compliance with any of the Obligations shall be extended, or such performance or compliance shall be waived;

(b)     any of the acts mentioned in any of the provisions of any of the Loan Documents or other documents relating to the Obligations shall be done or omitted;

(c)     the maturity of any of the Obligations shall be accelerated, or any of the Obligations shall be modified, supplemented or amended in any respect, or any right under any of the Loan Documents or other documents relating to the Obligations shall be waived or any other guarantee of any of the Obligations or any security therefor shall be released, impaired or exchanged in whole or in part or otherwise dealt with;

(d)     any Lien granted to, or in favor of, Administrative Agent or any other holder of the Obligations as security for any of the Obligations shall fail to attach or be perfected; or

(e)     any of the Obligations shall be determined to be void or voidable (including, without limitation, for the benefit of any creditor of any Guarantor) or shall be subordinated to the claims of any Person (including, without limitation, any creditor of any Guarantor).

With respect to its obligations hereunder, each Guarantor hereby expressly waives diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that Administrative Agent or any other holder of the Obligations exhaust any right, power or remedy or proceed against any Person under any of the Loan Documents or any other document relating to the Obligations, or against any other Person under any other Guarantee of, or security for, any of the Obligations.

13.3    **Reinstatement**.  The obligations of each Guarantor under this Article 13 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Person in respect of the Obligations is rescinded or must be otherwise restored by any holder of any of the Obligations, whether as a result of any Debtor Relief Laws or otherwise, and each Guarantor agrees that it will indemnify Administrative Agent and each other holder of the Obligations on demand for all reasonable costs and expenses (including, without limitation, the fees, charges and disbursements of counsel) incurred by Administrative Agent or such holder of the Obligations in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any Debtor Relief Laws.

13.4    **Certain Additional Waivers**.  Each Guarantor agrees that such Guarantor shall have no right of recourse to security for the Obligations, except through the exercise of rights of subrogation pursuant to Section 13.2 and through the exercise of rights of contribution pursuant to Section 13.6.

13.5    **Remedies**.  The Guarantors agree that, to the fullest extent permitted by Applicable Laws, as between the Guarantors, on the one hand, and Administrative Agent and the other holders of the Obligations, on the other hand, the Obligations may be declared to be forthwith due and payable as specified in Section 11.2 (and shall be deemed to have become automatically due and

payable in the circumstances specified in <u>Section 11.2</u>) for purposes of <u>Section 13.1</u> notwithstanding any stay, injunction or other prohibition under any Debtor Relief Laws (or other Applicable Laws) preventing such declaration (or preventing the Obligations from becoming automatically due and payable) as against any other Person and that, in the event of such declaration in accordance with the terms of the Loan Documents (or the Obligations being deemed to have become automatically due and payable), the Obligations (whether or not due and payable by any other Person as a result of any such stay, injunction or prohibition) shall forthwith become due and payable by the Guarantors for purposes of <u>Section 13.1</u>.  The Guarantors acknowledge and agree that their obligations hereunder are secured in accordance with the terms of the Security Documents and that the holders of the Obligations may exercise their remedies thereunder in accordance with the terms thereof.

13.6    **<u>Rights of Contribution</u>**.  The Guarantors hereby agree as among themselves that, if any Guarantor shall make an Excess Payment (as defined below), such Guarantor shall have a right of contribution from each other Guarantor in an amount equal to such other Guarantor's Contribution Share (as defined below) of such Excess Payment.  The payment obligations of any Guarantor under this <u>Section 13.6</u> shall be subordinate and subject in right of payment to the Obligations until such time as the Obligations have been indefeasibly paid in full (other than contingent indemnification obligations under the Loan Documents which by their terms expressly survive payment of the Obligations and termination of the Loan Documents and for which no claim has been made as of the date of determination) and the Commitments have irrevocably terminated, and none of the Guarantors shall exercise any right or remedy (whether under this <u>Section 13.6</u> or otherwise) against any other Guarantor until such Obligations have been indefeasibly paid in full (other than contingent indemnification obligations under the Loan Documents which by their terms expressly survive payment of the Obligations and termination of the Loan Documents and for which no claim has been made as of the date of determination) and the Commitments have irrevocably terminated.  For purposes of this <u>Section 13.6</u>, (a) the term "<u>Excess Payment</u>" means the amount paid by any Guarantor in excess of its Ratable Share of any Obligations; (b) the term "<u>Ratable Share</u>" means, for any Guarantor in respect of any payment of Obligations, the ratio (expressed as a percentage) as of the date of such payment of Obligations of (i) the amount by which the aggregate present fair salable value of all of its assets and properties exceeds the amount of all debts and liabilities of such Guarantor (including contingent, subordinated, unmatured, and unliquidated liabilities, but excluding the obligations of such Guarantor hereunder) to (ii) the amount by which the aggregate present fair salable value of all assets and other properties of all of the Loan Parties exceeds the amount of all of the debts and liabilities (including contingent, subordinated, unmatured, and unliquidated liabilities, but excluding the obligations of the Loan Parties hereunder) of the Loan Parties; *provided that*, for purposes of calculating the Ratable Share of each Guarantor in respect of any payment of Obligations, any Guarantor that became a Guarantor subsequent to the date of any such payment shall be deemed to have been a Guarantor on the date of such payment and the financial information for such Guarantor as of the date such Guarantor became a Guarantor shall be utilized for such Guarantor in connection with such payment; and (c) the term "<u>Contribution Share</u>" means, for any Guarantor in respect of any Excess Payment made by any other Guarantor, the ratio (expressed as a percentage) as of the date of such Excess Payment of (i) the amount by which the aggregate present fair salable value of all of its assets and properties exceeds the amount of all debts and liabilities of such Guarantor (including contingent, subordinated, unmatured, and unliquidated liabilities, but excluding the obligations of such Guarantor hereunder) to (ii) the amount by which the aggregate present fair salable value of

89

all assets and other properties of the Loan Parties other than the maker of such Excess Payment exceeds the amount of all of the debts and liabilities (including contingent, subordinated, unmatured, and unliquidated liabilities, but excluding the obligations of the Loan Parties) of the Loan Parties other than the maker of such Excess Payment; *provided that*, for purposes of calculating the Contribution Shares of the Guarantors in respect of any Excess Payment, any Guarantor that became a Guarantor subsequent to the date of any such Excess Payment shall be deemed to have been a Guarantor on the date of such Excess Payment and the financial information for such Guarantor as of the date such Guarantor became a Guarantor shall be utilized for such Guarantor in connection with such Excess Payment.

13.7    **Guarantee of Payment; Continuing Guarantee**.  The Guaranty in this Article 13 is a Guarantee of payment and not of collection, is a continuing guarantee, and shall apply to the Obligations whenever arising.

## ARTICLE 14

## MISCELLANEOUS

14.1    **Notices**.

(a)    Notices Generally.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows:

(i)    if to Borrower or any other Loan Party, to it at c/o Mountain Express Oil Company, 5333 Bells Ferry Road, Ste. 201, Acworth, GA 30102, Attention of Lamar Frady, (Facsimile No. 678-398-7228);

with copies (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attention:  Jeffrey N. Pomerantz, Esq. and Henry C. Kevane, Esq.
Email: jpomerantz@pszjlaw.com; hkevane@pszjlaw.com

(ii)    if to the Administrative Agent or the LC Issuer, to First Horizon Bank, Loan Syndications, 4725 Piedmont Row Drive, Suite 400, Charlotte, North Carolina 28210, Attention of Jamie M. Swisher, Reference to Mountain Oil Express Company;

with copies (which shall not constitute notice) to:

First Horizon Bank
Commercial Banking
3625 Cumberland Blvd SE, Bldg Two
Atlanta, Georgia 30339
Attention:  Paula M. Davis, Senior Vice President and Chris
Catone, Senior Vice President

and

Greenberg Traurig, LLP
Terminus 200
3333 Piedmont Road NE
Suite 2500
Atlanta, GA 30305
Attention:  John D. Elrod, Esq. and
Bethani Oppenheimer, Esq.

(iii)     if to a Lender, to it at its address (or facsimile number) set out in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received.  Notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices delivered through electronic communications, to the extent provided in Section 14.1(b) below, shall be effective as provided in said Section 14.1(b).

(b)     Electronic Communications.

(i)     Notices and other communications to the Lenders and the LC Issuer under this Agreement may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided that* the foregoing shall not apply to notices to any Lender or the LC Issuer pursuant to Article 2 if such Lender or the LC Issuer, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Section by electronic communication.  The Administrative Agent or Borrower may, in its discretion, agree to accept notices and other communications to it under this Agreement by electronic communications pursuant to procedures approved by it; *provided that* approval of such procedures may be limited to particular notices or communications.

(ii)     Unless the Administrative Agent otherwise prescribes, (A) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written

acknowledgement), and (B) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing *clause (A)*, of notification that such notice or communication is available and identifying the website address therefor; *provided that*, for both *clauses (A)* and *(B)* above, if such notice, e-mail or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(c)     <u>Change of Address, etc</u>.  Any party hereto may change its address or facsimile number for notices and other communications under this Agreement by notice to the other parties to this Agreement.

(d)     <u>Platform</u>.

(i)     Each Loan Party agrees that the Administrative Agent may, but shall not be obligated to, make the Communications (as defined below) available to the LC Issuer and the other Lenders by posting the Communications on Debt Domain, Intralinks, Syndtrak or a substantially similar electronic transmission system (the "<u>Platform</u>").

(ii)     The Platform is provided "as is" and "as available."  The Administrative Agent and its Related Parties do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications.  No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by the Administrative Agent of any of its Related Parties in connection with the Communications or the Platform.  In no event shall the Administrative Agent or any of its Related Parties have any liability to Borrower or the other Loan Parties, any Lender or any other Person or entity for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of Borrower's, any Loan Party's or the Administrative Agent's transmission of communications through the Platform.  "<u>Communications</u>" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein which is distributed to the Administrative Agent, any Lender or the LC Issuer by means of electronic communications pursuant to this Section, including through the Platform.

14.2    **No Deemed Waiver; Cumulative Remedies**.  No failure on the part of Administrative Agent or any Lender to exercise, and no delay in exercising, and no course of dealing with respect to, any right, power, or privilege under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege under this Agreement, nor any abandonment or discontinuation of steps to enforce any right, power, or privilege under this Agreement, preclude any other or further exercise thereof or the exercise of

any other right, power, or privilege.  The rights and remedies provided for in this Agreement and the other Loan Documents are cumulative and not exclusive of any rights and remedies provided by law.

14.3    **Expenses; Indemnity; Damage Waiver; Costs and Expenses**.  Subject to the terms of the Financing Orders and as may otherwise be consistent with or permitted by the Approved Budget, Borrower shall pay (i) all reasonable out of pocket expenses incurred by the Administrative Agent and its Affiliates (including the reasonable fees, charges and disbursements of outside counsel, accountants, consultants, and other advisors for the Administrative Agent), and shall pay all reasonable fees, charges and disbursements for attorneys who may be employees of the Administrative Agent, in connection with (A) the syndication of the Facility, (B) the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents, or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (C) the Cases, (ii) all reasonable out of pocket expenses incurred by the LC Issuer in connection with the issuance, amendment, renewal or extension of any LC or any demand for payment thereunder, and (iii) all out of pocket expenses incurred by the Administrative Agent, any Lender or the LC Issuer (including the reasonable fees, charges and disbursements of outside counsel for the Administrative Agent, any Lender or the LC Issuer), and shall pay all reasonable fees, charges and disbursements for attorneys who may be employees of the Administrative Agent, any Lender, or the LC Issuer, in connection with the enforcement or protection of its rights (A) in connection with this Agreement, the other Loan Documents, including its rights under this Section, and the Cases, or (B) in connection with the Loans made or LCs issued under this Agreement, including all such out of pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or LCs.  In addition, Borrower agrees to pay on demand (1) all costs, expenses, taxes, assessments, and other charges incurred in connection with any filing, registration, recording, or perfection of any security interest contemplated by any Security Document or any other document referred to therein (2) all costs and expenses incurred in connection with inspections, Collateral Examinations, or monitoring in connection with the Loan Documents, and (3) all costs, expenses, and other charges in respect of insurance, flood insurance, title insurance, surveys, appraisals, lien searches, other due diligence, or notary fees procured with respect to Liens created pursuant to deeds of trust or mortgages or the other Security Documents.

(a)    <u>INDEMNIFICATION BY BORROWER</u>.    BORROWER SHALL INDEMNIFY THE ADMINISTRATIVE AGENT (AND ANY SUB-AGENT THEREOF), EACH LENDER AND THE LC ISSUER, AND EACH RELATED PARTY OF ANY OF THE FOREGOING PERSONS (EACH SUCH PERSON BEING CALLED AN "<u>INDEMNITEE</u>") AGAINST, AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, LIABILITIES AND RELATED EXPENSES (INCLUDING THE REASONABLE FEES, CHARGES AND DISBURSEMENTS OF ANY OUTSIDE COUNSEL FOR ANY INDEMNITEE), AND SHALL INDEMNIFY AND HOLD HARMLESS EACH INDEMNITEE FROM ALL REASONABLE FEES, CHARGES AND DISBURSEMENTS FOR ATTORNEYS WHO MAY BE EMPLOYEES OF ANY INDEMNITEE, INCURRED BY ANY INDEMNITEE OR ASSERTED AGAINST ANY INDEMNITEE BY ANY PERSON (INCLUDING BORROWER OR ANY OTHER LOAN PARTY) OTHER THAN SUCH INDEMNITEE AND ITS RELATED PARTIES ARISING OUT OF, IN CONNECTION WITH, OR AS

A RESULT OF (I) THE EXECUTION OR DELIVERY OF THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY OR THE CASES, THE PERFORMANCE BY THE PARTIES HERETO OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR THEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR BY THE CASES, (II) ANY LOAN OR LC OR THE USE OR PROPOSED USE OF THE PROCEEDS THEREFROM (INCLUDING ANY REFUSAL BY THE LC ISSUER TO HONOR A DEMAND FOR PAYMENT UNDER A LC IF THE DOCUMENTS PRESENTED IN CONNECTION WITH SUCH DEMAND DO NOT STRICTLY COMPLY WITH THE TERMS OF SUCH LC), (III) ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY BORROWER OR ANY OF ITS SUBSIDIARIES, OR ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO BORROWER OR ANY OF ITS SUBSIDIARIES, OR (IV) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY, WHETHER BROUGHT BY A THIRD PARTY OR BY BORROWER OR ANY OTHER LOAN PARTY, AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO; *PROVIDED THAT* SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES (A) ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE OR (B) RESULT FROM A CLAIM BROUGHT BY BORROWER OR ANY OTHER LOAN PARTY AGAINST AN INDEMNITEE FOR BREACH IN BAD FAITH OF SUCH INDEMNITEE'S OBLIGATIONS UNDER THIS AGREEMENT OR UNDER ANY OTHER LOAN DOCUMENT, IF BORROWER OR SUCH LOAN PARTY HAS OBTAINED A FINAL AND NONAPPEALABLE JUDGMENT IN ITS FAVOR ON SUCH CLAIM AS DETERMINED BY A COURT OF COMPETENT JURISDICTION. THIS <u>SECTION 14.3(A)</u> SHALL NOT APPLY WITH RESPECT TO TAXES OTHER THAN ANY TAXES THAT REPRESENT LOSSES, CLAIMS, DAMAGES, ETC. ARISING FROM ANY NON-TAX CLAIM.

(b)    <u>REIMBURSEMENT BY LENDERS</u>.    TO THE EXTENT THAT BORROWER FOR ANY REASON FAILS TO INDEFEASIBLY PAY ANY AMOUNT REQUIRED UNDER *PARAGRAPH (A)* OR *(B)* OF THIS <u>SECTION 14.3</u> TO BE PAID BY IT TO THE ADMINISTRATIVE AGENT (OR ANY SUB-AGENT THEREOF), THE LC ISSUER OR ANY RELATED PARTY OF ANY OF THE FOREGOING, EACH LENDER SEVERALLY AGREES TO PAY TO THE ADMINISTRATIVE AGENT (OR ANY SUCH SUB-AGENT), THE LC ISSUER OR SUCH RELATED PARTY, AS THE CASE MAY BE, SUCH LENDER'S PRO RATA SHARE (DETERMINED AS OF THE TIME THAT THE APPLICABLE UNREIMBURSED EXPENSE OR INDEMNITY PAYMENT IS SOUGHT BASED ON EACH LENDER'S TERM LOAN PERCENTAGE AT SUCH TIME) OF SUCH UNPAID AMOUNT (INCLUDING ANY SUCH UNPAID AMOUNT IN RESPECT OF A CLAIM ASSERTED BY SUCH LENDER); *PROVIDED*

*THAT*, THAT THE UNREIMBURSED EXPENSE OR INDEMNIFIED LOSS, CLAIM, DAMAGE, LIABILITY OR RELATED EXPENSE, AS THE CASE MAY BE, WAS INCURRED BY OR ASSERTED AGAINST THE ADMINISTRATIVE AGENT (OR ANY SUCH SUB-AGENT) OR THE LC ISSUER, IN ANY SUCH CASE IN ITS CAPACITY AS SUCH, OR AGAINST ANY RELATED PARTY OF ANY OF THE FOREGOING ACTING FOR THE ADMINISTRATIVE AGENT (OR ANY SUCH SUB-AGENT) OR THE LC ISSUER IN CONNECTION WITH SUCH CAPACITY.  THE OBLIGATIONS OF THE LENDERS UNDER THIS *PARAGRAPH (B)* ARE SUBJECT TO THE PROVISIONS OF SECTION 3.5(D).  NO INDEMNITEE REFERRED TO IN THIS *PARAGRAPH (B)* ABOVE SHALL BE LIABLE FOR ANY DAMAGE ARISING FROM THE USE BY UNINTENDED RECIPIENTS OF ANY INFORMATION OR OTHER MATERIALS DISTRIBUTED BY IT THROUGH TELECOMMUNICATIONS, ELECTRONIC OR OTHER INFORMATION TRANSMISSION SYSTEMS IN CONNECTION WITH THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

(c)      Payments.   All amounts due under this Section 14.3 shall be payable promptly and not later than five (5) days after demand therefor.

14.4    **Survival**.  Each party's obligations under this Section shall survive in accordance with the terms hereof the termination of the Loan Documents and payment or full satisfaction of the Obligations under this Agreement.

14.5    **Governing Law and Jurisdiction**.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET OUT THEREIN) AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS.

(a)      Jurisdiction.   Borrower and each other Loan Party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against the Administrative Agent, any Lender, the LC Issuer, or any Related Party of the foregoing in any way relating to this Agreement or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the Bankruptcy Court, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts.  Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or in any other Loan Document shall affect any right that the Administrative Agent, any Lender or the LC Issuer may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against Borrower or any other Loan Party or its properties in the courts of any jurisdiction.

(b)   <u>Waiver of Venue</u>.  Borrower and each other Loan Party irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in <u>Section 14.5(a)</u>.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by Applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)   <u>Service of Process</u>.  Each party hereto irrevocably consents to service of process in the manner provided for notices in <u>Section 14.1(a)</u>.  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by Applicable Law.

(d)   <u>Litigation Priority</u>.  Borrower irrevocably waives, to the fullest extent permitted by Applicable Law, any claim that any action or proceeding commenced by the Administrative Agent, any Lender or the LC Issuer relating in any way to this Agreement should be dismissed or stayed by reason, or pending the resolution, of any action or proceeding commenced by Borrower or any other Loan Party relating in any way to this Agreement whether or not commenced earlier.  To the fullest extent permitted by Applicable Law, Borrower shall take all measures necessary for any such action or proceeding commenced by the Administrative Agent, any Lender or the LC Issuer to proceed to judgment prior to the entry of judgment in any such action or proceeding commenced by Borrower.

14.6   **Waiver of Jury Trial**.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

14.7   **Successors and Assigns**.

(a)   <u>Successors and Assigns Generally</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither Borrower nor any other Loan Party may assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Administrative Agent and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations under this Agreement except (i) to an assignee in accordance with the provisions of <u>Section 14.7(b)</u>, (ii) by way of

participation in accordance with the provisions of Section 14.7(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 14.7(e) (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 14.7(d) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Assignments by Lenders.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)     Minimum Amounts.

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and/or the Loans at the time owing to it or contemporaneous assignments to related Approved Funds that equal at least the amount specified in Section 14.7(b)(i)(B) in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender, or an Approved Fund, no minimum amount need be assigned; and

(B)     in any case not described in Section 14.7(b)(i)(A), the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $1,000,000, and in each case in minimum increments of $1,000,000 in excess of such amounts, unless each of the Administrative Agent otherwise consents (such consent not to be unreasonably withheld or delayed).

(ii)     Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned, except that this *paragraph (ii)* shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Facilities on a non-pro rata basis.

(iii)     Required Consents.   No consent shall be required for any assignment except to the extent required by Section 14.7(b)(i)(B) and, in addition:

(A)     [reserved]; and

97

(B)     the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of (i) any unfunded Commitments with respect to the Facility, or (ii) any Term Loans to a Person who is not a Lender, an Affiliate of a Lender, or an Approved Fund.

(iv)     <u>Assignment and Assumption</u>.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; *provided that* the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)     <u>No Assignment to Certain Persons</u>.  No such assignment shall be made to (A) Borrower nor any Affiliate of any Loan Party, or (B) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender under this Agreement, would constitute any of the foregoing Persons described in this *clause (B)*.

(vi)     <u>No Assignment to Natural Persons</u>.  No such assignment shall be made to a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person).

(vii)     <u>Certain Additional Payments</u>.  In connection with any assignment of rights and obligations of any Defaulting Lender under this Agreement, no such assignment shall be effective unless and until, in addition to the other conditions thereto set out herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Administrative Agent, the applicable Commitment Percentage of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (A) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent, the LC Issuer and each other Lender under this Agreement (and interest accrued thereon), and (B) acquire (and fund as appropriate) its full pro rata share of all Loans and participations in LCs in accordance with its Commitment Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender under this Agreement shall become effective under Applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to <u>Section 14.7(c)</u>, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned

98

by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 4.2 and 14.3 with respect to facts and circumstances occurring prior to the effective date of such assignment; *provided that* except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party under this Agreement arising from that Lender's having been a Defaulting Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 14.7(d).

(c)     Register.  The Administrative Agent, acting solely for this purpose as an agent of Borrower, shall maintain at one of its offices in the U.S. a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender under this Agreement for all purposes of this Agreement.  The Register shall be available for inspection by Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)     Participations.  Any Lender may at any time, without the consent of, or notice to, Borrower or the Administrative Agent, sell participations to any Person (other than a natural Person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person, or Borrower or any of Borrower's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); *provided that* (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) Borrower, the Administrative Agent, the LC Issuer and Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, each Lender shall be responsible for the indemnity under ***Section 14.3(c)*** with respect to any payments made by such Lender to its Participant(s).

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided that* such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that affects such Participant and required the unanimous consent of the Lenders.  Borrower agrees that each Participant shall be

entitled to the benefits of <u>Sections 4.1</u>, <u>4.2</u>, and <u>4.5</u> (subject to the requirements and limitations therein, including the requirements under <u>Section 4.1(a)</u> (it being understood that the documentation required under <u>Section 4.1(a)</u> shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to <u>Section 14.7(b)</u>; *provided that*, such Participant (A) agrees to be subject to the provisions of <u>Section 4.7</u> as if it were an assignee under <u>Section 14.7(b)</u>; and (B) shall not be entitled to receive any greater payment under <u>Sections 4.1</u> or <u>4.2</u>, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at Borrower's request and expense, to use reasonable efforts to cooperate with Borrower to effectuate the provisions of <u>Section 4.7</u> with respect to any Participant. To the extent permitted by Applicable Law, each Participant also shall be entitled to the benefits of <u>Section 3.7</u> as though it were a Lender; *provided that* such Participant agrees to be subject to <u>Section 3.6</u> as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as an agent of Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "<u>Participant Register</u>"); *provided that* no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the U.S. Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)    <u>Certain Pledges</u>. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided that*, no such pledge or assignment shall release such Lender from any of its obligations under this Agreement or substitute any such pledgee or assignee for such Lender as a party hereto.

14.8    **Amendments, Consents, and Waivers**

(a)    Neither this Agreement nor any provision of this Agreement may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by Borrower and the Required Lenders, and acknowledged by the Administrative Agent, or, in the case of any other Loan Documents, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders, and each such amendment, modification, waiver, or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided that*, no such agreement shall (i) extend or increase the Commitment of any Lender without the

written consent of such Lender (it being understood that a waiver of any condition set forth in *Article 6* or the waiver of any Default or a mandatory reduction in Commitments shall not constitute an extension or increase of any Commitment of any Lender), (ii) reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees payable under this Agreement, without the written consent of each Lender affected thereby, *provided that*, only the consent of the Required Lenders shall be necessary to (A) amend the definition of "*Default Rate*" or to waive any obligation of Borrower to pay interest or fees in respect of LCs at the Default Rate, or (B) amend any financial covenant hereunder (or any defined term used in such covenants), even if the effect of such amendment would be to reduce the rate of interest on any Loan or LC Disbursement or to reduce any fee payable hereunder or the amount of any mandatory prepayment hereunder, (iii) reduce the face amount of (or the amount which may be drawn upon) any LC or reduce the rate of interest thereon, or reduce any fees payable under this Agreement, without the written consent of each Lender affected thereby, (iv) postpone the scheduled date of payment of the principal amount of any Loan or LC Borrowing, or any interest thereon, or any fees payable under this Agreement, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender affected thereby (for the avoidance of doubt, mandatory prepayments pursuant to *Section 3.3* may be postponed, delayed, reduced, waived or modified with the consent of Required Lenders only), (v) amend, modify, or waive any provisions of *Section 3.3(d)*, *Section 3.6*, or *Section 11.5* in any manner that would alter the pro rata sharing of payments required under this Agreement, without the written consent of each Lender adversely affected thereby, (vi) change any of the provisions of this *Section 14.8(a)* or the definition of "*Required Lenders*" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights under this Agreement or make any determination or grant any consent under this Agreement, without the written consent of each Lender, (vii) release all or substantially all the Guarantors from their Guarantees under their Guaranty Agreement except as expressly provided in the Guaranty Agreement, or limit the liability of the Guarantors in respect of their Guaranty Agreement, without the written consent of each Lender, (viii) release all or substantially all of the Collateral without the written consent of each Lender, *provided that*, nothing herein shall prohibit the Administrative Agent from releasing any Collateral, or require the consent of the other Lenders for such release, if such release is expressly permitted under this Agreement, or (ix) change Section 2.5(a) in a manner that would permit the expiration date of any LC to occur after the Termination Date without the consent of each Lender; provided that, (A) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the LC Issuer under this Agreement without the prior written consent of the Administrative Agent or the LC Issuer, as the case may be, and (B) any agreement between Borrower and the Administrative Agent providing for the payment of any fees may be amended, supplemented, or otherwise modified, and any terms or provisions therein waived, pursuant to a written agreement entered into by the parties thereto.

(b)     Notwithstanding the foregoing, any provision of this Agreement may be amended by an agreement in writing entered into by Borrower, the Required Lenders and the Administrative Agent (and, if their rights or obligations are affected thereby the LC Issuer) if (A) by the terms of such agreement the Commitment of each Lender not

consenting to the amendment provided for therein shall terminate upon the effectiveness of such amendment and (B) at the time such amendment becomes effective, each Lender not consenting thereto receives payment in full of the principal of and interest accrued on each Loan made by it and all other amounts owing to it or accrued for its account under this Agreement.

(c)     Notwithstanding anything to the contrary herein, (i) no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent under this Agreement, except that (A) the Commitment of such Defaulting Lender may not be increased or extended without the consent of such Defaulting Lender, and (B) any amendment, waiver or consent requiring all of the Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than the other affected Lenders shall require the consent of such Defaulting Lender, (ii) the Administrative Agent and Borrower may amend or modify this Agreement and any other Loan Document to (A) cure any ambiguity, omission, defect or inconsistency therein, and (B) grant a new Lien for the benefit of the Secured Parties, extend an existing Lien over additional property for the benefit of the Secured Parties, or join additional Persons as Loan Parties, and (iii) Administrative Agent may amend Schedule 1 to reflect assignments entered into pursuant to Section 14.7.

