**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MOUNTAIN EXPRESS OIL COMPANY, *et al.*,[1] | ) Case No. 23-90147 (DRJ) |
| | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) |

**NECESSITY LANDLORDS' (I) OBJECTION TO DEBTORS' REQUEST FOR EMERGENCY RELIEF AND TO SCHEDULE EXPEDITED HEARING UNDER LOCAL RULE OF BANKRUPTCY PROCEDURE 9013-1(i) AND (II) PRELIMINARY OBJECTION TO DEBTORS' EMERGENCY FIRST OMNIBUS MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO REJECT CERTAIN UNEXPIRED LEASES, SUBLEASES AND RELATED CONTRACTS PURSUANT TO 11 U.S.C. § 365**

Landlords (i) AFN ABSPROP001, LLC, (ii) ARG MESMOAR001, LLC, (iii) ARG MEVNAAL001, LLC, and (iv) ARG E19PCK001, LLC, each affiliated with The Necessity Retail REIT, Inc. (collectively, the "Necessity Landlords") hereby file this (I) Objection to Debtors' Request for Emergency Relief and to Schedule Expedited Hearing Under Local Rule of Bankruptcy Procedure 9013-1(i) and (II) Preliminary Objection to the Emergency Motion [Docket No. 295] (the "Rejection Motion")[2] of the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), seeking, among other things, entry of an order on an emergency basis to reject certain leases with the Necessity Landlords. In support of the Objection, the Necessity Landlords respectfully state as follows:

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at www.kccllc.net/mountainexpressoil. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 Cases is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Rejection Motion.

AFDOCS:27320827.5

## PRELIMINARY STATEMENT

1.      These cases appear to be in flux. Information flow from the Debtors has been undisputedly constrained and even the limited information provided thus far reveals that the path forward, and implementation of that path, are uncertain. The Debtors' lack of disclosure is troubling and compounding the uncertainty. By way of example, out of the blue, with one day's informal notice to the Necessity Landlords and without any apparent notice to the Committee, and in an apparent response to the Necessity Landlords' demand that the Debtors satisfy their section 365(d)(3) obligation to pay April rent, the Debtors filed the Rejection Motion. In a sudden self-created rush to file the Rejection Motion, the Debtors seem to have given no consideration to the consequences of seeking such emergency relief. The Debtors certainly provide no plan for dealing with those consequences.

2.      This Rejection Motion is not a simple motion whereby a debtor rejects certain unprofitable leases for premises from which they have vacated. Far from it. The Debtors here operate in a highly regulated industry involving underground storage tanks ( the "UST's") where the risks and consequences of unattended operations are significant.[3] The Rejection Motion seeks to reject 28 "Primary Leases" with the Necessity Landlords and 27 subleases with 27 different sub-tenants who currently occupy and operate the properties in various capacities. The Debtors also seek to reject another 27 agreements with parties who, among other things, operate concessions, but not reject the fuel supply agreements under which the Debtors sell fuel products to those rejected dealers that operate the convenience stores at those same subleased locations.[4]

---

[3] The Debtors' First Day Declaration of Michael Healy [ECF No. 57] (the "First Day Decl") describes some of the steps the Debtors claim to take to ensure state and regulatory environmental compliance, including visual inspections and compliance inspections performed by a third party tank inspection service company and a related party of the Debtors. *See* First Day Decl. at ¶ 17.

[4] It is unclear to the Necessity Landlords why the Debtors elected not to reject these fuel agreements if the operators will no longer be in place.

AFDOCS:27320827.5

Incredibly, the Rejection Motion is silent as to the exit plan from these businesses, the surrender of the premises, and an orderly transition process to among other things, ensure compliance with the various state regulatory regimes governing ownership, operation and maintenance of the UST's. Other than claiming not to reject the Debtors' or non-debtor affiliates' provision of fuel at these locations, the Motion ignores operations, or wind-down or transition of such operations.

