# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| MOUNTAIN EXPRESS OIL COMPANY, et al., | Case No. 23-90147 (DRJ) |
| Debtors. [1] | (Jointly Administered) |

## DECLARATION OF MICHAEL HEALY IN SUPPORT
## OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Michael Healy, pursuant to section 1726 of Title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am the Chief Restructuring Officer (the "CRO") of Mountain Express Oil Company ("MEX") and its affiliates (collectively, the "Company"). In addition to serving as MEX's CRO, I am a Senior Managing Director at FTI Consulting, Inc. ("FTI"), a leading global business advisory firm with 121 offices worldwide and over 7,600 professionals. I have more than 20 years of restructuring experience and have advised companies, lenders, creditors, corporate boards, and equity sponsors across a diverse range of industries both domestically and internationally. My experience includes advising on complex restructuring and turnaround situations in out-of-court restructurings and formal bankruptcy proceedings. Specific areas of my expertise include business plan development, cash flow forecasting, cash management, development and implementation of cost reduction plans, negotiating restructuring plans, bankruptcy planning, and negotiating business and asset sales. I have advised companies, lenders,

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/mountainexpressoil. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 Cases is 3650 Mansell Road, Suite 250, Alpharetta, Georgia 30022.



2390147230321000000000018

and investors in a variety of industries and in select instances served as Chief Restructuring Officer, including Speedcast International Limited, F+W Media, Inc., All American Group, Inc., and TransCentra, Inc.

2.      On March 18, 2023 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") each commenced a voluntary case (collectively, the "Chapter 11 Cases") under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court"), and they will continue to operate their business and manage their properties as debtors in possession.

3.      I am generally familiar with the Debtors' day-to-day operations, business affairs, books and records, and the Company's restructuring efforts.  Except as otherwise indicated herein, the facts set forth in this declaration (this "Declaration") are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors, my opinion based upon my experience, knowledge, and information concerning the Debtors' operations, and my discussions with other employees of FTI and with the Company's restructuring advisors.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.      To minimize any adverse effects of filing the bankruptcy petitions (the "Petitions") and to preserve value for the benefit of all stakeholders, the Debtors have filed a number of motions requesting various forms of "first day" relief (collectively, the "First Day Pleadings").  I submit, and am authorized by the Debtors to submit, this Declaration in support of the Petitions and the First Day Pleadings.  The relief requested in the First Day Pleadings is necessary to preserve and

maximize the value of the Debtors' estates and allow them to sustain their current operations in chapter 11.

5.     This Declaration is intended to provide a summary overview of the Debtors' businesses, the circumstances leading to the commencement of these Chapter 11 Cases, and in support of the relief the Debtors seek in the First Day Pleadings.  I have organized this Declaration as follows:

- **Part I** provides an introduction to the commencement of the Chapter 11 Cases.

- **Part II** provides a general overview of the Company's corporate history and business operations.

- **Part III** describes the Company's prepetition corporate and capital structure.

- **Part IV** describes the circumstances leading to the commencement of these Chapter 11 Cases.

- **Part V** sets forth the evidentiary basis for the relief requested in the First Day Pleadings.

## I.   INTRODUCTION[2]

6.     Based in Alpharetta, Georgia, the Debtors are a vertically-integrated market leader in the fuel supply business.  The Debtors' history with Oak Street Real Estate Capital, LLC (together with its affiliates "Oak Street"), was, until recently, one of collaboration.  For the past several years, the Debtors would acquire Fueling Centers and Travel Centers and sell the properties to Oak Street, who in turn leased the properties back to the Debtors.  This relationship between the Debtors and Oak Street, which began in 2021, resulted in the Debtors' acquisition and sale-leaseback of 286 locations (the "Oak Street Leased Properties"), making Oak Street the Debtors' largest single Landlord among the Debtors' 550 locations.  Integral to the Debtors' business operations is both the Debtors' entry into fuel purchase contracts with stringent minimum

---

[2]     Capitalized terms used but not defined in this section shall have the meanings ascribed to them *infra*.

purchasing requirements (the "Oil Company Agreements") with the major fuel suppliers (the "Fuel Suppliers") and the Debtors' entry into long-term agreements with Dealers (collectively, the "Fuel Supply Agreements") to supply the Dealers with fuel.

7.  Something changed in recent months—rather than continue to partner with the Debtors, Oak Street instead decided it wanted to transfer more than 150 of the Debtors' properties to operators of its choice (who would not be parties to the Fuel Supply Agreements with the Debtors, thereby severely devaluing the Debtors' operations). The pretext for this change was Oak Street's decision to assert notices of default (the "Oak Street Default Notices") on February 17, 2023 with respect to non-monetary, ordinary course property remediation issues the Debtors were undertaking at certain locations. Oak Street was fully aware of these non-monetary defaults, most of which existed at the time the properties became part of the Oak Street portfolio and which were not asserted to be events of default at the time of the most recent amendments to the Oak Street MLAs—which occurred just a month prior to the transmission of the Oak Street Default Notices. Indeed, until January 2023, a representative of Oak Street was on the Debtors' Board of Directors[3] and was fully aware of the Debtors' ongoing efforts to complete such work.[4]

8.  After receiving the notices of default, the Debtors attempted to engage with Oak Street to discuss the Debtors' current business plan and address any concerns Oak Street had with the Debtors' operations. The Debtors requested a thirty-day extension of the time to cure the

---

[3]  Whether and to what extent Oak Street used information obtained from Jared Sheiker – the Oak Street representative formerly on the Debtors' Board – in connection with such efforts may be the subject of discovery in these Chapter 11 Cases. In fact, I am informed that in the days leading up to the filing of these cases, the Debtors were contacted by Pilot, one of their significant trading partners and fuel suppliers to the Travel Centers, who informed them that a dealer not associated with the Debtors had approached them to potentially operate three of the Travel Centers for Oak Street.

[4]  In connection with the assumption and/or assignment of the Oak Street MLAs, the Debtors will demonstrate that the alleged defaults have been substantially cured, to the extent the Debtors (as opposed to a third party, such as a governmental unit) are in control of such cure.

alleged defaults in order to facilitate these discussions and avoid the need to prepare for a bankruptcy filing. Oak Street's willingness to have these discussions was conditioned upon numerous demands, including that the Debtors release more than 150 properties from the Oak Street MLAs, presumably because they had lined up new tenants for those locations. Under the terms of the Debtors' Oil Company Agreements, the Debtors must meet certain minimum fuel purchase requirements and under the Fuel Supply Agreements, the Debtors must supply the Dealers with whom they contract. Were the Debtors to ignore their fiduciary duties and accede to Oaks Street's demands to dispossess a significant portion of the Debtors' properties, it would decimate the Debtors' business, and would likely cause the breach of the Oil Company Agreements and certain Fuel Supply Agreements. Oak Street's demands neither provided any relief to the Debtors nor the ability for the Debtors to continue to address their go-forward business in a manner that would benefit all stakeholders—as opposed to Oak Street alone. Oak Street's efforts had to be halted for the benefit of all of the Debtors' stakeholders – thus these Chapter 11 Cases were filed.

## II. **THE COMPANY'S HISTORY AND BUSINESS OPERATIONS**

9.      Mountain Express was originally founded in 2000 by Barry and Gail Bierenbaum as a distributor of fuel and lubricants. In 2003, Turjo Wadud and Lamar Frady joined the Company and, over the course of the decade, Mountain Express grew to supply approximately 180 fuel stations, including approximately 50 owned fuel stations. After selling its business to Empire Petroleum in 2010, Mountain Express re-entered the market in 2013 through a re-acquisition of 33 locations from Empire Petroleum. Two years later, Mr. Wadud and Mr. Frady—having served the Company in senior management positions for over a decade— became equity partners in Mountain

Express and, in March 2020, became co-owners of the company they helped to grow into a multimillion dollar business.

10.    As of the Petition Date, the Debtors have three business segments: (a) the "C-Store Operation Business" which consists of the operation of fueling centers and associated convenience stores ("Fueling Centers"); (b) the "Travel Center Operation Business" which consists of the operation of travel centers ("Travel Centers"); and (c) the "Fuel Distribution Business" which consists of the distribution of fuel procured from the Fuel Suppliers.

11.    In structuring their operations, the Debtors acquire Fueling Centers and Travel Centers and simultaneously re-sell them to third-party investment vehicles (the "Landlords") who then lease the Fueling Centers and Travel Centers back to the Debtors pursuant to long-term agreements (collectively, the "Prime Leases").   Certain of the Fueling Centers (the "Operated Fueling Centers") and Travel Centers (the "Operated Travel Centers" and, together with the Operated Fueling Centers, the "Operated Sites") are operated by the Debtors ("Operated Dealers"), while certain sites are "dealered out" and subleased to third-parties (the "Network Dealers" and, together with the Operated Dealers, the "Dealers") to operate a Fueling Center on the site (the "Network Dealer Sites" and, together with the Operated Sites, the "Controlled Sites").   The Debtors' Fuel Distribution Business provides fuel to both Controlled Sites and sites in which the Debtors hold no real property interests (the "Non-Controlled Sites").  A diagram that describes the Debtors' business segments follows:



12.     As of the Petition Date, the Debtors serve 828 Fueling Centers and 27 Travel Centers across 27 states.  Of the 855 locations, 550 are Controlled Sites and 305 are Non-Controlled Sites.  The Debtors are ExxonMobil's second largest customer nationwide and its largest customer in the Southeast.  The Debtors are also a significant customer of several other national Fuel Suppliers, including Shell, Sunoco, and Valero.  In addition, the Debtors are one of the largest dealers to Pilot Travel Centers; at the same time, Pilot is a Fuel Supplier to the Travel Centers.

A.    **Mountain Express' Growth Strategy**

13.    Beginning in June 2021, Mountain Express embarked on a rapid growth strategy to pursue value-accretive acquisitions of multi-unit fuel retailers targeted at obtaining geographic diversification, economies of scale, and operational efficiencies.  The Debtors do not own the real estate underlying any of the Controlled Sites; rather, certain Debtors (in general, the MEX RE Entities, as defined below) lease the Controlled Sites from a third-party Landlord[5] and then sublease the Controlled Sites to either a third-party Network Dealer or a Debtor entity (in general, a Retail Entity, as defined below) in the case of Operated Sites.  By having long-term property interests in the Controlled Sites through their tenancy under the Prime Leases, the Debtors can guarantee an equally long-term, steady revenue stream as the sole fuel distributor to the Controlled Dealers.

14.    As noted above, the Debtors have generally expanded their network of Controlled Dealers through the acquisition of Fueling Centers and Travel Centers from third parties and the simultaneous sale-leaseback of those locations to a Landlord, realizing value in the process through cap rate arbitrage.  Thereafter, the Debtors enter into sublease agreements (the "Subleases") and Fuel Supply Agreements (as defined below) with either a Network Dealer or Operated Dealer.

---

[5]    I understand that certain Landlords are entities directly or indirectly owned or controlled by Mr. Frady and/or Mr. Wadud (the "Related Parties"), including 4Court Holdings, LLC; 4Court Leasing LLC; LTE Capital, LLC; and and Time and Water LLC.



As of the Petition Date, approximately 64% of the Controlled Dealers are Network Dealers and 36% are Operated Dealers.[6]

## B. The Fuel Distribution Business

15. As noted above, the core of the Debtors' operations is the Fuel Distribution Business, through which revenue is realized under the Debtors' Fuel Supply Agreements. The Debtors purchase fuel and lubricants from the Fuel Suppliers, with whom the Debtors enjoy long-tenured business relationships pursuant to the Oil Company Agreements,[7] at spot rates (the "Spot Price"). The Debtors then sell the fuel and lubricants to Dealers pursuant to the Fuel Supply Agreements, which incorporate one of two pricing models—(a) a commission model, wherein the Debtors consign fuel to a Dealer, controlling the price of the fuel at the pump and sharing in the

---

[6]    As discussed in further detail herein, the Debtors are in the process of strategically refocusing their operations on the Fuel Distribution Business and have therefore been converting Operated Fuel Centers to Network Dealers.

[7]    The Debtors purchase less than 5% of their annual fuel needs on a spot basis (*i.e.* not pursuant to an Oil Company Agreement).

retail profit upon its sale at agreed-to rates (the "Commission Model"); and (b) a cost plus model, wherein the Debtors sell the fuel to a Dealer at the Spot Price plus freight, fees, and an agreed-to cents-per-gallon markup (the "Wholesale Model").

16.     Essential to the Fuel Distribution Business is the Debtors' ability to reliably and regularly supply each of the Dealers with sufficient fuel under the Fuel Supply Agreements. To do so, the Debtors use the services of approximately 82% outside fuel trucking companies (the "Trucking Companies"). One such company is Adelphi Transport, LLC ("Adelphi Transport"), a non-Debtor Related Party that, as of the Petition Date, transports approximately 18% of the Debtors' fuel supply from terminals to the dealers. I understand that Adelphi Transport was founded in January 2022 by Mr. Wadud and Mr. Frady in response to major disruptions to the Debtors' business during 2020 and 2021, including as a result of the national shortage of drivers,[8] infrastructure outages concerning the Colonial[9] and Plantation[10] pipelines, and widespread service cancellations by Trucking Companies.[11] The rates charged to the Debtors by Adelphi Transport are at market for the services provided and, upon information and belief, are the same as or better than those that Adelphi Transport charges to its other customers.

---

[8]     *See* Madeline Ngo and Ana Swanson, "The Biggest Kink in America's Supply Chain: Not Enough Truckers," *New York Times* (November 9, 2021) (available at https://www.nytimes.com/2021/11/09/us/politics/trucker-shortage-supply-chain.html).

[9]     *See* Martha C. White, "Pipeline shutdown could lead to price spikes, shortages – and problems for East Coast airports," *NBC News* (May 10, 2021) (available at https://www.nbcnews.com/business/energy/pipeline-shutdown-could-lead-price-spikes-shortages-problems-east-coast-n1266881).

[10]    *See* Laura Sanicola, "Kinder Morgan delays restart of southeast fuels pipeline due to flooding," *Reuters* (Oct. 7, 2021) (available at https://www.reuters.com/business/energy/kinder-morgan-delays-restart-southeast-fuels-pipeline-due-flooding-2021-10-07/).

[11]    For example, I understand that one of the Debtors' Trucking Companies ceased providing services to North Georgia in December 2022 and Alabama in January 2023.

17.     The Debtors' operations require testing, phase I environmental site assessments, and monthly visual inspections to meet various state and regulatory and environmental requirements (collectively, "Environmental Services").  Each state in which the Debtors operate maintains its own regulatory requirements, including the need for annual inspections to review compliance. Upon information and belief, prior to January 2023, all Environmental Services were performed by a Debtor entity, Spartan Tank Management LLC ("Spartan").[12]  However, I am advised that, because Spartan was unable to achieve profitability, the Debtors began exploring alternative sources for the provision of Environmental Services in 2022.  By the end of the year, the Debtors entered into bifurcated arrangements for the provision of Environmental Services; commencing in January 2023, monthly visual inspections are handled by MVI Field Services, a nationwide, third-party tank inspection service company, while compliance work and phase I assessments are performed by Adelphi Environmental Services LLC ("Adelphi Environmental"), a newly-formed Related Party, pursuant to a January 6, 2023, Services Agreement with MEX.  The rates charged to the Debtors by Adelphi Environmental are at market for the services provided.

### III.  THE DEBTORS' CORPORATE AND CAPITAL STRUCTURE

#### A.     Corporate Structure

18.     MEX, a Georgia corporation, is the ultimate parent of the other 143 Debtor entities and is privately held.  As of the Petition Date, MEX's equity interests are held as follows: (a) 48.5% by Turjo Wadud, the Debtors' Co-CEO; (b) 48.5% by Lamar Frady, the Debtors' Co-CEO; and (c) 3% by West Hill Ranch Investors, LLC ("WHRI").[13]

---

[12]   As of the Petition Date, Spartan has no further business activities.

[13]   WHRI acquired 3% of MEX's equity interests in connection with the Debtors' acquisition of West Hill Ranch Group LLC ("West Hill Ranch").

19.     As shown in detail on the organizational chart attached hereto as **Exhibit A**, MEX is the parent of various subsidiaries, including West Hill Ranch, MEX RE Holdings LLC ("MEX RE" and, together with its direct and indirect Debtor subsidiaries, the "MEX RE Entities"), MEX Fuels LLC ("MEX Fuels" and, together with its direct and indirect Debtor subsidiaries, the "MEX Fuels Entities"), and WHRG-LA2, LLC (together with its direct and indirect Debtor subsidiaries, the "Brothers Entities").  West Hill Ranch is the direct parent of two Debtors, WHRG Retail Ops LLC ("WHRG Retail" and, together with its direct and indirect Debtor subsidiaries, the "Retail Entities") and WHRG TC LLC ("WHRG TC" and, together with its direct and indirect Debtor subsidiaries, the "Travel Center Entities").

20.     As noted above, the MEX RE Entities are largely the tenants under the Debtors' Prime Leases and sub-landlords under the Subleases.[14]  The Retail Entities are the tenants under Subleases with the MEX RE Entities with respect to the Operated Fueling Centers and the Travel Center Entities are the tenants under the Subleases with the MEX RE Entities with respect to the Operated Travel Centers.

