# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>MOUNTAIN EXPRESS OIL COMPANY, et al.,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-90147 (DRJ)<br><br>(Jointly Administered) |

**DECLARATION OF MICHAEL HEALY IN SUPPORT OF
DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION
FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND
PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,
(III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED
PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING
A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

I, Michael Healy, pursuant to section 1726 of Title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am the Chief Restructuring Officer (the "CRO") of Mountain Express Oil Company ("MEX") and its affiliates (collectively, the "Company"). In addition to serving as MEX's CRO, I am a Senior Managing Director at FTI Consulting, Inc. ("FTI"), a leading global business advisory firm with 121 offices worldwide and over 7,600 professionals. I have more than 20 years of restructuring experience and have advised companies, lenders, creditors, corporate boards, and equity sponsors across a diverse range of industries both domestically and internationally.

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/mountainexpressoil. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 Cases is 3650 Mansell Road, Suite 250, Alpharetta, Georgia 30022.

DOCS_DE:242669.4 58614/002



2390147230323000000000016

2. I submit this declaration (the "Declaration") in support of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion"),[2] filed concurrently herewith, of the above-captioned debtors and debtors in possession (the "Debtors") for entry of interim and final orders: (a) authorizing the Debtors to obtain post-petition financing, (b) authorizing the Debtors' further use of cash collateral,[3] (c) granting liens and super-priority administrative claims, and (d) granting adequate protection to certain prepetition secured parties, among other relief.

3. Unless otherwise indicated, the statements set forth in this Declaration are based on (a) my personal knowledge or views based on my experience; (b) information I have received from the Debtors and my colleagues at FTI who are assisting me in my role as CRO, as well as other advisors of the Debtors; and/or (c) my review of relevant documents. If I were called upon to testify, I would testify competently to the facts and views set forth herein.

---

[2] A capitalized term used but not defined herein shall have the meaning ascribed to it in the DIP Motion.

[3] The Court has previously entered its *Interim Order (A) Authorizing The Use Of Cash Collateral, (B) Providing Adequate Protection, (C) Modifying The Automatic Stay, and (D) Scheduling a Further Hearing* on March 20, 2023 [Docket No. 37] ("Interim Cash Collateral Order"). I understand that the terms of the proposed interim order granting the DIP Motion would incorporate authority granted by the Initial Cash Collateral Order for the Debtors to use cash collateral for the Interim Budget Period specified therein.

A. **DIP Motion Overview**

4. As the Court is undoubtedly aware from the earlier hearing on the interim use of cash collateral, the proposed DIP Facility is the product of painstaking, arms' length negotiations, with each party represented by independent counsel and advisors. The DIP Motion requests approval of a multiple draw term loan facility in the total committed amount of $28,600,000.00 under which the Debtors will be able to make an initial draw, following interim approval, of $20,000,000 million. That interim amount will be sufficient, in my estimation, to meet the Debtors' operating needs and administrative expenses for the next four weeks of these Chapter 11 Cases. The DIP Motion contains a concise summary of the essential terms of the proposed DIP facility, and also carefully describes those provisions of the proposed financing that are required to be highlighted under applicable rules.

5. The proposed interest rate under the DIP Facility is 10%. The financing also contemplates a one-time facility fee of 5% of the new money commitment that would be earned upon closing of the initial draw under the DIP facility but would not be payable until maturity. The DIP Motion also contemplates that a portion of the Prepetition Loans outstanding to the Prepetition Lenders (the "Roll-Up Amount") will be converted into the DIP Facility (*i.e.*, "rolled-up" into the DIP facility), but that relief is subject to the entry of a final order approving the DIP Facility.

6. As is customary for DIP financing facilities, the DIP liens and the super-priority administrative expense claims granted to the DIP lender on account of the borrowing (as well as the adequate protection liens and super-priority administrative expense claims granted to the Prepetition Lenders) will be subject to a "carve-out" in favor of the Debtors' employees with respect to any accrued but unpaid payroll and associated taxes, as well as the professionals retained

in these Chapter 11 Cases. The "carve-out" is tied to the weekly projection for restructuring fees set forth in the Initial Budget (defined below). This amount will be funded on a weekly basis into an escrow account maintained by the Debtors' bankruptcy counsel until such time as the fees and expenses of professionals are approved by this Court and otherwise authorized for payment.

B. **The Need for DIP Financing and Use of Cash Collateral**

7. As was explained on the record of the hearing on March 20, 2023, for entry of the Interim Cash Collateral Order, the Debtors lack sufficient liquidity and do not generate sufficient cash from operations to fund their businesses and meet the administrative expenses associated with a chapter 11 bankruptcy process. In addition, it has become imperative that the Debtors demonstrate their capacity to continue to purchase fuel from their major oil suppliers in order to maintain the uninterrupted operation of their dealer network, not to mention honor the Debtors' obligations to their employees. Without the DIP Facility and the ability to use cash collateral, the Debtors will not have the liquidity needed to operate their businesses, continue to purchase and supply fuel, fund their ordinary course expenditures, or pay the expenses necessary to administer these Chapter 11 Cases. Absent increased funding in the form of the DIP Facility, the Debtors may be compelled to shutter their operations to the permanent detriment of all constituents of these estates.

