```
                  UNITED STATES BANKRUPTCY COURT
                 SOUTHERN DISTRICT OF TEXAS (HOUSTON)

                                   .
IN RE:                             .  Case No. 23-90147
                                   .  Chapter 11
MOUNTAIN EXPRESS OIL COMPANY,      .
et al.,                            .  515 Rusk Street
                                   .  Houston, TX 77002
              Debtors.             .
                                   .  Friday, April 14, 2023
. . . . . . . . . . . . . . . .    .  10:00 a.m.
```

             TRANSCRIPT OF DEBTORS' EMERGENCY MOTION FOR ENTRY
               OF AN ORDER ESTABLISHING PROCEDURES FOR DEALER
                      CONVERSION TRANSACTIONS [189];
         JOINT EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING
                  CLOSING OF CAMERON TRANSACTION [197]
                   BEFORE THE HONORABLE DAVID R. JONES
                  UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES:

For the Debtors:            Pachulski Stang Ziehl & Jones LLP
                            By:  BENJAMIN WALLEN, ESQ.
                                 MICHAEL WARNER, ESQ.
                            440 Louisiana Street, Suite 900
                            Houston, TX 77002
                            (713) 691-9385

                            Pachulski Stang Ziehl & Jones LLP
                            By:  JEFFREY POMERANTZ, ESQ.
                                 JEFFREY W. DULBERG, ESQ.
                            10100 Santa Monica Blvd., 13th Floor
                            Los Angeles, CA 90067-4003
                            (310) 277-6910

TELEPHONIC APPEARANCES CONTINUED.

Audio Operator:             Courtroom ECRO Personnel

Transcription Company:      Access Transcripts, LLC
                            10110 Youngwood Lane
                            Fishers, IN 46048
                            (855) 873-2223
                            www.accesstranscripts.com


     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
TELEPHONIC APPEARANCES (Continued):

For the Debtors:            Pachulski Stang Ziehl & Jones LLP
                            By:  STEVEN W. GOLDEN, ESQ.
                            780 Third Avenue, 34th Floor
                            New York, NY 10017-2024
                            (212) 561-7700

                            Lugenbuhl Wheaton Peck Rankin &
                            Hubbard
                            By:  BENJAMIN KADDEN, ESQ.
                                 COLEMAN L. TORRANS, ESQ.
                            601 Poydras Street, Suite 2775
                            New Orleans, LA 70130
                            (504) 568-1990

For the Official           McDermott Will & Emery LLP
Committee of Unsecured     By:  CHARLES R. GIBBS, ESQ.
Creditors:                      MARCUS A. HELT, ESQ.
                                CHARLES G. COWDEN, ESQ.
                            250 North Harwood Street, Suite 1900
                            Dallas, TX 75201
                            (214) 295-8063

                            McDermott Will & Emery LLP
                            By:  MARIS J. KANDESTIN, ESQ.
                            1007 North Orange Street, 10th Floor
                            Wilmington, DE 19801
                            (302) 485-3900

                            McDermott Will & Emery LLP
                            By:  LUKE BARRETT, ESQ.
                            One Vanderbilt Avenue
                            New York, NY 10017-3852
                            (212) 547-5400

For the United States      Office of the United States Trustee
Trustee:                   By:  JAYSON RUFF, ESQ.
                           515 Rusk Street, Suite 3516
                           Houston, TX 77002
                           (713) 718-4640

For SASS Petroleum         Fellows LaBriola LLP
LLC:                       By:  STEVEN KUSHNER, ESQ.
                           233 Peachtree Street NE, Suite 2400
                           Harris Tower
                           Atlanta, GA 30303
                           (404) 586-9200
```

```
TELEPHONIC APPEARANCES (Continued):
```

| For Pepsi-Cola Bottling Co. of McAlester, Inc.: | Crowe & Dunlevy<br>By:  CHRISTOPHER M. STAINE, ESQ.<br>2525 McKinnon Street, Suite 425<br>Dallas, TX 75201<br>(214) 420-2143 |
|---|---|
| | Crowe & Dunlevy<br>By:  MARK A. CRAIGE, ESQ.<br>222 North Detroit Avenue, Suite 600<br>Tulsa, OK 74120<br>(918) 592-9878 |
| For Bank of Hope: | Buchalter<br>By:  WILLIAM S. BRODY, ESQ.<br>1000 Wilshire Boulevard, Suite 1500<br>Los Angeles, CA 90017-1730<br>(213) 891-5015 |
| For CAM-PL Cedar Rapids LLC, CAM-PL Cokeville LLC, and CAM-PL Kansas City LLC: | Rubin & Levin P.C.<br>By:  JAMES E. ROSSOW, JR., ESQ.<br>135 North Pennsylvania Street<br>Suite 1400<br>Indianapolis, IN 46204<br>(317) 860-2893 |
| For Hunt Refining Company and Pilot Travel Centers LLC: | Sidley Austin LLP<br>By:  MAEGAN QUEJADA, ESQ.<br>1000 Louisiana Street, Suite 5900<br>Houston, TX 77002<br>(713) 495-4618 |
| For Bowie Central Appraisal District: | McCreary Veselka Bragg & Allen P.C.<br>By:  JULIE PARSONS, ESQ.<br>700 Jeffrey Way<br>Round Rock, TX 78665<br>(512) 323-3200 |
| For First Horizon Bank, as Administrative Agent: | Greenberg Traurig, LLP<br>By:  JOHN D. ELROD, ESQ.<br>Terminus 200<br>3333 Piedmont Road NE, Suite 2500<br>Atlanta, GA 30305<br>(678) 553-2259 |

```
TELEPHONIC APPEARANCES (Continued):

For BFM Enterprise          Locke Lord LLP
LLC:                        By:  PHILIP EISENBERG, ESQ.
                                 SIMON MAYER, ESQ.
                            JPMorgan Chase Tower
                            600 Travis, Suite 2800
                            Houston, TX 77002
                            (713) 226-1200

                            Locke Lord LLP
                            By:  OMER F. KUEBEL III, ESQ.
                            601 Poydras Street, Suite 2660
                            New Orleans, LA 70130
                            (504) 558-5155

For ExxonMobil Oil          Jackson Walker LLP
Corporation:                By:  BRUCE RUZINSKY, ESQ.
                            1401 McKinney Street, Suite 1900
                            Houston, TX 77010
                            (713) 752-4200

For Sunoco:                 Katten Muchin Rosenman
                            By:  MICHAELA C. CROCKER, ESQ.
                            2121 North Pearl Street, Suite 1100
                            Dallas, TX 75201-2591
                            (214) 765-3600

