```
                     UNITED STATES BANKRUPTCY COURT
                  SOUTHERN DISTRICT OF TEXAS (HOUSTON)

                                       .
IN RE:                                 . Case No. 23-90147
                                       . Chapter 11
MOUNTAIN EXPRESS OIL COMPANY,          .
et al.,                                . 515 Rusk Street
                                       . Houston, TX 77002
                  Debtors.             .
                                       . Tuesday, April 25, 2023
. . . . . . . . . . . . . . . .        . 11:25 a.m.
```

      TRANSCRIPT OF  DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM
            AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO
      (A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH COLLATERAL,
      (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
           EXPENSE CLAIMS, (III) GRANTING ADEQUATE PROTECTION TO
         PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC
          STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING
                          RELATED RELIEF [105];
      DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING
        AND APPROVING A NON-INSIDER KEY EMPLOYEE RETENTION PLAN AND
                   (II) GRANTING RELATED RELIEF [247];
                 BEFORE THE HONORABLE DAVID R. JONES
                  UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES:

For the Debtors:          Pachulski Stang Ziehl & Jones LLP
                          By:  BENJAMIN WALLEN, ESQ.
                          440 Louisiana Street, Suite 900
                          Houston, TX 77002
                          (713) 691-9385



TELEPHONIC APPEARANCES CONTINUED.

Audio Operator:           Courtroom ECRO Personnel

Transcription Company:    Access Transcripts, LLC
                          10110 Youngwood Lane
                          Fishers, IN 46048
                          (855) 873-2223
                          www.accesstranscripts.com


     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
TELEPHONIC APPEARANCES (Continued):

For the Debtors:           Pachulski Stang Ziehl & Jones LLP
                           By:  STEVEN W. GOLDEN, ESQ.
                           780 Third Avenue, 34th Floor
                           New York, NY 10017-2024
                           (212) 561-7700

                           Pachulski Stang Ziehl & Jones LLP
                           By:  JEFFREY POMERANTZ, ESQ.
                                JEFFREY W. DULBERG, ESQ.
                           10100 Santa Monica Blvd., 13th Floor
                           Los Angeles, CA 90067-4003
                           (310) 277-6910

                           Pachulski Stang Ziehl & Jones LLP
                           By:  MAXIM LITVAK, ESQ.
                           One Sansome Street, Suite 3430
                           San Francisco, CA 94104
                           (415) 263-7000

                           Lugenbuhl Wheaton Peck Rankin &
                           Hubbard
                           By:  BENJAMIN KADDEN, ESQ.
                           601 Poydras Street, Suite 2775
                           New Orleans, LA 70130
                           (504) 568-1990

For the Official           McDermott Will & Emery LLP
Committee of Unsecured     By:  MARCUS A. HELT, ESQ.
Creditors:                      CHARLES G. COWDEN, ESQ.
                           250 North Harwood Street, Suite 1900
                           Dallas, TX 75201
                           (214) 295-8063

                           McDermott Will & Emery LLP
                           By:  MARIS J. KANDESTIN, ESQ.
                           1007 North Orange Street, 10th Floor
                           Wilmington, DE 19801
                           (302) 485-3900

                           McDermott Will & Emery LLP
                           By:  LUKE BARRETT, ESQ.
                           One Vanderbilt Avenue
                           New York, NY 10017-3852
                           (212) 547-5400
```

TELEPHONIC APPEARANCES (Continued):

| | |
|---|---|
| For the United States Trustee: | Office of the United States Trustee<br>By:  JAYSON RUFF, ESQ.<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002<br>(713) 718-4640 |
| For Bank of Hope: | Buchalter<br>By:  WILLIAM S. BRODY, ESQ.<br>1000 Wilshire Boulevard, Suite 1500<br>Los Angeles, CA 90017-1730<br>(213) 891-5015 |
| For Hunt Refining Company and Pilot Travel Centers LLC: | Sidley Austin LLP<br>By:   MAEGAN QUEJADA, ESQ.<br>      DUSTON K. MCFAUL, ESQ.<br>1000 Louisiana Street, Suite 5900<br>Houston, TX 77002<br>(713) 495-4618 |
| For First Horizon Bank, as Administrative Agent: | Greenberg Traurig, LLP<br>By:  JOHN D. ELROD, ESQ.<br>Terminus 200<br>3333 Piedmont Road NE, Suite 2500<br>Atlanta, GA 30305<br>(678) 553-2259 |
| | Greenberg Traurig, LLP<br>By:  SHARI L. HEYEN, ESQ.<br>     EMILY D. NASIR, ESQ.<br>1000 Louisiana Street, Suite 6700<br>Houston, TX 77002<br>(713) 374-3500 |
| For BFM Enterprise LLC: | Locke Lord LLP<br>By:  PHILIP EISENBERG, ESQ.<br>JPMorgan Chase Tower<br>600 Travis, Suite 2800<br>Houston, TX 77002<br>(713) 226-1200 |
| For Marathon Petroleum Company LP: | Frost Brown Todd LLP<br>By:  RONALD E. GOLD, ESQ.<br>3300 Great American Tower<br>301 East Fourth Street<br>Cincinnati, OH 45202<br>(513) 651-6800 |

```
TELEPHONIC APPEARANCES (Continued):

For the Necessity        ArentFox Schiff LLP
Landlords:               By:  JAMES BRITTON, ESQ.
                              BETH BROWNSTEIN, ESQ.
                         1301 Avenue of the Americas
                         42nd Floor
                         New York, NY 10019
                         (212) 484-3900

For Mesa Valley          Tiffany & Bosco, P.A.
Housing:                 By:  CHRISTOPHER R. KAUP, ESQ.
                         2525 East Camelback Road
                         Phoenix, AZ 85016-9240
                         (602) 255-6000

For ICEE Company:        Kean Miller LLP
                         By:  MICHELLE FRIERY, ESQ.
                         Pennzoil South Tower
                         711 Louisiana Street, Suite 1800
                         Houston, TX 77002
                         (713) 844-3000

Also Present:            JUSTIN NEISS

                         ADRIAN LUDWIG

                         TURJO WADUD

                         LAMAR FRADY

                         MICHAEL HEALY
```

```
1          (Proceedings commence at 11:25 a.m.)

2          THE COURT:  Good morning, everyone.  This is

3   Judge Jones.  The time is 11:25 Central.  Today is April

4   the 25th, 2023.  This is the docket for Houston, Texas.  On the

5   eleven o'clock docket, we have the jointly administered cases

6   under Case Number 23-90147, Mountain Express Oil Company.

7          Folks, please don't forget to record your electronic

8   appearance.  That's a quick trip to the website, couple mouse

9   clicks.  You can do that at any time prior to the conclusion of

10  this morning's hearing.

11         First time that you speak, if you would please state

12  your name and who you represent.  That really does help the

13  court reporters do what is a very difficult job in the event

14  that a transcript request is made.

15         We do have a number of folks who are on the phone

16  line.  I have activated the hand-raising feature.  If you know

17  you're going to be speaking, if you would give me a "five

18  star," I will get you unmuted.

