David R. Gibson
SBN 07861220
david.gibson@gibsonlawgroup.com
15400 Knoll Trail Dr., Suite 205
Dallas, Texas 75248
(817) 769-4044
(817) 764-4313 (facsimile)

**COUNSEL FOR CREDITOR SAMNOSH, LLC**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| IN RE: MOUNTAIN EXPRESS OIL COMPANY, | § § § § § | CASE NO. 23-90147 |
| | | CHAPTER 11 |
| *Debtor* | | |

**SAMNOSH LLC'S FIRST AMENDED MOTION TO COMPEL REJECTION OF EXECUTORY CONTRACT AND NOTICE OF OBJECTION DEADLINE**

### NOTICE:

**If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

### Introduction

Samnosh LLC moves the Court to compel Debtor Mountain Express Oil Company ("Debtor") to reject its petroleum products supply agreement with Movant under Fed. R. Bankr.

P. 6006(a) and (c) because the contract is void or, in the alternative, because Debtor is in material breach and its assumption would cause serious economic harm for Movant.

## Facts

1.     Samnosh LLC, is the owner of a fuel station and convenience store located at 2439 Walnut Hill Lane, Dallas, Texas 75229 (the "Store").

2.     On December 18, 2018, Movant entered a petroleum products supply agreement (the "Agreement") with Mountain Express Oil Company. Under the Agreement, Debtor was to provide Movant's entire fuel capacity requirements, major oil company branding for the Store, and merchant services for the Store. The Agreement is attached hereto as Exhibit A.

3.     From minute one Debtor failed to perform its material obligations under the Agreement. Debtor delayed 28 months before branding provided the Store and, to this very day, has been regularly and substantially delinquent in making fuel deliveries. Because the Store was forced to sell unbranded fuel (a huge competitive disadvantage) and did not have an adequate and reliable supply of fuel and had no branded signage, Movant lost sales and its regular customer base dwindled. See the 2017-2018 Fuel Purchase Summary and the 2019-2020 Fuel Purchase Summary showing Movant's fuel sales before and after the Agreement attached hereto as Exhibits B & C, respectively.

4.     Branding. Debtor was to pay for and install branding of the Movant's store with a "brand…associated with high quality service and products…"  See Exhibit A, Sec. 3.

5.     Schedule 3 of the Agreement states that the initial branding of the Movant was to be 76 or Exxon. Because Debtor failed to provide branding as agreed, Movant had to brand the Movant with "76" logos at its own expense in June 2019. Debtor finally did provide Valero branding for the Movant in April of 2021, *28 months after entering into the Agreement*.

6.      <u>Fuel Delivery</u>. The Agreement is a requirements contract. The Agreement provides that "[Debtor] agrees to sell to customer…such quantities of [Debtor's] petroleum and other products as may be necessary ***to meet the customer demand*** for motor fuel products at the Location." *See* <u>Exhibit A</u>, Sec. 2(a).

7.      The Agreement further requires that Debtor "will fill all orders with reasonable promptness."

8.      From the beginning of the term of the Agreement, Debtor regularly failed to provide Movant's orders with reasonable promptness, resulting in Movant not having fuel for days at a time. It is essential for a convenience store to always have fuel, as it is the principal driver of inside sales. Moreover, when a c-store is consistently out of fuel, it loses customers who never return, going across the street or around the corner instead.

9.      Because fuel order delivery was sporadic at best, Movant was deprived of fuel for significant periods of time resulting in an immediate loss of sales and a long-term loss of customers, *i.e.*, goodwill. Correspondence between Movant and Debtor regarding delayed fuel delivery is attached hereto as <u>Exhibit D</u>.

10.      <u>Merchant Services</u>. Under section 8 of the Agreement, Debtor has the sole right to provide the credit card network for the fuel pumps and the in-store credit card sales. The proceeds of those sales go directly into Debtor's account and are only to be credited to future fuel sales:

> Invoices from credit card sales shall be credited and paid to [Debtor] in accordance with fuel jobber (wholesaler) industry standards; provided that *credit cards* [*sic*] *sales shall not be repaid to Customer but held on Customer's account as additional credit against fuel purchases.*

<u>Exhibit A</u>, Sec. 8.

11.      In typical jobber/c-store arrangements, proceeds from credit card sales in excess

of the cost of whatever is owed to the jobber for fuel are paid back to the c-store. Under the present Agreement, however, Debtor indefinitely retains all funds received for credit card purchases leaving Movant to operate a business on the meager cash sales it can muster, including for inside sales.

12.     Essentially, apart from the signing bonus, *Movant receives no benefit from the Agreement*, and even revenue from sales that are unrelated to fuel are paid to Debtor. *This is an untenable business situation that will put Movant out of business if allowed to continue.*

### Request to Compel Rejection

13.     Movant requests that the court compel Debtor to reject the Agreement.

14.     Under the terms of the Agreement, its terms are governed by the laws of Georgia regarding contracts.

15.     The Agreement is an executory contract as defined by § 365 of the Bankruptcy Code. The terms of the Agreement render it void for unconscionability, lack of consideration, and fraud.  Even if the contract is not void for the foregoing reasons, Debtor has materially breached by failing to provide branding, failing to provide Movant's fuel capacity requirements, and by not paying net proceeds of credit card transactions of the Movant.

16.     The foregoing breaches have created substantial economic harm for Movant. Specifically, Debtor's failure to provide branding and Movant's fuel capacity requirements have caused the loss of sales and the loss of long-term customers. *See* Exhibits B & C.

17.     Debtor has failed to provide adequate assurances that it will be able to remedy its breaches; Debtor's inability to meet Movant's capacity requirements is ongoing, Debtor has never paid any net proceeds for credit card sales to Movant, and Debtor refuses to provide a clarification of the terms under which such a payment would ever be made.

18.     Movant will not have adequate revenue to support its operations if Debtor is allowed to continue retaining all of Movant's credit card sales.

**A.  The Court should compel rejection because the Agreement is void.**

19.     The Agreement is void and unenforceable because it is unconscionable, and because there is a lack of consideration.

20.     <u>Unconscionability</u>. Under the Uniform Commercial Code of Georgia, a contract for the sale of goods is void if it is "unconscionable":

> If the court as a matter of law finds the contract *or any clause of the contract* to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

OCGA § 11-2-302(1) (emphasis added).

21.     While the UCC does not provide a definition for "unconscionability," the Georgia Supreme Court has stated that there are two types of unconscionability: (1) "procedural unconscionability," whereby there is a disparity between the sophistication, competency, or bargaining position of the parties; and (2) "substantive unconscionability," whereby the court considers the terms of the contracts themselves.  *See Technologies, Inc. v. Nelson*, 478 S.E.2d 769, 771 (Ga. 1996).

22.     In this case, the Agreement is substantively unconscionable.  When evaluating the substantive unconscionability of a contract, the courts look to the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns. *Id* at 772.

23.     The terms of a contract are unconscionable when, "one side or the other is to be penalized by the enforcement of the terms of a contract so unconscionable that ***no decent, fair***

*minded person would view the ensuing result without being possessed of a profound sense of injustice*, that equity will deny the use of its good offices in the enforcement of such unconscionability." *Id.* at 775.

24.     The Agreement obligates Movant to **provide** a storefront, convenience store inventory, equipment, and personnel; and Debtor has the exclusive right to sell its fuel products and to collect *all* credit card sales for the Movant, including sales of non-fuel inventory sold inside the c-store, or what is known in the industry as "inside sales."

25.     Essentially, Debtor gets a free fuel depot where it sells fuel and collects all sales of the Movant, with no obligation to provide compensation for its rights or even to reimburse Movant for its inside sales:

> Invoices from credit card sales shall be credited and paid to [Debtor] in accordance with fuel jobber (wholesaler) industry standards; provided that *credit cards [sic] sales shall not be repaid to Customer but held on Customer's account as additional credit against fuel purchases.*

Exhibit A, Sec. 8 (emphasis added).

26.     Clearly, the terms of the Agreement are such that "no decent, fair minded person would view the ensuing result without being possessed of a profound sense of injustice" from the beginning.

27.     Consideration. Under the Georgia Code, a contract is void without consideration. OCGA § 13-3-40(a).

28.     Under the Agreement, Debtor has the exclusive **right** to sell fuel to Movant and the exclusive right to receive revenue from the sale of not only fuel, but the sale of the non-fuel inventory of the Movant. *See* Exhibit A, Sec. 8.  Additionally, Debtor has the right to dictate how the Movant conducts business. *Id. at* Sec. 3.

29.     Further, the Agreement does not require Debtor to make *any* payments to Movant at *any* time. And any funds received in excess of the fuel purchase requirements of the Movant are not credited to Movant at any time. Apart from the signing bonus, Movant receives no benefit from the Agreement. Accordingly, the Agreement is void for want of consideration.

30.     <u>Fraud</u>. Despite the fact that there was a signing bonus that provided *some* consideration, "the inadequacy is so great that it is a strong circumstance to evidence a fraud." OCGA § 13-3-46. Accordingly, the Agreement is void for being fraudulent on its face.

31.     For the foregoing reasons, the court find the contract void and unenforceable and compel Debtor to reject the Agreement.

**B.  The Court should deny assumption because Debtor is in breach of the Agreement.**

32.     In the alternative, Movant requests that the court compel rejection of the Agreement because Debtor is in breach.

33.     On December 18, 2018, Movant and Debtor executed a written contract. *See* <u>Exhibit A</u>. The contract provided that Debtor would: 1) supply Movant's fuel and petroleum product capacity requirements; 2) provide major oil company branding of the Movant; and, 3) provide merchant services for the Store. In exchange, Movant was to send all of its credit card sales receipts to Debtor to be credited towards future fuel purchases.

