IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| IN RE: | § CASE NO. 23-90147-11 |
| | § JOINTLY ADMINISTERED |
| MOUNTAIN EXPRESS OIL COMPANY, | § HOUSTON, TEXAS |
| ET AL, | § THURSDAY, |
| | § MAY 25, 2023 |
| DEBTORS. | § 1:00 P.M. TO 2:02 P.M. |

## **MOTION HEARING** (HYBRID)

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE NEXT PAGE

**(Recorded via CourtSpeak.)**

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:


 FOR THE DEBTOR:                           PACHULSKI STANG ZIEHL & JONES
                                           Jeffrey N. Pomerantz, Esq.
                                           10100 Santa Monica Blvd.
                                           13th Floor
                                           Los Angeles, CA  90067-4003
                                           310-277-6910



FOR UNSECURED CREDITORS
COMMITTEE:                                 MCDERMOTT WILL & EMERY, LLP
                                           Charles Gibbs, Esq.
                                           2501 N. Harwood St., Ste. 1900
                                           Dallas, TX  75281
                                           214-295-8063



FOR FIRST HORIZON BANK, AS
DIP AGENT:                                 GREENBERG TRAURIG, LLP
                                           John D. Elrod, Esq.
                                           Terminus 200
                                           3333 Piedmont Road NE
                                           Suite 2500
                                           Atlanta, GA 30305
                                           678-553-2259



(Please also see Electronic Appearances.)

1                    **HOUSTON, TEXAS; THURSDAY, MAY 25, 2023; 1:00 P.M.**

2              THE COURT:  All right.  Good afternoon, everyone.

3        This is Judge Jones.  The time is 1:00 o'clock Central, today

4        is May the 25th, 2023.  This is the Docket for Houston, Texas.

5              On the 1:00 o'clock Docket, we have the jointly

6        administer cases under Case Number 23-90147, Mountain Express

7        Oil Company.

8              Folks, please don't forget to record your electronic

9        appearance.  If this is a first, that's a quick trip to my

10       website, a couple of mouse clicks.  It will take you less than

11       20 seconds.  You can do that at any time prior to the

12       conclusion of the hearing.  But it is the way that we note your

13       initial appearance.

14             If you do choose to speak this afternoon, the first

15       time that you do so, if you would, please state your name and

16       who you represent.  That really does help the court reporter do

17       what is a very difficult job on these hybrid hearings by giving

18       them a good point of reference.

19             I have activated the hand-raising feature just

20       because of the number of parties that were coming in and out.

21       If you know you're going to be speaking and haven't already

22       done so, give me a five-star on your telephone.  You can

23       obviously change your mind at any time.

24             Finally, we are recording this afternoon using

25       CourtSpeak, and we will have the audio up on the Docket shortly

1    after the conclusion of the hearing this afternoon.

2            Mr. Pomerantz, good afternoon.

3            MR. POMERANTZ:  Good afternoon, Your Honor.  With me

4    in the virtual courtroom today are the Debtors' Chief

5    Restructuring Officer, Michael Healy from FTI Consulting, as

6    well as the Debtors' Independent Directors, Craig Barbarosh and

7    Larry Perkins, and also the Debtors' investment banker, Geoff

8    Richards from Raymond James.

9            There's one matter on the hearing today, Your Honor,

10   and that's our application relating to the independent

11   directors.  And I intend to proffer the testimony of

12   Mr. Barbarosh after I conclude my opening remarks.

13           THE COURT:  All right.

14           MR. POMERANTZ:  Pursuant to the application before

15   Your Honor, the Debtors request a court order ratifying the

16   Debtors' appointment of Mr. Barbarosh and Mr. Perkins as the

17   Debtors' independent directors.

18           Mr. Barbarosh and Mr. Perkins were appointed to the

19   Debtors' board on March 15th, 2023, three days before the

20   Debtors commenced these bankruptcy cases.  Neither gentleman

21   has any pre-petition relationship with the Debtors or their

22   insiders.

23           Each of them is a party to an independent services

24   agreement, under which they each receive $25,000 per month from

25   the Debtors for their services.

1          Both Mr. Barbarosh and Mr. Perkins have decades of

2    experience as restructuring advisors.  Mr. Barbarosh has been a

3    nationally recognized real estate lawyer with the Pillsbury and

4    Katten firms for over 30 years and substantial recent

5    experience serving as independent directors for several

6    distressed companies who have gone through Chapter 11,

7    including Payless Shoes and Ruby Tuesday's.

8          Mr. Perkins also makes his living in the

9    restructuring world, as he is a Managing Director of

10   SierraConstellation, a well known financial advisory firm.  He

11   has advised companies for more than 20 years and has also been

12   an independent director, including for the parent of

13   (indiscernible).

14         More details on both gentlemen's background and

15   experience are contained in the exhibits to the application.

16         And the Debtors retained Mr. Barbarosh and

17   Mr. Perkins in light of the commercial relationships that

18   existed between the Debtors and certain parties owned and

19   controlled by the Debtors' founding shareholders and two other

20   board members.

21         No one questions the need for independent directors

22   in these cases.  In fact, the Committee and the United States

23   Trustee both suggest that it is a correct and important step in

24   these cases.

25         No one questions the expertise of Mr. Barbarosh and

1    Mr. Perkins to fulfill their roles.  Again, neither the U.S.

2    Trustee or the Committee have any questions or clarifications.

3         And no one questions the role they are to play in

4    these cases.  Both the Committee and the U.S. Trustee have

5    advised that the role is important.

6         Nor does anyone question their compensation or their

7    disinterestedness.

8         So why are we here?  Well, we're here because the

9    United States Trustee and the creditors' Committee question why

10   the Debtors filed the application because, in their view, it's

11   unnecessary and the independent directors were appointed pre-

12   petition by a valid corporate action.  In fact, both the U.S.

13   Trustee and the Committee wouldn't even have objected today if

14   all the Debtors had done was continue the three-day pre-

15   petition retention post-petition without application.

16        Your Honor, the reason we are here is simple.  I, as

17   lead counsel to the Debtors, recommended to the board that the

18   application be filed and the board accepted my recommendation.

19   And why did I recommend that the application be filed?

20        Over the last 15 years, the appointment of

21   independent directors in restructuring cases has become

22   relatively commonplace.  Independent directors have been used

23   in a variety of contexts in Chapter 11, including, as is the

24   case here, to evaluate transactions involving affiliates and to

25   address potential conflicts that could arise in the sale

1    process.

2         The restructuring world has recognized that having

3    independent directors is helpful to ensure the integrity and

4    honesty of the Chapter 11 process in the case overall.  But at

5    the same time, as the process has been developing, there has

6    been substantial push-back from creditors' Committees and

7    others, who question the manner in which independent directors

8    are chosen, their relationship with stakeholders, their

9    compensation, and the rules of engagement.

10        As Your Honor knows, I routinely represent both

11   Debtors and creditors' Committees.  And I have been a critic of

12   the independent director process, insofar as the pre-petition

13   appointment under the stealth of night, with no transparency or

14   creditor involvement, I believe damages the Chapter 11 process.

15        I specifically referenced the Court to the Debtors'

16   use of the independent director in the Neiman Marcus case,

17   where I was one of the professionals representing the

18   Committee.  Following the Court's questioning of one of the

19   Debtors' pre-petition independent directors, the debt -- the

20   Court expressed significant concern with the ability and the

21   scope of such director.  In such matter, no application was

22   filed and no transparency, which was warranted in that case,

23   existed.

24        Short of 2004 applications, which is only a discovery

25   tool, or other drastic litigation alternatives, there is simply

1  no way to shed appropriate light on the independent director

2  process as it has developed, which has left many skeptical and

3  suspicious of the process.  Alternatively, such light might be

4  shined in subsequent hearings when the process has gone on too

5  long and it's too destructive in the case to do anything

6  different.  And that, Your Honor, is why I recommended to the

7  board that the application be filed, to add much needed

8  transparency and clarity to the process.

