**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| MOUNTAIN EXPRESS OIL COMPANY, *et al.*,[1] | Case No. 23-90147 (DRJ) |
| Debtors. | (Jointly Administered) |
| MOUNTAIN EXPRESS OIL COMPANY, *et al.*, Plaintiffs, | Adv. Case No. [_____] |
| v. | |
| IMPERIAL CAPITAL LLC, IMPERIAL RELIANCE LLC, MOHAMMAD SAJJAD, AND ABRAR ABID Defendants. | |

**DEBTORS' ADVERSARY COMPLAINT**

The debtors and debtors-in-possession (collectively, the "**Debtors**") in the above-captioned cases, hereby file this Complaint against Imperial Capital LLC, Imperial Reliance LLC, Mohammad Sajjad, and Abrar Abid (all together, "**Defendants**") for pre- and post-petition breaches by the Defendants of fuel supply agreements and lease agreements critical to the Debtors' businesses and the successful administration of the Debtors' bankruptcy cases.  In support of this Complaint, the Debtors respectfully state as follows:

---

[1] A complete list of each of the Debtors in these Chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/mountainexpressoil. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 cases is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022.

## NATURE OF ACTION

1.      The Defendants are operators of 22 gas stations and travel centers leased to them by the Debtors. Pursuant to several supply agreements entered between the Debtors and the Defendants, the Debtors are the exclusive suppliers for the fuel retailed at the leased stores.

2.      Around the time the Debtors commenced their bankruptcy cases, the Debtors became aware that the Defendants were materially breaching their agreements with the Debtors. In addition to any pre-petition notices of default the Debtors provided, the Debtors gave post-petition notice to the Defendants of their continuing breaches of the parties' agreements. More specifically, the Debtors gave notice that the Defendants were, among other things, avoiding the Debtors' credit card network when retailing fuel to customers at the pump via the unauthorized use of third-party payment terminals. As is explained herein, the Defendants failure to use the Debtors' credit card system—as was agreed by the parties—entirely disrupts the system of credit the Defendants rely on to purchase fuel. And the Defendants have ongoing obligations to purchase minimum quantities of fuel from the Debtors that they continuously fail to satisfy.

3.      Separate and apart from the Defendants breaches of the supply agreements, the Defendants have also repeatedly failed to timely remit the monthly rent owed the Debtors under the leases.

4.      The Defendants' actions have been extremely disruptive to the Debtors' operations and are damaging to the Debtors' efforts to successfully reorganize, to the detriment of the entire estate. Although the Debtors and their professionals have invested significant time and attention negotiating with the Defendants for their compliance with the supply agreements and leases post-petition, these efforts have proved fruitless, necessitating this proceeding for termination of the agreements and damages for the breaches.

## JURISDICTION

5.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

6.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory predicates for the relief requested herein include sections 327 and 330 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), Rules 2014(a) and 2016 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rules 2014-1 and 2016-1 of the local rules of the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**").

8.      Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure and Rule 7008-1 of the Bankruptcy Local Rules for the Southern District of Texas, Debtors consent to the entry of final orders or judgment by the Court in connection with this adversary proceeding if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## DEFENDANTS

9.      Imperial Capital LLC ("**ImpCap**"), a New York limited liability company, is, along with its member, Abrar Abid, a party to a "Commercial Lease" dated as effective, August 17, 2022 ("**209-13 Lease**"), and a "Fuel Supply Agreement," dated as effective, August 17, 2022 ("**209-13 FSA**"), pursuant to which ImpCap agreed, respectively, to lease Mountain Express Stores #209, #210, #211, #212, and #213, and to exclusively purchase fuel from the Debtors, for the purpose of ImpCap operating fuel retail businesses at these stores. Additionally, ImpCap, along with Abrar Abid, is a party to a "Commercial Lease" dated as effective, August 17, 2022 ("**977-85 Lease**"), and a "Fuel Supply Agreement," dated as effective, August 17, 2022 ("**977-85 FSA**"), pursuant to which ImpCap agreed, respectively, to lease Mountain Express Stores #977, #978, #979, #980,

#981, #982, #983, #984, and #985, and to exclusively purchase fuel from the Debtors, for the purpose of ImpCap operating fuel retail businesses at the leased stores. The 977-85 Lease and 977-85 FSA were subsequently amended by the parties pursuant to the "First Amendment of Commercial Lease and Fuel Supply Agreement" dated as effective, August 19, 2022 (together with the 209-13 Lease, the 209-13 FSA, the 977-85 Lease, and the 977-85 FSA, the "**ImpCap Agreements**").

10.     Imperial Reliance LLC ("**ImpRel**"), an Oklahoma limited liability company with its principal place of business at 3010 LBJ Freeway, Suite 1200, Dallas, Texas 75234, is, along with its member, Mohammad Sajjad, a party to a "Master Sublease Agreement" dated as effective, January 20, 2021 ("**744-46 Lease**"), pursuant to which ImpRel agreed to lease Mountain Express Stores #744, #745, and #746; a "Fuel Supply Agreement," dated as effective, January 20, 2022 ("**744-46 FSA**"), pursuant to which  ImpRel agreed to exclusively purchase fuel from the Debtors for those stores; a "Master Sublease Agreement" dated as effective, January 27, 2022 ("**747-51 Lease**"), pursuant to which ImpRel agreed to lease Mountain Express Stores #747, #748, #749, #750, and #751; and a "Fuel Supply Agreement," dated as effective, January 27, 2022 ("**747-51 FSA**"), pursuant to which  ImpRel agreed to exclusively purchase fuel from the Debtors for those stores, all for the purpose of ImpRel operating fuel retail businesses at the leased stores. The 744-46 FSA and 747-51 FSA were subsequently amended by the parties pursuant to the "First Amendment of Fuel Supply Agreement" dated as effective, April 28, 2022 (the "**ImpRel FSA Amend.**," and together with the 744-46 Lease, the 744-46 FSA, the 747-51 Lease, and the 747-51 FSA, the "**ImpRel Agreements**").

11.     Abrar Abid (together with ImpCap, the "**ImpCap Defendants**") is a member and manager of ImpCap and an individual party to the ImpCap Agreements, residing in New York City, New York.

12.     Mohammad Sajjad  (together with ImpRel, the "**ImpRel Defendants**") is a member and manager of ImpRel and an individual party to the ImpRel Agreements, residing in Dallas, Texas.

