DocuSign Envelope ID: E386982F-2E6B-45EA-A801-F4B1883F2ED5

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| MOUNTAIN EXPRESS OIL COMPANY, et al., | Case No. 23-90147 (DRJ) |
| Debtors. [1] | (Jointly Administered) |

**DECLARATION OF DISINTERESTEDNESS OF GRANT THORNTON LLP**
**PURSUANT TO THE ORDER AUTHORIZING THE RETENTION AND**
**COMPENSATION OF CERTAIN PROFESSIONALS UTILIZED IN THE ORDINARY**
**COURSE OF BUSINESS**

I, Shalin Pathak, make this declaration (this "Declaration") under penalty of perjury:

1.      I am a Partner of Grant Thornton LLP, located at 171 N. Clark St. Suite 200, Chicago, IL 60601 (the "Company").

2.      Mountain Express Oil Company (and the other debtors in the above-captioned chapter 11 cases) and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), have requested that the Company provide assistance with financial and accounting services to the Debtors, namely Mountain Express Oil Company and the Company has consented to provide such services. Although it will depend on particular services requested by the Debtors at a particular point in time, I anticipate that the fees, costs and expenses incurred by the Company for the duration of these chapter 11 cases will likely be in the range of $230,000 - $270,000 per month.

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/mountainexpressoil. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these chapter 11 cases is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022.

DocuSign Envelope ID: E386982F-2E6B-45EA-A801-F4B1883F2ED5

3.      The Debtors have requested that the Company be categorized as a Tier 1 Ordinary Course Professional ("OCP") and abide by the Tier-specific parameters as described more fully in the *Debtors' Amended Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* [Docket No. 343] and the *Order Authorizing the Retention of an Compensation of Certain Professionals in the Ordinary Course of Business* [Docket No 407], entered on May 15, 2023 (the "OCP Order").

4.      The Debtors have provided the Company with a list of the Potential Parties-in-Interest, as amended (the "List"), included as Schedule 1 to the *Declaration of Jeffrey N. Pomerantz in Support of the Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Pachulski Stang Ziehl & Jones LLP as Counsel for the Debtors Effective as of March 18, 2023*. *See* Docket No. 281, Exhibit A. The Company has reviewed the List, and run the List through its conflicts system. The Company may have performed services in the past, may currently perform services and may perform services in the future, in matters unrelated to these chapter 11 cases, for persons on the List. The Company does not perform services for any such person on the List in connection with these chapter 11 cases or have any relationship with any such person on the List, their attorneys, or accountants that would be adverse to the Debtors or their estates with respect to the matter on which the Company is proposed to be employed.

5.      As part of its customary practice, the Company is retained in cases, proceedings, and transactions involving many different parties, some of whom may represent or be employed by the Debtors, claimants, and parties in interest in these chapter 11 cases.

6.      Neither I nor any principal, partner, director, officer of, or professional employed by, the Company has agreed to share or will share any portion of the compensation to be received

DocuSign Envelope ID: E386982F-2E6B-45EA-A801-F4B1883F2ED5

from the Debtors with any other person other than the principal and regular employees of the Company.

7.     Neither I nor any principal, partner, director, officer, of or professional employed by, the Company, insofar as I have been able to ascertain, holds or represents any interest adverse to the Debtors or their estates with respect to the matter(s) upon which this Company is to be employed, and the Company is a "disinterested person" within the meaning set forth in section 101(14) of title 11 of the United States Code

8.     The Debtors owe the Company $229,474.03 for prepetition services, the payment of which is subject to limitations contained in the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532. During the 90-days preceding March 18, 2023, the Petition Date, the Company was paid $57,918.50.

9.     I understand that the amount owed by any of the Debtors to the Company for prepetition services will be treated as a general unsecured claim, and, as such, the Company may file a proof of claim.

10.     I further understand that this Declaration will not suffice as the Company's proof of claim.

11.     To the extent the Company performs any services on behalf of a non-Debtor entity, including any non-Debtor affiliates, the Company will maintain separate timekeeping records with respect to such services and the Debtors' estates shall not be responsible in any way for such services.

12.     As of March 18, 2023, which was the date on which the Debtors commenced these chapter 11 cases, the Company was party to an agreement for indemnification with certain of the Debtors. A copy of such agreement is attached as **Exhibit 1** to this Declaration.

DocuSign Envelope ID: E386982F-2E6B-45EA-A801-F4B1883F2ED5

13. Such agreement for indemnification (the "OCP Agreement") is subject to the following modifications, applicable during the pendency of the Debtors' chapter 11 cases:

    a. The OCP shall not be entitled to indemnification, contribution, or reimbursement pursuant to the OCP Agreement for services other than the services provided under the OCP Agreement, unless such services and the indemnification, contribution, or reimbursement are approved by the Court.

    b. Notwithstanding anything to the contrary in the OCP Agreement, the Debtors shall have no obligation to indemnify the OCP, or provide contribution or reimbursement to the OCP, for any claim or expense that is either: (i) judicially determined (the determination having become final) to have arisen from the OCP's gross negligence, willful misconduct, fraud, self-dealing (if found to be applicable), bad faith, or breach of fiduciary duty (if any); (ii) for a contractual dispute in which the Debtors allege the breach of the OCP's contractual obligations if the Court determines that indemnification, contribution, or reimbursement would not be permissible under applicable law; (iii) of any type for which the Court determines that indemnification, contribution, or reimbursement would not be permissible; or (iv) settled prior to a judicial determination under (i) or (ii), but determined by the Court, after notice and a hearing, to be a claim or expense for which the OCP should not receive indemnity, contribution, or reimbursement under the terms of the OCP Agreement as modified by the Court.

    c. If, before the earlier of (i) the entry of an order confirming a chapter 11 plan in these cases (that order having become a final order no longer subject to appeal), or (ii) the entry of an order closing these chapter 11 cases, the OCP believes that it is entitled to the payment of any amounts by the Debtors on account of the Debtors' indemnification, contribution and/or reimbursement obligations under the OCP Agreement (as modified by this Order), including the advancement of defense costs, the OCP must file an application therefor in this Court, and the Debtors may not pay any such amounts to the OCP before the entry of an order by the Court approving the payment. All parties in interest shall retain the right to object to any demand by the OCP for indemnification, contribution, or reimbursement. In the event that the OCP seeks reimbursement from the Debtors for attorneys' fees and expenses in connection with the payment of an indemnity claim pursuant to the OCP Agreement, the invoices and supporting time records for the attorneys' fees and expenses shall be included in the OCP's own applications, both interim and final, but determined by the Court after notice and a hearing.

