## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| MOUNTAIN EXPRESS OIL COMPANY, et al., | Case No. 23-90147 (DRJ) |
| Debtors. [1] | (Jointly Administered ) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF ORDERS (A)(I) AUTHORIZING ASSET PURCHASE AGREEMENT FOR SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS, (II) APPROVING BID PROCEDURES FOR SALE OF DEBTORS' ASSETS, (III) APPROVING BID PROTECTIONS, (IV) SCHEDULING CERTAIN DATES WITH RESPECT THERETO, (V) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (VI) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES; (B) APPROVING (I) SALE OF CERTAIN ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, AND (II) ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND LEASES; AND (C) GRANTING RELATED RELIEF**

**Emergency relief has been requested. Relief is requested not later than June 22, 2023.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on June 22, 2023 at 3:00 p.m. (prevailing Central time) in Courtroom 400, Floor 4, 515 Rusk, Houston, Texas 77002. You may participate in the hearing either in person or by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Jones' conference room number is 205691. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Jones' home page. The meeting code is "JudgeJones". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Jones' home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1]     A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at www.kccllc.net/mountainexpressoil. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 Cases is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state the following in support of this motion (this "Motion"):

## INTRODUCTION AND RELIEF REQUESTED[2]

1.      By this Motion, the Debtors seek approval of bid procedures and related relief to facilitate the continuation of their efforts to market and sell substantially all of their assets through one or more sales under section 363 of the Bankruptcy Code.  The Debtors have been engaged in a robust marketing process since March 2023 to assist with the identification of one or more parties interested in consummating a sale transaction with the Debtors (each, a "Potential Bidder").

2.      Since the Petition Date, the Debtors have continued the marketing and sale process and file this Motion to facilitate their continued efforts to market and sell their assets, while preserving maximum optionality for the Debtors and their stakeholders.  To date, the Debtors have received significant interest from multiple parties interested in a potential transaction to acquire all, as well as different parts of, the Debtors' business.  Substantial diligence has been completed by many of these parties and is ongoing for a subset of the Potential Bidders.  While the Debtors have not yet identified a Stalking Horse Purchaser for their assets, they seek authority to do so as provided below and in the Bid Procedures Order, up to the time of the Auction.  Overall, the Bid Procedures contemplate an open process that protects the best interests of the Debtors' estates and creditors and preserves the Debtors' ability to exercise their fiduciary duties throughout the sale process (the "Sale Process").

3.      The Bid Procedures provide the formal framework for a sale or sales and have been structured to elicit value-maximizing bids for the Debtors' assets.  Among other things, the Bid Procedures: (a) set forth the timeline for the Sale Process that is reasonable and appropriate to

---

[2] Capitalized terms used but not defined in this Introduction shall have the meanings ascribed to them *infra*.

produce value-maximizing bids for the Debtors' Assets and are consistent with the milestones set forth in the Debtors' DIP financing facility; (b) establish the basic rules for submitting bids for the purchase of some or all of the Debtors' assets; (c) authorize the provision to any Stalking Horse Purchaser of certain Bid Protections; and (d) provide major creditor groups with consultation rights at various stages in the process.  The proposed Bid Procedures comply with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and, therefore, should be approved.

4.    Consistent with the Debtors' need to consummate a Sale or Sales as quickly and efficiently as possible, the Debtors propose the following key dates and deadlines for the Sale Process:[3]

| **Date**[4] | **Event** |
| --- | --- |
| **June 22, 2023** | Bid Procedures Hearing[5] |
| **Within four business days after entry of Bid Procedures Order** | Deadline to file Bid Procedures and Sale Notice |
| **Within four business days after entry of Bid Procedures Order** | Deadline to File Assumption and Assignment Notice |
| **July 12, 2023** | Cure/Assignment Objection Deadline |
| **July 21, 2023** | Deadline to Submit Qualified Bids |
| **Deadline to Designate Stalking Horse Purchaser(s) if Selected by Debtors** | Prior to the Auction |
| **July 28, 2023 at 10:00 a.m. (prevailing Eastern Time)** | Sale Auction |
| **Promptly after Auction** | Deadline to File Notice of Successful Bidder(s) and Backup Bidder(s) |

---

[3]    The Debtors, consistent with their fiduciary duties, in the exercise of their business judgment, and in consultation with the Consultation Parties, and with the consent of First Horizon Bank, as DIP Agent (the "DIP Agent"), reserve the right to modify these dates consistent with the terms of the DIP Facility to achieve a value-maximizing Sale or Sales.

[4]    Unless otherwise noted, all times are prevailing Central time.

[5]    Because the Bid Procedures Motion is being filed on an emergency basis, objections to the Bid Procedures Motion may be filed up to and including the date of the Bid Procedures Hearing.

| Date[4] | Event |
|---|---|
| **July 31, 2023** | Adequate Assurance Objection Deadline<br>Deadline to Object to Sale(s) |
| **August 7, 2023, subject to the Court's availability** | Sale Hearing |
| **August 15, 2023** | Deadline to Close Transaction(s) |

