United States Bankruptcy Court
Southern District of Texas

**ENTERED**

June 22, 2023

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| MOUNTAIN EXPRESS OIL COMPANY, et al., | Case No. 23-90147 (DRJ) |
| Debtors. [1] | (Jointly Administered) |

### ORDER (I) APPROVING BID PROCEDURES FOR SALE
### OF THE DEBTORS' ASSETS, (II) APPROVING BID PROTECTIONS,
### (III) SCHEDULING CERTAIN DATES WITH RESPECT THERETO,
### (IV) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND
### (V) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES

### (Related Docket No. 536)

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), (a) authorizing and approving the Bid Procedures, substantially in the form attached hereto as **Exhibit 1** (the "Bid Procedures"), (b) establishing certain dates and deadlines in connection with the Bid Procedures, (c) approving the Bid Protections (in the event of one or more Stalking Horse Purchasers), (d) approving procedures for assuming and assigning certain executory contracts and unexpired leases, and certain related notices, approving the Sale Notice, substantially in the form attached hereto as **Exhibit 2**, and approving the Cure Notice, substantially in the form attached hereto as **Exhibit 3**, all as more fully set forth in the Motion; and the Court having reviewed the evidence in support of the Motion; and the Court having reviewed the Motion and having heard the statements in support of the relief

---

[1] A complete list of each of the Debtors in these Chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at www.kccllc.net/mountainexpressoil. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 cases is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the Bid Procedures, as applicable.

requested therein at a hearing before the Court (the "<u>Hearing</u>"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and any objections to the Motion having been withdrawn with prejudice or overruled on the merits at the Hearing; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor,

**THE COURT FINDS**:[3]

A.    <u>Jurisdiction and Venue</u>. The Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334, and venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

B.    <u>Bases for Relief</u>. The bases for the relief requested in the Motion are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and 9014 and Bankruptcy Local Rule 9013-1.

C.    <u>Notice of the Bid Procedures Motion</u>. Good and sufficient notice of the Motion, the Bid Procedures, and the relief sought in the Motion has been given under the circumstances, and no other or further notice is required except as set forth herein and in the Bid Procedures. The notice of the Motion and of the Hearing is reasonable and sufficient in light of the circumstances and nature of the relief requested in the Motion, and no other or further notice of the Motion or the Hearing is necessary. A reasonable and fair opportunity to object to the Motion and the relief granted in this Order has been afforded under the circumstances.

D.    <u>Bid Procedures</u>. The Debtors have articulated good and sufficient reasons for authorizing and approving the Bid Procedures, which are fair, reasonable, and appropriate under

---

[3]    The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052 made applicable pursuant to Bankruptcy Rule 9014. To the extent any findings of facts are conclusions of law, they are adopted as such.

the circumstances and designed to maximize value for the benefit of the Debtors' estates, their creditors, and other parties in interest. The Debtors, with the assistance of their advisors, are engaged in a fulsome marketing and sale process to solicit and develop the highest or otherwise best offer for the Assets. The Bid Procedures are designed to build on that marketing and sale process following entry of this Order.

E.      Bid Protections.  In the case of one or more Stalking Horse Purchasers, subject to the noticing requirements and objection procedures set forth in this Order, the Bid Protections (i) are an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, (ii) are commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Purchaser(s), and (iii) are fair, reasonable, and appropriate, including in light of the commitments that have been made and the efforts that have been and will be expended by the Stalking Horse Purchaser(s). The Bid Protections are necessary to induce the Stalking Horse Purchaser(s) to pursue the Sale and to be bound by the Stalking Horse Purchase Agreement.

F.      Assumption and Assignment Procedures. The Cure Notice is reasonably calculated to provide counterparties to the Transferred Contracts to be assumed, assumed and assigned, or transferred with proper notice of the intended assumption, assumption and assignment, or transfer of their Transferred Contracts, any cure amounts, and the Assumption and Assignment Procedures, and no other or further notice of such intention, the cure amounts, or the Assumption and Assignment Procedures shall be required.

G.      Sale Notice. The Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the Auction, including the date, time, and place of the Auction (if one is held) and the Bid Procedures and certain dates and deadlines related thereto, and

no other or further notice of the Auction shall be required.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED**:

1.      All objections, statements, and reservations of rights to the relief granted herein that have not been withdrawn with prejudice, waived, or settled are overruled and denied on the merits with prejudice.

**I.      Important Dates and Deadlines.**

2.      The following dates and deadlines regarding the Sale are hereby established, subject to the right of the Debtors, to modify the following dates in consultation with the Consultation Parties (as defined in the Bid Procedures), and with the consent of the DIP Agent, provided notice is given in accordance with the terms of this Order:

| Date | Event |
|------|-------|
| **June 22, 2023** | Bid Procedures Hearing[4] |
| **Within four business days after entry of Bid Procedures Order** | Deadline to file and serve Bid Procedures and Sale Notice |
| **Within four business days after entry of Bid Procedures Order** | Deadline to File Assumption and Assignment Notice |
| **July 12, 2023** | Cure/Assignment Objection Deadline |
| **July 21, 2023** | Deadline to Submit Qualified Bids |
| **Deadline to Designate Stalking Horse Purchaser(s) if Selected by Debtors** | Prior to the Auction |
| **July 28, 2023 at 10:00 a.m. ET** | Auction |
| **Promptly after Auction** | Deadline to File Notice of Successful Bidder(s) and Backup Bidder(s) |
| **August 3, 2023** | Adequate Assurance Objection Deadline |
| | Deadline to Object to Sale(s) |
| **August 7, 2023, at 2:00 p.m. (prevailing Central Time)** | Sale Hearing |
| **August 15, 2023** | Deadline to Close Transaction(s) |

---

[4] Because the Bid Procedures Motion is being filed on an emergency basis, objections to the Bid Procedures Motion may be filed up to and including the date of the Bid Procedures Hearing.

3.      *Successful Bidder*.   Following the Auction (if any), the Debtors will promptly file with the Court a notice (the "Notice of Successful Bidder") that will inform the Court of the results of the Auction.   In the event that, in accordance with the Bid Procedures, no Auction is conducted and the Stalking Horse Purchaser(s) (if any) is/are named the Successful Bidder, the Debtors will file a notice to that effect, which will constitute the Notice of Successful Bidder. The Notice of Successful Bidder will identify: (i) the Successful Bidder(s) as the proposed purchaser(s) of the Assets; (ii) the amount and form of consideration to be paid by the Successful Bidder(s) for the Assets; (iii) the liabilities to be assumed by the Successful Bidder(s); and (iv) the Potential Assumed/Assigned Contracts to be assumed by the Debtors and assigned or transferred to the Successful Bidder(s), or the Debtors' rights and interests therein sold and transferred to the Successful Bidder(s), as the case may be, in connection with the Sale Transaction(s) (the "Transferred Contracts").  The list of Transferred Contracts may be modified at any time until the closing of the Sale Transaction.  The Notice of Successful Bidder will also include similar information relating to the Back-Up Bidder(s) and the Back-Up Bid(s).   In addition, the Debtors will attach to the Notice of Successful Bidder: (i) the Sale Order(s) approving the Sale(s) to the Successful Bidder(s); (ii) a copy of the Purchase Agreement(s) entered into by the Debtors and the Successful Bidder(s) following the Auction; and (iii) any additional information or documentation relevant to the Successful Bid(s).  The Debtors will file the Notice of Successful Bidder on the docket for these Chapter 11 Cases as promptly as is

reasonably practicable prior to the Sale Hearing, but will not be required to serve the same on any parties-in-interest in these Chapter 11 Cases.

## II.      The Bid Procedures.

4.      The Bid Procedures, which are incorporated by reference as though fully set forth herein, are hereby approved, and the Debtors are authorized to solicit bids and conduct an Auction, if necessary, on the terms set forth in the Bid Procedures. The Bid Procedures shall govern the submission, receipt, and analysis of all bids, and any party desiring to submit a bid on the Assets must do so strictly in accordance with the terms of the Bid Procedures and this Order. The Debtors are authorized to take all actions as are reasonably necessary or appropriate to implement the Bid Procedures.

5.      Each bidder participating at an Auction (if any) shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale, as set forth in the Bid Procedures, and an Auction (if any) shall be transcribed or recorded.

6.      Pursuant to the Bid Procedures, including any applicable consultation rights therein, the Debtors may (a) determine which Qualified Bid is the highest or otherwise best offer for the applicable Assets, (b) at any time prior to entry of an Order of the Court approving the applicable Successful Bid, reject any Bid (other than the Stalking Horse Purchase Agreement, if any) that the Debtors determine, after consultation with the Consultation Parties, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bid Procedures, or (iii) contrary to the best interests of the Debtors' estates and their creditors, and (c) prior to conclusion of an Auction (if any) and after consultation with the Consultation Parties, impose such other terms and conditions upon Qualified Bidders as the Debtors determine to be in the best interests of the Debtors' estates in the Chapter 11 Cases.

6

7.      If the Auction is cancelled, then the Debtors shall file a notice with the Court of such election within two (2) business days of the determination of such election by the Debtors. The deadline to object to the Sale shall be **August 3, 2023, at 4:00 p.m.** (prevailing Central Time).

8.      Other than any Bid Protections approved for the Stalking Horse Purchaser (if any) in accordance with the procedures set forth in this Order, no person or entity shall be entitled to any expense reimbursement, breakup fees, "topping," termination, or other similar fee or payment, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this Court any request for expense reimbursement or any fee of any nature in connection with such bid, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

**III.      Approval of Procedures for Selection of Stalking Horse Purchaser and Bid Protections.**

9.      The Debtors are authorized to enter into a Stalking Horse Purchase Agreement in form and substance acceptable to the DIP Agent and the Committee, which may provide for payment of the Bid Protections, as set forth in the Bid Procedures; *provided, however*, that if the DIP Agent or the Committee, for any reason, do not consent to the Debtors' entry into a Stalking Horse Purchase Agreement, the Debtors may seek approval of the Stalking Horse Purchase Agreement on an emergency basis.

10.     In the event that the Debtors select one or more parties to serve as a Stalking Horse Purchaser, either with the consent of the Committee and the DIP Agent or pursuant to entry of a Court Order, then prior to the commencement of the Auction the Debtors shall file with the Court notice of selection of a Stalking Horse Purchaser ("Notice of Stalking Horse Purchaser") and serve such Notice of Stalking Horse Purchaser on the following parties (a) the United States

7

Trustee for the Southern District of Texas; (b) counsel for the Committee; (c) counsel for the DIP

Agent; and (d) persons who have filed a request for notice pursuant to Bankruptcy Rule 2002.

## IV.    The Assumption and Assignment Procedures

11.    The following Assumption and Assignment Procedures regarding the assumption

and assignment of the Transferred Contracts proposed to be assumed by the Debtors and assigned

to a Successful Bidder are approved:

(a)    **Cure Notice**. Within four (4) business days after entry of the Bid Procedures Order, the Debtors will file a notice (the "Cure Notice") identifying the Potential Assumed/Assigned Contracts (such list, the "Cure Schedule"), substantially in the form attached as Exhibit 3 to the Bid Procedures Order, and serve such notice on all Contract Counterparties to the Potential Assumed/Assigned Contracts. The Cure Schedule attached to the Cure Notice served on each Contract Counterparty shall: (i) identify Potential Assumed/Assigned Contracts; (ii) identify the Debtor counterparty to such Potential Assumed/Assigned Contracts; (iii) list the proposed cure amounts, if any, that the Debtors believe must be paid to cure all defaults outstanding under each Potential Assumed/Assigned Contract (the "Cure Amounts") as of such date; (iv) include a statement that assumption and assignment of such Potential Assumed/Assigned Contract is not required or guaranteed; and (v) inform such Contract Counterparty of the requirement to file any Cure/Assignment Objection (as defined below) by the Cure/Assignment Objection Deadline (as defined below). Service of the Cure Notice, including the Cure Schedule, upon a Contract Counterparty does not constitute an admission that a particular Potential Assumed/Assigned Contract is an executory contract or unexpired lease, or confirm that the Debtors are required to assume and/or assign such contract or lease.

(b)    **Cure and Assignment Objections**. A Contract Counterparty with any Potential Assumed/Assigned Contract listed on the Cure Schedule must file any objections to a proposed Cure Amount (a "Cure Objection") and/or any other objections to the assumption and assignment or transfer of any of the Potential Assumed/Assigned Contracts (an "Assignment Objection") by **July 12, 2023 at 4:00 p.m. (prevailing Central Time)** (the "Cure/Assignment Objection Deadline"). Any Cure Objection and/or Assignment Objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Bankruptcy Local Rules, and any order governing the administration of these Chapter 11 Cases; (iii) state with specificity the nature of the objection and, if the Cure Objection pertains to the proposed Cure Amounts, state the cure amount

8

alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; (iv) include complete contact information for such Contract Counterparty (including address, telephone number, and email address); and (v) be filed with the Court and served upon the Objection Notice Parties[5] prior to the Cure/Assignment Objection Deadline; *provided* that the Debtors may modify the Cure/Assignment Objection Deadline with respect to any Contract Counterparty upon consultation with the Stalking Horse Purchaser (if any) or the Successful Bidder, as applicable, by email confirmation.

(c)     **Adequate Assurance Objections**.  A Contract Counterparty with any Potential Assumed/Assigned Contract listed on the Cure Schedule must file any objections to the Successful Bidder's and/or Backup Bidder's proposed form of adequate assurance of future performance (an "Adequate Assurance Objection" and, together with Cure Objections and Assignment Objections, "Contract Objections") no later than **August 3, 2023 at 4:00 p.m. (prevailing Central time)**.   Upon request of a Contract Counterparty, the Debtors will provide information demonstrating adequate assurance of future performance on a confidential basis promptly following the conclusion of the Auction but in no event later than 9:00 a.m. CT on July 31, 2023.

(d)     **Effects of Filing a Cure Objection**. A properly filed Contract Objection will reserve such objecting party's rights against the Debtors only with respect to the assumption and assignment or transfer of the Potential Assumed/Assigned Contracts at issue, and/or objection to the accompanying Cure Amounts, as set forth in the Contract Objection, but will not constitute an objection to the remaining relief requested in the Motion.

(e)     **Dispute Resolution**. Any Contract Objection that remains unresolved after the Sale Hearing shall be heard at such later date as may be agreed upon by the parties or fixed by the Court. To the extent that any Contract Objection cannot be resolved by the parties, any Potential Assumed/Assigned Contracts subject to such Contract Objection shall be assumed and assigned or transferred only upon satisfactory resolution of the Contract Objection, to be determined in the Successful Bidder's reasonable discretion. To the extent a Contract Objection which is an Adequate Assurance Objection remains unresolved, the Potential Assumed/Assigned Contract may be conditionally assumed and assigned, subject to the express written consent of the Successful Bidder and the Objecting Contract Counterparty, pending a resolution of the Contract

---

[5] The Objection Notice Parties are (i) the United States Trustee for the Southern District of Texas; (ii) counsel to the DIP Agent; (iii) counsel to the Official Committee of Unsecured Creditors; (iv) counsel to any Stalking Horse Purchaser (if any); and (v) persons who have filed a request for notice pursuant to Bankruptcy Rule 2002.

Objection after notice and a hearing. If a Contract Objection is not satisfactorily resolved, the Successful Bidder may determine that such Contract should not be a Transferred Contract, in which case the Successful Bidder will not be responsible for any Cure Amounts in respect of such contract. Notwithstanding the foregoing, if a Contract Objection is solely a Cure Objection (any such objection, a "Cure Dispute"), the applicable Potential Assumed/Assigned Contract may be assumed by the Debtors and assigned to the Successful Bidder provided that the cure amount the Contract Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account and not disbursed by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

(f)     **Supplemental Cure Notice**. If the Debtors discover Potential Assumed/Assigned Contracts inadvertently omitted from the Cure Notice or the Successful Bidder identifies other Potential Assumed/Assigned Contracts that it desires to assume or assume and assign in connection with the Sale, the Debtors may, after consultation with the Successful Bidder, at any time before the closing of the Sale, supplement the Cure Notice with previously omitted Potential Assumed/Assigned Contracts or modify a previously filed Cure Notice, including by modifying the previously stated Cure Amounts associated with any Potential Assumed/Assigned Contracts (the "Supplemental Cure Notice").

(g)     **Objection to the Supplemental Cure Notice**. Any Contract Counterparty listed on a Supplemental Cure Notice may file an objection (a "Supplemental Cure/Assignment Objection") only if such objection is to the proposed assumption or assumption and assignment or transfer of the applicable Potential Assumed/Assigned Contracts or the proposed Cure Amounts, if any. All Supplemental Cure/Assignment Objections must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, the Bankruptcy Local Rules, and any order governing the administration of these Chapter 11 Cases; (iii) state with specificity the nature of the objection and, if the Supplemental Cure/Assignment Objection pertains to the proposed Cure Amounts, state the cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; (iv) include complete contact information for such Contract Counterparty (including address, telephone number, and email address); and (v) be filed no later than 5:00 p.m. (prevailing Central Time) on the date that is the later of (x) seven (7) days following the date of service of such Supplemental Cure Notice and (y) the Cure/Assignment Objection Deadline (the "Supplemental Cure/Assignment Objection Deadline"); *provided* that the Debtors may modify the Supplemental Cure/Assignment Objection Deadline with respect to any Contract Counterparty upon

consultation with the Stalking Horse Purchaser or the Successful Bidder, as applicable, by email confirmation.

(h)     **Dispute Resolution of Supplemental Cure Objection**. If a Contract Counterparty files a Supplemental Cure/Assignment Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors shall seek an expedited hearing before the Court to determine the Cure Amounts, if any, and approve the assumption or transfer of the relevant Potential Assumed/Assigned Contracts.  If there is no such objection, then the Sale Order shall constitute an order of the Court fixing the Cure Amounts and approving the assumption and assignment or transfer of any Potential Assumed/Assigned Contracts listed on a Supplemental Cure Notice, subject to such Potential Assumed/Assigned Contract's designation as a Transferred Contract. Notwithstanding the foregoing, if a Supplemental Cure/Assignment Objection relates solely to a Cure Dispute, the applicable Potential Assumed/Assigned Contracts may be assumed by the Debtors and assigned to the Successful Bidder provided that the cure amount the Contract Counterparty asserts is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code (or such lower amount as agreed to by the Contract Counterparty) is deposited in a segregated account and not disbursed by the Debtors pending the Court's adjudication of the Cure Dispute or the parties' consensual resolution of the Cure Dispute.

(i)     **No Cure Objections**. If there are no Contract Objections or Supplemental Cure/Assignment Objections, or if a Contract Counterparty does not file and serve a Contract Objection or a Supplemental Cure/Assignment Objection in a manner that is consistent with the requirements set forth above, and absent a subsequent order of the Court establishing an alternative Cure Amount, (i) the Cure Amounts, if any, set forth in the Cure Notice (or Supplemental Cure Notice) shall be controlling, notwithstanding anything to the contrary in any Potential Assumed/Assigned Contract or any other document, and (ii) the Contract Counterparty will be deemed to have consented to the assumption, assumption and assignment, or transfer of the Potential Assumed/Assigned Contract and the Cure Amounts, if any, and will be forever barred from objecting to the assumption, assumption and assignment, or transfer of such Potential Assumed/Assigned Contract and rights thereunder, including the Cure Amounts, if any, and from asserting any other claims related to such Potential Assumed/Assigned Contract against the Debtors or the Successful Bidder, or the property of any of them.

12. Any objection to the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Assigned Contract must be filed with the Court no later than **August 3, 2023 at 4:00 p.m. (prevailing Central Time)**.

13. The inclusion of a Potential Assumed/Assigned Contract on a Cure Notice or Supplemental Cure Notice will not (a) obligate any Debtor to assume, assume and assign, and/or transfer such Potential Assumed/Assigned Contract listed thereon nor obligate the Stalking Horse Purchaser or any other Successful Bidder to take assignment of such Potential Assumed/Assigned Contract; or (b) constitute any admission or agreement of the Debtors that such Potential Assumed/Assigned Contract is an executory contract or unexpired lease. <u>Only those Potential Assumed/Assigned Contracts that are included on a schedule of assumed and assigned contracts attached to the definitive agreement of the Successful Bidder (including amendments or modifications to such schedules in accordance with such agreement)—*i.e.* the Transferred Contracts—will be assumed and assigned or transferred to the Successful Bidder.</u>

## V.   Sale Notice and Related Relief.

14. The Sale Notice, substantially in the form attached hereto as **<u>Exhibit 2</u>**, is hereby approved. Within four (4) business days after entry of this Order, the Debtors shall serve the Bid Procedures and the Sale Notice upon (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the Official Committee of Unsecured Creditors, McDermott Will & Emery LLP, Attn: Maris J. Kandestin (mkandestin@mwe.com), Chuck Gibbs (crgibbs@mwe.com), Marcus Helt (mhelt@mwe.com); (c) counsel to the DIP Agent, Greenberg Traurig, LLP, Attn: John D. Elrod, Esq. (elrodj@gtlaw.com) and Shari Heyen, Esq. (heyens@gtlaw.com); (d) the state Attorneys General for states in which the Debtors conduct business; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) the

Environmental Protection Agency and similar state agencies for states in which the Debtors conduct business; (h) all known holders of liens, encumbrances, and other claims secured by the Assets; (i) all known creditors of the Debtors; (j) each governmental agency that is an interested party with respect to the Sale and transactions proposed thereunder; (k) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (l) any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).  In addition, within five (5) business days after entry of this Order, the Debtors will publish the Sale Notice, with any modifications necessary for ease of publication, on the case-specific website maintained by KCC to provide notice to any other potential interested parties, and will serve the Cure Notice upon the Objection Notice Parties and the applicable Contract Counterparties.  No publication notice shall be required under the circumstances of these cases.

15.     Nothing in this Order or the Bid Procedures shall be deemed a waiver of any rights, remedies, or defenses that any party (including the Debtors, the Debtors' lenders, the DIP Agent, the Stalking Horse Purchaser, or any other prospective purchaser) has or may have under applicable bankruptcy and non-bankruptcy law or any rights, remedies or defenses of the Debtors with respect thereto, including seeking relief from the Court with regard to the Auction, the Bid Procedures, the Sale, and any related items (including, if necessary, to seek an extension of the Bid Deadline).

16.     This Order permits the use of cash only to the extent authorized under this Court's applicable orders authorizing debtor-in-possession financing, including the Budget (as defined therein) (the "DIP Orders").  In the event of any inconsistency between this Order and the DIP Orders, the DIP Orders shall control.  Notwithstanding the foregoing, nothing in the DIP Orders shall affect the Stalking Horse Purchaser's right to the payment from sale proceeds of the Breakup

Fee and Expense Reimbursement pursuant to this Order, the Bid Procedures, and the Stalking Horse Purchase Agreement, subject in all cases to the conditions giving rise to payment of the Breakup Fee and Expense Reimbursement under the Stalking Horse Purchase Agreement having occurred.

17.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

18.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

19.    The requirements set forth in Bankruptcy Local Rule 9013-1 and the Procedures for Complex Chapter 11 Cases in the Southern District of Texas are satisfied by the contents of the Motion.

20.    Notwithstanding Bankruptcy Rule 6004(h) and 6006, to the extent applicable, this Order shall be immediately effective and enforceable upon entry hereof.

21.    The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Signed:  June 22, 2023.

DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

14

**Exhibit 1**

**Bid Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| MOUNTAIN EXPRESS OIL COMPANY, et al., | Case No. 23-90147 (DRJ) |
| Debtors. [1] | (Jointly Administered) |

**BID PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS**

On March 18, 2023, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court").

On ●, 2023, the Court entered the *Order (I) Approving Bid Procedures for the Sale of the Debtors' Assets, (II) Approving Bid Protections, (III) Scheduling Certain Dates with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, and (V) Approving Contract Assumption and Assignment Procedures* [Docket No. ●] (the "Bid Procedures Order"),[2] by which the Court approved the following procedures (the "Bid Procedures").

These Bid Procedures set forth the process for a potential auction (the "Auction") for the sale or sales (any such sale, a "Sale") of some or all of the assets of the Debtors (the "Assets").

---

**Copies of the Bid Procedures Order or other documents related thereto are available upon request to KCC by calling 888-647-1737 or visiting the Debtors' restructuring website at www.kccllc.net/mountainexpressoil.**

---

**Assets to Be Auctioned**

These Bid Procedures set forth the terms by which prospective bidders, if any, may qualify for and participate in an Auction, thereby competing to make the highest or otherwise best offer or combination of offers which in the aggregate will make the highest or otherwise best offer to purchase some or all of the Debtors' Assets. The Debtors may consider bids from multiple bidders (including multiple bids submitted by the same bidder) in any combination for the Assets.

---

[1]   A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at www.kccllc.net/mountainexpressoil. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 Cases is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022.

