United States Bankruptcy Court
Southern District of Texas

**ENTERED**

July 19, 2023

Nathan Ochsner, Clerk

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| MOUNTAIN EXPRESS OIL COMPANY, et al., | Case No. 23-90147 (DRJ) |
| Debtors.[1] | (Jointly Administered) |

## ORDER APPROVING SECOND AMENDMENT TO SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

(Related Docket Nos. 332 & 1020)

Upon the motion (the "Motion")[2] of the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases seeking approval of that certain Second Amendment (the "Second Amendment") to *Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement* dated as of March 23, 2023 (the "DIP Credit Agreement"); and the Court having considered all objections, if any, to the Motion; and upon the record made by the Motion and the exhibits attached thereto and declarations and other evidence submitted in support thereof; and after due deliberation and consideration, and good and sufficient cause appearing therefor,

## IT IS HEREBY FOUND AND CONCLUDED THAT:

1.     The Second Amendment is approved and the Debtors are authorized and empowered to execute and consummate the Second Amendment.

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at www.kccllc.net/mountainexpressoil. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these chapter 11 cases is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022.

[2]    Capitalized terms used but not immediately defined shall have the meanings ascribed to them in the Motion.

2.      Subject to the terms, conditions, and limitations of the DIP Loan Documents and the Final DIP Order, the Debtors are hereby authorized to request loans under the DIP Credit Agreement up to the amended Maximum Advance Amount of **$46.85 million**.

3.      This Order is effective immediately notwithstanding anything to the contrary in Bankruptcy Rules 6004(a) or 6004(h).

4.      Except as expressly set forth herein, the Final DIP Order remains in full force and effect.

5.      The Court has and will retain jurisdiction to enforce the terms of, and any and all matters arising from or related to, the Second Amendment and/or this Order.

**Signed:  July 19, 2023.**

_____
**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

# EXHIBIT A

## Second Amendment

**SECOND AMENDMENT TO SENIOR SECURED, SUPER-PRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

THIS SECOND AMENDMENT TO SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement"), dated as of July 19, 2023, is by and among MOUNTAIN EXPRESS OIL COMPANY, a Georgia corporation (the "Company" or the "Borrower"), the persons identified as the Guarantors on the signature pages hereto (together with the Borrower, the "Loan Parties"), the persons identified as the Lenders on the signature pages hereto (the "Lenders"), and FIRST HORIZON BANK, as Administrative Agent (in such capacity, together with its successors and assigns in such capacity, "Agent").

**W I T N E S S E T H :**

WHEREAS, on March 18, 2023 (the "Petition Date"), the Loan Parties commenced jointly administered voluntary cases under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") (each a "Case" and, collectively, the "Cases");

WHEREAS, Debtors, the Agent, and Lenders are parties to that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement dated as of March 23, 3023 (as amended by that certain First Amendment to Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement dated as of April 28, 2023, and as further amended, restated, supplemented, or otherwise modified prior to the date hereof, the "Postpetition Credit Agreement"; capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Postpetition Credit Agreement);

WHEREAS, the Bankruptcy Court entered its Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-1 (i) Authorizing the Debtors to Use Cash Collateral and Obtain Post-Petition Financing, (ii) Granting Liens and Providing Super-Priority Administrative Expense Status, (iii) Granting Adequate Protection, and (iv) Granting Related Relief (the "Final DIP Order"), on April 25, 2023;

WHEREAS, Borrower has requested that Agent and Lenders (a) amend certain provisions of the Postpetition Credit Agreement and (b) provide for additional Term Loan commitments to be provided by certain of the Lenders;

WHEREAS, Agent and Lenders are willing to do so on the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the agreements herein contained and other good and valuable consideration, the parties hereby agree as follows:

PART I.
DEFINITIONS

SUBPART 1.1  Certain Definitions.  Unless otherwise defined herein or the context otherwise requires, the following terms used in this Agreement, including its preamble and recitals, have the following meanings:

"Amended Credit Agreement" means the Postpetition Credit Agreement as amended hereby.

"Second Amendment Effective Date" shall have the meaning set forth in Subpart 3.1.

*ACTIVE 686991212v2*

SUBPART 1.2 <u>Other Definitions</u>.  Unless otherwise defined herein or the context otherwise requires, terms used in this Agreement, including its preamble and recitals, have the meanings provided in the Amended Credit Agreement.

## PART II.
## AMENDMENTS

SUBPART 2.1 <u>Amendments to Credit Agreement</u>.  Upon the Second Amendment Effective Date, the Postpetition Credit Agreement is hereby modified and amended as follows:

(a)     by deleting the stricken text (indicated textually in the same manner as the following example: <s>stricken text</s>) and by adding the double-underlined text (indicated textually in the same manner as the following example: <u>double-underlined text</u>) as set forth in the marked pages of the Postpetition Credit Agreement attached as <u>Annex A</u> hereto;

(b)     by amending and restating <u>Schedule 1</u> thereto in its entirety in the form set forth as Schedule 1 attached hereto; and

## PART III.
## CONDITIONS TO EFFECTIVENESS

SUBPART 3.1 <u>Effective Date</u>.  This Agreement shall be and become effective as of the date set forth in the preamble to this Agreement (the "<u>Second Amendment Effective Date</u>"), subject to the following conditions having been satisfied in full:

(a)     Each Loan Party and each Lender shall have executed and delivered counterparts of this Agreement to Agent;

(b)     After giving effect to this Agreement, (i) the representations and warranties of Borrower contained in <u>Subpart 4.6</u> hereof shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) on and as of the Second Amendment Effective Date, except to the extent that such representations and warranties expressly relate to an earlier date (in which event such representations and warranties shall have been true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date) and (ii) no Default shall have occurred and be continuing;

(c)     the Bankruptcy Court shall have entered an order approving this Agreement, and

(d)     all other documents and legal matters in connection with the transactions contemplated by this Agreement shall have been delivered, executed, or recorded and shall be in form and substance satisfactory to Agent.

## PART IV.
## MISCELLANEOUS

SUBPART 4.1 <u>No Additional Obligations</u>.  Each Loan Party acknowledges and agrees that the execution, delivery and performance of this Agreement shall not create (nor shall such Loan Party rely upon the existence of or claim or assert that there exists) any obligation of any of Agent or Lenders to consider or agree to any other amendment of or waiver or consent with respect to the Amended Credit Agreement or any other instrument or agreement to which Agent or any Lender is a party (collectively, an "<u>Additional Amendment</u>" or "<u>Consent</u>"), and in the event that Agent and Lenders subsequently agree to consider any

2

requested Additional Amendment or Consent, neither the existence of this Agreement nor any other conduct of Agent or Lenders related hereto, shall be of any force or effect on Lenders' consideration or decision with respect to any such requested Additional Amendment or Consent, and Lenders shall not have any obligation whatsoever to consider or agree to any such Additional Amendment or Consent.

SUBPART 4.2  Waiver of Claims.  In order to induce Agent and Lenders to enter into this Agreement, each Loan Party hereby releases, remises, acquits and forever discharges each Lender and Agent and each of their respective employees, agents, representatives, consultants, attorneys, officers, directors, partners, fiduciaries, predecessors, successors and assigns, subsidiary corporations, parent corporations and related corporate divisions (collectively, the "Released Parties"), from any and all actions, causes of action, judgments, executions, suits, debts, claims, demands, liabilities, damages and expenses of any and every character, known or unknown, direct or indirect, at law or in equity, of whatever nature or kind, whether heretofore or hereafter arising, for or because of any manner of things done, omitted or suffered to be done by any of the Released Parties, prior to and including the date of execution hereof, and in any way directly or indirectly arising out of any or in any way connected to this Agreement, the Amended Credit Agreement, or the other Loan Documents (collectively, the "Released Matters") provided, that the foregoing shall not apply as to any Released Party to matters resulting solely from such Released Party's own willful misconduct or gross negligence.  Each Loan Party hereby acknowledges that the agreements in this Subpart 4.2 are intended to be in full satisfaction of all or any alleged injuries or damages arising in connection with the Released Matters.  Each Loan Party hereby represents and warrants to each Lender and Agent that it has not purported to transfer, assign or otherwise convey any right, title or interest of in any Released Matter to any other Person and that the foregoing constitutes a full and complete release of all Released Matters.

SUBPART 4.3  Acknowledgments and Stipulations.  In order to induce Agent and Lenders to enter into this Agreement, each Loan Party acknowledges, stipulates and agrees that (a) all of the Obligations are absolutely due and owing to Agent and Lenders in accordance with the terms and provisions of the Amended Credit Agreement without any defense, deduction, offset or counterclaim (and, to the extent any Loan Party had any defense, deduction, offset or counterclaim on the date hereof, the same is hereby waived by such Loan Party); (b) the Loan Documents executed by the Loan Parties are legal, valid and binding obligations of such Loan Party, enforceable against such Loan Party in accordance with their respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally; (c) the Liens granted by each Loan Party to Agent in the Collateral are valid and duly perfected, first priority Liens, subject only to Permitted Prior Liens; (d) each of the recitals contained at the beginning of this Agreement is true and correct; and (e) prior to executing this Agreement, the Loan Parties consulted with and had the benefit of advice of legal counsel of its own selection and has relied upon the advice of such counsel, and in no part upon the representation of Agent, any Lender or any counsel to Agent or any Lender concerning the legal effects of this Agreement or any provision hereof.

SUBPART 4.4  Cross-References.  References in this Agreement to any Part or Subpart are, unless otherwise specified, to such Part or Subpart of this Agreement.

SUBPART 4.5  References in Other Loan Documents.  At such time as this Agreement shall become effective pursuant to the terms of Part IV, all references in the Postpetition Credit Agreement (including without limitation the Schedules thereto) to the "Agreement", and all references in the other Loan Documents to the "Credit Agreement", shall be deemed to refer to the Amended Credit Agreement.

SUBPART 4.6  Representations and Warranties of Borrower.  Borrower hereby represents and warrants that, after giving effect to this Agreement, (a) the representations and warranties contained in Section 7 of the Postpetition Credit Agreement are correct in all material respects on and as of the date

3

hereof as though made on and as of such date, except to the extent that any such representation or warranty specifically relates to an earlier date, and (b) no Default exists under the Postpetition Credit Agreement. Without limitation of the preceding sentence, each Loan Party hereby expressly reaffirms the validity, effectiveness and enforceability of each Loan Document to which it is a party (in each case, as the same may be modified by the terms of this Agreement).

SUBPART 4.7  <u>This Agreement Constitutes a Loan Document</u>.  Without limiting the generality of anything contained in the Amended Credit Agreement, this Agreement constitutes a Loan Document.  The breach of any representation, covenant, agreement or obligation of any Loan Party set forth herein shall constitute a Default.

SUBPART 4.8  <u>Counterparts</u>.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in <u>Part III</u>, this Agreement shall become effective when it shall have been executed by the Agent and when the Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

SUBPART 4.9  <u>Choice of Law; Venue</u>.  THIS AGREEMENT SUPPLEMENTS, AND FORMS A PART OF, THE POSTPETITION CREDIT AGREEMENT, BUT (FOR THE AVOIDANCE OF DOUBT) THE PARTIES HERETO IN ANY EVENT SPECIFICALLY AGREE (WITHOUT LIMITATION OF THE FIRST PART OF THIS SENTENCE) THAT THE PROVISIONS OF <u>ARTICLE 14</u> OF THE POSTPETITION CREDIT AGREEMENT APPLY TO THIS AGREEMENT, *MUTATIS MUTANDIS*.

SUBPART 4.10 <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

4

Each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

**BORROWER**:

MOUNTAIN EXPRESS OIL COMPANY,
a Georgia corporation

By: _____
　　　 Michael Healy
　　　 Chief Restructuring Officer

**GUARANTORS**:

Loan Parties listed on following page

By: _____
　　　 Michael Healy
　　　 Chief Restructuring Officer

[MEX—SECOND AMENDMENT]

## GUARANTORS

1200 Wego LLC
1227 Veterans, LLC
1308 Jefferson Davis LLC
13289 Old Hammond Highway LLC
1600 Manhattan Blvd, LLC
2601 Gen. Degaulle LLC
2698 Barataria Blvd LLC
2701 Canal Street LLC
2850 Belle Chasse Hgwy LLC
300 Lee Drive LLC
3049 Loyola Drive L.L.C.
4115 Airline Hgwy., LLC
4408 S. I-10 Service Road LLC
4520 Jefferson Highway LLC
4662 GDD LLC
4915 Westbank Expwy LLC
4940 Groom Road, L.L.C.
5310 Flannery Road, LLC
798 Jean Lafitte, L.L.C.
8692 River Road, LLC
9410 Greenwell Springs, LLC
Alabama Terminal Property, LLC
Avondale Brothers No 128 LLC
Avondale Investments, L.L.C.
B&T Petroleum LLC
Brothers Belle Chasse, L.L.C.
Brothers Carol Sue, LLC
Brothers Expressway, Inc.
Brothers I-10 Service Road, Inc.
Brothers Petroleum, L.L.C.
Brothers Stonebridge, Inc.
Brothers Terry Parkway, Inc.
CONSOLIDATED HR SERVICES LLC
Crowder Brothers, LLC
Exxon General Degaulle, LLC
Gause Operation, L.L.C.
Jamie Boulevard, LLC
Lapalco Brothers No. 125, LLC
Madison Auto Truck Plaza And Lucky Dollar Casino, LLC
MEX Fuels LLC
MEX Fuels NE LLC
MEX Fuels NE-IL LLC
MEX Fuels NE-IN LLC
MEX Fuels NE-KY LLC
MEX Fuels NE-NJ LLC
MEX Fuels NE-NY LLC
MEX Fuels NE-OH LLC
MEX Fuels NW LLC
MEX Fuels NW-IA LLC

[MEX—SECOND AMENDMENT]

MEX Fuels NW-MO LLC
MEX Fuels SE LLC
MEX Fuels SE-GA LLC
MEX Fuels SE-MS LLC
MEX Fuels SE-TN LLC
MEX Fuels SW LLC
MEX Fuels SW-LA LLC
MEX Fuels SW-OK LLC
MEX North Alabama, LLC
MEX RE Holdings LLC
MEX RE-NE LLC
MEX RE-NE-IN LLC
MEX RE-NE-NJ LLC
MEX RE-NE-NY LLC
MEX RE-NE-NY-LI LLC
MEX RE-NE-OH LLC
MEX RE-NE-PA LLC
MEX RE-NW LLC
MEX RE-NW-IA LLC
MEX RE-NW-KS LLC
MEX RE-NW-MN LLC
MEX RE-NW-MO LLC
MEX RE-NW-ND LLC
MEX RE-NW-WI LLC
MEX RE-SE LLC
MEX RE-SE-AL LLC
MEX RE-SE-FL LLC
MEX RE-SE-GA LLC
MEX RE-SE-MS LLC
MEX RE-SE-NC LLC
MEX RE-SE-SC LLC
MEX RE-SE-TN LLC
MEX RE-SW LLC
MEX RE-SW-AR LLC
MEX RE-SW-LA LLC
MEX RE-SW-OK LLC
MEX RE-SW-TX LLC
Mississippi MEX Company, LLC
Mountain Express Baking and Coffee Co.
Mountain Express Ethanol Company
Mountain Express Oil Company Southeast, LLC
Newton Brothers, Inc.
South Claiborne Operation LLC
Spartan Tank Management LLC
Star Mountain Express, LLC
Texas MEX Limited Company, LLC
Webster P II L.L.C.
WebsterP L.L.C.
West Hill Ranch Group LLC
WHRG Retail Ops LLC
WHRG TC LLC

[MEX—SECOND AMENDMENT]

WHRG TC-NE LLC
WHRG TC-NE-PA LLC
WHRG TC-NW LLC
WHRG TC-NW-IA LLC
WHRG TC-NW-KS LLC
WHRG TC-NW-MO LLC
WHRG TC-NW-ND LLC
WHRG TC-NW-WY LLC
WHRG TC-SE LLC
WHRG TC-SE-AL LLC
WHRG TC-SE-SC LLC
WHRG TC-SW LLC
WHRG TC-SW-AR LLC
WHRG TC-SW-LA LLC
WHRG-LA, LLC
WHRG-LA2, LLC
WHRGOPS NE LLC
WHRGOPS NE-NY LLC
WHRGOPS NE-NY-LI LLC
WHRGOPS NE-PA LLC
WHRGOPS NW LLC
WHRGOPS NW-IA LLC
WHRGOPS NW-IA-WIA LLC
WHRGOPS NW-KS LLC
WHRGOPS NW-MI LLC
WHRGOPS NW-MO LLC
WHRGOPS NW-MO-NMO LLC
WHRGOPS NW-WI LLC
WHRGOPS NW-WI-NWI LLC
WHRGOPS SE LLC
WHRGOPS SE-AL-NORTH LLC
WHRGOPS SE-MS LLC
WHRGOPS SE-MS-JACKSON LLC
WHRGOPS SE-SC LLC
WHRGOPS SE-TN LLC
WHRGOPS SE-TN-WTN LLC
WHRGOPS SW LLC
WHRGOPS SW-AR LLC
WHRGOPS SW-AR-NWAR LLC
WHRGOPS SW-OK LLC
WHRGOPS SW-OK-OKC LLC
WHRGOPS SW-TX LLC
WHRGOPS SW-TX-DALLAS LLC
WHRGOPS SW-TX-STX LLC

[MEX—SECOND AMENDMENT]

**AGENT**:

FIRST HORIZON BANK,
as Agent


By: _____
Name: _____
Title: _____


**LENDERS**:

FIRST HORIZON BANK,
as a Lender


By: _____
Name: _____
Title: _____

HANCOCK WHITNEY BANK,
as a Lender

By: _____
Name: _____
Title: _____

[MEX—FIRST AMENDMENT]

CADENCE BANK,
as a Lender


By: _____

Name: _____

Title: _____

[MEX—SECOND AMENDMENT]

BANK OF HOPE,
as a Lender


By: _____

Name: _____

Title: _____

*ACTIVE 686991212v2*

UNITED COMMUNITY BANK,
as a Lender

By: _____
Name: _____
Title: _____

[MEX—SECOND AMENDMENT]

SYNOVUS BANK,
as a Lender

By: _____
Name: _____
Title: _____

SOUTH STATE BANK,
as a Lender


By:   _____
Name:  _____
Title:  _____

[MEX—SECOND AMENDMENT]

PINNACLE BANK,
as a Lender


By: _____
Name: _____
Title: _____

[MEX—SECOND AMENDMENT]

## ANNEX A

[See attached.]

~~AMENDED~~ SENIOR SECURED, SUPER-PRIORITY

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

among

**MOUNTAIN EXPRESS OIL COMPANY**,
*as Borrower*,

THE GUARANTORS FROM TIME TO TIME PARTY TO THIS AGREEMENT,

**FIRST HORIZON BANK**,
*as Administrative Agent and LC Issuer*,

and

THE LENDERS FROM TIME TO TIME PARTY HERETO

Dated: ~~April 28~~March 23, 2023

As amended by that certain First Amendment to Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement dated as of April 28, 2023; and
That certain Second Amendment to Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement dated as of July 19, **2023**

ACTIVE 686990614v6

# TABLE OF CONTENTS

ARTICLE 1 DEFINITIONS .................................................................................................. 2

    1.1    Definitions ............................................................................................... 2
    1.2    Other Definitional Provisions ............................................................... ~~31~~30
    1.3    [Reserved] ............................................................................................... ~~32~~31
    1.4    Accounting Terms .................................................................................. ~~32~~31
    1.5    UCC Terms ............................................................................................. ~~32~~31
    1.6    Rounding ................................................................................................ ~~32~~31
    1.7    References to Agreement and Laws ....................................................... ~~32~~31
    1.8    Time ........................................................................................................ ~~32~~31
    1.9    Divisions ................................................................................................ ~~32~~31
    1.10    [Reserved] ............................................................................................. ~~33~~32
    1.11    Superpriority Administrative Expense Claim ...................................... ~~33~~32
    1.12    Waiver of Any Priming Rights ............................................................. ~~33~~32
    1.13    Waiver of Claims to Surcharge ............................................................ ~~33~~32

ARTICLE 2 COMMITMENTS, LOANS, AND LCS ..................................................... ~~33~~32

    2.1    [Reserved] ............................................................................................. ~~33~~32
    2.2    [Reserved] ............................................................................................. ~~33~~32
    2.3    Facility .................................................................................................. ~~33~~32
    2.4    Method of Borrowing, Funding of Loans, and Minimum Amounts ..... ~~35~~34
    2.5    Subfacility for Letters of Credit ........................................................... ~~35~~34
    2.6    Cash Collateral ..................................................................................... ~~38~~37
    2.7    Defaulting Lenders ............................................................................... ~~39~~38
    2.8    Acknowledgement and Consent to Bail-In of Affected Financial
            Institutions ............................................................................................ 41

ARTICLE 3 INTEREST, FEES, AND PAYMENTS ..................................................... ~~42~~41

    3.1    Interest Rates ......................................................................................... ~~42~~41
    3.2    Payment of Principal and Interest ........................................................ ~~42~~41
    3.3    Prepayments .......................................................................................... 42
    3.4    Computations of Interest and Fees ....................................................... ~~44~~43
    3.5    General Payment Terms ........................................................................ ~~45~~44
    3.6    Pro Rata Treatment and Sharing of Payments ..................................... 46
    3.7    Right of Setoff ....................................................................................... 48
    3.8    Fees ........................................................................................................ ~~49~~48

ARTICLE 4 TAXES, YIELD PROTECTION AND ILLEGALITY ............................ ~~50~~49

    4.1    Taxes ...................................................................................................... ~~50~~49
    4.2    Increased Costs ..................................................................................... ~~54~~53
    4.3    [Reserved] ............................................................................................. 55

i

| | | |
|---|---|---|
| 4.4 | [Reserved] | 55 |
| 4.5 | [Reserved] | 55 |
| 4.6 | Requests for Compensation | 55 |
| 4.7 | Mitigation of Obligations; Replacement of Lenders | 55 |
| 4.8 | [Reserved] | 5756 |
| 4.9 | Survival | 5756 |

ARTICLE 5 COLLATERAL AND GUARANTIES ......... 5756

| | | |
|---|---|---|
| 5.1 | Collateral | 5756 |
| 5.2 | [Reserved] | 57 |
| 5.3 | Perfection; Financing Statements | 57 |
| 5.4 | Grants, Rights, and Remedies | 57 |
| 5.5 | Further Assurances – Collateral | 57 |
| 5.6 | Liens Granted to the Administrative Agent | 5857 |

ARTICLE 6 CONDITIONS PRECEDENT ......... 5857

| | | |
|---|---|---|
| 6.1 | Initial Credit Extension | 5857 |
| 6.2 | Conditions to All Credit Extensions | 59 |

ARTICLE 7 REPRESENTATIONS AND WARRANTIES ......... 6160

| | | |
|---|---|---|
| 7.1 | Existence and Power | 6160 |
| 7.2 | Authorization and No Conflicts | 6160 |
| 7.3 | Enforceability | 61 |
| 7.4 | Subsidiaries | 61 |
| 7.5 | Debt | 6261 |
| 7.6 | Liens | 6261 |
| 7.7 | Ownership and Location of Assets | 6261 |
| 7.8 | Intellectual Property | 62 |
| 7.9 | Place of Business | 62 |
| 7.10 | Financial Information | 62 |
| 7.11 | Compliance with Laws | 6362 |
| 7.12 | Material Agreements | 63 |
| 7.13 | Litigation | 63 |
| 7.14 | Taxes | 63 |
| 7.15 | Environmental Matters | 63 |
| 7.16 | Insurance | 6463 |
| 7.17 | Margin Regulations | 6463 |
| 7.18 | Trade Names | 6463 |
| 7.19 | Transactions with Affiliates | 64 |
| 7.20 | ERISA | 64 |
| 7.21 | Labor Matters | 64 |
| 7.22 | Investment Company Act | 64 |
| 7.23 | Anti-Corruption Laws and Sanctions | 6564 |
| 7.24 | Patriot Act | 6564 |

ACTIVE 686990614v6

7.25    [Reserved] .................................................................................. 65
7.26    No Restrictive Agreement ........................................................... 65
7.27    Approved Budget ......................................................................... 65
7.28    Financing Orders .......................................................................... 65
7.29    Super-Priority Claims .................................................................. 6665

ARTICLE 8 AFFIRMATIVE COVENANTS ................................................... 6665

8.1     Reporting Requirements ............................................................... 6665
8.2     Keeping Books and Records ........................................................ 6867
8.3     Inspection; Collateral Examinations ........................................... 6867
8.4     Maintenance of Existence ............................................................ 68
8.5     Maintenance of Properties ........................................................... 68
8.6     Insurance ...................................................................................... 6968
8.7     Compliance with Laws ................................................................. 6968
8.8     Compliance with Agreements ...................................................... 69
8.9     Payment of Taxes ......................................................................... 69
8.10    Payment of Obligations ............................................................... 6970
8.11    [Reserved] .................................................................................... 6970
8.12    ERISA ........................................................................................... 70
8.13    Conduct Business ......................................................................... 70
8.14    Banking Relationship ................................................................... 70
8.15    Proceeds ....................................................................................... 70
8.16    Preserve Collateral ....................................................................... 70
8.17    [Reserved] .................................................................................... 7071
8.18    Further Assurances ....................................................................... 71
8.19    Budget Compliance ...................................................................... 71
8.20    Milestones .................................................................................... 71

ARTICLE 9 NEGATIVE COVENANTS .......................................................... 71

9.1     Debt ............................................................................................... 71
9.2     Limitation on Liens ...................................................................... 72
9.3     Acquisitions, Mergers, and Other Fundamental Changes ............ 72
9.4     Disposition of Assets .................................................................... 7273
9.5     Restricted Payments ..................................................................... 73
9.6     Investments ................................................................................... 73
9.7     Compliance with Environmental Laws ........................................ 73
9.8     Accounting .................................................................................... 73
9.9     Change of Business ...................................................................... 73
9.10    Transactions With Affiliates ......................................................... 73
9.11    Hedge Agreements ....................................................................... 7374
9.12    Compliance with Government Regulations .................................. 7374
9.13    Organizational Documents; Material Agreements ....................... 74
9.14    Prepayment of Debt; Payment of Subordinated Debt .................. 74
9.15    Restrictive Agreement .................................................................. 7475
9.16    Sale and Leaseback Transactions ................................................ 7475

9.17    Financing Orders; Administrative Priority; Lien Priority; Payment of Claims .......... 75

ARTICLE 10 [RESERVED] .......... 75

ARTICLE 11 DEFAULT .......... 75

11.1    Default .......... 75
11.2    Remedies Upon Default .......... 79
11.3    Cash Collateral .......... 80
11.4    Performance by Administrative Agent .......... 80
11.5    Application of Liquidation Proceeds .......... 80

ARTICLE 12 THE ADMINISTRATIVE AGENT .......... 81

12.1    Appointment and Authority .......... 81
12.2    Rights as a Lender .......... 81
12.3    Exculpatory Provisions .......... 81
12.4    Reliance by Administrative Agent .......... 82
12.5    Delegation of Duties .......... 83
12.6    Resignation of Administrative Agent .......... 83
12.7    Non-Reliance on Administrative Agent and Other Lenders .......... 84
12.8    No Other Duties, etc .......... 84
12.9    Administrative Agent May File Proofs of Claim .......... 8485
12.10    Collateral and Guaranty Matters .......... 85
12.11    Other Agents .......... 86
12.12    Lender ERISA Representations .......... 8687

ARTICLE 13 GUARANTY .......... 89

13.1    Guaranty .......... 89
13.2    Obligations Unconditional .......... 89
13.3    Reinstatement .......... 90
13.4    Certain Additional Waivers .......... 90
13.5    Remedies .......... 9091
13.6    Rights of Contribution .......... 91
13.7    Guarantee of Payment; Continuing Guarantee .......... 92

ARTICLE 14 MISCELLANEOUS .......... 92

14.1    Notices .......... 92
14.2    No Deemed Waiver; Cumulative Remedies .......... 94
14.3    Expenses; Indemnity; Damage Waiver; Costs and Expenses .......... 95
14.4    Survival .......... 97
14.5    Governing Law and Jurisdiction .......... 97
14.6    Waiver of Jury Trial .......... 98
14.7    Successors and Assigns .......... 98
14.8    Amendments, Consents, and Waivers .......... 102

| | | |
|---|---|---|
| 14.9 | Limitation of Liability | 104 |
| 14.10 | Survival | 104 |
| 14.11 | Patriot Act; KYC Information | 105 |
| 14.12 | Foreign Lender Reporting Requirements | 106 |
| 14.13 | Document Imaging | 106 |
| 14.14 | Counterparts; Integration; Effectiveness; Electronic Execution | 106 |
| 14.15 | Treatment of Certain Information; Confidentiality | 106 |
| 14.16 | Severability | 107 |
| 14.17 | Erroneous Payments | 107 |
| 14.18 | Waiver of Effect of Corporate Seal | 110 |
| 14.19 | [Reserved] | 110 |
| 14.20 | ENTIRE AGREEMENT | 110 |
| 14.21 | Agent and Lenders as Party-in-Interest | 110 |
| 14.22 | Waiver of Right to Obtain Alternative Financing | 111 |
| 14.23 | Releases | 111 |
| 14.24 | Conflict of Terms | 111 |

ACTIVE 686990614v6

## SCHEDULES AND EXHIBITS

| Schedule 1 | Lenders and Commitments |
| Schedule 2 | Prepetition LCs |
| Schedule 3 | Minimum Sale Amount |

| Exhibit A | Form of Loan Note |
| Exhibit B | Borrowing Request |
| Exhibit C | [Reserved] |
| Exhibit D | Assignment and Assumption Agreement |
| Exhibit E-1 – E-4 | Form of U.S. Tax Compliance Certificate |
| Exhibit F | Approved Budget |

48657538.1
ACTIVE 686990614v6

# ~~AMENDED~~ SENIOR SECURED, SUPER-PRIORITY

# DEBTOR-IN-POSSESSION CREDIT AGREEMENT

THIS ~~AMENDED~~ SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of ~~April 28~~March 23, 2023 (this "Agreement"), is among MOUNTAIN EXPRESS OIL COMPANY, a Georgia corporation (the "Company" or the "Borrower"), the Guarantors from time to time party to this Agreement (together with the Borrower, the "Loan Parties"), the Lenders from time to time party to this Agreement, and FIRST HORIZON BANK, as Administrative Agent and the LC Issuer.

## RECITALS:

WHEREAS, on March 18, 2023 (the "Petition Date"), the Loan Parties commenced jointly administered voluntary cases under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") (each a "Case" and, collectively, the "Cases");

WHEREAS, as of the Petition Date, certain of the Loan Parties and the Prepetition Lenders (each as defined below) are parties to that certain First Amended and Restated Credit Agreement, dated as of March 12, 2020 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Credit Agreement"), pursuant to which the Prepetition Lenders provided financing to the Borrower and the obligations under which were secured by security interests in the Prepetition Collateral (as defined below);

WHEREAS, since the Petition Date, the Loan Parties have continued, and intend to continue to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Loan Parties need financing in order to fund their respective business operations during the course of the Cases and have asked the Lenders to make loans and advances to the Borrower in a principal amount not to exceed $~~37,850,000.00~~46,850,000.00 (the "Maximum Advance Amount") in the aggregate pursuant to sections 364(c) and 364(d) of the Bankruptcy Code which shall consist of (a) an Initial Advance in the amount of **$20,000,000.00 (the "Initial Advance")**, plus (b) from and after the Final DIP Order Entry Date, the Roll-up Amount (as defined herein), plus (c) after the Final DIP Order Entry Date, further advances (each, a "Subsequent Advance") in an aggregate amount of ~~$17,850,000.00~~(i) prior to the Second Amendment Effective Date, $17,850,000 and (ii) after the Second Amendment Effective Date, $9,000,000 (the "Second Amendment Term Loan Amount"), in each case, in accordance with the Approved Budget and subject to the terms and conditions set forth herein;

WHEREAS, the Lenders are willing to extend credit to the Borrower, subject to the terms and conditions set forth herein, in the other Loan Documents, and the proposed orders of the Bankruptcy Court approving the proposed financing, and in accordance with sections 364(c) and

48657538.1
ACTIVE 686990614v6

364(d) of the Bankruptcy Code, including that all of the Obligations (i) are secured by Liens on the Collateral granted by the Loan Parties, subject in priority only to certain Permitted Prior Liens and the Carve-Out, as hereinafter provided, and (ii) constitute allowed superpriority administrative expense claims pursuant to sections 364(c) and 364(d)(1) of the Bankruptcy Code, subject in priority only to the Carve-Out, in each case as set forth herein and in the Interim DIP Order and the Final DIP Order, as applicable; and

WHEREAS, the Loan Parties have agreed to provide such collateral security, superpriority claims and adequate protection, subject to the approval of the Bankruptcy Court.

NOW THEREFORE, in consideration of the premises, the mutual benefits to be derived from this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1

## DEFINITIONS

1.1     **Definitions**.  As used in this Agreement, the following terms have the following meanings:

"Acceptable Form" means in form and substance satisfactory to the Administrative Agent in its Permitted Discretion.

