**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| MOUNTAIN EXPRESS OIL COMPANY, et al., | Case No. 23-90147 (DRJ) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' POST-AUCTION STATUS REPORT**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this post-auction status report (the "Report") to update the Court and parties in interest regarding the outcome of the auction for the Debtors' assets held on August 2-4, 2023. The Debtors are pleased to report that the extended and complex auction process, while unconventional, yielded a truly creative, market-driven result that offers a definite and funded path to a closing, while preserving jobs, paying down taxes, and generating a material recovery for the DIP lenders. Founded on the contributions and concessions of the estates' largest lessor and the Debtors' professionals, as explained below, this success would not have coalesced without the concerted efforts of many of the Debtors' key constituents, including their master lessors, who stand to lose significant value if the Debtors cannot carry out this "highest and best proposal" for an orderly sale and transition.

---

[1]   A complete list of each of the Debtors in these Chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at www.kccllc.net/mountainexpressoil. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 cases is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022.

The Debtors understand that the DIP lenders are not supportive of this innovative solution and instead intend to exercise their remedies and compel a shutdown of the Debtors' business.[2] In fact, before the auction had even commenced, one of the members of the DIP lender group informed the Debtors' investment banker that, at the anticipated recovery levels being considered, (at the time, $10 million cash plus other valuable assets to the DIP lenders), it "**would rather take [our] chances in 7 and see [it] all burn**."[3] Putting aside the DIP lenders' irrational response in the face of the proposal presented in this Report, such an outcome would cause severe and lasting hardship to the Debtors' employees, dealers, and stakeholders across the capital structure. Many of the Debtors' convenience stores and gas stations are "*mom and pop*" operations, run by first-generation families in rural areas. The repercussions of a sudden closure of the stores (or a sudden loss of fuel deliveries) would be devastating to these small business owners who depend on the income from their stores and who have devoted a lifetime to their growth and success.

Notably, the Debtors are ***not*** asking anything of the DIP lenders to achieve the result the Debtors seek. For the period leading to a sale closing, these cases will be funded by the Debtors' lessors, and by the use of the buyer's non-refundable purchase price deposit ***prior to*** the close of the transaction. All the Debtors ask is that the DIP lenders refrain from forcing the cases to convert to chapter 7 and authorize use of their cash collateral which consists of revenues which will not be generated if the Debtors cease operations. Indeed, on top of the cash consideration

---

[2]   On August 3, 2023, the DIP lenders delivered a notice of default under the DIP credit agreement and the DIP order (each as referenced below) and further declared the occurrence of the Carve-Out Trigger Date ("DIP Default Notice"). On August 3, 2023, the DIP lenders also accelerated the DIP obligations and declared the occurrence of the Maturity Date of the DIP facility. In light of this development, the Debtors intend to seek emergency authorization for the use of cash collateral. On August 4, 2023, the DIP lenders threatened to file a motion that day to convert this case to chapter 7.

[3]   A true and correct copy of this correspondence, and the response from the Debtors' investment banker, is attached hereto as **Exhibit A**.

generated from the sale, under the Debtors' proposal, the DIP lenders will preserve their existing liens on (a) various claims and causes of action and (b) the Debtors' real estate assets.

Seeking conversion in the face of these terms is economically irrational and should not be welcomed.  The Debtors intend to leave no stone unturned and no option unexplored in their efforts to avoid this unwarranted upheaval.  The Debtors have filed this Report, therefore, to apprise the Court of the critical juncture now facing creditors, employees and all stakeholders and to authorize the Debtors to continue to document the transaction set forth herein at **Exhibit B** which it will seek to have approved at a continued hearing in approximately one week.

## Background

1.      On March 18, 2023 (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

2.      On April 4, 2023, the Office of the United States Trustee (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "Committee"), consisting of the following three members: (i) The Necessity Retail REIT, Inc.; (ii) Total Image Solutions, LLC; and (iii) Coca-Cola Bottling Company United, Inc.  *See* Docket No. 202.

**B.      DIP Financing**

3.      When the DIP lenders refused to provide the Debtors with debtor-in-possession financing at the outset of these cases, which is customary in chapter 11, the Debtors sought non-consensual use of cash collateral.  On March 20, 2023, the Court entered an *Interim Order Pursuant to 11 U.S.C. (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate*

*Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Further Hearing* [Docket No. 37], authorizing, among other things the Debtors' use of cash collateral during the first week of these chapter 11 cases.

4.     The Debtors then struggled to obtain acceptable terms for post-petition financing from their pre-petition lenders.  Indeed, the Debtors' professionals warned the pre-petition lenders that a delay in providing funding would cause fuel suppliers to abruptly cut off the fuel supply. Then, just as the Debtors said would happen, many of the Debtors' customers did not get fuel deliveries for several days, setting a very negative tone for the case and raising alarms throughout the industry.  The Debtors ultimately were prepared to finance these cases via a priming loan; however, the DIP lenders eventually relented.

5.     The Debtors finally reached an agreement to obtain a limited amount of financing several days into these cases.  On March 23, 2023, the Court entered its *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-2 (I) Authorizing the Debtors to Use Cash Collateral and Obtain Post-Petition Financing, (II) Granting Liens and Providing Super-Priority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 117], approving debtor-in-possession financing on an interim basis pending a final hearing.

6.     Once again, the DIP lenders agreed to provide further financing under the DIP Financing Order *only after* being threatened with a priming loan to pay down their post-petition new money financing in full. On April 25, 2023,  the Court entered *its Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-1 (I) Authorizing the Debtors to Use Cash Collateral and Obtain Post-Petition*

*Financing, (II) Granting Liens and Providing Super-Priority Administrative Expense Status, (III)*
*Granting Adequate Protection, and (IV) Granting Related Relief* (the "DIP Financing Order")
[Docket No. 332].  Subsequently, the funding authorized under the DIP Financing Order was
increased and extended through July 6, 2023 [Docket No. 735], and further extended through July
31, 2023, by agreement of the parties.

7.     As of July 31, 2023, the Debtors have been operating by the consensual use of cash
collateral pursuant to a budget approved by their DIP lenders.  That budget, however, only allowed
the use of cash collateral for certain critical and immediate expenses, such as fuel purchases and
payroll costs, and did not include any funding for administrative rent accrued as of August 1, 2023.
Even that limited budget authorization, however, expired on Friday, August 4 (and has now been
earlier terminated by the DIP Default Notice).

**C.     The Marketing and Sale Process**

8.     Even before these cases were commenced, the Debtors undertook to market their
assets on a going concern basis.  That process has been managed by Raymond James & Associates,
Inc. ("Raymond James"), which was retained by the Debtors on February 10, 2023.  On May 25,
2023, the Court entered an order [Docket No. 457], authorizing the employment of Raymond
James as the Debtors' investment banker to continue to lead the Debtors' efforts to, among other
things, market and sell substantially all of their assets through one or more sales under section 363
of the Bankruptcy Code.

9.     Raymond James has worked closely with the Debtors' management and the
Debtors' other professionals to analyze the Debtors' financial position and outlook, prepare
marketing and diligence materials (including a Confidential Information Presentation, or "CIP"),
and populate a comprehensive electronic data  room (the "Data Room") containing nearly 12,000

documents for prospective purchasers interested in acquiring all or any portion of the Debtors' assets.   Commencing in mid-March 2023, Raymond James contacted 121 potential buyers, comprised of 82 strategic counterparties and 39 financial counterparties.

10.     On June 16, 2023, the Debtors filed their Sale Motion [Docket No. 536], seeking among other things, approval of bid procedures and related relief to facilitate their efforts to market and sell substantially all of their assets through one or more sale transactions.

