IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| MOUNTAIN EXPRESS OIL COMPANY, *et al.,* | Case No. 23-90147 (DRJ) |
| Debtors.[1] | Jointly Administered |
| | **Related to Docket Nos. 701, 717, 1109, 1168, 1190, 1192, 1194** |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
STATEMENT AND RESERVATION OF RIGHTS WITH RESPECT TO
DEBTORS' NOTICE OF SUCCESSFUL BID AND POST-AUCTION STATUS REPORT**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors in possession (the "Debtors"), by and through its undersigned counsel, hereby submits this statement and reservation of rights (the "Statement") to (i) the Debtors' *Corrected Notice of Successful Bid for the Sale of Substantially All of Debtors' Assets* [Docket No. 1192] (the "Successful Bidder Notice") filed on August 4, 2023, and (ii) *Debtors' Post-Auction Status Report* [Docket No. 1194] (the "Report") filed on August 5, 2023.[2] In support of this Statement, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1. It has become increasingly clear to the Committee that the Debtors and the DIP Lenders are not behaving like rational economic actors and that the relationship between those

---

[1] A complete list of each of the Debtors in the Chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/mountainexpressoil. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in the Chapter 11 cases is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022.

[2] Capitalized terms not otherwise defined herein shall have the meanings set forth in the Status Report.

1

parties has devolved into one of mistrust and blame shifting. And the Committee finds itself now in the unenviable position of having to wade through the rhetoric and hyperbole exchanged by the parties to determine what makes the most sense for these cases and the real stakeholders.

2. On the one hand, the DIP Agent has called a default under the DIP Facility, accelerated all amounts due thereunder,[3] and terminated the Debtors' use of cash collateral based on the Debtors' failure to once again[4] adhere to the milestones approved through the Final DIP Order. The DIP Agent has made it clear that it intends to seek stay relief and exercise its remedies under the Final DIP Order in the near term.[5] The DIP Agent also may or may not seek to convert these chapter 11 cases to those under chapter 7 of the Bankruptcy Code, putting the Debtors in the position of having to support a sale transaction that is wrought with problems and seek emergency relief from this Court for the non-consensual use of cash collateral at the hearing previously scheduled to approve a sale transaction.[6]

3. On the other hand, the Debtors have expended time, estate funds, and resources undertaking a sale process that was doomed from the start. The Debtors admittedly could not provide prospective bidders with anything approaching sufficient diligence information to allow them to formulate actionable bids,[7] and the Debtors did not shift their focus away from an all-asset sale to the consideration of sales where certain assets and buyers were packaged together until it was too late for those bids to be actionable under the DIP milestones. And now the Debtors intend to seek approval, on an expedited basis, of a transaction based on a non-binding letter of intent

---

[3] *See* Docket No. 1168.

[4] *See* Docket No. 735.

[5] *See* Docket No. 1168.

[6] *See* Docket No. 1197.

[7] *See* Report, ¶ 17.

(the "LOI") submitted by GPM Investments, LLC and its subsidiaries and affiliated entities (collectively, "GPM") that contains seemingly unachievable concessions as conditions precedent to the transaction (the "Transaction"), and a release of causes of action that at the beginning of the case appeared to have real potential value according to the Debtors, and if the Transaction is not approved, the Debtors have suggested that dismissal of these cases would be appropriate.[8]

4. So does the Committee support the DIP Lenders' position and allow these cases to be converted to chapter 7, ***in which case, there would be no recovery to general unsecured creditors***, or does the Committee support the Debtors' position and allow the proposed transaction to move forward, ***in which case, there would also be no recovery to general unsecured creditors?***[9] Or does the Committee step in and attempt to turn down the volume in these cases and drive the parties to a rational economic solution that preserves and produces value to all stakeholders and saves jobs in the process? Is the solution that the parties engage in mediation before Judge Isgur or Judge Lopez, assuming the Debtors and DIP Lenders would agree to get into a room together and come up with a tenable solution?

5. One thing is certain. While the Committee would absolutely prefer a path that avoids the conversion of these cases, preserves jobs, and sells the Debtors' business as a going concern, the option presented by the Debtors is unworkable based on the information the Committee has at this point in time. Indeed, the proposal outlined in the non-binding LOI, the Debtors' description of the transaction in the Report, and certain information provided to the

---

[8] *See id.*, at ¶ 46, 47.

[9] Pursuant to the Transaction, all Excluded Assets would go to satisfy the claims of the DIP Lenders. *See id.*, at p. 2, ¶¶ 24, 26, 33. Additionally, it is unclear whether the Transaction will be sufficient to satisfy allowed administrative expense claims. The Committee has requested a schedule of outstanding, accrued administrative expenses from the Debtors, which the Debtors provided to the Committee the afternoon of August 6, 2023. According to the information the Debtors provided, they are not current on 65% of their post-petition non-professional fee administrative expense payments, and owe approximately $2.5 million on account of same.

