IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>MOUNTAIN EXPRESS OIL COMPANY, *et al.*,<br><br>Debtors.<sup>1</sup> | Chapter 11<br><br>Case No. 23-90147 (DRJ)<br><br>(Jointly Administered) |

**FIRST HORIZON BANK, AS ADMINISTRATIVE AGENT'S OBJECTION TO DEBTORS' AMENDED <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE USE OF CASH COLLATERAL, (B) PROVIDING ADEQUATE PROTECTION, (C) MODIFYING THE AUTOMATIC <u>STAY, AND (D) SCHEDULING A FINAL HEARING</u>**

First Horizon Bank, as DIP Agent (the "<u>Agent</u>") objects (the "<u>Objection</u>") to the *Debtors' Amended <u>Emergency</u> Motion for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing* [Doc. 1196] (the "<u>Motion</u>") as set forth herein.[2] In support of its Objection, the Agent states as follows:

### INTRODUCTION

1. After conducting a failed and admittedly flawed sale process, the Debtors now seek the use of the Agent's cash collateral to effectuate a "transaction" that is neither in the best interest of creditors nor acceptable to the Agent. It also is a proposed transaction that the

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/mountainexpressoil. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 Cases is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022.

[2] All capitalized terms not specifically defined herein shall have the meaning ascribed to them in the Motion or in the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, Bankruptcy Rules 2002, 4001, 6004, And 9014, and Local Rule 4001-1 (I) Authorizing the Debtors to Use Cash Collateral and Obtain Post-Petition Financing, (II) Granting Liens and Providing Super-Priority Administrative Expense Status, (III) Granting Adequate Protection, and (IV) Granting Related Relief* [Doc. 332] (the "<u>Final DIP Order</u>").

1

Debtors previously agreed they would not pursue without the Agent's consent.[3]  Following months of hiding the Debtors' lack of fundamental accounting records and internal controls from the Court, the Agent, and other parties, the Debtors ignored the bid procedures, Final DIP Order, and prior agreements and conducted an "unconventional" sales process that resulted in no qualified bids from a qualified bidder or signed offer from the proposed buyer.  Instead, the Debtors seek additional time to negotiate an agreement based on an expression of interest outlining a sale transaction that would leave the DIP loan largely unpaid with no prospect for any distribution to the prepetition secured lenders and unsecured creditors.

2. The proposed non-binding, unsigned letter of intent will not maximize the value of the Debtors' assets but, instead, will affirmatively harm the estates by continuing the administrative expense cash burn and releasing potentially valuable claims against Oak Street and other unnamed parties.[4]  The Debtors admit in the *Post-Auction Status Report* [Docket No. 1194] (the "<u>Status Report</u>"),[5] that after borrowing over $46 million in DIP Financing, they and their employed professionals (including FTI and Grant Thornton) were incapable of populating a data room for prospective purchasers with basic financial statements and records.[6]  In the face of this remarkable admission, the Debtors ask the Court to permit them to continue their failed sale effort in breach of their agreements with the Agent.

---

[3] The Agent's consent rights in this regard are contained in the DIP Credit Agreement approved by an Order of this Court.
[4] Oak Street is the landlord that was highlighted by the Debtors at the first day hearings as the cause of this bankruptcy.  *See Declaration of Michael Healy in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 57] at pp. 3-5.  The Debtors' counsel also detailed this to the Court at the first day hearings.
[5] The Status Report is a gross mischaracterization of the events surrounding the sale process.  In fact, no auction occurred, and the Debtors did not consult with the Agent in any meaningful way.  The Debtors use an email sent by a disaffected representative of one of eight DIP lenders.  The Agent and the other six DIP lenders were not involved in that communication and did not authorize it.  The Debtors attempt to use that email to distract the Court from the economic reality of the proposed sale, which will be less favorable to the estates than a liquidation under chapter 7.
[6] Status Report, ¶ 17.

