```
                  UNITED STATES BANKRUPTCY COURT
                 SOUTHERN DISTRICT OF TEXAS (HOUSTON)

                                    .   Case No. 23-90147
IN RE:                              .   Chapter 11
                                    .   (Jointly Administered)
MOUNTAIN EXPRESS OIL COMPANY,       .
et al.,                             .   515 Rusk Street
                                    .   Houston, TX 77002
              Debtors.              .
                                    .   Thursday, June 22, 2023
. . . . . . . . . . . . . . . . .   .   2:58 p.m.
```

```
     TRANSCRIPT OF DEBTORS' EMERGENCY MOTION FOR ENTRY OF ORDERS
        (A)(I) AUTHORIZING ASSET PURCHASE AGREEMENT FOR SALE OF
      SUBSTANTIALLY ALL OF DEBTORS' ASSETS, (II) APPROVING BID
    PROCEDURES FOR SALE OF DEBTORS' ASSETS, (III) APPROVING BID
   PROTECTIONS, (IV) SCHEDULING CERTAIN DATES WITH RESPECT
   THERETO, (V) APPROVING THE FORM AND MANNER OF NOTICE THEREOF,
       AND (VI) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT
    PROCEDURES; (B) APPROVING (I) SALE OF CERTAIN ASSETS FREE AND
   CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS,
    AND (II) ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND
       LEASES; AND (C) GRANTING RELATED RELIEF FILED BY DEBTOR
                MOUNTAIN EXPRESS OIL COMPANY [536];
   DEBTORS' EMERGENCY SECOND OMNIBUS MOTION FOR ENTRY OF AN ORDER
       (I) AUTHORIZING THE DEBTORS TO REJECT CERTAIN EXECUTORY
   CONTRACTS PURSUANT TO 11 U.S.C. 365 AND (II) GRANTING RELATED
    RELIEF, FILED BY DEBTOR MOUNTAIN EXPRESS OIL COMPANY [660]
              BEFORE THE HONORABLE DAVID R. JONES
              UNITED STATES BANKRUPTCY COURT JUDGE
```

```
TELEPHONIC APPEARANCES CONTINUED.

Audio Operator:          Courtroom ECRO Personnel

Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46048
                         (855) 873-2223
                         www.accesstranscripts.com
```

```
     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

```
TELEPHONIC APPEARANCES (Continued):


 For the Debtors:              Pachulski Stang Ziehl & Jones LLP
                               By:  GREGORY V. DEMO, ESQ.
                               780 Third Avenue, 34th Floor
                               New York, NY 10017-2024
                               (212) 561-7700

                               Pachulski Stang Ziehl & Jones LLP
                               By:  JEFFREY POMERANTZ, ESQ.
                               10100 Santa Monica Blvd., 13th Floor
                               Los Angeles, CA 90067-4003
                               (310) 277-6910

                               Pachulski Stang Ziehl & Jones LLP
                               By:  BENJAMIN L. WALLEN, ESQ.
                               440 Louisiana Street, Suite 900
                               Houston, TX  77002
                               (713) 691-9385

                               Lugenbuhl Wheaton Peck Rankin &
                               Hubbard
                               By:  BENJAMIN KADDEN, ESQ.
                               601 Poydras Street, Suite 2775
                               New Orleans, LA 70130
                               (504) 568-1990

For the Official              McDermott Will & Emery LLP
Committee of Unsecured        By:  CHARLES R. GIBBS, ESQ.
Creditors:                    250 North Harwood Street, Suite 1900
                               Dallas, TX 75201
                               (214) 295-8063

For the Necessity             ArentFox Schiff LLP
Landlords:                    By:  BETH BROWNSTEIN, ESQ.
                               1301 Avenue of the Americas
                               42nd Floor
                               New York, NY 10019
                               (212) 484-3900

For First Horizon             Greenberg Traurig, LLP
Bank, as                      By:  JOHN D. ELROD, ESQ.
Administrative Agent:         Terminus 200
                               3333 Piedmont Road NE, Suite 2500
                               Atlanta, GA 30305
                               (678) 553-2259
```

```
For BFM Enterprise          Locke Lord LLP
LLC:                        By:  OMER F. KUEBEL, III, ESQ.
                            601 Poydras Street, Suite 2660
                            New Orleans, LA  70130
                            (504) 558-5155

For Samnosh, LLC:           The Gibson Law Group
                            By:  DAVID R. GIBSON, ESQ.
                            1304 W. Walnut Hill Lane, Suite 212
                            Irving, TX  75038
                            (817) 769-4044
```

 1    (Proceedings commence at 2:59 p.m.)

 2         ELECTRONIC VOICE:  Conference muted.

 3         THE COURT:  Good afternoon, everyone.  This is Judge

 4    Jones.  We've still got a minute or so before we get started.

 5    There was just an awful lot of background noise on the line, so

 6    I went ahead and activated the hand-raising feature.  If you

 7    know you're going to be speaking, go ahead and give me a "five

 8    star," let me get you unmuted before we begin.  You, obviously,

 9    can change your mind at any time.  60 people on the line, 60

10    people raising their hands.

11         All right.  I think we're ready to begin.  Officially

12    good afternoon, everyone.  This is Judge Jones.  The time is

13    three o'clock Central.  Today is June 22nd, 2023.  This is the

14    docket for Houston, Texas, although greetings today from sunny

15    and very warm Laredo, Texas.  On the three o'clock docket, we

16    have the jointly-administered cases under Case Number 23-90147,

17    Mountain Express Oil Company.

18         Folks, please don't forget to record your electronic

19    appearance.  That's a quick trip to the website.  You can do

20    that at any time prior to the conclusion of the hearing this

21    afternoon, but it is the way that we record your appearance.

22         First time that you speak today, if you would please

23    state your name and who you represent.  Only need to do that

24    once, but it really, really does assist the court reporters in

25    preparing accurate transcripts.

```
 1              Finally, we are recording this afternoon using
 2   CourtSpeak.  We -- since we are in Laredo, we probably won't
 3   get that uploaded to the docket on Monday -- until Monday, but
 4   if we can possibly get it done tomorrow, we will, but more
 5   likely on Monday.
 6              And with that, Mr. Gibbs, I just wanted to confirm
 7   that Judge Lopez was sufficiently accommodating.  And you can't
 8   hit "five star" because you don't -- give you access to the
 9   phone.  Number one, I very much appreciate Judge Lopez opening
10   up his courtroom for you.  I was just poking a little fun at
11   him.  But if there's anybody -- if any of his staff are in
12   there, and Albert, perhaps you could send a text, if they could
13   hit "five star" on the telephone.  Or maybe I can find it.
14              Albert, won't that be a 250 number?
15              THE CLERK:  Mm-hmm.  I just texted Rosario to see if
16   she could --
17              THE COURT:  I bet I can find it.  How about now?
18              MR. GIBBS:  Can you hear me now, Your Honor?
19              THE COURT:  Loud and clear.  I got that one right.
20   All right.  Thank you.
21              MR. GIBBS:  Perfect.
22              THE COURT:  All right.  With that --
23              MR. GIBBS:  They were very accommodating.  Thank you.
24              THE COURT:  Of course, I appreciate what Judge Lopez
25   does.
```

```
 1              All right.  Who's taking the lead this afternoon?
 2  Not going to presume that it's Mr. Pomerantz.
 3              MR. POMERANTZ:  Afternoon.
 4              THE COURT:  But I'm --
 5              MR. POMERANTZ:  It is, Your Honor.  You're stuck with
 6  me today.  I would ask Your Honor if you can provide Mr. Wallen
 7  with presenter privileges?  We have a couple of demonstratives
 8  that we're going to use in the course of the hearing.
 9  (Indiscernible) get later when I refer to them.
10              THE COURT:  Of course.  All right.  Mr. --
11              MR. POMERANTZ:  So good afternoon, Your Honor.  Jeff
12  Pomerantz of Pachulski Stang Ziehl & Jones appearing on behalf
13  of the debtors in possession, along with my partner, Greg Demo,
14  and my colleague, Ben Wallen.  Also in the virtual courtroom is
15  Michael Healy, a senior managing director of FTI Consulting and
16  the debtors' chief restructuring officer; as well as Geoffrey
17  Richards, a senior managing director of Raymond James, the
18  debtors' investment bank.  Mr. Healy and Mr. Richards will
19  serve as the debtors' witnesses for today's hearing.
20              Mr. Wallen, you can take down it since we're not
21  going to be referring to it for a few minutes.
22              We have three sets of matters for today, Your Honor.
23  The first three relate to the debtors' portfolio of properties
24  which they lease from what has been referred to in the pleading
25  as either AR Global or the Necessity Landlords, who is a member
```

1   of the Creditors' Committee in this case.  And for ease of

2   reference, I will refer to the landlords as the "Necessity

3   Landlords."

4          I think it would be helpful to provide the Court with

5   some background relating to the debtors' relationship with the

6   necessary -- Necessity Landlords as it will provide context for

7   the remaining matters that are covered by the first three

8   agenda items that have not yet been resolved.

9          The debtors lease 71 properties from the Necessity

10  Landlords.  These properties were largely legacy properties

11  that the current owners inherited when they acquired the

12  business.  The properties are generally located in rural areas,

13  consist exclusively of properties that are operated by third-

14  party dealers, and are among some of the most poorly performing

15  properties in the debtors' portfolio.  For that reason, the

16  debtors stopped paying rent to the Necessity Landlords

17  prepetition and the Necessity Landlords commenced the lawsuits

18  in state court prepetition.  I would point out that other than

19  the Necessity Landlords, the debtors were current on all rent

20  for all of the landlords as of the petition date.

21          After the petition date, the debtors approached the

22  Necessity Landlords to attempt to negotiate (indiscernible)

23  that would allow the properties to essentially break even while

24  the debtors implemented its going-concern sale process.  When

25  the Necessity Landlords refused to enter into any negotiations

1   without full payment of March sub rent and April rent, the

2   debtors filed its emergency motion seeking to reject the leases

3   that covered 28 of those properties, the subleases with the

4   dealers, and the latest contract that related to operation of

5   those properties.  The debtors sought to have the motion heard

6   prior to the end of April to prevent the accrual of May rent.

7   And I'll refer to this motion as the "April rejection motion"

8   and it is Item Number 1 on the docket -- of the agenda filed at

9   Docket 684.

10          Importantly, the rejection motion did not seek to

11  reject the fuel supply agreements between the debtors and the

12  dealers with respect to those 20-year locations.  Why?  Because

13  the debtors had anticipated that the Necessity Landlords might

14  want to engage in negotiations with the dealers directly

15  regarding new leases and the debtors did not want to

16  irrevocably prevent that from happening by cutting off the fuel

17  supply to the dealers.

18          After the debtors filed the April rejection motion,

19  the Necessity Landlords filed their own motion requiring the

20  debtors to comply with its obligations under 355(b)(3) and to

21  pay Necessity Landlords the March sub rent and the April full

22  rent.

23          Over the next several weeks, the debtors and the

24  Necessity Landlords engaged in extensive good faith

25  negotiations geared towards transitioning the properties to the

1  Necessity Landlords and renegotiating the rent payment to be

2  made to them in the interim until that happened.  During this

3  negotiation process, which culminated in the stipulation and

4  agreed order appearing at Docket Number 672, which Your Honor

5  signed, it became apparent that the Necessity Landlords had no

6  interest in having the debtors continue to provide fuel to the

7  dealers who operated the 28 sites.

8          Accordingly, as part of the stipulation of the agreed

9  order, the debtors were required to file a motion to reject

10  those fuel supply agreements effective June 30th, and to seek

11  to have a hearing on that motion on an emergency basis.  The

12  debtors filed that motion, which appears at Docket Number 660.

13  So with the Court having entered the stipulation and agreed

14  order, which is Docket Number 672, the Necessity Landlords'

15  objection to the April rejection motion, Agenda Item Number 1

16  is resolved, as well as the Necessity Landlord's 355(b)(3)

17  motion, which is Item Number 2.

18          Accordingly Your Honor, there are two things left to

19  accomplish today.  First, the debtors seek an order rejecting

20  the subleases and related agreements which were part of the

21  April rejection motion and not subject to the stipulated agreed

22  order with Necessity Landlords.  The debtors have received no

23  objection to that motion, which is pending for quite some time

24  now.  The debtors have filed a proposed order, which appears as

25  Docket Number 676, and we request that Your Honor enter that

1   order.

2          Secondly, the debtors seek an order rejecting the

3   fuel agreements relating to the 28 properties, which is Item

4   Number 3 on the agenda.  The debtors have received no objection

5   to the motion, although recognizing it was only several days

6   ago, and the motion appears at Docket Number 650 and the

7   proposed order was attached to the motion.

8          If the Court has any questions or comments, I'd be

9   happy to answer them, or else I could proceed with the proffer

10  of Michael Healy, the debtors' chief restructuring officer, to

11  support both requests.

12          THE COURT:  All right, Mr. Pomerantz, and thank you

13  for the background.  This seems relatively straightforward, but

14  let me just make the circle to see if there are any parties

15  that would like to make what I'll just take as opening

16  arguments.  And again, if you haven't already done so and wish

17  to speak, "five star" on your phone.  Anybody?

18          MS. BROWNSTEIN:  Good afternoon, Your Honor.  This

19  is -- I don't know if you can see me because my camera doesn't

20  work.  This is Beth Brownstein from ArnetFox Schiff on behalf

21  of the Necessity Landlords --

22          THE COURT:  And Ms. Brownstein, I can both see you

23  and hear you just perfectly fine.

24          MS. BROWNSTEIN:  Okay.  Great.  Your Honor, as

25  Mr. Pomerantz mentioned, we did work extensively and did those

1  negotiations to come up with a stipulation that helps

2  transition the properties, and ensure environmental and

3  regulatory compliance.  And we are pleased with the stipulation

4  and appreciate Your Honor's entry, and then the following steps

5  that Mr. Pomerantz outlined are consistent with the stipulation

6  and order.

7          THE COURT:  All right.  Thank you, Ms. Brownstein.

8          Anyone else?

9          All right.  Mr. Pomerantz, if you'd like to go ahead

10  and make your proffer.

11          MR. POMERANTZ:  Thank you, Your Honor.  We're

12  proffering the testimony of Michael Healy, the chief

13  restructuring officer of the debtors:

14          "If called as a witness, I would testify as follows:

15          I'm the senior managing director with FTI Consulting,

16          and I'm acting as the debtors' chief restructuring

17          officer, a position I have held since the debtors'

18          filing in middle of March 2023.

19          "As a debtors' chief restructuring officer, I become

20          familiar with the debtors' business and portfolio of

21          leases.  And as part of my process in evaluating the

22          debtors' leases -- lease portfolio, I had an analysis

23          performed as to the profitability of the leases which

24          are subject of the various leases with the Necessity

25          Landlords.

1        "As a result of that analysis, I determined that 28

2        of the properties which are the subject of the

3        necessity lease portfolio produce negative cash flow

4        for the debtors' estates.  What I mean by that is,

5        the monthly lease cost payable to the Necessity

6        Landlords materially exceeds the revenue the debtors

7        generate from such properties on account of fuel

8        margin and rental income received from the sublessees

9        operating those properties.

10       "Based upon the properties' poor economic

11       performance, I direct counsel to file a motion

12       seeking to reject the leases with the Necessity

13       Landlords of the 28 properties and the related

14       subleases and other agreements to which the debtors

15       are party relating to those 28 properties.  I

16       instructed debtors' counsel not to originally include

17       the fuel agreements with the dealers relating to

18       those 28 properties in the (indiscernible) motion

19       because of the potential that the Necessity Landlords

20       would want to ensure continued fuel supply to those

21       locations while determining how to dispose of the

22       properties.

23       "After extensive negotiations with the Necessity

24       Landlords, the parties reached an agreement which

25       provided for, among other things, the rejection of

