```
                    UNITED STATES BANKRUPTCY COURT
                  SOUTHERN DISTRICT OF TEXAS (HOUSTON)

                                    .  Case No. 23-90147
IN RE:                              .  Chapter 11
                                    .  (Jointly Administered)
MOUNTAIN EXPRESS OIL COMPANY,       .
et al.,                             .  515 Rusk Street
                                    .  Houston, TX 77002
                  Debtors.          .
                                    .  Monday, August 7, 2023
. . . . . . . . . . . . . . . .     .  2:24 p.m.

                    TRANSCRIPT OF SALE HEARING
                 BEFORE THE HONORABLE DAVID R. JONES
                 UNITED STATES BANKRUPTCY COURT JUDGE
```

APPEARANCES:

```
 For the Debtors:            Pachulski Stang Ziehl & Jones LLP
                             By:  MAXIM B. LITVAK, ESQ.
                             One Sansome Street, Suite 3430
                             San Francisco, CA 94104
                             (415) 263-7000

                             Pachulski Stang Ziehl & Jones LLP
                             By:  JEFFREY POMERANTZ, ESQ.
                                  JEFFREY DULBERG, ESQ.
                             10100 Santa Monica Blvd., 13th Floor
                             Los Angeles, CA 90067-4003
                             (310) 277-6910
```

APPEARANCES CONTINUED.

```
Audio Operator:             Courtroom ECRO Personnel

Transcription Company:      Access Transcripts, LLC
                            10110 Youngwood Lane
                            Fishers, IN 46048
                            (855) 873-2223
                            www.accesstranscripts.com
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
APPEARANCES (Continued):


 For the Debtors:              Pachulski Stang Ziehl & Jones LLP
                               By:  BENJAMIN L. WALLEN, ESQ.
                                    MICHAEL D. WARNER, ESQ.
                               440 Louisiana Street, Suite 900
                               Houston, TX  77002
                               (713) 691-9385


For the Official
Committee of Unsecured         McDermott Will & Emery LLP
Creditors:                     By:  CHARLES R. GIBBS, ESQ.
                                    MARCUS A. HELT, ESQ.
                               250 North Harwood Street, Suite 1900
                               Dallas, TX 75201
                               (214) 295-8063


                               McDermott Will & Emery LLP
                               By:  MARIS J. KANDESTIN, ESQ.
                               1007 North Orange Street, 10th Floor
                               Wilmington, DE 19801
                               (302) 485-3900

For First Horizon
Bank, as                       Greenberg Traurig, LLP
Administrative Agent:          By:  JOSEPH DAVIS, ESQ.
                               Terminus 200
                               3333 Piedmont Road NE, Suite 2500
                               Atlanta, GA 30305
                               (678) 553-2259

For Phillips 66:
                               Locke Lord LLP
                               By:  BRADLEY KNAPP, ESQ.
                               601 Poydras Street, Suite 2660
                               New Orleans, LA  70130
                               (504) 558-5155

For SASS Petroleum,
LLC:                           Foley & Lardner LLP
                               By:  JOHN MELKO, ESQ.
                               1000 Louisiana Street, Suite 2000
                               Houston, TX 77002
                               (713) 276-5500


                               Fellows LaBriola LLP
                               By:  STEVEN KUSHNER, ESQ.
                               233 Peachtree Street Northeast
                               Suite 2400, Harris Tower
                               Atlanta, GA 30303
                               (404) 586-9200
```

```
APPEARANCES (Continued):

For MEX 1123 Lane,        Fishman Jackson
LLC:                      By:  MARK RALSTON, ESQ.
                          4835 LBJ Freeway, Suite 475
                          Dallas, TX 75244
                          (972) 419-5544


For the U.S. Trustee:     United States Department of Justice
                          By:  JAYSON RUFF, ESQ.
                          515 Rusk Street, Suite 3516
                          Houston, TX 77002
                          (713) 718-4650


For Sunoco:               Katten Muchin Rosenman
                          By:  MICHAELA CROCKER, ESQ.
                          2121 North Pearl Street, Suite 1100
                          Dallas, TX 75201-2591
                          (469) 627-7070


For Spirit Realty,        Reed Smith LLP
Inc.:                     By:  KEITH AURZADA, ESQ.
                          2850 North Harwood Street
                          Suite 1500
                          Dallas, TX 75201
                          (469) 680-4211


For Brazoria County,      Perdue Brandon Fielder Collins &
et al.:                   Mott
                          By:  MELISSA VALDEZ, ESQ.
                          1235 North Loop W, Suite 600
                          Houston, TX 77008-1772
                          (713) 862-1860


For Marathon Petroleum    Frost Brown Todd LLP
Company:                  By:  RONALD GOLD, ESQ.
                              MARK PLATT, ESQ.
                          Great American Tower
                          301 East Fourth Street, Suite 3300
                          Cincinnati, OH 45202
                          (513) 651-6800


For 4Court Holdings       Baker Donelson Bearman Caldwell &
LLC, 4Court Leading       Berkowitz, P.C.
LLC, 4Court Solutions     By:  LOCKE WALDROP, ESQ.
LLC, and 4Court           First Horizon Building
Imaging LLC:              165 Madison Avenue, Suite 2000
                          Memphis, TN 38103
                          (901) 526-2000
```

```
APPEARANCES (Continued):

For Subway/Doctor's         Venable LLP
Associates:                 By:  PAUL BATTISTA, ESQ.
                            100 Southeast 2nd Street, Suite 4400
                            Miami, FL 33131
                            (305) 349-2300

For Aftermarket Sales       Quilling Selander Lownds Winslett &
& Consulting LLC and        Moser P.C.
LIM5903 Properties          By:  JOSHUA SHEPHERD, ESQ.
LLC:                        2001 Bryan Street, Suite 1800
                            Dallas, TX 75201
                            (214) 880-1824

For Nine Shell Gas          Dorsey & Whitney
Stations okay LLC:          By:  ERIC LOPEZ SCHNABEL, ESQ.
                            300 Delaware Avenue, Suite 1010
                            Wilmington, DE 19801
                            (302) 425-7171

For CAM-PL Cedar            Rubin & Levin P.C.
Rapids LLC, CAM-PL          By:  JAMES ROSSOW, ESQ.
Cokeville LLC, and          135 N. Pennsylvania Street
CAM-PL Kansas City          Suite 1400
LLC:                        Indianapolis, IN 46204
                            (317) 860-2893

For DBW Land Co. LLC:       Hudson Potts & Bernstein LLP
                            By:  JASON SMITH, ESQ.
                            1800 Hudson Lane, Suite 300
                            Monroe, LA 71201
                            (318) 388-4400

For Bowie Central           McCreary Veselka Bragg & Allen P.C.
Appraisal District:         By:  JULIE PARSONS, ESQ.
                            700 Jeffrey Way
                            Round Rock, TX 78665
                            (512) 323-3200

For Schierl Sales           McGuire Craddock & Strother, P.C.
Corp.:                      By:  J. MARK CHEVALLIER, ESQ.
                            500 North Akard Street, Suite 2200
                            Dallas, TX 75201
                            (214) 954-6807
```

```
APPEARANCES (Continued):

For Ford Motor Credit        Devlin Naylor & Turbyfill PLLC
Company LLC:                 By:  DONALD TURBYFILL, ESQ.
                             5120 Woodway Drive, Suite 9000
                             Houston, TX 77056-1725
                             (713) 622-8338

For GPM Investments          Howley Law PLLC
LLC, as a party in           By:  TOM HOWLEY, ESQ.
interest:                    Pennzoil Place, South Tower
                             711 Louisiana Street, Suite 1850
                             Houston, TX 77002
                             (713) 333-9125

For Valero Marketing         Dykema Gossett
and Supply Company:          By:  DEBORAH WILLIAMSON, ESQ.
                             112 East Pecan Street, Suite 1800
                             San Antonio, TX 78205
                             (210) 554-5500

For CITGO Petroleum:         Whiteford Taylor & Preston
                             By:  BRENT STRICKLAND, ESQ.
                             111 Rockville Pike, Suite 800
                             Rockville, MD 20850
                             (301) 804-3610

For Total Image              McGuireWoods LLP
Solutions LLC:               By:  JOHN MADDOCK III, ESQ.
                             Gateway Plaza
                             800 East Canal Street
                             Richmond, VA 23219-3916
                             (804) 775-1000
```

1      (Proceedings commence at 2:24 p.m.)

2           THE COURT:  Good afternoon, everyone.  This is

3  Judge Jones.  The time is 2:24 Central.  Today is August

4  the 7th, 2023.  This is the docket for Houston, Texas.  On the

5  two o'clock docket, we have the jointly-administered cases

6  under Case Number 23-90147, Mountain Express Oil Company.

7           Folks, please don't forget to record your electronic

8  appearance.  That's a quick trip to the website, a couple mouse

9  clicks.  You can do that at any time prior to the conclusion of

10 the hearing.  It is the way that we note your official

11 appearance.

12          We've got folks both in the courtroom as well as on

13 GoTo Meeting.  For those of you who are in the courtroom, if

14 you rise to speak, if you would please come to the podium.

15 It's the only place that you can both be seen and be heard.

16 For those folks of you who are on GoTo Meeting, a number of you

17 have already hit "five star," but if you do wish to speak,

18 you'll need to hit "five star."  Only need to do it once, but

19 you'll need to do "five star."  I'll unmute you, and then you

20 can be heard live in the courtroom.

21          Either way, first time that you speak, if you would

22 please state your name and who you represent, that really does

23 help the court reporter in the event that a transcript request

24 is made.

25          And finally, this afternoon, we are recording using

1   CourtSpeak.  We will get the audio of this afternoon's hearing

2   up on the docket, available for your download, shortly after

3   the conclusion of the hearing.

4          And with that, who is taking the lead this afternoon

5   for the debtors?  Mr. Pomerantz, is that you?  Mr. Wallen, is

6   that you?

7          MR. POMERANTZ:  That is me, Your Honor.

8          THE COURT:  All right.  Thank you.

9          MR. POMERANTZ:  Your Honor, can you hear me okay?

10          THE COURT:  Loud and clear.

11          MR. POMERANTZ:  Can you hear me okay?

12          THE COURT:  Yes, sir.  Thank you.

13          MR. POMERANTZ:  Good afternoon, Your Honor.  Jeff

14   Pomerantz of Pachulski Stang Ziehl & Jones, on behalf of the

15   debtors.  Appearing from my firm, with me virtually in the

16   courtroom, are Max Litvak, who will handle the evidentiary

17   aspects of today's hearing, Mr. Wallen is in court, and Mike

18   Warner is on the phone.

19          Also appearing are the debtors' chief restructuring

20   officer, Michael Healy from FTI, and Geoff Richards, the senior

21   managing director of Raymond James, the debtors' retained

22   investment banker.  And they will be, Your Honor, two of the

23   debtors' witnesses for today.

24          Your Honor, on Friday evening, August 4th, the

25   debtors filed their notice of successful bid at Docket

1    Number 1192 and the notice attached a letter of intent between

2    the debtors and GPM Investments, LLC, a subsidiary of ARKO

3    Corp., which described a going-concern transaction pursuant to

4    which the debtors would seek to sell substantially all, but not

5    all, of their assets for a gross purchase price of $49 million,

6    with $18.5 million of that amount coming from Oak Street, the

7    debtors' master lessor, who controls more than half of the

8    debtors' locations.

9            I will refer to this today as the "ARKO/Oak Street

10   transaction."  The initial document that was filed on the court

11   was not signed; but when we filed our amended exhibit and

12   witness list, a signed version was actually filed.

