**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| MOUNTAIN EXPRESS OIL COMPANY, et al., | Case No. 23-90147 (DRJ) |
| Debtors. [1] | (Jointly Administered) |

**MONTO FOOD MART INC., BROADWAY FUEL, INC., PRIME PETRO, INC.,
AMERICAN 1 GAS INC., COMMACK FUEL INC., AND RIVERDALE FUEL, INC.'S
WITNESS AND EXHIBIT LIST FOR HEARING SCHEDULED FOR APRIL 15, 2023
AT 1:00 P.M. (PREVAILING CENTRAL TIME)**

Monto Food Mart Inc., Broadway Fuel, Inc., Prime Petro, Inc., American 1 Gas Inc., Commack Fuel Inc., and Riverdale Fuel, Inc. (the "Operators") file their Witness and Exhibit List for the hearing to be held on August 15, 2023 at 1:00 P.M. (prevailing Central Time)(the "Hearing") as follows:

**WITNESSES**

The Operators may call the following witnesses at the Hearing:

1. Suleyman Issi, Corporate Representative of American 1 Gas Inc.

2. Kazi Faruk, Corporate Representative of Broadway Fuel Inc.

3. Rajeev Malhotra, Corporate Representative of Commack Fuel Inc.

4. Varander Nayar, Corporate Representative of Monto Food Mart Inc.

5. Achla Duggal, Corporate Representative of Prime Petro Inc.

6. Jahirul Alam, Corporate Representative of Riverdale Fuel Inc.

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/mountainexpressoil. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 cases is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022.

**EXHIBITS**

| EXHIBIT | DESCRIPTION | MARK | OFFER | OBJECT | ADMIT | W/D | DISPOSITION AFTER TRIAL |
|---|---|---|---|---|---|---|---|
| 1. | Fuel Supply Agreement between American 1 Gas Inc. and Debtors | | | | | | |
| 2. | Fuel Supply Agreement between Broadway Fuel Inc. and Debtors | | | | | | |
| 3. | Fuel Supply Agreement between Commack Fuel Inc. and Debtors | | | | | | |
| 4. | Fuel Supply Agreement between Prime Petro, Inc. and Debtors | | | | | | |
| 5. | Fuel Supply Agreement between Riverdale Fuel Inc. and Debtors | | | | | | |
| 6. | Fuel System Reports of Monto Food Mart, Inc. between July 12, 2023 through August 5, 2023 | | | | | | |
| 7. | Fuel System Reports of Riverdale Fuel, Inc. between July 11, 2023 through August 7, 2023 | | | | | | |
| 8. | Fuel System Reports of Broadway Fuel, Inc. on July 23, 2023 and July 29, 2023 | | | | | | |

| 9. | Fuel System Reports of Prime Petro, Inc. between August 2, 2023 through August 6, 2023 | | | | | | |
|---|---|---|---|---|---|---|---|
| 10. | Fuel System Reports of Commack Fuel, Inc. between July 11, 2023 through August 2, 2023 | | | | | | |
| 11. | Fuel System Reports of American 1 Gas, Inc. between July 11, 2023 through August 7, 2023 | | | | | | |

**Certificate of Service**

I certify that on August 14, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Susan Tran Adams*
Susan Tran Adams

**EXHIBIT 1 - FUEL SUPPLY AGREEMENT BETWEEN AMERICAN 1 GAS INC. AND DEBTORS**

EXHIBIT

1



**MOUNTAIN EXPRESS**
OIL COMPANY

### AMENDED AND RESTATED COMMERCIAL LEASE

**THIS AMENDED AND RESTATED COMMERCIAL LEASE** ("Lease") is made this 11th day of Febuary 2022 ("Effective Date") by and between **MEX RE-NY-LI LLC**, a Wyoming corporation ("Landlord"), and **American 1 Gas Inc.**, a New York Corporation, having a mailing address of 86 Sunrise Highway, Lindenhurst, New York 11757 ("Tenant") (Landlord and Tenant are sometimes referred to collectively herein as the "Parties").

### W I T N E S S E T H:

**WHEREAS**, Landlord has a possessory interest in the property known as Mountain Express Store #968 located at 86 Sunrise Highway, Lindenhurst, New York 11757 ("Location"); and

**WHEREAS**, Tenant operates a business on the Location and the Parties wish to enter into this Lease for the rental of such Location on terms as specified herein with such Lease amending and resetating any and all other lease agreements by, between, or among the Parties for the Location.

**NOW THEREFORE**, in consideration of the mutual undertakings contained herein, the sufficiency of which is hereby acknowledged, the parties agree as follows:

      **1.**     **LOCATION.** Landlord, for and in consideration of the rents, covenants, agreements and stipulations herein contained, to be paid, kept, and performed by Tenant, has leased and rented, and by these presents does lease and rent unto said Tenant, and said Tenant hereby agrees to lease and take upon the terms and conditions which hereinafter appear, all of the property, improvements, and related gas and convenience store equipment located inside the convenience store on the Location. Tenant accepts the Location on an "as-is" basis and Landlord is under no obligation to take any action or to perform any obligations with respect to the Location, except as specifically set out below.

      **2.**     **TERM OF LEASE.** The Term of this Lease shall begin on February 11, 2022 and continue for three (3) years ("Term"), shall automatically renew from month to month after the said Term unless either party gives written notice of non-renewal to the other party at least thirty (30) days prior to the expiration of the initial Term or the then existing extended term, or unless sooner terminated as otherwise hereinafter provided. Landlord may terminate this Lease for any reason and at any time during the Term of the Lease with thirty (30) days written notice to Tenant. Contingent upon Landlord's approval, Tenant

Store #968

may terminate this Lease for any reason and at any time during the Term of the Lease with one hundred eighty (180) days written notice to Landlord. Any option to extend shall be provided for in **Section 36**. Upon exercise and approval of such option to extend this Agreement, the term of the Fuel Supply Agreement in place at the Location shall also be extended concurrently herewith. This Lease is expressly contingent upon the termination of any existing lease agreement in place at the Location.

3.　　**MONTHLY RENTAL FEES.**　Tenant agrees to pay Landlord a monthly base rental amount equal to the sum of $25,000.00 + NNN. The monthly base rental amount shall increase by two percent (2%) annually upon each anniversary date.

Tenant agrees to remit to Landlord a security deposit in the amount of $50,000.00, an amount equivalent to the first and last month's monthly base rent, upon the first day of the Term.

4.　　**RENTAL PAYMENTS AND FEES.**

4.1　　*Rental.*　Tenant agrees to pay Landlord, in electronic form (ACH) to Landlord's bank account, or in any other manner as designated by Landlord in writing to Tenant, promptly on the first (1ˢᵗ) day of each month, in advance, during the term hereof. Tenant shall provide Landlord with such banking information and authorizations as needed for the payment of rent in ACH form. There shall be a One Hundred Dollar ($100.00) fee for any bounced ACH draft. In the event of a bounced ACH draft, Tenant shall either (a) provide documented proof of funds in the ACH draft account on file in order to clear a redraft; or (b) wire the funds directly to Landlord.

4.2　　*Rental Proration.*　In the event the commencement date of this Lease is any day other than the first day of a calendar month, the first month's rental shall be prorated.

4.3　　*Late Fees.*　Tenant agrees to pay Landlord, promptly at the times and in the manner herein specified, all amounts due, without deduction, setoff, abatement, counterclaim or defense. If any amount due is not received by Landlord on or before five (5) days following the date on which it is due, Tenant shall pay Landlord a late charge equal to five percent (5%) of the amount of such past due payment, notwithstanding the date on which such payment is actually paid to Landlord. Failure for Tenant to pay any amounts due hereunder on or before the due date constitutes a default hereunder, however, Landlord's election to accept amounts due after the due date shall not operate as a waiver or modification of the amounts due or payment terms for any subsequent months.

4.4　　*Administrative Fees.*　Tenant shall pay an annual $100.00 administrative fee payable to Landlord upon the inception of the initial term of this Lease, and on each anniversary date thereafter during the remaining term or any extended term thereof. Tenant shall pay a $25.00 monthly

Store #968

administrative fee payable to Landlord on the first day of each month during the initial term and any extended term of this Lease.

## 5.    UTILITIES, COMMON AREA MAINTENANCE, TAXES AND OTHER AMOUNTS.

5.1    *Utilities.* Tenant shall bear and pay all utility bills, including, but not limited to, water charges, sewer, gas, electricity, fuel, telephone, light and heat for the leased Location. Tenant shall also bear and pay all charges for garbage collection services or other sanitary services rendered to leased Location or used by Tenant in connection therewith. If Tenant fails to pay any of said utility bills, charges for garbage collection or other sanitary services or other amounts due, Landlord may pay same and such payment may be added to the rent next due.

5.2    Taxes. Landlord shall pay all real property taxes assessed to the Location. Tenant shall pay all other Taxes relating to the Location, including, without limitation, all federal, state, local, governmental, special district and special service area taxes, charges, assessments and any other government charges, surcharges and levies, general and special, ordinary or extraordinary, including business license fees or charges (including interest thereon whenever same may be payable in installments) which Tenant shall pay or be obligated to pay arising out of the use, occupancy, management, repair or replacement of the Location, any appurtenance thereto or any property, fixtures or equipment thereon.

5.3    *Location Insurance*.  Landlord shall at all times during the Term of this Lease procure and maintain in full force and effect an All Risk Property Insurance Policy on the Location, which shall include flood insurance if the Location is in a flood zone, and on all improvements constructed thereon and any additions or alterations thereto or replacements thereof. Said policy shall to contain a Replacement Cost Endorsement, insuring against perils therein specified, in an amount equal to not less than one hundred percent (100%) of the replacement cost of all improvements on the Location, exclusive of foundation and excavation costs, the proceeds of which shall be payable to Landlord and any designated mortgagee in accordance with their respective interests therein. The cost of such insurance shall be billed to Tenant on a monthly basis, which shall be paid at the same time and by the same method as the monthly rent.

## 6.    USE OF LOCATION. The convenience store on the Location shall be used for a convenience store and the retail sale of gasoline and other petroleum products only, including any incidental products and food, including but not limited to items such as prepared food, which might be sold at the convenience store. Tenant shall be responsible for all licenses or permits associated with said use. The Location shall not be used by Tenant for any other purpose unless Landlord agrees in writing to such additional use. Location shall not be used for any illegal purpose, or in any manner so as to create any nuisance or

Store #968

trespass, or in any manner to vitiate the insurance or increase the rate of insurance on the Location. Tenant shall not commit or allow any waste or nuisance upon the leased Location, and shall maintain the Location in a clean, neat, orderly, and attractive condition.

7.    **OPERATION OF THE LOCATION.** During the Term of the Lease, Tenant shall:

(a) keep the Location, buildings, equipment, fixtures, rest rooms, sidewalks, approaches, and driveways in good condition, properly lighted, clean, safe, sanitary, and free of trash, rubbish, and other debris;

(b) keep the approaches, driveways, and service areas uncluttered and free of parked vehicles, trailers, and other obstructions, including ice and snow, at all times;

(c) not engage in or permit any improper act or conduct on the Location detrimental to Tenant, Landlord, or any member of the public; and

(d) comply with all laws, ordinances, rules, or regulations of constituted public authority applicable to the use and occupancy of the Location, use of the equipment and the conduct of the business.

8.    **A. MOTOR FUEL SUPPLY, REPORTING AND OTHER AGREEMENTS.** Before entering into any supply agreement or any purchase or delivery of motor fuel to the Location may only be made from vendors who have been approved in advance by Landlord. Prior to accepting delivery of motor fuel to the Location from any motor fuel vendor, Tenant shall submit for Landlord's approval, which approval may be withheld by Landlord in its sole discretion and for any reason whatsoever, Landlord reserves the right in its sole discretion and for any reason whatsoever to withdraw or revoke any approval previously given for the purchase or delivery from a specific motor fuel vendor, such withdrawal or revocation to be effective immediately or as otherwise indicated in the notice of the withdrawal or revocation. Tenant shall provide a complete copy of the proposed agreement, including all exhibits, addenda, and other documents constituting the proposed agreement.  Once approved by Landlord, any proposed amendment or modification of such supply agreement must also be submitted by Tenant for Landlord's prior approval, which approval may be withheld by Landlord in its sole discretion and for any reason whatsoever.  Any approval given by Landlord shall be indicated only in writing.  In connection with any approved supply agreement, Tenant must comply with all terms and conditions set forth in such supply agreement, including without limitation, compliance with OPIS. In the event the Landlord chooses to enter into a supply agreement for the delivery of motor fuels to the Location (whether or not such agreement covers other properties owned or managed by Landlord) (the "Prime Agreement"), Tenant must also enter into and comply with all the terms and conditions set forth in such Prime Agreement, and Landlord reserves

Store #968

4

the right to negotiate any such Prime Agreement and to receive payments under any such Prime Agreement; provided, however, Tenant may elect, in lieu of entering into and becoming subject to any such Prime Agreement, to pay to Landlord FIVE CENTS (5 cents) per gallon of motor fuel dispensed at the Location throughout the Term, and once such election is made (x) Tenant shall not have the right to alter its election without the mutual agreement of Landlord, and (y) Tenant shall provide, in addition to the gross sales reports required to be provided to and/or made available for inspection by Landlord pursuant to this Lease, all records and information as Landlord may request from time to time relating to Tenant's retail sale of motor fuels and amounts of motor fuels dispensed at the Leased Premises during the Term. Tenant's failure to meet any minimum monthly or annual petroleum sale requirements applicable to Tenant as set forth in the supply agreement or by the Landlord shall constitute a default hereunder. Upon said default, the Landlord upon ten (10) days written notice may terminate this Lease agreement and regain possession of the Leased Premises, by self help or otherwise. Tenant shall provide, in addition to the gross sales reports required to be provided to and/or made available for inspection by Landlord pursuant to this Lease, all records and information as Landlord may request from time to time relating to Tenant's retail sale of motor fuels and amounts of motor fuels dispensed at the Leased Premises during the Term.

**B. ABANDONMENT OF LEASED LOCATION.** Tenant agrees not to abandon or vacate the leased Location during the period of this Lease and agrees to use said Location only for purposes herein leased until the expiration or termination hereof.  None of the equipment owned by Landlord, and provided for on the accompanying equipment lease, shall be removed from the Location.

9.      **REPAIRS AND MAINTENANCE.**

9.1      *Repairs and Maintenance by Tenant.* Landlord gives to Tenant exclusive control of Location and shall be under no obligation to inspect said Location. Tenant acknowledges that Tenant has had the right to inspect the Location, including all equipment located thereon, and Tenant accepts the same in their present condition as suited for the intended use by Tenant "AS IS, WITHOUT WARRANTY." During the Term, Tenant shall, at Tenant's sole cost and expense, maintain in good order and repair the leased Location, and all equipment, fixtures and other improvements located upon the Location. Tenant further agrees to care for the grounds around the building, including the mowing of grass, care of shrubs, and general landscaping. Additionally, Tenant shall be responsible for repairs to the roof, foundation, exterior walls, underground utility and sewer pipes. Tenant agrees to return the Location and all equipment, fixtures, and other improvements to Landlord, at the expiration or prior to the termination of this Lease, in as good condition and repair as when first received, natural wear and tear and acts of God excepted.  Tenant understands that Tenant is responsible for any replacement and upgrade to any equipment upon the Location and any related costs and/or expenses shall be borne by Tenant.

9.2     *Repairs and Maintenance by Landlord.*  It is acknowledged that the intent of this paragraph is for the Landlord to have **no** duty to repair or maintain any portion of the Location, equipment, fixtures, or other improvements located thereon whatsoever.

9.3     *Environmental Management and Inspection Fees.* Landlord shall keep in good repair the underground gasoline storage tanks and underground fuel lines, except repairs rendered necessary by the acts or omissions of Tenant, its agents, employees and invitees.  Tenant shall also reimburse Landlord for its monthly environmental management consulting fees incurred by Landlord during the term and any extended term of this lease.  Landlord shall select an environmental firm of its choosing, and nothing contained herein shall be deemed to prohibit Landlord from selecting any other qualified environmental management company to perform environmental management services for Landlord in regard to the Location, at a cost that is usual and customary in the industry.  Landlord shall be under no obligation to inspect said Location.  Tenant shall promptly report in writing to Landlord any defective condition known to it which Landlord is required to repair, and failure to so report such defects shall make Tenant responsible to Landlord for any liability incurred by Landlord by reason of such defects.  Tenant agrees to engage indemnify, defend, and hold Landlord harmless from all clean-up costs, personal injury, death or property damage claims, and fines or penalties which arise out of or are related to the leakage of petroleum products during the Term of the Lease but not for any matters arising before the inception hereof.  Further, if applicable, Tenant agrees to participate in the applicable state's Petroleum Storage Tank Trust Fund and take all actions necessary to maintain eligibility thereunder.  Tenant shall be liable for the deductible under the applicable state's Storage Tank Trust Fund should a release occur, unless such release is caused by the failure of Landlord to keep the underground gasoline storage tanks and underground fuel lines in good repair, as provided herein.

9.4     *Record Keeping.* Tenant agrees to provide to Landlord upon demand, or at a minimum, at least annually, copies of all leak detection or other compliance records.  Tenant shall maintain such records for a minimum of three (3) years.

**10.**     **ENVIRONMENTAL/SOIL COMPLIANCE.** Tenant shall comply with all environmental laws, rules and regulations pertaining to operation of the business on the Location including all of the requirements pertaining to leak detection and other regulatory compliance issues associated with the use of the underground storage tanks.

**11.**     **DESTRUCTION OF OR DAMAGE TO LOCATION.** If Location are totally destroyed by storm, fire, lightning, earthquake, or other casualty, this Lease shall terminate.

**12.**     **INDEMNIFICATION OF LANDLORD AGAINST LOSS OR CLAIM.** For and during the Term of this Lease, Tenant shall protect, indemnify, defend, and save harmless Landlord from and against all

Store #968

6

claims, demands, liability, losses, or costs, whether from injury to persons or loss of life or damage to property occurring on or within the Location and arising in any manner, directly or indirectly, out of the use and occupancy of the Location by Tenant.  Tenant shall, at Tenant's expense, provide and keep in force for the benefit of Landlord comprehensive general liability insurance covering the Location and the business to be operated thereon, in which insurance policy or policies Landlord, as well as Tenant, shall be named as an insured.  The said policy or policies of insurance shall provide for limits of liability for bodily injury of not less than $1,000,000.00 single limit coverage for each accident or occurrence, and not less than $250,000.00 for property damage.  Said policy shall include any "dram shop" or liquor liability coverage in the event Tenant sells alcoholic beverages at the Location. Tenant shall furnish to Landlord evidence of such insurance within fifteen (15) days of the date hereof and at such other times as Landlord may require.  Tenant shall defend, indemnify, and save harmless Landlord from and against all claims, demands, liabilities, losses, or costs to which Landlord may be subjected for or by reason of any person, firm, or corporation seeking to hold or holding Landlord liable or in any way responsible for the debts or obligations incurred in any manner in connection with the conduct and operation of the business conducted on the Location.

13.    **GOVERNMENTAL ORDERS.**  Tenant agrees that, at Tenant's own expense, Tenant will promptly comply with all requirements of any legally constituted public authority made necessary by reason of Tenant's occupancy of said Location.

14.    **CONDEMNATION.**  If the whole of the leased Location, or such portion thereof as will make the Location unusable for the purposes herein leased, shall be condemned by any legally constituted authority for any public use or purpose, then in either of said events, the Term hereby granted shall cease from the date when possession thereof is taken by public authorities, and rental shall be computed and paid as of said date.  Each party may make a claim against the condemning authority for their respective interests in the property.

15.    **ASSIGNMENT AND SUBLETTING.**  Tenant shall not assign or sublet this Lease or any interest hereunder, or sublet Location or any part thereof, or permit the use of the Location by any party other than Tenant without the prior written consent of Landlord.  No such assignment or sublease shall have the effect of releasing Tenant.  In regard to each approved assignment or sublease, Tenant agrees to be responsible for Landlord's attorney's fees associated therewith.  Landlord shall consent to the assignment by Tenant to any other entity formed and owned by the shareholders of the Tenant, Further, Landlord shall not unreasonably withhold consent to the assignment by Tenant to any other entity to which Tenant desires to sublease the Location or sell its business assets.

16.    **DEFAULT.**  It is mutually agreed that in the event Tenant (i) becomes insolvent, (ii) is generally unable to pay, or fails to pay, its debts as they become due, (iii) files, or has filed against it, a

petition for voluntary or involuntary bankruptcy or pursuant to any other insolvency law, (iv) makes or seeks to make a general assignment for the benefit of its creditors, or (v) applies for, or consents to, the appointment of a trustee, receiver, or custodian for a substantial part of its property or business; or (vi) if Tenant violates or is in default of any other agreements between Landlord and Tenant; Landlord, at its option, may provide ten (10) days' notice of said default and the right to cure said event of default, and if Tenant has not cured said default within said period, Landlord may:

(a) terminate this Lease by written notice to Tenant whereupon this Lease shall terminate immediately, and possession of the Location shall immediately be returned to Landlord;

(b) not terminate this Lease and enter the Location and take possession thereof and relet the Location or any portion thereof on such terms as Landlord deems appropriate. Any rent from any reletting shall be applied to any indebtedness other than rent owing to Landlord, second to Landlord's attorney's fees and brokerage fees and other expenses of exercising its rights, and third, to the rent due. Tenant agrees to pay any deficiency within ten (10) days of demand by Landlord therefor; or

(c) pursue separately or concurrently, any and all other remedies allowed by law or in equity.

Any notice provided in this paragraph may be given by Landlord or its attorney. Upon Lease termination by Landlord, Tenant will at once surrender possession of the Location to Landlord and remove all of Tenant's effects therefrom; and Landlord may forthwith re-enter the Location and repossess itself thereof, and remove all persons and effects therefrom, using such force as may be necessary without being guilty of trespass, forcible entry, detainer, or other tort. If Tenant refuses to surrender possession immediately, Landlord may institute appropriate legal proceedings and Tenant agrees that Landlord may obtain injunctive relief for removal of Tenant, should Tenant's leasehold become subject to cancellation hereunder.

It is expressly agreed that no termination of this Lease as the result of Tenant's default or breach shall have the effect of releasing Tenant from his obligation to pay the full Rent due for the entire period of the then existing Term.

17.    **SIGNS.** Tenant shall not install, paint, display, inscribe, place, or affix any sign, picture, advertisement, notice, lettering, or direction ("Signs") on the exterior of the Location, the common areas of the building upon the Location, the interior surface of glass and any other location which could be visible from outside of the Location without first securing written consent from Landlord therefore. Any Signs permitted by Landlord shall, at all times, conform with all municipal ordinances or other laws, rules, regulations, deed restrictions, and protective covenants applicable thereto. Tenant shall remove all Signs at the expiration or other termination of this Lease, at Tenant's sole risk and expense, and shall in a good

and work-man like manner properly repair any damage caused by the installation, existence, or removal of Tenant's Signs.

18.     **QUIET ENJOYMENT**. So long as Tenant complies with all provisions hereof, Tenant shall have quiet enjoyment of the Location.

19.     **EFFECT OF TERMINATION OF LEASE.**  No termination of this Lease prior to the normal ending thereof, by lapse of time or otherwise, shall affect Landlord's right to collect rent for the full term.

20.     **MORTGAGEE'S RIGHTS.**  Tenant's rights shall be subject to any bona fide mortgage or deed to secure debt, which is now, or may hereafter be, placed upon the Location by Landlord. Tenant agrees to cooperate with Landlord's efforts to finance or refinance the Location and to sign or consent to any such financing arrangements, including providing estoppel certificates and any other instrument reasonably required. Further, Tenant shall provide financial income statements for the Location to Landlord, showing the sales, profits and losses, assets and liabilities pertaining to the Location. Such financial records shall be provided within thirty (30) days after the end of each fiscal quarter and within one hundred (100) days after the end of each fiscal year.

21.     **NO ESTATE IN LAND.** Except as otherwise provided herein, this contract shall create the relationship of Landlord and Tenant between the parties hereto; no estate shall pass out of Landlord. Tenant's interest in the Location is possessory only, and personal to Tenant, and is not subject to levy or sale, nor assignable by Tenant except by Landlord's prior written consent.

22.     **HOLDING OVER.**  If Tenant remains in possession of the Location after expiration of the Term hereof, with or without Landlord's acquiescence and without any express agreement of the parties, Tenant shall be a Tenant at will at 150% the rental rate in effect at the end of the Lease.  There shall be no renewal of this Lease by operation of law.

23.     **ATTORNEY'S FEES AND HOMESTEAD.**  Should Landlord retain counsel for the purpose of enforcing, or preventing the breach of, any provision hereof, including the institution of any action or proceeding, to enforce any provision hereof or for damages for any alleged breach of any provision hereof, or for a declaration of such party's rights or obligations hereunder, then, whether such matter is settled by negotiation, or judicial determination, the Landlord shall be entitled to be reimbursed by Tenant for all costs and expenses incurred, including reasonable attorneys' fees. Tenant waives all homestead rights and exemptions which it may have under any law against any obligations owing under this Lease.  Tenant hereby assigns to Landlord its homestead and exemption.

24.     **SERVICE OF NOTICE.**  Any notices to Tenant required under this Lease, shall be sent by

certified mail, overnight delivery to the address first written above or by electronically verifiable means to such email address as provided by Tenant.

25. **TIME OF ESSENCE.** Time is of the essence of this Lease.

26. **RIGHTS CUMULATIVE.** All rights, powers, and privileges conferred hereunder upon parties hereto shall be cumulative, including those rights given by law.

27. **NO WAIVER OF RIGHTS.** All rights, powers, and privileges conferred hereunder upon parties hereto shall be cumulative, including those rights given by law. No failure of Landlord to exercise any power given Landlord hereunder, or to insist upon strict compliance by Tenant with its obligation hereunder, and no custom or practice of the parties at variance with the terms hereof shall constitute a waiver of Landlord's right to demand exact compliance with the terms hereof.

28. **LEGALITY OF AGREEMENT.** In the event any portion or portions of this Lease are declared unconstitutional, illegal, void, or of no force and effect, the balance of this Lease shall remain in full force and effect and enforceable as a binding contract.

29. **TERMS INCLUSIVE.** "Landlord" as used in this Lease shall include Landlord, its assigns, and successors. "Tenant" shall include Tenant, his heirs, and representatives, and if this Lease shall be validly assigned or sublet, shall include also Tenant's assignees or sublessees, as to such assignment or sublease. "Landlord" and "Tenant" include male and female, singular and plural, and shall also include any corporation, partnership, or individual, as may fit the particular parties.

30. **LICENSES AND PERMITS.** During the Term, Tenant shall be responsible to obtain and maintain, at Tenant's sole cost and expense, Tenant's own licenses and/or permits required to operate such a business upon the Location, including, but not limited to any necessary beer/wine, liquor and lotto licenses. Tenant agrees to acquire from the appropriate authorities, and agrees to maintain, any required and/or necessary permits, licenses and/or qualifications, prior to:

(a) operating Tenant's business upon the Location; and/or

(b) making any improvement, modification or other change to the Location (said improvement, modification or change may require the prior written consent of Landlord). Tenant shall be responsible for all obligations, claims, and debts of the business upon the Location arising during the Term. Tenant agrees to indemnify and hold Landlord harmless from all losses, claims, damages, or assessments, including attorney fees and costs, incurred by Tenant or the business operated upon the Location, for any citation/violation of any permit or license.

Store #968

31.  **ENTIRE AGREEMENT.** This document contains the entire agreement between the parties hereto and no representations, inducements, promises, or agreements, oral or otherwise, between the parties, not embodied herein, shall be of any force or effect.

32.  **ELECTRONIC TRANSMISSION AND SIGNATURE.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of Electronic Transmission and/or with Electronic Signatures shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

(a) "Electronic Transmission" means any form of communication not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved, and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

(b) "Electronic Signature" has the meaning provided in [the Georgia Electronic Records and Signatures Act, O.C.G.A. § 10-12-1 et seq. OR Wyo. Stat. § 40-21-102(a)(viii) or OR Tex. Bus. & Com. Code § 322.002(8).]

33.  **ALTERATIONS.** Tenant shall not make any alterations, additions, or improvements to the Location without Landlord's prior written consent. Tenant shall promptly remove any alterations, additions, or improvements constructed in violation of this paragraph upon Landlord's written request. All approved alterations, additions, and improvements will be accomplished in a good and workmanlike manner, in conformity with all applicable laws and regulations, and by a contractor approved by Landlord, free from any liens or encumbrances. Landlord may require Tenant to remove any alterations, additions or improvements (whether or not made with Landlord's consent) at the termination of this Lease and to restore the Location to its prior condition, all at Tenant's expense. All alterations, additions and improvements which Landlord has not required Tenant to remove shall become Landlord's property and shall be surrendered to Landlord upon the termination of this Lease, except that Tenant may remove any of Tenant's machinery or equipment which can be removed without material damage to the Location. Tenant shall repair, at Tenant's expense, any damage to the Location caused by the removal of any such machinery or equipment.

34.  **ADDITIONAL PROVISIONS.**

34.1  *Acknowledgement of Risks.* Without limiting the other terms and conditions of

this Lease, Tenant specifically acknowledges and further agrees that:

(a) There are inherent risks in the operation of a business at the Location and Tenant is willing and able to bear such risks, including, without limitation, the loss of any investment in the Location or such business upon termination of this Lease;

(b) upon termination of this Lease for any reason, Landlord shall have the right to use the Location as it deems appropriate, including, but not limited to selling the Location, operating a similar or other business upon the Location, converting the Location to any other use Landlord deems appropriate or leasing the Location to a new lessee;

(c) Landlord has no obligation to lease the Location to any new lessee, whether or not prospective lessee is willing to purchase Tenant's inventory, trade fixtures, or equipment;

(d) Any improvements, fixtures or equipment are not or cannot be removed in accordance with the provisions of the Lease shall become the sole and entire property of Landlord upon termination of this Lease;

(e) Landlord has no obligation to reimburse Tenant for any losses which Tenant might suffer in the operation of Tenant's business at the Location or due to the termination of this Lease; and

(f) Landlord has no obligation to purchase any of Tenant's inventory, equipment or trade fixtures, or to reimburse Tenant for any sums invested by Tenant to improve the Location or the business operated by Tenant on the Location.

34.2     *Personalty Removed Upon Lease Termination.*  At the termination or expiration of the Lease Term, Tenant shall surrender the Demised Location on the same condition as it was in upon delivery or possession thereto under this Lease, reasonable wear and tear excepted, and shall deliver all keys to locks to Landlord. Before surrendering the Demised Location, Tenant shall remove prior to the expiration of the Lease Term, all its personal property, trade fixtures, alterations, additions and decorations and shall promptly repair any damage caused thereby. Tenant's obligations to perform under this provision shall survive the expiration of the Lease Term. If Tenant fails to remove its property upon the termination or expiration of the Term, such property shall be deemed abandoned and shall become the property of Landlord.

34.3     *Background Check.*  This Lease is contingent upon Tenant passing a background check.

Store #968

**35.** **CROSS-DEFAULTS.** Any default by Tenant under the terms of this Lease shall likewise constitute a default of Tenant, as customer, Tenant, or otherwise, under the terms of any and all other agreements between these same parties, including without limitation, other leases, motor fuel supply or commissioned sales agreements, purchase and /or sale agreement and other contracts, whether or not pertaining to the Location, or other Location or locations or to the sale or purchase for resale of motor fuels or other products. This provision shall also apply to any agreements with Landlord's affiliates and related parties and in particular for the subject Location, Mountain Express Oil Company, a Georgia corporation. In the event Tenant is a tenant of a third-party landlord at the Location, and Landlord has acquired the written consent to this provision from such landlord by way of a separate document or agreement, default by Tenant hereunder shall likewise constitute a default under the terms of the lease between Tenant and such landlord and a default under the lease shall be a default under this Lease.

**36. OPTION TO EXTEND TERM.** Landlord shall have the option to extend the Term for one additional three (3) year term with at least thirty (30) days' notice to Tenant, prior to the expiration of the then existing Term. Each extended Term shall be on the same terms and conditions as set forth in this Lease, except as otherwise specifically stated herein.

**37.** **RIGHT OF FIRST OFFER.** Landlord agrees to provide Tenant with written notice of the availability of the Tenant's business at the Location ("Business") for sale and offer the Business to Landlord on such terms and conditions as Tenant would offer to third parties, as determined by Tenant in its sole and absolute discretion, prior to marketing said Business to third parties. Landlord shall have sixty (60) days from the date of Tenant's Notice to respond in writing to the same. If Tenant has not received a written response by the end of said sixty (60) day period or if Landlord declines to accept Tenant's offer or makes a counteroffer which Tenant shall reject, in writing, as unacceptable in Tenant's sole and absolute discretion, Tenant shall thereafter be free to market the Business and sell the Business for not less than the counter-offer submitted by Landlord. If Tenant and Landlord agree on terms for the sale of the Business, but are subsequently unable, in good faith, to consummate an agreement with respect thereto acceptable to both Tenant and Landlord shall thereafter be free to market the Business and sell the Business on such terms and conditions as Tenant shall determine, in its sole and absolute discretion, without any further obligation to offer said Business again to Landlord.

*[signature page to follow]*

**IN WITNESS WHEREOF**, the parties have hereunto placed their hands on the day and year first written above.

**LANDLORD**
**MEX RE-NY-LI LLC**


By: _____
    Turjo Wadud, President


**TENANT**
**American 1 Gas Inc.**

_____
    Suleyman Issi

**AMERICAN 1 GAS INC**
86 E SUNRISE HIGHWAY
LINDENHURST, NY 11757

0405

50-791/214

VOID

PAY
TO THE
ORDER OF

DATE

$

DOLLARS

CAPITAL ONE BANK

FOR

⑈000405⑈ ⑆021407912⑈ ⑈7528⑈90000⑈9⑈

**EXHIBIT 2- FUEL SUPPLY AGREEMENT BETWEEN BROADWAY FUEL INC. AND DEBTORS**

EXHIBIT
2



**MOUNTAIN EXPRESS**
OIL COMPANY

## AMENDED AND RESTATED FUEL SUPPLY AGREEMENT

**THIS AMENDED AND RESTATED FUEL SUPPLY AGREEMENT** ("Agreement") is made this 11th day of February 2022 ("Effective Date") by and between **MEX FUELS NE-NY LLC**, a Wyoming corporation ("Supplier"), and **575 Fuel Inc.**, a New York Corporation, having a mailing address of 575 S Broadway, Hicksville, New York 11801 ("Dealer") (Suplier and Dealer are sometimes collectively referred to herein as the "Parties").

**WHEREAS**, this Agreement is for the fueling station known as Mountain Express Store #963 located at 575 S Broadway, Hicksville, New York 11801, as more particularly described on **Schedule 1** herein attached and incorporated ("Location"); and

**WHEREAS**, Dealer operates a business on the Location and the Parties wish to enter into this Agreement for Supplier to supply motor fuels to Dealer at such Location on terms as specified herein with such Agreement amending and resetating any and all other fuel supply agreements by, between, or among the Parties for the Location.

**NOW THEREFORE**, in consideration of the mutual undertakings herein contained, the sufficiency of which are hereby acknowledged, Supplier agrees to sell, and Dealer agrees to buy, petroleum and other products on the following terms and conditions:

**1. TERM.** The Term of this Agreement shall begin on February 11, 2022 and continue for three (3) years ("Term"), and shall automaticaly renew from month to month after the said Term unless either party gives written notice of non-renewal to the other party at least thirty (30) days prior to the expiration of the initial Term or the then existing extended term, or unless sooner terminated as otherwise hereinafter provided. Supplier may terminate this Agreement for any reason and at any time during the Term of the Agreement with thirty (30) days written notice to Dealer.  Contingent upon Supplier's approval, Dealer may terminate this Agreement for any reason and at any time during the Term of the Agreement with one hundred eighty (180) days written notice to Supplier. Any option to extend shall be provided for on **Schedule 2**. Upon exercise and approval of such option to extend this Agreement, the term of the Lease in place at the Location shall also be extended concurrently herewith. This Agreement is expressly contingent upon the termination of any existing fuel supply agreements in place at the Location.

**2. SUPPLY OF PRODUCTS.**

(a) Supplier agrees to sell to Dealer, and Dealer agrees to buy and diligently to promote the sale of all grades and such quantities of Supplier's petroleum and other products as may be necessary to meet the Dealer demand for motor fuel products at the Location, and Dealer must offer all grades of fuel available from Supplier for sale at all times. Supplier shall have the right to provide ethanol additives, when available, in the gasoline, at the discretion of Supplier. Any incentives or rebates provided by Supplier's supplier relating to the sale of ethanol shall remain the property of Supplier. All fuel deliveries shall be made in full truckload quantities or in such other minimum quantities per delivery as specified by Supplier from time to time. If Dealer requests delivery of less than Supplier's established minimum volumes, compensatory delivery charges may be imposed. In no circumstances is Supplier obligated to make deliveries into a tank which is, or is suspected of leaking. Under this Agreement, Supplier is obligated to supply products to only the Location specified herein.

(b) Dealer covenants and agrees to purchase from Supplier and offer for sale, at the Location, only such gasoline, diesel fuel, other petroleum products or any additional motor vehicle fuel and/or energy-related products as are supplied and delivered by Supplier, including but not limited to those set forth on **Schedule 3** for the full duration of the stated term of this Agreement.

(c) It is the intention of the parties that the supply and purchase obligations contained herein shall remain in full force and effect throughout the term of this Agreement and shall not be suspended during any period of remodeling, renovation, repair, or rebuilding of the improvements located at the Location. Provided further, in the event Dealer's completion of the construction, remodeling and rebranding of the Location is not completed prior to the commencement of the term of this Agreement, due to conditions beyond the control of Dealer, Dealer's obligation to purchase petroleum products hereunder shall commence upon the completion of such construction remodeling and rebranding.

(d)     Supplier has the sole and exclusive right to designate the hauler for delivery of products to the Location and hereby reserves the right to change the designated hauler from time to time. Dealer acknowledges and agrees further to comply with hauler's protocol for ordering of products and to allow a minimum of forty-eight (48) hour notice to receive delivery thereof. Dealer acknowledges that haulers' business is dependent on many external factors and that there may be delays in deliveries without any consequences to Supplier. Dealer shall grant full access to hauler's vehicles to make deliveries at any hour of the day. Communications between hauler and Dealer are the sole and exclusive responsibility of the Dealer. Any mistakes in ordering due to miscommunications between the hauler and Dealer are to be resolved between the hauler and Dealer. Any product outage(s) due to Dealer's failure to: (1) timely order sufficient volumes of product; (2) comply with hauler's protocol for ordering of products; or (3) grant full access to hauler's vehicles to make deliveries, or (4) provide forty-eight (48) hour notice to hauler for delivery of product shall constitute an event of default. Dealer acknowledges and agrees that Supplier shall not be liable for any misconduct of any designated hauler and that Dealer is responsible, at all times, for any discrepancies or variances in the amount of fuel delivered or maintained at the Location.

2

**3. OPERATION OF STATION.** Dealer recognizes that the brand utilized by Supplier is associated with high quality service and products and agrees to conduct business at the Location in a manner to maintain that association. Accordingly, Dealer agrees to furnish such service and accommodations to retail motor fuel Dealers as are customarily provided by convenience store/filling stations.

Dealer agrees to keep the business operated at the Location open for business during no less than the hours hereinafter set forth. Such business shall be open 365 days per year, (366 days during any leap year) opening no later than 6:00am EST and closing no earlier than 11:00pm EST daily.

Dealer agrees to provide, at its sole cost and expense:

(a) broadband service to the Location in a manner acceptable to Supplier; and

(b) promptly upon execution of this Agreement, a real property survey of the Location in a form that is acceptable for the purposes of filing any any all approvals, licenses and permits reasonably required to operate the Location for its intended purpose under this Agreement. In the event that Dealer does not provide a survey, Supplier may charge Dealer for the cost of a new survey.

**4. EXCLUSION OF OTHER SUPPLIERS.** Dealer covenants and agrees to offer for sale, at the Location, only the motor fuels as are provided to the Location supplied by Supplier under this Agreement. Dealer shall not sell any other supplier's motor fuels without the express written permission of Supplier. Dealer affirmatively represents unto Supplier that Dealer is not bound by the terms of any other motor fuels supply agreement relative to the Location and that Supplier has not induced, directed nor assisted Dealer in breaching the terms of any agreement with another motor fuel supplier.

**5. PRICE OF PRODUCTS TO DEALER AND RETAIL PRICING.** A. Prices for all products purchased by Dealer from Supplier shall be Supplier's rack price from its supplier at its supplier's terminal, plus call and demand freight rates, plus One Cent ($0.01) per gallon, plus any applicable Superfund tax per gallon, plus the UST fee per gallon, plus any other applicable taxes, charges, duties and fees levied on any of the products of Supplier, or required to be collected by Supplier upon the sale, transportation or delivery of the products ("Supplier's Cost").

B. The retail pricing of motor fuels at the Location, shall be set by Supplier based upon market conditions and such other factors as may be deemed appropriate by Supplier, and in the exercise of Supplier's sole discretion. Supplier shall notify Dealer, by telephone, fax transmission, e-mail transmission, electronic transmission, or other expeditious means of any price changes to be made for the retail pricing of motor fuels at the Location. Dealer shall cause the pricing changes to be made within one hour of such notification.

In the event Dealer fails to cause the change of retail pricing, as required, Dealer shall pay to Supplier the sum of $100.00 per hour for each hour or fraction thereof, subsequent to the first hour from the time of notice, until such pricing change is made at the Location. Such payment(s) shall be in the nature of damages sustained by

3

Supplier as a result of Dealer's failure to comply with its obligation to change retail pricing as directed by Supplier.

In the event Dealer fails to change retail pricing within one hour after such notice, on three separate occasions, Supplier shall have the right, but not the obligation, to immediately terminate this Agreement and to avail itself of all remedies provided for Supplier hereunder in the event of termination of this Agreement. Except for commissions as hereinafter stated, the gross retail receipts from the sale of motor fuels at the location shall be the property of Supplier.

**6. COMMISSION AND TERMS OF PAYMENT.** Dealer shall be entitled to a commission equal to Six Cents ($.06) upon each gallon of motor fuel sold, including unleaded regular gasoline, unleaded plus gasoline, super unleaded gasoline, diesel fuel, and kerosene.

In the event Supplier sets the retail price of motor fuels below cost, Dealer shall remain responsible for one-half of the credit charges and fees but shall not otherwise be responsible for any portion of any loss incurred by Supplier as the result of such pricing, except as otherwise provided for herein.

Dealer shall record and maintain accurate sales and inventory records for the sale of motor fuels at each pump upon a daily basis. Supplier shall provide Dealer with appropriate banking inforamation and other documentation for Supplier to either draft or deposit funds as may be necessary. In the event any draft or electronic fund transfer is returned or dishonored by reason of insufficient funds or otherwise, Dealer shall be in default hereunder and in order to cure such default, as may otherwise be provided for in this Agreement, Dealer shall additionally pay unto Supplier an administrative charge of $200.00 for each such dishonored instrument or transfer. In the event of a bounced ACH draft, Tenant shall either (a) provide documented proof of funds in the ACH draft account on file in order to clear a redraft; or (b) wire the funds directly to Landlord.

Dealer expressly acknowledges that failure to provide necessary funds as required herein may constitute theft by conversion of Supplier's funds for which Dealer may be subject to criminal prosecution. Dealer shall retain sales and inventory records for all motor fuels for a minimum of five (5) years and shall make such records available to Supplier, for inspection and copying during normal business hours, and allow Supplier, at any reasonable time, to take physical inventory of the bulk motor fuel products. In no event shall Dealer destroy any such inventory or sales records without first making them available to Supplier.

Dealer shall, prior to 10:00 a.m. EST each day, transmit by fax transmission, e-mail transmission, electronic transmission, or other expeditious means, a daily report of the sales of motor fuels during the prior business day. Such transmission shall be upon the format provided by Supplier. Additionally, Dealer shall, by 12:00 Noon EST each day, transmit to Supplier, by fax transmission, e-mail transmission, electronic transmission, or other expeditious means, a copy of all deposit slips validated by the depository bank, for the prior day's motor fuel sales. Supplier reserves the right to designate an alternative data transmission mode for compliance herewith.

4

In the event Dealer fails to transmit daily sales reports and/or copies of deposit slips in a timely manner, as aforesaid, Dealer shall pay unto Supplier the sum of $100.00 for the first such failure; $300.00 for the second such failure and $500.00 for each and every such subsequent failure , in which such transmissions are late. Further, in the event Dealer fails to timely transmit sales reports and/or copies of deposit slips, as aforesaid, on three occasions, Supplier shall have the right to immediately terminate this Agreement and avail itself of all of Supplier's remedies upon termination as provided for herein.

**Dealer expressly acknowledges that converting Supplier's fuel into retained cash by failing to make daily deposits as required herein is considered by Supplier as constituting theft by conversion of Supplier's funds for which Supplier shall seek criminal prosecution against Dealer to fullest extent allowed by law.**

**Dealer(s)' initials:** _____ _____

Supplier shall be responsible for the payment of all sales tax due to any appropriate taxing jurisdiction upon and for the sale of motor fuels under the terms of this Agreement. It is expressly acknowledged between the parties that Supplier shall be entitled to retain any and all rebates or other purchase incentives paid or provided by its supplier in regard to motor fuels delivered to and sold at the Location. Dealer shall also be responsible for all discrepancies, variances, and shortages of fuel at the Location.

**7. CREDIT CARD NETWORK AND SALES.** Dealer shall use and be responsible for all costs associated with such use, including but not limited to, connection, processing, and equipment fees during the term of this Agreement, and only the credit card network provided by and/or associated with Supplier's supplier or such other credit card network as directed by Supplier, which shall be maintained and upgraded by Dealer at its cost.

(a) No secondary or supplemental or other credit card network or credit card machines shall be used for the processing of any sales, whether for fuel, inventory, merchandise or otherwise. In the event that Dealer uses a separate EBT machine, Dealer shall be required to use a network or machine supplied by an state agency approved vendor. In the event of the unauthorized use of a credit card network or machine for processing sales at the Location, by Dealer or any of its Dealers or employees or contractors, Dealer shall be in default in its obligations under this Agreement. In the event of any such default, the cure for the unauthorized activity (in addition the discontinuance of such unauthorized activity), Dealer shall pay unto Supplier a five hundred dollar ($500.00) cure fee for the first such default; and a one thousand dollar ($1,000.00) cure fee for any subsequent default during the Term hereof. In the event of default by Dealer under any other terms of this Agreement, Supplier shall also be entitled to immediately disable said credit card network at the Location.

(b) Invoices from credit card sales shall be credited and paid to Supplier in regard to approved credit card purchases from Dealer. Supplier shall credit Dealer's account for products purchased hereunder, for the amount of credit card sales credited and paid to Supplier in accordance with fuel jobber (wholesaler) industry standards; provided, however that credit cards sales shall not be immediately repaid to Dealer but held on Dealer's account as additional credit against fuel purchases. Upon any failure by Dealer to strictly comply with the terms and

5

conditions of credit card transactions at the Location, Supplier shall have the right to charge-back to the Dealer all sums not credited to or paid to Supplier as a result of defective or noncomplying credit card sales at the Location. Any "charge-backs" shall be immediately paid by Dealer to Supplier. Dealer shall be responsible for all point of sale programming, updates and installation and maintenance costs for EMV requirements from governmental agencies or oil companies.

**8.   USE OF TECHNOLOGY FOR PRICING SURVEY, INVENTORY MEASUREMENT, AND REPORTING OF SALES.**
Dealer shall have the option to use electronic software reporting systems for conducting market surveys of posted motor vehicle fuel prices, electronic measurement and reporting of motor vehicle fuel inventory levels, and recording and reporting of motor vehicle fuel sales as may be offered and/or provided by Supplier; current systems including but not limited to Black Box, Opis, and Price Advantage technology ("Reporting Systems"). Supplier may offer and/or provide new Reporting Systems as new technology emerges.  In the event Dealer elects to use such Reporting Systems, Dealer shall be responsible for all applicable monthly charges and fees for the use of such Reporting Systems, with such monthly charges and expenses to be paid via electronic fund transfers (EFT / ACH) from Dealer's account, and Dealer agrees, further, to defend, indemnify and hold the Supplier, its subsidiaries, divisions, affiliates, Dealers and employees harmless from any and all claims, injuries, damages, losses or suits including attorney fees, arising out of or in connection with the use of such Reporting Systems.

**9. DEALER'S BUSINESS.** It is mutually agreed that the business conducted by Dealer at the Location is the independent business of Dealer, and this Agreement shall not be construed as reserving to or conferring upon Supplier any right to direct or control Dealer or any of Dealer's employees in the conduct of Dealer's business. Dealer acknowledges that Supplier has made no representation of profitability in regard to any business to be operated by Dealer at the Location and Dealer has not relied upon any business information provided by Supplier in regard thereto; and Dealer enters into this Agreement based upon the exercise of Dealer's own business judgment after having full opportunity to exercise due diligence on Dealer's own behalf.  Dealer acknowledges its sole resposibility for: (1) pricing of all the products, including updating the retail price of motor vehicle fuels, sold at the Location; and (2) the operation of its business in accordance with all applicable laws, regulations and standards.  Dealer agrees, further, to defend, indemnify and hold the Supplier, its subsidiaries, divisions, affiliates, Dealers and employees harmless from any and all claims, injuries, damages, losses or suits including attorney fees, arising out of or in connection with the Dealer's business.

Dealer affirmatively represents and warrants unto Supplier that Dealer is not under contract with another fuel supplier and is authorized to enter into this Agreement with Supplier, and that Supplier has not induced Dealer to breach, nor has Supplier interfered with, any other existing contract between Dealer and any other product supplier. In the event Dealer is a corporation or limited liability company, Dealer represents that it is a corporation or limited liability company in good standing duly authorized to do business in the State where the location is situated, and that the undersigned party executing this Agreement on behalf of Dealer has full and

complete authority to bind the corporation or limited liability company hereto. Further, it is expressly agreed that the corporate officer or limited liability company manager and/or member executing this Agreement on behalf of a corporation or limited liability company shall be, in his or her individual capacity, jointly and severally liable and responsible, with such corporation or limited liability company, for the satisfaction of all obligations of Dealer under the terms of this Agreement.

**10. UNDERGROUND STORAGE TANKS AND MAINTENANCE.**  Dealer is in exclusive possession and control of the underground storage tanks, lines, and associated underground equipment at the Location, and shall be responsible for all maintenance and repairs and all environmental issues or matters arising out of the use, maintenance or repair of such tanks, lines, pumps, dispensers and fuel equipment (including EMV upgrades), except as to any maintenance, repair or environmental costs or damage directly caused or arising from any intentional or negligent act or omission of Supplier, or except as to any repairs that are expressly made the responsibility of Supplier as Landlord under the terms of a Agreement of the Location to Dealer as Tenant, if applicable. Dealer shall, throughout the term hereof, provide daily tank stick readings to Supplier's transport company (hauler) in such manner as directed by Supplier. In addition, Dealer shall provide daily stick readings to Supplier with water detecting putty and take accurate and prompt measures at Dealer's cost to cure and remove any water or other contaminants from the tanks, lines and fuel equipment.  Dealer warrants that throughout the entire Term of this Agreement, Dealer's location shall be in full and complete compliance with all local, State and Federal environmental regulations and statutes pertaining to the storage, handling, and dispersing of petroleum products and motor fuels. Further,  Dealer shall comply with all directions, instructions, or recommendations made by any environmental consultant retained by Supplier for the purposes of managing environmental and inventory control at the Location.  Dealer shall pay such premiums as may be necessary to have the storage tanks and pumping equipment covered under private underground storage tank insurance, at its election, all of which shall be paid by Dealer.

Upon the breach of this warranty, and in addition to any other remedies Supplier may have by law, Supplier shall have the right to immediately cease delivery of products to Dealer and terminate this Agreement. Without limiting the foregoing, Dealer shall, at its expense, cause the cleaning of the underground motor fuel storage tanks prior to Supplier's installation of any new, refurbished, or upgraded motor fuel pumping equipment or before the first delivery of motor fuels to the Location by Supplier, whichever occurs first; and shall cause the cleaning of the underground storage tanks periodically during the Term of this Agreement, as may be reasonably required by Supplier.  Dealer shall pay one-half the cost of any software, hardware and service costs including annual and monthly maintenance fees associated with automated tank, pump, sign and/or register readings. Dealer specifically acknowledges that Supplier has no obligation with regard to underground tanks or submersible pumps or any other fueling equipment located in the tanks.

Store #963    COMMISSION

In the event it is determined, during the term of this Agreement, that the Location is environmentally contaminated as a result of a leak, spill, or other discharge of hazardous substances which constitutes a violation of local, state or federal law, rule, regulation or ordinance, Supplier shall have the right to suspend delivery of products to the Location until such contamination is remediated as required by law during which time Dealer shall remain liable unto Supplier for any shortfall payments due hereunder by virtue of Dealer's failure or inability to purchase the minimum number of gallons of petroleum products required under the terms of this Agreement, notwithstanding such suspension. In the alternative, in the event of such contamination, Supplier shall have the right to terminate this Agreement in which case Dealer shall reimburse Supplier for all branding investment costs incurred by Supplier for branding of the Location and shall reimburse Supplier for all purchase incentive rebates received by Dealer under the terms of this Agreement.

**11. INSTALLATION OF PETROLEUM PRODUCT DISPENSING AND OTHER EQUIPMENT.** Supplier shall cause, at its expense, the installation of petroleum product dispensing equipment and or accessories and/or fixtures at the Location as may be set forth on **Schedule 4** attached hereto and made part hereof. Dealer acknowledges that Supplier shall have the right to engage any qualified vendor for the purpose of acquisition and installation of the same or similar equipment described therein. The total cost to Supplier for the acquisition and installation of such equipment, accessories and fixtures shall be considered part of Supplier's branding investment under the terms of this Agreement.  At all times relevant hereto, the Supplier shall be the sole and exclusive owner of such equipment listed on Schedule 4, with the full right and authorization of Dealer to remove same upon a default under Section 19 hereof which remains uncured for more than thirty (30) days of written notice of default hereunder.  Dealer hereby grants to Supplier a power of attorney coupled with an interest, for the purpose of removing the said equipment from the location upon an uncured default and Supplier shall have no liability whatsoever for removal of the equipment after notice and cure period.

**12.  REPAIR OR EQUIPMENT OBLIGATIONS OF DEALER.** Dealer shall cause the repairs and/or maintenance upgrades at the Location, and install such equipment as may be specified in **Schedule 5** attached hereto and made part hereof at the commencement of this Agreement. Dealer shall commence such work promptly and pursue the same diligently through completion as set for in said schedule and as a prerequisite to Supplier's performance and obligations under section 2 of this Agreement.

**13. LEASED EQUIPMENT.**    Dealer acknowledges that any equipment, accessories or fixtures provided by Supplier under the terms of this Agreement may have been leased to Supplier by one or more leasing companies. In the event of a transfer or assignment of this Agreement, Supplier will continue to make any such equipment Agreement payments through the full term of any such Agreement(s).  Notwithstanding the foregoing in this Section 13., for purposes of this Agreement Supplier shall be deemed to be the owner of any such equipment, accessories or fixtures, and shall have the right to enter upon and in the premises and remove same in the event of a default by Dealer under Section 19 herein.  For purposes of the preceding sentence Dealer hereby grants Supplier a power of attorney coupled with an interest to take all actions necessary and

8

desired on in the name of Dealer to remove the said personal property from the premises including obtaining permits and granting rights to others reasonably required to carry out the removal.

**14. BRANDING, TRADEMARKS, AND QUALITY ASSURANCE.**

(a) *MOTOR FUEL BRAND &TRADEMARKS*. Supplier shall have the right to designate the branding of the motor fuels to be purchased by Dealer hereunder. The initial branding, if any, shall be as designated on **Schedule 6** attached hereto and made part hereof. Supplier shall incur such costs as may be reasonably necessary for changing and or installation of the branding image of the Location (said sum hereinafter being referred to as Supplier's Branding Investment), in order to obtain the approval of Supplier's chosen branded fuel supplier. Dealer shall be responsible for payment of any and all further sums necessary for signage or other branding image items in order to maintain such approval during the term of this Agreement. In the event Supplier changes branding during the term of this Agreement, all costs of maintaining the subsequent banding image(s), after Supplier's initial costs in rebranding the Location, shall be borne by Dealer. All signage shall be contingent upon and subject to the requirements of any applicable state or local law or ordinance.

(b) *QUALITY ASSURANCE AND MARKETING*. Dealer acknowledges that Supplier's supplier maintains a program for product quality and marketing assurances. Specifically, Dealer shall:

(i) Comply with all quality and marketing programs, which shall include but not be limited to, oil company uniforms, employee name tags, clean and available restrooms, proper maintenance of landscaping, buildings (interior and exterior), canopy and equipment, proper presentation and display of retail merchandise, maintenance and location of signs and other branding image items and other such matters pertaining to the brand image of the Location, and shall cooperate at all reasonable times and in all reasonable manners with all quality assurance programs and inspections;

(ii) Refrain from the sale, use, storage, rent, display, or offering at the Location of:

(a) pornographic or sexually explicit magazines, video tapes, compact discs, digital video discs, similar literature or items of merchandise;

(b) any item, in Supplier's judgment, that is intended or designed for use in ingesting, inhaling or otherwise consuming an illegal drug or from manufacturing or processing an illegal drug, including but not limited to pipes, tubes, roach clips, instructions or descriptive materials, or containers designed for concealing illegal drugs or paraphernalia, or bath salts or synthetic drugs designed to mimic the effects of illegal drugs; and

(c) any substance or item prohibited to be offered for sale by the branding and/or quality assurance standards of the motor fuel supplier providing motor fuel for sale or resale at the Location; and

Store #963    COMMISSION

(ii) Dealer shall properly display all point of purchase marketing materials and credit card applications, and, at its sole cost and expense participate in any marketing or loyalty programs established by the brand of motor fuels sold at the Location, install all marketing materials, such as point of purchase (POP) signage, credit card applications and related materials and attend any training or informational programs offered.

It is acknowledged between the parties that Supplier and/or Supplier's supplier may conduct periodic "mystery shopper" or other inspections of the Location and the operation of the business thereon in order to determine whether Dealer is meeting the image, retail and Dealer service standards required under the terms of this Agreement. In the event Dealer scores below 80% of a perfect score, or otherwise fails inspection as determined by Supplier or Supplier's supplier making the inspection and in accordance with the quality assurance standards, Dealer shall pay unto Supplier an inspection fee of $500.00 or such amount charged by Supplier's supplier as an inspection fee, whichever is greater, due and payable within three days of Dealer receiving notice of such failure and a copy of the inspection report. The foregoing inspection fee shall apply to each and any failure of such inspections; provided further, Supplier shall have the right, in its discretion, to waive the requirement for payment of an inspection fee based upon its determination of Dealer's exercise of good faith in promptly correcting all quality assurance deficiencies. Dealer shall also be subject to certain fines as provided for on the attached Fine Schedule as provided for on **Schedule 7** herein attached an incorporated for violations which may not result in a failing score. In the event Dealer fails a mystery shopper inspection or other inspection at the Location, Supplier reserves the right to implement a monthly maintenance program at the Location and choose a vendor to cure at its sole and absolute discretion.  The cost of said maintenance program shall be the responsibility of the Dealer, which shall be no more than the customary cost of said services in the local area of the Location.

In the event Dealer's branded retail facility does not meet such standards or requirements and which results in Supplier's receiving notice to debrand Dealer, or if such retail facility is abandoned, Dealer shall allow Supplier or Supplier's representatives or   Dealers to immediately remove all brand identification from the Location, and Dealer shall be liable to Supplier for all expenses and damages incurred as a result thereof. For the purposes of this Agreement, the Location shall be deemed abandoned if it is not open for business during normal business hours for three consecutive days. Dealer expressly agrees that all of Supplier's (or Supplier's suppliers') trademarks, names and colors appearing at the Location shall be kept clear and legible, and that Dealer will use only signs approved by Supplier to advertise products purchased by Dealer from Supplier. Supplier shall be entitled to withdraw or substitute at Supplier's cost the use of any particular trademark, name, or colors.

Provided further, in the event Supplier determines, in its sole discretion, that Dealer is not in compliance with any marketing or quality assurance retailing standard in regards to the physical condition of the Location and the operation of the business thereon, Supplier shall have the right (but not the obligation) to enter upon the Location and to correct any deficiency or substandard condition and bill Dealer for the cost thereof. Dealer

shall reimburse Supplier for any and all of such costs within seven days of receipt of such bill. Such reimbursement payment(s) shall be made by electronic fund transfer in the same manner as payment for products purchased from Supplier. Further, without limiting the foregoing, Dealer shall comply with the image and identification standards established, from time to time, for "branded outlets" by Supplier's branded supplier.

## 15. RESERVED.

**16.  SECURITY DEPOSIT**. Dealer shall pay unto Supplier a security deposit upon the execution of this Agreement in an amount and in the manner as specified on **Schedule 8** hereto attached an made part hereof. During the term of this Agreement, Supper shall have the right to apply all or part of said deposit to any sums owed by Dealer to Supplier under the terms hereof. In such event, Supplier shall notify Dealer of such application and Dealer shall pay over to Supplier such amounts as may be necessary to restore the full amount of the security deposit. Supplier's application of all or any portion of the security deposit shall not relieve Dealer from its obligations to make any payments due to Supplier nor prejudice Supplier's rights to exercise any remedy provided for herein, or at law, in consequence of Dealer's default under the terms of this Agreement. Further, Dealer hereby grants Supplier a security interest in all of Dealer's business equipment, supplies, inventory and fixtures at the Location, in which Supplier shall have all the rights of a secured party under the terms of the Uniform Commercial Code, and which interest may be evidenced and/or perfected by the filing of a UCC-1 Financing and Fixture Filing Statement(s).

**17. ASSIGNMENT-SUBLETTING-SALE.**  Dealer shall not, without the prior written consent of Supplier endorsed hereon, assign this Agreement or any interest hereunder, or any part hereof, or permit the operation of the Location by any party other than Dealer. Supplier's consent shall not be unreasonably withheld, however, in making such a determination, Supplier may rely upon the financial and creditworthiness and criminal background, if any, of any proposed assignee in making a determination as to whether or not the withholding of such consent is reasonable. Dealer must provide Supplier with thirty (30) days prior written notice of a proposed consent together with all information for the proposed assignee.  If approved, Dealer shall remit funds in the amount of $2,000.00 for legal and administrative fees. Consent to the assignment shall not destroy this provision, and all later assignments shall be made likewise only on the prior written consent of Supplier.  An assignee of Dealer, at option of Supplier, shall become directly liable to Supplier for all obligations of Dealer hereunder, but no assignment by Dealer shall relieve Dealer of any liability hereunder, and Dealer shall remain jointly and severally liable with assignee for the satisfaction and performance of all Dealer's obligations under the terms of this Agreement. Dealer shall have the right, without prior written consent of Supplier, to form a corporation or limited liability company organized under the laws of the state of the Location,  and wholly owned by Dealer, and may assign or tranfer this Agreement to such company with notice provided to Supplier however, any such assignment or transfer shall not relieve Dealer of joint and several liability for all of Dealer's obligations hereunder, the performance of which shall be personally guaranteed by Dealer.  This Agreement is

freely assignable by Supplier and in the event Supplier elects to sell, assign or convey rights, titles and interest in this Agreement, Dealer shall provide a fuel estoppel agreement, in acceptable form to Supplier, confirming the terms of this Agreement at Supplier's request and without delay.

**18. OPTION TO CONVERT BUSINESS RELATIONSHIP BETWEEN THE PARTIES.** None.

**19. DEFAULT, TERMINATION AND LIQUIDATED DAMAGES.** All terms, conditions, covenants, warranties, and agreements contained in this Agreement are essential and material to the continued relationship between the parties. It is mutually agreed that in the event Dealer (i) becomes insolvent, (ii) is generally unable to pay, or fails to pay, its debts as they become due, (iii) files, or has filed against it, a petition for voluntary or involuntary bankruptcy or pursuant to any other insolvency law, (iv) makes or seeks to make a general assignment for the benefit of its creditors, or (v) applies for, or consents to, the appointment of a trustee, receiver, or custodian for a substantial part of its property or business; or (vi) if Dealer violates or is in default of any other agreements between Supplier and Dealer, Dealer shall be considered in default of the Agreement. In addition to the aforementioned, the following shall constitute events of breach or default:

(a) failure to remit to Supplier any monies owed by Dealer to Supplier in accordance with the provisions of this Agreement;

(b) violation of any federal, state, county or any municipal law, ordinance, rule, or regulation relating to Dealer's operation of the business conducted pursuant to or in connection with this Agreement;

(c) false or misleading statements made by Dealer to Supplier, including financial statements made or provided by Dealer in order to enter into this Agreement;

(d) failure of a mystery shopper inspection or other inspection at the Location and denying Supplier's implementation of a monthly maintenance program at the Location by a vendor to be selected by Supplier in its sole and absolute discretion;

(e) the institution of any insolvency, bankruptcy, or a receivership proceeding in or against Dealer;

(f) failure of Dealer to pay taxes or license fees as required by the terms of this Agreement or by any law or regulation or arising out of Dealer's employment of any person;

(g) abandonment or cessation of operation of the business of Dealer;

(h) severe physical or mental disability of Dealer;

(i) Willful adulteration, mislabeling or misbranding of motor fuel or other violation by Dealer of trade mark requirements for products sold by Dealer as set forth under this Agreement;

(j) violation of any term or condition of the Agreement, any cash advance agreement or any other agreements between the parties related to the Location; or

12

Store #963   COMMISSION

(k) any act or omission allowing for termination, non-renewal or debranding of the Location or as provided under the Petroleum Marketing Practices Act 15 U.S.C. Sec. 2801 et seq.

Subject to all rights under the Petroleum Marketing Practices Act, Supplier shall provide Dealer written notice of the occurrence of any event or breach which is cause for termination of this Agreement hereunder. Dealer shall have 15 days from the date of such notice in which to cure such breach or correct any condition or otherwise comply with the terms of this Agreement and in lieu of which this Agreement shall automatically be terminated at the expiration of such 15 day period.  In the event Dealer receives written notice from Supplier of any events of default hereunder, Dealer specifically acknowledges and agrees that Supplier, through its Dealers, shall have the right to inspect Dealer's facility at the Location for purposes of determining compliance with this Agreement.  In the event such event is not cured within 15 days of notice thereof, Supplier shall be entitled to make any corrections and/or repairs necessary at the Dealer's expense.   Notwithstanding the foregoing, in the event Dealer fails to remit Supplier any monies owed to Supplier under the terms hereunder, Supplier shall have the right to immediately suspend motor fuel delivery until and unless such breach is cured. In the event such a breach is not cured within five 5 days from the date of written notice to Dealer, then in such event Supplier shall have the right to then immediately terminate this Agreement.

The parties hereto agree and stipulate that in the event of default by Dealer and early termination of this Agreement, Supplier's actual damages cannot be calculated with any degree of certainty as Supplier is relying upon Dealer's continuing purchase of petroleum products throughout the term of this Agreement. Accordingly, Dealer and Supplier specifically acknowledge and agree that such damages upon Dealer's breach would be virtually impossible to determine, and that the formula provided in this paragraph provides a reasonable pre-estimate of Supplier's probable loss that will be suffered by Supplier.  Therefore, the parties agree that, in addition to any other amounts owed to Supplier hereunder, Dealer shall pay to Supplier as liquidated damages and not as a penalty a sum equal to Five Cents ($0.05) times the minimum number of gallons required to be purchased monthly as contained herein times the number of months remaining in the Term of this Agreement from the date of default. The parties further agree that the above formula is reasonable because the amount of such liquidated damages are decreased by each month that Dealer performs its obligations under this Agreement. Moreover, the parties stipulate and agree that their intent in using the above damages formula is to provide a readily calculable pre-estimate of Supplier's probable loss upon breach and that it not be construed as a penalty of any kind or sort.

It is further agreed that in the event of default by Dealer under any of the terms of this Agreement and that in addition to the aforesaid liquidated damages, Supplier shall be entitled to recoup from Dealer the unamortized portion of its investment in the Location that is more particularly described in **Schedule 4** hereto. The investment described in **Schedule 4** shall be amortized on a "straight line" basis over the term of this Agreement; if Dealer defaults and this Agreement is terminated before the end of the term, Supplier shall be entitled to immediate payment of the amount of the investment that has not been amortized on the date of

13

default. Dealer acknowledges that recoupment by Supplier of the unamortized investment is a reasonable pre-estimate of Supplier's damages with respect to the investment, and that Supplier has the reasonable expectation that Dealer shall perform its obligations hereunder for the full term. In lieu of Supplier's right to recoupment of its investment in the Location, Supplier may also immediately remove from, or disable at, the Location and retain full ownership of the petroleum product dispensing equipment, cash register, point of sale and other branding image items installed pursuant to **Schedule 4** attached hereto. Upon any default Supplier shall also be authorized and permitted to immediately remove all motor fuel products in the underground storage tanks at the Location, pursuant to Section 6 of this Agreement. Termination of this Agreement shall not affect or abridge the rights and obligations of the parties occurring prior to termination, and Supplier may pursue any available legal remedies relating thereto whether or not it exercises its right to declare this Agreement terminated. In addition to the foregoing, in the event of termination, Dealer shall pay to Supplier the cost of "debranding" the Location. "Debranding" is hereby defined as the removal of all brand signage, brand color scheme, repayment of any unamortized oil company branding costs and rebates at the Location.

**20. ATTORNEY'S FEES, COSTS, INTEREST.** In the event it becomes necessary for Supplier to employ the services of its attorney to enforce any aspect of this Agreement, whether Dealer is in default of this Agreement or this Agreement is amended, assigned, or modified, Supplier shall be entitled to charge and collect administrative costs and legal fees in an amount not less than $2,000.00. In the event that either party files litigation regarding this Agreement, the losing party agrees to pay the prevailing party fifteen percent (15%) of the amount of damages for attorney's fees and costs of litigation.

**21. MISCELLANEOUS.**

(a) *DELIVERIES DELAYED OR PREVENTED*. Supplier will fill all orders with reasonable promptness, but shall not be liable for loss or damage due to delays or failure, in whole or in part, to fill orders resulting from acts of public enemies, regulations, or orders of civil or military authorities, fires, floods, strikes, labor disputes, accidents, shortage of labor, of crude oil, or refined products or refinery capacity, or materials or of transportation, or any other cause beyond Supplier's reasonable control, either at its own plants or those of its sources of supply, or in connection with the delivery of its products. If Supplier is prevented by any of the foregoing causes from supplying the full quantities of any one or more of its products hereunder, Supplier shall have the right without liability to Dealer to allocate the quantity deliverable hereunder to Dealer, to its other Dealers under contracts calling for delivery of like products, and to its own requirements in such manner as it may deem reasonable, or according to any required allocation program, and Dealer shall be bound by such allocation. If Supplier is unable to deliver products for more than seventy-two (72) hours, Dealer shall have the right to purchase products from other suppliers until such time as Supplier can recommence delivery.

i. Supplier reserves the right to give preference in allocation to a dealer or group of dealers for any reason in its sole discretion, including those dealers whose needs are related to providing fuel to customers whose

responsibilties relate to the: (a) protection of life or health, (b) production and transportation of food and energy, (c) mass transportation, and (iv) national defense.

ii. Supplier's allocation plans may be put into effect on any geograph basis (including treating one geographic area differently from another) as Supplier may determine, without regard for the specific inventory at the place or places from which the supplied products are normally produced, shipped, or delivered.

(b) *INSURANCE*. Dealer shall continuously maintain general liability insurance and liquor liability insurance with such coverage as may be approved by Suppier and naming Supplier as an additional insured; and Dealer shall maintain workers' compensation insurance as required to be in full compliance with the State's Workers Compensation Act and obtain Workers Compensation Insurance. Dealer shall furnish Landlord certificates establishing that the insurance requirements contained herein are met and maintained, from time to time, and upon request by Supplier. Additionally, Dealer shall reimburse Supplier, by EFT on a monthly basis, for any all insurance premiums incurred by Supplier, during the term of this Agreement, for fire, casualty, hazard and liability insurance maintained by Supplier covering any equipment, accessories, fixtures and/or branding image items owned or Agreementd by Supplier and installed at the Location. In the event that Dealer fails to provide a certificate of insurance after written notice from Supplier, Supplier may obtain such insurance and charge Dealer the actual cost of the insurance plus an administrative fee.

(c) *CONTINGENCIES*. This Agreement and the rights and obligations of the parties hereunder is expressly contingent upon the approval of the Location, receipt of a survey of the Location supplied by Dealer, the branding image and specifications therefor, and Dealer's credit history by Supplier's supplier. Further, in the event Supplier is obligated to cause the installation or upgrade of any motor fuel dispensing equipment or accessories at the Location, this Agreement is expressly contingent upon Supplier obtaining financing, by Agreement or otherwise, for such obligations upon terms and conditions acceptable to Supplier; and contingent upon Dealer's third party landlord (and the prime landlord at the Location, if applicable), if any, executing a Landlord's Acknowledgment and Equipment Waiver in such form satisfactory to Supplier and under which such landlord (and prime landlord) waives any right or claim, during the term of this Agreement, to the equipment, accessories, fixtures and branding image items installed and owned by Supplier, and acknowledges Supplier's exclusive right to supply motor fuel to the Location for the full term hereof. Upon any breach or default under Section 19 hereof, Supplier shall have the right to injunctive relief in the form of a restraining order against Dealer and/or Landlord preventing any other fuel supplier from supplying fuel at the location for the term of this Agreement.Dealer shall exercise good faith and make diligent efforts and cooperate with Supplier in obtaining the execution of such Landlord Acknowledgment and Waiver, in failure of which Supplier may terminate this Agreement.

(d) *SEVERABILITY*. (i) If any one or more of the provisions of this Agreement are determined, by a court of competent jurisdiction, to be invalid or unenforceable, the remaining provisions hereof shall continue to be of full force and effect provided that the invalidity of any provisions hereof does not result in a lack of mutuality

15

or a failure of consideration in regards to the benefits and obligations set forth herein. (ii) If, subsequent to the date of this Agreement, valid state or federal laws or regulations governing the relationship between Dealer and Supplier take effect, this Agreement shall be deemed amended and shall incorporate any mandatory requirements of such laws or regulations so long as they shall be effective, unless such amendment(s) shall operate to increase Supplier's taxes, costs or expenses hereunder, in which case Supplier shall have the option to terminate this Agreement by notice to Dealer.

(e) *ENTIRETY-AGREEMENT*. This Agreement constitutes the entire agreement and understanding between Supplier and Dealer merging and superseding all prior agreements, understandings, warranties and representations, whether oral, written, express, or implied, between Supplier and Dealer. All prior agreements between Supplier and Dealer concerning the subject matter hereof, relating to the Location defined herein, are hereby terminated. Neither this Agreement nor any modification or waiver of any of the provisions hereof shall be binding upon Supplier or Dealer unless in writing, duly executed by Dealer and a duly authorized  Dealer of Supplier.

(f) *ELECTRONIC TRANSMISSION AND SIGNATURE*.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, email or other means of Electronic Transmission and/or with Electronic Signatures shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

i. "Electronic Transmission" means any form of communication not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved, and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

ii. "Electronic Signature" has the meaning provided in [the Georgia Electronic Records and Signatures Act, O.C.G.A. § 10-12-1 et seq. OR Wyo. Stat. §  40-21-102(a)(viii) or OR Tex. Bus. & Com. Code § 322.002(8).]

(g) *NOTICES.* Any notice provided for herein shall be given in writing and shall be considered properly given when received if personally delivered, provided by verifiable elctrontic means or, if deposited in the United States mail by certified mail, return receipt requested, postage prepaid, properly addressed by either party to the other at such party's address shown above, or at any changed address of which notice is duly given, as of the date received.  Dealer has an obligation to notify supplier if they move or otherwise change the address noted above.  In the event Dealer fails to notify Supplier of an address change, all mail sent by Supplier to Dealer's address shown above shall be deemed sufficient notice whether claimed or unclaimed.

Store #963    COMMISSION

(h) *CHOICE OF LAW.* This Agreement has been entered into in and shall be construed under the laws of the State of Georgia and the parties agree that exclusive venue and jurisdiction shall be with the Superior Court of Cherokee County, Georgia for any actions, suits or proceedings.

(i) *JOINT AND SEVERAL LIABILITY.* In the event more than one person, firm, company or entity are named as Dealer hereunder, each such named person, firm, company and entity shall be jointly and severally liable unto Supplier for the satisfaction of the obligations of Dealer hereunder; and Supplier may look to any, all or any combination of them for such satisfaction thereof.

(j) *CROSS-DEFAULTS.* Any default by Dealer under the terms of this Agreement shall likewise constitute a default of Dealer, as tenant, Dealer, or otherwise, under the terms of any and all other agreements between these same parties, including without limitation, other Agreements, motor fuel supply or commissioned sales agreements, purchase and /or sale agreement and other contracts, whether or not pertaining to the Location, or other premises or locations or to the sale or purchase for resale of motor fuels or other products. This provision shall also apply to any agreements with Supplier's affiliates and related parties, including but not limited to any Dealer defaults with any branded fuel supplier. In the event Dealer is a tenant of a third-party landlord at the Location, and Supplier has acquired the written consent to this provision from such landlord by way of a separate document or agreement, default by Dealer hereunder shall likewise constitute a default under the terms of the Agreement between Dealer and such landlord and a default under the Agreement shall be a default under this Agreement.

(k) *CREDIT CARD FRAUD SKIMMING.* Supplier shall have the right to immediately charge back to the Dealer any credit card "charge-backs" from the Supplier's Supplier immediately. In addition, Dealer is responsible for any credit card fraud which may occur at the Location including Skimming. Skimming is the theft of credit card information. This theft occurs when a third-party card-reading device is installed either outside or inside a fuel dispenser or other card-swiping terminal. This device allows a thief to capture a Dealer's credit and debit card information, including their PIN, with each card swipe. Dealer is responsible for any credit card or debit card information theft and the fraudulent charges that are a result of Skimming. Dealer is required to daily check the Pumps and card swiping terminals for possible sources of Skimming.

(l) *QUALITY AND CLAIMS.* Supplier guarantees that all products delivered hereunder will be uniform in quality and according to industry standards. Any claim for deficiency in quality or quantity of any product is waived unless Dealer gives Supplier notice of such deficiency at time of delivery (or during the next period of regular business hours if night delivery) for quantity claims and within ninety-six (96) hours of discovery of the alleged deficiency for quality claims. Such notice shall fully set forth the facts on which Dealer's claim is based, and Supplier shall be given full opportunity to inspect, measure, and test the products and/or equipment involved. Dealer shall immediately notify Supplier if its equipment is leaking. Dealer's failure to comply with the above requirements shall operate as a waiver of any and all claims and remedies by Dealer against Supplier arising out of product defects, variances, or shortages.

17

**22. RIGHT OF FIRST OFFER.**   Dealer agrees to provide Supplier with written notice of the availability of the Dealer's business at the Location ("Business") for sale and offer the Business to Supplier on such terms and conditions as Dealer would offer to third parties, as determined by Dealer in its sole and absolute discretion, prior to marketing said Business to third parties. Supplier shall have sixty (60) days from the date of Dealer's Notice to respond in writing to the same. If Dealer has not received a written response by the end of said sixty (60) day period or if Supplier declines to accept Dealer's offer or makes a counteroffer which Dealer shall reject, in writing, as unacceptable in Dealer's sole and absolute discretion, Dealer shall thereafter be free to market the Business and sell the Business for not less than the counter-offer submitted by Supplier. If Dealer and Supplier agree on terms for the sale of the Business, but are subsequently unable, in good faith, to consummate an agreement with respect thereto acceptable to both Dealer and Supplier shall thereafter be free to market the Business and sell the Business on such terms and conditions as Dealer shall determine, in its sole and absolute discretion, without any further obligation to offer said Business again to Supplier.

*[signature page to follow]*

Store #963     COMMISSION

**IN WITNESS WHEREOF,** the parties hereto have caused this Fuel Supply Agreement to be effective as of the Effective Date first written above.

**SUPPLIER**
**MEX FUELS NE-NY LLC**

By:_____

  Turjo Wadud, President

**DEALER**
**575 Fuel Inc.**

_____

  Ranju Narang

## SCHEDULE 1 - PROPERTY DESCRIPTION

575 S Broadway, Hicksville, New York 11801

## LEGAL DESCRIPTION

## SCHEDULE 2 – OPTION TO EXTEND TERM

Supplier shall have the option to extend the Term for one additional three (3) year term with at least thirty (30) days' notice to Dealer, prior to the expiration of the then existing Term.  Each extended Term shall be on the same terms and conditions as set forth in this Agreement, except as otherwise specifically stated herein.

**SCHEDULE 3 – PRODUCTS TO BE PROVIDED EXCLUSIVELY BY SUPPLIER**

1.  Regular, Super and Premium Gasoline;

2.  Diesel;

3.  E85/and other Ethanol Blends;

4.  Bio Diesel;

5.  Ethanol Free Fuel;

6.  Boutique Fuels (Future);

7.  Natural Gas Related Fuels (Future);

8.  Electric Car Charging Networks (Future);

9.  Lubricants and Oils (Future)

10. Hydrogen Fuels (Future); and

11. Any other fuel known or currently unknown used to power automobiles, trucks, tractors, boats, lawn mowers, etc.

## SCHEDULE 4 - EQUIPMENT, ACCESSORIES AND/OR FIXTURES TO BE INSTALLED BY SUPPLIER

Supplier shall provide EMV ugrades at the Location at its sole cost and expense, if required.

## SCHEDULE 5 - DEALER'S REPAIR/MAINTENANCE AND EQUIPMENT OBLIGATIONS

Dealer is responsible for all inside and outside maintenance at the Location.

24

**SCHEDULE 6 - BRANDING**

The initial branding image to be installed at the Location, and the initial brand of motor fuels to be delivered to the Location for resale by Dealer shall be a brand approved by Supplier. Supplier reserves the right to change the brand at the Location at anytime.

## SCHEDULE 7 – FINE SCHEDULE

No Name Tag:                          $25.00

No Uniform:                          $50.00

Illegal Drugs/Drug Paraphenalia:     $500.00

## SCHEDULE 8- ALTERNATIVE SECURITY DEPOSIT PROVISIONS

The security deposit provisions of section 16 of this Agreement are modified as follows:

Total security deposit shall be $40,000.00, to be collected at One Cent ($0.01) per gallon of fuel sold at the Location.

27

## Mountain Express Oil Co. Field Inspection Evaluation

### Exterior

| | |
|---|---|
| Main Price ID sign functional and lighted | 2 |
| Main Price ID sign unobstructed and free of non-oil company signage | 1 |
| Landscape Free of Trash | 2 |
| Landscape Grass Cut and Neat | 4 |
| Parking Lot Neat and Clean | 2 |
| Parking Lot free of weeds growth | 1 |
| Parking Lot with no potholes | 1 |
| Freshly painted curbs, poles and parking lines | 2 |
| All MPDs functioning correctly | 4 |
| All MPDs clean, free of spider webs and dirt | 1 |
| Pump Islands clean and well maintained | 1 |
| Card reader working with RECEIPT paper present | 2 |
| Credit Card Applications present | 2 |
| Current POP Present and clean | 2 |
| Nozzles and hoses clean/functional | 2 |
| All MPD displays operational | 1 |
| Trash Receptacles not overflowing and CLEAN | 1 |
| Valet supplies present. (Squeegees, paper towel and water) | 2 |
| Spanner clean, lit and well maintained | 1 |
| Canopy fascia maintained and lit | 1 |
| Canopy Clean and well maintained | 1 |
| Canopy lights working | 2 |
| Exterior lights working | 1 |
| Dumpster area clean and without debris | 1 |
| No storage or objects outside the building or at dumpster | 1 |
| No abandoned or illegally parked vehicles | 1 |
| Air & Water hose working outside | 1 |
| Building Exterior clean, painted and well maintained | 1 |
| Building Sidewalk clean, unobstructed and pressure washed | 1 |
| Store windows clean, not cracked and free of extra signage | 1 |
| Front door clean and free of unnecessary signage | 1 |
| Operation hours posted | 1 |

### INTERIOR

| | |
|---|---|
| Odor Free | 1 |
| Comfortable Temperature | 1 |
| Inside Lights working and sufficient light | 1 |
| Clean Floor | 2 |
| Clean Walls / attractive & inviting ambiance | 1 |
| Ceiling tiles spotless and clean | 1 |
| Vents clean and dirt free | 1 |
| Clutter Free merchandising / Dealer navigation friendly | 1 |
| Floor Merchandisers well organized, properly placed and allowing navigation | 1 |

Store #963    COMMISSION

28

| | |
|---|---|
| Fully Stocked and Merchandised | 1 |
| No handwritten signs in the store | 1 |
| Shelves clean, free of dirt and front faced | 1 |
| Beverage Bar clean and inviting | 1 |
| Beverage equipment operational | 1 |
| Beverage Bar stocked | 1 |
| Cooler operational and clean | 1 |
| Cooler lights working | 1 |
| Check out area clean, clutter free and inviting | 1 |
| Waste receptacles clean and not overflowing | 1 |
| No storage in Dealer visible sales area | 1 |

## BATHROOMS

| | |
|---|---|
| All available bathrooms open for Dealer use | 1 |
| Bathroom floors clean and neat | 1 |
| Bathroom walls clean and free of graffiti | 1 |
| Bathroom supplies present | 2 |
| Bathroom door clean, lock functioning correctly | 1 |
| Bathroom equipment Commode, urinal, sink, mirror, soap disp, paper disp, towel disp | 1 |
| Bathroom trash clean, not overflowing and well maintained | 2 |

## DEALER SERVICE

| | |
|---|---|
| CSR in Uniform shirt | 5 |
| CSR wearing name tag | 3 |
| CSR well groomed | 1 |
| CSR acknowledged at entry and first interaction | 1 |
| CSR made eye contact | 1 |
| CSR courteous and provides pleasant Dealer service | 1 |
| CSR repeats sales amount and counts cash back | 1 |
| CSR provides welcome and parting remarks | 1 |
| CSR familiar with Oil Co programs and offers program sales | 2 |

## MISC

| | |
|---|---|
| Pornographic Magazine on display | 3 |
| Any type of Drug Paraphernalia present | 3 |
| **TOTAL SCORE** | **100** |

**Mountain Express Oil Company**

Credit Card Schedule Upon
Conversion

| Sales at Store | Notice to MEX | $$$ to MEX | $$$ to Dealer |
|---|---|---|---|
| Monday | Tuesday | Wednesday | Thursday |
| Tuesday | Wednesday | Thursday | Friday |
| Wednesday | Thursday | Friday | Monday |
| Thursday | Friday | Monday | Tuesday |
| Friday | Monday | Monday | Tuesday |
| Saturday | Monday | Monday | Tuesday |
| Sunday | Monday | Tuesday | Wednesday |

Billing Terms

Load to Load
Payment is due at the earlier of
10 days or the date a new load
is delivered.

(Assuming 7-day payment terms)

| Delivery Date | Draft Notice | Payment Due |
|---|---|---|
| Saturday | Friday | Monday |
| Sunday | Friday | Monday |
| Monday | Friday | Monday |
| Tuesday | Monday | Tuesday |
| Wednesday | Monday | Wednesday |
| Thursday | Tuesday | Thursday |
| Friday | Wednesday | Friday |

7 Days
Payment is due within 7 days
from date of delivery.

Store #963      COMMISSION

**EXHIBIT 3 - FUEL SUPPLY AGREEMENT BETWEEN COMMACK FUEL INC. AND DEBTORS**

EXHIBIT
3



MOUNTAIN EXPRESS
OIL COMPANY

## AMENDED AND RESTATED FUEL SUPPLY AGREEMENT

**THIS AMENDED AND RESTATED FUEL SUPPLY AGREEMENT** ("Agreement") is made this 11th day of February 2022 ("Effective Date") by and between **MEX FUELS NE-NY LLC,** a Wyoming corporation ("Supplier"), and **Commack Fuel Inc.**, a New York corporation, having a mailing address of 100 Crooked Hill Road, Commack, New York 11725 ( "Dealer") (Supllier and Dealer are sometimes collectively referred to herein as the "Parties").

**WHEREAS**, this Agreement is for the fueling station known as Mountain Express Store #974 located at 100 Crooked Hill Road, Commack, New York 11725, as more particularly described on **Schedule 1** herein attached and incorporated ("Location"); and

**WHEREAS**, Dealer operates a business on the Location and the Parties wish to enter into this Agreement for Supplier to supply motor fuels to Dealer at such Location on terms as specified herein with such Agreement amending and resetating any and all other fuel supply agreements by, between, or among the Parties for the Location.

**NOW THEREFORE**, in consideration of the mutual undertakings herein contained, the sufficiency of which are hereby acknowledged, Supplier agrees to sell, and Dealer agrees to buy, petroleum and other products on the following terms and conditions:

**1. TERM.** The Term of this Agreement shall begin on February 11, 2022 and continue for three (3) years ("Term"), and shall automaticaly renew from month to month after the said Term unless either party gives written notice of non-renewal to the other party at least thirty (30) days prior to the expiration of the initial Term or the then existing extended term, or unless sooner terminated as otherwise hereinafter provided. Supplier may terminate this Agreement for any reason and at any time during the Term of the Agreement with thirty (30) days written notice to Dealer.  Contingent upon Supplier's approval, Dealer may terminate this Agreement for any reason and at any time during the Term of the Agreement with one hundred eighty (180) days written notice to Supplier. Any option to extend shall be provided for on **Schedule 2**. Upon exercise and approval of such option to extend this Agreement, the term of the Lease in place at the Location shall also be extended concurrently herewith. This Agreement is expressly contingent upon the termination of any existing fuel supply agreements in place at the Location.

**2. SUPPLY OF PRODUCTS.**

Store #974    COMMISSION

(a) Supplier agrees to sell to Dealer, and Dealer agrees to buy and diligently to promote the sale of all grades and such quantities of Supplier's petroleum and other products as may be necessary to meet the Dealer demand for motor fuel products at the Location, and Dealer must offer all grades of fuel available from Supplier for sale at all times. Supplier shall have the right to provide ethanol additives, when available, in the gasoline, at the discretion of Supplier. Any incentives or rebates provided by Supplier's supplier relating to the sale of ethanol shall remain the property of Supplier. All fuel deliveries shall be made in full truckload quantities or in such other minimum quantities per delivery as specified by Supplier from time to time. If Dealer requests delivery of less than Supplier's established minimum volumes, compensatory delivery charges may be imposed. In no circumstances is Supplier obligated to make deliveries into a tank which is, or is suspected of leaking. Under this Agreement, Supplier is obligated to supply products to only the Location specified herein.

(b) Dealer covenants and agrees to purchase from Supplier and offer for sale, at the Location, only such gasoline, diesel fuel, other petroleum products or any additional motor vehicle fuel and/or energy-related products as are supplied and delivered by Supplier, including but not limited to those set forth on **Schedule 3** for the full duration of the stated term of this Agreement.

(c) It is the intention of the parties that the supply and purchase obligations contained herein shall remain in full force and effect throughout the term of this Agreement and shall not be suspended during any period of remodeling, renovation, repair, or rebuilding of the improvements located at the Location. Provided further, in the event Dealer's completion of the construction, remodeling and rebranding of the Location is not completed prior to the commencement of the term of this Agreement, due to conditions beyond the control of Dealer, Dealer's obligation to purchase petroleum products hereunder shall commence upon the completion of such construction remodeling and rebranding.

(d) Supplier has the sole and exclusive right to designate the hauler for delivery of products to the Location and hereby reserves the right to change the designated hauler from time to time. Dealer acknowledges and agrees further to comply with hauler's protocol for ordering of products and to allow a minimum of forty-eight (48) hour notice to receive delivery thereof. Dealer acknowledges that haulers' business is dependent on many external factors and that there may be delays in deliveries without any consequences to Supplier. Dealer shall grant full access to hauler's vehicles to make deliveries at any hour of the day. Communications between hauler and Dealer are the sole and exclusive responsibility of the Dealer. Any mistakes in ordering due to miscommunications between the hauler and Dealer are to be resolved between the hauler and Dealer. Any product outage(s) due to Dealer's failure to: (1) timely order sufficient volumes of product; (2) comply with hauler's protocol for ordering of products; or (3) grant full access to hauler's vehicles to make deliveries, or (4) provide forty-eight (48) hour notice to hauler for delivery of product shall constitute an event of default. Dealer acknowledges and agrees that Supplier shall not be liable for any misconduct of any designated hauler and that Dealer is responsible, at all times, for any discrepancies or variances in the amount of fuel delivered or maintained at the Location.

2

**3. OPERATION OF STATION.** Dealer recognizes that the brand utilized by Supplier is associated with high quality service and products and agrees to conduct business at the Location in a manner to maintain that association. Accordingly, Dealer agrees to furnish such service and accommodations to retail motor fuel Dealers as are customarily provided by convenience store/filling stations.

Dealer agrees to keep the business operated at the Location open for business during no less than the hours hereinafter set forth. Such business shall be open 365 days per year, (366 days during any leap year) opening no later than 6:00am EST and closing no earlier than 11:00pm EST daily.

Dealer agrees to provide, at its sole cost and expense:

  (a) broadband service to the Location in a manner acceptable to Supplier; and

  (b) promptly upon execution of this Agreement, a real property survey of the Location in a form that is acceptable for the purposes of filing any any all approvals, licenses and permits reasonably required to operate the Location for its intended purpose under this Agreement.  In the event that Dealer does not provide a survey, Supplier may charge Dealer for the cost of a new survey.

**4. EXCLUSION OF OTHER SUPPLIERS.** Dealer covenants and agrees to offer for sale, at the Location, only the motor fuels as are provided to the Location supplied by Supplier under this Agreement.  Dealer shall not sell any other supplier's motor fuels without the express written permission of Supplier.  Dealer affirmatively represents unto Supplier that  Dealer is not bound by the terms of any other motor fuels supply agreement relative to the Location and that Supplier has not induced, directed nor assisted  Dealer in breaching the terms of any agreement with another motor fuel supplier.

**5. PRICE OF PRODUCTS TO DEALER AND RETAIL PRICING.** A. Prices for all products purchased by Dealer from Supplier shall be Supplier's rack price from its supplier at its supplier's terminal, plus call and demand freight rates, plus One Cent ($0.01) per gallon, plus any applicable Superfund tax per gallon, plus the UST fee per gallon, plus any other applicable taxes, charges, duties and fees levied on any of the products of Supplier, or required to be collected by Supplier upon the sale, transportation or delivery of the products ("Supplier's Cost").

B. The retail pricing of motor fuels at the Location, shall be set by Supplier based upon market conditions and such other factors as may be deemed appropriate by Supplier, and in the exercise of Supplier's sole discretion. Supplier shall notify  Dealer, by telephone, fax transmission, e-mail transmission, electronic transmission, or other expeditious means of any price changes to be made for the retail pricing of motor fuels at the Location. Dealer shall cause the pricing changes to be made within one hour of such notification.

In the event  Dealer fails to cause the change of retail pricing, as required,  Dealer shall pay to Supplier the sum of $100.00 per hour for each hour or fraction thereof, subsequent to the first hour from the time of notice, until such pricing change is made at the Location. Such payment(s) shall be in the nature of damages sustained by

3

Store #974     COMMISSION

Supplier as a result of Dealer's failure to comply with its obligation to change retail pricing as directed by Supplier.

In the event Dealer fails to change retail pricing within one hour after such notice, on three separate occasions, Supplier shall have the right, but not the obligation, to immediately terminate this Agreement and to avail itself of all remedies provided for Supplier hereunder in the event of termination of this Agreement. Except for commissions as hereinafter stated, the gross retail receipts from the sale of motor fuels at the location shall be the property of Supplier.

**6. COMMISSION AND TERMS OF PAYMENT.** Dealer shall be entitled to a commission equal to Four Cents ($.04) upon each gallon of motor fuel sold, including unleaded regular gasoline, unleaded plus gasoline, super unleaded gasoline, diesel fuel, and kerosene.

In the event Supplier sets the retail price of motor fuels below cost, Dealer shall remain responsible for one-half of the credit charges and fees but shall not otherwise be responsible for any portion of any loss incurred by Supplier as the result of such pricing, except as otherwise provided for herein.

Dealer shall record and maintain accurate sales and inventory records for the sale of motor fuels at each pump upon a daily basis. Supplier shall provide Dealer with appropriate banking inforamation and other documentation for Supplier to either draft or deposit funds as may be necessary. In the event any draft or electronic fund transfer is returned or dishonored by reason of insufficient funds or otherwise, Dealer shall be in default hereunder and in order to cure such default, as may otherwise be provided for in this Agreement, Dealer shall additionally pay unto Supplier an administrative charge of $200.00 for each such dishonored instrument or transfer. In the event of a bounced ACH draft, Tenant shall either (a) provide documented proof of funds in the ACH draft account on file in order to clear a redraft; or (b) wire the funds directly to Landlord.

Dealer expressly acknowledges that failure to provide necessary funds as required herein may constitute theft by conversion of Supplier's funds for which Dealer may be subject to criminal prosecution. Dealer shall retain sales and inventory records for all motor fuels for a minimum of five (5) years and shall make such records available to Supplier, for inspection and copying during normal business hours, and allow Supplier, at any reasonable time, to take physical inventory of the bulk motor fuel products. In no event shall Dealer destroy any such inventory or sales records without first making them available to Supplier.

Dealer shall, prior to 10:00 a.m. EST each day, transmit by fax transmission, e-mail transmission, electronic transmission, or other expeditious means, a daily report of the sales of motor fuels during the prior business day. Such transmission shall be upon the format provided by Supplier. Additionally, Dealer shall, by 12:00 Noon EST each day, transmit to Supplier, by fax transmission, e-mail transmission, electronic transmission, or other expeditious means, a copy of all deposit slips validated by the depository bank, for the prior day's motor fuel sales. Supplier reserves the right to designate an alternative data transmission mode for compliance herewith.

4

In the event  Dealer fails to transmit daily sales reports and/or copies of deposit slips in a timely manner, as aforesaid,  Dealer shall pay unto Supplier the sum of $100.00 for the first such failure; $300.00 for the second such failure and $500.00 for each and every such subsequent failure , in which such transmissions are late. Further, in the event  Dealer fails to timely transmit sales reports and/or copies of deposit slips, as aforesaid, on three occasions, Supplier shall have the right to immediately terminate this Agreement and avail itself of all of Supplier's remedies upon termination as provided for herein.

**Dealer expressly acknowledges that converting Supplier's fuel into retained cash by failing to make daily deposits as required herein is considered by Supplier as constituting theft by conversion of Supplier's funds for which Supplier shall seek criminal prosecution against  Dealer to fullest extent allowed by law.**

**Dealer(s)' initials: _____ _____**

Supplier shall be responsible for the payment of all sales tax due to any appropriate taxing jurisdiction upon and for the sale of motor fuels under the terms of this Agreement.  It is expressly acknowledged between the parties that Supplier shall be entitled to retain any and all rebates or other purchase incentives paid or provided by its supplier in regard to motor fuels delivered to and sold at the Location.  Dealer shall also be responsible for all discrepancies, variances, and shortages of fuel at the Location.

**7. CREDIT CARD NETWORK AND SALES.** Dealer shall use and be responsible for all costs associated with such use, including but not limited to, connection, processing, and equipment fees during the term of this Agreement, and only the credit card network provided by and/or associated with Supplier's supplier or such other credit card network as directed by Supplier, which shall be maintained and upgraded by Dealer at its cost.

(a) No secondary or supplemental or other credit card network or credit card machines shall be used for the processing of any sales, whether for fuel, inventory, merchandise or otherwise. In the event that Dealer uses a separate EBT machine, Dealer shall be required to use a network or machine supplied by an state agency approved vendor. In the event of the unauthorized use of a credit card network or machine for processing sales at the Location, by Dealer or any of its Dealers or employees or contractors, Dealer shall be in default in its obligations under this Agreement. In the event of any such default, the cure for the unauthorized activity (in addition the discontinuance of such unauthorized activity), Dealer shall pay unto Supplier a five hundred dollar ($500.00) cure fee for the first such default; and a one thousand dollar ($1,000.00) cure fee for any subsequent default during the Term hereof. In the event of default by Dealer under any other terms of this Agreement, Supplier shall also be entitled to immediately disable said credit card network at the Location.

(b) Invoices from credit card sales shall be credited and paid to Supplier in regard to approved credit card purchases from Dealer. Supplier shall credit Dealer's account for products purchased hereunder, for the amount of credit card sales credited and paid to Supplier in accordance with fuel jobber (wholesaler) industry standards; provided, however that credit cards sales shall not be immediately repaid to Dealer but held on Dealer's account as additional credit against fuel purchases. Upon any failure by Dealer to strictly comply with the terms and

5

conditions of credit card transactions at the Location, Supplier shall have the right to charge-back to the Dealer all sums not credited to or paid to Supplier as a result of defective or noncomplying credit card sales at the Location. Any "charge-backs" shall be immediately paid by Dealer to Supplier.  Dealer shall be responsible for all point of sale programming, updates and installation and maintenance costs for EMV requirements from governmental agencies or oil companies.

**8.   USE OF TECHNOLOGY FOR PRICING SURVEY, INVENTORY MEASUREMENT, AND REPORTING OF SALES.** Dealer shall have the option to use electronic software reporting systems for conducting market surveys of posted motor vehicle fuel prices, electronic measurement and reporting of motor vehicle fuel inventory levels, and recording and reporting of motor vehicle fuel sales as may be offered and/or provided by Supplier; current systems including but not limited to Black Box, Opis, and Price Advantage technology ("Reporting Systems"). Supplier may offer and/or provide new Reporting Systems as new technology emerges.  In the event Dealer elects to use such Reporting Systems, Dealer shall be responsible for all applicable monthly charges and fees for the use of such Reporting Systems, with such monthly charges and expenses to be paid via electronic fund transfers (EFT / ACH) from Dealer's account, and Dealer agrees, further, to defend, indemnify and hold the Supplier, its subsidiaries, divisions, affiliates, Dealers and employees harmless from any and all claims, injuries, damages, losses or suits including attorney fees, arising out of or in connection with the use of such Reporting Systems.

**9. DEALER'S BUSINESS.** It is mutually agreed that the business conducted by Dealer at the Location is the independent business of Dealer, and this Agreement shall not be construed as reserving to or conferring upon Supplier any right to direct or control Dealer or any of Dealer's employees in the conduct of Dealer's business. Dealer acknowledges that Supplier has made no representation of profitability in regard to any business to be operated by Dealer at the Location and Dealer has not relied upon any business information provided by Supplier in regard thereto; and Dealer enters into this Agreement based upon the exercise of Dealer's own business judgment after having full opportunity to exercise due diligence on Dealer's own behalf.  Dealer acknowledges its sole resposibility for: (1) pricing of all the products, including updating the retail price of motor vehicle fuels, sold at the Location; and (2) the operation of its business in accordance with all applicable laws, regulations and standards.  Dealer agrees, further, to defend, indemnify and hold the Supplier, its subsidiaries, divisions, affiliates, Dealers and employees harmless from any and all claims, injuries, damages, losses or suits including attorney fees, arising out of or in connection with the Dealer's business.

Dealer affirmatively represents and warrants unto Supplier that Dealer is not under contract with another fuel supplier and is authorized to enter into this Agreement with Supplier, and that Supplier has not induced Dealer to breach, nor has Supplier interfered with, any other existing contract between Dealer and any other product supplier. In the event Dealer is a corporation or limited liability company, Dealer represents that it is a corporation or limited liability company in good standing duly authorized to do business in the State where the location is situated, and that the undersigned party executing this Agreement on behalf of Dealer has full and

6

complete authority to bind the corporation or limited liability company hereto. Further, it is expressly agreed that the corporate officer or limited liability company manager and/or member executing this Agreement on behalf of a corporation or limited liability company shall be, in his or her individual capacity, jointly and severally liable and responsible, with such corporation or limited liability company, for the satisfaction of all obligations of Dealer under the terms of this Agreement.

**10. UNDERGROUND STORAGE TANKS AND MAINTENANCE**.  Dealer is in exclusive possession and control of the underground storage tanks, lines, and associated underground equipment at the Location, and shall be responsible for all maintenance and repairs and all environmental issues or matters arising out of the use, maintenance or repair of such tanks, lines, pumps, dispensers and fuel equipment (including EMV upgrades), except as to any maintenance, repair or environmental costs or damage directly caused or arising from any intentional or negligent act or omission of Supplier, or except as to any repairs that are expressly made the responsibility of Supplier as Landlord under the terms of a Agreement of the Location to Dealer as Tenant, if applicable. Dealer shall, throughout the term hereof, provide daily tank stick readings to Supplier's transport company (hauler) in such manner as directed by Supplier. In addition, Dealer shall provide daily stick readings to Supplier with water detecting putty and take accurate and prompt measures at Dealer's cost to cure and remove any water or other contaminants from the tanks, lines and fuel equipment.  Dealer warrants that throughout the entire Term of this Agreement, Dealer's location shall be in full and complete compliance with all local, State and Federal environmental regulations and statutes pertaining to the storage, handling, and dispersing of petroleum products and motor fuels. Further,  Dealer shall comply with all directions, instructions, or recommendations made by any environmental consultant retained by Supplier for the purposes of managing environmental and inventory control at the Location.  Dealer shall pay such premiums as may be necessary to have the storage tanks and pumping equipment covered under private underground storage tank insurance, at its election, all of which shall be paid by Dealer.

Upon the breach of this warranty, and in addition to any other remedies Supplier may have by law, Supplier shall have the right to immediately cease delivery of products to Dealer and terminate this Agreement. Without limiting the foregoing, Dealer shall, at its expense, cause the cleaning of the underground motor fuel storage tanks prior to Supplier's installation of any new, refurbished, or upgraded motor fuel pumping equipment or before the first delivery of motor fuels to the Location by Supplier, whichever occurs first; and shall cause the cleaning of the underground storage tanks periodically during the Term of this Agreement, as may be reasonably required by Supplier.  Dealer shall pay one-half the cost of any software, hardware and service costs including annual and monthly maintenance fees associated with automated tank, pump, sign and/or register readings. Dealer specifically acknowledges that Supplier has no obligation with regard to underground tanks or submersible pumps or any other fueling equipment located in the tanks.

Store #974    COMMISSION

In the event it is determined, during the term of this Agreement, that the Location is environmentally contaminated as a result of a leak, spill, or other discharge of hazardous substances which constitutes a violation of local, state or federal law, rule, regulation or ordinance, Supplier shall have the right to suspend delivery of products to the Location until such contamination is remediated as required by law during which time Dealer shall remain liable unto Supplier for any shortfall payments due hereunder by virtue of Dealer's failure or inability to purchase the minimum number of gallons of petroleum products required under the terms of this Agreement, notwithstanding such suspension. In the alternative, in the event of such contamination, Supplier shall have the right to terminate this Agreement in which case Dealer shall reimburse Supplier for all branding investment costs incurred by Supplier for branding of the Location and shall reimburse Supplier for all purchase incentive rebates received by Dealer under the terms of this Agreement.

**11. INSTALLATION OF PETROLEUM PRODUCT DISPENSING AND OTHER EQUIPMENT**. Supplier shall cause, at its expense, the installation of petroleum product dispensing equipment and or accessories and/or fixtures at the Location as may be set forth on **Schedule 4** attached hereto and made part hereof. Dealer acknowledges that Supplier shall have the right to engage any qualified vendor for the purpose of acquisition and installation of the same or similar equipment described therein. The total cost to Supplier for the acquisition and installation of such equipment, accessories and fixtures shall be considered part of Supplier's branding investment under the terms of this Agreement.  At all times relevant hereto, the Supplier shall be the sole and exclusive owner of such equipment listed on Schedule 4, with the full right and authorization of Dealer to remove same upon a default under Section 19 hereof which remains uncured for more than thirty (30) days of written notice of default hereunder.  Dealer hereby grants to Supplier a power of attorney coupled with an interest, for the purpose of removing the said equipment from the location upon an uncured default and Supplier shall have no liability whatsoever for removal of the equipment after notice and cure period.

**12. REPAIR OR EQUIPMENT OBLIGATIONS OF DEALER**. Dealer shall cause the repairs and/or maintenance upgrades at the Location, and install such equipment as may be specified in **Schedule 5** attached hereto and made part hereof at the commencement of this Agreement. Dealer shall commence such work promptly and pursue the same diligently through completion as set for in said schedule and as a prerequisite to Supplier's performance and obligations under section 2 of this Agreement.

**13. LEASED EQUIPMENT.**   Dealer acknowledges that any equipment, accessories or fixtures provided by Supplier under the terms of this Agreement may have been leased to Supplier by one or more leasing companies. In the event of a transfer or assignment of this Agreement, Supplier will continue to make any such equipment Agreement payments through the full term of any such Agreement(s).  Notwithstanding the foregoing in this Section 13., for purposes of this Agreement Supplier shall be deemed to be the owner of any such equipment, accessories or fixtures, and shall have the right to enter upon and in the premises and remove same in the event of a default by Dealer under Section 19 herein.  For purposes of the preceding sentence Dealer hereby grants Supplier a power of attorney coupled with an interest to take all actions necessary and

8

desired on in the name of Dealer to remove the said personal property from the premises including obtaining permits and granting rights to others reasonably required to carry out the removal.

## 14. BRANDING, TRADEMARKS, AND QUALITY ASSURANCE.

(a) *MOTOR FUEL BRAND &TRADEMARKS.* Supplier shall have the right to designate the branding of the motor fuels to be purchased by Dealer hereunder. The initial branding, if any, shall be as designated on **Schedule 6** attached hereto and made part hereof. Supplier shall incur such costs as may be reasonably necessary for changing and or installation of the branding image of the Location (said sum hereinafter being referred to as Supplier's Branding Investment), in order to obtain the approval of Supplier's chosen branded fuel supplier. Dealer shall be responsible for payment of any and all further sums necessary for signage or other branding image items in order to maintain such approval during the term of this Agreement. In the event Supplier changes branding during the term of this Agreement, all costs of maintaining the subsequent banding image(s), after Supplier's initial costs in rebranding the Location, shall be borne by Dealer. All signage shall be contingent upon and subject to the requirements of any applicable state or local law or ordinance.

(b) *QUALITY ASSURANCE AND MARKETING.* Dealer acknowledges that Supplier's supplier maintains a program for product quality and marketing assurances. Specifically, Dealer shall:

(i) Comply with all quality and marketing programs, which shall include but not be limited to, oil company uniforms, employee name tags, clean and available restrooms, proper maintenance of landscaping, buildings (interior and exterior), canopy and equipment, proper presentation and display of retail merchandise, maintenance and location of signs and other branding image items and other such matters pertaining to the brand image of the Location, and shall cooperate at all reasonable times and in all reasonable manners with all quality assurance programs and inspections;

(ii) Refrain from the sale, use, storage, rent, display, or offering at the Location of:

(a) pornographic or sexually explicit magazines, video tapes, compact discs, digital video discs, similar literature or items of merchandise;

(b) any item, in Supplier's judgment, that is intended or designed for use in ingesting, inhaling or otherwise consuming an illegal drug or from manufacturing or processing an illegal drug, including but not limited to pipes, tubes, roach clips, instructions or descriptive materials, or containers designed for concealing illegal drugs or paraphernalia, or bath salts or synthetic drugs designed to mimic the effects of illegal drugs; and

(c) any substance or item prohibited to be offered for sale by the branding and/or quality assurance standards of the motor fuel supplier providing motor fuel for sale or resale at the Location; and

9

(ii) Dealer shall properly display all point of purchase marketing materials and credit card applications, and, at its sole cost and expense participate in any marketing or loyalty programs established by the brand of motor fuels sold at the Location, install all marketing materials, such as point of purchase (POP) signage, credit card applications and related materials and attend any training or informational programs offered.

It is acknowledged between the parties that Supplier and/or Supplier's supplier may conduct periodic "mystery shopper" or other inspections of the Location and the operation of the business thereon in order to determine whether Dealer is meeting the image, retail and Dealer service standards required under the terms of this Agreement. In the event Dealer scores below 80% of a perfect score, or otherwise fails inspection as determined by Supplier or Supplier's supplier making the inspection and in accordance with the quality assurance standards, Dealer shall pay unto Supplier an inspection fee of $500.00 or such amount charged by Supplier's supplier as an inspection fee, whichever is greater, due and payable within three days of Dealer receiving notice of such failure and a copy of the inspection report. The foregoing inspection fee shall apply to each and any failure of such inspections; provided further, Supplier shall have the right, in its discretion, to waive the requirement for payment of an inspection fee based upon its determination of Dealer's exercise of good faith in promptly correcting all quality assurance deficiencies. Dealer shall also be subject to certain fines as provided for on the attached Fine Schedule as provided for on **Schedule 7** herein attached an incorporated for violations which may not result in a failing score. In the event Dealer fails a mystery shopper inspection or other inspection at the Location, Supplier reserves the right to implement a monthly maintenance program at the Location and choose a vendor to cure at its sole and absolute discretion. The cost of said maintenance program shall be the responsibility of the Dealer, which shall be no more than the customary cost of said services in the local area of the Location.

In the event Dealer's branded retail facility does not meet such standards or requirements and which results in Supplier's receiving notice to debrand Dealer, or if such retail facility is abandoned, Dealer shall allow Supplier or Supplier's representatives or  Dealers to immediately remove all brand identification from the Location, and Dealer shall be liable to Supplier for all expenses and damages incurred as a result thereof. For the purposes of this Agreement, the Location shall be deemed abandoned if it is not open for business during normal business hours for three consecutive days. Dealer expressly agrees that all of Supplier's (or Supplier's suppliers') trademarks, names and colors appearing at the Location shall be kept clear and legible, and that Dealer will use only signs approved by Supplier to advertise products purchased by Dealer from Supplier. Supplier shall be entitled to withdraw or substitute at Supplier's cost the use of any particular trademark, name, or colors.

Provided further, in the event Supplier determines, in its sole discretion, that Dealer is not in compliance with any marketing or quality assurance retailing standard in regards to the physical condition of the Location and the operation of the business thereon, Supplier shall have the right (but not the obligation) to enter upon the Location and to correct any deficiency or substandard condition and bill Dealer for the cost thereof. Dealer

shall reimburse Supplier for any and all of such costs within seven days of receipt of such bill. Such reimbursement payment(s) shall be made by electronic fund transfer in the same manner as payment for products purchased from Supplier. Further, without limiting the foregoing, Dealer shall comply with the image and identification standards established, from time to time, for "branded outlets" by Supplier's branded supplier.

**15. RESERVED.**

**16. SECURITY DEPOSIT**. Dealer shall pay unto Supplier a security deposit upon the execution of this Agreement in an amount and in the manner as specified on **Schedule 8** hereto attached an made part hereof. During the term of this Agreement, Suppler shall have the right to apply all or part of said deposit to any sums owed by Dealer to Supplier under the terms hereof. In such event, Supplier shall notify Dealer of such application and Dealer shall pay over to Supplier such amounts as may be necessary to restore the full amount of the security deposit. Supplier's application of all or any portion of the security deposit shall not relieve Dealer from its obligations to make any payments due to Supplier nor prejudice Supplier's rights to exercise any remedy provided for herein, or at law, in consequence of Dealer's default under the terms of this Agreement. Further, Dealer hereby grants Supplier a security interest in all of Dealer's business equipment, supplies, inventory and fixtures at the Location, in which Supplier shall have all the rights of a secured party under the terms of the Uniform Commercial Code, and which interest may be evidenced and/or perfected by the filing of a UCC-1 Financing and Fixture Filing Statement(s).

**17. ASSIGNMENT-SUBLETTING-SALE**.  Dealer shall not, without the prior written consent of Supplier endorsed hereon, assign this Agreement or any interest hereunder, or any part hereof, or permit the operation of the Location by any party other than Dealer. Supplier's consent shall not be unreasonably withheld, however, in making such a determination, Supplier may rely upon the financial and creditworthiness and criminal background, if any, of any proposed assignee in making a determination as to whether or not the withholding of such consent is reasonable. Dealer must provide Supplier with thirty (30) days prior written notice of a proposed consent together with all information for the proposed assignee.  If approved, Dealer shall remit funds in the amount of $2,000.00 for legal and administrative fees. Consent to the assignment shall not destroy this provision, and all later assignments shall be made likewise only on the prior written consent of Supplier.  An assignee of Dealer, at option of Supplier, shall become directly liable to Supplier for all obligations of Dealer hereunder, but no assignment by Dealer shall relieve Dealer of any liability hereunder, and Dealer shall remain jointly and severally liable with assignee for the satisfaction and performance of all Dealer's obligations under the terms of this Agreement. Dealer shall have the right, without prior written consent of Supplier, to form a corporation or limited liability company organized under the laws of the state of the Location,  and wholly owned by Dealer, and may assign or tranfer this Agreement to such company with notice provided to Supplier however, any such assignment or transfer shall not relieve Dealer of joint and several liability for all of Dealer's obligations hereunder, the performance of which shall be personally guaranteed by Dealer.  This Agreement is

11

Store #974     COMMISSION

freely assignable by Supplier and in the event Supplier elects to sell, assign or convey rights, titles and interest in this Agreement, Dealer shall provide a fuel estoppel agreement, in acceptable form to Supplier, confirming the terms of this Agreement at Supplier's request and without delay.

**18. OPTION TO CONVERT BUSINESS RELATIONSHIP BETWEEN THE PARTIES.** None.

**19. DEFAULT, TERMINATION AND LIQUIDATED DAMAGES.**    All terms, conditions, covenants, warranties, and agreements contained in this Agreement are essential and material to the continued relationship between the parties. It is mutually agreed that in the event Dealer (i) becomes insolvent, (ii) is generally unable to pay, or fails to pay, its debts as they become due, (iii) files, or has filed against it, a petition for voluntary or involuntary bankruptcy or pursuant to any other insolvency law, (iv) makes or seeks to make a general assignment for the benefit of its creditors, or (v) applies for, or consents to, the appointment of a trustee, receiver, or custodian for a substantial part of its property or business; or (vi) if Dealer violates or is in default of any other agreements between Supplier and Dealer, Dealer shall be considered in default of the Agreement. In addition to the aforementioned, the following shall constitute events of breach or default:

(a) failure to remit to Supplier any monies owed by Dealer to Supplier in accordance with the provisions of this Agreement;

(b) violation of any federal, state, county or any municipal law, ordinance, rule, or regulation relating to Dealer's operation of the business conducted pursuant to or in connection with this Agreement;

(c) false or misleading statements made by Dealer to Supplier, including financial statements made or provided by Dealer in order to enter into this Agreement;

(d) failure of a mystery shopper inspection or other inspection at the Location and denying Supplier's implementation of a monthly maintenance program at the Location by a vendor to be selected by Supplier in its sole and absolute discretion;

(e) the institution of any insolvency, bankruptcy, or a receivership proceeding in or against Dealer;

(f) failure of Dealer to pay taxes or license fees as required by the terms of this Agreement or by any law or regulation or arising out of Dealer's employment of any person;

(g) abandonment or cessation of operation of the business of Dealer;

(h) severe physical or mental disability of Dealer;

(i) Willful adulteration, mislabeling or misbranding of motor fuel or other violation by Dealer of trade mark requirements for products sold by Dealer as set forth under this Agreement;

(j) violation of any term or condition of the Agreement, any cash advance agreement or any other agreements between the parties related to the Location; or

12

Store #974    COMMISSION

(k) any act or omission allowing for termination, non-renewal or debranding of the Location or as provided under the Petroleum Marketing Practices Act 15 U.S.C. Sec. 2801 et seq.

Subject to all rights under the Petroleum Marketing Practices Act, Supplier shall provide Dealer written notice of the occurrence of any event or breach which is cause for termination of this Agreement hereunder. Dealer shall have 15 days from the date of such notice in which to cure such breach or correct any condition or otherwise comply with the terms of this Agreement and in lieu of which this Agreement shall automatically be terminated at the expiration of such 15 day period. In the event Dealer receives written notice from Supplier of any events of default hereunder, Dealer specifically acknowledges and agrees that Supplier, through its Dealers, shall have the right to inspect Dealer's facility at the Location for purposes of determining compliance with this Agreement. In the event such event is not cured within 15 days of notice thereof, Supplier shall be entitled to make any corrections and/or repairs necessary at the Dealer's expense. Notwithstanding the foregoing, in the event Dealer fails to remit Supplier any monies owed to Supplier under the terms hereunder, Supplier shall have the right to immediately suspend motor fuel delivery until and unless such breach is cured. In the event such a breach is not cured within five 5 days from the date of written notice to Dealer, then in such event Supplier shall have the right to then immediately terminate this Agreement.

The parties hereto agree and stipulate that in the event of default by Dealer and early termination of this Agreement, Supplier's actual damages cannot be calculated with any degree of certainty as Supplier is relying upon Dealer's continuing purchase of petroleum products throughout the term of this Agreement. Accordingly, Dealer and Supplier specifically acknowledge and agree that such damages upon Dealer's breach would be virtually impossible to determine, and that the formula provided in this paragraph provides a reasonable pre-estimate of Supplier's probable loss that will be suffered by Supplier. Therefore, the parties agree that, in addition to any other amounts owed to Supplier hereunder, Dealer shall pay to Supplier as liquidated damages and not as a penalty a sum equal to Five Cents ($0.05) times the minimum number of gallons required to be purchased monthly as contained herein times the number of months remaining in the Term of this Agreement from the date of default. The parties further agree that the above formula is reasonable because the amount of such liquidated damages are decreased by each month that Dealer performs its obligations under this Agreement. Moreover, the parties stipulate and agree that their intent in using the above damages formula is to provide a readily calculable pre-estimate of Supplier's probable loss upon breach and that it not be construed as a penalty of any kind or sort.

It is further agreed that in the event of default by Dealer under any of the terms of this Agreement and that in addition to the aforesaid liquidated damages, Supplier shall be entitled to recoup from Dealer the unamortized portion of its investment in the Location that is more particularly described in **Schedule 4** hereto. The investment described in **Schedule 4** shall be amortized on a "straight line" basis over the term of this Agreement; if Dealer defaults and this Agreement is terminated before the end of the term, Supplier shall be entitled to immediate payment of the amount of the investment that has not been amortized on the date of

13

default. Dealer acknowledges that recoupment by Supplier of the unamortized investment is a reasonable pre-estimate of Supplier's damages with respect to the investment, and that Supplier has the reasonable expectation that Dealer shall perform its obligations hereunder for the full term. In lieu of Supplier's right to recoupment of its investment in the Location, Supplier may also immediately remove from, or disable at, the Location and retain full ownership of the petroleum product dispensing equipment, cash register, point of sale and other branding image items installed pursuant to **Schedule 4** attached hereto. Upon any default Supplier shall also be authorized and permitted to immediately remove all motor fuel products in the underground storage tanks at the Location, pursuant to Section 6 of this Agreement. Termination of this Agreement shall not affect or abridge the rights and obligations of the parties occurring prior to termination, and Supplier may pursue any available legal remedies relating thereto whether or not it exercises its right to declare this Agreement terminated. In addition to the foregoing, in the event of termination, Dealer shall pay to Supplier the cost of "debranding" the Location. "Debranding" is hereby defined as the removal of all brand signage, brand color scheme, repayment of any unamortized oil company branding costs and rebates at the Location.

**20. ATTORNEY'S FEES, COSTS, INTEREST.**  In the event it becomes necessary for Supplier to employ the services of its attorney to enforce any aspect of this Agreement, whether Dealer is in default of this Agreement or this Agreement is amended, assigned, or modified, Supplier shall be entitled to charge and collect administrative costs and legal fees in an amount not less than $2,000.00. In the event that either party files litigation regarding this Agreement, the losing party agrees to pay the prevailing party fifteen percent (15%) of the amount of damages for attorney's fees and costs of litigation.

**21. MISCELLANEOUS.**

(a) *DELIVERIES DELAYED OR PREVENTED.* Supplier will fill all orders with reasonable promptness, but shall not be liable for loss or damage due to delays or failure, in whole or in part, to fill orders resulting from acts of public enemies, regulations, or orders of civil or military authorities, fires, floods, strikes, labor disputes, accidents, shortage of labor, of crude oil, or refined products or refinery capacity, or materials or of transportation, or any other cause beyond Supplier's reasonable control, either at its own plants or those of its sources of supply, or in connection with the delivery of its products. If Supplier is prevented by any of the foregoing causes from supplying the full quantities of any one or more of its products hereunder, Supplier shall have the right without liability to Dealer to allocate the quantity deliverable hereunder to Dealer, to its other Dealers under contracts calling for delivery of like products, and to its own requirements in such manner as it may deem reasonable, or according to any required allocation program, and Dealer shall be bound by such allocation. If Supplier is unable to deliver products for more than seventy-two (72) hours, Dealer shall have the right to purchase products from other suppliers until such time as Supplier can recommence delivery.

i. Supplier reserves the right to give preference in allocation to a dealer or group of dealers for any reason in its sole discretion, including those dealers whose needs are related to providing fuel to customers whose

14

responsibilties relate to the: (a) protection of life or health, (b) production and transportation of food and energy, (c) mass transportation, and (iv) national defense.

ii. Supplier's allocation plans may be put into effect on any geograph basis (including treating one geographic area differently from another) as Supplier may determine, without regard for the specific inventory at the place or places from which the supplied products are normally produced, shipped, or delivered.

(b) *INSURANCE*. Dealer shall continuously maintain general liability insurance and liquor liability insurance with such coverage as may be approved by Suppier and naming Supplier as an additional insured; and Dealer shall maintain workers' compensation insurance as required to be in full compliance with the State's Workers Compensation Act and obtain Workers Compensation Insurance. Dealer shall furnish Landlord certificates establishing that the insurance requirements contained herein are met and maintained, from time to time, and upon request by Supplier. Additionally, Dealer shall reimburse Supplier, by EFT on a monthly basis, for any all insurance premiums incurred by Supplier, during the term of this Agreement, for fire, casualty, hazard and liability insurance maintained by Supplier covering any equipment, accessories, fixtures and/or branding image items owned or Agreementd by Supplier and installed at the Location. In the event that Dealer fails to provide a certificate of insurance after written notice from Supplier, Supplier may obtain such insurance and charge Dealer the actual cost of the insurance plus an administrative fee.

(c) *CONTINGENCIES*. This Agreement and the rights and obligations of the parties hereunder is expressly contingent upon the approval of the Location, receipt of a survey of the Location supplied by Dealer, the branding image and specifications therefor, and Dealer's credit history by Supplier's supplier. Further, in the event Supplier is obligated to cause the installation or upgrade of any motor fuel dispensing equipment or accessories at the Location, this Agreement is expressly contingent upon Supplier obtaining financing, by Agreement or otherwise, for such obligations upon terms and conditions acceptable to Supplier; and contingent upon Dealer's third party landlord (and the prime landlord at the Location, if applicable), if any, executing a Landlord's Acknowledgment and Equipment Waiver in such form satisfactory to Supplier and under which such landlord (and prime landlord) waives any right or claim, during the term of this Agreement, to the equipment, accessories, fixtures and branding image items installed and owned by Supplier, and acknowledges Supplier's exclusive right to supply motor fuel to the Location for the full term hereof. Upon any breach or default under Section 19 hereof, Supplier shall have the right to injunctive relief in the form of a restraining order against Dealer and/or Landlord preventing any other fuel supplier from supplying fuel at the location for the term of this Agreement.Dealer shall exercise good faith and make diligent efforts and cooperate with Supplier in obtaining the execution of such Landlord Acknowledgment and Waiver, in failure of which Supplier may terminate this Agreement.

(d) *SEVERABILITY*. (i) If any one or more of the provisions of this Agreement are determined, by a court of competent jurisdiction, to be invalid or unenforceable, the remaining provisions hereof shall continue to be of full force and effect provided that the invalidity of any provisions hereof does not result in a lack of mutuality

15

or a failure of consideration in regards to the benefits and obligations set forth herein. (ii) If, subsequent to the date of this Agreement, valid state or federal laws or regulations governing the relationship between Dealer and Supplier take effect, this Agreement shall be deemed amended and shall incorporate any mandatory requirements of such laws or regulations so long as they shall be effective, unless such amendment(s) shall operate to increase Supplier's taxes, costs or expenses hereunder, in which case Supplier shall have the option to terminate this Agreement by notice to Dealer.

(e) *ENTIRETY-AGREEMENT*. This Agreement constitutes the entire agreement and understanding between Supplier and Dealer merging and superseding all prior agreements, understandings, warranties and representations, whether oral, written, express, or implied, between Supplier and Dealer. All prior agreements between Supplier and Dealer concerning the subject matter hereof, relating to the Location defined herein, are hereby terminated. Neither this Agreement nor any modification or waiver of any of the provisions hereof shall be binding upon Supplier or Dealer unless in writing, duly executed by Dealer and a duly authorized  Dealer of Supplier.

(f) *ELECTRONIC TRANSMISSION AND SIGNATURE*.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, email or other means of Electronic Transmission and/or with Electronic Signatures shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

i. "Electronic Transmission" means any form of communication not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved, and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

ii. "Electronic Signature" has the meaning provided in [the Georgia Electronic Records and Signatures Act, O.C.G.A. § 10-12-1 et seq. OR Wyo. Stat. §  40-21-102(a)(viii) or OR Tex. Bus. & Com. Code § 322.002(8).]

(g) *NOTICES*. Any notice provided for herein shall be given in writing and shall be considered properly given when received if personally delivered, provided by verifiable elctrontic means or, if deposited in the United States mail by certified mail, return receipt requested, postage prepaid, properly addressed by either party to the other at such party's address shown above, or at any changed address of which notice is duly given, as of the date received.  Dealer has an obligation to notify supplier if they move or otherwise change the address noted above.  In the event Dealer fails to notify Supplier of an address change, all mail sent by Supplier to Dealer's address shown above shall be deemed sufficient notice whether claimed or unclaimed.

16

(h) *CHOICE OF LAW.* This Agreement has been entered into in and shall be construed under the laws of the State of Georgia and the parties agree that exclusive venue and jurisdiction shall be with the Superior Court of Cherokee County, Georgia for any actions, suits or proceedings.

(i) *JOINT AND SEVERAL LIABILITY.* In the event more than one person, firm, company or entity are named as Dealer hereunder, each such named person, firm, company and entity shall be jointly and severally liable unto Supplier for the satisfaction of the obligations of Dealer hereunder; and Supplier may look to any, all or any combination of them for such satisfaction thereof.

(j) *CROSS-DEFAULTS.* Any default by Dealer under the terms of this Agreement shall likewise constitute a default of Dealer, as tenant, Dealer, or otherwise, under the terms of any and all other agreements between these same parties, including without limitation, other Agreements, motor fuel supply or commissioned sales agreements, purchase and /or sale agreement and other contracts, whether or not pertaining to the Location, or other premises or locations or to the sale or purchase for resale of motor fuels or other products. This provision shall also apply to any agreements with Supplier's affiliates and related parties, including but not limited to any Dealer defaults with any branded fuel supplier. In the event Dealer is a tenant of a third-party landlord at the Location, and Supplier has acquired the written consent to this provision from such landlord by way of a separate document or agreement, default by Dealer hereunder shall likewise constitute a default under the terms of the Agreement between Dealer and such landlord and a default under the Agreement shall be a default under this Agreement.

(k) *CREDIT CARD FRAUD SKIMMING.* Supplier shall have the right to immediately charge back to the Dealer any credit card "charge-backs" from the Supplier's Supplier immediately. In addition, Dealer is responsible for any credit card fraud which may occur at the Location including Skimming. Skimming is the theft of credit card information. This theft occurs when a third-party card-reading device is installed either outside or inside a fuel dispenser or other card-swiping terminal. This device allows a thief to capture a Dealer's credit and debit card information, including their PIN, with each card swipe. Dealer is responsible for any credit card or debit card information theft and the fraudulent charges that are a result of Skimming. Dealer is required to daily check the Pumps and card swiping terminals for possible sources of Skimming.

(l) *QUALITY AND CLAIMS.* Supplier guarantees that all products delivered hereunder will be uniform in quality and according to industry standards. Any claim for deficiency in quality or quantity of any product is waived unless Dealer gives Supplier notice of such deficiency at time of delivery (or during the next period of regular business hours if night delivery) for quantity claims and within ninety-six (96) hours of discovery of the alleged deficiency for quality claims. Such notice shall fully set forth the facts on which Dealer's claim is based, and Supplier shall be given full opportunity to inspect, measure, and test the products and/or equipment involved. Dealer shall immediately notify Supplier if its equipment is leaking. Dealer's failure to comply with the above requirements shall operate as a waiver of any and all claims and remedies by Dealer against Supplier arising out of product defects, variances, or shortages.

17

**22. RIGHT OF FIRST OFFER.**   Dealer agrees to provide Supplier with written notice of the availability of the Dealer's business at the Location ("Business") for sale and offer the Business to Supplier on such terms and conditions as Dealer would offer to third parties, as determined by Dealer in its sole and absolute discretion, prior to marketing said Business to third parties. Supplier shall have sixty (60) days from the date of Dealer's Notice to respond in writing to the same. If Dealer has not received a written response by the end of said sixty (60) day period or if Supplier declines to accept Dealer's offer or makes a counteroffer which Dealer shall reject, in writing, as unacceptable in Dealer's sole and absolute discretion, Dealer shall thereafter be free to market the Business and sell the Business for not less than the counter-offer submitted by Supplier. If Dealer and Supplier agree on terms for the sale of the Business, but are subsequently unable, in good faith, to consummate an agreement with respect thereto acceptable to both Dealer and Supplier shall thereafter be free to market the Business and sell the Business on such terms and conditions as Dealer shall determine, in its sole and absolute discretion, without any further obligation to offer said Business again to Supplier.

*[signature page to follow]*

18

**IN WITNESS WHEREOF**, the parties hereto have caused this Fuel Supply Agreement to be effective as of the Effective Date first written above.

**SUPPLIER**

**MEX FUELS NE-NY LLC**


By:_____

    Turjo Wadud, President


**DEALER**

**Commack Fuel Inc.**


_____

    Rajeev Malhotra

19

IN WITNESS WHEREOF, the parties hereto have caused this Fuel Supply Agreement to be effective as of the Effective Date first written above.

SUPPLIER
MEX FUELS NE-NY LLC

By: _____
Tunje Wadud, President

DEALER
Commack Fuel Inc.

_____

Sanjeev Mehrotra

2/11/2022

## SCHEDULE 1 - PROPERTY DESCRIPTION

100 Crooked Hill Road, Commack, New York 11725

## LEGAL DESCRIPTION

20

## SCHEDULE 2 – OPTION TO EXTEND TERM

Supplier shall have the option to extend the Term for one additional three (3) year term with at least thirty (30) days' notice to Dealer, prior to the expiration of the then existing Term.  Each extended Term shall be on the same terms and conditions as set forth in this Agreement, except as otherwise specifically stated herein.

21

## SCHEDULE 3 – PRODUCTS TO BE PROVIDED EXCLUSIVELY BY SUPPLIER

1. Regular, Super and Premium Gasoline;

2. Diesel;

3. E85/and other Ethanol Blends;

4. Bio Diesel;

5. Ethanol Free Fuel;

6. Boutique Fuels (Future);

7. Natural Gas Related Fuels (Future);

8. Electric Car Charging Networks (Future);

9. Lubricants and Oils (Future)

10. Hydrogen Fuels (Future); and

11. Any other fuel known or currently unknown used to power automobiles, trucks, tractors, boats, lawn mowers, etc.

22

## SCHEDULE 4 - EQUIPMENT, ACCESSORIES AND/OR FIXTURES TO BE INSTALLED BY SUPPLIER

Supplier shall provide EMV ugrades at the Location at its sole cost and expense, if required.

23

## SCHEDULE 5 - DEALER'S REPAIR/MAINTENANCE AND EQUIPMENT OBLIGATIONS

Dealer is responsible for all inside and outside maintenance at the Location.

**SCHEDULE 6 - BRANDING**

The initial branding image to be installed at the Location, and the initial brand of motor fuels to be delivered to the Location for resale by Dealer shall be a brand approved by Supplier. Supplier reserves the right to change the brand at the Location at anytime.

25

## SCHEDULE 7 – FINE SCHEDULE

No Name Tag:                          $25.00

No Uniform:                           $50.00

Illegal Drugs/Drug Paraphenalia:      $500.00

## SCHEDULE 8- ALTERNATIVE SECURITY DEPOSIT PROVISIONS

The security deposit provisions of section 16 of this Agreement are modified as follows:

Total security deposit shall be $40,000.00, to be collected at One Cent ($0.01) per gallon of fuel sold at the Location.

Store #974     COMMISSION

## Mountain Express Oil Co. Field Inspection Evaluation

### Exterior

| | |
|---|---|
| Main Price ID sign functional and lighted | 2 |
| Main Price ID sign unobstructed and free of non-oil company signage | 1 |
| Landscape Free of Trash | 2 |
| Landscape Grass Cut and Neat | 4 |
| Parking Lot Neat and Clean | 2 |
| Parking Lot free of weeds growth | 1 |
| Parking Lot with no potholes | 1 |
| Freshly painted curbs, poles and parking lines | 2 |
| All MPDs functioning correctly | 4 |
| All MPDs clean, free of spider webs and dirt | 1 |
| Pump Islands clean and well maintained | 1 |
| Card reader working with RECEIPT paper present | 2 |
| Credit Card Applications present | 2 |
| Current POP Present and clean | 2 |
| Nozzles and hoses clean/functional | 2 |
| All MPD displays operational | 1 |
| Trash Receptacles not overflowing and CLEAN | 1 |
| Valet supplies present. (Squeegees, paper towel and water) | 2 |
| Spanner clean, lit and well maintained | 1 |
| Canopy fascia maintained and lit | 1 |
| Canopy Clean and well maintained | 1 |
| Canopy lights working | 2 |
| Exterior lights working | 1 |
| Dumpster area clean and without debris | 1 |
| No storage or objects outside the building or at dumpster | 1 |
| No abandoned or illegally parked vehicles | 1 |
| Air & Water hose working outside | 1 |
| Building Exterior clean, painted and well maintained | 1 |
| Building Sidewalk clean, unobstructed and pressure washed | 1 |
| Store windows clean, not cracked and free of extra signage | 1 |
| Front door clean and free of unnecessary signage | 1 |
| Operation hours posted | 1 |

### INTERIOR

| | |
|---|---|
| Odor Free | 1 |
| Comfortable Temperature | 1 |
| Inside Lights working and sufficient light | 1 |
| Clean Floor | 2 |
| Clean Walls / attractive & inviting ambiance | 1 |
| Ceiling tiles spotless and clean | 1 |
| Vents clean and dirt free | 1 |
| Clutter Free merchandising / Dealer navigation friendly | 1 |
| Floor Merchandisers well organized, properly placed and allowing navigation | 1 |

Store #974    COMMISSION

28

| | |
|---|---|
| Fully Stocked and Merchandised | 1 |
| No handwritten signs in the store | 1 |
| Shelves clean, free of dirt and front faced | 1 |
| Beverage Bar clean and inviting | 1 |
| Beverage equipment operational | 1 |
| Beverage Bar stocked | 1 |
| Cooler operational and clean | 1 |
| Cooler lights working | 1 |
| Check out area clean, clutter free and inviting | 1 |
| Waste receptacles clean and not overflowing | 1 |
| No storage in Dealer visible sales area | 1 |

### BATHROOMS

| | |
|---|---|
| All available bathrooms open for Dealer use | 1 |
| Bathroom floors clean and neat | 1 |
| Bathroom walls clean and free of graffiti | 1 |
| Bathroom supplies present | 2 |
| Bathroom door clean, lock functioning correctly | 1 |
| Bathroom equipment Commode, urinal, sink, mirror, soap disp, paper disp, towel disp | 1 |
| Bathroom trash clean, not overflowing and well maintained | 2 |

### DEALER SERVICE

| | |
|---|---|
| CSR in Uniform shirt | 5 |
| CSR wearing name tag | 3 |
| CSR well groomed | 1 |
| CSR acknowledged at entry and first interaction | 1 |
| CSR made eye contact | 1 |
| CSR courteous and provides pleasant Dealer service | 1 |
| CSR repeats sales amount and counts cash back | 1 |
| CSR provides welcome and parting remarks | 1 |
| CSR familiar with Oil Co programs and offers program sales | 2 |

### MISC

| | |
|---|---|
| Pornographic Magazine on display | 3 |
| Any type of Drug Paraphernalia present | 3 |

| | |
|---|---|
| **TOTAL SCORE** | **100** |

29

Store #974    COMMISSION

**Mountain Express Oil Company**

Credit Card Schedule Upon
Conversion

| Sales at Store | | Notice to MEX | $$$ to MEX | $$$ to Dealer |
|---|---|---|---|---|
| Monday | | Tuesday | Wednesday | Thursday |
| Tuesday | | Wednesday | Thursday | Friday |
| Wednesday | | Thursday | Friday | Monday |
| Thursday | | Friday | Monday | Tuesday |
| Friday | | Monday | Monday | Tuesday |
| Saturday | | Monday | Monday | Tuesday |
| Sunday | | Monday | Tuesday | Wednesday |

Billing Terms

Load to Load
Payment is due at the earlier of
10 days or the date a new load
is delivered.

7 Days
Payment is due within 7 days
from date of delivery.

(Assuming 7-day payment terms)

| Delivery Date | Draft Notice | Payment Due |
|---|---|---|
| Saturday | Friday | Monday |
| Sunday | Friday | Monday |
| Monday | Friday | Monday |
| Tuesday | Monday | Tuesday |
| Wednesday | Monday | Wednesday |
| Thursday | Tuesday | Thursday |
| Friday | Wednesday | Friday |

30

Store #974      COMMISSION

**EXHIBIT 4 - FUEL SUPPLY AGREEMENT BETWEEN PRIME PETRO, INC. AND DEBTORS**

EXHIBIT
4



**MOUNTAIN EXPRESS**
OIL COMPANY

## AMENDED AND RESTATED FUEL SUPPLY AGREEMENT

**THIS AMENDED AND RESTATED FUEL SUPPLY AGREEMENT** ("Agreement") is made this 11th day of February 2022 ("Effective Date") by and between **MEX FUELS NE-NY LLC,** a Wyoming corporation ("Supplier"), and **Prime Petro Inc.,** a New York Corporation, having a mailing address of 434 Clinton Street, Hempstead, New York, 11550 ("Dealer") (Supllier and Dealer are sometimes collectively referred to herein as the "Parties").

**WHEREAS,** this Agreement is for the fueling station known as Mountain Express Store #965 located at 434 Clinton Street, Hempstead, New York, 11550, as more particularly described on **Schedule 1** herein attached and incorporated ("Location"); and

**WHEREAS,** Dealer operates a business on the Location and the Parties wish to enter into this Agreement for Supplier to supply motor fuels to Dealer at such Location on terms as specified herein with such Agreement amending and resetating any and all other fuel supply agreements by, between, or among the Parties for the Location.

**NOW THEREFORE,** in consideration of the mutual undertakings herein contained, the sufficiency of which are hereby acknowledged, Supplier agrees to sell, and Dealer agrees to buy, petroleum and other products on the following terms and conditions:

**1. TERM.** The Term of this Agreement shall begin on February 11, 2022 and continue for three (3) years ("Term"), and shall automaticaly renew from month to month after the said Term unless either party gives written notice of non-renewal to the other party at least thirty (30) days prior to the expiration of the initial Term or the then existing extended term, or unless sooner terminated as otherwise hereinafter provided. Supplier may terminate this Agreement for any reason and at any time during the Term of the Agreement with thirty (30) days written notice to Dealer.  Contingent upon Supplier's approval, Dealer may terminate this Agreement for any reason and at any time during the Term of the Agreement with one hundred eighty (180) days written notice to Supplier. Any option to extend shall be provided for on **Schedule 2**. Upon exercise and approval of such option to extend this Agreement, the term of the Lease in place at the Location shall also be extended concurrently herewith. This Agreement is expressly contingent upon the termination of any existing fuel supply agreements in place at the Location.

**2. SUPPLY OF PRODUCTS.**

(a) Supplier agrees to sell to Dealer, and Dealer agrees to buy and diligently to promote the sale of all grades and such quantities of Supplier's petroleum and other products as may be necessary to meet the Dealer demand for motor fuel products at the Location, and Dealer must offer all grades of fuel available from Supplier for sale at all times. Supplier shall have the right to provide ethanol additives, when available, in the gasoline, at the discretion of Supplier. Any incentives or rebates provided by Supplier's supplier relating to the sale of ethanol shall remain the property of Supplier. All fuel deliveries shall be made in full truckload quantities or in such other minimum quantities per delivery as specified by Supplier from time to time. If Dealer requests delivery of less than Supplier's established minimum volumes, compensatory delivery charges may be imposed. In no circumstances is Supplier obligated to make deliveries into a tank which is, or is suspected of leaking. Under this Agreement, Supplier is obligated to supply products to only the Location specified herein.

(b) Dealer covenants and agrees to purchase from Supplier and offer for sale, at the Location, only such gasoline, diesel fuel, other petroleum products or any additional motor vehicle fuel and/or energy-related products as are supplied and delivered by Supplier, including but not limited to those set forth on **Schedule 3** for the full duration of the stated term of this Agreement.

(c) It is the intention of the parties that the supply and purchase obligations contained herein shall remain in full force and effect throughout the term of this Agreement and shall not be suspended during any period of remodeling, renovation, repair, or rebuilding of the improvements located at the Location. Provided further, in the event Dealer's completion of the construction, remodeling and rebranding of the Location is not completed prior to the commencement of the term of this Agreement, due to conditions beyond the control of Dealer, Dealer's obligation to purchase petroleum products hereunder shall commence upon the completion of such construction remodeling and rebranding.

(d) Supplier has the sole and exclusive right to designate the hauler for delivery of products to the Location and hereby reserves the right to change the designated hauler from time to time. Dealer acknowledges and agrees further to comply with hauler's protocol for ordering of products and to allow a minimum of forty-eight (48) hour notice to receive delivery thereof. Dealer acknowledges that haulers' business is dependent on many external factors and that there may be delays in deliveries without any consequences to Supplier. Dealer shall grant full access to hauler's vehicles to make deliveries at any hour of the day. Communications between hauler and Dealer are the sole and exclusive responsibility of the Dealer. Any mistakes in ordering due to miscommunications between the hauler and Dealer are to be resolved between the hauler and Dealer. Any product outage(s) due to Dealer's failure to: (1) timely order sufficient volumes of product; (2) comply with hauler's protocol for ordering of products; or (3) grant full access to hauler's vehicles to make deliveries, or (4) provide forty-eight (48) hour notice to hauler for delivery of product shall constitute an event of default. Dealer acknowledges and agrees that Supplier shall not be liable for any misconduct of any designated hauler and that Dealer is responsible, at all times, for any discrepancies or variances in the amount of fuel delivered or maintained at the Location.

2

Store #965   COMMISSION

**3. OPERATION OF STATION.** Dealer recognizes that the brand utilized by Supplier is associated with high quality service and products and agrees to conduct business at the Location in a manner to maintain that association. Accordingly, Dealer agrees to furnish such service and accommodations to retail motor fuel Dealers as are customarily provided by convenience store/filling stations.

Dealer agrees to keep the business operated at the Location open for business during no less than the hours hereinafter set forth. Such business shall be open 365 days per year, (366 days during any leap year) opening no later than 6:00am EST and closing no earlier than 11:00pm EST daily.

Dealer agrees to provide, at its sole cost and expense:

(a) broadband service to the Location in a manner acceptable to Supplier; and

(b) promptly upon execution of this Agreement, a real property survey of the Location in a form that is acceptable for the purposes of filing any any all approvals, licenses and permits reasonably required to operate the Location for its intended purpose under this Agreement. In the event that Dealer does not provide a survey, Supplier may charge Dealer for the cost of a new survey.

**4. EXCLUSION OF OTHER SUPPLIERS.** Dealer covenants and agrees to offer for sale, at the Location, only the motor fuels as are provided to the Location supplied by Supplier under this Agreement. Dealer shall not sell any other supplier's motor fuels without the express written permission of Supplier. Dealer affirmatively represents unto Supplier that Dealer is not bound by the terms of any other motor fuels supply agreement relative to the Location and that Supplier has not induced, directed nor assisted Dealer in breaching the terms of any agreement with another motor fuel supplier.

**5. PRICE OF PRODUCTS TO DEALER AND RETAIL PRICING.** A. Prices for all products purchased by Dealer from Supplier shall be Supplier's rack price from its supplier at its supplier's terminal, plus call and demand freight rates, plus One Cent ($0.01) per gallon, plus any applicable Superfund tax per gallon, plus the UST fee per gallon, plus any other applicable taxes, charges, duties and fees levied on any of the products of Supplier, or required to be collected by Supplier upon the sale, transportation or delivery of the products ("Supplier's Cost").

B. The retail pricing of motor fuels at the Location, shall be set by Supplier based upon market conditions and such other factors as may be deemed appropriate by Supplier, and in the exercise of Supplier's sole discretion. Supplier shall notify Dealer, by telephone, fax transmission, e-mail transmission, electronic transmission, or other expeditious means of any price changes to be made for the retail pricing of motor fuels at the Location. Dealer shall cause the pricing changes to be made within one hour of such notification.

In the event Dealer fails to cause the change of retail pricing, as required, Dealer shall pay to Supplier the sum of $100.00 per hour for each hour or fraction thereof, subsequent to the first hour from the time of notice, until such pricing change is made at the Location. Such payment(s) shall be in the nature of damages sustained by

3

Store #965   COMMISSION

Supplier as a result of Dealer's failure to comply with its obligation to change retail pricing as directed by Supplier.

In the event Dealer fails to change retail pricing within one hour after such notice, on three separate occasions, Supplier shall have the right, but not the obligation, to immediately terminate this Agreement and to avail itself of all remedies provided for Supplier hereunder in the event of termination of this Agreement. Except for commissions as hereinafter stated, the gross retail receipts from the sale of motor fuels at the location shall be the property of Supplier.

**6. COMMISSION AND TERMS OF PAYMENT.** Dealer shall be entitled to a commission equal to Seven Cents ($.07) upon each gallon of motor fuel sold, including unleaded regular gasoline, unleaded plus gasoline, super unleaded gasoline, diesel fuel, and kerosene.

In the event Supplier sets the retail price of motor fuels below cost, Dealer shall remain responsible for one-half of the credit charges and fees but shall not otherwise be responsible for any portion of any loss incurred by Supplier as the result of such pricing, except as otherwise provided for herein.

Dealer shall record and maintain accurate sales and inventory records for the sale of motor fuels at each pump upon a daily basis. Supplier shall provide Dealer with appropriate banking inforamation and other documentation for Supplier to either draft or deposit funds as may be necessary. In the event any draft or electronic fund transfer is returned or dishonored by reason of insufficient funds or otherwise, Dealer shall be in default hereunder and in order to cure such default, as may otherwise be provided for in this Agreement, Dealer shall additionally pay unto Supplier an administrative charge of $200.00 for each such dishonored instrument or transfer. In the event of a bounced ACH draft, Tenant shall either (a) provide documented proof of funds in the ACH draft account on file in order to clear a redraft; or (b) wire the funds directly to Landlord.

Dealer expressly acknowledges that failure to provide necessary funds as required herein may constitute theft by conversion of Supplier's funds for which Dealer may be subject to criminal prosecution. Dealer shall retain sales and inventory records for all motor fuels for a minimum of five (5) years and shall make such records available to Supplier, for inspection and copying during normal business hours, and allow Supplier, at any reasonable time, to take physical inventory of the bulk motor fuel products. In no event shall Dealer destroy any such inventory or sales records without first making them available to Supplier.

Dealer shall, prior to 10:00 a.m. EST each day, transmit by fax transmission, e-mail transmission, electronic transmission, or other expeditious means, a daily report of the sales of motor fuels during the prior business day. Such transmission shall be upon the format provided by Supplier. Additionally, Dealer shall, by 12:00 Noon EST each day, transmit to Supplier, by fax transmission, e-mail transmission, electronic transmission, or other expeditious means, a copy of all deposit slips validated by the depository bank, for the prior day's motor fuel sales. Supplier reserves the right to designate an alternative data transmission mode for compliance herewith.

4

In the event Dealer fails to transmit daily sales reports and/or copies of deposit slips in a timely manner, as aforesaid, Dealer shall pay unto Supplier the sum of $100.00 for the first such failure; $300.00 for the second such failure and $500.00 for each and every such subsequent failure , in which such transmissions are late. Further, in the event Dealer fails to timely transmit sales reports and/or copies of deposit slips, as aforesaid, on three occasions, Supplier shall have the right to immediately terminate this Agreement and avail itself of all of Supplier's remedies upon termination as provided for herein.

**Dealer expressly acknowledges that converting Supplier's fuel into retained cash by failing to make daily deposits as required herein is considered by Supplier as constituting theft by conversion of Supplier's funds for which Supplier shall seek criminal prosecution against Dealer to fullest extent allowed by law.**

**Dealer(s)' initials:** _____ _____

Supplier shall be responsible for the payment of all sales tax due to any appropriate taxing jurisdiction upon and for the sale of motor fuels under the terms of this Agreement. It is expressly acknowledged between the parties that Supplier shall be entitled to retain any and all rebates or other purchase incentives paid or provided by its supplier in regard to motor fuels delivered to and sold at the Location. Dealer shall also be responsible for all discrepancies, variances, and shortages of fuel at the Location.

**7. CREDIT CARD NETWORK AND SALES.** Dealer shall use and be responsible for all costs associated with such use, including but not limited to, connection, processing, and equipment fees during the term of this Agreement, and only the credit card network provided by and/or associated with Supplier's supplier or such other credit card network as directed by Supplier, which shall be maintained and upgraded by Dealer at its cost.

(a) No secondary or supplemental or other credit card network or credit card machines shall be used for the processing of any sales, whether for fuel, inventory, merchandise or otherwise. In the event that Dealer uses a separate EBT machine, Dealer shall be required to use a network or machine supplied by an state agency approved vendor. In the event of the unauthorized use of a credit card network or machine for processing sales at the Location, by Dealer or any of its Dealers or employees or contractors, Dealer shall be in default in its obligations under this Agreement. In the event of any such default, the cure for the unauthorized activity (in addition the discontinuance of such unauthorized activity), Dealer shall pay unto Supplier a five hundred dollar ($500.00) cure fee for the first such default; and a one thousand dollar ($1,000.00) cure fee for any subsequent default during the Term hereof. In the event of default by Dealer under any other terms of this Agreement, Supplier shall also be entitled to immediately disable said credit card network at the Location.

(b) Invoices from credit card sales shall be credited and paid to Supplier in regard to approved credit card purchases from Dealer. Supplier shall credit Dealer's account for products purchased hereunder, for the amount of credit card sales credited and paid to Supplier in accordance with fuel jobber (wholesaler) industry standards; provided, however that credit cards sales shall not be immediately repaid to Dealer but held on Dealer's account as additional credit against fuel purchases. Upon any failure by Dealer to strictly comply with the terms and

5

conditions of credit card transactions at the Location, Supplier shall have the right to charge-back to the Dealer all sums not credited to or paid to Supplier as a result of defective or noncomplying credit card sales at the Location. Any "charge-backs" shall be immediately paid by Dealer to Supplier. Dealer shall be responsible for all point of sale programming, updates and installation and maintenance costs for EMV requirements from governmental agencies or oil companies.

**8. USE OF TECHNOLOGY FOR PRICING SURVEY, INVENTORY MEASUREMENT, AND REPORTING OF SALES.** Dealer shall have the option to use electronic software reporting systems for conducting market surveys of posted motor vehicle fuel prices, electronic measurement and reporting of motor vehicle fuel inventory levels, and recording and reporting of motor vehicle fuel sales as may be offered and/or provided by Supplier; current systems including but not limited to Black Box, Opis, and Price Advantage technology ("Reporting Systems"). Supplier may offer and/or provide new Reporting Systems as new technology emerges. In the event Dealer elects to use such Reporting Systems, Dealer shall be responsible for all applicable monthly charges and fees for the use of such Reporting Systems, with such monthly charges and expenses to be paid via electronic fund transfers (EFT / ACH) from Dealer's account, and Dealer agrees, further, to defend, indemnify and hold the Supplier, its subsidiaries, divisions, affiliates, Dealers and employees harmless from any and all claims, injuries, damages, losses or suits including attorney fees, arising out of or in connection with the use of such Reporting Systems.

**9. DEALER'S BUSINESS.** It is mutually agreed that the business conducted by Dealer at the Location is the independent business of Dealer, and this Agreement shall not be construed as reserving to or conferring upon Supplier any right to direct or control Dealer or any of Dealer's employees in the conduct of Dealer's business. Dealer acknowledges that Supplier has made no representation of profitability in regard to any business to be operated by Dealer at the Location and Dealer has not relied upon any business information provided by Supplier in regard thereto; and Dealer enters into this Agreement based upon the exercise of Dealer's own business judgment after having full opportunity to exercise due diligence on Dealer's own behalf. Dealer acknowledges its sole resposibility for: (1) pricing of all the products, including updating the retail price of motor vehicle fuels, sold at the Location; and (2) the operation of its business in accordance with all applicable laws, regulations and standards. Dealer agrees, further, to defend, indemnify and hold the Supplier, its subsidiaries, divisions, affiliates, Dealers and employees harmless from any and all claims, injuries, damages, losses or suits including attorney fees, arising out of or in connection with the Dealer's business.

Dealer affirmatively represents and warrants unto Supplier that Dealer is not under contract with another fuel supplier and is authorized to enter into this Agreement with Supplier, and that Supplier has not induced Dealer to breach, nor has Supplier interfered with, any other existing contract between Dealer and any other product supplier. In the event Dealer is a corporation or limited liability company, Dealer represents that it is a corporation or limited liability company in good standing duly authorized to do business in the State where the location is situated, and that the undersigned party executing this Agreement on behalf of Dealer has full and

Store #965    COMMISSION

complete authority to bind the corporation or limited liability company hereto. Further, it is expressly agreed that the corporate officer or limited liability company manager and/or member executing this Agreement on behalf of a corporation or limited liability company shall be, in his or her individual capacity, jointly and severally liable and responsible, with such corporation or limited liability company, for the satisfaction of all obligations of Dealer under the terms of this Agreement.

**10. UNDERGROUND STORAGE TANKS AND MAINTENANCE**.  Dealer is in exclusive possession and control of the underground storage tanks, lines, and associated underground equipment at the Location, and shall be responsible for all maintenance and repairs and all environmental issues or matters arising out of the use, maintenance or repair of such tanks, lines, pumps, dispensers and fuel equipment (including EMV upgrades), except as to any maintenance, repair or environmental costs or damage directly caused or arising from any intentional or negligent act or omission of Supplier, or except as to any repairs that are expressly made the responsibility of Supplier as Landlord under the terms of a Agreement of the Location to Dealer as Tenant, if applicable. Dealer shall, throughout the term hereof, provide daily tank stick readings to Supplier's transport company (hauler) in such manner as directed by Supplier. In addition, Dealer shall provide daily stick readings to Supplier with water detecting putty and take accurate and prompt measures at Dealer's cost to cure and remove any water or other contaminants from the tanks, lines and fuel equipment.  Dealer warrants that throughout the entire Term of this Agreement, Dealer's location shall be in full and complete compliance with all local, State and Federal environmental regulations and statutes pertaining to the storage, handling, and dispersing of petroleum products and motor fuels. Further,  Dealer shall comply with all directions, instructions, or recommendations made by any environmental consultant retained by Supplier for the purposes of managing environmental and inventory control at the Location.  Dealer shall pay such premiums as may be necessary to have the storage tanks and pumping equipment covered under private underground storage tank insurance, at its election, all of which shall be paid by Dealer.

Upon the breach of this warranty, and in addition to any other remedies Supplier may have by law, Supplier shall have the right to immediately cease delivery of products to Dealer and terminate this Agreement. Without limiting the foregoing, Dealer shall, at its expense, cause the cleaning of the underground motor fuel storage tanks prior to Supplier's installation of any new, refurbished, or upgraded motor fuel pumping equipment or before the first delivery of motor fuels to the Location by Supplier, whichever occurs first; and shall cause the cleaning of the underground storage tanks periodically during the Term of this Agreement, as may be reasonably required by Supplier.  Dealer shall pay one-half the cost of any software, hardware and service costs including annual and monthly maintenance fees associated with automated tank, pump, sign and/or register readings. Dealer specifically acknowledges that Supplier has no obligation with regard to underground tanks or submersible pumps or any other fueling equipment located in the tanks.

7

In the event it is determined, during the term of this Agreement, that the Location is environmentally contaminated as a result of a leak, spill, or other discharge of hazardous substances which constitutes a violation of local, state or federal law, rule, regulation or ordinance, Supplier shall have the right to suspend delivery of products to the Location until such contamination is remediated as required by law during which time Dealer shall remain liable unto Supplier for any shortfall payments due hereunder by virtue of Dealer's failure or inability to purchase the minimum number of gallons of petroleum products required under the terms of this Agreement, notwithstanding such suspension. In the alternative, in the event of such contamination, Supplier shall have the right to terminate this Agreement in which case Dealer shall reimburse Supplier for all branding investment costs incurred by Supplier for branding of the Location and shall reimburse Supplier for all purchase incentive rebates received by Dealer under the terms of this Agreement.

**11. INSTALLATION OF PETROLEUM PRODUCT DISPENSING AND OTHER EQUIPMENT**. Supplier shall cause, at its expense, the installation of petroleum product dispensing equipment and or accessories and/or fixtures at the Location as may be set forth on **Schedule 4** attached hereto and made part hereof. Dealer acknowledges that Supplier shall have the right to engage any qualified vendor for the purpose of acquisition and installation of the same or similar equipment described therein. The total cost to Supplier for the acquisition and installation of such equipment, accessories and fixtures shall be considered part of Supplier's branding investment under the terms of this Agreement. At all times relevant hereto, the Supplier shall be the sole and exclusive owner of such equipment listed on Schedule 4, with the full right and authorization of Dealer to remove same upon a default under Section 19 hereof which remains uncured for more than thirty (30) days of written notice of default hereunder. Dealer hereby grants to Supplier a power of attorney coupled with an interest, for the purpose of removing the said equipment from the location upon an uncured default and Supplier shall have no liability whatsoever for removal of the equipment after notice and cure period.

**12. REPAIR OR EQUIPMENT OBLIGATIONS OF DEALER**. Dealer shall cause the repairs and/or maintenance upgrades at the Location, and install such equipment as may be specified in **Schedule 5** attached hereto and made part hereof at the commencement of this Agreement. Dealer shall commence such work promptly and pursue the same diligently through completion as set for in said schedule and as a prerequisite to Supplier's performance and obligations under section 2 of this Agreement.

**13. LEASED EQUIPMENT**. Dealer acknowledges that any equipment, accessories or fixtures provided by Supplier under the terms of this Agreement may have been leased to Supplier by one or more leasing companies. In the event of a transfer or assignment of this Agreement, Supplier will continue to make any such equipment Agreement payments through the full term of any such Agreement(s). Notwithstanding the foregoing in this Section 13., for purposes of this Agreement Supplier shall be deemed to be the owner of any such equipment, accessories or fixtures, and shall have the right to enter upon and in the premises and remove same in the event of a default by Dealer under Section 19 herein. For purposes of the preceding sentence Dealer hereby grants Supplier a power of attorney coupled with an interest to take all actions necessary and

8

desired on in the name of Dealer to remove the said personal property from the premises including obtaining permits and granting rights to others reasonably required to carry out the removal.

## 14. BRANDING, TRADEMARKS, AND QUALITY ASSURANCE.

(a) *MOTOR FUEL BRAND &TRADEMARKS.* Supplier shall have the right to designate the branding of the motor fuels to be purchased by Dealer hereunder. The initial branding, if any, shall be as designated on **Schedule 6** attached hereto and made part hereof. Supplier shall incur such costs as may be reasonably necessary for changing and or installation of the branding image of the Location (said sum hereinafter being referred to as Supplier's Branding Investment), in order to obtain the approval of Supplier's chosen branded fuel supplier. Dealer shall be responsible for payment of any and all further sums necessary for signage or other branding image items in order to maintain such approval during the term of this Agreement. In the event Supplier changes branding during the term of this Agreement, all costs of maintaining the subsequent banding image(s), after Supplier's initial costs in rebranding the Location, shall be borne by Dealer. All signage shall be contingent upon and subject to the requirements of any applicable state or local law or ordinance.

(b) *QUALITY ASSURANCE AND MARKETING.* Dealer acknowledges that Supplier's supplier maintains a program for product quality and marketing assurances. Specifically, Dealer shall:

(i) Comply with all quality and marketing programs, which shall include but not be limited to, oil company uniforms, employee name tags, clean and available restrooms, proper maintenance of landscaping, buildings (interior and exterior), canopy and equipment, proper presentation and display of retail merchandise, maintenance and location of signs and other branding image items and other such matters pertaining to the brand image of the Location, and shall cooperate at all reasonable times and in all reasonable manners with all quality assurance programs and inspections;

(ii) Refrain from the sale, use, storage, rent, display, or offering at the Location of:

(a) pornographic or sexually explicit magazines, video tapes, compact discs, digital video discs, similar literature or items of merchandise;

(b) any item, in Supplier's judgment, that is intended or designed for use in ingesting, inhaling or otherwise consuming an illegal drug or from manufacturing or processing an illegal drug, including but not limited to pipes, tubes, roach clips, instructions or descriptive materials, or containers designed for concealing illegal drugs or paraphernalia, or bath salts or synthetic drugs designed to mimic the effects of illegal drugs; and

(c) any substance or item prohibited to be offered for sale by the branding and/or quality assurance standards of the motor fuel supplier providing motor fuel for sale or resale at the Location; and

9

(ii) Dealer shall properly display all point of purchase marketing materials and credit card applications, and, at its sole cost and expense participate in any marketing or loyalty programs established by the brand of motor fuels sold at the Location, install all marketing materials, such as point of purchase (POP) signage, credit card applications and related materials and attend any training or informational programs offered.

It is acknowledged between the parties that Supplier and/or Supplier's supplier may conduct periodic "mystery shopper" or other inspections of the Location and the operation of the business thereon in order to determine whether Dealer is meeting the image, retail and Dealer service standards required under the terms of this Agreement. In the event Dealer scores below 80% of a perfect score, or otherwise fails inspection as determined by Supplier or Supplier's supplier making the inspection and in accordance with the quality assurance standards, Dealer shall pay unto Supplier an inspection fee of $500.00 or such amount charged by Supplier's supplier as an inspection fee, whichever is greater, due and payable within three days of Dealer receiving notice of such failure and a copy of the inspection report. The foregoing inspection fee shall apply to each and any failure of such inspections; provided further, Supplier shall have the right, in its discretion, to waive the requirement for payment of an inspection fee based upon its determination of Dealer's exercise of good faith in promptly correcting all quality assurance deficiencies. Dealer shall also be subject to certain fines as provided for on the attached Fine Schedule as provided for on **Schedule 7** herein attached an incorporated for violations which may not result in a failing score. In the event Dealer fails a mystery shopper inspection or other inspection at the Location, Supplier reserves the right to implement a monthly maintenance program at the Location and choose a vendor to cure at its sole and absolute discretion. The cost of said maintenance program shall be the responsibility of the Dealer, which shall be no more than the customary cost of said services in the local area of the Location.

In the event Dealer's branded retail facility does not meet such standards or requirements and which results in Supplier's receiving notice to debrand Dealer, or if such retail facility is abandoned, Dealer shall allow Supplier or Supplier's representatives or  Dealers to immediately remove all brand identification from the Location, and Dealer shall be liable to Supplier for all expenses and damages incurred as a result thereof. For the purposes of this Agreement, the Location shall be deemed abandoned if it is not open for business during normal business hours for three consecutive days. Dealer expressly agrees that all of Supplier's (or Supplier's suppliers') trademarks, names and colors appearing at the Location shall be kept clear and legible, and that Dealer will use only signs approved by Supplier to advertise products purchased by Dealer from Supplier. Supplier shall be entitled to withdraw or substitute at Supplier's cost the use of any particular trademark, name, or colors.

Provided further, in the event Supplier determines, in its sole discretion, that Dealer is not in compliance with any marketing or quality assurance retailing standard in regards to the physical condition of the Location and the operation of the business thereon, Supplier shall have the right (but not the obligation) to enter upon the Location and to correct any deficiency or substandard condition and bill Dealer for the cost thereof. Dealer

10

shall reimburse Supplier for any and all of such costs within seven days of receipt of such bill. Such reimbursement payment(s) shall be made by electronic fund transfer in the same manner as payment for products purchased from Supplier. Further, without limiting the foregoing, Dealer shall comply with the image and identification standards established, from time to time, for "branded outlets" by Supplier's branded supplier.

**15. RESERVED.**

**16. SECURITY DEPOSIT.** Dealer shall pay unto Supplier a security deposit upon the execution of this Agreement in an amount and in the manner as specified on **Schedule 8** hereto attached an made part hereof. During the term of this Agreement, Supplier shall have the right to apply all or part of said deposit to any sums owed by Dealer to Supplier under the terms hereof. In such event, Supplier shall notify Dealer of such application and Dealer shall pay over to Supplier such amounts as may be necessary to restore the full amount of the security deposit. Supplier's application of all or any portion of the security deposit shall not relieve Dealer from its obligations to make any payments due to Supplier nor prejudice Supplier's rights to exercise any remedy provided for herein, or at law, in consequence of Dealer's default under the terms of this Agreement. Further, Dealer hereby grants Supplier a security interest in all of Dealer's business equipment, supplies, inventory and fixtures at the Location, in which Supplier shall have all the rights of a secured party under the terms of the Uniform Commercial Code, and which interest may be evidenced and/or perfected by the filing of a UCC-1 Financing and Fixture Filing Statement(s).

**17. ASSIGNMENT-SUBLETTING-SALE.** Dealer shall not, without the prior written consent of Supplier endorsed hereon, assign this Agreement or any interest hereunder, or any part hereof, or permit the operation of the Location by any party other than Dealer. Supplier's consent shall not be unreasonably withheld, however, in making such a determination, Supplier may rely upon the financial and creditworthiness and criminal background, if any, of any proposed assignee in making a determination as to whether or not the withholding of such consent is reasonable. Dealer must provide Supplier with thirty (30) days prior written notice of a proposed consent together with all information for the proposed assignee. If approved, Dealer shall remit funds in the amount of $2,000.00 for legal and administrative fees. Consent to the assignment shall not destroy this provision, and all later assignments shall be made likewise only on the prior written consent of Supplier. An assignee of Dealer, at option of Supplier, shall become directly liable to Supplier for all obligations of Dealer hereunder, but no assignment by Dealer shall relieve Dealer of any liability hereunder, and Dealer shall remain jointly and severally liable with assignee for the satisfaction and performance of all Dealer's obligations under the terms of this Agreement. Dealer shall have the right, without prior written consent of Supplier, to form a corporation or limited liability company organized under the laws of the state of the Location,  and wholly owned by Dealer, and may assign or tranfer this Agreement to such company with notice provided to Supplier however, any such assignment or transfer shall not relieve Dealer of joint and several liability for all of Dealer's obligations hereunder, the performance of which shall be personally guaranteed by Dealer.  This Agreement is

11

freely assignable by Supplier and in the event Supplier elects to sell, assign or convey rights, titles and interest in this Agreement, Dealer shall provide a fuel estoppel agreement, in acceptable form to Supplier, confirming the terms of this Agreement at Supplier's request and without delay.

**18. OPTION TO CONVERT BUSINESS RELATIONSHIP BETWEEN THE PARTIES.**  None.

**19. DEFAULT, TERMINATION AND LIQUIDATED DAMAGES.**   All terms, conditions, covenants, warranties, and agreements contained in this Agreement are essential and material to the continued relationship between the parties. It is mutually agreed that in the event Dealer (i) becomes insolvent, (ii) is generally unable to pay, or fails to pay, its debts as they become due, (iii) files, or has filed against it, a petition for voluntary or involuntary bankruptcy or pursuant to any other insolvency law, (iv) makes or seeks to make a general assignment for the benefit of its creditors, or (v) applies for, or consents to, the appointment of a trustee, receiver, or custodian for a substantial part of its property or business; or (vi) if Dealer violates or is in default of any other agreements between Supplier and Dealer, Dealer shall be considered in default of the Agreement. In addition to the aforementioned, the following shall constitute events of breach or default:

(a) failure to remit to Supplier any monies owed by Dealer to Supplier in accordance with the provisions of this Agreement;

(b) violation of any federal, state, county or any municipal law, ordinance, rule, or regulation relating to Dealer's operation of the business conducted pursuant to or in connection with this Agreement;

(c) false or misleading statements made by Dealer to Supplier, including financial statements made or provided by Dealer in order to enter into this Agreement;

(d) failure of a mystery shopper inspection or other inspection at the Location and denying Supplier's implementation of a monthly maintenance program at the Location by a vendor to be selected by Supplier in its sole and absolute discretion;

(e) the institution of any insolvency, bankruptcy, or a receivership proceeding in or against Dealer;

(f) failure of Dealer to pay taxes or license fees as required by the terms of this Agreement or by any law or regulation or arising out of Dealer's employment of any person;

(g) abandonment or cessation of operation of the business of Dealer;

(h) severe physical or mental disability of Dealer;

(i) Willful adulteration, mislabeling or misbranding of motor fuel or other violation by Dealer of trade mark requirements for products sold by Dealer as set forth under this Agreement;

(j) violation of any term or condition of the Agreement, any cash advance agreement or any other agreements between the parties related to the Location; or

12

Store #965    COMMISSION

(k) any act or omission allowing for termination, non-renewal or debranding of the Location or as provided under the Petroleum Marketing Practices Act 15 U.S.C. Sec. 2801 et seq.

Subject to all rights under the Petroleum Marketing Practices Act, Supplier shall provide Dealer written notice of the occurrence of any event or breach which is cause for termination of this Agreement hereunder. Dealer shall have 15 days from the date of such notice in which to cure such breach or correct any condition or otherwise comply with the terms of this Agreement and in lieu of which this Agreement shall automatically be terminated at the expiration of such 15 day period. In the event Dealer receives written notice from Supplier of any events of default hereunder, Dealer specifically acknowledges and agrees that Supplier, through its Dealers, shall have the right to inspect Dealer's facility at the Location for purposes of determining compliance with this Agreement. In the event such event is not cured within 15 days of notice thereof, Supplier shall be entitled to make any corrections and/or repairs necessary at the Dealer's expense. Notwithstanding the foregoing, in the event Dealer fails to remit Supplier any monies owed to Supplier under the terms hereunder, Supplier shall have the right to immediately suspend motor fuel delivery until and unless such breach is cured. In the event such a breach is not cured within five 5 days from the date of written notice to Dealer, then in such event Supplier shall have the right to then immediately terminate this Agreement.

The parties hereto agree and stipulate that in the event of default by Dealer and early termination of this Agreement, Supplier's actual damages cannot be calculated with any degree of certainty as Supplier is relying upon Dealer's continuing purchase of petroleum products throughout the term of this Agreement. Accordingly, Dealer and Supplier specifically acknowledge and agree that such damages upon Dealer's breach would be virtually impossible to determine, and that the formula provided in this paragraph provides a reasonable pre-estimate of Supplier's probable loss that will be suffered by Supplier. Therefore, the parties agree that, in addition to any other amounts owed to Supplier hereunder, Dealer shall pay to Supplier as liquidated damages and not as a penalty a sum equal to Five Cents ($0.05) times the minimum number of gallons required to be purchased monthly as contained herein times the number of months remaining in the Term of this Agreement from the date of default. The parties further agree that the above formula is reasonable because the amount of such liquidated damages are decreased by each month that Dealer performs its obligations under this Agreement. Moreover, the parties stipulate and agree that their intent in using the above damages formula is to provide a readily calculable pre-estimate of Supplier's probable loss upon breach and that it not be construed as a penalty of any kind or sort.

It is further agreed that in the event of default by Dealer under any of the terms of this Agreement and that in addition to the aforesaid liquidated damages, Supplier shall be entitled to recoup from Dealer the unamortized portion of its investment in the Location that is more particularly described in **Schedule 4** hereto. The investment described in **Schedule 4** shall be amortized on a "straight line" basis over the term of this Agreement; if Dealer defaults and this Agreement is terminated before the end of the term, Supplier shall be entitled to immediate payment of the amount of the investment that has not been amortized on the date of

13

default. Dealer acknowledges that recoupment by Supplier of the unamortized investment is a reasonable pre-estimate of Supplier's damages with respect to the investment, and that Supplier has the reasonable expectation that Dealer shall perform its obligations hereunder for the full term. In lieu of Supplier's right to recoupment of its investment in the Location, Supplier may also immediately remove from, or disable at, the Location and retain full ownership of the petroleum product dispensing equipment, cash register, point of sale and other branding image items installed pursuant to **Schedule 4** attached hereto. Upon any default Supplier shall also be authorized and permitted to immediately remove all motor fuel products in the underground storage tanks at the Location, pursuant to Section 6 of this Agreement. Termination of this Agreement shall not affect or abridge the rights and obligations of the parties occurring prior to termination, and Supplier may pursue any available legal remedies relating thereto whether or not it exercises its right to declare this Agreement terminated. In addition to the foregoing, in the event of termination, Dealer shall pay to Supplier the cost of "debranding" the Location. "Debranding" is hereby defined as the removal of all brand signage, brand color scheme, repayment of any unamortized oil company branding costs and rebates at the Location.

**20. ATTORNEY'S FEES, COSTS, INTEREST.**   In the event it becomes necessary for Supplier to employ the services of its attorney to enforce any aspect of this Agreement, whether Dealer is in default of this Agreement or this Agreement is amended, assigned, or modified, Supplier shall be entitled to charge and collect administrative costs and legal fees in an amount not less than $2,000.00. In the event that either party files litigation regarding this Agreement, the losing party agrees to pay the prevailing party fifteen percent (15%) of the amount of damages for attorney's fees and costs of litigation.

**21. MISCELLANEOUS.**

(a) *DELIVERIES DELAYED OR PREVENTED*. Supplier will fill all orders with reasonable promptness, but shall not be liable for loss or damage due to delays or failure, in whole or in part, to fill orders resulting from acts of public enemies, regulations, or orders of civil or military authorities, fires, floods, strikes, labor disputes, accidents, shortage of labor, of crude oil, or refined products or refinery capacity, or materials or of transportation, or any other cause beyond Supplier's reasonable control, either at its own plants or those of its sources of supply, or in connection with the delivery of its products. If Supplier is prevented by any of the foregoing causes from supplying the full quantities of any one or more of its products hereunder, Supplier shall have the right without liability to Dealer to allocate the quantity deliverable hereunder to Dealer, to its other Dealers under contracts calling for delivery of like products, and to its own requirements in such manner as it may deem reasonable, or according to any required allocation program, and Dealer shall be bound by such allocation. If Supplier is unable to deliver products for more than seventy-two (72) hours, Dealer shall have the right to purchase products from other suppliers until such time as Supplier can recommence delivery.

i. Supplier reserves the right to give preference in allocation to a dealer or group of dealers for any reason in its sole discretion, including those dealers whose needs are related to providing fuel to customers whose

14

responsibilties relate to the: (a) protection of life or health, (b) production and transportation of food and energy, (c) mass transportation, and (iv) national defense.

ii. Supplier's allocation plans may be put into effect on any geograph basis (including treating one geographic area differently from another) as Supplier may determine, without regard for the specific inventory at the place or places from which the supplied products are normally produced, shipped, or delivered.

(b) *INSURANCE*. Dealer shall continuously maintain general liability insurance and liquor liability insurance with such coverage as may be approved by Suppier and naming Supplier as an additional insured; and Dealer shall maintain workers' compensation insurance as required to be in full compliance with the State's Workers Compensation Act and obtain Workers Compensation Insurance. Dealer shall furnish Landlord certificates establishing that the insurance requirements contained herein are met and maintained, from time to time, and upon request by Supplier. Additionally, Dealer shall reimburse Supplier, by EFT on a monthly basis, for any all insurance premiums incurred by Supplier, during the term of this Agreement, for fire, casualty, hazard and liability insurance maintained by Supplier covering any equipment, accessories, fixtures and/or branding image items owned or Agreementd by Supplier and installed at the Location. In the event that Dealer fails to provide a certificate of insurance after written notice from Supplier, Supplier may obtain such insurance and charge Dealer the actual cost of the insurance plus an administrative fee.

(c) *CONTINGENCIES*. This Agreement and the rights and obligations of the parties hereunder is expressly contingent upon the approval of the Location, receipt of a survey of the Location supplied by Dealer, the branding image and specifications therefor, and Dealer's credit history by Supplier's supplier. Further, in the event Supplier is obligated to cause the installation or upgrade of any motor fuel dispensing equipment or accessories at the Location, this Agreement is expressly contingent upon Supplier obtaining financing, by Agreement or otherwise, for such obligations upon terms and conditions acceptable to Supplier; and contingent upon Dealer's third party landlord (and the prime landlord at the Location, if applicable), if any, executing a Landlord's Acknowledgment and Equipment Waiver in such form satisfactory to Supplier and under which such landlord (and prime landlord) waives any right or claim, during the term of this Agreement, to the equipment, accessories, fixtures and branding image items installed and owned by Supplier, and acknowledges Supplier's exclusive right to supply motor fuel to the Location for the full term hereof. Upon any breach or default under Section 19 hereof, Supplier shall have the right to injunctive relief in the form of a restraining order against Dealer and/or Landlord preventing any other fuel supplier from supplying fuel at the location for the term of this Agreement.Dealer shall exercise good faith and make diligent efforts and cooperate with Supplier in obtaining the execution of such Landlord Acknowledgment and Waiver, in failure of which Supplier may terminate this Agreement.

(d) *SEVERABILITY*. (i) If any one or more of the provisions of this Agreement are determined, by a court of competent jurisdiction, to be invalid or unenforceable, the remaining provisions hereof shall continue to be of full force and effect provided that the invalidity of any provisions hereof does not result in a lack of mutuality

15

or a failure of consideration in regards to the benefits and obligations set forth herein. (ii) If, subsequent to the date of this Agreement, valid state or federal laws or regulations governing the relationship between Dealer and Supplier take effect, this Agreement shall be deemed amended and shall incorporate any mandatory requirements of such laws or regulations so long as they shall be effective, unless such amendment(s) shall operate to increase Supplier's taxes, costs or expenses hereunder, in which case Supplier shall have the option to terminate this Agreement by notice to Dealer.

(e) *ENTIRETY-AGREEMENT.* This Agreement constitutes the entire agreement and understanding between Supplier and Dealer merging and superseding all prior agreements, understandings, warranties and representations, whether oral, written, express, or implied, between Supplier and Dealer. All prior agreements between Supplier and Dealer concerning the subject matter hereof, relating to the Location defined herein, are hereby terminated. Neither this Agreement nor any modification or waiver of any of the provisions hereof shall be binding upon Supplier or Dealer unless in writing, duly executed by Dealer and a duly authorized Dealer of Supplier.

(f) *ELECTRONIC TRANSMISSION AND SIGNATURE.* This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of Electronic Transmission and/or with Electronic Signatures shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

i. "Electronic Transmission" means any form of communication not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved, and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

ii. "Electronic Signature" has the meaning provided in [the Georgia Electronic Records and Signatures Act, O.C.G.A. § 10-12-1 et seq. OR Wyo. Stat. § 40-21-102(a)(viii) or OR Tex. Bus. & Com. Code § 322.002(8).]

(g) *NOTICES.* Any notice provided for herein shall be given in writing and shall be considered properly given when received if personally delivered, provided by verifiable elctronic means or, if deposited in the United States mail by certified mail, return receipt requested, postage prepaid, properly addressed by either party to the other at such party's address shown above, or at any changed address of which notice is duly given, as of the date received. Dealer has an obligation to notify supplier if they move or otherwise change the address noted above. In the event Dealer fails to notify Supplier of an address change, all mail sent by Supplier to Dealer's address shown above shall be deemed sufficient notice whether claimed or unclaimed.

16

Store #965    COMMISSION

(h) *CHOICE OF LAW.* This Agreement has been entered into in and shall be construed under the laws of the State of Georgia and the parties agree that exclusive venue and jurisdiction shall be with the Superior Court of Cherokee County, Georgia for any actions, suits or proceedings.

(i) *JOINT AND SEVERAL LIABILITY.* In the event more than one person, firm, company or entity are named as Dealer hereunder, each such named person, firm, company and entity shall be jointly and severally liable unto Supplier for the satisfaction of the obligations of Dealer hereunder; and Supplier may look to any, all or any combination of them for such satisfaction thereof.

(j) *CROSS-DEFAULTS.* Any default by Dealer under the terms of this Agreement shall likewise constitute a default of Dealer, as tenant, Dealer, or otherwise, under the terms of any and all other agreements between these same parties, including without limitation, other Agreements, motor fuel supply or commissioned sales agreements, purchase and /or sale agreement and other contracts, whether or not pertaining to the Location, or other premises or locations or to the sale or purchase for resale of motor fuels or other products. This provision shall also apply to any agreements with Supplier's affiliates and related parties, including but not limited to any Dealer defaults with any branded fuel supplier.  In the event Dealer is a tenant of a third-party landlord at the Location, and Supplier has acquired the written consent to this provision from such landlord by way of a separate document or agreement, default by Dealer hereunder shall likewise constitute a default under the terms of the Agreement between Dealer and such landlord and a default under the Agreement shall be a default under this Agreement.

(k) *CREDIT CARD FRAUD SKIMMING.*  Supplier shall have the right to immediately charge back to the Dealer any credit card "charge-backs" from the Supplier's Supplier immediately. In addition, Dealer is responsible for any credit card fraud which may occur at the Location including Skimming.  Skimming is the theft of credit card information.  This theft occurs when a third-party card-reading device is installed either outside or inside a fuel dispenser or other card-swiping terminal.  This device allows a thief to capture a Dealer's credit and debit card information, including their PIN, with each card swipe.  Dealer is responsible for any credit card or debit card information theft and the fraudulent charges that are a result of Skimming.  Dealer is required to daily check the Pumps and card swiping terminals for possible sources of Skimming.

(l) *QUALITY AND CLAIMS.* Supplier guarantees that all products delivered hereunder will be uniform in quality and according to industry standards. Any claim for deficiency in quality or quantity of any product is waived unless Dealer gives Supplier notice of such deficiency at time of delivery (or during the next period of regular business hours if night delivery) for quantity claims and within ninety-six (96) hours of discovery of the alleged deficiency for quality claims. Such notice shall fully set forth the facts on which Dealer's claim is based, and Supplier shall be given full opportunity to inspect, measure, and test the products and/or equipment involved. Dealer shall immediately notify Supplier if its equipment is leaking. Dealer's failure to comply with the above requirements shall operate as a waiver of any and all claims and remedies by Dealer against Supplier arising out of product defects, variances, or shortages.

17

Store #965    COMMISSION

**22. RIGHT OF FIRST OFFER.**   Dealer agrees to provide Supplier with written notice of the availability of the Dealer's business at the Location ("Business") for sale and offer the Business to Supplier on such terms and conditions as Dealer would offer to third parties, as determined by Dealer in its sole and absolute discretion, prior to marketing said Business to third parties. Supplier shall have sixty (60) days from the date of Dealer's Notice to respond in writing to the same. If Dealer has not received a written response by the end of said sixty (60) day period or if Supplier declines to accept Dealer's offer or makes a counteroffer which Dealer shall reject, in writing, as unacceptable in Dealer's sole and absolute discretion, Dealer shall thereafter be free to market the Business and sell the Business for not less than the counter-offer submitted by Supplier. If Dealer and Supplier agree on terms for the sale of the Business, but are subsequently unable, in good faith, to consummate an agreement with respect thereto acceptable to both Dealer and Supplier shall thereafter be free to market the Business and sell the Business on such terms and conditions as Dealer shall determine, in its sole and absolute discretion, without any further obligation to offer said Business again to Supplier.

*[signature page to follow]*

18

Store #965     COMMISSION

**IN WITNESS WHEREOF**, the parties hereto have caused this Fuel Supply Agreement to be effective  as of the Effective Date first written above.

**SUPPLIER**
**MEX FUELS NE-NY LLC**


By:_____
    Turjo Wadud, President


**DEALER**
**Prime Petro Inc.**

_____ Achla Duggal
    Achla Duggal

19

Store #965      COMMISSION

## SCHEDULE 1 - PROPERTY DESCRIPTION

434 Clinton Street, Hempstead, New York, 11550

### LEGAL DESCRIPTION

.

## SCHEDULE 2 – OPTION TO EXTEND TERM

Supplier shall have the option to extend the Term for one additional three (3) year term with at least thirty (30) days' notice to Dealer, prior to the expiration of the then existing Term.  Each extended Term shall be on the same terms and conditions as set forth in this Agreement, except as otherwise specifically stated herein.

## SCHEDULE 3 – PRODUCTS TO BE PROVIDED EXCLUSIVELY BY SUPPLIER

1. Regular, Super and Premium Gasoline;

2. Diesel;

3. E85/and other Ethanol Blends;

4. Bio Diesel;

5. Ethanol Free Fuel;

6. Boutique Fuels (Future);

7. Natural Gas Related Fuels (Future);

8. Electric Car Charging Networks (Future);

9. Lubricants and Oils (Future)

10. Hydrogen Fuels (Future); and

11. Any other fuel known or currently unknown used to power automobiles, trucks, tractors, boats, lawn mowers, etc.

22

## SCHEDULE 4 - EQUIPMENT, ACCESSORIES AND/OR FIXTURES TO BE INSTALLED BY SUPPLIER

Supplier shall provide EMV ugrades at the Location at its sole cost and expense, if required.

23

## SCHEDULE 5 - DEALER'S REPAIR/MAINTENANCE AND EQUIPMENT OBLIGATIONS

Dealer is responsible for all inside and outside maintenance at the Location.

Store #965    COMMISSION

## SCHEDULE 6 - BRANDING

The initial branding image to be installed at the Location, and the initial brand of motor fuels to be delivered to the Location for resale by Dealer shall be a brand approved by Supplier.  Supplier reserves the right to change the brand at the Location at anytime.

25

## SCHEDULE 7 – FINE SCHEDULE

No Name Tag:                          $25.00

No Uniform:                           $50.00

Illegal Drugs/Drug Paraphenalia:      $500.00

Store #965      COMMISSION

## SCHEDULE 8- ALTERNATIVE SECURITY DEPOSIT PROVISIONS

The security deposit provisions of section 16 of this Agreement are modified as follows:

Total security deposit shall be $40,000.00, to be collected at One Cent ($0.01) per gallon of fuel sold at the Location.

27

## Mountain Express Oil Co. Field Inspection Evaluation

### Exterior

| | |
|---|---|
| Main Price ID sign functional and lighted | 2 |
| Main Price ID sign unobstructed and free of non-oil company signage | 1 |
| Landscape Free of Trash | 2 |
| Landscape Grass Cut and Neat | 4 |
| Parking Lot Neat and Clean | 2 |
| Parking Lot free of weeds growth | 1 |
| Parking Lot with no potholes | 1 |
| Freshly painted curbs, poles and parking lines | 2 |
| All MPDs functioning correctly | 4 |
| All MPDs clean, free of spider webs and dirt | 1 |
| Pump Islands clean and well maintained | 1 |
| Card reader working with RECEIPT paper present | 2 |
| Credit Card Applications present | 2 |
| Current POP Present and clean | 2 |
| Nozzles and hoses clean/functional | 2 |
| All MPD displays operational | 1 |
| Trash Receptacles not overflowing and CLEAN | 1 |
| Valet supplies present. (Squeegees, paper towel and water) | 2 |
| Spanner clean, lit and well maintained | 1 |
| Canopy fascia maintained and lit | 1 |
| Canopy Clean and well maintained | 1 |
| Canopy lights working | 2 |
| Exterior lights working | 1 |
| Dumpster area clean and without debris | 1 |
| No storage or objects outside the building or at dumpster | 1 |
| No abandoned or illegally parked vehicles | 1 |
| Air & Water hose working outside | 1 |
| Building Exterior clean, painted and well maintained | 1 |
| Building Sidewalk clean, unobstructed and pressure washed | 1 |
| Store windows clean, not cracked and free of extra signage | 1 |
| Front door clean and free of unnecessary signage | 1 |
| Operation hours posted | 1 |

### INTERIOR

| | |
|---|---|
| Odor Free | 1 |
| Comfortable Temperature | 1 |
| Inside Lights working and sufficient light | 1 |
| Clean Floor | 2 |
| Clean Walls / attractive & inviting ambiance | 1 |
| Ceiling tiles spotless and clean | 1 |
| Vents clean and dirt free | 1 |
| Clutter Free merchandising / Dealer navigation friendly | 1 |
| Floor Merchandisers well organized, properly placed and allowing navigation | 1 |

28

| | |
|---|---|
| Fully Stocked and Merchandised | 1 |
| No handwritten signs in the store | 1 |
| Shelves clean, free of dirt and front faced | 1 |
| Beverage Bar clean and inviting | 1 |
| Beverage equipment operational | 1 |
| Beverage Bar stocked | 1 |
| Cooler operational and clean | 1 |
| Cooler lights working | 1 |
| Check out area clean, clutter free and inviting | 1 |
| Waste receptacles clean and not overflowing | 1 |
| No storage in Dealer visible sales area | 1 |

## BATHROOMS

| | |
|---|---|
| All available bathrooms open for Dealer use | 1 |
| Bathroom floors clean and neat | 1 |
| Bathroom walls clean and free of graffiti | 1 |
| Bathroom supplies present | 2 |
| Bathroom door clean, lock functioning correctly | 1 |
| Bathroom equipment Commode, urinal, sink, mirror, soap disp, paper disp, towel disp | 1 |
| Bathroom trash clean, not overflowing and well maintained | 2 |

## DEALER SERVICE

| | |
|---|---|
| CSR in Uniform shirt | 5 |
| CSR wearing name tag | 3 |
| CSR well groomed | 1 |
| CSR acknowledged at entry and first interaction | 1 |
| CSR made eye contact | 1 |
| CSR courteous and provides pleasant Dealer service | 1 |
| CSR repeats sales amount and counts cash back | 1 |
| CSR provides welcome and parting remarks | 1 |
| CSR familiar with Oil Co programs and offers program sales | 2 |

## MISC

| | |
|---|---|
| Pornographic Magazine on display | 3 |
| Any type of Drug Paraphernalia present | 3 |

## TOTAL SCORE

| | |
|---|---|
| | 100 |

**Mountain Express Oil Company**

Credit Card Schedule Upon
Conversion

| Sales at Store | | Notice to MEX | $$$ to MEX | $$$ to Dealer |
|---|---|---|---|---|
| | | | | |
| Monday | | Tuesday | Wednesday | Thursday |
| Tuesday | | Wednesday | Thursday | Friday |
| Wednesday | | Thursday | Friday | Monday |
| Thursday | | Friday | Monday | Tuesday |
| Friday | | Monday | Monday | Tuesday |
| Saturday | | Monday | Monday | Tuesday |
| Sunday | | Monday | Tuesday | Wednesday |

Billing Terms

Load to Load
Payment is due at the earlier of
10 days or the date a new load
is delivered.

7 Days
Payment is due within 7 days
from date of delivery.

(Assuming 7-day payment terms)

| Delivery Date | Draft Notice | Payment Due |
|---|---|---|
| | | |
| Saturday | Friday | Monday |
| Sunday | Friday | Monday |
| Monday | Friday | Monday |
| Tuesday | Monday | Tuesday |
| Wednesday | Monday | Wednesday |
| Thursday | Tuesday | Thursday |
| Friday | Wednesday | Friday |

Store #965      COMMISSION

**EXHIBIT 5 - FUEL SUPPLY AGREEMENT BETWEEN RIVERDALE FUEL INC. AND DEBTORS**

**EXHIBIT 5**



**MOUNTAIN EXPRESS**
OIL COMPANY

## AMENDED AND RESTATED FUEL SUPPLY AGREEMENT

**THIS AMENDED AND RESTATED FUEL SUPPLY AGREEMENT** ("Agreement") is made this 11th day of February 2022 ("Effective Date") by and between **MEX FUELS NE-NY LLC,** a Wyoming corporation ("Supplier"), and **Yonkers Fuel Inc.,** a New York Corporation, having a mailing address of 380 Riverdale Avenue, Yonkers, New York 10705 ("Dealer") (Supllier and Dealer are sometimes collectively referred to herein as the "Parties").

**WHEREAS,** this Agreement is for the fueling station known as Mountain Express Store #962 located at 380 Riverdale Avenue, Yonkers, New York 10705, as more particularly described on **Schedule 1** herein attached and incorporated ("Location"); and

**WHEREAS,** Dealer operates a business on the Location and the Parties wish to enter into this Agreement for Supplier to supply motor fuels to Dealer at such Location on terms as specified herein with such Agreement amending and resetating any and all other fuel supply agreements by, between, or among the Parties for the Location.

**NOW THEREFORE,** in consideration of the mutual undertakings herein contained, the sufficiency of which are hereby acknowledged, Supplier agrees to sell, and Dealer agrees to buy, petroleum and other products on the following terms and conditions:

**1. TERM.** The Term of this Agreement shall begin on February 11, 2022 and continue for three (3) years ("Term"), and shall automaticaly renew from month to month after the said Term unless either party gives written notice of non-renewal to the other party at least thirty (30) days prior to the expiration of the initial Term or the then existing extended term, or unless sooner terminated as otherwise hereinafter provided. Supplier may terminate this Agreement for any reason and at any time during the Term of the Agreement with thirty (30) days written notice to Dealer.  Contingent upon Supplier's approval, Dealer may terminate this Agreement for any reason and at any time during the Term of the Agreement with one hundred eighty (180) days written notice to Supplier. Any option to extend shall be provided for on **Schedule 2.** Upon exercise and approval of such option to extend this Agreement, the term of the Lease in place at the Location shall also be extended concurrently herewith. This Agreement is expressly contingent upon the termination of any existing fuel supply agreements in place at the Location.

**2. SUPPLY OF PRODUCTS.**

Store #962    COMMISSION

1

(a) Supplier agrees to sell to Dealer, and Dealer agrees to buy and diligently to promote the sale of all grades and such quantities of Supplier's petroleum and other products as may be necessary to meet the Dealer demand for motor fuel products at the Location, and Dealer must offer all grades of fuel available from Supplier for sale at all times. Supplier shall have the right to provide ethanol additives, when available, in the gasoline, at the discretion of Supplier. Any incentives or rebates provided by Supplier's supplier relating to the sale of ethanol shall remain the property of Supplier. All fuel deliveries shall be made in full truckload quantities or in such other minimum quantities per delivery as specified by Supplier from time to time. If Dealer requests delivery of less than Supplier's established minimum volumes, compensatory delivery charges may be imposed. In no circumstances is Supplier obligated to make deliveries into a tank which is, or is suspected of leaking. Under this Agreement, Supplier is obligated to supply products to only the Location specified herein.

(b) Dealer covenants and agrees to purchase from Supplier and offer for sale, at the Location, only such gasoline, diesel fuel, other petroleum products or any additional motor vehicle fuel and/or energy-related products as are supplied and delivered by Supplier, including but not limited to those set forth on **Schedule 3** for the full duration of the stated term of this Agreement.

(c) It is the intention of the parties that the supply and purchase obligations contained herein shall remain in full force and effect throughout the term of this Agreement and shall not be suspended during any period of remodeling, renovation, repair, or rebuilding of the improvements located at the Location. Provided further, in the event Dealer's completion of the construction, remodeling and rebranding of the Location is not completed prior to the commencement of the term of this Agreement, due to conditions beyond the control of Dealer, Dealer's obligation to purchase petroleum products hereunder shall commence upon the completion of such construction remodeling and rebranding.

(d) Supplier has the sole and exclusive right to designate the hauler for delivery of products to the Location and hereby reserves the right to change the designated hauler from time to time. Dealer acknowledges and agrees further to comply with hauler's protocol for ordering of products and to allow a minimum of forty-eight (48) hour notice to receive delivery thereof. Dealer acknowledges that haulers' business is dependent on many external factors and that there may be delays in deliveries without any consequences to Supplier. Dealer shall grant full access to hauler's vehicles to make deliveries at any hour of the day. Communications between hauler and Dealer are the sole and exclusive responsibility of the Dealer. Any mistakes in ordering due to miscommunications between the hauler and Dealer are to be resolved between the hauler and Dealer. Any product outage(s) due to Dealer's failure to: (1) timely order sufficient volumes of product; (2) comply with hauler's protocol for ordering of products; or (3) grant full access to hauler's vehicles to make deliveries, or (4) provide forty-eight (48) hour notice to hauler for delivery of product shall constitute an event of default. Dealer acknowledges and agrees that Supplier shall not be liable for any misconduct of any designated hauler and that Dealer is responsible, at all times, for any discrepancies or variances in the amount of fuel delivered or maintained at the Location.

**3. OPERATION OF STATION.** Dealer recognizes that the brand utilized by Supplier is associated with high quality service and products and agrees to conduct business at the Location in a manner to maintain that association. Accordingly, Dealer agrees to furnish such service and accommodations to retail motor fuel Dealers as are customarily provided by convenience store/filling stations.

Dealer agrees to keep the business operated at the Location open for business during no less than the hours hereinafter set forth. Such business shall be open 365 days per year, (366 days during any leap year) opening no later than 6:00am EST and closing no earlier than 11:00pm EST daily.

Dealer agrees to provide, at its sole cost and expense:

   (a) broadband service to the Location in a manner acceptable to Supplier; and

   (b) promptly upon execution of this Agreement, a real property survey of the Location in a form that is acceptable for the purposes of filing any any all approvals, licenses and permits reasonably required to operate the Location for its intended purpose under this Agreement.  In the event that Dealer does not provide a survey, Supplier may charge Dealer for the cost of a new survey.

**4. EXCLUSION OF OTHER SUPPLIERS.** Dealer covenants and agrees to offer for sale, at the Location, only the motor fuels as are provided to the Location supplied by Supplier under this Agreement.  Dealer shall not sell any other supplier's motor fuels without the express written permission of Supplier.  Dealer affirmatively represents unto Supplier that  Dealer is not bound by the terms of any other motor fuels supply agreement relative to the Location and that Supplier has not induced, directed nor assisted  Dealer in breaching the terms of any agreement with another motor fuel supplier.

**5. PRICE OF PRODUCTS TO DEALER AND RETAIL PRICING.** A. Prices for all products purchased by Dealer from Supplier shall be Supplier's rack price from its supplier at its supplier's terminal, plus call and demand freight rates, plus One Cent ($0.01) per gallon, plus any applicable Superfund tax per gallon, plus the UST fee per gallon, plus any other applicable taxes, charges, duties and fees levied on any of the products of Supplier, or required to be collected by Supplier upon the sale, transportation or delivery of the products ("Supplier's Cost").

B. The retail pricing of motor fuels at the Location, shall be set by Supplier based upon market conditions and such other factors as may be deemed appropriate by Supplier, and in the exercise of Supplier's sole discretion. Supplier shall notify  Dealer, by telephone, fax transmission, e-mail transmission, electronic transmission, or other expeditious means of any price changes to be made for the retail pricing of motor fuels at the Location. Dealer shall cause the pricing changes to be made within one hour of such notification.

In the event  Dealer fails to cause the change of retail pricing, as required,  Dealer shall pay to Supplier the sum of $100.00 per hour for each hour or fraction thereof, subsequent to the first hour from the time of notice, until such pricing change is made at the Location. Such payment(s) shall be in the nature of damages sustained by

3

Supplier as a result of Dealer's failure to comply with its obligation to change retail pricing as directed by Supplier.

In the event Dealer fails to change retail pricing within one hour after such notice, on three separate occasions, Supplier shall have the right, but not the obligation, to immediately terminate this Agreement and to avail itself of all remedies provided for Supplier hereunder in the event of termination of this Agreement. Except for commissions as hereinafter stated, the gross retail receipts from the sale of motor fuels at the location shall be the property of Supplier.

**6. COMMISSION AND TERMS OF PAYMENT.** Dealer shall be entitled to a commission equal to Twelve Cents ($.12) upon each gallon of motor fuel sold, including unleaded regular gasoline, unleaded plus gasoline, super unleaded gasoline, diesel fuel, and kerosene.

In the event Supplier sets the retail price of motor fuels below cost, Dealer shall remain responsible for one-half of the credit charges and fees but shall not otherwise be responsible for any portion of any loss incurred by Supplier as the result of such pricing, except as otherwise provided for herein.

Dealer shall record and maintain accurate sales and inventory records for the sale of motor fuels at each pump upon a daily basis. Supplier shall provide Dealer with appropriate banking inforamation and other documentation for Supplier to either draft or deposit funds as may be necessary. In the event any draft or electronic fund transfer is returned or dishonored by reason of insufficient funds or otherwise, Dealer shall be in default hereunder and in order to cure such default, as may otherwise be provided for in this Agreement, Dealer shall additionally pay unto Supplier an administrative charge of $200.00 for each such dishonored instrument or transfer. In the event of a bounced ACH draft, Tenant shall either (a) provide documented proof of funds in the ACH draft account on file in order to clear a redraft; or (b) wire the funds directly to Landlord.

Dealer expressly acknowledges that failure to provide necessary funds as required herein may constitute theft by conversion of Supplier's funds for which Dealer may be subject to criminal prosecution. Dealer shall retain sales and inventory records for all motor fuels for a minimum of five (5) years and shall make such records available to Supplier, for inspection and copying during normal business hours, and allow Supplier, at any reasonable time, to take physical inventory of the bulk motor fuel products. In no event shall Dealer destroy any such inventory or sales records without first making them available to Supplier.

Dealer shall, prior to 10:00 a.m. EST each day, transmit by fax transmission, e-mail transmission, electronic transmission, or other expeditious means, a daily report of the sales of motor fuels during the prior business day. Such transmission shall be upon the format provided by Supplier. Additionally, Dealer shall, by 12:00 Noon EST each day, transmit to Supplier, by fax transmission, e-mail transmission, electronic transmission, or other expeditious means, a copy of all deposit slips validated by the depository bank, for the prior day's motor fuel sales. Supplier reserves the right to designate an alternative data transmission mode for compliance herewith.

In the event  Dealer fails to transmit daily sales reports and/or copies of deposit slips in a timely manner, as aforesaid,  Dealer shall pay unto Supplier the sum of $100.00 for the first such failure; $300.00 for the second such failure and $500.00 for each and every such subsequent failure , in which such transmissions are late. Further, in the event  Dealer fails to timely transmit sales reports and/or copies of deposit slips, as aforesaid, on three occasions, Supplier shall have the right to immediately terminate this Agreement and avail itself of all of Supplier's remedies upon termination as provided for herein.

**Dealer expressly acknowledges that converting Supplier's fuel into retained cash by failing to make daily deposits as required herein is considered by Supplier as constituting theft by conversion of Supplier's funds for which Supplier shall seek criminal prosecution against  Dealer to fullest extent allowed by law.**

**Dealer(s)' initials:**   _____ _____

Supplier shall be responsible for the payment of all sales tax due to any appropriate taxing jurisdiction upon and for the sale of motor fuels under the terms of this Agreement. It is expressly acknowledged between the parties that Supplier shall be entitled to retain any and all rebates or other purchase incentives paid or provided by its supplier in regard to motor fuels delivered to and sold at the Location.  Dealer shall also be responsible for all discrepancies, variances, and shortages of fuel at the Location.

**7. CREDIT CARD NETWORK AND SALES.** Dealer shall use and be responsible for all costs associated with such use, including but not limited to, connection, processing, and equipment fees during the term of this Agreement, and only the credit card network provided by and/or associated with Supplier's supplier or such other credit card network as directed by Supplier, which shall be maintained and upgraded by Dealer at its cost.

(a) No secondary or supplemental or other credit card network or credit card machines shall be used for the processing of any sales, whether for fuel, inventory, merchandise or otherwise. In the event that Dealer uses a separate EBT machine, Dealer shall be required to use a network or machine supplied by an state agency approved vendor. In the event of the unauthorized use of a credit card network or machine for processing sales at the Location, by Dealer or any of its Dealers or employees or contractors, Dealer shall be in default in its obligations under this Agreement. In the event of any such default, the cure for the unauthorized activity (in addition the discontinuance of such unauthorized activity), Dealer shall pay unto Supplier a five hundred dollar ($500.00) cure fee for the first such default; and a one thousand dollar ($1,000.00) cure fee for any subsequent default during the Term hereof. In the event of default by Dealer under any other terms of this Agreement, Supplier shall also be entitled to immediately disable said credit card network at the Location.

(b) Invoices from credit card sales shall be credited and paid to Supplier in regard to approved credit card purchases from Dealer. Supplier shall credit Dealer's account for products purchased hereunder, for the amount of credit card sales credited and paid to Supplier in accordance with fuel jobber (wholesaler) industry standards; provided, however that credit cards sales shall not be immediately repaid to Dealer but held on Dealer's account as additional credit against fuel purchases.  Upon any failure by Dealer to strictly comply with the terms and

5

conditions of credit card transactions at the Location, Supplier shall have the right to charge-back to the Dealer all sums not credited to or paid to Supplier as a result of defective or noncomplying credit card sales at the Location. Any "charge-backs" shall be immediately paid by Dealer to Supplier. Dealer shall be responsible for all point of sale programming, updates and installation and maintenance costs for EMV requirements from governmental agencies or oil companies.

**8.   USE OF TECHNOLOGY FOR PRICING SURVEY, INVENTORY MEASUREMENT, AND REPORTING OF SALES.** Dealer shall have the option to use electronic software reporting systems for conducting market surveys of posted motor vehicle fuel prices, electronic measurement and reporting of motor vehicle fuel inventory levels, and recording and reporting of motor vehicle fuel sales as may be offered and/or provided by Supplier; current systems including but not limited to Black Box, Opis, and Price Advantage technology ("Reporting Systems"). Supplier may offer and/or provide new Reporting Systems as new technology emerges. In the event Dealer elects to use such Reporting Systems, Dealer shall be responsible for all applicable monthly charges and fees for the use of such Reporting Systems, with such monthly charges and expenses to be paid via electronic fund transfers (EFT / ACH) from Dealer's account, and Dealer agrees, further, to defend, indemnify and hold the Supplier, its subsidiaries, divisions, affiliates, Dealers and employees harmless from any and all claims, injuries, damages, losses or suits including attorney fees, arising out of or in connection with the use of such Reporting Systems.

**9. DEALER'S BUSINESS.** It is mutually agreed that the business conducted by Dealer at the Location is the independent business of Dealer, and this Agreement shall not be construed as reserving to or conferring upon Supplier any right to direct or control Dealer or any of Dealer's employees in the conduct of Dealer's business. Dealer acknowledges that Supplier has made no representation of profitability in regard to any business to be operated by Dealer at the Location and Dealer has not relied upon any business information provided by Supplier in regard thereto; and Dealer enters into this Agreement based upon the exercise of Dealer's own business judgment after having full opportunity to exercise due diligence on Dealer's own behalf. Dealer acknowledges its sole resposibility for: (1) pricing of all the products, including updating the retail price of motor vehicle fuels, sold at the Location; and (2) the operation of its business in accordance with all applicable laws, regulations and standards. Dealer agrees, further, to defend, indemnify and hold the Supplier, its subsidiaries, divisions, affiliates, Dealers and employees harmless from any and all claims, injuries, damages, losses or suits including attorney fees, arising out of or in connection with the Dealer's business.

Dealer affirmatively represents and warrants unto Supplier that Dealer is not under contract with another fuel supplier and is authorized to enter into this Agreement with Supplier, and that Supplier has not induced Dealer to breach, nor has Supplier interfered with, any other existing contract between Dealer and any other product supplier. In the event Dealer is a corporation or limited liability company, Dealer represents that it is a corporation or limited liability company in good standing duly authorized to do business in the State where the location is situated, and that the undersigned party executing this Agreement on behalf of Dealer has full and

6

Store #962      COMMISSION

complete authority to bind the corporation or limited liability company hereto. Further, it is expressly agreed that the corporate officer or limited liability company manager and/or member executing this Agreement on behalf of a corporation or limited liability company shall be, in his or her individual capacity, jointly and severally liable and responsible, with such corporation or limited liability company, for the satisfaction of all obligations of Dealer under the terms of this Agreement.

**10. UNDERGROUND STORAGE TANKS AND MAINTENANCE.**  Dealer is in exclusive possession and control of the underground storage tanks, lines, and associated underground equipment at the Location, and shall be responsible for all maintenance and repairs and all environmental issues or matters arising out of the use, maintenance or repair of such tanks, lines, pumps, dispensers and fuel equipment (including EMV upgrades), except as to any maintenance, repair or environmental costs or damage directly caused or arising from any intentional or negligent act or omission of Supplier, or except as to any repairs that are expressly made the responsibility of Supplier as Landlord under the terms of a Agreement of the Location to Dealer as Tenant, if applicable. Dealer shall, throughout the term hereof, provide daily tank stick readings to Supplier's transport company (hauler) in such manner as directed by Supplier. In addition, Dealer shall provide daily stick readings to Supplier with water detecting putty and take accurate and prompt measures at Dealer's cost to cure and remove any water or other contaminants from the tanks, lines and fuel equipment.  Dealer warrants that throughout the entire Term of this Agreement, Dealer's location shall be in full and complete compliance with all local, State and Federal environmental regulations and statutes pertaining to the storage, handling, and dispersing of petroleum products and motor fuels. Further,  Dealer shall comply with all directions, instructions, or recommendations made by any environmental consultant retained by Supplier for the purposes of managing environmental and inventory control at the Location.  Dealer shall pay such premiums as may be necessary to have the storage tanks and pumping equipment covered under private underground storage tank insurance, at its election, all of which shall be paid by Dealer.

Upon the breach of this warranty, and in addition to any other remedies Supplier may have by law, Supplier shall have the right to immediately cease delivery of products to Dealer and terminate this Agreement. Without limiting the foregoing, Dealer shall, at its expense, cause the cleaning of the underground motor fuel storage tanks prior to Supplier's installation of any new, refurbished, or upgraded motor fuel pumping equipment or before the first delivery of motor fuels to the Location by Supplier, whichever occurs first; and shall cause the cleaning of the underground storage tanks periodically during the Term of this Agreement, as may be reasonably required by Supplier.  Dealer shall pay one-half the cost of any software, hardware and service costs including annual and monthly maintenance fees associated with automated tank, pump, sign and/or register readings. Dealer specifically acknowledges that Supplier has no obligation with regard to underground tanks or submersible pumps or any other fueling equipment located in the tanks.

Store #962     COMMISSION

In the event it is determined, during the term of this Agreement, that the Location is environmentally contaminated as a result of a leak, spill, or other discharge of hazardous substances which constitutes a violation of local, state or federal law, rule, regulation or ordinance, Supplier shall have the right to suspend delivery of products to the Location until such contamination is remediated as required by law during which time Dealer shall remain liable unto Supplier for any shortfall payments due hereunder by virtue of Dealer's failure or inability to purchase the minimum number of gallons of petroleum products required under the terms of this Agreement, notwithstanding such suspension. In the alternative, in the event of such contamination, Supplier shall have the right to terminate this Agreement in which case Dealer shall reimburse Supplier for all branding investment costs incurred by Supplier for branding of the Location and shall reimburse Supplier for all purchase incentive rebates received by Dealer under the terms of this Agreement.

**11. INSTALLATION OF PETROLEUM PRODUCT DISPENSING AND OTHER EQUIPMENT**. Supplier shall cause, at its expense, the installation of petroleum product dispensing equipment and or accessories and/or fixtures at the Location as may be set forth on **Schedule 4** attached hereto and made part hereof. Dealer acknowledges that Supplier shall have the right to engage any qualified vendor for the purpose of acquisition and installation of the same or similar equipment described therein. The total cost to Supplier for the acquisition and installation of such equipment, accessories and fixtures shall be considered part of Supplier's branding investment under the terms of this Agreement. At all times relevant hereto, the Supplier shall be the sole and exclusive owner of such equipment listed on Schedule 4, with the full right and authorization of Dealer to remove same upon a default under Section 19 hereof which remains uncured for more than thirty (30) days of written notice of default hereunder. Dealer hereby grants to Supplier a power of attorney coupled with an interest, for the purpose of removing the said equipment from the location upon an uncured default and Supplier shall have no liability whatsoever for removal of the equipment after notice and cure period.

**12. REPAIR OR EQUIPMENT OBLIGATIONS OF DEALER**. Dealer shall cause the repairs and/or maintenance upgrades at the Location, and install such equipment as may be specified in **Schedule 5** attached hereto and made part hereof at the commencement of this Agreement. Dealer shall commence such work promptly and pursue the same diligently through completion as set for in said schedule and as a prerequisite to Supplier's performance and obligations under section 2 of this Agreement.

**13. LEASED EQUIPMENT.** Dealer acknowledges that any equipment, accessories or fixtures provided by Supplier under the terms of this Agreement may have been leased to Supplier by one or more leasing companies. In the event of a transfer or assignment of this Agreement, Supplier will continue to make any such equipment Agreement payments through the full term of any such Agreement(s). Notwithstanding the foregoing in this Section 13., for purposes of this Agreement Supplier shall be deemed to be the owner of any such equipment, accessories or fixtures, and shall have the right to enter upon and in the premises and remove same in the event of a default by Dealer under Section 19 herein. For purposes of the preceding sentence Dealer hereby grants Supplier a power of attorney coupled with an interest to take all actions necessary and

8

Store #962   COMMISSION

desired on in the name of Dealer to remove the said personal property from the premises including obtaining permits and granting rights to others reasonably required to carry out the removal.

## 14. BRANDING, TRADEMARKS, AND QUALITY ASSURANCE.

(a) *MOTOR FUEL BRAND &TRADEMARKS.* Supplier shall have the right to designate the branding of the motor fuels to be purchased by Dealer hereunder. The initial branding, if any, shall be as designated on **Schedule 6** attached hereto and made part hereof. Supplier shall incur such costs as may be reasonably necessary for changing and or installation of the branding image of the Location (said sum hereinafter being referred to as Supplier's Branding Investment), in order to obtain the approval of Supplier's chosen branded fuel supplier. Dealer shall be responsible for payment of any and all further sums necessary for signage or other branding image items in order to maintain such approval during the term of this Agreement. In the event Supplier changes branding during the term of this Agreement, all costs of maintaining the subsequent banding image(s), after Supplier's initial costs in rebranding the Location, shall be borne by Dealer. All signage shall be contingent upon and subject to the requirements of any applicable state or local law or ordinance.

(b) *QUALITY ASSURANCE AND MARKETING.* Dealer acknowledges that Supplier's supplier maintains a program for product quality and marketing assurances. Specifically, Dealer shall:

(i) Comply with all quality and marketing programs, which shall include but not be limited to, oil company uniforms, employee name tags, clean and available restrooms, proper maintenance of landscaping, buildings (interior and exterior), canopy and equipment, proper presentation and display of retail merchandise, maintenance and location of signs and other branding image items and other such matters pertaining to the brand image of the Location, and shall cooperate at all reasonable times and in all reasonable manners with all quality assurance programs and inspections;

(ii) Refrain from the sale, use, storage, rent, display, or offering at the Location of:

(a) pornographic or sexually explicit magazines, video tapes, compact discs, digital video discs, similar literature or items of merchandise;

(b) any item, in Supplier's judgment, that is intended or designed for use in ingesting, inhaling or otherwise consuming an illegal drug or from manufacturing or processing an illegal drug, including but not limited to pipes, tubes, roach clips, instructions or descriptive materials, or containers designed for concealing illegal drugs or paraphernalia, or bath salts or synthetic drugs designed to mimic the effects of illegal drugs; and

(c) any substance or item prohibited to be offered for sale by the branding and/or quality assurance standards of the motor fuel supplier providing motor fuel for sale or resale at the Location; and

9

(ii) Dealer shall properly display all point of purchase marketing materials and credit card applications, and, at its sole cost and expense participate in any marketing or loyalty programs established by the brand of motor fuels sold at the Location, install all marketing materials, such as point of purchase (POP) signage, credit card applications and related materials and attend any training or informational programs offered.

It is acknowledged between the parties that Supplier and/or Supplier's supplier may conduct periodic "mystery shopper" or other inspections of the Location and the operation of the business thereon in order to determine whether Dealer is meeting the image, retail and Dealer service standards required under the terms of this Agreement. In the event Dealer scores below 80% of a perfect score, or otherwise fails inspection as determined by Supplier or Supplier's supplier making the inspection and in accordance with the quality assurance standards, Dealer shall pay unto Supplier an inspection fee of $500.00 or such amount charged by Supplier's supplier as an inspection fee, whichever is greater, due and payable within three days of Dealer receiving notice of such failure and a copy of the inspection report. The foregoing inspection fee shall apply to each and any failure of such inspections; provided further, Supplier shall have the right, in its discretion, to waive the requirement for payment of an inspection fee based upon its determination of Dealer's exercise of good faith in promptly correcting all quality assurance deficiencies. Dealer shall also be subject to certain fines as provided for on the attached Fine Schedule as provided for on **Schedule 7** herein attached an incorporated for violations which may not result in a failing score. In the event Dealer fails a mystery shopper inspection or other inspection at the Location, Supplier reserves the right to implement a monthly maintenance program at the Location and choose a vendor to cure at its sole and absolute discretion. The cost of said maintenance program shall be the responsibility of the Dealer, which shall be no more than the customary cost of said services in the local area of the Location.

In the event Dealer's branded retail facility does not meet such standards or requirements and which results in Supplier's receiving notice to debrand Dealer, or if such retail facility is abandoned, Dealer shall allow Supplier or Supplier's representatives or  Dealers to immediately remove all brand identification from the Location, and Dealer shall be liable to Supplier for all expenses and damages incurred as a result thereof. For the purposes of this Agreement, the Location shall be deemed abandoned if it is not open for business during normal business hours for three consecutive days. Dealer expressly agrees that all of Supplier's (or Supplier's suppliers') trademarks, names and colors appearing at the Location shall be kept clear and legible, and that Dealer will use only signs approved by Supplier to advertise products purchased by Dealer from Supplier. Supplier shall be entitled to withdraw or substitute at Supplier's cost the use of any particular trademark, name, or colors.

Provided further, in the event Supplier determines, in its sole discretion, that Dealer is not in compliance with any marketing or quality assurance retailing standard in regards to the physical condition of the Location and the operation of the business thereon, Supplier shall have the right (but not the obligation) to enter upon the Location and to correct any deficiency or substandard condition and bill Dealer for the cost thereof. Dealer

10

shall reimburse Supplier for any and all of such costs within seven days of receipt of such bill. Such reimbursement payment(s) shall be made by electronic fund transfer in the same manner as payment for products purchased from Supplier. Further, without limiting the foregoing, Dealer shall comply with the image and identification standards established, from time to time, for "branded outlets" by Supplier's branded supplier.

**15. RESERVED.**

**16. SECURITY DEPOSIT**. Dealer shall pay unto Supplier a security deposit upon the execution of this Agreement in an amount and in the manner as specified on **Schedule 8** hereto attached an made part hereof. During the term of this Agreement, Supplier shall have the right to apply all or part of said deposit to any sums owed by Dealer to Supplier under the terms hereof. In such event, Supplier shall notify Dealer of such application and Dealer shall pay over to Supplier such amounts as may be necessary to restore the full amount of the security deposit. Supplier's application of all or any portion of the security deposit shall not relieve Dealer from its obligations to make any payments due to Supplier nor prejudice Supplier's rights to exercise any remedy provided for herein, or at law, in consequence of Dealer's default under the terms of this Agreement. Further, Dealer hereby grants Supplier a security interest in all of Dealer's business equipment, supplies, inventory and fixtures at the Location, in which Supplier shall have all the rights of a secured party under the terms of the Uniform Commercial Code, and which interest may be evidenced and/or perfected by the filing of a UCC-1 Financing and Fixture Filing Statement(s).

**17. ASSIGNMENT-SUBLETTING-SALE.** Dealer shall not, without the prior written consent of Supplier endorsed hereon, assign this Agreement or any interest hereunder, or any part hereof, or permit the operation of the Location by any party other than Dealer. Supplier's consent shall not be unreasonably withheld, however, in making such a determination, Supplier may rely upon the financial and creditworthiness and criminal background, if any, of any proposed assignee in making a determination as to whether or not the withholding of such consent is reasonable. Dealer must provide Supplier with thirty (30) days prior written notice of a proposed consent together with all information for the proposed assignee. If approved, Dealer shall remit funds in the amount of $2,000.00 for legal and administrative fees. Consent to the assignment shall not destroy this provision, and all later assignments shall be made likewise only on the prior written consent of Supplier. An assignee of Dealer, at option of Supplier, shall become directly liable to Supplier for all obligations of Dealer hereunder, but no assignment by Dealer shall relieve Dealer of any liability hereunder, and Dealer shall remain jointly and severally liable with assignee for the satisfaction and performance of all Dealer's obligations under the terms of this Agreement. Dealer shall have the right, without prior written consent of Supplier, to form a corporation or limited liability company organized under the laws of the state of the Location,  and wholly owned by Dealer, and may assign or tranfer this Agreement to such company with notice provided to Supplier however, any such assignment or transfer shall not relieve Dealer of joint and several liability for all of Dealer's obligations hereunder, the performance of which shall be personally guaranteed by Dealer.  This Agreement is

11

freely assignable by Supplier and in the event Supplier elects to sell, assign or convey rights, titles and interest in this Agreement, Dealer shall provide a fuel estoppel agreement, in acceptable form to Supplier, confirming the terms of this Agreement at Supplier's request and without delay.

**18. OPTION TO CONVERT BUSINESS RELATIONSHIP BETWEEN THE PARTIES.**  None.

**19. DEFAULT, TERMINATION AND LIQUIDATED DAMAGES.**   All terms, conditions, covenants, warranties, and agreements contained in this Agreement are essential and material to the continued relationship between the parties. It is mutually agreed that in the event Dealer (i) becomes insolvent, (ii) is generally unable to pay, or fails to pay, its debts as they become due, (iii) files, or has filed against it, a petition for voluntary or involuntary bankruptcy or pursuant to any other insolvency law, (iv) makes or seeks to make a general assignment for the benefit of its creditors, or (v) applies for, or consents to, the appointment of a trustee, receiver, or custodian for a substantial part of its property or business; or (vi) if Dealer violates or is in default of any other agreements between Supplier and Dealer, Dealer shall be considered in default of the Agreement. In addition to the aforementioned, the following shall constitute events of breach or default:

(a) failure to remit to Supplier any monies owed by Dealer to Supplier in accordance with the provisions of this Agreement;

(b) violation of any federal, state, county or any municipal law, ordinance, rule, or regulation relating to Dealer's operation of the business conducted pursuant to or in connection with this Agreement;

(c) false or misleading statements made by Dealer to Supplier, including financial statements made or provided by Dealer in order to enter into this Agreement;

(d) failure of a mystery shopper inspection or other inspection at the Location and denying Supplier's implementation of a monthly maintenance program at the Location by a vendor to be selected by Supplier in its sole and absolute discretion;

(e) the institution of any insolvency, bankruptcy, or a receivership proceeding in or against Dealer;

(f) failure of Dealer to pay taxes or license fees as required by the terms of this Agreement or by any law or regulation or arising out of Dealer's employment of any person;

(g) abandonment or cessation of operation of the business of Dealer;

(h) severe physical or mental disability of Dealer;

(i) Willful adulteration, mislabeling or misbranding of motor fuel or other violation by Dealer of trade mark requirements for products sold by Dealer as set forth under this Agreement;

(j) violation of any term or condition of the Agreement, any cash advance agreement or any other agreements between the parties related to the Location; or

12

Store #962     COMMISSION

(k) any act or omission allowing for termination, non-renewal or debranding of the Location or as provided under the Petroleum Marketing Practices Act 15 U.S.C. Sec. 2801 et seq.

Subject to all rights under the Petroleum Marketing Practices Act, Supplier shall provide Dealer written notice of the occurrence of any event or breach which is cause for termination of this Agreement hereunder. Dealer shall have 15 days from the date of such notice in which to cure such breach or correct any condition or otherwise comply with the terms of this Agreement and in lieu of which this Agreement shall automatically be terminated at the expiration of such 15 day period. In the event Dealer receives written notice from Supplier of any events of default hereunder, Dealer specifically acknowledges and agrees that Supplier, through its Dealers, shall have the right to inspect Dealer's facility at the Location for purposes of determining compliance with this Agreement. In the event such event is not cured within 15 days of notice thereof, Supplier shall be entitled to make any corrections and/or repairs necessary at the Dealer's expense.   Notwithstanding the foregoing, in the event Dealer fails to remit Supplier any monies owed to Supplier under the terms hereunder, Supplier shall have the right to immediately suspend motor fuel delivery until and unless such breach is cured. In the event such a breach is not cured within five 5 days from the date of written notice to Dealer, then in such event Supplier shall have the right to then immediately terminate this Agreement.

The parties hereto agree and stipulate that in the event of default by Dealer and early termination of this Agreement, Supplier's actual damages cannot be calculated with any degree of certainty as Supplier is relying upon Dealer's continuing purchase of petroleum products throughout the term of this Agreement. Accordingly, Dealer and Supplier specifically acknowledge and agree that such damages upon Dealer's breach would be virtually impossible to determine, and that the formula provided in this paragraph provides a reasonable pre-estimate of Supplier's probable loss that will be suffered by Supplier. Therefore, the parties agree that, in addition to any other amounts owed to Supplier hereunder, Dealer shall pay to Supplier as liquidated damages and not as a penalty a sum equal to Five Cents ($0.05) times the minimum number of gallons required to be purchased monthly as contained herein times the number of months remaining in the Term of this Agreement from the date of default. The parties further agree that the above formula is reasonable because the amount of such liquidated damages are decreased by each month that Dealer performs its obligations under this Agreement. Moreover, the parties stipulate and agree that their intent in using the above damages formula is to provide a readily calculable pre-estimate of Supplier's probable loss upon breach and that it not be construed as a penalty of any kind or sort.

It is further agreed that in the event of default by Dealer under any of the terms of this Agreement and that in addition to the aforesaid liquidated damages, Supplier shall be entitled to recoup from Dealer the unamortized portion of its investment in the Location that is more particularly described in **Schedule 4** hereto. The investment described in **Schedule 4** shall be amortized on a "straight line" basis over the term of this Agreement; if Dealer defaults and this Agreement is terminated before the end of the term, Supplier shall be entitled to immediate payment of the amount of the investment that has not been amortized on the date of

13

default. Dealer acknowledges that recoupment by Supplier of the unamortized investment is a reasonable pre-estimate of Supplier's damages with respect to the investment, and that Supplier has the reasonable expectation that Dealer shall perform its obligations hereunder for the full term. In lieu of Supplier's right to recoupment of its investment in the Location, Supplier may also immediately remove from, or disable at, the Location and retain full ownership of the petroleum product dispensing equipment, cash register, point of sale and other branding image items installed pursuant to **Schedule 4** attached hereto. Upon any default Supplier shall also be authorized and permitted to immediately remove all motor fuel products in the underground storage tanks at the Location, pursuant to Section 6 of this Agreement. Termination of this Agreement shall not affect or abridge the rights and obligations of the parties occurring prior to termination, and Supplier may pursue any available legal remedies relating thereto whether or not it exercises its right to declare this Agreement terminated. In addition to the foregoing, in the event of termination, Dealer shall pay to Supplier the cost of "debranding" the Location. "Debranding" is hereby defined as the removal of all brand signage, brand color scheme, repayment of any unamortized oil company branding costs and rebates at the Location.

**20. ATTORNEY'S FEES, COSTS, INTEREST.**  In the event it becomes necessary for Supplier to employ the services of its attorney to enforce any aspect of this Agreement, whether Dealer is in default of this Agreement or this Agreement is amended, assigned, or modified, Supplier shall be entitled to charge and collect administrative costs and legal fees in an amount not less than $2,000.00. In the event that either party files litigation regarding this Agreement, the losing party agrees to pay the prevailing party fifteen percent (15%) of the amount of damages for attorney's fees and costs of litigation.

**21. MISCELLANEOUS.**

(a) *DELIVERIES DELAYED OR PREVENTED*. Supplier will fill all orders with reasonable promptness, but shall not be liable for loss or damage due to delays or failure, in whole or in part, to fill orders resulting from acts of public enemies, regulations, or orders of civil or military authorities, fires, floods, strikes, labor disputes, accidents, shortage of labor, of crude oil, or refined products or refinery capacity, or materials or of transportation, or any other cause beyond Supplier's reasonable control, either at its own plants or those of its sources of supply, or in connection with the delivery of its products. If Supplier is prevented by any of the foregoing causes from supplying the full quantities of any one or more of its products hereunder, Supplier shall have the right without liability to Dealer to allocate the quantity deliverable hereunder to Dealer, to its other Dealers under contracts calling for delivery of like products, and to its own requirements in such manner as it may deem reasonable, or according to any required allocation program, and Dealer shall be bound by such allocation. If Supplier is unable to deliver products for more than seventy-two (72) hours, Dealer shall have the right to purchase products from other suppliers until such time as Supplier can recommence delivery.

i. Supplier reserves the right to give preference in allocation to a dealer or group of dealers for any reason in its sole discretion, including those dealers whose needs are related to providing fuel to customers whose

14

responsibilties relate to the: (a) protection of life or health, (b) production and transportation of food and energy, (c) mass transportation, and (iv) national defense.

ii. Supplier's allocation plans may be put into effect on any geograph basis (including treating one geographic area differently from another) as Supplier may determine, without regard for the specific inventory at the place or places from which the supplied products are normally produced, shipped, or delivered.

(b) *INSURANCE.* Dealer shall continuously maintain general liability insurance and liquor liability insurance with such coverage as may be approved by Suppier and naming Supplier as an additional insured; and Dealer shall maintain workers' compensation insurance as required to be in full compliance with the State's Workers Compensation Act and obtain Workers Compensation Insurance. Dealer shall furnish Landlord certificates establishing that the insurance requirements contained herein are met and maintained, from time to time, and upon request by Supplier. Additionally, Dealer shall reimburse Supplier, by EFT on a monthly basis, for any all insurance premiums incurred by Supplier, during the term of this Agreement, for fire, casualty, hazard and liability insurance maintained by Supplier covering any equipment, accessories, fixtures and/or branding image items owned or Agreementd by Supplier and installed at the Location. In the event that Dealer fails to provide a certificate of insurance after written notice from Supplier, Supplier may obtain such insurance and charge Dealer the actual cost of the insurance plus an administrative fee.

(c) *CONTINGENCIES.* This Agreement and the rights and obligations of the parties hereunder is expressly contingent upon the approval of the Location, receipt of a survey of the Location supplied by Dealer, the branding image and specifications therefor, and Dealer's credit history by Supplier's supplier. Further, in the event Supplier is obligated to cause the installation or upgrade of any motor fuel dispensing equipment or accessories at the Location, this Agreement is expressly contingent upon Supplier obtaining financing, by Agreement or otherwise, for such obligations upon terms and conditions acceptable to Supplier; and contingent upon Dealer's third party landlord (and the prime landlord at the Location, if applicable), if any, executing a Landlord's Acknowledgment and Equipment Waiver in such form satisfactory to Supplier and under which such landlord (and prime landlord) waives any right or claim, during the term of this Agreement, to the equipment, accessories, fixtures and branding image items installed and owned by Supplier, and acknowledges Supplier's exclusive right to supply motor fuel to the Location for the full term hereof. Upon any breach or default under Section 19 hereof, Supplier shall have the right to injunctive relief in the form of a restraining order against Dealer and/or Landlord preventing any other fuel supplier from supplying fuel at the location for the term of this Agreement.Dealer shall exercise good faith and make diligent efforts and cooperate with Supplier in obtaining the execution of such Landlord Acknowledgment and Waiver, in failure of which Supplier may terminate this Agreement.

(d) *SEVERABILITY.* (i) If any one or more of the provisions of this Agreement are determined, by a court of competent jurisdiction, to be invalid or unenforceable, the remaining provisions hereof shall continue to be of full force and effect provided that the invalidity of any provisions hereof does not result in a lack of mutuality

15

or a failure of consideration in regards to the benefits and obligations set forth herein. (ii) If, subsequent to the date of this Agreement, valid state or federal laws or regulations governing the relationship between Dealer and Supplier take effect, this Agreement shall be deemed amended and shall incorporate any mandatory requirements of such laws or regulations so long as they shall be effective, unless such amendment(s) shall operate to increase Supplier's taxes, costs or expenses hereunder, in which case Supplier shall have the option to terminate this Agreement by notice to Dealer.

(e) *ENTIRETY-AGREEMENT*. This Agreement constitutes the entire agreement and understanding between Supplier and Dealer merging and superseding all prior agreements, understandings, warranties and representations, whether oral, written, express, or implied, between Supplier and Dealer. All prior agreements between Supplier and Dealer concerning the subject matter hereof, relating to the Location defined herein, are hereby terminated. Neither this Agreement nor any modification or waiver of any of the provisions hereof shall be binding upon Supplier or Dealer unless in writing, duly executed by Dealer and a duly authorized Dealer of Supplier.

(f) *ELECTRONIC TRANSMISSION AND SIGNATURE.* This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email or other means of Electronic Transmission and/or with Electronic Signatures shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

i. "Electronic Transmission" means any form of communication not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved, and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

ii. "Electronic Signature" has the meaning provided in [the Georgia Electronic Records and Signatures Act, O.C.G.A. § 10-12-1 et seq. OR Wyo. Stat. § 40-21-102(a)(viii) or OR Tex. Bus. & Com. Code § 322.002(8).]

(g) *NOTICES.* Any notice provided for herein shall be given in writing and shall be considered properly given when received if personally delivered, provided by verifiable elctronic means or, if deposited in the United States mail by certified mail, return receipt requested, postage prepaid, properly addressed by either party to the other at such party's address shown above, or at any changed address of which notice is duly given, as of the date received. Dealer has an obligation to notify supplier if they move or otherwise change the address noted above. In the event Dealer fails to notify Supplier of an address change, all mail sent by Supplier to Dealer's address shown above shall be deemed sufficient notice whether claimed or unclaimed.

16

Store #962    COMMISSION

(h) *CHOICE OF LAW.* This Agreement has been entered into in and shall be construed under the laws of the State of Georgia and the parties agree that exclusive venue and jurisdiction shall be with the Superior Court of Cherokee County, Georgia for any actions, suits or proceedings.

(i) *JOINT AND SEVERAL LIABILITY.* In the event more than one person, firm, company or entity are named as Dealer hereunder, each such named person, firm, company and entity shall be jointly and severally liable unto Supplier for the satisfaction of the obligations of Dealer hereunder; and Supplier may look to any, all or any combination of them for such satisfaction thereof.

(j) *CROSS-DEFAULTS.* Any default by Dealer under the terms of this Agreement shall likewise constitute a default of Dealer, as tenant, Dealer, or otherwise, under the terms of any and all other agreements between these same parties, including without limitation, other Agreements, motor fuel supply or commissioned sales agreements, purchase and /or sale agreement and other contracts, whether or not pertaining to the Location, or other premises or locations or to the sale or purchase for resale of motor fuels or other products. This provision shall also apply to any agreements with Supplier's affiliates and related parties, including but not limited to any Dealer defaults with any branded fuel supplier. In the event Dealer is a tenant of a third-party landlord at the Location, and Supplier has acquired the written consent to this provision from such landlord by way of a separate document or agreement, default by Dealer hereunder shall likewise constitute a default under the terms of the Agreement between Dealer and such landlord and a default under the Agreement shall be a default under this Agreement.

(k) *CREDIT CARD FRAUD SKIMMING.* Supplier shall have the right to immediately charge back to the Dealer any credit card "charge-backs" from the Supplier's Supplier immediately. In addition, Dealer is responsible for any credit card fraud which may occur at the Location including Skimming. Skimming is the theft of credit card information. This theft occurs when a third-party card-reading device is installed either outside or inside a fuel dispenser or other card-swiping terminal. This device allows a thief to capture a Dealer's credit and debit card information, including their PIN, with each card swipe. Dealer is responsible for any credit card or debit card information theft and the fraudulent charges that are a result of Skimming. Dealer is required to daily check the Pumps and card swiping terminals for possible sources of Skimming.

(l) *QUALITY AND CLAIMS.* Supplier guarantees that all products delivered hereunder will be uniform in quality and according to industry standards. Any claim for deficiency in quality or quantity of any product is waived unless Dealer gives Supplier notice of such deficiency at time of delivery (or during the next period of regular business hours if night delivery) for quantity claims and within ninety-six (96) hours of discovery of the alleged deficiency for quality claims. Such notice shall fully set forth the facts on which Dealer's claim is based, and Supplier shall be given full opportunity to inspect, measure, and test the products and/or equipment involved. Dealer shall immediately notify Supplier if its equipment is leaking. Dealer's failure to comply with the above requirements shall operate as a waiver of any and all claims and remedies by Dealer against Supplier arising out of product defects, variances, or shortages.

17

**22. RIGHT OF FIRST OFFER.**   Dealer agrees to provide Supplier with written notice of the availability of the Dealer's business at the Location ("Business") for sale and offer the Business to Supplier on such terms and conditions as Dealer would offer to third parties, as determined by Dealer in its sole and absolute discretion, prior to marketing said Business to third parties. Supplier shall have sixty (60) days from the date of Dealer's Notice to respond in writing to the same. If Dealer has not received a written response by the end of said sixty (60) day period or if Supplier declines to accept Dealer's offer or makes a counteroffer which Dealer shall reject, in writing, as unacceptable in Dealer's sole and absolute discretion, Dealer shall thereafter be free to market the Business and sell the Business for not less than the counter-offer submitted by Supplier. If Dealer and Supplier agree on terms for the sale of the Business, but are subsequently unable, in good faith, to consummate an agreement with respect thereto acceptable to both Dealer and Supplier shall thereafter be free to market the Business and sell the Business on such terms and conditions as Dealer shall determine, in its sole and absolute discretion, without any further obligation to offer said Business again to Supplier.

*[signature page to follow]*

18

Store #962    COMMISSION

**IN WITNESS WHEREOF**, the parties hereto have caused this Fuel Supply Agreement to be effective  as of the Effective Date first written above.

**SUPPLIER**

**YONKERS FUEL INC**


By:_____

    Turjo Wadud, President



**DEALER**

**Yonkers Fuel Inc.**


_____

    Suleyman Issr

19

Store #962      COMMISSION

## SCHEDULE 1 - PROPERTY DESCRIPTION

380 Riverdale Avenue, Yonkers, New York  10705

### LEGAL DESCRIPTION

Store #962     COMMISSION

## SCHEDULE 2 – OPTION TO EXTEND TERM

Supplier shall have the option to extend the Term for one additional three (3) year term with at least thirty (30) days' notice to Dealer, prior to the expiration of the then existing Term.  Each extended Term shall be on the same terms and conditions as set forth in this Agreement, except as otherwise specifically stated herein.

Store #962     COMMISSION

## SCHEDULE 3 – PRODUCTS TO BE PROVIDED EXCLUSIVELY BY SUPPLIER

1. Regular, Super and Premium Gasoline;

2. Diesel;

3. E85/and other Ethanol Blends;

4. Bio Diesel;

5. Ethanol Free Fuel;

6. Boutique Fuels (Future);

7. Natural Gas Related Fuels (Future);

8. Electric Car Charging Networks (Future);

9. Lubricants and Oils (Future)

10. Hydrogen Fuels (Future); and

11. Any other fuel known or currently unknown used to power automobiles, trucks, tractors, boats, lawn mowers, etc.

Store #962    COMMISSION

## SCHEDULE 4 - EQUIPMENT, ACCESSORIES AND/OR FIXTURES TO BE INSTALLED BY SUPPLIER

Supplier shall provide EMV ugrades at the Location at its sole cost and expense, if required.

23

## SCHEDULE 5 - DEALER'S REPAIR/MAINTENANCE AND EQUIPMENT OBLIGATIONS

Dealer is responsible for all inside and outside maintenance at the Location.

**SCHEDULE 6 - BRANDING**

The initial branding image to be installed at the Location, and the initial brand of motor fuels to be delivered to the Location for resale by Dealer shall be a brand approved by Supplier.  Supplier reserves the right to change the brand at the Location at anytime.

25

**SCHEDULE 7 – FINE SCHEDULE**

No Name Tag:                                $25.00

No Uniform:                                 $50.00

Illegal Drugs/Drug Paraphenalia:            $500.00

Store #962       COMMISSION

**SCHEDULE 8- ALTERNATIVE SECURITY DEPOSIT PROVISIONS**

The security deposit provisions of section 16 of this Agreement are modified as follows:

Total security deposit shall be $40,000.00, to be collected at One Cent ($0.01) per gallon of fuel sold at the Location.

27

## Mountain Express Oil Co. Field Inspection Evaluation

### Exterior

| | |
|---|---|
| Main Price ID sign functional and lighted | 2 |
| Main Price ID sign unobstructed and free of non-oil company signage | 1 |
| Landscape Free of Trash | 2 |
| Landscape Grass Cut and Neat | 4 |
| Parking Lot Neat and Clean | 2 |
| Parking Lot free of weeds growth | 1 |
| Parking Lot with no potholes | 1 |
| Freshly painted curbs, poles and parking lines | 2 |
| All MPDs functioning correctly | 4 |
| All MPDs clean, free of spider webs and dirt | 1 |
| Pump Islands clean and well maintained | 1 |
| Card reader working with RECEIPT paper present | 2 |
| Credit Card Applications present | 2 |
| Current POP Present and clean | 2 |
| Nozzles and hoses clean/functional | 2 |
| All MPD displays operational | 1 |
| Trash Receptacles not overflowing and CLEAN | 1 |
| Valet supplies present. (Squeegees, paper towel and water) | 2 |
| Spanner clean, lit and well maintained | 1 |
| Canopy fascia maintained and lit | 1 |
| Canopy Clean and well maintained | 1 |
| Canopy lights working | 2 |
| Exterior lights working | 1 |
| Dumpster area clean and without debris | 1 |
| No storage or objects outside the building or at dumpster | 1 |
| No abandoned or illegally parked vehicles | 1 |
| Air & Water hose working outside | 1 |
| Building Exterior clean, painted and well maintained | 1 |
| Building Sidewalk clean, unobstructed and pressure washed | 1 |
| Store windows clean, not cracked and free of extra signage | 1 |
| Front door clean and free of unnecessary signage | 1 |
| Operation hours posted | 1 |

### INTERIOR

| | |
|---|---|
| Odor Free | 1 |
| Comfortable Temperature | 1 |
| Inside Lights working and sufficient light | 1 |
| Clean Floor | 2 |
| Clean Walls / attractive & inviting ambiance | 1 |
| Ceiling tiles spotless and clean | 1 |
| Vents clean and dirt free | 1 |
| Clutter Free merchandising / Dealer navigation friendly | 1 |
| Floor Merchandisers well organized, properly placed and allowing navigation | 1 |

Store #962    COMMISSION

28

| | |
|---|---|
| Fully Stocked and Merchandised | 1 |
| No handwritten signs in the store | 1 |
| Shelves clean, free of dirt and front faced | 1 |
| Beverage Bar clean and inviting | 1 |
| Beverage equipment operational | 1 |
| Beverage Bar stocked | 1 |
| Cooler operational and clean | 1 |
| Cooler lights working | 1 |
| Check out area clean, clutter free and inviting | 1 |
| Waste receptacles clean and not overflowing | 1 |
| No storage in Dealer visible sales area | 1 |

## BATHROOMS

| | |
|---|---|
| All available bathrooms open for Dealer use | 1 |
| Bathroom floors clean and neat | 1 |
| Bathroom walls clean and free of graffiti | 1 |
| Bathroom supplies present | 2 |
| Bathroom door clean, lock functioning correctly | 1 |
| Bathroom equipment Commode, urinal, sink, mirror, soap disp, paper disp, towel disp | 1 |
| Bathroom trash clean, not overflowing and well maintained | 2 |

## DEALER SERVICE

| | |
|---|---|
| CSR in Uniform shirt | 5 |
| CSR wearing name tag | 3 |
| CSR well groomed | 1 |
| CSR acknowledged at entry and first interaction | 1 |
| CSR made eye contact | 1 |
| CSR courteous and provides pleasant Dealer service | 1 |
| CSR repeats sales amount and counts cash back | 1 |
| CSR provides welcome and parting remarks | 1 |
| CSR familiar with Oil Co programs and offers program sales | 2 |

## MISC

| | |
|---|---|
| Pornographic Magazine on display | 3 |
| Any type of Drug Paraphernalia present | 3 |

| | |
|---|---|
| **TOTAL SCORE** | **100** |

Store #962    COMMISSION

**Mountain Express Oil Company**

Credit Card Schedule Upon
Conversion

| Sales at Store | | Notice to MEX | $$$ to MEX | $$$ to Dealer |
|---|---|---|---|---|
| Monday | | Tuesday | Wednesday | Thursday |
| Tuesday | | Wednesday | Thursday | Friday |
| Wednesday | | Thursday | Friday | Monday |
| Thursday | | Friday | Monday | Tuesday |
| Friday | | Monday | Monday | Tuesday |
| Saturday | | Monday | Monday | Tuesday |
| Sunday | | Monday | Tuesday | Wednesday |

Billing Terms

Load to Load
Payment is due at the earlier of
10 days or the date a new load
is delivered.

7 Days
Payment is due within 7 days
from date of delivery.

(Assuming 7-day payment terms)

| Delivery Date | Draft Notice | Payment Due |
|---|---|---|
| Saturday | Friday | Monday |
| Sunday | Friday | Monday |
| Monday | Friday | Monday |
| Tuesday | Monday | Tuesday |
| Wednesday | Monday | Wednesday |
| Thursday | Tuesday | Thursday |
| Friday | Wednesday | Friday |

30

Store #962     COMMISSION

**EXHIBIT 6 - FUEL SYSTEM REPORTS OF MONTO FOOD MART, INC. BETWEEN
JULY 12, 2023 THROUGH AUGUST 5, 2023**

EXHIBIT
6



```
        CONOCO
        320 FOREST AVE.
        LOCUST VALLEY, N.Y.
        09519208

          07-12-23   9:19 AM


         SYSTEM STATUS REPORT
   - - - - - - - - - - - - -
   T 1:LOW PRODUCT ALARM

   T 1:DELIVERY NEEDED

   T 2:LOW PRODUCT ALARM

   T 2:DELIVERY NEEDED


   INVENTORY REPORT


   T 1:REGULAR
   VOLUME     =    638 GALS
   ULLAGE     =  10957 GALS
   90% ULLAGE=   9797 GALS
   TC VOLUME  =    630 GALS
   HEIGHT     =   9.54 INCHES
   WATER VOL  =      0 GALS
   WATER      =   0.00 INCHES
   TEMP       =   77.1 DEG F


   T 2:SUPER   UNLEADED
   VOLUME     =    761 GALS
   ULLAGE     =   3237 GALS
   90% ULLAGE=   2837 GALS
   TC VOLUME  =    753 GALS
   HEIGHT     =  23.18 INCHES
   WATER VOL  =      0 GALS
   WATER      =   0.00 INCHES
   TEMP       =   74.6 DEG F


   T 3:DIESEL
   VOLUME     =   2253 GALS
   ULLAGE     =   1745 GALS
   90% ULLAGE=   1345 GALS
   TC VOLUME  =   2237 GALS
   HEIGHT     =  49.45 INCHES
   WATER VOL  =      0 GALS
   WATER      =   0.00 INCHES
   TEMP       =   75.6 DEG F

 x x x x x  END  x x x x x
```

## CLOSE
### Day REPORT

```
8/4/23                          8:16:05 PM
STORE #AB123 REGISTER #101 day #029
CASHIER #01 CORPORATE
    Includes daypart #029 thru #029
ALL DCRS Receipt #9011788 to #9011660
         Receipt #9021460 to #9021511
         Receipt #9031017 to #9031052
         Receipt #9041001 to #9041036
         Receipt #9050976 to #9051000
         Receipt #9061136 to #9061166
REG NO #101 Receipt #1014322 to #1014493
OPEN  day 8/3/23 7:38:30 PM
CLOSE day 8/4/23 8:13:39 PM
```

## SUMMARY REPORT
### NON-TAX SALES

```
TOTAL      232    1992.321    7773.69
```

## TANK REPORT

|         | VOLUME   | DOLLARS |
|---------|----------|---------|
| DIESEL  | 64.948   | 297.40  |
| SUPER   | 0.033    | 0.14    |
| UNLEAD  | 1927.340 | 7476.15 |
| TOTAL   | 1992.321 | 7773.69 |

## NETWORK CARD REPORT

| NAME     | CNT | SALES   | CNT | REFUNDS |
|----------|-----|---------|-----|---------|
| AMEX     | 15  | 629.14  | 0   | 0.00    |
| DEBIT    | 21  | 411.29  | 0   | 0.00    |
| DISCOVER | 2   | 33.25   | 0   | 0.00    |
| MASTERCRD| 23  | 788.70  | 0   | 0.00    |
| VISA     | 48  | 2239.68 | 0   | 0.00    |
| WEX      | 1   | 46.75   | 0   | 0.00    |
| TOTAL    | 110 | 4148.81 | 0   | 0.00    |

BATCH/DAY SEQ# = 29

---

```
CONOCO
320 FOREST AVE.
LOCUST VALLEY, N.Y.
09519208

    08-04-23   8:17 PM


    SYSTEM STATUS REPORT
- - - - - - - - - -
T 1:LOW PRODUCT ALARM
T 1:INVALID FUEL LEVEL
T 1:DELIVERY NEEDED
T 2:LOW PRODUCT ALARM
T 2:INVALID FUEL LEVEL
T 2:DELIVERY NEEDED

INVENTORY REPORT

T 1:REGULAR
T 1:INVALID FUEL LEVEL
VOL INVALID  = 408 GALS
ULLAGE       = 11187 GALS
90% ULLAGE   = 10027 GALS
TC VOLUME    = 401 GALS
HGT INVALID  = 7.04 INCHES
WATER VOL    = 0 GALS
WATER        = 0.00 INCHES
TEMP         = 79.8 DEG F


T 2:SUPER   UNLEADED
T 2:INVALID FUEL LEVEL
VOL INVALID  = 125 GALS
ULLAGE       = 3873 GALS
90% ULLAGE   = 3473 GALS
TC VOLUME    = 123 GALS
HGT INVALID  = 7.11 INCHES
WATER VOL    = 0 GALS
WATER        = 0.00 INCHES
TEMP         = 78.8 DEG F


T 3:DIESEL
VOLUME       = 2386 GALS
ULLAGE       = 1612 GALS
90% ULLAGE   = 1212 GALS
TC VOLUME    = 2364 GALS
HEIGHT       = 51.70 INCHES
WATER VOL    = 0 GALS
WATER        = 0.00 INCHES
TEMP         = 80.1 DEG F

* * * * * END * * * * *
```

```
             CLOSE
          Day REPORT
    8/5/23              8:11:41 PM
    STORE#AB123 REGISTER#101 day#030
    CASHIER #01 CORPORATE
      Includes daypart #030 thru #030
    ALL DCRS Receipt #9011861 to #9011861
           Receipt #9031053 to #9031053
           Receipt #9051002 to #9051004
    REG NO#101 Receipt #1014494 to #1014653
    OPEN day 8/4/23 8:13:39 PM
    CLOSE day 8/5/23 8:09:06 PM
```

```
PRODUCT TOTALS
--------------------------------------
  REGULAR    1      5.143      19.95
  DIESEL 2   2     11.791      53.99

  TOTAL      3     16.934      73.94


TANK REPORT
             VOLUME        DOLLARS
--------------------------------------
DIESEL       11.791          53.99
UNLEAD        5.143          19.95

TOTAL        16.934          73.94


NETWORK CARD REPORT

NAME        CNT   SALES  CNT REFUNDS
--------------------------------------
AMEX         1     0.00   0     0.00
MASTERCRD    1     0.00   0     0.00
            -------------------------
TOTAL        2     0.00   0     0.00

BATCH/DAY SEQ# = 30
```

```
CONOCO
320 FOREST AVE.
LOCUST VALLEY, N.Y.
09519208

     08-05-23   6:30 AM

 INVENTORY REPORT

T 1:REGULAR
T 1:INVALID FUEL LEVEL
VOL INVALID    407 GALS
ULLAGE  =  11188 GALS
90% ULLAGE =  10028 GALS
TC VOLUME  =    401 GALS
HGT INVALID   7.04 INCHES
WATER VOL =      0 GALS
WATER     =   0.00 INCHES
TEMP      =   78.6 DEG F


T 2:SUPER   UNLEADED
T 2:INVALID FUEL LEVEL
VOL INVALID    125 GALS
ULLAGE  =   3873 GALS
90% ULLAGE =   3473 GALS
TC VOLUME  =    123 GALS
HGT INVALID   7.11 INCHES
WATER VOL =      0 GALS
WATER     =   0.00 INCHES
TEMP      =   78.7 DEG F


T 3:DIESEL
VOLUME    =   2386 GALS
ULLAGE    =   1612 GALS
90% ULLAGE=   1212 GALS
TC VOLUME =   2364 GALS
HEIGHT    =  51.70 INCHES
WATER VOL =      0 GALS
WATER     =   0.00 INCHES
TEMP      =   79.9 DEG F


* * * * END * * * * *
```

**EXHIBIT 7 - FUEL SYSTEM REPORTS OF RIVERDALE FUEL, INC. BETWEEN
JULY 11, 2023 THROUGH AUGUST 7, 2023**


EXHIBIT 7


Sharik we're here

Wed, May 31 at 5:38 PM



```
CITGO SERVICE STA.
380 RIVERDALE AVE.
YONKERS, N.Y. 10705

MAY 30, 2023 10:07 AM

    SYSTEM STATUS REPORT
T 2:LOW PRODUCT ALARM

T 2:INVALID FUEL LEVEL


INVENTORY REPORT

T 1:SUPER
VOLUME     =   2895 GALS
ULLAGE     =   3151 GALS
90% ULLAGE=   2546 GALS
TC VOLUME  =   2886 GALS
HEIGHT     =  48.07 INCHES
WATER VOL  =      0 GALS
WATER      =   0.00 INCHES
TEMP       =   66.5 DEG F


T 2:REGULAR-MIDDLE TANK
T 2:INVALID FUEL LEVEL
VOL INVALID    333 GALS
ULLAGE     =   5714 GALS
90% ULLAGE=   5109 GALS
TC VOLUME  =    330 GALS
HGT INVALID   9.61 INCHES
WATER VOL  =     69 GALS
WATER      =   1.33 INCHES
TEMP       =   68.5 DEG F


T 3:DIESEL
VOLUME     =   4102 GALS
ULLAGE     =   1945 GALS
90% ULLAGE=   1340 GALS
TC VOLUME  =   4086 GALS
HEIGHT     =  62.44 INCHES
WATER VOL  =     16 GALS
WATER      =   1.06 INCHES
TEMP       =   65.3 DEG F


* * * * END * * * * *
```

Read 5/31/23

Case 23-90147   Document 1255   Filed in TXSB on 08/14/23   Page 154 of 186

```
CITGO SERVICE STA.
380 RIVERDALE AVE.
YONKERS, N.Y. 10705


MAY 31, 2023  6:27 AM


SYSTEM STATUS REPORT
- - - - - - - - - - - - -
T 2:LOW PRODUCT ALARM

INVENTORY REPORT


T 1:SUPER
VOLUME      =  2493 GALS
ULLAGE      =  3553 GALS
90% ULLAGE= 2948 GALS
TC VOLUME  =  2486 GALS
HEIGHT      = 43.07 INCHES
WATER VOL  =  0 GALS
WATER       =  0.00 INCHES
TEMP        = 65.8 DEG F


T 2:REGULAR-MIDDLE TANK
VOLUME      =   852 GALS
ULLAGE      =  5195 GALS
90% ULLAGE= 4590 GALS
TC VOLUME  =   846 GALS
HEIGHT      = 18.60 INCHES
WATER VOL  =    69 GALS
WATER       =  1.33 INCHES
TEMP        = 68.1 DEG F


T 3:DIESEL
VOLUME      =  4076 GALS
ULLAGE      =  1971 GALS
90% ULLAGE= 1366 GALS
TC VOLUME  =  4060 GALS
HEIGHT      = 62.11 INCHES
WATER VOL  =    16 GALS
WATER       =  1.06 INCHES
TEMP        = 65.6 DEG F
```

```
CITGO SERVICE STA.
380 RIVERDALE AVE.
YONKERS, N.Y. 10705


JUL 11, 2023   6:16 AM


    SYSTEM STATUS REPORT
  - - - - -   - - - - - -
T 1:LOW PRODUCT ALARM

T 1:INVALID FUEL LEVEL


INVENTORY REPORT


T 1:SUPER
T 1:INVALID FUEL LEVEL
VOL INVALID     263 GALS
ULLAGE      =   5783 GALS
90% ULLAGE=     5178 GALS
TC VOLUME   =    261 GALS
HGT INVALID  10.20 INCHES
WATER VOL =       0 GALS
WATER       =   0.00 INCHES
TEMP        =  73.4 DEG F


T 2:REGULAR-MIDDLE TANK
VOLUME      =   2724 GALS
ULLAGE      =   3323 GALS
90% ULLAGE=     2718 GALS
TC VOLUME   =   2693 GALS
HEIGHT      =  43.48 INCHES
WATER VOL =       0 GALS
WATER       =   0.00 INCHES
TEMP        =  75.9 DEG F


T 3:DIESEL
VOLUME      =   5101 GALS
ULLAGE      =    946 GALS
90% ULLAGE=      341 GALS
TC VOLUME   =   5051 GALS
HEIGHT      =  75.90 INCHES
WATER VOL =      16 GALS
WATER       =   1.05 INCHES
TEMP        =  74.1 DEG F


* * * * * END * * * * *
```

```
        CITGO SERVICE STA.
        380 RIVERDALE AVE.
        YONKERS, N.Y. 10705


        JUL 11, 2023  8:24 PM


         SYSTEM STATUS REPORT
        - - - - - -  - - - - - -
        T 1:LOW PRODUCT ALARM

        T 1:INVALID FUEL LEVEL


        INVENTORY REPORT


        T 1:SUPER
        T 1:INVALID FUEL LEVEL
        VOL INVALID   263 GALS
        ULLAGE    =   5783 GALS
        90% ULLAGE=   5178 GALS
        TC VOLUME =    261 GALS
        HGT INVALID 10.20 INCHES
        WATER VOL =      0 GALS
        WATER     =   0.00 INCHES
        TEMP      =   72.9 DEG F


        T 2:REGULAR-MIDDLE TANK
        VOLUME    =   1324 GALS
        ULLAGE    =   4723 GALS
        90% ULLAGE=   4118 GALS
        TC VOLUME =   1308 GALS
        HEIGHT    =  25.47 INCHES
        WATER VOL =      0 GALS
        WATER     =   0.00 INCHES
        TEMP      =   76.0 DEG F


        T 3:DIESEL
        VOLUME    =   5045 GALS
        ULLAGE    =   1002 GALS
        90% ULLAGE=    397 GALS
        TC VOLUME =   4995 GALS
        HEIGHT    =  75.08 INCHES
        WATER VOL =     16 GALS
        WATER     =   1.06 INCHES
        TEMP      =   74.1 DEG F


        * * * * * END * * * * *
```

Case 23-90147   Document 1255   filed in TXSB on 08/14/23   Page 157 of 186

```
CITGO SERVICE STA.
380 RIVERDALE AVE.
YONKERS, N.Y. 10705

JUL 19, 2023   8:55 PM


    SYSTEM STATUS REPORT
- - - - - - - - - - - - -
T 1:LOW PRODUCT ALARM

T 2:LOW PRODUCT ALARM

T 2:INVALID FUEL LEVEL


INVENTORY REPORT


T 1:SUPER
VOLUME     =    900 GALS
ULLAGE     =   5146 GALS
90% ULLAGE=   4541 GALS
TC VOLUME  =    893 GALS
HEIGHT     = 21.59 INCHES
WATER VOL  =      0 GALS
WATER      =  0.00 INCHES
TEMP       =  75.8 DEG F


T 2:REGULAR-MIDDLE TANK
T 2:INVALID FUEL LEVEL
VOL INVALID    301 GALS
ULLAGE     =   5746 GALS
90% ULLAGE=   5141 GALS
TC VOLUME  =    297 GALS
HGT INVALID  8.96 INCHES
WATER VOL  =      0 GALS
WATER      =  0.00 INCHES
TEMP       =  76.0 DEG F


T 3:DIESEL
VOLUME     =   4387 GALS
ULLAGE     =   1660 GALS
90% ULLAGE=   1055 GALS
TC VOLUME  =   4339 GALS
HEIGHT     = 66.10 INCHES
WATER VOL  =     16 GALS
WATER      =  1.05 INCHES
TEMP       =  75.5 DEG F
```

```
CITGO SERVICE STA.
380 RIVERDALE AVE.
YONKERS. N.Y. 10705


JUL 21. 2023  6:09 PM


   SYSTEM STATUS REPORT
- - - - - - - - - - -
T 2:LOW PRODUCT ALARM

T 2:INVALID FUEL LEVEL


INVENTORY REPORT


T 1:SUPER
VOLUME    =  4535 GALS
ULLAGE    =  1511 GALS
90% ULLAGE=   906 GALS
TC VOLUME =  4489 GALS
HEIGHT    = 68.94 INCHES
WATER VOL =     0 GALS
WATER     =  0.00 INCHES
TEMP      = 82.6 DEG F


T 2:REGULAR-MIDDLE TANK
T 2:INVALID FUEL LEVEL
VOL INVALID   301 GALS
ULLAGE    =  5746 GALS
90% ULLAGE=  5141 GALS
TC VOLUME =   297 GALS
HGT INVALID  8.98 INCHES
WATER VOL =     0 GALS
WATER     =  0.00 INCHES
TEMP      = 75.5 DEG F



T 3:DIESEL
VOLUME    =  4314 GALS
ULLAGE    =  1733 GALS
90% ULLAGE=  1128 GALS
TC VOLUME =  4267 GALS
HEIGHT    = 65.15 INCHES
WATER VOL =    18 GALS
WATER     =  1.05 INCHES
TEMP      = 75.5 DEG F



* * * * * END * * * * *
```

```
CITGO SERVICE STA.
380 RIVERDALE AVE.
YONKERS, N.Y. 10705


JUL 28, 2023  6:01 PM


    SYSTEM STATUS REPORT
- - - - - - - - - - - -
   ALL FUNCTIONS NORMAL

INVENTORY REPORT


T 1:SUPER
VOLUME    =  4255 GALS
ULLAGE    =  1791 GALS
90% ULLAGE=  1186 GALS
TC VOLUME =  4219 GALS
HEIGHT    = 65.20 INCHES
WATER VOL =     0 GALS
WATER     =  0.00 INCHES
TEMP      = 78.7 DEG F


T 2:REGULAR-MIDDLE TANK
VOLUME    =  5065 GALS
ULLAGE    =   982 GALS
90% ULLAGE=   377 GALS
TC VOLUME =  4994 GALS
HEIGHT    = 73.53 INCHES
WATER VOL =     0 GALS
WATER     =  0.00 INCHES
TEMP      = 80.0 DEG F



T 3:DIESEL
VOLUME    =  3805 GALS
ULLAGE    =  2242 GALS
90% ULLAGE=  1637 GALS
TC VOLUME =  3766 GALS
HEIGHT    = 58.70 INCHES
WATER VOL =    16 GALS
WATER     =  1.05 INCHES
TEMP      = 74.5 DEG F



* * * * * END * * * * *
```

```
CITGO SERVICE STA.
380 RIVERDALE AVE.
YONKERS, N.Y. 10705


AUG  7, 2023  5:38 AM


  SYSTEM STATUS REPORT
- - - - - - - - - - -
T 1:LOW PRODUCT ALARM

T 1:INVALID FUEL LEVEL

T 2:LOW PRODUCT ALARM

T 2:INVALID FUEL LEVEL


INVENTORY REPORT


T 1:SUPER
T 1:INVALID FUEL LEVEL
VOL INVALID   260 GALS
ULLAGE      = 5786 GALS
90% ULLAGE= 5181 GALS
TC VOLUME =   258 GALS
HGT INVALID 10.14 INCHES
WATER VOL =     0 GALS
WATER     =  0.00 INCHES
TEMP      =  74.6 DEG F


T 2:REGULAR-MIDDLE TANK
T 2:INVALID FUEL LEVEL
VOL INVALID   301 GALS
ULLAGE      = 5746 GALS
90% ULLAGE= 5141 GALS
TC VOLUME =   297 GALS
HGT INVALID  8.96 INCHES
WATER VOL =     0 GALS
WATER     =  0.00 INCHES
TEMP      =  76.0 DEG F


T 3:DIESEL
VOLUME    =  2961 GALS
ULLAGE    =  3086 GALS
90% ULLAGE=  2481 GALS
TC VOLUME =  2927 GALS
HEIGHT    = 48.30 INCHES
WATER VOL =    16 GALS
WATER     =  1.06 INCHES
TEMP      =  76.2 DEG F
```

**EXHIBIT 8 - FUEL SYSTEM REPORTS OF BROADWAY FUEL, INC. ON JULY 23, 2023 AND JULY 29, 2023**

**EXHIBIT 8**

```
---- IN-TANK ALARM -----
T 2:REGULAR
DELIVERY NEEDED
JUL 23. 2023  6:17 PM




CONOCO
575 S BROADWAY
HICKSVILLE NY 11801


JUL 23. 2023  6:17 PM


  SYSTEM STATUS REPORT
- - - - -  - - - - - -
T 2:DELIVERY NEEDED


INVENTORY REPORT


T 1:SUPER
VOLUME      =   2135 GALS
ULLAGE      =   1886 GALS
90% ULLAGE=   1483 GALS
TC VOLUME =   2069 GALS
HEIGHT      = 47.92 INCHES
WATER VOL =      0 GALS
WATER       =   0.00 INCHES
TEMP        = 103.8 DEG F


T 2:REGULAR
VOLUME      =    968 GALS
ULLAGE      =   8728 GALS
90% ULLAGE=   7758 GALS
TC VOLUME =    951 GALS
HEIGHT      = 14.56 INCHES
WATER VOL =      0 GALS
WATER       =   0.00 INCHES
TEMP        =  84.5 DEG F


T 3:DIESEL
VOLUME      =    749 GALS
ULLAGE      =   3272 GALS
90% ULLAGE=   2869 GALS
TC VOLUME =    742 GALS
HEIGHT      = 21.92 INCHES
WATER VOL =     15 GALS
WATER       =   1.50 INCHES
TEMP        =  79.4 DEG F


* * * * * END * * * * *
```

Case 23-90147   Document 1285   Filed in TXSB on 08/14/23   Page 163 of 186

```
CONOCO
575 S BROADWAY
HICKSVILLE NY 11801


JUL 29. 2023   4:52 PM


  SYSTEM STATUS REPORT
- - - - - - - - - - - -
  ALL FUNCTIONS NORMAL

INVENTORY REPORT


T 1:SUPER
VOLUME     =   2855 GALS
ULLAGE     =   1166 GALS
90% ULLAGE-    769 GALS
TC VOLUME =    2785 GALS
HEIGHT    =   61.18 INCHES
WATER VOL =       0 GALS
WATER     =    0.00 INCHES
TEMP      =    94.7 DEG F


T 2:REGULAR
VOLUME     =   2004 GALS
ULLAGE     =   7692 GALS
90% ULLAGE=    6722 GALS
TC VOLUME =    1966 GALS
HEIGHT    =   24.10 INCHES
WATER VOL =       0 GALS
WATER     =    0.00 INCHES
TEMP      =    87.3 DEG F


T 3:DIESEL
VOLUME     =   2597 GALS
ULLAGE     =   1424 GALS
90% ULLAGE=    1021 GALS
TC VOLUME =    2568 GALS
HEIGHT    =   56.34 INCHES
WATER VOL =      15 GALS
WATER     =    1.51 INCHES
TEMP      =    84.3 DEG F


* * * * * END * * * * *
```

```
CONOCO
575 S BROADWAY
HICKSVILLE NY 11801


AUG  7. 2023  5:34 PM


 SYSTEM STATUS REPORT
- - - - -  - - - - -
T 1:DELIVERY NEEDED

T 2:LOW PRODUCT ALARM

T 2:DELIVERY NEEDED

T 3:DELIVERY NEEDED


INVENTORY REPORT


T 1:SUPER
VOLUME     =    379 GALS
ULLAGE     =   3642 GALS
90% ULLAGE=   3239 GALS
TC VOLUME =    372 GALS
HEIGHT     = 13.52 INCHES
WATER VOL =      0 GALS
WATER      =  0.00 INCHES
TEMP       =  85.6 DEG F


T 2:REGULAR
VOLUME     =    353 GALS
ULLAGE     =   9343 GALS
90% ULLAGE=   8373 GALS
TC VOLUME =    347 GALS
HEIGHT     =  7.36 INCHES
WATER VOL =      0 GALS
WATER      =  0.00 INCHES
TEMP       =  81.7 DEG F


T 3:DIESEL
VOLUME     =    304 GALS
ULLAGE     =   3717 GALS
90% ULLAGE=   3314 GALS
TC VOLUME =    301 GALS
HEIGHT     = 11.60 INCHES
WATER VOL =     15 GALS
WATER      =  1.50 INCHES
TEMP       =  80.0 DEG F


* * * * * END * * * * *
```

**EXHIBIT 9 - FUEL SYSTEM REPORTS OF PRIME PETRO, INC. BETWEEN
AUGUST 2, 2023 THROUGH AUGUST 6, 2023**

**EXHIBIT 9**

Stor 965
434 Hempstead

—OMNTEC Mfg., Inc.
Tel: 1(631)981-2001
Fax: 1(631)981-2007

MO 08/06/23 18:50:24

INVENTORY REPORT

TANK 1: REGULAR
PRODUCT HEIGHT : 6.62 (In)
WATER HEIGHT : 0.00 (In)
GROSS VOLUME : 389.59 (G)
T.C. VOLUME : 385.93 (G)
WATER VOLUME : 0.19 (G)
ULLAGE : 11204.41 (G)
90% ULLAGE : 10045.01 (G)
TEMP. : 73.56 (F)

—OMNTEC Mfg., Inc.
Tel: 1(631)981-2001
Fax: 1(631)981-2007

MO 08/06/23 18:50:25

INVENTORY REPORT

TANK 2: SUPER
PRODUCT HEIGHT : 9.31 (In)
WATER HEIGHT : 0.00 (In)
GROSS VOLUME : 190.12 (G)
T.C. VOLUME : 188.79 (G)
WATER VOLUME : 0.04 (G)
ULLAGE : 3807.86 (G)
90% ULLAGE : 3408.07 (G)
TEMP. : 75.74 (F)

—OMNTEC Mfg., Inc.
Tel: 1(631)981-2001
Fax: 1(631)981-2007

MO 08/06/23 18:50:27

INVENTORY REPORT

TANK 3: DIESEL
PRODUCT HEIGHT : 53.88 (In)
WATER HEIGHT : 0.25 (In)
GROSS VOLUME : 2478.81 (G)
T.C. VOLUME : 2462.70 (G)
WATER VOLUME : 3.76 (G)
ULLAGE : 1513.19 (G)
90% ULLAGE : 1113.99 (G)
TEMP. : 74.56 (F)

Store 965
434 Hempstead

—OMNTEC Mfg., Inc.
Tel: 1(631)981-2001
Fax: 1(631)981-2007

SU 08/05/23 19:20:43

INVENTORY REPORT

TANK 1: REGULAR
PRODUCT HEIGHT : 6.63 (In)
WATER HEIGHT : 0.00 (In)
GROSS VOLUME : 390.00 (G)
T.C. VOLUME : 386.26 (G)
WATER VOLUME : 0.11 (G)
ULLAGE : 11204.00 (G)
90% ULLAGE : 10044.60 (G)
TEMP. : 73.84 (F)

—OMNTEC Mfg., Inc.
Tel: 1(631)981-2001
Fax: 1(631)981-2007

SU 08/05/23 19:20:45

INVENTORY REPORT

TANK 2: SUPER
PRODUCT HEIGHT : 9.31 (In)
WATER HEIGHT : 0.00 (In)
GROSS VOLUME : 190.16 (G)
T.C. VOLUME : 188.76 (G)
WATER VOLUME : 0.03 (G)
ULLAGE : 3807.84 (G)
90% ULLAGE : 3408.04 (G)
TEMP. : 76.50 (F)

—OMNTEC Mfg., Inc.
Tel: 1(631)981-2001
Fax: 1(631)981-2007

SU 08/05/23 19:20:47

INVENTORY REPORT

TANK 3: DIESEL
PRODUCT HEIGHT : 53.88 (In)
WATER HEIGHT : 0.25 (In)
GROSS VOLUME : 2479.14 (G)
T.C. VOLUME : 2462.82 (G)
WATER VOLUME : 3.76 (G)
ULLAGE : 1512.86 (G)
90% ULLAGE : 1113.66 (G)
TEMP. : 74.92 (F)

Store 965
434 Hempstead

—OMNTEC Mfg., Inc.
Tel: 1(631)981-2001
Fax: 1(631)981-2007

SU 08/05/23 18:30:13

INVENTORY REPORT

TANK 1: REGULAR
PRODUCT HEIGHT : 6.63 (In)
WATER HEIGHT : 0.00 (In)
GROSS VOLUME : 390.10 (G)
T.C. VOLUME : 386.35 (G)
WATER VOLUME : 0.08 (G)
ULLAGE : 11203.90 (G)
90% ULLAGE : 10044.50 (G)
TEMP. : 73.86 (F)

—OMNTEC Mfg., Inc.
Tel: 1(631)981-2001
Fax: 1(631)981-2007

SU 08/05/23 18:30:14

INVENTORY REPORT

TANK 2: SUPER
PRODUCT HEIGHT : 9.31 (In)
WATER HEIGHT : 0.00 (In)
GROSS VOLUME : 190.16 (G)
T.C. VOLUME : 188.75 (G)
WATER VOLUME : 0.02 (G)
ULLAGE : 3807.84 (G)
90% ULLAGE : 3408.04 (G)
TEMP. : 76.59 (F)

—OMNTEC Mfg., Inc.
Tel: 1(631)981-2001
Fax: 1(631)981-2007

SU 08/05/23 18:30:16

INVENTORY REPORT

TANK 3: DIESEL
PRODUCT HEIGHT : 53.88 (In)
WATER HEIGHT : 0.25 (In)
GROSS VOLUME : 2479.14 (G)
T.C. VOLUME : 2462.61 (G)
WATER VOLUME : 3.76 (G)
ULLAGE : 1512.86 (G)
90% ULLAGE : 1113.66 (G)
TEMP. : 74.94 (F)

Store 965
434 Hempstead

—OMNTEC Mfg., Inc.
Tel: 1(631)981-2001
Fax: 1(631)981-2007

SA 08/04/23 13:53:16

INVENTORY REPORT

TANK 1: REGULAR
PRODUCT HEIGHT : 6.63 (In)
WATER HEIGHT : 0.00 (In)
GROSS VOLUME : 390.69 (G)
T.C. VOLUME : 386.85 (G)
WATER VOLUME : 0.11 (G)
ULLAGE : 11203.31 (G)
90% ULLAGE : 10043.91 (G)
TEMP. : 74.18 (F)

—OMNTEC Mfg., Inc.
Tel: 1(631)981-2001
Fax: 1(631)981-2007

SA 08/04/23 13:53:17

INVENTORY REPORT

TANK 1: REGULAR
PRODUCT HEIGHT : 6.63 (In)
WATER HEIGHT : 0.00 (In)
GROSS VOLUME : 390.69 (G)
T.C. VOLUME : 386.85 (G)
WATER VOLUME : 0.11 (G)
ULLAGE : 11203.31 (G)
90% ULLAGE : 10043.91 (G)
TEMP. : 74.18 (F)

—OMNTEC Mfg., Inc.
Tel: 1(631)981-2001
Fax: 1(631)981-2007

SA 08/04/23 13:53:20

INVENTORY REPORT

TANK 3: DIESEL
PRODUCT HEIGHT : 55.64 (In)
WATER HEIGHT : 0.25 (In)
GROSS VOLUME : 2580.06 (G)
T.C. VOLUME : 2562.88 (G)
WATER VOLUME : 3.76 (G)
ULLAGE : 1411.94 (G)
90% ULLAGE : 1012.74 (G)
TEMP. : 74.91 (F)

Store
434 Hempstead

—OMNTEC Mfg.
Tel: 1(631)981-2001
Fax: 1(631)981-2007

TH 08/02/23 18:54:32

INVENTORY REPORT

TANK 1: REGULAR
PRODUCT HEIGHT : 6.85 (In)
WATER HEIGHT : 0.00 (In)
GROSS VOLUME : 408.54 (G)
T.C. VOLUME : 404.67 (G)
WATER VOLUME : 0.00 (G)
ULLAGE : 11185.46 (G)
90% ULLAGE : 10026.06 (G)
TEMP. : 75.79 (F)

—OMNTEC Mfg., Inc
Tel: 1(631)981-2001
Fax: 1(631)981-2007

TH 08/02/23 18:54:34

INVENTORY REPORT

TANK 2: SUPER
PRODUCT HEIGHT : 29.25 (In)
WATER HEIGHT : 0.00 (In)
GROSS VOLUME : 1061.73 (G)
T.C. VOLUME : 1053.93 (G)
WATER VOLUME : 0.02 (G)
ULLAGE : 2936.27 (G)
90% ULLAGE : 2536.47 (G)
TEMP. : 76.50 (F)

—OMNTEC Mfg., Inc.
Tel: 1(631)981-2001
Fax: 1(631)981-2007

TH 08/02/23 18:54:36

INVENTORY REPORT

TANK 3: DIESEL
PRODUCT HEIGHT : 57.79 (In)
WATER HEIGHT : 0.25 (In)
GROSS VOLUME : 2700.83 (G)
T.C. VOLUME : 2682.76 (G)
WATER VOLUME : 3.75 (G)
ULLAGE : 1291.17 (G)
90% ULLAGE : 891.97 (G)
TEMP. : 74.56 (F)

**EXHIBIT 10 - FUEL SYSTEM REPORTS OF COMMACK FUEL, INC. BETWEEN
JULY 11, 2023 THROUGH AUGUST 2, 2023**

SYSTEM STATUS REPORT

T 4:DELIVERY NEEDED

INVENTORY REPORT

4.039

T 1:SUPER 12000
VOLUME       =   8957 GALS
ULLAGE       =   2670 GALS
90% ULLAGE=   1507 GALS
TC VOLUME  =   8928 GALS
HEIGHT       =  65.64 INCHES
WATER VOL  =      0 GALS
WATER        =   0.00 INCHES
TEMP         =  64.5 DEG F

3.279

T 2:REGULAR 12000
VOLUME       =   3517 GALS
ULLAGE       =   8110 GALS
90% ULLAGE=   6947 GALS
TC VOLUME  =   3501 GALS
HEIGHT       =  31.93 INCHES
WATER VOL  =      0 GALS
WATER        =   0.00 INCHES
TEMP         =  66.4 DEG F

3.799

T 3:DIESEL 12000
VOLUME       =   2808 GALS
ULLAGE       =   8819 GALS
90% ULLAGE=   7656 GALS
TC VOLUME  =   2802 GALS
HEIGHT       =  27.29 INCHES
WATER VOL  =      0 GALS
WATER        =   0.00 INCHES
TEMP         =  64.3 DEG F

3.799

T 4:DIESEL 15000
VOLUME       =   1717 GALS
ULLAGE       =  13258 GALS
90% ULLAGE=  11760 GALS
TC VOLUME  =   1711 GALS
HEIGHT       =  20.61 INCHES
WATER VOL  =      0 GALS
WATER        =   0.00 INCHES
TEMP         =  66.8 DEG F

* * * * * END * * * * *

```
TRUCK STOP


JUL 11, 2023  8:54 PM


  SYSTEM STATUS REPORT
- - - - - - - - - - - -
T 1:HIGH WATER ALARM

T 1:INVALID FUEL LEVEL

T 1:HIGH WATER WARNING

T 1:DELIVERY NEEDED

T 4:DELIVERY NEEDED


INVENTORY REPORT


T 1:SUPER 12000
T 1:INVALID FUEL LEVEL
VOL INVALID   924 GALS
ULLAGE     = 10703 GALS
90% ULLAGE=  9540 GALS
TC VOLUME =   912 GALS
HGT INVALID 12.87 INCHES
WATER VOL =   171 GALS
WATER      = 4.28 INCHES
TEMP       = 77.2 DEG F


T 2:REGULAR 12000
VOLUME     = 6186 GALS
ULLAGE     = 5441 GALS
90% ULLAGE= 4278 GALS
TC VOLUME  = 6096 GALS
HEIGHT     = 48.23 INCHES
WATER VOL  =    0 GALS
WATER      = 0.00 INCHES
TEMP       = 80.8 DEG F


T 3:DIESEL 12000
VOLUME     = 1235 GALS
ULLAGE     = 10392 GALS
90% ULLAGE= 9229 GALS
TC VOLUME  = 1225 GALS
HEIGHT     = 15.61 INCHES
WATER VOL  =   13 GALS
WATER      = 0.89 INCHES
TEMP       = 75.5 DEG F


T 4:DIESEL 15000
VOLUME     = 1499 GALS
ULLAGE     = 13476 GALS
90% ULLAGE= 11978 GALS
TC VOLUME  = 1483 GALS
HEIGHT     = 18.78 INCHES
WATER VOL  =    0 GALS
WATER      = 0.00 INCHES
TEMP       = 81.9 DEG F


* * * * * END * * * * *
```

```
TRUCK STOP

JUL 12, 2023  1:46 PM


   SYSTEM STATUS REPORT
- - - - - - - - - - - - -
T 1:HIGH WATER ALARM

T 1:INVALID FUEL LEVEL

T 1:HIGH WATER WARNING

T 1:DELIVERY NEEDED

T 3:DELIVERY NEEDED

T 4:LOW PRODUCT ALARM

T 4:INVALID FUEL LEVEL

T 4:DELIVERY NEEDED


INVENTORY REPORT


T 1:SUPER 12000
T 1:INVALID FUEL LEVEL
VOL INVALID   923 GALS
ULLAGE   = 10704 GALS
90% ULLAGE=  9541 GALS
TC VOLUME =   912 GALS
HGT INVALID 12.86 INCHES
WATER VOL =   171 GALS
WATER    =  4.28 INCHES
TEMP     = 77.1 DEG F


T 2:REGULAR 12000
VOLUME    =  4844 GALS
ULLAGE    =  6783 GALS
90% ULLAGE=  5620 GALS
TC VOLUME =  4774 GALS
HEIGHT    = 40.16 INCHES
WATER VOL =     0 GALS
WATER    =  0.00 INCHES
TEMP     = 80.4 DEG F


T 3:DIESEL 12000
VOLUME    =   805 GALS
ULLAGE    = 10822 GALS
90% ULLAGE=  9659 GALS
TC VOLUME =   797 GALS
HEIGHT    = 11.74 INCHES
WATER VOL =    13 GALS
WATER    =  0.90 INCHES
TEMP     = 78.0 DEG F


T 4:DIESEL 15000
T 4:INVALID FUEL LEVEL
VOL INVALID   111 GALS
ULLAGE    = 14864 GALS
90% ULLAGE= 13366 GALS
TC VOLUME =   109 GALS
HGT INVALID  3.33 INCHES
WATER VOL =     0 GALS
WATER    =  0.00 INCHES
TEMP     = 78.8 DEG F
```

```
JUL. 12, 2023   6:10 AM


   SYSTEM STATUS REPORT
- - - - - - - - - - - - -
T 1:HIGH WATER ALARM

T 1:INVALID FUEL LEVEL

T 1:HIGH WATER WARNING

T 1:DELIVERY NEEDED

T 4:LOW PRODUCT ALARM

T 4:DELIVERY NEEDED


INVENTORY REPORT


T 1:SUPER 12000
T 1:INVALID FUEL LEVEL
  VOL INVALID   924 GALS
ULLAGE      = 10703 GALS
90% ULLAGE=  9540 GALS
TC VOLUME =   913 GALS
HGT INVALID 12.87 INCHES
WATER VOL =   171 GALS
WATER     =  4.28 INCHES
TEMP      =  76.9 DEG F


T 2:REGULAR 12000
VOLUME     =  5958 GALS
ULLAGE     =  5669 GALS
90% ULLAGE=  4506 GALS
TC VOLUME =   5871 GALS
HEIGHT    = 46.87 INCHES
WATER VOL =     0 GALS
WATER     =  0.00 INCHES
TEMP      =  80.8 DEG F


T 3:DIESEL 12000
VOLUME     =  1187 GALS
ULLAGE     = 10440 GALS
90% ULLAGE=  9277 GALS
TC VOLUME =   1178 GALS
HEIGHT    = 15.21 INCHES
WATER VOL =    13 GALS
WATER     =  0.90 INCHES
TEMP      =  75.4 DEG F


T 4:DIESEL 15000
VOLUME     =   245 GALS
ULLAGE     = 14730 GALS
90% ULLAGE= 13232 GALS
TC VOLUME =   242 GALS
HEIGHT    =  5.60 INCHES
WATER VOL =     0 GALS
WATER     =  0.00 INCHES
TEMP      =  80.7 DEG F


* * * * * END * * * * *
```

TRUCK STOP

JUL 12, 2023   8:14 AM

SYSTEM STATUS REPORT
- - - - - - - - - - -
T 1:HIGH WATER ALARM

T 1:INVALID FUEL LEVEL

T 1:HIGH WATER WARNING

T 1:DELIVERY NEEDED

T 3:DELIVERY NEEDED

T 4:LOW PRODUCT ALARM

T 4:INVALID FUEL LEVEL

T 4:DELIVERY NEEDED

INVENTORY REPORT

T 1:SUPER 12000
T 1:INVALID FUEL LEVEL
VOL INVALID    924 GALS
ULLAGE    = 10703 GALS
90% ULLAGE=  9540 GALS
TC VOLUME =    912 GALS
HGT INVALID 12.86 INCHES
WATER VOL =    171 GALS
WATER     =   4.28 INCHES
TEMP      =   77.0 DEG F


T 2:REGULAR 12000
VOLUME    =   5575 GALS
ULLAGE    =   6052 GALS
90% ULLAGE=   4889 GALS
TC VOLUME =   5496 GALS
HEIGHT    =  44.57 INCHES
WATER VOL =      0 GALS
WATER     =   0.00 INCHES
TEMP      =   80.2 DEG F


T 3:DIESEL 12000
VOLUME    =    805 GALS
ULLAGE    =  10822 GALS
90% ULLAGE=   9659 GALS
TC VOLUME =    798 GALS
HEIGHT    =  11.74 INCHES
WATER VOL =     13 GALS
WATER     =   0.90 INCHES
TEMP      =   76.9 DEG F


T 4:DIESEL 15000

```
TRUCK STOP


JUL 12, 2023  8:27 PM


  SYSTEM STATUS REPORT
- - - - - - - - - - - -
T 1:HIGH WATER ALARM

T 1:INVALID FUEL LEVEL

T 1:HIGH WATER WARNING

T 1:DELIVERY NEEDED

T 3:DELIVERY NEEDED

T 4:LOW PRODUCT ALARM

T 4:INVALID FUEL LEVEL

T 4:DELIVERY NEEDED


INVENTORY REPORT


T 1:SUPER 12000
T 1:INVALID FUEL LEVEL
VOL INVALID   924 GALS
ULLAGE    = 10703 GALS
90% ULLAGE=  9540 GALS
TC VOLUME =   912 GALS
HGT INVALID 12.86 INCHES
WATER VOL =   171 GALS
WATER     =  4.28 INCHES
TEMP      =  77.0 DEG F


T 2:REGULAR 12000
VOLUME    =  3664 GALS
ULLAGE    =  7963 GALS
90% ULLAGE=  6800 GALS
TC VOLUME =  3610 GALS
HEIGHT    = 32.87 INCHES
WATER VOL =     0 GALS
WATER     =  0.00 INCHES
TEMP      =  81.1 DEG F


T 3:DIESEL 12000
VOLUME    =   805 GALS
ULLAGE    = 10822 GALS
90% ULLAGE=  9659 GALS
TC VOLUME =   797 GALS
HEIGHT    = 11.74 INCHES
WATER VOL =    13 GALS
WATER     =  0.90 INCHES
TEMP      =  77.9 DEG F


T 4:DIESEL 15000
T 4:INVALID FUEL LEVEL
VOL INVALID   111 GALS
ULLAGE    = 14864 GALS
90% ULLAGE= 13366 GALS
TC VOLUME =   109 GALS
HGT INVALID  3.33 INCHES
WATER VOL =     0 GALS
WATER     =  0.00 INCHES
TEMP      =  78.3 DEG F


* * * * * END * * * * *
```

```
TRUCK STOP


JUL 22, 2023 10:19 PM


  SYSTEM STATUS REPORT
- - - - - - - - - - - -
T 2:LOW PRODUCT ALARM

T 2:INVALID FUEL LEVEL

T 2:DELIVERY NEEDED

T 3:DELIVERY NEEDED


INVENTORY REPORT


T 1:SUPER 12000
VOLUME      =  2609 GALS
ULLAGE      =  9018 GALS
90% ULLAGE=   7855 GALS
TC VOLUME   =  2573 GALS
HEIGHT      = 25.93 INCHES
WATER VOL   =     0 GALS
WATER       =  0.00 INCHES
TEMP        =  79.4 DEG F


T 2:REGULAR 12000
T 2:INVALID FUEL LEVEL
VOL INVALID   523 GALS
ULLAGE      = 11104 GALS
90% ULLAGE=   9941 GALS
TC VOLUME   =   515 GALS
HGT INVALID  8.84 INCHES
WATER VOL   =     0 GALS
WATER       =  0.00 INCHES
TEMP        =  80.3 DEG F


T 3:DIESEL 12000
VOLUME      =  1117 GALS
ULLAGE      = 10510 GALS
90% ULLAGE=   9347 GALS
TC VOLUME   =  1109 GALS
HEIGHT      = 14.60 INCHES
WATER VOL   =    15 GALS
WATER       =  0.96 INCHES
TEMP        =  79.1 DEG F


T 4:DIESEL 15000
VOLUME      =  5142 GALS
ULLAGE      =  9833 GALS
90% ULLAGE=   8335 GALS
TC VOLUME   =  5089 GALS
HEIGHT      = 44.22 INCHES
WATER VOL   =     8 GALS
WATER       =  0.63 INCHES
TEMP        =  81.8 DEG F


* * * * * END * * * * *
```

```
          TRUCK STOP


      JUL 23. 2023  6:57 AM


      SYSTEM STATUS REPORT
   - - - - - - - - - - - -
   T 2:LOW PRODUCT ALARM

   T 2:INVALID FUEL LEVEL

   T 2:DELIVERY NEEDED

   T 3:DELIVERY NEEDED


   INVENTORY REPORT


   T 1:SUPER 12000
   VOLUME     =   2471 GALS
   ULLAGE     =   9156 GALS
   90% ULLAGE=   7993 GALS
   TC VOLUME  =   2438 GALS
   HEIGHT     =  24.98 INCHES
   WATER VOL  =      0 GALS
   WATER      =   0.00 INCHES
   TEMP       =   78.9 DEG F


   T 2:REGULAR 12000
   T 2:INVALID FUEL LEVEL
   VOL INVALID    499 GALS
   ULLAGE     =  11128 GALS
   90% ULLAGE=   9965 GALS
   TC VOLUME  =    492 GALS
   HGT INVALID   8.57 INCHES
   WATER VOL  =      0 GALS
   WATER      =   0.00 INCHES
   TEMP       =   80.1 DEG F


   T 3:DIESEL 12000
   VOLUME     =   1117 GALS
   ULLAGE     =  10510 GALS
   90% ULLAGE=   9347 GALS
   TC VOLUME  =   1108 GALS
   HEIGHT     =  14.60 INCHES
   WATER VOL  =     15 GALS
   WATER      =   0.96 INCHES
   TEMP       =   74.7 DEG F


   T 4:DIESEL 15000
   VOLUME     =   4767 GALS
   ULLAGE     =  10208 GALS
   90% ULLAGE=   8710 GALS
   TC VOLUME  =   4718 GALS
   HEIGHT     =  41.90 INCHES
   WATER VOL  =      8 GALS
   WATER      =   0.63 INCHES
   TEMP       =   81.6 DEG F

   * * * * END * * * * *
```

TRUCK STOP

JUL 23, 2023 11:58 AM

SYSTEM STATUS REPORT
- - - - - - - - - - -
T 2:LOW PRODUCT ALARM

T 2:INVALID FUEL LEVEL

T 2:DELIVERY NEEDED

T 3:DELIVERY NEEDED

INVENTORY REPORT

T 1:SUPER 12000
VOLUME      =    2270 GALS
ULLAGE      =    9357 GALS
90% ULLAGE=    8194 GALS
TC VOLUME =    2240 GALS
HEIGHT      =   23.57 INCHES
WATER VOL =       0 GALS
WATER       =    0.00 INCHES
TEMP        =    79.0 DEG F

T 2:REGULAR 12000
T 2:INVALID FUEL LEVEL
VOL INVALID    499 GALS
ULLAGE      =   11128 GALS
90% ULLAGE =    9965 GALS
TC VOLUME =     492 GALS
HGT INVALID   8.57 INCHES
WATER VOL =       0 GALS
WATER       =    0.00 INCHES
TEMP        =    79.9 DEG F

T 3:DIESEL 12000
VOLUME      =    1116 GALS
ULLAGE      =   10511 GALS
90% ULLAGE=    9348 GALS
TC VOLUME =    1106 GALS
HEIGHT      =   14.59 INCHES
WATER VOL =      15 GALS
WATER       =    0.96 INCHES
TEMP        =    78.0 DEG F

T 4:DIESEL 15000
VOLUME      =    4528 GALS
ULLAGE      =   10447 GALS
90% ULLAGE=    8949 GALS
TC VOLUME =    4482 GALS
HEIGHT      =   40.40 INCHES
WATER VOL =       0 GALS
WATER       =    0.00 INCHES
TEMP        =    81.5 DEG F

* * * * * END * * * * *

```
TRUCK STOP

JUL 24, 2023  7:11 AM


  SYSTEM STATUS REPORT
- - - - - - - - - - -
T 2:LOW PRODUCT ALARM

T 2:INVALID FUEL LEVEL

T 2:DELIVERY NEEDED

T 3:DELIVERY NEEDED


INVENTORY REPORT


 T 1:SUPER 12000
VOLUME      =  1388 GALS
ULLAGE      = 10239 GALS
90% ULLAGE=  9076 GALS
TC VOLUME   =  1369 GALS
HEIGHT      = 16.89 INCHES
WATER VOL   =     0 GALS
WATER       =  0.00 INCHES
TEMP        =  78.9 DEG F


 T 2:REGULAR 12000
 T 2:INVALID FUEL LEVEL
VOL INVALID   498 GALS
ULLAGE      = 11129 GALS
90% ULLAGE=  9966 GALS
TC VOLUME   =   490 GALS
HGT INVALID  8.55 INCHES
WATER VOL   =     0 GALS
WATER       =  0.00 INCHES
TEMP        =  79.3 DEG F


 T 3:DIESEL 12000
VOLUME      =  1071 GALS
ULLAGE      = 10556 GALS
90% ULLAGE=  9393 GALS
TC VOLUME   =  1063 GALS
HEIGHT      = 14.20 INCHES
WATER VOL   =    15 GALS
WATER       =  0.97 INCHES
TEMP        =  74.9 DEG F


 T 4:DIESEL 15000
VOLUME      =  2759 GALS
ULLAGE      = 12216 GALS
90% ULLAGE= 10718 GALS
TC VOLUME   =  2731 GALS
HEIGHT      = 28.56 INCHES
WATER VOL   =     0 GALS
WATER       =  0.00 INCHES
TEMP        =  81.2 DEG F


 * * * * END * * * * *
```

```
SYSTEM STATUS REPORT
- - - - - - - - - - -
T 1:HIGH WATER ALARM

T 1:INVALID FUEL LEVEL

T 1:HIGH WATER WARNING

T 1:DELIVERY NEEDED

T 2:LOW PRODUCT ALARM

T 2:INVALID FUEL LEVEL

T 2:DELIVERY NEEDED


INVENTORY REPORT


T 1:SUPER 12000
T 1:INVALID FUEL LEVEL
VOL INVALID    990 GALS
ULLAGE      = 10637 GALS
90% ULLAGE=  9474 GALS
TC VOLUME  =   976 GALS
HGT INVALID 13.47 INCHES
WATER VOL  =   159 GALS
WATER      =  4.08 INCHES
TEMP       =  79.5 DEG F


T 2:REGULAR 12000
T 2:INVALID FUEL LEVEL
VOL INVALID    530 GALS
ULLAGE      = 11097 GALS
90% ULLAGE=  9934 GALS
TC VOLUME  =   521 GALS
HGT INVALID  8.91 INCHES
WATER VOL  =     0 GALS
WATER      =  0.00 INCHES
TEMP       =  81.0 DEG F


T 3:DIESEL 12000
VOLUME     =  2304 GALS
ULLAGE     =  9323 GALS
90% ULLAGE=  8160 GALS
TC VOLUME  =  2286 GALS
HEIGHT     = 23.81 INCHES
WATER VOL  =    14 GALS
WATER      =  0.93 INCHES
TEMP       =  76.1 DEG F


T 4:DIESEL 15000
VOLUME     =  2725 GALS
ULLAGE     = 12250 GALS
90% ULLAGE= 10752 GALS
TC VOLUME  =  2696 GALS
HEIGHT     = 28.31 INCHES
WATER VOL  =     0 GALS
WATER      =  0.00 INCHES
TEMP       =  82.4 DEG F


* * * * * END * * * * *
```

```
TRUCK STOP


AUG  2, 2023  6:45 AM


  SYSTEM STATUS REPORT
- - - - - - - - - - - -
T 1:HIGH WATER ALARM

T 1:INVALID FUEL LEVEL

T 1:HIGH WATER WARNING

T 1:DELIVERY NEEDED

T 2:DELIVERY NEEDED


INVENTORY REPORT


T 1:SUPER 12000
T 1:INVALID FUEL LEVEL
VOL INVALID   904 GALS
ULLAGE   = 10723 GALS
90% ULLAGE=  9560 GALS
TC VOLUME =   891 GALS
HGT INVALID 12.68 INCHES
WATER VOL =   157 GALS
WATER     =  4.06 INCHES
TEMP      =  79.0 DEG F


T 2:REGULAR 12000
VOLUME    =   984 GALS
ULLAGE    = 10643 GALS
90% ULLAGE=  9480 GALS
TC VOLUME =   970 GALS
HEIGHT    = 13.42 INCHES
WATER VOL =     0 GALS
WATER     =  0.00 INCHES
TEMP      =  80.6 DEG F


T 3:DIESEL 12000
VOLUME    =  1871 GALS
ULLAGE    =  9756 GALS
90% ULLAGE=  8593 GALS
TC VOLUME =  1855 GALS
HEIGHT    = 20.66 INCHES
WATER VOL =    14 GALS
WATER     =  0.94 INCHES
TEMP      =  77.2 DEG F


T 4:DIESEL 15000
VOLUME    =  3866 GALS
ULLAGE    = 11109 GALS
90% ULLAGE=  9611 GALS
TC VOLUME =  3824 GALS
HEIGHT    = 36.14 INCHES
WATER VOL =     8 GALS
WATER     =  0.65 INCHES
TEMP      =  82.9 DEG F


* * * * * END * * * * *
```

**EXHIBIT 11 - FUEL SYSTEM REPORTS OF AMERICAN 1 GAS, INC. BETWEEN
JULY 11, 2023 THROUGH AUGUST 7, 2023**

EXHIBIT
11

PHILLIPS 66
86 SUNRISE HWY
LINDENHURST NY

JUL 11. 2023  6:57 PM


SYSTEM STATUS REPORT
- - - - - - - - - - - -
T 3:LOW PRODUCT ALARM

T 3:DELIVERY NEEDED

L 1:LIQUID WARNING


INVENTORY REPORT


T 1:REG
VOLUME     =   6765 GALS
ULLAGE     =  13186 GALS
90% ULLAGE=  11190 GALS
TC VOLUME  =   6683 GALS
HEIGHT     =  44.90 INCHES
WATER VOL  =      0 GALS
WATER      =   0.00 INCHES
TEMP       =   77.2 DEG F


T 2:SUPER
VOLUME     =   1918 GALS
ULLAGE     =   8339 GALS
90% ULLAGE=   7313 GALS
TC VOLUME  =   1899 GALS
HEIGHT     =  30.39 INCHES
WATER VOL  =      0 GALS
WATER      =   0.00 INCHES
TEMP       =   73.4 DEG F


T 3:DIESEL
VOLUME     =    348 GALS
ULLAGE     =   5760 GALS
90% ULLAGE=   5149 GALS
TC VOLUME  =    346 GALS
HEIGHT     =  12.49 INCHES
WATER VOL  =      0 GALS
WATER      =   0.00 INCHES
TEMP       =   69.2 DEG F


* * * * * END * * * * *

PHILLIPS 66
86 SUNRISE HWY
LINDENHURST NY

JUL 12, 2023  8:08 PM

SYSTEM STATUS REPORT
- - - - - - - - - - -
T 1:LOW PRODUCT ALARM

T 1:DELIVERY NEEDED

T 2:LOW PRODUCT ALARM

T 2:DELIVERY NEEDED

T 3:LOW PRODUCT ALARM

T 3:DELIVERY NEEDED

L 1:LIQUID WARNING

INVENTORY REPORT

T 1:REG
VOLUME      =    254 GALS
ULLAGE      = 19697 GALS
90% ULLAGE= 17701 GALS
TC VOLUME =    251 GALS
HEIGHT      =   4.93 INCHES
WATER VOL =      0 GALS
WATER       =   0.00 INCHES
TEMP        =  72.7 DEG F


T 2:SUPER
VOLUME      =   1057 GALS
ULLAGE      =   9200 GALS
90% ULLAGE=   8174 GALS
TC VOLUME =   1049 GALS
HEIGHT      =  20.52 INCHES
WATER VOL =      0 GALS
WATER       =   0.00 INCHES
TEMP        =  70.7 DEG F


T 3:DIESEL
VOLUME      =    348 GALS
ULLAGE      =   5760 GALS
90% ULLAGE=   5149 GALS
TC VOLUME =    346 GALS
HEIGHT      =  12.49 INCHES
WATER VOL =      0 GALS
WATER       =   0.00 INCHES
TEMP        =  66.7 DEG F

* * * * * END * * * * *

```
PHILLIPS 66
86 SUNRISE HWY
LINDENHURST NY

JUL 17, 2023   7:15 PM


   SYSTEM STATUS REPORT

T 1:LOW PRODUCT ALARM

T 1:DELIVERY NEEDED

T 3:LOW PRODUCT ALARM

L 1:LIQUID WARNING


   INVENTORY REPORT


  T 1:REG
  VOLUME    =    249 GALS
  ULLAGE    =  19702 GALS
  90% ULLAGE=  17706 GALS
  TC VOLUME =    247 GALS
  HEIGHT    =   4.87 INCHES
  WATER VOL =      0 GALS
  WATER     =   0.00 INCHES
  TEMP      =   68.1 DEG F


  T 2:SUPER
  VOLUME    =   7622 GALS
  ULLAGE    =   2635 GALS
  90% ULLAGE=   1609 GALS
  TC VOLUME =   7502 GALS
  HEIGHT    =  81.83 INCHES
  WATER VOL =      0 GALS
  WATER     =   0.00 INCHES
  TEMP      =   82.5 DEG F


  T 3:DIESEL
  VOLUME    =   1051 GALS
  ULLAGE    =   5057 GALS
  90% ULLAGE=   4446 GALS
  TC VOLUME =   1046 GALS
  HEIGHT    =  27.08 INCHES
  WATER VOL =      0 GALS
  WATER     =   0.00 INCHES
  TEMP      =   68.5 DEG F


* * * * * END * * * * *
```

```
PHILLIPS 66
86 SUNRISE HWY
LINDENHURST NY

JUL 16, 2023   7:43 PM


   SYSTEM STATUS REPORT

T 1:LOW PRODUCT ALARM

T 1:DELIVERY NEEDED

L 1:LIQUID WARNING


   INVENTORY REPORT


  T 1:REG
  VOLUME    =    416 GALS
  ULLAGE    =  19535 GALS
  90% ULLAGE=  17539 GALS
  TC VOLUME =    411 GALS
  HEIGHT    =   6.80 INCHES
  WATER VOL =      0 GALS
  WATER     =   0.00 INCHES
  TEMP      =   73.9 DEG F


  T 2:SUPER
  VOLUME    =   1832 GALS
  ULLAGE    =   8425 GALS
  90% ULLAGE=   7399 GALS
  TC VOLUME =   1818 GALS
  HEIGHT    =  29.48 INCHES
  WATER VOL =      0 GALS
  WATER     =   0.00 INCHES
  TEMP      =   70.5 DEG F


  T 3:DIESEL
  VOLUME    =   1720 GALS
  ULLAGE    =   4388 GALS
  90% ULLAGE=   3777 GALS
  TC VOLUME =   1712 GALS
  HEIGHT    =  38.68 INCHES
  WATER VOL =      0 GALS
  WATER     =   0.00 INCHES
  TEMP      =   70.1 DEG F


* * * * * END * * * * *
```

```
PHILLIPS 66
86 SUNRISE HWY
LINDENHURST NY

JUL 12, 2023   8:07 PM


   SYSTEM STATUS REPORT

T 1:LOW PRODUCT ALARM

T 1:DELIVERY NEEDED

T 2:LOW PRODUCT ALARM

T 2:DELIVERY NEEDED

T 3:LOW PRODUCT ALARM

T 3:DELIVERY NEEDED

L 1:LIQUID WARNING


   INVENTORY REPORT


  T 1:REG
  VOLUME    =    257 GALS
  ULLAGE    =  19694 GALS
  90% ULLAGE=  17698 GALS
  TC VOLUME =    254 GALS
  HEIGHT    =   4.97 INCHES
  WATER VOL =      0 GALS
  WATER     =   0.00 INCHES
  TEMP      =   72.7 DEG F


  T 2:SUPER
  VOLUME    =   1057 GALS
  ULLAGE    =   9200 GALS
  90% ULLAGE=   8174 GALS
  TC VOLUME =   1049 GALS
  HEIGHT    =  20.52 INCHES
  WATER VOL =      0 GALS
  WATER     =   0.00 INCHES
  TEMP      =   70.7 DEG F


  T 3:DIESEL
  VOLUME    =    348 GALS
  ULLAGE    =   5760 GALS
  90% ULLAGE=   5149 GALS
  TC VOLUME =    346 GALS
  HEIGHT    =  12.49 INCHES
  WATER VOL =      0 GALS
  WATER     =   0.00 INCHES
  TEMP      =   66.7 DEG F


* * * * * END * * * * *
```

Case 23-47247   Document 1265   Filed in TXSB on 08/14/23   Page 184 of 186

```
PHILLIPS 66
86 SUNRISE HWY
LINDENHURST NY

JUL 20, 2023  6:03 PM


SYSTEM STATUS REPORT
- - - - - - - - - - - -
T 1:LOW PRODUCT ALARM

T 1:DELIVERY NEEDED

L 1:LIQUID WARNING


INVENTORY REPORT


T 1:REG
VOLUME     =   248 GALS
ULLAGE     = 19703 GALS
90% ULLAGE= 17707 GALS
TC VOLUME  =   245 GALS
HEIGHT     =  4.85 INCHES
WATER VOL  =     0 GALS
WATER      =  0.00 INCHES
TEMP       =  71.8 DEG F


T 2:SUPER
VOLUME     =  5253 GALS
ULLAGE     =  5004 GALS
90% ULLAGE=  3978 GALS
TC VOLUME  =  5197 GALS
HEIGHT     = 60.76 INCHES
WATER VOL  =     0 GALS
WATER      =  0.00 INCHES
TEMP       =  75.1 DEG F


T 3:DIESEL
VOLUME     =  1863 GALS
ULLAGE     =  4245 GALS
90% ULLAGE=  3634 GALS
TC VOLUME  =  1852 GALS
HEIGHT     = 41.02 INCHES
WATER VOL  =     0 GALS
WATER      =  0.00 INCHES
TEMP       =  72.5 DEG F


* * * * * END * * * * *
```

```
PHILLIPS 66
86 SUNRISE HWY
LINDENHURST NY

JUL 25, 2023  7:35 PM


SYSTEM STATUS REPORT
- - - - - - - - - - - -
T 1:LOW PRODUCT ALARM

T 1:DELIVERY NEEDED

L 1:LIQUID WARNING


INVENTORY REPORT


T 1:REG
VOLUME     =   718 GALS
ULLAGE     = 19233 GALS
90% ULLAGE= 17237 GALS
TC VOLUME  =   707 GALS
HEIGHT     =  9.75 INCHES
WATER VOL  =     0 GALS
WATER      =  0.00 INCHES
TEMP       =  79.6 DEG F


T 2:SUPER
VOLUME     =  3428 GALS
ULLAGE     =  6829 GALS
90% ULLAGE=  5803 GALS
TC VOLUME  =  3400 GALS
HEIGHT     = 44.93 INCHES
WATER VOL  =     0 GALS
WATER      =  0.00 INCHES
TEMP       =  71.8 DEG F


T 3:DIESEL
VOLUME     =  3828 GALS
ULLAGE     =  2280 GALS
90% ULLAGE=  1669 GALS
TC VOLUME  =  3805 GALS
HEIGHT     = 71.73 INCHES
WATER VOL  =     0 GALS
WATER      =  0.00 INCHES
TEMP       =  73.6 DEG F


* * * * * END * * * * *
```

```
PHILLIPS 66
86 SUNRISE HWY
LINDENHURST NY

JUL 26, 2023  7:28 PM


SYSTEM STATUS REPORT
- - - - - - - - - - - -
T 1:LOW PRODUCT ALARM

T 1:DELIVERY NEEDED

L 1:LIQUID WARNING


INVENTORY REPORT


T 1:REG
VOLUME     =   215 GALS
ULLAGE     = 19736 GALS
90% ULLAGE= 17740 GALS
TC VOLUME  =   213 GALS
HEIGHT     =  4.42 INCHES
WATER VOL  =     0 GALS
WATER      =  0.00 INCHES
TEMP       =  69.6 DEG F


T 2:SUPER
VOLUME     =  2210 GALS
ULLAGE     =  8047 GALS
90% ULLAGE=  7021 GALS
TC VOLUME  =  2192 GALS
HEIGHT     = 33.40 INCHES
WATER VOL  =     0 GALS
WATER      =  0.00 INCHES
TEMP       =  71.1 DEG F


T 3:DIESEL
VOLUME     =  3303 GALS
ULLAGE     =  2805 GALS
90% ULLAGE=  2194 GALS
TC VOLUME  =  3284 GALS
HEIGHT     = 63.54 INCHES
WATER VOL  =     0 GALS
WATER      =  0.00 INCHES
TEMP       =  72.4 DEG F


* * * * * END * * * * *
```

```
PHILLIPS 66
86 SUNRISE HWY
LINDENHURST NY

JUL 27, 2023  8:44 PM


SYSTEM STATUS REPORT
- - - - - - - - - - - -
T 1:LOW PRODUCT ALARM

T 1:DELIVERY NEEDED

T 2:LOW PRODUCT ALARM

T 2:DELIVERY NEEDED

L 1:LIQUID WARNING


INVENTORY REPORT


T 1:REG
VOLUME     =   214 GALS
ULLAGE     = 19737 GALS
90% ULLAGE= 17741 GALS
TC VOLUME  =   212 GALS
HEIGHT     =  4.41 INCHES
WATER VOL  =     0 GALS
WATER      =  0.00 INCHES
TEMP       =  68.7 DEG F


T 2:SUPER
VOLUME     =   861 GALS
ULLAGE     =  9396 GALS
90% ULLAGE=  8370 GALS
TC VOLUME  =   854 GALS
HEIGHT     = 17.96 INCHES
WATER VOL  =     0 GALS
WATER      =  0.00 INCHES
TEMP       =  71.5 DEG F


T 3:DIESEL
VOLUME     =  2263 GALS
ULLAGE     =  3845 GALS
90% ULLAGE=  3234 GALS
TC VOLUME  =  2250 GALS
HEIGHT     = 47.41 INCHES
WATER VOL  =     0 GALS
WATER      =  0.00 INCHES
TEMP       =  71.5 DEG F


* * * * * END * * * * *
```

PHILLIPS 66
86 SUNRISE HWY
LINDENHURST NY

JUL 31. 2023 11:28 AM


SYSTEM STATUS REPORT
- - - - - - - - - - - - -
T 1:LOW PRODUCT ALARM

T 1:DELIVERY NEEDED

L 1:LIQUID WARNING


INVENTORY REPORT


T 1:REG
VOLUME      =    373 GALS
ULLAGE      =  19578 GALS
90% ULLAGE= 17582 GALS
TC VOLUME   =    369 GALS
HEIGHT      =   6.34 INCHES
WATER VOL   =      0 GALS
WATER       =   0.00 INCHES
TEMP        =   74.0 DEG F


T 2:SUPER
VOLUME      =   2026 GALS
ULLAGE      =   8231 GALS
90% ULLAGE=   7205 GALS
TC VOLUME   =   2009 GALS
HEIGHT      =  31.52 INCHES
WATER VOL   =      0 GALS
WATER       =   0.00 INCHES
TEMP        =   71.2 DEG F


T 3:DIESEL
VOLUME      =   2595 GALS
ULLAGE      =   3513 GALS
90% ULLAGE=   2902 GALS
TC VOLUME   =   2581 GALS
HEIGHT      =  52.60 INCHES
WATER VOL   =      0 GALS
WATER       =   0.00 INCHES
TEMP        =   71.7 DEG F


* * * * * END * * * * *

```
PHILLIPS 66
86 SUNRISE HWY
LINDENHURST NY

AUG  4, 2023  6:58 PM

   SYSTEM STATUS REPORT
T 1:LOW PRODUCT ALARM
T 1:DELIVERY NEEDED
T 2:LOW PRODUCT ALARM
T 2:DELIVERY NEEDED
L 1:LIQUID WARNING

INVENTORY REPORT

T 1:REG
VOLUME      =    388 GALS
ULLAGE      = 19563 GALS
90% ULLAGE= 17567 GALS
TC VOLUME   =    385 GALS
HEIGHT      =   6.51 INCHES
WATER VOL.  =      0 GALS
WATER       =   0.00 INCHES
TEMP        =  69.0 DEG F


T 2:SUPER
VOLUME      =    230 GALS
ULLAGE      = 10027 GALS
90% ULLAGE=  9001 GALS
TC VOLUME   =    228 GALS
HEIGHT      =   7.73 INCHES
WATER VOL.  =      0 GALS
WATER       =   0.00 INCHES
TEMP        =  69.7 DEG F


T 3:DIESEL
VOLUME      =   2275 GALS
ULLAGE      =   3833 GALS
90% ULLAGE=   3222 GALS
TC VOLUME   =   2263 GALS
HEIGHT      =  47.59 INCHES
WATER VOL.  =      0 GALS
WATER       =   0.00 INCHES
TEMP        =  71.1 DEG F

* * * * END * * * * *
```

```
PHILLIPS 66
86 SUNRISE HWY
LINDENHURST NY

AUG  5, 2023  8:47 PM

   SYSTEM STATUS REPORT
T 1:LOW PRODUCT ALARM
T 1:DELIVERY NEEDED
T 2:LOW PRODUCT ALARM
T 2:DELIVERY NEEDED
L 1:LIQUID WARNING

INVENTORY REPORT

T 1:REG
VOLUME      =    387 GALS
ULLAGE      = 19564 GALS
90% ULLAGE= 17568 GALS
TC VOLUME   =    384 GALS
HEIGHT      =   6.49 INCHES
WATER VOL.  =      0 GALS
WATER       =   0.00 INCHES
TEMP        =  68.8 DEG F


T 2:SUPER
VOLUME      =    230 GALS
ULLAGE      = 10027 GALS
90% ULLAGE=  9001 GALS
TC VOLUME   =    228 GALS
HEIGHT      =   7.72 INCHES
WATER VOL.  =      0 GALS
WATER       =   0.00 INCHES
TEMP        =  69.4 DEG F


T 3:DIESEL
VOLUME      =   1674 GALS
ULLAGE      =   4434 GALS
90% ULLAGE=   3823 GALS
TC VOLUME   =   1665 GALS
HEIGHT      =  37.91 INCHES
WATER VOL.  =      0 GALS
WATER       =   0.00 INCHES
TEMP        =  70.7 DEG F

* * * * END * * * * *
```

```
PHILLIPS 66
86 SUNRISE HWY
LINDENHURST NY

AUG  6, 2023  9:02 PM

   SYSTEM STATUS REPORT
T 1:LOW PRODUCT ALARM
T 1:DELIVERY NEEDED
T 2:LOW PRODUCT ALARM
T 2:DELIVERY NEEDED
T 3:LOW PRODUCT ALARM
L 1:LIQUID WARNING

INVENTORY REPORT

T 1:REG
VOLUME      =    386 GALS
ULLAGE      = 19565 GALS
90% ULLAGE= 17569 GALS
TC VOLUME   =    383 GALS
HEIGHT      =   6.48 INCHES
WATER VOL.  =      0 GALS
WATER       =   0.00 INCHES
TEMP        =  68.7 DEG F


T 2:SUPER
VOLUME      =    227 GALS
ULLAGE      = 10030 GALS
90% ULLAGE=  9004 GALS
TC VOLUME   =    225 GALS
HEIGHT      =   7.66 INCHES
WATER VOL.  =      0 GALS
WATER       =   0.00 INCHES
TEMP        =  69.1 DEG F


T 3:DIESEL
VOLUME      =   1345 GALS
ULLAGE      =   4763 GALS
90% ULLAGE=   4152 GALS
TC VOLUME   =   1340 GALS
HEIGHT      =  32.35 INCHES
WATER VOL.  =      0 GALS
WATER       =   0.00 INCHES
TEMP        =  67.8 DEG F

* * * * END * * * * *
```

```
PHILLIPS 66
86 SUNRISE HWY
LINDENHURST NY

AUG  7, 2023  4:36 PM

   SYSTEM STATUS REPORT
T 1:LOW PRODUCT ALARM
T 1:DELIVERY NEEDED
T 2:LOW PRODUCT ALARM
T 2:DELIVERY NEEDED
T 3:LOW PRODUCT ALARM
T 3:DELIVERY NEEDED
L 1:LIQUID WARNING

INVENTORY REPORT

T 1:REG
VOLUME      =    385 GALS
ULLAGE      = 19566 GALS
90% ULLAGE= 17570 GALS
TC VOLUME   =    382 GALS
HEIGHT      =   6.47 INCHES
WATER VOL.  =      0 GALS
WATER       =   0.00 INCHES
TEMP        =  68.6 DEG F


T 2:SUPER
VOLUME      =    227 GALS
ULLAGE      = 10030 GALS
90% ULLAGE=  9004 GALS
TC VOLUME   =    225 GALS
HEIGHT      =   7.66 INCHES
WATER VOL.  =      0 GALS
WATER       =   0.00 INCHES
TEMP        =  69.0 DEG F


T 3:DIESEL
VOLUME      =    766 GALS
ULLAGE      =   5342 GALS
90% ULLAGE=   4731 GALS
TC VOLUME   =    762 GALS
HEIGHT      =  21.84 INCHES
WATER VOL.  =      0 GALS
WATER       =   0.00 INCHES
TEMP        =  68.8 DEG F

* * * * END * * * *
```