**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| MOUNTAIN EXPRESS OIL COMPANY, *et al.*, | Case No. 23-90147 (DRJ) |
| Debtors.[1] | (Jointly Administered) |

**DIP AGENT'S <u>EMERGENCY</u> MOTION TO APPOINT CHAPTER 11**
**TRUSTEE, OR IN THE ALTERNATIVE, CONVERT THESE**
**<u>CHAPTER 11 CASES TO CASES UNDER CHAPTER 7</u>**

> **EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN AUGUST 16, 2023.**
>
> **IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**
>
> **A HEARING WILL BE CONDUCTED ON THIS MATTER ON AUGUST 16, 2023, AT 4:00 P.M. (PREVAILING CENTRAL TIME). YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION.**
>
> **AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT (832) 917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE JONES'S CONFERENCE ROOM NUMBER IS 205691. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE JONES'S HOMEPAGE.**
>
> **THE MEETING CODE IS "JUDGE JONES". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**
>
> **HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE JONES'S HOMEPAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/mountainexpressoil. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these chapter 11 cases is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022.

First Horizon Bank, as Administrative Agent for the DIP Loans (the "Agent"), files this emergency motion (the "Motion") for entry of an order (i) appointing a chapter 11 trustee (the "Chapter 11 Trustee") pursuant to section 1104(a) of title 11 of the United States Code, 11 U.S.C §§ 101, *et seq.* (the "Bankruptcy Code") or, in the alternative, (ii) converting the above-captioned chapter 11 cases of Mountain Express Oil Company and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") to cases under chapter 7 of the Bankruptcy Code pursuant to section 1112(b) of the Bankruptcy Code and Rule 1019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  In support of the Motion, the Agent respectfully states as follows:

## I.
## PRELIMINARY STATEMENT[2]

1.     After spending nearly $50 million in these cases, the Debtors' efforts to conduct a sale process have failed and it is time to appoint a disinterested fiduciary to monetize the Debtors' assets for the benefit of creditors.  The immediate appointment of a Chapter 11 Trustee is the appropriate remedy to maximize any return for creditors of these estates.

2.     The Debtors have wasted significant time and estate funds — to the detriment of the estates' creditors — undertaking a lengthy and flawed sale process that failed to produce a single qualified bidder or qualified bid.  The Debtors demanded this expensive sales process by threatening to convert these cases or implementing a priming DIP if the Agent did not accede. The Agent disagreed with the Debtors' strategy but ultimately provided more than sufficient funding for the Debtors to pursue their course.  The Agent has sunk approximately $46.9 million in post-petition financing into the Debtors and their half-baked sales process.

---

[2]     Capitalized but undefined terms in this section shall have the same meanings as ascribed to them elsewhere in the Motion.

3.      The Debtors are grossly mismanaged as, *inter alia*,: (i) they could not provide prospective bidders with anything approaching sufficient diligence information for them to formulate actionable bids; (ii) the Debtors have failed to pay taxes and other administrative expenses that are overdue (despite adequate significant financing from the Agent to pay these administrative expenses); (iii) the Debtors are not filing MORs on a timely basis; (iv) the Debtors defaulted under the DIP Facility; and (v) the Debtors have violated the Bid Procedures Order, including by never commencing the Auction and failing to consult with either the Agent or, upon information and belief, the Committee despite those parties being named as consultation parties under the Bid Procedures Order.

4.      The Debtors ultimately proposed a transaction based on a non-binding letter of intent ("LOI") that continued seemingly unachievable concessions as conditions precedent to the transaction and released causes of action that appear to have real potential.  The Agent provided the Debtors a well-funded runway to conduct a sales process, and the Debtors have nothing to show for it today.  The Agent is not withholding funds from the Debtors that could save the reorganization; to the contrary, the Agent is another victim of the Debtors' gross mismanagement, sinking tens of millions into the estates post-petition for the Debtors to burn through unchecked.

