**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CHAPTER 11 |
| MOUNTAIN EXPRESS OIL COMPANY, et al., | § | |
| | § | CASE NO. 23-90147 (DRJ) |
| DEBTORS.[1] | § | |
| | § | (Jointly Administered) |

**EMERGENCY MOTION OF SASS PETROLEUM, LLC**
**FOR RELIEF FROM THE AUTOMATIC STAY**

---

**Emergency relief has been requested.  Relief is requested not later than 5:00 p.m. on August 18, 2023.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**This is a motion for relief from the automatic stay.  If it is granted, the movant may act outside of the bankruptcy process.  If you do not want the stay lifted, immediately contact the moving party to settle.  If you cannot settle, you must file a response and send a copy to the moving party at least 7 days before the hearing.  If you cannot settle, you must attend the hearing.  Evidence may be offered at the hearing and the court may rule.**

---

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

SASS Petroleum, LLC ("SASS") files this *Emergency Motion for Relief from the Automatic Stay* ("Motion") pursuant to Bankruptcy Code §362(d) and Local Bankruptcy Rule 4001(b), and would respectfully show the Court the following:

**I.    JURISDICTION**

1.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.

---

[1]  A complete list of each of the Debtors in these Chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/mountainexpressoil. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 cases is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory basis for the relief requested herein is 11 U.S.C. §§105(a) and 362(d), Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure, and Local Rules 4001 and 9014 of the Local Rules of Court for the United States Bankruptcy Court for the Southern District of Texas.

## II.      <u>RELIEF REQUESTED</u>[2]

4.      SASS seeks relief from the automatic stay to exercise its rights under the Operating Agreement between SASS and B&T, a debtor attached hereto as **Exhibit A**.  Mountain Express Oil Company ("<u>MEX</u>"), the lead debtor, serves as manager of US Fueling under the Operating Agreement and has failed to:

    **a.**      Carry out its obligations under the Operating Agreement;

    **b.**      Failing to remit rebates, incentive, and other monies from the Oil Majors to US Fueling in a timely manner, again in which MEX serves in a purely custodial capacity only and which is not property of the estate; and

    **c.**      Failing to remit credit card receipts to US Fueling in a timely manner, for which MEX serves in a purely custodial capacity only and which is not property of the estate.

5.      The events before the filing of the these bankruptcy cases, and continuing thereafter have crystallized the inherent conflict of interest in which MEX finds itself vis a vis US Fueling. While MEX may not have been able to use its <u>own</u> cash collateral, the Final DIP Financing Order specifically excluded credit card receipts from the DIP Liens.  This includes, but is not limited to, credit card receipts generated from the sale of fuel and non-fuel products at the USF Dealers.  The

---

[2] All capitalized terms are defined herein.

delay in turning over the credit card receipts and the failure to turn over incentives and other rebates have allowed the Debtors to use non-debtor property to finance their businesses.

6. On August 17, 2023, despite the Court's appointment of an operating trustee in Chapter 11, MEX employees informed SASS that it had been shut down and was no longer supplying fuel. In addition to the fuel supply issues, SASS has grave concerns that the credit card receipts and any incentives and rebates that belong to US Fueling and the USF Dealers are tied up in these bankruptcy estates, and will hamper US Fueling's ability to meet the fuel supply needs of the USF Dealers.

7. Even though US Fueling and the USF Dealers eventually received their credit card receipts last week, almost all of the USF Dealers were out of fuel and trying to find alternative suppliers. With the recent events over the last twenty-four hours, US Fueling is not being supplied fuel, and cannot meet its obligations to the USF Dealers, which are running out of fuel, and in some cases, have run out of fuel.

8. By withholding the credit card receipts from US Fueling and the USF Dealers, and failing to deliver fuel, MEX disrupted US Fueling's business, which in turn disrupted the businesses of the USF Dealers – not only causing them to run out of fuel, but hampered their ability to obtain alternative fuel supplies as the credit card receipts were held back.

9. By withholding the incentive and rebate payments (as described below), MEX also has disrupted US Fueling's business, as it is behind in paying vendors and carrying out its obligations to various USF Dealers.

