UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION


IN RE: MOUNTAIN EXPRESS OIL    .    CASE NO. 23-90147
  COMPANY,                     .
              DEBTOR.        .    HOUSTON, TEXAS
                       .    MONDAY, AUGUST 21, 2023
                       .    08:00 A.M. TO 08:51 A.M.
                       .
. . . . . . . . . . . . . . . .


STATUS CONFERENCE

(SOME PARTIES APPEARING VIA GOTOMEETING)

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:                    SEE NEXT PAGE

ELECTRONIC RECORDING OFFICER: NOT IDENTIFIED

OFFICIAL INTERPRETER:           NONE PRESENT

CASE MANAGER:                   ALBERT ALONZO



TRANSCRIPTION SERVICE BY:


**Trinity Transcription Services**
1081 Main Street
Surgoinsville, TN 37873
281-782-0802
battshott@aol.com



**Proceedings recorded by electronic sound recording;**
**Transcript produced by transcription service.**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: MOUNTAIN EXPRESS OIL COMPANY, | . | CASE NO. 23-90147 |
| | . | |
| DEBTOR. | . | HOUSTON, TEXAS |
| | . | MONDAY, AUGUST 21, 2023 |
| | . | 08:00 A.M. TO 08:51 A.M. |
| | . | |

. . . . . . . . . . . . . . . .

STATUS CONFERENCE

(SOME PARTIES APPEARING VIA GOTOMEETING)

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

Appearances:

| | |
|---|---|
| JANET NORTHRUP,<br>  CHAPTER 11 TRUSTEE: | JOSHUA WOLFSHOHL, ESQ.<br>Porter Hedges LLP<br>1000 Main, 36th Floor<br>Houston, TX 77002 |
| FIRST HORIZON BANK, AS<br>  ADMINISTRATIVE AGENT: | JOHN D. ELROD, ESQ.<br>Greenberg Traurig, LLP<br>Terminus 200<br>3333 Piedmont Road, NE, Ste. 2500<br>Atlanta, GA 30305 |
| | SHARI L. HEYEN, ESQ.<br>Greenberg Traurig, LLP<br>1000 Louisiana, Suite 1800<br>Houston, TX 77002 |
| MARATHON PETROLEUM COMPANY: | MARK A. PLATT, ESQ.<br>Frost Brown Todd LLC<br>Rosewood Court<br>2101 Cedar Springs Road, Ste. 900<br>Dallas, TX 75201 |

Appearances (cont.)

| | |
|---|---|
| **OFFICIAL COMMITTEE OF**<br>  **UNSECURED CREDITORS:** | **CHARLES R. GIBBS, ESQ.**<br>McDermott Will & Emery LLP<br>2501 North Harwood Street<br>Suite 1900<br>Dallas, TX 75201 |
| **UNKNOWN:** | **HEATHER MCINTYRE, ESQ.**<br>**WAYNE KITCHENS, ESQ.**<br>Hughes Watters Askinase<br>TotalEnergies Tower<br>1201 Louisiana, 28th Floor<br>Houston, TX 77002 |
| **UNITED STATES TRUSTEE:** | **JAYSON B. RUFF, ESQ.**<br>Office of the United States<br>  Trustee<br>515 Rusk Street, Suite 3516<br>Houston, TX 77002 |
| **SHALAMI VENTURES:** | **LOUIS PHILLIPS, ESQ.**<br>No Address Provided |
| **RAYMOND JAMES (PHONETIC):** | **SAM NEWMAN, ESQ.**<br>Sidley Austin<br>555 West Fifth Street, Suite 4000<br>Los Angeles, CA 90013 |
| **SASS PETROLEUM:** | **JOHN P. MELKO, ESQ.**<br>Foley & Lardner LLP<br>1000 Louisiana Street, Suite 2000<br>Houston, TX 77002<br><br>**MICHAEL HARDY, ESQ.** |
| **HILAL REAL ESTATE**<br>  **CAPITAL, LLC** | **ASHLEY SURINAK, Esq.**<br>Kirkland and Ellis LLP<br>601 Lexington Avenue<br>New York, NY 10022 |
| **GPM INVESTMENTS, LLC:** | **TOM A. HOWLEY, ESQ.**<br>Howley Law PLLC<br>711 Louisiana, Suite 1850<br>Houston, TX 77002 |

Appearances (cont.)


(Please see electronic appearances.)


Transcriber:                    Cheryl Battaglia
                                Trinity Transcription Services
                                1081 Main Street
                                Surgoinsville, TN 37873
                                281-782-0802

1        **Houston, Texas; Monday, August 21, 2023; 08:00 a.m.**

2        **(Some parties appearing via GoToMeeting)**

3             **THE COURT:**  Good morning, everyone.  This is Judge

4    Jones.  The time is eight o'clock Central.  Today is August the

5    21st, 2023.  This is the docket for Houston, Texas.

6             On the eight o'clock docket this morning, sounds odd

7    to say that.  But on the eight o'clock this morning, we have

8    the jointly administered cases under *Case Number 23-90147,*

9    *Mountain Express Oil Company.*

10            Folks, please don't forget to record your electronic

11   appearance.  If this is the first for you, or it's been a

12   while, it's a quick trip to the website, couple of mouse

13   clicks, take you less than 20 seconds.  But it is the way we

14   note your appearance here today.

15            For those of you in the courtroom, I'll just remind

16   you, if you do rise to speak, if you would please come to the

17   lectern.  It's the only place we have both camera and

18   microphones.  And we want you to both be seen and be heard.

19            For those of you who are on GoToMeeting, I have

20   activated the hand raising feature.  If you know you're going

21   to be speaking and haven't already done so, if you'll give me a

22   five star on your telephone.  You can, of course, change your

23   mind at any time.

24            Whether you are in the courtroom or on GoToMeeting,

25   first time that you speak, if you would, please, state your

2

1  name and who you represent.  That really does serve as a good

2  point of reference for the court reporters in the event that a

3  request is made for a transcript.  Finally, we are recording

4  this morning using CourtSpeak.  We'll have the audio up on the

5  docket shortly after the conclusion of this morning's hearing.

6          With that, Mr. Wolfshohl, are you starting us off?

7          **MR. WOLFSHOHL:**  I am, your Honor.

8          **THE COURT:**  And -- and I -- I want you to understand,

9  I am perfectly confused, given what was filed.  And so if you

10  want to spend a couple of minutes and just sort of level set

11  me, that would be most helpful.

12          **MR. WOLFSHOHL:**  Okay.  That's what I intend to do,

13  your Honor.

14          And I realize that I asked for this eight a.m.

15  hearing.  And I probably should have a script for you.  But

16  there's one thing I've learned in the just over 48 hours I've

17  been in this case, this case is not capable of -- of scripting.

18          **THE COURT:**  Fair enough.

19          **MR. WOLFSHOHL:**  I -- I -- I've used this term a

20  couple of times over the course of the weekend.  I think it's

21  fair to say that Miss Northrup, myself, and Mr. Kitchens and

22  Miss McIntyre are drinking from a firehose.  I'm not sure that

23  it's shooting water or fire.

24          The -- everybody in the courtroom and a number of

25  people on -- on the screen, your Honor, has been working

3

1   diligently through the weekend trying to come up with a

2   solution.  The biggest issue being that we have a serious

3   liquidity crisis.

4           **THE COURT:**  Sure.

5           **MR. WOLFSHOHL:**  I would say that the liquidity crisis

6   that -- and -- and it's not even something we have a hundred

7   percent of a handle on.  But I believe we can get through

8   tomorrow, maybe beyond tomorrow.

