1                 IN THE UNITED STATES BANKRUPTCY COURT

2                 FOR THE SOUTHERN DISTRICT OF TEXAS

3                           HOUSTON DIVISION

4   IN RE:                        §     CASE NO. 23-90147-7
                                  §     JOINTLY ADMINISTERED
5   MOUNTAIN EXPRESS OIL COMPANY, §     HOUSTON, TEXAS
    ET AL,                        §     THURSDAY,
6                                 §     AUGUST 24, 2023
          DEBTORS.                §     4:15 P.M. TO 05:37 P.M.
7                 **STATUS CONFERENCE (VIA ZOOM)**

8           BEFORE THE HONORABLE DAVID R. JONES
9               UNITED STATES BANKRUPTCY JUDGE

10

11

12      APPEARANCES:                    SEE NEXT PAGE

13

14              **(Recorded via CourtSpeak)**

15

16

17

18

19

20              TRANSCRIPTION SERVICE BY:

21          JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                935 Eldridge Road, #144
22              Sugar Land, TX 77478
                    281-277-5325
23          www.judicialtranscribers.com

24
        Proceedings recorded by electronic sound recording;
25          transcript produced by transcription service.

1                      <u>APPEARANCES (VIA ZOOM)</u>:

2

3   FOR THE TRUSTEE:              PORTER HEDGES LLP
                                 Joshua W. Wolfshohl, Esq.
4                                Megan N. Young-John, Esq.
                                 1000 Main, 36th Floor
5                                Houston, TX 77002
                                 713-226-6000
6

7   THE CHAPTER 11 TRUSTEE:       HUGHES WATTERS AND ASKANASE
                                 Janet Casciato-Northrup, Esq.
8                                1201 Louisiana, 28th Floor
                                 Houston, TX 77002
9                                713-759-0818

10  FOR THE DIP AGENT:           GREENBERG TRAURIG, LLP
                                 John D. Elrod, Esq.
11                               Terminus 200
                                 3333 Piedmont Road NE,
12                               Suite 2500
                                 Atlanta, GA 30305
13                               678-553-2259

14  FOR CHEVRON:                 PILLSBURY WINTHROP SHAW
                                 PITTMAN, LLP
15                               Hugh M. Ray, III, Esq.
                                 909 Fannin, Ste. 2000
16                               Houston, TX  77010-1028

17  FOR SASS PETROLEUM, LLC:     FOLEY & LARDNER, LLP
                                 John P. Melko, Esq.
18                               1000 Louisiana, Ste. 2000
                                 Houston, TX  77002
19                               713-276-5727

20  FOR THE OFFICIAL COMMITTEE OF
    UNSECURED CREDITORS:         MCDERMOTT WILL & EMERY, LLP
21                               Charles R. Gibbs, Esq.
                                 2501 North Harwood St.
22                               Suite 1900
                                 Dallas, TX  75201
23                               214-295-8063

24

25

```
 1                    APPEARANCES (CONT'D - VIA ZOOM):

 2

 3   FOR SUNOCO, LLC:              KATTEN MUCHIN ROSENMAN, LLP
                                  Michaela Crocker, Esq.
 4                                2121 North Pearl Street
                                  Suite 1100
 5                                Dallas, TX  75201
                                  469-627-7070
 6

 7   FOR GSS HOLDINGS LA, LLC:    KEAN MILLER, LLP
                                  Lloyd A. Lim, Esq.
 8                                711 Louisiana Street
                                  Suite 1800
 9                                Houston, TX  77002
                                  713-844-3070
10

11   FOR PHILLIPS 66 AND BFM
     ENTERPRISES, LLC:            LOCKE LORD, LLP
12                                Omer F. Kuebel, III, Esq.
                                  601 Poydras Street
13                                Suite 2660
                                  New Orleans, LA  70130-6036
14

15   FOR FORTUNA INVESTMENTS:     PARKINS & RUBIO, LLP
                                  Lenard M. Parkins, Esq.
16                                700 Milam Street
                                  Suite 1300
17                                Houston, TX  77002
                                  713-542-7225
18

19   FOR BLUE OWL:                KIRKLAND & ELLIS, LLP
                                  Ashley L. Surinak, Esq.
20                                300 North LaSalle
                                  Chicago, IL  60654
21                                312-862-2000

22   FOR PILOT, FLYING J AND
     HUNT REFINING COMPANY:       SIDLEY AUSTIN, LLP
23                                Duston McFaul, Esq.
                                  1000 Louisiana St.
24                                Suite 5900
                                  Houston, TX  77002
25                                713-495-4618
```

```
 1                    APPEARANCES (CONT'D - VIA ZOOM):

 2

 3   FOR VALERO MARKETING &
     SUPPLY COMPANY:              DYKEMA GOSSETT, PLLC
 4                                Deborah D. Williamson, Esq.
                                  112 East Pecan Street
 5                                Suite 1800
                                  San Antonio, TX  78205
 6                                210-554-5500

 7   FOR BROTHERS:                LOCKE LORD BISSELL & LIDDELL,
                                  LLP
 8                                Philip Eisenberg, Esq.
                                  600 Travis, Ste. 2800
 9                                Houston, TX  77002
                                  713-226-1200
10

11   FOR BFM ENTERPRISES, LLC:    LOCKE LORD, LLP
                                  Simon R. Mayer, Esq.
12                                600 Travis, Ste. 2800
                                  Houston, TX  77002
13                                713-226-1200

14   FOR CF GAS STORE, LLC:       NORMAN A. ABOOD, ATTORNEY AT
                                  LAW
15                                Norman A. Abood, Esq.
                                  136 North Huron Street
16                                Suite 101
                                  Toledo, OH  43604
17                                419-724-3700

18   FOR NINE SHELL GAS STATIONS
     OK, LLC:                     DORSEY & WHITNEY, LLP
19                                Rachel Stoian, Esq.
                                  300 Crescent Court
20                                Suite 400
                                  Dallas, TX  75201
21                                214-981-9959

22   FOR EQUILON:                 Paul Turner

23   Also present:                MR. POMERANTZ
                                  MR. PLATT
24

25   (Please also see Electronic Appearances.)
```

1      **HOUSTON, TEXAS; THURSDAY, AUGUST 24, 2023; 4:15 P.M.**

2          (Recording begins abruptly.)

3          THE COURT:  -- Central.  Today is August the

4    24th, 2023.  This is the Docket for Houston, Texas.  On the

5    4:15 Docket, we have the jointly administered cases under

6    Case No. 23-90147, Mountain Express Oil Company.

7          Folks, please don't forget to record your

8    electronic appearance.  And, again, even if you made it this

9    morning, I ask that you do it again this afternoon.  We will

10   have created a different list.  It is the way we note your

11   official appearance.

12         We do have folks both here in the courtroom as

13   well as on GoToMeeting.  For those folks in the courtroom,

14   if you do rise to speak, if you would, please make sure you

15   come to the lectern so that everyone can both hear you and

16   see you.  If you are on GoToMeeting, I have activated the

17   hand-raising feature.

18         If you know you're going to be speaking, if you'd

19   go ahead and give me a five star, so I can get you unmuted.

20   You can, of course, change your mind at any time.

21         Whether you are in the courtroom or on

22   GoToMeeting, the first time that you speak, if you would,

23   please state your name and who you represent.  It really is

24   a good point of reference for the court reporters in the

25   event that a transcript request is made.

1          Finally, we are recording this afternoon using

2  CourtSpeak.  We'll have that recording up on the Docket

3  shortly after the conclusion of the hearing.

4          I think, like, 92 people hit five star.  I will

5  get to all of you in just a moment.  It just doesn't work

6  that fast.

7      (Pause in the proceedings.)

8          THE COURT:  All right, Mr. Wolfshohl, why don't

9  you go ahead and tell me where we are while I'm still

10  clicking through these.

11          MR. WOLFSHOHL:  Thank you, Your Honor, Joshua

12  Wolfshohl and Megan Young-John for the Trustee.  And

13  Ms. Northrup is in the courtroom as well, Your Honor.

14          THE COURT:  Good afternoon to everybody.

15          MS. YOUNG-JOHN:  Good afternoon, Your Honor.

16          MR. WOLFSHOHL:  Your Honor, we did circulate a

17  draft order to a lot of people.

18          THE COURT:  Sure.

19          MR. WOLFSHOHL:  I -- we actually collectively got

20  our notes together to try to make sure that we were

21  including everybody that had asked for notice and people

22  that had emails -- emailed us for notice.  I hope we got

23  everybody that we talked about at the last hearing.

24          We sent an order around.  We got a lot of

25  comments back.  A lot of the comments were focused on the

1  concept of what happens with the termination and the

2  rejection.  And so we attempted to accommodate those with

3  language that tried to synthesize what we thought that --

4  the main comments we were getting, but we, in no way,

5  incorporated everybody's exact comments.  It just wasn't

6  possible in the time that we had.

7          THE COURT:  I got that.  And they are going to be

8  other -- this is not -- this is not in place of the ability

9  to seek relief based upon your particular circumstances.

10  It's just to try and deal with as many general issues as we

11  could.  So I appreciate the effort.

12          I haven't -- I just now see that 1396 exists.

13  I'm going to hear from everybody, and I am going to take a

14  couple of minutes and read it.

