IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 23-90147 |
| | § | JOINTLY ADMINISTERED |
| MOUNTAIN EXPRESS OIL COMPANY, | § | HOUSTON, TEXAS |
| ET AL, | § | WEDNESDAY, |
| | § | AUGUST 16, 2023 |
| DEBTORS. | § | 4:00 P.M. TO 5:56 P.M. |

**MOTION HEARING**

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                         SEE NEXT PAGE

**(RECORDED VIA COURTSPEAK)**

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
(281) 277-5325 (office)
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>APPEARANCES (VIA ZOOM)</u>:


| | |
|---|---|
| FOR DEBTOR MOUNTAIN EXPRESS OIL COMPANY: | PACHULSKI STANG ZIEHL & JONES<br>Jeffrey N. Pomerantz, Esq.<br>10100 Santa Monica Blvd.<br>13th Floor<br>Los Angeles, CA 90067<br>310-277-6910 |
| FOR FIRST HORIZON BANK AS DIP AGENT: | GREENBERG TRAURIG<br>John D. Elrod, Esq.<br>3333 Piedmont Road NE<br>Suite 2500<br>Atlanta, GA 30305<br>678-553-2259<br><br>GREENBERG TRAURIG<br>Shari Heyen, Esq.<br>1000 Louisiana Street<br>Suite 6700<br>Houston, TX 77002<br>713-374-3535 |
| FOR OAK STREET REAL ESTATE CAPITAL, LLC: | KIRKLAND & ELLIS, LLP<br>Ashley L. Surinak, Esq.<br>300 N. Lasalle Street<br>Chicago, IL 60654<br>312-862-4073 |
| FOR THE US TRUSTEE: | DEPARTMENT OF JUSTICE<br>OFFICE OF THE US TRUSTEE<br>Ross Travis, Esq.<br>515 Rusk Avenue, Suite 3516<br>Houston, TX 77002<br>713-718-4650 |
| FOR THE UNSECURED CREDITORS COMMITTEE: | McDERMOTT WILL & EMERY<br>Charles R. Gibbs, Esq.<br>845 Texas Avenue<br>Suite 4000<br>Houston, TX 77002<br>713-653-1707 |

APPEARANCES (CONT'D - VIA ZOOM):


FOR BFM ENTERPRISES, LLC:          LOCKE LORD, LLP
                                   Simon Mayer, Esq.
                                   600 Travis Street
                                   Suite 2800
                                   Houston, TX 77002
                                   713-226-1507

                                   LOCKE LORD, LLP
                                   Omer F. "Rick" Kuebel, III, Esq
                                   601 Poydras Street
                                   Suite 2660
                                   New Orleans, LA 70130
                                   504-558-5155

FOR VALERO MARKETING AND           DYKEMA
SUPPLY COMPANY:                    Deborah D. Williamson
                                   112 E. Pecan Street
                                   Suite 1800
                                   San Antonio, TX 78205
                                   210-554-5275

FOR NEXT 1123 LANE:

                                   Mark Lawson, Esq.


FOR MARATHON PETROLEUM             FROST BROWN TODD
COMPANY, LP:                       Mark A. Platt, Esq.
                                   2101 Cedar Springs Road
                                   Rosewood Court
                                   Suite 900
                                   Dallas, TX 75201
                                   214-580-5852

FOR LEGACY ACQUISITIONS            ANDREWS MYERS, PC
AND THE NANCY AND                  Josh Judd, Esq.
 2007 TRUST:                       1885 Saint James Place
                                   Suite 1500
                                   Houston, TX 77056
                                   713-850-8218

**HOUSTON, TEXAS; WEDNESDAY, AUGUST 16, 2023; 4:00 P.M.**

1

2          THE COURT:  Good afternoon, everyone.  This is Judge

3  Jones.  The time is 4:00 o'clock Central, today is August 16,

4  2023, this is the docket for Houston, Texas.  On the 4:00

5  o'clock docket we have the jointly administered cases under

6  Case Number 23-90147, Mountain Express Oil Company.

7          Folks, please don't forget to make your electronic

8  appearance.  It's a quick trip to the website, a couple of

9  mouse clicks, it is the way that we note your official

10  appearance today.

11          We've got parties participating both in-person, as

12  well as by GoToMeeting.  Those of you who are in the

13  courtroom, if you do rise to speak, please make sure you come

14  to the lectern before you speak.  It's the only place that you

15  can both be seen and be heard.

16          For those folks who are on GoToMeeting, I have

17  activated the hand-raising feature.  If you haven't already

18  done so, and you know you're going to be speaking, give me a

19  five star on your telephone, and you can of course do that at

20  any time.

21          Whether you are in person or by GoToMeeting, the

22  first time that you speak if you would please state your name

23  and who you represent.  It really does help the court reporter

24  in the event that a transcript is made.

25          Finally, we are recording this afternoon using

1   CourtSpeak.  We'll have the audio up on the docket shortly

2   after the conclusion of the hearing.

3          And with that, Mr. Pomerantz, you want to give me an

4   update?

5          MR. POMERANTZ:  Good afternoon, Your Honor.  Jeff

6   Pomerantz, Pachulski Stang Ziehl & Jones, appearing on behalf

7   of the Debtors and Debtors-in-Possession.  Also in the virtual

8   courtroom is my partners, Mike Warner and Ben Wallen, and also

9   on the video is Michael Healy, Senior Managing Director of FTI

10  Consulting, the Debtors' Chief Restructuring Officer.

11         Your Honor, it's a great disappointment, frustration

12  and honestly anger that I appear before you today to announce

13  that the Debtors are withdrawing its motion to sell

14  substantially all of their assets and will be immediately

15  ceasing all operations.  It is also with great sadness (glitch

16  in the audio) people who depend on these (glitch in the audio)

17  for their livelihood.

18         This is not the announcement I wanted to make here

19  today.  Rather, I had hoped to announce that the lenders had

20  agreed to support a sales transaction with Arco and Oak Street

21  that would have preserved thousands of jobs, hundreds of small

22  businesses and valuable landlord and vendor relationships and

23  allowed the company to (glitch in the audio) as a going

24  concern with a proven operator.

25         I'll not re-hash the results of the sale process

1    that I reported to the Court at the August 7th hearing.

2    Rather, I will point out that the Arco Oak Street transaction

3    is and remains the highest and best result after a diligent,

4    comprehensive, market-tested sale process that lasted several

5    months.  Even entities that sat back and watched the sale

6    process unfold and conclude, who had a post-auction

7    opportunity to re-engage after it saw the highest bid, did

8    not.  The sale process, Your Honor, worked as best as it could

9    under the circumstances.

10         So what (glitch in the audio)?  We are here because

11   rather than accepting a going concern sale that maximized all

12   recoveries of stakeholders, the lenders decided apparently to

13   punish the Debtors, the thousands of employees involved in the

14   Debtors' businesses, and all of its stakeholders by assuring

15   that the Debtors would crash and burn in a complete and utter

16   meltdown.

17         In retrospect, Your Honor, the writing was on the

18   wall when the night before the auction that's when Richard

19   Marshall, a senior credit officer at Bank of Hope and one of

20   the lenders, told the Debtors' investment banker that he would

21   rather see the Debtors burn in Chapter 7.

22         Now it appears that the sentiment was not an

23   intemperate response in the heat of the moment by one of the

24   lenders, as lenders' counsel ask Your Honor to believe.  But

25   rather a sentiment held by First Horizon Bank, Hancock Whitney

1    Bank, Cadence Bank, United Community Bank, Senova's Bank,

2    South Street State Bank and Pinnacle Bank, the other lenders

3    in the syndicate who are making the vindictive, inhumane and

4    irresponsible decision to force an uncontrolled dismantling of

5    these companies (glitch in the audio) to get a lower recovery

6    in liquidation than they would receive in a sale.

7         These lenders, many of which are community banks,

8    should explain to their shareholders and their communities why

9    they are destroying thousands of families in every community

10   that they serve.  Rejecting a sale and forcing a liquidation

11   will force families from their homes and wreak utter chaos and

12   havoc for hard-working Americans.  The lenders' irrational and

13   illogical behavior will have profound human consequences.

14        Your Honor, FTI (glitch in the audio) and Pachulski

15   Stang, along with the 2 independent directors were hired on

16   the eve essentially of what was a freefall bankruptcy filing.

17   Forced into Chapter 11 to protect their leases and without any

18   financing to administer these cases, the Debtors'

19   professionals and independent directors did everything

20   possible they could to keep this company alive.

21        As restructuring professionals, our goal is to

22   maximize value, preserve businesses as going concerns, and

23   achieve consensus.  Yes, these cases were extremely

24   challenging without a doubt.  And the Debtors face severe

25   challenges heading into and throughout the course of these

cases.  So while the professionals -- but as a professional we take Debtors as we find them.  We do everything possible we can do to accomplish what quality restructuring professionals must, save businesses and preserve value.

And while the auction did not produce as much overall value as many of the parties -- many of the parties had hoped, it did produce a transaction that maximized the value of the Debtors' assets while at the same time preserving the lenders' right to litigate most the claims they so preciously valued.

Unfortunately, Your Honor, the lenders did not approach these cases in the same way the Debtor did.  As Your Honor commented at the August 7th hearing, "In retrospect this lender group had no business making this loan to the Debtors, and certainly had no business extending DIP financing to the Debtors."  They stepped aside when Arco agreed to provide the DIP in the first week of the case.

So when the Debtors and the Committee sought to extend the sale process from 4 to 5 months, the lenders were offered a second lifeboat, the Debtors again procured an actionable DIP alternative, but the lenders (glitch in the audio) and insisted on funding the DIP.  Rather than being a constructive part of the process, the lender groups fought with the Debtors at every turn to make this case as difficult as it could be.

1          They did not understand the Debtors' businesses,

2     they continuously pushed the Debtors to the brink refusing to

3     provide additional financing, and then only agreed to do so

4     after the Debtors called their bluff.  On multiple occasions

5     they took actions that adversely and irreparably damaged the

6     process, and finally in later stages of the case they

7     sabotaged the sale process by making unrealistic demands.

8          Was the lenders' destructive actions during the

9     cases the only cause the sale process tuned out the way it

10    did?  No.  But they exacerbated an already challenging process

11    and contributed to the results.

12         These lenders simply could not get over the (glitch

13    in the audio) Debtors or accept that they were the one that

14    made the pre-petition loans for a business they had no

15    understanding how it operated.  And in the end they have

16    refused to accept the results of the comprehensive market-

17    tested process that they were informed of every step of the

18    way, that brought to the Court the best possible transaction.

19         The callous decision to pull the plug on the process

20    will have real consequences to the thousands of people who

21    rely on their connection with Mountain Express.

22         Mr. Marshall and the rest of the lender group were

23    to -- will get exactly what they wanted to before the auction.

24    They will witness the Debtors burn.

25         So, Your Honor, we do not think the next step should

1    be Chapter 7.  That conversion to Chapter 7 with no funding,

2    facilities in 27 states and with all the potential legal and

3    environmental liability that comes from the immediate chaotic

4    cessation of operations of hundreds of gas stations would be a

5    disaster.  Rather, the lenders should file a motion for relief

6    from stay to allow them to pursue whatever State Court

7    remedies they have.  They should not be able to use this Court

8    to clean up the mess that they helped create and which is

9    totally avoidable -- which was totally avoidable.

10           And I note -- I will discuss in a few moments, Your

11    Honor, the Court can issue an order to show cause why these

12    cases should not be dismissed to be heard next week.  More

13    importantly, all of the other constituents should be provided

14    whatever opportunities available to them to allow them to

15    salvage their business, especially the family operators of gas

16    stations and the owners of related properties, and allow them

17    go on unhindered in what will be an extremely confusing

18    conclusion to these bankruptcy cases.

19           Your Honor, the Debtors (glitch in the audio)  have

20    their eye on what has been transpiring the last couple of

21    weeks, the landlords who are not paid rent because the lenders

22    shut off funding, the dealers who are desperately seeking fuel

23    shipments if the Debtors lack of liquidity to buy sufficient

24    fuel.  And the employees who are wondering whether to come to

25    work each day because of the lenders publicly distanced to the

1   sale process.

2           It's time for these parties to get some relief from

3   this Court to mitigate the damage and chaos caused by the

4   lenders' decision.  That is why, Your Honor, today the Debtors

5   are asking the following from Your Honor:  First, approval of

6   the Debtors' rejection of all of its real property leases,

7   dealers' subleases, fuel supply agreements with dealers, other

8   agreements relating to the provision of goods and services to

9   specific sites, fuel supply agreements with the non-controlled

10   locations, and fuel supply agreements with the oil company.

11   Essentially all operating executory contract releases should

12   be rejected today.

13           Second, specific authorization, notwithstanding

14   anything in the contracts to the contrary, so each of the

15   Debtors to go and immediately procure fuel from alternative

16   soft sources to allow them to mitigate their damages.

17   Essentially confirming that Section 326 does not hinder those

18   parties from taking those actions to protect their rights.

19           Third, authorize the Debtors to waive the

20   restrictions, all the confidentiality agreements with respect

21   to bidders that prevented them from communicating with the

22   Debtors' lenders, lessors, dealers and creditors without the

23   Debtors' consent.  While those provisions were critical during

24   the sale process, now that the sale process had ended, it is

25   only fair that any bidders be able to have those

1        communications to try to salvage something for all the people

2        affected by today's decision.

3              And last, Your Honor, to issue an order to show

4        cause why these cases should not be dismissed and set a

5        hearing for such motions some time next week with the

6        Debtors to lodge a proposed order the day before the hearing.

7              We also, Your Honor, would like to use existing cash

8        on hand to pay accrued but unpaid sales taxes for inventory

9        sold inside the stores which was incurred in July and August

10       for which the Debtor has not yet received a bill.  To total

11       amount for such taxes is approximately $857,000.  These

12       monies, Your Honor, are not the Debtors' property.  These are

13       sales and use taxes that Your Honor is -- and they be should

14       immediately be turned over to the taxing authority.

15             Your Honor, we are going to terminate all of our

16       employees effective tomorrow and seek confirmation and

17       authority to pay all unpaid wages, benefits, taxes owed with

18       respect to these employees and also to pay up to $150,000 in

19       paid time off plans according to company policy that these

20       employees are entitled to receive upon termination.

