

**FUEL SUPPLY AGREEMENT**

**THIS FUEL SUPPLY AGREEMENT** ("Agreement") is made this 15th day of February 2023 ("Effective Date") by and between between **MEX FUELS SW-LA LLC**, a Wyoming limited liability company, having a mailing address of 3650 Mansell Road, Suite 250, Alpharetta, Georgia 30022 ("Supplier"), **GSS HOLDINGS LA LLC**, a Louisiana limited liability company, and **SUKHRANJAN MULTANI**, an individual resident of the State of Louisiana, both having a mailing address of 11398 Wellington Lane, Hammond, Louisiana 70403 (collectively, "Dealer") (Supplier and Dealer are sometimes referred to collectively herein as the "Parties".)

**WHEREAS**, this Agreement is for the fueling stations known as listed on **Schedule 1** herein attached and incorporated (collectively, "Locations," each a "Location"); and

**WHEREAS**, Supplier and Dealer wish to enter into this Agreement for Supplier to supply motor fuels to Dealer at such Locations.

**NOW THEREFORE**, in consideration of the mutual undertakings herein contained, the sufficiency of which are hereby acknowledged, Supplier agrees to sell, and Dealer agrees to buy petroleum and other products on the following terms and conditions:

**1. TERM.** The Term of this Agreement shall begin on the Commencment Date provided in that certain Commercial Lease between Dealer and Supplier's affiliated entity of even date herewith ("Lease") and continue until April 1, 2033 ("Term"), and shall automaticaly renew from month to month after the said Term unless either party gives written notice of non-renewal to the other party at least thirty (30) days prior to the expiration of the initial Term or the then existing extended term, or unless sooner terminated as otherwise hereinafter provided.  Any option to extend shall be provided for on **Schedule 2**. Upon exercise and approval of such option to extend this Agreement, the term of the Lease in place at the Location shall also be extended concurrently herewith.  This Agreement is expressly contingent upon the termination of any existing fuel supply agreements in place at the Location.

**2. SUPPLY OF PRODUCTS.**

(a) Supplier agrees to sell to Dealer, and Dealer agrees to buy and diligently to promote the sale of all grades and such quantities of Supplier's petroleum and other products as may be necessary to meet the Dealer demand for motor fuel products at the Location, and  Dealer must offer all grades of fuel available from Supplier for sale at all times. Supplier shall have the right to provide ethanol additives, when available, in the gasoline, at the discretion of Supplier. Any incentives or rebates provided by Supplier's supplier relating to the sale of ethanol shall remain the property of  Supplier. All fuel deliveries shall be made in full truckload quantities or in such other minimum quantities per delivery as specified by Supplier from time to time. If Dealer requests delivery of less than Supplier's established minimum volumes, compensatory delivery charges may be imposed. In no circumstances is Supplier obligated to make deliveries into a tank which is, or is suspected of leaking. Under this Agreement, Supplier is obligated to supply products to only the Location specified herein.

(b) Dealer covenants and agrees to purchase from Supplier and offer for sale, at the Location, only such gasoline, diesel fuel, other petroleum products or any additional motor vehicle fuel and/or energy-related products as are supplied and delivered by Supplier, including but not limited to those set forth on **Schedule 3** for the full duration of the stated term of this Agreement; and to purchase each month, not less than eighty-five percent (85%) of the average fuel volume in gallons for October 2023, November 2023 and December 2023 per Location beginning January 2024. In the event Dealer has a shortfall by failing to purchase such minimum gallons per month, Dealer shall pay over to Supplier within seven days of notice by Supplier to Dealer of such shortfall, charges in an amount equal to Four Cents ($0.04) times the difference between the number of actual gallons purchased and the minimum purchase requirement for such month.

(c) It is the intention of the parties that the supply and purchase obligations contained herein shall remain in full force and effect throughout the term of this Agreement and shall not be suspended during any period of remodeling, renovation, repair, or rebuilding of the improvements located at the Location. Provided further, in the event Dealer's completion of the construction, remodeling and rebranding of the Location is not completed prior to the commencement of the term of this Agreement, due to conditions beyond the control of Dealer, Dealer's obligation to purchase petroleum products hereunder shall commence upon the completion of such construction remodeling and rebranding.

(d) Supplier has the sole and exclusive right to designate the hauler for delivery of products to the Location and hereby reserves the right to change the designated hauler from time to time.  Dealer acknowledges and agrees further to comply with hauler's protocol for ordering of products and to allow a minimum of forty-eight (48) hour notice to receive delivery thereof.  Dealer acknowledges that haulers' business is dependent on many external factors and that there may be delays in deliveries without any consequences to Supplier.  Dealer shall grant full access to hauler's vehicles to make deliveries at any hour of the day. Communications between hauler and Dealer are the sole and exclusive responsibility of the Dealer.  Any mistakes in ordering due to miscommunications between the hauler and Dealer are to be resolved between the

DocuSign Envelope ID: B37AE740-3610-495D-9E94-DF721330B3EB

hauler and Dealer. Any product outage(s) due to Dealer's failure to: (1) timely order sufficient volumes of product; (2) comply with hauler's protocol for ordering of products; or (3) grant full access to hauler's vehicles to make deliveries, or (4) provide forty-eight (48) hour notice to hauler for delivery of product shall constitute an event of default. Dealer acknowledges and agrees that Supplier shall not be liable for any misconduct of any designated hauler.

**3. OPERATION OF STATION.** Dealer recognizes that the brand utilized by Supplier is associated with high quality service and products and agrees to conduct business at the Location in a manner to maintain that association. Accordingly, Dealer agrees to furnish such service and accommodations to retail motor fuel Dealers as are customarily provided by convenience store/filling stations.

Dealer agrees to keep the business operated at the Location open for business during no less than the hours hereinafter set forth. Such business shall be open 365 days per year, (366 days during any leap year) opening no later than 6:00am EST and closing no earlier than 10:00pm EST daily.

Dealer agrees to provide, at its sole cost and expense:

(a) broadband service to the Location in a manner acceptable to Supplier; and

(b) promptly upon execution of this Agreement, a real property survey of the Location in a form that is acceptable for the purposes of filing any any all approvals, licenses and permits reasonably required to operate the Location for its intended purpose under this Agreement. In the event that Dealer does not provide a survey, Supplier may charge Dealer for the cost of a new survey.

**4. EXCLUSION OF OTHER SUPPLIERS.** Dealer covenants and agrees to offer for sale, at the Location, only the motor fuels as are provided to the Location supplied by Supplier under this Agreement. Dealer shall not sell any other supplier's motor fuels without the express written permission of Supplier. Dealer affirmatively represents unto Supplier that Dealer is not bound by the terms of any other motor fuels supply agreement relative to the Location and that Supplier has not induced, directed nor assisted Dealer in breaching the terms of any agreement with another motor fuel supplier.

