**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| MOUNTAIN EXPRESS OIL COMPANY, et al., | Case No. 23-90147 (EVR) |
| Debtors. [1] | (Jointly Administered) |

**COVER SHEET TO FINAL APPLICATION OF LUGENBUHL, WHEATON, PECK,
RANKIN & HUBBARD FOR ALLOWANCE OF COMPENSATION FOR SERVICES
RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED AS SPECIAL
LITIGATION COUNSEL TO THE DEBTORS FOR THE PERIOD FROM
APRIL 7, 2023 THROUGH AUGUST 16, 2023**

**Chapter 7 Final Fee Application Coversheet Pursuant to the**
**Court Procedures of the Honorable Eduardo V. Rodriguez**

| Name of applicant: | | Lugenbuhl, Wheaton, Peck, Rankin & Hubbard |
|---|---|---|
| Applicant's professional role in case: | | Debtors' Special Litigation Counsel |
| Indicate whether this is an interim or final application: | | This is the Final Application. |
| Date Order of Appointment | | Signed: 06.01.2023; Eff.:      04.07.2023; Docket No. 479 |
| | **Beginning of Period** | **Ending of Period** |
| Total period covered in this final application | 04.07.2023 | 08.16.2023 |
| Time periods covered by any prior (interim) applications | 04.07.2023 | 06.30.2023 |
| Total amounts awarded in all prior (interim) applications | | $292,646.50 |
| Amount of retainer received in the case | | None |

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained for a fee at the Court's website at http://ecf.txsb.uscourts.gov. A login identification and password to the Court's Public Access to Court Electronic Records ("PACER") are required to access this information and can be obtained through the PACER Service Center at http://www.pacer.psc.uscourts.gov. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 Cases (the "Cases") is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022.

| Name of applicant: | Lugenbuhl, Wheaton, Peck, Rankin & Hubbard |
|---|---|
| Total fees applied for in this final application and in all prior interim applications (including any retainer amounts applied or to be applied) | $401,779.50 |
| Total fees applied for in this final application (including any retainer amounts to be applied) | $401,779.50 |
| Total professional fees requested in this final application | $400,069.50 |
| Total professional hours covered by this final application | 758 |
| Average hourly rate for professionals | $390.83 |
| Total paraprofessional hours covered by this final application | 11.4 |
| Average hourly rate for paraprofessionals | $150.00 |
| Reimbursable expenses sought in this final application | $4,450.11 |
| Application Cost | $0.00 |
| Total of other payments paid to Secured Claimants | Unknown |
| Total of other payments paid to Administrative Claimants | Unknown |
| Estimated Total for distribution to Priority Unsecured | Unknown |
| Expected % dividend to be paid to Priority Unsecured | Unknown |
| Estimated total for distribution to General Unsecured | Unknown |
| Expected % dividend to be paid to General Unsecured | Unknown |
| Expected amount to be paid to all pre-petition creditors | Unknown |
| Receipts to date | Unknown |
| Disbursements to date | Unknown |
| Current balance in the Trustee's accounts | Unknown |

Dated: November 15, 2023

*Respectfully submitted,*

*/s/ Benjamin W. Kadden*
**LUGENBUHL, WHEATON, PECK, RANKIN & HUBBARD**
Benjamin W. Kadden (TX 24077542)
Coleman L. Torrans (*Pro Hac Vice*)
601 Poydras St., 27thFloor
New Orleans, LA
(t) 504.568.1990
(f) 504.310.9195
bkadden@lawla.com
ctorrans@lawla.com
***Former Special Litigation Counsel to the Debtors and Debtors in Possession***

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| MOUNTAIN EXPRESS OIL COMPANY, et al., | Case No. 23-90147 (EVR) |
| Debtors. [1] | (Jointly Administered) |

**FINAL APPLICATION OF LUGENBUHL, WHEATON, PECK, RANKIN & HUBBARD FOR ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED AS SPECIAL LITIGATION COUNSEL TO THE DEBTORS FOR THE PERIOD FROM APRIL 7, 2023 THROUGH AUGUST 16, 2023**

THIS APPLICATION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE APPLICATION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE APPLICATION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE APPLICATION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE APPLICATION AT THE HEARING.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

THERE WILL BE AN ELECTRONIC HEARING ON THIS APPLICATION ON FEBRUARY 15, 2024 VIA GOTOMEETING, AS PREVIOUSLY ORDERED BY THE COURT.

TO PARTICIPATE IN THE HEARING, AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT (832) 917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE RODRIGUEZ'S CONFERENCE ROOM NUMBER IS 999-276. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE RODRIGUEZ'S HOMEPAGE. THE MEETING CODE IS "JUDGERODRIGUEZ". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained for a fee at the Court's website at http://ecf.txsb.uscourts.gov. A login identification and password to the Court's Public Access to Court Electronic Records ("PACER") are required to access this information and can be obtained through the PACER Service Center at http://www.pacer.psc.uscourts.gov. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 Cases (the "Cases") is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022.

Lugenbuhl, Wheaton, Peck, Rankin & Hubbard ("Lugenbuhl"), Special Litigation Counsel for the above-captioned debtors (the "Debtors"), hereby files its final application (this "Final Application") seeking allowance on a final basis of compensation for services rendered and necessary expenses in the above-captioned cases (the "Cases") for the period from April 7, 2023 through August 16, 2023 (the "Final Application Period"), pursuant to section 330 of Title 11 of the United States Code (the "Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2016-1 and 9013-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Southern District of Texas (the "Local Rules").  For the Final Application Period, Lugenbuhl seeks final allowance of $401,779.50 as fees for services rendered and $4,450.11 as reimbursement of expenses.[2]  As part and parcel of the foregoing relief, Lugenbuhl asks the Court grant the request by Pachulski Stang Ziehl & Jones LLP ("PSZJ") in the motion pending at Docket No. 1519 to pay any unpaid amounts granted in any order approving this Final Application from the Carve-Out Funds (as defined in Docket No. 1519), to the extent attributable to Lugenbuhl. In support of this Final Application, Lugenbuhl submits the declaration of Benjamin W. Kadden attached hereto as **Exhibit 1** and a proposed order granting the Final Application attached hereto as **Exhibit 2**. In further support of this Final Application,[3] Lugenbuhl respectfully states as follows:

---

[2]    Of the amounts of compensation and reimbursement of expenses sought to be approved on a final basis herein, Lugenbuhl has previously received  $292,646.50 and $3,515.49  respectively, as more fully detailed below.

[3]    This Final Application is filed in accordance with the dates and deadlines set forth in the *Stipulation Regarding Scheduling Deadlines and Hearing in Connection with Chapter 11 Final Fee Applications and Reserve Distribution Motion* [Docket No. 1632] (the "Scheduling Order"), as approved by the Court.

## PRELIMINARY STATEMENT

**The Debtors' Corporate Structure and Ownership.**

1.    On March 18, 2023 (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  MEX, a Georgia corporation, is the ultimate parent of the other 143 Debtor entities and is privately held.  As of the Petition Date, MEX's equity interests were held as follows: (a) 48.5% by Turjo Wadud, the Debtors' Co-CEO; (b) 48.5% by Lamar Frady, the Debtors' Co-CEO; and (c) 3% by West Hill Ranch Investors, LLC.

