**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| MOUNTAIN EXPRESS OIL COMPANY, et al., | Case No. 23-90147 (EVR) |
| Debtors. [1] | (Jointly Administered) |

**COVER SHEET TO FINAL APPLICATION OF PACHULSKI STANG ZIEHL &
JONES LLP FOR ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED
AND REIMBURSEMENT OF EXPENSES INCURRED AS COUNSEL TO THE
DEBTORS FOR THE PERIOD FROM MARCH 18, 2023 THROUGH AUGUST 16, 2023**

**Chapter 7 Final Fee Application Coversheet Pursuant to the
Court Procedures of the Honorable Eduardo V. Rodriguez**

| Name of applicant: | | Pachulski Stang Ziehl & Jones LLP |
|---|---|---|
| Applicant's professional role in case: | | Chapter 11 Debtors' Counsel |
| Indicate whether this is an interim or final application: | | This is the Final Application. |
| Date Order of Appointment Signed | | 05/15/2023. Docket No. 406 |
| | **Beginning of Period** | **Ending of Period** |
| Total period covered in application | 03.18.23 | 08.16.23 |
| Time periods covered by any prior applications | 03.18.23 | 06.30.23 |
| Total amounts awarded in all prior applications | | $4,490,136.25 |
| Amount of retainer received in the case | | $195,301.67 |
| Total fees applied for in this application and in all prior applications (including any retainer amounts applied or to be applied) | | $6,161,313.50 |
| Total fees applied for in this application (including any retainer amounts to be applied) | | $6,161,313.50 |
| Total professional fees requested in this application | | $5,824,707.00 |
| Total professional hours covered by this application | | 4,677.60 |

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained for a fee at the Court's website at http://ecf.txsb.uscourts.gov. A login identification and password to the Court's Public Access to Court Electronic Records ("PACER") are required to access this information and can be obtained through the PACER Service Center at http://www.pacer.psc.uscourts.gov. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 Cases (the "Cases") is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022.

| Name of applicant: | Pachulski Stang Ziehl & Jones LLP |
|---|---|
| Average hourly rate for professionals | $1,245.23 |
| Total paraprofessional hours covered by this application | 622.70 |
| Average hourly rate for paraprofessionals | $540.56 |
| Reimbursable expenses sought in this application | $40,140.37 |
| Application Cost | $0.00 |
| Total of other payments paid to Secured Claimants | Unknown |
| Total of other payments paid to Administrative Claimants | Unknown |
| Estimated Total for distribution to Priority Unsecured | Unknown |
| Expected % dividend to be paid to Priority Unsecured | Unknown |
| Estimated total for distribution to General Unsecured | Unknown |
| Expected % dividend to be paid to General Unsecured | Unknown |
| Expected amount to be paid to all pre-petition creditors | Unknown |
| Receipts to date | Unknown |
| Disbursements to date | Unknown |
| Current balance in the Trustee's accounts | Unknown |

Dated: November 15, 2023

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Michael D. Warner*

Michael D. Warner (SBT 00792304)
Steven W. Golden (SBT 24099681)
440 Louisiana Street, Suite 900
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile:  (713) 691-9407
mwarner@pszjlaw.com
sgolden@pszjlaw.com

-and-

Jeffrey N. Pomerantz (admitted *pro hac vice*)
Jeffrey W. Dulberg (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
jpomerantz@pszjlaw.com
jdulberg@pszjlaw.com

*Former Counsel to the Debtors*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>MOUNTAIN EXPRESS OIL COMPANY, et al.,<br><br>Debtors. [1] | Chapter 7<br><br>Case No. 23-90147 (EVR)<br><br>(Jointly Administered) |

**FINAL APPLICATION OF PACHULSKI STANG ZIEHL & JONES LLP FOR ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED AS COUNSEL TO THE DEBTORS FOR THE PERIOD FROM MARCH 18, 2023 THROUGH AUGUST 16, 2023**

**THIS APPLICATION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE APPLICATION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE APPLICATION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE APPLICATION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE APPLICATION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**THERE WILL BE AN ELECTRONIC HEARING ON THIS APPLICATION ON FEBRUARY 15, 2024 AT 9:00 A.M. (CENTRAL TIME) VIA GOTOMEETING, AS PREVIOUSLY ORDERED BY THE COURT. [2]**

**TO PARTICIPATE IN THE HEARING, AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT (832) 917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE RODRIGUEZ'S CONFERENCE ROOM NUMBER IS 999-276. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE RODRIGUEZ'S HOMEPAGE. THE MEETING CODE IS "JUDGERODRIGUEZ". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained for a fee at the Court's website at http://ecf.txsb.uscourts.gov. A login identification and password to the Court's Public Access to Court Electronic Records ("PACER") are required to access this information and can be obtained through the PACER Service Center at http://www.pacer.psc.uscourts.gov. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 Cases (the "Cases") is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022.

[2]   This Final Application is filed in accordance with the dates and deadlines set forth in the *Stipulation Regarding Scheduling Deadlines and Hearing in Connection with Chapter 11 Final Fee Applications and Reserve Distribution Motion* [Docket No. 1632] (the "Scheduling Order"), as approved by the Court.

Pachulski Stang Ziehl & Jones LLP ("PSZJ"), as former counsel to the above-captioned debtors (the "Debtors"), hereby files its final application (this "Final Application") seeking allowance on a final basis of compensation for services rendered and necessary expenses in the above-captioned cases (the "Cases") for the period from March 18, 2023 through August 16, 2023 (the "Final Application Period"), pursuant to section 330 of Title 11 of the United States Code (the "Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2016-1 and 9013-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Southern District of Texas (the "Local Rules").  For the Final Application Period , PSZJ seeks final allowance of $6,161,313.50 as fees for services rendered and $40,410.37 as reimbursement of expenses.[3]  As part and parcel of the foregoing relief, PSZJ further seeks authority to pay an unpaid amounts granted in any order approving this Final Application from the Carve-Out Funds (defined below), to the extent allocable to PSZJ, and the PSZJ Retainer (defined below).  In support of this Final Application, PSZJ submits the declaration of Jeffrey N. Pomerantz attached hereto as **Exhibit 1** and a proposed order granting the Final Application attached hereto as **Exhibit 2**. In further support of this Final Application, PSZJ respectfully states as follows:

## PRELIMINARY STATEMENT

### A.     The Debtors' Corporate Structure and Ownership.

1.     On March 18, 2023 (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  MEX, a Georgia corporation, is the ultimate parent of the other 143 Debtor entities and is privately held.  As of the Petition Date, MEX's equity interests were held as follows: (a) 48.5% by Turjo Wadud, the Debtors' Co-CEO; (b) 48.5% by Lamar Frady, the Debtors' Co-CEO; and (c) 3% by West Hill Ranch Investors, LLC.

---

[3]     Of the amounts of compensation and reimbursement of expenses sought to be approved on a final basis herein, PSZJ has previously received  $4,446,887.00 and $23,248.75 respectively, as more fully detailed below.

B.      **The Debtors' Business Operations.**

2.      As of the Petition Date, the Debtors had three business segments: (a) the "C-Store Operation Business," which consisted of the operation of fueling centers and associated convenience stores ("Fueling Centers"); (b) the "Travel Center Operation Business," which consisted of the operation of travel centers ("Travel Centers"); and (c) the "Fuel Distribution Business," which consisted of the distribution of fuel procured from the Fuel Suppliers.

3.      In structuring their operations, the Debtors typically acquired Fueling Centers and Travel Centers and simultaneously sold them to third-party real estate investment vehicles (the "Landlords") who then leased the Fueling Centers and Travel Centers back to the Debtors pursuant to long-term agreements.  Certain of the Fueling Centers and Travel Centers (collectively, the "Operated Sites") were operated by the Debtors, while most sites were "dealered out," i.e., subleased to third-parties (the "Network Dealers") to operate a Fueling Center on the site (the "Network Dealer Sites" and, together with the Operated Sites, the "Controlled Sites").  The Debtors' Fuel Distribution Business provided fuel to both Controlled Sites and sites in which the Debtors held no real property interest (the "Non-Controlled Sites").

