**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| MOUNTAIN EXPRESS OIL COMPANY, et al., | Case No. 23-90147 (EVR) |
| Debtors. [1] | (Jointly Administered) |

**COVER SHEET TO FINAL APPLICATION OF FTI CONSULTING, INC. FOR
ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND
REIMBURSEMENT OF EXPENSES INCURRED AS FINANCIAL ADVISOR TO THE
DEBTORS FOR THE PERIOD FROM MARCH 18, 2023 THROUGH AUGUST 24, 2023**

**Chapter 7 Final Fee Application Coversheet Pursuant to the
Court Procedures of the Honorable Eduardo V. Rodriguez**

| Name of applicant: | | FTI Consulting, Inc. |
|---|---|---|
| Applicant's professional role in case: | | Chapter 11 Debtors' Financial Advisor |
| Indicate whether this is an interim or final application: | | This is the Final Application. |
| Date Order of Appointment Signed | | 05/15/2023. Docket No. 405 |
| | **Beginning of Period** | **Ending of Period** |
| Total period covered in application | 03.18.23 | 08.24.23 |
| Time periods covered by any prior applications | 03.18.23 | 07.31.23 |
| Total amounts awarded in all prior applications | | $6,321,672.23 |
| Amount of retainer received in the case | | $0 |
| Total fees applied for in this application and in all prior applications (including any retainer amounts applied or to be applied) | | $7,180,713.20 |
| Total fees applied for in this application (including any retainer amounts to be applied) | | $7,180,713.20 |
| Total professional fees requested in this application | | $7,180,713.20 |

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained for a fee at the Court's website at http://ecf.txsb.uscourts.gov. A login identification and password to the Court's Public Access to Court Electronic Records ("PACER") are required to access this information and can be obtained through the PACER Service Center at http://www.pacer.psc.uscourts.gov. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 Cases (the "Cases") is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022.

| Name of applicant: | FTI Consulting, Inc. |
|---|---|
| **Total professional hours covered by this application** | 9,950.00 |
| **Average hourly rate for professionals** | $721.68 |
| **Total paraprofessional hours covered by this application** | 0.00 |
| **Average hourly rate for paraprofessionals** | $0.00 |
| **Reimbursable expenses sought in this application** | $131,360.10 |
| **Application Cost** | $0.00 |
| **Total of other payments paid to Secured Claimants** | Unknown |
| **Total of other payments paid to Administrative Claimants** | Unknown |
| **Estimated Total for distribution to Priority Unsecured** | Unknown |
| **Expected % dividend to be paid to Priority Unsecured** | Unknown |
| **Estimated total for distribution to General Unsecured** | Unknown |
| **Expected % dividend to be paid to General Unsecured** | Unknown |
| **Expected amount to be paid to all pre-petition creditors** | Unknown |
| **Receipts to date** | Unknown |
| **Disbursements to date** | Unknown |
| **Current balance in the Trustee's accounts** | Unknown |

Dated:  November 15, 2023           **FTI CONSULTING, INC.**

Chief Restructuring Officer


*/s/ Michael Healy*

Michael Healy
Senior Managing Director
1166 Avenue of the Americas.
15th Floor
New York, New York 10036
(212) 247-1010

*Former Financial Advisor to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | Chapter 7 |
| MOUNTAIN EXPRESS OIL COMPANY, et al., | Case No. 23-90147 (EVR) |
| Debtors. [1] | (Jointly Administered) |

**FINAL APPLICATION OF FTI CONSULTING, INC. FOR ALLOWANCE OF
COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF
EXPENSES INCURRED AS FINANCIAL ADVISOR TO THE DEBTORS FOR THE
PERIOD FROM MARCH 18, 2023 THROUGH AUGUST 24, 2023**

**THIS APPLICATION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE APPLICATION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE APPLICATION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE APPLICATION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE APPLICATION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**THERE WILL BE AN ELECTRONIC HEARING ON THIS APPLICATION ON FEBRUARY 15, 2024 AT 9:00 A.M. (CENTRAL TIME) VIA GOTOMEETING, AS PREVIOUSLY ORDERED BY THE COURT.[2]**

**TO PARTICIPATE IN THE HEARING, AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT (832) 917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE RODRIGUEZ'S CONFERENCE ROOM NUMBER IS 999-276. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE RODRIGUEZ'S HOMEPAGE. THE MEETING CODE IS "JUDGERODRIGUEZ". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained for a fee at the Court's website at http://ecf.txsb.uscourts.gov.  A login identification and password to the Court's Public Access to Court Electronic Records ("PACER") are required to access this information and can be obtained through the PACER Service Center at http://www.pacer.psc.uscourts.gov. The location of Debtor Mountain Express Oil Company's principal place of business and the Debtors' service address in these Chapter 11 Cases (the "Cases") is 3650 Mansell Road, Suite 250, Alpharetta, GA 30022.

[2]   This Final Application is filed in accordance with the dates and deadlines set forth in the *Stipulation Regarding Scheduling Deadlines and Hearing in Connection with Chapter 11 Final Fee Applications and Reserve Distribution Motion* [Docket No. 1632] (the "Scheduling Order"), as approved by the Court.

FTI Consulting, Inc. ("FTI"), the former financial advisor to the above-captioned debtors (the "Debtors"), hereby files its final application (this "Final Application") seeking allowance on a final basis of compensation for services rendered and necessary expenses for the period from March 18, 2023 through August 24, 2023 (the "Final Application Period"), pursuant to sections 330 and 331 of Title 11 of the United States Code (the "Bankruptcy Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2016-1 and 9013-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Southern District of Texas (the "Local Rules"), and the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 397] (the "Compensation Order").  For the Final Application Period, FTI seeks final allowance of $7,180,713.20 as fees for services rendered and $131,360.10 as reimbursement of expenses.  In support of this Final Application, FTI submits the declaration of Michael Healy attached hereto as **Exhibit 1** and a proposed order granting the Final Application attached hereto as **Exhibit 2**.  In further support of this Final Application, FTI respectfully states as follows:

## PRELIMINARY STATEMENT

**A.**     **The Debtors' Corporate Structure and Ownership.**

1.     On March 18, 2023 (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  MEX, a Georgia corporation, is the ultimate parent of the other 143 Debtor entities and is privately held.  As of the Petition Date, MEX's equity interests were held as follows: (a) 48.5% by Turjo Wadud, the Debtors' Co-CEO; (b) 48.5% by Lamar Frady, the Debtors' Co-CEO; and (c) 3% by West Hill Ranch Investors, LLC.

B.      **The Debtors' Business Operations.**

2.      As of the Petition Date, the Debtors had three business segments: (a) the "C-Store Operation Business," which consisted of the operation of fueling centers and associated convenience stores ("Fueling Centers"); (b) the "Travel Center Operation Business," which consisted of the operation of travel centers ("Travel Centers"); and (c) the "Fuel Distribution Business," which consisted of the distribution of fuel procured from the Fuel Suppliers.

3.      In structuring their operations, the Debtors typically acquired Fueling Centers and Travel Centers and simultaneously sold them to third-party real estate investment vehicles (the "Landlords") who then leased the Fueling Centers and Travel Centers back to the Debtors pursuant to long-term agreements.  Certain of the Fueling Centers and Travel Centers (collectively, the "Operated Sites") were operated by the Debtors, while most sites were "dealered out," i.e., subleased to third-parties (the "Network Dealers") to operate a Fueling Center on the site (the "Network Dealer Sites" and, together with the Operated Sites, the "Controlled Sites").  The Debtors' Fuel Distribution Business provided fuel to both Controlled Sites and sites in which the Debtors held no real property interest (the "Non-Controlled Sites").

4.      As of the Petition Date, the Debtors had an interest in at total of 855 locations consisting of 828 Fueling Centers and 27 Travel Centers across 27 states.  Of the 855 locations, 550 were Controlled Sites and 305 were Non-Controlled Sites.  Of the 550 Controlled Sites, approximately 350 were operated by Network Dealers, with certain Network Dealers operating multiple sites.  The Debtors were ExxonMobil's second largest customer nationwide and its largest customer in the Southeast.  The Debtors were also a significant customer of several other national Fuel Suppliers, including Shell, Sunoco, and Valero.  In addition, the Debtors were one of the

largest dealers to Pilot Travel Centers; at the same time, Pilot was a Fuel Supplier to the Travel Centers.

**C.**    **The Debtors' Material Creditor Relationships.**

5.      As of the Petition Date, the Debtors (as primary obligor and guarantors) owed approximately $176.5 million under that certain *First Amended and Restated Credit Agreement* dated as of March 12, 2020, as amended, and related agreements to the lender parties thereto (the "Secured Lenders"), which obligations were secured by substantially all of the Debtors' assets. The Debtors were current on their payment obligations to the Secured Lenders as of the Petition Date but were in covenant default since December 21, 2022 for failure to provide financial statements in a timely manner and other alleged breaches.

