IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

```
-----------------------------------------------------------)
In re:                                                     )   Chapter 7
                                                           )   (Previously Chapter 11)
MOUNTAIN EXPRESS OIL COMPANY, et al.,                      )
                                                           )   Case No.: 23-90147 (EVR)
                                                           )
        Debtors.                                           )   Jointly Administered
-----------------------------------------------------------)
```

### CHAPTER 7 TRUSTEE'S MOTION TO COMPEL OAK STREET REAL ESTATE CAPITAL, LLC AND JARED SHEIKER TO ALLOW THE TRUSTEE TO COMPLETE THEIR RULE 2004 EXAMINATIONS

> **THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**
>
> **REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**
>
> **AN ELECTRONIC HEARING WILL BE CONDUCTED ON THIS MATTER ON APRIL 23, 2024 AT 9:00 A.M. YOU MAY PARTICIPATE IN THE HEARING BY AN AUDIO AND VIDEO CONNECTION.**
>
> **AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE RODRIGUEZ'S CONFERENCE ROOM NUMBER IS 999276. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT BY CLICKING THE LINK UNDER "TELEPHONIC AND VIDEO PARTICIPATION" ON JUDGE RODRIGUEZ'S HOME PAGE.**

Janet Northrup, as duly appointed Chapter 7 Trustee (the "**Trustee**") of the jointly administered bankruptcy estates of Mountain Express Oil Company and affiliated debtors

1

(together, "**MEX**" or "**the Company**"), hereby moves this Court to compel Oak Street Real Estate Capital, LLC ("**Oak Street**")[1] and Jared Sheiker ("**Sheiker**") to allow the Trustee to complete their Rule 2004 examinations.

I.      INTRODUCTION[2]

"A bankruptcy trustee is entrusted with specific, legally binding responsibilities," including "investigat[ing] the acts, conduct, assets, liabilities, and financial condition of the debtor." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 342, 353 (1985); *see also generally* Federal Rule of Bankruptcy Procedure 2004 ("**Rule 2004**"). One of the purposes of the Trustee's investigation is to "determin[e] whether wrongdoing has occurred," *In re Correra*, 589 B.R. 76, 108 (N.D. Tex. 2018), and, if so, "discover[] evidence upon which future causes of action may be based." *In re Royce Homes, LP*, 449 B.R. 709, 722 (S.D. Tex. 2011). As shown herein, Oak Street and Sheiker are attempting to thwart the Trustee's investigation into the acts, conduct, liabilities, and financial condition of MEX by refusing to allow the Trustee to complete their Rule 2004 examinations.

Oak Street and Sheiker are two of the most important witnesses in this bankruptcy proceeding. In June 2021, MEX executed a Program Agreement with Oak Street pursuant to which Oak Street agreed to finance up to one billion dollars in sale-leaseback transactions. Thereafter, MEX and Oak Street participated in over fifty (50) sale-leaseback transactions involving over 250 properties with an aggregate value exceeding eight hundred million dollars. As described below,

---

[1] In December 2021, Blue Owl Capital Inc. ("**Blue Owl**") acquired Oak Street. Throughout this Motion, Oak Street refers to (i) Oak Street Real Estate Capital, LLC prior to the acquisition and (ii) Oak Street (to the extent it continues to operate as a separate legal entity) and Blue Owl, individually and collectively, post-acquisition.

[2] The information contained in this Motion is based on the Trustee's investigation, which remains ongoing. The Trustee may obtain additional facts or evidence that changes, modifies, and/or impacts the statements and positions contained herein.

these sale-leaseback transactions and conduct associated therewith played a material role in MEX's bankruptcy and, consequently, the facts relating to the sale-leaseback transactions are critical to the Trustee's investigation into (i) MEX's acts and conduct leading up the bankruptcy; (ii) any causes of action for wrongdoing associated with MEX's collapse; and (iii) potential sources through which the Trustee can obtain a recovery for the benefit of MEX and its' creditors. *See, e.g., In re McCombs*, 436 B.R. 421, 450 (Bankr. S.D. Tex. Aug. 17, 2010) ("There is no question that Chapter 7 trustees have a fiduciary duty to locate and liquidate assets for the benefit of unsecured creditors.").

