IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 23-90147-7 |
| | § | HOUSTON, TEXAS |
| MOUNTAIN EXPRESS OIL COMPANY, | § | TUESDAY, |
| ET AL, | § | APRIL 23, 2024 |
| DEBTORS. | § | 9:10 A.M. TO 9:59 A.M. |

### MOTION HEARING (VIA ZOOM)

BEFORE THE HONORABLE EDUARDO V. RODRIGUEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                          SEE NEXT PAGE

CASE MANAGER:                  JEANNIE CHAVEZ

COURTROOM ERO:               ANA CASTRO

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**APPEARANCES (VIA ZOOM):**


FOR THE CHAPTER 7 TRUSTEE:      GREENBERG TRAURIG, LLP
                                John D. Elrod, Esq.
                                Steven J. Rosenwasser, Esq.
                                Terminus 200
                                3333 Piedmont Road, NE
                                Suite 2500
                                Atlanta, GA 30305
                                678-553-2259


FOR OAK STREET REAL ESTATE      PORTER & HEDGES, LLP
CAPITAL, LLC:                   John F. Higgins, IV, Esq.
                                1000 Main Street
                                Suite 3600
                                Houston, TX 77002
                                713-226-6648


FOR BLUE OWL REAL ESTATE        KIRKLAND & ELLIS, LLP
CAPITAL, LLC F/K/A OAK          Benjamin T. Kurtz, Esq.
STREET REAL ESTATE CAPITAL,     333 W. Wolf Point Plaza
LLC AND JARED SHEIKER:          Chicago, IL 60654
                                312-862-7145

1          **HOUSTON, TEXAS; TUESDAY, APRIL 23, 2024; 9:10 A.M.**

2          THE COURT:  All right.  The next matter I'll take

3     appear on is 23-90147, Mountain Express Oil Company.

4          Mr. Elrod, good morning.

5          MR. ELROD:  Good morning, Your Honor.  It's John

6     Elrod, Greenberg Traurig, LLP, as special litigation counsel

7     for Janet Northrup.  I'm here along with my colleague, Steven

8     Rosenwasser, and Mr. Rosenwasser will handle the argument on

9     behalf of the Trustee.

10          THE COURT:  All right.  Thank you.

11          Mr. Higgins.

12          MR. HIGGINS:  Good morning, Your Honor.  John

13     Higgins on behalf of Oak Street Real Estate Capital.  I'm here

14     with (indiscernible) --

15          THE COURT:  (Indiscernible).

16          MR. HIGGINS:   -- co-counsel at Kirkland.

17          THE COURT:  Thank you.

18          Mr. Kurtz?

19          MR. KURTZ:  Good morning, Your Honor.  Ben Kurtz of

20     Kirkland & Ellis on behalf of Blue Owl Real Estate Capital

21     formerly Oak Street and Jared Sheiker.

22          THE COURT:  Very well.  All right.  This is a motion

23     to compel.

24          MR. ROSENWASSER:  Good morning, Your Honor.  This is

25     Steven --

1              THE COURT:  Mr. Rosenwasser.

2              MR. ROSENWASSER:  -- good morning, Your Honor.

3     This is Steven Rosenwasser.  I appreciate the opportunity to

4     argue before you this morning.  I actually had a PowerPoint to

5     just briefly walk us through the argument.  Would it be okay

6     if I shared my screen?

7              THE COURT:  Sure.  You have the presenter role.

8              MR. ROSENWASSER:  Yes.  All right.  Give me -- can

9     Your Honor see my screen?

10             THE COURT:  Yes, sir.

11             THE COURT:  Okay.  Thank you.  Good morning, Your

12    Honor.  Just to give a brief over of why we're here today.  As

13    the Court is familiar, the Trustee has a responsibility for

14    investigating the acts, conducts, assets, liabilities and

15    financial commitment of the Debtor, which includes

16    investigating to determine whether there's been any

17    wrongdoing, and if so, the evidence upon which future causes

18    of action may be based.

19             The reason we are here today, Your Honor, is Oak

20    Street and Mr. Sheiker are attempting to thwart the Trustee's

21    investigation, are choosing to allow special counsel to

22    complete their role of 2004 Examinations of those two separate

23    persons.  And as you'll see today, what they claim was that

24    the Trustee was required to complete two separate important

25    depositions in a single day.

1           And I think it's important to discuss up front why
2      these two deponents, which is Oak Street and Mr. Sheiker, are
3      so important to the Trustee's investigation.  So we start with
4      Oak Street.  Mountain Express and Oak Street were parties to
5      over $850 million in sale-leaseback transactions which
6      occurred during the relevant time.  And in short how these
7      things would work is MEX would acquire property, they would
8      sell it to Oak Street, Oak Street would then immediately lease
9      it back to MEX.

10          And it was respectively a form of financing through
11     the lease payments MEX would refund the funds it borrowed as
12     well as give Oak Street a substantial return.  And, in fact,
13     what we've learned as we crossed the -- the lease rates were
14     based on the purchase price.  The more that Oak Street paid
15     for the property, the more money it actually made.

16          Now there are several issues relating to the sale-
17     leaseback transactions that we need to investigate.  The first
18     one is that in connection with this transaction it appears
19     that millions of dollars of funds that should have gone to MEX
20     actually went to its two insiders, Mr. Frady and Mr. Wadud,
21     who collectively owed -- owned more than 98 percent of the
22     company.

23          And to briefly show you what I mean, here's a
24     seller's statement relating to one of the sale-leaseback
25     transactions, and there are many of these, and it shows here

1     that Oak Street was the counterparty.  And then if you look

2     down at the transmission of funds in connection with just this

3     one sale-leaseback transaction, a company trying to --

4               THE COURT:  Mr. Rosenwasser, all I see is the

5     telephonic participation link for this Court on the screen.