14.9     **Limitation of Liability**.   Neither Administrative Agent, any Lender nor any affiliate, officer, director, employee, attorney, or agent of such Person shall have any liability with respect to, and to the fullest extent permitted by Applicable Law, Borrower and each other Loan Party hereby waives, releases, and agrees not to sue any of them upon, any claim for any special, indirect, incidental, or consequential damages suffered or incurred by Borrower or any other Loan Party in connection with, arising out of, or in any way related to, this Agreement or any of the other Loan Documents, or any of the transactions contemplated by this Agreement or any of the other Loan Documents.  Borrower and each other Loan Party hereby waives, releases, and agrees not to sue Administrative Agent, any Lender or any of such Person's Affiliates, officers, directors, employees, attorneys, or agents for punitive damages in respect of any claim in connection with, arising out of, or in any way related to, this Agreement or any of the other Loan Documents, or any of the transactions contemplated by this Agreement or any of the other Loan Documents.

14.10   **Survival**.

(a)     Survival of Indemnification.  All indemnities set out in this Agreement and in the other Loan Documents shall survive the execution and delivery of this Agreement, the making of the Loans, the repayment of the Loans and the other Obligations and the termination of the Commitments under this Agreement.

(b)     Survival of Representations and Warranties.   All representations and warranties made under this Agreement and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or

knowledge of any Default or Potential Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Commitment remains in effect or any Loan, LC, or any other Obligations under this Agreement shall remain unpaid or unsatisfied.

(c)     Survival of Yield Protection Provisions.  The provisions of **Article 4** shall survive and shall continue in full force and effect as long as any Commitment remains in effect or any Loan, LC, or any other Obligations under this Agreement shall remain unpaid or unsatisfied.

(d)     The Cases.  The Liens, lien priority, administrative priorities and other rights and remedies granted to the Agent pursuant to this Agreement, the Financing Orders and the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by the Loan Parties (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Cases, or by any other act or omission whatsoever. Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(i)     except for the Permitted Liens and the Carve-Out, no costs or expenses of administration that have been or may be incurred in the Cases or any conversion of the same or in any other proceedings related thereto, and no priority Claims, are or will be prior to or on a parity with any Claim of the Agent or the Lenders against the Loan Parties in respect of any Obligations;

(ii)     except for the Permitted Liens, the Liens in favor of the Agent set forth in any Security Agreement shall constitute valid and perfected priming first priority Liens and security interests and shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(iii)     the Liens in favor of the Agent set forth herein and in the other Loan Documents shall continue to be valid and perfected without the necessity that the Agent file or record financing statements, mortgages or otherwise perfect its Lien under applicable non-bankruptcy law.

14.11   **Patriot Act; KYC Information**.  Administrative Agent hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow each Lender to identify each Loan Party in accordance with the Patriot Act.  Borrower shall, and shall cause each Subsidiary to, promptly following a request by any Lender, provide all documentation and other information that such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act and Beneficial Ownership Regulations.

14.12   **Foreign Lender Reporting Requirements**.  If any Foreign Lender becomes a party to this Agreement, such Lender will deliver to Borrower and Administrative Agent such documents and forms related to such status as Borrower or Administrative Agent may require.

14.13   **Document Imaging**.   Each Loan Party (a) understands and agrees that Administrative Agent's document retention policy involves the imaging of executed loan documents and the destruction of the paper originals, and (b) waives any right that it may have to claim that the imaged copies of the Loan Documents are not originals.

14.14   **Counterparts; Integration; Effectiveness; Electronic Execution**.

(a)   Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.   This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in *Article 6*, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

(b)   Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

14.15   **Treatment of Certain Information; Confidentiality**.

(a)   Each of the Administrative Agent, the Lenders and the LC Issuer agree to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its Affiliates and to its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (ii) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners); (iii) to the extent required by Applicable Law or by any subpoena or similar legal process; (iv) to any other party hereto; (v) in connection with the exercise of any remedies under this Agreement or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the

enforcement of rights under this Agreement or thereunder; (vi) subject to an agreement containing provisions substantially the same as those of this Section, to (A) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and obligations under this Agreement, or (B) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to Borrower and its obligations, this Agreement or payments under this Agreement; (vii) on a confidential basis to (A) any Credit Rating Agency in connection with rating Borrower or its Subsidiaries or the Facilities or (B) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Facilities; (viii) with the consent of Borrower; or (ix) to the extent such Information (A) becomes publicly available other than as a result of a breach of this Section, or (B) becomes available to the Administrative Agent, any Lender the LC Issuer or any of their respective Affiliates on a nonconfidential basis from a source other than Borrower who did not acquire such information as a result of a breach of this Section. In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Administrative Agent or any Lender in connection with the administration of this Agreement, the other Loan Documents, and the Commitments.

(b)     For purposes of this Section, "**_Information_**" means all information received from Borrower or any of its Subsidiaries relating to Borrower or any of its Subsidiaries or the business of Borrower, other than any such information that is available to the Administrative Agent, any Lender or the LC Issuer on a nonconfidential basis prior to disclosure by Borrower or any of its Subsidiaries; provided that, in the case of information received from Borrower or any of its Subsidiaries after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

14.16   **Severability**. Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

14.17   **Erroneous Payments**.

(a)     Each Lender, each LC Issuer, each other Secured Party and any other party hereto hereby severally agrees that if (i) the Administrative Agent notifies (which such notice shall be conclusive absent manifest error) such Lender, LC Issuer, or any other Secured Party (or the Lender which is an Affiliate of a Lender, LC Issuer, or any other Secured Party) or any other Person that has received funds from the Administrative Agent or any of its Affiliates, either for its own account or on behalf of a Lender, LC Issuer, or any other Secured Party (each such recipient, a "**_Payment Recipient_**") that the

Administrative Agent has determined in its sole discretion that any funds received by such Payment Recipient were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Payment Recipient), or (ii) any Payment Recipient receives any payment from the Administrative Agent (or any of its Affiliates) (A) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, as applicable, (B) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, as applicable, or (C) that such Payment Recipient otherwise becomes aware was transmitted or received in error or by mistake (in whole or in part) then, in each case, an error in payment shall be presumed to have been made (any such amounts specified in *subclauses (i)* or *(ii)* of this *Section 14.17(a)*, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise; individually and collectively, an "***Erroneous Payment***"), and, in each case, such Payment Recipient is deemed to have knowledge of such error at the time of its receipt of such Erroneous Payment; *provided that*, nothing in this *Section 14.17* shall require the Administrative Agent to provide any of the notices specified in subclauses (i) or (ii) above.  Each Payment Recipient agrees that it shall not assert any right or claim to any Erroneous Payment, and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments, including, without limitation, waiver of any defense based on "discharge for value" or any similar doctrine.

(b)      Without limiting the immediately preceding *clause (a)*, each Payment Recipient agrees that, in the case of *clause (a)(ii)* above, it shall promptly notify the Administrative Agent in writing of such occurrence.

(c)      In the case of either *clause (a)(i)* or *(a)(ii)* above, such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and upon demand from the Administrative Agent such Payment Recipient shall (or, shall cause any Person who received any portion of an Erroneous Payment on its behalf to), promptly, but in all events no later than one Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds and in the currency so received, together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(d)      In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the Administrative Agent in accordance with immediately preceding *clause (c)*, from any Lender that is a Payment Recipient or an Affiliate of a Payment Recipient (such unrecovered amount as to

such Lender, an "**_Erroneous Payment Return Deficiency_**"), then at the sole discretion of the Administrative Agent and upon the Administrative Agent's written notice to such Lender, such Lender shall be deemed to have made a cashless assignment of the full face amount of the portion of its Loans (but not its Commitments) with respect to which such Erroneous Payment was made (the "**_Erroneous Payment Impacted Class_**") to the Administrative Agent or, at the option of the Administrative Agent, the Administrative Agent's applicable lending affiliate (such assignee, the "**_Agent Assignee_**") in an amount that is equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the Loans (but not Commitments) of the Erroneous Payment Impacted Class, the "**_Erroneous Payment Deficiency Assignment_**"), plus any accrued and unpaid interest on such assigned amount, without further consent or approval of any party hereto and without any payment by the Agent Assignee as the assignee of such Erroneous Payment Deficiency Assignment.  Without limitation of its rights hereunder, following the effectiveness of the Erroneous Payment Deficiency Assignment, the Administrative Agent may make a cashless reassignment to the applicable assigning Lender of any Erroneous Payment Deficiency Assignment at any time by written notice to the applicable assigning Lender and upon such reassignment all of the Loans assigned pursuant to such Erroneous Payment Deficiency Assignment shall be reassigned to such Lender without any requirement for payment or other consideration. The parties hereto acknowledge and agree that (i) any assignment contemplated in this _clause (d)_ shall be made without any requirement for any payment or other consideration paid by the applicable assignee or received by the assignor, (ii) the provisions of this _clause (d)_ shall govern in the event of any conflict with the terms and conditions of **_Section 14.7_**, and (iii) the Administrative Agent may reflect such assignments in the Register without further consent or action by any other Person.

(e)    Each party hereto hereby agrees that (i) irrespective of whether the Administrative Agent may be equitably subrogated, in the event an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent (A) shall be subrogated to all the rights and interests of such Payment Recipient under the Loan Documents with respect to such amount (the "**_Erroneous Payment Subrogation Rights_**") and (B) is authorized to set off, net and apply any and all amounts at any time owing to such Payment Recipient under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Payment Recipient from any source, against any amount due to the Administrative Agent under this **_Section 14.17_** or under the indemnification provisions of this Agreement, (ii) the receipt of an Erroneous Payment by a Payment Recipient shall not for the purpose of this Agreement be treated as a payment, prepayment, repayment, discharge or other satisfaction of any Obligations owed by the Borrower or any other Loan Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Loan Party for the purpose of making a payment on the Obligations, and (iii) to the extent that an Erroneous Payment was in any way or at any time credited as payment or satisfaction of any of the Obligations, the Obligations or any part thereof that were so credited, and all rights of the Payment Recipient, as the case may be, shall be reinstated

and continue in full force and effect as if such payment or satisfaction had never been received.

(f)     Each party's obligations under this **Section 14.17** shall survive the resignation or replacement of the Administrative Agent or any transfer of right or obligations by, or the replacement of, a Lender, the termination of the Commitments or the repayment, satisfaction or discharge of the Obligations (or any portion thereof).

(g)     The provisions of this **Section 14.17** to the contrary notwithstanding, (i) nothing in this **Section 14.17** will constitute a waiver or release of any claim of any party hereunder arising from any Payment Recipient's receipt of an Erroneous Payment and (ii) there will only be deemed to be a recovery of the Erroneous Payment to the extent that Administrative Agent has received payment from the Payment Recipient in immediately available funds of the Erroneous Payment Return Deficiency, whether directly from the Payment Recipient, as a result of the exercise by Administrative Agent of its rights of subrogation or set off as set forth above in *clause (e)* above, or as a result of the receipt by Agent Assignee of a payment of the outstanding principal balance of the Loans assigned to Agent Assignee pursuant to an Erroneous Payment Deficiency Assignment, but excluding any other amounts in respect thereof (it being agreed that any payments of interest, fees, expenses or other amounts (other than principal) received by Agent Assignee in respect of the Loans assigned to Agent Assignee pursuant to an Erroneous Payment Deficiency Assignment shall be the sole property of the Agent Assignee and shall not constitute a recovery of the Erroneous Payment).

14.18   **Waiver of Effect of Corporate Seal**.  Each Loan Party represents and warrants that neither it nor any other Loan Party is required to affix its corporate seal to this Agreement or any other Loan Document pursuant to any Applicable Law, agrees that this Agreement is delivered by Borrower under seal, and waives any shortening of the statute of limitations that may result from not affixing the corporate seal to this Agreement or such other Loan Documents.

14.19   **[Reserved]**.

14.20   **ENTIRE AGREEMENT**.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REFERRED TO HEREIN EMBODY THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES HERETO WITH RESPECT TO THE SUBJECT MATTER HEREOF AND THEREOF AND SUPERSEDE ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO.  THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES HERETO.

14.21   **Agent and Lenders as Party-in-Interest**.  The Loan Parties hereby stipulate and agree that the Agent and the Lenders are and shall remain parties in interest in the Cases and shall have the right to participate, object and be heard in any motion or proceeding in connection therewith.  Nothing in this Agreement or any other Loan Document shall be deemed to be a waiver

of any of the Agent's or any Lender's rights or remedies under applicable law or documentation. Without limitation of the foregoing, each of the Agent or any Lender shall have the right to make any motion or raise any objection it deems to be in its interests (specifically including but not limited to objections to use of proceeds of the Term Loans, to payment of professional fees and expenses or the amount thereof (excluding the professional fees and expenses of bankruptcy counsel for the Loan Parties), to sales or other transactions outside the ordinary course of business or to the assumption or rejection of any executory contract or lease).

14.22   **Waiver of Right to Obtain Alternative Financing**.  In consideration of the Term Loans and other extensions of credit to be made to the Borrower by the Lenders, the Loan Parties hereby further waive any right they may have to obtain an order by the Bankruptcy Court authorizing the Borrower to obtain financing pursuant to Section 364 of the Bankruptcy Code from any Person other than the Lenders, unless such financing would result in all of the Obligations to the Agent and the Lenders (whether arising before, on or after the date of this Agreement) being paid in full, in cash, on or before the expiration of the term of this Agreement.

14.23   **Releases**.   In connection with the indefeasible payment in full in cash of the Obligations, and the termination of this Agreement, the Loan Parties covenant and agree, jointly and severally, that at such time they shall execute and deliver in favor of the Agent and the Lenders a valid and binding termination and release agreement, in form and substance acceptable to the Agent and the Lenders.

14.24   **Conflict of Terms**.  To the extent that any provision of this Agreement contradicts other provisions of the Loan Documents, the provisions of the Financing Orders shall control.

*[Signatures appear on the following pages.]*

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**BORROWER**:

MOUNTAIN EXPRESS OIL COMPANY,
a Georgia corporation

By: _____
        Michael Healy
        Chief Restructuring Officer

**GUARANTORS**:

Loan Parties listed on following page

By: _____
        Michael Healy
        Chief Restructuring Officer

## GUARANTORS

1200 Wego LLC
1227 Veterans, LLC
1308 Jefferson Davis LLC
13289 Old Hammond Highway LLC
1600 Manhattan Blvd, LLC
2601 Gen. Degaulle LLC
2698 Barataria Blvd LLC
2701 Canal Street LLC
2850 Belle Chasse Hgwy LLC
300 Lee Drive LLC
3049 Loyola Drive L.L.C.
4115 Airline Hgwy., LLC
4408 S. I-10 Service Road LLC
4520 Jefferson Highway LLC
4662 GDD LLC
4915 Westbank Expwy LLC
4940 Groom Road, L.L.C.
5310 Flannery Road, LLC
798 Jean Lafitte, L.L.C.
8692 River Road, LLC
9410 Greenwell Springs, LLC
Alabama Terminal Property, LLC
Avondale Brothers No 128 LLC
Avondale Investments, L.L.C.
B&T Petroleum LLC
Brothers Belle Chasse, L.L.C.
Brothers Carol Sue, LLC
Brothers Expressway, Inc.
Brothers I-10 Service Road, Inc.
Brothers Petroleum, L.L.C.
Brothers Stonebridge, Inc.
Brothers Terry Parkway, Inc.
Claiborne Operations LLC
CONSOLIDATED HR SERVICES LLC
Crowder Brothers, LLC
Exxon General Degaulle, LLC
Gause Operation, L.L.C.
Jamie Boulevard, LLC
Lapalco Brothers No. 125, LLC
Madison Auto Truck Plaza And Lucky Dollar Casino, LLC
MEX Fuels LLC
MEX Fuels NE LLC
MEX Fuels NE-IL LLC
MEX Fuels NE-IN LLC
MEX Fuels NE-KY LLC
MEX Fuels NE-NJ LLC
MEX Fuels NE-NY LLC
MEX Fuels NE-OH LLC
MEX Fuels NW LLC

MEX Fuels NW-IA LLC
MEX Fuels NW-MO LLC
MEX Fuels SE LLC
MEX Fuels SE-GA LLC
MEX Fuels SE-MS LLC
MEX Fuels SE-TN LLC
MEX Fuels SW LLC
MEX Fuels SW-LA LLC
MEX Fuels SW-OK LLC
MEX North Alabama, LLC
MEX RE Holdings LLC
MEX RE-NE LLC
MEX RE-NE-IN LLC
MEX RE-NE-NJ LLC
MEX RE-NE-NY LLC
MEX RE-NE-NY-LI LLC
MEX RE-NE-OH LLC
MEX RE-NE-PA LLC
MEX RE-NW LLC
MEX RE-NW-IA
MEX RE-NW-MN
MEX RE-NW-MO
MEX RE-NW-ND LLC
MEX RE-NW-WI LLC
MEX RE-SE LLC
MEX RE-SE-AL LLC
MEX RE-SE-GA LLC
MEX RE-SE-MS LLC
MEX RE-SE-NC LLC
MEX RE-SW LLC
MEX RE-SW-AR LLC
MEX RE-SW-LA LLC
MEX RE-SW-OK LLC
MEX RE-SW-TX LLC
Mississippi MEX Company, LLC
Mountain Express Baking and Coffee Co.
Mountain Express Ethanol Company
Mountain Express Oil Company
Mountain Express Oil Company Southeast, LLC
Newton Brothers, Inc.
Second Financial Management Services, LLC
South Claiborne Operation LLC
Spartan Tank Management LLC
Star Mountain Express, LLC
Texas MEX Limited Company, LLC
Webster P II L.L.C.
Webster L.L.C.
West Hill Ranch Group LLC
West Hill Ranch Investors, LLC
WHRG Retail Ops LLC
WHRG TC LLC

Signature Page to First Amended and Restated Credit Agreement

WHRG TC-NE LLC
WHRG TC-NE-PA LLC
WHRG TC-NW LLC
WHRG TC-NW-IA LLC
WHRG TC-NW-KS LLC
WHRG TC-NW-MO LLC
WHRG TC-NW-ND LLC
WHRG TC-NW-WY LLC
WHRG TC-SE LLC
WHRG TC-SE-AL LLC
WHRG TC-SE-SC LLC
WHRG TC-SW-AR LLC
WHRG TC-SW-LA LLC
WHRG-LA, LLC
WHRG-LA2, LLC
WHRGOPS NE LLC
WHRGOPS NE-NY LLC
WHRGOPS NE-NY-LI LLC
WHRGOPS NE-PA LLC
WHRGOPS NW LLC
WHRGOPS NW-IA LLC
WHRGOPS NW-IA-WIA LLC
WHRGOPS NW-MI LLC
WHRGOPS NW-MO LLC
WHRGOPS NW-MO-NMO LLC
WHRGOPS NW-WI LLC
WHRGOPS NW-WI-NWI LLC
WHRGOPS SE LLC
WHRGOPS SE-AL-NORTH LLC
WHRGOPS SE-SC LLC
WHRGOPS SE-TN LLC
WHRGOPS SE-TN-WTN LLC
WHRGOPS SW LLC
WHRGOPS SW-AR LLC
WHRGOPS SW-AR-NWAR LLC
WHRGOPS SW-OK LLC
WHRGOPS SW-OK-OKC LLC
WHRGOPS SW-TX LLC
WHRGOPS SW-TX-DALLAS LLC
WHRGOPS SW-TX-STX LLC

Signature Page to First Amended and Restated Credit Agreement

**ADMINISTRATIVE AGENT**:

FIRST HORIZON BANK,
as Administrative Agent


By: _____
Name: _____
Title: _____


**LENDERS**:

FIRST HORIZON BANK,
as LC Issuer and as a Lender


By: _____
Name: _____
Title: _____

HANCOCK WHITNEY BANK,
as a Lender

By: _____
Name: _____
Title: _____

CADENCE BANK,
as a Lender


By: _____
Name: _____
Title: _____

Signature Page to DIP Credit Agreement

BANK OF HOPE,
as a Lender


By: _____
Name: _____
Title: _____

Signature Page to DIP Credit Agreement

UNITED COMMUNITY BANK,
as a Lender


By: _____
Name: _____
Title: _____

Signature Page to DIP Credit Agreement

SYNOVUS BANK,
as a Lender

By: _____
Name: _____
Title: _____

SOUTH STATE BANK,
as a Lender

By: _____
Name: _____
Title: _____

PINNACLE BANK,
as a Lender


By: _____
Name: _____
Title: _____

Signature Page to DIP Credit Agreement

Schedule 1

| Lender | Commitment | Roll-up Amount | Total |
|---|---|---|---|
| [To Be Provided] | | | |
| | | | |
| | | | |

Schedule 2

Prepetition LCs

[To Be Provided]

Exhibit A

Form of Note

[To Be Provided]

Exhibit B

Borrowing Request

[To Be Provided]

Exhibit C

[Reserved]

Exhibit D

Assignment and Assumption Agreement

[To Be Provided]

Exhibit E

Form of U.S. Tax Compliance Certificate

[To Be Provided]

Exhibit F

Approved Budget

[See Attached]

**MEX DIP Budget dated March 23, 2023**
**Mountain Express Oil**
($ in '000s)

| | Week 1 Forecast 24-Mar-23 | Week 2 Forecast 31-Mar-23 | Week 3 Forecast 7-Apr-23 | Week 4 Forecast 14-Apr-23 | Week 5 Forecast 21-Apr-23 | Week 6 Forecast 28-Apr-23 | Week 7 Forecast 5-May-23 | Week 8 Forecast 12-May-23 | Week 9 Forecast 19-May-23 | Week 10 Forecast 26-May-23 | Week 11 Forecast 2-Jun-23 | Week 12 Forecast 9-Jun-23 | Week 13 Forecast 16-Jun-23 | Subtotal 13-Week Period WE 3/24 - WE 6/16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | | | | | |
| Net Fuel Profit | $2,771 | $1,969 | $3,465 | $2,211 | $2,239 | $2,536 | $2,808 | $1,461 | $2,289 | $2,536 | $2,700 | $2,143 | $2,143 | $31,272 |
| Rent Income | – | – | 5,106 | – | 490 | – | 5,106 | – | 490 | – | 3,069 | 2,046 | 568 | 16,876 |
| Net Retail Supporting Operations | (411) | (129) | (70) | 479 | 681 | (468) | 203 | 267 | 292 | (518) | 253 | 114 | 114 | 806 |
| Other Receipts | – | – | – | – | – | – | – | – | – | – | – | 146 | 146 | 292 |
| **Total Operating Receipts** | **$2,360** | **$1,840** | **$8,501** | **$2,690** | **$3,410** | **$2,068** | **$8,117** | **$1,729** | **$3,071** | **$2,018** | **$6,022** | **$4,449** | **$2,971** | **$49,246** |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Rent Expense | – | – | (8,472) | – | – | – | (8,490) | – | – | – | (8,481) | – | – | (25,443) |
| Payroll & Benefits [1] | (279) | (1,037) | (279) | (1,037) | (279) | (1,037) | (279) | (1,037) | (279) | (1,037) | (279) | (783) | (196) | (7,841) |
| Vendor Disbursements | (6,000) | (7,525) | (3,051) | (1,525) | (1,338) | (1,777) | (1,036) | (725) | (1,338) | (1,777) | (953) | (462) | (462) | (27,971) |
| Utilities & Insurance | (3) | (3) | (344) | (9) | (19) | (57) | (338) | (9) | (19) | (11) | (338) | (92) | (92) | (1,335) |
| Other Operating Disbursements | (15) | (13) | (36) | (19) | (19) | (17) | (15) | (36) | (19) | (17) | (15) | (8) | (8) | (253) |
| **Total Operating Costs** | **($6,297)** | **($8,578)** | **($12,182)** | **($2,591)** | **($1,654)** | **($2,886)** | **($10,179)** | **($1,790)** | **($1,654)** | **($2,840)** | **($10,087)** | **($1,346)** | **($759)** | **($62,843)** |
| **Operating Cash Flow** | **($3,937)** | **($6,738)** | **($3,681)** | **$99** | **$1,756** | **($818)** | **($2,062)** | **($62)** | **$1,417** | **($822)** | **($4,066)** | **$3,103** | **$2,213** | **($13,597)** |
| **Non-Restructuring Related** | | | | | | | | | | | | | | |
| Inventory | 300 | 700 | – | – | 1,100 | – | – | – | – | – | – | – | – | 2,100 |
| Capital Expenditures | – | – | (500) | – | – | (500) | – | – | – | (200) | – | – | – | (1,200) |
| **Total Non-Restructuring Related** | **$300** | **$700** | **($500)** | **–** | **$1,100** | **($500)** | **–** | **–** | **–** | **($200)** | **–** | **–** | **–** | **$900** |
| **Restructuring Related** | | | | | | | | | | | | | | |
| Restructuring Fees [1] | (656) | (656) | (631) | (2,869) | (669) | (669) | (1,400) | (450) | (450) | (450) | (1,000) | (550) | (550) | (11,001) |
| Other Restructuring Related | 279 | (250) | – | (167) | – | – | – | (238) | – | – | – | – | (259) | (635) |
| **Total Restructuring Related** | **($377)** | **($906)** | **($631)** | **($3,036)** | **($669)** | **($669)** | **($1,400)** | **($688)** | **($450)** | **($450)** | **($1,000)** | **($550)** | **($809)** | **($11,636)** |
| **Net Cash Flow** | **($4,014)** | **($6,945)** | **($4,812)** | **($2,937)** | **$2,187** | **($1,987)** | **($3,462)** | **($750)** | **$967** | **($1,472)** | **($5,066)** | **$2,553** | **$1,403** | **($24,333)** |
| **Cash (Unrestricted)** | (4,014) | (6,945) | (4,812) | (2,937) | 2,187 | (1,987) | (3,462) | (750) | 967 | (1,472) | (5,066) | 2,553 | 1,403 | |
| Beginning Balance | $3,696 | $19,683 | $12,738 | $7,926 | $13,588 | $15,776 | $13,789 | $10,327 | $9,577 | $10,544 | $9,072 | $4,007 | $6,560 | $3,696 |
| Net Cash Flow | (4,014) | (6,945) | (4,812) | (2,937) | 2,187 | (1,987) | (3,462) | (750) | 967 | (1,472) | (5,066) | 2,553 | 1,403 | (24,333) |
| DIP Draws | 20,000 | – | – | 8,600 | | | | | | | | | | 28,600 |
| **Ending Unrestricted Cash Balance** | **$19,683** | **$12,738** | **$7,926** | **$13,588** | **$15,776** | **$13,789** | **$10,327** | **$9,577** | **$10,544** | **$9,072** | **$4,007** | **$6,560** | **$7,963** | **$7,963** |
| **DIP** | | | | | | | | | | | | | | |
| Beginning Balance | – | $20,000 | $20,000 | $20,000 | $28,600 | $28,600 | $28,600 | $28,600 | $28,600 | $28,600 | $28,600 | $28,600 | $28,600 | – |
| DIP Draws | 20,000 | – | – | 8,600 | | | | | | | | | | 28,600 |
| **Ending DIP Balance Excl. Roll-Up** | **$20,000** | **$20,000** | **$20,000** | **$28,600** | **$28,600** | **$28,600** | **$28,600** | **$28,600** | **$28,600** | **$28,600** | **$28,600** | **$28,600** | **$28,600** | **$28,600** |

[1] Excludes Raymond James transaction fee, the quantum of which is unknown and depends on the nature and terms of the transaction.

**GZJ KDKV'4**
**To Be Filed**

# EXHIBIT 3

,"

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>MOUNTAIN EXPRESS OIL COMPANY, et al.,<br><br>Debtors. [1] | Chapter 11<br><br>Case No. 23-90147 (DRJ)<br><br>(Jointly Administered) |

**DECLARATION OF MICHAEL HEALY IN SUPPORT
OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

I, Michael Healy, pursuant to section 1726 of Title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Restructuring Officer (the "CRO") of Mountain Express Oil Company ("MEX") and its affiliates (collectively, the "Company"). In addition to serving as MEX's CRO, I am a Senior Managing Director at FTI Consulting, Inc. ("FTI"), a leading global business advisory firm with 121 offices worldwide and over 7,600 professionals. I have more than 20 years of restructuring experience and have advised companies, lenders, creditors, corporate boards, and equity sponsors across a diverse range of industries both domestically and internationally. My experience includes advising on complex restructuring and turnaround situations in out-of-court restructurings and formal bankruptcy proceedings. Specific areas of my expertise include business plan development, cash flow forecasting, cash management, development and implementation of cost reduction plans, negotiating restructuring plans, bankruptcy planning, and negotiating business and asset sales. I have advised companies, lenders,

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/mountainexpressoil. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 Cases is 3650 Mansell Road, Suite 250, Alpharetta, Georgia 30022.



2390147230321000000000018

and investors in a variety of industries and in select instances served as Chief Restructuring Officer, including Speedcast International Limited, F+W Media, Inc., All American Group, Inc., and TransCentra, Inc.