3. The alleged emergency stems solely from the Debtors' desire to reject the Leases (defined below) prior to May 1, 2023, so as to avoid incurring the obligation for May rent.[5] The Debtors provide no other factual basis for the emergency, and their actions indicate there is none. If there was an emergency, one would anticipate the Debtors would have favored transparency and immediately undertaken steps to coordinate among the more than 55 counterparties and ensure a smooth transition (or any transition or cessation), out of these locations. The mere nature of the operations requires it. The Debtors instead include absolutely no discussion or disclosures or information as to whether the operations at these locations are being continued, mothballed, or suspended, and there are significant differences and requirements for each. Nor do they explain how they intend to properly surrender the premises by the May 1st payment date. Even if all 27 sub-tenants and 27 other counterparties could vacate the premises by April 27th, it wouldn't necessarily be safe to do so. There needs to be a clear gameplan for operations and addressing the USTs (testing, contamination, remediation, leak detection, etc.), including dealing with the fuel onsite and in the UST's.[6] The Leases include highly specific provisions for dealing with the UST's upon termination. These locations cannot sit idle. The Debtors cannot simply

---

[5] The Debtors include no location by location analysis or any information about the loss (if any) attributable to the proposed rejected locations and specifically, the difference between the rent due under the Leases and the amounts received by the Debtors from subleases, fuel contracts and other revenue sources.

[6] Pursuant to the Leases, the Debtors have indemnified the Necessity Landlords for all environmental liabilities and losses arising at the sites, including for example in any way related to environmental laws, hazardous materials, regulated substances, USTs, or other environmental matters concerning the property, including all fines, penalties, claims or expenses imposed from environmental law and cost remediation.

AFDOCS:27320827.5

walk away and ignore state law requirements or put the public and environment at risk. The proposed emergency relief invites chaos, risk and uncertainty and, potentially a legitimate emergency.

4. There is a better path forward. Instead of hearing the Rejection Motion on an emergency basis, the Debtors should coordinate and communicate with the counterparties and Committee, and establish an organized process for dealing with the Leases, subleases and other agreements. The Debtors must address whether the operations are being continued, suspended, or terminated, and how necessary regulatory and safety compliance will be implemented. The Debtors also need to explain how they propose to supply fuel to locations the Debtors themselves are seeking to reject. The Debtors' participation is essential, as the Necessity Landlords have no information about the sub-tenant operators, their contracts with the Debtor-related environmental service providers, or any open regulatory or environmental contamination issues.[7] In addition, the Committee and other parties should be afforded reasonable time to review and access information and form their own view on sale, versus termination and suspension, including the costs and benefits of each approach and the time, nature, approach and cost of effectuating a termination of operations at these locations. To reject these Leases and agreements precludes optionality for the Debtors and these estates by losing the chance to sell the operations and provide a process to transition operations. The Rejection Motion makes this impossible to ascertain or consider. To state this simply, there should be a plan.

5. Given that the Debtors fail to demonstrate cause to shorten time, and the possibility that an expedited hearing on shortened notice could result in unintended environmental, safety, or other harm at the sites and may not be beneficial to the estates or

---

[7] The Necessity Landlords understand there was a fire at one of the locations. This location has no subtenant and is subject to the Rejection Motion The Necessity Landlords have requested further information about insurance proceeds and re-building of that site.

creditors (and is harmful to the Necessity Landlords and other third parties), the Necessity Landlords request that the Court deny any emergency determination of the Rejection Motion and either schedule a hearing in the ordinary course or alternatively, allow the parties to develop a comprehensive schedule and process for dealing with rejection to the extent warranted. This very well may be a topic for consensual resolution among the Debtors, the Necessity Landlords, the Committee, and any other relevant interest holders, but allowing the expedited timeline that the Debtors request will make that impossible. Under these circumstances, it is premature to consider the highly complicated, substantive relief sought through the Rejection Motion, and it therefore should not be considered on the Debtors' proposed "emergency" timeline.

## BACKGROUND

6. The Necessity Landlords are landlords under the twenty-eight (28) leases (including a master lease) identified on Exhibit 1 to the Rejection Motion (collectively, the "Leases"). A Debtor counterparty is tenant under each Lease and lessor under the subleases to the operators. Each of the Leases generally requires, among other things, payment of all rent as provided thereunder on the first day of each month.

7. To date, the Debtors have not paid any rent due and owing under the Leases from January 2023 onwards except as set forth below.[8]

8. On March 18, 2023 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for bankruptcy protection under chapter 11 of the

---

[8] For further background on the Leases and the Necessity Landlords' efforts to enforce them prepetition, see the *Objection of the Necessity Landlords to Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use of Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 293] (the "DIP Objection") filed on April 18, 2023.

Bankruptcy Code. No trustee has been appointed and the Debtors continue to operate their businesses as debtors-in-protection.