**B.      Prepetition Capital Structure**

    i.   *Prepetition Secured Parties*

21.     MEX is the Borrower under that certain *First Amended and Restated Credit Agreement* dated as of March 12, 2020 (the "Prepetition Credit Agreement"),[15] among MEX (the "Prepetition Borrower"), the Prepetition Guarantors (defined below), certain Lenders (as defined

---

[14]     Certain of the Prime Leases are held by other Debtor entities, including MEX, West Hill Ranch, and certain Brothers Entities.

[15]     References to documents herein shall include such documents as each of them may have been amended, modified, supplemented, and restated from time to time unless provided otherwise.  The Prepetition Credit Agreement amends and restates an original credit agreement dated October 25, 2018.  The Prepetition Credit Agreement was most recently amended pursuant to that certain *Fourth Amendment to First Amended and Restated Credit Agreement and Limited Waiver* dated as of December 1, 2022.

in, and designated from time to time pursuant to, the Prepetition Credit Agreement) (the "<u>Prepetition Lenders</u>"), and First Horizon Bank[16] (in its capacity as administrative agent, the "<u>Prepetition Agent</u>" and, together with the Prepetition Lenders, the "<u>Prepetition Secured Parties</u>") with respect to a secured term loan and revolving credit facility (the "<u>Prepetition Loan Facility</u>").[17] The Prepetition Loan Agreement, collectively with the Loan Documents (as defined in the Prepetition Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as amended, restated, supplemented, waived, or otherwise modified from time to time, the "<u>Prepetition Loan Documents</u>") provided for loans to the Prepetition Borrower of up to $205 million in aggregate principal amount. As of the Petition Date, the aggregate amount outstanding under the Loan Facility is approximately $176.5 million, consisting of approximately $148.3 million in outstanding principal due under the Prepetition Term Loan Facility, approximately $28.2 million in outstanding principal due under the Prepetition Revolving A Facility, and no outstanding principal due under the Prepetition Revolving B Facility. Each of the foregoing amounts is exclusive of accrued interest, fees, costs and charges.

22.     As more fully set forth in the Prepetition Loan Documents, prior to the Petition Date the Prepetition Borrower and the Prepetition Guarantors (as defined below) granted to the

---

[16]   Formerly known as IberiaBank, a division of First Horizon Bank. The Prepetition Agent is also a Prepetition Lender.

[17]   The Prepetition Loan Agreement provided for the funding of three separate types of loans with different terms and applicable interest rates. Specifically, the Prepetition Loan Agreement permits borrowing under a term loan facility in the amount of $155 million (inclusive of a $5 million swing line loan) (the "<u>Prepetition Term Loan Facility</u>"), a revolving A credit facility with an aggregate commitment amount of $30 million (the "<u>Prepetition Revolving A Facility</u>"), and a revolving B facility with an aggregate commitment amount of $20 million (the "<u>Prepetition Revolving B Facility</u>"). In addition, the Borrower and certain of the Prepetition Secured Parties were parties to a hedge agreement (the "<u>Prepetition Hedge Agreement</u>") to hedge interest rate exposure applicable to a portion of the principal amount borrowed under the Prepetition Term Loan Facility. The Prepetition Hedge Agreement was terminated as of March 8, 2023, yielding a termination payment to the Prepetition Borrower in the approximate amount of $6.648 million (the "<u>Hedge Termination Payment</u>"). I was informed on the evening of March 19, 2023 that, prior to the Petition Date, the Prepetition Agent applied the Hedge Termination Payment against amounts owed pursuant to the Prepetition Loan Documents.

Prepetition Agent, for the benefit of itself and the Prepetition Lenders, a security interest in and continuing lien (the "Prepetition Liens") on substantially all of their assets and property, including inventory and equipment (with certain exceptions set forth in the Prepetition Loan Documents) and all proceeds, products, accessions, rents, and profits thereof (collectively, the "Prepetition Collateral"). The obligations of the Prepetition Borrower under the Prepetition Credit Agreement are guaranteed by Mountain Express Baking and Coffee Co.; Mountain Express Ethanol Company; Alabama Terminal Property, LLC; Spartan;[18] Mountain Express Oil Company Southeast, LLC; MEX North Alabama, LLC; Mississippi MEX Company, LLC; B&T Petroleum LLC; Texas MEX Limited Company, LLC; Star Mountain Express, LLC; and West Hill Ranch Group LLC (collectively, the "Prepetition Guarantors").[19] Each of the Prepetition Guarantors is a wholly-owned subsidiary of MEX[20] and is a Debtor in these Chapter 11 Cases. Pursuant to the Prepetition Loan Documents, the obligations of the Prepetition Guarantors to guarantee the full payment and performance of the Prepetition Borrower are secured by substantially all of the personal property assets of each of the Prepetition Guarantors.

23. On December 21, 2022, the Prepetition Agent notified the Prepetition Borrower and the Prepetition Guarantors that certain defaults had occurred under the Prepetition Credit Agreement. Specifically, the Prepetition Agent alleged defaults arising from the Debtors' alleged failure to timely deliver financial statements to the Prepetition Agent and the Debtors' alleged

---

[18] Formerly known as MEX Advance Fleet Services, LLC.

[19] Second Financial Management Services, LLC, which was dissolved prior to the Petition Date, was previously a Prepetition Guarantor.

[20] Alabama Terminal Property, LLC, is a wholly-owned subsidiary of Mountain Express Oil Company Southeast, LLC, which, in turn, is wholly-owned by MEX.

failure to satisfy certain conditions of the Prepetition Credit Agreement at the time borrowing requests were made thereunder.

    ii.    *Landlords*

24.      Each of the Debtors' 550 Controlled Sites are leased from Landlords, certain of which (including Oak Street and AR Global Investments, LLC) are Landlords at multiple locations.[21] As of the Petition Date, the Debtors believe they owe approximately $1.1 million to their Landlords.

    iii.    *General Unsecured Claims*

25.      As of the Petition Date, the Debtors estimate that they owe approximately $26.2 million in the aggregate to their trade creditors. Of this amount, the Debtors estimate that the aggregate unpaid prepetition balance owing to the Fuel Relationship Parties could total up to $25 million, all of which will be coming due during the first 21 days of these Cases (the "Fuel Relationship Claims"). As discussed in further detail in the *Debtors' Emergency Motion for Entry of Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Fuel Suppliers and Transporters and (II) Granting Related Relief*, filed concurrently herewith, the Debtors are seeking authority to pay an amount which shall not exceed $25 million on account of Fuel Relationship Claims. Accordingly, the Debtors believe that all or substantially all of the Fuel Supplier Claims have arisen in—and but for the filing of these Chapter 11 Cases would have been paid in the ordinary course of the Debtors' business.

---

[21]    Related Parties are Landlords at approximately nine of the Debtors' locations.

## IV. EVENTS LEADING TO THE PETITION DATE

### A.   The Oak Street Program Agreement

26.   On June 30, 2021, the Debtors and Oak Street entered into an agreement (the "Oak Street Program Agreement") pursuant to which Oak Street agreed to finance up to $1 billion (or more) of the Debtors' acquisition of Fueling Centers and Travel Centers through sale-leaseback transactions, each through a separate Oak Street MLA.  After executing certain Oak Street MLAs, the Debtors and Oak Street entered into the Oak Street Side Letters with respect to environmental assessment and remediation, code compliance, and related matters to be completed at some of the Oak Street Leased Properties after closing of the applicable Oak Street Transaction.  On December 31, 2021, as contemplated by the Oak Street Program Agreement, Jared Sheiker, a Principal of Oak Street, was appointed to the Debtors' Board of Directors.

27.   For more than a year, Oak Street funded the Debtors' acquisition of 286 Oak Street Leased Properties for an aggregate purchase price of over $825 million through over 60 separate sale-leaseback transactions (each, an "Oak Street Transaction").  Each Oak Street Transaction was documented through a separate master lease agreement (each, an "Oak Street MLA"), and, in some instances where a subject parcel was undergoing environmental assessment or remediation, code compliance, or similar work ("Post-Closing Work"), Oak Street would close that particular Oak Street Transaction and enter into letter agreements (the "Oak Street Side Letters") for the eventual completion of the Post-Closing Work.[22]  In all, the Debtors entered into 44 Oak Street Side Letters that addressed Post-Closing Work at 72 Oak Street Leased Properties between July 2021 and October 2022.

---

[22]   Due to the nature of the convenience store business, stores are often subject to minor, but recurring, local code violations and correction notices.  The Debtors consistently monitor and address these matters but the timing of their resolution varies widely by jurisdiction and may be outside the Debtors' control.

28.     For over a year, the Debtors and Oak Street worked collaboratively under the Oak Street Program Agreement without incident.  The Debtors worked diligently to address the Post-Closing Work contemplated by the Oak Street Side Letters and Oak Street never raised any concerns with the speed at which such matters were being completed—rather, Oak Street continued to make hundreds of millions of dollars available to the Debtors under the Oak Street Program Agreement.

**B.**     **The Debtors' Transition from the Unprofitable C-Store Operation Business**

29.     In October 2022, based on changes in the marketplace, the Debtors determined to strategically reposition the business and re-focus on the core Fuel Distribution Business and the profitable Travel Center Operation Business.  The Debtors believed these measures would enable them to reduce fixed cost working capital requirements and increase operating leverage.  With Oak Street's support, the Debtors began to exit the C-Store Operation Business; between October 2022 and the Petition Date, the Debtors converted 104 Operated Fueling Centers to Network Dealers and is presently under contract to convert 55 additional Operated Fueling Centers.  The Debtors are actively marketing the remaining 45 Operated Fueling Centers and anticipate that the conversion will be complete by June 2023, allowing the Debtors to significantly strengthen their operations and focus their efforts on the profitable Fuel Supply Business and Travel Center Operation Business.

**C.**     **The A&R Oak Street MLAs**

30.     On January 1, 2023, the Debtors and Oak Street entered into three amended and restated master lease agreements (the "A&R Oak Street MLAs") to combine, amend, and restate the earlier Oak Street MLAs.  Due to the continued drain of the C-Store Operations Business, in early January 2023, the Debtors faced a liquidity shortfall that would have affected payment of

January rent to Oak Street under the Oak Street MLAs. Accordingly, the Debtors approached Oak Street to request a deferral of January and February rent, but rather than defer the Debtors' rent, Oak Street funded a total of $10 million with a third-party escrow agent on January 16, 2023, to be released to Oak Street in installments for payment of the January, February, and March rent due under the A&R Oak Street MLAs.[23]

**D.    The First Amendments to MLAs**

31.    On January 16, 2023, the Debtors and Oak Street entered into amendments to the A&R Oak Street MLAs (the "First Amendments to MLAs") which, among other things, (a) added the $10 million to the future rent due under the A&R Oak Street MLAs; (b) increased the rent under the A&R Oak Street MLAs by 10% per year; and (c) required an equity or subordinated debt infusion of $10 million into the Debtors. Still, even at that time and with month after month passing, Oak Street did not provide the Debtors with notice of any alleged default with respect to the Post-Closing Work (or any other matter).

**E.    The Oak Street Default Notices**

32.    Soon after the Debtors and Oak Street entered into the First Amendments to MLAs, Oak Street demanded that the Debtors agree to release Oak Street Leased Properties from the A&R Oak Street MLAs for sale to third parties. When the Debtors refused to agree, Oak Street transmitted three Oak Street Default Notices to the Debtors, one under each A&R Oak Street MLA, relating to approximately 74 of their leased locations. The Oak Street Default Notices alleged solely non-monetary defaults relating to Post-Closing Work, non-operational convenience stores (on which the Debtors were, in any event, paying rent), or alleged lack of financial reporting

---

[23]    The escrowed amounts were insufficient to pay March 2023 rent. On March 1, 2023, the. Debtors paid March rent to Oak Street in full and intend to pay all rent to Oak Street under the MLAs during the pendency of these Chapter 11 Cases.

(collectively, the "Alleged Non-Monetary Defaults"). Unless the Debtors remedied the Alleged Non-Monetary Defaults within 30 days, Oak Street would reclaim any or all of the Oak Street Leased Properties by terminating the A&R Oak Street MLAs and force the Debtors to transfer operations to a replacement operator of Oak Street's choosing—permanently kneecapping the Debtors' business.

33. But these were far from newly-discovered defaults. On average, the Post-Closing Work required by the Oak Street Side Letters was supposed to have been completed—according to the dates listed on the Oak Street Default Notices—months before the date that the Oak Street Default Notices were sent. Moreover, the alleged lack of financial reporting had been—according to the Oak Street Default Notices—ongoing for three fiscal quarters. As noted, the Post-Closing Work reflected a persistent low level of technical non-compliance that Oak Street was perfectly aware was in the process of being remedied in the ordinary course of business. Even Oak Street itself acknowledged that the financial reporting requirement was in need of updating.

**F.** **The Debtors' Efforts to Obtain a Forbearance**

34. After sending the Oak Street Default Notices, Oak Street asked to allow three of the properties covered by the A&R Oak Street MLAs to be sold to third parties and relinquish an additional 146 Oak Street Leased Properties to be "re-tenanted," with the concomitant Fuel Supply Agreements voided.

35. Thereafter, the Debtors retained Pachulski Stang Ziehl & Jones LLP ("PSZJ") as restructuring counsel, who contacted Kirkland & Ellis ("K&E"), counsel to Oak Street, and requested that Oak Street forbear from exercising remedies under the Oak Street Default Notices for a thirty-day period to enable to parties to meet and discuss their go-forward business relationship. PSZJ informed K&E that relinquishing a substantial number of properties from the

A&R Oak Street MLAs would decimate the Debtors' business, cause it to default under its Fuel Supply Agreements and prevent the Debtors from continuing to operate as a going concern. PSZJ further informed K&E that unless Oak Street would agree to a forbearance agreement, the Debtors would have no choice but to commence preparation of chapter 11 bankruptcy cases.

36.     Over the succeeding days, the Debtors' professionals continued to communicate with Oak Street to try to reach some agreement on a thirty-day forbearance to avoid the commencement of these Chapter 11 Cases. In connection therewith, the Debtors offered to meet with Oak Street to discuss the Company's current business plan, allow Oak Street to participate on calls with the Prepetition Agent and otherwise provide Oak Street with information to enable it to evaluate the Debtors' current business operations.

37.     As the deadline to cure the Alleged Non-Monetary Defaults approached, the parties continued to discuss the terms of a forbearance and the Debtors requested that Oak Street provide them with a proposed forbearance agreement. During such discussions, Oak Street was unwavering in its demands to have the Debtors relinquish a significant number of their properties. The Debtors similarly were unwavering in their response that doing so would decimate the Debtors' business operations, causing harm to the Debtors' stakeholders.

38.     Finally, late in the day on March 15, 2023, Oak Street provided the Debtors with a draft thirty-day forbearance agreement which demanded that the Debtors pay it $8.5 million by mid-day on March 17, relinquish 75 sites for re-tenanting, and require the Debtors to facilitate Oak Street's contact with the Debtors' creditors and trading partners, including the Secured Lenders and counterparties to the Fuel Supply Agreements, in any manner requested by Oak Street. Because agreeing to Oak Street's terms would have been a breach of their fiduciary duties to other

stakeholders and decimated the Debtors' business, the Debtors rejected the proposal and instead elected to commence these Chapter 11 Cases to preserve value under the A&R Oak Street MLAs.[24]

### G.    The Debtors' Prepetition Retention of Professionals and Appointment of Independent Directors

39.    On February 10, 2023, the Debtors hired Raymond James & Associates, Inc. ("Raymond James") as its investment banker.  On February 22 and March 9, 2023, respectively, the Debtors retained PSZJ as its restructuring counsel and FTI as its financial advisor.  On March 18, 2023, I was named the Debtors' Chief Restructuring Officer.

40.    On March 15, 2023, MEX appointed Craig Barbarosh and Lawrence Perkins to serve as independent directors.  Mr. Barbarosh is an experienced board member with over 30 years of professional experience.  He is serving or has served as an independent director for businesses in a variety of industries, including healthcare, software, pharmaceuticals, and food service, among others.  A copy of Mr. Barbarosh's curriculum vitae is attached hereto as **Exhibit B-1**.  Mr. Perkins is a Founder and Chief Executive Officer of SierraConstellation Partners, and has worked on a variety of projects geared towards enhancing business performance for numerous companies on projects ranging from interim management, profit improvement and working capital management to strategic planning and transaction execution.  He has served in a variety of capacities, including Interim CEO/President, Chief Restructuring Officer, Board of Directors Member, Financial Advisor, Strategic Consultant, and Investment Banker.  A copy of Mr. Perkins's curriculum vitae is attached hereto as **Exhibit B-2**.

---

[24]    On March 16, 2023, Oak Street provided the Debtors with a draft five-day forbearance agreement, however even that short-term forbearance agreement came with significant conditions that, if agreed to, would have been harmful to the Debtors.

## V.  **FIRST DAY PLEADINGS**[25]

41.     I am familiar with the contents of each First Day Pleading (including the exhibits and other attachments thereto) and, to the best of my knowledge, after reasonable inquiry, believe the relief sought in each First Day Pleading:  (a) will enable the Debtors to sustain operations while in chapter 11; (b) is critical to the Debtors' ability to maximize the value of their estates; and (c) serves the best interests of the Debtors' estates and creditors.  Further, it is my belief that the relief sought in the First Day Pleadings is in each case narrowly-tailored and necessary to achieve the goals identified above.