8. I am also convinced that approval of the DIP Facility will provide a clear message to the Debtors' oil company vendors and the Debtors' network of dealers that the Debtors will have sufficient liquidity to meet their post-petition obligations.

C. **The DIP Sizing Process**

9. In consultation with the Debtors' advisors, including me and other members of my financial advisory team from FTI, the Debtors' management team reviewed and analyzed the

Company's projected cash flows and prepared a budget outlining the Debtors' postpetition cash needs. Specifically, the budget is a forecast that sets forth all material cash receipts and cash disbursements on a weekly basis over a 13-week period, pursuant to which the Debtors will fund operations and the costs associated with these Chapter 11 Cases. The initial budget is attached hereto as **Exhibit 1** (the "Initial Budget").

10. Under my direction and oversight, professionals at FTI worked with the Debtors and their other advisors to formulate the Initial Budget, which includes reasonable and foreseeable expenses to be incurred, and the costs of administering the Chapter 11 Cases, during the applicable period. The Debtors' use of the proceeds of the DIP Facility will be governed by the Initial Budget, subject to permitted variances.

11. Given the Company's current liquidity position and an estimate of the potential duration of these cases, the Debtors and their advisors determined that any DIP Facility amount would need to be sufficient to fund the Company for at least a four-month process in order to provide sufficient liquidity to run an orderly process to maximize value. I am comfortable that the DIP Facility proposed by the DIP Motion will enable the Debtors to meet their administrative obligations over this period and fully stabilize the Debtors' operations. Based on that timeline, FTI has (i) forecasted weekly cash flows through July 14, 2023; (ii) layered in appropriate adjustments for chapter 11 expenses; and (iii) from that, derived the funding that would be required to maintain a reasonable minimum amount of cash during that period. As has been noted on the record, the Debtors' cash flow is highly variable and it is thus imperative for the Debtors to maintain a certain minimum level of cash on hand. Under the Initial Budget, FTI has forecast a weekly end cash balance of at least $4 million.

12. Based on these assumptions and analysis, the Debtors have determined they require approximately $28.6 million of new money financing through the course of these Chapter 11 Cases, of which $20 million must be available during the interim period. This interim amount is vital to avoid immediate and irreparable harm to the Debtors' estates.

13. Absent authority to enter into and access the proceeds of the DIP Facility, even for a limited period of time, the Debtors will be unable to continue operating their business, resulting in a deterioration of value and permanent harm to the Debtors' estates. Thus, the Debtors and their advisors are in agreement that the Debtors require immediate access to the proceeds of the DIP Facility, as well as access to Cash Collateral, to finance their operations and continue operating as a going concern during the pendency of these Chapter 11 Cases.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 23rd day of March, 2023 at New York, NY

/s/ Michael Healy
Michael Healy

# EXHIBIT 1

(*Initial Budget*)