Also Present:               ADAM GLICKMAN
                            AMG Oil
```

1        (Proceedings commence at 10:00 a.m.)

2            THE COURT:  All right.  Good morning, everyone.  This

3   is Judge Jones.  The time is ten o'clock Central.  Today is

4   April the 14th, 2023.  This is the docket for Houston, Texas,

5   although greetings from very balmy Corpus Christi this morning.

6   Next on the ten o'clock docket, we have the

7   jointly-administered cases of Case Number 23-90147, Mountain

8   Express Oil Company.

9            Folks, please don't forget to record your electronic

10  appearance.  It's a quick trip to the website.  You can do that

11  at any time prior to the conclusion of this morning's hearing,

12  but it is the way that we note your official appearance.

13            First time that you speak this morning, if you would,

14  please state your name and who you represent.  You only have to

15  do that once, but it really does give a good reference for the

16  court reporter in the event that a transcript request is made.

17            We are recording this morning using CourtSpeak.  I

18  will have the audio up on the docket shortly after the

19  conclusion of the hearing.

20            Final announcement this morning, again, we had gotten

21  a number of requests that folks would like to have easier

22  access to the daily calendars of Judge Lopez and Judge Jones.

23  We've been able to accomplish that.  To the extent that you

24  would like to receive an email every morning at 5 a.m., we can

25  do so.  We will have a link on it that will connect to the

1    schedules for both Lopez and Jones.

2            And again, all I need is an email.  It doesn't cost

3    anything.  You can try it.  If you don't like it, it can be

4    deleted.  But it does give you the ability first thing in the

5    morning to think about your two favorite bankruptcy judges at 5

6    a.m., even earlier if you're on the West Coast.  I joke, but

7    it's -- folks have really liked it, at least from the feedback

8    that I've gotten.  All I need is an email, just direct it

9    toward Mr. Alonzo.  It takes about a day or so to get you

10   added.  But again, it's just -- it's an easy thing to do.

11   Happy to provide the service.

12           With that -- oh, finally, if you came in toward the

13   end or right before ten o'clock, have activated the

14   hand-raising feature.  If you know you're going to be speaking,

15   if you'd give me a "five star," I'll get you unmuted now.  If

16   you change your mind later and want to speak, "five star" at

17   any time, I'll see it, and I'll get you unmuted.

18           With that, Mr. Pomerantz, good morning.  I assume

19   that you're taking the lead?

20           MR. POMERANTZ:  Yes, Your Honor.  Good morning.  Jeff

21   Pomerantz, Pachulski Stang Ziehl & Jones.  I'm joined by my

22   colleagues, Jeff Dulberg and Ben Wallen.

23           Your Honor, we have two matters that are on for

24   today's calendar.  The debtor-in-possession financing was

25   continued until next Thursday.  And each of these motions that

 1  are before Your Honor are -- request authority to take action

 2  that materially will aid the debtor in its efforts to pursue a

 3  restructuring transaction.  I will be handling the Cameron

 4  transaction, which we would ask Your Honor that we be permitted

 5  to proceed with first because there are parties waiting to send

 6  wires if Your Honor grants the motion.  And then after, my

 7  partner, Jeff Dulberg, will handle the dealer conversion

 8  motion.

 9          THE COURT:  Okay.

10          MR. POMERANTZ:  I could say with both -- with respect

11  to both motions, Your Honor, we've had a lot of discussion with

12  parties of interest, including lenders and the Committee.

13  We've incorporated language in proposed orders from the

14  Committee.  And we believe from the lender and the Committee's

15  perspectives that they're both unopposed or supportive of the

16  motion.  And with respect to the dealer conversion motion,

17  we've had substantial discussions, as Mr. Dulberg will explain

18  to the Court, with one party, and I think we're almost there in

19  terms of approved language, but I'm not sure we're completely

20  there yet.

21          THE COURT:  Okay.

22          MR. POMERANTZ:  So, Your Honor -- with that, Your

23  Honor, the first motion is the motion for an order authorizing

24  the closing of the Cameron transaction.  And also, Mr. Healy, I

25  believe if he's not yet in the courtroom, he will be in the

1    courtroom very shortly.

2         So the first transaction -- the first motion, Your

3    Honor, is with respect to the Cameron transaction.  As I have

4    explained to Your Honor on prior occasions, one of the most

5    profitable aspects of the debtors' business is its operation of

6    travel centers, which are essentially super-sized, convenience

7    operations, that the economics work.  And unlike, as you'll

8    hear from Mr. Dulberg, in connection with the convenience

9    stores that were operated by the debtor, the debtor really

10   wants to operate travel centers, and they are a significant

11   source of profit.  And as is typical with the debtors'

12   operations, it seeks to acquire real estate, control of the

13   underlying real estate.  It then flips that as part of the sale

14   leaseback transaction, enters into a long-term lease, and then,

15   in the case of the travel centers, operates the property --

16   properties.

17        One of the transactions that was sort of caught in

18   the, I would say, somewhat limbo by virtue of the petition date

19   was the Cameron transaction.  This is the transaction that

20   dates back several months where the debtor was acquiring three

21   travel centers from Pilot.  It then financed those transactions

22   through Cameron.  The issue and the wrinkle with that

23   transaction, as opposed to other transactions, was the fact

24   that the purchase price was not ready to be paid in full at the

25   time of the closing of the transaction.  So while the closing

1  occurred and the real estate was transferred, ultimately what

2  happened was there was a $15 million note that the buyer,

3  Cameron, owed the debtor, which was secured by the real estate.

4  And there was a back-to-back note where basically the debtor

5  was obligated to Pilot with Pilot taking possession of the

6  Cameron note and also having a security interest in the note.

7          So until such time as the purchase price was fully

8  paid, Pilot was going to be operating the location.  The debtor

9  was, of course, anxious to have the transaction completed

10  because as soon the transaction could be completed, it would

11  then be able to operate the travel centers and the revenue and

12  income generated would be accretive to the debtors' business.

13          The transaction or the notes were extended a couple

14  of times, most recently until April 14th.  We thought it was --

15  while this was, in our view, an ordinary course transaction

16  consistent with what the debtors had been doing pre-bankruptcy,

17  given the straddling, given the financing nature, we thought it

18  prudent to file a motion.  We sought the motion on emergency

19  hearing.  It was originally scheduled for early this week, and

20  Cameron and Pilot were gracious enough to agree to an extension

21  until today to provide the newly-formed committee with