19         And again, as always, we are recording using

20  CourtSpeak.  We'll have the audio up on the docket shortly

21  after the conclusion of the hearing.  Since we do have folks

22  both in the courtroom as well as on video, folks in the

23  courtroom, when you speak, if you would please come to the

24  lectern.  Please don't start talking until you get there, just

25  so you can both be seen and be heard.
```

1          And with that, Mr. Pomerantz, are you starting us off
2  this morning?

3          MR. POMERANTZ:  Yes, I am, Your Honor.  Good morning,
4  Your Honor.  Jeff Pomerantz, Pachulski Stang Ziehl & Jones,
5  proposed counsel for the debtors and debtors-in-possession.

6          THE COURT:  Good morning.

7          MR. POMERANTZ:  Your Honor, given what is likely to
8  be on the calendar today and the status of the matters, I made
9  the decision that Mr. Healy, Mr. Richards, and myself, our time
10  could better be served not in airports.  So our lack of coming
11  into court should be taken as nothing other than a desire to
12  conserve estate resources, given how efficient we can be on the
13  video.

14          Okay.  I'd like to introduce, once again, Michael
15  Healy, who is the debtors' proposed chief restructuring
16  officer, senior managing director of FTI.  Also on the video
17  are Mr. Turjo Wadud and Lamar Frady, who I've introduced to
18  Your Honor before.  They are two of the members of the debtors'
19  board of directors.

20          Your Honor, last night, we filed with the Court a
21  notice, with the Court, attaching a final order and agreement
22  and redlines to the documents that the Court had entered prior
23  to or at -- in connection with the interim hearing.  I had
24  hoped that today would be simply a victory lap, since we have
25  -- I thought we had resolved, as of last night, when we filed

1   the documents, all the issues with the Committee, the lender,

2   as well as the issues with the Texas state taxing authorities,

3   as well as the Necessity lenders.

4           The latter two, I am pleased to report, have been

5   fully resolved.  This morning, the Committee circulated

6   additional comments to the order that sort of raised two

7   issues, which I believe one should be relatively

8   non-controversial, which I'll describe; and the other, a couple

9   of issues that, unless Mr. Elrod and Mr. Gibbs were

10  successfully able to use the last 15 minutes resolving, may be

11  an issue that is still out there.

12          Nevertheless, I do want to thank the lender and the

13  Committee and their respective professionals for the work over

14  the last few weeks.  And of course, I want to thank the Court's

15  indulgence for the continued hearings.  And I'm sure Your Honor

16  has read the documents that we filed this morning, and I don't

17  intend to do a page-turn highlighting the differences, although

18  I will do so if the Court requires.  But I would like to

19  highlight a few aspects of the final financing agreement that

20  is embodied in the documents, and then I will just set up the

21  two issues that are out there, again, one of which I think is

22  non-controversial and has been resolved.

23          THE COURT:  Okay.

24          MR. POMERANTZ:  First, as a result of discussions

25  between the debtors, the lenders, and the newly-minted

1  Committee who engaged McDermott Will & Emery and Province as

2  their advisors, all parties agreed that extending the runway

3  for the sale process from four months to five months was

4  necessary to enable parties to continue to conduct due

5  diligence and hopefully achieve a value-maximizing transaction,

6  which is obviously the goal of these Chapter 11 cases.

7          Since the runway is extended, Your Honor, the debtors

8  required additional funding with which to sustain operations

9  and satisfy administrative claims during the extra month.  And

10  accordingly, pursuant to the final documents filed with the

11  Court, the lenders have agreed to increase the DIP financing by

12  an additional $9.25 million, which is expected to provide

13  sufficient runway for the additional month.

14          The agreement to increase the financing, however, as

15  Your Honor might expect, was subject to a few conditions.

16  First, the DIP agreement contains a series of milestones that

17  are tied to the progress of the sale process, such that, as

18  long as the debtors are moving towards a sale transaction and

19  achieving minimum results, the financing will be available.

20          There are four milestones.  One deals with

21  indications of interest; one deals with letters of intent; one

22  deals with an executed purchase agreement; and one deals with

23  the Court's ultimate approval of the sale.  For obviously [sic]

24  reasons and not to affect the success of the sale process, the

25  amount at which we would have to essentially go through each of

1    those gates and have access to additional financing is

2    something that the Committee, the lenders, and the debtor

3    agreed, but is not public -- part of the public documents.

4            If Your Honor requires, we could certainly file that

5    under the seal.  We can have it in camera, but it is a number

6    that everyone was comfortable would demonstrate that the

7    debtors are moving towards a process that will ultimately end,

8    hopefully, in a transaction that will close.

9            Second, the debtors will only be permitted to request

10   additional financing if the minimum liquidity is or is expected

11   to be during the period, the one-week period following the draw

12   request, that -- falls below $70 million, so that the debtor is

13   only calling money if it actually needs it.

14           In consideration for agreeing to the increased

15   financing, the debtors agreed that the lenders would be

16   entitled to a full roll-up of the prepetition debt.  I know,

17   Your Honor, that is perhaps an out-of-the-ordinary term, but

18   Your Honor has experienced the first month of the case with us

19   side by side.  You know the difficulty the debtor has had

20   obtaining financing.  You know the risk that the financing

21   poses, given the lack of really hard assets.  And the lenders

22   have extended their neck above and beyond what they initially

23   agreed to do.  And we felt it was appropriate that, in light of

24   those circumstances, in these -- in the circumstances in this

25   particular case -- of course, not to be used in any other case,

1   that it was appropriate to have a full roll-up.  And we hope

2   that Your Honor agrees.

3          Second, and this really relates to one of the issues

4   that is -- I don't think should be in dispute, but the interest

5   rate was increased from 10 percent to 11 percent.  I want to

6   clarify that the interest rate from the interim date to the

7   final date, hearing date, is 10 percent.  And then the interest

8   rate from the final hearing date until payment and maturity

9   would be 11 percent, not only on the additional financing, but

10  on the rolled-up financing and everything else.

11         That was an issue that I think has been resolved,

12  based upon my discussions with Mr. Elrod and Mr. Gibbs, so we

13  could put that one to bed.

14         The lenders also agreed to certain changes to -- in

15  the order to address the Committee's concerns.  I'm sure

16  Mr. Gibbs will outline those, to the extent he believes

17  necessary.  And importantly, the Committee's carve-out was

18  increased to an aggregate amount of $1.75 million, which, given

19  the size of this case, the size of the potential unsecured

20  creditor body, we believe should be sufficient to pay for the

21  Committee to have the adequate top-notch representation it

22  does.

23         The debtors also filed an updated budget with the

24  final DIP documents, which contains the actual results for the

25  first few weeks of the case and a projected budget for the DIP

1  period.  I do want to point out one item that was included in

2  the budget, which is -- I don't want to use the word "buried,"

3  but it's not readily apparent, but to let the Court know about

4  it, what we intend to do, and ask if Your Honor needs any

5  further documents on it.

6          As the Court will recall, prior to the entry of the

7  interim DIP order in late March, the debtors pursued potential

8  priming DIP financing.  And as part of those efforts, the