34.     Movant performed its contractual obligations as best it could, considering Debtor's material failure to perform.

35.     Debtor breached the contract by continuously failing to provide Movant's fuel requirements. Debtor has never consistently met Movants capacity fuel requirements, and its failure to do so has continued after petitioning the court for Chapter 11 relief.

36.     Debtor further breached the agreement by having never paid Movant any net proceeds of credit card sales.

37.     Debtor's breach caused injury to Movant. Specifically, Movant has lost sales on an ongoing basis due to not having fuel to sell to its customers, and it has lost regular customers who might otherwise have purchased fuel and convenience Movant products from Movant. *See* Exhibits B & C.

38.     Movant requests that the court compel Debtor to reject the Agreement.

### Prayer

For these reasons, Movant asks that Debtor be cited to appear and answer and that the court compel rejection of the Agreement.

Respectfully submitted,

THE GIBSON LAW GROUP, P.C.

By: _____
David R. Gibson
SBN 07861220
david.gibson@gibsonlawgroup.com

15400 Knoll Trail Dr., Ste. 205
Dallas, Texas 75248
(817) 769-4002
(817) 764-4313 Facsimile

**COUNSEL FOR SAMNOSH, LLC**

### CERTIFICATE OF SERVICE

On this 12th day of May 2023, a true and correct copy of the foregoing instrument was served through the Court's CM/ECF system on all parties who receive such notice.

_____
David R. Gibson

### L<small>OCAL</small> R<small>ULE</small> 4001-1(a) C<small>ERTIFICATE OF</small> C<small>ONFERENCE</small>

I certify that Movant has conferred with opposing counsel on the requested relief, and the parties hereto were not able to come to an agreement on the requested relief.

_____
David R. Gibson

S<small>AMNOSH</small> LLC'<small>S</small> F<small>IRST</small> A<small>MENDED</small> M<small>OTION TO</small> C<small>OMPEL</small> R<small>EJECTION OF</small> E<small>XECUTORY</small> C<small>ONTRACT</small>
<small>AND</small> N<small>OTICE OF</small> O<small>BJECTION</small> D<small>EADLINE</small>

9

# EXHIBIT A



**PETROLEUM PRODUCTS SUPPLY AGREEMENT**

**THIS PETROLEUM PRODUCTS SUPPLY AGREEMENT** ("Agreement") is entered into this 18th day of December 2018, between **MOUNTAIN EXPRESS OIL COMPANY**, a Georgia corporation having  a mailing address of 5333 Bells Ferry Road, Suite 201, Acworth, Georgia 30102 ("Supplier"), **SAMNOSH LLC**, a Texas limited liability company and **GAURAB BASNET,** an individual resident of the State of Texas both having a mailing address of 2602 Howlite Lane, Rosharon, Texas 77583 (collectively, "Customer").

**WHEREAS**, this Agreement is for the fueling station that shall be  known as Mountain Express Store **#590**, located at 2439 Walnut Hill Lane, Dallas, Texas 75229 ("Location"), as more particularly described on **Schedule 1**; and

**WHEREAS**, the parties desire to enter into an agreement for Supplier to supply motor fuels to Customer at such Location.

**NOW THEREFORE**, in consideration of the mutual undertakings herein contained, the sufficiency of which are hereby acknowledged, Supplier agrees to sell, and Customer agrees to buy, petroleum and other products on the following terms and conditions:

**1.   TERM.**   This Agreement shall commence upon the Effective Date, as provided for on Schedule 7 as herein incorporated, and shall continue for ten (10) years ("Term"),  and from month to month after the said Term unless either party gives written notice of non-renewal to the other party at least thirty (30) days prior to the expiration of the initial Term or the then existing extended term, or  unless sooner terminated as otherwise hereinafter provided.

**2.  SUPPLY OF PRODUCTS.**

      (a)  Supplier agrees to sell to Customer, and Customer agrees to buy and diligently to promote the sale of all grades and such quantities of Supplier's petroleum and other products as may be necessary to meet the customer demand for motor fuel products at the Location, and  Customer must offer all grades of fuel available from Supplier for sale at all times.   The Location may be more particularly described on **Schedule 1** attached hereto and made part hereof.  Supplier shall have the right to provide ethanol additives, when available, in the gasoline, at the discretion of Supplier.  Any incentives or rebates provided by Supplier's supplier relating to the sale of ethanol shall remain the property of  Supplier. All fuel deliveries shall be made in full truckload quantities or in such other minimum quantities per delivery

DocuSign Envelope ID: 7E866809-2BCD-4CDD-AA54-3217A8A8F3C8

as specified by Supplier from time to time. If customer requests delivery of less than Supplier's established minimum volumes, compensatory delivery charges may be imposed. In no circumstances is Supplier obligated to make deliveries into a tank which is, or is suspected of leaking. Under this Agreement, Supplier is obligated to supply products to only the Location specified herein.

(b)  Customer covenants and agrees to purchase from Supplier and offer for sale, at the Location, only such gasoline, diesel fuel, other petroleum products or any additional motor vehicle fuel and/or energy-related products as are supplied and delivered by Supplier, including but not limited to those set forth on **Schedule 2** for the full duration of the stated term of this Agreement; and to purchase not less than 125,000 gallons of gasoline and/or diesel fuel per month which equals 15,000,000 gallons over the term of the Agreement. In the event Customer does not purchase 15,000,000 gallons during the term of this Agreement then the Agreement will automatically extend until Customer purchases 15,000,000 gallons.

(c)  It is the intention of the parties that the supply and purchase obligations contained herein shall remain in full force and effect throughout the term of this Agreement and shall not be suspended during any period of remodeling, renovation, repair, or rebuilding of the improvements located at the Location. Provided further, in the event Customer's completion of the construction, remodeling and rebranding of the Location is not completed prior to the commencement of the term of this Agreement, due to conditions beyond the control of Customer, Customer's obligation to purchase petroleum products hereunder shall commence upon the completion of such construction remodeling and rebranding.

(d)  Supplier has the sole and exclusive right to designate the hauler for delivery of products to the Location and hereby reserves the right to change the designated hauler from time to time. Customer acknowledges and agrees further to comply with hauler's protocol for ordering of products and to allow sufficient time to receive delivery thereof. Customer acknowledges that haulers' business is dependent on many external factors and that there may be delays in deliveries without any consequences to Supplier. Customer shall grant full access to hauler's vehicles to make deliveries at any hour of the day. Communications between hauler and Customer are the sole and exclusive responsibility of the Customer. Any mistakes in ordering due to miscommunications between the hauler and Customer are to be resolved between the hauler and Customer. Any product outage(s) due to Customer's failure to: (1) timely order sufficient volumes of product; (2) comply with hauler's protocol for ordering of products; or (3) grant full access to hauler's vehicles to make deliveries shall constitute an event of default. Customer acknowledges and agrees that Supplier shall not be liable for any misconduct of any designated hauler.

**3.   OPERATION OF STATION.** Customer recognizes that the brand utilized by Supplier is associated with high quality service and products and agrees to conduct business at the Location in a manner to maintain

DocuSign Envelope ID: 7E866609-3BCD-4CDD-AA54-3217ABA8F3C8

that association. Accordingly, Customer agrees to furnish such service and accommodations to retail motor fuel customers as are customarily provided by convenience store/filling stations.

Customer specifically agrees to refrain from the sale, use, storage, rent, display, or offering at the Location of:

(a) pornographic or sexually explicit magazines, video tapes, compact discs, digital video discs, similar literature or items of merchandise;

(b) any item, in Supplier's judgment, that is intended or designed for use in ingesting, inhaling or otherwise consuming an illegal drug or from manufacturing or processing an illegal drug, including but not limited to pipes, tubes, roach clips, instructions or descriptive materials, or containers designed for concealing illegal drugs or paraphernalia, or bath salts or synthetic drugs designed to mimic the effects of illegal drugs; and

(c) any substance or item prohibited to be offered for sale by the branding and/or quality assurance standards of the motor fuel supplier providing motor fuel for sale or resale at the Location.

Customer agrees to keep the business operated at the Location open for business during no less than the hours hereinafter set forth. Such business shall be open 365 days per year, (366 days during any leap year) operating 24 hours a day.

Customer agrees to provide:

(a) broadband service to the Location in a manner acceptable to Supplier; and

(b) promptly upon execution of this Agreement, a real property survey of the Location in a form that is acceptable for the purposes of filing any any all approvals, licenses and permits reasonably required to operate the Location for its intended purpose under this Agreement. In the event that Customer does not provide a survey, Supplier may charge Customer for the cost of a new survey.

**4. EXCLUSION OF OTHER SUPPLIERS**. Customer covenants and agrees to offer for sale, at the Location, only the motor fuels as are provided to the Location supplied by Supplier under this Agreement. Customer shall not sell any other supplier's motor fuels without the express written permission of Supplier. Custromer affirmatively represents unto Supplier that Customer is not bound by the terms of any other motor fuels supply agreement relative to the Location and that Supplier has not induced, directed nor assisted Customer in breaching the terms of any agreement with another motor fuel supplier.