9       Rather than commend the Debtors for giving the U.S.

10 Trustee and the Committee a forum to evaluate the terms and

11 conditions under which the independent directors were chosen,

12 both watchdogs of the Chapter 11 process have, remarkably,

13 objected.  They have objected arguing that the application is

14 not necessary and amounts to a comfort order.

15       Further, the United States Trustee goes as far as to

16 suggest that the Bankruptcy Court does not provide for such

17 approval, as if to suggest that, absent a specific Code

18 provision authorizing an action, the Court should not approve

19 that action.

20       Whether or not the motion was necessary -- and this

21 is the point -- Section 105 authorizes the Court to issue any

22 note -- orders that are necessary or appropriate to carry out

23 the provisions of Title 11.  The Court -- and this Court and

24 courts throughout the country routinely enter orders

25 appropriate in the administration of a case.  One simple

1      example is a critical vendor order.

2           The U.S. Trustee and the Committee cannot possibly be

3      arguing that shedding light on how, why, and on what terms the

4      independent directors are appointed in Chapter 11 cases is not

5      appropriate, nor reasonable, nor within the authority of this

6      Court.

7           There is also nothing wrong or extraordinary with any

8      party seeking a comfort order for the Court.  It's done all the

9      time.  The irony is that the Debtor filed the motion to provide

10      the U.S. Trustee and the Committee comfort regarding the

11      Debtors' corporate governance.

12           The order we are seeking not only provides the

13      Debtors and the independent directors knowledge that their

14      retention won't be challenged in hindsight, after

15      (indiscernible), but it also should be providing comfort to the

16      Trustee and the Committee that the process was fair,

17      transparent, and providing the with the forum opportunity to

18      address any concerns they may have now.

19           The forum and opportunity exists now.  And if

20      subsequent events occur, that's if the Committee or the U.S.

21      Trustee wants to raise them with the Court, the forum will

22      remain in -- available.

23           And Your Honor, the process has worked as it's

24      intended.  The Committee raised concerns with the corporate

25      documentation regarding how meetings of the special transaction

1   Committee -- a Committee comprised of the independent directors

2   -- would be called; how we determine whether a matter is within

3   the purview of the special transactions Committee; and whether

4   a replacement director would be subject to court approval.  We

5   addressed each of those concerns in the resolution that is

6   attached to our reply and appears on our exhibit list as Docket

7   -- at Docket Number 435, it's Item 10.  Without the

8   application, the Committee would not have had a vehicle to

9   address those concerns.

10          The Committee also objects to the paragraph of the

11  order, which is Paragraph 6 in the amended owner, which has two

12  components:

13          First, consistent with the Barton Doctrine and the

14  Fifth Circuit's recent opinion in Highland, it requires parties

15  seeking to assert claims against the independent directors to

16  first seek permission from this Court.

17          There is nothing remarkable about this Court acting

18  as a gatekeeper.  It does so when it decides whether to grant

19  the Committee standing to prosecute estate claims that have

20  been waived.  And such a provision will discourage baseless

21  litigation, thereby conserving estate assets.  A gatekeeper

22  provision is, therefore, in the best interests of the Debtors'

23  estates and should be approved.

24          Nor is there anything remarkable about establishing

25  the standard of care by which independent directors,

1    disinterested volunteers who do -- agree to become involved in

2    complex and litigious restructurings, will have their conduct

3    evaluated by the Court.

4              Importantly, both independent directors were

5    employed, first, three days prior to the bankruptcy.  This is

6    not a case where independent directors are seeking to cleanse

7    retroactively pre-petition conduct.

8              The Committee tries to equate establishing a

9    prospective standard of care with a retroactive release.  They

10   are not the same thing.  An exculpation in a plan retroactively

11   cleanses conduct which has already occurred and releases

12   parties from what can otherwise be actionable conduct.

13   Conversely, setting the standard of care prospectively is not a

14   release of any kind.

15             The Committee argues that the independent directors

16   already are protected because they are indemnified by the

17   Debtor, rendering the bar to negligence claims superfluous.

18   But again, the Committee misses the point.  It is exactly

19   because the Debtors indemnify the independent directors that

20   the go forward exculpation is warranted.  If the independent

21   directors are exposed to negligence claims, they will ask the

22   Debtors to fund their defense, which the Debtors will be

23   required to do under their bylaws.  And if a claim of

24   negligence is proven, then the independent directors will ask

25   the Court -- will ask the Debtors to satisfy any judgment.

1          So how is the estate benefitted by permitting people

2     to sue the independent directors for negligence when the estate

3     will foot the bill?  And Your Honor, I've practiced for 32

4     years and I don't think I've ever seen a suit against a

5     director post-petition for negligence.

6          In Highland, Your Honor, the Fifth Circuit analogized

7     independent directors to Trustees who, under Fifth Circuit law,

8     are entitled to exculpation for negligence.  So, too, should

9     this Court rule that the independent directors in this case are

10    entitled to the same protection.

11         Your Honor, we have been trying to ask ourselves why

12    the Committee, who should be (indiscernible) this application,

13    has filed a twenty-page application -- objection with 78

14    footnotes.  We have not been able to answer that question and

15    request that the Court overrule the objections and grant the

16    application.

17         Your Honor, at this time, I would like to move into

18    evidence Exhibits 1 through 10 attached to the Debtors' witness

19    and exhibit list, which can be found at Docket 435.

20         THE COURT:  All right.  Before I do that, let me see.

21    Mr. Gibbs, did you intend on making any opening remarks?

22         MR. GIBBS:  I was.

23         THE COURT:  Good afternoon.

24         MR. GIBBS:  Good afternoon, Your Honor.  Chuck Gibbs

25    with McDermott Will & Emery, proposed counsel for the

1   Committee.

2          I was intending to argue my objection.  I assumed

3   what I just heard was the argument in favor of the motion,

4   rather than opening remarks.  But to the extent that was --

5   those were opening remarks and we're going to hear a more

6   fulsome argument in favor of the motion, I will try to

7   condense.  But I think it's probably in the best interest for

8   me, at whatever time the Court think it's appropriate, to

9   make --

10          THE COURT:  Sure.  Just so you -- let me ask you, if

11   I could -- and I read the Committee's objection.

12          MR. GIBBS:  Uh-huh.

13          THE COURT:  And you know, this is a topic that I have

14   spoken on a lot.

15          MR. GIBBS:  Uh-huh.

16          THE COURT:  And this -- it has always been my view

17   that this is exactly what Debtors should be doing for the very

18   reasons -- or some of the reasons that Mr. Pomerantz

19   identified, and so that there is transparency and clarity to

20   the process, so there is no question as to who these folks are

21   and how they came to be.  And obviously, you know, they're

22   subject to reasonable inquiry prior to a hearing, if that's the

23   case.  And it just puts everything out front and I really,

24   really like that.

25          Now I picked up in your objection that you were

1    complaining somewhat, not about the appointment, but the

2    process under which they operate.  And I didn't see anything in

3    either order that somehow gave credence to or blessed the

4    process.  It was just simply the appointment and compensation

5    of the independent directors.  Did I miss something?  Did I

6    misunderstand your objection.  And this isn't a substitute for

7    your argument.  I'm just trying to get context.

8         MR. GIBBS:  We -- our argument is and our position is

9    that we have no issue with the appointment by the board, on

10   approval of the shareholders pre-petition, of these two

11   gentlemen as independent directors.  They have full authority

12   to do that under Georgia law and we haven't challenged that --

13   the bonafides of those actions.

14        And corollary to that, we don't believe the Court

15   needs to approve and ratify a pre-petition action.

16        And I fully agree with you that there is significant

17   benefit to transparency.  However, in this case, it's not a

18   situation where they are asking Your Honor to approve a

19   proposed action.  They're asking you to ratify something they

20   had full authority to do.  We haven't challenged, nor do we

21   intend to challenge the terms of the engagement of these two

22   gentlemen --

23        THE COURT:  Right.

24        MR. GIBBS:  -- the independent director agreements,

25   the IDSA -- IDSA, I believe it's called, which is too close to

1   ISDA, so I try to stay away from that.

2           THE COURT:  Got it.

3           MR. GIBBS:  We don't challenge those terms.  We don't

4   challenge the compensation.  We don't -- we haven't any

5   challenge to their independence and have -- we have, in fact,

6   said we support the retention of -- lowercase -- independent

7   directors as a general rule, you know, by companies that are

8   entering into Chapter 11.