## **BACKGROUND**

13.     Based in Alpharetta, Georgia, the Debtors are a vertically-integrated market leader in the fuel supply business. The Debtors' business includes leasing fueling centers and associated convenience stores ("**Fueling Centers**") and travel centers ("**Travel Centers**") from landlords and distributing fuel purchased from major fuel suppliers to retail pump sites where consumers can purchase fuel from vendors via credit card machines. The Debtors' operations depend upon the Debtors entering into fuel purchase contracts with stringent minimum purchasing requirements with the major fuel suppliers (the "**Fuel Suppliers**") and long-term agreements with dealers (such as the Defendants) to supply the dealers with fuel.

14.     Certain of the Fueling Centers and Travel Centers are operated by the Debtors, while others are "dealered out," meaning the sites are subleased to third parties and operated by those third parties.[2]

### a.     **The Debtors Lease Stores to the Defendants**

15.     The Debtors and the Defendants are parties to leases—the 209-13 Lease, 744-46 Lease, 747-51 Lease, and 977-85 Lease (all together, the "**Leases**" and each a "**Lease**")—pursuant to which the Defendants agreed to lease certain Fueling Centers and/or Travel Centers from the

---

[2] See Declaration of Michael Healy in Support of Debtors' Chapter 11 Petitions and First Day Relief (D.I. 57) at page 6.

Debtors in exchange for rent and other consideration for a specified term. A list of the Fueling Centers and/or Travel Centers leased to the Defendants (each a "**Store**" and all together, the "**Stores**") is provided in the attached and incorporated **Appendix A**. Rent is owed by the Defendants to the Debtors on a monthly basis. The Defendants agreed that they would transfer any amounts due to the Debtors under the Leases by Automated Clearing House Debit ("**ACH**") initiated by Debtors from accounts maintained by the Defendants. A summary schedule (the "**Rent Schedule**") of the Defendants' obligations under the Leases is included in Appendix A.

16.     The Leases obligate the Defendants to pay a specified base rent amount via ACH on the first day of each month of the term of the Lease, in addition to any specified yearly and monthly administrative fees, property taxes, environmental fees, and costs for property insurance. The 209-13 Lease and 977-95 Lease also schedule fees for stopped ACHs and late rental payments.

17.     Per its section 2, the term of the 209-13 Lease begins on August 15, 2022 and ends on August 15, 2032. Per its section 2.02, the term of the 744-46 Lease ends on January 20, 2041. Per its section 2.02, the term of the 747-51 Lease ends on January 27, 2042. Per its section 2, the term of the 977-85 Lease begins on August 15, 2022 and ends on August 15, 2032.

18.     Default by a Defendant under a Lease entitles the Debtors to numerous remedies, including termination of the Lease. Pursuant to sections 16 and 19 of the 209-13 Lease and the 977-85 Lease, the Debtors and the ImpCap Defendants agreed that early termination of a Lease shall not affect the Debtors' right to collect unpaid rent for the entire term of the Lease. Pursuant to section 13.02 of the 744-46 Lease and the 747-51 Lease, the Debtors and the ImpRel Defendants agreed that the ImpRel Defendants shall be obligated in the event of breach for the full rent due under the remaining term of the Lease, discounted to present value and less fair rental value for each Store.

> **b.** **The Defendants Agree to Exclusively Purchase Motor Fuels from the Debtors for the Leased Stores**

19.     The Leases were entered between the parties for the purpose of the Defendants operating fuel retail businesses at specified Stores. Consistent with this purpose, the parties also entered into fuel agreements, the 209-13 FSA, 744-46 FSA, 747-51 FSA, and 977-85 FSA (all together, the "**FSAs**" and each an "**FSA**"), pursuant to which the parties agreed that the Defendants would <u>exclusively</u> purchase fuel from the Debtors to retail at the Stores:

> Dealer covenants and agrees to offer for sale, at the Location, only the motor fuels as are provided to the Location supplied by Supplier [Debtors] under this Agreement. Dealer shall not sell any other supplier's motor fuels without the express written permission of Supplier.

20.     The FSAs in section 2(b) require the Defendants to purchase a minimum number of gallons of petroleum products per month ("**Minimum Purchase Amount**"). The Minimum Purchase Amount for each of the FSAs is provided in the attached and incorporated **Appendix B**.

21.     Per section 1, the term of each FSA is ten years. The term of the 209-13 FSA begins on August 15, 2022 and ends on August 15, 2032. The term of the 744-46 FSA begins on January 20, 2022 and ends on January 20, 2032. The term of the 747-51 FSA begins on January 27, 2022 and ends on January 27, 2032. The term of the 977-85 FSA begins on August 15, 2022 and ends on August 15, 2032.

22.     Each FSA is to be governed under Georgia law pursuant to a choice of law clause contained in section 21(h).

23.     In the event of breach of the parties' exclusive fuel sale agreements, the parties agree in section 21(c) that "Supplier [the Debtors] shall have the right to injunctive relief in the form of a restraining order against Dealer . . . preventing any other fuel supplier from supplying fuel at the location for the term of this Agreement."

24.     The FSAs in section 14 provide the Debtors with the right to designate branding of motor fuels to be purchased by the Defendants (e.g., ExxonMobil, Shell, Sunoco, and Valero). Under the FSAs, the initial cost of changing or installing branding at a Store is borne by the Debtors ("**Branding Investment**").

25.     The price for motor fuels is calculable from a formula agreed to by the parties in the FSAs. The terms of payment are provided in the FSAs' section 6, which states that "[m]otor fuel sales shall be net payment, COD [cash on delivery], at time of delivery." The FSAs also permit the Debtors to, at their discretion, provide credit terms for payment, but these credit terms may be reverted to the default COD terms by the Debtors unilaterally giving notice to the Defendants. The FSAs state the Defendants must provide banking information necessary for electronic fund transfers ("**ECF**") to pay for fuel deliveries. A return of an ECF is a default by Defendants, and Defendants are subject to an administrative charge of $200.00 for each such dishonored instrument or transfer.

26.     The FSAs, in section 7, require the Defendants to exclusively use a credit card network ("**CC Network**") provided by the Debtors to conduct retail purchases:

> In the event of the unauthorized use of a credit card network or machine for processing sales at the Location, by Dealer or any of its Dealers or employees or contractors, Dealer shall be in default in its obligations under this Agreement. In the event of any such default, the cure for the unauthorized activity (in addition the discontinuance of such unauthorized activity), Dealer shall pay unto Supplier a five hundred dollar ($500) cure fee for the first such default; and a one thousand dollar ($1,000) cure fee for any subsequent default during the Term hereof. In the event of default by Dealer under any other terms of this Agreement, Supplier shall also be entitled to immediately disable said credit card network at the Location.