14. The Company is conducting further inquiries regarding its retention by any creditors of the Debtors, and upon conclusion of that inquiry, or at any time during the period of

DocuSign Envelope ID: E386982F-2E6B-45EA-A801-F4B1883F2ED5

its employment, if the Company should discover any facts bearing on the matters described herein, the Company will supplement the information contained in this Declaration.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date: June 7, 2023

DocuSigned by:

*Shalin Pathak*     6/12/2023  |  3:30 PM CDT

94D9B5 696CD44D

Shalin Pathak

# EXHIBIT 1



**Grant Thornton LLP**

1100 Peachtree St Ne
Suite 1200
Atlanta, GA 30309

D: +1 404 330 2000
S   linkd.in/grantthorntonus
     twitter.com/grantthorntonus

January 23, 2023

Dustin Martin
Chief Operating Officer
Mountain Express Oil Company
3650 Mansell Road, Suite 250
Alpharetta, GA 30022

Dear Dustin:

Grant Thornton LLP ("Grant Thornton," "Firm," or "we") is pleased to provide professional services (the "Services") to Mountain Express Oil Company (the "Company," "Client," or "you"). The purpose of this Engagement Letter (the "Letter"), Attachment A – Standard Grant Thornton LLP Engagement Terms, and any related Statement(s) of Work, as defined below, (collectively, the "Agreement") is to confirm the scope and terms of our engagements.  This Agreement is structured to allow us to offer professional services under a single agreement through the execution of Statements of Work for each project.

The Agreement is effective on January 23, 2023 (the "Effective Date") and will remain in full force and effect in accordance with its terms until terminated by either party in accordance with the termination provision set forth in Attachment A.  Attachment A – Standard Grant Thornton LLP Engagement Terms (Version 2022.04) ("Attachment A") contains the terms and conditions of this Agreement that reflect our mutual understanding. You should read it carefully. Because applicable professional standards, laws, and regulations may change in the future, Grant Thornton reserves the right to amend this Agreement upon appropriate notice to you upon receiving your consent.

### Delivering the services

The Services we provide to you under this Agreement will be set forth in distinct Statements of Work signed by Grant Thornton and your authorized representative, specifying matters including applicable professional standards, scope, deliverables, timing, fees, and payment terms. The Statements of Work may include additional provisions that are necessary in regards to the applicable professional standards, including matters pertaining to any applicable independence requirements, such as audit committee pre-approval of the services.

From time to time in the course of our relationship, we may perform Services that you request without a Statement of Work. This Agreement will cover all Services rendered whether or not the parties execute a Statement of Work. Such Services will be billed at our standard hourly rates or as otherwise mutually agreed.

### Other matters

This Agreement may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute one and the same agreement. This Agreement may be executed and delivered by either party by electronic transmission. For purposes of this Agreement, any signature page signed and transmitted electronically shall be treated as an original document, and the signature of any party thereon, for purposes hereof, shall be considered as an original signature and the document transmitted electronically shall be considered to have the same binding effect as an original signature on an original document.

© Grant Thornton LLP | All rights reserved
U.S. member firm of Grant Thornton International Ltd



Mountain Express Oil Company, Inc.
January 23, 2023
Page 2 of 10

Please confirm your acceptance of this Agreement by signing below, signing the enclosed Statement(s) of Work, and returning the signed Agreement to me. We look forward to the opportunity to serve you.

Very truly yours,

**GRANT THORNTON LLP**

*Shalin Pathak*

Shalin Pathak
Partner

Cc:  William Mann, Partner (Audit)

Enclosures:
Attachment A
Statement(s) of Work

**Agreed and Accepted**

The foregoing letter, Attachment A and the attached Statement(s) of Work, if applicable, fully describe our understanding and are accepted by us.

**MOUNTAIN EXPRESS OIL COMPANY**

By: *Dustin Martin*              Date: 1/24/2023  |  5:14 AM PST

Dustin Martin
Chief Operating Officer

© Grant Thornton LLP | All rights reserved
U.S. member firm of Grant Thornton International Ltd



## ATTACHMENT A - STANDARD GRANT THORNTON LLP ENGAGEMENT TERMS

This Attachment A – Standard Grant Thornton LLP Engagement Terms (this "Attachment A") is incorporated into and a part of the attached Engagement Letter by and between Grant Thornton LLP ("Grant Thornton") and Mountain Express Oil Company ("Client").  Any Statement of Work (a "SOW") attached hereto or referencing this Attachment A is incorporated into and subject to the terms and conditions of this Attachment A.  The Engagement Letter, each Statement of Work, and this Attachment A are collectively referred to as the "Agreement".  Any capitalized terms in this Attachment A that are not defined shall have the meanings set forth in the Engagement Letter.

1.      Standards of Performance.  Grant Thornton warrants that it will perform the services described in each SOW (the "Services") and provide any reports, information or other documents (the "Deliverables") specified in each SOW in substantial conformity with all applicable professional standards and the terms and conditions expressly set forth in the Agreement. Accordingly, Grant Thornton's Services and the Deliverables shall be evaluated solely on Grant Thornton's substantial conformance with such terms and conditions, professional standards expressly set forth in the SOW, and applicable law. This warranty is in lieu of, and Grant Thornton expressly disclaims, all other warranties, express, implied, or otherwise, including without limitation, any implied warranties of merchantability or fitness for a particular purpose. Grant Thornton cannot and does not warrant computer hardware, software, or services provided by other parties.

2.      Management Responsibilities. Grant Thornton assumes no management responsibilities for Client. Accordingly, Client agrees to perform all management responsibilities and oversee the Services by designating an individual, preferably within senior management, who possesses suitable skill, knowledge, and experience, to evaluate the adequacy and results of the Services performed and accept responsibility for the results of the Services.

Because Grant Thornton cannot assume management responsibilities when providing Services, Client agrees that its management, including its designated representative, will make an informed judgment on the results of the Services and be responsible for making the significant judgments and decisions that are the responsibility of management. In addition, Client agrees to undertake: (a) all management decisions and performance of all management functions, including maintaining all internal books and records; (b) the evaluation of the adequacy and results of the Services and responsibility for such results; and (c) the establishment and maintenance of effective internal controls, including monitoring activities, retaining custody of Client's assets, and controlling Client's premises.

3.      Business Risk Allocations. The terms of this Section 3 shall apply regardless of the nature of any claim asserted (including but not limited to contract, statute, tort, strict liability, or negligence, whether by Client, Grant Thornton, or others) but such terms shall not apply to the extent finally determined to be contrary to applicable law.

(a)      With respect to the Services and this Agreement generally, the liability of Grant Thornton and its present, future, and former partners, principals, directors, employees, agents and contractors (collectively referred to as the "Grant Thornton Firm") for all claims, including but not limited to the Grant Thornton Firm's own negligence, shall not exceed and shall be limited to the fees payable for the portion of the work giving rise to such liability. This limitation shall not apply to the extent that it is finally determined that any claims, losses, or damages are the result of the Grant Thornton Firm's willful misconduct or fraud.