5.     Accordingly, as discussed in detail herein, the Debtors respectfully request entry of

an order, substantially in the form attached hereto (the "Bid Procedures Order"):

    a.  authorizing and approving bid procedures (the "Bid Procedures"), substantially in the form attached as Exhibit 1 to the Bid Procedures Order, in connection with the sale or sales (each, a "Sale") of substantially all or a portion of the Debtors' assets (the "Assets") pursuant to section 363 of the Bankruptcy Code;

    b.  authorizing the Debtors, in their discretion, to enter into an Asset Purchase Agreement (the "Stalking Horse Purchase Agreement") with one or more Qualified Bidders (each a "Stalking Horse Purchaser") to serve as the stalking horse offer for the applicable assets, subject to the Committee and DIP Agent's consent,[6] and (ii) in connection with the Stalking Horse Purchase Agreement, authorization to pay (1) an expense reimbursement ("Expense Reimbursement") for the reasonable, documented out-of-pocket expenses of the Stalking Horse Purchaser incurred in connection with the Stalking Horse Purchase Agreement in an aggregate amount not to exceed $1,000,000 of actual, documented out of pocket expenses; and (2) a breakup fee ("Breakup Fee") for the Stalking Horse Purchaser in an amount not to exceed three percent (3%) of the cash portion of the purchase price under the Stalking Horse Purchase Agreement ((1) and (2) of this sentence, collectively, the "Bid Protections"), payable only from the proceeds of a Sale with a Qualified Bidder other than the Stalking Horse Purchaser. The Bid Protections shall be an allowed administrative expense;

    c.  deeming the DIP Agent to be a Qualified Bidder and recognizing the right of the DIP Agent to credit bid some or all of its indebtedness for any or all of the Debtors' assets;

    d.  scheduling an auction or auctions for a Sale or Sales (each, an "Auction") and approving the form and manner of notice thereof (the "Bid Procedures/Auction Notice");

    e.  establishing certain procedures relating to the assumption and assignment of executory contracts and unexpired leases in connection with a Sale, including notice of proposed cure amounts (the "Assumption and Assignment Procedures"),

---

[6]     If the DIP Agent or the Committee, for any reason, do not consent to the Debtors' entry into a Stalking Horse Purchase Agreement, the Debtors may seek approval of the Stalking Horse Purchase Agreement on an emergency basis.

and approving the form and manner of notice of the proposed assumption and assignment of executory contracts and unexpired leases (the "<u>Cure Notice</u>"); and

    f.    setting a hearing for approval of any Sale(s) (the "<u>Sale Hearing</u>").

6.    The Debtors also seek entry of an order (the "<u>Sale Order</u>"), among other things, (a) approving the sale of the Debtors' assets to the Stalking Horse Purchaser(s) (if any) or other successful bidder(s) at the Auction (the "<u>Successful Bidder</u>") free and clear of liens, claims, and interests pursuant to section 363(f) of the Bankruptcy Code; (b) approving the assumption and assignment of the Transferred Contracts pursuant to section 365(a) of the Bankruptcy Code; (c) determining that the Successful Bidder is a good faith purchaser pursuant to sections 363(f) and (m) of the Bankruptcy Code, and is entitled to the protections thereof; (d) waiving the 14-day stay under each of Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"); and (e) granting related relief.

## <u>JURISDICTION AND VENUE</u>

7.    The United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court.

8.    Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9.    The bases for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"); Bankruptcy Rules 2002, 6004, 6006(a), 9007, and 9014; and Rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "<u>Bankruptcy Local Rules</u>").

# BACKGROUND

## A.  General Case Background

10.     On March 18, 2023 (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

11.     On April 4, 2023, the Office of the United States Trustee (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Committee"), consisting of the following three members: (i) The Necessity Retail REIT, Inc.; (ii) Total Image Solutions, LLC; and (iii) Coca-Cola Bottling Company United, Inc.  *See* Docket No. 202.

12.     Founded in 2000 and based in Alpharetta, Georgia, the Debtors are a recognized leader in the fuel distribution and retail convenience industry.  As one of the largest fuel distributors in the American South, the Debtors served 828 Fueling Centers and 27 Travel Centers across 27 states as of the Petition Date.  The Debtors enjoy trusted relationships with every major oil company including ExxonMobil, BP, Shell, Chevron, Texaco, and Sunoco and have obtained Regal Status with Chevron, Platinum Status with ExxonMobil, and is the largest Pilot Dealer in the United States.  Since 2013, the Debtors have distributed over 1.1 billion gallons of fuel.

13.     Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the

DOCS_DE:243412.4 58614/002

*Declaration of Michael Healy in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 57] (the "First Day Declaration").[7]

**B.      The Marketing Process**

14.      The Debtors' sale process for a going-concern sale of substantially all the Debtors' assets has been managed by their investment banker, Raymond James & Associates, Inc. ("Raymond James"), which was hired by the Debtors on February 10, 2023.  Raymond James has worked closely with the Debtors' management to analyze the Debtors' financial position and outlook, prepare marketing and diligence materials (including a Confidential Information Presentation), and populate an electronic data room (the "Data Room") (containing approximately 11,732 documents) for prospective purchasers interested in purchasing all or any portion of the Debtors' assets.  Commencing in mid-March 2023, Raymond James contacted approximately 121 potential buyers (82 strategic counterparties / 39 financial counterparties).  To date, 51 of these parties have signed non-disclosure agreements and have received access to the comprehensive Data Room.  Raymond James has held calls with 37 different interested parties and has continued to facilitate numerous diligence requests.  Nine (9) parties submitted preliminary, non-binding Indications of Interest (IOIs) in connection with a May 8 IOI deadline.   The Debtors entered into further negotiations with certain of the remaining parties, and are continuing to negotiate to obtain a Stalking Horse Purchaser.

---

[7]      A capitalized term used but not otherwise defined herein shall have the meanings ascribed to it in the First Day Declaration.