[2]   All capitalized terms used but not immediately defined shall have the meanings ascribed to them elsewhere in these Bid Procedures or the Bid Procedures Order.

The following is a table setting forth key dates and deadlines with respect to the Sale process:

| Date | |
|---|---|
| **June 22, 2023** | Bid Procedures Hearing[3] |
| **Within four business days after entry of Bid Procedures Order** | Deadline to File Bid Procedures Notice |
| **Within four business days after entry of Bid Procedures Order** | Deadline to File Assumption and Assignment Notice |
| **July 12, 2023** | Cure/Assignment Objection Deadline |
| **July 21, 2023** | Deadline to Submit Qualified Bids |
| **Deadline to Designate Stalking Horse Purchaser(s) if Selected by Debtors** | Prior to the Auction |
| **July 28, 2023 at 10:00 a.m. ET** | Auction |
| **Promptly after Auction** | Deadline to File Notice of Successful Bidder(s) and Backup Bidder(s) |
| **August 3, 2023** | Adequate Assurance Objection Deadline |
| | Deadline to Object to Sale(s) |
| **August 7, 2023, at 2:00 p.m. (prevailing Central Time)** | Sale Hearing |
| **August 15, 2023** | Deadline to Close Transaction(s) |

## I.    Public Announcement of Auction.

Within four (4) business days after entry of the Bid Procedures Order, the Debtors shall serve on the Sale Notice Parties a notice of the Auction and Sale (the "Sale Notice").

## II.    Potential Bidder Requirements.

To participate in the bidding process or otherwise be considered for any purpose hereunder, a person or entity interested in purchasing some or all of the Debtors' Assets (a "Potential Bidder") must deliver or have previously delivered to the Debtors the following documents (collectively, the "Preliminary Bid Documents"):

a.      an executed confidentiality agreement (a "Confidentiality Agreement") in form and substance acceptable to the Debtors;

b.      a non-binding written indication of interest specifying, among other things, with respect to any proposed Sale, the identity of the Assets to be acquired, the amount and type of consideration to be offered, and any other material terms to be included in a bid by such party;

---

[3] Because the Bid Procedures Motion is being filed on an emergency basis, objections to the Bid Procedures Motion may be filed up to and including the date of the Bid Procedures Hearing.

c.      preliminary proof by the Potential Bidder of its financial capacity to close the proposed Sale (which may include current audited or verified financial statements of, or verified financial commitments ("Financial Statements") obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach) as well as an overview of any recent transactions), the adequacy of which must be reasonably acceptable to the Debtors after consultation with the Consultation Parties (as defined below); *provided, however,* that the Debtors may only determine that a Potential Bidder has not provided adequate information of its financial wherewithal with the consent of the DIP Agent;

d.      identity of the Potential Bidder, including its legal name, jurisdiction and form of organization, and details regarding the ownership and capital structure of the Potential Bidder, as well as the identity of any controlling persons, significant direct or indirect equity or debt investors, and/or guarantors of such entity, and any known connections the Potential Bidder has to the Debtors or their advisors, any statutory committee appointed in these cases or its advisors, the DIP Agent or its advisors, or any creditor or equity security interest holder of the Debtors; and

e.      a list with the names and contact information for any financial, legal and other advisors the Potential Bidder has engaged to assist in connection with the proposed Sale.

The Debtors, in their reasonable discretion, and after consultation with the Consultation Parties, may agree to waive some or all of the Potential Bidder requirements set forth above. Each Potential Bidder shall comply with all reasonable requests for information and access by the Debtors or their advisors regarding the ability of such Potential Bidder, as applicable, to consummate a proposed Sale. Promptly after a Potential Bidder delivers Preliminary Bid Documents, the Debtors shall (a) determine and notify each Potential Bidder as to whether such Potential Bidder has submitted acceptable Preliminary Bid Documents, (b) provide copies of any such notices to the Objection Notice Parties, and (c) provide copies of such Preliminary Bid Documents to the following parties (each, a "Consultation Party" and collectively, the "Consultation Parties"): (i) counsel to the DIP Agent, Greenberg Traurig, LLP, Attn: John D. Elrod, Esq. (elrodj@gtlaw.com) and Shari Heyen, Esq. (heyens@gtlaw.com); and (ii) counsel to the Official Committee of Unsecured Creditors, McDermott Will & Emery LLP, Attn: Maris J. Kandestin (mkandestin@mwe.com), Chuck Gibbs (crgibbs@mwe.com), Marcus Helt (mhelt@mwe.com). If the DIP Agent submits a Bid, including a credit bid, on a particular asset that serves as collateral under the DIP Facility, it shall no longer be deemed a Consultation Party with respect to the Sale of that asset; *provided* that the DIP Agent shall still be a Consultation Party with respect to any Sale for all other individual assets that serve as collateral under the DIP Facility as well as any Sale for all or substantially all of the Debtors' Assets; *provided* further that if the DIP Agent submit a Bid for all or substantially all of the Debtors' Assets, the DIP Agent shall cease being a Consultation Party.

Only those Potential Bidders that have submitted acceptable Preliminary Bid Documents to the reasonable satisfaction of the Debtors and their advisors, after consultation with the Consultation Parties, may submit bids to purchase the Debtors' Assets. The Debtors reserve the

3

right to work with any Potential Bidder to cure any deficiencies in the Preliminary Bid Documents.

### III.     **Obtaining Due Diligence Access**.

Only Potential Bidders that have submitted acceptable Preliminary Bid Documents to the reasonable satisfaction of the Debtors and their advisors shall be eligible to receive information and access to the Debtors' electronic data room and to additional non-public, non-privileged information regarding the Debtors. All information requests must be directed to the Debtors' investment banker, Raymond James & Associates, Inc., Attn: Jake Wainwright (email: Jake.Wainwright@raymondjames.com). The Debtors will provide to each Potential Bidder reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request, and the Debtors shall post substantially all written due diligence provided to any Potential Bidder to the Debtors' electronic data room. Potential Bidders will not, directly or indirectly, contact or initiate or engage in discussions in respect of matters relating to the Debtors or a potential transaction with any customer, supplier, or contractual counterparty of the Debtors without the prior written consent of the Debtors. The due diligence period will end on the Bid Deadline (as defined herein), *provided* that the Debtors will provide reasonable access to information reasonably requested by any Qualified Bidder (as defined below) after the Bid Deadline.

In connection with the provision of due diligence information to Potential Bidders, the Debtors shall not furnish any confidential information relating to the Debtors or a potential transaction to any person except a Potential Bidder or such Potential Bidder's duly authorized representatives to the extent provided in an applicable Confidentiality Agreement.

The Debtors and their advisors shall coordinate all reasonable requests for additional information and due diligence access from Potential Bidders; *provided* that the Debtors may decline to provide such information to Potential Bidders who, in the Debtors' reasonable business judgment, after consultation with the Consultation Parties and with the consent of the DIP Agent, have not established, or who have raised doubt, that such Potential Bidders intend in good faith to, or have the capacity to, consummate any Sale. For any Bidder who is a competitor or customer of the Debtors or is affiliated with any competitors or customers of the Debtors, the Debtors reserve the right, after consultation with the Consultation Parties and with the consent of the DIP Agent, to withhold or modify any diligence materials that the Debtors determine are commercially sensitive or otherwise inappropriate for disclosure to such bidder.

> Raymond James Associates Attn: Jake Wainwright shall coordinate all requests for additional information and due diligence access on behalf of the Debtors.

### A.     Communications with Potential Bidders (including Qualified Bidders).

Notwithstanding anything to the contrary in these Bid Procedures, all substantive direct communications, including any diligence requests, with Potential Bidders and Qualified Bidders shall be through Raymond James Associates (via email shall be acceptable), Attn:

Geoffrey Richards (geoffrey.richards@raymondjames.com),
Scott Garfinkel (scott.garfinkel@raymondjames.com),
Roger Woodman (roger.woodman@raymondjames.com) and
Jake Wainwright (jake.wainwright@raymondjames.com).

### B.     Due Diligence from Potential Bidders (including Qualified Bidders).

Each Potential Bidder (including any Qualified Bidder) shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of such Potential Bidder (including any Qualified Bidder) to consummate its contemplated Sale. Failure by a Potential Bidder (including any Qualified Bidder) to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors, after consultation with the Consultation Parties and with the consent of the DIP Agent, to determine that such bidder is no longer a Qualified Bidder or that a bid made by such bidder is not a Qualified Bid.

### C.     No Communications Among Potential Bidders.

There must be no communications between or among Potential Bidders, or between Potential Bidders and the Consultation Parties, unless the Debtors have previously authorized such communication in writing. Should any Potential Bidder attempt to communicate directly with another Potential Bidder or the Consultation Parties, such Potential Bidder or the Consultation Parties, as applicable shall not communicate with such Potential Bidder and shall immediately inform, in writing, the Debtors' counsel and the Debtors' investment banker but in no event later than one business day after being contacted by a Potential Bidder. The Debtors reserve the right, in their reasonable business judgment and upon consultation with the Consultation Parties and consent of the DIP Agent, to disqualify any Potential Bidders that have communications between and amongst themselves without the prior written consent of the Debtors (email acceptable).

The Debtors further reserve their right, in their reasonable business judgment, to disqualify any Potential Bidders that have communications with any Consultation Party; *provided* that the Debtors shall provide such Consultation Party with notice that the Debtors are exercising their rights to strip the Consultation Parties of its consultation rights and shall work in good faith with such Consultation Party to resolve the issue without the need to strip the Consultation Party of their consultation rights; *provided further however*, and for the avoidance of doubt, if any Consultation Party is contacted by a Potential Bidder but otherwise complies

DOCS_DE:243413.8 58614/002

with the requirements in this section such contact shall not be grounds to strip a Consultation Party of its consultation rights.

## IV.     Bid Protections in the Event of a Stalking Horse Purchaser.

Recognizing that a Stalking Horse Purchaser will expend time, energy and resources, and that the Stalking Horse Purchaser (if any) provides a floor bid with respect to the Assets that it offers to purchase, the Debtors are authorized (pursuant to the Bid Procedures Order), but not required, to provide the following bidding protections to the Stalking Horse Purchaser (if any) (subject to the Committee and DIP Agent's consent):[4]

(A) an expense reimbursement ("Expense Reimbursement") for the reasonable, documented out-of-pocket expenses of the Stalking Horse Purchaser incurred in connection with the Stalking Horse Purchase Agreement in an aggregate amount not to exceed $1,000,000 of actual, documented out of pocket expenses; and

(B) a breakup fee ("Breakup Fee") for the Stalking Horse Purchaser in an amount not to exceed three percent (3%) of the cash portion of the purchase price under the Stalking Horse Purchase Agreement ((A) and (B) of this sentence, collectively, the "Bid Protections"), payable only from the proceeds of a Sale with a Qualified Bidder other than the Stalking Horse Purchaser. The Bid Protections shall be an allowed administrative expense.

Any Bid submitted on or before the Bid Deadline by a party or parties other than the Stalking Horse Purchaser must be in an amount that is sufficient to pay the Breakup Fee and Expense Reimbursement and result in additional consideration to the Debtors' estates in the amount of at least $500,000 (as compared to the Purchase Price offered by the Stalking Horse Purchaser), after payment of the Breakup Fee and Expense Reimbursement.

## V.     Bid Requirements.

To be selected to acquire the Assets or to be eligible to participate in the Auction, if applicable, a Potential Bidder must deliver to the parties set forth in Section VII below a written, irrevocable, and binding offer for purchase of the Assets (the "Bid") that must be determined by the Debtors in their business judgment, after consultation with the Consultation Parties, to satisfy each of the following conditions (collectively, the "Bid Requirements"):

a.      **Identity**: Each Bid must fully disclose the identity of each entity and each entity's shareholders, partners, investors, and ultimate controlling entities that will be bidding for or purchasing the applicable Assets or otherwise participating in connection with such Bid, and the complete terms of any such participation, along with sufficient evidence that the Potential Bidder is legally empowered to complete the transactions on the terms contemplated by the parties. Each Bid must also include contact information for the specific person(s) whom Debtors' counsel and investment banker should contact regarding such Bid;

---

[4] If the DIP Agent or the Committee, for any reason, do not consent to the Debtors' entry into a Stalking Horse Purchase Agreement, the Debtors may seek approval of the Stalking Horse Purchase Agreement on an emergency basis.

b.  **Identity of Assets and Purchase Price**: Each Bid must clearly state which of the Assets the Potential Bidder seeks to acquire and which liabilities of the applicable Debtor the Potential Bidder agrees to assume. Each Bid must clearly set forth the purchase price to be paid, including cash and non-cash components, if any, including any assumption of liabilities (collectively, the "Purchase Price"). The Purchase Price should be a single point value for the total enterprise value of the Assets the Potential Bidder seeks to acquire on a cash-free, debt-free basis; *provided* that the Potential Bidder shall include an allocation of such Purchase Price among the Assets the Potential Bidder seeks to acquire;

c.  **Markup of the Purchase Agreement**: Each Bid must be accompanied by executed transaction documents, including a draft purchase agreement, and a markup of the form of Asset Purchase Agreement attached as Exhibit 4 to the Bid Procedures Order (the "Form Asset Purchase Agreement"), including the exhibits, schedules and ancillary agreements related thereto, and any other related material documents integral to such Bid pursuant to which the Potential Bidder proposes to effectuate the proposed Sale, along with copies that are marked to reflect any amendments and modifications from the Form Asset Purchase Agreement provided to such Potential Bidder, which amendments and modifications may not be materially more burdensome than the provisions in the Form Asset Purchase Agreement, or otherwise inconsistent with these Bid Procedures. The Debtors, in their reasonable business judgment, after consultation with the Consultation Parties, will determine whether any such amendments and modifications are materially more burdensome;

d.  **Contingencies; No Financing or Diligence Outs**: Any Bid shall not be conditioned on the obtaining or the sufficiency of financing, any internal approval, or on the outcome or review of due diligence, and each Bid must identify with particularity each and every condition to closing, including the executory contracts and unexpired leases for which assumption and assignment is required. The Potential Bidders are expected to have completed all of their due diligence by the Bid Deadline, including all business, legal, accounting, and other confirmatory diligence. The extent and nature of any remaining due diligence should be set forth in a specific list attached to each Bid;

e.  **As-Is, Where-Is**: Each Bid must include a written acknowledgement and representation that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the completeness of any information provided in connection therewith, except as expressly stated in the Potential Bidder's proposed purchase agreement;

f.  **Authorization**: Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its shareholders and/or its board of

7

managers or directors, as applicable, with respect to the submission of its Bid and the consummation of the Sale contemplated by such Bid;

g.  **Deposit:** Each Bid must be accompanied by a cash deposit by wire transfer to an escrow agent selected by the Debtors with the DIP Agent's consent in an amount equal to 10% of the cash purchase price of the bid (the "Good Faith Deposit"). The Qualified Bidder must deliver the Good Faith Deposit on or before the Bid Deadline.  If the DIP Agent elects to submit a Bid, it shall not be required to provide a Good Faith Deposit.

h.  **Adequate Assurance of Future Performance**: Each Bid must (i) identify the Contracts to be assumed and assigned in connection with the proposed Sale, (ii) provide for the payment of all Cure Amounts related to such Contract by the Potential Bidder and otherwise demonstrate that any non-monetary Cure Amounts will be promptly cured, and (iii) demonstrate, in the Debtors' reasonable business judgment, that the Potential Bidder can provide adequate assurance of future performance under all such Contracts;

i.  **Government Approvals**: Each Bid must include a description of all governmental, licensing, regulatory, or other approvals or consents that are required to close the proposed Sale, together with evidence satisfactory to the Debtors, after consultation with the Consultation Parties, of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such consents or approvals;

j.  **Government Approvals Timeframe**: Each Bid must set forth (i) an estimated timeframe for obtaining any required governmental, licensing, regulatory, or other approvals or consents for consummating any proposed Sale, and (ii) the basis for such estimate;

k.  **Compliance with Bankruptcy Code and Non-Bankruptcy Law; Acknowledgment**: Each Bid must comply in all respects with the Bankruptcy Code and any applicable non-bankruptcy law. Each Bid must also include a written acknowledgment that the Bidder agrees to all of the terms of the Sale set forth in these Bid Procedures and that it has not engaged in any collusion, coordination, or unfair competitive practices with respect to its Bid;

l.  **Irrevocable**: A Potential Bidder's Bid must be binding and irrevocable unless and until the Debtors accept a higher Bid and such Potential Bidder is not selected as the Backup Bidder (as defined herein);

m.  **No Fees**: Each Potential Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the proposed Sale, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for a breakup fee, transaction fee, termination fee, expense reimbursement, or any

8

similar type of payment or reimbursement on any basis, including under section 503(b) of the Bankruptcy Code;

n.    **Joint Bids**: The Debtors will be authorized in consultation with the Consultation Parties to approve joint Bids in their reasonable discretion on a case-by-case basis;

o.    **Adherence to Bid Procedures**: By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these Bid Procedures and agrees not to submit a Bid or seek to reopen the Sale process or the Auction (if held) after conclusion of the selection of the Successful Bidder (as defined herein). By submitting its Bid, each Potential Bidder is agreeing to comply in all respects with the Bankruptcy Code and any applicable non-bankruptcy law;

p.    **Consent to Jurisdiction**: Each Potential Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, the Auction (if held), the construction and enforcement of these Bid Procedures, the Sale documents, and consummation of a Sale (or Sales) (including confirmation of chapter 11 plan in connection therewith), as applicable;

q.    **Backup Bid**: Each Bid must provide that the Potential Bidder will serve as a Backup Bidder if the Potential Bidder's Bid is the next highest or otherwise best Bid, ready to close the Sale on the terms stated in the next highest or otherwise best Bid within two business days of the failure of the Successful Bidder to close; and

r.    **Expected Closing Date**: Each Bid must state the Potential Bidder's expected date of closing of the Sale, which shall be no later than August 15, 2023; *provided*, such closing date may be extended pursuant to the terms of an asset purchase agreement in consultation with the Consultation Parties.

Only Bids fulfilling all of the preceding requirements contained in this section may, at the Debtors' reasonable discretion, after consultation with the Consultation Parties, be deemed to be "Qualified Bids," and only those parties submitting Qualified Bids may, at the Debtors' reasonable discretion, after consultation with the Consultation Parties, be deemed to be "Qualified Bidders." All information disclosed by any Potential Bidder in connection with all of the preceding requirements will promptly be made available by the Debtors to the Consultation Parties; *provided* that any confidential financing and/or equity commitment documents received from any such Potential Bidder shall only be shared with the Consultation Parties on a "professionals' eyes only" basis; *provided, however,* that the DIP Agent's professionals may share any such information with one representative of the DIP Agent.

As soon as reasonably practicable following the Bid Deadline, the Debtors shall determine, after consultation with the Consultation Parties, which Potential Bidders are Qualified Bidders and will notify the Potential Bidders whether Bids submitted constitute Qualified Bids, which will enable such Qualified Bidders to participate in the Auction (if held). Any Bid that is not deemed a Qualified Bid shall not be considered by the Debtors; *provided*, *however*, that if the

Debtors receive a Bid prior to the Bid Deadline that does not satisfy the requirements of a Qualified Bid, the Debtors shall provide the Potential Bidder with the opportunity to remedy any deficiencies prior to the Bid Deadline. The Debtors may accept a single Qualified Bid or multiple Bids for non-overlapping material portions of the Assets such that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid (in which event those multiple bidders will be treated as a single Qualified Bidder for purposes of selecting the Successful Bidder; *provided* that the Debtors also reserve the right, in consultation with the Consultation Parties, to conduct more than one Sale process or Auction with respect to non-overlapping material portions of the Assets).

## VI.    **Bid Deadline**.

Binding Bids must be received (via email shall be acceptable) by (a) the Debtors' counsel, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Boulevard, 13th Floor, Los Angeles, California 90067, Attn.: Jeffrey Pomerantz (jpomerantz@pszjlaw.com) and Jeffrey Dulberg (jdulberg@pszjlaw.com); (b) the Debtors' investment banker, Raymond James & Associates, Inc., Attn.: Geoffrey Richards (geoffrey.richards@raymondjames.com), Scott Garfinkel (scott.garfinkel@raymondjames.com), Roger Woodman (roger.woodman@raymondjames.com) and Jake Wainwright (jake.wainwright@raymondjames.com), counsel to the Official Committee of Unsecured Creditors, McDermott Will & Emery LLP, Attn: Maris J. Kandestin (mkandestin@mwe.com), Chuck Gibbs (crgibbs@mwe.com), Marcus Helt (mhelt@mwe.com); and counsel to the DIP Agent, Greenberg Traurig, LLP, Attn: John D. Elrod, Esq. (elrodj@gtlaw.com) and Shari Heyen, Esq. (heyens@gtlaw.com) in each case so as to be **actually received** no later than **5:00 p.m. (prevailing Central Time) on July 21, 2023** (the "Bid Deadline").

## VII.    **Evaluation of Qualified Bids**.

Prior to the Auction (if held), the Debtors and their advisors will evaluate Qualified Bids and identify the Qualified Bid(s) that is, in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, the highest or otherwise best Bid (the "Starting Bid"). If applicable, the Starting Bid shall include the amount provided for in the Stalking Horse Purchase Agreement, if any, *plus* the amount of the Bid Protections, *plus* $500,000. In addition, prior to the selection of the Successful Bidder, the Debtors may, in the Debtors' reasonable business judgment, engage in negotiations with bidders with respect to their Bids. For the avoidance of doubt, the Debtors may, after consultation with the Consultation Parties, select more than one Qualified Bid to collectively serve as the Starting Bid in an Auction (if held) if each such Qualified Bid contemplates the purchase of different Assets. In conducting the evaluation of the Qualified Bids, the Debtors will take into consideration the following non-exclusive factors:

a.    the amount of the Purchase Price of the Qualified Bid;

b.    the value to be provided to the Debtors under the Bid, including the net economic effect upon the Debtors' estates, taking into account the Bid Protections;

c.    the proposed changes or modifications to the Form Asset Purchase Agreement

delivered in connection with such Qualified Bid and the comparative favorability of the terms set forth in such proposed purchase agreement versus the Form Asset Purchase Agreement;

d.      the assets and liabilities excluded from the Qualified Bid and any executory contracts or leases or other liabilities proposed to be assumed;

e.      any benefit to the Debtors' bankruptcy estates from any assumption of liabilities or waiver of liabilities;

f.      the certainty of a Qualified Bid leading to a confirmed chapter 11 plan;

g.      the transaction structure and execution risk, including conditions to, timing of, and certainty of closing; termination provisions; availability of financing and financial wherewithal to meet all commitments; and required governmental or other approvals; and

h.      any other factors the Debtors may, consistent with their fiduciary duties, reasonably deem relevant.

Promptly after determination of the Starting Bid and prior to the Auction, the Debtors will distribute a copy of the Starting Bid to each Qualified Bidder who has submitted a Qualified Bid with respect to such Assets.

If any Bid is determined by the Debtors not to be a Qualified Bid, the Debtors will refund such Qualified Bidder's Good Faith Deposit within five (5) business days after the Bid Deadline.

## VIII.    <u>No Qualified Bids</u>.

If no Qualified Bids other than the Stalking Horse Purchase Agreement, if any, are received by the Bid Deadline, then the Debtors, after consultation with the Consultation Parties and with the consent of the DIP Agent, may cancel the Auction, and may decide, in the Debtors' reasonable business judgment, to designate the Stalking Horse Purchase Agreement as the Successful Bid, and pursue entry of the Sale Order approving a Sale of the Debtors' Assets to the Stalking Horse Purchaser pursuant to the Stalking Horse Purchase Agreement. The Debtors shall file notice of any cancellation of the Auction and designation of the Stalking Horse Purchase Agreement as the Successful Bid with the Court, within two business days of the determination of such election by the Debtors.

## IX.    <u>Right to Credit Bid</u>.

Any Qualified Bidder that has a valid and perfected lien on any assets of the Debtors' estates (a "<u>Secured Creditor</u>"), and the right under applicable non-bankruptcy law to credit bid claims secured by such lien shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of, and subject to, section 363(k) of the Bankruptcy Code; *provided* that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured; *provided further*, that a credit bid shall not constitute a Qualified Bid if the bid does not include a cash component sufficient to pay

in full all claims for which there are valid, perfected, and unavoidable liens on any assets included in such bid that are senior in priority to those of the Secured Creditor seeking to credit bid.

For the avoidance of doubt, the DIP Agent is a Secured Creditor and shall be deemed a Qualified Bidder in all respects without the need for the submission of any additional documentation or Court approval. The DIP Agent shall be entitled to credit bid any portion of its secured claim prior to the Bid Deadline. If the DIP Agent elects to credit bid, the DIP Agent may do so by letter with no further documentation required but will no longer be considered a Consultation Party or have any consent or consultation rights provided for in this Bid Procedures Order.