"Acquisition" means, as to any Person, the purchase or other acquisition (in one transaction or a series of transactions, including through a merger or division) of more than 50% the Equity Interests of another Person or all or substantially all of the property, assets or business of another Person or of the assets constituting a business unit, line of business or division of another Person.

"Acquisition Cost" means, with respect to any Acquisition, as of the date of entering into any agreement therefor, the sum of the following (without duplication):  (a) the value of the Equity Interests of any Loan Party or any of its Subsidiaries to be transferred in connection with such Acquisition; (b) the amount of any cash and the fair market value of other property (excluding property described in *clause (a)* and the unpaid principal amount of any instrument evidencing Debt) given as consideration in connection with such Acquisition; (c) the amount (determined by using the face amount or the amount payable at maturity, whichever is greater) of any Debt incurred, assumed or acquired by any Loan Party or any of its Subsidiaries in connection with such Acquisition; (d) all additional purchase price amounts in the form of earnouts and other contingent obligations that should be recorded on the financial statements of the Borrower and its Subsidiaries in accordance with GAAP in connection with such Acquisition; (e) all amounts paid in respect of covenants not to compete and consulting agreements that should be recorded on the financial statements of the Borrower and its Subsidiaries in accordance with GAAP in connection with such Acquisition; and (f) the aggregate fair market value of all other consideration given by any Loan Party or any of its Subsidiaries in connection with such Acquisition.  For purposes of determining the Acquisition

ACTIVE 686990614v6

Cost for any transaction, the Equity Interests of any Loan Party or any of its Subsidiaries shall be valued in accordance with GAAP.

"Administrative Agent" or "Agent" means FIRST HORIZON BANK (formerly known as IBERIABANK, a division of First Horizon Bank), or any successor administrative agent appointed pursuant to Section 12.6.

"Administrative Agent's Office" means the Administrative Agent's address as set out in Section 14.1, or such other address as the Administrative Agent may from time to time provide notice to Borrower and the Lenders.

"Administrative Questionnaire" means an administrative questionnaire in a form supplied by the Administrative Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, with respect to a specified Person, (a) another Person that directly or indirectly, through one or more intermediaries, Controls or is Controlled by or is under common Control with the specified Person, (b) another Person that directly or indirectly owns or holds (i) ten percent (10%) or more of any class of Equity Interests with voting power in the specified Person or (ii) ten percent (10%) or more of the Equity Interests in the specified Person, or (c) any officer, director, manager, or partner of the specified Person.

"Agent Assignee" is defined in Section 14.17(d).

"Agreement" means this Senior-Secured Super-Priority Debtor-In-Possession Credit Agreement together with all schedules and exhibits, in each case, as amended, restated, increased, or supplemented.

"Anti-Corruption Laws" means all laws, rules, and regulations of any Governmental Authority applicable to the Borrower and its Subsidiaries from time to time concerning or relating to bribery, money laundering or corruption.

"Applicable Law" means all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority (whether or not such orders, requests, licenses, authorizations, permits or agreements have the force of law) including all Environmental Laws.

"Approved Appraiser" means an appraiser with expertise in the appraisal of real estate in the applicable jurisdiction and that is acceptable to Administrative Agent in its Permitted Discretion.

"Approved Budget" means a rolling 13-week cash flow budget, an initial form of which is attached hereto as Exhibit F, prepared by CRO and approved by the Borrower, on a

3

consolidated and consolidating basis, showing projected weekly cash receipts and cash disbursements for the Borrower and its Subsidiaries, in form and substance acceptable to Lenders, which shall be updated in accordance with Section 8.1(c).

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 14.7), and accepted by the Administrative Agent, in substantially the form of Exhibit D or any other form approved by the Administrative Agent.

"Attributable Debt" means, as of any date of determination, (a) in respect of any Capital Lease Obligation of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a capital lease.

"Auto-Renewal LC" is defined in Section 2.5(a)(iv).

"Avoidance Actions" means any and all actions to avoid or recover a transfer of property of the Loan Parties' bankruptcy estate or an interest of any Loan Party in property, which any such Loan Party, a trustee, debtor in possession or other appropriate party in interest may assert on behalf of such Loan Party's estate under Chapter 5 of the Bankruptcy Code, including actions under one or more provisions of Section 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code or under any other similar applicable federal, state or common law, and any and all other causes of action, grievances, arbitrations, actions, suits, demands, demand letters, claims, complaints, notices of non-compliance or violation, enforcement actions, investigations or proceedings that a Loan Party may assert under Chapter 5 of the Bankruptcy Code or any similar Applicable Law.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers of the applicable EEA Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, rule, regulation or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

4

"Bank Product Agreement" means an agreement or other arrangement under which Bank Products are provided.

"Bank Product Liabilities" means the indebtedness, obligations and liabilities of any Loan Party to any Bank Product Provider which provides any Bank Products to such Loan Party (including all obligations and liabilities owing in respect of any returned items deposited with such Bank Product Provider).

"Bank Products" means the following products or services, (a) credit cards, (b) credit card processing services, (c) debit cards and stored value cards, (d) commercial cards, (e) ACH transactions, and (f) Bank Product and treasury management services and products, including controlled disbursement accounts or services, lockboxes, automated clearinghouse transactions, return items, overdrafts, and interstate depository network services.

"Bank Product Provider" means any Lender, or any Affiliate of any Lender, which provides Bank Products to any Loan Party under a Bank Product Agreement.

"Bankruptcy Code" has the meaning ascribed to it in the Recitals to this Agreement.

"Bankruptcy Court" has the meaning ascribed to it in the Recitals to this Agreement.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and is subject to Section 4975 of the Code or (c) any Person whose assets include the assets of any such "employee benefit plan" or "plan".

"BHC Act Affiliate" is defined in Section 2.9(b).

"Borrowing" means Term Loans.

"Borrowing Request" means a written request substantially in the form of Exhibit B, which is fully completed and executed by a Responsible Officer of Borrower.

"Building" has the meaning assigned to such term in the applicable Flood Insurance Regulation.

"Business Day" means any day that is not a Saturday, Sunday or a day on which commercial banks in New York, New York, or the jurisdiction in which the Administrative Agent's Office is located, are authorized or required by law to close.

"Capital Expenditure" means, for any Person, any expenditure or commitment to expend money for any purchase or other acquisition of any asset which would be classified as a fixed or capital asset on a consolidated balance sheet of any such Person in accordance with GAAP.

"Capital Lease Obligation" means, for any Person, the obligations required to be classified and accounted for as a capital lease on a balance sheet of any such Person in accordance with GAAP.

"Carve-Out" has the meaning ascribed to it in the Financing Orders.

"Case" has the meaning ascribed to it in the Recitals to this Agreement.

"Cash Collateral" means cash and Cash Equivalents pledged as Collateral to the Administrative Agent and deposited into a cash collateral account maintained with (or on behalf of) the Administrative Agent, and under the sole dominion and control of the Administrative Agent, pursuant to documentation in Acceptable Form.

"Cash Collateralize" means to pledge and deposit Cash Collateral (or other credit support pursuant to documentation in Acceptable Form) in an amount equal to at least 105% of the applicable credit exposure, for the benefit of one or more of the (a) LC Issuer, as collateral for LC Exposure, or (b) Lenders as collateral for the obligations of Lenders to purchase participations in respect of LC Exposure.

"Cash Equivalents" means, collectively, (a) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the U.S. (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the U.S.), in each case maturing within one year from the date of acquisition thereof, (b) investments in commercial paper maturing within 270 days after the date of acquisition thereof and currently having the highest rating obtainable from a Credit Rating Agency, (c) investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the U.S. of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000, (d) fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above, and (e) money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA and Aaa (or equivalent rating) by at least two Credit Rating Agencies and (iii) have portfolio assets of at least $5,000,000,000.

"Cash Management Order" means the order of the Bankruptcy Court entered in the Cases after the "first day" hearing, together with all extensions, modifications and amendments thereto, in form and substance reasonably satisfactory to the Administrative Agent, which among other matters authorizes the Loan Parties to maintain their existing cash management and treasury arrangements (as set forth in the Prepetition Credit Agreement and the Financing Orders) or such other arrangements as shall be reasonably acceptable to the Administrative Agent in all material respects.

"CFTC" means the Commodity Futures Trading Commission or any successor thereto.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided that* notwithstanding anything in this Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the U.S. or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or "group" (within the meaning of Exchange Act) of 15% or more of the voting Equity Interests of Borrower; (b) a majority of the seats (other than vacant seats) of the Governing Body of Borrower shall be occupied by Persons who are neither (i) nominated by the Governing Body of Borrower nor (ii) appointed by directors so nominated; (c) the acquisition of direct or indirect Control of Borrower by any Person or "group" (within the meaning of Exchange Act); or (d) any sale, lease, exchange, transfer, or other Dispositions (in a single transaction or in a series of related transactions) of any Loan Party or any of its Subsidiaries, or all or substantially all of the assets of any Loan Party or any of its Subsidiaries, except pursuant to a transaction expressly permitted under this Agreement.

"Claim" has the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code.

"Closing Certification" is defined in Section 8.1(l).

"Closing Date" means the date on which this Agreement has been executed and delivered by the parties hereto and the conditions set out in Section 6.1 have been satisfied or waived in writing in accordance with this Agreement.

"Collateral" means any and all property owned, leased, or operated by a Person covered by the Security Documents and any and all other property of any Loan Party, now existing or hereafter acquired, that may at any time be, become or intended to be, subject to a security interest or Lien in favor of the Administrative Agent, on behalf of itself and the Lenders and other Secured Parties, to secure the Obligations, including, without limitation, (a) the Collateral (as such term is defined in the Prepetition Credit Agreement), (b) all property of any Loan Party in which a Lien is granted to the Agent under the Financing Orders, (c) all other property that is subject to any Lien in favor of Agent or any sub-agent for the benefit of Lenders pursuant to any Security Document, and (d) all of the proceeds (as such term is defined in the UCC) and products, whether tangible or intangible, of any of the foregoing, money, or other tangible or intangible property resulting from the sale, lease, license, exchange, collection, or other disposition of any of the foregoing, the proceeds of any award in condemnation with respect to

any of the foregoing, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and the proceeds thereof, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, or guaranty payable by reason of loss or damage to, or otherwise with respect to any of the foregoing; <u>provided</u> that the Collateral shall not include Avoidance Actions or the proceeds thereof prior to the entry of the Final DIP Order.

"<u>Collateral Access Agreement</u>" means a landlord waiver or subordination agreement, bailee letter, or acknowledgment agreement of any lessor, warehouseman, processor, consignee, or other Person in possession of, having a Lien upon, or having rights or interests in any Loan Party's or any of its Subsidiaries' books and records, equipment, or inventory, in each case, in form and substance acceptable to the Administrative Agent.

"<u>Collateral Examination</u>" means audits, verifications and inspections of (a) the Collateral, (b) the accounting and financial processes and procedures of Borrower and the other Loan Parties pertaining to the Collateral, and (c) the books, records and documents of Borrower and the other Loan Parties pertaining to the Collateral, in each case conducted by a Person (which may be an employee of Administrative Agent or any Lender, or may be an independent third party) satisfactory to Required Lenders.

"<u>Commitment</u>" means (a) as to all Lenders, the aggregate commitment of all Lenders to make the Term Loan in an aggregate amount not to exceed the Committed Amount, and (b) as to any Lender, the obligation of such Lender to make a portion of ~~the~~<u>any</u> Term Loan under this Agreement in an aggregate principal amount not to exceed the Committed Amount for such Lender (inclusive of such Lender's share of the Roll-up Amount).

"<u>Committed Amount</u>" means (a) as to all Lenders, the aggregate amount set out for the Lenders on Schedule 1 (inclusive of the Roll-up Amount) (as such amount may be modified at any time or from time to time pursuant to any Assignment and Assumption or otherwise pursuant to the terms of this Agreement) and (b) as to any Lender, the amount set out opposite such Lender's name on Schedule 1 as its Committed Amount (inclusive of such Lender's share of the Roll-up Amount) (as such amount may be modified at any time or from time to time pursuant to the terms of this Agreement).

"<u>Commitment Percentage</u>" means, as to any Lender, ~~(a) prior to the entry of the Final DIP Order, the *ratio of* (i) the Committed Amount of such Lender to (ii) the Committed Amount of all the Lenders, and (b) after the funding of the Term Loan,~~ the *ratio of* (i) the Term Principal Amount of such Lender to (ii) the Term Principal Amount of all Lenders.

"<u>Committee</u>" means any official committee of unsecured creditors appointed by the United States Trustee in relation to any of the Cases.

"<u>Commodity Exchange Act</u>" means the Commodity Exchange Act (7 U.S.C. § 1 *et seq.*), as amended, and all related rules, regulations and published interpretations.

"<u>Communications</u>" is defined in <u>Section 14.1(d)(ii)</u>.

ACTIVE 686990614v6

"Company" has the meaning given such term in the Preamble to this Agreement.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Contribution Share" is defined in Section 13.6.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract, or otherwise, and the terms Controls, Controlling, and Controlled have meanings analogous thereto.

"Control Account Agreement" means any tri-party agreement by and among a Loan Party, the Administrative Agent and a depositary bank or securities intermediary at which such Loan Party maintains a Controlled Account, in each case in form and substance satisfactory to the Administrative Agent.

"Controlled Account" is defined in Section 8.14(a).

"Covered Party" is defined in Section 2.9(a).

"Credit Extension" means the making, conversion, or continuation of a Loan or the issuance, amendment, renewal, or increase of an LC.

"Credit Rating Agency" means (a) S&P, (b) Moody's, or (c) another nationally recognized credit rating agency that evaluates the financial condition of issuers of debt instruments and then assigns a rating that reflects its assessment of the issuer's ability to make debt payments.

"CRO" means Michael Healy of FTI Consulting.

"Current Financials" means, when determined, the consolidated financial statements of Borrower most recently delivered to the Administrative Agent in accordance with Section 8.1.

"Debt" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP (a) all Funded Debt and all other obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments, (b) all direct or contingent obligations of such Person arising under (i) letters of credit (including standby and commercial), bankers' acceptances and bank guaranties and (ii) surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person, (c) all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business; provided that, for purposes of Section 11.1(h), trade payables overdue by more than 120 days shall be included in this definition and shall constitute Debt except to the extent that any of such trade payables are being disputed in good faith and by appropriate proceedings and as to which reserves have been established in accordance with GAAP), (d) indebtedness (excluding prepaid interest thereon)

9

secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse, (e) all Attributable Debt, (f) all obligations of such Person in respect of Disqualified Equity Interests, (g) all other obligations required by GAAP to be classified upon such Person's balance sheet as liabilities and (h) all Guarantees of such Person in respect of any of the foregoing.  For all purposes hereof, the Debt of any Person shall include the Debt of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Debt is expressly made non-recourse to such Person.  The amount of any Debt of any Person for purposes of *clause (e)* that is expressly made non-recourse or limited-recourse (limited solely to the assets securing such Debt) to such Person shall be deemed to be equal to the lesser of (i) the aggregate principal amount of such Debt and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"Debtor Relief Laws" means the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, fraudulent transfer, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, suspension of payments, or similar debtor relief laws of the U.S.  or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" has the meaning specified in Section 11.1.

"Default Rate" means the *lesser of* (a) the Maximum Rate and (b) a rate per annum of five percent (5%) in excess of the rate then applicable to Loans.

~~"Default Right" is defined in Section 2.9(b).~~

"Defaulting Lender" means any Lender that

(a)      has failed to (i) fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded under this Agreement unless such Lender notifies the Administrative Agent and Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable Default or Potential Default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent, the LC Issuer or any other Lender any other amount required to be paid by it under this Agreement (including in respect of its participation in LCs) within two (2) Business Days of the date when due,

(b)      has notified Borrower, the Administrative Agent or the LC Issuer in writing that it does not intend to comply with its funding obligations under this Agreement, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan under this Agreement and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable Default or

ACTIVE 686990614v6

Potential Default, shall be specifically identified in such writing or public statement) cannot be satisfied),

(c)     has failed, within three (3) Business Days after written request by the Administrative Agent or Borrower, to confirm in writing to the Administrative Agent and Borrower that it will comply with its prospective funding obligations under this Agreement (*provided that*, such Lender shall cease to be a Defaulting Lender pursuant to this *clause (c)* upon receipt of such written confirmation by the Administrative Agent and Borrower), or

(d)     has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the FDIC or any other state or federal regulatory authority acting in such a capacity, or (iii) become the subject of a Bail-In Action;

*provided that*, a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the U.S. or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of *clauses (a) through (d)* above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to Borrower, the LC Issuer, and each Lender.

"DIP Financing Motion" means the motion of Loan Parties filed with the Bankruptcy Court seeking approval of this Agreement, the other Loan Documents, the financing and other transactions provided for herein, and entry of the Financing Orders.

"Disclosure Schedules" means the Loan Parties' disclosure schedules to the Bankruptcy Court.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition of any property by any Person (including any Sale and Leaseback Transaction and any issuance of Equity Interests by a Subsidiary of such Person), including (a) any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith, and (b) the granting of any option or other right to do any of the foregoing.

"Disqualified Equity Interest" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interest into which it is convertible or for which it is exchangeable) or upon the happening of any event or condition, (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund

ACTIVE 686990614v6

obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (b) is redeemable at the option of the holder thereof, (c) provides for the scheduled payment of dividends in cash, or (d) is or becomes convertible into or exchangeable for Debt or any other Equity Interests that would constitute a Disqualified Equity Interest, in each case, prior to the date that is 180 days after the Maturity Date, *provided that*, if such Equity Interests are issued pursuant to a plan for the benefit of employees of any Loan Party or any of its Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by the Loan Party or any of its Subsidiaries in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability.

"Distribution" means (a) any dividend, distribution, or other payment (whether in cash, securities, or other property) in respect of the Equity Interests of a Person, (b) any redemption, purchase, retirement or other acquisition by a Person of any of its Equity Interests, including under any put option or call option, or (c) the establishment of any fund for any such distribution, dividend, payment, redemption, purchase, retirement, or acquisition, including any sinking fund or similar arrangement.

"Dollar," "Dollars" and "$" means currency of the U.S. which is at the time of payment legal tender for the payment of public and private debts in the U.S.

"Domestic Subsidiary" means, when determined, each subsidiary of Borrower which is organized under Applicable Law of the U.S. in a state of the U.S. or the District of Columbia.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country that is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in *clause (a)* of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in *clauses (a)* or *(b)* of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Electronic Applications" is defined in Section 2.5(g).

"Eligible Assignee" means (a) a Lender, (b) an Affiliate of a Lender, (c) a commercial bank having a combined capital and surplus of at least $100,000,000, (d) a finance company, insurance company or any other financial institution or fund, in each case reasonably acceptable to Required Lenders and regularly engaged in making, purchasing, or investing in loans and having net worth, determined in accordance with GAAP, in excess of $100,000,000, (e) an

Approved Fund, and (f) subject to the provisions of Section 14.7, any other Person approved by Required Lenders.  Neither Borrower nor any Subsidiary or Affiliate of Borrower shall qualify as an Eligible Assignee.

"Eligible Contract Participant" means an "eligible contract participant" as defined in the Commodity Exchange Act and regulations thereunder.

"Eminent Domain Event" means any Governmental Authority, or any Person acting under, for, or on behalf of, a Governmental Authority, institutes proceedings to condemn, seize or appropriate all or part of any asset of a Loan Party.

"Eminent Domain Proceeds" means all amounts received by any Loan Party as a result of any Eminent Domain Event.

"Environmental Law" means any Applicable Law that relates to the preservation or reclamation of natural resources, pollution or protection of the environment, the Release of any materials into the environment, including those related to Hazardous Materials, air emissions and discharges to waste or public systems, or to health and safety.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Loan Party directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment, or disposal of any Hazardous Material, (c) exposure to any Hazardous Material, (d) the Release or threatened Release of any Hazardous Material into the environment, or (e) any contract, agreement or other consensual arrangement pursuant to which liabilities are assumed or imposed to any of the foregoing.

"Equity Interests" means, as to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with Borrower, is treated as a single employer under Section 414(b) or (c) of the Tax Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Tax Code, is treated as a single employer under Section 414 of the Tax Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to an ERISA Plan (other than an event for

ACTIVE 686990614v6

which the 30-day notice period is waived); (b) the failure to satisfy the "minimum funding standard" (as defined in Section 412 of the Tax Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(c) of the Tax Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any ERISA Plan; (d) the incurrence by Borrower or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any ERISA Plan; (e) the receipt by Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any ERISA Plan or Plans or to appoint a trustee to administer any ERISA Plan; (f) the incurrence by Borrower or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal of Borrower or any ERISA Affiliate from any ERISA Plan; or (g) the receipt by Borrower or any ERISA Affiliate of any notice, or the receipt by any ERISA Plan from Borrower or any ERISA Affiliate of any notice, concerning the imposition upon Borrower or any ERISA Affiliate of Withdrawal Liability or a determination that an ERISA Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"ERISA Plan" means any employee pension benefit plan (other than a multiemployer plan) subject to the provisions of Title IV of ERISA or Section 412 of the Tax Code or Section 302 of ERISA, and in respect of which Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) (a) an "employer" as defined in Section 3(5) of ERISA, (b) a multiemployer plan as defined in Section 4001(a)(3) of ERISA, and (c) a pension, profit-sharing, or stock bonus plan intended to qualify under Section 401(a) of the Tax Code, maintained or contributed to by Borrower or any ERISA Affiliate, including any multiemployer plan within the meaning of Section 4001(a)(3) of ERISA.

"Erroneous Payment" is defined in Section 14.17(a).

"Erroneous Payment Deficiency Assignment" is defined in Section 14.17(d).

"Erroneous Payment Impacted Class" is defined in Section 14.17(d).

"Erroneous Payment Return Deficiency" is defined in Section 14.17(d).

"Erroneous Payment Subrogation Rights" is defined in Section 14.17(d).

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Excess Payment" is defined in Section 13.6.

"Exchange Act" means the Securities Exchange Act of 1934 and the rules of the Securities Exchange Commission thereunder as in effect on the Closing Date.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that

ACTIVE 686990614v6

are Other Connection Taxes; (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by Borrower under Section 4.7) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to Section 4.1, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office; (c) Taxes attributable to such Recipient's failure to comply with Section 4.1(g) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Extraordinary Receipts" means any payments received by any Loan Party or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds described in Section 3.3(b)(iii)(E) of this Agreement) including, without limitation (a) proceeds of judgments, proceeds of settlements, or other consideration of any kind received in connection with any cause of action or claim (and not consisting of proceeds described in Section 3.3(b)(iii)(E) of this Agreement), but including proceeds of business interruption insurance, (b) indemnity payments (other than to the extent such indemnity payments are immediately payable to a Person that is not an Affiliate of any Loan Party or any of its Subsidiaries), (c) any purchase price adjustment received in connection with any purchase agreement, (d) tax refunds and pension plan reversions.

"Facility" means the delayed draw term loan facility established pursuant to Section 2.3.

"FATCA" means Sections 1471 through 1474 of the Tax Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, and any agreements entered into pursuant to Section 1471(b)(1) of the Tax Code, and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Tax Code.

"FCPA" means the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"FDIC" means the U.S. Federal Deposit Insurance Corporation or any successor thereto.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it; *provided that*, if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the U.S.

"FEMA" means the Federal Emergency Management Agency, a component of the U.S. Department of Homeland Security that administers the National Flood Insurance Program.

"Final DIP Order" means the order entered by the Bankruptcy Court in the Cases pursuant to Sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code approving this Agreement and the other Loan Documents and the making of the Term Loans in an amount not to exceed the Commitments (taking into account the Roll-up Amounts), authorizing on a final basis the incurrence by the Loan Parties of permanent post-petition secured and superpriority indebtedness in accordance with this Agreement, authorizing the use of cash collateral, granting Liens and providing superpriority administrative expense status, authorizing conversion of the Roll-up Amounts, granting adequate protection, and modifying the automatic stay, to be entered on the docket of the Cases no later than April 25, 2023, which order shall be in substantially the form of the Interim DIP Order (with only such modifications thereto as are necessary to convert the Interim DIP Order to a Final DIP Order and such other modifications as are satisfactory in form and substance to the Agent and Lenders in their reasonable discretion).

"Final DIP Order Entry Date" means the date on which the Bankruptcy Court enters the Final DIP Order in the Cases.

"Final Hearing" means a hearing held by the Bankruptcy Court regarding the approval of the Final DIP Order.

~~"Final Order" means an order, judgment, ruling or other decree (or any revision, modification or amendment thereto) issued and entered by the Bankruptcy Court or by any state or other federal court as may have jurisdiction over any proceeding in connection with the Cases for the purpose of such proceeding, which order, judgment, ruling or other decree has not been reversed, vacated, stayed, modified or amended and as to which (i) no appeal, petition for review, reargument, rehearing, reconsideration or certiorari has been taken and is pending and the time for the filing of any such appeal, petition for review, reargument, rehearing, reconsideration or certiorari has expired, or (ii) such appeal or petition has been heard and dismissed or resolved and the time to further appeal or petition has expired with no further appeal or petition pending.~~

"Finance Code" is defined in the definition of "Maximum Rate."

"Financing Orders" means the Interim DIP Order, the Final DIP Order and such other interim, final, permanent and/or supplemental orders entered by the Bankruptcy Court after notice pursuant to Section 364 of the Bankruptcy Code relating thereto or authorizing the granting of credit by the Agent and the Lenders to the Borrower or Borrower's use of Lender's "cash collateral" (within the meaning of Bankruptcy Code § 363(a)).

"First Tier Foreign Subsidiary" means any Foreign Subsidiary that is a "controlled foreign corporation" within the meaning of Section 957 of the Tax Code and the Equity Interests of which are owned directly by any Loan Party.

"Flood Insurance" means, for any owned real property located in a Special Flood Hazard Area, Federal Flood Insurance or private insurance that meets or exceeds the requirements set forth by FEMA in its "Mandatory Purchase of Flood Insurance Guidelines".

"Flood Insurance Regulations" means (a) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (b) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (c) the National Flood Insurance Reform Act of 1994 (amending 42 USC § 4001, et seq.), as the same may be amended or recodified from time to time, and (d) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto, and in each case, any rules and regulations promulgated thereunder.

"Foreign Lender" means (a) if Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which Borrower is resident for tax purposes.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary (and includes any Canadian Subsidiary).

"Fronting Exposure" means, at any time there is a Defaulting Lender, with respect to the LC Issuer, such Defaulting Lender's Commitment Percentage of the outstanding LC Exposure with respect to LCs issued by the LC Issuer other than LC Exposure as to which such Defaulting Lender's participation obligation has been reallocated to other Lenders or Cash Collateralized in accordance with the terms of this Agreement.

"Fund" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course of its activities.

"Funded Debt" means, when determined, for any Person (a) all Debt for borrowed money, whether or not evidenced by notes, bonds, debentures or similar instruments, (b) all Capital Lease Obligations, and (c) the LC Exposure and liabilities related to other letters of credit.

"GAAP" means generally accepted accounting principles in the U.S. set out in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and the Financial Accounting Standards Board as in effect from time to time.

"Governing Body" means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person, (b) in the case of any limited liability company, the board of managers, sole member, managing member, or other governing body of such Person, (c) in the case of any partnership, the Governing Body of the general partner of such Person, and (d) in any other case, the functional equivalent of the foregoing.

"Governmental Authority" means the government of the U.S. or any other nation or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive,

ACTIVE 686990614v6

legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank) and any group or body charged with setting financial accounting or regulatory capital rules or standards (including, without limitation, the Financial Accounting Standards Board, the Bank for International Settlements or the Basel Committee on Banking Supervision or any successor or similar authority to any of the foregoing).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Debt or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Debt or other obligation of the payment or performance of such Debt or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Debt or other obligation or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Debt or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (b) any Lien on any assets of such Person securing any Debt or other obligation of any other Person, whether or not such Debt or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Debt to obtain any such Lien); *provided that* the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor" means (a) each Subsidiary of the Borrower party hereto as a Guarantor as of the Closing Date, (b) any other Person which executed a Joinder Agreement and joins this Agreement as a Guarantor, and (c) any other Person which executes a Guaranty Agreement in favor of the Administrative Agent.

"Guaranty Agreement" means (a) the guaranty under Article 13, or (b) a guaranty in Acceptable Form executed by a Loan Party or other Person in favor of Administrative Agent to, directly or indirectly, guarantee the Obligations, as such Guaranty Agreement may be amended, restated, supplemented or modified from time to time.

"Hazardous Material" means (a) any explosive or radioactive substance or waste, all hazardous or toxic substances, waste, or other pollutants, and any other substance the presence of which requires removal, remediation or investigation under any applicable Environmental Law, (b) any substance that is defined or classified as a hazardous waste, hazardous material, pollutant, contaminant, or toxic or hazardous substance under any applicable Environmental Law, or (c) petroleum, petroleum distillates, petroleum products, oil, polychlorinated biphenyls, radon gas, infectious medical wastes, and asbestos or asbestos-containing materials.

ACTIVE 686990614v6

"Honor Date" is defined in Section 2.5(b)(i).

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in *clause (a)*, Other Taxes.

"Indemnitee" is defined in Section 14.3(a).

"Information" is defined in Section 14.15(b).

"Insurance Proceeds" means all cash and non-cash proceeds in respect of any insurance policy maintained by any Loan Party or any of its Subsidiaries, including any key-man life insurance proceeds and business interruption proceeds.

~~"Interest Expense" means for any Person on a consolidated basis, for any period, the sum of all cash interest expense paid or required by its terms to be paid during such period (including interest expense attributable to Capital Lease Obligations and Synthetic Lease Obligations), as determined in accordance with GAAP consistently applied in accordance with historical practices.~~

"Interest Period" means (a) initially, the period from the Closing Date to the last day of the month in which the Closing Date occurs, and (b) thereafter, monthly from the first (1st) day of each month to, but excluding the first (1st) day of the following month thereafter; *provided that*, (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (ii) no Interest Period with respect to any Term Loan may extend beyond the Maturity Date.  Borrower and the Administrative Agent may agree that the initial Interest Period may begin on the date of the initial Borrowing and end on the last Business Day of a calendar month.

"Interim DIP Order" means an interim order entered by the Bankruptcy Court in the Cases pursuant to Sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code approving this Agreement and the other Loan Documents, and authorizing on an interim basis the incurrence by the Loan Parties of post-petition secured and superpriority indebtedness in accordance with this Agreement, authorizing the use of "cash collateral" (within the meaning of Bankruptcy Code § 363(a)), granting Liens and providing superpriority administrative expense status, granting adequate protection, and modifying the automatic stay, to be entered on the docket of the Cases within three (3) days of the Petition Date, which order shall be in the form attached to the DIP Financing Motion or otherwise in form and substance satisfactory to the Agent and the Lenders in their reasonable discretion.

"Interim DIP Order Entry Date" means the date on which the Bankruptcy Court enters the Interim DIP Order in the Cases.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or

assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor incurs Debt of the type referred to in *clause (g)* of the definition of "Debt" in respect of such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment but giving effect to any returns or distributions of capital or repayment of principal actually received in case by such Person with respect thereto.

"ISP98" means the International Standby Practices (1998 revision, effective January 1, 1999), International Chamber of Commerce Publication No. 590.

"Joinder Agreement" means an agreement in Acceptable Form under which a Person becomes a Loan Party under this Agreement and assumes all of the applicable duties and obligations of a Loan Party under this Agreement.

"LC" means any letter of credit issued by the LC Issuer for the account of any Loan Party under the terms of this Agreement (and the applicable LC Application), including, without limitation, each Prepetition LC.

"LC Application" means the standard form of letter of credit application and agreement for the issuance or amendment of LCs which is from time to time in use by the LC Issuer.

"LC Credit Extension" means, with respect to any LC, the issuance, amendment, renewal, or increase of LC.

"LC Credit Extension Date" means the date on which an LC Credit Extension occurs.

"LC Disbursement" means an extension of credit resulting from a drawing under any LC which has not been reimbursed or refinanced as a Loan under the Facility.

"LC Exposure" means, when determined and without duplication, the sum of (a) the aggregate undrawn maximum face amount of each LC at such time, *plus* (b) the aggregate unpaid obligations of the Borrower to reimburse the LC Issuer for amounts paid by the LC Issuer under LCs (including all LC Disbursements and excluding any Loans to fund such reimbursement obligations under Section 2.5).  The LC Exposure of any Lender at any time shall be its Commitment Percentage of the total LC Exposure at such time.

"LC Issuer" means First Horizon Bank (formerly known as IBERIABANK, a division of First Horizon Bank), in its capacity as issuer of LCs under this Agreement, or any successor issuer of LCs hereunder.

"Lenders" means the Persons listed on Schedule 1 and any other Person that becomes party to this Agreement pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party to this Agreement pursuant to an Assignment and Assumption.

ACTIVE 686990614v6

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify Borrower and the Administrative Agent.

"Lien" means any lien (including statutory liens), mortgage, security interest, financing statement, collateral assignment, pledge, negative pledge assignment, charge, encumbrance, hypothecation, deposit arrangement, preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, the interest of a lessor under a capital lease and any synthetic or any financing lease having substantially the same economic effect as any of the foregoing), or encumbrance of any kind, and any other right of or arrangement with any creditor (whether based on common law, constitutional provision, statute or contract) to have its claim satisfied out of any property or assets, or their proceeds, before the claims of the general creditors of the owner of the property or assets.