11.     On June 22, 2023, the Court approved the Sale Motion, authorizing the purchase of some or all of the Debtors' assets and the assumption of certain liabilities of the Debtors, consistent with the bidding procedures (the "Bid Procedures")[4] approved by order entered on June 22, 2023 [Docket No. 701] (the "Bid Procedures Order").  The Bid Procedures Order also established a Bid Deadline of July 21, 2023, and scheduled an Auction for July 28, 2023, a Sale Objection Deadline of August 3, 3023, and a Sale Hearing, which is presently scheduled to commence on August 7, 2023, at 2:00 p.m. CDT.

12.     As of the date of the Sale Motion, 51 parties had signed non-disclosure agreements and had received access to the Data Room.  Raymond James held calls with 37 different interested parties and continued to facilitate numerous diligence requests.   Nine (9) parties submitted preliminary, non-binding Indications of Interest (IOIs) in connection with an initial May 8, 2023, deadline.  In response to the more formal bid deadline of June 6, 2023, Raymond James received bid letters from several parties.  The Debtors entered into further negotiations with certain of the remaining parties, and continued to negotiate to obtain a Stalking Horse Purchaser.  Many of the initial bids received by the Debtors shared certain conditions (such as a requirement to reach lease

---

[4]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bid Procedures Order or the Bid Procedures, as applicable.

or supply agreement amendments and other accommodations or the breakage of master leases which the Debtors did not have the legal ability to accomplish) or contemplated closing timetables that required access to further financing to achieve.   Raymond James worked extensively with each of these interested parties to eliminate or reduce the conditionality of the proposals and to shorten the time needed to close.

13.     On June 28, 2023, the Debtors served a notice of the Auction [Docket No. 717] in accordance with the Bid Procedures Order.   The Debtors received a total of 14 bids (two of which were submitted after the July 21 Bid Deadline) for a variety of sets of the Debtors' assets.   None of these bids, however, fully satisfied the requirements set forth in the Bid Procedures for bid qualification.   As the Debtors continued to receive bids (two further bids were received after July 26, for a total of 16 bids), the Auction was continued to August 2, 2023 [Docket No. 1099] in an effort to further consider, group and qualify the bids.   The Auction was convened at 10 a.m. EDT on August 2, 2023, and negotiations, discussions and meetings brokered by Raymond James occurred throughout the day; the Auction was then adjourned until 11:00 a.m. EDT on August 3, 2023.   Following additional intensive negotiations during the August 3 session, the Auction was adjourned once again to August 4, 2023, and completed by video conference at 6:00 p.m. EDT on that day.   At the conclusion of the Auction, the Debtors announced their determination that the Auction had generated the highest and best value for the Debtors' assets.

### D.     A Complex and Fluid Auction

14.     Ever since the sale process began in earnest, the Debtors have been focused on two key mandates: to deliver as much value as possible to the estate and to preserve the jobs—and the livelihoods—of the Debtors' employees and dealers.   The Debtors' network of convenience stores and gas stations is comprised partly of controlled locations (currently, about 480 sites, where a

Debtor "controls" the leasehold rights to the real estate)[5] and non-controlled locations (currently, about 300 sites, where a Debtor merely supplies fuel to a third-party dealer). These non-controlled sites are commonly referred to as "dealer-owned / dealer operated" stores, or "DODOs." Despite these structural differences, most of the Debtors' stores are family-operated, small business enterprises. The stores and travel centers operated directly by the Debtors employ approximately 600 employees (not including approximately 80 corporate-level employees whose positions would also be terminated under a shutdown). In addition to the Debtor-operated stores, there are approximately 400 Debtor-controlled, but dealer-operated, locations. Assuming that each such store employs between 1-4 persons per location, it is apparent that an unplanned shutdown of the Debtors' store network might jeopardize thousands of jobs. The interruption of fuel supply to the 300 DODO locations will also invariably affect the employees at those locations.

15. Preserving the uninterrupted operation of the store network has been a driving motivation for the Debtors since the commencement of these cases. The Debtors' operations are very complex, involving multiple primary leases (with major landlords such as Oak Street, which controls over 280 of the Debtors' controlled sites), numerous individual subleases with store operators, fuel supply agreements with dealers, and oil company commitments for the provision of fuel across the entire store network (both to branded and unbranded locations). Of course, the Debtors and their professionals are also keenly mindful of their obligations to the DIP lenders and have done their utmost to adhere to the case milestones and the sale timetable embodied in the DIP financing agreement. Ultimately, however, economic reality compels parties to make hard decisions and the Debtors now stand at a pivotal inflection point.

---

[5]    Most of the controlled stores are operated by third-party dealers which whom the Debtors enter into sublease and fuel supply arrangements, although some of the controlled stores are operated directly by the Debtors (including some travel centers).

16.     On Wednesday, August 2, the Debtors convened the Auction.  The Auction elicited the participation of several active bidders, as well as several of the Debtors' master lessors.  Only one bidder, however, had proposed an acquisition that would include all (or virtually all) of the Debtors' stores (i.e., a whole company, or "whole-co" bid).  Five other bidders were interested only in distinct segments of the Debtors' operations.[6]  For instance, one bidder was interested only in the acquisition of the Debtors' fuel supply rights at the non-controlled DODOs.  Other bidders were interested only in selected controlled sites, based on geographic or brand affinity.  Many of the bids contemplated extended, and sometimes conditional, pathways to closing.[7]  And, perhaps most importantly, none of the bid packages aligned exactly with the store locations subject to master leases (in other words, such bids would have required the assent of the master lessors to the severability of their master leases to accommodate partial leases and multiple lessees).  For example, all of the five segment bids in combination accounted for only 38% of the entirety of the Oak Street leased locations.  This would mean that Oak Street would not only face the requirement of breaking apart its master leases, but would also be left without a tenant for over half its locations.

17.     The Auction process also underscored various shortcomings with the Debtors' ability to meet the due diligence needs of bidders which, in turn, contributed to the conditionality of many bids and the indefinite scope of the purchased assets (i.e., many bidders retained the ability to include or exclude selected assets depending on further investigation).  Notwithstanding herculean efforts, the Debtors faced considerable challenges populating the Data Room with customary due diligence materials.  Generally speaking:

---

[6]     Not at issue here are certain bids for discrete assets (such as motor vehicles), or certain bids that failed to meet fundamental bid qualifications such as the remittance of a deposit, the proposal of a firm purchase price or the submission of a revised version of the template asset purchase agreement.

[7]     For a variety of reasons, the Debtors ultimately were unable to identify or qualify a stalking horse bidder for the sale of substantially all of their assets.

- The Debtors lacked complete and current financial statements (most recent audited financial statements were for the period ending December 31, 2021).

- The Debtors were unable to generate accurate and current store level profit and loss statements, fuel gallon and margin data, and in-store financials (such as inventory levels, product pricing, food sales and, payroll expense), among other issues.

- The Debtors lacked complete historical information about store level environmental and zoning compliance.

- The Debtors were missing leases, contracts, and other agreements integral to the management of the business.

- The Debtors did not maintain detailed, store-level accounting on unamortized fuel branding discounts and rebates provided by major oil companies and related store-specific "imaging" liabilities.

18.     With these challenges as a backdrop, the Debtors also faced the need to finance the continued operation of the business to reach a closing for many of the foregoing bids (most of which contemplated between 30 to 60 days following approval, if not longer, to effectuate a transition from the Debtors' current point-of-sale platform to a buyer's platform).  Even the single "whole-co" bid contemplated approximately 90 days to reach a closing.