Committee since the close of the Auction all make one thing clear: the Committee has more questions than answers and is not optimistic those questions can or will be answered on the one-week timeframe the Debtors are proposing for approval of the Transaction.

6. For example, in addition to the Transaction giving the Committee pause in terms of its feasibility, the Committee is very concerned with the Debtors' agreement to grant broad releases to ARKO Corp. ("ARKO"), its wholly-owned subsidiary GPM, and Oak Street Real Estate Capital, LLC ("Oak Street"), GPM's lender and business partner,[10] on the Debtors' one-week timeline.[11] Of particular concern is the Debtors' willingness to grant releases in favor of Oak Street when the Debtors asserted at the beginning of these cases that Oak Street was veritably *the sole impetus* for the Debtors' bankruptcy filing.[12] Also of concern is the fact that the Debtors are seeking approval of the Transaction, which appears to cloak Oak Street's monetary contributions as concessions instead of what they really are—a request to approve post-petition financing on less than fourteen (14) days' notice and without any associated challenge period.[13] It is further concerning that all the Debtors' leases appear to be above-market, including their leases with Oak Street,[14] which could give rise to valuable causes of action against Oak Street—potential causes of action that the Debtors are willing to abandon without investigation despite the fact that general unsecured creditors are out of the money in these chapter 11 cases and the Debtors' sale process was a bust. That is simply unacceptable.

---

[10] *See infra* n.30.

[11] The releases did not appear in any prior iterations of any letters of intent submitted by GPM/ARKO but appeared for the first time in the LOI that was shared with the Committee on shortly before the Debtors went on the record on August 6, 2023 to declare GPM as the successful bidder for their assets.

[12] *See Declaration of Michael Healy in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 57], at ¶¶ 6-8 (preliminary statement), and ¶¶ 26-38 (events leading to chapter 11); *see also* Mar. 12, 2023 Hr'g Tr. 10:23-15:2.

[13] *See* Fed. R. Bankr. P. 4001(b)(2).

[14] Multiple bidders have required lease concessions in connection with the sale process. *See e.g.,* Report, ¶ 12.

7.     It goes without saying that the Committee cannot adequately investigate the claims and causes of action the Debtors are seeking to release through an order approving the Transaction (the "Sale Order") in the one-week timeframe proposed by the Debtors.[15]  Thus, to the extent the Court is inclined to enter a Sale Order that includes good-faith findings in favor of GPM and releases in favor of GPM, ARKO, Oak Street, and to-date unknown additional parties affiliated with them, the Sale Order should condition these provisions on an investigation period of 90 days that would run concurrently with GPM's 90-day closing timeline.

8.     All said, the Committee would support the Debtors' use of cash collateral for ten days or so days[16] to allow the Debtors, the Committee, and the DIP Lenders time to engage in meaningful discussions and exchanges of information regarding the Transaction.[17]

---

[15]   The Debtors have indicated that they have reviewed the Oak Street leases and have not found any actionable claims or causes of action.  The Debtors have made similar statements to the Committee in the past, but, despite requests for their evaluations, memoranda, presentations, etc. regarding their investigations and analyses, the Debtors have heretofore refused to share any of this information.  And the Debtors' investigation into the Oak Street leases is no exception.

[16]   Based on discussions with Debtors' counsel, the Debtors do not anticipate any diminution in the value of the DIP Lenders' collateral during this period.