3. The result of the Debtors' expensive and protracted sale process is an unsigned letter of intent where the bulk of the proceeds will be used to partially fund these administratively insolvent estates rather than to repay the Agent for post-petition amounts loaned in good faith.[7] The proposed sale – in its present, vague form – is not a transaction bringing close to $49 million to the Debtors' secured and unsecured creditors. Rather, this non-binding expression of interest contains material contingencies and execution risks that likely will result in the headline "purchase price" being lowered substantially.[8] Even if the sale consideration does not drop (which it almost certainly will), the conversion of these cases to chapter 7 would likely yield a larger return to creditors than the proposed sale.

4. Regarding the details of the proposed cash collateral usage, the Debtors' budget for the next week presents more questions than it answers. For example, how can the Debtors be trusted with budgeting their expenses when they have missed their budgets (exceeding projected expenditures with revenues coming in below forecasts) nearly every week since these cases were filed and now admit a complete absence of internal controls? Why do the Debtors need to pay $682,000 in restructuring fees for one week after receiving millions in professional fees (funded by the DIP lenders) during these cases and when a post-default carveout of $400,000 has already been provided? Further, the Debtors have offered essentially no adequate protection to the Agent for the proposed cash collateral usage.

5. Finally, the relief requested in the Motion is futile, as the proposed sale is not acceptable to the Agent and cannot be approved over the Agent's objection under section 363(f) of the Bankruptcy Code and the terms of the Final DIP Order. Accordingly, the Court should

---

[7] The suggestion that the DIP Lenders are acting in bad faith is baseless. The DIP Lenders have recently extended an additional $9 million in financing to bail the Debtors out of unpaid post-petition taxes and other amounts. These amounts were not, strictly speaking, required to be paid for the sale process to come to fruition.
[8] The proposed sale also appears to be contingent.

3

deny the Motion and convert these cases to chapter 7 or, alternatively, appoint a chapter 11 trustee *instanter*.[9]

## BACKGROUND

6. On March 18, 2023 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or statutory committee of creditors has been appointed in the Debtors' chapter 11 cases.

7. The Debtors and the lenders are parties to that First Amended and Restated Credit Agreement, dated as of March 12, 2020 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Agreement," and, together with the other Loan Documents (as defined in the Prepetition Agreement), the "Loan Documents"). The Loan Documents evidence and govern the obligations of the Debtors for principal, accrued and unpaid interest, fees, costs, expenses, indemnities and other amounts arising under the Loan Documents totaling not less than $171,641,151.00 (the "Prepetition Obligations"). The Prepetition Obligations were secured by first priority liens and security interests (the "Prepetition Liens") granted to the Agent, on the collateral described and defined in the Loan Documents for the Prepetition Loan.

8. On April 25, 2023, the Court entered the Final DIP Order. Pursuant to the Final DIP Order, the Agent agreed to loan an additional $37,850,000 to finance these cases and the sale process, which amounts are secured by liens on all assets of these estates.

---

[9] The Agent will be filing a motion to appoint a chapter 11 trustee or to convert in the near future.

ACTIVE 689305950v1

9. On July 19, 2023, the Court approved a further extension of post-petition credit pursuant to the *Order Approving Second Amendment to Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement* [Docket No. 1042]. Thereafter, the Agent extended an additional $9.05 million in credit.

10. Accordingly, the total funded and unfunded obligations owing from the Debtors to the Agent total not less than $218.5 million, with funded debt of $217,904,783.

## BASES FOR LIMITED OBJECTION

### I. The Motion is Futile Because the Sale Cannot Be Approved.

11. The Agent does not consent to the sale of the Debtors' assets for a price below the amount of its liens, which is $217.9 million.

12. Section 363(f) of the Bankruptcy Code provides as follows:

> (f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> (2) such entity consents;
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (4) such interest is in bona fide dispute; or
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

Here, the proposed purchase price – purportedly $49 million but actually much lower - is far less than the amount of the Agent's debt. Contrary to the Debtors' estimated payment from the transaction to the secured lenders of $20 million – less than half of the post-petition DIP loans – the evidence will show that this number is inflated and the actual sale proceeds for distribution to the lenders will be significantly lower. Accordingly, the use of cash should not be approved because it does not comply with the statute.