```
1              the leases within Necessity Landlords for the 28
2              properties.  And the Court has entered an order
3              approving a stipulation.
4              "Having reached agreement to reject the Necessity
5              Landlords' leases, the remaining contracts involved
6              in the rejection motion are burdensome to the estate
7              and provide no value.  In fact, the no -- the debtors
8              are no longer in a position to honor their
9              obligations under the subleases and related
10             agreements.  Accordingly, the debtors request that
11             the Court enter an order authorizing the debtors to
12             reject those agreements effectively -- effective June
13             30th.
14             "Similarly, the stipulation with the Necessity
15             Landlords also requires the debtors to be delivering
16             fuel to the affected locations.  In order to
17             facilitate the return of properties to the Necessity
18             Landlords and minimize the prolonged presence of
19             unsold fuel in the store, I authorized the debtors to
20             reject the fuel supply agreements with the dealers
21             effective June 30th."
22             That concludes my proffer of Mr. Healy's testimony.
23             THE COURT:  All right, thank you.
24             Mr. Healey, first of all, could you just confirm for
25   me that you can hear me?
```

1              MR. HEALY:  I can hear you loud and clear.

2              THE COURT:  Thank you.  Now, I can hear you as well.

3    If you would please raise your right hand.

4              MICHAEL HEALY, DEBTORS' WITNESS, SWORN

5              THE COURT:  Thank you.  Did you listen to

6    Mr. Pomerantz's proffer of your testimony in support of the

7    relief requested by the debtors today?

8              MR. HEALY:  I did.

9              THE COURT:  Do you understand it all?

10             MR. HEALY:  I did.

11             THE COURT:  Everything he told me, true and accurate

12   to the best of your knowledge?

13             MR. HEALY:  It was.

14             THE COURT:  And do you adopt those statements as your

15   sworn testimony in support of the debtors' requested relief?

16             MR. HEALY:  I do.

17             THE COURT:  Thank you, Mr. Healy.  I'll accept the

18   proffer.

19             Anyone wish to cross examine Mr. Healy?

20             All right.  Mr. Healy, thank you, sir.

21             Mr. Pomerantz, anything else on these issues?

22             MR. POMERANTZ:  Nothing further.  Happy to answer any

23   questions Your Honor has.

24             THE COURT:  This is about as straightforward as it

25   gets.  First of all, I want to compliment the parties on

1    working together to act in a commercial way to narrow the

2    issues down, and to do this in a way that, to the extent it's

3    possible, is sort of a win-win for everybody.

4           And I think win-win in this case means just as easy a

5    transition as possible debtors decision, to assume or reject a

6    lease is to subject to, at least in my view, a business

7    judgment analysis.  And based upon what I've read, the proffer

8    in support of the requested of relief, this is not just

9    reasonable business judgment, it is prudent business judgment.

10   It furthers the goals of the case.  Again, it recognizes that

11   there are other parties involved and works to minimize the

12   impact on them.  I have no concerns at all.  I'll grant the

13   requested relief.

14          Mr. Pomerantz -- and maybe it's Mr. Wallen question.

15   I have read and am prepared to sign the orders at 660-1 and

16   676.  I just want to make sure that I have the final forms of

17   order and that I read the right ones.

18          MR. POMERANTZ:  I believe that's correct, but I will

19   ask Mr. Wallen to confirm.

20          THE COURT:  All right.  Thank you.

21          THE COURT:  I'm sorry, Mr. Gibbs.  Let me -- first of

22   all, let me get Mr. Wallen, and then I'll come back to you,

23   Mr. Gibbs.  My apologies.

24          MR. GIBBS:  No problem.

25          THE COURT:  There's Mr. Wallen.  Mr. Wallen?

1          MR. WALLEN:  Good afternoon, Your Honor.  Ben Wallen,

2  Pachulski Stang Ziehl & Jones, counsel to the debtors.

3          Judge, I believe that's correct.

4          THE COURT:  Okay.  Thank you.

5          And Mr. Gibbs?

6          MR. GIBBS:  Your Honor, again, thank you.  Chuck

7  Gibbs with McDermott Will & Emery, counsel for the Committee.

8  We obviously have reviewed the motions, the requested relief,

9  the underlying agreements.  We do not contest the efficacy of

10  the debtors' business judgment or the correctness here, do not

11  oppose the relief requested.  I rise only to ask for

12  clarification that the proposed orders at 660 and at -- 660-1

13  and 676 reference 27 leases.  And I understood from the proffer

14  that there were 28, and I'm just not sure what the discrepancy

15  is.

16          THE COURT:  Thank you.

17          Mr. Pomerantz?

18          MR. POMERANTZ:  Yeah, I think, if I recall correctly,

19  one property is not operating because they've been in a

20  casualty event at some point prepetition, so that's why we're

21  only dealing with fuel supply agreements and related agreements

22  at the 27 properties.  I don't think that other one is

23  operating.

24          THE COURT:  Mr. Gibbs, is that satisfactory to you?

25          MR. GIBBS:  Yes.  We can cross reference and make

1   sure we got it.

2          THE COURT:  All right.  Thank you.  And obviously, if

3   there's an issue, you know how to raise it.

4          And with that, I have signed 660-1, and it is off to

5   docketing.  I have signed 676, and that is off to docketing.

6          All right.  Mr. Pomerantz?

7          MR. POMERANTZ:  So, Your Honor, before I proceed with

8   the next motion, which is the bid procedures motion, we just

9   filed a few minutes before the hearing, at Docket Number 694, a

10  redline proposed order.  In the redline, we, I believe,

11  adequately addressed the comments that Ms. Brownstein had to

12  the bid procedures, and we did try to address certain of the

13  lenders' objections that were reflected in their opposition.

14  We recognize that it was filed a few minutes before the

15  hearing, and we have no intent to jam any parties, nor do we

16  have an intent to jam the Court.  So if parties believe they

17  needed maybe a 10-, 15-minute break to review that, we would

18  find that acceptable.

19          THE COURT:  Mr. Pomerantz, I very much appreciate the

20  offer.  I saw it get filed.  I've been reading the redline

21  while I've been listening.  But I think it's a very appropriate

22  offer for folks who care about that redlining to take a couple

23  of minutes and see if it resolves issues or narrows issues.

24          Anybody have an objection?  It is I'm just going to

25  say 3:20.  Anyone have an objection to taking a break until

1    3:30, just to read what was filed at 694?  There is a redline,

2    so it shouldn't take you very long.

3         All right.  Mr. Pomerantz, again, thank you.  On

4    behalf of everyone, I'm going to take advantage of the offer,

5    and we'll stand adjourned until 3:30 Central time so the folks

6    can take a look at what was filed.

7         MR. POMERANTZ:  Thank you.

8       (Recess taken at 3:18 p.m.)

9       (Proceedings resumed at 3:30 p.m.)

10         THE COURT:  All right.  We are back on the record.

11   The time is 3:30 Central.

12         Mr. Pomerantz, now that everybody's had an

13   opportunity to review the new proposed order, how did you

14   intend on proceeding?  Mr. Pomerantz?  I think you need to give

15   me -- that was you.

16         MR. POMERANTZ:  That was me.  That was me.  That was

17   me.

18         Your Honor, before I proceed to present the

19   procedures motion, Your Honor, I just want to provide Your

20   Honor with an update on the debtors' liquidity and financing

21   situation.

22         THE COURT:  Terrific.  Thank you.

23         MR. POMERANTZ:  As Your Honor may recall, as part of

24   the final DIP hearing, the lender group agreed to extend an

25   additional $9.2 million of financing beyond what was

1   contemplated by the interim lawyer.  And those $9.2 million of

2   financing was to be made over four tranches and subject to

3   certain condition precedent.  The debtors met the first

4   condition precedent, the first $2.3 million was funded.

5   Debtors have not yet met the second, third, or fourth

6   precedent, but have an urgent need for additional financing to

7   sustain the company throughout the sale process.

8          We've been in active discussions with the bank group,

9   and we are hopeful that they will agree to provide the

10  financing notwithstanding the failure conditions.  We do not

11  have an answer yet.  We'd hope we have an answer by the hearing

12  today.

13         My only comment is to say, Your Honor, if the

14  lenders, for some reason, decide not to provide the financing,

15  we would like to be back to Your Honor in short order to decide

16  what to do next.

17         THE COURT:  Understood.

18         MR. POMERANTZ:  With that, Your Honor, I would like

19  to turn to the next motion on the calendar today which is the

20  motion to, among other things, approve bidding procedures for

21  the sale of the debtors' assets, approve bid protections to be

22  provided to any potential stalking horse bidders, scheduling

23  certain dates with respect to the sale process, and approving

24  the manner of (indiscernible) notice and other related relief.

25         As the Court is aware, soon after the petition date,

1  the debtors embarked on a sale process designed to maximize the

2  value of all stakeholders.  The marketing process is in full

3  swing, and the debtors have received significant interest from

4  multiple parties that are interested in the potential

5  transaction.  A data room has been established which contains

6  over 11,000 (indiscernible) and substantial diligence has been

7  conducted by many parties.

8        Some key facts about the sale process to date:

9  commencing in mid-March 2023, Raymond James contacted

10  approximately 121 buyers, 82 of whom were strategic and 39 of

11  whom were financial.  Fifty-one of those parties signed

12  nondisclosure agreements, and since the filing of the motion,

13  two additional parties have signed nondisclosure agreements.

14  Raymond James has had calls with 39 separate parties.

15        Nine parties submitted preliminary non-binding

16  indications of interest in connection with the May 8th

17  indication of interest deadline.  The debtors entered into

18  further negotiations with a number of those parties who have

19  submitted indications of interest and continue to seek a

20  potential stock list.

21        Through the motion, the debtors seek to establish

22  procedures which will govern the remainder of the marketing

23  process and are similar to procedures that have been approved

24  by courts in this district.  The procedures are designed to set

25  a timeline for the rest of the process, establish basic rules

1    for submitting debt for the purchase of assets, provide the

2    lenders and the Committee with consultation rights, virtually

3    every aspect of the process, and ultimately to maximize

4    shareholder and stakeholder recoveries.

5            While the debtors have not yet identified a stalking

6    horse, as parties are completing their diligence, the debtors

7    seek to do so with the lenders and continued consent or further

8    court order, based upon certain preapproved bid protections,

9    which include a 3 percent breakup fee and up to $1 million in

10   documented reimbursement of expenses

11           The proceedings contemplate the following date.

12           Mr. Wallen, could you put up the dates on the screen,

13   please?

14           So, Your Honor, this slide contains the dates for the

15   sale process, a couple of which have been modified, as I will

16   mention.  So June 22nd, today is the hearing.  Within four

17   business days, or June 26th, it'll be the deadline to file in

18   terms of bid procedures and sale notice.  Within four business

19   days after that, we will also file the assumption on the

20   assignment notice so those will both be done on June 26th.

21           July 12th will be the cure and assignment objection

22   deadline will be distinguished from the ad insurance objection

23   deadline.

24           July 21st is the deadline to submit qualified bid.

25   The deadline to designate stalking horse purchaser or

1   purchasers will be at any time prior to the auction.  While

2   typically there is a deadline in advance of the auction, we

3   believe in a case such as this, given the dynamic, the time,

4   that we needed up until the auction to designate the stalking

5   horse.

6          The auction will occur on July 28th, 2023, and

7   promptly after the auction, we will file the notice of the

8   successful bidder and also provide adequate assurance

9   information.  We will do that no later than July 31 at nine

10  o'clock a.m., (indiscernible) Central time.

11         We have moved the objection to adequate assurance

12  from July 31st to August 3rd, so it would give parties at least

13  three days after receipt, if not more, as we will try to get

14  the adequate (indiscernible) as the auction concludes on July

15  28th.  But August 3rd will give several days for parties to

16  file a position with respect to having insurance.

17         Subject to the Court's calendar, we would see an

18  order by sale hearing on or about August 7th, with a focus on

19  closing on or about August 15th.  These dates are generally

20  consistent with the milestones set forth in the final DIP

21  order.  There may be a couple of days -- I believe it was

22  originally July 26th, we moved it to the 28, but they are

23  generally consistent.

24         Prior to filing the motion, Your Honor, the debtors

25  provided the Committee and the lenders with a draft motion and

1  order to solicit their comment.  The debtors included certain

2  comments proposed by the Committee, but not all of them, and

3  the debtors believe that the Committee supports approval of the

4  motion and entry of the redline order filed just before the

5  hearing.

6          The debtors also included buried comments by the

7  lenders.  However, there were certain comments from the lenders

8  that the debtors believed were not appropriate and were not

9  included in the filed motion.  Contrary to what the lenders

10  state in their opposition filed this morning, the debtors did

11  let the lenders know why they were not agreeing to many of the

12  changes.  And as we'll discuss in a few moments, the lenders'

13  significant request with respect to virtually every decision

14  the debtors will make in connection with the sale profit is

15  neither reasonable nor appropriate, especially in a case like

16  this, where there is a possibility that there'll be some

17  distribution to general unsecured creditors.  As the debtors

18  decided to promptly pay all those (indiscernible) to the

19  lenders, Mr. Gibbs would likely be up there arguing that it is

20  a debtor in possession with a fiduciary duty to the estate who

21  must make such decisions and not a lender in possession.

22          The lenders, Your Honor, have made it difficult for

23  Your Honor today to invest their objection.  If they attach to

24  their objection a redline of draft bid procedures order that

25  the debtors provided them in advance of filing (indiscernible)

1  rather than a redline to the order filed with the motion on

2  June 16th at Docket Number 536.

3          As the lenders acknowledge in their objections, the