13           As you'll hear, Your Honor, the ARKO/Oak Street

14   transaction is actually an integration of two transactions

15   which have and continue to require a careful balance of efforts

16   for the benefit of all constituents.  The ARKO/Oak Street

17   transaction will preserve thousands of jobs, hundreds of small

18   businesses, maximize going concern value for the benefit of all

19   stakeholders, and was the result of an extensive and extremely

20   complicated sale process which culminated in a successful

21   auction process which spanned August 2nd to August 4th.

22           In a few moments, I will describe the sale process

23   and the auction in more detail.  And, Your Honor, when I use

24   the word "successful" in talking about the auction, we use it

25   in the manner that the assets were market-tested under an

1  extensive process.  The ARKO transaction, we believe, is

2  supported by the debtors' major landlords, the debtors'

3  employees, and we believe will be supported by all of the oil

4  companies, a substantial -- and a substantial majority of

5  dealers.

6          The lenders have not supported it, as Your Honor is

7  fully aware, and the Committee has filed a response indicating

8  they need more information before they can take a position.

9          As we said in the notice, Your Honor, we are not

10  seeking court approval of the ARKO/Oak Street transaction at

11  today's hearing.  Rather, we are reporting to the Court on the

12  ARKO/Oak Street transaction in response to several actions that

13  lenders have taken over the last several days which challenged

14  the debtors' ability to proceed to document the ARKO/Oak Street

15  transaction and proceed with closing the sale.

16          The timeline, Your Honor, is quite telling.  On

17  July 21st, the deadline for submission of bids pursuant to the

18  bid procedures order, the debtors received 12 bids.

19  Thereafter, the debtors received an additional four bids, for a

20  total of 16.  None of these bids, however, were "qualified

21  bids," as that term is defined in the bid procedures order.

22          Importantly, of those 16 bids, none of them were

23  from the lenders who were required to submit a credit bid by

24  July 21st.  Your Honor recalls in the bid procedures order, all

25  they had to do was send a letter.  They didn't have to send

1   documentation saying that they were willing to credit bid.

2   They did not.

3           On July 24th, the debtors' professionals made a

4   presentation to the lenders regarding the 14 bids that were

5   received at that time.  And at that meeting, the debtors'

6   professionals recommended that the lenders agree to continue

7   the auction from July 28th to August 2 to allow the debtors'

8   professionals to continue negotiation with the bidders in the

9   hopes of qualifying as many bidders as possible.

10          Although the debtors -- although the lenders rejected

11  the debtors' request to continue the auction, the debtors did

12  so anyway (indiscernible) they were permitted to do so under

13  the terms of the bid procedures order and because they

14  determined that in the absence of any qualified bids, it would

15  have been impossible to conduct an auction on July 28th.

16          The debtors filed their notice continuing the auction

17  to August 2, which appears at Docket Number 1099.  And on the

18  evening of August 1, the debtors met with the entire lender

19  group and updated them on the status of the negotiation with

20  bidders heading into the auction.  In fact, we tried to meet

21  with the lenders' professionals in person if they were in New

22  York.  They refused.  And only after we took the initiative of

23  calling a meeting with all the lenders did we have that forum.

24          And at that time, Your Honor, the debtors informed

25  the lenders that they had received a proposal from ARKO and

1    Oak Street which would fund the debtors' operations prior to

2    close -- which would fund the debtors options [sic] prior to

3    close, not require another penny from the lenders, and pay the

4    lenders $10 million net of closing costs the debtors believe

5    would be required to be paid as a closing of the sale plus

6    leave the lenders with owned real estate as well as certain

7    claims against the estate which the lenders had indicated that

8    they wanted to pursue.

9            The debtors at that meeting asked the lenders that if

10   the $10 million was insufficient that they should come back to

11   the debtor and say what amount would be sufficient to support

12   their consent so that the debtors would have a target at the

13   auction the next day.

14           After the lender meeting, Your Honor, one of the

15   lenders in the syndicate, Bank of Hope, sent an email to Geoff

16   Richards of Raymond James stating that if we think -- "if we

17   all think this business is going to be sold for $10 million, I

18   would rather take chances in 7 and see all burn."  That letter,

19   Your Honor, is Document Number 7 in our witness and exhibit

20   list, which is at Docket 1197.

21           The debtors have subpoenaed Mr. Marshall, the Bank of

22   Hope representative and the author of the "burn" email, and

23   intend to call him as a witness during the evidentiary portion

24   of today's hearing.

25           On August 2nd, the parties convened in the Raymond

1   James office for the auction.  Prior to engaging with the

2   bidders and other interested parties, the debtors asked the

3   lenders if they had decided on a target for the debtors to

4   shoot for that would be acceptable to the lenders.  The

5   lenders' response?  They would need to receive $150 million in

6   proceeds to consent to a sale.  That response affirmed --

7   reaffirmed what the debtors have experienced from the lenders

8   throughout these cases:  they could not count on the lenders to

9   be constructive in the process.

10          The debtors' professionals spent nearly all day on

11  August 2nd and August 3, meeting with all of the bidders and

12  the major landlords to work with them to try to maximize value.

13  And I will discuss in a few moments some of the dynamics of the

14  auction process that made it extremely complex, and I will

15  explain the results that came out of the auction process.

16          While constructive negotiations were ongoing with the

17  bidders and landlords, on August 3rd, the lenders concurrently

18  took a number of destructive actions, deciding to end the case.

19  On August 3rd, the lenders declared an event of default and

20  issued a carve-out trigger notice under the DIP order, which

21  terminated the debtors' use of cash collateral.

22          What was the default that was declared by the

23  lenders?  Failing to conduct the auction by July 28th and

24  continuing it until August 2, a restriction in the DIP

25  agreement, but not the bid procedures order.  Yes, Your Honor,

1   that was it, a five-day continuance of the auction.

2            On August 3rd, the lenders sent the debtors a notice

3   of the occurrence of maturity date, at Docket Number -- at

4   Docket Number 1197, in our witness and exhibit list, Number 4.

5   And on August 3rd, the lenders filed with the Court notice of

6   occurrence of the maturity date, which is Exhibit 5, at Docket

7   1168.

8            The public notice, as would be expected and probably

9   intended, had adverse consequences for the debtors.  Several of

10  the debtors' major oil suppliers reached out to the debtors

11  immediately, concerned about the debtors' viability.  The

12  debtors explained to the oil suppliers that unless the lenders

13  froze the debtors' accounts, thereby causing automatic drafts

14  to bounce, action that required relief from the automatic stay,

15  the oil companies would be paid for fuel.

16            Based on that explanation and the understanding that

17  the debtors today would be asking the Court for the green light

18  to proceed with the ARKO/Oak Street transaction, the oil

19  companies did not take any action, although certain have since

20  put the debtors on credit hold.

21            At the end of the day, after August 3rd, after

22  exhaustive discussions with the bidders, the debtors met with

23  the lenders and informed them that they believed that the

24  ARKO/Oak Street transaction could be structured to provide a

25  recovery of $20 million, double the projection from August 1

1  that resulted in the "burn" email.  And importantly, the

2  debtors would not require any new financing from the lenders to

3  close the transaction, and the transaction would leave the

4  estate with the real estate and litigation subject to the

5  lenders' lien, to monetize for the lenders' benefit.

6          The lenders' response, their last, best, and final

7  offer, they needed to be paid approximately $47 million, which

8  was the amount of the new money advance post-petition.  They

9  told the debtors' professionals that this was best, last, and

10 final, and not to come back with any other offer.

11         In the morning, on August 1st, lenders' counsel

12 emailed me that they would be filing a motion to convert the

13 cases to Chapter 7.  We have not seen any such motion hit the

14 docket.  However, the lenders' behavior during the last few

15 days was consistent with the August 1 proclamation from the

16 Bank of Hope that they preferred to see the estate burn.

17         Although the lenders try to distance themselves from

18 that email in their response to cash collateral, they may have

19 been the only one that sent the email, but it's pretty clear

20 that the majority group of lenders feel that way.

21         During the day on August 4th, the debtors reached a

22 tentative agreement in principle with ARKO and Oak Street with

23 respect to the ARKO/Oak Street transaction, and I will describe

24 those terms in detail in a few moments.

25         The debtors went on the record on August 4th, at

1 | 6 p.m., declared the ARKO/Oak Street transaction as the winning

2 | bid; Docket Number 1197 -- of our witness/exhibit list,

3 | Number 3.  And on August 4, as I mentioned, the debtors filed

4 | their notice of successful bid, and their notice of status

5 | conference report is at Docket 1194, which outlines how we got

6 | to this point, much of which I am going over today.

7 | The lenders have told the debtors that they believe

8 | they have the unfettered right to say no to any further use of

9 | cash collateral and that the debtors can't do anything about

10 | it.  We believe, Your Honor, it is the Court, not the lenders,

11 | who will have the final say on whether a sale should be

12 | approved and whether the proposed transaction is in the best

13 | interest of creditors.

14 | What we are asking for from the Court today is a

15 | determination that the Court has the discretion to approve a

16 | sale, notwithstanding the lenders' refusal to consent.  If the

17 | Court answers that question in the affirmative, we will then

18 | ask the Court for authority to use cash collateral for a

19 | one-week period while we work to document the terms of the

20 | ARKO/Oak Street sale transaction.

21 | And on August 5, we filed an emergency amended motion

22 | for use of cash collateral, seeking authority to use cash

23 | collateral for one week.  And that amended motion is at Docket

24 | Number 1196.  We then asked the Court for a continued hearing

25 | on Monday, August 14th or thereabouts to consider approval of

1    the ARKO/Oak Street transaction, to address the objections that

2    have been filed thereto.  And we hope in the interim, at least

3    as it relates to the Committee, to answer any unanswered

4    questions they have.

5         If the Court declines either of the debtors'

6    requests, we would ask the Court to issue an order why these

7    cases should not be dismissed, as opposed to converted, as

8    threatened by the lenders (audio interference) set a hearing

9    for later this week.  And as I will discuss towards the end of

10   my presentation, if the case is going to liquidate under these

11   circumstances, we believe that the Bankruptcy Court is not the

12   appropriate venue for that process.

13        During the course of my presentation, I am going to

14   provide a detailed background of how we got here.  While the

15   sale is just a status conference, we also have the cash

16   collateral motion.  So I will seek to put on the evidence of

17   Mr. Healy and Mr. Richards, as well as the bank

18   representatives, to support the factual statements that I'm

19   going to go into a little more detail now.

20        I would like to take the Court back to the time

21   leading up to the filing of these cases.  These cases did not

22   have a soft landing into Chapter 11, as I'm sure the Court will

23   recall.  Pachulski Stang and Raymond James were retained

24   approximately a month before the filing, and FTI was retained

25   two weeks before the filing.

1           As the debtors' professionals were learning about the

2   company, they lended -- they encountered a lender group which

3   was, apparently, according to them, caught off guard with the

4   debtors' financial distress and unwilling to provide debtors

5   with debtor-in-possession financing.

6           It's hard to believe that they were really caught off

7   guard, Your Honor, because prior to the petition, they had

8   provided notices of default for lack of recordkeeping and they

9   had not received financial statements for some time.  So they

10  were not caught off surprise.  Maybe they were asleep at the

11  switch, but they were not caught off surprise.

12          The debtors' professionals warned the lenders that a

13  free-fall filing with no DIP funding in place was a very bad

14  idea and that the oil companies would likely immediately shut

15  off the debtors' fuel supply.  Notwithstanding these warnings,

16  shockingly, the lenders refused initially to provide DIP

17  financing commitment, and the debtors filed these cases on

18  March 18th without any financing.

19          As a result, the debtors immediately faced an

20  unforced error of a liquidity crisis upon filing.  It reduced

21  fuel shipments to suppliers, which strained relationships with

22  dealers and caused an upheaval in an already chaotic business

23  climate.