5.      Since the Petition Date, the Debtors have lost at least $48 million.  Administrative expenses have been significant to date and will continue to accrue going forward, further burdening the estates.  The Debtors are a runaway train with no conductor at the helm to get these cases back on track.  For cause and in the interest of justice, these estates and their creditors, the Agent respectfully requests the Court appoint a Chapter 11 Trustee.

6.      Alternatively, if a Chapter 11 Trustee is not appointed, then the Agent moves the Court to convert these chapter 11 cases to cases under chapter 7.  Cause also exists under

section 1112(b) of the Bankruptcy Code for conversion.  As discussed, the Debtors failed to conduct a value-maximizing sale despite being provided with more than ample funding and time by the Agent for the sales process and get to an exit.  Moreover, if the Debtors are left unchecked in chapter 11 without the guidance of a Chapter 11 Trustee, then liquidation provides the estates' creditors with the best opportunity of receiving a return or a greater return.

## II.
## JURISDICTION AND VENUE

7.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## III.
## BACKGROUND

8.      On March 18, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtors have continued to operate and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  To date, no trustee or examiner has been appointed in the Debtors' chapter 11 cases.

**A.      The Sale/Leaseback Arrangement with Oak Street**

9.      The Debtors were originally a wholesale fuel supplier.  Approximately three years before the Petition Date, the Debtors pivoted into owning and operating retail fuel locations.  The Debtors grew rapidly through a series of sale/leaseback transactions with, among other landlords, Oak Street Real Estate Capital, LLC *n/k/a* Blue Owl Real Estate Capital LLC (together with its affiliates, "Oak Street").

10.     As argued by the Debtors at the first day hearings, these cases were precipitated by the threatened termination of leases by Oak Street, the Debtors' largest landlord.

**B.      The Debtors Failed to Maintain Financial Records**

11.     The Debtors failed to keep adequate financial records or financial statements for its retail division.   This mismanagement has continued throughout these cases; the Debtors' professionals were never able to get their arms around the financials for the Debtors' retail division despite the retention of capable professionals.

12.     Notwithstanding these glaring and concerning issues, the Debtors insisted on a lengthy (and by extension, expensive) sale process, rather than the quick sale procedure requested by the Agent.   With the passage of time, the Debtors' financial position has worsened to the detriment of these estates and their creditors.

**C.      The Prepetition Loans and DIP Loans**

13.     The Debtors and their lenders are parties to that certain First Amended and Restated Credit Agreement, dated as of March 12, 2020 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition Agreement," and, together with the other Loan Documents (as defined in the Prepetition Agreement), the "Loan Documents").   The Loan Documents govern the Debtors' obligations for principal, accrued and unpaid interest, fees, costs, expenses, indemnities, and other amounts arising thereunder — with such obligations totaling not less than $171,641,151.00 (the "Prepetition Obligations").   The Prepetition Obligations are secured by first priority liens and security interests (the "Prepetition Liens") granted to the Agent on the collateral described and defined in the Loan Documents.

14.     On April 25, 2023, the Court entered the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-1 (I) Authorizing the Debtors to Use Cash Collateral and Obtain Post-Petition Financing,*

*(II) Granting Liens and Providing Super-Priority Administrative Expense Status, (III) Granting Adequate Protection, and (IV) Granting Related Relief* [Docket No. 332] (the "<u>Final DIP Order</u>").

15.     Pursuant to the Final DIP Order, the Agent agreed to loan an additional $37,850,000.00 to finance these cases and the sale process, which amounts are secured by liens on all assets of these estates.  *See* Final DIP Order, at ¶ 4.

16.     On July 19, 2023, the Court approved a further extension of post-petition credit pursuant to the *Order Approving Second Amendment to Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement* [Docket No. 1042].  Thereafter, the Agent extended an additional $9.05 million in credit.  The additional DIP funding was supposed to provide the Debtors with sufficient financing to conduct a fulsome sale process — a lengthy process that the Agent disagreed with, yet nevertheless, supported through the provision of financing.