10. For the reasons further explained below, SASS requests that the stay be lifted to allow SASS to exercise its rights under the Operating Agreement to replace MEX as Manager.

### III.   BACKGROUND

11.     B&T is a wholly owned subsidiary of MEX.  Turjo Wadud and Lamar Frady are the managers of B&T.  *See* Statement of Financial Affairs, Dkt No. 666 at 36.

12.     SASS and B&T are each a fifty percent (50%) owner of United States Fueling Company LLC ("US Fueling"). US Fueling is not a debtor.

13.     As further explained below, MEX is the Manager of US Fueling.

**B.    The Operating Agreement for US Fueling**

14.     SASS, B&T, and US Fueling are parties to that certain 2019 operating agreement ("Operating Agreement"). SASS and B&T are each a "Member" under the Operating Agreement.

15.     Pursuant to the paragraph 19 of the Operating Agreement, the person then serving as President of MEX is the manager of US Fueling ("Manager").  Turjo Wadud is the Chief Executive Officer of US Fueling and Rohil Virani is the Chief Operating Officer.  However, the Chief Operating Officer is subject to the authority of the Manager.

16.     The Manager has certain responsibilities, including, but not limited to: (a) "keep the Members advised in all matters pertaining to the operation of" US Fueling; and (b) to engage MEX to provide regular bookkeeping, accounting and other services. *See* paragraph 19 of the Operating Agreement.  However, the Manager has no authority to: (a) do any act in contravention of this Agreement; (b) do any act that would make it impossible to carry on the ordinary business of the Company [US Fueling]; or (c) possess Company [US Fueling] property or assign any rights in specific Company property other than for a Company purpose." *See* paragraph 21 of the Operating Agreement.

17.     The Operating Agreement also provides that any one or more of the Mangers may be removed from office, with or without cause, by the affirmative vote of the Members.  *See*

paragraph 24 of the Operating Agreement.  In addition, any officer may be removed for malfeasance, which includes misappropriation of corporate funds with respect to US Fueling.

## C.     The USF Dealer Stations

18.     US Fueling supplies fuel to about eighty-four (84) dealer-owned and operated stations ("USF Dealer Stations") under various fuel supply agreements (collectively, the "USF Dealer Agreements").  All but five (5) of the USF Dealer Stations are branded locations, which requires branded fuel to be supplied to such stations.  The major oil companies for these branded stations include BP/Amoco, Chevron/Texaco, Citgo, Exxon/Mobil, Motiva, Valero, Marathon, and Sunoco (collectively, the "Oil Majors").  The USF Dealer Stations are staffed by employees of the respective dealers.  Disruptions caused by the Debtors' breaches thus impacted hundreds of workers outside of the Debtors' employ.

19.     The USF Dealer Agreements are long term agreements (ranging from ten to twelve years).  Each of these USF Dealer Agreements address various requirements, including payment for fuel.  If the USF Dealer is a branded location, there are other specific branding requirements.

20.     To supply fuel to the various USF Dealers, US Fueling entered into that certain Exclusive Fuel Supply Agreement dated December 13, 2019 ("Fuel Supply Agreement"), in which MEX supplies fuel, including branded fuel, to the USF Dealer Stations.  Under the Fuel Supply Agreement, US Fueling is the "Customer" and MEX is the "Supplier".  The material terms of the Fuel Supply Agreement are:

  a. MEX is required to supply fuel to the USF Dealers.

  b. US Fueling will not purchase fuel from any other supplier without MEX's express consent.  If MEX fails to deliver fuel for 72-hours, US Fueling can seek an alternative fuel supplier during this period.

  c. US Fueling will cause the USF Dealers to use the credit card network designated by MEX.

    **d.**      Credit card sales shall not be immediately repaid to US Fueling, and will be held on account as an additional credit against fuel purchases.

    **e.**      For branded locations, MEX is required to pass through and promptly pay US Fueling all income, rebates, incentives, branding money or other amounts when received from the applicable Oil Major to US Fueling.