9           But I think safely tomorrow.

10          **THE COURT:**  If it makes you feel any better, I

11   haven't understood it since day one of the case.  And you know

12   I'm a numbers guy.  And I haven't understood it since day one

13   of the case.

14          **MR. WOLFSHOHL:**  I -- I -- I'm in the same boat at

15   this point, your Honor.

16          With -- with -- with only 48 hours.

17          **THE COURT:**  Sure.

18          **MR. WOLFSHOHL:**  We -- we do believe we can get

19   through tomorrow.  Just -- just the upshot of what I'm going to

20   ask you for, your Honor, is -- is a hearing setting tomorrow.

21   But let me tell you a little bit about the wrath.

22          **THE COURT:**  Yeah.  Okay.

23          **MR. WOLFSHOHL:**  We've been working -- one person

24   that's -- that's not on the screen or in the courtroom that

25   we've been working with extensively over the course of the

1    weekend is Judge Isgur, who has put in a tremendous amount of

2    effort trying to find a way to keep this company alive and --

3    and help us with finding a path forward.

4            Where we're at is that -- and -- and I want to -- I

5    want to specifically say that the banks have, at least the

6    agent, has worked extensively with us with their counsel over

7    the course of the weekend, and going into the -- to late

8    yesterday.

9            The Trustee has presented sort of a three -- three

10   potential options that she sees to the banks.  We laid those

11   out last night.  And in fairness to the banks, you know,

12   there -- there -- there was only the agent on the phone.  And

13   they, I believe, have a call with the banks to discuss those

14   proposals that we've laid out later this morning.

15           **THE COURT:**  Okay.

16           **MR. WOLFSHOHL:**  I have -- well, the Trustee has

17   presented them -- first off, one -- one of the options in the

18   proposal is contingent on a party being able to provide DIP

19   financing.

20           So we have provided these three options to the banks

21   as we don't see any other alternative.  One is DIP financing

22   that allows us to proceed with the sale process that's roughly

23   30 days long.  That would be a priming DIP.  Obviously, nobody

24   is going to come into this situation and provide a DIP that's

25   not priming.  We're not intending to pursue a priming DIP

5

1    without the bank's consent.

2          The alternatives to that are credit bid or proceed

3    with a sale transaction that doesn't involve the DIP and has a

4    quicker timeline for closing.

5        **(Pause in the proceeding.)**

6        **THE COURT:**  How could you do that?

7        **MR. WOLFSHOHL:**  The -- we would use the -- it's --

8    it's a staged process.  There'd be an initial amount that came

9    in that would allow us to have liquidity to be able to proceed.

10       **THE COURT:**  So you're going to have a stalking horse

11   who's going to pre-fund or something?

12       **MR. WOLFSHOHL:**  It's not -- it's a -- it's not a

13   stalking horse.  It has a 21-day fiduciary out.  It wouldn't

14   be -- it -- the first process with the DIP is more in the

15   nature of a traditional stalking horse.

16          The other -- the other one has a fiduciary out that

17   allows the Trustee to take a better deal if it shows up.  But

18   it's -- it's a less formalized structure as far as bid

19   procedures, your Honor.

20       **THE COURT:**  But to do that you got to get the credit

21   bid out of the way.

22       **MR. WOLFSHOHL:**  That's right.

23       **THE COURT:**  Got it.  Okay.

24       I -- I got it.

25       **MR. WOLFSHOHL:**  And I'm -- and at this point I'm not,

1   you know, I don't want to speak for the bank.  I -- I don't

2   know that that is something that they are interested in doing.

3   But I think that they do, in fairness because we presented all

4   this to them late in the evening yesterday.

5           **THE COURT:**  They need time.

6           **MR. WOLFSHOHL:**  They need -- they need time.

7           **THE COURT:**  Need time.  Okay.

8           **MR. WOLFSHOHL:**  I -- I -- I will say that we are

9   going to continue to work with them after they have their

10  discussions with the -- with the bank and -- and try to see if

11  we can get to a point where we're coming in and saying this is

12  something that the bank supports.

13          But unfortunately, even if the bank doesn't support

14  it, I might be coming in here and asking you to approve

15  something that is over their objection.

16          **THE COURT:**  I got it.

17      **(Pause in the proceeding.)**

18          **MR. WOLFSHOHL:**  The -- there -- there -- and you're

19  going to -- you're going to hear about this I'm sure from

20  other -- other parties.

21          But there -- there have been other, at least one

22  other option presented.  And there also are a number of other

23  potential interested parties.  If we had the luxury of spending

24  a lot of time marketing these assets and had the money to

25  create a runway in order to market the assets to other parties,

1   we'd be open to that.

2          If that presents itself, we will explore that option.

3   But the reality is we run out of money, I believe, tomorrow.

4          **THE COURT:**  Got it.

5          **MR. WOLFSHOHL:**  And the alternative to --

6          **THE COURT:**  Any idea why these folks didn't show up

7   earlier?

8          **MR. WOLFSHOHL:**  I -- I -- I don't know for sure.

9   I -- I -- I believe -- let me -- let me tell you this.

10          My impression is that this process was so siloed that

11   people weren't communicating.  I think one thing that I have

12   been told repeatedly through the last three days is that the

13   transparency of the process that we have -- and part of it is

14   that we just have to, but it's also just you know Miss Arthur.

15   I think you've known her for probably 30 or 40 years.

16          **THE COURT:**  Sure.  Let's not go 40.  That makes us

17   older.

18      **(Laughter.)**

19          **THE COURT:**  But 30 I can live with.

20          **MR. WOLFSHOHL:**  Okay.

21      **(Laughter.)**

22          **MR. WOLFSHOHL:**  It does seem like 30's closer.  I'm

23   just rounding up.

24          She wouldn't do it any other way.

25          **THE COURT:**  Yeah.

8

1          **MR. WOLFSHOHL:**  But the comments that we've gotten

2    is -- is that a lot has -- a lot of light has been shed on --

3    on the circumstances.

4          **THE COURT:**  Fair enough.  It -- there's another for

5    that.  I was just curious as why --

6          **MR. WOLFSHOHL:**  That's absolutely right, your Honor.

7          **THE COURT:**  -- the parties hadn't shown up before

8    now.  I got it.

9          **MR. WOLFSHOHL:**  And -- and some of them I think

10   have -- have been trying.  To be honest, I think they've been

11   trying to get access.  And I think it's been difficult.

12          But we have done our best to listen to people.  I

13   think that the process that we've suggested to the bank as --

14   as what we believe the alternatives to be, I think that there

15   is at least some ability for somebody to come in and outbid

16   the -- the -- the offer that we have on the table.

17          But like I said, Judge, if we had the luxury of time,

18   I -- I'd be having a different conversation with you.

19          **THE COURT:**  I got it.

20          **MR. WOLFSHOHL:**  And we don't.

21          **THE COURT:**  I'm assuming it would be helpful if you

22   had financial data that actually made sense.

23          **MR. WOLFSHOHL:**  That -- that's absolutely right, your

24   Honor.

25          And -- and -- and when I tell you that I think we --

9

1   I -- I know we can get through tomorrow.  But I wish I could

2   tell you exactly how far we can get, but -- but I can't.

3           **THE COURT:**  Right.  And, you know, don't forget,

4   there's the John Melko and those who are situated like him, the

5   problem that's out there.

6           **MR. WOLFSHOHL:**  Yeah.

7           **THE COURT:**  I assume you've talked to him or heard

8   from him?

9           **MR. WOLFSHOHL:**  Mr. Kitchens, I believe, has spoken

10  to him, your Honor.

11          We're -- we're -- we're --

12          **THE COURT:**  I got it.

13          **MR. WOLFSHOHL:**  -- dividing, and conquering, and a

14  lot of this is just triage.