15          MR. WOLFSHOHL:  No problem, Your Honor.  We also

16  sent a Word version to Mr. Alonzo just so you know, Your

17  Honor.

18          THE COURT:  Got it.  I just -- I haven't been

19  down --

20          MR. WOLFSHOHL:  Understood.

21          THE COURT:  -- so got it.  Okay.

22          MR. WOLFSHOHL:  And not everybody -- I mean, I'm

23  not sure everybody has really even seen how we attempted to

24  incorporate their comments just because of the time

25  constraints, and we needed to get over here.  So --

1              THE COURT:  Sure.  They can read it while I'm

2    reading it --

3              MR. WOLFSHOHL:  Okay.

4              THE COURT:  -- if they haven't already done so.

5    All right.  So you think you've got an order that's

6    incorporated as many comments as you could, but it

7    accomplishes my instructions to you from (indiscernible)?

8              MR. WOLFSHOHL:  I believe so.

9              THE COURT:  Okay.  All right.  Let me -- with the

10   understanding that I've not yet read the order -- so don't

11   go, well, I think paragraph 12 ought to be modified to say

12   the following because I don't know what paragraph 12 says at

13   this point.

14             Conceptually, anyone have an issue that they need

15   to address?

16             MR. ELROD:  Your Honor, this is John Elrod on

17   behalf of the DIP agent.

18             THE COURT:  Sure.

19             MR. ELROD:  If I could raise one issue that's

20   late breaking.

21             THE COURT:  Okay.

22             MR. ELROD:  Your Honor, I believe that a number

23   of interested parties heard Your Honor's statement at the

24   12:15 hearing loud and clear.  And, therefore, there was a

25   -- there were a number of interested parties in a subset of

1   the Debtors' fuel supply agreements.  These are those that

2   relate to, what I understand, are generally referred to as

3   the non-controlled sites and the fuel supply agreements

4   associated with those.

5             THE COURT:  Uh-huh.

6             MR. ELROD:  Your Honor, you may recall at the

7   hearing on Monday morning, there was an individual in the

8   courtroom by the name of Shaneel Lalani.  He is the

9   principal of an entity known as Lalani Petroleum.  Lalani

10  Petroleum has agreed, in principle, to assume and assign

11  those contracts for material consideration to the estates.

12  And I can read the terms.  I believe Mr. Phillips, who

13  represents Mr. Lalani, may be on the line.

14            THE COURT:  Yeah.  And Mr. Elrod, all due

15  respect, too late.  I gave you the time -- I gave you the

16  time without any sort of constraints whatsoever.  I told you

17  what I was going to do today.  I'm a man of my word.  I'm

18  going to do exactly what I said I was going to do.

19            I also question sort of some of the comments

20  about that he was shut out of the process and that he never

21  had ample opportunity to participate.  Simply not true.

22  It's too late.  We're done.

23            MR. ELROD:  Understood, Your Honor.

24            THE COURT:  All right.

25            Anyone else?

1              Ms. Surinak?

2              MS. WILLIAMSON:  Your Honor, Deborah Williamson.

3              THE COURT:  Ms. Williamson, Ms. Surinak was

4    first.  I'll be -- I'll circle back around.

5              MS. SURINAK:  Good afternoon, Your Honor.  Can

6    you hear me?

7              THE COURT:  Yes, ma'am.  Thank you for checking.

8              MS. SURINAK:  Thank you.  Ashley Surinak on

9    behalf of Blue Owl and its affiliated entities.

10             Your Honor, we circulated one comment that did

11   not make it into the proposed form of order that we believe

12   certain other landlords are also supportive of, which is

13   just the fact that -- understanding that you haven't read

14   the order and that there's going to be certain inventory and

15   lender collateral on the sites upon rejection of the real

16   property leases.

17             Our proposal is to just build in a concept that

18   basically allows landlords to liquidate those estate

19   proceeds and whether or not the proceeds then -- you know,

20   net of costs in terms of their reasonable necessary costs

21   incurred with liquidating that inventory in the interest of

22   efficiency and allowing the landlords to get back into the

23   sites and begin operating, as opposed to waiting for, you

24   know, someone to come in at some point to assess what's

25   actually left of the properties.

1          I think we just want to build in some mechanism

2    that would allow the landlords to do so.  And whether or not

3    -- I know Mr. Kuebel had raised, you know, maybe the

4    proceeds to go into a trust account that's controlled by the

5    Chapter 11 Trustee, as opposed to directly to the DIP

6    lender.  We're not opposed to, you know, any construct.  We

7    just think there should be a mechanism built in so that

8    landlords aren't, you know, regaining control of the

9    properties upon rejection and termination of the leases.

10          But then they have, you know, certain foods, fuel

11   in the ground, other inventory that they could be

12   liquidating in the interest of efficiency and actually

13   taking control back of the site versus, you know, a delayed

14   process in terms of the lenders having someone come out to

15   assess everything and go from there.

16          THE COURT:  So let me ask this, Mr. Wolfshohl.

17   It would seem to me that given the amount of, number one,

18   the outstanding DIP as well as the prepetition, it would

19   just seem to me that all of this property -- and I think I

20   can do it pursuant to Rule 70.  I'll just transfer all of

21   that property to the DIP lender, and then that becomes a

22   conversation that the Trustee's not involved in.  That's a

23   conversation in the example between Mr. Elrod and

24   Ms. Surinak.

25          I see no reason for the Trustee to be involved in

1 that, unless you tell me that there's a lien issue or

2 perfection issue, which I can't imagine there is with

3 respect to the DIP, but I'm happy to hear it.

4          MR. WOLFSHOHL:  No, Your Honor, we're not raising

5 any kind of issue like that.  And the less involved we are

6 in that process, for us, the better.  So --

7          THE COURT:  I mean, Ms. Surinak, wouldn't you

8 rather just negotiate with Mr. Elrod and work that out

9 between the two of you than to have to have a three-party

10 conversation?

11          MS. SURINAK:  Yes, Your Honor.  And we've had

12 conversations with Mr. Elrod, and we just think there should

13 be some kind of concept built into the order --

14          THE COURT:  No.  I --

15          MS. SURINAK:  -- that permits for it.

16          THE COURT:  -- I can do this in two sentences.

17          MS. SURINAK:  Of course.

18          Mr. Elrod?

19          MR. ELROD:  Yes, Your Honor.

20          THE COURT:  Any issue from just letting you --

21 again, I said this many times:  I mean, we're to the point I

22 want all the parties to be able to control their own

23 destiny.  Why shouldn't -- why shouldn't you -- why

24 shouldn't you just take that, and then you can -- if you

25 want stuff thrown away, you can say, nope, throw it away.

1  If you want to say, nope, you can have it all, you can do

2  that by location.

3           If you want to enter into an agreement that you

4  do some sort of -- I'm making this up -- some sort of

5  proceeds-sharing arrangement with somebody who's selling it

6  for you, you're free to do it.  You don't have to come get

7  my approval.  You don't have to negotiate with a Trustee.

8  You just make your own decisions.

9           MR. ELROD:  Your Honor, I think the -- we have no

10  issue with the concept.  There may be some formalities that

11  we'd like to make sure are observed.  As a regulated

12  financial institution, I'm not sure that we want to take

13  title to these assets.

14           THE COURT:  I don't think you do either.

15           MR. ELROD:  So, you know, maybe that we could set

16  up a special purpose vehicle to take title to them.  But,

17  you know, this is -- I understand Your Honor's thoughts on

18  it.  We don't necessarily need to involve the Chapter 7

19  Trustee or the Chapter 11 Trustee in that process and would

20  just ask that we have a period of time to think through that

21  process.

22           THE COURT:  So let me ask -- and, Mr. Elrod, I

23  want to be practical.  The moment this order gets entered,

24  and certainly no later than tomorrow, you're going to have

25  an issue.  And so I -- how practically do you think we can

1  deal with this?

2          MR. ELROD:  Your Honor, what I would suggest is,

3  if you could give us, yeah, I guess, yeah, 24 hours to get

4  this just structured, I think that would give us time to

5  work through the issue.

6          THE COURT:  Ms. Surinak?

7          MS. SURINAK:  We're amenable to giving them time.

8          THE COURT:  All right.

9          Mr. McFaul, you've been hitting -- you've raised

10  your hand 13 times.  Sorry.  I didn't mean to ignore you.

11          MR. MCFAUL:  Well, I just -- before the Court

12  ruled on something, I would like to be heard on this point.

13  Thank you, Your Honor.

14          THE COURT:  Sure.

15          MR. MCFAUL:  Duston McFaul for Pilot Flying J and

16  Hunt Refining Company.

17          I was glad to see the form of the order did not

18  include the revisions by Oak Street, and we have a serious

19  issue with them because at -- with the Flying J dealer

20  locations, Your Honor, Pilot Flying J keeps title to the

21  diesel at the pumps and remits rent to MEX.  So it's

22  actually its property, and the revisions had it such that

23  anything in any location is defined as a state property.  I

24  think it's dangerous to be defining a state property and

25  allowing Oak Street to just liquidate it and also allow them

1   to decrease any turnover with damages, costs.

2              And, you know, the problem here is there's not a

3   one size fits all.

4              THE COURT:  Right.

5              MR. MCFAUL:  I mean, we're not all just pure

6   suppliers.  So we object in that Conversion Order to cutting

7   out the Chapter 7 Trustee this early and not doing, you

8   know, lines in the tanks, determining the inventory, not

9   having some control over the liquidation.  We certainly

10  object to Oak Street liquidating our property, which was

11  defined as estate property because it was on their location.

12             So Oak Street owns the property.  MEX operated at

13  least 22 of these sites where we owned the actual product.