21             Lastly, Your Honor, there are certain orders that

22       are waiting Your Honor's signature, which we request that Your

23       Honor enter, and they are, number 1, Whitman automatic stay

24       modification stipulation which appears at Docket Number 1117;

25       2, a certificate of counsel at Docket Number 1118 regarding

1    the application to retain Akerman as the Debtors' special

2    environmental counsel, which is at Docket Number 752; and

3    third, specifically we have no objection at Docket Number 1272

4    regarding Pachulski Stang's first interim fee application,

5    which is at Document 1090.

6           Your Honor has also set several motions for

7    emergency hearings today, I think there are three or four.  We

8    will await Your Honor's ruling on where the case goes from

9    here before addressing the motions.  But suffice it to say

10   that if Your Honor agrees with the Debtors' proposed course of

11   action, we will be -- not be contesting the release of those

12   motions.

13          Happy to answer any questions Your Honor has.

14          THE COURT:  All right.  Thank you.  I'm sure there

15   will be as we make the circle.

16          Mr. Elrod?

17          MR. ELROD:  Good afternoon, Your Honor.  John Elrod

18   and Shari Heyen on behalf of First Horizon Bank as DIP agent.

19          Your Honor, I'm puzzled by the anger as expressed by

20   Mr. Pomerantz as a result of the failed mediation.  Based upon

21   his comments today in the hearing it would seem that that

22   makes a case per se for the appointment of a Chapter 11

23   Trustee.  His suggested path forward is about as value

24   destructive as a Chapter 11 Debtor can suggest in a case of

25   this nature.

1          As acknowledged by all parties involved, Your Honor,

2     the Debtors' sale process failed despite the lenders extending

3     over $48 million in credit.  Every time the Debtors made a

4     funding request they ultimately got what they wanted.  For

5     Mr. Pomerantz to suggest somehow the lenders were acting in

6     bad faith or wanted to see this case fail is absurd and

7     without any evidentiary basis whatsoever.

8          Importantly, Your Honor, all the Debtors' major

9     creditor constituents opposed the relief that Mr. Pomerantz

10    has now suggested on the fly from the hearing.  As the Court

11    may have seen, the Debtor has now -- or the agent has now

12    filed a motion to appoint a Chapter 11 Trustee or to convert

13    these cases.  There are potential alternative paths forward,

14    Your Honor, which can be effectuated under a Chapter 11

15    Trustee or a Chapter 7 Trustee.

16         For whatever reason these options now appear to have

17    been appropriately vetted by the Debtors.  We have been

18    approached by a variety of proposed purchasers and operators

19    who have been shut out of this process since day one or along

20    the way.  We are evaluating these options and believe that one

21    or more of them can be accomplished through the appointment of

22    a Chapter 11 Trustee.  And we believe these options will

23    result in a superior return to creditors than the path

24    proposed by the Debtors, which is apparently the dismissal of

25    these cases.

1    And the DIP agent is agreeable in the event a

2  Chapter 11 Trustee is appointed to a limited appropriate and

3  measured interim cash collateral usage that would enable the

4  Chapter 11 Trustee to fund these cases until these options are

5  run to ground.

6    We would ask the Court to defer ruling on any

7  requests by Mr. Pomerantz today.  There's no pleadings, we

8  have no notice of this, and unfortunately, as is the case in

9  much of the communications, or lack of thereof in these cases,

10  we had no notice whatsoever of Mr. Pomerantz's planned request

11  to the Court and heard it for the first time as Your Honor

12  did.

13    The Debtor -- the agent obviously objects to any

14  attempts by the Debtors to dismiss these cases.  Dismissal

15  should not be an option for several reasons.  These Chapter 11

16  cases are administratively insolvent, there's no question

17  about it.  Dismissal would potentially result in professionals

18  of the Debtors receiving more than their fair share of post-

19  petition payments relative to administrative expense claimants

20  in Chapter 11.

21    The Debtors have yet to do the basic things that are

22  required in Chapter 11 cases.  They haven't filed a request

23  for an administrative expense bar date, they haven't even

24  filed a request for a 503(b)(9) bar date.  So we don't even

25  know what the Chapter 11 administrative expense population is.

1    The Debtors haven't even filed Monthly Operating Reports.  The

2    Debtors have conducted no investigation whatsoever of their

3    pre-petition affairs.  It would be inequitable, Your Honor,

4    for these cases to be dismissed when these basic items have

5    not been addressed by the Debtor and its professionals.

6         Your Honor, it's uncontested that millions of

7    dollars were paid to to the Debtors' insiders within one year

8    prior to the petition date.  The Debtors have undertaken no

9    substantive investigation of those transactions whatsoever.

10   Certain of these transfers are detailed in the Statements of

11   Financial Affairs at Docket 664, Pages 117 of 154.  The first

12   page of Attachment 4 of that document alone indicates that

13   millions of dollars went out to insiders in the year prior to

14   the petition date.  That Statement of Financial Affairs was

15   sworn to under penalty of perjury by Mr. Healy.  The Debtors

16   have done nothing to investigate those transactions.

17        When I, during the course of these cases, requested

18   the Debtors undertake some investigation, or requested the

19   lenders have the authority to undertake some type of

20   investigation I was told by Mr. Pomerantz that would result in

21   chilling of bidding, it would distract them from the sale

22   process and otherwise result in an unfavorable result.

23        Your Honor, we of course sat by and let that occur.

24   You know, we were respectful of the sale process.  In fact, we

25   respected everything about the sale process that the Debtors

1    requested until it became clear in New York that the auction

2    process had utterly failed.  So, Your Honor, dismissing these

3    cases would result in a grievous harm to the creditors of

4    these estates.

5         At least two witnesses have approached me, one a

6    former employee and one a potential -- or one, a seller of

7    assets, a pre-petition seller of assets to the Debtors, and

8    have advised the Debtors' insiders enrich themselves pre-

9    petition at every turn at the expense of the Debtors in an

10   endemic fashion.  We are aware of a stock redemption

11   transaction to two former insiders of the Debtor in the amount

12   of $55 million that occurred in 2021.  And as Your Honor is

13   aware, simple dismissal of these cases would threaten those

14   avoidance actions to recover these amounts.

15        The Debtor in its status report filed after the

16   conclusion of the auction indicated that, oh, well, the DIP

17   agent will have its rights under Georgia's Uniform Voidable

18   Transfers Act.  Well, Your Honor, I think that's a false offer

19   in the sense that Sections 544 and 546 of the Bankruptcy Code,

20   when coupled with the UVTA, enable a Trustee to go back

21   further than the DIP agent be able to under its state law

22   rights.  Obviously we've been in bankruptcy now for five

23   months and the time period, the time frame some of that has

24   burned off.  But perhaps that's Mr. Pomerantz's design.

25        Your Honor, no investigation of Oak Street, which

1    installed one of its employees as a board member of the

2    Debtors prior to the petition date, has been conducted by the

3    Debtors.  Mr. Pomerantz spent the bulk of the time at the

4    first day hearing in these cases attacking Oak Street.  Since

5    that time no investigation of Oak Street has been undertaken.

6    In fact, at the auction Oak Street teamed up with the, if you

7    want to call it, the successful bidder, the party that

8    Mr. Pomerantz was proposing the Debtors sell the assets to

9    and, you know, basically proposing a release of Oak Street so

10   that there would be no investigation and no recovery of these

11   estates.

12        Also a release of that director who served on the

13   board, had a clear conflict of interest.  I'm told by

14   Mr. Pomerantz that he never recused himself from decisions

15   that were made relating to Oak Street transactions.

16        Your Honor, no review of the sale lease back

17   transaction with Oak Street or any other landlord to determine

18   whether those leases were above market, whether they were

19   disguised financings, or otherwise subject to attack were

20   undertaken.  And, Your Honor, just the basic review of kind of

21   your garden variety trade preference claims.  None of that has

22   been done either.  Likely not a big source of recovery, but it

23   needs to be looked at.

24        To suggest that dismissal of these cases is the

25   appropriate path forward is simply wrong, Your Honor, and we

1    would ask, as you have seen by now, I believe we have filed a

2    motion for a Chapter 11 Trustee, we would ask that in light of

3    Mr. Pomerantz's comments that that Chapter 11 Trustee be

4    appointed immediately.

5              THE COURT:  All right.  Thank you.

6              MR. ELROD:  Thank you, Your Honor.

7              THE COURT:  Let me ask, do I have anybody on the

8    line from Kirkland?

9         (No audible response.)

10             THE COURT:  Any other counsel for Oak Street?

11             MR. POMERANTZ:  I believe Ashley (glitch in the

12   audio) line, Your Honor.

13             THE COURT:  Mr. Pomerantz, I'm sorry, you just cut

14   out on me, I didn't hear you.

15             MR. POMERANTZ:  I'm looking (glitch in the audio)

16   Ashley Surinak.  She is from Kirkland for Oak Street.

17             THE COURT:  All right.  Thank you.

18             MS. SURINAK:  Good afternoon, Your Honor.  Can you

19   hear me?

20             THE COURT:  I can.  I was just giving you a moment

21   to get everything together.  You didn't know that was coming.

22   I didn't mean to be unfair.

23             You have a view about this in terms of next steps?

24             MS. SURINAK:  Your Honor, I think, you know, the

25   outcome of mediation last week we were generally supportive of

1    a go-forward transaction, obviously understanding that at some

2    point something has to be done with our leases.

3           THE COURT:  Okay.

4           MS. SURINAK:  Generally speaking, I think our client

5    is most concerned being able to get possession of the property

6    to address the ongoing issues at the properties.  But

7    otherwise I think, you know, we all have been extremely

8    supportive of the Debtors' efforts participating in the

9    auction, attempting to maximize value, understanding that the

10   DIP lenders are not supportive of that transaction.

11          THE COURT:  Right.

12          MS. SURINAK:  And I believe now the primary concern

13   is to get into these properties to address the ongoing issues

14   related to the properties and to otherwise support the process

15   in the way that makes the most sense for all stakeholders.

16          THE COURT:  Right.  So I need to understand from

17   your client, and if you need to step off and then get back on,

18   I certainly understand that, but I need to understand from

19   your client as to how they think the most efficient way to

20   accomplish that is.  Is it for, as Mr. Pomerantz suggested,

21   that I effectively take the Debtor out of the middle of the

22   relationship and let them negotiate directly with the

23   operators, or something different or something that is staged.

24          And again, I'm not suggesting that I'm headed that

25   direction, but I need to understand because they've got the

1    largest portfolio, they've got the biggest problem to deal

2    with and I'm hoping they've given some thought.  I can't

3    imagine that they wouldn't have thought about a Plan B because

4    everyone had to suspect that the mediation could fail.

5         So I would really like to understand their views

6    about next step.  And if you need to hop off the line, have a

7    private conversation, then come back on.  I'm going to guess

8    this is probably going to take a while so I'm going to guess

9    we'll probably be here.

10        MS. SURINAK:  Yes, Your Honor.  If you wouldn't

11   mind, I'd like to confer with our client and we'll hop off.

12        THE COURT:  Don't mind at all.  So just pop back on

13   when you're ready.

14        MS. SURINAK:  Thank you very much.

15        THE COURT:  All right.  Thank you.

16        The US Trustee have a view about all of this?

17        MR. TRAVIS:  Good afternoon, Your Honor.  Ross

18   Travis for the US Trustee.

19        I've not had an opportunity to discuss this -- these

20   new revelations with my client, so at this time the US

21   Trustee's taking no position on whether conversion or

22   dismissal is appropriate.  So we are ready to appoint a -- you

23   know, start the process on appointing a Trustee if necessary.

24        THE COURT:  So let me sort of -- this is

25   complicated.  The chances of me dismissing the case, given

1    what I've heard thus far, are slim to none.  I'm not going to

2    run from this problem, I'm not going to let loose of potential

3    environmental issues.  And I've got however many Debtors there

4    are that have to come to a conclusion.  And I'm simply not

5    going to depend upon, you know, an unstated, well, we intend

6    to dissolve, or we'll get to that eventually.  I mean,

7    there's -- you know, I know how to do that and it's called a

8    Chapter 7 case.

9         I'm reluctant -- I'm going to have to really

10   understand why a Chapter 11 would make sense.  I mean, I've

11   effectively had a Chapter 11, I had Mr. Healy in charge, and

12   all a Chapter 11's going to do is just going to add another

13   layer of overhead on top of a layer of overhead that the

14   Debtor can't sustain anyway.  I mean, I know how that works.

15   I mean, a Chapter 11 Trustee's not going to run anything, a

16   Chapter 11 Trustee's going to hire somebody to run it and then

17   go hire all the professionals.  Perhaps some of the ones that

18   exist, and I would certainly understand that argument that you

19   would keep everything in place for a while while you figured

20   out what the issues are.

21        I also wouldn't put a Chapter 7 Trustee in the midst

22   of having to go deal with all of this.  But I might -- you

23   know, I can see putting a Chapter 7 Trustee in place after I

24   terminate leases and make sure the operations are shut down so

25   the Chapter 7 Trustee's not having to go out and physically

1    inspect 800 stations.  It becomes a litigation case.  To the

2    extent that there are litigation claims, I'm going to see that

3    those litigation claims are pursued.

4         What I do not want to do is to put an under-funded

5    or unfunded Chapter 7 Trustee in the position where he or she

6    is having to incur expenses that they may be personally

7    responsible for in order to do a job that may never have any

8    money.

9         That was a long-winded way of talking to a whole lot

10   of people who are listening, but also asking you, it would

11   seem to me that if we go the Chapter 7 Trustee route, this

12   would probably require a special appointment.  I haven't had

13   that experience with your current boss on that issue.

14   Obviously some predecessors I have many times, but I just

15   don't know the policy, I don't know how quickly it could be

16   done, I don't know if there's -- you're going to get

17   communications from everybody involved, if that's what I

18   decide, and then go get it, I don't know how quickly it can be

19   done if it's a special appointment.

20        Do you have any idea, answers to those questions?

21   And I understand if the answer is no.

22        MR. TRAVIS:  Honestly, Judge, I can't give you an

23   exact answer to that question.  I know we've had a couple of

24   recent cases where the creditor body has, you know, attempted

25   to vote in their own trustee.

1           THE COURT:  Well, we can't wait -- we can't wait

2     for that.