**5. PRICE OF PRODUCTS TO DEALER.** Prices for all products purchased by Dealer from Supplier shall be Supplier's rack price from its supplier at its supplier's terminal, plus call and demand freight rates, plus Two Cents ($0.02) per gallon, plus any applicable Superfund tax per gallon, plus the UST fee per gallon, plus any other applicable taxes, charges, duties and fees levied on any of the products of Supplier, or required to be collected by Supplier upon the sale, transportation or delivery of the products

**6. TERMS OF PAYMENT.** Motor fuel sales shall be net payment, COD, at time of delivery. Provided further, Supplier may, in its sole discretion, provide load to load, or 7 day credit or other deferred credit terms for payment. Supplier shall notify Dealer of the payment terms prior to, or at the time of any delivery of motor

fuels. Supplier may, after providing credit terms, require Dealer, upon notice, to revert to making payments COD, for all fuel deliveries at any time during the term of this Agreement.  Any notice to Dealer may be by facsimile or electronic transmission, verbal notice (inperson or by telephone), by e-mail, or any other commercially reasonable manner. Payment shall be made by draft or direct deposit into Supplier's bank account or by electronic fund transfer, at Supplier's election. For the purposes hereof, Dealer shall furnish Supplier with the name of the bank and the account number from which payments shall be directly drafted by electronic fund transfer and shall execute such documents and authorizations that may be necessary to provide for such transfer if such method of payment is chosen by Supplier.  In the event any draft or electronic fund transfer is returned or dishonored by reason of insufficient funds or otherwise, Dealer shall be in default hereunder and in order to cure such default, as may otherwise be provided for in this Agreement, Dealer shall additionally pay unto Supplier an administrative charge of $400.00 for each such dishonored instrument or transfer.  In the event of a bounced ACH draft, Dealer shall either (a) provide documented proof of funds in the ACH draft account on file in order to clear a redraft; or (b) wire the funds directly to Supplier. Provided further, in the event of the return or dishonor of any draft or electronic fund transfer, or in the event Supplier has reasonable grounds upon which to believe that Dealer will not pay for fuel previously delivered to the Location in accordance herewith, then in either event, Supplier shall have the right to cause the removal (pump-out) of the in-ground fuel previously delivered to and stored upon the Location and to credit Dealer's account for such fuel in an amount equal to the price of products that Dealer owes for the delivery of such fuel removed, less the cost of the pump-out.  Provided further, upon any such return or dishonor of any draft or electronic fund transfer and prior to causing the removal of in- ground fuel as heretofore provided, Supplier shall have the right to enter upon the Location and cause an electronic or manual cut-offor disabling of the fuel dispensing equipment so that no in-ground fuel can be pumped until the pump-out is completed or until the fund transfer is honored, whichever occurs first.

**7. CREDIT CARD NETWORK AND SALES.** Dealer shall use and be responsible for all costs associated with such use including but not limited to connection, processing, and equipment fees during the term of this Agreement, only the credit card network provided by and/or associated with Supplier's supplier or such other credit card network as directed by Supplier which shall be maintained and upgraded by Dealer at its cost.

(a) No secondary or supplemental or other credit card network or credit card machines shall be used for the processing of any sales, whether for fuel, inventory, merchandise or otherwise. In the event that Dealer uses a separate EBT machine, Dealer shall be required to use a network or machine supplied by a state agency approved vendor.  In the event of the unauthorized use of a credit card network or machine for processing sales at the Location, by Dealer or any of its Dealers or employees or contractors, Dealer shall be in default in its obligations under this Agreement.  In the event of any such default, the cure for the unauthorized activity (in addition the discontinuance of such unauthorized activity), Dealer shall pay unto Supplier a five hundred dollar ($500) cure fee for the first such default; and a one thousand dollar ($1,000) cure fee for any subsequent default during the Term hereof.  In the event of default by Dealer under any other terms of this Agreement, Supplier

Store #  3066A-3099A LA (32) Brothers   WHOLESALE

4

shall also be entitled to immediately disable said credit card network at the Location.

(b) Invoices from credit card sales shall be credited and paid to Supplier in regard to approved credit card purchases from Dealer. Supplier shall credit Dealer's account for products purchased hereunder, for the amount of credit card sales credited and paid to Supplier in accordance with fuel jobber (wholesaler) industry standards; provided, however that credit cards sales shall not be immediately repaid to Dealer but held on Dealer's account as additional credit against fuel purchases.  Upon any failure by Dealer to strictly comply with the terms and conditions of credit card transactions at the Location, Supplier shall have the right to charge-back to the Dealer all sums not credited to or paid to Supplier as a result of defective or noncomplying credit card sales at the Location. Any "charge-backs" shall be immediately paid by Dealer to Supplier.  Dealer shall be responsible for all point-of-sale programming, updates and installation and maintenance costs for EMV requirements from governmental agencies or oil companies.

**8.    USE OF TECHNOLOGY FOR PRICING SURVEY, INVENTORY MEASUREMENT, AND REPORTING OF SALES.** Dealer shall use such electronic software reporting systems for conducting market surveys, electronic measurement, tracking, and reporting of fuel and merchandise inventory levels, and recording and reporting of fuel and merchandise sales and all other sales conducted at the Locations as directed by Supplier; current systems may include, but are not limited to, Black Box, Opis, JBOX, Wireless Guardian, and Price Advantage technology ("Reporting Systems").  Dealer shall be responsible for all applicable monthly charges and fees for the use of such Reporting Systems, with such monthly charges and expenses to be paid via electronic fund transfers (EFT / ACH) from Dealer's account, and Dealer agrees, further, to defend, indemnify and hold the Supplier, its subsidiaries, divisions, affiliates, Dealers and employees harmless from any and all claims, injuries, damages, losses or suits including attorney fees, arising out of or in connection with the use of such Reporting Systems.

**9. DEALER'S BUSINESS.** It is mutually agreed that the business conducted by Dealer at the Location is the independent business of Dealer, and this Agreement shall not be construed as reserving to or conferring upon Supplier any right to direct or control Dealer or any of Dealer's employees in the conduct of Dealer's business. Dealer acknowledges that Supplier has made no representation of profitability in regard to any business to be operated by Dealer at the Location and Dealer has not relied upon any business information provided by Supplier in regard thereto; and Dealer enters into this Agreement based upon the exercise of Dealer's own business judgment after having full opportunity to exercise due diligence on Dealer's own behalf.  Dealer acknowledges its sole resposibility for: (1) pricing of all the products, including motor vehicle fuels, sold at the Location; and (2) the operation of its business in accordance with all applicable laws, regulations and standards. Dealer agrees, further, to defend, indemnify and hold the Supplier, its subsidiaries, divisions, affiliates, Dealers and employees harmless from any and all claims, injuries, damages, losses or suits including attorney fees, arising out of or in connection with the Dealer's business.

Store #  3066A-3099A LA (32) Brothers   WHOLESALE

Dealer affirmatively represents and warrants unto Supplier that Dealer is not under contract with another fuel supplier and is authorized to enter into this Agreement with Supplier, and that Supplier has not induced Dealer to breach, nor has Supplier interfered with, any other existing contract between Dealer and any other product supplier. In the event Dealer is a corporation or limited liability company, Dealer represents that it is a corporation or limited liability company in good standing duly authorized to do business in the State where the location is situated, and that the undersigned party executing this Agreement on behalf of Dealer has full and complete authority to bind the corporation or limited liability company hereto. Further, it is expressly agreed that the corporate officer or limited liability company manager and/or member executing this Agreement on behalf of a corporation or limited liability company shall be, in his or her individual capacity, jointly and severally liable and responsible, with such corporation or limited liability company, for the satisfaction of all obligations of Dealer under the terms of this Agreement.