**B.    The Debtors' Business Operations.**

2.    As of the Petition Date, the Debtors had three business segments: (a) the "C-Store Operation Business," which consisted of the operation of fueling centers and associated convenience stores ("Fueling Centers"); (b) the "Travel Center Operation Business," which consisted of the operation of travel centers ("Travel Centers"); and (c) the "Fuel Distribution Business," which consisted of the distribution of fuel procured from the Debtors' major fuel suppliers.

3.    In structuring their operations, the Debtors typically acquired Fueling Centers and Travel Centers and simultaneously sold them to third-party real estate investment vehicles (the "Landlords") who then leased the Fueling Centers and Travel Centers back to the Debtors pursuant to long-term agreements.  Certain of the Fueling Centers and Travel Centers (collectively, the "Operated Sites") were operated by the Debtors, while most sites were "dealered out," i.e., subleased to third-parties (the "Network Dealers") to operate a Fueling Center on the site (the "Network Dealer Sites" and, together with the Operated Sites, the "Controlled Sites").  The Debtors' Fuel Distribution Business provided fuel to both Controlled Sites and sites in which the Debtors held no real property interest (the "Non-Controlled Sites").

4.       As of the Petition Date, the Debtors had an interest in a total of 855 locations consisting of 828 Fueling Centers and 27 Travel Centers across 27 states.  Of the 855 locations, 550 were Controlled Sites and 305 were Non-Controlled Sites.  Of the 550 Controlled Sites, approximately 350 were operated by Network Dealers, with certain Network Dealers operating multiple sites.  The Debtors were ExxonMobil's second largest customer nationwide and its largest customer in the Southeast.  The Debtors were also a significant customer of several other national fuel suppliers ("Fuel Suppliers"), including Shell, Sunoco, and Valero.  In addition, the Debtors were one of the largest dealers to Pilot Travel Centers; at the same time, Pilot was a Fuel Supplier to the Travel Centers.

## C.       The Debtors' Material Creditor Relationships.

5.       As of the Petition Date, the Debtors (as primary obligor and guarantors) owed approximately $176.5 million under that certain *First Amended and Restated Credit Agreement* dated as of March 12, 2020, as amended, and related agreements to the lender parties thereto (the "Secured Lenders"), which obligations were secured by substantially all of the Debtors' assets. The Debtors were current on their payment obligations to the Secured Lenders as of the Petition Date but were in covenant default since December 21, 2022 for failure to provide financial statements in a timely manner and other alleged breaches.

6.       Each of the Debtors' 550 Controlled Sites were leased from Landlords. Several large REIT's including Blue Owl Real Estate Capital LLC (f/k/a Oak Street Real Estate Capital, LLC) ("Oak Street"), AR Global Investments, LLC, Spirit Realty Capital and Vereit, Inc. controlled approximately 390 of the Controlled Sites with the remainder leased to the Debtors primarily by individual Landlords.  The Debtors in turn subleased the majority of the Controlled

Sites to various Network Dealers which operated the Controlled Sites and relied upon the Debtors for, among other things, consistent delivery of fuel.

7.      As of the Petition Date, the Debtors' prepetition liabilities consisted primarily of monies owed for fuel purchases (which were paid pursuant to one of the Debtors' first day motions), prepetition rent owing to AR Global, one of the Debtors' largest Landlords, certain tax payments which the Debtors' professionals learned post-petition had not been paid by the Debtors and related trade payables.

**D.      The Events Precipitating the Chapter 11 Filings.**

8.      The Debtors' most significant Landlord counterparty was Oak Street which controlled 277 locations through a financing facility which commenced on June 30, 2021.  An Oak Street designee sat on the Debtors' Board of Directors from December 31, 2021 until January 2023.[4]

9.      As part of the sale/leaseback transactions between Oak Street and the Debtors in the latter half of 2021 and 2022, the parties entered into side letters with respect to environmental assessment and remediation, code compliance, and related matters to be completed at some of the Oak Street Leased Properties after closing of the applicable Oak Street Transaction (the "Post Closing Regulatory and Environmental Work").

10.      In January 2023 because of liquidity concerns Oak Street agreed to capitalize $10 million of rent due under its leases on certain terms and conditions.  Soon thereafter, Oak Street requested that the Debtors agree to turn over a substantial number of properties to Oak Street to

---

[4]      A full description of the Debtors' relationship with Oak Street and the circumstances precipitating the chapter 11 cases is contained in the *Declaration of Michael Healy in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 57] (the "First Day Declaration").  The above is a summary to provide the Court with context on the emergency nature of the chapter 11 filings and the challenges facing the Debtors' professionals who were hired a few weeks before the commencement of the cases. A capitalized term used but not defined herein shall have the meaning ascribed to it in the First Day Declaration.

allow Oak Street to relet the properties to alternative operators. The Debtors refused, as relinquishing a material number of properties to Oak Street would dramatically affect the Debtors' operations and ability to maintain its minimum volumes under its fuel supply contracts as well as favorable and operationally critical volume-based pricing with certain of their fuel suppliers.

11.     On February 17, 2023, apparently concerned with the Debtors' deteriorating financial condition, Oak Street issued several notices of default demanding that the Post Closing Regulatory and Environmental Work be completed within thirty days.  Unless the Debtors were able to remedy the Post Closing Regulatory and Environmental Work within that time period, Oak Street threatened to terminate the leases for the Debtors' properties, which would have been disastrous.

**E.     The Debtors' Retention of Professionals to Prepare for Emergency Chapter 11 Filings.**

12.     Faced with increased tensions with Oak Street and the need to consider bankruptcy protection to prevent the loss of a substantial portion of their portfolio, the Debtors retained various professionals to provide restructuring advice. The Debtors retained (a) Raymond James & Associates, Inc. ("Raymond James") as its investment banker on February 10, 2023; (b) PSZJ, as restructuring counsel on February 22, 2023; (c) Grant Thornton LLP's ("Grant Thornton") restructuring team as financial advisor on February 27, 2023, to work alongside Grant Thornton's transformational finance team which had previously been engaged to assist the Debtors with financial operations and controls in the months prior to filing and (d) Michael Healy of FTI Consulting, Inc. ("FTI") as their Chief Restructuring Officer and FTI as their financial advisor on March 9, 2023.  The Debtors also appointed two independent directors to their Board on March 15, 2023: Craig Barbarosh, an experienced restructuring lawyer and board member for troubled companies, and Lawrence Perkins, the Founder and Chief Executive Officer of

SierraConstellation Partners, LLC, a nationally-recognized advisory firm. Lugenbuhl was retained on April 7, 2023, after it became apparent to the Debtors and their professionals that litigation would likely be required to resolve disputes between the Debtors and certain of their Landlords and Network Dealers.

13.     Accordingly, this was not a case where the Debtors' restructuring advisors had the luxury of time to diligence the Debtors' business, analyze its operations, liquidity, and contractual relationships and commence an out-of-court process designed to attract additional capital or a buyer. Rather, from the moment the Debtors' professionals were retained they were in "triage" mode and facing an impending liquidity crisis.  In the first three weeks of their engagement, the Debtors' professionals were proceeding down parallel paths of negotiating with Oak Street for a forbearance agreement to either avoid, or at the very least delay chapter 11 filings and preparing the Debtors for an emergency freefall filing with as soft a landing as possible.