4.      As of the Petition Date, the Debtors had an interest in at total of 855 locations consisting of 828 Fueling Centers and 27 Travel Centers across 27 states.  Of the 855 locations, 550 were Controlled Sites and 305 were Non-Controlled Sites.  Of the 550 Controlled Sites, approximately 350 were operated by Network Dealers, with certain Network Dealers operating multiple sites.  The Debtors were ExxonMobil's second largest customer nationwide and its largest customer in the Southeast.  The Debtors were also a significant customer of several other national Fuel Suppliers, including Shell, Sunoco, and Valero.  In addition, the Debtors were one of the

largest dealers to Pilot Travel Centers; at the same time, Pilot was a Fuel Supplier to the Travel Centers.

**C.**     **The Debtors' Material Creditor Relationships.**

5.     As of the Petition Date, the Debtors (as primary obligor and guarantors) owed approximately $176.5 million under that certain *First Amended and Restated Credit Agreement* dated as of March 12, 2020, as amended, and related agreements to the lender parties thereto (the "Secured Lenders"), which obligations were secured by substantially all of the Debtors' assets. The Debtors were current on their payment obligations to the Secured Lenders as of the Petition Date but were in covenant default since December 21, 2022 for failure to provide financial statements in a timely manner and other alleged breaches.

6.     Each of the Debtors' 550 Controlled Sites were leased from Landlords. Several large REIT's including Blue Owl Real Estate Capital LLC (f/k/a Oak Street Real Estate Capital, LLC) ("Oak Street"), AR Global Investments, LLC, Spirit Realty Capital and Vereit, Inc. controlled approximately 390 of the Controlled Sites with the remainder leased to the Debtors primarily by individual Landlords.  The Debtors in turn subleased the majority of the Controlled Sites to various Network Dealers which operated the Controlled Sites and relied upon the Debtors for, among other things, consistent delivery of fuel.

7.     As of the Petition Date, the Debtors' prepetition liabilities consisted primarily of monies owed for fuel purchases (which were paid pursuant to one of the Debtors' first day motions), prepetition rent owing to AR Global, one of the Debtors' largest Landlords, certain tax payments which the Debtors' professionals learned post-petition had not been paid by the Debtors and related trade payables.

D.      **The Events Precipitating the Chapter 11 Filings.**

8.      The Debtors' most significant Landlord counterparty was Oak Street which controlled 277 locations through a financing facility which commenced on June 30, 2021. An Oak Street designee sat on the Debtors' Board of Directors from December 31, 2021 until January 2023.[4]

9.      As part of the sale/leaseback transactions between Oak Street and the Debtors in the latter half of 2021 and 2022, the parties entered into side letters with respect to environmental assessment and remediation, code compliance, and related matters to be completed at some of the Oak Street Leased Properties after closing of the applicable Oak Street Transaction (the "Post Closing Regulatory and Environmental Work").

10.     In January 2023 because of liquidity concerns Oak Street agreed to capitalize $10 million of rent due under its leases on certain terms and conditions. Soon thereafter, Oak Street requested that the Debtors agree to turn over a substantial number of properties to Oak Street to allow Oak Street to relet the properties to alternative operators. The Debtors refused, as relinquishing a material number of properties to Oak Street would dramatically affect the Debtors' operations and ability to maintain its minimum volumes under its fuel supply contracts as well as favorable and operationally critical volume-based pricing with certain of their fuel suppliers.

11.     On February 17, 2023, apparently concerned with the Debtors' deteriorating financial condition, Oak Street issued several notices of default demanding that the Post Closing Regulatory and Environmental Work be completed within thirty days. Unless the Debtors were

---

[4]     A full description of the Debtors' relationship with Oak Street and the circumstances precipitating the chapter 11 cases is contained in the *Declaration of Michael Healy in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 57] (the "First Day Declaration"). The above is a summary to provide the Court with context on the emergency nature of the chapter 11 filings and the challenges facing the Debtors' professionals who were hired a few weeks before the commencement of the cases. A capitalized term used but not defined herein shall have the meaning ascribed to it in the First Day Declaration.

able to remedy the Post Closing Regulatory and Environmental Work within that time period, Oak Street threatened to terminate the leases for the Debtors' properties, which would have been disastrous.

**E.    The Debtors' Retention of Professionals to Prepare for
Emergency Chapter 11 Filings.**

12.    Faced with increased tensions with Oak Street and the need to consider bankruptcy protection to prevent the loss of a substantial portion of their portfolio, the Debtors retained various professionals to provide restructuring advice. The Debtors retained (a) Raymond James & Associates, Inc. ("Raymond James") as its investment banker on February 10, 2023; (b) PSZJ as restructuring counsel on February 22, 2023; (c) Grant Thornton LLP's ("Grant Thornton") restructuring team as financial advisor on February 27, 2023, to work alongside Grant Thornton's transformational finance team which had previously been engaged to assist the Debtors with financial operations and controls in the months prior to filing and (d) Michael Healy of FTI Consulting, Inc. ("FTI") as their Chief Restructuring Officer and FTI as their financial advisor on March 9, 2023.  The Debtors also appointed two independent directors to their Board on March 15, 2023: Craig Barbarosh, an experienced restructuring lawyer and board member for troubled companies, and Lawrence Perkins, the Founder and Chief Executive Officer of SierraConstellation Partners, LLC, a nationally-recognized advisory firm.

13.    Accordingly, this was not a case where the Debtors' restructuring advisors had the luxury of time to diligence the Debtors' business, analyze its operations, liquidity, and contractual relationships and commence an out-of-court process designed to attract additional capital or a buyer. Rather, from the moment the Debtors' professionals were retained they were in "triage" mode and facing an impending liquidity crisis.  In the first three weeks of their engagement, the Debtors' professionals were proceeding down parallel paths of negotiating with Oak Street for a

forbearance agreement to either avoid, or at the very least delay chapter 11 filings and preparing the Debtors for an emergency freefall filing with as soft a landing as possible.

**F.      The State of the Debtors' Financial and Operational Records
        Which Adversely Impacted Operations and the Sale Process.**

14.      One thing became apparent to the Debtors' professionals only after the outset of the engagement:  the Debtors' financial, accounting and operational records were in utter disarray (or did not exist) and required complete reconstruction to provide meaningful information to both assist the Debtors in operating their businesses and prepare the Debtors' business for sale (and ultimately to provide responses to prospective buyers' requests for information).  For example, the following is a non-exhaustive list of the challenges the Debtors' professionals faced: (a) the Debtors lacked complete and current financial statements (their most recent audited financial statements were for the period ending December 31, 2021); (b) the Debtors were unable to generate accurate or current store level profit and loss statements, fuel gallon and margin data, and in-store financials (such as inventory levels, product pricing, and food sales); (c) the Debtors lacked historical information about store level environmental and zoning compliance; (d) the Debtors were missing leases, contracts, and other agreements integral to the management of the business and lacked systems altogether for storing and retrieving this data; (e) the Debtors did not maintain detailed, store-level accounting on unamortized fuel branding discounts and rebates provided by major oil companies and related store-specific "imaging" liabilities; (f) the Debtors provided inaccurate financial and operational data that, once discovered by the Debtors' professionals, resulted in the Debtors revising the associated results/projections; and (g) the Debtors did not maintain an accurate or reliable record of tax filings, furloughs and outstanding tax obligations.

15.      These problems, among others, made normal customary tasks like preparation of the Schedules of Assets and Liabilities, Statements of Financial Affairs and Monthly Operating

Reports or motions to reject leases or sell assets, extremely challenging and very time-consuming. On May 4, 2023, the Debtors re-engaged Grant Thornton on a post-petition basis as an ordinary course professional to try to create, effectively from scratch, basic financial information necessary to administer the chapter 11 cases and conduct the sale process. Ultimately, on July 17, 2023, the Debtors were instructed by the Secured Lenders to cease the Grant Thornton work and terminate efforts to complete the financial statements prior to the conclusion of the sale process. Additionally, these deficiencies, as well as many others, adversely impacted the sale process. Some examples of how these deficiencies impacted the sale process include: (a) buyers self-selecting out of the process after expressing strong initial interest due to lack of reliable and comprehensive diligence information; (b) undermining buyer confidence in the Debtors' available diligence information; (c) buyer concerns regarding unknown potential environmental and regulatory liabilities that might exist post-acquisition; (d) buyer inability to accurately underwrite performance due to lack of information; (e) assessment by buyers that the Debtors lacked detailed understanding of performance data, resulting in the Debtors entering into unattractive leases with unsustainable rents; and (f) concerns regarding post-acquisition integration and regulatory approval requirements.