6.      Each of the Debtors' 550 Controlled Sites were leased from Landlords. Several large REIT's including Blue Owl Real Estate Capital LLC (f/k/a Oak Street Real Estate Capital, LLC) ("Oak Street"), AR Global Investments, LLC, Spirit Realty Capital and Vereit, Inc. controlled approximately 390 of the Controlled Sites with the remainder leased to the Debtors primarily by individual Landlords.  The Debtors in turn subleased the majority of the Controlled Sites to various Network Dealers which operated the Controlled Sites and relied upon the Debtors for, among other things, consistent delivery of fuel.

7.      As of the Petition Date, the Debtors' prepetition liabilities consisted primarily of monies owed for fuel purchases (which were paid pursuant to one of the Debtors' first day motions), prepetition rent owing to AR Global, one of the Debtors' largest Landlords, certain tax payments which the Debtors' professionals learned post-petition had not been paid by the Debtors and related trade payables.

D.    **The Events Precipitating the Chapter 11 Filings.**

8.    The Debtors' most significant Landlord counterparty was Oak Street which controlled 277 locations through a financing facility which commenced on June 30, 2021.  An Oak Street designee sat on the Debtors' Board of Directors from December 31, 2021 until January 2023.[3]

9.    As part of the sale/leaseback transactions between Oak Street and the Debtors in the latter half of 2021 and 2022, the parties entered into side letters with respect to environmental assessment and remediation, code compliance, and related matters to be completed at some of the Oak Street Leased Properties after closing of the applicable Oak Street Transaction (the "Post Closing Regulatory and Environmental Work").

10.    In January 2023 because of liquidity concerns Oak Street agreed to capitalize $10 million of rent due under its leases on certain terms and conditions.  Soon thereafter, Oak Street requested that the Debtors agree to turn over a substantial number of properties to Oak Street to allow Oak Street to relet the properties to alternative operators. The Debtors refused, as relinquishing a material number of properties to Oak Street would dramatically affect the Debtors' operations and ability to maintain its minimum volumes under its fuel supply contracts as well as favorable and operationally critical volume-based pricing with certain of their fuel suppliers.

11.    On February 17, 2023, apparently concerned with the Debtors' deteriorating financial condition, Oak Street issued several notices of default demanding that the Post Closing Regulatory and Environmental Work be completed within thirty days.  Unless the Debtors were

---

[3]    A full description of the Debtors' relationship with Oak Street and the circumstances precipitating the chapter 11 cases is contained in the *Declaration of Michael Healy in Support of Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 57] (the "First Day Declaration").  The above is a summary to provide the Court with context on the emergency nature of the chapter 11 filings and the challenges facing the Debtors' professionals who were hired a few weeks before the commencement of the cases. A capitalized term used but not defined herein shall have the meaning ascribed to it in the First Day Declaration.

able to remedy the Post Closing Regulatory and Environmental Work within that time period, Oak Street threatened to terminate the leases for the Debtors' properties, which would have been disastrous.

**E.      The Debtors' Retention of Professionals to Prepare for
        <u>Emergency Chapter 11 Filings.</u>**

12.      Faced with increased tensions with Oak Street and the need to consider bankruptcy protection to prevent the loss of a substantial portion of their portfolio, the Debtors retained various professionals to provide restructuring advice. The Debtors retained (a) Raymond James & Associates, Inc. ("<u>Raymond James</u>") as its investment banker on February 10, 2023; (b) Pachulski Stang Ziehl & Jones LLP ("<u>PSZJ</u>") as restructuring counsel on February 22, 2023; (c) Grant Thornton LLP's ("<u>Grant Thornton</u>") restructuring team as financial advisor on February 27, 2023, to work alongside Grant Thornton's transformational finance team which had previously been engaged to assist the Debtors with financial operations and controls in the months prior to filing and (d) Michael Healy of FTI as their Chief Restructuring Officer and FTI as their financial advisor on March 9, 2023.  The Debtors also appointed two independent directors to their Board on March 15, 2023: Craig Barbarosh, an experienced restructuring lawyer and board member for troubled companies, and Lawrence Perkins, the Founder and Chief Executive Officer of SierraConstellation Partners, LLC, a nationally-recognized advisory firm.

13.      Accordingly, this was not a case where the Debtors' restructuring advisors had the luxury of time to diligence the Debtors' business, analyze its operations, liquidity, and contractual relationships and commence an out-of-court process designed to attract additional capital or a buyer. Rather, from the moment the Debtors' professionals were retained they were in "triage" mode and facing an impending liquidity crisis.  In the first three weeks of their engagement, the Debtors' professionals were proceeding down parallel paths of negotiating with Oak Street for a

forbearance agreement to either avoid, or at the very least delay chapter 11 filings and preparing the Debtors for an emergency freefall filing with as soft a landing as possible.

**F.      The State of the Debtors' Financial and Operational Records**
**Which Adversely Impacted Operations and the Sale Process.**

14.      One thing became apparent to the Debtors' professionals only after the outset of the engagement:  the Debtors' financial, accounting and operational records were in utter disarray (or did not exist) and required complete reconstruction to provide meaningful information to both assist the Debtors in operating their businesses and prepare the Debtors' business for sale (and ultimately to provide responses to prospective buyers' requests for information).  For example, the following is a non-exhaustive list of the challenges the Debtors' professionals faced: (a) the Debtors lacked complete and current financial statements (their most recent audited financial statements were for the period ending December 31, 2021); (b) the Debtors were unable to generate accurate or current store level profit and loss statements, fuel gallon and margin data, and in-store financials (such as inventory levels, product pricing, and food sales); (c) the Debtors lacked historical information about store level environmental and zoning compliance; (d) the Debtors were missing leases, contracts, and other agreements integral to the management of the business and lacked systems altogether for storing and retrieving this data; (e) the Debtors did not maintain detailed, store-level accounting on unamortized fuel branding discounts and rebates provided by major oil companies and related store-specific "imaging" liabilities; (f) the Debtors provided inaccurate financial and operational data that, once discovered by the Debtors' professionals, resulted in the Debtors revising the associated results/projections; and (g) the Debtors did not maintain an accurate or reliable record of tax filings, furloughs and outstanding tax obligations.

15.      These problems, among others, made normal customary tasks like preparation of the Schedules of Assets and Liabilities, Statements of Financial Affairs and Monthly Operating

Reports or motions to reject leases or sell assets, extremely challenging and very time-consuming. On May 4, 2023, the Debtors re-engaged Grant Thornton on a post-petition basis as an ordinary course professional to try to create, effectively from scratch, basic financial information necessary to administer the chapter 11 cases and conduct the sale process. Ultimately, on July 17, 2023, the Debtors were instructed by the Secured Lenders to cease the Grant Thornton work and terminate efforts to complete the financial statements prior to the conclusion of the sale process. Additionally, these deficiencies, as well as many others, adversely impacted the sale process. Some examples of how these deficiencies impacted the sale process include: (a) buyers self-selecting out of the process after expressing strong initial interest due to lack of reliable and comprehensive diligence information; (b) undermining buyer confidence in the Debtors' available diligence information; (c) buyer concerns regarding unknown potential environmental and regulatory liabilities that might exist post-acquisition; (d) buyer inability to accurately underwrite performance due to lack of information; (e) assessment by buyers that the Debtors lacked detailed understanding of performance data, resulting in the Debtors entering into unattractive leases with unsustainable rents; and (f) concerns regarding post-acquisition integration and regulatory approval requirements.

16.     The state of the Debtors' financial records was an issue for these Debtors even before the disputes with Oak Street arose which led directly to the chapter 11 filings.  Prior to the Petition Date, the Secured Lenders were aware of the Debtors' inability to produce meaningful financial information, having declared an event of default on December 21, 2022, for failure to provide contractually required financial statements. Following the post-petition retention of Grant Thornton as an ordinary course professional to assist in preparing the financials, the Debtors' advisors provided regular updates to the Secured Lenders on the status of Grant Thornton's work.

**G.      The Debtors' Unsuccessful Efforts to Negotiate a Forbearance Agreement with Oak Street or Obtain Committed Financing from the Secured Lenders Prior to the Commencement of the Chapter 11 Cases.**

17.      The Debtors' professionals' efforts to negotiate a forbearance agreement with Oak Street failed as the conditions placed thereon by Oak Street would have decimated the Debtors' business.  Accordingly, by the second week of March 2023 it became apparent that a chapter 11 filing would be necessary.  The Debtors' professionals turned their attention to negotiating a DIP financing facility with the Secured Lenders to provide as smooth of an entry to chapter 11 as possible and facilitate a runway to a value-maximizing transaction.