Among other things, Oak Street has unique and important knowledge relating to: (i) the facts and circumstances underlying MEX's over eight hundred million dollars in sale-leaseback transactions; (ii) the potential siphoning of millions of dollars in MEX funds to MEX insiders in connection with the closing of sale-leaseback transactions; (iii) self-interested and/or conflicted transactions involving MEX insiders in connection with the sale-leaseback transactions; (iv) the identity of entities who received funds subject to avoidance or other claims in connection with sale-leaseback transactions; and (v) the facts and circumstances leading Oak Street to declare dozens of MEX leases in purported default, which MEX insiders have testified drove them to file for bankruptcy.[3]

Notably, as a condition of executing the Program Agreement, Oak Street demanded that MEX allow Oak Street to appoint one of MEX's three Board members. MEX agreed and, in December 2021, Sheiker was appointed to MEX's Board. From December 2021 until January 2023, Sheiker held two roles: he (i) was an Oak Street employee and (ii) a member of MEX's

---

[3] For example, Turjo Wadud, MEX's former Co-CEO and 48.5% owner, testified: "Q: And do you believe that Oak Street's calling of a default precipitated or caused the bankruptcy? A: I believe so." *See* 10/25/23 Deposition Transcript at 136.

3

Board. In those dual roles, Sheiker obtained a wealth of information critical to the Trustee's investigation. Among other things, Sheiker has knowledge relating to not only the subject matters identified above for Oak Street, but also (i) whether and to what extent MEX established and maintain internal controls relating to the sale-leaseback transactions and the operation of its retail business; (ii) the disbursement of funds that caused MEX to become insolvent; (iii) whether MEX's controlling owners (Wadud and Frady) breached their fiduciary and other duties and, if so, the facts relating thereto; (iv) sale-leaseback transactions involving entities other than Oak Street; (v) self-interested transactions involving MEX insiders that caused or contributed to MEX's insolvency; and (vi) the recipients of MEX's funds who may be a potential source of recovery for MEX's estate.

Given the substantial amount of knowledge Oak Street and Sheiker independently hold, the Trustee sought their **separate** Rule 2004 examinations. Oak Street, who shares counsel with Sheiker, designated Sheiker to serve as its corporation representative and, thereafter, requested that the Trustee take Sheiker's individual and corporate representative deposition concurrently. The Trustee agreed. But, in so accommodating Oak Street and Sheiker, the Trustee never waived her right to take a full and complete examination of both Oak Street and Sheiker.

Sheiker's individual and corporate representative examinations convened on February 14 at 9:30 a.m. At approximately 3:45 p.m., after obtaining only 5.2 hours of on-the-record testimony, the Trustee's counsel concluded that it would be impossible to complete the concurrent examinations in a single day and therefore adjourned the examinations for the day, though making clear that the examinations were being held open so they could be completed on a later date.

Unfortunately, Oak Street and Sheiker are now refusing to allow the examinations to continue. Instead, they are claiming that the Trustee's counsel was required to stay late into the

4

evening and finish the examinations in a single day. Setting aside that the Trustee could not reasonably complete both examinations of these important witnesses in a single day, Oak Street and Sheiker cite no authority for their claim. In fact, the law is to the contrary. The Bankruptcy Rules do not contain any time limitation for Rule 2004 examinations. And even stricter Fed. R. Civ. P. 30 (which does not apply) permits the Trustee fourteen hours to complete the examinations, *i.e.*, seven hours for Sheiker's individual examination and another seven for his examination as Oak Street's corporate representative.

The Trustee has conferred in good faith to avoid this Motion. To that end, the Trustee offered to (i) reconvene the examinations in Chicago (where Sheiker resides); (ii) work with Sheiker to find a mutually agreeable date and time; and (iii) limit the remaining examination to 3.5 hours on-the-record (assuming no undue delays or lengthy objections). Oak Street and Sheiker refused, necessitating this Motion.

I.  **STATEMENT OF THE RELEVANT FACTS**

   A.  **Overview of MEX and the Bankruptcy**

In 2000, Barry and Gail Bierenbaum formed MEX as a fuel and lubricant distributor. In 2020, the Bierenbaums effectuated a leveraged buyout ("**LBO**") through which (i) the Bierenbaums received roughly One Hundred Million Dollars in proceeds and (ii) two of MEX's then employees, Lamar Frady ("**Frady**") and Turjo Wadud ("**Wadud**"), became the Company's sole owners and Co-CEOs.