6               MR. ROSENWASSER:  Okay.  Let me find --

7               MR. KURTZ:  Sorry to interrupt, Your Honor, but I

8     also cannot see the slides.

9               MR. ROSENWASSER:  Let me try and fix that, if you

10    can give me one second, Your Honor.  I apologize.

11         (Pause in the proceedings.)

12              MR. ROSENWASSER:  I think where I need to do is go

13    out and go back in.

14         (Pause in the proceedings.)

15              MR. ROSENWASSER:  I think I have it fixed now.  All

16    right.  Does that work?

17              THE COURT:  Sure, just enlarge the image a little

18    bit for me, please.

19              MR. ROSENWASSER:  Okay.  I apologize for that.

20              MR. KURTZ:  I'm still not seeing anything, Your

21    Honor.

22              THE COURT:  You should be able to see it on your

23    screen.

24              MR. ELROD:  I'm able to see it, Your Honor.  This is

25    John Elrod.

1          THE COURT:  Okay.

2          MR. ROSENWASSER:  Okay.  Can I go forward?  Mr.

3    Higgins, can you see it?

4          THE COURT:  Yes, just -- just go ahead and enlarge

5    that screen for me, please.

6          MR. ROSENWASSER:  Your Honor, if I enlarge --

7          THE COURT:  If I enlarge it, I feel like it's going

8    to -- if I enlarge my screen, it's going to probably block

9    some of what you want to show me.

10          MR. ROSENWASSER:  My screen is totally

11    (indiscernible).

12          MR. HIGGINS:  I see the screen but it's very small.

13    That's better.

14          THE COURT:  Okay.  Go ahead.

15          MR. ROSENWASSER:  Okay.

16          THE COURT:  (Indiscernible) you see it?

17          MR. KURTZ:  I'm unable to see it.  Is there a

18    setting I need to click.  I'm just seeing the individuals

19    whose cameras are on.

20          MR. ROSENWASSER:  Are you on active cameras?

21          MR. KURTZ:  I am.

22          MR. ROSENWASSER:  That may be the reason.

23        (Pause in the proceedings.)

24          MR. KURTZ:  Are you able to email me the slides?

25          MR. ROSENWASSER:  If we took our two minute break, I

1    could.

2            THE COURT:  But you should be able to see it on your

3    monitor.  I mean we can all see it.

4            MR. KURTZ:  Okay.  I cannot see it, but --

5            THE COURT:  Mr. Kurtz, you may have to -- maybe you

6    have a glitch in the connection.  You maybe just log out and

7    log back in to GoToMeeting.  We'll allow you to do that just

8    want to get so you can see that.  Why don't you try that.

9            MR. KURTZ:  Okay.  Thank you.

10           MR. ROSENWASSER:  I'm going to endeavor to try and

11   email it to him as well while I'm sitting here.

12       (Pause in the proceedings.)

13           MR. ELROD:  Your Honor, this is John Elrod.  Just so

14   the Court is aware, I have emailed the slide deck to Mr.

15   Kurtz.  It appears he may be having trouble logging back on

16   given the delay though.  Oh, here he is again.

17           THE COURT:  Thank you.

18       (Pause in the proceedings.)

19           THE COURT:  Mr. Kurtz, you're still on the call?

20           MR. KURTZ:  I am.

21           THE COURT:  All right.  Can you -- do you have the

22   slide deck in your email?

23           MR. KURTZ:  It hasn't come through yet, but I'm sure

24   it's working its way to me.

25       (Pause in the proceedings.)

1          THE COURT:  All right.  Let's go ahead and continue,

2     Mr. Rosenwasser.

3          MR. ROSENWASSER:  Thank you, Your Honor.

4          To reorient I was discussing the over $850 million

5     of sale-leaseback transactions between MEX and Oak Street and

6     providing an example of how one of the issues we're

7     investigating are funds that belong to MEX being siphoned off

8     to two of its owners, Mr. Wadud and Mr. Frady.  So here's one

9     example of one of the transactions with Oak Street, and this

10    is the seller's statement.

11         And what I was referring to, Your Honor, was this is

12    part of that same seller's statement and you see that there

13    are two companies, one called (indiscernible) Consulting and

14    another called In Depth Services Company.  Each of them got

15    $875,000 in fees in connection with this one sale-leaseback

16    transaction.  Those companies are wholly owned by Mr. Wadud

17    and Mr. Frady, and together they owned roughly 98.5 percent of

18    MEX.

19         So one of the issues that we need to investigate is

20    the extent to which Oak Street was sending and transmitting

21    MEX's funds to side companies owned by the insiders, which as

22    this shows was not an insubstantial amount of money, it was

23    hundreds of millions of dollars.  So that's one of the things

24    we're investigating.

25         Another thing that we're investigating relating to

1    sale-leaseback transactions was a complete failure in

2    establishing internal controls over the retail business.  What

3    MEX was purporting to do through these sale-leaseback

4    transactions was after it sold the property and leased it, it

5    would purportedly operate these convenience stores, but it

6    never established any internal controls relating to those

7    stores.

8         And, in fact, in the time that we did spend with Mr.

9    Sheiker, one of the things he conceded was that while he was

10   on the board Mr. Wadud and Mr. Frady failed to cause MEX to

11   establish sufficient internal controls over the retail

12   business.  And that's -- we need to get a lot more information

13   from Sheiker about what it is he knew, what Oak Street knew

14   why the internal controls weren't put into place and where the

15   funds went.