2.  On March 18, 2023 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") each commenced a voluntary case (collectively, the "Chapter 11 Cases") under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court"), and they will continue to operate their business and manage their properties as debtors in possession.

3.  I am generally familiar with the Debtors' day-to-day operations, business affairs, books and records, and the Company's restructuring efforts. Except as otherwise indicated herein, the facts set forth in this declaration (this "Declaration") are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors, my opinion based upon my experience, knowledge, and information concerning the Debtors' operations, and my discussions with other employees of FTI and with the Company's restructuring advisors. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.  To minimize any adverse effects of filing the bankruptcy petitions (the "Petitions") and to preserve value for the benefit of all stakeholders, the Debtors have filed a number of motions requesting various forms of "first day" relief (collectively, the "First Day Pleadings"). I submit, and am authorized by the Debtors to submit, this Declaration in support of the Petitions and the First Day Pleadings. The relief requested in the First Day Pleadings is necessary to preserve and

maximize the value of the Debtors' estates and allow them to sustain their current operations in chapter 11.

5.     This Declaration is intended to provide a summary overview of the Debtors' businesses, the circumstances leading to the commencement of these Chapter 11 Cases, and in support of the relief the Debtors seek in the First Day Pleadings. I have organized this Declaration as follows:

- **Part I** provides an introduction to the commencement of the Chapter 11 Cases.

- **Part II** provides a general overview of the Company's corporate history and business operations.

- **Part III** describes the Company's prepetition corporate and capital structure.

- **Part IV** describes the circumstances leading to the commencement of these Chapter 11 Cases.

- **Part V** sets forth the evidentiary basis for the relief requested in the First Day Pleadings.

## I.   INTRODUCTION[2]

6.     Based in Alpharetta, Georgia, the Debtors are a vertically-integrated market leader in the fuel supply business. The Debtors' history with Oak Street Real Estate Capital, LLC (together with its affiliates "Oak Street"), was, until recently, one of collaboration. For the past several years, the Debtors would acquire Fueling Centers and Travel Centers and sell the properties to Oak Street, who in turn leased the properties back to the Debtors. This relationship between the Debtors and Oak Street, which began in 2021, resulted in the Debtors' acquisition and sale-leaseback of 286 locations (the "Oak Street Leased Properties"), making Oak Street the Debtors' largest single Landlord among the Debtors' 550 locations. Integral to the Debtors' business operations is both the Debtors' entry into fuel purchase contracts with stringent minimum

---

[2]    Capitalized terms used but not defined in this section shall have the meanings ascribed to them *infra*.

purchasing requirements (the "Oil Company Agreements") with the major fuel suppliers (the "Fuel Suppliers") and the Debtors' entry into long-term agreements with Dealers (collectively, the "Fuel Supply Agreements") to supply the Dealers with fuel.

7.      Something changed in recent months—rather than continue to partner with the Debtors, Oak Street instead decided it wanted to transfer more than 150 of the Debtors' properties to operators of its choice (who would not be parties to the Fuel Supply Agreements with the Debtors, thereby severely devaluing the Debtors' operations).  The pretext for this change was Oak Street's decision to assert notices of default (the "Oak Street Default Notices") on February 17, 2023 with respect to non-monetary, ordinary course property remediation issues the Debtors were undertaking at certain locations.  Oak Street was fully aware of these non-monetary defaults, most of which existed at the time the properties became part of the Oak Street portfolio and which were not asserted to be events of default at the time of the most recent amendments to the Oak Street MLAs—which occurred just a month prior to the transmission of the Oak Street Default Notices. Indeed, until January 2023, a representative of Oak Street was on the Debtors' Board of Directors[3] and was fully aware of the Debtors' ongoing efforts to complete such work.[4]

8.      After receiving the notices of default, the Debtors attempted to engage with Oak Street to discuss the Debtors' current business plan and address any concerns Oak Street had with the Debtors' operations.  The Debtors requested a thirty-day extension of the time to cure the

---

[3]    Whether and to what extent Oak Street used information obtained from Jared Sheiker – the Oak Street representative formerly on the Debtors' Board – in connection with such efforts may be the subject of discovery in these Chapter 11 Cases.  In fact, I am informed that in the days leading up to the filing of these cases, the Debtors were contacted by Pilot, one of their significant trading partners and fuel suppliers to the Travel Centers, who informed them that a dealer not associated with the Debtors had approached them to potentially operate three of the Travel Centers for Oak Street.

[4]    In connection with the assumption and/or assignment of the Oak Street MLAs, the Debtors will demonstrate that the alleged defaults have been substantially cured, to the extent the Debtors (as opposed to a third party, such as a governmental unit) are in control of such cure.

alleged defaults in order to facilitate these discussions and avoid the need to prepare for a bankruptcy filing. Oak Street's willingness to have these discussions was conditioned upon numerous demands, including that the Debtors release more than 150 properties from the Oak Street MLAs, presumably because they had lined up new tenants for those locations. Under the terms of the Debtors' Oil Company Agreements, the Debtors must meet certain minimum fuel purchase requirements and under the Fuel Supply Agreements, the Debtors must supply the Dealers with whom they contract. Were the Debtors to ignore their fiduciary duties and accede to Oaks Street's demands to dispossess a significant portion of the Debtors' properties, it would decimate the Debtors' business, and would likely cause the breach of the Oil Company Agreements and certain Fuel Supply Agreements. Oak Street's demands neither provided any relief to the Debtors nor the ability for the Debtors to continue to address their go-forward business in a manner that would benefit all stakeholders—as opposed to Oak Street alone. Oak Street's efforts had to be halted for the benefit of all of the Debtors' stakeholders – thus these Chapter 11 Cases were filed.

## II. THE COMPANY'S HISTORY AND BUSINESS OPERATIONS

9. Mountain Express was originally founded in 2000 by Barry and Gail Bierenbaum as a distributor of fuel and lubricants. In 2003, Turjo Wadud and Lamar Frady joined the Company and, over the course of the decade, Mountain Express grew to supply approximately 180 fuel stations, including approximately 50 owned fuel stations. After selling its business to Empire Petroleum in 2010, Mountain Express re-entered the market in 2013 through a re-acquisition of 33 locations from Empire Petroleum. Two years later, Mr. Wadud and Mr. Frady—having served the Company in senior management positions for over a decade— became equity partners in Mountain

Express and, in March 2020, became co-owners of the company they helped to grow into a multimillion dollar business.

10.    As of the Petition Date, the Debtors have three business segments: (a) the "<u>C-Store Operation Business</u>" which consists of the operation of fueling centers and associated convenience stores ("<u>Fueling Centers</u>"); (b) the "<u>Travel Center Operation Business</u>" which consists of the operation of travel centers ("<u>Travel Centers</u>"); and (c) the "<u>Fuel Distribution Business</u>" which consists of the distribution of fuel procured from the Fuel Suppliers.

11.    In structuring their operations, the Debtors acquire Fueling Centers and Travel Centers and simultaneously re-sell them to third-party investment vehicles (the "<u>Landlords</u>") who then lease the Fueling Centers and Travel Centers back to the Debtors pursuant to long-term agreements (collectively, the "<u>Prime Leases</u>").  Certain of the Fueling Centers (the "<u>Operated Fueling Centers</u>") and Travel Centers (the "<u>Operated Travel Centers</u>" and, together with the Operated Fueling Centers, the "<u>Operated Sites</u>") are operated by the Debtors ("<u>Operated Dealers</u>"), while certain sites are "dealered out" and subleased to third-parties (the "<u>Network Dealers</u>" and, together with the Operated Dealers, the "<u>Dealers</u>") to operate a Fueling Center on the site (the "<u>Network Dealer Sites</u>" and, together with the Operated Sites, the "<u>Controlled Sites</u>").  The Debtors' Fuel Distribution Business provides fuel to both Controlled Sites and sites in which the Debtors hold no real property interests (the "<u>Non-Controlled Sites</u>").  A diagram that describes the Debtors' business segments follows:



12.    As of the Petition Date, the Debtors serve 828 Fueling Centers and 27 Travel Centers across 27 states.  Of the 855 locations, 550 are Controlled Sites and 305 are Non-Controlled Sites.  The Debtors are ExxonMobil's second largest customer nationwide and its largest customer in the Southeast.  The Debtors are also a significant customer of several other national Fuel Suppliers, including Shell, Sunoco, and Valero.  In addition, the Debtors are one of the largest dealers to Pilot Travel Centers; at the same time, Pilot is a Fuel Supplier to the Travel Centers.

A.  **Mountain Express' Growth Strategy**

13.     Beginning in June 2021, Mountain Express embarked on a rapid growth strategy to pursue value-accretive acquisitions of multi-unit fuel retailers targeted at obtaining geographic diversification, economies of scale, and operational efficiencies.  The Debtors do not own the real estate underlying any of the Controlled Sites; rather, certain Debtors (in general, the MEX RE Entities, as defined below) lease the Controlled Sites from a third-party Landlord[5] and then sublease the Controlled Sites to either a third-party Network Dealer or a Debtor entity (in general, a Retail Entity, as defined below) in the case of Operated Sites.  By having long-term property interests in the Controlled Sites through their tenancy under the Prime Leases, the Debtors can guarantee an equally long-term, steady revenue stream as the sole fuel distributor to the Controlled Dealers.

14.     As noted above, the Debtors have generally expanded their network of Controlled Dealers through the acquisition of Fueling Centers and Travel Centers from third parties and the simultaneous sale-leaseback of those locations to a Landlord, realizing value in the process through cap rate arbitrage.  Thereafter, the Debtors enter into sublease agreements (the "Subleases") and Fuel Supply Agreements (as defined below) with either a Network Dealer or Operated Dealer.

---

[5]     I understand that certain Landlords are entities directly or indirectly owned or controlled by Mr. Frady and/or Mr. Wadud (the "Related Parties"), including 4Court Holdings, LLC; 4Court Leasing LLC; LTE Capital, LLC; and and Time and Water LLC.



As of the Petition Date, approximately 64% of the Controlled Dealers are Network Dealers and 36% are Operated Dealers.[6]

## B.  The Fuel Distribution Business

15.  As noted above, the core of the Debtors' operations is the Fuel Distribution Business, through which revenue is realized under the Debtors' Fuel Supply Agreements.  The Debtors purchase fuel and lubricants from the Fuel Suppliers, with whom the Debtors enjoy long-tenured business relationships pursuant to the Oil Company Agreements,[7] at spot rates (the "Spot Price").  The Debtors then sell the fuel and lubricants to Dealers pursuant to the Fuel Supply Agreements, which incorporate one of two pricing models—(a) a commission model, wherein the Debtors consign fuel to a Dealer, controlling the price of the fuel at the pump and sharing in the

---

[6]  As discussed in further detail herein, the Debtors are in the process of strategically refocusing their operations on the Fuel Distribution Business and have therefore been converting Operated Fuel Centers to Network Dealers.

[7]  The Debtors purchase less than 5% of their annual fuel needs on a spot basis (*i.e.* not pursuant to an Oil Company Agreement).

retail profit upon its sale at agreed-to rates (the "Commission Model"); and (b) a cost plus model, wherein the Debtors sell the fuel to a Dealer at the Spot Price plus freight, fees, and an agreed-to cents-per-gallon markup (the "Wholesale Model").

16.     Essential to the Fuel Distribution Business is the Debtors' ability to reliably and regularly supply each of the Dealers with sufficient fuel under the Fuel Supply Agreements.  To do so, the Debtors use the services of approximately 82% outside fuel trucking companies (the "Trucking Companies").  One such company is Adelphi Transport, LLC ("Adelphi Transport"), a non-Debtor Related Party that, as of the Petition Date, transports approximately 18% of the Debtors' fuel supply from terminals to the dealers.  I understand that Adelphi Transport was founded in January 2022 by Mr. Wadud and Mr. Frady in response to major disruptions to the Debtors' business during 2020 and 2021, including as a result of the national shortage of drivers,[8] infrastructure outages concerning the Colonial[9] and Plantation[10] pipelines, and widespread service cancellations by Trucking Companies.[11]  The rates charged to the Debtors by Adelphi Transport are at market for the services provided and, upon information and belief, are the same as or better than those that Adelphi Transport charges to its other customers.

---

[8]     *See* Madeline Ngo and Ana Swanson, "The Biggest Kink in America's Supply Chain: Not Enough Truckers," *New York Times* (November 9, 2021) (available at https://www.nytimes.com/2021/11/09/us/politics/trucker-shortage-supply-chain.html).

[9]     *See* Martha C. White, "Pipeline shutdown could lead to price spikes, shortages – and problems for East Coast airports," *NBC News* (May 10, 2021) (available at https://www.nbcnews.com/business/energy/pipeline-shutdown-could-lead-price-spikes-shortages-problems-east-coast-n1266881).

[10]    *See* Laura Sanicola, "Kinder Morgan delays restart of southeast fuels pipeline due to flooding," *Reuters* (Oct. 7, 2021) (available at https://www.reuters.com/business/energy/kinder-morgan-delays-restart-southeast-fuels-pipeline-due-flooding-2021-10-07/).

[11]    For example, I understand that one of the Debtors' Trucking Companies ceased providing services to North Georgia in December 2022 and Alabama in January 2023.

17.     The Debtors' operations require testing, phase I environmental site assessments, and monthly visual inspections to meet various state and regulatory and environmental requirements (collectively, "Environmental Services").  Each state in which the Debtors operate maintains its own regulatory requirements, including the need for annual inspections to review compliance. Upon information and belief, prior to January 2023, all Environmental Services were performed by a Debtor entity, Spartan Tank Management LLC ("Spartan").[12]  However, I am advised that, because Spartan was unable to achieve profitability, the Debtors began exploring alternative sources for the provision of Environmental Services in 2022.  By the end of the year, the Debtors entered into bifurcated arrangements for the provision of Environmental Services; commencing in January 2023, monthly visual inspections are handled by MVI Field Services, a nationwide, third-party tank inspection service company, while compliance work and phase I assessments are performed by Adelphi Environmental Services LLC ("Adelphi Environmental"), a newly-formed Related Party, pursuant to a January 6, 2023, Services Agreement with MEX.  The rates charged to the Debtors by Adelphi Environmental are at market for the services provided.

### III. THE DEBTORS' CORPORATE AND CAPITAL STRUCTURE

**A.     Corporate Structure**

18.     MEX, a Georgia corporation, is the ultimate parent of the other 143 Debtor entities and is privately held.  As of the Petition Date, MEX's equity interests are held as follows: (a) 48.5% by Turjo Wadud, the Debtors' Co-CEO; (b) 48.5% by Lamar Frady, the Debtors' Co-CEO; and (c) 3% by West Hill Ranch Investors, LLC ("WHRI").[13]

---

[12]     As of the Petition Date, Spartan has no further business activities.

[13]     WHRI acquired 3% of MEX's equity interests in connection with the Debtors' acquisition of West Hill Ranch Group LLC ("West Hill Ranch").

19.     As shown in detail on the organizational chart attached hereto as **Exhibit A**, MEX is the parent of various subsidiaries, including West Hill Ranch, MEX RE Holdings LLC ("MEX RE" and, together with its direct and indirect Debtor subsidiaries, the "MEX RE Entities"), MEX Fuels LLC ("MEX Fuels" and, together with its direct and indirect Debtor subsidiaries, the "MEX Fuels Entities"), and WHRG-LA2, LLC (together with its direct and indirect Debtor subsidiaries, the "Brothers Entities").  West Hill Ranch is the direct parent of two Debtors, WHRG Retail Ops LLC ("WHRG Retail" and, together with its direct and indirect Debtor subsidiaries, the "Retail Entities") and WHRG TC LLC ("WHRG TC" and, together with its direct and indirect Debtor subsidiaries, the "Travel Center Entities").

20.     As noted above, the MEX RE Entities are largely the tenants under the Debtors' Prime Leases and sub-landlords under the Subleases.[14]  The Retail Entities are the tenants under Subleases with the MEX RE Entities with respect to the Operated Fueling Centers and the Travel Center Entities are the tenants under the Subleases with the MEX RE Entities with respect to the Operated Travel Centers.

**B.    Prepetition Capital Structure**

> i.    *Prepetition Secured Parties*

21.     MEX is the Borrower under that certain *First Amended and Restated Credit Agreement* dated as of March 12, 2020 (the "Prepetition Credit Agreement"),[15] among MEX (the "Prepetition Borrower"), the Prepetition Guarantors (defined below), certain Lenders (as defined

---

[14]    Certain of the Prime Leases are held by other Debtor entities, including MEX, West Hill Ranch, and certain Brothers Entities.

[15]    References to documents herein shall include such documents as each of them may have been amended, modified, supplemented, and restated from time to time unless provided otherwise.  The Prepetition Credit Agreement amends and restates an original credit agreement dated October 25, 2018.  The Prepetition Credit Agreement was most recently amended pursuant to that certain *Fourth Amendment to First Amended and Restated Credit Agreement and Limited Waiver* dated as of December 1, 2022.

in, and designated from time to time pursuant to, the Prepetition Credit Agreement) (the "Prepetition Lenders"), and First Horizon Bank[16] (in its capacity as administrative agent, the "Prepetition Agent" and, together with the Prepetition Lenders, the "Prepetition Secured Parties") with respect to a secured term loan and revolving credit facility (the "Prepetition Loan Facility").[17] The Prepetition Loan Agreement, collectively with the Loan Documents (as defined in the Prepetition Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as amended, restated, supplemented, waived, or otherwise modified from time to time, the "Prepetition Loan Documents") provided for loans to the Prepetition Borrower of up to $205 million in aggregate principal amount. As of the Petition Date, the aggregate amount outstanding under the Loan Facility is approximately $176.5 million, consisting of approximately $148.3 million in outstanding principal due under the Prepetition Term Loan Facility, approximately $28.2 million in outstanding principal due under the Prepetition Revolving A Facility, and no outstanding principal due under the Prepetition Revolving B Facility. Each of the foregoing amounts is exclusive of accrued interest, fees, costs and charges.

22.    As more fully set forth in the Prepetition Loan Documents, prior to the Petition Date the Prepetition Borrower and the Prepetition Guarantors (as defined below) granted to the

---

[16]    Formerly known as IberiaBank, a division of First Horizon Bank. The Prepetition Agent is also a Prepetition Lender.

[17]    The Prepetition Loan Agreement provided for the funding of three separate types of loans with different terms and applicable interest rates. Specifically, the Prepetition Loan Agreement permits borrowing under a term loan facility in the amount of $155 million (inclusive of a $5 million swing line loan) (the "Prepetition Term Loan Facility"), a revolving A credit facility with an aggregate commitment amount of $30 million (the "Prepetition Revolving A Facility"), and a revolving B facility with an aggregate commitment amount of $20 million (the "Prepetition Revolving B Facility"). In addition, the Borrower and certain of the Prepetition Secured Parties were parties to a hedge agreement (the "Prepetition Hedge Agreement") to hedge interest rate exposure applicable to a portion of the principal amount borrowed under the Prepetition Term Loan Facility. The Prepetition Hedge Agreement was terminated as of March 8, 2023, yielding a termination payment to the Prepetition Borrower in the approximate amount of $6.648 million (the "Hedge Termination Payment"). I was informed on the evening of March 19, 2023 that, prior to the Petition Date, the Prepetition Agent applied the Hedge Termination Payment against amounts owed pursuant to the Prepetition Loan Documents.

Prepetition Agent, for the benefit of itself and the Prepetition Lenders, a security interest in and continuing lien (the "Prepetition Liens") on substantially all of their assets and property, including inventory and equipment (with certain exceptions set forth in the Prepetition Loan Documents) and all proceeds, products, accessions, rents, and profits thereof (collectively, the "Prepetition Collateral").  The obligations of the Prepetition Borrower under the Prepetition Credit Agreement are guaranteed by Mountain Express Baking and Coffee Co.; Mountain Express Ethanol Company; Alabama Terminal Property, LLC; Spartan;[18] Mountain Express Oil Company Southeast, LLC; MEX North Alabama, LLC; Mississippi MEX Company, LLC; B&T Petroleum LLC; Texas MEX Limited Company, LLC; Star Mountain Express, LLC; and West Hill Ranch Group LLC (collectively, the "Prepetition Guarantors").[19]  Each of the Prepetition Guarantors is a wholly-owned subsidiary of MEX[20] and is a Debtor in these Chapter 11 Cases. Pursuant to the Prepetition Loan Documents, the obligations of the Prepetition Guarantors to guarantee the full payment and performance of the Prepetition Borrower are secured by substantially all of the personal property assets of each of the Prepetition Guarantors.

23.    On December 21, 2022, the Prepetition Agent notified the Prepetition Borrower and the Prepetition Guarantors that certain defaults had occurred under the Prepetition Credit Agreement.  Specifically, the Prepetition Agent alleged defaults arising from the Debtors' alleged failure to timely deliver financial statements to the Prepetition Agent and the Debtors' alleged

---

[18]   Formerly known as MEX Advance Fleet Services, LLC.

[19]   Second Financial Management Services, LLC, which was dissolved prior to the Petition Date, was previously a Prepetition Guarantor.

[20]   Alabama Terminal Property, LLC, is a wholly-owned subsidiary of Mountain Express Oil Company Southeast, LLC, which, in turn, is wholly-owned by MEX.

failure to satisfy certain conditions of the Prepetition Credit Agreement at the time borrowing requests were made thereunder.

ii.   *Landlords*

24.   Each of the Debtors' 550 Controlled Sites are leased from Landlords, certain of which (including Oak Street and AR Global Investments, LLC) are Landlords at multiple locations.[21]  As of the Petition Date, the Debtors believe they owe approximately $1.1 million to their Landlords.

iii.   *General Unsecured Claims*

25.   As of the Petition Date, the Debtors estimate that they owe approximately $26.2 million in the aggregate to their trade creditors.  Of this amount, the Debtors estimate that the aggregate unpaid prepetition balance owing to the Fuel Relationship Parties could total up to $25 million, all of which will be coming due during the first 21 days of these Cases (the "<u>Fuel Relationship Claims</u>").  As discussed in further detail in the *Debtors' Emergency Motion for Entry of Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Fuel Suppliers and Transporters and (II) Granting Related Relief*, filed concurrently herewith, the Debtors are seeking authority to pay an amount which shall not exceed $25 million on account of Fuel Relationship Claims.  Accordingly, the Debtors believe that all or substantially all of the Fuel Supplier Claims have arisen in—and but for the filing of these Chapter 11 Cases would have been paid in the ordinary course of the Debtors' business.

---

[21]   Related Parties are Landlords at approximately nine of the Debtors' locations.

## IV. EVENTS LEADING TO THE PETITION DATE

### A. The Oak Street Program Agreement

26.     On June 30, 2021, the Debtors and Oak Street entered into an agreement (the "Oak Street Program Agreement") pursuant to which Oak Street agreed to finance up to $1 billion (or more) of the Debtors' acquisition of Fueling Centers and Travel Centers through sale-leaseback transactions, each through a separate Oak Street MLA.  After executing certain Oak Street MLAs, the Debtors and Oak Street entered into the Oak Street Side Letters with respect to environmental assessment and remediation, code compliance, and related matters to be completed at some of the Oak Street Leased Properties after closing of the applicable Oak Street Transaction.  On December 31, 2021, as contemplated by the Oak Street Program Agreement, Jared Sheiker, a Principal of Oak Street, was appointed to the Debtors' Board of Directors.

27.     For more than a year, Oak Street funded the Debtors' acquisition of 286 Oak Street Leased Properties for an aggregate purchase price of over $825 million through over 60 separate sale-leaseback transactions (each, an "Oak Street Transaction").  Each Oak Street Transaction was documented through a separate master lease agreement (each, an "Oak Street MLA"), and, in some instances where a subject parcel was undergoing environmental assessment or remediation, code compliance, or similar work ("Post-Closing Work"), Oak Street would close that particular Oak Street Transaction and enter into letter agreements (the "Oak Street Side Letters") for the eventual completion of the Post-Closing Work.[22]  In all, the Debtors entered into 44 Oak Street Side Letters that addressed Post-Closing Work at 72 Oak Street Leased Properties between July 2021 and October 2022.

---

[22]     Due to the nature of the convenience store business, stores are often subject to minor, but recurring, local code violations and correction notices.  The Debtors consistently monitor and address these matters but the timing of their resolution varies widely by jurisdiction and may be outside the Debtors' control.

28.     For over a year, the Debtors and Oak Street worked collaboratively under the Oak Street Program Agreement without incident.  The Debtors worked diligently to address the Post-Closing Work contemplated by the Oak Street Side Letters and Oak Street never raised any concerns with the speed at which such matters were being completed—rather, Oak Street continued to make hundreds of millions of dollars available to the Debtors under the Oak Street Program Agreement.

**B.     The Debtors' Transition from the Unprofitable C-Store Operation Business**

29.     In October 2022, based on changes in the marketplace, the Debtors determined to strategically reposition the business and re-focus on the core Fuel Distribution Business and the profitable Travel Center Operation Business.  The Debtors believed these measures would enable them to reduce fixed cost working capital requirements and increase operating leverage.  With Oak Street's support, the Debtors began to exit the C-Store Operation Business; between October 2022 and the Petition Date, the Debtors converted 104 Operated Fueling Centers to Network Dealers and is presently under contract to convert 55 additional Operated Fueling Centers.  The Debtors are actively marketing the remaining 45 Operated Fueling Centers and anticipate that the conversion will be complete by June 2023, allowing the Debtors to significantly strengthen their operations and focus their efforts on the profitable Fuel Supply Business and Travel Center Operation Business.

**C.     The A&R Oak Street MLAs**

30.     On January 1, 2023, the Debtors and Oak Street entered into three amended and restated master lease agreements (the "A&R Oak Street MLAs") to combine, amend, and restate the earlier Oak Street MLAs.  Due to the continued drain of the C-Store Operations Business, in early January 2023, the Debtors faced a liquidity shortfall that would have affected payment of

January rent to Oak Street under the Oak Street MLAs. Accordingly, the Debtors approached Oak Street to request a deferral of January and February rent, but rather than defer the Debtors' rent, Oak Street funded a total of $10 million with a third-party escrow agent on January 16, 2023, to be released to Oak Street in installments for payment of the January, February, and March rent due under the A&R Oak Street MLAs.[23]

**D.     The First Amendments to MLAs**

31.     On January 16, 2023, the Debtors and Oak Street entered into amendments to the A&R Oak Street MLAs (the "First Amendments to MLAs") which, among other things, (a) added the $10 million to the future rent due under the A&R Oak Street MLAs; (b) increased the rent under the A&R Oak Street MLAs by 10% per year; and (c) required an equity or subordinated debt infusion of $10 million into the Debtors. Still, even at that time and with month after month passing, Oak Street did not provide the Debtors with notice of any alleged default with respect to the Post-Closing Work (or any other matter).

**E.     The Oak Street Default Notices**

32.     Soon after the Debtors and Oak Street entered into the First Amendments to MLAs, Oak Street demanded that the Debtors agree to release Oak Street Leased Properties from the A&R Oak Street MLAs for sale to third parties. When the Debtors refused to agree, Oak Street transmitted three Oak Street Default Notices to the Debtors, one under each A&R Oak Street MLA, relating to approximately 74 of their leased locations. The Oak Street Default Notices alleged solely non-monetary defaults relating to Post-Closing Work, non-operational convenience stores (on which the Debtors were, in any event, paying rent), or alleged lack of financial reporting

---

[23]    The escrowed amounts were insufficient to pay March 2023 rent. On March 1, 2023, the. Debtors paid March rent to Oak Street in full and intend to pay all rent to Oak Street under the MLAs during the pendency of these Chapter 11 Cases.

(collectively, the "Alleged Non-Monetary Defaults").  Unless the Debtors remedied the Alleged Non-Monetary Defaults within 30 days, Oak Street would reclaim any or all of the Oak Street Leased Properties by terminating the A&R Oak Street MLAs and force the Debtors to transfer operations to a replacement operator of Oak Street's choosing—permanently kneecapping the Debtors' business.

33.     But these were far from newly-discovered defaults.  On average, the Post-Closing Work required by the Oak Street Side Letters was supposed to have been completed—according to the dates listed on the Oak Street Default Notices—months before the date that the Oak Street Default Notices were sent.  Moreover, the alleged lack of financial reporting had been—according to the Oak Street Default Notices—ongoing for three fiscal quarters.  As noted, the Post-Closing Work reflected a persistent low level of technical non-compliance that Oak Street was perfectly aware was in the process of being remedied in the ordinary course of business. Even Oak Street itself acknowledged that the financial reporting requirement was in need of updating.