9. As of the date of this Objection, the Necessity Landlords have not received any payment on account of April rent under any of the Leases that are subject to the Rejection Motion. The Landlords received a belated partial payment on account of the remaining Leases (i.e. those that were not the subject of the Rejection Motion) on April 21, 2023. The Debtors still have paid no rent from January to March 2023 under any of the Leases.

10. The Debtors, non-debtor affiliates, their sub-tenants or other counterparties are currently in possession of and using and operating the leased properties. These operations generally include the use and operation of USTs at each of the leased premises for purposes of storing and selling fuel subject to fuel supply agreements, as well as various operations related to the management of convenience stores on the leased premises. As a potential environmental hazard, the USTs are subject to various state and federal regulations and environmental laws, as observed by the Debtors in the First Day Decl. These regulations include, but are not limited to, the requirement to have the USTs regularly inspected, a role that the Necessity Landlords understands to be filled by certain non-debtor affiliates of the Debtors. The Necessity Landlords neither own nor operate the USTs at each of the leased premises. The Necessity Landlords have virtually no recent information as to the operations of the leased premises.

11. The Debtors have neither sought nor been granted any extension of their postpetition obligations (including with respect to the Leases) under § 365(d)(3) of the Bankruptcy Code.

12. On April 18, 2023, the Debtors filed the Rejection Motion.

**OBJECTION**

13.     Bankruptcy Rule 9006(d) provides that "a written motion . . . and notice of any hearing shall be served not later than seven days before the time specified for such hearing[,]" and that "any written response shall be served not later than one day before the hearing . . . ." Local Rule 9013-1(b) provides that any responsive pleading to a motion filed in the Bankruptcy Court must be filed and served within 21 days of the date that such motion was served. Thus, the Necessity Landlords would normally have until May 9, 2023 to file any response to the Rejection Motion, with a hearing scheduled for a date thereafter.

14.     Furthermore, under Bankruptcy Rule 9014(c), the evidentiary provisions of, *inter alia*, Bankruptcy Rule 7026 and 7028–37 apply to contested matters brought by motion. Therefore, under normal circumstances, the Necessity Landlords or other parties would have time to obtain information and documents from the Debtors or otherwise be entitled to conduct discovery and an opportunity to work out an agreed plan as to the operations, whether that plan is to continue, transition or suspend operations, and address other attendant issues, challenges and regulatory compliance and licensing, if required. Time is especially important here, where the Debtors provide very little information or disclosures and the operations are extremely complicated.

15.     Instead, the Debtors are asking for expedited relief and a hearing to be held on April 27th, with any responses due by that time and relief to be entered on that same day. The Debtors provide no evidence however, by affidavit or otherwise, of the alleged emergency nature of the relief sought through the Rejection Motion. The only basis proffered is that the Debtors will incur their May rent obligations if they fail to reject the Leases prior to May 1, 2023. But the Debtors do not explain the performance at these locations and the difference between the rent

7

obligation under the Leases and the revenue the Debtors generate at those locations. In fact, the record indicates that despite not paying rent since January, the Debtors have acted with no sense of urgency to organize and undertake a responsible process for dealing with the 50 counterparties at 28 locations and addressing the lease issues.

16. This is a manufactured "emergency" entirely of the Debtors' own making. The Debtors have thus far not provided any information concerning the subleases or the identities of the sub-tenants, the operations or regulatory or licensing compliance. This is fundamental information of which the Necessity Landlords, Committee and other parties should be aware. The Debtors have not explained what outreach has been made to these various sub-tenants who may not have counsel representing them in these cases. The Debtors have not explained how and why they are continuing to supply fuel to these locations since those contracts are not to be rejected, or how the Debtors are dealing with the USTs. The Debtors appear to assume that they can obtain a rejection order on April 27th without telling the Court any of this information and then wipe out any obligations or responsibilities they have, resulting in chaos, and potentially litigation, over these locations.

17. In contrast to the Debtors' illusory emergency, granting the expedited relief could in fact engender legitimate emergencies at the leased premises and throw operations into chaos. Each of the USTs requires specialized and regular service, maintenance, and oversight. The Necessity Landlords are not aware of who provides these services for the USTs, and the Debtors' plan to simply reject the Leases (and their corresponding sub-leases) as of April 27 puts forth no transition plan or details whatsoever. The Necessity Landlords have no idea what the Debtors intend to do with the USTs at the leased premises, and is unaware if the Debtors know either. These USTs pose significant environmental hazards if not properly maintained and serviced.

obligation under the Leases and the revenue the Debtors generate at those locations. In fact, the record indicates that despite not paying rent since January, the Debtors have acted with no sense of urgency to organize and undertake a responsible process for dealing with the 50 counterparties at 28 locations and addressing the lease issues.