### ADMINISTRATIVE MOTIONS AND APPLICATIONS

A.     ***Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (II) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information, and (III) Granting Related Relief* (the "<u>Personal Information and Notice of Commencement Motion</u>")**

42.     Pursuant to the Personal Information and Notice of Commencement Motion, the Debtors seek entry of an order (a) authorizing the Debtors to redact certain personally identifiable information, (b) approving the form and manner of notifying creditors of the commencement of these Chapter 11 cases, and (c) granting related relief.

### A.     Redaction of Certain Confidential Information of Individuals

43.     I believe that it is appropriate to authorize the Debtors to redact from any paper filed or to be filed with the Court in these Chapter 11 Cases, including the consolidated list of creditors (the "<u>Creditor Matrix</u>") and Schedules and Statements (defined below), the home addresses of individual creditors including the Debtors' employees, independent contractors, and

---

[25]     Unless otherwise noted herein, capitalized terms used in this section have the meanings ascribed to them in the applicable First Day Pleading.

former employees because such information can be used to perpetrate identity theft and phishing scams or to locate survivors of domestic violence, harassment, or stalking, exposing the Debtors to potential civil liability and significant financial penalties. The risk is not merely speculative. I am informed that in at least one chapter 11 case, the abusive former partner of a debtor's employee used the publicly accessible creditor and employee information filed in the chapter 11 case to track the employee at her new address that had not been publicly available until then, forcing the employee to change addresses again.[26]

44.     The Debtors propose to provide an unredacted version of the Creditor Matrix, Schedules and Statements, and any other filings redacted pursuant to the Order to (a) the Court, (b) the U.S. Trustee, (c) counsel to any official committee appointed in these Chapter 11 Cases, and (d) any party in interest upon a request to the Debtors (email being sufficient) or to the Court that is reasonably related to these Chapter 11 Cases. In each case, I believe that this would be subject to a review of whether such disclosure, on a case-by-case basis, would violate any privacy or data protection law or regulation. Moreover, nothing in the Personal Information and Notice of Commencement Motion will prejudice a party in interest's right to file a motion requesting that the Court unseal the information redacted. In addition, the Debtors will distribute, as applicable, any notices that are received at the Debtors' corporate headquarters and are intended for a current employee.

45.     I believe that absent the relief requested in the Personal Information and Notice of Commencement Motion the Debtors (a) would unnecessarily render individuals more susceptible to identity theft and (b) could jeopardize the safety of claimants in these Chapter 11 Cases who,

---

[26]     The incident, which took place during the first *Charming Charlie* chapter 11 proceedings in 2017, is described in the "creditor matrix motion" filed in *In re Charming Charlie Holdings, Inc.*, No. 19-11534 (CSS) (Bankr. D. Del. Jul. 11, 2019), Docket No. 4.

unbeknownst to the Debtors, are survivors of domestic violence, harassment, or stalking by publishing their home addresses without any advance notice or opportunity to opt out or take protective measures

### B. Service of Required Notices to Creditors

46.     In the Personal Information and Notice of Commencement Motion, the Debtors propose that Kurtzman Carson Consultants LLC (the "Claims Agent"), the Debtors' claims and noticing agent, undertake all mailings directed by the Court or the U.S. Trustee or as may be required under the Bankruptcy Code, including the notice of commencement of these Chapter 11 Cases, substantially in the form attached as Exhibit A to the order granting the Personal Information and Notice of Commencement Motion (the "Notice of Commencement"). I believe that using the Claims Agent to promptly provide notices to all applicable parties will maximize efficiency in administering these Chapter 11 Cases and will ease administrative burdens that would otherwise fall upon the Court and the U.S. Trustee. Additionally, the Claims Agent will assist the Debtors in preparing creditor lists and mailing initial notices, and, therefore, it is more efficient to authorize the Claims Agent to mail the notice of commencement of these Chapter 11 Cases. Further, coordinating the mailing of notice of any bar date and the Notice of Commencement through a single source, the Claims Agent, will reduce the opportunities for the dissemination of conflicting or confusing information to parties in interest. Accordingly, I believe that the Claims Agent should undertake such mailings, and that the Court should grant the relief requested in the Personal Information and Notice of Commencement Motion.

**B.** **Debtors' _Emergency_ Motion for Entry of an Order (I) Extending Time to File (A) _Schedules of Assets and Liabilities, (B) Schedules of Current Income and Expenditures, (C) Schedules of Executory Contracts and Unexpired Leases, and (D) Statements of Financial Affairs, and (II) Granting Related Relief_ (the "Schedules Extension Motion")**

47.     Pursuant to the Schedules Extension Motion, the Debtors seek entry of an order (a) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") by 46 days, for a total of 60 days from the Petition Date, through and including May 17, 2023, and (b) granting related relief.

48.     I believe there to be ample cause to grant the relief requested in the Schedules Extension Motion.  To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to thousands of claims, assets, leases, and contracts from each of the 144 Debtor entities.  Collection of the necessary information will require a significant expenditure of time and effort on the part of the Debtors, their employees, and their advisors at a time when such resources would be best used to stabilize the Debtors' business operations at the outset of these cases.  Additionally, because this information is voluminous and located in numerous places throughout the Debtors' organization, it may be some time before the Debtors have access to all of the information required to prepare the Schedules and Statements. Compounding the difficulty in accurately preparing the Schedules and Statements, prior to the Petition Date, the Debtors lost multiple employees who possessed extensive institutional knowledge regarding the Debtors operations, assets, and records.

49.     Although I believe that the Debtors' management, employees, professional advisors, and key personnel have prepared diligently for these Chapter 11 Cases, preparing the Schedules and Statements was not practicable given the complex nature of the Debtors' business.

Prior to the Petition Date, the Debtors focused their efforts on preparing for a smooth transition into chapter 11. Such efforts made it difficult for the Debtors to prepare the Schedules and Statements in advance of the Petition Date.

50.     The Debtors, with the assistance of their professional advisors, have been and will continue working diligently and expeditiously to prepare the Schedules and Statements within the additional time requested. I anticipate that the Debtors may require at least 60 days after the Petition Date to complete the Schedules and Statements. I believe that an extension will not harm creditors or other parties in interest because, even under the extended deadline, the Debtors will file the Schedules and Statements in advance of an applicable deadline for filing proofs of claim in these Chapter 11 Cases. Moreover, many of the Debtors' records are maintained on a consolidated basis, requiring further time and effort to file as accurate Schedules and Statements, on a debtor by debtor basis, as possible. Absent the duration of the extension requested herein, the Debtors may be required to file amendments to their Schedules and Statements, which could cause undue confusion and uncertainty for parties wishing to review and rely upon the Schedules and Statements filed in these Chapter 11 Cases without commensurate benefit. Accordingly, the Court should grant the relief requested in the Schedules Extension Motion.

## OPERATIONAL MOTIONS

**A.     *Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing Maintenance of Existing Bank Accounts; (II) Authorizing Continuance of Existing Cash Management System; (III) Granting Limited Waiver of Section 345(b) Deposit Requirements; (IV) Authorizing Continued Performance of Intercompany Transactions and Funding; and (V) Granting Related Relief* (the "<u>Cash Management Motion</u>")**

51.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors to (a) continue operating the Cash Management System (as defined herein); (b) honor and pay the Bank Fees (as defined herein) in the ordinary course,

including any prepetition Bank Fees; (c) maintain existing business forms; and (d) continue intercompany transactions and funding consistent with the Debtors' historical practices, subject to the terms described herein; (ii) granting a limited waiver of the deposit and investment requirements imposed by section 345(b) of the Bankruptcy Code; and (iii) granting related relief.

### A. The Cash Management System

52. In the ordinary course of business, the Debtors utilize a centralized cash management system (the "Cash Management System") to collect, manage, and disburse funds used in their business. The Cash Management System is essential to the stability of the Debtors' assets and business objectives and to maximizing the value of their estates. Importantly, the continuity of the Cash Management System is critical to the Debtors' ability to procure and transport fuel products offered at loading terminals controlled by major oil company providers to the Debtors.

53. The Cash Management System is tailored to meet the operating needs of the Debtors by enabling them to centrally control and monitor corporate funds, ensure cash availability and liquidity, and reduce administrative burdens by facilitating the movement of funds between and among the Debtors. I believe these controls are critical to the operation of the Debtors' businesses given the significant volume of transactions managed through the Cash Management System. The Debtors' treasury department maintains daily oversight over the Cash Management System and controls the entering, processing, and releasing of funds, including in connection with Intercompany Transactions (defined below). As the Debtors require prompt access to cash for their daily operations, I believe any disruption of the Cash Management System would have an immediate and devastating adverse effect on the Debtors' operations to the detriment of their estates and stakeholders.

## B.     Bank Accounts and Funds Flow

54.     As of the Petition Date, the Debtors maintain bank accounts at 25 different banks (the "Cash Management Banks" or "Banks"), of which 144 open bank accounts are owned by the Debtors (the "Debtor Bank Accounts" or "Bank Accounts").[27]   The Debtors' primary Cash Management Bank is First Horizon Bank ("First Horizon"),[28] which at which the Debtors maintain 33 Bank Accounts.  A listing of the Bank Accounts and applicable information therefor is set forth in the following exhibits attached to the Cash Management Motion: Exhibit 1 (schematic overview), Exhibit 2 (listing of closed or inactive accounts), and Exhibit 3 (listing of prepetition date balances) (each a "CM Exhibit").

55.     The Debtors have approximately 144 open Bank Accounts.  In due course, the Debtors expect to close their inactive Bank Accounts unless business needs for such accounts arise during the cases.  The basic elements of the current Cash Management System (as further illustrated by CM Exhibit 1) consist of:

- ▪ Wholesale Fuel:  One main First Horizon operating account held by Mountain Express Oil Company is the primary operating account for the Debtors' wholesale business. *See* p. 1 of CM Exhibit 1 (Wholesale & Corporate Master Operating Account, IB-9820 ("Wholesale Operating Account")).  Funds are swept via ZBA (zero balance account) transfers to the Wholesale Operating Account from a variety of deposit subaccounts. Certain of these deposit subaccounts ("Fuel Subaccounts") are  established to process obligations due to the major fuel suppliers (*i.e*. Chevron, Exxon, *etc*.), and payments due from the Debtors' network of fuel dealers and other fuel vendors on account of corresponding fuel deliveries to such parties.[29]  The Wholesale Operating Account also

---

[27]   The Debtors administer and manage certain accounts for non-Debtor entities pursuant to operating agreements or other arrangements.  Such accounts and the funds therein belong to the applicable non-Debtor party (subject to any applicable agreements), and are not commingled with the accounts (and funds therein) held in the Company's name.

[28]   First Horizon Bank merged with IBERIABANK in 2020.

[29]   The Fuel Subaccounts are generally designed so that fuel purchases (from the major oil companies) are tied by brand to fuel sales (to the Debtors' network of dealers).  In other words, the Chevron Fuel Subaccount is dedicated to transactions, both in-bound and out-bound, of Chevron branded fuel.  Receipts and drafts are made against each particular Fuel Subaccount on a daily basis; any daily net profit in the Fuel Subaccounts are swept daily

funds disbursement accounts which make payments for general corporate purposes (including payroll expense, rental expense, taxes, *etc.*), and funds the loan accounts from which periodic interest and principal payments are made pursuant to the Debtors' financing arrangements with First Horizon (as agent for itself and the other lenders). *See* p. 1 of <u>CM Exhibit 1</u>.

- **Retail Business:** Generally, as illustrated on page 2 of <u>CM Exhibit 1</u>, the Debtor Bank Accounts are aligned among the Debtors' various retail segments, with intermittent transfers up and down to higher operation and disbursement accounts, including in particular, Retail Master Operating Account IB-2998 ("<u>Retail Master Operating Account</u>") (generally supporting the West Hill, Mountain Express, Fox Fuel, Quik Check, Central Oil and Fresh Pantry retail segments) and Concentration Account IB-9813 (generally supporting the Brothers retail segment)).

   o Cash activity for each of the retail segments is aggregated at a concentration account.

   o As illustrated on p. 2 of <u>CM Exhibit 1</u>, underlying the Retail Master Operating Account are a variety of sub-accounts, most of which align with individual locations, clusters of locations, and/or types of disbursements (payroll, utilities, general accounts payable). Receipts are also received at the subaccount level before being consolidated at the concentration account. Receipts sweep to the respective concentration accounts whereas the disbursement accounts sweep from the concentration accounts. Generally, receipt activity at the concentration account level is sufficient to fund operating disbursements. Periodically transfers are made from the main retail operating accounts to satisfy any shortfall (discussed further below).

In any given period the foregoing operating accounts collectively represent approximately 90% of all cash activity of the Debtors. Payments to creditors and other parties are made from the Bank Accounts, in a variety of ways, including checks, drafts, wire transfers, credit cards, and automated clearinghouse ("<u>ACH</u>") transfers.

56. All funds on deposit in the Debtors' Bank Accounts are insured by the Federal Deposit Insurance Corporation to the extent provided by law. Most but not all of the Cash Management Banks are on the Region 7 U.S. Trustee's list of approved depository institutions. The Debtors believe that the institutions listed on <u>CM Exhibit 1</u> that are not U.S. Trustee-approved

---

(ZBA) to the Wholesale Operating Account. Due to timing differences, funds occasionally may be transferred from the Wholesale Operating Account to a Fuel Subaccount to cover any shortfalls.

(the "Non-U.S. Trustee Approved Depositories") are nonetheless stable entities, and the Debtor Bank Accounts thereat typically hold relatively small amounts of cash (below the $250,000 FDIC insurance limit) or are ZBAs, as discussed further herein. The Debtors do not invest any of their excess cash on hand.

57. Certain of the Bank Accounts maintained by the Debtors contain credit card receipts and/or other cash receipts from retail transactions undertaken by an applicable Dealer, which funds the Debtors temporarily hold and use as a security deposit pending the Debtors' and dealer's reconciliation of the amounts due to and from the other party under the parties' applicable agreements and arrangements, which occurrence frequency varies but sometimes occur several times each month.[30]

### C. Intercompany Transactions

58. In the ordinary course of business, the Company engages in intercompany transactions and transfers of funds among various Bank Accounts ("Intercompany Transactions"). As a result, Intercompany Transactions may exist that reflect intercompany receivables and payables ("Intercompany Claims") made in the ordinary course of business between and among Debtors.

59. These Intercompany Claims include those arising from transfers from the respective main accounts for West Hill Ranch Group and/or MEX to individual retail accounts, when interim funding for retail related operations (for particular locations and/or particular expenses) is needed. Such intercompany transfers for shortfall funding are relatively uncommon, and are recorded in the Debtors' books as intercompany receivables/payables.

---

[30] Relating to such temporary holdbacks, the Debtors have filed the Dealer Reconsolidation Motion (defined below). Further, the Debtors maintain certain accounts (listed on CM Exhibit 1) holding state lottery related funds, which funds are the subject of the contemporaneously filed Tax Motion (defined below).

60. The Debtors record and track the Intercompany Transactions and Intercompany Claims that occur across the corporate structure, as and after they occur, through entries in the general ledger. On a postpetition basis, the Debtors will continue to track, record, and monitor Intercompany Transactions in the ordinary course of business.

61. By the Cash Management Motion, the Debtors seek to balance their desire to minimize disruptions to their businesses and preserve estate value, on the one hand, and to provide this Court with an appropriate level of supervision and oversight, on the other hand. Thus, the Debtors propose the following approach with respect to each postpetition Intercompany Transaction (each, a "Postpetition Intercompany Transaction"): the Debtors seek authority in the Cash Management Motion, but not direction, to continue entering into ordinary course Postpetition Intercompany Transactions (including with respect to any netting and setoff) without further notice or Court approval. The Debtors will maintain current records with respect to all postpetition cash transfers so that all Postpetition Intercompany Transactions may be readily ascertained, traced and properly recorded on any applicable intercompany accounts.

62. Further, to ensure that no Debtor will fund the operations of a Debtor at the expense of such entity's creditors, the Debtors respectfully request under the Cash Management Motion that all Intercompany Claims on account of valid postpetition transfers from a Debtor to another Debtor be accorded administrative expense status, subject and junior only to the claims, including adequate protection claims, granted in connection with the Debtors' use of cash collateral, and in accordance with any interim and final order, as applicable, approving the use of cash collateral (collectively, the "Cash Collateral Orders").

### D. Bank Fees

63.     The Debtors incur certain fees and charges in connection with the ordinary course operation of the Cash Management System (collectively, the "Bank Fees"). The Bank Fees include account maintenance charges, charges relating to ACH and wire transfers, lockbox and depository service charges, and other customary miscellaneous charges. On average, the Debtors incur approximately $10,000 in Bank Fees per month. In the ordinary course of business and typically on a monthly basis, the Bank charges the Debtors and deducts from the appropriate bank accounts certain service charges, and other fees, costs, and expenses. The Debtors do not believe there are any material prepetition Bank Fees outstanding on the Petition Date, but nonetheless seek approval in the Cash Management Motion to pay and, for the Bank to deduct, any such Bank Fees in the ordinary course when due.

### E. Business Forms

64.     The Debtors utilize numerous preprinted business forms in the ordinary course of their business (including, without limitation, letterhead, purchase orders, invoices, and checks), including in connection with their Cash Management System. I understand that the Debtors would be required by the U.S. Trustee under its guidelines to incur the expense and delay of ordering entirely new business forms referencing the Debtors' status as debtors-in-possession absent relief from the Court. The Debtors seek authority to use pre-existing business forms without such a reference in order to minimize expense to the estates. The Debtors submit that parties in interest will not be prejudiced if such relief is granted because parties doing business with the Debtors will likely be aware of their status as debtors-in-possession and, therefore, changing business forms is unnecessary and would be unduly burdensome. To the extent the Debtors exhaust their existing

supply of checks, the Debtors will reorder checks with the designation "Debtor-in-Possession" and the corresponding case number.