DOCS_DE:242669.4 58614/002

| MEX DIP Budget dated March 23, 2023<br>Mountain Express Oil<br>($ in '000s) | Week 1<br>Forecast<br>24-Mar-23 | Week 2<br>Forecast<br>31-Mar-23 | Week 3<br>Forecast<br>7-Apr-23 | Week 4<br>Forecast<br>14-Apr-23 | Week 5<br>Forecast<br>21-Apr-23 | Week 6<br>Forecast<br>28-Apr-23 | Week 7<br>Forecast<br>5-May-23 | Week 8<br>Forecast<br>12-May-23 | Week 9<br>Forecast<br>19-May-23 | Week 10<br>Forecast<br>26-May-23 | Week 11<br>Forecast<br>2-Jun-23 | Week 12<br>Forecast<br>9-Jun-23 | Week 13<br>Forecast<br>16-Jun-23 | Subtotal<br>13-Week Period<br>WE 3/24 - WE 6/16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Operating Receipts | | | | | | | | | | | | | | |
| Net Fuel Profit | $2,771 | $1,969 | $3,465 | $2,211 | $2,239 | $2,536 | $2,808 | $1,461 | $2,289 | $2,536 | $2,700 | $2,143 | $2,143 | $31,272 |
| Rent Income | – | – | 5,106 | – | 490 | – | 5,106 | – | 490 | – | 3,069 | 2,046 | 568 | 16,876 |
| Net Retail Supporting Operations | (411) | (129) | (70) | 479 | 681 | (468) | 203 | 267 | 292 | (518) | 253 | 114 | 114 | 806 |
| Other Receipts | – | – | – | – | – | – | – | – | – | – | – | 146 | 146 | 292 |
| Total Operating Receipts | $2,360 | $1,840 | $8,501 | $2,690 | $3,410 | $2,068 | $8,117 | $1,729 | $3,071 | $2,018 | $6,022 | $4,449 | $2,971 | $49,246 |
| Operating Disbursements | | | | | | | | | | | | | | |
| Rent Expense | – | – | (8,472) | – | – | – | (8,490) | – | – | – | (8,481) | – | – | (25,443) |
| Payroll & Benefits | (279) | (1,037) | (279) | (1,037) | (279) | (1,037) | (279) | (1,037) | (279) | (1,037) | (279) | (783) | (196) | (7,841) |
| Vendor Disbursements | (6,000) | (7,525) | (3,051) | (1,525) | (1,338) | (1,777) | (1,036) | (725) | (1,338) | (1,777) | (953) | (462) | (462) | (27,971) |
| Utilities & Insurance | (3) | (3) | (344) | (9) | (19) | (57) | (338) | (9) | (19) | (11) | (338) | (92) | (92) | (1,335) |
| Other Operating Disbursements | (15) | (13) | (36) | (19) | (17) | (15) | (36) | (19) | (17) | (15) | (36) | (8) | (8) | (253) |
| Total Operating Costs | ($6,297) | ($8,578) | ($12,182) | ($2,591) | ($1,654) | ($2,886) | ($10,179) | ($1,790) | ($1,654) | ($2,840) | ($10,087) | ($1,346) | ($759) | ($62,843) |
| Operating Cash Flow | ($3,937) | ($6,738) | ($3,681) | $99 | $1,756 | ($818) | ($2,062) | ($62) | $1,417 | ($822) | ($4,066) | $3,103 | $2,213 | ($13,597) |
| Non-Restructuring Related | | | | | | | | | | | | | | |
| Inventory | 300 | 700 | – | – | 1,100 | – | – | – | – | – | – | – | – | 2,100 |
| Capital Expenditures | – | – | (500) | – | – | (500) | – | – | – | (200) | – | – | – | (1,200) |
| Total Non-Restructuring Related | $300 | $700 | ($500) | – | $1,100 | ($500) | – | – | – | ($200) | – | – | – | $900 |
| Restructuring Related | | | | | | | | | | | | | | |
| Restructuring Fees [1] | (656) | (656) | (631) | (2,869) | (669) | (669) | (1,400) | (450) | (450) | (450) | (1,000) | (550) | (550) | (11,001) |
| Other Restructuring Related | 279 | (250) | – | (167) | – | – | – | (238) | – | – | – | – | (259) | (635) |
| Total Restructuring Related | ($377) | ($906) | ($631) | ($3,036) | ($669) | ($669) | ($1,400) | ($688) | ($450) | ($450) | ($1,000) | ($550) | ($809) | ($11,636) |
| Net Cash Flow | ($4,014) | ($6,945) | ($4,812) | ($2,937) | $2,187 | ($1,987) | ($3,462) | ($750) | $967 | ($1,472) | ($5,066) | $2,553 | $1,403 | ($24,333) |
|  | (4,014) | (6,945) | (4,812) | (2,937) | 2,187 | (1,987) | (3,462) | (750) | 967 | (1,472) | (5,066) | 2,553 | 1,403 |  |
| Cash (Unrestricted) | | | | | | | | | | | | | | |
| Beginning Balance | $3,696 | $19,683 | $12,738 | $7,926 | $13,588 | $15,776 | $13,789 | $10,327 | $9,577 | $10,544 | $9,072 | $4,007 | $6,560 | $3,696 |
| Net Cash Flow | (4,014) | (6,945) | (4,812) | (2,937) | 2,187 | (1,987) | (3,462) | (750) | 967 | (1,472) | (5,066) | 2,553 | 1,403 | (24,333) |
| DIP Draws | 20,000 | – | – | 8,600 | – | – | – | – | – | – | – | – | – | 28,600 |
| Ending Unrestricted Cash Balance | $19,683 | $12,738 | $7,926 | $13,588 | $15,776 | $13,789 | $10,327 | $9,577 | $10,544 | $9,072 | $4,007 | $6,560 | $7,963 | $7,963 |
| DIP | | | | | | | | | | | | | | |
| Beginning Balance | – | $20,000 | $20,000 | $20,000 | $28,600 | $28,600 | $28,600 | $28,600 | $28,600 | $28,600 | $28,600 | $28,600 | $28,600 | – |
| DIP Draws | 20,000 | – | – | 8,600 | – | – | – | – | – | – | – | – | – | 28,600 |
| Ending DIP Balance Excl. Roll-Up | $20,000 | $20,000 | $20,000 | $28,600 | $28,600 | $28,600 | $28,600 | $28,600 | $28,600 | $28,600 | $28,600 | $28,600 | $28,600 | $28,600 |

[1] Excludes Raymond James transaction fee, the quantum of which is unknown and depends on the nature and terms of the transaction.