22  additional time to get up the speed, as well as the lenders.

23          So as I said, I'm happy to say that I believe it's a

24  fully consensual motion.  Pursuant to the transaction, what

25  will happen is Cameron will pay off the note.  The debtor will

1   pay off its note.  All liens will be released.  The debtors

2   will acquire -- will purchase inventory from Pilot and enter

3   into a couple of -- an equipment and through-put agreement with

4   Pilot that allows Pilot to operate the diesel canopies at the

5   travel centers and allows -- gives access to all the FF&E to

6   the debtor.

7           Your Honor, Mr. Healy, I believe he's in the

8   courtroom.  I didn't see him before, but I do have a proffer.

9           THE COURT:  Let me just check to make sure he's at

10  least on the line.  Mr. Healy, if you can hear me, first, if

11  you haven't already done so, I need you to hit "five star" on

12  your telephone.  If you've already done that and you can hear

13  me, if you would just please respond.

14          MR. HEALY:  Yes, I am here, Your Honor.  Yes, I'm

15  here, Your Honor.

16          THE COURT:  All right, thank you.  And do we have a

17  video problem this morning?

18          MR. HEALY:  No, I'm joining that at the moment.

19          THE COURT:  Oh, okay.  Then we'll just take a breath.

20  I just saw you pop in, and your camera should be on

21  momentarily.

22          MR. HEALY:  Yep.

23          THE COURT:  Now I have a message that says your

24  camera is off, but I see your square.

25          MR. HEALY:  Yeah.

1          THE COURT:  Let's do this.  Mr. Pomerantz, and if

2    Mr. Healy gets his camera on, great.  Mr. Healy, I am assuming

3    -- Mr. Pomerantz, you're just going to offer the proffer and

4    then tender Mr. Healy for any cross.  Is that a safe

5    assumption?

6          MR. POMERANTZ:  That -- yes, if that is acceptable to

7    the Court, that's what I plan to do.

8          THE COURT:  That is perfectly fine.  I -- it also

9    gives Mr. Healy a little time to see if he can figure out the

10   camera issue.  So why don't you go ahead and proceed?

11         MR. POMERANTZ:  Thank you, Your Honor.

12         So if Mr. Healy was called to testify, he would

13   testify that his name is Michael Healy and that he is the

14   senior managing director of FTI Consulting and that he is the

15   debtors' proposed chief restructuring officer.  He would

16   testify that he has more than 20 years of restructuring

17   experience and has advised companies, lenders, creditors,

18   corporate boards, and equity sponsors across a diverse range of

19   industries, both domestically and internationally.

20         He would testify that one of debtors' business

21   segments is the operation of travel centers, and he would

22   testify that as is the case with its convenience store

23   business, the debtors acquire the real property in which a

24   travel center is operated, sell the real property to a real

25   estate investment trust, and then lease back the property under

1  a long-term lease.  He would testify that under -- unlike its

2  convenience store business, the debtors want to operate travel

3  centers because they're extremely profitable and that as of the

4  petition date, there was one travel center transaction that

5  actually involved three separate travel centers, which while

6  the real estate transfer closed prepetition, it was not yet

7  being operated by the debtors.

8          He would testify that is the Cameron transaction,

9  which is subject to the present motion and that in December

10 2022, the debtors acquired from third-party, Pilot Travel

11 Centers, three locations in Wyoming, Iowa, and Missouri, who

12 then simultaneously sold the properties to the parties referred

13 to in the motion as Cameron, who immediately entered into the

14 leases with the debtors for such locations.  He would testify

15 that Pilot agreed to provide $15 million in seller financing to

16 the debtors in connection with this transaction and that the

17 debtors, in turn, provided $15 million in seller financing to

18 Cameron.  He would testify that as part of the seller

19 financing, the debtors hold liens upon the Cameron properties

20 to secure the $15 million owned by Cameron and that the debtors

21 pledged the Cameron note and underlying lien to Pilot to secure

22 the debtors' obligation to Cameron and that the note is in

23 possession of Pilot.

24          He would testify that as a result of certain payments

25 made pre-petition and other amendments to the transaction, the

1    current balance due under the note is $10 million, and he would

2    testify that he understands that Cameron is now obligated

3    directly to pay that money to Pilot.  He would testify that

4    Pilot has been operating these locations pursuant to a

5    temporary license until the balance of the purchase price is

6    paid and that -- he would testify that Cameron -- he

7    understands that Cameron is ready to pay the purchase price and

8    that their deadline to close the transactions and transition

9    the operations to the debtors is today, April 14th.

10            He'd testify that in order to close the transactions

11   and transfer operations to the debtors, Cameron will sell

12   inventory -- or Pilot will sell inventory at these locations to

13   the debtors and the debtor and Pilot will enter into equipment

14   lease through-put agreements with the debtors and Cameron will

15   satisfy their seller financing obligations, and everyone will

16   release all liens.

17            He would testify that he believes that the

18   transactions contemplated by the -- this motion are in the best

19   interest of the debtors, their estates, and stakeholders.  And

20   he would testify that notably the only funds that these debtors

21   are expected to expend in order to consummate the transaction

22   are those related to the ordinary transition of operations to

23   the applicable locations, including the acquisition of the

24   inventory.  He would testify that the debtors expect their

25   go-forward revenues to increase as a result of transferring

1   operations to the debtors and for the foregoing reasons, he

2   would testify that he believes that the Court should approve

3   the Cameron transaction.  That is the conclusion of the proffer

4   for Mr. Healy, Your Honor.

5            THE COURT:  All right.  Thank you.  M

6            r. Healy, since I can't see you, I'm going to ask you

7   to raise your right hand.  Confirm for me that your right hand

8   is raised.

9            MR. HEALY:  I think IT is getting me on in one

10  second, Your Honor.

11           THE COURT:  There you are -- I can -- there we go.

12  Thank you.  Then -- terrific.  Then you're now still eligible

13  to be CRO of a tech company.  I just -- I'll put that on the

14  record for you.  All right.

15           If you would, Mr. Healy, if you'd raise your right

16  hand.

17             MICHAEL HEALY, DEBTORS' WITNESS, SWORN

18           THE COURT:  Thank you.  Did you listen carefully to

19  the proffer made by Mr. Pomerantz of your testimony in support

20  of the motion this morning?

21           MR. HEALY:  I did.

22           THE COURT:  Did you understand it all?

23           MR. HEALY:  I do.

24           THE COURT:  The statement's true and accurate to the

25  best of your knowledge?