9  debtors engaged with one particular party, started performing

10  significant diligence, and actually provided the debtors with a

11  term sheet prior to the hearing.  I believe that was one of the

12  reasons that facilitated the DIP in the first place.

13          As it turned out, we were able to reach an agreement

14  with the lenders, and we did not need to proceed down that line

15  with the alternative financing.  When the lenders initially

16  refused to provide the additional financing for the 9.25 that

17  is now reflected in the final documents today, the debtors

18  again started pursuing a potential priming DIP and engaged with

19  the same party to provide that financing.

20          The lender conducted diligence, retained counsel, and

21  was in the advanced stages of negotiating the priming DIP with

22  the debtors when we informed them that we were likely to reach

23  an agreement with the lenders.  So that party, who potentially

24  may be a party also interested in the sale process, has now

25  spent time and expense on two separate occasions, providing a

1    DIP term sheet in the first instance and advanced negotiations

2    on the DIP term sheet in the second round.  And we believe

3    that, under these circumstances, it's appropriate to pay them

4    $100,000 for the expenses that they have incurred in connection

5    therewith.

6         We have discussed it with the lenders and the

7    Committee, and we understand they do not object to payment of

8    the $100,000 as part of the overall agreement reached between

9    the parties, and that is reflected in the restructuring expense

10   line item in the budget, which is not called out as to

11   particular party or as to these expenses, but I thought it's

12   appropriate to bring it to the Court's attention.

13        So that's a long way of saying that, rather than

14   incurring the time and expense to file either a substantial

15   contribution motion or a stipulation with the parties, we

16   request that the payment be included and approved as part of

17   the DIP without any further documentation.  Of course, if

18   Your Honor believes that a paper trail is necessary, we're

19   happy to do that.

20        Your Honor, before I proffer Mr. Healy's testimony, I

21   would like to move into admission -- move for admission into

22   evidence Documents 1 through 7, which is reflected on the

23   debtors' amended witness and exhibit list, which could be found

24   at Document Number 318-1 to 318-7.  Mr. Richards and Mr. Healy

25   are in the courtroom to testify if they need be.  At the

1 appropriate time, Your Honor, I would proffer the testimony of

2 Mr. Healy, which I think would provide the support for the

3 relief we're seeking today.

4           THE COURT:  Got it.  What's the remaining issue?

5           MR. POMERANTZ:  The remaining issue is, since we have

6 a full roll-up, the question is whether the full roll-up

7 essentially abrogates the challenge period that has otherwise

8 been provided to the Committee, or whether the full roll-up is

9 subject to the challenge period.

10          And since this is largely a dispute between Mr. Elrod

11 and Mr. Gibbs, I will leave it to them.  I don't think the

12 debtor has to take a position, and hopefully they will tell us

13 that this issue has been resolved.

14          THE COURT:  All right.  I haven't forgotten your

15 evidentiary offer, but let me hear from the other parties.

16          Mr. Gibbs -- all right.  I don't care who goes first.

17 I was just looking at you.  Good morning.

18          MR. GIBBS:  Good morning, Your Honor.  Chuck Gibbs.

19 With me are my partners, Marcus Helt, who I think is having

20 video problems, so he may only be on by audio, and Maris

21 Kandestin, who's in our Wilmington office, who have been

22 working with me on behalf of the Committee.  We are proposed

23 counsel for the Official Unsecured Creditors' Committee.

24 Pardon me.  I have a bit of a frog.

25          THE COURT:  No, certainly.

1          MR. GIBBS:  We do have an issue, sadly, and somewhat

2    to our surprise.  We spent a fair amount of time -- "we"

3    primarily my partner, Mr. Helt -- negotiating with counsel for

4    the lender for extensions, if possible, of the proposed review

5    period, challenge period, as well as an increase in the

6    proposed carve-out amount to do the challenge.

7          We got a final proposed DIP order yesterday, late,

8    that had their final proposals with respect to the carve-out

9    amount and the challenge period time, which we agreed to.  And

10   Mr. Helt appropriately asked for assurance that, because what

11   is being challenged are the prepetition obligations, that it

12   wasn't the lender's position that a roll-up of the prepetition

13   debt therefore meant there was nothing left to challenge.

14   Otherwise, the negotiation for and the desire to challenge or

15   at least investigate to see if a challenge exists, the validity

16   and extent and priority of the lien as supported by whatever

17   documents they have.

18         We have none of the lender's documents with respect

19   to their prepetition liens.  It is my understanding -- and if

20   we have to elicit it through cross-examination of Mr. Healy --

21   it's my understanding the debtor hasn't either.  We think it's

22   just fundamentally inappropriate to say that we're going to

23   make this loan and take an entire roll-up.  And even though

24   we've given you a carve out and a period of time to

25   investigate, you've got nothing to investigate.

1          So -- and I think -- I don't know where the lender is

2     on that.  So there is -- so I won't violate settlement

3     conversations, but that's where we are.  And to the extent that

4     the Court is entertaining that proposal, that it in fact does

5     vitiate and eliminate our rights to challenge or investigate,

6     then we would -- I'll just tell the Court -- I'd be asking the

7     Court by oral motion to continue today's hearing because we

8     need to elicit testimony as to the debtors' business judgment

9     of not pursuing the priming DIP if it's at the expense of

10    completely forgiving and eliminating the Committee's chance to

11    determine whether or not valid claims against this lender.

12          THE COURT:  Right.  So I want to make sure.  You find

13    yourself in the position you have an agreement on the amount of

14    your investigation budget.  You have an agreement on the

15    deadline by which you will do it.  But you're now being faced

16    with the argument that a roll-up says that means nothing.  Is

17    that kind of where we are?

18          MR. GIBBS:  That's exactly it.  And we heard that by

19    email about an hour before the hearing.

20          THE COURT:  So let me -- and, again, I'm happy to

21    hear from the lender.  But, again, if that is truly the issue,

22    there is zero chance that that happens today.  You know I don't

23    like complete roll-ups.  I'm a big fan of the creeping roll-up

24    because I think it keeps a balance.  Given that everybody's

25    reached an agreement and given, as Mr. Pomerantz so eloquently

1   put it, "under the circumstances of this case," I'm willing to

2   live with that.  But that's all subject to being undone.  If

3   it -- I'm not going to fabricate perfection or fabricate even

4   the existence of a lien by that.  I'm accepting that -- the

5   representation that there is a valid, perfected lien.

6          And so the fact that you've negotiated terms on which

7   to take a look at that, there just isn't a scenario today where

8   that would happen.  And so I'm perfectly happy to give parties

9   another break if that's helpful, but -- and I'm happy if

10  someone wants to try and argue that that is a position that I

11  should find meritorious.  I just don't know how that argument

12  would go.  And I'm trying to be as completely transparent as I

13  can possibly be, but I'm happy to proceed ahead.  I'm happy for

14  folks to take another break.  What's the desire of the parties?

15          Ms. Heyen?

16          MS. HEYEN:  Good morning, Your Honor.  Shari Heyen,

17  for the DIP lender.  Thank you for hearing us this morning.  I

18  haven't been privy to all of the discussions.  I'm not sure

19  that everything that was stated on the record by Mr. Gibbs is

20  100 percent of what, you know, what's going on here.

21          THE COURT:  Got it.

22          MS. HEYEN:  I think we've both been kind of on the