**5. QUALITY AND CLAIMS.** Supplier guarantees that all products delivered hereunder will be uniform in quality and according to industry standards. Any claim for deficiency in quality or quantity of any product is waived unless Customer gives Supplier notice of such deficiency at time of delivery (or during

DocuSign Envelope ID: 7E866E09-3BCD-4CDP-AA54-3217ABA8F3C8

the next period of regular business hours if night delivery) for quantity claims and within ninety-six (96) hours of discovery of the alleged deficiency for quality claims. Such notice shall fully set forth the facts on which Customer's claim is based, and Supplier shall be given full opportunity to inspect, measure, and test the products and/or equipment involved. Customer shall immediately notify Supplier if its equipment is leaking.  Customer's failure to comply with the above requirements shall operate as a waiver of any and all claims and remedies by Customer against Supplier arising out of product defects, variances or shortages.

**6.  PRICE OF PRODUCTS.** Prices for all products purchased by Customer from Supplier shall be Supplier's rack price from its supplier at its supplier's terminal, plus call and demand freight rates, plus ONE CENT $0.01 per gallon, plus any applicable Superfund tax per gallon, plus the UST fee per gallon, plus any other applicable taxes, charges, duties and fees levied on any of the products of Supplier, or required to be collected by Supplier upon the sale, transportation or delivery of the products.  Customer shall be entitled to any rebates paid by the oil company to Supplier for volumes of gasoline sold at the Location during the term of this Agreement, up to a maximum of THREE CENTS ($0.03) per gallon of gasoline sold, so long as Agreement is not in default.

**7.  TERMS OF PAYMENT.** Motor fuel sales shall be net payment, COD, at time of delivery. Provided further, Supplier may, in its sole discretion, provide load to load, or 7 day credit or other deferred credit terms for payment.  Supplier shall notify Customer of the payment terms prior to or at the time of any delivery of motor fuels.  Supplier may, after providing credit terms, require Customer, upon notice, to revert to making  payments, COD, for all fuel deliveries at any time during the term of this Agreement. Any notice to Customer  may be by facsimile transmission, verbal notice (in person or by telephone), by e-mail, or any other commercially reasonable manner.  Payment shall be made by draft or direct deposit into Supplier's bank account or by electronic fund transfer, at Supplier's election.  For the purposes hereof, Customer shall furnish Supplier with the name of the bank and the account number from which payments shall be directly drafted by electronic fund transfer and shall execute such documents and authorizations that may be necessary to provide for such transfer if such method of payment is chosen by Supplier.  In the event any draft or electronic fund transfer is returned or dishonored by reason of insufficient  funds or otherwise, Customer shall be in default hereunder and in order to cure such default, as may otherwise be provided for in this Agreement, Customer shall additionally pay unto Supplier an administrative charge of TWO HUNDRED DOLLARS ($200.00) for each such dishonored instrument or transfer.  Provided further, in the event of the return or dishonor of any draft or electronic fund transfer, or in the event Supplier has reasonable grounds upon which to believe that Customer will not pay for fuel previously delivered to the Location in accordance herewith, then in either event, Supplier shall have the right to cause the removal (pump-out) of the in-ground fuel  previously delivered to and stored upon the Location and to credit Customer's account for such fuel in an amount equal to the price of products that Customer owes for the delivery of such fuel removed, less the cost of the pump-out.

Provided further, upon any such return or dishonor of any draft or electronic fund transfer and prior to causing the removal of in- ground fuel as heretofore provided, Supplier shall have the right to enter upon the Location and cause an electronic or manual cut-off or disabling of the fuel dispensing equipment so that no in- ground fuel can be pumped until the pump-out is completed or until the fund transfer is honored, whichever occurs first.

**8.   CREDIT CARD NETWORK AND SALES.**   Customer shall use, during the term of this Agreement, only the credit card network provided by and/or associated with Supplier's supplier or such other credit card network as directed by Supplier which shall be maintained and upgraded by Customer at its cost. No secondary or supplemental or other credit card network or credit card machines shall be used for the processing of any sales, whether for fuel, inventory, merchandise or otherwise.   In the event that Customer uses a separate EBT machine, Customer shall be required to use a network or machine supplied by Supplier or its approved vendor.   In the event of the unauthorized use of a credit card network or machine for processing sales at the Location, by Customer or any of its customers or employees or contractors, Customer shall be in default in its obligations under this Agreement.   In the event of any such default, the cure for the unauthorized activity (in addition the discontinuance of such unauthorized activity), Customer shall pay unto Supplier a FIVE HUNDRED DOLLAR ($500) cure fee for the first such default; and a ONE THOUSAND DOLLAR ($1,000) cure fee for any subsequent default during the Term hereof.   In the event of default by Customer under any other terms of this Agreement, Supplier shall also be entitled to immediately disable said credit card network at the Location.   Invoices from credit card sales shall be credited and paid to Supplier in regard to approved credit card purchases from Customer.   Supplier shall credit Customer's account for products purchased hereunder, for the amount of credit card sales credited and paid to Supplier in accordance with fuel jobber (wholesaler) industry standards; provided that credit cards sales shall not be repaid to Customer but held on Customer's account as additional credit against fuel purchases.   Upon any failure by Customer to strictly comply with the terms and conditions of credit card transactions at the Location, Supplier shall have the right to charge back to the Customer all sums not credited to or paid to Supplier as a result of defective or noncomplying credit card sales at the Location.    Any "charge-backs" shall be immediately paid by Customer to Supplier.   Customer shall be responsible for all point of sale programming and updates and installation and maintenance costs for EMV requirements from governmental agencies or oil companies. Customer shall attend point of sale training and customization prior to fuel delivery and shall pay FIVE HUNDRED DOLLARS ($500) for the cost of training and customization.

**9.   BRANDING, TRADEMARKS AND NAMES**.  Supplier shall have the right to designate the branding of the motor fuels to be purchased by Customer hereunder.   The initial branding, if any, shall be as designated on **Schedule 3** attached hereto and made part hereof.  Supplier shall incur such costs as may be reasonably necessary for changing and or installation of the branding image of the Location  (said sum hereinafter being referred to as Supplier's branding investment), in order to obtain the approval of

Supplier's chosen branded fuel supplier. Customer shall be responsible for payment of any and all further sums necessary for signage or other branding image items in order to maintain such approval during the term of this Agreement. In the event Supplier changes branding during the term of this Agreement, all costs of maintaining the subsequent banding image(s), after Supplier's initial costs in rebranding the Location, shall be borne by Customer. All signage shall be contingent upon and subject to the requirements of any applicable state or local law or ordinance. Customer agrees to conduct its operations and cause its retail facilities to be operated during the Term of this Agreement in accordance with the image requirements and minimum standards established by the branded fuel supplier as chosen by Supplier, from time to time which shall include but not be limited to, oil company uniforms, employee name tags, clean and available restrooms, and in accordance with the image requirements and minimum standards established by the Supplier and/or its affiliates. In the event Customer's branded retail facility does not meet such standards or requirements and which results in Supplier's receiving notice to debrand Customer, or if such retail facility is abandoned, Customer shall allow Supplier or Supplier's representatives or customers to immediately remove all brand identification from the Location, and Customer shall be liable to Supplier for all expenses and damages incurred as a result thereof. For the purposes of this Agreement, the Location shall be deemed abandoned if it is not open for business during normal business hours for three consecutive days. Customer expressly agrees that all of Supplier's (or Supplier's suppliers') trademarks, names and colors appearing at the Location shall be kept clear and legible, and that Customer will use only signs approved by Supplier to advertise products purchased by Customer from Supplier. Supplier shall be entitled to withdraw or substitute at Supplier's cost the use of any particular trademark, name, or colors. Customer shall at its sole cost and expense participate in any marketing or loyalty programs established by the brand of motor fuels sold at the Location; install all marketing materials, such as point of purchase (POP) signage, credit card applications and related materials; and attend any training or informational programs offered.

**10.   CUSTOMER'S BUSINESS.**   It is mutually agreed that the business conducted by Customer at the Location is the independent business of Customer, and this Agreement shall not be construed as reserving to or conferring upon Supplier any right to direct or control Customer or any of Customer's employees in the conduct of Customer's business. Customer acknowledges that Supplier has made no representation of profitability in regard to any business to be operated by Customer at the Location and Customer has not relied upon any business information provided by Supplier in regard thereto; and Customer enters into this Agreement based upon the exercise of Customer's own business judgment after having full opportunity to exercise due diligence on Customer's own behalf. Customer acknowledges its sole resposibility for: (1) the pricing of all products, including motor vehicle fuels, sold at the Location; and (2) the operation of its business in accordance with all applicable laws, regulations and standards. Customer agrees, further, to defend, indemnify and hold the Supplier, its subsidiaries, divisions, affiliates, agents and employees harmless from any and all claims, injuries, damages, losses or

suits including attorney fees, arising out of or in connection with the Customer's business. Provided, however, that Supplier agrees to defend, indemnify and hold the Customer, its subsidiaries, divisions, affiliates, agents and employees harmless from any and all claims, injuries, damages, losses or suits including attorney fees, arising out of or in connection with intentional acts of Supplier.