9           It's especially the case here because we have 97

10  percent of the stock owned by two individuals who received pre-

11  petition distributions.  And the concern in the absence of

12  those independent director appointments, they would have an

13  inappropriate control over the way the case proceeded, so we

14  applaud that.

15          THE COURT:  Right.

16          MR. GIBBS:  What we asked for in our -- in an effort

17  to see whether or not we needed to object to this motion --

18  forget for a moment that we don't think it's necessary --

19          THE COURT:  Got it --

20          MR. GIBBS:  -- but just we asked for the governance

21  documents.  The governance documents amplified our concerns,

22  rather than allayed our concerns.

23          THE COURT:  Right.

24          MR. GIBBS:  And Mr. Pomerantz is right, we have

25  worked with them consensually to modify -- or to address our

1    concerns and it has resulted in the supplemental resolution

2    that was, in fact, affixed to their reply.  And it addressed

3    the concerns we had that the independent directors were, based

4    on the existing governance documents, somewhat neutered.

5              THE COURT:  Right.

6              MR. GIBBS:  They couldn't really be independent, they

7    couldn't take action without the approval of the insider, non-

8    independent directors.

9              THE COURT:  Right.  But if we hadn't gone through

10   this process, would you have ever known?

11             MR. GIBBS:  Uh-huh, sure.

12             THE COURT:  You would have known.

13             MR. GIBBS:  I mean, yes, I could have done it non-

14   consensually through asking the Court for authority to take a

15   2004 --

16             THE COURT:  No, of course.

17             MR. GIBBS:  -- but --

18             THE COURT:  But I mean --

19             MR. GIBBS:  Yeah, we would have asked for the

20   documents, we assume the Debtor would have given them to us.

21   We would have said, well, wait a minute, guys, these

22   independent directors really aren't independent here because

23   they can't take the actions that an independent director should

24   take unless they go with a mother-may-I --

25             THE COURT:  Right.

1          MR. GIBBS:  -- to the insiders.

2          THE COURT:  So haven't --

3          MR. GIBBS:  And so --

4          THE COURT:  -- we been efficient in the process that

5     we've gone through?  I mean, it was put right out in front of

6     you, I mean, to say -- I mean, it caused you to ask the

7     question, okay, if we're going to go through this process, then

8     I want to understand how these two guys function.

9          MR. GIBBS:  Uh-huh.

10          THE COURT:  And it got -- because there was the

11     existence of the contested matter, you -- the Debtor could not

12     come up with a valid basis for, you know, not giving you every

13     possible thing you wanted on an expedited basis.  I mean, isn't

14     this just a great example of why this ought to be done in every

15     case?

16          MR. GIBBS:  No, I don't -- I mean, I think there's

17     benefit to framing the issue.

18          THE COURT:  Uh-huh.

19          MR. GIBBS:  I just don't think that the Court should

20     sanction ratification of pre-petition conduct by the board of

21     the company.  I -- we don't have any -- we don't have any issue

22     with it.  But let me, I guess, be more direct.

23          The issues were less about the retention --

24          THE COURT:  Right.

25          MR. GIBBS:  -- the engagement of these gentlemen,

1    their retention, the terms of their retention.  The motion made

2    no reference to what I'll call the "gatekeeper" provision.

3                   THE COURT:  Right.

4                   MR. GIBBS:  None whatsoever.  It didn't ask the Court

5    for permission to -- or for an order giving that.  It just

6    showed up in the draft order.

7                   THE COURT:  Right.

8                   MR. GIBBS:  And it's entirely different than the

9    ratification of their employment and the ratification --

10                   THE COURT:  So let me --

11                   MR. GIBBS:  -- of their terms.

12                   THE COURT:  Because I'm not ready to move on yet.

13                   MR. GIBBS:  Let me get my bottle of water.

14                   THE COURT:  Oh, of course, of course.

15                   I want to go back to the employment.

16                   MR. GIBBS:  Uh-huh.

17                   THE COURT:  So, if the request had been approve their

18    appointment effective as of the petition date, would you be

19    making a different argument?

20                   MR. GIBBS:  Talking about Westwind, I think, which is

21    your prior ruling.  It happened to have been filed on my

22    corner.

23                   THE COURT:  No, I mean, forget all that.  I mean,

24    just practically, if what you are -- if what you are generally

25    concerned about is that I'm somehow creating precedent of

1    validating pre-petition conduct by a Debtor's board, you know,

2    I honestly didn't think about it that way.

3         But if what you're -- and that's why I ask the

4    question.  If the request was appoint independent directors as

5    of -- effective as of the petition date, again, with the

6    advantages of having everything right out on the Docket for the

7    world to see, does that solve your problem or am I missing

8    something?

9         MR. GIBBS:  No, I don't think -- you're certainly not

10   missing anything, in my experience.  But does it -- I can't

11   tell you for sure, but my judgment is that we would not be here

12   today if their motion had been exactly what was filed by

13   Mr. Warner at his prior firm in Westwind, which was for

14   appointment of independent directors, because the resolutions

15   by which they were going to be appointed specifically said

16   effective on the petition date.

17        THE COURT:  Right.

18        MR. GIBBS:  These resolutions that appointed him were

19   not conditioned on or effective upon a subsequent event; they

20   just got hired --

21        THE COURT:  Right.

22        MR. GIBBS:  -- and got appointed, and they had

23   authority to do that under Georgia law.

24        THE COURT:  Right.  So, if --

25        MR. GIBBS:  And if they had said --

1          THE COURT:  No, my --

2          MR. GIBBS:  If they had --

3          THE COURT:  -- apologies.

4          MR. GIBBS:  -- said, Your Honor, approve the

5     appointment of these two gentlemen because their engagement is

6     conditioned on the filing of bankruptcy, and so now it's

7     technically a post-petition, I doubt if I would have been here.

8          THE COURT:  Right.

9          MR. GIBBS:  I would have been here if that motion

10    asked for that, for an order appointing them, and they put in

11    what's now Paragraph 6 because I think that's just wrong.  And

12    I -- there's a -- I think a -- do I need -- do you want to fix

13    that or no?

14         THE COURT:  Mr. Pomerantz, my phone says that that's

15    coming from your extension.  Did you hear that beep, as well?

16         MR. POMERANTZ:  I think I did.  I guess I could put

17    it on mute.  It could have been my iPad, sorry about that.

18         THE COURT:  Yeah, that's okay.

19         All right.  So, again, I want to work -- I'm really

20    curious because, again, I think this is such a great idea.

21    Again, I've advocated for it for, for a number of years.

22         MR. GIBBS:  Uh-huh.

23         THE COURT:  If the concerns it that you worry about

24    me reaching back pre-petition, I hadn't ever thought about it

25    that way and it's certainly something that I can fix with a

1    word tweak or two.  And so, if that solves that problem, I'm

2    going to guess that that's a nonevent.  And so, if that's the -

3    - if that issue is resolved, what you really -- what you really

4    -- or what really remains a problem for you is the existence of

5    a gatekeeper.

6            MR. GIBBS:  Yes, Your Honor.  And --

7            THE COURT:  And if it had been -- if it had actually

8    been mentioned in the motion, what argument would you make that

9    that's not appropriate?