27.     The FSAs require, in section 16, that the Defendants furnish scheduled security deposits ("**Security Deposits**") for each Store, typically in the amount of $40,000. Per the FSAs, the Security Deposits are to be collected through the CC Network at a rate of two cents per gallon of fuel retailed at each Store. The FSAs, in section 7(b), further provide:

Invoices from credit card sales shall be credited and paid to Supplier in regard to approved credit card purchases from Dealer. Supplier shall credit Dealer's account for products purchased hereunder, for the amount of credit card sales credited and paid to Supplier in accordance with fuel jobber (wholesaler) industry standards; provided, however that credit cards sales shall not be immediately repaid to Dealer but held on Dealer's account as additional credit against fuel purchases. Upon any failure by Dealer to strictly comply with the terms and conditions of credit card transactions at the Location, Supplier shall have the right to charge-back to the Dealer all sums not credited to or paid to Supplier as a result of defective or noncomplying credit card sales at the Location. Any "charge-backs" shall be immediately paid by Dealer to Supplier.

28.    The Debtors are to provide a credit card settlement to the Defendants every two weeks:

This settlement shall be for the net amount of credit card funds held on behalf of Dealer as of the last two weeks, which shall be netted against any currently owing but unpaid invoices. The Locations shall be settled in two (2) week periods from Wednesday to Wednesday and settlement shall be paid out on Friday. This settlement shall not be assignable upon assignment or transfer of this Agreement without the express written consent of Supplier. Supplier reserves the right to change the credit card settlement terms at any time. In the event Supplier agrees to provide 3 day credit terms for payment of fuel, the credit card settlement terms shall be as follows:

Every week, Supplier shall provide a credit card settlement paid by check, EFT, or other agreed upon means, to Dealer. This settlement shall be for the net amount of credit card funds held on behalf of Dealer as of the last week, which shall be netted against any currently owing but unpaid invoices. The Location shall be settled in weekly periods from Wednesday to Wednesday and settlement shall be paid out on Friday. . . . Supplier reserves the right to revert back to the former credit card settlement terms at any time.

29.    Accordingly, construed as complete agreements, the FSAs provide that the Debtors shall provide fuel to Defendants with fuel purchased from the Fuel Suppliers via deliveries made by designated fuel haulers; fuel delivered to Stores by fuel haulers is to be sold to customers by the Defendants at the Stores' pumps via payment terminals, installed by the Debtors and operating the Debtors' CC Network; upon retail, point of sale ("**POS**") credit card funds are immediately transferred from the Dealer to the Fuel Supplier; approximately two days after sale, POS credit card funds are transferred to the Debtors from the Fuel Supplier; approximately three days after

sale, funds for the fuel purchased from the Fuel Supplier is drafted to the Fuel Supplier from the

Debtors via ACH; approximately one to two weeks after sale, the net sale funds are transferred to

the Defendants via ACH. **Diagram 1**, below, visualizes the flow of funds and fuel contemplated

under the FSAs:



30.     The FSAs, in section 3, mandate the Defendants operate the Stores 365 days a year

and furnish service and accommodations customary to convenience stores and filling stations. The

FSAs, in section 17, prohibit the Defendants from assigning the parties' agreement or permitting

third-party operation of a Store, except with the prior written consent of the Debtors.

31.     The FSAs further identify numerous additional acts or omissions that may constitute a breach or default in section 19, including:

(a) failure to remit to Supplier any monies owed by Dealer to Supplier in accordance with the provisions of this agreement; . . .

(d) failure of a mystery shopper inspection or other inspection at the Location and denying Supplier's implementation of a monthly maintenance program at the Location by a vendor to be selected by Supplier in its sole and absolute discretion; . . .

(f) abandonment or cessation of operation of the business of Dealer; [and]

(i) violation of any term or condition of the lease, . . .

32.     The FSAs contain a cross-default clause in section 21 providing the default on an FSA shall also be a default on all other agreements between the same parties, inclusive of the FSAs and Leases.

33.     Section 19 of the FSAs also specifies the numerous consequences of default. Among other remedies, "in the event Dealer fails to remit Supplier any monies owed to Supplier under the terms hereunder, Supplier shall have the right to immediately suspend motor fuel delivery until and unless such breach is cured." Section 19 also authorizes the Debtors to send a notice of default and demand cure within 15 days or have the FSAs terminated at the Debtors' discretion.

34.     The FSAs also provide that in the events of default and termination, the Debtors may recoup, as stipulated damages, their Branding Investment and the cost of "debranding" the Stores, inclusive of the costs to remove all brand signage and brand color scheme and repayment of any unamortized oil company branding costs and rebates at the Stores.

35.     Additionally, Defendants and the Debtors stipulated to liquidated damages ("**Liquidated Fuel Damages**") in the event of termination caused by Defendants' default:

[T]he parties agree that, in addition to any other amounts owed to Supplier hereunder, Dealer shall pay to Supplier as liquidated damages and not as a penalty a sum equal to FIVE CENTS ($0.05) times the minimum number of gallons required to be purchased monthly as contained herein times the number of months remaining in the Term of this Agreement from the date of default. The parties further agree that the above formula is reasonable because the amount of such liquidated damages are decreased by each month that Dealer performs its obligations under this Agreement.

36.     Separate and apart from the Liquidated Fuel Damages, the FSAs also entitle the Debtors to attorney's fees, costs, and interest as provided in section 21:

In the event it becomes necessary for Supplier to employ the services of its attorney to enforce any aspect of this Agreement, whether Dealer is in default of this Agreement or this Agreement is amended, assigned, or modified, Supplier shall be entitled to charge and collect administrative costs and legal fees in an amount not less than $2,000.00. In the event that either party files litigation regarding this Agreement, the losing party agrees to pay the prevailing party fifteen percent (15%) of the amount of damages for attorney's fees and costs of litigation.

c.     **The Defendants Breach the FSAs and the Leases Prior to and After the Petition Date and Refuse to Act in Compliance with the Agreements Post-Petition**

37.     Beginning prior to the Petition Date, the Debtors became aware that a Defendant or Defendants had committed and were actively committing various material breaches of the FSAs. More specifically, in or around early 2022, the Debtors learned that the ImpRel Defendants were in breach of the 747-51 FSA because at various Stores: the price sign had been turned off; fuel pump dispensers were non-functioning; gas was not available; and secondary credit card machine readers were being used in violation of the FSAs' section 7. Additionally, the Debtors learned that a third party was operating Stores without the Debtors' written consent, in violation of the FSAs.