(b)      EACH PARTY HEREBY WAIVES, AND IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR, ANY INDIRECT, SPECIAL, CONSEQUENTIAL, PUNITIVE, INCIDENTAL, OR EXEMPLARY DAMAGES OR LOSS, INCLUDING WITHOUT LIMITATION, ANY LOST PROFITS, TAXES, INTEREST, PENALTIES, LOSS OF SAVINGS, OR LOST BUSINESS OPPORTUNITY.

(c)      In responding to any claim asserted, each party may avail itself of any defense available under applicable law, but in no event shall the aggregate liability of each party for any claims, losses or damages related to this Agreement exceed an amount that is proportional to the relative fault of such party that is finally determined to have caused the other party's losses.

(d)      Client shall, upon the receipt of written notice, indemnify, defend, and hold harmless the Grant Thornton Firm from and against any liability, damages, fees, expenses, losses, demands and costs (including reasonable defense costs) (collectively, "Losses") associated with third-party claims arising out of or relating to (i) misrepresentations made by, or false or incomplete information provided by, Client or its agents or representatives or (ii) such third party's use of or reliance upon the Services or Deliverables. Client agrees to reimburse the Grant Thornton Firm for all reasonable expenses, including reasonable attorneys' fees and expenses, as they are incurred in connection with the investigation

© Grant Thornton LLP | All rights reserved
U.S. member firm of Grant Thornton International Ltd

DocuSign Envelope ID: 34D29C26-3A71-428D-BC40-7E771D304E9D



Mountain Express Oil Company, Inc.
January 23, 2023
Page 4 of 10

of, preparation for, or defense of, any pending or threatened claim or action or proceeding for which the Grant Thornton Firm is entitled to indemnification.

(e)     In the event of any controversy or claim against Grant Thornton arising from or related to the Services, Grant Thornton shall be entitled, at its option, to defend itself from such controversy or claim. Grant Thornton also reserves the right to participate in any settlement, administrative, or judicial proceedings. Grant Thornton's decision to abstain or defend or participate in any proceedings as set forth above shall in no way prejudice its rights to indemnification.

4.     Use of Documentation and Reliance.

(a)     Professional standards require Grant Thornton to maintain sufficient documentation to support its work. This documentation may include copies of Client's information. However, to the extent that Grant Thornton has copies of Client's information, Grant Thornton will protect and safeguard Client's information from unauthorized disclosure.

(b)     Unless provided for differently in the applicable SOW, all Deliverables provided by Grant Thornton to Client in performing the Services are the sole and exclusive property of Grant Thornton and are prepared solely for the internal use of Client's management, employees and board of directors. Except as provided below, upon full payment of Grant Thornton's billings, Client shall acquire a limited, perpetual, non-transferable, royalty-free license to use the Deliverables for Client's internal business purposes.

(c)     Client agrees to protect all Deliverables from unauthorized use and prevent disclosure of the Deliverables to third parties who may rely on them.  Further, Grant Thornton has not and shall not be deemed to assume any duties or obligations to any third party.

(d)     If Client wishes to make reference to Grant Thornton or to disclose or disseminate in any manner and in any medium (e.g., Client website), any portion of any Deliverable to a third party, Client agrees to first (i) provide Grant Thornton with a draft of the proposed disclosure, (ii) obtain Grant Thornton's advance written approval, and (iii) if requested by Grant Thornton, obtain from any third party and provide Grant Thornton with a non-disclosure agreement and/or release in a form satisfactory to Grant Thornton  in its sole discretion.

(e)     Grant Thornton shall retain sole and exclusive ownership of and all right, title, and interest in and to any know-how, concepts, techniques, methodologies, ideas, processes, models, templates, tools, utilities, routines, trade secrets, and other intellectual property that (i) existed prior to, or were developed independent of, Client's engagement or (ii) may have been discovered, created, or developed by Grant Thornton as a result of its own efforts during the engagement, which are of general application and do not contain Client's confidential information (collectively, the "Grant Thornton Property"). Client shall acquire no right to or interest in the Grant Thornton Property, except for a non-exclusive, non-transferable, royalty-free right to use such Grant Thornton Property solely in connection with Client's permitted use of the Deliverables to the extent any Grant Thornton Property is incorporated therein. Client will not sublicense or otherwise grant any other party any rights to use, copy, or otherwise exploit or create derivative works from the Grant Thornton Property.

(f)     Except as expressly contemplated by the applicable SOW, Grant Thornton assumes no responsibility to update any conclusions or Deliverables.

5.     Third-Party Proceedings. Unless expressly provided for, the Services do not include giving testimony or appearing or participating in discovery proceedings, administrative hearings, court, or other legal or regulatory inquiries or proceedings. Except with respect to a dispute or litigation between Grant Thornton and Client, Grant Thornton's costs (including reasonable attorneys' fees) and time spent in legal and regulatory matters or proceedings relating to Grant Thornton's engagement, whether made at the Client's request or by subpoena, request for testimony, or consultation involving private litigation, arbitration, industry, or government regulatory inquiries, will be billed to Client separately.

6.     Access to Resources and Information. Unless specified in a SOW as the responsibility of Grant Thornton to provide, Client shall have obtained on a timely basis as required for Grant Thornton's performance of the Services (i) any internal and third-party permissions, licenses or approvals (including use of any necessary software or data); and (ii) all information and assistance as may be necessary or as Grant Thornton may reasonably request. Grant Thornton's personnel assigned to any engagement shall not be assumed or deemed to have knowledge of information provided to other Grant Thornton engagement teams or third parties.

7.     Term and Termination. This Agreement will commence on the Effective Date and it will not expire, unless earlier terminated as provided in this Section. Grant Thornton and Client shall each have the right to terminate this Agreement (or



Mountain Express Oil Company, Inc.
January 23, 2023
Page 5 of 10

applicable SOW therein), in whole or in part at any time without further obligation to the other by giving not less than thirty (30) days written notice to the other party. Further, Grant Thornton shall have the right to terminate this Agreement and/or any SOW immediately if it discovers practices by Client that it deems dishonest, fraudulent, or illegal; or Grant Thornton determines that application of or changes in applicable rules or professional standards, such as those established by the American Institute of Certified Public Accountants, Public Company Accounting Oversight Board, or U.S. Securities and Exchange Commission, restrict the Grant Thornton Firm's ability to complete the work.  If either party terminates this Agreement or any SOW as set forth in this Section, Client agrees to pay Grant Thornton for the Services performed, including out-of-pocket expenses and costs, rendered up to the date of such termination.  Grant Thornton retains the right to suspend or terminate the Services in the event of nonpayment.  Services will not be resumed until Client's account is paid as agreed.