## THE BID PROCEDURES

15.     Because the Bid Procedures are attached to the proposed Bid Procedures Order, they are not restated fully below. The Bid Procedures establish, among other things:[8]

- the process by which the Debtors will provide the Bid Procedures Order, the Bid Procedures, the Sale Notice, and the Cure Notice to interested parties as soon as practicable after entry of the Bid Procedures Order;

- the requirements that Potential Bidders must satisfy to participate in the bidding process and become Qualified Bidders;

- the availability of and access to due diligence by Potential Bidders;

- the deadlines and requirements for submitting bids and the method and criteria by which such bids are deemed to be Qualified Bids sufficient to trigger the Auction and participate in the Auction, including the minimum consideration that must be provided, the terms and conditions that must be satisfied, and the deadline that must be met, for any bidder (other than the Stalking Horse Purchaser) to be considered a Qualified Bidder, which shall be determined by the Debtors, in consultation with the Consultation Parties;

- the manner in which Qualified Bids will be evaluated by the Debtors to determine the starting bid (or starting bids) for the Auction;

- the conditions for having an Auction and procedures for conducting the Auction, if any;

- the criteria by which the Successful Bidder will be selected by the Debtors, after consultation with the Consultation Parties; and

- various other matters relating to the sale process generally, including the designation of the Backup Bid, return of any good faith deposits, and certain reservations of rights.

16.     Importantly, the Bid Procedures do not impair the Debtors' ability to consider all Qualified Bid proposals, and, as noted, they preserve the Debtors' right to modify the Bid Procedures as necessary or appropriate to maximize value for the Debtors' estates, in consultation

---

[8]     This summary is qualified in its entirety by the Bid Procedures. All capitalized terms that are used in this summary but not otherwise defined here have the meanings given to them in the Bid Procedures. If there are any conflicts between this summary and the Bid Procedures, the terms of the Bid Procedures govern.

with the Consultation Parties. As such, the Bid Procedures uphold and comply with the Debtors' fiduciary obligations to maximize value.

17.     Following conclusion of the Auction, if any, and the selection of a Successful Bidder, and Back-Up Bidder (if any) the Debtors intend to present the results of the Auction at the Sale Hearing and seek entry of the Sale Order. The Sale Order would authorize the Debtors to enter into and perform under the asset purchase agreement with the Successful Bidder (or the Back-Up Bidder) and deem the Debtors' selection of the applicable Successful Bid final.

**A.      Form and Manner of Sale Notice and Notice of Successful Bidder**

18.     The Auction, if any, will take place at 10:00 a.m. (prevailing Eastern Time) in person at the offices of Raymond James in New York City, NY on July 28, 2023 or such later date and time as selected by the Debtors, after consultation with the Consultation Parties.

19.     Within four business days after entry of the Bid Procedures Order, the Debtors will cause the Sale Notice, substantially in the form attached as Exhibit 2 to the Bid Procedures Order, to be served on the following parties or their respective counsel, if known (collectively, the "Sale Notice Parties"): (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the Official Committee of Unsecured Creditors, McDermott Will & Emery LLP, Attn: Maris J. Kandestin (mkandestin@mwe.com), Chuck Gibbs (crgibbs@mwe.com), Marcus Helt (mhelt@mwe.com); (c) counsel to the DIP Agent, Greenberg Traurig, LLP, Attn: John D. Elrod, Esq. (elrodj@gtlaw.com) and Shari Heyen, Esq. (heyens@gtlaw.com); (d) the state Attorneys General for states in which the Debtors conduct business; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) the Environmental Protection Agency and similar state agencies for states in which the Debtors conduct business; (h) all known holders of liens, encumbrances, and other claims secured by the Assets; (i) all known creditors of the Debtors; (j)

each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; (k) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (l) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

20.     The Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of any proposed Sale(s), including the date, time, and place of the Auction (if one is held) and the Bid Procedures and the dates and deadlines related thereto. The Debtors request that the form and manner of the Sale Notice be approved and no other or further notice of the Sales or the Auction (in each case, if any) be required.

21.     **Notice of Successful Bidder(s)**.  Following the Auction, the Debtors will promptly file with the Court a notice (the "Notice of Successful Bidder") that will inform the Court and parties in interest of the results of the Auction.  The Notice of Successful Bidder will identify, among other things: (i) the Successful Bidder(s) as the proposed purchaser(s) of the Assets; (ii) the amount and form of consideration to be paid by the Successful Bidder(s) for the Assets; (iii) the liabilities to be assumed by the Successful Bidder(s); and (iv) the Potential Assumed/Assigned Contracts to be assumed by the Debtors and assigned to the Successful Bidder(s), or the Debtors' rights and interests therein sold and transferred to the Successful Bidder(s), as the case may be, in connection with the Sale Transaction(s) (the "Transferred Contracts").[9]  The Notice of Successful Bidder will also include similar information relating to the Back-Up Bidder(s) and the Back-Up Bid(s).  In addition, the Debtors will attach to the Notice of Successful Bidder: (i) the Sale Order(s) approving the Sale(s) to the Successful Bidder(s); (ii) a copy of the Purchase Agreement(s) entered into by the Debtors and the Successful Bidder(s) following the Auction; and (iii) any additional

---

[9]     For the avoidance of doubt, the list of Transferred Contracts may be modified at any time until the closing of the Sale Transaction.

information or documentation relevant to the Successful Bid(s).  The Debtors will file the Notice

of Successful Bidder on the docket for these Chapter 11 Cases as promptly as is reasonably

practicable prior to the Sale Hearing, but will not be required to serve the same on any parties-in-

interest in these Chapter 11 Cases.