## X.    Auction.

If one or more Qualified Bids are received by the Bid Deadline with respect to any applicable non-overlapping Assets, then the Debtors shall conduct the Auction with respect to such Assets. The Auction will be held on **July 28, 2023**, at **10:00 a.m. (prevailing Eastern Time)**, at the office of Raymond James, 320 Park Ave. 12th Floor, New York, NY, or at such later time or other place as the Debtors determine, after consultation with the Consultation Parties, in which case the Debtors shall timely notify all Qualified Bidders of such later time or other place, and file a notice of the change on the Court's docket for these chapter 11 cases.[5]

The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

a.    except as otherwise provided herein, the Auction will be conducted openly;

b.    only Qualified Bidders, including the Stalking Horse Purchaser (if any), shall be entitled to bid at the Auction;

c.    the Qualified Bidders, including the Stalking Horse Purchaser (if any), shall appear at the Auction through duly authorized representatives at the Auction;

d.    only the following parties shall be permitted to attend the Auction: authorized representatives of each of the Qualified Bidders (including the Stalking Horse Purchaser), the Debtors, and the Consultation Parties and their respective advisors;

e.    bidding at the Auction will begin at the applicable Starting Bid;

f.    Bids at the Auction, including any Bids by the Stalking Horse Purchaser, must be made in minimum increments of such amount as the Debtors determine and announce at or prior to the Auction, after consultation with the Consultation Parties and with the consent of the DIP Agent, of additional value (including after payment of the Bid Protections to the Stalking Horse Purchaser);

g.    each Qualified Bidder will be permitted a reasonable time to respond to previous

---

[5]    If the Debtors decide to hold a live, in-person Auction, Qualified Bidders shall still have the ability to submit Bids remotely.

bids at the Auction, as determined by the Debtors in consultation with the Consultation Parties;

h.     the bidding will be transcribed or recorded to ensure an accurate recording of the bidding at the Auction;

i.     no Qualified Bidders (or their respective representatives) may communicate with one another, collude, or otherwise coordinate for purposes of participating in the Auction, and each Qualified Bidder will be required to confirm on the record of the Auction that (i) it has not engaged in any collusion, coordination, or unfair competitive practices with respect to the bidding or the Sale and (ii) its Bid represents an irrevocable, binding, good faith, and bona fide offer to purchase some or all of the Assets identified in such Bid if such Bid is selected as the Successful Bid; *provided*, *however*, that two or more Qualified Bidders may coordinate to the extent they wish to provide a combined bid if the Debtors, after consultation with the Consultation Parties, approve such coordination in their reasonable discretion;

j.     the Auction will not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an overbid at the Auction to the then-prevailing highest bid, subject to the Debtors' right, in consultation with the Consultation Parties, to require last and final bids to be submitted on a "blind" basis;

k.     the Debtors reserve the right, in their reasonable business judgment, after consultation with the Consultation Parties, to adjourn the Auction one or more times to, among other things, (i) facilitate discussions between the Debtors and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, after consultation with the Consultation Parties, may require that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount; and

l.     the Auction will be governed by such other Auction Procedures as may be announced by the Debtors and their advisors, after consultation with the Consultation Parties, from time to time on the record at the Auction; *provided* that such other Auction Procedures are (i) not inconsistent with the Bid Procedures Order, the Bankruptcy Code, or any other order of the Court, (ii) disclosed orally or in writing to all Qualified Bidders, and (iii) determined by the Debtors, after consultation with the Consultation Parties, to further the goal of attaining the highest or otherwise best offer for the applicable Assets.

     For the avoidance of doubt, nothing in the Auction Procedures (if an Auction is held) will prevent the Debtors from exercising their respective fiduciary duties under applicable law (as reasonably determined in good faith by the Debtors).

XI.    **Acceptance of the Successful Bid**.

The Auction shall continue until only one Qualified Bid is the highest or otherwise best bid to purchase some or all of the Assets in the Debtors' reasonable business judgment (after consultation with the Consultation Parties) and in a manner consistent with the exercise of their fiduciary duties and outlined below in further detail (a "Successful Bid"), and that further bidding is unlikely to result in a different Successful Bid or Successful Bids that would be acceptable to the Debtors, at which point, the Auction will be closed. When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors may consider the following factors in addition to any other factors that the Debtors deem appropriate: (a) the amount and nature of the total consideration; (b) the likelihood of the Qualified Bidder's ability to close a Sale and the timing thereof; (c) the net economic effect of any changes to the value to be received by each of the Debtors' estates from the Sale contemplated by the Bid Documents; (d) the tax consequences of such Qualified Bid; and (e) the certainty of the Debtors being able to confirm a chapter 11 plan.

For the avoidance of doubt, the Debtors may select more than one Qualified Bid to collectively serve as a Successful Bid if each such Qualified Bid contemplates the purchase of different Assets. The Qualified Bidder or Qualified Bidders having submitted the Successful Bid or Successful Bids will be deemed the "Successful Bidder" or "Successful Bidders," with respect to the applicable Assets. The Debtors shall promptly file notice of the Successful Bid(s) and the Successful Bidder(s) with the Court. The Debtors shall present the results of the Auction at a hearing (the "Sale Hearing") and shall seek Court approval to enter into a binding purchase agreement or other definitive documentation with the Successful Bidder(s) on the terms of the Successful Bid(s) (the order approving such entry, the "Sale Order"). For the avoidance of doubt, the Sale Order shall deem the Debtors' selection of the Successful Bid(s) final and, subject to the designation of the Backup Bid, the Debtors shall not solicit or accept any further bids or offers to submit a bid after such selection; *provided* that, notwithstanding anything to the contrary in these Bid Procedures, nothing in these Bid Procedures shall require the board of directors, board of managers, or such similar governing body of any Debtor to take or refrain from taking any action that would be inconsistent with applicable law or its fiduciary obligations under applicable law.

Each Successful Bidder and the Debtors shall, as soon as commercially reasonable and practicable, complete and sign all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which each such Successful Bid was made.

XII.    **Designation of Backup Bidder**.

The Qualified Bidder or Qualified Bidders with the second highest or otherwise best bid(s) or combination(s) of bids (each, a "Backup Bid") to purchase any or all of the applicable Assets (each, a "Backup Bidder") will be determined by the Debtors, after consultation with the Consultation Parties, at the conclusion of the Auction and will be announced at that time to all the Qualified Bidders participating in the Auction. Each Backup Bidder shall be required to keep its Qualified Bid open and irrevocable until the earlier of (i) the closing of the transaction with the applicable Successful Bidder; and (ii) August 30, 2023. The Backup Bidder's Good Faith Deposit (if any) shall be held in escrow until the closing of the transaction with the applicable Successful Bidder. If for any reason a Successful Bidder fails to consummate the purchase of

such Assets within the time permitted after the entry of the Sale Order, then the Backup Bidder will automatically be deemed to have submitted the Successful Bid for such Assets, and the Backup Bidder shall be deemed a Successful Bidder for such Assets and shall be required to consummate the Sale with the Debtors as soon as is commercially practicable without further order of the Court; *provided* that the Debtors shall file a notice with the Court.

## XIII.   Approval of Sale.

The Debtors will present the results of the Auction to the Court for approval at the Sale Hearing, at which certain findings will be sought from the Court regarding the Auction, including, among other things, that: (a) the Auction was conducted, and the Successful Bidder or Successful Bidders were selected, in accordance with the Bid Procedures; (b) the Auction was fair in substance and procedure; (c) the Successful Bid or Successful Bids were Qualified Bids as defined in the Bid Procedures; and (d) consummation of any Sale(s) as contemplated by the Successful Bid(s) in the Auction will provide the highest or otherwise best offer for the Debtors and the Debtors' Assets and is in the best interests of the Debtors and their estates.

The Sale Hearing is presently scheduled to commence on **August ●, 2023**, at ● **(prevailing Central Time)**, or as soon thereafter as counsel may be heard, before the Honorable David R. Jones, United States Bankruptcy Court for the Southern District of Texas.

## XIV.   Return of Good Faith Deposit.

The Good Faith Deposit of a Successful Bidder shall, upon consummation of any Sale, be credited to the purchase price paid for the applicable Assets. If a Successful Bidder fails to consummate the Sale, then the Good Faith Deposit (if any) shall be forfeited to, and retained irrevocably by, the Debtors; provided, however, that the forfeited Good Faith Deposit will constitute the DIP Agent's cash collateral and be subject to the DIP Agent's liens.  The Debtors specifically reserve the right to seek all available damages from the defaulting Successful Bidder.

The Good Faith Deposit of any Qualified Bidders that are not Successful Bidders or Backup Bidders will be returned within five (5) business days after the Auction or upon the permanent withdrawal of the applicable proposed Sale, and the Good Faith Deposit of any Backup Bidders will be returned within five (5) business days after the consummation of the applicable Sale or upon the permanent withdrawal of the applicable proposed Sale.

Each Good Faith Deposit shall be held in interest-free escrow and at no time shall be deemed property of the Debtors' estates absent further order of the Court, except as otherwise provided herein.

## XV.   Reservation of Rights.

The Debtors reserve their rights to modify these Bid Procedures in their reasonable business judgment, after consultation with the Consultation Parties, in a manner consistent with the exercise of their fiduciary duties, and in any manner that will best promote the goals of the bidding process, or impose, at or before the Auction (if held), additional customary terms and conditions on the sale of some or all of the Debtors' Assets, including, without limitation: (a) extending the deadlines set forth in these Bid Procedures; (b) adjourning the Auction; (c)

15

modifying the Auction Procedures or adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; (e) rejecting any or all Bids or Qualified Bids; and (f) adjusting the applicable minimum overbid increment, including by requesting that Qualified Bidders submit last or final bids on a "blind" basis. For the avoidance of doubt, the Debtors reserve the right at any point prior to the selection of the Successful Bidder, and after consultation with the Consultation Parties and with the consent of the DIP Agent, to terminate the Sale processes contemplated hereunder with respect to any or all of the Debtors' Assets and seek to sell any or all Assets pursuant to section 363(b) of the Bankruptcy Code.

## XVI.    **Consent to Jurisdiction.**

All Qualified Bidders at the Auction will be deemed to have consented to the core jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to any Sale, the Auction, and the construction and enforcement of these Bid Procedures, any written indications of interest, any Preliminary Bid Documents, or any Bid documents, as applicable, and consented to the entry of a final order or judgment in any way related to these Bid Procedures, the bid process, the Auction, the Sale Hearing, or the construction and enforcement of any agreement or any other document relating to a Sale if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

Any parties raising a dispute relating to these Bid Procedures must request that such dispute be heard by the Court on an expedited basis.

## XVII. **Fiduciary Out**.

Notwithstanding anything to the contrary in these Bid Procedures, nothing in these Bid Procedures or the Bid Procedures Order shall require a Debtor or the board of directors, board of managers, or similar governing body of a Debtor, after consulting with counsel, to take any action or to refrain from taking any action related to any sale transaction to the extent taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law; *provided, however,* that the foregoing does not constitute a finding by the Court or any other court of competent jurisdiction that the Debtors' officers and directors have complied with their fiduciary duties by taking, or refraining from, any such action.

Further, notwithstanding anything to the contrary in these Bid Procedures, through the date of the Auction (if held), nothing in these Bid Procedures or the Bid Procedures Order shall diminish the right of the Debtors and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives to: (a) consider, respond to, and facilitate alternate proposals for sales or other restructuring transactions involving any or all of the Debtors' Assets (each an "Alternate Proposal"); (b) provide access to non-public information concerning the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity; (c) maintain or continue discussions or negotiations with respect to Alternate Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternate Proposals; and (e) enter into or continue discussions or negotiations with holders of claims against or equity

interests in a Debtor or any other party in interest in these chapter 11 cases (including the United States Trustee), or any other entity regarding Alternate Proposals.

17

**Exhibit 2**

**Form of Sale Notice**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| MOUNTAIN EXPRESS OIL COMPANY, et al., | Case No. 23-90147 (DRJ) |
| Debtors. [1] | (Jointly Administered) |

**NOTICE OF AUCTION FOR THE SALE OF THE DEBTORS' ASSETS FREE
AND CLEAR OF ANY AND ALL CLAIMS, INTERESTS, AND ENCUMBRANCES**

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "Debtors") are soliciting offers for a transaction or transactions, any of which may include the purchase of some or all of the Debtors' Assets and assumption of certain liabilities of the Debtors, consistent with the bidding procedures (the "Bid Procedures")[2] approved by the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court") by entry of an order on June ●, 2023 [Docket No. ●] (the "Bid Procedures Order"). **All interested bidders should carefully read the Bid Procedures and Bid Procedures Order**. To the extent that there are any inconsistencies between this notice and the Bid Procedures or the Bid Procedures Order, the Bid Procedures or the Bid Procedures Order, as applicable, shall govern in all respects.

**Copies of the Bid Procedures Order or other documents related thereto are available upon request to KCC by calling 866-967-0495 or visiting the Debtors' restructuring website at www.kccllc.net/mountainexpressoil.**

**PLEASE TAKE FURTHER NOTICE** that the Bid Deadline is **July 21, 2023**, **at 4:00 p.m. (prevailing Central Time)**, and that any person or entity who wishes to participate in the Auction must comply with the participation requirements, bid requirements, and other requirements set forth in the Bid Procedures.

**PLEASE TAKE FURTHER NOTICE** that the Debtors intend to conduct the Auction, at which time they will consider proposals submitted to the Debtors and their professionals, by and pursuant to the Bid Procedures as set forth in the Bid Procedures Order, beginning on **July 28, 2023**, at **10:00 a.m. (prevailing Eastern Time)** via videoconference or such other form of remote communication arranged by counsel to the Debtors.

---

[1]     A complete list of each of the Debtors in these Chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at www.kccllc.net/mountainexpressoil. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 cases is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bid Procedures Order or the Bid Procedures, as applicable.

**PLEASE TAKE FURTHER NOTICE** that the Debtors expect to seek approval of any Sales at the Sale Hearing, which is presently scheduled to commence on **August ●, 2023**, at ● **(prevailing Central Time)**, or as soon thereafter as counsel may be heard, before the Honorable David R. Jones in the United States Courthouse, Courtroom 400, 4th Floor, 515 Rusk Street, Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise set forth in the Bid Procedures Order with respect to objections to proposed cure amounts or the assumption and assignment of Potential Assumed/Assigned Contracts, objections, if any, to a proposed Sale **must**: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Bankruptcy Local Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court by **August 3, 2023**, at **4:00 p.m. (prevailing Central Time)**; *provided, however,* that any objections to the manner in which the Auction was conducted and the identity of the Successful Bidder or Backup Bidder may be filed up to 24 hours prior to the Sale Hearing, or, if the Debtors elect not to proceed with an Auction, two (2) business days following the notification filed with the Court of such election not to proceed with an Auction.

<u>**CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION**</u>

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO A SALE ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BID PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO SUCH SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE SELLING DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS.**

## NO SUCCESSOR OR TRANSFEREE LIABILITY

The Sale Order is expected to provide, among other things, that the Successful Bidder from the Sale will have no responsibility for, and the Assets will be sold free and clear of, any successor liability, including the following:

To the greatest extent allowable by applicable law, the Successful Bidder shall not be deemed, as a result of any action taken in connection with the Stalking Horse Purchase Agreement (in the case where the Stalking Horse Purchaser is the Successful Bidder) or a separate purchase agreement entered into with the Successful Bidder (if the Stalking Horse Purchaser is not the Successful Bidder), the consummation of the Sale, or the transfer or operation of the Assets, to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with respect to any obligations as an assignee under the Potential Assumed/Assigned Contracts arising after the effective date); (b) have, de facto or otherwise, merged with or into the Debtors; or (c) be an alter ego or mere continuation or substantial continuation of the Debtors, in the case of each of (a), (b), and (c), including, without limitation, within the meaning of any foreign, federal, state or local revenue law, pension law, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act, the WARN Act (29 U.S.C. §§ 2101 et seq.), the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the National Labor Relations Act (29 U.S.C. § 151, et seq.), environmental liabilities, debts, claims or obligations, any liabilities, debts or obligations of or required to be paid by the Debtors for any taxes of any kind for any period, labor, employment, or other law, rule or regulation (including without limitation filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

All rights of any party to set off any claims, debts, or obligations owed by or to the Successful Bidder in connection with the assets shall be extinguished on the effective date pursuant to the Sale Order. Other than as expressly set forth in the Stalking Horse Purchase Agreement (or another Successful Bidder's purchase agreement, as applicable) with respect to assumed liabilities, the Successful Bidder shall not have any responsibility for (a) any liability or other obligation of the Debtors or related to the assets or (b) any claims (as such term is defined by section 101(5) of the Bankruptcy Code) against the Debtors or any of their predecessors or affiliates. To the greatest extent allowed by applicable law, the Successful Bidder shall have no liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, de facto merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the effective date, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Assets prior to the effective date.

3

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right, after consultation with the Consultation Parties and in their reasonable business judgment and subject to the exercise of their fiduciary duties, to modify the Bid Procedures and/or to terminate discussions with any Potential Bidders at any time, to the extent not materially inconsistent with the Bid Procedures.

**PLEASE TAKE FURTHER NOTICE** that copies of the Bid Procedures Motion, Bid Procedures, and Bid Procedures Order, as well as all related exhibits, are available: free of charge upon request to KCC by calling **866-967-0495** or visiting the Debtors' restructuring website at www.kccllc.net/mountainexpressoil, or for a fee via PACER by visiting http://www.txs.uscourts.gov.

Dated: [●]

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ DRAFT*
Michael D. Warner (SBT 00792304)
Steven W. Golden (SBT 24099681)
440 Louisiana Street, Suite 900
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile:  (713) 691-9407
mwarner@pszjlaw.com
sgolden@pszjlaw.com

-and-

Jeffrey N. Pomerantz (admitted *pro hac vice*)
Jeffrey W. Dulberg (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
jpomerantz@pszjlaw.com
jdulberg@pszjlaw.com

*Counsel to the Debtors and Debtors in Possession*

4

**Exhibit 3**

**Form of Cure Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| MOUNTAIN EXPRESS OIL COMPANY, et al., | Case No. 23-90147 (DRJ) |
| Debtors. [1] | (Jointly Administered) |

**NOTICE TO CONTRACT PARTIES TO POTENTIALLY
ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

---

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU
OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY TO AN
EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH ONE OR MORE
OF THE DEBTORS AS SET FORTH ON <u>EXHIBIT A</u> ATTACHED HERETO.**

---

      **PLEASE TAKE NOTICE** that on ●, 2023, the United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") entered the *Order (I) Approving Bid Procedures for the Sale of the Debtors' Assets, (II) Approving Bid Protections, (III) Scheduling Certain Dates with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, and (V) Approving Contract Assumption and Assignment Procedures* [Docket No. ●] (the "<u>Bid Procedures Order</u>"),[2] authorizing the Debtors to conduct an auction (the "<u>Auction</u>") to select a party or parties to purchase some or all of the Debtors' assets (the "<u>Assets</u>"). The Auction will be governed by the bidding procedures (attached to the Bid Procedures Order as <u>Exhibit 1</u> the "<u>Bid Procedures</u>").

      **PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bid Procedures and the terms of any Successful Bid, the Debtors **<u>may</u>** assume and assign to the Successful Bidder certain of the Potential Assumed/Assigned Contracts listed on the Cure Schedule, attached hereto as **<u>Exhibit A</u>**, to which you are a counterparty, upon approval of the Sale. The Cure Schedule can also be viewed on the Debtors' case website (www.kccllc.net/mountainexpressoil). The Debtors have conducted a review of their books and records and have determined that the cure amount for unpaid monetary obligations under such Potential Assumed/Assigned Contracts is as set forth on **<u>Exhibit A</u>** attached hereto (the "<u>Cure Amounts</u>").

---

[1]    A complete list of each of the Debtors in these Chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at www.kccllc.net/mountainexpressoil. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 cases is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022.

[2]    All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bid Procedures Order or the Bid Procedures, as applicable.

PLEASE TAKE FURTHER NOTICE that if you disagree or otherwise have any objections to a proposed Cure Amount (a "Cure Objection") and/or any other objection to the assumption and assignment or transfer of any of the Potential Assumed/Assigned Contracts (an "Assignment Objection"), your objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Bankruptcy Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Amounts, state the correct cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) be filed with the Court **no later than July 12, 2023**, at **5:00 p.m. (prevailing Central Time)** (the "Cure/Assignment Objection Deadline"), and if you object to the ability of the Successful Bidder and/or Backup Bidder to provide adequate assurance of future performance with respect to any Potential Assumed/Assigned Contract (an "Adequate Assurance Objection" and, together with Cure Objections and Assignment Objections, "Contract Objections"), be filed with the Court **no later than August 3, 2023 at 4:00 p.m. (prevailing Central time)** (the "Adequate Assurance Objection Deadline"), in each case, by the following parties: (a) the Debtors' counsel, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Boulevard, 13th Floor, Los Angeles, California 90067, Attn.: Jeffrey Pomerantz (jpomerantz@pszjlaw.com) and Jeffrey Dulberg (jdulberg@pszjlaw.com); and (b) the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, Texas 77002, Attn.: Jayson B. Ruff (jayson.b.ruff@usdoj.gov).

PLEASE TAKE FURTHER NOTICE that if no Contract Objection is filed by the Cure/Assignment Objection Deadline or Adequate Assurance Objection Deadline, as applicable, then (i) you will be deemed to have stipulated that the Cure Amounts as determined by the Debtors are correct, (ii) you will be forever barred, estopped, and enjoined from asserting any additional cure amount under the Potential Assumed/Assigned Contract, and (iii) you will be forever barred, estopped, and enjoined from objecting to such proposed assignment or transfer to the Successful Bidder on any grounds whatsoever, including the grounds that the Successful Bidder has not provided adequate assurance of future performance as of the closing date of the Sale.

PLEASE TAKE FURTHER NOTICE that any Cure Objection in connection with the Successful Bid that otherwise complies with these procedures yet remains unresolved as of the commencement of the Sale Hearing, shall be heard at a later date to be fixed by the Court.

PLEASE THAT FURTHER NOTICE that, notwithstanding anything herein, the mere listing of any Potential Assumed/Assigned Contract on the Cure Notice does not require or guarantee that such Potential Assumed/Assigned Contract will be assumed by the Debtors at any time or assumed and assigned or transferred, and all rights of the Debtors and the Successful Bidder with respect to such Potential Assumed/Assigned Contract are reserved. Moreover, the Debtors explicitly reserve their rights, in their reasonable discretion, to seek to reject or assume each Potential Assumed/Assigned Contract pursuant to section 365(a) of the Bankruptcy Code and in accordance with the procedures allowing the Debtors and/or the Successful Bidder, as applicable, to designate any Potential Assumed/Assigned Contract as either rejected or assumed on a post-closing basis.

PLEASE TAKE FURTHER NOTICE that, nothing herein (i) alters in any way the prepetition nature of the Potential Assumed/Assigned Contracts or the validity, priority, or amount

of any claims of a counterparty to any Potential Assumed/Assigned Contract against the Debtors that may arise under such Potential Assumed/Assigned Contract, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any Potential Assumed/Assigned Contract against the Debtors that may arise under such Potential Assumed/Assigned Contract.