"Litigation" means any action by or before any Governmental Authority, arbitrator, or arbitration panel.

"Loan" or "Loans" means the Term Loans.

"Loan Documents" means (a) this Agreement, all certificates and requests delivered under this Agreement, and all exhibits and schedules to this Agreement, (b) the Notes, (c) all Guaranty Agreements, (d) the Security Documents, (e) all Subordination Agreements (if any), (f) all LCs and LC Applications, (g) all Collateral Access Agreements, (h) each Financing Order, (i) all other agreements, documents, and instruments in favor of Administrative Agent, any Lender, the LC Issuer, ever delivered in connection with or under this Agreement, and (j) all renewals, extensions, amendments, modifications, supplements, restatements, and replacements of, or substitutions for, any of the foregoing; provided, that the Loan Documents shall not include any Prepetition Loan Documents.

"Loan Parties" means, collectively, Borrower and the Guarantors (including any other Person who becomes a party to this Agreement pursuant to a Joinder Agreement) and their respective successors and assigns, and "Loan Party" means any one of them or all of them individually, as the context may require.

"Manufactured (Mobile) Home" has the meaning assigned to such term in the applicable Flood Insurance Regulation.

"Material Adverse Effect" means (a) the material impairment of the ability of the Loan Parties (taken as a whole) to perform any of their payment or other material obligations under any Loan Document, (b) the material impairment of the ability of Administrative Agent to enforce any Loan Party's material obligations, or Administrative Agent's rights, under any Loan Document, (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Loan Parties (taken as a whole) of any Loan Document to which they are a party, or (d) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent), or condition (financial or otherwise) of the Loan Parties, taken as a whole, as represented in the initial financial statements delivered to the

Administrative Agent on or about the Closing Date; provided that changes, events, effects or circumstances which, directly or indirectly, to the extent that relate to or result from the following, shall be excluded from the determination of a Material Adverse Effect: (i) the filing of the Cases (and any defaults or claims under pre-petition agreements so long as the exercise of remedies as a result of such defaults or claims are stayed under the Bankruptcy Code or such agreements are voided or invalidated by the Bankruptcy Court); (ii) any litigation or claim threatened or initiated by creditors of the Loan Parties against the Loan Parties or any of their officers or directors, in each case, arising out of the filing of the Cases or the transactions contemplated thereby; and (iii) the existence of any claims or liability from the period prior to the commencement of the Cases, which is unsecured and junior in priority to the Obligations.

"Material Adverse Event" means any circumstance or event that, individually or collectively with other circumstances or events, could reasonably be expected to have a Material Adverse Effect.

"Material Agreement" means (a) all agreements, indentures or notes governing the terms of any Material Indebtedness (other than the Obligations), (b) [reserved], (c) each Supply Contract under which the total amount payable by any party thereto in any period of twelve consecutive months exceeds the Threshold Amount, (d) the Oil Company Agreements, and (e) all other agreements, documents, contracts, indentures and instruments pursuant to which (i) any Loan Party or any of its Subsidiaries are obligated to make payments in any twelve month period in excess of the Threshold Amount, (ii) any Loan Party or any of its Subsidiaries expects to receive revenue in any period of twelve consecutive months in excess of the Threshold Amount, and (iii) a default, breach or termination thereof could reasonably be expected to result in a Material Adverse Effect.

"Material Indebtedness" means Debt of Borrower or any other Loan Party or any of its Subsidiaries in an aggregate committed or outstanding principal amount in excess of the Threshold Amount.

"Maturity Date" the earliest of (i) the date on which the Administrative Agent (acting at the written direction of the Required Lenders) provides written notice to the Borrower, counsel for the Loan Parties and counsel for any Committee of the occurrence of any Event of Default, (ii) the date of acceleration of the Obligations under Section 11.2, (iii) the effective date of a confirmed plan of reorganization or liquidation in the Cases, (iv) the entry of an order converting any of the Cases to a case or cases under Chapter 7 of the Bankruptcy Code, (v) the entry of an order dismissing any of the Cases, (vi) the entry of an order appointing a chapter 11 trustee or examiner with expanded powers in any of the Cases, (vii) the failure of the Borrower to obtain entry of the Interim DIP Order within five (5) Business Days following the Petition Date, (viii) the failure of the Borrower to obtain entry of the Final DIP Order on or before April 25, 2023, ~~or~~ (ix) August 15, 2023, or (x) the date ~~that is 120 days following the Petition Date~~of any sale, in one or a series of transactions approved by the Administrative Agent with respect to the purchase of all or substantially of the Loan Parties' assets.

"Maximum Rate" means the maximum rate of nonusurious interest permitted from day-to-day by Applicable Law, including Chapter 303 of the Texas Finance Code (the "Finance Code") (and as the same may be incorporated by reference in other Texas statutes). To the

extent that Chapter 303 of the Finance Code is relevant to Lenders for the purposes of determining the Maximum Rate, Lenders may elect to determine such applicable legal rate pursuant to the "weekly ceiling," from time to time in effect, as referred to and defined in Chapter 303 of the Finance Code; subject, however, to the limitations on such applicable ceiling referred to and defined in the Finance Code, and further subject to any right any Lender may have subsequently, under Applicable Law, to change the method of determining the Maximum Rate.

"Milestones" has the meaning ascribed to it in Section 8.20.

"Minimum Cash Amount" means an amount equal to $7,000,000.

"Minimum Sale Amount" means the amount set forth on Schedule 3.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage" means each mortgage, deed of trust, deed to secure debt, leasehold mortgage, leasehold deed of trust, and other similar instruments, in each case in Acceptable Form and executed by any Loan Party for the benefit of Administrative Agent, to secure the Obligations.

"National Flood Insurance Program" means the program created by any Governmental Authority of the U.S. pursuant to the Flood Insurance Regulations that mandates the purchase of flood insurance to cover real property improvements located in Special Flood Hazard Areas in participating communities and provides protection to property owners through a federal insurance program.

"Net Proceeds" means (a) with respect to any Disposition of any asset by any Person, the aggregate amount of cash and non-cash proceeds from such Disposition received by, or paid to or for the account of, such Person, net of customary and reasonable out-of-pocket costs, fees, and expenses, (b) with respect to the issuance of Equity Interests or Subordinated Debt or the making of any cash capital contributions, the cash and non-cash proceeds received from such issuance, incurrence, or contribution net of attorneys' fees, investment banking fees, accountants fees, underwriting discounts and commissions and other customary fees and expenses incurred in connection with such issuance, (c) with respect to Insurance Proceeds, all cash proceeds received by any Loan Party or any of its Subsidiaries, Administrative Agent, or any Lender from an insurer under any insurance policy maintained by any such Loan Party or any of its Subsidiaries, and (d) with respect to Eminent Domain Proceeds, all cash proceeds received by any Loan Party or any of its Subsidiaries from any Governmental Authority net of attorney's fees and other customary and reasonable out of pocket costs, fees, and expenses.  Non-cash proceeds include any cash proceeds received by way of deferred payment of principal pursuant to a note, installment receivable, purchase price adjustment receivable, or otherwise, but only as and when received.

"Non-Consenting Lender" means any Lender that does not approve any consent, waiver or amendment that (a) requires the approval of all affected Lenders in accordance with the terms of Section 14.8 and (b) has been approved by the Required Lenders.

ACTIVE 686990614v6

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Non-Qualifying Party" means Borrower or any Guarantor that on the Eligibility Date fails for any reason to qualify as an Eligible Contract Participant.

"Nonrenewal Notice Date" is defined in Section 2.5(a)(iv).

"Notes" means the Term Loan Notes.

"Obligations" means the collective reference to:

(a)     all present and future Debt, liabilities and obligations (including the Loans, the LC Exposure, and indemnity obligations), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, and all renewals, increases and extensions thereof, or any part thereof, now or in the future owed to the Administrative Agent, any Lender, the LC Issuer, by any Loan Party under this Agreement or any of the other Loan Documents, together with all interest accruing thereon, reasonable fees, costs and expenses payable under the Loan Documents or in connection with the enforcement of rights under the Loan Documents, including (i) fees and expenses under this Agreement, (ii) interest and fees that accrue after the commencement of any proceeding under any Debtor Relief Law naming any Loan Party or any Affiliate thereof as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, and (iii) any obligation to pay, discharge, and satisfy the Erroneous Payment Subrogation Rights; and

(b)     Bank Product Liabilities;

provided, that the Obligations shall not include any Prepetition Obligations (other than the Roll-up Amount).

"Off-Balance Sheet Liabilities" means, for any Person, (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (b) any liability of such Person under any sale and leaseback transactions that do not create a liability on the balance sheet of such Person, (c) any Synthetic Lease Obligations, or (d) any obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person.

"Oil Company Agreements" shall mean all agreements entered into now and hereafter by and between Borrower, as purchaser, and various oil companies for the purchase, distribution and marketing by Borrower of oil, gasoline and petroleum products, together with all amendments now or hereafter entered into by the parties thereto.

"Organizational Documents" means, for any Person, (a) the articles of incorporation or certificate of formation and bylaws of such Person if such Person is a corporation, (b) the articles of organization or certificate of formation and regulations or limited liability company agreement (or other similar governing document) of such Person if such Person is a limited liability company, (c) the certificate of limited partnership or certificate of formation and the limited

ACTIVE 686990614v2

partnership agreement of such Person if such Person is a limited partnership, or (d) the documents under which such Person was created and is governed if such person is not a corporation, limited liability company or limited partnership.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 4.7).

"Participant" is defined in Section 14.7(d).

"Participant Register" is defined in Section 14.7(d).

"Patriot Act" means USA Patriot Act (Title III of Pub.L107-56 (signed into law October 26, 2001)).

"Payment Recipient" is defined in Section 14.17(a).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Debt" means Debt permitted in Section 9.1.

"Permitted Discretion" means a determination made in the exercise of reasonable business judgment (from the perspective of a senior secured lender).

"Permitted Liens" means Liens permitted in Section 9.2.

"Permitted Third Party Bank" shall mean (a) a Lender and (b) any bank or other financial institution with whom any Loan Party maintains a deposit account or lockbox in a state in which First Horizon Bank does not accept deposits, in each case, with whom a Control Account Agreement has been executed

"Permitted Prior Liens" means Liens described in clauses (b) through (f) of Section 9.2.

"Person" means any natural person, partnership, limited partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, syndicate, Governmental Authority or other entity or organization.

"Petition Date" has the meaning ascribed to it in the Recitals to this Agreement.

"Platform" is defined in Section 14.1(d)(i).

"Potential Default" means the occurrence of any event or the existence of any circumstance that would, with the giving of notice or lapse of time or both, become a Default.

"Prepetition Agent" means FIRST HORIZON BANK (formerly known as IBERIABANK, a division of First Horizon Bank), in its capacity as administrative agent for the benefit of the Prepetition Lenders.

"Prepetition Collateral" means the collateral described and defined in the Prepetition Loan Documents, which includes "cash collateral" (within the meaning of Bankruptcy Code § 363(a)), as applicable.

"Prepetition Credit Agreement" has the meaning set forth in the Recitals.

"Prepetition LCs" means the "LCs" as defined in and issued pursuant to the Prepetition Credit Agreement as of the Closing Date and described on Schedule 2 to this Agreement.

"Prepetition Lenders" means the financial institutions from time to time parties to the Prepetition Credit Agreement as lenders.

"Prepetition Liens" means the first priority liens and security interests granted to the Prepetition Agent for the benefit of the Prepetition Lenders by certain of the Prepetition Loan Documents to secure the Prepetition Obligations to the Prepetition Lenders.

"Prepetition Loan Documents" means the "Loan Documents" as described and defined in the Prepetition Credit Agreement.

"Prepetition Obligations" means obligations of certain of the Loan Parties for unpaid principal, accrued and unpaid interest, fees, costs, expenses, indemnities and other amounts arising under the Prepetition Loan Documents and shall include all "Obligations" under the Prepetition Credit Agreement.

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor (or any successor agency), as any such exemption may be amended from time to time.

"QFC" is defined in Section 2.9(b).

"QFC Credit Support" is defined in Section 2.9.

"Qualified Equity Interests" means any Equity Interests that are not Disqualified Equity Interests.

"Ratable Share" is defined in Section 13.6.

ACTIVE 686990614v6

"Recipient" means (a) the Administrative Agent, (b) any Lender, and (c) the LC Issuer, as applicable.

"Register" is defined in Section 14.7(c).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Release" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing, or dumping of any substance into the environment.

"Removal Effective Date" is defined in Section 12.6(b).

"Required Lenders" means, at any time, Lenders having Total Credit Exposure representing more than 50% of the Total Credit Exposure of all Lenders; *provided that*, (a) the Total Credit Exposure of any Defaulting Lender shall be disregarded in determining Required Lenders at any time, and (b) while there are only two Lenders, Required Lenders means all Lenders.

"Resignation Effective Date" is defined in Section 12.6(a).

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means (a) the president, chief executive officer, chief financial officer, controller, chief accounting officer, or chief operating officer of Borrower, or (b) any other individual who is designated in writing to the Administrative Agent by Borrower as a Person authorized to take specific actions on behalf of Borrower.

"Restricted Payment" means with respect to any Person, (a) any Distribution or other payment in respect of the Equity Interests of such Person, (b) any Distribution or other payment with respect to any option, warrant, or other right to acquire any Equity Interests of such Person, (c) any payment or prepayment of principal of, premium, or interest on, or the redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), establishment of a sinking fund, or similar payment with respect to, any Subordinated Debt, or (d) any management or similar fees.

"Restrictive Agreement" means any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of any Loan Party or any of its Subsidiaries to create, incur or permit to exist any Lien upon any of its property or assets, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any Equity Interests or to make or repay loans or advances to any Loan Party or any of its Subsidiaries or to guarantee Debt of any Loan Party or any of its Subsidiaries; *provided that* the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured debt permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such

ACTIVE 686990614v6

Debt and *clause (a)* shall not apply to customary provisions in leases and other contracts restricting the assignment thereof.

"<u>Roll-up Amount</u>" means the aggregate outstanding amount of all Prepetition Obligations, including all "LC Exposure" with respect to the Prepetition LCs as of the Closing Date to be converted into LC Exposure and LCs hereunder.

"<u>S&P</u>" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business.

"<u>Sale and Leaseback Transaction</u>" means any arrangement with any Person providing for the leasing by Borrower or any Subsidiary of Borrower of any property (except for temporary leases for a term, including any renewal thereof, of not more than one year and except for leases between Borrower and a Subsidiary or between Subsidiaries), which property has been or is to be sold or transferred by Borrower or such Subsidiary to such Person.

"<u>Sanctioned Country</u>" means, at any time, a country or territory which is itself the subject or target of any Sanctions.

"<u>Sanctioned Person</u>" means, at any time, (a) any Person currently the subject or target of Sanctions or listed in any Sanction-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State or by the United Nations Security Council, the European Union or any European Union member state, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person or Persons described in the foregoing *clauses (a) or (b)*.

"<u>Sanctions</u>" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom.

 "<u>Satisfactory Asset Purchase Agreement</u>" means an asset purchase agreement from one or more third parties in form and substance reasonably satisfactory to the Administrative Agent with respect to the purchase of all or substantially of the Loan Parties' assets for cash consideration in an aggregate amount which equals or exceeds the Minimum Sale Amount, which asset purchase agreement shall have been executed and delivered by the Loan Parties and each applicable third party.

"<u>Satisfactory Indication of Interest</u>" means an indication of interest from one or more third parties with respect to the purchase of all or substantially of the Loan Parties' assets for cash consideration in an aggregate amount which equals or exceeds the Minimum Sale Amount.

"<u>Satisfactory Letter of Intent</u>" means a letter of intent from one or more third parties with respect to the purchase of all or substantially of the Loan Parties' assets for cash consideration in an aggregate amount which equals or exceeds the Minimum Sale Amount, which letter of intent shall have been executed and delivered by the Loan Parties and each applicable third party.

ACTIVE 686990614v6

"Satisfactory Sale" means the sale, in one or a series of transactions approved by the Administrative Agent with respect to the purchase of all or substantially of the Loan Parties' assets for cash consideration in an aggregate amount which equals or exceeds the Minimum Sale Amount.

"Second Amendment Committed Amount" means (a) as to all Lenders with a Second Amendment Term Loan Commitment, the aggregate amount set out for the Lenders on Schedule 1 and (b) as to any Lender with a  Second Amendment Term Loan Commitment, the amount set out opposite such Lender's name on Schedule 1 as its Second Amendment Committed Amount.

"Second Amendment Effective Date" means July 19, 2023.

"Second Amendment Term Loan" has the meaning given such term in Section 2.3.

"Second Amendment Term Loan Commitment" means (a) the aggregate commitment of all Lenders set forth on Schedule 1 to make the Second Amendment Term Loan in an aggregate amount not to exceed the Second Amendment Committed Amount, and (b) as to any Lender, the obligation of such Lender to make a portion of the Second Amendment Term Loan under this Agreement in an aggregate principal amount not to exceed the Second Amendment Committed Amount for such Lender.

"Second Amendment Term Loan Percentage" means, as to any Lender with a Second Amendment Term Loan Commitment, at any time of determination, the *ratio of* (i) the sum of (A) the unfunded Second Amendment Term Loan Commitment of such Lender plus (B) the outstanding principal balance of Second Amendment Term Loans funded by such Lender to (ii) the sum of (A) the unfunded Second Amendment Term Loan Commitment of all the Lenders plus (B) the outstanding principal balance of Second Amendment Term Loans of all Lenders

"Secured Party" means each of and "Secured Parties" means all of, the Administrative Agent, the Lenders, the LC Issuer and the Bank Product Providers.

"Security Agreement" means each Security Agreement in Acceptable Form executed by any Loan Party, as debtor, and by Administrative Agent, as secured party.

"Security Documents" means all Financing Orders, Security Agreements, Mortgages, pledge agreements, Control Account Agreements, and all other documents executed in connection therewith, in each case to create or perfect a Lien in favor of Administrative Agent on the assets of the Loan Parties.

"Special Flood Hazard Area" means an area that FEMA's current flood maps indicate has at least a one percent (1%) chance of a flood equal to or exceeding the base flood elevation (a 100-year flood) in any given year.

"Subordinated Debt" means Debt which is contractually subordinated in right of payment, collection, enforcement and lien rights to the prior payment in full of the Obligations on terms satisfactory to the Administrative Agent.

ACTIVE 686990614v6

"Subordination Agreement" means a subordination agreement in Acceptable Form.

"Subsidiary" of a Person means a corporation, partnership, limited liability company, association or joint venture or other business entity of which a majority of the Equity Interests having ordinary voting power for the election of the Governing Body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time owned or the management of which is controlled, directly, or indirectly through one or more intermediaries, by such Person.   Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.  For the avoidance of doubt, United States Fueling Company, LLC, a Georgia limited liability company, shall not be deemed to be a Subsidiary for purposes of this Agreement or any of the other Loan Documents.

"Super-Priority Claims" has the meaning ascribed to it in Section 1.11.

"Supply Contracts" shall mean all agreements entered into now and hereafter by and between Borrower, as seller, and an operator of a filling station/convenience store, as purchaser, for the supply and sale by Borrower of agreed-upon minimum quantities of gasoline and related petroleum products to such purchaser over a term of years, together with all amendments now or hereafter entered into by the parties thereto.

~~"Supported QFC" is defined in Section 2.9.~~

"Synthetic Lease Obligations" means the obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but, upon the insolvency or bankruptcy of such Person, would be characterized as the Debt of such Person (without regard to accounting treatment).

"Tax Code" means the Internal Revenue Code of 1986, as amended, and related rules, regulations and published interpretations.

~~"Tax Liability Amount" means, when determined, with respect to a Person taxed as a partnership, S corporation, or disregarded entity for U.S. federal income tax purposes, the excess (if any) of (a) the product of (i) the net amount of cumulative taxable income and gain (net of losses and deductions, and in all cases excluding allocations under Section 704(c) of the Code) currently and previously allocated to such Person's owners (or the owners' predecessors-in-interest) in accordance with the Person's Organizational Documents since the inception of the Person through the end of the applicable period, and (ii) the combined (A) maximum prevailing U.S. federal income tax rate applicable to individuals and (B) if any owners of such Person are subject to state or local income tax on the amounts determined under clause "(i)" for or with respect to the applicable period, the highest state and local income tax rates applicable to such owners with respect to such amounts for or with respect to such applicable period (taking into account for purposes of this clause (ii) the deductibility of state and local taxes for U.S. federal income tax purposes and the character of income and loss allocated as it effects the applicable tax rate), over (b) the cumulative amount of Distributions by such Person~~

30

~~to its current and prior owners (or the owners' predecessors-in-interest) since the inception of the Person through the end of the applicable period.~~

"<u>Taxes</u>" means, for any Person, all present and future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority upon that Person, its income, or any of its properties, franchises or assets (including any applicable interest, additions to tax, or penalties).

"<u>Term Loan</u>" means any Loan made (or deemed made) to Borrower in accordance with <u>Section 2.3</u>.

"<u>Term Loan Note</u>" means a promissory note made by Borrower in favor of a Lender evidencing the portion of the Term Loan made by such Lender, substantially in the form attached as <u>Exhibit A-3</u>, and any amendments, supplements and modifications thereto, any substitutes therefor, and any replacements, restatements, renewals or extension thereof, in whole or in part.

"<u>Term Loan Percentage</u>" means, as to any Lender, at any time of determination, the *ratio of* (i) the sum of (A) the unfunded Committed Amount of such Lender plus (B) the Term Principal Amount of such Lender to (ii) the sum of (A) the unfunded Committed Amount of all the Lenders plus (B) the Term Principal Amount of all Lenders.

"<u>Term Principal Amount</u>" means, when determined, (a) for all Lenders, the aggregate outstanding principal balance of the Term Loan (including, after the Final DIP Order Entry Date, the Roll-up Amount), and (b) for any Lender, such Lender's Term Loan Percentage of the aggregate outstanding principal balance of the Term Loan (including, after the Final DIP Order Entry Date, the Roll-up Amount).

"<u>Termination Date</u>" means the date that all Obligations (other than contingent Obligations with respect to indemnity and reimbursement of expenses as to which no claim has been made as of the time of determination) have been paid in full in cash, all LCs have been terminated or expired (or been Cash Collateralized), and all Commitments shall have terminated.

"<u>Threshold Amount</u>" means $5,000,000.

"<u>Total Credit Exposure</u>" means, when determined for any Lender, (a) Term Principal Amount of such Lender at such time, *plus* (b) without duplication, the LC Exposure of such Lender at such time and the unused Committed Amount of such Lender at such time.

"<u>Trade Date</u>" is defined in <u>Section 14.7(b)(1)(B)</u>.

"<u>UCC</u>" means the Uniform Commercial Code in effect from time to time in the State of Texas or any other applicable jurisdiction.

"<u>UK Financial Institution</u>" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct

ACTIVE 686990614v6

Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Uniform Customs" means the Uniform Customs and Practice for Documentary Credits (2007 revision) effective July, 2007, International Chamber of Commerce Publication No. 600.

"Unreimbursed Amount" is defined in Section 2.5(b)(1).

"U.S." means United States of America.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Tax Code.

"Withdrawal Liability" means liability to an ERISA Plan as a result of a complete or partial withdrawal from such ERISA Plan.

"Withholding Agent" means any Loan Party and the Administrative Agent.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.2    **Other Definitional Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified in this Agreement or in such other Loan Document:

(a)    the definitions of terms in this Agreement shall apply equally to the singular and plural forms of the terms defined, and whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms, and any reference in this Agreement to any Person shall be construed to include such Person's successors and assigns;

(b)    the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", the words "herein", "hereof" and "under this Agreement", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, and all references in this

ACTIVE 686990614v6

Agreement to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement;

(c)     the word "will" shall be construed to have the same meaning and effect as the word "shall", the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights, the word "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form;

(d)     in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including";

(e)     any conflict or ambiguity between this Agreement and any other Loan Document is controlled by the terms and provisions of this Agreement;

(f)     Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears, unless otherwise indicated; and

(g)     section headings in this Agreement and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

1.3     **[Reserved]**.

1.4     **Accounting Terms**.  All accounting terms not specifically or completely defined in this Agreement shall be construed in conformity with, and all financial data required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, applied on a consistent basis, as in effect from time to time and in a manner consistent with that used in preparing the audited financial statements required by Section 8.1(a), except as otherwise specifically prescribed in this Agreement and, in the case of unaudited statements, without footnotes and year-end adjustments.

1.5     **UCC Terms**.  Terms defined in the UCC in effect on the Closing Date and not otherwise defined in this Agreement shall, unless the context otherwise indicates, have the meanings provided by those definitions.  Subject to the foregoing, the term "*UCC*" refers, as of any date of determination, to the UCC then in effect.

1.6     **Rounding**.  Any financial ratios required to be maintained by the Loan Parties pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio or percentage is expressed in this Agreement and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

1.7     **References to Agreement and Laws**.  Unless otherwise expressly provided herein, (a) references to Organizational Documents, agreements (including the Loan Documents)

ACTIVE 686990614v6

and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are not prohibited by any Loan Document; and (b) references to any Applicable Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Applicable Law.

1.8    **Time**.  Unless otherwise specified, all references in this Agreement to times of day shall be references to Eastern time (daylight or standard, as applicable).

1.9    **Divisions**.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws):  (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

1.10    **[Reserved]**.

1.11    **Superpriority Administrative Expense Claim**.  Subject to and subordinate only to the Carve-Out, the Obligations of the Loan Parties arising hereunder shall constitute allowed super-priority administrative claims in accordance with Sections 364(c)(1) and 507(b) of the Bankruptcy Code, which claims shall have priority in right of payment over any and all other obligations, liabilities and indebtedness of the Loan Parties, now in existence or hereafter incurred by the Loan Parties and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia, Bankruptcy Code §§ 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), or 726 (to the extent permitted by Applicable Law), and/or 364(c)(1), and any other provision of the Bankruptcy Code (including, subject to entry of the Final DIP Order, section 506(c)) (the "Super-Priority Claims"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre- and post-petition property of the Loan Parties and all proceeds thereof (excluding proceeds of Avoidance Actions until the Final DIP Order Entry Date).

1.12    **Waiver of Any Priming Rights**.  Each Loan Party agrees on behalf of itself and its bankruptcy estate, that for so long as any Obligations shall be outstanding, such Loan Party and such Loan Party's bankruptcy estate hereby irrevocably waive any right pursuant to Section 364(c) or 364(d) of the Bankruptcy Code or otherwise to grant any Lien or ~~Security Interest~~security interest of equal or greater priority than the Liens and Security Interest securing the Obligations or to approve a Claim of equal or greater priority than the Obligations.

1.13    **Waiver of Claims to Surcharge**.  Subject to entry of the Final DIP Order, each Loan Party and such Loan Party's bankruptcy estate hereby waive any claims to surcharge the Collateral under Section 506(c) of the Bankruptcy Code.

## ARTICLE 2

## COMMITMENTS, LOANS, AND LCS

2.1     **[Reserved]**.

2.2     **[Reserved]**.

2.3     **Facility**.   Subject to the terms and conditions of this Agreement (including, without limitation, Article 6 of this Agreement and the Financing Orders):

(a)     From and after the Second Amendment Effective Date and to (but not including) the Maturity Date, each Lender with a Second Amendment Term Loan Commitment agrees to make an additional Term Loans to Borrower in an amount equal to such Lender's Second Amendment Term Loan Percentage of the Second Amendment Term Loan Commitment (the "Second Amendment Term Loans" and, together with the Existing Term Loans (defined below), collectively, the "Term Loans") as follows:

(i)     $5,200,000 in a single draw by no later than July 20, 2023 (the "Second Amendment Initial Advance"); and

(ii)     $3,800,000 in a single draw by no later than July 25, 2023 (the "Second Amendment Subsequent Advance");

(b)     (a) Each Lender agrees to make Loans to Borrower ratably in accordance with its Term Loan Percentage and in an aggregate principal amount which shall not cause (i) such Lender's Term Principal Amount to exceed its Committed Amount or (ii) the Term Principal Amount of all Lenders to exceed the Committed Amount for all Lenders. Each Term Loan, once it has been advanced and then paid or prepaid, may not be reborrowed.

(b)     Each Term Loan shall be made by a Lender ratably in accordance with its Term Loan Percentage of such Borrowing.

(c)     The Term Loans shall be made as follows:

(i)     Upon the Interim DIP Order Entry Date, the Lenders shall make initial Term Loans in an aggregate amount not to exceed **$20,000,000.00** (collectively, the "Initial Advance"); and

(ii)     from the Final DIP Order Entry Date to and until the date contemplated by the Approved Budget, the Lenders shall make subsequent Term Loans (the "Final DIP Order Advance") in an aggregate amount not to exceed **$8,600,000.00**, which shall be made in a single draw.

(iii)     from the First Amendment Effective Date to and until (but not including) the Maturity Date, the Lenders shall make subsequent Term Loans

(each, a "Subsequent Advance") in an aggregate amount not to exceed $9,250,000.00 as follows:

      (A)    up to $2,312,500 in a single draw after the receipt by the Lenders of a Satisfactory Indication of Interest;

      (B)    up to $2,312,500 in a single draw after receipt by the Lenders of a Satisfactory Letter of Intent;

      (C)    up to $2,312,500 in a single draw after receipt by the Lenders of a Satisfactory Asset Purchase Agreement; and

      (D)    up to $2,312,500 in a single draw after entry of an order approving a Satisfactory Sale;

provided, that the aggregate amount of all

(c)    Notwithstanding anything to the contrary contained in this Section 2.3, the Borrower hereby acknowledges, confirms and agrees that (i) immediately prior to the Second Amendment Effective Date, the aggregate outstanding principal amount of the Term Loans (other than the Roll-Up Amount and the amount of all interest, fees, expenses and other amounts which have been capitalized and addition to the principal amount) is equal to $37,850,000.00 (such Loan, the "Existing Term Loan" and such amount, the "Existing Term Loan Amount"), (ii) the Existing Term Loan is outstanding and payable to the Lenders without set-off, counterclaim, deduction, offset or defense and is secured by a first priority security interest in and lien on the Collateral (subject to Permitted Prior Liens), (iii) the Existing Term Loan shall not be repaid on the Second Amendment Effective Date, but rather, shall constitute a portion of the Term Loan outstanding under this Agreement and be subject to the terms and conditions herein set forth, (iv) for all purposes of this Agreement and the other Loan Documents, the Existing Term Loan and the Second Amendment Term Loans, collectively, shall constitute the Term Loan outstanding on the Second Amendment Effective Date, and (v) after giving effect to the making of the Second Amendment Term Loan on the Second Amendment Effective Date, the Term Loan is outstanding and payable to the Lenders under the terms of this Agreement and the other Loan Documents without set-off, counterclaim, deduction, offset or defense and is secured by a first priority security interest in and lien on the Collateral (subject to Permitted Prior Liens).

(d)    Term Loans to be made by the Lenders hereunder shall not exceed the Maximum Advance Amount at any time.  Term Loans (including the Initial Advance, the Final DIP Order Advance, and each Subsequent Advance) shall be used by the Borrower only to make disbursements in accordance with the Approved Budget.  Without limiting the foregoing, the proceeds of the Second Amendment Term Loans shall be used by the Loan Parties, in part, to pay post-petition Taxes due and payable by the Loan Parties in accordance with Section 8.9.  Subject to the satisfaction of the conditions set forth herein, Term Loans shall be made upon delivery of a Notice of Borrowing Request by the Borrower in accordance with Section 2.4.

ACTIVE 686990614v6

(e)   (d)  Roll-Up Facility Loans.  Upon entry ofOn the Final DIP Order Entry Date, the amount of the outstanding Prepetition Obligations of the Lenders shall bewere deemed to have been refinanced by and/or converted into Term Loans hereunder and shall beare deemed to be part of the Obligations.  On the Closing Date, all LC Exposure with respect to Prepetition LCs on the Closing Date shall bewere "rolled up" and constitute LC Exposure hereunder and all Prepetition LCs shall beare deemed to be LCs issued hereunder and shall be deemed to be part of the Obligations.

(f)   (e)  Single Loan.  All Term Loans to the Borrower and all of the other Obligations of the Loan Parties (including, upon the entry of the Final DIP Order, the Roll-Up Amount) arising under this Agreement and the other Loan Documents shall constitute one general obligation of the Loan Parties secured by all of the Collateral.

2.4   **Method of Borrowing, Funding of Loans, and Minimum Amounts**.

(a)   Except for the Initial Advance, by no later than 10:00 a.m. at least five (5) Business Days prior to the date of the requested Borrowing of Loans, Borrower shall notify the Administrative Agent electronically as well as submit a written Borrowing Request to the Administrative Agent (A) specifying the amount of the Loans requested, (B) specifying the date of the requested Borrowing, and (C) certifying that Borrower has complied in all respects with Section 6.2.