19.     The DIP lenders' response to this Auction reality was alarming.  When asked on August 3 what they would accept as a release price for their liens, ***notwithstanding*** the difficult situation facing all stakeholders and the expressed market value of the Debtors' assets, the DIP lenders demanded a minimum of $150 million in net proceeds from the auction.  Rather than offer a reasonable—and realistic—target given the outcomes achieved after a day of auction-related negotiations involving sophisticated market participants, the DIP lenders instead chose an absurd response disconnected from the actuality of the Debtors' situation.

20.     By the DIP Default Notice, the DIP lenders have now declared that they are not prepared to make additional advances under the DIP facility, nor even to permit the continued use of cash collateral needed to finance the carrying costs of the estate during this period to reach a closing.  As noted above, for the week ending August 4, the DIP lenders only permitted the use of cash collateral to cover certain immediate and critical expenses.  That authorization to use cash collateral expired on Friday, August 4 and has now been earlier terminated as of August 3 pursuant to the DIP Default Notice.

21.     In light of this funding predicament, the Debtors immediately engaged with their lessor constituents to defray the rental expense associated with keeping the stores' leases intact for an additional 90 day period.  Auspiciously, certain key lessors have proved willing to explore creative ways to minimize an unplanned disruption to the operation of the convenience stores.  In fact, certain of the Debtors' master lessors (such as Oak Street, Spirit and Vereit) participated in the Auction in order to engage with the disparate bidder groups.  Moreover, these master lessors have indicated their willingness to defer and restructure the payment of rent from August 1, 2023, through an outside closing date of October 31, 2023.

22.     Of course, there are many other lessors to the Debtors that only account for a single store, or a relatively small number of multi-store, locations.  The Debtors are now commencing a process to request that each lessor accept a deferral of rent for the August-October period (to be added to the restructured lease) and a restructuring of future rent.  For those lessors that decline the Debtors' proposal, the Debtors plan to reject each affected lease effective as of August 31, 2023.  The Debtors anticipate that many of the lessors, faced with the prospect of the return of their leased properties, will voluntarily opt to keep their leases in place pending the possible

transition to a new tenant.  If not, the future lease expense associated with such sites will cease as of August 31.

23.     The foregoing lease concessions are a critical component of the Debtors' determination to conserve operating costs, reach a closing and keep the stores open.  But, they do not fully alleviate the need for additional financing.  The Debtors' CRO, Michael Healy, has estimated that—even with all lessors participating in a voluntary rent deferral for the period from August 1 through October 31—the estate still will require approximately $4.5 million per month to sustain normal operations.  Thus, for the next three months, the Debtors require additional minimum funding of approximately $13.5 million.

24.     The DIP lenders remain implacably opposed to any further funding and have now, by the DIP Default Notice, terminated the Debtors' ability to use cash collateral after August 3. This has not deterred the Debtors from continuing to pursue all possible avenues to maintain operations until a future closing.  Specifically, the Debtors explored a creative framework under which a lessor/bidder party would acquire the outstanding DIP obligations in full and would commit to fund the amounts necessary to consummate one or more transactions that would avert store closures.   Under that framework, the DIP lenders would receive immediate cash consideration for the assignment of their DIP rights and obligations *as well as* the immediate transfer of certain specific assets included in their existing DIP collateral package.[8]

25.     The Debtors believed that this framework might accomplish several crucial objectives—(i) relieve the existing DIP lenders of any further financing requests, (ii) deliver to the DIP lenders a recovery superior to a chapter 7 conversion, (iii) provide a viable runway to a closing, and (iv) most importantly, keep the convenience stores and gas stations open for business.

---

[8]     These specified components of the existing DIP collateral pool are (a) certain claims and causes of action, and (b) the Debtors' five parcels of owned real property (which are not used in the Debtors' business).

According to Mr. Healy's analysis, a conversion to chapter 7 (and the offsetting expenses associated with a case under chapter 7), would yield a recovery to the DIP lenders below (and, in certain scenarios, drastically below) the combined value of the <u>cash</u> paid for assignment of the DIP loan and the <u>components</u> of the DIP collateral that would be conveyed to the DIP lenders (those identical assets would remain part of the DIP collateral following conversion).

26.     The Debtors presented this recovery framework, and a detailed illustrative recovery model under chapter 7, to the complete DIP lender group the day prior to the commencement of the auction.  The Debtors' professionals also provided a fulsome and candid discussion of the current status of the bids received and the need for further financing in order to make any of them actionable.  The DIP lender group did not dispute their professed unwillingness to extend further funding to the Debtors.  Nor did they dispute the fact that none of the bidders was prepared to close immediately.  Nor did they dispute that none of the bidders was in competition for the same segment of assets with any other bidder (and, hence, a traditional auction dynamic would not result in escalating bids).

27.     Instead, the DIP lender group reacted with fury and vitriol, not economic rationality.  The representative for one member of the DIP lender group claimed he would prefer to "*see [it] all burn*" rather than contemplate—much less accept—the framework recovery proposed by the Debtors.  In the Debtors' view, that recovery would be materially better, and certainly no worse, than the outcome of a chaotic liquidation in a chapter 7 case.

28.     The DIP lenders would rather completely dismantle the Debtors' business than see a constructive outcome for any other constituency—particularly the Debtors' dealers and employees.  That is not the exercise of contractual rights and remedies in good faith (the bedrock

for granting protection to the DIP lenders under section 364(e) of the Bankruptcy Code) but rather a destructive and compulsive repudiation of the obligation to act in good faith.

29.     The Debtors' professionals have worked feverishly to assemble a proposal that will avoid a catastrophic loss of jobs **and** deliver tangible and superior value to the DIP lenders.  While the DIP lenders may perceive that their actions are taken in a manner consistent with their rights and duties under the DIP credit agreement and the financing orders, these steps callously, even recklessly, ignore the consequences to other stakeholders.

**E.     The Successful Bid**

30.     The continued negative reaction from the DIP lenders did not deter the Debtors from forging ahead with their efforts during the Auction to convert the conceptual framework into an actionable expression of interest.  The Debtors are pleased to report that, on August 4, they received a proposal for an asset acquisition from GPM Investments, LLC, an affiliate of ARKO Corp. ("ARKO/GPM" and the "Successful Bid").[9]  A true and correct copy of the Successful Bid is attached hereto as **Exhibit B**[10].  The Successful Bid contemplates total consideration for substantially all of the Debtors' assets of $49 million, of which $20 million is anticipated to be payable at closing to the DIP lenders.  The Successful Bid also carves out certain causes of action and owned real estate which will further enhance the recovery to the DIP lenders.  The net amount payable to the DIP lenders is considerably higher than the Debtors' estimate of the proceeds that might be realized from a liquidation of the purchased assets – and results in the preservation of thousands of jobs.

---

[9]     In light of the steps since taken by the DIP lenders to accelerate the DIP obligations and declare the occurrence of the Maturity Date under the DIP facility, the Successful Bid no longer proposes a purchase of the DIP lenders' DIP obligations but is a traditional asset purchase transaction.

[10]     Exhibit B is a substantially final version of the Successful Bid.  The Debtors will file an executed version when available.

31.    As with the framework transaction shared with the DIP lenders earlier during the Auction, the Successful Bid would not include the Debtors' owned real property and certain claims and causes of action of the Debtors.  In combination, the proceeds from the sale of the purchased assets and the value of the excluded assets offer a recovery to the DIP lenders that, according to the Debtors' advisors, is superior to the forced liquidation value of the same property.  The Successful Bid further contemplates that the chapter 11 cases would be adequately funded over the next 90 days using the $13.5 million purchase deposit payable by ARKO/GPM, in combination with the rent deferrals, following approval of the Successful Bid.