[17]   The Committee is a Consultation Party, as that term is defined in the Bid Procedures.  *See* Bid Procedures Order, Ex. 1, § II.  The Bid Procedures provide that the Debtors shall consult with the Consultation Parties with respect to: (a) the adequacy of the financial support provided by potential bidders (*id.*, at § II.c.); (b) any proposed waiver of the bid requirements set forth in the Bid Procedures (*id.,* at § II.); (c) whether a potential bidder has submitted acceptable preliminary bid documents (*id.*); (d) with respect to the Debtors' decision to decline to provide potential bidders with additional information (*id.*); (e) with respect to the Debtors' decision to modify diligence materials in situations where a bidder is a competitor, or is affiliated with a competitor, of the Debtors (*id.*, at § III.); (f) with respect to the Debtors' determination that a bidder is no longer qualified (*id.*, at § III.B.); (g) with respect to the Debtors' decision to disqualify bidders based on a failure to adhere to the communications protocols set forth in the Bid Procedures (*id.*, at § III.C.); (h) any determination that a bid satisfies with the bid requirements set forth in the Bid Procedures (*id.*, at § V.); (i) any determination as to whether terms set forth in a modified asset purchase agreement are "materially more burdensome" (*id*, at § V.c.); (j) whether evidence of a bidders ability to obtain all necessary approvals is satisfactory (*id.*, at § V.i.); (k) with respect to the Debtors' decision to approve joint bids (*id.*, at § V.n.); (l) modifications to an expected closing date beyond August 15, 2023 (*id.*, at § V.r.); (m) whether a bid is a "Qualified Bid" (*id.*, at § V.); (n) with respect to any decision to conducting more than one sale process or auction as regards bids for overlapping assets (*id.*); (o) determination of the highest or otherwise best starting bid (*id.*, at § VII.); (p) with respect to the Debtors' decision to select more than one bid to serve as the starting bid (*id.*); (q) with respect to the Debtors' decision to cancel the auction in the event no bids are qualified (*id.*, at § VIIII.); (r) with respect to the Debtors' decision to designate a stalking horse bid (*id.*); (s) with respect to acceptable bid increments the auction (*id.*, at § X.); (t) the reasonableness of the amount of time that elapses between bids (*id.*, at § X.g.); (u) any acceptance of combined bids (*id.*, at § X.i.); (v) with respect to the Debtors' decision to close or adjourn the auction (*id.*, at § X.j., k.); (w) whether bidders are permitted to submit additional information during the auction (*id.*, at § X.k.); (x) with respect to the Debtors' decision to include

## JURISDICTION AND VENUE

9. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Committee confirms its consent to the entry of a final order with respect to these matters, if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

10. Venue of the Chapter 11 Cases in this district is proper under 28 U.S.C. §§ 1408 and 1409.

---

additional procedures at the auction that are not inconsistent with the Bid Procedures Order or the Bankruptcy Code (*id.*, at § X.l.); (y) with respect to the Debtors' determination that a bid is the "Successful Bid" (*id.*, at § XI.); (z) with respect to the Debtors' designation of a backup bidder (*id.*, at § XII.); (aa) with respect to "(a) extending the deadlines set forth in these Bid Procedures; (b) adjourning the Auction; (c) modifying the Auction Procedures or adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; (e) rejecting any or all Bids or Qualified Bids; and (f) adjusting the applicable minimum overbid increment, including by requesting that Qualified Bidders submit last or final bids on a "blind" basis." (*id.*, at § XV.); and (bb) with respect to the Debtors' decision to terminate the sale process (*id.*). The Bid Procedures also require the Debtors to promptly share "[a]ll information disclosed by any Potential Bidder in connection with all of the preceding [bid] requirements" with the Consultation Parties. *Id.*, at § V.

The Debtors have failed to comply with the Committee's consultation rights in several instances, including, without limitation, but failing to share "[a]ll information disclosed by any Potential Bidder in connection with all of the preceding [bid] requirements" despite the Committee's repeated requests for same, and otherwise failing to consult the Committee with respect to (i) the adequacy of the financial support of bidders—the Committee has received no information in this regard; (ii) whether a bidder has submitted acceptable preliminary bid documents—the Committee received copies of the initial bids, but never received copies of any revised bids; (iii) whether a bid satisfies the bid requirements; (iv) whether a bid is the highest or otherwise best starting bid; (v) whether a closing date beyond August 15, 2023 should be accepted; (vi) whether a bid is a "Qualified Bid"); (vii) whether a bidder is permitted to provide additional information at the auction, which may have been countenanced in connection with any amended bids that the Committee has not yet seen; (viii) whether a bidder is the "Successful Bidder"; (ix) whether to adjourn or close the auction; and (x) a decision to reject any bids.

6

**STATEMENT**

**A. Proposed Transaction**

11. The Debtors have determined that the Transaction represents the highest and best offer for its assets.[18] Based on the LOI, the Transaction contemplates the following terms, conditions, and contingencies:

    a. **Advanced Proceeds.**

        (i) Pursuant to the LOI, GPM or (Oak Street)[19] will deliver $13.5 million,[20] (a) ***subject to*** the Court having entered an order rejecting the Oak Street leases (the "Oak Street Leases"), and (b) ***contingent upon*** the Debtors' use of the Advanced Payment in accordance with the "Approved Budget" attached to the LOI as an exhibit.[21]

        (ii) Any use of the Advanced Payment in "material violation" of the Budget would constitute a breach of the "definitive Agreement."[22]

        (iii) Additionally, "[a]ny available savings/excess cash flow will inure to the benefit of the Company's DIP Lenders, after payment of the $1 million portion of the transaction fee owed to Raymond James on account of the closing of the Transaction that it has agreed to defer."[23]

---

[18]   *See e.g.,* Report, ¶ 13.

[19]   *See infra.* n.30.