13.     The majority of courts interpreting section 363(f) have held that the consent of a secured lender is required for the approval of the sale when the price does not clear the secured lender's debt.  *See In re PW LLC*, 391 B.R. 25 (B.A.P. 9th Cir. 2008); *Criimi Mae Servs. Ltd. P'ship v. WDH Howell LLC (In re WDH Howell LLC)*, 298 B.R. 527 (D.N.J. 2003); *Scherer v. Fed. Nat'l Mortg. Ass'n (In re Terrace Chalet Apts. Ltd.)*, 159 B.R. 821 (N.D. Ill. 1993); *Richardson v. Pitt Cnty. (In re Stroud Wholesale Inc.)*, 47 B.R. 999 (E.D.N.C. 1985); *In re Prime Props. of N.Y. Inc.*, 2010 WL 4026380 (Bankr. E.D.N.Y. Oct. 13, 2010); *In re Canonigo*, 276 B.R. 257 (Bankr. N.D. Cal. 2002); *In re Feinstein Family P'ship*, 247 B.R. 502, 509 (Bankr. M.D. Fla. 2000); *Criimi Mae Servs. Ltd. P'ship v. WDH Howell, LLC (In re WDH Howell, LLC)*, 298 B.R. 527, 531 n.6 (D.N.J. 2003); *In re Perroncello*, 170 B.R. 189 (Bankr. D. Mass. 1994); *In re Heine*, 159 B.R. 189 (Bankr. D.S.D. 1992).  *See also Secured Lender Rights in 363 Sales and Related Issues of Lender Consent, 18 Am. Bankr. Inst. L. Rev. 535* (compiling decisions and noting the majority approach requiring lender consent).

14.     In support of their proposed sale, the Debtors have cited *In re Terrace Gardens Park P'ship*, 96 B.R. 707 (Bankr. W.D. Tex. 1989), an oft-criticized, non-binding decision. *Terrace Gardens* is wrongly decided as it ignores the plain language of section 363(f). Moreover, *Terrace Gardens* is factually distinguishable as there, the objecting lender, EPF, had voluntarily agreed to the subordination of its loan to the second lien lender, and the second lien lender was the purchaser.  *Id.* at 708.  No such subordination agreement exists here.  Further, EPF had agreed to release prices for various pieces of its real estate collateral, which has also not occurred in the instant case.  Accordingly, *Terrace Gardens* should be disregarded.

15. Moreover, the Debtors previously agreed in the DIP Agreement that they would not use the proceeds of a sale in the manner contemplated.[10] In reliance on this agreement, which was approved by the Court, the Lenders faithfully extended $46 million in post-petition credit. The Debtors now make a mockery of the Final DIP Order by seeking to re-trade the DIP Agreement to effectuate a sale that is not in the best interests of creditors and has not been approved by the Agent.[11] The Court should not permit this to happen as it would only harm the Debtors' post-petition and prepetition creditors, including the DIP lenders.

16. Because the Debtors' proposed use of cash collateral is to provide bridge financing to a sale that cannot be approved, the Motion should be denied.

---

[10] *See Amended Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement* [Docket No. 332] (the "DIP Agreement"). Section 3.3(b) of the DIP Agreement provides:

> Mandatory Prepayment. Subject to the terms of the Financing Orders:
> ….
> (iii) On the date such amounts are received by, or for the account of, any Loan Party or any of its Subsidiaries, the following amounts shall be paid to the Administrative Agent for the ratable benefit of the Lenders in the form received with any necessary endorsement or assignment:
> …
> (E) 100% of the Net Proceeds from the Disposition of any Collateral …

Under Section 9.3 (Acquisitions, Mergers, and Other Fundamental Changes), the Debtors may not (without consent of the Court and the Agent) make certain fundamental changes including liquidating.