4  debtors did make changes the lenders requested, but by

5  attaching the redline to the prior draft, as opposed to the

6  redline to the final draft, they make it virtually impossible

7  for the Court to determine what is actually in dispute.  What I

8  plan to do in a few moments is to put up a demonstrative, where

9  we can walk through the comments they made in the redline as to

10 opposition, to let the Court know which ones were addressed in

11 the original motion which was filed.

12         Certain changes -- I informed the (indiscernible)

13 last night were in process to address some of his concerns and

14 those changes that the lenders requested that we did not make

15 and are still in dispute.  The premise of the lenders'

16 objection is that the debtors must accept any change the

17 lenders request, no matter how unreasonable and no matter how

18 it might affect the sale process and maximizing value because

19 the DIP agreement requires the lenders to consent to the form

20 of the order.  Your Honor, the debtors take their fiduciary

21 duty seriously and we do not support a process which makes the

22 debtors exercise their fiduciary duty subject to lender

23 consent.

24         The first set of objections, Your Honor relate to

25 this issue, the level of control the lenders can assert over

1   the sale process.  While the debtors have provided the lenders

2   with consultation rights, as is typical in Chapter 11 cases

3   like these, the lenders have requested more.  They essentially

4   want consent rights, as I mentioned, with respect to virtually

5   every decision the debtors will make from here on out

6   throughout the remainder of the marketing process.  The lenders

7   will have the ability to object to and potentially block

8   approval of any sale that does not pay them off in full.  And

9   that ultimate veto right should provide the lenders with

10  comfort with respect to a sale and a sale process it does not

11  approve of.

12          But it is quite another thing to require the debtors

13  to obtain the lenders' consent for every decision they make

14  themselves.  The debtors will surely do as they have gone

15  throughout the case.  Veto right over decisions made during

16  this process is neither appropriate or customary, especially

17  since the lenders have insisted that the debtors

18  (indiscernible) make it clear that the lenders may exercise

19  their credit bid rights.

20          Providing the lender with consent rights is

21  particularly inappropriate where they want to pursue their

22  credit bid rights.  How can the lenders dictate how the

23  (indiscernible) is run at every step of the way and still

24  deserve the right to credit?  This is quite a different

25  situation than a lender being a consultation party up until the

1   time it makes the credit bid, which you see often in sale

2   proceedings.  If the lender is not in their way, key decisions

3   regarding the sale process will have already been decided,

4   potentially cycling competition by the time this lender

5   subsides to credit.  That, Your Honor, is not appropriate.

6          The lender cited this Court's order in the Athenex

7   case as authority that the lender should receive consent rights

8   with respect to every decision made in the sale process.  Our

9   firm is counsel to the debtors in those cases and

10  Mr. (indiscernible) is one of the attorneys working on the

11  (indiscernible) team representing Athenex.  And he told me that

12  the reason why such consent rights were given in that case is

13  because there was absolutely no prayer that there would be any

14  recovery for general unsecured creditors.  So it really was no

15  harm, no foul, providing the lenders with such consent rights.

16          This case, Your Honor, is different.  There is a

17  possibility that we have a successful auction, that general

18  unsecured creditors can receive money (indiscernible), and

19  giving the lender such consent rights is inappropriate and

20  would be an abdication of the DIP fiduciary duty.

21  Nevertheless, we have gone back through the sale procedures and

22  have identified several areas where we are willing to provide

23  the lenders with consent.

24          I would now like to put up on the screen a chart

25  which identifies the decisions over which the lenders want

1    consent as reflected their objection, where the debtors have

2    agreed, and what outstanding issues remain.

3          Mr. Wallen, if you could put up this slide?

4          Okay.  Your Honor -- and there are 16 of these.  I'm

5    willing to go through each and every one and explain them.  It

6    may be tedious, but I think it's important Your Honor

7    understands in particular the issues as opposed to just the

8    general commentary.  So with your indulgence, I would be happy

9    to proceed.

10         THE COURT:  No, please.

11         MR. POMERANTZ:  The first one is decisions whether to

12   modify specified sale dates and deadlines.  The debtors have

13   given the lenders consent rights regarding modification to the

14   specific sale dates and deadlines.  And how we reconcile that

15   is that dates are usually subject to milestones.  Lenders

16   bargain for those dates and we're okay giving them consent

17   rights before changing those dates.  Of course, if we have an

18   issue, we might be back to court, but we give them the consent.

19         The second, the decision whether to reject a

20   nonconforming, inadequate, or insufficient bid, or a bid that

21   is not in the best interest of the estate, the lenders want the

22   ability to say, you can't have a bid in the (indiscernible).

23   We do not think that's appropriate, Your Honor.  We may have

24   disagreement with the lenders, and frankly, with the Committee,

25   as to whether a party meets the qualification.  It is the

1   debtors' decision in the exercise of their (indiscernible).  Of

2   course, if that party proceeds to win and the lenders don't

3   like that party, they reserve the right to (indiscernible), but

4   the lenders should not be able to cut off a pass and eliminate

5   certain parties from participating in the process.

6           The next is the decision whether to impose other

7   terms and conditions on qualified bidders in the best interest

8   of the debtors' estate.  As I know Your Honor knows from your

9   years as a practitioner, these auction processes are fluid.  We

10  have senior professionals representing the DIP.  We have a

11  variety of different assets, a variety of different parties.

12  We need the ability, subject to consulting with the lenders or

13  the Committee, to act on the fly to make decisions how the

14  process should be conducted, what additional rules

15  (indiscernible) should be made.  Giving the lenders

16  (indiscernible) is not appropriate.

17          The decision on whether a potential bidder has

18  presented adequate proof of financial ability. again, Your

19  Honor, we may have a disagreement with the lenders.  We and the

20  Committee may decide we want a party in the process because

21  creating an active auction might get the unsecured creditors

22  the money.  The lenders should not have the ability to say no,

23  the party can't be in the process because we have not

24  demonstrated financial wherewithal, the sale, if we seek

25  approval of the sale and there are questions about a party's

1  financial wherewithal.  Of course everyone deserves the right

2  to object.

3          A decision to waive any potential bidder

4  requirements, as Your Honor reviews these bidding procedures,

5  they're quite extensive.  There's a lot of different

6  requirements.  Again, the debtor needs to be able to, in the

7  interest of the estate and the interest of the auction process,

8  potentially weigh certain of those requirements, again, after

9  consultation with the consultation party.

10          The decision whether a potential bidder's preliminary

11  bid documents are acceptable, same issue as before.  The

12  lenders cannot keep a party outside of the process.

13          The decision whether to cease or modify provision of

14  diligence information to potential bidders, we will agree with

15  the lenders -- we look at (indiscernible) that if we seek to

16  withhold diligence information from a potential bidder, we can

17  only do that with a lender's (indiscernible).

18          And Your Honor, going back to Number 4, we did agree

19  to a concession that we would give the lenders consent rights

20  if the debtor seeks to exclude a bidder based upon lack of

21  financial wherewithal.  So if the lenders say hey, a party has

22  a bid wherewithal we disagree, we will let them in process.

23  It's just the other way around.

24          The decision whether to strip a bidder from their

25  status as a qualified bidder, we will now agree, as reflected

1  in the revised order, not to strip a bidder from the sentence

2  of being a cost by bidder without a lender's consent.

3           The next, Your Honor, is the decision whether to

4  disqualify a potential bidder for unauthorized communications

5  with other potential bidders.  We will agree not to disqualify

6  a bidder from -- a potential bidder as being qualified based

7  upon communications with other bidders without the lenders'

8  consent.

9           Next slide, please.

10          The decision whether the debtors will approve the

11 submission of a joint bid, again, Your Honor, we may determine

12 at certain points in time to marry up parties in a joint bid.

13 It happens all the time.  Why would we do that?  We would do

14 that to maximize value.  If for some reason the lenders say no,

15 we don't think it's appropriate, again, they can object.  But

16 we think it's in the best interest of the estate to drive

17 value, we should be able to do that.

18          The decision of which bids are qualified bids, again

19 -- and I think you're hearing a consistent theme here, Your

20 Honor -- determining who is in our process, whether they have

21 met bidding -- process, whether their bids are qualified bids,

22 we need to make that decision.  The lenders are potentially

23 going to credit it.  It would be appropriate to allow them to

24 be making those decisions.

25          The decision which bid will be the opening bid at the

1  auction, again, if we have a stalking horse that's approved,

2  that's another story that will be the starting bid.  But after

3  that, we would want to decide how do we sell this.  Do we sell

4  this as a group?  Do we sell this as pieces?  Which bid is

5  better?  Taking away that discretion and authority really does

6  not allow the debtor to basically fulfill its fiduciary duty.

7           The decision to whether to designate a stalking horse

8  bidder as a successful bidder if no other qualified bids are

9  received by the (indiscernible), we will agree that we will not

10  designate the stalking horse bidder as a successful bid in the

11  absence of other bids without lender consent.

12          The decision of whether to change or adjourn the

13  location of the auction, I believe in the context of allowing

14  -- not allowing us to change dates without the lender's

15  consent, we are okay with that even though it's not reflected

16  here.

17          The decision whether to adjust or establish the terms

18  of the auction procedures in accordance with the terms thereof,

19  there are several aspects of that, Your Honor.  One, for

20  example, the amount of minimum increment.  We agree that we

21  won't set minimum increment without the lenders' consent.  But

22  the debtors will not give the lenders consent rights with

23  respect to the amount of time for qualified bidders to respond

24  to a bid, whether two or more qualified bids may coordinate to

25  submit a combined bid, whether qualified bidders will be

1   required to submit last and final blind bids, whether the

2   auction may be adjourned to allow qualified bidders to engage

3   in further discussions with the debtor and consider how they

4   would like to proceed, of course subject to not being able to

5   change the date without the letters of consent.  And whether

6   the debtors may establish any further auction procedures to

7   maximize value, consistent of course with the spirit and intent

8   of the sale procedures.

9           Next, Your Honor, the decision which qualified bid is

10  a successful bid, (indiscernible) decision in consultation with

11  the lenders and Committee, with the lenders (indiscernible) to

12  object at the hearing.

13          And lastly, Your Honor, the decision to modify the

14  terms and procedures impose additional terms and conditions for

15  terminated (indiscernible) again similar to the other

16  (indiscernible).

17          So, Your Honor, those are the issues with respect to

18  consent.  Other than the issues surrounding consent rights, the

19  lenders have objected to several other aspects of the bid

20  procedures, some of which were already addressed in a motion

21  filed on June 16th as Docket Number 536.

22          I would like to now ask, Mr. Wallen, put up a chart

23  which outlines these other objections other than consent.

24          The first one, Your Honor, is the expense

25  reimbursement and the breakup fee.  The lenders requested that

1     the breakup fee be reduced from 3 percent to 2 percent and the

2     expense reimbursement be reduced from $1 million to 500,000.

3     Your Honor, we believe these protections are below market, and

4     in my proffer of Mr. Richard's testimony, he will testify to

5     such.  In fact, Your Honor, I note that in the affidavits order

6     that (indiscernible) for their consent rights.  Your Honor did

7     approve a 3 percent breakup fee and a 1 percent expense

8     reimbursement, which I believe are standard and customary not

9     only courts in this district, but courts around the country.

10          The debtors strongly believe that being able to offer

11     market-based bidding protections is critical to the debtors'

12     ability to attract a stalking horse, particularly in this case,

13     where the decision to become and name a stalking horse may not

14     be made until right before the auction.  And the principal

15     reason that a party may agree to become a stalking horse would

16     be based on the bid projections.  If you water down the bid

17     projections, you water down the likelihood of getting a

18     stalking horse.

19          But, Your Honor, in many, this fight is premature for

20     the following reason:  Our procedures provide that we may only

21     designate a stalking horse with the lenders' and Committee's

22     consent (indiscernible).  Accordingly, to the extent that we

23     present the lenders with a stalking horse or stalking horses

24     which contain the proceedings we have requested in this motion,

25     and the lenders object to our designation of the stalking horse

1   with those provisions, we will then come back to the Court on

2   an emergency basis and request that the Court authorize the

3   stalking horse on terms the debtors believe is appropriate.  If

4   the lenders object then, they can force us to file a motion and

5   take it up to that time.

6           Next, Your Honor, as I just mentioned, the comments

7   on the selection of the stalking horse, the lenders' objection

8   filed with the Court and the redline contain comments to the

9   prior version Paragraphs 9 and 10.

10          In consultation with the Committee and taking the

11  lenders' objections into account, we pretty much totally

12  rewrote Paragraphs 9 and 10 to provide how I just explained it

13  would work, and we believe that that should be acceptable to

14  the lenders.

15          The decision of whether the DIP order or bid