24          As Michael Healy, the debtors' CRO, has told the

25  Court and will tell the Court again today, the debtors have

1   been playing catch-up ever since and have not fully recovered

2   from this disruption.  We are not by any means saying this is

3   the sole cause of what brought us here today, but it sure

4   didn't help.

5           After the Court authorized one-week use of cash

6   collateral, the lenders agreed to provide a limited amount of

7   debtor-in-possession financing to run a four-month sale

8   process, including an accelerated closing time frame.

9   Importantly, the lenders extended such financing only after the

10  debtors had obtained a commitment for a priming loan from a

11  third party, which would have provided the debtors with the

12  financing they needed.

13          So the lenders could have allowed the sale process to

14  proceed with alternative third-party financing.  But they did

15  not, and they chose to support the sale process culminating in

16  last week's auction.

17          While the debtors hoped that the financing and

18  timeline would be sufficient to maximize value in the sale

19  process, the debtors' professionals at that time did not fully

20  appreciate the information challenges they would encounter

21  during these cases.  More on that later.

22          So, in April, the debtors asked the lenders for

23  $9.35 million of additional financing to extend the sale

24  process for another month.  Again, the lenders balked.  The

25  debtors obtained an alternative priming commitment, and the

1   lenders ultimately relented.

2          This was the second time that the lenders could have

3   limited their exposure and been in these cases without any

4   additional financial commitment.  They refused and advanced new

5   money pursuant to the final DIP order entered on April 25th.

6   Certain waivers and an additional $9 million of financing

7   followed, for a total of approximately $46.85 million advanced.

8          To be sure, throughout the process, the debtors kept

9   the lenders fully up to speed regarding the sale process,

10  information challenges faced, and the feedback regarding the

11  bids.  And Mr. Richards will testify that there were no less

12  than 12 different reports, formal reports provided to the

13  lenders and their professionals, in addition to the numerous

14  other conversations and meetings that were had, including

15  weekly meetings that were established early on in the case.

16  So throughout the process, Your Honor, the lenders knew full

17  well what they were lending into.

18          As I mentioned, Raymond James was hired on

19  February 10th, approximately a month before the filing.  And

20  because the debtors were prepared -- were forced to prepare for

21  an emergency filing, all efforts during February and the first

22  month of March were directed towards trying to obtain a

23  forbearance from Oak Street, trying to shore up liquidity,

24  trying to understand the case, and prepare for what ultimately

25  was a very chaotic free-fall filing.

1          It did not really become apparent until soon after

2   the cases were filed that a sale process would be required.  It

3   was then that the marketing began in earnest.  Unlike most

4   cases that come before Your Honor, this was not a case where

5   the marketing process was baked for three full months.  This

6   was literally a standing start at the beginning of the filing.

7          Why was Raymond James hired?  It was hired because it

8   has a C-store vertical group that is best in class and has been

9   involved in more than 80 transactions in the industry, and

10  because of Mr. Richards' substantial restructuring experience

11  and that of his team of 25 bankers.  The robustness of the

12  marketing process that I will describe momentarily demonstrates

13  that Raymond James was the right investment bank for these

14  cases.

15         Commencing at or around the filing, Raymond James

16  contacted 142 potential buyers, comprised of 103 strategic

17  counterparties and 39 financial (audio interference) parties.

18  Nine parties submitted preliminary nonbinding indications of

19  interest in connection with an initial May 8th deadline.

20         In response to the end of -- response to the June 6th

21  deadline to submit letters of intent, Raymond James received

22  letters of intent from several parties; and on June 16th, the

23  debtors filed its procedures motion, which the Court entered on

24  June 22nd.  And that's at Docket Number -- Docket 701.

25         As the Court will recall, the lenders insisted on all

1    sorts of controls in the sale process which would have

2    prevented, in the debtors' opinion, its ability to exercise

3    their fiduciary duties and to run the process that they

4    believed was the best way to maximize value.  After the debtors

5    pushed back, the lenders relented and didn't press most of

6    their objections at the hearing.

7           The bid procedures order established a bid deadline

8    of July 21st and scheduled an auction on July 28th and provided

9    for the sale hearing today.  Importantly, at the hearing, the

10   Court was very clearly told that the lenders -- the Court very

11   clearly told the lenders that they could either be a bidder or

12   a consultation party and that they would have to submit a

13   credit bid by July 21st.  And as I mentioned, they did not do

14   so then or at any other time.

15          Notwithstanding their intentional failure to submit

16   the timely credit bid, the lenders would not, until pushed at

17   the auction, acknowledge that they had relinquished such rights

18   under the bid procedures order.  And this is important,

19   Your Honor, because ultimately, submission of a credit bid is

20   the lenders' right and check to make sure the assets are being

21   sold at fair value.  Intentionally skipping the credit bid

22   deadline and then rejecting a sale that was market-tested by an

23   auction process, in favor of liquidation and a preference to

24   burn the estate, is not how the Bankruptcy Code is supposed to

25   work.

1          As of mid-June, 51 parties signed NDAs and received

2   access to the data room and, ultimately, 71 parties signed

3   NDAs, which Mr. Richards will testify is a very high yield

4   percentage of the parties that were reached out to.  They also

5   had calls with more than 200 parties and 54 different parties

6   -- more than 200 calls with 54 different parties to facilitate

7   diligence requests.  And ultimately, he will tell Your Honor

8   that this M&A process has been one of the most, if not the

9   most, challenging in his career.

10         While the debtors often have various operational and

11  informational shortcomings, the state of the debtors' financial

12  records in these cases and the ability to provide parties and

13  bidders with basic financial information was unlike anything he

14  has ever seen.

15         Example of some of these financial challenges facing

16  Raymond James as it conducted in the sale process were:  the

17  debtors lacked complete and current financial statements.  The

18  most recent audited financial statements were for the period

19  ending December 31, 2021.

20         The debtors were unable to generate accurate and

21  current store-level profit and loss statements; fuel gallon and

22  margin data; and in-store financials such as inventory levels,

23  product pricing, fuel sales, and payroll expense, among other

24  issues.

25         The debtors lacked complete historical information

1   about store-level environmental and zoning compliance.  The

2   debtors were missing leases, contracts, and other agreements

3   integral to the management of their business, and they did not

4   maintain detailed store-level accounting on unamortized fuel

5   branding discounts and rebates provided by major oil companies

6   and related store-specific imaging liabilities.

7           Your Honor, it wasn't only the lack of this financial

8   information, but the inability to provide this financial

9   information led a number of parties to be concerned that they

10  were buying into unknown liabilities.

11          Now, Your Honor, I read the lenders' opposition to

12  cash collateral filed a couple of hours before the hearing.

13  And I've learned very early on in my career, and from

14  Your Honor, that lawyers should not make allegations that

15  somebody is hiding things or committing malfeasance unless they

16  have the facts to back that up.

17          But that's exactly what the lenders did in this case.

18  They filed an opposition where they say in two places that we

19  hid information from them, from the creditors, and from the

20  Court.  That, Your Honor, is categorically untrue.  There will

21  be never any way for the lenders to prove that, and that is

22  just unprofessional.

23          Rather, the evidence will show that the lenders knew

24  of the financial issues before the case, and when Raymond

25  James, FTI, and Pachulski came in, we were not shy in sharing

1  the concerns with the systems and the procedures.  In fact,

2  Your Honor, that is why the sale process was continued -- was

3  extended from four months to five months.  And in fact, the

4  lenders had authorized the debtors pre-bankruptcy to bring in

5  Grant Thornton to start working to put together information.

6        The deficiencies, again, prevented basic financial

7  information from being provided, but nonetheless, numerous

8  parties remained interested in the process in the hope that the

9  debtors would be able to produce meaningful financial data.

10  And as I mentioned, the debtors had retained Grant Thornton to

11  help in that regard.

12        But post-petition, the lenders were counting every

13  penny, and they questioned, why is Grant Thornton being

14  retained?  And there wasn't any assurances that Grant Thornton

15  would be paid.  So they, in fact, had to wait until after

16  budgets were approved and their ordinary course retention was

17  approved.

18        So, ultimately, they were retained, but their start

19  date or their continuation date was put back a few weeks.  They

20  ultimately worked three months in interest -- in earnest to try

21  to put together information and were making good progress until

22  July 17th, when the lenders said, Grant Thornton, pencils down,

23  we don't see your work having meaningful impact on the sale

24  process.

25        So while they had made substantial progress in making

1   sense out of the books and records, they ran out of time.  Not

2   saying, Your Honor, here, if they had the other two weeks, the

3   auction would have been different, but it was indicative of the

4   lenders' approach, in this case, shutting down Grant Thornton,

5   which didn't help things.

6          So that was the primary reason, Your Honor, that we

7   were not able to reach an agreement with a stalking horse.

8   There was just too much uncertainty, too much lack of financial

9   information.  But, as I said, the debtors did receive a total

10  of 14 bids, two of which were submitted after the July 21st

11  deadline and subsequently another two bids after that, so a

12  total of 16.  But, as I mentioned, none of them satisfied the

13  requirements in the bid procedures for qualification.

14         The auction was then continued to August 2nd, as I

15  mentioned, to further consider the group and qualify the bid.

16  The parties convened at Raymond James office in August 2nd for

17  the auction.  And after the lenders communicated to the debtors

18  an unrealistic $150 million release price for their consent to

19  the sale, the debtors realized they were on their own and would

20  endeavor to generate the highest and best value for the

21  debtors' assets and then present it to the lenders to get their

22  reaction.

23         So, over the next two days, the debtors'

24  professionals conducted round-the-clock negotiations with

25  several parties for various parts of the business and several

1   landlords who were parties to master leases with the debtors.

2   The purpose of those discussions was to see if the debtors

3   could cobble together bids or groups of bids that could compete

4   with a whole company bid or provide more value than the whole

5   company buyer was willing to pay.  Essentially, the parts are

6   greater than the whole strategy.

7           During the process, which lasted more than two and a

8   half days, the debtor provided the lenders and the Committee

9   with updates.  I understand the Committee feels they weren't

10  provided with sufficient updates.  We endeavored to keep them

11  all informed.  Could we have done a better job?  Maybe,

12  Your Honor.  But in fact, when we were talking about a deal

13  that would pay half of the DIP facility, at the end of the day,

14  there would not be any recovery for unsecured creditors under

15  any circumstance.  Not a reason not to include them in the

16  process.  If we could have included them more, bad on us.  But

17  as I'm sure Your Honor is getting a flavor for what was

18  happening in those two days, this is a chaotic and a fluid

19  situation.

20          But you'll hear from Mr. Elrod that the debtors

21  didn't consult often enough with the lenders and shut them out

22  of the process.  And that, in fact, will be false and

23  inconsistent with the facts.  We met with them a few times.

24  But seriously, when the lenders said they insisted on

25  $150 million to support the sale, it was a clear message that

1  they were not going to be a constructive part of the process,

2  but were there sitting patiently, waiting for this case to

3  fail.

4  The two-plus days the debtors spent with all of the

5  bidders and landlords revealed some harsh realities which

6  affected the values the debtors could receive from their

7  assets.  First, the bids other than the WholeCo bid overlapped

8  materially, making it virtually impossible, since most parties

9  did not allocate value to individual assets, to assess

10 realistically the realizable value of the aggregate of those

11 bids.

12 Second, many of the bidders' contingencies relating

13 to lease concessions could not be satisfied.