17.     Accordingly, the total funded and unfunded obligations owing from the Debtors to the Agent exceed an aggregate $218.5 million.  Pursuant to the Final DIP Order, as amended, the entire amount of the Prepetition Obligations have been rolled up into the new money extended post-petition.

**D.      <u>The Bankruptcy Cases and Proposed Sale of the Debtors' Assets</u>**

18.     The Debtors purportedly filed these chapter 11 cases to conduct an orderly sale process.  Prior to the Petition Date, the Debtors agreed to a three-month sale process as part of negotiations with the Agent.

19.     Following the Petition Date, the Debtors insisted on an even longer (and by extension, more expensive) sale process, promising that an extended timeline would maximize value.  The Agent reluctantly agreed to fund a longer sale process.

20.     The Debtors' insistence on the lengthier, more costly sale process proved to be wrong — the additional time did *not* result in a qualified offer from a qualified bidder in an amount

that brought value to creditors.  Rather, through this long and unfruitful sale process, the estates incurred additional, and ultimately unnecessary, administrative expenses and the DIP lenders have increased exposure on their DIP loan.

**E.  The Agent's Liens**

21.     As set forth in the Final DIP Order, the Agent has liens on substantially all of the Debtors' assets.  These liens include liens on avoidance actions and prepetition litigation claims. These claims may be valuable to the Agent.

22.     The Agent believes the value of the causes of action securing its liens exceeds the value of the net proceeds it would receive from the Debtors' failed sales process, which attracted no qualified bidders or qualified bids.

**F.  The Bid Procedures and the Delayed, Failed Auction**

23.     On June 22, 2023, the Court entered the *Order (I) Approving Bid Procedures for Sale of the Debtors' Assets, (II) Approving Bid Protections, (III) Scheduling Certain Dates with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, and (V) Approving Contract Assumption and Assignment Procedures* [Docket No. 701] (the "Bid Procedures Order").

24.     Under the Bid Procedures Order, the deadline to submit qualified bids was July 21, 2023 (the "July 21st Bid Deadline").  No qualified bids were submitted by the July 21st Bid Deadline.[3]

25.     The Auction (as defined in the Bid Procedures Order) was originally scheduled for July 28, 2023.  The Debtors unilaterally moved the Auction to August 2, 2023 without consulting

---

[3]     *See Debtors' Post-Auction Status Report* [Docket No. 1194], at ¶ 13 ("The Debtors received a total of 14 bids (two of which were submitted after the July 21 Bid Deadline) for a variety of sets of the Debtors' assets.  None of these bids, however, fully satisfied the requirements set forth in the Bid Procedures for bid qualification.").

the Agent.  By failing to hold the Auction on July 28, 2023, the Debtors defaulted under the DIP Facility (as defined in the Final DIP Order).

26.     On August 2, 2023, the Debtors, the Agent, the Committee, and various potential purchasers convened at the offices of Raymond James & Associates, Inc. in New York City. Although the Auction was set for that date, the Debtors never commenced the Auction, never made introductory remarks, and never went on the record despite having a court reporter present.

27.     The Debtors failed to consult with the Agent or, upon information and belief, with the Committee despite those parties being named as consultation parties under the Bid Procedures Order.  In fact, throughout the day on August 2, 2023, the Agent repeatedly inquired about the status of the (non-existent) Auction.  Nevertheless, the Debtors never consulted with the Agent in any meaningful manner — spending less than twenty minutes over the day discussing matters with the Agent.

28.     The more aptly-named meeting — since an auction never occurred — resumed on August 3, 2023.  The Agent received no substantive communication from the Debtors until later that afternoon, when a non-binding proposal was presented to the Agent that had been received from one interested party ("Party A") several hours earlier.  The non-binding proposal from Party A was not even a qualified bid.

29.     Despite the lack of consent of the DIP Lenders and numerous objectionable features thereof by other parties in these cases, the Debtors previously indicated that they would nevertheless seek Court approval of the non-binding proposal from Party A was not even a qualifying bid and was unacceptable to the Agent and remaining DIP Lenders.  *See Debtors' Post-Auction Status Report* [Docket No. 1194], at ¶¶ 37-40 (which attached the unsigned LOI).