    **f.**      US Fueling provided a $200,000 security deposit to MEX.

    **g.**      As additional security, US Fueling also assigned the USF Dealer Agreements to MEX; provided however US Fueling retains all control and performance obligations under such USF Dealer Agreements; provided further, MEX may not take over any USF Dealer Agreements unless US Fueling defaults under the Fuel Supply Agreement.

21.     While the Fuel Supply Agreement provides that MEX does not need to immediately turn over credit card receipts, MEX, in its ordinary course of business, did perform and has performed account reconciliations several times a week with US Fueling.  In addition, MEX is holding security deposits for fuel purchases from various USF Dealers.

22.     At the USF Dealers, most consumers pay for fuel and other non-fuel purchases by credit card.  Often the credit card receipts are for more than just fuel purchases, and are for non-fuel purchases in the convenience store.  MEX is receiving the credit card receipts for both the fuel purchases and the non-fuel purchases.  Thus, MEX is "ahead" of the USF Dealers because of: (a) the constant submission of credit card receipts; (b) the credit cards receipts include non-fuel purchases; and (c) the security deposits posted by various USF Dealers.

23.     In contrast, if there is a delay by MEX in reconciling the credit card receipts against the fuel purchases, it is US Fueling and the USF Dealers that suffer.  With the credit card receipts trapped at MEX, this, in turn, limits US Fueling and the USF Dealers' ability to pay for alternative fuel supply.

24.     The USF Dealers agreed that these credit card receivables are available to net or offset against fuel purchases by the applicable USF Dealer against fuel supplied by US Fueling. Since US Fueling obtains its fuel from MEX under the Fuel Supply Agreement, US Fueling and

6

MEX perform any account reconciliations and then submit the required information to US Fueling to reconcile the amounts due to and from US Fueling and the USF Dealer.  This allows the USF Dealers with the means to continue to purchase fuel and run their businesses.

25.     For the USF Dealers, SASS understands that the several times a week there is a reconciliation of the fuel purchases against the credit card receivables among the USF Dealer, US Fueling, MEX, and the applicable Oil Major. However, if any one party withholds the credit card receivables and fails to send such credit card receivables to the USF Dealer, the USF Dealer is left without the credit card receipts, which constitutes the majority of its revenue, and has no ability to pay for fuel on a going forward basis and meet its other ongoing obligations.

26.     Prepetition MEX owes over $540,000 in incentives and rebates to US Fueling.  *See* Claim No. 279.  These monies are not property of the estate as the Fuel Agreement provides that such monies are to pass through MEX to US Fueling upon receipt.  Since the Petition Date, MEX has failed to turn over $250,000 in incentives and rebates to US Fueling.  MEX is therefore in default under the Fuel Agreement attached hereto as **Exhibit B**.

27.     Prior to the Petition Date, SASS, as the fifty-percent owner of US Fueling, has repeatedly requested that the rebates and other incentive payments be turned over so that US Fueling can meet its obligations under its various agreements.

28.     Prior to the Petition Date, MEX as Manager declared that there would be a distribution of available to cash to the members (SASS and B&T).  However, MEX directed that the distribution be wired directly to MEX (and not B&T) in the amount of $800,000.  After learning of the distribution and without knowledge of the impending bankruptcy filing, SASS requested similar treatment and received the same distribution a few days later.

**D.      The Bankruptcy Cases and Dealer Agreements**

29.      On March 18, 2023 ("Petition Date"), Mountain Express Oil Company ("MEX"),

along with certain affiliates, including B&T Petroleum LLC ("B&T") (collectively, the "Debtors")

each filed for bankruptcy relief under chapter 11.

30.      On the Petition Date, the Debtors filed a motion to maintain and administer their

existing dealer account reconciliation process, including the transfer of the net dealer collections

to the dealers ("Dealer Motion").  *See* Dkt. No. 4.  In the Dealer Motion, the Debtors stated that:

> The Debtors collect in various Bank Accounts credit card receipts and/or other cash
> receipts ("Dealer Collections") from or for the benefit of an applicable Dealer relating to
> fuel and other sales at the Dealer's location, which funds the Debtors collect and use as a
> security deposit, pending the Debtors' and Dealer's reconciliation of the amounts due to
> and from the other party under the parties' applicable agreements and arrangements
> ("Reconciliation Process").  The frequency of the Reconciliation Process varies per Dealer.