15          **THE COURT:**  Oh fine.  I just -- I -- I have pushed

16  him off in an effort to try and see if there's anything here.

17  But as I said last week, at some point, you're going to have to

18  give Mr. Melko his opportunity to stand at the lectern.

19          **MR. WOLFSHOHL:**  I -- I -- I understand, your Honor.

20          **THE COURT:**  Okay.  All right.

21          **MR. WOLFSHOHL:**  And I'm -- I'm happy to cede the

22  podium to someone else.  And obviously, Miss Northrup's here if

23  you have any kind of questions.  I think she, you know, again,

24  we don't have a script for you, but we're prepared to answer

25  questions.

10

1      **THE COURT:**  So let me say this.  I have a ton of

2  questions.  I'm also worried that because I don't know

3  anything, that I hit a button that I shouldn't.

4      And so my inclination is if we're going to have

5  another hearing tomorrow, my inclination, because I trust

6  everybody involved, is to just wait and see what happens.  And

7  then hopefully we get to the point where I can begin to try and

8  understand.

9      Cause I -- I've just never been in this position

10  before.  I literally don't understand anything.  Everything

11  that I believed has been wrong.  And I just, you know, I'm

12  going to have to work through this.

13      **MR. WOLFSHOHL:**  I -- I completely understand, your

14  Honor.  And I actually -- I -- my preference is to take the

15  approach that you've suggested, your Honor, because of the --

16      **THE COURT:**  Okay.

17      **MR. WOLFSHOHL:**  -- moving parts.

18      **THE COURT:**  All right.  Let me ask -- and as I'm

19  looking, what are you looking for tomorrow?

20      **MR. WOLFSHOHL:**  I was just -- just given the -- the

21  fact that we probably have a lot of stuff to do between now and

22  then, I was thinking early afternoon if you're -- if you have

23  availability, your Honor.

24      **THE COURT:**  So let me -- let me give you the

25  schedule.  And we'll figure out what to do.

1          As you know, I'm -- I'm mediating at 9:30.  That was

2    supposed to continue on until tomorrow, with the understanding

3    that I had a Chapter 13 panel in the morning.  And that I've

4    got first days reserved at noon, depending upon, you know, if I

5    draw the case.  Then I would have first days at noon.  If Judge

6    Lopez draws the case, then, you know, that's free time.

7          **MR. WOLFSHOHL:**  Okay.

8          **THE COURT:**  But then I was supposed to be back --

9          **MR. WOLFSHOHL:**  At mediation.

10         **THE COURT:**  -- mediating.

11         But, you know, if -- if what you want is tomorrow

12    afternoon, can it be late afternoon?

13         **(Pause in the proceeding.)**

14         **THE COURT:**  That's difficult.

15         **MR. WOLFSHOHL:**  The -- yeah.  The -- the -- what

16    we're thinking about, and this is optimistic, is -- is wire

17    deadlines if we were able to get a transaction approved

18    tomorrow.

19         **THE COURT:**  Right.

20         **MR. WOLFSHOHL:**  And the only concern I have is we

21    can't really initiate a wire after four o'clock.  And I -- what

22    I don't -- and this is -- this is getting to the whole issue

23    that we're dealing with is --

24         **THE COURT:**  Right.

25         **MR. WOLFSHOHL:**  -- I don't know how far we last

12

1  beyond tomorrow, based on liquidity.

2         **THE COURT:**  So if my -- if my calendar were clear,

3  which it's not, but if my calendar were clear, when would you

4  want your hearing?

5         **MR. WOLFSHOHL:**  One o'clock.

6         **(Pause in the proceeding.)**

7         **(Court confers off the record.)**

8         **MR. WOLFSHOHL:**  Or -- or -- or, your Honor -- your

9  Honor -- if you has 12 reserved, I -- I could do 12, too.

10         **THE COURT:**  You got one o'clock.  We'll figure out a

11  way to make it work.

12         **MR. WOLFSHOHL:**  I -- I appreciate that, your Honor.

13         **(Pause in the proceeding.)**

14         **MR. WOLFSHOHL:**  And if -- unless you have any other

15  questions, I'll let other people talk to you.

16         **THE COURT:**  No.  Thank you.

17         And again, I'm trying to bite my tongue.  So thank

18  you.  All right.

19         Mr. Gibbs?

20         **(Pause in the proceeding.)**

21         **MR. GIBBS:**  Good morning, your Honor.  Chuck Gibbs

22  from McDermott Will and Emory on behalf of the Committee.

23         Give you some additional color.  Committee's here

24  today pretty frustrated, feeling a little defeated.  And -- and

25  to directly respond to the question you asked Mr. Wolfshohl is

1   about why the other party didn't -- hadn't surfaced.

2          Let me speak to that directly.  And I'll call them

3   Party A.  Party A is an experienced operator, who was never

4   contacted by the investment banker who ran the sale process for

5   the Debtor, resourced him.  My partner, Marcus Hale (phonetic)

6   did.

7          And even though we weren't allowed to talk directly

8   to bidders, we continued to kind of keep them on ice trying to

9   keep them interested, even though they really weren't part of

10  the process.

11          **THE COURT:**  Right.

12          **MR. GIBBS:**  Took it with -- once we -- once we

13  introduced that party to the investment banker for the Debtor,

14  it took them four weeks to get an NDA from the investment

15  banker.

16          So they were negotiated, not delivered.  So they were

17  effectively shut out of the process.  You heard me make

18  reference to that at the last hearing.

19          We believe, and -- and we presented that party,

20  they're -- they're represented by able counsel, whose office

21  you are observing on the screen earlier.  And we believe they

22  A, can solve the Trustee's liquidity crisis; B, they can -- B,

23  they can provide a significantly higher recovery to the banks

24  than the offer that we understand is circulating, that was

25  proposed, or at least described a week ago by Debtor's counsel

1    before the Trustee was appointed.

2           And we, along with all the professionals and the

3    principles, worked literally around the weekend, around the

4    clock all weekend, including with Judge Isgur, to try to get to

5    an understanding that would allow the Debtor to come in this

6    morning with a request to borrow money from them, proceed to an

7    alternate transaction.  Couldn't get there.

8           **THE COURT:**  Okay.

9           **MR. GIBBS:**  Part of the frustration is that, to my

10   knowledge, that party hasn't been -- hasn't been involved in

11   discussions with Judge Isgur to try to see if he could involve

12   them in a mediated solution.  Nor really with us.  We've been a

13   little bit kept apprised of conversations.  And that's not

14   atypical sometimes for mediations where the Committee's out of

15   the money and but still involved.

16          **THE COURT:**  Sure.

17          **MR. GIBBS:**  So, we are hopeful that the next 36 hours

18   can continue to be productive.  If it's productive only vis-à-

19   vis the -- the options that I understood Mr. Wolfshohl to

20   describe, which I believe does not involve Party A, then, you

21   know, we'll probably be here objecting to it next -- tomorrow

22   at one o'clock.

23          Cause we don't think that it's the -- it's an

24   appropriate path to go forward without considering whether

25   there's another alternative that could be supported by the

1  Committee and the lenders and recover more for the creditors

2  than what we understand the offer to be.

3         So that's where we are this morning.  As I said,

4  frustrated, a little bit defeated.  But still, you know,

5  because I still have in all my inherent optimism beating on a

6  mule these years, still hopeful that we can get to something

7  tomorrow afternoon that is supportable.

8         We certainly want the Debtor to have the liquidity to

9  survive beyond tomorrow.  We certainly want the Debtor --

10  Debtor through the Trustee to have liquidity to see if, in

11  fact, a better deal can be had.