14  So I'm -- you know, just would plead, Your Honor, that we

15  don't push all this in without thought into a Conversion

16  Order.

17             THE COURT:  So, Mr. McFaul, tell me again what it

18  is you don't want me to do because I'm not sure I fully

19  understood.

20             MR. MCFAUL:  Yes.  I don't want you to sign an

21  order that allows Oak Street to sell Flying J Pilot product

22  or its -- or its point of sale equipment or a number of

23  things that it continues to own by virtue of the

24  relationship and the contracts here with MEX.

25             THE COURT:  So I don't think I ever contemplated

1  letting anybody sell anything that didn't belong to the

2  Chapter 7 estate.  What I was really focused on was

3  Mr. Elrod's client has a lien on certain things.  And, you

4  know, if he's able -- if he's able to pull a rabbit out of

5  his hat with meaningful value out of all of this net of

6  costs, then I think that he's a miracle worker, but I want

7  to give him the ability to make his own decisions about that

8  without the administrative overhead of the Chapter 7 Trustee

9  since I'm not aware of a way that there could ever be any

10 incremental value to the estate above Mr. Elrod's -- both

11 his DIP liens, as well as his prepetition liens.  That's all

12 I was focused on.  I wasn't suggesting --

13             MR. MCCALL:  Yes.

14             THE COURT:  -- that we were going to go conduct

15 an auction of everything.  It was just to -- if you had --

16 if Mr. Elrod had collateral, I think that he ought to be

17 able to deal directly with the disposition of that

18 collateral and not have to work through the Trustee.  That

19 was -- that was all I was -- that's all I was focused on.

20             If you own something, then you own it.  I --

21 somebody else can't sell what you own if you own it

22 outright --

23             MR. MCFAUL:  And it's --

24             THE COURT:  -- and undisputed.

25             MR. MCFAUL:  -- and it's unfair for Your Honor to

1   be having this conversation because you didn't see the

2   insert because it didn't make it into the --

3             THE COURT:  Ah.

4             MR. MCCALL:  -- final form, the proposed order.

5   But the way property of the estate was defined and the way

6   the rights of Oak Street were defined, it would have allowed

7   exactly that.  So that's the context I think you're missing.

8             THE COURT:  I get it.  Okay.  No.  Thank you.

9             MR. MCCALL:  And apologies doing this in a vacuum

10  where you didn't see the language.

11            THE COURT:  No.  All good.  I'm learning as we

12  go, and I appreciate your patience.

13            Let me -- a number of folks have raised their

14  hand; plus one gentleman came to the lectern.  Let me do

15  Ms. Williamson next.  I promised her.

16            UNIDENTIFIED SPEAKER:  Yes, Your Honor.

17            THE COURT:  Ms. Williamson?

18            MS. WILLIAMSON:  Yes, Your Honor.

19  Deborah Williamson with -- representing Valero Marketing and

20  Supply Company.

21            Your Honor, my statement's just fairly general.

22  The proposed order that was submitted only makes reference

23  to fuel supply agreements.  The relationship between, I

24  think, the fuel suppliers and Mountain Express is broader

25  than that and often reflected in multiple agreements, many

1  of which are controlled.

2            As I said before, the PNPA, like the branding;

3  the, you know, the signage.  And so I -- we would just

4  recommend that and just saying all agreements for the supply

5  of fuel, just all agreements of fuel suppliers are

6  terminated.  That way we don't have to pick and figure out

7  which one do we have to go back to.  I think that was the

8  intent.

9            THE COURT:  Mr. Wolfshohl?

10            MR. WOLFSHOHL:  I have no issue with that.

11            THE COURT:  No.  Understood.

12            MR. WOLFSHOHL:  I have -- I have no issue with

13  that, Your Honor.

14            THE COURT:  All right, Ms. Williamson, thank you

15  for the input.  Let me -- so I don't forget.  So what you're

16  saying is in paragraph 3?

17            MS. WILLIAMSON:  Yes, Your Honor.

18            THE COURT:  But would --

19            MS. WILLIAMSON:  Where it says, "All agreements

20  for the" -- well, it says, "for the supply of fuel."  I

21  would say "all agreements of fuel suppliers, including but

22  not limited to supply of fuel are rejected."  And we have a

23  footnote insert with the list of the fuel suppliers we've

24  provided.

25            THE COURT:  So all agreements with fuel.  All

1    right.  Got it.  When I -- when I get around to the end of

2    this, I'll come back, and I'll put -- I'll put the order up

3    on the screen, and we'll work through that.  Okay?

4              MS. WILLIAMSON:  Thank you, Your Honor.

5              THE COURT:  All right.  Thank you.

6              MR. EISENBERG:  Your Honor, in that same

7    paragraph -- and I apologize.  I know I'm stepping in front

8    of somebody.  Philip Eisenberg, on behalf of the Brothers.

9              We have a license agreement.  It's also a

10   branding agreement.  So they're running the brand, the

11   stations, and now that they're shutting down, we'd like that

12   license agreement included in the litany of agreements

13   that's rejected.

14             MR. WOLFSHOHL:  I don't have an issue with that,

15   Your Honor, either.  I -- not to use it as an excuse, but

16   there was a fire drill at my office as we were trying to

17   prepare this order, and I walked over to Ms. Northrup's

18   office in order to try to prepare it and avoid the fire

19   drill which was going to delay me about 30 minutes.

20             And so we attempted to get everything in there,

21   but the reality is we're trying to get -- we're trying to be

22   comprehensive.

23             THE COURT:  I get it.  We'll get there.

24             MR. WOLFSHOHL:  Yeah.

25             THE COURT:  No.  We get it.

1          MR. EISENBERG:  Thank you.

2          THE COURT:  Thank you, Mr. Eisenberg.

3          Mr. Lim, or --

4          MR. PARKINS:  May I speak, Your Honor?

5          THE COURT:  Absolutely.

6          MR. PERKINS:  Thank you.  Lenard Parkins, Parkins

7  & Rubio, on behalf of Fortuna Investments.

8          Your Honor, I just represent a landlord --

9          THE COURT:  Okay.

10         MR. PARKINS:  -- and he has a store in Louisiana.

11 He's a remote landlord.  He doesn't live there.  He doesn't

12 run the property.  A couple of issues I want to just raise:

13 Number one, I don't want my client to be liable to the bank.

14 If the family running the store is listening to these

15 hearings and has already taken all the potato chips and

16 everything out of the store and has moved it already, I

17 don't want him to be liable for that.

18         Number two, I would think that any order,

19 especially like we're dealing with my client in Louisiana,

20 any order that is entered by the Court would be very helpful

21 when the Sheriff shows up and says, what's going on here,

22 when you're taking -- changing the locks and stuff, that the

23 order is specific enough so that you can show the security

24 people or the local police you have a legitimate federal

25 court order authorizing you to do this so you can take

1    possession and protect the property.

2            Those two points, I think, are very important.

3    My experience with Louisiana is that they may not listen to

4    any kind of order from anywhere, but having one will be very

5    helpful for the landlords in order to try to protect their

6    interest without interference or with -- maybe with the help

7    of the security or local police, if there's a federal court

8    order that gives the landlord authority to do such actions,

9    especially now.  During the night, they may have to go in in

10   order to protect their property.

11           Thank you, Judge.

12           THE COURT:  I get it.  Thank you.

13           Mr. Lim, you'll eventually get here.  Yes, sir.

14           MR. LIM:  Thank you, Your Honor.  Lloyd Lim on

15   behalf of GSS Holdings and Fox Fuels.

16           I represent a group of about 40 convenience store

17   operators, and we're concerned about the order to the extent

18   that it transfers to the lender, to any other party the fuel

19   that my clients have recently put in the ground by the Stay

20   of Relief Order that it got last week --

21           THE COURT:  It --

22           MR. LIM:  -- or the inventory that it's

23   purchased.

24           THE COURT:  Got it.  Well, I think where

25   everybody came out today is, while I'm perfectly willing to

1   sign a Rule 70 order, I think everybody said, "Please don't

2   do that to me today."

3            MR. LIM:  Thank you, Your Honor.

4            THE COURT:  Yes, sir.  All right.

5            Mr. Kuebel, I think you were next.  All right.

6            MR. KUEBEL:  Good afternoon, Your Honor.  Can you

7   hear me?

8            THE COURT:  Loud and clear.  Thank you for

9   checking.

10           MR. KUEBEL:  Great.  All right.  Thank you.

11  Omer F. Kuebel, III, appearing today for both P66, Phillips

12  66 Company and the BFM, Brothers Food Mart related entities.

13           And I wanted to address the language that was

14  raised by Blue Owl.  And I do think that there are aspects

15  of that language that we were supportive of.  We do think

16  that it would make sense for the landlords to be able to --

17  and I referenced this earlier, Your Honor --

18           THE COURT:  You did.

19           MR. KUEBEL:  -- do an inventory and have a sale,

20  but I was concerned about the prospect of turning that over

21  -- turning those sale proceeds over strictly to the lender

22  because there may be fuel suppliers, obviously, that have

23  stepped forward to claim an interest.  There may be PNSI

24  vendors and thought that potentially a better way to handle

25  this was that, if such a transaction occurred, that the

1   proceeds could be turned over to the Registry in the Court

2   or to the Trustee so -- pending further order, so that, on

3   the one hand, the landlords aren't stuck in limbo; but on

4   the other hand, to the extent that there were proceeds

5   liquidated, we made sure that all the various stakeholders

6   had an opportunity to stake their claim to those proceeds

7   and didn't just send it straight to the bank.  No offense to

8   Mr. Elrod's client.

9          THE COURT:  Yeah.  So I think what I was

10  suggesting is that it allowed everybody to do this on a one-

11  off basis, given their level of comfort and their particular

12  circumstances.  All I'm -- all I'm -- if the estate has no

13  interest, all I'm effectively doing is putting you back to

14  applicable estate law, which I think is where it ought to

15  be.