3           MR. TRAVIS:  I know, and that's always taken three

4     or four weeks.

5           THE COURT:  Right.  And so let me ask you, and

6     again, I just don't know, and this is not complaint, I just

7     don't know the current procedure that's employed by

8     Mr. Epstein.  It is -- is this decision made downstairs on the

9     fourth floor, is it made in Austin or wherever Mr. Epstein is,

10    or is there -- is it -- does it go somewhere else?  In other

11    words --

12          MR. TRAVIS:  It's going --

13          THE COURT:   -- if I tell you at 4:45 that I want a

14    Chapter 7 Trustee by 5:00 o'clock, is that possible?

15          MR. TRAVIS:  I don't think so.  Mr. Epstein was

16    actually in the building today and is on his way to the

17    airport right now to go back to San Antonio.

18          THE COURT:  Got it.

19          MR. TRAVIS:  So I don't think I have any way to get

20    in touch with him, and our AUST is in South Carolina at the

21    moment.

22          THE COURT:  Is it something that can be accomplished

23    overnight, if that's --

24          MR. TRAVIS:  I don't know about overnight, I could

25    probably get something done by the end of tomorrow, maybe

1    Friday at the latest.

2              THE COURT:  Got it.  You do understand that once

3    this stops this will be -- this will be like a looting

4    scenario, you understand that.  Right?

5              MR. TRAVIS:  Yes, Your Honor, I do understand that.

6              THE COURT:  So Friday is problematic.  And there are

7    landlords that are going to be stuck in a difficult position

8    if we go down this path.

9              MR. TRAVIS:  Could you give me five minutes and I

10   will walk downstairs and see if Mr. Epstein happens to still

11   be in the building?

12             THE COURT:  Absolutely.  Can you send him a text or

13   email because I don't want you to miss what everyone else is

14   going to say and I don't want to stop.  Can you just text him

15   or email him from here?  Is it better if you go downstairs?

16             MR. TRAVIS:  Actually my phone is downstairs, that's

17   my personal cell phone over there.

18        (Laughter.)

19             THE COURT:  Fair enough.  So you're free to go, and

20   if there's --

21             MR. TRAVIS:  Okay.  I will make it quick, Judge.

22             THE COURT:   -- and if there's something that pops

23   up then I'll try to write it down and regurgitate it to you.

24             All right.  Mr. Gibbs?  I'm actually sorry you have

25   to be here, but you'll be the one I lean on the hardest.

1          MR. GIBBS:  I understand, Your Honor.  Chuck Gibbs

2     with McDermott Will & Emery, counsel for the Unsecured

3     Creditors Committee.  We share I mean, all the parties'

4     chagrin as to where we find ourselves.

5          THE COURT:  Yeah, you know, it happens.  Look, it

6     doesn't always work.

7          MR. GIBBS:  And I'm going to resist the temptation

8     to respond not only not in kind, but just respond with any

9     particular rejoinder to a lot of what I heard.  I sat through

10     an hour of that last week.

11          THE COURT:  Yeah, it's not productive.

12          MR. GIBBS:  It isn't.  I can tell you that the

13     Committee, all of whom are creditors who are owed a lot of

14     money, including a lot of admin money, who continue to provide

15     business services in some cases to the Debtor, support a

16     couple of things that we want the Court to know.

17          Number 1, we support the lenders' decision not to

18     accept the offer that was the mediator's final proposal.

19          THE COURT:  Yeah, look, the mediation process didn't

20     work.  The one thing that I'm 110 percent confident of is that

21     Isgur gave it everything he had.  I'm just confident of that.

22     So that's just okay.

23          MR. GIBBS:  He absolutely did, and he may be the

24     most frustrated that he wasn't able to get this successfully

25     concluded.  But I wanted the Court to know that with respect

1    to inferences as to the parties' good faith or efforts, we

2    didn't find what we understood to be the mediator's final

3    proposal to be one that should -- the banks should have

4    accepted.  And number 1, the offer that was evidenced in the

5    letter of intent that preceded the commencement of the

6    mediation was we thought a non-starter.

7         So the lenders' decision I don't think is borne out

8    of any malice personally, just from our observation point.

9    The lenders' decision was based on what they believe to be an

10   unsatisfactory recovery on $220 million of indebtedness,

11   including almost 50 of which they loaned at the Debtor's

12   request to the Debtor to fund these cases.  And we have

13   millions, if not tens of millions of unpaid administrative

14   expenses is where we find ourselves today.

15        We had a Committee meeting today, and the Committee

16   has voted to support the lenders' motion which was filed right

17   before the hearing.  And I heard the Court's reaction to it as

18   to -- the skepticism as whether a Chapter 11 Trustee would

19   solve anything.  We don't go in -- we're not making that --

20   we're not offering that support and are joining in that

21   request with rose colored glasses on.

22        THE COURT:  Sure.

23        MR. GIBBS:  Representing my constituency it's borne

24   in part of a hope that cooperatively with the lender there may

25   be some recovery down the road that otherwise the lender would

1    have first recovery on in a Chapter 7, which would guarantee

2    that my constituency gets nothing in this case.  So there is

3    some self-interest in my desire to join the lender.

4          But the conversations we've been having non-stop

5    with the lender and throughout the mediation and throughout

6    the sale process and subsequent to the termination of the

7    mediation gives us, I think, and based on my experience, a

8    significant basis to hope that we could put alternative buyers

9    who were either shut out of the process or never contacted,

10    maddeningly so from our standpoint, an opportunity to see if

11    they can provide an operating solution that can save jobs,

12    that can, in fact, not require a complete a shut down and

13    liquidation of all the assets of the Debtor.

14          And a process that the lender can trust enough to

15    let their cash collateral be used for a very short period of

16    time to see if that result can be achieved.  A Chapter 11

17    Trustee, if it turns out the best efforts are unrewarded, can

18    certainly become the Chapter 7 Trustee.  I think that deciding

19    to appoint a Chapter 7 Trustee, turn the lights off, fire the

20    people, release all the landlords on an oral request is an

21    impossible bell to un-ring so.

22          THE COURT:  Sure.  So let me -- can we take a step

23    back a little bit?  So, you know, one, as you well know, I can

24    authorize a 7 Trustee to operate for a short period of time

25    under the Code.  And it seems to me that that's a much better

1     and cheaper way of proceeding forward than with an 11 Trustee.

2     Unless you want to tell me, and this is no -- I have no basis

3     to believe this, but I had an 11 Trustee, I've had Healy

4     sitting there since the beginning of the case, and he

5     understands that he answers to nobody but me.  I mean, I

6     understand -- you know, I understand how corporate formalities

7     work, but he understands he answers to me.  If there's a

8     problem, he has an obligation to bring it to my attention.

9          But what's an 11 Trustee going to do other than just

10    prolong the expense burn?  And nobody's ever told me what the

11    burn is per day, per week.  I mean, does anybody know?

12         MR. GIBBS:  Unfortunately we have no confidence in

13    what that number is.

14         THE COURT:  Right.  And how do I deal with, you

15    know, Mr. Singh and Ms. Tran's clients who, granted, and I

16    haven't forgotten, they did something very wrong, and there's

17    a day for that.  But how do I deal with the fact that they

18    can't -- you know, that they can't get what they contemplated

19    when they signed that agreement?  Why shouldn't I let them go

20    buy gas from whoever it is that will sell it to them?

21         MR. GIBBS:  I can tell you what my suggested

22    solution for their dilemma is.

23         THE COURT:  Sure.

24         MR. GIBBS:  That the stay relief be granted

25    immediately, but be granted for a temporal period.  They're

1    free for the next two weeks, and then in the absence of

2    reinstatement of the stay that they're completely released

3    from the automatic stay.  They can go get gas so that they can

4    operate their business, but still preserve the ability to

5    maintain that contractual relationship if and when the Debtor

6    through a separate operator can, in fact, provide them with

7    the fuel that they need to operate their businesses.  So I

8    think --

9            THE COURT:  Yeah, a heck of cure calculation, isn't

10   it?

11           MR. GIBBS:  I'm sorry?

12           THE COURT:  It's going to be a heck of a cure

13   calculation, isn't it?

14           MR. GIBBS:  There's a lot of cure calculations --

15           THE COURT:  Yeah, no, I -- yeah.

16           MR. GIBBS:   -- it would be difficult to come up

17   with, so.

18           THE COURT:  Have you conveyed that thought to

19   Ms. Tran and Mr. Singh?

20           MR. GIBBS:  I have not, Your Honor.  We got their

21   pleadings asking for emergency relief at the same time as we

22   were having conversations to see what the path forward ought

23   to be, but, you know, that's just the Committee's position.

24   Mr. Elrod may be wanting to get my attention so he could do

25   this, but --

1          THE COURT:  No, look --

2          MR. GIBBS:   -- that's just me thinking it through

3     as a --

4          THE COURT:  -- so I'm trying --

5          MR. GIBBS:  -- long-time practitioner --

6          THE COURT:  Sure.

7          MR. GIBBS:   -- as to maybe how to skin that cat.

8          THE COURT:  Yeah, and you've got a laundry list of

9     things to talk about and think about.  We're not going to

10    leave here today without some solution that lets those folks

11    have a chance at survival.  Now if it's a two-week you can go

12    buy fuel from anybody but we want to talk again in two weeks,

13    you know, that may be the right balance.  If it is a, you

14    know, and I don't know what the evidentiary presentation would

15    be, but if it is this is just so horrible that this can never

16    be repaired, I hear that, too.

17          But we're not going to leave without a solution that

18    lets their clients -- because they're the ones who stood up

19    and asked, I mean, there have been a lot of me toos that have

20    now been filed, and I've got Mr. Simon sitting over there, his

21    situation's a little different.  But there's going to be a

22    solution that lets them buy gas.  They have to have an

23    opportunity to survive.  I gave the Debtor a chance to

24    survive, isn't going to work.

25          Although you think that you may see a path, and

1       again, I want to hear more about it, it bothers me that
2       there's the assertion that there are viable purchasers that
3       were excluded from the process.  You know that I demand
4       transparency.  And I don't know what to do.
5                UNIDENTIFIED SPEAKER:  (Indiscernible).
6                THE COURT:  And so I will -- you know, I mean, I
7       need to understand a little bit more about that.
8                But have you seen a proposed budget?  I mean, I
9       don't know what the current cash position is, I'm worried
10      about sales taxes, I've got Mr. Melko's issue that's sitting
11      out there.  I mean, I've ignored him for two hearings, but
12      eventually I'm going to have to deal with Mr. Melko because
13      he's got -- he's got an issue, it's a real issue.  I was, you
14      know, I was just trying to wait to see whether it was going to
15      be done in a meltdown or be done as part of a transaction.
16      But I mean, there are all sorts of those issues that are out
17      there.
18               MR. GIBBS:  The only budget we've seen is the one
19      that was attached to the order that you signed an hour to two
20      ago that carries the Debtor through Friday, I believe it was.
21               THE COURT:  Wasn't that last Friday or --
22               MR. GIBBS:  It was proposed for the week ending this
23      Friday, I believe.
24               THE COURT:  Okay.
25               MR. GIBBS:  And then they've been using it for that

1   budget on a 48-hour basis as we had these interim hearings.

2          THE COURT:  All right.

3          MR. GIBBS:  That's the only budget that we've seen

4   from the Debtor that would show their cash needs, earlier

5   versions of 13-week, but the situation has changed.  But from

6   a current budgeting standpoint the last we've seen, I believe

7   is the one that carries them through Friday.

8          THE COURT:  I mean, the past three or four weeks

9   cash been going up or cash been going down?

10         MR. GIBBS:  Unfortunately down.

11         THE COURT:  And have administrative expenses been

12  going up or been going down?

13         MR. GIBBS:  I don't know.  I think I know, but I

14  haven't seen anything that confirms it.

15         THE COURT:  I mean, that's the problem because the

16  admin burn's going to go up in an 11.

17         MR. GIBBS:  August rent hasn't been paid to my

18  knowledge.

19         THE COURT:  Right.

20         MR. GIBBS:  So you have --

21         THE COURT:  July rent wasn't paid.

22         MR. GIBBS:  Well, a lot of rent wasn't paid --

23         THE COURT:  Right.

24         MR. GIBBS:   -- I'm not sure if all of it wasn't.

25         THE COURT:  Okay.

1          MR. GIBBS:  And people are continuing to work and

2     accruing expenses, professionals.

3          THE COURT:  Yeah, I haven't even -- I mean, I can't

4     imagine what the hole is for the professionals.  Right?  You

5     know, and so I don't know I'm going to react to all of that.

6     I did read one of the applications and I had to put it down.

7     But we'll deal with that when that comes up.

8          MR. GIBBS:  And we've got post-petition taxes, and I

9     heard Mr. Pomerantz ask for immediate authority to spend

10    857,000, I believe to pay post-petition taxes, which are trust

11    fund taxes, but --

12         THE COURT:  Right.

13         MR. GIBBS:   -- I believe there's a significant

14    multiple of that of post-petition accrued unpaid taxes.  So

15    I'm not sure of the significance of those versus others that

16    are owed, but it -- that number is part of the whole.

17         THE COURT:  And so let me ask, in terms of your

18    constituency, have you thought about what the exit it?  I

19    mean, I know -- what I mean, when I heard you say earlier was

20    maybe there's some combination of sales and litigation

21    recoveries that lets you negotiate out a piece or maybe

22    there's a piece that's not covered by the lien.  I don't know,

23    I was just trying to speculate, versus, you know, is the right

24    outcome for your constituents, your non-insider constituents,

25    you know, understanding that there's no preference liability?

1          I mean, have we had all those discussions?  I'm just

2    trying to figure out --

3          MR. GIBBS:  No, Your Honor.

4          THE COURT:   -- where we're --

5          MR. GIBBS:  I would love to be able to give you the

6    comfort of saying we have a well-thought through articulated

7    agreed upon Plan B.  Not even --

8          THE COURT:  You do not.

9          MR. GIBBS:   -- close.

10         THE COURT:  All right.

11         MR. GIBBS:  Not even close.  What we have is, I

12   think I can say this without risk of losing credibility,

13   people with credibility who have demonstrated a significant

14   interest in coming in and providing an alternative way for

15   these -- the vast majority of these locations to continue to

16   operate, to get to a stabilized operational level that may

17   yield the lenders a better recovery than what -- the offer

18   that was rejected will give them.