**10. UNDERGROUND STORAGE TANKS AND MAINTENANCE**.   Dealer is in exclusive possession and control of the underground storage tanks, lines, and associated underground equipment at the Location, and shall be responsible for all maintenance and repairs and all environmental issues or matters arising out of the use, maintenance or repair of such tanks, lines, pumps, dispensers and fuel equipment (including EMV upgrades), except as to any maintenance, repair or environmental costs or damage directly caused or arising from any intentional or negligent act or omission of Supplier, or except as to any repairs that are expressly made the responsibility of Supplier as Landlord under the terms of a lease of the Location to Dealer as Tenant. Dealer shall, throughout the term hereof, provide daily tank stick readings to Supplier's transport company (hauler) in such manner as directed by Supplier. In addition, Dealer shall provide daily stick readings to Supplier with water detecting putty and take accurate and prompt measures at Dealer's cost to cure and remove any water or other contaminants from the tanks, lines and fuel equipment.   Dealer warrants that throughout the entire Term of this Agreement, Dealer's location shall be in full and complete compliance with all local, State and Federal environmental regulations and statutes pertaining to the storage, handling, and dispersing of petroleum products and motor fuels. Further,  Dealer shall comply with all directions, instructions, or recommendations made by any environmental consultant retained by Supplier for the purposes of managing environmental and inventory control at the Location.   Upon the breach of this warranty, and in addition to any other remedies Supplier may have by law, Supplier shall have the right to immediately cease delivery of products to Dealer and terminate this Agreement. Without limiting the foregoing, Dealer shall, at its expense, cause the cleaning of the underground motor fuel storage tanks prior to Supplier's installation of any new, refurbished, or upgraded motor fuel pumping equipment or before the first delivery of motor fuels to the Location by Supplier, whichever occurs first; and shall cause the cleaning of the underground storage tanks periodically during the Term of this Agreement, as may be reasonably required by Supplier.   Dealer shall pay one-half the cost of any software, hardware and service costs including annual and monthly maintenance fees associated with automated tank, pump, sign and/or register readings. Dealer specifically acknowledges that Supplier has no obligation with regard to underground tanks or submersible pumps or any other fueling equipment located in the tanks.

Store #  3066A-3099A LA (32) Brothers   WHOLESALE

In the event it is determined, during the term of this Agreement, that the Location is environmentally contaminated as a result of a leak, spill, or other discharge of hazardous substances which constitutes a violation of local, state or federal law, rule, regulation or ordinance, Supplier shall have the right to suspend delivery of products to the Location until such contamination is remediated as required by law during which time Dealer shall remain liable unto Supplier for any shortfall payments due hereunder by virtue of Dealer's failure or inability to purchase the minimum number of gallons of petroleum products required under the terms of this Agreement, notwithstanding such suspension. In the alternative, in the event of such contamination, Supplier shall have the right to terminate this Agreement in which case Dealer shall reimburse Supplier for all branding investment costs incurred by Supplier for branding of the Location and shall reimburse Supplier for all purchase incentive rebates received by Dealer under the terms of this Agreement.

**11. INSTALLATION OF PETROLEUM PRODUCT DISPENSING AND OTHER EQUIPMENT**. Supplier shall cause, at its expense, the installation of petroleum product dispensing equipment and or accessories and/or fixtures at the Location as may be set forth on **Schedule 4** attached hereto and made part hereof. Dealer acknowledges that Supplier shall have the right to engage any qualified vendor for the purpose of acquisition and installation of the same or similar equipment described therein. The total cost to Supplier for the acquisition and installation of such equipment, accessories and fixtures shall be considered part of Supplier's branding investment under the terms of this Agreement.  At all times relevant hereto, the supplier shall be the sole and exclusive owner of such equipment listed on Schedule 4, with the full right and authorization of dealer to remove same upon a default under Section 19 hereof which remains uncured for more than thirty (30) days of written notice of default hereunder.  Dealer hereby grants to Supplier a power of attorney coupled with an interest, for the purpose of removing the said equipment from the location upon an uncured default and Supplier shall have no liability whatsoever for removal of the equipment after notice and cure period.

**12.  REPAIR OR EQUIPMENT OBLIGATIONS OF DEALER**. Dealer shall cause the repairs and/or maintenance upgrades at the Location, and install such equipment as may be specified in **Schedule 5** attached hereto and made part hereof at the commencement of this Agreement. Dealer shall commence such work promptly and pursue the same diligently through completion as set for in said schedule and as a prerequisite to Supplier's performance and obligations under Section 2 of this Agreement.

**13. LEASED EQUIPMENT**.   Dealer acknowledges that any equipment, accessories or fixtures provided by Supplier under the terms of this Agreement may have been leased to Supplier by one or more leasing companies. In the event of a transfer or assignment of this Agreement, Supplier will continue to make any such equipment lease payments through the full term of any such lease(s).  Notwithstanding the foregoing in this Section 13, for purposes of this Agreement Supplier shall be deemed to be the owner of any such equipment, accessories or fixtures, and shall have the right to enter upon and in the premises and remove same in the event of a default by Dealer under Section 19 herein.  For purposes of the preceding sentence, Dealer hereby grants

Store #  3066A-3099A LA (32) Brothers   WHOLESALE

Supplier a power of attorney coupled with an interest to take all actions necessary and desired in the name of Dealer to remove the said personal property from the premises including obtaining permits and granting rights to others reasonably required to carry out the removal.

**14. BRANDING, TRADEMARKS, AND QUALITY ASSURANCE.**

(a) *MOTOR FUEL BRAND &TRADEMARKS*. Supplier shall have the right to designate the branding of the motor fuels to be purchased by Dealer hereunder. The initial branding, if any, shall be as designated on **Schedule 6** attached hereto and made part hereof. Supplier shall incur such costs as may be reasonably necessary for changing and or installation of the branding image of the Location (said sum hereinafter being referred to as Supplier's Branding Investment), in order to obtain the approval of Supplier's chosen branded fuel supplier. Dealer shall be responsible for payment of any and all further sums necessary for signage or other branding image items in order to maintain such approval during the term of this Agreement. In the event Supplier changes branding during the Term of this Agreement, all costs of maintaining the subsequent banding image(s), after Supplier's initial costs in rebranding the Location, shall be borne by Dealer. All signage shall be contingent upon and subject to the requirements of any applicable state or local law or ordinance.

(a) *QUALITY ASSURANCE AND MARKETING*. Dealer acknowledges that Supplier's supplier maintains a program for product quality and marketing assurances. Specifically, Dealer shall:

(i) Comply with all quality and marketing programs, which shall include but not be limited to, oil company uniforms, employee name tags, clean and available restrooms, proper maintenance of landscaping, buildings (interior and exterior), canopy and equipment, proper presentation and display of retail merchandise, maintenance and location of signs and other branding image items and other such matters pertaining to the brand image of the Location, and shall cooperate at all reasonable times and in all reasonable manners with all quality assurance programs and inspections;

(ii) Refrain from the sale, use, storage, rent, display, or offering at the Location of:

(a) pornographic or sexually explicit magazines, video tapes, compact discs, digital video discs, similar literature or items of merchandise;

(b) any item, in Supplier's judgment, that is intended or designed for use in ingesting, inhaling or otherwise consuming an illegal drug or from manufacturing or processing an illegal drug, including but not limited to pipes, tubes, roach clips, instructions or descriptive materials, or containers designed for concealing illegal drugs or paraphernalia, or bath salts or synthetic drugs designed to mimic the effects of illegal drugs; and

(c) any substance or item prohibited to be offered for sale by the branding and/or quality assurance standards of the motor fuel supplier providing motor fuel for sale or resale at the Location; and

8

Store #  3066A-3099A LA (32) Brothers   WHOLESALE

(iii) Dealer shall properly display all point of purchase marketing materials and credit card applications, and, at its sole cost and expense participate in any marketing or loyalty programs established by the brand of motor fuels sold at the Location, install all marketing materials, such as point of purchase (POP) signage, credit card applications and related materials and attend any training or informational programs offered.

It is acknowledged between the parties that Supplier and/or Supplier's supplier may conduct periodic "mystery shopper" or other inspections of the Location and the operation of the business thereon in order to determine whether Dealer is meeting the image, retail and Dealer service standards required under the terms of this Agreement. In the event Dealer scores below 80% of a perfect score, or otherwise fails inspection as determined by Supplier or Supplier's supplier making the inspection and in accordance with the quality assurance standards, Dealer shall pay unto Supplier an inspection fee of $500.00 or such amount charged by Supplier's supplier as an inspection fee, whichever is greater, due and payable within three days of Dealer receiving notice of such failure and a copy of the inspection report. The foregoing inspection fee shall apply to each and any failure of such inspections; provided further, Supplier shall have the right, in its discretion, to waive the requirement for payment of an inspection fee based upon its determination of Dealer's exercise of good faith in promptly correcting all quality assurance deficiencies. Dealer shall also be subject to certain fines as provided for on the attached Fine Schedule as provided for on **Schedule 7** herein attached and incorporated for violations which may not result in a failing score.  In the event Dealer fails a mystery shopper inspection or other inspection at the Location, Supplier reserves the right to implement a monthly maintenance program at the Location and choose a vendor to cure at its sole and absolute discretion.  The cost of said maintenance program shall be the responsibility of the Dealer, which shall be no more than the customary cost of said services in the local area of the Location.