**F.     The State of the Debtors' Financial and Operational Records**
**Which Adversely Impacted Operations and the Sale Process.**

14.     One thing became apparent to the Debtors' professionals only after the outset of the engagement:  the Debtors' financial, accounting and operational records were in utter disarray (or did not exist) and required complete reconstruction to provide meaningful information to both assist the Debtors in operating their businesses and prepare the Debtors' business for sale (and ultimately to provide responses to prospective buyers' requests for information).  For example, the following is a non-exhaustive list of the challenges the Debtors' professionals faced: (a) the Debtors lacked complete and current financial statements (their most recent audited financial statements were for the period ending December 31, 2021); (b) the Debtors were unable to generate accurate or current store level profit and loss statements, fuel gallon and margin data, and in-store financials (such as inventory levels, product pricing, and food sales); (c) the Debtors lacked

historical information about store level environmental and zoning compliance; (d) the Debtors were missing leases, contracts, and other agreements integral to the management of the business and lacked systems altogether for storing and retrieving this data; (e) the Debtors did not maintain detailed, store-level accounting on unamortized fuel branding discounts and rebates provided by major oil companies and related store-specific "imaging" liabilities; (f) the Debtors provided inaccurate financial and operational data that, once discovered by the Debtors' professionals, resulted in the Debtors revising the associated results/projections; and (g) the Debtors did not maintain an accurate or reliable record of tax filings, furloughs and outstanding tax obligations.

15.     These problems, among others, made normal customary tasks like preparation of the Schedules of Assets and Liabilities, Statements of Financial Affairs and Monthly Operating Reports or motions to reject leases or sell assets, extremely challenging and very time-consuming. On May 4, 2023, the Debtors re-engaged Grant Thornton on a post-petition basis as an ordinary course professional to try to create, effectively from scratch, basic financial information necessary to administer the chapter 11 cases and conduct the sale process. Ultimately, on July 17, 2023, the Debtors were instructed by the Secured Lenders to cease the Grant Thornton work and terminate efforts to complete the financial statements prior to the conclusion of the sale process. Additionally, these deficiencies, as well as many others, adversely impacted the sale process. Some examples of how these deficiencies impacted the sale process include: (a) buyers self-selecting out of the process after expressing strong initial interest due to lack of reliable and comprehensive diligence information; (b) undermining buyer confidence in the Debtors' available diligence information; (c) buyer concerns regarding unknown potential environmental and regulatory liabilities that might exist post-acquisition; (d) buyer inability to accurately underwrite performance due to lack of information; (e) assessment by buyers that the Debtors lacked detailed

understanding of performance data, resulting in the Debtors entering into unattractive leases with unsustainable rents; and (f) concerns regarding post-acquisition integration and regulatory approval requirements.

16.     The state of the Debtors' financial records was an issue for these Debtors even before the disputes with Oak Street arose which led directly to the chapter 11 filings.  Prior to the Petition Date, the Secured Lenders were aware of the Debtors' inability to produce meaningful financial information, having declared an event of default on December 21, 2022, for failure to provide contractually required financial statements. Following the post-petition retention of Grant Thornton as an ordinary course professional to assist in preparing the financials, the Debtors' advisors provided regular updates to the Secured Lenders on the status of Grant Thornton's work.

**G.     The Debtors' Unsuccessful Efforts to Negotiate a Forbearance Agreement with Oak Street or Obtain Committed Financing from the Secured Lenders Prior to the Commencement of the Chapter 11 Cases.**

17.     The Debtors' professionals' efforts to negotiate a forbearance agreement with Oak Street failed as the conditions placed thereon by Oak Street would have decimated the Debtors' business.  Accordingly, by the second week of March 2023 it became apparent that a chapter 11 filing would be necessary.  The Debtors' professionals turned their attention to negotiating a DIP financing facility with the Secured Lenders to provide as smooth of an entry to chapter 11 as possible and facilitate a runway to a value-maximizing transaction.

18.     Unfortunately, the Secured Lenders were unwilling to commit to provide the Debtors with any post-petition financing commitment before chapter 11 cases were filed.  As a result, the Debtors commenced the chapter 11 cases on March 18, 2023, to avoid termination of the hundreds of locations Oak Street leased to the Debtors.  The Debtors warned the Secured Lenders that the lack of financing – and the inability to send a strong message to the Debtors'

dealers, oil suppliers and vendors that the Debtors had sufficient liquidity to support the chapter 11 filing—would have serious and long-lasting effects and undermine the chapter 11 process.

**H.      The Commencement of the Chapter 11 Cases and Post-Petition Financing.**

19.     The Debtors commenced these cases on Saturday, March 18, 2023, without any committed DIP financing facility.  At a hearing on Monday, March 20, 2023, the Debtors obtained one week use of cash collateral to purchase fuel.  As a result of this, the Debtors' fuel suppliers immediately restricted the terms and credit limits associated with daily fuel purchases, further constraining the Debtors' liquidity, resulting in reduced fuel shipments, and as a result a loss of fuel margin, the Debtors' primary source of revenue.  Thereafter, the Debtors negotiated a priming DIP financing facility with an unrelated third party and intended to seek approval over the Secured Lenders' objection.  Ultimately the Secured Lenders agreed to provide a DIP facility to fund a four month sale process pursuant to the Court's March 23, 2023, *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-2 (I) Authorizing the Debtors to Use Cash Collateral and Obtain Post-Petition Financing, (II) Granting Liens and Providing Super-Priority Administrative Expenses Status, (III) Granting Adequate Protection, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 117].

20.     The Debtors' concerns regarding the adverse impact on their businesses from failing to enter chapter 11 with committed financing eventually proved prophetic.  The Debtors were unable to provide Network Dealers with sufficient fuel on a timely basis and credit from oil suppliers tightened.   Network Dealers "held back" millions of dollars in rent from the Debtors, further stressing liquidity and resulting in substantial post-petition litigation with the Network Dealers.   The Debtors' lack of liquidity lead to deteriorating relationships with key trading

partners.  Inevitably, instead of leaning into a sale process, the Debtors and its professionals were forced to play defense from the start.

21.     In retrospect, the Debtors were never able to recover from the distress caused by the circumstances under which these cases were filed, including the significant turnover in key personnel prior to and shortly after the filing, despite the Debtors' efforts to implement a Key Employee Retention Plan, and the inability to reconstruct the Debtors' financial records in the accelerated sale process mandated by the milestones that the Secured Lenders demanded (despite the Debtors' professionals' requests for a longer process) in the Final DIP Order (defined below). These circumstances placed a significant burden on the Debtors' advisors and contributed to the lack of reliable books and records that maligned and ultimately led to the demise of the Debtors' chapter 11 sale process and the conversion of the cases to cases under chapter 7, all as more fully discussed below.