16.     The state of the Debtors' financial records was an issue for these Debtors even before the disputes with Oak Street arose which led directly to the chapter 11 filings. Prior to the Petition Date, the Secured Lenders were aware of the Debtors' inability to produce meaningful financial information, having declared an event of default on December 21, 2022, for failure to provide contractually required financial statements. Following the post-petition retention of Grant Thornton as an ordinary course professional to assist in preparing the financials, the Debtors' advisors provided regular updates to the Secured Lenders on the status of Grant Thornton's work.

**G.    The Debtors' Unsuccessful Efforts to Negotiate a Forbearance Agreement with Oak Street or Obtain Committed Financing from the Secured Lenders Prior to the Commencement of the Chapter 11 Cases.**

17.    The Debtors' professionals' efforts to negotiate a forbearance agreement with Oak Street failed as the conditions placed thereon by Oak Street would have decimated the Debtors' business.  Accordingly, by the second week of March 2023 it became apparent that a chapter 11 filing would be necessary.  The Debtors' professionals turned their attention to negotiating a DIP financing facility with the Secured Lenders to provide as smooth of an entry to chapter 11 as possible and facilitate a runway to a value-maximizing transaction.

18.    Unfortunately, the Secured Lenders were unwilling to commit to provide the Debtors with any post-petition financing commitment before chapter 11 cases were filed.  As a result, the Debtors commenced the chapter 11 cases on March 18, 2023, to avoid termination of the hundreds of locations Oak Street leased to the Debtors.  The Debtors warned the Secured Lenders that the lack of financing – and the inability to send a strong message to the Debtors' dealers, oil suppliers and vendors that the Debtors had sufficient liquidity to support the chapter 11 filing—would have serious and long-lasting effects and undermine the chapter 11 process.

**H.    The Commencement of the Chapter 11 Cases and Post-Petition Financing.**

19.    The Debtors commenced these cases on Saturday, March 18, 2023, without any committed DIP financing facility.  At a hearing on Monday, March 20, 2023, the Debtors obtained one week use of cash collateral to purchase fuel.  As a result of this, the Debtors' fuel suppliers immediately restricted the terms and credit limits associated with daily fuel purchases, further constraining the Debtors' liquidity, resulting in reduced fuel shipments, and as a result a loss of fuel margin, the Debtors' primary source of revenue.  Thereafter, the Debtors negotiated a priming DIP financing facility with an unrelated third party and intended to seek approval over the Secured Lenders' objection.  Ultimately the Secured Lenders agreed to provide a DIP facility to fund a four

month sale process pursuant to the Court's March 23, 2023, *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-2 (I) Authorizing the Debtors to Use Cash Collateral and Obtain Post-Petition Financing, (II) Granting Liens and Providing Super-Priority Administrative Expenses Status, (III) Granting Adequate Protection, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 117].

20.     The Debtors' concerns regarding the adverse impact on their businesses from failing to enter chapter 11 with committed financing eventually proved prophetic.  The Debtors were unable to provide Network Dealers with sufficient fuel on a timely basis and credit from oil suppliers tightened.   Network Dealers "held back" millions of dollars in rent from the Debtors, further stressing liquidity and resulting in substantial post-petition litigation with the Network Dealers.  The Debtors' lack of liquidity lead to deteriorating relationships with key trading partners.  Inevitably, instead of leaning into a sale process, the Debtors and its professionals were forced to play defense from the start.

21.     In retrospect, the Debtors were never able to recover from the distress caused by the circumstances under which these cases were filed, including the significant turnover in key personnel prior to and shortly after the filing, despite the Debtors' efforts to implement a Key Employee Retention Plan, and the inability to reconstruct the Debtors' financial records in the accelerated sale process mandated by the milestones that the Secured Lenders demanded (despite the Debtors' professionals' requests for a longer process) in the Final DIP Order (defined below). These circumstances placed a significant burden on the Debtors' advisors and contributed to the lack of reliable books and records that maligned and ultimately led to the demise of the Debtors'

chapter 11 sale process and the conversion of the cases to cases under chapter 7, all as more fully discussed below.

22.     Given the pressures on liquidity resulting from the response of the creditors, oil companies and dealers to the emergency chapter 11 filing, and the unavoidable delays in providing diligence material to prospective buyers, the Debtors, after consulting with the newly-formed Official Committee of Unsecured Creditors (the "Committee"), sought further financing from the Secured Lenders to sustain operations and additional time to run the sale process.  The Secured Lenders initially refused to provide more financing to extend the sale process prompting the Debtors to, once again, source an alternative priming facility to provide additional time for the sale.  But, as before, the Secured Lenders, in an effort to avoid being "primed" and in order to maintain control of potential causes of action, ultimately agreed to provide additional financing to extend the sale process by one additional month pursuant to the Court's *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-1 (I) Authorizing the Debtors to Use Cash Collateral and Obtain Post-Petition Financing, (II) Granting Liens and Providing Super-Priority Administrative Expense Status, (III) Granting Adequate Protection, and (IV) Granting Related Relief* [Docket No. 330] (the "Final DIP Order").[5]

## I.      The Chapter 11 Sale Process.

23.     Notwithstanding the foregoing challenges, the Debtors, the Secured Lenders and the Committee agreed that it was in the best interests of the estates and their constituents to proceed

---

[5]     Thereafter, the Secured Lenders agreed to extend further credit to the Debtors and authorize use of cash collateral pursuant to the court's August 5, 2023 *Order Approving Second Amendment to Senior Secured, Super-Priority Debtor In-Possession Credit Agreement* [Docket No. 1042] and August 8, 2023 *Interim Order (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, and (C) Modifying the Automatic Stay* [Docket No. 1223].

with the sale process in the hope that operations would stabilize, allowing the Debtors more time to develop reliable financial and operating data that could be used to support a value-maximizing transaction within the milestones required by the Secured Lenders in the Final DIP Order.

24.     On June 22, 2023, the Court entered its *Order (I) Approving Bid Procedures for Sale of the Debtors' Assets (II) Approving Bid Protections, (III) Scheduling Certain Dates with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, and (V) Approving Contract Assumption and Assignment Procedures* [Docket No. 701] (the "Bid Procedures Order"), establishing deadlines and procedures for the sale of substantially all of the Debtors' assets through an auction that would occur on August 2, 2023.[6] The Debtors were unable, however, to entice any party to become a stalking horse prior to entry of the Bid Procedures Order.

25.     While the Debtors' professionals made substantial headway post-petition to develop meaningful financial and operational information prospective bidders could rely upon, the Debtors also faced material deterioration in their operational performance on a post-petition basis that impacted the perceived value of the business. At the end of the day, the information produced by the Debtors was either insufficiently fulsome or was not in line with bidders' assumptions on the performance of the Debtors.  These issues were compounded by bidders' requirements for rent reductions from Landlords and the master lessors' unwillingness to break their respective master leases affecting the ability to bring together bidders with an interest in smaller packages across the Debtors' footprint. As such, buyers were not able to, or chose not to, complete the required due diligence to formulate firm bids by the July 21, 2023, bid deadline under the Bid Procedures Order.

26.     Throughout the sale process the Debtors' professionals were completely transparent with the Secured Lenders with respect to the challenges to provide meaningful

---

[6]   The Auction was originally scheduled for July 28, 2023 but was later continued to August 2, 2023.  *See* Docket No. 1099.

financial information to the dozens of parties who had expressed interest in acquiring certain aspects of the Debtors' business.   In fact, from the Petition Date through July 28, 2023, the Debtors' professionals met with the Secured Lenders' professionals on a weekly basis and provided detailed updates to the DIP Agent, which included sharing with the Secured Lenders the status and indicated value ranges of IOI's, LOI's, and APA's that had been received. This was done in conjunction with the Debtors' efforts to obtain incremental post-petition financing and represented funding milestones pursuant to the Final DIP Order. Similarly, the Debtors' professionals met with the Committee once or twice each week to update them on operations, liquidity and the progress and challenges of the sale process.