18.      Unfortunately, the Secured Lenders were unwilling to commit to provide the Debtors with any post-petition financing commitment before chapter 11 cases were filed.  As a result, the Debtors commenced the chapter 11 cases on March 18, 2023, to avoid termination of the hundreds of locations Oak Street leased to the Debtors.  The Debtors warned the Secured Lenders that the lack of financing – and the inability to send a strong message to the Debtors' dealers, oil suppliers and vendors that the Debtors had sufficient liquidity to support the chapter 11 filing—would have serious and long-lasting effects and undermine the chapter 11 process.

**H.      The Commencement of the Chapter 11 Cases and Post-Petition Financing.**

19.      The Debtors commenced these cases on Saturday, March 18, 2023, without any committed DIP financing facility.  At a hearing on Monday, March 20, 2023, the Debtors obtained one week use of cash collateral to purchase fuel.  As a result of this, the Debtors' fuel suppliers immediately restricted the terms and credit limits associated with daily fuel purchases, further constraining the Debtors' liquidity, resulting in reduced fuel shipments, and as a result a loss of fuel margin, the Debtors' primary source of revenue.  Thereafter, the Debtors negotiated a priming DIP financing facility with an unrelated third party and intended to seek approval over the Secured Lenders' objection.  Ultimately the Secured Lenders agreed to provide a DIP facility to fund a four

month sale process pursuant to the Court's March 23, 2023, *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-2 (I) Authorizing the Debtors to Use Cash Collateral and Obtain Post-Petition Financing, (II) Granting Liens and Providing Super-Priority Administrative Expenses Status, (III) Granting Adequate Protection, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 117].

20.    The Debtors' concerns regarding the adverse impact on their businesses from failing to enter chapter 11 with committed financing eventually proved prophetic.  The Debtors were unable to provide Network Dealers with sufficient fuel on a timely basis and credit from oil suppliers tightened.  Network Dealers "held back" millions of dollars in rent from the Debtors, further stressing liquidity and resulting in substantial post-petition litigation with the Network Dealers.  The Debtors' lack of liquidity lead to deteriorating relationships with key trading partners.  Inevitably, instead of leaning into a sale process, the Debtors and its professionals were forced to play defense from the start.

21.    In retrospect, the Debtors were never able to recover from the distress caused by the circumstances under which these cases were filed, including the significant turnover in key personnel prior to and shortly after the filing, despite the Debtors' efforts to implement a Key Employee Retention Plan, and the inability to reconstruct the Debtors' financial records in the accelerated sale process mandated by the milestones that the Secured Lenders demanded (despite the Debtors' professionals' requests for a longer process) in the Final DIP Order (defined below). These circumstances placed a significant burden on the Debtors' advisors and contributed to the lack of reliable books and records that maligned and ultimately led to the demise of the Debtors'

chapter 11 sale process and the conversion of the cases to cases under chapter 7, all as more fully discussed below.

22.     Given the pressures on liquidity resulting from the response of the creditors, oil companies and dealers to the emergency chapter 11 filing, and the unavoidable delays in providing diligence material to prospective buyers, the Debtors, after consulting with the newly-formed Official Committee of Unsecured Creditors (the "Committee"), sought further financing from the Secured Lenders to sustain operations and additional time to run the sale process.  The Secured Lenders initially refused to provide more financing to extend the sale process prompting the Debtors to, once again, source an alternative priming facility to provide additional time for the sale.  But, as before, the Secured Lenders, in an effort to avoid being "primed" and in order to maintain control of potential causes of action, ultimately agreed to provide additional financing to extend the sale process by one additional month pursuant to the Court's *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-1 (I) Authorizing the Debtors to Use Cash Collateral and Obtain Post-Petition Financing, (II) Granting Liens and Providing Super-Priority Administrative Expense Status, (III) Granting Adequate Protection, and (IV) Granting Related Relief* [Docket No. 330] (the "Final DIP Order").[4]

## I.     The Chapter 11 Sale Process.

23.     Notwithstanding the foregoing challenges, the Debtors, the Secured Lenders and the Committee agreed that it was in the best interests of the estates and their constituents to proceed

---

[4]     Thereafter, the Secured Lenders agreed to extend further credit to the Debtors and authorize use of cash collateral pursuant to the court's August 5, 2023 *Order Approving Second Amendment to Senior Secured, Super-Priority Debtor In-Possession Credit Agreement* [Docket No. 1042] and August 8, 2023 *Interim Order (A) Authorizing the Use of Cash Collateral, (B) Providing Adequate Protection, and (C) Modifying the Automatic Stay* [Docket No. 1223].

with the sale process in the hope that operations would stabilize, allowing the Debtors more time to develop reliable financial and operating data that could be used to support a value-maximizing transaction within the milestones required by the Secured Lenders in the Final DIP Order.

24.     On June 22, 2023, the Court entered its *Order (I) Approving Bid Procedures for Sale of the Debtors' Assets (II) Approving Bid Protections, (III) Scheduling Certain Dates with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, and (V) Approving Contract Assumption and Assignment Procedures* [Docket No. 701] (the "Bid Procedures Order"), establishing deadlines and procedures for the sale of substantially all of the Debtors' assets through an auction that would occur on August 2, 2023.[5]  The Debtors were unable, however, to entice any party to become a stalking horse prior to entry of the Bid Procedures Order.

25.     While the Debtors' professionals made substantial headway post-petition to develop meaningful financial and operational information prospective bidders could rely upon, the Debtors also faced material deterioration in their operational performance on a post-petition basis that impacted the perceived value of the business. At the end of the day, the information produced by the Debtors was either insufficiently fulsome or was not in line with bidders' assumptions on the performance of the Debtors.  These issues were compounded by bidders' requirements for rent reductions from Landlords and the master lessors' unwillingness to break their respective master leases affecting the ability to bring together bidders with an interest in smaller packages across the Debtors' footprint. As such, buyers were not able to, or chose not to, complete the required due diligence to formulate firm bids by the July 21, 2023, bid deadline under the Bid Procedures Order.

26.     Throughout the sale process the Debtors' professionals were completely transparent with the Secured Lenders with respect to the challenges to provide meaningful

---

[5]     The Auction was originally scheduled for July 28, 2023 but was later continued to August 2, 2023.  *See* Docket No. 1099.

financial information to the dozens of parties who had expressed interest in acquiring certain aspects of the Debtors' business.   In fact, from the Petition Date through July 28, 2023, the Debtors' professionals met with the Secured Lenders' professionals on a weekly basis and provided detailed updates to the DIP Agent, which included sharing with the Secured Lenders the status and indicated value ranges of IOI's, LOI's, and APA's that had been received. This was done in conjunction with the Debtors' efforts to obtain incremental post-petition financing and represented funding milestones pursuant to the Final DIP Order. Similarly, the Debtors' professionals met with the Committee once or twice each week to update them on operations, liquidity and the progress and challenges of the sale process.

27.    Despite these challenges the Debtors did, however, receive 14 bids from a variety of parties interested in certain aspects of the Debtors' business.   The bids presented certain structural issues including the following: (1) only one bidder proposed an acquisition that would include all (or virtually all) of the Debtors' stores; (2) five other bidders were interested only in distinct segments of the Debtors' operations; (3) several other bidders were interested only in selected Controlled Sites, based on geographic or brand affinity; (4) none of the bids aligned exactly with the store locations subject to master leases (in other words, such bids would have required the assent of the master lessors to the severability of their master leases to accommodate partial leases and multiple lessees); (5) all of the bids required material reductions in rent from master lessors and the properties leased to the Debtors by Landlords controlling one location; and (6) each of the bids required additional time to close a transaction, and additional liquidity to which the Debtors did not have access.  The Debtors' professionals encouraged the Secured Lenders and their professionals to engage with them to evaluate the bids and develop a strategy for maximizing value from the sale process, but they declined the invitation on multiple occasions.

28.     The Debtors requested that the Secured Lenders agree to extend the auction process an additional week to allow the Debtors to work with the bidders to refine their bids, attempt to eliminate contingencies and arrive at a structure that would not require additional financing from the Secured Lenders and that could close within a reasonable time.   The Secured Lenders rejected the Debtors' request for more time and, in the middle of the auction, called a default under the Final DIP Order.

29.     Notwithstanding the Secured Lenders' negative reaction to the auction process, the Debtors proceeded with the auction.  The Debtors were able to negotiate a letter of intent with a prospective buyer which contemplated a sale of substantially all the Debtors' assets of $49 million, of which $20 million was anticipated to be payable at closing to the Secured Lenders, and also carved-out other assets which would further enhance the recovery to the Secured Lenders (the "Successful Bid").  The Debtors' advisors made exhaustive efforts to reach a figure that they believed would be acceptable to the Secured Lenders, including concessions on a portion of fees incurred by the Debtors' professionals in order to enhance the recovery to the Secured Lenders. While not the result the parties were seeking at the outset of the sale process, the Successful Bid was market tested after an extensive sale process and the best available under the circumstances. The Debtors believed that the amount that the Secured Lenders would receive from the Successful Bid was considerably higher than they would receive in a chapter 7.