Prior to the LBO, MEX's business was focused primarily on fuel distribution *i.e.*, entering into fuel supply agreements with major fuel suppliers (*e.g.*, Exxon) and then re-selling and distributing that fuel to independent convenience stores ("**C-Stores**") and other retail suppliers. However, after the LBO, Frady and Wadud embarked on a plan to rapidly expand MEX's retail

business by leasing hundreds of C-Stores and trying to operate them.

A key component of MEX's retail expansion was its execution of sale-leaseback transactions through which MEX would (i) acquire real property and a C-Store contained thereon; (ii) sell that property to a third party; and (iii) thereafter lease the C-Store back from the third party (together, a "**Sale-Leaseback Transaction**").

From 2020 through 2022, Frady and Wadud, using Sale-Leaseback Transactions, caused MEX to expand its retail business by more than 300%. Indeed, by the end of 2022, MEX was operating roughly 550 C-Stores. Although Sale-Leaseback Transactions became a material part of MEX's business, Frady and Wadud failed to establish or maintain internal controls over that business. That fact is undisputed. Indeed, Sheiker, one of MEX's three Board members, testified:

> Q: Is it fair to say that while you were a MEX board member, Turjo and Lamar failed to cause MEX to establish sufficient internal controls over the retail business?
> A: I think it's fair.

*See* 2/14/24 Deposition Transcript at 197.

While the Trustee's investigation continues, there is evidence indicating that Wadud and Frady failed to establish internal controls, and failed to make a reasonable effort to determine whether Sale-Leaseback Transactions were profitable to the Company, because they used those transactions to siphon millions of dollars to their own side companies Illuminous (100% owned by Wadud) and Indepth (100% owned by Frady). Indeed, at closing, Wadud and Frady would cause funds to be wired to Illuminous and Indepth as purported "fees" for the work they performed locating and conducting due diligence on properties (even though such tasks were part of their jobs as MEX Co-CEOs). The "fees" were substantial. For example, in September 2021 Illuminous and Indepth *each* received $875,000 in connection with a Sale-Leaseback Transaction. Similarly, in October 2021, Illuminous and Indepth *each* received another $875,000 in purported "fees" in

6

connection with Sale-Leaseback Transactions. These entities received additional "fees" on other Sale-Leaseback Transactions.

In 2021 and 2022, MEX engaged in over 60 Sale-Leaseback Transactions involving 286 locations with an aggregate purchase price of over $825 million. The Trustee is now investigating, *inter alia*, (i) whether and to what extent there was wrongdoing relating to these transactions (*e.g.*, the siphoning of funds to MEX insiders' separate companies) and (ii) whether parties associated with the Sale-Leaseback Transactions are a source of potential recovery for MEX's estates and their creditors. Oak Street's and Sheiker's knowledge is important to that investigation.

### B. Background on Oak Street.

On June 30, 2021, MEX and Oak Street executed a Program Agreement pursuant to which Oak Street agreed to finance up to **one billion dollars** of MEX's acquisition of C-Stores and travel centers through Sale-Leaseback Transactions. At a very high level, the Sale-Leaseback Transactions with Oak Street generally worked as follows:

- MEX would purchase a property and then sell that property to Oak Street;

- Oak Street would then immediately lease the property back to MEX, with the lease rate being based on the price Oak Street paid MEX for the property, *i.e.*, the more money Oak Street had to pay for a property, the more MEX would have to pay in rent.

- Through the purported "rent" payments, MEX would repay Oak Street the funds it borrowed to acquire the properties as well as provide Oak Street with a return on that investment.

While the Trustee's investigation continues, it appears that Oak Street entered into the Program Agreement and executed these transactions because, if successful, they provided Oak Street with a substantial return over the life of the lease. That is, through the monthly lease payments, MEX not only repaid the loan it obtained first Oak Street, but effectively paid a high interest rate thereon over the course of the lease.

### C. Background on Sheiker.

As a condition of executing the Program Agreement, Oak Street demanded that MEX allow it to appoint one member to MEX's Board. Thus, in December 2021, Oak Street appointed Sheiker (an Oak Street employee) to serve on MEX's Board. From December 2021 until January 2023, MEX's Board consisted of Wadud, Frady, and Sheiker. During that same time, Sheiker also remained an Oak Street employee. As discussed below, given his dual role as a MEX Board member and Oak Street employee, Sheiker has a wealth of information relevant to this proceeding.