16        Now an important part of (indiscernible) issues is

17   in August of 2022 Mr. Sheiker in his role as vice president of

18   Oak Street, and one of the things we're going to talk about is

19   he was not only a board member of MEX but he also was a vice

20   president of Oak Street, but he got a letter from lawyers from

21   a company called West Hill Ranch, and MEX had acquired West

22   Hill Ranch and gave that company 3 percent interest in MEX.

23        And the lawyers who were now representing a company

24   that owned an interest in MEX reached out to Mr. Sheiker and

25   Oak Street and told them in August of 2022 that West Hill

1    Ranch believes that they have not made satisfactory progress

2    in developing anything close to adequate financial report and

3    controls, and also told Mr. Sheiker and Oak Street that their

4    clients believed that Mr. Frady and Mr. Wadud were routinely

5    taking commissions and gains out of the real estate

6    transactions, which are along the lines that I showed the

7    Court earlier.

8         So we need, again, to know what it is that Oak

9    Street and Mr. Sheiker did when they got this letter, what

10   investigation they conducted, what they learned from that

11   investigation and all the facts relating to that.  There's one

12   thing we've seen is that these sale-leaseback transactions

13   continued in earnest even after this letter occurred, and we

14   need to understand why.

15        Another thing relating to these sale-leaseback

16   transactions, just to briefly mention, is Mr. Wadud's claim in

17   his examination is that Oak Street declaring default on the

18   leases was one of the reasons that MEX was actually forced

19   into declaring bankruptcy.  I mean it was a direct question,

20   Do you believe that Oak Street calling in a default

21   precipitated your call to bankruptcy.  He said he believes so.

22        And to give a little context here, what happened was

23   in January of 2023 Oak Street claimed that the leases that MEX

24   was involved with with Oak Street were in default and declared

25   them in bankruptcy and then did a bunch of cross-defaults

1    which is what pushed this all into the original Chapter 11

2    bankruptcy.  So we have a lot relating to that as well.

3          So I only touched on some of the issues here, but

4    Oak Street has a substantial amount of information.  I mean

5    this is hundreds of millions of dollars of transactions where

6    we know that at least some money was sent to insiders and

7    we've learned more about where it went.

8          One of the things I didn't mention that occurred

9    during the sale-leaseback transactions is Mr. Wadud and Mr.

10   Frady had other side companies like Adelphi (phonetic)

11   Environmental which reportedly did due diligence and

12   environmental services.  And they were getting fees in

13   connection with these sale-leasebacks as well, and we need to

14   know exactly what Oak Street and Mr. Sheiker knows about

15   those -- these other companies.

16         We need to know which other entities got the money

17   so we can see what sources of potential recovery there are.

18   And as I mentioned before, we need to know why these things

19   were declared in default and any investigation that was taken.

20         Just to very briefly talk about Mr. Sheiker, who we

21   separately noticed for examination.  In connection with --

22   there's a document called a Program Agreement.  And a Program

23   Agreement is through which Oak Street agreed to finance up to

24   $1 billion in sale-leasebacks with MEX.  But as a condition of

25   that Oak Street demanded that MEX allow Oak Street to appoint

1       one of member to its board, and that person was Mr. Sheiker.

2            So Mr. Sheiker, during a critical time period for

3       this bankruptcy, was not only a vice president of Oak Street,

4       but he was also on MEX's Board of Directors.  So we want to

5       talk to him not only about what Oak Street knew, but also

6       about what he knew as a member of MEX's Board of Directors,

7       and that involves things like what was discussed during MEX's

8       board meetings, what did he know about its financial

9       performance, what did he know about the sale-leasebacks and

10      these insider transactions, what did he know about the

11      internal controls and where the funds went that caused the

12      company to go insolvent, and all the different other things

13      related to potential claims you could have against Mr. Frady,

14      Mr. Wadud, and all their side companies.

15           And one important point to make here is when Mr.

16      Sheiker served on MEX's board, he had a fiduciary duty to

17      maintain MEX's confidential information.  And if he honored

18      that duty, then he will have information that's separate from

19      Oak Street because he should not have been providing that

20      information from Oak Street which is one of the reasons why we

21      originally made this to be two separate examinations.

22           And as I mentioned a moment ago, we sought two

23      different depositions, and this brings us to the heart of the

24      argument here.  After we served these examination notices what

25      Oak Street did is they told us that they were designating Mr.

1    Sheiker as their corporate representative.  And they asked us

2    if we will take the depositions concurrently.  And we agreed.

3         And as we put in our brief, this is a situation

4    where no good deed goes unpunished.  They're somehow claiming

5    that we, as part of our agreement to do this at once, said we

6    would do this in a single day.  And there is no evidence that

7    that actually occurred, nor would it make any sense.  You

8    know, as I've shown at the outset, these are two very

9    important examinations and we would never limit our time.

10   One, it was unnecessary to do so, particularly as a courtesy

11   to their request that we take these depositions concurrently.

12        Now I should point out why Rule 30(b)(6) doesn't

13   apply, it is stricter than the bankruptcy rules.  And even

14   under Federal Rule 30(b)(6) in a situation like this one where

15   we have a person who's both being individually deposed and

16   being deposed as a corporate representative, the rules are

17   clear, you get 7 hours for the individual deposition and 7

18   hours for the corporate representation deposition.  So even

19   under Rule 30(b)(6) we'd be entitled to depose Mr. Sheiker for

20   14 hours.

21        Now what Mr. Sheiker and Oak Street argue is that in

22   exchange for Mr. Simon to allow the Trustee to simultaneously

23   examine him in individual and corporate capacity, we agreed we

24   would do this in one day, and that's on Page 1 of their

25   opposition.  But we didn't need to make that agreement.  This

1    was their request, not ours.  Simultaneous examinations

2    benefit them, not us.