**F.     The Debtors' Efforts to Obtain a Forbearance**

34.     After sending the Oak Street Default Notices, Oak Street asked to allow three of the properties covered by the A&R Oak Street MLAs to be sold to third parties and relinquish an additional 146 Oak Street Leased Properties to be "re-tenanted," with the concomitant Fuel Supply Agreements voided.

35.     Thereafter, the Debtors retained Pachulski Stang Ziehl & Jones LLP ("PSZJ") as restructuring counsel, who contacted Kirkland & Ellis ("K&E"), counsel to Oak Street, and requested that Oak Street forbear from exercising remedies under the Oak Street Default Notices for a thirty-day period to enable to parties to meet and discuss their go-forward business relationship.  PSZJ informed K&E that relinquishing a substantial number of properties from the

A&R Oak Street MLAs would decimate the Debtors' business, cause it to default under its Fuel Supply Agreements and prevent the Debtors from continuing to operate as a going concern. PSZJ further informed K&E that unless Oak Street would agree to a forbearance agreement, the Debtors would have no choice but to commence preparation of chapter 11 bankruptcy cases.

36. Over the succeeding days, the Debtors' professionals continued to communicate with Oak Street to try to reach some agreement on a thirty-day forbearance to avoid the commencement of these Chapter 11 Cases. In connection therewith, the Debtors offered to meet with Oak Street to discuss the Company's current business plan, allow Oak Street to participate on calls with the Prepetition Agent and otherwise provide Oak Street with information to enable it to evaluate the Debtors' current business operations.

37. As the deadline to cure the Alleged Non-Monetary Defaults approached, the parties continued to discuss the terms of a forbearance and the Debtors requested that Oak Street provide them with a proposed forbearance agreement. During such discussions, Oak Street was unwavering in its demands to have the Debtors relinquish a significant number of their properties. The Debtors similarly were unwavering in their response that doing so would decimate the Debtors' business operations, causing harm to the Debtors' stakeholders.

38. Finally, late in the day on March 15, 2023, Oak Street provided the Debtors with a draft thirty-day forbearance agreement which demanded that the Debtors pay it $8.5 million by mid-day on March 17, relinquish 75 sites for re-tenanting, and require the Debtors to facilitate Oak Street's contact with the Debtors' creditors and trading partners, including the Secured Lenders and counterparties to the Fuel Supply Agreements, in any manner requested by Oak Street. Because agreeing to Oak Street's terms would have been a breach of their fiduciary duties to other

stakeholders and decimated the Debtors' business, the Debtors rejected the proposal and instead elected to commence these Chapter 11 Cases to preserve value under the A&R Oak Street MLAs.[24]

## G.   The Debtors' Prepetition Retention of Professionals and Appointment of Independent Directors

39.    On February 10, 2023, the Debtors hired Raymond James & Associates, Inc. ("Raymond James") as its investment banker.  On February 22 and March 9, 2023, respectively, the Debtors retained PSZJ as its restructuring counsel and FTI as its financial advisor.  On March 18, 2023, I was named the Debtors' Chief Restructuring Officer.

40.    On March 15, 2023, MEX appointed Craig Barbarosh and Lawrence Perkins to serve as independent directors.  Mr. Barbarosh is an experienced board member with over 30 years of professional experience.  He is serving or has served as an independent director for businesses in a variety of industries, including healthcare, software, pharmaceuticals, and food service, among others.  A copy of Mr. Barbarosh's curriculum vitae is attached hereto as **Exhibit B-1**.  Mr. Perkins is a Founder and Chief Executive Officer of SierraConstellation Partners, and has worked on a variety of projects geared towards enhancing business performance for numerous companies on projects ranging from interim management, profit improvement and working capital management to strategic planning and transaction execution.  He has served in a variety of capacities, including Interim CEO/President, Chief Restructuring Officer, Board of Directors Member, Financial Advisor, Strategic Consultant, and Investment Banker.  A copy of Mr. Perkins's curriculum vitae is attached hereto as **Exhibit B-2**.

---

[24]    On March 16, 2023, Oak Street provided the Debtors with a draft five-day forbearance agreement, however even that short-term forbearance agreement came with significant conditions that, if agreed to, would have been harmful to the Debtors.

## V. **FIRST DAY PLEADINGS**[25]

41.     I am familiar with the contents of each First Day Pleading (including the exhibits and other attachments thereto) and, to the best of my knowledge, after reasonable inquiry, believe the relief sought in each First Day Pleading: (a) will enable the Debtors to sustain operations while in chapter 11; (b) is critical to the Debtors' ability to maximize the value of their estates; and (c) serves the best interests of the Debtors' estates and creditors. Further, it is my belief that the relief sought in the First Day Pleadings is in each case narrowly-tailored and necessary to achieve the goals identified above.

### ADMINISTRATIVE MOTIONS AND APPLICATIONS

A.     *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (II) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information, and (III) Granting Related Relief* (the "**Personal Information and Notice of Commencement Motion**")

42.     Pursuant to the Personal Information and Notice of Commencement Motion, the Debtors seek entry of an order (a) authorizing the Debtors to redact certain personally identifiable information, (b) approving the form and manner of notifying creditors of the commencement of these Chapter 11 cases, and (c) granting related relief.

### A.     Redaction of Certain Confidential Information of Individuals

43.     I believe that it is appropriate to authorize the Debtors to redact from any paper filed or to be filed with the Court in these Chapter 11 Cases, including the consolidated list of creditors (the "Creditor Matrix") and Schedules and Statements (defined below), the home addresses of individual creditors including the Debtors' employees, independent contractors, and

---

[25]     Unless otherwise noted herein, capitalized terms used in this section have the meanings ascribed to them in the applicable First Day Pleading.

former employees because such information can be used to perpetrate identity theft and phishing scams or to locate survivors of domestic violence, harassment, or stalking, exposing the Debtors to potential civil liability and significant financial penalties. The risk is not merely speculative. I am informed that in at least one chapter 11 case, the abusive former partner of a debtor's employee used the publicly accessible creditor and employee information filed in the chapter 11 case to track the employee at her new address that had not been publicly available until then, forcing the employee to change addresses again.[26]

44.      The Debtors propose to provide an unredacted version of the Creditor Matrix, Schedules and Statements, and any other filings redacted pursuant to the Order to (a) the Court, (b) the U.S. Trustee, (c) counsel to any official committee appointed in these Chapter 11 Cases, and (d) any party in interest upon a request to the Debtors (email being sufficient) or to the Court that is reasonably related to these Chapter 11 Cases. In each case, I believe that this would be subject to a review of whether such disclosure, on a case-by-case basis, would violate any privacy or data protection law or regulation. Moreover, nothing in the Personal Information and Notice of Commencement Motion will prejudice a party in interest's right to file a motion requesting that the Court unseal the information redacted. In addition, the Debtors will distribute, as applicable, any notices that are received at the Debtors' corporate headquarters and are intended for a current employee.

45.      I believe that absent the relief requested in the Personal Information and Notice of Commencement Motion the Debtors (a) would unnecessarily render individuals more susceptible to identity theft and (b) could jeopardize the safety of claimants in these Chapter 11 Cases who,

---

[26]      The incident, which took place during the first *Charming Charlie* chapter 11 proceedings in 2017, is described in the "creditor matrix motion" filed in *In re Charming Charlie Holdings, Inc*., No. 19-11534 (CSS) (Bankr. D. Del. Jul. 11, 2019), Docket No. 4.

unbeknownst to the Debtors, are survivors of domestic violence, harassment, or stalking by publishing their home addresses without any advance notice or opportunity to opt out or take protective measures

### B. Service of Required Notices to Creditors

46. In the Personal Information and Notice of Commencement Motion, the Debtors propose that Kurtzman Carson Consultants LLC (the "Claims Agent"), the Debtors' claims and noticing agent, undertake all mailings directed by the Court or the U.S. Trustee or as may be required under the Bankruptcy Code, including the notice of commencement of these Chapter 11 Cases, substantially in the form attached as Exhibit A to the order granting the Personal Information and Notice of Commencement Motion (the "Notice of Commencement"). I believe that using the Claims Agent to promptly provide notices to all applicable parties will maximize efficiency in administering these Chapter 11 Cases and will ease administrative burdens that would otherwise fall upon the Court and the U.S. Trustee. Additionally, the Claims Agent will assist the Debtors in preparing creditor lists and mailing initial notices, and, therefore, it is more efficient to authorize the Claims Agent to mail the notice of commencement of these Chapter 11 Cases. Further, coordinating the mailing of notice of any bar date and the Notice of Commencement through a single source, the Claims Agent, will reduce the opportunities for the dissemination of conflicting or confusing information to parties in interest. Accordingly, I believe that the Claims Agent should undertake such mailings, and that the Court should grant the relief requested in the Personal Information and Notice of Commencement Motion.

**B.** ***Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, and (D) Statements of Financial Affairs, and (II) Granting Related Relief (the "<u>Schedules Extension Motion</u>")***

47.     Pursuant to the Schedules Extension Motion, the Debtors seek entry of an order (a) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "<u>Schedules and Statements</u>") by 46 days, for a total of 60 days from the Petition Date, through and including May 17, 2023, and (b) granting related relief.

48.     I believe there to be ample cause to grant the relief requested in the Schedules Extension Motion.  To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to thousands of claims, assets, leases, and contracts from each of the 144 Debtor entities.  Collection of the necessary information will require a significant expenditure of time and effort on the part of the Debtors, their employees, and their advisors at a time when such resources would be best used to stabilize the Debtors' business operations at the outset of these cases.  Additionally, because this information is voluminous and located in numerous places throughout the Debtors' organization, it may be some time before the Debtors have access to all of the information required to prepare the Schedules and Statements. Compounding the difficulty in accurately preparing the Schedules and Statements, prior to the Petition Date, the Debtors lost multiple employees who possessed extensive institutional knowledge regarding the Debtors operations, assets, and records.

49.     Although I believe that the Debtors' management, employees, professional advisors, and key personnel have prepared diligently for these Chapter 11 Cases, preparing the Schedules and Statements was not practicable given the complex nature of the Debtors' business.

Prior to the Petition Date, the Debtors focused their efforts on preparing for a smooth transition into chapter 11. Such efforts made it difficult for the Debtors to prepare the Schedules and Statements in advance of the Petition Date.

50. The Debtors, with the assistance of their professional advisors, have been and will continue working diligently and expeditiously to prepare the Schedules and Statements within the additional time requested. I anticipate that the Debtors may require at least 60 days after the Petition Date to complete the Schedules and Statements. I believe that an extension will not harm creditors or other parties in interest because, even under the extended deadline, the Debtors will file the Schedules and Statements in advance of an applicable deadline for filing proofs of claim in these Chapter 11 Cases. Moreover, many of the Debtors' records are maintained on a consolidated basis, requiring further time and effort to file as accurate Schedules and Statements, on a debtor by debtor basis, as possible. Absent the duration of the extension requested herein, the Debtors may be required to file amendments to their Schedules and Statements, which could cause undue confusion and uncertainty for parties wishing to review and rely upon the Schedules and Statements filed in these Chapter 11 Cases without commensurate benefit. Accordingly, the Court should grant the relief requested in the Schedules Extension Motion.

## OPERATIONAL MOTIONS

**A.** **Debtors' _Emergency_ Motion for Entry of Interim and Final Orders (I) Authorizing Maintenance of Existing Bank Accounts; (II) Authorizing Continuance of Existing Cash Management System; (III) Granting Limited Waiver of Section 345(b) Deposit Requirements; (IV) Authorizing Continued Performance of Intercompany Transactions and Funding; and (V) Granting Related Relief (the "Cash Management Motion")**

51. Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors to (a) continue operating the Cash Management System (as defined herein); (b) honor and pay the Bank Fees (as defined herein) in the ordinary course,

including any prepetition Bank Fees; (c) maintain existing business forms; and (d) continue intercompany transactions and funding consistent with the Debtors' historical practices, subject to the terms described herein; (ii) granting a limited waiver of the deposit and investment requirements imposed by section 345(b) of the Bankruptcy Code; and (iii) granting related relief.

### A.     The Cash Management System

52.     In the ordinary course of business, the Debtors utilize a centralized cash management system (the "Cash Management System") to collect, manage, and disburse funds used in their business.  The Cash Management System is essential to the stability of the Debtors' assets and business objectives and to maximizing the value of their estates.  Importantly, the continuity of the Cash Management System is critical to the Debtors' ability to procure and transport fuel products offered at loading terminals controlled by major oil company providers to the Debtors.

53.     The Cash Management System is tailored to meet the operating needs of the Debtors by enabling them to centrally control and monitor corporate funds, ensure cash availability and liquidity, and reduce administrative burdens by facilitating the movement of funds between and among the Debtors.  I believe these controls are critical to the operation of the Debtors' businesses given the significant volume of transactions managed through the Cash Management System.  The Debtors' treasury department maintains daily oversight over the Cash Management System and controls the entering, processing, and releasing of funds, including in connection with Intercompany Transactions (defined below).  As the Debtors require prompt access to cash for their daily operations, I believe any disruption of the Cash Management System would have an immediate and devastating adverse effect on the Debtors' operations to the detriment of their estates and stakeholders.

### B. Bank Accounts and Funds Flow

54. As of the Petition Date, the Debtors maintain bank accounts at 25 different banks (the "Cash Management Banks" or "Banks"), of which 144 open bank accounts are owned by the Debtors (the "Debtor Bank Accounts" or "Bank Accounts").[27] The Debtors' primary Cash Management Bank is First Horizon Bank ("First Horizon"),[28] which at which the Debtors maintain 33 Bank Accounts. A listing of the Bank Accounts and applicable information therefor is set forth in the following exhibits attached to the Cash Management Motion: Exhibit 1 (schematic overview), Exhibit 2 (listing of closed or inactive accounts), and Exhibit 3 (listing of prepetition date balances) (each a "CM Exhibit").

55. The Debtors have approximately 144 open Bank Accounts. In due course, the Debtors expect to close their inactive Bank Accounts unless business needs for such accounts arise during the cases. The basic elements of the current Cash Management System (as further illustrated by CM Exhibit 1) consist of:

- Wholesale Fuel: One main First Horizon operating account held by Mountain Express Oil Company is the primary operating account for the Debtors' wholesale business. *See* p. 1 of CM Exhibit 1 (Wholesale & Corporate Master Operating Account, IB-9820 ("Wholesale Operating Account")). Funds are swept via ZBA (zero balance account) transfers to the Wholesale Operating Account from a variety of deposit subaccounts. Certain of these deposit subaccounts ("Fuel Subaccounts") are established to process obligations due to the major fuel suppliers (*i.e.* Chevron, Exxon, *etc.*), and payments due from the Debtors' network of fuel dealers and other fuel vendors on account of corresponding fuel deliveries to such parties.[29] The Wholesale Operating Account also

---

[27] The Debtors administer and manage certain accounts for non-Debtor entities pursuant to operating agreements or other arrangements. Such accounts and the funds therein belong to the applicable non-Debtor party (subject to any applicable agreements), and are not commingled with the accounts (and funds therein) held in the Company's name.

[28] First Horizon Bank merged with IBERIABANK in 2020.

[29] The Fuel Subaccounts are generally designed so that fuel purchases (from the major oil companies) are tied by brand to fuel sales (to the Debtors' network of dealers). In other words, the Chevron Fuel Subaccount is dedicated to transactions, both in-bound and out-bound, of Chevron branded fuel. Receipts and drafts are made against each particular Fuel Subaccount on a daily basis; any daily net profit in the Fuel Subaccounts are swept daily

funds disbursement accounts which make payments for general corporate purposes (including payroll expense, rental expense, taxes, *etc*.), and funds the loan accounts from which periodic interest and principal payments are made pursuant to the Debtors' financing arrangements with First Horizon (as agent for itself and the other lenders). *See* p. 1 of <u>CM Exhibit 1</u>.

▪ <u>Retail Business:</u>  Generally, as illustrated on page 2 of <u>CM Exhibit 1</u>, the Debtor Bank Accounts are aligned among the Debtors' various retail segments, with intermittent transfers up and down to higher operation and disbursement accounts, including in particular, Retail Master Operating Account IB-2998 ("<u>Retail Master Operating Account</u>") (generally supporting the West Hill, Mountain Express, Fox Fuel, Quik Check, Central Oil and Fresh Pantry retail segments) and Concentration Account IB-9813 (generally supporting the Brothers retail segment)).

  o Cash activity for each of the retail segments is aggregated at a concentration account.

  o As illustrated on p. 2 of <u>CM Exhibit 1</u>, underlying the Retail Master Operating Account are a variety of sub-accounts, most of which align with individual locations, clusters of locations, and/or types of disbursements (payroll, utilities, general accounts payable).  Receipts are also received at the subaccount level before being consolidated at the concentration account.  Receipts sweep to the respective concentration accounts whereas the disbursement accounts sweep from the concentration accounts.  Generally, receipt activity at the concentration account level is sufficient to fund operating disbursements.  Periodically transfers are made from the main retail operating accounts to satisfy any shortfall (discussed further below).

In any given period the foregoing operating accounts collectively represent approximately 90% of all cash activity of the Debtors.  Payments to creditors and other parties are made from the Bank Accounts, in a variety of ways, including checks, drafts, wire transfers, credit cards, and automated clearinghouse ("<u>ACH</u>") transfers.

56.    All funds on deposit in the Debtors' Bank Accounts are insured by the Federal Deposit Insurance Corporation to the extent provided by law.  Most but not all of the Cash Management Banks are on the Region 7 U.S. Trustee's list of approved depository institutions. The Debtors believe that the institutions listed on <u>CM Exhibit 1</u> that are not U.S. Trustee-approved

---

(ZBA) to the Wholesale Operating Account.  Due to timing differences, funds occasionally may be transferred from the Wholesale Operating Account to a Fuel Subaccount to cover any shortfalls.

(the "Non-U.S. Trustee Approved Depositories") are nonetheless stable entities, and the Debtor Bank Accounts thereat typically hold relatively small amounts of cash (below the $250,000 FDIC insurance limit) or are ZBAs, as discussed further herein. The Debtors do not invest any of their excess cash on hand.

57.     Certain of the Bank Accounts maintained by the Debtors contain credit card receipts and/or other cash receipts from retail transactions undertaken by an applicable Dealer, which funds the Debtors temporarily hold and use as a security deposit pending the Debtors' and dealer's reconciliation of the amounts due to and from the other party under the parties' applicable agreements and arrangements, which occurrence frequency varies but sometimes occur several times each month.[30]

C.     **Intercompany Transactions**

58.     In the ordinary course of business, the Company engages in intercompany transactions and transfers of funds among various Bank Accounts ("Intercompany Transactions"). As a result, Intercompany Transactions may exist that reflect intercompany receivables and payables ("Intercompany Claims") made in the ordinary course of business between and among Debtors.

59.     These Intercompany Claims include those arising from transfers from the respective main accounts for West Hill Ranch Group and/or MEX to individual retail accounts, when interim funding for retail related operations (for particular locations and/or particular expenses) is needed. Such intercompany transfers for shortfall funding are relatively uncommon, and are recorded in the Debtors' books as intercompany receivables/payables.

---

[30]     Relating to such temporary holdbacks, the Debtors have filed the Dealer Reconsolidation Motion (defined below). Further, the Debtors maintain certain accounts (listed on CM Exhibit 1) holding state lottery related funds, which funds are the subject of the contemporaneously filed Tax Motion (defined below).

60.    The Debtors record and track the Intercompany Transactions and Intercompany Claims that occur across the corporate structure, as and after they occur, through entries in the general ledger.  On a postpetition basis, the Debtors will continue to track, record, and monitor Intercompany Transactions in the ordinary course of business.

61.    By the Cash Management Motion, the Debtors seek to balance their desire to minimize disruptions to their businesses and preserve estate value, on the one hand, and to provide this Court with an appropriate level of supervision and oversight, on the other hand.  Thus, the Debtors propose the following approach with respect to each postpetition Intercompany Transaction (each, a "Postpetition Intercompany Transaction"):  the Debtors seek authority in the Cash Management Motion, but not direction, to continue entering into ordinary course Postpetition Intercompany Transactions (including with respect to any netting and setoff) without further notice or Court approval.  The Debtors will maintain current records with respect to all postpetition cash transfers so that all Postpetition Intercompany Transactions may be readily ascertained, traced and properly recorded on any applicable intercompany accounts.

62.    Further, to ensure that no Debtor will fund the operations of a Debtor at the expense of such entity's creditors, the Debtors respectfully request under the Cash Management Motion that all Intercompany Claims on account of valid postpetition transfers from a Debtor to another Debtor be accorded administrative expense status, subject and junior only to the claims, including adequate protection claims, granted in connection with the Debtors' use of cash collateral, and in accordance with any interim and final order, as applicable, approving the use of cash collateral (collectively, the "Cash Collateral Orders").

### D.       Bank Fees

63.       The Debtors incur certain fees and charges in connection with the ordinary course operation of the Cash Management System (collectively, the "Bank Fees").  The Bank Fees include account maintenance charges, charges relating to ACH and wire transfers, lockbox and depository service charges, and other customary miscellaneous charges.  On average, the Debtors incur approximately $10,000 in Bank Fees per month.  In the ordinary course of business and typically on a monthly basis, the Bank charges the Debtors and deducts from the appropriate bank accounts certain service charges, and other fees, costs, and expenses.  The Debtors do not believe there are any material prepetition Bank Fees outstanding on the Petition Date, but nonetheless seek approval in the Cash Management Motion to pay and, for the Bank to deduct, any such Bank Fees in the ordinary course when due.

### E.       Business Forms

64.       The Debtors utilize numerous preprinted business forms in the ordinary course of their business (including, without limitation, letterhead, purchase orders, invoices, and checks), including in connection with their Cash Management System.  I understand that the Debtors would be required by the U.S. Trustee under its guidelines to incur the expense and delay of ordering entirely new business forms referencing the Debtors' status as debtors-in-possession absent relief from the Court.  The Debtors seek authority to use pre-existing business forms without such a reference in order to minimize expense to the estates.  The Debtors submit that parties in interest will not be prejudiced if such relief is granted because parties doing business with the Debtors will likely be aware of their status as debtors-in-possession and, therefore, changing business forms is unnecessary and would be unduly burdensome.  To the extent the Debtors exhaust their existing

supply of checks, the Debtors will reorder checks with the designation "Debtor-in-Possession" and the corresponding case number.

### F. Compliance with the U.S. Trustee Guidelines and Section 345 of the Bankruptcy Code

65.     I understand that under the U.S. Trustee's guidelines, the U.S. Trustee generally requires chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with the requirements of the U.S. Trustee's office.  I also understand that all of the Bank Accounts set forth in <u>CM Exhibit 1</u> are FDIC-insured (up to applicable limits), and most of the Bank Accounts are maintained at institutions that have executed a Uniform Depository Agreement ("<u>UDA</u>") with, and are designated as authorized depositories by, the U.S. Trustee.  I believe that the Non-U.S. Trustee Approved Depositories are reputable and financially stable.  Further, all accounts held at the Non-U.S. Trustee Approved Depositories either (i) are ZBAs (zero balance accounts), or (ii) on average, contain relatively small amounts of funds (below the $250,000 FDIC insurance limit) as reflected in <u>CM Exhibit 3</u> (balances), and are periodically swept to zero by the Debtors.

66.     As set forth in the proposed interim order approving the Cash Management Motion, with respect to the foregoing entities, the Debtors request through May 4, 2023 (subject to the right to seek additional extensions) to comply with section 345(b) or to make other arrangements to which the U.S. Trustee agrees.

67.     I believe that any applicable U.S. Trustee and section 345 requirements could properly be waived or otherwise modified.  Given the Debtors' extensive operations and cash management requirements overall (including the large number of Debtors' fuel stations and travel centers), it is not feasible to consolidate all applicable cash activities to the narrow group of financial institutions approved in the U.S. Trustee's guidelines.  Requiring the Debtors to adopt a

new cash management system relating to the Debtors' widespread business operations at this critical stage of the Chapter 11 Cases would be unduly expensive, create unnecessary administrative burdens, and be extraordinarily disruptive to the operation of the Debtors' business. I believe that all of the Bank Accounts are maintained at reputable, financially stable banks and financial institutions, which are well-positioned to continue performing depository and cash management functions during the Chapter 11 Cases.  As set forth in the proposed interim order approving the Cash Management Motion, the Debtors will work collaboratively with the U.S. Trustee to address any concerns it may have, subject to the Debtors' right to seek further relief with this Court.

68.     In sum, I believe the Cash Management System is critical to the ongoing stability of the Debtors' businesses and smooth transition into chapter 11.  Requiring the Debtors to transfer any of the above-described Bank Accounts to other depositories would place a needless and excessive administrative burden on the Debtors and impose significant, value-destructive costs to the Debtors' estates.  In any event, the Debtors will continue to work in good faith with the U.S. Trustee to address any concerns regarding the continued use of these accounts on a postpetition basis.  Accordingly, the Court should grant the relief requested in the Cash Management Motion.

**B.      *Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to (i) Pay and/or Honor Prepetition Wages, Salaries, Bonus Payments, Employee Benefits, and Other Compensation; (ii) Remit Withholding Obligations and Deductions; (iii) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (iv) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests* (the "Wage Motion")**

69.     Pursuant to the Wage Motion, the Debtors seek entry of an order "), authorizing the Debtors, in their sole discretion: (a) to pay and honor, *inter alia*, certain prepetition claims of their employees (collectively, the "Employees") for wages, salaries, and compensation (the "Wages"); (b) to pay and honor employee benefits and expense reimbursements and honor and pay incentive

payments owed to certain non-insider Employees (collectively, the "Benefits" and, together with Wages, the "Wages and Benefits"); (c) remit withholding obligations and employee deductions and withholdings; and (d) to continue to pay and honor such Wages and Benefits as they become due postpetition in the ordinary course of the Debtors' business. In the Wage Motion, the Debtors seek authority to pay or honor, in their sole discretion, the following, subject to the limits noted in the chart below (collectively, the "Prepetition Employee Obligations"):

| Wages or Benefits | Amount |
|---|---|
| Gross Wages | $625,000 |
| Administrative fees (payroll processing, COBRA, HSAs) | $50,000 |
| Corporate Credit Card Program | $102,000 |
| Incentive and Commission Payments | $100,000 |
| Independent Contractors | $50,000 |
| Miscellaneous Benefits | $25,000 |

A.  **General Employee Overview**

70.  As of March 16, 2023, the Debtors employed approximately 180 full-time Employees and 791[31] part-time Employees. Full-time Employees are those normally scheduled to work on average of 30 or more hours per week while part-time Employees are those normally scheduled to work on average of less than 30 hours per week.[32] The Employees are not unionized. The Debtors also supplement their workforce with certain independent contractors who provide IT services (the "Independent Contractors").[33]

---

[31]  The census fluctuates frequently.

[32]  Some part-time Employees work more than 30 hours per week from time to time.

[33]  The Debtors retain the Independent Contractors through an employment agency.

71.     Non-Debtor affiliates Adelphi Transport LLC ("Adelphi Transport") and Adelphi Environmental Services LLC ("Adelphi Environmental" and, together with Adelphi Transport, "Adelphi"), employ approximately 102 full-time employees as of the Petition Date.  The Debtors, in the ordinary course, funded Adelphi's payroll together with the payroll of the Debtors and are reimbursed by Adelphi for the payroll.[34]   In year-to-date 2023 to date, Adelphi's payroll has averaged approximately $365,000 per month.

72.     Pursuant to the Wage Motion, the Debtors seek to pay or honor all Wages and Benefits and other amounts detailed therein, to the extent described herein, on an ongoing basis and in the ordinary course of business and subject to the applicable limits under section 507(a) of the Bankruptcy Code. I believe there is no good reason for the regular payment of Wages and Benefits to be disrupted, which would directly harm the Debtors and their Employees.

**B.      The Debtors' Payroll Schedules and Payroll Amounts**

73.     The Debtors' payroll schedules are as follows:

74.     Cycle No. 1: Mountain Express Oil, Adelphi Environmental. These Employees are paid every other week, 5 days in arrears. The applicable biweekly pay date (the "Cycle 1 Pay Date") occurs every other Wednesday. The last Cycle 1 Pay Date was March 15, 2023. The next Cycle 1 Pay Date will be on Wednesday, March 29, 2023 for accrued wages owing through March 24, 2023.

75.     Cycle No. 2: Quik Chek, Adelphi Transport. These Employees are paid each week, 6 days in arrears. The applicable weekly pay date (the "Cycle 2 Pay Date") occurs each Friday.

---

[34]     In the case of Adelphi Environmental, payment to the Debtors has been made by deducting from the A/R balance owed by the Debtors to Adelphi Environmental.  Postpetition, Adelphi Environmental will make cash reimbursements to the Debtors following the Debtors' payments on account of the Adelphi Environmental Employees' payroll.