16. This is a manufactured "emergency" entirely of the Debtors' own making. The Debtors have thus far not provided any information concerning the subleases or the identities of the sub-tenants, the operations or regulatory or licensing compliance. This is fundamental information of which the Necessity Landlords, Committee and other parties should be aware. The Debtors have not explained what outreach has been made to these various sub-tenants who may not have counsel representing them in these cases. The Debtors have not explained how and why they are continuing to supply fuel to these locations since those contracts are not to be rejected, or how the Debtors are dealing with the USTs. The Debtors appear to assume that they can obtain a rejection order on April 27th without telling the Court any of this information and then wipe out any obligations or responsibilities they have, resulting in chaos, and potentially litigation, over these locations.

17. In contrast to the Debtors' illusory emergency, granting the expedited relief could in fact engender legitimate emergencies at the leased premises and throw operations into chaos. Each of the USTs requires specialized and regular service, maintenance, and oversight. The Necessity Landlords are not aware of who provides these services for the USTs, and the Debtors' plan to simply reject the Leases (and their corresponding sub-leases) as of April 27 puts forth no transition plan or details whatsoever. The Necessity Landlords have no idea what the Debtors intend to do with the USTs at the leased premises, and is unaware if the Debtors know either. These USTs pose significant environmental hazards if not properly maintained and serviced.

The Debtors cannot simply walk out on their regulatory and environmental responsibilities without communicating any kind of plan or process for doing so. That is, however, exactly what the Debtors intend to do, rather than address the "emergency" of incurring May rent under the Leases. It bears mentioning as well that, because of the Debtors' indemnity obligations under the Leases, any problems arising from abandonment of the USTs could result in a substantial liability for the Debtors and their estates, potentially far in excess of whatever the May rent obligations would be.

18. Further complicating matters is the fact that each site is further subject to additional agreements, including but not limited to fuel supply agreements (which implicate the USTs), which information once again the Debtors have not provided to the Necessity Landlords. The Necessity Landlords lack any kind of clarity on the situation that will result from rejection of the Leases, and an unwarranted acceleration of that process will only serve to further complicate matters to the Necessity Landlords' prejudice.

19. To the best of the Necessity Landlords' knowledge (which knowledge is limited by the Debtors' lack of facilitation and disclosure), each of the properties subject to the Leases is still currently occupied by the Debtors' sublessee. The Debtors do not provide justification as to why the Court should enter a rejection order while the premises remain occupied by their sub-tenants. *See*, *e.g.*, *In re Chi-Chi's, Inc.*, 305 B.R. 396, 399 (Bankr. D. Del. 2004) (denying retroactive effective date of rejection because premises were still occupied by sublessee, because "[t]he more appropriate date is the day that the Debtors surrendered the premises to the Landlords, and the Landlords were able to enter into agreements with the current tenants); *In re Cafeteria Operators, L.P.*, 299 B.R. 384, 394 (Bankr. N.D. Tex. 2003) (same).

20. There is no emergency here. The Debtors defaulted on the Leases in January 2023 at the latest, prompting the Necessity Landlords to send multiple demand letters and finally bring state court actions against the Debtors to enforce the terms of the Leases. During the entire timespan, the Debtors' subtenants have occupied the properties and presumably continued to pay the Debtors rent, while the Debtors remitted nothing to the Necessity Landlords. Operations continue and presumably the Debtors and operators have been in compliance with all regulatory and leasing requirements. The Debtors have not notified the Necessity Landlords of any issues. In fact, the Debtors have not provided any information to the Necessity Landlords for a period of time. Nothing new or immediate has been occasioned by the Debtors' bankruptcy filing. The Necessity Landlords are not aware of any new or immediate issues. If this were a true emergency, the Debtors would have (i) filed the Rejection Motion immediately after the Petition Date, (ii) not have given a ten-day window for the requested relief and (iii) taken clear steps to effectuate an orderly winddown or transition of the premises. There has been no discussion whatsoever about the operations with the Necessity Landlords.

21. The Court should not reward the Debtors' purposeful delay by granting the Rejection Motion on an emergency basis, to the prejudice of the Necessity Landlords and the detriment of the Debtors' estates. Rather, the Court should schedule the Rejection Motion on the Court's calendar in the ordinary course, and allow sufficient time for the Necessity Landlords to obtain information and documents or otherwise conduct discovery, consider what is the best path forward, the merits of a sale versus rejection, and the Debtors, Committee, Necessity Landlords, and other relevant parties should begin to discuss a continuation or orderly winddown, suspension, or transition process. There is an approach here, but that approach will take time.