### F. Compliance with the U.S. Trustee Guidelines and Section 345 of the Bankruptcy Code

65.    I understand that under the U.S. Trustee's guidelines, the U.S. Trustee generally requires chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with the requirements of the U.S. Trustee's office.  I also understand that all of the Bank Accounts set forth in <u>CM Exhibit 1</u> are FDIC-insured (up to applicable limits), and most of the Bank Accounts are maintained at institutions that have executed a Uniform Depository Agreement ("<u>UDA</u>") with, and are designated as authorized depositories by, the U.S. Trustee.  I believe that the Non-U.S. Trustee Approved Depositories are reputable and financially stable.  Further, all accounts held at the Non-U.S. Trustee Approved Depositories either (i) are ZBAs (zero balance accounts), or (ii) on average, contain relatively small amounts of funds (below the $250,000 FDIC insurance limit) as reflected in <u>CM Exhibit 3</u> (balances), and are periodically swept to zero by the Debtors.

66.    As set forth in the proposed interim order approving the Cash Management Motion, with respect to the foregoing entities, the Debtors request through May 4, 2023 (subject to the right to seek additional extensions) to comply with section 345(b) or to make other arrangements to which the U.S. Trustee agrees.

67.    I believe that any applicable U.S. Trustee and section 345 requirements could properly be waived or otherwise modified.  Given the Debtors' extensive operations and cash management requirements overall (including the large number of Debtors' fuel stations and travel centers), it is not feasible to consolidate all applicable cash activities to the narrow group of financial institutions approved in the U.S. Trustee's guidelines.  Requiring the Debtors to adopt a

new cash management system relating to the Debtors' widespread business operations at this critical stage of the Chapter 11 Cases would be unduly expensive, create unnecessary administrative burdens, and be extraordinarily disruptive to the operation of the Debtors' business. I believe that all of the Bank Accounts are maintained at reputable, financially stable banks and financial institutions, which are well-positioned to continue performing depository and cash management functions during the Chapter 11 Cases. As set forth in the proposed interim order approving the Cash Management Motion, the Debtors will work collaboratively with the U.S. Trustee to address any concerns it may have, subject to the Debtors' right to seek further relief with this Court.

68.    In sum, I believe the Cash Management System is critical to the ongoing stability of the Debtors' businesses and smooth transition into chapter 11. Requiring the Debtors to transfer any of the above-described Bank Accounts to other depositories would place a needless and excessive administrative burden on the Debtors and impose significant, value-destructive costs to the Debtors' estates. In any event, the Debtors will continue to work in good faith with the U.S. Trustee to address any concerns regarding the continued use of these accounts on a postpetition basis. Accordingly, the Court should grant the relief requested in the Cash Management Motion.

**B.**    ***Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to (i) Pay and/or Honor Prepetition Wages, Salaries, Bonus Payments, Employee Benefits, and Other Compensation; (ii) Remit Withholding Obligations and Deductions; (iii) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (iv) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests* (the "<u>Wage Motion</u>")**

69.    Pursuant to the Wage Motion, the Debtors seek entry of an order "), authorizing the Debtors, in their sole discretion: (a) to pay and honor, *inter alia*, certain prepetition claims of their employees (collectively, the "<u>Employees</u>") for wages, salaries, and compensation (the "<u>Wages</u>"); (b) to pay and honor employee benefits and expense reimbursements and honor and pay incentive

payments owed to certain non-insider Employees (collectively, the "<u>Benefits</u>" and, together with Wages, the "<u>Wages and Benefits</u>"); (c) remit withholding obligations and employee deductions and withholdings; and (d) to continue to pay and honor such Wages and Benefits as they become due postpetition in the ordinary course of the Debtors' business. In the Wage Motion, the Debtors seek authority to pay or honor, in their sole discretion, the following, subject to the limits noted in the chart below (collectively, the "<u>Prepetition Employee Obligations</u>"):

| Wages or Benefits | Amount |
|---|---|
| Gross Wages | $625,000 |
| Administrative fees (payroll processing, COBRA, HSAs) | $50,000 |
| Corporate Credit Card Program | $102,000 |
| Incentive and Commission Payments | $100,000 |
| Independent Contractors | $50,000 |
| Miscellaneous Benefits | $25,000 |

### A.     General Employee Overview

70.     As of March 16, 2023, the Debtors employed approximately 180 full-time Employees and 791[31] part-time Employees. Full-time Employees are those normally scheduled to work on average of 30 or more hours per week while part-time Employees are those normally scheduled to work on average of less than 30 hours per week.[32] The Employees are not unionized. The Debtors also supplement their workforce with certain independent contractors who provide IT services (the "<u>Independent Contractors</u>").[33]

---

[31]     The census fluctuates frequently.

[32]     Some part-time Employees work more than 30 hours per week from time to time.

[33]     The Debtors retain the Independent Contractors through an employment agency.

71.     Non-Debtor affiliates Adelphi Transport LLC ("Adelphi Transport") and Adelphi Environmental Services LLC ("Adelphi Environmental" and, together with Adelphi Transport, "Adelphi"), employ approximately 102 full-time employees as of the Petition Date.  The Debtors, in the ordinary course, funded Adelphi's payroll together with the payroll of the Debtors and are reimbursed by Adelphi for the payroll.[34]   In year-to-date 2023 to date, Adelphi's payroll has averaged approximately $365,000 per month.

72.     Pursuant to the Wage Motion, the Debtors seek to pay or honor all Wages and Benefits and other amounts detailed therein, to the extent described herein, on an ongoing basis and in the ordinary course of business and subject to the applicable limits under section 507(a) of the Bankruptcy Code. I believe there is no good reason for the regular payment of Wages and Benefits to be disrupted, which would directly harm the Debtors and their Employees.

**B.      The Debtors' Payroll Schedules and Payroll Amounts**

73.     The Debtors' payroll schedules are as follows:

74.     Cycle No. 1: Mountain Express Oil, Adelphi Environmental. These Employees are paid every other week, 5 days in arrears. The applicable biweekly pay date (the "Cycle 1 Pay Date") occurs every other Wednesday. The last Cycle 1 Pay Date was March 15, 2023. The next Cycle 1 Pay Date will be on Wednesday, March 29, 2023 for accrued wages owing through March 24, 2023.

75.     Cycle No. 2: Quik Chek, Adelphi Transport. These Employees are paid each week, 6 days in arrears. The applicable weekly pay date (the "Cycle 2 Pay Date") occurs each Friday.

---

[34]    In the case of Adelphi Environmental, payment to the Debtors has been made by deducting from the A/R balance owed by the Debtors to Adelphi Environmental.  Postpetition, Adelphi Environmental will make cash reimbursements to the Debtors following the Debtors' payments on account of the Adelphi Environmental Employees' payroll.

The last Cycle 2 Pay Date was March 17, 2023. The next Cycle 2 Pay Date will be on Friday, March 24, 2023 for accrued wages owing through March 18, 2023.

76.     Cycle No. 3: Brothers Petroleum, Big Red, Grab 'n Go, WHRG Entities. These Employees are paid every other week, 6 days in arrears. The applicable biweekly pay date (the "Cycle 3 Pay Date" and together with the Cycle 1 Pay Date and the Cycle 2 Pay Date, the "Pay Dates") occurs every other Friday. The last Cycle 3 Pay Date was March 17, 2023. The next Cycle 3 Pay Date will be on Friday, March 31, 2023 for accrued wages owing through March 25, 2023.

77.     Two business days prior to each Pay Date, the Debtors' payroll service provider, Proliant (the "Payroll Processor"), drafts the funds from the Debtors' segregated payroll account at First Horizon Bank, and the funds are automatically transferred that same day. Wages are paid to Employees the following Wednesday or Friday, as applicable, via direct deposit. In rare circumstances, the Debtors issue manual paychecks with respect to off-payroll cycle payments, payroll adjustments, and other limited situations (collectively, the "Manual Checks"). To the extent any prepetition Manual Checks have not been cashed, the Debtors request authority to reissue Manual Checks postpetition to the affected Employees for any prepetition amounts owed. The Payroll Processor also remits Deductions and Withholding Obligations (each as defined below) to the appropriate taxing and governmental jurisdictions on each Pay Date.

78.     In the Wage Motion, the Debtors seek authority, in their discretion, to continue to fund Adelphi's payroll consistent with past practice, and subject to subsequent cash reimbursement by Adelphi.  As part of such requested relief, the Debtors seek authority to permit the Payroll Processor to continue to process the Debtors' payroll obligations, including of Adelphi, in the ordinary course of business. The Debtors believe that they are current to the Payroll Processor on account of unpaid payroll servicing fees. To the extent that any fees are still outstanding to the

Payroll Processor as of the Petition Date, the Debtors request authority in the Wage Motion, in their discretion, to remit such amounts, not to exceed $50,000.

79.     The Debtors estimate that they will accrue approximately $625,000 in prepetition unpaid Wages between the end of the prior pay period and the Petition Date. To ensure there is no interruption in payment of amounts to Employees, the Debtors have funded $300,000 (the amount of the upcoming pay cycle) prepetition to the Payroll Processor in advance of the Petition Date.

### C.     Gross Pay Deductions and Payroll Taxes

80.     For each applicable pay period, the Debtors routinely deduct certain amounts from each Employee's gross payroll, including, without limitation, garnishments, child support, spousal support, and similar deductions and other pre-tax and post-tax deductions payable pursuant the employee benefit plans discussed herein (including, for example, the Employee's share of health care benefits, retirement plan contributions, legally ordered deductions, and miscellaneous deductions) (collectively, the "Deductions"). As set forth below, I understand that the Deductions are not property of the Debtors or their estates and are withheld from Employees' gross payroll and remitted to the appropriate third parties. On average, the Debtors' payroll Deductions total approximately $35,000 per month, which the Debtors remit to the appropriate third-party recipients. As of the Petition Date, certain of the Deductions may not yet have been transmitted to the appropriate third party recipients and the Debtors request authority to transfer any Deductions to the appropriate third party recipients or as may be required under applicable nonbankruptcy law.

81.     In addition to the Deductions, applicable federal and state laws require the Debtors to withhold amounts related to federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities (collectively, the "Withholding Obligations"). The Debtors must also pay, from their own funds, for Social Security

and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively the "Employer Payroll Taxes," and, together with the Withholding Obligations, the "Payroll Taxes"). On average, the Payroll Taxes per month, including both the Employee and employer portions, total approximately $900,000.

82.     To the extent any of the prepetition Deductions or Payroll Taxes have not yet been forwarded to the appropriate third-party recipients, the Debtors seek authority in the Wage Motion to forward such amounts (and to continue to forward Deductions and Payroll Taxes on a postpetition basis whether or not related to the prepetition period) to the applicable third-party recipients in the ordinary course of business and consistent with past practice.

### D.     Corporate Credit Card Program

83.     The Debtors offer certain Employees[35] a corporate credit card to utilize for authorized business expenditures.  As of the Petition Date, there are approximately 47 issued American Express corporate credit cards (the "Corporate Credit Card Program").  The Debtors pay these credit cards directly, and Employees are not liable for the balances of the Corporate Credit Card Program.  The majority of the expenses incurred under the Corporate Credit Card Program are by the Debtors' district managers who regularly incur travel expenses, including rooms, meals, and incidentals such as gas and mileage expenses, as well as emergency repairs and maintenance costs associated with fuel tanks and fuel delivery vehicles.  In the year to date, monthly payments by the Debtors to American Express have averaged approximately $220,000.  As of the Petition Date, the Debtors estimate that they owe approximately $102,000 on account of

---

[35]     In addition to Employees of the Debtors, certain credit cards have been issued to Adelphi (the "Adelphi Credit Cards").  On a go-forward basis (including with respect to all amounts to be paid pursuant to the Wage Motion), the Debtors will not pay any amounts under the Corporate Credit Card Program on account of the Adelphi Credit Cards unless Adelphi reimburses the Debtors for such payments.

the Corporate Credit Card Program.  The Debtors seek authority in the Wage Motion to pay all outstanding amounts owed on account of the Corporate Credit Card Program and to continue the Corporate Credit Card Program in the ordinary course in their discretion.

### E.    Employee Incentive and Commission Payments

84.    The Debtors do not generally provide Employees with bonuses, other than (a) specific retention incentives offered to certain Employees related to the 2021 acquisition of Brothers Petroleum[36] and (b) in connection with the conversions of retail convenience stores to dealerships to reward loyalty and performance (the "Incentive Payments"). The Debtors' ability to fund the Incentive Payments has been critical to maintaining Employee morale and loyalty. The Incentive Payments provide the eligible Employees with stability and incentivizes them to continue to support critical components of the Debtors' operations. None of the Employees to whom Incentive Payments will be paid pursuant to the Wage Motion are insiders of the Debtors.

85.    In addition, the Debtors pay certain Employees commissions based on various criteria, such as sales, on a regular basis (*i.e.*, monthly or quarterly) (the "Commissions"), and together with the Incentive Payments, the "Incentive and Commission Payments"). The Commissions are paid through a combination of payroll, 1099, and W-2.

86.    The Debtors wish to honor the prepetition amounts owed to their Employees for Incentive and Commission Payments as these amounts are an element of compensation that is relied upon by participating Employees. The Debtors seek authority in the Wage Motion, in their discretion, to pay the Incentive and Commission Payments up to $100,000 in the aggregate, and

---

[36]    Two incentive payments of $20,000 each are due on March 31, 2023.  The retention incentives to certain accountants were provided in late 2021.

to continue to pay the Incentive and Commission Payments that may arise postpetition in the ordinary course of business and in the Debtors' discretion.

### F. Independent Contractors

87. The Debtors are invoiced for the services of the Independent Contractors. The Debtors have paid approximately $12,000 year to date, representing services provided in January 2023. As the amount owing depends on hours actually spent, the precise amount of prepetition amounts owing to the Independent Contractors is unknown. Accordingly, the Debtors seek authorization in the Wage Motion in their discretion to pay up to the amount of $50,000 on account of prepetition amounts that may be owing to Independent Contractors.

### G. Health Benefits

88. The Debtors provide health insurance to certain Employees, including, *inter alia*, medical and prescription drug, dental, vision, disability, COBRA, and health savings accounts (collectively, the "Health Plans"), as described in more detail below. Each pay period, Employees make contributions toward the Health Plans for medical, dental, and vision coverage, and the Debtors deduct the Employees' contributions, if applicable, owing under the Health Plans from their Wages as Deductions.

a. Medical, Dental and Vision Insurance.

89. The Debtors offer a choice of a point of service (POS) or high-deductible medical plan through Anthem ("Anthem") for full time Employees and their dependents (collectively, the "Anthem Medical Plan"). The Anthem Medical Plan is fully insured. Employees enrolled in the Anthem Medical Plan pay approximately 33% of the cost through premium contributions. In addition to health care coverage, participants in the Anthem Medical Plan receive telemedicine health care service, prescription drug coverage, and a 24/7 nurse line at no additional cost.

90.     For legacy Brothers Petroleum Employees in New Orleans, the Debtors offer a medical plan through Humana (the "Humana Medical Plan" and together with the Anthem Medical Plan, the "Medical Plans"). The Humana Medical Plan is also fully insured.

91.     Based on the current number of enrolled Employees and dependents, the Debtors pay approximately $200,000 monthly in the aggregate on account of the Medical Plans, inclusive of Employee contributions. The Debtors are current on obligations to Anthem, however the payment made on account of the Humana invoice dated March 1, 2023 in the approximate amount of $50,000 was returned.  The Debtors seek authority in the Wage Motion to pay any prepetition amounts owing to Humana and to continue to pay postpetition amounts under the Medical Plans in the ordinary course of business and in the Debtors' discretion.

92.     The Debtors also offer dental plans (the "Dental Plan") and vision plans (the "Vision Plan") through Anthem and Humana.  Employees' Dental Plan and Vision Plan premiums are covered partially by Employee contributions. Except as set forth above, the Debtors are current on monthly premiums to Anthem and Humana. In an abundance of caution, the Debtors seek authority in the Wage Motion to pay any prepetition amounts owing to Anthem and Humana as they come due in the ordinary course of business, and to continue to honor the Dental Plan and Vision Plan postpetition, in the Debtors' discretion.

    b.     COBRA Benefits.

93.     The Consolidated Omnibus Budget Reconciliation Act ("COBRA") gives workers and their families who lose their health benefits the right to choose to continue the group health benefits provided by their group health plan for limited periods of time under certain circumstances, such as voluntary or involuntary job loss, reduction in the hours worked, transition

between jobs, death, divorce, and other life events. Qualified individuals are generally required to pay the entire premium for coverage, up to 102 percent of the cost to the plan.