```
 1                MR. HEALY:  It is.

 2                THE COURT:  And do you adopt the proffer as your

 3    sworn testimony this morning?

 4                MR. HEALY:  I do.

 5                THE COURT:  All right, thank you.  Does anyone have

 6    any questions for Mr. Healy?

 7                All right.  Then I will accept the proffer.

 8    Mr. Healy, thank you.  Don't turn that camera off.

 9                All right.  Mr. Pomerantz, anything else?

10                MR. POMERANTZ:  No, that is it, Your Honor.  With

11    that evidentiary basis and my summary at the beginning, we

12    would ask that Your Honor approve the transaction and, if

13    possible, expedite entry of the order so that the transaction

14    can close today.

15                THE COURT:  And thank you, Mr. Pomerantz.  I just

16    wanted to confirm, it is -- the order that you want me to sign

17    is the order that was attached to the original motion at 197-1?

18                MR. POMERANTZ:  That is correct, Your Honor.

19                THE COURT:  Thank you.  Mr. Gibbs, I know that you

20    didn't file an objection.  I also know that you're very new to

21    this and you are racing to catch up.  Just want to make sure

22    the Committee's had ample time to look at this under the

23    circumstances and has no objection.

24                MR. GIBBS:  Thank you.  Good morning, Your Honor.

25    Chuck Gibbs from McDermott, Will & Emery, proposed counsel for
```

1  the Unsecured Creditor's Committee.  With me is my partner,

2  Maris Kandestin, who's filed a pro hac motion, which I think

3  has been approved.  And Ms. Kandestin has been handling this on

4  behalf of the Committee in my stead and -- as well as the next

5  motion.  And with my introduction of her to you, I think my

6  work today is down, and she can directly answer your questions.

7            THE COURT:  Terrific.  Ms. Kandestin, good morning.

8  Ms. Kandestin, I can't hear you.  Had you hit "five star" on

9  your telephone or do you have me muted from your side?  There

10 we go.

11           MS. KANDESTIN:  All right.  Sorry about that.  Thank

12 you, Your Honor.

13           We did have an opportunity to converse with the

14 debtors and request information, including financial

15 information, with respect to this motion.  The debtors very

16 promptly provided that information, and we reviewed it and

17 we're comfortable with the motion and believe it is in the best

18 interest of the estate.

19           THE COURT:  All right, thank you.

20           Anyone else wish to be heard?

21           MR. ROSSOW:  Your Honor, this is Jim Rossow.

22 Briefly, I'm -- I represent the Cameron parties, the purchasers

23 under the proposed transaction.  And I want to just emphasize,

24 first of all, thank you for allowing me to be admitted for this

25 case.  I'm here in Indianapolis, Indiana.

1          With respect to what Mr. Pomerantz indicated about

2    the urgency, one other issue that's probably not directly

3    salient is that for the Cameron parties, the urgency is that

4    they have other components that their lender has imposed on

5    them for closing today that are totally unrelated to the

6    debtors' interests and the debtors' assets.  But the bottom

7    line is that they avoid defaults if they are able to close

8    today, so they're ready and willing to pay.  And if the order

9    is circulated, the -- those wires will be released.

10          THE COURT:  All right, Mr. Rossow, and thank you for

11    letting me know that.  Don't go away.

12          Anyone else?

13          All right.  I've had the opportunity to review the

14    proposed or to review the motion and the proposed form of

15    order.  I do find that I have jurisdiction over the matter

16    pursuant to 28 U.S.C. Section 1334.  I do find that the matter

17    constitutes a core proceeding under 28 U.S.C. Section 157.  I

18    further find that I have the requisite constitutional authority

19    to enter a final order with respect to the request.

20          Mr. Pomerantz, I do compliment the debtors and their

21    professionals for not trying to squeeze this into an ordinary

22    course transaction.  I'm not passing on whether it is or it

23    isn't, but I do think under the circumstances of the case, it

24    was prudent to bring this to everyone's attention and to treat

25    it as though it were not a transaction in the ordinary course.

1  I just think that's -- that represents, as you always foster,

2  good business judgment on behalf of the debtor.

3          I don't have any concerns at all about what's being

4  done.  It is -- it just makes good sense.  I will find that the

5  debtor has properly exercised its business judgment.  Had a

6  chance to review the order at 197.  I have signed it.

7          Mr. Rossow, I will tell you because I never see a

8  piece of paper.  This is all done electronically.  I just added

9  my signature.  It's on its way to docketing.  It will show up

10  in about five minutes.

11          So, you know, grab your favorite soda, you know,

12  enjoy it for about five minutes, and then you can get to work.

13          MR. ROSSOW:  Thank you very much, Your Honor.  And I

14  was told this might happen, so I'm pleased to see it.

15          THE COURT:  Terrific.  Thank you.  All right.  Thank

16  you.

17          MR. POMERANTZ:  Your Honor, I would like to -- I

18  would like to turn the virtual podium over to my partner, Jeff

19  Dulberg, who is going to walk through the dealer conversion

20  motion.

21          THE COURT:  Thank you.

22          Mr. Dulberg, good morning.

23          MR. DULBERG:  Good morning, Your Honor.  Am I audible

24  in the courtroom?

25          THE COURT:  Loud and clear.  Thank you.

1          MR. DULBERG:  Great.  Thank you so much.  So Your

2     Honor, as you know, this is our dealer conversion procedures

3     motion.  The motion is an effort by the debtors to lay out a

4     procedure for the efficient closing of what we call "dealering

5     out" or dealer-conversion transactions.  These are transactions

6     by which the company, as it has for several months prepetition

7     and wishes to continue to do, converts certain of its C-store

8     locations, its convenience store locations, into

9     dealer-operated locations, or dealer-operated sites as we call

10     them.

11          This effectively requires two things.  One is a sale

12     of the inventory and FF&E at the location to a prospective

13     dealer, and then, two, entry into a lease and fuel supply

14     agreement, or a sublease, as it were, and fuel supply agreement

15     with that new operator, that new dealer, at these locations.

16     In short, this eliminates the costs and hassles associated with

17     operating these locations for the debtor, provides rental

18     income, and most importantly, accretes to the overall sale of

19     fuel, which is, in fact, the lifeblood of the company.

20          The process, as the motion lays out, has been

21     undertaken on many occasions, leading to the conversion of over

22     100 of these locations prepetition, and a few dozen are in

23     various states of preparedness awaiting approvals of a motion

24     of this sort before they could go forward.  Your Honor, a