23  periphery, but I --

24          THE COURT:  Is the problem -- did he get the problem

25  right, that you're trying to use the roll-up --

1          MS. HEYEN:  Here's what I understand.  I understand

2    that about an hour before this hearing started, we received

3    comments from the Committee's counsel in Dallas.  We have not

4    had a chance to talk to our client about that language that

5    came in at the last minute.  So these are kind of last-minute

6    changes that we're being asked to make in a vacuum.  And I

7    think that it would --

8          THE COURT:  I don't --

9          MS. HEYEN:  -- probably be wise if we were allowed to

10   talk to our client group.  We've got a -- it's a bank group.

11   And so being able to call --

12         THE COURT:  Let me stop you right there.

13         MS. HEYEN:  Okay.

14         THE COURT:  If you haven't had a chance to talk to

15   your bank group, you absolutely should have that opportunity to

16   do that.

17         MS. HEYEN:  Thank you, Your Honor.

18         THE COURT:  And again, I want to make it very clear.

19   And again, you can come back and tell me that Mr. Gibbs has it

20   wrong --

21         MS. HEYEN:  Uh-huh.

22         THE COURT:  -- but I'm never going to let a roll-up

23   do away with the ability to question the secured status of a

24   lender.  In other words, I mean -- otherwise, you could come in

25   and say, well, we really don't have a lien, but we're going to

1   get a lien by virtue of the roll-up.  I mean, that -- and not

2   that I'm suggesting that you would ever do that, but that

3   would -- that so cuts against the transparency of the process

4   that I'm just going to require.

5        And so I'm saying this really for your clients'

6   benefit.  I know that you already know that I feel this way.

7   So, if you need some time to go convene a lender call.

8   Perfectly happy, you know -- you have my entire attention until

9   two o'clock and three o'clock, and then you can have my

10  attention after if you need it.  But I do think that it makes

11  sense for you to be able to talk to your lenders and for your

12  clients to be able to ask you questions.  What does he mean by

13  this?  How much does he really mean it?  I hope I've conveyed

14  that.  What does this mean in terms of going forward?  You

15  know, all those sorts of things, you should absolutely get --

16  if you haven't had that opportunity, you should absolutely have

17  it.

18        MS. HEYEN:  Thank you, Your Honor.  And we would --

19  we will take that opportunity to talk with the bank group.  The

20  reason I took the podium so quickly is because I'm not sure

21  that we agree.  We don't agree with the way the issue was

22  framed.  We just haven't had a chance.  We got these at the

23  eleventh hour, honestly.  And so we haven't had a chance to

24  even talk to our bank group.

25        THE COURT:  And so let me ask -- Mr. Gibbs, are these

1   comments in -- well --

2           MS. HEYEN:  They are not in the redline that

3   Your Honor received in the filed version --

4           THE COURT:  Yesterday.  Is -- let me ask this.  Is

5   there a version that people are ready to show me, or would you

6   like to keep this amongst yourselves and see if there's a

7   misunderstanding about the conversation?

8           MS. HEYEN:  I think it makes sense for us to talk off

9   of the record --

10          THE COURT:  Okay.

11          MS. HEYEN:  -- and continue to understand that the

12  reason behind the comments.  Like I said, we got these shortly

13  before the hearing started.

14          THE COURT:  Let me --

15          MS. HEYEN:  Okay.

16          THE COURT:  Let me ask what's reasonable in terms of

17  you being able to talk to your clients and then being able to

18  reengage with the Committee?

19          MR. ELROD:  I would say approximately an hour,

20  Your Honor.

21          MR. GIBBS:  Okay.

22          MR. ELROD:  This is John Elrod on behalf of the bank

23  group.

24          THE COURT:  No, I -- all right, fair enough.  So if

25  we came back at -- and this is a question.  If we came back

1    at -- it's almost noon now.  If we came back at one Central, so

2    that's an hour and 15 minutes from now, does that make sense?

3              MR. ELROD:  I think so, Your Honor.

4              THE COURT:  And Mr. Pomerantz, does that cause the

5    debtors any issue?

6              MR. POMERANTZ:  No, it doesn't, Your Honor.  My only

7    thing today is I am getting a replacement cap at three o'clock.

8    So I'm all everyone's until that happens.

9              THE COURT:  Is that three o'clock California time?

10             MR. POMERANTZ:  Three o'clock California time.

11             Your Honor, before we break, there is one thing I

12   would like to raise on a housekeeping matter that I was going

13   to raise at the end of the hearing, and it may mean a couple of

14   people don't need to participate.

15             Your Honor, we have a hearing scheduled before

16   Your Honor, on Thursday.  We actually have two hearings.  One

17   is on cash management, which we uploaded a certificate of

18   counsel, so we think that hearing will go away.  The second is

19   a motion to reject 28 leases of the portfolio that the debtors

20   have with lender -- lessors now known as the Necessity lenders.

21             We have been in discussions with Ms. Brownstein, who

22   is on the screen, and we have agreed to continue that hearing

23   subject to the Court's calendar, subject to the proviso that,

24   given that one of the issues that's raised in the motion is the

25   payment of (indiscernible) rent, that the -- having a hearing

1  after May 1, that will essentially revert back and there won't

2  be an argument that would be made, that May rent.

3            So we have looked and need some time, and hopefully

4  to resolve the issue.  We're optimistic that the parties can

5  engage in negotiations.  But if not, we wanted to get a

6  continued hearing date.  Initially, Ms. Brownstein and I

7  suggested a week from tomorrow afternoon, in the afternoon.

8  I understand Your Honor may be traveling that day.  And if

9  Your Honor is traveling that day, we would ask for something

10 early the next week.

11            THE COURT:  So let me do this.  First of all,

12 Ms. Brownstein, can you just confirm for me that you can hear

13 us?

14            MS. BROWNSTEIN:  Yes, Your Honor.  Beth Brownstein

15 from ArentFox Schiff on behalf of AR Global, known as the

16 Necessity landlords.  Can you hear me okay?

17            THE COURT:  Loud and clear.  Good to see you.  It's

18 been a while.

19            MS. BROWNSTEIN:  (Audio interference)

20            THE COURT:  So let me make this suggestion.  One, I

21 don't have any -- well, first of all, let me just  -- did

22 Mr. Pomerantz get it right?

23            MS. BROWNSTEIN:  Yes, Your Honor.  You know, we do

24 intend to use this time to hopefully negotiate a resolution;

25 but if we can't, you know, our focus will remain on a smooth

1   transition of these properties.

2           THE COURT:  I got it.  Let's do this, is why don't

3   you, sort of while these folks are talking, just reach out to

4   Mr. Alonzo.  He's got the ability to give you a hearing time.

5   Just start a text string or a phone call with him and just tell

6   him what you need, what's convenient for your respective

7   calendars, and generally how much time you think that if it all

8   goes south, it would require.  I'm more than -- and he'll just

9   set it for you if he can find a convenient time for the two of

10  you, and that will be just fine.

11          And Mr. Pomerantz, I did see the certificate.  My

12  memory is that I've already signed that.  And I'm going to go

13  verify that, but I have a memory of looking at this late last

14  night.  It could be a different case, but I think I looked at

15  this last night.  So you're just telling me no hearing on

16  Thursday?

17          MR. POMERANTZ:  Correct, Your Honor.

18          THE COURT:  Okay.  I'll find it.  Thank you for the

19  announcement.  That will certainly help those folks who are

20  listening on their calendars.

21          So let me ask, do you folks need a conference room?

22  Are you just going to go -- what can I do to help facilitate

23  conversations?

24          MR. ELROD:  Thank you, Your Honor.  I believe we have

25  the conference room in the vestibule out here.