**11.  UNDERGROUND STORAGE TANKS AND MAINTENANCE.**Customer is in exclusive possession and control of the underground storage tanks, lines, and associated underground equipment at the Location, and shall be responsible for all maintenance and repairs and all environmental issues or matters arising out of the use, maintenance or repair of such tanks, lines, pumps, dispensers and fuel equipment (including EMV upgrades), except as to any maintenance, repair or environmental costs or damage directly caused or arising from any intentional or negligent act or omission of Supplier, or except as to any repairs that are expressly made the responsibility of Supplier as Landlord under the terms of a lease of the Location to Customer as Tenant.  Customer shall, throughout the term hereof, provide daily tank stick readings to Supplier's transport company (hauler) in such manner as directed by Supplier. In addition, Customer shall provide daily stick readings to Supplier with water detecting putty and take accurate and prompt measures at Customer's cost to cure and remove any water or other contaminants from the tanks, lines and fuel equipment.  Customer warrants that throughout the entire Term of this Agreement, Customer's location shall be in full and complete compliance with all local, State and Federal environmental regulations and statutes pertaining to the storage, handling and dispersing of petroleum products and motor fuels. Further,  Customer shall comply with all directions, instructions or recommendations made by any environmental consultant retained by Supplier for the purposes of managing environmental and inventory control at the Location.  Upon the breach of this warranty, and in addition to any other remedies Supplier may have by law, Supplier shall have the right to immediately cease delivery of products to Customer and terminate this Agreement.  Without limiting the foregoing, Customer shall, at its expense, cause the cleaning of the underground motor fuel storage tanks prior to Supplier's installation of any new, refurbished or upgraded motor fuel pumping equipment or before the first delivery of motor fuels to the Location by Supplier, whichever occurs first; and shall cause the cleaning of the underground storage tanks periodically during the Term of this Agreement, as may be reasonably required by Supplier.  Customer shall pay one half the cost of any software, hardware and service costs including annual and monthly maintenance fees associated with automated tank, pump, sign and/or register readings. Customer specifically acknowledges that Supplier has no obligation with regard to underground tanks or submersible pumps or any other fueling equipment located in the tanks.

**12.  DELIVERIES DELAYED OR PREVENTED**. Supplier will fill all orders with reasonable promptness, but shall not be liable for loss or damage due to delays or failure, in whole or in part, to fill orders resulting from acts of public enemies, regulations, or orders of civil or military authorities, fires, floods, strikes, labor disputes, accidents, shortage of labor, of crude oil, or refined products or refinery capacity, or

materials or of transportation, or any other cause beyond Supplier's reasonable control, either at its own plants or those of its sources of supply, or in connection with the delivery of its products. If Supplier is prevented by any of the foregoing causes from supplying the full quantities of any one or more of its products hereunder, Supplier shall have the right without liability to Customer to allocate the quantity deliverable hereunder to Customer, to its other customers under contracts calling for delivery of like products, and to its own requirements in such manner as it may deem reasonable, or according to any required allocation program, and Customer shall be bound by such allocation. If Supplier is unable to deliver products for more than seventy-two (72) hours, Customer shall have the right to purchase products from other suppliers until such time as Supplier can recommence delivery, and Customer may suspend its performance under this Agreement during such an event. Once Supplier has recommenced delivery, Customer shall immediately begin abiding by the terms and covenants contained herein.

**13. ASSIGNMENT-SUBLETTING-SALE**. Customer shall not, without the prior written consent of Supplier endorsed hereon, assign this Agreement or any interest hereunder, or any part hereof, or permit the operation of the Location by any party other than Customer. Supplier's consent shall not be unreasonably withheld, however, in making such a determination, Supplier may rely upon the financial and creditworthiness and criminal background, if any, of any proposed assignee in making a determination as to whether or not the withholding of such consent is reasonable. Customer must provide Supplier with thirty (30) days prior written notice of a proposed consent together with all information for the proposed assignee. Consent to the assignment shall not destroy this provision, and all later assignments shall be made likewise only on the prior written consent of Supplier. An assignee of Customer, at option of Supplier, shall become directly liable to Supplier for all obligations of Customer hereunder, but no assignment by Customer shall relieve Customer of any liability hereunder, and Customer shall remain jointly and severally liable with assignee for the satisfaction and performance of all Customer's obligations under the terms of this Agreement. Notwithstanding the foregoing, Customer shall have the right, without prior written consent of Supplier, to assign this Agreement, in its entirety, to any corporation or limited liability company organized under the laws of the State of Arkansas and wholly owned by Customer; however, any such assignment shall not relieve Customer of joint and several liability for all of Customer's obligations hereunder, the performance of which shall be personally guaranteed by Customer. In the event any assignment is authorized and executed hereunder, Customer shall pay Supplier the costs, including administrative and legal fees, incurred by Supplier as the result thereof. In the event Supplier elects to sell, assign or convey rights, titles and interest in this Agreement, Customer shall provide a fuel estoppel agreement, in acceptable form to Supplier, confirming the terms of this Agreement at Supplier's request and without delay.

**14. DEFAULT, TERMINATION AND LIQUIDATED DAMAGES**. All terms, conditions, covenants, warranties and agreements contained in this Agreement are essential and material to the continued relationship between the parties. In addition to the aforementioned, the following shall constitute

events of breach or default: (1) failure to remit to Supplier any monies owed by Customer to Supplier in accordance with the provisions of this Agreement; (2) violation of any federal, state, county or any municipal law, ordinance, rule, or regulation relating to Customer's operation of the business conducted pursuant to or in connection with this Agreement; (3) false or misleading statements made by Customer to Supplier, including financial statements made or provided by Customer in order to enter into this Agreement; (4) the institution of any insolvency, bankruptcy, or a receivership proceeding in or against Customer; (5) failure of Customer to pay taxes or license fees as required by the terms of this Agreement or by any law or regulation or arising out of Customer's employment of any person; (6) abandonment or cessation of operation of the business of Customer; (7) severe physical or mental disability of Customer; (8) Willful adulteration, mislabeling or misbranding of motor fuel or other violation by Customer of trade mark requirements for products sold by Customer as set forth under this Agreement; (9) violation of any term or condition of the lease, any cash advance agreement or any other agreements between the parties related to the Location; or (10) any act or omission allowing for termination, non-renewal or debranding of the Location or as provided under the Petroleum Marketing Practices Act 15 U.S.C. Sec. 2801 et seq. Subject to all rights under the Petroleum Marketing Practices Act, Supplier shall provide Customer written notice of the occurrence of any event or breach which is cause for termination of this Agreement hereunder. Customer shall have 15 days from the date of such notice in which to cure such breach or correct any condition or otherwise comply with the terms of this Agreement and in lieu of which this Agreement shall automatically be terminated at the expiration of such 15 day period. Notwithstanding the foregoing, in the event Customer fails to remit Supplier any monies owed to Supplier under the terms hereunder, Supplier shall have the right to immediately suspend motor fuel delivery until and unless such breach is cured. In the event such a breach is not cured within 5 days from the date of written notice to Customer, then in such event Supplier shall have the right to then immediately terminate this Agreement. In the event Customer receives written notice from Supplier of any events of default hereunder, Customer specifically acknowledges and agrees that Supplier, through its agents, shall have the right to inspect Customer's facility at the Location for purposes of determining compliance with this Agreement. In the event such event is not cured withing 15 days of notice thereof, Seller shall be entitled to make any corrections and/or repairs necessary at the Customer's expense.

The parties hereto agree and stipulate that in the event of default by Customer and early termination of this Agreement, Supplier's actual damages cannot be calculated with any degree of certainty as Supplier is relying upon Customer's continuing purchase of petroleum products throughout the term of this Agreement. Accordingly, Customer and Supplier specifically acknowledge and agree that such damages upon Customer's breach would be virtually impossible to determine, and that the formula provided in this paragraph provides a reasonable pre-estimate of Supplier's probable loss that will be suffered by Supplier. Therefore, the parties agree that, in

Store #590                                                                                                        Revised 10.2018

addition to any other amounts owed to Supplier hereunder, Customer shall pay to Supplier as liquidated damages and not as a penalty a sum equal to FOUR CENTS ($0.04) times the minimum number of gallons required to be purchased monthly  (see Section 3 (b)) times the number of months remaining in the Term of this Agreement from the date of default.  The parties further agree that the above formula is reasonable because the amount of such liquidated damages are decreased by each month that Customer performs its obligations under this Agreement.  Moreover, the parties stipulate and agree that their intent in using the above damages formula is to provide a readily calculable pre-estimate of Supplier's probable loss upon breach and that it not be construed as a penalty of any kind or sort.

It is further agreed that in the event of default by Customer under any of the terms of this Agreement and that in addition to the aforesaid liquidated damages, Supplier shall be entitled to recoup from Customer the unamortized portion of its investment in the Location that is more particularly described in **Schedule 5** hereto.  The investment described in **Schedule 5** shall be amortized on a "straight line" basis over the ten year term of this Agreement; if Customer defaults and this Agreement is terminated before the end of the term, Supplier shall be entitled to immediate payment of the amount of the investment that has not been amortized on the date of default.  Customer acknowledges that recoupment by Supplier of the unamortized investment is a reasonable pre-estimate of Supplier's damages with respect to the investment, and that Supplier has the reasonable expectation that Customer shall perform its obligations hereunder for the full term.  In lieu of Supplier's right to recoupment of its investment in the Location, Supplier may also immediately remove from, or disable at, the Location and retain full ownership of the petroleum product dispensing equipment, cash register, point of sale and other branding image items installed pursuant to **Schedule 5** attached hereto.  Upon any default Supplier shall also be authorized and permitted to immediately remove all motor fuel products in the underground storage tanks at the Location, pursuant to Section 6 of this Agreement.  Termination of this Agreement shall not affect or abridge the rights and obligations of the parties occurring prior to termination, and Supplier may pursue any available legal remedies relating thereto whether or not it exercises its right to declare this Agreement terminated.  In addition to the foregoing, in the event of termination, Customer shall pay to Supplier the cost of "debranding" the Location.  "Debranding" is hereby defined as the removal of all brand signage, brand color scheme, repayment of any unamortized oil company branding costs and rebates at the Location.