10           MR. GIBBS:  The one I made in the objection --

11           THE COURT:  Okay.

12           MR. GIBBS:  -- and the one I'm prepared to argue

13   today, that that gatekeeper provision in an order employing --

14   authorizing the -- assuming you're going to use your -- you

15   know, your fix to take care of the -- instead of ratifying a

16   pre-petition action --

17           THE COURT:  Right.

18           MR. GIBBS:  -- and appointment of these gentlemen, we

19   think it's inappropriate to provide the exculpation and the --

20           THE COURT:  Well, how is it exculpation?

21           MR. GIBBS:  It's what they've asked for in the order.

22           THE COURT:  Yeah, but I was -- I'm not constrained by

23   their order, I'm just constrained by my thought process, so I

24   was only focused on just the gatekeeper provision presently

25   that says, before you get sued, you got to come and show me a

1    complaint that's got a colorable claim in it.  I'll get to the

2    standard of care in a minute.

3            MR. GIBBS:  I have less heartburn as a practicing,

4    you know, lawyer in this arena for all these years with that

5    concept.

6            THE COURT:  Okay.

7            MR. GIBBS:  It was clearly warranted in Highland.

8    Judge Jernigan's decision, after a fulsome factual record, to

9    enjoin the -- defined term "enjoined parties" --

10            THE COURT:  Right.

11            MR. GIBBS:  -- from doing anything before they first

12    went to her and showed a colorable claim.  I would prefer that

13    the entry of an order that contains a gatekeeper be based on a

14    similar set of facts.

15            There are no facts in this case that are remotely

16    similar to Highland.  But as a philosophical matter, does it

17    give me heartburn significantly to have a provision that says,

18    if anybody wants to sue one of these people who have stepped up

19    to act in a -- as an independent director --

20            THE COURT:  Right.

21            MR. GIBBS:  -- they need to first come to you and

22    show a colorable claim, and then you get to the standard of

23    care issue.

24            But they went further and they said -- in their

25    proposed language, and say and you're the only party that can

1          ever have jurisdiction to decide any of those claims --

2                    THE COURT:  Right.

3                    MR. GIBBS:  -- which is a whole 'nother --

4                    THE COURT:  That's --

5                    MR. GIBBS:  -- grab, I think, that's inappropriate.

6                    THE COURT:  Totally got that.

7                    So I want to come back to -- I have to inch along.

8          So, with respect to just the pure gatekeeper function, is it

9          safe to say that you believe that a gatekeeper function ought

10         to be a solution after the existence of a problem, as opposed

11         to a problem avoidance --

12                   MR. GIBBS:  I do.

13                   THE COURT:  -- solution?

14                   MR. GIBBS:  I do.

15                   THE COURT:  Okay.  Fair enough.  All right.

16                   All right.  And so then we get to -- then we get to

17         the standard of care and the limitations.  And is it your view

18         that that simply is too much, given the lack of notice, or is

19         it that should just never exist?  Did that make sense?  Poor

20         question.

21                   So there are two issues that --

22                   MR. GIBBS:  Uh-huh.

23                   THE COURT:  -- I think that you've raised, or at

24         least that I hear you, is that:

25                   One, there was not fair notice given of this request.

1     So that's sort of a due process issue.

2          And then there is a -- what I hear you also saying is

3     that, even if there had been due process, it's just not -- it's

4     not an appropriate limitation.

5          MR. GIBBS:  At this stage of the case, I'm -- you

6     know, the concern we have is that that ought to be something

7     creditors vote on as part of a confirmation.  So I -- the

8     exculpation and potential release of claims, depending on how

9     they're defined --

10         THE COURT:  Okay.

11         MR. GIBBS:  -- is something that ought to be part of

12    a confirmation process, not two months into the case, where

13    there's been no litigation filed, you know, and nothing that

14    would justify the need for that level of protection.

15         It certainly wasn't asked for by these independent

16    directors.  The record is devoid of any conditionality of their

17    acceptance.  And that was a condition to the independent

18    directors' acceptance of their position in Highland.  And in

19    fact, the Debtor couldn't get D&O insurance in the absence of

20    the entry of that order.

21         So what you had the Fifth Circuit blessing in

22    Highland was a confirmation order based on over a hundred

23    findings of fact, as well as two non-appealed orders that were

24    entered in the course of the case that were entered after

25    fulsome evidentiary hearings.  And that's just -- I think we're

1   taking that, which was appropriate in that case, and trying to

2   extrapolate it into this will become the law of Chapter 11s, or

3   at least cited as precedence in every other case filed

4   hereafter, and I just don't think it's necessary.

5          THE COURT:  I got it.  Okay.  And I'm -- you know, I

6   wasn't not listening to you.  I was reading the provisions of

7   446 that I was asking you about just to make sure I had it in

8   my mind.

9          All right.  Mr. Gibbs, thank you.  And again, I'll

10  give you other opportunity to weigh in.  I'm going to take this

11  as your involuntary opening comments.

12         (Laughter)

13         MR. GIBBS:  Under --

14         THE COURT:  All right.

15         MR. GIBBS:  Understood, Your Honor.  I'm sure you

16  remember Ed Creel (phonetic).  He had a uniquely effective way

17  of negotiating.  He would ask me what I want, like a dummy, I'd

18  tell him what I want.  He'd say, no problem, you got that.  And

19  by the end of the negotiation, he had taken every bit of it

20  back --

21         THE COURT:  Take it back.

22         MR. GIBBS:  -- just by reason.  I'm kind of feeling a

23  little bit like I'm in a negotiation.

24         THE COURT:  You shouldn't.  I'm just trying to

25  understand.

1          MR. GIBBS:  Understood.

2          THE COURT:  All right.

3          MR. GIBBS:  Thank you.

4          Mr. Ruff, did you want to make any opening comments?

5          MR. RUFF:  The only -- I -- all I had today is

6     argument.

7          But I did want to let Your Honor know that we had

8     joining with us today is our summer intern, Shania Kasam

9     (phonetic), who's a rising 2L at -- wow, that's really hot.

10         THE COURT:  So I had somebody with a really soft

11    voice earlier.  I will back that off.  And my apologies for

12    doing that to you.

13         MR. RUFF:  Not a problem.

14         THE COURT:  That's --

15         MR. RUFF:  A rising 2L at UT, Your Honor.  So she's

16    in the courtroom with us today, just to -- she let me know,

17    when we were coming up here, that, because she started law

18    school during the pandemic, this is actually her first time in

19    a live courtroom, so ...

20         THE COURT:  Is that right?

21         MR. RUFF:  Yeah.

22         THE COURT:  Well, you know, you can't be in a live

23    courtroom without making an appearance.  So let's have your

24    summer intern come up and make her appearance on behalf of the

25    United States Trustee.

1          (Participants confer)

2              THE COURT:  So come up to the lectern, get

3      comfortable.

4              MS. KASAM:  Okay.

5              THE COURT:  All right.  And then the purpose is, is

6      to tell me who you are.  And so it's also an opportunity to let

7      me see a little bit of your personality.  So, if you're very

8      formal, you can say, you know, David Jones on behalf of the

9      U.S. Trustee.  You could also show me a little personality and

10     say, you know, good afternoon, Judge, you know, David Jones on

11     behalf of the U.S. Trustee.

12             But go ahead and make your appearance.

13             MS. KASAM:  Hello.  Good afternoon.  My name is

14     Shania Kasam.  I am an intern at the U.S. Trustee's Office for

15     the summer, for ten weeks.  And I am writing 2L, as he had

16     mentioned previously.  And yeah, I went to the University of

17     Houston, I'm an undergraduate.  So, yes, and I'm excited to

18     learn more about bankruptcy

19             THE COURT:  Now, see, you have a career path to being

20     a fine lawyer.  She's making her apperance and she's already

21     started advocating.

22             MR. RUFF:  Yes.

23         (Laughter)

24             THE COURT:  So very nicely done.  Thank you and

25     welcome.

1       MS. KASAM:  Good to meet you.

2       THE COURT:  All right.  All right.  Let me ask:

3   Anyone else want to make, again, what I'll just take as opening

4   comments before we get to the evidentiary presentation?