38.     A dealer (inclusive of ImpCap and ImpRel) using an unauthorized payment terminal to conduct POS transactions with retail customers constitutes a substantial and material breach of the FSAs. Use of such machines allows a dealer to bypass the Debtors' CC Network, which is the mechanism by which: (i) the Debtors make payments to Fuel Suppliers and,

ultimately, recoup payment from dealers for fuel delivered on credit and (ii) the dealers maintain the Security Deposits for the Stores. Where an unauthorized payment terminal is used, POS credit card funds are not transferred to the Fuel Supplier and then onto the Debtors as is contemplated under the FSAs and indicated in Diagram 1. Rather, POS funds bypass the Fuel Supplier and the Debtors entirely, and are transferred directly to the dealer, as is demonstrated in the below **Diagram 2**:



39.     On March 8, 2023, the Debtors sent a "Notice of Default" to ImpRel and Mohammad Sajjad informing them of their defaults and invoking the FSAs' cross-default clause. The Debtors further gave notice that ImpRel and Mr. Sajjad had 15 days from the date of the notice

to cure the defaults or be subjected to subjected to damages in the estimated amount of $54,792,285, plus attorney's fees.

40.     ImpRel did not resume compliance with the FSAs after the Debtors filed for bankruptcy on March 18; rather, the Debtors continued learning of the ImpRel Defendants' additional breaches of the FSAs at various Stores. Specifically, the Debtors became aware in March 2023 that ImpRel was failing to use the CC Network at Stores additional to those noticed as being in default on March 8.

41.     Contemporaneously, the Debtors became aware that ImpCap and Abrar Abid were violating the FSAs. ImpCap stopped payment of an ACH draft for fuel delivered to Store #212 in an amount totaling $24,557.26. In addition, the Debtors learned that ImpCap, like ImpRel, was using a secondary credit card networks instead of the Debtor's CC Network, in violation of the FSAs.

42.     On March 28, 2023, the Debtors sent a "Default and Demand" to ImpRel and Mr. Sajjad notifying them of their additional defaults under the FSAs, that they were being fined $500 per Store for the use of an unauthorized credit card network and $2,000 in legal fees per Store, and that the Stores were being put on hold for future fuel deliveries.  The Debtors' letter warned that failure to use the CC Network would result in termination of the FSAs and damages in the form of equipment removal, debranding costs, recoupment of the Brand Investment, Liquidated Fuel Damages and costs, and further attorney's fees. The letter attached the Court's Order Restating Automatic Stay and warned the notice recipients their actions could be deemed "self-help" and constitute a violation of the automatic stay.

43.     Also on March 28, 2023, the Debtors sent a "Notice of Default" to ImpCap and Mr. Abid notifying them of their defaults under the FSAs, that they were being fined $500 per Store

for the use of an unauthorized credit card network and $2,000 in legal fees per Store, and that the Stores were being put on hold for future fuel deliveries.  The Debtors' letter warned that failure to use the CC Network would result in termination of the FSAs and damages in the form of equipment removal, debranding costs, and Brand Investment recoupment, Liquidated Fuel Damages and costs, and further attorney's fees. The letter likewise attached the Court's Order Restating Automatic Stay and warned the notice recipients their actions could be deemed "self-help" and constitute a violation of the automatic stay.

44.     Counsel for the Defendants responded to the Debtors' letters on March 29, 2023, acknowledging the automatic stay and expressing a desire to work through issues related to the FSAs, but also stating the Defendants intended to buy fuel from third-party suppliers—without written consent of the Debtors—in response to an alleged failure by the Debtors to deliver fuel.

45.     The Debtors have worked in good faith with Defendants' counsel (including Defendants' predecessor counsel) to reach a resolution of the parties' dispute and to bring the Defendants into compliance with the FSAs and the Leases. However, the Debtors have so far been unable to obtain agreement from the Defendants to comply with the FSAs and Leases, necessitating the relief sought in the Complaint.

46.     In addition to any other default notices received by the Defendants from the Debtors, or its agents, this Complaint shall serve as a notice of default under each Lease and FSA.

## **COUNTS**

I.     **Count I: Breaches of Contract Under the 209-13 FSA by ImpCap Defendants, Liquidated or Actual Damages**

47.     Debtors incorporate by reference the allegations in all preceding paragraphs as if set forth fully herein.

48.     The ImpCap Defendants breached the 209-13 FSA by:

    (1)      Stopping ACH drafts for fuel purchases or causing ECF failures;

    (2)      Failing to use the Debtors' CC Network and employing an unauthorized credit card network;

    (3)      Failing to purchase the monthly minimum volume of petroleum products;

    (4)      Failing to maintain the Security Deposits;

    (5)      Failing to remit to monies owed to Debtors in accordance with the provisions of the FSA;

    (6)      Ceasing or abandoning business operations at Stores;

    (7)      Failing mystery shopper inspections; and

    (8)      Violating the terms and conditions of the parties' Leases.

49.     Pursuant to the 209-13 FSA, the Debtors and the ImpCap Defendants agreed that breach by the ImpCap Defendants and termination of the agreement would trigger two forms of stipulated damages: (i) the Liquidated Fuel Damages, representing the loss of profits from fuel sales contemplated under the FSA but never realized and (ii) the recoupment of the Branding Investment and the Debtors' debranding costs, representing the Debtors' losses from costs associated with front-end investment in the Stores.

50.     Specifically, section 19 of the 209-13 FSA states that a default by the ImpCap Defendants entitles Debtors to Liquidated Fuel Damages in the amount calculable under the FSA.

51.     However, calculating Liquidated Fuel Damages requires determining the Minimum Purchase Amount, the volume in gallons the ImpCap Defendants are obligated to purchase every month of the FSA's term. The Minimum Purchase Amount is determined by averaging monthly fuel purchases at the applicable stores for a six-month period beginning and ending on specified dates. The ImpCap Defendants failed to purchase fuel for any of the applicable stores for the full six-month period; this constitutes a breach of the FSA and also makes it difficult to determine the Minimum Purchase Amount that is necessary for calculating Liquidated Fuel Damages.

52.     The ImpCap Defendants should not be allowed to avoid their agreement to pay Liquidated Fuel Damages by virtue of their own breaches. Accordingly, the Debtors reserve their rights to seek Liquidated Fuel Damages calculated from an appropriately modified Minimum Purchase Amount.

53.     Pursuant to section 19 of the 209-13 FSA, a default by the ImpCap Defendants further entitles Debtors to its costs for debranding the Stores and to recoup its Branding Investment, inclusive of repayment of any unamortized oil company branding costs and rebates for the Stores. The amount of these stipulated damages is estimated in the appended and incorporated **Appendix C**.