8.     Third-Party Service Providers.  Grant Thornton LLP is the U.S. member firm of Grant Thornton International Ltd ("GTIL"), a global organization of member firms. Member firms are neither members of one international partnership nor otherwise legal partners with one other. There is no common ownership, control, governance, or agency relationship among member firms.  GTIL and its member firms are not agents of, and do not obligate, one another and are not liable for one another's acts or omissions. In the event Grant Thornton subcontracts some of the Services to a GTIL member firm, Grant Thornton takes sole responsibility for all work performed in relation to the applicable SOW and Client agrees that, with respect to work that is the subject of the SOW, its sole recourse is against Grant Thornton.

Additionally, Grant Thornton may use third parties to provide administrative and operational support to Grant Thornton business operations, or to provide engagement team resource services. All of these third-party service providers are subject to confidentiality obligations to protect the confidentiality of client data. Such entities may be located within or outside the United States.

9.     Electronic Communications. During the course of the engagement, the parties may need to electronically transmit confidential information to each other and to third-party service providers or other entities engaged by either Grant Thornton or Client. Electronic methods include telephones, mobile devices, e-mail, cloud services and fax. All forms of electronic communication have inherent security weaknesses, and the risk of compromised confidentiality cannot be eliminated. Client agrees to the use of electronic methods to transmit and receive information, including confidential information. Grant Thornton shall not be liable for any loss, damage, expense, inconvenience, or harm resulting from the loss, delay, interception, corruption, or alteration of any electronic communication due to any reason beyond its reasonable control.

If applicable, Grant Thornton may use automated data gathering tools developed by it, its affiliates, or third-party providers, such as SQL scripts to extract data for further analysis for purposes of the applicable engagement.  These tools are designed to be executed by the Client's information technology professionals within the Client's information systems environment.  Client hereby consents and authorizes Grant Thornton to use these tools only for the purpose of performing the applicable engagement.

Grant Thornton shall not be responsible for any service interruptions of, or corruption or damages to, Client's or third-party information systems and the information and data contained therein, including but not limited to denial of access, and automatic shutdown of information systems caused by or resulting from Grant Thornton's performance of the Services.

10.    Management Representations. Grant Thornton's findings, conclusions, and recommendations are limited solely to the matters for which Grant Thornton was engaged. No conclusions should be inferred as to any matters not specifically covered by the applicable SOW. Further, the findings, conclusions, and recommendations are based upon the facts and information presented by Client and may be inapplicable if the actual facts differ from those presented in any respect.

Because of the importance of the information that Client provides to Grant Thornton with respect to Grant Thornton's ability to perform the Services, Client hereby releases the Grant Thornton Firm from any liability, damages, fees, expenses, and costs (including defense costs) relating to the Services, that arise from or relate to any information (including representations by management) provided by Client, its personnel or agents, that is misleading or not complete, accurate, or current.

11.    Confidential Information.  Each party (the "Disclosing Party") may disclose to the other party (the "Receiving Party") information that it considers confidential or proprietary ("Confidential Information").

       (a)     Confidential Information includes but is not limited to (i) reports, financial information, studies, drawings, contracts, business plans, inventions, technical information, know-how, plans, and specifications and (ii) any information or data which is disclosed by a party to the other party under or in contemplation of this Agreement which has been marked or identified as confidential or which a reasonable person would know to be confidential or

© Grant Thornton LLP | All rights reserved
U.S. member firm of Grant Thornton International Ltd

DocuSign Envelope ID: 34D29C26-3A71-428D-BC40-7E771D304E9D



Mountain Express Oil Company, Inc.
January 23, 2023
Page 6 of 10

proprietary due to the circumstances of its disclosure. Client will provide the minimum amount of Confidential Information and minimum access to such information necessary for Grant Thornton to perform the Services.

(b)      A party's Confidential Information shall not include information that (i) is or becomes part of the public domain through no act or omission of the other party; (ii) was in the other party's lawful possession prior to the disclosure and had not been obtained from the Disclosing Party; (iii) is lawfully disclosed to the other party by a third party without restriction on disclosure; or (iv) is independently developed by one party without use of or reference to the other party's Confidential Information. In addition, nothing contained herein shall be construed as preventing either party from using the information retained from the Confidential Information of the other party as part of its general skill, knowledge, talent, and expertise.

(c)      The Receiving Party agrees to hold in confidence and not to disclose or reveal to any person or entity except its Representatives (as defined below), the Confidential Information of the Disclosing Party.  The Receiving Party further agrees  to protect the Disclosing Party's Confidential Information in the same manner it protects its own confidential information, provided no less than reasonable care shall be used.  The Receiving Party may disclose Confidential Information to its partners, principals, officers, directors, employees, agents, GTIL member firms, and contractors (collectively, its "Representatives") who have a legitimate need to review such information.  The Receiving Party shall be responsible for any breach of this Agreement by its Representatives and shall take all reasonable steps to cause its Representatives to comply with the terms hereof.

(d)      If Receiving Party is requested or required by law, regulation, legal process or an oversight body to disclose Confidential Information, Receiving Party will, to the extent practical and legally permitted, notify Disclosing Party of such request or requirement so that Disclosing Party may seek an appropriate protective order or other relief.  In the absence of a protective order or other applicable relief, Receiving Party may disclose the portion of Confidential Information subject to such request or requirement without liability hereunder.

(e)      Grant Thornton may be requested to make certain documentation available to regulators, governmental agencies, or their representatives ("Regulator(s)") pursuant to law or regulations. If requested, access to the documentation will be provided to Regulators under the supervision of Grant Thornton personnel and at a location designated by Grant Thornton. Furthermore, upon request, Grant Thornton may provide photocopies of selected documentation to Regulators. Regulators may intend, or decide, to distribute the photocopies or information contained therein to others, including other governmental agencies. Client hereby authorizes Grant Thornton to allow Regulators access to, and photocopies of, the documentation in the manner discussed above. To the extent legally permissible, Grant Thornton will notify Client of any requests made by Regulators prior to granting access or release of such information to Regulators.

12.      Privacy.  Grant Thornton will maintain Client's personal information in confidence in accordance with professional standards and governing laws. Client will not provide any personal information unless necessary for Grant Thornton to perform the Services. Client will strictly limit provision of personal information to that personal information essential to Grant Thornton's performance of the Services. Client will anonymize, mask, obfuscate, and/or de-identify all personal information unless Grant Thornton requires otherwise to provide the Services. Client is responsible for obtaining, pursuant to law or regulation, consents for any personal information that Client provides to Grant Thornton.