**B.**     **Assumption and Assignment Procedures**

22.     The Debtors are seeking approval of the Assumption and Assignment Procedures

for notifying counterparties to executory contracts and unexpired leases (the "Contract

Counterparties") of, among other things, proposed Cure Amounts (as defined below) with respect

to those executory contracts and unexpired leases that the Debtors may assume and assign and/or

transfer in connection with a Sale Transaction(s) to the Successful Bidder(s) (the "Potential

Assumed/Assigned Contracts").  The proposed Assumption and Assignment Procedures are as

follows:

a.     **Cure Notice.**  Within four (4) business days after entry of the Bid
Procedures Order, the Debtors will file a notice (the "Cure Notice")
identifying the Potential Assumed/Assigned Contracts (such list, the "Cure
Schedule"),[10] substantially in the form attached as Exhibit 3 to the Bid
Procedures Order, and serve such notice on all Contract Counterparties to
the Potential Assumed/Assigned Contracts.  The Cure Schedule attached to
the Cure Notice served on each Contract Counterparty shall: (i) identify
Potential Assumed/Assigned Contracts; (ii) identify the Debtor
counterparty to such Potential Assumed/Assigned Contracts; (iii) list the
proposed cure amounts, if any, that the Debtors believe must be paid to cure
all defaults outstanding under each Potential Assumed/Assigned Contract
(the "Cure Amounts") as of such date; (iv) include a statement that
assumption and assignment of such Potential Assumed/Assigned Contract
is not required or guaranteed; and (v) inform such Contract Counterparty of
the requirement to file any Cure/Assignment Objection (as defined below)
by the Cure/Assignment Objection Deadline (as defined below).  Service of
the Cure Notice, including the Cure Schedule, upon a Contract Counterparty
does   not   constitute   an   admission   that   a   particular   Potential
Assumed/Assigned Contract is an executory contract or unexpired lease, or

---

[10]    For the avoidance of doubt, the Debtors reserve all rights to remove any contract or lease from the Cure Schedule
prior to Closing of any Sale Transaction(s), in which instance such executory contract or unexpired lease will not
be a Transferred Contract (as such term is defined below).

confirm that the Debtors are required to assume and/or assign such contract or lease.[11]

b.    **Cure and Assignment Objections.**  A Contract Counterparty with any Potential Assumed/Assigned Contract listed on the Cure Schedule must file any objections to a proposed Cure Amount (a "Cure Objection") and/or any other objections to the assumption and assignment or transfer of any of the Potential Assumed/Assigned Contracts (an "Assignment Objection") by **July 12, 2023 at 5:00 p.m. (prevailing Central Time)** (the "Cure/Assignment Objection Deadline").   Any Cure Objection and/or Assignment Objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Bankruptcy Local Rules, and any order governing the administration of these Chapter 11 Cases; (iii) state with specificity the nature of the objection and, if the Cure Objection pertains to the proposed Cure Amounts, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; (iv) include complete contact information for such Contract Counterparty (including address, telephone number, and email address); and (v) be filed with the Court and served upon the Objection Notice Parties[12] prior to the Cure/Assignment Objection Deadline; *provided* that the Debtors may modify the Cure/Assignment Objection Deadline with respect to any Contract Counterparty upon consultation with the Stalking Horse Purchaser or the Successful Bidder, as applicable, by email confirmation.

c.    **Adequate Assurance Objections**.  A Contract Counterparty with any Potential Assumed/Assigned Contract listed on the Cure Schedule must file any objections to the Successful Bidder's and/or Backup Bidder's proposed form of adequate assurance of future performance (an "Adequate Assurance Objection" and, together with Cure Objections and Assignment Objections, "Contract Objections") no later than **July 31, 2023 at 4:00 p.m. (prevailing Central time)**.

d.    **Effects of Filing a Contract Objection**. A properly filed Contract Objection will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment or transfer of the Potential Assumed/Assigned Contracts at issue, and/or objection to the accompanying Cure Amounts, as set forth in the Contract Objection, but will not constitute an objection to the remaining relief requested in the Motion.

---

[11]   The Debtors reserve all rights concerning the characterization of the Potential Assumed/Assigned Contracts in all respects.

[12]   The Objection Notice Parties are (i) the United States Trustee for the Southern District of Texas; (ii) counsel to the DIP Agent; (iii) counsel to the Official Committee of Unsecured Creditors; (iv) counsel to any Stalking Horse Bidder (if any); and (v) persons who have filed a request for notice pursuant to Bankruptcy Rule 2002.