Dated:  [●]                              **PACHULSKI STANG ZIEHL & JONES LLP**

                                         */s/ DRAFT*
                                         Michael D. Warner (SBT 00792304)
                                         Steven W. Golden (SBT 24099681)
                                         440 Louisiana Street, Suite 900
                                         Houston, TX 77002
                                         Telephone: (713) 691-9385
                                         Facsimile:  (713) 691-9407
                                         mwarner@pszjlaw.com
                                         sgolden@pszjlaw.com

                                         -and-

                                         Jeffrey N. Pomerantz (admitted *pro hac vice*)
                                         Jeffrey W. Dulberg (admitted *pro hac vice*)
                                         10100 Santa Monica Blvd., 13th Floor
                                         Los Angeles, CA 90067
                                         Telephone: (310) 277-6910
                                         Facsimile:  (310) 201-0760
                                         jpomerantz@pszjlaw.com
                                         jdulberg@pszjlaw.com

                                         *Counsel to the Debtors and Debtors in Possession*

DOCS_DE:243413.8 58614/002

**Exhibit 4**

**Form Asset Purchase Agreement**

DOCS_DE:243413.8 58614/002

ASSET PURCHASE AGREEMENT

BY AND AMONG

MOUNTAIN EXPRESS OIL COMPANY,

AND THE PARTIES LISTED ON SCHEDULE A HERETO, as Sellers,

AND

[INSERT], as Purchaser

Dated as of [Insert]

TABLE OF CONTENTS

ARTICLE I DEFINITIONS ........................................................................................... 1
    1.1    Definitions.................................................................................................. 1
ARTICLE II PURCHASE AND SALE; CLOSING ..................................................... 12
    2.1    Purchase and Sale. ................................................................................... 12
    2.2    Excluded Assets. ...................................................................................... 13
    2.3    Assumed Liabilities. ................................................................................ 15
    2.4    Excluded Liabilities. ................................................................................ 16
    2.5    Non-Transferable Contracts and Permits................................................. 16
    2.6    Payment of Cash Consideration............................................................... 16
    2.7    Closing. .................................................................................................... 17
    2.8    Addition/Removal of Contracts and Permits. .......................................... 18
ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS........................... 18
    3.1    Due Incorporation. ................................................................................... 18
    3.2    Due Authorization. ................................................................................... 18
    3.3    Consents and Approvals. .......................................................................... 19
    3.4    Compliance With Laws............................................................................ 19
    3.5    Litigation.................................................................................................. 19
    3.6    Certain Financial Information................................................................... 20
    3.7    Real Property. ........................................................................................... 20
    3.8    Material Contracts.................................................................................... 20
    3.9    Employees and Labor Matters. ................................................................ 21
    3.10    Benefit Plans. ........................................................................................... 22
    3.11    Permits and Licenses................................................................................ 22
    3.12    Intellectual Property................................................................................. 22
    3.13    Environmental Matters............................................................................. 24
    3.14    Title to Assets; Sufficiency of Assets; Condition of Assets. ............................. 24
    3.15    Taxes. ....................................................................................................... 24
    3.16    Insurance.................................................................................................. 25
    3.17    Brokers and Finders. ................................................................................ 25
    3.18    Disclaimer of Additional Representations and Warranties................................ 25
ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER..................... 26
    4.1    Due Organization. .................................................................................... 26
    4.2    Due Authorization. ................................................................................... 26
    4.3    Consents and Approvals; No Violations................................................... 26
    4.4    Purchaser's Examination. ......................................................................... 26
    4.5    Investigation; Limitation on Warranties. ................................................. 26
    4.6    Available Funds. ....................................................................................... 27
    4.7    Brokers and Finders. ................................................................................ 27
ARTICLE V COVENANTS........................................................................................ 28

i

| | | |
|---|---|---|
| 5.1 | Access to Information and Applicable Locations. | 28 |
| 5.2 | Preservation of Business. | 28 |
| 5.3 | Efforts. | 28 |
| 5.4 | Preservation of Records; Post-Closing Access and Cooperation. | 29 |
| 5.5 | Employees and Benefits. | 29 |
| 5.6 | Public Announcements. | 30 |
| 5.7 | Transfer Taxes. | 30 |
| 5.8 | Tax Proration. | 31 |
| 5.9 | Non-Tax Proration. | 31 |
| 5.10 | Hart-Scott-Rodino Act. | 31 |
| 5.11 | Use of Names and Marks. | 33 |
| 5.12 | No Successor Liability. | 33 |
| 5.13 | Assumption and Assignment of Contracts. | 33 |
| 5.14 | Transfer of 401(k) Plan. | 33 |
| 5.15 | Benefit Plan Cooperation. | 34 |

**ARTICLE VI CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER** ............ 34

| | | |
|---|---|---|
| 6.1 | Warranties True as of Present Date. | 34 |
| 6.2 | Compliance with Agreements and Covenants. | 34 |
| 6.3 | No Prohibition. | 35 |
| 6.4 | Entry of Sale Order. | 35 |
| 6.5 | No Material Adverse Effect. | 35 |
| 6.6 | HSR Clearance. | 35 |

**ARTICLE VII CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS** ................. 35

| | | |
|---|---|---|
| 7.1 | Warranties True as of Present Date. | 35 |
| 7.2 | Compliance with Agreements and Covenants. | 35 |
| 7.3 | No Prohibition. | 36 |
| 7.4 | Entry of Sale Order. | 36 |
| 7.5 | HSR Clearance. | 36 |

**ARTICLE VIII TERMINATION** .................................................................. 36

| | | |
|---|---|---|
| 8.1 | Termination. | 36 |
| 8.2 | Expenses. | 37 |
| 8.3 | Effect of Termination. | 38 |
| 8.4 | No Survival. | 38 |

**ARTICLE IX BANKRUPTCY COURT MATTERS** ................................................ 38

| | | |
|---|---|---|
| 9.1 | Motion for Approvals. | 38 |
| 9.2 | Bid Procedures and Bid Protections. | 39 |

**ARTICLE X MISCELLANEOUS** ................................................................ 40

| | | |
|---|---|---|
| 10.1 | Amendment. | 40 |
| 10.2 | Notices. | 40 |
| 10.3 | Waivers. | 41 |
| 10.4 | Counterparts. | 41 |
| 10.5 | Interpretation. | 41 |

| 10.6 | Time of the Essence. | 41 |
| 10.7 | Applicable Law. | 41 |
| 10.8 | Binding Agreement; Assignment. | 41 |
| 10.9 | Third Party Beneficiaries. | 42 |
| 10.10 | Further Assurances. | 42 |
| 10.11 | Entire Understanding. | 42 |
| 10.12 | EXCLUSIVE JURISDICTION OF BANKRUPTCY COURT. | 42 |
| 10.13 | WAIVER OF JURY TRIAL. | 42 |
| 10.14 | Disclosure Schedule. | 43 |
| 10.15 | Severability. | 43 |
| 10.16 | Attorneys' Fees. | 44 |
| 10.17 | Construction. | 44 |
| 10.18 | Survival. | 44 |
| 10.19 | No Vicarious Liability. | 44 |
| 10.20 | Specific Performance. | 44 |

**SCHEDULES**

A.      MEX Subsidiaries

1.      Permitted Liens

2.      Section 2.1(a): Acquired Equipment

3.      Section 2.1(c): Acquired Contracts

4.      Section 2.1(e): Acquired Real Property Leases

5.      Section 2.1(f): Acquired Real Property Subleases

6.      Section 2.1(g): Acquired Personal Property Leases

7.      Section 2.1(h): Permits and Licenses

8.      Section 2.1(k): Acquired Intellectual Property Rights

9.      Section 2.1(m): Prepaid Assets

10.     Section 2.2(h): Certain Excluded Assets

11.     Section 3.3: Consents and Approvals

12.     Section 3.4: Compliance with Laws

13.     Section 3.5: Litigation

14.     Section 3.6(a): Financial Statements

15.     Section 3.6(c): Accounts Receivable

16.     Section 3.6(d): Acquired Inventory Held on Consignment

17.     Section 3.6(e): Capital Leases

18.     Section 3.7: Owned Real Property

19.     Section 3.8(a): Material Contracts

20.     Section 3.8(b): Defaults Under Material Contracts

21.     Section 3.9(a): Employees

22.     Section 3.9(d): Employment Agreements

iv

23.     Section 3.10(a): Employee Benefit Plans

24.     Section 3.11: Permits and Licenses (Exclusions)

25.     Section 3.12(a): Intellectual Property

26.     Section 3.12(c): Intellectual Property Matters

27.     Section 3.12(f): Computer Systems Matters

28.     Section 3.13: Environmental Matters

29.     Section 3.15: Tax Matters

30.     Section 3.16: Insurance

31.     Section 3.17: Brokers and Finders

32.     Section 5.5(a): Subject Employees

# **EXHIBITS**

Exhibit 1.1 – Form of Sale Order

Exhibit 2.7(b)(i) – Form of Bill of Sale, Assignment and Assumption

Exhibit 2.7(b)(ii) – Form of IP Assignment

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of [Date] by and among [Insert], a [Insert] corporation (the "Purchaser"), and Mountain Express Oil Company, a Georgia corporation ("MEX"), and each of the parties listed on Schedule A hereto (collectively, the "MEX Subsidiaries") (together, MEX and the MEX Subsidiaries are referred to herein as the "Sellers"), each Seller being a chapter 11 debtor and debtor-in-possession in Case No. 23-90147 (DRJ) (jointly administered) (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"). Certain capitalized terms used herein are defined in ARTICLE I.

## W I T N E S S E T H:

WHEREAS, Sellers are engaged in the conduct of the Business (as defined below); and

WHEREAS, Purchaser desires to purchase and acquire from Sellers, and Sellers desire to sell and transfer to Purchaser, pursuant to, among other provisions thereof, Sections 363 and 365 of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), the Purchased Assets and certain designated Contracts (each as defined below), for the consideration and upon the terms and conditions contained in this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and warranties contained herein, and for their mutual reliance, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

1.1     Definitions. The following terms shall have the following meanings for the purposes of this Agreement:

"Accounts Receivable" means accounts and notes receivable (whether current or non-current) and all causes of action pertaining to the collection of the foregoing, in each case to the extent arising out of the operation of the Business.  For the avoidance of doubt, Accounts Receivable do not include (x) rights or claims to proceeds under Insurance Policies held by or for the benefit of any Seller (except for any Acquired Insurance Policy Claims), (y) accounts and notes receivable due from related parties of any Seller, or (z) intercompany obligations between or among any Seller or any of their respective Affiliates.

"Acquired Contracts" shall have the meaning set forth in Section 2.1(c).

"Acquired Equipment" shall have the meaning set forth in Section 2.1(a).

"Acquired Insurance Policy Claims" means any right, proceed or claim under an Insurance Policy of Sellers for loss, casualty or damage to any of the Purchased Assets arising prior to the Closing Date.

1

"Acquired Intellectual Property Rights" shall have the meaning set forth in Section 2.1(k).

"Acquired Inventory" shall have the meaning set forth in Section 2.1(d).

"Acquired Personal Property Leases" shall have the meaning set forth in Section 2.1(g).

"Acquired Real Property Leases" shall have the meaning set forth in Section 2.1(e).

"Acquired Real Property Subleases" shall have the meaning set forth in Section 2.1(e).

"Acquired Receivables" shall have the meaning set forth in Section 2.1(j).

"Affiliate" means, with respect to any specified Person, any other Person which, directly or indirectly, controls, is under common control with, or is controlled by, such specified Person.

"Agreement" means this Agreement, including the Disclosure Schedule and all other exhibits and schedules hereto, as it and they may be amended from time to time.

"Alternative Buyer" means any Person(s), other than Purchaser, that is party to an Alternative Transaction.

"Alternative Transaction" means any transaction or series of transactions (whether pursuant to section 363 or 1129 of the Bankruptcy Code or pursuant to any applicable non-bankruptcy law) involving the direct or indirect sale, transfer, or other disposition of all, or a material portion of, the Purchased Assets to a purchaser or purchasers other than Purchaser or effecting any other transaction the consummation of which would be substantially inconsistent with the transaction contemplated by this Agreement, including the confirmation of a plan of reorganization.

"Applicable Laws" means all laws, statutes, orders, rules, and regulations of Governmental Authorities, and judgments, decisions or orders entered by any Governmental Authority applicable to Sellers or the Business.

"Assumed Liabilities" shall have the meaning set forth in Section 2.3.

"Auction" has the meaning ascribed to such term in the Bid Procedures Order.

"Avoidance Actions" means any avoidance claims, rights, recoveries, subordinations or causes of action or remedies under Chapter 5 of the Bankruptcy Code, including any proceeds thereof, and any analogous state law Claims, in each case, of each Seller or its estate in the Bankruptcy Case.

"Bankruptcy Case" has the meaning ascribed to such term in the preamble.

"Bankruptcy Code" has the meaning ascribed to such term in the recitals of this Agreement.

"Bankruptcy Court" has the meaning ascribed to such term in the preamble.

2

"Benefit Plans" means (i) any "employee welfare benefit plan" or "employee pension benefit plan" (as those terms are respectively defined in Sections 3(1) and 3(2) of ERISA), other than a Multiemployer Plan; and (ii) any retirement or deferred compensation plan, incentive compensation, employment, change-in-control, collective bargaining, retention, compensation, employee loan, consulting, severance, stock, share appreciation right, unemployment compensation, vacation pay, severance pay, bonus arrangement, health benefit, profit-sharing, death or disability plan, agreement, commitment, program, policy, practice or arrangement or any other welfare or fringe benefit arrangements in each case in which any Employees participate or with respect to which a Seller has or may have any liability.

"Bid Procedures" means the process and procedures established in the Bid Procedures Order with respect to the conduct of the transactions contemplated herein and Sellers' disposition of the Purchased Assets.

"Bid Procedures Order" means that certain [*Insert*], Docket No. [X], entered in the Bankruptcy Case on [Date].

"Bid Protections" means (a) the Break-Up Fee plus (b) the Expense Reimbursement, matters relating to both of which (including Purchaser's entitlement thereto and the timing of payment thereof) are addressed in the Bid Procedures Order and Section 9.2 of this Agreement.

"Bill of Sale, Assignment and Assumption" shall have the meaning set forth in Section 2.7(b)(i).

"Break-Up Fee" means an amount equal to [3%] of the Cash Consideration.

"Business" means the wholesale fuel supply operation of Sellers that is integrated with the network of retail service stations, convenience stores and travel centers operated by the Sellers, their Dealers and other third-parties.

"Business Day" means any day other than a Saturday, Sunday or other day on which banking institutions in the State of Texas are authorized or required by law or other action of a Governmental Authority to close.

"Capital Lease Obligations" shall have the meaning set forth in Section 3.6(e).

"Cash and Cash Equivalents" means, collectively, all of the Sellers' cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, government securities and other cash equivalents, net of uncleared checks issued by Sellers that are not yet reflected in the applicable bank accounts of Sellers.

"Cash Consideration" has the meaning ascribed to such term in the definition of Purchase Price.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

3

"Claim" means any claim (including any claim as defined by Section 101(5) of the Bankruptcy Code), action, cause of action, suit, debt, lien, liability, claim, counterclaim, cross-claim, demand, damage, loss, attorneys' or consultants' fees, costs or expenses, of any nature whatsoever, in law or in equity.

"Closing" means the consummation of the transactions contemplated herein.

"Closing Date" shall have the meaning set forth in Section 2.7(a).

"COBRA" means the applicable requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code (and predecessors thereof).

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means any confidentiality or non-disclosure agreement that is or may be executed by Purchaser in favor of Sellers.

"Consent" means any approval, consent, ratification, waiver or other authorization.

"Contract" means any contract, agreement, grant, sub-grant, arrangement, understanding, commitment, ground lease, lease, sublease, license, mortgage, bond, note or other instrument (including any instrument evidencing indebtedness), or other legally binding obligation, and all amendments thereof (whether written or oral and whether express or implied).

"Contamination" or "Contaminated" means the presence of Hazardous Material in, on or under the soil, groundwater, surface water or other environmental channels to an extent that any Response Action is legally required by any Governmental Authority under any Environmental Law with respect to such presence of Hazardous Material.

"Controlled Stores" means any of the service station, convenience store or travel center sites for which a Seller holds a leasehold interest.

"Cure Costs" means the monetary amounts that must be paid or the other obligations that must be satisfied  under Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and/or assignment of any Acquired Contract, Acquired Real Property Lease, Acquired Real Property Sublease, Acquired Personal Property Lease, or any Permits and Licenses, as agreed upon by the Sellers, Purchaser and the counter-party to any such agreement, or as determined by the Bankruptcy Court pursuant to the Bid Procedures Order.

"Dealer" means any third-party operator, franchisee or subtenant of any of the Controlled Stores.

"Debtors" means MEX and each of the MEX Subsidiaries as debtors and debtors-in-possession in the Bankruptcy Case.

"Deposit" means a cash amount equal to 10% of the Cash Consideration.

"Designated Contact" shall have the meaning set forth in Section 5.1(a).

4

"Disclosure Schedule" means the Disclosure Schedule delivered by Sellers to Purchaser on the date of this Agreement, as amended, modified or supplemented in accordance with this Agreement.

"DOJ" shall have the meaning set forth in Section 5.10(a).

"Employees" means all full-time and part-time employees employed by Sellers at their locations in the United States.

"Environmental Claim" means any Claim by any Person alleging liability (including liability for a Response Action, investigatory costs, governmental response costs, remediation or clean-up costs, natural resources damages, property damages, personal injuries, attorneys' fees, fines or penalties) arising out of, based on, resulting from or relating to (a) the presence, Release or threatened Release of, or exposure to any Hazardous Materials; (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law; or (c) any other matters for which liability is imposed under Environmental Laws.

"Environmental Law" means any federal, state or local statute, order, regulation or ordinance relating to (a) the protection of the natural environment, including natural resources, (b) the protection of human health and safety as it pertains to exposure to Hazardous Materials, (c) the manufacture, registration, distribution, formulation, packaging or labeling of Hazardous Materials or products containing Hazardous Materials, or (d) the handling, use, presence, generation, treatment, storage, disposal, Release or threatened Release of or exposure to any Hazardous Materials.

"Environmental Liabilities" means any indebtedness, liability, Claim, loss, damage, fine, penalty, cost, expense, deficiency or responsibility, whether known or unknown, arising under, based on or relating to any Environmental Law, whether based on negligence, strict liability or otherwise, including liability or responsibility for the costs of enforcement proceedings, investigations, Response Action, governmental response, removal, remediation, cleanup, restoration, abatement, monitoring, personal injury, property damage, medical monitoring, penalties, contribution, indemnification, injunctive relief, natural resource damages, court costs and reasonable attorneys' fees.

"Environmental Permit" means any Permits and Licenses required or issued by any Governmental Authority under or in connection with any Environmental Law, including any and all orders, consent orders or binding agreements issued by or entered into with a Governmental Authority under any applicable Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow" shall have the meaning set forth in Section 2.6(a).

"Escrow Holder" shall have the meaning set forth in Section 2.6(a).

"Excluded Assets" shall have the meaning set forth in Section 2.2.

"Excluded Actions" means (i) any Avoidance Actions, including any proceeds thereof, and (ii) any state law commercial tort or breach of fiduciary duty Claims, including any proceeds thereof.

"Excluded Liabilities" shall have the meaning set forth in Section 2.4.

"Expense Reimbursement" means a reimbursement of the actual and documented Expenses of Purchaser in connection with its consideration, diligence, negotiation, execution and pursuit of implementation and consummation of this Agreement and the Related Agreements, in an amount up to $[1,000,000].

"Expenses" shall have the meaning set forth in Section 8.2.

"Financial Statements" shall have the meaning set forth in Section 3.6(a).

"Financing Orders" has the meaning ascribed to such term in the *Amended Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement* dated as of April 25, 2023, among the Sellers, First Horizon Bank, and the other lenders from time to time party thereto.

"FTC" shall have the meaning set forth in Section 5.10(a).

"Fuel Supply Agreement" means any agreement (as it may be amended or supplemented from time to time) between a Seller, as a seller or consignor, and any Dealer or other third-party, as a buyer or consignee, for the supply of oil, gasoline and other petroleum products for resale to end-user customers.

"GAAP" means U.S. generally accepted accounting principles, as in effect from time to time, consistently applied.

"Good Funds" shall have the meaning set forth in Section 2.6(a).

"Governmental Authority" means (i) any U.S., state, local or foreign governmental, regulatory or administrative body, agency, instrumentality or authority, (ii) any court or judicial authority or arbitration tribunal, whether national, Federal, state or local or otherwise, or (iii) any Person lawfully empowered by any of the foregoing to enforce or seek compliance with any applicable law, statute, regulation, order or decree.

"Hazardous Material" means any chemicals, materials, or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "hazardous constituents," "restricted hazardous materials," "extremely hazardous substances," "toxic substances," "contaminants," "pollutants," "toxic pollutants," under any Environmental Law or for which liability or standards of conduct may be imposed pursuant to Environmental Law, including petroleum and petroleum products, by-products, derivatives or wastes.

"HSR Act" shall have the meaning set forth in Section 5.10(a).

"Income Tax" means any United States or foreign, federal, state, provincial, municipal or county Tax that, in whole or in part, is based on, measured by or calculated by reference to net

income, profits or gains, including any state or local franchise Tax, and including any interest, penalty or addition thereto, whether disputed or not.

"Income Tax Returns" means any Tax Return with respect to Income Taxes.

"Insurance Policies" shall have the meaning set forth in Section 3.16.

"Intellectual Property Rights" means all of the following in any jurisdiction throughout the world: (a) patents, patent applications, patent disclosures and statutory invention registrations, including reissues, divisions, continuations, continuations in part, extensions and reexaminations thereof, all rights therein provided by international treaties or conventions ("Patents"); (b) trademarks, service marks, trade dress, trade names, logos (and all translations, adaptations, derivations and combinations of the foregoing) and Internet domain names, together with all goodwill associated with each of the foregoing, any and all common law rights, and registrations and applications for registration thereof, all rights therein provided by international treaties or conventions, and all reissues, extensions and renewals of any of the foregoing; (c) copyrightable works (including computer software source code, executable code, databases and related documentation and maskworks), copyrights, whether or not registered, and registrations and applications for registration thereof, and all rights therein provided by international treaties or conventions; and (d) confidential and proprietary information, including trade secrets, unpatented inventions, data and know-how.

"IP Assignment" shall have the meaning set forth in Section 2.7(b)(ii).

"Knowledge" means, with respect to Sellers, the actual knowledge as of the date hereof and as of the Closing, of Michael Healy, the Chief Restructuring Officer of Sellers.

"Lien" means all liens, encumbrances, mortgages, charges, claims, restrictions, pledges, security interests, title defects, easements, rights of way, covenants and encroachments.

"Look-Back Period" means the period beginning on the Petition Date.

"Material Adverse Effect" means any change, event, occurrence, condition, development, fact, or state of facts occurring since the date of this Agreement that has had or would reasonably be expected to have a material adverse effect on (i) the condition (financial or otherwise) or results of operations of the Business, the Purchased Assets or the Assumed Liabilities, taken as a whole, or (ii) Sellers' ability to consummate the transactions contemplated by this Agreement; provided, however, the following shall be disregarded in determining whether there has been a Material Adverse Effect or whether a Material Adverse Effect could or would reasonably be expected to occur: (i) general economic, business, industry or credit, financial or capital market conditions (whether in the United States or internationally), including conditions affecting generally all companies engaged in the Business or a segment thereof, or the industries served by the Business; (ii) the announcement of this Agreement or pendency of the transactions contemplated hereby, (iii) the breach of this Agreement or any Related Agreement by Purchaser, (iv) pandemics (including, without limitation, the COVID-19 pandemic existing and continuing as of the date of this Agreement), earthquakes, tornados, hurricanes, floods and acts of God, (v) acts of war (whether declared or not declared), sabotage, terrorism, military actions or the escalation thereof; (vi) any changes or prospective changes in applicable laws, regulations or accounting rules, including

GAAP or interpretations thereof, or any changes or prospective changes in the interpretation or enforcement of any of the foregoing, or any changes in general legal, regulatory or political conditions; (vii) any existing event, occurrence or circumstance set forth in the Disclosure Schedule, and (viii) any change to the Business or the Purchased Assets that results from the filing or pendency of the Bankruptcy Case, except, in the case of the foregoing clauses (i), (iv), (v), and (vii), to the extent that the Business or the Purchased Assets, are disproportionately adversely affected thereby relative to other similarly situated Persons operating in the industries in which the Business operates.  Notwithstanding the foregoing, if Sellers are in compliance with the Approved DIP Budget (as such term is defined in the Financing Orders and as such budget may be amended from time), Purchaser acknowledges and agrees that no Material Adverse Effect shall be deemed to exist (despite any change, event, occurrence, condition, development, fact or state of facts that might otherwise cause such an effect), *provided that*, the failure of Sellers to be or to remain in compliance with the Approved DIP Budget shall not, in itself, constitute a Material Adverse Effect.

"Material Contract" shall have the meaning set forth in Section 3.8(a).

"Multiemployer Plan" has the meaning ascribed to such term in Section 3(37) of the Code.

"Non-Tax Prorations" means the utility charges and rents (but not Property Taxes) allocable to Purchaser and Sellers pursuant to the procedures set forth in Section 5.8 to the extent unpaid at the Closing.

"Notice of Successful Bidder" has the meaning ascribed to such term in the Bid Procedures Order.

"Oil Company Accruals" means any amounts earned by a Seller but unpaid as of the Closing Date under an Oil Company Agreement on account of brand incentive program payments, rebates or reimbursements, marketing assistance program payments, rebates or reimbursements, or other funding due for upgrades or improvements to a Controlled Store.

"Oil Company Agreement" means any agreement (as it may be amended or supplemented from time to time) between MEX, as a buyer, and an oil company, as a seller, for the purchase, distribution and marketing by Borrower of oil, gasoline and other petroleum products.

"Order" means any award, decision, injunction, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Authority or by any arbitrator.

"Ordinary Course of Business" means, with respect to any Person, actions that are taken in the ordinary course of business and consistent with the past practices of such Person.

"Owned Intellectual Property" shall have the meaning set forth in Section 3.12(a).

"Owned Real Property" shall have the meaning set forth in Section 3.12(a).