(b)   Each Borrowing shall be in a minimum amount of the lesser of $1,000,000 (and in integral multiples of $10,000 in excess thereof) or the remaining amount available to be borrowed.

(c)   UponWith respect to the Second Amendment Term Loans, upon receipt of a Borrowing Request, the Administrative Agent shall promptly inform the Lenders as to the terms thereof.  Each Lender with a Second Amendment Term Loan Commitment shall make its CommitmentSecond Amendment Term Loan Percentage of the requested Borrowing available to the Administrative Agent in Dollars and in immediately available funds at the Administrative Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Borrowing Request.

(d)   UponWith respect to the Second Amendment Term Loans, upon satisfaction of the conditions set out in Section 6.2,

(i)   For the Second Amendment Initial Advance, the applicable amount of the requested Second Amendment Term Loans will then be made available to Borrower by the Administrative Agent either by (i) crediting the account of Borrower on the books of the Administrative Agent with the amount of such funds, or (ii) wire transfer of such funds, in each case in accordance with instructions provided by Borrower to (and reasonably acceptable to) the Administrative Agent; and

(ii)   For the Second Amendment Subsequent Advance, the applicable amount of the requested Second Amendment Term Loans will then be made available to Borrower by the Administrative Agent by transfer of such funds to a

37

deposit account maintained with the Administrative Agent and under the sole dominion and control of the Administrative Agent, pursuant to documentation in Acceptable Form (such deposit account, the "Tax Payments Blocked Account"). Borrower hereby grants to the Administrative Agent a first priority security interest in the Tax Payments Blocked Account and acknowledges and agrees that such deposit account constitutes Collateral. The funds in the Tax Payments Blocked Account shall be disbursed to satisfy postpetition tax obligations upon satisfaction of the requirements of Section 8.9.

2.5 **Subfacility for Letters of Credit**.

(a) The LC Commitment.

(i) The Borrower, the Administrative Agent, and the Lenders hereby acknowledge and agree that all Prepetition LCs shall constitute LCs under this Agreement as of the Closing Date with the same effect as if such Prepetition LCs were issued by LC Issuer at the request of Borrower on the Closing Date. Borrower shall not request, and LC Issuer shall not have any obligation to issue any LC or make any LC Credit Extension after the Closing Date.

(ii) Each LC Credit Extension for an amendment of any outstanding LC shall be made upon the request of Borrower delivered to the LC Issuer in the form of an LC Application, appropriately completed and signed by a Responsible Officer of Borrower. Such LC Application must be received by the LC Issuer not later than 10:00 a.m. at least five (5) Business Days prior to the proposed LC Credit Extension Date. Such LC Application shall specify in form and detail satisfactory to the LC Issuer (1) the LC to be amended, (2) the proposed date of the amendment (which shall be a Business Day), (3) the nature of the proposed amendment, and (4) such other matters as the LC Issuer may reasonably require.

(iii) Promptly after receipt of any LC Application, the LC Issuer will confirm that the requested LC Credit Extension is permitted in accordance with the terms of this Agreement, and, if so, then, subject to the terms and conditions hereof, the LC Issuer may, on the requested date enter into the applicable amendment in each case in accordance with the LC Issuer's usual and customary business practices

(iv) If Borrower so requests in any applicable LC Application, the LC Issuer may, in its sole and absolute discretion, agree to issue an LC that has automatic renewal provisions (each, an "Auto-Renewal LC"); *provided that*, any such Auto-Renewal LC must permit the LC Issuer to prevent any such renewal at least once in each twelve-month period (commencing with the date of issuance of such LC) by giving prior notice to the beneficiary thereof not later than a day (the "Nonrenewal Notice Date") in each such twelve-month period to be agreed upon at the time such LC is issued. Unless otherwise directed by the LC Issuer, Borrower shall not be required to make a specific request to the LC Issuer for any such renewal. The LC Issuer may elect not to renew any auto-renewal LC for any

ACTIVE 686990614v6

reason and the LC Issuer may not permit any such Credit Extension if, (A) the LC Issuer has determined that such Credit Extension would not be permitted or the LC Issuer would have no obligation at such time to issue such LC in its renewed form under the terms hereof (by reason of the provisions of Section 2.5(a)(i)) or otherwise, or (B) it has received notice (which may be by telephone or in writing) on or before the day that is two (2) Business Days before the Nonrenewal Notice Date (1) that beneficiary has elected not to permit such renewal or (2) from the Administrative Agent or the Borrower that one or more of the applicable conditions specified in Section 6.2 is not then satisfied.

(b)    Drawings and Reimbursements.

(i)    Upon receipt from the beneficiary of any LC of any notice of a drawing under such LC, the LC Issuer shall notify Borrower thereof.  Not later than 11:00 a.m. on the date of any payment by the LC Issuer under an LC (each such date, an "Honor Date"), Borrower shall reimburse the LC Issuer in an amount equal to the amount of such drawing.  If Borrower fails to so reimburse the LC Issuer by such time, Borrower shall be deemed to have requested a Loan under the Facility to be disbursed on the Honor Date in an amount equal to the amount of the unreimbursed drawing (the "Unreimbursed Amount"), without regard to the minimum amount specified in Section 2.4 for the principal amount of Loans, but subject to the conditions set out in Section 6.2.  Any notice given by the LC Issuer pursuant to this Section 2.5(b)(i) may be given by telephone if immediately confirmed in writing; *provided that*, the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(ii)    With respect to any Unreimbursed Amount that is not fully refinanced by a Loan because the conditions set out in **Section 6.2** cannot be satisfied, sufficient funds are not available under the Facility, or for any other reason, Borrower shall be deemed to have incurred from the LC Issuer an LC Disbursement in the amount of the Unreimbursed Amount, which LC Disbursement shall accrue interest at the Default Rate and be due and payable on demand (together with accrued and unpaid interest).

(iii)    If the LC Issuer shall make an LC Disbursement, then, unless the Borrower shall reimburse such LC Disbursement in full on the date such LC Disbursement is made, the unpaid amount thereof shall accrue interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrower reimburse such LC Disbursement, at the Default Rate.

(c)    Obligations Absolute.  The obligation of Borrower to reimburse the LC Issuer for each drawing under each LC and to repay each LC Disbursement shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances.  Borrower shall promptly examine a copy of each LC and each amendment thereto that is delivered to it and, Borrower will immediately notify the LC Issuer of any claim of noncompliance with Borrower's instructions or of any other irregularity, Borrower shall be conclusively deemed to have

ACTIVE 686990614v6

waived any such claim against the LC Issuer and its correspondents unless such notice is timely given.

(d)     [Reserved].

(e)     Applicability of ISP98 and UCP.  Unless otherwise expressly agreed by the LC Issuer and Borrower when an LC Credit Extension is made (including any such agreement applicable to a Prepetition LC), (i) the rules of ISP98 shall apply to each standby LC, and (ii) the rules of Uniform Customs shall apply to each documentary LC.

(f)     Reserved.

(g)     Provisions Regarding Electronic Issuance of Letters of Credit.  The LC Issuer may adopt procedures pursuant to which Borrower may request the issuance of LCs by electronic means and the LC Issuer may issue LCs based on such electronic requests.   Such procedures may include the entering by Borrower into the LC Applications electronically.  All the procedures, actions and documents referred to in the two preceding sentences are referred to as "Electronic Applications".  Borrower holds the LC Issuer harmless with respect to actions taken by the LC Issuer based upon Electronic Applications.   Borrower further agrees to be bound by all the terms and provisions contained in the LC Applications, including, the terms and provisions of the LC Applications contained on the reverse side of the paper copies thereof, the release and indemnification provisions contained therein, provided that, in the event of any conflict between any term in this Agreement and any term in such LC Application or otherwise, this Agreement shall control.

(h)     Participation by Lenders.  By the issuance of any LC and without any further action on the part of the LC Issuer or any Lender in respect thereof, the LC Issuer hereby grants to each Lender, and each Lender hereby agrees to acquire from the LC Issuer, a participation in each such LC and the related LC Exposure, effective upon the issuance thereof without recourse or warranty, equal to such Lender's Commitment Percentage of such LC and the LC Exposure related to such LC.  The LC Issuer shall provide a copy of each LC to the Administrative Agent promptly after issuance thereof. This agreement to grant and acquire participations is an agreement between the LC Issuer and Lenders, and neither Borrower nor any beneficiary of an LC shall be entitled to rely thereon.  Borrower agrees that each Lender purchasing a participation from the LC Issuer pursuant to this **Section 2.5(h)** may exercise all of its rights to payment against Borrower including the right of setoff, with respect to such participation as fully as if such Lender were the direct creditor of Borrower in the amount of such participations.

2.6     **Cash Collateral**.  At any time that there shall exist a Defaulting Lender, within one (1) Business Day following the written request of the Administrative Agent or the LC Issuer (with a copy to the Administrative Agent) Borrower shall Cash Collateralize the LC Issuer's Fronting Exposure solely with respect to such Defaulting Lender (determined after giving effect to Section 2.7(a)(iv) and any Cash Collateral provided by such Defaulting Lender).

ACTIVE 686990614v6

(a)     Grant of Security Interest.  Borrower, and to the extent provided by any Defaulting Lender, such Defaulting Lender, hereby grants to the Administrative Agent, for the benefit of the LC Issuer, and agrees to maintain, a first priority security interest in all such Cash Collateral as security for the Defaulting Lenders' obligation to fund participations in respect of LCs.  If at any time the Administrative Agent determines that Cash Collateral is subject to any right or claim of any Person other than the Administrative Agent and the LC Issuer as herein provided, or that the total amount of such Cash Collateral is less than the amount required, Borrower will, promptly upon demand by the Administrative Agent, pay or provide to the Administrative Agent additional Cash Collateral in an amount sufficient to eliminate such deficiency (after giving effect to any Cash Collateral provided by the Defaulting Lender).

(b)     Application.  Notwithstanding anything to the contrary contained in this Agreement, Cash Collateral provided under this Section 2.6 or under Section 2.5 in respect of LCs shall be applied to the satisfaction of the LC Exposure, of the Defaulting Lender's obligation to fund participations in respect of LC Exposure (including, as to Cash Collateral provided by a Defaulting Lender, any interest accrued on such obligation) and other obligations for which the Cash Collateral was so provided, prior to any other application of such property as may otherwise be provided for herein.

(c)     Termination of Requirement.  Cash Collateral (or the appropriate portion thereof) provided to reduce the LC Issuer's Fronting Exposure shall no longer be required to be held as Cash Collateral pursuant to this Section 2.6 following (i) the elimination of the applicable Fronting Exposure (including by the termination of Defaulting Lender status of the applicable Lender), or (ii) the determination by the Administrative Agent and the LC Issuer that there exists excess Cash Collateral; *provided that*, subject to Section 2.5 the Person providing Cash Collateral and the LC Issuer may agree that Cash Collateral shall be held to support future anticipated Fronting Exposure or other obligations and *provided that* to the extent that such Cash Collateral was provided by Borrower, such Cash Collateral shall remain subject to the security interest granted pursuant to the Loan Documents.

2.7     **Defaulting Lenders**.

(a)     Defaulting Lender Adjustments.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by Applicable Law:

(i)     Waivers and Amendments.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set out in the definition of Required Lenders.

(ii)     Defaulting Lender Waterfall.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article 11 or otherwise) or received by the Administrative Agent from a

Defaulting Lender pursuant to Section 3.7 shall be applied at such time or times as may be determined by the Administrative Agent as follows:  first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent under this Agreement; second, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the LC Issuer under this Agreement; third, to Cash Collateralize the Fronting Exposure with respect to such Defaulting Lender in accordance with Section 2.6; fourth, as Borrower may request (so long as no Default or Potential Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; fifth, if so determined by the Administrative Agent and Borrower, to be held in a deposit account and released pro rata in order to (A) satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement and (B) Cash Collateralize the LC Issuer's future Fronting Exposure with respect to such Defaulting Lender with respect to future LCs issued under this Agreement, in accordance with Section 2.6; sixth, to the payment of any amounts owing to the Lenders or the LC Issuer, as a result of any judgment of a court of competent jurisdiction obtained by any Lender, or the LC Issuer against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; seventh, so long as no Default or Potential Default exists, to the payment of any amounts owing to Borrower as a result of any judgment of a court of competent jurisdiction obtained by Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and eighth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided that* if (1) such payment is a payment of the principal amount of any Loans or LC Disbursements in respect of which such Defaulting Lender has not fully funded its appropriate share, and (2) such Loans were made or the related LCs were issued at a time when the conditions set out in Section 6.2 were satisfied or waived, such payment shall be applied solely to pay the Loans of, and LC Exposure owed to, all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or LC Exposure owed to, such Defaulting Lender until such time as all Loans and funded and unfunded participations in LC Exposure are held by the Lenders pro rata in accordance with the Commitments under the Facility without giving effect to Section 2.7(a)(iv). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post Cash Collateral pursuant to this Section 2.7(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    Certain Fees.

(A)    No Defaulting Lender shall be entitled to receive any commitment fee for any period during which that Lender is a Defaulting Lender (and Borrower shall not be required to pay any such fee that

otherwise would have been required to have been paid to that Defaulting Lender).

(B)     Each Defaulting Lender shall be entitled to receive LC fees under Section 3.8 for any period during which that Lender is a Defaulting Lender only to the extent allocable to its Commitment Percentage of the stated amount of LCs for which it has provided Cash Collateral pursuant to Section 2.6.

(C)     With respect to any LC fee not required to be paid to any Defaulting Lender pursuant to *clause (B)* above, the Borrower shall (1) pay to each Non-Defaulting Lender that portion of any such fee otherwise payable to such Defaulting Lender with respect to such Defaulting Lender's participation in LC Obligations or that has been reallocated to such Non-Defaulting Lender pursuant to *clause (iv)* below, (2) pay to the LC Issuer the amount of any such fee otherwise payable to such Defaulting Lender to the extent allocable to the LC Issuer's Fronting Exposure to such Defaulting Lender, and (3) not be required to pay the remaining amount of any such fee.

(iv)     <u>Reallocation of Participations to Reduce Fronting Exposure</u>.  All or any part of such Defaulting Lender's participation in LC Exposure shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Commitment Percentages (calculated without regard to such Defaulting Lender's Commitment) but only to the extent that (A) the conditions set out in Section 6.2 are satisfied at the time of such reallocation (and, unless Borrower shall have otherwise notified the Administrative Agent at such time, Borrower shall be deemed to have represented and warranted that such conditions are satisfied at such time), and (B) such reallocation does not cause the aggregate Total Credit Exposure of any Non-Defaulting Lender to exceed such Non-Defaulting Lender's Committed Amount.   No reallocation under this Agreement shall constitute a waiver or release of any claim of any party under this Agreement against a Defaulting Lender arising from that Lender having become a Defaulting Lender, including any claim of a Non-Defaulting Lender as a result of such Non-Defaulting Lender's increased exposure following such reallocation.

(v)     <u>Cash Collateral</u>.  If the reallocation described in Section 2.7(a)(iv) above cannot, or can only partially, be effected, Borrower shall, without prejudice to any right or remedy available to it under this Agreement or under Applicable Law, Cash Collateralize the LC Issuer's Fronting Exposure in accordance with the procedures set out in Section 2.6.

(b)     <u>Letters of Credit</u>.  So long as any Lender is a Defaulting Lender, no LC Issuer shall be required to issue, extend, renew or increase any LC unless it is satisfied that it will have no Fronting Exposure after giving effect thereto.

ACTIVE 686990614v6

(c)     Defaulting Lender Cure.  If Borrower, the Administrative Agent, and LC Issuer agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in LCs to be held pro rata by the Lenders in accordance with the Commitments (without giving effect to *paragraph (a)(iv)* above), whereupon, such Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of Borrower while that Lender was a Defaulting Lender; and *provided, further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

2.8     **Acknowledgement and Consent to Bail-In of Affected Financial Institutions**. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)     the effects of any Bail-in Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

ACTIVE 686990614v6

## ARTICLE 3

## INTEREST, FEES, AND PAYMENTS

3.1 **Interest Rates**.

(a) <u>Interest</u>.  Each Loan shall accrue interest at a rate per annum equal to 11%.

(b) <u>Default Rate</u>.  Upon the occurrence and during the continuance of a Default, interest on the Term Principal Amount, and any other amounts owing under this Agreement or under the other Loan Documents, shall accrue interest at a per annum rate equal to the Default Rate.

3.2 **Payment of Principal and Interest**.

(a) <u>Interest Payments</u>.  Accrued and unpaid interest on the Term Principal Amount (other than the Roll-up Amount) shall be due and payable in arrears on the first day of each month (each, an "<u>Interest Payment Date</u>"), commencing with the first such date to occur after the Closing Date.  Accrued interest on the Roll-up Amount shall be due and payable in kind in arrears on each Interest Payment Date by adding such interest to the outstanding Roll-up Amount and on the Maturity Date (each such addition, a "<u>Principal Increase</u>"); provided that in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment. Principal Increases shall be considered principal of the Loans for all purposes, including, without limitation, calculation of interest on subsequent Interest Payment Dates.

(b) <u>Payment of Default Rate Interest</u>.  Notwithstanding the foregoing, any interest that is payable at the Default Rate shall be payable from time to time on written demand from Administrative Agent to Borrower.

(c) <u>Payment in Full at Maturity</u>.  On the Maturity Date, Borrower unconditionally promises to pay in full, and there shall become due and payable in full, the entire outstanding Term Principal Amount, together with accrued and unpaid interest and all fees and other sums then owing under the Loan Documents.

3.3 **Prepayments**.

(a) <u>Voluntary Prepayment</u>.  Borrower may prepay all or any part of the Term Principal Amount at any time without premium or penalty upon notice to the Administrative Agent.  Each voluntary prepayment is subject to the following conditions:

(i) Administrative Agent must receive Borrower's written or telephonic prepayment notice not later than 10:00 a.m. on the date of prepayment;

(ii) Borrower's prepayment notice shall (A) specify the prepayment date, (B) specify the amount of the Loan to be prepaid, and (C) constitute an

ACTIVE 686990614v6

irrevocable and binding obligation of Borrower to make a prepayment in such amount on the designated prepayment date;

(iii)     each such partial prepayment shall be in the minimum principal amount of $1,000,000 and integral multiples of $500,000 or, if less than such minimum amounts, the entire principal amount thereof then outstanding; and

(iv)     if all or any portion of the Term Principal Amount is being prepaid, all accrued and unpaid interest on the portion of the Term Principal Amount prepaid must also be paid in full on the prepayment date.

(b)     <u>Mandatory Prepayment</u>. Subject to the terms of the Financing Orders:

(i)     [Reserved].

(ii)     [Reserved].

(iii)     On the date such amounts are received by, or for the account of, any Loan Party or any of its Subsidiaries, the following amounts shall be paid to the Administrative Agent for the ratable benefit of the Lenders in the form received with any necessary endorsement or assignment:

(A)     [Reserved];

(B)     [Reserved];

(C)     100% of any Net Proceeds from insurance in respect of any casualty event affecting any Collateral;

(D)     100% of all Net Proceeds from an Eminent Domain Event affecting any Collateral;

(E)     100% of the Net Proceeds from the Disposition of any Collateral (other than (1) Dispositions of inventory and other assets in the ordinary course of business permitted under <u>Sections 9.4(a)</u> and <u>(c)</u>); and

(F)     100% of the Net Proceeds of any Extraordinary Receipts.

(c)     [Reserved].

(d)     <u>Application of Prepayments</u>.

(i)     Subject to the terms of the Financing Orders, all prepayments under <u>Sections 3.3</u> shall be (A) applied (1) first, to the <u>Lenders that made a Second Amendment Term Loan up to the Second Amendment Term Loan Amount until paid in full (2), second, to the remaining</u> Term Principal Amount until the Term Principal Amount is paid in full, (~~2~~<u>3</u>) ~~second~~<u>third</u>, to Cash Collateralize the LC Exposure until all the LC Exposure is Cash Collateralized,

(3and (4) thirdfourth, to the Bank Product Liabilities, and (4) [reserved] and (B) accompanied by (1) the interest on the principal amount prepaid through the date of prepayment and (2) all other fees and expenses in respect of the Obligations, to the extent then due and payable.

(ii)     Amounts prepaid pursuant to this <u>Section 3.3</u> shall be applied based on the Lender's respective Term Loan Percentages (other than amounts prepaid pursuant to the foregoing Section 3.3(d)(i)(A)(1), which shall be applied based on the Lender's respective Second Amendment Term Loan Percentages.

### 3.4     **Computations of Interest and Fees**.

(a)     <u>Calculation of Interest</u>.  All computations of interest and fees under this Agreement shall be made on the basis of the actual number of days elapsed over a year of 360 days.  Interest shall accrue from and including the Closing Date or from the first date of Borrowing to but excluding the last day occurring in the period for which such interest is payable.

(b)     <u>Maximum Rate</u>.  It is the intent of the Lenders and Borrower to conform to and contract in strict compliance with applicable usury law from time to time in effect.  All agreements between the Lenders and Borrower are hereby limited by the provisions of this <u>Section 3.4</u> which shall override and control all such agreements, whether now existing or hereafter arising and whether written or oral.  In no way, nor in any event or contingency (including but not limited to prepayment or acceleration of the maturity date of the Obligations), shall the interest taken, reserved, contracted for, charged, or received under this Agreement, under the Notes or otherwise, exceed the Maximum Rate.  If, from any possible construction of any of the Loan Documents or any other document, interest would otherwise be payable in excess of the Maximum Rate, any such construction shall be subject to the provisions of this paragraph and interest owing pursuant to such documents shall be automatically reduced to the Maximum Rate without the necessity of execution of any amendment or new document.  If any Lender shall ever receive anything of value which is characterized as interest on the Loans under Applicable Law and which would, apart from this provision, be in excess of the Maximum Rate, an amount equal to the amount which would have been excessive interest shall, without penalty, be applied to the reduction of the principal amount owing on the Loans and not to the payment of interest, or refunded to Borrower or the other payor thereof if and to the extent such amount which would have been excessive exceeds such unpaid principal amount of the Loans.  The right to demand payment of the Loans or any other Debt evidenced by any of the Loan Documents does not include the right to receive any interest which has not otherwise accrued on the date of such demand, and the Lenders do not intend to charge or receive any unearned interest in the event of such demand.  All interest paid or agreed to be paid to the Lenders with respect to the Loans shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full stated term (including any renewal or extension) of the Loans so that the amount of interest on account of the Loans does not exceed the Maximum Rate.

(c)     [Reserved].

3.5     **General Payment Terms**.

(a)     Payments by Borrower.  Except as otherwise expressly provided in this Agreement (i) all payments by Borrower under this Agreement shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 1:00 p.m. on the date specified herein, (ii) the Administrative Agent will promptly distribute to each Lender its Commitment Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office, and (iii) all payments received by the Administrative Agent after 1:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  All payments to be made by Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.

(b)     Payment Dates.  If any payment or prepayment to be made by Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(c)     Advances by Administrative Agent.  Unless Borrower or any Lender has notified the Administrative Agent, prior to the time any payment is required to be made by it to the Administrative Agent under this Agreement, that Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto.  If and to the extent that such payment was not in fact made to the Administrative Agent in Dollars and in immediately available funds, then:

(i)     if Borrower fails to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in Dollars and in immediately available funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in immediately available funds at the greater of Federal Funds Effective Rate from time to time in effect and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing; and

(ii)     if any Lender fails to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in Dollars and in immediately available funds, together with interest thereon for the

period from the date such amount was made available by the Administrative Agent to Borrower to the date such amount is recovered by the Administrative Agent at a rate per annum equal to the greater of the Federal Funds Effective Rate from time to time in effect and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in the applicable Borrowing. If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon Borrower, and Borrower shall pay such amount to the Administrative Agent, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to Borrower to the date such amount is recovered by the Administrative Agent at a rate per annum equal to the rate of interest applicable to such Borrowing. Nothing in this Agreement shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or Borrower may have against any Lender as a result of any default by such Lender under this Agreement.

A notice of the Administrative Agent to any Lender or Borrower with respect to any amount owing under this ***Section 3.5(c)*** shall be conclusive, absent manifest error.

(d)     Several Obligations. The obligations of the Lenders under this Agreement to make Loans and to fund or purchase participation interests in LCs are several and not joint. The failure of any Lender to make any Loan or to fund or purchase any participation interest on any date required under this Agreement shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or fund its participation interest.

(e)     Funding Offices. Nothing in this Agreement shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)     Notes. To the extent requested by any Lender, the obligation of Borrower to repay the Term Loans owed to such Lender shall be evidenced by a Term Loan Note executed by Borrower and payable to such Lender.

(g)     Defaulting Lender. If any Lender shall fail to make any payment required to be made by it pursuant to Section 3.5(c) or Section 3.6, then the Administrative Agent may, in its discretion and notwithstanding any contrary provision hereof (and subject to Section 2.7(a)(ii)), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

ACTIVE 686990614v6

3.6    **Pro Rata Treatment and Sharing of Payments**.

(a)     Except to the extent otherwise provided herein, each Borrowing, each payment or prepayment of principal of any Loan, each payment of interest, and each payment of fees (other than fees paid to the Administrative Agent for its own account), each reduction in the Committed Amount, shall be allocated pro rata among the relevant Lenders in accordance with their Term Loan Percentages; *provided that*, if any Lender shall have failed to pay its Commitment Percentage of any Loan or purchase or fund its participation interest in any LC, then any amount to which such Lender would otherwise be entitled pursuant to this Section 3.6 shall instead be payable to the Administrative Agent until the share of such Loan or such participation interest not purchased or funded by such Lender has been purchased or funded unless such Lender's obligations are the subject of a good faith dispute.

(b)     In the event any principal, interest, fee or other amount paid to any Lender pursuant to this Agreement or any other Loan Document is rescinded or must otherwise be returned by the Administrative Agent, (i) such principal, interest, fee or other amount that had been satisfied by such payment shall be revived, reinstated and continued in full force and effect as if such payment had not occurred and (ii) such Lender shall, upon the request of the Administrative Agent, repay to the Administrative Agent the amount so paid to such Lender, with interest for the period commencing on the date such payment is returned by the Administrative Agent until the date the Administrative Agent receives such repayment at a rate per annum equal to the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, if repaid within two (2) Business Days after such request, and thereafter at a rate per annum equal to the greater of the Federal Funds Effective Rate from time to time in effect and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing.

(c)     The Lenders agree among themselves that, except to the extent otherwise provided in this Agreement, in the event that any Lender shall obtain payment in respect of any Loan or any other obligation owing to such Lender under this Agreement or any other Loan Document through the exercise of a right of setoff, banker's lien or counterclaim, or pursuant to a secured claim under Section 506 of the Bankruptcy Code or other security or interest arising from, or in lieu of, such secured claim, received by such Lender under any applicable Debtor Relief Law or other similar law or otherwise, or by any other means,

(i)     in excess of its Term Loan Percentage of such payment as provided for in this Agreement, such Lender shall promptly pay in cash or purchase from the other Lenders a participation in such Loans and other obligations in such amounts, and make such other adjustments from time to time,

ACTIVE 686990614v6

as shall be equitable to the end that all Lenders share such payment in accordance with their respective Term Loan Percentages; or

(ii)    such payment shall be rescinded or must otherwise be returned, each Lender which shall have shared the benefit of such payment shall, by payment in cash or a repurchase of a participation theretofore sold, return its share of that benefit (together with its share of any accrued interest payable with respect thereto) to each Lender whose payment shall have been rescinded or otherwise returned.

Borrower agrees that (A) any Lender so purchasing such a participation may, to the fullest extent permitted by Applicable Law, exercise all rights of payment, including setoff, banker's lien or counterclaim, with respect to such participation as fully as if such Lender were a holder of such Loan or other obligation in the amount of such participation and (B) the Obligations that have been satisfied by a payment that has been rescinded or otherwise returned shall be revived, reinstated and continued in full force and effect as if such payment had not occurred.

(d)    Except as otherwise expressly provided in this Agreement, if any Lender or the Administrative Agent shall fail to remit to any other Lender or the Administrative Agent an amount payable by such Lender or the Administrative Agent to such other Lender or the Administrative Agent pursuant to this Agreement on the date when such amount is due, such payments shall be made together with interest thereon for each date from the date such amount is due until the date such amount is paid to the Administrative Agent or such other Lender at a rate per annum equal to the Federal Funds Effective Rate. If under any applicable Debtor Relief Law or other similar law, any Lender receives a secured claim in lieu of a setoff to which this <u>Section 3.6</u> applies, such Lender shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the Lenders under this <u>Section 3.6</u> to share in the benefits of any recovery on such secured claim.

3.7    **Right of Setoff**.  If any Default shall have occurred and be continuing, each Lender, the LC Issuer, and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held, and other obligations (in whatever currency) at any time owing, by such Lender, the LC Issuer or any such Affiliate, to or for the credit or the account of Borrower or any other Loan Party against any and all of the obligations of Borrower or such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender or the LC Issuer or their respective Affiliates, irrespective of whether or not such Lender, the LC Issuer or Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of Borrower or such Loan Party may be contingent or unmatured or are owed to a branch, office or Affiliate of such Lender or the LC Issuer different from the branch, office or Affiliate holding such deposit or obligated on such Debt; *provided that* in the event that any Defaulting Lender shall exercise any such right of setoff, (a) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.7 and, pending such payment, shall be segregated by such Defaulting

ACTIVE 686990614v6

Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, the LC Issuer, and the Lenders, and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender, the LC Issuer and their respective Affiliates under this Section 3.7 are in addition to other rights and remedies (including other rights of setoff) that such Lender, the LC Issuer or their respective Affiliates may have. Each Lender and the LC Issuer agrees to notify Borrower and the Administrative Agent promptly after any such setoff and application; *provided that*, the failure to give such notice shall not affect the validity of such setoff and application.

3.8     **Fees**.

(a)     Certain Fees. Borrower agrees to pay to the Administrative Agent, for its own account or for the account of the Lenders, as applicable, such other fees as may separately be agreed upon in writing by Borrower and the Administrative Agent and authorized by the Bankruptcy Court.

(b)     Closing Fee. The Borrower shall pay to each Lender its pro-rata share of a closing fee equal to **$1,430,000.00** (the "Facility Fee"), which such Facility Fee shall be fully earned on the Closing Date but shall be due and payable in full in cash on the Maturity Date. The Borrower shall pay to each Lender its pro-rata share of an amendment fee equal to **$462,500.00** (the "Amendment Fee"), which such Amendment Fee shall be fully earned on the First Amendment Effective Date but shall be due and payable in full in cash on the Maturity Date.

(c)     LC Fees.

(i)     Borrower shall pay to the Administrative Agent, for the ratable benefit of the Lenders, a letter of credit fee for each LC equal to the rate per annum then applicable to the Loans multiplied by the daily maximum amount available to be drawn under such LC (whether or not such maximum amount is then in effect under such LC), provided that, the letter of credit fee for any LC may not be less than $500. Such LC fees shall be computed on a quarterly basis in arrears and be due and payable on the last day of each March, June, September, and December on the first such date to be occur after the Closing Date, and are nonrefundable.

(ii)     In addition to the foregoing fees, Borrower shall pay to the LC Issuer for its own account, an issuance fee with respect to each LC in the amount equal to the daily amount available to be drawn under such LC times 0.125%; *provided that*, the amount of such issuance fee may not be less than $500. Such issuance fee shall be payable on the date of issuance (and renewal, extension, amendment, or increase, as applicable) of such LC.

(iii)     In addition, Borrower shall pay directly to the LC Issuer the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of the LC Issuer relating to letters of credit as from

time to time in effect.  Such customary fees and standard costs and charges are due and payable on demand and are nonrefundable.

# ARTICLE 4

## TAXES, YIELD PROTECTION AND ILLEGALITY

4.1  **Taxes**.

(a)  <u>Lender and Applicable Law</u>.  For purposes of this <u>Section 4.1,</u> the term "<u>Lender</u>" includes the LC Issuer, and the term "<u>Applicable Law</u>" includes FATCA.

(b)  <u>Payments Free of Taxes</u>.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law.  If any Applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and, if the withholding or deduction is made on account of an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this <u>Section 4.1</u>) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)  <u>Payment of Other Taxes by the Loan Parties</u>.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)  <u>Indemnification by the Loan Parties</u>.  The Loan Parties shall jointly and severally indemnify each Recipient, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 4.1</u>) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any penalties, interest, and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)  <u>Indemnification by the Lenders</u>.  Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party

ACTIVE 686990614v6

has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 14.7 relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this Section 4.1.

(f)     Evidence of Payments.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 4.1 such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)     Status of Lenders.

(i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to Borrower and the Administrative Agent, at the time or times reasonably requested by Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by Borrower or the Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by Borrower or the Administrative Agent as will enable Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 4.1(g)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which

ACTIVE 686990614v6

such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the U.S. is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed copies of IRS Form W-8ECI;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Tax Code, (x) a certificate substantially in the form of <u>Exhibit E-1</u> to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Tax Code, a "10-percent shareholder" of Borrower within the meaning of Section 871(h)(3)(B) of the Tax Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Tax Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, or IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of <u>Exhibit E-2</u> or <u>Exhibit E-3</u>, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided that* if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender

55

may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-4 on behalf of each such direct and indirect partner;

(C)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)      if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Tax Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by Applicable Law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Tax Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this *clause (D)*, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h)      Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 4.1 (including by the payment of additional amounts pursuant to this Section 4.1), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 4.1 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any

ACTIVE 686990614v6

interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this *paragraph (h)* (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this *paragraph (h)*, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this *paragraph (h)* the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This *paragraph (h)* shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)      Survival.  Each party's obligations under this <u>Section 4.1</u> shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

4.2    **Increased Costs**.