32.    As contemplated by the Bid Procedures, the Debtors, in their business judgment, have selected the Successful Bid as the "highest and best" offer for substantially all of the Debtors' assets.  Consistent with their obligations under the Bid Procedures, the Debtors have also shared the terms of the Successful Bid with the other Consultation Parties.  The Successful Bid provides the necessary combination of material value to the DIP lenders (superior to a liquidation recovery), a source of funding to sustain operations pending a closing, and the preservation of countless jobs and small businesses.

33.    At the resumed Auction on August 4, the Debtors announced the key terms of the Successful Bid.  As explained on the record at the Auction, the Successful Bid solves the Debtors' liquidity issues, allows the Debtors to proceed towards closing as a going concern, and affords the DIP lenders an anticipated $20 million recovery (not including the additional recoveries from the retained litigation and real property assets), with utterly no further funding obligations.  The Debtors have therefore determined to seek approval for the Successful Bid.

34.     As the means for its implementation, the Successful Bid contemplates:

a.      The acquisition by ARKO/GPM of the Debtors' inventory, accounts receivable and other tangible assets at the Debtors' controlled convenience stores that are company operated for an estimated $13 million;

b.      The acquisition by ARKO/GPM of the Debtors' inventory, accounts receivable and other tangible assets at the Debtors' 23 travel centers, plus the fuel supply arrangements with the DODOs, for an estimated $15.25 million;

c.      The acquisition by ARKO/GPM of the Debtors' collection rights against Brothers and Imperial on account of unpaid rent due from such parties under subleases with the Debtors for $2 million;

d.      The contribution by Oak Street or other affiliates of Blue Owl Real Estate Capital, LLC ("Oak Street"') of $18.75 million to the purchase price payable by ARKO/GPM, coupled with the deferral and restructuring of administrative rent due under the Oak Street leases for the period from August 1, 2023, until closing (approximately $17 million through October 31);

e.      The exclusion from the Transaction of the Debtors' owned real property and claims and causes of action; and

f.      A procedure for the rejection and/or restructuring of the Debtors' leasehold interests.

35.     Of critical importance to evaluating the Successful Bid is the lengths to which many key parties—lessors *and* estate professionals in particular—are willing to go to ensure the Successful Bid can close.  Oak Street has agreed to defer *three* months of rent *plus* it has agreed to contribute ***$17.5 million*** toward the purchase price.  Raymond James has agreed to ***forgo $1 million*** in transaction fees; the Debtors' two independent directors have agreed ***to reduce their fees by 50%***; and PSZJ and FTI together have agreed to forego the payment, from sale proceeds, of $2.05 million of fees incurred in excess of their respective carve out amounts and to reduce the amount of their budgeted fees for the period until closing by approximately $700,000.  Each of these concessions and accommodations was vital to the formulation of the Successful Bid.

36.     Oak Street's participation is an integral piece of the Successful Bid.  Oak Street is contributing the $13.5 million purchase price deposit that will be used to sustain the Debtors'

operations until a closing can be consummated.  The deposit would be non-refundable and irrevocable—hence, Oak Street is assuming the risk that for reasons unforeseen the transaction may not ultimately close.  Furthermore, Oak Street is making substantial near-term and long-term rent concessions.  For these reasons, among others, the Successful Bid also contemplates that Oak Street would be granted a release of any claims held by the Debtors upon approval of the sale order by the Court.  Moreover, the Debtors would immediately reject the Oak Street leases and enter new short-term leases for the period until closing, which leases would not create any administrative liability.  Insofar as Oak Street's contribution to the Successful Bid is indispensable to its implementation, the Debtors believe that the release of the estate's claims against Oak Street is fair and reasonable.

**F.      The Court Should Authorize the Debtors to Work Towards Documenting the Successful Bid Notwithstanding the DIP Lenders Refusal to Consent**

37.      The Debtors intend to proceed with the approval of the Successful Bid and the implementation of the pre-closing funding of $13.5 million contemplated therein.  The Successful Bid will also be shared with the Debtors' lessors as part of the plan to minimize ongoing administrative rent expenses during the next 90 days.  The Successful Bid offers each lessor a clear picture of the timetable for a sale closing and the opportunity to keep intact its existing leasing arrangements.  The Debtors anticipate that the orderly exit offered by the Successful Bid will be highly persuasive to lessors and will encourage each of them to participate in a collective solution for the preservations of jobs and income.

38.      The Successful Bid requires the irrevocable deposit of an advance under the purchase price in the amount of $13.5 million.  That amount will be used pursuant to the budget (attached as Exhibit A to the Successful Bid), to fund the Debtors' operations through the end of October 2023, the anticipated outside closing date for the transaction.  The Debtors believe that

the funding derived from the bid deposit will be sufficient to maintain operations during the pre-closing period (excluding the payment of administrative rent which, as noted above, will be subject to a process of consensual accommodations or rejection by August 31).

39.     The DIP lenders may assert that the Debtors' assets cannot be sold free and clear of the DIP lenders' liens without their consent.  But nothing in the DIP approval orders bars the Debtors from seeking authorization for a sale.  And, although the DIP credit agreement may give the DIP lenders consent rights to a disposition, the Debtors can, under the clear language of Section 363(f) and with the approval of this Court, sell such portion of the DIP collateral that is included in the Successful Bid free and clear of the DIP liens.  The Successful Bid, derived from a market-driven Auction, sets the value of the assets being sold, i.e., the DIP collateral, and hence, by definition, equals or exceeds the actual value of the DIP collateral.   If the Court agrees that the DIP lenders' failure to consent does not prohibit the Debtors from consummating a sale on the terms set forth in the Successful Bid, the Debtors will work towards documenting the transaction and seek formal approval at a continued sale hearing to be held in approximately one week.[11]

40.     Section 363(f)(3) permits the sale of the DIP collateral "free and clear" of the DIP agent's lien.  *See* 11 U.S.C. § 363(f)(3) ("The trustee may sell property … free and clear of any interest in such property … only if … (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property …."); *In re Terrace Gardens Park Partnership*, 96 B.R. 707, 712-13 (Bankr. W.D. Tex. 1989) (finding "a sale price need only exceed the value of the property, relying on the definition of a secured claim in Section 506(a), which equates such a claim to the value of the collateral securing the claim" to satisfy

---

[11]    The Debtors intend to file a motion for authority to use cash collateral for the one week period through August 11, 2023.  Thereafter, if the Court approves the Successful Bid the Debtors will seek further use of cash collateral which, together with the additional liquidity to be provided by the $13.5 million deposit, will provide the Debtors sufficient runway to allow the Sale to close.

Section 363(f)(3)) (citing *In re Beker Industries Corp.,* 63 B.R. 474 (Bankr. S.D.N.Y. 1986)); 3 COLLIER ON BANKRUPTCY ¶ 363.06[4].

41.     If the DIP lenders disagreed with the value of the DIP collateral, as set by the market following the Auction, they could have credit bid;[12] ***they elected not to***.  They are now barred from challenging the value of the DIP collateral and the Successful Bid.  *Terrace Gardens*, at 713 ("[A] secured creditor who disagrees with the purchase price has recourse to Section 363(k), which permits it to bid in its lien … to head off a sale.")

## G.     The DIP Lenders Are Not Acting in Good Faith

42.     The DIP lenders, having been bestowed with the protection of a good faith finding under Section 364(e), now appear intent on skirting their obligations to fairly accept and address the outcome of the Auction.  The DIP lenders were present at the Auction and aware of the complex and contingent nature of the bids submitted and the values being ascribed to the Debtors' assets (i.e., their DIP collateral).  Yet, the DIP lenders declined to submit a credit bid for their collateral as required by the Bid Procedures.  Instead, faced with the economic reality of the Auction, and unwilling to purchase their own collateral, the DIP lenders have determined that their best exit is a total shutdown and the destruction of value for all stakeholders, including the many small businesses that depend upon the Debtors' survival.