[20]   Upon information and belief, the deposit referenced in the LOI refers to the deposit GPM was required to fund under the Bid Procedures order in advance of the Bid Deadline. *See* Bid Procedures Order, Ex. 1, § V.g. ("Each Bid must be accompanied by a cash deposit by wire transfer to an escrow agent selected by the Debtors with the DIP Agent's consent in an amount equal to 10% of the cash purchase price of the bid (the "Good Faith Deposit"). The Qualified Bidder must deliver the Good Faith Deposit on or before the Bid Deadline."). Based on the language in the LOI, it is unclear to the Committee whether GPM submitted its Good Faith Deposit in advance of the Bid Deadline. *See e.g.,* LOI p. 6 ("In the event our proposal is accepted, ***GPM and Oak Street will be prepared to submit the $13.5 million cash deposit***, which will constitute the Advanced Proceeds.") (emphasis added).

[21]   LOI, p. 1.

[22]   *Id.*, at p. 6.

[23]   *Id.,* at p. 3. The Report is inconsistent with the LOI in several places, including with respect to the characterization of Raymond James' fee concession. Specifically, the Report provides that "Raymond James has agreed to ***forgo $1 million*** in transaction fees[.]" Report, ¶ 35 (emphasis in original). The Debtors' characterization of the concession implies that Raymond James has agreed to waive $1 million of its sale-related fee. However, this is belied by the language of the LOI cited above, as well as the statements Geoffrey Richards made at the Auction. *See* Aug. 6, 2023 Auction Tr. 19:14-20:2 (the "Auction Transcript") (Richards: "Importantly, Raymond James

b. **Acquisition of Incentive Payments.** Under the Transaction, GPM would acquire pre-closing accrued by unpaid incentive payments under existing fuel agreements with ExxonMobil.[24]

c. **Purchase Price Consideration.** The total consideration under the LOI is $49 million, which amount is allocated as follows:

(i) $13 million[25] for fuel and usable, merchandise inventory at each of the Debtor-operated locations in which GPM becomes a tenant and, with respect to fuel inventory, any consignment sites where GPM becomes a fuel supplier, together with "non-defaulted current collectable accounts receivable of the Company."[26]

(ii) $15.25 million[27] for twenty-three (23) travel centers and all related assets (the "Travel Centers"), which acquisition *is conditioned upon* significant lease concessions by non-Oak Street landlords (the "Non-Oak Street Lessors"), as discussed below.[28]

---

has agreed to reduce its M&A fee by $1 million **subject to recapture if there are cash flow savings prior to close**…The Lenders would also be entitled to any surplus funds not spent through the budget **after Raymond James has [been] paid its $1 million deferred fee.**") (emphasis added).  A true and correct copy of the Auction Transcript is attached hereto as **Exhibit A**.

[24] *Id.*, at p. 2.  The Committee has not been provided any information as to the value of these incentive payments, and therefore cannot evaluate the value of the overall Transaction.

[25] Per the LOI, this amount is based on FTI's valuation, which has not been provided to the Committee.  *See id.*, at p. 3.

[26] *See id.*

[27] Per the LOI, this amount is based on FTI's valuation, which has not been provided to the Committee.  *See id.*, at p. 3.

[28] *See id.*

(iii) $18.75 million,[29] which will be *paid and/or credited to GPM by Oak Street*,[30] and consists rent deferrals through closing by Oak Street, which are estimated to be approximately $12 million to $17 million.[31]

(iv) $2 million for assignment of Debtors' rights to funds related to pre-closing accrued and unpaid subtenant rent from Brothers/GSS and Imperial,[32] which FTI has valued at approximately $5.6 million, plus another $1.4 million per month on a go forward basis, which equates to a purchase price of $2 million for potential upside of $6 million.[33]

d. **Lease Concession Contingencies.** The LOI provides that the order approving the Transaction (the "Sale Order") must include the rejection of all non-Oak

---

[29] In the Report, the Debtors indicate that Oak Street will contribute, on behalf of ARKO/GPM, $18.75 million of the purchase price (¶ 34(d)), but also indicates that Oak Street is contributing $17.5 million (¶ 35). Further, the LOI requires that the Debtors obtain an order of the Court rejecting the Oak Street Leases either through the Sale Order or pursuant to another order entered concurrently with the Sale Order.