Moreover, section 9.4 of the DIP Agreement provides:

> Disposition of Assets. No Loan Party may, and no Loan Party may permit any Subsidiary to, (whether in one transaction or a series of transactions) make any Disposition, or enter into any agreement to make any Disposition … subject to the approval of the Bankruptcy Court and the Agent.

A Disposition means "the sale, transfer, license, lease or other disposition of any property by any Person …"

[11] Further, in numerous conversations the Debtors' counsel, Jeff Pomerantz, stated to the Agent's counsel, John Elrod, that the Agent had the "ultimate objection right" to the sale under section 363(f) if a bid did not clear the secured debt. Mr. Pomerantz has now changed his tune in an effort to extract cash for creditors who are subordinate to the Agent, including professionals.

## II. The Proposed Sale Contains an Improper Release of Oak Street and Its Related Parties, Which Includes a Former Board Member of the Debtors.

17. The proposed sale would include releases of claims that have not been valued or investigated by the Debtors or estate professionals. Specifically, the non-binding letter provides for:

> full releases against GPM, Oak Street, and each of their respective affiliates, successors and/or assigns, and each of its and their respective current or former officers, directors, members, partners, equity holders, and managers, from and against any and all losses, claims, damages, liabilities, judgments and costs and expenses (including reasonable attorneys' fees and expenses), whether arising or pleaded at law or in equity, under contract, statute, tort or otherwise, whether known or unknown, whether accrued, potential, inchoate, liquidated, contingent or actual, whether asserted or that might have been asserted, which the Company and/or any claimant under the bankruptcy may now have, has ever had or may hereafter have against such persons, in respect of or arising out of any matter, act, omission, cause or event relating to the Company, the assets to be acquired thereunder, or the Business, excluding any obligations of the parties under the Transaction.

Claims against Oak Street may have significant merit and value to the Debtors' creditors. The Debtors spent much of the first day hearing describing the prepetition conduct of Oak Street, and the sale process has revealed that the Oak Street leases are significantly above-market. In fact, Oak Street caused this bankruptcy filing through its attempts to terminate its leases with the Debtors. Oak Street's Principal, Jared Sheiker, served on the Debtors' board of directors prior to the Petition Date. Based on representations by the Debtors' counsel, Sheiker did not recuse himself from decisions relating to the Oak Street leases with the Debtors.[12] It would be improper for the Court to approve a sale that includes a release of Oak Street and related parties or, for that matter, any unnamed parties that may fall into the broad classes of proposed releasees. The

---

[12] Mr. Sheiker's LinkedIn profile indicates that he is a Principal of Oak Street.

ACTIVE 689305950v1

Debtors seek the use of cash collateral to facilitate an undocumented transaction. Because this release is not in the best interests of creditors, the use of cash collateral should not be approved.

### III. The Debtors' Offer of Adequate Protection is Illusory.

#### A. The Replacement Liens Likely Will Not Offer Adequate Protection.

18. The adequate protection package offered by the Debtors is not acceptable to the Agent. It is illusory. The Debtors essentially offer replacement liens that are insufficient to adequately protect the Agent's interest in the existing cash collateral given the Debtors' atrocious financial performance to date and lack of internal controls. This is particularly true in these cases where the Debtors have repeatedly missed their budgets. In fact, for the 18 weeks from case commencement through July 21, 2023, the Debtors missed their revenue forecast in 15 weeks.

19. By their own admission in the Status Report, the Debtors admit they are lacking internal controls, including:

- an absence of financial statements;

- an inability to generate accurate and current store level profit and loss statements, fuel gallon and margin data, and in-store financials (such as inventory levels, product pricing, food sales and, payroll expense), among other issues;

- missing leases, contracts, and other agreements integral to the management of the business; and

- an absence of detailed, store-level accounting.[13]

Given these admissions of facts known to the Debtors but hidden from the Debtors' creditors, any replacement liens are illusory as the Debtors cannot accurately predict the results of

---

[13] *See* Debtors' Status Report, pp. 9-10.

operations. Accordingly, cash collateral usage should be denied, and these cases should be converted to chapter 7 *instanter*.