16  procedures order governs in the event of consistency --

17  inconsistency, the DIP agent requested that the DIP order

18  govern, and we agree that the DIP order will govern over any

19  inconsistencies with the bid procedures order.

20          The debtors' reservation of rights to disqualify a

21  potential bidder from communicating with consultation parties,

22  the DIP agent requested language -- this language be deleted.

23  We don't think it's appropriate, Your Honor.  If there is a

24  situation where a consultation party has had inappropriate

25  discussions with the bidder, the debtors have to be able to

1  disqualify that bidder.  We want to maintain the integrity of

2  the (indiscernible) process.  We don't want to do anything that

3  will undermine a successful bidder's receipt of 363(n)

4  protection.  And if a consultation party, which I would never

5  expect to happen, does something like this, our ability to

6  disqualify the bidders should not be subject to the

7  consultation party's consent.

8        The debtors -- the DIP agent requested that any

9  good-faith deposit be subject to the DIP agent's lien.

10 Your Honor, that's kind of a silly request, because the

11 deposit is not property of the estate.  Of course, any deposit

12 prior to the closing and prior to becoming nonrefundable can't

13 be subject to their lien.  It's not our property.  So we were

14 not willing to make that change.

15       The DIP agent requested the ability to share on --

16 professional eyes only information with one representative of

17 the DIP agent.  We have accepted the DIP agent's right to share

18 that information as requested.  We just want to make sure that

19 the information is not extensively disseminated, because, as

20 Your Honor knows, the more information gets out, the more it

21 could compromise the sale process.

22       The DIP agent requested the right to credit bid at

23 the auction, and we accepted the DIP agent's right to credit

24 bid.  But the credit bid has to be made by the bid deadline.

25 Otherwise, what are they credit bidding?

1          Now, the agent in their brief says that there's

2     nothing that requires them under 363(k) to do this.  Well, no,

3     363 says they can credit bid.  The form and matter of how they

4     credit it is subject to the Court's discretion.  And not

5     knowing what that credit bid entails, what the documentation

6     is, what the terms and conditions are, we think it's

7     (indiscernible) reasonable to require that, if they do want to

8     credit bid, that they provide us with the document that sets

9     forth the terms of their credit bid.

10          And lastly, Your Honor, the DIP agent requests that

11     any good-faith deposit forfeited to the debtors be subject to

12     the DIP agent's lien.  (Audio interference) after the deposit

13     becomes nonrefundable because of a breach or obviously in

14     connection with a consummated sale, of course, then the deposit

15     shall be subject to the liens.

16          So, Your Honor, that concludes the lender objections.

17     I would like to take up the objections -- two other objections

18     that were filed as well.  We've received two other objections,

19     one from the Necessity Landlords, and they objected to language

20     in Paragraph 11(e) of the bid procedures order that provided

21     that a contract could be conditionally assumed and assigned

22     pending resolution of the counterparty's objection.

23          We have revised the sentence to make clear that, if

24     there is an objection based upon adequate assurance of future

25     performance, that the contract can only be conditionally

1  assumed and assigned with the counterparty's express written

2  consent.  I expect, Your Honor, if there are objections to

3  adequate assurance, we will have to set an expedited hearing --

4  evidentiary hearing on that because I assume that the

5  successful bidder is not going to want to close, pay a lot of

6  money, if it can't be assumed.  So I think everyone is aligned

7  with that.

8          As Paragraph 11(e) already provided, if the only

9  dispute is the amount of the cure, the contract can be assumed

10  and assigned, as is standard, subject to reserving amounts

11  equal to the counterparty's assertion of the cure, which funds

12  cannot be used without (indiscernible) court order.  With that,

13  Your Honor, I believe it resolves the Necessity Landlords'

14  objection.

15          The last objection, Your Honor, was filed by

16  (indiscernible) call the "BFM entities" from which the debtors

17  acquired a certain number of properties prepetition.  As we

18  informed the Court previously, the debtors and the BFM entities

19  were involved in material prepetition litigation relating to

20  those transactions.  Litigation remains; but, of course, it's

21  stayed by the bankruptcy.

22          They have raised essentially two objections to the

23  motion.  First, they allege that because there are ongoing

24  disputes between the debtors and BFM regarding licensing

25  agreements between the parties, and that they identified what

1   they believe are inaccuracies in the schedules for over 50 of

2   the debtors that were filed earlier this week, that that

3   somehow casts doubt on the reliability of information generally

4   being provided to buyers in the sale process.

5           BFM's comments are disingenuous.  If they were

6   really, truly concerned about information in the schedules,

7   they would have privately reached out to the debtors with their

8   alleged inaccuracies so that they can be reviewed and

9   evaluated, rather than filing a pleading, attempting to

10  publicly cast doubt on the debtors' information systems, which

11  could be detrimental to the sale process.

12          BFM could provide the debtors with a list of the

13  information that they believe is inaccurate and complete, and

14  the debtors will review in due course and make amendments as

15  necessary.  This is not a reason to deny the motion.

16          BFM's second objection relates to the procedures

17  relating to the assumption and assignment of the contract.

18  Remarkably, BFM -- BPM argues that because they believe the

19  debtors may not have adequate information to include in their

20  assumption and assignment notice to be filed by June 26th that

21  the Court should not approve the timeline for the sale process.

22          Your Honor, the debtors know exactly what they have

23  signed up for in terms of the notice of assignment and are

24  prepared to meet that deadline.  If BFM wants to -- if BPM

25  wants to provide the debtors with what they believe are a full

1    and accurate listing of all of its contracts with the debtors,

2    we are happy to review and make sure appropriate information is

3    provided in the notice.  And as is typical, if any other party

4    has any questions as to how their contracts are listed in the

5    notice, the debtors will be happy to work with them to resolve

6    any such issues.

7              BPM has also objected to the deadline for parties to

8    file adequate assurance objections.  And this, Your Honor, we

9    believe was a fair point.  The motion originally contemplated a

10   July 31st deadline to object on adequate assurance grounds,

11   which is the Monday following the July 28th auction.

12             As discussed before, I have made a couple of changes

13   to ameliorate BPM's concerns.  First, the debtors will provide

14   adequate assurance information to anyone who requests such

15   information in writing and will agree to keep such information

16   confidential promptly at the conclusion of the auction on

17   Friday, but in no event later than 9 a.m. on Monday, July 31st.

18             Second, we will agree to extend the deadline to file

19   an objection to adequate assurance to close of business on

20   August 3rd.

21             In addition, we understand that this time frame is a

22   tight time frame, and we understand, based upon prior dealings

23   with Your Honor in this case and others, that the Court will

24   consider any requests for additional time if under the

25   circumstances an extension is appropriate.  But rather than

1    extend out the process now by adding time that will cause

2    additional liquidity concerns, we request that the Court

3    address any further issues on a case-by-case basis later on in

4    the process.

5           Your Honor, after the Court hears any opening

6    comments from other parties, I'm prepared to proffer the

7    testimony of Geoff Richards, who is in the virtual courtroom

8    and available for cross-examination.  Thank you, Your Honor.

9           THE COURT:  Thank you, Mr. Pomerantz.

10          Mr. Elrod, would you like to make what I'll just take

11   as opening statements?

12          MR. ELROD:  Thank you, Your Honor.  Can you hear me?

13          THE COURT:  Loud and clear.  Thank you for asking.

14          MR. ELROD:  Thank you, Your Honor.  Your Honor, to

15   set the stage here, I think it's important for the Court to be

16   aware that, despite the lengthy presentation that was given by

17   Mr. Pomerantz, this is the first time we have had any detailed

18   discussion with the debtors regarding the form of the bid

19   procedures.

20          When we submitted our comments to the proposed order

21   that was circulated, we were simply told no, that this is the

22   debtors' process and that's the way this would go.  We were

23   given no ability to negotiate, no ability to discuss, and,

24   quite frankly, no ability to understand the debtors' position

25   behind these issues.

1          Unfortunately, Your Honor, the debtors appear to have

2     spent more time presenting to the Court and preparing for this

3     hearing today than trying to work this out between the DIP

4     lenders outside of court, which would have been a much better

5     use of the Court's time and of all parties' time, given that

6     there are 83 people on the line right now.

7          With that being said, Your Honor, to give the Court

8     further context, as the Court likely recalls, the secured

9     lenders here extended $37 million or have committed to extend

10    $37 million in additional post-petition credit.  One of the

11    items that we received in exchange for doing that were the

12    right to have a bidding procedures order that was acceptable to

13    the lenders.  The debtors were aware of that, they agreed to

14    that, and now they're seeking to re-trade that.

15         Your Honor, I will say that now that the debtors have

16    refiled an order five minutes prior to this hearing, which

17    Your Honor graciously gave us a few minutes to review, the

18    consent rights issue has largely been resolved.  There are,

19    however, Your Honor, several issues that remain outstanding.

20    The first is with respect to the deposit.  This is another

21    example of why we should have had a discussion about this

22    issue.

23         Here, the deposit issue, I believe we're actually on

24    the same page with the debtors on it, now that I've heard

25    Mr. Pomerantz's explanation.  I'm, unfortunately, in an

1  unrelated case, having to litigate this issue on behalf of the

2  secured lender where a bidder did not close and now we have a

3  situation where a Chapter 7 trustee is asserting on behalf of

4  the estate that it's not our cash collateral, and we are

5  obviously maintaining that it is our cash collateral.

6          So I believe we're on the same page with the debtors

7  on this point at present, and I believe that can be fixed

8  through appropriate language, but the language that came back

9  to us was not acceptable.

10         Your Honor, on the credit bidding rights issue, as

11  Mr. Pomerantz indicated, as we all know from our time and from

12  working through auctions of this nature, auctions are fluid.

13  We never know what may happen in an auction.  As presently

14  structured, secured lenders are required to submit a bid prior

15  to the bid deadline, which is proposed to be July 21st.  But

16  what if we get to a situation during the auction where one or

17  more buyers withdraw, and the agent then decides to lodge a

18  credit bid?

19         It is a fluid process, and like in many other cases

20  in this court, as -- like in the Athenex case, as an example,

21  we should be entitled to credit bid on the fly.  Everybody has

22  notice of that.  They know that it's a possibility.  They know

23  roughly what our debt number is.  And so that's an appropriate

24  concession to provide in light of this.

25         The next item is the lack of contact with buyers.

Case 23-90147   Document 1224   Filed in TXSB on 08/09/23   Page 43 of 78

1   Your Honor, obviously, I'm not going to do anything, my client

2   isn't going to do anything to spoil this auction process.  We

3   are all about driving value in this process, perhaps more than

4   any other party in this virtual courtroom.  The issue here is

5   what if a buyer reaches out to us and contacts us and wants to

6   discuss things, whether it's a unilateral email or some other

7   communication that we don't solicit?  At that point, the

8   debtors have the unilateral right to exclude us as a

9   consultation party.  That's a completely inequitable result and

10  should not be approved by the Court.

11          Your Honor, the next item relates to the breakup fee

12  and expense reimbursement.  We believe that the expense

13  reimbursement should be capped at $500,000 and the breakup fee

14  should be at 2 percent, rather than 3 percent and 1 percent.

15  The debtors are basically proposing to use the secured lender's

16  cash collateral doing this, and we aren't agreeable to that

17  use.  And obviously, as the Court is well aware, they can't use

18  our cash collateral without permission of the Court or without

19  our consent.

20          So, Your Honor, had there been more discussion on

21  these issues, we could have avoided Mr. Pomerantz's lengthy

22  discussion on the matter; but unfortunately, we weren't even

23  given that level of respect.  So here we are today in front of

24  the Court, having wasted a bunch of time that -- it could have

25  been resolved prior to a hearing, but instead we were simply

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

1 | shut out of the process despite clear language in Your Honor's

2 | prior final DIP order that provided us with that right as a

3 | condition to DIP funding.

4 |         THE COURT:  All right.  Thank you.

5 |         Let me ask, Ms. Brownstein, I do see you there.  Are

6 | you still activated?

7 |         MS. BROWNSTEIN:  Yes, Your Honor.  Beth Brownstein

8 | from ArentFox Schiff on behalf of the Necessity Landlords.

9 | Your Honor, we filed a list of objections at Docket Number 692

10 | and we did work with the debtors in advance of the hearing on

11 | proposed language, which I can confirm was incorporated in the

12 | redline that was filed.  So, with that, Your Honor, we reserve

13 | all rights with respect to the sale (indiscernible) but our

14 | objection for today has been resolved.

15 |         THE COURT:  All right.  Thank you.

16 |         And let me -- who is representing the BPN parties?

17 | Do we have anybody on the line representing the BPN parties?

18 |         MR. KUEBEL:  Your Honor?

19 |         THE COURT:  Yes.  Is that Mr. Kuebel?

20 |         MR. KUEBEL:  It is, Your Honor.  Thank you.

21 |         THE COURT:  Good afternoon.

22 |         MR. KUEBEL:  Good afternoon, Your Honor.  Omer F.

23 | Kuebel, III, on behalf of the BFM parties.  And we've also made

24 | an appearance for our other clients in the case, Your Honor,

25 | P66 Petroleum, who's got a fuel agreement with the debtors --