14 Third, because the debtors were unable to break their

15 master leases with Oak Street and the debtors' other landlords

16 without their consent, the debtors had no ability outside their

17 consent to sell partial lots.  And in fact, if you aggregated

18 all the partial company bids, it only amounted to 38 percent of

19 Oak Street's leases.  So, not surprisingly, Oak Street

20 preferred an alternative that would deal with its entire

21 portfolio as opposed give more than 60 percent of its

22 properties back.

23 And fourth, Your Honor, ARKO, the only party

24 submitting the WholeCo bid, declined to carve assets out from

25 its bid in order to allow the debtor to sell those assets to

1  other bidders as a means of potentially increasing value.

2          And lastly, Your Honor, several parties required

3  material time to reach a closing of (audio interference)

4  transactions and were not providing any liquidity in their bids

5  to make that happen, and the debtors did not have that

6  liquidity.

7          As a result, Your Honor, the debtors' only viable

8  alternative was to negotiate the best possible transaction with

9  ARKO and Oak Street (indiscernible) their liquidity needs prior

10 to closing.  Much of August 3 and August 4 were spent

11 negotiating the LOI, which is before the Court today.  And

12 after a lot of hard work, the debtors reached agreement with

13 ARKO and Oak Street, the principal terms which were reflected

14 in the letter of intent attached to the notice of successful

15 bid, and they are as follows:

16         ARKO will pay the debtors approximately $49 million

17 for substantially all of the assets.  I'm not going to sit here

18 today, Your Honor, and tell everyone to take $49 million to the

19 bank.  However, when Mr. Healy gets on the stand, Your Honor,

20 he will tell the Court that, based upon the assumptions and

21 based upon conversations with landlords and others, he thinks

22 we have a good shot at reaching that amount or somewhere close

23 to it.

24         Excluded from the sale will be cash on hand,

25 prepetition litigation claims, and the debtors' own real

1    estate.  Upon execution of the asset purchase agreement,

2    execution of the agreement and approval by the Court, which we

3    hope to occur as soon as next Monday, the debtors will receive

4    a nonrefundable 13 and a half million dollar deposit to be used

5    to fund operations pending a closing of a transaction which is

6    scheduled to close on or before October 31st.

7            Oak Street is funding the 13 and a half million

8    dollar deposit upon Court approval and funding an additional

9    $5 million at closing; and agreeing to defer all rent for

10   August, September, and October; and agreeing to restructure its

11   leases with ARKO post-closing.

12           Two items on the Oak Street aspect of the

13   transaction:  First, there seems to be a serious disconnect

14   with the lenders, because when they filed their exhibit and

15   witness list today for the cash collateral motion, they took a

16   deduct of $18.5 million payable to Oak Street upon closing.

17   That is incorrect.  Oak Street is putting the 18 and a half

18   million in, it's deferring its rent, but the rent deferred is

19   going to be part of the new ARKO restructured leases.  There

20   will be zero rent paid to Oak Street, so it is not in any way a

21   deduct.

22           But second, Your Honor, I stood before Your Honor at

23   the beginning of this case, and I said one of the principal

24   reasons that we were here is because of aggressive actions that

25   Oak Street had taken to force the debtor into bankruptcy.  And

1   I don't shy away from those comments, Your Honor.  Mr. Healy

2   doesn't shy away from those comments.  What the lenders and the

3   Committee both say is, wow, there must be tremendous claims

4   against Oak Street that the debtors would be giving up by doing

5   a deal with Oak Street and giving them a release.

6          Your Honor, Mr. Healy will not say that he's

7   investigated the claims, but what Mr. Healy will say is that,

8   subsequent to the filing, when we expected Oak Street to be the

9   significant protagonist in this case, they have not.  True,

10  they've been paid their rent, but they have not made trouble by

11  calling in all the defaults, environmental or anything that

12  they could have raised with the Court, with respect to their

13  properties.  They have sat and waited to see how they could be

14  helpful in an ultimate restructuring.

15         So, yeah, we have not conducted a full, fair

16  investigation of the claims.  Are there claims that exist?  We

17  don't believe so, based upon what we know.  But neither have

18  the lenders or the Committee done any investigation.

19         So, at some point, Your Honor, this case will be at a

20  threshold and a crossroads.  Your Honor will have to decide.

21  Is this case going to be a litigation case where people are

22  going to roll up their sleeves, probably hire people on a

23  contingency basis, no money to prosecute these claims, and make

24  it all about the claims against Oak Street?  Or is Your Honor

25  going to look at the 13 and a half million they're paying on

1  signing, the five additional million they're paying, and the 17

2  and a half -- 17 to 22 million, depending on when the sale

3  closes, either at the end of September or October, as

4  sufficient consideration, given where we are today?

5        And again, that's not necessarily here for Your Honor

6  to decide today.  That will be for Your Honor to decide at the

7  ultimate sale hearing.  But it is clear, and there will be no

8  dispute, that without Oak Street's support and participation,

9  we would not be here with an ARKO/Oak Street transaction.  We

10  would not be here with a potential going-concern sale to save

11  thousands of jobs, business relationships, and vendor

12  relationships, and we would be liquidating.

13        Your Honor, the remainder of the 30 and a half

14  million dollars of the purchase price, which is the 49- minus

15  Oak Street contribution, will be paid at closing by ARKO based

16  upon the following:  an estimated $13 million for all the

17  debtors' fuel and non-fuel inventory; an estimated

18  $15.25 million of the debtors' travel centers and fuel supply

19  business based upon the fuel supply business generating

20  119 million gallons of fuel per year; $2 million for any money

21  collected by the debtors in connections with its claims to

22  Imperial and GSS.

23        Interestingly, we asked ARKO to buy the claims

24  because, although we are owed several million dollars more, we

25  thought we were doing the lenders a favor and increasing the

1  purchase price so they wouldn't have to fund the litigation and

2  they could get a recovery.  In the lenders' liquidation

3  analysis, in opposition to cash collateral, they say that they

4  think that the claims are worth four and a half to $6 million.

5           So we are happy to go back to ARKO, ask them to carve

6  those claims out of the transaction and reduce their purchase

7  price by $2 million.  I suspect ARKO would agree to that.  And

8  if the lenders want that, that's another asset that they could

9  prosecute.

10          Your Honor, the 13 and a half million dollars of cash

11 that is being provided to the debtors to fund preclosing

12 operations, and which will be subject to a cash collateral

13 motion next week to cover the period through October, is based

14 upon the amount of liquidity the debtors need to supplement the

15 cash generated by the business to pay operating expenses and

16 professional fees with a couple of important caveats:  First,

17 it assumes no rent payments to Oak Street, Vereit, and Spirit

18 through October 31st closing.

19          Oak Street, which represents more than 50 percent of

20 the debtors' monthly rent expense, has agreed to the treatment.

21 And the others -- other two REIT landlords, Vereit and Spirit,

22 have also indicated a willingness to do so.

23          With respect to the non-REIT landlords, Your Honor,

24 the debtors intend to send out a letter to all of its non-REIT

25 landlords informing them that its leases will be rejected as of

1   August 31st, unless the landlords defer rent, restructure their

2   leases in the matters contemplated by the letter of intent,

3   waive cure payments, and agree to extend the time to assume and

4   reject their leases until October 31st.

5          Faced with the task of taking back their leases, the

6   debtors anticipate and the cash flow projections contemplate a

7   substantial number of landlords agreeing to this deal.  And, in

8   fact, it assumes that 50 percent of all non-REIT landlords will

9   agree to the Oak -- ARKO/Oak Street transaction.

10          To make the numbers work, Your Honor, Pachulski Stang

11   and FTI have agreed to reduce their run rate to closing below

12   the amounts that they believe are necessary to close the

13   transaction, in the aggregate amount combined for Pachulski and

14   FTI of $700,000.  And as I will discuss in a couple of moments,

15   Raymond James is agreeing to reduce his M&A fee by $1 million

16   at closing.

17          Your Honor, the lenders made a big issue in their

18   opposition to cash collateral regarding the debtors' financial

19   performance and projections in this case.  They say, which is a

20   complete mischaracterization, that the debtors have missed

21   projections in the last 15 of their 18 reporting periods.  But

22   in fact, as I will mention when I get to the cash collateral

23   presentation, that for the last eight weeks, the debtors not

24   only have been spot on in net fuel, in operating expenses and

25   cash flow, they have exceeded.

1          So, yes, at the beginning stages of the case, the

2   debtor was hit with a lot of problems from their landlords and

3   from their dealers.  That's litigation, a lot of which has been

4   brought before Your Honor:  Imperial, GSS, VM Petro.  So, yes,

5   that caused the debtor to miss the projections.  But once

6   things were smoothed out, actually, projections have been

7   pretty accurate.

8          If the debtors' operating cash estimates actually

9   prove conservative, any excess will be paid to the lenders,

10  increasing their recovery after Raymond James recaptures its

11  million-dollar fee that it is deferring or waiving.  And if the

12  debtors' estimates hold up at closing, which they believe they

13  have a fighting chance to, they will receive $35.5 million at

14  closing.  Of that amount, they would pay approximately

15  $10 million on account of post-petition taxes -- as Mr. Healy

16  will let Your Honor know that he believes, as a CRO, a debtor

17  should be paying its post-petition taxes; $4.6 million to

18  Raymond James, which consists of a portion of its DIP fee that

19  has been deferred and its reduced M&A fee; $230,000 on account

20  of the KERP the Court has approved; and a few hundred thousand

21  in miscellaneous costs.  And the net result would be an

22  estimated $20 million to the lenders.

23          While these numbers are based on estimates, we think

24  we have a shot at achieving them.  But we're not going to

25  (audio interference) Your Honor and say they could take that

1   $20 million to the bank.  What we will tell Your Honor is that

2   that vastly exceeds what they would receive in a liquidation.

3           So this is the transaction.  So what are the benefits

4   to the estate?  The transaction saves thousands of jobs, scores

5   of family businesses that rely on the debtors' businesses;

6   preserves tenants for the debtors' landlords and preserves fuel

7   outlets for the oil suppliers; and a going concern to continue

8   to do business with various unsecured vendors.  The sale carves

9   out cash on hand, owned real estate, certain prepetition

10  litigation claims, and if the lenders want, the post-petition

11  litigation claims against Brothers to provide additional

12  recovery to the lenders.

13          Importantly, the lenders do not need to extend any

14  new financing to consummate the transaction.  All they need to

15  do is allow their cash collateral to be used, cash collateral

16  which would not be generated if the debtors ceased operations.

17  The debtors' judgment is that this deal is in the best interest

18  of the estate.

19          Do we have a lot of wood to chop between now and

20  getting to a final APA?  Absolutely.  Your Honor has known as a

21  practitioner, that getting from an LOI to an APA is not an easy

22  task.  Should we all try to do that to preserve this company?

23  The lenders -- the debtors' professionals answer that in an

24  unequivocal yes.

25          So what stands in the way of this transaction?  The

1   lenders.  Why?  They would rather see the cases liquidated.

2   I'd refer the Court back to Mr. Marshall of Bank of Hope's

3   email to Mr. Richards on the eve of the auction.  He said he

4   would rather take his chances in Chapter 7, and see all burn,

5   rather than receive $10 million in real estate recovery.

6          As the lenders are persisting in their position, they

7   obviously have the same view, even under a transaction that has

8   doubled the recovery to $20 million.  The lenders apparently

9   have this view because they believe a Chapter 7 would generate

10  a better recovery, and they have put Mr. Tibus on their witness

11  list, and they have added a liquidation analysis.