**G.**     **The Maturity of the DIP Facility**

30.     To cease the cash burn in these cases and to preserve its cash collateral, the Agent sent a notice of default under the DIP Facility on August 3, 2023.

31.     On that same date, the Agent provided notice of the occurrence of the Maturity Date under the DIP Facility to the Debtors, the Committee, and the U.S. Trustee, and filed a *Notice of Occurrence of Maturity Date of DIP Facility* [Docket No. 1168].

**H.**     **The Debtors' Cash Burn During these Cases**

32.     The Debtors have hemorrhaged cash during these cases, to the detriment of the estates and their creditors.  As of the week ending July 21, 2023, the Debtors' net cash flow was negative $37.99 million since the Petition Date.  Since July 21, the Debtors have burned an additional $9.2 to $10.2 million in cash, making the total cash burn not less than $48 million since the Petition Date.

**IV.**
**ARGUMENT AND AUTHORITY**

33.     By this Motion, the Agent requests that the Court enter an order (i) appointing a Chapter 11 Trustee, or, in the alternative, (ii) converting the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.

**A.**     **The Court Must Appoint a Chapter 11 Trustee**

34.     Section 1104(a) of the Bankruptcy Code provides, in pertinent part:

> (a)     . . . [O]n request of a party in interest . . . , and after notice and a hearing, the court shall order the appointment of a trustee—
>
> > (1)     for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause . . . ; or
> >
> > (2)     if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate . . . .

9

11 U.S.C. § 1104(a).

35.     Whether "cause" exists is not limited to the enumerated grounds in section 1104(a)(1), but, instead, "is within the discretion of the Court and due consideration must be given to the various interests involved in the bankruptcy proceeding." *In re Bellevue Place Assoc.*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994).  Stated another way, cause covers myriads of actions of the debtor, and can be found simply where appointment is in the interests of creditors.  *See In re Oklahoma Refining Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988).  "[S]ection 1104 represents a [potentially important] protection that the Court should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession."  *See Bellevue Place*, 171 at 623 (quoting *In re V. Salvino Oil & Heating Co., Inc.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989)).  Moreover, where cause exists, the bankruptcy court's appointment of a trustee is mandatory.  *See* 11 U.S.C. § 1104(a) ("[T]he court *shall* order the appointment of a trustee . . . .") (emphasis added); *Oklahoma Refining Co.*, 838 F.2d at 1136.

### i.     "Cause" Exists to Appoint a Trustee in These Cases under Section 1104(a)(1) of the Bankruptcy Code

36.     The Court must appoint a Chapter 11 Trustee because the Debtors' gross pre- and post-petition incompetence and mismanagement establishes "cause" pursuant to section 1104(a)(1) of the Bankruptcy Code.   The Agent provided approximately $46.9 million in post-petition financing to the Debtors for them to have more than sufficient funds to conduct a fulsome sales process.  Nevertheless, the Debtors were unable to hold an Auction — unilaterally pushing back the date of the Auction, in violation of the DIP Facility, and then failing to commence even a barebones shell of one.  The Debtors did not communicate in any meaningful manner with the Agent or, upon information and belief, the Committee at this "Auction" despite both parties

being named as consultation parties under the Bid Procedures Orders.  The Debtors have also failed to file monthly operating reports ("MORs") on a timely basis.  Indeed, the Debtors' current management are unable to meet deadlines and follow basic requirements ordered in these cases.

37.     Appointment of a Chapter 11 Trustee (or, alternatively, a Chapter 7 Trustee) is the best option to preserve value in the Debtors' assets and to provide a recovery for creditors under the difficult circumstances that exist today.  The Debtors' sale process has failed.  The Debtors and their numerous professionals were unable to populate a data room with the most basic of financial records.  No binding offers, let alone a signed APA, exist.  The DIP loan is exhausted, and the Lenders have not agreed to provide additional funding.  Several parties have sought stay relief.   The professional fees have been exorbitant and the results, to date, have been negligible.  Most importantly, the mediation effort of The Honorable Marvin Isgur has been terminated after the parties were unable to resolve their differences over the sales process.