> Dkt 48, at 4.

31.      On March 21, 2023, the Debtors filed their cash management motion ("Cash

Management Motion").  *See* Dkt No. 52. In the Cash Management Motion, the Debtors stated that

the Debtor MEX has an operating account at First Horizon that is the primary operating account

for the Debtors' wholesale business.  Under this primary operating account, there are several

subaccounts that process the obligations due to the major fuel suppliers and payments due from

the Debtors' network of fuel dealers.  All the amounts held in the subaccounts are swept into the

primary operating account.   In addition, the Debtors indicated that credit card receipts may be

held in one or more bank accounts, even though the Debtors also indicated that such credit card

receipts are being held for the benefit of fuel dealers, are temporarily held and used as a security

deposit until the Debtors' and dealers' reconciliation process is performed.  *See* paragraph 13 of

the Cash Management Motion.

32.      On April 25, 2023, the Debtors obtained authority to use cash collateral and obtain

debtor-in-possession financing ("Final DIP Financing Order").  *See* Dkt No. 332.  Pursuant to the

Final DIP Financing Order, the DIP Liens (as defined in the Final DIP Financing Order) shall have second priority or other junior liens on and security interests in now owned or hereafter acquired assets and property of the Debtors that are subject to valid and properly-perfected, non-avoidable liens and security interests (including any and all setoff and recoupment rights in existence as of the Petition Date (or perfected thereafter to the extent permitted by the Bankruptcy Code). *See* p. 16.

33.     In the Final DIP Financing Order, the definition of "Cash Proceeds" includes all cash collateral or other cash coming into possession or control of the Debtors, including arising from the collateral or other conversion to cash of the DIP Collateral, including cash from the sale of inventory and the collection of accounts receivable, tax refunds, deposits subject to setoff, and insurance proceeds." *See* paragraph 9.  Then, in paragraph 12 of the same order, the Final DIP Financing Order provided that "[f]or avoidance of doubt, the DIP Liens do not attach to credit card receipts or cash proceeds thereof that are not property of the Debtors' estates."  At para. 12.  There is no mention of rebates, incentives, or other monies from the Oil Majors in the Final DIP Financing Order.[3]

34.     On April 26, 2023, the Debtors obtained authority to maintain their existing cash management system.  *See* Dkt No. 336.  The cash management order, however, did not specifically address the Final DIP Financing Order or the Dealer Order.

35.     On June 19, 2023, MEX filed its Schedules of Assets and Liabilities.  MEX does not list US Fueling as a creditor.  MEX does list US Fueling as a counterparty to the Fuel Supply Agreement.

---

[3] The word "rebates" does appear in the definition of "Collateral" in the DIP financing agreement attached to the Final DIP Financing Order.  It is unclear whether this reference was meant to include rebates or other incentives received from the Oil Majors under various agreements.

9

36.     On July 25, 2023, US Fueling filed a claim against MEX, alleging that US Fueling was owed about $2.8 million.  The claim is based on MEX's failure to turn over rebates, brand incentives, and other monies (which are approximately $540,000), that should have been passed through to US Fueling.  In addition, US Fueling asserts that MEX double-charged US Fueling for various erroneous charges (approximately $325,000), and finally amounts are owed various real estate transactions (approximately $1.9 million).

37.     During these cases, SASS understands that many of the USF Dealers have received sporadic deliveries.  This became an acute problem during the first two weeks of August for almost all the USF Dealers.  In early August, SASS was informed by US Fueling that many of the USF Dealers had not received fuel deliveries or their net credit card receipts.  While MEX allowed USF Dealers to temporarily purchase from other fuel suppliers, US Fueling and the USF Dealers were hampered since the credit card receipts used to purchase such fuel and run their businesses were trapped at MEX.  As of August 10, 2023, at least 50% of the USF Dealers had not received fuel from MEX, and were out of fuel.  As of this Motion, the USF Dealers are either out or running out of fuel, and lack of credit card receipts is furthering hampering and impairing their ability to operate.