12         Because the one that we understood was, as you heard

13  from Mr. Elrod and myself a week ago, the one that none of the

14  creditors could support.  So --

15         **THE COURT:**  Right.

16         **MR. GIBBS:**  -- what we -- we heard the three paths

17  described by Mr. Wolfshohl.  One of the things that we tried to

18  find out is exactly what the banks want.

19         We have -- we've heard loud and clear what they don't

20  want.  We've heard loud and clear what options they don't

21  prefer.  But we really don't know what they want, what they,

22  other than something that impossible, which is get their loan

23  paid back.

24         But -- so that is an inherent structural impediment.

25  We're kind of shooting in the dark, and trying to get to

16

1   something that is acceptable that makes economic sense to an

2   alternative party, that is acceptable to the lender and to the

3   Trustee.

4         So that's where the Committee is this morning.

5         **THE COURT:**  Got it.

6         So let me ask, and -- and this is all going to be

7   relatively easy.  I mean, if we can't figure out a path, then

8   the bank's going to be an owner.  And the bank's going to be an

9   owner really quick.  Not sure what that means, but they'll be

10  an owner really quick.

11        Is there anything from the Committee's perspective

12  that you think that I need to do to make sure that we explore

13  all avenues, other than try to be responsive with respect to

14  hearing requests?

15        **(Pause in the proceeding.)**

16        **MR. GIBBS:**  It's a hard one for me to answer.  Cause

17  I know that mediator's the mediator.  And he'll do what he

18  feels like he has to do.

19        But I do think broadening the conversations to

20  include an alternative --

21        **THE COURT:**  Does -- does he know?  I mean, I don't --

22  I mean, it's, you know --

23        **MR. GIBBS:**  It's my understanding he's aware of.

24        **THE COURT:**  Okay.

25        **MR. GIBBS:**  And I may be misspeaking.  Somebody can

17

1   remind me of a call that I wasn't aware of that did occur

2   between Judge Isgur and this representative for this party.  I

3   don't think it happened over the weekend.

4           That would be the only other unturned stone that

5   might be helpful.  So -- but I -- I'll certainly reach out to

6   Judge Isgur.  We were in pretty frequent contact with each

7   other late in the evenings and early in the mornings throughout

8   the weekend.  So -- but to my knowledge, the -- the direct

9   interaction was not held with this party.  I know that there's

10  been significant interactions with the -- the buyer that the

11  Debtor had sourced, that is the one that they were recommending

12  last week.

13          **THE COURT:**  Okay.

14          **MR. GIBBS:**  Mr. Howley's client.

15          **THE COURT:**  So if you could just indulge me for

16  just --

17          **MR. GIBBS:**  Uh-huh.

18          **THE COURT:**  -- a couple of minutes.

19          So -- so down this path, so based on all we know,

20  there's no scenario where these assets result in a dividend to

21  general unsecureds.  Or am I wrong about that?

22          **MR. GIBBS:**  These hard assets, no.

23          **THE COURT:**  Okay.

24          **MR. GIBBS:**  Other than through a negotiated plan that

25  would provide some sharing out of the -- out of sale proceeds,

18

1   as much as I know Mr. Elrod likes me, he -- he just hasn't yet

2   been able to say here's some for the unsecureds.

3            There are -- there are causes of action that exist

4   that have value that may be part of the solution long term.

5            **THE COURT:**  Got it.  Causes of action against third

6   parties?

7            **MR. GIBBS:**  Third parties.

8            **THE COURT:**  Got it.  And have we done insurance

9   investigation?

10           **MR. GIBBS:**  Yeah.  We -- they're aware of the

11  insurance policies.

12           **THE COURT:**  Okay.

13           **MR. GIBBS:**  There has not been significant discovery

14  or investigation into the bona fides of potential third-party

15  causes of action.

16           We know of significant pre-petition transfers to the

17  former insiders that we think are -- is within the claw back

18  period.  Significant meaning eight figures significant.

19           We believe there are causes of action against the

20  funder of the -- or the funder/partner, largest landlord in the

21  case.  That is, they are affiliated with the purchaser that

22  Mr. Howley represents.  So --

23           **THE COURT:**  Got it.

24           And is the -- is the potentially insurance covered

25  claims derived out of allowing these things to happen?  Or is

1   there -- are there other things that I just don't yet know.

2           I'm trying to figure out.  Have we put carriers on

3   notice.  I mean, I just want to make sure that we're -- I know

4   you guys are running 900 miles an hour.  I just want to make

5   sure we don't lose something.

6           **MR. GIBBS:**  We would like to be -- have that same

7   level of assurance that last -- to the last point.  I don't

8   know whether the Debtor put its carriers on notice, Debtor's

9   counsel did.  Committee hasn't.  We -- we know of, we know

10   third-hand of what exists, not by identity of -- of insurance

11   policies in the stack, just the dollar amount.

12          **THE COURT:**  Yeah.  Miss Northrup's making a note.  So

13   we'll figure that out and hopefully some action will be taken.

14          **MR. GIBBS:**  Okay.

15          **THE COURT:**  I just want to make sure that we don't --

16          **MR. GIBBS:**  We --

17          **THE COURT:**  We don't --

18          **MR. GIBBS:**  We share that --

19          **THE COURT:**  -- do harm.

20          **MR. GIBBS:**  -- too.

21          **THE COURT:**  Okay.  I got it.

22          So just running down the path.  So let's assume that

23   something occurs.  So what I'm going to call the operating

24   assets gets sold, not going to come close to addressing

25   probably not even the DIP, much less pre-petition secured.

1          What's the next step, your view?  I mean, have you --

2     having discussions, you know I've always, you know, you -- you

3     know I've -- I've hinted at this before.  The value may simply

4     be, you know, releases of 547 claims against non-insiders, you

5     know, that may be the only value that comes out of it.

6          I don't know.  I mean, I'm not aware that there's a

7     requirement that that can only be done in a plan.  You know me.

8     I don't like living inside of a box.

9          And I -- I just didn't know if there's been

10    discussions about what -- what the end game is.

11          **MR. GIBBS:**  Um.

12          **THE COURT:**  Too soon?

13          **MR. GIBBS:**  Surely too soon.

14          But there imnacient (phonetic) if that's the right

15    word, at the very beginning stages.  But we're all like to

16    think we're creative.  So we're, you know, the issues have been

17    flagged.  The opportunities have been flagged.  Have the -- has

18    there been productive, meaningful conversations about those,

19    no.

20          **THE COURT:**  I got it.  Okay.  All right.

21          So back to other than giving Mr. Wolfshohl his

22    hearing tomorrow at one o'clock, are you aware of anything and

23    I'm -- that I can do to help the process?

24          **(Pause in the proceeding.)**

25          **THE COURT:**  And, you know, I'm not going to tell

1   Isgur how to mediate.  I mean, he -- he taught me how to

2   mediate.  I'm not going to begin to tell him, you know, how to

3   do what he volunteered to do.

4           **MR. GIBBS:**  Other than tell all the parties to do

5   exactly what the out-of-money committee wants, I'm not sure.

6           **THE COURT:**  It's a hard conversation to have.

7           I got it.  That's -- I appreciate your staying

8   engaged.  I've certainly seen circumstances where people didn't

9   stay engaged.  So I -- I appreciate you staying engaged.  Gives

10  me a point of reference.

11          **MR. GIBBS:**  One of the counsel on the -- on the phone

12  observed over the weekend, I think we should be called

13  Sisyphus.

14          **THE COURT:**  Fair enough.  Thank you, Mr. Gibbs.