16          Mr. Pomerantz, are you sure you want to weigh in

17  on this?

18          MR. POMERANTZ:  Your Honor, I'm happy to go last,

19  I just would like --

20          THE COURT:  Yeah.

21          MR. POMERANTZ:  -- 30 seconds of your time, based

22  upon a provision of the order, but I don't want to interrupt

23  the flow of people, trading partners, addressing motions.

24          THE COURT:  No.  Go ahead.

25          MR. POMERANTZ:  So, Your Honor, I've been

1  monitoring the proceedings in the last week and a half, and

2  when I received the order -- actually, when I printed off

3  the Docket, I didn't ask Mr. Wolfshohl for a copy; so he

4  didn't send it to me.  So I don't -- I don't fault him for

5  that.

6           I noticed there's a provision in the order that

7  supports the obligations of the Debtor and their

8  professionals upon the convergence.  And it not only does

9  not track what Rule 1094 provides, but it goes further away,

10  which I think has the effect of modifying Your Honor's DIP

11  order.

12          Dealing with the second issue first, Your Honor,

13  as Your Honor may recall, under the DIP order, there was a

14  trust account established with my firm, weekly amounts of

15  professional fees through the budget (glitch in the audio).

16  Those monies were to be held in trust and once the

17  applications were approved, they would be paid, of course,

18  subject to Your Honor's final fee applications.

19          Just this morning I received -- and we have been

20  operating under that procedure for the four and a half

21  months of the case.  Money has been coming in and coming

22  out.  We have been asked, through Mr. Healy, to provide the

23  Trustee, over the last couple of days, with a full

24  accounting of the monies that went in and the monies that

25  went out; and we have provided that information to Mr. Healy

1   and assumed that he forwarded it on to the Trustee.

2            This morning we received an email from

3   Mr. Wolfshohl's colleague asking for us to turn over to the

4   Trustee all money in our -- in our trust account.  And while

5   we were in the process of preparing a response -- which we

6   don't believe it's estate property.  We believe it's trust

7   account money, pursuant to the order -- lo and behold, in

8   paragraph 7 of the order, the Trustee has added its language

9   that requires us to turn over that money.

10           I'm not asking, Your Honor, for a ruling right

11  now whether that is true or not.  That would require Your

12  Honor to go back and look in the -- into the DIP order.  I'm

13  happy to have a further conversation with Mr. Wolfshohl and

14  try to convince him that, in the drinking from the firehose,

15  he perhaps did not read paragraph 17 of the DIP order.  But

16  all I want to do is to make sure that there's nothing in

17  this conversion order that prejudges that issue one way or

18  the other, as well as the paragraph that comes after

19  paragraph 8, which talks about a carve-out for Trustee

20  professionals, which, of course, we have a problem with.

21  But we don't want anything in this order to in any way

22  impact the rights of the Debtors' professionals or expand

23  what the obligations of the Debtors' professionals are under

24  101.94 of the rules, which we, of course, will comply with.

25           THE COURT:  Mr. Wolfshohl?

1          MR. WOLFSHOHL:  Your Honor, I'm happy to have

2     Your Honor look at it and modify it as you see -- deem

3     appropriate.  Normally, when a case gets converted like

4     this --

5          THE COURT:  Yeah.

6          MR. WOLFSHOHL:  I -- I've never been in a

7     situation where a Trustee didn't get retainers that were

8     held, but I -- I'm not trying to upset whatever the DIP

9     order requires.

10          THE COURT:  Not retainers.  I'll put in some

11     language --

12          MR. WOLFSHOHL:  Okay.

13          THE COURT:  -- that preserves the status quo --

14          MR. WOLFSHOHL:  Okay.

15          THE COURT:  -- for that issue.

16          MR. WOLFSHOHL:  That's fine.

17          THE COURT:  I got that.

18          MR. WOLFSHOHL:  I have no issue with that, Your

19     Honor.

20          THE COURT:  I wouldn't have expected you to --

21          MR. WOLFSHOHL:  Yeah.

22          THE COURT:  -- have known that.  And if it turns

23     out that something needs to happen, then it's another

24     motion, another order.

25          MR. WOLFSHOHL:  A separate hearing.  Correct.

1    Right.  I agree.

2         MR. POMERANTZ:  The other aspect, Your Honor,

3    they use language -- again, when people use different

4    language from the statute, it is a breeding ground for

5    problems.  Rule 101.94 requires delivery of property and

6    possession or control to the Trustee.  They have deleted the

7    word possession, and they've included the word dominion and

8    custody.

9         I don't know what dominion or custody means

10   separate from control or possession, but, Your Honor, I'm

11   not sure why we even need paragraph 7 in there at all.  We

12   have our obligations.  We are seasoned professionals.  We

13   will, of course, comply with the obligations.  But if there

14   is going to be language, I would ask that it track exactly

15   the language of Rule 101.94.

16        (Pause in the proceedings.)

17        THE COURT:  All right.  I will put this up for

18   everybody before -- but I got that issue.  Sorry for the

19   delay.

20        All right.  Anyone else before I go back and

21   start editing?

22        MR. LIM:  Your Honor, if I may?

23        THE COURT:  Sure.

24        MR. LIM:  Your Honor, again, Lloyd Lim on behalf

25   of GSS Holdings and Fox Fuels.

1          I've just looked at the order for the first time

2    on my cell phone, but I'm concerned that any provision in

3    there would be read to allow the landlords to occupy, you

4    know, occupy locations where they're being operated and the

5    subtenant operators have not been evicted under applicable

6    state law.

7          So we would ask that, if the Court intend this,

8    to just put everybody back to where their state rights --

9    law rights were, that that's what the orders say.  But we

10   would object to it allowing the landlords to dispossess the

11   operators at this point.

12          THE COURT:  Okay.  All right.  Thank you.

13          Mr. Eisenberg, go ahead.

14          MR. EISENBERG:  Yes, Your Honor.  That's the

15   point that there's no agreement with them whatsoever.  The

16   leases are terminated, and we want to take possession of our

17   property.

18          THE COURT:  Right.  But I think all Mr. Lim was

19   saying is that you've got to follow a legal process to do

20   that.

21          MR. EISENBERG:  Yes.  And we're here in this

22   court to do that.  The -- they can put on whatever the

23   rights they think that they have here, but we -- we've got a

24   hearing at 4:30, and we -- somebody's going to try to hold

25   over after Your Honor terminates these leases?

1          THE COURT:  I get it.

2          MR. EISENBERG:  Okay.

3          THE COURT:  I'm just giving you the opportunity

4  to --

5          MR. EISENBERG:  Thank you.

6          THE COURT:  -- make your record.

7          MR. EISENBERG:  Yes.

8          THE COURT:  All right.

9          Mr. Melko?

10         MR. MELKO:  Yes, Your Honor.  Thank you.  John

11  Melko on behalf of SASS Petroleum.

12         We had made a couple of minor comments to the

13  order which have been largely accommodated.  So we

14  appreciate Ms. Williamson and Mr. Wolfshohl's work there, as

15  well as the whole Trustee team and the lenders as well.

16         We do have one small remaining issue, and this is

17  consistent with Your Honor saying, "I'm letting people go

18  their own way."

19         Judge, you'll recall that SSAS Petroleum is a

20  50 percent owner of U.S. Fueling, which is an LLC that's

21  half owned by Debtor BNC, and it's half owned by my -- by

22  SASS Petroleum.

23         By contract, Debtor MEX, or Mountain Express, is

24  the operator, and the -- so -- and with the fuel supply --

25  and it also -- MEX is also the fuel supplier to that LLC,

1   which, in effect, acts, then, as a subjobber to 85 separate

2   stations.  We need somebody to step in as operator or as

3   manager of that LLC.  My client is ready, willing, and able

4   to do it.

5          Your Honor, I don't know that Ms. Northrup or

6   Mr. Elrod is particularly interested in being the operator

7   of a -- of a gasoline jobber.  So if we can either have an

8   agreement or a provision in the order that would permit

9   SASS, pending further resolution of the ownership, which I

10  think may be presented to Your Honor shortly, not today,

11  we'd appreciate it.  Because somebody has to operate that

12  and get fuel to the -- to the stations.

13         THE COURT:  So what you're suggesting is that you

14  simply want to substitute your client for the Debtor as the

15  operator of the entity.  Did I get that about right?

16         MR. MELKO:  Yes.

17         THE COURT:  All right.

18         MR. MELKO:  Yes.  And there's two Debtors

19  involved in it.  So the operator is actually, or the

20  manager, to be precise, is actually Mountain Express.  The

21  ownership is in BNC.  We're not -- we're not looking to

22  affect the ownership, only the operatorship because

23  otherwise it's just going to lay dormant in those 85 dealers

24  who are not in privity with the Debtor.  Their privity with

25  U.S. Fuels will be stranded.

1           THE COURT:  Mr. Wolfshohl?

2           MR. WOLFSHOHL:  Thank you, Your Honor.  We had

3   negotiated a deal to sell the interest to accommodate this

4   issue.  I don't have a problem with the concept.  I mean,

5   we're not going to be able to operate, and there does need

6   to be somebody that operates that.