19         THE COURT:  Is this --

20         MR. GIBBS:  Like there are causes of action which

21   you've heard plenty of.

22         THE COURT:  Sure.

23         MR. GIBBS:  My read of the tea leaves in a

24   Chapter 7, the lender has a lien on those, too, and they're

25   not going to get made whole.  So to the extent that there is

1    some negotiated, agreed upon sharing of cause of action

2    recovery that's available through an 11, I think we stand

3    behind them in the likelihood -- unless the damages are

4    hundreds of millions of dollars -- of standing behind all of

5    that money going to the lender in Chapter 7.

6            And I think that, you know, frankly for considering

7    and operating a Chapter 7 Trustee, the expenses are not going

8    to be significantly lower, I don't think, than a Chapter 11

9    Trustee.  They're going to have to have somebody to come in to

10   figure out where the money is, who's it owed to, how do they

11   get fuel, how do they deliver fuel.

12           THE COURT:  There's not going to be any fuel, not

13   going to be any leases.

14           MR. GIBBS:  Well, if that's the operating premise

15   and if that's the quick decision by a Chapter 11 Trustee, then

16   again, you're, I think, at some level of stasis.

17           THE COURT:  So is it your belief that you can't

18   negotiate a deal and make it binding on a conversion to a 7?

19           MR. GIBBS:  Never going to admit that I can't.

20       (Laughter.)

21           THE COURT:  Okay.  I know.

22           MR. GIBBS:  I think that --

23           THE COURT:  I'm just trying to -- I'm just trying to

24   understand --

25           MR. GIBBS:  Yeah.

1          THE COURT:   -- the push back because I really don't

2     see it.  I mean, I'm -- look, I'm not -- I have not starry

3     eyes about what happens in a 7.  I also have no starry eyes

4     about where wee are right now.  And the one thing that I am

5     confident of is that nobody has yet perhaps even figured but

6     certainly not told me how big the hole is, and, you know,

7     it's -- the more I sort of read through and try to read

8     between the lines, it's a huge hole.  It's a hole I don't know

9     how it gets filled.

10          But I got it.  That's -- I was going to ask you to

11    be -- I'm going to ask you to do more good work for everybody

12    with probably little chance of being paid in a couple of

13    minutes.  But let me hear from the US Trustee.

14          MR. GIBBS:  Thank you, Judge.

15          THE COURT:  Thank you.

16          MR. TRAVIS:  I do apologize, Your Honor --

17          THE COURT:  No, no.

18          MR. TRAVIS:   -- I'm slightly out of breath from

19    running up the stairs.

20          THE COURT:  Ah.  So that's impressive.

21          MR. TRAVIS:  Ross Travis for the US Trustee again.

22          I was able to get hopefully a satisfactory answer

23    for the Court.

24          THE COURT:  Okay.

25          MR. TRAVIS:  We can have a panel trustee appointed

1    by tomorrow morning.  If we were going to go off panel,

2    there's going to be a lot of other issues.  We have bonding

3    requirements before we can appoint a trustee, we have --

4              THE COURT:  Right.

5              MR. TRAVIS:   -- background check requirements

6    before we can appoint a trustee.  The only other option is to

7    appoint a panel trustee and then have the creditor body vote

8    in a non-panel trustee a couple of weeks down the road.

9              THE COURT:  Yeah, which is -- it's over.

10             MR. TRAVIS:  It's over at that point, right.  It

11   looks like the best option may be to see if the DIP lender

12   would be agreeable to a carve out and provide the Chapter 7

13   Trustee with a budget.  But we could get you a panel trustee

14   appointed by tomorrow.

15             THE COURT:  And again, I fully understand the US

16   Trustee has the absolute right to appoint every trustee.  All

17   I have the right to say is no.  But do we have any idea,

18   because this is not going to be something, and again, no

19   disrespect intended, but this is going to be something that a

20   number of the panel trustees are just not going to be equipped

21   both back office-wise and just financially not going to be

22   able to withstand.  I mean, do we have any idea of who it

23   would be, or is that -- that's --

24             MR. TRAVIS:  I mean, the general process is it's up

25   on a rotation.  We could definitely reach out to the trustees

1       and explain the situation and look for whichever one has the

2       most expertise and availability.

3               THE COURT:  Got it.  Okay.  Let me continue talking

4       to people.  Thank you.

5               Mr. Simon?

6               MR. MAYER:  Good afternoon, Your Honor.

7               THE COURT:  Good afternoon.

8               MR. MAYER:  Simon Mayer from Locke Lord.  With me is

9       Philip Eisenberg and on the line is Mr. Rick Kuebel.

10              THE COURT:  All right.  Good afternoon, gentlemen.

11              UNIDENTIFIED SPEAKER:  Good afternoon.

12              THE COURT:  Your view on this.

13              MR. MAYER:  Well, Your Honor --

14              THE COURT:  And I've read your motion again.

15              MR. MAYER:  Thank you.

16              THE COURT:  Where are you on all of this, given what

17      you've heard today?  Because you're the focal point of this, I

18      mean, in general.  I mean, I say you generically, I mean, it's

19      the ultimate property owners that really -- it's time for you

20      to weigh in.  It's time for you to weigh in heavy.  This is --

21      whatever we do is really going to affect the value of your

22      assets.  And I mean, I really do want to understand what

23      you're thinking.  It's time to -- it's time to put the

24      strategy aside, or maybe it's time to strategize me, I mean, I

25      don't know, but I really need to hear -- that's why I asked

1     the Kirkland lawyer to go talk to the client, I really do want

2     to hear where you folks are.

3          MR. MAYER:  Your Honor, I think to be fair

4     Mr. Kuebel is probably the man that's the closest to the

5     client and we're --

6          THE COURT:  Well, let me ask this, I mean, did -- I

7     believe it only fair that I give you the same opportunity that

8     I gave the young lawyer from Kirkland.  If you all want a

9     couple of minutes to go huddle with the client, given

10    everything that has been said, so that you can convey it, I'm

11    more than happy to do that.  Mr. Kuebel sometimes doesn't need

12    that because he's always two steps ahead of us.

13         Mr. Kuebel, would you -- would you like -- first of

14    all, you'd like for me to un-mute your phone line.  Okay.

15    Mr. Kuebel, would you like -- would you like the opportunity

16    to, given everything that you heard, to go have a conversation

17    with your client?  Because I -- I mean, I'm telling you how I

18    generally feel.  It's time for you folks to really speak up

19    because you're the value that's next to a road.

20         MR. KUEBEL:  Yeah, Your Honor, believe me, this has

21    been almost late-night exercises with our client as well, and

22    unfortunately yesterday -- and I have sent some emails over to

23    Oak Street -- one of the local news stores ran a very

24    unflattering story about one of the MEX locations in New

25    Orleans on Jefferson Highway that happened to be abandoned,

1    looted, windows knocked out.  Mr. Mayer's got some pictures

2    and a link to the article if the Court wants to see it.

3           But this has been a late-night set of calls and an

4    early morning set of calls today with our client to discuss

5    where they are.  I mean, particularly with the clients that we

6    moved for with respect to the -- with respect to the leases

7    that are unpaid.  And we've got a group of six in the New

8    Orleans area, Your Honor.  Rents weren't paid for July or

9    August.

10          Our clients are ready to move forward.  I think they

11   would be willing to work through a stepped lease termination,

12   for example a dynamic where the leases would terminate at the

13   end of the month unless there's maybe some -- excuse me, Your

14   Honor -- unless there may be a dynamic where a trustee would

15   want to save those leases and get them current or work an

16   alternative arrangement with the landlords.

17          But what's really I think grating on our clients is

18   the instant security to the side.  I mean, it's the point

19   where it's no longer -- it's no longer like (glitch in the

20   audio) necessary the rent, but it's out of the trap of the

21   stores being vacant, unoccupied.  And we'd certainly like to

22   get some relief from the Court, even if we do an interim or

23   stepped type of lease termination to where we've got locations

24   that right now are unmanned or closed, we could step in to

25   secure them.

1          THE COURT:  To me that doesn't -- that shouldn't

2     even be a conversation item, that ought to be a given.  But

3     I -- so I started all this, and if you're perfect -- if you

4     can answer the question, I'm perfectly happy to hear it, you

5     know, what I'm looking at is, you know, as I've said before,

6     again, without -- without a lot more structure, which I

7     haven't heard, no way I'm going to dismiss the case.  And so

8     it becomes something else.

9          And again, not -- you know, I've said what I've said

10    and I've tried to give you my honest reaction to what's on

11    file, and my own, you know, 30-plus years of I lived in that

12    world, you know, I always got thrown the stuff in the gutter.

13    I wasn't the one throwing it, I was the one that had to deal

14    with it once it got thrown.  I know what this is going to be

15    like.  And so, again, I want everybody's honest opinions.  You

16    know, if it is a, we simply would like the Debtor out of the

17    way because we want to go negotiate with the sub-tenants, you

18    know, terrific, I want to know that.  If it is a, we just want

19    to get away from this and start over, I want to know that,

20    too.          But, so, Mr. Kuebel, totally up to you.  People

21    are stepping out in the hallway, which they're welcome to do.

22    Do you want to -- I can -- Mr. Mayer knows where the

23    conference rooms are, do you guys want to get on a phone call

24    really quick and come back?

25          MR. KUEBEL:  It's funny, Your Honor, I have the

1    clients ringing me off the hook.  But -- and I do want to talk

2    to them.  One thing, I didn't answer Your Honor about the

3    dismissal question or the dismissal issue.  I don't think our

4    clients will want to see this case dismissed and have to go

5    all over various parishes in Louisiana to seek relief.

6              Also, I think the issue that the bank's counsel

7    raised about -- and the Committee counsel, about the integrity

8    of the Chapter 5 causes of actions staying here is very, very

9    important.  So --

10              THE COURT:  No, I got it.

11              MR. KUEBEL:   -- we would definitely --

12              THE COURT:  Totally got it.

13              MR. KUEBEL:   -- (glitch in the audio) dismissal but

14    we certainly also want -- I think we will say for a dynamic

15    where at least with respect to the landlords, the landlords

16    would have the availability to immediately secure stores that

17    are not currently operating and be on a very short lease

18    horizon to get those stores back the end of month unless we

19    can come up with some alternative arrangement.

20              THE COURT:  Yeah, don't know what the timing is, but

21    again, if there are vacant stores, that's a threat, that's a

22    threat not only to your value, it's also a threat to the

23    surrounding community.  And that we're going to fix today.  No

24    issue.

25              MR. KUEBEL:  Thank you, Your Honor.

1          THE COURT:  All right.  So if you would like to --

2     you know the combination across the hall.  Right?

3          MR. MAYER:  I think so.

4          THE COURT:  All right.  If it turns out that

5     somebody's in there, come back, Ms. Portillo will take my key

6     and unlock the door next door, or it may already be unlocked,

7     I don't know.  But, you know, the one next door is mine.  It's

8     next door to the attorney lounge.  So when you guys are ready,

9     just come on back in.  Okay?

10          MR. MAYER:  Thank you.

11          THE COURT:  All right.  Thank you.

12          Ms. Surinak, you should be -- have you -- you may

13     have needed to hit five star again.

14          (Pause in the proceedings.)

15          THE COURT:  So haven't seen you.  Could you say

16     something, because I thought I heard you actually hit the

17     keys.

18          MS. SURINAK:  Can you hear me, Your Honor?

19          THE COURT:  Oh, yes, you're live.  Sorry.  Yes.

20          MS. SURINAK:  For the Record, and I apologize, I

21     didn't say my name for the first name.  Ashley Surinak of

22     Kirkland & Ellis on behalf of (indiscernible) Real Estate

23     Capital.  Thank you for providing us the time to confer with

24     our client, and hopefully we have an answer that is sufficient

25     for Your Honor.

1          First and foremost we would just like to reiterate,

2     understanding that it's not the path forward at the time, so

3     we believe the proposed sale transaction was the best possible

4     outcome to maximize value in these Chapter 11 cases.

5          THE COURT:  Right.

6          MS. SURINAK:  But having said that, and kind of

7     reiterating our previous position, our second preference is

8     really for whichever option allows for a quick orderly

9     transition of our properties back to allow -- so that we can

10    bring in new operators for locations that aren't currently

11    operating so we can save jobs at those locations.  And really

12    the most important thing to us is that they are safe and

13    operational.  And they're kind of just stuck in their current

14    (glitch in the audio) the process --

15         THE COURT:  Right.

16         MS. SURINAK:   -- and I think that if we could come

17    to some kind of resolution, understanding Your Honor's

18    comments and concerns about a dismissal of these Chapter 11

19    cases, but whether that's working with a Chapter 7 or a

20    Chapter 11 Trustee to get the properties returned to us so

21    that we can move in with new operators and, you know, restore

22    the properties to proper working condition so that they're

23    safe not only to those that go to the properties but those in

24    the communities where they are.  I think that would be our

25    client's preference.  And generally speaking (glitch in the

1    audio) ready today and able to move as quickly as, you know,

2    the process allows to go in and do so.

3         THE COURT:  So let me parse that just a little bit

4    if I could.  So stores that are vacant, that's easy.  You

5    know, we're not going to have vacant stores protected by the

6    stay.  And again, it may need to be some stepped procedure,  I

7    mean, I haven't gotten that far down the path yet, I mean,

8    Mr. Elrod hasn't started trying to convince me that there's

9    really a business that can be saved here.  And I'm certainly

10   going to hear that, but issues regarding vacant stores one way

11   or another not going to be an issue.

12        What I am concerned about is to the extent that

13   there are subtenants that are operating the stores, I want

14   there to be a process where those folks have a genuine

15   opportunity, number one, to continue their business while they

16   have a discussion directly with you that, you know -- and

17   again, I'm not saying that you have take anybody or that you

18   could exclude everyone, everyone should stand on their own

19   merits.  If they're a good operator, I would assume your folks

20   would want them in.  If they're not a good operator, then, you

21   know, you should be able to make that decision, too.