In the event Dealer's branded retail facility does not meet such standards or requirements and which results in Supplier's receiving notice to debrand Dealer, or if such retail facility is abandoned, Dealer shall allow Supplier or Supplier's representatives or Dealers to immediately remove all brand identification from the Location, and Dealer shall be liable to Supplier for all expenses and damages incurred as a result thereof. For the purposes of this Agreement, the Location shall be deemed abandoned if it is not open for business during normal business hours for three consecutive days. Dealer expressly agrees that all of Supplier's (or Supplier's suppliers') trademarks, names and colors appearing at the Location shall be kept clear and legible, and that Dealer will use only signs approved by Supplier to advertise products purchased by Dealer from Supplier. Supplier shall be entitled to withdraw or substitute at Supplier's cost the use of any particular trademark, name, or colors.

Provided further, in the event Supplier determines, in its sole discretion, that Dealer is not in compliance with any marketing or quality assurance retailing standard in regards to the physical condition of the Location and the operation of the business thereon, Supplier shall have the right (but not the obligation) to enter upon the Location and to correct any deficiency or substandard condition and bill Dealer for the cost thereof. Dealer

9

shall reimburse Supplier for any and all of such costs within seven days of receipt of such bill. Such reimbursement payment(s) shall be made by electronic fund transfer in the same manner as payment for products purchased from Supplier. Further, without limiting the foregoing, Dealer shall comply with the image and identification standards established, from time to time, for "branded outlets" by Supplier's branded supplier.

**15. RESERVED.**

**16.   SECURITY DEPOSIT**. Dealer shall pay unto Supplier a security deposit upon the execution of this Agreement in an amount and in the manner as specified on **Schedule 8** hereto attached an made part hereof. During the Term of this Agreement, Supplier shall have the right to apply all or part of said deposit to any sums owed by Dealer to Supplier under the terms hereof. In such event, Supplier shall notify Dealer of such application and Dealer shall pay over to Supplier such amounts as may be necessary to restore the full amount of the security deposit. Supplier's application of all or any portion of the security deposit shall not relieve Dealer from its obligations to make any payments due to Supplier nor prejudice Supplier's rights to exercise any remedy provided for herein, or at law, in consequence of Dealer's default under the terms of this Agreement. Further, Dealer hereby grants Supplier a security interest in all of Dealer's business equipment, supplies, inventory and fixtures at the Location, in which Supplier shall have all the rights of a secured party under the terms of the Uniform Commercial Code, and which interest may be evidenced and/or perfected by the filing of a UCC-1 Financing and Fixture Filing Statement(s).

**17. ASSIGNMENT-SUBLETTING-SALE**.  Dealer shall not, without the prior written consent of Supplier endorsed hereon, assign this Agreement or any interest hereunder, or any part hereof, or permit the operation of the Location by any party other than Dealer. Supplier's consent shall not be unreasonably withheld, however, in making such a determination, Supplier may rely upon the financial and creditworthiness and criminal background, if any, of any proposed assignee in making a determination as to whether or not the withholding of such consent is reasonable. Dealer must provide Supplier with thirty (30) days prior written notice of a proposed consent together with all information for the proposed assignee.  If approved, Dealer shall remit funds in the amount of $2,000.00 for legal and administrative fees. Consent to the assignment shall not destroy this provision, and all later assignments shall be made likewise only on the prior written consent of Supplier.  An assignee of Dealer, at option of Supplier, shall become directly liable to Supplier for all obligations of Dealer hereunder, but no assignment by Dealer shall relieve Dealer of any liability hereunder, and Dealer shall remain jointly and severally liable with assignee for the satisfaction and performance of all Dealer's obligations under the terms of this Agreement. Dealer shall have the right, without prior written consent of Supplier, to form a corporation or limited liability company organized under the laws of the state of the Location,  and wholly owned by Dealer, and may assign or tranfer this Agreement to such company with notice provided to Supplier, however, any such assignment or transfer shall not relieve Dealer of joint and several liability for all of Dealer's obligations hereunder, the performance of which shall be personally guaranteed by Dealer.  This Agreement is

Store #  3066A-3099A LA (32) Brothers   WHOLESALE

freely assignable by Supplier and in the event Supplier elects to sell, assign or convey rights, titles and interest in this Agreement, Dealer shall provide a fuel estoppel agreement, in acceptable form to Supplier, confirming the terms of this Agreement at Supplier's request and without delay.

**18. RESERVED.**

**19. DEFAULT, TERMINATION AND LIQUIDATED DAMAGES.**    All terms, conditions, covenants, warranties, and agreements contained in this Agreement are essential and material to the continued relationship between the parties.  It is mutually agreed that in the event Dealer (i) becomes insolvent, (ii) is generally unable to pay, or fails to pay, its debts as they become due, (iii) files, or has filed against it, a petition for voluntary or involuntary bankruptcy or pursuant to any other insolvency law, (iv) makes or seeks to make a general assignment for the benefit of its creditors, or (v) applies for, or consents to, the appointment of a trustee, receiver, or custodian for a substantial part of its property or business; or (vi) if Dealer violates or is in default of any other agreements between Supplier and Dealer, Dealer shall be considered in default of the Agreement. In addition to the aforementioned, the following shall constitute events of breach or default:

(a) failure to remit to Supplier any monies owed by Dealer to Supplier in accordance with the provisions of this Agreement;

(b) violation of any federal, state, county or any municipal law, ordinance, rule, or regulation relating to Dealer's operation of the business conducted pursuant to or in connection with this Agreement;

(c) false or misleading statements made by Dealer to Supplier, including financial statements made or provided by Dealer in order to enter into this Agreement;

(d)  failure of a mystery shopper inspection or other inspection at the Location and denying Supplier's implementation of a monthly maintenance program at the Location by a vendor to be selected by Supplier in its sole and absolute discretion;

(e) the institution of any insolvency, bankruptcy, or a receivership proceeding in or against Dealer; (e) failure of Dealer to pay taxes or license fees as required by the terms of this Agreement or by any law or regulation or arising out of Dealer's employment of any person;

(f) abandonment or cessation of operation of the business of Dealer;

(g) severe physical or mental disability of Dealer;

(h) Willful adulteration, mislabeling or misbranding of motor fuel or other violation by Dealer of trademark requirements for products sold by Dealer as set forth under this Agreement;

(i) violation of any term or condition of the lease, any cash advance agreement or any other agreements between the parties related to the Location; or

Store #  3066A-3099A LA (32) Brothers   WHOLESALE

(j) any act or omission allowing for termination, non-renewal or debranding of the Location or as provided under the Petroleum Marketing Practices Act 15 U.S.C. Sec. 2801 et seq.