22.     Given the pressures on liquidity resulting from the response of the creditors, oil companies and dealers to the emergency chapter 11 filing, and the unavoidable delays in providing diligence material to prospective buyers, the Debtors, after consulting with the newly-formed Official Committee of Unsecured Creditors (the "Committee"), sought further financing from the Secured Lenders to sustain operations and additional time to run the sale process.  The Secured Lenders initially refused to provide more financing to extend the sale process prompting the Debtors to, once again, source an alternative priming facility to provide additional time for the sale.  But, as before, the Secured Lenders, in an effort to avoid being "primed" and in order to maintain control of potential causes of action, ultimately agreed to provide additional financing to extend the sale process by one additional month pursuant to the Court's *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, Bankruptcy Rules 2002, 4001, 6004, and 9014,*

*and Local Rule 4001-1 (I) Authorizing the Debtors to Use Cash Collateral and Obtain Post-Petition Financing, (II) Granting Liens and Providing Super-Priority Administrative Expense Status, (III) Granting Adequate Protection, and (IV) Granting Related Relief* [Docket No. 330] (the "Final DIP Order").[5]

## I.     **The Chapter 11 Sale Process.**

23.     Notwithstanding the foregoing challenges, the Debtors, the Secured Lenders and the Committee agreed that it was in the best interests of the estates and their constituents to proceed with the sale process in the hope that operations would stabilize, allowing the Debtors more time to develop reliable financial and operating data that could be used to support a value-maximizing transaction within the milestones required by the Secured Lenders in the Final DIP Order.

24.     On June 22, 2023, the Court entered its *Order (I) Approving Bid Procedures for Sale of the Debtors' Assets (II) Approving Bid Protections, (III) Scheduling Certain Dates with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, and (V) Approving Contract Assumption and Assignment Procedures* [Docket No. 701] (the "Bid Procedures Order"), establishing deadlines and procedures for the sale of substantially all of the Debtors' assets through an auction that would occur on August 2, 2023.[6]   The Debtors were unable, however, to entice any party to become a stalking horse prior to entry of the Bid Procedures Order.

25.     While the Debtors' professionals made substantial headway post-petition to develop meaningful financial and operational information prospective bidders could rely upon, the

---

[5]     Thereafter, the Secured Lenders agreed to extend further credit to the Debtors and authorize use of cash collateral pursuant to the court's August 5, 2023 *Order Approving Second Amendment to Senior Secured, Super-Priority Debtor In-Possession Credit Agreement* [Docket No. 1042] and August 8, 2023 *Interim Order (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, and (C) Modifying the Automatic Stay* [Docket No. 1223].

[6]     The Auction was originally scheduled for July 28, 2023 but was later continued to August 2, 2023.  *See* Docket No. 1099.

14

Debtors also faced material deterioration in their operational performance on a post-petition basis that impacted the perceived value of the business. At the end of the day, the information produced by the Debtors was either insufficiently fulsome or was not in line with bidders' assumptions on the performance of the Debtors.  These issues were compounded by bidders' requirements for rent reductions from Landlords and the master lessors' unwillingness to break their respective master leases affecting the ability to bring together bidders with an interest in smaller packages across the Debtors' footprint. As such, buyers were not able to, or chose not to, complete the required due diligence to formulate firm bids by the July 21, 2023, bid deadline under the Bid Procedures Order.

26.     Throughout the sale process the Debtors' professionals were completely transparent with the Secured Lenders with respect to the challenges to provide meaningful financial information to the dozens of parties who had expressed interest in acquiring certain aspects of the Debtors' business.   In fact, from the Petition Date through July 28, 2023, the Debtors' professionals met with the Secured Lenders' professionals on a weekly basis and provided detailed updates to the DIP Agent, which included sharing with the Secured Lenders the status and indicated value ranges of IOI's, LOI's, and APA's that had been received. This was done in conjunction with the Debtors' efforts to obtain incremental post-petition financing and represented funding milestones pursuant to the Final DIP Order. Similarly, the Debtors' professionals met with the Committee once or twice each week to update them on operations, liquidity and the progress and challenges of the sale process.

27.     Despite these challenges the Debtors did, however, receive 14 bids from a variety of parties interested in certain aspects of the Debtors' business.   The bids presented certain structural issues including the following: (1) only one bidder proposed an acquisition that would include all (or virtually all) of the Debtors' stores; (2) five other bidders were interested only in

distinct segments of the Debtors' operations; (3) several other bidders were interested only in selected Controlled Sites, based on geographic or brand affinity; (4) none of the bids aligned exactly with the store locations subject to master leases (in other words, such bids would have required the assent of the master lessors to the severability of their master leases to accommodate partial leases and multiple lessees); (5) all of the bids required material reductions in rent from master lessors and the properties leased to the Debtors by Landlords controlling one location; and (6) each of the bids required additional time to close a transaction, and additional liquidity to which the Debtors did not have access. The Debtors' professionals encouraged the Secured Lenders and their professionals to engage with them to evaluate the bids and develop a strategy for maximizing value from the sale process, but they declined the invitation on multiple occasions.

28.    The Debtors requested that the Secured Lenders agree to extend the auction process an additional week to allow the Debtors to work with the bidders to refine their bids, attempt to eliminate contingencies and arrive at a structure that would not require additional financing from the Secured Lenders and that could close within a reasonable time.  The Secured Lenders rejected the Debtors' request for more time and, in the middle of the auction, called a default under the Final DIP Order.

29.    Notwithstanding the Secured Lenders' negative reaction to the auction process, the Debtors proceeded with the auction.  The Debtors were able to negotiate a letter of intent with a prospective buyer which contemplated a sale of substantially all the Debtors' assets of $49 million, of which $20 million was anticipated to be payable at closing to the Secured Lenders, and also carved-out other assets which would further enhance the recovery to the Secured Lenders (the "Successful Bid").  The Debtors' advisors made exhaustive efforts to reach a figure that they believed would be acceptable to the Secured Lenders, including concessions on a portion of fees

incurred by the Debtors' professionals in order to enhance the recovery to the Secured Lenders. While not the result the parties were seeking at the outset of the sale process, the Successful Bid was market tested after an extensive sale process and the best available under the circumstances. The Debtors believed that the amount that the Secured Lenders would receive from the Successful Bid was considerably higher than they would receive in a chapter 7.

30.     The Debtors sought approval from the Court to document the Successful Bid at a hearing on August 6, 2023.  At that hearing, the Court deferred consideration of the Successful Bid and suggested the parties mediate with Judge Isgur to reach a consensual path forward. Mediation with Judge Isgur ultimately proved unsuccessful.

**J.**      **The Appointment of the Trustee and the Conversion of the Cases.**

31.     On August 16, 2023, the DIP Agent filed, *DIP Agent's Emergency Motion to Appoint Chapter 11 Trustee, or in the Alternative, Convert These Chapter 11 Case to Case Under Chapter 7* [Docket No. 1280].

32.     On August 17, 2023, following the *Court's Order Directing the Appointment of a Chapter 11 Trustee* [Docket No. 1284] (the "Chapter 11 Trustee Order"), the United States Trustee (the "U.S. Trustee") filed a *Notice of Appointment of Chapter 11 Trustee* [Docket No, 1286], and appointed Janet S. Northrup to serve as the chapter 11 trustee in the Cases (the "Chapter 11 Trustee").

33.     On August 24, 2023, upon its own motion and the Chapter 11 Trustee's request, the Court converted these Cases to cases under chapter 7 of the Bankruptcy Code [Docket No. 1397] (the "Conversion Order"). Thereafter, Janet Northrup was also appointed as the chapter 7 trustee (the "Chapter 7 Trustee").