27.     Despite these challenges the Debtors did, however, receive 14 bids from a variety of parties interested in certain aspects of the Debtors' business.   The bids presented certain structural issues including the following: (1) only one bidder proposed an acquisition that would include all (or virtually all) of the Debtors' stores; (2) five other bidders were interested only in distinct segments of the Debtors' operations; (3) several other bidders were interested only in selected Controlled Sites, based on geographic or brand affinity; (4) none of the bids aligned exactly with the store locations subject to master leases (in other words, such bids would have required the assent of the master lessors to the severability of their master leases to accommodate partial leases and multiple lessees); (5) all of the bids required material reductions in rent from master lessors and the properties leased to the Debtors by Landlords controlling one location; and (6) each of the bids required additional time to close a transaction, and additional liquidity to which the Debtors did not have access.  The Debtors' professionals encouraged the Secured Lenders and their professionals to engage with them to evaluate the bids and develop a strategy for maximizing value from the sale process, but they declined the invitation on multiple occasions.

28. The Debtors requested that the Secured Lenders agree to extend the auction process an additional week to allow the Debtors to work with the bidders to refine their bids, attempt to eliminate contingencies and arrive at a structure that would not require additional financing from the Secured Lenders and that could close within a reasonable time. The Secured Lenders rejected the Debtors' request for more time and, in the middle of the auction, called a default under the Final DIP Order.

29. Notwithstanding the Secured Lenders' negative reaction to the auction process, the Debtors proceeded with the auction. The Debtors were able to negotiate a letter of intent with a prospective buyer which contemplated a sale of substantially all the Debtors' assets of $49 million, of which $20 million was anticipated to be payable at closing to the Secured Lenders, and also carved-out other assets which would further enhance the recovery to the Secured Lenders (the "Successful Bid"). The Debtors' advisors made exhaustive efforts to reach a figure that they believed would be acceptable to the Secured Lenders, including concessions on a portion of fees incurred by the Debtors' professionals in order to enhance the recovery to the Secured Lenders. While not the result the parties were seeking at the outset of the sale process, the Successful Bid was market tested after an extensive sale process and the best available under the circumstances. The Debtors believed that the amount that the Secured Lenders would receive from the Successful Bid was considerably higher than they would receive in a chapter 7.

30. The Debtors sought approval from the Court to document the Successful Bid at a hearing on August 6, 2023. At that hearing, the Court deferred consideration of the Successful Bid and suggested the parties mediate with Judge Isgur to reach a consensual path forward. Mediation with Judge Isgur ultimately proved unsuccessful.

**J.**     **The Appointment of the Trustee and the Conversion of the Cases.**

31.     On August 16, 2023, the DIP Agent filed, *DIP Agent's Emergency Motion to Appoint Chapter 11 Trustee, or in the Alternative, Convert These Chapter 11 Case to Case Under Chapter 7* [Docket No. 1280].

32.     On August 17, 2023, following the *Court's Order Directing the Appointment of a Chapter 11 Trustee* [Docket No. 1284] (the "Chapter 11 Trustee Order"), the United States Trustee (the "U.S. Trustee") filed a *Notice of Appointment of Chapter 11 Trustee* [Docket No, 1286], and appointed Janet S. Northrup to serve as the chapter 11 trustee in the Cases (the "Chapter 11 Trustee").

33.     On August 24, 2023, upon its own motion and the Chapter 11 Trustee's request, the Court converted these Cases to cases under chapter 7 of the Bankruptcy Code [Docket No. 1397] (the "Conversion Order"). Thereafter, Janet Northrup was also appointed as the chapter 7 trustee (the "Chapter 7 Trustee").

**SUMMARY OF FEES AND EXPENSES REQUESTED IN THIS FINAL APPLICATION AND HOW PROFESSIONAL FEES AND EXPENSES WERE PAID DURING THE CHAPTER 11 PHASE OF THESE CASES**

34.     Through this Final Application, PSZJ seeks the final award of compensation, consisting of $6,161,313.50 as fees for services rendered and $40,410.37 as reimbursement of expenses.  Prior to these cases converting to chapter 7 on August 24, 2023, PSZJ received a total of $4,446,877.00 in fees and $23,248.75 in reimbursement of expenses, pursuant to provisions of the Bankruptcy Code, the Court's *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 408] (the "Compensation Order"), and the Final DIP Order.  Accordingly, as of the date of filing of this Final Application, PSZJ has not been paid a total of $1,711,587.62 (the "PSZJ Unpaid Amounts").  PSZJ is currently holding $634,863.75 set aside for PSZJ in PSZJ's trust account (the "PSZJ Trust Account"), pursuant to

the requirements of the Final DIP Order (the "PSZJ Reserved Funds").  PSZJ is also holding $195,301.67 as a prepetition retainer (the "PSZJ Retainer").  If authorized to apply the PSZJ Reserved Funds and the PSZJ Retainer to the PSZJ Unpaid Amounts, there will still be a balance due of $881,422.20, which PSZJ understands will be subject to payment of claims of higher priority.

35.     Throughout the chapter 11 phase of these cases, professional fees were paid pursuant to the terms of the Compensation Order and Final DIP Order.  The Compensation Order, *inter alia*, established procedures for the payment of 80% of fees and 100% of expenses incurred by estate professionals upon the filing of a monthly fee statement (each a "Fee Statement") and the passing of an objection deadline with respect to each such Fee Statement.  The Compensation Order further required the periodic filing of interim fee applications with the Court, including for the approval of the remaining 20% of fees contained in a Fee Statement for the applicable period. The following is a chart of PSZJ's March through July 2023 Fee Statements and the amounts paid pursuant thereto, as well as the amounts incurred by PSZJ in August 2023 prior to the appointment of the Chapter 11 Trustee.  The amounts included within the March 2023 through June 2023 Fee Statements were included within PSZJ's first interim fee application [Docket No. 1090], which was approved by the Court at Docket No. 1279.

| Period | Fee Statement Docket No. | Fees Incurred | Fees Paid | Expenses Incurred | Expenses Paid | Balance (Fees & Expenses) |
|---|---|---|---|---|---|---|
| 03.18.23 - 03.31.23 | 410 | $  831,220.00 | $  831,220.00 | $ 5,194.52 | $ 5,194.52 | $        0.00 |
| 04.01.23 - 04.30.23 | 491 | $1,439,375.00 | $1,439,375.00 | $ 3,354.81 | $ 3,354.81 | $        0.00 |
| 05.01.23 - 05.31.23 | 530 | $1,141,979.00 | $1,141,979.00 | $ 2,601.26 | $ 2,601.26 | $        0.00 |
| 06.01.23 - 06.30.23 | 1054 | $1,054,313.50 | $1,054,313.50 | $12,098.16 | $12,098.16 | $        0.00 |

| Period | Fee Statement Docket No. | Fees Incurred | Fees Paid | Expenses Incurred | Expenses Paid | Balance (Fees & Expenses) |
|---|---|---|---|---|---|---|
| 07.01.23 - 07.31.23 | 1296 | $ 886,557.50 | $ 0.00 | $ 3,067.37 | $ 0.00 | $889,624.87 |
| 08.01.23 – 08.16.23 | N/A | $ 807,868.50 | $ 0.00 | $14,094.25 | $ 0.00 | $821,962.75 |
| | Totals: | $6,161,313.50 | $4,466,887.50 | $40,410.37 | $23,248.75 | $1,711,587.62 |

36.     In order to fund the Debtors' estates ongoing obligations to pay professional fees to professionals retained by the Debtors and the Committee, the Final DIP Order contained a feature that is customary in complex chapter 11 cases.  The feature contemplated the Debtors transferring, on a weekly basis, to the PSZJ Trust Account an amount sufficient to cover the budgeted professional fees and expenses for that week.  Specifically, paragraph 17 of the Final DIP Order provided that:

> Prior to the occurrence of the Carve-Out Trigger Date, the Carve-Out for Professionals shall be funded on a weekly basis to a trust account of the Debtors' counsel in the amounts specified in the Approved Budget for distribution to such Professionals once such fees and expenses are allowed by the Court. Following the occurrence of the Carve-Out Trigger Date, any remaining fees and expenses in the amount specified in the Approved Budget for the Professionals through the Carve-Out Trigger Date and the Professional Carve-Out Cap shall be funded to a trust account of the Debtors' counsel and distributed to such Professionals once such fees and expenses are allowed by the Court.