30.     The Debtors sought approval from the Court to document the Successful Bid at a hearing on August 6, 2023.  At that hearing, the Court deferred consideration of the Successful Bid and suggested the parties mediate with Judge Isgur to reach a consensual path forward. Mediation with Judge Isgur ultimately proved unsuccessful.

**J.      The Appointment of the Trustee and the Conversion of the Cases.**

31.     On August 16, 2023, the DIP Agent filed, *DIP Agent's Emergency Motion to Appoint Chapter 11 Trustee, or in the Alternative, Convert These Chapter 11 Case to Case Under Chapter 7* [Docket No. 1280].

32.     On August 17, 2023, following the *Court's Order Directing the Appointment of a Chapter 11 Trustee* [Docket No. 1284] (the "Chapter 11 Trustee Order"), the United States Trustee (the "U.S. Trustee") filed a *Notice of Appointment of Chapter 11 Trustee* [Docket No, 1286], and appointed Janet S. Northrup to serve as the chapter 11 trustee in the Cases (the "Chapter 11 Trustee").

33.     On August 24, 2023, upon its own motion and the Chapter 11 Trustee's request, the Court converted these Cases to cases under chapter 7 of the Bankruptcy Code [Docket No. 1397] (the "Conversion Order"). Thereafter, Janet Northrup was also appointed as the chapter 7 trustee (the "Chapter 7 Trustee").

**SUMMARY OF FEES AND EXPENSES REQUESTED IN THIS
FINAL APPLICATION AND HOW PROFESSIONAL FEES AND EXPENSES
WERE PAID DURING THE CHAPTER 11 PHASE OF THESE CASES**

34.     Through this Final Application Period, FTI provided financial advisory and CRO services under an hourly fee arrangement totaling $7,180,713.20 and $131,360.10 in expenses actually and necessarily incurred by FTI while providing services to the Debtors during the Final Application Period. During the Final Application Period, FTI professionals expended a total of 9,950 hours for which compensation is requested. Prior to these cases converting to chapter 7 on August 24, 2023, FTI received a total of $3,711,515.20 in fees and $87,458.28 in reimbursement of expenses, pursuant to provisions of the Bankruptcy Code, the Court's *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 408] (the "Compensation Order"), and the Final DIP Order.  Furthermore, FTI received a payment amounting to $5,662.50 in consideration for the professional services rendered and

subsequently invoiced and included in the FTI monthly fee statements of June and July, pertinent to the litigation proceedings involving the local soda bottler stay violators. Accordingly, as of the date of filing of this Final Application, FTI has not been paid a total of $3,507,437.32 (the "FTI Unpaid Amounts"). PSZJ is currently holding $1,770,930.12 set aside for FTI in PSZJ's trust account (the "PSZJ Trust Account"), pursuant to the requirements of the Final DIP Order (the "FTI Reserved Funds"). If authorized to apply the FTI Reserved Funds to the FTI Unpaid Amounts, there will still be a balance due of $1,736,507.20, which FTI understands will be subject to payment of claims of higher priority.

35.    Throughout the chapter 11 phase of these cases, professional fees were paid pursuant to the terms of the Compensation Order and Final DIP Order. The Compensation Order, *inter alia*, established procedures for the payment of 80% of fees and 100% of expenses incurred by estate professionals upon the filing of a monthly fee statement (each a "Fee Statement") and the passing of an objection deadline with respect to each such Fee Statement. The Compensation Order further required the periodic filing of interim fee applications with the Court, including for the approval of the remaining 20% of fees contained in a Fee Statement for the applicable period. Pursuant to the Compensation Order, during these Cases, FTI has submitted five monthly Fee Statements for the calendar months of March 2023 [Docket No. 413], April 2023 [Docket No. 496], May 2023 [Docket No. 742], June 2023 [Docket No. 1111], and July 2023 [Docket No. 1285] and a First Interim Application [Docket No. 1113].[6]

36.    FTI has received payment in accordance with the terms of the Compensation Order and Plan, as set forth in the table below. As of the date of this Final Application, FTI has not received any objections to any of its Fee Statements and the deadlines to object thereto have

---

[6] The Chapter 7 Trustee filed an objection [Docket No. 1539] to FTI's first interim fee application.

passed.  In accordance with the Compensation Order, FTI submitted monthly Fee Statements as set forth in the chart below.  To date, FTI has received payment of (i) 80% of fees and 100% of expenses with respect to its March through May Fee Statements.  Furthermore, FTI received a payment amounting to $5,662.50 in consideration for the professional services rendered and subsequently invoiced and included in the FTI monthly Fee Statements of June and July, pertinent to the litigation proceedings involving the local soda bottler stay violators. A summary of the paid and unpaid amounts in the Final Application Period follows:

| Period | Docket # | Fees Incurred | Fees Paid | Expenses Incurred | Expenses Paid | Balance (Fees & Expenses) |
|---|---|---|---|---|---|---|
| 03/18/23 – 03/31/23 | 413 | 953,944.00 | 763,155.20 | 18,522.77 | 18,522.77 | 190,788.80 |
| 04/01/23 – 04/30/23 | 496 | 2,071,723.80 | 1,657,379.04 | 48,159.92 | 48,159.92 | 414,344.76 |
| 05/01/23 – 05/31/23 | 742 | 1,613,726.20 | 1,290,980.96 | 20,775.59 | 20,775.59 | 322,745.24 |
| 06/01/23 – 06/30/23 | 1111 | 1,571,366.00 | 0.00 | 23,453.95 | 0.00 | 1,594,819.95 |
| **Total Interim:** | **1113** | **6,210,760.00** | **3,711,515.20** | **110,912.23** | **87,458.28** | **2,522,698.75** |
| 07/01/23 – 07/31/23 | 1285 | 716,141.70 | 5,662.50 | 11,623.71 | 0.00 | 727,765.41 |
| 08/01/23 – 08/24/23 | N/A | 253,811.50 | 0.00 | 8,824.16 | 0.00 | 262,635.66 |
| **Total Final:** | | **7,180,713.20** | **3,717,177.70** | **131,360.10** | **87,458.28** | **3,507,437.32** |

37.     In order to fund the Debtors' estates' ongoing obligations to pay professional fees to professionals retained by the Debtors and the Committee, the Final DIP Order contained a feature that is customary in complex chapter 11 cases.  The feature contemplated the Debtors transferring, on a weekly basis, to the PSZJ Trust Account an amount sufficient to cover the budgeted professional fees and expenses for that week.  Specifically, paragraph 17 of the Final DIP Order provided that:

> Prior to the occurrence of the Carve-Out Trigger Date, the Carve-Out for Professionals shall be funded on a weekly basis to a trust account of the Debtors' counsel in the amounts specified in the Approved Budget for distribution to such Professionals once such fees and expenses are allowed by the Court. Following the occurrence of the Carve-Out Trigger Date, any remaining fees and expenses in the amount specified in the Approved Budget for the Professionals through the Carve-Out Trigger Date and the Professional Carve-Out Cap shall be funded to a trust account of the Debtors' counsel and distributed to such Professionals once such fees and expenses are allowed by the Court.

38.     Accordingly, the amounts in the PSZJ Trust Account were to be used exclusively to pay the fees and expenses of the Debtors' and Committee's professionals and could not be accessed by the Debtors or any other party in interest for any purpose.  Thereafter, as payment of the fees became due to the Debtors' and Committee's professionals pursuant to the terms of the Compensation Order (*i.e.* the fees and expenses contained within the Fee Statements and interim fee applications filed by such professionals), PSZJ would transfer funds out of the PSZJ Trust Account to the professionals to pay such fees and expenses.

39.     As of the date these cases were converted to chapter 7, the PSZJ Trust Account contained $5,116,118.18.   In connection with the Conversion Order, the Chapter 11 Trustee requested that the Court order PSZJ to turn over the amounts in the PSZJ Trust Account to the Chapter 7 Trustee.  The Court rejected that request and instead included the following language in paragraph 10 of the Conversion Order:

> The Debtors and their retained professionals shall promptly turn over to the chapter 7 trustee any and all records and estate property under their possession, control or custody, including but not limited to any estate cash or other property held in escrow or trust. Notwithstanding the foregoing, any fee reserves held by the professionals shall remain in the *status quo*, subject of a future order.

40.     On October 3, 2023, PSZJ filed the *Motion of Former Counsel for the Debtors for Entry of an Order Authorizing the Payment of Estate Professionals' Fees Pursuant to Final DIP*

*Order and Professional Fee Order* [Docket No. 1519] (the "Reserve Distribution Motion").[7]  The Reserve Distribution Motion seeks, *inter alia*, authority to distribute the Carve-Out Funds (as defined therein) to estate professionals (as applicable) to the extent allowed under the Compensation Order or pursuant to interim and final compensation orders of this Court. Accordingly, FTI requests that any order approving this Final Application authorize PSZJ to disburse any amounts set aside for FTI from the Carve-Out Funds, in accordance with the Final DIP Order.