### D. Oak Street and Sheiker Have a Wealth of Relevant Knowledge.

While the sections above provide a very general overview of Oak Street's and Sheiker's involvement with MEX and the Sale-Leaseback Transactions, they make clear that both Oak Street and Sheiker have a substantial amount of knowledge relevant to this proceeding. Among other things, Oak Street and Sheiker each have knowledge and information relating to: (i) the reasons why Oak Street executed over eight hundred million dollars of Sale-Leaseback Transactions with MEX; (ii) the flow of funds to and from MEX in connection with those transactions; (iii) the extent to which Wadud, Frady or others siphoned funds from MEX in connection with Sale-Leaseback Transactions and the current locations of those funds; and (iv) the reasons why Oak Street declared MEX in purported default of certain leases and the impact thereon on MEX.

In addition to having knowledge on the topics listed above, if Sheiker complied with his confidentiality obligations and fiduciary duties to MEX (a point the Trustee is not conceding), Sheiker, as a MEX Board member, will have knowledge that Oak Street would not be privy to because it is MEX's own confidential and proprietary information. Such knowledge would include, among other things, (i) the information discussed at MEX's Board meetings relating to the Company's financial performance, Sale-Leaseback Transactions, internal controls, and the use

8

of Company funds and assets; (ii) whether, to what extent, and how MEX established and maintained internal controls; (iii) the details of any transactions involving entities owned, in whole or in part, by MEX insiders; (iv) whether and to what extent MEX transferred funds or other assets to entities owned, in whole or in part, by insiders such as Wadud and Frady; and (v) the current location of MEX's assets.

      E.      **The Trustee Accommodates Oak Street and Sheiker by Agreeing to Take their Separate Rule 2004 Examinations Concurrently.**

The Trustee properly requested **separate** Rule 2004 examinations of Oak Street and Sheiker. Separate examinations were warranted because, even though Oak Street and Sheiker have overlapping knowledge given that Sheiker was and remains an Oak Street employee, if Sheiker honored his fiduciary and confidentiality obligations to MEX, then Sheiker should have information that is unknown to Oak Street as discussed above.

After the Trustee requested Oak Street's and Sheiker's separate examinations, Oak Street's counsel – who also represents Sheiker – informed the Trustee that Oak Street intended on designating Sheiker as its corporate representative for purposes of Oak Street's Rule 2004 examination. Oak Street and Sheiker's counsel then requested that the Trustee agree to take Oak Street's and Sheiker's examinations at the same time to avoid duplicative questions of the same witness. The Trustee agreed. But, in so doing, the Trustee never agreed to limit the amount of time for the examinations. Nor would the Trustee do so. Given the substantial and materially important information held by both Oak Street and Sheiker, the Trustee would not (and did not) forfeit the right to conduct a thorough and shifting examination of both Oak Street and Sheiker simply to accommodate those witnesses' request to be deposed concurrently.

      F.      **Oak Street and Sheiker Refuse to Continue their Examinations.**

The Trustee's counsel commenced the concurrent examinations of Oak Street and Sheiker on February 14. The examination began at approximately 9:30 and continued until approximately 3:45. At that time, the Trustee's counsel had only been able to obtain 5.2 hours of on-the-record testimony, and it had become clear that it would be impossible to complete the examinations of both witnesses in a single day. Indeed, given the wealth of knowledge held by Oak Street and Sheiker, at 3:45pm Trustee's counsel still had many hours of questioning that needed to be conducted.

Given that both examinations could not be completed in a single day, the Trustee's counsel adjourned the examinations, making clear that they needed to be completed on another date. To avoid any purported burden on Sheiker, the Trustee's counsel made clear that (i) he would re-convene the examination in Chicago where Sheiker resides and (ii) would work cooperatively with Sheiker to find a date and time that was mutually convenient.

To that end, after the examinations the Trustee's counsel emailed Oak Street and Sheiker's counsel to schedule a time to complete the examinations. *See* Exhibit A (2/16/24 Elrod e-mail). In that email, Trustee's counsel explained that the first date of examination involved only roughly five hours of on-the-record testimony and why, under applicable law, the Trustee was entitled to at least another 8.5 hours of on-the-record testimony (for a total of 14 hours, *i.e.*, seven hours examining Oak Street and seven hours examining Sheiker). To minimize any alleged burden, the Trustee's counsel, although not required to do so, agreed to limit the second examination to 3.5 hours on the record.[4] *Id.* As before, the Trustee's counsel was amenable to traveling to Chicago for the resumed examination.