3         Now the main thing they rely on as part of their

4    argument is they say there was a written agreement that this

5    would all be done in one day.  I put up for Your Honor the

6    only document that they say supports that, which is an email

7    from Mr. Kurtz.  And what he said is, Jared is likely going to

8    be Oak's corporate representative so a single date should, key

9    wording should, should be all we need, and then he put some

10   proposed dates, and we agreed to one of the dates.

11        Nowhere in here did the Trustee ever agree that this

12   will be limited to a single day.  They simply said, We should

13   get it done in a day.  We hoped it would get done in a day,

14   but at no point in time did we ever say that that would be the

15   case.

16        So just on the issue of an agreement.  There is no

17   agreement, nor have we ever reached an agreement.  In fact, if

18   they had told us that we had to do this in a single day, we

19   wouldn't have accepted their request, or agree to their

20   request to do this concurrently.  Instead we would have said,

21   We're going to take our time for each of these, but it is

22   separately.

23        Or their other argument.  One of the things they say

24   is we could have taken a later flight.  So let's talk about

25   that for a minute.  We scheduled a flight that lands back here

1    at 9:00 p.m.  We weren't going to insist that we make that

2    flight if we thought the deposition and examinations could be

3    completed in a single day.

4           If it ended up that we believed that we could get it

5    done, we would have gotten it done.  And, in fact, in their

6    brief they mention that we said we would try to stay, and we

7    were going to leave the next morning if we could get it done

8    in a single day.

9           But what became perfectly clear by late afternoon is

10   there is no way we were going to be able to finish these two

11   examinations in a single day.  And, in fact, by 3:45 we'd only

12   finished roughly 5 hours of on-the-record testimony.

13          Another argument they make is they go, We'd already

14   asked the witnesses about the topics that are noticed in the

15   examination notice.  Well, the fact that we asked a couple of

16   questions doesn't mean we were able to do a thorough

17   (indiscernible) examination.  We did not complete the

18   deposition or examination and that's what we told them.

19          And, in fact, there are many issues we didn't get

20   to, and I'll just put a couple on the Court, because they keep

21   saying in their opposition that we haven't identified anything

22   else we need to ask.  So one issue is there were sale-

23   leaseback transactions with Oak Street, but there were also

24   sale-leaseback transactions with other companies, side

25   companies owned by Mr. Frady and Mr. Wadud.

1          And one example here is there's an instance where

2     MEX bought two properties for 6.5 million and literally the

3     same day sold it to a company owned by Mr. Frady and Mr. Wadud

4     for $500,000, and then leased it back at $240,000 a year.

5     That is highly suspicious on its face.  We never got an

6     opportunity to ask Mr. Sheiker about it who was there at the

7     time.

8          Another example are sale-leasebacks with the

9     Beerenbaums (phonetic) who are MEX's (indiscernible) monitors,

10    and I put another very suspicious transaction here where four

11    properties were sold to Taylor Mercantile which is owned by

12    the Beerenbaums for 5 million, and yet the same day Mr. Wadud

13    and Mr. Frady caused MEX to lease then for 20 years at

14    $450,000 a year.

15         Never got an opportunity to ask Mr. Sheiker about

16    that.  Never got an opportunity to really dig into these other

17    side companies that Mr. Frady and Mr. Wadud owned like Adelphi

18    Environmental.  And then there's also issues with respect to

19    purported reinvestment of business expenses that we think are

20    personal expenses, didn't talk about that either.  So the idea

21    that we got through all the deposition, you know, deposition

22    questions and all the topics is simply not true.

23         Another problem we had, Your Honor, and another

24    reason why we were not able to get this done in a single day

25    is Mr. Sheiker's answers were incomplete or evasive, and I'm

1    just going to go very quickly through a couple of examples.

2    We asked him if Oak Street put any guardrails around the

3    purchase price proceeds and what they'd be used for, and that

4    goes back to the fees that went to (indiscernible).  He

5    doesn't know the answer, he doesn't recall.

6         And we asked him what steps that Oak Street took to

7    ensure that proceeds stayed within the company.  He doesn't

8    recall anything about that.  We asked him when did he first

9    suspect that Mountain Express was headed for bankruptcy.  He

10   didn't recall that.  We asked him if he could tell us by year,

11   was it in 2022 or '23 when he thought the company was headed

12   for bankruptcy.  He didn't know that.

13        And maybe one of the clearest and egregious examples

14   of this is we asked how much his bonus was because one of the

15   things we believe is that the more sale-leaseback transactions

16   that he -- that got finished, the more money he made, which

17   gave him an incentive to push these things through even if

18   they were bad for MEX.  I asked how much his bonus was in

19   2021, he didn't know.  How much it was in 2022, he didn't

20   know.

21        But most significantly, and I should point out this

22   was the first case, I believe, in his young 30s.  What -- we

23   asked him did he make a million dollars in bonuses, and he

24   claimed he didn't even know that.  And went on to say that he

25   doesn't do this for the money.  He works for a real estate

1    investment firm, he's not out saving the world, he's not

2    working for a charity.  But we just couldn't get answers out

3    of the guy, and this is a perfect example of it.

4         The other argument they quickly make is they say

5    that we haven't cited any cases that say we're entitled to a

6    second Rule 2004 Examination.  We're not seeking a second

7    examination.  We are seeking to complete the first examination

8    where we only got roughly 5 hours of testimony when we are

9    entitled to up to 14, even under the stricter Federal Rules of

10   Civil Procedure.

11        And finally, in the world of prejudice we're not out

12   to expend -- to make this go as long as we can, to make it

13   difficult for these people.  We actually tried to compromise

14   as best we could to make it as easy as we could for Mr.