The last Cycle 2 Pay Date was March 17, 2023. The next Cycle 2 Pay Date will be on Friday, March 24, 2023 for accrued wages owing through March 18, 2023.

76.     Cycle No. 3: Brothers Petroleum, Big Red, Grab 'n Go, WHRG Entities. These Employees are paid every other week, 6 days in arrears. The applicable biweekly pay date (the "Cycle 3 Pay Date" and together with the Cycle 1 Pay Date and the Cycle 2 Pay Date, the "Pay Dates") occurs every other Friday. The last Cycle 3 Pay Date was March 17, 2023. The next Cycle 3 Pay Date will be on Friday, March 31, 2023 for accrued wages owing through March 25, 2023.

77.     Two business days prior to each Pay Date, the Debtors' payroll service provider, Proliant (the "Payroll Processor"), drafts the funds from the Debtors' segregated payroll account at First Horizon Bank, and the funds are automatically transferred that same day. Wages are paid to Employees the following Wednesday or Friday, as applicable, via direct deposit. In rare circumstances, the Debtors issue manual paychecks with respect to off-payroll cycle payments, payroll adjustments, and other limited situations (collectively, the "Manual Checks"). To the extent any prepetition Manual Checks have not been cashed, the Debtors request authority to reissue Manual Checks postpetition to the affected Employees for any prepetition amounts owed. The Payroll Processor also remits Deductions and Withholding Obligations (each as defined below) to the appropriate taxing and governmental jurisdictions on each Pay Date.

78.     In the Wage Motion, the Debtors seek authority, in their discretion, to continue to fund Adelphi's payroll consistent with past practice, and subject to subsequent cash reimbursement by Adelphi.  As part of such requested relief, the Debtors seek authority to permit the Payroll Processor to continue to process the Debtors' payroll obligations, including of Adelphi, in the ordinary course of business. The Debtors believe that they are current to the Payroll Processor on account of unpaid payroll servicing fees. To the extent that any fees are still outstanding to the

Payroll Processor as of the Petition Date, the Debtors request authority in the Wage Motion, in their discretion, to remit such amounts, not to exceed $50,000.

79. The Debtors estimate that they will accrue approximately $625,000 in prepetition unpaid Wages between the end of the prior pay period and the Petition Date. To ensure there is no interruption in payment of amounts to Employees, the Debtors have funded $300,000 (the amount of the upcoming pay cycle) prepetition to the Payroll Processor in advance of the Petition Date.

### C. Gross Pay Deductions and Payroll Taxes

80. For each applicable pay period, the Debtors routinely deduct certain amounts from each Employee's gross payroll, including, without limitation, garnishments, child support, spousal support, and similar deductions and other pre-tax and post-tax deductions payable pursuant the employee benefit plans discussed herein (including, for example, the Employee's share of health care benefits, retirement plan contributions, legally ordered deductions, and miscellaneous deductions) (collectively, the "Deductions"). As set forth below, I understand that the Deductions are not property of the Debtors or their estates and are withheld from Employees' gross payroll and remitted to the appropriate third parties. On average, the Debtors' payroll Deductions total approximately $35,000 per month, which the Debtors remit to the appropriate third-party recipients. As of the Petition Date, certain of the Deductions may not yet have been transmitted to the appropriate third party recipients and the Debtors request authority to transfer any Deductions to the appropriate third party recipients or as may be required under applicable nonbankruptcy law.

81. In addition to the Deductions, applicable federal and state laws require the Debtors to withhold amounts related to federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities (collectively, the "Withholding Obligations"). The Debtors must also pay, from their own funds, for Social Security

and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively the "Employer Payroll Taxes," and, together with the Withholding Obligations, the "Payroll Taxes"). On average, the Payroll Taxes per month, including both the Employee and employer portions, total approximately $900,000.

82.     To the extent any of the prepetition Deductions or Payroll Taxes have not yet been forwarded to the appropriate third-party recipients, the Debtors seek authority in the Wage Motion to forward such amounts (and to continue to forward Deductions and Payroll Taxes on a postpetition basis whether or not related to the prepetition period) to the applicable third-party recipients in the ordinary course of business and consistent with past practice.

**D.     Corporate Credit Card Program**

83.     The Debtors offer certain Employees[35] a corporate credit card to utilize for authorized business expenditures.  As of the Petition Date, there are approximately 47 issued American Express corporate credit cards (the "Corporate Credit Card Program").  The Debtors pay these credit cards directly, and Employees are not liable for the balances of the Corporate Credit Card Program.  The majority of the expenses incurred under the Corporate Credit Card Program are by the Debtors' district managers who regularly incur travel expenses, including rooms, meals, and incidentals such as gas and mileage expenses, as well as emergency repairs and maintenance costs associated with fuel tanks and fuel delivery vehicles.  In the year to date, monthly payments by the Debtors to American Express have averaged approximately $220,000.  As of the Petition Date, the Debtors estimate that they owe approximately $102,000 on account of

---

[35]     In addition to Employees of the Debtors, certain credit cards have been issued to Adelphi (the "Adelphi Credit Cards").  On a go-forward basis (including with respect to all amounts to be paid pursuant to the Wage Motion), the Debtors will not pay any amounts under the Corporate Credit Card Program on account of the Adelphi Credit Cards unless Adelphi reimburses the Debtors for such payments.

the Corporate Credit Card Program. The Debtors seek authority in the Wage Motion to pay all outstanding amounts owed on account of the Corporate Credit Card Program and to continue the Corporate Credit Card Program in the ordinary course in their discretion.

### E. Employee Incentive and Commission Payments

84. The Debtors do not generally provide Employees with bonuses, other than (a) specific retention incentives offered to certain Employees related to the 2021 acquisition of Brothers Petroleum[36] and (b) in connection with the conversions of retail convenience stores to dealerships to reward loyalty and performance (the "Incentive Payments"). The Debtors' ability to fund the Incentive Payments has been critical to maintaining Employee morale and loyalty. The Incentive Payments provide the eligible Employees with stability and incentivizes them to continue to support critical components of the Debtors' operations. None of the Employees to whom Incentive Payments will be paid pursuant to the Wage Motion are insiders of the Debtors.

85. In addition, the Debtors pay certain Employees commissions based on various criteria, such as sales, on a regular basis (*i.e.*, monthly or quarterly) (the "Commissions"), and together with the Incentive Payments, the "Incentive and Commission Payments"). The Commissions are paid through a combination of payroll, 1099, and W-2.

86. The Debtors wish to honor the prepetition amounts owed to their Employees for Incentive and Commission Payments as these amounts are an element of compensation that is relied upon by participating Employees. The Debtors seek authority in the Wage Motion, in their discretion, to pay the Incentive and Commission Payments up to $100,000 in the aggregate, and

---

[36] Two incentive payments of $20,000 each are due on March 31, 2023. The retention incentives to certain accountants were provided in late 2021.

to continue to pay the Incentive and Commission Payments that may arise postpetition in the ordinary course of business and in the Debtors' discretion.

### F. Independent Contractors

87.     The Debtors are invoiced for the services of the Independent Contractors. The Debtors have paid approximately $12,000 year to date, representing services provided in January 2023. As the amount owing depends on hours actually spent, the precise amount of prepetition amounts owing to the Independent Contractors is unknown. Accordingly, the Debtors seek authorization in the Wage Motion in their discretion to pay up to the amount of $50,000 on account of prepetition amounts that may be owing to Independent Contractors.

### G. Health Benefits

88.     The Debtors provide health insurance to certain Employees, including, *inter alia*, medical and prescription drug, dental, vision, disability, COBRA, and health savings accounts (collectively, the "Health Plans"), as described in more detail below. Each pay period, Employees make contributions toward the Health Plans for medical, dental, and vision coverage, and the Debtors deduct the Employees' contributions, if applicable, owing under the Health Plans from their Wages as Deductions.

a.     Medical, Dental and Vision Insurance.

89.     The Debtors offer a choice of a point of service (POS) or high-deductible medical plan through Anthem ("Anthem") for full time Employees and their dependents (collectively, the "Anthem Medical Plan"). The Anthem Medical Plan is fully insured. Employees enrolled in the Anthem Medical Plan pay approximately 33% of the cost through premium contributions.  In addition to health care coverage, participants in the Anthem Medical Plan receive telemedicine health care service, prescription drug coverage, and a 24/7 nurse line at no additional cost.

90.     For legacy Brothers Petroleum Employees in New Orleans, the Debtors offer a medical plan through Humana (the "Humana Medical Plan" and together with the Anthem Medical Plan, the "Medical Plans"). The Humana Medical Plan is also fully insured.

91.     Based on the current number of enrolled Employees and dependents, the Debtors pay approximately $200,000 monthly in the aggregate on account of the Medical Plans, inclusive of Employee contributions. The Debtors are current on obligations to Anthem, however the payment made on account of the Humana invoice dated March 1, 2023 in the approximate amount of $50,000 was returned.  The Debtors seek authority in the Wage Motion to pay any prepetition amounts owing to Humana and to continue to pay postpetition amounts under the Medical Plans in the ordinary course of business and in the Debtors' discretion.

92.     The Debtors also offer dental plans (the "Dental Plan") and vision plans (the "Vision Plan") through Anthem and Humana.  Employees' Dental Plan and Vision Plan premiums are covered partially by Employee contributions. Except as set forth above, the Debtors are current on monthly premiums to Anthem and Humana. In an abundance of caution, the Debtors seek authority in the Wage Motion to pay any prepetition amounts owing to Anthem and Humana as they come due in the ordinary course of business, and to continue to honor the Dental Plan and Vision Plan postpetition, in the Debtors' discretion.

        b.     COBRA Benefits.

93.     The Consolidated Omnibus Budget Reconciliation Act ("COBRA") gives workers and their families who lose their health benefits the right to choose to continue the group health benefits provided by their group health plan for limited periods of time under certain circumstances, such as voluntary or involuntary job loss, reduction in the hours worked, transition

between jobs, death, divorce, and other life events. Qualified individuals are generally required to pay the entire premium for coverage, up to 102 percent of the cost to the plan.

94.     COBRA generally requires that group health plans sponsored by employers with 20 or more employees in the prior year offer employees and their families the opportunity for a temporary extension of health coverage (called continuation coverage) in certain instances where coverage under the plan would otherwise end. These former Employees fund approximately 102 percent of the cost of their health plan. Former Employees electing to receive COBRA benefits pay fixed premiums to Flores & Associates (for the Anthem Medical Plan) and iSolved (for the Humana Medical Plan), the Debtors' COBRA administrators. As of the Petition Date, the Debtors are unaware of any outstanding prepetition administrative COBRA fees that may be owed by the Debtors. Out of an abundance of caution, the Debtors seek in the Wage Motion to pay any unpaid prepetition COBRA administrative fees to Flores & Associates and iSolved, and to continue to pay postpetition COBRA administrative fees in the ordinary course of business and in the Debtors' discretion.

        c.    <u>Health Savings Accounts</u>

95.     As noted above, the Debtors provide eligible Employees with Health Savings Accounts ("<u>HSAs</u>"), administered by Anthem, which help defray the costs of the Employees' Health Plan deductibles and co-pays. Specifically, Employees may use HSA funds to pay medical expenses, including deductible payments, coinsurance, prescription drugs, urgent and emergency care, lab tests, and hospital visits. The Debtors seek authority in the Wage Motion to continue to withhold and remit payments to the HSAs.

    d.    Life Insurance, Accidental Death & Dismemberment and
          Disability Plan

96.    Full-time Employees of the Debtors may elect voluntary life insurance and AD&D coverage for themselves and dependents (the "Life/AD&D Insurance Plan") through Lincoln Financial Group ("Lincoln") at the sole cost of the Employees. The Employees pay all premiums in connection with the Life/AD&D Insurance Plan. Additionally, the Debtors may elect voluntary long-term disability and short-term disability coverage (the "Employee Disability Plan").

97.    The Debtors do not incur any costs of administration of these programs. The Debtors are current on payments owing under the Basic Life/AD&D Insurance Plan and Employee Disability Plan on behalf of the Employee participants. In an abundance of caution, the Debtors seek authority to pay unpaid prepetition amounts on account of the Basic Life/AD&D Insurance Plan and Employee Disability Plan, and to continue to pay postpetition premium amounts on account of the Basic Life/AD&D Insurance Plan and Employee Disability Plan in the ordinary course of business and in the Debtors' discretion.

    e.    Holidays, Vacation and Sick Leave

98.    Employees have six paid holidays per year. The Debtors also award paid time off ("PTO") to Employees. Employees of Debtor Mountain Express Oil Company (the "Corporate Employees") in their first four years of employment by the Debtors accrue 3.08 hours of PTO per bi-weekly payroll cycle (totaling two weeks per year). Starting their fifth year of consecutive employment, Corporate Employees accrue 4.61 hours of PTO per bi-weekly payroll cycle (totaling three weeks per year). Corporate Employees also accrue five days of paid sick leave per year ("Sick Leave").

99.    Store Employees start earning PTO after one year of consecutive employment. During their first four years of employment, they earn two days of PTO per year. Starting their

fifth year of consecutive employment, store Employees accrue five days of PTO per year. Employees may roll over a maximum of 40 hours of PTO to the following year provided that it must be used by March 1.

100.    Pursuant to the Wage Motion, the Debtors seek authority to continue to honor their PTO and Sick Leave programs in the ordinary course of business by allowing Employees to use accrued prepetition PTO and Sick Leave postpetition in the Debtors' discretion and consistent with past practice. The Debtors also seek authority in the Wage Motion, but not the obligation, in their sole discretion, to pay out any accrued and prepetition PTO amounts that are owed to Employees solely to the extent their employment with the Debtors is terminated postpetition in accordance with their ordinary course business practices and/or applicable law.

      f.     401(k) Plan[37]

101.    The Debtors provide Employees who have been employed by the Debtors for at least six (6) months with a 401(k) retirement plan (the "401(k) Plan"). Employee contributions are withheld from paychecks as Deductions. To the extent any prepetition 401(k) Deductions have not yet been made, the Debtors seek authority to process those Deductions.

102.    Historically, the Debtors have matched up to 4% of eligible earnings. In 2022, the Debtors funded matching contributions to the 401(k) Plan in the amount of approximately $115,000.

103.    The Debtors are in the process of employing an auditor for the 401(k) Plan (the "401(k) Plan Audit") in accordance with compliance requirements under certain Department of Labor and IRS regulations. The 401(k) Plan Audit fees are estimated to be approximately $30,000,

---

[37]    The 401(k) Plan is the only active retirement plan currently offered by the Debtors which the Debtors seek authority under the Wage Motion.

to be conducted and paid in the coming months. The Debtors intend to pay postpetition amounts with respect to the 401(k) Plan Audit in the ordinary course of business and in their discretion.

104. The 401(k) Plan is maintained by Human Interest, Inc. ("Human Interest"). The Debtors seek authority, in their discretion, to continue the 401(k) Plan postpetition in the ordinary course of business, consistent with their prepetition policies, including paying all fees to Human Interest associated therewith.

### H. Other Benefits

105. As of the Petition Date, the Debtors offer eligible Employees with additional miscellaneous benefits including the following (collectively, the "Miscellaneous Benefits"):

- The Debtors provide an employee assistance program (the "EAP") through Lincoln Financial Group, which is designed to assist employees in resolving personal problems that may be adversely affecting the Employee's performance including child or elder care, relationship challenges, financial or legal problems, wellness matters, and traumatic events like workplace violence. Programs are delivered at no cost to Employees by Master's level counselors. Services are often delivered via phone, video-based counseling, online chatting, e-mail interactions, or face-to-face;

- Employees may enroll for DailyPay payroll benefits. For enrollees in DailyPay, the Employee will build up a "pay balance" in the DailyPay account each day worked that can be transferred into the Employee's bank account, to the Employee's debit card or to the Employee's payroll card. This balance is updated when the Employee clocks out of each shift;

- TravelConnect is a comprehensive program that can assist with accessing care for a medical emergency while traveling 100 or more miles from home. Employees enrolled in the Debtors' voluntary life insurance and/or AD&D benefits plans have access to TravelConnect 24 hours, 7 days a week; and

- Employees enrolled in the Debtors' voluntary life insurance and disability benefits plans will have access to LifeKeys. LifeKeys is a service that offers discounts on shopping and entertainment, identity theft protection, will preparation, and additional services.

106. The Debtors anticipate that any prepetition amounts owing in connection with the Miscellaneous Benefits are *de minimis* and seek authority under the Wage Motion in the abundance of caution to pay up to $25,000 on account of prepetition Miscellaneous Benefits costs owed and

to continue to administer these and similar programs and pay amounts owed on account of the Miscellaneous Benefits postpetition in the ordinary course of business and in their discretion.

### I.     Workers' Compensation Insurance

107.    The Debtors maintain no-deductible workers' compensation insurance (the "<u>WC Program</u>") to provide Employees with coverage for injury claims arising from or related to their employment with the Debtors (the "<u>WC Claims</u>") in accordance with applicable state law.  The Debtors' insurance carrier is Federated Mutual Insurance Company ("<u>FMIC</u>").

108.    For the mid-2022 to mid-2023 policy year, the annual premium was approximately $1.2 million based on estimated annual payroll, with a true-up at the end of the policy year.  The Debtors pay the policy in monthly installments and are current on premiums owing to FMIC. Out of abundance of caution and to avoid any potential interruptions in coverage or administration of claims, the Debtors seek authority in the Wage Motion to pay to FMIC any amounts owed to them that may be related to the prepetition period (including based on the afore-referenced true-up) and to continue to pay postpetition amounts to them in the ordinary course of business in the Debtors' discretion.

109.    I believe that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties. Finding, attracting, and training new qualified talent would be extremely difficult and would most likely require higher salaries, guaranteed bonuses, and more comprehensive compensation packages than are currently provided to Employees.

110.    Furthermore, based on my experience, I believe that many Employees may live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in order to continue to pay their daily living expenses. These

Employees may be exposed to significant financial and healthcare-related problems if the Debtors are not permitted to pay and/or honor the Wages and Benefits, and the expenses associated therewith, in the ordinary course of the Debtors' business.  Moreover, I believe that if they are unable to honor accrued Wages and the Benefits described above, including honoring prepetition PTO and Sick Leave by allowing Employees to use accrued prepetition PTO and Sick Leave on a postpetition basis, Employee morale and loyalty will be jeopardized at a time when Employee support is critical. I also believe that any uncertainty with regard to continuation of Wages and Benefits will cause significant anxiety at precisely the time the Debtors need their Employees to perform their jobs at peak efficiency

111.    In addition, I believe that the Employees have an intimate knowledge of the operation of the Debtors' business and are critical components to the successful reorganization of the Debtors' business.  Deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtors and their ability to sustain their operations. Satisfaction of the Wages and Benefits, as described herein, is necessary to maintain the Employees' morale during the cases and to insure continued, efficient operation in order to maximize value for all creditors.  Accordingly, the Court should grant the relief requested in the Wage Motion.

**C.**    ***Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief*** (the "<u>Tax Motion</u>")

112.    Pursuant to the Tax Motion, the Debtors seek entry of an order (a) authorizing the Debtors to remit and pay or use tax credits to offset prepetition Taxes and Fees and postpetition Taxes and Fees (defined below) as they become due and owing, including obligations arising on account of an Audit (defined below) or Assessment (defined below), and (b) granting related relief.

113. In the ordinary course of business, the Debtors collect, withhold, and incur taxes and fees related to sales and use, property, income, motor fuel, franchise, annual reporting fees, audits, and business and regulatory fees (collectively, the "Taxes and Fees").[38] The Debtors remit the Taxes and Fees to various governmental authorities on a monthly, quarterly, semi-annual, or annual basis (collectively, the "Authorities"). A schedule identifying the Authorities is attached to the Tax Motion as **Exhibit A**.

114. The Debtors seek authority in the Tax Motion to make payments where (a) the Taxes and Fees have accrued or were incurred prepetition but (i) were not paid prepetition or (ii) were paid in an amount less than actually owed, (b) the Debtors made payments prepetition that were lost or the Authorities did not receive the prepetition payments in full, which may give rise to interest and other penalties, (c) the Taxes and Fees were incurred for prepetition periods and become due and payable after the Petition Date, (d) the Taxes and Fees accrued or are incurred postpetition, and (e) the Taxes and Fees are for so-called "straddle" periods.[39]

115. Failure to pay the Taxes and Fees could materially disrupt the Debtors' business operations in various ways, including: (a) the Authorities may initiate Audits of the Debtors, which would unnecessarily divert the Debtors' attention from the restructuring process; (b) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and/or pursue other remedies that will harm the estates; and (c) in certain instances, the

---

[38] The Debtors do not seek authority to pay prepetition amounts related to employment taxes and payroll withholding taxes under the Tax Motion but rather request such authority in the Wage Motion.

[39] Claims for so-called "straddle" Taxes and Fees may be entitled to administrative claim treatment pursuant to section 503(b)(1)(B) of the Bankruptcy Code. The Debtors are seeking the authority to pay such "straddle" Taxes and Fees as they become due under applicable law because the Debtors could be subject to late payment penalties and interest in the event they do not pay such "straddle" Taxes and Fees and a court ultimately concludes that such taxes are entitled to administrative treatment. The Debtors reserve their rights with respect to the proper characterization of such "straddle" Taxes and Fees and to seek reimbursement of any portion of a payment that was made that ultimately is not entitled to administrative or priority treatment.

Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key individuals from their duties related to the Debtors' restructuring. Unpaid Taxes and Fees may result in fines and penalties, the accrual of interest, or both. Finally, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and these funds may not constitute property of the Debtors' estates.

116.     The description of the Taxes and Fees set forth below is based in part upon the Debtors' books and records that, until shortly before the Petition Date, were maintained by certain individuals who have recently left employment by the Debtors. In light of the institutional knowledge that has been lost, the Debtors will amend or supplement the Tax Motion if material additional prepetition accruals of Taxes and Fees are determined that the Debtors intend to seek authority to pay. The Debtors believe they are substantially current on the payment of Taxes and Fees, but have incurred the following prepetition taxes that are not yet due.

### A.     Sales and Use Taxes

117.     In the ordinary course of business, the Debtors incur and pay state and local sales and use taxes (collectively, the "Sales and Use Taxes") by purchasing inventory, supplies, or other regularly used goods. As of the Petition Date, the Debtors estimate that they have incurred or collected approximately $350,000 in Sales and Use Taxes that have not been remitted to the relevant Authorities. The Debtors request authority in the Tax Motion to pay prepetition Sales and Use Taxes as they become due and owing and to continue paying their Sales and Use Taxes obligations on a postpetition basis in the ordinary course of business.

### B.     Motor Fuel Taxes

118.     The Debtors collect and remit motor fuel taxes (collectively, "Motor Fuel Taxes") to the applicable Authorities in connection with their operations in certain jurisdictions. The time

and manner that the Motor Fuel Taxes accrue and are paid are based on applicable non-bankruptcy law. As of the Petition Date, the Debtors estimate that they have incurred or collected approximately $16 million in Motor Fuel Taxes that are not yet due to the relevant Authorities. The Debtors request authority in the Tax Motion to pay prepetition Motor Fuel Taxes as they become due and owing and to continue paying their Motor Fuel Taxes obligations on a postpetition basis in the ordinary course of business.

### C. Property Taxes

119. The Debtors own a terminal property and operate commercial property under triple net leases, which require that the Debtors pay the real property taxes associated with such properties (collectively, "Real Property Taxes") directly to the applicable Authorities. Additionally, the Debtors incur personal property taxes (the "Personal Property Taxes," and together with the Real Property Taxes, the "Property Taxes") in connection with their operations in certain jurisdictions. The time and manner that Property Taxes accrue and are paid are based on applicable non-bankruptcy law.

120. Importantly, state and local laws in jurisdictions in which the Debtors operate generally provide that certain Authorities may assert a lien on property for unpaid Property Taxes in certain circumstances. Such a lien could affect the rights of third parties if left unsatisfied, including the rights of mortgagees, secured lenders, and lessors of the Debtors' real and personal property. It is essential to the Debtors' go-forward operations that they are authorized to pay all of their Property Taxes in the ordinary course, including those that accrued prepetition, which will become due postpetition. The Debtors estimate that they have accrued approximately $4.1 million in Property Taxes as of the Petition Date. Accordingly, the Debtors request authority in the Tax

Motion to pay prepetition Property Taxes as they become due and owing and to continue paying their Property Tax obligations on a postpetition basis in the ordinary course of business.

### D. Income and Other Taxes

121. The Debtors are required to make payments for amounts due to certain Authorities that require the Debtors to pay income or corporate taxes, including gross receipts taxes (collectively, "Income and Other Taxes"). Generally, Income and Other Taxes are calculated as a percentage of net income (*i.e.*, the difference between gross receipts and expenses after accounting for additional write-offs). The Debtors own and/or operate property in 26 states: Alabama, Arkansas, Connecticut, Florida, Georgia, Indiana, Iowa, Kansas, Kentucky, Louisiana, Michigan, Minnesota, Mississippi, Missouri, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Wisconsin, and Wyoming. Additionally, the Debtors supply fuel in Nebraska. As a result, many Authorities calculate Income and Other Taxes for a particular Debtor based on the proportion of the applicable Debtor's taxable income derived from operations in the applicable jurisdiction.

122. The Debtors are required to pay the Income and Other Taxes on a quarterly or annual basis.[40] For context, I understand that the Debtors' tax returns for 2022 have not been completed. Total state and federal income taxes due for 2021 totaled approximately $9.6 million, including penalties and fees. The Debtors request authority in the Tax Motion to pay prepetition Income and Other Taxes as they become due and owing and to continue paying their Income and Other Tax obligations on a postpetition basis in the ordinary course of business.

---

[40] Different types of Taxes are included on the Debtors' state income tax return for certain jurisdictions. For the avoidance of doubt, the Debtors are seeking authority in the Tax Motion to continue remitting these Taxes, which are included on income tax returns in the ordinary course of business and consistent with past practices.

123. The Debtors incur and remit annual reporting, permitting, and licensing fees in connection with chartering or operating in those states ("Fees"). The Debtors request authority in the Tax Motion to pay prepetition Fees (the "Fee Obligations") as they become due and owing and to continue paying their Fee Obligations on a postpetition basis in the ordinary course of business.

### F. Franchise and Business Privilege Taxes

124. The Debtors are required to pay state franchise taxes independent of income taxes, in order to continue conducting their business pursuant to applicable law ("Franchise Taxes"). Certain state and local Authorities also impose taxes on the Debtors for, among other things, operating licenses, liquor licenses and additional business privileges (together with Franchise Taxes, "Franchise and Privilege Taxes"). Failure to pay Franchise and Privilege Taxes as they become due in the ordinary course could cause the Debtors to lose their ability to conduct business in the applicable jurisdictions. The Debtors generally pay their Franchise and Privilege Taxes on an annual basis, depending on the jurisdiction. The Debtors request authority in the Tax Motion to pay prepetition Franchise and Privilege Taxes and to continue paying the Franchise and Privilege Taxes on a postpetition basis in the ordinary course of business.

### G. Audits and Assessments

125. The Debtors may currently be involved in ongoing audit investigations and may be subject to further investigations on account of tax returns and/or tax obligations in prior years (collectively, the "Audits"). Additionally, the Debtors may be assessed additional Taxes and Fees for prepetition amounts paid notwithstanding whether an Audit has occurred (collectively, the "Assessments"). Further, the Debtors routinely review their books and records and perform other related activities in connection with their Taxes and Fees in the ordinary course of business, which could give rise to additional liabilities that are not associated with an Audit or Assessment. As of the Petition Date, the Debtors do not believe there are any outstanding amounts owed in Taxes and

Fees on account of the Assessments, which includes amounts that are being disputed in the appropriate judicial or administrative proceeding. The Debtors seek authority in the Tax Motion to pay undisputed prepetition Assessments and continue to negotiate settlements or resolutions with the applicable Authority regarding any disputed Assessments on a postpetition basis in the ordinary course of business.

### H. Lottery Ticket Sales Revenue

126. One source of the Debtors' revenue is derived from the sale of lottery tickets at the Debtors' convenience stores. The proceeds of these sales are received by the Debtors from consumers for the purchase price of lottery tickets but are held in trust for the applicable Authorities. The Debtors pay the proceeds of the lottery ticket sales to the applicable Authorities, typically on a weekly basis. The Debtors estimate that they have accrued approximately $1.6 million in lottery ticket sale obligations as of the Petition Date. The Debtors seek authorization in the Tax Motion to pay to the applicable Authorities any lottery ticket sale proceeds that they may have collected prepetition and to continue to pay over lottery ticket sale proceeds postpetition in the ordinary course of business.