22. Furthermore, providing the usual timeline to gather information and documents and allowing discovery will allow the Necessity Landlords, Committee, and other interest holders, including the Committee, to properly investigate and test the Debtors' plan. Indeed, it appears possible that the Necessity Landlords, the Debtors, and other interest holders like the Committee could reach a consensual plan to facilitate the Debtors' rejection of these Leases and their abandonment of the leased premises back to the Necessity Landlords. The Necessity Landlords are certainly willing to entertain any discussions to that effect. However, any realistic path forward is simply impossible on the Debtors' proposed schedule. The Debtors have not afforded either information or time enough to make that possible.

23. The Debtors have provided no information or documents related to sites subject to the Leases, which at a minimum should have been provided to the Necessity Landlords and the Committee in order to determine if there is any "value" associated with the Leases and the costs and other exposure with respect to the treatment of operations at these locations. While the Rejection Motion claims that the Debtors' fuel supply agreements partially offset the "delta" between the rent paid under the Leases and the rent received under the associated subleases, the Debtors apparently fail to account for other associated sales, such as food and beverage, etc. Nor they disclose the overall "delta" at each property. The Rejection Motion also fails to consider the costs of the path that the Debtors seem to be taking and the costs of failing to allow a sale process to occur.

24. Furthermore, the Debtors' business model is based upon subleasing at a commercially lower rate with the expectation of recouping those amounts through the fuel supply agreements. Other potential lessees may have more profitable uses for the sites that will make the Leases more appealing. If the Court grants the Rejection Motion on an emergency

basis, the Debtors' estates will never know if that is the case, and any potential value that could have been realized through assignment will instead be converted in an unsecured claim in the millions of dollars.  In fact, rejection on an expedited basis will cause chaos rather than any orderly winddown or transition.  The Debtors should not be permitted to take such drastic action without giving the Necessity Landlords, the Committee, and any other stakeholders an opportunity to examine alternatives and determine if the Debtors' statements are supported or not, and if supported, provide for a winddown and surrender that is orderly and designated to efficiently winddown operations and surrender the properties.

25. In short, there is no reason or basis for entertaining the substantive merits of the Rejection Motion on an emergency basis.  Interest holders must be given the necessary information and the opportunity to determine if a consensual path forward is possible.  There will be a detrimental impact to these estates should the Debtors simply file the Rejection Motion, provide no information or documents concerning the financials or the day-to-day operations of the leased premises, including the critically important information and plan for the USTs, regulatory and environmental and licensing compliance, and then walk away from the Leases.. The Court should therefore deny the expedited relief sought by the Rejection Motion and allow matters to proceed along a reasonably timeline.

## RESERVATION OF RIGHTS

26. The Necessity Landlords reserve all rights to supplement and/or amend this Objection prior to or at any hearing thereon, in the event that the Necessity Landlords' objections raised herein are not resolved or to further address the Rejection Motion or any other ancillary issues.

## CONCLUSION

WHEREFORE, The Necessity Landlords respectfully request that this Court enter an order (i) denying emergency relief with respect to the Rejection Motion, (ii) scheduling a hearing on the Rejection Motion in the ordinary course in accordance with the Bankruptcy Rules and the Local Rules, and (iii) granting such other relief as the Court may deem proper.

Dated: April 23, 2023  
      New York, New York

**ARENTFOX SCHIFF LLP**

*/s/ Andrew I. Silfen*  
Andrew I. Silfen (admitted *pro hac vice*)  
Beth M. Brownstein (admitted *pro hac vice*)  
1301 Avenue of the Americas, Floor 42  
New York, NY 10019  
Tel: (212) 484-3900  
Fax: (212) 484-3990  
Email: andrew.silfen@afslaw.com  
       beth.brownstein@afslaw.com

*Counsel to AFN ABSPROP001, LLC, ARG MESMOAR001, LLC, ARG MEVNAAL001, LLC, and ARG E19PCK001, LLC*

## CERTIFICATE OF SERVICE

I certify that on April 23, 2023, a copy of this document was served via electronic mail on all counsel of record via the Court's CM/ECF system.

*/s/ Andrew I. Silfen*
Andrew I. Silfen

AFDOCS:27320827.5