94.     COBRA generally requires that group health plans sponsored by employers with 20 or more employees in the prior year offer employees and their families the opportunity for a temporary extension of health coverage (called continuation coverage) in certain instances where coverage under the plan would otherwise end. These former Employees fund approximately 102 percent of the cost of their health plan. Former Employees electing to receive COBRA benefits pay fixed premiums to Flores & Associates (for the Anthem Medical Plan) and iSolved (for the Humana Medical Plan), the Debtors' COBRA administrators. As of the Petition Date, the Debtors are unaware of any outstanding prepetition administrative COBRA fees that may be owed by the Debtors. Out of an abundance of caution, the Debtors seek in the Wage Motion to pay any unpaid prepetition COBRA administrative fees to Flores & Associates and iSolved, and to continue to pay postpetition COBRA administrative fees in the ordinary course of business and in the Debtors' discretion.

       c.     <u>Health Savings Accounts</u>

95.     As noted above, the Debtors provide eligible Employees with Health Savings Accounts ("<u>HSAs</u>"), administered by Anthem, which help defray the costs of the Employees' Health Plan deductibles and co-pays. Specifically, Employees may use HSA funds to pay medical expenses, including deductible payments, coinsurance, prescription drugs, urgent and emergency care, lab tests, and hospital visits. The Debtors seek authority in the Wage Motion to continue to withhold and remit payments to the HSAs.

       d.     <u>Life Insurance, Accidental Death & Dismemberment and Disability Plan</u>

96.    Full-time Employees of the Debtors may elect voluntary life insurance and AD&D coverage for themselves and dependents (the "<u>Life/AD&D Insurance Plan</u>") through Lincoln Financial Group ("<u>Lincoln</u>") at the sole cost of the Employees. The Employees pay all premiums in connection with the Life/AD&D Insurance Plan. Additionally, the Debtors may elect voluntary long-term disability and short-term disability coverage (the "<u>Employee Disability Plan</u>").

97.    The Debtors do not incur any costs of administration of these programs. The Debtors are current on payments owing under the Basic Life/AD&D Insurance Plan and Employee Disability Plan on behalf of the Employee participants. In an abundance of caution, the Debtors seek authority to pay unpaid prepetition amounts on account of the Basic Life/AD&D Insurance Plan and Employee Disability Plan, and to continue to pay postpetition premium amounts on account of the Basic Life/AD&D Insurance Plan and Employee Disability Plan in the ordinary course of business and in the Debtors' discretion.

       e.     <u>Holidays, Vacation and Sick Leave</u>

98.    Employees have six paid holidays per year. The Debtors also award paid time off ("<u>PTO</u>") to Employees. Employees of Debtor Mountain Express Oil Company (the "<u>Corporate Employees</u>") in their first four years of employment by the Debtors accrue 3.08 hours of PTO per bi-weekly payroll cycle (totaling two weeks per year). Starting their fifth year of consecutive employment, Corporate Employees accrue 4.61 hours of PTO per bi-weekly payroll cycle (totaling three weeks per year). Corporate Employees also accrue five days of paid sick leave per year ("<u>Sick Leave</u>").

99.    Store Employees start earning PTO after one year of consecutive employment. During their first four years of employment, they earn two days of PTO per year. Starting their

fifth year of consecutive employment, store Employees accrue five days of PTO per year. Employees may roll over a maximum of 40 hours of PTO to the following year provided that it must be used by March 1.

100.    Pursuant to the Wage Motion, the Debtors seek authority to continue to honor their PTO and Sick Leave programs in the ordinary course of business by allowing Employees to use accrued prepetition PTO and Sick Leave postpetition in the Debtors' discretion and consistent with past practice. The Debtors also seek authority in the Wage Motion, but not the obligation, in their sole discretion, to pay out any accrued and prepetition PTO amounts that are owed to Employees solely to the extent their employment with the Debtors is terminated postpetition in accordance with their ordinary course business practices and/or applicable law.

   f.  401(k) Plan[37]

101.    The Debtors provide Employees who have been employed by the Debtors for at least six (6) months with a 401(k) retirement plan (the "401(k) Plan"). Employee contributions are withheld from paychecks as Deductions. To the extent any prepetition 401(k) Deductions have not yet been made, the Debtors seek authority to process those Deductions.

102.    Historically, the Debtors have matched up to 4% of eligible earnings. In 2022, the Debtors funded matching contributions to the 401(k) Plan in the amount of approximately $115,000.

103.    The Debtors are in the process of employing an auditor for the 401(k) Plan (the "401(k) Plan Audit") in accordance with compliance requirements under certain Department of Labor and IRS regulations. The 401(k) Plan Audit fees are estimated to be approximately $30,000,

---

[37]    The 401(k) Plan is the only active retirement plan currently offered by the Debtors which the Debtors seek authority under the Wage Motion.

to be conducted and paid in the coming months. The Debtors intend to pay postpetition amounts with respect to the 401(k) Plan Audit in the ordinary course of business and in their discretion.

104.   The 401(k) Plan is maintained by Human Interest, Inc. ("Human Interest"). The Debtors seek authority, in their discretion, to continue the 401(k) Plan postpetition in the ordinary course of business, consistent with their prepetition policies, including paying all fees to Human Interest associated therewith.

### H.   Other Benefits

105.   As of the Petition Date, the Debtors offer eligible Employees with additional miscellaneous benefits including the following (collectively, the "Miscellaneous Benefits"):

- The Debtors provide an employee assistance program (the "EAP") through Lincoln Financial Group, which is designed to assist employees in resolving personal problems that may be adversely affecting the Employee's performance including child or elder care, relationship challenges, financial or legal problems, wellness matters, and traumatic events like workplace violence. Programs are delivered at no cost to Employees by Master's level counselors. Services are often delivered via phone, video-based counseling, online chatting, e-mail interactions, or face-to-face;

- Employees may enroll for DailyPay payroll benefits. For enrollees in DailyPay, the Employee will build up a "pay balance" in the DailyPay account each day worked that can be transferred into the Employee's bank account, to the Employee's debit card or to the Employee's payroll card. This balance is updated when the Employee clocks out of each shift;

- TravelConnect is a comprehensive program that can assist with accessing care for a medical emergency while traveling 100 or more miles from home. Employees enrolled in the Debtors' voluntary life insurance and/or AD&D benefits plans have access to TravelConnect 24 hours, 7 days a week; and

- Employees enrolled in the Debtors' voluntary life insurance and disability benefits plans will have access to LifeKeys. LifeKeys is a service that offers discounts on shopping and entertainment, identity theft protection, will preparation, and additional services.

106.   The Debtors anticipate that any prepetition amounts owing in connection with the Miscellaneous Benefits are *de minimis* and seek authority under the Wage Motion in the abundance of caution to pay up to $25,000 on account of prepetition Miscellaneous Benefits costs owed and

to continue to administer these and similar programs and pay amounts owed on account of the Miscellaneous Benefits postpetition in the ordinary course of business and in their discretion.

## I.    Workers' Compensation Insurance

107.    The Debtors maintain no-deductible workers' compensation insurance (the "<u>WC Program</u>") to provide Employees with coverage for injury claims arising from or related to their employment with the Debtors (the "<u>WC Claims</u>") in accordance with applicable state law.  The Debtors' insurance carrier is Federated Mutual Insurance Company ("<u>FMIC</u>").

108.    For the mid-2022 to mid-2023 policy year, the annual premium was approximately $1.2 million based on estimated annual payroll, with a true-up at the end of the policy year.  The Debtors pay the policy in monthly installments and are current on premiums owing to FMIC. Out of abundance of caution and to avoid any potential interruptions in coverage or administration of claims, the Debtors seek authority in the Wage Motion to pay to FMIC any amounts owed to them that may be related to the prepetition period (including based on the afore-referenced true-up) and to continue to pay postpetition amounts to them in the ordinary course of business in the Debtors' discretion.

109.    I believe that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties. Finding, attracting, and training new qualified talent would be extremely difficult and would most likely require higher salaries, guaranteed bonuses, and more comprehensive compensation packages than are currently provided to Employees.

110.    Furthermore, based on my experience, I believe that many Employees may live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in order to continue to pay their daily living expenses. These

Employees may be exposed to significant financial and healthcare-related problems if the Debtors are not permitted to pay and/or honor the Wages and Benefits, and the expenses associated therewith, in the ordinary course of the Debtors' business. Moreover, I believe that if they are unable to honor accrued Wages and the Benefits described above, including honoring prepetition PTO and Sick Leave by allowing Employees to use accrued prepetition PTO and Sick Leave on a postpetition basis, Employee morale and loyalty will be jeopardized at a time when Employee support is critical. I also believe that any uncertainty with regard to continuation of Wages and Benefits will cause significant anxiety at precisely the time the Debtors need their Employees to perform their jobs at peak efficiency

111. In addition, I believe that the Employees have an intimate knowledge of the operation of the Debtors' business and are critical components to the successful reorganization of the Debtors' business. Deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtors and their ability to sustain their operations. Satisfaction of the Wages and Benefits, as described herein, is necessary to maintain the Employees' morale during the cases and to insure continued, efficient operation in order to maximize value for all creditors. Accordingly, the Court should grant the relief requested in the Wage Motion.

**C.** ***Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief** (the "<u>Tax Motion</u>")*

112. Pursuant to the Tax Motion, the Debtors seek entry of an order (a) authorizing the Debtors to remit and pay or use tax credits to offset prepetition Taxes and Fees and postpetition Taxes and Fees (defined below) as they become due and owing, including obligations arising on account of an Audit (defined below) or Assessment (defined below), and (b) granting related relief.

113.     In the ordinary course of business, the Debtors collect, withhold, and incur taxes and fees related to sales and use, property, income, motor fuel, franchise, annual reporting fees, audits, and business and regulatory fees (collectively, the "Taxes and Fees").[38]  The Debtors remit the Taxes and Fees to various governmental authorities on a monthly, quarterly, semi-annual, or annual basis (collectively, the "Authorities"). A schedule identifying the Authorities is attached to the Tax Motion as **Exhibit A**.

114.     The Debtors seek authority in the Tax Motion to make payments where (a) the Taxes and Fees have accrued or were incurred prepetition but (i) were not paid prepetition or (ii) were paid in an amount less than actually owed, (b) the Debtors made payments prepetition that were lost or the Authorities did not receive the prepetition payments in full, which may give rise to interest and other penalties, (c) the Taxes and Fees were incurred for prepetition periods and become due and payable after the Petition Date, (d) the Taxes and Fees accrued or are incurred postpetition, and (e) the Taxes and Fees are for so-called "straddle" periods.[39]

115.     Failure to pay the Taxes and Fees could materially disrupt the Debtors' business operations in various ways, including: (a) the Authorities may initiate Audits of the Debtors, which would unnecessarily divert the Debtors' attention from the restructuring process; (b) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and/or pursue other remedies that will harm the estates; and (c) in certain instances, the

---

[38]     The Debtors do not seek authority to pay prepetition amounts related to employment taxes and payroll withholding taxes under the Tax Motion but rather request such authority in the Wage Motion.

[39]     Claims for so-called "straddle" Taxes and Fees may be entitled to administrative claim treatment pursuant to section 503(b)(1)(B) of the Bankruptcy Code. The Debtors are seeking the authority to pay such "straddle" Taxes and Fees as they become due under applicable law because the Debtors could be subject to late payment penalties and interest in the event they do not pay such "straddle" Taxes and Fees and a court ultimately concludes that such taxes are entitled to administrative treatment. The Debtors reserve their rights with respect to the proper characterization of such "straddle" Taxes and Fees and to seek reimbursement of any portion of a payment that was made that ultimately is not entitled to administrative or priority treatment.

Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key individuals from their duties related to the Debtors' restructuring. Unpaid Taxes and Fees may result in fines and penalties, the accrual of interest, or both. Finally, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and these funds may not constitute property of the Debtors' estates.

116. The description of the Taxes and Fees set forth below is based in part upon the Debtors' books and records that, until shortly before the Petition Date, were maintained by certain individuals who have recently left employment by the Debtors. In light of the institutional knowledge that has been lost, the Debtors will amend or supplement the Tax Motion if material additional prepetition accruals of Taxes and Fees are determined that the Debtors intend to seek authority to pay. The Debtors believe they are substantially current on the payment of Taxes and Fees, but have incurred the following prepetition taxes that are not yet due.

A. **Sales and Use Taxes**

117. In the ordinary course of business, the Debtors incur and pay state and local sales and use taxes (collectively, the "Sales and Use Taxes") by purchasing inventory, supplies, or other regularly used goods. As of the Petition Date, the Debtors estimate that they have incurred or collected approximately $350,000 in Sales and Use Taxes that have not been remitted to the relevant Authorities. The Debtors request authority in the Tax Motion to pay prepetition Sales and Use Taxes as they become due and owing and to continue paying their Sales and Use Taxes obligations on a postpetition basis in the ordinary course of business.

B. **Motor Fuel Taxes**

118. The Debtors collect and remit motor fuel taxes (collectively, "Motor Fuel Taxes") to the applicable Authorities in connection with their operations in certain jurisdictions. The time

and manner that the Motor Fuel Taxes accrue and are paid are based on applicable non-bankruptcy law. As of the Petition Date, the Debtors estimate that they have incurred or collected approximately $16 million in Motor Fuel Taxes that are not yet due to the relevant Authorities. The Debtors request authority in the Tax Motion to pay prepetition Motor Fuel Taxes as they become due and owing and to continue paying their Motor Fuel Taxes obligations on a postpetition basis in the ordinary course of business.

### C. Property Taxes

119. The Debtors own a terminal property and operate commercial property under triple net leases, which require that the Debtors pay the real property taxes associated with such properties (collectively, "Real Property Taxes") directly to the applicable Authorities. Additionally, the Debtors incur personal property taxes (the "Personal Property Taxes," and together with the Real Property Taxes, the "Property Taxes") in connection with their operations in certain jurisdictions. The time and manner that Property Taxes accrue and are paid are based on applicable non-bankruptcy law.

120. Importantly, state and local laws in jurisdictions in which the Debtors operate generally provide that certain Authorities may assert a lien on property for unpaid Property Taxes in certain circumstances. Such a lien could affect the rights of third parties if left unsatisfied, including the rights of mortgagees, secured lenders, and lessors of the Debtors' real and personal property. It is essential to the Debtors' go-forward operations that they are authorized to pay all of their Property Taxes in the ordinary course, including those that accrued prepetition, which will become due postpetition. The Debtors estimate that they have accrued approximately $4.1 million in Property Taxes as of the Petition Date. Accordingly, the Debtors request authority in the Tax

Motion to pay prepetition Property Taxes as they become due and owing and to continue paying their Property Tax obligations on a postpetition basis in the ordinary course of business.

### D.     Income and Other Taxes

121.    The Debtors are required to make payments for amounts due to certain Authorities that require the Debtors to pay income or corporate taxes, including gross receipts taxes (collectively, "Income and Other Taxes"). Generally, Income and Other Taxes are calculated as a percentage of net income (*i.e.*, the difference between gross receipts and expenses after accounting for additional write-offs).   The Debtors own and/or operate property in 26 states:   Alabama, Arkansas, Connecticut, Florida, Georgia, Indiana, Iowa, Kansas, Kentucky, Louisiana, Michigan, Minnesota, Mississippi, Missouri, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Wisconsin, and Wyoming. Additionally, the Debtors supply fuel in Nebraska.  As a result, many Authorities calculate Income and Other Taxes for a particular Debtor based on the proportion of the applicable Debtor's taxable income derived from operations in the applicable jurisdiction.

122.    The Debtors are required to pay the Income and Other Taxes on a quarterly or annual basis.[40] For context, I understand that the Debtors' tax returns for 2022 have not been completed. Total state and federal income taxes due for 2021 totaled approximately $9.6 million, including penalties and fees. The Debtors request authority in the Tax Motion to pay prepetition Income and Other Taxes as they become due and owing and to continue paying their Income and Other Tax obligations on a postpetition basis in the ordinary course of business.

---

[40]    Different types of Taxes are included on the Debtors' state income tax return for certain jurisdictions. For the avoidance of doubt, the Debtors are seeking authority in the Tax Motion to continue remitting these Taxes, which are included on income tax returns in the ordinary course of business and consistent with past practices.

123. The Debtors incur and remit annual reporting, permitting, and licensing fees in connection with chartering or operating in those states ("Fees"). The Debtors request authority in the Tax Motion to pay prepetition Fees (the "Fee Obligations") as they become due and owing and to continue paying their Fee Obligations on a postpetition basis in the ordinary course of business.

F. **Franchise and Business Privilege Taxes**

124. The Debtors are required to pay state franchise taxes independent of income taxes, in order to continue conducting their business pursuant to applicable law ("Franchise Taxes"). Certain state and local Authorities also impose taxes on the Debtors for, among other things, operating licenses, liquor licenses and additional business privileges (together with Franchise Taxes, "Franchise and Privilege Taxes"). Failure to pay Franchise and Privilege Taxes as they become due in the ordinary course could cause the Debtors to lose their ability to conduct business in the applicable jurisdictions. The Debtors generally pay their Franchise and Privilege Taxes on an annual basis, depending on the jurisdiction. The Debtors request authority in the Tax Motion to pay prepetition Franchise and Privilege Taxes and to continue paying the Franchise and Privilege Taxes on a postpetition basis in the ordinary course of business.