25     couple of different comments were received with respect to the

1    proposed order.  First the Committee counsel, in particular,

2    Ms. Kandestin, on the Committee's behalf, negotiated for a

3    variety of different comments and revisions to the order.  Your

4    Honor, you'll see at Docket Number 274, as of this morning, --

5    is an amended order that includes all of them.  Some of them --

6    and not only were they all very helpful for all of us to

7    effectively expand the notice period, provide for a little bit

8    of a process by which a draw can be resolved with -- if we're

9    at loggerheads and otherwise puts in some typical consultation

10   rights for a Committee and for the DIP lender.  This has led to

11   our agreements on the -- that form of the order with respect to

12   all of those matters.  And in particular, I also note that the

13   DIP lender has conveyed to us that they have no objection to

14   the motion, and I assume to this form of order, as well.

15          The only other wrinkle, Your Honor, is you'll note

16   that there was an objection filed by Brothers, the -- a --

17   which is an operator of a food -- a part of the food sales that

18   we do in that roughly six to ten locations in Louisiana.  We

19   have a license with Brothers for the sale of chicken in those

20   locations.

21          Brothers, I think quite rightly, raised their hands

22   and said, hey, you know, we would like to, in particular, be

23   made aware of any sale that -- or any particular

24   dealer-conversion that's going to affect us, and we believe

25   we'd like to bring in some other provisions that sort of inform

1   what your dealer's obligations will be.  Your Honor,

2   unfortunately, we don't have a agreement yet as of this morning

3   on that form of that order.  You'll notice at the very end of

4   the order at 274 is language that I know is very close to doing

5   the trick for Brothers, and they can otherwise suggest that if

6   it didn't -- if they disagree.

7            I do want to say that even keeping things sort of hot

8   right up to the last moment, we've agreed to remove the word

9   "materially," which we inserted in this version of the order

10  there at the very last paragraph.  It is Paragraph Number --

11  the last substantive paragraph, I should say, Number 13.  There

12  is at line -- second line down, the material effect that

13  Brothers has conveyed that they do not accept that insert of

14  that word.  And we are happy, Your Honor, if Your Honor does

15  end up entering the order, to remove that.

16           Otherwise, we believe the order is appropriate.  And

17  to sort of strike the balance between the rights of third

18  parties to gain notice and to speak up with respect to

19  substantive issues that may impact them, while at the same time

20  providing the debtors a smooth procedure by which to get these

21  matters closed.

22           Your Honor, as similarly with the Cameron

23  transaction, we have a proffer of the testimony that Mr. Healy

24  would give in support of the motion.  I'm prepared to provide

25  that if Your Honor is ready to have it.

1              THE COURT:  All right.  Thank you.

2              Let me -- let's see.  Mr. Kuebel, are you taking -- I

3    saw Mr. Eisenberg earlier, but since this is Louisiana, is this

4    you?

5              MR. KUEBEL:  Yes, Your Honor.

6              THE COURT:  All right.  Thank you.  Good morning.

7              MR. KUEBEL:  Good morning, Your Honor.  Omer F.

8    Kuebel, III, with Locke Lord.  I'm with my partner today, Phil

9    Eisenberg, and I believe Simon Mayer is with us, as well.  And

10   we represent BFM Enterprises, Your Honor, and a number of its

11   affiliates generally under the banner of the Brothers Food

12   Mart.

13             Your Honor, obviously the debtors have announced

14   their intentions to exit the day-to-day operations of the

15   remaining C-stores.  Our limited objection has no real issues

16   with the debtors' business judgment in that regard.  In

17   reviewing the motion, and the motion seeks to establish

18   expedited procedures for transfers of these remaining operated

19   C-stores to what they call dealers, our clients do believe, and

20   I think the Court understands, that often these dealer assets

21   are really creatures of contracts, significant contracts, maybe

22   the sublease of the sublease of the actual real estate itself,

23   fuel supply agreement obviously are key issues in this case,

24   and wholesale or other agreements for provisions or supplies of

25   the interior C-store goods.  Sometimes we would call them

1  sundries in the industry, but they may be everything to Coke

2  and Pepsi, what Your Honor's already had to deal with in this

3  case, the snacks, et cetera.

4       And we had reached out to the debtor initially

5  because we were concerned that the procedures didn't expressly

6  address assumption or rejection of those contracts.  And in the

7  case of our client, BFM, Your Honor, we are most concerned

8  about a -- one significant contract to us, which is a license

9  agreement and a license agreement that allows the debtor, MEX,

10  to use the trade name, the trademark, logos, and maybe most

11  importantly, the Brother's legendary fried chicken recipe.

12       We do believe that maybe, that as we work through it,

13  the universe of stores that would be left that would

14  potentially be existing operated Brother stores that would move

15  to dealers is a pretty small universe.  The entirety of the

16  transaction across Southeast Louisiana is a little closer to 40

17  stores, but I think that the remaining dealer stores that are

18  at issue are a smaller number and probably less than 10, Your

19  Honor.  So, you know, we -- we're limited, and we're -- we

20  reached out to the debtor to try to get a fix for our concerns

21  in this regard.

22       I think the debtor is aware that there are some

23  current disputes over the licensing agreement.  We've worked

24  with the debtor to adopt a notice procedure to make sure that

25  BFM and its affiliates are getting notice of related

1   transactions, particularly transactions that may implicate any

2   efforts of MEX to put its future dealers under the licensing

3   agreement.  I think we've largely agreed to terms.  Mr. Dulberg

4   is correct that we did have an issue with the materiality

5   qualifier on limiting notice, and I think we've resolved that

6   issue.

7            And part of our concern, so Your Honor is aware, is

8   that BFM and its affiliates had not been scheduled or listed by

9   the debtor in its initial list of creditors, and still, as of

10  the most recent mailing matrix, we're still not on it.  So we

11  have had some notice concerns, but I think we've regarded -- we

12  -- we've resolved it.

13           And really, I think we come before Your Honor today

14  with one, you know, relatively small issue with respect to the

15  carve-out language in this proposed order.  And it really gets

16  to the question, Your Honor, of whether in this expedited

17  marketing process, if Mountain Express seeks to provide access,

18  to one of its dealers to the Brother's license as part of its

19  expedited marketing procedures, it gives the dealer access to