```
 1                    THE COURT:  So you're just using the attorney lounge?
 2                    MS. HEYEN:  Yes, we can -- we can use the lounge.
 3                    THE COURT:  So let me do this.  I had -- the room
 4     next door to the attorney conference room is mine.  Let me open
 5     that up.  So, if you need to, you're welcome to it.  If you
 6     don't need it, you know, then you don't need it.  But let me
 7     get that unlocked just so everybody has a place if they need
 8     it.  And if for some odd reason you get invaded by people
 9     looking for attorney lounge, let me know and I'll be helpful.
10                    MR. ELROD:  Thank you, Your Honor.
11                    MS. HEYEN:  Thank you for the accommodation.
12                    THE COURT:  So we'll see everybody back at one
13     o'clock Central time.
14                    MR. GIBBS:  Which is fine.  Can I have just --
15                    MR. POMERANTZ:  Thank you, Your Honor.
16                    THE COURT:  Oh, no.  Of course.  Absolutely,
17     Mr. Gibbs.
18                    MR. GIBBS:  Just for the Court's edification and all
19     parties, especially lender's counsel, before they go meet with
20     their client.  The only thing we're looking for in the way of a
21     change to the order that's on your screen --
22                    THE COURT:  Okay.
23                    MR. GIBBS:  -- is clarification of the point I
24     raised.  There were other proposed language changes in the
25     redline we sent over a couple of hours before the hearing.  But
```

1  the only thing we need is exactly the issue I raised.  We need

2  to make sure that the lender is not going to come in, if we

3  find something meritorious and say, ah, gotcha, this order says

4  you had no right to -- there was nothing to challenge because

5  everything was rolled up.

6          THE COURT:  Maybe it's worth the two of you spending

7  five minutes.

8          MS. HEYEN:  I think so, too.

9          THE COURT:  Just looking -- whatever draft it is that

10  you folks are working from, why don't you just spend five

11  minutes making sure that you agree what you're fighting about?

12  And again, if it's -- you know, hopefully it won't be that big

13  of an issue.  Okay?

14          MS. HEYEN:  Okay.  Thank you, Your Honor.

15          MR. GIBBS:  Thank you, Your Honor.

16          THE COURT:  Terrific.  Thank you.

17          Before we stop until 1, anyone else have anything

18  they wish to raise?

19          All right.  I'll see everybody back at one o'clock.

20  Again, that's Central time, so that's an hour and nine minutes

21  from now.  Thank you, everybody.

22          MR. POMERANTZ:  Thank you, Your Honor.

23      (Recess taken at 11:51 a.m.)

24      (Proceedings resumed at 1:01 p.m.)

25          THE COURT:  Good afternoon, everyone.  We are back on

1    the record.  The time is 1:01 Central.  Today is April

2    the 25th, 2023.  In the jointly administered cases under Case

3    Number 23-90147, <u>Mountain Express Oil Company</u>.

4           Let me ask, Mr. Pomerantz.  The courtroom is largely

5    vacant.  Do we have an update?  Oh, Mr. Pomerantz, I'm sorry.

6    You are still muted.  Had you hit "five star"?  So I thought I

7    heard the keystroke.  Could you say something?  No?  Sorry.

8    Any chance you had me muted from your side?  No?

9           MR. POMERANTZ:  Yes, I did.  Sorry about that,

10   Your Honor.

11          THE COURT:  All right.

12          MR. POMERANTZ:  Your Honor, I've largely tried to

13   stay out of this battle on this matter.  I figure I've done

14   enough damage to the Committee/lender relationships thus far in

15   the case.

16          THE COURT:  No.  Fair enough.

17          MR. POMERANTZ:  So nobody's called me, so I don't --

18   and also, Your Honor, I do not see a camera in the courtroom,

19   so I'm not sure --

20          THE COURT:  Yeah, I was just going to say.

21          Ms. Portillo, could you -- for whatever reason --

22   that it's on.

23          We've had one of the lawyers come in who's at the

24   podium.  We don't have a camera yet, but -- how are we doing?

25          MS. NASIR:  Your Honor, Emily Nasir with Greenberg

1    Traurig for the DIP lender.  They're still discussing some

2    changes to the proposed DIP order.

3              THE COURT:  Okay.

4              MS. NASIR:  So they would request a few more minutes

5    of the Court's time --

6              THE COURT:  Do you think 15 minutes would suffice?

7              MS. NASIR:  I think 15 minutes would be fine.

8              THE COURT:  All right.  Thank you.

9              Mr. Pomerantz?

10             MR. POMERANTZ:  Yeah.  Your Honor, I would suggest

11   that whatever language is agreed, while it's dealing with this

12   issue, I'm probably agnostic, that the lenders and the

13   Committee counsel, or one of them, give me the courtesy of

14   sending it around to my team so we can take a look at it, so

15   that I don't have to come in 15 minutes, Your Honor, and say I

16   haven't had a chance to review the document.

17             THE COURT:  Fair enough.  So let's do this.  We'll

18   adjourn for 15 minutes.  If it turns out that you need more

19   time, if you would just knock on chambers door -- or if

20   Ms. Portillo is sitting here.  Let her know.

21             For the folks on the line, we'll make an announcement

22   at 1:15.  If we're going to go forward, then we'll all be here.

23   And if there's a request for additional time, we'll make an

24   announcement so that you folks aren't waiting.  All right?

25             MS. NASIR:  Thank you, Your Honor.

1          THE COURT:  All right.  Thank you.

2          MR. POMERANTZ:  Thank you, Your Honor.

3          THE COURT:  We'll be adjourned until 1:15.

4      (Recess taken at 1:03 p.m.)

5      (Proceedings resumed at 1:37 p.m.)

6          THE COURT:  Folks, good afternoon again.  This is

7  Judge Jones.  The time is 1:37.  Today is April the 25th, 2023.

8  We are back on the record in the jointly administered cases

9  under Case Number 23-90147, Mountain Express Oil Company.

10          For folks -- if you have dialed back in, I do -- and

11  you think you're going to be speaking, if you'd go ahead and

12  give me a "five star," I'll get that taken care of.

13          There's Mr. Pomerantz.

14          MR. POMERANTZ:  I'm here, Your Honor.  Can you hear

15  me?

16          THE COURT:  Yes, sir.  Thank you.  I've now got your

17  number flagged, so good thing or a bad thing.

18          All right.  Counsel?

19          MR. ELROD:  Good afternoon, Your Honor.  John Elrod

20  of Greenberg Traurig, LLP on behalf of First Horizon Bank as

21  DIP agent.  Your Honor, we're pleased to announce that we have

22  resolved the issues.  It did take us some time to obviously

23  consult with our client and then to work through appropriate

24  language with the Creditors' Committee.

25          We would anticipate, and I believe -- it's in the

1    works as we speak.  Perhaps Mr. Pomerantz has the latest update

2    on that, but we would anticipate including all the additional

3    language in the proposed order and submitting it to Your Honor

4    as quickly as we can.

5              THE COURT:  So let me ask this, just as -- to make

6    sure -- and we'll make the circle to make sure everybody's in

7    agreement.  If possible, if this isn't going to take too long,

8    if I can ask you folks just to stay here.  I mean, use the room

9    across the hall.  Once it's been -- once everybody's signed off

10   on it, then great, we know that we're done.  But I would hate

11   to have to try to catch somebody at the airport or somebody at

12   an office and say, hey, can you walk back?  Would that be too

13   big of an imposition?

14             MR. ELROD:  No issue with the DIP lender, Your Honor.