**15.  QUALITY ASSURANCE.**  Customer acknowledges that Supplier's supplier(s)  maintain programs for product quality and marketing assurances.  Customer shall be responsible for the satisfaction of all credit card processing fees and shall, at its cost and expense,  comply with all quality and marketing programs, and shall cooperate at all reasonable times and in all reasonable manners with all quality assurance programs and inspections, in failure of which Customer shall be in default under the terms of this Agreement. Customer shall properly display all point of purchase marketing materials and credit card

DocuSign Envelope ID: 7E866809-9BCD-4CDD-AA5A-3217A8A8F3C8

applications. Provided further, in the event Supplier determines, in its sole discretion, that Customer is not in compliance with any marketing or quality assurance retailing standard in regards to the physical condition of the Location and the operation of the business thereon, Supplier shall have the right (but not the obligation)  to enter upon the Location and to correct any deficiency or substandard condition and bill Customer for the cost thereof.  Customer shall reimburse Supplier for any and all of such costs within seven days of receipt of such bill.  Such reimbursement payment(s) shall be made by electronic fund transfer in the same manner as payment for products purchased from Supplier.  Without limiting the foregoing, it is understood between the parties that the quality assurance standards to be met, to the satisfaction of Supplier, include  but are not limited to the proper maintenance of landscaping, the maintenance and cleanliness of the restroom facilities, buildings (interior and exterior), canopy and equipment, proper presentation and display of retail merchandise, maintenance and location of signs and other branding image items and other such  matters pertaining to the brand image of the Location. Customer shall cause all employees and personnel to wear the uniforms and name tags of Supplier's supplier while engaged in Customer's business at the Location. Further, without limiting the foregoing, Customer shall comply with the image and identification standards established,  from time to time, for "branded outlets" by Supplier's branded supplier.   It is acknowledged between the parties that Supplier and/or Supplier's supplier may conduct periodic "mystery shopper" or other inspections of the Location and the operation of the business thereon in order to determine whether Customer is meeting the image, retail and customer service standards required under the terms of this Agreement.  In the event Customer scores below 90% of a perfect score, or otherwise fails inspection as determined by Supplier or Supplier's supplier making the inspection and in accordance with the quality assurance standards, Customer shall pay unto Supplier an inspection fee of $500.00 or such amount charged by Supplier's supplier as an inspection fee, whichever is greater, due and payable within three days of Customer receiving notice of such failure and a copy of the inspection report.  The foregoing inspection fee shall apply to each and any failure of such inspections;  provided further, Supplier shall have the right, in its discretion, to waive the requirement for payment of an inspection fee based upon its determination of Customer's exercise of good faith in promptly correcting all quality assurance deficiencies.

**16.   SEVERABILITY**. (a)   If any one or more of the provisions of this Agreement are determined, by a court of competent jurisdiction, to be invalid or unenforceable, the remaining provisions hereof shall continue to be of full force and effect provided that the invalidity of any provisions hereof does not result in a lack of mutuality or a failure of consideration in regards to the benefits and obligations set forth herein.  (b) If, subsequent to the date of this Agreement, valid state or federal laws or regulations governing the relationship between Customer and Supplier take effect, this Agreement shall be deemed amended and shall incorporate any mandatory requirements of such laws or regulations so long as they shall be effective,    unless such amendment(s) shall operate to increase Supplier's taxes, costs or

expenses hereunder, in which case Supplier shall have the option to terminate this Agreement by notice to Customer.

**17.   CUSTOMER'S REPRESENTATIONS**. Customer affirmatively represents and warrants unto Supplier that Customer is not under  contract with another fuel supplier and is authorized to enter into this Agreement with Supplier, and that Supplier has not induced Customer to breach, nor has Supplier interfered with, any other existing contract between Customer and any other product supplier.  In the event  Customer is a corporation or limited liability company,    Customer represents that it is a corporation or limited liability company in good standing duly authorized to do business in the State of Texas, and that the undersigned party executing this Agreement on behalf of Customer has full and complete authority to bind the corporation or limited liability company  hereto.  Further, it is expressly agreed that the corporate officer or limited liability company manager and/or member executing this Agreement on behalf of a corporation or limited liability company shall be, in his or her individual capacity, jointly and severally liable and responsible, with such corporation or limited liability company, for the satisfaction of all obligations of Customer under the terms of this Agreement.

**18.   ENTIRETY-RELEASE:**  This Agreement constitutes the entire agreement and understanding between Supplier and Customer merging and superseding all prior agreements, understandings, warranties and representations, whether oral, written, express, or implied, between Supplier and Customer.  All prior agreements between Supplier and Customer concerning the subject matter hereof, relating to the Location defined herein, are hereby terminated.  Neither this Agreement nor any modification or waiver of any of the provisions hereof shall be binding upon Supplier or Customer unless in writing, duly executed by Customer and a duly authorized  Customer of Supplier.

**19.   ENVIRONMENTAL CONTAMINATION**.  In the event it is determined, during the term of this Agreement, that the Location is environmentally contaminated as a result of a leak, spill, or other discharge of hazardous substances which constitutes a violation of local, state or federal law, rule, regulation or ordinance, Supplier shall have the right to suspend delivery of products to the Location until such contamination is remediated as required by law during which time Customer shall remain liable unto Supplier for any shortfall payments due hereunder by virtue of Customer's failure or inability to purchase the minimum number of gallons of petroleum products required under the terms of this Agreement, notwithstanding such suspension.  In the alternative, in the event of such contamination, Supplier shall have the right to terminate this Agreement in which case Customer shall reimburse Supplier for all branding investment costs incurred by Supplier for branding of the Location and shall reimburse Supplier for all purchase incentive rebates received by Customer under the terms of this Agreement.

**20.   NOTICES**. Any notice provided for herein shall be given in writing and shall be considered properly given when received if personally delivered or, if deposited in the United States mail by certified mail,

return receipt requested, postage prepaid, properly addressed by either party to the other at such party's address shown above, or at any changed address of which notice is duly given, as of the date received.

**21. ATTORNEY'S FEES, COSTS, INTEREST.** In the event it becomes necessary for Supplier to employ the services of an attorney to enforce any aspect of this Agreement; Customer is in default of this Agreement; or this Agreement is amended, assigned or modified; Supplier shall be entitled to charge and collect administrative costs and legal fees in an amount not less than TWO THOUSAND DOLLARS ($2,000.00). In the event that either party files litigation regarding this Agreement, the losing party agrees to pay the prevailing party reasonable attorney's fees and costs of litigation.

**22. CHOICE OF LAW.** This Agreement has been entered into in and shall be construed under the laws of the State of Georgia and the parties agree that exclusive venue and jurisdiction shall be with the Superior Court of Cherokee County, Georgia for any actions, suits or proceedings.

**23. SECURITY DEPOSIT.** Unless otherwise stated as an alternative security deposit payment provision in **Schedule 4** attached hereto and made part hereof, Customer shall pay unto Supplier a TWENTY-FIVE THOUSAND DOLLAR ($25,000.00) security deposit as paid according to **Schedule 4** herein attached. Such payment shall be due at the same time and in the same manner as payments made for purchases of motor fuels and shall be in addition thereto. During the term of this Agreement, Supplier shall have the right to apply all or part of said deposit to any sums owed by Customer to Supplier under the terms hereof. In such event, Supplier shall notify Customer of such application and Customer shall pay over to Supplier such amounts as may be necessary to restore the full amount of the security deposit to TWENTY-FIVE THOUSAND DOLLARS ($25,000.00). Supplier's application of all or any portion of the security deposit shall not relieve Customer from its obligations to make any payments due to Supplier nor prejudice Supplier's rights to exercise any remedy provided for herein, or at law, in consequence of Customer's default under the terms of this Agreement. Further, Customer hereby grants Supplier a security interest in all of Customer's business equipment, supplies, inventory and fixtures at the Location, in which Supplier shall have all the rights of a secured party under the terms of the Uniform Commercial Code, and which interest may be evidenced and/or perfected by the filing of a UCC-1 Financing and Fixture Filing Statement(s).

**24. JOINT AND SEVERAL LIABILITY.** In the event more than one person, firm, company or entity are named as Customer hereunder, each such named person, firm, company and entity shall be jointly and severally liable unto Supplier for the satisfaction of the obligations of Customer hereunder; and Supplier may look to any, all or any combination of them for such satisfaction thereof.

**25. INSTALLATION OF PETROLEUM PRODUCT DISPENSING AND OTHER EQUIPMENT.** Supplier shall cause, at its expense, the installation of petroleum product dispensing equipment and or accessories and/or fixtures at the Location as may be set forth on **Schedule 5** attached hereto and made part hereof.

Customer acknowledges that Supplier shall have the right to engage any qualified vendor for the purpose of acquisition and installation of the same or similar equipment described therein. The total cost to Supplier for the acquisition and installation of such equipment, accessories and fixtures shall be considered part of Supplier's branding investment under the terms of this Agreement.

**26. LEASED EQUIPMENT**. Customer acknowledges that any equipment, accessories or fixtures provided by Supplier under the terms of this Agreement may have been leased to Supplier by one or more leasing companies. In the event of a transfer or assignment of this Agreement, Supplier will continue to make any such equipment lease payments through the full term of any such lease(s).

**27. REPAIR OR EQUIPMENT OBLIGATIONS OF CUSTOMER**. Customer shall cause the repairs and/or maintenance upgrades at the Location; and install such equipment as may be specified in **Schedule 6** attached hereto and made part hereof at the commencement of this Agreement. Customer shall commence such work promptly and pursue the same diligently through completion as set for in said schedule and as a prerequisite to Supplier's performance and obligations under section 25 of this Agreement.