5       (No verbal response)

6       THE COURT:  All right.  Mr. Pomerantz.

7       MR. POMERANTZ:  Your Honor, I seemed to have caused

8   some confusion by calling my remarks "opening."  They kind of

9   were opening and closing.  But I have a brief evidentiary

10  presentation.  I think all parties agree that, largely, this

11  was a legal, rather than factual matter --

12      THE COURT:  Right.

13      MR. POMERANTZ:  -- by recognizing that every -- as

14  Mr. Wallen has reminded me, as he -- I need to him to do, that

15  every motion has some factual background.  I'm prepared to

16  proffer the testimony of Mr. Barbarosh.

17      THE COURT:  All right.  Any objection to the proffer

18  of Mr. Barbarosh's testimony, subject, of course, to cross?

19      MR. GIBBS:  None, Your Honor.

20      THE COURT:  All right.  Thank you.

21      Then, Mr. Barbarosh, I'll do this just up front.  If

22  you would, please, sir, raise your right hand.

23      (Oath administered)

24      THE COURT:  Ah, we need to get you unmuted.  Have you

25  -- if you'd hit five-star.  You only have to do that once.  But

1    you might have me muted from your side, as well.  Ah, there you

2    are.  How about now?

3            THE WITNESS:  Yes.  Yes, I do, Your Honor.

4    CRAIG BARBAROSH, WITNESS FOR THE DEBTORS, SWORN

5            THE COURT:  All right.  Thank you.

6            All right.  Mr. Pomerantz, go ahead, sir.

7            MR. POMERANTZ:  Thank you, Your Honor.

8            Craig Barbarosh, if called to testify, would testify

9    that I was elected to the Board of Mountain Express, along with

10   Lawrence Perkins, on March 15th, 2023, three days before the

11   Debtors commenced these Chapter 11 cases.

12           I understood that Mr. Perkins and I were appointed to

13   address any potential conflicts that could arise between the

14   Debtors' incumbent directors or companies owned by them and the

15   Debtors.

16           On March 15th, the Debtors and I executed an

17   independent services agreement that governs the services I am

18   providing to the Debtors as an independent director.  I

19   understand that Mr. Perkins executed his independent director

20   services agreement on the same day.

21           The Debtors' counsel recommended to the board that

22   the direct -- Debtors file a motion with the Court to approve

23   the independent directors' services agreement to provide

24   transparency to the process of the appointment of the

25   independent directors and provide stakeholders the opportunity

1    to evaluate our disinterestedness, the terms of our employment,

2    and the role that the independent directors will play in

3    connection with the administration of the Debtors' estates.

4    And based upon the recommendation of counsel, the board

5    instructed the Debtors' counsel to file a motion.

6            And based upon the advice of counsel, I directed

7    counsel to include Paragraph 5 in the order, to ensure that the

8    Court act as a gatekeeper to prevent frivolous litigation from

9    distracting the Debtors and causing the estates to incur

10   needless costs that the order approving the independent

11   directors' employment include paragraph -- what is now

12   Paragraph 6 of the order.  And based upon the recommendation of

13   counsel, the board instructed Debtors' counsel to include

14   Paragraph 6 in the proposed order approving the motion.

15           That concludes my proffer, Your Honor.

16           THE COURT:  All right.  Thank you.

17                            EXAMINATION

18   BY THE COURT:

19   Q    Mr. Barbarosh, did you listen carefully to Mr. Pomerantz's

20   statements?

21   A    Yes, I did, Your Honor.

22   Q    Did you understand them all?

23   A    Yes.

24   Q    Everything he told me true and correct to the best of your

25   knowledge?

1    A    It is, Your Honor.

2    Q    And do you adopt Mr. Pomerantz's statements made on your

3    behalf as your sworn testimony in support of the request made

4    this afternoon?

5    A    Yes, I do.

6    Q    All right.  Thank you.

7            THE COURT:  Any cross-examination for Mr. Barbarosh,

8    Mr. Gibbs?

9            MR. GIBBS:  Your Honor, I find myself in an

10   uncomfortable position.  We had a meet-and-confer regarding

11   discovery that we wanted to take.

12           THE COURT:  Okay.

13           MR. GIBBS:  We've reached agreements regarding what

14   we wouldn't do.  We had no intention of cross-examining this

15   witness based upon the evidence that was in his declaration,

16   and we thought that that was the evidentiary record that the

17   Debtor was, in fact, going to rely upon, which are the exhibits

18   and are the two declarations.

19           The proffer that was just made by Mr. Pomerantz goes

20   far beyond the declaration --

21           THE COURT:  Okay.

22           MR. GIBBS:  -- and deals specifically with the

23   arguments that we made in our objection that they -- that these

24   independent directors did not ask for or, indeed -- we -- based

25   on their declaration, there was no evidence that they were

1    requiring the gatekeeper provision.  We now hear for the first
2    time that -- through the proffer, that, in fact, it was their
3    instruction to counsel and that they did require it.
4         So, yes, I unfortunately think I need to make sure I
5    understand what the record now is.
6              THE COURT:  All right.  Mr. Pomerantz?
7              MR. POMERANTZ:  Your Honor, may I respond?
8              THE COURT:  Certainly.
9              MR. POMERANTZ:  Mr. Gibbs and I -- Mr. Gibbs and I
10   talked about the reason why the applications were filed and the
11   reason why Paragraph 6.  I told him, I told Your Honor, and I
12   believe the proffer is consistent that the basis for
13   determining and the recommendation was myself.  I recommended
14   it to the board, and that's why Mr. Barbarosh is testifying.
15        I am not the Debtor.  I have to be instructed to file
16   something.  So the fact that, based upon my recommendations, I
17   was instructed to file something recognizes nothing more than
18   I, as counsel, can't make a determination, I have to be
19   instructed.  So I think it's totally consistent.
20        Mr. Barbarosh's testimony was not that he required
21   it.  His testimony would be that he did not require it, he did
22   not require the application to be filed and he did not require
23   Paragraph 6 to be in, that it was my recommendation and the
24   board adopted it.  So I think it's actually consistent.
25        We tried to stipulate to these facts and the

1    Committee, after I thought they had agreed to stipulate to

2    these facts, wouldn't, which necessitated the proffer and the

3    evidence.

4            But to make it clear, it was my decision to recommend

5    it, both the filing and Paragraph 6.  And Mr. Barbarosh's

6    testimony is that, based upon my recommendation, we were told

7    to file the document as is.

8            THE COURT:  All right.  Does that help you

9    understand?

10           MR. GIBBS:  It does.  I may have misunderstood the

11   proffer.  I thought his proffer was that, in fact, this was

12   something required and requested --

13           THE COURT:  I do think --

14           MR. GIBBS:  -- by --

15           THE COURT:  -- that that's where the proffer came

16   out.  But I will take Mr. Pomerantz's statements as a

17   correction to that proffer.  And with that --

18           MR. GIBBS:  I'm fine.

19           THE COURT:  -- you're okay?  All right.

20           Does the U.S. Trustee have any questions?

21           MR. RUFF:  No questions, Your Honor.  Thank you.

22           THE COURT:  All right.  Thank you.

23           Mr. Barbarosh, thank you.  I want to stay on the

24   line, but you are excused as a witness.

25           (Witness excused)

1          THE COURT:  All right.  Mr. Pomerantz.

2          MR. POMERANTZ:  Your Honor, I just wanted to -- and

3    again, just a couple of comments addressing what Mr. Gibbs -- a

4    couple of the comments he made.

5          He related this case to Highland, and I realize

6    Highland is a case that's gone on for four years, has thousands

7    of Docket entries.  And people not intimately involved in

8    Highland, like I am as I'm Debtors' counsel, may  not

9    understand actually what happened in that case.  So, to make

10   the record clear, let me tell the Court what happened in that

11   case.

12         When the independent directors were appointed on

13   January 9th, 2020, it was done consensually.  There was no

14   litigation with Mr. Dondero.  There was no litigation with any

15   of his affiliates.  It was consensual.  He agreed with the

16   Committee to have the independent directors retained.  That's

17   when the gatekeeper and the ex -- the go forward standard of

18   care was put in.