54.     In the event the 209-13 FSA's liquidated damages clauses are found to be unenforceable, the Debtors seek, in the alternative, all actual damages resulting from the ImpCap Defendants' breaches.

**II.     Count II: Breaches of Contract Under the 744-46 FSA, Liquidated or Actual Damages**

55.     Debtors incorporate by reference the allegations in all preceding paragraphs as if set forth fully herein.

56.     The ImpRel Defendants breached the 744-46 FSA by:

> (1)     Stopping ACH drafts for fuel purchases or causing ECF failures;
>
> (2)     Failing to use the Debtors' CC Network and employing an unauthorized credit card network;
>
> (3)     Failing to purchase the monthly minimum volume of petroleum products;
>
> (4)     Failing to maintain the Security Deposits;
>
> (5)     Failing to remit to monies owed to Debtors in accordance with the provisions of the FSA;
>
> (6)     Ceasing or abandoning business operations at Stores;

(7)    Failing mystery shopper inspections;

(8)    Violating the terms and conditions of the parties' Leases;

(9)    Failing to furnish service and accommodations customary to convenience stores and filling stations; and

(10)    Allowing operation of Stores by a third-party dealer without the Debtors' consent.

57.    Pursuant to section 19 of the 744-46 FSA, a default by the ImpRel Defendants entitles Debtors to Liquidated Fuel Damages in the amount calculated in the attached and incorporated Appendix B.

58.    Pursuant to section 19 of the 744-46 FSA, a default by the ImpCap Defendants further entitles Debtors to its costs for debranding the Stores and to recoup its Branding Investment, inclusive of repayment of any unamortized oil company branding costs and rebates for the Stores. The amount of these stipulated damages is estimated in Appendix C.

59.    In the event the 744-46 FSA's liquidated damages clauses are found to be unenforceable, the Debtors seek, in the alternative, all actual damages resulting from the ImpRel Defendants' breaches.

### III.    Count III: Breaches of Contract Under the 747-51 FSA, Liquidated or Actual Damages

60.    Debtors incorporate by reference the allegations in all preceding paragraphs as if set forth fully herein.

61.    The ImpRel Defendants breached the 747-51 FSA by:

(1)    Stopping ACH drafts for fuel purchases or causing ECF failures;

(2)    Failing to use the Debtors' CC Network and employing an unauthorized credit card network;

(3)    Failing to purchase the monthly minimum volume of petroleum products;

(4)    Failing to maintain the Security Deposits;

(5)     Failing to remit to monies owed to Debtors in accordance with the provisions of the FSA;

(6)     Ceasing or abandoning business operations at Stores;

(7)     Failing mystery shopper inspections;

(8)     Violating the terms and conditions of the parties' Leases;

(9)     Failing to furnish service and accommodations customary to convenience stores and filling stations; and

(10)    Allowing operation of Stores by a third-party dealer without the Debtors' consent.

62.     Pursuant to the 747-51 FSA, the Debtors and the ImpCap Defendants agreed that breach by the ImpCap Defendants and termination of the agreement would trigger two forms of stipulated damages: (i) the Liquidated Fuel Damages, representing the loss of profits from fuel sales contemplated under the FSA but never realized and (ii) the recoupment of the Branding Investment and the Debtors' debranding costs, representing the Debtors' losses from costs associated with front-end investment in the Stores.

63.     Pursuant to section 19 of the 747-51 FSA, a default by the ImpRel Defendants entitles Debtors to Liquidated Fuel Damages in the amount calculated in the attached and incorporated Appendix B.

64.     Pursuant to section 19 of the 747-51 FSA, a default by the ImpCap Defendants further entitles Debtors to its costs for debranding the Stores and to recoup its Branding Investment, inclusive of repayment of any unamortized oil company branding costs and rebates for the Stores. The amount of these stipulated damages is estimated in Appendix C.

65.     In the event the 747-51 FSA's liquidated damages clauses are found to be unenforceable, the Debtors seek, in the alternative, all actual damages resulting from the ImpRel Defendants' breaches.

IV.    **Count IV: Breaches of Contract Under the 977-85 FSA, Liquidated or Actual Damages**

66.    Debtors incorporate by reference the allegations in all preceding paragraphs as if set forth fully herein.

67.    The ImpCap Defendants breached the 977-85 FSA by:

(1)    Stopping ACH drafts for fuel purchases or causing ECF failures;

(2)    Failing to use the Debtors' CC Network and employing an unauthorized credit card network;

(3)    Failing to purchase the monthly minimum volume of petroleum products;

(4)    Failing to maintain the Security Deposits;

(5)    Failing to remit to monies owed to Debtors in accordance with the provisions of the FSA;

(6)    Ceasing or abandoning business operations at Stores;

(7)    Failing mystery shopper inspections; and

(8)    Violating the terms and conditions of the parties' Leases.

68.    Pursuant to section 19 of the 977-85 FSA, a default by the ImpCap Defendants entitles Debtors to Liquidated Fuel Damages in the amount calculated in the attached and incorporated Appendix B.

69.    Pursuant to the 977-85 FSA, the Debtors and the ImpCap Defendants agreed that breach by the ImpCap Defendants and termination of the agreement would trigger two forms of stipulated damages: (i) the Liquidated Fuel Damages, representing the loss of profits from fuel sales contemplated under the FSA but never realized and (ii) the recoupment of the Branding Investment and the Debtors' debranding costs, representing the Debtors' losses from costs associated with front-end investment in the Stores.

70.     Specifically, section 19 of the 977-85 FSA states that a default by the ImpCap Defendants entitles Debtors to Liquidated Fuel Damages in the amount calculable under the FSA.

71.     However, calculating Liquidated Fuel Damages requires determining the Minimum Purchase Amount, the volume in gallons the ImpCap Defendants are obligated to purchase every month of the FSA's term. The Minimum Purchase Amount is determined by averaging monthly fuel purchases at the applicable stores for a six-month period beginning and ending on specified dates. The ImpCap Defendants failed to purchase fuel for any of the applicable stores for the full six-month period; this constitutes a breach of the FSA and also makes it difficult to determine the Minimum Purchase Amount that is necessary for calculating Liquidated Fuel Damages.

72.     The ImpCap Defendants should not be allowed to avoid their agreement to pay Liquidated Fuel Damages by virtue of their own breaches. Accordingly, the Debtors reserve their rights to seek Liquidated Fuel Damages calculated from an appropriately modified Minimum Purchase Amount.