13.      Dispute Resolution.

(a)      Mediation.  Any controversy or claim arising out of or relating to the Services, related fees, or this Agreement shall first be submitted to mediation. A mediator will be selected by agreement of the parties, or if the parties cannot agree, a mediator acceptable to all parties will be appointed by the American Arbitration Association. The mediation will proceed in accordance with the customary practice of mediation and shall be concluded within sixty (60) days from receipt of written notice unless the parties agree otherwise. Any facts disclosed related to the mediation shall be kept confidential and each side shall pay its own costs of the mediation but will share equally the mediator's expenses.

(b)      Arbitration. In the event mediation is not successfully resolved, then the parties agree that such dispute(s) or claim(s) shall be settled by binding arbitration. The provisions herein supersede any contrary arbitral rules that might otherwise apply. The arbitration proceeding shall take place in Chicago, Illinois unless the parties mutually agree to a different location. The proceeding, including any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of any of these procedures, shall be governed by the provisions of the Federal Arbitration Act and will proceed in accordance with the then current Conflict Prevention & Resolution ("CPR") or the similar rules of another arbitration association if one other than CPR is selected, except



that pre-hearing discovery shall be limited as provided for herein or unless specifically authorized by the arbitrators. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of any of these procedures, shall be governed by the Federal Arbitration Act and resolved by the arbitrators.

i.      To begin the arbitration process, a party shall provide written notice of the issues to be resolved by arbitration (the "Notice") within fifteen (15) days of the parties' agreement to terminate or waive mediation, and the other party shall respond within twenty one (21) days and shall add any other issues to be resolved within the arbitration. The arbitrators shall only resolve those issues identified in the Notice, and issues that are not identified shall not be arbitrated nor brought to court.

ii.     The arbitration shall be conducted by three (3) arbitrators. Each party shall select an arbitrator experienced in relevant subject matters within twenty-one (21) days of the Notice. The two (2) designated arbitrators shall then select a third neutral arbitrator within twenty-one (21) days of their selection. It is the parties' intention that the two (2) arbitrators selected by the parties be "neutrals" who will not be informed as to which party selected them. If the two (2) arbitrators cannot agree on selection of a third arbitrator within twenty-one (21) days of their appointment, the governing arbitration agency shall manage a list of arbitrators and select a third arbitrator under the agency's rules within thirty (30) days. If both parties are in agreement, the dispute may be heard by one (1) arbitrator selected within sixty (60) days following receipt of the Notice.

iii.    The parties shall not be entitled to discovery except as it directly relates to the underlying Services that are at issue and shall submit a joint proposed schedule to the arbitrators within thirty (30) days of the arbitrator's selection. Other than described herein, no other discovery is allowed except by the arbitrators and only for good cause shown.

iv.     Except for impeachment-only information, each party must disclose within thirty (30) days after the selection of the arbitrators: (1) the names, addresses, telephone numbers, and email addresses of persons who have knowledge and/or discoverable information relating to the issues submitted for resolution; (2) its claims and defenses; and (3) a computation showing each element of claimed damages.

v.      The parties shall be entitled to take (i) up to three (3) depositions and (ii) the depositions of any expert witness who will testify in the arbitration proceeding.  No deposition shall exceed seven (7) hours. Each testifying expert shall provide the same materials required under Federal Rule of Civil Procedure 26(a)(2)(B). The parties must confer in good faith to resolve all discovery disputes. If they cannot resolve these themselves, the parties must attempt to do so in conference with the arbitrators. If the dispute is not resolved in conference, the arbitrators must promptly rule on the issues.  Each side may file dispositive motions without obtaining leave from the arbitrators but must confer with the other side prior to filing any dispositive motions. All motions should be filed no later than sixty (60) days prior to the arbitration hearing, unless agreed otherwise by the parties or ordered by the arbitrators.

vi.     The arbitrators shall have no authority to award non-monetary equitable relief or indirect, consequential, or punitive damages. The award of the arbitration shall be in writing and shall be accompanied by a well-reasoned opinion. The award issued by the arbitrators may be confirmed in a judgment by any federal or state court of competent jurisdiction. Each party shall be responsible for its own costs associated with the arbitration, except that the costs of the arbitrators shall be equally divided by each side involved in the arbitration. The arbitration proceeding and all information disclosed during the arbitration shall be maintained as confidential, except as required to confirm the award, or disclosed to professional or regulatory bodies, as required by law or a court of law, or in a related confidential mediation or arbitration. The parties agree that arbitration is the sole and exclusive remedy for disputes arising out of or related to this Agreement.  If arbitration is initiated and the other party declines to participate and instead initiates litigation elsewhere, doing so will constitute a default judgment.

(c)     Limitation on Period to File Claims.  It is expressly agreed by each party that any action, regardless of form, arising out of the Services, whether it be in contract, tort, or otherwise, shall be deemed waived if a claim is asserted more than two (2) years from the earlier of the date that the applicable Deliverable is issued or the Services are completed.

14.     Personnel.

© Grant Thornton LLP | All rights reserved
U.S. member firm of Grant Thornton International Ltd



Mountain Express Oil Company, Inc.
January 23, 2023
Page 8 of 10

(a)      During the term of a SOW and for a period of one (1) year after the Services are completed, Client agrees not to solicit, directly or indirectly, or hire, Grant Thornton's personnel performing Services hereunder without Grant Thornton's written consent. If this Section is violated, Client will pay Grant Thornton a fee equal to the hired person's annual salary in effect at the time of the violation as reimbursement for the estimated costs of replacement personnel. The foregoing shall not apply if the individual is hired in response to a general advertisement made available to the public.

(b)      For engagements subject to the SEC independence rules, Client acknowledges that hiring Grant Thornton (or GTIL) personnel participating on an engagement may be perceived as compromising Grant Thornton's objectivity, and if applicable, impairing Grant Thornton's independence. Accordingly, prior to entering into any employment discussions with such personnel, Client agrees to discuss the potential employment, including any applicable independence ramifications, with the engagement partner responsible for the Services.

15.    <u>Miscellaneous</u>.

(a)      <u>No Assignment</u>.  Neither party shall assign any rights, obligations or claims relating to this Agreement without the prior written consent of the other party, except Grant Thornton may assign this Agreement to a successor in interest upon written notice in connection with a change of control or sale of a line of business or all or substantially all of its assets.

(b)      <u>Client</u>. For the purposes of this Agreement, "Client" shall include all affiliates that are recipients or intended beneficiaries of the Services, including, but not limited to, any affiliates identified in the Agreement or any Statement of Work.

c)      <u>Successors and Affiliates</u>.   Recognizing that at times the Services may pertain not only to Client but also to various of its subsidiaries, other affiliates, advisors, contractors, partnerships, companies, estates, or foundations, Client shall, as may be requested by Grant Thornton from time to time (including subsequent to completion of the Services), obtain written consent of their agreement to the terms of this Agreement. This Agreement is binding on each party hereto and on each of its successors, assigns, heirs, legatees, and legal representatives.