e.     **Dispute Resolution**. Any Contract Objection that remains unresolved after the Sale Hearing shall be heard at such later date as may be agreed upon by the parties or fixed by the Court. To the extent that any Contract Objection cannot be resolved by the parties, any Potential Assumed/Assigned Contracts subject to such Contract Objection shall be assumed and assigned or transferred only upon satisfactory resolution of the Contract Objection, to be determined in the Successful Bidder's reasonable discretion. To the extent a Contract Objection remains unresolved, the Potential Assumed/Assigned Contract may be conditionally assumed and assigned, subject to the consent of the Successful Bidder, pending a resolution of the Contract Objection after notice and a hearing. If a Contract Objection is not satisfactorily resolved, the Successful Bidder may determine that such Contract should not be a Transferred Contract, in which case the Successful Bidder will not be responsible for any Cure Amounts in respect of such contract. Notwithstanding the foregoing, if a Contract Objection is solely a Cure Objection (any such objection, a "Cure Dispute"), the applicable Potential Assumed/Assigned Contract may be assumed by the Debtors and assigned to the Successful Bidder provided that the cure amount the Contract Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

f.     **Supplemental Cure Notice**. If the Debtors discover Potential Assumed/Assigned Contracts inadvertently omitted from the Cure Notice or the Successful Bidder identifies other Potential Assumed/Assigned Contracts that it desires to assume or assume and assign in connection with the Sale, the Debtors may, after consultation with the Successful Bidder, at any time before the closing of the Sale, supplement the Cure Notice with previously omitted Potential Assumed/Assigned Contracts or modify a previously filed Cure Notice, including by modifying the previously stated Cure Amounts associated with any Potential Assumed/Assigned Contracts (the "Supplemental Cure Notice").

g.     **Objection to the Supplemental Cure Notice**. Any Contract Counterparty listed on a Supplemental Cure Notice may file an objection (a "Supplemental Cure/Assignment Objection") only if such objection is to the proposed assumption or assumption and assignment or transfer of the applicable Potential Assumed/Assigned Contracts or the proposed Cure Amounts, if any. All Supplemental Cure/Assignment Objections must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Bankruptcy Local Rules, and any order governing the administration of these Chapter 11 Cases; (iii) state with specificity the nature of the objection and, if the Supplemental Cure/Assignment Objection pertains to the proposed Cure Amounts, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable

and appropriate documentation in support thereof; (iv) include complete contact information for such Contract Counterparty (including address, telephone number, and email address); and (v) be filed no later than 5:00 p.m. (prevailing Central Time) on the date that is the later of (x) seven (7) days following the date of service of such Supplemental Cure Notice and (y) the Cure/Assignment Objection Deadline (the "Supplemental Cure/Assignment Objection Deadline"); *provided* that the Debtors may modify the Supplemental Cure/Assignment Objection Deadline with respect to any Contract Counterparty upon consultation with the Stalking Horse Purchaser or the Successful Bidder, as applicable, by email confirmation.

h.      **Dispute Resolution of Supplemental Cure Objection**. If a Contract Counterparty files a Supplemental Cure/Assignment Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek an expedited hearing before the Court to determine the Cure Amounts, if any, and approve the assumption or transfer of the relevant Potential Assumed/Assigned Contracts.  If there is no such objection, then the Sale Order shall constitute an order of the Court fixing the Cure Amounts and approving the assumption and assignment or transfer of any Potential Assumed/Assigned Contracts listed on a Supplemental Cure Notice, subject to such Potential Assumed/Assigned Contract's designation as a Transferred Contract. Notwithstanding the foregoing, if a Supplemental Cure/Assignment Objection relates solely to a Cure Dispute, the applicable Potential Assumed/Assigned Contracts may be assumed by the Debtors and assigned to the Successful Bidder provided that the cure amount the Contract Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

i.      **No Cure Objections**. If there are no Contract Objections or Supplemental Cure/Assignment Objections, or if a Contract Counterparty does not file and serve a Contract Objection or a Supplemental Cure/Assignment Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Amount, (i) the Cure Amounts, if any, set forth in the Cure Notice (or Supplemental Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Potential Assumed/Assigned Contract or any other document, and (ii) the Contract Counterparty will be deemed to have consented to the assumption, assumption and assignment, or transfer of the Potential Assumed/Assigned Contract and the Cure Amounts, if any, and will be forever barred from objecting to the assumption, assumption and assignment, or transfer of such Potential Assumed/Assigned Contract and rights thereunder, including the Cure Amounts, if any, and from asserting

14

any other claims related to such Potential Assumed/Assigned Contract against the Debtors or the Successful Bidder, or the property of any of them.

23.     At the Sale Hearing, (i) the Successful Bidder(s) shall present evidence necessary to demonstrate adequate assurance of future performance by the Successful Bidder(s) with respect to the Transferred Contracts and (ii) the Debtors will request entry of an order approving the assumption and assignment of any or all Potential Assumed/Assigned Contracts to be assumed by the applicable Debtors and assigned to the Successful Bidder(s).  For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of all parties-in-interest.

24.     **For the avoidance of doubt, the inclusion of a Potential Assumed/Assigned Contract on a Cure Notice or Supplemental Cure Notice will not (a) obligate any Debtor to assume, assume and assign, and/or transfer such Potential Assumed/Assigned Contract listed thereon nor obligate the Stalking Horse Purchaser or any other Successful Bidder to take assignment of such Potential Assumed/Assigned Contract; or (b) constitute any admission or agreement of the Debtors that such Potential Assumed/Assigned Contract is an executory contract or unexpired lease.  <u>Only those Potential Assumed/Assigned Contracts that are included on a schedule of assumed and assigned contracts attached to the definitive agreement of the Successful Bidder (including amendments or modifications to such schedules in accordance with such agreement)—*i.e.* the Transferred Contracts—will be assumed and assigned or transferred to the Successful Bidder.</u>**

## <u>BASIS FOR RELIEF</u>

**A.      The Bid Procedures Are Fair, Designed to Maximize the Value Received for <u>the Property, and Consistent with the Debtors' Reasonable Business Judgment</u>**

25.     A debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g.*, *In re Institutional Creditors of*

*Continental Air Lines, Inc. v. Continental Air Lines, Inc., et al. (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *In re Crutcher Resources Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business but the movant must articulate some business justification for the sale.").