"Patents" has the meaning ascribed to such term in the definition of Intellectual Property Rights.

"Permits and Licenses" shall have the meaning set forth in Section 2.1(h).

"Permitted Access Parties" shall have the meaning set forth in Section 5.4.

"Permitted Liens" means, as of the Closing Date, all (a) Liens for Taxes, assessments and governmental charges or levies not yet delinquent or for which adequate reserves are maintained on the financial statements of Sellers and set forth as a current liability on the Estimated Closing Statement; (b) Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's liens and other similar liens arising in the ordinary course of business securing obligations that are not overdue for a period of more than 60 days or which are being contested in good faith by appropriate proceedings and set forth as a current liability on the Estimated Closing Statement; (c) pledges or deposits to secure obligations under workers' compensation laws or similar legislation or to secure public or statutory obligations that are not otherwise due or delinquent; (d) deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business consistent with past practice and set forth as a current liability on the Estimated Closing Statement; (e) all matters of record, including survey exceptions, reciprocal easement agreements and other encumbrances on title to real property; (f) all applicable zoning, entitlement, conservation restrictions and other land use and environmental regulations; (g) all exceptions, restrictions, easements, charges, rights-of-way and other Liens set forth in any permits, any deed restrictions, groundwater or land use limitations or other institutional controls utilized in connection with any required environmental remedial actions, or other state, local or municipal franchise applicable to each Seller or any of its respective properties; and (h) Liens referred to in the Disclosure Schedule.

"Permitted Post-Closing Encumbrance" means the following non-monetary encumbrances: (a) licenses and similar rights granted with respect to Intellectual Property Rights, (b) with respect to any real property interest, zoning restrictions, building codes and other land use laws regulating the use or occupancy of real property and imperfections in title, charges, and easements, in each case that do not materially interfere with the operation of the assets or property to which they relate, and (c) with respect to any real property interest, Liens on the interest of any third party landlord or sublandlord or underlying fee interest of any Acquired Real Property Lease or Acquired Real Property Sublease, but only those not extinguished by the Sale Order.

"Person" means an individual, corporation, partnership, joint venture, trust, association, estate, joint stock company, limited liability company, Governmental Authority or any other organization of any kind.

"Personal Information" means, in addition to any definition for "personal information" or any similar term (e.g., "personal data" or "personally identifiable information") provided by Applicable Law, or by any Seller in any of its privacy policies, notices or contracts applicable to the Business or the Purchased Assets, all information that identifies, could be used to identify or is otherwise associated with an individual person.

"Petition Date" means March 18, 2023, the date of commencement of the Bankruptcy Case.

"Prepaid Assets" means all cash deposits (including any security deposit held by a landlord under an Acquired Real Property Lease(s)), advance payments and other prepaid items relating to or arising in connection with the operation of the Business or an Acquired Contract; provided that, the Prepaid Assets shall *not* include any cash deposits or security deposits paid under any Acquired Contract that is a Fuel Supply Contract or under any Acquired Real Property Sublease to the extent such amounts are not segregated or held separately from the Sellers' Cash and Cash Equivalents.

"Privacy Laws" means any and all Applicable Laws, legal requirements and self-regulatory guidelines relating to the receipt, collection, compilation, use, storage, processing, sharing, safeguarding, security (both technical and physical), disposal, destruction, disclosure or transfer (including cross-border) of Personal Information, including the Federal Trade Commission Act, California Consumer Privacy Act, Gramm-Leach-Bliley Act, Payment Card Industry Data Security Standard, EU General Data Protection Regulation, and any and all applicable Laws relating to breach notification or marketing in connection with Personal Information.

"Proceeding" means any judicial, administrative or arbitral actions, arbitrations, suits, hearings, disputes, audits, administrative proceedings, condemnation or eminent domain proceedings.

"Property Taxes" means ad valorem, property, excise or similar Taxes (including any interest, fine, penalty or additions to tax imposed by any Governmental Authority in connection with such Taxes) based upon the acquisition, operation or ownership of the Purchased Assets but excluding, for the avoidance of doubt, Income Taxes and Transfer Taxes.

"Purchase Price" means the sum of: (i) cash in the amount of $[X], (ii) plus (A) the amount of any Cure Costs paid or escrowed by Purchaser in accordance with Section 5.13, minus (B) the Tax Prorations allocable to Sellers but paid or payable by Purchaser in accordance with Section 5.8, and plus or minus (as applicable) (C) the Non-Tax Prorations determined, and reimbursable to either Sellers and Purchaser, in accordance with Section 5.9, and (iii) without duplication of any item described in clause (ii) of this definition, the Assumed Liabilities.   The consideration described in clause (i) of this definition is referred to as the "Cash Consideration."

"Purchased Assets" shall have the meaning set forth in Section 2.1.

"Purchaser" has the meaning ascribed to such term in the preamble.

"Related Agreements" means the Bill of Sale, Assignment and Assumption, and the IP Assignment.

"Release" means any release, spill, emission, discharge, leaking, pumping, injection, deposit, placing, disposal, dispersal, leaching or migration into the environment (including, without limitation, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the movement of any Hazardous Material through or in the air, vapor, soil, surface water, groundwater or property.

"Response Action" means any action taken to investigate, abate, treat, remediate, clean up, remove or mitigate any violation of Environmental Law, any Contamination of any property owned, leased or used by the Business or any release or threatened release of Hazardous Materials.

Without limitation, Response Action shall include any action that would be a response as defined by the Comprehensive Environmental Response, Compensation and Liability Act, as amended at the date of Closing, 42 U.S.C. § 9601 (25).

"Sale Hearing" has the meaning ascribed to such term in the Bid Procedures Order.

"Sale Motion" has the meaning ascribed to such term in the Bid Procedures Order.

"Sale Order" means an order of the Bankruptcy Court entered in the Bankruptcy Case approving and authorizing this Agreement and the transactions contemplated herein (including, without limitation, approving and authorizing the applicable Seller's assumption and assignment pursuant to Section 365 of the Bankruptcy Code of the Acquired Contracts, Acquired Personal Property Leases, Acquired Real Property Leases and Acquired Real Property Subleases), which Sale Order shall be substantially in the form attached as Exhibit 1.1 to this Agreement, but as to any material changes affecting a party hereto, only those that are acceptable to Sellers and Purchaser in their respective sole discretion, as applicable.

"Schedules and Statements" means each Seller's *Schedule of Assets and Liabilities* and *Statement of Financial Affairs* filed in the Bankruptcy Case on [Date].

"Selected Employees" shall have the meaning set forth in Section 5.5(a).

"Seller Intellectual Property" means Owned Intellectual Property, together with all other Intellectual Property Rights licensed to any Seller or which any Seller otherwise has the right to use.

"Sellers" has the meaning ascribed to such term in the preamble.

"Subject Employees" shall have the meaning set forth in Section 5.5(a).

"Tax" (and, with correlative meaning, "Taxes," "Taxable" and "Taxing") means (i) any net income, capital gains, gross income, gross receipts, sales, use, transfer, ad valorem, franchise, profits, license, capital, withholding, payroll, estimated, employment, excise, goods and services, severance, stamp, occupation, premium, property, social security, environmental (including Code section 59A), alternative or add-on, value added, registration, windfall profits or other taxes, duties, charges, fees, levies or other assessments imposed by any Governmental Authority, or any interest, penalties, or additions to tax incurred under Applicable Laws with respect to taxes and (ii) any liability in respect of any item described in clause (i) above that arises by reason of a contract, assumption, transferee or successor liability, operation of law (including by reason of participation in a consolidated, combined or unitary Tax Return) or otherwise.

"Tax Prorations" means the Property Taxes allocable to Purchaser and Sellers pursuant to the procedures set forth in Section 5.8 to the extent unpaid at the Closing.

"Tax Returns" means any report, return (including any information return), declaration or other filing required or permitted to be supplied to any taxing authority or jurisdiction with respect to Taxes, including any amendments or attachments to such reports, returns, declarations or other filings.

"Termination Date" shall have the meaning set forth in Section 8.1(b).

"Trade Secrets" has the meaning ascribed to such term in the definition of Intellectual Property Rights.

"Transfer Taxes" shall have the meaning set forth in Section 5.7.

"Transferred Employees" shall have the meaning set forth in Section 5.5(a).

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended.

## ARTICLE II

## PURCHASE AND SALE; CLOSING

2.1    Purchase and Sale.  Upon the terms and subject to the conditions set forth in this Agreement (including, without limitation, entry of the Sale Order), at the Closing, Sellers shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase and accept from Sellers, all of Sellers' right, title and interest in and to all of the assets of Sellers, wherever located, including, without limitation, the following assets (the "Purchased Assets"), in each case free and clear of all Liens to the extent provided in the Sale Order (other than Permitted Post-Closing Encumbrances):

(a)    All machinery, equipment, furniture, fixtures, office furnishings, tools and dies, molds and parts, spares, vehicles, computer hardware and software, and other tangible personal property owned by Sellers for use in connection with the Business, including, without limitation, the tangible personal property identified on Section 2.1(a) of the Disclosure Schedule (collectively, the "Acquired Equipment");

(b)    to the extent assignable, all rights in all warranties of any manufacturer or vendor in connection with the Acquired Equipment;

(c)    all contracts and agreements, licenses, purchase orders, customer orders, and other contracts and agreements, whether written or oral, related to the Business and identified on Section 2.1(c) of the Disclosure Schedule (collectively, the "Acquired Contracts").  For the avoidance of doubt, references herein to Acquired Contracts shall (i) include those Oil Company Agreements and Fuel Supply Agreements identified on Section 2.1(c) of the Disclosure Schedule, and (ii) not be deemed to include Acquired Real Property Leases, Acquired Real Property Subleases, Acquired Personal Property Leases or Permits and Licenses;

(d)    all inventories of fuel and fuel products, merchandise, supplies and other goods owned by Sellers and used or held for use in connection with the Business (collectively, the "Acquired Inventory");

(e)    each Seller's leasehold interest arising under the real property leases identified in Section 2.1(e) of the Disclosure Schedule (collectively, the "Acquired Real Property Leases");

(f)      each Seller's rights under any sublease, assignment, or rental agreement to use any of the leasehold interests of a Seller under an Acquired Real Property Lease identified in Section 2.1(f) of the Disclosure Schedule (collectively, the "Acquired Real Property Subleases");

(g)      each Seller's leasehold rights arising under the personal property leases identified in Section 2.1(g) of the Disclosure Schedule (collectively, the "Acquired Personal Property Leases");

(h)      the permits, including Environmental Permits, licenses, approvals, franchises and registrations and other governmental licenses, permits or approvals issued to any Seller with respect to the ownership or operation of any of the Purchased Assets or the conduct of the Business, identified in Section 2.1(h) of the Disclosure Schedule (collectively, the "Permits and Licenses");

(i)      other than the books and records contemplated by Section 2.2(a) and (b) below, all non-privileged books and records maintained by Sellers related to the Business or the Purchased Assets, including without limitation, user manuals; inventory, maintenance, and asset history records; construction plans and specifications; administrative libraries; environmental records required by law or regulation; and systems documentation and other data processing information and records;

(j)      all Accounts Receivable of Sellers (collectively, the "Acquired Receivables");

(k)      all Intellectual Property Rights, wherever located, owned by Sellers and used or held for use in connection with the Business, including those Intellectual Property Rights set forth on Section 2.1(k) of the Disclosure Schedule (the "Acquired Intellectual Property Rights");

(l)      all Claims owned by or available to Seller (other than Excluded Actions), (i) relating to the Purchased Assets, the Assumed Liabilities or the acquisition, ownership, management, operation, use, function or value of the Business or any Purchased Asset or (ii) against any counterparty to an Acquired Contract, Acquired Real Property Lease, Acquired Real Property Sublease, Acquired Personal Property Lease, or any Permit and License;

(m)      all Prepaid Assets listed on Section 2.1(m) of the Disclosure Schedule;

(n)      any Acquired Insurance Policy Claims; and

(o)      all employee-related files and records, including occupational health and safety records, assessments and audits; workers compensation records; workers compensation claims files; and personnel employment, payroll and medical records (in each case, to the extent the transfer thereof is not prohibited by law) for Transferred Employees.

2.2      Excluded Assets.  Notwithstanding anything to the contrary contained in Section 2.1 above or any other provision of this Agreement or any Related Agreement, the following assets are not being sold, assigned, transferred or conveyed to Purchaser by Sellers hereunder (collectively, the "Excluded Assets"):

13

(a)      the corporate seals, organizational documents, minute books, stock books, Income Tax Returns, books of account and other records having to do with the corporate or limited liability company formation, organization or governance of Sellers;

(b)      the books and records of account and all supporting vouchers, invoices and other records and materials primarily relating to any or all Income Taxes of Sellers;

(c)      all claims for refunds due to Sellers for Taxes of any nature paid by Sellers with respect to any period ending on or prior to the Closing Date;

(d)      all Insurance Policies of Sellers covering the Purchased Assets and any rights, proceeds and claims of and from such policies (except any Insurance Policy Claims);

(e)      all Benefit Plans and Benefit Plan assets;

(f)      data files, archive files, systems documentation and other data processing information and records relating solely to any of the foregoing Excluded Assets;

(g)      all contracts, leases, permits, licenses, purchase orders, customer orders, and other agreements, whether written or oral, *other than* those explicitly identified as Acquired Contracts on Section 2.1(c) of the Disclosure Schedule, Acquired Real Property Leases on Section 2.1(e) of the Disclosure Schedule, Acquired Real Property Subleases on Section 2.1(e) of the Disclosure Schedule, Acquired Personal Property Leases on Section 2.1(g) of the Disclosure Schedule, or Permits and Licenses on Section 2.1(h) of the Disclosure Schedule;

(h)      any assets, properties, rights and Claims specifically described or set forth on Section 2.2(h) of the Disclosure Schedule;

(i)      any Prepaid Assets *other than* those explicitly identified as Purchased Assets on Section 2.1(m) of the Disclosure Schedule;

(j)      the rights which accrue or will accrue to Sellers under this Agreement and the Related Agreements;

(k)      any rights or Claims to the extent related to (i) Excluded Assets described herein and (ii) intercompany obligations between or among any Seller or any of their respective Affiliates;

(l)      any tangible or intangible asset held by Sellers pursuant to a lease, license, contract, or other agreement where such lease, license, contract or other agreement is not among the Acquired Contracts, Acquired Personal Property Leases, Acquired Real Property Leases, Acquired Real Property Subleases, and/or Permits and Licenses assumed by Sellers and assigned to Purchaser at the Closing in accordance with the Bankruptcy Code;

(m)      any letters of credit or similar financial accommodations issued to any third party(ies) for the account of Sellers and any collateral therefor;

(n)      all securities, whether capital stock or debt, of a Seller or any other entity;

14

(o)     all Cash and Cash Equivalents, whether on hand, in transit or in banks or other financial institutions, security entitlements, securities accounts, commodity contracts and commodity accounts and including any cash collateral that is collateralizing any letters of credit or Insurance Policies, or any obligations with respect thereto;

(p)     all Personal Information that any Seller is prohibited by Applicable Law, including applicable Privacy Laws, or under any Seller's public-facing policies, notices or other disclosures, from delivering or transferring to Purchaser;

(q)     all deposit and other bank accounts of Sellers;

(r)     any Owned Real Property;

(s)     any Oil Company Accruals; and

(t)     all Excluded Actions.

2.3     Assumed Liabilities.  Upon the terms and conditions contained in this Agreement, Purchaser shall upon, from and after the Closing Date, assume and be solely liable and responsible for paying and satisfying, solely and only the following liabilities and obligations, all items not specifically set forth below in this Section 2.3 being excluded (all liabilities and obligations so assumed, the "Assumed Liabilities"):

(a)     all liabilities attributable to the use of the Purchased Assets or the operation of the Business arising on or after the Closing Date;

(b)     all obligations arising from any actions taken by Purchaser after the Closing Date with respect to the Transferred Employees or the operation of the Business;

(c)     all Cure Costs and all post-Closing obligations arising under the Acquired Contracts, Acquired Real Property Leases, Acquired Real Property Subleases, Acquired Personal Property Leases and Permits and Licenses;

(d)     all post-Closing obligations of Sellers to purchase or pay for deliveries made to Sellers pursuant to Oil Company Agreements outstanding as of the Closing Date;

(e)     all post-Closing obligations of Sellers to deliver products or services pursuant to Fuel Supply Agreements outstanding as of the Closing Date;

(f)     the Tax Prorations and the Non-Tax Prorations allocated to Purchaser;

(g)     all accrued and unpaid vacation, holiday, sick pay and other paid time-off (whether accrued prior to or during the Bankruptcy Case) to which the Transferred Employees are entitled with respect to all periods of service up to and including the Closing Date under the policies and practices of Sellers;

(h)     without duplication of any other item described in this Section 2.3, the Capital Lease Obligations, if any; and

15

(i)      all other obligations expressly assumed by Purchaser under the other terms and provisions of this Agreement or any of the Related Agreements or other documents and agreements executed in connection with the Closing.

2.4      Excluded Liabilities.  Except for the Assumed Liabilities expressly set forth in Section 2.3, Purchaser shall not assume or become responsible for any Seller's obligations or liabilities other than those expressly set forth in Section 2.3 (such excluded liabilities are collectively referred to herein as the "Excluded Liabilities") and Sellers shall remain fully and solely responsible for all Excluded Liabilities.

2.5      Non-Transferable Contracts and Permits.  Anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign or transfer any Acquired Contract, Acquired Personal Property Lease, Acquired Real Property Lease, Acquired Real Property Sublease or any of the Permits and Licenses, or any claim or right or any benefit or obligation thereunder or resulting therefrom if, an assignment or transfer thereof is prohibited or, without the consent of a third party thereto, would, notwithstanding the provisions of section 365(f) of the Bankruptcy Code and the effect of the Sale Order, be prohibited and such consent has not been obtained.  If such consent is required and has not been obtained or if an attempted assignment or transfer is ineffective or prohibited, Sellers shall use commercially reasonable efforts to cooperate with Purchaser in any reasonable arrangement requested and approved by Purchaser to provide for Purchaser all of the benefits under any such Acquired Contract, Acquired Personal Property Lease, Acquired Real Property Lease, Acquired Real Property Sublease, or Permit or License.  In connection with any such arrangement, (i) Purchaser shall bear the expense of structuring and implementing the arrangement and (ii) Purchaser shall honor each Seller's commitments set forth in any such Acquired Contract, Acquired Personal Property Lease, Acquired Real Property Lease, Acquired Real Property Sublease, or Permit or License to the extent arising following the Closing Date in connection with Purchaser's use of any such Acquired Contract, Acquired Personal Property Lease, Acquired Real Property Lease, Acquired Real Property Sublease, or Permit or License that is the subject of such arrangement (or assets or rights relating thereto).

2.6      Payment of Cash Consideration.

(a)      Deposit.  Concurrently with the execution and delivery of this Agreement by all parties hereto, Purchaser shall deposit into a non-interest bearing trust account (the "Escrow") with Sellers' bankruptcy counsel (the "Escrow Holder") an amount equal to the Deposit in immediately available, good funds of the United States of America (funds delivered in this manner are referred to herein as "Good Funds"). The Deposit shall be credited and applied toward payment of the Cash Consideration at the Closing.

(b)      Payment at Closing.  On the Closing Date, subject to the satisfaction of the conditions set forth herein, Purchaser shall (i) (A) cause the Escrow Holder to deliver the Deposit to Sellers, (B) pay and deliver to Sellers, in Good Funds, the Cash Consideration less the Deposit, in each case, by wire transfer in accordance with written wire instructions provided by Sellers to Purchaser not later than two (2) Business Days prior to Closing and (ii) pay the Cure Costs, in Good Funds.

16

(c)      Purchase Price Allocation. Within ninety (90) days after the Closing Date, Purchaser will prepare or cause to be prepared and delivered to Sellers an allocation of the Purchase Price for applicable Tax purposes among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury Regulations issued thereunder.  Sellers and Purchaser shall cooperate in good faith to finalize a mutually agreeable Internal Revenue Service Form 8594 allocation within thirty (30) Business Days after the delivery of the allocation by Purchaser to Sellers.  Sellers and Purchaser covenant (i) to report gain or loss or cost basis, as the case may be, in a manner consistent with such allocation, (ii) to prepare and file their Tax Returns, including Internal Revenue Service Form 8594, on a basis consistent with the allocation, (iii) not to voluntarily take any position inconsistent therewith in any proceeding relating to Taxes, and (iv) to use commercially reasonable efforts to sustain such allocation in any subsequent Tax audit or Tax dispute.

2.7      Closing.

(a)      The Closing shall take place on the date that is three (3) Business Days after the satisfaction or waiver of the conditions precedent set forth in ARTICLES VI and VII or on such other date, and at such time and place, as may be agreed by Purchaser and Sellers.  The date on which the Closing occurs in accordance with the preceding sentence is referred to in this Agreement as the "Closing Date."

(b)      At the Closing, Sellers shall deliver counterparts of the following to Purchaser:

(i)      a bill of sale and assignment and assumption agreement in the form attached hereto as Exhibit 2.7(b)(i) (the "Bill of Sale, Assignment and Assumption") duly executed by Sellers;

(ii)      an assignment of the Acquired Intellectual Property Rights in the form attached hereto as Exhibit 2.7(b)(ii) (the "IP Assignment");

(iii)      a certificate of Sellers, dated as of the Closing Date, certifying as to the satisfaction of the conditions set forth in ARTICLE VI hereof;

(iv)      a certified copy of the Sale Order as entered by the Bankruptcy Court, vesting the Purchased Assets in Purchaser free and clear of any Liens (except for Permitted Post-Closing Encumbrances), and a certified copy of the docket for the period following entry of the Sale Order and through the date immediately prior to the date of the Closing; and

(v)      such other instruments and documents as may be reasonably requested by Purchaser at least five (5) Business Days prior to Closing in order to consummate the transactions contemplated under this Agreement.

(c)      At the Closing, Purchaser shall pay the Cure Costs and deliver the following to Sellers:

17

(i)       the amount described in <u>Section 2.6(b)</u> pursuant to the payment procedures described in <u>Section 2.6(b)</u>;

(ii)      duly executed counterparts of each of the Related Agreements referred to in <u>Section 2.7(b)</u>;

(iii)     a certificate of Purchaser, dated as of the Closing Date, as to the satisfaction of the conditions set forth in <u>ARTICLE VII</u> hereof; and

(iv)     a counterpart of any assignment and assumption agreement for any Acquired Real Property Lease or Acquired Real Property Sublease executed by Purchaser and dated as of the Closing Date; and

(v)      such other instruments and documents as may be reasonably requested by Sellers at least five (5) Business Days prior to Closing in order to consummate the transactions contemplated under this Agreement.

2.8    <u>Addition/Removal of Contracts and Permits</u>.  Purchaser may, in its sole discretion, add any Contract or Permits and Licenses to (or remove any Contract or Permits and Licenses from) the Acquired Contracts on <u>Section 2.1(c)</u> of the Disclosure Schedule, the Acquired Real Property Leases on <u>Section 2.1(e)</u> of the Disclosure Schedule, the Acquired Real Property Subleases on <u>Section 2.1(e)</u> of the Disclosure Schedule the Acquired Personal Property Leases on <u>Section 2.1(g)</u> of the Disclosure Schedule or the Permits and Licenses on <u>Section 2.1(h)</u> of the Disclosure Schedule up to the date that is three (3) Business Days prior to the date of the Auction. The Sellers shall comply with the terms of the Bid Procedures Order and any notices of designation of any Contracts or Permits and Licenses for potential assumption and assignment to Purchaser with respect to all such Contracts and Permits and Licenses added to (or removed from) the relevant sections of the Disclosure Schedule.  Any removal or addition of Contracts or Permits and Licenses pursuant to this <u>Section 2.8</u> shall have no effect upon the Cash Consideration payable to Sellers hereunder (although, for the avoidance of doubt, such removal or addition may affect the Cure Costs payable as a component of the Purchase Price).

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller hereby represents and warrants to Purchaser, as of the date hereof and as of the Closing Date, as follows:

3.1    <u>Due Incorporation</u>.  Each Seller is duly organized, validly existing and in good standing under the laws of the state where it is organized.