(a)      <u>Increased Costs Generally</u>.  If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender or the LC Issuer;

(ii)      subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in *clauses (b)*, *(c)* and *(d)* of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)      impose on any Lender or the LC Issuer any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or any LC or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to increase the cost to such Lender, the LC Issuer or such other Recipient of participating in, issuing or maintaining any LC (or of maintaining its obligation to participate in or to issue any LC), or to reduce the amount of any sum received or receivable by such Lender, the LC Issuer or other Recipient under this Agreement from any Loan Party (whether of principal, interest or any other amount) then, upon written request of such

ACTIVE 686990614v6

Lender, the LC Issuer or other Recipient that reasonably details the basis for such request, Borrower will pay to such Lender, the LC Issuer or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender, the LC Issuer or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)     Capital Requirements.  If any Lender or the LC Issuer determines that any Change in Law affecting such Lender or the LC Issuer or any Lending Office of such Lender or such Lender's or the LC Issuer's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's or the LC Issuer's capital or on the capital of such Lender's or the LC Issuer's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or participations in LCs held by, such Lender, or the LC issued by the LC Issuer, to a level below that which such Lender or the LC Issuer or such Lender's or the LC Issuer's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the LC Issuer's policies and the policies of such Lender's or the LC Issuer's holding company with respect to capital adequacy), then from time to time Borrower will pay to such Lender or the LC Issuer, as the case may be, such additional amount or amounts as will compensate such Lender or the LC Issuer or such Lender's or the LC Issuer's holding company for any such reduction suffered.

(c)     Certificates for Reimbursement.  A certificate of a Lender or the LC Issuer setting out the amount or amounts necessary to compensate such Lender or the LC Issuer or its holding company, as the case may be, as specified in Sections 4.2(a) or (b) above, and delivered to Borrower, shall be conclusive absent manifest error.  Borrower shall pay such Lender or the LC Issuer, as the case may be, the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)     Delay in Requests.  Failure or delay on the part of any Lender or the LC Issuer to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's or the LC Issuer's right to demand such compensation; *provided that* Borrower shall not be required to compensate a Lender or the LC Issuer pursuant to this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender or the LC Issuer, as the case may be, notifies Borrower of the Change in Law giving rise to such increased costs or reductions, and of such Lender's or the LC Issuer's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine (9) month period referred to above shall be extended to include the period of retroactive effect thereof).

4.3     **[Reserved]**.

4.4     **[Reserved]**.

4.5     **[Reserved]**.

ACTIVE 686990614v6

4.6     **Requests for Compensation**.  A certificate of a Lender claiming compensation under this Article 4 and setting out the additional amount or amounts to be paid to it under this Agreement shall be conclusive in the absence of manifest error.  In determining such amount, a Lender may use any reasonable averaging and attribution methods.  Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

4.7     **Mitigation of Obligations; Replacement of Lenders**.

(a)     _Designation of a Different Lending Office_.  If any Lender requests compensation under Section 4.2, or requires Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 4.1, then such Lender shall (at the request of Borrower) use reasonable efforts to designate a different Lending Office for funding or booking its Loans under this Agreement or to assign its rights and obligations under this Agreement to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 4.1 or Section 4.2, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     _Replacement of Lenders_.  If any Lender requests compensation under Section 4.2, or if Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 4.1 and, in each case, such Lender has declined or is unable to designate a different Lending Office in accordance with Section 4.7(a), or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then Borrower may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 14.7), all of its interests, rights (other than its existing rights to payments pursuant to Section 4.1 or Section 4.2) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); _provided that_:

(i)     Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 14.7;

(ii)     such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in LC Exposure, accrued interest thereon, accrued fees and all other amounts payable to it under this Agreement and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or Borrower (in the case of all other amounts);

(iii)     in the case of any such assignment resulting from a claim for compensation under **_Section 4.2_** or payments required to be made pursuant to **_Section 4.1_**, such assignment will result in a reduction in such compensation or payments thereafter;

(iv)     such assignment does not conflict with Applicable Law; and

(v)     in the case of any assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver, or consent.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrower to require such assignment and delegation cease to apply.

Notwithstanding anything in this Section 4.7 to the contrary, (A) any Lender that acts as an LC Issuer may not be replaced hereunder at any time it has any LC outstanding hereunder unless arrangements satisfactory to such Lender (including the furnishing of a backstop standby letter of credit in form and substance, and issued by an issuer, reasonably satisfactory to such LC or the depositing of cash collateral into a cash collateral account in amounts and pursuant to arrangements reasonably satisfactory to such LC Issuer) have been made with respect to such outstanding LC, and (B) the Lender that acts as the Administrative Agent may not be replaced hereunder except in accordance with the terms of Section 12.6.

4.8     **[Reserved]**.

4.9     **Survival**.   All of Borrower's obligations under this Article 4 shall survive termination of the Commitments and repayment of all Obligations.

# ARTICLE 5

# COLLATERAL AND GUARANTIES

5.1     **Collateral**.   To secure full and complete payment and performance of the Obligations (including all Term Loans, LCs, and Bank Product Liabilities), each Loan Party shall execute and deliver, or cause to be executed and delivered, a Security Agreement prior to the Final Hearing under which each shall grant to the Administrative Agent a first priority security interest in and Lien on all of its Collateral described therein.

5.2     **[Reserved]**.

5.3     **Perfection; Financing Statements**.   The Liens and Security Interest securing the Obligations, as granted pursuant to the Security Documents, shall be deemed valid and perfected by the entry of relevant Financing Orders; provided, that each Loan Party hereby authorizes Administrative Agent to file, and agrees to execute, if requested, financing statements, continuation statements, or termination statements (each in Acceptable Form), or take other

action reasonably requested by Administrative Agent relating to the Collateral, including any Lien search required by Administrative Agent.

5.4    **Grants, Rights, and Remedies**.   The Liens and the administrative priority granted pursuant to the Financing Orders may be independently granted by the Loan Documents. This Agreement, the Interim DIP Order, the Final DIP Order and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Agent hereunder and thereunder are cumulative.

5.5    **Further Assurances – Collateral**.   Each Loan Party (at its expense) shall obtain, or cooperate with Administrative Agent to obtain, agreements, documents, instruments, and papers (all in Acceptable Form) as Administrative Agent may from time to time reasonably request to attach or preserve the attachment, and to perfect or preserve the perfection and priority, of Administrative Agent's security interests granted under the Loan Documents (including, landlord subordination agreements, creditor and mortgagee subordination agreements, and Lien release documents).   Borrower hereby appoints and empowers Administrative Agent or its representatives, as its attorney-in-fact, to execute and/or endorse (and file, as appropriate) on its behalf any documents, agreements, papers, checks, financing statements and other documents which, in Administrative Agent's sole judgment, are necessary to be executed, endorsed and/or filed in order to (a) perfect or preserve the perfection and priority of Administrative Agent's security interests granted under the Loan Documents and (b) collect or realize upon the Collateral or otherwise exercise its rights and remedies under any of the Loan Documents or Applicable Law.

5.6    **Liens Granted to the Administrative Agent**.   Liens granted to the Administrative Agent under the Loan Documents are granted to the Administrative Agent for the ratable benefit of the Secured Parties.

# ARTICLE 6

## CONDITIONS PRECEDENT

6.1    **Initial Credit Extension**.  This Agreement shall be effective once it is executed and delivered by each of the parties thereto.  The obligations of the Lenders to make Loans under this Agreement shall not become effective until the date on which Administrative Agent has received each of the following in Acceptable Form (or has waived the requirement in accordance with Section 14.8):

(a)    Executed Loan Documents.  Duly executed copies of this Agreement and, prior to the Final Hearing, the Notes in favor of each Lender requesting same, and all other Loan Documents and Security Documents required by Administrative Agent to be executed and delivered on the date hereof, each in Acceptable Form;

(b)    Security Interest.  The Administrative Agent and each Lender shall be satisfied that the Loan Documents and the Interim DIP Order shall be effective to create in favor of the Administrative Agent for the benefit of the Secured Parties a legal, valid,

perfected and enforceable security interest and Lien upon the Collateral, with the priority set forth in the Interim DIP Order and the terms thereof.

(c)     [Reserved].

(d)     [Reserved].

(e)     Budget.   The Administrative Agent shall have received the initial Approved Budget.

(f)     Cases.   The Bankruptcy Court shall have approved and entered all "first day" orders, including, without limitation, the Interim DIP Order and the Cash Management Order, in form and substance satisfactory to the Lenders, within five (5) Business Days of the Petition Date, and such orders shall be in full force and effect and shall not have been modified or amended (unless otherwise approved by the Lenders), reversed, or stayed;

(g)     Consents and Approvals. The Agent and the Lenders shall have received evidence, in form and substance reasonably satisfactory to the Lenders, that the Loan Parties have obtained all requisite consents and approvals in connection with the filing of the Cases and the execution, delivery, and performance of this Agreement and the other Loan Documents;

(h)     No Adverse Proceedings.   No action, proceeding, investigation, regulation or legislation shall have been instituted or threatened before any Governmental Authority to enjoin, restrain or prohibit, or to obtain damages in respect of, or which is related to or arises out of this Agreement or any of the other Loan Documents or the consummation of the transactions contemplated hereby and thereby and which, in Lenders' reasonable judgment, would make it inadvisable to consummate the transactions contemplated by this Agreement or any of the other Loan Documents;

(i)     Cases.   The Loan Parties shall have filed the Cases in the Bankruptcy Court on or before March 18, 2023, and the Loan Parties shall be debtors and debtors in possession under Chapter 11 of the Bankruptcy Code;

(j)     [Reserved].

(k)     Milestones.   The Borrower shall have timely and fully satisfied any and all applicable Milestones required to be satisfied under Section 8.20 on or prior to the date the Borrower requests the Initial Advance to be made;

(l)     [Reserved].

(m)     Fees and Expenses.   To the extent permitted under the Approved Budget, payment by Borrower of all fees and expenses invoiced by, and owed by it to, the Administrative Agent or any Lender, including any fees payable on the Closing Date pursuant to any written agreement between Borrower and the Administrative Agent, and

evidence that the costs and expenses (including reasonable attorneys' fees) of the Administrative Agent have been paid in full by Borrower; and

(n)     Other.  Such other documents, instruments, agreements or information as reasonably requested by any Lender.

6.2     **Conditions to All Credit Extensions**.  The obligation of the Lenders to make any Term Loan is subject to:

(a)     all of the representations and warranties contained in Article 7 hereof and the other Loan Documents being true and correct on and as of the date of such Credit Extension, with the same force and effect as if such representations and warranties had been made on and as of such date (except to the extent any such representation and warranty specifically relates to an earlier date in which case such representation and warranty shall have been true and correct as of such earlier date);

(b)     no Material Adverse Event has occurred;

(c)     no Default or Potential Default is existing and continuing;

(d)     (x) prior to the Final DIP Order Entry Date, the Interim DIP Order shall have been entered and be in full force and effect, (y) prior to the Final DIP Order Entry Date, any "second day orders" approving on a final basis any first day orders intended to be entered on or prior to the date of entry of the Final DIP Order shall have been entered by the Bankruptcy Court, shall be acceptable to the Administrative Agent, in its sole and exclusive discretion, shall be in full force and effect, shall not have been vacated or reversed, shall not be subject to a stay and shall not have been modified or amended other than as acceptable to the Administrative Agent in its sole and exclusive discretion, and (z) on and after the Final DIP Order Entry Date, the Final DIP Order shall have been entered and be in full force and effect;

(e)     the Loan Parties shall have timely and fully satisfied any and all applicable Milestones required to be satisfied under Section 8.20 on or prior to the date of the requested Term Loan;

(f)     the Agent shall have received a ~~Notice of~~ Borrowing Request with respect to such Term Loan;

(g)     the Approved Budget shall be in form and substance satisfactory to the Agent and the Lenders;

(h)     the Agent and the Lenders shall have received such other approvals or documents as the Agent and the Lenders may reasonably request;

(i)     no injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the extending of such credit shall have

ACTIVE 686990614v6

been issued and remain in force by any Governmental Authority against the Loan Parties or the Lenders;

(j)       with respect to each Subsequent Advance, the aggregate amount of cash and Cash Equivalents of the Loan Parties' shall be less than the projected Minimum Cash Amount either on the date of funding of such Subsequent Advance or within seven (7) days thereafter; and

(k)       with respect to the Second Amendment Subsequent Advance, the Lenders shall have received a certificate signed by each of the CRO of the Borrower certifying that the proceeds of the Second Amendment Subsequent Advance shall be used solely to pay post-petition taxes which are due and payable by the Loan Parties; and

(l)       (k) the Lenders shall have received a certificate signed by the CRO certifying the Loan Parties' satisfaction of each of the foregoing conditions set forth in this Section 6.2 as of the date of each requested credit extension.

Each Borrowing Request delivered to the Administrative Agent constitutes a representation and warranty by Borrower that the conditions in this Section 6.2 are true and correct in all material respects.

## ARTICLE 7

## REPRESENTATIONS AND WARRANTIES

To induce Administrative Agent, the LC Issuer, and Lenders to enter into this Agreement, Borrower represents and warrants to the Administrative Agent, the LC Issuer, and Lenders that:

7.1     **Existence and Power**.  Each Loan Party and each of its Subsidiaries (a) is duly organized, validly existing, and in good standing under the Applicable Laws of the jurisdiction in which it is organized, (b) is qualified to do business and is in good standing in all jurisdictions where such qualification is required (except where failure to so qualify could not reasonably be expected to have a Material Adverse Effect), (c) has the necessary power and authority, and all necessary permits, licenses, franchises, patents, copyrights, trademarks and trade names, or rights, to conduct its business, (except where the failure to possess any such permit, license, franchise, patent, copyright, trademark and trade name or right would not reasonably be expected to have a Material Adverse Effect), and (d) has the requisite power and authority to execute, deliver and perform this Agreement and the other Loan Documents to which it is a party.

7.2     **Authorization and No Conflicts**.  The execution and delivery by each Loan Party of the Loan Documents to which it is a party, and each Loan Party's performance of its obligations under the Loan Documents, (a) have been duly authorized by such Loan Party, (b) do not conflict with any of its Organizational Documents, (c) do not conflict with any Applicable Law or Material Agreement by which such Loan Party is bound, (d) do not require any material consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except the entry of the Interim DIP Order and the Final DIP Order and except such as have been obtained or made and are in full force and effect, and (e) will not result in the creation

ACTIVE 686990614v6

or imposition of any Lien on any of its assets or any of its Subsidiaries, except those in favor of Administrative Agent.

7.3     **Enforceability**.  Each Loan Document has been duly executed and delivered to the Administrative Agent by each Loan Party which is a party to it, and each such Loan Document constitutes a legal, valid, and binding obligation of the Loan Party thereto and is enforceable against such Loan Party in accordance with its respective terms, except as enforceability may be limited by applicable Debtor Relief Laws, other laws of general application relating to the enforcement of creditors' rights, and general principles of equity.

7.4     **Subsidiaries**.

(a)     For Borrower and each Subsidiary, the Disclosure Schedules set out such Person's name, address, U.S. taxpayer identification number, entity type and jurisdiction of organization, the amount of issued and outstanding Equity Interests of such Person, and the names of the owners of its Equity Interests.

(b)     (i) Borrower and its Subsidiaries owns, free and clear of Liens, and has the unencumbered right to vote, all outstanding Equity Interests in each Person shown to be held by it in said Schedule, (ii) all of the issued and outstanding Equity Interests of each such Person is validly issued, fully paid, and nonassessable, and (iii) there are no outstanding options, warrants or other rights with respect to such Person's rights in such Equity Interests.

(c)     There are no restrictions on the right or ability of Borrower's Subsidiaries to pay dividends or make Distributions to Borrower except as contemplated by this Agreement and the other Loan Documents.

7.5     **Debt**.  No Loan Party nor any of its Subsidiaries has any Debt except Permitted Debt.

7.6     **Liens**.  No Lien exists on any asset of any Loan Party or any of its Subsidiaries, other than Permitted Liens.

7.7     **Ownership and Location of Assets**.

(a)     The Disclosure Schedules set out (i) a complete and correct list of all real property interests held by the Borrower and its Subsidiaries indicating in each case whether the respective property is owned or leased, the identity of the owner or lessee, and the location of the respective property, (ii) the location of all of the inventory, equipment or goods for each Loan Party and each of its Subsidiaries (other than goods on consignment, in transit, or in the possession of a Person under the terms of a contract with a Loan Party), and (iii) a complete and correct list of deposit accounts, lockbox accounts, disbursement accounts, investments accounts, and other similar accounts as of the Closing Date, specifying the name of each applicable financial institution, the owner of each such account, and the complete account number therefor.

65

(b)     Each Loan Party and each of its Subsidiaries has (i) indefeasible title to its owned real property, (ii) a vested leasehold interest in all of its material leased properties, and (iii) good and marketable title to its personal property, except, in each case, for (A) minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes and (B) Permitted Liens.

7.8     **Intellectual Property**.  Each Loan Party and each of its Subsidiaries owns, or is licensed to use, all trademarks, trade names, copyrights, patents and other intellectual property material to its business and its use thereof does not infringe on the rights of any Person (and no claim of infringement has been made), other than infringements or claims which, if successfully asserted against or determined adversely to any Loan Party or any of its Subsidiaries, could not, individually or collectively, reasonably be expected to have a Material Adverse Effect.

7.9     **Place of Business**.  The Disclosure Schedules set out the location of each Loan Party's and each of its Subsidiaries' place of business or chief executive office.  The books and records of each Loan Party and each of its Subsidiaries are located at its place of business or chief executive office.

7.10     **Financial Information**.

(a)     With respect to all financial statements delivered by the Loan Parties to the Agent, in each case (i) such financial statements (including the Current Financials) are true and correct in all material respects, have been prepared in accordance with GAAP, and fairly and accurately present, on a consolidated basis, the financial condition of Borrower and its Subsidiaries as of the respective dates indicated therein, (ii) since the date of such financial statements (including the Current Financials) there has been no material adverse change in the business condition (financial or otherwise), operations, or properties of the Borrower and its Subsidiaries, and (iii) no Loan Party nor any of its Subsidiaries has any material contingent liabilities, liabilities for Taxes, material forward or long-term commitments, or unrealized or anticipated losses from any unfavorable commitments not reflected in such financial statements (including the Current Financials).

(b)     Other than arising as the result of the commencement of the Cases, there has been no Material Adverse Event since the Petition Date.

(c)     Each material fact or material condition relating to the Loan Documents, the Collateral, and the Borrower and its Subsidiaries' (taken as a whole) financial condition, business, or property has been disclosed to the Administrative Agent in writing.

7.11     **Compliance with Laws**.  Each Loan Party is in compliance with all Applicable Laws applicable to it or to its property except where the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

7.12     **Material Agreements**.  As of the Closing Date, no Loan Party is a party to any Material Agreement, other than the Loan Documents and the Material Agreements set forth in

ACTIVE 686990614v6

the Disclosure Schedules, and each such Material Agreement is in full force and effect. No Loan Party (a) is in violation of, or default under, any Material Agreement or (b) has knowledge of any pending amendments or pending or threatened termination of any Material Agreement. As of the Closing Date, Borrower has delivered to the Administrative Agent a true, complete and correct copy of each Material Agreement (including all schedules, exhibits, amendments, supplements, modifications, assignments and all other documents delivered pursuant thereto or in connection therewith).

7.13    **Litigation**.  For each Loan Party, there is no Litigation pending, or to such Loan Party's knowledge, threatened in writing, involving any Loan Party which (a) purports to affect or pertain to this Agreement, any other Loan Document, or any of the transactions contemplated by the Loan Documents, or (b) would reasonably be expected to have a Material Adverse Effect. There are no outstanding judgments, arbitration awards or unpaid settlement agreements against any Loan Party.

7.14    **Taxes**.  All tax returns of each Loan Party required to be filed have been timely filed (or extensions have been granted) and all post-petition Taxes imposed upon any Loan Party that are due and payable have been paid or will be paid in accordance with the requirements of the Bankruptcy Code and other applicable insolvency laws to the extent permitted under the Financing Orders.

7.15    **Environmental Matters**.  There is no pending or, to Borrower's knowledge, threatened investigation or inquiry by any Governmental Authority of any Loan Party, or any of their respective properties pertaining to any Hazardous Material.  Except in the ordinary course of business and in compliance with all Environmental Laws, (a) there are no Hazardous Materials located on or under any of the properties of any Loan Party, and (b) no Loan Party has caused or permitted any Hazardous Material to be disposed of on or under or released from any of its properties that could reasonably be expected to have a Material Adverse Effect.  Each Subsidiary has obtained all permits, licenses, and authorizations which are required under and by all Environmental Laws, except for such permits, licenses, and authorizations which, if not obtained, would result in a Material Adverse Effect.

7.16    **Insurance**.  The Loan Parties maintain insurance required under Section 8.6.

7.17    **Margin Regulations**.  No Loan Party is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T, U, or X of the Federal Reserve Board), and no part of the proceeds of any Credit Extension will be used to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying margin stock.

7.18    **Trade Names**.  Each Loan Party is in compliance with all applicable trade name or "d/b/a" statutes in each state in which such Loan Party does business and except as disclosed in the Disclosure Schedules, no Loan Party has used or transacted business under any other corporate name, d/b/a, or trade name in the five-year period preceding the Closing Date (including names of all Persons with which any Loan Party has merged or consolidated, or from which any Loan Party has acquired all or a substantial portion of such Person's assets).

67

7.19    **Transactions with Affiliates**.  Except as set forth in the Disclosure Schedules, no Loan Party is a party to an agreement or transaction with any of its Affiliates other than transactions in the ordinary course of business and upon fair and reasonable terms not materially less favorable than it could obtain or could become entitled to in an arm's-length transaction with a Person that was not its Affiliate.

7.20    **ERISA**.  Each Loan Party has complied with all applicable minimum funding requirements and all other applicable and material requirements of ERISA, and there are no existing conditions that would reasonably be expected to give rise to material liability thereunder.  No ERISA Event has occurred in connection with any employee benefit plan that might constitute grounds for the termination thereof by the PBGC or for the appointment by the appropriate U.S. District Court of a trustee to administer such plan.

7.21    **Labor Matters**.   There are no collective bargaining agreements covering the employees of any Loan Party or any of their respective Subsidiaries and there is not pending, nor (to the knowledge of Borrower) is there threatened, any strike, walkout, slowdown or work stoppage, or any unfair labor practice complaint or grievance or arbitration proceeding arising out of or under any collective bargaining agreement covering the employees of any Loan Party or any of their respective Subsidiaries that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

7.22    **Investment Company Act**.   No Loan Party is, or is affiliated with, an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

7.23    **Anti-Corruption Laws and Sanctions**.  Each Loan Party has implemented and maintains in effect policies and procedures designed to ensure compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and such Loan Party, its Subsidiaries and their respective officers and employees and to the knowledge of such Loan Party its directors, managers, officers and employees, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in any Loan Party being designated as a Sanctioned Person. None of (a) any Loan Party, any Subsidiary or any of their respective directors, managers, officers or employees, or (b) to the knowledge of any such Loan Party or Subsidiary, any agent of such Loan Party or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No Borrowing or LC, use of proceeds, or other transaction contemplated by this Agreement or the other Loan Documents will violate Anti-Corruption Laws or applicable Sanctions.

7.24    **Patriot Act**.  No Loan Party (a) is a Person described or designated in the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control or in Section 1 of the Anti-Terrorism Order or (b) engages in any dealings or transactions with any such Person.  Each Loan Party and its Subsidiaries is in compliance, in all material respects, with the Patriot Act.

7.25    **[Reserved]**.

7.26 **No Restrictive Agreement**.  No Loan Party is a party to any Restrictive Agreement.

7.27 **Approved Budget**.  Attached hereto as Exhibit F is a true and complete copy of the Approved Budget, in form and substance satisfactory to the Lenders.  The Approved Budget has been prepared on a reasonable basis and represents (and as of the date on which any other Approved Budget is delivered to Lenders, such additional Approved Budget represents) the Loan Parties' good faith estimate, based on diligent investigation, on the date such Approved Budget is delivered, of the Loan Parties' future performance for the periods covered thereby based upon the Loan Parties' good faith assumptions believed by the Borrower to be reasonable at the time of the delivery thereof to the Lenders or their advisors.  The Loan Parties are not aware of any information that would lead them to believe that such Approved Budget is not attainable and the Loan Parties have not failed to disclose any material assumptions with respect to such Approved Budget.

7.28 **Financing Orders**.  The Interim DIP Order and, at all times after its entry by the Bankruptcy Court, the Final DIP Order, has been duly entered, is valid, subsisting and continuing (and provides for, among other things, a valid, perfected, continuing, enforceable, non-avoidable first priority priming Lien on the Collateral of each Loan Party in favor of the Agent) and except as otherwise expressly consented to by the Lenders, has not been vacated, modified, reversed on appeal, or vacated or modified by any bankruptcy or district court judge and is not subject to any pending stay.  On and after the date any other Financing Order is entered by the Bankruptcy Court, such other Financing Order shall have been duly entered, valid, subsisting and continuing and except as otherwise expressly consented to by the Lenders, shall not have been vacated, modified, reversed on appeal, or vacated or modified by any bankruptcy or district court judge and shall not be subject to any pending stay.

7.29 **Super-Priority Claims**.  All Obligations of the Loan Parties incurred during the pendency of the Cases, in addition to being secured by the Collateral, constitute Super-Priority Claims, as more fully set forth in the Financing Orders, subject to the Carve-Out and any other Super-Priority Claims to the extent set forth in the Financing Orders.

# ARTICLE 8

## AFFIRMATIVE COVENANTS

So long as Lenders are committed to make any Credit Extension under this Agreement, and thereafter until the Termination Date, Borrower covenants and agrees as follows:

8.1 **Reporting Requirements**.  Borrower will (i) hold weekly telephonic conference calls with their advisors, the Lenders and advisors to the Lenders during which the Borrower and their advisors shall report on, among other things, any material developments in the Cases, (ii) allow the Administrative Agent to have direct access to senior management and the CRO from time to time in its discretion to discuss the plan, sale, and the marketing process and other business and affairs of the Loan Parties, and (iii) deliver, or cause to be delivered, to the Agent and the Lenders those reports and other information set forth in the Financing Orders.

(a)     [Reserved].

(b)     [Reserved].

(c)     [Reserved].

(d)     [Reserved].

(e)     [Reserved].

(f)     Supply Contract Valuation.   The Loan Parties shall provide to the Administrative Agent or its designee, to the extent not already provided, the five-year business plan requested by such Person in order to complete a valuation of the Supply Contracts, which valuation shall be prepared by Alvarez & Marsal or other Person selected by the Administrative Agent and otherwise acceptable in form, methodology and substance to the Administrative Agent.

(g)     [Reserved].

(h)     Tax Returns.   As soon as available, and in any event within 30 days after filing, (i) complete copies of all state and federal income tax returns (including all schedules and statements) of the Borrower and its Subsidiaries, and (ii) complete copies of all extensions filed in connection with such state and federal tax returns, if applicable.

(i)     Material Agreements, Etc.   After the consummation of any amendment, renewal or extension of any Material Agreement, certified copies of any such amendment, extension or renewal of any such Material Agreement.

(j)     Notice of Litigation, Defaults, and Other Material Events.   Notice, immediately after any Loan Party receives notice of, or otherwise becomes aware of, (i) the commencement of any Litigation involving any Loan Party for which the monetary amount at issue is greater than the Threshold Amount, individually or in the aggregate, (ii) the commencement of any Litigation involving any Loan Party, other than claims, litigation or proceedings under the Cases, (iii) any material liability or alleged material liability under any Environmental Law arising out of, or directly affecting, the properties or operations of such Loan Party, (iv) any dispute with any Governmental Authority, (v) the occurrence of any default or event of default, or the receipt by the Borrower or any of its Subsidiaries or any other Loan Party of any written notice of an alleged default or event of default, with respect to any Material Indebtedness, (vi) the occurrence of any default or event of default, or the receipt by any Loan Party of any written notice of an alleged default or event of default, with respect to any Material Indebtedness, (vii) any claim, action or proceeding challenging a Lien granted by a Loan Party to the Administrative Agent or affecting title to all or any material portion of the Collateral, (viii) any Default, specifying the nature thereof and what action each Loan Party has taken, is taking, or proposes to take, (ix) [reserved], (x) any amendment or modification to any Material Agreement (together with a copy thereof), and prompt notice of any termination, expiration or loss of any Material Agreement, and (xi) any material default

ACTIVE 686990614v6

(or receipt of notice of any claimed default) under any Material Agreement (including Oil Company Agreements).

(k)    <u>Notice of Changes by a Loan Party</u>.  Prior written notice on or before the occurrence of (i) any proposed relocation of any Loan Party's chief executive office or principal place of business, (ii) any proposed relocation of the place where a Loan Party's books and records relating to accounts and general intangibles are kept, (iii) a change of any Loan Party's name, Organizational Documents, jurisdiction of organization, or type of organizational structure, (iv) any proposed relocation of any of the Collateral to a location other than those set out on the Disclosure Schedules, or as approved by the Bankruptcy Court and the Agent, and (v) any Acquisition, division, or creation of a Subsidiary by any Loan Party, or that any Person has become a Subsidiary of any Loan Party.  Nothing in this <u>Section 8.1(k)</u> shall be construed as permitting the Acquisition, division, or creation of a Subsidiary.

(l)    <u>Beneficial Ownership</u>.  Prompt notification (i) of any change in 25% or more of the direct or indirect ownership interests in Borrower as reported in the Beneficial Ownership Certification or other similar certification provided to Lender on or prior to the Closing Date (the "<u>Closing Certification</u>"), and (ii) if the Person or Persons with significant managerial responsibility identified in the Closing Certification cease to have that responsibility or if the information reported about any such Person changes.  Borrower hereby agrees to provide such information and documentation as Lender may reasonably request in order to confirm or update the continued accuracy of the information provided in connection with the Closing Certification, any other Beneficial Ownership Certification delivered in connection herewith, and any updates or supplements to any of the foregoing.

(m)    <u>Chapter 11 Case Pleadings</u>.  Advance copies of all material financing and sale applications, motions, and pleadings to be filed by any Loan Party in the Cases not later than two days prior to the filing thereof (or upon such lesser notice acceptable to the Agent in its sole discretion).

(n)    [Reserved].

(o)    <u>General Information</u>.  Promptly, upon reasonable request by the Administrative Agent or any Lender, such other information and documents not otherwise required to be furnished under the Loan Documents respecting the business affairs, assets and liabilities of the Borrower and its Subsidiaries.

8.2    **Keeping Books and Records**.  Borrower will maintain, and will cause each other Loan Party to maintain, proper books of record and account in which full, true, and correct entries in conformity with GAAP shall be made of all dealings and transactions in relation to its business and activities.

8.3    **Inspection; Collateral Examinations**.  Borrower will permit, and will cause each Loan Party to permit, representatives of Administrative Agent:

ACTIVE 686990614v6

(a)      to examine and make copies of the books and records of, and visit and inspect the properties or assets of Borrower and any Subsidiary and to discuss the business, operations, and financial condition of any such Persons with their respective officers and employees and with their independent certified public accountants, all during normal business hours at such reasonable times and as often as the Administrative Agent or any Lender may request after prior notice to the Borrower; *provided that*, if a Default has occurred and is continuing, no prior notice shall be required and Borrower shall also permit representatives of any Lender to take such actions; and

(b)      upon the request of the Administrative Agent, to conduct Collateral Examinations once during each fiscal year of Borrower, unless a Default or a Potential Default exists (in which case Administrative Agent may conduct additional Collateral Examinations at its discretion), and the cost of each such Collateral Examination shall be paid by Borrower.

8.4      **Maintenance of Existence**.  Each Loan Party will do all things necessary to preserve, renew, and keep in effect (a) its existence and good standing in its jurisdiction of organization and its authority to transact business and good standing in all other jurisdictions where the nature and extent of its business and properties require due qualification and good standing, and (b) all permits, licenses, franchises, patents, copyrights, trademarks and trade names, or rights material to the conduct of its business where failure to do so could reasonably be expected to result in a Material Adverse Event.

8.5      **Maintenance of Properties**.  Borrower will maintain, and will cause each other Loan Party to maintain, its assets and properties material to the conduct of its business in good working order, condition and repair (ordinary wear and tear excepted) and make all necessary repairs and replacements.