43.     The Debtors have provided a careful analysis showing the illustrative recoveries in a shutdown scenario.  Tellingly, one of the most important components of the DIP collateral – accounts receivable from fuel and sundry sales – degrades almost instantly in a shutdown scenario. The Debtors do not expect any of their third-party dealers or their DODO accounts to continue to permit payment processing "as usual" once it is known that fuel deliveries have terminated.  Many

---

[12]    Under the Bid Procedures, if the DIP Agent intended to submit a credit bid it was required to do so by submitting a letter prior to the Bid Deadline.  The DIP Agent did not timely submit a credit bid for any of the DIP collateral.

other components of the DIP collateral will suffer a similar degradation under a liquidation scenario.  Fuel inventory is also unlikely to generate a meaningful recovery; the reason for this is simple—branded fuel deliveries (i.e., from Exxon, Chevron, Marathon, etc.), and consumer sales are processed through the particular oil company's proprietary payment platform.  Once it becomes apparent that liquidity is constrained, the oil companies will suspend payment settlements to build a reserve for setoff and recoupment purposes.  The Debtors' advisors have shared detailed information with the advisors for the DIP lenders regarding numerous collateral categories, such as FF+E, pre-paid deposits, oil company rebates, and cash on hand.  For each category of collateral, the recovery prospects in a chapter 7 scenarios are considerably diminished compared to the anticipated recovery values as a going concern.

44.    The DIP lenders economic irrationality—evidenced by their desire to "see [it] all burn" rather than accept the market value of their collateral—and their disregard for the thousands of people who depend upon the Debtors for their livelihood, is fundamentally at odds with their obligation to extend credit and exercise their remedies in good faith pursuant to Section 364(e).

## H.    **The DIP Lenders Should Not Be Permitted to Destroy the Debtors' Business**

45.    The DIP lenders, by the DIP Default Notice, have terminated the Debtors' ability to use cash collateral as of August 3.  As a result, the Debtors also plan to seek emergency authorization for the continued use of cash collateral pending the Court's consideration of the Successful Bid.  Pending further authorization, the Debtors have taken immediate steps to implement the cessation of their authority to expend cash collateral.

46.    The DIP lenders have threatened to move for relief from the automatic stay to exercise remedies against the DIP collateral and to convert the chapter 11 cases to cases under chapter 7.  Fortunately, the DIP lenders do not solely control the outcome of these chapter 11 cases.

The Debtors believe that, given the anticipated negligible recoveries in a potential chapter 7 scenario, a dismissal would be a superior option for the dealers and the subtenants at the Debtors' controlled locations. That result would leave the existing lease arrangements in place, and would afford the operators of the stores an opportunity to establish a direct leasing arrangement with the lessors. Although a dismissal might not appear to offer any tangible advantages for the DODO locations (because the Debtors' fuel supply commitments will necessarily cease), a dismissal may still be preferable to the delay, expense and disarray of a chapter 7 proceeding.

47.     For these reasons, among others, the Debtors will likely seek a dismissal of the cases instead of a conversion if the Debtors are unable to pursue consummation of the Successful Bid. A chapter 7 case without any funding is a disaster "waiting to happen." Indeed, under these circumstances it is questionable whether the Office of the United States Trustee would find a person willing to serve as a chapter 7 trustee. The only benefit served by a conversion to chapter 7 is to provide a path for the DIP lenders to liquidate their collateral for their exclusive benefit. The DIP lenders efforts to use the bankruptcy court to handle a pure liquidation should not be countenanced; having left the chapter 11 estates administratively insolvent (save the $50,000 carve out for a chapter 7 trustee) and with no prospect of a stakeholder receiving any distribution, the DIP lenders should be relegated to their state law remedies without burdening this Court. If the DIP lenders are concerned about the preservation of avoidance actions, there are state law analogues that would fill the breach.[13] Stated simply, the DIP lenders have rolled up all of their pre-petition debt, and scooped up as DIP collateral all of the property of the estate. There is no

---

[13]     *See, e.g.,* GA Code § 18-2-75(b) (transfer made by a debtor is voidable as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent).

source of a distribution to any other creditor and a chapter 7 case would merely be a private foreclosure conducted in a federal court.

## Conclusion

The Debtors and their professionals have been confronted with an extraordinarily daunting and difficult Auction.  The various bidders have, understandably in light of the reporting and record-keeping challenges facing the Debtors, submitted proposals that are contingent, variable and require extensive pre-closing efforts.  The DIP lenders have announced their refusal to sustain ordinary course operations needed to reach a closing.  As a result, the Debtors have sought to re-arrange the assets and groups of assets in order to enhance the prospect of generating meaningful value over the near term.  But again, the DIP lenders have chosen to ignore economic reality.  Initially, they demanded that the Debtors conjure a $150 million recovery in order to assent to a disposition of their collateral, and they never reduced their demand to less than approximately $46 million (the amount of funds advanced post-petition), plus causes of action and real estate in exchange for a purchase of their debt.  Despite these roadblocks, the Debtors have persisted in their efforts to maximize the Debtors' value as a going concern.  These efforts have culminated in the submission of the Successful Bid—that bid requires no further financial contributions from the DIP lenders and provides a clear path to generating potentially $49 million in sale proceeds.  The Debtors urge the Court to authorize them to pursue this transaction, keep their store network alive and preserve the livelihoods and hopes of thousands of employees and small business owners.

Respectfully submitted,

Dated: August 4, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Michael D. Warner*

Michael D. Warner (SBT 00792304)
Steven W. Golden (SBT 24099681)
440 Louisiana Street, Suite 900
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile:  (713) 691-9407
mwarner@pszjlaw.com
sgolden@pszjlaw.com

-and-

Jeffrey N. Pomerantz (admitted *pro hac vice*)
Jeffrey W. Dulberg (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
jpomerantz@pszjlaw.com
jdulberg@pszjlaw.com

*Counsel to the Debtors and Debtors in Possession*

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2023, a true and correct copy of the above and foregoing has been served on all parties that are registered to receive electronic transmission through this Court's CM/ECF filing system in these cases.

*/s/ Michael D. Warner*

Michael D. Warner

# EXHIBIT A

**From:** "Richard D. Marshall" <richard.marshall@bankofhope.com>
**Date:** August 1, 2023 at 7:09:54 PM EDT
**To:** Geoffrey Richards <Geoffrey.Richards@raymondjames.com>
**Subject: Call**

Geoff
Know you have your hands full with auction tomorrow but from what I can see, this looks like a 7 where banks optimize.  We will see what happens tomorrow but if we all think this business is going to be sold for $10mm, I would rather take chances in 7 and see all burn.

Good luck tomorrow.

Rich


Get Outlook for iOS
Disclaimer: Hope Bancorp, Inc. and its wholly owned subsidiary, Bank of Hope never asks for your account or personal information via email. When emailing us, please do not include any non-public information such as account numbers or Tax Identification Number. This e-mail message is only intended for the person(s) to whom it is addressed. It may contain confidential and proprietary information and is protected from disclosure. If you are not the intended recipient or a person responsible for delivering it to the intended recipient, you are hereby notified that any review, retention, copying or distribution of this communication is prohibited by law. Please reply to the sender that you have received the message in error, and then delete it. In addition, please be aware that any message addressed to our company is subject to archiving and review by persons other than the intended recipient. Although reasonable precautions have been taken to ensure that no viruses or other harm are present, Hope Bancorp, Inc. and Bank of Hope make no warranty or guaranty with respect to, and are not responsible for any loss or damage arising from the receipt or use of this e-mail or attachments. Thank you.