[30] Generally speaking, the Committee is not clear on what the exact relationship between GPM, ARKO, and Oak Street is, and what it does know is based on the following description in the LOI: "GPM entered into an agreement with Oak Street Real Estate Capital, LLC ("Oak Street") for Oak Street to acquire real estate assets from and/or on behalf of GPM and its affiliates and to lease those assets to GPM and its affiliates, and on May 2, 2023 this commitment was extended through September 30, 2024 and amended to provide availability of up to $1.5 billion form new transactions entered into after May 2, 2023." *See* LOI, p. 7; *see also* ARKO Corp.'s 8-K filing dated May 8, 2023, at https://www.arkocorp.com/sec-filings/all-sec-filings?page=2. Further, according to ARKO's the May 3, 2023 8-K filing, GPM and an Oak Street affiliate are parties to "a standby real estate purchase, designation and lease program agreement (the "Program Agreement")." According to the 8-K, the Program Agreement:

- Includes an agreement by Oak Street "to purchase, subject to the conditions contained in the Program Agreement, up to $1.0 billion of convenience store and gas station real property, including in connection with purchase agreements that GPM or an affiliate thereof, may from time to time enter into to acquire convenience stores and gas stations from third parties (each, a "Property")."

- Provides that "upon any acquisition of a Property by Oak Street, or an affiliate thereof, GPM, or an affiliate thereof, would enter into a triple-net lease agreement with Oak Street or such affiliate pursuant to which GPM or such affiliate would lease such Property from Oak Street or such affiliate based upon commercial terms contained in the Program Agreement."

- With some exceptions, prohibits GPM from selling or designating "any Property pursuant to a sale-leaseback or similar transaction without first offering such Property to Oak Street in accordance with the terms and conditions of the Program Agreement."

*See* https://www.sec.gov/Archives/edgar/data/1823794/000119312521153351/d177933d8k.htm.

This may or may not be the extent of the relationship between GPM, ARKO, and Oak Street, but, at the very least, the intricacies of the relationship between these parties raises concerns for the Committee with respect to the inclusion of any findings of fact under section 363(m) of the Bankruptcy Code until such time that the Committee has been able to undertake a full investigation on an appropriate timeline.

[31] The Committee has not been provided support for this broad estimate.

[32] The Debtors are currently in litigation with Brothers and Imperial. *See* Adv. Pro. No. 23-03096 and Adv. Pro. No. 23-03111. It is unclear whether GPM will take over or fund the liquidation of the Debtors' claims against these defendants.

[33] Per the LOI, this amount is based on FTI's valuation, which has not been provided to the Committee. *See* LOI, p. 3.

Street leases (the "Non-Oak Street Leases") by August 31, 2023 unless the landlords at those locations agree to the following terms:[34]

- (i) New Leases. An agreement to enter into new leases with GPM with minimum terms of fifteen (15) years with six (6) five-year renewal terms.[35]

- (ii) Post-Closing Rent Concessions. An agreement to adhere to a 2:1 store level rent ratio, which is subject to adjustment at 3- and 6-month intervals, and which may not be finalized until the 12th or 13th month following the closing.[36]

- (iii) Assumption of Debtors' CapEx Obligations. An agreement to "assume and pay for any required CapEx payments in order to get the stores back to operating condition/going concern condition[,]" which will be added to rental payments under the new leases.[37]

- (iv) Assumption of Debtors' Environmental Liabilities. An agreement to "assume all pre-closing environmental and other liabilities and obligations related to the stores."[38]

- (v) Pre-Closing Rent Concessions. The Transaction is dependent on the Non-Oak Street Lessors agreeing to waive rent through the closing of the Transaction.[39]

e. **Excluded Assets.** The Transaction does not contemplate the acquisition of the Debtors' owned real estate, which "Raymond James has been [sic] valued at approximately $3 million[,]"[40] or prepetition claims and causes of action other than those released in the Sale Order.[41]

---

[34] See id., at p. 4.

[35] See id.

[36] See id., at p. 5.

[37] See id.

[38] See id. In the Report, the Debtors note that "[t]he Auction process was underscored by various shortcomings with the Debtors' ability to meet due diligence needs of bidders[,]: which informational deficits included "complete historical information about store level environmental and zoning compliance." Report, ¶ 17. Thus, it is conceivable that the Debtors are asking landlords to assume environmental liabilities of unknown quantity and severity.

[39] See infra ¶ 11(d).

[40] See LOI, p. 3. The Committee requested but has not received this valuation. It is also unclear to the Committee why these assets were not sold pursuant to the Bid Procedures or some other sale procedures at any point in these cases.