20. The additional items of proposed adequate protection also are not sufficient. The promise of a going concern sale as adequate protection is particularly disingenuous when the terms of the sale have not been negotiated, let alone finalized in a signed APA. The Debtors claim that the value of cash collateral will not drop over the next week, but the unfortunate history of this case demonstrates otherwise. For example, for the week of August 4, when the Agent agreed to cash collateral usage contemplating negative net cash flow of $850,000, the Debtors' negative net cash flow was $2.1 million.

21. These estates are hopelessly administratively insolvent. The following table reflects approximate amounts that have not been paid by the Debtors post-petition, despite fulsome funding from the DIP Lenders:

| **Unpaid Administrative Expenses** | **Est. 7/31/23** |
|---|---|
| Georgia Motor Fuels Tax | $ 10,500 |
| Other Accrued/Unpaid Taxes | 1,000 |
| Post-petition Accounts Payable | 6,427 |
| Professional Fees in Excess of Escrow | 2,050 |
| Unpaid Raymond James Fee | 2,102 |
| Unpaid August Rents | 7,500 |
| 503(b)9 Claims | 1,000 |
| | $ 30,579 [14] |

These amounts further demonstrate that the proposed transaction is futile. Even if this transaction were to be consummated on the terms and consideration reported by the Debtors, the proceeds generated by the sale will not be sufficient to make these estates administratively

---

[14] These amounts are in millions, *i.e.* the net unpaid administrative expense is not less than $30,579,000 (in addition to the amounts owed to the Agent, namely an additional $46 million), and were accurate as of July 31, 2023.

ACTIVE 689305950v1

solvent. The Court should convert the cases now to avoid additional damage to the DIP Lenders, vendors, and taxing authorities.

### B. The DIP Agent's Existing Liens Do Not Offer Adequate Protection

22.     Finally, the Debtors' assertion that the "existing liens and superpriority claims already constitute adequate protection" rings hollow. Through the proposed sale transaction, the Debtors are stripping away those liens and seeking a release of valuable claims against Oak Street and a conflicted former director who is an Oak Street principal. The use of cash collateral will further deteriorate the value of the property attaching to those liens. Accordingly, the relief should be denied.

### IV.    The Debtors' Budget Contains Amounts That Are Not Required.

23.     The proposed budget contains amounts that are not needed to get through the week ending August 11. For example, the Restructuring Fees line item of $682,000 is not required to get through the week. Moreover, this proposed amount far exceeds the Professional Carve-Out Cap of $400,000 set forth in the Final DIP Order Carve Out Trigger procedures. While it is unclear what Restructuring Fees will be paid in this line item, there is no requirement that they be paid this week, particularly when the Agent does not support the sale.

For the foregoing reasons, the Agent objects to the proposed use of cash collateral and requests that the Motion be denied.

*(Signature page follows.)*

Respectfully submitted this 7th day of August 2023.

**GREENBERG TRAURIG, LLP**

By: */s/ Shari L. Heyen*
Shari L. Heyen
Texas Bar No. 09564750
*Shari.Heyen@gtlaw.com*
1000 Louisiana St., Suite 1700
Houston, Texas 77002
Telephone:  (713) 374-3564
Facsimile:  (713) 374-3505

– and –

John D. Elrod (admitted *pro hac vice*)
*ElrodJ@gtlaw.com*
Terminus 200, Suite 2500
3333 Piedmont Road, NE
Atlanta, Georgia 30305
Telephone:  (678) 553-2259
Facsimile:  (678) 553-2269

**COUNSEL FOR FIRST HORIZON BANK, AS ADMINISTRATIVE AGENT**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served upon the parties eligible to receive notice through the Court's ECF facilities by electronic mail on August 7, 2023.

*/s/ John D. Elrod*
John D. Elrod