```
 1              THE COURT:  Certainly.
 2              MR. KUEBEL:  -- and Imperial Trading, but our
 3   specific objection was BFM.  Much like Mr. Elrod, Your Honor,
 4   I'm a little bit taken aback by the comments that some of our
 5   objections were disingenuous.  The debtor filed its MEX
 6   schedules on Monday, on the 19th.  We immediately reached out
 7   to the debtor, through Mr. Golden and Mr. Kadden, to try to
 8   address some of our concerns.  And most notably, that the
 9   licensing agreement between our client, BFM Enterprises, and
10   the MEX debtor, even though we brought this before
11   (indiscernible) we filed our list of what we think are
12   defaults, sent them to the debtor on -- through counsel on June
13   6th and we've had a few calls about them, in terms of follow-
14   up, we were surprised to see that our license agreement was not
15   included in the schedules that were filed on Monday.
16              So we did immediately reach out.  Unfortunately, we
17   didn't really get any engagement from the team, and so we moved
18   forward and -- with our limited opposition last night.  And I
19   don't know how much Your Honor wants to hear, but I'm happy to
20   go through, in chapter and verse, our concerns if you want to
21   hear them now.
22              THE COURT:  So, Mr. Kuebel, let me do this.  I want
23   to try and understand just where you are.  I think that the
24   revised order, at least my reading of it, should have solved
25   some of your issues, but not all.  Am I right about that?
```

1           MR. KUEBEL:  Yes, Your Honor.  I think that the --

2    moving the adequate assurance date back is very helpful for,

3    quite frankly, all of our client groups.

4           THE COURT:  Sure.

5           MR. KUEBEL:  Even P66.  Obviously, Your Honor, we

6    don't know what this looks like in a vacuum, and we don't know

7    who's going to end up being the successful purchaser.  It may

8    be an entity with great credit that our clients already do

9    business with, in which case it won't be a significant issue.

10   But it could also be an amalgam of four or five bids put

11   together regionally with clients that don't have a track record

12   or don't have a lot of good financials or in public, and so

13   that's going to take some time to take a look at.

14          So we thought that an auction that may go late into a

15   Friday night, followed by Monday adequate assurance, was a

16   little bit too tight of a deadline.  And at this point, backing

17   it up three to four days is helpful.  And as Your Honor knows,

18   we're not shy.  If we've got an issue, we'll be back before

19   Your Honor --

20          THE COURT:  Sure.

21          MR. KUEBEL:  -- if that timetable isn't enough.

22          THE COURT:  Got it.

23          MR. KUEBEL:  So --

24          THE COURT:  No, I got it.  So what I was really --

25   where I was really trying to get to was, with the improvements

1  that have been made to the proposed order, if you could -- and

2  again, I'm not -- I don't want to know whose fault it is.  What

3  I really want to understand is what are your remaining issues?

4         MR. KUEBEL:  So, Your Honor, our remaining issues

5  really go into the contract assumption timetable.

6         THE COURT:  Okay.

7         MR. KUEBEL:  And there's also a substantive issue

8  with respect to how to deal with nonmonetary defaults.  And

9  certainly we've got some non-monetaries, and I can give the

10 Court a flavor for what those are.

11        THE COURT:  Well, no.  I mean --

12        MR. KUEBEL:  But as Your Honor --

13        THE COURT:  If you can't cure, you can't assume and

14 assign.  I mean --

15        MR. KUEBEL:  Yeah.

16        THE COURT:  I'm trying to figure out what we're

17 really doing before we even know if this is an issue.

18        MR. KUEBEL:  Yeah.  So I mean, our concerns, first of

19 all, Your Honor, are can the debtor make -- it's four days from

20 the entry of the order -- potentially four days if today --

21 timeline, to file the assumption and assignment notice.

22        THE COURT:  Okay.

23        MR. KUEBEL:  And I say that, on the one hand, with

24 concerns that, for example, our license agreement wasn't even

25 scheduled with MEX, but really a greater concern that a number

1   of the entities -- and it's back at 512 -- haven't filed their

2   schedules at all yet.  I think they will be filed circa

3   mid-July, probably after this is due.

4           And I'd point out to the Court that a number of those

5   entities include Brothers Petroleum and at least ten other

6   Brothers entities that are potentially contract counterparties

7   with our clients.

8           THE COURT:  Okay.

9           MR. KUEBEL:  And so not being able to even see the

10  schedules or have the schedules prepared, I'm concerned about

11  whether four days from now (indiscernible) going to get

12  adequate files and assignment notice.

13          THE COURT:  And so can we go down the branch of that

14  decision tree?  So, if you do get a schedule --

15          MR. KUEBEL:  Of course.

16          THE COURT:  If you do get a schedule and you're

17  referenced, then you can either say I have a problem or I don't

18  have a problem or I have a question, right?  And if you don't

19  get a schedule, then the debtor is in breach of the bidding

20  procedures, for which there are consequences, right?

21          So I'm trying to figure out -- it always bothers me

22  when parties on the other side say I'm really doing this for

23  the benefit of the other party, because no one really acts that

24  way.  And what I'm trying to understand is what you're really

25  worried about.