12         We, in the evidentiary portion of this hearing,

13  Your Honor, will clearly demonstrate that their liquidation

14  analysis is inaccurate, it's overstated, and it's wildly

15  optimistic.  Mr. Healy, who has been living with this company

16  for five months, will walk the Court through the liquidation

17  analysis to show that if the taxes are paid and other closing

18  costs are paid, there will be zero, zero recovery.

19  (Indiscernible) there's a source of funding for the Chapter 7

20  trustee to run whatever liquidation process the lenders

21  apparently have in mind.

22         In their liquidation analysis, they say Chapter 7

23  professional fees will be a million to a million and a quarter.

24  They should know better than that.  Your Honor knows that in a

25  conversion, in a case of this size, of this complexity, it will

1 | cost multiples of a million to a million and a quarter for the

2 | lenders' professionals, in addition to pursuing the claims that

3 | they say they have.

4 | And the lenders conveniently ignore that if the Court

5 | was to convert the case, I suspect the Court would consider

6 | first terminating the leases so that the landlords could take

7 | back their properties, some of which are in disrepair, rather

8 | than let a lengthy Chapter 7 process go on.  Your Honor,

9 | there'll just be very little to monetize and no funding to do

10 | so.  And we will demonstrate that by the evidentiary record.

11 | The only persuasive evidence presented today will be

12 | from Michael Healy, who will testify, as I said, in a

13 | liquidation there's zero, as opposed to a going-concern

14 | transaction where they have a realistic shot of $20 million.

15 | The lenders really are apparently content to rely on

16 | what they believe is their unilateral right to veto a

17 | transaction that they do not like, relying on Paragraph 11 of

18 | the DIP order, and destroying the value and shutter a large

19 | business with all the collateral damage that comes with that

20 | reckless decision.  And the lenders are content to rely on what

21 | they believe is the debtors' inability to seek to use cash

22 | collateral under Paragraph 11 of the DIP order.

23 | From the lenders' perspective, essentially, that is

24 | the beginning and the end of the argument.  But they are wrong,

25 | Your Honor.  Under Paragraph 22 of the final DIP order, the

1   Court expressly reserved the right to fashion an appropriate

2   remedy on the determination that an event of default occurred

3   and the lenders get relief -- seek relief from stay.

4           I've been before Your Honor many times, and I know

5   Your Honor insists on that language because Your Honor does not

6   want to be hamstrung on what happens when an event of default

7   occurs.  The Court's equitable power, taken together with its

8   powers under Section 105, provides the Court with discretion to

9   fashion appropriate relief, which in this case would be to

10  authorize the debtor to proceed with an economically,

11  rationally, market-tested sale.

12          Second, Your Honor, Rule 60(b) of the Federal Rules

13  of Civil Procedure made applicable to bankruptcy cases under

14  Bankruptcy Rule 9024 provides the Court with authority to

15  relieve the debtors from the requirement to obtain the lenders'

16  consent to a use of cash collateral or a sale.

17          60(b)(6) provides for relief from a judgment for any

18  other reason that justifies relief.  And the Fifth Circuit

19  cases we have cited in our materials, the Hesling and Harrell

20  cases, say that "60(b)(6) is a grand reservoir of equitable

21  power to do justice in a particular case" where relief is not

22  warranted under other sections of Rule 60(b).  So Your Honor

23  doesn't have to rule on 105, and courts generally tend to not

24  like only to rule on 105.  Here, Your Honor, has Rule 60(b)(6).

25          And as the Fifth Circuit has said, "The broad

1  language of Clause 6 gives the court ample power to vacate

2  judgments whenever such action is appropriate to accomplish

3  justice."

4        And there is authority in the Pan Am case, district

5  court from New York, Southern District, in the '90s, cited in

6  our amended cash collateral motion, that if the court wants to

7  amend a financing order, 60(b)(6) is the appropriate vehicle to

8  seek to do so.  And in that case, Judge Blackshear had amended

9  a DIP financing order but didn't go through the analysis of

10  60(b)(6).  And the lender said you can't do it, and the

11  District Court said you can, you've just got to go back to

12  Bankruptcy Court and have Judge Blackshear make the appropriate

13  findings.

14        Your Honor, we don't make this argument lightly.  We

15  understand the sanctity of court orders and that the Court's

16  ability to override the lenders' consent would only be

17  justified in extraordinary circumstances.  But these cases

18  provide those extraordinary circumstances.  The debtors

19  indisputably ran a thorough and robust sale process.

20        The Committee makes a comment that the process was

21  doomed to fail at the beginning.  With all due respect, we

22  disagree.  We find, as the Court finds, debtors as they are.

23  This debtor has its challenges.  We ran a process.  The process

24  produced a market-tested result.  It worked.  Did we get as

25  much value as people would have hoped?  Of course not.  Was it

1   a market-tested process?  Yes, it was.

2           The ARKO/Oak Street transaction is a going-concern

3   sale.  As I said, will save thousands of jobs, hundreds of

4   businesses, tenants for landlords, and provide the lenders with

5   an estimated $20 million in cash, plus leave the estate with

6   claims to be further modified -- monetized.  And we say the

7   evidence that will be presented, Your Honor, is that the

8   transaction will generate significantly higher recovery than a

9   Chapter 7, which we believe would generate the zero recovery.

10  And the debtors have the financing to approve -- to go to

11  closing this transaction without further new money from the

12  lenders.

13          The lenders are inexplicably refusing to approve the

14  transaction, with one lender representative saying he would

15  rather see the case burn.  Your Honor, if this case doesn't

16  present extraordinary circumstances justifying relief under

17  60(b)(6), then I can't imagine what circumstances would

18  justify.

19          And I want to return to what I told the Court early

20  on in my presentation.  The lenders intentionally decided not

21  to submit a credit bid when they had the opportunity to do so.

22  That was the lenders' ability to check the process not yielding

23  sufficient value to their liking, and they made a deliberate

24  decision not to do so.

25          Under Section 363(f)(3), the debtors may sell free

1  and clear of a lien if the price at which the property is to be

2  sold is greater than the aggregate value of all liens on

3  property.  Your Honor has seen this issue, I'm sure, many, many

4  times.  There's no controlling law in the Fifth Circuit.  We

5  and the lenders have cited basically the cases that go both

6  ways.  And basically, Colliers [sic], who is the expert in

7  bankruptcy, holds that a market-tested auction process

8  determines the value of all liens on property and allows the

9  court to approve a sale that does not cover the face value of

10  the lien.  The secured creditor's ability and response to that

11  is a credit bid right.

12         Your Honor, before I summarize, I just would like to

13  address a few of the items in the cash collateral motion.  In

14  our cash collateral motion, we seek cash collateral for a week.

15  Very small amount of money, for just a week.  And why do we

16  seek it for a week?  As I said, to try to document this

17  transaction.

18         The lenders have made a number of statements and

19  arguments that are just flat wrong.  First, they argued the LOI

20  is not signed.  I told the Court before that the document

21  before the Court is signed.  Second, they said it was a failed

22  and admittedly flawed sale process.  For the reasons I've

23  discussed, it is not -- it is not such.

24         Then they say the transaction is not in the best

25  interest of the estate, and we haven't provided an explanation

1   why conversion is not in the best interest of creditors.  But

2   we have done so, Your Honor, and the evidence will show.

3          They also say months of -- actually, as I said, of

4   hiding the debtors' lack of finance -- fundamental accounting

5   records and internal controls from the Court and the parties.

6   You've heard my concern with those statements, which will not

7   be true, and really cast aspersion on the integrity of

8   Pachulski Stang, FTI, and Raymond James, who have been working

9   hard throughout this case to generate value.  To now be told

10  that we have been hiding things from the Court and the lenders

11  is irresponsible.

12         They say the sale will cause harm because it will

13  increase the administrative insolvency in this case.  That is

14  not correct, Your Honor.  The testimony will be that whatever

15  unpaid administrative claims exist today, and the lenders

16  grossly overstate it, the debtors estimate having sufficient

17  money to pay all non-rent administrative claims until closing,

18  both in this week -- one-week budget and the budget that would

19  be presented to the Court next Monday.

20         They say the headline purchase price will not be

21  obtained -- attained.  Well, again, they've misconstrued the

22  Oak Street contribution.  It's not a deduction.  And the

23  evidence -- and they say the evidence will show that they're

24  inflated, all the estimates are inflated.  And again, while the

25  numbers are an estimate, they are not inflated, and Your Honor

1    will be the one to determine whether you believe Mr. Healy's

2    testimony that he believes that the debtors have a reasonable

3    shot of reaching it.

4           They also say that the conversion of the cases to

5    Chapter 7 will yield a large return.  As I mentioned, we

6    categorically reject that.

7           And with respect to their argument that we can't be

8    trusted with budgeting -- putting aside that all we have,

9    Your Honor, is a one-week budget, okay?  They said we missed 15

10   of 18 budgets.  And as I said, the big issue early on in this

11   case was sublease rent; but over the last eight weeks, from

12   June 2 to July 21st, we've done two and a half percent better

13   on operating receipts, 15.9 percent better on operating

14   disbursements, and 25.4 percent better on cash flow.

15          So it's convenient to say we missed projections and

16   to try to hammer us on what happened early in the case; but if

17   you look carefully, as I know the Court will, you will see that

18   over the last two months that is not true.

19          And they say why do you need professional fees for

20   the next week, because you already got your $400,000 carve-out?

21   Your Honor knows the time and effort that went into last week,

22   Your Honor knows the time and effort that goes into a hearing

23   today preparing multiple witnesses.

24          Unfortunately, as has been the case from the

25   beginning, we're spending millions of dollars fighting with the

1    lenders.  So, yeah, that $400,000, which is available to all

2    professionals, I got to believe is pretty much close to

3    exhausted by the end of today.

4         Your Honor, if you're going to give the debtor the

5    go-ahead to try to document this transaction, to answer

6    questions the Committee has, questions the lenders have, and

7    honestly, I'm sure, questions Your Honor has, it's only

8    appropriate that professionals be paid to do so.  And again, I

9    think the amount set forth in the budget, even for this one

10   week, are less than what we will end up incurring.

11        They say there's no adequate protection, but if the

12   case shuts down, there will be no revenue stream.  That's what

13   they seem to miss.  If we shut down, you're not going to be

14   able to generate the money in the budget.  So we're essentially

15   saying keep the company alive for a week, let us use the

16   money -- and it shows, I think, there's $30,000 degradation in

17   their protection package.  Otherwise, they are adequately

18   protected.

19        And then they talk about the 363(f) and contractual

20   provisions.

21        Lastly, Your Honor, they say that the estate is

22   administratively insolvent and present evidence of 30 and a

23   half million dollars.  That is wrong.  That includes seven and

24   a half million of August rent, which is just made up.  We

25   expect rent to be deferred.  To the extent it's not deferred,

1   there's a minor amount that -- from the landlords who don't

2   accept the deal.  But that's in the hundreds of thousand

3   dollars.

4          They say Raymond James back-end financing fee is an

5   administratively insolvent amount.  No, that's paid from the

6   carve-out.

7          And they point to the fact that we're not paying

8   503(b)(9) claims.  Well, Your Honor has seen a lot of cases

9   that doesn't pay 503(b)(9) claims.  So you ignore that,

10  Your Honor, and you ignore the over $2 million that Pachulski

11  and FTI are over budget, you have amount, no question,

12  administrative claims that may not get paid in this case.  But

13  the key point for Your Honor and for other case constituents is

14  whether from hereon in there is an expectation of further

15  administrative insolvency, and the evidence will show that it's

16  not.