38.     Unsurprisingly, the Debtors' flawed sale process yielded *not a single* qualified offer from a qualified bidder.  The Debtors' self-admitted mismanagement of its financial records became an expensive exercise in futility.

39.     The Auction process also underscored various shortcomings with the Debtors' ability to meet the due diligence needs of bidders which, in turn, contributed to the conditionality of many bids and the indefinite scope of the purchased assets . . . .   [T]he Debtors faced considerable challenges populating the Data Room with customary due diligence materials.  Generally speaking:

> • The Debtors lacked complete and current financial statements (most recent audited financial statements were for the period ending December 31, 2021).

11

- The Debtors were unable to generate accurate and current store level profit and loss statements, fuel gallon and margin data, and in-store financials (such as inventory levels, product pricing, food sales and, payroll expense), among other issues.

- The Debtors lacked complete historical information about store level environmental and zoning compliance.

- The Debtors were missing leases, contracts, and other agreements integral to the management of the business.

- The Debtors did not maintain detailed, store-level accounting on unamortized fuel branding discounts and rebates provided by major oil companies and related store-specific "imaging" liabilities.

*Debtors' Post-Auction Status Report* [Docket No. 1194], at ¶ 17.  The Debtors now concede mismanagement and now acknowledge that such mismanagement led to the failure of the Auction? *See Salvino Oil & Heating*, 99 B.R. at 525 (debtor's pre-petition conduct, post-petition nondisclosures and misrepresentations and noncompliance with statutory requirements, singularly and in the aggregate, constitute "cause" for appointment of trustee).

40.     The Debtors have further depleted their estates by accruing significant administrative expenses, to the detriment of all creditors, without any corresponding benefit all in pursuit of their flawed sales process.  There may never be any recoveries for creditors, including the Agent, if the Debtors are left unchecked or if these cases are dismissed, as orally suggested by the Debtors.  More than sufficient cause exists requiring the Court to appoint a Chapter 11 Trustee under section 1104(a)(1) of the Bankruptcy Code.

**ii.     Appointment of a Trustee Is in the Best Interests of the Estates and Their Creditors Under Section 1104(a)(2) of the Bankruptcy Code**

41.     The Court need not find "cause" in order to appoint a trustee.  Pursuant to section 1104(a)(2), the Court has wider discretion and the standards are even more flexible than those under subsection (a)(1).  *See Oklahoma Refining Co.*, 838 F.2d at 1136; *see also Bellevue Place*,

171 B.R. at 623; *In re Colorado-Ute Elec. Assoc., Inc.*, 120 B.R. 164, 176 (Bankr. D. Col. 1900) ("As to whether the appointment of a trustee is in the best interest of creditors pursuant to Section 1104(a)(2), the court should 'eschew rigid absolutes and look to the practical realities and necessities.'" (quoting *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990)). Indeed, it is enough that appointment of a chapter 11 trustee is "in the interest of the estate generally, which can mean that there may be competing interests that weigh for and against the appointment." *In re Sanders*, Case No. 99 B 9876, 2000 WL 329574, at *5 (Bankr. N.D. Ill. Mar. 2, 2000).

42.     Pursuant to section 1104 (a)(2), a bankruptcy court may exercise its broad equity powers when appointing a trustee to protect the interests of creditors. *See In re Russell*, 60 B.R. 42, 45 (Bankr. W.D. Ark. 1985).  Among the factors considered are: (a) the trustworthiness of the debtor; (b) the debtor-in-possession's past and present performance and prospects for the debtor's rehabilitation; (c) the confidence — or lack thereof — of the business community and of creditors in present management; and (d) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment. *In re Ford Steel, LLC*, 629 B.R. 871, 890 (Bankr. S.D. Tex. 2021).