38.     In addition, SASS was informed that only after MEX received the authority to use its own cash collateral on August 8, 2023, did MEX start the process to turn over credit card receivables to US Fueling and its USF Dealers. By August 11, 2023, the credit card receipts through August 9, 2023 were finally released to US Fueling and the USF Dealers, and fuel deliveries were made.

39.     In early August 2023, SASS was informed by employees at MEX that MEX could not assist US Fueling with their request for accounting or financials for US Fueling[4] because the Chief Restructuring Officer was running MEX (and presumably B&T, the other owner of US Fueling).  US Fueling and SASS were told to contact Debtors' counsel for assistance.  This makes no sense due to the inherent conflict described above.

## IV.     ARGUMENT AND AUTHORITIES

40.     SASS is entitled to relief from the stay because "cause" exists under 11 U.S.C. § 362(d)(1).  On request of a party in interest, the court shall grant relief from the stay for cause. Though "cause," as used in § 362(d)(1), has no clear and limited definition, it is determined on a case-by-case basis.  *See In re Texas State Optical, Inc.,* 188 B.R. 552 (Bankr. E.D. Tex. 1995).

41.     "Cause" is an intentionally broad and flexible concept that permits the bankruptcy court, as a court of equity, to respond to inherently fact-sensitive situations.  *See   id.*  "Cause" includes any reason cognizable to the equity power and conscience of the court as constituting an abuse of the bankruptcy process.  *See   Little Creek Dev. Co. v. Commonwealth Mortgage Co. (In re Little Creek Dev. Co.),* 779 F.2d 1068, 1072 (5th Cir. 1986).

42.     What constitutes "cause" under section 362(d)(1) has been developed on a case-by-case basis. *See In re Milne*, 185 B.R. 280, 283 (Bankr. N.D. Ill. 1995). The decision of whether to lift the stay for cause under section 362(d)(1) is committed to the sound discretion of the bankruptcy court. *See id*.  Factors generally looked to in determining whether to modify the stay for "cause" include (i) interference with the bankruptcy, (ii) good or bad faith of the debtor, (iii) injury to the debtor and other creditors if the stay is modified, (iv) injury to the movant if the stay

---

[4] MEX as manager has failed to provide the necessary information for 2022 income and related taxes.

is not modified, and (v) the proportionality of the harms from modifying or continuing the stay. *See id.*

43.     When balancing the injury to the debtor and other creditors if the stay is modified, the injury to the movant if the stay is not modified, and the proportionality of the harms from modifying or continuing the stay, the equities tip the scale in favor of the Movant.

44.     Here, SASS, as fifty percent owner of US Fueling, has concerns that US Fueling through its Manager MEX is not protecting the rights and property of US Fueling in these bankruptcy cases.  B&T is a company without any assets and is a wholly owned subsidiary of MEX.  MEX as Manager of US Fueling and B&T have conflicting interests as it concerns the US Fueling.

45.     Both prior to the Petition Date and after the Petition Date, MEX has not complied with its own obligations as Manager of US Fueling under Operating Agreement.

46.     Since the Petition Date, MEX has not turned over the incentives and rebates from the Oil Majors to US Fueling.  US Fueling has asked for updated financial information from MEX, but has not received a response.  On or around August 4, 2023, SASS was informed that the chief restructuring officer of the Debtors was running the show, and the Chief Executive Officer of MEX was unable to answer any questions.

47.     MEX's actions, or lack of action, shows that MEX has conflicting interests, and may not be advocating for US Fueling in the same way if an unrelated party was managing US Fueling.  The latest issue on the cash collateral dispute with the DIP Lenders shows this lack of action or inherent conflict.  In the Dealer Motion, MEX identified the credit card receipts as being held for the benefit of third parties, and that such receipts were treated as security deposits.  In addition, MEX stated that such credit card receipts were temporarily held to give MEX the ability to reconcile fuel purchases and fuel payments.  At the same time, in the Final DIP Financing Order,

credit card receipts were specifically excluded from the DIP Liens since such were not property of the estate.