15          Mr. Ruff, U.S. Trustee have any perspective?

16      **(Pause in the proceeding.)**

17          **MR. RUFF:**  Good morning, your Honor.  Jayson Ruff

18  with the U.S. Trustee's office.

19          Your Honor, we're -- I don't have anything with

20  respect to the actual offer other than what's been shared with

21  the Court by other parties at this moment.  We're very much an

22  outsider looking in.  And I think I'll just leave it at that,

23  your Honor.

24          **THE COURT:**  All right.  Thank you.

25          Mr. Phillips, did you have any commentary before I go

22

1  to Mr. Elrod?

2          **MR. PHILLIPS:**  Your Honor, Louis Phillips on behalf

3  of Shalami (phonetic) Ventures.

4          Mr. Elrod, I can speak now.  I'm not a party of

5  interest, except that we've been very interested.  My client

6  representative's in the courtroom today.  We -- this is the

7  party that I believe Mr. Gibbs was referring to.

8          **THE COURT:**  Ah.

9          **MR. PHILLIPS:**  He has extensive knowledge,

10 experience, operational, ownership, et cetera.  He has spent

11 Friday, Saturday, and Sunday, maybe Thursday, and has viewed

12 nearly a hundred sites in four states.

13          We sent a term sheet proposal which was not the 50-

14 page version.  But it was, because of my pea-sized brain, Louis

15 Phillips version.

16      **(Pause in the proceeding.)**

17          **THE COURT:**  Mr. Phillips, did we lose you?

18      **(No audible response.)**

19          **THE COURT:**  Looks like he was voice over IP as well

20 as video.

21      **(Pause in the proceeding.)**

22          **THE COURT:**  Mr. Phillips, are you there?

23      **(No audible response.)**

24          **THE COURT:**  All right.  Well hopefully, you'll come

25 back in.

23

1          Mr. Newman, I need for you to hit, cause I recognize

2    the other phone numbers.  I need for you to hit five star on

3    your telephone.  That will unmute you.

4        **(Pause in the proceeding.)**

5               **THE COURT:**  There we go.

6               Mr. Newman, can you hear me?

7               **MR. NEWMAN:**  Yes.  Can you hear me, your Honor?

8               **THE COURT:**  Loud and clear.  Thank you.

9               **MR. NEWMAN:**  Thank you.  My name's Sam Newman, Sidley

10   Austin, we represent Raymond (phonetic) James (phonetic) who

11   represented in connection with their applications.

12          And I just wanted to represent to the Court, and the

13   benefit of the parties, and particularly the Trustee, who I

14   know is drinking from a firehose and try to come up to speed,

15   Raymond James did work -- reach out on Friday to offer to

16   provide whatever information we have as quickly as possible

17   with respect to the sale process and the contact.

18          As you know, Raymond James ran on a process over the

19   last six months contacted, you know, close to 200 parties.

20   The -- the representations that have been made on the record

21   today are -- are not consistent with Raymond James' experience.

22   There is no party that they are aware that waited any material

23   time let alone four months for an NDA.

24          So we have significant records that we believe could

25   help the Trustee get up to speed.  And we just wanted to make

1  sure that all the parties were aware that we're, you know,

2  we're very interested in doing anything we can to help

3  facilitate this transaction coming to a successful conclusion.

4       But some of the representations that have been made

5  on the record, we -- we take issue with and are happy to

6  provide, you know, information directly to the Trustee.

7       **THE COURT:**  Got it.  Mr. Newman, thank you for

8  appearing this morning.  That you for making that statement.

9       Mr. Howley, I saw you rise.

10      **MR. HOWLEY:**  Yes.  Good morning, your Honor.

11      **THE COURT:**  Good morning.

12      **MR. HOWLEY:**  For the record, Tom Howley with Howley

13  Law.  We represent GPM Investments, LLC, which is a subsidiary

14  of Arco Holdings, one of the bidders in this process.

15      We're here to monitor the hearing.  We've been in

16  active discussions with the parties to try to find a

17  solution --

18      **THE COURT:**  Okay.

19      **MR. HOWLEY:**  -- to keep this thing as a going

20  concern.  I want to reiterate our desire to participate in

21  that.

22      I also rise to correct the record.  With all due

23  respect to Mr. Gibbs, I know there's a lot of moving pieces

24  and -- and it's a fluid situation.  But he said that we were an

25  affiliate of the largest landlord.  That's not correct.  We're

25

1  not an affiliate in any way, shape, or form.

2          We entered into this process as a bidder.  And we, as

3  part of the bid, we have a deal with the largest landlord on

4  how to operate the business as a going concern.  But we're not

5  an affiliate in any way, shape, or form.  And I just wanted to

6  correct that.

7          **THE COURT:**  No.  Got it.  Thank you.

8          **MR. HOWLEY:**  Thank you.

9          **MR. NEWMAN:**  Your Honor?

10     **(Pause in the proceeding.)**

11         **MR. NEWMAN:**  Your Honor, if I could, just that I'll

12  acknowledge those comments and agree with him to the extent I

13  used the word affiliate.  I didn't mean in the legal term, but

14  I mean affiliated in that we understood that they're --

15         **THE COURT:**  I took it as co-bidder.  How about that?

16         **MR. NEWMAN:**  Not even -- not even sure it's that.

17  But they're involved.  Thank you.

18         **THE COURT:**  Thank you.

19          Let's see.  Miss Surinak, good morning.

20         **MS. SURINAK:**  Morning, your Honor.  Can you hear me

21  okay?

22         **THE COURT:**  Loud and clear.  Thank you.

23         **MS. SURINAK:**  For the record, Ashley Surinak of

24  Kirkland and Ellis on behalf of Hilal (phonetic) Real Estate

25  Capital.  Your Honor, I just want to make a brief comment.

1          We have been engaging constructively with the Trustee

2    and in mediation with Judge Isgur over the weekend.  And just

3    want to represent our continued support.  Want to be helpful

4    regardless of what transaction, you know, is going forward at

5    this point.  And just want to reiterate our concern for the

6    segregation of the assets and -- and just want to come to a

7    resolution.

8          But in any case, just wanted to make a brief

9    statement about our constructive efforts to continue this

10   process as well.

11          **THE COURT:**  Got it.  Thank you, Miss Surinak.

12          Mr. Melko, are you -- have I -- are you -- you're

13   hiding from me by being an observer and not Mr. Melko.

14          **MR. MELKO:**  No, your Honor.  Actually, I thought I --

15   I did go to the website and register.  Must not have taken.

16          Anyway, John Melko representing SASS Petroleum.

17   Since you've mentioned me a few times, let me chime in and say

18   I was disappointed in the Status Conference not to hear some

19   reference to what's happening with credit card receivables.

20   There are two or three counsel for the oil companies who do the

21   credit card processing, or we at least have the contracts with

22   the banks, to do the credit card processing.

23          We continue to got -- to get complaints over the

24   weekend from dealers who say they are still not getting their

25   credit cards.  That's a large part of the revenue.  I would say

27

1    it's the bulk of the revenue of this company.  And look,

2    I've -- I realize that the Trustee was out of town, worked out

3    of town, just now retained counsel and got back, and it's a

4    complicated business.

5             But that needs to be addressed for a couple of

6    reasons.  One, it's a significant source of revenue to the

7    Debtor.  And second, much of those credit card receipts

8    represent funds that are not property of the Debtor.  They are

9    actually property of the dealers having to do with sales of

10   anything from soda and chips, to lottery tickets, to

11   cigarettes, to whatever.  They were not petroleum related.

12   They have nothing to do with purchases by or through the Debtor

13   or from the oil company for that matter.

14             So I have -- I would -- I'm happy to talk to

15   Mr. Wolfshohl if he's ever got time later today.  But that is a

16   significant item that needs to be addressed.