7           THE COURT:  So let me propose this because I do

8   not want to make this order any more complicated than it

9   needs to be:  It would seem to me, Mr. Melko, at least what

10  I heard, is that the Trustee is amenable to letting your

11  client simply substitute as the operator with all other

12  rights and benefits, burdens of the agreement, that I

13  haven't seen, remaining intact.  It seems to me that a

14  really short stipulation and agreed order that would be

15  separate could be done potentially this afternoon.

16          Mr. Elrod, do you have an interest in that if it

17  only substitutes the operatorship with no -- with nothing

18  else affected?

19          MR. ELROD:  Your Honor, I do not have those

20  documents in front of me.  I'm aware, obviously, of the

21  offer from Mr. Melko and not to bring up the Court's prior

22  ruling, but the issue would potentially have been solved had

23  the Court considered that that proposed sale.  But

24  nonetheless, as I sit here right now, I'm not aware of any

25  interest that we would have in that, Your Honor.

1          THE COURT:  All right.  So what I want -- I want

2  you to run that stipulation by Mr. Elrod just so he sees it.

3          MR. WOLFSHOHL:  Yes, sir.

4          THE COURT:  But I -- I'm -- what I'm

5  contemplating is just a couple of sentences that references

6  the agreement, and if there's a definitional substitution,

7  just do that.  Sign it.  Get it to me.  I'll sign it, turn

8  it around, and that way --

9          MR. WOLFSHOHL:  It's seamless.

10          THE COURT:  Yeah.

11          MR. WOLFSHOHL:  Yeah, I agree.

12          THE COURT:  Okay.

13          MR. WOLFSHOHL:  Thank you, Your Honor.

14          THE COURT:  All right.  Mr. Melko, can you --

15          MR. MELKO:  Thank you, Your Honor.

16          THE COURT:  -- can you have your team accomplish

17  that?

18          MR. MELKO:  We will.  Thank you, Your Honor.

19          THE COURT:  All right.  Thank you.

20          Ms. Stoian?  It -- hold on.  I have too many

21  screens -- oh --

22          MS. STOIAN:  Can you hear me, Your Honor?

23          THE COURT:  Yes, ma'am.  Thank you.  I was

24  worried that I couldn't.

25          MS. STOIAN:  Yeah.  I had to unmute myself.

1    Rachel Stoian, Dorsey & Whitney, appearing on behalf of Nine
2    Shell Gas Stations OK, LLC.

3            I wanted to reiterate a concern that was raised
4    by Counsel who is in the courtroom.  I -- I'm sorry that I
5    do not know his name, but as Counsel to an operator, the
6    ordered termination of all real property leases is
7    concerning.  Under the Code, as you're well aware, 365(h)
8    provides rights to non-debtor lessees of rejected leases.

9            Here everything's being rejected and could be
10   read to mean all operators are going to have to leave their
11   premises, which I think, based on my sitting through
12   numerous of these status conferences, really runs against
13   what Your Honor was hoping the ultimate outcome may be here
14   -- that folks would be able to continue operating these
15   stations.

16           So I wanted to raise the concern that an order,
17   as presently constituted, really undercut some of the rights
18   for a lot of operators, including my client, and I believe a
19   number of others have similar concerns.  So I wanted to
20   raise that.  I don't know if -- whether it's something that
21   could be resolved by way of stipulation similar to that that
22   was just described for Mr. Melko's client with my client
23   substituting in as operator even though they are the
24   operator.

25           I'm -- I'll be honest and say I'm still trying to

1  figure out a good way to approach this, recognizing that
2  we're converting to 7 and carrying these leases doesn't make
3  a lot of sense.  So I wanted to put that on the Record that
4  my clients do presently object to the form of the order to
5  the extent it terminates their rights to occupy those
6  premises.  That --
7              THE COURT:  Got it.
8              MS. STOIAN:  -- as a thought.
9              THE COURT:  Thank you.  No.  I got it.
10 Thank you.
11             Let's see.  That was Ms. Stoian.
12             Mr. Turner?  Mr. Turner, I can't hear you.  Had
13 you hit five star on your phone, or do you perhaps have me
14 muted from your side?  There you go.
15             MR. TURNER:  Okay.  Didn't even know I had to do
16 it on the phone as well.  Paul Turner, Womble Bond, for
17 Equilon Enterprises.
18             I just want to clarify, Your Honor, that my
19 understanding of what you were saying is that, with respect
20 to certain elements of the order with respect to the fuel
21 distributors, would be supported through that with a draft
22 up on the screen and people making suggestions; is that
23 correct?  Or did I misinterpret?
24             THE COURT:  No.  When I've heard from everybody,
25 I'm going to take a break, and I'm going to make certain

1  changes to the order, which I will then publish on the

2  screen, and you will have an opportunity to comment on.  No

3  guarantees that I take any of the comments --

4           MR. TURNER:  Of course.  Of course.  Go ahead.

5           THE COURT:  -- but yes.

6           MR. TURNER:  Very good.  Thank you.

7           THE COURT:  Yes.

8           MR. TURNER:  I just wanted to make sure I had a

9  sense.  Thanks.

10          THE COURT:  Oh, yes, sir.  All right.

11          Anyone else?

12      (No audible response.)

13          THE COURT:  All right.  Then what I would like to

14 do -- it is 4:53 Central.  I would like for everyone to come

15 back at 5:05, and I just -- I need -- I need theoretical

16 quiet time to go through the order and process the comments

17 that I've heard.  I'll then come back.  I'll put it up on

18 the screen.  I'll give everybody an opportunity to say, no,

19 that -- no, that doesn't work.  It doesn't solve my

20 objection.

21          And I'm not going to solve everybody's objection.

22 Not possible.  But I will -- I will do my best to address

23 the issues.  All right?

24          If you want to step out in the hall, please come

25 and go as you see fit.  But we're going to be adjourned

1  again -- why don't we say this -- until 5:10 Central Time?

2  So that's roughly 16 minutes.

3           All right.  Thank you, everybody.

4           SEVERAL VOICES:  Thank you, Your Honor.

5      (Recess taken from 4:53 p.m. to 5:12 p.m.)

6                       AFTER RECESS

7           MALE SPEAKER:  In paragraph 9, there's still a

8  bracket around the dollar amount, Your Honor, I believe.

9           THE COURT:  Is that agreed to?

10          MALE SPEAKER:  It's -- I believe the DIP lenders

11 -- Ms. Heyen sent me an email beforehand, and I believe that

12 that was agreed to.

13          THE COURT:  Okay.  I just didn't know.

14          MALE SPEAKER:  Yeah.  I know I submitted it that

15 way.

16          THE COURT:  Okay.  Other than that, I'm not

17 asking whether you agree with everything.  You're certainly

18 free to argue against it.

19          MALE SPEAKER:  Yeah.  I think other than that, I

20 don't -- I don't -- I mean, I -- I think it accomplishes

21 what I was expecting, Your Honor.

22          THE COURT:  Okay.  All right.  Let's see.  Let me

23 put this -- let me put this up.

24           Mr. Eisenberg, I know you're old school.  Would

25 it help you if I printed you out a copy, or can you read on

1   the screen?

2          MR. EISENBERG:  If you printed me a copy, Your

3   Honor, that would be marvelous.

4          THE COURT:  Sorry.  I'll make this bigger for

5   everybody, and I can -- I'll print out a couple.  Just give

6   me a minute.

7        (Pause in the proceedings.)

8          THE COURT:  You folks ready for me to roll

9   forward?

10       (No audible response.)

11         THE COURT:  Mr. Lim, if you wanted a hard copy,

12  we have some extras.

13         MR. LIM:  Thank you, Your Honor.

14         THE COURT:  Sure.

15         All right.  Let me -- let me start.

16         Ms. Williamson, is it possible for you to turn

17  your camera back on?

18       (No audible response.)

19         THE COURT:  All right.  So, Ms. Williamson, first

20  of all, did I -- did I encompass what you -- what you were

21  trying to tell me?

22       (No audible response.)

23         THE COURT:  Ah, Ms. Williamson, hold on.  Hold

24  on.  I moved all my screens around to be able to do this.

25  Give me just a second.

1           How about now?

2       (No audible response.)

3           THE COURT:  Ms. Williamson, I still can't hear

4  you.  Did you hang up, perhaps, or something?  Did you hit

5  five star again maybe?  Or do you have me muted from your

6  side?

7           There you are.  Somehow you got disconnected.

8  All right.

9           MS. WILLIAMSON:  Your Honor, again, Deborah

10  Williamson, representing Valero Marketing and Supply

11  Company.

12           I think it would be helpful, because this order

13  is going to be around for a while, if we can make fuel

14  supplier capital F -- capital F and then drop a footnote,

15  included and not limited to.

16           And I have the list of names.  While we were

17  waiting here, I've been confirming the proper names to

18  include in there.  And that way there's no question which --

19  a specific fuel supplier was included within this order.

20  And it says in paragraph 3 -- and I can email the list to

21  the Court.

22           The other question that we had, looking at it,

23  and I forget which paragraph number it is -- "The Court

24  provides that we're not required to give notice to the

25  Debtor or the Trustee."  I think it should be to anybody --

1                    THE COURT:  I --

2                    MS. WILLIAMSON:  -- because we don't want to --

3                    THE COURT:  -- I'm unwilling to do that.

4                    MS. WILLIAMSON:  Okay.

5                    THE COURT:  I don't -- I don't know who anybody

6    else is, and I'm not going to affect anybody's rights except

7    those folks that I know I have jurisdiction over.