22        It's more of a if I take the Debtor out of the

23   middle of it, which means I would step out of it and I would

24   have no authority over it, I would want to make sure that

25   there's a process that would allow for existing operators to

1    have an opportunity to be evaluated by your client, to be able

2    to discuss a direct relationship with your client.  And if it

3    turned out that the relationship wasn't going to work, there

4    needs to be -- it's not a you're out tonight.  That's just not

5    fair.  Does that make sense?

6         MS. SURINAK:  Yes, Your Honor.  And (glitch in the

7    audio) is definitely amenable to that and is willing to have

8    those conversations --

9         THE COURT:  Yeah.

10         MS. SURINAK:  -- and is also willing, you know, if

11    there is funding as the cases continue, if the banks continue

12    to fund for a short period of time, if there are other buyers,

13    I believe that our client is also amenable to speaking to, you

14    know, whichever third parties are interested, provided that

15    rents are paid in that scenario, so.

16         But generally speaking, understood, in terms of

17    giving subtenants a chance to engage and our client would be

18    willing to participate in that.

19         THE COURT:  So let me -- have you talked directly to

20    Mr. Elrod or Ms. Heyen?

21         MS. SURINAK:  We have briefly, not specifically on

22    this topic.

23         THE COURT:  So let me suggest this because I just

24    saw -- not that -- Ms. Surinak, you are more than perfectly

25    capable.  I saw Mr. Serajeddini just pop on.  Given what was

1   just said and given everything that you've heard, do you want

2   to go have a quick conversation with them?

3          MR. ELROD:  Certainly, Your Honor.  And we did have

4   our first substantive conversation with them earlier today.

5          We do think there is an arrangement that is

6   possible --

7          THE COURT:  Right.

8          MR. ELROD:  -- and we do think that there's a value-

9   maximizing opportunity between the parties, you know, with

10   certain protections and guardrails in place that would enable

11   both parties to benefit.

12          THE COURT:  I want to hear that.  And I don't expect

13   you to have every T crossed or I dotted, but I would be

14   interested in hearing that.

15          I do want -- there has to be something in place to

16   deal with vacant stores all the way around, but that's just

17   not -- I -- quite frankly, I didn't realize that it was as

18   many as perhaps it is.  But we need to remedy that.

19          And even it is, as Mr. Kuebel suggested, and maybe

20   -- you know, maybe, you know, Ms. Heyen ought to go jump on

21   the call with Mr. Kuebel.  If there's, you know, some process

22   that says, hey, we want to get in, and there's -- you know,

23   there's -- I'm making this up -- you know, there's 28 days to

24   find a buyer and, you know, we're going to make sure that rent

25   gets paid and electricity stays on and the coolers are on --

1    that's the part that scares me because I've cleaned those out

2    before --

3              MR. ELROD:  As have I.

4              THE COURT:  -- and I've watched them been cleaned

5    out.  I've cleaned them out.

6              MR. ELROD:  I have cleaned them out, too.

7              THE COURT:  Yeah, and so --

8              MR. ELROD:  In Jacksonville, Florida in the 1990s.

9    Not pleasant.

10             THE COURT:  Yeah.  So, again, I -- those things will

11   matter.  And it also helps preserve value.

12             I also think that, perhaps -- and maybe while you

13   all are doing this -- and I'm going to give you as much time

14   as we need.  It would seem to me that Mr. Gibbs' comments

15   about what I'm just going to call the Tran Singh situation, is

16   an awfully good -- I don't know why I didn't think of that.  I

17   mean, I guess that's why you keep the old guys around, right?

18   They come up with good ideas.

19             (Laughter)

20             THE COURT:  About coming up with something temporary

21   that says, you know, hey, go buy fuel because we're not -- you

22   know, if anything, it's mitigation.  And then -- you know, and

23   then come back once you've vetted through these other issues.

24             Let me ask.  Mr. Healy, do you know how much cash is

25   on hand, or Mr. Elrod?

1           MR. ELROD:  I don't have the exact numbers, Your

2      Honor.  I think that the budget the Court approved earlier

3      today would have the most current number, to my knowledge, but

4      Mr. Healy likely has better detail.

5           THE COURT:  Mr. Healy, can you tell me current cash

6      on hand today and then all of the pluses and minuses from

7      that?

8           MR. HEALY:  Yeah.  So (glitch in the audio), Your

9      Honor, is roughly, you know, maybe the high threes.  I mean,

10     the number moves around during the day as we get auto-drafted

11     by oil companies.  But roughly $4 million, a tad below that

12     is, is a fair number.

13          THE COURT:  Okay.  And that would -- and no major

14     pluses or minuses that you're aware of that are in -- that are

15     floating out there in transit?

16          MR. HEALY:  So, as of -- you know, for the balance

17     of today, no.

18          THE COURT:  Okay.

19          MR. HEALY:  But every morning, obviously, we get

20     drafted for fuel for prior day's transactions.

21          THE COURT:  Okay.  To me, that's helpful because it

22     helps put some of the other things in perspective.  Okay.

23          Thank you, Mr. Healy.  Don't go far.

24          Let me ask:  Do you want to -- do you want to step

25     out and have that conversation?  Do you -- it just seems to me

1          that you should.

2                    MR. ELROD:  I think so, Your Honor.  This is --

3          maybe the parties are talking past each other.  But this is

4          the first time we're really hearing that they might be

5          interested --

6                    THE COURT:  That's why we're --

7                    MR. ELROD:  -- in alternative purchasers.

8                    THE COURT:  That's why --

9                    MR. ELROD:  So --

10                   THE COURT:  -- we're doing do this.  That's why

11         we're doing this.

12                   MR. ELROD:  Thank you, Your Honor.

13                   THE COURT:  Thank you.

14                   And Mr. Pomerantz, I haven't ignored you.  I just

15         also think that this is one of those that probably is best

16         handled by me.

17                   MR. POMERANTZ:  That is fine, Your Honor.

18                   I did want to just -- and I'm not going to comment

19         on a lot of what I heard.

20                   THE COURT:  Uh-huh.

21                   MR. POMERANTZ:  (Glitch in the audio) particularly

22         troubling are the comments from Mr. Elrod and Mr. Gibbs that

23         people were shut out of property.

24                   THE COURT:  Yeah, so we'll --

25                   MR. POMERANTZ:  From the (indiscernible) --

1          THE COURT:  We'll work through today.  What I'm

2     worried about today is I'm worried about people working that

3     can't get paid, I'm worried about people having jobs, I'm

4     worried about storefronts that aren't secure, I'm worried

5     about tanks that leak stuff that we don't want in our water

6     supply.  That's what I'm focused on today.

7          There will be another day for the rest of it.  But I

8     got it, I heard it all.

9          Ms. Williamson --

10         MR. POMERANTZ:  Thank you.

11         THE COURT:  -- I saw you pop on and you weren't

12    smiling at me, so I'm worried that there's an issue.

13         Good afternoon.

14         MS. WILLIAMSON:  Well, Your Honor -- thank you.

15    Deborah Williamson representing Valero Marketing and Supply

16    Company.

17         Your Honor, just two points I want to bring to the

18    Court's attention:

19         One, Valero sells primarily branded fuel.  We are

20    willing and, in fact, we would encourage that the -- in fact,

21    58 -- we have a number of locations -- that we would have the

22    ability to connect other distributors of Valero-branded fuel

23    to the current companies that sell Valero-branded, so they

24    don't have the risk of going dry, which they just -- they have

25    last week.

1          THE COURT:  Right.

2          MS. WILLIAMSON:  So part of this would be can they

3    do that.

4          The other issue that we're facing, Your Honor, is

5    that, for the fuel supply agreements that Valero, and I think

6    probably others have with the Debtors, it's not just rejection

7    because that doesn't work -- result in termination of those

8    agreements.  Under the PMPA, we would have to still give

9    notice before we could terminate those agreements and reach

10   agreements with other distributors.

11         So we would ask the Court, if the Court is going to

12   permit the Debtor to reject, that you would also include

13   termination language in there.  And these are usually two-

14   party agreements between, in my case, Valero and one of the

15   Debtors.

16         THE COURT:  Got it.  So, one, thank you for the

17   education because I -- you know, I don't know the effects of

18   everything that I'm talking about.  But we are going to figure

19   out a solution to this.

20         And I assume, Ms. Heyen, you heard all of that?

21         MS. HEYEN:  Yes, Your Honor, I heard.

22         THE COURT:  All right.

23         MS. HEYEN:  (Indiscernible).

24         THE COURT:  So she's on top of it.  And you know how

25   to talk to Ms. Williamson.  She's not going anywhere.  If

1    there are issues that pop up out in the hallway that then

2    there needs to be confirmation, you know how to reach her --

3              MS. HEYEN:  Certainly.

4              THE COURT:  -- and you guys can work through that.

5    Okay.

6              MS. HEYEN:  Absolutely.  Thank you.

7              THE COURT:  All right.  Got it.

8              MS. WILLIAMSON:  Thank you, Your Honor.

9              THE COURT:  Thank you.

10             Mr. Ralston, I saw you pop on.  Hold on, let me --

11   there we go.

12             MR. RALSTON:  Hello, Your Honor.  Good afternoon.

13             THE COURT:  Good afternoon.

14             MR. RALSTON:  And Your Honor, this has been an

15   education over the last week and a half.  I was just brought

16   into this case four weeks ago.

17             I represent an outfit called -- and it's -- by the

18   way, for the Record, Mark Ralston, Fishman Jackson on behalf

19   of MEX 1123 Lane.

20             So my client owns one store that's been going under

21   renovations, located in Ohio, hasn't been opened yet.  We are

22   the landlord, the Debtor is a tenant, and there is a subtenant

23   in place.  We were paid rent, I think through July, haven't

24   been paid in August, we don't expect to have been August or in

25   the future.

1           One of the things -- and there's a lot going on.

2       And my client is an investor.  He is not someone who is super

3       sophisticated as far as this industry, and I can't claim to

4       have to have experience -- much experience, either, except for

5       what I've gained in this case.

6           One of the things that Mr. Pomerantz indicated in

7       his opening statement that was, I think, of significant

8       interest to us, is that we were -- we would like to be able to

9       talk separately and freely with, I guess, GPM.  And we also

10      would like to know who the other parties that were -- that

11      submitted -- albeit not qualified bids, but submitted bids.

12      We'd like to be able to talk to other folks.

13          And I think Mr. Pomerantz indicated that he would

14      ask for a -- that the Debtors would be agreeable to a waiver

15      of a privilege that prevents us from knowing and talking with

16      other potential new tenants, as it were.  And I think that's

17      something that I -- you know, while we haven't made a firm

18      decision as to whether we want our lease rejected right now or

19      that we'd prefer to wait for two weeks to see if a trustee can

20      resurrect a deal with GPM or another potential party, we would

21      at least like the ability to start seeing if others are

22      interested in our location.

23          THE COURT:  I think that that's an incredibly

24      reasonable ask.  And I think, as Mr. Pomerantz put it, the

25      need for that secrecy no longer exists.  I want to get

1    everybody back in here to hear arguments before I make any

2    rulings.  But it's a very reasonable, thoughtful ask.  And you

3    know, everyone needs a plan B.  I mean, I generally have a

4    plan B and a plan C.  And you need to be working on your B.  I

5    got it.  So don't let me forget that.

6            MR. RALSTON:  Yes, Your Honor.

7            THE COURT:  All right.  Thank you.

8            MR. RALSTON:  Thank you.

9            THE COURT:  I've got so many parties out in the hall

10   that I'm not going to do anything until I get everybody back.

11           Yes, sir.  You just hanging out?

12           UNIDENTIFIED-RT:  I was just going to provide the

13   Court with an update on where we stand, but --

14           THE COURT:  That would be great.

15           UNIDENTIFIED-RT:  So I have attempted to get in

16   contact with Janet Northrup.

17           THE COURT:  Okay.

18           UNIDENTIFIED-RT:  It seems like the U.S. Trustee,

19   the lenders, and the UCC would all be agreeable to her serving

20   as a Chapter 11 Trustee.

21           THE COURT:  Okay.  And --

22           UNIDENTIFIED-RT:  I don't see anything that would

23   disqualify her, I'm not, you know, aware of any conflicts that

24   she has.

25           THE COURT:  She's bonded and she's --

1          UNIDENTIFIED-RT:  She's bonded fully.

2          THE COURT:  -- she's served in my --

3          UNIDENTIFIED-RT:  Vetted through the --

4          THE COURT:  -- utility case and did -- from at least

5    what all the creditors said, did a great job.

6          Okay.  Thank you for that update.

7          All right.  Mr. Kuebel, the rest of your team has

8    wandered back in.  And I don't know -- let me see if there's

9    any update that you need.

10          I think that there was an expression by Oak Street

11   that there was perhaps some desire, on a limited basis, to

12   work with the lender group.  They have the same concern as you

13   do about vacant locations.  They are out in the hall talking.

14   And we got the update from the U.S. Trustee that, at least

15   preliminary, no commitments, but that there was an interest,

16   regardless of whether we went the 7 or 11 route, that Janet

17   Northrup would be an acceptable trustee.

18          And just given my experience with her, she's

19   certainly done a good job in some of the cases I've had.  And

20   again, so full disclosure, you know, 12 years ago, I used to

21   represent her, so I know she's been educated by the best

22   lawyers.

23          (Laughter)

24          THE COURT:  So that's -- Mr. Simon?

25          MR. SIMON:  Yes, Judge.  So the transaction that our

1    client had with Mountain Express, we had sold roughly 40

2    stores to Mountain Express; four or five of these, which are

3    the subject of our motion for relief from the stay, we are the

4    landlord on.  There were seven or eight others that there are

5    third-party lessors -- or lessees in.  And then the remainder

6    of the -- are the -- are currently under Oak Street.  I think

7    Oak Street has about 26 of those stores, 28 of those stores.

8              THE COURT:  Okay, got it.

9              MR. SIMON:  So what we would do is -- first of all,

10   we had license agreement, the Brothers Marx (phonetic), we

11   were one of the --

12             THE COURT:  So like the pizza and the sandwiches and

13   stuff?

14             MR. SIMON:  Fried chicken, I believe, Your Honor.

15             THE COURT:  Oh, fried chicken.  Okay.  Sorry.

16             MR. SIMON:  We would want that license back.

17             We would also want to terminate the leases for --

18   where we're the landlord and for those seven or eight third-

19   party lessees, and we would step in and work with them on an

20   arrangement to continue operating those or assisting them in

21   operating those stores.