Subject to all rights under the Petroleum Marketing Practices Act, Supplier shall provide Dealer written notice of the occurrence of any event or breach which is cause for termination of this Agreement hereunder. Dealer shall have 15 days from the date of such notice in which to cure such breach or correct any condition or otherwise comply with the terms of this Agreement and in lieu of which this Agreement shall automatically be terminated at the expiration of such 15 day period.  In the event Dealer receives written notice from Supplier of any events of default hereunder, Dealer specifically acknowledges and agrees that Supplier, through its Dealers, shall have the right to inspect Dealer's facility at the Location for purposes of determining compliance with this Agreement.  In the event such event is not cured within 15 days of notice thereof, Supplier shall be entitled to make any corrections and/or repairs necessary at the Dealer's expense.   Notwithstanding the foregoing, in the event Dealer fails to remit Supplier any monies owed to Supplier under the terms hereunder, Supplier shall have the right to immediately suspend motor fuel delivery until and unless such breach is cured. In the event such a breach is not cured within five 5 days from the date of written notice to Dealer, then in such event Supplier shall have the right to then immediately terminate this Agreement.

The parties hereto agree and stipulate that in the event of default by Dealer and early termination of this Agreement, Supplier's actual damages cannot be calculated with any degree of certainty as Supplier is relying upon Dealer's continuing purchase of petroleum products throughout the term of this Agreement. Accordingly, Dealer and Supplier specifically acknowledge and agree that such damages upon Dealer's breach would be virtually impossible to determine, and that the formula provided in this paragraph provides a reasonable pre-estimate of Supplier's probable loss that will be suffered by Supplier.  Therefore, the parties agree that, in addition to any other amounts owed to Supplier hereunder, Dealer shall pay to Supplier as liquidated damages and not as a penalty a sum equal to FIVE CENTS ($0.05) times the minimum number of gallons required to be purchased monthly as contained herein times the number of months remaining in the Term of this Agreement from the date of default.  The parties further agree that the above formula is reasonable because the amount of such liquidated damages are decreased by each month that Dealer performs its obligations under this Agreement.  Moreover, the parties stipulate and agree that their intent in using the above damages formula is to provide a readily calculable pre-estimate of Supplier's probable loss upon breach and that it not be construed as a penalty of any kind or sort.

It is further agreed that in the event of default by Dealer under any of the terms of this Agreement and that in addition to the aforesaid liquidated damages, Supplier shall be entitled to recoup from Dealer the unamortized portion of its investment in the Location that is more particularly described in **Schedule 4** hereto. The investment described in **Schedule 4** shall be amortized on a "straight line" basis over the Term of this Agreement; if Dealer defaults and this Agreement is terminated before the end of the Term, Supplier shall be entitled to immediate payment of the amount of the investment that has not been amortized on the date of

default.  Dealer acknowledges that recoupment by Supplier of the unamortized investment is a reasonable pre-estimate of Supplier's damages with respect to the investment, and that Supplier has the reasonable expectation that Dealer shall perform its obligations hereunder for the full term.  In lieu of Supplier's right to recoupment of its investment in the Location, Supplier may also immediately remove from, or disable at, the Location and retain full ownership of the petroleum product dispensing equipment, cash register, point of sale and other branding image items installed pursuant to **Schedule 4** attached hereto.  Upon any default Supplier shall also be authorized and permitted to immediately remove all motor fuel products in the underground storage tanks at the Location, pursuant to Section 6 of this Agreement.  Termination of this Agreement shall not affect or abridge the rights and obligations of the parties occurring prior to termination, and Supplier may pursue any available legal remedies relating thereto whether or not it exercises its right to declare this Agreement terminated. In addition to the foregoing, in the event of termination, Dealer shall pay to Supplier the cost of "debranding" the Location. "Debranding" is hereby defined as the removal of all brand signage, brand color scheme, repayment of any unamortized oil company branding costs and rebates at the Location.

**20. ATTORNEY'S FEES, COSTS, INTEREST.**   In the event it becomes necessary for Supplier to employ the services of its attorney to enforce any aspect of this Agreement, whether Dealer is in default of this Agreement or this Agreement is amended, assigned, or modified, Supplier shall be entitled to charge and collect administrative costs and legal fees in an amount not less than $2,000.00.  In the event that either party files litigation regarding this Agreement, the losing party agrees to pay the prevailing party fifteen percent (15%) of the amount of damages for attorney's fees and costs of litigation.

**21. MISCELLANEOUS.**

(a) *DELIVERIES DELAYED OR PREVENTED*. Supplier will fill all orders with reasonable promptness, but shall not be liable for loss or damage due to delays or failure, in whole or in part, to fill orders resulting from acts of public enemies, regulations, or orders of civil or military authorities, fires, floods, strikes, labor disputes, accidents, shortage of labor, of crude oil, or refined products or refinery capacity, or materials or of transportation, or any other cause beyond Supplier's reasonable control, either at its own plants or those of its sources of supply, or in connection with the delivery of its products. If Supplier is prevented by any of the foregoing causes from supplying the full quantities of any one or more of its products hereunder, Supplier shall have the right without liability to Dealer to allocate the quantity deliverable hereunder to Dealer, to its other Dealers under contracts calling for delivery of like products, and to its own requirements in such manner as it may deem reasonable, or according to any required allocation program, and Dealer shall be bound by such allocation. If Supplier is unable to deliver products for more than seventy-two (72) hours, Dealer shall have the right to purchase products from other suppliers until such time as Supplier can recommence delivery.

i. Supplier reserves the right to give preference in allocation to a dealer or group of dealers for any reason in its sole discretion, including those dealers whose needs are related to providing fuel to customers whose

Store #  3066A-3099A LA (32) Brothers   WHOLESALE

responsibilties relate to the: (a) protection of life or health, (b) production and transportation of food and energy, (c) mass transportation, and (iv) national defense.

ii. Supplier's allocation plans may be put into effect on any geograph basis (including treating one geographic area differently from another) as Supplier may determine, without regard for the specific inventory at the place or places from which the supplied products are normally produced, shipped, or delivered.

(b) *INSURANCE*. Dealer shall continuously maintain general liability insurance and liquor liability insurance with such coverage as may be approved by Suppier and naming Supplier as an additional insured; and Dealer shall maintain workers' compensation insurance as required to be in full compliance with the State's Workers Compensation Act and obtain Workers Compensation Insurance. Dealer shall furnish Landlord certificates establishing that the insurance requirements contained herein are met and maintained, from time to time, and upon request by Supplier. Additionally, Dealer shall reimburse Supplier, by EFT on a monthly basis, for any all insurance premiums incurred by Supplier, during the term of this Agreement, for fire, casualty, hazard and liability insurance maintained by Supplier covering any equipment, accessories, fixtures and/or branding image items owned or leased by Supplier and installed at the Location. In the event that Dealer fails to provide a certificate of insurance after written notice from Supplier, Supplier may obtain such insurance and charge Dealer the actual cost of the insurance plus an administrative fee.

(c) *CONTINGENCIES*. This Agreement and the rights and obligations of the parties hereunder is expressly contingent upon the approval of the Location, receipt of a survey of the Location supplied by Dealer, the branding image and specifications therefor, and Dealer's credit history by Supplier's supplier. Further, in the event Supplier is obligated to cause the installation or upgrade of any motor fuel dispensing equipment or accessories at the Location, this Agreement is expressly contingent upon Supplier obtaining financing, by lease or otherwise, for such obligations upon terms and conditions acceptable to Supplier; and contingent upon Dealer's third party landlord (and the prime landlord at the Location, if applicable), if any, executing a Landlord's Acknowledgment and Equipment Waiver in such form satisfactory to Supplier and under which such landlord (and prime landlord) waives any right or claim, during the term of this Agreement, to the equipment, accessories, fixtures and branding image items installed and owned by Supplier, and acknowledges Supplier's exclusive right to supply motor fuel to the Location for the full term hereof. Upon any breach or default under Section 19 hereof, Supplier shall have the right to injunctive relief in the form of a restraining order against Dealer and/or Landlord preventing any other fuel supplier from supplying fuel at the location for the term of this Agreement.Dealer shall exercise good faith and make diligent efforts and cooperate with Supplier in obtaining the execution of such Landlord Acknowledgment and Waiver, in failure of which Supplier may terminate this Agreement.