## SUMMARY OF HOW PROFESSIONAL FEES AND
## EXPENSES WERE PAID DURING THE CHAPTER 11 PHASE OF THESE CASES

34.     Throughout the chapter 11 phase of these cases, professional fees were paid pursuant to the terms of the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 408] ("Compensation Order"), entered on May 15, 2023, and the Final DIP Order.  The Compensation Order, *inter alia*, established procedures for the payment of 80% of fees and 100% of expenses incurred by estate professionals upon the filing of a monthly fee statement and the passing of an objection deadline with respect to each such Fee Statement.  The Compensation Order further required the periodic filing of interim fee applications with the Court, including for the approval of the remaining 20% of fees contained in a Fee Statement for the applicable period.  Table 1, *infra*, is a summary chart of all of Lugenbuhl's Fee Statements and the amounts paid pursuant thereto.  The amounts included within the April 2023 through June 2023 Fee Statements were included within Lugenbuhl's first interim fee application [Docket No. 1105], which was approved by the Court at Docket No. 1310.

35.     In order to fund the Debtors' estates ongoing obligations to pay professional fees to professionals retained by the Debtors and the Committee, the Final DIP Order contained a feature that is customary in complex chapter 11 cases.  The feature contemplated the Debtors transferring, on a weekly basis, to PSZJ's trust account ("PSZJ Trust Account") an amount sufficient to cover the budgeted professional fees and expenses for that week.  Specifically, paragraph 17 of the Final DIP Order provided that:

> Prior to the occurrence of the Carve-Out Trigger Date, the Carve-Out for Professionals shall be funded on a weekly basis to a trust account of the Debtors' counsel in the amounts specified in the Approved Budget for distribution to such Professionals once such fees and expenses are allowed by the Court. Following the occurrence of the Carve-Out Trigger Date, any remaining fees and expenses in the amount specified in the Approved Budget for the Professionals through the Carve-Out Trigger Date and the Professional Carve-Out Cap shall be funded to a trust

account of the Debtors' counsel and distributed to such Professionals once such fees and expenses are allowed by the Court.

36.     Accordingly, the amounts in the PSZJ Trust Account were to be used exclusively to pay the fees and expenses of the Debtors' and Committee's professionals and could not be accessed by the Debtors or any other party in interest for any purpose.  Thereafter, as payment of the fees became due to the Debtors' and Committee's professionals pursuant to the terms of the Compensation Order (*i.e.* the fees and expenses contained within the Fee Statements and interim fee applications filed by such professionals), PSZJ would transfer funds out of the PSZJ Trust Account to the professionals to pay such fees and expenses.

37.     As of the date these cases were converted to chapter 7, the PSZJ Trust Account contained $5,116,118.18, in addition to PSZJ's prepetition retainer in the amount of $195,301.67 (the "PSZJ Retainer").  In connection with the Conversion Order, the Chapter 11 Trustee requested that the Court order PSZJ to turn over the amounts in the PSZJ Trust Account to the Chapter 7 Trustee.  The Court rejected that request and instead included the following language in paragraph 10 of the Conversion Order:

> The Debtors and their retained professionals shall promptly turn over to the chapter 7 trustee any and all records and estate property under their possession, control or custody, including but not limited to any estate cash or other property held in escrow or trust. Notwithstanding the foregoing, any fee reserves held by the professionals shall remain in the *status quo*, subject of a future order.

38.     On October 3, 2023, PSZJ filed the *Motion of Former Counsel for the Debtors for Entry of an Order Authorizing the Payment of Estate Professionals' Fees Pursuant to Final DIP Order and Professional Fee Order* [Docket No. 1519] (the "Reserve Distribution Motion").[7]  The Reserve Distribution Motion seeks, *inter alia*, authority to distribute the Carve-Out Funds (as

---

[7]     The Reserve Distribution Motion is set to be heard concurrently herewith pursuant to the Scheduling Order.

defined therein) to Lugenbuhl and other estate professionals (as applicable) to the extent allowed under the Compensation Order or pursuant to interim and final compensation orders of this Court. As part of the relief requested herein, the movant seeks authority to apply amounts set aside for Lugenbuhl and other estate professionals under the Final DIP Order from the Carve-Out Funds, as applicable and as more fully discussed in the Reserve Distribution Motion (which is incorporated herein by reference), to satisfy any unpaid amounts under any order granting this Final Application.

39.     On November 1, 2023, the Court approved the "Scheduling Stipulation," establishing that, *inter alia*, this Final Application (among other final fee applications of the chapter 11 estates' professionals) and the Reserve Distribution Motion would be heard by the Court *via* an electronic hearing on February 15, 2024 at 9:00 a.m. (prevailing Central Time).

## SUMMARY OF FEES AND EXPENSES
## REQUESTED IN THIS FINAL APPLICATION AND IN PRIOR APPLICATIONS

40.     Pursuant to the Compensation Order and the Final DIP Order, during these Cases, Lugenbuhl submitted five monthly fee statements (each a "Fee Statement") for the periods of April 7, 2023 through April 30, 2023 [Docket No. 525], May 1, 2023 through May 31, 2023 [Docket No. 745], June 1, 2023 through June 30, 2023 [Docket No. 1018], July 1, 2023 through July 31, 2023  [Docket No. 1236], and August 1, 2023 through August 16, 2023 [Docket No. 1503]. Together, the Fee Statements cover the entire Final Application Period.

41.     On July 27, 2023 and in accordance with the Compensation Order, Lugenbuhl filed the *First Interim Application of Lugenbuhl Wheaton Peck Rankin & Hubbard For Compensation for Services and Reimbursement of Expenses as Counsel to the Debtor for the Period from April 7, 2023 through June 30, 2023* [Docket No. 1105] (the "First Interim Application"). The First Interim Application requested interim allowance of $292,646.50 as fees for services rendered and

$3,515.49 as reimbursement of expenses for the period of the Petition Date through and including June 30, 2023 (*i.e.* the time periods covered by the April through June Fee Statements), in accordance with the terms of the Compensation Order.  On August 18, 2023, the Court entered an Order [Docket No. 1310], granting the First Interim Application (the "Interim Fee Order").

42.     On September 29, 2023, the Chapter 7 Trustee filed objections to two pending fee statements and an interim fee application submitted by various of the estates' retained professionals, including, in response to Lugenbuhl's August Fee Statement, the *Chapter 7 Trustee's Preliminary Objection to Entry of Order Granting Fifth Monthly Fee Statement of Lugenbuhl, Wheaton, Peck, Rankin & Hubbard for Compensation for Services and Reimbursement of Expenses as Special Litigation Counsel to the Debtors for the Period from August 1, 2023 Through August 16, 2023 and Request for Abatement* [Docket No. 1510] ("Preliminary Objection").  The Preliminary Objection contains no substantive objections, merely a request that the Court abate any decision on the August Fee Statement until the Trustee has conducted a general investigation of professionals' fees with the help of a fee examiner.