37.     Accordingly, the amounts in the PSZJ Trust Account were to be used exclusively to pay the fees and expenses of the Debtors' and Committee's professionals and could not be accessed by the Debtors or any other party in interest for any purpose.  Thereafter, as payment of the fees became due to the Debtors' and Committee's professionals pursuant to the terms of the Compensation Order (*i.e.* the fees and expenses contained within the Fee Statements and interim fee applications filed by such professionals), PSZJ would transfer funds out of the PSZJ Trust Account to the professionals to pay such fees and expenses.

38.     As of the date these cases were converted to chapter 7, the PSZJ Trust Account contained $5,116,118.18.   In connection with the Conversion Order, the Chapter 11 Trustee requested that the Court order PSZJ to turn over the amounts in the PSZJ Trust Account to the Chapter 7 Trustee.   The Court rejected that request and instead included the following language in paragraph 10 of the Conversion Order:

> The Debtors and their retained professionals shall promptly turn over to the chapter 7 trustee any and all records and estate property under their possession, control or custody, including but not limited to any estate cash or other property held in escrow or trust. Notwithstanding the foregoing, any fee reserves held by the professionals shall remain in the *status quo*, subject of a future order.

39.     On October 3, 2023, PSZJ filed the *Motion of Former Counsel for the Debtors for Entry of an Order Authorizing the Payment of Estate Professionals' Fees Pursuant to Final DIP Order and Professional Fee Order* [Docket No. 1519] (the "Reserve Distribution Motion").[7]   The Reserve Distribution Motion seeks, *inter alia*, authority to distribute the Carve-Out Funds (as defined therein) and PSZJ Retainer to PSZJ and other estate professionals (as applicable) to the extent allowed under the Compensation Order or pursuant to interim and final compensation orders of this Court.   As part of the relief requested herein, PSZJ seeks authority to apply amounts set aside for PSZJ and other estate professionals under the Final DIP Order from the Carve-Out Funds and PSZJ Retainer, as applicable and as more fully discussed in the Reserve Distribution Motion (which is incorporated herein by reference), to satisfy any unpaid amounts under any order granting this Final Application .

---

[7]     The Reserve Distribution Motion is set to be heard concurrently herewith pursuant to the Scheduling Order.

## JURISDICTION AND VENUE

40.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334 and

the *Amended Standing Order of Reference from the United States District Court for the Southern*

*District of Texas*, dated May 24, 2012.

41.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and

Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and

1409.

## THE DEBTORS' RETENTION OF PSZJ

42.     On April 14, 2023, PSZJ filed its *Application for Entry of an Order Authorizing the*

*Retention and Employment of Pachulski Stang Ziehl & Jones LLP as Counsel for the Debtors*

*Effective as of March 18, 2023* [Docket No. 281] (the "PSZJ Retention Application").

43.     On May 15, 2023, the Court entered an Order Approving the PSZJ Retention

Application [Docket No. 406] (the "Retention Order").  The Retention Order authorized the

Debtors to compensate and reimburse PSZJ in accordance with the Bankruptcy Code, the

Bankruptcy Rules, the Local Rules, and any Orders entered in these Chapter 11 Cases. The

Retention Order also authorized the compensation of PSZJ at its standard hourly rates and the

reimbursement of PSZJ's actual and necessary out-of-pocket expenses incurred, subject to

application to this Court.

44.      On August 24, 2023, the Court entered its *Order Authorizing the Withdrawal of*

*Pachulski Stang Ziehl & Jones LLP as Debtors' Counsel* [Docket No. 1390].

## SUMMARY OF SERVICES RENDERED
## DURING THE FINAL APPLICATION PERIOD

45.     A summary breakdown of hours and amounts billed by timekeeper during the Final

Application Period is attached hereto as **Exhibit 3**.  Additionally, the following narrative provides

a brief summary of the services rendered by PSZJ on behalf of the Debtors during the Final Application Period, organized by project category.  The summary that follows is intended to highlight certain areas in which services were rendered during the Final Application Period but is not intended to be a detailed description of the work performed by PSZJ during the Final Application Period.  Rather, these day-to-day services and the time expended in performing such services by all timekeepers during the Final Application Period are fully set forth in the contemporaneous time records that are attached as **Exhibit 4**.

A.    **Asset Analysis / Recovery**

Fees:   $113,176.00        Total Hours:   104.20

46.    As of the Petition Date, the Debtors were parties to approximately one dozen purchase agreements which contemplated the Debtors' acquisition of additional locations to grow the Debtors' dealer network.  The Firm, working together with FTI, analyzed these transactions, conducted legal research and prepared a memorandum regarding the effect of the bankruptcy filing on the deadlines applicable to each or these transactions and fielded calls from non-debtor counterparties to discuss the disposition of these acquisition opportunities.  In addition, the Firm performed other services, from time to time, relating to the analysis of the Debtors' assets that arose in the course of the chapter 11 cases.

B.    **Asset Disposition**

Fees:   $1,561,314.00        Total Hours:   1,132.30

47.    As discussed above, the principal focus of the Firm and the Debtors' other professionals during the five months that these cases were in chapter 11 was to facilitate a robust marketing process designed to generate the highest and best value for the Debtors' assets for the benefit of stakeholders through one or more transactions.  As discussed above, the Firm faced

substantial challenges in connection with the sale process relating to the lack of adequate financial information.  The sale process was further complicated by the existence of multiple master leases which impacted flexibility to sell the Debtors' assets in segments.   During the early stages of these cases, the Firm worked with the Debtors' other professionals to devise a marketing process which took into account available liquidity, the expected diligence needs of potential bidders and the expected timeline to closing.

48.    In connection with the sale efforts, the Firm (a) prepared a form Asset Purchase Agreement which was provided to all potential bidders; (b) conducted substantial negotiations with GPM Investments, LLC, an affiliate of ARKO Corp., ("ARKO"), over a period of several weeks to document a proposed stalking horse purchase agreement including the exchange of many drafts of a proposed Asset Purchase Agreement, which, unfortunately, never came to fruition; (c) prepared a motion to establish bidding procedures and litigated that motion when the Secured Lenders objected to several of the provisions contained therein; (d) communicated extensively through weekly meetings with the Secured Lenders, the Committee and their professionals regarding all aspects of the sale process; (e) responded to diligence requests from potential bidders; (f) participated in numerous strategy meetings, often several times a week, with Raymond James and FTI to strategize in connection with the sale process; (g) reviewed 14 bids that were submitted in connection to purchase all or certain parts of the Debtors' business; (h) participated in a three day in person auction in New York City; (i) negotiated a Letter of Intent which detailed a transaction to sell substantially all of the Debtors' assets to ARKO which contemplated total consideration for substantially all of the Debtors' assets of $49 million, of which $20 million was anticipated to be payable at closing to the Secured Lenders and left behind other assets to be liquidated; (j) prepared for an evidentiary hearing seeking approval of the sale over the Secured

Lenders' objection; (k) participated in a week long mediation with Judge Marvin Isgur to try to reach an agreement with the Secured Lenders, the Committee and the Debtors regarding a going concern transaction; and (l) participated in a hearing after the unsuccessful mediation to address how the cases would proceed in the absence of a going concern sale.

C.      **Bankruptcy Litigation**

Fees:   $442,867.00      Total Hours:   413.90

49.      One of the consequences of the Debtors' lack of liquidity entering into these cases was the deterioration of the Debtors' relationships with its trading partners, landlords and dealers. This deterioration resulted in material litigation during these cases which was time consuming, costly and distracting towards efforts to stabilize the Debtors' businesses and run an effective sale process. Litigation was focused on several areas.

50.      *First*, the Debtors' inability to provide reliably fuel to Dealers resulted in a significant number of dealers refusing to pay rent which significantly strained liquidity. The Firm worked closely with special litigation counsel to address these matters, first by negotiation and then by litigation spearheaded by special litigation counsel.