41.    The fees charged by FTI in the Debtors' Chapter 11 Cases are billed in accordance with FTI's existing billing rates and procedures in effect during the Final Application Period, and in accordance with the FTI Retention Order.  The rates FTI charges for the services rendered by its professionals in these Cases generally are the same rates FTI charges for professional services rendered in comparable bankruptcy and non-bankruptcy related matters.  Such fees are reasonable based on the customary compensation charged by comparably skilled practitioners in comparable bankruptcy and non-bankruptcy cases in a competitive national market.

42.    Attached hereto as **Exhibit 3** is a summary breakdown of hours and amounts billed by timekeeper during the Final Application Period. The summary sheet lists FTI professionals who have performed services for the Debtors during the Final Application Period, the capacities in which each individual is employed by FTI, the hourly billing rate charged by FTI for services performed by such individual, and the aggregate number of hours expended in this matter and fees billed therefor.

43.    FTI maintains computerized records of the time spent by all FTI professionals performing financial advisory services. FTI's time records include itemized time entries and

---

[7]    The Reserve Distribution Motion is set to be heard concurrently herewith pursuant to the Scheduling Order.

separate matter numbers for different project types. Copies of the time records of FTI professionals for the period from March 18, 2023, through August 24, 2023 (*i.e.*, the Final Application Period) are attached hereto as **Exhibit 4**.

## THE DEBTORS' RETENTION OF FTI

44.     On April 14, 2023, FTI filed its *Application for Entry of an Order Authorizing the Retention and Employment of FTI Consulting, Inc. as Financial Advisor to provide the Debtors with a Chief Restructuring Officer ("CRO") as well as additional personnel for the Debtors Effective as of March 18, 2023* [Docket No. 282] (the "FTI Retention Application").  On May 15, 2023, the Court entered an Order Approving the FTI Retention Application [Docket No. 405] (the "Retention Order").

45.     The Retention Order authorizes the Debtors to compensate and reimburse FTI in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any Orders entered in these Chapter 11 Cases.  The Retention Order also authorizes the compensation of FTI at its standard hourly rates and the reimbursement of FTI's actual and necessary out-of-pocket expenses incurred, subject to application to this Court.

## JURISDICTION AND VENUE

46.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012.

47.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## SUMMARY OF SERVICES RENDERED

48.     The following narrative provides a brief summary of the services rendered by FTI during the Final Application Period.  This summary is organized in accordance with the internal system of task codes set up by FTI at the outset of these Chapter 11 Cases. The summary that follows is not intended to be a detailed description of the work performed by FTI during the Final Application Period, as those day-to-day services and the time expended in performing such services are fully set forth in the contemporaneous time records that are attached as **Exhibit 4**. Rather, the following summary attempts to highlight certain of those areas in which services were rendered to the Debtors during the Final Application Period.  If a task code does not appear below, then FTI did not bill significant time for that task code.

### A.     Cash Management / Treasury (Task Code 1)

**Fees:  $328,301.50          Total Hours:  303.7**

- Conducted weekly calls with management to review and provide guidance on weekly cash payments.

- Assisted the Debtors with various cash management activities, including, but not limited to, analysis and updates to management's internal cash flow forecast, cash collections and disbursement analyses and review of bank account transactions.

- Worked with the Debtors to establish and implement treasury functions and activities pursuant to court orders, including, but not limited to, establishment of new accounts and payments tracking procedures pursuant to court orders.

- Addressed questions related to cash management and prepare various ad-hoc liquidity analyses in support of the cash management process.

- Analyzed opening liquidity and daily cash positions and attended daily cash calls with various stakeholders to address liquidity situations, vendor claims and payments, rent payments, credit cards, post-petition taxes, post-petition and pre-petition payment processes, and operational updates.

- Collaborated on post-petition transfers, cash management, financial planning, payment runs and financial statements.

- Ensured timely and accurate processing of payables and disbursements, as well as tracking and monitoring payments.

- Conducted reviews of cash payments, Key Employee Retention Plan payouts, and fuel drafts.

- Addressed operations level invoicing, store operations, fuel plans, fuel-related documentation, and operational readiness.

**B.**     **Cash Forecasting, Cash Reporting and Other Financial Reporting (Task Code 2)**

**Fees:  $1,325,817.00**          **Total Hours:  1,443.8**

- Engaged in meetings and discussions with Mountain Express Oil Company ("MEX") and stakeholders for the development and analysis of weekly cash flow forecasts, DIP budget, and financing considerations.

- Reviewed and updated financial documents including DIP financing motions, cash collateral motions, and addressed matters related to leases and cash disbursements.

- Routinely prepared, reviewed, and revised cash flow forecasts. This incorporated various elements, including but not limited to, fuel receipts, professional fees, and payroll considerations.

- Performed review and assessment of DIP financing terms, conditions, and associated budgeting; collaborated on updates to weekly cash flow forecasts

- Tracked payments and term contraction for reparation of DIP budgets and cash flow forecasts.

- Worked on regular analysis and forecasting of cash flow, modeling, and reporting updating cash flow models with real-time data and anticipated changes.

- Reviewed terms and conditions of DIP financing, conducting correspondence on DIP financing requirements and covenant analysis.

- Addressed dealer conversion analysis, cash disbursements related to DIP financing, and reviewed aspects of DIP financing agreements.

- Conducted thorough freight market rate analysis, revising margin assumptions for incorporation into cash flow forecasts.

- Participated in reviews of daily cash activities, equipment leasing details, and preparation of various reports enhancing the financial reporting framework.

- Created operational update presentations for the Trustee, preparing analyses on various financial areas and refining financial materials.

**C.**    **DIP and Exit Financing Due Diligence Support  (Task Code 4)**

**Fees:  $220,865.00    Total Hours:  228.0**

- Reviewed, negotiated, and revised the interim DIP Order, credit agreements, and DIP agreement.

- Worked on DIP budget scenarios, including preparation, negotiation, and revision stages. Engaged in discussions with stakeholders like Greenberg Traurig, counsel for

the DIP Agent, and Raymond James to align the DIP budget with financial expectations and requirements.

- Prepared multiple iterations of the DIP budget, ranging from 4-week to 6-month scenarios. This involved creating covenant analyses, variance analyses, and presentations for lenders, as well as incorporating feedback, latest terms, professional fee assumptions.

- Revised DIP budgets considering various factors like sublease income, rent expense, and vendor disbursement timing and addressing specific items like fuel volume and margin adjustments.

- Participated in discussions with potential lenders and advisors to prepare weekly DIP reporting packages, milestone schedules, and handling various diligence queries.

- Collaborated with key stakeholders to discuss, review and manage due diligence materials, including information requests, real estate property analysis, and data related to lender requirements. This involved compiling, organizing, revising, updating, and responding to numerous diligence inquiries from various parties, and coordinating with the appropriate teams on priority tasks and challenges.

**D.      First Day Orders Implementation and Compliance (Task Code 5)**

**Fees:  $40,433.00      Total Hours:  43.0**

- Coordinated with MEX and FTI representatives on employee lists, corporate cards, vendor categorizations, and bank accounts.

- Identified vendors and categories in Open AP and prepared critical vendor analyses to ensure compliance with first day orders.

- Prepared and reviewed motions related to wages, employee benefits, and cash management, ensuring their alignment with first day orders.

- Collaborated with PSZJ on first day motion filings, utility shutoff issues, critical vendor payments, and legal correspondences.

- Conducted research on properties, tax authorities, and utility providers to ensure comprehensive understanding and compliance.

- Worked on utilities reconciling current providers, refining notice lists, and adequate assurance deposits.

- Drafted and reviewed communications regarding vendor escalations, bankruptcy reporting, and utility settlements.

- Reviewed and commented on various documents to ensure compliance, including AP data, vendor balances, and motions in preparation for hearings.

**E.      Other Pleadings, Motions and Filings (Task Code 6)**

**Fees:  $122,001.00   Total Hours: 120.9**

- Prepared analysis for numerous draft motions, including those related to critical vendors, taxes, fuel parties, cash management, insurance, dealer collections, among others, while also addressing various employee-related issues, wages matter, reimbursements, and bonding companies.

- Collaborated with MEX, and PSZJ teams on the preparation and evaluation of first day motions and creditor matrix.

- Prepare several analyses specifically concerning to vendors, cash collateral and first day proceedings.

- Prepared Ordinary Course Professional ("OCPs") list, consolidated OCP-related invoices, performed spend analysis, and prepared exhibits for the OCP motion.

- Participated in various meetings, and calls focused on specific motions, litigation cases, and tax inquiries, primarily with MEX and PSZJ representatives, supplemented by discussions regarding the analysis, exhibits, and ongoing litigation summaries.

**F.   Employee Matters (Task Code 9)**

**Fees:  $49,199.00     Total Hours:  51.8**

- Performed in-depth analysis, creation, and refinement of the Key Employee Retention Plan ("KERP") proposal, incorporating feedback from various team members, addressing concerns raised during reviews and formulating of drafts and write-ups.