---

[4] At the time of the adjournment, the Trustee's counsel concluded that he could not complete the two examinations even if he stayed well into the night. Further, by adjourning the examinations, the Trustee's counsel was afforded an opportunity to review the remaining topics and testimony

Despite the Trustee's right to complete the Rule 2004 examinations and the accommodations relating thereto, Oak Street and Sheiker refuse to permit the Trustee to complete the examinations. *See* Exhibit B. Oak Street and Sheiker claim that, rather than continue the examination on a second date, the Trustee's counsel was required to continue the examination late into the evening (noting their belief that there was a 10:40pm flight that night). It is unsurprising that they provide no case law to support the proposition that the Trustee's counsel was required to examine both Oak Street and Sheiker in a single day, rather than follow the more reasonable approach of conducting the examination of two dates.

## III.     ARGUMENT AND CITATION OF AUTHORITY

### A.     The Standard Governing This Motion.

"A Rule 2004 examination permits a broad range of inquiry into all matters relevant to the Debtors' financial affairs," including inquiry into "the acts, conduct or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the Debtors' estate, or to the Debtors' right to a discharge." *See* Fed. R. Bankr. P. 2004(b); *In re Arkin Melo, Inc.*, 44 B.R. 138, 140 (Bankr. S.D.N.Y. 1985); *In re Washington Mutual*, *Inc.*, 408 B.R. 45, 49 (Bankr. D. Del. 2009) (noting that the scope of inquiry under Rule 2004 "is unfettered and broad"). For that reason, courts have found that the scope of Rule 2004 examination is very broad, in fact, far broader than discovery under the Federal Rules of Civil Procedure. *See, e.g.*, *In re Correra*, 589 B.R. 76, 109 (N.D. Tex. 2018) ("Discovery under Rule 2004 is broader than that

---

provided and, where appropriate, reduce the number of questions (something that could not have been accomplished if the Trustee's counsel was forced to move forward on February 14). Regardless, given the pace of the examinations and the need to break for dinner, another 3.5 hours on the record would have likely taken at least six more hours to complete. Of course, nothing required the Trustee's counsel to examine both witnesses for more than twelve hours and until 10 p.m. at night or later.

11

available under the Federal Rules of Civil Procedure"); *In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991) (same); *French*, 145 B.R. at 992 (same).

Notable here, Rule 2004 examinations are intended to root out and "expos[]e [] fraudulent conduct" as well as "determin[e] whether wrongdoing has occurred." *In re Correra*, 589 B.R. 76, 108 (N.D. Tex. 2018). And, if wrongdoing has occurred, a Rule 2004 examination can be used to "discover[] evidence upon which future causes of action may be based." *In re Bounds*, 443 B.R. 729, 732 (Bankr. W.D. Tex. 2010); *In re Royce Homes, LP*, 449 B.R. at 722 ("Rule 2004 examination is 'aimed at discovering evidence upon which future causes of action may be based"). To that end, courts have "likened [a Rule 2004 examination] to a 'fishing expedition.'" *In re Bounds*, 443 B.R. at 736.

    **B.**    **Oak Street and Sheiker Have No Legitimate Basis for Refusing to Allow the Trustee to Complete their Rule 2004 Examinations**.

Oak Street and Sheiker have failed to provide, and cannot provide, any legitimate basis for refusing to permit the Trustee to complete the Rule 2004 examinations.

    **1.**    **Federal Rule of Civil Procedure 30 Does Not Apply.**

Oak Street and Sheiker have taken conflicting positions as to whether their examinations are governed by Fed. R. Civ. P. 30(d)'s ("**Rule 30**") (rebuttal) presumption that "a deposition is limited to 1 day of 7 hours." To the extent Oak Street and Sheiker rely on that argument now, it fails. In fact, Rule 30 only supports the Trustee's position that the examinations should continue.

For one, Rule 30 does not apply to a Rule 2004 examination unless the examination is being taken in connection with an adversary proceeding. *See* Bankruptcy Rule of Civ. P 7030 ("Rule 30 Fed. R. Civ. P. applies in adversary proceedings."). Oak Street's and Sheiker's Rule 2004 examinations are not part of an adversary proceeding, and therefore Rule 30 does not apply. While Oak Street and Sheiker originally relied upon Rule 30 as a basis for limiting the

12

examinations, they now concede that Rule 30 is inapplicable here. *See* Exhibit B ("At no point prior to or during his examination did I assert, as you now claim, that Mr. Sheiker's Rule 2004 examination was governed by Fed. R. Civ. P. 30(b)(6).").