15   Sheiker.  So what we told them is, we will go back up to

16   Chicago where Mr. Sheiker resides and finish the examination

17   there.  And by the way, that's where the first half took

18   place.  We also said we're happy to work with him on days and

19   times that are convenient.

20        And even though even under the federal rules we are

21   deemed -- the Federal Rules of Civil Procedures, we would get

22   8-1/2 hours more testimony.  We said for this second part of

23   the deposition we're willing to limit it to 3-1/2 hours on the

24   Record.  It's basically a morning.  And rather than just

25   simply agree to go to where Mr. Sheiker lives and have him

1      spend a morning to finish this important examination, they

2      made us go through this process instead.

3              But at the end of the day, these examinations are

4      critically important to our investigation.  These are probably

5      the two most important entities -- well, one entity, one

6      person with respect to what we're trying to learn, and we're

7      simply asking for 3-1/2 more hours to finish what we started.

8      I'm happy to answer any questions Your Honor may have.

9              THE COURT:  All right.  So he was -- Mr. Sheiker was

10     deposed individually or as corporate representative?

11             MR. ROSENWASSER:  So they wanted to do both at the

12     same time and that's what we agreed to do.  And that is really

13     what the issue is.

14             THE COURT:  Got it.  Okay.

15             Mr. Kurtz?

16             MR. KURTZ:  Thank you, Your Honor.  Your Honor, is

17     my camera working?  I'm sorry for the technical issues in the

18     beginning.

19             THE COURT:  Yes, I can see you.  Yes, sir.

20             MR. KURTZ:  Okay.  Thank you.  All right.  Judge,

21     Ben Kurtz for Oak Street and Mr. Sheiker.  Judge, listening to

22     the Trustee's counsel's argument I think one should take away

23     that my clients have been attempting to dodge Rule 2004

24     discovery, and that's just not so.

25             Oak Street and Mr. Sheiker have been cooperating

1    with Rule 2004 discovery requests since the Trustee's counsel

2    first served their initial round of document requests on them

3    nearly 8 months ago.  Since then my clients have produced more

4    than 12,000 documents totally nearly 320,000 pages of records

5    in response to dozens of requests.

6         Following that production, as you heard, Mr. Sheiker

7    sat for a wide-ranging Rule 2004 deposition both in his

8    personal and as corporate representative capacities.  He did

9    that on February 14.  He provided more than 300 pages of sworn

10    testimony.

11         My clients have sought to be agreeable and

12    reasonable in cooperating with the Trustee's discovery

13    requests, both out of respect for the Trustee and the wide

14    latitude that Rule 2004 affords her, and also to clear up any

15    misguided notion as to their own culpability in this

16    proceeding.

17         As I believe Your Honor's aware, my client, Oak

18    Street, was the first casualty of the Mountain Express

19    downfall when its tenant, Mountain Express, could no longer

20    make its monthly rent payments.  And for those reasons we have

21    been fully supportive of the Trustee's investigative efforts

22    through Rule 2004.  We've been transparent and we worked in

23    good faith to provide the Trustee with the information to

24    which she's entitled, and our stance in opposition to the

25    motion today is based on our belief that our good faith is no

1    longer being reciprocated.

2         Now I understand that this is a point of contention

3    but we believe that the exchange between myself and counsel

4    for the Trustee in November of last year clearly showed that

5    the Trustee agreed in writing through her counsel to take Mr.

6    Sheiker's deposition both in his personal and his corporate

7    representative capacities on a single date.  That exchange is

8    at Exhibit 4 to our opposition brief, and counsel showed it to

9    you briefly today.

10        On that date Mr. Sheiker was then questioned and he

11   testified to every noticed topic.  We've included in our

12   brief, it's at Footnote 5, exemplar testimony from the 300-

13   page transcript on every one of the topics that was noticed

14   for deposition.  Even the more particular areas that the

15   Trustee says in her motion and that you've heard discussed

16   today that she wants to explore, each one of them was already

17   addressed on February 14, and we pointed Your Honor to

18   exemplar testimony on those issues as well, that's in Footnote

19   6 of our brief.

20        To our surprise though, Judge, on the -- during an

21   afternoon break of the examination the Trustee's counsel

22   informed us for the first time that he had prearranged a

23   flight, a return flight from Chicago, that would require him

24   to leave for the airport before 4:00 o'clock.  And he left

25   shortly thereafter at 3:45 despite our objection to his

surprise attempt to bifurcate his questioning across multiple
days, and our on-the-record statements that we would stay as
long as necessary that day to provide the Trustee with her
requested testimony.

Judge, after cooperating with discovery requests for
months, we were taken aback to see counsel leave at 3:45 in
what appeared to us as a transparent attempt to get a second
deposition.  If the Trustee's counsel wanted more testimony
from Mr. Sheiker, he could have obtained it that day but he
knowingly booked a flight that forced him to end the
deposition in the middle of the afternoon.

And now without any indication of topics of
examination that have not already been thoroughly addressed
the Trustee is asking that Mr. Sheiker be deposed again.  To
be clear about what this is, this is a request for a
duplicative second examination.  There are no new topics that
have been indicated, these are the same topics that were
originally noticed, and we believe the Trustee is just seeking
a second bite at the apple.

Rule 2004 is broad but it does not allow repeat
discovery requests.  It's the Trustee's burden to show good
cause for why Mr. Sheiker needs to sit for a second
deposition.