127. I believe that the Debtors' ability to pay the Taxes and Fees is critical to their continued and uninterrupted operations. If certain Taxes and Fees remain unpaid, I understand that the Authorities may seek to recover such amounts directly from the Debtors' directors, officers, or employees, thereby distracting such key personnel from the administration of these Chapter 11 Cases. Any collection action on account of such claims and any potential ensuing liability would distract the Debtors and their personnel from their restructuring objectives to the detriment of all parties in interest. The dedicated and active participation of the Debtors' officers and employees

is integral to the Debtors' continued operations and essential to the orderly administration and, ultimately, the success of these Chapter 11 Cases.

128.     I further believe that the relief requested in the Taxing Motion is reasonable in light of the added costs and penalties that may be incurred if such amounts remain unpaid. Specifically, I understand that the Debtors' Taxes and Fees obligations may ultimately result in increased liabilities for the Debtors if interest and penalties accrue on the Tax and Fee claims, which amounts may also be entitled to priority treatment. I believe that such a result would be contrary to the best interests of the Debtors' estates and all stakeholders. Accordingly, the Court should grant the relief requested in the Taxing Motion.

**D.     *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Honor and Renew the Premium Financing Agreement Entered into Prepetition and Satisfy Obligations Related Thereto, and (C) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies; and (II) Granting Related Relief* (the "<u>Insurance Motion</u>")**

129.     Pursuant to the Insurance Motion, the Debtors seek entry of an order a) authorizing the Debtors to (i) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto in the ordinary course of business,[41] (ii) honor and renew the premium financing agreement entered into prepetition and satisfy obligations related thereto, and enter into new premium financing agreements in the ordinary course of business, and (iii) renew, amend, supplement, extend, or purchase insurance coverage in the ordinary course of business on a postpetition basis; and (b) granting related relief.

---

[41]     Nothing herein or in the Insurance Motion shall be deemed an admission of any payments due or past due under or related to any of the Insurance Policies (as defined herein).

### A.     The Insurance Policies

130.     In the ordinary course of the Debtors' business, the Debtors maintain approximately 56 insurance policies (collectively, the "<u>Insurance Policies</u>," and the carriers thereof, the "<u>Insurance Carriers</u>") [42] providing coverage for, among other things, commercial property, flood, tank pollution, liquor, employer practice, and directors' and officers' liability.[43]  The Insurance Policies are essential to the preservation of the Debtors' business and assets, and, in many instances, such insurance coverage is required by regulation, law, or contract that governs the Debtors' business.  A comprehensive list of the Insurance Policies is attached to the proposed order approving the Insurance Motion as <u>Exhibit 1</u>.

131.     To preserve the value of the Debtors' business operations, properties, and assets, it is essential that the Debtors be able to continue or renew the Insurance Policies and enter into new insurance policies.  I understand that in many cases, regulations, laws, and contract provisions that govern the Debtors' commercial activities require the types of coverage provided for under the Insurance Policies, as well as the Bankruptcy Code and U.S. Trustee Guidelines.  The relief requested in the Insurance Motion is designed to ensure uninterrupted coverage under the Insurance Policies.  Therefore, the Debtors seek authorization in the Insurance Motion to maintain

---

[42]     The descriptions of the Insurance Policies set forth in the Insurance Motion constitute a summary only.  The actual terms of the Insurance Policies and related agreements will govern in the event of any inconsistency with the description in the Insurance Motion.  Although <u>Exhibit 1</u> to the order approving the Insurance Motion is intended to be comprehensive, the Debtors may have inadvertently omitted Insurance Policies therefrom.  The Debtors request authority to honor existing Insurance Policies and renew Insurance Policies, as applicable, regardless of whether the Debtors inadvertently failed to include a particular Insurance Policy on such <u>Exhibit 1</u>, and any such omitted Insurance Policy is hereby included in the defined term "Insurance Policies" as used in the Insurance Motion and order with respect thereto.  In addition, the Debtors maintain numerous insurance policies with respect to, among other things, employee health, disability, and life insurance benefits, as well as the Debtors' workers' compensation program. These programs are described, and the relief is requested with respect to such programs, in the Wage Motion.

[43]     In addition to the Debtors' ordinary course directors' and officers' policy, on March 16, 2023, the Debtors purchased Side A coverage in connection with the appointment of independent board members.

the existing Insurance Policies, pay prepetition obligations (if any) related thereto upon entry of the Order, and renew, amend, supplement, extend, or purchase new Insurance Policies on a postpetition basis in the ordinary course of business consistent with past practice.

### B. Premium Financing

132.    While the Debtors pay most of their premiums for their Insurance Policies in full in advance, the Debtors pay eleven (11) of their Insurance Policies insured by Federated Mutual Insurance Company on an installment basis.  As of the Petition Date, the Debtors expend approximately $438,873.80, in the aggregate,[44] each month on such monthly premium payments, and believe they are current on all monthly premium obligations.

133.    In addition, one of the Insurance Policies was financed through a premium financing agreement (the "Premium Financing Agreement").  The Premium Financing Agreement is between Mountain Express Oil Company and IPFS Corporation (the "Premium Financing Provider") and was paid in full prior to the Petition Date.  As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the Premium Financing Agreement and that the Premium Financing Agreement has been paid off.

134.    The Debtors seek authority to enter into new premium financing agreements, directly with the finance providers, or new non-financed Insurance Policies as necessary or appropriate, without further Court approval.

### C. Deductibles and Self-Insured Retentions

135.    Certain of the Insurance Policies require the Debtors to pay a deductible (collectively, the "Deductibles").  Generally, if a claim is made under an Insurance Policy with a Deductible, the Debtors are obligated to pay any defense costs or successful or settled claims up

---

[44]    Amounts on account of the Debtors' workers' compensations policies are included in the aggregate payment.

to the amount of the Deductible. Carriers are directly responsible for any claim under the applicable Insurance Policy to the extent such claim is in excess of the Deductible. The Deductibles may range up to $1,000,000, subject to certain limitations.

136. Alternatively, certain of the Insurance Policies may use self-insured retentions (collectively, the "SIRs") instead of Deductibles. If a claim is made under these policies, the Debtors must make payments in the first instance up to the limit of the SIR and, once the Debtors have made such payments, the carrier is obligated to cover remaining costs.

137. The Debtors do not believe there are any accrued but unpaid amounts pursuant to the Deductibles and SIRs. However, out of an abundance of caution, the Debtors seek authority in the Insurance Motion to continue to honor their obligations under the Deductibles or SIRs as they come due on a postpetition basis in the ordinary course of business.

### D. Insurance Brokerage Fees

138. The Debtors obtain Insurance Policies through Lockton Companies, Dickey McCay, and Federated Mutual Insurance Company, their insurance brokers (collectively, the "Insurance Brokers"), who assist the Debtors in obtaining comprehensive insurance coverage and with the procuring and negotiating the Insurance Policies, enabling the Debtors to obtain Insurance Policies on advantageous terms and at competitive rates. The Insurance Brokers collect fees for services rendered as part of the Premiums paid on the Insurance Policies (the "Brokerage Fees"). As of the Petition Date, the Debtors do not believe that they owe the Insurance Brokers any amounts on account of the Brokerage Fees. Pursuant to the Insurance Motion, the Debtors seek authority to pay any outstanding prepetition Brokerage Fees and to continue to honor any Brokerage Fees as they come due on a postpetition basis in the ordinary course of business

139.     The Insurance Policies provide a comprehensive range of protection for the Debtors' businesses, properties, and assets.  It is essential that the Debtors' insurance coverage continues in full force and effect during the course of these Chapter 11 Cases.  At bottom, the Insurance Policies provide the Debtors with essential insurance coverage.  Any lapse in the coverage to be provided under the Insurance Policies could expose the Debtors to substantial liability, monetary and otherwise, for injuries, damages, and penalties for failing to maintain proper insurance.  Therefore, in light of the importance of the Insurance Policies, I believe the Debtors should be permitted to exercise their reasonable business judgment to continue and/or renew the Insurance Policies as they expire. Moreover, I believe permitting the Debtors to continue their installment premiums and to enter into new premium financing agreements, directly with the finance providers, or new non-financed Insurance Policies as necessary or appropriate, is in the best interests of the Debtors' estates.  Accordingly, the Court should grant the Insurance Motion.

**E.**     ***Debtors' <u>Emergency</u> Motion for the Entry of an Order (I) Approving the Proposed Adequate Assurance Deposit for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Proposed Adequate Assurance Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* (the "<u>Utility Motion</u>")**

140.     Pursuant to the Utility Motion, the Debtors seek entry of an order (a) determining that the Adequate Assurance Deposit (defined below) provides the Utility Providers (defined below) with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code (defined below), (b) prohibiting the Utility Providers from altering, refusing, or discontinuing services, (c) approving the Adequate Assurance Procedures (defined below) for resolving any dispute in connection with the Adequate Assurance Deposit, and (d) granting related relief.

A.     **The Utility Services**

141.    In connection with the operation of their businesses, the Debtors obtain electricity, water, internet, telephone, and other similar services (collectively, the "Utility Services"), from a number of utility providers (collectively, the "Utility Providers").  A non-exclusive list of the Utility Providers that provide Utility Services to the Debtors as of the Petition Date is annexed to the proposed order approving the Utility Motion as Schedule 1 (the "Utility Providers List").  In addition, the Debtors pay for Utility Services through their landlords in accordance with the terms of applicable real property leases.  While the Debtors are providing notice of the Utility Motion to all known Utility Providers, the relief requested herein is requested with respect to all Utility Providers and is not limited to those listed on the Utility Providers List.[45]

B.     **The Adequate Assurance Deposit**

142.    On average, the Debtors spend approximately $70,000, in the aggregate, each week on Utility Services, calculated based on the historical average of payments made to the Utility Providers during January 1, 2022 through March 3, 2023.  The Debtors anticipate that their weekly utility spending will continue consistently with historical practice following the Petition Date.

143.    The Debtors intend to satisfy postpetition obligations owed to the Utility Providers in the ordinary course of business and in a timely manner.  The Debtors' cash on hand, cash generated in the ordinary course of business, and the Debtors' proposed cash collateral budgets provide for payments to Utility Providers in accordance with ordinary prepetition practice.  As

---

[45]    Although the Debtors believe that the Utility Providers List includes all of their Utility Providers, subject to the limitations set forth in the Adequate Assurance Procedures, the Debtors reserve the right to supplement the list if they inadvertently omitted any Utility Provider.  Additionally, the listing of an entity on the Utility Providers List is not an admission by the Debtors that such entity is or is not a utility within the meaning of section 366 of the Bankruptcy Code, and the Debtors reserve all rights with respect to any such determination.  The Debtors also may have inadvertently omitted one or more Utility Providers.  Therefore, the Debtors request relief in the Utility Motion applicable to all Utility Providers regardless of whether such Utility Provider is identified on the Utility Providers List.

additional assurance of payment, the Debtors propose to deposit $150,000.00 (the "Adequate Assurance Deposit") into a segregated bank account (the "Adequate Assurance Account") maintained by the Debtors, within seven (7) calendar days after entry of an order approving the Utility Motion.

144.    The Adequate Assurance Deposit is equal to approximately two weeks of the Debtors' average weekly cost of Utility Services, calculated based on the historical average of payments made to the Utility Providers during the period of January 1, 2022 through March 3, 2023.  I believe that the Adequate Assurance Deposit, in conjunction with the Debtors' cash on hand, cash generated in the ordinary course of business, and anticipated access to cash collateral (collectively, the "Proposed Adequate Assurance"), demonstrates the Debtors' ability to pay for future Utility Services in accordance with past practice and constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of section 366 of the Bankruptcy Code.

## C.    The Adequate Assurance Procedures

145.    The Debtors propose the adequate assurance procedures set forth in the Utility Motion (the "Adequate Assurance Procedures") for any Utility Provider that is either (a) not satisfied with the Proposed Adequate Assurance or (b) seeking payment of their applicable portion of the Adequate Assurance Deposit for adequate assurance of future payment (each, an "Adequate Assurance Request") during the pendency of these Chapter 11 Cases.  In summary, the Adequate Assurance Procedures permit a Utility Provider to object to the Proposed Adequate Assurance by filing or serving an Adequate Assurance Request upon certain notice parties identified in the Proposed Order.  Under the Adequate Assurance Procedures, the Debtors may use their discretion to resolve any Adequate Assurance Request with the Utility Provider and without further order of the Court.  If the Debtors determine that the Adequate Assurance Request cannot be consensually resolved, the Debtors may seek Court resolution of the Adequate Assurance Request.  In addition,

if postpetition amounts remain unpaid beyond the applicable grace period associated with the Utility Services, the Utility Provider may make an Adequate Assurance Request pursuant to the proposed Adequate Assurance Procedures. As such, the proposed Adequate Assurance Procedures are an efficient and streamlined resolution process for matters related to Utility Services that may arise during the cases.

### D. Modifications to the Utility Providers List

146.    The Debtors have made an extensive and good faith effort to identify all Utility Providers and include them on the Utility Providers List. If the Debtors subsequently identify additional Utility Providers or discontinue any Utility Services, the Debtors seek authority, in their sole discretion, to amend the Utility Providers List to add or remove any Utility Provider. The Debtors further request in the Utility Motion that the relief requested therein, including the proposed Adequate Assurance Procedures, and any order granting the relief requested in the Utility Motion shall apply to any subsequently identified Utility Provider. The Debtors will serve a copy of the Utility Motion and any related order on any Utility Provider added to the Utility Providers List. Any subsequently added Utility Provider shall have twenty one (21) calendar days from the date of service of the Utility Motion and any related order to make a request for additional adequate assurance of payment in accordance with the Adequate Assurance Procedures. Pursuant to the Adequate Assurance Procedures, the Debtors may seek to resolve any subsequently added Utility Provider's request for adequate assurance of payment by mutual agreement with the Utility Provider without further order of this Court or the need to schedule a hearing with this Court to determine the adequacy of assurance payment.

### E. Prohibitions on Altering, Refusing, or Discontinuing Service

147.    I believe that uninterrupted Utility Service is essential to the Debtors' ongoing business operations and overall success of these Chapter 11 Cases. Should any Utility Provider

refuse or discontinue service, the Debtors' business operations could be disrupted severely and cause operational and manufacturing disruptions.  Moreover, based on their books and records, the Debtors believe there are no material defaults or arrearages for undisputed invoices accrued in connection with Utility Services.  As such, it is essential that the Utility Services continue uninterrupted during the pendency of these Chapter 11 Cases.

148.    For the foregoing reasons, the Debtors request that, pending the entry of an order approving the Utility Motion and the resolution of any Additional Assurance Request, objection, or Determination Hearing, the Utility Providers, including any Additional Utility Provider, are prohibited from (a) discriminating against the Debtors, (b) altering, refusing, or discontinuing service to the Debtors, or (c) requiring payment of a deposit or receipt of any other security for continued service other than the Adequate Assurance Deposit as a result of these Chapter 11 Cases or any unpaid prepetition invoices.

F.    ***Debtors' <u>Emergency</u> Motion for the Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Account Reconciliation Practices and (II) Granting Related Relief (the "<u>Dealer Reconciliation Motion</u>")***

149.    Pursuant to the Dealer Reconciliation Motion, the Debtors seek entry of an order (a) granting the Debtors the authority to maintain, administer, and honor certain prepetition obligations owed to the applicable Dealers and related account-reconciliation and fund release procedures (collectively, the "<u>Dealer Procedures</u>"), and (b) granting related relief.

150.    The Debtors operate and/or distribute fuel products to many hundreds of Dealers across the United States.  The Debtors' ordinary course arrangements and relationships with their Dealers are crucial to the preservation and maximization of the Debtors' going concern value and the prospects of a chapter 11 restructuring.

151.    As an integral part of the Debtors' operations and the contractual and other arrangements with Dealers, in the ordinary course of business, the Debtors collect in various Bank

Accounts credit card receipts and/or other cash receipts ("Dealer Collections") from or for the benefit of an applicable Dealer relating to fuel and other sales at the Dealer's location, which funds the Debtors collect and use as a security deposit, pending the Debtors' and Dealer's reconciliation of the amounts due to and from the other party under the parties' applicable agreements and arrangements ("Reconciliation Process"). The frequency of such reconciliations varies, but Dealer-specific reconciliations sometimes occur several times each month.

152.    Prepetition, in the ordinary course of business, the Debtors regularly engaged in the Reconciliation Process as to each applicable Dealer and subsequently released the net Dealer Collections each applicable cycle to the Dealer. Because of the timing of these Chapter 11 Cases and the automatic stay, the Debtors hold certain prepetition amounts of Dealer Collections which, after the applicable Reconciliation Process, would otherwise be remitted to the Dealers in the ordinary course of business. If the relief sought by the Dealer Reconciliation Motion were not granted, and the Debtors were unable to transfer the net Dealer Collections to the relevant Dealers, I believe many said Dealers would suffer great hardship and prejudice due to the delayed remittances, the Debtors would risk alienating their Dealers, who could take actions adverse to the Debtors, and the Debtors' relationships with their Dealers, as well as the Debtors' reputation in the marketplace, would be substantially harmed. Just as the Debtors' fuel supply and transport chains (discussed below) are critical to the Debtors' businesses, the Debtors' ordinary course arrangements and relationships with their Dealers (which buy fuel from or through the Debtors) are critical to the goodwill of the Debtors' business and the preservation and maximization of the Debtors' going concern value and a successful chapter 11 restructuring.

153.    Because Dealers' collections and reconciliation cycles vary, among other factors, an estimation of amounts at stake is difficult and complex, but the Debtors believe approximately

$7-8 million of prepetition Dealer Collections may be owed to Dealers after the applicable Reconciliation Process. By the Dealer Reconciliation Motion, the Debtors seek authorization to continue with their Reconciliation Process with Dealers and remit net Dealer Collections, as applicable, to the Dealers in the ordinary course of business, irrespective of whether the Dealer Collections relate to the prepetition period. Accordingly, the Court should grant the relief requested in the Dealer Reconciliation Motion.

G.    **Debtors' _Emergency_ Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Fuel Suppliers and Transporters and (II) Granting Related Relief (the "_Fuel Supplier Motion_")**

154.    Pursuant to the Fuel Supplier Motion, the Debtors seek entry of an order (a) authorizing the Debtors to pay certain fuel suppliers, haulers, transporters, shippers, and carriers in the Debtors' fuel purchase, distribution and/or storage chains ("Fuel Relationship Parties"), subject to the limits set forth below; and (b) granting related relief as set forth in the Order.

155.    Given the nature of their business, the Debtors require a ready, consistent, significant supply of fuel for the continued operation of the Debtors' and third parties' Fuel Centers, Travel Centers, and other locations across the United States. In short, if there is no fuel supply, there will be no business of the Debtors to restructure in these Chapter 11 Cases.

156.    The Debtors' Oil Company Agreements are typically between the major national oil companies (the "Fuel Suppliers") and MEX, the Debtors' parent company.[46] Although they vary from contract to contract, they generally entitle MEX to purchase, and obligate the Fuel Supplier to sell, certain annual quantifies of fuel (often expressed as maximum output). These in-bound fuel entitlements, naturally, are tied to the Debtors' corresponding ability to sell the fuel throughout the Debtors' Fueling Centers and Travel Centers. The loss of Dealer locations (and

---

[46] Certain Oil Company Agreements are between a Fuel Supplier and a MEX Fuels Entity.

the fuel supplies that those locations consume), could jeopardize the Debtors' ability to adhere to their purchase commitments under the Oil Company Agreements. The Debtors have limited storage capacity and their fuel purchases are often tied to back-to-back delivery obligations to dealers. Any interruption in the in-bound and out-bound flow of fuel products could cause certain locations to run low supplies thus harming customer relationships.

157.     I believe that granting the Debtors authorization to pay prepetition claims of the Fuel Relationship Parties important to the Debtors' fuel purchase, distribution, and/or storage chains will enhance the likelihood of successful Chapter 11 Cases and maximize the value of the Debtors' estates. Without their arrangements with the Fuel Relationship Parties,[47] the Debtors would not have adequate access to fuel or the infrastructure through which to distribute it to the Debtors' and third parties' locations. Without adequate fuel supply at the locations, customers will go elsewhere to fuel up and shop – devastating to the Debtors' business. In light of the large and essential role played by a distinct group of Fuel Relationship Parties, I believe that it is prudent to seek the relief requested in the Fuel Supplier Motion.

158.     Prepetition, the Debtors were current on their obligations to the Fuel Relationship Parties. On a daily basis, the Debtors run approximately 170 loads of fuel equating to approximately 1.4 million gallons per day. On a weekly basis, the amounts due to the Fuel Relationship Parties range between $10 million and $15 million. Due to the timing of the nature of the Debtors' business, the timing of the chapter 11 filings, and the parties' billing cycles, the Debtors cannot estimate with precision the prepetition invoices that will be generated in the days following the Petition Date. By the Fuel Supplier Motion, the Debtors are seeking authority to

---

[47]     The Debtors are parties to certain fuel supply and other agreements with certain Fuel Relationship Parties, which agreements remain enforceable by the Debtors. The Debtors reserve all of their rights with respect to all such agreements.

pay an amount necessary to preserve the value of their estates, which shall not exceed $25 million in the aggregate, on account of prepetition claims held by the Fuel Relationship Parties and accrued in the ordinary course of business ("Fuel Relationship Claims").  The Debtors intend to apply their business judgment and discretion on a case-by-case basis and pay only those Fuel Relationship Claims that are crucial to maintaining the supply chains for the Debtors' wholesale and retail operations and/or otherwise preserving the Debtors' going concern value.

### A.    The Fuel Relationship Parties

159.    In the ordinary course of business, the Debtors incur obligations to various fuel suppliers, transporters, haulers, shippers, carriers, and other vendors in the Debtors' fuel purchase, distribution, and/or storage chains, servicing fuel stations, travel centers, and other locations across the United States.  As noted above, the Debtors were current on their prepetition obligations to the Fuel Relationship Parties, and the significant prepetition amounts owed to such parties stem from the timing of the chapter 11 filings.  The Fuel Relationship Parties are either essentially single source providers (for certain locations) or otherwise cannot be quickly enough and cost-effectively replaced, and are absolutely crucial to the continued, uninterrupted operation of the Debtors' businesses and the preservation and maximization of the value of the Debtors' assets for the benefit of all stakeholders.

160.    Further, some of the Fuel Relationship Parties could potentially assert statutory and/or other liens (including transportation and freight liens) against the Debtors' property, to secure payment of prepetition goods and services provided to the Debtors.  I am informed that such Fuel Relationship Parties may have a right to assert and perfect certain liens on account of unpaid goods or services under applicable non-bankruptcy law, notwithstanding the automatic stay of the Bankruptcy Code in certain instances.  In my experience, such statutory liens often allow

the goods or services provider to retain possession of all applicable materials until the debtor satisfies the outstanding amounts owed.

161.    Absent payment of any outstanding prepetition amounts, I believe that Fuel Relationship Parties may refuse or attempt to refuse to provide goods and/or services for, and/or honor obligations under their existing arrangements with, the Debtors on a go-forward basis, including supplying and distributing fuel post-petition in the ordinary course of business.  It is therefore critical that the Debtors be allowed to pay Fuel Relationship Parties to avoid the potential disruption of their operations.[48]

162.    The Debtors estimate that the aggregate unpaid prepetition balance owing to the Fuel Relationship Parties could total up to $25 million, all of which will be coming due during the first 21 days of these Cases.

163.    For the avoidance of doubt, the Debtors seek authority in the Fuel Supplier Motion to pay only those amounts that they determine, in their sole discretion, are necessary or appropriate to: (a) obtain the release of ordered fuel supplies and/or any other critical or valuable goods (as applicable); (b) maintain efficient, reliable, and smooth operations at the Debtors' locations (as applicable); and (c) induce the Fuel Relationship Parties to continue performing and otherwise supporting the Debtors' operations on a postpetition basis.

**B.    The Proposed Fuel Supplier Process**

164.    If authorized to pay the Fuel Relationship Claims under the Fuel Supplier Motion, the Debtors will, in their discretion, use commercially reasonable efforts to require the applicable Fuel Relationship Parties to provide favorable trade terms consistent with historical practice.  The

---

[48]    By the Fuel Supplier Motion, the Debtors do not acknowledge or concede that any liens (contractual, common law, statutory, or otherwise) described in therein are valid and enforceable, and the Debtors expressly reserve the right to contest the extent, validity, and perfection of any and all such putative liens.

Debtors request authority, but not the obligation, to condition payment of a Fuel Relationship Claim on a Fuel Relationship Party's agreement to continue providing fuel and/or other supplies or services to the Debtors in accordance with each Fuel Relationship Party's agreement to (a) accept such payment in satisfaction of all or part of its Fuel Relationship Claim, and (b) continue to provide fuel, supplies and/or services to the Debtors during these Chapter 11 Cases on (i) the most favorable trade terms, practices, and programs (including, but not limited to, credit limits, rebates, discounts, pricing, timing of payments, and availability, and other applicable terms and programs) as in place before the Petition Date or (ii) such other favorable terms as the Debtors and the Fuel Relationship Party may mutually agree on ((a) and (b) together, "Customary Trade Terms").

165.    To ensure each Fuel Relationship Party continues providing fuel, other goods or services on Customary Trade Terms for the duration of these Chapter 11 Cases, the Debtors seek authority under the Fuel Supplier Motion, but not direction, in their discretion, to execute vendor agreements, substantially similar to the form attached thereto as Exhibit A hereto (each a "Vendor Agreement").

**H.      _Debtors' _Emergency_ Motion for Entry of an Order(I) Authorizing the Debtors to Pay Certain Prepetition Claims of Lien Claimants and Critical Vendors and (II) Granting Related Relief (the "Critical Vendor Motion")_**

166.    Pursuant to the Critical Vendor Motion, the Debtors seek entry of an order (a) authorizing the Debtors to pay (i) certain ordinary-course vendors and providers that supply goods or services that the Debtors rely upon to continue their daily or otherwise key operations, or are in certain instances sole or limited source providers of goods and services necessary for the uninterrupted operation of the Debtors' businesses (including, as discussed below, providers of remediation and other environmental related services, software, technology and data related services, and other goods and services for the Debtors' retail segment) ("Trade Claimants"); and

(ii) certain mechanics', materialman's, and other statutory lien claimants ("Lien Claimants" and, together with the Trade Claimants, the "Critical Vendors"), subject to the limits set forth below; and (b) granting related relief. Granting the Debtors authorization to pay prepetition claims of Critical Vendors as described in the Critical Vendor Motion will avert substantial harm to the Debtors' operations and businesses, enhance the likelihood of successful Chapter 11 Cases, and preserve and maximize the value of the Debtors' estates.

167.    With respect to the Trade Claimants, these vendors supply goods and/or services that the Debtors rely upon to continue their daily or otherwise key operations, or are sole or limited source providers of goods and services necessary for the uninterrupted operation of the Debtors' businesses. Without these Trade Claimants, the Debtors' wholesale and retail operations would essentially not be up and running; the Trade Claimants, among other things, provide the software, technology, and services to manage and implement fuel transport, fuel supply, store inventory, credit card, and other payment processing; provide necessary remediation and other environmental related services; and keep the retail locations stocked with necessary goods and products. Moreover, I understand that many of the Trade Claimants who supply goods to the Debtors may be entitled to assert administrative claimants for goods delivered to the Debtors in the 20 days preceding the Petition Date under the Bankruptcy Code in any event.

168.    In addition, while I do not believe any Lien Claimants currently exist, to the extent any Lien Claimants have filed or may in the future file mechanics', materialman's, and other statutory liens, non-payment of such liens would be disruptive to the Debtors' business to the extent the Liens Claimants may refuse or attempt to refuse to provide goods and/or services for, and/or honor obligations under their existing arrangements with, the Debtors on a go-forward basis, including necessary construction, installation, repairs, and maintenance, or may refuse to

release certain goods, equipment, supplies, or other materials in their possession. It is thus imperative that the Debtors be allowed to pay certain Lien Claimants in the ordinary course of business to avoid the potential disruption of their operations.

169. As of the Petition Date, the Debtors owe approximately $6.1 million to the Critical Vendors. By the Critical Vendor Motion, the Debtors are only seeking authority to pay an amount necessary to preserve the value of their estates, which shall not exceed $7.5 million in the aggregate on account of prepetition claims held by certain Critical Vendors and accrued in the ordinary course of business ("Critical Vendor Claims"). The Debtors intend to apply their business judgment and discretion on a case-by-case basis and pay only those Critical Vendor Claims that are crucial to the Debtors' wholesale and/or retail operations and/or otherwise preserving the Debtors' going concern value. The Debtors are generally not proposing to pay the Critical Vendor Claims in full.