G. **Audits and Assessments**

125. The Debtors may currently be involved in ongoing audit investigations and may be subject to further investigations on account of tax returns and/or tax obligations in prior years (collectively, the "Audits"). Additionally, the Debtors may be assessed additional Taxes and Fees for prepetition amounts paid notwithstanding whether an Audit has occurred (collectively, the "Assessments"). Further, the Debtors routinely review their books and records and perform other related activities in connection with their Taxes and Fees in the ordinary course of business, which could give rise to additional liabilities that are not associated with an Audit or Assessment. As of the Petition Date, the Debtors do not believe there are any outstanding amounts owed in Taxes and

Fees on account of the Assessments, which includes amounts that are being disputed in the appropriate judicial or administrative proceeding. The Debtors seek authority in the Tax Motion to pay undisputed prepetition Assessments and continue to negotiate settlements or resolutions with the applicable Authority regarding any disputed Assessments on a postpetition basis in the ordinary course of business.

### H.    Lottery Ticket Sales Revenue

126.    One source of the Debtors' revenue is derived from the sale of lottery tickets at the Debtors' convenience stores. The proceeds of these sales are received by the Debtors from consumers for the purchase price of lottery tickets but are held in trust for the applicable Authorities.  The Debtors pay the proceeds of the lottery ticket sales to the applicable Authorities, typically on a weekly basis.  The Debtors estimate that they have accrued approximately $1.6 million in lottery ticket sale obligations as of the Petition Date. The Debtors seek authorization in the Tax Motion to pay to the applicable Authorities any lottery ticket sale proceeds that they may have collected prepetition and to continue to pay over lottery ticket sale proceeds postpetition in the ordinary course of business.

127.    I believe that the Debtors' ability to pay the Taxes and Fees is critical to their continued and uninterrupted operations. If certain Taxes and Fees remain unpaid, I understand that the Authorities may seek to recover such amounts directly from the Debtors' directors, officers, or employees, thereby distracting such key personnel from the administration of these Chapter 11 Cases.  Any collection action on account of such claims and any potential ensuing liability would distract the Debtors and their personnel from their restructuring objectives to the detriment of all parties in interest.  The dedicated and active participation of the Debtors' officers and employees

is integral to the Debtors' continued operations and essential to the orderly administration and, ultimately, the success of these Chapter 11 Cases.

128.     I further believe that the relief requested in the Taxing Motion is reasonable in light of the added costs and penalties that may be incurred if such amounts remain unpaid. Specifically, I understand that the Debtors' Taxes and Fees obligations may ultimately result in increased liabilities for the Debtors if interest and penalties accrue on the Tax and Fee claims, which amounts may also be entitled to priority treatment. I believe that such a result would be contrary to the best interests of the Debtors' estates and all stakeholders. Accordingly, the Court should grant the relief requested in the Taxing Motion.

**D.** **_Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Honor and Renew the Premium Financing Agreement Entered into Prepetition and Satisfy Obligations Related Thereto, and (C) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies; and (II) Granting Related Relief_ (the "_Insurance Motion_")**

129.     Pursuant to the Insurance Motion, the Debtors seek entry of an order a) authorizing the Debtors to (i) continue insurance coverage entered into prepetition and satisfy prepetition obligations related thereto in the ordinary course of business,[41] (ii) honor and renew the premium financing agreement entered into prepetition and satisfy obligations related thereto, and enter into new premium financing agreements in the ordinary course of business, and (iii) renew, amend, supplement, extend, or purchase insurance coverage in the ordinary course of business on a postpetition basis; and (b) granting related relief.

---

[41]     Nothing herein or in the Insurance Motion shall be deemed an admission of any payments due or past due under or related to any of the Insurance Policies (as defined herein).

A.      **The Insurance Policies**

130.    In the ordinary course of the Debtors' business, the Debtors maintain approximately 56 insurance policies (collectively, the "<u>Insurance Policies</u>," and the carriers thereof, the "<u>Insurance Carriers</u>") [42] providing coverage for, among other things, commercial property, flood, tank pollution, liquor, employer practice, and directors' and officers' liability.[43]  The Insurance Policies are essential to the preservation of the Debtors' business and assets, and, in many instances, such insurance coverage is required by regulation, law, or contract that governs the Debtors' business.  A comprehensive list of the Insurance Policies is attached to the proposed order approving the Insurance Motion as <u>Exhibit 1</u>.

131.    To preserve the value of the Debtors' business operations, properties, and assets, it is essential that the Debtors be able to continue or renew the Insurance Policies and enter into new insurance policies.  I understand that in many cases, regulations, laws, and contract provisions that govern the Debtors' commercial activities require the types of coverage provided for under the Insurance Policies, as well as the Bankruptcy Code and U.S. Trustee Guidelines.  The relief requested in the Insurance Motion is designed to ensure uninterrupted coverage under the Insurance Policies.  Therefore, the Debtors seek authorization in the Insurance Motion to maintain

---

[42]    The descriptions of the Insurance Policies set forth in the Insurance Motion constitute a summary only.  The actual terms of the Insurance Policies and related agreements will govern in the event of any inconsistency with the description in the Insurance Motion.  Although <u>Exhibit 1</u> to the order approving the Insurance Motion is intended to be comprehensive, the Debtors may have inadvertently omitted Insurance Policies therefrom.  The Debtors request authority to honor existing Insurance Policies and renew Insurance Policies, as applicable, regardless of whether the Debtors inadvertently failed to include a particular Insurance Policy on such <u>Exhibit 1</u>, and any such omitted Insurance Policy is hereby included in the defined term "Insurance Policies" as used in the Insurance Motion and order with respect thereto.  In addition, the Debtors maintain numerous insurance policies with respect to, among other things, employee health, disability, and life insurance benefits, as well as the Debtors' workers' compensation program. These programs are described, and the relief is requested with respect to such programs, in the Wage Motion.

[43]    In addition to the Debtors' ordinary course directors' and officers' policy, on March 16, 2023, the Debtors purchased Side A coverage in connection with the appointment of independent board members.

the existing Insurance Policies, pay prepetition obligations (if any) related thereto upon entry of the Order, and renew, amend, supplement, extend, or purchase new Insurance Policies on a postpetition basis in the ordinary course of business consistent with past practice.

### B. Premium Financing

132.    While the Debtors pay most of their premiums for their Insurance Policies in full in advance, the Debtors pay eleven (11) of their Insurance Policies insured by Federated Mutual Insurance Company on an installment basis.  As of the Petition Date, the Debtors expend approximately $438,873.80, in the aggregate,[44] each month on such monthly premium payments, and believe they are current on all monthly premium obligations.

133.    In addition, one of the Insurance Policies was financed through a premium financing agreement (the "Premium Financing Agreement").  The Premium Financing Agreement is between Mountain Express Oil Company and IPFS Corporation (the "Premium Financing Provider") and was paid in full prior to the Petition Date.  As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the Premium Financing Agreement and that the Premium Financing Agreement has been paid off.

134.    The Debtors seek authority to enter into new premium financing agreements, directly with the finance providers, or new non-financed Insurance Policies as necessary or appropriate, without further Court approval.

### C. Deductibles and Self-Insured Retentions

135.    Certain of the Insurance Policies require the Debtors to pay a deductible (collectively, the "Deductibles").  Generally, if a claim is made under an Insurance Policy with a Deductible, the Debtors are obligated to pay any defense costs or successful or settled claims up

---

[44]    Amounts on account of the Debtors' workers' compensations policies are included in the aggregate payment.

to the amount of the Deductible. Carriers are directly responsible for any claim under the applicable Insurance Policy to the extent such claim is in excess of the Deductible. The Deductibles may range up to $1,000,000, subject to certain limitations.

136. Alternatively, certain of the Insurance Policies may use self-insured retentions (collectively, the "SIRs") instead of Deductibles. If a claim is made under these policies, the Debtors must make payments in the first instance up to the limit of the SIR and, once the Debtors have made such payments, the carrier is obligated to cover remaining costs.

137. The Debtors do not believe there are any accrued but unpaid amounts pursuant to the Deductibles and SIRs. However, out of an abundance of caution, the Debtors seek authority in the Insurance Motion to continue to honor their obligations under the Deductibles or SIRs as they come due on a postpetition basis in the ordinary course of business.

**D.    Insurance Brokerage Fees**

138. The Debtors obtain Insurance Policies through Lockton Companies, Dickey McCay, and Federated Mutual Insurance Company, their insurance brokers (collectively, the "Insurance Brokers"), who assist the Debtors in obtaining comprehensive insurance coverage and with the procuring and negotiating the Insurance Policies, enabling the Debtors to obtain Insurance Policies on advantageous terms and at competitive rates. The Insurance Brokers collect fees for services rendered as part of the Premiums paid on the Insurance Policies (the "Brokerage Fees"). As of the Petition Date, the Debtors do not believe that they owe the Insurance Brokers any amounts on account of the Brokerage Fees. Pursuant to the Insurance Motion, the Debtors seek authority to pay any outstanding prepetition Brokerage Fees and to continue to honor any Brokerage Fees as they come due on a postpetition basis in the ordinary course of business

139.    The Insurance Policies provide a comprehensive range of protection for the Debtors' businesses, properties, and assets.  It is essential that the Debtors' insurance coverage continues in full force and effect during the course of these Chapter 11 Cases.  At bottom, the Insurance Policies provide the Debtors with essential insurance coverage.  Any lapse in the coverage to be provided under the Insurance Policies could expose the Debtors to substantial liability, monetary and otherwise, for injuries, damages, and penalties for failing to maintain proper insurance.  Therefore, in light of the importance of the Insurance Policies, I believe the Debtors should be permitted to exercise their reasonable business judgment to continue and/or renew the Insurance Policies as they expire. Moreover, I believe permitting the Debtors to continue their installment premiums and to enter into new premium financing agreements, directly with the finance providers, or new non-financed Insurance Policies as necessary or appropriate, is in the best interests of the Debtors' estates.  Accordingly, the Court should grant the Insurance Motion.

**E.**     ***Debtors' <u>Emergency</u> Motion for the Entry of an Order (I) Approving the Proposed Adequate Assurance Deposit for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Proposed Adequate Assurance Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* (the "<u>Utility Motion</u>")**

140.    Pursuant to the Utility Motion, the Debtors seek entry of an order (a) determining that the Adequate Assurance Deposit (defined below) provides the Utility Providers (defined below) with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code (defined below), (b) prohibiting the Utility Providers from altering, refusing, or discontinuing services, (c) approving the Adequate Assurance Procedures (defined below) for resolving any dispute in connection with the Adequate Assurance Deposit, and (d) granting related relief.

A.    **The Utility Services**

141.    In connection with the operation of their businesses, the Debtors obtain electricity, water, internet, telephone, and other similar services (collectively, the "Utility Services"), from a number of utility providers (collectively, the "Utility Providers").   A non-exclusive list of the Utility Providers that provide Utility Services to the Debtors as of the Petition Date is annexed to the proposed order approving the Utility Motion as Schedule 1 (the "Utility Providers List").   In addition, the Debtors pay for Utility Services through their landlords in accordance with the terms of applicable real property leases.   While the Debtors are providing notice of the Utility Motion to all known Utility Providers, the relief requested herein is requested with respect to all Utility Providers and is not limited to those listed on the Utility Providers List.[45]

B.    **The Adequate Assurance Deposit**

142.    On average, the Debtors spend approximately $70,000, in the aggregate, each week on Utility Services, calculated based on the historical average of payments made to the Utility Providers during January 1, 2022 through March 3, 2023.   The Debtors anticipate that their weekly utility spending will continue consistently with historical practice following the Petition Date.

143.    The Debtors intend to satisfy postpetition obligations owed to the Utility Providers in the ordinary course of business and in a timely manner.   The Debtors' cash on hand, cash generated in the ordinary course of business, and the Debtors' proposed cash collateral budgets provide for payments to Utility Providers in accordance with ordinary prepetition practice.   As

---

[45]    Although the Debtors believe that the Utility Providers List includes all of their Utility Providers, subject to the limitations set forth in the Adequate Assurance Procedures, the Debtors reserve the right to supplement the list if they inadvertently omitted any Utility Provider.  Additionally, the listing of an entity on the Utility Providers List is not an admission by the Debtors that such entity is or is not a utility within the meaning of section 366 of the Bankruptcy Code, and the Debtors reserve all rights with respect to any such determination.  The Debtors also may have inadvertently omitted one or more Utility Providers.  Therefore, the Debtors request relief in the Utility Motion applicable to all Utility Providers regardless of whether such Utility Provider is identified on the Utility Providers List.

additional assurance of payment, the Debtors propose to deposit $150,000.00 (the "Adequate Assurance Deposit") into a segregated bank account (the "Adequate Assurance Account") maintained by the Debtors, within seven (7) calendar days after entry of an order approving the Utility Motion.

144.    The Adequate Assurance Deposit is equal to approximately two weeks of the Debtors' average weekly cost of Utility Services, calculated based on the historical average of payments made to the Utility Providers during the period of January 1, 2022 through March 3, 2023. I believe that the Adequate Assurance Deposit, in conjunction with the Debtors' cash on hand, cash generated in the ordinary course of business, and anticipated access to cash collateral (collectively, the "Proposed Adequate Assurance"), demonstrates the Debtors' ability to pay for future Utility Services in accordance with past practice and constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of section 366 of the Bankruptcy Code.

## C.    The Adequate Assurance Procedures

145.    The Debtors propose the adequate assurance procedures set forth in the Utility Motion (the "Adequate Assurance Procedures") for any Utility Provider that is either (a) not satisfied with the Proposed Adequate Assurance or (b) seeking payment of their applicable portion of the Adequate Assurance Deposit for adequate assurance of future payment (each, an "Adequate Assurance Request") during the pendency of these Chapter 11 Cases. In summary, the Adequate Assurance Procedures permit a Utility Provider to object to the Proposed Adequate Assurance by filing or serving an Adequate Assurance Request upon certain notice parties identified in the Proposed Order. Under the Adequate Assurance Procedures, the Debtors may use their discretion to resolve any Adequate Assurance Request with the Utility Provider and without further order of the Court. If the Debtors determine that the Adequate Assurance Request cannot be consensually resolved, the Debtors may seek Court resolution of the Adequate Assurance Request. In addition,

if postpetition amounts remain unpaid beyond the applicable grace period associated with the Utility Services, the Utility Provider may make an Adequate Assurance Request pursuant to the proposed Adequate Assurance Procedures.  As such, the proposed Adequate Assurance Procedures are an efficient and streamlined resolution process for matters related to Utility Services that may arise during the cases.

### D.     Modifications to the Utility Providers List

146.     The Debtors have made an extensive and good faith effort to identify all Utility Providers and include them on the Utility Providers List.  If the Debtors subsequently identify additional Utility Providers or discontinue any Utility Services, the Debtors seek authority, in their sole discretion, to amend the Utility Providers List to add or remove any Utility Provider.  The Debtors further request in the Utility Motion that the relief requested therein, including the proposed Adequate Assurance Procedures, and any order granting the relief requested in the Utility Motion shall apply to any subsequently identified Utility Provider.  The Debtors will serve a copy of the Utility Motion and any related order on any Utility Provider added to the Utility Providers List.  Any subsequently added Utility Provider shall have twenty one (21) calendar days from the date of service of the Utility Motion and any related order to make a request for additional adequate assurance of payment in accordance with the Adequate Assurance Procedures.  Pursuant to the Adequate Assurance Procedures, the Debtors may seek to resolve any subsequently added Utility Provider's request for adequate assurance of payment by mutual agreement with the Utility Provider without further order of this Court or the need to schedule a hearing with this Court to determine the adequacy of assurance payment.

### E.     Prohibitions on Altering, Refusing, or Discontinuing Service

147.     I believe that uninterrupted Utility Service is essential to the Debtors' ongoing business operations and overall success of these Chapter 11 Cases.  Should any Utility Provider

refuse or discontinue service, the Debtors' business operations could be disrupted severely and cause operational and manufacturing disruptions. Moreover, based on their books and records, the Debtors believe there are no material defaults or arrearages for undisputed invoices accrued in connection with Utility Services. As such, it is essential that the Utility Services continue uninterrupted during the pendency of these Chapter 11 Cases.

148.     For the foregoing reasons, the Debtors request that, pending the entry of an order approving the Utility Motion and the resolution of any Additional Assurance Request, objection, or Determination Hearing, the Utility Providers, including any Additional Utility Provider, are prohibited from (a) discriminating against the Debtors, (b) altering, refusing, or discontinuing service to the Debtors, or (c) requiring payment of a deposit or receipt of any other security for continued service other than the Adequate Assurance Deposit as a result of these Chapter 11 Cases or any unpaid prepetition invoices.

**F.     *Debtors' Emergency Motion for the Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Account Reconciliation Practices and (II) Granting Related Relief* (the "Dealer Reconciliation Motion")**

149.     Pursuant to the Dealer Reconciliation Motion, the Debtors seek entry of an order (a) granting the Debtors the authority to maintain, administer, and honor certain prepetition obligations owed to the applicable Dealers and related account-reconciliation and fund release procedures (collectively, the "Dealer Procedures"), and (b) granting related relief.

150.     The Debtors operate and/or distribute fuel products to many hundreds of Dealers across the United States. The Debtors' ordinary course arrangements and relationships with their Dealers are crucial to the preservation and maximization of the Debtors' going concern value and the prospects of a chapter 11 restructuring.

151.     As an integral part of the Debtors' operations and the contractual and other arrangements with Dealers, in the ordinary course of business, the Debtors collect in various Bank

Accounts credit card receipts and/or other cash receipts ("Dealer Collections") from or for the benefit of an applicable Dealer relating to fuel and other sales at the Dealer's location, which funds the Debtors collect and use as a security deposit, pending the Debtors' and Dealer's reconciliation of the amounts due to and from the other party under the parties' applicable agreements and arrangements ("Reconciliation Process"). The frequency of such reconciliations varies, but Dealer-specific reconciliations sometimes occur several times each month.