20  or provides both notice of and a copy of that licensing

21  agreement to the dealers.  And I think that's kind of our

22  remaining issue.

23           The debtors' been reluctant to do it.  We're a little

24  bit concerned about why the debtors' been reluctant to do it.

25  It would seem that any dealer that would want to step into the

1  Brother's trade name, logos, and fried chicken recipes would

2  want to know that it's under a license agreement and what the

3  terms of those licensing agreements are.

4         But nevertheless, Your Honor, that's our last issue

5  that we may bring before you to see if we could get resolution.

6  Otherwise, I think our concerns have been addressed.  The kind

7  of overarching concern is if the debtor remains reluctant to

8  provide its dealers with copies of the licensing agreement,

9  that it almost ensures that we're back here, Your Honor, either

10 on a dealer-by-dealer notice, or potentially we've got to come

11 before Your Honor and move to shorten the time to assume or

12 reject the licensing agreement.  So that -- that's our one

13 remaining issue, Your Honor, and I'm happy to answer any

14 questions you may have.

15         THE COURT:  So let me propose this because I think I

16 understand, at least I think I do, why you don't have the

17 absolute language that you want.  But I -- I've read through,

18 again, looking at order form, 274, I've made the change in

19 Paragraph 13.  And let me propose this as a fix because I

20 actually think this will solve the problem, is if you get a

21 notice and you want to schedule a hearing, even with no

22 pleading on file, I will commit to you that if you will reach

23 out on the day that you get the notice, I'll give you a hearing

24 slot within the 14-day time period.  And that way, if you can't

25 work this out between the two of you, once you and

1 Mr. Dulberg -- and I use "you" just simply in the

2 representative capacity -- if the two of you begin, again based

3 upon the specific identity of the person that is, or the entity

4 that's going to be taking over, if you don't have it resolved,

5 then you have a time period or you have a hearing date within

6 the time period that you've negotiated, that being the 14 days,

7 where it won't go forward unless you have resolved your issue.

8 You want to tell me why that doesn't work?  And it also gives

9 everybody an incentive not to come to that hearing.

10         MR. KUEBEL:  Your Honor, from my perspective, I think

11 that's a great fix and thank you for suggesting it, and it

12 would be acceptable to our client.

13         THE COURT:  All right.  Mr. Dulberg, I can't imagine

14 you have any issue with that.  All I'm saying is look, you --

15 if the request is made, you'll have a time -- you'll have a

16 hearing date within the 14 days.  I hope to never see the two

17 of you on this issue, but if we need to, I'm obviously very

18 happy to do it.

19         MR. DULBERG:  Your Honor, we have no issue with that.

20 I should say that Mr. Kuebel's recitation of what occurred

21 isn't exactly accurate.  I have in front of me their request

22 that we tell the third-party dealer that they're bound by the

23 license agreement and assure that they'll remain in compliance,

24 which goes way past what he described.  But Your Honor has, as

25 Your Honor does, already resolved it without us having to get

1   into a dispute over that.  And, Your Honor, that's acceptable

2   to us.

3            THE COURT:  All right.  That's -- and again, are the

4   two of you happy with my statement?  And Mr. Alonzo is sitting

5   about three feet away from me.  Are you all happy with my

6   statement on the record that if you'll just reach out to him --

7   and do it when you get the notice, I'll create that time slot

8   for you.  And then if there isn't an issue, perfectly happy for

9   the two of you to send an email to him that says, we don't need

10  the hearing time.  And obviously I want you to -- and I -- this

11  goes without saying, obviously you'll loop in the other major

12  constituents as this is developing, including the Committee.

13  Does that work for everybody or you want an order -- you want

14  to modify 274?

15           MR. KUEBEL:  Your Honor, from our perspective, I

16  think we may need to tweak 274 anyway on an issue we've agreed

17  on to make sure we've augmented the proper list of our client

18  and its affiliates.  Other than that, I'm happy with the

19  Court's representations.  We understand what the process is

20  going to be.  I mean, as Your Honor knows, this has been a back

21  and forth, and as we highlighted in our objection and as we

22  have gone back and forth, that our key issue is making sure

23  that these dealers get notice of our license.

24           THE COURT:  No, I got it.  I'm just comfortable, and

25  I want to give the professionals maximum flexibility to address

1  whatever may pop up, so I'm just fine.  And again, Mr. Alonzo's

2  there.  You know how to reach him.

3           In terms of other comments, I have 274 up on the

4  screen.  I'm happy to be your scrivener if the changes are

5  short.  If there's, you know, if there's a huge amount of

6  rewriting, then, you know, I'm happy for you all to upload an

7  order.  But if it's just inserting a couple of names somewhere,

8  I'm more than happy to do that right now, just so we can put

9  this issue to bed.

10          MR. KUEBEL:  Your Honor, I'm fine with working

11  through it that way.  At the risk of it being a bit

12  (indiscernible). So in going through the language of the order,

13  Your Honor, in Paragraph 13, I think the striking of the word

14  "materially" in the first sentence.

15          THE COURT:  So hold on.  Hold on for a second.  So I

16  want you to follow along.

17          MR. KUEBEL:  Yeah.

18          THE COURT:  All right.  So you should see the order

19  up on the screen and --

20          MR. KUEBEL:  Yes, Your Honor.

21          THE COURT:  I actually -- I didn't strike through it.

22  I just deleted the word "materially."

23          MR. KUEBEL:  Perfect.  So our proposed second change,

24  Your Honor, would be further on in that sentence where we're

25  listing the entities.  And we would -- and I think we can do it

1  anywhere.  We can do it after Hand and Holdings, LLC.  For

2  example, insert BFM Operations, LLC, Imad, I-M-A-D, Hamdan.

3           THE COURT:  I'm sorry.  I just didn't hear you,

4  Mr. Kuebel.  My apologies.

5           MR. KUEBEL:  The next insert would be Imad, I-M-A-D

6  Hamdan, H-A-M-D-A-N.  And that would cover it.

7           THE COURT:  I'm sorry.  Mr. Kuebel, did I -- again, I

8  just didn't hear what you said after you said Hamdan.

9           MR. KUEBEL:  That would conclude our inserts, Your

10  Honor.

11           THE COURT:  Oh, okay.  That's easy.  And I assume --

12  I assumed, Mr. Dulberg, that you don't really care.

13           MR. DULBERG:  Your Honor, that's correct.

14           THE COURT:  All right.  So I do care that my

15  punctuation is right.  Let me add -- oops.  All right.  Maybe I

16  don't care that much.  Let see if I can move that out.  Okay.

17  There we go.

18           And Ms. Kandestin, I assume that you're okay with

19  this?

20           MS. KANDESTIN:  Yes, Your Honor.

21           THE COURT:  All right.  Thank you.  So with that,