15             THE COURT:  All right.  Thank you.

16             And Mr. Gibbs, I'm assuming that the Committee can

17   stay as well.

18             MR. GIBBS:  Absolutely.

19             THE COURT:  Terrific.  Thank you.  And since you're

20   up, you agree that you found common ground?

21             MR. GIBBS:  I think violent peace has broken out.

22             THE COURT:  Fair enough.

23             And Mr. Pomerantz, have you had time to look at the

24   amendments to the order?

25             MR. POMERANTZ:  Yes, Your Honor, and my instinct to

1  keep out of the fight, was -- made sense.  The language is

2  acceptable.  And one of the benefits of us having -- being in

3  the office, we can actually turn the document, send it around,

4  and then we can do an upload so it could be efficiently

5  submitted to the Court so we can get it entered if Your Honor

6  is otherwise inclined to enter the order.

7            THE COURT:  Terrific.  Thank you.

8            Mr. Ruff, have you had a chance to see the proposed

9  amendments?  If you haven't, do you want to?

10            MR. RUFF:  Yeah.  Thank you, Your Honor.  Jayson Ruff

11  for the U.S. Trustee's Office.  I have not.  I doubt that I'm

12  going to have any issues, but I would just like the courtesy of

13  being able to see it, and I'll look at it very promptly.

14            THE COURT:  No problem.

15            And, Mr. Pomerantz, can I ask you to assume that

16  obligation to make sure that, once it's turned, that that

17  distribution list includes Mr. Ruff?

18            MR. POMERANTZ:  Absolutely, Your Honor.  We'll make

19  sure Mr. Ruff gets it.

20            THE COURT:  All right.  Thank you.

21            Then does anyone else -- does anyone else have an

22  issue?

23            All right.  Then, Mr. Pomerantz -- I'm sorry.

24            Mr. Eisenberg, come on.

25            MR. EISENBERG:  I don't, Your Honor.

1          THE COURT:  Okay.  Thank you.

2          Then, Mr. Pomerantz.  With respect to that, I've had

3  an opportunity to look at the last version of the order that

4  was filed yesterday, and I'm going to assume that the proposed

5  changes are within the scope of what has been talked about.  If

6  there are other substantive issues, I certainly would like for

7  you to point those out.  But, at this point, you know, whether

8  you do it by a very short proffer, whether you put Mr. Healy on

9  just at a very high level, I would like just a general record,

10  but it doesn't need to be a lot, given that we have an

11  agreement.

12          MR. POMERANTZ:  Thank you, Your Honor.  I'll go back

13  to my request to have admitted into evidence the documents 1

14  through 7 listed on 318.1 to 318.7.

15          THE COURT:  Absolutely.

16          MR. POMERANTZ:  Is that acceptable, Your Honor?

17          THE COURT:  Any objection to the admission of, again,

18  pursuant to the protocol, the debtors' exhibits identified as

19  318-1 through 318-7?

20          All right.  Then they are admitted.

21      (ECF Numbers 318-1 through 318-7 admitted into evidence)

22          MR. POMERANTZ:  Thank you, Honor.  And I prepared a

23  proffer.  I'd proceed like that, unless Your Honor would rather

24  we put Mr. Healy on the stand, so --

25          THE COURT:  All just fine.  And Mr. Healy, you've

1   been through this before.  Please listen carefully to what

2   Mr. Pomerantz says.  Once he's completed the proffer, I'm going

3   to swear you in.  I'm going to ask you if you listened closely,

4   if you understood it, it's true and accurate, and if you adopt

5   the statements as your sworn testimony.  Understood?

6           And why don't you go ahead and give me a "five star,"

7   if you haven't already done so -- or if you had me muted from

8   your side?  There we go.  Mr. Healy, let's just confirm.

9           MR. HEALY:  Understood, Your Honor.

10          THE COURT:  All right.  Thank you.

11          Mr. Pomerantz, whenever you're ready.

12          MR. POMERANTZ:  Thank you, Your Honor.  If called to

13  testify, Mr. Healy would testify that his name is Michael

14  Healy, and then he is a senior managing director of FTI

15  Consulting.  He would testify he's the debtors' proposed chief

16  restructuring officer in a position he has held since early

17  March of 2023.  He would testify that he has had more than 20

18  years of restructuring experience and has advised companies,

19  lenders, creditors, corporate boards, and equity sponsors

20  across a diverse range of industries, both domestically and

21  internationally.

22          He would testify that, under his supervision, the

23  debtors prepared a budget of operations to support the DIP

24  financing facility that the Court approved on an interim basis

25  on March 23rd, 2023.  He would testify that over the last

1   month, under his supervision, the debtors have continued to

2   refine their budget of operations based upon events that have

3   transpired since the interim financing was approved.

4            He would testify that, based upon discussions between

5   the debtors, the Committee, the lenders, and their respective

6   professionals, it became apparent that in order to allow

7   parties further time to conduct due diligence, to enable the

8   debtors to achieve a value-maximizing transaction, that the

9   runway for the sale process needed to be extended from four

10  months to five months; and that, under his supervision, the

11  debtors prepared a budget of operations to determine if

12  additional liquidity was required to sustain operations for an

13  additional amount, and if so, in what amount.

14           He would testify that, based upon the experience

15  learned during the first month in the case and the best

16  assumptions of the debtors' receipts and disbursements going

17  forward, a budget was prepared that reflected that the debtors

18  would need an additional $9.25 million in order -- in financing

19  to sustain operations and administrative expenses during the

20  extended sale process.

21           He would testify that thereafter engaged in intensive

22  arm's-length negotiations with the lenders and the Committee to

23  try to reach an agreement on whether the lenders would extend

24  financing and on what terms.  He would also testify that, as a

25  contingency, if the letters -- the lenders did not agree to

1  provide such financing, that he also instructed debtors'

2  professionals, mainly at Raymond James, to explore obtaining

3  priming take-out DIP financing with several parties, and that

4  such efforts included diligence meetings and negotiation with

5  the term sheet with the parties that -- who had offered to

6  provide priming financing prior to the Court's approval of the

7  interim financing.

8          He would testify that that party has requested to be

9  reimbursed their expenses up to $100,000, that he believes that

10 that is appropriate under the circumstances.  He would testify

11 that ultimately the lenders, the debtor, and the Committee

12 reached an agreement on the terms of additional financing,

13 which is reflected in the final DIP documents filed with the

14 Court last night, which includes a roll-up, increased interest,

15 and an increased fee.

16         He would testify that he heard me summarize the key

17 terms of the additional financing on the record early this

18 morning and agrees that that recitation is accurate.  And then

19 he would testify that he believes entry into the final DIP

20 documents will further stabilize the debtors' operations, will

21 provide sufficient runway to achieve a value-maximizing

22 transaction, and is the best interest of the debtors' estate

23 and stakeholders, and would request that Your Honor approve the

24 motion for a final order approving the financing.

25         That is the end of my proffer, Your Honor.