**28. CONTINGENCIES.** This Agreement and the rights and obligations of the parties hereunder is expressly contingent upon the approval of the Location, receipt of a survey of the Location supplied by Customer, the branding image and specifications therefor, and Customer's credit history by Supplier's supplier. Further, in the event Supplier is obligated to cause the installation or upgrade of any motor fuel dispensing equipment or accessories at the Location, this Agreement is expressly contingent upon Supplier obtaining financing, by lease or otherwise, for such obligations upon terms and conditions acceptable to Supplier; and contingent upon Customer's third party landlord (and the prime landlord at the Location, if applicable), if any, executing a Landlord's Acknowledgment and Equipment Waiver in such form satisfactory to Supplier and under which such landlord (and prime landlord) waives any right or claim, during the term of this Agreement, to the equipment, accessories, fixtures and branding image items installed by Supplier, and acknowledges Supplier's exclusive right to supply motor fuel to the Location for the full term hereof. Customer shall exercise good faith and make diligent efforts and cooperate with Supplier in obtaining the execution of such Landlord Acknowledgment and Waiver, in failure of which Supplier may terminate this Agreement.

**29. CROSS-DEFAULTS**. Any default by Customer under the terms of Paragraph 7 of this Agreement shall likewise constitute a default of Customer under the terms of any and all other agreements between these same parties, for the locations at 1407 West Carrier Parkway, Grand Prairie, Texas 75050, 9505 Wallsville Road, Houston, Texas 77013, and the Lake Murray parcel near Lake Murray, Oklahoma, if fully built, including without limitation, leases, motor fuel supply or commissioned sales agreements, purchase and/or sale agreement and other contracts, whether or not pertaining to the Location, or the other above-mentioned premises or locations or to the sale or purchase for resale of motor fuels or other products.

This provision shall also apply to the non-payment of funds for any agreements with Supplier's affiliates and related parties, including but not limited to any Customer non-payment of funds' defaults with any branded fuel supplier. In the event Customer is a tenant of a third-party landlord at the Location, and Supplier has acquired the written consent to this provision from such landlord by way of a separate document or agreement, a non-payment of funds' default by Customer under the lease shall be a default under this Agreement.

**30.  INSURANCE.**      Customer shall continuously maintain general liability insurance and liquor liability insurance with such coverage as may be approved by Suppier and naming Supplier as an additional insured; and Customer shall maintain workers' compensation insurance as required to be in full compliance with the Texas Workers Compensation Act and obtain Workers Compensation Insurance. Customer shall furnish Landlord certificates establishing that the insurance requirements contained herein are met and maintained, from time to time, and upon request by Supplier.  Additionally, Customer shall reimburse Supplier, by EFT on a monthly basis, for any all insurance premiums incurred by Supplier, during the term of this Agreement, for fire, casualty, hazard and liability insurance maintained by Supplier covering any equipment, accessories, fixtures and/or branding image items owned or leased by Supplier and installed at the Location. In the event that Customer fails to provide a certificate of insurance after written notice from Supplier, Supplier may obtain such insurance and charge Customer the actual cost of the insurance plus an administrative fee.

**31. USE OF TECHNOLOGY FOR PRICING SURVEY, INVENTORY MEASUREMENT, AND REPORTING OF SALES.**  Customer shall have the option to use electronic software reporting systems for conducting market surveys of posted motor vehicle fuel prices, electronic measurement and reporting of motor vehicle fuel inventory levels, and recording and reporting of motor vehicle fuel sales as may be offered and/or provided by Supplier, current systems including but not limited to Black Box, Opis, and Price Advantage technology ("Reporting Systems").  Supplier may offer and/or provide new Reporting Systems as new technology emerges.  In the event Customer elects to use such Reporting Systems, Customer shall be responsible for all applicable monthly charges and fees for the use of such Reporting Systems, with such monthly charges and expenses to be paid via electronic fund transfers (EFT / ACH) from Agent's account, and Customer agrees, further, to defend, indemnify and hold the Supplier, its subsidiaries, divisions, affiliates, agents and employees harmless from any and all claims, injuries, damages, losses or suits including attorney fees, arising out of or in connection with the use of such Reporting Systems.

**32. SPECIAL STIPULATIONS.**  Attached hereto and made part hereof is **Schedule 7** setting forth any special stipulations pertaining to this Agreement.  In the event, and to the extent that the special stipulations conflict with any of the foregoing provisions of this Agreement, the special stipulations  shall control.

*[signature page to follow]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Petroleum Products Supply Agreement to be executed on the date first written above.

**SUPPLIER**

**MOUNTAIN EXPRESS OIL COMPANY**



By: _____

Barry Bierenbaum, President

**CUSTOMER**

**SAMNOSH LLC**

By: _____

Gaurab Basnet, Member

**GAURAB BASNET**

By: _____

Gaurab Basnet, Individually

16

**SCHEDULE 1 - PROPERTY DESCRIPTION**

ADDRESS: 2439 Walnut Hill Lane, Dallas, Texas 75229

**LEGAL DESCRIPTION**

WALNUT STEMMONS IINDUS PK III REV
BLK 3-6512 LT 1C LESS ROW
ACS 0.6101
VOL2005123/9476 DD06082005 CO-DC
6512 003 01C00 2DA6512 003

DocuSign Envelope ID: 7E866609-9BCD-4CDP-AA54-3217ABA8F708

## SCHEDULE 2 – PRODUCTS TO BE PROVIDED EXCLUSIVELY BY SUPPLIER

1. Regular, Super and Premium Gasoline;

2. Diesel;

3. E85/and other Ethanol Blends;

4. Bio Diesel;

5. Ethanol Free Fuel;

6. Boutique Fuels (Future);

7. Natural Gas Related Fuels (Future);

8. Electric Car Charging Networks (Future);

9. Lubricants and Oils (Future)

10. Hydrogen Fuels (Future); and

11. Any other fuel known or currently unknown used to power automobiles, trucks, tractors, boats, lawn mowers, etc.

**SCHEDULE 3 – BRANDING**

The initial branding image to be installed at the Location; and the initial brand of motor fuels to be delivered to the Location for resale by Customer shall be 76 or EXXON, if approved. Provided, however, for diesel only, the parties agree that Mountain Express will, at its sole discretion, make best efforts to procure unbranded diesel from multiple sources for purchase by Customer for resale to its unbranded diesel customers. The number of unbranded diesel supply sources may vary from market to market and is based upon competitive conditions. Mountain Express, during the Term of this Agreement, shall have complete control of the hauler and sources for the diesel fuel. Customer, during the Term of this Agreement, will be responsible for ordering fuel in a timely manner from the hauler in order to ensure adequate diesel inventory at all times to support the unbranded diesel fuel business.

It is further agreed that from time to time unbranded diesel supply sources may change or be eliminated based on competition or market conditions. If that occurs Mountain Express will notify the Customer of such changes. It is further understood that Mountain Express has no control over these conditions and therefore some sources may be eliminated completely from further use.

**SCHEDULE 4 - ALTERNATIVE SECURITY DEPOSIT PROVISIONS**

The $25,000.00 Security Deposit shall be collected at a rate of $0.02 per gallon of fuel sold until such time as the balance has reached $25,000.00.

**SCHEDULE 5 - EQUIPMENT, ACCESSORIES AND/OR FIXTURES TO BE INSTALLED BY SUPPLIER**

1. Price Sign (New and/or Refaced)
2. Gasoline Canopy Imaging
3. Gasoline Fuel Dispensers (Non-Truck Island)
4. Oil Company Imaging -  76/EXXON in amount not to exceed $65,000.00

Copies of invoices for actual installed items to be attached and herein incorporated.

DocuSign Envelope ID: 7E866809-9BCD-4CDD-AA54-3217ABA8F398

## SCHEDULE 6

**CUSTOMER'S REPAIR/MAINTENANCE AND EQUIPMENT OBIGATIONS UPON COMMENCEMENT**

1. Customer will install 1 MPD with appropriate imaging.
2. Customer will build a 3,500 square foot C-Store at the Location.
3. Customer must maintain landscaping in accordance with oil company brand standards.
4. Customer must clean and maintain restrooms in accordance with oil company brand standards.
5. Customer must clean and maintain the site and inside store in accordance with oil company brand standards.

Customer shall open the C-Store for business no later than October 2019. In the event that Customer fails to meet this deadline, Customer shall be responsible for penalty fees of $1,000.00 per day for each day in which the business is not operating after the deadline, by means of a reduction in the final payment of the upfront funds, which is payable upon completion of the project. A reasonable determination for assessing the penalty fees shall be made by Supplier taking into account all of the facts and circumstances, including but not limited to, any unforeseen delays that arise which are beyond the control of the Customer.

Customer shall provide all estimates, scopes of work, orders, and site plans supplied by any contractor to Supplier, who shall have final approval for all location improvements.

## SCHEDULE 7 - SPECIAL STIPULATIONS

**CREDIT CARD FRAUD SKIMMING.** Supplier shall have the right to immediately charge back to the Customer any credit card "charge-backs" from the Supplier's Supplier immediately. In addition, Customer is responsible for any credit card fraud which may occur at the **Location** including Skimming.  Skimming is the theft of credit card information.  This theft occurs when a third-party card-reading device is installed either outside or inside a fuel dispenser or other card-swiping terminal.  This device allows a thief to capture a customer's credit and debit card information, including their PIN, with each card swipe. Customer is responsible for any credit card or debit card information theft and the fraudulent charges that are a result of Skimming.  Customer is required to daily check the Pumps and card swiping terminals for possible sources of Skimming.