19         Now, of course, Highland has become legendary because

20   of the three and a half years of litigation that's followed and

21   because of, ultimately, the appeal of the confirmation order

22   that made it to the Fifth Circuit, and may ultimately make it

23   to the Supreme Court.

24         And in connection with confirmation, that's when

25   there was a gatekeeper discussed in the context of the plan, a

1    totally different animal than the gatekeeper approved.

2          So, notwithstanding Mr. Gibbs' comments, there wasn't

3    a track record of litigation, there wasn't the evidentiary

4    basis.  At the time they were appointed, it was a consensual

5    case.  And I submit, Your Honor, at that point, it was the

6    same.

7          Now I acknowledge that the directors in that case did

8    seek and did request, as a condition of their appointment, the

9    gatekeeper and the exculpation.  But there was no record, at

10   least in the bankruptcy case at that point.

11         Your Honor, with respect to the fair notice, yes, in

12   retrospective, should we have added the request in the motion?

13   There has been no prejudice.  Mr. Gibbs, in his twenty-page,

14   seventy-eight-footnote objection, was adequately able to

15   address it, as was the United States Trustee.  We believe, Your

16   Honor, there's no issue with respect to notice.  The issue has

17   been fully briefed and will be fully argued.

18         And that's all I have, Your Honor.  I reserve the

19   opportunity to -- after hearing more fulsome argument from

20   Mr. Gibbs and Mr. Ruff, to respond appropriately.

21         THE COURT:  All right.  Thank you.

22         Mr. Gibbs, is there anything you wanted to add to

23   your earlier comments?  Excuse me.

24         MR. GIBBS:  Your Honor, I'll have a little more

25   granularity on a couple of the concerns that we had once we

1    reviewed the corporate documents and how they were addressed

2    and --

3                   THE COURT:  Okay.

4                   MR. GIBBS:  -- just so that the Court knows and the

5    Record is clear.

6                   One of the concerns that we raised was that the

7    governance documents disclosed -- that existed prior to last

8    week, disclosed that the "special transaction Committee" --

9    defined term, just the two independent directors -- the special

10   transaction Committee could only meet if the full  board

11   directed it.

12                  THE COURT:  Yeah, I read that.  I see that's been

13   remedied.

14                  MR. GIBBS:  It has been remedied --

15                  THE COURT:  Okay.

16                  MR. GIBBS:  -- in a the resolution that's dated May

17   20.  I don't think it was actually signed by the -- all of the

18   directors until Monday or Tuesday of this week.  But it now

19   says that the special transaction Committee shall meet when

20   requested by any member of the special transaction Committee to

21   do so, and any such meeting shall require the attendance of all

22   members of the special transaction Committee whose attendance

23   may be in person or via telephone or video conference.  So our

24   concern that the full board could block the meeting by -- any

25   requested meeting by the special transaction Committee has been

1      adequately resolved.

2               THE COURT:  Sure.

3               MR. GIBBS:  The full board -- it used to say, also,

4      Your Honor, that the full board would decide whether a conflict

5      existed, such that it would elevated to the special transaction

6      Committee for consideration.  And the concern again there,

7      obviously, was that non -- that insider directors, non-

8      independent directors could, in fact, be the parties that made

9      the decision whether something should ever go to the special

10     transaction Committee.

11              That also has been addressed.  And it -- now that --

12     by that resolution, that is Exhibit 10 that was filed with the

13     Debtors' witness and exhibit list.  That new resolution now

14     provides that determination of whether a specific transaction

15     is to be evaluated as a "conflicted transaction" -- defined

16     term -- shall be made solely by the special transactions

17     Committee, acting unanimously, following receipt of the advice

18     of counsel.

19              And they have also, Your Honor, asked for a provision

20     in the order that would vary the way that independent director

21     vacancies are filled, different from what's in the existing

22     corporate governance documents, and we're fine with that.

23              MR. GIBBS:  Your Honor --

24              THE COURT:  So you're okay with the -- with what was

25     the numbered Paragraph 3 --

1          MR. GIBBS:  Yes.

2          THE COURT:  -- that said the other ID would appoint -

3  - it had to be acceptable to Wadud and Frady and subject to a

4  court order.

5          MR. GIBBS:  Correct.

6          THE COURT:  Okay.  Got it.

7          MR. GIBBS:  So -- and I made -- I think I've hit the

8  high points of our concerns about what is now Paragraph 6.

9          THE COURT:  Right.  So --

10          MR. GIBBS:  I mean and --

11          THE COURT:  -- let me show you --

12          MR. GIBBS:  Uh-huh.

13          THE COURT:  -- as you knew I was going to do.

14      (Laughter)

15          MR. POMERANTZ:  Your Honor, may I address a couple of

16  the points in the resolution that Mr. Gibbs explained to the

17  Court?

18          THE COURT:  Certainly.

19          MR. POMERANTZ:  So, Your Honor, just to allay

20  everyone's concerns on the first point, on when the special

21  transactions Committee meets, since their appointment, they

22  have met every time the board has met and it hasn't been at the

23  direction of the board.

24          Now what is, I guess, a document bust, it was

25  interpreted to say that the board had control.  It's not

1       actually how it happened, but I'm glad Mr. Gibbs brought it to

2       our attention to get fixed.

3               The second point, Your Honor, Mr. Gibbs actually

4       described inaccurately.  What the current documents continue to

5       say is that the full board is entitled to have a discussion

6       with the independent members on any conflicted transaction.

7       Why is that there?  Well, it's important that the independent

8       directors hear the people who are on the other side of the

9       conflicted transactions, their side of it.

10              What the resolutions didn't say is how it gets

11      decided on whether a transaction is within the purview of the

12      special transaction Committee.

13              THE COURT:  Uh-huh.

14              MR. POMERANTZ:  It did not say the full board has

15      that determination.

16              Now, again, as a practical matter and I think as just

17      a matter of corporate law, I'm not sure the bylaws ever really

18      go through that granularity.  And the reality is, as it had

19      been happening since the appointment of a case, is Mr. Healy,

20      as CRO, and myself, we have determined whether a transaction

21      was within the benefit -- was within the purview of the special

22      transactions Committee.

23              But to address the concern because, if you can

24      resolve things to make something clearer, it's always better

25      than arguing about it, we agreed that the special transactions

1    Committee would have the ability to decide based upon advice of

2    counsel.  But there was never anything in the documents that

3    said the full board had to make that decision.  Thank you, Your

4    Honor.

5              THE COURT:  All right.  Thank you.

6              So, Mr. Gibbs, let me -- what I would like to do --

7    and nothing is a foregone conclusion here, but I genuine think

8    that this is just such a good idea for the process because I

9    think that any time we can take something that is a mystery to

10   the non-bankruptcy world and make it more transparent and easy

11   to access, easy to understand, easy to criticize, easy to

12   debate, whatever that might be, I actually think that's a good

13   thing.

14             You made me think about a couple of things, given

15   your comments, and I very much appreciate that.  And so what

16   I'd like for you to do is I'll show you -- I'll show you the

17   paragraphs I changed.

18             The first one was 2.  And I tend to agree with you

19   that my authority starts as of the day the case was filed, not

20   one minute before.  And so I -- does that change -- cure that

21   issue?

22             MR. GIBBS:  It does.  And had I had a summer

23   associate with me today, I would have counseled that person

24   before the hearing that it's never a good idea to tell a judge

25   he or she does not have jurisdiction.

1          THE COURT:  No.  No, no, no.  It's -- absolutely, you

2     should because sometimes I think it's broader than it really

3     is.

4          MR. GIBBS:  Well, that paragraph, with your change,

5     I'm -- you know, I think it resolves the issue.

6          THE COURT:  All right.  And you've told me that

7     Paragraph 3, I've made no changes to it, I've --

8          MR. GIBBS:  I need to back on the screen.  Somehow it

9     went to --

10          THE COURT:  It went away?

11          MR. GIBBS:  -- the side in a window.

12          THE COURT:  Oh, sorry.

13     (Participants confer)

14          THE COURT:  So I made no changes to 3.

15          MR. GIBBS:  All right.  Okay.

16          THE COURT:  And then 4, I made no change to.

17          5, I made no change to.