73.     Pursuant to section 19 of the 977-85 FSA, a default by the ImpCap Defendants further entitles Debtors to its costs for debranding the Stores and to recoup its Branding Investment, inclusive of repayment of any unamortized oil company branding costs and rebates for the Stores. The amount of these stipulated damages is estimated in Appendix C.

74.     In the event the 977-85 FSA's liquidated damages clauses are found to be unenforceable, the Debtors seek, in the alternative, all actual damages resulting from the ImpCap Defendants' breaches.

**V.      Count V: Breaches of Contract Under the 209-13 Lease, Liquidated or Actual Damages**

75.     Debtors incorporate by reference the allegations in all preceding paragraphs as if set forth fully herein.

76.     The ImpCap Defendants breached the 209-13 Lease by:

> (1)     Stopping ACH drafts for rent or causing ECF failures;
>
> (2)     Failing to remit rent and fees owed to Debtors in accordance with the provisions of the Lease;
>
> (3)     Ceasing or abandoning business operations at Stores; and
>
> (4)     Violating the terms and conditions of the parties' FSAs.

77.     Due to the ImpCap Defendants' breaches of the 209-13 Lease, the Debtors are entitled to, among other remedies, terminate the 209-13 Lease. Pursuant to sections 4 and 16 of the 209-13 Lease, the Debtors are further entitled to all unpaid rent for the entire term of the Lease, as set forth in Appendix A.

**VI.     Count VI: Breaches of Contract Under the 744-46 Lease, Liquidated or Actual Damages**

78.     Debtors incorporate by reference the allegations in all preceding paragraphs as if set forth fully herein.

79.     The ImpRel Defendants breached the 744-46 Lease by:

> (1)     Stopping ACH drafts for rent or causing ECF failures;
>
> (2)     Failing to remit rent and fees owed to Debtors in accordance with the provisions of the Lease;
>
> (3)     Ceasing or abandoning business operations at Stores;
>
> (4)     Violating the terms and conditions of the parties' FSA;
>
> (5)     And subletting or assigning one or more stores without the written authorization of the Debtors.

80.     Due to the ImpRel Defendants' breaches of the 744-46 Lease, the Debtors are entitled to, among other remedies, terminate the 744-46 Lease. Pursuant to section 13.02 of the 744-46 Lease, the Debtors are further entitled to all unpaid rent for the entire term of the Lease, as set forth in Appendix A.

**VII.   Count VII: Breaches of Contract Under the 747-51 Lease, Liquidated or Actual Damages**

81.     Debtors incorporate by reference the allegations in all preceding paragraphs as if set forth fully herein.

82.     The ImpRel Defendants breached the 747-51 Lease by:

      (1)     Stopping ACH drafts for rent or causing ECF failures;

      (2)     Failing to remit rent and fees owed to Debtors in accordance with the provisions of the Lease;

      (3)     Ceasing or abandoning business operations at Stores;

      (4)     Violating the terms and conditions of the parties' FSA;

      (5)     And subletting or assigning one or more stores without the written authorization of the Debtors.

83.     Due to the ImpRel Defendants' breaches of the 747-51 Lease, the Debtors are entitled to, among other remedies, terminate the 747-31 Lease. Pursuant to section 13.02 of the 747-51 Lease, the Debtors are further entitled to all unpaid rent for the entire term of the Lease, as set forth in Appendix A.

**VIII.  Count VIII: Breaches of Contract Under the 977-85 Lease, Liquidated or Actual Damages**

84.     Debtors incorporate by reference the allegations in all preceding paragraphs as if set forth fully herein.

85.     The ImpCap Defendants breached the 977-85 Lease by:

      (1)     Stopping ACH drafts for rent or causing ECF failures;

      (2)     Failing to remit rent and fees owed to Debtors in accordance with the provisions of the Lease;

      (3)     Ceasing or abandoning business operations at Stores; and

      (4)     Violating the terms and conditions of the parties' FSAs.

86. Due to the ImpCap Defendants' breaches of the 977-85 Lease, the Debtors are entitled to, among other remedies, terminate the 977-85 Lease. Pursuant to sections 4 and 16 of the 977-85 Lease, the Debtors are further entitled to all unpaid rent for the entire term of the Lease, as set forth in Appendix A.

**IX.     Count IX: Attorney's Fees**

87. Debtors incorporate by reference the allegations in all preceding paragraphs as if set forth fully herein.

88. Section 18.07 of the 744-46 Lease and 747-51 Lease, section 23 of the 209-13 Lease and 977-85 Lease, and section 20 of the FSAs authorize the recovery of attorney's fees and litigation costs and expenses, stipulated under the FSAs to be in the amount of 15% of the prevailing parties' judgment for damages.

89. All conditions precedent with respect to attorney's fees have been performed— Debtors are entitled to recover their attorney's fees and costs as provided under the parties' agreements.

**WHEREFORE**, the Debtors respectfully request that the Court grant the following relief in their favor:

A. Judgment against Defendants Imperial Capital LLC and Abrar Abid for breach of the 209-13 FSA under Count I.

B. Judgment against Defendants Imperial Reliance LLC and Mohammad Sajjad for breach of the 744-46 FSA under Count II.

C. Judgment against Defendants Imperial Reliance LLC and Mohammad Sajjad for breach of the 747-51 FSA under Count III.

D. Judgment against Defendants Imperial Capital LLC and Abrar Abid for breach of the 977-85 FSA under Count IV.

E.  Judgment against Defendants Imperial Capital LLC and Abrar Abid for breach of the 209-13 Lease under Count V.

F.  Judgment against Defendants Imperial Reliance LLC and Mohammad Sajjad for breach of the 744-46 Lease under Count VI.

G.  Judgment against Defendants Imperial Reliance LLC and Mohammad Sajjad for breach of the 747-51 Lease under Count VII.

H.  Judgment against Defendants Imperial Capital LLC and Abrar Abid for breach of the 977-85 Lease under Count VIII.

I.  An award of monetary damages, in the amount stipulated to by the parties as liquidated damages, as set forth in Counts I-VIII.

J.  An award of monetary damages, consisting of actual damages to be determined at trial, as set forth in Counts I-VIII, to the extent a relevant stipulated damages clause is not enforceable.