(d)      <u>Force Majeure</u>.  Neither party shall be liable for any delay or failure in performance (except for payment obligations) due to any strikes, work stoppages, accidents, acts of war or terrorism, governmental actions, civil or military disturbances, pandemics, epidemics, contagious diseases, nuclear or natural catastrophes or acts of god, or other circumstances beyond its reasonable control.

(e)      <u>No Third-Party Beneficiaries</u>.  No third-party beneficiaries are intended under this Agreement.

(f)      <u>Name Use</u>.  Neither party shall use the other's name, service marks, or trademarks in external publicity materials without prior written consent.

(g)      <u>Governing Law</u>.  This Agreement, including its formation and the parties' respective rights and duties and all disputes that might arise from or in connection with this Agreement or its subject matter, shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to its conflicts of laws rules that would require the application of another state's laws.

(h)      <u>Independent Contractors</u>.  Each party is an independent contractor with respect to the other and shall not be construed as having an employee/employer, trustee, joint venture, agency or fiduciary relationship.

(i)      <u>Effect of Invalidity</u>.  If any portion of this Agreement is held invalid, it is agreed that such invalidity shall not affect any of the remaining portions. Moreover, if the terms of any provision hereof are determined to be unenforceable under applicable law as a result of their duration, scope, limitation, or exclusions, such provision shall be construed to the extent possible to be valid and enforceable while adhering as closely as possible to the parties intent as contemplated hereby. If because of a change in Client's status or due to any other reason, any provision in this Agreement or the Services hereunder would be prohibited by laws, regulations, or published interpretations by governmental bodies, commissions, state boards of accountancy, or other regulatory agencies, such provision shall, to that extent, be of no further force and effect, and the Agreement shall consist of the remaining portions.

(j)      <u>Entire Agreement</u>.  This Agreement, including any other incorporated attachments, sets forth the entire understanding between and among the parties regarding the Services and the exchange of information and supersedes all prior and contemporaneous agreements (whether written or oral), arrangements and communications which shall

© Grant Thornton LLP | All rights reserved
U.S. member firm of Grant Thornton International Ltd



Mountain Express Oil Company, Inc.
January 23, 2023
Page 9 of 10

hereby be terminated and may not be modified or amended, except by the mutual written agreement of both parties that references and is incorporated into this Agreement. If there is a conflict between this Attachment A, the Engagement Letter, or any SOWs, this Attachment A shall control unless the applicable SOW specifically references the applicable provision of this Attachment A to be overridden. Except as otherwise agreed in an attachment to this Agreement, no "click-through," "shrink-wrap," "browse-wrap," similar agreements or other terms, whether entered into before, on, or after the date of this Agreement, will be effective to add to or modify the terms of this Agreement or alter the relationship of the parties, regardless of any party's (or its personnel's) acceptance of or agreement to such terms by electronic or other means.

(k)     Survival.  The Sections regarding confidentiality, liability limitations, third-party proceedings, indemnification, dispute resolution and any such terms that by their nature should survive shall survive any termination of this Agreement..

16.     Tax Terms and Conditions.  This Section 16 is applicable to all Tax Services provided under this Agreement.

(a)     Reportable Transactions. Taxpayers are required to disclose their participation in certain types of transactions ("Reportable Transactions") on forms filed with their federal income tax returns and/or with the IRS Office of Tax Shelter Analysis, and with agencies of certain states (or, in some cases, foreign jurisdictions) that impose similar requirements. Failure to adhere to Reportable Transaction disclosure and filing requirements may result in the imposition of significant penalties under applicable federal, state and/or foreign law. Grant Thornton may be a "Material Advisor" with regard to Services provided to Client and Grant Thornton may be subject to Grant Thornton's own federal and/or state reporting, registration and list maintenance obligations, which are separate and independent of any taxpayer disclosure obligation. Grant Thornton may be required to maintain and disclose to applicable federal and/or state regulatory agencies certain information regarding Client's participation in a Reportable Transaction, including Client's name and federal identification number, and other information as required.

Except as specifically stated in this Agreement, Grant Thornton does not assume any obligation to express any opinion on, provide any advice related to, or identify from any information provided by Client or obtained by Grant Thornton during the course of providing Services to Client under this Agreement, whether any particular transaction is a Reportable Transaction or the potential consequences of non-compliance with disclosure and filing requirements pertaining to a Reportable Transaction. Reliance on any opinion or advice Grant Thornton may provide regarding whether a transaction is or is not a Reportable Transaction and/or any disclosure and filing requirements may not avoid the imposition of any penalty imposed on Client under federal or state law for the failure to comply with such disclosure and filing obligations.

(b)     Privileges Relating to Taxpayer Communications. Any advice given by Grant Thornton with respect to a matter that is within the scope of Grant Thornton's authority to practice before the IRS may be privileged under federal and state laws. This privilege may be asserted in any non-criminal tax matter before the IRS and in any non-criminal tax proceeding in Federal court and may be asserted to the extent such communication would be considered privileged communication if it were between a taxpayer and an attorney. At Client's sole cost and expense, Grant Thornton will cooperate with Client's efforts to assert taxpayer privileges when Grant Thornton receive a demand or inquiry for Client's information to the extent required by law.

(c)     Conditions of Confidentiality Not Imposed. Notwithstanding anything to the contrary herein, Grant Thornton imposes no conditions of confidentiality on any information it provides to Client to the extent that it concerns the tax structure or tax treatment of any transaction.

(d)     No Responsibility to Update. Tax Deliverables will be based on Grant Thornton's interpretation of the federal and state laws, regulations, administrative and judicial pronouncements, and other relevant authorities, in effect when Grant Thornton provides the Tax Deliverables. All of these authorities are subject to change, and such change may be retroactive or prospective in effect. Grant Thornton assumes no responsibility to either advise Client of, or to update conclusions, for changes in respect to federal and state laws, regulations, administrative and judicial pronouncements, and other relevant authorities expressly set forth in this Agreement and applicable law.

(e)     Tax Deliverables. Client is authorized to provide Tax Deliverables to taxing jurisdictions with respect to tax filings contemplated in a SOW.

© Grant Thornton LLP | All rights reserved
U.S. member firm of Grant Thornton International Ltd



Mountain Express Oil Company, Inc.
January 23, 2023
Page 10 of 10

© Grant Thornton LLP | All rights reserved
U.S. member firm of Grant Thornton International Ltd



**Mountain Express Oil Company, Inc.**

**Statement of Work for Accounting Advisory Services**
**As of January 23, 2023**

This Statement of Work ("Statement of Work") dated January 23, 2023 becomes a part of and is subject to the terms and conditions of the Engagement Letter and related Attachment A – Standard Grant Thornton LLP Engagement Terms dated January 23, 2023 between Mountain Express Oil Company, Inc. ("Client", "Company" or "you") and Grant Thornton LLP ("Grant Thornton," "Firm," or "we").  Any capitalized terms that are not defined in this Statement of Work shall have the meanings set forth in the Engagement Letter and Attachment A – Standard Grant Thornton LLP Engagement Terms. The purpose of this Statement of Work is to describe the scope of services ("Services") the Company is requesting Grant Thornton to perform, and to set forth the agreed fee, timing and other matters related to the Services.