26.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).

27.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy transactions. *See, e.g.*, *In re Integrated Res., Inc.*, 147 B.R. at 659 (bidding procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an

adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

28.     Here, the Bid Procedures will promote active bidding from interested parties and will elicit the highest or otherwise best offers available for some or all of the Assets. The Bid Procedures are designed to facilitate orderly yet competitive bidding to maximize the value realized by the Debtors' estates from any sale transactions. In particular, the Bid Procedures contemplate an open auction process and provide potential bidding parties with sufficient time to continue to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

29.     It is well-settled that where there is a court-approved auction process, a full and fair price is presumed for the assets sold because the best way to determine value is exposure to the market. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "sale transaction does not require an auction procedure," "the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction"). This is true here, where the Sale has been subjected to a marketing process and intensively scrutinized by the Debtors and their retained advisors. The proposed Bid Procedures will encourage competitive bidding and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.

**B.     The Breakup Fee and Expense Reimbursement Have
        a Sound Business Purpose and Should Be Approved**

30.     The Debtors are also seeking authority to provide the Breakup Fee and Expense Reimbursement to any Stalking Horse Purchaser. While there has been substantial interest in the Debtors' assets, to date, the Debtors have not identified any Stalking Horse Purchaser, but reserve

the right to designate a Stalking Horse Purchaser up to the time of the Auction.  The use of a stalking horse in a public auction process for sales is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Official Comm. of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL 2671254, No. 11-cv-219, at *1 n. 1 (E.D. Wis. July 7, 2011).  As a result, stalking horse bidders virtually always require break-up fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing [their] bid[s] to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Id.* (citation omitted).  The use of bidding protections has become an established practice in chapter 11 cases.

31.     Break-up fees and other forms of bidding protections are a normal and, in many cases, necessary component of significant sales conducted in chapter 11: "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . In fact, because the directors of a corporation have a duty to encourage bidding, break-up fees can be *necessary* to discharge the directors' duties to maximize value." *Integrated Res.*, 147 B.R. at 659-60 (emphasis in original). Specifically, bid protections "may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (citation and quotations omitted); *see also Integrated Res.*, 147 B.R. at 660–61 (noting bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid").

32.     As a result, courts routinely approve such bidding protections in connection with proposed bankruptcy sales where a proposed fee or reimbursement provides a benefit to the estate.

18

*See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) ("In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."). The approval of Bid Protections and Expense Reimbursement is in the best interests of the Debtors' estates and their creditors, as the Stalking Horse Purchase Agreement will establish a floor for further bidding that may increase the consideration given in exchange for the Assets, which will inure to the benefit of the Debtors' estates.

33.     Courts in the Fifth Circuit analyze the appropriateness of bidding incentives under the "business judgment rule" standard, and the law is well established in this district that courts consider whether (a) the incentive hampers, rather than encourages, bidding, and (b) the amount of the incentive is unreasonable relative to the proposed purchase price. *See In re ASARCO, L.L.C.*, 650 F.3d 593 (5th Cir. 2011) (affirming bankruptcy court's decision to apply the business judgment rule to evaluate whether an expense reimbursement bid protection was permissible); *see also In re ASARCO LLC*, 441 B.R. 813, 826 (S.D. Tex. 2010) (explaining three-part test used to determine whether expense reimbursement was permissible under business judgment rule).

34.     The Breakup Fee and Expense Reimbursement are a critical component of the Sale Process. A Stalking Horse Purchaser will have expended substantial time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by third parties. The proposed Breakup Fee and Expense Reimbursement are within the commonly approved ranges used by bankruptcy courts.  By the Breakup Fee and Expense Reimbursement, the Debtors will be able to ensure that their estates can realize the benefit of a transaction with the Stalking

Horse Purchaser without sacrificing the potential for interested parties to submit overbids at the Auction.

35.     The Breakup Fee and Expense Reimbursement (a) are an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, (b) are commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Purchaser, and (c) are fair, reasonable, and appropriate, including in light of the size and nature of the proposed transaction, the commitments that have been made, and the efforts that have been and will be expended by the Stalking Horse Purchaser.

36.     If the Court does not approve Breakup Fee and Expense Reimbursement, the Debtors may not be able to induce any Qualified Bidder to serve as the Stalking Horse Purchaser, to the detriment of the Debtors' estates. Further, if the Bid Protections were ultimately to be paid, it will necessarily be because the Debtors have received higher or otherwise superior offers for the Assets. In short, the proposed Breakup Fee and Expense Reimbursement are fair and reasonable under the circumstances because they constitute a "fair and reasonable percentage of the proposed purchase price" and are "reasonably related to the risk, effort, and expenses of the prospective purchaser." *Integrated Res.*, 147 B.R. at 662.   Accordingly, the Breakup Fee and Expense Reimbursement are a sound exercise of the Debtors' business judgment and are in the best interests of the Debtors, their estates, and all stakeholders.

**C.     The Court Should Approve the Debtors' Sale of Their Assets as a Sound Exercise of Business Judgment**

37.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of

property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon "some articulated business justification for using, selling, or leasing the property outside the ordinary course of business." *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996).