3.2    <u>Due Authorization</u>.  Subject to entry of the Sale Order, each Seller has full power and authority to (a) enter into this Agreement and its Related Agreements and to consummate the transactions contemplated hereby and thereby and (b) own, lease, hold and operate the assets and properties owned, leased, held or operated by it and to carry on its business as it is currently conducted.  To Sellers' Knowledge, each Seller is duly qualified or licensed and in good standing to do business in each jurisdiction in which the property owned, leased, held or operated by it or

the nature of its business makes such qualification or licensing necessary, except where the failure to be so qualified, licensed or in good standing has not been, and would not reasonably be expected to be, material to the Business or the Purchased Assets. Subject to entry of the Sale Order, the execution, delivery and performance by each Seller of this Agreement and the Related Agreements has been duly and validly approved on behalf of the board of directors or the managing member, as applicable, of each Seller and no other corporate or entity actions or proceedings on the part of Sellers is necessary to authorize this Agreement, each Seller's Related Agreements and the transactions contemplated hereby and thereby. Each Seller has duly and validly executed and delivered this Agreement and has duly and validly executed and delivered (or prior to or at the Closing will duly and validly execute and deliver) its Related Agreements. Subject to entry of the Sale Order, (i) this Agreement constitutes the legal, valid and binding obligation of each Seller and (ii) each Seller's Related Agreements, upon execution and delivery by such Seller, will constitute the legal, valid and binding obligations of such Seller, in each case, enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws in effect which affect the enforcement of creditors' rights generally and by equitable principles.

3.3    <u>Consents and Approvals</u>. To Sellers' Knowledge, except as set forth in <u>Section 3.3</u> of the Disclosure Schedule, the execution, delivery and performance by Sellers of this Agreement and the Related Agreements will not, subject to entry of the Sale Order, violate, conflict with or result in a breach of (with or without notice or lapse of time, or both), require a Consent, result in the loss of any material benefit under, require payment pursuant to, or give rise to a right of acceleration, termination, modification or loss of benefits under (i) any provision of any of the articles of incorporation, by-laws, certificate of formation or operating agreement, as applicable, of Sellers, (ii) any Permits and Licenses, order, writ, injunction, decree, statute, treaty, rule or regulation applicable to the Business, the Purchased Assets, Sellers or any of their assets or (iii) any Contract included in the Purchased Assets other than, in the case of clause (ii) and (iii) above, as would not reasonably be expected to result in a Material Adverse Effect.

3.4    <u>Compliance With Laws</u>. To Sellers' Knowledge, except as set forth in <u>Section 3.4</u> of the Disclosure Schedule, and subject to the requirements of the Bankruptcy Code, each Seller is operating the Business in compliance in all material respects with all Applicable Laws.

3.5    <u>Litigation</u>. To Sellers' Knowledge, except (i) for the general pendency of the Bankruptcy Case and related Proceedings that would not reasonably be expected to be, individually or in the aggregate, material to the Business or the Purchased Assets, (ii) for Proceedings identified in the Schedules and Statements and (iii) for the Proceedings described in <u>Section 3.5</u> of the Disclosure Schedule: (a) there is no Proceeding pending or threatened against Sellers or the Purchased Assets (except as have been addressed by the Bankruptcy Court) that would have the effect of prohibiting or otherwise restricting the ability of Sellers to consummate the transactions contemplated by this Agreement or any Related Agreement, and (b) Sellers are not subject to any outstanding Order that prohibits or otherwise restricts the ability of Sellers to consummate the transactions contemplated by this Agreement or any Related Agreement.

3.6    <u>Certain Financial Information</u>.

(a)    Attached to <u>Section 3.6(a)</u> of the Disclosure Schedule are true and complete copies of unaudited, consolidated balance sheets and related statement of operations and statement of cash flows of Sellers as of [Date(s)] (the "<u>Financial Statements</u>").

(b)    Except for liabilities reflected on the Schedules and Statements, Sellers do not have any material liabilities other than liabilities that have been incurred in the Ordinary Course of Business since the Petition Date.

(c)    All Acquired Receivables resulted from bona fide sales in the Ordinary Course of Business and represent the genuine, valid and legally enforceable indebtedness of the account debtor.  <u>Section 3.6(c)</u> of the Disclosure Schedule sets forth a true and complete list of all Accounts Receivable that are more than sixty (60) days past due as of the date hereof.

(d)    All Acquired Inventory is usable and salable in the Ordinary Course of Business.  Except as otherwise set forth on <u>Section 3.6(d)</u> of the Disclosure Schedule, no Acquired Inventory is held on a consignment basis.

(e)    <u>Section 3.6(e)</u> of the Disclosure Schedule sets forth a true and complete list of all capital leases secured by any of the Purchased Assets (the "<u>Capital Lease Obligations</u>").

3.7    <u>Real Property</u>.

<u>Section 3.7</u> of the Disclosure Schedule sets forth a complete and correct list of all of the real property owned by Sellers ("<u>Owned Real Property</u>").

3.8    <u>Material Contracts</u>.

(a)    <u>Section 3.8(a)</u> of the Disclosure Schedule contains a complete and correct list of the following types of Contracts to which a Seller is a Party relating to the Business (each Contract listed, and each Contract that should be listed, on <u>Section 3.8(a)</u> of the Disclosure Schedule being referred to as a "<u>Material Contract</u>"), a copy of which (as in effect on the date hereof), and including all amendments, supplements, restatements, waivers, side letters, addenda, exhibits, schedules and modifications thereto, has been furnished to Purchaser by Sellers:

(i)    any Contract pursuant to which a Seller is the lessee under any lease of real property, including the Acquired Real Property Leases;

(ii)    any Contract pursuant to which a Seller is the lessor under any lease of real property, including the Acquired Real Property Subleases

(iii)    any Contract pursuant to which a Seller leases any personal property, including the Acquired Personal Property Leases;

(iv)    any Oil Company Agreement;

(v)    any Fuel Supply Agreement;

20

(vi)     any Contract with a Governmental Authority;

(vii)    any Contract by which any material Intellectual Property Rights are (A) licensed by Sellers to a third party or (B) licensed to Sellers by a third party (other than Contracts that are shrinkwrap, clickwrap or other similar non-negotiable terms granted to the Sellers for third-party software that is available to the general public); and

(viii)   any collective bargaining Contract.

(b)     To Sellers' Knowledge, with respect to each Material Contract: (i) such Material Contract is the legal and valid obligation of the applicable Seller and each other party thereto, and constitutes the binding and enforceable obligation of such Seller and each other party thereto, in accordance with its terms; (ii) except as otherwise set forth in Section 3.8(b) of the Disclosure Schedule or as a result of the pendency of the Bankruptcy Case, no condition exists or event has occurred (including any condition or event that with notice or lapse of time, or both) would permit termination or modification in any manner materially adverse to the Business or the Purchased Assets.

3.9     Employees and Labor Matters.

(a)     Section 3.9(a) of the Disclosure Schedule sets forth the following information for each current Employee (including each current Employee on leave of absence): employer; name; date of hire; job title or position; current compensation paid or payable; status as exempt or non-exempt under the Fair Labor Standards Act of 1938, as amended; current base salary or rate of pay; bonus compensation (if any) paid or payable for calendar year 2022; accrued and unused vacation and other paid time-off (except for retail-level Employees); and leave status (including nature and duration of any leave).

(b)     To Sellers' Knowledge, no Employee is a party to, or is otherwise bound by, any agreement, including any confidentiality, noncompetition, or proprietary rights agreement, between such Employee and any other Person that in any way (i) adversely affects the performance of his or her duties as an Employee; (ii) adversely affects the ability of Sellers, or could reasonably be expected to adversely affect the ability of Purchaser after the Closing Date, to conduct the Business; or (iii) is being violated by virtue of the Employee's provision of services to Sellers.

(c)     No Seller is a party to any collective bargaining agreement or other labor union Contract applicable to the Employees and there are not any activities or Proceedings of any labor union to organize any of the Employees.

(d)     To Sellers' Knowledge, except as set forth in Section 3.9(d) of the Disclosure Schedule, the employment or other engagement of all Employees is terminable at will without any penalty or severance obligation of any kind on the part of the employer. All sums due for employee compensation and benefits and, except for retail-level Employees, all vacation time or paid time off owing to any Employees have been duly and adequately accrued on the accounting records of Sellers.

21

(e)     No Seller has effectuated (i) a "plant closing" (as defined in the WARN Act) in connection with the Business, or (ii) a "mass layoff" (as defined in the WARN Act) of individuals employed at or who primarily provided service to the Business.

3.10    Benefit Plans.

(a)     Section 3.10(a) of the Disclosure Schedule sets forth an accurate and complete list of all Benefit Plans.  Sellers have made available to Purchaser or its counsel a true and complete copy of all plan documents (including related trust agreements, funding arrangements, Form 5500s and insurance contracts and all amendments thereto) with respect to each Benefit Plan in which any Employees participate or are eligible to participate.

(b)     To Sellers' Knowledge, each Benefit Plan has been established, funded, maintained and administered in all material respects in accordance with its terms and in compliance with the applicable provisions of ERISA, the Code and other Applicable Law.  To Sellers' Knowledge, with respect to each Benefit Plan that is intended to qualify under Section 401(a) of the Code, Sellers have received a favorable determination, opinion or advisory letter with respect to such Benefit Plan and its related trust that has not been revoked and no circumstances exist and no events have occurred that could adversely affect the qualified status of such Benefit Plan or the related trust.  To Sellers' Knowledge, no Benefit Plan provides retiree health or life insurance benefits except as may be required by Section 4980B of the Code and Section 601 of ERISA or at the sole expense of the participant or the participant's beneficiary.  To Sellers' Knowledge, no Benefit Plan that provides health insurance or medical coverage is self-funded or self-insured and all premiums that have become due have been paid in full.

(c)     To Sellers' Knowledge, no Benefit Plan is (i) a "defined benefit plan" (as defined in Section 3(35) of ERISA), (ii) an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) that is subject to Title IV of ERISA or Sections 412 or 430 of the Internal Revenue Code, (iii) a "multiemployer plan" (as defined in Section 3(37) or 4001(a)(3) of ERISA), or (iv) a "multiple employer plan" within the meaning of Section 413(c) of the Code.

3.11    Permits and Licenses.  To Sellers' Knowledge, Sellers have made all filings and paid all fees and duties, in each case, necessary to maintain the Permits and Licenses, each of which is valid and in full force and effect.  To Sellers' Knowledge, except as otherwise set forth in Section 3.11 of the Disclosure Schedule or as a result of the pendency of the Bankruptcy Case, (i) each Seller is in compliance in all material respects with the Permits and Licenses included in the Purchased Assets, and no condition exists that with notice or passage of time or both would reasonably be expected to constitute a default under any such Permits and Licenses and (ii) no Seller has received any notice of any violation of any Permits and Licenses included in the Purchased Assets or notice of any proposal to revoke, cancel, rescind, modify or refuse to renew any of such Permits and Licenses.

3.12    Intellectual Property.

(a)     Section 3.12(a) of the Disclosure Schedule is a true and complete list of all (i) Patents; (ii) registered trademarks, service marks and trade names and those for which an application is pending; (iii) registered or applied for copyrights; and (iv) Internet domain names

and social media accounts, in each case, owned or purported to be owned by Sellers (items (i) through (iii), the "Registered Intellectual Property," together with all other Intellectual Property Rights owned or purported to be owned by each of the Sellers, collectively the "Owned Intellectual Property").

(b)     To Sellers' Knowledge, (i) other than pending applications included in the Registered Intellectual Property, the Registered Intellectual Property is subsisting, valid and enforceable, (ii) Sellers are not subject to any Order that restricts or impairs its use of any Owned Intellectual Property, and (iii) no Person has alleged, in a Proceeding to which a Seller is a party or otherwise, that any Owned Intellectual Property is not owned by a Seller or that rights thereto are invalid or unenforceable.

(c)     To Sellers' Knowledge, (i) Sellers exclusively own all right, title and interest in and to all Registered Intellectual Property and material Owned Intellectual Property, free and clear of all Liens, (ii)  Sellers have valid, subsisting and enforceable licenses to use all Intellectual Property Rights owned by any third party, including sufficient quantities of seat, server core, or other license units. Sellers are in compliance in all material respects with all licenses, and all license fees, renewal fees and maintenance fees that have become due have been timely paid by Sellers, including with respect to seat, server core or other unit license restrictions., and (iii) the consummation of the transactions contemplated by this Agreement will not alter or impair any rights of any Seller to Seller Intellectual Property.

(d)     To Sellers' Knowledge, except as set forth in Section 3.12(c) of the Disclosure Schedule, (i) the operation of the Business as conducted as of the date hereof does not, and the services provided by Sellers do not, infringe, misappropriate, or otherwise violate in any material respect, and have not during the Look-Back Period infringed, misappropriated or otherwise violated in any material respect, the Intellectual Property Rights of any third party, and no third party is infringing, misappropriating, or otherwise violating the Owned Intellectual Property, (ii) during the Look-Back Period, no Seller has received any communication regarding any actual, alleged or suspected material infringement, misappropriation or other material violation of Intellectual Property Rights of a third party by a Seller, and (iii) during the Look-Back Period, no Seller has sent any written notice, charge, complaint, claim or other written assertion asserting or threatening to assert in any Proceedings against any Person regarding the material infringement, misappropriation, dilution or other material violation of any Owned Intellectual Property.

(e)     To Sellers' Knowledge (i) no current or former employee or officer of Sellers and no current or former consultant or contractor of Sellers has any right, title or interest in or to any material Seller Intellectual Property, and (ii) no funding, facilities or personnel of any Governmental Authority or academic or research institution were used to develop or create, in whole or in part, any Owned Intellectual Property.

(f)     To Sellers' Knowledge, Sellers have taken commercially reasonable actions to safeguard and maintain the secrecy and the confidentiality of, and their respective proprietary rights in and to, all non-public Owned Intellectual Property.

(g)     To Sellers' Knowledge, (i) the computer software, computer hardware, firmware, networks, interfaces and related systems included in the Purchased Assets (collectively,

23

"Computer Systems") are sufficient in all material respects for the Sellers' operation of the Business and the Purchased Assets as conducted as of the date hereof and as contemplated to be conducted as of the date hereof, and (ii) except as set forth on Section 3.12(g) of the Disclosure Schedule, there have been no material failures, crashes, ransomware attacks, security breaches or similar adverse events affecting the Computer Systems.

3.13   Environmental Matters.

(a)   To Sellers' Knowledge, except as set forth in Section 3.13 of the Disclosure Schedule, there is no known or reported Environmental Claim pending or threatened against the Sellers or with respect to the Business or the Purchased Assets.

(b)   To Sellers' Knowledge, except as set forth in Section 3.13 of the Disclosure Schedule, no known or reported Release or threatened Release of Hazardous Material has occurred or is currently occurring at or from any property owned, operated, leased or used by the Sellers for which Environmental Law requires (i) notice to any Person or (ii) any form of Response Action.

(c)   To Sellers' Knowledge, except as set forth in Section 3.13 of the Disclosure Schedule, Sellers have not been notified under any Environmental Law to remove or remediate Contamination with respect to the Business or the Purchased Assets.

(d)   Sellers have identified and made available to Purchaser complete and correct copies of material information maintained in the Ordinary Course of Business relating to Hazardous Materials, Environmental Claims or Environmental Liabilities that are in its possession or control pertaining to the Business and the Purchased Assets.

3.14   Title to Assets; Sufficiency of Assets; Condition of Assets.   Pursuant to the Sale Order (i) the Sellers shall convey good and valid legal and beneficial title to, or a valid, binding and enforceable leasehold interest in, as applicable, all of the Purchased Assets, and (ii) such Purchased Assets are not subject to any Liens (other than (x) as of the date hereof, Permitted Liens and (y) as of the Closing Date, Permitted Post-Closing Encumbrances).   To Sellers' Knowledge, the Purchased Assets constitute (a) all of the tangible and intangible assets, rights and properties that are used or held for use by each Seller in connection with the Business, and (b) all of the assets, rights and properties necessary for the conduct of the Business in the Ordinary Course of Business following the Closing.   To Sellers' Knowledge, the Purchased Assets are in good working condition and are suitable for the purposes for which they are used (subject to normal wear and tear) including for Purchaser to conduct and operate the Business in the Ordinary Course of Business.

3.15   Taxes.   Except to the extent an inaccuracy of the following would neither result in a Lien on any of the Purchased Assets nor a Tax liability to the Purchaser, except as a result of the pendency of the Bankruptcy Case, or except as set forth on Section 3.15 of the Disclosure Schedule:

(a)   To Sellers' Knowledge, (i) all Tax Returns required to be filed by Sellers or otherwise related to the Purchased Assets or the Business have been duly and timely filed and each such Tax Return is true, correct and complete in all material respects, and (ii) all Taxes owed by Sellers or otherwise related to the Purchased Assets or the Business for which Purchaser may be

liable that are or have become due have been paid in full and all other Taxes attributable to pre-Closing periods have been fully accrued through Closing on the financials statements of Sellers.

(b)     To Sellers' Knowledge, (i) Sellers do not have in force any waiver of any statute of limitations in respect of Taxes or any extension of time related to a Tax assessment or deficiency with respect to the Purchased Assets or the Business, (ii) no extension of time within which to file any Tax Return with respect to the Purchased Assets or the Business is currently in effect, (iii) there is no audit, litigation or other Proceeding, Claim, assessment, deficiency, or adjustment pending, asserted, proposed or threatened with respect to Taxes of Sellers or otherwise with respect to the Purchased Assets or the Business, and (iv) all of the Purchased Assets have been properly listed and described on the property tax rolls for all periods prior to and including the Closing Date and no portion of the Purchased Assets constitutes omitted property for property tax purposes.  Pursuant to the Sale Order, Purchaser will not be held liable for any unpaid Taxes that are or have become due on or prior to the Closing Date as a successor or transferee, by statute, contract or otherwise, as a result of the transfer of the Purchased Assets pursuant to this Agreement.

3.16    Insurance.  Section 3.16 of the Disclosure Schedule sets forth a true and complete list of all insurance policies maintained by Sellers with respect to the Business, the Employees or the Purchased Assets (collectively, the "Insurance Policies").  To Sellers' Knowledge, (i) each Insurance Policy is in full force and effect and, except as otherwise set forth on Section 3.16 of the Disclosure Schedule, all premiums due to date thereunder have been paid in full and no Seller is in material default thereunder, and (ii) no Seller has received notice of cancellation or nonrenewal, in whole or in part, in respect of any Insurance Policy.

3.17    Brokers and Finders.  Other than as set forth on Section 3.17 of the Disclosure Schedule, no agent, broker, investment banker, financial advisor or other firm or person is entitled to any brokerage, finder's, financial advisor's or other similar fee or commission for which Purchaser could become liable in connection with the transactions contemplated by this Agreement as a result of any action taken by or on behalf of Sellers.

3.18    Disclaimer of Additional Representations and Warranties. EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, NEITHER SELLERS, NOR ANY OF THEIR AFFILIATES, NOR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, CONTROLLING PERSONS, AGENTS OR REPRESENTATIVES MAKES OR HAS MADE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR OF THE ACCURACY OR COMPLETENESS OF ANY PROJECTIONS, ESTIMATES OR OTHER FORWARD LOOKING INFORMATION PROVIDED OR OTHERWISE MADE AVAILABLE TO PURCHASER, ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, CONTROLLING PERSONS, AGENTS OR REPRESENTATIVES.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers as of the date hereof and as of the Closing, as follows:

4.1     Due Organization.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of [Insert] with all requisite power and authority to own and operate its assets and properties as they are now being owned and operated.

4.2     Due Authorization.  Purchaser has full power and authority to enter into this Agreement and its Related Agreements and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Purchaser of this Agreement and its Related Agreements have been duly authorized by all necessary entity action of Purchaser. Purchaser has duly and validly executed and delivered this Agreement and has duly and validly executed and delivered (or prior to or at the Closing will duly and validly execute and deliver) its Related Agreements.  This Agreement constitutes the legal, valid and binding obligation of Purchaser and its Related Agreements, upon execution and delivery by Purchaser, will constitute legal, valid and binding obligations of Purchaser enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws in effect which affect the enforcement of creditors' rights generally and by equitable principles.

4.3     Consents and Approvals; No Violations.  The execution, delivery and performance by Purchaser of this Agreement and its Related Agreements will not (i) violate any law, regulation or order of any Governmental Authority applicable to Purchaser; (ii) except for filings that may be required pursuant to ARTICLE IX, require any filing or registration by Purchaser with, or consent or approval with respect to Purchaser of, any Governmental Authority; (iii) violate or conflict with or result in a breach or default under any Contract to which Purchaser is a party or by which Purchaser or any of its assets or properties are bound; or (iv) violate or conflict with the certificate of formation or limited liability company agreement of Purchaser, except where any such filing, registration, consent or approval, if not made or obtained, or any such violation, conflict, breach or default, would not have a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby.

4.4     Purchaser's Examination.  Purchaser and its representatives have been afforded the opportunity to meet with, ask questions of and receive answers from the management of Sellers in connection with the determination by Purchaser to enter into this Agreement and the Related Agreements and consummate the transactions contemplated hereby and thereby, and all such questions have been answered to the reasonable satisfaction of Purchaser.

4.5     Investigation; Limitation on Warranties.

(a)     Purchaser acknowledges and agrees that neither Sellers, nor any other Person acting on behalf of Sellers or any of their Affiliates or representatives has made any representation or warranty, express or implied, as to the accuracy or completeness of any

26

information regarding Sellers, the Business or the Purchased Assets, except as expressly set forth in this Agreement or the Related Agreements or as and to the extent required by this Agreement to be set forth in the Disclosure Schedule. Purchaser further agrees that, except only as expressly provided in this Agreement or the Related Agreements, Sellers will not have or be subject to any liability to Purchaser or any other Person resulting from the distribution or use by Purchaser, any of its Affiliates or any of their respective directors, officers, employees, agents, consultants, accountants, counsel or other representatives of any such information, and any legal opinions, memoranda, summaries or any other information, document or material made available to Purchaser or its Affiliates or representatives in certain "data rooms," management presentations or any other form otherwise provided in expectation of the transactions contemplated by this Agreement.

(b)     Purchaser acknowledges and agrees that except for the representations and warranties of Sellers expressly set forth in <u>ARTICLE III</u> hereof and the Related Agreements, the Purchased Assets are being acquired "AS IS, WHERE IS" WITHOUT ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR INTENDED USE OR OTHER EXPRESSED OR IMPLIED WARRANTY.  Purchaser acknowledges and agrees that it is consummating the transactions contemplated hereby without any representation or warranty, express or implied, by any Person, except for the representations and warranties of Sellers expressly set forth in <u>ARTICLE III</u> hereof.

(c)     In connection with Purchaser's investigation of Sellers and the Business, Purchaser has received from or on behalf of Sellers certain projections, including projected statements of operating revenues and income from operations of the Business and certain business plan information of Sellers.  Purchaser acknowledges that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Purchaser is familiar with such uncertainties, that Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections and forecasts), and that Purchaser shall have no claim against Sellers or any other Person with respect thereto.  Accordingly, Sellers make no representations or warranties whatsoever with respect to such estimates, projections and other forecasts and plans (including the reasonableness of the assumptions underlying such estimates, projections and forecasts) except as set forth in <u>ARTICLE III</u>.  Purchaser is relying on the representations and warranties of Sellers regardless of the knowledge obtained through its own investigation, diligence or otherwise.

4.6     <u>Available Funds</u>.  Purchaser has sufficient cash resources on hand or available to it in an aggregate amount sufficient to pay in cash any and all amounts required to be paid by it pursuant to this Agreement, including the Cash Consideration and all fees and expenses related to the transactions contemplated by this Agreement to be paid by Purchaser.

4.7     <u>Brokers and Finders</u>.  No agent, broker, investment banker, financial advisor or other firm or person is entitled to any brokerage, finder's, financial advisor's or other similar fee or commission for which a Seller could become liable in connection with the transactions contemplated by this Agreement as a result of any action taken by or on behalf of Purchaser.

## ARTICLE V

## COVENANTS

5.1    <u>Access to Information and Applicable Locations</u>.

(a)    From the date of this Agreement to the earlier of the Closing Date or the date this Agreement is terminated, subject to the Confidentiality Agreement, each shall give Purchaser and Purchaser's representatives, upon reasonable notice, reasonable access during normal business hours to the offices, Facility, employees, and non-privileged books and records relating to the Business, and shall make the officers and employees of Sellers available to Purchaser and its representatives as Purchaser and its representatives shall from time to time reasonably request, in each case to the extent that such access and disclosure would not obligate Sellers to take any actions that would unreasonably disrupt the normal course of their businesses or violate the terms of any contract to which a Seller is bound or any Applicable Law; <u>provided</u>, that all requests for access shall be directed to Michael Healy, the Chief Restructuring Officer of Sellers (the "<u>Designated Contact</u>").  Notwithstanding the foregoing, other than the Designated Contact, Purchaser is not authorized to and shall not (and shall cause its employees, agents, representatives and Affiliates to not) contact any officer, director, employee, franchisee, Dealer, customer, supplier, distributor, lender or other material business relation of Sellers prior to the Closing without the prior written consent of the Designated Contact (it being agreed that if the Designated Contact elects to give any such consent, the consent may be conditioned upon, among other things, Sellers being able to monitor or participate in any such contacts and any discussions or dialogue resulting therefrom).  Purchaser acknowledges and agrees that the access contemplated by this <u>Section 5.1</u> shall be subject to such terms, conditions, times and other means as may be determined by the Designated Contact in his discretion.