8.6      **Insurance**.  Borrower will maintain, and will cause each other Loan Party to maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks, and with such deductibles, as in each case are customarily maintained by companies engaged in the same or similar businesses, owning similar properties and operating in the same or similar locations.  Without limiting the foregoing, such insurance shall include (a) property, casualty, or physical hazard insurance on an "all risk" basis, (b) commercial general liability insurance against claims for bodily injury, death or property damage covering any and all insurable claims, and (c) such other insurance as the Administrative Agent may from time to time require (such policies to be in Acceptable Form).  Each casualty insurance policy and each insurance policy covering Collateral shall by endorsement name Administrative Agent as lender loss payee or mortgagee, as applicable, and each policy of liability insurance shall by endorsement name Administrative Agent as an additional insured and provide that such policy will not be cancelled without thirty (30) days' prior written notice to the Administrative Agent. Each insurance policy shall include a waiver of subrogation and shall be primary and non-contributory.  With respect to each portion of any real property of the Loan Parties which constitutes Collateral and on which any Building or Manufactured (Mobile) Home is located, if at any time such Building or Manufactured (Mobile) Home is located on any such real property in a Special Flood Hazard Area, Borrower shall, and shall cause each other Loan Party to, obtain

Flood Insurance in such total amount as the applicable Flood Insurance Regulations may require and otherwise in Acceptable Form, and otherwise comply with Flood Insurance Regulations.

8.7     **Compliance with Laws.**     Borrower and each other Loan Party will comply (a) (i) with all applicable Anti-Corruption Laws and Sanctions, (ii) with the Patriot Act, (iii) with the Beneficial Ownership Regulation, (iv) with the Financing Orders, and (v) in all material respects, with any other Applicable Laws which are applicable to it or its assets and (b) will maintain in effect policies and procedures designed to promote compliance by Borrower, each Subsidiary, and their respective directors, managers, partners, officers, employees, and agents with applicable Sanctions, Patriot Act requirements, Beneficial Ownership Regulation, the FCPA, and any other applicable Anti-Corruption Laws.

8.8     **Compliance with Agreements**.  Borrower will comply, and will cause each other Loan Party to comply, in all material respects, with the terms and provisions of all Material Agreements (including, but not limited to, Oil Company Agreements) of the Borrower or any Loan Party except as may otherwise be excused or permitted under the Bankruptcy Code.

8.9     **Payment of Taxes**.  Borrower will pay or discharge, and will cause each other Loan Party to pay or discharge, all Taxes, levies, assessments, and governmental charges imposed on it or its income or profits or any of its property in accordance with the requirements of the Bankruptcy Code to the extent permitted under the Financing Orders and the Approved Budget.  With respect to post-petition Taxes due and payable by the Loan Parties, in each case, in an amount up to the amount of the Second Amendment Subsequent Advance which then is available in the Tax Payments Blocked Account (the "Post-Petition Tax Amounts"), Borrower shall submit to the Administrative Agent from time to time after the Second Amendment Effective Date actual invoices reflecting such Post-Petition Tax Amount.  The Administrative Agent acknowledges receipt of actual invoices to support the payment of Post-Petition Tax Payments totaling no less than $2,756,522.  On or before July 28, 2023, the Administrative Agent shall either (a) pay the Post-Petition Tax Amounts, which includes but is not limited to the $2,756,522 referenced in the prior sentence, directly to taxing authorities from the Tax Payments Blocked Account or (b) disburse funds to Borrower from the Tax Payments Blocked Account to pay the Post-Petition Tax Amounts in accordance with instructions provided by Borrower to the Administrative Agent.  With respect to the Second Amendment Subsequent Advance, to the extent that such funds are disbursed to Borrower, then Borrower shall (a) use the proceeds of such Borrowing solely to pay the post-petition Taxes then due and payable within one (1) Business Day after the Administrative Agent makes such proceeds of such Borrowings available to Borrower and (b) contemporaneously with the payment of such Taxes, Borrower shall provide the Administrative Agent a certificate signed by the CRO certifying the Loan Parties' satisfaction of the foregoing clause (a), together with evidence of such Tax payments as the Administrative Agent may request.  To the extent that the Administrative Agent pays any Post-Petition Tax Amounts directly from the Tax Payments Blocked Account, the Administrative Agent shall provide Borrower a certificate signed by an authorized representative certifying the Administrative Agent's satisfaction of the Post-Petition Tax Amounts, together with evidence of such Tax payments as Borrower may request.  **For the avoidance of doubt, notwithstanding anything to the contrary herein or in the other Loan Documents or the Financing Orders, the funding of the Post-Petition Tax Amounts set forth in this Section 8.9 shall occur, and the relevant taxing authorities shall be paid in accordance with this Section 8.9,**

**notwithstanding the occurrence of any Default or Event of Default under this Agreement or the Financing Orders; it being the intent of the Parties that the Post-Petition Tax Amounts shall be paid if the conditions set forth in this Section 8.9 have been satisfied**.

8.10  **Payment of Obligations**.  Borrower unconditionally and irrevocably covenants that it will promptly pay the principal of, interest on and any other amount due on the Notes and the other Obligations in the amounts, on the dates and in the manner provided herein, in the Notes, and each other document evidencing the Obligations to the extent permitted by the Financing Orders and the Approved Budget.

8.11  **[Reserved]**.

8.12  **ERISA**.  Borrower will comply, and will cause each other Loan Party to comply, with all minimum funding requirements, and all other material requirements, of ERISA, if applicable, so as not to give rise to any ERISA Event, and shall, if an ERISA Event occurs, pay the amount of the liability promptly.

8.13  **Conduct Business**.  Borrower will continue to conduct, and will cause each other Loan Party to continue to conduct, its primary business as conducted as of the Closing Date.

8.14  **Banking Relationship**.  Borrower shall establish and maintain, and shall cause each other Loan Party to, establish and maintain, its banking depository and disbursement relationships consistent with the Cash Management Order.

8.15  **Proceeds**.  The proceeds of the Loans will be used (a) to fund the operating expenses of the Loan Parties, (b) for payment of the costs and expenses of the Cases, and (c) for the payment of such other expenses as the Lenders shall reasonably agree and the Bankruptcy Court shall approve, in each case, limited to and in accordance with the Approved Budget or as may otherwise be consented to by the Lenders.  Except as specifically set forth in the Financing Orders, no proceeds of any credit extension may be utilized to finance in any way professional fees, disbursements, costs, or expenses incurred by any person in connection with asserting, investigating, preparing, prosecuting, or joining in any claims, counterclaims, causes of action, contested matter, objection, defense or other proceeding, the purpose of which is to seek a judgment, order, declaration, or similar relief (i) against the Agent, any of the Lenders, or their respective counsel or advisors, on account of any claim arising on, before, or after the Petition Date, including, without limitation, a claim for lender liability or pursuant to Section 105 or chapter 5 of the Bankruptcy Code; (ii) invalidating, setting aside, avoiding, challenging, avoiding, subordinating, or raising any defenses to (A) any of the Obligations, and/or Liens under this Agreement or other Loan Documents, (B) any of the Prepetition Obligations and/or Prepetition Liens under the Prepetition Loan Documents; (iii) declaring any of the Loan Documents or Prepetition Loan Documents to be invalid, not binding or unenforceable in any respect; (iv) attempting to modify or restrict any of the rights or remedies granted to any of the Lenders under any of the Loan Documents, the Financing Orders, any other order of the Court, or Applicable Law; (v) paying any amount on account of any claims or equity interests arising before the commencement of the Cases unless such payments are approved by an order of the Bankruptcy Court; or (vi) after the occurrence and during the continuance of an Event of Default,

ACTIVE 686990614v6

paying any success, completion, back-end or similar fees (other than the Facility Fee) that is not covered by the Carve-Out.

8.16  **Preserve Collateral**.   In the event any claim is asserted in respect of any Collateral or Lender's Lien on such Collateral, the applicable Loan Party shall appear in and defend any such action or proceeding at Borrower's reasonable expense.   In the event of any default by any Loan Party or any other party under or in connection with any material portion (individually or collectively) of the Collateral, the Loan Parties will immediately use commercially reasonable efforts to remedy the same or immediately demand that the same be remedied.

8.17  **[Reserved]**.

8.18  **Further Assurances**.   The Financing Orders shall be sufficient and conclusive evidence of the validity, perfection and priorities of the Agent's Liens upon the Collateral, without the necessity of filing or recording any financing statement, assignment, mortgage, leasehold mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Liens of the Agent in and to the Collateral or to entitle the Agent to the priorities granted herein; provided, Borrower will execute and deliver, and will cause each other Loan Party to, promptly upon the request of the Administrative Agent, (a) correct any defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) to the fullest extent permitted by Applicable Law, subject any Loan Party's properties, assets, rights or interest to the Liens now or hereafter intended to be covered by any of the Security Documents, (iii) perfect and maintain the validity, effectiveness, and priority of any of the Security Documents and any of the Liens intended to be created thereunder, and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Administrative Agent and the Lenders the rights granted or hereafter intended to be granted to the Administrative Agent and the Lenders under any Loan Documents or under any other instrument executed in connection with the Loan Documents to which any Loan Party is or is to be a party.

8.19  **Budget Compliance**.   The Loan Parties deliver, or cause to be delivered, to the Agent and the Lenders those reports and other information relating to the Approved Budget as set forth in the Financing Orders.

8.20  **Milestones**.   The Loan Parties shall ensure that each of the milestones set forth in the Financing Orders (the "Milestones") are achieved ~~in accordance with the applicable timing set forth below~~ (or such later dates as approved by the Lenders), except that (a) the commencement of an auction for a sale or sales of substantially all of the Loan Parties' assets shall commence by July 28, 2023; (b) the entry of an order or orders approving the sale(s) resulting from the auction(s) shall occur by August 7, 2023; and (c) the closing of the sale(s) approved by the Bankruptcy Court shall occur by August 15, 2023.

75

# ARTICLE 9

## NEGATIVE COVENANTS

So long as Lenders are committed to make any Credit Extension under this Agreement, and thereafter until the Termination Date, Borrower covenants and agrees as follows:

9.1     **Debt**.  No Loan Party will incur, create, guarantee, assume or permit to exist, and no Loan Party will permit any Subsidiary to incur, create, assume, guarantee, or permit to exist, any Debt, except for the following (but, in any case of the following that arise after the Petition Date, only to the extent set forth in the Approved Budget and consented to by Agent) (collectively, the "Permitted Debt"); (a) the Obligations; (b) trade accounts payable in the ordinary course of business that are not more than 120 days past due, except to the extent that such trade accounts payable are being disputed in good faith and by appropriate proceedings and as to which reserves have been established in accordance with GAAP; (c) [Reserved]; (d) [Reserved]; (e) Debt arising from the endorsement of instruments for collection in the ordinary course of business; (f) Debt of a Loan Party to another Loan Party; *provided that*, such Debt is subordinate to the Obligations; and (g) Debt existing on the Closing Date and disclosed in the Disclosure Schedules (including Debt of the Loan Parties under the Prepetition Credit Agreement).

9.2     **Limitation on Liens**.  No Loan Party will incur, create, assume or permit to exist, and no Loan Party will permit any Subsidiary to incur, create, assume or permit to exist, any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, except for the following (collectively, the "Permitted Liens"):  (a) Liens in favor of Administrative Agent; (b) encumbrances consisting of minor easements, zoning restrictions, or other restrictions on the use of real property that do not (individually or in the aggregate) secure any indebtedness, materially affect the value of the assets encumbered thereby, or materially impair the ability of a Loan Party to use such assets in its business, and none of which is violated in any material respect by existing or proposed structures or land use; (c) Liens for Taxes which (i) are not delinquent, or (ii) for which (A) no Lien has been filed of record with respect to such Tax, (B) no Collateral or any portion thereof or interest therein would be in any danger of sale, forfeiture or loss by reason of the contest for such Taxes, and (C) such Loan Party has set aside on its books adequate reserves against such Taxes; (d) Liens of mechanics, materialmen, warehousemen, carriers or other similar statutory Liens securing obligations that are not yet due (or are being contested in good faith, for which adequate reserves have been established) and are incurred in the ordinary course of business; (e) to the extent set forth in the Approved Budget, pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance or other social security, old age pension or public liability obligations; (f) to the extent set forth in the Approved Budget, Liens on cash or securities pledged to secure performance of tenders, surety and appeal bonds, government contracts, performance and return of money bonds, bids, trade contracts, leases, statutory obligations, regulatory obligations and other obligations of a like nature incurred in the ordinary course of business; (g) Liens in favor of the agent and the lenders under the Prepetition Credit Agreement, and any replacement Liens and super-priority adequate protection claims in connection therewith; and (h) Liens securing Debt permitted under Section 9.1(g).

76

ACTIVE 686990614v6

9.3     **Acquisitions, Mergers, and Other Fundamental Changes**.  No Loan Party may, and no Loan Party may permit any Subsidiary to, (whether in one transaction or a series of transactions) without consent of the Bankruptcy Court and the Administrative Agent: (a) acquire all or any substantial portion of the Equity Interests issued by any other Person, (b)  acquire all or any substantial portion of the assets of any other Person or the line of business of another Person, (c)  merge, combine, divide, or consolidate with any other Person, (d) liquidate, wind up or dissolve (or suffer any liquidation or dissolution), (e) suspend operations, (f) create, divide, or acquire any Subsidiaries, or (g) acquire any real property.

9.4     **Disposition of Assets**.  No Loan Party may, and no Loan Party may permit any Subsidiary to, (whether in one transaction or a series of transactions) make any Disposition, or enter into any agreement to make any Disposition, except (a) Dispositions of assets in the ordinary course of business which (i) are obsolete or worn out, or (ii) are no longer used in such Loan Party's business and which such Loan Party has decided to replace, (b) Disposition of delinquent accounts in the ordinary course of business for purposes of collection, (c) Dispositions of inventory in the ordinary course of business, and (d) other Dispositions of assets, subject to the approval of the Bankruptcy Court and the Agent.

9.5     **Restricted Payments**.  No Loan Party may, and no Loan Party may permit any Subsidiary to, make any Restricted Payment.

9.6     **Investments**.  No Loan Party may make or hold (or agree to make or hold), and no Loan Party may permit any Subsidiary to make or hold (or agree to make or hold), any Investments, except:   (a) Investments by such Loan Party in the form of cash or Cash Equivalents; (b) Investments by any Loan Party or any Subsidiary in any Loan Party; (c) to the extent constituting Investments, transactions permitted under Sections 9.1 and 9.3; (d) Investments consisting of extensions of trade credit in the nature of accounts receivable or notes receivable arising from the sale or lease of goods or services in the ordinary course of business and solely to the extent set forth in the Approved Budget to Persons which are not Affiliates, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors; (e) Investments in the ordinary course of business consisting of endorsements for collection or deposit; (f) each Loan Party may own the Equity Interests of such Loan Party's Subsidiaries; and (g) Investments existing on the Closing Date and disclosed in the Disclosure Schedules.

9.7     **Compliance with Environmental Laws**.  No Loan Party may, and no Loan Party will permit any Subsidiary to, (a) use (or permit any tenant to use) any of their respective properties or assets for the handling, processing, storage, transportation, or disposal of any Hazardous Material, except in the ordinary course of business and in compliance with all Environmental Laws, or (b) generate any Hazardous Material in violation of any Environmental Law, (c) conduct any activity which is likely to cause a Release or threatened Release of any Hazardous Material in violation of any Environmental Law, or (d) otherwise conduct any activity or use any of their respective properties or assets in any manner that is likely to violate any Environmental Law.

ACTIVE 686990614v6

9.8    **Accounting**.  No Loan Party may make, and no Loan Party will permit any Subsidiary to make, any change in accounting treatment or reporting practices, except as required or permitted by GAAP.  No Loan Party will change its fiscal year end from December 31.

9.9    **Change of Business**.  No Loan Party may enter into, and no Loan Party will permit any Subsidiary to enter into, any type of business which is materially different from the business in which such Loan Party is engaged as of the Closing Date.

9.10   **Transactions With Affiliates**.   Except as expressly permitted by the Administrative Agent and the Bankruptcy Court, no Loan Party will enter into or permit to exist, and no Loan Party will permit any Subsidiary to enter into or permit to exist, any transaction, arrangement or contract (including any lease or other rental agreement) with any of its Affiliates on terms which are less favorable than are obtainable from any Person who is not an Affiliate of such Loan Party or such Subsidiary.

9.11   **Hedge Agreements**.  No Loan Party will, and no Loan Party will permit any Subsidiary to, enter into any hedge agreement or hedge transaction.

9.12   **Compliance with Government Regulations**.  No Loan Party will, and no Loan Party will permit any Subsidiary to, (a) at any time be in violation of any Applicable Law if such Loan Party's violation of such Applicable Law would result in (i) any Lender being prohibited from making any Credit Extension to any Loan Party, (ii) any limitation on the ability of any Lender to make a Credit Extension to any Loan Party, or (iii) any Lender being prohibited from otherwise conducting business with any Loan Party, or (b) fail to provide documentary and other evidence of any Loan Party's identity as may be requested by Administrative Agent or any Lender at any time to enable Administrative Agent or such Lender to verify such Loan Party's identity or to comply with any Applicable Law, including Section 326 of the Patriot Act.

9.13   **Organizational Documents; Material Agreements**.  No Loan Party may, and no Loan Party may permit any Subsidiary to:

(a)    modify, repeal, replace or amend any provision of its Organizational Documents in any manner, other than (i) minor modifications, supplements, or waivers that do not in any material respect increase the obligations, or limit the rights of, such Loan Party, and (ii) nonmaterial modifications that could not reasonably be expected to be materially adverse to the interests of the Lenders.  If as of the Closing Date a Loan Party has not "opted in" to Article 8 of the applicable Uniform Commercial Code and thereby elected to have its Equity Interests treated as securities for purposes of the applicable Uniform Commercial Code, such Loan Party may not "opt in" to Article 8 of the applicable Uniform Commercial Code without the prior written consent of Required Lenders; or

(b)    terminate, amend, replace, or otherwise modify any Material Agreement (including, but not limited to, Oil Company Agreements) except for (i) any replacement, modification or amendment of a Material Agreement made in the ordinary course of business consistent with past practice and which replacement, amendment or modification is not materially adverse to the Loan Parties, the Administrative Agent, or

the Lenders, (ii) replacements, renewals or extensions (A) on either substantially the same terms as the applicable existing Material Agreements (excluding rental payments or other pricing which shall be at then market rates), as applicable, or (B) as otherwise approved by the Administrative Agent in writing.

9.14    **Prepayment of Debt; Payment of Subordinated Debt**.

(a)    No Loan Party, or Subsidiary, may voluntarily prepay principal of, or interest on, any Debt (*other than* the Obligations).

(b)    No Loan Party, or Subsidiary, may make scheduled payments, payments due at maturity, voluntary or mandatory repayments, or any other prepayment, redemption, retirement, repurchase, or defeasance in respect of any Subordinated Debt.

9.15    **Restrictive Agreement**.    No Loan Party may enter into any Restrictive Agreement.

9.16    **Sale and Leaseback Transactions**.    Unless otherwise consented to by the Bankruptcy Court and the Agent, Borrower will not, and will not permit any other Loan Party to, enter into or suffer to exist, any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereinafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred.

9.17    **Financing Orders; Administrative Priority; Lien Priority; Payment of Claims**.  No Loan Party will:

(a)    at any time, seek, consent to or suffer to exist any reversal, modification, amendment, stay or vacation of any Financing Order, except for modifications and amendments agreed to by the Lenders in their sole discretion in advance and in writing;

(b)    at any time, suffer to exist a priority for any administrative expense or unsecured Claim against a Loan Party (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 503(b), 506(c), 507(a), 507(b), 546(c) 726 and 1114 of the Bankruptcy Code) equal or superior to the priority of the Agents and the Lenders in respect of the Obligations;

(c)    at any time, suffer to exist any Lien on the Collateral having a priority equal or superior to the Liens in favor of the Agent for the benefit of the Lenders in respect of the Collateral with respect to the Obligations, except for Permitted Prior Liens; and

(d)    prior to the date on which all Obligations (other than contingent indemnification and reimbursement obligations in respect of which no claim for payment has been asserted) have been fully and indefeasibly paid and satisfied, pay any administrative expense claims except (i) Obligations due and payable hereunder, (ii) administrative expenses incurred in the ordinary course of such Loan Party's business as

contemplated by this Agreement and the Approved Budget, and (iii) as may otherwise be authorized or ordered by the Bankruptcy Court in accordance with the Approved Budget.

**ARTICLE 10**

**[RESERVED]**

**ARTICLE 11**

**DEFAULT**

11.1   <u>**Default**</u>.  The term "***Default***" means the occurrence of any one or more of the following events:

(a)   <u>Default in Payment</u>.  Borrower shall fail to pay (i) any principal of or interest on the Obligations when due, (ii) any reimbursement obligation in respect of any LC, or (iii) any other amount due under this Agreement or any Loan Document when due and such failure under this *clause (iii)* shall continue unremedied for three (3) Business Days.

(b)   <u>Breach of Covenants</u>.  Any Loan Party shall fail to perform, observe or comply with (i) any covenant, agreement or term contained in <u>Section 8.1</u>, <u>8.4</u>, <u>8.6</u>, <u>8.9</u>, <u>8.13</u>, <u>8.14</u>, <u>8.17</u>, <u>8.19</u>, <u>8.20</u>, <u>8.21</u>, or <u>Article 9</u> of this Agreement, (ii) any covenant, agreement or term contained in the Financing Orders, or (iii) any covenant, agreement or term in this Agreement or any other Loan Document (other than <u>Section 11.1(a)</u> or the preceding *clause (i)*) and, with respect to this *clause (iii)*, such failure shall have continued unremedied for a period of seven (7) Business Days.

(c)   <u>Inaccuracy of Representations</u>.  Any representation or warranty made or deemed made by any Loan Party (or any of their respective officers) in this Agreement, any other Loan Document, or in any amendment of this Agreement or any other Loan Document, or in any certificate, report, notice, or financial statement furnished at any time in connection with this Agreement, any other Loan Document, or in any amendment of this Agreement or any other Loan Document, shall prove to have been incorrect in any material respect when made or deemed to have been made.

(d)   <u>[Reserved]</u>.

(e)   <u>[Reserved]</u>.

(f)   <u>[Reserved]</u>.

(g)   <u>[Reserved]</u>.

(h)   <u>[Reserved]</u>.

(i)   <u>[Reserved]</u>.

ACTIVE 686990614v6

(j)     Invalidity of Loan Documents.   This Agreement or any other Loan Document shall cease to be in full force and effect or shall be declared null and void or the validity or enforceability thereof shall be contested or challenged by any Loan Party or any of their respective owners, or any Loan Party shall deny that it has any further liability or obligation under any of the Loan Documents, or any Lien or security interest created by the Loan Documents shall for any reason cease to be a valid, first priority perfected security interest in and Lien upon any of the Collateral purported to be covered thereby.

(k)     Change of Control.  A Change of Control occurs.

(l)     ERISA.  An ERISA Event occurs with respect to an ERISA Plan that has resulted or could reasonably be expected to result in liability of Borrower under Title IV of ERISA to the ERISA Plan or the PBGC in an aggregate amount in excess of the Threshold Amount.

(m)     [Reserved].

(n)     [Reserved].

(o)     Material Adverse Event.  Any event or other conditions shall occur and be continuing that is reasonably likely to result in a Material Adverse Event.

(p)     Additional Events of Default.  The occurrence of any of the following in any of the Cases:

(i)     The Loan Parties shall fail to file the DIP Financing Motion within five Business Days after the Petition Date in form and substance acceptable to the Agent and the Lenders, in their reasonable discretion;

(ii)     Any of the Cases shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

(iii)     The filing of a proposed plan of reorganization or liquidation by any Borrower, which plan does not provide for the indefeasible payment in full in cash of the Obligations and the Prepetition Obligations as of the effective date of such plan or which plan is not acceptable to the Agent and the Lenders in their reasonable discretion;

(iv)     The entry of an order confirming a plan of reorganization that does not require repayment in full of the Obligations and the Prepetition Obligations in cash as of the effective date of such plan or which plan is not acceptable to the Agent and the Lenders in their discretion;

(v)     The appointment in any of the Cases of a trustee under section 1104 of the Bankruptcy Code or an examiner with enlarged powers (powers

beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code;

(vi)     The Borrower's termination of the engagement of the CRO of the Borrower or the material impairment or reduction of the responsibilities and activities of the CRO by the Borrower;

(vii)     The Interim DIP Order ceasing to be in full force and effect, or the entry of an order amending, supplementing, staying, vacating, revoking, reversing or otherwise modifying this Agreement, the Financing Orders, or any agreement relating to the Loan Documents, without the prior written consent of the Lenders;

(viii)    The entry of an order permitting any claim against, or obligation of, any Loan Party (now existing or hereafter arising, of any kind or nature whatsoever), to have priority equal or superior to the priority of the Agent or the Lenders in respect of this Agreement and the Liens granted in favor of the Agent hereunder, other than the Carve-Out;

(ix)     Any attempt by either a Loan Party, or any officer, director or affiliate thereof, or any party related thereto, to invalidate, reduce, or otherwise impair any of the rights, claims, or liens of the Agent or the Lenders under this Agreement, the Financing Orders or other Loan Documents, or any such rights, claims, or liens shall, for any reason, cease to be valid;

(x)     Any Loan Party's engagement in or support of any investigation or assertion of any claims or causes of action (or directly or indirectly support assertion of the same) against the Administrative Agent or the Lenders;

(xi)     The assertion by any Loan Party of a surcharge right or claim or the entry of an order that subjects the Collateral to assessment pursuant to section 506(c) of the Bankruptcy Code;

(xii)     The filing of any pleading by any Loan Party seeking or otherwise consenting to or supporting any of the matters set forth in clauses (ii) or (viii) this clause (p);

(xiii)    the entry of an order by the Bankruptcy Court in favor of the Committee, if any, appointed in the Cases, any ad hoc committee, or any other party in interest, (A) granting such party standing to pursue any claims against the Secured Parties and/or Prepetition Lenders, (B) sustaining an objection to claims of the Secured Parties or the Prepetition Lenders, (C) avoiding any liens held by the Secured Parties, (D) sustaining an objection to claims of the Prepetition Lenders or the Prepetition Agent, or (E) avoiding any liens held by the Prepetition Lenders or the Prepetition Agent except as otherwise agreed by the Prepetition Agent in writing (provided, that the foregoing shall not be deemed to prohibit the investigation by any such committee of any such claims or liens in respect of the Prepetition Obligations);

ACTIVE 686990614v6

(xiv)   The Loan Parties' exclusivity period under Section 1121 of the Bankruptcy Code for the filing of a chapter 11 plan terminates for any reason;

(xv)   Any material payment (in excess of $250,000) is made on, or application for authority to pay (which is supported, directly or indirectly, by any Loan Party, or is not being actively contested by each Loan Party in good faith), any material prepetition claim without the Agent's consent, except as authorized by the Bankruptcy Court;

(xvi)   An order is entered granting any creditor relief from the automatic stay to exercise rights with respect to property of the estate having a value of more than $250,000 or which has a material effect on the ability of any Loan Party to operate its business consistent with current practice, maintain any material license or privilege, or dispose of the Collateral as an enterprise or going concern;

(xvii)   Any Term Loan or other extension of credit hereunder or any portion of the Carve-Out is utilized to prosecute actions, claims, demands, or causes of action against the Lenders or to object to or contest in any manner or to raise any defense in any pleading to the entry of the Financing Orders, the validity, perfection, priority, or enforceability of this Agreement, or the rights, claims, liens, and security interests granted to the Agent or the Lenders under this Agreement or the Financing Orders;

(xviii)   The entry of an order authorizing or approving any Loan Party's assumption, assignment, and/or rejection of any material executory contract or unexpired lease without the Agent's prior written consent;

(xix)   The sale by any Loan Party, or the entry of an order approving the sale by any Loan Party, of any material assets outside of the ordinary course of business without the Agent's prior written consent;

(xx)   A motion or application for any of the orders or actions described in clauses (b), (p)(ii), or (p)(v) through (p)(xv) shall be made by any person, including any Committee appointed in the Cases, without the Agent' prior written consent, and such motion or application either is in collusion with or supported, directly or indirectly, by any Loan Party, or is not actively contested by each Loan Party in good faith within the applicable objection period;

(xxi)   Without prior written consent of the Administrative Agent, any Loan Party shall have failed to satisfy any of the Milestones set forth in Section 8.20 (provided that any such Milestones may be extended upon prior written consent of the Agent in its sole and absolute discretion);

(xxii)   The occurrence and notice of default of (i) a Material Adverse Effect, recognizing that the Loan Parties have filed the Cases, (ii) the material impairment of the ability of any Loan Party to meet its obligations substantially as set forth in the Approved Budget or to otherwise perform its obligations in connection with this Agreement, (iii) the imposition of any obligation on the

Agent or the Lenders, compliance with which would materially impair the Agent's or the Lenders' ability to receive its contemplated economic benefits hereunder, (iv) the material impairment of the validity or enforceability of, or the rights, claims, liens, remedies, or benefits available to the Agent and the Lenders under the Financing Orders, or any Loan Document or (v) the material impairment of the validity, perfection, or priority of the ~~Security Interest~~Liens or any ~~lien~~security interest granted in favor of the Agent or the Lenders; or

(xxiii)  Without the prior written consent of the Lenders, a Borrower shall have made any disbursement not permitted under Section 8.15 hereof, except for the permitted deviations in amounts set forth in Section 8.19 hereof.

11.2    **Remedies Upon Default**.  If any Default shall occur, Administrative Agent may, and, upon the direction of the Required Lenders, shall, do any one or more of the following:  (a) declare the outstanding principal of and accrued and unpaid interest on the Notes and the Obligations or any part thereof to be immediately due and payable, and the same shall thereupon become immediately due and payable, without notice, demand, presentment, notice of dishonor, notice of acceleration, notice of intent to accelerate, notice of intent to demand, protest, or other formalities of any kind, all of which are hereby expressly waived by Borrower, (b) terminate the Commitments without notice to Borrower, (c) foreclose or otherwise enforce any Lien granted to the Administrative Agent to secure payment and performance of the Obligations, (d) demand payment from the Guarantors, (e) exercise any and all rights and remedies afforded by the laws of the State of Texas or any other jurisdiction, by any of the Loan Documents, by equity or otherwise; (f) upon five (5) business days' written notice to the Borrower and any Committee and the filing of such written notice with the Bankruptcy Court, (i) the Agent may exercise any or all of the following rights and remedies and (ii) relief from the automatic stay provided under Section 362 of the Bankruptcy Code shall be deemed automatically lifted or modified to the extent necessary to allow the Lender to take the actions described in this Section 11.2 or under any other Loan Document without further notice or a hearing, (provided that the Loan Parties, the United States Trustee and Committee may seek an emergency hearing before the Bankruptcy Court to be heard in connection herewith), (g) exercise and enforce its rights and remedies under the Interim DIP Order, the Final DIP Order and/or the Security Documents, and (h) seek the appointment of a Chapter 11 trustee and have an expedited hearing with respect to such request, subject to the Bankruptcy Court's calendar.

11.3    **Cash Collateral**.  If any Default shall occur, Borrower shall, if requested by any Lender, immediately Cash Collateralize the LC Exposure as security for the Obligations.

11.4    **Performance by Administrative Agent**.  If any Loan Party shall fail to perform any covenant, duty, or agreement contained in any of the Loan Documents, Administrative Agent may perform or attempt to perform such covenant, duty, or agreement on behalf of such Loan Party.  In such event, the applicable Loan Party shall, at the request of Administrative Agent, promptly pay any amount expended by Administrative Agent in such performance or attempted performance to the Administrative Agent, together with interest thereon at the Default Rate from the date of such expenditure until paid.  Notwithstanding the foregoing, it is expressly agreed that neither Administrative Agent nor any Lender shall have any liability or responsibility for the

ACTIVE 686990614v6

performance of any obligation of any Loan Party under this Agreement or any other Loan Document.

11.5 **Application of Liquidation Proceeds**. All monies received by Administrative Agent from the exercise of remedies under this Agreement or the Loan Documents shall, unless otherwise required by Applicable Law and subject to the Financing Orders, be applied in the following order: (a) first, to the payment of all fees, expenses, indemnities, and other amounts payable to the Administrative Agent, in its capacity as such, including in connection with the exercise of such rights and remedies, together with all reasonable costs and expenses of collection, attorneys' fees, financial advisor fees, court costs and foreclosure expenses; (b) second, to the payment of all fees, expenses, indemnities and other amounts (other than principal, interest, reimbursement obligations, and LC fees) then due to the Lenders from Borrower (other than in connection with Bank Product Liabilities) until paid in full; (c) third, to the payment of all accrued and unpaid interest on the outstanding principal amount of the Obligations (including the remaining Term Principal Amount) (other than in connection with Bank Product Liabilities) on a ratable and pari passu basis until paid in full; (d) fourth, to the payment of all LC Disbursements until paid in full and to Cash Collateralize all outstanding LC Exposure; (e) fifth, to the payment of all interest, fees, and expenses with respect to Bank Product Liabilities on a ratable and pari passu basis until paid in full; (f) sixth, to the payment of the outstanding principal amount of the Second Amendment Term Loans, on a ratable and pari passu basis up to the Second Amendment Term Loan Amount until paid in full to the Lenders that which made the Second Amendment Term Loans, (g) seventh, to the payment of the outstanding principal amount of the Obligations  (including the remaining Term Principal Amount, and Bank Product Liabilities), on a ratable and pari passu basis until paid in full; and (gh), seventheighth, to the payment of any other Obligations on a ratable and pari passu basis until paid in full; (h) [reserved]; and (i) [reserved]. The provisions of this Section 11.5 shall govern and control over any conflicting provisions in this Agreement or any Loan Document.