# EXHIBIT B

STRICTLY CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY



8565 Magellan Parkway, Ste 400, Richmond, Virginia 23227  Phone:  (804) 730-1568 Fax:  (804) 559-3285

August 4, 2023

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, California 90067
Attn.: Jeffrey Pomerantz (jpomerantz@pszjlaw.com)
       Jeffrey Dulberg (jdulberg@pszjlaw.com)

Raymond James & Associates, Inc.
Attn: Scott Garfinkel (scott.garfinkel@raymondjames.com)
       Roger Woodman (roger.woodman@raymondjames.com)
       Jake Wainwright (jake.wainwright@raymondjames.com)

Counsel to the Official Committee of Unsecured Creditors, McDermott Will & Emery LLP
Attn: Maris J. Kandestin (mkandestin@mwe.com)
       Chuck Gibbs (crgibbs@mwe.com)
       Marcus Helt (mhelt@mwe.com)

Counsel to the DIP Agent, Greenberg Traurig, LLP
Attn: John D. Elrod, Esq. (elrodj@gtlaw.com)
       Shari Heyen, Esq. (heyens@gtlaw.com)

Gentlemen:

On behalf of GPM Investments, LLC, its subsidiaries and affiliated entities (collectively, "GPM"), we are
delighted to provide this revised proposal with regard to a potential asset acquisition (the "Transaction")
by GPM of substantially all or certain, as set forth below, of the assets which comprise the bankruptcy
estates of Mountain Express Oil Company and its affiliated entities (collectively, the "Company") in
connection with the pending cases filed by the Company in the United States Bankruptcy Court for the
Southern District of Texas, Houston Division (the "Bankruptcy Court") pursuant to chapter 11 of title 11
of the United States Code (as amended, the "Bankruptcy Code") on March 18, 2023, including, without
limitation, certain real estate interests, leases, licenses and improvements owned or leased by the Company,
including all fixtures, equipment and inventory, and all assets and businesses relating to any and all of the
foregoing, including certain or all, as set forth below, of the trademarks and other intellectual property
rights of the Company (collectively, the "Business"). As noted below, immediately upon execution of the
definitive Agreement and issuance of the Order by the Bankruptcy Court, and following the Bankruptcy
Court's rejection of the Oak Street leases as set forth below, we are prepared to deliver to the Company the
sum of $13.5 million of the below proceeds, to be utilized by the Company in accordance with the

Mountain Express Oil Company
August 4, 2023
Page 2 of 9

Approved Budget (as defined below) (the "Advanced Proceeds").  The acquisition would include GPM's affiliate, GPM Petroleum, LLC ("GPMP"), a subsidiary of GPM Petroleum LP ("GPM Petroleum"), acquiring the supplier based intangible and other rights associated with the wholesale distribution of fuel to the stores comprising part of the Business.  The acquisition would also include pre-closing accrued but unpaid incentive payments under the existing fuel supply agreements with ExxonMobil.  **We believe that our proposal will allow the Company to execute an orderly winding-down of the Business while allowing for continued employment of a majority of the Company's employees.  Additionally, we believe that our proposal will provide the opportunity for the hundreds of the Company's dealers to continue to operate their small businesses at the stations and provide for employment of their thousands of employees, as opposed to causing the creditors, employees, the dealers' small businesses, and other Company stakeholders to be subject to a Chapter 7 liquidation.**

### About GPM Investments, LLC

GPM Investments, LLC is wholly owned by ARKO Corp., a Fortune 500 company that is publicly traded on NASDAQ (NASDAQ: ARKO) with a market cap of approximately $1 billion.

GPM is the sixth largest convenience store chain in the United States and one of the largest motor fuel distributors in the United States, operating and/or supplying over 3,700 convenience stores, cardlock locations and independent gas stations in more than 30 states.  GPM sells branded gas at most of its locations and also has stores that sell unbranded gas under GPM's proprietary fuel brands such as fas fuel®.  GPM's annual fuel volume is over 2 billion gallons.

GPM is headquartered in Richmond, Virginia, and employs approximately 14,000 employees.  Since 2013, GPM has successfully acquired and integrated approximately 1,300 c-store locations, approximately 1,850 dealer locations, and approximately 300 cardlock sites through 24 acquisitions.  GPM's long-term business plan is to continue its growth through a smart but aggressive acquisition strategy.

### Dedicated Acquisitions Team Enabling Fast Track Closings

GPM has a team of professionals on hand dedicated to acquisitions and who through experience have developed efficient standardized processes which enable GPM to fast track closing large-scale acquisitions.  Our experienced management team has a proven capability to close and integrate acquisitions.  Given this core expertise, we expect to close this Transaction in an expedited and efficient timeframe.

### Valuation, Consideration and Inventory

Under our proposal, GPM proposes for the Company to receive consideration at closing of approximately $49 million (less the Advanced Proceeds) as follows (collectively, the "Valuation"):

- ■ fuel and usable, merchandise inventory (in each case, to the extent owned by the Company) for each company-operated leased location in which GPM becomes a tenant and with respect to fuel inventory only, any consignment sites where GPM becomes the fuel supplier, as set forth below, at

Mountain Express Oil Company
August 4, 2023
Page 3 of 9

cost, together with non-defaulted current collectable accounts receivables of the Company, which valuation FTI has estimated in the aggregate to be approximately $13 million; plus

- the twenty-three (23) travel centers that comprise part of the Business, together with all assets to the extent related thereto (collectively, the "Travel Centers"), subject to consent for the applicable leases to be assigned to and assumed by GPM at closing and to such leases being amended in the manner set forth below, together with the non-controlled fuel supply/consignment agreements which are assigned to and assumed by GPM as set forth below (which agreements are for supplying approximately 119 million gallons of fuel per year per annum at a rate of approximately 5 cents per gallon, in each case as FTI has indicated), collectively for approximately $15.25 million in the aggregate; plus

- $18.75 million which, simultaneously with being paid by GPM to the Company, will be paid and/or credited to GPM by affiliates of Blue Owl Real Estate Capital, LLC ("Oak Street"), and Oak Street will additionally defer rent payments until closing of the Transaction (estimated to be approximately $12 million-$17 million, and subject to an outside date to be agreed upon by the parties); plus

- $2 million for an assignment of any and all funds received on account of pre-closing accrued and unpaid subtenant rent from the subleases with Brothers/GSS and Imperial, which amount collectively FTI has advised is approximately $5.6 million currently, plus another $1.4 million per month on a going forward basis, provided that the Company has not collected, forgiven, or waived or released its rights to such amounts.

Our proposed Transaction will exclude the following assets, which may be retained for the benefit of the DIP lenders (collectively, the "Excluded Assets"):

- all owned real estate (which we understand from Raymond James has been valued at approximately $3 million); plus

- any and all claims and causes of action of the Company arising prior to the commencement of the Company's bankruptcy cases.

In addition, for the avoidance of doubt, the Company would retain any and all of its cash on hand and funds in bank accounts, and the Company has represented that the Company is not holding any dealer deposits in segregated accounts.

The Advanced Proceeds would be utilized by the Company pursuant to the approved budget through October 31, 2023 attached hereto as **Exhibit A** (the "Approved Budget"). The Approved Budget will include budgeted amounts for the Company's operating costs and professional fees, as well as provide for the payment of Georgia post-petition taxes.  Any available savings/excess cash flow will inure to the benefit of the Company's DIP lenders, after payment of the $1 million portion of the transaction fee owed to Raymond James on account of the closing of the Transaction that it has agreed to defer.