[41] See id., at p. 3.

    f. **Section 363(m) Findings.** Under the LOI, the Sale Order must include specific findings of fact in the Sale Order, including a finding of good faith under section 363(m) of the Bankruptcy Code.[42]

    g. **Releases.** The LOI contemplates that the Sale Order will provide a full release in the Sale Order of "GPM, Oak Street, and each of their respective affiliates, successors and/or assigns, and each of its and their respective current or former officers, directors, members, partners, equity holders, and managers . . . ."[43]

    h. **Closing.** The LOI provides that GPM will "strive to close within 60-90 days of the execution and delivery of the definitive Agreement."[44]

    i. **Greenberg Traurig Conflict Waiver.** Per the LOI, the Debtors "shall agree to use its commercially reasonable efforts to have the DIP lenders provide a conflict waiver so that Greenberg Traurig LLP can represent GPM on securities matters related to the Transaction."[45]

    j. **Employees.** The LOI provides that "GPM would be interested in hiring the Company's operation-level field and certain other employees . . . .".[46]

    k. **Non-Binding.** The LOI is non-binding pursuant to its terms.[47]

B. <u>**Debtors' Assumptions Regarding the Transaction**</u>

12. Based on information provided to the Committee after the Auction concluded on August 5, 2023, the Debtors have made the following assumptions in throwing their support to the Transaction:[48]

---

[42]    *See id.*, at pp. 5-6.

[43]    *See id.*, at p. 6. The Committee does not know the full scope of the parties to be released and therefore cannot assess the value of same.

[44]    *See id.*, at p. 6-7.

[45]    *See id.*, at p. 7. Greenberg Traurig LLP serves as counsel to the DIP Agent in these cases, and as counsel to Raymond James in matters unrelated to these cases. *See* Docket No. 2. The inclusion of this waiver is puzzling to the Committee as Greenberg Traurig LLP does not represent the Debtors and thus, it is unclear to the Committee how or why the Debtors were assigned this task.

[46]    *See id.* The Debtors do not employ persons at the Dealer-Operated Locations, so the employees that GPM is sort of agreeing to employ would cover approximately 600 employees, and not the assumed "1-4 persons" per 400 Dealer-Operated locations. *See* Report, ¶ 14. To the extent the Non-Oak Street Lessors decline to grant the various rent and other concessions required under the LOI, those locations presumably would not be acquired by GPM and hence, those jobs would not be preserved.

[47]    *See* LOI, p. 8.

[48]    *See* **Exhibit B**, which the Committee has filed under seal.

a. The DIP Lenders will agree to a buy-out of $46.85 million of their position under the DIP for a purchase price of $20 million;

b. All accrued and unpaid lender professional fees will be paid out the proceeds of the Transaction;

c. Oak Street will waive DIP interest and fees once they purchase the DIP Lenders' debt position;

d. $17.5 million is sufficient to bridge to the closing of the Transaction, which amount assumes that (i) 50% of the non-REIT properties do not agree to rent deferrals and are rejected beginning in September—i.e., that 50% will agree, and (ii) 100% deferral of all other rent payments;

e. The non-payment of approximately of $2 million of the fees and expenses of the Committee's professionals in excess of the carve-out under the Final DIP Order;[49]

f. A commitment by the Committee's professionals to a fee cap of $279,000[50] through the closing of the Transaction;[51]

g. Employees at the Debtor-Operated Locations will be transitioned to GPM.

## C. The Committee Lacks Critical Information Regarding the Transaction and the Debtors' Assumptions Regarding Same

13. Based on the Committee's review of the LOI and certain information provided by the Debtors, the Committee is left with more questions than answers regarding the Transactions and the assumptions underlying same, including, without limitation:[52]

---

[49] The Debtors never made this request to the Committee's professionals, who learned about it when they received the sources and uses from the Debtors.

[50] Immediately following the Debtors' announcement on the record at the Auction that the Debtors had selected GPM as the successful bidder for the Debtors' assets, the Committee requested an analysis of the sources and uses of the purchase price under the LOI. The Debtors shared their analysis with the Committee's professionals Friday evening, August 4, 2023 (the "Analysis"), which is attached hereto as Exhibit B. The Debtors shared the supporting schedules for the Analysis late in the afternoon on August 6, 2023. The Analysis included an illustrative 13-week cash forecast, which listed a presumptive cap on the go-forward fees of the Committee's professionals of $279,000 in the aggregate.

[51] The Analysis provides a fee cap for the Debtors' professionals of $8.5 million for the same period.

[52] To date, the Committee has not received satisfactory information with respect to the bids, the Transaction, or the sale process generally, despite frequent and repeated requests by the Committee's professionals for same, and despite the Debtors' obligations under the Bid Procedures Order to share all such information with the Committee. *See supra* n.17.

    a. the actual consideration being provided under the LOI and by whom;[53]

    b. whether GPM submitted a Good Faith Deposit prior to the Bid Deadline as required under the Bid Procedures;[54]

    c. whether the Advanced Payment (which, like a typical DIP, is tied to an Approved Budget), and/or the rent deferrals by Oak Street are tantamount to debtor-in-possession bridge financing that the Debtors are seeking to have approved on a final basis in less than a week's time and without affording the Committee an appropriate challenge period;[55]

    d. With respect to the fee concessions agreed to by the Debtors' professionals:

        (i) How the $2.05 million reduction PSZJ and FTI have agreed to take with respect to accrued but unpaid fees is allocated between them;

        (ii) Whether the $700,000 of fees PSZJ and FTI have agreed to reduce on a go-forward basis is aggregated or whether each professional has reduced their fees by $700,000; and

        (iii) The impact of such reductions when compared to the total amount of accrued and anticipated fees of the Debtors' professionals in these cases;

    e. Information with supporting data regarding the lease concessions Oak Street has agreed to make in favor of GPM;

    f. The nature and extent of the relationship between Oak Street, ARKO Corp., and GPM, and thus, whether or not a section 363(m) finding is warranted;

    g. The value of the claims to be released through the Sale Order;[56]

    h. The parties being released through the releases under the Sale Order;

    i. The value of the Excluded Assets, including the real estate;

---

[53] It is unclear to the Committee what comprises the delta between the valuation of Oak Street's rent deferrals at $18.75 million and the estimate of $12 million to $17 million of deferred rent. *See* LOI, p. 3.

[54] *See supra* n.20.

[55] *See* Bankruptcy Rule 4001(b)(2) (requiring a minimum of 14-days' notice of a hearing to requests approval of post-petition financing on a final basis).

[56] The bid analysis the Committee received on August 6, 2023 does not note the value assessed to the released claims.

j.  At what point in time the Debtors decided to forsake all other bids to focus on the GPM bid;[57]

k.  The Debtors' analysis of the feasibility of the rent and other significant concessions required of the Non-Oak Street Lessors under the LOI;[58]

l.  What happens to locations where the Non-Oak Street Lessors decline to make the required lease concessions after the applicable leases are rejected, including whether there will be a purchase price adjustment and the estimated amount of same;[59]

m.  What happens if GPM is unable to close by end of 90 days, which is also the outside date for the Oak Street lease amendments;[60]

n.  Whether the $13.5 million the Debtors assert is sufficient to bridge to the closing of the Transaction;[61] and

o.  Whether the Transaction consideration will be sufficient to satisfy all allowed non-professional fee administrative claims.[62]

**D. If Approved, the Releases and Findings of Fact Should be Subject to a Challenge Period of 90 Days**

14.  As noted above, the LOI requires that the Court enter a Sale Order that includes (a) broad releases of claims and causes of action in favor of GPM, ARKO, Oak Street, and host of unknown affiliated persons and entities thereof, and (b) specific factual findings that GPM, and perhaps ARKO and Oak Street, acted in good faith as provided for in section 363(m) of the Bankruptcy Code.[63]  For the following reasons, this relief is unjustified based on the timeline the Debtors are pushing.

---

[57]  *See* Aug. 6, 2023 Auction Tr. 17:22-18:2.

[58]  The Report provides that "[t]he Debtors anticipate that the orderly exit offered by the Successful Bid will be highly persuasive to lessors and will encourage each of them to participate in a collective solution for the preservations of jobs and incomes." Report, ¶ 37.  The basis for this statement remains unclear to the Committee.

[59]  Oak Street is not obligated to take assignment of a certain threshold number of leases under the LOI.

[60]  *See* LOI, p. 4.

[61]  *See supra* ¶ 11.

[62]  *See supra* n.9.

[63]  *See supra* ¶ 11(g) & (f).

15. ***First***, the Committee has no information regarding what claims and causes of action, if any, are being released. The Debtors have provided no such information with the Committee, including the results of the Debtors' investigation into the released claims and determined that they were not actionable.[64] Moreover, the Committee first learned that GPM, ARKO, Oak Street were seeking full releases in connection with the Transaction ***two hours prior to the Debtors' announcement that it designated GPM as the "Successful Bidder" for their assets***. Thus, the Committee cannot form an independent view of the value, if any, of the claims and causes action the Debtors are agreeing to release, including whether the Oak Street Leases are "true leases" and if not, whether Oak Street perfected its interests therein, or whether the Debtors' estates have actionable causes of action under sections 547 and/or 548 of the Bankruptcy Code. And it goes without saying that the Committee will not be able to conduct its own investigation prior to next week's anticipated hearing to approve the Transaction and the releases into same and will not be able to do so in one week's time.

16. ***Second***, the Committee has not even scratched the surface in terms of understanding the relationship between GPM/ARKO and Oak Street; thus, it cannot conclude that those parties are entitled to good-faith finding under section 363(m) of the Bankruptcy Code. And again, the Committee is unlikely to conduct and conclude its own investigation with respect to same in the next week.