```
 1              MR. KUEBEL:  So -- a "for example," Your Honor.

 2              THE COURT:  Sure.

 3              MR. KUEBEL:  And this may be helpful, and -- I know

 4   this is an emergency hearing, and while we did not tender a

 5   witness, I think I've got our CFO available if Your Honor wants

 6   to hear, but --

 7              THE COURT:  No.  Mr. Kuebel, I just --

 8              MR. KUEBEL:  We got access --

 9              THE COURT:  I want to understand the issues.  So,

10   again, not assessing --

11              MR. KUEBEL:  Yes.  Let me --

12              THE COURT:  Stop trying -- no, I get to talk.  Please

13   stop --

14              MR. KUEBEL:  Yes.

15              THE COURT:  Please trying to justify.  Please stop

16   trying to assess blame.  Help me understand the problem.

17              MR. KUEBEL:  Yeah.  So, Your Honor, as I understand

18   it, our client currently has access to the PDI system for

19   purposes of trying to reconcile what a cure injection or cure

20   amount would look like.

21              THE COURT:  Okay.

22              MR. KUEBEL:  But the system has not been updated for

23   months, as the case may be.  And while we have access to it, we

24   can't work with the debtor or haven't been able to work with

25   the debtor to actually do any auditing or reconciliation.  And
```

1    according to our CFO, there are over 300,000 lines of Excel

2    data that we need to be reconciled to really get to the balance

3    of the accurate to/due froms in order to come up with what we

4    think the right cure number should be.

5              THE COURT:  Right.

6              MR. KUEBEL:  And it's a pretty significant task,

7    according to the accountants, Your Honor.

8              THE COURT:  Right.  But as I understood what the --

9    or if I read correctly the change that's been made, if this is

10   purely an amount calculation issue, then when you get the

11   number, you're going to say this is subject to an audit, it's

12   not right.  And now we're going to have -- you're going to have

13   plenty of time to go back and do the accounting and the

14   reconciliation.

15             So -- but first, Mr. Pomerantz, did I misunderstand

16   what you did?

17             MR. POMERANTZ:  No, you didn't.

18             THE COURT:  Okay.  And so, Mr. Kuebel, if it's just

19   an amount issue, I think that you would be perfectly -- you

20   would be perfectly within your rights when you get the notice

21   to say this is subject to an audit, you know, of this system

22   which hasn't been available.  And since it is an amount, the

23   revised order provides all the time you need to go through and

24   do the accounting to figure out what the number is.  So I'm

25   trying to understand the issue, and I'm just not getting there.

```
 1              MR. KUEBEL:  My understanding, Your Honor, is we have
 2   approximately eight or nine days from maybe next Wednesday to
 3   come up with our cure objection on those type of contracts.
 4   So I -- and --
 5              THE COURT:  Take me where you're reading in 694 --
 6   and, Mr. Pomerantz, if you would do the same.  I obviously
 7   missed something or I'm misunderstanding something.
 8              MR. POMERANTZ:  Your Honor, there is a deadline to
 9   file a cure objection to our amount.
10              THE COURT:  Right.
11              MR. POMERANTZ:  We will have an amount.  It will be
12   our best faith case, good-faith estimate of what the amount is.
13   If Mr. Kuebel's client disagrees, and to the extent he
14   basically is saying that he doesn't know and he needs
15   information, we will, of course, work with him to try to
16   provide it, because we're about solving problems, Your Honor.
17   With this -- respect to this issue, if the buyer wants to take
18   those contracts, it's in our best interest to resolve the
19   amounts.  And if we can't, we'll agree on some amount that gets
20   escrowed (indiscernible).
21              So that's how I think it gets resolved.  There's
22   nothing different from this case than any other case.  And
23   Mr. Kuebel's comments about our lack of recordkeeping, again,
24   not really helpful to the sale process.  So I think we've
25   resolved this issue.
```