17         So, in summary, Your Honor, the debtors request the

18  Court authorized the debtor to work towards documenting the

19  ARKO and Oak Street transaction.  And we don't ask for approval

20  of it at this time, only a determination that the lenders do

21  not have an unequivocal veto right.  And we understand that the

22  Court's approval will wait for next week, where the Court will

23  also rule on the many other objections that were filed to the

24  motion, which we will work on to resolve.

25         If the Court does not agree with us and determines

1   that the lenders have a veto right, then we would request that

2   the Court issue an order why these cases should not be

3   dismissed.  The lenders aren't financing these cases anymore.

4   They intentionally watched the sale process to see if it

5   produced a result they liked; failed to credit bid; and

6   rejected a market-tested sale without [sic] any rational

7   economic actor would do, and elected not to credit bid.  They

8   haven't indicated any willingness to fund any profit.

9          Nobody else other than the lenders stand to benefit

10  in a 7.  Rather, the lender has state law remedies available to

11  it, and the Court should allow them to go exercise those state

12  court remedies as opposed to clogging this Court's docket.

13         They haven't indicated any willingness to fund any

14  process.  Nobody else, other than the lender, stands to benefit

15  in a 7.  Rather, the lender has state court remedies available

16  to us, and the Court should allow them to go exercise those

17  state court remedies as opposed to clogging this Court's

18  docket.  So under these facts, if the Court cannot proceed to a

19  sale, the debtor should dismiss the cases rather than convert.

20         Finally, Your Honor, I would like to move into

21  evidence, Exhibits 1 through 13, which were reflected on the

22  debtor's second amended witness and exhibit list, filed at

23  Docket 1197.  And of course, I'm prepared to answer any

24  comments Your Honor has.  And after Your Honor has opening

25  statements from other parties, we are prepared to go forward

1   with the evidentiary aspect of today's hearing.  Thank you,

2   Your Honor.

3          THE COURT:  All right.  Thank you, Mr. Pomerantz.

4   I'm going to wait on the admission of the exhibits.

5          Let me ask.  Ms. Reckler, you're going to tell me

6   about 1182?

7          MS. RECKLER:  No, Your Honor.  I know to stay out of

8   other people's business when it doesn't involve me.

9          THE COURT:  NoO, no, no.  It's -- I -- your Sorrento

10  order.

11         MS. RECKLER:  Yes, Your Honor.

12         THE COURT:  1182 has been uploaded.

13         MS. RECKLER:  Yeah, we're all set, Your Honor.

14         THE COURT:  I got it.  It's -- you're welcome to stay

15  and listen.  You're also welcome to go.  Thank you very much.

16         MS. RECKLER:  Thank you, Your Honor.

17         THE COURT:  Thank you.  All right.  Mr. Elrod, do you

18  want to respond?  Or you certainly get the opportunity to make

19  opening.

20         MR. ELROD:  Thank you, Your Honor.  John Elrod, for

21  the record, on behalf of the -- John Elrod, for the record, on

22  behalf of First Horizon Bank as the DIP agent.  Ms. Heyen will

23  cover the opening for the lenders.

24         THE COURT:  All right.  Thank you.  Sorry about that,

25  Ms. Heyen.

1          MS. HEYEN:  No problem, Your Honor.  I promise I

2    won't go on for an hour, so I'll try to make this short and to

3    the point.

4          Your Honor, Shari Heyen of Greenberg Traurig on

5    behalf of the DIP agent, who's First Horizon Bank.  And so,

6    Your Honor, after spending almost 50,000, or excuse me, $50

7    million in post-petition DIP financing, the debtors produced no

8    qualified bids, no qualified bidders, no binding asset purchase

9    agreement, no signed agreement at the end of the day, and no

10   deposits.  And attached to the status report that the debtors

11   filed late one evening is a nine-page, unsigned letter from a

12   potential bidder who we understand never even put up a deposit.

13   And that was the outcome, after spending $50 million in post-

14   petition financing.

15         The lenders have been faithfully and in good faith,

16   extending post -- extended post-petition financing.  We were

17   told that the money would be used to get to a robust auction

18   where qualified bidders would show up.  Even on July 21st, the

19   debtor's professionals were telling us that one of the bids

20   came in around $97 million.  However, on August 1st, which was

21   the eve of the auction, the debtor's professionals told us that

22   they might, might be able to get us $10 million, and that was a

23   shocking result, and of course, frustrating.

24         The DIP lenders were pressured into loaning another

25   $9.5 million to get us to an auction.  A process, again, that

1    resulted in a draft letter agreement and a statement that

2    maybe, just maybe, we could get $20 million.  Upon realizing

3    that the process had failed on the eve of the auction, which

4    was August 1st, the debtor's professionals asked us for a

5    release price, which we gave them at 9 a.m. on August 2nd.

6    They said they wanted a target to shoot for, so we gave them a

7    number.  We did that, and their response was not one of shock,

8    not one of disgust, one of thank you, we've got it.

9          When we were at the auction on August 2nd, or I don't

10   know if there even was an auction because we asked if we were

11   having an auction.  We weren't -- that question was never

12   answered.  We asked again and again.  We sat in a conference

13   room for over eight hours.  We maybe got 10 or 15 minutes of

14   dialogue and update from the debtors' team.  There was no

15   record.

16         We asked for a record.  We asked for a transcript to

17   be taken.  None of that was ever done.  We have emails from the

18   debtor's team telling us that we weren't even going to go on

19   the record on August 7th.  Excuse me, on August 2nd.

20         Your Honor, the debtors talked a lot about the bid

21   procedures, so I'll just address that briefly.  Your Honor, we

22   feel like the debtors have ignored the Court's bid procedures.

23   The bid procedures order at Docket Number 701 referenced by

24   debtors' counsel shows that on July 21st, that was a deadline

25   to submit qualified bids.  None were submitted.  That was the

1    deadline to come up with a stalking horse.  None was ever

2    surfaced.

3              On July 28th, 2023, at 10 a.m. Eastern, an auction

4    was supposed to be held.  The debtors unilaterally moved that

5    to August the 2nd.  Promptly after the auction, the notice of

6    successful bidder was supposed to be filed.  There was no

7    successful bidder.  All we got was a nine-page, unsigned, non-

8    binding draft document.

9              On August 3rd, the adequate assurance objection

10   deadline was supposed to occur but that's been moved to an

11   indefinite date.  And today, Your Honor, we were supposed to be

12   before you on a sale hearing, and obviously, that's not

13   happening either.  The bid procedures order provides that

14   August 15th was the deadline to close the transaction.  That's

15   not happening either.

16             Attached to Your Honor's order at Docket 701 is a

17   laundry list of gating items that have to be met before we can

18   even get to an auction.  There are bid requirements that are

19   set out.  These are bid requirements, they're not suggestions.

20   The debtors wanted -- they -- their own bid procedures say that

21   among other things, that the bidder has to -- must, must

22   deliver to the parties an irrevocable binding offer for the

23   purchase of the assets.  Included in the irrevocable offer were

24   things like you must clearly state the list of assets and

25   liabilities that you're picking up or leaving behind.  You must

1 | accompany your documents with an executed transaction document,
2 | including a draft asset purchase agreement.  The bid must be
3 | accompanied by a 10 percent cash deposit.  That never happened.
4 | The documents have to identify all contracts that were being
5 | assumed and assigned.  Again, Your Honor, that never happened
6 | and there's a lot more features in the bid procedures, Your
7 | Honor.

8 |         The debtors and the potential bidders were supposed
9 | to honor the terms of the bid procedures.  Then after -- only
10 | after all of those requirements were met, were there, was there
11 | supposed to be an auction.  Again, there was no starting bid.
12 | They didn't have one.  They asked us for a release number.  We
13 | gave it to them, and again, there was no alarm.  There was no
14 | shock.  It was just, thank you.

15 |         All of this was supposed to -- all the bid procedures
16 | were supposed to culminate in a successful bid.  And again, as
17 | Your Honor knows, that never happened.

18 |         Rather than admit that their expensive process
19 | failed, they now try to shift the focus to the lenders who have
20 | funded a $50 million process and $218 million, all in.  The
21 | expenditure of our cash collateral has yielded nothing as we
22 | sit here today.  And so for the first time, the debtors are now
23 | disclosing to Your Honor and to others that, and I'll just
24 | quote from the status report, and Mr. Palmer has quoted from it
25 | too, that the "debtors lacked complete and current financial

 1  statements, that they were unable to generate accurate current

 2  store, profit level -- profit and loss statements, that the

 3  debtors lacked complete historical information, that the

 4  debtors were missing leases, contracts and other agreements

 5  integral to the management of the business."  The debtors did

 6  not maintain detailed store-level accounting on unamortized

 7  fuel branding discounts, et cetera, et cetera.  And they also

 8  say in their status report that they had considerable

 9  difficulties even populating a data room with the most

10  fundamental basic data.

11        But with all of those admitted deficiencies, the

12  debtor -- debtors now try to point the -- paint the lenders

13  with an intemperate email by a frustrated banker who's not the

14  agent and doesn't speak for our group, who watched the sale

15  process go down in flames.  And the auction, if there ever one

16  is -- if there ever was one, Your Honor, is closed.  There were

17  no bids.  There was no deposit.  All we got, again, on the

18  evening of August 4th, was an announcement on the record that

19  the auction had closed and that the proceeds had produced only

20  an unsigned letter of intent in which we might, and again,

21  might, get $20 million.  So the process has failed to or this

22  failed process has led to yet another request to use our cash

23  collateral to fund another week to see if the debtors can get

24  to the deal -- get to a deal.

25        We have spent close to $50 million trying to get to a

1  deal, and the lenders believe that they're probably going to

2  get more in a Chapter 7 liquidation, and they're taking steps

3  that any reasonable lenders would take under these dire

4  circumstances.  We believe that these estates are

5  administratively insolvent.  Currently, we estimate -- our

6  financial advisor estimates that there's about $30 million in

7  unpaid administrative expenses, and those expenses are

8  climbing.  So right now, there are unpaid taxes of about 10 and

9  a half million dollars.  The vendors are being stretched so

10  that this case could be financed.  August rents haven't been

11  filed -- paid, and there are other categories of expenses that

12  will continue to climb.

13          These are -- the 30 million represents the unpaid

14  admin expenses just through July 31st.  It's now August 7th,

15  and those expenses are -- will continue to go up.  That means

16  the debtors are digging a deeper insolvency hole than they are

17  showing the Court and the public.  We feel like there's a

18  complete lack of transparency here with the numbers and the

19  budgets.

20          And Your Honor, no one's more disappointed in all of

21  this than the lenders.  We are owed $218 million, all in.  The

22  debtors hope they can get us $20 million after they've spent

23  $50 million in post-petition financing.  We -- they have now

24  produced, I guess an -- a non-binding letter of intent after

25  all of their efforts.  And I think all of us will admit that

1  the letter that was received is ambiguous.

2       We feel like we've been strung along.  We've financed

3  a process that was supposed to yield hundreds of millions of

4  dollars.  And yet as we sit here today, all we have is that the

5  -- all that our $50 million has produced is a non-binding

6  letter of intent.  All the sale procedures deadlines have been

7  blown through.  They spent all of the money and now they're

8  asking for more.

9       And so, Your Honor, I think that you're now and maybe

10  even for the first time, getting a flavor for why the lenders

11  don't think that they should be forced to fund into a deepening

12  hole where there is not yet, after all the time and money has

13  been spent, a binding offer.  Your Honor, the debtors have a

14  fiduciary obligation to the creditors.  Yet their papers focus

15  on saving jobs of employees of third parties, some of whom

16  they've sued in litigation and who are not even creditors of

17  these bankruptcy estates.  That's not what the Bankruptcy Code

18  requires.  They owe a fiduciary obligation to their creditors,

19  not just third parties who are not creditors of these estates.