43.     However, "[i]t is clear, both from the language of the statue and established case law, that the court need not find any of the enumerated wrongs in order to find cause for appointing a trustee.   It is sufficient that the appointment be in the best interest of creditors." *Oklahoma Refining Co.*, 838 F.2d at 1136; *see also Ford Steel*, 629 B.R. at 890 ("[T]he § 1104(a)(2) standard is flexible.  Ultimately, the court should consider the practical realities, necessities of the case, and the totality of the circumstances in determining whether to appoint a trustee.") (footnote omitted).

44.    The Agent likewise submits that the best interests of creditors mandate the appointment of a Chapter 11 Trustee to safeguard the Debtors' estates at this pivotal point.  The Debtors racked up significant administrative fees and expenses running a mismanaged sales process that produced no qualified bidder or qualified bid.  Indeed, the Debtors' past and present performance do not bode well for their rehabilitation.  Even with an influx of post-petition cash provided by the Agent totaling approximately $46.9 million, the Debtors could not provide complete, accurate diligence information to potential bidders or otherwise run a fulsome, successful Auction.

45.    Other options, such as dismissal of these cases or granting stay relief for landlords and dealers to obtain immediate relief, will throw the Debtors into chaos and harm creditor recoveries.  Valuable estate assets, such as avoidance actions, could be lost if these cases are dismissed.  Granting wholesale stay relief would lead quickly to the dissipation of estate assets and further reduce any potential recoveries for creditors.  Appointment of a trustee, however, would stabilize the situation and bring confidence to creditors and estate stakeholders that an orderly liquidation process is in place.

46.    Moreover, there is a complete lack of creditor confidence and trust in the Debtors that is rooted in objective fact.  If the Debtors now admit that they cannot produce basic financials or run a successful Auction despite sufficient funding to do so, they will not be able to achieve a value-maximizing result for their creditors in these cases.  Dismissal is certainly not a viable or appropriate option, as valuable causes of action would be destroyed.  Moreover, the Debtors broke their initial pre-petition agreement with the Agent for an expedient sales process by suddenly insisting on an unnecessarily lengthy one post-petition, further straining the trust between the

parties.   In the interest of justice, the estates and their creditors, the Court must appoint a Chapter 11 Trustee under section 1104(a)(2) of the Bankruptcy Code.

**B.**   **In the Alternative, the Court Should Convert the Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code**

47.   Section 1112(b)(1) of the Bankruptcy Code provides, in relevant part:

> [O]n request of a party in interest, and after notice and a hearing, the court ***shall*** convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, ***for cause*** unless the court determines that the appointment under section 1104(a) of a trustee or examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1) (emphases added).   Section 1112(b)(4) sets forth a non-exhaustive list of examples of "cause" that would warrant conversion, and the Court has discretion to determine if cause exists based on the particular circumstances of the case regardless of whether the factors ultimately relied upon are included in section 1112(b).   *See In re Coffee Cupboard, Inc.*, 119 B.R. 14, 17-18 (E.D.N.Y. 1990) (holding that discretion should be legal discretion, rather than one merely at will, or one that expresses the court's own notion of equitable principles).   In addition, in determining whether conversion is in the best interests of the estate and its creditors, the court "should not focus on the interests of administrative claimants because section 1112(b) limits the court's consideration to the interests of creditors and the estate."   *In re BH S & B Holdings, LLC*, 439 B.R. 342, 350 (Bankr. S.D.N.Y. 2010).

48.   Once the moving party has established cause for conversion, then conversion is mandatory unless the court "finds and specifically identifies unusual circumstances establishing that converting . . . the case is not in the best interests of creditors and the estate . . . ."   11 U.S.C. § 1112(b)(2).   Even if a debtor can establish "unusual circumstances" within the meaning of section 1112(b)(2), the debtor must also demonstrate (a) there is a reasonable likelihood that a plan

will be confirmed within a reasonable time, (b) the grounds for converting or dismissing the case include an act or omission of the debtors other than the substantial and continuing loss or diminution of the estate, (c) there is a reasonable justification or excuse for the debtor's act or omission, and (d) the act or omission can be cured in a reasonable time.   11 U.S.C. § 1112(b)(2)(A)-(B).  *See In re Baribeau*, 603 B.R. 797, 802 (Bankr. W.D. Tex. 2019) (denying motion to reconsider order converting case and finding "unusual circumstances" exception did not apply where the basis for conversion was the substantial and continuing loss or diminution of the estate and absence of a reasonable likelihood of rehabilitation).