48.     While MEX had no authority to use its own cash collateral, this did not mean that MEX had the right to withhold and presumably use such credit card receipts from US Fueling and the USF Dealers, and perhaps others.  This is what MEX did.

49.     As MEX is the exclusive fuel supplier to US Fueling, and specifically agreed that it was a pass through from the Oil Majors to US Fueling, MEX also has no right to hold onto the incentives, rebates, and other similar monies that belong to US Fueling.  MEX continues to hold incentives and rebates earned from the Oil Majors <u>after</u> the Petition Date, and which are the property of US Fueling.  These monies are needed for US Fueling to meet its obligations to vendors.  As Manager of US Fueling, MEX should have made sure that these monies were turned over to US Fueling in a timely manner, and should make sure that such are turned over in a timely manner.

50.     By improperly holding onto this cash and other proceeds (i.e., credit card receipts, incentives, and rebates), MEX has caused and continues to cause US Fueling to fail to meet its obligations to the USF Dealers.  MEX's actions reveal that MEX is in an impossible situation, and likely an inherent conflict between its roles as the lead debtor and its role as Manager of a non-debtor.  As SASS is an owner of US Fueling, relief from the automatic stay will allow SASS to exercise its rights under the Operating Agreement to put in place a Manager that will act in the best interests of US Fueling.

51.     This will ensure that US Fueling will have an advocate to protect its interests, its business, and its property in these cases.

52.     SASS therefore requests that the stay be lifted so that SASS may exercise its rights under the Operating Agreement to ensure that the Manager and officers of US Fueling are making decisions in the best interests of US Fueling, a non-debtor, in these cases.

53.     SASS also requests waiver of the 14-day stay under Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure to allow SASS relief from the automatic stay upon entry of an order.

54.     If the Court grants the above requested relief, SASS further requests on behalf of US Fueling that US Fueling be: (a) permanently allowed to obtain fuel from alternative suppliers; and (b) relieved from any obligations to continue to have the credit card receipts processed through MEX.

55.     Accordingly, for all of the above reasons, SASS is entitled to relief for "cause" pursuant to 11 U.S.C. § 362(d), and should be entitled to exercise any and all rights under the Operating Agreement.

56.     SASS reserves its rights to amend or supplement this Motion.

### V.     CONCLUSION

WHEREFORE, SASS respectfully requests that this Court enter an order granted the relief requested herein, and grant all other relief that this Court deems just and proper.

14

4881-8245-1062.5

Dated: August 17, 2023          Respectfully submitted,
Houston, Texas

**FOLEY & LARDNER LLP**

*/s/ John P. Melko*
John P. Melko
State Bar No. 13919600
Email: jmelko@foley.com
Sharon M. Beausoleil
State Bar No. 24025245
Email: sbeausoleil@foley.com
1000 Louisiana Street, Suite 2000
Houston, TX 77002
Telephone:  713.276.5500
Facsimile:  713.276-5555

**ATTORNEYS FOR SASS PETROLEUM, LLC**

**CERTIFICATE OF CONFERENCE**

In accordance with BLR 4001-1(a)(1), I do hereby certify that Sharon Beausoleil and John Melko attempted to confer by e-mail and telephone with Wayne Kitchens, counsel for Janet Northrup, in her capacity as chapter 11 trustee for these Debtors on August 17, 2023.

*/s/ Sharon M. Beausoleil*
Sharon M. Beausoleil

4881-8245-1062.5

## CERTIFICATE OF SERVICE

I do hereby certify that on August 17, 2023, a true and correct copy of the foregoing pleading was served via CM/ECF to all parties authorized to receive electronic notice in this case and to the parties listed below by U.S. mail, first class, postage prepaid.

*/s/ John P. Melko*
John P. Melko

**Chapter 11 Trustee**
Janet S Casciato-Northrup
Hughes Watters and Askanase
1201 Louisiana
28th Floor
Houston, TX 77002

**Attorney for Chapter 11 Trustee**
Wayne Kitchens
Hughes Watters and Askanase
1201 Louisiana
28th Floor
Houston, TX 77002

4881-8245-1062.5