17             **THE COURT:**  So, Mr. Melko, I think Mr. Wolfshohl

18   heard me.

19             You know, I don't generally mention peoples' names,

20   except for a reason.  I think he heard me.  I'm going to guess

21   that you'll probably talk today.

22             **MR. MELKO:**  Always happy to talk to Mr. Wolfshohl,

23   your Honor.

24             **THE COURT:**  All right.  Thank you.

25             Mr. Phillips, I see you're back.  Didn't mean to lose

1   you there.

2          **MR. PHILLIPS:**   Your Honor, it was my home internet.

3   So I apologize.   But I'm back.

4          I -- I -- and I -- I don't know where I had froze,

5   but my client representative is in the courtroom, Mr. Sumido

6   (phonetic).   And as I tried to say earlier, he traveled across

7   four states, North and South Carolina, Alabama, and Louisiana

8   looking at locations over the weekend, certainly Friday,

9   Saturday and Sunday.

10          He has communicated with the fuel suppliers.   He's

11   communicated with managers at locations.   He has an idea.   He

12   has proposed DIP financing through a term sheet proposal.   And

13   at -- and -- and management services proposals that had been

14   under discussion or, at least, some of the parties had been

15   discussing before I got involved.

16          And his proposal to -- to line it out is to put up

17   immediate liquidity to deal with the credit card issues that

18   were mentioned by Mr. Melko.   To reestablish the flow of fuel.

19   He is -- he's under the impression that approximately -- that a

20   large percentage of the locations do not have fuel, have bags

21   over the pumps.

22          He's in a position he thinks to get fuel flowing

23   immediately.   He wants -- he -- he wants -- he -- he has

24   proposed, because he's in this business and because he's

25   already seen close to a hundred stores, he has visited we think

1    a lot of stores, not more stores than the -- the CRO had ever

2    visited.  He has gotten now all the -- all the way down into

3    the weeds about what's needed at what places.  He's proposing

4    DIP financing and fuel deposit financing so that the fuel can

5    get going.

6            He wanted -- he believes he can get the operations

7    turned around to generate more value.  And he wanted some

8    break-up and success fees of prime rate on his DIP facility.

9    Which, as I understand, is a very reasonable rate within the

10   confines of the current DIP financing.

11           He wanted to be first because he's putting up new

12   money, of course.  We are not -- did not propose a 240-page

13   credit agreement.  My purchase -- my term sheet is very short

14   and easily digestible.  I got some pushback yesterday about

15   some of the terms which I thought some of which we could talk

16   about, some of which I didn't really understand.

17           But it would seem to me like the Trustee would like

18   an experienced operator to operate the properties for the

19   benefit of the Trustee and the estate.  If -- if the Trustee

20   wants some type of modicum of control, I just don't think the

21   Trustee wants to be dealing with, you know, hundreds of

22   thousands of transactions a day over 500 locations.

23           We know we have lease concerns.  He's already started

24   talking to landlords.  He started talking to locations that

25   haven't paid rent because they can't get fuel.  And so, we

1  think, and -- and our proposal was a six-month process where we

2  operate.  And then if we buy, fine.  We get a credit bid, part

3  of our break-up and success fee, plus our DIP.

4       And if -- if there's no transaction within six months

5  while the properties are being operated, then he will stay on

6  without exclusivity.  And what -- with a right of first

7  refusal.

8       And we needed to talk around those terms, fine.  But

9  what I heard from counsel for the Trustee today is that our --

10  the structure of our proposal is not even under consideration.

11       And, you know, we -- we thought the banks -- we

12  thought the bank agent was supportive of -- but I can only do,

13  you know.  I've only -- I've only been involved since Friday of

14  this -- Thursday afternoon of last week.

15       **THE COURT:**  All right.  And I assume both bank and

16  Trustee have this proposal.  And that it's a topic of

17  conversation.

18       **MR. WOLFSHOHL:**  Absolutely, your Honor.

19       We've had -- we've had I think at least three, maybe

20  four, calls with Mr. Phillips as well as his client.  Look,

21  I -- I want to make it clear.  I believe Mr. Lalani (phonetic)

22  has -- has worked very hard to try to get involved in the

23  process.

24       **THE COURT:**  Right.

25       **MR. WOLFSHOHL:**  Sometimes you're in a situation that

1   you -- you -- you arrive too late.  I hope that's not true.  I

2   hope that there's a process where -- where he can participate

3   at some point.

4        Mr. Phillips talked a lot about the proposal.  He

5   gave you a bunch of terms.  I don't think it's productive to

6   show you what the proposal is.  But if the Court has any

7   questions as to why the Trustee has serious concerns, all you

8   would have to do is look at the proposal.

9        I just -- I just want to point out that if it -- if

10  that ever becomes an issue, I'm prepared to let the Court see

11  what it is.  And I don't think that I even had to explain to

12  the Court what the problems are with it.

13       The -- that's not to say that we are shutting them

14  out of the process.  We have had extensive communications with

15  them.  It was very clear to us that the bank and the UCC were

16  interested in exploring it.

17       I'm not saying that it's impossible that we don't end

18  up with a transaction with him.  I'm also not saying that

19  whatever process, if we go forward with -- with someone else,

20  doesn't involve them potentially having an opportunity to come

21  in in some other capacity.

22       Because it's clear that they have made a lot of

23  effort.  Mr. Lalani, who I haven't shaken his hand yet.  But

24  I've talked to him on the phone several times.

25       He -- he has spent a lot of time over the last

1    several days.  I think he's sincere.  I think he's real.

2    But -- but the reality is, both the parties we're talking to

3    are very experienced operators.

4            We're -- we're not -- we're not dealing with people

5    that are, you know, fly by night, you know, just want to have

6    an investment that they think could generate some money.  These

7    are -- these are both parties that have a lot of experience

8    operating.

9            And so that's a very important consideration to the

10   Judge.  I mean, to the -- to the Trustee.  But probably also to

11   the Judge.  And that is part of why we have taken him so

12   seriously.  Because he -- he clearly is putting in the effort.

13   And he clearly is somebody that has the ability to do it.

14           The problem we have is that the terms that are on the

15   table right now are so far apart that, you know, and I don't

16   want to get too far into that right now.

17           I -- it might be the subject of tomorrow's hearing

18   more.  Because people might be coming and saying this is why we

19   don't like this one.  And this is why we want that one.

20           And if that's the case, that's the case.  I'd like to

21   not get into that today.  But I just want to clarify that.

22   Because Mr. Phillips did start talking about a bunch of terms.

23   And I just want your Honor to understand, because you asked me,

24   we are taking all of the -- the potential options very

25   seriously if they look like they're legitimate.

33

1          And I do think that Mr. Lalani is a legitimate

2   financial purchaser.

3          **THE COURT:**  I got it.  It -- I -- I'll look at it

4   when the parties are ready for me to take a look at it.

5          And I -- as I said before, because I know so very

6   little about what's currently going on, I'm not going to ask

7   many questions just simply cause I don't want to put my finger

8   on something that pushes anyone in a particular direction.

9          I'll wait.  And if it's tomorrow at one o'clock, then

10  it's tomorrow at one o'clock.

11         **MR. WOLFSHOHL:**  I appreciate that.

12         **THE COURT:**  All right.  Thank you.

13         All right.  Anyone before I go to Mr. Elrod?

14      **(No audible response.)**

15         **THE COURT:**  All right.  Mr. Elrod?

16         **MR. ELROD:**  Thank you, your Honor.

17         **THE COURT:**  Yes, sir.