8                    MS. WILLIAMSON:  Appreciate that, Your Honor.

9    Then we will -- we will -- we will live with what we have.

10                   THE COURT:  And, Ms. Williams, you'll send me

11   that list or send it to Mr. Alonzo, or --

12                   MS. WILLIAMSON:  I will send it right now, Your

13   Honor.

14                   THE COURT:  All right.  Thank you.

15                   All right.  No particular order.  Anyone else

16   have a comment?  Complaint?  Question?

17                   Mr. --

18                   MS. CROCKER:  Your Honor?

19                   THE COURT:  Yes, ma'am.

20                   MS. CROCKER:  I apologize.  Michaela Crocker with

21   Katten on behalf of Sunoco.

22                   Apparently, I read a little slower than everyone

23   else.  If I could see paragraph 6 again, please?

24                   THE COURT:  Of course.

25                   MS. CROCKER:  Thank you.

1          THE COURT:  Uh-huh.

2          Mr. McFaul, while she's reading, did you have

3   something you wanted to raise?

4          MR. MCFAUL:  No.  I just wanted to thank the

5   Court.  Paragraph 5 looks perfect, and this is going to

6   sound like a -- an absurd request, but there's been some

7   ongoing confusion with product orders, diesel orders from

8   MEX, and if Mr. Wolfshohl or somebody on Ms. Northrup's team

9   can just confirm, for the Record, a client request that

10  there will be no further orders of petroleum by the Debtors,

11  it would be helpful for practical purposes --

12         THE COURT:  I'm guessing --

13         MR. MCFAUL:  -- as odd as it sounds.

14         THE COURT:  -- I'm guessing that's easy.

15         MR. WOLFSHOHL:  That's the easiest thing I've

16  answered all day.  Absolutely not.  And we've locked down

17  accounts and everything and taken precautions to make sure

18  that things don't happen outside of our control.

19         MR. MCFAUL:  Thank you, Your Honor.

20         THE COURT:  All right.  Thank you, Mr. McFaul,

21  Mr. Abood?  Let's see.  Mr. Abood, have you

22  hidden -- had you hit five star, or do you have me muted

23  from your side, perhaps?

24      (No audible response.)

25         THE COURT:  I haven't seen you yet.  I'll come

1   back around.

2            Anyone else have -- Mr. Turner?  Yes, sir?

3            MR. TURNER:  Can you hear me okay, Your Honor?

4            THE COURT:  Yes, sir.  Thank you.

5            MR. TURNER:  Very good.  Again, Paul Turner for

6   Equilon Service.

7            And I guess the one question/request that I would

8   have is whether we could make a little bit more explicit

9   that, with respect to the terminated contracts for the fuel

10  suppliers, that the intellectual property, i.e., the

11  trademarks, trade address and service parts -- their rights

12  under those terminated contracts don't exist anymore.  Just

13  to clarify that because those sorts of IP rights are very

14  important, too.

15            THE COURT:  Mr. Wolfshohl?

16            MR. TURNER:  If they could just -- to make it a

17  bit more explicit, that the rights and -- the rights to any

18  use of the trademarks, trade address, service marks, and

19  color schemes granted by the agreements that are terminated

20  are also terminated.

21            MR. WOLFSHOHL:  I didn't hear that last part.

22            THE COURT:  If you just look at the screen,

23            MR. TURNER:  Are also terminated.

24            MR. WOLFSHOHL:  Got it.

25            MR. TURNER:  All right.  That's already better.

1  And that's the personal comment I had.

2           MR. WOLFSHOHL:  All right.  I don't have an issue

3  with it.  Obviously, I mean, if the DIP lender somehow

4  thinks that that has value, and it's the DIP lender's

5  collateral, perhaps, I -- but the Trustee doesn't have any

6  issue with that, Your Honor.

7           THE COURT:  So I mean, I don't -- I don't know

8  that.  I don't not know that.  So I get it.  Okay.

9           MR. TURNER:  Very good.  Thank you, sir.

10          THE COURT:  Thank you.  Now, subject to --

11 Mr. Turner, don't go away, because I'm going to hear from

12 Mr. Elrod --

13          MR. TURNER:  Right.

14          THE COURT:  -- once I get comments, and we may

15 revisit this issue.

16          MR. TURNER:  No worries.  Thank you, sir.

17          THE COURT:  Thank you.   All right.

18          Mr. Abood, I think I now have -- I now think I

19 have you live.  Could you say something, please?

20          MR. ABOOD:  Your Honor, this is Norman Abood.

21          THE COURT:  Yes, sir.  Thank you.

22          MR. ABOOD:  Thank you for your patience.

23          The language in the -- I think it's the sixth

24 paragraph, or maybe it's up above.  No.  I'm sorry.  The

25 second paragraph regarding the nonresidential leases.  The

1   language or the language that's proposed that indicates

2   termination -- and Ms. Stoian raised his earlier, and I've

3   been researching, and I found *Austin Developer v. Citgo*

4   *Petroleum*.  Our concern is that the rejection not affect the

5   termination or an implied forfeiture of the rights of the

6   sublessees.

7          THE COURT:  So you need to -- you need to read --

8   you need to read that paragraph very carefully.  I addressed

9   that issue --

10         MR. ABOOD:  Okay.

11         THE COURT:  -- as best I think I can.  I'll come

12   back once you've had time to think about it.

13         Ms. Stoian?

14         MR. ABOOD:  Thank you.

15         MS. STOIAN:  Thank you, Your Honor.

16   Rachel Stoian of Dorsey & Whitney, appearing on behalf of

17   Nine Shells Gas Stations OK, LLC.

18         I have reviewed Your Honor's revisions to

19   paragraph 2, and I do appreciate the time that you took to

20   make that change distinguishing between where Debtor is

21   lessee versus Debtor as lessor.

22         My concern remains, however, that my client, as a

23   lessee, where the Debtor is -- it's two steps down the line.

24   And if the prime lease is terminated, what rights remain

25   with my client as the subtenant even if it's just rejected?

1   I guess that would be my concern that, if that prime lease

2   is terminated, does it, in effect, extinguish the rights

3   that would have been preserved --

4               THE COURT:  So --

5               MS. STOIAN:  -- had the sublease just --

6               THE COURT:  Ms. Stoian --

7               MS. STOIAN:  -- be rejected versus terminated?

8               THE COURT:  -- so I totally -- I totally

9   understand the issue.  I'm -- I think that I have limits

10  under 365.  I think that I've done my best to leave intact

11  whatever rights may have existed.  You know, being a

12  subtenant, as you know, is not the best place in the world

13  to be in a bankruptcy case.  I also think the issue that

14  you're raising is one that I find really interesting.  I

15  also think it requires an adversary proceeding.

16              MS. STOIAN:  Understood, Your Honor.

17              THE COURT:  All right.  Thank you.

18              Ms. Crocker?

19              MS. CROCKER:  Yes, Your Honor.  And my apologies

20  if this is already at the bottom of the order, but I don't

21  recall seeing a waiver of the 14-day stay.

22              THE COURT:  Nope.  Hadn't gotten there yet.

23              MS. CROCKER:  Apologies.

24              THE COURT:  No, no, no.  I -- it's -- I should

25  have said something.  I -- there's an issue that I think

1  that Mr. Elrod's going to raise, and I want to hear it

2  before I decide what to do.  All right.

3           Mr. Newman?

4       (No audible response.)

5           THE COURT:  Ah, Mr. Newman, had you hit five star

6  on your phone?

7           There you are.

8           MR. NEWMAN:  Now?

9           THE COURT:  Yes, sir.  I can hear you now.  Thank

10  you.

11          MR. NEWMAN:  I tried -- I tried, Your Honor, and

12  I guess I didn't do it right.  You can hear me now, though?

13          THE COURT:  Uh-huh.  Loud and clear.  Thank you.

14          MR. NEWMAN:  Thank you.  I just wanted to ask the

15  Court whether it's your understanding, for the Record, or if

16  it should be clarified in the order with respect to the

17  additional carve-outs contained in -- I -- it's a little

18  small on my screen, but I believe it's paragraph 7, is it?

19          THE COURT:  I think --

20          MR. NEWMAN:  But those are in addition?

21          THE COURT:  Are you talking about the -- are you

22  talking about the million five?

23          MR. NEWMAN:  Yes, Your Honor.

24          THE COURT:  So as I understand it -- and we can

25  get clarification -- and I can make this bigger -- is that

1   is an agreement that has been negotiated between the Trustee

2   and the DIP lender, and I really -- I kept their language.

3   The only thing I did was to take out the brackets because

4   Mr. Wolfshohl told me that he thought that there was an

5   agreement as to the amount.

6           MR. NEWMAN:  And my only comment, Your Honor, is

7   that there are other carve-outs provided for in the DIP

8   order, and I just want it to be clear that this is in

9   addition to any carve-outs provided for the DIP order.

10          THE COURT:  That is my understanding.

11          MR. WOLFSHOHL:  It's not meant to disrupt the DIP

12  order at all, Your Honor.

13          THE COURT:  All right.

14          MR. WOLFSHOHL:  I do have a change to that just

15  because there were some -- the way it's drafted, and

16  obviously I'll want the lenders' Counsel to weigh in on it,

17  but I don't think they're going to have an issue with it.