22             THE COURT:  Okay.  So let me take -- let me take a

23   step back for just a second.

24             MR. SIMON:  Sure, Your Honor.

25             THE COURT:  That's a bit aggressive for today.

1          MR. SIMON:  Yes, Your Honor.

2          THE COURT:  It may not be -- it may be on the table

3   tomorrow.  It's -- but I think -- you know, I -- you can't --

4   the problem is you can't sit here and negotiate with me,

5   right?  That's the problem, right?

6          MR. SIMON:  Correct.

7          THE COURT:  And so the real issue is:  How do we go

8   forward?  And you know, this all started with the lender's

9   request for a Chapter 11 Trustee.  You know I don't think

10  that's a great idea.  But if they're going to fund it and if

11  I've got somebody whose capability I know that can immediately

12  convert to a Chapter 7 role and it's going to be adequately

13  funded, you know, I'll start -- or I'm at least going to think

14  about it; or, if it's a 7 with limited ability to operate,

15  which I actually think is better, but Mr. Gibbs is going to

16  work really hard to try and convince me that I'm wrong and I

17  got all of that.  That's kind of where we are.

18          Do you have thoughts about that issue before we

19  start talking about a structure?  Because the moment you step

20  up and say I have these five asks, then I'm going to get --

21  everybody else is going to pop on and say, well, I want this,

22  this, and this.  And I'm just not the right guy to do that.

23  I'm the guy who says, yes, that makes sense, it complies with

24  the Code, that's okay.  But I'm not the one you negotiate

25  with.

1          MR. SIMON:  As far as an 11 versus a 7 Trustee, Your
2     Honor, I --
3          THE COURT:  Or just --
4          MR. SIMON:  I've represented the 7 Trustees and 11
5     Trustees, but I know 11 Trustees are going to cost a lot more.
6     I've worked with Janet Northrup.
7          THE COURT:  Right.
8          MR. SIMON:  I think she's a capable trustee, she's
9     at a good firm.  So, I mean, --
10          THE COURT:  If she's the trustee, you're telling me
11     you don't really care if the bank is funding it.  Is that --
12     for a short period of time.
13          MR. SIMON:  For a short period of time, I think --
14          THE COURT:  And your hearing --
15          MR. SIMON:  I --
16          THE COURT:  Your motion got set for a hearing.  I
17     mean, so I'm not going to -- I mean, I'm not going to let that
18     sit for long.
19          MR. SIMON:  Yes, Your Honor.
20          THE COURT:  I just want someone to come in -- I
21     don't have a good handle on any of this and I'm really
22     uncomfortable.  And I'm really uncomfortable about picking up
23     the paper tomorrow and finding out that I've got storefronts
24     that have been looted or that I've got gasoline tanks that are
25     out of compliance that are leaking in the ground.  That's what

1    I'm really, really uncomfortable about.

2             MR. SIMON:  And Your Honor, I can tell you from --

3    if you read our papers, you saw we've already got one of our

4    stores that was looted two days ago.

5             THE COURT:  I know, I --

6             MR. SIMON:  So --

7             THE COURT:  That's what really got me on this issue,

8    is when I read that.

9             MR. SIMON:  And so I think we need at least some

10   immediate relief.  So, for those stores --

11            THE COURT:  You're --

12            MR. SIMON:  -- that are not --

13            THE COURT:  You're going to get immediate relief for

14   closed stores.  How we implement it, I got to get everybody

15   back in here and figure that out.  But for stores that are

16   vacant, you are absolutely going to get relief, everybody is

17   going to get relief to go protect your property.

18             Now it may very well be that there's a time period

19   attached to that that we have to come back, but that shouldn't

20   be that big of a deal.  But you are absolutely going to be

21   able to go protect your property, absolutely.

22            UNIDENTIFIED:  (Indiscernible).

23            THE COURT:  So if -- and maybe, you know, use the

24   time, to -- you know, Ms. Heyen is sitting right here.  And

25   having a conversation with her about how you -- she's heard

1    me.  She knows that you're going to get relief to go protect

2    your property.  Maybe having a conversation with her about how

3    that gets implemented takes this from everybody has got to

4    stand up and take a defensive position versus we can enter

5    into that stipulation and then we're going to see what

6    happens, you know, two weeks or three weeks from now.  Just a

7    suggestion.

8              MR. SIMON:  Yes, Your Honor.

9              THE COURT:  Okay.  Mr. Platt, we couldn't go a

10   hearing without hearing from you.

11             MR. PLATT:  Good afternoon, Your Honor.  Mark Platt

12   for Marathon Petroleum Company, LP.

13             Since there's no cash collateral order to deal with,

14   I don't have that normal paragraph to ask you for.

15        (Laughter)

16             MR. PLATT:  But I really -- I mainly wanted to say

17   "me too" to --

18             THE COURT:  Ms. Williamson's --

19             MR. PLATT:  -- what Ms. Williamson was saying.  I

20   think that we will need to be a part of that conversation.  To

21   the extent that there are rejections, we will need to have the

22   opportunity to have protective language in there.

23             There are also re-branding issues for us that we

24   would probably need stay relief for.

25             So I mainly am saying "me too" to what some other

1    people have said.  And we will, of course, reach out directly

2    to Ms. Heyen.

3              THE COURT:  No, I got.  Look, I --

4              MR. PLATT:  (Indiscernible).

5              THE COURT:  I used -- I may have used incorrect

6    language, but you know, I do bankruptcy-speak, so that's what

7    I did.  All right.  Let me --

8              MR. PLATT:  Thank you, Your Honor.

9              THE COURT:  Yes, sir.

10             Mr. Abood?

11          (No verbal response)

12             THE COURT:  Mr. Abood?

13          (No audible response.)

14             THE COURT:  Mr. Abood?

15          (No audible response.)

16             THE COURT:  I can see you talking, but I can't hear

17   you.  Had you hit five-star on your telephone previously?

18   Because I got to have that.

19             Ah, there you are.  Yes, sir.

20          (No audible response.)

21             THE COURT:  Mr. Abood, I still can't hear you.  How

22   about now?

23             MR. ABOOD:  Can you hear me now?

24             THE COURT:  Yes, sir.  Good afternoon.

25             MR. ABOOD:  Thank you.  My apologies for that.

1    Norman Abood, attorney in Toledo.  I represent a number of the

2    operators in this area specifically, but not by way of

3    limitations, Store 737, 110, 111, 295.

4         Your Honor, I raise my hand to specifically applaud

5    the relief that you suggested for the operators because I'm

6    about to file -- I've been holding off on filing similar

7    motions to relief to what was filed by Ms. Tran and other

8    counsel that have become (indiscernible) because we wanted to

9    see what was happening and what (glitch in the audio) motions

10   for relief.

11        Nevertheless, whatever happens, your point is right

12   on point that the operators need the ability to continue to

13   operate.  And so, to the extent that you're going to enter an

14   order -- which we hope that you do -- that allows them to buy

15   gas from other sources when we are not being currently

16   supplied by Mountain Express, there are other parameters to

17   that, which goes to the (glitch in the audio).

18        Along with being able to buy gas from another

19   source, we need to be able to run our credit cards through

20   when the customers pay us --

21        THE COURT:  Right.

22        MR. ABOOD:  -- so that Mountain Express doesn't end

23   up with all the cash.  And then we don't have the money to pay

24   for the gas and buy more gas.

25        THE COURT:  Yeah.

1          MR. ABOOD:  So that's a joined concern that we ask

2     you incorporate in any such order.

3          The third part of the relief, obviously there are

4     funds that have already been run through their credit card

5     system that are being held by Mountain Express.  And I know

6     that might not be something you want to deal with at this

7     point in time, but it is of critical importance to the local

8     operators.  Some of my clients are literally on a shoestring.

9          THE COURT:  Right.  And --

10          MR. ABOOD:  So we ask (indiscernible) --

11          THE COURT:  And you heard the problem, right?

12     There's less than $4 million of cash on hand.  You got --

13          MR. ABOOD:  Yes.

14          THE COURT:  You got a million dollars worth of taxes

15     and all sorts of other things.  Yeah, we're not going to get

16     that addressed today.

17          The credit card issue was front and center in the

18     Singh Tran motion, and I -- it was always incorporated.  I

19     understand the need for that.  I just -- I was just

20     shorthanding, and I didn't mean to not include that.

21          MR. ABOOD:  Thank you, Your Honor.

22          THE COURT:  All right.  Thank you.

23          Mr. Judd, you raised your hand.

24          MR. JUDD:  Yes, Your Honor.  Josh Judd on behalf of

25     Legacy Acquisitions and the Nancy Ratto 2007 Trust.

1          Your Honor, just very briefly.  My clients, although

2     they have a very small role in this case in the grand scheme

3     of things, this case is very important to them.  They have

4     three locations, two of which I think are -- will be addressed

5     through your comments earlier, that will be vacant by the end

6     of business today, based upon Mr. Pomerantz's representation.

7          One of the locations -- and I would just ask that

8     the Court consider it -- does have a subtenant.  And to the

9     extent that the Court would consider that any order entered by

10    the Court would allow those landlords where a subtenant is

11    operating to engage with the subtenant immediately to forego

12    any -- or to engage with them to preserve any potential value.

13    And that may be phased over a couple of weeks, but at least we

14    can start having discussions with those subtenants to see if

15    an agreement can be reached to maximize value.

16              THE COURT:  All right.  Thank you.

17              All right.  Let me.

18          (Pause in proceedings)

19              THE COURT:  Mr. Elrod?  And I know you've got --

20    I've thrown a lot at you, you have a lot of moving pieces.

21    Where are we?

22              MR. ELROD:  Well, Your Honor, we do have some

23    progress with respect to Oak Street.  And I understand there

24    was some discussion while we were talking regarding the

25    appointment of a trustee.  I'm not sure in what form, but that

1    would certainly -- as indicated, that would be our preferred

2    path.

3           Your Honor, I'm sure Mr. Serajeddini will correct me

4    if I'm wrong, but the concept would be that Oak would be

5    willing to give us a week or two -- or the trustee a week or

6    two, I should say - the parties, generally, a week or two to

7    work through any expressions of interest or potentially

8    interested parties who are -- you know, want to come to the

9    table --

10          THE COURT:  Uh-huh.

11          MR. ELROD:  -- you know, felt like they were not

12   given the attention they should have gotten, or new entrants

13   into the process, to give them a chance to, you know, lodge a

14   bid or give their ideas, so that we can try to monetize these

15   assets for the benefit of, you know, the various creditor

16   constituents.

17          THE COURT:  So let me walk through that.  So -- and

18   forget the time period for a second.  Let's just say it's two

19   weeks, but it can be -- you know, it can be more or less, but

20   let's just assume that it's two weeks.

21          So the Debtor is going to shut down operations

22   tomorrow.  The trustee -- is it your -- is it your suggestion

23   that the trustee would take -- that the shutdown wouldn't

24   actually occur, but that the trustee would take over

25   operations tomorrow for two weeks, funded by your group?

1          MR. ELROD:  Your Honor, the suggestion would be that

2     the Debtors do not cease operations tomorrow.

3          THE COURT:  No, no.  I got that.  I corrected

4     myself, at least I thought I did.

5          So -- but that the trustee would step in and the

6     trustee would continue the oversight for a period of two

7     weeks, would investigate alternatives.

8          During that two weeks, the Debtors that aren't

9     getting fuel would have to have the right to buy fuel.  I've

10    sat hard enough on them for too long.

11         MR. ELROD:  It's the lifeblood of the business, of

12    course.

13         THE COURT:  Right.

14         MR. ELROD:  So --

15         THE COURT:  Plus I mean, quite frankly, if it -- if

16    nothing else, it's mitigation of a claim, which may not

17    matter, I got that, and probably doesn't, given the grand

18    scheme of things.  But perhaps it's preservation of going

19    concern value.  But it would just be they can buy fuel and

20    they would come back and that order would have a life to it of

21    two weeks.

22         And as pointed out -- and I need to be precise about

23    it -- those folks have to have the ability to charge credit

24    cards on a system that let's them get the money.  They -- I

25    mean, I'm going to guess that these folks have had dollars

1    going to the Debtor for gas that they paid for, not from the

2    Debtors, and that's a problem.  But it would stop during this

3    two-week period.

4           They get to bring in -- if they're buying fuel --

5    and I -- it becomes an administrative problem, I got it,

6    because, if they're buying gas from someone else, then they

7    should be able to charge credit cards that go to their

8    account.  If they're selling fuel that the Debtors delivered,

9    then I got it that the existing arrangement ought to stay in

10   place.

11          But folks who aren't getting gas, haven't gotten

12   gas, they've got to be able to go out and operate and they

13   can't come to the Debtor for the money.  They've got to be

14   able to collect their own receipts, again, you know, be it for

15   two weeks or whatever it is you think you need.

16          I mean, I'm guessing, in large part, that the two

17   weeks is driven by the fact that there's a little less than

18   $4 million.  I'm assuming that your group probably doesn't

19   want another capital raise.

20          Do you have any idea what the burn is at this point?

21          MR. ELROD:  Your Honor, I think Mr. Healy is the

22   best source of information --

23          THE COURT:  Okay.

24          MR. ELROD:  -- on that.

25          THE COURT:  Yeah.  I didn't ask him that question

1      and I -- you know, I don't know what's accumulating or not, I

2      just don't know.

3              MR. ELROD:  I would point out, Your Honor -- I think

4      you alluded to these -- a couple of issues:

5              Obviously, if there is inventory that is our

6      collateral, we reserve all rights on that and would want all

7      that, obviously, to be funded back to the Debtor, so --

8              THE COURT:  Sure.

9              MR. ELROD:  You know, it's kind of a commingle --

10     potential commingling-type problem there with proceeds that

11     may come in from some of these dealers.  I just want to make

12     sure that we're -- you know, we're certain of that.

13             THE COURT:  And I don't have the foggiest notion how

14     we sort that out.

15             MR. ELROD:  It's messy for sure.

16             THE COURT:  Yeah.  I mean, I -- are we dealing with

17     -- like we're supposed to deliver -- I'm making this up.  We

18     are supposed to deliver fuel every Tuesday and we've only been

19     delivering every other Tuesday, so they've been going out and

20     buying fuel from someone else in the off weeks to make it

21     work.  I mean, oh, my goodness, I don't know how you figure

22     that one out.