(d) *SEVERABILITY*. (i) If any one or more of the provisions of this Agreement are determined, by a court of competent jurisdiction, to be invalid or unenforceable, the remaining provisions hereof shall continue to be of full force and effect provided that the invalidity of any provisions hereof does not result in a lack of mutuality

14

or a failure of consideration in regards to the benefits and obligations set forth herein.  (ii) If, subsequent to the date of this Agreement, valid state or federal laws or regulations governing the relationship between Dealer and Supplier take effect, this Agreement shall be deemed amended and shall incorporate any mandatory requirements of such laws or regulations so long as they shall be effective, unless such amendment(s) shall operate to increase Supplier's taxes, costs or expenses hereunder, in which case Supplier shall have the option to terminate this Agreement by notice to Dealer.

(e) *ENTIRETY-RELEASE*. This Agreement constitutes the entire agreement and understanding between Supplier and Dealer merging and superseding all prior agreements, understandings, warranties and representations, whether oral, written, express, or implied, between Supplier and Dealer. All prior agreements between Supplier and Dealer concerning the subject matter hereof, relating to the Location defined herein, are hereby terminated. Neither this Agreement nor any modification or waiver of any of the provisions hereof shall be binding upon Supplier or Dealer unless in writing, duly executed by Dealer and a duly authorized  Dealer of Supplier.

(f) *ELECTRONIC TRANSMISSION AND SIGNATURE*.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, email or other means of Electronic Transmission and/or with Electronic Signatures shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

i "Electronic Transmission" means any form of communication not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved, and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

ii. "Electronic Signature" has the meaning provided in [the Georgia Electronic Records and Signatures Act, O.C.G.A. § 10-12-1 et seq. OR Wyo. Stat. §  40-21-102(a)(viii) or OR Tex. Bus. & Com. Code § 322.002(8).]

(g) *NOTICES*. Any notice provided for herein shall be given in writing and shall be considered properly given when received if personally delivered or, if deposited in the United States mail by certified mail, return receipt requested, postage prepaid, properly addressed by either party to the other at such party's address shown above, or at any changed address of which notice is duly given, as of the date received.  Dealer has an obligation to notify supplier if they move or otherwise change the address noted above.  In the event Dealer fails to notify Supplier of an address change, all mail sent by Supplier to Dealer's address shown above shall be deemed sufficient notice whether claimed or unclaimed.

Store #  3066A-3099A LA (32) Brothers   WHOLESALE

DocuSign Envelope ID: D37AF749-3C10-40ED-9E94-DE721330B2E9

(h) *CHOICE OF LAW.* This Agreement has been entered into in and shall be construed under the laws of the State of Georgia and the parties agree that exclusive venue and jurisdiction shall be with the Superior Court of Cherokee County, Georgia for any actions, suits or proceedings.

(i) *JOINT AND SEVERAL LIABILITY*. In the event more than one person, firm, company or entity are named as Dealer hereunder, each such named person, firm, company and entity shall be jointly and severally liable unto Supplier for the satisfaction of the obligations of Dealer hereunder; and Supplier may look to any, all or any combination of them for such satisfaction thereof.

(j) *CROSS-DEFAULTS*. Any default by Dealer under the terms of this Agreement shall likewise constitute a default of Dealer, as tenant, Dealer, or otherwise, under the terms of any and all other agreements between these same parties, including without limitation, other leases, motor fuel supply or commissioned sales agreements, purchase and /or sale agreement and other contracts, whether or not pertaining to the Location, or other premises or locations or to the sale or purchase for resale of motor fuels or other products. This provision shall also apply to any agreements with Supplier's affiliates and related parties, including but not limited to any Dealer defaults with any branded fuel supplier.  In the event Dealer is a tenant of a third-party landlord at the Location, and Supplier has acquired the written consent to this provision from such landlord by way of a separate document or agreement, default by Dealer hereunder shall likewise constitute a default under the terms of the lease between Dealer and such landlord and a default under the lease shall be a default under this Agreement.

(k) CREDIT CARD FRAUD SKIMMING.  Supplier shall have the right to immediately charge back to the Dealer any credit card "charge-backs" from the Supplier's Supplier immediately. In addition, Dealer is responsible for any credit card fraud which may occur at the Location including Skimming.  Skimming is the theft of credit card information.  This theft occurs when a third-party card-reading device is installed either outside or inside a fuel dispenser or other card-swiping terminal.  This device allows a thief to capture a Dealer's credit and debit card information, including their PIN, with each card swipe.  Dealer is responsible for any credit card or debit card information theft and the fraudulent charges that are a result of Skimming.  Dealer is required to daily check the Pumps and card swiping terminals for possible sources of Skimming.

(l) *QUALITY AND CLAIMS*. Supplier guarantees that all products delivered hereunder will be uniform in quality and according to industry standards. Any claim for deficiency in quality or quantity of any product is waived unless Dealer gives Supplier notice of such deficiency at time of delivery (or during the next period of regular business hours if night delivery) for quantity claims and within ninety-six (96) hours of discovery of the alleged deficiency for quality claims. Such notice shall fully set forth the facts on which Dealer's claim is based, and Supplier shall be given full opportunity to inspect, measure, and test the products and/or equipment involved. Dealer shall immediately notify Supplier if its equipment is leaking. Dealer's failure to comply with the above requirements shall operate as a waiver of any and all claims and remedies by Dealer against Supplier arising out of product defects, variances or shortages.

Store #  3066A-3099A LA (32) Brothers   WHOLESALE

**22.  RIGHT OF FIRST OFFER.**      Dealer agrees to provide Supplier with written notice of the availability of the Dealer's business at the Location ("Business") for sale and offer the Business to Supplier on such terms and conditions as Dealer would offer to third parties, as determined by Dealer in its sole and absolute discretion, prior to marketing said Business to third parties. Supplier shall have thirty (30) days from the date of Dealer's Notice to respond in writing to the same. If Dealer has not received a written response by the end of said thirty (30) day period or if Supplier declines to accept Dealer's offer or makes a counteroffer which Dealer shall reject, in writing, as unacceptable in Dealer's sole and absolute discretion, Dealer shall thereafter be free to market the Business and sell the Business for not less than the counter-offer submitted by Supplier. If Dealer and Supplier agree on terms for the sale of the Business, but are subsequently unable, in good faith, to consummate an agreement with respect thereto acceptable to both Dealer and Supplier shall thereafter be free to market the Business and sell the Business on such terms and conditions as Dealer shall determine, in its sole and absolute discretion, without any further obligation to offer said Business again to Supplier.

**23.  SPECIAL STIPULATIONS.** The Parties agree that Supplier may conduct periodic "mystery shopper" or other inspections of the Location and the operation of the business thereon in order to determine whether Dealer is meeting standards required by Supplier. In the event Dealer fails inspection as determined by Supplier, Dealer shall receive notice from Supplier to correct the deficiencies.   If not corrected during the specified amount of time, Supplier may impose a penalty fee.  Supplier shall have the right, in its discretion, to waive the requirement for payment of an inspection fee based upon its determination of  Dealer's exercise of good faith in promptly correcting  all  quality assurance deficiencies.

**24.  TRANSFER.**   Dealer acknowledges that Supplier has relied both on the business experience and creditworthiness of Dealer and upon the particular purposes for which Dealer intends to use the Location in entering into this Agreement.  Without the prior written consent of Supplier: (i) no direct or indirect Transfer of an interest in Dealer (whether by stock, partnership interest or otherwise, voluntarily or by operation of law) shall occur except for any such Transfer to an Affiliate; (ii) no direct or indirect interest in Dealer shall be pledged, encumbered, hypothecated or assigned as collateral for any obligation of Dealer; and (iii) no change of Control of Dealer shall occur (each of items (i) through (iii) are hereinafter referred to as a "Transfer").  As used herein and for purposes hereof, (a) the term "Control" shall mean with respect to an entity that is a corporation, limited liability company, partnership or other entity, the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the ownership interests of the entity, with respect to any non-publicly traded company, and more than ten percent (10%) ownership, or management control, with respect to a publicly traded company and (b) the term "Affiliate" shall mean a person or entity that directly or indirectly through one or more intermediaries Controls, is Controlled by, or is under common Control with such person or entity.