43.     As of the date of this Final Application, Lugenbuhl has not received any other objections to any of its other Fee Statements or the First Interim Application[8] and the deadlines to object thereto have passed. Accordingly, to date, Lugenbuhl has received payment of (i) 100% of fees and expenses with respect to its April through June Fee Statements (*i.e.* the time periods covered by the First Interim Application and Interim Fee Order). Lugenbuhl has not received payment on account of its July and August Fee Statements.  A summary of the paid and unpaid amounts in the Final Application Period follows in the below **Table 1**:

---

[8]     Nor has there been any filing with respect to the Interim Compensation order.

| Period | Fees Incurred | Fees Paid | Expenses Incurred | Expenses Paid | Balance (Fees & Expenses) |
|---|---|---|---|---|---|
| 04.07.23 - 04.30.23 | $34,190.00 | $34,190.00 | $0.00 | $0.00 | $0.00 |
| 05.01.23 - 05.31.23 | $110,322.50 | $110,322.50 | $272.00 | $272.00 | $0.00 |
| 06.01.23 - 06.30.23 | $148,134.00 | $148,134.00 | $3,243.49 | $3,243.49 | $0.00 |
| 07.01.23 - 07.31.23 | $80,740.50 | $0.00 | $934.62 | $0.00 | $81,675.12 |
| 08.01.23 - 08.16.23 | $28,392.50 | $0.00 | $0.00 | $0.00 | $28,392.50 |
| **Totals:** | **$401,779.50** | **$292,646.50** | **$4,450.11** | **$3,515.49** | **$110,067.62** |

44.     Through this Final Application, Lugenbuhl seeks the final award of compensation, consisting of $401,779.50 as fees for services rendered and $4,450.11 as reimbursement of expenses.  Prior to these cases converting to chapter 7 on August 24, 2023, Lugenbuhl received a total of $292,646.50 in fees and $3,515.49 in reimbursement of expenses, pursuant to provisions of the Bankruptcy Code, the Court's Compensation Order and the Final DIP Order.  Accordingly, as of the date of filing of this Final Application, Lugenbuhl has not been paid a total of $110,067.62 (the "Lugenbuhl Unpaid Amounts").   PSZJ is currently holding $163,978.01 set aside for Lugenbuhl in the PSZJ Trust Account, pursuant to the requirements of the Final DIP Order (the "Lugenbuhl Reserved Funds").   If authorized to apply the Lugenbuhl Reserved Funds to the Lugenbuhl Unpaid Amounts, the balance due to Lugenbuhl will be fully satisfied and excess funds will remain.

45.     The fees charged by Lugenbuhl in these Cases are billed in accordance with Lugenbuhl's existing billing rates and procedures in effect during the Final Application Period. The rates Lugenbuhl charges for the services rendered by its professionals and paraprofessionals in these Cases generally are the same rates Lugenbuhl charges for professional and paraprofessional services rendered in comparable bankruptcy and non-bankruptcy related matters. Such fees are reasonable based on the customary compensation charged by comparably skilled

practitioners in comparable bankruptcy and non-bankruptcy cases in a competitive national legal market.

## JURISDICTION AND VENUE

46.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012.

47.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE DEBTORS' RETENTION OF LUGENBUHL
## AND THE SCOPE OF LUGENBUHL'S ENGAGEMENT

48.     As discussed *supra*, post-Petition Date, it became clear that disputes between the Debtors and its contract-counterparties had become sufficiently contentious that litigation was likely inevitable. These contract counterparties included those parties who entered into fuel sale agreements ("Dealers") with the Debtors, the lessees and sub-lessees of the Debtors' Fueling Centers and the Travel Centers, and the Debtors' Landlords. The Debtors determined it was critical to the estates that they retain a dedicated attorney team with experience litigating in bankruptcy while the Debtors' other professionals focused on the effort to conduct a global assets sale and explored other possible routes of bankruptcy exit for the Debtors. The Debtors selected Lugenbuhl for this special litigation role because of Lugenbuhl's substantial experience with commercial litigation and complex chapter 11 cases; practice before this Court; and knowledge of the Local Rules and practices, as well as Lugenbuhl's highly competitive rates and proximate geographical location to the Court.

49.     On May 8, 2023, Lugenbuhl filed its *Application for Entry of an Order Authorizing the Retention and Employment of Lugenbuhl Wheaton Peck Rankin & Hubbard as Special Litigation Counsel for the Debtors Effective as of April 7, 2023* [Docket No. 376] (the "Lugenbuhl Retention Application"). On June 9, 2023, the Court entered an *Order Approving the Lugenbuhl Retention Application* [Docket No. 510] (the "Retention Order") effective as of April 7, 2023.

50.     The Retention Order authorized the Debtors to compensate and reimburse Lugenbuhl in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any Orders entered in these Chapter 11 Cases. The Retention Order also authorized the compensation of Lugenbuhl at its standard hourly rates and the reimbursement of Lugenbuhl's actual and necessary out-of-pocket expenses incurred, subject to application to this Court.

51.     As set forth in the Lugenbuhl Retention Application, Lugenbuhl was retained by the Debtors to provide specific Services (defined therein) to the Debtors, consisting of the following:

a.     advising the Debtors with respect to matters related to, or arising from disputes between the Debtors and specified Dealers and/or operators;

b.     advising the Debtors with respect to matters related to, or arising from disputes regarding specified leases of Fueling Centers and Travel Centers and/or Fuel Supply Agreements;

c.     taking necessary and appropriate actions to protect and preserve the Debtors' estates, including prosecuting actions on the Debtors' behalf, defending actions commenced against the Debtors, and representing the Debtors in negotiations concerning litigation in which the Debtors are involved, including objections to claims filed against the Debtors' estates or motions to compel the assumption or rejection of executory contracts;

d.     preparing pleadings in connection with the foregoing Services, including motions, applications, answers, orders, reports, and papers necessary or otherwise beneficial to the administration of the Debtors' estates; and

e.     appearing before the Court and any appellate courts to represent the interests of the Debtors' estates in connection with the foregoing Services.

52.     On August 24, 2023, the Court entered an *Order Authorizing the Withdrawal of Lugenbuhl Wheaton Peck Rankin & Hubbard as Debtors' Special Litigation Counsel* [Docket No. 1388].

## SUMMARY OF SERVICES RENDERED
## DURING THE FINAL APPLICATION PERIOD

53.     Attached hereto as **Exhibit 3** is a summary breakdown of hours and amounts billed by timekeeper during the Final Application Period. The summary sheet lists those Lugenbuhl professionals, paraprofessionals, and other personnel who have performed services for the Debtors during the Final Application Period, the capacities in which each individual is employed by Lugenbuhl, the department in which each individual practices, the hourly billing rate charged by Lugenbuhl for services performed by such individual, the year in which each attorney was first licensed to practice law, where applicable, and the aggregate number of hours expended in this matter and fees billed therefor.

54.     Lugenbuhl maintains computerized records of the time spent by all Lugenbuhl attorneys and paraprofessionals in connection with these Cases. Copies of the time records of Lugenbuhl's attorneys and paraprofessionals for the period from April 7, 2023, through August 16, 2023 (*i.e.*, the Final Application Period) were attached to the Fee Statements. True and correct copies of the Fee Statements with the appended time records are attached hereto as **Exhibit 4**.

55.     The following narrative provides a brief summary of the services rendered by Lugenbuhl on behalf of the Debtors during the Final Application Period, organized by project category. The summary that follows is not intended to be a detailed description of the work performed by Lugenbuhl during the Final Application Period, as those day-to-day services and the time expended in performing such services are fully set forth in the contemporaneous time records that are attached to the Fee Statements attached as Exhibit 4. Rather, the following summary

attempts to highlight certain of those areas in which services were rendered during the Final Application Period.

### A.    [B110] Case Administration

Fees:  $12,767.50          Total Hours:   28.80

56.    During the Final Application Period, in connection with the day-to-day management of the work-flow, organization, and efficiency of services provided by the Debtors' professionals and other miscellaneous tasks that are not unique to another category, Lugenbuhl spent time: (i) coordinating with other of the Debtors' other professionals to ensure no work was being duplicated and the needs of the Cases were being adequately addressed; (ii) maintaining an internal calendar of events relevant to Lugenbuhl's Services; and (iii) reviewing the docket and various pleadings potentially relevant to Lugenbuhl's Services.