51.      *Second*, after efforts to renegotiate the Debtors' leases covering several dozen locations with landlord AR Global/ Necessity failed, the Firm prepared and prosecuted motions to reject those leases. AR Global/Necessity objected contending that the Debtors could not reject the leases without addressing certain regulatory and environmental issues at the properties. The parties engaged in discovery, negotiated interim stipulations regarding the payment of rent prior to the hearing and prepared for a contested evidentiary hearing over the next several

weeks.  Ultimately the Debtors and AR Global/ Necessity agreed to resolve the disputes without litigation and negotiated a settlement and prosecuted a motion seeking approval thereof.[8]

52.     During the Final Application Period, the Firm also spent material time prosecuting a motion seeking approval of the appointment of the Debtors' Independent Directors, opposition to which was raised by the U.S. Trustee and the Committee.[9] The Firm engaged in discovery with the Committee and participated in a contested hearing after which the Court largely granted the relief requested.

53.     Additional work performed by the Firm during the Final Application Period and billed to the Bankruptcy Litigation category included: finalizing various first day motions and preparing them for filing, preparing agendas and witness and exhibit lists, reviewing and analyzing various motions and filed oppositions and conferring with estate professionals regarding strategies regarding same, preparing for and attending the first day hearing and other hearings related thereto, and preparing witness outlines for contested hearings.

D.     **Case Administration**

Fees:   $639,700.50          Total Hours:   638.80

54.     Because of the dire circumstances upon which the Debtors entered chapter 11, the recent retention of virtually all of the Debtors' professionals and the complexity of the Debtors' business operations, coordination of the administration of the cases was critical.  Accordingly, the Firm, FTI, and Raymond James participated in standing calls, often multiple times a week and oftentimes with Debtors' personnel, to coordinate the massive amount of work – both legal and financial – required in these cases.  Similarly, the Firm conducted weekly internal calls to

---

[8]   Certain of the matters related to the AG Global/Necessity issues discussed above were also contained in other categories, principally the Executory Contract category discussed below.

[9]   Certain of the matters related to the retention of the Debtors' retention of the Independent Directors were also contained in the Retention of Professionals category.

appropriately and efficiently handle the extensive services the Firm provided the Debtors during these cases.  These "work in progress" calls comprise a significant portion of the time billed to the Case Administration category.  In addition, during the Final Application Period the Firm also spent time (i) submitting electronic hearing appearances; (ii) reviewing, revising, and filing various pleadings in accordance with local practice and rules; (iii) preparing various critical date and work-in-process memoranda regarding case status and various dates and deadlines in the cases; and (iv) preparing a notice of appearance and various witness and exhibit lists.

**E.**     **Claims Administration and Objections**

> Fees:  $52,207.50          Total Hours:   56.80

55.     During the Final Application Period, the Firm spent time, among other things: responding to creditor inquiries, preparing a motion to set claims bar dates, addressing various claim disputes, reviewing and analyzing certain filed claims, addressing various tax claim issues, and reviewing administrative expense claims.

**F.**     **Compensation of Professionals**

> Fees:  $59,963.50          Total Hours:   62.60

56.     During the Final Application Period, the Firm spent time, among other things: preparing a motion for approval of interim compensation procedures, addressing ordinary course professional fee payments, maintaining a professional fee reserve account, preparing and filing the Firm's Fee Statements and interim fee application, and  assisting the Debtors' professionals with the preparation and filing of their Fee Statements and interim fee applications.

G.      **Corporate Governance**

Fees:   $262,057.00          Total Hours:   237.10

57.      The urgency, pace, complexity and problems faced by the Debtors during these cases required an active Board of Directors which, as of just prior to the Petition Dates, included two new Independent Directors.  The Firm participated in numerous meetings of the Board of Directors and the Special Transactions Committee, sometimes occurring several times a week, on a variety of topics including the status of post-petition financing, the concerns with being able to produce meaningful financial information and a very complicated sale process.  The Firm had virtually constant communication with members of the Board of Directors throughout these cases, prepared and circulated minutes of meetings of the Board of Directors and Special Transactions Committee and otherwise advised members of the Board of Directors on how to fulfill their fiduciary duties.

H.      **Employee Benefits**

Fees:   $50,640.50          Total Hours:   38.50

58.      During the Final Application Period, the Firm, spent time among other things, preparing a motion to allow for payment of employee wages and benefits, performing research, conferring with the Debtors Professionals and addressing issues in connection with an approved KERP program, and preparing a motion in connection therewith, addressing workers' compensation issues, and addressing WARN and wind-down issues.

I.      **Executory Contracts**

Fees:   $913,154.00          Total Hours:   806.80

59.      At the commencement of the Firm's representation of the Debtors, the Debtors lacked a full understanding of the Debtors' contractual relationships that governed (i) their

relationships with fuel suppliers; (ii) their relationships with the Network Dealers who operated hundreds of locations; (iii) their relationships with parties who had fuel supply contracts only with the Debtors, and (iv) the locations where the Debtors operated Fueling Centers and Travel Centers. Similarly, in connection with the potential assumption and assignment of real estate leases in connection with the sale process, Oak Street asserted significant non-monetary regulatory and environmental defaults under leases with the Debtors, which the Debtors lacked a full understanding of their nature, extent and ability to cure.

60.     As a result of the foregoing, and given the urgent need to organize and synthesize massive amounts of information for parties interested in acquiring the Debtors' assets, the Firm was required to expend a significant amount of time locating, categorizing, understanding, evaluating and synthesizing all of this information. On top of all this, the Firm spent a substantial amount of time preparing for litigation, and ultimately settling with the AR Global/Necessity landlords, regarding the Debtors' rejection of leases therewith.

61.     Accordingly, during the Final Application Period, the Firm spent time, among other things: reviewing and analyzing real property and equipment leases, and hundreds of contracts by working with FTI and outside environmental consultants to develop an extensive database to evaluate cure issues, prepare three omnibus lease/contract rejection motions which were met with significant opposition from the AR Global/Necessity landlords because of the condition of the leasehold properties and environmental concerns (time relating to these issues was also billed to the Bankruptcy Litigation category, as discussed above); reviewing and analyzing numerous agreements with fuel suppliers and working with them to address their concerns throughout these cases; and addressing numerous fuel supplier contract issues, and fielding inquiries and resolving numerous issues arising with contract counterparties.

J.    **Financial Filings**

Fees:   $176,872.50          Total Hours:   211.90

62.      Because of the condition of the Debtors' financial records and the 145 Debtors in these cases, preparation of the Debtors' schedules of assets and liabilities, statements of financial affairs and monthly operating reports was extremely challenging.  The Firm worked closely with FTI, Raymond James and Grant Thornton to provide as detailed and as accurate information as possible on a timely basis.  During the Final Application Period, the Firm spent time, among other things: assisting the Debtors in preparing for and attending the initial debtor interview with the U.S. Trustee, assisting the Debtors and its professionals in the analysis, preparation and filing of the Debtors' schedules of asset and liabilities and statements of financial affairs and global notes thereto, assisting the Debtors and their professionals with the preparation and filing of the monthly operating reports, and assisting the Debtors and their professionals with the preparation and filing of its Rule 2015.3 reports.

K.    **Financing**

Fees:   $704116.00          Total Hours:   520.20

63.      As discussed above, obtaining sufficient financing to enable the Debtors to sustain operations to run a sale process designed to maximize value was a critical issue the Firm and the Debtors' other professionals addressed throughout the chapter 11 cases.  Unlike most cases where financing is negotiated prior to the chapter 11 filing and post-petition efforts are limited to obtaining court approval, the Debtors had no financing in place when the case filed.  The following is a summary of the key financing events that occurred during these cases all of which required significant effort from the Firm: (i) pursuit of use of cash collateral, on a contested and emergency basis, in the first couple of days of these cases; (ii) status conferences during the first

week of the case to address the status of obtaining financing; (iii) pursuit of contested priming financing, not once but twice, when the Secured Lenders refused to agree to sufficient financing; (iv) negotiating, documentation, and subsequently obtaining approval of debtor in possession financing (including negotiating a financing agreement exceeding 100 pages) from the Secured Lenders after they agreed to provide financing instead of being primed; (v) engaging with the Committee, after its appointment, to address issues in connection with final approval of the financing which involved substantial negotiations with the Secured Lenders who initially refused to extend additional financing the Debtors, which the Committee believed was necessary, resulting in the need to source another priming commitment when the Secured Lenders again refused to provide financing before they ultimately relented; and (vi) two additional modifications of the financing because of the deterioration in the Debtors' operations, which required substantial negotiations with the Secured Lenders and the threat of further litigation. In addition, the Firm and the Debtors' other professionals participated in weekly meetings with the Secured Lenders' professionals and several meetings with the Secured Lender group to address issues that came up with operations and the need for additional financing. The fragile nature of the Debtors' business operations and the Secured Lenders' unwillingness to extend financing that the Debtors believed necessary to create a sufficient runway to a sale process made the financing process in these cases was intense, time consuming, adversarial and much more costly than in the typical complex chapter 11 case.