- Conducted comprehensive research and analysis on comparable KERP programs, including evaluations of benchmarking comps, market studies, and industry-specific segments to ensure the robustness of the proposed plan.

- Collaborated with PSZJ representatives to finalize terms, gain insights, and keep the draft KERP aligned with prevailing industry practices.

- Engaged in multiple meetings with MEX and FTI teams regarding historical retention, incentive payments, bonuses, and employee salary schedules and adjustments.

- Reviewed and revised details concerning commission, incentive payments, and bonus structures, with specific emphasis on historical data and distinctions between insiders and non-insiders.

- Collaborated with MEX team on topics ranging from project management of accounting processes, employee compensation, and statutory insider considerations for bankruptcy reporting.

G.     **Tax Matters (Task Code 10)**

**Fees:  $164,684.50    Total Hours:  156.7**

- Identified the company's outstanding and delinquent tax payments through multiple communications and reviews with MEX team and Debtor professionals.

- Analyzed and revised tax exposure, filings data, and estimated amounts using information provided by various stakeholders, with a focus on property tax notices and obligations linked to inactive locations and leased locations.

- Collaborated with key stakeholders for the reconciliation of tax information, including identifying specific locations and the corresponding taxing authorities.

- Kept open lines of communication with the U.S. Trustee ("UST"), taxing authorities, and other involved parties to discuss, update, and seek clarifications on tax-related issues and liabilities. These discussions included strategizing and reviewing memos related to tax claims.

- Corresponded frequently with taxing authorities to receive tax notices, confirm payment statuses, and assess the implications of new tax bills and demands.

- Identified and analyzed tax shortfalls and estimate prepetition and post-petition tax amounts.

- Reviewed, evaluated, and updated tax notice databases, comparing historical tax notices with recent ones received from taxing authorities. This involved reconciling tax payments with historical tax notices.

- Prepared cash flow forecasting, considering recent tax analyses, and revising cash flow sensitivity scenarios to incorporate the latest tax assumptions.

- Collaborated with MEX, PSZJ, and BDO teams to discuss outstanding taxes, tax exposure, payment statuses, tax bills, tax analysis, and tax filings data.

- MEX lacked an internal system altogether to handle and track tax obligations. As such, FTI created, essentially from scratch, a comprehensive tax notice database, including updates related to historical notices covering local/school taxes, property taxes, income taxes, sales & use taxes, motor fuel taxes, and licensing/permitting.

- Prepared in-depth analysis of property tax obligation and notices in relation to inactive site locations, especially with obligations connected to landlords and lease terms.

- Prepared and reviewed documentation for the 2022 tax return extension and status checks in April and May tax filings.

- Performed analysis and maintained databases on tax materials, prepetition and post-petition tax allocations, tax filing claim amounts, trends, penalties, interest, and tax exposure with a focus on reconciling tax payments and notices.

**H.    UCC Due Diligence Support (Task Code 12)**

**Fees:   $61,762.00     Total Hours:  61.6**

- Prepared and gathered Unsecured Creditors Committee ("UCC") diligence materials, including compiling items for distribution to Province, the UCC's financial advisor.

- Reviewed, prepared, and updated diligence responses to Province, UCC professionals, attorneys and other parties involved.

- Participated in regular committee update calls with Province, and other stakeholders, discussing UCC diligence updates, issues, and information gathered.

- Collaborated with PSZJ regarding initial diligence requests, and available materials.

- Engaged in the preparation and review of unsecured claims summaries, analyses, estimates, and related correspondences.

- Worked on aging reports, auditor engagement terms, and ordinary course professional matters in response to UCC diligence requests.

I.  **Official Committees and Professionals Meetings (Task Code 13)**

**Fees:  $117,765.50   Total Hours:  106.5**

- Participated in various board meetings and special committee sessions to address operations, budgeting, taxes, and special transactions, as well as to discuss case updates, sale processes, and operating issues.

- Participated in specialized sessions, including mediation, and emergency board meetings, addressing pivotal concerns.

- Prepared necessary materials and agendas for both regular and emergency board meetings to ensure efficient and productive discussions.

- Participated in Professional meetings with Debtor professionals to review critical matters such as DIP, vendor disputes, dealer issues, workstreams, diligence requests, case-specific issues, and the overall sale process.

- Prepared for and attended Work in Progress ("WIP") calls with Debtor professionals, focusing on the review of outstanding tasks and case updates.

J.  **Secured Creditors, Other Creditors, Parties-in-Interest and Professionals Meetings (Task Code 14)**

**Fees:  $93,691.00    Total Hours:  84.8**

- Participated in weekly lender update calls with lender advisors to discuss workstreams, case-related issues and addressing the sale process.

- Prepared and participated in calls with lenders to discuss DIP credit agreement issues. This included examining, finalizing the signing, executing credit agreements, and managing related email communications.

- Reviewed and prepared materials for lender advisor meetings and provided updates to lenders on case developments.

- Prepared for, attended, and participated in UCC update calls with professionals from Province, PSZJ, and McDermott.

- Participated in meetings with MEX, Raymond James, and PSZJ, to discuss due diligence processes, organization, and preparation of materials.

- Reviewed Alvarez & Marsal ("A&M") diligence agendas, request lists, and prepared comments and materials for meetings.

**K.**   **Vendors, Suppliers, Contracts, Cures, Assumption and Rejection (Task Code 15)**

**Fees:  $745,001.50   Total Hours:  716.1**

- Addressed vendor-specific issues including analysis of contracts, contract rejections, account balance reconciliations, trade agreement discussions, litigation matters, payment statuses, reclamation matters, lease agreements, and vendor outreach.

- Participated in meetings and calls with MEX team and Debtor professionals addressing payment issues, operational relationships, supplier concerns, and critical vendor identification.

- Managed vendor relationships and contracts, including vendor payments, affiliate transactions, equipment and trade agreements, account reconciliations, and potential legal proceedings.

- Drafted and reviewed critical vendor trade agreements, and strategized on supplier negotiations and vendor contract matters.

- Prepared and analyzed documentation such as the AP report, AP aging, and Critical Vendor's list.

- Conducted in-depth reviews and analysis related to contracts, utility providers, AP records, invoice reconciliation, and other vendor-related issues.

- Analyzed market pricing, especially for equipment finance leases and environmental services, and prepared presentation drafts. This included taking into consideration diverse types of leases, such as affiliate and non-affiliate equipment leases.

- Participated in discussions on oil company agreements, incentives, rebates, and affiliate-related analyses.

- Addressed concerns from utility providers, prepared and updated summaries for rent concessions. This included working on utility management, reviewing utility data, providers, and spends.

- Prepared data analyses (e.g., net fuel profit, inventory, deliveries, damage calculations) and took part in litigation-related calls.

- Prepared and reviewed contract schedules, discussing cure amounts and contemplating contract rejection motions. Also, reviewed, and reconciled lease data with cure schedules. This included updating legal documentation, cure schedule and objection trackers.

**L.**     **US Trustee Compliance, IDI, MORs, Reporting, Research and Communications (Task Code 16)**

**Fees:  $602,327.50    Total Hours:  590.9**

- Prepared for and attended the Initial Debtor Interview ("IDI") and collaborated with the MEX team and Debtor professionals on the process.

- Engaged in preparation, review, and correspondence related to the IDI, monthly operating reports ("MORs"), and UST, reporting requirements, and the bankruptcy reporting process.

- Addressed various requests and deliverables associated with the UST including status updates, reporting requirements, and specific UST inquiries.

- Reviewed, revised, and provided feedback on various materials and reports to be provided to UST, including DIP details, board presentations, financial reports, 2015.3 report, MEX BtoA reporting package, and the MEX Location Information Matrix.

- Created checklists, report samples, cash disbursements by entity, and UST fee calculations.

- Engaged in compliance matters, emphasizing cash positions, covenant tests, automation of MOR preparation, and by-entity reporting.

- Worked on the MORs, including preparing and updating forms, and reviewing trial balances, bank reconciliations, and financial analyses. Given the state of the Debtors' books and records, time spent included engaging in financial data analysis, reconciling discrepancies in financial statements, analyzing variances, and mapping trial balance accounts. Also, analyzing, and compiling payment details, and reconciling variances between book and bank cash balances.

**M.**   **SOFA and SOAL and 341 meeting (Task Code 17)**

**Fees:   $1,610,164.90        Total Hours:  3,598.70**

- Developed, reviewed, and updated bankruptcy reporting materials, including presentations, training, and guidelines specific to Statements of Financial Affairs ("SOFA"), Schedules of Assets and Liabilities ("SOAL"), and other related bankruptcy topics.

- Prepared, organized, and updated documents, schedules, and templates related to SOFA/SOAL, bank account reconciliation, and disbursements.