Further, even under stricter Rule 30,[5] the Trustee would be permitted at least fourteen hours to examine Sheiker in his dual corporate and individual capacities. Where, as here, a person is being deposed in both an individual and corporate representative capacity, the examining party is entitled to fourteen hours of deposition testimony, *i.e.*, seven hours for the individual deposition and seven hours for the corporate representative deposition. For example, in *S. Tex. Neon Sign Co. v. Ixtapa, Inc.*, 2009 U.S. Dist. LEXIS 148335, at *4 (S.D. Tex. June 2, 2009), a court in this District rejected the claim that a witness who was being deposed in his individual and corporate representative capacity was only required to testify for seven hours in a single day, holding: "**Plaintiff was allowed to depose Mr. Gonzales for seven hours in his individual capacity and for seven hours as Defendant's corporate representative.**" In so holding, the Court quoted another federal case holding that "[a]s a separate deposition that probes the knowledge of the entity and not the personal knowledge of the individual testifying, a 30(b)(6) deposition should be subject to its own independent seven-hour limit." *Id.* (quoting *Miller v. Waseca Med. Ctr.*, 205 F.R.D. 537, 540 (D. Minn. 2002)).

This District's holding in *Ixtapa* is consistent with caselaw nationwide. *See, e.g., Sabre v. First Dominion Capital, LLC*, 2001 U.S. Dist. LEXIS 20637, at *1 (S.D.N.Y. Dec. 10, 2001) ("the depositions of an individual who is noticed as an individual witness pursuant to Fed.R.Civ.P. 30(b)(1) and who is also produced as a corporate representative pursuant to Fed.R.Civ.P.

---

[5] "Discovery under Rule 2004 is far broader than discovery under the Federal Rules of Civil Procedure and is often described as being in the nature of a fishing expedition." *In re VOX II, LLC*, 2008 Bankr. LEXIS 556, at *2 (Bankr. D. Md. Mar. 4, 2008).

13

30(b)(6) are presumptively subject to independent seven-hour time limits."); *Diplomat Golf Course Venture, LLC v. Certain Underwriters at Lllyods, London,* 2020 U.S. Dist. LEXIS 260013, at *7-9 (S.D. Fla. Nov. 10, 2020) (rejecting argument that individual and corporate representative deposition was limited to seven hours because "[t]here is a difference between an individual deposition and one as a corporate representative."); *LendingTree, Inc. v. LowerMyBills, Inc.*, 2006 U.S. Dist. LEXIS 59589, at *3-6, 9 (W.D.N.C. Aug. 22, 2006) (granting motion to compel Rule 30(b)(6) deposition even though 30(b)(6) designee had previously testified in his individual capacity on topics similar to those identified in the 30(b)(6) notice); *Smith v. General Mills*, 2006 U.S. Dist. LEXIS 19093, at *15 (S.D. Ohio Apr. 13, 2006) ("Courts have soundly rejected [the] argument that prior deposition testimony from individual fact witnesses relieves a corporation from designating a corporate spokesperson in response to a Rule 30(b)(6) notice of deposition.").

In short, nothing in the Bankruptcy Rules limits the Trustee's examination to a single day. In fact, even the stricter Federal Rules afford the Trustee at least fourteen hours to conduct the dual examinations of Sheiker in his individual and corporate capacity.

### C.   Oak Street's and Sheiker's Claim that the Trustee Was Required to Complete Two Examinations in a Single Day is Unreasonable.

In their counsel's February 21 letter, Oak Street and Sheiker provide only one purported basis for refusing to permit the Trustee to complete the Rule 2004 examinations, *i.e.*, the Trustee's counsel should have stayed well into the night on February 14 to complete the examinations "in a single day." *See* Exhibit B. In so arguing, Oak Street and Sheiker's counsel notes that Trustee's counsel could have taken a flight that "did not depart until 10:40pm." *Id.* Unsurprisingly, Oak Street and Sheiker do not cite a single case holding that a Trustee's counsel (or any attorney) is required to conduct **two** Rule 2004 examinations in a single day (for more than twelve hours) regardless of whether those examinations continue well into the night.