Judge, you heard counsel speak at length about the
importance of Oak Street and Mr. Sheiker's testimony.  There

1    were many factual characterizations made, many we do not agree

2    with.  But the importance of Oak Street and Mr. Sheiker alone,

3    and any relevance that they might have to this proceeding,

4    that's not good cause for a second deposition.

5         We don't dispute that Mr. Sheiker and Oak Street's

6    relationship with the Debtors may be relevant, but that was

7    the case when Mr. Sheiker sat for his first examination, and

8    this dispute is about whether Mr. Sheiker has to appear for a

9    second examination.

10        The Trustee has also said that he should be made to

11   appear for his second exam because her counsel unexpectedly

12   ran out of time during the first one.  But again, that is

13   contrary to the Record.  Her counsel knowingly prearranged a

14   flight that required him to end the examination at 3:45 to our

15   surprise, over our repeated on-the-record objection.  He

16   didn't run out of time, he left on how own accord before time

17   was up.

18        And even so the Trustee has not identified topics of

19   testimony that are outside of what was originally noticed on.

20   And we -- the Trustee's had multiple opportunities to do so,

21   to identify what additional topics or information she needs

22   from Mr. Sheiker.  Counsel for the Trustee didn't do so in the

23   letter that was sent to us two days after the deposition, they

24   didn't do so -- they didn't respond to our letter asking for

25   some indication of what additional testimony was sought.

1        And now even in the motion and today we're just

2   hearing about topics that Mr. Sheiker already testified to, or

3   that were well within the scope of the original notice.  The

4   Trustee had ample opportunity to glean information on these

5   topics on February 14, and could have learned more but counsel

6   left the deposition early.

7        Again, perhaps the analysis would be different if

8   there was some new previously unavailable information that had

9   emerged since Mr. Sheiker's testimony, but you're not hearing

10  that either, that's not the case either.  The Trustee is just

11  looking for license to examine again on the same topics

12  counsel already questioned on.

13       And none of the case law that the Trustee cites

14  supports the contention that there's good cause for a second

15  deposition of Mr. Sheiker and Oak Street.  It merely supports

16  the notion that Rule 2004 discovery is broad.  We of course

17  acknowledge that, but the Trustee points to no case where Rule

18  2004 countenance a repeat deposition on the same topics

19  already addressed.

20       And there's a reason for this.  Unless new topics

21  are going to be addressed, a second deposition isn't about

22  Rule 2004 investigation, it's about litigation.  The case law

23  does not support parties taking limitless Rule 2004 discovery

24  while they hold off filing an adversary proceeding.  And here

25  the Trustee has, by her own admission, been sitting on

1    perceived claims against my clients for more than four months.

2    On December 14 the Trustee served my client with a

3    letter demanding payment of more than $250 million in damages

4    on account of various alleged breaches and claims, this is at

5    Exhibit 5 to our opposition.  The Trustee also sent copies of

6    this letter to my clients' D&O insurers improperly instructing

7    them not to pay proceeds towards the fees and expenses

8    relating to the defense of these claims.

9    Now of course we deny any contention of wrongdoing,

10    but this is important context.  The Trustee is seeking

11    duplicative discovery of Mr. Sheiker while depriving him or

12    attempting to deprive him of the very insurance coverage that

13    was purchased to protect him against these types of unfounded

14    assertions.  That's not right.  It's increased the burden on

15    my clients and we're going to be back before Your Honor in a

16    few weeks on our pending motion for relief from the automatic

17    stay as to those policies.

18    Again though, up until this attempt at a repeat

19    examination on topics already noticed, Mr. Sheiker and Oak

20    Street were transparent and cooperative in Rule 2004 requests.

21    There are no valid claims against my clients.  But if the

22    Trustee believes otherwise, she's not without options.  She

23    could commence her long-threatened claims.

24    Judge, we believe that *In Re Defoor Centre*, 634 BR

25    630 out of the Middle District of Florida is instructive.

1    There, like here, the Debtor had expressly threatened a party

2    with claims for many months to avoid the pending proceeding

3    rule which prevents the use of Rule 2004 discovery in an

4    adversary proceeding.  The Debtor held off filing the

5    adversary in favor of further Rule 2004 requests.

6         The Court there denied those requests finding "Rule

7    2004 Examinations are meant to obtain preliminary information.

8    The Debtor should not be allowed to delay the filing of an

9    adversary proceeding so that it can avoid the pending

10   proceeding rule and gain a tactical advantage".

11        Judge, the Trustee may not be satisfied that the

12   information she has obtained supports her threatened claims

13   against my clients.  As noted, they're meritless, that there

14   is no doubt that she has obtained all the information that she

15   sought, she has obtained the information that she's entitled

16   to under Rule 2004, and for those reasons and the others I

17   mentioned in our brief, Your Honor, we would ask that the

18   Trustee's motion be denied.  Happy to answer any questions.

19        THE COURT:  Mr. Rosenwasser?

20        MR. ROSENWASSER:  I just have a very brief response.

21   If you look back at the purported agreement to do this in a

22   single day, what Mr. Kurtz wrote in his email is "So a single

23   date should work".  Now he didn't go on to say, If you don't

24   get it done in a single day, you can't take any more.  He

25   didn't say, If we do it concurrently, you cannot come back.

1    What he said is, We think it should be done in a single day,

2    which implies he recognized it might not get done in a single

3    day.  And that's exactly what happened.

4         Now much is talked about the fact that a flight was

5    prearranged.  Yes, we had hoped to finish the deposition and

6    be done in a single day.  And as they acknowledge in their

7    brief, we even said at the deposition we're willing to stay

8    until the next -- and leave the next morning, if we can get it

9    done in a single day.  It became clear it was never going to

10   get done in a single day because there are simply too much

11   material to get through and we were not getting clear answers

12   as I showed.