A. **The Trade Claimants**

170. In the ordinary course of business, the Debtors incur obligations to certain other vendors and providers that supply goods or services that the Debtors rely upon to continue their operations and are either sole or limited source providers of goods and services necessary for the uninterrupted operation of the Debtors' businesses or otherwise cannot be quickly enough and cost-effectively replaced. In all events, these Trade Claimants are integral to the continued, uninterrupted operation of the Debtors' businesses and the preservation and maximization of the value of the Debtors' assets:

(i) *Environmental cleanup, remediation and other environmental related services:* As set forth above, the Debtors' business and operations entail numerous Fuel Centers and Travel Centers across the United States. Given the nature of the Debtors'

businesses and the applicable public interest therein, the Debtors are subject to a high degree of governmental and regulatory oversight from a variety of regulatory bodies, including the United States Environmental Protection Agency and analogous state agencies. Accordingly, the Debtors rely on a number of Trade Claimants to assist them in ensuring compliance with applicable governmental laws and regulations and/or addressing remedial, disposal, or other waste or environmental issues at or related to the locations.

(ii) *Software and other technology/electronic data administration, processing and technical services*: These Trade Claimants provide goods and services integral to key parts of the Debtors' businesses and operations including fuel transport, fuel supply, store inventory, pricing, credit card and other payment processing, and environmental/site level data.

(iii) *Goods, supplies and services for retail segment*: These Trade Claimants provide goods and/or services crucial to the Debtors' retail operations, including suppliers of certain products and inventory for the fuel stations, travel centers and other locations. Without adequate inventory and goods furnished by certain Trade Claimants at the locations, customers will go elsewhere to fuel up and shop – devastating to the Debtors' business.

171. The Debtors estimate that the aggregate unpaid prepetition balance owing to the Trade Claimants totals $6.1 million, all of which the Debtors expect will come due during the first 21 days of these Cases.

## B.      The Lien Claimants

172.    In the ordinary course of business, the Debtors incur obligations (collectively, the "Lien Claims") to third party contractors, repairmen, equipment installers, manufacturers, and other parties that perform labor or furnish materials, with respect to their own or third party branded fuel stations, travel centers and other locations (the "Lien Claimants").  These Lien Claimants could potentially assert statutory and/or other liens (including mechanics' and materialman's liens) against the Debtors' property or property managed or operated by the Debtors (including the applicable retail locations), to secure payment of prepetition goods and services provided to the Debtors.

173.    I am informed that the Lien Claimants may have a right to assert and perfect certain liens on account of unpaid goods or services, including mechanics' liens under applicable non-bankruptcy law, notwithstanding the automatic stay under the Bankruptcy Code.  Such statutory liens often allow the goods or services provider to retain possession of all applicable materials until the debtor satisfies the outstanding amounts owed.

174.    While I understand that no Lien Claimants currently exist, to the extent any Lien Claimants have filed or may file mechanics', materialman's and other statutory liens, non-payment of such liens would be disruptive to the Debtors' business to the extent the Liens Claimants may refuse or attempt to refuse to provide goods and/or services for, and/or honor obligations under their existing arrangements with, the Debtors on a go-forward basis, including necessary construction, installation, repairs and maintenance, or may refuse to release certain goods, equipment, supplies, or other materials in their possession.  It is thus imperative that the Debtors be allowed to pay certain Lien Claimants in the ordinary course of business to avoid the potential

disruption of their operations.[49] Moreover, I believe that if the relief requested in the Critical Vendor Motion with respect to the Lien Claimants is granted, the total amount to be paid to the Lien Claimants will likely be less than the losses the Debtors may suffer if their operations are disrupted.

## C.    The Critical Vendor Process

175.    The Debtors have thoroughly reviewed their business relationships and identified the Critical Vendors, the loss of whose particular goods or services would cause immediate and irreparable harm to the Debtors' business. To identify the Critical Vendors, the Debtors reviewed their accounts payable and prepetition vendor lists to identify those creditors most essential to the Debtors' operations pursuant to the following criteria:  (a) which suppliers were sole source or limited source suppliers, without whom the Debtors could not continue to operate without disruption, (b) the Debtors' ability to find alternative sources of supply and the potential disruption or lost revenues while a new supplier was resourced, (c) which suppliers would be prohibitively expensive to replace, (d) which suppliers would present an unacceptable risk to the Debtors' operations given the volume of essential services or products that such suppliers provide, (e) the extent to which suppliers may assert an administrative expense claims under the Bankruptcy Code; and (f) whether a vendor meeting the foregoing criteria is able or likely to refuse to ship goods or other supplies to the Debtors postpetition if its prepetition balances are not paid, but the vendor's failure to perform would constitute a disruption of the Debtors' business.

176.    If authorized to pay the claims of Trade Claimants ("Trade Vendor Claims"), the Debtors will, in their discretion, use commercially reasonable efforts to require the applicable

---

[49]    By the Critical Vendor Motion, the Debtors do not acknowledge or concede that any liens (contractual, common law, statutory, or otherwise) described therein  are valid and enforceable, and the Debtors expressly reserve the right to contest the extent, validity, and perfection of any and all such putative liens.

Trade Claimants to provide favorable trade terms consistent with historical practice. The Debtors request authority under the Critical Vendor Motion, but not the obligation, to condition payment of a Trade Vendor Claim on a Trade Claimant's agreement to continue providing supplies or services to the Debtors in accordance with each Trade Claimant's agreement to (a) accept such payment in satisfaction of all or part of its Trade Vendor Claim and (b) continue to provide supplies or services to the Debtors during these Chapter 11 Cases on (i) the most favorable trade terms, practices, and programs (including, but not limited to, credit limits, rebates, discounts, pricing, timing of payments, and availability, and other applicable terms and programs) as in place before the Petition Date or (ii) such other favorable terms as the Debtors and the Trade Claimant may mutually agree on.

177. To ensure each Trade Claimant continues providing goods or services on Customary Trade Terms for the duration of these Chapter 11 Cases, the Debtors seek authority under the Critical Vendor Motion, in their discretion, to execute vendor agreements, substantially similar to the form attached as **Exhibit A** thereto.

178. For all of the foregoing reasons, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 21st day of March, 2023 at New York, NY

_/s/ Michael Healy_
Michael Healy

**Exhibit A**

(Corporate Organizational Chart)

**MOUNTAIN EXPRESS**
OIL COMPANY

Mountain Express Oil Company *(GA)*

- Mountain Express Ethanol Company *(GA)*
  - Mountain Express Oil Company Southeast, LLC *(GA)*
    - Alabama Terminal Property, LLC *(GA)*
- Consolidated HR Services, LLC *(WY)*
- Spartan Tank Management LLC *(GA)*
  - Mississippi MEX Company, LLC *(MS)*
- Texas MEX Limited Company, LLC *(TX)*
  - West Hill Ranch Group LLC *(DE)*
- MEX North Alabama, LLC *(GA)*
  - B&T Petroleum LLC[18] *(NV)*
- Star Mountain Express, LLC *(TX)*
  - MEX RE Holdings LLC *(WY)*
    - MEX RE-NE LLC[9] *(WY)*
    - MEX RE-NW LLC[10] *(WY)*
    - MEX RE-SE LLC[11] *(WY)*
    - MEX RE-SW LLC[12] *(WY)*
- Mountain Express Baking and Coffee Co. *(GA)*
  - MEX Fuels LLC *(WY)*
    - MEX Fuels NE LLC[13] *(WY)*
    - MEX Fuels NW LLC[14] *(WY)*
    - MEX Fuels SE LLC[15] *(WY)*
    - MEX Fuels SW LLC[16] *(WY)*
- WHRG-LA, LLC *(LA)*
  - WHRG-LA2, LLC *(LA)*
    - Brothers Petroleum, LLC[17] *(LA)*
    - 300 Lee Drive, LLC *(LA)*
    - Brothers Expressway, Inc. *(LA)*
    - Brothers Stonebridge, Inc. *(LA)*
    - Brothers Terry Parkway, Inc. *(LA)*
  - Madison Auto Truck Plaza and Lucky Dollar Casino, LLC *(LA)*

Loan Party

**Retail Entities**
- WHRG Retail Ops LLC *(WY)*
  - WHRGOPS NE LLC[1] *(WY)*
  - WHRGOPS NW LLC[2] *(WY)*
  - WHRGOPS SE LLC[3] *(WY)*
  - WHRGOPS SW LLC[4] *(WY)*
- WHRG TC LLC *(WY)*
  - WHRG TC-NE LLC[5] *(WY)*
  - WHRG TC-NW LLC[6] *(WY)*
  - WHRG TC-SE LLC[7] *(WY)*
  - WHRG TC-SW LLC[8] *(WY)*

**MEX RE Entities**

**Brothers Entities**

# Notes to Org Chart

[1] Holds 100% of the membership interests in each of WHRGOPS NE-PA LLC and WHRGOPS NE-NY LLC, each a Wyoming limited liability company. WHRGOPS NE-NY LLC holds 100% of the membership interests in NE-NY-LI LLC, a Wyoming limited liability company.

[2] Holds 100% of the membership interests in each of WHRGOPS NW-MI LLC; WHRGOPS NW-WI LLC; WHRGOPS NW-IA LLC; and WHRGOPS NW-MO LLC, each a Wyoming limited liability company. WHRGOPS NW-WI LLC holds 100% of the membership interests in WHRGOPS NW-WI-NWI LLC, a Wyoming limited liability company. WHRGOPS NW-IA LLC holds 100% of the membership interests in WHRGOPS NW-IA-WIA LLC, a Wyoming limited liability company. WHRGOPS NW-MO LLC holds 100% of the membership interests in WHRGOPS NW-MO-NMO LLC, a Wyoming limited liability company.

[3] Holds 100% of the membership interests in each of WHRGOPS SE-SC LLC; WHRGOPS SE-TN LLC; and WHRGOPS SE-AL-North LLC, each a Wyoming limited liability company. WHRGOPS SE-TN LLC holds 100% of the membership interests in WHRGOPS SE-TN-WTN LLC, a Wyoming limited liability company.

[4] Holds 100% of the membership interests in each of WHRGOPS SW-AR LLC; WHRGOPS SW-OK LLC; and WHRGOPS SW-TX LLC, each a Wyoming limited liability company. WHRGOPS SW-AR LLC holds 100% of the membership interests in WHRGOPS SW-AR-NWAR LLC, a Wyoming limited liability company. WHRGOPS SW-OK LLC holds 100% of the membership interests in WHRGOPS SW-OK-OKC LLC, a Wyoming limited liability company. WHRGOPS SW-TX LLC holds 100% of the membership interests in each of WHRGOPS SW-TX-STX LLC and WHRGOPS SW-TX-Dallas LLC, each a Wyoming limited liability company.

[5] Holds 100% of the membership interests in WHRG TC-NE-PA LLC, a Wyoming limited liability company.

[6] Holds 100% of the membership interests in each of WHRG TC-NW-ND, LLC; WHRG TC-NW-IA, LLC; WHRG TC-NW-KS, LLC; WHRG TC-NW-MO, LLC; and WHRG TC-NW-WY, LLC, each a Wyoming limited liability company.

[7] Holds 100% of the membership interests in each of WHRG TC-SE-AL LLC and WHRG TC-SE-SC LLC, each a Wyoming limited liability company.

[8] Holds 100% of the membership interests in each of WHRG TC-SW-AR LLC and WHRG TC-SW-LA LLC, each a Wyoming limited liability company. WHRG TC-SW-LA LLC holds 100% of the membership interests in each of Webster P LLC and Webster P II LLC, each a Louisiana limited liability company.

[9] Holds 100% of the membership interests in each of MEX RE-NE-NJ LLC; MEX RE-NE-NY LLC; MEX RE-NE-IN LLC; MEX RE-NE-OH LLC; and MEX RE-NE-PA LLC, each a Wyoming limited liability company. MEX RE-NE-NY LLC holds 100% of the membership interests in MEX RE-NE-NY-LI LLC, a Wyoming limited liability company.

[10] Holds 100% of the membership interests in each of MEX RE-NW-IA LLC; MEX RE-NW-MN LLC; MEX RE-NW-MO LLC; MEX RE-NW-ND LLC; and MEX RE-NW-WI LLC, each a Wyoming limited liability company.

[11] Holds 100% of the membership interests in each of MEX RE-SE-AL LLC; MEX RE-SE-MS LLC; MEX RE-SE-GA LLC; and MEX RE-SE-NC LLC, each a Wyoming limited liability company.

[12] Holds 100% of the membership interests in each of MEX RE-SW-OK LLC; MEX RE-SW-TX LLC; MEX RE-SW-LA LLC; and MEX RE-SW-AR LLC, each a Wyoming limited liability company.

[13] Holds 100% of the membership interests in each of MEX Fuels NE-NY LLC; MEX Fuels NE-NJ LLC; MEX Fuels NE-IN LLC; MEX Fuels NE-OH LLC; MEX Fuels NE-KY LLC; and MEX Fuels NE-IL LLC, each a Wyoming limited liability company.

[14] Holds 100% of the membership interests in each of MEX Fuels NW-IA LLC and MEX Fuels NW-MO LLC, each a Wyoming limited liability company.

[15] Holds 100% of the membership interests in each of MEX Fuels SE-GA LLC; MEX Fuels SE-MS LLC; and MEX Fuels SE-TN LLC, each a Wyoming limited liability company.

[16] Holds 100% of the membership interests in each of MEX Fuels SW-OK LLC and MEX Fuels SW-LA LLC, each a Wyoming limited liability company.

[17] Holds (a) 100% of the equity interests in Newton Brothers, Inc. and Brothers I-10 Service Road, Inc., each a Louisiana corporation; and (b) 100% of the membership interests in each of 4408 S. I-10 Service Road LLC; Crowder Brothers, LLC; Exxon General DeGaulle, LLC; 4662 GDD LLC; 5310 Flannery Road, LLC; 4520 Jefferson Highway LLC; Jamie Boulevard, LLC; 13289 Old Hammond Highway LLC; 1308 Jefferson Davis LLC; 2850 Belle Chasse Hgwy LLC; 2698 Barataria Blvd LLC; 1227 Veterans, LLC; Brothers Belle Chasse, LLC; Avondale Brothers No 128 LLC; 1200 Wego LLC; Claiborne Operations LLC; Lapalco Brothers No. 25, LLC; 8692 River Road, LLC; Brothers Carol Sue, LLC; Gause Operation, LLC; 4940 Groom Road, LLC; 2601 Gen. DeGaulle LLC; 9410 Greenwell Springs, LLC; 4115 Airline Hgwy., LLC; 798 Jean Lafitte, LLC; 3049 Loyola Drive LLC; South Claiborne Operation LLC; 1600 Manhattan Blvd, LLC; 4915 Westbank Expwy LLC; 2701 Canal Street LLC; and 300 Lee Drive LLC, each a Louisiana limited liability company.

**Exhibit B-1**

(*Curriculum Vitae* of Craig Barbarosh)



**Craig A. Barbarosh (55)**

Craig Barbarosh is an experienced board member and business leader/strategic advisor with over 30 years of professional experience. Craig presently serves as an independent director on the boards of: Lifecore Biomedical, Inc. (NASDAQ: LFCR), where he is the Chairman of the Board and was previously a member of the Compensation Committee; Nextgen Healthcare, Inc. (NASDAQ: NXGN), where he served as Vice Chairman of the Board and currently as Chair of the Compensation Committee and a member of the Nominating and Governance and Special Transactions Committees and was previously a director of NXGN's India subsidiary; Sabra Healthcare REIT, Inc. (NASDAQ: SBRA), where he is the Chair of the Audit Committee and a member of the Compensation Committee; and Evolent Health, Inc. (NYSE: EVH), where he is the Co-Chair of the Strategy Committee and a member of the Compensation Committee. In addition to his public company board service, Craig currently serves as an Independent Director of Mariner Health Central, Inc. in its Chapter 11 proceeding.

Craig previously served on the boards of directors of Aratana Therapeutics, Inc. (NASDAQ: PETX), a leading pet therapeutics company, where he was a member of the Compensation Committee and Chair of the Strategic Review Committee, Bazaarvoice, Inc. (NASDAQ:BV), a market-leading SaaS-based provider of software and service solutions and data analytics for the retail sector, where he was a member of the Compensation Committee, and BiopharmX, Inc. (NYSE MKT: BPMX), a specialty pharmaceutical company based in Menlo Park, CA, where he served as the Chair of the Nominating and Governance Committee and a member of the Audit and Compensation Committees. Craig also previously served as an Independent Director of Ruby Tuesday, Inc., a 200+ location casual dining restaurant chain, Hytera Communications, Inc., a manufacturer and distributor of digital mobile radios and Easterday Farms/Ranches, a large integrated farming and ranching operation based in Eastern Washington, in their respective Chapter 11 proceedings. Craig also served as the Independent Board Observer for Payless Holdings LLC (owner of the Payless shoe store chain) during its Chapter 11 proceeding and the Independent Board Advisor to the holding company of Plum Healthcare Group in connection with a portfolio sale transaction.

Craig has extensive experience in debt and equity offerings, M&A, governance and compliance, turnarounds and restructurings, CEO and founder transitions, senior leadership recruitment, activist shareholder relationships (including three contested proxy contests), executive compensation, dispute resolution and leadership coaching and development. Craig is a "financial expert" as defined by the SEC and completed certificated executive education programs at The Wharton School of the University of Pennsylvania in Corporate Valuation (2019), Harvard Business School in Effective Corporate Boards (2015), Strategic Business Valuation (2010) and Private Equity/Venture Capital (2007) and Carnegie Mellon University in Cybersecurity Oversight (2019).

Craig is a lawyer by background and was a senior partner in two international law firms where he held various leadership positions including on the firm's Boards of Directors, Executive Committees and Strategy Committees. Craig's financial restructuring practice was national in scope and included leading roles in many of the largest corporate restructuring matters in the country.

Craig holds a B.A. in Business Economics from the University of California, Santa Barbara, and a J.D. from the University of Pacific, McGeorge School of Law, where he graduated with honors. Craig is a frequent speaker at seminars and conferences discussing corporate governance and restructuring-related issues and has published several articles addressing current business, governance and legal topics.

**<u>Exhibit B-2</u>**

(*Curriculum Vitae* of Lawrence Perkins)



**LAWRENCE PERKINS BIOGRAPHY**

*Lawrence Perkins, Founder & CEO*

Lawrence Perkins, Founder and Chief Executive Officer of SierraConstellation Partners, has more than 20 years of management consulting and advisory experience with companies undergoing transition. Lawrence has enhanced business performance for numerous companies on projects ranging from interim management, profit improvement and working capital management to strategic planning and transaction execution.

Lawrence has served in a variety of senior-level positions including Interim CEO/President, Chief Restructuring Officer, Board of Directors Member, Financial Advisor, Strategic Consultant, and Investment Banker, to numerous middle-market companies and is particularly skilled at assisting clients through challenging situations.

Prior to founding SCP in 2013, Lawrence was a Senior Managing Director and regional leader of a national consulting firm where he was responsible for business development, marketing, staffing, and general management of the firm's western region. Lawrence joined the firm in 2010 when it acquired El Molino Advisors, a company he founded in January 2007 and led as the CEO.

A few noteworthy engagements include:

- Independent Director to RM Foods, parent company of El Torito, Real Mex, etc.
- Financial Advisor to major Franchisee of Papa Johns and Burger Kings.
- Financial Advisor to 3rd largest chain of Denny's Franchises in US.
- Financial Advisor to 3rd largest Applebee's Franchisee in US.
- Independent board member to a major venture backed Company serving the entry level aerospace market.
- Independent Board Member and CRO to Vitamin World, the second largest multi-unit retailer of nutritional supplements.
- CRO to Crestlloyd LLC, the owner of a large real estate project in California.
- CRO to Quanergy Systems, Inc., a publicly traded automotive sensor company.
- CRO to Wave Computing, Inc. a $200+ million semiconductor manufacturer.
- CRO to Proteus Digital Health, a digital health "unicorn."
- CRO to NewAge, Inc., a publicly traded consumer products manufacturing company.
- CRO to a privately held biotech development Company.
- CRO to Clarus Therapeutics, a publicly traded pharmaceutical company.
- CRO to PhaseBio, Inc., a publicly traded biotech development company.
- CRO to Mariner Healthcare, Inc., a privately held skilled nursing home operator.
- Interim CEO of Z Bros Holdings (600+ million family office.)
- CRO of Liberty Asset Management, a $500 million real estate holding Company.
- CRO of Oak River Asset Management, a $20 million real estate holding Company.
- CRO to CFO Management Holdings, LLC.
- CRO of Woodbridge Group of Companies, a ~$1 billion real estate holding company.

- CRO to a confidential tech "Unicorn" through their out of court turnaround and restructuring.
- CRO to a chain of 40 medical facilities with operations throughout the United States.
- Interim President and CEO of a privately held chain of dental laboratories.
- Project lead for CRO to National Stores, Inc., a $750 million chain of discount stores.
- Interim president to Appvion, a $400+ million paper manufacturer.
- CEO/CRO of Katy Industries, Inc., a $200+ million publicly traded manufacturer.
- CRO of Bethel Healthcare, Inc., a chain of skilled nursing facilities.
- CRO of the Fuller Brush Company, a 100 year old manufacturer of cleaning products.

Lawrence is a frequent public speaker and has been cited as an expert on the topics of restructuring, corporate governance, and M&A in publications including the Wall Street Journal, the New York Times, CNN, CNBC, and the Washington Post.

Lawrence began his career in the strategic consulting group of Arthur Andersen after graduating from the University of Southern California Marshall School of Business. He is currently on the board of several non-profits, and two corporate boards, and is a member of the Young Presidents Organization.

Lawrence has won multiple M&A Advisor Turnaround Awards, including 'Information Technology Deal of the Year' for his work with Wave Computing in 2021 and "Turnaround of the Year" for his work on Crestlloyd, LLC in 2023.

Lawrence is the author of the Amazon bestseller, *Don't Be A Stranger*, where he explores the secrets of strategic relationship building. He provides personal advice on how to create luck in business by offering techniques that can ultimately help readers develop their own enriching community.

# EXHIBIT 4

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| MOUNTAIN EXPRESS OIL COMPANY, et al., | Case No. 23-90147 (DRJ) |
| Debtors. [1] | (Jointly Administered) |

### DECLARATION OF GEOFFREY RICHARDS IN SUPPORT OF DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

I, Geoffrey Richards, hereby declare under penalty of perjury as follows:

1. I submit this declaration (the "Declaration") in support of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion"), filed concurrently herewith, of the above-captioned debtors and debtors in possession (the "Debtors") for entry of interim and final orders: (a) authorizing the Debtors to obtain postpetition financing, (b) authorizing the Debtors' use of cash

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/mountainexpressoil. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these cases is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022.



2390147230323000000000015

collateral, (c) granting liens and superpriority administrative claims, and (d) granting adequate protection to certain prepetition secured parties, among other relief.

2.    Unless otherwise indicated, the statements set forth in this Declaration are based on (a) my personal knowledge or views based on my experience; (b) information I have received from the Debtors, my colleagues at Raymond James working directly with me or under my supervision, direction, or control, or other advisors of the Debtors; and/or (c) my review of relevant documents.

3.    I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.  I am not being specifically compensated for this testimony other than through payments received by Raymond James & Associates, Inc. ("Raymond James"), as engaged by the Debtors; none of those payments are specifically payable on account of this testimony.  If I were called upon to testify, I would testify competently to the facts and views set forth herein.

## Professional Background and Qualifications

4.    I am a Senior Managing Director and Head of the Capital Structure Advisory Group at Raymond James, which has its principal office at 880 Carillon Parkway, St. Petersburg, Florida 33716. The Debtors retained Raymond James as its investment banker prepetition and intend to file a motion to retain Raymond James as its investment banker in these chapter 11 cases. Raymond James has a dedicated 22-person Capital Structure Advisory investment banking group with extensive experience advising companies, creditors' committees, and other constituents in complex situations involving underperforming businesses facing difficult financing conditions, liquidity crises, out-of-court restructurings, and chapter 11 cases. Investment bankers at Raymond James have advised on, or been involved with, numerous restructuring-related or distressed transactions, both out-of-court and in chapter 11 cases, including, without limitation, sale, restructuring, financing, financial opinion, and special advisory transactions.

2

5.      I have more than 25 years of investment banking and restructuring experience. During my career, I have personally led an investment banking team or otherwise been involved in the sale of over 125 companies as a going concern, many of which had been experiencing financial distress. I have also personally led an investment banking team or otherwise been involved in approximately 100 chapter 11 cases over the past 25 years. I have provided investment banking expertise and distressed mergers and acquisitions and financing advice to companies, lenders, and investors in both in- and out-of-court restructurings. Prior to joining Raymond James, I was head of North America debt finance and restructuring at Canaccord Genuity Group Inc., head of special situations and restructuring at William Blair & Company, and a partner in the Kirkland & Ellis LLP restructuring practice. In each role, my primary responsibilities included advising companies and investors in restructuring, distressed mergers and acquisitions, distressed financing, and special situations. Since 2001, I have taught the class Corporate Restructuring at Northwestern Pritzker School of Law as an Adjunct Professor.

### General Background

6.      A detailed description of the Debtors' business and facts precipitating the filing of the Debtors' chapter 11 proceedings are set forth in the *Declaration of Michael Healy in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 57] (the "First Day Declaration"), incorporated herein by reference.[2]

7.      Founded in 2000 and based in Alpharetta, Georgia, the Debtors are a recognized leader in the fuel distribution and retail convenience industry.  As one of the largest fuel distributors in the southern United States, the Debtors serve 828 fueling centers and 27 travel

---

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration and/or the DIP Motion, as applicable.

3

centers across 27 states. The Debtors have historically enjoyed strong relationships with many of the major oil companies including ExxonMobil, BP, Shell, Chevron, Texaco, and Sunoco. Since 2013, the Debtors have distributed over 1.1 billion gallons of fuel.

### Retention of Raymond James

8. The Debtors engaged Raymond James in February 2023 as their investment banker to provide advice regarding obtaining financing and pursuing strategic alternatives, including initiating Chapter 11 Cases, in the midst of an increasingly difficult liquidity situation. In a short period of time prior to the Petition Date, it became increasingly clear that the Debtors would likely need to file these Chapter 11 Cases to obtain a breathing spell and pursue restructuring options to maximize value, including an orderly sale of their businesses through an in-court process.

### The Debtors' Need for the DIP Facility and Access to Cash Collateral

9. As part of the Debtors' preparation for these Chapter 11 Cases, Raymond James assisted the Debtors with the evaluation of their immediate financing needs and funding alternatives. Raymond James also assisted the Debtors in their assessment of the current DIP financing market. As part of the foregoing evaluation, Raymond James worked with the Debtors and their chief restructuring officer (the "CRO") in analyzing the Debtors' immediate and long term financing needs. Among other things, this evaluation focused on the Debtors' anticipated cash receipts and disbursements during the projected period, the necessary funding required to continue operations, the effect of potential chapter 11 filings on the operations of the businesses, the expenses of administration of chapter 11 cases, as well as the fees and interest expense associated with the proposed DIP Facility.

10. Based on discussions with the Debtors' management and the CRO, I understand that the Debtors lack sufficient liquidity and do not generate sufficient cash from operations to

4

fund their businesses through a chapter 11 bankruptcy process. Accordingly, without the DIP Facility and the ability to use cash collateral, the Debtors will not have the liquidity needed to operate their businesses, fund their ordinary course expenditures, or pay the expenses necessary to administer these Chapter 11 Cases. Absent increased funding in the form of the DIP Facility, the Debtors could be forced to terminate their businesses as going concerns to the detriment of the Debtors, their estates, and all stakeholders.

11.    The Debtors also believe that the DIP Facility and access to cash collateral will provide a clear message to their customers, vendors, employees, and contract counterparties that the Debtors have sufficient liquidity to meet their current and future obligations based on how they have historically conducted business. The financing will demonstrate the Debtors' ability to continue meeting the needs of their customers, provide compensation to their employees, and operate their businesses in the ordinary course based on how they have historically conducted business.

### The Debtors' Efforts to Obtain Postpetition Financing

12.    Recognizing the need to move quickly while also securing the best available financing under the circumstances, the Debtors sought financing from numerous third-party sources as well as from the Prepetition Secured Parties beginning shortly after Raymond James was engaged.