152. Prepetition, in the ordinary course of business, the Debtors regularly engaged in the Reconciliation Process as to each applicable Dealer and subsequently released the net Dealer Collections each applicable cycle to the Dealer. Because of the timing of these Chapter 11 Cases and the automatic stay, the Debtors hold certain prepetition amounts of Dealer Collections which, after the applicable Reconciliation Process, would otherwise be remitted to the Dealers in the ordinary course of business. If the relief sought by the Dealer Reconciliation Motion were not granted, and the Debtors were unable to transfer the net Dealer Collections to the relevant Dealers, I believe many said Dealers would suffer great hardship and prejudice due to the delayed remittances, the Debtors would risk alienating their Dealers, who could take actions adverse to the Debtors, and the Debtors' relationships with their Dealers, as well as the Debtors' reputation in the marketplace, would be substantially harmed. Just as the Debtors' fuel supply and transport chains (discussed below) are critical to the Debtors' businesses, the Debtors' ordinary course arrangements and relationships with their Dealers (which buy fuel from or through the Debtors) are critical to the goodwill of the Debtors' business and the preservation and maximization of the Debtors' going concern value and a successful chapter 11 restructuring.

153. Because Dealers' collections and reconciliation cycles vary, among other factors, an estimation of amounts at stake is difficult and complex, but the Debtors believe approximately

$7-8 million of prepetition Dealer Collections may be owed to Dealers after the applicable Reconciliation Process. By the Dealer Reconciliation Motion, the Debtors seek authorization to continue with their Reconciliation Process with Dealers and remit net Dealer Collections, as applicable, to the Dealers in the ordinary course of business, irrespective of whether the Dealer Collections relate to the prepetition period. Accordingly, the Court should grant the relief requested in the Dealer Reconciliation Motion.

G.      *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Fuel Suppliers and Transporters and (II) Granting Related Relief* (the "<u>Fuel Supplier Motion</u>")

154.    Pursuant to the Fuel Supplier Motion, the Debtors seek entry of an order (a) authorizing the Debtors to pay certain fuel suppliers, haulers, transporters, shippers, and carriers in the Debtors' fuel purchase, distribution and/or storage chains ("<u>Fuel Relationship Parties</u>"), subject to the limits set forth below; and (b) granting related relief as set forth in the Order.

155.    Given the nature of their business, the Debtors require a ready, consistent, significant supply of fuel for the continued operation of the Debtors' and third parties' Fuel Centers, Travel Centers, and other locations across the United States. In short, if there is no fuel supply, there will be no business of the Debtors to restructure in these Chapter 11 Cases.

156.    The Debtors' Oil Company Agreements are typically between the major national oil companies (the "<u>Fuel Suppliers</u>") and MEX, the Debtors' parent company.[46] Although they vary from contract to contract, they generally entitle MEX to purchase, and obligate the Fuel Supplier to sell, certain annual quantifies of fuel (often expressed as maximum output). These in-bound fuel entitlements, naturally, are tied to the Debtors' corresponding ability to sell the fuel throughout the Debtors' Fueling Centers and Travel Centers. The loss of Dealer locations (and

---

[46] Certain Oil Company Agreements are between a Fuel Supplier and a MEX Fuels Entity.

the fuel supplies that those locations consume), could jeopardize the Debtors' ability to adhere to their purchase commitments under the Oil Company Agreements. The Debtors have limited storage capacity and their fuel purchases are often tied to back-to-back delivery obligations to dealers. Any interruption in the in-bound and out-bound flow of fuel products could cause certain locations to run low supplies thus harming customer relationships.

157.    I believe that granting the Debtors authorization to pay prepetition claims of the Fuel Relationship Parties important to the Debtors' fuel purchase, distribution, and/or storage chains will enhance the likelihood of successful Chapter 11 Cases and maximize the value of the Debtors' estates. Without their arrangements with the Fuel Relationship Parties,[47] the Debtors would not have adequate access to fuel or the infrastructure through which to distribute it to the Debtors' and third parties' locations. Without adequate fuel supply at the locations, customers will go elsewhere to fuel up and shop – devastating to the Debtors' business. In light of the large and essential role played by a distinct group of Fuel Relationship Parties, I believe that it is prudent to seek the relief requested in the Fuel Supplier Motion.

158.    Prepetition, the Debtors were current on their obligations to the Fuel Relationship Parties. On a daily basis, the Debtors run approximately 170 loads of fuel equating to approximately 1.4 million gallons per day. On a weekly basis, the amounts due to the Fuel Relationship Parties range between $10 million and $15 million. Due to the timing of the nature of the Debtors' business, the timing of the chapter 11 filings, and the parties' billing cycles, the Debtors cannot estimate with precision the prepetition invoices that will be generated in the days following the Petition Date. By the Fuel Supplier Motion, the Debtors are seeking authority to

---

[47]    The Debtors are parties to certain fuel supply and other agreements with certain Fuel Relationship Parties, which agreements remain enforceable by the Debtors. The Debtors reserve all of their rights with respect to all such agreements.

pay an amount necessary to preserve the value of their estates, which shall not exceed $25 million in the aggregate, on account of prepetition claims held by the Fuel Relationship Parties and accrued in the ordinary course of business ("Fuel Relationship Claims"). The Debtors intend to apply their business judgment and discretion on a case-by-case basis and pay only those Fuel Relationship Claims that are crucial to maintaining the supply chains for the Debtors' wholesale and retail operations and/or otherwise preserving the Debtors' going concern value.

### A. The Fuel Relationship Parties

159.    In the ordinary course of business, the Debtors incur obligations to various fuel suppliers, transporters, haulers, shippers, carriers, and other vendors in the Debtors' fuel purchase, distribution, and/or storage chains, servicing fuel stations, travel centers, and other locations across the United States. As noted above, the Debtors were current on their prepetition obligations to the Fuel Relationship Parties, and the significant prepetition amounts owed to such parties stem from the timing of the chapter 11 filings. The Fuel Relationship Parties are either essentially single source providers (for certain locations) or otherwise cannot be quickly enough and cost-effectively replaced, and are absolutely crucial to the continued, uninterrupted operation of the Debtors' businesses and the preservation and maximization of the value of the Debtors' assets for the benefit of all stakeholders.

160.    Further, some of the Fuel Relationship Parties could potentially assert statutory and/or other liens (including transportation and freight liens) against the Debtors' property, to secure payment of prepetition goods and services provided to the Debtors. I am informed that such Fuel Relationship Parties may have a right to assert and perfect certain liens on account of unpaid goods or services under applicable non-bankruptcy law, notwithstanding the automatic stay of the Bankruptcy Code in certain instances. In my experience, such statutory liens often allow

the goods or services provider to retain possession of all applicable materials until the debtor satisfies the outstanding amounts owed.

161.     Absent payment of any outstanding prepetition amounts, I believe that Fuel Relationship Parties may refuse or attempt to refuse to provide goods and/or services for, and/or honor obligations under their existing arrangements with, the Debtors on a go-forward basis, including supplying and distributing fuel post-petition in the ordinary course of business.  It is therefore critical that the Debtors be allowed to pay Fuel Relationship Parties to avoid the potential disruption of their operations.[48]

162.     The Debtors estimate that the aggregate unpaid prepetition balance owing to the Fuel Relationship Parties could total up to $25 million, all of which will be coming due during the first 21 days of these Cases.

163.     For the avoidance of doubt, the Debtors seek authority in the Fuel Supplier Motion to pay only those amounts that they determine, in their sole discretion, are necessary or appropriate to: (a) obtain the release of ordered fuel supplies and/or any other critical or valuable goods (as applicable); (b) maintain efficient, reliable, and smooth operations at the Debtors' locations (as applicable); and (c) induce the Fuel Relationship Parties to continue performing and otherwise supporting the Debtors' operations on a postpetition basis.

**B.     The Proposed Fuel Supplier Process**

164.     If authorized to pay the Fuel Relationship Claims under the Fuel Supplier Motion, the Debtors will, in their discretion, use commercially reasonable efforts to require the applicable Fuel Relationship Parties to provide favorable trade terms consistent with historical practice. The

---

[48]     By the Fuel Supplier Motion, the Debtors do not acknowledge or concede that any liens (contractual, common law, statutory, or otherwise) described in therein are valid and enforceable, and the Debtors expressly reserve the right to contest the extent, validity, and perfection of any and all such putative liens.

Debtors request authority, but not the obligation, to condition payment of a Fuel Relationship Claim on a Fuel Relationship Party's agreement to continue providing fuel and/or other supplies or services to the Debtors in accordance with each Fuel Relationship Party's agreement to (a) accept such payment in satisfaction of all or part of its Fuel Relationship Claim, and (b) continue to provide fuel, supplies and/or services to the Debtors during these Chapter 11 Cases on (i) the most favorable trade terms, practices, and programs (including, but not limited to, credit limits, rebates, discounts, pricing, timing of payments, and availability, and other applicable terms and programs) as in place before the Petition Date or (ii) such other favorable terms as the Debtors and the Fuel Relationship Party may mutually agree on ((a) and (b) together, "Customary Trade Terms").

165.    To ensure each Fuel Relationship Party continues providing fuel, other goods or services on Customary Trade Terms for the duration of these Chapter 11 Cases, the Debtors seek authority under the Fuel Supplier Motion, but not direction, in their discretion, to execute vendor agreements, substantially similar to the form attached thereto as Exhibit A hereto (each a "Vendor Agreement").

**H.    Debtors' _Emergency_ Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Lien Claimants and Critical Vendors and (II) Granting Related Relief (the "Critical Vendor Motion")**

166.    Pursuant to the Critical Vendor Motion, the Debtors seek entry of an order (a) authorizing the Debtors to pay (i) certain ordinary-course vendors and providers that supply goods or services that the Debtors rely upon to continue their daily or otherwise key operations, or are in certain instances sole or limited source providers of goods and services necessary for the uninterrupted operation of the Debtors' businesses (including, as discussed below, providers of remediation and other environmental related services, software, technology and data related services, and other goods and services for the Debtors' retail segment) ("Trade Claimants"); and

(ii) certain mechanics', materialman's, and other statutory lien claimants ("Lien Claimants" and, together with the Trade Claimants, the "Critical Vendors"), subject to the limits set forth below; and (b) granting related relief. Granting the Debtors authorization to pay prepetition claims of Critical Vendors as described in the Critical Vendor Motion will avert substantial harm to the Debtors' operations and businesses, enhance the likelihood of successful Chapter 11 Cases, and preserve and maximize the value of the Debtors' estates.

167. With respect to the Trade Claimants, these vendors supply goods and/or services that the Debtors rely upon to continue their daily or otherwise key operations, or are sole or limited source providers of goods and services necessary for the uninterrupted operation of the Debtors' businesses. Without these Trade Claimants, the Debtors' wholesale and retail operations would essentially not be up and running; the Trade Claimants, among other things, provide the software, technology, and services to manage and implement fuel transport, fuel supply, store inventory, credit card, and other payment processing; provide necessary remediation and other environmental related services; and keep the retail locations stocked with necessary goods and products. Moreover, I understand that many of the Trade Claimants who supply goods to the Debtors may be entitled to assert administrative claimants for goods delivered to the Debtors in the 20 days preceding the Petition Date under the Bankruptcy Code in any event.

168. In addition, while I do not believe any Lien Claimants currently exist, to the extent any Lien Claimants have filed or may in the future file mechanics', materialman's, and other statutory liens, non-payment of such liens would be disruptive to the Debtors' business to the extent the Liens Claimants may refuse or attempt to refuse to provide goods and/or services for, and/or honor obligations under their existing arrangements with, the Debtors on a go-forward basis, including necessary construction, installation, repairs, and maintenance, or may refuse to

release certain goods, equipment, supplies, or other materials in their possession. It is thus imperative that the Debtors be allowed to pay certain Lien Claimants in the ordinary course of business to avoid the potential disruption of their operations.

169.     As of the Petition Date, the Debtors owe approximately $6.1 million to the Critical Vendors. By the Critical Vendor Motion, the Debtors are only seeking authority to pay an amount necessary to preserve the value of their estates, which shall not exceed $7.5 million in the aggregate on account of prepetition claims held by certain Critical Vendors and accrued in the ordinary course of business ("Critical Vendor Claims"). The Debtors intend to apply their business judgment and discretion on a case-by-case basis and pay only those Critical Vendor Claims that are crucial to the Debtors' wholesale and/or retail operations and/or otherwise preserving the Debtors' going concern value. The Debtors are generally not proposing to pay the Critical Vendor Claims in full.

A.     **The Trade Claimants**

170.     In the ordinary course of business, the Debtors incur obligations to certain other vendors and providers that supply goods or services that the Debtors rely upon to continue their operations and are either sole or limited source providers of goods and services necessary for the uninterrupted operation of the Debtors' businesses or otherwise cannot be quickly enough and cost-effectively replaced. In all events, these Trade Claimants are integral to the continued, uninterrupted operation of the Debtors' businesses and the preservation and maximization of the value of the Debtors' assets:

(i)     *Environmental cleanup, remediation and other environmental related services:* As set forth above, the Debtors' business and operations entail numerous Fuel Centers and Travel Centers across the United States. Given the nature of the Debtors'

businesses and the applicable public interest therein, the Debtors are subject to a high degree of governmental and regulatory oversight from a variety of regulatory bodies, including the United States Environmental Protection Agency and analogous state agencies. Accordingly, the Debtors rely on a number of Trade Claimants to assist them in ensuring compliance with applicable governmental laws and regulations and/or addressing remedial, disposal, or other waste or environmental issues at or related to the locations.

(ii) *Software and other technology/electronic data administration, processing and technical services:* These Trade Claimants provide goods and services integral to key parts of the Debtors' businesses and operations including fuel transport, fuel supply, store inventory, pricing, credit card and other payment processing, and environmental/site level data.

(iii) *Goods, supplies and services for retail segment:* These Trade Claimants provide goods and/or services crucial to the Debtors' retail operations, including suppliers of certain products and inventory for the fuel stations, travel centers and other locations. Without adequate inventory and goods furnished by certain Trade Claimants at the locations, customers will go elsewhere to fuel up and shop – devastating to the Debtors' business.

171. The Debtors estimate that the aggregate unpaid prepetition balance owing to the Trade Claimants totals $6.1 million, all of which the Debtors expect will come due during the first 21 days of these Cases.

### B.     The Lien Claimants

172.     In the ordinary course of business, the Debtors incur obligations (collectively, the "Lien Claims") to third party contractors, repairmen, equipment installers, manufacturers, and other parties that perform labor or furnish materials, with respect to their own or third party branded fuel stations, travel centers and other locations (the "Lien Claimants").  These Lien Claimants could potentially assert statutory and/or other liens (including mechanics' and materialman's liens) against the Debtors' property or property managed or operated by the Debtors (including the applicable retail locations), to secure payment of prepetition goods and services provided to the Debtors.

173.     I am informed that the Lien Claimants may have a right to assert and perfect certain liens on account of unpaid goods or services, including mechanics' liens under applicable non-bankruptcy law, notwithstanding the automatic stay under the Bankruptcy Code.  Such statutory liens often allow the goods or services provider to retain possession of all applicable materials until the debtor satisfies the outstanding amounts owed.

174.     While I understand that no Lien Claimants currently exist, to the extent any Lien Claimants have filed or may file mechanics', materialman's and other statutory liens, non-payment of such liens would be disruptive to the Debtors' business to the extent the Liens Claimants may refuse or attempt to refuse to provide goods and/or services for, and/or honor obligations under their existing arrangements with, the Debtors on a go-forward basis, including necessary construction, installation, repairs and maintenance, or may refuse to release certain goods, equipment, supplies, or other materials in their possession.  It is thus imperative that the Debtors be allowed to pay certain Lien Claimants in the ordinary course of business to avoid the potential

disruption of their operations.[49] Moreover, I believe that if the relief requested in the Critical Vendor Motion with respect to the Lien Claimants is granted, the total amount to be paid to the Lien Claimants will likely be less than the losses the Debtors may suffer if their operations are disrupted.

### C.     The Critical Vendor Process

175.    The Debtors have thoroughly reviewed their business relationships and identified the Critical Vendors, the loss of whose particular goods or services would cause immediate and irreparable harm to the Debtors' business. To identify the Critical Vendors, the Debtors reviewed their accounts payable and prepetition vendor lists to identify those creditors most essential to the Debtors' operations pursuant to the following criteria:  (a) which suppliers were sole source or limited source suppliers, without whom the Debtors could not continue to operate without disruption, (b) the Debtors' ability to find alternative sources of supply and the potential disruption or lost revenues while a new supplier was resourced, (c) which suppliers would be prohibitively expensive to replace, (d) which suppliers would present an unacceptable risk to the Debtors' operations given the volume of essential services or products that such suppliers provide, (e) the extent to which suppliers may assert an administrative expense claims under the Bankruptcy Code; and (f) whether a vendor meeting the foregoing criteria is able or likely to refuse to ship goods or other supplies to the Debtors postpetition if its prepetition balances are not paid, but the vendor's failure to perform would constitute a disruption of the Debtors' business.