22  Mr. Kuebel, objection withdrawn?

23           MR. KUEBEL:  Yes, Your Honor.

24           THE COURT:  All right.  Thank you.

25           MR. KUEBEL:  And of course, subject to Your Honor's

1   accommodation to -- with respect to the hearing date that you

2   suggested on the record.

3            THE COURT:  I -- I've stated it on the record.  Quite

4   frankly, I didn't need to.  You always have that anyway.

5            But I, the only thing I ask is that, you know, soon

6   as -- as soon as this happens, that you reach out and get a

7   date because I'm obviously able to be more flexible.  I don't

8   want you to call me on day 13 and say, well, you promised me a

9   hearing date within the 14-day period and, you know, I'm in the

10  middle of something else.  I mean, I'll make it work, but it

11  may be, you know, it may be a really late or a really early

12  hearing.

13           MR. KUEBEL:  You always do, and we're incredibly

14  appreciative for your service.  Thank you.

15           THE COURT:  All right.  Mr. Kuebel, kind words.

16  Thank you.

17           All right.  Then with that, Mr. Dulberg, do you want

18  to go ahead and make your proffer?

19           MR. DULBERG:  Your Honor, I'd like to.  I'll go as

20  quickly as I can.  So, Your Honor, if Mr. Healy were to

21  testify, he would testify as follows.

22           "My name is Michael Healy.  I'm a senior managing

23           director of FTI Consulting, Inc., and I am the duly

24           appointed chief restructuring officer of each of the

25           debtors.  I have more than 20 years of restructuring

1           experience and have advised companies, lenders,

2           creditors, corporate boards, and equity sponsors in

3           this capacity.

4           "Among the debtors' business segments is its C-store

5           operations business, which consists of the operation

6           of fueling centers and convenience stores.  I

7           understand that beginning in 2022, the debtors

8           determined to transform this business segment to a

9           third-party, dealer-operated model.  In or about

10          October, 2022, the debtors began to sublease these

11          locations to third-party dealers and transfer related

12          operated dealer assets on site, which includes

13          inventory, fixtures, and equipment to those dealers.

14          As part of the transition to dealer-operated sites,

15          these same dealers also entered into fuel supply

16          agreements with the debtors.

17          "Prior to the petition date, the debtors converted

18          104 operated fueling centers to network dealer sites,

19          and as of the petition date, are positioned to

20          convert an additional 55 operated fueling centers to

21          network dealer sites with various third parties.  By

22          way of each dealer conversion transaction, the

23          dealers maintain long-term positive cash flows

24          through fuel volume distribution and vent (phonetic)

25          income, while simultaneously eliminating their

1          operating expenses and difficulties associated with

2          the day-to-day operations of a fueling center.

3          "In general, dealer conversion transactions do not

4          produce a large amount of sale proceeds due to the

5          debtors, in certain instances, the debtors receive

6          funds for inventory that they sell to the dealer as

7          part of the conversion.  And occasionally as part of

8          the negotiation process, the dealers agree to incur

9          certain capital expenditures."

10         He would continue:

11         "Although I believe dealer conversion transactions to

12         be ordinary course of business transactions, the

13         debtors seek approval of procedures that authorize a

14         streamlined process to undertake dealer conversion

15         transactions in cooperation with other key parties in

16         interest.  I believe that approval of the dealer

17         conversion transaction procedures to be in the best

18         interest of the debtors' estates.  The use, sale, or

19         transfer of the operated-dealer assets will generate

20         additional value and help preserve existing value for

21         the benefit of the debtors' estates and all parties

22         in interest.

23         "The cost associated with a prolonged court approval

24         process for numerous processes could easily diminish

25         the benefits these transactions provide to the

1          debtors' estates.  Additionally, the debtors often

2          have a limited window of time during which they can

3          take advantage of opportunities to engage in dealer

4          conversion transactions, so a streamlined set of

5          procedures approved by this Court will assure third

6          parties of the debtors' ability to consummate these

7          transactions.

8          "At bottom, the dealer conversion transaction

9          procedures permit the debtors to convert operated

10         fueling centers into network dealers in a streamlined

11         and cost effective manner, while balancing these

12         efficiencies by providing notice and an opportunity

13         to object, to parties of interest.  Importantly, the

14         dealer conversion transaction procedures do not apply

15         to any transactions involving insiders."

16         Mr. Healy would conclude that "For the reasons set

17    forth of the dealer conversion motion, I believe the Court

18    should approve the dealer conversion motion and the dealer

19    conversion transaction procedures contained therein."

20         That would conclude the proffer, Your Honor.

21         THE COURT:  All right.  Thank you.

22         Mr. Elrod and Ms. Crocker, I'll get to you in just

23    one second.  I did see you.  I just got a bit ahead of myself

24    and my apologies.

25         Mr. Healy, if you would please raise your hand again,

1    please, sir?

2                MICHAEL HEALY, DEBTORS' WITNESS, RE-SWORN

3                THE COURT:  All right.  Thank you.  Did you listen to

4    the proffer of your testimony this morning?

5                MR. HEALY:  Yes, I did.

6                THE COURT:  Understand it all?

7                MR. HEALY:  I did.

8                THE COURT:  Everything true and accurate to the best

9    of your knowledge?

10               MR. HEALY:  Yes.

11               THE COURT:  Do you adopt the proffer as your sworn

12   testimony this morning in support of the debtors' request for

13   relief?

14               MR. HEALY:  I do.

15               THE COURT:  All right.  Thank you.  And anyone wish

16   to cross-examine Mr. Healy?

17               All right.  Thank you.

18               Let me just start, Ms. Crocker, I saw yours first.

19   I'm also from the South, so you're probably always going to get

20   to go first, just to completely candid.  I saw you raise your

21   hand, and again, I didn't mean not to be responsive.  Did you

22   need to make a statement?

23               MS. CROCKER:  Just briefly, Your Honor.  Michaela

24   Crocker on behalf of Sunoco.

25               Mr. Kuebel's comments just raised one issue I would