```
1              THE COURT:  All right.  Thank you.

2              Mr. Healy, if you'd please raise your right hand.

3                MICHAEL HEALY, DEBTORS' WITNESS, SWORN

4              THE COURT:  Thank you, sir.  Did you listen closely

5    to Mr. Pomerantz's proffer of your testimony?

6              MR. HEALY:  I did.

7              THE COURT:  Understand it?

8              MR. HEALY:  I did.

9              THE COURT:  Everything true and accurate to the best

10   of your knowledge?

11             MR. HEALY:  It is.

12             THE COURT:  And do you adopt Mr. Pomerantz's

13   statements as your sworn testimony in support of the requested

14   relief today?

15             MR. HEALY:  I do.

16             THE COURT:  All right.  Thank you.  I will accept the

17   proffer.

18             Anyone have any cross-examination for Mr. Healy?

19             All right.  Mr. Healy, another day.  All right.

20   Thank you.  You are excused as a witness.  Obviously, I want

21   you to stay on the line.

22             Mr. Pomerantz, with that, anything else?

23             MR. POMERANTZ:  No, Your Honor.  Based upon the

24   evidentiary record before Your Honor; the agreement reached

25   between the lenders, the Committee, and the debtor; as embodied
```

1   by the financing documents and the importance of the financing

2   to the successful conclusion of these cases, we would ask that

3   Your Honor approve the motion.

4            THE COURT:  All right.  Thank you.

5            Mr. Gibbs, did you want to make a statement?

6            MR. GIBBS:  Two things.  One, I think it's apparent,

7   but -- have the record reflect the Committee supports the entry

8   of the order reflecting this agreement.

9            THE COURT:  Thank you.

10           MR. GIBBS:  Secondly, and this is really in the

11  nature of housekeeping, we filed a motion for reconsideration

12  of the interim order seeking it to be heard on an emergency

13  basis.  That is at Docket 303.

14           THE COURT:  Correct.

15           MR. GIBBS:  We filed a motion to seal on that, at

16  301.  We understood that that was going to be set for today,

17  but wasn't on the debtors' agenda, I believe.  But I wanted

18  to -- we had notice out, at Docket 304, of the hearing this

19  morning on that.  And I just wanted the Court, with the Court's

20  permission, to withdraw that motion now that the existing DIP

21  has gone forward to our satisfaction and been approved.

22           THE COURT:  So let me propose this.  We can either

23  note by docket entry that they both have been withdrawn.  I

24  would prefer, just given the way that things have developed, is

25  that I grant the motion to seal, and then we simply note by

```
1   docket entry that the sealed motion at 303 was withdrawn by the
2   Committee.  Does that work for you?
3              MR. GIBBS:  Absolutely.
4              THE COURT:  Then we will do that.
5              So, Ms. Portillo, if you'll make sure that you move
6   over 301-1, and then simply by docket entry reflect that, based
7   upon the announced agreement, that 303 has been withdrawn by
8   the Committee.
9              Okay.  Anything else?
10              MR. GIBBS:  Only other thing, I believe, is another
11   matter on the agenda.
12              THE COURT:  Right.  Right.  All right.  Thank you.
13              Anyone else wish to be heard?
14              All right.  Again, I very much appreciate all of --
15   someone raised their hand.  Someone in Florida?
16              MS. BROWNSTEIN:  Good afternoon, Your Honor.  Beth
17   Brownstein again for the Necessity landlord.  Your Honor, we
18   had filed a supplemental objection yesterday requesting certain
19   language be included in the proposed final order, and it was
20   incorporated in that final order that was filed last night.  So
21   our issue with respect to the DIP has been resolved.
22              THE COURT:  Thank you.  We'll just note that the
23   objection is now moot based upon additional language being
24   added to the proposed order.  Does that work for you,
25   Ms. Brownstein?
```