**FIRST RIGHT OF REFUSAL.** Supplier shall have a first right of refusal in the event Customer receives a bona fide offer to purchase the Location during the term of the Agreement. In the event that Supplier declines to purchase the property, Supplier shall have the right to renegotiate the Agreement and any ancillary contracts associated with the Location prior to the sale.

**UPFRONT PAYMENT.** Supplier agrees to pay dealer $325,000.00 in upfront funds once the following conditions have been satisfied:
1.  Credit Check has been completed and approved.
2.  Background check has been completed and approved.
3.  All documentation has been completed and fully executed including a Landlord Waiver.
4.  Ownership and title of the property have been verified.
5.  Supply Agreement is fully executed and agreed to.
6.  No disputes as to the branding of the location.

In the event that these conditions are not met, no upfront funds will be provided to Customer, and this Agreement shall be considered null and void immediately, with no further performance required by either Supplier or Customer.

**EFFECTIVE DATE.** The Effective Date of this Agreement is ___January 9, 2019_____.

## CERTIFICATION OF INSPECTION
## CANOPY STRUCTURE

I hereby certify, to the best of my knowledge, that the canopy structure at 2439 Walnut Hill Lane, Dallas, Texas 75229, is structurally sound. The canopy will be further evaluated by Total Imaging, Inc., or another MEX approved vendor, and in the event the canopy is found not to be structurally sound, I hereby agree to cover any and all costs associated with the repairs necessary to make it structurally sound.

A copy of the inspection report will be attached to this Certification.

By: _Gaurab Basnet_
DocuSigned by:
3D5661ABE1924DC...

Gaurab Basnet

**CERTIFICATION OF TANK CLEANING**

I hereby certify that the underground motor fuel storage tanks have been properly cleaned within the last one hundred and eighty (180) days, or that cleaning has been rendered unnecessary, so as to comply with the requirements of Paragraph 11 of this Agreement. In the event that a cleaning of the tanks becomes necessary, I hereby agree to cover any and all costs associated with the cleaning and will send appropriate documentation to MEX.

A copy of the invoice or other such documentation provided by a contractor has been attached to this Certification.

By: _Gaurab Basnet_
    DocuSigned by:
    3D5661ABE1924DC...

Gaurab Basnet

**CERTIFICATION OF TANK INSPECTION/INTEGRITY**

I hereby certify that the underground motor fuel storage tanks have been properly inspected pursuant to the requirements of Paragraph 11 of this Agreement. In the event the motor fuel storage tanks are found to be structurally deficient, I hereby agree to cover any and all costs associated with the repairs necessary to make them structurally sound.

A copy of the inspection report has been attached to this Certification.

By: _Gaurab Basnet_

Gaurab Basnet

## CERTIFICATION OF BUILDING PERMITS

I hereby certify that in the event Building Permits are required for any necessary repairs, upgrades, equipment installation, branding, or otherwise, at 2439 Walnut Hill Lane, Dallas, Texas 75229, that all required Building Permits will be applied for within five (5) days of receiving notice that Building Permits are necessary. Copies of applications and Building Permits, when received, shall be provided to MEX within five (5) days of application and/or receipt.

By: _Gaurab Basnet_

Gaurab Basnet

**Mountain Express Oil Company**

Credit Card Schedule

| Sales at Store | | Notice to MEX | $$$ to MEX | $$$ to Customer |
|---|---|---|---|---|
| | | | | |
| Monday | | Tuesday | Wednesday | Thursday |
| Tuesday | | Wednesday | Thursday | Friday |
| Wednesday | | Thursday | Friday | Monday |
| Thursday | | Friday | Monday | Tuesday |
| Friday | | Monday | Monday | Tuesday |
| Saturday | | Monday | Monday | Tuesday |
| Sunday | | Monday | Tuesday | Wednesday |

Billing Terms

Load to Load
Payment is due at the earlier of
10 days or the date a new load
is delivered.

7 Days
Payment is due within 7 days
from date of delivery.

(Assuming 7 day payment terms)

| Delivery Date | Draft Notice | Payment Due |
|---|---|---|
| | | |
| Saturday | Friday | Monday |
| Sunday | Friday | Monday |
| Monday | Friday | Monday |
| Tuesday | Monday | Tuesday |
| Wednesday | Monday | Wednesday |
| Thursday | Tuesday | Thursday |
| Friday | Wednesday | Friday |

## Mountain Express Oil Co. Site Inspection Report

### Exterior

| | |
|---|---|
| Main Price ID Functional and Lighted | 3 |
| Main Price ID Free of Temporary Sign | 1 |
| Price ID Sign and Pole well maintained | 1 |
| Landscape Free of Trash | 1 |
| Landscape Grass Cut and Neat | 2 |
| Parking Lot Neat & Clean, Free of Trash | 1 |
| Freshly Painted Curbs & Parking Lines | 1 |
| Any Pot Holes in Parking Lot | 1 |
| Parking Lot & Landscape Area Clean and Well Maintained | 1 |
| No Abandoned or For-Sale Vehicles on Premises | 1 |
| Perimeter Free of Signage. If Yes, EM Signs Present | 1 |
| Perimeter Yard Lights Operational, Free of Dirt | 1 |
| Air Hose & Water Available and Working | 1 |
| Dumpster Area Clean and Without Debris | 1 |
| No Storage or other Objects by Dumpster | 1 |
| All MPDs Functioning Correctly | 2 |
| All MPDs Clean, Free of Spider Webs/Dirt | 2 |
| Nozzles and Hoses Clean & Free of Dirt | 1 |
| All MPDs Free of Hand-Written Signs/Promotions | 1 |
| Pump Facings/Skirts/Sides Clean, Free of Dirt/Damage | 1 |
| Current POP Present and Clean | 2 |
| Credit Cards Holders Present | 1 |
| Plenti Orange or 5 Step & White Plenti Partner Decals Present | 1 |
| Speedpass+ QR Codes Present | 1 |
| Grade Activators & MPD Stickers Free of Damage | 1 |
| Credit Card Reader Working | 1 |
| Receipt Paper Present | 2 |
| Bollard Posts Clean, Painted and Undamaged | 1 |
| Pump Island Curbs Clean and Well Maintained | 1 |
| Trash Receptacles Clean & Not Overflowing | 2 |
| Valet Supplies Present (Squeegees, Paper Towel, Water) | 3 |
| Canopy Clean and Well Maintained | 1 |
| Canopy Lights Working | 2 |
| Spanner Clean, Lit and Well Maintained | 1 |
| Exterior Building Clean, Painted and Well Maintained | 1 |
| Building Side Walk Clean, Unobstructed and Pressure Washed | 1 |
| Store Windows Clean and Free of Excess Signage | 1 |
| Front Door Clean & Free of Unnecessary Signage | 1 |
| Store Operation Hours Posted | 1 |
| All Exterior Lights Working | 1 |

### Interior

| | |
|---|---|
| Interior Odor Free | 1 |
| Interior Temperature Comfortable | 1 |
| Interior Waste Receptacles Clean and Not Overflowing | 1 |
| Clean Floors | 2 |
| Doors, Walls, Ceiling, Vents Clean and Free of Dirt | 1 |
| Ceiling Tiles Clean and No Spots | 1 |

| | |
|---|---|
| All Inside Lights Working | 2 |
| All Aisles Free of Clutter and Open to Allow Easy Access | 1 |
| Shelves Clean and Free of Dirt | 1 |
| Fully Stocked and Merchandised | 1 |
| Beverage Bar Clean and Inviting | 1 |
| Beverage Bar Equipment Clean and Fully Operational | 1 |
| Coolers Frames and Glass Clean, Free of Spills / Fully Stocked | 1 |
| Cooler Lights Working | 2 |
| No Storage in Customer Visible Sales Area | 1 |

## Bathroom

| | |
|---|---|
| Bathrooms Open to Customers | 1 |
| Bathroom Doors Properly Decaled | 1 |
| Bathroom Doors Clean and Lock Functioning Correctly | 1 |
| Bathroom Equipment Present: Commode, Mirror, Dispensers | 1 |
| Bathroom Sink & Mirror Free of Scratches and Cracks | 1 |
| Bathroom Floors Clean and Neat | 1 |
| Bathroom Walls Clean and Free of Graphiti | 1 |
| Bathroom Supplies Present (Soap, Paper towel, Toilet paper) | 3 |
| Bathroom Trash Clean and Not Overflowing | 2 |

## Customer Service

| | |
|---|---|
| No Hand-Written Signs in the Store | 1 |
| Check-out Area Clean and Clutter Free | 1 |
| POP Present (Smart / Plenti / CC Apps / Synergy Offer) | 1 |
| CSR in Uniform Shirt | 4 |
| CSR Wearing NAME tag | 2 |
| CSR Well Groomed | 1 |
| CSR Familiar with Oil Co / Offer Programs | 4 |
| CSR Greeted You | 2 |
| CSR Offer a Sincere and Friendly Closing Remark | 1 |

## Misc

| | | |
|---|---|---|
| Pornographic Magazines on Display | | 1 |
| Any Type of Drug Paraphernalia on Display | | 1 |
| | Total Points | 100 |

Store #590                                    Revised 10.2018

# EXHIBIT B

# Purchase Summary

Account: SADIQ CORPORATION PC4082W (1-66040059)

**Historical Access**

This site provides historical data prior to January 1st, 2023. Current acccount information can be found by going to: **dealer.gpmempire.com**