18          6, I am concerned about the issue of due process.

19          I -- while you're here, I don't know who else cares

20     about this, and so that rings a chord.  So what I have done is

21     that I have made no substantive rulings.  What I have done, in

22     my mind, is I've established a process, much like would -- I

23     would do with respect to a Trustee or an independent fiduciary

24     or anyone else that I might appoint, is to just say bring me

25     what you have and show me that you have a colorable claim.  I'm

1    making no determination as to court.  I'm making no

2    determination, at this point, as to standard of care.

3            What I will say, I might have been willing to go

4    further, had there been -- had there been ample opportunity for

5    everybody to weigh in.  I don't think there was that ample

6    opportunity.

7            But for purposes of this, I just like this process

8    because it means that anyone who wants to understand what's

9    going on in the bankruptcy case, there's one place to look. It

10   all has to be right here.  And you may not understand

11   everything that's going on, but at least you know what

12   questions to ask.  And I actually think that that's a positive

13   thing.

14           Does that -- does the change I made to 6 -- I think

15   it addresses your issues for today.  Am I wrong about that?

16           MR. GIBBS:  No.  You're correct.

17           THE COURT:  All right.  Thank you.

18           Then, with that -- and again, I didn't make changes

19   to 7 or 8, other than to move them up.

20           I do think that -- as I said before, I applaud the

21   Debtors for thinking through this.  Again, whatever the

22   motivation in doing it, any time the process benefits, I'm a

23   fan, and I think the process has benefitted from it.

24           I applaud the Committee for getting engaged.  And I

25   think we dealt with, in the context of, you know, an hour or

1      two what might have otherwise been the subject of a lot of

2      discussion and fighting that would have taken maybe tens of

3      hours.  And so I actually comp -- everybody played their role,

4      which is exactly what the process requires.

5           Mr. Pomerantz, do you want to try and convince me

6      that I shouldn't make the changes that I just ran through with

7      Mr. Gibbs?

8           MR. POMERANTZ:  No, Your Honor, I'm not going to try

9      to convince you on the negligence, based upon your comments.

10          I guess my question would be that, if we set an

11     amendment to this order on full notice that indicated that we

12     were seeking an exculpation or a standard of care of

13     negligence, whether that's something that the Court would

14     entertain because I understand Your Honor --

15          THE COURT:  So let me --

16          MR. POMERANTZ:  -- just held back because Your Honor

17     has perceived due process concerns.

18          THE COURT:  So let me say this.  I would give you a

19     ruling on the merits.  I don't know what I will do with it, but

20     I would give you a ruling on the merits.  What I'm giving you

21     today is a ruling based upon my perceived lack of due process.

22          MR. POMERANTZ:  And Your Honor, you don't believe

23     that the order that was served on everyone, that was told --

24     and I think that's one of the reasons that people put orders

25     and are required to attach orders to their motions -- clearly

1    indicated that's what we'd be seeking.

2         THE COURT:  So I -- just given the number of things I

3    see every day, people attach orders and only about 80 percent

4    of the time, but they do that because there's a rule that

5    requires it.  I don't think that it's reasonable to assume

6    that, if you read the motion, that the order might say

7    something different.  That's just my fundamental belief.

8         But if you want to -- if you want to seek an amended

9    order and everybody has a chance to weigh in, I'll give you a

10    ruling on the merits.  I don't know what I will do.  I don't

11    want this order to be precedent for any other case.

12         I do think that this is just a great idea and I

13    applaud the Debtors for taking the extra step.  I applaud the

14    directors for subjecting themselves to probably a little more

15    inquiry than maybe they would otherwise have gotten.  But I

16    also think that it lets my independent directors go forward and

17    focus on their jobs and that I'm a big fan of.

18         So, with -- I will grant the motion using the

19    modified order, as we've done on the Record.  I've started with

20    446.  I've run through the changes on the Record.

21         To the extent that I haven't addressed an objection

22    -- and I guess the one that I really didn't speak on was

23    whether or not I have jurisdiction or authority to do that.

24    That's -- I don't really take that as a serious issue.

25         I mean, I remove people all the time.  And to say

1  that I don't have the ability to appoint them because there's

2  not a specific statute or rule that says I can do it, I just

3  don't buy that argument.  This is a court of equity.  And

4  again, if I can remove somebody, I can sure replace them.  So I

5  appreciate the objection, but I don't find it persuasive.  All

6  right?

7         MR. GIBBS:  Understood, Your Honor.

8         THE COURT:  How is everything else going?

9         MR. POMERANTZ:  Thank you, Your Honor.

10         THE COURT:  Thank you.

11         Is the Committee getting everything else that it's

12  been working toward?  Are we making progress?  Are we working -

13  - are we working towards something that will be an economic

14  discussion or are we not there?

15         MR. GIBBS:  It -- I think --

16         MR. POMERANTZ:  Do you want me to answer that, Your

17  Honor --

18         THE COURT:  I --

19         MR. POMERANTZ:  -- or Mr. Gibbs to answer?

20         THE COURT:  I was talking -- unless you have insight

21  into the Committee, I was wanting to hear from Mr. Gibbs.

22         MR. POMERANTZ:  Okay.  Okay.

23         MR. GIBBS:  Although I sometimes wonder if

24  Mr. Pomerantz reads my mind, so --

25         THE COURT:  He probably can.

1        MR. GIBBS:  I'd give the case, thus far, a -- you

2   know, a passing grade, but not an A.

3        THE COURT:  Okay.

4        MR. GIBBS:  We are frustrated on a couple of points.

5   We are -- and I think this first frustration is shared by the

6   Debtor and their professionals.  We continue to be frustrated

7   by a difficulty in getting reliable pre-petition financial data

8   on which necessarily post-petition projections --

9        THE COURT:  Sure.

10       MR. GIBBS:  -- are going to be based.  That's not

11  finger-pointing, that's just a frustration.

12       THE COURT:  Just a fact of life.

13       MR. GIBBS:  A fact of life.

14       THE COURT:  Yeah.

15       MR. GIBBS:  We have significant concerns about the

16  Debtors' liquidity as we try to get to the end of the sale

17  process, notwithstanding the additional money that we were able

18  to get authority to borrow --

19       THE COURT:  Sure.

20       MR. GIBBS:  -- a month or so ago.

21       We've, frankly, got frustrations over the pace with

22  which we are getting information as to how the sale process is

23  undergoing.  I think and believe that frustration has been

24  substantially resolved through agreements that we -- on process

25  that we have reached with the Debtor and its investment banker

1    as a result of the settlement of our objection that Your Honor

2    has approved.

3              THE COURT:  Got it.  Yeah.  So you're just having

4    weekly calls or updates or --

5              MR. GIBBS:  Yes.

6              THE COURT:  -- something --

7              MR. GIBBS:  That's correct.

8              THE COURT:  -- like that?  Okay.

9              MR. GIBBS:  And there's a frustration, I think, in

10   still getting information that we think exists.  There is some

11   information requests we've made that are five weeks old now and

12   we still --

13             THE COURT:  Sure.

14             MR. GIBBS:  -- we've followed up repeatedly.  And it

15   may be that they'll tell us definitively I'd love to give it to

16   you, but it's -- we can't find --

17             THE COURT:  Right.

18             MR. GIBBS:  -- it, it doesn't exist, but --

19             THE COURT:  Well, my guess is -- and this is not a

20   comment on the business, but I've been in similar situations.

21   My guess is there's just going to be some things that you think

22   ought -- that ought to exist, which just, in fact, don't.

23             MR. GIBBS:  Right.

24             THE COURT:  And we're all just going to have to deal

25   with that, but I got that.