K.  An award for Debtors' stipulated (and/or otherwise reasonable) attorney's fees and litigation costs and expenses.

L.  An award for pre- and post-judgment interest on the monetary damages awarded under Counts I-IX as provided by law; and

M.  Such other and further legal and equitable relief as may be just and proper.

*Respectfully submitted,*

Dated: <u>June 2, 2023</u>

New Orleans, LA

**LUGENBUHL, WHEATON, PECK, RANKIN & HUBBARD**

*/s/ Benjamin W. Kadden*

Benjamin W. Kadden (TX  24077542)
Coleman L. Torrans (*Pro Hac Vice* Pending)
601 Poydras St., 27th Floor
New Orleans, LA
(t) 504.568.1990
(f) 504.310.9195
bkadden@lawla.com
ctorrans@lawla.com

**Proposed Special Litigation Counsel to the Debtors and Debtors in Possession**

## APPENDIX A

### Rent Schedule[3]

**Annual Rate Increase**                              **2%[4]**

| Store No. | Def. Group | Store Address | 2023 Rent | ** | 2032 Rent | ** | 2040 Rent | 2041 Rent | Total Rent Due for Rem. Term[5] |
|---|---|---|---|---|---|---|---|---|---|
| 209 | ImpCap | 701 N. Mission St., Sapula, OK | $18,000 | | $21,512 | | $0 | $0 | |
| 210 | ImpCap | 226 E. Gentry Ave., Checotah, OK | $8,800 | | $10,517 | | $0 | $0 | |
| 211 | ImpCap | 400 N. Kentucky Ave., Panama, OK | $8,800 | | $10,517 | | $0 | $0 | |
| 212 | ImpCap | 13037 W. 834 Road, Tahlequah, OK | $10,129 | | $12,105 | | $0 | $0 | |
| 213 | ImpCap | 7201 S. Zero St., Fort Smith, AR | $12,000 | | $14,341 | | $0 | $0 | |
| Lease Subtotal | | | $57,729 | | $68,992 | | $0 | $0 | |
| x Cal. Months Rem. Unpaid | | | $443,833 | | $517,438 | | | | $7,026,040 |
| 744 | ImpRel | 11249 State Highway 56, Okemah, OK, | $50,061 | | $59,827 | | $70,097 | $71,499 | |
| 745 | ImpRel | 9062 US Highway 69, Savanna, OK, | $53,801 | | $64,297 | | $75,335 | $76,841 | |
| 746 | ImpRel | 424 N. Van Buren Road, Enid, OK, | $16,795 | | $20,072 | | $23,518 | $23,988 | |
| Lease Subtotal | | | $1,447,890 | | $1,730,363 | | $2,027,396 | $2,067,943 | |

---

[3] This appendix provides a good faith estimate of all rent due and unpaid under the Leases; the Debtors intend seek all monies due under the Leases, including monies in excess of the amounts set forth herein, and reserve all rights to do so.

[4] Pursuant to the terms of each Lease, base rent is increased by 2% every year.

[5] For purposes of readability only, rent for years 2024-2031 and 2033-3039 is not shown but is factored into the totals provided in this summing column.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| x Cal. Months Rem. Unpaid | | | $965,260 | $1,730,363 | $2,027,396 | $172,329 | **$30,588,509** |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 747 | ImpRel | 1013 S Blue Mound Road, Blue Mountain, TX, | $25,6890 | $30,702 | $35,972 | $36,692 | |
| 748 | ImpRel | 1225 Oakland Blvd., Fort Worth, TX, | $13,718 | $16,395 | $19,209 | $19,593 | |
| 749 | ImpRel | 9400 White Settlement Road, Fort Worth, TX, | $22,924 | $27,396 | $32,099 | $32,741 | |
| 750 | ImpRel | 5600 N Tarrant Pkwy., Fort Worth, TX, | $26,339 | $31,478 | $36,882 | $37,619 | |
| 751 | ImpRel | 5255 Davis Blvd., North Richland Hills, TX, | $23,316 | $27,865 | $32,648 | $33,301 | |
| Lease Subtotal | | | $1,343,850 | $1,606,025 | $1,881,714 | $1,919,349 | |
| x Cal. Months Rem. Unpaid | | | $797,632 | $1,606,025 | $1,881,714 | $159,946 | **$28,388,663** |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 977 | ImpCap | 13 -19 2nd St. NW, Aitkin, MN | $12,000 | $14,341 | $0 | $0 | |
| 978 | ImpCap | US-169, Aitkin, MN, 56431 | $11,500 | $13,744 | $0 | $0 | |
| 979 | ImpCap | 900 MN-65, Mora, MN | $13,500 | $16,134 | $0 | $0 | |
| 980 | ImpCap | 1135 E. 37th St. Hibbing, Minnesota 55746 | $18,000 | $21,512 | $0 | $0 | |
| 981 | ImpCap | 730 S River St., Spooner, WI | $13,250 | $15,835 | $0 | $0 | |
| 982 | ImpCap | 15771 US-63, Hayward, WI | $12,000 | $14,341 | $0 | $0 | |
| 983 | ImpCap | 24184 WI-35, Siren, WI | $10,000 | $11,951 | $0 | $0 | |
| 984 | ImpCap | 2330 Wiley Blvd. SW, Cedar Rapids, IA | $10,312 | $12,324 | $0 | $0 | |
| 985 | ImpCap | 2875 Commerce Dr., Iowa City, IA | $11,500 | $13,744 | $0 | $0 | |
| Lease Subtotal | | | $112,062 | $133,924 | $0 | $0 | |

| x Cal. Months Rem. Unpaid | | $896,496 | $1,004,433 | **$13,673,663** |
|---|---|---|---|---|
| **ImpCap Unpaid Rent Total:** | **$20,699,703.85** | | | |
| **ImpRel Unpaid Rent Total:** | **$58,977,172.99** | | | |
| | | | | |

**APPENDIX B**

**Minimum Purchase Amounts and Liquidated Fuel Damages[6]**

| Store No. | FSA | Def. Co. | Date of Default Notice | End Date for Term | Months Left Under Term from Default Notice | Average of Gallons Purchased for Store Over 6 Month Period Provided in FSA § 2(b) | Notes | FSA Minimum Monthly Purchase Amount under FSA in Gallons [2(b)] | Total Est. Gallons to be Purchased for Stores for Remaining Term | Liq. Dmg. Rate [19] | Liquidated Fuel Damages Due Under FSA |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 209 | | | | | | 14,732 | [1] | | | | |
| 210 | | | | | | 0 | [2] | | | | |
| 211 | | | | | | 0 | [2] | | | | |
| 212 | | | | | | 8,051 | [3] | | | | |
| 213 | 209-13 FSA | ImpCap | 3/28/2023 | 8/15/2032 | 112 | 9185 | [4] | 10,656.00 | 5,967,360.00 | $ 0.05 | $ 298,368.00 |
| | | | | | | | | | | | |
| 744 | | | | | | 61,077 | | | | | |
| 745 | | | | | | 82,106 | | | | | |
| 746 | 744-46 FSA | ImpRel | 3/8/2023 | 1/20/2032 | 106 | 14,244 | | 52,475.67 | 16,687,262.00 | $ 0.05 | $ 834,363.10 |
| | | | | | | | | | | | |
| 747 | | | | | | 75,969 | | | | | |
| 748 | | | | | | 31,596 | | | | | |
| 749 | | | | | | 27,699 | | | | | |
| 750 | 747-51 FSA | ImpRel | 3/8/2023 | 1/27/2032 | 106 | 60,978 | | 46,603.20 | 24,699,696.00 | $ 0.05 | $ 1,234,984.80 |

[6] This appendix provides a good faith estimate of all Liquidated Fuel Damages due under the FSAs; the Debtors intend seek all monies due under the FSAs, including monies in excess of the amounts set forth herein, and reserve all rights to do so.