### Project Objectives and Scope

The Services under this Statement of Work include the following:

- o   Assist Management in preparation of business unit specific financial statements for certain historical periods

The Company may, from time to time, request on-call technical accounting services for various accounting and financial reporting topics that arise within the normal course of business as well as topics that arise from transactional or non-routine events.

### Grant Thornton's Responsibilities and Deliverables

We will perform the Services in accordance with the American Institute of Certified Public Accountants (AICPA) *Statement on Standards for Consulting Services*. Grant Thornton is not being engaged to perform audit, review, or attestation services under AICPA auditing, review, or attestation standards or to provide any form of assurance or report under such standards in conjunction with this engagement.

Our work will not include management functions or making management decisions and cannot be relied upon to disclose errors, fraud, or illegal acts with respect to the financial records and related information provided to us. The ultimate responsibility for the decision on the appropriate application of the requirements of an applicable financial reporting framework, such as accounting principles generally accepted in the United States of America, rests with management. Our judgments will be based solely on the facts provided to us by management; should these facts and circumstances differ, our judgments may change. The appropriate application of the requirements of an applicable financial reporting framework is subject to interpretation. We will not express an opinion or any other form of assurance. In addition, our services do not include issuing a written report or providing oral advice as contemplated by AU-C section 915, *Reports on Application of Requirements of an Applicable Financial Reporting Framework*.

Grant Thornton shall be entitled to rely on the accuracy, completeness and reliability of all information provided by, and on all decisions and approvals of, the Company and its retained advisors, consultants or legal counsel. Grant Thornton's work does not guarantee that errors and irregularities will not occur and it may not detect errors or irregularities if they arise.

The parties are entering into this SOW at a time when a state of national emergency has been declared and the nation is responding to the Coronavirus (COVID-19) pandemic.  The parties agree that each will use all reasonable efforts to complete the engagement as specified herein, so long as each can reasonably do so while also protecting the health, welfare and safety of its professionals and the public, and abiding by emergency or regular executive orders, or changes in law mandated to address the pandemic.  Neither party shall be liable for any delay or failure in performance (excluding payment for fees and expenses incurred) due to circumstances resulting from the pandemic which are beyond its reasonable control.

Grant Thornton's Responsibilities and Deliverables (both as defined herein) include the following:

Our function is to provide counsel, based mostly, if not entirely, on existing knowledge of the Company, the circumstances and technical matters involved, management's representations, and the mutual intent of any parties involved. Accordingly, our services may involve a combination of the following activities: determining client objectives,



fact-finding, research, definition of the problems or opportunities, evaluating alternatives, formulating proposed actions, communicating results, assisting with implementation and follow up.

During the course of our engagement, management may request us to provide accounting and financial reporting services that we believe falls within the scope of AU-C section 915, Reports on Application of Requirements of an Applicable Financial Reporting Framework. Such services, which may be written or oral, will be provided at the Company's request and will be limited to the appropriate application of the requirements of accounting principles generally accepted in the United States of America ("US GAAP") to specific transactions, either completed or proposed, involving the facts and circumstances of the Company ("particular transaction").

Grant Thornton will not provide any written advice on the application of accounting principles to a hypothetical transaction. However, Grant Thornton may provide oral observations on the accounting impact of business decisions and may assist management in formulating the Company's accounting positions prior to management discussing such positions with the Company's independent auditors.

We will plan the engagement to accumulate sufficient information to provide a basis for our professional judgements and conclusions.

To aid if forming our judgements and conclusions with regard to a particular transaction, we will:

- Obtain an understanding of the form and substance of the transaction
- Review the applicable US GAAP
- Consult with the Company's independent auditors, as appropriate
- Consult with other professionals, experts, or regulatory authorities, as appropriate
- Identify and consider the existence of creditable precedents or analogies, as applicable

It is possible that because of unexpected circumstances, we may determine that we are unable to form a conclusion or complete a specific assignment. Accordingly, we may decline to express a conclusion or issue a report. Further, if in our professional judgement the circumstances necessitate, we may resign from a specific assignment or the engagement prior to completion.

## Company Responsibilities and Assumptions

1. Company Responsibilities

   Company management ("Management") is responsible for the preparation and fair presentation of the Company's financial statements in accordance with the applicable financial reporting framework and for designing, implementing, and maintaining effective internal control over financial reporting, including programs and controls to prevent and detect fraud and monitoring ongoing activities. Accordingly, the responsibility for matters pertaining to accounting and financial reporting, including the appropriate application of the requirements of applicable accounting principles to a particular circumstance, rests with management. Management is also responsible for:

   - notifying the board of directors and the Company's independent auditors of the Services, as appropriate;

   - making all management decisions and performing all management functions;

   - designating an individual who possesses suitable skills, knowledge, or experience, preferably within senior management, to oversee our services;

   - providing relevant facts, circumstances, and assumptions relevant and informing us of changes related thereto;

   - informing us of the accounting treatment for similar matters or transactions in the past, as applicable;

   - providing access to all financial records and related information and to management and personnel with information of relevance pertaining to our Services;

   - consulting, as appropriate, with the Company's independent auditors with regard to the selected method of accounting and informing us about the matters discussed;

 **Grant**Thornton

- acknowledging that we may need to consult with the Company's independent auditors and authorizing, upon our request, the Company's independent auditors to fully respond to our inquiries; and

- evaluating the adequacy and the results of the services performed and accepting responsibility for such results.

### Grant Thornton Engagement Team

Grant Thornton will assign the individuals listed below to the engagement. While we will attempt to fulfill requests for specific individuals, we may need to add or re-assign personnel. We will inform you of such changes within a reasonable amount of time.

- Shalin Pathak, Partner – Accounting Advisory Services
- Mike Hennessey, Principal – Finance Transformation
- Ben Chacko, Senior Manager – Finance Transformation
- Manny Abud, Manager – Finance Transformation
- Luis Juarez, Manager – Accounting Advisory Services
- Noor Ali, Senior Associate – Accounting Advisory Services
- William Mann, Partner - Audit
- John R. Ward, Senior Manager – State and Local Tax

### Use of Third-party Services Providers and Affiliates

Grant Thornton intends to use the technology and resources of the following (additional) entities to assist us as follows:

- GT US Shared Services Center India Private Limited ("GTSSC") and/or the Grant Thornton Knowledge and Capability Center India Private Limited ("KCC"), affiliates of Grant Thornton located in Bangalore, India – may assist us in providing our professional services.