38.     As noted above, the business judgment rule shields a debtor's management's decisions from judicial second-guessing. *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (a "presumption of reasonableness attaches to a debtor's management decisions" and courts generally will not entertain objections to the debtor's conduct after a reasonable basis is set forth). Once a debtor articulates a valid business justification, the court should review that request under the business judgment rule. *See In re Gulf Coast Oil Corp.*, 404 B.R. 407, 415 (Bankr. S.D. Tex. 2009) (noting that a debtor in possession has the discretionary authority to exercise business judgment given to an officer or director of a corporation). The business judgment rule protects certain debtor decisions -- such as the Debtors' entry into one or more definitive purchase agreements -- from reevaluation by a court with the benefit of hindsight. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F. 2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."). If a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

39.     Based on this rationale, courts have authorized a debtor's sale of assets as a sound exercise of business judgment under section 363 of the Bankruptcy Code.

1.     **A Sound Business Purpose Exists for the Sale**

40.     The Debtors have a sound business justification for selling the Assets. It is currently in the best interest of the Debtors' estates and all stakeholders to complete a marketing and going-concern sale of substantially all their assets. In light of the Debtors' duty to maximize value for their estates, the Debtors have a sound business purpose for the Sale.  The ultimate successful bid, after being subject to a "market check" in the form of the Auction (if any), will constitute, in the Debtors' reasonable business judgment, the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practicably available alternative. *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section 363(b) sale transaction does not require an auction procedure … the auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

41.     The asset purchase agreement of the Successful Bidder will constitute the highest or otherwise best offer for the applicable Assets, which will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The Debtors' determination to sell the Assets through an Auction process and to enter into an asset purchase agreement with the Successful Bidder (and any Back-Up Bidder) will be a valid and sound exercise of the Debtors' business judgment. The Debtors request that the Court authorize the proposed Sale as a proper exercise of the Debtors' business judgment.

2.     **The Sale Should Be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code**

42.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale

price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

43.     Section 363(f) of the Bankruptcy Code is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Assets free and clear of all liens, security interests, pledges, charges, defects, or similar encumbrances (collectively, "Encumbrances"), except with respect to any Encumbrances that may be assumed by the Successful Bidder. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

44.     Any Encumbrance that will not be an assumed liability satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code, and any such Encumbrance will be adequately protected by either being paid in full at the time of closing, or by having it attach to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto. The Debtors request authority to convey the Assets to the Successful Bidder free and clear of all Encumbrances including liens, claims, rights, interests, charges, and encumbrances, with any such liens, claims, rights, interests, charges, and encumbrances to attach to the proceeds of the Sale.

### 3.     Successful Bidders Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code

45.     Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *See, e.g., In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *Miami Ctr. Ltd. P'ship*

*v. Bank of New York*, 838 F.2d 1547, 1554 (11th Cir. 1988); *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985).

46.     As noted above, any purchase agreement executed by a Successful Bidder will have been negotiated at arm's-length and in good faith in accordance with the Bid Procedures and Bid Procedures Order, with each of the parties represented by its own advisors and counsel. Accordingly, the Debtors request that the Sale Order include a provision that any Successful Bidder(s) for the Debtors' Assets is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code.  The Debtors maintain that providing the Successful Bidders with such protection will ensure that the maximum price will be received by the Debtors for the Assets.

**D.     The Form and Manner of the Sale Notice Should Be Approved**

47.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with 21-days' notice of a hearing where the Debtors will seek to use, lease, or sell property of the estate outside the ordinary course of business. Bankruptcy Rule 2002(c) requires any such notice to include the time and place of the auction and the hearing and the deadline for filing any objections to the relief requested therein. As required under Bankruptcy Rule 2002(b), the Debtors seek approval of the Sale Notice as proper notice of the Auction. Notice of this Motion and the related hearing to consider entry of the Bid Procedures Order, coupled with service of the Sale Notice, as provided for herein, constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. The Debtors request that this Court approve the form and manner of the Sale Notice.

E.      **The Assumption and Assignment Procedures Are Appropriate and
        Should Be Approved**

        1.      **The Assumption and Assignment of the Transferred Contracts
                Reflects the Debtors' Reasonable Business Judgment**

48.     To facilitate and effectuate the Sale, the Debtors are seeking authority to assign or

transfer the Transferred Contracts to a Successful Bidder to the extent required by such bidder.

Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory

contracts and unexpired leases, subject to the approval of the court, *provided* that the defaults under

such contracts and leases are cured and adequate assurance of future performance is provided. The

Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy

the "business judgment rule" and will not be subject to review unless such decision is clearly an

unreasonable exercise of such judgment. *See, e.g.*, *Richmond Leasing*, 762 F.2d at 1309 (applying

a business judgment standard to debtor's determination to assume unexpired lease).

49.     As set forth in the Bid Procedures Order, the Debtors also request that any party

that fails to object to the proposed assumption and assignment of any Potential Assumed/Assigned

Contract be deemed to consent to the assumption and assignment or transfer of the applicable

contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order,

along with the Cure Amounts identified in the Cure Notice or Supplemental Cure Notice, as

applicable. *See, e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting

to sale motion, creditor deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R.

661, 667 (Bankr. W.D. La. 1985) (same).

50.     Here, the Court should approve the decision to assume and assign the Transferred

Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment. ***First***,

the Transferred Contracts are essential to the value of the Debtors' business and, as such, they are

essential to inducing the highest or otherwise best offer for the Assets. ***Second***, it is unlikely that

any purchaser would want to acquire certain of the Assets unless certain of the contracts needed

to conduct business and manage day-to-day operations of those Assets were included in the

transaction. **Third,** the Transferred Contracts will be assumed and assigned through the process

approved by the Court pursuant to the Bid Procedures Order and, thus, will be reviewed by key

constituents in these Chapter 11 Cases.