(b)    Purchaser and their representatives shall treat and hold strictly confidential any confidential information (in whatever form) provided by or on behalf of Sellers to the extent required by the Confidentiality Agreement.

5.2    <u>Preservation of Business</u>.  From the date of this Agreement until the Closing Date, other than as specifically contemplated by this Agreement or with the prior consent of Purchaser, Sellers shall (a) operate the Business in the Ordinary Course of Business and (b) use commercially reasonable efforts to preserve intact the Purchased Assets and the Business and preserve the Business's goodwill and relationships with customers, suppliers, distributors and others having material business dealings with the Sellers or the Business.

5.3    <u>Efforts</u>.  Subject to the terms and conditions hereof, each party hereto shall use its commercially reasonable efforts to consummate the transactions contemplated hereby as promptly as practicable.  The "commercially reasonable efforts" of Sellers shall not require Sellers, nor any of their Affiliates or representatives, to incur or expend any material sums of money to remedy any breach of any representation or warranty hereunder or to provide financing to Purchaser for consummation of the transaction contemplated herein; provided that, if Sellers, their Affiliates or their representatives elect to remedy any such breach, Sellers shall not be deemed to be in breach of such representation or warranty, or in violation of any covenant pursuant to <u>Section 5.2</u>, for

28

purposes of determining Purchaser's obligations to consummate the transaction contemplated herein pursuant to Section 6.1.

5.4     Preservation of Records; Post-Closing Access and Cooperation.  For a period of six (6) years after the Closing Date or such other period (if longer) required by Applicable Law, Purchaser shall preserve and retain, all corporate, accounting, legal, auditing, human resources and other books and records included in the Purchased Assets that are in its possession relating to the Business and the Purchased Assets prior to the Closing Date.  Purchaser shall, after the Closing Date, (a) permit Sellers' counsel and other professionals and counsel for any successor to Sellers and its professionals, including a liquidating trust or other representative of the estates of Sellers in the Bankruptcy Case (collectively, "Permitted Access Parties") reasonable access, for the purpose of Sellers' tax reporting requirements, financial accounting, implementation of any plan of reorganization that may be confirmed in the Bankruptcy Case, and compliance with Applicable Law, to the material financial and other books and records included in the Purchased Assets that are in its possession, during regular business hours and upon reasonable advance notice, which access shall include (i) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such documents and records as they may reasonably request in furtherance of the purposes described above, and (ii) Purchaser's copying and delivering to the relevant Permitted Access Parties such documents or records as they may reasonably request in furtherance of the purposes described above, but only to the extent such Permitted Access Parties furnish Purchaser with reasonably detailed written descriptions of the materials to be so copied and the applicable Permitted Access Party reimburses the Purchaser for the reasonable costs and expenses thereof, and (b) Purchaser shall provide the Permitted Access Parties (at no cost to the Permitted Access Parties) with reasonable access to a representative during regular business hours and upon reasonable advance notice so that Sellers and the other Permitted Access Parties have information necessary for the preparation of tax returns, collection of those Accounts Receivable that are Excluded Assets, and other activities in connection with the administration and wind-down of the Bankruptcy Case; provided that such access does not unreasonably interfere with the Purchaser's operation of the Business and Purchaser shall not be required to provide access for requests unrelated to the Business or the Purchased Assets.  Nothing in this Section 5.4 shall require Purchaser to take any such action if (a) such action (i) could result in a waiver or breach of any attorney-client, attorney work product or other legally recognized privileges or immunity from disclosure or (ii) would result in the disclosure of any trade secrets of third parties or violate any Applicable Laws related to the exchange of information or any obligation of Purchaser with respect to confidentiality, or (b) such access or information is requested in relation to disputes involving Purchaser, its equity holders or any of their respective Affiliates or the Business or Purchased Assets, including disputes arising under this Agreement or any other Related Agreement.

5.5     Employees and Benefits.

(a)     As of the Closing, Sellers shall terminate the employment of the Employees identified on Section 5.5(a) of the Disclosure Schedule (the "Subject Employees").  Section 5.5(a) of the Disclosure Schedule hereto shall be amended from time to time prior to the Closing to delete any individuals who are no longer employed by Sellers.  Purchaser, in cooperation with Sellers, shall, at least five (5) Business Days prior to the Closing Date and effective as of the Closing Date, extend a written offer of employment to those Subject Employees selected by Purchaser, in its sole and absolute discretion (the "Selected Employees"), at a level and with responsibilities that are

substantially commensurate with their employment by Sellers and at a wage or salary and bonus opportunity not less than the respective wage or salary and bonus opportunity specified for such Selected Employees on Section 5.5(a) of the Disclosure Schedule and with other benefits substantially comparable to those provided to similarly situated employees of the Purchaser. Those Selected Employees who accept offers of employment with Purchaser and who become employees of Purchaser as of the Closing Date are referred to as "Transferred Employees." Notwithstanding Purchaser's discretion to choose the Selected Employees, Purchaser shall ensure that it has identified sufficient Subject Employees as Selected Employees to avoid any liability to Sellers in the Bankruptcy Case under the WARN Act.

(b)    It is understood and agreed between the parties that all provisions contained in this Agreement with respect to Benefit Plans or employee compensation are included for the sole benefit of the respective parties hereto and do not and shall not create any right in any other person, including, but not limited to, any Employee, any participant in any benefit or compensation plan or any beneficiary thereof.

(c)    In any termination or layoff of any Transferred Employee by Purchaser on or after the Closing, Purchaser will comply fully, if applicable, with the WARN Act and all other applicable foreign, Federal, state and local laws, including those prohibiting discrimination and requiring notice to employees. Purchaser shall not at any time prior to ninety (90) days after the Closing Date, effectuate a "plant closing" or "mass layoff" as those terms are defined in the WARN Act affecting in whole or in part any facility, site of employment, operating unit or employee of the Business without complying fully with the requirements of the WARN Act. Purchaser shall be solely responsible for, and will bear the entire cost of, compliance with (or failure to comply with) any such laws following the Closing Date.

(d)    To the extent permissible under the Benefit Plans of Purchaser as of the Closing Date, Purchaser shall administer COBRA continuation coverage (other than with respect to flexible spending accounts) for M&A Qualified Beneficiaries (as defined in COBRA) that both (x) are Subject Employees (and not probationary or inactive employees as of the Closing Date) and (y) were not made offers of employment by Purchaser in accordance with Section 5.5(a).

5.6    Public Announcements. Purchaser and Sellers will consult with each other before issuing any press release or otherwise making any public statements or disclosures with respect to the transactions contemplated by this Agreement, including the terms hereof, and no party shall, without the prior written consent of the other party, issue any such press release or make any such public statement, except as may be required by Applicable Law; provided, however, that Sellers may make public statements or disclosures with respect to this Agreement and the transactions contemplated herein as may be necessary or advisable in connection with the Bankruptcy Case, including, without limitation, to comply with the Bid Procedures Order and/or in seeking issuance of the Sale Order.

5.7    Transfer Taxes.    To the extent that any sales, purchase, transfer, stamp, documentary stamp, registration, use or similar taxes ("Transfer Taxes") are payable by reason of the sale of the Purchased Assets under this Agreement, such Transfer Taxes shall be borne and timely paid by Purchaser. Purchaser and Sellers shall reasonably cooperate in good faith to

minimize, to the extent permissible under Applicable Law, the amount of any Transfer Taxes that might otherwise be imposed in connection with the transactions contemplated by this Agreement.

5.8     Tax Proration.  All Property Taxes levied with respect to the Purchased Assets for any taxable period falling entirely within the period ending on or before the Closing Date shall be the responsibility of Sellers.  All Property Taxes levied with respect to the Purchased Assets for any taxable period that includes the Closing Date and ends after the Closing Date, whether imposed or assessed before or after the Closing Date will be prorated based on the number of days in such period that occur before the Closing Date, on the one hand, and the number of days in such period that occur on or after the Closing Date, on the other hand, the amount of such Property Taxes allocable to the portion of the period ending before the Closing Date being the responsibility of Sellers and the remainder being the responsibility of Purchaser.  If the exact amount of any Property Taxes is not known on the Closing Date, such taxes shall be estimated based upon the best available information at the time of Closing (i.e., the taxable value currently assigned to the real property).  There shall be no re-proration of Property Taxes after Closing.  The amount of such Property Taxes allocable to Sellers pursuant to this Section 5.8 that have not been paid prior to Closing, if any, shall be paid to the appropriate Governmental Authority by Purchaser, but shall result in a reduction of the Cash Consideration in like amount.

5.9     Non-Tax Proration.  Liability for utility charges and rents will be allocated and prorated between Purchaser and Sellers through the Closing Date to reflect the principle that Sellers shall be responsible for all expenses arising prior to or on the Closing Date, and Purchaser shall be responsible for all expenses arising after the Closing Date.  To the extent that any of such items are paid by Sellers prior to the Closing or are payable by Purchaser or Sellers after the Closing Date, such items shall be apportioned as of the Closing Date, such that Sellers shall be liable for (and shall reimburse Purchaser to the extent that Purchaser shall pay) that portion of any such item relating or attributable to periods prior to the Closing Date (except to the extent that such item is an Assumed Liability), and Purchaser shall be liable for (and shall reimburse Sellers to the extent Sellers shall have paid) that portion of any such item relating or attributable to periods on or after the Closing Date.  If any amounts to be prorated have not been finally determined on the Closing Date, a mutually satisfactory estimate of such amounts made on the basis of Sellers' records shall be used as a basis for settlement at Closing, and the amount finally determined will be prorated as of the Closing Date, and appropriate settlement made as soon as practicable after such final determination.  If as a result of any such settlement in accordance with the preceding sentence, either party is owed an amount from the other party, then the appropriate party shall make reimbursement for such amounts.  Sellers and Purchaser agree to furnish each other with such documents and other records as each party reasonably requests in order to confirm all adjustment and proration calculations made pursuant to this Section 5.9.  Final payment to a party as reimbursement for an expense under this Section 5.9 shall be made within two (2) Business Days following the later of: (i) final determination of the party responsible for payment of such expense; or (ii) when such expense is actually paid.

5.10     Hart-Scott-Rodino Act.

(a)     Purchaser and Sellers agree, promptly after execution of this Agreement, to the extent any such filings have not been made prior to such date, to file Notification and Report Forms with the Federal Trade Commission ("FTC") and Antitrust Division of the United States

Department of Justice ("DOJ") as required by the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), and to give, submit, make and deliver, as applicable, all notices, filings, petitions, statements, registrations, submissions of information, applications and submissions of other documents in connection with the same. Each of Purchaser and Sellers shall cause all documents that it is responsible for filing with any governmental authority under this Section 5.10 to comply in all material respects with all applicable legal requirements, and Purchaser shall bear and pay any and all filing fees and the like for applications or filings necessary under the HSR Act.

(b)     Purchaser agrees to, and will cause its Affiliates to, use reasonable best efforts to take any and all actions necessary to avoid, eliminate and resolve any and all impediments under any Antitrust Law or trade regulation law that may be asserted by any Governmental Authority or any other Person with respect to the transaction contemplated by this Agreement and to obtain all consents, approvals and waivers under any Antitrust Law that may be required by any Governmental Authority to enable the parties to close the transaction as promptly as practicable. In addition, if any action or proceeding is instituted (or threatened) challenging the transaction as violating any Antitrust Law or if any decree, order, judgment or injunction (whether temporary, preliminary or permanent) is entered, enforced or attempted to be entered or enforced by any Governmental Authority that would make the transaction illegal or otherwise delay or prohibit the consummation of the transaction, Purchaser and its Affiliates shall take any and all actions to contest and defend any such claim, cause of action or proceeding to avoid entry of, or to have vacated, lifted, reversed, repealed, rescinded or terminated, any decree, order, judgment or injunction (whether temporary, preliminary or permanent) that prohibits, prevents or restricts consummation of the transaction.

(c)     Except where prohibited by applicable legal requirements, Sellers and Purchaser shall each consult with the other prior to taking a position with respect to any such filing, shall permit the other to review and discuss in advance, and consider in good faith the views of the other in connection with any analyses, appearances, presentations, memoranda, briefs, white papers, other materials, arguments, opinions and proposals before making or submitting any of the foregoing to any governmental authority in connection with any investigations or proceedings in connection with this Agreement or the transactions contemplated hereby, coordinate with the other in preparing and providing such information and promptly provide the other (and its counsel) copies of all filings, presentations and submissions (and a summary of oral presentations) made by such party to or with any governmental authority in connection with this Agreement and the transactions contemplated hereby.

(d)     Purchaser and Sellers shall each notify the other promptly upon the receipt of (i) any comments from any officials of any governmental authority in connection with any filings made pursuant hereto, and (ii) any request by any officials of any governmental authority for amendments or supplements to any filings made pursuant to, or information provided to comply in all materials respect with, applicable legal requirements. Whenever any event occurs that is required to be set forth in an amendment or supplement to any filing made pursuant to this Section 5.10, Purchaser or Sellers, as the case may be, will promptly inform the other of such occurrence and cooperate in filing with the applicable governmental authority such amendment or supplement.

(e)      Notwithstanding the foregoing provisions of this <u>Section 5.10</u>, neither Purchaser nor Sellers shall be required to litigate with any governmental authority.

5.11    <u>Use of Names and Marks</u>.  As soon as reasonably practicable after the Closing, but in no event more than thirty (30) Business Days after the Closing, Sellers shall cause an amendment to the certificate or articles of incorporation or formation (or any equivalent organizational documents) of Sellers to be filed with the appropriate Governmental Authority and shall take all other action necessary to change each Seller's legal, registered, assumed, trade and "doing business as" name, as applicable, to a name or names not containing any Acquired Intellectual Property Rights, and will cause to be filed as soon as practicable after the Closing, in all jurisdictions in which a Seller is qualified to do business, any documents necessary to reflect such change in its legal, registered, assumed, trade and "doing business as" name, as applicable, or to terminate its qualification therein.

5.12    <u>No Successor Liability</u>.  The parties hereto agree that the Sale Order shall provide that to the fullest extent permitted by Applicable Law (including under Section 363(f) of the Bankruptcy Code), (a) Purchaser shall not be liable for any liability or Lien (other than Assumed Liabilities) against the Sellers and (b) Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Purchased Assets or any liabilities of Sellers arising prior to the Closing Date.

5.13    <u>Assumption and Assignment of Contracts</u>.  At the Closing, Sellers shall assume and assign to Purchaser the Acquired Contracts, Acquired Real Property Leases, Acquired Real Property Subleases, Acquired Personal Property Leases and Permits and Licenses, and Purchaser shall pay in full the Cure Costs (as a component of the Purchase Price and in addition to the Cash Consideration), in each case pursuant to Section 365 of the Bankruptcy Code, the Sale Order and <u>Sections 2.1</u> and <u>2.6</u>, subject to Purchaser's provision of adequate assurance as may be required under Section 365 of the Bankruptcy Code, <u>provided that</u>, with respect to Cure Costs for which an objection has been filed that has not been consensually resolved by the parties or determined by the Bankruptcy Court at or prior to the Sale Hearing, Purchaser shall pay such disputed Cure Cost amount into the Escrow in accordance with the Sale Order pending final resolution of such dispute. Purchaser will be entitled to any amount remaining in the Escrow after the final resolution of all disputed Cure Costs and the payment from the Escrow of all amounts finally determined to be owed.  Notwithstanding anything to the contrary in this Agreement, Purchaser expressly acknowledges that a Seller's inability to assume and assign any Acquired Contracts, Acquired Real Property Leases, Acquired Real Property Subleases, Acquired Personal Property Leases and/or Permits and Licenses by reason of Purchaser's failure to provide adequate assurance of future performance with respect thereto to the Bankruptcy Court's satisfaction shall have no effect on Purchaser's obligation to consummate the transactions set forth herein and any such Acquired Contracts, Acquired Real Property Leases, Acquired Real Property Subleases, Acquired Personal Property Leases and/or Permits and Licenses that a Seller fails to so assume and assign at the Closing shall for all purposes thereafter be deemed an Excluded Asset.

5.14    <u>Transfer of 401(k) Plan</u>.  From and after the date of the Auction (if Purchaser is the Successful Bidder), Sellers and Purchaser shall cooperate and use reasonable best efforts to determine the advisability of transferring the assets and liabilities of any Seller's 401(k) plan

relating to the Transferred Employees to the Purchaser's 401(k) plan (excluding those employees who retired effective on or prior to the date of transfer) in accordance with applicable requirements of a Seller's 401(k) plan, Purchaser's 401(k) plan and the Code.  In order to implement this <u>Section 5.14</u> (as applicable), Purchaser and Sellers shall cooperate in the exchange of information, the notification of Transferred Employees, and the preparation of any documentation required to implement any such transfer.  Without limiting the generality of the foregoing, Sellers shall promptly provide Purchaser with such documents and other information as Purchaser shall reasonably request in connection with the foregoing, and in connection with any such transfers agreed by the Sellers and the Purchaser.

      5.15    <u>Benefit Plan Cooperation</u>.  Prior to the Closing, Sellers shall cooperate in good faith with and provide reasonable assistance to Purchaser in connection with and to facilitate Purchaser and/or its Affiliates' establishment of new health, welfare and retirement plans for the Transferred Employees (including, without limitation, Sellers' prompt execution and delivery of broker access and change of broker forms in respect of Benefit Plans in form and content reasonably satisfactory to Sellers and the delivery of claims and other participant information, in each case, as reasonably requested by Purchaser and not prohibited or restricted by applicable law).

ARTICLE VI

CONDITIONS PRECEDENT TO OBLIGATIONS<br>OF PURCHASER

      The obligations of Purchaser at Closing under this Agreement are subject to the satisfaction (or waiver by Purchaser) of the following conditions precedent on or before the Closing Date:

      6.1    <u>Warranties True as of Present Date</u>.  Each of the representations and warranties of Sellers contained in <u>ARTICLE III</u> (a) that are qualified as to Material Adverse Effect shall be true and correct in all respects as of the Closing Date as if made anew as of such date (except to the extent such representations and warranties expressly relate to an earlier date (in which case, as of such earlier date)), except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the transactions contemplated hereby; and (b) that are not so qualified shall be true and correct (without giving effect to any qualifications as to "materiality," "Material Adverse Effect" or similar qualifications as to materiality) as of the Closing Date as if made anew as of such date (except to the extent such representations and warranties expressly relate to an earlier date (in which case, as of such earlier date)), except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the transactions contemplated hereby and except for failures of such representations and warranties to be true and correct as do not and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

      6.2    <u>Compliance with Agreements and Covenants</u>.  Sellers shall have, in all material respects, performed and complied with all of the covenants, obligations and agreements contained in this Agreement to be performed by, and complied with, them on or prior to the Closing Date (including delivery of the documents referred to in <u>Section 2.7(b)</u>.

34

6.3     No Prohibition.  No law or injunction shall have been adopted, promulgated or entered by any Governmental Authority which prohibits, and no lawsuit, proceeding or investigation shall be pending, which would be reasonably expected to prohibit, the consummation of the transactions contemplated hereby.

6.4     Entry of Sale Order.  The Sale Order shall have been entered by the Bankruptcy Court, shall be in full force and effect, and shall not have been vacated, reversed, stayed, modified or amended in any manner not approved by Purchaser, and the stay imposed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure has expired or the Bankruptcy Court has ordered otherwise.

6.5     No Material Adverse Effect.  Since the date of this Agreement, no Material Adverse Effect shall have occurred and be continuing.

6.6     HSR Clearance.  All applicable waiting periods (and any extensions thereof) under the HSR Act shall have expired or been terminated or clearance has been obtained, as applicable.

Any waiver of a condition by Purchaser shall be effective only if such waiver is stated in writing and signed by Purchaser; provided, however, that the consent of Purchaser to the Closing shall constitute a waiver by Purchaser of any conditions to Closing as to Purchaser not satisfied as of the Closing Date.

ARTICLE VII

CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS

The obligations of Sellers at Closing under this Agreement are subject to the satisfaction (or waiver in writing by Sellers) of the following conditions precedent on or before the Closing Date:

7.1     Warranties True as of Present Date.  Each of the representations and warranties of Purchaser contained in ARTICLE IV (a) that are qualified as to "material adverse effect" shall be true and correct as of the Closing Date as if made anew as of such date (except to the extent such representations and warranties expressly relate to an earlier date (in which case, as of such earlier date)), except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the transactions contemplated hereby, and (b) that are not so qualified shall be true and correct as of the Closing Date as if made anew as of such date (except to the extent such representations and warranties expressly relate to an earlier date (in which case, as of such earlier date)), except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the transactions contemplated hereby and except for failures of the representations and warranties referred to in this clause (b) to be true and correct as do not and would not reasonably be expected to have, in the aggregate, a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereby.

7.2     Compliance with Agreements and Covenants.  Purchaser shall have performed and complied with all of its covenants, obligations and agreements contained in this Agreement to be performed and complied with by it on or prior to the Closing Date, in all material respects, including delivery of the documents referred to in Section 2.7(b) hereof.

7.3     <u>No Prohibition</u>.  No law or injunction shall have been adopted, promulgated or entered by any Governmental Authority which prohibits and no lawsuit, proceeding or investigation shall be pending, which would be reasonably expected to prohibit the consummation of the transactions contemplated hereby.

7.4     <u>Entry of Sale Order</u>.  The Sale Order shall have been entered by the Bankruptcy Court, shall be in full force and effect, and shall not have been vacated, reversed, stayed, modified or amended in any manner not approved by Sellers, and the stay imposed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure has expired or the Bankruptcy Court has ordered otherwise.

7.5     <u>HSR Clearance</u>.  All applicable waiting periods (and any extensions thereof) under the HSR Act shall have expired or been terminated or clearance has been obtained, as applicable.

Any waiver of a condition by Sellers shall be effective only if such waiver is stated in writing and signed by the Sellers; provided, however, that the consent of Sellers to the Closing shall constitute a waiver by the Sellers of any conditions to Closing as to Sellers not satisfied as of the Closing Date.

## ARTICLE VIII

## TERMINATION

8.1     <u>Termination</u>.  This Agreement may be terminated at any time on or prior to the Closing Date:

(a)     With the mutual written consent of Purchaser and Sellers;

(b)     By either Purchaser or Sellers, if the Closing shall not have occurred on or before [Date], as such date may be extended with the mutual agreement of Purchaser and Sellers (the "<u>Termination Date</u>"); <u>provided</u>, that the right to terminate this Agreement under this <u>Section 8.1(b)</u> shall not be available to any party whose failure to fulfill any obligation under this Agreement has been the primary cause of, or primarily resulted in, the failure of the Closing to occur on or before the Termination Date;

(c)     By Sellers, if Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (A) would give rise to the failure of a condition set forth in <u>Section 7.1</u> or <u>Section 7.2</u> and (B) has not been or is incapable of being cured by Purchaser within ten (10) Business Days after its receipt of written notice thereof from Sellers;

(d)     By Purchaser, if Sellers shall have breached or failed to perform any of their representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (A) would give rise to the failure of a condition set forth in <u>Section 6.1</u> or <u>Section 6.2</u> and (B) has not been or is incapable of being cured by Sellers within ten (10) Business Days after their receipt of written notice thereof from Purchaser;

(e)      By Sellers, if (i) all of the conditions set forth in <u>ARTICLE VI</u> have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing) and (ii) Purchaser fails to proceed with and consummate the Closing within three (3) Business Days after receipt of written notice from Sellers that Sellers are ready, willing and able to proceed with and consummate the Closing;

(f)      By Purchaser, if (i) all of the conditions set forth in <u>Article VII</u> have been satisfied or waived (other than those conditions that by their terms are to be satisfied at the Closing) and (ii) Sellers fail to proceed with and consummate the Closing within three (3) Business Days after receipt of written notice from Purchaser that Purchaser is ready, willing and able to proceed with and consummate the Closing;

(g)      By either Purchaser or Sellers, if any Governmental Authority shall have issued an order, decree or ruling or taken any other action permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement, and such order, decree, ruling or other action shall have become final and nonappealable;

(h)      Automatically if Sellers consummate any Alternative Transaction with someone other than Purchaser involving the Purchased Assets;

(i)      By Sellers, if (i) the conditions set forth in <u>Section 6.6</u> and <u>Section 7.5</u> shall not have been satisfied on and as of the date of the Auction, and (ii) Sellers determine that, as of the Auction, Purchaser is not a "qualified bidder" for the Auction and as a result of such determination, Purchaser is not permitted to participate in and bid at, the Auction; or

(j)      By Purchaser, if: (i) Purchaser is not selected and designated as the Successful Bidder in the Notice of Successful Bidder to be filed by Sellers in accordance with the Bid Procedures Order; or (ii) the Sale Order shall not have been entered on or before [Date].