# ARTICLE 12

# THE ADMINISTRATIVE AGENT

12.1 **Appointment and Authority**. Each of the Lenders and the LC Issuer hereby irrevocably appoints First Horizon Bank to act on its behalf as the Administrative Agent under this Agreement and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Administrative Agent, the Lenders and the LC Issuer, and neither Borrower nor any other Loan Party shall have rights as a third-party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any Applicable Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

ACTIVE 686990614v6

12.2     **Rights as a Lender**.  The Person serving as the Administrative Agent under this Agreement shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent under this Agreement in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent under this Agreement and without any duty to account therefor to the Lenders.

12.3     **Exculpatory Provisions**.

(a)     The Administrative Agent shall not have any duties or obligations except those expressly set out in this Agreement and in the other Loan Documents, and its duties under this Agreement shall be administrative in nature.  Without limiting the generality of the foregoing, the Administrative Agent:

(i)     shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii)     shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); *provided that* the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or Applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may affect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(iii)     shall not, except as expressly set out in this Agreement and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

(b)     The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in *Sections 14.8* and *11.2*), or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment.   The Administrative Agent shall be deemed not to have

knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent in writing by Borrower, a Lender, or the LC Issuer.

(c)    The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered under this Agreement or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set out herein or therein or the occurrence of any Potential Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set out in Article 6 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

12.4    **Reliance by Administrative Agent**.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition under this Agreement to the making of a Credit Extension that by its terms must be fulfilled to the satisfaction of a Lender, or the LC Issuer, the Administrative Agent may presume that such condition is satisfactory to such Lender or the LC Issuer unless the Administrative Agent shall have received notice to the contrary from such Lender or the LC Issuer prior to the making of such Credit Extension.  The Administrative Agent may consult with legal counsel (who may be counsel for Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

12.5    **Delegation of Duties**.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers under this Agreement or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Facility as well as activities as Administrative Agent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

87

12.6    **Resignation of Administrative Agent**.

(a)    The Administrative Agent may at any time give notice of its resignation to the Lenders, the LC Issuer, and Borrower.   Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with Borrower, to appoint a successor, which shall be a bank with an office in Houston, Texas, or an Affiliate of any such bank with an office in Houston, Texas.   If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, and the LC Issuer, appoint a successor Administrative Agent meeting the qualifications set out above; provided that in no event shall any such successor Administrative Agent be a Defaulting Lender.   Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)    If the Person serving as Administrative Agent is a Defaulting Lender pursuant to *clause (d)* of the definition thereof, the Required Lenders may, to the extent permitted by Applicable Law, by notice in writing to Borrower and such Person remove such Person as Administrative Agent and, in consultation with Borrower, appoint a successor.   If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days (or such earlier day as shall be agreed by the Required Lenders) (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c)    With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (i) the retiring or removed Administrative Agent shall be discharged from its duties and obligations under this Agreement and under the other Loan Documents (except that in the case of any Collateral security held by the Administrative Agent on behalf of the Lenders, or the LC Issuer under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such Collateral security until such time as a successor Administrative Agent is appointed) and (ii) except for any indemnity payments owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender, and the LC Issuer directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above.   Upon the acceptance of a successor's appointment as Administrative Agent under this Agreement, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring or removed Administrative Agent (other than any rights to indemnity payments owed to the retiring or removed Administrative Agent), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations under this Agreement or under the other Loan Documents.   The fees payable by Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrower and such successor.   After the retiring or

removed Administrative Agent's resignation or removal under this Agreement and under the other Loan Documents, the provisions of this Article 12 and Section 14.3 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Administrative Agent was acting as Administrative Agent.

12.7   **Non-Reliance on Administrative Agent and Other Lenders**.  Each Lender and the LC Issuer acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender and the LC Issuer also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished under this Agreement or thereunder.

12.8   **No Other Duties, etc.**   Anything in this Agreement to the contrary notwithstanding, no titles listed on the cover page hereof shall provide any Person with any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in such Person's capacity, as applicable, as the Administrative Agent, a Lender or the LC Issuer under this Agreement.

12.9   **Administrative Agent May File Proofs of Claim**.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan or LC Exposure shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)   to file a proof a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, LC Exposure, and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the LC Issuer and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the LC Issuer and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the LC Issuer, and the Administrative Agent under Sections 3.8 and 14.3) allowed in such judicial proceeding; and

(b)   to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the LC Issuer to make such

89

payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the LC Issuer, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 3.8 and 14.3.

12.10   **Collateral and Guaranty Matters**.

(a)     The Lenders and the LC Issuer irrevocably authorize the Administrative Agent, at its option and in its discretion,

(i)     to release any Lien granted to or held by Administrative Agent under any Loan Document (A) upon the Termination Date; (B) on property sold or to be sold or disposed of as part of or in connection with any Disposition permitted under this Agreement or the other Loan Documents; or (C) subject to Section 14.8, if approved, authorized or ratified in writing by the Required Lenders.   Upon request by Administrative Agent at any time, Lenders will confirm in writing Administrative Agent's authority to release, or subordinate its interest in, particular types or items of collateral pursuant to this Section 12.10;

(ii)     to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Permitted Prior Lien on such property which secures Funded Debt;

(iii)     to negotiate and enter into Subordination Agreements, Control Account Agreements, Collateral Access Agreements, and other Loan Documents; and

(iv)     to release any Guarantor from its obligations under the Guaranty Agreement if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Loan Documents.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty Agreement pursuant to this Section 12.10.

(b)     THE ADMINISTRATIVE AGENT SHALL NOT BE RESPONSIBLE FOR OR HAVE A DUTY TO ASCERTAIN OR INQUIRE INTO ANY REPRESENTATION OR WARRANTY REGARDING THE EXISTENCE, VALUE OR COLLECTABILITY OF THE COLLATERAL, THE EXISTENCE, PRIORITY OR PERFECTION OF THE ADMINISTRATIVE AGENT'S LIEN THEREON, OR ANY CERTIFICATE PREPARED BY ANY LOAN PARTY IN CONNECTION THEREWITH, NOR SHALL THE ADMINISTRATIVE AGENT BE RESPONSIBLE OR LIABLE TO THE LENDERS, THE LC ISSUER, OR THE BANK PRODUCT PROVIDERS FOR ANY FAILURE TO MONITOR OR MAINTAIN ANY PORTION OF THE COLLATERAL.

ACTIVE 686990614v6

(c)     Credit Bidding.

(i)     The holders of the Obligations authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid and purchase for the benefit of the Administrative Agent and the Lenders all or any portion of Collateral at any sale thereof conducted by the Administrative Agent under the provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the U.S. Bankruptcy Code, including Section 363 thereof, or a sale under a plan of reorganization, or at any other sale or foreclosure conducted by the Administrative Agent (whether by judicial action or otherwise) in accordance with Applicable Law.

(ii)     Each Lender hereby agrees that, except as otherwise provided in any Loan Documents or with the written consent of the Administrative Agent and the Required Lenders, it will not take any enforcement action, accelerate obligations under any Loan Documents, or exercise any right that it might otherwise have under Applicable Law to credit bid at foreclosure sales, UCC sales or other similar dispositions of Collateral.

12.11   **Other Agents**.  Aside from the Administrative Agent, no other syndication agent, documentation agent, bookrunner, arranger, or other agent shall have any right, power, obligation, liability, responsibility or duty under this Agreement other than those applicable to all Lenders as such, and shall not be deemed to have any fiduciary relationship with any Lender. Each Lender acknowledges that it has not relied, and will not rely, on any such Person in deciding to enter into this Agreement.

12.12   **Lender ERISA Representations**.

(a)     Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the arrangers, and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)     such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans, the LCs, or the Commitments,

(ii)     the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to

ACTIVE 686990614v6

such Lender's entrance into, participation in, administration of and performance of the Loans, the LCs, the Commitments and this Agreement,

(iii)     (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the LCs, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the LCs, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14, and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the LCs, the Commitments and this Agreement, or

(iv)     such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)     In addition, unless Section 12.12(a)(i) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in Section 12.12(a)(iv), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent, the arrangers and their respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that:

(i)     none of the Administrative Agent, the arrangers or any of their respective Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto),

(ii)     the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the LCs, the Commitments and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E),

(iii)     the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the LCs, the Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with

ACTIVE 686990614v6

regard to particular transactions and investment strategies (including in respect of the Obligations),

(iv)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the LCs, the Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, the LCs, the Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v)    no fee or other compensation is being paid directly to the Administrative Agent, or any of its Affiliates for investment advice (as opposed to other services) in connection with the Loans, the LCs, the Commitments or this Agreement.

(c)    The Administrative Agent and the arrangers hereby inform the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the LCs, the Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans, the LCs, or the Commitments for an amount less than the amount being paid for an interest in the Loans, the LCs, or the Commitments by such Lender, or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

## ARTICLE 13

## GUARANTY

13.1    **Guaranty**.

(a)    Each of the Guarantors hereby jointly and severally guarantees to each Lender, the LC Issuer, and each other holder of the Obligations as hereinafter provided, as primary obligor and not as surety, the prompt and complete payment and performance of the Obligations when due (whether at stated maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise) strictly in accordance with the terms thereof.  The Guarantors hereby further agree that if any of the Obligations are not paid in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise), the Guarantors will, jointly and severally, promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the

Obligations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration, as a mandatory cash collateralization or otherwise) in accordance with the terms of such extension or renewal.

(b)     Notwithstanding any provision to the contrary contained herein or in any other of the Loan Documents or the other documents relating to the Obligations, the obligations of each Guarantor under this Agreement and the other Loan Documents shall not exceed an aggregate amount equal to the largest amount that would not render such obligations subject to avoidance under applicable Debtor Relief Laws.

13.2     **Obligations Unconditional**.  The obligations of the Guarantors under Section 13.1 are joint and several, absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of any of the Loan Documents or other documents relating to the Obligations, or any substitution, release, impairment or exchange of any other Guarantee of or security for any of the Obligations, and, to the fullest extent permitted by Applicable Laws, irrespective of any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 13.2 that the obligations of the Guarantors hereunder shall be absolute and unconditional under any and all circumstances.  Each Guarantor agrees that such Guarantor shall have no right of subrogation, indemnity, reimbursement or contribution against Borrower or any other Loan Party for amounts paid under this Article 13 until such time as the Obligations have been indefeasibly paid in full (other than contingent indemnification obligations under the Loan Documents which by their terms expressly survive payment of the Obligations and termination of the Loan Documents and for which no claim has been made as of the date of determination) and the Commitments have expired or have irrevocably terminated.  Without limiting the generality of the foregoing, it is agreed that, to the fullest extent permitted by Applicable Laws, the occurrence of any one or more of the following shall not alter or impair the liability of any Guarantor hereunder, which shall remain absolute and unconditional as described above:

(a)     at any time or from time to time, without notice to any Guarantor, the time for any performance of or compliance with any of the Obligations shall be extended, or such performance or compliance shall be waived;

(b)     any of the acts mentioned in any of the provisions of any of the Loan Documents or other documents relating to the Obligations shall be done or omitted;

(c)     the maturity of any of the Obligations shall be accelerated, or any of the Obligations shall be modified, supplemented or amended in any respect, or any right under any of the Loan Documents or other documents relating to the Obligations shall be waived or any other guarantee of any of the Obligations or any security therefor shall be released, impaired or exchanged in whole or in part or otherwise dealt with;

(d)     any Lien granted to, or in favor of, Administrative Agent or any other holder of the Obligations as security for any of the Obligations shall fail to attach or be perfected; or

ACTIVE 686990614v6

(e)     any of the Obligations shall be determined to be void or voidable (including, without limitation, for the benefit of any creditor of any Guarantor) or shall be subordinated to the claims of any Person (including, without limitation, any creditor of any Guarantor).

With respect to its obligations hereunder, each Guarantor hereby expressly waives diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that Administrative Agent or any other holder of the Obligations exhaust any right, power or remedy or proceed against any Person under any of the Loan Documents or any other document relating to the Obligations, or against any other Person under any other Guarantee of, or security for, any of the Obligations.

13.3     **Reinstatement**.  The obligations of each Guarantor under this Article 13 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Person in respect of the Obligations is rescinded or must be otherwise restored by any holder of any of the Obligations, whether as a result of any Debtor Relief Laws or otherwise, and each Guarantor agrees that it will indemnify Administrative Agent and each other holder of the Obligations on demand for all reasonable costs and expenses (including, without limitation, the fees, charges and disbursements of counsel) incurred by Administrative Agent or such holder of the Obligations in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any Debtor Relief Laws.

13.4     **Certain Additional Waivers**.  Each Guarantor agrees that such Guarantor shall have no right of recourse to security for the Obligations, except through the exercise of rights of subrogation pursuant to Section 13.2 and through the exercise of rights of contribution pursuant to Section 13.6.

13.5     **Remedies**.   The Guarantors agree that, to the fullest extent permitted by Applicable Laws, as between the Guarantors, on the one hand, and Administrative Agent and the other holders of the Obligations, on the other hand, the Obligations may be declared to be forthwith due and payable as specified in Section 11.2 (and shall be deemed to have become automatically due and payable in the circumstances specified in Section 11.2) for purposes of Section 13.1 notwithstanding any stay, injunction or other prohibition under any Debtor Relief Laws (or other Applicable Laws) preventing such declaration (or preventing the Obligations from becoming automatically due and payable) as against any other Person and that, in the event of such declaration in accordance with the terms of the Loan Documents (or the Obligations being deemed to have become automatically due and payable), the Obligations (whether or not due and payable by any other Person as a result of any such stay, injunction or prohibition) shall forthwith become due and payable by the Guarantors for purposes of Section 13.1.   The Guarantors acknowledge and agree that their obligations hereunder are secured in accordance with the terms of the Security Documents and that the holders of the Obligations may exercise their remedies thereunder in accordance with the terms thereof.

13.6     **Rights of Contribution**.  The Guarantors hereby agree as among themselves that, if any Guarantor shall make an Excess Payment (as defined below), such Guarantor shall have a right of contribution from each other Guarantor in an amount equal to such other Guarantor's

Contribution Share (as defined below) of such Excess Payment. The payment obligations of any Guarantor under this Section 13.6 shall be subordinate and subject in right of payment to the Obligations until such time as the Obligations have been indefeasibly paid in full (other than contingent indemnification obligations under the Loan Documents which by their terms expressly survive payment of the Obligations and termination of the Loan Documents and for which no claim has been made as of the date of determination) and the Commitments have irrevocably terminated, and none of the Guarantors shall exercise any right or remedy (whether under this Section 13.6 or otherwise) against any other Guarantor until such Obligations have been indefeasibly paid in full (other than contingent indemnification obligations under the Loan Documents which by their terms expressly survive payment of the Obligations and termination of the Loan Documents and for which no claim has been made as of the date of determination) and the Commitments have irrevocably terminated. For purposes of this Section 13.6, (a) the term "Excess Payment" means the amount paid by any Guarantor in excess of its Ratable Share of any Obligations; (b) the term "Ratable Share" means, for any Guarantor in respect of any payment of Obligations, the ratio (expressed as a percentage) as of the date of such payment of Obligations of (i) the amount by which the aggregate present fair salable value of all of its assets and properties exceeds the amount of all debts and liabilities of such Guarantor (including contingent, subordinated, unmatured, and unliquidated liabilities, but excluding the obligations of such Guarantor hereunder) to (ii) the amount by which the aggregate present fair salable value of all assets and other properties of all of the Loan Parties exceeds the amount of all of the debts and liabilities (including contingent, subordinated, unmatured, and unliquidated liabilities, but excluding the obligations of the Loan Parties hereunder) of the Loan Parties; *provided that*, for purposes of calculating the Ratable Share of each Guarantor in respect of any payment of Obligations, any Guarantor that became a Guarantor subsequent to the date of any such payment shall be deemed to have been a Guarantor on the date of such payment and the financial information for such Guarantor as of the date such Guarantor became a Guarantor shall be utilized for such Guarantor in connection with such payment; and (c) the term "Contribution Share" means, for any Guarantor in respect of any Excess Payment made by any other Guarantor, the ratio (expressed as a percentage) as of the date of such Excess Payment of (i) the amount by which the aggregate present fair salable value of all of its assets and properties exceeds the amount of all debts and liabilities of such Guarantor (including contingent, subordinated, unmatured, and unliquidated liabilities, but excluding the obligations of such Guarantor hereunder) to (ii) the amount by which the aggregate present fair salable value of all assets and other properties of the Loan Parties other than the maker of such Excess Payment exceeds the amount of all of the debts and liabilities (including contingent, subordinated, unmatured, and unliquidated liabilities, but excluding the obligations of the Loan Parties) of the Loan Parties other than the maker of such Excess Payment; *provided that*, for purposes of calculating the Contribution Shares of the Guarantors in respect of any Excess Payment, any Guarantor that became a Guarantor subsequent to the date of any such Excess Payment shall be deemed to have been a Guarantor on the date of such Excess Payment and the financial information for such Guarantor as of the date such Guarantor became a Guarantor shall be utilized for such Guarantor in connection with such Excess Payment.

13.7   **Guarantee of Payment; Continuing Guarantee**. The Guaranty in this Article 13 is a Guarantee of payment and not of collection, is a continuing guarantee, and shall apply to the Obligations whenever arising.

ACTIVE 686990614v6

# ARTICLE 14

## MISCELLANEOUS

14.1 **Notices**.

(a)    <u>Notices Generally</u>.    Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows:

(i)    if to Borrower or any other Loan Party, to it at c/o Mountain Express Oil Company, 5333 Bells Ferry Road, Ste. 201, Acworth, GA 30102, Attention of Lamar Frady, (Facsimile No. 678-398-7228);

with copies (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attention: Jeffrey N. Pomerantz, Esq. and Henry C. Kevane, Esq.
Email: jpomerantz@pszjlaw.com; hkevane@pszjlaw.com

(ii)    if to the Administrative Agent or the LC Issuer, to First Horizon Bank, Loan Syndications, 4725 Piedmont Row Drive, Suite 400, Charlotte, North Carolina 28210, Attention of Jamie M. Swisher, Reference to Mountain Oil Express Company;

with copies (which shall not constitute notice) to:

First Horizon Bank
Commercial Banking
3625 Cumberland Blvd SE, Bldg Two
Atlanta, Georgia 30339
Attention: Paula M. Davis, Senior Vice President and Chris Catone, Senior Vice President

and

Greenberg Traurig, LLP
Terminus 200
3333 Piedmont Road NE
Suite 2500
Atlanta, GA 30305
Attention: John D. Elrod, Esq. and
Bethani Oppenheimer, Esq.

(iii)     if to a Lender, to it at its address (or facsimile number) set out in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received.  Notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices delivered through electronic communications, to the extent provided in Section 14.1(b) below, shall be effective as provided in said Section 14.1(b).

(b)     Electronic Communications.

(i)     Notices and other communications to the Lenders and the LC Issuer under this Agreement may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided that* the foregoing shall not apply to notices to any Lender or the LC Issuer pursuant to Article 2 if such Lender or the LC Issuer, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Section by electronic communication.  The Administrative Agent or Borrower may, in its discretion, agree to accept notices and other communications to it under this Agreement by electronic communications pursuant to procedures approved by it; *provided that* approval of such procedures may be limited to particular notices or communications.

(ii)     Unless the Administrative Agent otherwise prescribes, (A) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (B) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing *clause (A)*, of notification that such notice or communication is available and identifying the website address therefor; *provided that*, for both *clauses (A)* and *(B)* above, if such notice, e-mail or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

(c)     Change of Address, etc.  Any party hereto may change its address or facsimile number for notices and other communications under this Agreement by notice to the other parties to this Agreement.

(d)     Platform.

(i)     Each Loan Party agrees that the Administrative Agent may, but shall not be obligated to, make the Communications (as defined below) available to the LC Issuer and the other Lenders by posting the Communications on Debt

Domain, Intralinks, Syndtrak or a substantially similar electronic transmission system (the "Platform").

(ii)     The Platform is provided "as is" and "as available."   The Administrative Agent and its Related Parties do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications.   No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by the Administrative Agent of any of its Related Parties in connection with the Communications or the Platform.   In no event shall the Administrative Agent or any of its Related Parties have any liability to Borrower or the other Loan Parties, any Lender or any other Person or entity for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of Borrower's, any Loan Party's or the Administrative Agent's transmission of communications through the Platform.   "Communications" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to any Loan Document or the transactions contemplated therein which is distributed to the Administrative Agent, any Lender or the LC Issuer by means of electronic communications pursuant to this Section, including through the Platform.

14.2     **No Deemed Waiver; Cumulative Remedies**.   No failure on the part of Administrative Agent or any Lender to exercise, and no delay in exercising, and no course of dealing with respect to, any right, power, or privilege under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege under this Agreement, nor any abandonment or discontinuation of steps to enforce any right, power, or privilege under this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.   The rights and remedies provided for in this Agreement and the other Loan Documents are cumulative and not exclusive of any rights and remedies provided by law.

14.3     **Expenses; Indemnity; Damage Waiver; Costs and Expenses**.   Subject to the terms of the Financing Orders and as may otherwise be consistent with or permitted by the Approved Budget, Borrower shall pay (i) all reasonable out of pocket expenses incurred by the Administrative Agent and its Affiliates (including the reasonable fees, charges and disbursements of outside counsel, accountants, consultants, and other advisors for the Administrative Agent), and shall pay all reasonable fees, charges and disbursements for attorneys who may be employees of the Administrative Agent, in connection with (A) the syndication of the Facility, (B) the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents, or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby and thereby shall be consummated) and (C) the Cases, (ii) all reasonable out of pocket expenses incurred by the LC Issuer in connection with the issuance, amendment, renewal or extension of any LC or any demand for payment thereunder, and (iii) all out of pocket expenses incurred by the Administrative Agent, any Lender or the LC Issuer (including the reasonable fees, charges and

disbursements of outside counsel for the Administrative Agent, any Lender or the LC Issuer), and shall pay all reasonable fees, charges and disbursements for attorneys who may be employees of the Administrative Agent, any Lender, or the LC Issuer, in connection with the enforcement or protection of its rights (A) in connection with this Agreement, the other Loan Documents, including its rights under this Section, and the Cases, or (B) in connection with the Loans made or LCs issued under this Agreement, including all such out of pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or LCs.  In addition, Borrower agrees to pay on demand (1) all costs, expenses, taxes, assessments, and other charges incurred in connection with any filing, registration, recording, or perfection of any security interest contemplated by any Security Document or any other document referred to therein (2) all costs and expenses incurred in connection with inspections, Collateral Examinations, or monitoring in connection with the Loan Documents, and (3) all costs, expenses, and other charges in respect of insurance, flood insurance, title insurance, surveys, appraisals, lien searches, other due diligence, or notary fees procured with respect to Liens created pursuant to deeds of trust or mortgages or the other Security Documents.

        (a)    <u>INDEMNIFICATION BY BORROWER</u>.   BORROWER SHALL INDEMNIFY THE ADMINISTRATIVE AGENT (AND ANY SUB-AGENT THEREOF), EACH LENDER AND THE LC ISSUER, AND EACH RELATED PARTY OF ANY OF THE FOREGOING PERSONS (EACH SUCH PERSON BEING CALLED AN "<u>INDEMNITEE</u>") AGAINST, AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, LIABILITIES AND RELATED EXPENSES (INCLUDING THE REASONABLE FEES, CHARGES AND DISBURSEMENTS OF ANY OUTSIDE COUNSEL FOR ANY INDEMNITEE), AND SHALL INDEMNIFY AND HOLD HARMLESS EACH INDEMNITEE FROM ALL REASONABLE FEES, CHARGES AND DISBURSEMENTS FOR ATTORNEYS WHO MAY BE EMPLOYEES OF ANY INDEMNITEE, INCURRED BY ANY INDEMNITEE OR ASSERTED AGAINST ANY INDEMNITEE BY ANY PERSON (INCLUDING BORROWER OR ANY OTHER LOAN PARTY) OTHER THAN SUCH INDEMNITEE AND ITS RELATED PARTIES ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (I) THE EXECUTION OR DELIVERY OF THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY OR THE CASES, THE PERFORMANCE BY THE PARTIES HERETO OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR THEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR BY THE CASES, (II) ANY LOAN OR LC OR THE USE OR PROPOSED USE OF THE PROCEEDS THEREFROM (INCLUDING ANY REFUSAL BY THE LC ISSUER TO HONOR A DEMAND FOR PAYMENT UNDER A LC IF THE DOCUMENTS PRESENTED IN CONNECTION WITH SUCH DEMAND DO NOT STRICTLY COMPLY WITH THE TERMS OF SUCH LC), (III) ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY BORROWER OR ANY OF ITS SUBSIDIARIES, OR ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO BORROWER OR ANY OF ITS SUBSIDIARIES, OR (IV) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT,

ACTIVE 686990614v6

TORT OR ANY OTHER THEORY, WHETHER BROUGHT BY A THIRD PARTY OR BY BORROWER OR ANY OTHER LOAN PARTY, AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO; *PROVIDED THAT* SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES OR RELATED EXPENSES (A) ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE OR (B) RESULT FROM A CLAIM BROUGHT BY BORROWER OR ANY OTHER LOAN PARTY AGAINST AN INDEMNITEE FOR BREACH IN BAD FAITH OF SUCH INDEMNITEE'S OBLIGATIONS UNDER THIS AGREEMENT OR UNDER ANY OTHER LOAN DOCUMENT, IF BORROWER OR SUCH LOAN PARTY HAS OBTAINED A FINAL AND NONAPPEALABLE JUDGMENT IN ITS FAVOR ON SUCH CLAIM AS DETERMINED BY A COURT OF COMPETENT JURISDICTION.  THIS <u>SECTION 14.3(A)</u> SHALL NOT APPLY WITH RESPECT TO TAXES OTHER THAN ANY TAXES THAT REPRESENT LOSSES, CLAIMS, DAMAGES, ETC. ARISING FROM ANY NON-TAX CLAIM.

(b)     <u>REIMBURSEMENT BY LENDERS</u>.     TO THE EXTENT THAT BORROWER FOR ANY REASON FAILS TO INDEFEASIBLY PAY ANY AMOUNT REQUIRED UNDER *PARAGRAPH (A)* OR *(B)* OF THIS <u>SECTION 14.3</u> TO BE PAID BY IT TO THE ADMINISTRATIVE AGENT (OR ANY SUB-AGENT THEREOF), THE LC ISSUER OR ANY RELATED PARTY OF ANY OF THE FOREGOING, EACH LENDER SEVERALLY AGREES TO PAY TO THE ADMINISTRATIVE AGENT (OR ANY SUCH SUB-AGENT), THE LC ISSUER OR SUCH RELATED PARTY, AS THE CASE MAY BE, SUCH LENDER'S PRO RATA SHARE (DETERMINED AS OF THE TIME THAT THE APPLICABLE UNREIMBURSED EXPENSE OR INDEMNITY PAYMENT IS SOUGHT BASED ON EACH LENDER'S TERM LOAN PERCENTAGE AT SUCH TIME) OF SUCH UNPAID AMOUNT (INCLUDING ANY SUCH UNPAID AMOUNT IN RESPECT OF A CLAIM ASSERTED BY SUCH LENDER); *PROVIDED THAT*, THAT THE UNREIMBURSED EXPENSE OR INDEMNIFIED LOSS, CLAIM, DAMAGE, LIABILITY OR RELATED EXPENSE, AS THE CASE MAY BE, WAS INCURRED BY OR ASSERTED AGAINST THE ADMINISTRATIVE AGENT (OR ANY SUCH SUB-AGENT) OR THE LC ISSUER, IN ANY SUCH CASE IN ITS CAPACITY AS SUCH, OR AGAINST ANY RELATED PARTY OF ANY OF THE FOREGOING ACTING FOR THE ADMINISTRATIVE AGENT (OR ANY SUCH SUB-AGENT) OR THE LC ISSUER IN CONNECTION WITH SUCH CAPACITY.  THE OBLIGATIONS OF THE LENDERS UNDER THIS *PARAGRAPH (B)* ARE SUBJECT TO THE PROVISIONS OF <u>SECTION 3.5(D)</u>.  NO INDEMNITEE REFERRED TO IN THIS *PARAGRAPH (B)* ABOVE SHALL BE LIABLE FOR ANY DAMAGE ARISING FROM THE USE BY UNINTENDED RECIPIENTS OF ANY INFORMATION OR OTHER MATERIALS DISTRIBUTED BY IT THROUGH TELECOMMUNICATIONS, ELECTRONIC OR OTHER INFORMATION TRANSMISSION SYSTEMS IN CONNECTION WITH THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

(c)    <u>Payments</u>.  All amounts due under this <u>Section 14.3</u> shall be payable promptly and not later than five (5) days after demand therefor.

14.4   **<u>Survival</u>**. Each party's obligations under this Section shall survive in accordance with the terms hereof the termination of the Loan Documents and payment or full satisfaction of the Obligations under this Agreement.

14.5   **<u>Governing Law and Jurisdiction</u>**.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET OUT THEREIN) AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS.

(a)    <u>Jurisdiction</u>.  Borrower and each other Loan Party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against the Administrative Agent, any Lender, the LC Issuer, or any Related Party of the foregoing in any way relating to this Agreement or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the Bankruptcy Court, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts.  Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or in any other Loan Document shall affect any right that the Administrative Agent, any Lender or the LC Issuer may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against Borrower or any other Loan Party or its properties in the courts of any jurisdiction.

(b)    <u>Waiver of Venue</u>.  Borrower and each other Loan Party irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in <u>Section 14.5(a)</u>.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by Applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)    <u>Service of Process</u>.  Each party hereto irrevocably consents to service of process in the manner provided for notices in <u>Section 14.1(a)</u>.  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by Applicable Law.

(d)    <u>Litigation Priority</u>.  Borrower irrevocably waives, to the fullest extent permitted by Applicable Law, any claim that any action or proceeding commenced by the

Administrative Agent, any Lender or the LC Issuer relating in any way to this Agreement should be dismissed or stayed by reason, or pending the resolution, of any action or proceeding commenced by Borrower or any other Loan Party relating in any way to this Agreement whether or not commenced earlier.   To the fullest extent permitted by Applicable Law, Borrower shall take all measures necessary for any such action or proceeding commenced by the Administrative Agent, any Lender or the LC Issuer to proceed to judgment prior to the entry of judgment in any such action or proceeding commenced by Borrower.

14.6   **Waiver of Jury Trial**.   EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

14.7   **Successors and Assigns**.

(a)   Successors and Assigns Generally.   The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither Borrower nor any other Loan Party may assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Administrative Agent and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations under this Agreement except (i) to an assignee in accordance with the provisions of Section 14.7(b), (ii) by way of participation in accordance with the provisions of Section 14.7(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 14.7(e) (and any other attempted assignment or transfer by any party hereto shall be null and void).   Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 14.7(d) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)   Assignments by Lenders.   Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this

Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)     Minimum Amounts.

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and/or the Loans at the time owing to it or contemporaneous assignments to related Approved Funds that equal at least the amount specified in Section 14.7(b)(i)(B) in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender, or an Approved Fund, no minimum amount need be assigned; and

(B)     in any case not described in Section 14.7(b)(i)(A), the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $1,000,000, and in each case in minimum increments of $1,000,000 in excess of such amounts, unless each of the Administrative Agent otherwise consents (such consent not to be unreasonably withheld or delayed).

(ii)     Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned, except that this *paragraph (ii)* shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Facilities on a non-pro rata basis.

(iii)     Required Consents.   No consent shall be required for any assignment except to the extent required by Section 14.7(b)(i)(B) and, in addition:

(A)     [reserved]; and

(B)     the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of (i) any unfunded Commitments with respect to the Facility, or (ii) any Term Loans to a Person who is not a Lender, an Affiliate of a Lender, or an Approved Fund.

(iv)     Assignment and Assumption.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; *provided that* the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The assignee, if it is not a

ACTIVE 686990614v6

Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)　　No Assignment to Certain Persons.  No such assignment shall be made to (A) Borrower nor any Affiliate of any Loan Party, or (B) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender under this Agreement, would constitute any of the foregoing Persons described in this *clause (B)*.

(vi)　　No Assignment to Natural Persons.  No such assignment shall be made to a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person).

(vii)　　Certain Additional Payments.  In connection with any assignment of rights and obligations of any Defaulting Lender under this Agreement, no such assignment shall be effective unless and until, in addition to the other conditions thereto set out herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Administrative Agent, the applicable Commitment Percentage of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (A) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent, the LC Issuer and each other Lender under this Agreement (and interest accrued thereon), and (B) acquire (and fund as appropriate) its full pro rata share of all Loans and participations in LCs in accordance with its Commitment Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender under this Agreement shall become effective under Applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 14.7(c), from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 4.2 and 14.3 with respect to facts and circumstances occurring prior to the effective date of such assignment; *provided that* except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party under this Agreement arising from that Lender's having been a Defaulting Lender.  Any assignment or transfer by a Lender of rights or

obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 14.7(d).