Mountain Express Oil Company
August 4, 2023
Page 4 of 9

*Assumptions*

*Existing Leases*

Acquisition of the Travel Centers, other leases, inventory and accounts receivables to be acquired with respect to each of the leased locations (GPM will also receive all of the Company's interests in the equipment located at such locations) will be subject to GPM entering into new leases with the applicable landlords as follows:

*Oak Street Leases*

With respect to the leases with Oak Street (whose stores represent approximately 55% of the controlled portfolio and whose total rent is approximately 70% of total rent for the whole portfolio), GPM has reached an agreement in principle with Oak Street pursuant to which such leases would be required to be rejected by the Company in the bankruptcy effective as of the entering into of the definitive Agreement and issuance of the Order by the Bankruptcy Court. Oak Street and the Company will then enter into new, short-term lease arrangements which shall not exceed ninety (90) days and shall be automatically terminated as of the closing of the Transaction. Oak Street will agree to defer rent payments over the term of such new short term leases. As of closing, GPM and Oak Street will enter into new arrangements for these locations.

*All Sites Other Than Those Leased from Affiliates of Oak Street*

With respect to the leases with each of these respective landlords other than Oak Street, the Order shall provide that such leases shall be rejected by the Company in the bankruptcy as of August 31, 2023, unless alternative arrangements are reached as set forth below. GPM and such landlords would then enter into new lease arrangements effective as of closing as follows:

- GPM would enter into new leases with the landlords for a term of no less than 15 years from the closing with six (6) five-year renewal options.

- GPM would, based on the preliminary financial information provided by the Company, propose to adjust the rent under the new lease arrangements from and after closing of the Transaction, such that such rental amount would be on a 2:1 store-level EBITDA rent coverage ratio based on available historical financial information. Additionally, the landlords will cease collecting rent until closing of the Transaction. Such accrued and unpaid rent (as such rent is adjusted to amounts set forth above) will be payable on a pro rata basis over the following fifteen (15) years of the lease terms under each such lease.

- In each of the fourth and seventh month following the closing, GPM would review actual cumulative financial results of each location over the initial three month and initial six month periods following the closing and calculate the 2:1 coverage ratio based on such results. Such periodic reviews will be necessary to account for seasonal adjustments. The rent under each such lease would then be readjusted on a going forward basis to conform to such 2:1 coverage ratio, and to the extent such revised rent amount (which would be based on actual prior results of financial operations) is less than the rent amount actually paid by GPM over the prior period, GPM would

Mountain Express Oil Company
August 4, 2023
Page 5 of 9

receive a credit against going forward rent in the amount of the difference between what GPM would have paid in rent during the prior period based on such going forward rental adjustment and the amount of rent GPM actual paid over such period.

- Between the 12th and 13th month following the closing, GPM will, based on actual results of financial operations over the period since the closing, notify the respective landlords of the permanent rent adjustment amount on a going forward basis, which rent adjustment will be a 2:1 coverage ratio based on such results.  The rent under such respective lease would thenceforth be permanently adjusted to such rent amount, subject to the escalations provided in the respective leases.

- In addition to the foregoing, each of the respective landlords will be required to assume and pay for any required Capex payments in order to bring the stores back to operating condition/going concern condition, and will further assume all pre-closing environmental and other liabilities and obligations related to the stores, in each case which are not retained by the bankruptcy estate, provided that any such Capex payments made by the respective landlords will be added to rent.

Any such landlord who does not accept the foregoing terms or does not reach another agreement acceptable to GPM will be notified that its leases with the Company will be rejected effective August 31, 2023.

*Dealer Agreements*

GPM's acquisition/assignment of each of the applicable dealer agreements will be subject to GPM's review of such agreement as well as the historical financials relating to such agreement.

*Structure; Assumption of Liabilities; Excluded Liabilities*

The Transaction would be structured as a free and clear asset acquisition of the Business pursuant to an Asset Purchase Agreement to be negotiated between GPM and the Company (the "Agreement"), which shall contain customary representations, warranties, covenants and other provisions in the context of a sale pursuant to section 363 of the Bankruptcy Code.  As you know, we previously provided our comments to the draft Asset Purchase Agreement provided in the Company's virtual deal room ("VDR") and provided the proposed Exhibit 2.6(d) previously provided, which will be an exhibit to the definitive Agreement, provided that such comments and Exhibit 2.6(d) will be modified to reflect the proposed Transaction referenced above and payment due at closing.  Please note that the draft asset purchase agreement is still being reviewed by specialists with our outside counsel, and is therefore subject to further comment therefrom.  In addition, any missing disclosure schedules and exhibits to be attached to the Agreement will need to be reviewed by our team.  Notice of the proposed sale (both actual and notice by publication) shall be acceptable to GPM in its sole discretion.

In the event GPM is the winning bidder in accordance with the bid procedures, the definitive Agreement shall be approved by the Bankruptcy Court pursuant to an order (the "Order") to be entered pursuant to Sections 363 or 365, as applicable, of the Bankruptcy Code and applicable portions of Titles 18 and 28 of the United States Code (i) authorizing the sale of the Business to GPM; (ii) approving the Agreement and the transactions contemplated thereby; (iii) approving, with specific findings of fact in support thereof, the

Mountain Express Oil Company
August 4, 2023
Page 6 of 9

sale of the Business to GPM free and clear of all liens, mortgages, pledges, claims, charges, security interests, hypothecations or encumbrance of any nature whatsoever to the fullest extent permitted by applicable law and consented to by GPM and pursuant to Section 363(f) of the Bankruptcy Code, including, without limitation, free and clear of (A) any fixed or contingent, liquidated or unliquidated, disclosed or undisclosed liability, obligation or claim against the Company or its estate or any of its predecessors or affiliates, whether based upon successor or vicarious liability or otherwise, and whether any of such items are known or unknown as of the applicable closing date, (B) any violation or alleged violation of any environmental laws, or (C) liabilities under any pension, ERISA, tax, employment, labor, antidiscrimination laws or regulations, any products liability law, tort law, pending or threatened litigation, security interests, warranties, interests of any kind, known or unknown, liquidated or unliquidated, whether now existing or arising in the future, or debts of any kind or nature, all of which, if any, shall be retained by the Company and its estate, except as otherwise expressly provided in the Agreement or Order; (iv) finding, with specific findings of fact in support thereof, that GPM is a good-faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code; (v) providing that Bankruptcy Rule 6004(g) is waived and there will be no stay of execution of the Order under Rule 62(a) of the Federal Rules of Civil Procedure as incorporated by Bankruptcy Rule 7062; (vi) finding, with specific findings of fact in support thereof, that the Order is final pursuant to Rule 54(b) as incorporated by Bankruptcy Rules 7054(a) and 9014(c); (vii) retaining jurisdiction of the Bankruptcy Court to interpret and enforce the terms and provisions of the Agreement and the Order; and (viii) finding that the Order is final upon entry by the Bankruptcy Court (subject to the expiration of applicable appeal periods).  Subject to the funding of the Advanced Proceeds to the Company, which funding will be irrevocable and non-refundable subject to the Company utilizing such Advanced Proceeds in accordance with the Approved Budget and any use of the Advanced Proceeds in material violation of the Approved Budget shall be a breach of the definitive Agreement, the Order would further include full releases against GPM, Oak Street, and each of their respective affiliates, successors and/or assigns, and each of its and their respective current or former officers, directors, members, partners, equity holders, and managers, from and against any and all losses, claims, damages, liabilities, judgments and costs and expenses (including reasonable attorneys' fees and expenses), whether arising or pleaded at law or in equity, under contract, statute, tort or otherwise, whether known or unknown, whether accrued, potential, inchoate, liquidated, contingent or actual, whether asserted or that might have been asserted, which the Company and/or any claimant under the bankruptcy may now have, has ever had or may hereafter have against such persons, in respect of or arising out of any matter, act, omission, cause or event relating to the Company, the assets to be acquired thereunder, or the Business, excluding any obligations of the parties under the Transaction.