17. ***Third***, certain aspects of the LOI bear the badges of post-petition financing, including, without limitation, the requirement that the Advanced Payment be expended in accordance with the Approved Budget, the fact that the $18.75 million with be "***paid and/or***

---

[64] As noted in n.15, *supra*, the Debtors represented that they conducted an investigation into potential claims and causes of action against Oak Street that the Debtors are seeking to release in the Sale Order, but the Debtors have not shared any materials or supporting documentation as regards same with the Committee.

15

*credited to GPM by Oak Street*,"[65] and Oak Street's agreement to defer rent payments, which is essentially a form of post-petition financing.

18. Thus, to the extent the Court is inclined to approve the Transaction on the timeline proposed by the Debtors, any Sale Order that the Court enters should make the grant of the releases (including under section 363(n) of the Bankruptcy Code) and any 363(m) findings subject to a 90-day challenge period. A 90-day challenge period will run concurrently with the 3-month closing timeline required by GPM; thus, it will not prejudice GPM/ARKO, Oak Street, or any other releasee proposed by the Debtors, and it will afford the Committee sufficient time to investigate the claims that the Debtors are seeking to release in connection with the Transaction and whether a good-faith finding under section 363(m) in favor of GPM is appropriate.

## CONCLUSION

19. In sum, the Committee cannot support the Transaction at this time as it does not have information sufficient to understand the Transaction, including its economics, whether the proposed financing provided under the LOI is sufficient, the nature and extent of the claims and causes of action the Debtors are seeking to release under a Sale Order, and the relationship between GPM/ARKO and Oak Street such that the Committee could make a determination that those parties are entitled to a good faith finding under section 363(m) of the Bankruptcy Code. That said, the Committee does not believe that the dismissal or conversion of these cases to chapter 7 is appropriate at this time. Accordingly, the Committee supports the Debtors' request to use cash collateral for ten or so days so that the Debtors can provide the Committee with the information necessary for the Committee to take a position with respect to the Transaction, including the Debtors' representation that there will be no diminution of the DIP Lenders' collateral during that

---

[65] *See* LOI, p. 3.

time. Further, any Sale Order should include a 90-day challenge period so that the Committee may investigate the claims and causes of action the Debtors seek to release as well as the propriety of any factual findings of good faith in favor of GPM/ARKO/Oak Street. Finally, the Committee believes that these cases would benefit from the parties agreement to mediate their issues before Judge Isgur or Judge Lopez in a last-ditch attempt to avoid an expensive and time-consuming exercise on how best to exit chapter 11 in a way that minimizes damages to the economic stakeholders and other parties affected by these cases.

*[Remainder of page intentionally left blank.]*

## RESERVATION OF RIGHTS

20. The Committee reserves all rights to object to the proposed Transaction at any time prior to the hearing to approve the Transaction.

Dated: August 7, 2023
      Dallas, Texas

**MCDERMOTT WILL & EMERY LLP**

<u>/s/ Charles R. Gibbs</u>
Charles R. Gibbs (Texas Bar No. 7846300)
Marcus A. Helt (Texas Bar No. 24052187)
Jane A. Gerber (Texas Bar No. 24092416)
2501 North Harwood Street, Suite 1900
Dallas, Texas 75201-1664
Telephone: (214) 295-8000
Facsimile: (972) 232-3098
Email: crgibbs@mwe.com
       mhelt@mwe.com
       jagerber@mwe.com

-and-

Maris J. Kandestin (admitted *pro hac vice*)
The Nemours Building
1007 North Orange Street, 10th Floor
Wilmington, Delaware 19801
Telephone: (302) 485-3900
Facsimile: (302) 351-8711
Email:  mkandestin@mwe.com

*Counsel to the Official Committee of Unsecured Creditors*

**CERTIFICATE OF SERVICE**

The undersigned does hereby certify that a true and correct copy of the foregoing document was served by the CM/ECF system for the United States Bankruptcy Court for the Southern District of Texas on August 7, 2023.

The undersigned further certifies that he caused a true and correct unsealed version of the foregoing document to be served on August 7, 2023, by electronic mail on counsel for the Debtors, counsel for the DIP Agent and the United States Trustee as follows:

*DEBTORS*

| | |
|---|---|
| Michael D. Warner | mwarner@pszjlaw.com |
| Steven W. Golden | sgolden@pszjlaw.com |
| Jeffrey N. Pomerantz | jpomerantz@pszjlaw.com |
| Jeffrey W. Dulberg | jdulberg@pszjlaw.com |

*DIP AGENT*

| | |
|---|---|
| Shari L. Heyen | Shari.Heyen@gtlaw.com |
| John D. Elrod | ElrodJ@gtlaw.com |

*OFFICE OF THE U.S. TRUSTEE*

| | |
|---|---|
| Jayson B. Ruff | jayson.b.ruff@usdoj.gov |

*/s/ Charles R. Gibbs*
Charles R. Gibbs