```
 1              THE COURT:  So, Mr. Kuebel, let me come back to --
 2   because I want to -- if you've got a concern, I want to make
 3   sure that I've at least understood it and thought through it.
 4   So you get a number, it says a dollar.  And you talk to your
 5   CFO and your CFO says, wow, I just don't see how it could be a
 6   dollar, what we really need to do is we need to go through and
 7   audit this system that we haven't had access to.  So you're
 8   going to file an objection that says we dispute the amount
 9   subject to an audit of the system.  And I'm sorry for not
10   remembering what the acronym was.
11              MR. KUEBEL:  PDI.
12              THE COURT:  Yeah, thank you.  So, at that point, I
13   think Mr. Pomerantz is right.  You're either going to reach a
14   number that everybody can live with and avoid the audit
15   expense, or you'll go through and do the audit and the
16   purchasing party will either say this is important enough to me
17   to wait and figure out what the number is, or you'll agree that
18   you'll take the buyer out of the middle of it by escrowing an
19   amount that everybody agrees to live within.
20              I just don't see how that doesn't give you the
21   appropriate time when I've told you the objection that you can
22   file, which is not going to surprise me, and we'll get this
23   resolved once we know if we have a fight.
24              MR. KUEBEL:  Your Honor, I'm all for that.  We may
25   have to come back and knock on your door for some either
```

1  expedited discovery or expedited resolution of these cure

2  issues, but certainly that's something that we wanted to

3  mention and make sure that we're maintaining the rights to do

4  in order to try to resolve these information gaps.

5          THE COURT:  Well, you know I like problems that

6  involve numbers, so I will be right there waiting to see you.

7  What else?

8          MR. KUEBEL:  Your Honor, the other issue that we have

9  raised is that there (indiscernible) process for dealing with

10 some of the nonmonetary issues.  I told Your Honor I'd give you

11 an example.  And one of the examples, for example, the license

12 agreement dispute that requires continuous operations to keep

13 the marks in a number of the stores that have been closed.

14          And I recognize that, in this instance, the debtor

15 filed a significant lawsuit yesterday against some of the

16 dealers who weren't operating.  So it may not be a dealer

17 issue, but it's nevertheless one that we may have to resolve

18 that's nonmonetary for -- that is a "for example" nonmonetary.

19 There are others.

20          THE COURT:  No, I got it.  And is this the license

21 that isn't listed?

22          MR. KUEBEL:  Yes.

23          THE COURT:  And are you upset that it isn't listed or

24 you think that there's a real problem there?

25          MR. KUEBEL:  Since we filed the license, raised it

1   before, and actually had (indiscernible) with the debtor, we

2   were surprised (indiscernible) listed, Your Honor.  Certainly.

3   There are other agreements out there that were not listed as

4   well.  The Imperial Supply agreement wasn't listed, for

5   example.  Our P66 agreements were listed, but there were other

6   agreements that (indiscernible) and it was creating for us a

7   fundamental concern.

8          And I think this is something that we can work out

9   with the debtor.  But -- and look, I understand the debtors

10  have priorities, and we may not be -- and for all good reasons

11  that we may not be in, but these are issues that we do need to

12  identify the universe of agreements.  As Your Honor's aware,

13  these -- particularly in a dynamic where this debtor doesn't

14  (indiscernible) own and operate many of its stations.  They are

15  creatures of contract, and the contract assumption process is

16  important.  And being able to get the information and work with

17  the debtor to identify cures and other issues are a fundamental

18  mutual value, we think, Your Honor.

19         THE COURT:  I got it.  All right.

20         Let me -- is there anyone else that had an objection?

21         All right.  Could -- I thought I saw him leave.  Is

22  counsel for the DIP lender still there?

23         MR. ELROD:  Yes, Your Honor.

24         THE COURT:  All right.  Thank you.  Could you turn

25  your camera back on?  Is it possible?

1          MR. ELROD:  Your Honor, that may take me a moment,
2    but I will turn it on.

3          THE COURT:  Well, then I'll just start without you.
4    It's always easier just to look at people.  It's hard to talk
5    to hard to talk to someone you can't see.

6          Here's what I'd like for everybody to do, and I'm
7    going to make a couple of comments, and then I'm going to let
8    the two of you do what you both know how to do so very well.
9    All of the comments about who talked to whom and who should
10   have involved us, you know, those are relationship issues.
11   Those are business issues.  And I don't mean this in any way
12   disrespectfully to either one of you.  I just don't care.  You
13   reap the consequences of what you sow, both directions.

14         But I do have some observations, and it seems to me a
15   lot of these things can easily be worked through.  I do think,
16   as I listen to both of you, that the issue about the deposits
17   is not a big deal.  We just need to make sure that the language
18   says that it's subject to the lien upon forfeiture and not one
19   second before.  I can't imagine that that's a real dispute
20   because I think both of you said it in just different ways.

21         With respect to the whole credit bidding issue and
22   the sharing of information, so here's my view of this.  And
23   again, I don't take the Athenex order as precedential in any
24   way, indicative of anything.  It was an agreement.  I wasn't
25   asked to resolve disputes.  When people agree to things, I can

1    live with an awful lot.  When they can't, then they ask me to

2    -- when they ask me to work through the process, then I care a

3    lot more.

4           If the DIP lenders are going to be a credit bidder,

5    they need to say that up front.  If they're going to be a

6    credit bidder, then they're not going to participate in the

7    sharing of information.  They're not going to be talking to

8    parties.  If we need to work out a statement that will be -- if

9    someone reaches out to the lenders, you know, I'm perfectly

10   happy for there to be some language that this is the only thing

11   we will say and that won't trigger any rights.

12          But the process is going to be transparent and DIP

13   lender is not going to be both in -- wearing the hat of a

14   potential bidder as well as a lender.  Going to choose.  If you

15   want to be a bidder, which you have every right to do, you're

16   going to be a bidder and you're going to be treated like every

17   other bidder.  If you're going to say we're not going to credit

18   bid, then you are going to get access to information that the

19   Committee and the debtor have.

20          That's going to happen whether the two of you like it

21   or not, because I'm not going to approve a process that in any

22   way appears tainted or weighted in favor of one party or

23   another.  So I'm going to give you an opportunity to work your

24   way through that.

25          Breakup fee and expense reimbursement, that's an

1  evidentiary issue.  If you don't have an agreement, I'll take

2  that up when we come back.  I'll listen to the evidence and I

3  will make the call.

4            As I listen to the two of you, I don't really hear

5  any other disputes.  I will tell you this.  If you don't have

6  common ground on the consents, I have my own view about lender

7  consents and I'll start imposing it if the parties don't have

8  an agreement.

9            So with that, it's 4:30 my time, 4:28.  I'm going

10  to -- we're going to adjourn until five o'clock my time.  And

11  I'm going to -- Mr. Pomerantz, I'm going to instruct you to

12  initiate a call to your DIP lenders' counsel.  And I don't know

13  who all of the professionals are that need to be involved.  I'm

14  not suggesting that there are any others that need to be.  I'm

15  not suggesting that there aren't.  But I'm instructing you to

16  initiate the call.  I want you to work through these -- I want

17  you to have a conversation about these issues.

18            These do -- I've given you some guidelines.  If we

19  can't find common ground around those issues, then I'm

20  misunderstanding something.  And when we get back, then I'll

21  start molding the bid procedures in the way that I think they

22  ought to be done.

23            With respect to Mr. Kuebel's objections, I don't

24  understand them.  They seem to be protective to me, not really

25  substantive at this point.  If -- again, as I go down the

1   decision tree, these are procedures.  If people don't live up

2   to procedures, there are consequences.  If there are missing

3   contracts, I assume that they're missing for a reason.  I don't

4   need to know them today.  But I don't understand the concerns,

5   given the way that I read the changes that were made to 694.

6           With respect to Ms. Brownstein, she's happy, and I

7   compliment you on that.  I've known Ms. Brownstein long time,

8   think she's a fabulous lawyer.  I also know how hard it is to

9   make her happy, so I will compliment you on that.

10          Any questions or comments before -- Mr. Ruff, I

11  haven't meant to ignore you at all.  You've just been very

12  quiet.  U.S. Trustee want to weigh in on any of this?  Have

13  comments?  Want to be involved in any of this?

14          MR. RUFF:  Your Honor.  Thank you.  Jayson Ruff for

15  the U.S. Trustee's Office.  No, we don't see any need to weigh

16  in on any of these issues that have been raised today.

17          THE COURT:  All right.  Then I would like you back

18  at --

19          MR. GIBBS:  Your Honor?

20          THE COURT:  -- I would like you back at five o'clock,

21  if you can --

22          MR. GIBBS:  Your Honor?

23          THE COURT:  Yes, sir.  Mr. Gibbs.

24          MR. GIBBS:  Oh, good.  I was afraid I lost audio.

25          THE COURT:  No.

1          MR. GIBBS:  I just want the Court to know, I think at

2   this stage, we prefer to weigh in after we see where the

3   parties are coming back.  Would like to be on that call if it's

4   physically possible, but -- and if the Court wants to know

5   where we are, I'm happy to give you our input.

6          THE COURT:  I'm happy to wait and hear.  I don't know

7   why you can't be involved in that call.

8          MR. POMERANTZ:  Your Honor, I was going to save

9   Mr. Gibbs the trouble of getting up and say that we would

10  perfectly like the Committee to be involved, that they are part

11  of the process.  And as long as Mr. Elrod doesn't have a

12  problem (indiscernible).

13         THE COURT:  Yeah, I just think -- again, I want the

14  process to be as open and as transparent as it can be.  So I

15  don't really care if anyone has a problem with it.  Committee

16  has an absolute seat at the table, and I want to hear their

17  opinion on this issue.

18         So let's have the call.  I'll see everybody back at

19  five o'clock Central time, so that is in roughly 29 minutes.

20         In the meantime, folks, I'm going to -- yes?

21         MR. POMERANTZ:  I was going to say, Mr. Wallen, if

22  you'd just send the Zoom out to the Greenberg folks and the

23  (indiscernible) folks and us so we can hopefully resolve this

24  and not take up any more of Judge Jones' time.

25         THE COURT:  All right.  Thank you, folks.  I'll see

1   you back at five.

2           Folks who are on the line for Paradox, I'm going to

3   go ahead and call the Paradox case, see where we are, and we'll

4   figure out what we're going to do with the time that we have.

5           We'll be adjourned, everyone.  Thank you.

6       (Recess taken at 4:32 p.m.)

7       (Proceedings resumed at 5:00 p.m.)

8       THE COURT:  All right.  We are back on the record in

9   Case Number 23-90147, the jointly-administered cases under

10  Mountain Express Oil Company.  Time is five o'clock Central.

11          Mr. Pomerantz, where are we?

12          MR. POMERANTZ:  So, Your Honor, I'm pleased to report

13  that we have been able to resolve successfully the language

14  changes to three provisions.  We actually pulled one out of

15  Judge Isgur's hat and actually put the language on the screen

16  and drafted on the fly, which I always found a little scary

17  before Judge Isgur, but, you know, given that I control the

18  document, it was a lot easier.

19          So I'd like to describe to Your Honor the three

20  changes made, and then we will upload the order, but the

21  language has been approved by everyone.  So, Your Honor, first,

22  with respect to the credit bid rights of the lenders, we have

23  provided that they shall be required to elect on whether or not

24  they are going to be a credit bidder by the bid deadline.  But

25  upon doing so, we agreed that they do not -- they do so by

1  letter without any further documentation.

2          THE COURT:  Sure.

3          MR. POMERANTZ:  And also provided that they would no

4  longer have consultation rights or consent rights as provided

5  (indiscernible).

6          And, second, we were able to clarify language

7  regarding the deposit and when it is forfeited, that it would

8  be subject to the DIP lien (indiscernible) and also constitute

9  (indiscernible) as cash collateral.  So we did -- we resolved

10  that issue.

11          And then the last issue to deal with the concern

12  about if there is an unsolicited contact with the

13  (indiscernible) consultation parties, they are not allowed to

14  communicate with them; and within one business day they are to

15  let us know that that -- communication received.  And if they

16  comply with those procedures, that would not be grounds for

17  deleting them as a consultation party.

18          So I think those three issues, we have an agreed

19  order.  I do have the proffer of Mr. Richard's testimony, which

20  I'm prepared to present to provide (indiscernible) evidentiary

21  support for the motion.  And then I don't want to forget

22  there's also one other matter on the calendar that we have to

23  deal with.

24          THE COURT:  Understood.  And I do want to hear

25  Mr. Richards' proffer.

1          Mr. Kuebel, again, you have my commitment that if you

2    have a real issue, you know how to ask for access.  And I just

3    don't understand your issue today.  Once it has manifested

4    itself, perfectly, nothing that we're doing today in any way

5    inhibits your ability to seek emergency relief.  I will take it

6    up as soon as I know it.  I just don't understand it today.

7    Fair enough?

8          Oh, and I'm sorry, Mr. Kuebel.  I think you've got --

9    there you are.  You just popped up, 504 number.

10         MR. KUEBEL:  Yes.  Good.  Thank you, Honor.  One

11   other point that I want to raise to Your Honor, and it's just

12   trying to keep with the changes that were already made to the

13   order.  There were changes that were accepted to Paragraph (e)

14   of the order, Your Honor, relative to the dispute resolution

15   process.

16         There is a similar set of language -- and I'm

17   specifically referring to Subparagraph (h) with Document Number

18   -- I believe it's 694-1 on the dispute resolution for

19   supplemental cure objections.  And there may need to be, I

20   believe, one change to keep it consistent with (e) that would

21   carry over into Paragraph (h).  I wanted to note that.  You

22   know, Your Honor had asked me about, well, what if the

23   contracts aren't included.  There is supplemental cure notices

24   and objections.  It did seem to me that the changes that were

25   made to (e) should be consistent with (h), at least with

1  respect to language in the last sentence about the segregated

2  account.

3          THE COURT:  I'm reading.  It's not my silence means

4  anything.  I'm reading.

5          MR. KUEBEL:  No, no.  I understand.  There was an

6  addition to "and not be disbursed by the debtor" in

7  Paragraph (e) that it seemed would be consistent in

8  Paragraph (h).

9          MR. POMERANTZ:  It actually already said it's

10  deposited in the segregated account.  So what additional

11  language you need?

12          THE COURT:  I think -- sorry.  Go ahead, Mr. Kuebel.

13          MR. KUEBEL:  Go ahead, Your Honor.  Go ahead.

14          THE COURT:  I think he was focused on, in (e), the

15  phrase that came after the word "and."  If you put that -- I

16  think it says more or less the same thing.  I think what (h)

17  does is -- it's just a little different, but I think it says

18  exactly the same thing.

19          MR. POMERANTZ:  So is the request to add "and not

20  disbursed" in (h)?

21          MR. KUEBEL:  Yes.

22          MR. POMERANTZ:  That's fine.  That's fine.

23          THE COURT:  Okay.

24          MR. KUEBEL:  And with that, Your Honor knows that,

25  you know, we're not shy.  We're going to try to work with the

1   debtor to address our information and contract issues; and if

2   we can't get there, we'll be back in front of Your Honor in

3   short order.

4           THE COURT:  All right.  Thank you, Mr. Kuebel.  Thank

5   you for being practical.

6           All right, Mr. Pomerantz.  Mr. Richards'

7   declaration -- or Mr. Richards' proffer.

8           MR. POMERANTZ:  Yes, Your Honor.  Your Honor, I'm

9   going to proffer the testimony of Geoff Richards.  If Geoff

10  Richards was called as a witness, I would testify that -- as

11  follows:

12          "I'm a senior managing director with Raymond James,

13          the debtors' investment banker.  I lead our firm's

14          capital structure advisory group of approximately 25

15          bankers.  I have nearly 20 years of investment

16          banking experience representing companies in all

17          types of financing transactions, including debt and

18          equity capital raises in mergers and acquisitions,

19          both in court and out of court, in many different

20          industries.

21          "Raymond James was hired in February 2023, and since

22          that time, Raymond James has spearheaded on behalf of

23          the debtors a sale process designed to maximize the

24          value of the debtors' assets for all stakeholders.

25          The debtors have received significant interest from

```
 1          multiple parties interested in a potential
 2          transaction.  A data room has been established and
 3          contains over 11,000 files, and substantial due
 4          diligence has been conducted by many parties.
 5          "Some key facts about the sale process to date:
 6          Commencing in mid-March, Raymond James contacted 121
 7          potential buyers, 82 of whom were strategic and 39 of
 8          whom were financial.  Fifty-one parties signed
 9          nondisclosure agreements; and since the filing of the
10          motion, two additional parties have signed
11          nondisclosure agreements.
12          "Raymond James has had calls with 39 different
13          parties.  Nine parties have submitted preliminary,
14          non-binding indications of interest in connection
15          with the May 8th indication of interest deadline.
16          The debtors entered into further negotiations with a
17          number of those indication of interest parties and
18          continue to seek a potential stalking horse.
19          "Based upon my experience, I believe that it's
20          important to establish procedures to govern an
21          auction process in Chapter 11.  I personally
22          participated in developing the auction procedures
23          which are the subject of the motion.  The goal of
24          establishing these procedures is to set a timeline
25          for the rest of the process, establish basic rules
```

1          for submitting bids for the purchase of assets,

2          provide the lenders and the Committee with

3          consultation rights with respect to virtually every

4          aspect of the sale process, and to maximize

5          stakeholder recoveries.

6          "I believe that these procedures will accomplish

7          these goals and provide the debtors with the

8          necessary flexibility as we try to maximize value.

9          While we have not yet identified a stalking horse,

10         parties are finishing their diligence.  We are

11         working towards that objective and believe that being

12         able to offer market-based protections to induce one

13         or more parties to be the stalking horse is critical.

14         "Based upon my experience, a 3 percent breakup fee

15         and up to $1 million in documented out-of-pocket

16         expenses for a transaction like this is well within

17         the market for these types of protections.  The

18         procedures contemplate bids due on July 21st; an

19         auction on July 28th; a sale hearing on August 7th,

20         subject to the Court's calendar; and a closing on

21         August 15th.

22         "I believe that approving procedures with

23         (indiscernible) timeline increases the likelihood of

24         maximizing the value of the debtors' assets.  I have

25         reviewed the objections to the bid procedures filed

```
 1              by the lenders; and in my judgment and experience,

 2              providing the lenders with the type of consent rights

 3              that they seek would not be customary and are not the

 4              type of decisions that the debtors (indiscernible) to

 5              lenders.

 6              "The debtors have and will continue to regularly and

 7              actively consult with the lenders and the Committee

 8              regarding all aspects of the process, and I believe

 9              that approval of the motion to establish bid

10              procedures is in the best interest of the debtors'

11              estate and should maximize value to stakeholders."

12              That concludes my proffer, Your Honor.

13              THE COURT:  All right.  Thank you.

14              Mr. Richards, if you could raise your right hand,

15  please, sir.  Do you swear or affirm the testimony you're about

16  to give will be the truth, the whole truth, and nothing but the

17  truth?

18              Ah, sir.  You are raising your right hand and also

19  hitting "five star."  My apologies.  Let's start this over

20  again.

21              GEOFFREY RICHARDS, DEBTORS' WITNESS, SWORN

22              THE COURT:  Thank you, Mr. Richards.  Did you listen

23  carefully to Mr. Pomerantz's proffer of your testimony this

24  afternoon?