20       Here, the general unsecured creditors are getting $0

21  according to the debtors, and the DIP loan will not be repaid

22  under the scenario floated by the debtors that you just heard.

23  Your Honor, these are regional banks.  They serve customers and

24  their regions are in the southeast part of the United States.

25  They are taking action that any reasonable lender would do

1    under these dire circumstances, and they are respectfully

2    requesting that the use of cash collateral be denied, that we

3    move into an orderly wind down process with either a Chapter 11

4    trustee or convert these cases to a Chapter 7 to preserve any

5    remaining value for the benefit of the creditors.  Thank you.

6            THE COURT:  So before you go.  So and I appreciate

7    the statement, so let's kind of work backwards.  One, and you

8    know, sometimes what you learn along the way, while it doesn't

9    have monetary value, I mean, $50 million has shown us a lot

10   about what this group of assets is worth.

11           And I'm, you know, a couple of things have become

12   very apparent to me.  Number one, you know, this group of banks

13   never should have been a DIP lender.  I -- they didn't do it by

14   choice.  I know that.  It's also clear to me that, you know,

15   that there's a problem with -- between the professionals.  I

16   got that too.  But I'm not focused on any of that.

17           I've got a group of assets that I'm trying to figure

18   out what to do with, and those assets are not -- they're not

19   pieces of concrete that don't have any effect on the world

20   around them.  I mean, I've been through the process where gas

21   tanks leak and when certifications aren't kept up.  I mean,

22   I've been through all of that and a lot of these are in

23   populated areas and, you know, I can tell the story, you're old

24   enough to remember, you know, with -- there was a certain gas

25   delivery company whose pipeline ran across the back of a number

1    of residential homeowners and there was a great aquifer and

2    people for years had you know, had watered their lawns from

3    these aquifers.  And I do remember a set of circumstances, we

4    made a really cool video where we went out and lit the

5    sprinklers because it would shoot flame.  You know, that,

6    that's -- I --  that's a real story and it has impressed upon

7    me the fact that we all need to be sensitive to a lot of

8    different things.

9         So I actually think the process, and I don't

10   attribute anything to any of the professionals.  I think you're

11   all doing what you think you ought to be doing for your

12   respective clients.  Just a horrible set of facts.  And maybe

13   there are people who someday will have to answer for this.

14   Maybe not, I don't know.

15        But we're not going to make the situation worse.  And

16   as I look at this, I mean, the sale process didn't work.  I

17   mean, I appreciate the fact that the debtors believe they have

18   something.  It's not what they wanted.  I don't believe that

19   anybody went into this thinking that this was the outcome.

20   I certainly know you all didn't, and I don't think that --

21        MS. HEYEN:  It's not what we were told.  Okay.  We

22   were told in the hundreds of millions of dollars, hundreds of

23   millions.

24        THE COURT:  And you know that for whatever the

25   conversation was, no one knew, because you don't know what

```
 1  happens in an auction until someone shows up and bids.  You
 2  don't.  People can always change their minds.  So I'm not going
 3  to attribute anything to that.
 4          But I've got a group of assets that is dispersed and
 5  they are potentially problematic.  They affect an awful lot of
 6  people.  And I'll -- somewhat of a grain of salt.  I take your
 7  economic argument about they're not employees of the debtors,
 8  although I care about everybody that works for a living, I do.
 9  But the impact goes a lot further than that.
10          I've got it -- it's just an unusual structure and
11  I -- I'm worried about what happens.  So tell me and I'm not
12  predisposed on any of this.  I'm going to talk to Mr. Gibbs in
13  just a second, and I'm going to put him square in the middle of
14  everything, just so he knows it's coming.
15          What are we realistically supposed to do?  And I want
16  to walk through this with you.  You know what I did prior to
17  taking this job.  This case doesn't work with a Chapter 7.  We
18  haven't even talked about who's going to fund it and it's --
19  the estimate I heard is way low.  You know that because you did
20  some of that work too.  It's also unlikely that it's handled
21  very efficiently so I don't really see that as a really good
22  alternative.
23          I probably owe the landlords stay relief because I've
24  made them -- I've put them in a horrible situation as well,
25  given what's happened.  I mean, they've lost a ton of money
```

1  too, and will continue to do so.  And they don't really know

2  what their exposure is until they get out there and walk

3  through each of those facilities.  And while you can say, well,

4  there's a tenant out there, they can be responsible too.  Yes,

5  but you can only get what you can get.  And I recognize that

6  it's a horrible situation for the landlords as well.

7          But what are we supposed to do in terms of, you know,

8  how do we bring it into the process?  I agree with you.  You

9  don't need to argue.  You don't need to argue to me that where

10  we end up today doesn't track the bid procedures.  Probably

11  tracks reality just in terms of what happened, but it doesn't

12  track the bid procedures.  And I am -- I do think I have the

13  discretion to create remedies where I see the right outcome.  I

14  don't see the right outcome here.  I just don't see it.

15          And but you can't just walk away from this.  This is

16  a mess.  And, you know, I can say, okay, they're all yours.

17  You know, you got to think about that.  Do you really want

18  that?  Because again, I don't think anybody knows once it all

19  starts to fall apart, what that's going to look like.  But you

20  need to think about how we get from point A to an end, and if

21  it is simply lifting the automatic stay for the landlords,

22  maybe it's lifting the automatic stay for you.  Maybe it's, you

23  know, maybe it's the quintessential dirt for debt.  In a

24  contested matter, I don't think you want that, but, you know,

25  you ought to think through all those things.

1          I want an answer to the problem.  It's not that

2    people are good guys, people are bad guys.  I think everybody

3    tried.  This is a mess.  Process didn't work.  This didn't

4    work.  Nobody's to blame for that. That is -- that's a

5    professional standing here arguing a position.

6          There may be other people that contributed to this, I

7    don't know.  Haven't been brought to me yet.  But everybody

8    tried, failed.  So let's all recognize that it failed and let's

9    try as this, as much as we can, to come up with a solution that

10   now minimizes harm.  That's what I want.  And I'm trying to

11   give you some comfort.

12          I'm not going to make you spend more money

13   involuntarily.  You may decide you want to.  You may decide you

14   need to because it helps your downside.  But I'm not going to

15   make you spend more money today, not based on what I've heard.

16          But I want a solution.  I want a solution that is --

17   that just makes sense.  I want a solution that minimizes any

18   potential environmental concerns.  I want a solution that gives

19   people who have a genuine pecuniary interest in the

20   continuation of these small businesses, the opportunity to try

21   and continue with a small business.

22          This debtor's done.  You know, there may be some

23   litigation claims.  There may be some other pieces of property,

24   okay?  Those are easy to deal with.  Those aren't going to go

25   anywhere.  They aren't going to hurt anything, but, these, you

1  know, these businesses that, you know, that have tanks in the

2  ground, I want a solution where I have somebody responsible, in

3  charge, all the time.

4          So, again, I don't expect you, Ms. Heyen, to have an

5  answer to this today.  I'm telling you what's on my mind.  I'm

6  telling you what's bothering me.  I want to get out of your

7  concern, and it was a very passionate argument, made concisely.

8  I'm not going to make you spend any more money today on looking

9  at something that you don't believe in, that I don't know that

10  anybody believes in.  It's just a we're doing the best we can.

11  But I want a solution to the problem.

12          So let me -- we'll make another circle.  But let me

13  talk to Mr. Gibbs for a second.

14          MS. HEYEN:  Okay.

15          THE COURT:  Mr. Gibbs.

16          MS. HEYEN:  Thank you, your Honor.

17          THE COURT:  Thank you.  Mr. Gibbs.  Good afternoon.

18          MR. GIBBS:  I brought my water because I'm not sure

19  how long you're going to keep me up here.

20          THE COURT:  No, I -- it's -- I promise not to do this

21  too long.  I tried to give you a view into sort of where I am.

22  We've got a relationship problem.  Just got to recognize that.

23          MR. GIBBS:  Yeah.

24          THE COURT:  And I've got a problem.

25          MR. GIBBS:  So do we.

```
 1              THE COURT:  And I know, and I don't see a scenario
 2   where there's a meaningful distribution to your constituents.
 3   Maybe I'm wrong about that.  I don't know.  I'm not trying to
 4   evaluate litigation options.
 5              This may be one of those, you know, where you take a
 6   playbook or you take a play out of, you know, I think this is
 7   actually Pachulski's playbook where you start looking at and
 8   saying, best we can get is we want to make sure that all of our
 9   vendor constituents, you know, don't have to worry about 547s
10   in the future.  I don't know -- you guys will figure all of
11   that out.
12              What I want is -- I want ideas about what we do with
13   the problem assets that we have, which are those individual
14   locations.  And if it is a dismissal, I'm not adverse to that.
15   That's got -- that doesn't let me solve many problems.  It just
16   punts it and I'm not a guy that likes to punt things.  I like
17   to finish what I start.
18              I don't see, again, having spent a lot of time on the
19   Chapter 7 side, I view that as a punt as well.  An underfunded
20   Chapter 7 trustee dealing with geographically diverse assets is
21   a disaster waiting to happen.  And so I'm looking for a
22   solution.
23              We have no money.  We have a continuing cash burn.  I
24   have no doubt that there is a scenario where we are
25   administratively insolvent.  I don't know what that means as I
```

1    sit here today, but I need somebody to say, let's get focused

2    on fixing the problem.  And maybe that is, you know, maybe that

3    is just a lifting of the stay to let the landlords go take

4    their facilities and since they are well-capitalized and they

5    are certainly more knowledgeable than I am about all of these

6    things, or I certainly hope they are, and let them go start

7    dealing with those issues on a one-off basis and we focus on

8    some of the other things.

9          I got all of that, but I need a voice in the middle

10   that can keep people focused, and if money needs to be spent,

11   then people need to understand what they get for spending

12   money.  I don't have a lot more guidance that I feel

13   comfortable in giving you because I'm going to cross over the

14   line of being an advocate very quickly here, and that's not

15   what I intend to be doing.  But I do have a problem.  I see the

16   problem.  It may be bigger than what everyone else thinks the

17   problem is, but at the end of the day, it's my responsibility

18   and I take that very seriously.

19         So what can I do to empower you?  Because you're the

20   one person who really sits in the middle in all of this.  What

21   can I do to empower you to try and find a solution that no

22   one's going to like, but is going to give me some comfort that

23   appropriate safeguards or appropriately capitalized parties are

24   overseeing, again, what I'm just going to call potentially

25   problematic assets?  And you know, with respect, whatever else

1  is there, that we figure out a economically rational way of

2  dealing with it.

3            MR. GIBBS:  We can try to respond to the overture and

4  the invitation and try to continue to play a role that we see

5  as our only really viable and valuable role, and that is to be

6  the honest broker.

7            THE COURT:  Right.

8            MR. GIBBS:  This will be a terrible result for the

9  unsecured creditors of this company under --

10            THE COURT:  I understand.

11            MR. GIBBS:   -- any potential possible outcome.  We

12  know that.  We know that.

13            The advocates may say, therefore, sit down and be

14  quiet.  You don't have an economic stake in that.  I view it

15  entirely differently.  I think my job is to try to make the

16  best of a terrible situation.  This is probably the worst train

17  wreck that I've seen in the 45 years I've been doing this, ATP

18  notwithstanding, so it's, you know, it's in -- it's on the

19  short list, let's put it that way.

20            THE COURT:  Sure.

21            MR. GIBBS:  Very good professionals, very experienced

22  professionals, all came into their respective roles with their

23  eyes wide open.  And that's part of the risk we all take.