49.     Here, "cause" exists for a chapter 7 conversation based upon numerous enumerated and non-enumerated factors.  The statutory factors include:

     i.    the substantial or continuing loss to or diminution of the estates and the absence of a reasonable likelihood of rehabilitation;

     ii.    gross mismanagement of the estates;

     iii.    the unexcused failure to satisfy timely any filing or reporting requirements; and the failure to timely pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief.  *See* 11 U.S.C. § 1112(b)(4)(A), (B), (F), (G) & (I).

**i.     Substantial or Continuing Loss to or Diminution of the Estates and the Absence of a Reasonable Likelihood of Rehabilitation**

50.     Pursuant to section 1112(b)(4)(A), the moving party must "demonstrate that there is both (1) a substantial or continuing loss to or diminution of the estate and (2) the absence of a reasonable likelihood of rehabilitation."  *In re TMT Procurement Corp.*, 534 B.R. 912 (Bankr. S.D. Tex. 2015) (citing *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994)).  The loss "may be substantial or continuing; it need not be both."  *Id.*  Cause can be shown by "demonstrating that the debtor suffered or has continued to experience a negative cash flow or declining asset

values following the order for relief." *Id.* "Negative cash flow alone can be sufficient cause to dismiss or convert under section 1112(b)." *Id.*

51.     In *TMT Procurement*, the movant was able to show a substantial loss to the estate, which the court determined was sufficient to meet the first prong of section 1112(b)(4)(A). *Id.* Cause is defined under the Code as a "substantial or continuing loss to or diminution of the estate." *Id.* Having established a substantial loss to the estate, the court held that the movant met the first prong of section 1112(b)(4)(A). *Id.*

52.     Regarding the second prong of section 1112(b)(4)(A) — the absence of a reasonable likelihood of rehabilitation — the court stated that "[r]ehabilitation does not mean reorganization, which could involve liquidation." *Id.* Instead, "rehabilitation signifies something more, with it being described as to put back in good condition; re-establish on a firm, sound basis." *Id.* The issue of rehabilitation for purposes of section 1112(b)(4)(A) "is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort." *Id.*

53.     Since the Petition Date, the Debtors have suffered continuing, substantial losses. The Debtors have lost not less than $48 million since the Petition Date. Moreover, administrative expenses have been significant to date and will continue to accrue going forward, even if the potential sale to Party A were consummated. Furthermore, the Debtors cannot rehabilitate their affairs because they have no viable sale prospects. No qualified bid came from the sham "Auction." Accordingly, cause exists to convert these cases under section 1112(b)(4)(A) of the Bankruptcy Code.

### ii.     The Debtors' Gross Mismanagement of the Estates

54.     As discussed, the Debtors are grossly mismanaging their estates, to the detriment of all stakeholders. Some of the Debtors' failures include:

- **<u>Lack of Financial Records.</u>**  Corporate basics are non-existent with the Debtors.  Fulsome financial records are fundamental to proper management, but the Debtors have been utterly unable to maintain or produce even subpar records.  Despite retaining competent professionals, the Debtors have been unable to present an accurate, complete picture of the Debtors' assets, liabilities, and financial condition.

- **<u>Non-Payment of Taxes.</u>**  The Debtors have failed to pay taxes and other administrative expenses that are overdue.

- **<u>Failure to Meet Filing Deadlines.</u>**  The Debtors have failed to file MORs on a timely basis.  Pursuant to U.S. Trustee guidelines, MORs are due for the preceding month on the 21st day of the following month.  To date, the Debtors have filed MORs in the cases of Debtors Mountain Express Oil Company and Consolidated HR Services LLC.