18         **MR. ELROD:**  Good morning.  John Elrod on behalf of

19  First Horizon Bank as DIP agent.

20         I believe Mr. Wolfshohl's comments regarding the path

21  forward are more or less accurate.  We do want to ensure that

22  all options are explored.

23         **THE COURT:**  Sure.

24         **MR. ELROD:**  And we have had extensive conversations

25  with Mr. Lalani and Mr. Phillips.  And what I'm sure that

1    they're fairly invited into the process, because of the history

2    here, the lack of trust, et cetera, earlier in the case.  And

3    we want to make sure that everything is explored so the value

4    can be maximized.

5              The proposal that was discussed yesterday with

6    Mr. Phillips was not what we expected.  I'll put it that way.

7    I think gaps can be bridged, perhaps.

8              **THE COURT:**  Sure.

9              **MR. ELROD:**  But, you know, that remains to be seen.

10   So what --

11             **THE COURT:**  Has Isgur got a copy of this?

12             **MR. ELROD:**  Not to my knowledge, your Honor.

13             **MR. WOLFSHOHL:**  He has, your Honor.  Yeah.

14             **THE COURT:**  He does.

15             **MR. WOLFSHOHL:**  He does.

16             **MR. PHILLIPS:**  Well also -- we authorized the

17   Judge --

18             **MR. WOLFSHOHL:**  That's right.

19             **MR. PHILLIPS:**  -- for it to be shared with Judge

20   Isgur.

21             **MR. WOLFSHOHL:**  And -- and we've -- and we've talked

22   to him about it.  He has gone over it.

23             **THE COURT:**  Oh, okay.  I'm just going -- he's really

24   good at filling in gaps.  I mean --

25             **MR. WOLFSHOHL:**  And --

1          **THE COURT:**  You don't like -- you don't like the fill

2 ins sometimes, but he's really good at filling in the gaps.

3          **MR. ELROD:**  Right.

4          **THE COURT:**  Okay.  Okay.

5          **MR. ELROD:**  And I -- I -- what I wanted to say, your

6 Honor, is while the bank -- the bank's not made a definitive

7 decision as to which path forward, the path forward proposed by

8 Mr. Lalani, if he's successful, would result in a much larger

9 return than what's on the table.

10          **THE COURT:**  So let me ask just -- just trying to work

11 my way through that.  Cause I -- I did this with -- with

12 Mr. Gibbs.

13          So, I mean, if you're talking about, I mean, this

14 won't last six months.  You know that.  You know, I don't think

15 this'll last 30 days, I mean, without a significant influx of

16 cash.

17          And then, you know, at some point I've got a room

18 full of professionals.  I'm going to have to turn around.  And

19 I'm going to have to deal with that.  And Mr. Melko is, and I'm

20 assuming he's not the only one, you know, he's sitting right

21 there on the edge.

22          You got a whole bunch of -- of operators in -- couple

23 that we've dealt with.  But now you're seeing all the me too's

24 get filed.  And I know that there are more coming.

25          And you -- you heard the hint from the fuel suppliers

1   last week.  I mean, there are just a whole host of ugly issues

2   that are all going to have a time and a cost commitment.  And I

3   just -- and I -- and I'm looking at you.  I'm talking to you.

4   But I'm talking to everybody.

5            It just isn't going to last.  So if people are

6   motivated, you know, we need to -- we need to push as hard as

7   we can push.

8            And -- and I -- I hope I've demonstrated I'll make

9   whatever time commitments I need to make so that you have

10  access, whatever the deal is.

11           Look, I know nobody's going to be happy.  And I know

12  that you are dealing with a group of folks who don't live in

13  this business in terms of -- in terms of looking at it like the

14  private equity world.

15           You -- you got banks that are -- that are sort of out

16  of their comfort zone.  I got all of that.  You got smaller

17  banks that this is going to hurt.  I know it's going to hurt.

18           But we need to -- we all need to be realistic and

19  understand that while it may only be a peppercorn, a

20  peppercorn's better than an empty cupboard.

21           And so we need to really push as hard as we can to

22  get what we think we can get.  And again, I'll do whatever we

23  can.  If there's somebody out there that's -- that's, you know,

24  somebody real.  I'm going to assume with this group that we

25  don't have issues about involvement, or transparency, or

37

1    anything like that.

2            If there are, I want to know about them -- I want to

3    know about it yesterday.  I -- I -- I, you know, we -- we

4    spent, I mean, how much money did we spend since the initiation

5    of the case.  I mean, I heard you tell me the number that, you

6    know, was it 50 or $60 million?

7            **MR. ELROD:**  Yes, your Honor.

8            **THE COURT:**  Gone?

9            **MR. ELROD:**  Forty -- forty-eight, I believe.

10           **THE COURT:**  Forty-eight.  Okay.  So $50 million.  We

11   can't do that again.  We need to --

12           **MR. ELROD:**  Correct.

13           **THE COURT:**  -- really push.

14           **MR. ELROD:**  That's -- that's -- that's -- the

15   proposal would not contemplate that.  It would contemplate

16   basically offloading a lot of the operating costs to

17   Mr. Phillips' client on a go-forward basis, basically shifting

18   the risk to him, similar to what Mr. Wolfshohl detailed in

19   the -- in the proposal with the advances from GPM.

20           **THE COURT:**  I got it.  It's just, you know, I know --

21   I know Mr. Phillips.  He doesn't ever shift total risk to

22   anybody -- to any of his clients.  So, again, I --

23           **MR. ELROD:**  Well that -- that's where the issue came

24   up --

25           **THE COURT:**  I --

1          **MR. ELROD:**  -- yesterday.

2          **THE COURT:**  I totally got it.  I -- just I've --

3          **MR. ELROD:**  So --

4          **THE COURT:**  He's a superb -- he's superb at what he

5     does.  I just -- I've been on the receiving end of that a

6     couple of times.  There were great life lessons for me.

7          So we'll just -- I'll see it whenever -- I'll see it

8     whenever folks are ready to -- to give it to me.

9          **MR. ELROD:**  But I -- I rise mainly to say we want the

10    most open process that we can under the circumstances,

11    completely understanding the Trustee's and the business'

12    liquidity need.

13         That is what's driving most of this.  We also want to

14    ensure that contractual counterparties are giving alternative

15    proposals a -- a fair chance to be heard and -- and not

16    providing most favored nation status to anybody.

17         And we're getting a bit of that.

18         **THE COURT:**  You're getting a bit of that.  What does

19    that mean?

20         **MR. ELROD:**  Your Honor, with respect to one landlord

21    in particular, who has been approached by at least one party

22    about potential alternative, they were told to simply go to GPM

23    and cut a deal with them.

24         **THE COURT:**  Interesting.  All right.

25         When you're ready to do something about that, I'm

39

1   happy to take that issue up.  But I'm not going to do it

2   without a pleading.

3            **MR. ELROD:**  Understood.

4            **THE COURT:**  Okay.  All right.

5            **MR. ELROD:**  Thank you, your Honor.

6            **THE COURT:**  Thank you.

7            Anyone else have ay issue I need to raise or that I

8   need to address?

9        **(Court confers off the record.)**

10       **(Pause in the proceeding.)**

11           **THE COURT:**  Let me ask, Mr. Wolfshohl, it appears

12  more likely that the overnight filing that would have resulted

13  in first days is less likely to file.

14           **MR. WOLFSHOHL:**  Okay.

15           **THE COURT:**  It's still a possibility.  Would you

16  rather have noon versus one with the understanding that if it

17  did file and I did draw it, then, you know, you would get --

18  you would get pushed.  Or you can just keep one.  It's entirely

19  up to you.