18  It's at the end of it, Your Honor.  It's romanette iii.  It

19  reads "Currently necessary expenses related to records

20  retention."  And I would like it to say instead of related

21  miscellaneous administrative expenses and then of the

22  bankruptcy estate rather than the Chapter 7 estate with a

23  comma after estate to say, including but not limited to

24  trust fund taxes incurred since the Trustee's appointment.

25          I think that that was understood that that was

1  within the spirit of what we were talking about with the

2  lenders.  So I'd like them to weigh in, but that's something

3  that's obviously very important to Ms. Northrup, especially

4  because a lot of those taxes haven't come due yet.

5        THE COURT:  Did that accomplish what you -- and,

6  again, I'm going to go to Mr. Elrod --

7        MR. WOLFSHOHL:  Of course.

8        THE COURT:  -- but I didn't want to bounce back

9  and forth with him.

10        MALE SPEAKER:  Yeah.  And, Your Honor, just to be

11  clear, the -- this is not intended to disrupt the DIP order

12  or other orders.  I think there's an order regarding Raymond

13  James's retention that reflects rights under the carve-out.

14        THE COURT:  So I will absolutely -- this is --

15  this doesn't change any prior order.

16        MR. WOLFSHOHL:  There's a -- there's a not

17  between but and limited, Your Honor, that needs to go in

18  there.

19        THE COURT:  I'm sorry?  What?

20        MR. WOLFSHOHL:  There needs to be a not between

21  but and limited including but not limited to.

22        THE COURT:  Got it.  That would change the

23  meaning, wouldn't it?

24        MR. WOLFSHOHL:  Yes.  It's very significant.

25        MALE SPEAKER:  I might have gotten fired over

1  that one, Your Honor.

2          THE COURT:  Fair enough.  All right.  Fair

3  enough.

4          MALE SPEAKER:  Very significant.

5          THE COURT:  All right.  Fair enough.

6          And, Mr. Newman, does that give you the comfort

7  you were looking for?

8          MR. NEWMAN:  Yeah.  I think Your Honor said you

9  don't intend to change any existing orders that are

10 (indiscernible).

11         THE COURT:  Absolutely not.

12         MR. NEWMAN:  Thank you, Your Honor.

13         THE COURT:  All right.  All right.  Anyone else

14 before I go to Mr. Elrod?

15         Oh, Mr. Eisenberg, absolutely.  Come on up.

16         MR. EISENBERG:  I'm assuming Mr. Elrod is going

17 to take a while.  I might want to get in there first.  So I

18 know you put in -- if you could pull back up paragraph 2,

19 Your Honor?

20         THE COURT:  Of course.

21         MR. EISENBERG:  And you've got -- you've got

22 licenses and -- but can we -- can we have -- can we include

23 all licenses for branding at the locations or branding or

24 for the use and sale of food products at the locations that

25 the terminated leases are?

```
 1              THE COURT:  So I don't -- I want to make sure I
 2   understand what you're saying.
 3              MR. EISENBERG:  I want it to read right.  So --
 4              THE COURT:  Sure.
 5              MR. EISENBERG:  -- I apologize.
 6              THE COURT:  So all licenses or branding --
 7              MR. EISENBERG:  For --
 8              THE COURT:  -- for the use or sale of food
 9   products at --
10              MR. EISENBERG:  No, no.  It's just the brand
11   itself, Your Honor.  All licenses, all branding.  It's not
12   just for the sale of food products.  The brand -- the name
13   on the service station itself belongs to us.
14              THE COURT:  So you got to give me some context.
15              MR. EISENBERG:  Yes, sir.  We have a license
16   agreement.  It brands the Brothers' name.
17              THE COURT:  This says for -- okay.  So --
18              MR. EISENBERG:  And --
19              THE COURT:  -- they get to put the Brothers' name
20   on the top of the --
21              MR. EISENBERG:  Right.
22              THE COURT:  -- service station.
23              MR. EISENBERG:  And the colors and use the fried
24   chicken recipes and the other things.  And that's what we
25   need to make sure that it's not just limited to the use of
```

1   sale of food products.

2          (Pause in the proceedings.)

3                THE COURT:  Is that what you're looking for?

4                MR. EISENBERG:  Yes, Your Honor.  Thank you.

5                THE COURT:  Okay.

6                MR. EISENBERG:  And then just to clarify and I

7   guess, albeit for me to ask about a Bankruptcy Code Section,

8   but the leases are being rejected and terminated under

9   Section 365 of the Code?

10               THE COURT:  So, again, with respect to -- I don't

11  think that 365 actually deals with lease termination.

12               MR. EISENBERG:  Yes, sir.

13               THE COURT:  It deals with rejection.

14               MR. EISENBERG:  Yes, sir.

15               THE COURT:  But the -- what I have heard is that

16  what everybody -- because of the current situation, what

17  everybody has agreed to, to the extent where the Debtor is a

18  lessee, that the leases are being rejected under 365 and

19  terminated.

20               MR. EISENBERG:  Yes.

21               THE COURT:  And, again, with the issue raised by

22  Ms. Stoian, I think she's right, to the extent that her

23  clients have any rights, and I'm not determining that they

24  do or they don't.  I think that 365 says what it says.

25               MR. EISENBERG:  Yeah.

1          THE COURT:  I don't -- I'm not going to begin to

2    profess that I understand real property law in 50 different

3    states.  I'm trying to leave -- you know, the rejection

4    operates as a rejection, and I'm not trying to figure out

5    what happens.  I fully expect that this is not the last time

6    I'll deal with this dispute, but I do think it would be a

7    separate targeted motion on a particular set of facts.

8          MR. EISENBERG:  Right.  I just wanted to clarify

9    they're deemed rejected under Section 365 --

10          THE COURT:  Yeah.

11          MR. EISENBERG:  -- the provisions of 365.  Thank

12    you.

13          THE COURT:  Yes, sir.  All right.

14          MR. MAYER:  Your Honor, it was mentioned earlier

15    -- Simon Mayer on behalf of the BFM entities.

16          THE COURT:  Uh-huh.

17          MR. MAYER:  It was mentioned earlier, but I

18    didn't see it in here, the ability of landlords to secure

19    the properties once the leases have been rejected, and I

20    think --

21          THE COURT:  So I'm going to be careful about that

22    one.  What I am willing to do -- because I think, otherwise,

23    we need to follow applicable law.  What I am absolutely

24    willing to do is that the owners of any abandoned location

25    may absolutely enter to secure the premises.  I don't have

1    any issue at all with that.  To the extent that there's

2    someone in a state, whose law that I am not aware of, has a

3    possessory right, I'm not going to inadvertently terminate

4    that.  And, also, it's hard to make an argument, absent some

5    further evidence, that you're at risk if there's somebody

6    actually in the location.

7            MR. MAYER:  So can we get language on the

8    abandonment?

9            THE COURT:  Yeah.  No.  That's why -- you see me.

10   I just did paragraph 3.  I just haven't written it yet.

11           MR. MAYER:  Okay.

12           THE COURT:  All right.

13       (Pause in the proceedings.)

14           THE COURT:  What do you call these things?  What

15   term are they?

16           MR. MAYER:  I think the term they've used -- I've

17   seen used, Your Honor, is C-Store, but I don't -- that might

18   not apply to larger fueling stations.

19           THE COURT:  But you're the only one that's

20   complaining.  So if I use C-Store --

21           MR. MAYER:  C-Store, I think, is fine.

22           THE COURT:  C-Store or --

23           MR. MAYER:  C-Store.

24           THE COURT:  Okay.  Is the C capitalized?

25           MR. MAYER:  C is capitalized.  I believe store is

1    -- the S is capitalized as well.

2         (Pause in the proceedings.)

3              THE COURT:  Does that work for you?

4              MR. MAYER:  Except as --

5              FEMALE SPEAKER:  Typo (inaudible).

6              MR. MAYER:  -- protect and maintain property.

7              THE COURT:  Okay.  And if there's an issue --

8              MR. MAYER:  Thanks, Your Honor.

9              THE COURT:  And, again, I fully recognize there

10   are going to be issues, but if there are issues with

11   specific facts, I want the parties to have due process.  I

12   want -- I want a targeted set of facts.  I want to be back

13   in here so I can deal with it specifically.

14             MR. MAYER:  Yes, Your Honor.

15             THE COURT:  But to the extent that we've got

16   emergency situations out there, like the one that was

17   attached to your 807 Notice --

18             MR. MAYER:  Right.

19             THE COURT:  -- which, again, I really appreciate,

20   that's something -- you need to be out there tomorrow.

21             MR. MAYER:  Yes, Your Honor.

22             THE COURT:  And that's what I want you to have

23   the ability to do.  All right.

24             Mr. Parkins?

25             MR. PARKINS:  I raised the objection earlier.

1  Can I have my client's lease included in the properties

2  abandoned, too?

3             THE COURT:  Say that again.

4             MR. PARKINS:  The Fortuna lease with the Debtor

5  just so I can call it the Fortuna lease in Louisiana.

6  That'll be good enough to describe it if you can do that.

7             THE COURT:  And what is it that you want?

8             MR. PARKINS:  I want -- if that property is

9  abandoned tonight, I want my landlord to be able to go in

10 and secure it just like you provided.

11            THE COURT:  So is your --

12            MR. PARKINS:  Yeah.  Abandoned C-Store.  Okay.

13            THE COURT:  Well, C-Store --

14            MR. PARKINS:  C-Store is just a generic name?

15            THE COURT:  -- I'm told, is a -- is a term of

16 art.

17            MR. PARKINS:  Consumers.  Okay.  I'm good, then.

18 I will sit down at being an idiot.  Thank you.

19            THE COURT:  Okay.  No, no, no.  I -- again, I'm

20 dealing in an area that I don't profess to know even close

21 to everything.