23             MR. ELROD:  It's a pick-it.

24             THE COURT:  You know, they got to -- you know, if I

25     take the Singh Tran pleadings at their face, which I do until

1    somebody shows me different, they're easy because they haven't

2    gotten any gas.  And so they put in their own -- I call it a

3    "black box," but you know what I'm talking about, the machine

4    that takes credit cards and it runs through one of those

5    service providers.  That's easy for them.  If there's -- if

6    it's mixed, I don't know how in the world we do that.

7              If you know of some expert or somebody who says, oh,

8    yeah, there's an easy way to do this or we can -- you know, we

9    can stick a stick in the tank and take a measurement and we

10   know that it's that many gallons, I mean, all fine by me.  But

11   you know, we need to do that times three or four or 500.

12             MR. ELROD:  Right, right.

13             We have been approached by one potential operator

14   who has expertise in this business, I know from personal

15   experience in an unrelated matter.

16             Your Honor, I will say, to the extent you're

17   inclined to grant that relief -- and of course, it seems only

18   fair in some respects.  We have fuel that's actually not being

19   delivered.

20             THE COURT:  Right.

21             MR. ELROD:  We would like to avoid the prospect of a

22   free-for-all, so we would like some type of notice because it

23   may be that people just want to get free from their contracts

24   when they have gotten fuel deliveries.

25             THE COURT:  Right.

1          MR. ELROD:  So we would like some type of procedure

2     in place, where it's not just a blanket grant, it's more

3     targeted.

4          THE COURT:  So I'm going to let you think about that

5     one and so -- again, that's a -- that's hard and we do -- I

6     got it.  I mean, we don't want this to -- we don't want to

7     make it worse.

8          But I got to give people -- I mean, I'm going to

9     assume that people are, in general, good and acting in their

10    honest self-interest, which is just okay with me.  And I'm not

11    trying --

12         MR. ELROD:  It's like mix it --

13         THE COURT:  Not -- yeah, I'm not trying to steal,

14    just trying to --

15         MR. ELROD:  Make a buck.

16         THE COURT:  -- just trying to get until tomorrow.

17         The other thing that would have to be is that all of

18    the prohibitions against talking have to come to an end.

19    There have to -- people have to be able to talk to their

20    subtenants, people have to able to talk to you, people have to

21    be -- you have to be able to talk to people.  So all of the

22    restrictions on communications would have to come to an end.

23         You know, if you got to a point where you -- you

24    know, you thought, you know, an NDA was appropriate, you know

25    how to do that --

1           MR. ELROD:  Sure.

2           THE COURT:  -- for a specific person.  But the

3    general prohibitions would all have to come to an end, so that

4    people could talk.

5           MR. ELROD:  We would agree with that, Your Honor.

6    That's one point, and I believe that was one of Mr. Pomerantz'

7    points, if I understood him correctly --

8           THE COURT:  Yeah.

9           MR. ELROD:  -- when he was running through them.

10    That's one point that we would agree with.  We -- in fact, we

11    thought those were more restrictive than they should have been

12    to begin with because we anticipated a situation like this.

13           THE COURT:  But --

14           MR. ELROD:  In fact, in --

15           THE COURT:  Let's move on.  Keep --

16           MR. ELROD:  Okay.

17           THE COURT:  -- just on my issues.

18           MR. ELROD:  Thank you, Your Honor.

19           THE COURT:  No, no.  Don't go away quite yet.

20           So what we're talking about doing is that I would --

21    and this is a question, it's going to be inartfully asked.

22    But what you're asking me to do is to appoint an 11 Trustee

23    tonight with -- hopefully, with the understanding that it

24    would be Ms. Northrup.

25           That prohibitions against communications would come

1    to an end.

2              We would set a hearing in -- well, you tell me

3    because, again, you're going to fund it.  But we would set a

4    hearing in, you know, two weeks, a week, whatever you think is

5    rational, that we would consider further relief, including my

6    own *sua sponte* motion to convert to a Chapter 7.

7              And again, I've told you before.  I mean, you can

8    make the argument and preserve your -- I'm not going to

9    dismiss the case, not based on -- unless there's something out

10   there that I don't understand that I haven't yet been told

11   because this needs to -- this needs to roll through to a

12   conclusion, whatever that conclusion is.

13             With respect to the gas purchasing issue, my sense

14   is that, one, I'm -- and you all have reached an agreement.

15   But I'm going to grant the Singh Tran motion in some form or

16   fashion.  That's the only one that was set for today.  And

17   then I'm going to give you a day or two to figure out if there

18   is an easy way to do it.  In other words, if you sign on to

19   this order, then you can do this, and we can circulate it; or,

20   if people need to file their own individual motions, which I

21   think they have a right to do and I'm obligated to take them

22   up promptly, which I will, we can deal with it that way.

23             If there's a way to come up and say, hey, if you

24   sign off on this order, then, you know, over the next two

25   weeks -- and it gives you the time to look at sales and that

1    sort of thing.  You know?

2           MR. ELROD:  In terms of timing of the hearing, Your

3    Honor, what I would suggest is perhaps a status conference in

4    a week and then another one two weeks out because maybe, if we

5    quickly are able to run this to ground and there's just

6    nothing there --

7           THE COURT:  Sure.

8           MR. ELROD:  -- in which case, we'd, you know,

9    prefer --

10           THE COURT:  So let me ask you this.  I don't have a

11   problem with any of this.  I would like to have a status

12   conference, say maybe Monday or Tuesday.  I just want to know

13   what's going on.  You --

14           MR. ELROD:  Right.

15           THE COURT:  Everybody has got my antennae up.  I'm

16   showing some faith in people that I've known a long time, and

17   so I'm going to defer.  But I'm going to question, I'm going

18   to poke, I'm going to prod, I'm going to think about it.  I

19   want to know that this is headed in a direction.  But my

20   thought is to have a status conference, you know, on Monday or

21   Tuesday, just to tell me what's going on.

22           And it may be that a trustee files a one-page report

23   that says I got this all under control, I don't need a

24   hearing, you know, we'll see you at the next hearing, which

25   you're telling me ought to be sort of, you know, the 24th or

1    25th -- is that what I heard you say?

2         MR. ELROD:  Your Honor, I was just saying one a week

3    out and then the following week.  So I'm not wedded to any

4    particular dates, but I understand the Court's desire and

5    agree with you.

6         THE COURT:  Okay.  So let's do this.  What I'm going

7    to do is I'm going to set a continued hearing on all matters,

8    including my own *sua sponte* motion to convert the case to a 7.

9    I just want it out there.  I want everybody to see it, it will

10   be reflected with a docket entry.  And again, I'm putting that

11   out there because that's where I'm going to drive it if we

12   don't make some progress really quick.

13        Can we say September the 1st at 11:00 o'clock

14   Central Time?

15        (Participants confer.)

16             THE COURT:  Status --

17             MR. ELROD:  11:00 Central, Your Honor?

18             THE COURT:  I'm -- yes, Central.  Yes.

19             Status conference August the 25th at 10:30 Central.

20        And then I think what I'm going to do -- are we able

21   to say -- again, subject to her being available and not having

22   a conflict, which I can't imagine she does -- but can we say

23   that the Chapter 11 Trustee, if I appoint an 11 Trustee right

24   now, that it's going to be Ms. Northrup?

25             MALE SPEAKER:  It looks like that can happen, Your

1       Honor.  And I just spoke to Ms. Northrup the last time I

2       stepped out, and she has no conflicts --

3              THE COURT:  Okay.

4              MALE SPEAKER:  -- and would take the case.

5              THE COURT:  All right.  So what I'll do is I'll

6       grant the motion to appoint an 11 Trustee effective

7       immediately.  So, as soon as you -- I know you've got to go

8       get your order done.  But if you would just let Mr. Alonzo

9       know as soon as that's been uploaded.

10             And I want an order that says that all communication

11      prohibitions come to an end; that we have -- because I want

12      this to be circulated -- that we have a status conference on

13      the 25th and a continued hearing on September the 1st.

14             And then what I'm going to do is -- did you all come

15      to terms on the Tran Singh -- I keep saying it different ways,

16      Singh Tran, Tran Singh, whichever, the two of them in the

17      back.  Did you all come to an agreement on how we deal with

18      their ability to buy fuel?

19             MALE SPEAKER:  I have not had a chance to speak with

20      them, Your Honor.  I don't know if others on our team have,

21      but --

22             THE COURT:  All right.  Ms. Heyen, did you talk to

23      those folks?

24             MS. HEYEN:  I didn't have a chance to --

25             THE COURT:  Okay.

1          MS. HEYEN:  -- explore it in detail, Your Honor, but

2     happy to talk to them right now.

3          THE COURT:  So why don't we do this?  Ms. Tran,

4     Mr. Singh, whoever is going to handle the hearing?

5          MS. TRAN:  (Indiscernible).

6          THE COURT:  Could you come up, please?  Thank you.

7          Since we've got a hearing and based upon the

8     allegations that you've made in your motion --

9          MS. TRAN:  Yes, Your Honor.

10          THE COURT:  -- would you have any objection to an

11     order that permits you to buy fuel and install the credit card

12     machine, whatever appropriate term that is, on a temporary

13     basis?  We have a continued hearing on September the 1st,

14     along with the other hearing.

15          MS. TRAN:  I think that would be fine, Your Honor.

16          THE COURT:  If you would craft an order that

17     accomplishes that and gives your folks the comfort they need,

18     run it by the U.S. Trustee and run it by the lender, and also

19     I guess it would be run it by Ms. Northrup if she -- if

20     Ms. Northrup has been appointed, no need to run it by the U.S.

21     Trustee.  If Ms. Northrup hadn't been appointed, then run it

22     by the U.S. Trustee.  Let Mr. Alonzo know as soon as that's

23     been uploaded and I will sign that.

24          MS. TRAN:  Okay.

25          THE COURT:  Okay?

1          MS. TRAN:  That works, Your Honor.

2          THE COURT:  All right.  For those other folks -- I'm

3     sorry, Mr. Gibbs.

4          MR. GIBBS:  We'd like to see a copy, also.

5          THE COURT:  Oh, of course, yes, Mr. Gibbs, as well.

6          So, with respect to --

7          MALE SPEAKER:  Your Honor?

8          THE COURT:  Hold on, let me finish.

9          With respect to the other folks who are in the same

10    place, Mr. Elrod, what I want you to do is I want you to use

11    the rest of this evening and tomorrow to see if you can come

12    up with a structure that you can live with which lets people

13    who need to buy fuel buy fuel.  And if not, I'll take

14    individual emergency motions and I'll just deal with them as

15    they get filed.

16         But the Tran Singh motion was the only one that was

17    set for hearing today, so that's the only one I'm going to

18    hear.  And I'm hoping that folks can come up with a procedure

19    where we don't have to have 250 emergency motions to buy fuel.

20         Mr. Simon, I know you've got your motion that's

21    sitting out there.  When do you want a hearing?

22         MR. SIMON:  And it --

23         THE COURT:  Do you want to talk to Mr. Elrod and

24    then call Mr. Alonzo?  Do you want me to give you a hearing

25    date now?

1           MR. SIMON:  You can give me a hearing date now, Your

2      Honor.

3           THE COURT:  Okay.

4           MR. SIMON:  And that -- then, if I can -- I'll talk

5      to Mr. Elrod.  If Ms. Northrup is appointed, I'll talk to her.

6      If we can get a result beforehand, great; if not, then --

7           THE COURT:  Okay.  When do you --

8           MR. SIMON:  -- (indiscernible).

9           THE COURT:  When do you want your hearing?

10          MR. SIMON:  We'd request it by Friday, Friday at

11     5:00 o'clock is I think what we requested --

12          THE COURT:  Okay.

13          MR. SIMON:  -- or Friday at --

14          THE COURT:  You've got it at 3:30 on Friday.

15          MR. SIMON:  Yes, Your Honor.

16          THE COURT:  So, if you'd notice it out -- and if you

17     get it resolved, you know, I would very much like to be, you

18     know, off the airplane, floating in my pool at 3:30.

19          (Laughter)

20          THE COURT:  But if I have to be here, I will be

21     here.  But I would appreciate the courtesy of just letting

22     Mr. Alonzo know where you stand.  Okay?

23          MR. SIMON:  Will do, Your Honor.  Thank you.

24          THE COURT:  Okay.

25          UNIDENTIFIED-PH:  Your Honor, may I point out for

1    the Court, I was looking at my calendar --

2              THE COURT:  Sure.

3              UNIDENTIFIED-PH:  -- and there -- the bar date order

4    in the case is the 28th of -- the bar date is the 28th of

5    August.

6              THE COURT:  Okay.

7              UNIDENTIFIED-PH:  And with everything going on, does

8    it make sense to have folks filing --

9              THE COURT:  It probably does, but I want

10   Ms. Northrup to make that decision.

11             UNIDENTIFIED-PF:  Okay.

12             THE COURT:  It seems to me that that should be her

13   decision.

14             UNIDENTIFIED-PF:  Okay.

15             THE COURT:  Okay?

16             UNIDENTIFIED-PF:  Thank you.

17             THE COURT:  Or someone else's, if she disagrees.

18   But I think she ought to get the opportunity to say, yes, I

19   agree, no, I don't --

20             UNIDENTIFIED-PF:  And --

21             THE COURT:  -- if she's going to be in charge.

22             UNIDENTIFIED-PF:  I just wanted to bring it to the

23   Court's attention.

24             THE COURT:  No.  Thank you very much.

25             Ms. Williamson, I don't think I addressed any of

1    your issues today.  I think it's probably going to come up

2    really quick.  But I don't think we did anything to you today,

3    did I -- did we?

4              MS. WILLIAMSON:  No, Your Honor.

5              I do want to point out one thing.  The point of sale

6    equipment, at least in the Valero-branded stores, those credit

7    card receipts come to Valero --

8              THE COURT:  Right.

9              MS. WILLIAMSON:  -- and we've been releasing the net

10   number to the bank account with the DIP lender.

11             It's very complex.  If we're going to be selling

12   branded fuel that the distributors are buying individually,

13   and we'll work with -- we'll be willing to work with whoever.

14   I just want to make sure everyone understands those receipts

15   come to Valero.