*[signature page to follow]*

Store #  3066A-3099A LA (32) Brothers   WHOLESALE

DocuSign Envelope ID: D37AF749-3C19-40ED-9E94-DE721330B3E9

**IN WITNESS WHEREOF**, the parties hereto have caused this Fuel Supply Agreement to be effective  as of the Effective Date first written above.

**SUPPLIER**

**MEX FUELS SW-LA LLC,**

**a Wyoming limited liability company**

By: MOUNTAIN EXPRESS OIL COMPANY,

    a Georgia corporation,

    its Manager

By:_____

    Turjo Wadud, CEO

Date: _____

    2/22/2023

**DEALER**

**GSS HOLDINGS LA LLC,**

a Louisiana limited liability company

By: _____

    Sukhranjan Multani, Manager

_____

    Sukhranjan Multani, Individually

Date: _____

    2/20/2023

Store #  3066A-3099A LA (32) Brothers   WHOLESALE

## SCHEDULE 1 - PROPERTY DESCRIPTION

| Store # | Address |
|---------|---------|
| 3066A | 1675 Gause Blvd, Slidell, LA 70458 |
| 3069A | 2850 Belle Chasse Hwy, Gretna, LA 70056 |
| 3074A | 4101 S Claiborne, New Orleans, LA 70125 |
| 3075A | 4115 Airline Dr., Metairie, LA 70001 |
| 3077A | 4520 Jefferson Hwy, Metairie, LA 70121 |
| 3078A | 4662 General Degaulle Dr., New Orleans, LA 70131 |
| 3079A | 468 Lapalco Blvd, Gretna, LA 70056 |
| 3082A | 5310 Flannery Rd., Baton Rouge, LA 70814 |
| 3094A | 2901 Hwy 90, Avondale (Westwego), LA 70094 |
| 3098A | 300 Lee Drive, Baton Rouge, LA 70808 |
| 3099A | 2000 Earhart Blvd. Ste. A, New Orleans, LA 70113 |

Store #  3066A-3099A LA (32) Brothers   WHOLESALE

DocuSign Envelope ID: D37AF749-3C19-40ED-9E94-DE72133082E9

**SCHEDULE 2 – OPTION TO EXTEND TERM**

Dealer shall have the option to extend the Term for an additional five (5) year term with at least sixty (60) days' notice to Supplier, prior to the expiration of the then existing Term, upon approval of Supplier which shall not be unreasonably withheld. Each extended Term shall be on the same terms and conditions as set forth in this Agreement, except as otherwise specifically stated herein.

Store #  3066A-3099A LA (32) Brothers   WHOLESALE

DocuSign Envelope ID: D37AF749-3C19-40ED-9E94-DE721330B3E9

**SCHEDULE 3 – PRODUCTS TO BE PROVIDED EXCLUSIVELY BY SUPPLIER**

1.  Regular, Super and Premium Gasoline;

2.  Diesel;

3.  E85/and other Ethanol Blends;

4.  Bio Diesel;

5.  Ethanol Free Fuel;

6.  Boutique Fuels (Future);

7.  Natural Gas Related Fuels (Future);

8.  Electric Car Charging Networks (Future);

9.  Lubricants and Oils (Future)

10.  Hydrogen Fuels (Future); and

11.  Any other fuel known or currently unknown used to power automobiles, trucks, tractors, boats, lawn mowers, etc.

Store #  3066A-3099A LA (32) Brothers   WHOLESALE

DocuSign Envelope ID: D37AF749-3C19-40ED-9E94-DE721330B3E8

**SCHEDULE 4 - EQUIPMENT, ACCESSORIES AND/OR FIXTURES TO BE INSTALLED BY SUPPLIER**

Supplier shall ensure all Locations are EMV compliant within a reasonable amount of time.

Store #  3066A-3099A LA (32) Brothers   WHOLESALE

DocuSign Envelope ID: D37AF749-3C19-40ED-9E94-DE721330B2E9

### SCHEDULE 5 - DEALER'S REPAIR/MAINTENANCE AND EQUIPMENT OBLIGATIONS

None.

Store #  3066A-3099A LA (32) Brothers   WHOLESALE

**SCHEDULE 6 - BRANDING**

The branding image to be installed at the Location and the brand of motor fuels to be delivered to the Location for resale by Dealer shall be determined by Supplier.  Supplier reserves the right to change the brand at the Location at any time.

Store #  3066A-3099A LA (32) Brothers   WHOLESALE

DocuSign Envelope ID: D37AF749-3C19-40ED-9E94-DE72123DB3E9

**SCHEDULE 7 – FINE SCHEDULE**

No Name Tag:                              $25.00

No Uniform:                               $50.00

Illegal Drugs/Drug Paraphenalia:          $500.00

Store #  3066A-3099A LA (32) Brothers   WHOLESALE

DocuSign Envelope ID: D37AF749-3C19-40ED-9E94-DE721330B2E9

## SCHEDULE 8- ALTERNATIVE SECURITY DEPOSIT PROVISIONS

The security deposit shall be Forty Thousand and No/100 Dollars ($40,000.00) per Location, with Ten Thousand and 00/100 Dollars ($10,000.00) paid in upfront funds per Location, and the remainder collected at the rate of two cents ($0.02) per gallon of fuel sold at each Location.

Store #  3066A-3099A LA (32) Brothers   WHOLESALE

**Mountain Express Oil Co. Field Inspection Evaluation**

**Exterior**

| | |
|---|---|
| Main Price ID sign functional and lighted | 2 |
| Main Price ID sign unobstructed and free of non-oil company signage | 1 |
| Landscape Free of Trash | 2 |
| Landscape Grass Cut and Neat | 4 |
| Parking Lot Neat and Clean | 2 |
| Parking Lot free of weeds growth | 1 |
| Parking Lot with no pot holes | 1 |
| Freshly painted curbs, poles and parking lines | 2 |
| All MPDs functioning correctly | 4 |
| All MPDs clean, free of spider webs and dirt | 1 |
| Pump Islands clean and well maintained | 1 |
| Card reader working with RECEIPT paper present | 2 |
| Credit Card Applications present | 2 |
| Current POP Present and clean | 2 |
| Nozzles and hoses clean/functional | 2 |
| All MPD displays operational | 1 |
| Trash Receptacles not over flowing and CLEAN | 1 |
| Valet supplies present. (Squeegees, paper towel and water) | 2 |
| Spanner clean, lit and well maintained | 1 |
| Canopy fascia maintained and lit | 1 |
| Canopy Clean and well maintained | 1 |
| Canopy lights working | 2 |
| Exterior lights working | 1 |
| Dumpster area clean and without debris | 1 |
| No storage or objects outside the building or at dumpster | 1 |
| No abandoned or illegally parked vehicles | 1 |
| Air & Water hose working outside | 1 |
| Building Exterior clean, painted and well maintained | 1 |
| Building Side walk clean, unobstructed and pressure washed | 1 |
| Store windows clean, not cracked and free of extra signage | 1 |
| Front door clean and free of unnecessary signage | 1 |
| Operation hours posted | 1 |