### B.    [B120] Asset Analysis / Recovery

Fees:  $73,901.00          Total Hours:   148.2

57.    During the Final Application Period, as Special Litigation Counsel, Lugenbuhl spent time, among other things analyzing the Debtors' litigation and accounts receivable assets that might be liquidated, recovered, and used to fund the estates and creditors' recoveries.  At the behest of the Debtors, Lugenbuhl made demands for, and facilitated the recovery of, sums due from the Debtors' contract-counterparties, which included Dealers and the lessees and the sub-lessees of the Debtor's C-Stores, Fueling Centers, and Travel Centers. In addition to Lugenbuhl's attempts to recover sums due to the estate outside of litigation, Lugenbuhl ultimately filed two adversary proceedings[9] against eight Dealer-defendants, who collectively operated approximately

---

[9]    *See Mountain Express Oil Co., et al., v. Imperial Capital LLC, et al.*, Adv. No. 23-03096 (Bankr. S.D. Tex.), *Mountain Express Oil Co., et al., v. GSS Holdings LA LLC, et al.*, Adv. No. 23-03111 (Bankr. S.D. Tex.).

62 Fueling Centers and Travels Centers pursuant to a series of leases and fuel sale agreements executed between the defendants and various of the Debtors. Via the adversary complaints, on behalf of the Debtors, Lugenbuhl alleged eighteen separate counts, and sought over $213,565,479.03 in accelerated rent payments and stipulated damages.

### C.   [B130] Asset Disposition

Fees:   $2,112.50          Total Hours:   3.60

58.     During the Final Application Period, the Debtors' other professionals advised the Debtors through a robust sales and marketing effort in an attempt to sell substantially all of the Debtors' assets through one or more transactions. Lugenbuhl reviewed draft pleadings and filings relating to the Debtors' sale efforts in order to advise the Debtors as to possible impacts on pending litigation with the Debtors' lessees, Landlords, and Dealers.

### D.   [B140] Relief from Stay/Adequate Protection Proceedings

Fees:   $2,535.00          Total Hours:   3.9

59.     Near the end of the Final Application Period, several of the Debtors' Dealers made informal requests to lift or modify the automatic stay or filed formal motions for such relief. Lugenbuhl reviewed and counseled the Debtors with regard to these requests.

### E.   [B150] Meetings of and Communications with Creditors

Fees:   $935.00          Total Hours:   2.2

60.     During the Final Application Period, Lugenbuhl spent time, among other things, communicating with the Debtors' creditors.

### F.   [B160] Fee/Employment Applications

Fees:   $18,774.50          Total Hours:   42.1

61.     During the Final Application Period, Lugenbuhl spent time, among other things: (i) preparing the Interim Compensation Application; (ii) preparing the Fee Statements, (iii) redacting filed invoices and supporting documentation to protect sensitive or privileged information; and (iv) complying with the Bankruptcy Rules and the Local Rules and cooperating with the Office of the United States Trustee.

## G.     [B185] Assumption/Rejection of Leases and Contracts

Fees:   $39,372.50          Total Hours:   77.2

62.     During the Final Application Period, Lugenbuhl spent time (i) reviewing, counseling the Debtors as to, and objecting to requests to compel the rejection of leases by the Debtors; and (ii) reviewing and negotiating reconciliation of rejection cure amounts with the Debtors' Dealers, lessees, and Landlords.

## H.     [B190] Other Contested Matters (excluding assumption/ rejection motions)

Fees:   $230,874.00          Total Hours:   430.5

63.     During the Final Application Period, Lugenbuhl spent time, among other things, (i) advising the Debtors with respect to contested matters related to, or arising from, disputes regarding specified leases of fueling centers and Travel Centers and related fuel supply agreements;  (ii) preparing, filing, and prosecuting motions on the Debtors' behalf against the Debtors' Dealers, Landlords, and lessees regarding, among other things, violations of the automatic stay; (iii) defending from contested matters commenced against the Debtors by the Debtors' Dealers, Landlords, and lessees; (iv) representing the Debtors in negotiations concerning the foregoing; (v) preparing papers in connection with the foregoing, including motions, applications, answers, orders, reports, exhibits, and agendas, necessary or otherwise beneficial to

the administration of the Debtors' estates; and (vi) appearing before the Court to represent the interests of the Debtors' estates in connection with the foregoing.

64.     By the Petition Date, the Debtors' contract-counter parties, particularly its Dealers and Landlords, were voicing deep dissatisfaction with their business relationships with the Debtors. Shortly after Lugenbuhl was retained, it became clear that myriad issues had generated this dissatisfaction, including (allegedly) consistently tardy deliveries of fuel by the Debtors to Dealers and late remission of rents to Landlords. To maintain the Debtors' business operations (as best circumstances would allow) while the marketing and sale of the Debtors' assets was conducted by other professionals, it was necessary for Lugenbuhl to resort to motion practice to enforce the Debtors' pre-petition contracts and defend the Debtors from pre-planned breaches by the Debtors' contract-counterparties of their contracts and the automatic stay.

**I.     [B195] Non-Working Travel at Less than Full Hourly Rates**

        Fees:   $1,690.00        Total Hours:   2.6

65.     During the Final Application Period, the Firm incurred time while traveling on case matters. Non-working travel time is billed at one-half the normal hourly rate.

**J.     [B210] Business Operations**

        Fees:   $12,095.00       Total Hours:   19.3

66.     During the Final Application Period, the Firm spent time, among other things, addressing the daily operational issues of the Debtors, including, but not limited to addressing: (i) fuel supplier inquiries regarding de-branding of the Debtors' stores, (ii) fuel supplier, vendor agreement, and dealer conversion issues, (iii) Landlord inquiries, and (iv) various other day-to-day operational issues.

**K.    [B230] Financing/ Cash Collections**

   Fees:   $4,775.00          Total Hours:   7.9

67.    During the Final Application Period, the Firm spent time, among other things, reviewing the Final DIP Order and related pleadings and attending hearings affecting the Debtors' financing.

**L.    [B250] Real Estate**

   Fees:   $1,752.50          Total Hours:   2.8

68.    During the Final Application Period, the Firm, spent time, among other things, reviewing notices regarding environmental or code enforcement relative to the Debtors' real property interests and responding to Landlords' inquiries.

**M.    [B310] Claims Administration and Objections**

   Fees:   $195.00          Total Hours:   0.3

69.    During the Final Application Period, the Lugenbuhl reviewed the proof of claim of a creditor who was party to an adversary proceeding in which Lugenbuhl represented the Debtors.[10]

**FINAL APPLICATION PERIOD**

70.    The professional services performed by Lugenbuhl on behalf of the Debtors during the Final Application Period required an aggregate expenditure of more than 769.4 hours by Lugenbuhl's managing shareholder, counsel, associates, and paraprofessionals. Of the aggregate time expended in the Final Application Period, 365.2 recorded hours were expended by the managing shareholder of Lugenbuhl, 2.5 recorded hours were expended by counsel, 390.3

---

[10]   *See Samnosh, LLC v. Mountain Express Oil Co.*, Adv. No. 23-03122 (Bankr. S.D. Tex.).

recorded hours were expended by associates, and 11.4 recorded hours were expended by paraprofessionals of Lugenbuhl.