L.   **General Creditors' Committee**

Fees: $49,105.00         Total Hours: 38.00

64.   During the Final Application Period, the Firm spent time, among other things: conferring with the U.S. Trustee regarding Committee formation, preparing for and attending

regular Committee update calls, addressing Committee comments to first and second day motions, and addressing Committee issues with various ordinary course professionals retained in the case.

**M.**     **Insurance Coverage**

Fees:  $39,709.50          Total Hours:   30.10

65.     During the Final Application Period, the Firm spent time, among other things: reviewing and analyzing the Debtors' pre-petition insurance policies, including but not limited to their D&O policy; continuing to document D&O insurance policies obtained to protect the Debtors' Independent Directors; coordinating the placement of the D&O policies with the Independent Directors and the Debtors' insurance broker; and addressing issues arising in connection with the D&O insurance during the course of these cases.

**N.**     **Litigation (Non-Bankruptcy)**

Fees:  $49,462.50          Total Hours:   51.70

66.     During the Final Application Period, the Firm, spent time, among other things: performing research, reviewing and analyzing various state court and other regulatory litigation claims against the debtors, preparing and coordinating filing of litigation stay notices, responding to litigant inquiries and preparing stay letters in connection therewith, engaging outside litigation counsel to assist with various state court litigation actions, and preparing a motion to extend the statutory removal deadline.

**O.**     **Meeting of Creditors**

Fees:  $10,918.50          Total Hours:   9.50

67.     During the Final Application Period, the Firm spent time, among other things, assisting the Debtors with the preparation for and attendance at the initial and continued 341(a) meetings of creditors.

P.    **Operations**

Fees:   $452,036.00          Total Hours:   397.40

68.    As discussed above, from the outset of the Debtors' chapter 11 cases, the Debtors experienced liquidity constraints which caused the deterioration of relationships with their trade partners and the significant disruption to their operations.  The operational issues that arose or were discovered post-petition were legion.  During the Final Application Period, the Firm expended substantial effort in order to stabilize operations in order to maximize value in support of the Debtors' sale and marketing process.

69.    More particularly, the Firm expended time during the Final Application Period, among other things: (i) addressing fuel supply issues to maintain operations and engaging with the Debtors' fuel suppliers regarding such issues, as well as issues attendant thereto such as branding rebate/incentive issues and the negotiation of vendor agreements; (ii) engaging with the Debtors' trade suppliers and other critical vendors regarding the post-petition supply of goods and services, including the supply of rebranding services and state lottery inventory and equipment, that were critical to preserving value; (iii) engaging with the Debtors' dealers regarding the supply of fuel and other operational issues, including franchisor issues in certain locations, to maintain ongoing operations; (iv) addressing dozens of utility delinquency and disconnection notices to ensure adequate utility services at the Debtors' locations, as well as negotiation and resolving multiple utility adequate assurance requests; (v) researching, preparing, and engaging with the Debtors regarding a motion [Docket No. 189] to establish procedures for the transition of operations at certain locations from the Debtors to third party dealers; (vi) beginning to investigate, analyze, and evaluate issues related to affiliated non-Debtor counterparties; (vii) addressing credit card receipt reconciliation and payment issues and related cash management system issues; and (viii) reviewing

and assisting with the resolution of numerous environmental and underground storage tank compliance and transfer issues, certain of which constituted purported violations and defaults under the Debtors' real estate leases discussed above, including engaging with the Debtors' special environmental counsel and third party environmental compliance vendor, MVI.

Q.     **Plan and Disclosure Statement**

Fees:  $11,549.50          Total Hours:  9.90

70.     During the Final Application Period, the Firm spent time, among other things: responding to a term sheet that contemplated a plan of reorganization as opposed to a Section 363 sale and preparing and filing a motion to extend the Debtors' plan filing and solicitation exclusivity deadlines.

R.     **Retention of Professionals**

Fees:  $307,195.00          Total Hours:   286.50

71.     As set forth above, the status of the Debtors' records, operational, and compliance matters were haphazard from the outset of these chapter 11 cases.  These issues became increasingly more acute as the Firm and the Debtors' other professionals investigated and addressed these issues throughout the cases in order to stabilize operations and conduct a fulsome and rob use sale and marketing process.  In this regard, in addition to the professionals commonly retained by debtors in complex chapter 11 cases, the Debtors required the assistance of numerous professionals to assist with and remediate these challenges to the fullest extent possible within the milestones demanded by the Secured Lenders under the Final DIP Order.

72.     During the Final Application Period, the Firm expended time preparing the PSZJ Retention Application and assisted with the preparation and prosecution of the retention applications of FTI, to supply the Debtors' CRO and additional personnel as financial advisors,

and Raymond James, as investment banker.  Additionally, the Firm was also required to expend material time addressing and litigating with the Committee regarding Raymond James' retention and the Committee's objection thereto, including preparing for a deposition with respect thereto.  Ultimately, the Firm's efforts resulted in the resolution of the Committee's concerns regarding Raymond James' retention.

73.     In addition to the retentions of these typical chapter 11 professionals, the Debtors required the assistance of numerous ordinary course professionals, as well as numerous special counsels, including special environmental counsel and special litigation counsel.  Moreover, because at the commencement of these cases it appeared likely that a sale of the Debtors' assets could implicate concerns and obligations under the Hart-Scott-Rodino Act, the Debtors required the assistance of special antitrust counsel.  During the Final Application Period, the Firm assisted with the retention of all of these professionals, a significant undertaking given their numerosity, and engaged with the Committee and U.S. Trustee regarding their retentions.  Additionally, the Firm also assisted with the preparation and prosecution of an application to retain its two independent directors (certain time litigating these matters was also included within the Bankruptcy Litigation category, discussed above), including preparing a reply to objections by the U.S. Trustee and Committee, and preparing for a contested hearing with respect thereto, at which the Court largely granted the relief requested. The Firm also reviewed and engaged with the Committee regarding the retention of its professionals in these chapter 11 cases.

S.     **Stay Litigation**

Fees:   $173,826.00        Total Hours:   181.40

74.     Because of the unsophistication of many of the Debtors' trading partners, these cases resulted in an unusual number of parties violating the automatic stay.  As a result, the Firm

spent substantial time and effort addressing these violations (the substantial amount of the cost of which was reimbursed to the Debtors pursuant to Court Order), several of which required the filing and prosecution of motions to hold parties in civil contempt. Accordingly, during the Final Application Period, the Firm spent time, among other things addressing various stay violation issues, including: preparing correspondence in connection with such violations of the automatic stay, preparing motions for enforcement of the automatic stay and for sanctions in connection with violations by various "self-help" creditors, preparing for and attending hearings on such "self-help" violation motions, and conferring with estate professionals regarding stay violation damages.

T.  **Tax Issues**

> Fees:  $58,321.50          Total Hours:  51.70

75.    During the Final Application Period, the Firm spent time, among other things: reviewing and analyzing inquiries from various taxing authorities, analyzing tax claims, conferring with estate professionals regarding the Debtors' tax returns, performing research regarding tax obligations, addressing tax issues with the U.S. Trustee, and reviewing, analyzing and performing research regarding fuel tax issues.

U.  **Travel**

> Fees:  $33,121.50          Total Hours:  21.00

76.    During the Final Application Period, the Firm incurred time while traveling on case matters. Non-working travel time is billed at one-half the normal hourly rate.