- Updated SOFA and SOAL sections based on various data points, such as trial balance account reconciliations, AMEX disbursements, fixed asset schedules, and insider payments.

- Collected, analyzed, and managed contracts, leases, disbursements, accounts payable, intercompany transfers, fixed assets, vendor information, and other financial data for SOFA/SOAL reporting accuracy.

- Developed and managed tools, systems, and workflows for data collection, coding, and review, including construction of data room storage paths and SOFA/SOAL trackers.

- Worked on Schedule G, coding lease documents, preparing exports of lease and contract information, and conducting quality assurance and data consistency checks. This included validated, coded, and extracted information from leases and contracts.

- Compiled and formatted various data sets, including real estate, contracts for Schedule G amendments, and owned assets.

- Located, recorded, and analyzed fixed assets, retail trail balance, lease agreements, environmental compliance data, including underground storage tanks, and ensured data accuracy across databases.

- Given the state of the Debtors' books and records, conducted extensive data reconciliation, including GL account information, disbursements, and bank reconciliations. This included assistance in data investigations, such as property plant and equipment GL detail and retail trial balance fixed assets.

- Collaborated on accounts payable records, entity-level reporting, and cash activities. In addition, prepared, updated, and tracked progress using Gantt charts and other organizational tools.

- Conducted quality assurance checks, validation, and editing for notice data, Schedule G, and other financial outputs.

- Managed and assessed bank data, ownership interests, property sales, and tax return details.

- Prepared and followed up on legal questionnaires.

- Prepared and reviewed supporting documents for the 341 hearing, including balance sheets and reconciliations.

- Attended 341 meeting of creditors.

**N.**     **Plan and Disclosure Statement Development, Recovery Waterfall, and Supporting Analysis (Task Code 18)**
**Fees:  $67,139.00     Total Hours:  73.0**

- Developed and updated the illustrative waterfall analysis, integrating team comments and revising for various scenarios, claims, and assumptions.

- Developed and updated liquidation analysis report for DIP lenders.

- Assist MEX, Secured Lenders, Raymond James, PSZJ, UCC, and A&M to address inquiries and clarify financial nuances about the waterfall and liquidation analysis.

- Developed analysis reports on administrative claims, assets and liabilities, and wind-down planning.

- Created supporting exhibits for administrative claims calculation and analyzed the potential size of the claims pool using AP and other data reports.

- Formulated uses analysis for a proposed transaction scenario and drafted a summary of the liquidation analysis process.

- Engaged in various calls and correspondences with different landlords, discussing updates, August rent status, and case details.

- Compiled site-level data for landlords, incorporating dealer contacts, gallonage updates, and a contact matrix.

**O.    Asset Sale, Diligence and Sale Process (Task Code 19)**

**Fees:   $175,826.50    Total Hours:  173.0**

- Analyzed diligence materials prepared for the sale process and information requirements. This included compiling and updating potential buyer diligence requests.

- Worked on cash flow, operating metrics, and other diligence materials for potential buyers and investors. This included preparing cash flow and working on capital-related diligence materials, and analyzing financial data, bidding progress, and liquidity forecasts.

- Reviewed and analyzed sale process workstreams and updates. This included corresponding about the timing and status of the sale process.

- Reviewed and provided comments on Asset Purchase Agreements and investor term sheets. This included reviewing and updating various schedules and disclosures for the Asset Purchase Agreement.

- Participated in meetings and calls to discuss the disposition of assets and sale process issues.

- Participated in calls and meetings regarding buyer due diligence, data room access and the executed purchase agreement.

- Evaluated letters of intent ("LOIs") submissions and other purchase-related documents.

- Engaged in bid discussions to evaluate offers and make necessary decisions.

- Engaged in discussions and researched related to asset valuations and relevant schedules.

- Contributed to administrative tasks such as preparing demonstratives for hearings and participating in witness depositions.

**P.    Case / Project Management (Task Code 20)**

**Fees:  $12,452.50     Total Hours:  9.5**

- Collaborated with Debtors' advisors, MEX executive team and others to address critical operational matters, share updates, and coordinate on various case-related issues.

- Held discussions with relevant stakeholders on various matters, such as senior management roles, fuel shutdown plans, Pilot-related matters, and potential WARN considerations.

- Prepared postpetition workplan and timelines, including detail of key deadlines and reporting requirements.

- Corresponded on case status, next steps, and guidelines with management and Debtors' Counsel.

- Conducted debrief and strategy sessions post-court hearing to assess outcomes and strategize next steps.

**Q.    Preparation for and Attendance at Hearings (Task Code 21)**

**Fees:  $82,547.00     Total Hours:  75.80**

- Prepared for and attended first day hearing.

- Prepared for and attended hearings on cash collateral, DIP funding, and vendor self-help, including creating budgets, testimonies, and cross-questions.

- Attended several hearings, specifically concerning to vendors, cash collateral and first day proceedings.

- Prepared for and attended hearings related to APA and AR Global rejections, dealer issues, and MEX sale.

- Worked on witness deposition preparations and engaged in ad-hoc mediation request preparations.

- Attended multiple hearings, focusing on the status of lender negotiations and Chapter 7 conversion.

**R.    Fee and Retention Applications and OCPs (Task Code 22)**

**Fees:  $86,390.00     Total Hours:  98.80**

- Prepared FTI Retention Application for filing.

- Prepared, reviewed, and updated Fee Statements from March to July for filing.

- Prepared interim fee application for March 2023, April 2023, May 2023, and June 2023 periods.

- Prepared and updated analyses of ordinary course professionals, including spend, AP balances, and the inclusion of certain vendors.

- Worked on OCP declarations monitoring, payment tracking, and related matters.

- Prepared and updated Parties in Interest list and reconciled and updated the conflict check list accordingly.

**S.**   **Claims (Task Code 25)**

**Fees:  $15,357.50     Total Hours:  15.30**

- Reviewed potential 503(b)(9) claims, prepared summary schedules, reviewed accounts payable details for claims analysis and communicated status and progress with MEX and PSZJ teams.

- Participate in meetings with PSZJ to address claims waterfall, cash management issues, and administrative cost analysis.

- Provided comprehensive review and comments on draft recovery analysis and recovery waterfall, ensuring accuracy in the documentation.

**T.**   **Estate Wind-down Planning and Implementation (Task Code 26)**

**Fees:  $83,216.50     Total Hours:  78.0**

- Worked on liquidation/wind-down planning activities.

- Worked on and addressed liquidation planning issues.

- Oversighted and updated Directors & Officers ("D&O") insurance policies, reviewing policy details, coverages, and resolving outstanding policy issues.

- Examined insurance policies and engaged in discussions with insurers and brokers regarding claims, coverage terms, coverage extensions and pricing. Worked to confirm the status of tail coverage conditions and ensure proper timing for the initiation of tail extension.

- Reviewed and confirmed terms, pricing, and pre-payment details for D&O tail extension policies.

- Participated in meetings and follow-ups with the board, MEX team, and PSZJ teams regarding the post-sale trigger of D&O tail coverage, bankruptcy status for the trigger of the tail coverage, and tail coverage inception.

- Maintained constant communication and coordination with various parties including Lockton, PSZJ, MEX team, and insurers. Addressed queries related to insurance reporting obligations, coverage for prior claims, and issues regarding the notice, tail coverage conditions, and extensions, ensuring all parties were aligned and informed. In addition, provided status update to Lockton and the change in control date.

- Drafted, edited and finalized various insurance-related documents, including notice of circumstance letters to insurers, while also addressing coverage issues for prior claims and ensured proper record-keeping.

**U.    Strategic Communications (Task Code 27)**

**Fees:  $86,593.70    Total Hours:  147.30**

- Developed and reviewed communication materials for filing processes, including press releases, FAQs, talking points, and store communications. This included

developing post-petition communications strategies around various case milestones.

- Addressed inbound media and stakeholder inquiries, developed inbound communications tracking procedure, and strategized on communication next steps and deliverables.

- Drafted, revised, and distributed press releases and other communication materials. This included reviewing and drafting various outbound communications materials, including for vendors, stakeholders, and employees.

- Analyzed news coverage around various filing dates and adjusted communication strategies accordingly.

- Coordinated website updates and monitored content accuracy, including website updates regarding restructuring and press releases.

- Monitored and reported on media and case dockets regularly, developed and provided feedback on media monitoring reports.

- Managed communication strategies around potential DIP financing.

- Formulated case messaging and corporate communication strategies as well as implemented and refined employee communications strategies.

- Developed communication strategies related to sales processes, including drafting sale process communications packages.

- Collaborated with different teams and external stakeholders to ensure aligned messaging.

V.    **Real Estate Analysis and Compliance Tracking (Task Code 28)**

**Fees:   $1,089,177.10         Total Hours:  1,772.8**

- Conducted market research, analyses, and evaluations on real estate, including rent findings, financial assessments, market rates, and portfolio reports. Prepared and delivered client materials detailing these findings.