14

Oak Street's and Sheiker's position also ignores the fact that the Trustee's counsel adjourned the examinations because, even if they continued, they could not have been completed in a single day. As of the time of the adjournment, the Trustee's counsel still had many hours of questioning remaining and, consequently, the Trustee's counsel concluded that even if he stayed well into the night, the examinations could not be completed. *See supra* at n.5.

Moreover, Oak Street and Sheiker's position is indicative of the maxim "no good deed goes unpunished." Oak Street and Sheiker are the ones who requested that their depositions run concurrently. The Trustee's counsel could have rejected that request and insisted that each deposition take place independently. It did not. Rather, to act efficiently, cooperatively, and in good faith, the Trustee agreed to allow the examinations to occur concurrently. While it was certainly the Trustee's hope that both examinations could be completed in a single day, the Trustee never promised to do so. Nor did the Trustee agree that if the examinations could not be completed in a single day, that the Trustee was waived the right to complete the examinations on another date.

Unfortunately, rather than reciprocate the Trustee's cooperation, Oak Street and Sheiker are now engaging in gamesmanship. Having obtained the benefit of concurrent depositions, they are now trying to force the Trustee to have completed two critically important Rule 2004 examinations in a single day, which will materially prejudice the Trustee and the creditors she has a fiduciary duty to protect.

Further, had Oak Street and Sheiker's counsel informed the Trustee prior to the examinations that they must be completed in a single day, then the Trustee's counsel would not have agreed to Oak Street and Sheiker's request to take the examinations concurrently. Instead, Trustee's counsel would have demanded that the examinations take place independently, which necessarily would result in two depositions over two dates, each of which could last at least seven

15

hours. It is unfortunate that Oak Street and Sheiker are seeking to take advantage of the Trustee's counsel's willingness to work cooperatively on the examinations.

**D. Balancing the Harm Weighs Heavily in the Trustee's Favor**.

When balancing the harm, it is clear the harm to the Trustee (and, in turn, the estates) in precluding the completion of the examinations is materially greater than any purported harm to Oak Street and Sheiker in allowing the examinations to resume.

On the one hand, if the Trustee is not permitted to complete the examinations, the Trustee will be unable to obtain critically important information known to Oak Street and Sheiker, including information that is likely not known by any other witness. That runs contrary to Bankruptcy discovery rules, which are broad and designed to allow the Trustee to "determin[e] the nature and extent of the bankruptcy estate, reveal[] assets, examin[e] transactions and assess[] whether wrongdoing has occurred." *In re Millennium Lab Holdings, LLC*, 562 B.R. 614, 626 n.11 (Bankr. D. Del. 2016).

On the other hand, Oak Street and Sheiker will suffer little, if any, harm if the examinations are continued. As stated above, the Trustee has already agreed to (i) conduct the examinations in Chicago where Sheiker resides and (ii) to work cooperatively to find a date that is mutually agreeable to all parties. Sheiker cannot legitimately claim that driving down the street to resume an examination causes him harm.

**E. Request for Attorneys' Fees**.

Given that Oak Street and Sheiker do not have a valid basis for refusing to allow the Trustee to complete their examinations, the Trustee requests an award of the attorneys' fees incurred in connection with this Motion. *See* Bnkr. L.R. 2001-4(g).

16

## IV. CONCLUSION

For the reasons set forth herein, the Trustee requests that the Court (i) compel Oak Street and Sheiker to allow the Trustee to complete the Rule 2004 examinations; (ii) award the Trustee the reasonable attorneys' fees incurred in connection with this Motion; and (iii) award all other relief the Court deems just and proper.

Dated: March 29, 2024

**GREENBERG TRAURIG, LLP**

By: */s/ John D. Elrod*
Shari L. Heyen
Texas Bar No. 09564750
*Shari.Heyen@gtlaw.com*
1000 Louisiana St., Suite 1700
Houston, Texas 77002
Telephone: (713) 374-3564
Facsimile: (713) 374-3505

– and –

John D. Elrod (admitted *pro hac vice*)
*ElrodJ@gtlaw.com*
Terminus 200, Suite 2500
3333 Piedmont Road, NE
Atlanta, Georgia 30305
Telephone: (678) 553-2259
Facsimile: (678) 553-2269

**SPECIAL LITIGATION COUNSEL FOR THE CHAPTER 7 TRUSTEE**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served upon the parties eligible to receive notice through the Court's ECF facilities by electronic mail on March 29, 2024.

*/s/ John D. Elrod*
John D. Elrod