13        Now one of the things that Mr. Kurtz mentioned is

14   they cite to selected portions of the deposition where they --

15   questions were asked within the topics.  Well, again, the fact

16   that we asked a couple of questions about a topic doesn't mean

17   it was thorough.

18        An example would be if we asked -- the topic is the

19   relationship between Blue Owl and MEX.  According to them if

20   we asked the question, What is the first time you signed a

21   contract with MEX, we're now done asking about that topic.  Of

22   course that's not the case.  These are preliminary questions

23   that are just part of a lot of questions that go into the

24   topic.

25        So at the end of the day if we could get it done in

1     a single day, we would have gotten it done in a single day.

2     We couldn't.  We never agreed that we had to get it done in a

3     single day.  They never told us we had to get it done in a

4     single day.  This is gamesmanship.  The rules are clear that

5     we would get even under Federal Rules of Civil Procedure 14

6     hours.  They're trying to hamstring us to 5.

7              Oak Street and Mr. Sheiker are incredibly important

8     and they say we get 5 hours.  Or if we stayed late into the

9     night, maybe 6, 7 hours.  We need more time, they never said

10    we shouldn't get more time, and for that reason the motion

11    should be granted.

12             THE COURT:  All right.  Was there any discussion

13    ahead of time or any notice in this 2004 Exam that -- of the

14    contemplated time of the day you were going to start and end

15    this examination?

16             MR. ROSENWASSER:  It states the day of the

17    deposition and I believe it started at 9:00, and other than

18    that, no, Your Honor.

19             THE COURT:  Okay.  And were the parties on notice

20    that you -- and you had an agreement as I heard earlier to

21    depose this witness in both his individual and corporate

22    representative capacity?

23             MR. ROSENWASSER:  two separate notices were sent,

24    one for him as an individual and then one we sought a

25    corporate rep for Oak Street.  And then what happened is Oak

1    Street, who --  Oak Street and Mr. Sheiker have the same

2    counsel and they came back and said, We're going to designate

3    Mr. Sheiker as the corporate rep for Oak Street, so we want

4    you to take both depositions at the same time.  Instead of

5    doing one one day and one the next day, they wanted it

6    concurrently because otherwise we'd have a bunch of

7    duplicative questions.

8            So we were willing to accommodate that to avoid

9    asking the same questions twice, one that was (indiscernible)

10   on Oak Street and one that was individual, which makes sense.

11   But we never said we were limited to a time period when we

12   were otherwise entitled to two full days.

13           THE COURT:  So he was deposed in both capacities at

14   the same time?

15           MR. ROSENWASSER:  Correct, Your Honor, to avoid

16   duplicative questions.

17           THE COURT:  But that --

18           MR. ROSENWASSER:  And the parties (indiscernible) --

19   I'm sorry.

20           THE COURT:  And when did you notify opposing counsel

21   that you had to leave, you had a flight?

22           MR. ROSENWASSER:  In the middle of the day on the

23   deposition date we let them know that we had concerns about

24   time.  It is at that point where we indicated we were willing

25   to leave the next morning if it was possible to get it done.

1    And we continued to take the examination to see if we could

2    get it done.

3              And ultimately it proved impossible to be able to

4    get it done because of the amount of material we were getting

5    and the type of answers we were getting.  And at that point we

6    said, There's no reason to stay and depose him until 10:00

7    p.m. at night when no matter what we are going to have to come

8    back to continue.

9              THE COURT:  Why is that?

10             MR. ROSENWASSER:  Because by 3:45 in the afternoon

11   we only had about 5 hours of on-the-record time and there was

12   still just too much material to go through because remember

13   there's information that Oak Street has and then there's

14   completely separate information that Mr. Sheiker has because

15   as a member of MEX's board he shouldn't be sharing that

16   information of the Debtor.  So what he would -- what Oak

17   Street would know is not identical to what Mr. Sheiker knows,

18   and that's why we needed -- that's why we needed and asked for

19   two separate examinations.

20             THE COURT:  Okay.  I guess my question was --

21             MR. ROSENWASSER:  And what --

22             THE COURT:   -- why couldn't you stay until you

23   finished?

24             MR. ROSENWASSER:  I don't think there's anything

25   that required us to -- the information we had there, at the

1     time we probably had 5, 6 hours more time on the Record and it

2     was already 4:00 o'clock in the afternoon, and then you -- at

3     some point somebody needs to eat, so you're talking about

4     deposing him from 9:00 in the morning till 11:00 at night.

5     And again, at no point in time did they insist that that has

6     to be done before the deposition took place.

7          So one of the advantages of doing it this way, I

8     should point out, is we have the benefit of going back and

9     (indiscernible) number of questions we had, which is why said

10    (indiscernible) to 3-1/2 more hours on the Record.

11               THE COURT:  Is that all you need now?

12               MR. ROSENWASSER:  Correct, Your Honor.

13               THE COURT:  You don't need the full 8-1/2 hours?

14               MR. ROSENWASSER:  Correct.  What we said to them is

15    we are willing to go up to Chicago, to find a day and time

16    that works well for Mr. Sheiker and to limit it to 3-1/2 hours

17    on the Record.

18               THE COURT:  Mr. Kurtz, you want to respond?

19               MR. KURTZ:  Yes, Your Honor, briefly.  Judge, first

20    of all there was an amended notice of Rule 2004 Examination

21    sent to both Oak Street and Mr. Sheiker, so it was a single

22    notice.  Second, in terms of the parties' agreement, Judge, we

23    offered counsel multiple dates to choose from and indicated

24    that a single date should be all we need for both depositions,

25    and then in agreement counsel for the Trustees picked a single

1    date that we proposed.