13.    Raymond James, together with the Debtors' other advisors, held multiple conversations with the Prepetition Agent and, once they were engaged, the advisors for the Prepetition Secured Parties, over a number of weeks. As part of these conversations, the Debtors' advisors educated the Prepetition Agent and the advisors for the Prepetition Secured Parties about the Debtors' liquidity needs in the context of a chapter 11 process and emphasized the necessity

5

of DIP financing. Discussions involved detailed estimates for a potential DIP loan sizing, potential alternatives available to the Debtors, and the adverse impact to the Debtors' estates in the absence of such financing.

14.     In parallel, Raymond James initially identified and contacted 12 potential lenders regarding a junior DIP loan and/or a potential refinancing of the Prepetition Secured Parties. The parties were selected utilizing Raymond James' proprietary databases and were chosen because they provide capital solutions, primarily in the form of credit, to distressed middle market businesses and have expressed interest in providing financing to debtors-in-possession. Raymond James held introductory diligence discussions with 10 of the potential lenders contacted.

15.     All 12 parties contacted declined to submit a junior DIP financing and/or refinancing proposal. Common reasons cited for declining included: (i) lack of available collateral, (ii) inability to provide funding on a junior/unsecured basis, (iii) amount of debt outstanding to the Prepetition Secured Parties, and (iv) investment size.

16.     Following the initial outreach and further discussions with the Prepetition Secured Parties about their inability to provide adequate DIP financing in an amount necessary to complete a sale process, Raymond James notified the Prepetition Agent of its intent to explore a priming DIP loan. Raymond James promptly reengaged with all 12 parties that were previously contacted as well as eight additional lenders to discuss the prospect of a priming DIP loan. Inclusive of all potential lenders contacted, 14 of the 20 parties declined to provide a proposal for a priming DIP loan. Key considerations included (i) the complexity of promptly valuing the Prepetition Secured Parties' collateral, (ii) conducting diligence on collateral in more than 800 locations in 27 states on a compressed timeline, (iii) concerns about the Prepetition Secured Parties consenting to a priming DIP loan, and (iv) the relatively small size and short duration of the DIP loan.

17. At a point in time when it was uncertain whether the Prepetition Secured Parties would provide sufficient liquidity and time for a sale process through a DIP loan, the Debtors also engaged in discussions with a party affiliated with the Debtors to provide the necessary financing. The Prepetition Agent rejected this as a potential priming DIP loan option.

18. Raymond James has held multiple diligence discussions with the remaining six potential lenders who have expressed interest in providing a priming DIP loan. These parties (i) received background on the Debtors and these Chapter 11 Cases, (ii) received access to a virtual data room with diligence information, and (iii) conducted discussions with the Debtors and their advisors in order to evaluate the priming DIP loan opportunity. Raymond James has received several priming DIP loan term sheets and other parties are continuing their diligence.

19. After numerous discussions with the Prepetition Agent and advisors to the Prepetition Secured Parties and the feedback received from the market with respect to junior DIP loan proposals, the Debtors continued to pursue obtaining postpetition financing from the Prepetition Secured Parties, alongside efforts to solicit priming DIP loan proposals from additional lenders. The Prepetition Secured Parties continue to reject a potential priming DIP loan, but the existence of this option has assisted the Prepetition Secured Parties and Debtors in bridging the gap and reaching an agreement on the proposed DIP Facility. The Debtors and Prepetition Secured Parties engaged in extensive, good faith, arm's-length negotiations concerning the economics, milestones, covenants, and other provisions typical in debtor in possession financings with each of the existing constituencies comprising the Prepetition Secured Parties. In a compressed period of time leading up to and after the Petition Date, the Debtors and the Prepetition Secured Parties have meaningfully improved the terms of the DIP Facility.

7

**The DIP Facility**[3]

20.     The Debtors are now seeking secured post-petition financing and the use of Cash Collateral of the Prepetition Secured Parties subject to the terms and conditions of a proposed interim financing order.

21.     While the terms and conditions of the DIP Facility are more particularly described in the DIP Motion, I note that certain of the prepetition indebtedness of the Prepetition Secured Parties is contemplated to be subject to a roll-up (the "Roll-Up") converting such prepetition indebtedness into indebtedness under the DIP Facility.  The Roll-Up was a topic of significant negotiation and disagreement between the Debtors and the Prepetition Secured Parties and was a necessary condition to obtaining the DIP Facility.  Based on my observations, I believe the Debtors would not have access to DIP financing from the Prepetition Secured Parties without the proposed Roll-Up, which is subject to the entry of a final order approving the DIP Facility.

**The DIP Financing Is the Best Postpetition**
**Financing Arrangement Available to the Debtors**

22.     Based on my experience as a restructuring professional and involvement in the process described above, I believe the DIP Facility represents the best available and most expedient postpetition financing under the circumstances.  As noted above, no party that Raymond James is aware of was interested in providing, or willing to provide, DIP financing to the Debtors on an unsecured or junior basis.  Additionally, the Debtors have concerns that the parties who submitted priming DIP loan proposals to Raymond James and/or continue to conduct diligence with respect to a priming DIP loan will require additional time to complete the required diligence and

---

[3]     The material terms of the proposed DIP Facility are set forth in detail in the DIP Motion. For the avoidance of doubt, any description of the proposed terms of the DIP Facility herein or in the DIP Motion is qualified in its entirety by reference to the proposed interim order approving the borrowing contemplated by the DIP Facility.

documentation to provide the necessary funding. The Debtors and the Prepetition Secured Parties, moreover, agreed to terms that will provide the Debtors with access to much-needed liquidity and an opportunity to maximize value during the pendency of these Chapter 11 Cases.

### Conclusion

23.      Given the financing efforts and process described above and based on my experience as a restructuring professional and involvement in other financing transactions, I believe that the DIP Facility is the best financing option presently available to the Debtors and that the terms of the DIP Facility are in the best interests of the estates.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: March 23, 2023

/s/ Geoffrey Richards
Geoffrey Richards
Senior Managing Director and Head of
Capital Structure Advisory
Raymond James & Associates, Inc.

# EXHIBIT 5

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| MOUNTAIN EXPRESS OIL COMPANY, et al., | Case No. 23-90147 (DRJ) |
| Debtors. [1] | (Jointly Administered) |

## DECLARATION OF MICHAEL HEALY IN SUPPORT OF DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

I, Michael Healy, pursuant to section 1726 of Title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.        I am the Chief Restructuring Officer (the "CRO") of Mountain Express Oil Company ("MEX") and its affiliates (collectively, the "Company").  In addition to serving as MEX's CRO, I am a Senior Managing Director at FTI Consulting, Inc. ("FTI"), a leading global business advisory firm with 121 offices worldwide and over 7,600 professionals.  I have more than 20 years of restructuring experience and have advised companies, lenders, creditors, corporate boards, and equity sponsors across a diverse range of industries both domestically and internationally.

---

[1]     A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/mountainexpressoil. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 Cases is 3650 Mansell Road, Suite 250, Alpharetta, Georgia 30022.



2.      I submit this declaration (the "Declaration") in support of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion"),[2] filed concurrently herewith, of the above-captioned debtors and debtors in possession (the "Debtors") for entry of interim and final orders: (a) authorizing the Debtors to obtain post-petition financing, (b) authorizing the Debtors' further use of cash collateral,[3] (c) granting liens and super-priority administrative claims, and (d) granting adequate protection to certain prepetition secured parties, among other relief.

3.      Unless otherwise indicated, the statements set forth in this Declaration are based on (a) my personal knowledge or views based on my experience; (b) information I have received from the Debtors and my colleagues at FTI who are assisting me in my role as CRO, as well as other advisors of the Debtors; and/or (c) my review of relevant documents.  If I were called upon to testify, I would testify competently to the facts and views set forth herein.

---

[2]      A capitalized term used but not defined herein shall have the meaning ascribed to it in the DIP Motion.

[3]      The Court has previously entered its *Interim Order (A) Authorizing The Use Of Cash Collateral, (B) Providing Adequate Protection, (C) Modifying The Automatic Stay, and (D) Scheduling a Further Hearing* on March 20, 2023 [Docket No. 37] ("Interim Cash Collateral Order").  I understand that the terms of the proposed interim order granting the DIP Motion would incorporate authority granted by the Initial Cash Collateral Order for the Debtors to use cash collateral for the Interim Budget Period specified therein.

A. **DIP Motion Overview**

4.        As the Court is undoubtedly aware from the earlier hearing on the interim use of cash collateral, the proposed DIP Facility is the product of painstaking, arms' length negotiations, with each party represented by independent counsel and advisors.  The DIP Motion requests approval of a multiple draw term loan facility in the total committed amount of $28,600,000.00 under which the Debtors will be able to make an initial draw, following interim approval, of $20,000,000 million.  That interim amount will be sufficient, in my estimation, to meet the Debtors' operating needs and administrative expenses for the next four weeks of these Chapter 11 Cases.  The DIP Motion contains a concise summary of the essential terms of the proposed DIP facility, and also carefully describes those provisions of the proposed financing that are required to be highlighted under applicable rules.

5.        The proposed interest rate under the DIP Facility is 10%.  The financing also contemplates a one-time facility fee of 5% of the new money commitment that would be earned upon closing of the initial draw under the DIP facility but would not be payable until maturity. The DIP Motion also contemplates that a portion of the Prepetition Loans outstanding to the Prepetition Lenders (the "Roll-Up Amount") will be converted into the DIP Facility (*i.e.*, "rolled-up" into the DIP facility), but that relief is subject to the entry of a final order approving the DIP Facility.

6.        As is customary for DIP financing facilities, the DIP liens and the super-priority administrative expense claims granted to the DIP lender on account of the borrowing (as well as the adequate protection liens and super-priority administrative expense claims granted to the Prepetition Lenders) will be subject to a "carve-out" in favor of the Debtors' employees with respect to any accrued but unpaid payroll and associated taxes, as well as the professionals retained

in these Chapter 11 Cases. The "carve-out" is tied to the weekly projection for restructuring fees set forth in the Initial Budget (defined below). This amount will be funded on a weekly basis into an escrow account maintained by the Debtors' bankruptcy counsel until such time as the fees and expenses of professionals are approved by this Court and otherwise authorized for payment.

**B.     The Need for DIP Financing and Use of Cash Collateral**

7.     As was explained on the record of the hearing on March 20, 2023, for entry of the Interim Cash Collateral Order, the Debtors lack sufficient liquidity and do not generate sufficient cash from operations to fund their businesses and meet the administrative expenses associated with a chapter 11 bankruptcy process. In addition, it has become imperative that the Debtors demonstrate their capacity to continue to purchase fuel from their major oil suppliers in order to maintain the uninterrupted operation of their dealer network, not to mention honor the Debtors' obligations to their employees. Without the DIP Facility and the ability to use cash collateral, the Debtors will not have the liquidity needed to operate their businesses, continue to purchase and supply fuel, fund their ordinary course expenditures, or pay the expenses necessary to administer these Chapter 11 Cases. Absent increased funding in the form of the DIP Facility, the Debtors may be compelled to shutter their operations to the permanent detriment of all constituents of these estates.

8.     I am also convinced that approval of the DIP Facility will provide a clear message to the Debtors' oil company vendors and the Debtors' network of dealers that the Debtors will have sufficient liquidity to meet their post-petition obligations.

**C.     The DIP Sizing Process**

9.     In consultation with the Debtors' advisors, including me and other members of my financial advisory team from FTI, the Debtors' management team reviewed and analyzed the

Company's projected cash flows and prepared a budget outlining the Debtors' postpetition cash needs. Specifically, the budget is a forecast that sets forth all material cash receipts and cash disbursements on a weekly basis over a 13-week period, pursuant to which the Debtors will fund operations and the costs associated with these Chapter 11 Cases. The initial budget is attached hereto as **Exhibit 1** (the "Initial Budget").

10. Under my direction and oversight, professionals at FTI worked with the Debtors and their other advisors to formulate the Initial Budget, which includes reasonable and foreseeable expenses to be incurred, and the costs of administering the Chapter 11 Cases, during the applicable period. The Debtors' use of the proceeds of the DIP Facility will be governed by the Initial Budget, subject to permitted variances.

11. Given the Company's current liquidity position and an estimate of the potential duration of these cases, the Debtors and their advisors determined that any DIP Facility amount would need to be sufficient to fund the Company for at least a four-month process in order to provide sufficient liquidity to run an orderly process to maximize value. I am comfortable that the DIP Facility proposed by the DIP Motion will enable the Debtors to meet their administrative obligations over this period and fully stabilize the Debtors' operations. Based on that timeline, FTI has (i) forecasted weekly cash flows through July 14, 2023; (ii) layered in appropriate adjustments for chapter 11 expenses; and (iii) from that, derived the funding that would be required to maintain a reasonable minimum amount of cash during that period. As has been noted on the record, the Debtors' cash flow is highly variable and it is thus imperative for the Debtors to maintain a certain minimum level of cash on hand. Under the Initial Budget, FTI has forecast a weekly end cash balance of at least $4 million.

12. Based on these assumptions and analysis, the Debtors have determined they require approximately $28.6 million of new money financing through the course of these Chapter 11 Cases, of which $20 million must be available during the interim period. This interim amount is vital to avoid immediate and irreparable harm to the Debtors' estates.

13. Absent authority to enter into and access the proceeds of the DIP Facility, even for a limited period of time, the Debtors will be unable to continue operating their business, resulting in a deterioration of value and permanent harm to the Debtors' estates. Thus, the Debtors and their advisors are in agreement that the Debtors require immediate access to the proceeds of the DIP Facility, as well as access to Cash Collateral, to finance their operations and continue operating as a going concern during the pendency of these Chapter 11 Cases.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 23rd day of March, 2023 at New York, NY

<i>/s/ Michael Healy</i>             
Michael Healy

# EXHIBIT 1

**(*Initial Budget*)**

DOCS_DE:242669.4 58614/002

| MEX DIP Budget dated March 23, 2023 Mountain Express Oil ($ in '000s) | Week 1 Forecast 24-Mar-23 | Week 2 Forecast 31-Mar-23 | Week 3 Forecast 7-Apr-23 | Week 4 Forecast 14-Apr-23 | Week 5 Forecast 21-Apr-23 | Week 6 Forecast 28-Apr-23 | Week 7 Forecast 5-May-23 | Week 8 Forecast 12-May-23 | Week 9 Forecast 19-May-23 | Week 10 Forecast 26-May-23 | Week 11 Forecast 2-Jun-23 | Week 12 Forecast 9-Jun-23 | Week 13 Forecast 16-Jun-23 | Subtotal 13-Week Period WE 3/24 - WE 6/16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | | | | | |
| Net Fuel Profit | $2,771 | $1,969 | $3,465 | $2,211 | $2,239 | $2,536 | $2,808 | $1,461 | $2,289 | $2,536 | $2,700 | $2,143 | $2,143 | $31,272 |
| Rent Income | – | – | 5,106 | – | 490 | – | 5,106 | – | 490 | – | 3,069 | 2,046 | 568 | 16,876 |
| Net Retail Supporting Operations | (411) | (129) | (70) | 479 | 681 | (468) | 203 | 267 | 292 | (518) | 253 | 114 | 114 | 806 |
| Other Receipts | – | – | – | – | – | – | – | – | – | – | – | 146 | 146 | 292 |
| **Total Operating Receipts** | **$2,360** | **$1,840** | **$8,501** | **$2,690** | **$3,410** | **$2,068** | **$8,117** | **$1,729** | **$3,071** | **$2,018** | **$6,022** | **$4,449** | **$2,971** | **$49,246** |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Rent Expense | – | – | (8,472) | – | – | – | (8,490) | – | – | – | (8,481) | – | – | (25,443) |
| Payroll & Benefits | (279) | (1,037) | (279) | (1,037) | (279) | (1,037) | (279) | (1,037) | (279) | (1,037) | (279) | (783) | (196) | (7,841) |
| Vendor Disbursements | (6,000) | (7,525) | (3,051) | (1,525) | (1,338) | (1,777) | (1,036) | (725) | (1,338) | (1,777) | (953) | (462) | (462) | (27,971) |
| Utilities & Insurance | (3) | (3) | (344) | (9) | (19) | (57) | (338) | (9) | (19) | (19) | (11) | (338) | (92) | (1,335) |
| Other Operating Disbursements | (15) | (13) | (36) | (19) | (19) | (17) | (15) | (36) | (19) | (17) | (15) | (36) | (8) | (253) |
| **Total Operating Costs** | **($6,297)** | **($8,578)** | **($12,182)** | **($2,591)** | **($1,654)** | **($2,886)** | **($10,179)** | **($1,790)** | **($1,654)** | **($2,840)** | **($10,087)** | **($1,346)** | **($759)** | **($62,843)** |
| **Operating Cash Flow** | **($3,937)** | **($6,738)** | **($3,681)** | **$99** | **$1,756** | **($818)** | **($2,062)** | **($62)** | **$1,417** | **($822)** | **($4,066)** | **$3,103** | **$2,213** | **($13,597)** |
| **Non-Restructuring Related** | | | | | | | | | | | | | | |
| Inventory | 300 | 700 | – | – | 1,100 | – | – | – | – | – | – | – | – | 2,100 |
| Capital Expenditures | – | – | (500) | – | – | (500) | – | – | – | (200) | – | – | – | (1,200) |
| **Total Non-Restructuring Related** | **$300** | **$700** | **($500)** | **–** | **$1,100** | **($500)** | **–** | **–** | **–** | **($200)** | **–** | **–** | **–** | **$900** |
| **Restructuring Related** | | | | | | | | | | | | | | |
| Restructuring Fees [1] | (656) | (656) | (631) | (2,869) | (669) | (669) | (1,400) | (450) | (450) | (450) | (1,000) | (550) | (550) | (11,001) |
| Other Restructuring Related | 279 | (250) | – | (167) | – | – | – | (238) | – | – | – | – | (259) | (635) |
| **Total Restructuring Related** | **($377)** | **($906)** | **($631)** | **($3,036)** | **($669)** | **($669)** | **($1,400)** | **($688)** | **($450)** | **($450)** | **($1,000)** | **($550)** | **($809)** | **($11,636)** |
| **Net Cash Flow** | **($4,014)** | **($6,945)** | **($4,812)** | **($2,937)** | **$2,187** | **($1,987)** | **($3,462)** | **($750)** | **$967** | **($1,472)** | **($5,066)** | **$2,553** | **$1,403** | **($24,333)** |
| | (4,014) | (6,945) | (4,812) | (2,937) | 2,187 | (1,987) | (3,462) | (750) | 967 | (1,472) | (5,066) | 2,553 | 1,403 | |
| **Cash (Unrestricted)** | | | | | | | | | | | | | | |
| Beginning Balance | $3,696 | $19,683 | $12,738 | $7,926 | $13,588 | $15,776 | $13,789 | $10,327 | $9,577 | $10,544 | $9,072 | $4,007 | $6,560 | $3,696 |
| Net Cash Flow | (4,014) | (6,945) | (4,812) | (2,937) | 2,187 | (1,987) | (3,462) | (750) | 967 | (1,472) | (5,066) | 2,553 | 1,403 | (24,333) |
| DIP Draws | 20,000 | – | – | 8,600 | – | – | – | – | – | – | – | – | – | 28,600 |
| **Ending Unrestricted Cash Balance** | **$19,683** | **$12,738** | **$7,926** | **$13,588** | **$15,776** | **$13,789** | **$10,327** | **$9,577** | **$10,544** | **$9,072** | **$4,007** | **$6,560** | **$7,963** | **$7,963** |
| **DIP** | | | | | | | | | | | | | | |
| Beginning Balance | – | $20,000 | $20,000 | $20,000 | $28,600 | $28,600 | $28,600 | $28,600 | $28,600 | $28,600 | $28,600 | $28,600 | $28,600 | – |
| DIP Draws | 20,000 | – | – | 8,600 | – | – | – | – | – | – | – | – | – | 28,600 |
| **Ending DIP Balance Excl. Roll-Up** | **$20,000** | **$20,000** | **$20,000** | **$28,600** | **$28,600** | **$28,600** | **$28,600** | **$28,600** | **$28,600** | **$28,600** | **$28,600** | **$28,600** | **$28,600** | **$28,600** |

[1] Excludes Raymond James transaction fee, the quantum of which is unknown and depends on the nature and terms of the transaction.

# EXHIBIT 6

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| MOUNTAIN EXPRESS OIL COMPANY, et al., | Case No. 23-90147 (DRJ) |
| Debtors. [1] | (Jointly Administered) |

**DECLARATION OF MICHAEL HEALY IN SUPPORT OF
DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER
(I) AUTHORIZING AND APPROVING A NON-INSIDER
KEY EMPLOYEE RETENTION PLAN AND (II) GRANTING RELATED RELIEF**

I, Michael Healy, declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Restructuring Officer (the "CRO") of Mountain Express Oil Company ("MEX") and its affiliates (collectively, the "Company").  In addition to serving as the Company's CRO, I am a Senior Managing Director at FTI Consulting, Inc. ("FTI"), a leading global business advisory firm with 121 offices worldwide and over 7,600 professionals.  I have more than 20 years of restructuring experience and have advised companies, lenders, creditors, corporate boards and equity sponsors across a diverse range of industries both domestically and internationally.

2.      I submit this declaration (the "Declaration") in support of the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing and Approving a Non-Insider Key Employee*

---

[1]  A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/moutainexpressoil.  The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 Cases is 3650 Mansell Road, Suite 250, Alpharetta, Georgia 30022.

*Retention Plan and (II) Granting Related Relief* (the "KERP Motion"),[2] filed concurrently herewith, of the above-captioned debtors and debtors in possession (the "Debtors"). The KERP Motion requests an order authorizing the Debtors to implement a retention program for a small group of non-insider, non-executive employees. The program would apply to 29 employees and the total cost of the program would not exceed $522,000 (inclusive of a $50,000 supplemental cash pool for certain non-insider employees that are not otherwise included in the program).

3.      Unless otherwise indicated, the statements set forth in this Declaration are based on (a) my personal knowledge or views based on my experience; (b) information I have received from the Debtors and my colleagues at FTI who are assisting me in my role as CRO, as well as other advisors of the Debtors; and/or (c) my review of relevant documents. If I were called upon to testify, I would testify competently to the facts and views set forth herein.

4.      Following the commencement of these Chapter 11 cases, the Debtors have suffered unexpected attrition among their rank and file employees working at their corporate headquarters and in certain regional field offices. Prepetition, the Debtors had already been stretched thin by losses in their accounting, finance and operations departments and cannot suffer further reductions without adversely impacting the conduct of these cases. Since the petition date alone, the Debtors have lost the services of eight key employees, including a permit and licensing specialist, a retail controller and several district and territory managers.

5.      In order to alleviate the detrimental effect that continued attrition would have on the Debtors' ongoing operations, I worked with the Debtors' management team to formulate a cash-based retention program to retain certain vital employees over the course of the sale process contemplated during the case. The program applies only to non-insider, non-executive employees

---

[2] A capitalized term used but not defined herein shall have the meaning ascribed to it in the KERP Motion.

working at the Debtors' headquarters facilities (and a handful of key field employees) but not to retail, store-level employees.   In my view, each of the KERP participants serves a vital role at the Company and cannot be readily replaced.  The KERP program, and each of its 29 participants, has also been vetted and approved by the Debtors' Executive Vice President/Chief Operations Officer.

6.    As described in my First Day Declaration, the Debtors operate a vertically-integrated fuel supply and distribution network.   The Debtors are parties to fuel purchase agreements with virtually every major domestic oil company.  The acquired fuel is then distributed by the Debtors across their network of convenience stores, fuel stations and travel centers.  Some of these are controlled-locations (*i.e.,* where the Debtors hold a leasehold interest in the subject premises), and the remainder are non-controlled locations (*i.e.,* where third parties own the business premises).  The Debtors' controlled locations are partly operated in-house and partly by dealers. The complex, detailed and daily process of tracking and matching fuel purchase and supply commitments requires a highly skilled and dedicated workforce.  The Debtors operate in numerous states, each with varying logistics, permitting and payment stream requirements.

7.    To maintain their high standards and ensure their fuel supply system continues to perform as anticipated, it is vital the Debtors retain their specialized workforce while in chapter 11. Replacing these employees cannot occur without substantial costs, delays and disruptions in the Debtors' carefully synchronized wholesale and retail operations.

8.    Retaining the Debtors' key non-insider employees is also critical as the Debtors embark on a sale process.  By implementing the KERP program, the Debtors seek to acknowledge the extraordinary work that the headquarters team has been doing since the cases were commenced and to assure these employees that their continued, focused efforts will be recognized.

9.      The KERP program covers 29 KERP Participants.  The program is based on the Debtors' current compensation program (the KERP payments are based on 20% of the employee's annual base salary) and is intended to provide a meaningful reward for employees to remain with the Debtors during the chapter 11 process.  The KERP Participants perform a variety of important business functions for the Debtors that are vital to the Debtors' ability to preserve and enhance stakeholder value.  Most of the KERP Participants are employed in the Debtors' accounting, finance, treasury and operations departments.  Many of them have developed deep institutional knowledge regarding the Debtors' business operations that would be difficult and expensive to replace on an expedited basis.  In addition, the KERP Participants have provided important support to the Debtors' advisors in meeting the additional demands imposed by the chapter 11 process.

10.      The Non-Insider KERP consists of a cash pool for retention payments to 29 non-insiders in an aggregate amount of approximately $521,000.  Each participant is entitled to receive a retention payment not to exceed 20% of such person's base annual salary (with the average payout being approximately $16,268).[3]  Payments to each participant will be structured as two equal cash payments, with half payable shortly following the approval of the KERP program and the balance paid following the consummation of a sale of substantially all of the Debtors' asserts.  If a KERP Participant who receives the first installment under the KERP program voluntarily ceases his or her employment prior to the consummation of a sale, such installment would be subject to recapture by the Debtors.  The Non-Insider KERP contemplates an installment payout feature that corresponds to the anticipated sale process in the chapter 11 cases.  The second of the

---

[3]   The KERP also contemplates a modest supplemental cash pool of $50,000 for the purpose of rewarding extraordinary contributions to the Debtors' sale effort.  The supplemental cash pool will be available to those non-insider, non-executive employees who are not KERP Participants.  No more than $15,000 will be awarded to any single employee.  The amount and recipient of any award will be determined by the Debtors' management team, in their discretion.  An award from the supplemental cash pool would be payable at the time the final payment under the KERP program.

Non-Insider KERP's two installments would be distributed at closing of a sale, which provides a retentive effect on the KERP Participants that is directly tied to maintaining the Debtors' current operations through the consummation of a transaction.

11.     Although I have raised the need for a KERP program with advisors to the DIP Lenders, the Approved Budget under the Debtors' DIP financing does not, at present, reflect the cost of the Non-Insider KERP, nor have the DIP Lenders agreed to the proposed KERP program. The Debtors intend to amend the current Approved Budget to reflect the cost of the Non-Insider KERP and will submit the amended budget for review by the DIP Lenders in accordance with the interim order approving the DIP financing that was entered on March 23, 2023.

12.     In formulating the KERP program, we evaluated whether the KERP's design, structure, and cost are reasonable and consistent with market practices.  FTI analyzed twelve (12) non-insider plans approved in recent chapter 11 cases during the period from June 2016 through March 2022 (the "KERP Peer Group").  The KERP Peer Group was comprised of comparable non-insider plans (mostly in the oil and gas, and energy industries) with an average total cost of approximately $2.8 million.  Among the KERP Peer Group, the average number of non-insider participants was 60 and the average cost per participant was approximately $51,000.  Here, the total cost of the proposed Non-Insider KERP pool is under $522,000 with an average payment per participant of approximately $16,000, well-beneath the costs of comparable retention plans in the KERP Peer Group. (In addition, among the few plans in the KERP Peer Group that featured a supplemental cash pool, the amount of the pool was $300,000 – here, the Debtors propose a supplemental cash pool of $50,000.)  FTI also looked at the Debtors' historical compensation practices as a gauge for the reasonableness of the KERP program.  Although the Debtors have not

historically offered discretionary bonuses to supplement an employee's annual compensation, this is one reason that I believe the proposed KERP will have a meaningful retentive effect.

13.     The KERP Participants include highly trained and specialized personnel that would be extremely difficult to replace without a negative effect on the Debtors' business.  Given the increasing demands placed upon the potential KERP Participants during the chapter 11 cases, providing compensation designed to motivate key employees to remain with the Debtors through completion of the sale process is critical.  It is my opinion that the proposed KERP program will serve its intended purpose of maintaining the Debtors' key non-insider workforce intact and engaged through the consummation of a sale.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 11th day of April, 2023, at New York, NY

                                        */s/ Michael Healy*
                                        Michael Healy