176.    If authorized to pay the claims of Trade Claimants ("<u>Trade Vendor Claims</u>"), the Debtors will, in their discretion, use commercially reasonable efforts to require the applicable

---

[49]    By the Critical Vendor Motion, the Debtors do not acknowledge or concede that any liens (contractual, common law, statutory, or otherwise) described therein  are valid and enforceable, and the Debtors expressly reserve the right to contest the extent, validity, and perfection of any and all such putative liens.

Trade Claimants to provide favorable trade terms consistent with historical practice. The Debtors request authority under the Critical Vendor Motion, but not the obligation, to condition payment of a Trade Vendor Claim on a Trade Claimant's agreement to continue providing supplies or services to the Debtors in accordance with each Trade Claimant's agreement to (a) accept such payment in satisfaction of all or part of its Trade Vendor Claim and (b) continue to provide supplies or services to the Debtors during these Chapter 11 Cases on (i) the most favorable trade terms, practices, and programs (including, but not limited to, credit limits, rebates, discounts, pricing, timing of payments, and availability, and other applicable terms and programs) as in place before the Petition Date or (ii) such other favorable terms as the Debtors and the Trade Claimant may mutually agree on.

177. To ensure each Trade Claimant continues providing goods or services on Customary Trade Terms for the duration of these Chapter 11 Cases, the Debtors seek authority under the Critical Vendor Motion, in their discretion, to execute vendor agreements, substantially similar to the form attached as **Exhibit A** thereto.

178. For all of the foregoing reasons, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 21st day of March, 2023 at New York, NY

*/s/ Michael Healy*
Michael Healy

## Exhibit A

(Corporate Organizational Chart)

**MOUNTAIN EXPRESS**
OIL COMPANY

Mountain Express Oil Company *(GA)*

- Mountain Express Ethanol Company *(GA)*
  - Mountain Express Oil Company Southeast, LLC *(GA)*
    - Alabama Terminal Property, LLC *(GA)*
- Consolidated HR Services, LLC *(WY)*
- Spartan Tank Management LLC *(GA)*
  - Mississippi MEX Company, LLC *(MS)*
- Texas MEX Limited Company, LLC *(TX)*
  - West Hill Ranch Group LLC *(DE)*
- MEX North Alabama, LLC *(GA)*
  - B&T Petroleum LLC[18] *(NV)*
- Star Mountain Express, LLC *(TX)*
  - MEX RE Holdings LLC *(WY)*
  - MEX Fuels LLC *(WY)*
- Mountain Express Baking and Coffee Co. *(GA)*
  - WHRG-LA2, LLC *(LA)*
- WHRG-LA, LLC *(LA)*
  - Madison Auto Truck Plaza and Lucky Dollar Casino, LLC *(LA)*

Loan Party

**Retail Entities**

- WHRG Retail Ops LLC *(WY)*
  - WHRGOPS NE LLC[1] *(WY)*
  - WHRGOPS NW LLC[2] *(WY)*
  - WHRGOPS SE LLC[3] *(WY)*
  - WHRGOPS SW LLC[4] *(WY)*
- WHRG TC LLC *(WY)*
  - WHRG TC-NE LLC[5] *(WY)*
  - WHRG TC-NW LLC[6] *(WY)*
  - WHRG TC-SE LLC[7] *(WY)*
  - WHRG TC-SW LLC[8] *(WY)*

**MEX RE Entities**

- MEX RE-NE LLC[9] *(WY)*
- MEX RE-NW LLC[10] *(WY)*
- MEX RE-SE LLC[11] *(WY)*
- MEX RE-SW LLC[12] *(WY)*

- MEX Fuels NE LLC[13] *(WY)*
- MEX Fuels NW LLC[14] *(WY)*
- MEX Fuels SE LLC[15] *(WY)*
- MEX Fuels SW LLC[16] *(WY)*

**Brothers Entities**

- Brothers Petroleum, LLC[17] *(LA)*
- 300 Lee Drive, LLC *(LA)*
- Brothers Expressway, Inc. *(LA)*
- Brothers Stonebridge, Inc. *(LA)*
- Brothers Terry Parkway, Inc. *(LA)*

# Notes to Org Chart

[1] Holds 100% of the membership interests in each of WHRGOPS NE-PA LLC and WHRGOPS NE-NY LLC, each a Wyoming limited liability company. WHRGOPS NE-NY LLC holds 100% of the membership interests in NE-NY-LI LLC, a Wyoming limited liability company.

[2] Holds 100% of the membership interests in each of WHRGOPS NW-MI LLC; WHRGOPS NW-WI LLC; WHRGOPS NW-IA LLC; and WHRGOPS NW-MO LLC, each a Wyoming limited liability company. WHRGOPS NW-WI LLC holds 100% of the membership interests in WHRGOPS NW-WI-NWI LLC, a Wyoming limited liability company. WHRGOPS NW-IA LLC holds 100% of the membership interests in WHRGOPS NW-IA-WIA LLC, a Wyoming limited liability company. WHRGOPS NW-MO LLC holds 100% of the membership interests in WHRGOPS NW-MO-NMO LLC, a Wyoming limited liability company.

[3] Holds 100% of the membership interests in each of WHRGOPS SE-SC LLC; WHRGOPS SE-TN LLC; and WHRGOPS SE-AL-North LLC, each a Wyoming limited liability company. WHRGOPS SE-TN LLC holds 100% of the membership interests in WHRGOPS SE-TN-WTN LLC, a Wyoming limited liability company.

[4] Holds 100% of the membership interests in each of WHRGOPS SW-AR LLC; WHRGOPS SW-OK LLC; and WHRGOPS SW-TX LLC, each a Wyoming limited liability company. WHRGOPS SW-AR LLC holds 100% of the membership interests in WHRGOPS SW-AR-NWAR LLC, a Wyoming limited liability company. WHRGOPS SW-OK LLC holds 100% of the membership interests in WHRGOPS SW-OK-OKC LLC, a Wyoming limited liability company. WHRGOPS SW-TX LLC holds 100% of the membership interests in each of WHRGOPS SW-TX-STX LLC and WHRGOPS SW-TX-Dallas LLC, each a Wyoming limited liability company.

[5] Holds 100% of the membership interests in WHRG TC-NE-PA LLC, a Wyoming limited liability company.

[6] Holds 100% of the membership interests in each of WHRG TC-NW-ND, LLC; WHRG TC-NW-IA, LLC; WHRG TC-NW-KS, LLC; WHRG TC-NW-MO, LLC; and WHRG TC-NW-WY, LLC, each a Wyoming limited liability company.

[7] Holds 100% of the membership interests in each of WHRG TC-SE-AL LLC and WHRG TC-SE-SC LLC, each a Wyoming limited liability company.

[8] Holds 100% of the membership interests in each of WHRG TC-SW-AR LLC and WHRG TC-SW-LA LLC, each a Wyoming limited liability company. WHRG TC-SW-LA LLC holds 100% of the membership interests in each of Webster P LLC and Webster P II LLC, each a Louisiana limited liability company.

[9] Holds 100% of the membership interests in each of MEX RE-NE-NJ LLC; MEX RE-NE-NY LLC; MEX RE-NE-IN LLC; MEX RE-NE-OH LLC; and MEX RE-NE-PA LLC, each a Wyoming limited liability company. MEX RE-NE-NY LLC holds 100% of the membership interests in MEX RE-NE-NY-LI LLC, a Wyoming limited liability company.

[10] Holds 100% of the membership interests in each of MEX RE-NW-IA LLC; MEX RE-NW-MN LLC; MEX RE-NW-MO LLC; MEX RE-NW-ND LLC; and MEX RE-NW-WI LLC, each a Wyoming limited liability company.

[11] Holds 100% of the membership interests in each of MEX RE-SE-AL LLC; MEX RE-SE-MS LLC; MEX RE-SE-GA LLC; and MEX RE-SE-NC LLC, each a Wyoming limited liability company.

[12] Holds 100% of the membership interests in each of MEX RE-SW-OK LLC; MEX RE-SW-TX LLC; MEX RE-SW-LA LLC; and MEX RE-SW-AR LLC, each a Wyoming limited liability company.

[13] Holds 100% of the membership interests in each of MEX Fuels NE-NY LLC; MEX Fuels NE-NJ LLC; MEX Fuels NE-IN LLC; MEX Fuels NE-OH LLC; MEX Fuels NE-KY LLC; and MEX Fuels NE-IL LLC, each a Wyoming limited liability company.

[14] Holds 100% of the membership interests in each of MEX Fuels NW-IA LLC and MEX Fuels NW-MO LLC, each a Wyoming limited liability company.

[15] Holds 100% of the membership interests in each of MEX Fuels SE-GA LLC; MEX Fuels SE-MS LLC; and MEX Fuels SE-TN LLC, each a Wyoming limited liability company.

[16] Holds 100% of the membership interests in each of MEX Fuels SW-OK LLC and MEX Fuels SW-LA LLC, each a Wyoming limited liability company.

[17] Holds (a) 100% of the equity interests in Newton Brothers, Inc. and Brothers I-10 Service Road, Inc., each a Louisiana corporation; and (b) 100% of the membership interests in each of 4408 S. I-10 Service Road LLC; Crowder Brothers, LLC; Exxon General DeGaulle, LLC; 4662 GDD LLC; 5310 Flannery Road, LLC; 4520 Jefferson Highway LLC; Jamie Boulevard, LLC; 13289 Old Hammond Highway LLC; 1308 Jefferson Davis LLC; 2850 Belle Chasse Hgwy LLC; 2698 Barataria Blvd LLC; 1227 Veterans, LLC; Brothers Belle Chasse, LLC; Avondale Brothers No 128 LLC; 1200 Wego LLC; Claiborne Operations LLC; Lapalco Brothers No. 25, LLC; 8692 River Road, LLC; Brothers Carol Sue, LLC; Gause Operation, LLC; 4940 Groom Road, LLC; 2601 Gen. DeGaulle LLC; 9410 Greenwell Springs, LLC; 4115 Airline Hgwy., LLC; 798 Jean Lafitte, LLC; 3049 Loyola Drive LLC; South Claiborne Operation LLC; 1600 Manhattan Blvd, LLC; 4915 Westbank Expwy LLC; 2701 Canal Street LLC; and 300 Lee Drive LLC, each a Louisiana limited liability company.

**Exhibit B-1**

(*Curriculum Vitae* of Craig Barbarosh)



**Craig A. Barbarosh (55)**

Craig Barbarosh is an experienced board member and business leader/strategic advisor with over 30 years of professional experience.  Craig presently serves as an independent director on the boards of: Lifecore Biomedical, Inc. (NASDAQ: LFCR), where he is the Chairman of the Board and was previously a member of the Compensation Committee; Nextgen Healthcare, Inc. (NASDAQ: NXGN), where he served as Vice Chairman of the Board and currently as Chair of the Compensation Committee and a member of the Nominating and Governance and Special Transactions Committees and was previously a director of NXGN's India subsidiary; Sabra Healthcare REIT, Inc. (NASDAQ: SBRA), where he is the Chair of the Audit Committee and a member of the Compensation Committee; and Evolent Health, Inc. (NYSE: EVH), where he is the Co-Chair of the Strategy Committee and a member of the Compensation Committee. In addition to his public company board service, Craig currently serves as an Independent Director of Mariner Health Central, Inc. in its Chapter 11 proceeding.

Craig previously served on the boards of directors of Aratana Therapeutics, Inc. (NASDAQ: PETX), a leading pet therapeutics company, where he was a member of the Compensation Committee and Chair of the Strategic Review Committee, Bazaarvoice, Inc. (NASDAQ:BV), a market-leading SaaS-based provider of software and service solutions and data analytics for the retail sector, where he was a member of the Compensation Committee, and BiopharmX, Inc. (NYSE MKT: BPMX), a specialty pharmaceutical company based in Menlo Park, CA, where he served as the Chair of the Nominating and Governance Committee and a member of the Audit and Compensation Committees. Craig also previously served as an Independent Director of Ruby Tuesday, Inc., a 200+ location casual dining restaurant chain, Hytera Communications, Inc., a manufacturer and distributor of digital mobile radios and Easterday Farms/Ranches, a large integrated farming and ranching operation based in Eastern Washington, in their respective Chapter 11 proceedings.  Craig also served as the Independent Board Observer for Payless Holdings LLC (owner of the Payless shoe store chain) during its Chapter 11 proceeding and the Independent Board Advisor to the holding company of Plum Healthcare Group in connection with a portfolio sale transaction.

Craig has extensive experience in debt and equity offerings, M&A, governance and compliance, turnarounds and restructurings, CEO and founder transitions, senior leadership recruitment, activist shareholder relationships (including three contested proxy contests), executive compensation, dispute resolution and leadership coaching and development. Craig is a "financial expert" as defined by the SEC and completed certificated executive education programs at The Wharton School of the University of Pennsylvania in Corporate Valuation (2019), Harvard Business School in Effective Corporate Boards (2015), Strategic Business Valuation (2010) and Private Equity/Venture Capital (2007) and Carnegie Mellon University in Cybersecurity Oversight (2019).

Craig is a lawyer by background and was a senior partner in two international law firms where he held various leadership positions including on the firm's Boards of Directors, Executive Committees and Strategy Committees. Craig's financial restructuring practice was national in scope and included leading roles in many of the largest corporate restructuring matters in the country.

Craig holds a B.A. in Business Economics from the University of California, Santa Barbara, and a J.D. from the University of Pacific, McGeorge School of Law, where he graduated with honors.  Craig is a frequent speaker at seminars and conferences discussing corporate governance and restructuring-related issues and has published several articles addressing current business, governance and legal topics.

**<u>Exhibit B-2</u>**

(*Curriculum Vitae* of Lawrence Perkins)



**LAWRENCE PERKINS BIOGRAPHY**

*Lawrence Perkins, Founder & CEO*

Lawrence Perkins, Founder and Chief Executive Officer of SierraConstellation Partners, has more than 20 years of management consulting and advisory experience with companies undergoing transition. Lawrence has enhanced business performance for numerous companies on projects ranging from interim management, profit improvement and working capital management to strategic planning and transaction execution.

Lawrence has served in a variety of senior-level positions including Interim CEO/President, Chief Restructuring Officer, Board of Directors Member, Financial Advisor, Strategic Consultant, and Investment Banker, to numerous middle-market companies and is particularly skilled at assisting clients through challenging situations.

Prior to founding SCP in 2013, Lawrence was a Senior Managing Director and regional leader of a national consulting firm where he was responsible for business development, marketing, staffing, and general management of the firm's western region. Lawrence joined the firm in 2010 when it acquired El Molino Advisors, a company he founded in January 2007 and led as the CEO.

A few noteworthy engagements include:

- Independent Director to RM Foods, parent company of El Torito, Real Mex, etc.
- Financial Advisor to major Franchisee of Papa Johns and Burger Kings.
- Financial Advisor to 3rd largest chain of Denny's Franchises in US.
- Financial Advisor to 3rd largest Applebee's Franchisee in US.
- Independent board member to a major venture backed Company serving the entry level aerospace market.
- Independent Board Member and CRO to Vitamin World, the second largest multi-unit retailer of nutritional supplements.
- CRO to Crestlloyd LLC, the owner of a large real estate project in California.
- CRO to Quanergy Systems, Inc., a publicly traded automotive sensor company.
- CRO to Wave Computing, Inc. a $200+ million semiconductor manufacturer.
- CRO to Proteus Digital Health, a digital health "unicorn."
- CRO to NewAge, Inc., a publicly traded consumer products manufacturing company.
- CRO to a privately held biotech development Company.
- CRO to Clarus Therapeutics, a publicly traded pharmaceutical company.
- CRO to PhaseBio, Inc., a publicly traded biotech development company.
- CRO to Mariner Healthcare, Inc., a privately held skilled nursing home operator.
- Interim CEO of Z Bros Holdings (600+ million family office.)
- CRO of Liberty Asset Management, a $500 million real estate holding Company.
- CRO of Oak River Asset Management, a $20 million real estate holding Company.
- CRO to CFO Management Holdings, LLC.
- CRO of Woodbridge Group of Companies, a ~$1 billion real estate holding company.

- CRO to a confidential tech "Unicorn" through their out of court turnaround and restructuring.
- CRO to a chain of 40 medical facilities with operations throughout the United States.
- Interim President and CEO of a privately held chain of dental laboratories.
- Project lead for CRO to National Stores, Inc., a $750 million chain of discount stores.
- Interim president to Appvion, a $400+ million paper manufacturer.
- CEO/CRO of Katy Industries, Inc., a $200+ million publicly traded manufacturer.
- CRO of Bethel Healthcare, Inc., a chain of skilled nursing facilities.
- CRO of the Fuller Brush Company, a 100 year old manufacturer of cleaning products.

Lawrence is a frequent public speaker and has been cited as an expert on the topics of restructuring, corporate governance, and M&A in publications including the Wall Street Journal, the New York Times, CNN, CNBC, and the Washington Post.

Lawrence began his career in the strategic consulting group of Arthur Andersen after graduating from the University of Southern California Marshall School of Business. He is currently on the board of several non-profits, and two corporate boards, and is a member of the Young Presidents Organization.

Lawrence has won multiple M&A Advisor Turnaround Awards, including 'Information Technology Deal of the Year' for his work with Wave Computing in 2021 and "Turnaround of the Year" for his work on Crestlloyd, LLC in 2023.

Lawrence is the author of the Amazon bestseller, *Don't Be A Stranger*, where he explores the secrets of strategic relationship building. He provides personal advice on how to create luck in business by offering techniques that can ultimately help readers develop their own enriching community.