1  like some clarification on.  I had reached out to debtors'

2  counsel, and based on the terms of the motion and my

3  discussion, it's my understanding that this procedure will not

4  include the assumption or rejection of executory contracts for

5  the assignment of licenses.  And I just want to make sure that

6  is the case.

7            THE COURT:  That was my understanding.  Mr. Dulberg,

8  can you just confirm that for Ms. Crocker?

9            MR. DULBERG:  That is confirmed, Your Honor.

10           THE COURT:  Ms. Crocker, is that satisfactory to you?

11           MS. CROCKER:  It is, Your Honor.  Thank you.

12           THE COURT:  Thank you.

13           Mr. Elrod?  Mr. Elrod, I -- do you have me muted

14  from your side, perhaps?

15           MR. ELROD:  Apologies, Your Honor.  Good morning.

16  John Elrod on behalf of the DIP lenders.

17           Your Honor, just a minor clarification, and I think

18  it's somewhat implicit, but I would like it to be explicit.

19  Your Honor referenced some consultation rights in favor of the

20  Committee earlier, and I think you used the phrase "other major

21  constituents."  Presumably that includes the DIP lenders but I

22  just wanted to clarify that point.

23           THE COURT:  Couldn't imagine that it wouldn't.

24  Mr. Dulberg?

25           MR. DULBERG:  Your Honor, if I might, if you'll look

1  and Mr. Elrod will also notice, and it shows up in 274,

2  Paragraphs 1(a) and (e), I believe they are, Subparagraphs (a)

3  and (e), each contain the consultation rights, concomitant

4  rights for the DIP lender, as given to the Committee.

5           THE COURT:  You're even capitalized, Mr. Elrod.

6  That --

7           MR. ELROD:  I saw that.  I did see that, Your Honor.

8  I thought there was a modification on the record earlier and

9  that's what led to my comments.

10          THE COURT:  Ah, fair enough.  That's -- I didn't

11  intend to change the order.  I thought I was supplementing.  My

12  apologies.

13          MR. ELROD:  Thank you, Your Honor.

14          THE COURT:  Mr. Ruff, U.S. Trustee okay with this?

15  This seems really efficient and makes a lot of sense, but

16  hadn't heard from you this morning, so I just want to make sure

17  you're okay.

18          MR. RUFF:  Your Honor, I'm totally okay.  Again,

19  Jason Ruff for the U.S. Trustee's office.  Appreciate the

20  opportunity to speak.  No issues.  I think this strikes a nice

21  balance between, you know, due process and notice and allowing

22  the debtors to do what they've been doing historically for

23  their businesses, so --

24          THE COURT:  All right.  Thank you, Mr. Ruff.

25          And, Ms. Kandestin, process make sense to the

1   Committee and feel like you're at the table?

2          MS. KANDESTIN:  Yes, Your Honor.  Thank you.  And

3   thank you to the debtors for working with us to implement -- to

4   put all of the changes that you see in 274.

5          There was, subject to I think Mr. Dulberg is going to

6   make a statement on the record to clarify what exactly the

7   operated dealer assets are.  But other than that, Committee is

8   fully supportive of these changes.

9          THE COURT:  All right.  Thank you.  Mr. Dulberg, did

10  you need to make a statement?

11         MR. DULBERG:  Your Honor, I think it was fairly well

12  contained in the proffer, which is that it includes equipment,

13  inventory, and that's pretty much it.  Some fixtures.

14         THE COURT:  I got it.  I just didn't know if you had

15  agreed, that the two of you had agreed to specific language.

16         MR. DULBERG:  You're right.

17         THE COURT:  I thought I would give you the

18  opportunity.

19         MR. DULBERG:  Ms. Kandestin is correct, and I thought

20  of it as subsumed within the testimony, but it -- it's -- that

21  is what it is.  It is effectively inventory and FF&E.

22         THE COURT:  Ms. Kandestin, you okay with that?

23         MS. KANDESTIN:  Yes.  Thank you.

24         THE COURT:  All right.  Thank you.  Then I have no

25  objections that remain outstanding with respect to the

1  requested relief.  Do find that I have jurisdiction pursuant to

2  28 U.S.C. Section 1334.  The matter constitutes a core

3  proceeding under 28 U.S.C. Section 157.  I have the requisite

4  constitutional authority to enter a final order.

5            Practically speaking, I just really appreciate the

6  balance that's been struck.  Business has got to be able to

7  operate efficiently and take advantage of opportunities.

8  Bankruptcy adds a pull -- sometimes pushes against that with

9  making sure that everybody has an opportunity to be notified

10 and participate in the process.  This is a great balance.  I

11 don't have any concerns at all with the requested relief.

12           I have obviously had a chance to review the revised

13 form of order at 274.  We've made some interlineations as

14 everyone has seen to satisfy Mr. Kuebel's client's objections.

15 With that, I'll grant the motion.  I've signed the order.  It

16 is on its way to docketing.  All right?

17           MR. DULBERG:  Thank you, Your Honor.

18           THE COURT:  Thank you.

19           Mr. Pomerantz, are you closing us out?

20           MR. POMERANTZ:  I think we're ready to close out,

21 Your Honor.  Appreciate your time, and we will see you next

22 Thursday.

23           THE COURT:  All right.  Thank you.  Then everyone

24 have a great weekend.

25           MR. POMERANTZ:  Actually, just one question, Your

1 | Honor.  Next Thursday, how long do you have?  I know Your Honor

2 | is traveling.  Just for parties' expectations, you know, we

3 | hope to resolve the DIP issues, but if we don't, we just wanted

4 | to know how long you have set aside for us.

5 | THE COURT:  Fair enough.  So let me get there.  So

6 | let me just tell you.  Next Thursday will be day four of

7 | mediation part, first day of part, or second day of part two.

8 | I will be in New York.  How much time do I have set aside?  I

9 | hope it's very little, but I mean, if you'll just keep

10 | Mr. Alonzo engaged, we will figure out how to manage all of

11 | that.  You may see a pretzel stand in the background, but we

12 | will figure out how to make all this work.

13 | MR. POMERANTZ:  Appreciate it, Your Honor.

14 | THE COURT:  All right.  Thank you, everybody.  Have a

15 | great weekend.  We'll be adjourned.

16 | MR. POMERANTZ:  Thank you.

17 | (Proceedings concluded at 10:49 a.m.)

18 | * * * * *

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1                    C E R T I F I C A T I O N

2

3          I, Teresa Saint-Amour, do hereby certify that the

4    foregoing is a correct transcript from the electronic sound

5    recording provided for transcription and prepared to the best

6    of my professional skills and ability.

7

8    _____

9    TERESA SAINT-AMOUR, AAERT NO.  2020   Dated:  April 22, 2023

10   ACCESS TRANSCRIPTS, LLC

11

12

13

14                    **C E R T I F I C A T I O N**

15

16          I, Alicia Jarrett, court-approved transcriber, hereby

17   certify that the foregoing is a correct transcript from the

18   official electronic sound recording of the proceedings in the

19   above-entitled matter.

20

21

22

23   _____

24   ALICIA JARRETT, AAERT NO. 428    DATE: April 24, 2023

25   ACCESS TRANSCRIPTS, LLC