```
1              MS. BROWNSTEIN:  Yes, Your Honor.
2              THE COURT:  All right.  Thank you.
3              Anyone else?
4              All right.  Again, I appreciate the hard work that
5    went into this.  It's just very clear to me, based upon the
6    record, that the requested DIP is necessary for the continued
7    operation of the debtors' businesses and also to maximize,
8    hopefully, the value to be realized out of the sale process.
9              The terms are, in my mind, with the confidence I have
10   of the skill of people negotiating this, they represent a fair
11   balance of the risk assessment of the undertaking.  I'll find
12   it constitutes, under these circumstances, market rates.
13             I will also find, again, based upon the skills of the
14   parties involved, that the result represents arm's-length
15   negotiation.  I am comfortable with how everything has landed,
16   do think the order got better.  And with that, subject to
17   everyone signing off on the final form of order, I will approve
18   the DIP on a final basis.
19             One comment, Mr. Pomerantz.  Number one, I very much
20   agree -- because I did not pick that up, that with respect to
21   the reimbursement request, I agree with Mr. Healy's business
22   judgment.  Makes perfect sense to me.  It encourages
23   participation, and I just think that's one of those things, you
24   make those decisions with the benefit of hindsight.  But I
25   appreciate your calling that out for everyone to take a look
```

1   at.

2           MR. POMERANTZ:  Thank you, Your Honor.

3           THE COURT:  All right.  So what I'll do -- and folks,

4   I've got a two o'clock and a three o'clock, but if folks are

5   going to just hang around the room, if you would just knock on

6   chambers door, send Mr. Alonzo a text or an email.  Although I

7   think he may have had a personal matter that he was going to

8   have to leave for this afternoon.  But if we're in here, just

9   come up and slip Ms. Portillo a note.  If you'll tell me that

10  the order has been filed, I will sign it.  We'll get it done on

11  a break, certainly before I leave today.  Okay?

12          MS. HEYEN:  Very good.  Thank you, Honor.

13          THE COURT:  All right.  Terrific.  Thank you,

14  everybody.  And we'll be adjourned until two -- I'm sorry,

15  Mr. Gibbs --

16          MR. POMERANTZ:  Your Honor --

17          THE COURT:  We had one more matter.  That's right.  I

18  totally forgot about that.

19          MR. POMERANTZ:  Your Honor, we have one more matter.

20          THE COURT:  Yes.  Thank you.  And I didn't want to --

21          MR. POMERANTZ:  Your Honor, Jeff Pomerantz again,

22  Pachulski Stang Ziehl & Jones.  I think Mr. Wallen has earned

23  his way of graduating from contempt motions, so he will handle

24  the key employee retention motion.

25          THE COURT:  And Mr. Wallen, I did not intend to steal

1   your thunder with respect to the last motion.  My apologies.

2           MR. WALLEN:  No problem, Judge.  Ben Wallen,

3   Pachulski Stang Ziehl & Jones, proposed counsel to the debtors.

4   Judge, you're correct.  We do have another crucial motion for

5   the debtors.  Up next is the debtors non-insider key employee

6   retention motion filed at Docket 247.

7           As set forth in the motion, the debtors' proposed

8   non-insider KERP would apply to 29 non-insider employees at a

9   total cost of no more than $522,000, inclusive of a $50,000

10  supplemental cash pool for certain non-insider employees not

11  already participating in the KERP.  And I'll get to that more

12  here in a moment.

13          The non-insider KERP is structured to award

14  participants a retention payment not to exceed 20 percent of

15  their annual base salary.  Payments will be made to the

16  participants, with half awarded following Your Honor's approval

17  of the KERP and the second half paid following consummation of

18  the sale of substantially all the debtors' assets.

19          Importantly, Judge, any KERP participant who receives

20  an initial payment under the program but then voluntarily

21  terminates their employment or is terminated for cause, those

22  initial payments would be subject to recapture from the

23  debtors.

24          And then, as I say, with respect to the $50,000

25  supplemental cash pool, that is for the purpose of awarding

1   extraordinary contributions of employees who are not currently

2   designated as one of the 29 KERP participants.  No more than

3   $15,000 will be paid to any single employee, and these payments

4   will be made concurrently with the final payment following the

5   sale.

6          Judge, the debtors believe, in an exercise of their

7   sound business judgment, that the non-insider KERP is justified

8   by the facts and circumstances of these cases, because it is

9   vital to their success in these cases.  The KERP will assist

10  the debtors in retaining employees who are fundamental to both

11  maintaining operations and supporting the debtors' sale and

12  marketing process, as well as fulfilling their obligations as

13  part of these Chapter 11 cases.

14         As part of the motion, the debtors -- as set forth in

15  the motion -- excuse me -- the debtors experienced unexpected

16  post-petition attrition, in addition to the prepetition

17  attrition of folks in their accounting, finance, and

18  operational teams.  (Indiscernible) employees subject to the

19  KERP are vital to the debtors' day-to-day operations and

20  possess significant institutional knowledge and uncommon skill

21  sets, including for the debtors' crucial fuel supply program.

22         Additionally, these employees would not be easily

23  replaced.  It would be highly disruptive if we did not have

24  them.  As a result, the debtors believe that a program that

25  encourages retention and awards these employees for their

1  extraordinary work during the course of these cases is

2  appropriate and needed.

3           In that regard, Judge, the non-insider KERP is a

4  product of significant thought and analysis by Mr. Healy, as

5  well as FTI Consulting.  As set forth in Mr. Healy's

6  declaration, he and FTI went through a dozen similar

7  non-insider KERP programs and found the terms of this KERP to

8  be reasonable and consistent with market practice.

9           Judge, I will also let Your Honor that, since the

10  filing of the motion, we have engaged with Mr. Ruff for the

11  Office of the United States Trustee.  We understand that they

12  have no objection to the relief requested.  And additionally,

13  Judge, I will note that there are no objections or other

14  responses filed on the docket.  So, unless you have any

15  questions for me, we respectfully request entry of the proposed

16  order approving the KERP filed at 247-1.

17           THE COURT:  All right.  Thank you.

18           Mr. Gibbs?

19           MR. GIBBS:  Good afternoon again, Your Honor.  Chuck

20  Gibbs of McDermott Will & Emery, proposed counsel for the

21  Official Committee.  We reviewed the motion.  We had our

22  financial advisors engage with FTI.  They did their own

23  independent analysis of where this landed in sort of the market

24  test of other KERPs.  We found it to be reasonable, frankly,

25  right down the middle of the fairway, and we think the

1    employees are necessary, and the motion ought to be approved.

2            Before I yield the podium, I might have to say that,

3    with Mr. Wallen standing, he looks dangerously close to losing

4    the top of his head from those fans.  So they might have to

5    adjust the camera angle.  Worried for him.

6            THE COURT:  That's part of the halo.  Yeah.  He keeps

7    doing what he's doing, I'm going to continue to tell everybody

8    that I'm responsible for him.  That was -- he does an

9    impressive job.  You always want those that come through your

10   chambers to be better than you ever were, and he's proven me

11   right every single day.

12           MR. GIBBS:  Absolutely.  Thank you, Judge.

13           THE COURT:  Thank you.

14           With that, again, as I read this, and -- nice

15   presentation.  You just covered all the points.

16           Mr. Ruff, just let me confirm with you.  U.S. Trustee

17   has no objection?

18           MR. RUFF:  Confirmed, Your Honor.  And thank you to

19   the debtors for their prompt response to our due diligence

20   request and helping us review this pretty promptly, so --

21           THE COURT:  All right.  Thank you.  And while I

22   certainly don't have the benefit of having my own financial

23   advisor, just using the eyeball test, with what I see on a

24   day-to-day basis, this is just about as straightforward as I

25   get.  It is certainly intended to help preserve the overall

1  value of the estate.  Always hard when you know that you're

2  working yourself out of a job.  Just makes perfect sense to me.

3          Let me just make the circle one more time.  Anyone

4  have any comments or wish to raise any issues?

5          All right.  With that, I will grant the motion.

6  Thank you.  I will grant the motion.  Mr. Wallen, just want to

7  confirm.  It's still the original order that was attached at

8  247?

9          MR. WALLEN:  That's correct, Judge.

10          THE COURT:  All right.  Thank you.  That has been

11  signed.  It's on its way to docketing.

12          All right.  With that -- so people are going to reach

13  out when we've got the financing order that's been reviewed and

14  approved.  And anything else we need to talk about today?

15          Terrific.

16          MR. WALLEN:  No, Your Honor.

17          MR. GIBBS:  Thank you, Judge.

18          THE COURT:  All right.  Thank you.  Then, please,

19  you're all excused.  I've got a two o'clock, so I'm not going

20  to step down, but thank you.  Have a good trip home.

21          COUNSEL:  Thank you, Your Honor.

22          COUNSEL:  Thank you, Judge.

23          THE COURT:  Thank you.

24      (Proceedings concluded at 1:58 p.m.)

25                          * * * * *

1                    **C E R T I F I C A T I O N**

2

3              I, Alicia Jarrett, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9

10   _____

11   ALICIA JARRETT, AAERT NO. 428       DATE: April 28, 2023

12   ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25