**Search Criteria**

**Year:** 2018
**Report:** Gallons
**Group:** Product Line

25 >

Filter Results

| Product Line | | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DIESEL FUELS | | 8,015 | 6,509 | 4,991 | 5,977 | 6,940 | 7,407 | 9,365 | 7,400 | 4,990 | 6,925 | 6,535 | 5,225 | 80,279 |
| ETHANOL GASOLINE | | 81,734 | 73,080 | 82,285 | 78,028 | 84,298 | 83,802 | 95,729 | 81,412 | 72,078 | 86,714 | 77,218 | 59,318 | 955,696 |
| 2018 Totals: | | 89,749 | 79,589 | 87,276 | 84,005 | 91,238 | 91,209 | 105,094 | 88,812 | 77,068 | 93,639 | 83,753 | 64,543 | 1,035,975 |
| 2017 Totals: | | 70,633 | 75,956 | 93,940 | 79,408 | 93,949 | 78,720 | 89,445 | 75,401 | 85,421 | 71,417 | 77,098 | 91,375 | 982,763 |
| Change: | | +27.06% | +4.78% | -7.09% | +6.79% | -2.89% | +15.87% | +17.50% | +17.79% | -9.78% | +31.12% | +8.63% | -29.36% | +5.41% |

1 to 2 of 2 records

Previous  1  Next

# EXHIBIT C

**Report:** Units
**Group By:** Product Group

| Product Group | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total | Avg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Diesel | 5,511 | 1,001 | 1,994 | 996 | 1,983 | 500 | 0 | 3,951 | 4,852 | 3,272 | 997 | 500 | 25,557 | 2,130 |
| Gasoline | 44,733 | 33,087 | 29,619 | 14,254 | 23,290 | 32,456 | 23,752 | 28,084 | 28,136 | 31,139 | 24,254 | 23,448 | 336,252 | 28,021 |
| **2020 Total:** | **50,244** | **34,088** | **31,613** | **15,250** | **25,273** | **32,956** | **23,752** | **32,035** | **32,988** | **34,411** | **25,251** | **23,948** | **361,809** | **30,151** |
| **2019 Total:** | **32,479** | **53,548** | **58,219** | **49,676** | **48,884** | **48,271** | **48,595** | **39,135** | **40,168** | **40,949** | **33,245** | **30,805** | **523,974** | **43,665** |
| Change: | +54.70% | -36.34% | -45.70% | -69.30% | -48.30% | -31.73% | -51.12% | -18.14% | -17.87% | -15.97% | -24.05% | -22.26% | -30.95% | -30.95% |

Prices ▾   Orders ▾   Documents ▾   Cards ▾   Reports ▾

Quick Filter

25 ◇

1 to 2 of 2 records

**Note:** Taxes are not included in this report by default.

# EXHIBIT D

4:07

 **Me**

Re: Re: Re: Valero pull Gas order 2439 walnut hill ln Dallas 

From nainakhan2004@yahoo.com

To dispatchda@duprelogistics.com & 5 more

May 12, 2021 at 5:27 AM ⌄

We didnt receive delivery yet? Can you send us ETA

Sent from Yahoo Mail on Android

On Mon, May 10, 2021 at 10:58 AM, Dupre Energy DA Dispatch Group <dispatchda@duprelogistics.com> wrote:

Received Thanks 3599990

Ferlicia

Dupre Energy DA Dispatch Group
Energy Distribution Services

Dupré Logistics, LLC
Always forward thinking.

201 Energy Pkwy, Suite 500
Lafayette, LA 70508
866-254-7839
dispatchda@duprelogistics.com
www.duprelogistics.com


Delete


Archive


Move


Reply

• • •
More

4:06

 **Me**

Valero pull Gas order 2439 walnut hill ln Dallas ⭐

From nainakhan2004@yahoo.com

To Ashley Thibodeaux & 2 more

Oct 1, 2021 at 10:07 PM ⌄

We are total out with gas . What time we are getting delivery

[Sent from Yahoo Mail for iPhone](#)

On Thursday, September 30, 2021, 9:50 PM, Ashley Thibodeaux <asthibodeaux@duprelogistics.com> wrote:

This is the earliest ETA we can provide at this time.

**Ashley Thibodeaux**
Inventory and Planning Manager
Energy Distribution Services

**Dupré Logistics, LLC**
Always Forward Thinking.

201 Energy Pkwy, Suite 500
Lafayette, LA 70508
p 337-735-2029
c NA
[asthibodeaux@duprelogistics.com](#)
[www.duprelogistics.com](#)

CONFIDENTIALITY NOTICE: This e-mail, including any attachments, has been sent for the sole use of the intended recipient(s). It may contain information that is confidential and proprietary. The confidential and proprietary status of the information is not waived by having been sent by e-mail transmission. If you are not the intended recipient, you are not authorized to review, disclose, copy, distribute or use any of the information contained in this transmission. If you have received this e-mail in error, please notify the sender by reply e-mail

|  Delete |  Archive |  Move |  Reply | ••• More |
|---|---|---|---|---|

4:05

 

 **Me**

**Re: Valero pull Gas order 2439 walnut hill ln Dallas**

From nainakhan2004@yahoo.com
To patrick.howell@mtnexpressoil.com & 2 more
Nov 7, 2021 at 11:21 AM ⌄

Hello. We are waiting for delivery and there is no show up till now. We are almost out of gas. Please give us exact information for delivery

Sent from Yahoo Mail for iPhone

On Sunday, November 7, 2021, 7:21 AM, Naina Khan <nainakhan2004@yahoo.com> wrote:

Hello. What is ETA?

Sent from Yahoo Mail for iPhone

On Saturday, November 6, 2021, 7:41 AM, Naina Khan <nainakhan2004@yahoo.com> wrote:

Please send me tonight./am shift
Regular 7000
Super.   500
Diesal.   1000

Sent from Yahoo Mail for iPhone

On Tuesday, November 2, 2021, 1:25 PM, Naina Khan

| 
Delete | 
Archive | 
Move | 
Reply | 
More |

4:06

What is ETA?? Sent from Yahoo Mail for iPhone

**View message**

---

**Ashley Thibodeaux**                                      10/15/21

ETA is lla 10/16 Ashley Thibodeaux Inventory and Planning Manager Energy Distribution Ser…

**View message**

---

**NK** Me

## Re: Valero pull Gas order 2439 walnut hill ln Dallas

From nainakhan2004@yahoo.com
To Ashley Thibodeaux & 4 more
Oct 15, 2021 at 11:39 PM ⌄

We were told for 5am. Please send this delivery ASAP. We place order yesterday and it's more than 24 hours.

[Sent from Yahoo Mail for iPhone](#)

**View more**

↩ Reply     ↩↩ Reply All     ⋯ More

---

**NK** Me                                                  10/18/21

Please send us delivery tomorrow pm Regular.

🗑 Delete     ✉ Archive     📤 Move     ↩ Reply     ⋯ More

4:07

  Me

## Re: Valero pull Gas order 2439 walnut hill ln Dallas



From nainakhan2004@yahoo.com
To asthibodeaux@duprelogistics.com & 4 more
Apr 18, 2021 at 1:02 AM

We didnt get delivery yet

Sent from Yahoo Mail on Android

On Fri, Apr 16, 2021 at 8:37 PM,
asthibodeaux@duprelogistics.com
<asthibodeaux@duprelogistics.com> wrote:

> The ETA stands as is. We cannot move this order up which is why you were informed once we accepted the load. Thank you.
>
>
> **Ashley Thibodeaux**
> Inventory and Planning Manager
> Energy Distribution Services
>
> **Dupré Logistics, LLC**
> Always forward thinking.
>
> 201 Energy Pkwy, Suite 500
> Lafayette, LA 70508
> p 337-735-2029
> asthibodeaux@duprelogistics.com
> www.duprelogistics.com
>
> CONFIDENTIALITY NOTICE: This e-mail, including any

 Delete    Archive    Move    Reply    More

4:18

< **RE: 2439 walnut hill lane dallas**  AA

**Cc:** Edwin Bitegeko <Edwin.Bitegeko@mtnexpressoil.com>;
Alicia Pawlowski <Alicia.Pawlowski@mtnexpressoil.com>
**Subject:** Re: 2439 walnut hill lane dallas

Team,

Please help Naina.

---

**From:** Naina Khan <nainakhan2004@yahoo.com>
**Sent:** Tuesday, June 29, 2021 11:01:43 AM
**To:** Turjo Wadud <turjo.wadud@mtnexpressoil.com>
**Subject:** Fw: 2439 walnut hill lane dallas

Mr Turjo. This is not fair with us to have fuel supply so late every time.
We are facing problems due to your team who has not done immiging stuff at my store and we have price sign issue. My canopy is not done half of Valero signs. My building front colors are red. This is all we are facing from jan 2019. I don't understand the way you guys work. I have two more locations with other jobbers but I never face this attitude.
Please help our site to do all this work done asap and make your fuel guys committed with delivery. Or you can cancell the contract.  I have sent multiple times messages and emails to preeti and other team members but no actions have been taken.
I hope you will try to resolve the issues.

Sent from Yahoo Mail on Android

----- Forwarded Message -----
**From:** "Naina Khan" <nainakhan2004@yahoo.com>
**To:** "asthibodeaux@duprelogistics.com"
<asthibodeaux@duprelogistics.com>
**Cc:** "Energy_DA_Dispatch_Group@duprelogistics.com"
<Energy_DA_Dispatch_Group@duprelogistics.com>

| Received, thank you. | Acknowledged. | Thank you. |

 Delete    Archive    Move    Reply All    More