1          Mr. Pomerantz, things proceeding along at an

2    acceptable path --

3          MR. POMERANTZ:  Yeah, let me --

4          THE COURT:  -- for the Debtors?

5          MR. POMERANTZ:  Yeah, let me just address Mr. Gibbs'

6    comments --

7          THE COURT:  So --

8          MR. POMERANTZ:  -- first.  It's like look --

9          THE COURT:  And Mr. Pomerantz, you actually don't

10   need to.  That's -- I always expect the Committee to be --

11         MR. POMERANTZ:  No --

12         THE COURT:  -- slightly frustrated.

13         MR. POMERANTZ:  Your Honor --

14         THE COURT:  I just wanted --

15         MR. POMERANTZ:  But I just --

16         THE COURT:  -- to know that --

17         MR. POMERANTZ:  But I --

18         THE COURT:  -- we're proceeding forward.

19         MR. POMERANTZ:  Well, I think it's important because,

20   unfortunately, similar to their inadvertent disclosure of their

21   objection on the record that they intended to file an appeal,

22   the concern is that the comments made by Mr. Gibbs right now

23   are sending a wrong message to the marketplace and are

24   undermining the sale process.

25         So I would like to respond and say, look, I do as

1    much Committee work as probably anyone the country.  I

2    understand their frustration.  You always want more

3    information.  And as Mr. Pachulski once told me when I was

4    frustrated 30 years ago, they're Debtors for a reason.  Okay?

5         So, yes, we are working towards getting Mr. Gibbs the

6    information he and his colleagues ask for.  We are having

7    weekly calls.  We have a very good team here.

8         We have FTI, who is working and making sure this

9    company has and will have liquidity to get through the sale

10   process.

11        We have the BDO and the Grant Thornton people working

12   on putting together pre-petition financial information that

13   will be provided, if it has not already, to buyers and to the

14   creditors' Committee that will get them comfortable that this

15   is a good asset to sell.

16        And we have the Raymond James team, who is out there

17   with its star-studded (indiscernible) team that has been doing

18   an excellent job.  And I'm pleased to report we have received

19   numerous indications of interest and there is extreme interest

20   in this asset and this company.

21        So are there challenges?  Show me a Debtor's case

22   where there aren't any challenges.  Do we have confidence that

23   we will be able to bring a sale to the Court for approval that

24   we will be comfortable is maximizing value?  Yes, we are.  And

25   any of the comments from Mr. Gibbs to try to undermine that to

1   the marketplace just are inaccurate.

2           THE COURT:  Right.  So I don't think that's what he

3   was intending to do at all.  I asked him a question, I wanted

4   an answer.  The reason that I respect both of you the way that

5   I do is because you give me candid answers to the questions I

6   ask.  I just -- I'm just okay with everything.  This is the way

7   the process is supposed to work.

8           If I had concerns about what was going on, I wouldn't

9   true the two of you and I wouldn't give you the length of the

10  leash that I give you.  I trust you each to go do your jobs

11  because I have an immense amount of respect for what your

12  respective teams do.  I'm here if there's a problem, but I --

13  otherwise, I assume -- and I haven't ever been disappointed --

14  that you -- the two of you will go do what you know how to do

15  so very well.

16          So I think all is fine.  And I just wanted to hear if

17  there was anything particular that required my attention.

18  Otherwise, I'm just okay.  All right?

19          MR. GIBBS:  Can I have 30 seconds?

20          MR. POMERANTZ:  Thank you, Your Honor.

21          THE COURT:  So --

22          MR. GIBBS:  Not to respond.

23          THE COURT:  And so Mr. Gibbs is going to tempt fate,

24  he said "30 seconds."

25          MR. GIBBS:  I'm not going to respond to the comments

1    that you just heard.

2          I do want to make sure the Court knows --

3          THE COURT:  Yeah.

4          MR. GIBBS:  -- that Mr. Pomerantz didn't reference

5    something that did occur.  My office screwed up and I wanted

6    the Court to know that.  We filed -- we attempted to file our

7    objection under seal.  And in the middle of the filing process,

8    someone got diverted, their attention --

9          THE COURT:  Right.

10         MR. GIBBS:  -- and put the wrong pleading behind the

11   motion to seal and the objection was filed for about a minute

12   or two before the person responsible got a hold of Albert and

13   got it pulled back down.

14         THE COURT:  I got it.  Look --

15         MR. GIBBS:  Apparently, some news services are really

16   quick.

17         THE COURT:  Yeah.  I've known you for 30 years.

18   You've owned every mistake that you've ever made, not that

19   there have been that many.  And you know, we're all human and

20   we'll figure out how to deal with it.  And you know, we're here

21   to help if things do happen.

22         But I do agree with you that the reporting services

23   in these cases are very vigilant and they do their job --

24         MR. GIBBS:  Uh-huh.

25         THE COURT:  -- very well.

1          MR. GIBBS:  Very completely.

2          THE COURT:  All right.

3          MR. GIBBS:  Thank you.

4          THE COURT:  With that, Mr. Pomerantz, anything else?

5          MR. POMERANTZ:  Nothing else, Your Honor.

6          THE COURT:  All right.

7          MR. POMERANTZ:  Thank you for --

8          THE COURT:  Thank you.

9          MR. POMERANTZ:  -- squeezing us in today.  I know you

10    have a long day.

11          THE COURT:  Everyone have a good day.  We'll be

12    adjourned.

13          MR. POMERANTZ:  Thank you.

14       (Unrelated case discussed)

15          THE COURT:  Ah, Mr. Elrod, I'm sorry.  Did you -- ah,

16    sorry.  Hold on.  Mr. Elrod, I am so sorry.  I was looking at

17    eight different things.

18          Mr. Gibbs, don't go away just yet.

19          Mr. Elrod?

20          MR. ELROD:  No problem, Your Honor.  John Elrod on

21    behalf of First Horizon Bank as DIP Agent and pre-petition

22    Agent.

23          Your Honor, briefly, we wanted to raise an issue with

24    respect to the retention order of Raymond James, which was

25    signed by Your Honor this morning, and specifically with

1    respect to Paragraph 7 of that order, which contains a

2    provision whereby Raymond James, under certain circumstances,

3    would share 750,000 of its financing fee with unsecured

4    creditors.

5         I wanted to let Your Honor know that the Agent was

6    not involved in the negotiation of that provision and did not

7    have notice of it.  We did see the proposed order come across

8    last night at about 6:00 p.m. eastern, 5:00 p.m. Central Time.

9         In our view, Your Honor, it's not appropriate to use

10   the Agent's cash collateral without consultation with us.  The

11   provision also raises absolute priority rule issues, as well as

12   potential sub rosa plan issues, Your Honor.

13        We're in the process of discussing this with our bank

14   group but wanted to flag the issue for Your Honor because the

15   order was entered without a hearing.  And you know, we just saw

16   this last night and may be back in front of Your Honor.  But I

17   wanted to let that be raised, so that the Court was aware that

18   we may be back in front of you with respect to that provision.

19        THE COURT:  All right.  So, number one, I entered it

20   without a hearing because everyone told me it was agreed to.

21   If that turns out to be wrong, that turns out to be wrong.

22        Having read that provision, I -- it looks to me as

23   though it's neutral to the DIP lender.  And if I read that

24   wrong, I'm sure you'll tell me.  But if you need to file

25   something, file a motion to reconsider on an emergency basis,

1    reach out to Mr. Alonzo and get a hearing date and we'll take

2    up the substance of it.

3              MR. ELROD:  I appreciate that, Your Honor.

4              THE COURT:  All right.

5              MR. ELROD:  Thank you.

6              THE COURT:  Thank you.

7         All right.  Everybody go away before I have someone

8    else.

9         (Laughter)

10             THE COURT:  Thank you, everybody.

11             MR. GIBBS:  Thank you.

12        (Proceedings concluded at 2:02 p.m.)

13                        * * * * *

14        *I certify that the foregoing is a correct transcript*

15   *to the best of my ability produced from the electronic sound*

16   *recording of the proceedings in the above-entitled matter.*

17      */S./  MARY D. HENRY*

18   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

19   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

20   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

21   *JTT TRANSCRIPT #67315*

22   *DATE FILED:  MAY 31, 2023*

23

24

25