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 751 | | | | | | 36,774 | | | | | |
| | | | | | | | | | | | |
| 977 | | | | | | 23,806 | [5] | | | | |
| 978 | | | | | | 20,882 | [6] | | | | |
| 979 | | | | | | 15,506 | [7] | | | | |
| 980 | | | | | | 28,159 | [8] | | | | |
| 981 | | | | | | 23,013 | [9] | | | | |
| 982 | | | | | | 13,252 | [10] | | | | |
| 983 | | | | | | 36,993 | [11] | | | | |
| 984 | | | | | | 24,127 | [12] | | | | |
| 985 | 977-85 FSA | ImpCap | 3/28/2023 | 8/15/2032 | 112 | 32,935 | [13] | 24,297.00 | 24,491,376.00 | $ 0.05 | $ 1,224,568.80 |

**Notes:**

[1] Defendants only purchased fuel for four months and fuel purchases were  affected due to delivery holds caused by Defendants' defaults.

[2] Defendants never purchased fuel from Debtors.

[3] Defendants only purchased fuel for two months and  fuel purchases were  affected due to delivery holds caused by Defendants' defaults.

[4] Defendants only purchased fuel for one month.

[5] Defendants only purchased fuel for three months and  fuel purchases were affected due to delivery holds caused by Defendants' defaults.

[6] Defendants only purchased fuel for three months and  fuel purchases were affected due to delivery holds caused by Defendants' defaults.

[7] Defendants only purchased fuel for three months and  fuel purchases were affected due to delivery holds caused by Defendants' defaults.

[5] Defendants only purchased fuel for three months and  fuel purchases were affected due to delivery holds caused by Defendants' defaults.

[5] Defendants only purchased fuel for three months and  fuel purchases were affected due to delivery holds caused by Defendants' defaults.

[12] Defendants only purchased fuel for two months and  fuel purchases were affected due to delivery holds caused by Defendants' defaults.

[11] Defendants only purchased fuel for three months and  fuel purchases were affected due to delivery holds caused by Defendants' defaults.

[12] Defendants only purchased fuel for four months and  fuel purchases were affected due to delivery holds caused by Defendants' defaults.

[13] Defendants only purchased fuel for four months and  fuel purchases were affected due to delivery holds caused by Defendants' defaults.

## APPENDIX C

## Debranding and Brand Investment Costs[7]

| Store No. | Def. Group | National Branding | Brand commitment | MEX Branding Investment | MEX Equipment Investment | Total Investment |
|---|---|---|---|---|---|---|
| 209 | ImpCap | Unbranded | $0.00 | $0.00 | $0.00 | $0.00 |
| 210 | ImpCap | Unbranded | $0.00 | $0.00 | $0.00 | $0.00 |
| 211 | ImpCap | Unbranded | $0.00 | $0.00 | $0.00 | $0.00 |
| 212 | ImpCap | Unbranded | $0.00 | $0.00 | $0.00 | $0.00 |
| 213 | ImpCap | Unbranded | $0.00 | $0.00 | $70,467.27 | $70,467.27 |
| **Lease Total:** | | | **$0.00** | **$0.00** | **$70,467.27** | **$70,467.27** |
| 744 | ImpRel | Shell | $0.00 | $0.00 | $0.00 | $0.00 |
| 745 | ImpRel | Phillips66 | $258,183.62 | $0.00 | $0.00 | $258,183.62 |
| 746 | ImpRel | Shell | $220,000.00 | $61,176.50 | $54,171.33 | $335,347.83 |
| **Lease Total:** | | | **$478,183.62** | **$61,176.50** | **$54,171.33** | **$593,531.45** |
| 747 | ImpRel | Mobil | $155,000.00 | $140,748.72 | $0.00 | $295,748.72 |
| 748 | ImpRel | Mobil | $0.00 | $0.00 | $0.00 | $0.00 |
| 749 | ImpRel | Mobil | $110,000.00 | $119,630.75 | $0.00 | $229,630.75 |
| 750 | ImpRel | Mobil | $110,000.00 | $127,382.56 | $0.00 | $237,382.56 |
| 751 | ImpRel | Mobil | $110,000.00 | $67,712.74 | $0.00 | $177,712.74 |
| **Lease Total:** | | | **$485,000.00** | **$455,474.77** | **$0.00** | **$940,474.77** |
| 977 | ImpCap | Marathon | $173,763.29 | $0.00 | $0.00 | $173,763.29 |
| 978 | ImpCap | Marathon | $173,763.29 | $0.00 | $0.00 | $173,763.29 |

[7] This appendix provides a good faith estimate of stipulated damages for the Debtors Brand Investment and debranding costs under the FSAs; the Debtors intend seek all monies due under the FSAs, including monies in excess of the amounts set forth herein, and reserve all rights to do so.

| | | | | | | |
|---|---|---|---|---|---|---|
| 979 | ImpCap | Marathon | $173,763.29 | $0.00 | $0.00 | $173,763.29 |
| 980 | ImpCap | Marathon | $173,763.29 | $0.00 | $0.00 | $173,763.29 |
| 981 | ImpCap | Marathon | $173,763.29 | $0.00 | $0.00 | $173,763.29 |
| 982 | ImpCap | Marathon | $173,763.29 | $0.00 | $0.00 | $173,763.29 |
| 983 | ImpCap | Marathon | $173,763.29 | $0.00 | $0.00 | $173,763.29 |
| 984 | ImpCap | Bp | $155,000.00 | $0.00 | $0.00 | $155,000.00 |
| 985 | ImpCap | Bp | $125,000.00 | $0.00 | $0.00 | $125,000.00 |
| **Lease Total:** | | | **$1,496,343.00** | **$0.00** | **$0.00** | **$1,496,343.00** |