The Company hereby authorizes us to disclose its information to the above named entities for the purposes described above.

### Fees

### Standard Billings

Our billings for the Services set forth in this Statement of Work, which will be based upon our hourly rates for this type of work, will be rendered on an estimated basis and are payable upon receipt.

Based on the duration of the project to be 7 – 8 weeks, we estimate the corresponding fees to be in the range of $129,000 - $173,000.

The following is a schedule of our current hourly rates for this type of work based on the individuals involved.  We reserve the right to change our rates and accordingly, we will arrive at an understanding with you concerning such changes for these Services.

| Title | Rate |
|---|---|
| Partner | $400 |
| Director | $350 |
| Manager | $300 |
| Senior Associate | $250 |

Grant Thornton will invoice Client for fees and expenses incurred in performing the Services. In addition, Grant Thornton will bill you an administrative recovery fee equal to 3 percent of the fees for the administratrive time and expenses incurred on this engagement. From time to time, Grant Thornton may receive certain incentives in the form of bonuses

DocuSign Envelope ID: 34D29C26-3A71-428D-BC40-7E771D304E9D



Mountain Express Oil Company, Inc.
January 23, 2023
Page 4 of 5

and rewards from its corporate card and other vendors. Such incentives to the extent received will be retained by Grant Thornton to cover firm expenses.

If it appears that the estimated fee will be exceeded, we will bring this to your attention.

Client is solely responsible for any applicable taxes for the Services. To the extent Grant Thornton is required to collect such taxes under applicable law, Grant Thornton shall collect such taxes from Client and remit such taxes to the proper jurisdictions.

### Additional Billings

Of course, circumstances may arise that require us to do more work. Some of the more common circumstances include: changing professional requirements, incorrect accounting applications or errors in your records, inability to obtain information from third-parties, failure to furnish accurate and complete information to us on a timely basis, and unforeseen events – including regulatory changes.  If it appears that the estimated fee will be exceeded, we will consult with you so that you will have a better understanding of our fees before we continue. Additionally, our fee is neither a maximum nor a fixed fee quotation; therefore, we will keep you informed of any circumstances that affect the work's scope, the timetable or our level of participation.

Payment of our fees is not contingent on the completion of our Services. Furthermore, in the event we stop work for any reason (including, but not limited to, nonpayment or your request), you agree to pay our fees and expenses for all Services performed through the date work is stopped, whether or not we have produced any Deliverables.

At Grant Thornton, we pride ourselves on our ability to provide outstanding service and meeting our clients' deadlines. To help accomplish this goal, we work hard to have the right professionals available.  This involves complex scheduling models to balance the needs of our clients and the utilization of our people, particularly during peak periods of the year. Last minute client requested scheduling changes result in costly downtime due to our inability to make alternate arrangements for our staff.

We have mutually agreed to commence work for the Services described in this Statement of Work on January 19, 2022. If you do not provide proper notice, which we consider to be one week, of your inability to meet this date for any reason, or do not provide us with sufficient information required to complete the work in a timely manner, additional billings will be rendered for any downtime of our professional staff.

### Change Order Process

During the project either party may request additions, deletions or modifications to the scope or nature of the Services (a "Change"). Grant Thornton will not be obligated to start work on any Change until the fee and/or impact on the schedule is agreed on in a written change order. The change order should be signed by Grant Thornton and the Company

### Authorization

Please confirm your acceptance of this Statement of Work by signing below and returning one copy to us. We appreciate the opportunity to work with the Company.

**GRANT THORNTON LLP**

DocuSigned by:

*Shalin Pathak*

94B0B59686CB44D...

Shalin Pathak

Partner

Date:  1/23/2023 | 8:14 PM CST



**Agreed and accepted**

I am authorized to engage Grant Thornton to conduct this engagement and, by signing below, hereby agree to the terms and conditions as set forth above.

**Mountain Express Oil Company, INC.**

*Dustin Martin*

FAB2730E572F44A...

Date: 1/24/2023 | 5:14 AM PST

Dustin Martin

Chief Operating Officer

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Grant Thornton LLP (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Grant Thornton LLP:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: hypercare@us.gt.com

**To advise Grant Thornton LLP of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at hypercare@us.gt.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Grant Thornton LLP**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to hypercare@us.gt.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Grant Thornton LLP**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to hypercare@us.gt.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Grant Thornton LLP as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Grant Thornton LLP during the course of your relationship with Grant Thornton LLP.

# ADDENDUM

**THIS ADDENDUM** (the "Addendum") is entered into and effective as of the May 4, 2023 (the "Addendum Effective Date") by and between Mountain Express Oil Company ("Client" or "Debtor") and Grant Thornton LLP ("Grant Thornton") (collectively, the "Parties").

1. **RECITALS**

   1.1    The Parties entered into an engagement letter, dated January 23, 2023 (the "Agreement").

   1.2    The Parties entered into a Statement of Work, dated January 23, 2023 (the "SOW") to perform certain accounting advisory services (the "Services").

   1.3    On March 20, 2023, the Client declared bankruptcy (the "Petition Date").

   1.4    The parties desire to modify the Agreement and the SOW as set forth below in this Addendum.

   The Parties agree as follows:

2.    The Parties agree that the terms and conditions of the Agreement that were in effect before the Petition Date shall be in effect after the Petition Date, subject to Grant Thornton being approved by the Bankruptcy Court to perform services for the Debtor as an Ordinary Course Professional or otherwise.

3.    The Parties agree that the terms and conditions of the SOW that were in effect before the Petition Date to perform the Services shall be in effect after the Petition Date, subject to the following changes:

   3.1    Based on the current available information and the volume of transactions subject to potential review, the estimated fee range for the Services of the SOW is between $225,000 and $250,000 per month. The following is a schedule of our hourly rates based on the individuals involved. On a weekly basis, we will provide a list of individuals scheduled for the following week and will bill the minimum hours as scheduled per week.

| Title | Rate |
|---|---|
| Partner | $450 |
| Senior Manager / Director | $400 |
| Manager | $350 |
| Senior Associate | $300 |
| Associate | $250 |

Except as specifically modified by this Addendum, the terms and conditions of Agreement and the SOW remain unchanged and in full force and effect and this Addendum shall be deemed part of the Agreement), dated May 4, 2023

Entered into by the parties as of the Addendum Effective Date.

**Mountain Express Oil Company, Inc.**

By: _____

Name: _____

Title: _____

Date: _____

**Grant Thornton LLP**

By _____

Name: _____ Shalin Pathak

Title: _Partner_____

Date: _May 04, 2023_____