51.     The assumption and assignment or transfer of the Transferred Contracts by way of

the Assumption and Assignment Procedures should be approved as an exercise of the Debtors'

business judgment.

### 2.     Defaults Under the Assumed Contracts Will Be Cured in Connection with the Sale

52.     To facilitate and effectuate the Sale, the Debtors are seeking authority to assign or

transfer the Transferred Contracts to a Successful Bidder to the extent required by such bidder.

Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory

contracts and unexpired leases, subject to the approval of the court, *provided* that the defaults under

such contracts and leases are promptly cured and adequate assurance of future performance is

provided. *See, e.g., In re Tama Beef Packing Inc.*, 277 B.R. 407, 411 (Bankr. N.D. Iowa 2002)

("Various courts have held that prompt can mean anywhere between two weeks to five years,

depending on the circumstances of a particular case.").  The Debtors' decision to assume or reject

an executory contract or unexpired lease must only satisfy the "business judgment rule" and will

not be subject to review unless such decision is clearly an unreasonable exercise of such judgment.

*See, e.g.*, *Richmond Leasing*, 762 F.2d at 1309 (applying a business judgment standard to debtor's

determination to assume unexpired lease).

53.     Once finding that a debtor has exercised its business judgment in determining that

assuming an executory contract is in the best interest of its estate, courts must then evaluate

whether the assumption meets the requirements of section 365(b) of the Bankruptcy Code, specifically that a debtor (a) cure, or provide adequate assurance of promptly curing, prepetition defaults in the executory contract, (b) compensate parties for pecuniary losses arising therefrom, and (c) provide adequate assurance of future performance thereunder. This section "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *In re Luce Indus., Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).

54.     The statutory requirements of section 365(b)(1)(A) of the Bankruptcy Code will be satisfied because the Assumption and Assignment Procedures provide a clear process by which to resolve disputes over cure amounts or other defaults. The Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of non-Debtor parties.

### 3.     Non-Debtor Parties Will Be Adequately Assured of Future Performance

55.     Similarly, the third requirement of section 365(b) of the Bankruptcy Code—adequate assurance of future performance—is also satisfied given the facts and circumstances present here. "The phrase 'adequate assurance of future performance' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case." *In re U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982). Although no single solution will satisfy every case, "the required assurance will fall considerably short of an absolute guarantee of performance." *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance present where a prospective assignee has financial

resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

56.     The Debtors will demonstrate that the requirements for assumption and assignment of the Transferred Contracts to the Successful Bidder (and any Back-Up Bidder) will be satisfied. As required by the Bid Procedures, the Debtors will evaluate the financial wherewithal of Potential Bidders before designating such party a Qualified Bidder or Successful Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under the Transferred Contracts), including as it relates to such Qualified Bidder's willingness and ability to perform under the Transferred Contracts assigned to the Successful Bidder (or any Back-Up Bidder). Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder (or Back-Up Bidder) to provide adequate assurance of future performance and object to the assumption and assignment or transfer of the Potential Assumed/Assigned Contracts or proposed Cure Amounts. The Court therefore will have a sufficient basis to authorize the Debtors to assume and assign or transfer the Transferred Contracts as set forth in the Stalking Horse Purchase Agreement.

## EMERGENCY CONSIDERATION

57.     The Debtors request emergency consideration of the Motion no later than June 22, 2023.  Obtaining prompt approval of the Motion will assist the Debtors in maximizing the value of their assets within the milestones established by the Court's *Final Order Pursuant to 11 U.S.C. §§ 105, 105, 361, 362, 363, 364, and 507, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-1 (i) Authorizing the Debtors to Use Cash Collateral and Obtain Post-Petition Financing, (ii) Granting Liens and Providing Super-Priority Administrative Expense Status, (iii)*

*Granting Adequate Protection, and (iv) Granting Related Relief* [Docket No. 332].   The

Committee and the Lenders support consideration of the Motion on an emergency basis.

## **WAIVER OF BANKRUPTCY RULES 6004 AND 6006**

58.     To implement the foregoing successfully, the Debtors request that the Court enter

an order providing that notice of the relief requested herein satisfies Bankruptcy Rules 6004 and

6006 that the Debtors have established cause to exclude such relief from the 14-day stay periods

under Bankruptcy Rules 6004(h) and 6006(d).

## **NOTICE**

59.     Notice of the hearing on the relief requested in this Motion will be provided by the

Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Local

Rules, and is sufficient under the circumstances. The Debtors will provide notice to parties-in

interest, including on the Debtors' Master Service List.

[*Remainder of Page Intentionally Blank*]

## **CONCLUSION**

The Debtors request that the Court enter the Bid Procedures Order, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Dated: June 16, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Michael D. Warner*
Michael D. Warner (SBT 00792304)
Steven W. Golden (SBT 24099681)
440 Louisiana Street, Suite 900
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile:  (713) 691-9407
mwarner@pszjlaw.com
sgolden@pszjlaw.com

-and-

Jeffrey N. Pomerantz (admitted *pro hac vice*)
Jeffrey W. Dulberg (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
jpomerantz@pszjlaw.com
jdulberg@pszjlaw.com

*Counsel to the Debtors and Debtors in Possession*

## **Certificate of Service**

I certify that on June 16, 2023, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Michael D. Warner*
Michael D. Warner

DOCS_DE:243412.4 58614/002