Notwithstanding anything else contained in this Agreement, the right to terminate this Agreement under this <u>Section 8.1</u> shall not be available to any party (a) that is in material breach of its obligations hereunder or (b) whose failure to fulfill its obligations or to comply with its covenants under this Agreement has been the primary cause of, or primarily resulted in, the failure to satisfy any condition to the obligations of either party hereunder.

For the avoidance of doubt, each Seller agrees that any rules, criteria or factors used in connection with any determination that Purchaser is not a "qualified bidder" for the Auction, and that Purchaser may not participate in or bid at the Auction, shall be applied by Sellers, in their reasonable discretion, consistently across all other prospective bidders in the Auction; it being agreed that Sellers' disqualification of Purchaser from participation in the Auction solely or primarily to eliminate the Bid Protections shall not constitute reasonable cause for determining Purchaser is not a "qualified bidder."

8.2      <u>Expenses</u>.  Except with regard to the Expense Reimbursement or as otherwise provided in <u>Section 10.16</u>, below, whether or not the Closing occurs, all Expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such Expenses.  As used in this Agreement, "<u>Expenses</u>" means the out-of-pocket fees and expenses of the party's independent advisor(s), counsel, accountants and other

consultants, incurred or paid by the party or on its behalf in connection with this Agreement and the transactions contemplated hereby.

8.3    Effect of Termination.  In the event of termination of this Agreement by either Purchaser or Sellers as provided in Section 8.1, this Agreement will forthwith become void and have no further force or effect, without any liability (other than as set forth in Section 8.2, this Section 8.3, or Section 9.2) on the part of Purchaser or Sellers; provided, however, that the provisions of Section 8.2, this Section 8.3, Section **Error! Reference source not found.**, Section 9.2 and Sections 10.11 and 10.12 will survive any termination hereof; provided, further, however, that subject to the terms of this Section 8.3, nothing in this Section 8.3 shall relieve any party of any liability for any breach by such party of this Agreement prior to the date of any such termination.  For the avoidance of doubt, upon any termination of this Agreement pursuant to Section 8.1(c) or (e) above, Sellers shall have the right to collect the Deposit from the Escrow Holder as liquidated damages in accordance with Section **Error! Reference source not found.** above.  In connection with any termination pursuant to this Agreement (other than pursuant to Section 8.1(c) or Section 8.1(e)), Purchaser shall be entitled to the prompt return of the Deposit, less an amount equal to Purchaser's share of the Escrow Holder's actual expenses.  In the event of termination of this Agreement as provided in Section 8.1(g) or Section 8.1(i), Purchaser shall be entitled to the Bid Protections subject to entry of the Bid Procedures Order and Sellers shall pay the Bid Protections to Purchaser solely from the proceeds of such Alternative Transaction consistent with the terms of the Bid Procedures Order and Section 9.2 of this Agreement.

8.4    No Survival.  Upon and following the Closing, (i) the representations and warranties of Sellers set forth in this Agreement or any Related Agreement shall terminate and be of no further force and effect, and (ii) Sellers will have no liability for a breach of any representation or warranty.


ARTICLE IX

BANKRUPTCY COURT MATTERS

9.1    Motion for Approvals.

(a)    No later than the times set forth in the Bid Procedures Order, Sellers will make all filings and give all notices relating to this Agreement as Sellers are required to make and give pursuant to the Bid Procedures Order. Sellers shall take all actions as may be reasonably necessary to obtain entry of the Sale Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" Purchaser under Section 363(m) of the Bankruptcy Code.  Except for Sellers' obligations under Section 9.2(b) hereof, both Purchaser's and Sellers' obligations to consummate the transactions contemplated in this Agreement shall be conditioned upon the Bankruptcy Court's entry of the Sale Order.  If the

Bankruptcy Court refuses to issue the Sale Order or to approve a sale of the Purchased Assets to Purchaser at the hearing on the Sale Motion, then this transaction shall automatically terminate and Sellers and the Purchaser shall be relieved of any further liability or obligation hereunder, except for Sellers' obligations under <u>Section 9.2(b)</u> hereof.  Upon entry of the Sale Order in accordance with the provisions of this <u>Section 9.1(a)</u>, the condition set forth in this <u>Section 9.1(a)</u> shall conclusively be deemed satisfied.

(b)  Purchaser and Sellers shall consult with each other regarding pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably be expected to adversely affect the Bankruptcy Court's approval of the Sale Order, including, sharing in advance any drafts for the other's review and comment, it being agreed that each party shall give reasonable consideration to any comments the other(s) may provide within a reasonable time prior to the filing of any of such pleading.  No party hereto shall seek any modification to the Sale Order entered by the Bankruptcy Court without the prior written consent of the other(s) in its/their sole discretion.

9.2     <u>Bid Procedures and Bid Protections</u>.

(a)  Purchaser and Sellers shall take all actions as may be reasonably necessary to carry out the process contemplated in the Bid Procedures Order, including obtaining entry of the Sale Order on or before the Termination Date.

(b)  Subject to entry of the Bid Procedures Order, Purchaser shall be entitled to payment of the Bid Protections if, as and when provided in the Bid Procedures Order.  Purchaser shall be entitled to payment of the Bid Protections only in the event that Purchaser is not approved by the Bankruptcy Court as the Purchaser of the Purchased Assets and such assets (or substantially all thereof) are instead sold pursuant to a consummated Alternative Transaction for consideration in excess of the Purchase Price, which payment shall be made to the Purchaser concurrently with, and solely from the proceeds of, the consummation of such Alternative Transaction.  The Bid Procedures Order shall provide that the amount of the Bid Protections shall act as a credit in favor of Purchaser at the Auction as compared to bids that may be submitted by competing bidder(s). To the extent of any inconsistency between this Agreement and the Bid Procedures Order as to any matter covered or addressed in the Bid Procedures Order, the terms and provisions of the Bid Procedures Order shall govern and control.

(c)  Notwithstanding anything to the contrary in this Agreement, in the event that an Alternative Buyer is approved by the Bankruptcy Court as the acquirer of the Purchased Assets at the Sale Hearing, this Agreement shall not terminate, but instead shall remain in full force and effect as a "back-up bid" for the Purchased Assets which shall remain open for Sellers to provide written notice to Purchaser of acceptance during a period of thirty (30) days following the Sale Hearing, but subject and subordinate in all respects to the rights of the Alternative Buyer under the Alternative Transaction.  If Sellers provide timely notice of acceptance, then this Agreement shall remain in full force and effect until Closing or termination pursuant to the terms hereof.

(d)     Sellers and Purchaser shall take all actions as may be reasonably necessary to obtain entry of the Bid Procedures Order, including furnishing customary affidavits, declarations or other documents or information for filing with the Bankruptcy Court.

## ARTICLE X

## MISCELLANEOUS

10.1     <u>Amendment</u>.  This Agreement may be amended, modified or supplemented only in a writing signed by Purchaser and Sellers.

10.2     <u>Notices</u>.  Any notice, request, instruction or other document to be given hereunder by a party hereto shall be in writing and shall be deemed to have been given, (i) when received if given in person or by courier or a courier service, (ii) on the date of transmission if sent by confirmed electronic mail, (iii) on the next Business Day if sent by an overnight delivery service, or (iv) five Business Days after being deposited in the U.S. mail, certified or registered mail, postage prepaid:

(a)     If to Sellers, addressed as follows:

Michael Healy
Chief Restructuring Officer
c/o Mountain Express Oil Company
1166 Avenue of the Americas
15th Floor
New York, NY 10036
Email:  Michael.Healy@fticonsulting.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Attention: Jeffrey N. Pomerantz, Esq.
Email:  jpomerantz@pszjlaw.com

(b)     If to Purchaser, addressed as follows:

[Insert]

with a copy (which shall not constitute notice) to:

[Insert]

or to such other individual or address as a party hereto may designate for itself by notice given as herein provided.

10.3     Waivers.  The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same.  No waiver by a party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach in other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

10.4     Counterparts.  This Agreement may be executed in counterparts and such counterparts may be delivered in electronic format (including by email).  Such delivery of counterparts shall be conclusive evidence of the intent to be bound hereby and each such counterpart and copies produced therefrom shall have the same effect as an original.  To the extent applicable, the foregoing constitutes the election of the parties to invoke any law authorizing electronic signatures.

10.5     Interpretation.  The headings preceding the text of Articles and Sections included in this Agreement and the headings to Sections of the Disclosure Schedule are for convenience only and shall not be deemed part of this Agreement or the Disclosure Schedule or be given any effect in interpreting this Agreement or the Disclosure Schedule.  The use of the masculine, feminine or neuter gender herein shall not limit any provision of this Agreement.  The use of the terms "including" or "include" shall in all cases herein mean "including, without limitation" or "include, without limitation," respectively.  The term "made available to Purchaser" means made available in the Data Room at least two (2) Business Days prior to the date hereof.  Underscored references to Articles, Sections, Exhibits or Schedules shall refer to those portions of this Agreement.  Neither Purchaser nor Sellers shall be deemed to be in breach of any covenant contained in this Agreement if such party's deemed breach is the result of any action or inaction on the part of the other.

10.6     Time of the Essence.  The parties hereto acknowledge and agree that time is strictly of the essence with respect to each and every term, covenant and agreement in this Agreement and that the failure to timely perform any of the obligations hereunder shall constitute a breach of, and a default under, this Agreement by the party so failing to perform.  Purchaser and Sellers agree to exercise their best efforts promptly following the execution of this Agreement to submit, make and deliver, as applicable, all notices, filings, petitions, statements, registrations, submissions of information, applications and submissions of other documents in order to obtain clearance under the HSR Act for the transactions contemplated by this Agreement.

10.7     Applicable Law.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF TEXAS WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAW THEREOF.

10.8     Binding Agreement; Assignment.  This Agreement and the Related Agreements shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided that neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned (including by operation of law) by any party without the prior written consent of the other party(ies). For all purposes hereof, a transfer, sale or disposition

41

of a majority of the capital stock or other voting interest of a party (whether by contract or otherwise) shall be deemed an assignment requiring consent hereunder.  Any purported assignment in contravention of this <u>Section 10.8</u> shall be null and void. Notwithstanding the foregoing or anything else in this Agreement to the contrary, Purchaser may (a) transfer or assign its rights, interests or obligations under this Agreement, in whole or from time to time in part, to one or more of its Affiliates, provided that Purchaser will remain liable for the performance of its obligations and will provide notice to Sellers of such assignment and (b) collaterally assign its rights hereunder to any lender of Purchaser.

10.9   <u>Third Party Beneficiaries</u>.  This Agreement is solely for the benefit of the parties hereto and no provision of this Agreement shall be deemed to confer upon third parties, either express or implied, any remedy, claim, liability, reimbursement, cause of action or other right.

10.10   <u>Further Assurances</u>.  Upon the reasonable request of Purchaser or Sellers, each party will on and after the Closing Date execute and deliver to the other parties such other documents, assignments and other instruments as may be reasonably required (without imposing any material monetary obligations or other obligations beyond those specifically imposed on the cooperating party(ies) by the other provisions of this Agreement or the Related Agreements) to effectuate completely the transactions contemplated hereby, and to effect and evidence the provisions of this Agreement and the Related Agreements and the transactions contemplated hereby.  For the avoidance of doubt, as to Sellers, the obligations set forth in this <u>Section 10.10</u> shall lapse and cease to be of any further force or effect upon the closing of the Bankruptcy Case.

10.11   <u>Entire Understanding</u>.   The Exhibits, Schedules and Disclosure Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.  This Agreement and the Related Agreements set forth the entire agreement and understanding of the parties hereto and supersedes any and all prior agreements, arrangements and understandings among the parties.

10.12   <u>EXCLUSIVE JURISDICTION OF BANKRUPTCY COURT</u>.  IN THE EVENT ANY PARTY TO THIS AGREEMENT COMMENCES ANY LITIGATION, PROCEEDING OR OTHER LEGAL ACTION IN CONNECTION WITH OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN OR THEREIN, THE PARTIES TO THIS AGREEMENT HEREBY (A) AGREE ANY LITIGATION, PROCEEDING OR OTHER LEGAL ACTION SHALL BE INSTITUTED ONLY IN THE BANKRUPTCY COURT, WHICH SHALL HAVE SOLE AND EXCLUSIVE JURISDICTION OVER ANY SUCH MATTERS; (B) CONSENT AND SUBMIT TO PERSONAL JURISDICTION OF THE BANKRUPTCY COURT AND TO SERVICE OF PROCESS UPON THEM IN ACCORDANCE WITH THE RULES AND STATUTES GOVERNING SERVICE OF PROCESS; AND (C) AGREE TO WAIVE TO THE FULL EXTENT PERMITTED BY LAW ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH LITIGATION, PROCEEDING OR ACTION IN ANY SUCH COURT OR THAT ANY SUCH LITIGATION, PROCEEDING OR ACTION WAS BROUGHT IN AN INCONVENIENT FORUM.

10.13   <u>WAIVER OF JURY TRIAL</u>.   EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT

IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.13</u>.

10.14   <u>Disclosure Schedule</u>.  The inclusion of information in the Disclosure Schedule shall not be construed as an admission that such information is material to Sellers or the Business.  In addition, matters reflected in the Disclosure Schedule are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedule.  Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature.  Neither the specifications of any dollar amount in any provision of this Agreement nor the inclusion of any specific item in the Disclosure Schedule is intended to imply that such amount, or higher or lower amounts, or the item so included or other items, are or are not material, and no party shall use the fact of the setting forth of any such amount or the inclusion of any such item in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in the Disclosure Schedule is or is not material for purposes of this Agreement.  Further, neither the specification of any item or matter in any representation, warranty or covenant contained in this Agreement nor the inclusion of any specific item in the Disclosure Schedule is intended to imply that such item or matter, or other items or matters, are or are not in the ordinary course of business, and no party shall use the fact of setting forth or the inclusion of any such items or matter in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in the Disclosure Schedule is or is not in the ordinary course of business for purposes of this Agreement. Provided that any such amended disclosure does not materially affect the value of the Purchased Assets or result in additional liability to Purchaser, Purchaser and Sellers may mutually agree at any time prior to Closing to amend all schedules to correct errors and to add omitted items, or new items that first arise or occur after the date hereof.

10.15   <u>Severability</u>.   Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other situation or in any other jurisdiction.  If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be

43

enforceable as so modified after the expiration of the time within which the judgment may be appealed.

10.16   <u>Attorneys' Fees</u>.   In the event that Sellers or Purchaser bring an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing party(ies) in that action or proceeding shall be entitled to have and recover from the non-prevailing party(ies) all such reasonable, out of pocket fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party(ies) may suffer or incur in the pursuit or defense of such action or proceeding.

10.17   <u>Construction</u>.   The parties have participated jointly in the negotiation and drafting of this Agreement.   In the event an ambiguity or question of intent or interpretation arises, the language shall be construed as mutually chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party.   Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

10.18   <u>Survival</u>.   Except for Purchaser's representations and acknowledgments set forth in <u>Sections 4.5</u> and <u>4.7</u> hereof and Sellers' representations set forth in <u>Sections 3.1</u>, <u>3.2</u> and <u>3.17</u> of this Agreement (all of which shall survive and continue in force following the Closing) and without in any way affecting Sellers' disclaimer set forth in <u>Section 3.22</u> hereof, the respective representations and warranties of Purchaser and Sellers under this Agreement shall lapse and cease to be of any further force or effect effective immediately following the Closing.   Except as provided in the immediately preceding sentence, the covenants and agreements of Sellers and Purchaser herein, or in any certificates or other documents delivered prior to or at the Closing, shall not be deemed waived or otherwise affected by the Closing.

10.19   <u>No Vicarious Liability</u>.   This Agreement may only be enforced against the parties hereto and their respective successors and permitted assigns.   Any Claims or Proceedings that may be based upon, arise out of, or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) may be made only against the Persons that are signatories to this Agreement, and their respective successors and permitted assigns, and no agent, Affiliate or representative of any such Person (including any Person negotiating or executing this Agreement on behalf of such Person), will have any liability with respect to this Agreement or with respect to any Claim that may arise out of or relate to this Agreement, or the negotiation, execution, or performance of this Agreement (including a representation or warranty made in connection with this Agreement or as an inducement to enter into this Agreement).   Nothing in this <u>Section 10.19</u> will impair or adversely affect the rights of Purchaser or any other Person set forth in any other Contract executed and delivered in connection with the consummation of the transactions contemplated under this Agreement and the Related Agreements.

10.20   <u>Specific Performance</u>.   The parties agree that irreparable damage would occur if any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached.   Accordingly, from and after the entry of the Sale Order, Sellers, on the one hand, and Purchaser on the other hand, will be entitled to obtain an injunction or injunctions to

prevent breach of the provisions of this Agreement and to enforce specifically this Agreement and its terms and provisions, without the necessity of proving the inadequacy of money damages as a remedy, in addition to any other remedy to which they may be entitled, at law or in equity.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**SELLERS:**

**Mountain Express Oil Company,** a Georgia corporation

By:_____
    Name:  [Insert]
    Title:  [Insert]

**MEX Subsidiaries (listed on Schedule A)**

By:_____
    Name:  [Insert]
    Title:  [Insert]

**PURCHASER:**

[Insert], a [Insert] corporation

By:_____
    Name:  [Insert]
    Title:  [Insert]

46

# SCHEDULE A

# MEX SUBSIDIARIES

| | |
|---|---|
| Consolidated HR Services, LLC (WY) | West Hill Ranch Group LLC (DE) |
| Mountain Express Oil Company Southeast, LLC (GA) | MEX North Alabama, LLC (GA) |
| Alabama Terminal Property, LLC (GA) | B&T Petroleum LLC (NV) |
| Spartan Tank Management LLC (GA) | Star Mountain Express, LLC (TX) |
| Mississippi MEX Company, LLC (MS) | Mountain Express Baking and Coffee Co. (GA) |
| Texas MEX Limited Company, LLC (TX) | Mountain Express Ethanol Company (GA) |

| | |
|---|---|
| WHRG Retail Ops LLC (WY) | WHRGOPS SE-MS LLC (WY) |
| WHRGOPS NE LLC (WY) | WHRGOPS SE-MS-JACKSON LLC (WY) |
| WHRGOPS NE-PA LLC (WY) | WHRGOPS SE-SC LLC (WY) |
| WHRGOPS NE-NY LLC (WY) | WHRGOPS SE-TN LLC (WY) |
| WHRGOPS NE-NY-LI LLC | WHRGOPS SE-AL-North LLC (WY) |
| WHRGOPS NW LLC (WY) | WHRGOPS SE-TN-WTN LLC (WY) |
| WHRGOPS NW-MI LLC (WY) | WHRGOPS SW LLC (WY) |
| WHRGOPS NW-WI LLC (WY) | WHRGOPS SW-AR LLC (WY) |
| WHRGOPS NW-IA LLC (WY) | WHRGOPS SW-OK LLC (WY) |
| WHRGOPS NW-KS LLC (WY) | WHRGOPS SW-TX LLC (WY) |
| WHRGOPS NW-MO LLC (WY) | WHRGOPS SW-AR-NWAR LLC (WY) |
| WHRGOPS NW-WI-NWI LLC (WY) | WHRGOPS SW-OK-OKC LLC (WY) |
| WHRGOPS NW-IA-WIA LLC (WY) | WHRGOPS SW-TX-STX LLC (WY) |
| WHRGOPS NW-MO-NMO LLC (WY) | WHRGOPS SW-TX-Dallas LLC (WY) |
| WHRGOPS SE LLC (WY) | |

| | |
|---|---|
| WHRG TC LLC (WY) | WHRG TC-SE LLC (WY) |
| WHRG TC-NE LLC (WY) | WHRG TC-SE-AL LLC (WY) |
| WHRG TC-NE-PA LLC (WY) | WHRG TC-SE-SC LLC (WY) |
| WHRG TC-NW LLC (WY) | WHRG TC-SW LLC (WY) |
| WHRG TC-NW-ND LLC (WY) | WHRG TC-SW-AR LLC (WY) |
| WHRG TC-NW-IA LLC (WY) | WHRG TC-SW-LA LLC (WY) |
| WHRG TC-NW-KS LLC (WY) | Webster P LLC (WY) |
| WHRG TC-NW-MO LLC (WY) | Webster P II LLC (WY) |
| WHRG TC-NW-WY LLC (WY) | |

| | |
|---|---|
| MEX RE Holdings LLC (WY) | MEX RE-NW-WI LLC (WY) |
| MEX RE-NE LLC (WY) | MEX RE-SE LLC (WY) |
| MEX RE-NE-NJ LLC (WY) | MEX RE-SE-AL LLC (WY) |
| MEX RE-NE-NY LLC (WY) | MEX RE SE-FL LLC (WY) |
| MEX RE-NE-IN LLC (WY) | MEX RE-SE-MS LLC (WY) |
| MEX RE-NE-OH LLC (WY) | MEX RE-SE-GA LLC (WY) |
| MEX RE-NE-PA LLC (WY) | MEX RE-SE-NC LLC (WY) |
| MEX RE-NE-NY-LI LLC (WY) | MEX RE-SE-SC LLC (WY) |
| MEX RE-NW LLC (WY) | MEX RE-SE-TN LLC (WY) |
| MEX RE-NW-IA LLC (WY) | MEX RE-SW LLC (WY) |
| MEX RE-NW-KS LLC (WY) | MEX RE-SW-OK LLC (WY) |
| MEX RE-NW-MN LLC (WY) | MEX RE-SW-TX LLC (WY) |
| MEX RE-NW-MO LLC (WY) | MEX RE-SW-LA LLC (WY) |
| MEX RE-NW-ND LLC (WY) | MEX RE-SW-AR LLC (WY) |

| | |
|---|---|
| MEX Fuels LLC (WY) | MEX Fuels NW-IA LLC (WY) |
| MEX Fuels NE LLC (WY) | MEX Fuels NW-MO LLC (WY) |
| MEX Fuels NE-NY LLC (WY) | MEX Fuels SE LLC (WY) |
| MEX Fuels NE-NJ LLC (WY) | MEX Fuels SE-GA LLC (WY) |
| MEX Fuels NE-IN LLC (WY) | MEX Fuels SE-MS LLC (WY) |
| MEX Fuels NE-OH LLC (WY) | MEX Fuels SE-TN LLC (WY) |
| MEX Fuels NE-KY LLC (WY) | MEX Fuels SW LLC (WY) |
| MEX Fuels NE-IL LLC (WY) | MEX Fuels SW-OK LLC (WY) |
| MEX Fuels NW LLC (WY) | MEX Fuels SW-LA LLC (WY) |

| | |
|---|---|
| WHRG-LA, LLC (LA) | Madison Auto Truck Plaza and Lucky Dollar Casino, LLC (LA) |

| | |
|---|---|
| WHRG-LA2, LLC (LA) | Avondale Investments, LLC |
| Brothers Petroleum, LLC (LA) | Lapalco Brothers No. 25, LLC (LA) |
| Newton Brothers, Inc. (LA) | 8692 River Road, LLC (LA) |
| Brothers I-10 Service Road, Inc. (LA) | Brothers Carol Sue, LLC (LA) |
| 4408 S. I-10 Service Road LLC (LA) | Gause Operation, LLC (LA) |
| Crowder Brothers, LLC (LA) | 4940 Groom Road, LLC (LA) |
| Exxon General DeGaulle, LLC (LA) | 2601 Gen. DeGaulle LLC (LA) |
| 4662 GDD LLC (LA) | 9410 Greenwell Springs, LLC (LA) |
| 5310 Flannery Road, LLC (LA) | 4115 Airline Hgwy., LLC (LA) |
| 4520 Jefferson Highway LLC (LA) | 798 Jean Lafitte, LLC (LA) |
| Jamie Boulevard, LLC (LA) | 3049 Loyola Drive LLC (LA) |
| 13289 Old Hammond Highway LLC (LA) | South Claiborne Operation LLC (LA) |
| 1308 Jefferson Davis LLC (LA) | 1600 Manhattan Blvd, LLC (LA) |
| 2850 Belle Chasse Hgwy LLC (LA) | 4915 Westbank Expwy LLC (LA) |
| 2698 Barataria Blvd LLC (LA) | 2701 Canal Street LLC (LA) |
| 1227 Veterans, LLC (LA) | 300 Lee Drive LLC (LA) |
| Brothers Belle Chasse, LLC (LA) | Brothers Expressway, Inc. (LA) |
| Avondale Brothers No 128 LLC (LA) | Brothers Stonebridge, Inc. (LA) |
| 1200 Wego LLC (LA) | Brothers Terry Parkway, Inc. (LA) |

## SCHEDULES AND EXHIBITS

*{Provided separately}*