(c)     Register.  The Administrative Agent, acting solely for this purpose as an agent of Borrower, shall maintain at one of its offices in the U.S. a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender under this Agreement for all purposes of this Agreement.  The Register shall be available for inspection by Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)     Participations.  Any Lender may at any time, without the consent of, or notice to, Borrower or the Administrative Agent, sell participations to any Person (other than a natural Person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person, or Borrower or any of Borrower's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); *provided that* (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) Borrower, the Administrative Agent, the LC Issuer and Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, each Lender shall be responsible for the indemnity under ***Section 14.3(c)*** with respect to any payments made by such Lender to its Participant(s).

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided that* such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that affects such Participant and required the unanimous consent of the Lenders.  Borrower agrees that each Participant shall be entitled to the benefits of Sections 4.1, 4.2, and 4.5 (subject to the requirements and limitations therein, including the requirements under Section 4.1(a) (it being understood that the documentation required under Section 4.1(a) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 14.7(b); *provided that*, such Participant (A) agrees to be subject to the provisions of Section 4.7 as if it were an assignee under Section 14.7(b); and (B) shall not be entitled to receive any greater payment under Sections 4.1 or 4.2, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  Each Lender that sells a participation agrees, at Borrower's request

and expense, to use reasonable efforts to cooperate with Borrower to effectuate the provisions of Section 4.7 with respect to any Participant.  To the extent permitted by Applicable Law, each Participant also shall be entitled to the benefits of Section 3.7 as though it were a Lender; *provided that* such Participant agrees to be subject to Section 3.6 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as an agent of Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); *provided that* no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the U.S. Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)   Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided that*, no such pledge or assignment shall release such Lender from any of its obligations under this Agreement or substitute any such pledgee or assignee for such Lender as a party hereto.

14.8   **Amendments, Consents, and Waivers**.

(a)   Neither this Agreement nor any provision of this Agreement may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by Borrower and the Required Lenders, and acknowledged by the Administrative Agent, or, in the case of any other Loan Documents, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders, and each such amendment, modification, waiver, or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided that*, no such agreement shall (i) extend or increase the Commitment of any Lender without the written consent of such Lender (it being understood that a waiver of any condition set forth in *Article 6* or the waiver of any Default or a mandatory reduction in Commitments shall not constitute an extension or increase of any Commitment of any Lender), (ii) reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees payable under this Agreement, without the written consent of each Lender affected thereby, *provided that*, only the consent of the Required Lenders shall be necessary to (A) amend the definition of "*Default Rate*" or to waive any obligation of Borrower to pay interest or fees in respect of LCs at the Default Rate, or (B) amend any financial covenant hereunder (or any defined term used in such covenants), even if the effect of such amendment would be to reduce the rate of interest on any Loan

or LC Disbursement or to reduce any fee payable hereunder or the amount of any mandatory prepayment hereunder, (iii) reduce the face amount of (or the amount which may be drawn upon) any LC or reduce the rate of interest thereon, or reduce any fees payable under this Agreement, without the written consent of each Lender affected thereby, (iv) postpone the scheduled date of payment of the principal amount of any Loan or LC Borrowing, or any interest thereon, or any fees payable under this Agreement, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender affected thereby (for the avoidance of doubt, mandatory prepayments pursuant to **Section 3.3** may be postponed, delayed, reduced, waived or modified with the consent of Required Lenders only), (v) amend, modify, or waive any provisions of **Section 3.3(d)**, **Section 3.6**, or **Section 11.5** in any manner that would alter the pro rata sharing of payments required under this Agreement, without the written consent of each Lender adversely affected thereby, (vi) change any of the provisions of this **Section 14.8(a)** or the definition of "**Required Lenders**" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights under this Agreement or make any determination or grant any consent under this Agreement, without the written consent of each Lender, (vii) release all or substantially all the Guarantors from their Guarantees under their Guaranty Agreement except as expressly provided in the Guaranty Agreement, or limit the liability of the Guarantors in respect of their Guaranty Agreement, without the written consent of each Lender, (viii) release all or substantially all of the Collateral without the written consent of each Lender, *provided that*, nothing herein shall prohibit the Administrative Agent from releasing any Collateral, or require the consent of the other Lenders for such release, if such release is expressly permitted under this Agreement, or (ix) change Section 2.5(a) in a manner that would permit the expiration date of any LC to occur after the Termination Date without the consent of each Lender; provided that, (A) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or the LC Issuer under this Agreement without the prior written consent of the Administrative Agent or the LC Issuer, as the case may be, and (B) any agreement between Borrower and the Administrative Agent providing for the payment of any fees may be amended, supplemented, or otherwise modified, and any terms or provisions therein waived, pursuant to a written agreement entered into by the parties thereto.

(b)     Notwithstanding the foregoing, any provision of this Agreement may be amended by an agreement in writing entered into by Borrower, the Required Lenders and the Administrative Agent (and, if their rights or obligations are affected thereby the LC Issuer) if (A) by the terms of such agreement the Commitment of each Lender not consenting to the amendment provided for therein shall terminate upon the effectiveness of such amendment and (B) at the time such amendment becomes effective, each Lender not consenting thereto receives payment in full of the principal of and interest accrued on each Loan made by it and all other amounts owing to it or accrued for its account under this Agreement.

(c)     Notwithstanding anything to the contrary herein, (i) no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent under this Agreement, except that (A) the Commitment of such Defaulting Lender may not be

increased or extended without the consent of such Defaulting Lender, and (B) any amendment, waiver or consent requiring all of the Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than the other affected Lenders shall require the consent of such Defaulting Lender, (ii) the Administrative Agent and Borrower may amend or modify this Agreement and any other Loan Document to (A) cure any ambiguity, omission, defect or inconsistency therein, and (B) grant a new Lien for the benefit of the Secured Parties, extend an existing Lien over additional property for the benefit of the Secured Parties, or join additional Persons as Loan Parties, and (iii) Administrative Agent may amend Schedule 1 to reflect assignments entered into pursuant to Section 14.7.

14.9   **Limitation of Liability**.  Neither Administrative Agent, any Lender nor any affiliate, officer, director, employee, attorney, or agent of such Person shall have any liability with respect to, and to the fullest extent permitted by Applicable Law, Borrower and each other Loan Party hereby waives, releases, and agrees not to sue any of them upon, any claim for any special, indirect, incidental, or consequential damages suffered or incurred by Borrower or any other Loan Party in connection with, arising out of, or in any way related to, this Agreement or any of the other Loan Documents, or any of the transactions contemplated by this Agreement or any of the other Loan Documents.  Borrower and each other Loan Party hereby waives, releases, and agrees not to sue Administrative Agent, any Lender or any of such Person's Affiliates, officers, directors, employees, attorneys, or agents for punitive damages in respect of any claim in connection with, arising out of, or in any way related to, this Agreement or any of the other Loan Documents, or any of the transactions contemplated by this Agreement or any of the other Loan Documents.

14.10  **Survival**.

(a)    Survival of Indemnification.  All indemnities set out in this Agreement and in the other Loan Documents shall survive the execution and delivery of this Agreement, the making of the Loans, the repayment of the Loans and the other Obligations and the termination of the Commitments under this Agreement.

(b)    Survival of Representations and Warranties.  All representations and warranties made under this Agreement and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or Potential Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Commitment remains in effect or any Loan, LC, or any other Obligations under this Agreement shall remain unpaid or unsatisfied.

(c)    Survival of Yield Protection Provisions.  The provisions of ***Article 4*** shall survive and shall continue in full force and effect as long as any Commitment remains in

ACTIVE 686990614v6

effect or any Loan, LC, or any other Obligations under this Agreement shall remain unpaid or unsatisfied.

(d)    <u>The Cases</u>.   The Liens, lien priority, administrative priorities and other rights and remedies granted to the Agent pursuant to this Agreement, the Financing Orders and the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by the Loan Parties (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Cases, or by any other act or omission whatsoever.   Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(i)    except for the Permitted Prior Liens and the Carve-Out, no costs or expenses of administration that have been or may be incurred in the Cases or any conversion of the same or in any other proceedings related thereto, and no priority Claims, are or will be prior to or on a parity with any Claim of the Agent or the Lenders against the Loan Parties in respect of any Obligations;

(ii)   except for the Permitted Prior Liens, the Liens in favor of the Agent set forth in any Security Agreement shall constitute valid and perfected priming first priority Liens and security interests and shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(iii)   the Liens in favor of the Agent set forth herein and in the other Loan Documents shall continue to be valid and perfected without the necessity that the Agent file or record financing statements, mortgages or otherwise perfect its Lien under applicable non-bankruptcy law.

14.11   **Patriot Act; KYC Information**.   Administrative Agent hereby notifies the Loan Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow each Lender to identify each Loan Party in accordance with the Patriot Act.   Borrower shall, and shall cause each Subsidiary to, promptly following a request by any Lender, provide all documentation and other information that such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act and Beneficial Ownership Regulations.

14.12   **Foreign Lender Reporting Requirements**.   If any Foreign Lender becomes a party to this Agreement, such Lender will deliver to Borrower and Administrative Agent such documents and forms related to such status as Borrower or Administrative Agent may require.

14.13   **Document Imaging**.   Each Loan Party (a) understands and agrees that Administrative Agent's document retention policy involves the imaging of executed loan

documents and the destruction of the paper originals, and (b) waives any right that it may have to claim that the imaged copies of the Loan Documents are not originals.

14.14   **Counterparts; Integration; Effectiveness; Electronic Execution**.

(a)      Counterparts; Integration; Effectiveness.   This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in ***Article 6***, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

(b)      Electronic Execution of Assignments.   The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

14.15   **Treatment of Certain Information; Confidentiality**.

(a)      Each of the Administrative Agent, the Lenders and the LC Issuer agree to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its Affiliates and to its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (ii) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners); (iii) to the extent required by Applicable Law or by any subpoena or similar legal process; (iv) to any other party hereto; (v) in connection with the exercise of any remedies under this Agreement or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights under this Agreement or thereunder; (vi) subject to an agreement containing provisions substantially the same as those of this Section, to (A) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and obligations under this Agreement, or (B) any actual or prospective party (or its Related

Parties) to any swap, derivative or other transaction under which payments are to be made by reference to Borrower and its obligations, this Agreement or payments under this Agreement; (vii) on a confidential basis to (A) any Credit Rating Agency in connection with rating Borrower or its Subsidiaries or the Facilities or (B) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Facilities; (viii) with the consent of Borrower; or (ix) to the extent such Information (A) becomes publicly available other than as a result of a breach of this Section, or (B) becomes available to the Administrative Agent, any Lender the LC Issuer or any of their respective Affiliates on a nonconfidential basis from a source other than Borrower who did not acquire such information as a result of a breach of this Section.  In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Administrative Agent or any Lender in connection with the administration of this Agreement, the other Loan Documents, and the Commitments.

(b)     For purposes of this Section, "*Information*" means all information received from Borrower or any of its Subsidiaries relating to Borrower or any of its Subsidiaries or the business of Borrower, other than any such information that is available to the Administrative Agent, any Lender or the LC Issuer on a nonconfidential basis prior to disclosure by Borrower or any of its Subsidiaries; provided that, in the case of information received from Borrower or any of its Subsidiaries after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

14.16   **Severability**.  Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

14.17   **Erroneous Payments**.

(a)     Each Lender, each LC Issuer, each other Secured Party and any other party hereto hereby severally agrees that if (i) the Administrative Agent notifies (which such notice shall be conclusive absent manifest error) such Lender, LC Issuer, or any other Secured Party (or the Lender which is an Affiliate of a Lender, LC Issuer, or any other Secured Party) or any other Person that has received funds from the Administrative Agent or any of its Affiliates, either for its own account or on behalf of a Lender, LC Issuer, or any other Secured Party (each such recipient, a "***Payment Recipient***") that the Administrative Agent has determined in its sole discretion that any funds received by such Payment Recipient were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Payment Recipient), or (ii) any Payment Recipient receives any payment from the Administrative

Agent (or any of its Affiliates) (A) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, as applicable, (B) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, as applicable, or (C) that such Payment Recipient otherwise becomes aware was transmitted or received in error or by mistake (in whole or in part) then, in each case, an error in payment shall be presumed to have been made (any such amounts specified in *subclauses (i)* or *(ii)* of this **Section 14.17(a)**, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise; individually and collectively, an "***Erroneous Payment***"), and, in each case, such Payment Recipient is deemed to have knowledge of such error at the time of its receipt of such Erroneous Payment; *provided that*, nothing in this **Section 14.17** shall require the Administrative Agent to provide any of the notices specified in subclauses (i) or (ii) above.  Each Payment Recipient agrees that it shall not assert any right or claim to any Erroneous Payment, and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments, including, without limitation, waiver of any defense based on "discharge for value" or any similar doctrine.

(b)     Without limiting the immediately preceding *clause (a)*, each Payment Recipient agrees that, in the case of *clause (a)(ii)* above, it shall promptly notify the Administrative Agent in writing of such occurrence.

(c)     In the case of either *clause (a)(i)* or *a)(ii)* above, such Erroneous Payment shall at all times remain the property of the Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of the Administrative Agent, and upon demand from the Administrative Agent such Payment Recipient shall (or, shall cause any Person who received any portion of an Erroneous Payment on its behalf to), promptly, but in all events no later than one Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds and in the currency so received, together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(d)     In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor by the Administrative Agent in accordance with immediately preceding *clause (c)*, from any Lender that is a Payment Recipient or an Affiliate of a Payment Recipient (such unrecovered amount as to such Lender, an "***Erroneous Payment Return Deficiency***"), then at the sole discretion of the Administrative Agent and upon the Administrative Agent's written notice to such Lender, such Lender shall be deemed to have made a cashless assignment of the full face amount of the portion of its Loans (but not its

Commitments) with respect to which such Erroneous Payment was made (the "***Erroneous Payment Impacted Class***") to the Administrative Agent or, at the option of the Administrative Agent, the Administrative Agent's applicable lending affiliate (such assignee, the "***Agent Assignee***") in an amount that is equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the Loans (but not Commitments) of the Erroneous Payment Impacted Class, the "***Erroneous Payment Deficiency Assignment***"), plus any accrued and unpaid interest on such assigned amount, without further consent or approval of any party hereto and without any payment by the Agent Assignee as the assignee of such Erroneous Payment Deficiency Assignment.  Without limitation of its rights hereunder, following the effectiveness of the Erroneous Payment Deficiency Assignment, the Administrative Agent may make a cashless reassignment to the applicable assigning Lender of any Erroneous Payment Deficiency Assignment at any time by written notice to the applicable assigning Lender and upon such reassignment all of the Loans assigned pursuant to such Erroneous Payment Deficiency Assignment shall be reassigned to such Lender without any requirement for payment or other consideration.  The parties hereto acknowledge and agree that (i) any assignment contemplated in this *clause (d)* shall be made without any requirement for any payment or other consideration paid by the applicable assignee or received by the assignor, (ii) the provisions of this *clause (d)* shall govern in the event of any conflict with the terms and conditions of **Section 14.7**, and (iii) the Administrative Agent may reflect such assignments in the Register without further consent or action by any other Person.

(e)     Each party hereto hereby agrees that (i) irrespective of whether the Administrative Agent may be equitably subrogated, in the event an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent (A) shall be subrogated to all the rights and interests of such Payment Recipient under the Loan Documents with respect to such amount (the "***Erroneous Payment Subrogation Rights***") and (B) is authorized to set off, net and apply any and all amounts at any time owing to such Payment Recipient under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Payment Recipient from any source, against any amount due to the Administrative Agent under this **Section 14.17** or under the indemnification provisions of this Agreement, (ii) the receipt of an Erroneous Payment by a Payment Recipient shall not for the purpose of this Agreement be treated as a payment, prepayment, repayment, discharge or other satisfaction of any Obligations owed by the Borrower or any other Loan Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower or any other Loan Party for the purpose of making a payment on the Obligations, and (iii) to the extent that an Erroneous Payment was in any way or at any time credited as payment or satisfaction of any of the Obligations, the Obligations or any part thereof that were so credited, and all rights of the Payment Recipient, as the case may be, shall be reinstated and continue in full force and effect as if such payment or satisfaction had never been received.

(f)     Each party's obligations under this **Section 14.17** shall survive the resignation or replacement of the Administrative Agent or any transfer of right or obligations by, or the replacement of, a Lender, the termination of the Commitments or the repayment, satisfaction or discharge of the Obligations (or any portion thereof).

(g)     The provisions of this **Section 14.17** to the contrary notwithstanding, (i) nothing in this **Section 14.17** will constitute a waiver or release of any claim of any party hereunder arising from any Payment Recipient's receipt of an Erroneous Payment and (ii) there will only be deemed to be a recovery of the Erroneous Payment to the extent that Administrative Agent has received payment from the Payment Recipient in immediately available funds of the Erroneous Payment Return Deficiency, whether directly from the Payment Recipient, as a result of the exercise by Administrative Agent of its rights of subrogation or set off as set forth above in *clause (e)* above, or as a result of the receipt by Agent Assignee of a payment of the outstanding principal balance of the Loans assigned to Agent Assignee pursuant to an Erroneous Payment Deficiency Assignment, but excluding any other amounts in respect thereof (it being agreed that any payments of interest, fees, expenses or other amounts (other than principal) received by Agent Assignee in respect of the Loans assigned to Agent Assignee pursuant to an Erroneous Payment Deficiency Assignment shall be the sole property of the Agent Assignee and shall not constitute a recovery of the Erroneous Payment).

14.18   **Waiver of Effect of Corporate Seal**.  Each Loan Party represents and warrants that neither it nor any other Loan Party is required to affix its corporate seal to this Agreement or any other Loan Document pursuant to any Applicable Law, agrees that this Agreement is delivered by Borrower under seal, and waives any shortening of the statute of limitations that may result from not affixing the corporate seal to this Agreement or such other Loan Documents.

14.19   **[Reserved]**.

14.20   **ENTIRE AGREEMENT**.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REFERRED TO HEREIN EMBODY THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES HERETO WITH RESPECT TO THE SUBJECT MATTER HEREOF AND THEREOF AND SUPERSEDE ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO.  THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES HERETO.

14.21   **Agent and Lenders as Party-in-Interest**.  The Loan Parties hereby stipulate and agree that the Agent and the Lenders are and shall remain parties in interest in the Cases and shall have the right to participate, object and be heard in any motion or proceeding in connection therewith.  Nothing in this Agreement or any other Loan Document shall be deemed to be a waiver of any of the Agent's or any Lender's rights or remedies under applicable law or documentation.  Without limitation of the foregoing, each of the Agent or any Lender shall have the right to make any motion or raise any objection it deems to be in its interests (specifically

including but not limited to objections to use of proceeds of the Term Loans, to payment of professional fees and expenses or the amount thereof (excluding the professional fees and expenses of bankruptcy counsel for the Loan Parties), to sales or other transactions outside the ordinary course of business or to the assumption or rejection of any executory contract or lease).

14.22 **Waiver of Right to Obtain Alternative Financing**.  In consideration of the Term Loans and other extensions of credit to be made to the Borrower by the Lenders, the Loan Parties hereby further waive any right they may have to obtain an order by the Bankruptcy Court authorizing the Borrower to obtain financing pursuant to Section 364 of the Bankruptcy Code from any Person other than the Lenders, unless such financing would result in all of the Obligations to the Agent and the Lenders (whether arising before, on or after the date of this Agreement) being paid in full, in cash, on or before the expiration of the term of this Agreement.

14.23 **Releases**.  In connection with the indefeasible payment in full in cash of the Obligations, and the termination of this Agreement, the Loan Parties covenant and agree, jointly and severally, that at such time they shall execute and deliver in favor of the Agent and the Lenders a valid and binding termination and release agreement, in form and substance acceptable to the Agent and the Lenders.

14.24 **Conflict of Terms**.  To the extent that any provision of this Agreement contradicts other provisions of the Loan Documents (other than the Financing Orders), the provisions of this Agreement shall control.  To the extent that any provision of any Loan Document (other than the Financing Orders) contradicts any provision of the Financing Orders, the Financing Orders shall control.

*[**Signatures appear on the following pages**.]*

ACTIVE 686990614v6

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**BORROWER**:

MOUNTAIN EXPRESS OIL COMPANY,
a Georgia corporation

By: _____
       Michael Healy
       Chief Restructuring Officer

**GUARANTORS**:

Loan Parties listed on following page

By: _____
       Michael Healy
       Chief Restructuring Officer

ANNEX A

**GUARANTORS**

1200 Wego LLC
1227 Veterans, LLC
1308 Jefferson Davis LLC
13289 Old Hammond Highway LLC
1600 Manhattan Blvd, LLC
2601 Gen. Degaulle LLC
2698 Barataria Blvd LLC
2701 Canal Street LLC
2850 Belle Chasse Hgwy LLC
300 Lee Drive LLC
3049 Loyola Drive L.L.C.
4115 Airline Hgwy., LLC
4408 S. I-10 Service Road LLC
4520 Jefferson Highway LLC
4662 GDD LLC
4915 Westbank Expwy LLC
4940 Groom Road, L.L.C.
5310 Flannery Road, LLC
798 Jean Lafitte, L.L.C.
8692 River Road, LLC
9410 Greenwell Springs, LLC
Alabama Terminal Property, LLC
Avondale Brothers No 128 LLC
Avondale Investments, L.L.C.
B&T Petroleum LLC
Brothers Belle Chasse, L.L.C.
Brothers Carol Sue, LLC
Brothers Expressway, Inc.
Brothers I-10 Service Road, Inc.
Brothers Petroleum, L.L.C.
Brothers Stonebridge, Inc.
Brothers Terry Parkway, Inc.
CONSOLIDATED HR SERVICES LLC
Crowder Brothers, LLC
Exxon General Degaulle, LLC
Gause Operation, L.L.C.
Jamie Boulevard, LLC
Lapalco Brothers No. 125, LLC
Madison Auto Truck Plaza And Lucky Dollar Casino, LLC
MEX Fuels LLC
MEX Fuels NE LLC
MEX Fuels NE-IL LLC
MEX Fuels NE-IN LLC
MEX Fuels NE-KY LLC
MEX Fuels NE-NJ LLC
MEX Fuels NE-NY LLC
MEX Fuels NE-OH LLC
MEX Fuels NW LLC
MEX Fuels NW-IA LLC

ACTIVE 686990614v6

MEX Fuels NW-MO LLC
MEX Fuels SE LLC
MEX Fuels SE-GA LLC
MEX Fuels SE-MS LLC
MEX Fuels SE-TN LLC
MEX Fuels SW LLC
MEX Fuels SW-LA LLC
MEX Fuels SW-OK LLC
MEX North Alabama, LLC
MEX RE Holdings LLC
MEX RE-NE LLC
MEX RE-NE-IN LLC
MEX RE-NE-NJ LLC
MEX RE-NE-NY LLC
MEX RE-NE-NY-LI LLC
MEX RE-NE-OH LLC
MEX RE-NE-PA LLC
MEX RE-NW LLC
MEX RE-NW-IA LLC
MEX RE-NW-KS LLC
MEX RE-NW-MN LLC
MEX RE-NW-MO LLC
MEX RE-NW-ND LLC
MEX RE-NW-WI LLC
MEX RE-SE LLC
MEX RE-SE-AL LLC
MEX RE-SE-FL LLC
MEX RE-SE-GA LLC
MEX RE-SE-MS LLC
MEX RE-SE-NC LLC
MEX RE-SE-SC LLC
MEX RE-SE-TN LLC
MEX RE-SW LLC
MEX RE-SW-AR LLC
MEX RE-SW-LA LLC
MEX RE-SW-OK LLC
MEX RE-SW-TX LLC
Mississippi MEX Company, LLC
Mountain Express Baking and Coffee Co.
Mountain Express Ethanol Company
Mountain Express Oil Company Southeast, LLC
Newton Brothers, Inc.
South Claiborne Operation LLC
Spartan Tank Management LLC
Star Mountain Express, LLC
Texas MEX Limited Company, LLC
Webster P II L.L.C.
WebsterP L.L.C.
West Hill Ranch Group LLC
WHRG Retail Ops LLC
WHRG TC LLC

WHRG TC-NE LLC
WHRG TC-NE-PA LLC
WHRG TC-NW LLC
WHRG TC-NW-IA LLC
WHRG TC-NW-KS LLC
WHRG TC-NW-MO LLC
WHRG TC-NW-ND LLC
WHRG TC-NW-WY LLC
WHRG TC-SE LLC
WHRG TC-SE-AL LLC
WHRG TC-SE-SC LLC
WHRG TC-SW LLC
WHRG TC-SW-AR LLC
WHRG TC-SW-LA LLC
WHRG-LA, LLC
WHRG-LA2, LLC
WHRGOPS NE LLC
WHRGOPS NE-NY LLC
WHRGOPS NE-NY-LI LLC
WHRGOPS NE-PA LLC
WHRGOPS NW LLC
WHRGOPS NW-IA LLC
WHRGOPS NW-IA-WIA LLC
WHRGOPS NW-KS LLC
WHRGOPS NW-MI LLC
WHRGOPS NW-MO LLC
WHRGOPS NW-MO-NMO LLC
WHRGOPS NW-WI LLC
WHRGOPS NW-WI-NWI LLC
WHRGOPS SE LLC
WHRGOPS SE-AL-NORTH LLC
WHRGOPS SE-MS LLC
WHRGOPS SE-MS-JACKSON LLC
WHRGOPS SE-SC LLC
WHRGOPS SE-TN LLC
WHRGOPS SE-TN-WTN LLC
WHRGOPS SW LLC
WHRGOPS SW-AR LLC
WHRGOPS SW-AR-NWAR LLC
WHRGOPS SW-OK LLC
WHRGOPS SW-OK-OKC LLC
WHRGOPS SW-TX LLC
WHRGOPS SW-TX-DALLAS LLC
WHRGOPS SW-TX-STX LLC

**ADMINISTRATIVE AGENT**:

FIRST HORIZON BANK,
as Administrative Agent


By: _____
Name: _____
Title: _____


**LENDERS**:

FIRST HORIZON BANK,
as LC Issuer and as a Lender


By: _____
Name: _____
Title: _____

HANCOCK WHITNEY BANK,
as a Lender


By: _____

Name: _____

Title: _____

CADENCE BANK,
as a Lender

By: _____
Name: _____
Title: _____

BANK OF HOPE,
as a Lender


By: _____
Name: _____
Title: _____

UNITED COMMUNITY BANK,
as a Lender

By: _____

Name: _____

Title: _____

SYNOVUS BANK,
as a Lender


By: _____
Name: _____
Title: _____

SOUTH STATE BANK,
as a Lender


By: _____
Name: _____
Title: _____

PINNACLE BANK,
as a Lender

By: _____

Name: _____

Title: _____

ANNEX A

Schedule 1

| Lender | ~~Commitment~~Existing Term Loan Amount | Second Amendment Committed Amount | Roll-up Amount | Total |
|---|---|---|---|---|
| First Horizon Bank | $12,555,121.95 | $[          ] | $56,934,625.93 | ~~$69,489,747.88~~ $[          ] |
| Hancock Whitney Bank | $5,169,756.11 | $[          ] | $23,443,669.49 | ~~$28,613,425.60~~ $[          ] |
| Cadence Bank | $4,061,951.22 | $[          ] | $18,420,026.03 | ~~$22,481,977.25~~ $[          ] |
| United Community Bank | $3,323,414.63 | $[          ] | $15,070,930.39 | ~~$18,394,345.02~~ $[          ] |
| Synovus Bank | $4,061,951.22 | $[          ] | $18,420,026.05 | ~~$22,481,977.27~~ $[          ] |
| South State Bank | $2,769,512.19 | $[          ] | $12,559,108.64 | ~~$15,328,620.83~~ $[          ] |
| Bank of Hope | $4,061,951.22 | $[          ] | $18,420,026.03 | ~~$22,481,977.25~~ $[          ] |
| Pinnacle Bank | $1,846,341.46 | $0.00 | $8,372,739.09 | ~~$10,219,080.55~~ $10,219,080.55 |
| **Total:** | ~~**$37,850,000.00**~~ **$37,850,000.00** | **$9,000,000.00** | ~~**$171,641,151.65**~~ **$171,641,151.65** | ~~**$209,491,151.65**~~ **$[          ]** |

Schedule 2

Prepetition LCs

| LC Number | Amount | Beneficiary | Expiry Date |
|---|---|---|---|
| LC #25300 | $560,000 | Chevron | 3/12/24 |
| LC #25424 | $1,250,000 | Sunoco | 10/15/23 |

Schedule 3

Minimum Sale Amount

[Delivered under separate cover.  Not to be filed with the Court.]

Exhibit A

Form of Note

[To Be Provided]

Exhibit B

Borrowing Request

[To Be Provided]

Exhibit C

[Reserved]

Exhibit D

Assignment and Assumption Agreement

[To Be Provided]

ANNEX A

Exhibit E

Form of U.S. Tax Compliance Certificate

[To Be Provided]

Exhibit F

Approved Budget

[See Attached]

ACTIVE 686990614v6 DOCS_SF:109233.3 58614/002

| 5 Week Cash Flow<br>Mountain Express Oil<br>($ in '000s) | Week 1<br>*Actual*<br>30-Jun-23 | Week 2<br>*Forecast*<br>7-Jul-23 | Week 3<br>*Forecast*<br>14-Jul-23 | Week 4<br>*Forecast*<br>21-Jul-23 | Week 5<br>*Forecast*<br>28-Jul-23 | Total<br>5-Week Period<br>WE 06/30 - WE 07/28 |
|---|---|---|---|---|---|---|
| Operating Receipts | | | | | | |
| Net Fuel Profit | $ 2,028 | $ 633 | $ 1,580 | $ 1,634 | $ 1,634 | $ 7,508 |
| Rent Income | 24 | 2,962 | 12 | 97 | 1 | 3,096 |
| Net Retail Supporting Operations | (417) | 1,087 | 230 | 230 | 230 | 1,360 |
| Other Receipts | - | - | - | - | - | - |
| **Total Operating Receipts** | $ 1,634 | $ 4,682 | $ 1,823 | $ 1,960 | $ 1,865 | $ 11,964 |
| Operating Disbursements | | | | | | |
| Rent Expense | (33) | (5,879) | (2,566) | - | - | (8,478) |
| Payroll & Benefits | (126) | (1,080) | (47) | (904) | (47) | (2,204) |
| Vendor Disbursements | (70) | (1,985) | (1,435) | (1,104) | (944) | (5,538) |
| Utilities & Insurance | (128) | (3) | (548) | (4) | (3) | (687) |
| Tax | (3) | (2,204) | (1,323) | (1,284) | (1,319) | (6,133) |
| Other Operating Disbursements | (54) | (81) | (8) | (8) | (8) | (158) |
| **Total Operating Costs** | $ (414) | $ (11,232) | $ (5,927) | $ (3,305) | $ (2,320) | $ (23,198) |
| **Operating Cash Flow** | $ 1,220 | $ (6,550) | $ (4,104) | $ (1,344) | $ (455) | $ (11,234) |
| Non-Restructuring Related | | | | | | |
| Inventory | - | (450) | - | - | - | (450) |
| Capital Expenditures | - | - | - | - | - | - |
| **Total Non-Restructuring Related** | $ - | $ (450) | $ - | $ - | $ - | $ (450) |
| Restructuring Related | | | | | | |
| Restructuring Fees | (1,236) | (1,098) | (926) | (945) | (1,124) | (5,329) |
| Employee Retention | - | - | - | - | - | - |
| DIP Interest & Fees | (283) | - | - | - | - | (283) |
| Other Restructuring Related | (257) | - | - | - | - | (257) |
| **Total Restructuring Related** | $ (1,776) | $ (1,098) | $ (926) | $ (945) | $ (1,124) | $ (5,869) |
| **Net Cash Flow** | $ (556) | $ (8,098) | $ (5,030) | $ (2,290) | $ (1,579) | $ (17,553) |
| Cash (Unrestricted) | | | | | | |
| Beginning Balance | $ 4,955 | $ 6,711 | $ 3,238 | $ (1,792) | $ 1,118 | $ 4,955 |
| Net Cash Flow | (556) | (8,098) | (5,030) | (2,290) | (1,579) | (17,553) |
| (+ / −) DIP Draws / (Repayments) | 2,313 | 4,625 | - | 5,200 | 3,800 | 15,938 |
| **Ending Unrestricted Cash Balance** | $ 6,711 | $ 3,238 | $ (1,792) | $ 1,118 | $ 3,339 | $ 3,339 |
| DIP | | | | | | |
| Beginning DIP Balance | $ 30,913 | $ 33,225 | $ 37,850 | $ 37,850 | $ 43,050 | $ 30,913 |
| (+ / −) DIP Draws / (Repayments) | 2,313 | 4,625 | - | 5,200 | 3,800 | 15,938 |
| **Ending DIP Balance Excl. Roll-Up** | $ 33,225 | $ 37,850 | $ 37,850 | $ 43,050 | $ 46,850 | $ 46,850 |