### Deposit

In the event our proposal is accepted, GPM and Oak Street will be prepared to submit the $13.5 million cash deposit, which will constitute the Advanced Proceeds.

### Estimated Time to Sign and Close

Mountain Express Oil Company
August 4, 2023
Page 7 of 9

Subject to GPM having access to the Company's records and information requested by GPM in order to, *inter alia*, apply for and obtain all required licenses and permits to operate the Business, GPM would strive to close within 60-90 days of the execution and delivery of the definitive Agreement.

Additionally, in order to efficiently move toward closing of the Transaction, the Company shall agree to use its commercially reasonable efforts to have the DIP lenders provide a conflict waiver so that Greenberg Traurig LLP can represent GPM on securities matters related to the Transaction.

### Approval and Necessary Consents

Senior management has approved GPM submitting this proposal.  The Transaction will be subject to approval by GPM's board of managers and the Board of ARKO Corp.

GPM will further need to obtain all other required governmental permits and authorizations in order to consummate the Transaction, and the timing of obtaining such permits and authorizations would depend on the applicable regulatory agencies.  We believe that the approval and notification process will proceed efficiently given GPM's extensive experience with the processes required.

### Capital Sources

As of today, GPM has more than $800 million between cash on hand, cash equivalents, and available lines of credit for acquisitions. Also as was publicly announced, on May 3, 2021, GPM entered into an agreement with Oak Street Real Estate Capital, LLC ("Oak Street") for Oak Street to acquire real estate assets from and/or on behalf of GPM and its affiliates and to lease those assets to GPM and its affiliates, and on May 2, 2023 this commitment was extended through September 30, 2024 and amended to provide availability of up to $1.5 billion for new transactions entered into after May 2, 2023.  Accordingly, **no financing contingency will be required**.

### Employees

GPM would be interested in hiring the Company's operations-level, field and certain other employees, subject to GPM's normal hiring process and background-checking procedure.  GPM's acquisition on-boarding process will facilitate a smooth transition for all such employees.

### Contacts

All correspondence with GPM shall be directed to:

| | |
|---|---|
| GPM Investments, LLC | GPM Investments, LLC |
| Attn: Arie Kotler, CEO | Attn: Maury Bricks, General Counsel |
| 8565 Magellan Parkway | 8565 Magellan Parkway |
| Suite 400 | Suite 400 |
| Richmond, VA 23227 | Richmond, VA 23227 |
| Ph: 804-730-1568 x1171 | Ph: 804-730-1568 x1109 |
| Fax: 240-525-5520 | Fax: 804-559-3285 |
| e-mail: ak@gpminvestments.com | mbricks@gpminvestments.com |

Mountain Express Oil Company
August 4, 2023
Page 8 of 9

*Other Assumptions*

This proposal is not intended to constitute a binding and enforceable contract and may be withdrawn for any or no reason.  The terms of this proposal are proprietary to GPM and may not be shared with any third parties other than financial and legal advisors assisting the Company in this transaction or as required by the Bankruptcy Court.

**NOTWITHSTANDING ANYTHING SET FORTH HEREIN TO THE CONTRARY, THE TERMS OF THIS PROPOSAL AND ANY AND ALL DISCUSSIONS BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, SHALL BE <u>NON-BINDING</u> AND SHALL NOT IN ANY WAY OBLIGATE ANY PARTY HERETO TO PERFORM ANY TRANSACTION OUTLINED OR DESCRIBED HEREIN, OR ANY OTHER TRANSACTION, OR TO CONTINUE THEIR DISCUSSIONS WITH RESPECT HERETO OR THERETO.  SUCH PARTIES SHALL ONLY BECOME LEGALLY BOUND WITH RESPECT TO ANY SUCH TRANSACTION IF AND WHEN THEY EXECUTE AND DELIVER DEFINITIVE TRANSACTION DOCUMENTS WHICH ARE MUTUALLY ACCEPTABLE TO THE PARTIES TO SUCH DEFINITIVE TRANSACTION DOCUMENTS.**

As we hope is obvious from the foregoing, we are enthusiastic about the prospect of acquiring the Business.  We look forward to receiving your response as soon as possible.  Please feel free to contact Arie Kotler at (313) 779-0906 with any questions or comments.

Very truly yours,

GPM INVESTMENTS, LLC

By: _____
     Arie Kotler
     CEO

By: _____
     Maury Bricks
     General Counsel

STRICTLY CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY

**Exhibit A**
**Approved Budget**

| 13 Week Cash Flow Unaudited Forecast ($ in '000s) | Week 1 Forecast 28-Jul-23 | Week 2 Forecast 4-Aug-23 | Week 3 Forecast 11-Aug-23 | Week 4 Forecast 18-Aug-23 | Week 5 Forecast 25-Aug-23 | Week 6 Forecast 1-Sep-23 | Week 7 Forecast 8-Sep-23 | Week 8 Forecast 15-Sep-23 | Week 9 Forecast 22-Sep-23 | Week 10 Forecast 29-Sep-23 | Week 11 Forecast 6-Oct-23 | Week 12 Forecast 13-Oct-23 | Week 13 Forecast 20-Oct-23 | Week 14 Forecast 27-Oct-23 | Total 14-Week Period WK 07/28 - WK 10/27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | | | | | | |
| Net Fuel Profit | | | | | | | | | | | | | | | |
| Rent Income | | | | | | | | | | | | | | | |
| Net Retail Supporting Operations | | | | | | | | | | | | | | | |
| Other Receipts | | | | | | | | | | | | | | | |
| **Total Operating Receipts** | | | | | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| Rent Expense | | | | | | | | | | | | | | | |
| Payroll & Benefits | | | | | | | | | | | | | | | |
| Vendor Disbursements | | | | | | | | | | | | | | | |
| Utilities & Insurance | | | | | | | | | | | | | | | |
| Tax | | | | | | | | | | | | | | | |
| Other Operating Disbursements | | | | | | | | | | | | | | | |
| **Total Operating Costs** | | | | | | | | | | | | | | | |
| **Operating Cash Flow** | | | | | | | | | | | | | | | |
| **Restructuring Related** | | | | | | | | | | | | | | | |
| Restructuring Fees | | | | | | | | | | | | | | | |
| Employee Retention | | | | | | | | | | | | | | | |
| DIP Interest & Fees | | | | | | | | | | | | | | | |
| Other Restructuring Related | | | | | | | | | | | | | | | |
| **Total Restructuring Related** | | | | | | | | | | | | | | | |
| **Net Cash Flow** | | | | | | | | | | | | | | | |
| **Cash (Unrestricted)** | | | | | | | | | | | | | | | |
| Beginning Balance | | | | | | | | | | | | | | | |
| Net Cash Flow | | | | | | | | | | | | | | | |
| (+/-) DIP Draws / (Repayments) | | | | | | | | | | | | | | | |
| (+) Incremental Funding Need for Operations | | | | | | | | | | | | | | | |
| **Ending Unrestricted Cash Balance** | | | | | | | | | | | | | | | |
| **Tax Escrow** | | | | | | | | | | | | | | | |
| Beginning Balance | | | | | | | | | | | | | | | |
| (+/-) DIP Draws / (Repayments) | | | | | | | | | | | | | | | |
| (-) Tax Payments | | | | | | | | | | | | | | | |
| **Ending Tax Escrow Balance** | | | | | | | | | | | | | | | |
| **DIP** | | | | | | | | | | | | | | | |
| Beginning DIP Balance | | | | | | | | | | | | | | | |
| (+/-) DIP Draws / (Repayments) | | | | | | | | | | | | | | | |
| (+) Incremental Funding Need for Operations | | | | | | | | | | | | | | | |
| **Ending DIP Balance Excl. Roll Up** | | | | | | | | | | | | | | | |