25              MR. RICHARDS:  I did.  Yes, sir.
```

1              THE COURT:  Did you understand it all?

2              MR. RICHARDS:  Yes, sir.

3              THE COURT:  Everything he told me true and accurate

4   to the best of your knowledge?

5              MR. RICHARDS:  Yes, Your Honor.

6              THE COURT:  And do you adopt his statements as your

7   sworn testimony in support of the debtors' request to approve

8   bid procedures?

9              MR. RICHARDS:  Yes, sir.  I do, Your Honor.

10             THE COURT:  All right.  Thank you.  I'll accept the

11  proffer.

12             Anyone have any cross-examination for Mr. Richards?

13  "Five star" if you haven't already done so.

14             All right.  Mr. Richards, there are no takers.  You

15  are excused as a witness.  Thank you, sir.

16             MR. RICHARDS:  Thank you, Your Honor.

17             THE COURT:  All right.  Mr. Pomerantz, anything else

18  on this issue?

19             MR. POMERANTZ:  No, Your Honor.  Just in closing, I

20  think we've provided Your Honor with the evidentiary support.

21  I think we've resolved all the objections either in a manner

22  agreeable to the parties or, as Your Honor has indicated, we'll

23  process in uploading the order, and we would request that

24  Your Honor enter the order so we can have a document going out

25  to bidders that will facilitate the rest of the auction

1    process.

2            THE COURT:  All right.  Thank you.

3            Anyone else have closing comments?

4            All right.  Again --

5            MR. GIBBS:  Good afternoon, Your Honor.  Just --

6            THE COURT:  Yes?

7            MR. GIBBS:  Just for the record, Chuck Gibbs, on

8    behalf of the Committee.

9            THE COURT:  Yes, sir.

10           MR. GIBBS:  We were supportive of the motion as

11   filed.  We were supportive of the proposed changes that were

12   filed today to the order and bid procedures to try to address

13   the objections.  And we are similarly approve -- we similarly

14   approve and are okay with the proposed changes that

15   Mr. Pomerantz just advised the Court of to resolve the

16   remaining issues after the earlier hearing.  So we are

17   supportive and ask Your Honor to enter the order.

18           THE COURT:  Thank you, Mr. Gibbs.

19           Anyone else?

20           All right.  Again, and I compliment everybody for

21   fulfilling their roles to the process.  Everybody did exactly

22   what they were supposed to do.  No complaints whatsoever.  Got

23   before me the debtors' emergency motion for entry of orders

24   authorizing a sale process, bidding procedures, approving

25   bidding protections, setting forth a schedule, approving the

1  form of notice, and setting other deadlines with respect to

2  contract cures, assumptions, all of the things that go along

3  with a complicated auction process.

4        Again, I do find that I have jurisdiction over the

5  matter pursuant to 28 U.S.C. Section 1334.  Such a motion

6  constitutes a core proceeding under 28 U.S.C. Section 157.

7  Further find that I have the requisite constitutional authority

8  to enter a final order with respect to the requested relief.

9        Again, this is one of those issues that this is the

10  debtors exercising their business judgment to make a decision

11  on how they're going to go forward.  Put more practically, they

12  have put their faith in Mr. Richards and his firm to go forward

13  and achieve the highest possible outcome, given the

14  circumstances that the company faces.  In order to do that

15  efficiently, got to give Mr. Richards both a structure and a

16  process in which to work.  He needs the tools to be able to do

17  his job.

18        The proposed -- or the motion and the proposed order,

19  the proposed bid procedures, do exactly that.  Comforted by the

20  fact that he was integrally involved in the process.  This is

21  what he says he needs to be able to do his job.  Debtors put

22  their faith in the professionals that they retain.  In my view,

23  they've made the right decisions on how to move forward.  I

24  don't have any concerns at all.

25        I think the process, especially with the changes that

1   have been made, are intended both to achieve the maximum

2   possible value that can be achieved from the sale of these

3   assets.  They're intended to be inclusive.  They're intended to

4   encourage participation while at the same time not sacrificing

5   the transparency and the integrity of the bankruptcy process

6   that I require.  Don't have any concerns.

7          I will approve the motion subject to Mr. Wallen

8   confirming to Mr. Alonzo that a revised form of order has been

9   uploaded.

10         MR. POMERANTZ:  It's been uploaded, Your Honor.  I

11  believe it's Docket 695.

12         THE COURT:  Well, that's just too efficient.  All

13  right.  If you'll hold on just a second, let me grab that.  I

14  got it.  Give me just a moment, folks, to read the redline.

15  What did we all do before we could do this?

16         UNIDENTIFIED:  I think some of us that are old enough

17  used fax machines and carbon paper, so --

18         THE COURT:  Got it.  Okay.  So the one thing I need

19  to do is in your chart, you need a sale hearing time.  You'd

20  said you wanted it August the 7th.  How does two o'clock

21  Central work for everybody's calendar?

22         MR. POMERANTZ:  It works for the debtor, Your Honor.

23         THE COURT:  Thank you.  Anyone else have a conflict

24  that they can't manage?

25         All right.  So two o'clock p.m. Central time.  And

1   Mr. Pomerantz, I'm just interlineating into that little table

2   that is on Page 4.

3           MR. POMERANTZ:  Okay.  I think there are a couple of

4   places that need (indiscernible).  Right, Mr. Wallen?

5   (Indiscernible) the date of the hearing?

6           THE COURT:  So I'm looking.  I thought the other one

7   was actually in the notice, which I'll leave to you to fill in.

8   But if there's somewhere else, Mr. Wallen, please tell me.

9           MR. POMERANTZ:  He's trying -- I think he's trying to

10  get unmuted.

11          THE COURT:  Ah, sorry.  Thank you.  I was reading.

12          Mr. Wallen?

13          MR. WALLEN:  Judge, this is Ben Wallen, Pachulski

14  Stang Ziehl & Jones, counsel to the debtors.  Judge, there is

15  also in the bid procedures themselves a similar table.  Given

16  that it was just uploaded, I don't know the exact page, but it

17  should be around Page 17 of the clean PDF.

18          THE COURT:  Okay.  I got it.  So I said August 7th at

19  2:30, right?

20          MR. WALLEN:  Yes, Judge.  Or two --

21          MR. POMERANTZ:  (Audio interference) --

22          THE COURT:  So, Mr. Pomerantz, blood pressure down.

23  I was just trying to see if Mr. Wallen was paying attention.

24  That's all I was doing.

25          MR. POMERANTZ:  You know, I haven't caught him yet.

1    I don't know if you've ever caught him, but I haven't caught

2    him yet, so --

3              THE COURT:  All right.  Made that change.  It was,

4    Mr. Wallen, just that one other just that one other place?

5              MR. WALLEN:  Yes, Judge.  I think it's other places,

6    but that was the other key place.  Then the debtors can conform

7    with the appropriate notices at the appropriate time.

8              THE COURT:  All right.  Thank you.

9              Then, with that, all right.  Order has been signed

10   and it is off to docketing.

11             All right.  Mr. Pomerantz, I know we had one other

12   matter on the agenda that at least I believed had been

13   resolved; but if not, certainly need to address it.

14             MR. POMERANTZ:  I will hand the virtual podium over

15   to Ben Kadden who will present our concerns with respect to

16   the -- Samnosh withdrawal of their motion.

17             THE COURT:  All right.  Thank you.

18             Mr. Kadden.

19             MR. KADDEN:  Good afternoon, Your Honor.  Can you

20   hear me?

21             THE COURT:  Loud and clear, and thank you for

22   checking.

23             MR. KADDEN:  Your Honor, by way of background,

24   Samnosh had filed a motion to compel rejection back in April.

25   The debtors raised a number of procedural deficiencies at that

1    time.  They then withdrew the motion.  They then refiled the

2    motion, and the debtors were once again forced to incur time

3    and expense opposing the motion, and has now once again been

4    withdrawn two days prior to the hearing.

5            And so, while we certainly understand and appreciate

6    the withdrawal, the reason we asked to have the hearing today

7    was to understand what Samnosh's position was with respect to

8    going forward with either requested relief or some modified

9    version of relief, or, you know, the time and effort spent by

10   the debtor on this has been in vain.  And maybe they're just

11   scared.  I don't know.

12           THE COURT:  So let me -- first of all, let me ask do

13   I have Mr. Gibson on the line?  Mr. Gibson, is that you?  All

14   right.  Someone in area code 214, and I thought that Mr. Gibson

15   was in Dallas.

16           MR. GIBSON:  Your Honor, yes.  That's me.  I was

17   double muted.  I apologize.

18           THE COURT:  No, I appreciate that.  So, Mr. Gibson,

19   you don't need to respond.  So let me make a couple of

20   comments.  So I've read all of your pleadings, and I will just

21   tell you that to the extent -- and we're not trying anything

22   today.  We're making no factual findings.  We're not doing

23   anything today.

24           A motion to compel rejection is not the vehicle to

25   seek the relief that you want, at least not in front of me.

1    I'm making no comment whether you can do that by contested

2    matter under 9014 or it requires an adversary under 7001.  What

3    I am telling you is that the motion that you file doesn't get

4    you what you want.

5            And so I'm just going to leave it -- I'm going to

6    leave it there.  If you choose to file something, I will

7    certainly take it up and I will set it in due course.  But --

8    and I don't know you.  Are you a Dallas bankruptcy

9    practitioner?

10           MR. GIBSON:  I am not.  I'm a state court lawyer out

11   of water.

12           THE COURT:  Got it.  And so -- and again, I mean no

13   disrespect.  I kind of thought that.  If you choose to proceed

14   forward, might serve you -- you know, I have a lot of friends

15   who are great bankruptcy lawyers that reside in Dallas.  So

16   geographically they made bad decisions in their life, but they

17   are good bankruptcy lawyers.  I continue to try to get them to

18   move to Houston.  So far, they turned me down.

19           But if you choose to do something, I encourage you,

20   you know, get some help, but I'm not bothered by where we

21   stand.  I just -- this was my very polite way of telling you,

22   don't do this again.  Okay?

23           MR. POMERANTZ:  Absolutely.  And I appreciate that,

24   Judge.  That was the conclusion I came to after reading the

25   response.

```
 1              THE COURT:  All right.  Thank you.

 2              All right.  Mr. Gibbs, I saw you get up.  Did you

 3   have something that you wanted to address?

 4              MR. GIBBS:  No.  We just lost camera up in the

 5   courtroom, and I just wanted to make sure that we had video

 6   (indiscernible) of the hearing.

 7              THE COURT:  No, I got it.

 8              Mr. Kadden, with that admonition, that discussion,

 9   debtors okay?

10              MR. KADDEN:  Yes, Your Honor.

11              THE COURT:  All right.

12              MR. KADDEN:  I had one other housekeeping issue, if I

13   could, Your Honor?

14              THE COURT:  Sure.  Sure.  What have I missed?

15              MR. KADDEN:  Following Tuesday's show cause hearing

16   with respect to the group of New York dealers, we did connect

17   with Mr. Alonzo got a date of next Thursday for a follow-up

18   hearing, and submitted a proposed order late yesterday

19   afternoon.

20              I don't think that I've seen it hit the docket, but I

21   did just want to point out to Your Honor that when I inserted

22   the date for the 24 hours for them to comply with the

23   compliance inspection, that date has become stale.  So, if and

24   when Your Honor is prepared to enter the order, I will either

25   need to resubmit it, or if you have the ability to overwrite
```

1   the date that I picked in terms of timing.  That was at

2   Docket 682.

3           THE COURT:  I have it up on my screen.  It's one of

4   the things I know I've got to do.  Just had a long day

5   yesterday, but I will -- I am not leaving Laredo until that's

6   done.  But thank you for the reminder.

7           MR. KADDEN:  Thank you, Your Honor.

8           THE COURT:  All right.  With that, anyone else have

9   anything we need to talk about?

10          All right, then.  Everyone, have a good evening.

11  Again, thank you for the hard work, and we'll be adjourned.

12      (Proceedings concluded at 5:23 p.m.)

13                          * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

1                          **C E R T I F I C A T I O N**

2

3              I, Lisa Luciano, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter, to the best of my ability.

7

8

9    _____

10   LISA LUCIANO, AAERT NO.  327              DATE:  August 9, 2023

11   ACCESS TRANSCRIPTS, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25