24            What would I do directly?  I know I've heard you say

25  a number of times, I'm not going to order parties to mediation.

1  One of the parties that would need to be involved, and there

2  may not be, and the debtor may say, I'm not going to waste five

3  more minutes talking to lenders.  The lenders may say, I'm not

4  going to waste time, even five more minutes talking to the

5  debtor.  We're open for business and we'll talk to both

6  parties, number one.

7           There's another one or two economic parties here that

8  should be part of the discussions, and that's the party that

9  surfaced late Friday afternoon, and that's the party that has,

10 as you heard described, delivered a non-binding letter of

11 intent that may or may not get to any kind of an APA, that may

12 or may not get to the Court at some later date with the

13 debtor's support, to be approved.  What I don't want to have

14 happen today is have any evidence regarding that transaction

15 litter the record.  It sounded like from the very lengthy and

16 comprehensive statements that Mr. Pomerantz made is that he

17 wanted a first bite at the apple at justifying the debtor's

18 business judgment in approving that transaction.  That's not

19 before today. What they announced on the record Friday

20 afternoon was they were not going to go forward with the sale

21 motion.  We're here today on their emergency motion to use cash

22 collateral.

23           I'm not sure, and I asked my partner, Marcus Helt,

24 exactly what he thought you meant when you said, I'm not going

25 to make the lender spend any money.  If you meant by that, I'm

1    not going to allow the debtor, over their objection, to use

2    cash collateral, we have a very, very limited period of time, I

3    believe, because it -- without the ability to use the proceeds

4    from the sale of fuel or the products that are in the stores

5    that the debtor operates, the debtor will not have any ability

6    to pay even the next bill that comes in.

7              THE COURT:  Right.

8              MR. GIBBS:  What we saw in the budget that we really

9    haven't been able to spend any time trying to dig into and get

10   detail on, is a budget for a week that is essentially cash-flow

11   neutral.  I don't disagree with Mr. Pomerantz's

12   characterization about the accuracy of late, of their

13   projections regarding receipts and it's a pretty limited amount

14   of money they're asking for authority to use.

15             I don't get the request to spend 680,000 for

16   professional fees the next week.  We're in this -- we're, as I

17   said, we're all sophisticated advisors who came in with our

18   eyes wide open.  You take that out of the budget, they're going

19   to be cash flow positive, if anything, for the next week.

20             THE COURT:  Right.

21             MR. GIBBS:  I don't think coming back here in a week

22   and fighting over what currently would be postured as a

23   contested sale hearing is the right answer either.  I would

24   like the Court to entertain the request of the debtor to use,

25   on a non-consensual basis, absolutely those funds which are

1  necessary to provide the revenue stream that they're budgeting

2  and to pay the payroll of the employees they have for at least

3  a two-week period of time.  So but I can't ask for the use of

4  cash collateral.  Only the debtor can.

5         The debtor's asked for a week and it leaves us in

6  kind of a frustrating situation.  We don't really have the time

7  to, even if we got the parties to consent, to get somebody like

8  Judge Isgur involved to try to mediate and get cooler heads to

9  prevail.  We need the party that may or may not show up with a

10  checkbook to participate in those discussions.  And we need

11  just to try to find a solution.

12         None of what I heard is an acceptable solution.  Like

13  you, it is just saying, I give up.  You know, they were in here

14  for six months.  They borrowed $50 million.  They've incurred

15  tens of millions of dollars in professional fees.  It didn't

16  work, so let's just dismiss the case.  That leaves all of the

17  causes of action that may have value, that may not -- they're

18  gone in a dismissal, number one.  Not even a Chapter 7 trustee

19  could have the opportunity to look at them.  I don't know if

20  you could find a Chapter 7 trustee who would take the

21  assignment knowing that, for the reasons you just described and

22  you're full -- fully familiar with, they're going to be in an

23  underfunded operating Chapter 7 with 800 underground storage

24  tanks spread out over 25 states.  To say that that's an

25  acceptable solution is, I think, very far fetched.

1          I do think there is some benefit to considering -- it

2   hasn't been filed.  We're not asking for it today.  In short

3   order to come back and ask for the Court to consider whether or

4   not into these circumstances a Chapter 11 trustee is

5   appropriate if we -- if that is the condition upon which the

6   lender would be willing to allow more of its cash collateral to

7   be used or even fund further DIP financing to get to a fulsome,

8   closed sale that is we all -- what we all believe to be the

9   best that can be done and for a result that the lenders can

10  live with.

11         There is such a level of distrust between the lender

12  and the debtor, going both ways, that I don't think as I stand

13  here today, that we'll be back in a week or two weeks with any

14  meaningful hope of this process coming to a consensual

15  resolution in the absence of further discussion or potential

16  Chapter 11 trustee or a mediation.

17         So I'd like to take it in small bites.  I'd like to

18  have Your Honor consider giving the debtor a very short period

19  of time to use cash collateral non-consensually for as skinny a

20  budget as the Court is comfortable allowing them to spend.  And

21  I would like the parties to all tell the Court that they will

22  sit in a room, stop calling each other names, and try to come

23  up with parameters under which this debtor can survive to get

24  to the best possible sale.  And we're not there yet today at

25  all.

```
 1              THE COURT:  Let me -- Ms. Heyen, let me ask you, and
 2   while, not -- I did not mean to be disrespectful.  I was typing
 3   because I was trying to figure out whether Judge Lopez or Isgur
 4   were available.
 5              MR. GIBBS:  I didn't even notice.
 6              THE COURT:  Let me ask, Ms. Heyen, if I can get Lopez
 7   or Isgur relatively quickly, like in the next week or two, will
 8   you all consider a keep-the-doors-open budget?  That means no
 9   professional fees.  It just means keep the doors open.
10              MS. HEYEN:  Your Honor, I'm happy to take that back
11   to the agent if you can give me maybe five or ten minutes.
12              THE COURT:  Absolutely.
13              MS. HEYEN:  I think we will absolutely consider it.
14   We just need some time to discuss it with our team.
15              THE COURT:  Sure.
16              MR. ELROD:  Your Honor, I do have --
17              MR. POMERANTZ:  Your Honor?
18              MR. ELROD:  I do have a response from our client
19   since we've been in the courtroom.  I apologize for
20   communicating with the client when we're in the courtroom.
21              THE COURT:   No, no.
22              MR. ELROD:  I understand the urgency of the matter.
23   The lenders are willing to, or the agent is willing to permit
24   the use of cash collateral provided that there are no
25   professional fees in the budget.
```

 1              THE COURT:  Okay.  So let's do this and I don't know
 2  how, Mr. Wallen, since you're --
 3              MR. POMERANTZ:  Your Honor, can I respond?  To the
 4  concept of mediation, your Honor?
 5              THE COURT:  Sure.
 6              MR. POMERANTZ:  Your Honor, you know, your -- that
 7  I'm a big fan of mediation.  I've spent time with you in
 8  mediation and with (indiscernible) time, and we feel very
 9  highly about Judge Isgur and Judge Lopez.  There's an economic
10  reality that I think people are ignoring.  Putting aside
11  professional fees, Mr. Healy, this morning, and I, when I told
12  him that the best we can get is a hearing next week if
13  everything goes our way today, he said, we do not have the
14  time.  We need new financing.
15              So if we don't get new financing, put aside
16  professional fees.  Okay?  We've worked for free before.  We
17  don't like it.  We're going to do the right thing.  Your Honor
18  has always known that we and FTI and Raymond James, we will do
19  the right thing.
20              But Mr. Healy will say that putting aside
21  professional fees, if we don't get money in, we can't continue
22  to operate.  That's number one.
23              Number two, it's really not a question of convincing
24  us of doing something.  We don't have any more money.  All we
25  have is a proposal and a deal.  So if the lenders want to take

1    it back, they want to take it back.

2              We can't give them anything.  The only thing we can

3    give them is a deal.  And ARCO and Oak Street has steadfastly

4    refused to pay any more money.  So I don't know what we can do.

5              I do understand a lot of concerns about the letter of

6    intent.  I do understand people need to see a purchase

7    agreement.  So if the answer was, well, look, we think it is --

8    it's squishy, we'd like to get some questions answered.  We'd

9    like to be part of a documentation process and try to reach an

10   overall deal.  I totally get that, but I don't see really what

11   we are going to accomplish in mediation unless it's to talk

12   about the burial.  If the talk is about a burial, and your

13   Honor says, based upon what you've heard and all the open

14   questions, we shouldn't proceed to the sale, yeah, we could of

15   course have a conversation and a discussion on what's the

16   appropriate way to bury this.  But if it's really to

17   potentially have some transaction that is going to do the thing

18   -- the only way to do the things that Your Honor wants to be

19   done, protecting the environment, protecting the employees, not

20   making this a mess, not requiring a lot more money to be spent.

21             And again, I'll point out.  We are not asking the

22   lenders other than use of cash collateral to fund an additional

23   dime.  That was a key part of our transaction.  We needed to

24   have a deposit available upon signing the agreement and Court

25   approval.

1          So, Your Honor, I'm all for mediation in many cases

2     when there is a dispute that could be resolved.  I just don't

3     know what I have to offer in that dispute because we don't have

4     a checkbook.

5          THE COURT:  So, I can think, again, because I can't

6     be an advocate, I can think of half a dozen ways out of this.

7     I've just talked to Isgur.  I want Mr. Wallen, I mean, you're

8     going to have to coordinate with Mr. Pomerantz and if Isgur

9     wants to get Pomerantz on the phone, he's certainly welcome to

10     do that.

11          I need for you, one lawyer from the DIP lender, and

12     one lawyer from the Committee to go down and see Judge Isgur.

13     He says that he thinks he can find time within the next week to

14     ten days.  And I just want you to have a conversation with him.

15          But if I can see the path, I know that he can see the

16     path because he taught me the path.  So I want you to at least

17     go have the conversation and see what the options are and then

18     we can come back and figure out.  We're not going home today

19     until we have a plan.  And if we have to come up with a stop

20     gap cash collateral usage to, you know, for the next week or

21     two weeks or whatever it is that you all agree to, until we

22     figure out how we're going to proceed forward, all fine by me.

23     But again, I'm in an uncomfortable position because I'm going,

24     why can't you all see this?  And I can't start saying but A and

25     B and C and D and E.

1          I want you to go talk to Isgur, have a conversation

2   about when he's available.  Again, I have, you know, I have

3   a -- he left out a word, and I think I know what it means, but

4   I want you to go hear it from him and find out what he's got

5   available.  And I told him three people were coming down and

6   you know, you can go hover around his door.  If he's willing to

7   take more, all fine by me.  But I told him three people were

8   going to come see him.

9          And for those of you --

10         MR. POMERANTZ:  And (indiscernible) too, Your Honor?

11         THE COURT:  Okay.

12         MR. POMERANTZ:  It's okay if we call him?

13         THE COURT:  Of course it is.  Of course it is.  And

14  for those of you who are on video, I'm -- I've got two other

15  matters I'm going to call.  But when folks come back in the

16  courtroom, then we'll recall the case and figure out what we're

17  going to do either today or some other day.  All right?

18         All right.  Thank you, everybody.  You're excused.

19         MS. HEYEN:  Thank you, your Honor.

20     (Proceedings concluded at 4:04 p.m.)

21                         * * * * *

22

23

24

25

1                        **C E R T I F I C A T I O N**

2

3              I, Alicia Jarrett, court-approved transcriber, hereby

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9

10   _____

11   ALICIA JARRETT, AAERT NO. 428        DATE: August 10, 2023

12   ACCESS TRANSCRIPTS, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25