55.     The Debtors' estates are mismanaged as demonstrated by the failure of the Debtors to maintain their financial records, pay their taxes, and file their monthly operating reports.  Therefore, cause exists for the conversion of these cases to chapter 7 under section 1112(b)(4)(B) of the Bankruptcy Code.

**iii.     The Debtors' Unexcused Failure to Timely Satisfy Filing and Reporting Requirements, Namely MORs**

56.     As noted above, the Debtors have been unable to timely file operating reports in each of their cases.  Accordingly, cause exists for the appointment of a chapter 11 trustee or conversion of these cases pursuant to section 1112(b)(4)(F) of the Bankruptcy Code.

**iv.     The Debtors Have Failed to Timely Pay Taxes Owed After the Date of the Order for Relief**

57.     The Debtors have permitted significant taxes to accrue post-petition which are overdue, including Georgia motor fuel taxes.  Accordingly, cause exists to appoint a chapter 11 trustee or convert these cases under section 1112(b)(4)(I) of the Bankruptcy Code.

**v.     The Chapter 11 Administrative Costs Have Caused these Estates to Become Administratively Insolvent**

58.     Finally, the estates are administratively insolvent due to substantial administrative expenses that continue to accrue.  Although administrative insolvency is not an enumerated basis for conversion under section 1112(b)(4), the Court may still consider this factor in determining whether to convert a case.  *See BH S & B Holdings, LLC*, 439 B.R. at 349 (converting case to chapter 7 where, among other things, the estate was administratively insolvent, the committee's efforts to pursue litigation claims had yielded small returns at substantial expense, and the secured creditor was unwilling to make additional funds available) (citing *In re Bartmann*, No. 03-04975, 2004 WL 1057662, at *2 (B.A.P. 10th Cir., May 10, 2004); *In re Desmond*, 331 B.R. 38, 44 (Bankr. D.N.H. 2005)).

59.     These cases are administratively insolvent.  As noted previously, the Debtors have been losing money since these cases were filed, and additional administrative expenses will only increase as the cases remain pending in chapter 11.  Having funded in excess of $46 million post-petition, the DIP Lenders are unwilling to fund additional amounts.

60.     Without any actionable sale prospects combined with Oak Street's refusal to modify the leases, no viable sale path exists.  The estates will have incurred substantial additional expense while administratively insolvent, and the creditors of the estate will ultimately bear those costs.  The Court should not permit these cases to become more administratively insolvent and

should convert these cases to cases under chapter 7 to preserve any remaining value for the benefit of creditors.

**IV.**
**EMERGENCY RELIEF REQUESTED**

The Movant requests emergency consideration of this Motion on or before August 16, 2023 due to the value deterioration in these cases and the prospect that a Chapter 11 Trustee may have alternative, viable paths to maximizing value for these administratively insolvent estates.

*[Remainder of Page Intentionally Left Blank]*

**V.**

**CONCLUSION**

**WHEREFORE** the Agent respectfully requests that the Court enter an order (a) appointing a Chapter 11 Trustee or, alternatively, converting these cases to cases under chapter 7 of the Bankruptcy Code, and (b) granting such other relief as the Court deems just and proper.

Dated: August 16, 2023

**GREENBERG TRAURIG, LLP**

By: */s/ John D. Elrod*
Shari L. Heyen
Texas Bar No. 09564750
*Shari.Heyen@gtlaw.com*
1000 Louisiana St., Suite 1700
Houston, Texas 77002
Telephone:     (713) 374-3564
Facsimile:      (713) 374-3505

– and –

John D. Elrod (admitted *pro hac vice*)
*ElrodJ@gtlaw.com*
Terminus 200, Suite 2500
3333 Piedmont Road, NE
Atlanta, Georgia 30305
Telephone:     (678) 553-2259
Facsimile:      (678) 553-2269

**COUNSEL FOR FIRST HORIZON BANK, AS DIP AGENT**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been served upon the parties eligible to receive notice through the Court's ECF facilities by electronic mail on August 16, 2023.

*/s/ John D. Elrod*
John D. Elrod