20           **MR. WOLFSHOHL:**  Judge, let's take noon.  Let's --

21  let's just take noon --

22           **THE COURT:**  Right.  With -- with the understanding --

23           **MR. WOLFSHOHL:**  -- if you've got the time open, then

24  I think we ought to take it.

25           **THE COURT:**  Sure.

1      **MR. WOLFSHOHL:**  Yeah.

2          **THE COURT:**  I just want to be clear, if it does file

3  and if I did draw it, you would get pushed to one.

4          **MR. WOLFSHOHL:**  That -- that's totally fine, your

5  Honor.

6          **THE COURT:**  Then with that, then Mr. Alonzo, let's go

7  ahead and just go ahead and schedule the hearing for noon.

8          Do you anticipate any additional filings?

9          **MR. WOLFSHOHL:**  So I hope that I'm going to file

10  something before that that is setting out what it is that we

11  are going to ask your Honor to consider.

12          **THE COURT:**  Okay.  So the only request I have is, I

13  would very much like to read it.  And if I have a Chapter 13

14  panel, my only point was, you know --

15          **MR. WOLFSHOHL:**  Yeah.

16          **THE COURT:**  -- when I -- when I step on at nine, I

17  don't step off until it gets done.

18          **MR. WOLFSHOHL:**  I remember.

19          **THE COURT:**  Yeah.  So if you can -- I guess that's

20  true with Judge Steen (phonetic).  I guess that's right.

21          **MR. WOLFSHOHL:**  That's right.

22          **THE COURT:**  So if you can at all get it filed before

23  nine o'clock, you know, and if you would just keep Mr. Alonzo

24  in the loop.  If I need to come back down here at six-thirty.

25  While I wasn't happy about it this morning, I'm happy to do it

41

1   again if that's what I need to do.

2          That's -- but I'm somewhat picking on him.

3          **MR. WOLFSHOHL:** I don't think Mr. Alonzo was happy

4   about it either, your Honor.

5          **THE COURT:** But he didn't -- he didn't show up until

6   quarter of eight.

7      **(Laughter.)**

8          **THE COURT:** That's all -- I was texting with him, but

9   he didn't show up until quarter of eight. But all fine.

10         **MR. WOLFSHOHL:** Yeah.

11         **THE COURT:** Just give me an opportunity to read

12  whatever it is you're going to file.

13         **MR. WOLFSHOHL:** I will. I will absolutely try to do

14  that, your Honor. And -- and, you know, I may err on the side

15  of getting something on file that doesn't have all the detail I

16  want it to have just to give you some ideas to what we're

17  doing.

18         **THE COURT:** All fine. I would just love to be

19  educated. Right now I don't have a sense of where we're going,

20  other than everybody's trying to go somewhere.

21         **MR. WOLFSHOHL:** Yeah. I understand, your Honor.

22         **THE COURT:** All right.

23         **MR. WOLFSHOHL:** I appreciate it. Thank you.

24         Mr. Platt, you raised your hand. I think I got you

25  unmuted.

1          **MR. PLATT:**  You did, your Honor.  Good morning.  Mark

2    Platt for Marathon Petroleum Company LP.

3          I just -- and -- and I apologize for raising this

4    issue once again.  But the -- the issue about the -- the cash

5    collateral provision regarding fuel purchases.  Over the

6    weekend there was a cash collateral stipulation and order

7    entered related to cash collateral.

8          And there was a provision permitting fuel purchases.

9    But within that provision was a clause that, at -- at least

10   Marathon finds unacceptable, because there's a specific tie-in

11   to the budget that says that,

12              "If the Trustee uses cash collateral

13              outside of the budget to pay the fuel

14              supplier, any such fuel supplier shall be

15              subject to claims under §549 of the

16              Bankruptcy Code."

17         We as fuel suppliers have absolutely no control, as

18   you know, your Honor, over what is in the budget and what is

19   not.  So we have no -- we have no way of knowing whether money

20   that -- that comes to us is out of the budget or not out of the

21   budget.  And so --

22              **THE COURT:**  Right.

23              **MR. PLATT:**  -- that --

24              **THE COURT:**  So, is --

25              **MR. PLATT:**  -- that's a risk that is --

43

1          **THE COURT:**  Yeah.  Mr. Platt, let me --

2          **MR. PLATT:**  Yes.

3          **THE COURT:**  I -- I fixed this.

4          We have done -- we have done all of this with the

5     understanding that Paragraph 7 as we've referred to it, was in

6     ever single agreed order and stipulation.  If that got modified

7     or changed, I didn't go back and check that.  I assumed with

8     the representations on the record that it was included.

9          But if there needs to be something done, then let's

10    get it corrected.  But again, that's always been the agreement

11    that you --

12          **MR. WOLFSHOHL:**  Yes, your Honor.  I will say that

13    Friday was a very, very hectic day.

14          If the language is not identical to what is in the

15    prior versions, that was certainly the intent.

16          **THE COURT:**  Yeah.  Look.  I've -- I've known Platt

17    for a long time.

18          He's a -- he's a reasonable guy.  He -- he made his

19    ask early on.  He's been consistent about it.  Just have a

20    conversation with him and get it -- get it straight.

21          **MR. WOLFSHOHL:**  Thank you, your Honor.

22          **THE COURT:**  Mr. Platt, that work for you?

23          **MR. PLATT:**  That works for me.  Thank you, your

24    Honor.

25          **THE COURT:**  All right.  Thank you.

1          Mr. Gibbs?

2          **MR. GIBBS:**  One last request, your Honor.

3          The -- acknowledging that things were moving quite

4    quickly.  We didn't get a chance to even see the proposed order

5    or budget attached to it before it was uploaded and entered.  I

6    would like, if possible, to make sure that Trustee's counsel is

7    moving quickly as well as lender's counsel to make sure we see

8    drafts and hopefully --

9          **THE COURT:**  Committee should --

10         **MR. GIBBS:**  -- drafts of the pleadings they're

11   contemplating before we read it on the docket also.

12         **THE COURT:**  Committee should be on distribution

13   lists.

14         **MR. WOLFSHOHL:**  Yeah.  Yeah.  Absolutely, your Honor.

15   Got it.

16         **THE COURT:**  All right.  Thank you.

17         Anything else that we need to talk about this

18   morning?

19      **(No audible response.)**

20         **THE COURT:**  All right.  And let me do say this.

21         If things change, again, I'll stop.  I mean, I -- I'm

22   mediating in the Galleria area.  But I will drop whatever I'm

23   doing.  I'll come back if I need to.  I'm going to take my

24   computer set-up.  I can get on remotely if I need to.

25         It's -- I appreciate everyone's focus.  I want to

45

1   keep that focus.  I don't want to be the problem.  If you need

2   something, you reach out to Mr. Alonzo, we will figure out how

3   to -- how to get everything up and running.  All right?

4         **MR. WOLFSHOHL:**  I appreciate that, your Honor.

5         **THE COURT:**  All right.  Thank you.

6         With that, I'll see everybody tomorrow at one.  We'll

7   be adjourned.

8         **SEVERAL ATTORNEYS:**  Thank you, your Honor.

9         **MR. WOLFSHOHL:**  At -- at noon, your Honor, right?

10        **SEVERAL ATTORNEYS:**  At noon tomorrow.

11        **THE COURT:**  At noon.  Yes.  Thank you.

12      **(This proceeding was adjourned at 08:51 a.m.)**

13

14                  * * * * *

15

16              CERTIFICATION

17

18      I certify that the foregoing is a correct transcript

19   from the electronic sound recording of the proceedings in the

20   above-entitled matter.

21

22   /s/ *Cheryl L. Battaglia*          August 25, 2023

23        Transcriber            Date

24   4:23-90147

25   08/21/23 - 08/25/23