22            MR. PARKINS:  Okay.  Thank you, Judge.

23            THE COURT:  All right.  Anyone else before I go

24 to Mr. Elrod?

25            Mr. Platt?

1          MR. PLATT:  Your Honor, two things very quickly:

2  Back -- if we could go to -- back on paragraph 2, the last

3  -- the licensing and branding sentence.

4          THE COURT:  Yeah.

5          MR. PLATT:  If there is -- if there is any way

6  that that could be a separate paragraph, that would be ideal

7  because they're -- some of those licenses are -- the fuel

8  suppliers have licenses that would come under that

9  description as well.  So to the extent that there would

10 be --

11          THE COURT:  So --

12          MR. PLATT:  Yeah.  We would like to suggest that

13 that only relates to the real property leases --

14          THE COURT:  So --

15          MR. PLATT:  -- and landlord issues.

16          THE COURT:  I never read it that way.  It says

17 what it says --

18          MR. PLATT:  Right.

19          THE COURT:  -- and if you feel good, if I put in

20 an extra return, then you got an extra return.

21          MR. PLATT:  Okay.  I feel good, Your Honor.

22          THE COURT:  All right.

23          MR. PLATT:  And then, lastly, I guess now -- what

24 is now paragraph 7 -- if we could go back to that?  I know

25 that you and Ms. Williamson had a discussion about the

1   notice issue.

2           THE COURT:  Oh, that's it.

3           MR. PLATT:  Oh, I'm sorry.  I guess it's

4   paragraph -- it's paragraph 8 now.

5           THE COURT:  Yeah.

6           MR. PLATT:  The notice -- that you didn't want it

7   to say that -- no notice to anyone.  Could the language say

8   no notice is required to any of the Debtors or the Trustee

9   or any operator?

10           THE COURT:  No.  Because I don't know what rights

11   they have.  The Trustee and the Debtors ultimately answer to

12   me, and so I'm perfectly comfortable doing that, but I'm not

13   going to prejudge anyone else's rights that haven't -- many

14   of those folks probably don't even know about this hearing,

15   and so I'm not -- I'm not willing to do that.

16           MR. PLATT:  Understood.

17           THE COURT:  All right.  Thank you.

18           MR. PLATT:  Thank you, Your Honor.

19           THE COURT:  All right.  Mr. Abood, did you raise

20   your hand again?

21           MR. ABOOD:  I did, Your Honor.

22           THE COURT:  Okay.

23           MR. ABOOD:  Just so I -- I'm sorry to bother you

24   about this paragraph 2, but my clients are really concerned

25   that -- what some of the landlords are understanding.  And

1   I've reread your language, and I appreciate your correction

2   of my reading of it earlier.  You're talking about with

3   regard to the subtenants, those leases are rejected.

4        But if you would be so kind as to consider

5   anything that says that that does not imply a forfeiture or

6   termination of a subtenant's rights, that's one request.

7        The other is just a clarification, and it may not

8   be necessary, but I'm going to ask it because I'm getting

9   asked by all kinds of people right now --

10        THE COURT:  Sure.

11        MR. ABOOD:  -- is what this process would be.  I

12   -- because you mentioned an adversary proceeding.  If

13   there's a dispute over the leases, are you anticipating --

14   the relationship between the property owner and the

15   sublessee -- are you anticipating that to be addressed by an

16   adversary proceeding, or would it be through a state court

17   proceeding?

18        THE COURT:  I think the -- the question that you

19   asked -- that resolution would occur through a state court

20   proceeding.

21        MR. ABOOD:  Thank you.

22        THE COURT:  Yes, sir.  And with respect to the

23   first request, I'm going to decline to do that.

24        MR. ABOOD:  Thank you.

25        THE COURT:  All right.  Thank you.

1          All right.  Mr. Elrod, I think we're now to you.

2          MR. ELROD:  Thank you, Your Honor.  Can you hear

3  me?

4          THE COURT:  Yes, sir, loud and clear.  Thank you.

5          MR. ELROD:  Okay.  Your Honor, I believe we don't

6  have any issues with the language in the order.  I did want

7  to -- I haven't had a good chance to take a look at the --

8  since I'm not in the courtroom, I didn't have a copy, but if

9  I understand the import of the language, you're not

10 requiring affirmatively that the DIP agent exercise its

11 state law rights and remedies; is that correct?

12         THE COURT:  I left that open to you.  I assumed

13 that -- you asked for time, and by just practical effect,

14 I'm giving you that time.  I absolutely believe that

15 someone, in the midst of all of this, will file something,

16 and we'll just deal with it as we deal with it.  But no, I'm

17 giving you the time that you asked for.

18         MR. ELROD:  Okay.  Thank you.  Thank you, Your

19 Honor.

20         I've been in communication with my client on next

21 steps, but we just wanted to make sure we had time to set up

22 the appropriate mechanism for that.

23         THE COURT:  Okay.  All right.

24         Last opportunity, everyone.

25         Ms. Surinak, you've been awfully quiet, which

1    always troubles me just a little.  You okay?

2              MS. SURINAK:  Yes, Your Honor.  We reviewed the

3    order, and we're just fine with the revisions.

4              THE COURT:  All right.  Thank you.

5              Then let me do this.

6         (Pause in the proceedings.)

7              THE COURT:  Do we have -- do we have Trustees

8    still here?

9              UNIDENTIFIED SPEAKER:  (Inaudible), Your Honor.

10             MS. CROCKER:  Your Honor.

11             THE COURT:  Yes, ma'am.

12             MS. CROCKER:  Michaela Crocker on behalf of

13   Sunoco.  Just going back to the issue on the waiver of the

14   14-day stay, I'm just concerned.

15        (Pause in the proceedings.)

16             MS. CROCKER:  Thank you, Your Honor.

17             THE COURT:  No.  Thank you for bringing that back

18   up because I just totally forgot.  Long day.

19             MR. WOLFSHOHL:  Your Honor, there's just a little

20   typo on effective there.

21             THE COURT:  I'm sure there's more than one.

22             MR. WOLFSHOHL:  You know what?  You could be my

23   typist anytime.  You're doing great.

24             THE COURT:  Thank you.  All right.  Can you -- I

25   know that it's -- and I want people to have a --

1          MR. WOLFSHOHL:  Your Honor, I'm standing by.  As
2  soon as I see it hit the Docket, I can do the Notice of
3  Appointment myself.
4          THE COURT:  Terrific.  Thank you.
5          Then with that, let's save it.  And I thank -- I
6  thank everyone for their patience, for helping me work
7  through this.
8          Again, I fully anticipate this will not solve 100
9  percent of the problems.  That doesn't mean you're not free
10  to file a motion tomorrow if you believe that there's
11  something that needs to be addressed, but I've got to start
12  the process.  And I think we've all done the best we could.
13  The order has been signed.  It's on its way to docketing.
14          Mr. Gibbs, did you have something?
15          And thank you to the U.S. Trustee.
16          Mr. Gibbs?
17          MR. GIBBS:  Good evening, Your Honor.  Chuck
18  Gibbs with McDermott, Will & Emery, Counsel for the Official
19  Unsecured Creditors Committee.
20          It's my understanding that, with the entry of
21  this order, I no longer have a client.  So I would just ask
22  the Court's indulgence to allow me to file appropriate
23  papers to be relieved of our ongoing duties.
24          THE COURT:  Absolutely.  I will -- if it -- if it
25  is helpful to you, give you the same courtesy that I

1  extended to all of the Debtors' professionals.

2           MR. GIBBS:  Uh-huh.

3           THE COURT:  You know, you're not -- you know,

4  you're going to take a loss on the case.  I get it.  Don't

5  spend time filing a fancy motion.  Upload a proposed

6  order --

7           MR. GIBBS:   Thank you, Judge.

8           THE COURT:  -- and I'll take care of it.

9           MR. GIBBS:  All right.

10          THE COURT:  All right.  Thank you.

11          Folks, anything else that we need to talk about

12 today?

13      (No audible response.)

14          THE COURT:  All right.  And, again, thank you for

15 everything.  You are all excused.

16          MR. RAY:  Your Honor?

17          THE COURT:  Yes.

18          MR. RAY:  Sorry, Your Honor.  Hugh Ray, III on

19 behalf of Chevron Products Company.

20          The order you uploaded referenced an Exhibit 1

21 that has been sent to Mr. Alonzo, consisting of the names of

22 the fuel suppliers.

23          THE COURT:  Right.

24          MR. RAY:  I don't know if that was attached to

25 the order or not.

1          THE COURT:  No, it's not.  We -- it hadn't gone

2 -- it hasn't yet been docketed.  We're going to attach it on

3 before it gets docketed.

4          MR. RAY:  Thank you, Your Honor.  That's all I

5 had.

6          THE COURT:  All right.  Thank you.

7          MR. RAY:  Yes, Your Honor.

8          THE COURT:  Thank you, everyone.

9      (Hearing adjourned at 5:47 a.m.)

10                        *  *  *  *  *

11          *I certify that the foregoing is a correct*

12 *transcript to the best of my ability from the electronic*

13 *sound recording of the ZOOM/video/telephonic proceedings in*

14 *the above-entitled matter.*

15 */S/ MARY D. HENRY*

16 *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

17 *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

18 *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

19 *JTT TRANSCRIPT #67574*

20 *DATE FILED:  August 11, 2023*

21

22

23

24

25