16             THE COURT:  Got it.

17             So what I hope that this is limited to.  And again,

18   I don't know the scope of the problem because everyone stands

19   up and says "me too" the moment I do something, is that -- you

20   know, I had a very compelling motion filed that said we

21   haven't gotten fuel in a long time, we've been out doing the

22   best we can, we need the ability to go buy fuel, we don't want

23   to violate the automatic stay, we don't want to get in any

24   more trouble than we're already in because those folks already

25   had an issue, if you remember.  That's all I've addressed

1    today.

2          And I got Mr. Elrod's comment that this is just a --

3    this is a potentially huge problem.  I don't want a

4    potentially huge problem.  I also -- if people aren't getting

5    fuel, you know, it doesn't make much sense to run a gas

6    station if you can't sell gas.  And so -- again, I don't know

7    which stations are getting fuel, I don't know what stations

8    aren't.

9          I got it, Ms. Williamson, it's going to be a huge

10   problem.  And I -- you know, we're just going to have to work

11   through it one at a time.  I -- but I'm not going to give up

12   and say it's too hard to address because, if there are people

13   out there that are trying to make a living, I'm going to give

14   it everything I can to make sure they get that opportunity.

15   If they fail, they fail because of something that, you know,

16   they couldn't do, not because of something that we couldn't

17   enable them to do.

18         Oh, Ms. Williamson -- whoops.  Did you hang up on

19   me --

20         MS. WILLIAMSON:  I --

21         THE COURT:  -- or --

22         MS. WILLIAMSON:  No, no, no.  I muted you.

23         THE COURT:  Ah.

24         MS. WILLIAMSON:  Your Honor, we -- no, Valero is on

25   the same page, we want to work with our distributors as much

1   as we -- with our dealers as much as we can to make sure they

2   can survive.

3              THE COURT:  Okay.  All right.  Mister -- thank you.

4              Mr. Ruzinsky.

5              MR. RUZINSKY:  Thank you, Your Honor.  Bruce

6   Ruzinsky for ExxonMobil.

7              We have some of the same issues and concerns as

8   Valero and Marathon does and we simply want to be a part of

9   the process (indiscernible) to get fuel to operators

10  (indiscernible) stations that sell Exxon or Mobil-branded

11  fuel.  And so we're very much interested.

12             THE COURT:  Got it.

13             And so, to the extent that all of you have issues,

14  you all know to ask for time and I will make the time.  You

15  know, it's just hard for me to forecast what I don't know.

16  But as you all see it unfold, let me know ASAP and I will --

17  we will try to work through it.

18             Mr. Howley.

19             MR. RUZINSKY:  Thank you, Your Honor.

20             THE COURT:  Yes, sir.

21             MR. HOWLEY:  Good evening, Your Honor.  Can you hear

22  me?

23             THE COURT:  Yes, sir.  Loud and clear.  Thank you

24  for checking.

25             MR. HOWLEY:  Hi.  Tom Howley of Howley Law, I

1    represent GPM Investments, LLC, who's been referenced

2    throughout this hearing.  And they're a subsidiary of ARKO, so

3    we've been referred to as "ARKO" or "GPM."

4         The management team is on the phone.  Obviously, we

5    know this business.  You know, our deal wasn't accepted, but

6    we still want to be part of the solution here, Your Honor.  In

7    all of the discussion about fuel, you know, subject to

8    logistics, we serve a lot of these brands and we think we can

9    be part of the solution.  So I wanted to state for the Record

10   that we are on standby, ready to help with fuel supply, to

11   keep these dealers alive.  And I just wanted to note that for

12   the Record.  And we're prepared to work with the trustee to

13   help.

14         THE COURT:  Thank you.

15         The only thing, Mr. Howley, that I'll take issue

16   with is don't wait for the call.  You make the call.  And once

17   Ms. Northrup gets in place, you reach out.  She answers her

18   phone.

19         MR. HOWLEY:  Now that the restrictions are lifted,

20   Your Honor, we're going to make a lot of calls.

21         THE COURT:  Terrific.  Thank you.

22         Mr. Steen?

23      (No verbal response)

24         THE COURT:  Ah, Mr. Steen, had you hit five-star on

25   your phone?  There you go.  All right.

1          MR. STEEN:  I apologize, Your Honor.

2     (Indiscernible) Steen with Thompson (indiscernible) here on

3     behalf of Mountain View and its related entities.

4          Your Honor, we have two categories of executory

5     contracts, which makes our position a little bit unique.  But

6     one of them is we conduct a majority of the compliance and

7     inspections on a monthly basis for the MEX facilities in the

8     Continental United States, which is severely problematic for

9     us.

10          Number one, we haven't been being paid regularly.

11          And second, we also have a series of fuel supply

12     agreements with the Debtor for various (indiscernible)

13     locations at airport facilities throughout the United States.

14          THE COURT:  And Mr. Steen --

15          MR. STEEN:  (Indiscernible)

16          THE COURT:  -- if you can just help me.  Just,

17     again, I -- you know, I'm trying to process so much

18     information.  Are you the affiliate or are you the successor

19     to the affiliate?

20          MR. STEEN:  Of who, Your Honor?

21          THE COURT:  Of the Debtor.  Did -- originally,

22     compliance was done by an affiliate.  And then I think the

23     papers say they were replaced.  I just don't know who you are.

24          MR. STEEN:  (Indiscernible) we have the current

25     contract.  We're not a --

1          THE COURT:  Okay.

2          MR. STEEN:  -- an affiliate of the Debtor at all.

3          THE COURT:  Okay.

4          MR. STEEN:  And so with respect to the Conrac fuel

5     supply agreement, we require almost daily deliveries of fuel,

6     and we've been having continual problems with that and have

7     been waiting to see -- to file our motion for relief, to see

8     how the case progresses and whether things have been done.  So

9     we're a little bit unique in that we're not a single store

10    operator or a multi-store operator, but we service the

11    (indiscernible) return centers and provide fuel for those

12    locations.

13         We're experiencing the same level of frustration and

14    difficulty in procuring fuel on a regular basis and it is

15    taking a toll on our client's business.  We've had some

16    discussions with Debtor's counsel about those, but would

17    request that we also be included within the relief --

18         THE COURT:  No.

19         MR. STEEN:  -- as far as --

20         THE COURT:  So the answer -- no one is included

21    other than the Tran Singh clients.

22         If I -- what I suggest you do, have the conversation

23    tomorrow with the lender and the trustee.  If you don't get a

24    satisfactory answer, you're authorized to file something on an

25    emergency basis.  But I'm not going to start -- once I open

1    that door, I can't stop it.  So, if you can't get happy

2    tomorrow, then file an emergency pleading.  Okay?

3              MR. STEEN:  Sure, Your Honor.  Thank you.

4              THE COURT:  All right.  Thank you, sir.

5              Ms. Surinak, I did not mean to ignore you.  I know

6    you've been raising your hand for a while.  Yes, ma'am.

7              MS. SURINAK:  Thank you, Your Honor.  Can you hear

8    me okay?

9              THE COURT:  Loud and clear.  Thank you.

10             MS. SURINAK:  Again, for the Record, Ashley Surinak

11   of Kirkland & Ellis for Blue Owl.

12             I just wanted to circle back following Mr. Elrod's

13   earlier representation regarding Blue Owl's support for this

14   brief period during which the trustee and the DIP lender

15   intend to work together to revisit indications of interest

16   previously received.  Blue Owl is supportive -- and we just

17   wanted to confirm that for the Court -- of the process.  And

18   with the communication restrictions lifted, we intend to

19   engage with anyone and everyone during this period to

20   facilitate the best outcome.

21             And additionally, Blue Owl intends to take steps to

22   put proper management services in place at their properties,

23   including environmental services, to get the right folks on

24   the ground to make sure that these properties are safe and

25   secure during the interim period.  And we intend to reach out

1 to Mr. Elrod and the trustee, once appointed, to discuss this

2 further and to ensure all the proper protocols are in place.

3    THE COURT:  Absolutely.

4    And that reminds me of a third point I left out of

5 that order, Mr. Elrod, is that, to the extent that properties

6 are vacant, that stay relief is granted.  Again, just tie it

7 all to September 1st, so that parties can take necessary steps

8 to secure their property and to provide for the health and

9 safety of the surrounding communities.

10    Ms. Surinak, thank you for reminding me of that.

11    MS. SURINAK:  Thank you, Your Honor.

12    THE COURT:  All right.  Thank you.

13    And Mr. Ralston.

14    MR. RALSTON:  Thank you, Your Honor.

15    One nit, but a nit that's important to my client.

16 And this is Mark Ralston on behalf of MEX 1123 Lane, one of

17 the landlords.

18    Is it possible, Your Honor, that, as part of the

19 order, there can be attached a list of the -- whether they're

20 qualified or not qualified, of the folks that showed interest

21 in buying the Debtor's assets, with a contact person, so that

22 folks like my client, who aren't sophisticated in the

23 business, will know who to reach out to?

24    THE COURT:  Yeah.  Mr. Ralston, the short answer is

25 no.  I don't understand the impact of that, I don't know what

1    I'm being asked to do, so -- and there certainly hasn't been

2    any notice for that request, so the answer is no.

3          If you, talking to -- again, I've known this trustee

4    for 30 years.  If you have any issues in transparency or

5    getting information, then file an emergency pleading and I'll

6    take it up.  Okay?

7          MR. RALSTON:  Thank you, Your Honor.

8          THE COURT:  All right.  Thank you.

9          All right.  Anyone else before I go back to

10    Mr. Pomerantz?

11      (No verbal response)

12          THE COURT:  All right.  Mr. Pomerantz, it is my view

13    -- and again, I know that you have worked extremely hard, that

14    you've been very diligent, and most likely you are working

15    without compensation, unless something miraculous occurs.  It

16    is my view, unless you feel differently, that I would simply

17    note your withdrawal as counsel today with the appointment of

18    the Chapter 11 Trustee.

19          Feel free to submit an order that you find to be

20    acceptable.  Obviously, file your final fee app and, you know,

21    do whatever it is you need to do.  But I don't think that you

22    should continue to incur the expense of having to participate,

23    not knowing who you take direction for, and obviously not

24    knowing that you're going to be compensated.

25          Again, I appreciate everything that you've done.  It

1      just didn't work and they don't always work.  And I -- again,

2      I -- as you said it before, take your clients how you find

3      them.  But if you'll get that to me, I'll take care of that.

4               Mr. Healy, with respect to you, I want you to meet

5      with the Chapter 11 Trustee and she can -- if she says that,

6      you know, I can't pay you or I don't need you, then, if you --

7      I will sign the same withdrawal order and you go through the

8      same process.  If she says no, I need you for two weeks or a

9      week and that fits within the budget, then that decision is

10     yours.  I want to make that very clear.  No one can compel you

11     to work, but I want you to have the conversation with her.

12               Fair enough?

13               MR. HEALY:  Absolutely.  Thank you, Your Honor.

14               THE COURT:  All right.  Thank you.  And if

15     someone --

16               MR. POMERANTZ:  Your Honor?

17               THE COURT:  I'm sorry.

18               MR. POMERANTZ:  Your Honor, we have two independent

19     directors on the board.  They have been, as you can imagine,

20     working (indiscernible) hard over the last few months

21     (indiscernible) the company, I think they would prefer to

22     resign (indiscernible) --

23               THE COURT:  Do that --

24               MR. POMERANTZ:  -- not have to incur

25     (indiscernible).

1      THE COURT:  I totally agree.  And if you would do
2 that by order so it's very clear, make sure they sign off on
3 them, but if I could ask you to prepare those for them.
4      And obviously, if you would also convey that to
5 Raymond James, I think they're -- the need for their services
6 has come to an end, and I don't want them -- I don't want them
7 thinking that they've got obligations.  So if you'd go ahead
8 and have them prepare an order that they find acceptable, I'll
9 sign that as soon as I see them all.
10      All right?
11      MR. POMERANTZ:  We will do that, Your Honor.  I
12 would harken back.  We had a quarterly (indiscernible) Your
13 Honor and a certificate of no objection.  We would ask that
14 (indiscernible) money set aside --
15      THE COURT:  Yeah.
16      MR. POMERANTZ:  (Indiscernible), Your Honor.
17      THE COURT:  Mr. Pomerantz, I signed it this morning.
18 I just haven't had the staff here because I've been on the
19 bench all day.  But I signed it this morning.
20      MR. POMERANTZ:  Thank you, Your Honor.
21      THE COURT:  Yes, sir.
22      All right.  Anything else that we need to talk
23 about?
24      (No verbal response)
25      THE COURT:  All right.  U.S. Trustee, get me that

1    order.  Let me ask.  Can you get that order done with my

2    orally requiring the appointment of an 11 Trustee, or do you

3    need an order from me directing you to appoint an 11 Trustee?

4              UNIDENTIFIED-TRUSTEE:  Unfortunately, I think the

5    U.S. Trustee is going to want to see a written order.

6              THE COURT:  Then I'm going to sit right here and do

7    it and it will be on the docket by the time you get back

8    downstairs to your office.

9              UNIDENTIFIED-TRUSTEE:  All right.  Thank you, Judge.

10             THE COURT:  All right.  Thank you.

11             All right.  With that, everyone -- and I want to say

12   this.  This is a fluid situation, it's ugly.  I'm not

13   comfortable, I'm not happy, but it's where we are.

14             If anything changes, anyone needs anything, you

15   don't hesitate, you reach out, you ask for court time, and

16   we'll deal with the problems on a one-off basis as they pop

17   up.  All right?

18             All right.  Thank you, everyone.  You're all

19   excused.  I'm going to do the U.S. Trustee's order, so I'm not

20   going to move.  Thank you.

21             COUNSEL:  Thank you, Your Honor.  Thank you, Your

22   Honor.

23             (Proceedings concluded at 5:56 p.m.)

24

25                          *  *  *  *  *

1        *I certify that the foregoing is a correct transcript*

2    *to the best of my ability due to the condition of the*

3    *electronic sound recording of the ZOOM/video/telephonic*

4    *proceedings in the above-entitled matter.*

5    *    /S./   MARY D. HENRY*

6    *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

7    *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

8    *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

9    *JTT TRANSCRIPT #67622*

10    *DATE FILED:  SEPTEMBER 4, 2023*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25