**INTERIOR**

| | |
|---|---|
| Odor Free | 1 |
| Comfortable Temperature | 1 |
| Inside Lights working and sufficient light | 1 |
| Clean Floor | 2 |
| Clean Walls / attractive & inviting ambiance | 1 |
| Ceiling tiles spotless and clean | 1 |
| Vents clean and dirt free | 1 |
| Clutter Free merchandising / Dealer navigation friendly | 1 |

27

Store #  3066A-3099A LA (32) Brothers   WHOLESALE

| | |
|---|---|
| Floor Merchandisers well organized, properly placed and allowing navigation | 1 |
| Fully Stocked and Merchandised | 1 |
| No handwritten signs in the store | 1 |
| Shelves clean, free of dirt and front faced | 1 |
| Beverage Bar clean and inviting | 1 |
| Beverage equipment operational | 1 |
| Beverage Bar stocked | 1 |
| Cooler operational and clean | 1 |
| Cooler lights working | 1 |
| Check out area clean, clutter free and inviting | 1 |
| Waste receptacles clean and not overflowing | 1 |
| No storage in Dealer visible sales area | 1 |

### BATHROOMS

| | |
|---|---|
| All available bathrooms open for Dealer use | 1 |
| Bathroom floors clean and neat | 1 |
| Bathroom walls clean and free of graffiti | 1 |
| Bathroom supplies present | 2 |
| Bathroom door clean, lock functioning correctly | 1 |
| Bathroom equipment Commode, urinal, sink, mirror, soap disp, paper disp, towel disp | 1 |
| Bathroom trash clean, not overflowing and well maintained | 2 |

### DEALER SERVICE

| | |
|---|---|
| CSR in Uniform shirt | 5 |
| CSR wearing name tag | 3 |
| CSR well groomed | 1 |
| CSR acknowledged at entry and first interaction | 1 |
| CSR made eye contact | 1 |
| CSR courteous and provides pleasant Dealer service | 1 |
| CSR repeats sales amount and counts cash back | 1 |
| CSR provides welcome and parting remarks | 1 |
| CSR familiar with Oil Co programs and offers program sales | 2 |

### MISC

| | |
|---|---|
| Pornographic Magazine on display | 3 |
| Any type of Drug Paraphernalia present | 3 |
| **TOTAL SCORE** | **100** |

Store #  3066A-3099A LA (32) Brothers   WHOLESALE

**Mountain Express Oil Company**

Credit Card Schedule Upon
Conversion

| Sales at Store | | Notice to MEX | $$$ to MEX | $$$ to Dealer |
|---|---|---|---|---|
| | | | | |
| Monday | | Tuesday | Wednesday | Thursday |
| Tuesday | | Wednesday | Thursday | Friday |
| Wednesday | | Thursday | Friday | Monday |
| Thursday | | Friday | Monday | Tuesday |
| Friday | | Monday | Monday | Tuesday |
| Saturday | | Monday | Monday | Tuesday |
| Sunday | | Monday | Tuesday | Wednesday |

Billing Terms

Load to Load
Payment is due at the earlier of
10 days or the date a new load
is delivered.

7 Days
Payment is due within 7 days
from date of delivery.

(Assuming 7 day payment terms)

| Delivery Date | Draft Notice | Payment Due |
|---|---|---|
| | | |
| Saturday | Friday | Monday |
| Sunday | Friday | Monday |
| Monday | Friday | Monday |
| Tuesday | Monday | Tuesday |
| Wednesday | Monday | Wednesday |
| Thursday | Tuesday | Thursday |
| Friday | Wednesday | Friday |

Store #  3066A-3099A LA (32) Brothers   WHOLESALE



**FIRST AMENDMENT OF FUEL SUPPLY AGREEMENT**

      **THIS FIRST AMENDMENT OF FUEL SUPPLY AGREEMENT** ("Amendment"), made and entered into on the day the last party executed this Amendment, by and among **MOUNTAIN EXPRESS OIL COMPANY**, a Georgia Corporation ("Supplier"), **MEX FUELS SW-LA LLC,** a Wyoming limited liability company, having a mailing address of 3650 Mansell Road, Suite 250, Alpharetta, Georgia 30022 ("Supplier"), **GSS HOLDINGS LA LLC,** a Louisiana limited liability company, and **SUKHRANJAN MULTANI,** an individual resident of the State of Louisiana, both having a mailing address of 11398 Wellington Lane, Hammond, Louisiana 70403 (collectively, "Dealer")  (Supplier and Dealer are sometimes referred to collectively herein as the "Parties").

W I T N E S S E T H:

      **WHEREAS**, Supplier and Dealer entered into that certain Fuel Supply Agreement ("Agreement") dated February 15, 2023, for the following Mountain Express Stores (collectively, "Locations"):

| Store # | Address |
|---------|---------|
| 3066A | 1675 Gause Blvd, Slidell, LA 70458 |
| 3069A | 2850 Belle Chasse Hwy, Gretna, LA 70056 |
| 3074A | 4101 S Claiborne, New Orleans, LA 70125 |
| 3075A | 4115 Airline Dr., Metairie, LA 70001 |
| 3077A | 4520 Jefferson Hwy, Metairie, LA 70121 |
| 3078A | 4662 General Degaulle Dr., New Orleans, LA 70131 |
| 3079A | 468 Lapalco Blvd, Gretna, LA 70056 |
| 3082A | 5310 Flannery Rd., Baton Rouge, LA 70814 |
| 3094A | 2901 Hwy 90, Avondale (Westwego), LA 70094 |
| 3098A | 300 Lee Drive, Baton Rouge, LA 70808 |
| 3099A | 2000 Earhart Blvd. Ste. A, New Orleans, LA 70113 |

      **WHEREAS**, the Parties agree to amend the Locations on Schedule 1 and the credit card settlement and fuel payment terms of the Agreement.

      **NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

DocuSign Envelope ID: 9A5E89F4-B659-4EAB-B909-3AF51A661542

1. Schedule 1 shall be amended such that the property located at 4940 Groom Road, Baker, LA 70714 (Store #4080 which shall now become Store #3080A) shall be added as a wholesale "Location" in the Agreement at a price of rack + $.02.

2. The credit card settlement terms shall be as follows:

   CREDIT CARD SETTLEMENTS.   Every two (2) weeks, Supplier shall provide a credit card settlement paid by check, EFT, or other agreed upon means, to Dealer. This settlement shall be for the net amount of credit card funds held on behalf of Dealer as of the last two weeks, which shall be netted against any currently owing but unpaid invoices. The Locations shall be settled in two (2) week periods from Wednesday to Wednesday and settlement shall be paid out on Friday.  This settlement shall not be assignable upon assignment or transfer of this Agreement without the express written consent of Supplier.   Supplier reserves the right to change the credit card settlement terms at any time. Payment for fuel shall be three (3) day credit or other deferred credit terms for payment.

3. Except as expressly set forth herein, all other terms and conditions of the Supply Agreement are ratified and affirmed and shall remain in full force and effect. This Amendment shall be construed in accordance with the laws of the State of Georgia and shall be binding upon the parties hereto, their successors, heirs, executors and assigns.

   This Amendment may be executed by electronic means, and the transmission shall constitute an original of this Amendment. This Amendment may be executed and delivered in any number of counterparts, each of which, when so executed and delivered, shall be and constitute an original and one and the same document.

*[signature page to follow]*

2

**IN WITNESS WHEREOF**, the parties hereto have hereunto set their hands and affixed their seals as of the day and year first above written.

SUPPLIER

MEX FUELS SW-LA LLC,

a Wyoming limited liability company

By: MOUNTAIN EXPRESS OIL COMPANY,

a Georgia corporation,

its Manager

By: _____

Turjo Wadud, CEO

Date: _____3/6/2023_____

DEALER

**GSS HOLDINGS LA LLC,**

a Louisiana limited liability company

By: _____

Sukhranjan Multani, Member

_____

Sukhranjan Multani

Date: _____3/3/2023_____