71.     During the Final Application Period, Lugenbuhl billed the Debtors for time expended by attorneys based on hourly rates ranging from $245 to $650 per hour for attorneys. The average hourly rate for professional time billed was $390.83.

72.     Compensation for the foregoing services as requested is commensurate with the complexity, importance, and nature of the problems, issues, and tasks involved. The professional services were performed expediently and efficiently. Lugenbuhl sought to minimize the costs of its services to the Debtors by alternatively using a core group of professionals substantially familiar with the case or junior attorneys and paraprofessionals to handle the more routine aspects of case administration, as the circumstances required.

73.     In sum, the services rendered by Lugenbuhl during the Final Application Period were necessary and beneficial to the Debtors and their estates and were consistently performed in a timely manner commensurate with the complexity, importance, and nature of the issues involved. Accordingly, the final approval of the compensation for professional services and reimbursement of the expenses sought herein is warranted.

## BASIS FOR THE RELIEF REQUESTED

74.     Section 330 of the Bankruptcy Code provides that a Court may award a professional employed under section 327 of the Bankruptcy Code "reasonable compensation for actual, necessary services rendered [and] reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1).

75.     Section 330 also sets forth the criteria for the award of such compensation and reimbursement:

In determining the amount of reasonable compensation to be awarded to

. . . [a] professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –

    A.    the time spent on such services;

    B.    the rates charged for such services;

    C.    whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

    D.    whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

    E.    with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

    F.    whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

76.    In determining the reasonableness of fees, courts routinely employ the twelve factors set forth by the Fifth Circuit in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974) which incorporates and expands upon the requirements of section 330 of the Bankruptcy Code. These factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.* at 123 n.8. In *In re Fourth Colonial Corp. of America*, 544 F.2d 1291, 1298-99 (5th Cir. 1977), *cert. denied*, 431 U.S. 904

(1977), the Fifth Circuit applied the *Johnson* factors to the analysis of fee awards in bankruptcy cases.

77.     Under an analysis utilizing the *Johnson* factors and the standards customarily applied to fee awards under sections 330 of the Bankruptcy Code, Lugenbuhl submits that its request for compensation and reimbursement of expenses is reasonable and proper, and that such request should be allowed in the requested amount.  Lugenbuhl devoted a substantial amount of time and effort addressing the numerous issues involved in these Cases, as summarized above and detailed in Exhibit 4 hereto.

78.     Lugenbuhl respectfully submits that the services for which it seeks compensation in this Final Application were, at the time rendered, believed to be necessary to represent the Debtors effectively and efficiently.

79.     Further, Lugenbuhl submits that consideration of the relevant *Johnson* factors establishes that the compensation requested is reasonable in light of the nature, extent, and value of such services to the Debtors:

(a)     *The Time and Labor Required*. The professional services rendered by Lugenbuhl on behalf of the Debtors have required the expenditure of substantial time and effort, as well as a high degree of professional competence and expertise, in order to deal with the many issues encountered with skill and dispatch. Lugenbuhl respectfully represents that the services rendered by it were performed efficiently, effectively and economically.

(b)     *The Novelty and Difficulty of Questions*. These Cases are designated as "complex" cases prior to their conversion and necessarily involved a significant number of novel or difficult issues in host of areas in connection with the Debtors' restructuring efforts. Lugenbuhl's efforts and effective assistance was for the purpose of maximizing value for the benefit of the estates and their stakeholders.

(c)     *The Skill Required to Perform the Legal Services Properly*. Lugenbuhl believes that its recognized expertise in the area of bankruptcy litigation, particularly before this Court, have contributed to the efficient and effective representation of the Debtors in these Cases.

(d)     *The Preclusion of Other Employment by Applicant Due to Acceptance of the Case*. Lugenbuhl's representation of the Debtors has not precluded its acceptance of new

clients. However, the issues that have arisen in these Cases required attention on a continuing, and often times emergent, basis, requiring Lugenbuhl's professionals to commit significant portions of their time to these Cases.

(e) _The Customary Fee_. The fees sought herein are based upon Lugenbuhl's normal hourly rates for services of this kind. Lugenbuhl respectfully submits that the hourly rates of its professionals are not unusual given the time expended in attending to the representation of the Debtors. Lugenbuhl's hourly rates and the fees requested herein are commensurate with fees Lugenbuhl has been awarded in other cases, as well as with fees charged by other attorneys of comparable experience.

(f) _Whether the Fee is Fixed or Contingent_. The fees requested in this Final Application represent fees incurred based upon a fixed hourly rate basis, contingent upon the Court's approval of this Final Application.

(g) _Time Limitations Imposed by Client or other Circumstances_. Lugenbuhl provided capable legal representation within the time limitations imposed under the unique circumstances of these Cases. The issues that have arisen in these Cases, particularly with respect to the disputes among the various stakeholders, required attention on a continuing, and often times emergent, basis.

(h) _The Amount Involved and Results Obtained_. For the reasons described above, Lugenbuhl respectfully submits that the amount of fees for which compensation is sought is reasonable under the circumstances given the numerous matters that had to be addressed.

(i) _The Experience, Reputation and Ability of the Attorneys_. Lugenbuhl is a professional association whose more than 50 attorneys practice extensively in the fields of bankruptcy and corporate restructuring; litigation; real estate; corporate, finance and business transactions; and other phases of the law. Lugenbuhl has represented debtors, creditors, fiduciaries, and numerous other parties in cases before the Bankruptcy Courts for the Southern District of Texas as well as in various other Bankruptcy Courts throughout the country.

(j) _The Undesirability of the Case_. Not applicable.

(k) _Nature and Length of Professional Relationship_. Not applicable.

(l) _Awards in Similar Cases_. As previously indicated, the fees sought herein are commensurate with fees Lugenbuhl has been awarded in other chapter 11 cases.

80. In sum, the services rendered by Lugenbuhl were necessary and beneficial to the Debtors and were consistently performed in a timely manner commensurate with the complexity, importance, and nature of the issues involved. This Final Application requests final approval of the fees and expenses incurred by Lugenbuhl during the Final Application Period in accordance with section 330 of the Bankruptcy Code. _See_ 11 U.S.C. § 330.

81.   No previous final application for the relief sought herein has been made to this or any other Court.

**WHEREFORE**, Lugenbuhl respectfully requests that the Court: (a) approve final allowance for the period from April 7, 2023 through and including August 16, 2023, in the amount of $406,229.61, consisting of fees for professional services rendered to the Debtors in the amount of $401,779.50 and out-of-pocket expenses incurred in connection with the rendering of such services in the amount of $4,450.11; and (b) grant such other or further relief as may be just and proper under the circumstances.

*Respectfully submitted,*

Dated: November 15, 2023

*/s/ Benjamin W. Kadden*
**LUGENBUHL, WHEATON, PECK, RANKIN & HUBBARD**
Benjamin W. Kadden (TX 24077542)
Coleman L. Torrans (*Pro Hac Vice*)
601 Poydras St., 27thFloor
New Orleans, LA
(t) 504.568.1990
(f) 504.310.9195
bkadden@lawla.com
ctorrans@lawla.com
***Former Special Litigation Counsel to the Debtors and Debtors in Possession***