## FINAL APPLICATION PERIOD

77.    The professional services performed by PSZJ on behalf of the Debtors during the Final Application Period required an aggregate expenditure of more than 5,300.30 hours by PSZJ's partners, counsel, associates, paraprofessionals, and other non-legal staff. Of the aggregate time

expended in the Final Application Period, 3,591.10 recorded hours were expended by partners of PSZJ, 318.50 recorded hours were expended by counsel, 768.00 recorded hours were expended by associates, and 622.70 recorded hours were expended by paraprofessionals and others of PSZJ.

78.     During the Final Application Period, PSZJ billed the Debtors for time expended by attorneys based on hourly rates ranging from $735.00 to $1,895.00 per hour for attorneys. Allowance of compensation in the amount requested would result in a blended hourly billing rate of approximately $1,245.23 (based on 4,677.60 recorded hours for professionals at PSZJ's agreed billing rates in effect at the time of the performance of services).

79.     Compensation for the foregoing services as requested is commensurate with the complexity, importance, and nature of the problems, issues, and tasks involved. The professional services were performed expediently and efficiently. Whenever possible, PSZJ sought to minimize the costs of its services to the Debtors by utilizing junior attorneys and paraprofessionals to handle the more routine aspects of case administration.

80.     In sum, the services rendered by PSZJ during the Final Application Period were necessary and beneficial to the Debtors and their estates and were consistently performed in a timely manner commensurate with the complexity, importance, and nature of the issues involved. Accordingly, the final approval of the compensation for professional services and reimbursement of the expenses sought herein is warranted.

## BASIS FOR THE RELIEF REQUESTED

81.     Section 330 of the Bankruptcy Code provides that a Court may award a professional employed under section 327 of the Bankruptcy Code "reasonable compensation for actual, necessary services rendered [and] reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1).

82.     Section 330 also sets forth the criteria for the award of such compensation and reimbursement:

> In determining the amount of reasonable compensation to be awarded to . . . [a] professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –
>
> A.     the time spent on such services;
>
> B.     the rates charged for such services;
>
> C.     whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> D.     whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>
> E.     with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>
> F.     whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

83.     In determining the reasonableness of fees, courts routinely employ the twelve factors set forth by the Fifth Circuit in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974) which incorporates and expands upon the requirements of section 330 of the Bankruptcy Code. These factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.* at 123 n.8. In *In re Fourth*

*Colonial Corp. of America*, 544 F.2d 1291, 1298-99 (5th Cir. 1977), *cert. denied*, 431 U.S. 904 (1977), the Fifth Circuit applied the *Johnson* factors to the analysis of fee awards in bankruptcy cases.

84.     Under an analysis utilizing the *Johnson* factors and the standards customarily applied to fee awards under sections 330 of the Bankruptcy Code, PSZJ submits that its request for compensation and reimbursement of expenses is reasonable and proper, and that such request should be allowed in the requested amount.  PSZJ devoted a substantial amount of time and effort addressing the numerous issues involved in these Cases, as summarized above and detailed in **Exhibit 4** hereto.  Whenever possible, PSZJ sought to minimize the costs of its services to the Debtors by utilizing junior attorneys and paraprofessionals to handle the more routine aspects of case administration.

85.     PSZJ respectfully submits that the services for which it seeks compensation in this Final Application were, at the time rendered, believed to be necessary to represent the Debtors effectively and efficiently.

86.     Further, PSZJ submits that consideration of the relevant *Johnson* factors establishes that the compensation requested is reasonable in light of the nature, extent, and value of such services to the Debtors:

(a)     *The Time and Labor Required*. The professional services rendered by PSZJ on behalf of the Debtors have required the expenditure of substantial time and effort, as well as a high degree of professional competence and expertise, in order to deal with the many issues encountered with skill and dispatch. PSZJ respectfully represents that the services rendered by it were performed efficiently, effectively and economically.

(b)     *The Novelty and Difficulty of Questions*. These Cases are designated as "complex" cases prior to their conversion and necessarily involved a significant number of novel or difficult issues in host of areas in connection with the Debtors' restructuring efforts. PSZJ's efforts and effective assistance was for the purpose of maximizing value for the benefit of the estates and their stakeholders.

(c)     *The Skill Required to Perform the Legal Services Properly*. PSZJ believes that its recognized expertise in the area of insolvency proceedings and reorganization, particularly before this Court, have contributed to the efficient and effective representation of the Debtors in these Cases.

(d)     *The Preclusion of Other Employment by Applicant Due to Acceptance of the Case*. PSZJ's representation of the Debtors has not precluded its acceptance of new clients. However, the issues that have arisen in these Cases required attention on a continuing, and often times emergent, basis, requiring PSZJ's professionals to commit significant portions of their time to these Cases.

(e)     *The Customary Fee*. The fees sought herein are based upon PSZJ's normal hourly rates for services of this kind. PSZJ respectfully submits that the hourly rates of its professionals are not unusual given the time expended in attending to the representation of the Debtors. PSZJ's hourly rates and the fees requested herein are commensurate with fees PSZJ has been awarded in other cases, as well as with fees charged by other attorneys of comparable experience.

(f)     *Whether the Fee is Fixed or Contingent*. The fees requested in this Final Application represent fees incurred based upon a fixed hourly rate basis, contingent upon the Court's approval of this Final Application.

(g)     *Time Limitations Imposed by Client or other Circumstances*. PSZJ provided capable legal representation within the time limitations imposed under the unique circumstances of these Cases. The issues that have arisen in these Cases, particularly with respect to the disputes with the Secured Lenders and the sale process, required attention on a continuing, and often times emergent, basis.

(h)     *The Amount Involved and Results Obtained*. For the reasons described above, PSZJ respectfully submits that the amount of fees for which compensation is sought is reasonable under the circumstances given the numerous matters that had to be addressed.

(i)     *The Experience, Reputation and Ability of the Attorneys*. PSZJ is a professional association whose more than 80 attorneys practice extensively in the fields of bankruptcy and corporate restructuring; litigation; real estate; corporate, finance and business transactions; employment and other phases of the law. PSZJ has represented debtors, creditors, fiduciaries, and numerous other parties in cases before the Bankruptcy Courts for the Southern District of Texas as well as in various other Bankruptcy Courts throughout the country.

(j)     *The Undesirability of the Case*. Not applicable.

(k)     *Nature and Length of Professional Relationship*. Not applicable.

(l)     *Awards in Similar Cases*. As previously indicated, the fees sought herein are commensurate with fees PSZJ has been awarded in other chapter 11 cases.

87.     In sum, the services rendered by PSZJ were necessary and beneficial to the Debtors and were consistently performed in a timely manner commensurate with the complexity, importance, and nature of the issues involved.  This Final Application requests final approval of

Case 23-90147   Document 1721   Filed in TXSB on 11/15/23   Page 40 of 40

the fees and expenses incurred by PSZJ during the Final Application Period in accordance with section 330 of the Bankruptcy Code. *See* 11 U.S.C. § 330.

88.     No previous final application for the relief sought herein has been made to this or any other Court.

**WHEREFORE**, PSZJ respectfully requests that the Court: (a) approve final allowance for the period from March 18, 2023 through and including August 16, 2023, in the amount of $6,201,723.87, consisting of fees for professional services rendered to the Debtors in the amount of $6,161,313.50 and out-of-pocket expenses incurred in connection with the rendering of such services in the amount of $40,410.37; (b) authorize the disbursement of funds from the Carve-Out Funds and PSZJ Retainer to satisfy any unpaid amounts approved by the Court with respect hereto; and (c) grant such other or further relief as may be just and proper under the circumstances.

Dated: November 15, 2023

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Michael D. Warner*

Michael D. Warner (SBT 00792304)
Steven W. Golden (SBT 24099681)
440 Louisiana Street, Suite 900
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile:  (713) 691-9407
mwarner@pszjlaw.com
sgolden@pszjlaw.com

-and-

Jeffrey N. Pomerantz (admitted *pro hac vice*)
Jeffrey W. Dulberg (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
jpomerantz@pszjlaw.com
jdulberg@pszjlaw.com

*Former Counsel to the Debtors*

LA:4894-3719-2589.7 58614.002                                        40