- Managed, reviewed, and updated real estate matrices and trackers for outstanding site data, property details, and lease analyses. Integrated newly scanned lease documents, resolved discrepancies, and ensured data synchronization across platforms.

- Refined and improved real estate processes, tools, and databases. This included enhancing the functionality of tools like Kira AI, iterating on trackers, and adding features to platforms.

- Conducted site analyses, and assessments covering various aspects such as environmental violations, rent discrepancies, code violations, post-closing obligations, and subleases.

- Conducted quality checks, compared different data sets (EZ leases, Matrix Lease, site reports, FTI and MEX trackers), and integrated newly scanned lease documents into trackers.

- Provided analysis, commentary, and feedback on a wide array of real estate documents (leases, subleases, fuel supply agreements, environmental documents, etc.), ensuring accuracy, compliance, and addressing topics like environmental issues, Oak Street Real Estate obligations, and lease data verification.

- Documented missing real estate agreements, tracked discrepancies, and ensured alignment of data with due diligence requirements. Managed and updated various databases, like the MEX notice of violation database and the Oak Street Real Estate post-closing obligations summary table.

- Drafted, reviewed, and finalized various reports, memoranda, and summaries, emphasizing lease provisions, environmental statuses, and site-specific concerns. Offered comprehensive summaries and feedback for continuous improvement in these areas.

- Organized and managed information for prospective buyers, asset purchase agreements, and due diligence activities. This includes deep dives into site-specific issues, documentation of missing agreements, and strategy development for potential buyer inquiries.

- Conducted extensive coordination and discussions on environmental compliance, including violation notices, and property-specific environmental reports. Updated and validated databases, matrices, and summaries related to these areas.

- Conducted market research and market rent analyses on comparable leases across multiple states, along with evaluations, document reviews, and report preparations related to real estate portfolio and market rates.

- Prepared, discussed, and delivered client materials, including Excel models and reports detailing market rent findings.

- Evaluated lease income/expenses and provided analyses for various real estate holdings.

- Reviewed and organized information for prospective buyers, asset purchase agreements, and other due diligence activities.

49.     Upon completion of our final review and examination, FTI conducted a reevaluation and subsequently reclassified a total of 109 hours in comparison to the monthly Fee Statements previously submitted. The particulars of this re-categorization are set forth in the table provided herein. It is important to note that this reclassification process has not resulted in any alterations to either the total number of hours billed or the corresponding billed amounts thereof.

| Original Task Category | | Adjusted Task Category | | Sum of Hours |
|---|---|---|---|---|
| 2 | Cash Forecasting, Cash Reporting and Other Financial Reporting | 26 | Estate Wind-down Planning and Implementation | 0.3 |
| 6 | Other Pleadings, Motions and Filings | 21 | Preparation for and Attendance at Hearings | 7.3 |
| 9 | Employee Matters | 26 | Estate Wind-down Planning and Implementation | 0.2 |
| 14 | Secured Creditors, Other Creditors, Parties-in-Interest and Professionals Meetings | 17 | SOFA and SOAL and 341 meeting | 2.6 |
| 14 | Secured Creditors, Other Creditors, Parties-in-Interest and Professionals Meetings | 21 | Preparation for and Attendance at Hearings | 3.4 |
| 14 | Secured Creditors, Other Creditors, Parties-in-Interest and Professionals Meetings | 22 | Fee and Retention Applications and OCPs | 3.9 |
| 15 | Vendors, Suppliers, Contracts, Cures, Assumption and Rejection | 21 | Preparation for and Attendance at Hearings | 2.5 |
| 16 | US Trustee Compliance, IDI, MORs, Reporting, Research and Communications | 17 | SOFA and SOAL and 341 meeting | 1 |
| 16 | US Trustee Compliance, IDI, MORs, Reporting, Research and Communications | 21 | Preparation for and Attendance at Hearings | 8.6 |
| 16 | US Trustee Compliance, IDI, MORs, Reporting, Research and Communications | 22 | Fee and Retention Applications and OCPs | 2.4 |
| 16 | US Trustee Compliance, IDI, MORs, Reporting, Research and Communications | 26 | Estate Wind-down Planning and Implementation | 17.7 |
| 17 | SOFA and SOAL and 341 meeting | 22 | Fee and Retention Applications and OCPs | 0.6 |
| 17 | SOFA and SOAL and 341 meeting | 26 | Estate Wind-down Planning and Implementation | 0.2 |
| 21 | Preparation for and Attendance at Hearings | 17 | SOFA and SOAL and 341 meeting | 1.5 |
| 25 | Claims | 26 | Estate Wind-down Planning and Implementation | 48.1 |
| 27 | Strategic Communications | 21 | Preparation for and Attendance at Hearings | 6.2 |
| 28 | Real Estate Analysis and Compliance Tracking | 26 | Estate Wind-down Planning and Implementation | 2.5 |
| **Total** | | | | **109** |

50.     The professional services performed by FTI during the Final Application Period required an aggregate expenditure of more than 9,950.0 hours by FTI Professionals.

51.     During the Final Application Period, FTI billed the Debtors for time expended by FTI Professionals based on hourly rates ranging from $175 to $1,495 per hour per professional. Allowance of compensation in the amount requested would result in a blended hourly billing rate of approximately $721.68 (based on 9950.0 recorded hours for professionals at FTI's agreed billing rates in effect at the time of the performance of services).

52.     Compensation for the foregoing services as requested is commensurate with the complexity, importance, and nature of the problems, issues, and tasks involved. The professional services were performed expediently and efficiently. Whenever possible, FTI sought to minimize the costs of its services to the Debtors by utilizing junior professionals to handle the more routine aspects of case administration.

53.     In sum, the services rendered by FTI during the Final Application Period were necessary and beneficial to the Debtors and their estates and were consistently performed in a timely manner commensurate with the complexity, importance, and nature of the issues involved. Accordingly, the final approval of the compensation for professional services and reimbursement of the expenses sought herein is warranted.

## **BASIS FOR THE RELIEF REQUESTED**

54.     Section 330 provides that a Court may award a professional employed under section 327 of the Bankruptcy Code "reasonable compensation for actual, necessary services rendered [and] reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1).

55.     Section 330 also sets forth the criteria for the award of such compensation and reimbursement:

In determining the amount of reasonable compensation to be awarded to . . . [a] professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including –

A. the time spent on such services;

B. the rates charged for such services;

C. whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

D. whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

E. with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

F. whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

56.     In determining the reasonableness of fees, courts routinely employ the twelve factors set forth by the Fifth Circuit in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974) which incorporates and expands upon the requirements of section 330 of the Bankruptcy Code.  These factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  *Id.* at 123 n.8.  In *In re Fourth Colonial Corp. of America*, 544 F.2d 1291, 1298-99 (5th Cir. 1977), *cert. denied*, 431 U.S. 904

(1977), the Fifth Circuit applied the *Johnson* factors to the analysis of fee awards in bankruptcy cases.

57.     Under an analysis utilizing the *Johnson* factors and the standards customarily applied to fee awards under section 330 of the Bankruptcy Code, FTI submits that its request for compensation and reimbursement of expenses is reasonable and proper, and that such request should be allowed in the requested amount.  FTI devoted a substantial amount of time and effort addressing the numerous issues involved in these Cases, as summarized above and detailed in **Exhibit 4** hereto.  Whenever possible, FTI sought to minimize the costs of its services to the Debtors by utilizing junior professionals to handle the more routine aspects of case administration.

58.     FTI respectfully submits that the services for which it seeks compensation in this Final Application were, at the time rendered, believed to be necessary to represent the Debtors effectively and efficiently.

59.     In sum, the services rendered by FTI were necessary and beneficial to the Debtors and were consistently performed in a timely manner commensurate with the complexity, importance, and nature of the issues involved.  This Final Application requests final approval of the fees and expenses incurred by FTI during the Final Application Period in accordance with section 330 of the Bankruptcy Code.  *See* 11 U.S.C. § 330.

60.     No previous application for the relief sought herein has been made to this or any other Court.

**WHEREFORE**, FTI respectfully requests that the Court: (a) approve final allowance for the period from March 18, 2023 through and including August 24, 2023, in the amount of $7,312,073.30, consisting of fees for professional services rendered to the Debtors in the amount of $7,180,713.20 and out-of-pocket expenses incurred in connection with the rendering of such

services in the amount of $131,360.10; (b) authorize PSZJ to disburse amounts set aside in the Carve-Out Funds for FTI under the Final DIP Order; and (c) grant such other or further relief as may be just and proper under the circumstances.

Dated:  November 15, 2023

**FTI CONSULTING, INC.**
Chief Restructuring Officer

*/s/ Michael Healy*
Michael Healy
Senior Managing Director
1166 Avenue of the Americas.
15th Floor
New York, New York 10036
(212) 247-1010

*Former Financial Advisor to the Debtors and Debtors in Possession*