2         And that's why we were willing to take on the added

3    complexity of Mr. Sheiker testifying in dual capacities in a

4    single sitting.  The first we heard of counsel's desire to

5    take multiple depositions of Mr. Sheiker was in the afternoon

6    of February 14 shortly before he left for his flight.

7         And, Judge, counsel's lack of transparency about his

8    intentions, especially given our cooperation in discovery to

9    that point, it struck us then and it strikes us now as a

10   pretextual attempt to get a second bite at the apple.  He pre-

11   planned to leave in the middle of the afternoon knowing he

12   would seek further testimony without attempting to work it out

13   with us beforehand.  And that, Your Honor, our primary

14   objection to why Mr. Sheiker shouldn't be made to come back

15   for a second deposition.

16        THE COURT:  All right.  Gentlemen, thank you.  All

17   right.  This is complex case and the Trustee's entitled to

18   discovery.  But I've heard the arguments today, and so what I

19   am going to do order is that Mr. Sheiker present himself for a

20   continued 2004 Examination.  I'm going to limit it to 5 hours.

21        And where did this -- where would you like this to

22   take place, Mr. Kurtz, your office in Chicago?

23        MR. KURTZ:  Yes, we would like it in Chicago,

24   please.  And, Your Honor, just to make sure I heard you

25   correctly, did you say 5 hours?  I think the Trustee might

1    have said that they were willing to do it in 3-1/2 hours.

2              THE COURT:  And if they do, fine.  But I'm limiting

3    it to 5 if they need additional time.

4              MR. KURTZ:  Understood.

5              THE COURT:  I'm not ordering that they take the full

6    5 hours, but should they need it, they'll have the full 5

7    hours.

8              MR. KURTZ:  Okay.

9              THE COURT:  Give me just a moment.

10         (Pause in the proceedings.)

11             THE COURT:  All right.  What date and time?

12             MR. KURTZ:  Your Honor, if it's okay with you and

13   counsel, I'd like to confer with my client on his availability

14   and --

15             THE COURT:  Well, let's do it right now.  Let's do

16   it right now.  You can put your phone on mute and give your

17   client a call, I'm going to put in my order.

18             MR. KURTZ:  Okay.  Just one moment, please.

19             THE COURT:  Yep.

20             MR. KURTZ:  Your Honor, I may not be able to reach

21   him, he was heading into a medical appointment, but I will try

22   to reach him.

23             THE COURT:  All right.

24             Mr. Rosenwasser, would you might get your client on

25   the line as well and be ready.

1          MR. ROSENWASSER:  I'm texting as we speak, Your

2     Honor.

3          (Pause in the proceedings.)

4          MR. KURTZ:  Your Honor, Ben Kurtz again.  Like I

5     said, my client wanted to be able to attend today but he had a

6     medical appointment come up and he was not able to.  I just

7     tried his cell phone and was not able to reach him.

8          THE COURT:  All right.

9          MR. KURTZ:  Perhaps, Your Honor, we could include

10    some kind of outside dates or again we could come back to you

11    once we've had a chance to --

12         THE COURT:  Mr. Rosenwasser, what's a date you'd

13    like to have this done?

14         MR. ELROD:  Yes, Your Honor, this is John Elrod.

15    And if I could speak to that, I would appreciate it.

16         THE COURT:  Sure.  Go ahead.

17         MR. ELROD:  Your Honor, it would be likely be my

18    calendar that provides most -- you know, that is the one

19    that's at issue here.  I'm happy to work with Mr. Kurtz

20    offline.  I will say that I've reached out to the Trustee, I

21    wasn't able to reach her, but I assume that she will be fine

22    with whatever date works for counsel --

23         THE COURT:  Okay.

24         MR. ELROD:  -- for her counsel.  So I'm happy to

25    speak with Mr. Kurtz.  We would like an outside date here of I

1    would say by the end of May to complete this.  But with that

2    being said, I'm happy to talk with him offline about that.

3            THE COURT:  May 31?

4            MR. ELROD:  Yes, Your Honor.

5            THE COURT:  Okay.  Give me just a moment.

6        (Pause in the proceedings.)

7            THE COURT:  Mr. Kurtz, does that work for you?

8            MR. KURTZ:  Yes, it will.

9            THE COURT:  Okay.

10       (Pause in the proceedings.)

11           THE COURT:  All right.  That'll be in my order.  I'm

12   going to deny the Trustee's request for attorney's fees.  But

13   I am ordering a deposition to take place no later than May 31,

14   2024, and I'm limiting it to a total of 5 hours.  Gentlemen,

15   any questions about my order?

16           MR. ROSENWASSER:  No, Your Honor.

17           MR. KURTZ:  Thank you, Your Honor.

18           MR. HIGGINS:  Thank you, Your Honor.

19           THE COURT:  All right.  Thank you.  Gentlemen,

20   you're excused.  Have a good day.

21           MR. ROSENWASSER:  You, too.

22           MR. KURTZ:  Thank you.

23           MR. ELROD:  You, too, Your Honor.

24       (Hearing adjourned 9:59 a.m.)

25                         *  *  *  *  *

1          *I certify that the foregoing is a correct transcript*

2     *to the best of my ability due to the condition of the*

3     *electronic sound recording of the ZOOM/video/telephonic*

4     *proceedings in the above-entitled matter.*

5      */S./   MARY D. HENRY*

6     *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

7     *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

8     *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

9     *JTT TRANSCRIPT #68617*

10    *DATE FILED:  MAY 2, 2024*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25