**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 7 |
|  | ) |  |
| MOUNTAIN EXPRESS OIL COMPANY, *et al.*, | ) | Case No. 23-90147 |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |

**APPLICATION FOR ALLOWANCE**
**AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM**

| | |
|---|---|
| **CREDITOR NAME:** | Mountain Portfolio Owner LLC |
| **OTHER NAMES USED WITH THE DEBTOR:** | Blue Owl Real Estate Capital LLC; Oak Street Real Estate Capital, LLC |
| **CREDITOR ADDRESS:** | 30 N LaSalle Street, Suite 4140 <br> Chicago, IL 60602 |
| **CREDITOR EMAIL ADDRESS:** | drew.wides@blueowl.com |
| **CREDITOR PHONE NUMBER:** | (773) 389-6502 |
| **DEBTOR AGAINST WHOM CLAIM IS ASSERTED:** | Mountain Express Oil Company |
| **AMOUNT OF CLAIM:**[2] | $83,800.93 |
| **BASIS OF CLAIM:** | Unpaid rent from August 1, 2023 through and including August 24, 2023 arising under that certain lease attached hereto as Exhibit A |

---

[1]   A complete list of each of the Debtors in these chapter 7 cases may be obtained on the Court's website at www.ecf.txsb.uscourts.gov.  The location of Debtor Mountain Express Oil Company's principal place of business was 3650 Mansell Road, Suite 250, Alpharetta, GA 30022. The Debtors' service address is Neil Lansing, Designated Representative, 2295 Haynes Trail, Johns Creek, GA 30022.

[2]   For the avoidance of doubt, the administrative claim asserted by this Application was included in the proof of claim filed on April 18, 2024 in advance of the general claims bar date established in these chapter 7 cases [Docket No. 1853].  *See* Claim 436.

2

| **BASES FOR RELIEF:** | Sections 365(d), 503(b)(1), and 507(a)(2) of |
| | chapter 11 of title 11 of the United States Code, |
| | 11 U.S.C. §§ 101–1532 |

I swear or affirm under penalty of perjury that I am over the age of eighteen and otherwise competent to make this declaration and that the foregoing statements are within my personal knowledge and are true and correct.

| **SIGNED:** | */s/ Steven N. Serajeddini* |
| **PRINTED NAME AND TITLE:** | Steven N. Serajeddini<br>Partner, Kirkland & Ellis LLP |
| **ADDRESS:** | 601 Lexington Avenue<br>New York, NY 10022 |
| **EMAIL ADDRESS:** | steven.serajeddini@kirkland.com |
| **PHONE NUMBER:** | (212) 446-4800 |

2

**<u>Exhibit A</u>**

**Lease**

**AMENDED AND RESTATED
MASTER LEASE AGREEMENT
(OAK TRUST)**

**By and Among**

The landlord entities set forth on <u>Schedule I</u> attached hereto

**(Landlord)**

**and**

The tenant entities set forth on <u>Schedule I</u> attached hereto

**(Tenant)**

**TABLE OF CONTENTS**

**Page**

1.  BASIC TERMS ........................................................................................................ 1
2.  DEFINITIONS AND BASE PROVISIONS ...................................................... 2
3.  GRANTING CLAUSE ........................................................................................ 10
4.  USE ......................................................................................................................... 11
5.  RENT ...................................................................................................................... 12
6.  TRUE LEASE ....................................................................................................... 14
7.  NET LEASE .......................................................................................................... 14
8.  REAL ESTATE TAXES ...................................................................................... 16
9.  PERSONAL PROPERTY TAXES ..................................................................... 19
10. OPERATING EXPENSES ................................................................................... 19
11. TENANT'S REPAIR AND MAINTENANCE RESPONSIBILITIES ........... 19
12. COMPLIANCE WITH LAWS ............................................................................ 22
13. SURRENDER OF PREMISES ............................................................................ 22
14. ALTERATIONS .................................................................................................... 23
15. ENTRY BY LANDLORD ..................................................................................... 25
16. TENANT'S INSURANCE OBLIGATIONS ..................................................... 25
17. OFAC ...................................................................................................................... 30
18. WAIVER OF SUBROGATION .......................................................................... 31
19. FIRE OR OTHER CASUALTY .......................................................................... 31
20. CONDEMNATION .............................................................................................. 33
21. INDEMNIFICATION ........................................................................................... 33
22. ASSIGNMENT AND SUBLETTING ................................................................ 36
23. LIENS ..................................................................................................................... 39
24. TENANT'S DEFAULT ........................................................................................ 40
25. REMEDIES OF LANDLORD ............................................................................ 41
26. SUBORDINATION/ATTORNMENT ................................................................ 43
27. ESTOPPEL CERTIFICATE ................................................................................ 44
28. HAZARDOUS MATERIALS ............................................................................. 44
29. PRESS RELEASES .............................................................................................. 44
30. HOLDING OVER ................................................................................................. 48
31. FINANCIAL COVENANTS ............................................................................... 48
32. QUIET ENJOYMENT ......................................................................................... 50
33. NOTICES ............................................................................................................... 50
34. PERSONAL LIABILITY ..................................................................................... 51
35. ENTIRE AGREEMENT ...................................................................................... 51
36. AMENDMENTS ................................................................................................... 52
37. LEGAL INTERPRETATION ............................................................................. 52
38. OPTION TO RENEW .......................................................................................... 52
39. AUTHORITY TO ENTER INTO LEASE ........................................................ 53
40. PARTIES BOUND ............................................................................................... 53
41. COUNTERPARTS; ELECTRONIC SIGNATURES ....................................... 53
42. SEVERABILITY .................................................................................................. 54
43. WAIVER OF JURY TRIAL; CONSEQUENTIAL DAMAGES .................... 54

i

44.    MEMORANDUM OF LEASE ......................................................................................... 54
45.    BROKERS ........................................................................................................................ 55
46.    RIGHT OF FIRST REFUSAL TO PURCHASE ............................................................. 55
47.    GUARANTY ..................................................................................................................... 56
48.    REIT PROTECTION ........................................................................................................ 58
49.    LOCAL LAW PROVISIONS............................................................................................ 58

**AMENDED AND RESTATED MASTER LEASE AGREEMENT**
**(OAK TRUST)**


**THIS AMENDED AND RESTATED MASTER LEASE AGREEMENT (OAK TRUST)** (this "**Lease**") is entered into as of the 1st day of January, 2023 (the "Effective Date"), by and among the corresponding landlord entities set forth on **Schedule I** attached hereto and made a part hereof (individually and/or collectively, as the context may require, "Landlord"), and the corresponding tenant entities set forth on **Schedule I** attached hereto and made a part hereof (individually and/or collectively, as the context may require, "Tenant").

**RECITALS**

A.      Landlord and Tenant are parties to (i) those certain Master Lease Agreements set forth on **Schedule II** attached hereto and (ii) that certain Lease Agreement dated July 5, 2022, by and among Mountain IRTX001 LLC, Mountain DATX002 LLC, Mountain DATX 004 LLC, Mountain DATX005 LLC, Mountain METX001 LLC, each a Delaware limited liability company, as landlord, and Mountain Express Oil Company, a Georgia corporation, as tenant (as amended, collectively, the "**Original Leases**" and each individually, an "**Original Lease**").

B.      Landlord and Tenant desire to combine, amend and restate the Original Leases pursuant to this Lease.

C.      Accordingly, on and as of the Effective Date, the Original Leases are hereby combined, amended and restated into this Lease.

**NOW THEREFORE**, in consideration of the mutual promises, covenants, and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1.      **BASIC TERMS**.

      A.      "Base Rent":  Base Rent shall be paid in accordance with and in the amounts set forth on **Exhibit A** attached hereto and made a part hereof, subject to increases as set forth herein.

      B.      "Building":  The building or buildings located on the Property in the approximate square footages set forth on **Exhibit B-1** attached hereto and made a part hereof.

      C.      "Commencement Date": January 1, 2023.

      D.      "Expiration Date":  The last day of the calendar month in which the twenty-five (25) year anniversary of the Commencement Date shall occur, or as otherwise extended pursuant to the terms hereof.

1

E.    "Option to Renew":  Four (4) additional periods of five (5) years each under the terms and conditions set forth in Section 38 of this Lease.

F.    "Premises":  Collectively, the Building and the Property.

G.    "Property":  Those certain tracts or parcels of land, more particularly described on **Exhibit B-1** attached hereto and made a part hereof.

H.    "Term":  A period of twenty-five (25) years (plus the number of days, if any, to have this Lease expire on the last day of a calendar month), commencing on the Commencement Date and expiring on the Expiration Date, unless extended as hereinafter provided.

2.    **DEFINITIONS AND BASE PROVISIONS**.

For purposes of this Lease, the following terms shall have the meanings indicated below:

A.    "ADA":  The Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq., as the same may be amended from time to time and any and all rules and regulations which have become effective prior to the date of this Lease under such statutes.

B.    "Affiliate":  With respect to Landlord or Tenant, shall mean a person or entity that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with such person or entity.  The term "control" as used in the immediately preceding sentence, means, with respect to an entity that is a corporation, limited liability company, partnership or other entity, the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the ownership interests of the entity, with respect to any non-publicly traded company, and more than ten percent (10%) ownership, or management control, with respect to any publicly traded company.

C.    "Alterations":  Defined in Section 15.A hereof.

D.    "Anti-Money Laundering Laws":  The BSA and the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (commonly referred to as the USA Patriot Act), P.L. 107-56, as the same may be amended from time to time and any and all rules and regulations which have become effective prior to the date of this Lease under such statutes.

E.    "Applicable Rent Reduction Percentage" means, with respect to any Site, a fraction, the numerator of which shall be the dollar amount allocated to such Site on **Exhibit B-2** attached hereto, and the denominator of which shall be the total dollar amount allocated to all Sites on **Exhibit B-2** attached hereto that are then subject to this Lease.

2

F.  "Architect" shall mean an architect selected by Tenant to complete any applicable Tenant's Work, who is reasonably acceptable to Landlord.

G.  "Base Rent":  Defined in Section 1.A hereof.

H.  "BSA":  The Bank Secrecy Act (otherwise known as the Currency and Foreign Transactions Reporting Act), 31. U.S.C. §§ 310 et seq., as the same may be amended from time to time and any and all rules and regulations which have become effective prior to the date of this Lease under such statutes.

I.  "Building":  Defined in Section 1.B hereof.

J.  "Commencement Date":  Defined in Section 1.C hereof.

K.  "Comparable Buildings":  Buildings in the market in which the applicable Building is located that are comparable in size, design, use, age, location, class and quality to such Building

L.  "Consolidated Net Income": means, for Guarantor on a consolidated basis for any period, without duplication, the net income (or loss) for such period, but excluding therefrom (to the extent otherwise included therein) (a) any gains attributable to write-ups of assets or the sale of assets (other than the sale of assets in the ordinary course of business), (b) any equity interest of Guarantor in the unremitted earnings of any entity that is not a subsidiary of such Guarantor, and (c) any income (or loss) of any entity accrued prior to the date it becomes a subsidiary or is merged into or consolidated with the Guarantor  or any subsidiary or the date that such entity's assets are acquired by the Guarantor or any subsidiary.  Notwithstanding the foregoing, profits from the purchase and sale of real property and sale of businesses shall be considered usual and recurring "in the ordinary course of business" for purposes of determining "Consolidated Net Income".

M.  "Contract": Defined in Section 46.C hereof.

N.  "Control" shall mean with respect to an entity that is a corporation, limited liability company, partnership or other entity, the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the ownership interests of the entity, with respect to any non-publicly traded company, and more than ten percent (10%) ownership, or management control, with respect to publicly traded company.

O.  "Default Rate":  The lesser of (i) the Prime Rate plus ten percent (10%) per annum, compounding monthly, or (ii) the highest rate allowed by applicable Law.

P.  "EBITDA":  The sum, without duplication, of the following on a consolidated basis: (i) Consolidated Net Income (loss), plus (ii) income tax

3

expense, minus (iii) income tax benefit, plus (iv) interest expense, minus (v) interest income, plus (vi) depreciation expense, plus (vii) amortization expense, plus (x) any impairment charges, plus (xi) any expensed transaction/acquisition related fees and expenses, plus (xii) any extraordinary, unusual or non-recurring charges including any restructuring or integration costs that were expensed, minus (xiii) any extraordinary, unusual or non-recurring gains. To the extent that a significant transaction has been consummated within the measurement period, such as an acquisition, and some annual EBITDA for the acquisition is not included in the EBITDA for the measurement period, EBITDA shall be computed on proforma basis for the period of the acquisition that was excluded from the EBITDA measurement period; provided, however, such computation shall be subject to Landlord's reasonable approval.

Q.  "Encumbrance":  Any claim, lien, pledge, option, charge, easement, security interest, deed of trust, mortgage, lease, sublease, attachment, conditional sales agreement, encumbrance, preemptive right, right of first refusal, right of first offer, covenant, condition, restriction, reciprocal easement agreement, declaration or other right of third parties, whether voluntarily incurred or arising by operation of Law, and includes any agreement to give or enter into any of the foregoing.

R.  "Environmental Laws":  Each and every Law pertaining to environmental, health or safety matters or Hazardous Materials applicable to or which otherwise pertains to or affects the Premises or the use, ownership, occupancy or operation of the Premises or any portion thereof, and as the same have been or may be amended, modified or supplemented from time to time, including but not limited to the (1) Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §9601 et seq.), (2) Hazardous Substances Transportation Act (49 U.S.C. §1802 et seq.), (3) Resource Conservation and Recovery Act (42 U.S.C. §6901 et seq.), as amended by the Hazardous and Solid Wastes Amendments of 1984, (4) Water Pollution Control Act (33 U.S.C. §1251 et seq.), (5) Safe Drinking Water Act (42 U.S.C. §300f et seq.), (6) Clean Water Act (33 U.S.C. §1321 et seq.), (7) Clean Air Act (42 U.S.C. §7401 et seq.), (8) Solid Waste Disposal Act (42 U.S.C. §6901 et seq.), (9) Toxic Substances Control Act (15 U.S.C. §2601 et seq.), (10) Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. §11001 et seq.), (11) Radon Gas and Indoor Air Quality Research Act of 1986 (42 U.S.C. §7401 et seq.), (12) National Environmental Policy Act (42 U.S.C. §4321 et seq.), (13) Superfund Amendment Reauthorization Act of 1986 (42 U.S.C. §9601 et seq.), (14) Occupational Safety and Health Act (29 U.S.C. §651 et seq.), (15) Refuse Act of 1999 (33 U.S.C. § 407 et seq.), (16) Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136 et seq.), (17) Marine Protection, Research and Sanctuaries Act (33 U.S.C. § 1401 et seq.), (18) Noise Control Act (42 U.S.C. § 4902 et seq.), (19) Atomic Energy Act (42 U.S.C. § 2011 et seq.) and (20) Nuclear Waste Policy Act of 1982 (42

4

U.S.C. § 10101 et seq.), and any similar state or local Laws and any and all rules and regulations in effect under such Laws.

S. "Event of Default": Defined in Section 24 hereof.

T. "Exercise Period": Defined in Section 46.B hereof.

U. "Expiration Date": Defined in Section 1.D hereof.

V. "Final Completion" shall mean with respect to any Tenant's Work (a) the completion of construction of such Tenant's Work, including all "punch list" items, in accordance with the applicable Plans as certified by the applicable General Contractor, and (b) all permits and licenses required for the legal occupancy of such Tenant's Work, if any, have been obtained.

W. "Final Completion Date" shall mean the date that Final Completion of the applicable Tenant's Work occurs.

X. "General Construction Contract" shall mean with respect to any Tenant's Work, the applicable construction contract by and between the applicable General Contractor and Tenant and approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.

Y. "General Contractor" shall mean, with respect to any Tenant's Work, a contractor selected by Tenant to complete such Tenant's Work and reasonably acceptable to Landlord.

Z. "Guarantor" shall mean Mountain Express Oil Company, a Georgia corporation.

AA. "Guaranty" Defined in Section 47 hereof.

BB. "Hazardous Materials": shall mean (a) any toxic substance or hazardous waste, substance, solid waste or related material, or any pollutant or contaminant; (b) radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, radiation, mold or other microbial matter, odors, noise, per- and poly-fluoroalkyl substances, or any petroleum product or additive; (c) any substance, gas, material or chemical which is now or hereafter defined as or included in the definition of "hazardous substances," "toxic substances," "hazardous materials," "hazardous wastes," "regulated substances" or words of similar import under any Environmental Laws; and (d) any other chemical, material, gas or substance, the exposure to or release of which is or may be prohibited, limited or regulated by any governmental authority, or any chemical, material, gas or substance that does or is reasonably likely to pose a hazard to human health or safety or to the environment.

5

CC. "Indebtedness": shall mean (i) all indebtedness for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property for which Guarantor or its assets are liable; (ii) all unfunded amounts under a loan agreement, bond, debenture, note, letter of credit, or other similar instrument or credit facility for which Guarantor would be liable if such amounts were advanced thereunder; (iii) all amounts required to be paid by Guarantor as a guaranteed payment to shareholders or a preferred or special dividend, including any mandatory redemption of shares or interest; (iv) all indebtedness guaranteed by Guarantor directly or indirectly; (v) all obligations under leases that constitute capital leases for which Guarantor is liable; and (vi) all obligations of Guarantor under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether Guarantor is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations Guarantor otherwise assures a creditor against loss.

DD. "Indemnified Party" shall mean, with respect to any indemnification obligation contained in this Lease, the individual or entity so indemnified by the indemnifying party.

EE. "Landlord Indemnified Parties":  Landlord and Landlord Mortgagee, and each of their respective successors and assigns, and their respective members, managers, partners, shareholders, officers, directors, agents, attorneys and representatives.

FF. "Landlord":  Defined in the Preamble hereto.

GG. "Landlord Claim":  Defined in Section 21.A hereof.

HH. "Landlord Mortgage":  Defined in Section 26.B hereof.

II. "Landlord Mortgagee":  Defined in Section 26.B hereof.

JJ. "Landlord Notice Address":

c/o Oak Street Real Estate Capital, LLC
30 North LaSalle, Suite 4140
Chicago, IL 60602
Attention:  Asset Management
Email: oakstreetAM@blueowl.com

With a copy to

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attention: David A. Rosenberg
E-mail: david.rosenberg@kirkland.com

6

KK. "Landlord's Notice": Defined in Section 46.A hereof.

LL. "Landlord's Representatives": Landlord's agents, attorneys, representatives, members, directors, officers and employees.

MM. "Late Charge": Defined in Section 5.C hereof.

NN. "Law": All applicable statutes, ordinances, rules, regulations, codes, orders, requirements, directives, binding written interpretations and binding written policies, common law, rulings, and decrees of all local, municipal, state and federal governments, departments, agencies, commissions, boards or political subdivisions.

OO. "Negotiation Period": Defined in Section 46.C hereof.

PP. "Net Leverage Ratio": shall mean on any date of determination, the ratio of (a)(i) Indebtedness as of such date minus (ii) unrestricted cash on hand to (b) EBITDA for the fiscal quarter most recently ended for which financial statements have been (or are required to have been) delivered to Landlord.

QQ. "NFA": Defined in Section 28.H hereof.

RR. "OFAC Laws and Regulations": All Laws administered by the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury, codified at 31 C.F.R. Part 500 (including those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action regarding persons or entities with whom U.S. persons or entities are restricted from doing business (including persons or entities who have violated the U.S. Foreign Corrupt Practices Act 15 U.S.C. §§78dd-1, 78dd-2 and 78dd-3), as same may be amended from time to time.

SS. "Option to Renew": Defined in Section 1.E hereof.

TT. "Permitted Encumbrances": Any and all Encumbrances (i) affecting any portion of the Premises as of the Commencement Date, including, but not limited to, those Encumbrances shown on Landlord's title policy obtained in connection with the acquisition of the Premises (as applicable), (ii) consisting of any and all leases, subleases, licenses and other occupancy agreements in place with respect to the Premises as of the Effective Date (collectively, the "**Existing Leases**"), (iii) consisting of current taxes and assessments with respect to the Premises, not yet due or payable, (iv) arising or created by municipal and zoning ordinances and (v) arising after the Commencement Date that are approved in writing by Landlord in its sole and absolute discretion.

7

UU. "Personal Property":  All personal property on the Premises, which shall include, without limitation, all business machinery and equipment, including, but not limited to, specialized equipment unique to the nature of Tenant's business, business records, furniture, furnishings, communications equipment, office equipment, computer equipment, computer software, computer tapes, computer program tapes, computer program disks, computer program documentation and manuals, computer program codes, customer accounts, customer lists, customer information, inventory and proprietary information which may belong to Tenant or be in the possession of Tenant, which is located or used upon, in or about the Premises during the Term, or any renewal or extension thereof. Any generator and associated equipment located at the Premises, if any, shall constitute a fixture and shall not constitute Personal Property.

VV. "Plans" shall mean, with respect to any Tenant's Work, the plans and specifications prepared by the Architect and approved by Landlord.

WW. "Premises":  Defined in Section 1.F hereof.

XX. "Prime Rate":  Fifteen percent (15%) per annum, compounding monthly

YY. "Prohibited Persons":  Defined in Section 17.B hereof.

ZZ. "Property":  Defined in Section 1.G hereof.

AAA. "Purchase Agreement":  Defined in Recital B hereto.

BBB. "Real Estate Taxes":  Defined in Section 8.A hereof.

CCC. "Release":  Any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, migrating, presence of, exposure to or disposing into the environment of any Hazardous Materials, including the abandonment or discarding of barrels, containers, and other closed receptacles containing any Hazardous Materials.

DDD. "Renewal Amendment":  Defined in Section 38.C hereof.

EEE. "Renewal Notice":  Defined in Section 38.A.1 hereof.

FFF. "Renewal Option":  Defined in Section 38.A hereof.

GGG. "Renewal Term":  Defined in Section 38.A hereof.

HHH. "Rent":  Defined in Section 5.B hereof.

III. "Repossessed Premises":  Defined in Section 25.C hereof.

JJJ. "Right of First Refusal": Defined in Section 46 hereof.

8

KKK.  Intentionally Omitted.

LLL.  "Site" or "Sites" means the Building and the Property with respect to any one or more, as the context requires, of the locations described in **Exhibit B-1**.

MMM. "SNDA":  Defined in Section 26.A hereof.

NNN.  "Substitute Tenant":  Defined in Section 25.C hereof.

OOO.  "Tanks": Defined in Section 28.H hereof.

PPP.  "Taxes":  Defined in Section 8.D hereof.

QQQ.  "Tenant":  Defined in the Preamble hereto.

RRR.  "Tenant Notice Address":

Mountain Express Oil Company
3650 Mansell Road, Suite 250
Alpharetta, GA 30022
Attention:  Lamar Frady
Email:  lamar.frady@mtnexpressoil.com

With a copy to:

General Counsel
Mountain Express Oil Company
3650 Mansell Road, Suite 250
Alpharetta, GA 30022
Email: General.Counsel@MtnExpressOil.com

SSS.  "Tenant's Personal Property":  Defined in Section 13 hereof.

TTT.  "Tenant's Purchase Election": Defined in Section 46.B hereof.

UUU.  "Tenant's Representatives":  Tenant's agents, attorneys, representatives, directors, officers and employees and any mortgagee of Tenant's interest in this Lease or in the Premises.

VVV.  "Tenant's Work": Defined in **Exhibit C** hereof.

WWW. "Term":  Defined in Section 1.H hereof.

XXX.  "Transfer":  Defined in Section 22.B hereof.

YYY.  "U.S. Publicly-Traded Entity":  Defined in Section 17.A hereof.

ZZZ.  "Utility Charges":  Defined in Section 10.A hereof.

3.   **GRANTING CLAUSE**.

A.   Landlord, in consideration of the covenants and agreements to be performed by Tenant, and upon the terms and conditions contained in this Lease, does hereby lease, demise, let and deliver to Tenant, and Tenant, in consideration of the covenants and agreements to be performed by Landlord and upon the terms and conditions contained in this Lease, does hereby lease from Landlord, the Premises, to have and to hold for the Term. Tenant acknowledges receipt and delivery of complete and exclusive possession of the Premises, subject to the Permitted Encumbrances. Tenant acknowledges and confirms that for a period prior to and up to and including the execution of this Lease, Tenant has continuously leased and been in continuous possession of the Premises, and, accordingly, Tenant is fully familiar therewith, and Tenant has examined and otherwise has knowledge of the condition of the Premises prior to the execution and delivery of this Lease and has found the same to be satisfactory for its purposes hereunder. Regardless, however, of any knowledge, examination or inspection made by Tenant and whether or not any patent or latent defect or condition was revealed or discovered thereby, Tenant is leasing the Premises "as is," "where is" and "with all faults" in its present condition. Tenant hereby irrevocably, unconditionally and absolutely waives and relinquishes any claim or action against Landlord whatsoever in respect of the condition of the Premises as of the Commencement Date, including any patent or latent defects or adverse conditions not discovered or discoverable or otherwise known or unknown by Tenant as of the Commencement Date.

LANDLORD MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, IN FACT OR IN LAW, IN RESPECT OF THE PREMISES OR ANY PART THEREOF, EITHER AS TO ITS FITNESS FOR USE, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE OR OTHERWISE, OR AS TO THE NATURE OR QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, OR THE EXISTENCE OF ANY HAZARDOUS MATERIALS, IT BEING AGREED THAT ALL SUCH RISKS, KNOWN AND UNKNOWN, LATENT OR PATENT, ARE TO BE BORNE SOLELY BY TENANT, INCLUDING ALL RESPONSIBILITY  AND LIABILITY FOR ANY ENVIRONMENTAL CONDITION OF THE PREMISES, ENVIRONMENTAL REMEDIATION AND COMPLIANCE WITH ALL ENVIRONMENTAL LAWS.

Without limiting the foregoing, Tenant realizes and acknowledges that factual matters existing as of the Commencement Date now unknown to it may have given or may hereafter give rise to losses, damages, liabilities, costs and expenses that are presently unknown, unanticipated and unsuspected, and Tenant further agrees that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Tenant nevertheless hereby intends to release, discharge and acquit

10

Landlord and Landlord Mortgagee, and each of their respective successors and assigns, and their respective members, managers, partners, shareholders, officers, directors, agents, attorneys and representatives, from any and all such unknown losses, damages, liabilities, costs and expenses.

B.    Landlord and Tenant covenant and agree that, except to the extent otherwise required by applicable Law:  (i) each will treat this Lease in accordance with U.S. generally accepted accounting principles, consistently applied, and as a true lease for state law reporting purposes and for federal income tax purposes; and (ii) each party will not, nor will it permit any Affiliate to, at any time, take any action or fail to take any action with respect to the preparation or filing of any statement or disclosure to any governmental authority, including without limitation, any income tax return (including an amended income tax return), to the extent that such action or such failure to take action would be inconsistent with the intention of the parties expressed in this Section 3.B.

C.    Tenant acknowledges that fee simple title (both legal and equitable) to the Premises is vested in Landlord and that Tenant has only the leasehold right of possession and use of the Premises as provided herein.

4.    **USE**.

A.    Tenant may use the Premises as a gas station and convenience store, and ancillary uses associated therewith, in all cases subject to and in compliance with all Laws and Permitted Encumbrances.  Tenant shall use the Premises only as provided by and in accordance with all Permitted Encumbrances, subject to Landlord's reservation of rights herein.  Tenant shall not use or occupy the Premises, or any part thereof, nor permit or allow the Premises or any part thereof to be used or occupied, for (i) any purpose or in any manner which is in violation of any Law or a violation of the provisions set forth in Section 28 or any other provision of this Lease or (ii) in any manner which violates any certificates of occupancy for the Premises or makes void or voidable any insurance then in force with respect thereto as is required pursuant to Section 16 hereof.  Tenant's occupancy of the Premises will be in compliance with all Laws and insurance requirements, and as otherwise provided in this Lease.  Tenant shall neither suffer nor permit the Premises or any portion thereof to be used, or otherwise act or fail to act, in such a manner as (I) might impair Landlord's title thereto or to any portion thereof, (II) may make possible a claim of adverse use or possession or an implied dedication of the Premises or any portion of the Premises, or (III) may subject the Premises or this Lease to any Encumbrances, other than Permitted Encumbrances. Notwithstanding anything herein to the contrary, Tenant shall not (a) permit any unlawful or immoral practice to be carried on or committed in the Premises; (b) make any use of or allow the Premises to be used for any purpose that might invalidate or increase the rate of insurance thereof; (c) deface or injure the Premises; (d) overload the floors,

11

walls or ceilings of the Premises; (e) commit or suffer any material waste in or about the Premises; (f) use the Premises in any manner that may diminish the value of the Premises in any material respect; or (g) use the Premises for any of the following purposes without the Landlord's prior consent (in its sole and absolute discretion): (i) bar, nightclub, adult bookstore or video shop or other adult entertainment establishment; (ii) incineration or reduction of garbage or any garbage dumps on the Premises; (iii) mortuary; (iv) fire sale, bankruptcy sale or auction house operation; (v) automobile, truck, trailer or RV repairs on-site; (vi) "flea market", secondhand, surplus or other "off-price" or deep discount store; (vii) massage parlor; (viii) carnival; or (ix) gambling or off-track betting operation.

B.	At all times during the Term, (i) Tenant, or its subtenants, shall occupy the Premises and (ii) except during periods when the Premises may be untenantable by reason of fire or other casualty or condemnation (provided, however, during all such periods while the Premises are untenantable, Tenant shall strictly comply with the terms and conditions of Section 19 and Section 20 of this Lease), Tenant, or its subtenants, shall operate its business on the Premises in the ordinary course.

C.	Tenant will not enter into any agreements or consent to any transaction or instruments that will create an Encumbrance on the Premises without Landlord's prior written consent in its sole discretion. Tenant shall be responsible for complying with the terms and conditions of, and paying the costs and expenses under, all Encumbrances on the Premises (other than Landlord's obligations to pay debt service to any Landlord Mortgagee under any Landlord Mortgage). Tenant shall not, without Landlord's prior written consent (in Landlord's sole discretion), apply for or otherwise seek or obtain any zoning changes or variances with respect to the Property. If Landlord desires to seek or obtain any zoning changes or variances with respect to the Property, Tenant shall cooperate in all respects therewith, at Landlord's request, provided that such zoning change or variance will not prohibit Tenant's use of the Property for its then-current use.

D.	Tenant shall have the right to access and use the Premises twenty-four (24) hours per day, seven (7) days per week.

5.	**RENT**.

A.	Tenant shall pay Base Rent to Landlord in the manner provided in Section 5.B in equal consecutive monthly installments in advance on or before the 1st day of each calendar month commencing as of the Commencement Date and continuing through the Term.  If the Term commences on a day other than the first day of a calendar month, or ends on a day other than the last day of a calendar month, Base Rent for such month shall be prorated by multiplying such Base Rent by a fraction, the numerator of which is the number of days of the Term within such calendar

12

month and the denominator of which is the total number of days within such calendar month. Tenant shall pay its first monthly installment of Base Rent, which may be prorated pursuant to this Section 5.A, on the Commencement Date in connection with Landlord's acquisition of the Premises pursuant to the Purchase Agreement.

B.        For purposes of this Lease, the Base Rent, the Real Estate Taxes, the Utility Charges and any and all other amounts, sums, charges, liabilities and obligations which Tenant assumes or agrees to pay or may become liable for under this Lease at any time and from time to time are sometimes collectively referred to as "**Rent**"; and, in the event of any failure on the part of Tenant to pay any portion of the Rent, every fine, penalty, interest and cost which may be added for nonpayment or late payment of such items, including, without limitation, all amounts for which Tenant is or may become liable to indemnify Landlord and the Landlord Indemnified Parties under this Lease (including reasonable attorneys' fees and court costs) shall be deemed to be Rent. All Rent is payable in lawful money of the United States of America and legal tender for the payment of public and private debts without notice, demand, abatement, deduction, or setoff under any circumstances, in accordance with the wire or ACH information as Landlord designates to Tenant in writing from time to time.

C.        Tenant hereby acknowledges that late payment by Tenant to Landlord will cause Landlord to incur costs and administrative complications not contemplated hereunder, the exact amount and scope of which are presently anticipated to be extremely difficult to ascertain. Accordingly, if any installment of Rent due to Landlord is not paid on the date it is due for any reason, Tenant shall pay Landlord upon demand a late charge equal to the lesser of (i) ten percent (10%) of the delinquent installment of Rent and (ii) the highest amount allowed by applicable Law (each a "**Late Charge**"), provided, however, that for the first time in a calendar year that any installment of Rent is not paid on the date it is due, such Late Charge shall not apply unless the Rent remains unpaid five (5) days after the date it is due. The parties agree that this late charge represents a fair and reasonable estimate of the costs and expenses (including economic losses) that Landlord will incur by reason of late payment by Tenant. The parties further agree that such late charge is Rent and not interest and such assessment does not constitute a lender or borrower/creditor relationship between Landlord and Tenant. In addition, any amount of delinquent Rent (including the amount of any Late Charge) due to Landlord shall accrue interest at the Default Rate from the date on which such Rent was due up to the date that such Rent is paid. The payment of such late charge or such interest shall not constitute waiver of, nor excuse or cure, any default under this Lease, nor prevent Landlord from exercising any other rights and remedies available to Landlord. Without limitation of the foregoing, Tenant shall be responsible for payment of all interest, late charges, and other costs

13

and fees imposed by third parties with respect to late payments of Utilities or other third party charges that are the responsibility of Tenant hereunder.

D.     For any non-scheduled payment of Rent hereunder that is payable by Tenant on demand by Landlord, such shall be due ten (10) days following written demand therefor by Landlord, without abatement, deduction, or setoff under any circumstances.

6.     **TRUE LEASE**

A.     It is the intent of Landlord and Tenant that this Lease establish a "true lease" of all parcels constituting the Premises for all purposes under the United States Bankruptcy Code, applicable state law, and for Federal income tax purposes. The Rent for the Term is intended to be "fixed rent" within the meaning of Treasury Regulation Section 1.467-1(h)(3) for each annual period. This Lease is a "true lease" and does not represent a financing statement, financing lease, financing agreement, device or arrangement, security interest, security agreement, capital lease, mortgage, equitable mortgage, deed of trust, trust agreement, or other financing or trust arrangement or any other non-lease transaction. Each of the parties (1) waives any claim or defense based upon the characterization of the Lease as anything other than a "true lease", (2) stipulates and agrees not to challenge, and is estopped from challenging, the validity, enforceability or characterization of the lease of the Premises under the Lease as a "true lease," (3) stipulates and agrees, and is estopped from challenging, that nothing contained in the Lease creates or is intended to create a joint venture, partnership, equitable mortgage, trust, financing device or arrangement, security interest or the like and (4) shall support the intent of the parties that the lease of the Premises pursuant to this Lease is a "true lease" and does not create a joint venture, partnership, equitable mortgage, trust, financing device or arrangement, security interest or the like, if, and to the extent that, any challenge occurs. Landlord does not intend to convey any fee interest in any of the Premises to Tenant. Tenant does not intend to obtain an interest in the Premises other than a leasehold interest pursuant to the Lease. The Lease may not be construed in any manner to create any relationship between the parties other than a landlord-tenant relationship.

7.     **NET LEASE**.

A.     Landlord and Tenant acknowledge and agree that (i) this Lease is, and is intended to be, what is commonly referred to as a "net, net, net" or "triple net" lease, and (ii) the Rent shall be paid absolutely net to Landlord, so that this Lease shall yield to Landlord the full amount or benefit of the installments of Base Rent, Real Estate Taxes and all other Rent throughout the Term with respect to the entire Premises, all as more fully set forth in Section 5. All of the costs, expenses, responsibilities and obligations of every kind and nature whatsoever foreseen and unforeseen relating to the

14

condition, use, operation, management, maintenance, repair, restoration and replacement of the Premises and all improvements and appurtenances related thereto or any part thereof shall be performed and paid by Tenant, and Landlord shall have no responsibility or liability therefor. Tenant covenants to pay Base Rent, Real Estate Taxes and all other Rent hereunder are independent covenants, and Tenant shall have no right to hold back, offset, deduct, credit against or fail to pay in full any such amounts for claimed or actual default or breach by Landlord of whatsoever nature, for force majeure or for any other reason whatsoever. For the avoidance of doubt, Tenant shall not have, and hereby expressly and absolutely waives, relinquishes, and covenants not to assert, accept or take advantage of, any right to deposit or pay with or into any court or other third-party escrow, depository account or tenant account with respect to any disputed Rent, or any Rent pending resolution of any other dispute or controversy with Landlord. Tenant hereby expressly waives any and all defenses it may have at law or in equity to payment of Rent, including, without limitation, based on any theories of frustration of purpose, impossibility, or otherwise.

B. Landlord is the owner of the Sites. This Lease constitutes a single master lease of all, but not less than all, of the Premises. Landlord and Tenant have executed and delivered this Lease with the understanding that this Lease constitutes a unitary, non-severable, indivisible instrument pertaining to all, but not less than all, of the Premises then leased hereunder by Tenant, and that, except as specifically provided in this Lease (and in such cases only to the extent expressly so stated), neither this Lease nor the duties, obligations or rights of Tenant may be allocated or otherwise divided among the Premises by Tenant. Landlord and Tenant each further acknowledge and agree that each of Landlord and Tenant entered into this single master lease as part of the consideration for entering into the leasing transaction between the parties, and that the transaction would not have been consummated if there were to have been separate lease agreements for each of the individual Sites. Except as expressly provided in this Lease, the Base Rent payable hereunder is payable for all the Sites as a single, indivisible, integrated and unitary economic unit and that but for such integration, the Base Rent payable under this Lease would have been computed on a different basis. A default of any of the terms or conditions of this Lease occurring with respect to any particular Site shall constitute a default under this Lease in its entirety. Landlord and Tenant agree that for the purposes of any assumption, rejection or assignment of this Lease under 11 U.S.C. Section 365 or any amendment or successor section thereof, this is one indivisible and non-severable lease dealing with and covering one legal and economic unit which must be assumed, rejected or assigned as a whole with respect to all (and only all) the Premises then leased by Tenant hereunder, subject to the terms of this Lease. In furtherance of the foregoing, Landlord and Tenant intend that:

15

1.      This Lease is intended to be a "true lease" and an "operating lease" and not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, trust agreement, security agreement or other financing or trust arrangement, and the economic realities of this Lease are those of a true lease. The business relationship created by this Lease and any related documents is solely that of a long term commercial lease between Landlord and Tenant, this Lease has been entered into by both parties in reliance upon the economic and legal bargains contained herein, and none of the agreements contained herein is intended, or shall be deemed or construed, to create a partnership (de facto or de jure) between Landlord and Tenant, to make them joint venturers, to make Tenant an agent, legal representative, partner, subsidiary or employee of Landlord, or to make Landlord in any way responsible for the debts, obligations or losses of Tenant.

2.      Landlord and Tenant acknowledge and agree that the Term with respect to any Site, including any term extensions provided for in this Lease, is less than the remaining economic life of any such Site.

3.      The parties acknowledge and agree that the amounts allocated to each Site on **Exhibit B-2** are set forth solely for the convenience and use of the parties in making certain calculations as may be necessary from time to time pursuant to the provisions hereof.

4.      The expressions of intent, the waivers, the representations and warranties, the covenants, the agreements and the stipulations set forth in this Section 7 are a material inducement to each of Landlord and Tenant in entering into this Lease.

8.      **REAL ESTATE TAXES**.

A.      During the Term, Tenant shall promptly pay, or cause to be paid, on a cash basis when due to the applicable taxing authority one hundred percent (100%) of all taxes, including ad valorem, sales, use, rent or similar taxes, including tax increases and re-assessments; payments in lieu of taxes pursuant to any statutory service agreement, payment-in-lieu-of-taxes agreement or the like; transfer taxes; assessments, including assessments for supplemental assessments and public improvements or benefits, whether or not commenced or completed prior to the date hereof and whether or not to be completed within the Term, and including assessments under Encumbrances; water, sewer and other utility levies and charges; excise tax levies; fees, including license, permit, inspection, authorization and similar fees; and all other governmental and other charges, in each case whether general or special, ordinary or extraordinary, or foreseen or unforeseen, of every character and any kind and nature whatsoever in respect of the Premises (including, without limitation, any Building and/or Property)

16

and/or the Rent and all interest and penalties thereon attributable to any failure in payment by Tenant which at any time prior to, during or in respect of the Term hereof may be assessed or imposed on or in respect of or be a lien upon (i) the Premises or any part thereof or any appurtenance thereto, (ii) any Rent reserved or payable hereunder or any other sums payable by Tenant hereunder, (iii) this Lease or the leasehold estate hereby created or the operation, possession, occupancy or use of the Premises or any part thereof, (iv) any occupancy, operation, use or possession of, or sales from or activity conducted on or in connection with the Premises or the Property or the leasing or use of the Premises or the Property or any part thereof, or (v) any document to which Tenant is a party creating or transferring an interest or estate in the Premises, together with any interest or penalties thereon (all of which are hereinafter called "**Real Estate Taxes**"). Tenant shall make such payments directly to the taxing authorities and shall promptly furnish to Landlord copies of official receipts or other satisfactory proof evidencing such direct payments.  Tenant's obligation to pay Real Estate Taxes shall be absolutely fixed upon the date such Real Estate Taxes become a lien upon the Premises or any part thereof, subject to Section 8.C. Tenant shall also be responsible for all Real Estate Taxes which, on the Commencement Date, are a lien upon the Premises or any part thereof.

B.       If Landlord receives a bill for Real Estate Taxes, Landlord shall provide the bill for each installment of Real Estate Taxes to Tenant promptly upon Landlord's receipt of such bill.  Tenant shall pay the Real Estate Taxes set forth on such bill prior to when due.  Tenant shall provide Landlord with reasonable evidence that such Real Estate Taxes have been paid.  If Tenant shall default in the payment of any Real Estate Taxes, Landlord shall have the right (but not the obligation) to pay the same together with any penalties and interest, in which event the amount so paid by Landlord shall be paid by Tenant to Landlord upon demand with interest thereon at the Default Rate.  Tenant may pay any Real Estate Taxes in installments, if payment may be so made without penalty, fine, premium or interest, except that on the termination of this Lease any Real Estate Taxes which Tenant has elected to pay in installments shall be apportioned between Landlord and Tenant based on the time remaining in the Term.  All Real Estate Taxes for the tax year in which this Lease shall terminate shall be apportioned between Landlord and Tenant on a cash basis.

C.       Tenant shall have the right, before delinquency occurs, of protesting, contesting, objecting to or opposing, at Tenant's sole cost and expense, by appropriate legal proceedings conducted in good faith and with due diligence, the legality or amount of any such Real Estate Taxes, assessments or assessed valuations in its own or in Landlord's name as the case may be, and upon Tenant's written request, Landlord will, at no cost or expense to Landlord, reasonably cooperate with Tenant; provided, however, that (i) in the case of any unpaid Real Estate Taxes, lien, attachment, levy, encumbrance, charge or claim pursuant to any Law, the commencement and

17

continuation of such proceedings shall suspend the collection or enforcement thereof from or against Landlord and the applicable Site or Sites, which suspension may be caused by the payment by Tenant of a bond or some other form of security for payment; (ii) neither the applicable Site or Sites, the Rent therefrom nor any part or interest in either thereof would be in any danger of being sold, forfeited, attached or lost pending the outcome of such proceedings solely based on the outcome of the proceeding and not if Tenant has the right to make a curative payment following the outcome of the proceeding to avoid any of the foregoing consequences; (iii) in the case of any requirement of Law, neither Landlord nor Tenant would be in any danger of civil or criminal liability for failure to comply therewith pending the outcome of such proceedings; (iv) the insurance coverage required by Section 16 shall be maintained; (v) Tenant shall keep Landlord reasonably informed as to the status of and with copies of all documents in the proceedings, upon request by Landlord; and (vi) if such contest shall be finally resolved against Landlord or Tenant, Tenant shall promptly pay the amount required to be paid, together with all interest and penalties accrued thereon, or comply with the applicable requirement of law or insurance requirements of Section 16. Landlord shall execute and deliver to Tenant such authorizations and other documents as may reasonably be required in any such contest, provided Tenant shall reimburse Landlord for its actual out-of-pocket costs associated with such execution, and, if reasonably requested by Tenant, Landlord shall join as a party therein (and at no cost or expense to Landlord). The provisions of this Section 8.C shall not be construed to permit Tenant to contest the payment of Rent or any other amount payable by Tenant to Landlord hereunder. Without limiting any other provision of this Lease, Tenant shall indemnify, defend, protect and save harmless Landlord and all Landlord Indemnified Parties and the Premises from and against any and all liability, costs, fees, damages, expenses, penalties, fines and charges of any kind (including reasonable attorneys' fees, including those incurred in the enforcement of this indemnity) that may be imposed upon Landlord or the Premises or any portion thereof in connection with any such contest and any loss resulting therefrom. Any refund due from any taxing authority in respect of any Real Estate Taxes paid by or on behalf of Tenant shall be paid over to or retained by Tenant.

D.     Tenant will indemnify Landlord and/or any Landlord Indemnified Parties, on an after-tax basis, against any fees or taxes, including, but not limited to, Real Estate Taxes and any fees or taxes directly attributable to an individual Premise on a site level basis, including, without limitation, (i) with respect to any portion of the Premises located in the State of Ohio, the Ohio commercial activity tax and (ii) with respect to any portion of the Premises located in the State of Texas, all Texas margin tax and/or any other business tax imposed under Texas Tax Code Chapter 171 and/or any successor statutory provision for reports due under any such provision, ("**Taxes**") imposed by the United States or any taxing jurisdiction or authority of or in

18

the United States or any state in connection with this Lease, Landlord's ownership of the Premises and/or Tenant's use of the Premises; provide, however, this shall not include any fees, taxes, or other assessments imposed upon income, net wealth, or other business income at the corporate level (i.e., not attributable directly to the Premises).

E. Landlord and Tenant shall, upon request of the other, promptly provide such data as is maintained by the party to whom the request is made with respect to the Premises as may be necessary to prepare any required tax returns and reports required by a governmental authority.

9. **PERSONAL PROPERTY TAXES**.

Tenant shall be liable for and shall promptly pay when due all personal property taxes related to Personal Property and Tenant's Personal Property placed in the Premises. Tenant may, without Landlord's consent, before delinquency occurs, contest any such taxes related to the Personal Property.

10. **OPERATING EXPENSES**.

A. Utilities. During the Term, Tenant agrees to pay all fees, costs, expenses and charges for electricity, power, gas, oil, water, sanitary and storm sewer, septic system refuse collection, landscaping, telephone, internet, trash removal, security, and other utilities and services consumed, rendered or used on or about the Premises (or any portion thereof) and such utility franchises as may be appurtenant to the use of the Premises (or any portion thereof) (collectively, "**Utility Charges**"). Landlord acknowledges and agrees that Tenant may enter into contracts for any of the foregoing services or the like without Landlord's prior consent during the Term; provided, that any such contract shall be terminable by Tenant (or Landlord following termination of this Lease in accordance with its terms) at or prior to the expiration or sooner termination of the Lease or upon no more than thirty (30) days' prior notice to the third-party servicer. Any resulting termination premium, fee or penalty shall be the sole responsibility of Tenant.

B. Third Party Management. Tenant shall have the right to manage and operate the Premises (or any portion thereof) utilizing third parties for the management and operation thereof, without obtaining Landlord's prior written consent of such third party. Notwithstanding the appointment of any third-party manager, Tenant shall remain fully responsible for the Premises in accordance with the terms hereof.

11. **TENANT'S REPAIR AND MAINTENANCE RESPONSIBILITIES**.

A. Throughout the Term, Tenant, at its sole cost and expense, will keep each Site in a substantially similar condition as existed on the Commencement Date (reasonable wear and tear, damage from fire or other casualty excepted), whether or not the need for such repairs occurs as a result of

19

Tenant's or subtenant's use, the elements, or the age of the applicable Building, the applicable Property or Tenant's or subtenant's Personal Property, or otherwise, and will commit or allow no physical waste with respect thereto, and with reasonable promptness, will make all necessary and appropriate repairs and replacements thereto of every kind and nature, including without limitation those necessary to ensure continuing compliance with all Laws and insurance requirements, whether interior or exterior, structural or nonstructural, ordinary or extraordinary, foreseen or unforeseen. Tenant's maintenance, repair and replacement obligations shall extend to and include, without limitation, all systems serving each Site and, subject to any Permitted Encumbrances, any Parking Areas and landscaping on the Property. The necessity for and adequacy of repairs to any Building or other improvements forming a part of any Site shall be measured by the standard which is appropriate for and equivalent in quality to such Building's Comparable Buildings. Tenant's obligations under this Section 11 shall, without limitation, include the maintenance, repair and replacement (a) at all times, of any and all building systems, machinery and equipment which exclusively serve the applicable Site, and (b) the bearing walls, floors, foundations, roofs and all structural elements of each Site. Tenant will not take or omit to take any action the taking or omission of which would reasonably be expected to (i) create (or permit to continue) any dangerous condition, or (ii) create (or permit to continue) any condition which might reasonably be expected to involve any loss, damage or injury to any person or property. All repairs and replacements shall be in quality and class at least equal to the original work and shall be made promptly as and when necessary. Repairs and replacements called for as a result of fire and/or other casualty and condemnation shall be made pursuant to the provisions of Sections 19 and 20 hereof, respectively. In connection with the foregoing, Tenant's obligations shall include without limitation with respect to each Site, to the extent applicable:

1. Maintaining, repairing, and replacing, as necessary, the roof of the Building on such Site;

2. Maintaining and repairing the bearing walls, floors, foundations, and all structural elements of the Building on such Site;

3. Maintaining (including periodic window washing and periodic painting) and repairing the facade and exterior walls of the Building on such Site;

4. Repairing and replacing, as necessary, the doors (including, without limitation, any overhead doors) and windows of the Building on such Site, and the mechanisms therefor;

5. Causing the regular removal of garbage and refuse from such Site;

20

6. Causing the regular spraying for and control of insect, rodent, animal and pest infestation, and maintaining in good working order and condition all doors (both swinging and roll-up doors), including, without limitation, all weather seals;

7. Servicing, maintaining, repairing and replacing all systems and equipment serving the Premises, including, without limitation, heating, ventilation, and air-conditioning equipment, and generators;

8. Regular sweeping, cleaning and removal of trash, debris, other materials and stains from such Site and from the immediately adjacent sidewalks, service drives and loading or delivery areas, if any, of such Site, as necessary to keep the same clean and in good order and condition;

9. Regular sweeping, cleaning and washing of the interior of the Building, including, without limitation, floors, windows and fixtures, and periodic washing and painting of interior walls;

10. Repairing broken, damaged or leaking walls, bathrooms, ceilings, or fixtures and equipment in the interior of the Building, including, without limitation, plate glass windows, windows, floors and lighting fixtures; and

11. Performing all gardening and landscaping of all lawns, trees, shrubs and plantings comprising part of such Site.

B. Landlord shall not be required to furnish any services or facilities or make any repairs or alterations in or to any Site, and Landlord shall not under any circumstances be required to (i) build or rebuild any improvements on any Site; (ii) make any repairs, replacements, alterations, restorations or renewals of any nature to any Site, whether ordinary or extraordinary, structural or non-structural, foreseen or unforeseen, or to make any expenditure whatsoever with respect thereto; or (iii) maintain any Site (including any parking or common areas which comprise part of any Site) in any way. Tenant hereby expressly and unconditionally waives, to the fullest extent now or hereafter permitted by Law, the right to make repairs or perform any maintenance at the expense of Landlord which right may be provided for in any Law in effect at the time of the execution and delivery of this Lease or which may hereafter be enacted. Tenant hereby assumes the full and sole responsibility for the condition, operation, repair, replacement, maintenance and management of the Premises. However, on default of Tenant beyond the expiration of any applicable notice and cure periods in making such repairs or replacements, Landlord may, but shall not be required to, make such repairs and replacements for Tenant's account

21

and the expense thereof shall be paid by Tenant to Landlord upon demand with interest at the Default Rate.

C.     Except as expressly set forth herein, nothing contained in this Lease and no action or inaction by Landlord shall be construed as (i) constituting the consent or request of Landlord, expressed or implied, to any contractor, subcontractor, laborer, materialman or vendor to or for the performance of any labor or services or the furnishing of any materials or other property for the construction, alteration, addition, repair or demolition or maintenance of or to the Premises or any part thereof or any improvements thereto; or (ii) giving Tenant any right, power or permission to contract for or permit the performance of any labor or services or the furnishing of any materials or other property in such fashion as would permit the making of any claim against Landlord in respect thereof.

D.     To the extent such repairs remain uncompleted, Tenant shall complete the repairs set forth on **Exhibit F** within sixty (60) days after of the Commencement Date.

12.     **COMPLIANCE WITH LAWS**.

Tenant shall, at its sole cost and expense, use and maintain the Premises in compliance with all Laws, and Tenant shall, at its sole cost and expense, comply with all Laws applicable to or having jurisdiction over the use, occupancy, operation, and maintenance of the Premises, including without limitation, all Environmental Laws, the ADA and other access laws and those which require the making of any structural, unforeseen or extraordinary changes and including those which involve a change of policy on the part of the governmental body enacting the same. Without limiting the foregoing, Tenant shall, at its sole cost and expense, obtain any conditional use or other similar permits (individually and/or collectively, as the context may require, the "**Conditional Use Permit**") should such permit(s) be required for Tenant's occupancy and/or use of the Premises during the Term. For the avoidance of doubt, Tenant shall remain responsible for any and all Rents due with respect of any Site requiring a Conditional Use Permit regardless of any governmental actions taken as a result of Tenant's failure to comply with applicable governmental regulations or obtain any Conditional Use Permit. Tenant shall, at its sole cost and expense, comply with all Encumbrances affecting any Site or any portion thereof (other than Landlord's obligations to pay debt service to any Landlord Mortgagee under any Landlord Mortgage). Tenant, at its sole expense, shall comply with the requirements of policies of special form insurance coverage at any time in force with respect to the Premises as required pursuant to Section 16 hereof and with the provisions of all contracts, agreements and restrictions affecting the Premises or any part thereof in effect as of the date hereof or the ownership, occupancy or use thereof.  Without diminishing the obligations of Tenant, if Tenant shall at any time fail to comply as promptly as reasonably practicable with any Law applicable to each Site, or the use and occupation thereof, Landlord may cause each Site to so comply and the reasonable costs and expenses of Landlord in such compliance shall be paid by Tenant to Landlord upon demand with interest thereon at the Default Rate.

13.     **SURRENDER OF PREMISES**.

22

Upon the expiration of this Lease pursuant to its terms (or, in the event of a termination of this Lease on a date other than the scheduled Expiration Date of this Lease, as promptly as commercially practicable thereafter (but in any event within ten (10) days thereafter)), Tenant shall surrender to Landlord the Premises, including all Alterations constructed by Tenant therein that Landlord has not requested that Tenant remove in accordance with <u>Section 14</u> below, with all fixtures appurtenant thereto (but not including furnishings, trade fixtures, furniture, computers, telephone systems, machinery, equipment and other Personal Property installed or placed on the Premises by Tenant) (collectively, "**Tenant's Personal Property**"), free and clear of any occupants or tenancies (including subtenancies) (other than subtenants under subleases as in effect on the date hereof) and in compliance with Laws (including, without limitation, Environmental Laws) and in as good (or better) condition and repair as existed as of the Commencement Date, reasonable wear and tear and damage from fire or other casualty excepted, and any new buildings, alterations, improvements, replacements or additions constructed by Tenant and remaining at the Premises, in the same or better condition as when completed, reasonable wear and tear and damage from fire or other casualty excepted. Without limitation to the foregoing, at Landlord's request within sixty (60) days before or after the expiration of the Term, Tenant shall commission and provide to Landlord, or Landlord may commission, in each event, at Tenant's sole cost and expense, a Phase I site assessment, and, if recommended by the Phase I site assessment, a Phase II site assessment, for purposes of confirming the environmental condition of any such Site and Tenant's compliance with the terms of the Lease with respect to environmental matters. Any of Tenant's Personal Property installed or placed on the Premises by Tenant or any subtenant or assignee of Tenant, if not removed within ten (10) days after termination or expiration of this Lease shall be deemed abandoned and become the property of Landlord without any payment or offset therefor if Landlord so elects. If Landlord shall not so elect, Landlord may remove such property from the Premises and have it stored at Tenant's risk and expense. Tenant shall repair and restore and save Landlord harmless from all damage to the Premises caused by such removal by Landlord.

14. **<u>ALTERATIONS</u>**.

    A.    Tenant shall not make any alterations, additions or improvements to any Site or any portion thereof ("**Alterations**") without first obtaining the prior written consent of Landlord, provided, however, that so long as no Event of Default has occurred, Landlord's prior written consent shall not be required, but prior written notice shall be delivered to Landlord accompanied with full and complete drawings and plans prepared by a licensed architect or engineer, if applicable, for any Alterations to any Site that: (i) are not structural additions or structural alterations to such Site; (ii) will not change the essential nature of any Building as to its current use or ancillary uses; (iii) will not materially and adversely affect the structural elements or roof of any Building, the proper functioning of a Building's systems nor the value of the Building; and (iv) do not exceed the cost of One Hundred Seventy Five Thousand and No/100 Dollars ($175,000.00) on an annual basis. In seeking approval from Landlord of any Alterations, if required, Tenant shall provide Landlord with (1) full and complete drawings and plans for the proposed Alterations prepared by a licensed architect or engineer; and (2) notice of whether the Alteration will involve or affect Hazardous Materials. Tenant shall not have the right to seek any zoning

23

changes or variances in connection with any Alterations without Landlord's approval. Tenant shall reimburse Landlord upon demand for any reasonable out-of-pocket costs, including, without limitation, attorney's fees and engineering advisor's fees, related to Landlord's review of any Alterations request by Tenant. Landlord shall cooperate with Tenant (at no cost or expense to Landlord) to obtain any necessary permits, approvals, and other necessary documentation for such Alterations, including providing signatures and/or reasonable ownership information to obtain such permits and/or approvals from governmental authorities.

B.      All Alterations shall be constructed by Tenant, without expense to Landlord, in a good, first-class, professional and workmanlike manner so as not to void or make voidable any roof or other warranties, employing materials of first-class quality free of material defects, and in compliance with all Law, all applicable Encumbrances and all regulations and orders, rules and regulations of the Board of Fire Insurance Underwriters or any other body exercising similar functions, and in compliance with the terms and conditions of this Lease.

C.      Prior to the commencement of construction of any Alteration, Tenant shall deliver to Landlord certificates evidencing the existence of (a) workmen's compensation insurance with coverage limits not less than statutory limits covering all persons employed for such work; (b) a completed operations endorsement to the commercial general liability insurance policy referred to in Section 16.B; (c) reasonable comprehensive general liability and property damage insurance naming Landlord, its designees and Tenant as additional insureds, with coverage of at least $1,000,000 single-limit or such greater amount as may be reasonably requested by Landlord; and (d) builders all risk insurance on a completed value basis (or its equivalent) covering all physical loss, in an amount no less than the full replacement value of the Alterations in question.

D.      Promptly upon the completion of construction of any Alteration that is permanently affixed to the Premises and alters the existing footprint or elevation of a Building, Tenant shall deliver to Landlord one complete set of "as built" drawings thereof (and if the Alterations involve any change to the footprint of the applicable Building or the erection of a new building, an ALTA survey for the applicable Site certified to Landlord and any Landlord Mortgagee), proof of payment for all labor and materials, and if and to the extent commercially obtainable, copies of guarantees, if any, from all major contractors in favor of Landlord and Tenant (jointly and separately) against defects and deficiencies in materials and workmanship, and requiring the correction of the same upon demand of Landlord and Tenant at the expense of such contractor.

E.      All Alterations, whether temporary or permanent in character, made in or upon the Premises either by Landlord or Tenant (other than Tenant's

24

Personal Property installed or placed on the Premises by or on behalf of Tenant) shall be Landlord's property, and will remain with the Premises without compensation to Tenant. Notwithstanding the foregoing, in the case of any Alteration requiring Landlord's prior written approval, Landlord may condition such approval on Tenant's agreement to remove all or a portion of such Alteration at the end of the Term. Landlord shall provide Tenant with notice, prior to the Expiration Date, of Tenant's obligation to remove any Alteration approved by Landlord at the end of the Term. If Landlord does not notify Tenant that Tenant is obligated to remove such Alteration, such Alteration may be removed at Tenant's option. Upon the expiration or sooner termination of this Lease, all Alterations on the Premises required by Landlord to be removed as aforesaid, or any part or parts thereof so designated by Landlord, shall be removed from the Premises by Tenant and the Premises restored to the same or better condition than existed immediately prior to the construction of the Alteration, reasonable wear and tear, and damage from fire or other casualty excepted.

15. **ENTRY BY LANDLORD**.

Landlord or Landlord's Representatives shall have the right to enter, from time to time, any Site or any portion thereof during normal business hours (or at such other times as approved by Tenant in advance, which approval shall not be unreasonably withheld or delayed, or as may be reasonably necessary in emergency situations) to (i) inspect such Site, (ii) exercise its rights and/or obligations under this Lease, or (iii) show such Site to prospective purchasers or lenders or, if Tenant either has not timely exercised a Renewal Term or has no further Renewal Terms, prospective tenants within the last twelve (12) months of the Lease Term (or at any time during the continuance of an Event of Default); and Tenant shall not be entitled to any abatement or reduction of Base Rent by reason thereof, nor shall such entry or action by Landlord constitute an actual or constructive eviction or repossession, without Landlord's express intention to do so as expressed in writing. No such entry shall be deemed an eviction of Tenant. At any time during which Landlord or Landlord's Representatives are on the Premises, they shall use commercially reasonable efforts to not unreasonably interrupt or interfere with Tenant's use of the Premises and shall not cause any damage or injury to persons or property on the Premises.

16. **TENANT'S INSURANCE OBLIGATIONS**.

A. During the Term, Tenant shall provide and maintain property insurance on the Building and other improvements on the Premises on an all-risk basis against physical loss or damage by fire and all other risks and perils, including but not limited to, flood, earthquake, and windstorm, in amounts no less than the full replacement cost, excluding excavations, footings and foundations, and with a deductible no greater than Fifty Thousand and No/100 Dollars ($50,000.00). Such insurance shall be on terms (i) that have an agreed amount endorsement or with no co-insurance provisions; and (ii) with no exclusions for vandalism, malicious mischief, sprinkler leakage or terrorism. Boiler and Machinery Coverage shall be procured either by

endorsement to the property policy or under a separate placement in an amount no less than 100% of the replacement cost or as otherwise approved in writing by Landlord, if necessary, on a per property basis. The property insurance required hereunder shall (a) cover loss sustained when access to all or a portion of a Building is prevented due to an insured peril at a location in the vicinity of the applicable Site; (b) cover loss sustained due to the action of a public authority preventing access to a Building provided such order is the direct result of physical damage of the type insured against at such Building or within 1,000 feet of it; (c) insure loss caused by damage or mechanical breakdown; (d) provide an ordinance or law extension; (e) cover loss sustained due to the accidental interruption or failure of supplies of electricity, gas, sewers, water or telecommunication up to the terminal point of the utility supplier with any Site; (f) name Landlord and its lender(s) and other designees as loss payees and contain a lender loss payee endorsement; and (g) contain an endorsement providing coverage for cleanup of sudden and accidental pollution releases, with a sub-limit of at least One Hundred Thousand and No/100 Dollars ($100,000.00). In addition to the foregoing coverages on each Building and other improvements upon any Site, Tenant shall maintain property insurance covering Tenant's machinery, equipment, furniture, fixtures, and all other Tenant's Personal Property at a limit of liability determined by Tenant in its sole discretion. During the period of any restoration and repair of any Site or any portion thereof, Tenant shall maintain an "all-risk" Builder's Risk policy on a completed value basis for the full replacement cost of the property being repaired and restored, if and when there is a structural restoration and/or major repair required at any Building. To the extent any portion of any Site is located within a Special Flood Hazard Area, Tenant shall maintain NFIP flood insurance for such Site.

B.　During the Term, Tenant shall also provide and maintain the following insurance at the terms and in the limits specified below for each Site:

1.　Commercial General Liability Insurance against claims for third party Bodily Injury, Personal/Advertising Injury, Property Damage, and Products/Completed Operations Liability. Such insurance shall be written on an occurrence basis and such coverage shall include, but not be limited to, assumed contractual liability for the performance by Tenant of the indemnity agreements set forth in this Lease to which this insurance applies, cross liability, and/or severability of interests. Limits shall be no less than One Million and No/100 Dollars ($1,000,000.00) per occurrence and Two Million and No/100 Dollars ($2,000,000.00) general aggregate with no retention or self-insurance provision unless otherwise agreed to in writing in advance by the Landlord. Tenant shall cause Landlord and its lender or other designees to be named as additional insureds under such insurance.

26

2. If applicable to Tenant, Workers Compensation and Employer's Liability Insurance insuring against and satisfying Tenant's obligations and liabilities under the workers compensation laws of the jurisdiction in which the Premises are located, with Employers Liability minimum limits per insured of Five Hundred Thousand and No/100 Dollars ($500,000.00) Bodily Injury each accident; Five Hundred Thousand and No/100 Dollars ($500,000.00) Bodily Injury by disease, each employee; and Five Hundred Thousand and No/100 Dollars ($500,000.00) Bodily Injury by disease policy limit. Policies shall include Voluntary Coverage.

3. Automobile Liability Insurance for liability arising out of claims for bodily injury and property damage arising from owned (if any), leased (if any), non-owned and hired vehicles used in the performance of the business upon the Premises, with a combined single limit of One Million and No/100 Dollars ($1,000,000.00) per accident for bodily injury and property damage and containing appropriate no-fault insurance provisions wherever applicable.

4. Umbrella or Excess Liability Insurance written on an occurrence basis and covering claims in excess of the underlying insurance described in the foregoing subsections (1), (2) and (3) above, with a One Hundred Million and No/100 Dollars ($100,000,000.00) minimum limit per occurrence. Such insurance shall contain a provision that it will drop down as primary and noncontributory insurance in the event that the underlying insurance policy aggregate is exhausted.

5. As and to the extent Tenant engages in (i) the sale of alcoholic beverages upon such Site, liquor liability insurance with a minimum limit of One Million and No/100 Dollars ($1,000,000.00), and/or (ii) the sale or use of gasoline or other petroleum products upon such Site, Tenant shall procure pollution legal liability insurance covering each location with a retroactive date corresponding to the first occupation by Tenant with a minimum limit of Twenty-Five Million and No/100 Dollars ($25,000,000.00) for each incident which coverage shall be primary and non-contributory and shall also include coverage for any underground storage tanks located on such Site.

6. Business interruption insurance insuring that the Base Rent will be paid to Landlord for a minimum of eighteen (18) months if such Site is destroyed or rendered untenantable by any cause insured against (it being understood that the existence of such insurance does not reduce Tenant's obligation to pay Base Rent without diminution).

27

C.     The required limits and coverages of all insurance set forth in Sections 16.A and 16.B above may be reasonably adjusted by Landlord from time to time (but not more frequently than once every five (5) years) in conformity with the then prevailing custom of insuring liability in Comparable Buildings.

D.     In the event of a casualty or other loss under any property insurance policy, Tenant shall pay to Landlord the lesser of the amount of the deductible or the full amount of the loss in the case of a loss in an amount less than the deductible, which payment shall be treated in the same manner as insurance proceeds.  Tenant shall also cause all such property policies to permit Tenant's waiver of claims against Landlord under Section 18 for matters covered thereby.  Tenant shall cause Landlord, Landlord Mortgagee and any superior lessor or fee owner to be named as loss payees and/or mortgagees, as their interests may appear, under all property insurance policies and shall cause the coverage to continue for Landlord's benefit notwithstanding any act or omission on Tenant's part.  By this Section 16, Tenant intends that the risk of loss or damage to the Premises and all property thereon, including Personal Property and Tenant's Personal Property described above, be borne by responsible property insurance carriers and Tenant hereby agrees to look solely to, and to seek recovery only from, its respective property insurance carriers, in the event of a loss of a type described above to the extent that such coverage is agreed to be provided hereunder.  For this purpose, any applicable deductible shall be treated as though it were recoverable under such policies.

E.     All insurance required to be maintained by Tenant pursuant to Section 16.A and 16.B must be maintained with insurers authorized to do business in the jurisdiction in which the applicable Site is located and which have an A.M. Best Company Rating of at least A/VIII or Standard and Poor's Rating of at least A.  Tenant shall provide to Landlord, and at each renewal of expiring policies, such certificates as may be reasonably required to establish that the insurance coverage required by this Section 16 is in effect from time to time and that, to the extent commercially available, the insurer(s) have agreed to give Landlord and Landlord Mortgagee at least thirty (30) days' notice prior to any non-renewal or cancellation of, or material modification to, the required coverage.  Landlord and Tenant shall cooperate with each other in the collection of any insurance proceeds which may be payable in the event of any loss, including the execution and delivery of any proof of loss or other actions required to effect recovery.  Tenant shall cause all liability and property policies maintained by Tenant to be written as primary policies, not contributing with and not supplemental or excess to any coverage that Landlord or Landlord Mortgagee may carry.

F.     Tenant may provide the insurance required by virtue of the terms of this Lease by means of a combination of primary and excess or umbrella coverage and by means of a policy or policies of blanket property insurance so long as (i) the amount of the total insurance allocated to each Site under

28

the terms of the blanket policy or policies furnishes protection equivalent to that of separate policies in the amounts required by the terms of this Lease, and (ii) the blanket policy or policies comply in all other respects with the other requirements of this Lease.

G.    If Tenant fails to obtain the insurance coverage, as set forth in this <u>Section 16</u> and does not cure its failure within five (5) days after written notice from Landlord, Landlord may, at its option, obtain such insurance for Tenant, and Tenant shall, upon demand, pay, as additional Rent, the cost thereof.

H.    All policies of insurance required to be maintained pursuant to this Lease shall be endorsed, if commercially available, so that if at any time should they be not renewed, canceled, coverage be reduced (by any party including the insured) which affects the interests of the Landlord or Landlord Mortgagee, such non-renewal cancellation or reduction shall not be effective as to Landlord and Landlord Mortgagee for thirty (30) days, except for non-payment of premium which shall be for ten (10) days after receipt by Landlord of written notice from such insurer of such cancellation or reduction. In addition to the foregoing, all policies of insurance required to be maintained pursuant to this Lease shall contain terms in accordance with Tenant's normal business practice and reasonably acceptable to Landlord and shall (i) contain a severability of interest and a cross-liability clause; (ii) name Landlord, Landlord Mortgagee, any ground lessor of the applicable Site and other entities as additional insureds or loss payees, as required by contract; and (iii) be endorsed to waive any rights of subrogation against Landlord, its lenders, and their respective officers, directors, employees, agents, partners, and assigns. All policies of insurance required to be maintained pursuant to this Lease (other than in respect to automobile liability or workers compensation insurance) shall insure the interests of Landlord and Tenant regardless of any breach or violation by Tenant or any other party of warranties, declarations or conditions contained in such policies, any action or inaction of Tenant or others.

I.    Prior to the Commencement Date, at least ten (10) days prior to each policy anniversary, Tenant shall furnish Landlord with certificates of insurance or binders, in a form reasonably acceptable to Landlord, evidencing all of the insurance required by the provisions of this Lease for the benefit of Landlord and required to be in force by the provisions of this Lease. Such certificates of insurance/binders shall be executed by each insurer in the case of the property policies, and in the case of liability policies, by each insurer or by an authorized representative of each insurer where it is not practical for such insurer to execute the certificate itself. Such certificates of insurance/binders shall identify underwriters, the type of insurance, the insurance limits and deductibles and the policy term and shall specifically list the special provisions enumerated for such insurance required by this

29

Lease. At Landlord's request, Tenant shall furnish certified copies of all insurance policies required to be carried by Tenant pursuant to this Lease.

17. **OFAC**.

   A.   Tenant has taken all reasonable measures, in accordance with all applicable Anti-Money Laundering Laws, with respect to each holder of a direct or indirect ownership interest in the Tenant, to assure that funds invested by such holders in the Tenant are derived from legal sources; provided, however, none of the foregoing shall apply to any person to the extent that such person's interest in Tenant is in or through an entity whose stock or shares are listed and traded on any recognized stock exchange located in the United States (a "**U.S. Publicly-Traded Entity**").

   B.   Tenant hereby represents and warrants that neither Tenant, nor, to the actual knowledge of Tenant, any persons or entities holding any legal or beneficial ownership interest (direct or indirect) whatsoever in Tenant (1) has been designated by the President of the United States or OFAC pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, the Patriot Act, Public Law 107-56, Executive Order 13224 (September 23, 2001) or any Executive Order of the President issued pursuant to such statutes; or named on the following list that is published by OFAC: "List of Specially Designated Nationals and Blocked Persons" (collectively, "**Prohibited Persons**"), (2) is under investigation by any governmental authority for, or has been charged with, or convicted of, any violation of any Anti-Money Laundering Laws, or drug trafficking, terrorist-related activities or other money laundering predicated crimes or a violation of the BSA, (3) has been assessed civil penalties under these or related laws, or (4) has had any of its funds seized or forfeited in an action under these or related laws; provided, however, none of the foregoing shall apply to any person to the extent that such person's interest is in or through a U.S. Publicly-Traded Entity. If the foregoing representations are untrue at any time during the Term and Landlord suffers actual damages as a result thereof, an Event of Default will be deemed to have occurred, without the necessity of notice to Tenant.

   C.   Tenant has taken reasonable steps, consistent with industry practice for comparable organizations and in any event as required by Law, to ensure that Tenant is and shall be in compliance with all (1) Anti-Money Laundering Laws and (2) OFAC Laws and Regulations. Tenant will not during the Term knowingly engage in any transactions or dealings, or knowingly be otherwise associated, with any Prohibited Persons in connection with the use or occupancy of the Premises. A breach of the representations contained in this Section 17 by Tenant as a result of which Landlord suffers actual damages shall constitute a material breach of this Lease and shall entitle Landlord to any and all remedies available hereunder, or at law or in equity.

30

18.     **WAIVER OF SUBROGATION**.

Notwithstanding anything to the contrary set forth in this Lease, to the fullest extent permitted by Law, neither Landlord nor Tenant shall be liable (by way of subrogation or otherwise) to the other party (or to any insurance company insuring the other party) for any loss or damage to the property of the releasing party to the extent the loss or damage is covered by property insurance carried or required by this Lease to be carried by the releasing party **EVEN THOUGH SUCH LOSS MIGHT HAVE BEEN OCCASIONED BY THE NEGLIGENCE OR WILLFUL ACTS OR OMISSIONS OF LANDLORD OR TENANT OR THEIR RESPECTIVE EMPLOYEES, AGENTS, CONTRACTORS OR INVITEES**.  Landlord and Tenant shall give each insurance company which issues policies of insurance, with respect to the items covered by this waiver, written notice of the terms of this mutual waiver, and shall have such insurance policies properly endorsed, if necessary, to prevent the invalidation of any of the coverage provided by such insurance policies by reason of such mutual waiver.  For the purpose of the foregoing waiver, the amount of any deductible or self-insured retention applicable to any loss or damage shall be deemed covered by, and recoverable by the insured under the insurance policy to which such deductible or self-insured retention relates.  Each party shall pay any additional expense, if any, for obtaining such waiver.

19.     **FIRE OR OTHER CASUALTY**.

A.     All proceeds (except business interruption insurance proceeds not allocated to Rent expenses) payable by reason of any property loss, damage, or destruction of or to the Premises by fire or other casualty, or any portion thereof, under any property policy of insurance required to be carried hereunder, shall be paid to Landlord, to be held by Landlord or Landlord Mortgagee for purpose of restoration of the Premises and made available to Tenant upon request, pursuant to the procedures set forth in this Section 19 for the reasonable costs of preservation, stabilization, emergency restoration, business interruption (other than any amount allocated to Rent expenses), reconstruction and repair, as the case may be, of any damage to or destruction of the Premises, or any portion thereof; provided, however, that the portion of such proceeds that are attributable to Tenant's obligation to pay Rent shall be applied against Rent due by Tenant hereunder.  All proceeds paid to Tenant shall be used first for the repair of any damage to the Premises (other than such payment of Rent).  Any excess proceeds of insurance remaining after the completion of the restoration or reconstruction of the Premises to substantially the same condition as existed immediately before the damage or destruction and with materials and workmanship of like kind and quality and to Landlord's reasonable satisfaction, and in accordance with the general terms and conditions of **Exhibit C** attached hereto, as applicable (collectively, "**Restoration Standards**"), shall be retained by Landlord. Tenant shall have the right to reasonably prosecute and settle insurance claims, provided that Tenant shall consult with and involve Landlord in the process of adjusting any insurance claims under this Section 19.

31

B.    Subject to the terms of this <u>Section 19</u>, Landlord shall make available to Tenant the insurance proceeds (net of all reasonable administrative and collection costs, including reasonable attorneys' fees) paid to Landlord for such repair and rebuilding of the Premises as it progresses (other than business interruption proceeds to be allocated to Rent expenses as aforesaid).  Payments shall be made against certification of the architect responsible for the supervision of the repairs and rebuilding that the work had been performed substantially in conformance with the approved plans and specifications therefor and the value of the work in place is equal to not less than one hundred ten percent (110%) of the aggregate amount advanced by Landlord for the payment of such work.  Prior to commencing the repairing and rebuilding, Tenant shall deliver to Landlord for Landlord's approval a schedule setting forth the estimated monthly draws for such work.  Landlord shall contribute to such payments, out of the insurance proceeds being held by Landlord, an amount equal to the proportion that the total net amount so held by Landlord bears to the total estimated cost of repairing and rebuilding, multiplied by the payment by Tenant on account of such work.  Landlord may, however, withhold ten percent (10%) from each payment until the work has been completed and unconditional lien releases and/or other proof has been furnished to Landlord that no lien or liability has attached, or will attach, to the applicable Building or the Property or to Landlord in connection with repairing, reconstructing and rebuilding. In addition, disbursement of such proceeds to Tenant are subject to any customary conditions of a Landlord Mortgagee.

C.    If the Premises or any portion thereof is damaged by fire or other casualty, whether or not from a risk covered by insurance, Tenant shall give Landlord prompt written notice thereof and Rent shall continue unabated notwithstanding any casualty. Tenant waives any statutory rights of termination which may arise by reason of any damage or destruction of the Premises or any portion thereof.

D.    In the event of a fire or other casualty, Tenant shall, at its expense regardless of the amount of any such damage or destruction and whether or not the insurance proceeds attributable such damage or destruction made available to Tenant, if any, shall be sufficient for the purpose, cause the Premises to be repaired, restored and replaced in accordance with all Law, this <u>Section 19.D</u> and the Restoration Standards, as expeditiously as practicable using reasonable diligence to a condition as nearly as practicable to that which existed immediately prior to occurrence of the fire or other casualty and otherwise in a good workmanlike manner, using new materials of like quality.

E.    No damage or destruction of the Premises or any portion thereof as a result of fire or any other hazard, risk or casualty whatsoever shall relieve Tenant from Tenant's liability and obligation to timely pay the full Rent payable

32

under this Lease and Rent shall continue unabated notwithstanding any casualty.

F. The provisions of this Lease, including this <u>Section 19</u> constitute an express agreement between Landlord and Tenant with respect to any and all damage to, or destruction of, all or any part of the Premises, and any Law with respect to any rights or obligations concerning damage or destruction in the absence of an express agreement between the parties, and any similar or successor Laws now or hereinafter in effect, shall have no application to this Lease or any damage or destruction to all or any part of the Premises.

20. **CONDEMNATION**.

A. Tenant and Landlord shall promptly give the other written notice upon knowledge of the actual or threatened commencement of any condemnation or eminent domain proceeding or other governmental taking affecting the Premises or any portion thereof, and, to the extent not otherwise received, shall deliver to the other copies of any and all papers served in connection therewith. Subject to the remainder of this <u>Section 20</u>, if during the Term all or any part of the Premises shall be taken for any public or any quasi-public use under any statute or by right of eminent domain or by private purchase in lieu thereof, all compensation awarded or paid as a result thereof shall belong to and be the property of Landlord without any participation by Tenant and without any deduction therefrom for any estate hereby vested in or owned by Tenant and Tenant hereby irrevocably assigns to Landlord any award or payment to which Tenant may be or become entitled by reason of any taking of the Premises or any part thereof, subject to the other provisions of this <u>Section 20</u>. Landlord shall have the exclusive power to collect, receive and retain any such award proceeds and to make any compromise or settlement in connection with such award. Nothing herein shall be deemed to preclude Tenant from prosecuting any claim directly against the condemning authority in such condemnation proceeding for loss of business or depreciation to, damage to or cost of removal of, or for value of, stock, trade fixtures, furniture, machinery, equipment and other personal property belonging to Tenant (including, without limitation, Tenant's Personal Property), provided that no such claim shall diminish or otherwise adversely affect Landlord's award. Tenant agrees to execute any and all further documents that may be reasonably required in order to facilitate collection by Landlord of any and all awards. Tenant, in cooperation with Landlord, shall have the right to participate in any condemnation proceedings for the purpose of protecting Tenant's interest hereunder.

B. If during the Term all or substantially all of any Site shall be taken for any public or any quasi-public use under any statute or by right of eminent domain or by private purchase in lieu thereof, then Tenant may, not later than thirty (30) days after any such taking, give notice to Landlord of its

33

intention to terminate this Lease as to such Site on any business day specified in such notice which occurs not less than thirty (30) nor more than one hundred eighty (180) days after such taking. In such event, this Lease shall terminate with respect to such Site only, on the date set forth in the notice provided by Tenant and upon such termination with respect to such Site only: (x) neither party shall have any obligation to the other with respect to such Site under this Lease; (y) this Lease shall remain in full force and effect with respect to all other Sites and (z) thereafter the Base Rent shall be reduced by an amount equal to the product of (i) the Applicable Rent Reduction Percentage for such Site, and (ii) the aggregate Base Rent in effect at such time. A taking of substantially all of a Site under this Section 20.B shall be deemed to have occurred if (i) fifty percent (50%) or more of the square footage of such Site shall have been subject to a taking, or (ii) there shall have been a permanent loss of access, ingress or egress, parking capacity or any other appurtenance necessary for the operation of such Site substantially in the manner in which it had previously been operated and there is no reasonably equivalent replacement therefor.

C.    If during the Term all or any part of a Site shall be taken for any public or any quasi-public use under any statute or by right of eminent domain or by private purchase in lieu thereof and if the Lease is not terminated as to such Site pursuant to Section 20.B as expressly provided in Section 20.B, then this Lease shall continue in full effect without abatement or reduction of Rent or other sums payable by Tenant under this Lease, notwithstanding such taking or private purchase. Tenant shall, promptly after any such taking and at its expense (regardless of whether any awards are available as a result of such taking), repair any damage caused by any such taking in accordance with this Section 20 and the Restoration Standards and so that, after the completion of such repair, such Site shall be, as nearly as possible, in a condition as good as the condition thereof immediately prior to such taking, except for ordinary wear and tear. All of the net award collected by Landlord pursuant to Section 20.A shall be held by Landlord (or Landlord Mortgagee) and applied and paid over toward the cost of repair of damage due to such taking against certificates of Tenant, signed by an authorized officer of Tenant, delivered to Landlord from time to time as such repair progresses or is completed, each such certificate describing such repair for which Tenant is requesting payment, the cost incurred by Tenant in connection therewith and stating that Tenant has not theretofore received payment for such repair. If the cost of repairs shall exceed the net award collected by Landlord, Tenant shall pay the deficiency. Any balance remaining in the hands of Landlord after payment of such costs of demolition, repair and restoration shall be retained by Landlord.

D.    If the use or occupancy of any Site or any portion thereof shall be temporarily requisitioned by any governmental authority, civil or military, then this Lease shall continue in full effect notwithstanding such requisition, without abatement or reduction of Rent or other sums payable by Tenant

34

hereunder, and Tenant shall be entitled to receive the entire net award payable by reason of such temporary requisition. Any requisition of twenty four (24) months or longer shall be considered a taking of substantially all of a Site under Section 20.B, and Tenant shall be afforded the termination rights as and to the extent set forth in said Section 20.B.

21. **INDEMNIFICATION**.

A. Notwithstanding the existence of any insurance required to be provided hereunder (but not in duplication thereof), and without regard to the policy limits of any such insurance, and in addition to and not in limitation of any other indemnity provided in this Lease, Tenant shall protect, indemnify, defend and hold harmless all Landlord Indemnified Parties from and against any and all liabilities, obligations, claims, damages, penalties, causes of action, losses, costs, fees and expenses, including without limitation reasonable counsel fees and court costs, to the maximum extent permitted by Law, imposed upon, asserted against or suffered or incurred by any Indemnified Party directly or indirectly by reason of any claim, suit or judgment obtained or brought by or on behalf of any person or persons against any Landlord Indemnified Party, for damage, loss or expense, which arise out of, are occasioned by, or are in any way attributable to or related to the following: (i) Tenant's use or occupancy of the Premises; (ii) the conduct of Tenant's business at the Premises; (iii) any activity, work or thing done or permitted by or on behalf of Tenant or its agents, contractors or subtenants in or about the Premises; (iv) the condition of the Premises; (v) the Lease or any breach or default in the performance of any obligation to be performed by Tenant under the terms of this Lease or arising from any act, neglect, fault or omission of Tenant or Tenant's Representatives; or (vi) the Premises or any accident, injury to or death of any person or damage to any property howsoever caused in or on the Premises, except to the extent that any of the foregoing are directly caused by the gross negligence or willful misconduct of Landlord and/or any Landlord Indemnified Parties. Tenant, at its expense, shall contest, resist and defend any such claim, action or proceeding asserted or instituted against any Landlord Indemnified Party ("**Landlord Claim**"). If at any time a Landlord Indemnified Party shall have received written notice of or shall otherwise be aware of any Landlord Claim which is subject to indemnity under this Section 21.A, such Landlord Indemnified Party shall give reasonably prompt written notice of such Landlord Claim to Tenant; provided, that, except to the extent Tenant is materially prejudiced in its defense of such Landlord Claim, (I) such Landlord Indemnified Party shall have no liability for a failure to give notice of any Landlord Claim, and (II) the failure of such Landlord Indemnified Party to give such a notice to Tenant shall not limit the rights of such Landlord Indemnified Party or the obligations of Tenant with respect to such Landlord Claim. Landlord shall have the right to reasonably control the defense or settlement of any Landlord Claim. Tenant's liability under

35

this <u>Section 21</u> shall survive the expiration or earlier termination of this Lease.

B.      Except to the extent prohibited by Law or directly caused by the gross negligence or willful misconduct of Landlord or any Landlord Indemnified Parties, Tenant hereby expressly releases Landlord and Landlord Mortgagee and all other Landlord Indemnified Parties from, and waives all claims for, damage or injury to person, theft, loss of use of or damage to property and loss of business sustained by Tenant and resulting from the Premises, including the Building, Property, Personal Property or Tenant's Personal Property or any part thereof or any equipment therein or appurtenances thereto becoming in disrepair, or resulting from any damage, accident or event in or about the Premises. Without limiting the generality of the foregoing, this <u>Section 21.B</u> shall apply particularly, but not exclusively, to flooding, damage caused by Building equipment and apparatuses, water, snow, frost, steam, excessive heat or cold, broken glass, sewage, gas, odors, excessive noise or vibration, death, loss, conversion, theft, robbery, or the bursting or leaking of pipes, plumbing fixtures or sprinkler devices.

22.     **ASSIGNMENT AND SUBLETTING**.

A.      This Lease shall be fully assignable by the Landlord or its successors and assigns, in whole or in part in connection with Landlord's sale or transfer of its interest in a Site. In the event that from time to time Landlord desires to sever and partially assign its interest in the Lease with respect to one or more of the Sites in their entirety, then (a) the Base Rent allocated to any Sites covered by the partial assignment (the "**Allocated Base Rent Amount**") shall be equal to the product of the Applicable Rent Reduction Percentage for such Sites and the then current Base Rent; (b) Landlord and Tenant shall within ten (10) business days of written request (the "**Landlord Severance Notice**") by Landlord enter into (i) a lease modification agreement in the form attached hereto as **Exhibit H-1** (each a "**Lease Modification Agreement**") and (ii) a new lease agreement covering such assigned Sites in substantially the form attached hereto as **Exhibit H-2** (each a "**New Lease**"); (c) Landlord and Landlord's assignee shall enter into a landlord assignment and assumption of lease agreement with respect to such New Lease so assigned in the form reasonably required by Landlord's assignee (each a "**Landlord Assignment Agreement**", together with the Lease Modification Agreement and the New Lease, collectively, with respect to each Site or Sites being transferred, the "**Lease Transfer Documents**"); (d) upon the assignment by Landlord, this Lease shall be amended (pursuant to the Lease Modification Agreement) to exclude any such Sites the subject of such partial assignment from the Lease, and to reduce the Base Rent hereunder by the Allocated Base Rent Amount; and (e) the Base Rent payable under the New Lease will equal the Allocated Base Rent Amount. In such event, each party shall deliver

36

original executed counterparts of the Lease Transfer Documents to the party designated by Landlord within ten (10) business days of delivery of the Landlord Severance Notice. In addition, Tenant and Landlord shall execute and deliver to the other, any other instruments and documents reasonably requested by Landlord or Tenant and reasonably approved by the other in connection with the sale or assignment including without limitation, amended SNDAs and/or memorandum of leases. In addition, Tenant agrees to cooperate reasonably with Landlord in connection with any such sale or assignment at no cost or expense of or additional liability or adverse effect to, Tenant. From and after the effective date of any such Landlord Assignment Agreement, Landlord will be released from any liability thereafter accruing with respect to the Sites covered thereby and such assignee shall also be deemed to have assumed all such liabilities.

B.     Landlord shall have the right to sell or convey the entire Premises subject to this Lease or to assign its right, title and interest as Landlord under this Lease in whole or in part. In the event of any such sale or assignment other than a security assignment, Tenant shall attorn to such purchaser or assignee and Landlord shall be relieved, from and after the date of such transfer or conveyance, of liability for the performance of any obligation of Landlord contained herein, except for obligations or liabilities accrued prior to such assignment or sale.

C.     At any time and from time to time, Landlord shall have the right to severe this Lease into two or more Severed Master Leases in accordance with this Section 22.C (such severance, a "**Master Lease Severance**"). In the event Landlord desires to effectuate a Master Lease Severance, then, (a) Landlord and Tenant shall within ten (10) business days of Landlord's written request (the "**Landlord Master Lease Severance Notice**") execute two or more master leases each in the form of this Lease, among which the Sites shall be allocated (such number of master leases and the allocation of Sites among such master leases shall be determined by Landlord and designated in the Landlord Master Lease Severance Notice), which master leases shall, collectively, amend and restate this Lease in its entirety (each such master lease a "**Severed Master Lease**" and collectively, the "**Severed Master Leases**") and (b) the Base Rent under each Severed Master Lease shall equal the product of the aggregate Applicable Rent Reduction Percentages for the Sites subject to such Severed Master Lease and the then current Base Rent. In the event Landlord elects to cause a Master Lease Severance, each party shall deliver original executed counterparts of the Severed Master Leases within ten (10) business days of delivery of the Landlord Master Lease Severance Notice. In addition, Tenant and Landlord shall execute and deliver to the other, any other instruments and documents reasonably requested by Landlord or Tenant and reasonably approved by the other in connection with the Master Lease Severance, including, without limitation, amended SNDAs and/or memoranda of leases. In addition, Tenant agrees

to cooperate reasonably with Landlord in connection with any Master Lease Severance.

D.      Tenant acknowledges that Landlord has relied both on the business experience and creditworthiness of Tenant and upon the particular purposes for which Tenant intends to use the Premises in entering into this Lease. Without the prior written consent of Landlord, which consent may be granted or withheld in Landlord's sole and absolute discretion: (i) Tenant shall not assign, transfer, convey, sublease (except as provided in Section 22.H), pledge or mortgage this Lease or any interest therein, whether by operation of law or otherwise, except that Tenant may assign this Lease to any Affiliate of Tenant controlled by Mountain Express Oil Company, provided that Tenant and Guarantor shall remain fully liable under this Lease notwithstanding any such assignment; (ii) no direct or indirect transfer of fifty percent (50%) or more of an interest in Tenant (whether by stock, partnership interest or otherwise, voluntarily or by operation of law) shall occur except for any such transfer to an Affiliate; (iii) no direct or indirect interest in Tenant shall be pledged, encumbered, hypothecated or assigned as collateral for any obligation of Tenant; and (iv) no change of Control of Guarantor shall occur (each of items (i) through (v) are hereinafter referred to as a "**Transfer**").

E.      Landlord's consent to a Transfer shall be subject to the satisfaction of such conditions as Landlord shall determine in its sole and absolute discretion, including, without limitation, the proposed transferee having satisfactory creditworthiness as determined by Landlord in its sole and absolute discretion. In addition, any such consent shall be conditioned upon the payment by Tenant to Landlord of all out-of-pocket costs and expenses incurred by Landlord in connection with such consent, including, without limitation, reasonable attorneys' fees, in an amount not to exceed fifty thousand dollars ($50,000.00). The provisions of this Section 22 shall apply to every Transfer regardless of whether voluntary or not, or whether or not Landlord has consented to any previous Transfer. Any Transfer in violation of this Section 22 shall be voidable at the sole option of Landlord.

F.      Any Transfer shall not relieve Tenant, or any person claiming by, through or under Tenant, of the obligation to obtain the consent of Landlord, pursuant to this Section 22, to any further Transfer. In the event of a sublease, if there exists an Event of Default, Landlord may collect rent from the subtenant without waiving any rights under this Lease while such Event of Default is continuing. Any rent Landlord may collect from any such subtenant will be first applied to the Rent due and payable under this Lease and any other amounts then due and payable and then applied to the Rent as it becomes due and payable under this Lease. The collection of the Rent and any other sums due and payable under this Lease, from a person other than Tenant shall not be a waiver of any of Landlord's rights under this

38

Section 22.F, an acceptance of assignee or subtenant as Tenant, or a release of Tenant from the performance of Tenant's obligations under this Lease.

G. No Transfer shall impose any additional obligations on Landlord under this Lease. Tenant shall reimburse Landlord (and Landlord's Mortgagee, if applicable) for Landlord's reasonable costs and expenses (including reasonable attorneys' fees) incurred in conjunction with the reviewing and processing and documentation of any Transfer requiring Landlord's consent regardless of whether such Transfer is consummated, in an amount not to exceed fifty thousand dollars ($50,000.00).

H. Tenant may, upon at least ten (10) business days' prior written notice to Landlord (but without the requirement of obtaining Landlord's consent) sublease Tenant's interest in this Lease. With respect to any sublease, (a) such sublease, by its terms, must be expressly subordinate to and subject to the terms of this Lease (and all future amendments to this Lease); (b) the use contemplated under such sublease must not breach the use restrictions herein; (c) such sublease shall not impose any additional obligations on Landlord under this Lease; and (d) Landlord shall have no obligation to recognize any or to agree to not disturb any subtenant or other occupant of Tenant upon any Event of Default of Tenant under this Lease, unless Landlord shall agree to do so in writing by separate instrument, but Landlord, acting in its sole and absolute discretion, shall have no obligation to do so. For the avoidance of doubt, Tenant and Guarantor shall remain fully liable under this Lease for such Sites, notwithstanding any such sublease. Landlord shall have no right to any the rent collected by Tenant under any such sublease except as otherwise provide herein. On or before the effective date of such sublease, and to the best of Tenant's ability, Tenant shall provide to Landlord, in form and substance reasonably acceptable to Landlord, an acknowledgment and affirmation from such sublessee, Tenant and Guarantor, providing that such sublessee agrees to be bound by the terms of this Lease with respect to such Sites being subleased and that Tenant and Guarantor agree that they remain liable for the full and punctual performance of all of the terms and obligations of this Lease.

23. **LIENS**.

Tenant will not, directly or indirectly, create or permit to be created or to remain, and will promptly discharge, at its expense, any mechanic's, supplier's or vendor's lien, encumbrance or charge on the Premises or any part hereof. The existence of any mechanic's, supplier's or vendor's lien, or any right in respect thereof, shall not constitute a violation of this Section 23 if payment is not yet due upon the contract or for the goods or services in respect of which any such lien has arisen or, if Tenant is protesting or challenging such lien in good faith and has, within thirty (30) days after Tenant receives actual notice of such lien, bonded over such lien. Nothing contained in this Lease shall be construed as constituting the consent or request of Landlord, expressed or implied, of any contractor, subcontractor, laborer, materialman or vendor to or for the performance of any labor or services or the furnishing of any materials for any construction, alteration, addition,

repair or demolition of or to the Premises or any part thereof, and any such contractor, subcontractor, laborer, materialman or vendor shall look solely to Tenant and Tenant's interest in the Premises to secure the payment of any bills for any labor, services, or materials furnished. Notice is hereby given that Landlord will not be liable for any labor, services or materials furnished or to be furnished to Tenant, or to anyone holding the Premises or any part thereof through or under Tenant, and that no mechanic's or other liens for any such labor, services or materials shall attach to or affect the interest of Landlord in and to the Premises. If Tenant has not removed any such lien or other encumbrance described above within thirty (30) days after written notice thereof to Tenant, Landlord may, but shall not be obligated to, pay the amount of such lien or other encumbrance or discharge the same by deposit, and the amount so paid or deposited shall constitute additional Rent and be collectible upon demand with interest at the Default Rate. Landlord hereby consents to the granting of a lien or security interest on the fixtures, furnishings, trade fixtures, furniture, computers, telephone systems, machinery, equipment and other of Tenant's Personal Property installed or placed on the Premises by Tenant in connection with any customary credit facility that Tenant has or may have during the Term hereof, and Tenant shall give Landlord written notice of any such lien.

24. **<u>TENANT'S DEFAULT</u>**.

Each of the following events shall be deemed to be an "**Event of Default**" under this Lease: (i) failure to pay Rent or any other monetary obligation as and when due, and such failure continues for three (3) business days after Tenant's receipt of Landlord's written notice thereof; (ii) Tenant abandons the Premises; (iii) Guarantor or Tenant becomes insolvent, makes an assignment for the benefit of creditors, or institutes a proceeding under state or federal bankruptcy laws (or successor laws) or Guarantor or Tenant shall be adjudged bankrupt or insolvent in proceedings filed against Guarantor or Tenant; (iv) a writ of attachment or execution is levied on this Lease, or a receiver is appointed with authority to take possession of the Premises, which attachment, execution or receiver is not removed within thirty (30) days of filing or appointment of a receiver; (v) Guarantor or Tenant shall be liquidated or dissolved; (vi) Tenant shall violate <u>Section 23</u> hereof; (vii) the estate or interest of Tenant in the Premises or any part thereof shall be levied upon or attached in any proceeding relating to more than One Hundred Thousand and No/100 Dollars ($100,000.00), and the same shall not be vacated, discharged or stayed pending appeal (or bonded or otherwise similarly secured payment) within the earlier of sixty (60) days after commencement thereof or thirty (30) days after receipt by Tenant of notice thereof from Landlord or any earlier period provided by Law for obtaining any stay pending appeal or to prevent foreclosure or sale; provided, however, that such notice shall be in lieu of and not in addition to any notice required under applicable Law; (viii) Tenant fails to maintain any insurance required by this Lease; (ix) failure by Tenant to perform any other covenant, agreement or undertaking of the Tenant contained in this Lease if the failure to perform is not cured within thirty (30) days after Tenant's receipt of Landlord's written notice thereof; provided, however, if the breach cannot reasonably be cured within thirty (30) days, the same shall not result in an Event of Default if Tenant commences to cure the breach within thirty (30) days of receipt of Landlord's written notice and diligently and in good faith continues to prosecute the cure of said breach to completion, provided such breach is cured within sixty (60) days after Tenant's receipt of Landlord's written notice thereof; (x) to the extent required under the Guaranty, Guarantor fails to deliver the financial statements required to be delivered by Guarantor to Landlord; and (xi) an event of default beyond all applicable notice and cure periods by Guarantor under the Guaranty.

40

25. **REMEDIES OF LANDLORD**.

    A.    From and after the occurrence of any Event of Default, Landlord shall have the option to pursue any one or more of the following remedies as well as any other remedy available at Law or in equity for such Event of Default: (i) terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord; (ii) using lawful means, enter upon and take possession of the Premises without terminating this Lease and without being liable for prosecution or claim for damages, and relet, upon reasonable terms, all or a portion of the Premises (if Landlord elects to enter and relet the Premises, Landlord may at any time thereafter elect to terminate this Lease); (iii) sue periodically to recover damages during the period corresponding to the portion of the Term for which suit is instituted, and if Landlord elects to sue and is successful in such suit, Landlord shall be entitled to recover all costs and expenses of such suit, including reasonable attorneys' fees, together with interest at the Default Rate; (iv) re-enter the Premises or any portion thereof and attempt to cure any default of Tenant, or make any such payment or perform such act for the account of and at the expense of Tenant, in which event Tenant shall, upon demand, reimburse Landlord as additional Rent for all reasonable costs and expenses which Landlord incurs to cure such default, together with interest at the Default Rate accruing from the date such costs and expenses were incurred, and Tenant agrees that no such entry or action by Landlord shall constitute an actual or constructive eviction or repossession, without Landlord's express intention to do so as expressed in writing, and no such entry shall be deemed an eviction of Tenant; (v) to the extent permitted by applicable Law, accelerate and recover from Tenant all Rent and other monetary sums scheduled to become due and owing under this Lease after the date of such breach for the entire Term and any Renewal Term that has been exercised; and (vi) enforce the provisions of this Lease by a suit or suits in equity or at law for the specific performance of any covenant or agreement contained herein, or for the enforcement of any other appropriate legal or equitable remedy. Tenant shall reimburse Landlord for any out-of-pocket expenses which Landlord actually incurs in complying with the terms of this Lease on behalf of Tenant, together with interest at the Default Rate.

    B.    If Landlord elects to terminate this Lease, Landlord shall be entitled to recover from Tenant all Rent accrued and unpaid for the period up to and including such termination date, as well as all other additional Rent payable by Tenant, or for which Tenant is liable or for which Tenant has agreed to indemnify Landlord, which may be then owing and unpaid, and all costs and expenses, including court costs and reasonable attorneys' fees, incurred by Landlord in the enforcement of its rights and remedies hereunder, together with interest at the Default Rate. In addition, Landlord shall be entitled to recover as damages for loss of the bargain and not as a penalty the lesser of (i) the sum of (1) the aggregate sum which at the time of such termination represents the present value of the aggregate Rent which would

41

have been payable after the termination date had this Lease not been terminated for the remainder of the Term or Renewal Term, as applicable, during which such termination occurred, such present value to be computed on the basis of the rate of U.S. Treasury Bills with the closest maturity date correlating with the amount of time left in the Term or Renewal Term, as applicable, had this Lease not been terminated, and (2) any damages in addition thereto, including without limitation reasonable attorneys' fees and court costs, which Landlord sustains as a result of the breach of any of the covenants of this Lease other than for the payment of Rent, and interest at the Default Rate or (ii) the greatest amount permitted by applicable Law.

C.    Unless required by applicable Law, Landlord shall have no obligation to mitigate damages upon the occurrence of an Event of Default. However, if Landlord is required by applicable Law to mitigate Tenant's damages, Landlord's obligation shall be satisfied in full if Landlord undertakes to lease the Premises (the "**Repossessed Premises**") to another tenant (a "**Substitute Tenant**") in accordance with the following criteria: (1) Landlord shall have no obligation to solicit or entertain negotiations with any other prospective tenants for such Repossessed Premises until Landlord obtains full and complete possession of such Repossessed Premises including, without limitation, the final and unappealable legal right to relet such Repossessed Premises free of any claim of Tenant; (2) Landlord shall not be obligated to lease or show such Repossessed Premises, on a priority basis, or offer such Repossessed Premises to a prospective tenant when other premises in the applicable Building or any other building owned by Landlord suitable for that prospective tenant's use are (or will be) available; (3) Landlord shall not be obligated to lease such Repossessed Premises to a Substitute Tenant for a rent less than the current fair market rent then prevailing for similar uses in Comparable Buildings for such Repossessed Premises, nor shall Landlord be obligated to enter into a new lease under other terms and conditions that are unacceptable to Landlord under Landlord's then current leasing policies for comparable space in the applicable Building or for a building belonging to Landlord in the vicinity; (4) Landlord shall not be obligated to enter into a lease with a Substitute Tenant whose use would: (i) violate any restriction, covenant, or requirement contained in the lease of another tenant of the applicable Building; or (ii) adversely affect the reputation of the applicable Building; and (5) Landlord shall not be obligated to enter into a lease with any proposed Substitute Tenant which does not have, in Landlord's reasonable opinion, sufficient financial resources to operate such Repossessed Premises in a first-class manner and to fulfill all of the obligations in connection with the lease thereof as and when the same become due. No reletting shall be construed as an election on the part of Landlord to terminate this Lease unless a written notice of such intention is given to Tenant by Landlord. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this

42

Lease for such previous default and/or exercise its rights under <u>Section 25.A</u> and <u>Section 25.B</u>.

D. Pursuit of any of the above stated remedies by Landlord after an Event of Default shall not preclude pursuit of any other remedy provided in this Lease or at Law or in equity, nor shall pursuit of any remedy constitute forfeiture or waiver of any remedy of Landlord or payment due to Landlord. No waiver by Landlord of any violation or breach of any of the terms, provisions and covenants herein contained shall be deemed or construed to constitute a waiver of any other violation or breach of any of the terms, provisions and covenants herein contained. Forbearance by Landlord to enforce one or more of the remedies herein provided upon an Event of Default shall not be deemed or construed to constitute a waiver of any other violation or default. Once an Event of Default occurs, Landlord shall not be obligated to accept any cure of such Event of Default, and such Event of Default shall continue unless and until Landlord states in writing, in its sole and absolute discretion, that no Event of Default exists under this Lease.

26. **<u>SUBORDINATION/ATTORNMENT</u>**.

A. <u>Landlord Mortgage</u>. Landlord may mortgage its fee interest in the Premises or any portion thereof, at any time, and from time to time, in accordance with the terms hereof. Notwithstanding anything to the contrary contained herein, Landlord and Tenant agree that this Lease shall be subordinate to any Landlord Mortgage and the rights of any Landlord Mortgagee; provided, however, in the event of a foreclosure under any such Landlord Mortgage, or conveyance or assignment in lieu of foreclosure or by deed in lieu of foreclosure, such Landlord Mortgagee and its successors and assigns shall not disturb the occupancy or other rights of Tenant under the terms of this Lease so long as no Event of Default exists hereunder. The foregoing shall be self-operative and not require any additional documentation, provided, however, if requested by Landlord, Tenant shall, promptly and in no event later than fifteen (15) days after a request from Landlord, enter into a reasonable and customary subordination, non-disturbance and attornment agreement ("**SNDA**") with Landlord Mortgagee to effectuate the subordination, non-disturbance and attornment rights contemplated by this <u>Section 26.A</u>.

B. For the purposes of this Lease, the following definitions shall apply:

"**Landlord Mortgage**" shall mean any financing obtained by Landlord, as evidenced by any mortgage, deed of trust, assignment of leases and rents, financing statement or other instruments, and secured by the interest of Landlord in the Premises or any portion thereof, including any extensions, modifications, amendments, replacements, supplements, renewals, refinancings and consolidations thereof.

43

"**Landlord Mortgagee**" shall mean the mortgagee (and its successors and assigns) under any Landlord Mortgage.

27.    **ESTOPPEL CERTIFICATE**.

A.    At any time, and from time to time, Tenant shall, promptly and in no event later than fifteen (15) days after a request from Landlord, execute, acknowledge and deliver to Landlord a certificate in the form attached hereto as **Exhibit D** or such other form as may be supplied by Landlord certifying:  (i) that Tenant has accepted the Premises; (ii) that this Lease is in full force and effect and has not been modified (or if modified, setting forth all modifications); (iii) the commencement and expiration dates of the Term, including the terms of any extension options of Tenant; (iv) the date to which the rentals have been paid under this Lease and the amount thereof then payable; (v) whether there are then any existing defaults by Landlord in the performance of its obligations under this Lease, and, if there are any such defaults, specifying the nature and extent thereof; (vi) that Tenant is not in default under this Lease beyond any grace or cure periods, except as to defaults specified in the certificate; (vii) the capacity of the person executing such certificate, and that such person is duly authorized to execute the same on behalf of Tenant; (viii) that Landlord has no actual involvement in the management or control of decision making related to the operational aspects or the day-to-day operations of the Premises; and (ix) any other information reasonably requested by Landlord.

B.    At any time, and from time to time, Tenant shall, at Landlord's request, use commercially reasonable efforts to obtain estoppel certificates, in a form requested by Landlord or any Landlord Mortgagee, from any applicable counterparties under any applicable declarations, covenants, conditions and restrictions, reciprocal easement agreements or other encumbrances.

28.    **HAZARDOUS MATERIALS**.

Notwithstanding anything contained herein to the contrary:

A.    Tenant covenants and agrees that it shall not cause, conduct, authorize or allow (i) the presence, generation, transportation, storage, treatment, or usage at the Premises, or any portion thereof, of any Hazardous Material in violation of or as would give rise to liability under Environmental Laws; (ii) a Release or threat of Release of any Hazardous Material on, under, about or in the Premises; or (iii) any violation of or liability under any Environmental Law at or with respect to the Premises or activities conducted thereon.  For avoidance of doubt, nothing in this Section 28.A shall prohibit Tenant from using at the Premises (I) cleaning materials, pesticides, and other common household and office products, and/or (II) materials in connection with any fuel tanks, generators or the like on the Premises, solely to the extent, with respect to each of the preceding clauses

44

(I) and (II), that any such use thereof is in compliance with Environmental Laws.

B.      Tenant shall, at its own cost, comply and ensure that the Premises and all operations and activities at the Premises comply with all Environmental Laws and the terms of this Lease with respect to Hazardous Materials. Tenant shall, at its own cost, obtain all permits, licenses and authorizations required under Environmental Laws for the operations and activities conducted at the Premises. At Landlord's request, Tenant shall commission and provide to Landlord, or Landlord may commission, in each event, at Tenant's sole cost and expense, a Phase I site assessment, and, if recommended by the Phase I site assessment, a Phase II site assessment, for purposes of confirming the environmental condition of any such Site and Tenant's compliance with the terms of the Lease with respect to environmental matters.

C.      Tenant shall promptly provide Landlord with written notice of any actual or potential violation of Environmental Laws, any Release of Hazardous Materials in or around any Site that could impact the Premises or require any investigation, remediation or other response action under Environmental Law, and any claim or threat of a claim asserting any liability under Environmental Laws relating to the Premises, and copies of all reports, site assessments, and material communications, permits or agreements to, from or with any governmental authority or other third party relating to such violation, Release or claim; and

D.      Landlord and Landlord's Representatives, including such environmental consultants as Landlord may designate, shall have the right upon reasonable prior notice, and subject to Section 15 hereof, to enter any Site and/or conduct appropriate tests and investigations for the purpose of assessing the condition of any such Site or ascertaining that Tenant complies with the terms of this Lease and with all applicable Environmental Laws that relate in any way to any such Site.

E.      If the presence, Release, threat of Release, presence or placement on, in or around any Site, or the generation, transportation, storage, use, treatment, or disposal at or around any Site of any Hazardous Material by Tenant, Tenant's Representatives, or by any third party other than Landlord or Landlord's Representatives: (i) gives rise to any liability or obligation (including, but not limited to, any investigatory, remedial, removal, reporting, or other response action) under any Environmental Law, (ii) causes or threatens to cause any adverse effect on public health or occupational safety and health, (iii) pollutes or threatens to pollute the environment, or endanger human health, or (iv) otherwise violates Environmental Law, Tenant shall promptly take any and all remedial and removal actions required by Environmental Laws or otherwise necessary to clean up any such Site to comply with all environmental standards

45

applicable to any such Site given its use at the time of the remediation and mitigate exposure to liability arising from the Hazardous Material.

F.  Tenant shall promptly notify Landlord upon Tenant becoming aware of: (i) any enforcement action, investigation, cleanup, notice of violation, or other regulatory action taken or threatened against either party or otherwise related to the Premises by any governmental authority with respect to the presence of any Hazardous Material at any Site, or the migration thereof from or to other property, (ii) any demands or claims made or threatened by any governmental authority or other person against either party hereto or otherwise relating to any actual or alleged violation of or liability under Environmental Laws or relating to any loss or injury resulting from any Hazardous Material or based on Environmental Laws, (iii) any Release of Hazardous Materials, unlawful discharge, or non-routine, improper or unlawful disposal or transportation of any Hazardous Material on or from any Site, and (iv) any matters where Tenant is required by Environmental Law to give a notice to any governmental authority respecting any Hazardous Materials in, at, on, under or about any Site, and Tenant shall thereafter keep Landlord reasonably apprised with respect to the status and Tenant's actions to resolve such matters, and shall furnish Landlord with such other documents and information as Landlord may reasonably request with respect thereto.  At such times as Landlord may reasonably request, Tenant shall provide Landlord with a written list identifying any Hazardous Material then actually known by Tenant to be used, stored, or maintained in, on or upon the Premises.  In such case, Tenant shall if requested by Landlord provide Landlord with information with respect to the use and approximate quantity of each such material, a copy of any Material Safety Data Sheet issued by the manufacturer therefor, written information concerning the removal, transportation, and disposal of the same, and such other information as the Landlord may reasonably require or as may be required by Environmental Laws.

G.  Tenant shall indemnify, defend and hold Landlord and the Landlord Indemnified Parties harmless, in the manner specified in Section 21, from and against any and all liability, claim, expense, cause of action, fines, judgments, settlements, investigation, monitoring and remediation costs, penalties, losses and damages (including reasonable attorney's, consultant's and contractor's fees) resulting or arising from (i) the breach by Tenant of its covenants and agreements set forth in this Section 28, (ii) the presence, Release, placement on, in or around the Premises, or the generation, transportation, storage, use, treatment or disposal at or around any Site of any Hazardous Materials before or during the Term and any Renewal Term, as applicable, by Tenant or any third party other than Landlord or Landlord's Representatives, (iii) any violation of or obligation under Environmental Law before or during the Term and any Renewal Term, as applicable, by Tenant or any third party other than Landlord or Landlord's Representatives, and (iv) claims by governmental authorities or other third

46

parties associated with Hazardous Materials or violations of or obligations under Environmental Laws by Tenant or any third party other than Landlord or Landlord's Representatives, or Hazardous Materials present at, on, under or about any Site before or during the Term and any Renewal Term, as applicable, including, without limitation those that were discovered during the Term and any Renewal Term, as applicable, which were caused prior to the Term by Tenant or its agents, representatives, employees, contractors, subcontractors, licensees or invitees or any third party other than Landlord or Landlord's Representatives. The foregoing indemnity obligations shall survive the expiration or earlier termination of this Lease.

H.     Without limitation to the foregoing, Tenant shall, at its sole cost and expense, comply with all Environmental Laws relating to the operation and use of all aboveground and underground storage tanks ("**Tanks**") at any time located at the Premises, such compliance to include without limitation ensuring that all Tanks are equipped with leak detection systems and otherwise meet all applicable construction standards and technical requirements, are subject to regular inspections and tightness tests to confirm Tank integrity, and are covered by pollution insurance policies or other financial assurance mechanisms to the extent required under Environmental Laws. Tenant shall upon request provide Landlord copies of inspection reports, insurance policies, and other documentation reasonably necessary to confirm the compliance status of such Tanks. In the event of any spills, releases or evidence of leakage from or associated with the use of the Tanks, Tenant shall report the same to the appropriate regulatory agency and shall conduct testing of environmental media to confirm the nature and extent of contamination, complete all remedial and corrective actions required under Environmental Laws with respect to such spill, release or leakage, and upon completion of work provide Landlord a copy of a No Further Action letter or the equivalent determination from the applicable regulatory agency ("**NFA**") with respect to the remedial work.

I.     Upon the expiration or earlier termination of the Lease, at Landlord's request, Tenant, at its sole expense, shall remove from the Premises all Tanks in accordance with all Environmental Laws and applicable commercial guidelines, perform post-removal testing of soil and groundwater to confirm the presence or absence of contamination associated with such Tanks, and to the extent that such removal involves any excavation or remedial work at the Premises, Tenant shall perform such remediation and restore the Premises to the same grade level as immediately prior to excavation using clean fill soil, and Tenant shall obtain and provide Landlord a copy of a NFA with respect to the Tank removal and remedial work, as applicable.

29.     **PRESS RELEASES**.

47

Except for any announcement intended solely for internal distribution by Landlord or Tenant or any disclosure required by legal, accounting or regulatory requirements beyond the reasonable control of the disclosing party, all media releases or public announcements (including, but not limited to, promotional or marketing material) by Landlord or Tenant or either party's employees or agents relating to this Lease or its subject matter, or including the name, trade name, trade mark, or symbol of Tenant or an Affiliate of Tenant, or Landlord or an Affiliate of Landlord, shall be coordinated with and approved in writing by the other party prior to the release thereof; provided, that nothing herein is intended to require Tenant's consent to the identification of Tenant or the particulars of this Lease in connection with any marketing of the Premises or any portion thereof by Landlord.

30.   **HOLDING OVER**.

Except as set forth below, if Tenant continues to occupy the Premises or any portion thereof after the expiration or other termination of this Lease or the termination of Tenant's right of possession with respect to the Premises, such occupancy shall be that of a tenancy at sufferance. Tenant shall, throughout the entire holdover period, be subject to all the terms and provisions of this Lease (other than provisions relating to length of the Term) and shall pay for its use and occupancy an amount (on a per month basis without reduction for any partial months during any such holdover) equal to (i) one hundred percent (100%) of the additional Rent due under this Lease for the holdover period, and (ii) two hundred percent (200%) of the monthly Base Rent due in the month immediately prior to the expiration or earlier termination of the Term.  Except as set forth below, no holding over by Tenant or payments of money by Tenant to Landlord after the expiration of the Term shall be construed to extend the Term or prevent Landlord from recovery of immediate possession of the Premises by summary proceedings or otherwise.  In the event that Tenant continues to occupy the Premises or any portion thereof after the expiration or termination of this Lease, such occupancy shall be that of a tenancy at sufferance and Tenant shall be liable to Landlord for all direct and consequential damages which Landlord may suffer by reason of any holding over by Tenant.

31.   **FINANCIAL COVENANTS**.

A.   Tenant has delivered to Landlord certain financial statements and other information concerning the Tenant in connection with this Lease (collectively, the "**Financial Information**").  The Financial Information is true, correct and complete in all material respects; there have been no amendments to the Financial Information since the date such Financial Information was prepared or delivered to Landlord.  Tenant understands that Landlord is relying upon the Financial Information and Tenant represents that such reliance is reasonable.  All financial statements included in the Financial Information were prepared in accordance with GAAP and fairly present as of the date of such financial statements the financial condition of each individual or entity to which they pertain.  No change has occurred with respect to the financial condition of any of the Tenant Parties and/or any of the Properties as reflected in the Financial Information which has not been disclosed in writing to Landlord or has had, or could reasonably be expected to result in, a Material Adverse Effect.

48

B.   If at any time, and from time to time, during the Term, Guarantor's Net Leverage Ratio exceeds 2.50 to 1.00, then within thirty (30) days after Tenant's receipt of notice from Landlord (the "**Leverage Notice**"), (i) this Lease shall be amended (by written instrument reasonably acceptable to Landlord) to increase the then-applicable Base Rent by five percent (5%) (and which Base Rent, as so increased, shall continue to increase by two percent (2%) each year during the Term and each Renewal Term), which rent increase shall be effective as of the first day of Guarantor's fiscal quarter immediately after Guarantor's Net Leverage Ratio exceeds 2.50 to 1.00 and (ii) Tenant shall deliver to Landlord cash or, at Tenant's election, an irrevocable standby letter of credit in form and substance reasonably acceptable to Landlord (the "**Letter of Credit**") in an amount equal to twelve (12) times the Base Rent payable during the month of the date of the Leverage Notice (the "**Security Deposit**"). Upon Tenant's failure to timely pay Base Rent or any other sums due under this Lease, Landlord may, without limiting any other rights Landlord may have herein, draw on such Security Deposit to satisfy any such unpaid monetary obligation of Tenant, and Tenant shall, immediately upon written notice from Landlord thereof, deposit with landlord an amount in cash sufficient to replenish the Security Deposit to the same amount prior to such draw on the Security Deposit. Landlord shall retain the Security Deposit until the Net Leverage Ratio no longer exceeds 2.50 to 1.00 for two consecutive fiscal quarters of Guarantor, at which time, provided no Event of Default has occurred, (I) Landlord shall return the Security Deposit to Tenant (except to the extent the Security Deposit has been applied in accordance with the terms of this Lease) and (II) the Lease shall be amended (by written instrument reasonably acceptable to Landlord) to adjust the then-applicable Base Rent to be equal to the Base Rent amount that would have been in effect if a Leverage Notice had not been provided. The Letter of Credit shall be issued (the following collectively, the "**LC Issuer Requirements**"): by a commercial bank (a) with a net worth of at least Ten Billion Dollars ($10,000,000,000), (b) that is chartered under the laws of the United States, any State thereof or the District of Columbia, and which is insured by the Federal Deposit Insurance Corporation, (c) whose long-term, unsecured and unsubordinated debt obligations are rated in the highest category by at least two of S&P, Fitch, and Moody's (the "**Bank Rating Agencies**") or their respective successors (which shall mean A from Fitch, A-2 from Moody's and A from Standard & Poor's), (d) which has a short term deposit rating in the highest category from at least two Bank Rating Agencies (which shall mean F1 from Fitch, P-1 from Moody's and A-1 from S&P), and (e) which is not insolvent and is not placed into receivership or conservatorship by the Federal Deposit Insurance Corporation, or any successor or similar entity, and for which no trustee, receiver or liquidator is appointed. If at any time following the delivery of the Letter of Credit by Tenant pursuant to this Section 31.B the LC Issuer Requirements are not satisfied, then Tenant shall, no later than ten (10) business days thereafter, deliver to Landlord a replacement Letter

49

of Credit which meets the LC Issuer Requirements in the amount of the Security Deposit. If Tenant fails to deliver a replacement Letter of Credit from an institution that satisfies the LC Issuer Requirements to Landlord within such ten (10) business day period, Landlord, at its option, upon the delivery of written notice to Tenant may draw upon the Letter of Credit and instruct the Letter of Credit issuer to deliver the full amount of the Letter of Credit to Landlord as a cash Security Deposit. It is Tenant's responsibility to maintain and renew the Letter of Credit such that it is in effect at all times until the return of the Letter of Credit to Tenant in accordance herewith. Tenant shall renew such Letter of Credit no later than thirty (30) days prior to any expiration date thereof or replace such Letter of Credit with a replacement Letter of Credit which otherwise meets the LC Issuer Requirements. If Tenant has not renewed the Letter of Credit (and delivered the original of such renewal documentation to Landlord) or delivered a satisfactory replacement Letter of Credit to Landlord at least thirty (30) days prior to the expiration date of the Letter of Credit, Landlord, at its option, may draw upon the Letter of Credit and instruct the Letter of Credit issuer to deliver the full amount of the Letter of Credit to Landlord as a cash Security Deposit. For each Property, upon the 5 year anniversary of the effective date of such Property's lease, this clause will become null and void.

C. Within forty-five (45) days after the end of each calendar quarter, Guarantor shall deliver to Landlord complete financial statements of the Guarantor, and, within ninety (90) days after the end of each calendar year, Guarantor shall deliver to Landlord complete audited financial statements, in each case including a balance sheet, and profit and loss statement. Guarantor shall also provide unaudited financial statements, certified by Guarantor's chief financial officer, in each case including top-line gross receipts report on a Site by Site basis showing unit-level EBITDAR, statement of changes in financial condition, income statement with respect to the Property, annual EBITDA projections for the then-current fiscal year of Tenant and all other related schedules for the fiscal period then ended.

D. Beginning with Guarantor's fiscal year 2022, and at all times thereafter during the Term, Guarantor's audits shall be performed by a "Big 4" accounting firm.

32. **QUIET ENJOYMENT**.

So long as Tenant is not in default under this Lease, Landlord shall not take any action to disturb in any material respect Tenant's quiet enjoyment of the Premises (subject, however, to the exceptions, reservations and conditions of this Lease). Except to the extent expressly set forth in this Section 32, Tenant hereby waives any right or defense it may have at law or in equity relating to Tenant's quiet enjoyment of the premises.

33. **NOTICES**.

50

Any notice, demand, request, or other communication that any party hereto may be required or may desire to give hereunder shall be in writing and shall be deemed properly given (a) if hand delivered, when delivered; (b) if mailed by United States Certified Mail (postage prepaid, return receipt requested), three (3) business days after mailing; (c) if by Federal Express or other nationally recognized overnight courier service, on the next business day after delivered to such courier service for delivery on the next business day; or (d) if by facsimile or e-mail transmission, on the day of transmission so long as a copy is sent on the same day (or prior thereto) by Federal Express or other nationally recognized overnight courier service for delivery on the next business day, to the addresses set forth in Section 2 hereof, or at such other address as the party to be served with notice has furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice. Attorneys for either party hereto may provide notice of behalf of such party, provided that all other requirements of this Section 33 are satisfied.

34.     **PERSONAL LIABILITY**.

Notwithstanding anything to the contrary provided in this Lease, it is specifically understood and agreed, such agreement being a primary consideration for the execution of this Lease by the parties, that (i) there shall be absolutely no personal liability on the part of the direct and indirect members, partners, shareholders, officers, directors, employees and agents of either party, and its successors or assigns, with respect to any of the terms, covenants and conditions of this Lease, (ii) each waives all claims, demands and causes of action against the direct and indirect members, partners, shareholders, officers, directors, employees and agents of the other and its successors or assigns in the event of any breach by the other of any of the terms, covenants and conditions of this Lease to be performed by Landlord or Tenant, and (iii) Tenant shall look solely to Landlord's interest in the Premises for the satisfaction of each and every remedy of Tenant in the event of any breach by Landlord of any of the terms, covenants and conditions of this Lease to be performed by Landlord, or any other matter in connection with this Lease or the Premises, such exculpation of liability to be absolute and without any exception whatsoever. Notwithstanding anything to the contrary provided in this Lease, nothing in this Section 34 or otherwise in the Lease shall limit the obligations of Guarantor under the Guaranty. No breach by Landlord of any provision of this Lease shall give rise to a right of Tenant to terminate this Lease, it being understood and agreed that Tenant's sole remedy for any such breach shall be a claim for actual damages (if any). Furthermore, Tenant hereby knowingly, voluntarily and intentionally waives any right it may have to seek punitive, consequential, special and indirect damages from Landlord and any of such Landlord's direct and indirect members, partners, shareholders, officers, directors, employees and agents of Landlord and its successors or assigns with respect to any matter arising out of or in connection with this Lease or any document contemplated herein or related hereto. The waiver by Tenant of any right it may have to seek punitive, consequential, special and indirect damages has been negotiated by the parties hereto and is an essential aspect of their bargain. Except as otherwise set forth in this Lease, Landlord hereby knowingly, voluntarily and intentionally waives any right it may have to seek punitive, consequential, special and indirect damages from and any of such Tenant's direct and indirect members, partners, shareholders, officers, directors, employees and agents of Tenant and its successors or assigns with respect to any matter arising out of or in connection with this Lease or any document contemplated herein or related hereto.

35.     **ENTIRE AGREEMENT**.

This Lease represents the entire agreement and understanding between Landlord and Tenant with respect to the subject matter herein, and there are no representations, understandings, stipulations, agreements or promises not incorporated in writing herein.

36.  **AMENDMENTS**.

No amendments or modifications of this Lease shall be effective unless such amendment or modification is in writing and executed and delivered by and between Tenant and Landlord, nor shall any custom, practice or course of dealing between the parties be construed to waive the right to require specific performance by the other party in compliance with this Lease.

37.  **LEGAL INTERPRETATION**.

Each of Landlord and Tenant hereby agree that the State of North Carolina has a substantial relationship to the parties and to the underlying transaction embodied hereby, and in all respects (including, without limiting the foregoing, matters of construction, validity and performance), this Lease and the obligations arising hereunder shall be governed by, and construed in accordance with, the laws of the State of North Carolina applicable to contracts made and performed therein and all applicable law of the United States of America; except that, at all times, the provisions for the creation of the leasehold estate created by this Lease, enforcement of Landlord's rights and remedies with respect to right of re-entry and repossession, surrender, delivery, ejectment, dispossession, eviction or other in-rem proceeding or action regarding each Site pursuant to Section 25 hereunder shall be governed by and construed according to the Laws of the State in which such Site is located, it being understood that, to the fullest extent permitted by law of such State where such Site is located, the law of the State of North Carolina shall govern the validity and enforceability of this Lease, and the obligations arising hereunder.  To the fullest extent permitted by law, Tenant and Landlord hereby unconditionally and irrevocably waive any claim to assert that the law of any other jurisdiction governs this Lease.  Words of any gender shall be construed to include any other gender, and words in the singular number shall be construed to include the plural, unless the context otherwise requires.  The headings of the sections have been inserted for convenience only and are not to be considered in any way in the construction or interpretation of this Lease.  Except as otherwise herein expressly provided, the terms of this Lease shall apply to, inure to the benefit of, and be binding upon, the parties and their respective assigns, successors and legal representatives.  Any legal suit, action or proceeding against Tenant arising out of or relating to this Lease may be instituted in any federal court in the Northern District of Illinois or state court sitting in Cook County, State of Illinois, and Landlord and Tenant each waives any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding in such federal district or county and state, and Landlord and Tenant each hereby expressly and irrevocably submits to the jurisdiction of any such court in any suit, action or proceeding. In this Lease, the words "include", "includes" or "including" mean "include without limitation", "includes without limitation" and "including without limitation", respectively, and the words following "include", "includes" or "including" shall not be considered to set forth an exhaustive list.

38.  **OPTION TO RENEW**.

A. Tenant shall have the right, at its election made in its sole discretion, to extend the Term (the "**Renewal Option**") for the additional periods set forth in Section 1.E (each, a "**Renewal Term**"), provided that each of the following occurs:

    1. Landlord receives irrevocable written notice of exercise of the Renewal Option (the "**Renewal Notice**"), not less than twelve (12) full months but not greater than eighteen (18) full months prior to the expiration of the then existing Term (or Renewal Term, as case may be); and

    2. There is no uncured Event of Default beyond any applicable notice and cure period at the time that Tenant delivers the Renewal Notice or at the time Tenant delivers its Renewal Notice.

B. The Renewal Term shall be upon the same terms and conditions as in this Lease except Base Rent for the first year of the applicable Renewal Term shall be equal to one hundred two percent (102%) of the Base Rent for the year immediately preceding the first year of the applicable Renewal Term. The Base Rent shall increase by two percent (2%) annually during each Renewal Term.

C. If Tenant is entitled to and properly exercises its Renewal Option, Landlord and Tenant shall execute an amendment (the "**Renewal Amendment**") to reflect changes in the Base Rent, the Term, the Expiration Date and other appropriate terms; provided that an otherwise valid exercise of the Renewal Option shall be fully effective whether or not the Renewal Amendment is executed. During any validly exercised Renewal Term, references to the Term in this Lease shall mean and refer to the Term as extended by the Renewal Term.

39. **AUTHORITY TO ENTER INTO LEASE**.

Each of Tenant and Landlord represents and warrants (a) that the individual executing this Lease on its behalf is duly authorized to execute and deliver this Lease on behalf of the corporation, limited liability company or partnership, as the case may be, and (b) that this Lease is binding on the corporation, limited liability company and the partnership in accordance with its terms.

40. **PARTIES BOUND**.

The preparation and submission of a draft of this Lease by either party to the other party shall not constitute an offer, nor shall either party be bound to any terms of this Lease or the entirety of this Lease, until both parties have fully executed a final document. Until such time as described in the previous sentence, either party is free to terminate negotiations without penalty or any further obligation to the other party.

41. **COUNTERPARTS; ELECTRONIC SIGNATURES**.

This Lease may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become a binding agreement when one or more counterparts have been signed by each of the parties and delivered to the other party. Signatures to this Lease, any amendment hereof and any notice given hereunder, delivered electronically via .pdf, .jpeg, .TIF, .TIFF or similar electronic format shall be deemed an original signature and fully effective as such for all purposes. Each party agrees to deliver promptly an executed original of this Lease (and any amendment hereto) with its actual signature to the other party, but a failure to do so shall not affect the enforceability of this Lease (or any amendment hereto), it being expressly agreed that each party to this Lease shall be bound by its own electronically transmitted signature and shall accept the electronically transmitted signature of the other party to this Lease.

42. **SEVERABILITY**.

If any term or other provision of this Lease is invalid, illegal, or incapable of being enforced by any rule of law or public policy, all of the other conditions and provisions of this Lease will nevertheless remain in full force and effect. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Lease so as to reflect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

43. **WAIVER OF JURY TRIAL; CONSEQUENTIAL DAMAGES**.

LANDLORD AND TENANT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY. THIS WAIVER BY THE PARTIES HERETO OF ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

44. **MEMORANDUM OF LEASE**. This Lease shall not be recorded, either independently or as an exhibit, schedule, annex, or addendum to any other document. However, at Tenant's or Landlord's election, a Memorandum of Lease in the form annexed hereto as **Exhibit E,** shall be executed, acknowledged and delivered for recording in the county in which any Site is located by both parties with the costs of recording the Memorandum of Lease to be borne by Tenant. Tenant shall execute, acknowledge and deliver to Landlord a release of the Memorandum of Lease in recordable form within five (5) days following the expiration or earlier termination of this Lease in accordance with its terms. If Tenant fails to so execute, acknowledge and deliver the release within such five (5) day period, Landlord shall hereby be deemed to be Tenant's attorney-in-fact for the sole purpose of executing and recording the release on behalf of Tenant. Tenant shall pay any and all recording and other costs, fees and taxes in connection with the execution and recordation of the Memorandum of Lease.

45. **BROKERS**. Tenant warrants that it has had no dealings with any broker or agent in connection with this Lease. Tenant covenants and agrees to pay, hold harmless and indemnify Landlord and Landlord Mortgagee for any compensation, commissions and charges claimed by any other broker or agent with respect to this Lease, based on Tenant's actions. Landlord covenants and agrees to pay, hold harmless and indemnify Tenant for any compensation, commissions and charges claimed by any broker or agent with respect to this Lease, based on Landlord's actions.

46. **RIGHT OF FIRST REFUSAL TO PURCHASE**.

Provided that no Event of Default has occurred and is continuing under this Lease, commencing and effective from and after the date that is six (6) years after the Effective Date, Tenant shall, during the Term, have a right of first refusal ("**Right of First Refusal**") to purchase the Property from Landlord pursuant to the terms of this Section 46. The Right of First Refusal is subject to the following terms and conditions:

A. If Landlord receives a bona fide written offer from a third party to purchase the Property, and Landlord desires to accept such offer, Landlord shall give Tenant written notice thereof, including the stated purchase price and other material economic terms (if any), which notice may include the applicable letter of intent, purchase and sale agreement or a similar document reflecting the material terms of such offer from such third party ("**Landlord's Notice**").

B. Tenant may then deliver to Landlord written notice of its election ("**Tenant's Purchase Election**") to purchase the Property on the terms described in Landlord's Notice on or before the date that is ten (10) business days after delivery by Landlord to Tenant of Landlord's Notice (the "**Exercise Period**").

C. Upon Landlord's receipt of Tenant's Purchase Election, the parties shall negotiate reasonably and in good faith for a period of fifteen (15) days (the "**Negotiation Period**") in order to finalize and execute a mutually acceptable purchase and sale agreement setting forth such terms (the "**Contract**"), it being agreed that, if Landlord's Notice included a purchase and sale agreement negotiated by Landlord with the applicable third party, then Tenant shall be required to accept such purchase and sale agreement (with solely ministerial changes to reflect Tenant (or its designee) as purchaser) as the Contract.  In the event a Contract is not executed by the parties prior to the expiration of the Negotiation Period, then Tenant shall be deemed to have waived the Right of First Refusal to purchase the Property under the terms of Landlord's Notice and Landlord shall thereafter have the right to enter into a purchase and sale agreement with a third party for the Property on terms and conditions of the Landlord's Notice or any other terms and conditions, subject to Section 46.E, and consummate the sale of the Property pursuant thereto.

55

D.  If Tenant does not deliver a Tenant's Purchase Election prior to the expiration of the Exercise Period, then Tenant shall be deemed to have waived the Right of First Refusal to purchase the Property under the terms of Landlord's Notice, and Landlord shall thereafter have the right to enter into a purchase and sale agreement with a third party for the Property on terms and conditions of the Landlord's Notice or any other terms and conditions, subject to Section 46.E, and consummate the sale of the Property pursuant thereto.

E.  In the event that Tenant declines or waives (or is deemed to have waived) its Right of First Refusal to purchase the Property pursuant to this Section 46, Landlord shall have the right to sell the Property and Tenant shall not have a further Right of First Refusal unless (i) there shall be a material decrease in the purchase price from the purchase price provided in the initial Landlord's Notice or (ii) the other material economic terms of such sale (taken as a whole) are materially more favorable to the third-party purchaser as compared to those set forth in the initial Landlord's Notice. For the purposes of this Section 46.E, a "**material decrease**" shall mean a decrease of ten (10%) percent or more of the purchase price for the Property in the Landlord's Notice.  Notwithstanding the foregoing, Landlord shall re-institute the procedure set forth in this Article 46 if Landlord fails to (x) execute and deliver a bona fide contract with a third party for the proposed sale within one hundred eighty (180) days after Tenant declines or waives (or is deemed to have waived) its Right of First Refusal to purchase the Property or (y) consummate the proposed sale pursuant to such contract.

F.  Tenant's Right of First Refusal pursuant to this Article 46 shall be a one-time right, and, accordingly, if Tenant declines or waives (or is deemed to have waived) its Right of First Refusal to purchase the Property pursuant to this Article 46 and the sale of the Property by Landlord is subsequently consummated pursuant to this Article 46, then, thereafter, the terms and conditions of this Article 46 shall automatically be of no further force or effect.

G.  Notwithstanding anything herein to the contrary, Tenant's right to purchase the Property pursuant to this Article 46 is and shall be subject and subordinate to any Landlord Mortgage and shall not be applicable to any foreclosure sale, transfer by deed-in-lieu of foreclosure or similar transfer of the Property or to any subsequent transfer or sale of the Property by any Landlord Mortgagee or its nominee, in each case, whether such transfer or sale affects the Property or the ownership interests in Landlord.

47.  **GUARANTY**. Simultaneously with the execution of this Lease, Tenant shall deliver to Landlord a fully executed copy of the Amended and Restated Unconditional Guaranty of Payment and Performance in the form attached hereto as **Exhibit G** (the "**Guaranty**") signed by the Guarantor named in Section 2 hereof.

56

48.     **REIT PROTECTION.** The parties hereto intend that Rent and other amounts paid by Tenant hereunder will qualify as "rents from real property" within the meaning of Section 856(d) of the Code, or any similar or successor provision thereto and this Lease shall be interpreted consistent with this intent.

A.      Anything contained in this Lease to the contrary notwithstanding, Tenant shall not without Landlord's advance written consent (which consent shall not be unreasonably withheld) (i) sublet, assign or enter into a management arrangement for the Leased Property on any basis such that the rental or other amounts to be paid by the subtenant, assignee or manager thereunder would be based, in whole or in part, on either (x) the income or profits derived by the business activities of the subtenant, assignee or manager or (y) any other formula such that any portion of any amount received by Landlord would fail to qualify as "rents from real property" within the meaning of Section 856(d) of the Code, or any similar or successor provision thereto; (ii) furnish or render any services to the subtenant, assignee or manager or manage or operate the Leased Property so subleased, assigned or managed; (iii) sublet, assign or enter into a management arrangement for the Leased Property to any Person (other than a "taxable REIT subsidiary" (within the meaning of Section 856(l) of the Code) of OSREC) in which Landlord or OSREC owns an interest, directly or indirectly (by applying constructive ownership rules set forth in Section 856(d)(5) of the Code); or (iv) sublet, assign or enter into a management arrangement for the Leased Property in any other manner which could cause any portion of the amounts received by Landlord pursuant to this Lease or any sublease to fail to qualify as "rents from real property" within the meaning of Section 856(d) of the Code, or any similar or successor provision thereto, or which could cause any other income of Landlord to fail to qualify as income described in Section 856(c)(2) of the Code. The requirements of this Section 48(A) shall likewise apply to any further subleasing by any subtenant.

B.      Anything contained in this Lease to the contrary notwithstanding, the parties acknowledge and agree that Landlord, in its sole discretion, may assign this Lease or any interest herein to another Person (including without limitation, a "taxable REIT subsidiary" (within the meaning of Section 856(l) of the Code)) in order to maintain Landlord's status as a "real estate investment trust" (within the meaning of Section 856(a) of the Code); provided, however, Landlord shall be required to (i) comply with any applicable legal requirements related to such transfer and (ii) give Tenant notice of any such assignment; and provided, further, that any such assignment shall be subject to all of the rights of Tenant hereunder.

C.      Anything contained in this Lease to the contrary notwithstanding, upon request of Landlord, Tenant shall cooperate with Landlord in good faith and at no cost or expense to Tenant, and provide such documentation and/or information as may be in Tenant's possession or under Tenant's control and

57

otherwise readily available to Tenant as shall be reasonably requested by Landlord in connection with verification of OSREC's "real estate investment trust" (within the meaning of Section 856(a) of the Code) compliance requirements. Anything contained in this Lease to the contrary notwithstanding, Tenant shall take such reasonable action as may be requested by Landlord from time to time in order to ensure compliance with the Internal Revenue Service requirement that Rent allocable for purposes of Section 856 of the Code to personal property, if any, at the beginning and end of a calendar year does not exceed fifteen percent (15%) of the total Rent due hereunder as long as such compliance does not (i) increase Tenant's monetary obligations under this Lease or (ii) materially and adversely increase Tenant's nonmonetary obligations under this Lease or (iii) materially diminish Tenant's rights under this Lease.

D. Tenant acknowledges that Landlord's direct or indirect parent intends to qualify as a "real estate investment trust" (within the meaning of Section 856(a) of the Code). Tenant agrees that it will not knowingly or intentionally take or omit to take any action, or permit any status or condition to exist at the Leased Property, which Tenant actually knows (acting in good faith) would or could result in the Rent payable under this Lease not qualifying as "rents from real property" within the meaning of Section 856(d) of the Code.

49. **LOCAL LAW PROVISIONS**.

A. **Louisiana**. With respect to any portion of the Premises located in the State of Louisiana, but without limiting the choice of law provisions set forth in this Lease:

1. Louisiana Terminology. The term "real property;" shall mean immovable property; the term "fee simple"• shall mean full ownership; the term "personal property" shall mean movable property; the term "easement" shall mean servitude; the term "buildings" shall include other constructions; the term "fixtures" shall mean "component parts;" the term "county" shall mean parish; the terms "deed in lieu of foreclosure, conveyance in lieu of foreclosure" and words of similar import shall mean a dation en paiement; the term "tenancy at sufferance" shall mean a month to month tenancy and/or a reconducted lease; and the term "eminent domain" shall include "expropriation".

2. Additional Remedies Upon Tenant's Default. In addition to the remedies set forth in Section 25 above, upon the occurrence of an Event of Default by Tenant, Landlord shall have the right and privilege to terminate this Lease and declare the entire unpaid rent for the unexpired term of this Lease immediately due and payable and recover from Tenant all amounts which Landlord would have

58

received as rentals under the terms of this Lease had Tenant fully and properly performed Tenant's obligations hereunder, together with all costs and reasonable attorney's fees. If Tenant fails or refuses to permit Landlord to lawfully re-enter the Premises in the Event of Default, Landlord shall have the right to eject Tenant in accordance with the provisions of Louisiana Code of Civil Procedure, Articles 4701 -4735, without forfeiting any of Landlord's rights under the other terms of this Lease, and Landlord may at the same time or subsequently sue for any money due or to enforce any other rights which Landlord may have. Following an Event of Default, Tenant shall remain responsible for all damages or losses suffered by Landlord for which Tenant is responsible. Tenant waives any requirement of "putting in default" for any such breach, except as expressly required by this Lease.

3.    <u>Waiver of Notice to Vacate</u>. Upon termination of Tenant's right of occupancy under the terms of this Lease, Landlord or its agent may immediately institute eviction proceedings in accordance with Chapter 2 of Title XI of the Louisiana Code of Civil Procedure. Tenant specifically waives all notices to vacate, including but not limited to the notice to vacate specified in Louisiana Civil Code of Procedure Article 4701, or any successor provision of law.

4.    <u>Waiver of Claim for Compensation</u>. Subject to the terms and provisions of Sections 19 and 20, Tenant waives any and all claims for payment or other compensation, whether during the Term or any Renewal Term or at the termination of the Lease, for the loss of ownership to Landlord of any property located in or on the Land, including without limitation (i) any buildings, improvements or other constructions, or (ii) any things incorporated in or attached so as to become a component part of the immovable property.§§ 30:2171-2206), the Louisiana Inactive and Abandoned Hazardous Substance Remedial Action Act (La. R.S. §§ 30:2271-2281), the Louisiana Hazardous Material Information Development, Preparedness, and Response Act (La, R.S. §§ 30:2361-2379) and the Louisiana Oil Spill Prevention and Response Act (La. R.S. §§ 30:2451-2496).

5.    <u>Assumption of Responsibility by Tenant</u>. In accordance with La. R.S. 9:3221, Tenant hereby assumes full responsibility for the condition of the Premises, all buildings and improvements now or hereafter located thereon and all component parts thereof. Accordingly, Landlord shall have no liability for injury caused by any defect therein to Tenant or anyone on the Premises who derives his or her right to be thereon from Tenant, other than arising from the gross negligence or willful misconduct of Landlord or Landlord's agents, contractors or employees.

59

6. <u>Light and View</u>. This Lease does not entitle Tenant to rights of light or view and Tenant shall not be entitled to terminate this Lease, reduce the rent or exercise any other right or remedy by reason of the deprivation thereof.

7. <u>Environmental Laws</u>. The defined term "Environmental law" or "environmental laws" shall include, but not be limited to, the "Louisiana Environmental Quality Act", La. R.S. § 30:2001 et seq. and its chapters, including the Louisiana Air Control Law (La. R.S. §§ 30:2051-2064), the Louisiana Water Control Law (La. R.S. §§ 30:2071-2088), the Louisiana Solid Waste Management and Resource Recovery Law (La. R.S. §§ 30:2151-2161), the Louisiana Hazardous Waste Control Law (La. R.S.§§30:2171-2206), the Louisiana Inactive and Abandoned Hazardous Waste Site Law (La. R.S. §§ 30:2221-2226), the Liability for Hazardous Substance Remedial Action Act (La. R.S. §§ 30:2271-2281), the Louisiana Hazardous Material Information Development, Preparedness, and Response Act (La, R.S. §§ 30:2361-2379) and the Louisiana Oil Spill Prevention and Response Act (La. R.S. §§ 30:2451-2496).

8. <u>No Encumbrances</u>. Tenant shall have no authority or power, express or implied, to create or cause any mechanic's or materialmen's lien, charge or encumbrance of any kind against the Premises or the Property or any portion thereof. Neither Landlord's consent (nor contribution, if any) to the performance, scope or cost of any work to be performed by or on behalf of Tenant shall make Landlord liable for or subject Landlord's interest in the Premises or the Property to any claims granted by the provisions of La. R.S. § 9:4801 et seq. (as the same may be amended, revised, recodified, replaced or supplemented from time to time), and Landlord expressly disclaims any such liability or claims. Louisiana Terminology. The term "real property" shall mean immovable property; the term "fee simple" shall mean full ownership; the term "personal property" shall mean movable property; the term "easement" shall mean servitude; the term "buildings" shall include other constructions; the term "fixtures" shall mean "component parts;" the term "county" shall mean parish; the terms "deed in lieu of foreclosure," "conveyance in lieu of foreclosure" and words of similar import shall mean a dation en paiement; the term "tenancy at sufferance" shall mean a month to month tenancy and/or a reconducted lease; and the term "eminent domain" shall include "expropriation".

B. **North Carolina**. With respect to any portion of the Premises located in the State of North Carolina, but without limiting the choice of law provisions set forth in this Lease, if Tenant contemplates or undertakes any improvements to the real property for any of the Sites located in the State

of North Carolina, the cost of which undertakings are $30,000 or more, either at the time that the original building permit is issued or, in cases in which no building permit is required, at the time the contract for the improvements is entered into with the Tenant, Tenant as owner shall designate a lien agent no later than the time the owner first contracts with any person to improve the real property pursuant to the provisions of N.C. Gen. Stat. §§44A-11.1 et seq.

C.   **Texas**. With respect to any portion of the Premises located in the State of Texas, but without limiting the choice of law provisions set forth in this Lease:

1.   CALCULATION OF CHARGES.   Landlord and Tenant are knowledgeable and experienced in commercial transactions and agree that the provisions set forth in this Lease for determining charges, amounts and additional rent payable by Tenant are commercially reasonable and valid even though such methods may not state a precise mathematical formula for determining such charges. ACCORDINGLY, TENANT HEREBY VOLUNTARILY AND KNOWINGLY WAIVES ALL RIGHTS AND BENEFITS OF TENANT UNDER SECTION 93.012 OF THE TEXAS PROPERTY CODE, AS SUCH SECTION NOW EXISTS OR AS MAY BE HEREAFTER AMENDED OR SUCCEEDED.

2.   WAIVER OF DTPA. TENANT HEREBY WAIVES ITS RIGHTS UNDER THE DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT, SECTION 17.41 ET. SEQ., BUSINESS & COMMERCE CODE, A LAW THAT GIVES CONSUMERS SPECIAL RIGHTS AND PROTECTIONS.   AFTER CONSULTATION WITH AN ATTORNEY OF TENANT'S OWN SELECTION, TENANT VOLUNTARILY CONSENTS TO THIS WAIVER.

3.   WAIVER OF RIGHT TO PROTEST.   TENANT HEREBY WAIVES ANY AND ALL RIGHTS UNDER SECTION 41.413 AND 42.015 OF THE TEXAS TAX CODE GRANTING TO TENANT THE RIGHT TO CONTEST APPRAISED VALUES, OR TO RECEIVE NOTICE OF REAPPRAISED VALUES, ON ALL OR ANY PORTION OF THE BUILDING IRRESPECTIVE OF WHETHER LANDLORD HAS ELECTED TO CONTEST SAME.  To the extent such waiver is prohibited by applicable law, Tenant hereby appoints Landlord as Tenant's attorney in fact, coupled with an interest, to appear and take all actions on behalf of Tenant which Tenant may have under said Section of the Texas Tax Code with respect to the Building, but not with respect to Tenant's personal property located within the Premises.

61

4. <u>WAIVER OF LIEN</u>. TENANT WAIVES ALL LIEN RIGHTS UNDER SECTION 91.004 OF THE TEXAS PROPERTY CODE, AS WELL AS ANY SUCCESSOR STATUTE GRANTING TENANT A LIEN IN LANDLORD'S PROPERTY.

**[Signatures on following page]**

**IT WITNESS WHEREOF,** the undersigned have executed this Amended and Restated Master Lease Agreement effective as of the date first written above.

LANDLORD:

**MOUNTAIN PORTFOLIO OWNER LLC,**
a Delaware limited liability company

By:_____
Name: Michael Reiter
Title: Authorized Representative

STATE OF __Illinois__   )
                        )   SS.
COUNTY OF __Cook__   )

The foregoing instrument was acknowledged before me this _____ day of December 2022 by Michael Reiter the Authorized Representative of Mountain Portfolio Owner LLC, a Delaware limited liability company, on behalf of such company. This is an acknowledgement, and no oath or affirmation was administered to the signer of this instrument.

HEATHER PATRICIA BEAR
Official Seal
Notary Public - State of Illinois
My Commission Expires Feb 10, 2024

_____
Notary Public

[Signatures Continue on Next Page]

**MOUNTAIN PORTFOLIO OWNER AR LLC,**
a Delaware limited liability company

By: _____

Name: Michael Reiter
Title: Authorized Representative

STATE OF __Illinois__ )
                           )    SS.
COUNTY OF __Cook__ )

The foregoing instrument was acknowledged before me this _____ day of December 2022 by Michael Reiter the Authorized Representative of Mountain Portfolio Owner AR LLC, a Delaware limited liability company, on behalf of such company. This is an acknowledgement, and no oath or affirmation was administered to the signer of this instrument.

> HEATHER PATRICIA BEAR
> Official Seal
> Notary Public - State of Illinois
> My Commission Expires Feb 10, 2024

_____
Notary Public

[Signatures Continue on Next Page]

**MOUNTAIN PORTFOLIO OWNER LA LLC,**
a Delaware limited liability company

By:_____
Name: Michael Reiter
Title: Authorized Representative

STATE OF ___Illinois___    )
                         )    SS.
COUNTY OF __Cook__   )

The foregoing instrument was acknowledged before me this _____ day of December 2022 by Michael Reiter the Authorized Representative of Mountain Portfolio Owner LA LLC, a Delaware limited liability company, on behalf of such company. This is an acknowledgement, and no oath or affirmation was administered to the signer of this instrument.

HEATHER PATRICIA BEAR
Official Seal
Notary Public - State of Illinois
My Commission Expires Feb 10, 202..

_____
Notary Public

HEATHER PATRICIA BEAR
Official Seal
Notary Public - State of Illinois
My Commission Expires Feb 10, 2024

[Signatures Continue on Next Page]

**MOUNTAIN IRTX001 LLC,**
a Delaware limited liability company

By:_____

Name: Michael Reiter
Title: Authorized Representative

STATE OF __Illinois__ )
                                )    SS.
COUNTY OF __Cook__ )

     The foregoing instrument was acknowledged before me this _____ day of December 2022 by Michael Reiter the Authorized Representative of Mountain IRTX001 LLC, a Delaware limited liability company, on behalf of such company. This is an acknowledgement, and no oath or affirmation was administered to the signer of this instrument.

HEATHER PATRICIA BEAR
Official Seal
Notary Public - State of Illinois
My Commission Expires Feb 10, 2024

_____
Notary Public

[Signatures Continue on Next Page]

**MOUNTAIN DATX002 LLC,**
a Delaware limited liability company

By: _____

Name: Michael Reiter
Title: Authorized Representative

STATE OF __Illinois__ )
                       )    SS.
COUNTY OF __Cook__ )

The foregoing instrument was acknowledged before me this _____ day of December 2022 by Michael Reiter the Authorized Representative of Mountain DATX002 LLC, a Delaware limited liability company, on behalf of such company. This is an acknowledgement, and no oath or affirmation was administered to the signer of this instrument.

> HEATHER PATRICIA BEAR
> Official Seal
> Notary Public - State of Illinois
> My Commission Expires Feb 10, 2024

_____
Notary Public

[Signatures Continue on Next Page]

**MOUNTAIN DATX004 LLC,**
a Delaware limited liability company

By:_____

Name: Michael Reiter
Title: Authorized Representative

STATE OF ___Illinois___  )
                           )    SS.
COUNTY OF __Cook__  )

The foregoing instrument was acknowledged before me this _____ day of December 2022 by Michael Reiter the Authorized Representative of Mountain DATX004 LLC, a Delaware limited liability company, on behalf of such company. This is an acknowledgement, and no oath or affirmation was administered to the signer of this instrument.

> HEATHER PATRICIA BEAR
> Official Seal
> Notary Public - State of Illinois
> My Commission Expires Feb 10, 2024

_____
Notary Public

[Signatures Continue on Next Page]

**MOUNTAIN DATX005 LLC,**
a Delaware limited liability company

By:_____

Name: Michael Reiter
Title: Authorized Representative

STATE OF __Illinois__ )
                           )    SS.
COUNTY OF __Cook__ )

       The foregoing instrument was acknowledged before me this _____ day of December 2022 by Michael Reiter the Authorized Representative of Mountain DATX005 LLC, a Delaware limited liability company, on behalf of such company. This is an acknowledgement, and no oath or affirmation was administered to the signer of this instrument.

> HEATHER PATRICIA BEAR
> Official Seal
> Notary Public - State of Illinois
> My Commission Expires Feb 10, 2024

_____
Notary Public

[Signatures Continue on Next Page]

**MOUNTAIN METX001 LLC,**
a Delaware limited liability company

By: _____

Name: Michael Reiter
Title: Authorized Representative

STATE OF __Illinois__ )
                        )    SS.
COUNTY OF __Cook__ )

The foregoing instrument was acknowledged before me this _____ day of December 2022 by Michael Reiter the Authorized Representative of Mountain METX001 LLC, a Delaware limited liability company, on behalf of such company. This is an acknowledgement, and no oath or affirmation was administered to the signer of this instrument.

| HEATHER PATRICIA BEAR |
| Official Seal |
| Notary Public - State of Illinois |
| My Commission Expires Feb 10, 2024 |

_____
Notary Public

[Signatures Continue on Next Page]

**MOUNTAIN PORTFOLIO OWNER NC LLC,**
a Delaware limited liability company

By: _____

Name: Michael Reiter
Title: Authorized Representative

STATE OF __Illinois__ )
                        )    SS.
COUNTY OF __Cook__ )

The foregoing instrument was acknowledged before me this _____ day of December 2022 by Michael Reiter the Authorized Representative of Mountain Portfolio Owner NC LLC, a Delaware limited liability company, on behalf of such company. This is an acknowledgement, and no oath or affirmation was administered to the signer of this instrument.

HEATHER PATRICIA BEAR
Official Seal
Notary Public - State of Illinois
My Commission Expires Feb 10, 2024

_____
Notary Public

[Signatures Continue on Next Page]

TENANT:

**MOUNTAIN EXPRESS OIL COMPANY,**
a Georgia corporation

By: _____

Name: _____Turjo Wadud_____

Title: _____CEO_____

STATE OF _____GEORGIA_____ )
                                                    )     SS.
COUNTY OF _FULTON_____ )

     The foregoing instrument was acknowledged before me this ___15th___ day of _December_202_2_ by ____Turjo Wadud_____ the _____CEO_____ of _Mountain Express Oil Company_ a _Georgia corporation_ limited liability company, on behalf of such company. This is an acknowledgement, and no oath or affirmation was administered to the signer of this instrument.

Notary Public _____

[Signatures Continue on Next Page]

**WEST HILL RANCH GROUP LLC,**
a ~~Michigan~~ limited liability company
*Delaware*

By: _____,
its _____

By: _____
Name: Brandon Frampton
Title: Manager

STATE OF ___GEORGIA___ )
                      )    SS.
COUNTY OF _FULTON_ )

The foregoing instrument was acknowledged before me this __20__ day of __Dec.__ 2022 by __Brandon Frampt__ the __Manager__ of __West Hill Ranch Group, LLa Delaware LLC__ limited liability company, on behalf of such company. This is an acknowledgement, and no oath or affirmation was administered to the signer of this instrument.

Notary Public

[End of Signatures]

**WEST HILL RANCH GROUP LLC,**
a ~~Michigan~~ limited liability company
*Delaware*

By: _____,
    its _____

By: _____
Name: Brandon Frampton
Title: Manager

STATE OF _____GEORGIA_____ )
                        )    SS.
COUNTY OF __FULTON__ )

    The foregoing instrument was acknowledged before me this __20__ day of __Dec.__ 2022 by _Brandon Frampt_ the __Manager__ of _West Hill Ranch Group, LLa Delaware LLC_ limited liability company, on behalf of such company. This is an acknowledgement, and no oath or affirmation was administered to the signer of this instrument.

_____
Notary Public

[End of Signatures]

## SCHEDULE I
## TO
## AMENDED AND RESTATED MASTER LEASE AGREEMENT

### LANDLORD AND TENANT ENTITIES

| Street | City | State | Zip Code | Landlord | Tenant |
|---|---|---|---|---|---|
| 17013 State Road 37 | Harlan | IN | 46743 | Mountain Portfolio Owner LLC | Mountain Express Oil Company |
| 8717 US Hwy 24 | Fort Wayne | IN | 46804 | Mountain Portfolio Owner LLC | Mountain Express Oil Company |
| 4832 South Calhoun Road | Fort Wayne | IN | 46807 | Mountain Portfolio Owner LLC | Mountain Express Oil Company |
| 143 West Tully Street | Convoy | OH | 45832 | Mountain Portfolio Owner LLC | Mountain Express Oil Company |
| 5777 Ottawa Road | Lima | OH | 45807 | Mountain Portfolio Owner LLC | Mountain Express Oil Company |
| 602 East Perry Street | Paulding | OH | 45879 | Mountain Portfolio Owner LLC | Mountain Express Oil Company |
| 204 West East Main Street | Deshler | OH | 43516 | Mountain Portfolio Owner LLC | Mountain Express Oil Company |
| 305 East Main Street | McComb | OH | 45858 | Mountain Portfolio Owner LLC | Mountain Express Oil Company |
| 203 US Highway 62 | Alpena | AR | 72611 | Mountain Portfolio Owner AR LLC | Mountain Express Oil Company |
| 330 East Main Street | Gassville | AR | 72635 | Mountain Portfolio Owner AR LLC | Mountain Express Oil Company |
| 901 South College Street | Mountain Home | AR | 72653 | Mountain Portfolio Owner AR LLC | Mountain Express Oil Company |
| 1508 Highway 62 | Mountain Home | AR | 72653 | Mountain Portfolio Owner AR LLC | Mountain Express Oil Company |
| 700 US 64 East | Wynne | AR | 72396 | Mountain Portfolio Owner AR LLC | Mountain Express Oil Company |
| 702 Central Boulevard | Bull Shoals | AR | 72619 | Mountain Portfolio Owner AR LLC | Mountain Express Oil Company |
| 6132 AR-5 | Midway | AR | 72651 | Mountain Portfolio Owner AR LLC | Mountain Express Oil Company |
| 703 East Main Street | Flippin | AR | 72634 | Mountain Portfolio Owner AR LLC | Mountain Express Oil Company |
| 1580 South College Street | Mountain Home | AR | 72653 | Mountain Portfolio Owner AR LLC | Mountain Express Oil Company |
| 433 Albemarle Road | Troy | NC | 27371 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 6555 Highway 52 North | Welcome | NC | 27374 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 511 East Main Street | Biscoe | NC | 27209 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 512 West Main Street | Locust | NC | 28097 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 481 US Highway 1 South | Rockingham | NC | 28379 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 3233 Wow Road | Randleman | NC | 27317 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 530 North Main Street | Troy | NC | 27371 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 1634 Zoo Parkway | Asheboro | NC | 27205 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 103 South Main Street | Candor | NC | 27229 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 527 Old Liberty Road | Asheboro | NC | 27203 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 231 South Main Street | Star | NC | 27356 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 2655 North Church Street | Haw River | NC | 27258 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |

| | | | | | |
|---|---|---|---|---|---|
| 434 Little River Road | Seagrove | NC | 27341 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 11126 N NC Highway 150 | Winston-Salem | NC | 27127 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 100 Highway 52 South | Albemarle | NC | 28001 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 515 East Main Street (109 Hillview Extension) | Candor | NC | 28078 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 713 Main Street | Oakboro | NC | 28129 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 4416 South NC 150 | Lexington | NC | 27295 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 7039 Jordan Road | Ramseur | NC | 27316 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 2003 North Fayetteville Street | Asheboro | NC | 27203 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 315 Randolph Street | Thomasville | NC | 27360 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 800 Bryan Road | Thomasville | NC | 27360 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 1011 Liberty Road | Archdale | NC | 27263 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 2271 Main Street | Ellerbe | NC | 28338 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 402 West Swannanoa Street | Liberty | NC | 27298 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 1050 Albemarle Road | Troy | NC | 27371 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 100 West NC Highway 705 | Robbins | NC | 27325 | Mountain Portfolio Owner NC LLC | West Hill Ranch Group LLC |
| 11765 Crossett Road | Bastrop | LA | 71220 | Mountain Portfolio Owner LA LLC | Mountain Express Oil Company |
| 433 Highway 577 South | Delhi | LA | 71232 | Mountain Portfolio Owner LA LLC | Mountain Express Oil Company |
| 1601 Farmville Highway/I-20 | Ruston | LA | 71270 | Mountain Portfolio Owner LA LLC | Mountain Express Oil Company |
| 200 S Main Street | Junction City | LA | 71256 | Mountain Portfolio Owner LA LLC | Mountain Express Oil Company |
| 24605 Highway #2 | Homer | LA | 71749 | Mountain Portfolio Owner LA LLC | Mountain Express Oil Company |
| 1208 Broadway Street | Delhi | LA | 71232 | Mountain Portfolio Owner LA LLC | Mountain Express Oil Company |
| 4243 W. Pioneer Drive | Irving | TX | 75061 | Mountain IRTX001 LLC | Mountain Express Oil Company |
| 110110 Harry Hines Blvd | Dallas | TX | 75080 | Mountain DATX002 LLC | Mountain Express Oil Company |
| 8620 Lake June Rd | Dallas | TX | 75225 | Mountain DATX004 LLC | Mountain Express Oil Company |
| 5001 South Buckner Blvd | Dallas | TX | 75217 | Mountain DATX005 LLC | Mountain Express Oil Company |
| 2600 East Highway 30 | Mesquite | TX | 75217 | Mountain METX001 LLC | Mountain Express Oil Company |

**SCHEDULE II**
**TO**
**AMENDED AND RESTATED MASTER LEASE AGREEMENT**

**ORIGINAL LEASES**

Master Lease dated June 30, 2021, by and between Mountain Express Oil Company, a Georgia corporation, as tenant, and Mountain Portfolio Owner, LLC, a Delaware limited liability company, as landlord

Master Lease dated July 15, 2021, by and between Mountain Express Oil Company, a Georgia corporation, as tenant, and Mountain Portfolio Owner AR LLC, a Delaware limited liability company, as landlord

Master Lease dated September 2, 2021, by and between Mountain Express Oil Company, a Georgia corporation, as tenant, and Mountain Portfolio Owner LA LLC, a Delaware limited liability company, as landlord

Master Lease dated July 22, 2021, by and between West Hill Ranch Group LLC, a Delaware limited liability company, as tenant, and Mountain Portfolio Owner NC LLC, a Delaware limited liability company, as landlord

**EXHIBIT A**
**TO**
**AMENDED AND RESTATED MASTER LEASE AGREEMENT**

**BASE RENT SCHEDULE**

| Lease Year | Annual Base Rent | Monthly Base Rent |
|---|---|---|
| **Initial Term** | | |
| 1 | $ 10,520,215.45 | $ 876,684.62 |
| 2 | $ 10,730,619.76 | $ 894,218.31 |
| 3 | $ 10,945,232.15 | $ 912,102.68 |
| 4 | $ 11,164,136.80 | $ 930,344.73 |
| 5 | $ 11,387,419.53 | $ 948,951.63 |
| 6 | $ 11,615,167.92 | $ 967,930.66 |
| 7 | $ 11,847,471.28 | $ 987,289.27 |
| 8 | $ 12,084,420.71 | $ 1,007,035.06 |
| 9 | $ 12,326,109.12 | $ 1,027,175.76 |
| 10 | $ 12,572,631.30 | $ 1,047,719.28 |
| 11 | $ 12,824,083.93 | $ 1,068,673.66 |
| 12 | $ 13,080,565.61 | $ 1,090,047.13 |
| 13 | $ 13,342,176.92 | $ 1,111,848.08 |
| 14 | $ 13,609,020.46 | $ 1,134,085.04 |
| 15 | $ 13,881,200.87 | $ 1,156,766.74 |
| 16 | $ 14,158,824.89 | $ 1,179,902.07 |
| 17 | $ 14,442,001.38 | $ 1,203,500.12 |
| 18 | $ 14,730,841.41 | $ 1,227,570.12 |
| 19 | $ 15,025,458.24 | $ 1,252,121.52 |
| 20 | $ 15,325,967.40 | $ 1,277,163.95 |
| 21 | $ 15,632,486.75 | $ 1,302,707.23 |
| 22 | $ 15,945,136.49 | $ 1,328,761.37 |
| 23 | $ 16,264,039.22 | $ 1,355,336.60 |
| 24 | $ 16,589,320.00 | $ 1,382,443.33 |
| 25 | $ 16,921,106.40 | $ 1,410,092.20 |
| **Option 1** | | |
| 26 | $ 17,259,528.53 | $ 1,438,294.04 |
| 27 | $ 17,604,719.10 | $ 1,467,059.93 |
| 28 | $ 17,956,813.48 | $ 1,496,401.12 |
| 29 | $ 18,315,949.75 | $ 1,526,329.15 |
| 30 | $ 18,682,268.75 | $ 1,556,855.73 |
| **Option 2** | | |
| 31 | $ 19,055,914.12 | $ 1,587,992.84 |
| 32 | $ 19,437,032.41 | $ 1,619,752.70 |
| 33 | $ 19,825,773.05 | $ 1,652,147.75 |
| 34 | $ 20,222,288.51 | $ 1,685,190.71 |
| 35 | $ 20,626,734.28 | $ 1,718,894.52 |
| **Option 3** | | |
| 36 | $ 21,039,268.97 | $ 1,753,272.41 |
| 37 | $ 21,460,054.35 | $ 1,788,337.86 |
| 38 | $ 21,889,255.44 | $ 1,824,104.62 |
| 39 | $ 22,327,040.55 | $ 1,860,586.71 |
| 40 | $ 22,773,581.36 | $ 1,897,798.45 |

|  | Option 4 |  |
|---|---|---|
| 41 | $ 23,229,052.98 | $ 1,935,754.42 |
| 42 | $ 23,693,634.04 | $ 1,974,469.50 |
| 43 | $ 24,167,506.72 | $ 2,013,958.89 |
| 44 | $ 24,650,856.86 | $ 2,054,238.07 |
| 45 | $ 25,143,874.00 | $ 2,095,322.83 |

**EXHIBIT B-1**
**TO**
**AMENDED AND RESTATED MASTER LEASE AGREEMENT**

**PREMISES**

1. **17103 State Road 37, Harlan, IN**

   Lots Ten (10) and Eleven (11) in Marquit's Addition to the Town of Harlan, Allen County, Indiana the Plat of which is recorded in Plat Book 3, page 43, in the Office of the Recorder of Allen County, Indiana.

2. **8717 US Hwy 24, Fort Wayne, IN**

   Land situated in the County of Allen, State of Indiana, is described as follows:

   PARCEL I:

   Part of the Southeast Quarter of the Southwest Quarter of Section 23, Township 30 North, Range 11 East in Allen County, Indiana, more particularly described as follows, to-wit:

   Commencing at the Intersection of the center line of Ellison Road and the center line of United States Highway #24; thence Southwesterly on said center line of United States Highway #24, 225 feet; thence Southeasterly at right angles to said Center line of United States Highway #24, 70 feet to a point in the South right of way line of said United States Highway #24 for a place of beginning; thence Southeasterly at right angles to said South right of way line of United States Highway #24, 133.55 feet; thence East to meet the aforesaid center line of the Ellison Road at right angles, 72.75 feet; thence North on said center line of Ellison Road, 103 feet; thence West 18 feet to a point in the West line of the Ellison Road, thence Northwesterly 91 feet to a point in aforesaid South right of way line of United States Highway #24, said point being 57 feet distant in a Northeasterly direction from the place of beginning; thence Southwesterly on said South right of way line of United States Highway #24 to the place of beginning, containing 0.315 acres of land, more or less.

   PARCEL II:

   Part of the Southeast Quarter of the Southwest Quarter of Section 23; Township 30 North, Range 11 East in Allen County, Indiana, more particularly described as follows, to-wit:

   Commencing at the intersection of the center line of the Ellison Road and the center line of U.S. Highway #24; thence Southwesterly on said center line of U.S. Highway #24, 225 feet; thence Southeasterly at right angles to said center line of said U.S. Highway #24, 70 feet to a point in the South right of way line of said United States Highway # 24 for a place of beginning; thence Southeasterly at right angles to said South right of way of U.S. Highway #24, 133.55 feet; thence West on a line perpendicular to the aforesaid center line of the Ellison Road,

   59.75 feet; thence Northwesterly 100 feet to meet the aforesaid South right of way line of U.S. Highway #24 at right angles; thence Northeasterly on said South right of way line of United States Highway #24, 50 feet to the place of beginning; containing 0.134 acres of land, more or less;

   Ex. B-1-1

And

Part of the Southeast Quarter of the Southwest Quarter of Section 23, Township 30 North, Range 11 East, Allen County, Indiana, designated on the plat as Tract #3 and more particularly described as follows: commencing at the intersection of the center line of the Ellison Road and the center line of U.S. Highway #24; thence Southwesterly along said center line of U.S. Highway #24, 275 feet; thence Southeasterly at right angles to said center line of U.S. Highway #24, 70 feet to a point in the South right pf way line of said U.S. Highway #24 for a point of beginning; thence Southeasterly at right angles to said South right of way line of U.S. Highway #24, 100 feet; thence East on a line perpendicular to the center line of the Ellison Road aforesaid, 59.75 feet; thence Southwesterly making an included angle of the Tract surveyed of 25 degrees 37 minutes a distance of 100.75 feet; thence by a deflection right of 81 degrees 45 minutes a distance of 119 feet to the South right of way line of U.S. Highway #24 aforesaid; thence Northeasterly along said right of way line 50 feet to the point of beginning; containing 0.156 acres of land, more or less.

3. **4832 S Calhoun Road, Fort Wayne, IN**

The East 100 feet of Lots Numbered 584, 583, 582, and the North 30 feet of the East 100 feet of Lot Number 581 in Belmont Addition to the City of Fort Wayne, as recorded in Plat Book 5, Pages 39-40, in the Office of the Recorder of Allen County, Indiana.

4. **143 West Tully St., Convoy, OH**

Situate in the Village of Convoy, County of Van Wert, and the State of Ohio, to-wit:

In lot Number One Hundred Twenty-Six (126) and Lots Numbered One Hundred Twenty-Seven (127); One Hundred Twenty-Eight (128); One Hundred Twenty-Nine (129); One Hundred Thirty (130) and One Hundred Thirty-One (131).

5. **5777 Ottawa Road, Lima, OH**

Auditor's Parcel No. 27-3100-04-002.001:

Situated in the Township of Monroe, County of Allen and State of Ohio:

Being a parcel of land situate in the Southeast quarter of Section 31, T-2-S, R-7-E, Monroe Township, Allen County, Ohio and part of lands owned by Elizabeth M. Spradlin and Timothy L. Spradlin (Allen County Deed Vol. 925, Page 843) (Tax Parcel Number 27-3100-04-002) and being more particularly described as follows:

Commencing at a monument box over a stone (found) at the Southwest comer of said Southeast quarter.

Thence S 89°23'48" E, 721.61 feet, with the South line of said Southeast quarter (centerline of State Road), to a P.K. nail (found) at the intersection of the centerline of State Route 65 (Ottawa Road), the aforesaid line passing through a monument box over an iron pin (found) at 112.87 feet at the Northwest comer of the Northeast quarter of Section 6, T-3-S, R-7-E, Bath Township;

Thence N 19°21'34" E, 502.80 feet, with said centerline of State Route 65 (Ottawa Road), to Point of Intersection Station 674 + 25.03 as established by the Ohio Department of Transportation in a centerline survey in April and May, 1968;

Thence N 19°28'44" E, 937.87 feet, continuing with said centerline of State Route 65 (Ottawa Road), to a mag nail (set) at the PLACE OF BEGINNING;

Thence N 69°58'11" W, 133.43 feet to an iron pipe (set), the aforesaid line passing through an iron pipe (set) at 63.70 feet on the Westerly right-of-way line of said State Route 65 (Ottawa Road) (State of Ohio Easement-Allen County Deed Vol. 480, Page 272, Parcel No. 79); Thence

N. 17°51'33" E, 2.00 feet to an iron pipe (set);

Thence N. 70°14'22" W, 74.43 feet to an iron pipe (set);

Thence N 5°51'40" W, 20.30 feet to an iron pipe (set) West Northwest of the Southwest corner of the South end of a concrete wall;

Thence N. 20°02'29" E, 142.75 feet, parallel to and 2.00 feet West Northwest of said concrete wall, to an iron pipe (set);

Thence S 89°00'21" E, 138.78 feet to an iron pipe (set) on the Westerly Limited Access right-of-way line of U.S. Route 30 at intersection with State Route 65 (Ottawa Road) (State of Ohio- Allen County Deed Vol. 485, Page 556, Parcel No. 78-WL);

Thence S 12°30'45" W, 4.76 feet, with said Westerly Limited Access right-of-way line, to a railroad spike (set), said point being 83.00 feet left of station 22 + 00 on Page 333 of 338 on Ohio Department of Transportation (ODOn Right-of-Way Plans ALL-30N-7.39 dated 1967;

Thence S 70°31'16" E, 83.00 feet, with the Southerly Limited Access right-of-way line of said

U.S. Route 30 (State of Ohio-Allen County Deed Vol. 485, Page 556, Parcel No. 78-WL), to a mag nail (set) at station 22 + 00 on the centerline of State Route 65 (Ottawa Road);

Thence S 19°28'44" W, 204.01 feet, with said centerline of State Route 65 (Ottawa Road) to the PLACE OF BEGINNING, the aforesaid line passing through a monument box over an iron pin (found) at 100.00 feet at station 21 + 00;

This parcel contains 0.948 acre more or less, of which 0.269 acre is State Route 65 (Ottawa Road) right-of-way.

The legal description above is based on surveying work performed under the supervision of James A. Frederick of Kohli & Kaliher Associates, Inc. through March 13, 2006. The basis of bearing is the centerline of State Route 65 (Ottawa Road) being S 19°28'44" W.   Iron pipes called for herein are 3/4-inch diameter by 30-inch long with an orange plastic "K&K/LIMA" plug. Reference shall also be made to K&K Drawing B-372 for a graphic representative of this survey.

6. **602 East Perry St., Paulding, OH**

Situated in the Village of Paulding, County of Paulding, and State of Ohio and known as:

Ex. B-1-3

Situated in the Northeast quarter of Section 13, Town 2 North, Range 2 East, Village of Paulding, Paulding County, Ohio, being all of Lot 9 and Lot 10, and a part of Lot 8 and Lot 11 and part of a vacated alley and part of vacated Baltimore Street, as platted in Morrow Addition as platted in Cabinet A, Slide 61, and being more particularly described as follows:

Beginning at the southeast corner of said Lot 10, being a 5/8" iron pin found; thence along the east line of said addition, S. 01°10'39" W., a distance of 20.00 feet to a 5/8" iron pin set; thence on a new division line, N. 89°26'21" W., a distance of 135.83 feet to a 5/8" iron pin set in the east line of United States Route 127; thence on said east line of United States Route 127 on the following two (2) courses and distances: Along a curve to the left having a radius of 1175.90 feet (Chord Bearing N. 34°49'11" W., a chord distance of 86.98 feet and having a delta of 04°14'21") a length of 87.00 feet to a mag nail set at the point of curvature; N. 36°56'21 W., a distance of 112.59 feet to a 5/8" iron pin found in the centerline of a vacated alley; thence on said centerline S. 89°26'21" E., a distance of 58.46 feet to a surveyor stake found; thence N. 01°10'39" E., a distance of 4.25 feet to a surveyor stake found; thence S. 89°26'21" E., a distance of 99.00 feet to a surveyor stake found; thence S. 01°10'39" W., a distance of 4.25 feet to a 5/8" iron pin set; thence S. 89°26'21" E., a distance of 99.00 feet to a 5/8" iron pin found in the east line of said Morrow Addition and being the west line of Klinger Road as now exist; thence along said east line, S. 01°10'39" W., a distance of 140.25 feet to the point of beginning; containing 0.726 acres, more or less.

7. **204 West East Main Street, Deshler, OH**

**Auditor's Parcel No. 40-009421.4040:**

Situated in the Village of Deshler, County of Henry and State of Ohio and known as:

Being Inlot Two Hundred Two (202) of the Original Plat of the Village of Deshler, Henry County, Ohio.

**Auditor's Parcel No. 40-009421.1440:**

Situated in the Village of Deshler, County of Henry and State of Ohio and known as:

Being the East thirty-seven and one-half (37½) feet of Inlot Number Eighty-three (83) of the Original Plat of the Village of Deshler, Henry County, Ohio.

8. **305 E Main Street, McComb, OH**

Situated in the Village of McComb, County of Hancock and State of Ohio and known as:

Inlot Number One (1) in Dimm's Second Addition to said Village of McComb.

9. **203 U.S. Highway 62, Alpena, Arkansas**

A part of the Northeast Quarter of the Northwest Quarter (NE1/4 NW1/4) of Section Twenty-three (23), Township Nineteen (19) North of Range Twenty-two (22) West, Boone County, Arkansas, described as follows: Beginning at the Southeast corner of Block Twelve (12) in the Original Town of Alpena, Arkansas, run thence Southeasterly on a line which extends along the West side of Denton Street a distance of Fifty (50) feet to the South side of River Street, the Point

of Beginning, thence Southwesterly along the South side of River Street a distance of Three Hundred (300) feet to Hobbs Street, thence Southeasterly on a line parallel with the East side of Hobbs Street a distance of One Hundred-fifty (150) feet, thence Northeasterly on a line parallel with the South side of River Street a distance of Three Hundred (300) feet to the Westerly line of Denton Street, thence Northwesterly along the West line of Denton Street One Hundred-fifty (150) feet to the Point of Beginning.

10. **330 East Main Street, Gassville, Arkansas**

Part of Lots 8 and 13 of Robertson's Annex to Covingtons Addition to the City of Gassville and a Part of the SE 1/4 of the SW 1/4 of Section 28, Township 19 North, Range 14 West, Baxter County, Arkansas, described as follows: Starting at the SE corner of said SE 1/4 SW 1/4 (1/4 corner between Sections 28 & 33), thence North 01° 44' 30" East for a distance of 156.04 feet along the East line of said forty to a point; thence along a curve to the right having a radius of 918.52 feet and an arc length of 28.21 feet, being subtended by a chord of South 58° 00' 32" West for a distance of 28.21 feet; thence North 02° 09' 00" West for a distance of 18.89 feet a 3/8 inch rebar on the Northerly R/W line of U.S. Highway #62/412 and on the West side of Johnson Street being the point of beginning for the tract herein described; thence along a curve to the right having a radius of 904.93 feet and an arc length of 224.29 feet, being subtended by a chord of South 70° 38' 47" West for a distance of 223.72 feet along said northerly R/W line to a 3/8 inch rebar; thence leaving Highway R/W run thence North 01° 40' 55" East for a distance of 317.63 feet to a 3/8 inch rebar on the South line of Church Street; thence South 89° 09' 28" East for a distance of 184.08 feet along the South line of Church Street to a 3/8 inch rebar; thence along a curve to the right having a radius of 24.61 feet and an arc length of 39.04 feet, being subtended by a chord of South 43° 42' 29" East for a distance of 35.08 feet to a 3/8 inch rebar on the West side of Johnson Street; thence South 01° 44' 30" West for a distance of 215.39 feet along the West side of Johnson Street to the point of beginning.

11. **901 South College Street, Mountain Home, Arkansas**

Part of the NW 1/4 of the SE 1/4; Part of the SW 1/4 of the NE 1/4; Part of the NE 1/4 of the SW 1/4; and Part of the SE 1/4 of the NW 1/4, Section 9, Township 19 North, Range 13 West, Baxter County, Arkansas, more specifically described as follows: From the center quarter corner of said Section 9, go North 03° 17' 53" East 47.31 feet to the centerline of Arkansas Highway 5 (9th Street) the Point of Beginning of the tract being described; then go along said centerline North 89° 08' 51" West 61.77 feet to the intersection of Arkansas Highway 5 (9th Street) and College Street

(Arkansas Highway 201); then go along the centerline of said College Street (Arkansas Highway 201) South 02° 44' 59" West 209.52 feet; then leaving said centerline go South 87° 40' 40" East 221.04 feet to a 3/8" rebar as called for in Quitclaim Deed recorded as Slide 1205-87; then go North 04° 13' 20" East 89.80 feet to a 3/8" rebar with an aluminum cap; then go North 01° 34' 21" East 125.44 feet to the centerline of Arkansas Highway 5 (9th Street); then go along said centerline North 89° 08' 51" West 159.12 feet to the Point of Beginning. Subject to right of way easements for Arkansas Highway 5 (9th Street) and Arkansas Highway 201 (College Street).

LESS AND EXCEPT:

Ex. B-1-5

Part of the Northeast Quarter of the Southwest Quarter of Section 9, Township 19 North, Range 13 West, Baxter County, Arkansas, more particularly described as follows: Commencing at a 31/4" aluminum cap being used as the Center Quarter corner of Section 9; thence North 88° 51' 44" West along the North line of the Northeast Quarter of the Southwest Quarter of Section 9 a distance of 31.67 feet to a point on the Easterly right of way line of Arkansas State Highway 201 as established by AHTD Job 9952; thence South 02° 45' 14" West along said right of way line a distance of 61.50 feet to a point on the Easterly right of way line of Arkansas State Highway 201 as established by AHTD Job 090319 to the POINT OF BEGINNING; thence South 28° 59' 54" East along said right of way line a distance of 11.75 feet to a point; thence South 02° 38' 54" West along said right of way line a distance of 91.59 feet to a point; thence North 87° 39' 44" West a distance of 6.35 feet to a point on the Easterly right of way line of Arkansas State Highway 201 as established by AH TD Job 9952; thence North 02° 45' 14" East along said right of way line a distance of 101.62 feet to the Point of Beginning and containing 0.01 acres more or less as shown on plans prepared by the AHTD referenced as Job 090319.

12. **1508 Highway 62 SW, Mountain Home, Arkansas**

Part of Lot 1 of First Addition to Southern Meadows Estates, Baxter County, Arkansas, described as follows: From the Northeast corner of said Lot 1, the Point of Beginning of the tract being described, go along the boundary line of said Lot 1 the following: S 27 °36'47" W 71.09 feet to a 1/2" rebar; N 63°19'08" W 18.16 feet to a 3/8" rebar; then go N 21 °25' 19" E 76.39 feet to a 3/8" rebar on the Northerly boundary line of said Lot 1; then go S 52 °34' 56" E 26.78 feet to the Point of Beginning.
AND:
Part of the NE1/4 NE1/4 of Section 17, Township 19 North, Range 13 West, Baxter County, Arkansas, described as follows: From the Southeast corner of the NE1/4 NE1/4 of Section 17, go West 699.34 feet to a point on the old right of way of US Highway No 62; then go along said old right of way N 20°08'00" E 884.74 feet; then go N 64°34' 05" W 10.04 feet to a 3/8" rebar on the new right of way of US Highway No 62 and in a fence line, the Point of Beginning of the tract being described; then go along fence line N 64°34' 05" W 189.51 feet to a 3/8" rebar; then go N 20 °04' 34" E 64.32 feet to a 3/8" rebar; then go N 21°17' 26" E 19.12 feet to a 3/8" rebar on the boundary of Lot 1 of the First Addition to Southern Meadows Estates; then go along the boundary of Lot 1 the following: S 63°19' 08" E 18.16 feet to a 1/2" rebar; N 27 °36' 47" E 71.09 feet to a 1/2" rebar, the Northeast corner of said Lot 1; then go along the right of way of Coachman Drive S 53°39' 59" E 142.15 feet to an aluminum cap right of way marker on the right of way of US Highway 62; then go along said right of way the following: S 40 °48' 16" E 28.55 feet to an aluminum cap right of way marker; S 20 °18' 54" W 1 15.82 feet to the Point of Beginning.
Being shown on a Survey by Consolidated Land Services filed October 30, 1997 as RS-430-97.

13. **700 Highway 64 East, Wynne, Arkansas**

A 2.57 acre parcel lying in the NE 1/4 of Section 9, Township 7 North, Range 3 East, City of Wynne, Cross County, Arkansas, and being more particularly described as follows: Beginning at the intersection of the East right of way line of Bartlett Road and the North right of way of U.S. Highway 64; thence N 10°30'00" E 438.40 feet, along the East right of way line of Bartlett Road to a point; thence S 87°27'00" E 284.70 feet to a point; thence S 20°38'00" W 520.30 feet to a point on the North right of way line of U.S. Highway 64; thence N 69°15'28" W 194.00 feet along said North right of way line of Highway No. 64 to the point of beginning, containing 2.57 acres, more or less, and being subject to all easements and rights of way of record.

Ex. B-1-6

Cross-Easement: The Grantors and Grantees in a Warranty Deed recorded August 25, 1997, in Cross County Deed Book 365, Page 828, share a common East-West boundary line and said conveyance contains a restrictive covenant, restricting either party, their successors, assigns, or heirs from establishing a barrier or from restricting the common use of the drive way, parking lot or lands along the boundary line and that each hereby grants the other party a cross-easement for access, ingress and egress across their respective properties for the benefit of such party and their respective licensees, guests, customers and other permittees or invitees; provided, however, that such easement shall not be construed to permit or allow either party to use the other party's property for parking.

14. **702 Central Boulevard, Bull Shoals, Arkansas**

Lots 1, 2, 3, 4, 5, 6, 7, 8, 33, 34, 35 and 36 in Block 46, Town of Bull Shoals, Marion County, Arkansas, as shown by the recorded plat thereof.

ALSO, a 10 foot wide parcel North of and adjacent to Lots 1 through 8, being that part of Central Boulevard vacated by the City of Bull Shoals by ordinance. Also, the alley between Lots 1-8 and 33-36 of Block 46, Town of Bull Shoals, vacated and abandoned by the City of Bull Shoals in Ordinance No. 99-6 recorded August 12,1999 as Instrument No. 99-02954.

15. **6132 AR-5, Midway, Arkansas**

The real property described below, and improvements located thereon, if any, referred to herein below is situated in the County of Baxter, State of Arkansas, and is described as follows:

That part of the West one-half Northwest 1/4 of Section 26, Township 20 North, Range 14 West in the form of a triangle described as follows: Beginning at the intersection of the East boundary of State Highway No. 126 and the Southwest boundary of State Highway No. 5, run thence South, along the East boundary of State Highway No. 126, a distance of 700 feet; run thence Northeast to a point on the Southwest boundary of State Highway No. 5 which point is 550 feet Southeast from the point of beginning; run thence Northwesterly, along the boundary of State Highway No. 5 a distance of 550 feet to the point of beginning.

LESS AND EXCEPT the following described lands: A part of the Southwest 1/4 Northwest 1/4 of Section 26, Township 20 North, Range 14 West, described as follows: Beginning at the Northwest corner of said NW 1/4, Section 26, Township 20 North, Range 14 West, run South 4° 35' East, 1,630 feet to the point of beginning of the tract herein excepted; run thence North 2° 20' West, 100 feet; thence North 87° 40' East, 119.5 feet; thence South 47° 45' West, 155.7 feet to the point of beginning, containing 0.14 acre, more or less, in this exception.

ALSO, LESS AND EXCEPT the following described tract: A part of the Northwest Quarter of the Northwest Quarter of Section 26, Township 20 North, Range 14 West, Baxter County, Arkansas, more particularly described as follows: Starting at the West Quarter corner of Section 26, thence North 01° 05' 00" West, along the West line of Section 26, a distance of 1401.02 feet to a point; thence North 88 ° 54' 58" East, a distance of 44.15 feet to a point on the existing Easterly right of way line of State Highway 126 for the point of beginning of the tract herein excepted; thence North 01° 02' 22' West, along said existing right of way line a distance of 31.89 feet to a point; thence North 01 ° 02' 24" West, along said existing right of way line a distance of 108.48 feet to a point on the existing Southwesterly right of way line of State Highway

Ex. B-1-7

5; thence in a Southeasterly direction along said existing right of way line, on a curve to the left, having a radius of 411.97 feet a distance of 130.31 feet to a point on the proposed Southeasterly right of way line of State Highways 5 and 126; thence in a Southwesterly direction, along said proposed right of way line, on a curve to the left, having a radius of 64.00 feet, a distance of 108.83 feet to the point of beginning and containing 0.10 acre, more or less or 4,195 square feet, more or less, in this exception.

ALSO, LESS AND EXCEPT the following described tract: A part of the West one-half of the Northwest 1/4 of Section 26, Township 20 North, Range 14 West, Baxter County, Arkansas, described as follows: Starting at the West 1/4 corner of said Section 26; thence North 01° 05' 00" West for a distance of 1142.38 feet along the West line of said Section 26 to a point; thence North 89° 35' 59" East for a distance of 44.56 feet to a 3/8" rebar on the East R/W line of Ark. Hwy. 126 and the point of beginning; thence North 00 ° 57' 44" West for a distance of 210.47 feet along said East R/W line to a 3/8" rebar; thence leaving R/W, run North 86° 11' 10" East for a distance of 299.54 feet to a 3/8" rebar; thence North 53° 22' 17" East for a distance of 41.79 feet to a 3/8" rebar on the South line of Ark. Hwy. 5; thence South 62° 48' 33' East for a distance of 70.00 feet along Hwy. to a conc. marker; thence leaving Hwy., run South 49° 40' 59" West for a distance of 343.75 feet to a one-half inch rebar at the Northeast corner of Telephone Company tract; thence South 89° 35' 59" West for a distance of 129.04 feet along the North line of Telephone Company tract to the point of beginning, together with and subject to covenants, easements, and restrictions of record. Said property contains 1.36 acres more or less, in this exception.

16. **703 East Main St., Flippin, AR**

A part of the SW 1/4 of the NE 1/4 of Section 20, Township 19 North, Range 15 West, Marion County, Arkansas, described as follows: Begin at the NE corner of said SW 1/4 NE 1/4 and run South 00° 03' 49" E, 639.70 feet; thence S 89° 56' 47" W, 30.00 feet to the Point of Beginning of the tract herein described; thence S 89°56'47" W, 123.18 thence N 00° 55' 50" W, 164.27 feet; thence S 89° 57' 49" W, 228.45 feet; thence N 00° 03'13" W, 151.68 feet; thence N 89° 04' 00" E, 354.14 feet; thence S 00° 03' 49" E, 321.44 feet to the Point of Beginning, described tract includes a part of Lots 7, 8, 9,10,11,12 and 14, and all of Lot 13, in Block 26, a part of the alley in Block 26, a part of Girard Street and apart of Eighth Street, al! in the town of Flippin, Arkansas, as shown by the recorded Plat thereof.

Also: An easement for ingress and egress across the property adjoining on the West side, said easements described as follows: Begin at the SW corner of said tract, this being in the driveway entrance, and run S 89° 56' 47" W, 17.00 feet;thence N 00° 55' 50" W, 70.00 feet; thence N 89° 56' 47" E, 17.00 feet; thence S 00° 55' 50" E, 70.00 feet to the Point ofBeginning.

Subject to an easement for ingress and egress for the property adjoining on the West side, said easement described as follows: Begin at the SW corner of said tract,

this being in the driveway entrance, and run N00° 55' 50" W, 70.00 feet;thence N 89° 56' 47" E, 22.00 feet; thence S 00° 55' 50" E, 70.00 feet; thence S 89° 56' 47" W, 22.00 feet to the Point of Beginning.

Ex. B-1-8

17. **1580 S. College Street, Mountain Home, Arkansas**

The real property described below, and improvements located thereon, if any, referred to herein below is situated in the County of Baxter, State of Arkansas, and is described as follows:

Part of the Southeast 1/4 of the Northwest 1/4, Section 16, Township 19 North, Range 13 West, Baxter County, Arkansas, more specifically described as follows: From the Northeast corner of said Southeast 1/4 Northwest 1/4, go North 89 ° 10' 00" West, 40.89 feet to the West right of way line of Arkansas Highway 201; then go along said right of way line the following movements: South 01 ° 34' 59" West, 50.47 feet; South 04° 10' 59" West, 76.26 feet; South 11° 24' 34" West, 98.78 feet; South 20 ° 02' 11" West, 114.45 feet; South 29° 57' 59" West, 63.66 feet; South 29° 57' 59" West, 63.66 feet; South 40° 26' 59" West, 44.64 feet to the point of beginning of tract being described; then continue along said right of way line the following movements: South 40 ° 26' 59" West, 108.41 feet; South 45° 54' 12" West, 64.48 feet; then leaving said right of way line, go North 46 ° 58' 58" West, 182.22 feet; then go North 03° 17 17" East, 100.82 feet; then go South 86° 06' 20" East, 143.05 feet; then go South 49° 04' 34" East, 134.17 feet to the point of beginning.

EASEMENT#1

Together with an access easement more specifically described as follows: From the point of beginning of the above described tract, go South 40° 26' 59" West, 108.41 feet; then go South 45° 54' 12" West, 64.48 feet; then go North 46° 58' 58" West, 113.01 feet to the point of beginning of easement being described as follows: then go South 45 ° 06' 52" West, 82.33 feet to the East right of way line of Arena Drive; then go along said right of way line of Arena Drive, North 03° 13 00" East, 88.81 feet; then leaving said right of way line, go North 89° 01' 21" East, 1.79 feet; then go North 03° 17' 17" East, 16.65 feet to the Southerly boundary line of the above described property; then go along said boundary line, South 46° 58' 58" East, 69.21 feet to the point of beginning of access easement.

EASEMENT #2

Also together with an easement for a sign more specifically described as follows: From the point of beginning of the above described tract go along the Northeasterly boundary line of said tract, North 49° 04' 34" West, 24.58 feet to point of beginning of sign easement being described; then continue North 49° 04' 34" West, 2.47 feet; then leaving said boundary line, go North 76° 45' 34" East, 23.83 feet; then go North 30° 11' 21" East, 3.07 feet; then go South 51° 41' 03" East, 9.75 feet; then go South 29° 32' 42" West, 4.05 feet; then go North 51° 41' 02" West, 8.13 feet; then go South 76° 45' 34" West, 22.75 feet to the point of beginning.

EASEMENT #3

And subject to an access easement across the above described tract more specifically described as follows: From the point of beginning of the above described tract, being the point of beginning of the reserved access easement, go along the West right of way line of Arkansas Highway 201, South 40° 26' 59" West, 44.00 feet; then leaving said right of way line, go North 49° 04' 34" West, 122.00 feet; then go North 72° 39' 11" West, 76.28 feet; then South 42° 51' 01" West, 35.70 feet; then go South 00° 43' 08" East, 45.40 feet; then go South 47° 11' 22" East, 160.00 feet to the West right of way line of Arkansas Highway 201; then go along said right of way line, South

45 ° 54' 12" West, 23.35 feet; then leaving the right of way line of Arkansas Highway 201, go North 46 ° 58' 58" West, 182.22 feet; then go North 03° 17' 17" East, 50.84 feet; then go North 42° 22' 10" East, 63.84 feet to the North boundary line of the above described tract; then go along said boundary line, South 86° 06' 20" East, 50.21 feet; then leaving said boundary line, go South 78° 01' 58" East, 65.42 feet; then go South 49° 04' 34" East, 118.91 feet to the point of beginning of easement being described.

Being shown on a Survey by Consolidated Land Services Incorporated dated October 21, 2009 and filed October 26, 2009 as Instrument #RS-140-2009

18. **433 Albermarle Road, Troy, NC**

Montgomery County, North Carolina A tract or parcel of land lying and being in the Town of Troy, Troy Township, Montgomery County, North Carolina, being the site of Store No. 1 of the Quik Chek Stores, Dozier Properties, Inc. located along the southeast side of N.C. Highway 24 & 27, more particularly described as follows:

BEGINNING at a ¾ inch iron rebar set at the southeast right-of-way of N.C. Highway 24 & 27 as the northeast corner of the Dozier Properties, Inc. property ( Deed Book 252 Page 39 ) and being the northwest corner of the B & C Enterprises property (Deed Book 401 Page 391 ), and also being S 46°02'37" W 409.74 feet (grid distance) from NCGS Grid Monument "HANOVER" (NAD 83 coordinates: North= 585,650.89 feet, East = 1,731,652.39 feet, combined factor

= 0.9998484 ); thence a line with the B & C Enterprises property S 42°30'12" E 140.21 feet to a 7/8 inch iron rebar set in the western boundary of the B & C Enterprises property, being N 42°30'12" W 10.00 feet from a ¾ inch iron rebar found as another corner of the B & C Enterprises property; thence a line with an additional tract of the Dozier Properties, Inc. S 47°29'48" W 113.24 feet to a railroad spike set in the pavement between the Quik Chek store and Watkins Street; thence a line with the northeast margin of Watkins Street N 43°13'21" W 140.23 feet to railroad spike set in the edge of the paved surface of N.C. Highway 24 & 27; thence a line with the southeast right-of-way of N.C. Highway 24 & 27 N 47°29'48" E 115.00 feet to the BEGINNING, containing 0.37 acre, more or less, as shown on a plat for Dozier Properties, Inc. dated January 11, 2006 by Thomas

J. Fields, PLS-2906.

19. **6555 Hwy 52 North, Welcome, NC**

Davidson County, North Carolina All that certain tract or parcel of land lying and being in Welcome, Lexington Township Davidson County, North Carolina, also known as Quilt Chek Store #2, containing 1.22 acres and being more particularly described as follows:

BEGINNING at an existing iron pipe on the western right-of-way of Highway 52, also being the southeast corner of the Russell C. and Betty Charles property. Deed Book 483, Page 4. Plat Book 9, Page 56, Lot 8; and running thence along the western right-of-way of Highway 52 in a southern direction. S 36-24-25 W 227.00 feet to an existing iron pipe; thence leaving the right-of-way of Highway 52 in a western direction N 53.35.35 W 207.81 feet to an existing iron pipe in the line of Russell C. and Betty Charles; thence N 03-30-00 E 80.27 feet to a new iron pipe; thence still running with the Charles' line, N 03-31-59 E 118.62 feet to a bent existing iron pipe in the line of Charles; thence S 64-20-50 E 321.45 feet to THE POINT Of BEGINNING, containing 1.22 acres.

Ex. B-1-10

20. **511 East Main St., Biscoe, NC**

Montgomery County, North Carolina All that certain tract or parcel of land lying and being in Biscoe, Biscoe Township, Montgomery County, North Carolina, also known as Quik Chek Store No. 3, containing 5.134 acres and being more particularly described as follows:

BEGINNING at a nail inside the right-of-way of N.C. Highway 24-27 (E. Main Street), being the southeast corner of Montgomery Municipal A.B.C. Board, Deed Book 252, Page 744, and also further being the southwest corner of Quik Chek, Inc ., Deed Book 246, Page 581; and running thence in a northern direction in the centerline of a 20' road easement, N 07-26-00 W

264.04 feet to a new iron pipe at the terminus of the 20' road easement; thence S 84-34-12 W

123.48 feet to a new iron pipe located in the eastern line of Mat Cagle,Deed Book 142, Page 28; thence with Cagle's line N 07-08-39 W 614.45 feet to an existing iron pipe located in

J. David Monroe's line, Deed Book 207, Page 215; thence with Monroe's line S 88-16-47 E 356.62 feet to an existing iron pipe; thence in a southern direction S 00-45-15 W 258.08 feet to a new iron pipe, being the northwest corner of J.E. Baldwin Estate, Deed Book 73, Page 164; thence with the eastern line of Baldwin in a southern direction S 00-06-09 E 583.47 feet to a nail inside the right-of-way of N.C. Highway 24-27 (E. Main Street); thence in a western direction inside the right-of-way of NC Highway 24-27 S 86-24-05 W 120.84 feet to THE POINT OF BEGINNING, containing 5.134 acres.

21. **512 West Main St., Locust, NC**

Stanly County, North Carolina All that certain tract or parcel of land lying and being in Locust, Furr Township, Stanly County, North Carolina, also being known as Quik Chek Store No. 5, containing 7.41 acres and being more particularly described as follows:

Being that 7.41 acre tract shown on the survey map entitled, "Final Plan of Division for Quik Chek, Inc.", revised January 10, 2006, prepared by Rogell E. Hunsucker, PLS L-2488 and recorded in Plat Book 19 Page 182 in the office of the Register of Deeds of Stanly County, NC, to which reference is made for a more particular description.

22. **481 US Hwy. 1 South, Rockingham, NC**

Richmond County, North Carolina Starting at a right-of-way monument located on the northwest side of U.S. Highway No. 1 within the Carolina Power and Light Company right-of way easement and running thence N. 48-23-44 E. 266.36 feet to a right of-way monument, thence turning and crossing U.S. Highway No. 1 and running S. 72-24-34 E. 104.62 feet to the true point and place of beginning and running thence S. 41-58-50 E. 631.68 feet to an iron stake, thence running

S. 48-15-27 W. 726.32 feet to an iron stake, thence continuing the same call 10 feet to a point in the center of Rocky Branch, thence with the flow of Rocky Branch its various meanderings N. 57-43-06 W. 29.24 feet, S. 80-17-58 W. 11.71 feet, N. 37-34-27 W. 9.80 feet, N. 44-33-28 W. 91.93 feet, N. 65-27-11 E. 23.29 feet, N. 26-36-25 W. 68.92 feet, N. 36-41-45 W. 39.27 feet, N. 15-05-57 W. 70.60 feet, and N. 01-38-37 W. 42.57 feet, thence running N. 01-01-11 W. 45.69 feet to a right-of-way monument, thence running N. 11-29-09 W. 83.11 feet to a right-of-way monument,

Ex. B-1-11

thence running N. 22-10-24 W. 136.10 feet to a right-of-way monument in the southeastern right-of-way line of U.S. Highway No. 1, thence running along and with said right-of-way

N. 42-53-55 E. 426.99 feet to a right-of-way monument, thence running N. 42-20-21 W. 26.38 feet to a right-of-way monument, thence N. 48-01-10 E. 110.58 feet to the point and place of beginning, according to a plat of survey by Thomas Jeffrey Fields, Professional Land Surveyor, dated August through November, 2000, containing nine (9) acres, more or less. Less and except that property conveyed to the Department of Transportation by Deeds recorded in Book 922, Pages 133 and 491; and Book 1049, Page 410, all of the Richmond County Register of Deeds.

23. **3233 Wow. Road, Randleman, NC**

Randolph County, North Carolina BEING all of that 0.541 acres tract, as shown on Annexation Survey for UNITED FUELS, LLC recorded in Plat Book 163, Page 46 in the Office of the Register of Deeds for Randolph County, North Carolina. And being the same property described in Book 2635, Page 778 as follows:

Beginning at a new iron rod standing South 46 degrees 26 minutes West 45.36 feet from a nail in the centerline of S.R. #2122, and marking the intersection of the centerline of S.R. #2122 with the intersection of S.R. #2128 (WOW Camp Road); said beginning point also being the Northeastern corner of that certain 1.078 acre tract described of record in Book 1123, Page 243, Randolph County Registry; running thence from said beginning point and with the Northern boundary of the said 1.078 acre tract North 82 degrees 02 minutes West 151.16 feet to a new iron rod; thence a new line South 05 degrees 17 minutes West 139.73 feet to a new iron rod; thence a new South 70 degrees 02 minutes East 157.31 feet to a new iron rod in the Eastern boundary of said 1.078 acre tract; thence with the Eastern boundary of said tract North 04 degrees 53 minutes East 172.57 feet to the point and place of beginning, containing 0.543 acre, more or less, according to a survey by Roger Clarence Cagle, Cagle Surveys, dated October 4, 1989, and labeled "Charlie Thomas Routh and wife, Rosina B. Routh survey".

24. **530 North Main Street, Troy, NC**

BEGINNING at the northwest building corner of the J.C. Hurley Estates, Deed Book 297, Page 775, also being the southwest corner of Quik Chek, Inc., Deed Book 332, Page 117, and further located on the eastern right-of- way of N. Main Street; and running thence with the right-of-way of N. Main Street N 03-18-17 W 104.94 feet to a new iron pipe, also being the intersection of N. Main Street and E. Roswell Street; thence leaving the right- of-way of N. Main Street and following the right-of-way of E. Roswell Street in an eastern direction, N 87-39- 52 E 397.96 feet to a new iron pipe, being the northwest corner of Albred B. Saunders, Deed Book 108, Page 222; thence S 06-34-46 E 74.38 feet to a new iron pipe; thence with J.C. Hurley Estates line S 83-17-

13 W 302.20 feet to an existing iron pipe; thence S 03-18-17 E 6.00 feet to a new iron pipe; thence along the old building S 86-42-14 W 100.49 feet to THE POINT OF BEGINNING, containing 0.83 acre.

25. **1634 Zoo Parkway, Asheboro, NC**

Montgomery County, North Carolina All that certain tract or parcel of land lying and being in Troy, Troy Township, Montgomery County, North Carolina, also known as Quik Chek Store No. 9, containing 0.83 acre and being more particularly described as follows:

Ex. B-1-12

BEGINNING at an existing iron pipe in the northwestern intersection of Zoo Parkway and Ridge Street, also being the southeast corner of Quik Chek, Inc., Deed Book 1366, Page 766; and running thence along Ridge Street in a western direction N 81-41-31 W 195.29 feet to a new iron pipe, being the southeast corner of Gary T. and Helen V. Luck, Deed Book 1118, Page 668; thence with Luck's line N 08-12-16 E 188.41 feet to an existing iron pipe in the southern line of Tranel, Inc.; thence with the line of Tranel, Inc. in an eastern direction S 81-41-11 E 224.57 feet to a new iron pipe on the west right-of-way of Zoo Parkway; thence with Zoo Parkway right-of-way S 17- 02- 28 W 190.60 feet to THE POINT OF BEGINNING, containing 0.908 acre.

26. **103 South Main St., Candor, NC**

Montgomery County, North Carolina All that certain tract or parcel of land lying and being in Candor, Biscoe Township, Montgomery County, North Carolina, also known as Quik Chek Store No. 11, containing 0.479 acre and being more particularly described as follows:

BEGINNING at a new iron pipe located at the southeast intersection of S. Main Street and E. Main Street; and running thence with the southern right-of-way of E. Main Street in an eastern direction S 81-09-41 E 20.66 feet to a new iron pipe being the southwest intersection of E. Main Street and

S. Depot Street; thence leaving the right-of-way of E. Main Street, running with the right-of-way of S. Depot Street in a southern direction S 10-01-46 W 106.05 feet to an existing iron pipe, being the northeast comer of Deed Book 370, Page 822; thence leaving the right-of-way of S. Depot Street N 79-53-30 W 69.02 feet to an existing iron pipe; thence N 79-55-24 W 131.23 feet to an existing iron pipe on the eastern right-of-way of S. Main Street; thence along the eastern right-of- way of S. Main Street in a northern direction N 09-15-25 E 101.67 feet to THE POINT OF BEGINNING, containing 0.479 acre.

27. **527 Old Liberty Road, Asheboro, NC**

Randolph County, North Carolina All that certain tract or parcel of land lying and being in Asheboro, Asheboro Township, Randolph County, North Carolina, also known as Quik Chek Store No. 12, containing 0.507 acre and being more particularly described as follows:

BEGINNING at a new iron pipe at the northwest intersection of Old Liberty Road and E. Balfour Avenue; and running thence with the northern right-of-way of E. Balfour Avenue in a western direction S 85-09-33 W 45.00 feet to an existing iron pipe, being the southeast comer of Amick & Jones, Inc., Deed Book 1503, Page 1226; thence with Amick & Jones, Inc.' s line in a northern direction N 08-10-17 W 193.31 feet to an existing iron pipe, being Doris S. Miller's southwest comer; thence with Miller's line in an eastern direction S 89-00-00 E. 190.59 feet to an existing iron pipe on the western right-of-way of Old Liberty Road; thence with the western right-of-way of Old Liberty Road in a southern direction S 32-41-37 W 218.91 feet to THE POINT OF BEGINNING, containing 0.507 acre

28. **231 South Main Street, Star, NC**

Parcel 1: Being Lot Nos. 17 and 18 of the J.L. Stuart Estate property, plat of which is found recorded in the office of the Register of Deeds of Montgomery County, North Carolina in Book 56 at Page 600 together with that certain 30 foot parcel of land lying between Lots 18 and 19 of the said J.L. Stuart Estate property.

Parcel 2: Being Lot No. 19 in the Division of the J.L. Stuart Estate Property in the Town of Star, Star Township, Montgomery County, North Carolina, part of which is recorded in      the office of the Register of Deeds of Montgomery County in Book 56 at Page 600, to which reference is hereby made for a more particular description.

29. **2655 North Church Street, Haw River, NC**

Alamance County, North Carolina All that certain tract or parcel of land lying and being in Haw River, Haw River Township, Alamance County, North Carolina, also known as Quik Chek Store No. 14, containing 1.886 acres and being more particularly described as follows:

BEGINNING at an existing P.K. Nail located in the southern right-of-way of N. Church Street, being the northwest property comer of Quik Chek, Inc. Store No. 14 and the northeast comer of Randy L. Tucker and Debra S. Tucker, Deed Book 1295, Page 210; and running thence with the southernright-of-way of N. Church Street, running in an eastern direction, S 71-58-12 E 235.00 feet to anew iron pipe, being the northwest corner of Brillo Brothers, LLC, Deed Book 2143, Page 239;thence with the Brillo Brothers LLC's line in a southern direction S 04-34-33 W

200.00 feet to anexisting iron pipe; thence continuing south with Brillo Brothers LLC S 04-34-33 W 100.00 feet toa new iron pipe in the northern side of a 25.0 feet access easement; thence running in a westerndirection with the northern side of the 25.0 feet access easement N 72-55-01 W 322.63 feet to anew iron pipe; thence in a northern direction still with the 25.0 feet access easement N 21- 27-21E 100.00 feet to an existing iron pipe in Randy L. Tucker's line; thence N 21-27-21 E 197.63 feetto THE POINT OF BEGINNING, containing 1.886 acres and being all of Lot 19A recorded in PlatBook 60, Page 177 in the Register of Deeds of Alamance County, N

30. **434 Little River Road., Seagrove, NC**

Randolph County, North Carolina All that certain tract or parcel of land lying and being in Seagrove, Richland Township, Randolph County, North Carolina, also known as Quik Chek Store No. 15, containing 7.753 acres and being more particularly described as follows:

BEGINNING at an existing iron pipe at the northwest intersection of U.S.Highway 220 and Little River Road; and running thence with the eastern right-of-way of U.S. Highway 220 in a western direction N 34-18-53 W 290.27 feet to an existing iron pipe, being the southeast comer of Burty Boone Tract, Deed Book 1332, Page 289, also being the southwest corner of Quik Chek, Inc.; thence N 15-44-26 E 47.23 feet to a new iron pipe; thence N 12-47-18 E 720.72 feet to a new iron pipe passing through a point at 449.98 feet; thence in a southern direction with Geneva

B. Voncannon, Deed Book 1309, Page 1644, S 34-38-00 E 437.90 feet to an existing iron pipe; thence continuing with Voncannon in a southern direction S 36-07-15 E 240.09 feet to an axle; thence still with Voncannon line S 36-05-57 E 189.83 feet to a new iron pipe on the northern right-of-way of Little River Road; thence with the northern right of way of Little River Road as follows: S 51-52-40 W 88.95 feet; thence N 37-47-48 W 20.27 feet; thence S 51-50-07 W 58.00 feet; thence S 52-58-17 W 191.00 feet; thence S 58-08-22 W 58.00 feet; thence N 31-52-38 W 20.00 feet; thence S59-47-25 W 71.91 feet; thence S 69-22-19 W 115.94 feet to THE POINT OF BEGINNING, containing7.753 acres.

Less and except any property conveyed to the Department of Transportation by Deeds recorded in Book 1304, Page 241 and Book 1308, Page 819 of the Randolph County Register of Deeds.

Ex. B-1-14

31. **11126 N NC Hwy 150, Winston-Salem, NC**

Davidson County, North Carolina BEGINNING at an iron stake in the South line of Old Salisbury Road (N.C. Highway 150), said iron stake being the Northeast corner of Tract No. 1 and also being

30.0 feet southeastwardly from and at right angles to the center of said N.C. Highway 150; running thence along a line that is 30.0 ft Southeastwardly and parallel to the center of said Highway a chord measurement of N. 61° 13' E. 116.20 ft. to an iron stake, said iron stake being the Northwest corner of Tract 3; thence with the West line of Tract 3, S. 25° 35' E. 217.27 ft. to an iron stake at the N.W. intersection of Mt. Olivet Road and Union Grove Road, said iron stake being 30.0 ft. West of and at right angles to the center of Mt. Olivet Road and also 30.0 ft. N. of and at right angles to the center of Union Grove Road; thence along a line that is 30.0 ft. North of and parallel to the center of said Union Grove Road N. 87° 13' W. 201.10 ft. to an iron stake, the Southeast corner of Tract 1; thence along the East line of Tract 1 N. 02° 43' E.130.35 ft. to the place of Beginning, containing 0.56 acres, more or less.

32. **100 Hwy 52 South, Albemarle, NC**

Stanly County, North Carolina All that certain tract or parcel of land lying and being in Albemarle,

S. Albemarle Township, Stanly County, North Carolina, also known as Quik Chek Store No. 18, containing 0.891 acre and being more particularly described as follows:

BEGINNING at a new iron pipe in the southwest intersection of U.S. Hwy. 52 and W. Main Street, also being the northeast property comer of Quik Chek Store No. 18; and running thence with the western right-of-way of U.S. Hwy. 52 as follows: S 03-11-25 W 118.46 feet; thence S 80-27-46 W 3.25 feet; thence S 03-51-18 E 25.34 feet; thence S 02-12-18 W 5.61 feet; thence S 02-12-18 W 60.10 feet to a new iron pipe, being the northeast property comer of Ronald R. Morton et ux., Deed Book 386, Page 539, also being the southeast property corner of Quik Chek, Inc.; thence leaving the western right-of-way of U.S. Highway 52 in a western direction S 87-21-58 W 47.98 feet to an existing iron pipe in Morton's line; thence continuing west S 87-21-58 W 152.56 feet to an existing iron pipe in the eastern right-of-way of S. Broome Street; thence with the eastern right- of-way of S. Broome Street N 03-44-03 E 68.84 feet; thence N 03-35-21 E 9.94 feet; thence N 03- 35-11 E92.84 feet; thence N 03-22-27 E 11.31 feet to a new iron pipe located on the southern right- of-wayof W. Main Street; thence with the southern right-of-way of W. Main Street N 79-38-57 E 184.79feet; thence N 79-38-57 E 17.88 feet to THE POINT OF BEGINNING, containing 0.891 acre.

33. **515 E Main St (109 Hillview Extension), Candor, NC**

Montgomery County, North Carolina All that certain tract or parcel of land lying and being in Candor, Biscoe Township, Montgomery County, North Carolina, also known as Quik Chek Store No. 19, containing 1.836 acres and being more particularly described as follows:

BEGINNING at a new iron pipe located in the northeastern intersection of E. Main Street and Chesley Street, also being the southwest corner of Quik Chek, Inc. Store No. 19; and running thence in a northern direction with the eastern right-of-way of Chesley Street N 01-43-44 E 322.97 feet to an existing iron pipe, being the southwest property corner of Blakes Restaurant, Deed Book 240, Page 69; thence leaving the right-of-way of Chesley Street in an eastern direction with

Blakes Restaurant line, N 86-57-25 E 328.67 feet to a new iron pipe on the western right-of- way of N. Hill View Street; thence with the right-of-way of N. Hill View Street S 03-54-

16 W 172.70 feet to a concrete monument at the northwestern intersection of E. Main Street and N. Hill View Street; thence with the northern right-of-way of E. Main Street in a western direction S 62-46-44 W 210.49 feet to a new iron pipe; thence S 62-43-06 W 156.41 feet to THE POINT or BEGINNING, containing 1.836 acres.

## 34. **713 Main St, Oakboro, NC**

Stanly County, North CarolinaAll that certain tract or parcel of land lying and being in Oakboro, Oakboro Township, StanlyCounty, North Carolina, also known as Quik Chek Store No. 20, containing 0.481 acre and beingmore particularly described as follows:

BEGINNING at a new iron pipe located on the southern right-of-way of N. Main Street, also being the northwest property corner of Melvin J. Smith, Deed Book 651, Page 102 and the northeast property corner of Quik Chek, Inc. Store No. 20; thence leaving the right-of-way of N. Main Street in a southern direction S 41-48-00 W 140.00 feet to an existing iron pipe on the north side of a 20' alley; thence with the north side of the 20' alley N 48-12-00 W 149.77 feet to an existing iron pipe, being the southeast corner of Johnny Carpenter's property, Deed Book 594, Page 760; thence with Carpenter's line N 41-48-00 E 140.00 feet to a new iron pipe on the southern right-of-way of N.Main Street; thence with the southern right-of-way of N. Main Street S 48-12- 00 E 149.76 feetto THE POINT OF BEGINNING, containing 0.481 acre.

## 35. **4416 South NC 150, Lexington, NC**

Davidson County, North Carolina All that certain tract or parcel of land lying and being in Lexington, Tyro Township, Davidson County. North Carolina, also known as Quik Chek Store No. 22, containing 0.730 acre and being more particularly described as follows:

BEGINNING at a point in the right-of-way of N.C. Hwy. 150 South, also being the southwest property corner of Security Bank & Trust, Deed Book 549, Page 324, also being the southeast corner of Quik Chek, Inc., Deed Book 1254. Page 1933; and running thence within the right--of-way of N.C. Hwy. 150 South in a western direction, S 45-00-00 W 130.00 feet to a point located in the eastern margin of Tyro School Road; thence in a northern direction along the eastern margin of Tyro School Road N 35-30-00 W 248.00 feet to an existing iron pipe in the shoulder of Tyro School Road; thence leaving Tyro School Road in an eastern direction with Joseph Stamey's line, Deed Book 646, Page 438. N 45-00-00 E 130.00 feet to an existing iron pipe, being the northwest corner of Security Bank & Trust, Deed Book 549, Page 324; thence with Security Bank & Trust's western line S 35-30 00 E 248.00 feet to THE POINT OF BEGINNING containing 0.730 acre.

## 36. **7039 Jordan Road, Ramseur, NC**

Randolph County, North Carolina All that certain tract or parcel of land lying and being in Ramseur, Columbia Township, Randolph County, North Carolina, also known as Quik Chek Store No. 23, containing 1.243 acres and being more particularly described as follows:

BEGINNING at a concrete monument located at the northeast intersection of Jordan Road and N.C. Hwy. 49 N., also being the southwest property corner of Quik Chek, Inc. Store No. 23;

andrunning thence with the right-of-way of N.C. Hwy. 49 N. in a northern direction N 09-59-04 W122.75 feet to a new iron pipe; thence still running with the right-of-way of N.C. Hwy. 49 N., N 36-18-11 E 253.73 feet to a rebar, being the property corner of Janes L. and Irene Frazier, Deed Book1269, Page I, also being the northwest property corner of Quik Chek, Inc.; thence leaving the right-of-way of N.C. Hwy 49N, running with Frazier's southern line S 68-26-59 E 149.80 feet to anexisting iron pipe, being Frazier's southeast corner and also being a property corner on AndraBrady's line, Deed Book 1824, Page 2509; thence with Brady's line S 40-34-00 W 99.85 feet to anew iron pipe; thence still with Brady's line S 19-58-00 E 118.55 feet to a rebar located on thenorthern right-of-way of Jordan Road; thence with the north right- of-way of Jordan Road in awestern direction S 71-11-02 W 257.59 feet to THE POINT OF BEGINNING, containing 1.243 acres.

37. **2003 North Fayetteville Street, Asheboro, NC**

Randolph County, North Carolina All that certain tract or parcel of land lying and being in Asheboro, Asheboro Township, Randolph County, North Carolina, also known as Quik Chek Store No. 24, containing 2.17 acres and being more particularly described as follows:

BEGINNING at a new iron pipe located at the northwest intersection of the right-of-way of N. Fayetteville Street and W. Central Avenue, also being the southeast property corner of Quik Chek, Inc. Store No. 24; thence with the northern right-of-way of W. Central Avenue N 85-16-33 W 249.88 feet to a new iron pipe; thence N 82-36-53 W 40.78 feet to an existing iron pipe, being the southeast corner of Schwarz Properties, LLC, Deed Book 1743, Page 3139, and also being the southwest property corner of Quik Chek; thence with Schwarz' eastern line N 04-33-07 E 174.88 feet; thence N 04-15-48 E 25.47 feet to an existing iron pipe, being Schwarz northeast corner and also Burtin & Company LLC's southeast corner, Deed Book 1624, Page 159; thence with Burtin & Company's line N 04-36-38 E 110.30 feet to a new iron pipe in the line of Robert

M. Jarrell, Deed Book 1782, Page 1986; thence with Jarrell's line in an eastern direction S 87-31-33 E 294.74 feet to a new iron pipe on the western right-of-way of N. Fayetteville Street; thence with the western right-of-way of N. Fayetteville Street S 01-30-17 W 149.72 feet to a new iron pipe; thence S 08-26-41 W 175.00 feet to THE POINT OF BEGINNING, containing 2.17 acres.

38. **315 Randolph Street, Thomasville, NC**

Davidson County, North Carolina BEGINNING at the North edge of the curb on the North side of East Sunrise Avenue in the City of Thomasville, North Carolina, same being C. W. Floyd's Southwest corner; thence North 18 deg. 03 min. West 150 feet to a 2' iron pipe, C. W. Floyd's Northwest corner; thence South 72 deg. 22 min. West 111.98 feet to a 2' iron pipe, said pipe being 6 feet Eastwardly from the East curb of Randolph Street; thence South 18 deg. 51 min. East 150 feet to the North Edge of the curb on the North side of East Sunrise Avenue; thence along the North margin of the curb on East Sunrise Avenue North 72 deg. 22 min. East 109.90 feet to the point of beginning.

39. **800 Bryan Road, Thomasville, NC**

Davidson County, North Carolina Real property in the Thomasville Township, Davidson County, North Carolina, and being more particularly described as follows: BEING Lots 23, 24, 25, 26,

27, 28, 29 and 30 in Section 1 of Lambeth Knolls, a plat of which is recorded in Plat Book 6, Page 15, Office of the Register of Deeds of Davidson County, North Carolina.

40. **1011 Liberty Road, Archdale, NC**

TRACT ONE: BEGINNING at a ½" rebar in the right of way of Liberty Road (Hwy 62) and with the southeastern corner of Sessoms Lawn Care Maintenance, Inc. (Deed Book 7712, Page 2524, Guilford County Registry); thence with Sessoms Lawn Care Maintenance, lnc.'s eastern property line N 04° 00' 16" East 165.42 feet to a 5/8" iron pipe and common corner with Sessoms Lawn Care Maintenance, Inc. and Cheryl Bradham (Deed Book 7527, Page 2483); thence with Cheryl Bradham's eastern property line N 04° 13' 11" East 166.15 feet to an iron pipe in the right of way of E. Fairfield Road (Hwy 610); thence along the right of way of E. Fairfield Road (Hwy 610) S 50° 26' 42" East 207.89 feet to a ½" iron pipe; thence S 04° 02' 23" West 13.56 feet to a rebar set with cap to the northwestern corner of Linda Terrell (Deed Book 4107, Page 560); thence S 04° 06' 53" West 141.40 feet to a p.k. nail and southwestern corner of Linda Terrell; thence S 04° 06' 29" West 10.04 feet to a p.k. nail in the right of way of Liberty Road (Hwy 62); thence a curve to the left with chord bearing and distance of S 78° 54' 43" West 175.52 feet having a radius of 2377.38 feet, an arc distance of 175.56 feet to the point and place of BEGINNING and containing 0.962 acres, more or less, as shown on a Survey for United Fuels LLC by David J. Sgroi, PLS L-3681, dated February 24, 2021, Job no. 21-05.

TRACT TWO: BEGINNING at a rebar set with cap in the right of way line of E. Fairfield Road (Hwy 610), common corner to Linda Terrell (Deed Book 3377, Page 1083) ;thence S 52° 51' 38" East 36.40 feet to a p.k. nail; thence S 56°03' 01" East 52.99 feet to a p.k. nail; thence S 58° 42' 43" East 52.29 feet to a rebar set with cap; thence 53° 52' 31" East 53.05 feet to a rebar set with cap; thence S 25° 41' 37" East 14.78 feet to a p.k. nail at the intersection of E. Fairfield Road (Hwy 610) and Liberty Road (Hwy 62); thence with the right of way of Liberty Road {Hwy 62) S 85" 22' 01" West 101.97 feet to a p.k nail; thence S 82° 50' 07" West 76.02 feet to a p.k. nail in the eastern property line of Linda Terrell (Deed Book 3377, Page 1083); thence with the line of said Terrell N 04° 06' 53" East 141.40 feet to the point and place of BEGINNING and containing 0.296 acres, more or less as shown on a Survey for United Fuels LLC by David J. Sgroi, PLS L-3681, dated February 24, 2021. Job no. 21-05

41. **2271 Main St., Ellerbe, NC**

Richmond County, North Carolina All that certain tract or parcel of land lying and being in Ellerbe, Mineral Springs Township, Richmond County, North Carolina, also known as Quik Chek Store No. 33, containing 0.412 acres and being more particularly described as follows:

BEGINNING at a new iron pipe in the northwest intersection of Main Street and Church Street; and running thence with the northern right-of-way of Church Street in a western direction N 80-06-14 W 150.21 feet to an existing iron pipe, being the southeast property comer of Dr. James Howell; thence with Howell's east line N 07-21-00 E 118.96 feet to an existing iron pipe located on Richmont Enterprises, Inc.'s southern line; thence in an eastern direction with Richmont Enterprises, Inc. S 80-32-14 E 150.17 feet to a P.K. Nail in the western right-of-way of Main Street; thence with the western right-of-way in a southern direction S 07-21-00 W

120.10 feet to THE POINT OF BEGINNING, containing 0.412 acre.

Ex. B-1-18

42. **402 W. Swannanoa St., Liberty, NC**

Randolph County, North Carolina All that certain tract or parcel of land lying and being in Liberty, Liberty Township, Randolph County, North Carolina, also known as Quik Chek Store No. 47, containing 0.789 acre and being more particularly described as follows:

BEGINNING at an existing iron pipe in the northwest intersection of W. Swananoa Street and N. Foster Street, also being the southeast property comer of Quik Chek, Inc. Store No. 47; and running thence with the northern right-of-way of W. Swananoa Street in a western direction S 82-21-16 W 161.91 feet to an existing iron pipe, also being the southeast property corner of UnitedStates Postal Services, Deed Book 1165, Page 2000; thence leaving the right-of-way of W.Swananoa Street, running with the eastern line of United States Postal Services N 04-16-16 E272.93 feet to an existing iron pipe, being the northeast property corner of the United States PostalService, also being in the property line of Carolina Hosiery Mills, Inc.; thence in an easterlydirection with Carolina Hosiery Mills, Inc. and Ralph H. Carter, Deed Book 1861, Page 344, S 57-56-23 E 184.57 feet to a bent existing iron pipe located on the western right-of- way of N. FosterStreet; thence with the western right of way of N. Foster Street in a southern direction S 06-05-16W 153.53 feet to THE POINT OF BEGINNING, containing 0.789 acre.

43. **1050 Albemarle Road, Troy, NC**

Montgomery County, North Carolina A tract or parcel of land lying and being in Troy Township, Montgomery County, North Carolina, on the northwest side of Highway 24-27 & 109 just South of the town limits, and more particularly described as follows:

BEGINNING at a pipe on the West R/W of Highway 24-27 & 109, an original corner, also being the south corner of the McRae's 49.43 acre trct 9Deed Book 207, Page 383); thence with the said R/W S. 41°09'37" W. 200.00 feet to a point, on the said R/W, being N 41°09'37" E. 801.67 feet from the south corner of the Lincoln land which this is a part; thence with the two (2) new lines N. 59°47'12" W. 175.00 feet to a point; thence N. 32°04'15" E. 165.00 feet to a point in the old north line, being S. 68°23'57" E. 479.98 feet from the old north corner; thence with the old line S. 68°23'57" E. 210.00 feet to the BEGINNING, containing 0.79 acres, more or less, as shown on a Plat for Quik Chek, Inc. dated November 12, 1985, by James L. Wright, RLS, attached to Deed recorded in Book 219, Page 545, Montgomery County Registry.

44. **100 West NC Hwy 705, Robbins, NC**

Moore County, North Carolina All that certain tract or parcel of land lying and being in Robbins, Sheffield Township, Moore County, North Carolina, also known as Quik Chek Store No. 49, containing 0.830 acre and being more particularly described as follows:

BEGINNING at an existing iron pipe, being the northeast property corner of Wallner & Watkins Property Shopping Center, also being the northeast property corner of Quik Chek, Inc. Store No. 49, and further located in the south line of W.G. Routh, Deed Book 262, Page 616, and running thence with the southern line of W.G. Routh in a southern direction S 32-02-49 E 110.67 feet to an existing iron pipe located in the western right-of- way of N. Middleton Street, also being

W.G. Routh's southeast property corner; thence in a southern direction with the western right-of-way of N. Middleton Street S 35-56-13 W 50.24 feet to a new iron pipe; thence running inside the right-of-way of N. Middleton and N.C. Hwy 705 the following courses and distances: S 12-15-

Ex. B-1-19

53 E 39.70 feet to a point in N. Middleton Street; thence S 36-58-11 W 10.90 feet to a point; thence S 33-14-46 W 125.32 feet to a point; thence a curve to the right S 89-52-04 W a chord distance of 83.13 feet and a radius of 48.46 feet to a point on N.C. Hwy 705; thence north with N.C. Hwy 705 N 33-30-37 W 89.49 feet to a point in N.C. Hwy 705; thence in an eastern direction N 38-41-49 E 30.50 feet to a new iron pipe in the western right-of-way of N.C. Hwy 705, also being the southeast property corner of Wallner & Watkins Property Shopping Center, further being the northwest property corner of Quik Chek, Inc.; thence with the line of Wallner & Watkins N 38-41-49 E 241.61 feet to THE POINT OF BEGINNING, containing 0.830 acres.

45. **11765 Crossett Road, Bastrop, Louisiana**

Tract One
A certain tract of land containing 1.763 acres situated in Section 5, T 21 N - R 6 E, Morehouse Parish, Louisiana, further described as follows:
From the West One Quarter corner of Section 5, T 21 N - R 6 E, Morehouse Parish, Louisiana; run South 64° 43' 30" East, for 2592.45 feet to a Bar with a cap in the South right of way line of Log Cabin Road and the Point of Beginning;
thence run South 51° 44' 33" East, along said right of way line for 45.26 feet to a bar with a cap in the West right of way line of United States Highway No. 425, being in a curve to the right;
thence run along said right of way and curve to the right having a radius of 1982.47 feet, the chord being South 06° 41' 20" West, 171.09 feet for 171.14 feet to an iron pipe;
thence run South 89° 21' 40 West, for 375.33 feet to an iron pipe;
thence run North 00° 33' 33" West for 199.75 feet to an iron pipe in the South line of Log Cabin Road;
thence run North 89° 37' 17" East, along said right of way line for 361.66 feet to a bar with a cap and the Point of Beginning.
The above described tract of land is situated in Section 5, T 21 N - R 6 E, Morehouse Parish, Louisiana containing 1.763 acres, as surveyed by Jeffrey M. Messinger, Professional Land Surveyor, as shown on plat of survey File No. 8551 - C-4482 and is subject to all existing easements.

Tract Two
A certain tract of land containing 1.699 acres situated in Section 5, T 21 N - R 6 E, Morehouse Parish, Louisiana, further described as follows:
From the West One Quarter corner of Section 5, T 21 N - R 6 E, Morehouse Parish, Louisiana; run South 64° 43' 30" East, for 2592.45 feet to a bar with a cap in the South right of way line of Log Cabin Road;
thence run North 56° 47' 17" East, for 242.39 feet to a bar with a cap in the East right of way line of United States Highway No. 425 and the Point of Beginning;
thence run North 05° 29' 43" West, along said right of way line for 193.54 feet to an iron pipe in the North line of Lot 3 of the Subdivision of Freeland Johnson Log Cabin Property, as per Official Plat Book 3, page 62, of the records of Morehouse Parish, Louisiana;
thence run North 89° 55; 06" East, along said Northern line of Lot 3 for 234.54 feet to an iron pipe at the Northeast corner thereof;
thence run North 27° 17' 06" East, along the line common to Lots 4 and 7 of said subdivision for 113.50 feet to an iron pipe at the Northeast corner of said Lot 4;
thence run South 89° 33' 25" East, for 119.07 feet to an axle;
thence run South 86° 42' 31" East, along the North line of Lot 8 for 130.89 feet to a bar with a cap in the Western right of way line of Louisiana State Highway No. 140;

Ex. B-1-20

thence run South 43° 31' 26" West, along said right of way line for 206.72 feet to an iron pipe; thence run South 53° 35' 00" West, along said right of way line for 54.27 feet to a bar with a cap; thence run South 78° 18' 53" West, along said right of way line for 146.39 feet to an iron pipe; thence run South 68° 38' 35" West, for 202.28 feet to a bar with a cap and the Point of Beginning. The above described tract is situated in Section 5, T 21 N - R 6 E, Morehouse Parish, Louisiana, containing 1.699 acres as surveyed by Jeffrey M. Messinger, Professional Land Surveyor, as shown on plat of survey File No. 8551 - C-4482 and is subject to all existing easements.

46. **433 Highway 577 South, Delhi, Louisiana**

A certain tract or parcel of land located and being situated in the Northwest Quarter of Section 26, Township 17 North, Range 10 East, Madison Parish, Louisiana, more particularly described as follows:
Begin at the Southwest corner of the Northwest Quarter (NW/4) of said Section 26, said corner being an iron pipe in the center of an East and West Parish Gravel Road, and from said Point of Beginning;
run thence North along the West boundary of said Section 26, a distance of 1,526.25 feet to an iron pipe;
run thence South 50° 37' East, a distance of 1,363.27 feet to an iron pipe situated on the Western right of way line of Louisiana State Highway 577;
run thence in a Southwesterly direction, along said Western right of way line of Highway 577, a distance of 663 feet, more or less, to an iron pipe situated at the Northeast corner of that certain one acre lot of land acquired by Clyde and Blain Davis from Fred V. Frazier, by deed recorded in Conveyance Book 3, page 44, record of Madison Parish, Louisiana;
run thence North 84° 56' West, along the Northern Boundary of said Davis lot, a distance of 210 feet to an iron pipe at the Northwest corner of Davis lot;
run thence South 27° 18' West along the Western boundary of said Davis lot, a distance of 245 feet, more or less, to a point in the center of the above mentioned Parish Gravel Road;
thence North 89° 21' West, along the center of said Gravel Road, a distance of 256.8 feet to the Point of Beginning, containing 20.3 acres of land.
LESS AND EXCEPTING THEREFROM:
A certain tract or parcel of land, situated in the Parish of Madison, State of Louisiana, in Section 26, Township 17 North, Range 10 East, District North of Red River described as follows to-wit:
Commence at a 2 inch iron pipe marking the Southwest corner of the Southwest quarter (SW/4) of the Northwest Quarter
(NW/4) of Section 26, Township 17 North, Range 10 East;
run thence North 00° 39' 43" West, along the West boundary of said Section 26, a distance of 1512.82 feet to the Point of Beginning;
thence North 00° 39' 43" West, a distance of 13.43 feet to a point and corner;
thence South 51° 23' 03" East, a distance of 1359.41 feet to a point in the Northerly existing right of way limits of State Route La. 577 and corner;
thence South 47° 40' 03" West, a distance of 496.17 feet to a point and corner;
thence along the arc of a curve to the left having a radius of 1050.10 feet (the long chord of which bears South 40° 39' 39" West, a distance of 256.19 feet) a distance of 256.83 feet to a point and corner;
thence North 85° 21' 54" seconds West, a distance of 58.27 feet to a point and corner;
thence along the arc of a curve to the right having a radius of 1969.86 feet (the chord of which bears North 26° 53' 19" East, a distance of 179.64 feet) a distance of 179.71 feet to a point;
thence North 29° 30' 07" East, a distance of 226.46 feet to a point and corner;

Ex. B-1-21

thence North 36° 47' 01" West, a distance of 56.80 feet to a point;

thence along the arc of a curve to the right having a radius of 450.00 feet (the long chord of which bears North 45° 36' 31" West, a distance of 231.26 feet) a distance of 233.88 feet to a point;

thence North 30° 43' 09" West, a distance of 584.73 feet to a point;

thence along the arc of a curve to the left having a radius of 666.20 feet (the long chord of which bears North 44° 57' 15" West, a distance of 327.64 feet) a distance of 331.03 feet to the Point of Beginning; containing an area of 5.803 acres, more or less.

The property conveyed herein being the same as that acquired by Vendors from Lake Providence Investments, Inc. by deed recorded Mary 12, 1978, in Conveyance Book 44, page 33 of the records of Madison Parish, Louisiana.

47. **1601 Farmerville Hwy/I-20, Ruston, Louisiana**

That certain piece or portion of ground in Lincoln Parish, State of Louisiana, more fully described as follows:

Beginning at a point which is the intersection of the South right of way of I-20 and the Westerly right of way of Louisiana

Highway 33;

thence South 37° 46' 18" West (Record South 37° 38' West), along the Westerly right of way of Louisiana Highway 33, a

distance of 152.20 feet (record 152.00 feet) to a point;

thence South 46° 50' 40" West, (Record South 46° 42' 22" West) along the Westerly right of way of Louisiana Highway

33, a distance of 78.46 feet (Record 78.35 feet) a point;

thence North 51° 54' 00" West, a distance of 180 .59 feet to a point;

thence North 38° 16' 51" East, (Record North 38° 08' 30" East) a distance of 229.43 feet (Record 229.46 feet) to a point

on the Southerly right of way of I-20;

thence South 51° 59' 39" East, (Record South 51° 54' 00" East) along the Southerly right of way of I-20, a distance 190.92 feet, (Record 190.90 feet) back to the Point of Beginning.

All as more fully shown on plat of survey of ReCon Surveying, Inc., Virgil T. Collins, RPLS, dated June 22, 1999, Job 16579.

48. **200 S Main Street, Junction City, Louisiana 71749**

THOSE CERTAIN LOTS OF GROUND situated in Lots 5, 6, 7, and 8 of Block No. 28 of the Town of Junction City, Claiborne Parish, Louisiana, per the map and survey of said Town on file and of record in the office of the Clerk of Court, Claiborne Parish, Louisiana and being more fully described as follows:

Beginning at a P. K. Nail set for corner at the Northeast Corner of said Lot 5 and also being at the intersection of the West Right-of-Way of Main Street and the South Right-of-Way of 4th Street; thence run S 0 degrees 00 minutes 00 seconds E along the West Right-of-Way of Main Street and along the East lines of said Lots 5 through 8 to the South line of said Lot 8, a distance of 106.67 feet, to a ½" iron pipe set for corner and also being the Southeast corner of said Lot 8; thence run N 89 degrees 44 minutes 47 seconds W along the South line of said Lot 8, a distance of 150.0 feet, to a ½" iron pipe set for corner and also being the Southwest corner of said Lot 8; thence run N 0 degrees 00 minutes 00 seconds W along the West lines of said Lots 8 through 5 and along the East Right-of-Way of a 20 foot Alley to the South Right-of-Way of 4th Street, a distance of 106.67 feet, to a ½" iron pipe set for corner and also being the Northwest corner of

Ex. B-1-22

said Lot 5; thence run S 89 degrees 44 minutes 47 seconds E along the South Right-of-Way of 4th Street and along the North line of said Lot 5, a distance of 150.00 feet to the Point of Beginning.

All as more fully shown on plat of survey of Michael P. Bowman dated July 16, 1999.

TRACT 2:

From the Point where the Section line common to Sections 26 and 27, T. 17 N., R. 10 E. intersects the gravel road, running East and West, said point being an iron pipe; thence run East along the North right-of-way of said gravel road 267.2 â€™to an iron pipe and POINT OF BEGINNING; thence continue along said right-of-way 210â€™ to an iron pipe at the intersection of the said gravel road and the Waverly-Warsaw Road, La Highway 577, thence North along the right-of-way of the

Waverly-Warsaw road 210â€™ to an iron pipe; thence West parallel to the said gravel road 210â€™ to an iron pipe; thence South 210â€™ to the Point of Beginning, said tract lying in the NW Â¼ of Section 26, T. 17 N., R. 10E.

LESS AND EXCEPT that certain parcel of land conveyed to the State of Louisiana, Department of Highways, per deed dated May 28, 1968, recorded in Conveyance Book â€œ19â€•  at page 289, records of Madison Parish, Louisiana, more particularly described as follows, to wit:

Two (2) certain tracts or parcels of ground, situated in the Southwest Quarter (SW Â¼) of the Northwest Quarter (NW Â¼) of Section 26, Township 17 North, Range 10 East, Madison Parish, Louisiana, the boundary lines of which tracts are more particularly described as follows:

Commence at three-fourths (3/4) inch iron pipe marking the Southwest corner of the property of the Vendor and run thence North 89Â° 12â€™ 12â€•  East along the west property line of the property of the Vendor, a distance of 175.89 feet to the point of beginning; thence along the arc of a curve to the right having a radius  1,969.89 feet (the chord of which bears North 21Â° 0 00â€™ 25â€•  East, a distance of 159.64 feet) a distance of 156.68 feet to a point and corner; thence South 66Â° 04â€™ 15â€•  East, a distance of 46.89 feet to a point which is located in the westerly existing right of way limits of State Route LA 577 opposite approximate Highway Survey Station 8+70.94 and corner; thence along the arc of a curve to the left having a radius of 1050.10 feet (the chord of which bears South 26Â° 27â€™ 37â€•  West a distance of 157.96 feet) a distance of 158.11 feet to a point in the south property line of the Vendor and corner; thence South 89Â° 12â€™ 20â€•  West along with south boundary line of Vendorâ€™s property, a distance of 33.86 feet to the point of beginning and identified as PARCEL NO. 7-3, as shown on the Right of Way Map prepared by Fred. O. Eldred, Registered Land Surveyor, dated June 11, 1965 for the DELHI-TALLULAH INTERSTATE HIGHWAY, STATE PROJECT NO. 451-08-01, F. A. P. NO. I-20-4-(2)154, ROUTE I-20, MADISON PARISH, said map being filed in the office of the Louisiana Department of Highways in the City of Baton Rouge, Louisiana.

PARCEL NO. 7-3-1

Commence at a three-fourth (3/4) inch iron pipe marking the Southwest corner of the property of the vendor and run thence North 89Â° 12â€™ 20â€•  East a distance of 175.89 feet to a point and corner; thence along the arc of a curve to the right having a radius of 1969.86 feet (the chord of which bears North 21Â° 00â€™ 25â€•  East a distance of 159.64 feet) a distance of 159.68 feet to the Point of Beginning; thence along the arc of a curve to the right having a radius of 1969.86 feet (the Chord of which bears North 23Â° 48â€™ 07â€•  East a distance of 32.52 feet) a distance of 32.52 feet to a point in the north boundary line of the property of the Vendor and corner; thence South 86Â° 21â€™ 54â€•  East, a distance of 58.27 feet to a point in the existing westerly right of way line of State Route LA 577 and corner; thence along the arc of a curve to the left having a radius of 1050.10 feet (the chord of which bears South 32Â° 12â€™ 51â€•

Ex. B-1-23

West a distance of 52.79 feet) a distance of 52.79 feet to a point and corner; thence North 66Â°40â€™ 15â€• West a distance of 46.89 feet to the point of beginning and identified as PARCEL NO. 7-3-1, as shown of the Right of Way Map, prepared by Fred O. Eldred, Registered Land Surveyor, dated June 11, 1965 for the DELHI-TALLULAH INTERSTATE HIGHWAY, STATE PROJECT NO. 451-08-01, F.A.P. NO. I-20-4(2)154, ROUGHE i-20, MADISON PARISH, said map being filed the in the City of Baton Rouge, Louisiana.

And being the same property acquired by Vendors from Guarantee Bank and Trust Company of Delhi by deed recorded in Conveyance Book 57, Page 792, of the records of Madison Parish, Louisiana, as corrected through an Act of Correction recorded in Conveyance Book 183, Page 288 of the records of Madison Parish, Louisiana.

Please Note: any reference to â€œVendorâ€• refers to that certain Vendor in Cash Deed recorded March 4, 1999 in Book 183, Folio 294 of the Conveyance Records of Madison Parish, Louisiana.

49. **24605 Highway #2, Homer, Louisiana**

The following described tract situated in the Northwest Quarter of Southeast Quarter (NW 1/4 of SE 1/4) of Section 14, Township 21 North, Range 7 West, Claiborne Parish, Louisiana, to-wit:
Beginning at the point of intersection of the South right of way (70 feet from center) of Louisiana Highway No. 2 with the West
right of way line (67 feet from center) of U.S. Highway 79, and from said Point of Beginning;
run due South 62.2 feet to a Louisiana Highway Department concrete post for a starting point;
thence run North 43° 41' West,
along intersection right of way 91.6 feet to Louisiana Highway Department concrete post;
thence run North 86° 56'West, along the South right of way (70 feet from center) of Louisiana Highway No. 2, a distance of 307.6
feet;
thence run South 26° 05' West, 71.8 feet;
thence run South 17° 30' East, 39.8 feet;
thence run South 48° 51' East, 90.7 feet;
thence run South 15° 02' East, 108.1 feet;
thence run North 70° 08' East, 134.4 feet;
thence run South 87° 42' East, 67 feet;
thence run South 66° 22' East, 108 feet to the West right of way (67 feet center) of U.S. Highway No. 79;
thence run North 182.2 feet to the starting point, containing 1.82 acres more or less.

Being the same property conveyed by Liddie Ophelia Caver to Edward Ralph Spigener, et al., under an Act of Sale filed for record under File No. 282733 and recorded in Book 449 at Page 27 of the Conveyance Records of Claiborne Parish, Louisiana.

50. **1208 Broadway, Delhi, Louisiana 71232**

A certain tract or land situated near the Town of Delhi, Richland Parish, Louisiana, more particularly described as being situated in the Northeast Quarter of the Southeast Quarter of Section 24, Township 17 North, Range 9 East,
Commencing at the Section corner common to Sections 24 and 25, Township 17 North, Range 9 East, and Section 19 and 30, Township 17 North, Range 10 East; and

Ex. B-1-24

run North 1° 8' 38" West, along the common boundary line of said Section 24, Township 17 North, Range 9 East, and Section 19, Township 17 North, Range 9 East, and Section 19, Township 17 North, Rang 10 East, 2695.69 feet to a point and corner; thence South 89° 36' 44" West, 528.63 feet to a point and corner;

thence South 14° 59' 46" West, 1176.17 feet along the existing Easterly right of way line of Route La. 17 to a point and corner;

thence North 75° 01' 18" West, along a line which intersects the adopted center line of Route La. 17 at Highway Survey Station 45/50, a distance of 60.00 feet;

thence continuing North 75° 01' 18" West, 29.56 feet to a point and corner;

thence North 13° 52' 08" East 723.00 feet to the Point of Beginning of the property described herein;

thence South 14° 00' 12" West, actual (South 13° 52' 08" West, title) along the West line of Louisiana Highway No. 17 (being the Westerly line of that parcel conveyed to the State of Louisiana, Department Highways, by Deed, recorded in Conveyance Book 210, page 85, Richland Parish, Louisiana, records)174.83 feet actual (175 feet, title);

thence North 76° 07' 52" West, with a 90° interior angle 174.95 feet actual (175 feet, title);

thence North 13° 52' 08" East, and parallel to the West line of La. Highway No. 17, a distance of 293.51 feet to the South line of Interstate Highway 20 Frontage Road (being the Southerly line of that property above referred to conveyed to the State of Louisiana, Department of Highways);

thence South 42° 02' 28" East, actual (South 42° 01' 28" East, title) along the South line of said Interstate Highway No. 20 Frontage Road, 211.74 feet actual (211.35 feet, title) to the Point of Beginning.

All as more fully shown on Plat of Survey of Michael P. Bowman, PLS, dated July 29, 1999.

51. **4243 W. Pioneer Drive, Irving TX**

Tract I:

Lot 3, Block A, WAL-MART ADDITION, an Addition to the City of Irving, Dallas County, Texas, according to the Plat thereof recorded in Volume 93161, Page 1238, Map Records, Dallas County, Texas.

Tract IA:

Non- exclusive easements, for pedestrian and vehicular ingress and egress, as set forth in that certain Restrictive Use Easement Agreement dated 11/20/1997, filed 12/22/1997, recorded in Volume 97247, Page 1577, Deed Records, Dallas County, Texas.

52. **110110 Harry Hines Blvd., Dallas TX**

Tract III:

Lot 2, Block B/5794, of Harry Hines Willowbrook Addition, Phase One, an Addition to the City of Dallas, Dallas County, Texas, according to the Map or Plat thereof recorded under Clerk's File No. 201400256613, Real Property Records, Dallas County, Texas.

Tract IIIA:

Non-exclusive easements as created in Mutual Access Easement Appurtenant Agreement dated October 21, 2013, filed October 22, 2013, recorded under Clerk's File No. 201300330157, Real Property Records, Dallas County, Texas.

53. **8620 Lake June Rd., Dallas, TX**

Tract VI

Lot 2A, Block 6658, Lucky Texan-7, Lot 2A and 2B, Block 6658, an Addition to the City of Dallas, Dallas County, Texas, according to the Map or Plat recorded under Clerk's File No. 201500298426, Map Records of Dallas County, Texas.

54. **5001 South Buckner Blvd., Dallas TX**

Lot 1, Block 10/6127, BUCKNER PLACE, an Addition to the City of Dallas, Dallas County, Texas, according to the Map or Plat recorded in Volume 84115, Page 3440, Map Records of Dallas County, Texas.

55. **2600 East Highway 30, Mesquite, TX**

Lot 1R-1, in Block A, of Towne Crossing, an Addition to the City of Mesquite, Dallas County, Texas, according to the map thereof recorded under Clerk's File No. 202100034739, Real Property Records, Dallas County, Texas

Ex. B-1-26

# EXHIBIT B-2
# TO
# AMENDED AND RESTATED MASTER LEASE AGREEMENT

## ALLOCATED BASE RENT SCHEDULE

| Property Address | City | State | Allocated Base Rent |
|---|---|---|---|
| 17013 State Road 37 | Harlan | IN | $ 218,126.24 |
| 8717 US Hwy 24 | Fort Wayne | IN | $ 244,286.41 |
| 4832 South Calhoun Road | Fort Wayne | IN | $ 104,257.15 |
| 143 West Tully Street | Convoy | OH | $ 115,756.91 |
| 5777 Ottawa Road | Lima | OH | $ 198,268.93 |
| 602 East Perry Street | Paulding | OH | $ 125,954.36 |
| 204 West East Main Street | Deshler | OH | $ 113,431.81 |
| 305 East Main Street | McComb | OH | $ 178,832.62 |
| 203 US Highway 62 | Alpena | AR | $ 75,116.88 |
| 330 East Main Street | Gassville | AR | $ 78,862.32 |
| 901 South College Street | Mountain Home | AR | $ 86,353.20 |
| 1508 Highway 62 | Mountain Home | AR | $ 67,938.12 |
| 700 US 64 East | Wynne | AR | $ 78,030.00 |
| 702 Central Boulevard | Bull Shoals | AR | $ 62,424.00 |
| 6132 AR-5 | Midway | AR | $ 74,908.80 |
| 703 East Main Street | Flippin | AR | $ 75,116.88 |
| 1580 South College Street | Mountain Home | AR | $ 78,030.00 |
| 433 Albemarle Road | Troy | NC | $ 54,142.42 |
| 6555 Highway 52 North | Welcome | NC | $ 131,049.83 |
| 511 East Main Street | Biscoe | NC | $ 111,837.33 |
| 512 West Main Street | Locust | NC | $ 152,912.06 |
| 481 US Highway 1 South | Rockingham | NC | $ 373,492.54 |
| 3233 Wow Road | Randleman | NC | $ 147,018.45 |
| 530 North Main Street | Troy | NC | $ 136,714.69 |
| 1634 Zoo Parkway | Asheboro | NC | $ 117,637.79 |
| 103 South Main Street | Candor | NC | $ 96,596.49 |
| 527 Old Liberty Road | Asheboro | NC | $ 91,771.23 |
| 231 South Main Street | Star | NC | $ 117,354.19 |
| 2655 North Church Street | Haw River | NC | $ 96,644.09 |
| 434 Little River Road | Seagrove | NC | $ 181,569.86 |
| 11126 N NC Highway 150 | Winston-Salem | NC | $ 111,739.11 |
| 100 Highway 52 South | Albemarle | NC | $ 182,186.85 |
| 515 East Main Street (109 Hillview Extension) | Candor | NC | $ 97,057.59 |
| 713 Main Street | Oakboro | NC | $ 119,029.41 |
| 4416 South NC 150 | Lexington | NC | $ 248,341.33 |
| 7039 Jordan Road | Ramseur | NC | $ 139,472.74 |
| 2003 North Fayetteville Street | Asheboro | NC | $ 207,856.64 |
| 315 Randolph Street | Thomasville | NC | $ 180,687.46 |
| 800 Bryan Road | Thomasville | NC | $ 178,324.70 |
| 1011 Liberty Road | Archdale | NC | $ 198,407.33 |
| 2271 Main Street | Ellerbe | NC | $ 183,205.61 |

Ex. B-1-28

| 402 West Swannanoa Street | Liberty | NC | $ | 201,655.77 |
|---|---|---|---|---|
| 1050 Albemarle Road | Troy | NC | $ | 156,359.73 |
| 100 West NC Highway 705 | Robbins | NC | $ | 180,989.89 |
| 11765 Crossett Road | Bastrop | LA | $ | 210,187.95 |
| 433 Highway 577 South | Delhi | LA | $ | 347,036.50 |
| 1601 Farmville Highway/I-20 | Ruston | LA | $ | 117,356.58 |
| 200 S Main Street | Junction City | LA | $ | 136,961.07 |
| 24605 Highway #2 | Homer | LA | $ | 125,618.01 |
| 1208 Broadway Street | Delhi | LA | $ | 48,698.47 |
| 4243 W. Pioneer Drive | Irving | TX | $ | 822,168.53 |
| 110110 Harry Hines Blvd | Dallas | TX | $ | 366,716.29 |
| 8620 Lake June Rd | Dallas | TX | $ | 750,277.59 |
| 5001 South Buckner Blvd | Dallas | TX | $ | 712,722.35 |
| 2600 East Highway 30 | Mesquite | TX | $ | 712,722.35 |

Ex. B-1-28

**EXHIBIT C**
**TO**
**AMENDED AND RESTATED MASTER LEASE AGREEMENT**

**GENERAL REQUIREMENTS AND CONDITIONS**

All provisions of this Exhibit are expressly subject to the provisions in the Lease above governing any work performed by Tenant (or an Affiliate of Tenant, as the case may be) on its own behalf, including Alterations or any casualty or condemnation restoration ("**Tenant's Work**"). In the event of any conflict between the Lease and this Exhibit, the Lease shall control.

Tenant's Work will be performed by Tenant in substantial accordance with final Plans approved by Landlord (where such approval is provided for in the Lease). Tenant's contractor(s) shall secure and pay for all necessary permits, inspections, certificates, legal approvals, certificates of occupancy and/or fees required by public authorities and/or utility companies with respect to Tenant's Work.

A.     General Requirements

    1.     All Tenant's Work shall be completed in a good and workmanlike manner and in accordance with the Plans as approved by Landlord, the terms of the General Construction Contract and the budget applicable to such Tenant's Work.

    2.     Tenant and Tenant's contractors shall provide all insurance required by Landlord as set forth in this Lease, or as is otherwise maintained in the ordinary course by prudent and reputable contractors and/or property owners, prior to the start of any construction work within the Premises. Landlord and Landlord Mortgagee shall each be named as an additional insured in all such insurance.

    3.     Tenant shall, at all times, keep or cause to be kept the Premises and the surrounding area free from accumulations of waste materials and/or rubbish caused by it or its contractors' employees or workers. Tenant and/or its contractors shall provide dumpsters and maintenance of said dumpsters during the construction period in a secure, neat and orderly condition and shall remove and empty the same on a regular basis to avoid unsightly, obstructive or hazardous accumulations or conditions.

B.     Construction Procedures

    1.     When submitting construction plans and specifications (preliminary, completed or final), Tenant or Tenant's appointed representative shall issue Tenant's plans, specifications and supporting documents electronically via emails to Landlord's construction coordinator.

    2.     Once the applicable Plans are approved by Landlord, except for (A) changes required by governmental authorities having jurisdiction over the Premises or (B) interior changes requested by Tenant, and in each case which would not lessen the value of the Premises, Tenant shall not amend, modify or supplement the applicable

General Construction Contract in any respect, except pursuant to change orders approved by Landlord, and shall not attempt to terminate, whether by legal proceedings or otherwise, the applicable General Construction Contract without the prior written consent of Landlord, which shall not be unreasonably withheld, conditioned or delayed.

3. Not later than ninety (90) days after the Final Completion of the applicable Tenant's Work, Tenant shall deliver or cause to be delivered to Landlord (with a copy to Landlord's consultant) each of the following (1) a certificate addressed to Landlord, signed by a duly authorized officer of Tenant and the applicable Architect or General Contractor (but only if such General Contractor is a design-builder for the applicable Tenant's Work), stating that the Tenant's Work (and any equipment therein) including all "punch list" items have been completed and installed in accordance with the applicable Plans therefor; (2) a complete release of liens for the Premises signed by the General Contractor and all subcontractors of the Tenant's Work and Tenant shall, if a release is not obtainable, in lieu of such release cause such lien to be removed of record by bond or otherwise so that such lienor has no recourse for recovery from or collection out of the Premises; (3) evidence of receipt of a certificate of occupancy, if available, or comparable instruments, by all governmental authorities whose approval is required of the applicable completed Tenant's Work for the occupancy thereof and the intended uses thereof; (4) if applicable, a volume containing all warranties and indemnities from the applicable contractor or manufacturer for the applicable Tenant's Work or equipment therein (excepting therefrom any of Tenant's Personal Property), each of which shall be enforceable by Landlord and all in customary form for the jurisdiction in which the Premises is situated; (5) final as-built Plans and, in the event that the Tenant's Work has modified the footprint of the Building, an as-built ALTA-ACSM Land Title Survey for the Premises indicating the applicable Tenant's Work thereon, together with a surveyor's certification in a customary form as reasonably satisfactory to Landlord; and (6) a title commitment dated no earlier than the date that is thirty (30) days after Final Completion and which title commitment shall not disclose any mechanics' liens affecting the Property, except that with respect to any bona fide dispute with the applicable General Contractor or any such subcontractor that has resulted in a lien, Tenant shall, if a release is not obtainable, in lieu of such release cause such lien to be removed of record by bond or otherwise so that such lienor has no recourse for recovery from or collection out of the Premises.

4. Tenant hereby agrees to indemnify, save harmless, pay, protect and defend Landlord from and against any and all liabilities, losses, damages, penalties, costs, expenses (including Landlord's reasonable counsel fees and costs of suit), causes of action, suits, claims, demands or judgments of any nature whatsoever under this Lease or Landlord's ownership of the Premises arising from or in connection with (a) any General Construction Contract, if any, and any and all construction contracts or architect's agreement or resulting from the failure of Tenant to discharge Tenant's obligations thereunder or resulting from the failure of Tenant to perform its obligations under this Lease with respect to any instance of Tenant's Work, and (b) construction and completion of Tenant's Work, whether by reason

of any act or omission of Tenant, the General Contractor, Architect or by any other contractor, subcontractor or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable.

5. Tenant's Work shall comply in all respects with applicable Law.

**EXHIBIT D**
**TO**
**AMENDED AND RESTATED MASTER LEASE AGREEMENT**

**FORM ESTOPPEL CERTIFICATE**
**ESTOPPEL CERTIFICATE**

This ESTOPPEL CERTIFICATE (this "Estoppel") is made as of _____, by [_____
_____], a [_____] ("Tenant"), based upon the following facts and understandings of Tenant:

**RECITALS**

A.      Tenant is the tenant under that certain Amended and Restated Master Lease Agreement
        (Oak Trust) (the "Lease"), dated as of _____, 202_, between Tenant and
        [LANDLORD ENTITY], a Delaware limited liability company, as landlord ("Landlord")
        of certain real property commonly known as _____, and as more particularly
        described in the Lease (the "Property").

B.      Mountain Express Oil Company, a Georgia corporation ("Guarantor") is the guarantor
        under that certain Amended and Restated Unconditional Guaranty of Payment and
        Performance, dated as of [_____], 202_, by Guarantor in favor of Landlord (the
        "Guaranty", and together with the Lease, collectively, the "Agreements").

C.      Landlord has requested that Tenant provide this Estoppel pursuant to Section 27 of the
        Lease and Section XX of the Guaranty.

D.      [IF APPLICABLE] Landlord has agreed to convey the Property to _____, a
        _____ ("Purchaser").  As a condition to Purchaser purchasing the Property,
        Purchaser has required that Tenant furnish certain assurances to, and make certain
        agreements with, Purchaser, as set forth below.

E.      [IF APPLICABLE] [Landlord] [Purchaser], as borrower or as co-borrower with one or
        more other co-borrower(s), has applied to _____, a _____
        (together with its successors and assigns, "Lender") for a loan ("Loan"), which will be
        secured by, among other things, a mortgage, encumbering the Property.  As a condition to
        making the Loan, Lender has required that Tenant furnish certain assurances to, and make
        certain agreements with, Lender, as set forth below.

F.      Capitalized terms used but not otherwise defined herein shall have the definitions given
        such terms pursuant to the terms of the Lease.

THEREFORE, [as a material inducement to Lender to make the Loan and Purchaser to purchase
the Property], Tenant warrants and represents to, and agrees with, Landlord [Lender] and
[Purchaser] as follows:

1.      **ESTOPPEL.**

Tenant and Guarantor each warrants and represents to Landlord [Lender] and [Purchaser], as of the date hereof, that:

1.1 <u>Agreements Effective</u>. Attached hereto as <u>Exhibit A-1</u> is a true, complete and accurate copy of the Lease. Attached hereto as <u>Exhibit A-2</u> is a true, complete and accurate copy of the Guaranty. The Agreements have been duly executed and delivered by Tenant and are in full force and effect, the obligations of Tenant thereunder are valid and binding, and there have been no modifications or additions to the Agreements, written or oral, other than those, if any, which are attached on <u>Exhibit A-1</u> and <u>Exhibit A-2</u> attached hereto and made a part hereof. There are no other promises, agreements, understandings or commitments between Landlord and Tenant relating to the Property, and Tenant has not given Landlord any notice of termination under the Lease.

1.2 <u>Possession</u>. Except as set forth in <u>Exhibit B</u> attached hereto and made a part hereof, Tenant is in full and complete possession of the Property and has accepted the Property, including any tenant improvements or other work of Landlord performed thereon pursuant to the terms and provisions of the Lease, and the Property is in compliance with the Lease. There are no contributions, credits, free rent, rent abatements, deductions, concessions, rebates, unpaid or unreimbursed construction allowances, offsets or other sums due to Tenant from Landlord under the Lease, except _____.

1.3 <u>Minimum Rent</u>. The current *monthly* Base Rent under the Lease is $_____, subject to any escalation and/or additional Rent charges provided in the Lease, and such Base Rent is current as of the date hereof.

1.4 <u>Additional Rent</u>. The current *monthly* additional Rent under the Lease is $_____, and such additional Rent is current within thirty (30) days as of the date hereof.

1.5 <u>Rental Payment Commencement Date</u>. The Base Rent stated in <u>Section 1.3</u> above began on _____, 2021.

1.6 <u>Rentable Area</u>. The rentable area of the Building located upon the Premises is _____ square feet.

1.7 <u>Commencement Date</u>. The Term of the Lease commenced on _____, 2021.

1.8 <u>Expiration Date</u>. The Term of the Lease will expire on _____ (unless sooner terminated or extended in accordance with the Lease).

1.9 <u>Options to Renew or Extend</u>. Tenant has no option to renew or extend the Term of the Lease, except as follows: _____ (if none, write "None").

1.10 <u>No Default</u>. There exists no breach, default, or event or condition which, with the giving of notice or the passage of time or both, would constitute a breach or default

under the Agreements by Tenant or, to Tenant's knowledge, Landlord, except as follows: _____(if none, write "None"). Tenant has no existing claims, defenses or offsets against Rent due or to become due under the Lease, except as follows: _____(if none, write "None").

1.11 <u>Entire Agreement</u>. The Agreements constitute the entire agreement between Landlord and Tenant with respect to the Property, and Tenant claims no rights of any kind whatsoever with respect to the Property, other than as set forth in the Lease, except as follows: _____(if none, write "None").

1.12 <u>No Deposits or Prepaid Rent</u>. No deposits, including security deposits, or prepayments of Rent have been made in connection with the Lease, except: _____ (if none, write "None"). None of the Rent has been paid more than one (1) month in advance.

1.13 <u>No Purchase Option or Preferential Right to Purchase</u>. Tenant does not have any option or preferential right to purchase all or any part of the Property, except as follows: _____.

1.14 <u>Authority</u>. The undersigned representatives of Tenant are each duly authorized and fully qualified to execute this instrument on behalf of Tenant thereby binding Tenant.

1.15 <u>Financial Condition; Bankruptcy</u>. There are no voluntary or involuntary actions pending against Tenant under the bankruptcy laws of the United States or any state thereof.

2. **<u>HEIRS, SUCCESSORS AND ASSIGNS</u>**. The covenants herein shall be binding upon, and inure to the benefit of, the heirs, successors and assigns of the parties hereto. Whenever necessary or appropriate to give logical meaning to a provision of this Estoppel, the term "Landlord" shall be deemed to mean the then current owner of the Property and the landlord's interest in the Lease.

**[Signature Page to Follow]**

IN WITNESS WHEREOF, Tenant has executed this instrument as of the date first listed above.

**TENANT:**

[_____],
a [_____]

By:_____
Name: _____
Title: _____

**[GUARANTOR:**

[_____],
a [_____]

By:_____
Name: _____
Title: _____]

**Exhibit A-1**

**LEASE AND AMENDMENTS (IF ANY)**

**[Attached]**

**Exhibit A-2**

**GUARANTY AND AMENDMENTS (IF ANY)**

**[Attached]**

**Exhibit B**

**SUBLEASES (IF ANY)**

**[Attached]**

**EXHIBIT E
TO
AMENDED AND RESTATED MASTER LEASE AGREEMENT**

**FORM OF MEMORANDUM OF LEASE**

RECORD AND RETURN TO:

_____

_____

_____

**MEMORANDUM OF LEASE AGREEMENT**

THIS MEMORANDUM OF LEASE AGREEMENT (this "**Memorandum**") is made as of this ____ day of _____, 202__, by and between [LANDLORD ENTITY], a Delaware limited liability company ("**Landlord**"), and [_____], a [_____] ("**Tenant**").

      1.     Memorandum of Lease of Premises. This Memorandum is recorded in connection with, and as evidence of, that certain Amended and Restated Master Lease Agreement (Oak Trust) (the "**Lease**") dated as of _____ _____, 202_ as may be amended from time to time, by and between Landlord and Tenant for that certain real property and the improvements thereon described on Exhibit A attached hereto and made a part hereof (the "**Premises**"). The Lease is incorporated by reference into this Memorandum. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Lease.

      2.     Lease Term and Certain Other Provisions. The initial Term of the Lease commenced on _____, 20__ and expires on _____, 20__. Tenant has [_____] options to extend the initial Term of the Lease pursuant to the applicable provisions thereof for an additional term of [_] years each.

      3.     Subordination. The Lease shall be subordinate at all times to any Landlord Mortgage and the rights of any Landlord Mortgagee; provided, however, in the event of a foreclosure under any such Landlord Mortgage, or conveyance or assignment in lieu of foreclosure or by deed in lieu of foreclosure, such Landlord Mortgagee and its successors and assigns shall not disturb the occupancy or other rights of Tenant under the terms of the Lease so long as no Event of Default exists thereunder.

      4.     Purpose of Memorandum; Conflicting Provisions. The purpose of this Memorandum is to make the Lease a matter of public record. If a provision of this Memorandum conflicts with a provision in the Lease, the provision in the Lease will control.

      5.     Counterparts. This Memorandum may be executed in multiple counterparts, each of which shall be deemed an original instrument, and all of which, taken together, shall constitute

one and the same instrument.  The signature of a party hereto to any counterpart hereof shall be deemed a signature to, and may be appended to, any other counterpart hereof

**[Signature Pages Follow]**

IN WITNESS WHEREOF, Landlord and Tenant have duly executed this Memorandum of Lease Agreement as of the day and year first above written.

LANDLORD:

[LANDLORD ENTITY], a Delaware limited liability company

By:_____

Name: _____

Title: _____

STATE OF _____    )

COUNTY OF _____    )

I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that _____, whose name as _____ of _____, a Delaware limited liability company, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such [officer] and with full authority, executed the same voluntarily for and as the act of said [corporation], acting in its capacity as _____ of said limited liability company as aforesaid.

Given under my hand and official seal, this _____ day of _____, 20___.


_____
Notary Public

AFFIX SEAL

My commission expires: _____

**EXHIBIT A**
**Legal Description of Premises**

# EXHIBIT F
# TO
# AMENDED AND RESTATED MASTER LEASE AGREEMENT

## REQUIRED REPAIRS

| Property | Item | Total Cost | Expected Year of Analysis | Year | Tenant/ Landlord Cost? |
|---|---|---|---|---|---|
| 17013 IN-37, Harlan, IN | CBRE Project Number: 21-465PC-0572-10 | | | | |
| | Assorted roofing repairs | $1,400 | Immediate | 2021 | Tenant |
| | Service/replace fire extinguishers | $100 | Immediate | 2021 | Tenant |
| | ADA Compliance - add accessible van parking space | $250 | Immediate | 2021 | Tenant |
| | ADA Compliance - replace knob tpye faucets with paddles | $400 | Immediate | 2021 | Tenant |
| | ADA Compliance - pipe insulation | $50 | Immediate | 2021 | Tenant |
| | Replace damaged ceiling tiles | $700 | Immediate | 2021 | Tenant |
| | | | | | |
| 8717 US-24, Fort Wayne, IN | CBRE Project Number: 21-465PC-0572-11 | | | | |
| | Replace damaged rubbish enclosure fencing | $1,200 | Immediate | 2021 | Tenant |
| | Repair misc. damage/impact damage | $350 | Immediate | 2021 | Tenant |
| | Re-roofing, TPO single ply system | $12,617 | Immediate | 2021 | Tenant |
| | ADA Compliance - add accessible van parking space | $250 | Immediate | 2021 | Tenant |
| | Rout and seal asphalt pavement cracks | $1,125 | Immediate | 2021 | Tenant |
| | Replace rooftop unit | $17,000 | Immediate | 2021 | Tenant |
| | | | | | |
| 4832 S Calhoun St, Fort Wayne, IN | CBRE Project Number: 21-465PC-0572-12 | | | | |
| | Service/replace fire extinguishers | $150 | Immediate | 2021 | Tenant |
| | ADA Compliance - add accessible van parking space | $250 | Immediate | 2021 | Tenant |
| | Rout and seal asphalt pavement cracks | $700 | Short-term | 2021 | Tenant |
| | | | | | |
| 143 W Tully St, Convoy, OH | CBRE Project Number: 21-465PC-0572-13 | | | | |
| | Repair concrete parking lot/pavement areas | $750 | Immediate | 2021 | Tenant |
| | Repair siding damage | $1,400 | Immediate | 2021 | Tenant |
| | Assorted drainage repairs | $350 | Immediate | 2021 | Tenant |

| | | | | | |
|---|---|---|---|---|---|
| | Repair storage building | $5,000 | Immediate | 2021 | Tenant |
| | ADA Compliance - add accessible van parking space | $250 | Immediate | 2021 | Tenant |
| | Repair floor tiles | $700 | Immediate | 2021 | Tenant |
| | | | | | |
| **5777 Ottawa Rd, Lima, OH** | **CBRE Project Number: 21-465PC-0572-14** | | | | |
| | Repair concrete parking lot/pavement areas | $1,400 | Immediate | 2021 | Tenant |
| | Replace full depth service sections of asphalt pavement | $2,500 | Immediate | 2021 | Tenant |
| | Repair misc damage/impact damage | $350 | Immediate | 2021 | Tenant |
| | Assorted roofing repairs | $350 | Immediate | 2021 | Tenant |
| | service/replace fire extinguishers | $100 | Immediate | 2021 | Tenant |
| | ADA Compliance - add accessible van parking space | $250 | Immediate | 2021 | Tenant |
| | | | | | |
| **602 E Perry St, Paulding, OH** | **CBRE Project Number: 21-465PC-0572-15** | | | | |
| | Assorted roofing repairs | $1,750 | Immediate | 2021 | Tenant |
| | ADA Compliance - install drain wrap | $50 | Immediate | 2021 | Tenant |
| | ADA Compliance - add accessible van parking space | $250 | Immediate | 2021 | Tenant |
| | ADA Compliance - replace door hardware with lever type | $150 | Immediate | 2021 | Tenant |
| | Mill and overlay asphalt pavement | $26,400 | Short-term | 2021 | Tenant |
| | Re-coat metal roof | $9,788 | Short-term | 2021 | Tenant |
| | Replace water damage ceiling tiles | $700 | Short-term | 2021 | Tenant |
| | Replace self-contained, packaged unit | $17,000 | Short-term | 2021 | Tenant |
| | | | | | |
| **204 W E Main St, Deshler, OH** | **CBRE Project Number: 21-465PC-0572-16** | | | | |
| | ADA Compliance - add accessible van parking space | $250 | Immediate | 2021 | Tenant |
| | ADA Compliance - install drain pipe insulation | $50 | Immediate | 2021 | Tenant |
| | Replace full depth sections of asphalt pavement | $2,500 | Short-term | 2021 | Tenant |
| | Mill and overlay asphalt pavement | $10,925 | Short-term | 2021 | Tenant |
| | Repair concrete parking lot/pavement areas | $9,375 | Short-term | 2021 | Tenant |
| | | | | | |
| **305 E Main St, McComb, OH** | **CBRE Project Number: 21-465PC-0572-17** | | | | |
| | Replace concrete sidewalk sections | $750 | Immediate | 2021 | Tenant |

| | | | | | |
|---|---|---|---|---|---|
| | Service/repair fire extinguishers | $100 | Immediate | 2021 | Tenant |
| | ADA Compliance - add accessible van parking space | $250 | Immediate | 2021 | Tenant |
| | ADA Compliance - replace door hardware with lever type | $300 | Immediate | 2021 | Tenant |
| | ADA Compliance - install drain wrap | $50 | Immediate | 2021 | Tenant |
| | Replace full depth sections of asphalt pavement | $2,500 | Short-term | 2021 | Tenant |
| | Mill and overlay asphalt pavement | $15,471 | Short-term | 2021 | Tenant |
| | Repair concrete parking lot/pavement areas | $6,000 | Short-term | 2021 | Tenant |
| | Repair misc. damage/impact damage to fascia | $1,750 | Short-term | 2021 | Tenant |
| | Assorted roofing repairs | $1,400 | Short-term | 2021 | Tenant |
| | | | | | |
| **203 US Highway 62, Alpena, AR** | **CBRE Project Number: 21-465PC-0572-1** | | | | |
| | Emulsion sealcoat, crack seal and restripe asphalt pavement | $3,000 | Short-term | 2021 | Tenant |
| | Exterior walls; minor repairs, clean, seal & paint | $4,375 | Short-term | 2021 | Tenant |
| | Re-roofing, metal roof panels | $52,500 | Short-term | 2021 | Tenant |
| | ADA Compliance - add accessible van parking space | $250 | Short-term | 2021 | Tenant |
| | ADA Compliance - create accessible restroom | $5,000 | Short-term | 2021 | Tenant |
| | | | | | |
| **330 E Main St, Gassville, AR** | **CBRE Project Number: 21-465PC-0572-2** | | | | |
| | Re-coat metal roof | $7,614 | Immediate | 2021 | Tenant |
| | ADA Compliance - Install accessible parking space signage | $150 | Immediate | 2021 | Tenant |
| | ADA Compliance - add accessible van parking space | $250 | Immediate | 2021 | Tenant |
| | ADA Compliance - install grab bars (incl. finish repair) | $345 | Immediate | 2021 | Tenant |
| | Repair metal panels | $1,000 | Short-term | 2021 | Tenant |
| | | | | | |
| **901 S College St, Mountain Home, AR** | **CBRE Project Number: 21-465PC-0572-3** | | | | |
| | Repaint and caulk exterior finishes | $4,168 | Immediate | 2021 | Tenant |
| | ADA Compliance - add accessible van parking space | $250 | Immediate | 2021 | Tenant |
| | ADA Compliance - install accessible parking space signage | $150 | Immediate | 2021 | Tenant |
| | Repair concrete parking lot/pavement areas | $22,500 | Short-term | 2021 | Tenant |
| | | | | | |

| 1508 Hwy 62 East, Mountain Home, AR | **CBRE Project Number: 21-465PC-0572-4** | | | | |
|---|---|---|---|---|---|
| | ADA Compliance - install grab bars (incl. finish repair) | $345 | Immediate | 2021 | Tenant |
| | ADA Compliance - add accessible van parking space | $250 | Immediate | 2021 | Tenant |
| | Repair concrete parking lot/pavement areas | $30,000 | Short-term | 2021 | Tenant |
| | Repair crack in exterior wall | $1,500 | Short-term | 2021 | Tenant |
| | | | | | |
| **700 US-64 E, Wynne, AR** | **CBRE Project Number: 21-465PC-0572-5** | | | | |
| | ADA Compliance - add accessible van parking space | $250 | Immediate | 2021 | Tenant |
| | ADA Compliance - install accessible parking space signage | $150 | Immediate | 2021 | Tenant |
| | Rout and seal asphalt pavement cracks | $1,125 | Short-term | 2021 | Tenant |
| | | | | | |
| **702 Central Blvd, Bull Shoals, AR** | **CBRE Project Number: 21-465PC-0572-6** | | | | |
| | Replace full depth sections of asphalt pavement | $3,000 | Immediate | 2021 | Tenant |
| | Rout and seal asphalt pavement cracks | $3,750 | Immediate | 2021 | Tenant |
| | Re-roofing, TPO single ply system | $14,454 | Immediate | 2021 | Tenant |
| | ADA Compliance - add accessible van parking space | $250 | Immediate | 2021 | Tenant |
| | ADA Compliance - install accessible parking space signage | $150 | Immediate | 2021 | Tenant |
| | Re-roofing, TPO single ply system - car wash | $2,400 | Short-term | 2021 | Tenant |
| | | | | | |
| **6132 AR-5, Midway, AR** | **CBRE Project Number: 21-465PC-0572-7** | | | | |
| | ADA Compliance - add accessible van parking space | $250 | Immediate | 2021 | Tenant |
| | ADA Compliance - install accessible parking space signage | $150 | Immediate | 2021 | Tenant |
| | ADA Compliance - install grab bars (incl. finish repair) | $345 | Immediate | 2021 | Tenant |
| | Repair damaged canopy | $2,500 | Short-term | 2021 | Tenant |
| | | | | | |
| **703 E Main St, Flippin, AR** | **CBRE Project Number: 21-465PC-0572-8** | | | | |
| | Repair/replace concrete parking lot/pavement areas | $112,500 | Immediate | 2021 | Tenant |
| | Repaint exterior finishes | $6,250 | Immediate | 2021 | Tenant |
| | Re-roofing, TPO single ply system | $12,320 | Immediate | 2021 | Tenant |

| | | | | | |
|---|---|---|---|---|---|
| | ADA Compliance - add accessible van parking space | $250 | Immediate | 2021 | Tenant |
| | ADA Compliance - install grab bars (incl. finish repair) | $345 | Immediate | 2021 | Tenant |
| | | | | | |
| **1580 S College St, Mountain Home, AR** | | | | | |
| | ADA Compliance - add accessible van parking space | $250 | Immediate | 2021 | Tenant |
| | | | | | |
| **433 Albemarle Rd, Troy, NC** | **EBI Project No. 1121003763** | | | | |
| | Investigate and repair roof leaks | $6,000 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide signage for wheelchair-accessible facilities | $25 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide compliant grab bars installation | $250 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide blade sink handles for faucet operation | $250 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide pipes beneath sinks with insulation | $50 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| **6555 Highway 52 North, Welcome, NC** | **EBI Project No. 1121003764** | | | | |
| | Full depth asphalt repairs and overlay | $1,000 | IMMEDIATE | 2021 | Tenant |
| | Repair concrete sidewalks | $500 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| **511 E. Main St, Biscoe, NC** | **EBI Project No. 1121003765** | | | | |
| | Full depth asphalt repairs and overlay | $1,050 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide signage for wheelchair-accessible facilities | $25 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide compliant grab bars installation | $250 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide pipe beneath sinks with insulation | $50 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| **512 W. Main St, Locust, NC** | **EBI Project No. 1121003766** | | | | |
| | Investigate and repair roof leaks | $3,000 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| **481 US Highway 1 S,** | **EBI Project No. 1121003767** | | | | |

| Location | Item | Cost | Priority | Year | Responsibility |
|---|---|---|---|---|---|
| **Rockingham, NC** | | | | | |
| | ADA Compliance - provide additional van-accessible parking spaces (1 of every 6 handicapped-accessible spaces) to bring property into compliance | $250 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide handicapped-accessible parking designation vertically-mounted at the nose of each accessible space | $300 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| **3233 Wow Rd, Randleman, NC** | **EBI Project No. 1121003768** | | | | |
| | Patch and repair concrete, asphalt repairs, patching, crack sealing, seal coating and striping of asphalt pavement, and repair curbs | $7,500 | IMMEDIATE | 2021 | Tenant |
| | Provide updated fire extinguisher inspection tag | $100 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide handicapped-accessible parking designation on the paving in each space | $200 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| **530 N. Main St, Troy, NC** | **EBI Project No. 1121003769** | | | | |
| | Full depth concrete and asphalt repairs and overlay | $1,250 | IMMEDIATE | 2021 | Tenant |
| | Repair retaining wall and pipe guard | $2,000 | IMMEDIATE | 2021 | Tenant |
| | Investigate and repair roof leaks | $3,000 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide signage denoting "van-accessible" status of each van space beneath vertically-mounted handicapped-accessible signage | $150 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide compliant grab bars installation | $250 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| **1634 Zoo Parkway, Asheboro, NC** | **EBI Project No. 1121003770** | | | | |
| | Full depth asphalt repairs and overlay | $24,000 | IMMEDIATE | 2021 | Tenant |
| | Repair concrete sidewalks | $1,000 | IMMEDIATE | 2021 | Tenant |
| | Investigate and repair roof leaks | $6,000 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide blade sink handles for faucet operation | $500 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide pipes beneath sinks with insulation | $150 | IMMEDIATE | 2021 | Tenant |
| | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| **103 S Main St, Candor, NC** | **EBI Project No. 1121003771** | | | | |
| | ADA Compliance - provide compliant grab bars installation | $250 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| **527 Old Liberty Road, Asheboro, NC** | **EBI Project No. 1121003772** | | | | |
| | Regrade for proper drainage | $1,500 | IMMEDIATE | 2021 | Tenant |
| | Replace damaged soffits | $1,000 | IMMEDIATE | 2021 | Tenant |
| | Asphalt shingle roof replacement | $2,425 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide handicapped-accessible parking designation on the paving in each space | $200 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - Provide push/pull plates or lever handles | $75 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - Provide blade sink handles for faucet operation | $250 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - Provide pipes beneath sinks with insulation | $50 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| **231 S Main St, Star, NC** | **EBI Project No. 1121003773** | | | | |
| | Full depth asphalt repairs and overlay | $1,050 | IMMEDIATE | 2021 | Tenant |
| | Repair retaining wall | $4,000 | IMMEDIATE | 2021 | Tenant |
| | Investigate and repair roof leaks | $6,000 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide handicapped-accessible parking designation on the paving in each space | $200 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide signage for wheelchair-accessible facilities | $25 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide compliant grab bars installation | $500 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide pipes beneath sinks with insulation | $50 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| **2655 N. Church St, Haw River, NC** | **EBI Project No. 1121003774** | | | | |
| | Full depth asphalt repairs and overlay | $1,125 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| **434 Little River Road, Seagrove, NC** | **EBI Project No. 1121003775** | | | | |
| | None | $0 | IMMEDIATE | 2021 | Tenant |

| | | | | | |
|---|---|---|---|---|---|
| **11126 N NC Hwy 150, Winston-Salem, NC** | **EBI Project No.  1121003776** | | | | |
| | Full depth asphalt repairs and overlay | $1,500 | IMMEDIATE | 2021 | Tenant |
| | Repair concrete walkways | $500 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - modify layout to accommodate a wheelchair turnaround or convert into one-person restroom | $1,500 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide compliant grab bars installation | $250 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide pipes beneath sinks with insulation | $50 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - relocate bathroom accessories to appropriate mounting heights for accessibility | $50 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide tilted mirror for wheelchair use, or remount flat mirrow at accessible height | $150 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| **100 Highway 52 S, Albemarle, NC** | **EBI Project No.  1121003777** | | | | |
| | Investigate and repair roof leaks | $3,000 | IMMEDIATE | 2021 | Tenant |
| | Provide visual alarms, such as strobes, in all areas where audible alarms are present | $75 | IMMEDIATE | 2021 | Tenant |
| | Provide push/pull plates or lever handles | $150 | IMMEDIATE | 2021 | Tenant |
| | Provide audible and visual fire alarm devices in toilet rooms | $150 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| **515 E Main St, Candor, NC** | **EBI Project No.  1121003778** | | | | |
| | Full depth asphalt repairs and overlay | $10,500 | IMMEDIATE | 2021 | Tenant |
| | Investigate and repair roof leaks | $6,000 | IMMEDIATE | 2021 | Tenant |
| | ADA Complaince - provide additional van-accessible parking spaces (1 of every 6 handicapped-accessible spaces) to bring property into compliance | $250 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| **713 N Main St, Oakboro, NC** | **EBI Project No.  1121003779** | | | | |
| | Investigate and repair roof leaks | $3,000 | IMMEDIATE | 2021 | Tenant |

| | | | | | |
|---|---|---|---|---|---|
| | ADA Compliance - provide ramped curb cuts as necessary along the site's accessible route and at passenger drop-off areas. Provide roughened surface to delineate cuts from adjacent walks or paved areas. | $1,500 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide signage for wheelchair-accessible facilities | $25 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide push/pull plates or lever handles | $75 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide audible and visual fire alarm devices in toilet rooms | $150 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide blade sink handles for faucet operation | $500 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide pipes beneath sinks with insulation | $100 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| **4416 South NC-150, Lexington, NC** | **EBI Project No. 1121003780** | | | | |
| | ADA Compliance - provide pipes beneath sinks with insulation | $50 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| **7039 Jordan Rd, Ramseur, NC** | **EBI Project No. 1121003781** | | | | |
| | Patch and repair concrete, asphalt repairs, patching, crack sealing, seal coating and stripting of asphalt pavement | $10,000 | IMMEDIATE | 2021 | Tenant |
| | Provide updated fire extinguisher inspection tag | $100 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide signage delineating path from parking spaces to accessible building entrance | $150 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - lower one existing phone to wheelchair usable height | $300 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide signage for wheelchair-accessible facilities | $25 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide audible and visual fire alarm devices in toilet rooms | $75 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - although no required by the ADA, owner should consider the installation of an assit notification system as an owner-discretionary upgrade | $75 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide pipes beneath sinks with insulation | $50 | IMMEDIATE | 2021 | Tenant |
| | | | | | |

| 2003 N Fayetteville St, Asheboro, NC | **EBI Project No. 1121003782** | | | | |
|---|---|---|---|---|---|
| | Full depth asphalt repairs and overlay | $15,000 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide pipes beneath sinks with insulation | $50 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - relocate bathroom accessories to appropriate mounting heights for accessibility | $50 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| 315 Randolph St, Thomasville NC | **EBI Project No. 1121003783** | | | | |
| | ADA Compliance - provide additional van-accessible parking spaces (1 of every 6 handicapped-accessible spaces) to bring property into compliance | $250 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide compliant grab bars installation | $250 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide pipes beneath sinks with insulation | $50 | IMMEDIATE | 2021 | Tenant |
| | Ceiling tile replacement | $300 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| 800 Bryan Rd, Thomasville, NC | **EBI Project No. 1121003784** | | | | |
| | Full depth asphalt repairs and overlay | $27,000 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide handicapped-accessible parking designation on the paving in each space | $200 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| 1011 Liberty Rd, Archdale, NC | **EBI Project No. 1121003785** | | | | |
| | Patching, crack sealing, sealing and striping | None | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| 2271 Main St, Ellerbe, NC | **EBI Project No. 1121003786** | | | | |
| | Patch and repair concrete | $2,160 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| 402 West Swannonas Street, Liberty, NC | **EBI Project No. 1121003787** | | | | |
| | Patch and repair concrete | $20,400 | IMMEDIATE | 2021 | Tenant |

| | | | | | |
|---|---|---|---|---|---|
| | ADA Compliance - provide signage for wheelchair-accessible facilities | $50 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide audible and visual fire alarm devices in toilet rooms | $150 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide pipes beneath sinks with insulation | $100 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| **1050 Albemarle Rd, Troy, NC** | **EBI Project No. 1121003788** | | | | |
| | Investigate and repair roof leaks | $3,000 | IMMEDIATE | 2021 | Tenant |
| | Cover exposed wires and replace cover plate | $200 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| **100 West NC-705, Robbins, NC** | **EBI Project No. 1121003789** | | | | |
| | Full depth asphalt repairs and overlay | $1,500 | IMMEDIATE | 2021 | Tenant |
| | Replace damaged/missing fencing | $2,000 | IMMEDIATE | 2021 | Tenant |
| | Investigate and repair roof leaks | $3,000 | IMMEDIATE | 2021 | Tenant |
| | Provide updated fire extinguisher inspection tags | $500 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide handicapped-accessible parking designation on the paving in each space (existing symbol is heavily faded) | $200 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - provide signage denoting "van-accessible" status of each van space beneath vertically-mounted handicapped-accessile signage | $150 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| **11765 Crossett Rd, Bastrop, LA** | **EBI Project No. 1121005434** | | | | |
| | None | $0 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| **433 State Highway 577 Spur, Delhi, LA** | **EBI Project No. 1121005435** | | | | |
| | ADA Compliance - Provide handicapped-accessible parking designation vertically-mounted at the nose of each accessible space. | $150 | Immediate | 2021 | Tenant |
| | ADA Compliance - Provide signage denoting 'van-accessible' status of each van space beneath vertically-mounted handicapped-accessible signage. | $300 | Immediate | 2021 | Tenant |

| | | | | | |
|---|---|---|---|---|---|
| | ADA Compliance - Provide audible and visual fire alarm devices in toilet rooms. | $150 | Immediate | 2021 | Tenant |
| | ADA Compliance - Provide pipes beneath sinks with insulation. | $50 | Immediate | 2021 | Tenant |
| | Patch and repair concrete - fueling areas | $23,200 | Immediate | 2021 | Tenant |
| | Smokehouse storage shed - siding on the smokehouse storage shed appears to be significantly deteriorated from water damage and peeling paint | $7,823 | Immediate | 2021 | Tenant |
| | Investigate and repair roof leaks | $6,000 | Immediate | 2021 | Tenant |
| | | | | | |
| **1601 Farmerville Hwy, Ruston, LA** | **EBI Project No. 1121005439** | | | | |
| | ADA Compliance - Provide signage denoting 'van-accessible' status of each van space beneath vertically-mounted handicapped-accessible signage. | $150 | Immediate | 2021 | Tenant |
| | ADA Compliance - Provide delineated accessible route from access aisle to front entry door. | $560 | Immediate | 2021 | Tenant |
| | ADA Compliance - Provide compliant grab bars installation. | $500 | Immediate | 2021 | Tenant |
| | ADA Compliance - Provide minimum undersink clearance for wheelchair access to sink. | $1,000 | Immediate | 2021 | Tenant |
| | ADA Compliace - Relocate bathroom accessories to appropriate mounting heights for accessibility. | $100 | Immediate | 2021 | Tenant |
| | ADA Compliance - Provide tilted mirror for wheelchair use, or remount flat mirror at accessible height. | $300 | Immediate | 2021 | Tenant |
| | Patch and repair concrete - cracking and settlement in the concrete pavement were noted at random locations throughout the parking and fueling areas | $40,000 | Immediate | 2021 | Tenant |
| | Repair trip hazards - a trip hazard was noted near the south entrance | $150 | Immediate | 2021 | Tenant |
| | Investigate and repair roof leaks - indications of active roof leaks were noted in the form of water-damaged ceiling tiles in the convenience store | $6,000 | Immediate | 2021 | Tenant |
| | | | | | |
| **200 S Main St, Junction City, LA** | **EBI Project No. 1121005443** | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | ADA Compliance - Provide signage denoting 'van-accessible' status of each van space beneath vertically-mounted handicapped-accessible signage. | $150 | Immediate | 2021 | Tenant |
| | Patch and repair concrete - cracking and settlement in the pavement were noted in the fueling areas and entrance aprons | $16,000 | Immediate | 2021 | Tenant |
| | Repair drainage pipe and CMU - A drain pipe was observed along the north side of the building, extruding through the CMU wall, but flush with the wall surface.  At the time of EBI's assessment, it was noted that the pipe had been dripping water causing the CMU near the location of the pipe to spall. | $2,500 | Immediate | 2021 | Tenant |
| | Investigate and repair roof leaks - Indications of active roof leaks were noted in the form of stained ceiling tiles area in the convenience store. | $6,000 | Immediate | 2021 | Tenant |
| | | | | | |
| **24605 Highway #2, Homer, LA** | **EBI Project No.  1121005440** | | | | |
| | ADA Compliance - Provide handicapped-accessible parking designation vertically-mounted at the nose of each accessible space. | $150 | Immediate | 2021 | Tenant |
| | ADA Compliance - Provide pipes beneath sinks with insulation. | $200 | Immediate | 2021 | Tenant |
| | ADA Compliance - Relocate bathroom accessories to appropriate mounting heights for accessibility. | $200 | Immediate | 2021 | Tenant |
| | Patch and repair concrete - cracking and settlement in the pavement were noted in the fueling areas and truck parking areas | $40,000 | Immediate | 2021 | Tenant |
| | | | | | |
| **1208 Broadway Street, Delhi, LA** | **EBI Project No.  1121005442** | | | | |
| | ADA Compliance - Provide signage denoting 'van-accessible' status of each van space beneath vertically-mounted handicapped-accessible signage. | $150 | Immediate | 2021 | Tenant |
| | Restore eroded soil - soil erosion observed at the southwest corner of the building | $2,500 | Immediate | 2021 | Tenant |

| | Patch and repair concrete - cracking and settlement in the pavement were noted in random areas throughout the parking areas | $12,000 | Immediate | 2021 | Tenant |
|---|---|---|---|---|---|
| | Repair signage - the pylon sign was observed to be damaged | $1,500 | Immediate | 2021 | Tenant |
| | Repair fuel canopy - a portion of the fascia of the fuel pump canopy along the roof was observed to be missing | $3,000 | Immediate | 2021 | Tenant |
| | | | | | |
| **4243 W. Pioneer Drive, Irving TX 75061** | **EBI Project No. 1121005975** | | | | |
| | Repair exterior stairs | $2,500 | IMMEDIATE | 2021 | Tenant |
| | Repair retaining walls | $3,500 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| **10110 Harry Hines Boulevard, Dallas TX 75220** | **EBI Project No. 1121005977** | | | | |
| | ADA Compliance - Provide additional handicapped-accessible parking spaces to bring property into compliance. | $200 | IMMEDIATE | 2021 | Tenant |
| | ADA Compliance - Provide handicapped-accessible parking designation vertically-mounted at the nose of each accessible space. | $600 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| **8620 Lake June Road, Dallas TX 75217** | **EBI Project No. 1121005980** | | | | |
| | None | $0 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| **5001 South Buckner Boulevard, Dallas TX 75217** | **EBI Project No. 1121005981** | | | | |
| | None | $0 | IMMEDIATE | 2021 | Tenant |
| | | | | | |
| **2600 East Highway 30, Mesquite TX 75225** | **EBI Project No. 1121005982** | | | | |
| | None | $0 | IMMEDIATE | 2021 | Tenant |

**EXHIBIT G**
**TO**
**AMENDED AND RESTATED MASTER LEASE AGREEMENT**

**FORM OF GUARANTY**

**AMENDED AND RESTATED UNCONDITIONAL GUARANTY OF PAYMENT AND**
**PERFORMANCE**

THIS **AMENDED AND RESTATED UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE** (this "**Guaranty**") is made as of [●], 202_ by Mountain Express Oil Company, a Georgia corporation ("**Guarantor**"), to the entities set forth on **Schedule I** attached hereto and made a part hereof (individually and/or collectively, as the context may require, "**Landlord**").

**R E C I T A L S**

A.       Landlord and Tenant (as defined below) are parties to (i) those certain Master Lease Agreements set forth on **Schedule II** attached hereto and (ii) that certain Lease Agreement dated July 5, 2022 by and among Mountain IRTX001 LLC, Mountain DATX002 LLC, Mountain DATX 004 LLC, Mountain DATX005 LLC, Mountain METX001 LLC, each a Delaware limited liability company, as landlord, and Mountain Express Oil Company, a Georgia corporation, as tenant (as amended, collectively, the "**Original Leases**" and each individually, an "**Original Lease**"), as noted in such Original Leases.

B.       In connection with the Original Leases, Guarantor delivered to the applicable Landlord those certain Unconditional Guaranties of Payment and Performance set forth on **Schedule III** attached hereto and made a part hereof (as amended, collectively, the "**Original Guaranties**" and each individually, an "**Original Guaranty**").

C.       Landlord and the entities set forth on **Schedule IV** attached hereto and made a part hereof (individually and/or collectively, as the context may require, "**Tenant**"), have agreed to enter into that certain Amended and Restated Master Lease Agreement (Oak Trust), dated as of the date hereof (the "**Lease**"), for the Premises (as defined in the Lease), pursuant to which the Original Leases will be combined, amended and restated into the Lease.

D.       Landlord and Guarantor desire to combine, amend and restate the Original Guaranties pursuant to this Guaranty.

E.       Accordingly, on and as of the date hereof, the Original Guaranties are hereby combined, amended and restated into this Guaranty.

F.       Tenant is a subsidiary of Guarantor and Guarantor will derive substantial economic benefit from the execution and delivery of the Lease.

G.       Guarantor acknowledges that Landlord would not enter into the Lease unless this Guaranty accompanied the execution and delivery of the Lease.

H.      Guarantor hereby acknowledges receipt of a copy of the Lease.

**NOW, THEREFORE**, in consideration of the execution and delivery of the Lease and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor covenants and agrees as follows:

1.      **DEFINITIONS.**  Defined terms used in this Guaranty and not otherwise defined herein have the meanings assigned to them in the Lease.

2.      **COVENANTS OF GUARANTOR**.

A.      Guarantor absolutely, unconditionally and irrevocably guarantees, as a primary obligor and not merely as a surety: (i) the full and prompt payment of all Base Rent, Additional Rent and all other sums and charges of every type and nature payable by Tenant under the Lease, whether due by acceleration or otherwise, including costs and expenses of collection (collectively, the "**Monetary Obligations**"), and (ii) the full, timely and complete performance of all covenants, terms, conditions, obligations, indemnities and agreements to be performed by Tenant under the Lease, including any indemnities or other obligations of Tenant that survive the expiration or earlier termination of the Lease (all of the obligations described in clauses (i) and (ii) are collectively referred to herein as the "**Obligations**").  If Tenant defaults under the Lease, Guarantor will promptly pay and perform all of the Obligations and pay to Landlord, when and as due, all Monetary Obligations payable by Tenant under the Lease, together with all damages, costs and expenses to which Landlord is entitled pursuant to any or all of the Lease and this Guaranty.

B.      Guarantor agrees with Landlord that (i) any action, suit or proceeding of any kind or nature whatsoever (an "**Action**") commenced by Landlord against Guarantor to collect Base Rent, Additional Rent and any other sums and charges due under the Lease for any month or months shall not prejudice in any way Landlord's rights to collect any such amounts due for any subsequent month or months throughout the Lease Term in any subsequent Action, (ii) Landlord may, at its option, without prior notice or demand, join Guarantor in any Action against Tenant in connection with or based upon either or both of the Lease and any of the Obligations, (iii) Landlord may seek and obtain recovery against Guarantor in an Action (to the extent related to or based upon either or both of the Lease and any of the Obligations) against Tenant or in any independent Action (to the extent related to or based upon either or both of the Lease and any of the Obligations) against Guarantor without Landlord first asserting, prosecuting, or exhausting any remedy or claim against Tenant or against any security of Tenant held by Landlord under the Lease, (iv) Landlord may (but shall not be required to) exercise its rights against each of Guarantor and Tenant concurrently, and (v) Guarantor will be conclusively bound by a judgment entered in any Action (to the extent related to or based upon either or both of the Lease and any of the Obligations) in favor of Landlord against Tenant, as if Guarantor were a party to such Action, irrespective of whether or not Guarantor is entered as a party or participates in such Action.

C.  Guarantor agrees that, in the event of the rejection or disaffirmance of the Lease by Tenant or Tenant's trustee in bankruptcy, pursuant to bankruptcy law or any other law affecting creditors' rights, Guarantor will, if Landlord so requests, assume all obligations and liabilities of Tenant under the Lease, to the same extent as if Guarantor was a party to such document and there had been no such rejection or disaffirmance, and Guarantor will confirm such assumption, in writing, at the request of Landlord upon or after such rejection or disaffirmance.  Guarantor, upon such assumption, shall have all rights of Tenant under the Lease to the fullest extent permitted by law.

3.  **GUARANTOR'S OBLIGATIONS UNCONDITIONAL**.

A.  This Guaranty is an absolute and unconditional guaranty of payment and of performance, and not of collection, and shall be enforceable against Guarantor without the necessity of the commencement by Landlord of any Action against Tenant, and without the necessity of any notice of nonpayment, nonperformance or nonobservance, or any notice of acceptance of this Guaranty, or of any other notice or demand to which Guarantor might otherwise be entitled, all of which Guarantor hereby expressly waives in advance.  The obligations of Guarantor hereunder are independent of, and may exceed, the obligations of Tenant.

B.  This Guaranty shall apply notwithstanding any extension or renewal of the Lease, or any holdover following the expiration or termination of the Lease Term or any renewal or extension of the Lease Term.

C.  This Guaranty is a continuing guarantee and will remain in full force and effect notwithstanding, and the liability of Guarantor hereunder shall be absolute and unconditional irrespective of any or all of the following:  (i) any renewals, extensions, modifications, alterations or amendments of the Lease (regardless of whether Guarantor consented to or had notice of same); (ii) any releases or discharges of Tenant other than the full release and complete discharge of all of the Obligations; (iii) Landlord's failure or delay to assert any claim or demand or to enforce any of its rights against Tenant; (iv) any extension of time that may be granted by Landlord to Tenant; (v) any assignment or transfer of all or any part of Tenant's interest under the Lease (whether by Tenant, by operation of law, or otherwise); (vi) any subletting, concession, franchising, licensing or permitting of the Premises or any portion thereof; (vii) any changed or different use of the Premises (or any portion thereof); (viii) any other dealings or matters occurring between Landlord and Tenant; (ix) the taking by Landlord of any additional guarantees, or the receipt by Landlord of any collateral, from Tenant or any other persons or entities; (x) the release by Landlord of any other guarantor; (xi) Landlord's release of any security provided under the Lease; (xii) Landlord's failure to perfect any Landlord's lien or other lien or security interest available under any applicable statutes, ordinances, rules, regulations, codes, orders, requirements, directives, binding written interpretations and binding written policies, rulings, and decrees of all local, municipal, state and federal governments, departments, agencies, commissions, boards or political subdivisions ("**Laws**");

(xiii) any assumption by any person of any or all of Tenant's obligations under the Lease, or Tenant's assignment of any or all of its rights and interests under the Lease; (xiv) the power or authority or lack thereof of Tenant to execute, acknowledge or deliver the Lease; (xv) the existence, non-existence or lapse at any time of Tenant as a legal entity or the existence, non-existence or termination of any corporate, ownership, business or other relationship between Tenant and Guarantor; (xvi) any sale or assignment by Landlord of either or both of this Guaranty and the Lease (including, but not limited to, any direct or collateral assignment by Landlord to any mortgagee); (xvii) the solvency or lack of solvency of Tenant at any time or from time to time; or (xviii) any other cause, whether similar or dissimilar to any of the foregoing, that might constitute a legal or equitable discharge of Guarantor (whether or not Guarantor shall have knowledge or notice thereof). Without in any way limiting the generality of the foregoing, Guarantor specifically agrees that (A) if Tenant's obligations under the Lease are modified or amended with the express written consent of Landlord, this Guaranty shall extend to such obligations as so amended or modified without notice to, consideration to, or the consent of, Guarantor, and (B) this Guaranty shall be applicable to any obligations of Tenant arising in connection with a termination of the Lease, whether voluntary or otherwise. Guarantor hereby consents, prospectively, to Landlord's taking or entering into any or all of the foregoing actions or omissions.

D.   Guarantor hereby expressly agrees that the validity of this Guaranty and the obligations of Guarantor hereunder shall in no way be terminated, affected, diminished or impaired by reason of the assertion or the failure to assert by Landlord against Tenant, of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease or by relief of Tenant from any of Tenant's obligations under the Lease or otherwise by (i) the release or discharge of Tenant in any state or federal creditors' proceedings, receivership, bankruptcy or other proceeding; (ii) the impairment, limitation or modification of the liability of Tenant or the estate of Tenant in bankruptcy, or of any remedy for the enforcement of Tenant's liability under the Lease, resulting from the operation of any present or future provision of the United States Bankruptcy Code (11 U.S.C. § 101 et seq., as amended), or from other statute, or from the order of any court; or (iii) the rejection, disaffirmance or other termination of the Lease in any such proceeding. This Guaranty shall continue to be effective if at any time the payment of any amount due under the Lease or this Guaranty is rescinded or must otherwise be returned by Landlord for any reason, including, without limitation, the insolvency, bankruptcy, liquidation or reorganization of Tenant, Guarantor or otherwise, all as though such payment had not been made, and, in such event, Guarantor shall pay to Landlord an amount equal to any such payment that has been rescinded or returned.

**4.   <u>WAIVERS OF GUARANTOR.</u>**

A.   Without limitation of the foregoing, Guarantor waives (i) notice of acceptance of this Guaranty, protest, demand and dishonor, presentment, and demands of any kind now or hereafter provided for by any statute or rule of law or equity, (ii) notice of

any actions taken by Landlord or Tenant under the Lease or any other agreement or instrument relating thereto, (iii) notice of any and all defaults by Tenant in the payment of Base Rent, Additional Rent or any other charges or amounts, or of any other defaults by Tenant under the Lease, (iv) all other notices, demands and protests, and all other formalities of every kind in connection with the enforcement of the Obligations, omission of or delay in which, but for the provisions of this Section 4, might constitute grounds for relieving Guarantor of its obligations hereunder, (v) any requirement that Landlord protect, secure, perfect, insure or proceed against any security interest or lien, or any property subject thereto, or exhaust any right or take any action against Tenant or any other person or entity (including any additional guarantor or Guarantor) or against any collateral, and (vi) the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty.

B. GUARANTOR HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY PERSON OR ENTITY WITH RESPECT TO ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH: (A) THIS GUARANTY; (B) THE LEASE; (C) ANY LIABILITY OR OBLIGATION OF TENANT IN ANY MANNER RELATED TO THE PREMISES OR ANY PORTION THEREOF; (D) ANY CLAIM OF INJURY OR DAMAGE IN ANY WAY RELATED TO THE LEASE AND/OR THE PREMISES (OR ANY PORTION THEREOF); (E) ANY ACT OR OMISSION OF TENANT, ITS AGENTS, EMPLOYEES, CONTRACTORS, SUPPLIERS, SERVANTS, CUSTOMERS, CONCESSIONAIRES, FRANCHISEES, PERMITTEES OR LICENSEES; OR (F) ANY ASPECT OF THE USE OR OCCUPANCY OF, OR THE CONDUCT OF BUSINESS IN, ON OR FROM THE PREMISES (OR ANY PORTION THEREOF). GUARANTOR SHALL NOT IMPOSE ANY COUNTERCLAIM OR COUNTERCLAIMS OR CLAIMS FOR SET-OFF, RECOUPMENT OR DEDUCTION OF RENT IN ANY ACTION BROUGHT BY LANDLORD AGAINST GUARANTOR UNDER THIS GUARANTY, EXCEPT TO THE EXTENT ANY SUCH COUNTERCLAIM OR COUNTERCLAIMS OR CLAIMS FOR SET-OFF, RECOUPMENT OR DEDUCTION OF RENT IN ANY ACTION ARE MANDATORY PURSUANT TO APPLICABLE LAWS. GUARANTOR HEREBY WAIVES, BOTH WITH RESPECT TO THE LEASE AND WITH RESPECT TO THIS GUARANTY, ANY AND ALL RIGHTS WHICH ARE WAIVED BY TENANT UNDER THE LEASE, IN THE SAME MANNER AS IF ALL SUCH WAIVERS WERE FULLY RESTATED HEREIN. THE LIABILITY OF GUARANTOR UNDER THIS GUARANTY IS PRIMARY AND UNCONDITIONAL.

C. Guarantor expressly waives any and all rights to defenses arising by reason of (i) any "one-action" or "anti-deficiency" law or any other law that may prevent Landlord from bringing any action, including a claim for deficiency, against Guarantor before or after Landlord's commencement or completion of any action against Tenant; (ii) ANY ELECTION OF REMEDIES BY LANDLORD (INCLUDING, WITHOUT LIMITATION, ANY TERMINATION OF THE

LEASE) THAT DESTROYS OR OTHERWISE ADVERSELY AFFECTS GUARANTOR'S SUBROGATION RIGHTS OR GUARANTOR'S RIGHTS TO PROCEED AGAINST TENANT FOR REIMBURSEMENT; (iii) any disability, insolvency, bankruptcy, lack of authority or power, death, insanity, minority, dissolution, or other defense of Tenant, of any other guarantor (or any other Guarantor), or of any other person or entity, or by reason of the cessation of Tenant's liability from any cause whatsoever; (iv) any right to claim discharge of any or all of the Obligations on the basis of unjustified impairment of any collateral for the Obligations; (v) any change in the relationship between Guarantor and Tenant or any termination of such relationship; (vi) any irregularity, defect or unauthorized action by any or all of Tenant, any other guarantor (or Guarantor) or surety, or any of their respective officers, directors or other agents in executing and delivering any instrument or agreements relating to the Obligations or in carrying out or attempting to carry out the terms of any such agreements; (vii) any assignment, endorsement or transfer, in whole or in part, of the Obligations, whether made with or without notice to or consent of Guarantor; (viii) the recovery from Tenant or any other Person (including without limitation any other guarantor) becoming barred by any statute of limitations or being otherwise prevented; (ix) the benefits of any and all applicable statutes, laws, rules or regulations which may require the prior or concurrent joinder of any other party to any action on this Guaranty; (x) any release or other reduction of the Obligations arising as a result of the expansion, release, substitution, deletion, addition, or replacement (whether or not in accordance with the terms of the Lease) of the Premises or any portion thereof; or (xi) any neglect, delay, omission, failure or refusal of Landlord to take or prosecute any action for the collection or enforcement of any of the Obligations or to foreclose or take or prosecute any action in connection with any lien or right of security (including perfection thereof) existing or to exist in connection with, or as security for, any of the Obligations, it being the intention hereof that Guarantor shall remain liable as a principal on the Obligations notwithstanding any act, omission or event that might, but for the provisions hereof, otherwise operate as a legal or equitable discharge of Guarantor. Guarantor hereby waives all defenses of a surety to which it may be entitled by statute or otherwise.

5.      **SUBORDINATION AND SUBROGATION**. Guarantor shall not be subrogated, and hereby subordinates and postpones any claim or right against Tenant by way of subrogation or otherwise, to any of the rights of Landlord under the Lease or otherwise, or in the Premises (or any portion thereof), which may arise by any of the provisions of this Guaranty or by reason of the performance by Guarantor of any of its Obligations hereunder. Guarantor shall look solely to Tenant for any recoupment of any payments made or costs or expenses incurred by Guarantor pursuant to this Guaranty. If any amount shall be paid to Guarantor on account of such subrogation rights at any time when all of the Obligations shall not have been paid and performed in full, Guarantor shall immediately deliver the payment to Landlord for credit against the then outstanding balance of the Obligations, whether matured or unmatured.

6.      **REPRESENTATIONS AND WARRANTIES OF GUARANTOR.** Guarantor represents and warrants that:

A. Guarantor is a company formed under the laws of the State of Georgia; has all requisite power and authority to enter into and perform its obligations under this Guaranty; and this Guaranty is valid and binding upon and enforceable against Guarantor without the requirement of further action or condition.

B. The execution, delivery and performance by Guarantor of this Guaranty does not and will not (i) contravene any applicable Laws, the organizational documents of Guarantor, if applicable, any order, writ, injunction, decree applicable to Guarantor, or any contractual restriction binding on or affecting Guarantor or any of its properties or assets, nor (ii) result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of its properties or assets.

C. No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any governmental authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, Guarantor of this Guaranty or any other instrument or agreement required hereunder.

D. There is no action, suit or proceeding pending or, to Guarantor's knowledge, threatened against or otherwise affecting Guarantor before any court or other governmental authority or any arbitrator that may materially adversely affect Guarantor's ability to perform its obligations under this Guaranty.

E. Guarantor's principal place of business is 5333 Bells Ferry Road, Suite 201, Acworth, Georgia 30102.

F. Tenant is directly or indirectly owned and controlled by Guarantor.

G. Guarantor has derived or expects to derive financial and other advantages and benefits directly or indirectly, from the making of the Lease and the payment and performance of the Obligations. Guarantor hereby acknowledges that Landlord will be relying upon Guarantor's guarantee, representations, warranties and covenants contained herein.

7. **FINANCIAL STATEMENTS**. Within forty-five (45) days after the end of each calendar quarter, Guarantor shall deliver to Landlord complete financial statements of the Guarantor, and, within ninety (90) days after the end of each calendar year, Guarantor shall deliver to Landlord complete audited financial statements, in each case including a balance sheet, profit and loss statement, top-line gross receipts report on a Site by Site basis showing unit-level EBITDAR, statement of changes in financial condition, income statement with respect to the Property, annual EBITDA projections for the then-current fiscal year of Tenant and all other related schedules for the fiscal period then ended.

8. **NOTICES.** Any consents, notices, demands, requests, approvals or other communications given under this Guaranty shall be in writing and shall be given as provided in the Lease, as follows or to such other addresses as either Landlord or Guarantor (as applicable) may designate by notice given to the other in accordance with the provisions of this Section 8:

If to Guarantor:

[●]
[●]
[●]
Attn: [●]
Email: [●]

With a copy to:

[●]
[●]
[●]
Attn: [●]
Email: [●]

If to Landlord:

c/o Oak Street Real Estate Capital, LLC
30 North LaSalle, Suite 4140
Chicago, IL 60602
Attention:  Asset Management
Email: oakstreetAM@blueowl.com

With a copy to:

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attn: David A. Rosenberg, Esq.
Email: david.rosenberg@kirkland.com

9.  **CONSENT TO JURISDICTION**.  Guarantor hereby (a) consents and submits to the jurisdiction of the courts of the State of Illinois and the federal courts sitting in the State of Illinois with respect to any dispute arising, directly or indirectly, out of this Guaranty, (b) waives any objections which the undersigned may have to the laying of venue in any such suit, action or proceeding in either such court, (c) agrees to join Landlord in any petition for removal to either such court, and (d) irrevocably designates and appoints Tenant as its authorized agent to accept and acknowledge on its behalf service of process with respect to any disputes arising, directly or indirectly, out of this Guaranty.  The undersigned hereby acknowledges and agrees that Landlord may obtain personal jurisdiction and perfect service of process through Tenant as the undersigned agent, or by any other means now or hereafter permitted by Applicable Law.

10.  **ESTOPPEL CERTIFICATE**.  Guarantor shall, from time to time within fifteen (15) days after receipt of Landlord's request, execute, acknowledge and deliver to Landlord an estoppel certificate in the form attached to the Lease as Exhibit D.  Such certificate may be relied upon by Landlord and any prospective purchaser, landlord or lender of all or a portion of the Premises (or any portion thereof).

11.  **MISCELLANEOUS**.

A.  Guarantor further agrees that Landlord may, without notice, assign this Guaranty in whole or in part.  If Landlord disposes of its interest in the Lease, "**Landlord**," as used in this Guaranty, shall mean Landlord's successors and assigns.

B.  Guarantor promises to pay all costs of collection or enforcement incurred by Landlord in exercising any remedies provided for in the Lease or this Guaranty whether at law or in equity; provided, however, if any legal action or proceeding is commenced to interpret or enforce the terms of, or obligations arising out of, this Guaranty, or to recover damages for the breach thereof, the party prevailing in any such action or proceedings shall be entitled to recover from the non-prevailing party all attorneys' fees and reasonable costs and expenses incurred by the prevailing party.  As used herein, "attorneys' fees" shall mean the fees and expenses of counsel

to the parties hereto, which may include printing, photocopying, duplicating and other expenses, air freight charges, and fees billed for law clerks, paralegals, librarians and others not admitted to the bar but performing services under the supervision of an attorney. The term "attorneys' fees" shall also include, without limitation, all such fees and expenses incurred with respect to appeals, arbitrations and bankruptcy proceedings.

C.     If any portion of this Guaranty shall be deemed invalid, unenforceable or illegal for any reason, such invalidity, unenforceability or illegality shall not affect the balance of this Guaranty, which shall remain in full force and effect to the maximum permitted extent.

D.     The provisions, covenants and guaranties of this Guaranty shall be binding upon Guarantor and its heirs, successors, legal representatives and assigns (it being understood that Guarantor shall not have the right to assign its obligations under this Guaranty without the prior written consent of Landlord in Landlord's sole and absolute discretion), and shall inure to the benefit of Landlord and its successors and assigns, and shall not be deemed waived or modified unless such waiver or modification is specifically set forth in writing, executed by Landlord or its successors and assigns, and delivered to Guarantor.

E.     Whenever the words "include", "includes", or "including" are used in this Guaranty, they shall be deemed to be followed by the words "without limitation", and, whenever the circumstances or the context requires, the singular shall be construed as the plural, the masculine shall be construed as the feminine and/or the neuter and vice versa. This Guaranty shall be interpreted and enforced without the aid of any canon, custom or rule of law requiring or suggesting construction against the party drafting or causing the drafting of the provision in question.

F.     Each of the rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law or in the Lease or this Guaranty.

G.     The provisions of this Guaranty shall be governed by and interpreted solely in accordance with the internal laws of the State of Illinois, without giving effect to the principles of conflicts of law.

I.     The Recitals set forth above are hereby incorporated by this reference and made a part of this Guaranty. Guarantor hereby represents and warrants that the Recitals are true and correct.

<div align="center">SIGNATURE PAGE TO FOLLOW</div>

IN WITNESS WHEREOF, the undersigned has executed this Amended and Restated Unconditional Guaranty of Payment and Performance effective as of the date first written above.

**GUARANTOR:**

**MOUNTAIN EXPRESS OIL COMPANY**,
a Georgia corporation

By:_____
Name: _____
Its: _____

Signature Page to Amended and Restated Unconditional Guaranty of Payment and Performance

## SCHEDULE I

## LANDLORD ENTITIES

# SCHEDULE II

## ORIGINAL LEASES

## SCHEDULE III

## ORIGINAL GUARANTIES

**SCHEDULE III**

**TENANT ENTITIES**

## EXHIBIT H-1
## TO
## AMENDED AND RESTATED MASTER LEASE AGREEMENT

**FORM OF LEASE MODIFICATION AGREEMENT**

**THIS LEASE MODIFICATION AGREEMENT (this "Agreement")** is entered into as of _____, 20__, (the "**Effective Date**") by and between [LANDLORD ENTITY], each a Delaware limited liability company (collectively, "**Landlord**"), and [TENANT] (collectively, "**Tenant**").

**RECITALS**

A.  Landlord and Tenant are parties to that certain Amended and Restated Master Lease Agreement (Oak Trust), dated [_____], by and between Landlord and Tenant (as amended, the "**Lease**").

B.  Pursuant to Section 22.A of the Lease, Landlord has elected to assign its interest in the Sites set forth on **Exhibit A** attached hereto and made a part here of (the "**Assigned Sites**").

C.  In connection with Landlord's assignment of its interest in the Assigned Sites, (i) [ASSIGNING LANDLORD ENTITY] ("**Assigning Landlord**") has entered into that certain Lease Agreement, dated as of the date hereof, between Landlord and [APPLICABLE TENANT ENTITIES] with respect to the Assigned Sites (the "**New Lease**") and (ii) Assigning Landlord has assigned its right title and interest in the New Lease to [ASSIGNEE], a [●] ("**Assignee**") pursuant to that certain Assignment and Assumption of Lease Agreement, dated as of the date hereof, by and between Assigning Landlord and Assignee.

D.  In accordance with Section 22.A of the Lease, Landlord and Tenant are entering into this Agreement to amend the Lease to exclude the Assigned Sites and make other conforming changes as more particularly set forth herein.

**NOW THEREFORE,** in consideration of the mutual promises, covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

56. <u>Amendments</u>: The Lease is hereby amended as follows:

(i)  <u>Exhibit A</u>:  Exhibit A of the Lease is hereby deleted in its entirety and replaced with <u>Exhibit A</u> attached hereto.[1]

---

[1] Attached Exhibit A to reflect a reduction of Annual Base Rent equal to the Allocated Base Rent Amount for the Assigned Sites.

      (ii)     <u>Exhibit B-1</u>: Exhibit B-1 of the Lease is hereby amended to remove the Sites described on <u>Exhibit B</u> attached hereto and made a part hereof.[2]

      (iii)    <u>Exhibit B-2</u>: Exhibit B-2 of the Lease is hereby amended to remove the Sites described on <u>Exhibit C</u> attached hereto and made a part hereof.[3]

57. <u>Affirmation of Lease</u>. Except as expressly provided herein, the Lease shall remain unchanged and in full force and effect; provided, that to the extent this Agreement conflicts with the Lease, the provisions of this Agreement shall control.

58. <u>Counterparts; Electronic Signatures</u>. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of such counterparts shall together constitute but one and the same instrument. Delivery of an executed counterpart of this Amendment by electronic means shall be equally as effective as delivery of a manually executed original counterpart of this Agreement.

59. <u>Successors and Assigns</u>. This Agreement shall be binding upon and shall inure to the benefit of the successors and permitted assigns of the respective parties hereto.

60. <u>Entire Agreement</u>. This Agreement contains the entire agreement between the parties hereto with respect to the subject matter of this Agreement, and supersedes all prior understandings, agreements and representations, if any, with respect to such subject matter.

*[Remainder of Page Intentionally Blank]*

---

[2] Attached Exhibit B to be the site descriptions of the Assigned Sites.
[3] Attached Exhibit C to be the Assigned Sites.

IN WITNESS WHEREOF, Landlord and Tenant have duly executed this Agreement as of the day and year first above mentioned.

LANDLORD:[4]

[●],
a Delaware limited liability company


By:_____
Name: [●]
Title: [●]

---

[4] Landlord and Tenant entities to be modified as applicable.

TENANT:

[●],
a [●]

By:_____
Name: _____
Title: _____

## EXHIBIT A

## EXHIBIT A
## TO
## LEASE AGREEMENT

### BASE RENT SCHEDULE

| Lease Year | Annual Base Rent | Monthly Base Rent |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |
| 5. | | |
| 6. | | |
| 7. | | |
| 8. | | |
| 9. | | |
| 10. | | |
| 11. | | |
| 12. | | |
| 13. | | |
| 14. | | |
| 15. | | |
| 16. | | |

**EXHIBIT B**

**PREMISES[5]**

Address:

Square Footage of Building:

Type of Premises:

Legal Description:

---

[5] To include all Assigned Sites.

## EXHIBIT C[6]

|  | Property Address | City | State | Allocated Base Rent | Landlord |
|---|---|---|---|---|---|
| 1. | | | | | |

---

[6] To include all Assigned Sites.

**EXHIBIT H-2**
**TO**
**AMENDED AND RESTATED MASTER LEASE AGREEMENT**

**FORM OF NEW LEASE**

# FORM OF

# LEASE AGREEMENT

## By and Between

[LANDLORD ENTITY], a Delaware limited liability company

## (Landlord)

## and

Mountain Express Oil Company, a Georgia corporation[1]

## (Tenant)

---

[1] Note to Draft: Mountain Express Oil Company to be Guarantor if not the Tenant, consistent with applicable Master Lease.

## TABLE OF CONTENTS

| | | Page |
|---|---|---|

1. BASIC TERMS ......................................................................................................... 1
2. DEFINITIONS AND BASE PROVISIONS ............................................................. 2
3. GRANTING CLAUSE ............................................................................................. 9
4. USE ........................................................................................................................ 11
5. RENT ..................................................................................................................... 12
6. TRUE LEASE ........................................................................................................ 13
7. NET LEASE ........................................................................................................... 14
8. REAL ESTATE TAXES ........................................................................................ 15
9. PERSONAL PROPERTY TAXES ......................................................................... 18
10. OPERATING EXPENSES ..................................................................................... 18
11. TENANT'S REPAIR AND MAINTENANCE RESPONSIBILITIES .................... 19
12. COMPLIANCE WITH LAWS ............................................................................... 21
13. SURRENDER OF PREMISES ............................................................................... 21
14. ALTERATIONS ..................................................................................................... 22
15. ENTRY BY LANDLORD ...................................................................................... 24
16. TENANT'S INSURANCE OBLIGATIONS .......................................................... 24
17. OFAC ..................................................................................................................... 28
18. WAIVER OF SUBROGATION ............................................................................. 29
19. FIRE OR OTHER CASUALTY ............................................................................. 30
20. CONDEMNATION ................................................................................................ 32
21. INDEMNIFICATION ............................................................................................ 33
22. ASSIGNMENT AND SUBLETTING .................................................................... 35
23. LIENS .................................................................................................................... 37
24. TENANT'S DEFAULT .......................................................................................... 37
25. REMEDIES OF LANDLORD ............................................................................... 38
26. SUBORDINATION/ATTORNMENT .................................................................... 40
27. ESTOPPEL CERTIFICATE ................................................................................... 41
28. HAZARDOUS MATERIALS ................................................................................ 42
29. PRESS RELEASES ................................................................................................ 45
30. HOLDING OVER .................................................................................................. 45
31. FINANCIAL COVENANTS .................................................................................. 46
32. QUIET ENJOYMENT ........................................................................................... 48
33. NOTICES ............................................................................................................... 48
34. PERSONAL LIABILITY ....................................................................................... 48
35. ENTIRE AGREEMENT ......................................................................................... 49
36. AMENDMENTS .................................................................................................... 49
37. LEGAL INTERPRETATION ................................................................................. 49
38. OPTION TO RENEW ............................................................................................ 50
39. AUTHORITY TO ENTER INTO LEASE .............................................................. 51
40. PARTIES BOUND ................................................................................................. 51
41. COUNTERPARTS; ELECTRONIC SIGNATURES ............................................. 51
42. SEVERABILITY ................................................................................................... 51
43. WAIVER OF JURY TRIAL; CONSEQUENTIAL DAMAGES ............................ 52

44. MEMORANDUM OF LEASE ........................................................................................ 52
45. BROKERS ...................................................................................................................... 52
46. RIGHT OF FIRST REFUSAL TO PURCHASE ............................................................ 52
47. GUARANTY ................................................................................................................... 54
48. REIT PROTECTION ....................................................................................................... 56
49. LOCAL LAW PROVISIONS .......................................................................................... 56

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "**Lease**") is entered into as of the ___ day of _____, 2021 (the "Effective Date"), by and between [LANDLORD ENTITY], a Delaware limited liability company ("Landlord"), and [●], a [●] ("Tenant").

### RECITALS

A.      Landlord and Tenant were parties to that certain Amended and Restated Master Lease Agreement ([_____]) by and between Landlord and Tenant dated [_____] (as amended, the "Master Lease").

C.      In accordance with the terms of the Master Lease, in connection with the transfer of Landlord's interest in the Premises, Tenant is entering into this Lease with Landlord with respect to the Premises.

**NOW THEREFORE**, in consideration of the mutual promises, covenants, and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant agree as follows:

1.      **BASIC TERMS**.

      A.      "Base Rent":  Base Rent shall be paid in accordance with and in the amounts set forth on **Exhibit A** attached hereto and made a part hereof, subject to increases as set forth herein.

      B.      "Building":  The building or buildings located on the Property in the approximate square footages set forth on **Exhibit B** attached hereto and made a part hereof.

      C.      "Commencement Date":  [_____], 2021[2].

      D.      "Expiration Date":  The last day of the calendar month in which the twenty-five (25) year anniversary of the Commencement Date shall occur, or as otherwise extended pursuant to the terms hereof.

      E.      "Option to Renew":  Four (4) additional periods of five (5) years each under the terms and conditions set forth in Section 38 of this Lease.

      F.      "Premises":  Collectively, the Building and the Property.

      G.      "Property":  Those certain tracts or parcels of land, more particularly described on **Exhibit B** attached hereto and made a part hereof.

      H.      "Term":  A period of twenty-five (25) years (plus the number of days, if any, to have this Lease expire on the last day of a calendar month),

---

[2]     Note to Draft: To be the Effective Date of the applicable Master Lease.

1

commencing on the Commencement Date and expiring on the Expiration Date, unless extended as hereinafter provided.

2. **<u>DEFINITIONS AND BASE PROVISIONS</u>**.

For purposes of this Lease, the following terms shall have the meanings indicated below:

A. "<u>ADA</u>": The Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq., as the same may be amended from time to time and any and all rules and regulations which have become effective prior to the date of this Lease under such statutes.

B. "<u>Affiliate</u>": With respect to Landlord or Tenant, shall mean a person or entity that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with such person or entity. The term "control" as used in the immediately preceding sentence, means, with respect to an entity that is a corporation, limited liability company, partnership or other entity, the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the ownership interests of the entity, with respect to any non-publicly traded company, and more than ten percent (10%) ownership, or management control, with respect to any publicly traded company.

C. "<u>Alterations</u>": Defined in <u>Section 15.A</u> hereof.

D. "<u>Anti-Money Laundering Laws</u>": The BSA and the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (commonly referred to as the USA Patriot Act), P.L. 107-56, as the same may be amended from time to time and any and all rules and regulations which have become effective prior to the date of this Lease under such statutes.

E. Intentionally Omitted.

F. "<u>Architect</u>" shall mean an architect selected by Tenant to complete any applicable Tenant's Work, who is reasonably acceptable to Landlord.

G. "<u>Base Rent</u>": Defined in <u>Section 1.A</u> hereof.

H. "<u>BSA</u>": The Bank Secrecy Act (otherwise known as the Currency and Foreign Transactions Reporting Act), 31. U.S.C. §§ 310 et seq., as the same may be amended from time to time and any and all rules and regulations which have become effective prior to the date of this Lease under such statutes.

I. "<u>Building</u>": Defined in <u>Section 1.B</u> hereof.

J. "<u>Commencement Date</u>": Defined in <u>Section 1.C</u> hereof.

2

K. "Comparable Buildings": Buildings in the market in which the applicable Building is located that are comparable in size, design, use, age, location, class and quality to such Building

L. "Consolidated Net Income": means, for [Tenant][Guarantor] on a consolidated basis for any period, without duplication, the net income (or loss) for such period, but excluding therefrom (to the extent otherwise included therein) (a) any gains attributable to write-ups of assets or the sale of assets (other than the sale of assets in the ordinary course of business), (b) any equity interest of [Tenant][Guarantor] in the unremitted earnings of any entity that is not a subsidiary of such [Tenant][Guarantor], and (c) any income (or loss) of any entity accrued prior to the date it becomes a subsidiary or is merged into or consolidated with the [Tenant][Guarantor] or any subsidiary or the date that such entity's assets are acquired by the [Tenant][Guarantor] or any subsidiary.  Notwithstanding the foregoing, profits from the purchase and sale of real property and sale of businesses shall be considered usual and recurring "in the ordinary course of business" for purposes of determining "Consolidated Net Income".

M. "Contract": Defined in Section 46.C hereof.

N. "Control" shall mean with respect to an entity that is a corporation, limited liability company, partnership or other entity, the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the ownership interests of the entity, with respect to any non-publicly traded company, and more than ten percent (10%) ownership, or management control, with respect to publicly traded company.

O. "Default Rate":  The lesser of (i) the Prime Rate plus ten percent (10%) per annum, compounding monthly, or (ii) the highest rate allowed by applicable Law.

P. "EBITDA": The sum, without duplication, of the following on a consolidated basis: (i) Consolidated Net Income (loss), plus (ii) income tax expense, minus (iii) income tax benefit, plus (iv) interest expense, minus (v) interest income, plus (vi) depreciation expense, plus (vii) amortization expense, plus (x) any impairment charges, plus (xi) any expensed transaction/acquisition related fees and expenses, plus (xii) any extraordinary, unusual or non-recurring charges including any restructuring or integration costs that were expensed, minus (xiii) any extraordinary, unusual or non-recurring gains. To the extent that a significant transaction has been consummated within the measurement period, such as an acquisition, and some annual EBITDA for the acquisition is not included in the EBITDA for the measurement period, EBITDA shall be computed on proforma basis for the period of the acquisition that was excluded from the EBITDA measurement period; provided, however, such computation shall be subject to Landlord's reasonable approval.

3

Q.   "Encumbrance":  Any claim, lien, pledge, option, charge, easement, security interest, deed of trust, mortgage, lease, sublease, attachment, conditional sales agreement, encumbrance, preemptive right, right of first refusal, right of first offer, covenant, condition, restriction, reciprocal easement agreement, declaration or other right of third parties, whether voluntarily incurred or arising by operation of Law, and includes any agreement to give or enter into any of the foregoing.

R.   "Environmental Laws":  Each and every Law pertaining to environmental, health or safety matters or Hazardous Materials applicable to or which otherwise pertains to or affects the Premises or the use, ownership, occupancy or operation of the Premises or any portion thereof, and as the same have been or may be amended, modified or supplemented from time to time, including but not limited to the (1) Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §9601 et seq.), (2)  Hazardous Substances Transportation Act (49 U.S.C. §1802 et seq.), (3) Resource Conservation and Recovery Act (42 U.S.C. §6901 et seq.), as amended by the Hazardous and Solid Wastes Amendments of 1984, (4) Water Pollution Control Act (33 U.S.C. §1251 et seq.), (5) Safe Drinking Water Act (42 U.S.C. §300f et seq.), (6) Clean Water Act (33 U.S.C. §1321 et seq.), (7) Clean Air Act (42 U.S.C. §7401 et seq.), (8) Solid Waste Disposal Act (42 U.S.C. §6901 et seq.), (9) Toxic Substances Control Act (15 U.S.C. §2601 et seq.), (10) Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. §11001 et seq.), (11) Radon Gas and Indoor Air Quality Research Act of 1986 (42 U.S.C. §7401 et seq.), (12) National Environmental Policy Act (42 U.S.C. §4321 et seq.), (13) Superfund Amendment Reauthorization Act of 1986 (42 U.S.C. §9601 et seq.), (14) Occupational Safety and Health Act (29 U.S.C. §651 et seq.), (15) Refuse Act of 1999 (33 U.S.C. § 407 et seq.), (16) Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136 et seq.), (17) Marine Protection, Research and Sanctuaries Act (33 U.S.C. § 1401 et seq.), (18) Noise Control Act (42 U.S.C. §  4902 et seq.), (19) Atomic Energy Act (42 U.S.C. §  2011 et seq.) and (20) Nuclear Waste Policy Act of 1982 (42 U.S.C. § 10101 et seq.), and any similar state or local Laws  and any and all rules and regulations in effect under such Laws.

S.   "Event of Default":  Defined in Section 24 hereof.

T.   "Exercise Period": Defined in Section 46.B hereof.

U.   "Expiration Date":  Defined in Section 1.D hereof.

V.   "Final Completion" shall mean with respect to any Tenant's Work (a) the completion of construction of such Tenant's Work, including all "punch list" items, in accordance with the applicable Plans as certified by the applicable General Contractor, and (b) all permits and licenses required for the legal occupancy of such Tenant's Work, if any, have been obtained.

4

W.      "<u>Final Completion Date</u>" shall mean the date that Final Completion of the applicable Tenant's Work occurs.

X.      "<u>General Construction Contract</u>" shall mean with respect to any Tenant's Work, the applicable construction contract by and between the applicable General Contractor and Tenant and approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed.

Y.      "<u>General Contractor</u>" shall mean, with respect to any Tenant's Work, a contractor selected by Tenant to complete such Tenant's Work and reasonably acceptable to Landlord.

Z.      "<u>Guarantor</u>" shall mean [●], a [●].[3]

AA.     "<u>Guaranty</u>" Defined in <u>Section 47</u> hereof.

BB.     "<u>Hazardous Materials</u>": shall mean (a) any toxic substance or hazardous waste, substance, solid waste or related material, or any pollutant or contaminant; (b) radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, radiation, mold or other microbial matter, odors, noise, per- and poly-fluoroalkyl substances, or any petroleum product or additive; (c) any substance, gas, material or chemical which is now or hereafter defined as or included in the definition of "hazardous substances," "toxic substances," "hazardous materials," "hazardous wastes," "regulated substances" or words of similar import under any Environmental Laws; and (d) any other chemical, material, gas or substance, the exposure to or release of which is or may be prohibited, limited or regulated by any governmental authority, or any chemical, material, gas or substance that does or is reasonably likely to pose a hazard to human health or safety or to the environment.

CC.     "<u>Indebtedness</u>": shall mean (i) all indebtedness for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property for which [Tenant/Guarantor] or its assets are liable; (ii) all unfunded amounts under a loan agreement, bond, debenture, note, letter of credit, or other similar instrument or credit facility for which [Tenant/Guarantor] would be liable if such amounts were advanced thereunder; (iii) all amounts required to be paid by [Tenant/Guarantor] as a guaranteed payment to shareholders or a preferred or special dividend, including any mandatory redemption of shares or interest; (iv) all indebtedness guaranteed by [Tenant/Guarantor] directly or indirectly; (v) all obligations under leases that constitute capital leases for which [Tenant/Guarantor] is liable; and (vi) all obligations of [Tenant/Guarantor] under interest rate swaps, caps, floors, collars and other interest hedge

---

[3] <u>Note to Draft</u>: Mountain Express Oil Company to be Guarantor if not the Tenant, consistent with the applicable Master Lease.

5

agreements, in each case whether [Tenant/Guarantor] is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations [Tenant/Guarantor] otherwise assures a creditor against loss.

DD. "Indemnified Party" shall mean, with respect to any indemnification obligation contained in this Lease, the individual or entity so indemnified by the indemnifying party.

EE. "Landlord Indemnified Parties":  Landlord and Landlord Mortgagee, and each of their respective successors and assigns, and their respective members, managers, partners, shareholders, officers, directors, agents, attorneys and representatives.

FF. "Landlord":  Defined in the Preamble hereto.

GG. "Landlord Claim":  Defined in Section 21.A hereof.

HH. "Landlord Mortgage":  Defined in Section 26.B hereof.

II. "Landlord Mortgagee":  Defined in Section 26.B hereof.

JJ. "Landlord Notice Address":

c/o Oak Street Real Estate Capital, LLC
30 N. LaSalle Street, Suite 4140
Chicago, Illinois 60602
Attention: Michael Reiter
E-mail: Michael.reiter@blueowl.com

With a copy to

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attention: David A. Rosenberg
E-mail: david.rosenberg@kirkland.com

KK. "Landlord's Notice": Defined in Section 46.A hereof.

LL. "Landlord's Representatives":  Landlord's agents, attorneys, representatives, members, directors, officers and employees.

MM. "Late Charge": Defined in Section 5.C hereof.

NN. "Law":  All applicable statutes, ordinances, rules, regulations, codes, orders, requirements, directives, binding written interpretations and binding written policies, common law, rulings, and decrees of all local, municipal,

6

state and federal governments, departments, agencies, commissions, boards or political subdivisions.

OO.     "Negotiation Period": Defined in Section 46.C hereof.

PP.     "Net Leverage Ratio": shall mean on any date of determination, the ratio of (a)(i) Indebtedness as of such date minus (ii) unrestricted cash on hand to (b) EBITDA for the fiscal quarter most recently ended for which financial statements have been (or are required to have been) delivered to Landlord.

QQ.     "NFA": Defined in Section 28.H hereof.

RR.     "OFAC Laws and Regulations":  All Laws administered by the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury, codified at 31 C.F.R. Part 500 (including those named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action regarding persons or entities with whom U.S. persons or entities are restricted from doing business (including persons or entities who have violated the U.S. Foreign Corrupt Practices Act 15 U.S.C. §§78dd-1, 78dd-2 and 78dd-3), as same may be amended from time to time.

SS.     "Option to Renew":  Defined in Section 1.E hereof.

TT.     "Permitted Encumbrances":  Any and all Encumbrances (i) affecting any portion of the Premises as of the Commencement Date, including, but not limited to, those Encumbrances shown on Landlord's title policy obtained on the Commencement Date, (ii) consisting of any and all leases, subleases, licenses and other occupancy agreements in place with respect to the Premises as of the Effective Date (collectively, the "**Existing Leases**"), (iii) consisting of current taxes and assessments with respect to the Premises, not yet due or payable, (iv) arising or created by municipal and zoning ordinances and (v) arising after the Commencement Date that are approved in writing by Landlord in its sole and absolute discretion.

UU.     "Personal Property":  All personal property on the Premises, which shall include, without limitation, all business machinery and equipment, including, but not limited to, specialized equipment unique to the nature of Tenant's business, business records, furniture, furnishings, communications equipment, office equipment, computer equipment, computer software, computer tapes, computer program tapes, computer program disks, computer program documentation and manuals, computer program codes, customer accounts, customer lists, customer information, inventory and proprietary information which may belong to Tenant or be in the possession of Tenant, which is located or used upon, in or about the Premises during

7

the Term, or any renewal or extension thereof. Any generator and associated equipment located at the Premises, if any, shall constitute a fixture and shall not constitute Personal Property.

VV. "Plans" shall mean, with respect to any Tenant's Work, the plans and specifications prepared by the Architect and approved by Landlord.

WW. "Premises":  Defined in Section 1.F hereof.

XX. "Prime Rate":  Fifteen percent (15%) per annum, compounding monthly

YY. "Prohibited Persons":  Defined in Section 17.B hereof.

ZZ. "Property":  Defined in Section 1.G hereof.

AAA. "Purchase Agreement":  Defined in Recital B hereto.

BBB. "Real Estate Taxes":  Defined in Section 8.A hereof.

CCC. "Release":  Any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, migrating, presence of, exposure to or disposing into the environment of any Hazardous Materials, including the abandonment or discarding of barrels, containers, and other closed receptacles containing any Hazardous Materials.

DDD. "Renewal Amendment":  Defined in Section 38.C hereof.

EEE. "Renewal Notice":  Defined in Section 38.A.1 hereof.

FFF. "Renewal Option":  Defined in Section 38.A hereof.

GGG. "Renewal Term":  Defined in Section 38.A hereof.

HHH. "Rent":  Defined in Section 5.B hereof.

III. "Repossessed Premises":  Defined in Section 25.C hereof.

JJJ. "Right of First Refusal": Defined in Section 46 hereof.

KKK. Intentionally Omitted.

LLL. Intentionally Omitted.

MMM. "SNDA":  Defined in Section 26.A hereof.

NNN. "Substitute Tenant":  Defined in Section 25.C hereof.

OOO. "Tanks": Defined in Section 28.H hereof.

8

PPP.　"Taxes":  Defined in Section 8.D hereof.

QQQ.　"Tenant":  Defined in the Preamble hereto.

RRR.　"Tenant Notice Address":

[_____]
[Address]
[City, State, Zip Code]
Attn: [_____]

With a copy to:

[_____]
[Address]
[City, State, Zip Code]
Attn: [_____]

SSS.　"Tenant's Personal Property":  Defined in Section 13 hereof.

TTT.　"Tenant's Purchase Election": Defined in Section 46.B hereof.

UUU.　"Tenant's Representatives":　Tenant's agents, attorneys, representatives, directors, officers and employees and any mortgagee of Tenant's interest in this Lease or in the Premises.

VVV.　"Tenant's Work": Defined in **Exhibit C** hereof.

WWW.　"Term":  Defined in Section 1.H hereof.

XXX.　"Transfer":  Defined in Section 22.B hereof.

YYY.　"U.S. Publicly-Traded Entity":  Defined in Section 17.A hereof.

ZZZ.　"Utility Charges":  Defined in Section 10.A hereof.

3.　**GRANTING CLAUSE**.

A.　Landlord, in consideration of the covenants and agreements to be performed by Tenant, and upon the terms and conditions contained in this Lease, does hereby lease, demise, let and deliver to Tenant, and Tenant, in consideration of the covenants and agreements to be performed by Landlord and upon the terms and conditions contained in this Lease, does hereby lease from Landlord, the Premises, to have and to hold for the Term. Tenant acknowledges receipt and delivery of complete and exclusive possession of the Premises, subject to the Permitted Encumbrances. Tenant acknowledges and confirms that for a period prior to and up to and including the execution of this Lease, Tenant has been in continuous ownership and possession of

9

the Premises, and, accordingly, Tenant is fully familiar therewith, and Tenant has examined and otherwise has knowledge of the condition of the Premises prior to the execution and delivery of this Lease and has found the same to be satisfactory for its purposes hereunder. Regardless, however, of any knowledge, examination or inspection made by Tenant and whether or not any patent or latent defect or condition was revealed or discovered thereby, Tenant is leasing the Premises "as is," "where is" and "with all faults" in its present condition. Tenant hereby irrevocably, unconditionally and absolutely waives and relinquishes any claim or action against Landlord whatsoever in respect of the condition of the Premises as of the Commencement Date, including any patent or latent defects or adverse conditions not discovered or discoverable or otherwise known or unknown by Tenant as of the Commencement Date.

LANDLORD MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, IN FACT OR IN LAW, IN RESPECT OF THE PREMISES OR ANY PART THEREOF, EITHER AS TO ITS FITNESS FOR USE, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE OR OTHERWISE, OR AS TO THE NATURE OR QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, OR THE EXISTENCE OF ANY HAZARDOUS MATERIALS, IT BEING AGREED THAT ALL SUCH RISKS, KNOWN AND UNKNOWN, LATENT OR PATENT, ARE TO BE BORNE SOLELY BY TENANT, INCLUDING ALL RESPONSIBILITY AND LIABILITY FOR ANY ENVIRONMENTAL CONDITION OF THE PREMISES, ENVIRONMENTAL REMEDIATION AND COMPLIANCE WITH ALL ENVIRONMENTAL LAWS.

Without limiting the foregoing, Tenant realizes and acknowledges that factual matters existing as of the Commencement Date now unknown to it may have given or may hereafter give rise to losses, damages, liabilities, costs and expenses that are presently unknown, unanticipated and unsuspected, and Tenant further agrees that the waivers and releases herein have been negotiated and agreed upon in light of that realization and that Tenant nevertheless hereby intends to release, discharge and acquit Landlord and Landlord Mortgagee, and each of their respective successors and assigns, and their respective members, managers, partners, shareholders, officers, directors, agents, attorneys and representatives, from any and all such unknown losses, damages, liabilities, costs and expenses.

B. Landlord and Tenant covenant and agree that, except to the extent otherwise required by applicable Law: (i) each will treat this Lease in accordance with U.S. generally accepted accounting principles, consistently applied, and as a true lease for state law reporting purposes and for federal income tax purposes; and (ii) each party will not, nor will it permit any Affiliate to, at any time, take any action or fail to take any action with respect to the preparation or filing of any statement or disclosure to any governmental

10

authority, including without limitation, any income tax return (including an amended income tax return), to the extent that such action or such failure to take action would be inconsistent with the intention of the parties expressed in this <u>Section 3.B</u>.

C.    Tenant acknowledges that fee simple title (both legal and equitable) to the Premises is vested in Landlord and that Tenant has only the leasehold right of possession and use of the Premises as provided herein.

4.    **<u>USE</u>**.

A.    Tenant may use the Premises as a gas station and convenience store, and ancillary uses associated therewith, in all cases subject to and in compliance with all Laws and Permitted Encumbrances. Tenant shall use the Premises only as provided by and in accordance with all Permitted Encumbrances, subject to Landlord's reservation of rights herein. Tenant shall not use or occupy the Premises, or any part thereof, nor permit or allow the Premises or any part thereof to be used or occupied, for (i) any purpose or in any manner which is in violation of any Law or a violation of the provisions set forth in <u>Section 28</u> or any other provision of this Lease or (ii) in any manner which violates any certificates of occupancy for the Premises or makes void or voidable any insurance then in force with respect thereto as is required pursuant to <u>Section 16</u> hereof. Tenant's occupancy of the Premises will be in compliance with all Laws and insurance requirements, and as otherwise provided in this Lease. Tenant shall neither suffer nor permit the Premises or any portion thereof to be used, or otherwise act or fail to act, in such a manner as (I) might impair Landlord's title thereto or to any portion thereof, (II) may make possible a claim of adverse use or possession or an implied dedication of the Premises or any portion of the Premises, or (III) may subject the Premises or this Lease to any Encumbrances, other than Permitted Encumbrances. Notwithstanding anything herein to the contrary, Tenant shall not (a) permit any unlawful or immoral practice to be carried on or committed in the Premises; (b) make any use of or allow the Premises to be used for any purpose that might invalidate or increase the rate of insurance thereof; (c) deface or injure the Premises; (d) overload the floors, walls or ceilings of the Premises; (e) commit or suffer any material waste in or about the Premises; (f) use the Premises in any manner that may diminish the value of the Premises in any material respect; or (g) use the Premises for any of the following purposes without the Landlord's prior consent (in its sole and absolute discretion): (i) bar, nightclub, adult bookstore or video shop or other adult entertainment establishment; (ii) incineration or reduction of garbage or any garbage dumps on the Premises; (iii) mortuary; (iv) fire sale, bankruptcy sale or auction house operation; (v) automobile, truck, trailer or RV repairs on-site; (vi) "flea market", secondhand, surplus or other "off-price" or deep discount store; (vii) massage parlor; (viii) carnival; or (ix) gambling or off-track betting operation.

11

B.   At all times during the Term, (i) Tenant, or its subtenants, shall occupy the Premises and (ii) except during periods when the Premises may be untenantable by reason of fire or other casualty or condemnation (provided, however, during all such periods while the Premises are untenantable, Tenant shall strictly comply with the terms and conditions of Section 19 and Section 20 of this Lease), Tenant, or its subtenants, shall operate its business on the Premises in the ordinary course.

C.   Tenant will not enter into any agreements or consent to any transaction or instruments that will create an Encumbrance on the Premises without Landlord's prior written consent in its sole discretion. Tenant shall be responsible for complying with the terms and conditions of, and paying the costs and expenses under, all Encumbrances on the Premises (other than Landlord's obligations to pay debt service to any Landlord Mortgagee under any Landlord Mortgage). Tenant shall not, without Landlord's prior written consent (in Landlord's sole discretion), apply for or otherwise seek or obtain any zoning changes or variances with respect to the Property. If Landlord desires to seek or obtain any zoning changes or variances with respect to the Property, Tenant shall cooperate in all respects therewith, at Landlord's request, provided that such zoning change or variance will not prohibit Tenant's use of the Property for its then-current use.

D.   Tenant shall have the right to access and use the Premises twenty-four (24) hours per day, seven (7) days per week.

5.   **RENT**.

A.   Tenant shall pay Base Rent to Landlord in the manner provided in Section 5.B in equal consecutive monthly installments in advance on or before the 1st day of each calendar month commencing as of the Commencement Date and continuing through the Term. If the Term commences on a day other than the first day of a calendar month, or ends on a day other than the last day of a calendar month, Base Rent for such month shall be prorated by multiplying such Base Rent by a fraction, the numerator of which is the number of days of the Term within such calendar month and the denominator of which is the total number of days within such calendar month. Tenant shall pay its first monthly installment of Base Rent, which may be prorated pursuant to this Section 5.A, on the Commencement Date in connection with Landlord's acquisition of the Premises pursuant to the Purchase Agreement.

B.   For purposes of this Lease, the Base Rent, the Real Estate Taxes, the Utility Charges and any and all other amounts, sums, charges, liabilities and obligations which Tenant assumes or agrees to pay or may become liable for under this Lease at any time and from time to time are sometimes collectively referred to as "**Rent**"; and, in the event of any failure on the part of Tenant to pay any portion of the Rent, every fine, penalty, interest

12

and cost which may be added for nonpayment or late payment of such items, including, without limitation, all amounts for which Tenant is or may become liable to indemnify Landlord and the Landlord Indemnified Parties under this Lease (including reasonable attorneys' fees and court costs) shall be deemed to be Rent. All Rent is payable in lawful money of the United States of America and legal tender for the payment of public and private debts without notice, demand, abatement, deduction, or setoff under any circumstances, in accordance with the wire or ACH information as Landlord designates to Tenant in writing from time to time.

C. Tenant hereby acknowledges that late payment by Tenant to Landlord will cause Landlord to incur costs and administrative complications not contemplated hereunder, the exact amount and scope of which are presently anticipated to be extremely difficult to ascertain. Accordingly, if any installment of Rent due to Landlord is not paid on the date it is due for any reason, Tenant shall pay Landlord upon demand a late charge equal to the lesser of (i) ten percent (10%) of the delinquent installment of Rent and (ii) the highest amount allowed by applicable Law (each a "**Late Charge**"), provided, however, that for the first time in a calendar year that any installment of Rent is not paid on the date it is due, such Late Charge shall not apply unless the Rent remains unpaid five (5) days after the date it is due. The parties agree that this late charge represents a fair and reasonable estimate of the costs and expenses (including economic losses) that Landlord will incur by reason of late payment by Tenant. The parties further agree that such late charge is Rent and not interest and such assessment does not constitute a lender or borrower/creditor relationship between Landlord and Tenant. In addition, any amount of delinquent Rent (including the amount of any Late Charge) due to Landlord shall accrue interest at the Default Rate from the date on which such Rent was due up to the date that such Rent is paid. The payment of such late charge or such interest shall not constitute waiver of, nor excuse or cure, any default under this Lease, nor prevent Landlord from exercising any other rights and remedies available to Landlord. Without limitation of the foregoing, Tenant shall be responsible for payment of all interest, late charges, and other costs and fees imposed by third parties with respect to late payments of Utilities or other third party charges that are the responsibility of Tenant hereunder.

D. For any non-scheduled payment of Rent hereunder that is payable by Tenant on demand by Landlord, such shall be due ten (10) days following written demand therefor by Landlord, without abatement, deduction, or setoff under any circumstances.

6. **<u>TRUE LEASE</u>**

A. It is the intent of Landlord and Tenant that this Lease establish a "true lease" of all parcels constituting the Premises for all purposes under the United States Bankruptcy Code, applicable state law, and for Federal income tax

13

purposes. The Rent for the Term is intended to be "fixed rent" within the meaning of Treasury Regulation Section 1.467-1(h)(3) for each annual period. This Lease is a "true lease" and does not represent a financing statement, financing lease, financing agreement, device or arrangement, security interest, security agreement, capital lease, mortgage, equitable mortgage, deed of trust, trust agreement, or other financing or trust arrangement or any other non-lease transaction. Each of the parties (1) waives any claim or defense based upon the characterization of the Lease as anything other than a "true lease", (2) stipulates and agrees not to challenge, and is estopped from challenging, the validity, enforceability or characterization of the lease of the Premises under the Lease as a "true lease," (3) stipulates and agrees, and is estopped from challenging, that nothing contained in the Lease creates or is intended to create a joint venture, partnership, equitable mortgage, trust, financing device or arrangement, security interest or the like and (4) shall support the intent of the parties that the lease of the Premises pursuant to this Lease is a "true lease" and does not create a joint venture, partnership, equitable mortgage, trust, financing device or arrangement, security interest or the like, if, and to the extent that, any challenge occurs. Landlord does not intend to convey any fee interest in any of the Premises to Tenant. Tenant does not intend to obtain an interest in the Premises other than a leasehold interest pursuant to the Lease. The Lease may not be construed in any manner to create any relationship between the parties other than a landlord-tenant relationship.

7. **NET LEASE**.

A. Landlord and Tenant acknowledge and agree that (i) this Lease is, and is intended to be, what is commonly referred to as a "net, net, net" or "triple net" lease, and (ii) the Rent shall be paid absolutely net to Landlord, so that this Lease shall yield to Landlord the full amount or benefit of the installments of Base Rent, Real Estate Taxes and all other Rent throughout the Term with respect to the entire Premises, all as more fully set forth in Section 5. All of the costs, expenses, responsibilities and obligations of every kind and nature whatsoever foreseen and unforeseen relating to the condition, use, operation, management, maintenance, repair, restoration and replacement of the Premises and all improvements and appurtenances related thereto or any part thereof shall be performed and paid by Tenant, and Landlord shall have no responsibility or liability therefor. Tenant covenants to pay Base Rent, Real Estate Taxes and all other Rent hereunder are independent covenants, and Tenant shall have no right to hold back, offset, deduct, credit against or fail to pay in full any such amounts for claimed or actual default or breach by Landlord of whatsoever nature, for force majeure or for any other reason whatsoever. For the avoidance of doubt, Tenant shall not have, and hereby expressly and absolutely waives, relinquishes, and covenants not to assert, accept or take advantage of, any right to deposit or pay with or into any court or other third-party escrow, depository account or tenant account with respect to any disputed Rent, or

14

any Rent pending resolution of any other dispute or controversy with Landlord. Tenant hereby expressly waives any and all defenses it may have at law or in equity to payment of Rent, including, without limitation, based on any theories of frustration of purpose, impossibility, or otherwise.

B.      Landlord is the owner of the Premises.  In furtherance of the foregoing, Landlord and Tenant intend that:

1.      This Lease is intended to be a "true lease" and an "operating lease" and not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, trust agreement, security agreement or other financing or trust arrangement, and the economic realities of this Lease are those of a true lease.  The business relationship created by this Lease and any related documents is solely that of a long term commercial lease between Landlord and Tenant, this Lease has been entered into by both parties in reliance upon the economic and legal bargains contained herein, and none of the agreements contained herein is intended, or shall be deemed or construed, to create a partnership (de facto or de jure) between Landlord and Tenant, to make them joint venturers, to make Tenant an agent, legal representative, partner, subsidiary or employee of Landlord, or to make Landlord in any way responsible for the debts, obligations or losses of Tenant.

2.      Landlord and Tenant acknowledge and agree that the Term with respect to the Premises, including any term extensions provided for in this Lease, is less than the remaining economic life of the Premises.

3.      Intentionally Omitted.

4.      The expressions of intent, the waivers, the representations and warranties, the covenants, the agreements and the stipulations set forth in this Section 7 are a material inducement to each of Landlord and Tenant in entering into this Lease.

8.      **REAL ESTATE TAXES**.

A.      During the Term, Tenant shall promptly pay, or cause to be paid, on a cash basis when due to the applicable taxing authority one hundred percent (100%) of all taxes, including ad valorem, sales, use, rent or similar taxes, including tax increases and re-assessments; payments in lieu of taxes pursuant to any statutory service agreement, payment-in-lieu-of-taxes agreement or the like; transfer taxes; assessments, including assessments for supplemental assessments and public improvements or benefits, whether or not commenced or completed prior to the date hereof and whether or not to be completed within the Term, and including assessments under

15

Encumbrances; water, sewer and other utility levies and charges; excise tax levies; fees, including license, permit, inspection, authorization and similar fees; and all other governmental and other charges, in each case whether general or special, ordinary or extraordinary, or foreseen or unforeseen, of every character and any kind and nature whatsoever in respect of the Premises (including, without limitation, any Building and/or Property) and/or the Rent and all interest and penalties thereon attributable to any failure in payment by Tenant which at any time prior to, during or in respect of the Term hereof may be assessed or imposed on or in respect of or be a lien upon (i) the Premises or any part thereof or any appurtenance thereto, (ii) any Rent reserved or payable hereunder or any other sums payable by Tenant hereunder, (iii) this Lease or the leasehold estate hereby created or the operation, possession, occupancy or use of the Premises or any part thereof, (iv) any occupancy, operation, use or possession of, or sales from or activity conducted on or in connection with the Premises or the Property or the leasing or use of the Premises or the Property or any part thereof, or (v) any document to which Tenant is a party creating or transferring an interest or estate in the Premises, together with any interest or penalties thereon (all of which are hereinafter called "**Real Estate Taxes**"). Tenant shall make such payments directly to the taxing authorities and shall promptly furnish to Landlord copies of official receipts or other satisfactory proof evidencing such direct payments. Tenant's obligation to pay Real Estate Taxes shall be absolutely fixed upon the date such Real Estate Taxes become a lien upon the Premises or any part thereof, subject to Section 8.C. Tenant shall also be responsible for all Real Estate Taxes which, on the Commencement Date, are a lien upon the Premises or any part thereof.

B.  If Landlord receives a bill for Real Estate Taxes, Landlord shall provide the bill for each installment of Real Estate Taxes to Tenant promptly upon Landlord's receipt of such bill. Tenant shall pay the Real Estate Taxes set forth on such bill prior to when due. Tenant shall provide Landlord with reasonable evidence that such Real Estate Taxes have been paid. If Tenant shall default in the payment of any Real Estate Taxes, Landlord shall have the right (but not the obligation) to pay the same together with any penalties and interest, in which event the amount so paid by Landlord shall be paid by Tenant to Landlord upon demand with interest thereon at the Default Rate. Tenant may pay any Real Estate Taxes in installments, if payment may be so made without penalty, fine, premium or interest, except that on the termination of this Lease any Real Estate Taxes which Tenant has elected to pay in installments shall be apportioned between Landlord and Tenant based on the time remaining in the Term. All Real Estate Taxes for the tax year in which this Lease shall terminate shall be apportioned between Landlord and Tenant on a cash basis.

C.  Tenant shall have the right, before delinquency occurs, of protesting, contesting, objecting to or opposing, at Tenant's sole cost and expense, by appropriate legal proceedings conducted in good faith and with due

16

diligence, the legality or amount of any such Real Estate Taxes, assessments or assessed valuations in its own or in Landlord's name as the case may be, and upon Tenant's written request, Landlord will, at no cost or expense to Landlord, reasonably cooperate with Tenant; provided, however, that (i) in the case of any unpaid Real Estate Taxes, lien, attachment, levy, encumbrance, charge or claim pursuant to any Law, the commencement and continuation of such proceedings shall suspend the collection or enforcement thereof from or against Landlord and the Premises, which suspension may be caused by the payment by Tenant of a bond or some other form of security for payment; (ii) neither the Premises, the Rent therefrom nor any part or interest in either thereof would be in any danger of being sold, forfeited, attached or lost pending the outcome of such proceedings solely based on the outcome of the proceeding and not if Tenant has the right to make a curative payment following the outcome of the proceeding to avoid any of the foregoing consequences; (iii) in the case of any requirement of Law, neither Landlord nor Tenant would be in any danger of civil or criminal liability for failure to comply therewith pending the outcome of such proceedings; (iv) the insurance coverage required by Section 16 shall be maintained; (v) Tenant shall keep Landlord reasonably informed as to the status of and with copies of all documents in the proceedings, upon request by Landlord; and (vi) if such contest shall be finally resolved against Landlord or Tenant, Tenant shall promptly pay the amount required to be paid, together with all interest and penalties accrued thereon, or comply with the applicable requirement of law or insurance requirements of Section 16. Landlord shall execute and deliver to Tenant such authorizations and other documents as may reasonably be required in any such contest, provided Tenant shall reimburse Landlord for its actual out-of-pocket costs associated with such execution, and, if reasonably requested by Tenant, Landlord shall join as a party therein (and at no cost or expense to Landlord).  The provisions of this Section 8.C shall not be construed to permit Tenant to contest the payment of Rent or any other amount payable by Tenant to Landlord hereunder.  Without limiting any other provision of this Lease, Tenant shall indemnify, defend, protect and save harmless Landlord and all Landlord Indemnified Parties and the Premises from and against any and all liability, costs, fees, damages, expenses, penalties, fines and charges of any kind (including reasonable attorneys' fees, including those incurred in the enforcement of this indemnity) that may be imposed upon Landlord or the Premises or any portion thereof in connection with any such contest and any loss resulting therefrom. Any refund due from any taxing authority in respect of any Real Estate Taxes paid by or on behalf of Tenant shall be paid over to or retained by Tenant.

D.      Tenant will indemnify Landlord and/or any Landlord Indemnified Parties, on an after-tax basis, against any fees or taxes, including, but not limited to,

17

Real Estate Taxes and any fees or taxes directly attributable to the Premises[4] ("**Taxes**") imposed by the United States or any taxing jurisdiction or authority of or in the United States or any state in connection with this Lease, Landlord's ownership of the Premises and/or Tenant's use of the Premises; provide, however, this shall not include any fees, taxes, or other assessments imposed upon income, net wealth, or other business income at the corporate level (i.e., not attributable directly to the Premises).

E.    Landlord and Tenant shall, upon request of the other, promptly provide such data as is maintained by the party to whom the request is made with respect to the Premises as may be necessary to prepare any required tax returns and reports required by a governmental authority.

9.    **PERSONAL PROPERTY TAXES**.

Tenant shall be liable for and shall promptly pay when due all personal property taxes related to Personal Property and Tenant's Personal Property placed in the Premises.  Tenant may, without Landlord's consent, before delinquency occurs, contest any such taxes related to the Personal Property.

10.    **OPERATING EXPENSES**.

A.    Utilities.  During the Term, Tenant agrees to pay all fees, costs, expenses and charges for electricity, power, gas, oil, water, sanitary and storm sewer, septic system refuse collection, landscaping, telephone, internet, trash removal, security, and other utilities and services consumed, rendered or used on or about the Premises (or any portion thereof) and such utility franchises as may be appurtenant to the use of the Premises (or any portion thereof) (collectively, "**Utility Charges**").  Landlord acknowledges and agrees that Tenant may enter into contracts for any of the foregoing services or the like without Landlord's prior consent during the Term; provided, that any such contract shall be terminable by Tenant (or Landlord following termination of this Lease in accordance with its terms) at or prior to the expiration or sooner termination of the Lease or upon no more than thirty (30) days' prior notice to the third-party servicer.  Any resulting termination premium, fee or penalty shall be the sole responsibility of Tenant.

B.    Third Party Management.  Tenant shall have the right to manage and operate the Premises (or any portion thereof) utilizing third parties for the management and operation thereof, without obtaining Landlord's prior written consent of such third party.  Notwithstanding the appointment of any third-party manager, Tenant shall remain fully responsible for the Premises in accordance with the terms hereof.

---

[4] Note to Draft: Specific local taxes to be added as applicable.

11.  **TENANT'S REPAIR AND MAINTENANCE RESPONSIBILITIES**.

A.  Throughout the Term, Tenant, at its sole cost and expense, will keep the Premises in a substantially similar condition as existed on the Commencement Date (reasonable wear and tear, damage from fire or other casualty excepted), whether or not the need for such repairs occurs as a result of Tenant's or subtenant's use, the elements, or the age of the applicable Building, the applicable Property or Tenant's or subtenant's Personal Property, or otherwise, and will commit or allow no physical waste with respect thereto, and with reasonable promptness, will make all necessary and appropriate repairs and replacements thereto of every kind and nature, including without limitation those necessary to ensure continuing compliance with all Laws and insurance requirements, whether interior or exterior, structural or nonstructural, ordinary or extraordinary, foreseen or unforeseen.  Tenant's maintenance, repair and replacement obligations shall extend to and include, without limitation, all systems serving the Premises and, subject to any Permitted Encumbrances, any Parking Areas and landscaping on the Property.  The necessity for and adequacy of repairs to any Building or other improvements forming a part of the Premises shall be measured by the standard which is appropriate for and equivalent in quality to such Building's Comparable Buildings. Tenant's obligations under this Section 11 shall, without limitation, include the maintenance, repair and replacement (a) at all times, of any and all building systems, machinery and equipment which exclusively serve the Premises, and (b) the bearing walls, floors, foundations, roofs and all structural elements of the Premises.  Tenant will not take or omit to take any action the taking or omission of which would reasonably be expected to (i) create (or permit to continue) any dangerous condition, or (ii) create (or permit to continue) any condition which might reasonably be expected to involve any loss, damage or injury to any person or property.  All repairs and replacements shall be in quality and class at least equal to the original work and shall be made promptly as and when necessary. Repairs and replacements called for as a result of fire and/or other casualty and condemnation shall be made pursuant to the provisions of Sections 19 and 20 hereof, respectively.  In connection with the foregoing, Tenant's obligations shall include without limitation with respect to the Premises, to the extent applicable:

1.  Maintaining, repairing, and replacing, as necessary, the roof of the Building on the Premises;

2.  Maintaining and repairing the bearing walls, floors, foundations, and all structural elements of the Building on the Premises;

3.  Maintaining (including periodic window washing and periodic painting) and repairing the facade and exterior walls of the Building on the Premises;

19

4.      Repairing and replacing, as necessary, the doors (including, without limitation, any overhead doors) and windows of the Building on the Premises, and the mechanisms therefor;

5.      Causing the regular removal of garbage and refuse from the Premises;

6.      Causing the regular spraying for and control of insect, rodent, animal and pest infestation, and maintaining in good working order and condition all doors (both swinging and roll-up doors), including, without limitation, all weather seals;

7.      Servicing, maintaining, repairing and replacing all systems and equipment serving the Premises, including, without limitation, heating, ventilation, and air-conditioning equipment, and generators;

8.      Regular sweeping, cleaning and removal of trash, debris, other materials and stains from the Premises and from the immediately adjacent sidewalks, service drives and loading or delivery areas, if any, of the Premises, as necessary to keep the same clean and in good order and condition;

9.      Regular sweeping, cleaning and washing of the interior of the Building, including, without limitation, floors, windows and fixtures, and periodic washing and painting of interior walls;

10.     Repairing broken, damaged or leaking walls, bathrooms, ceilings, or fixtures and equipment in the interior of the Building, including, without limitation, plate glass windows, windows, floors and lighting fixtures; and

11.     Performing all gardening and landscaping of all lawns, trees, shrubs and plantings comprising part of the Premises.

B.      Landlord shall not be required to furnish any services or facilities or make any repairs or alterations in or to the Premises, and Landlord shall not under any circumstances be required to (i) build or rebuild any improvements on the Premises; (ii) make any repairs, replacements, alterations, restorations or renewals of any nature to the Premises, whether ordinary or extraordinary, structural or non-structural, foreseen or unforeseen, or to make any expenditure whatsoever with respect thereto; or (iii) maintain the Premises (including any parking or common areas which comprise part of the Premises) in any way.  Tenant hereby expressly and unconditionally waives, to the fullest extent now or hereafter permitted by Law, the right to make repairs or perform any maintenance at the expense of Landlord which right may be provided for in any Law in effect at the time of the execution and delivery of this Lease or which may hereafter be enacted.  Tenant

20

hereby assumes the full and sole responsibility for the condition, operation, repair, replacement, maintenance and management of the Premises. However, on default of Tenant beyond the expiration of any applicable notice and cure periods in making such repairs or replacements, Landlord may, but shall not be required to, make such repairs and replacements for Tenant's account and the expense thereof shall be paid by Tenant to Landlord upon demand with interest at the Default Rate.

C. Except as expressly set forth herein, nothing contained in this Lease and no action or inaction by Landlord shall be construed as (i) constituting the consent or request of Landlord, expressed or implied, to any contractor, subcontractor, laborer, materialman or vendor to or for the performance of any labor or services or the furnishing of any materials or other property for the construction, alteration, addition, repair or demolition or maintenance of or to the Premises or any part thereof or any improvements thereto; or (ii) giving Tenant any right, power or permission to contract for or permit the performance of any labor or services or the furnishing of any materials or other property in such fashion as would permit the making of any claim against Landlord in respect thereof.

12. **COMPLIANCE WITH LAWS**.

Tenant shall, at its sole cost and expense, use and maintain the Premises in compliance with all Laws, and Tenant shall, at its sole cost and expense, comply with all Laws applicable to or having jurisdiction over the use, occupancy, operation, and maintenance of the Premises, including without limitation, all Environmental Laws, the ADA and other access laws and those which require the making of any structural, unforeseen or extraordinary changes and including those which involve a change of policy on the part of the governmental body enacting the same. Tenant shall, at its sole cost and expense, comply with all Encumbrances affecting the Premises or any portion thereof (other than Landlord's obligations to pay debt service to any Landlord Mortgagee under any Landlord Mortgage). Tenant, at its sole expense, shall comply with the requirements of policies of special form insurance coverage at any time in force with respect to the Premises as required pursuant to Section 16 hereof and with the provisions of all contracts, agreements and restrictions affecting the Premises or any part thereof in effect as of the date hereof or the ownership, occupancy or use thereof. Without diminishing the obligations of Tenant, if Tenant shall at any time fail to comply as promptly as reasonably practicable with any Law applicable to the Premises, or the use and occupation thereof, Landlord may cause the Premises to so comply and the reasonable costs and expenses of Landlord in such compliance shall be paid by Tenant to Landlord upon demand with interest thereon at the Default Rate.

13. **SURRENDER OF PREMISES**.

Upon the expiration of this Lease pursuant to its terms (or, in the event of a termination of this Lease on a date other than the scheduled Expiration Date of this Lease, as promptly as commercially practicable thereafter (but in any event within ten (10) days thereafter)), Tenant shall surrender to Landlord the Premises, including all Alterations constructed by Tenant therein that Landlord has not requested that Tenant remove in accordance with Section 14 below, with all

21

fixtures appurtenant thereto (but not including furnishings, trade fixtures, furniture, computers, telephone systems, machinery, equipment and other Personal Property installed or placed on the Premises by Tenant) (collectively, "**Tenant's Personal Property**"), free and clear of any occupants or tenancies (including subtenancies) (other than subtenants under subleases as in effect on the date hereof) and in compliance with Laws (including, without limitation, Environmental Laws) and in as good (or better) condition and repair as existed as of the Commencement Date, reasonable wear and tear and damage from fire or other casualty excepted, and any new buildings, alterations, improvements, replacements or additions constructed by Tenant and remaining at the Premises, in the same or better condition as when completed, reasonable wear and tear and damage from fire or other casualty excepted. Without limitation to the foregoing, at Landlord's request within sixty (60) days before or after the expiration of the Term, Tenant shall commission and provide to Landlord, or Landlord may commission, in each event, at Tenant's sole cost and expense, a Phase I site assessment, and, if recommended by the Phase I site assessment, a Phase II site assessment, for purposes of confirming the environmental condition of the Premises and Tenant's compliance with the terms of the Lease with respect to environmental matters. Any of Tenant's Personal Property installed or placed on the Premises by Tenant or any subtenant or assignee of Tenant, if not removed within ten (10) days after termination or expiration of this Lease shall be deemed abandoned and become the property of Landlord without any payment or offset therefor if Landlord so elects. If Landlord shall not so elect, Landlord may remove such property from the Premises and have it stored at Tenant's risk and expense. Tenant shall repair and restore and save Landlord harmless from all damage to the Premises caused by such removal by Landlord.

14. **ALTERATIONS**.

A. Tenant shall not make any alterations, additions or improvements to the Premises or any portion thereof ("**Alterations**") without first obtaining the prior written consent of Landlord, provided, however, that so long as no Event of Default has occurred, Landlord's prior written consent shall not be required, but prior written notice shall be delivered to Landlord accompanied with full and complete drawings and plans prepared by a licensed architect or engineer, if applicable, for any Alterations to the Premises that: (i) are not structural additions or structural alterations to the Premises; (ii) will not change the essential nature of any Building as to its current use or ancillary uses; (iii) will not materially and adversely affect the structural elements or roof of any Building, the proper functioning of a Building's systems nor the value of the Building; and (iv) do not exceed the cost of One Hundred Seventy Five Thousand and No/100 Dollars ($175,000.00) on an annual basis. In seeking approval from Landlord of any Alterations, if required, Tenant shall provide Landlord with (1) full and complete drawings and plans for the proposed Alterations prepared by a licensed architect or engineer; and (2) notice of whether the Alteration will involve or affect Hazardous Materials. Tenant shall not have the right to seek any zoning changes or variances in connection with any Alterations without Landlord's approval. Tenant shall reimburse Landlord upon demand for any reasonable out-of-pocket costs, including, without limitation, attorney's fees and engineering advisor's fees, related to Landlord's review of any Alterations request by Tenant. Landlord shall

22

cooperate with Tenant (at no cost or expense to Landlord) to obtain any necessary permits, approvals, and other necessary documentation for such Alterations, including providing signatures and/or reasonable ownership information to obtain such permits and/or approvals from governmental authorities.

B.      All Alterations shall be constructed by Tenant, without expense to Landlord, in a good, first-class, professional and workmanlike manner so as not to void or make voidable any roof or other warranties, employing materials of first-class quality free of material defects, and in compliance with all Law, all applicable Encumbrances and all regulations and orders, rules and regulations of the Board of Fire Insurance Underwriters or any other body exercising similar functions, and in compliance with the terms and conditions of this Lease.

C.      Prior to the commencement of construction of any Alteration, Tenant shall deliver to Landlord certificates evidencing the existence of (a) workmen's compensation insurance with coverage limits not less than statutory limits covering all persons employed for such work; (b) a completed operations endorsement to the commercial general liability insurance policy referred to in Section 16.B; (c) reasonable comprehensive general liability and property damage insurance naming Landlord, its designees and Tenant as additional insureds, with coverage of at least $1,000,000 single-limit or such greater amount as may be reasonably requested by Landlord; and (d) builders all risk insurance on a completed value basis (or its equivalent) covering all physical loss, in an amount no less than the full replacement value of the Alterations in question.

D.      Promptly upon the completion of construction of any Alteration that is permanently affixed to the Premises and alters the existing footprint or elevation of a Building, Tenant shall deliver to Landlord one complete set of "as built" drawings thereof (and if the Alterations involve any change to the footprint of the applicable Building or the erection of a new building, an ALTA survey for the Premises certified to Landlord and any Landlord Mortgagee), proof of payment for all labor and materials, and if and to the extent commercially obtainable, copies of guarantees, if any, from all major contractors in favor of Landlord and Tenant (jointly and separately) against defects and deficiencies in materials and workmanship, and requiring the correction of the same upon demand of Landlord and Tenant at the expense of such contractor.

E.      All Alterations, whether temporary or permanent in character, made in or upon the Premises either by Landlord or Tenant (other than Tenant's Personal Property installed or placed on the Premises by or on behalf of Tenant) shall be Landlord's property, and will remain with the Premises without compensation to Tenant.  Notwithstanding the foregoing, in the case of any Alteration requiring Landlord's prior written approval, Landlord

23

may condition such approval on Tenant's agreement to remove all or a portion of such Alteration at the end of the Term. Landlord shall provide Tenant with notice, prior to the Expiration Date, of Tenant's obligation to remove any Alteration approved by Landlord at the end of the Term. If Landlord does not notify Tenant that Tenant is obligated to remove such Alteration, such Alteration may be removed at Tenant's option. Upon the expiration or sooner termination of this Lease, all Alterations on the Premises required by Landlord to be removed as aforesaid, or any part or parts thereof so designated by Landlord, shall be removed from the Premises by Tenant and the Premises restored to the same or better condition than existed immediately prior to the construction of the Alteration, reasonable wear and tear, and damage from fire or other casualty excepted.

15.     **ENTRY BY LANDLORD**.

Landlord or Landlord's Representatives shall have the right to enter, from time to time, the Premises or any portion thereof during normal business hours (or at such other times as approved by Tenant in advance, which approval shall not be unreasonably withheld or delayed, or as may be reasonably necessary in emergency situations) to (i) inspect the Premises, (ii) exercise its rights and/or obligations under this Lease, or (iii) show the Premises to prospective purchasers or lenders or, if Tenant either has not timely exercised a Renewal Term or has no further Renewal Terms, prospective tenants within the last twelve (12) months of the Lease Term (or at any time during the continuance of an Event of Default); and Tenant shall not be entitled to any abatement or reduction of Base Rent by reason thereof, nor shall such entry or action by Landlord constitute an actual or constructive eviction or repossession, without Landlord's express intention to do so as expressed in writing. No such entry shall be deemed an eviction of Tenant. At any time during which Landlord or Landlord's Representatives are on the Premises, they shall use commercially reasonable efforts to not unreasonably interrupt or interfere with Tenant's use of the Premises and shall not cause any damage or injury to persons or property on the Premises.

16.     **TENANT'S INSURANCE OBLIGATIONS**.

A.      During the Term, Tenant shall provide and maintain property insurance on the Building and other improvements on the Premises on an all-risk basis against physical loss or damage by fire and all other risks and perils, including but not limited to, flood, earthquake, and windstorm, in amounts no less than the full replacement cost, excluding excavations, footings and foundations, and with a deductible no greater than Fifty Thousand and No/100 Dollars ($50,000.00). Such insurance shall be on terms (i) that have an agreed amount endorsement or with no co-insurance provisions; and (ii) with no exclusions for vandalism, malicious mischief, sprinkler leakage or terrorism. Boiler and Machinery Coverage shall be procured either by endorsement to the property policy or under a separate placement in an amount no less than 100% of the replacement cost or as otherwise approved in writing by Landlord, if necessary, on a per property basis. The property insurance required hereunder shall (a) cover loss sustained when access to

24

all or a portion of a Building is prevented due to an insured peril at a location in the vicinity of the Premises; (b) cover loss sustained due to the action of a public authority preventing access to a Building provided such order is the direct result of physical damage of the type insured against at such Building or within 1,000 feet of it; (c) insure loss caused by damage or mechanical breakdown; (d) provide an ordinance or law extension; (e) cover loss sustained due to the accidental interruption or failure of supplies of electricity, gas, sewers, water or telecommunication up to the terminal point of the utility supplier with the Premises; (f) name Landlord and its lender(s) and other designees as loss payees and contain a lender loss payee endorsement; and (g) contain an endorsement providing coverage for cleanup of sudden and accidental pollution releases, with a sub-limit of at least One Hundred Thousand and No/100 Dollars ($100,000.00). In addition to the foregoing coverages on each Building and other improvements upon the Premises, Tenant shall maintain property insurance covering Tenant's machinery, equipment, furniture, fixtures, and all other Tenant's Personal Property at a limit of liability determined by Tenant in its sole discretion. During the period of any restoration and repair of the Premises or any portion thereof, Tenant shall maintain an "all-risk" Builder's Risk policy on a completed value basis for the full replacement cost of the property being repaired and restored, if and when there is a structural restoration and/or major repair required at any Building. To the extent any portion of the Premises is located within a Special Flood Hazard Area, Tenant shall maintain NFIP flood insurance for the Premises.

B.    During the Term, Tenant shall also provide and maintain the following insurance at the terms and in the limits specified below for the Premises:

    1.    Commercial General Liability Insurance against claims for third party Bodily Injury, Personal/Advertising Injury, Property Damage, and Products/Completed Operations Liability. Such insurance shall be written on an occurrence basis and such coverage shall include, but not be limited to, assumed contractual liability for the performance by Tenant of the indemnity agreements set forth in this Lease to which this insurance applies, cross liability, and/or severability of interests. Limits shall be no less than One Million and No/100 Dollars ($1,000,000.00) per occurrence and Two Million and No/100 Dollars ($2,000,000.00) general aggregate with no retention or self-insurance provision unless otherwise agreed to in writing in advance by the Landlord. Tenant shall cause Landlord and its lender or other designees to be named as additional insureds under such insurance.

    2.    If applicable to Tenant, Workers Compensation and Employer's Liability Insurance insuring against and satisfying Tenant's obligations and liabilities under the workers compensation laws of the jurisdiction in which the Premises are located, with Employers

Liability minimum limits per insured of Five Hundred Thousand and No/100 Dollars ($500,000.00) Bodily Injury each accident; Five Hundred Thousand and No/100 Dollars ($500,000.00) Bodily Injury by disease, each employee; and Five Hundred Thousand and No/100 Dollars ($500,000.00) Bodily Injury by disease policy limit. Policies shall include Voluntary Coverage.

3. Automobile Liability Insurance for liability arising out of claims for bodily injury and property damage arising from owned (if any), leased (if any), non-owned and hired vehicles used in the performance of the business upon the Premises, with a combined single limit of One Million and No/100 Dollars ($1,000,000.00) per accident for bodily injury and property damage and containing appropriate no-fault insurance provisions wherever applicable.

4. Umbrella or Excess Liability Insurance written on an occurrence basis and covering claims in excess of the underlying insurance described in the foregoing subsections (1), (2) and (3) above, with a One Hundred Million and No/100 Dollars ($100,000,000.00) minimum limit per occurrence. Such insurance shall contain a provision that it will drop down as primary and noncontributory insurance in the event that the underlying insurance policy aggregate is exhausted.

5. As and to the extent Tenant engages in (i) the sale of alcoholic beverages upon the Premises, liquor liability insurance with a minimum limit of One Million and No/100 Dollars ($1,000,000.00), and/or (ii) the sale or use of gasoline or other petroleum products upon the Premises, Tenant shall procure pollution legal liability insurance covering each location with a retroactive date corresponding to the first occupation by Tenant with a minimum limit of Twenty-Five Million and No/100 Dollars ($25,000,000.00) for each incident which coverage shall be primary and non-contributory and shall also include coverage for any underground storage tanks located on the Premises.

6. Business interruption insurance insuring that the Base Rent will be paid to Landlord for a minimum of eighteen (18) months if the Premises is destroyed or rendered untenantable by any cause insured against (it being understood that the existence of such insurance does not reduce Tenant's obligation to pay Base Rent without diminution).

C. The required limits and coverages of all insurance set forth in Sections 16.A and 16.B above may be reasonably adjusted by Landlord from time to time (but not more frequently than once every five (5) years) in conformity with the then prevailing custom of insuring liability in Comparable Buildings.

26

D.      In the event of a casualty or other loss under any property insurance policy, Tenant shall pay to Landlord the lesser of the amount of the deductible or the full amount of the loss in the case of a loss in an amount less than the deductible, which payment shall be treated in the same manner as insurance proceeds.  Tenant shall also cause all such property policies to permit Tenant's waiver of claims against Landlord under Section 18 for matters covered thereby.  Tenant shall cause Landlord, Landlord Mortgagee and any superior lessor or fee owner to be named as loss payees and/or mortgagees, as their interests may appear, under all property insurance policies and shall cause the coverage to continue for Landlord's benefit notwithstanding any act or omission on Tenant's part.  By this Section 16, Tenant intends that the risk of loss or damage to the Premises and all property thereon, including Personal Property and Tenant's Personal Property described above, be borne by responsible property insurance carriers and Tenant hereby agrees to look solely to, and to seek recovery only from, its respective property insurance carriers, in the event of a loss of a type described above to the extent that such coverage is agreed to be provided hereunder.  For this purpose, any applicable deductible shall be treated as though it were recoverable under such policies.

E.      All insurance required to be maintained by Tenant pursuant to Section 16.A and 16.B must be maintained with insurers authorized to do business in the jurisdiction in which the Premises is located and which have an A.M. Best Company Rating of at least A/VIII or Standard and Poor's Rating of at least A.  Tenant shall provide to Landlord, and at each renewal of expiring policies, such certificates as may be reasonably required to establish that the insurance coverage required by this Section 16 is in effect from time to time and that, to the extent commercially available, the insurer(s) have agreed to give Landlord and Landlord Mortgagee at least thirty (30) days' notice prior to any non-renewal or cancellation of, or material modification to, the required coverage.  Landlord and Tenant shall cooperate with each other in the collection of any insurance proceeds which may be payable in the event of any loss, including the execution and delivery of any proof of loss or other actions required to effect recovery.  Tenant shall cause all liability and property policies maintained by Tenant to be written as primary policies, not contributing with and not supplemental or excess to any coverage that Landlord or Landlord Mortgagee may carry.

F.      Tenant may provide the insurance required by virtue of the terms of this Lease by means of a combination of primary and excess or umbrella coverage and by means of a policy or policies of blanket property insurance so long as (i) the amount of the total insurance allocated to the Premises under the terms of the blanket policy or policies furnishes protection equivalent to that of separate policies in the amounts required by the terms of this Lease, and (ii) the blanket policy or policies comply in all other respects with the other requirements of this Lease.

27

G.  If Tenant fails to obtain the insurance coverage, as set forth in this Section 16 and does not cure its failure within five (5) days after written notice from Landlord, Landlord may, at its option, obtain such insurance for Tenant, and Tenant shall, upon demand, pay, as additional Rent, the cost thereof.

H.  All policies of insurance required to be maintained pursuant to this Lease shall be endorsed, if commercially available, so that if at any time should they be not renewed, canceled, coverage be reduced (by any party including the insured) which affects the interests of the Landlord or Landlord Mortgagee, such non-renewal cancellation or reduction shall not be effective as to Landlord and Landlord Mortgagee for thirty (30) days, except for non-payment of premium which shall be for ten (10) days after receipt by Landlord of written notice from such insurer of such cancellation or reduction.  In addition to the foregoing, all policies of insurance required to be maintained pursuant to this Lease shall contain terms in accordance with Tenant's normal business practice and reasonably acceptable to Landlord and shall (i) contain a severability of interest and a cross-liability clause; (ii) name Landlord, Landlord Mortgagee, any ground lessor of the Premises and other entities as additional insureds or loss payees, as required by contract; and (iii) be endorsed to waive any rights of subrogation against Landlord, its lenders, and their respective officers, directors, employees, agents, partners, and assigns.  All policies of insurance required to be maintained pursuant to this Lease (other than in respect to automobile liability or workers compensation insurance) shall insure the interests of Landlord and Tenant regardless of any breach or violation by Tenant or any other party of warranties, declarations or conditions contained in such policies, any action or inaction of Tenant or others.

I.  Prior to the Commencement Date, at least ten (10) days prior to each policy anniversary, Tenant shall furnish Landlord with certificates of insurance or binders, in a form reasonably acceptable to Landlord, evidencing all of the insurance required by the provisions of this Lease for the benefit of Landlord and required to be in force by the provisions of this Lease.  Such certificates of insurance/binders shall be executed by each insurer in the case of the property policies, and in the case of liability policies, by each insurer or by an authorized representative of each insurer where it is not practical for such insurer to execute the certificate itself.  Such certificates of insurance/binders shall identify underwriters, the type of insurance, the insurance limits and deductibles and the policy term and shall specifically list the special provisions enumerated for such insurance required by this Lease. At Landlord's request, Tenant shall furnish certified copies of all insurance policies required to be carried by Tenant pursuant to this Lease.

17.  **OFAC**.

28

A.    Tenant has taken all reasonable measures, in accordance with all applicable Anti-Money Laundering Laws, with respect to each holder of a direct or indirect ownership interest in the Tenant, to assure that funds invested by such holders in the Tenant are derived from legal sources; provided, however, none of the foregoing shall apply to any person to the extent that such person's interest in Tenant is in or through an entity whose stock or shares are listed and traded on any recognized stock exchange located in the United States (a "**U.S. Publicly-Traded Entity**").

B.    Tenant hereby represents and warrants that neither Tenant, nor, to the actual knowledge of Tenant, any persons or entities holding any legal or beneficial ownership interest (direct or indirect) whatsoever in Tenant (1) has been designated by the President of the United States or OFAC pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, the Patriot Act, Public Law 107-56, Executive Order 13224 (September 23, 2001) or any Executive Order of the President issued pursuant to such statutes; or named on the following list that is published by OFAC: "List of Specially Designated Nationals and Blocked Persons" (collectively, "**Prohibited Persons**"), (2) is under investigation by any governmental authority for, or has been charged with, or convicted of, any violation of any Anti-Money Laundering Laws, or drug trafficking, terrorist-related activities or other money laundering predicated crimes or a violation of the BSA, (3) has been assessed civil penalties under these or related laws, or (4) has had any of its funds seized or forfeited in an action under these or related laws; provided, however, none of the foregoing shall apply to any person to the extent that such person's interest is in or through a U.S. Publicly-Traded Entity. If the foregoing representations are untrue at any time during the Term and Landlord suffers actual damages as a result thereof, an Event of Default will be deemed to have occurred, without the necessity of notice to Tenant.

C.    Tenant has taken reasonable steps, consistent with industry practice for comparable organizations and in any event as required by Law, to ensure that Tenant is and shall be in compliance with all (1) Anti-Money Laundering Laws and (2) OFAC Laws and Regulations. Tenant will not during the Term knowingly engage in any transactions or dealings, or knowingly be otherwise associated, with any Prohibited Persons in connection with the use or occupancy of the Premises. A breach of the representations contained in this Section 17 by Tenant as a result of which Landlord suffers actual damages shall constitute a material breach of this Lease and shall entitle Landlord to any and all remedies available hereunder, or at law or in equity.

18.    **WAIVER OF SUBROGATION**.

Notwithstanding anything to the contrary set forth in this Lease, to the fullest extent permitted by Law, neither Landlord nor Tenant shall be liable (by way of subrogation or otherwise)

29

to the other party (or to any insurance company insuring the other party) for any loss or damage to the property of the releasing party to the extent the loss or damage is covered by property insurance carried or required by this Lease to be carried by the releasing party **EVEN THOUGH SUCH LOSS MIGHT HAVE BEEN OCCASIONED BY THE NEGLIGENCE OR WILLFUL ACTS OR OMISSIONS OF LANDLORD OR TENANT OR THEIR RESPECTIVE EMPLOYEES, AGENTS, CONTRACTORS OR INVITEES**. Landlord and Tenant shall give each insurance company which issues policies of insurance, with respect to the items covered by this waiver, written notice of the terms of this mutual waiver, and shall have such insurance policies properly endorsed, if necessary, to prevent the invalidation of any of the coverage provided by such insurance policies by reason of such mutual waiver. For the purpose of the foregoing waiver, the amount of any deductible or self-insured retention applicable to any loss or damage shall be deemed covered by, and recoverable by the insured under the insurance policy to which such deductible or self-insured retention relates. Each party shall pay any additional expense, if any, for obtaining such waiver.

19. **FIRE OR OTHER CASUALTY**.

A. All proceeds (except business interruption insurance proceeds not allocated to Rent expenses) payable by reason of any property loss, damage, or destruction of or to the Premises by fire or other casualty, or any portion thereof, under any property policy of insurance required to be carried hereunder, shall be paid to Landlord, to be held by Landlord or Landlord Mortgagee for purpose of restoration of the Premises and made available to Tenant upon request, pursuant to the procedures set forth in this Section 19 for the reasonable costs of preservation, stabilization, emergency restoration, business interruption (other than any amount allocated to Rent expenses), reconstruction and repair, as the case may be, of any damage to or destruction of the Premises, or any portion thereof; provided, however, that the portion of such proceeds that are attributable to Tenant's obligation to pay Rent shall be applied against Rent due by Tenant hereunder. All proceeds paid to Tenant shall be used first for the repair of any damage to the Premises (other than such payment of Rent). Any excess proceeds of insurance remaining after the completion of the restoration or reconstruction of the Premises to substantially the same condition as existed immediately before the damage or destruction and with materials and workmanship of like kind and quality and to Landlord's reasonable satisfaction, and in accordance with the general terms and conditions of **Exhibit C** attached hereto, as applicable (collectively, "**Restoration Standards**"), shall be retained by Landlord. Tenant shall have the right to reasonably prosecute and settle insurance claims, provided that Tenant shall consult with and involve Landlord in the process of adjusting any insurance claims under this Section 19.

B. Subject to the terms of this Section 19, Landlord shall make available to Tenant the insurance proceeds (net of all reasonable administrative and collection costs, including reasonable attorneys' fees) paid to Landlord for such repair and rebuilding of the Premises as it progresses (other than

30

business interruption proceeds to be allocated to Rent expenses as aforesaid). Payments shall be made against certification of the architect responsible for the supervision of the repairs and rebuilding that the work had been performed substantially in conformance with the approved plans and specifications therefor and the value of the work in place is equal to not less than one hundred ten percent (110%) of the aggregate amount advanced by Landlord for the payment of such work. Prior to commencing the repairing and rebuilding, Tenant shall deliver to Landlord for Landlord's approval a schedule setting forth the estimated monthly draws for such work. Landlord shall contribute to such payments, out of the insurance proceeds being held by Landlord, an amount equal to the proportion that the total net amount so held by Landlord bears to the total estimated cost of repairing and rebuilding, multiplied by the payment by Tenant on account of such work. Landlord may, however, withhold ten percent (10%) from each payment until the work has been completed and unconditional lien releases and/or other proof has been furnished to Landlord that no lien or liability has attached, or will attach, to the applicable Building or the Property or to Landlord in connection with repairing, reconstructing and rebuilding. In addition, disbursement of such proceeds to Tenant are subject to any customary conditions of a Landlord Mortgagee.

C. If the Premises or any portion thereof is damaged by fire or other casualty, whether or not from a risk covered by insurance, Tenant shall give Landlord prompt written notice thereof and Rent shall continue unabated notwithstanding any casualty. Tenant waives any statutory rights of termination which may arise by reason of any damage or destruction of the Premises or any portion thereof.

D. In the event of a fire or other casualty, Tenant shall, at its expense regardless of the amount of any such damage or destruction and whether or not the insurance proceeds attributable such damage or destruction made available to Tenant, if any, shall be sufficient for the purpose, cause the Premises to be repaired, restored and replaced in accordance with all Law, this Section 19.D and the Restoration Standards, as expeditiously as practicable using reasonable diligence to a condition as nearly as practicable to that which existed immediately prior to occurrence of the fire or other casualty and otherwise in a good workmanlike manner, using new materials of like quality.

E. No damage or destruction of the Premises or any portion thereof as a result of fire or any other hazard, risk or casualty whatsoever shall relieve Tenant from Tenant's liability and obligation to timely pay the full Rent payable under this Lease and Rent shall continue unabated notwithstanding any casualty.

F. The provisions of this Lease, including this Section 19 constitute an express agreement between Landlord and Tenant with respect to any and all damage

31

to, or destruction of, all or any part of the Premises, and any Law with respect to any rights or obligations concerning damage or destruction in the absence of an express agreement between the parties, and any similar or successor Laws now or hereinafter in effect, shall have no application to this Lease or any damage or destruction to all or any part of the Premises.

20.    **CONDEMNATION**.

A.     Tenant and Landlord shall promptly give the other written notice upon knowledge of the actual or threatened commencement of any condemnation or eminent domain proceeding or other governmental taking affecting the Premises or any portion thereof, and, to the extent not otherwise received, shall deliver to the other copies of any and all papers served in connection therewith.  Subject to the remainder of this Section 20, if during the Term all or any part of the Premises shall be taken for any public or any quasi-public use under any statute or by right of eminent domain or by private purchase in lieu thereof, all compensation awarded or paid as a result thereof shall belong to and be the property of Landlord without any participation by Tenant and without any deduction therefrom for any estate hereby vested in or owned by Tenant and Tenant hereby irrevocably assigns to Landlord any award or payment to which Tenant may be or become entitled by reason of any taking of the Premises or any part thereof, subject to the other provisions of this Section 20.  Landlord shall have the exclusive power to collect, receive and retain any such award proceeds and to make any compromise or settlement in connection with such award.  Nothing herein shall be deemed to preclude Tenant from prosecuting any claim directly against the condemning authority in such condemnation proceeding for loss of business or depreciation to, damage to or cost of removal of, or for value of, stock, trade fixtures, furniture, machinery, equipment and other personal property belonging to Tenant (including, without limitation, Tenant's Personal Property), provided that no such claim shall diminish or otherwise adversely affect Landlord's award.  Tenant agrees to execute any and all further documents that may be reasonably required in order to facilitate collection by Landlord of any and all awards.  Tenant, in cooperation with Landlord, shall have the right to participate in any condemnation proceedings for the purpose of protecting Tenant's interest hereunder.

B.     If during the Term all or substantially all of the Premises shall be taken for any public or any quasi-public use under any statute or by right of eminent domain or by private purchase in lieu thereof, then Tenant may, not later than thirty (30) days after any such taking, give notice to Landlord of its intention to terminate this Lease on any business day specified in such notice which occurs not less than thirty (30) nor more than one hundred eighty (180) days after such taking.  In such event, this Lease shall terminate on the date set forth in the notice provided by Tenant and upon such termination neither party shall have any obligation to the other with respect

32

to the Premises under this Lease. A taking of substantially all of the Premises under this <u>Section 20.B</u> shall be deemed to have occurred if (i) fifty percent (50%) or more of the square footage of the Premises shall have been subject to a taking, or (ii) there shall have been a permanent loss of access, ingress or egress, parking capacity or any other appurtenance necessary for the operation of the Premises substantially in the manner in which it had previously been operated and there is no reasonably equivalent replacement therefor.

C.  If during the Term all or any part of the Premises shall be taken for any public or any quasi-public use under any statute or by right of eminent domain or by private purchase in lieu thereof and if the Lease is not terminated pursuant to <u>Section 20.B</u> as expressly provided in <u>Section 20.B</u>, then this Lease shall continue in full effect without abatement or reduction of Rent or other sums payable by Tenant under this Lease, notwithstanding such taking or private purchase. Tenant shall, promptly after any such taking and at its expense (regardless of whether any awards are available as a result of such taking), repair any damage caused by any such taking in accordance with this <u>Section 20</u> and the Restoration Standards and so that, after the completion of such repair, the Premises shall be, as nearly as possible, in a condition as good as the condition thereof immediately prior to such taking, except for ordinary wear and tear. All of the net award collected by Landlord pursuant to <u>Section 20.A</u> shall be held by Landlord (or Landlord Mortgagee) and applied and paid over toward the cost of repair of damage due to such taking against certificates of Tenant, signed by an authorized officer of Tenant, delivered to Landlord from time to time as such repair progresses or is completed, each such certificate describing such repair for which Tenant is requesting payment, the cost incurred by Tenant in connection therewith and stating that Tenant has not theretofore received payment for such repair. If the cost of repairs shall exceed the net award collected by Landlord, Tenant shall pay the deficiency. Any balance remaining in the hands of Landlord after payment of such costs of demolition, repair and restoration shall be retained by Landlord.

D.  If the use or occupancy of the Premises or any portion thereof shall be temporarily requisitioned by any governmental authority, civil or military, then this Lease shall continue in full effect notwithstanding such requisition, without abatement or reduction of Rent or other sums payable by Tenant hereunder, and Tenant shall be entitled to receive the entire net award payable by reason of such temporary requisition. Any requisition of twenty four (24) months or longer shall be considered a taking of substantially all of the Premises under <u>Section 20.B</u>, and Tenant shall be afforded the termination rights as and to the extent set forth in said <u>Section 20.B</u>.

21.  **<u>INDEMNIFICATION</u>**.

33

A. Notwithstanding the existence of any insurance required to be provided hereunder (but not in duplication thereof), and without regard to the policy limits of any such insurance, and in addition to and not in limitation of any other indemnity provided in this Lease, Tenant shall protect, indemnify, defend and hold harmless all Landlord Indemnified Parties from and against any and all liabilities, obligations, claims, damages, penalties, causes of action, losses, costs, fees and expenses, including without limitation reasonable counsel fees and court costs, to the maximum extent permitted by Law, imposed upon, asserted against or suffered or incurred by any Indemnified Party directly or indirectly by reason of any claim, suit or judgment obtained or brought by or on behalf of any person or persons against any Landlord Indemnified Party, for damage, loss or expense, which arise out of, are occasioned by, or are in any way attributable to or related to the following: (i) Tenant's use or occupancy of the Premises; (ii) the conduct of Tenant's business at the Premises; (iii) any activity, work or thing done or permitted by or on behalf of Tenant or its agents, contractors or subtenants in or about the Premises; (iv) the condition of the Premises; (v) the Lease or any breach or default in the performance of any obligation to be performed by Tenant under the terms of this Lease or arising from any act, neglect, fault or omission of Tenant or Tenant's Representatives; or (vi) the Premises or any accident, injury to or death of any person or damage to any property howsoever caused in or on the Premises, except to the extent that any of the foregoing are directly caused by the gross negligence or willful misconduct of Landlord and/or any Landlord Indemnified Parties. Tenant, at its expense, shall contest, resist and defend any such claim, action or proceeding asserted or instituted against any Landlord Indemnified Party ("**Landlord Claim**"). If at any time a Landlord Indemnified Party shall have received written notice of or shall otherwise be aware of any Landlord Claim which is subject to indemnity under this <u>Section 21.A</u>, such Landlord Indemnified Party shall give reasonably prompt written notice of such Landlord Claim to Tenant; provided, that, except to the extent Tenant is materially prejudiced in its defense of such Landlord Claim, (I) such Landlord Indemnified Party shall have no liability for a failure to give notice of any Landlord Claim, and (II) the failure of such Landlord Indemnified Party to give such a notice to Tenant shall not limit the rights of such Landlord Indemnified Party or the obligations of Tenant with respect to such Landlord Claim. Landlord shall have the right to reasonably control the defense or settlement of any Landlord Claim. Tenant's liability under this <u>Section 21</u> shall survive the expiration or earlier termination of this Lease.

B. Except to the extent prohibited by Law or directly caused by the gross negligence or willful misconduct of Landlord or any Landlord Indemnified Parties, Tenant hereby expressly releases Landlord and Landlord Mortgagee and all other Landlord Indemnified Parties from, and waives all claims for, damage or injury to person, theft, loss of use of or damage to property and loss of business sustained by Tenant and resulting from the

34

Premises, including the Building, Property, Personal Property or Tenant's Personal Property or any part thereof or any equipment therein or appurtenances thereto becoming in disrepair, or resulting from any damage, accident or event in or about the Premises. Without limiting the generality of the foregoing, this Section 21.B shall apply particularly, but not exclusively, to flooding, damage caused by Building equipment and apparatuses, water, snow, frost, steam, excessive heat or cold, broken glass, sewage, gas, odors, excessive noise or vibration, death, loss, conversion, theft, robbery, or the bursting or leaking of pipes, plumbing fixtures or sprinkler devices.

22.    **ASSIGNMENT AND SUBLETTING**.

A.    Intentionally Omitted.

B.    Landlord shall have the right to sell or convey the entire Premises subject to this Lease or to assign its right, title and interest as Landlord under this Lease in whole or in part. In the event of any such sale or assignment other than a security assignment, Tenant shall attorn to such purchaser or assignee and Landlord shall be relieved, from and after the date of such transfer or conveyance, of liability for the performance of any obligation of Landlord contained herein, except for obligations or liabilities accrued prior to such assignment or sale.

C.    Intentionally Omitted.

D.    Tenant acknowledges that Landlord has relied both on the business experience and creditworthiness of Tenant and upon the particular purposes for which Tenant intends to use the Premises in entering into this Lease. Without the prior written consent of Landlord, which consent may be granted or withheld in Landlord's sole and absolute discretion: (i) Tenant shall not assign, transfer, convey, sublease (except as provided in Section 22.H), pledge or mortgage this Lease or any interest therein, whether by operation of law or otherwise, except that Tenant may assign this Lease to any Affiliate of Tenant controlled by [Mountain Express Oil Company], provided that Tenant [and Guarantor] shall remain fully liable under this Lease notwithstanding any such assignment; (ii) no direct or indirect transfer of fifty percent (50%) or more of an interest in Tenant (whether by stock, partnership interest or otherwise, voluntarily or by operation of law) shall occur except for any such transfer to an Affiliate; (iii) no direct or indirect interest in Tenant shall be pledged, encumbered, hypothecated or assigned as collateral for any obligation of Tenant; and (iv) no change of Control of [Tenant/Guarantor] shall occur (each of items (i) through (v) are hereinafter referred to as a "**Transfer**").

E.    Landlord's consent to a Transfer shall be subject to the satisfaction of such conditions as Landlord shall determine in its sole and absolute discretion,

35

including, without limitation, the proposed transferee having satisfactory creditworthiness as determined by Landlord in its sole and absolute discretion. In addition, any such consent shall be conditioned upon the payment by Tenant to Landlord of all out-of-pocket costs and expenses incurred by Landlord in connection with such consent, including, without limitation, reasonable attorneys' fees, in an amount not to exceed fifty thousand dollars ($50,000.00). The provisions of this <u>Section 22</u> shall apply to every Transfer regardless of whether voluntary or not, or whether or not Landlord has consented to any previous Transfer. Any Transfer in violation of this <u>Section 22</u> shall be voidable at the sole option of Landlord.

F.  Any Transfer shall not relieve Tenant, or any person claiming by, through or under Tenant, of the obligation to obtain the consent of Landlord, pursuant to this <u>Section 22</u>, to any further Transfer. In the event of a sublease, if there exists an Event of Default, Landlord may collect rent from the subtenant without waiving any rights under this Lease while such Event of Default is continuing. Any rent Landlord may collect from any such subtenant will be first applied to the Rent due and payable under this Lease and any other amounts then due and payable and then applied to the Rent as it becomes due and payable under this Lease. The collection of the Rent and any other sums due and payable under this Lease, from a person other than Tenant shall not be a waiver of any of Landlord's rights under this <u>Section 22.F</u>, an acceptance of assignee or subtenant as Tenant, or a release of Tenant from the performance of Tenant's obligations under this Lease.

G.  No Transfer shall impose any additional obligations on Landlord under this Lease. Tenant shall reimburse Landlord (and Landlord's Mortgagee, if applicable) for Landlord's reasonable costs and expenses (including reasonable attorneys' fees) incurred in conjunction with the reviewing and processing and documentation of any Transfer requiring Landlord's consent regardless of whether such Transfer is consummated, in an amount not to exceed fifty thousand dollars ($50,000.00).

H.  Tenant may, upon at least ten (10) business days' prior written notice to Landlord (but without the requirement of obtaining Landlord's consent) sublease Tenant's interest in this Lease. With respect to any sublease, (a) such sublease, by its terms, must be expressly subordinate to and subject to the terms of this Lease (and all future amendments to this Lease); (b) the use contemplated under such sublease must not breach the use restrictions herein; (c) such sublease shall not impose any additional obligations on Landlord under this Lease; and (d) Landlord shall have no obligation to recognize any or to agree to not disturb any subtenant or other occupant of Tenant upon any Event of Default of Tenant under this Lease, unless Landlord shall agree to do so in writing by separate instrument, but Landlord, acting in its sole and absolute discretion, shall have no obligation to do so. For the avoidance of doubt, Tenant [and Guarantor] shall remain fully liable under this Lease for the Premisess, notwithstanding any such

sublease. Landlord shall have no right to any the rent collected by Tenant under any such sublease except as otherwise provide herein. On or before the effective date of such sublease, and to the best of Tenant's ability, Tenant shall provide to Landlord, in form and substance reasonably acceptable to Landlord, an acknowledgment and affirmation from such sublessee, Tenant [and Guarantor], providing that such sublessee agrees to be bound by the terms of this Lease with respect to the Premisess being subleased and that Tenant [and Guarantor] agree that they remain liable for the full and punctual performance of all of the terms and obligations of this Lease.

23.    **LIENS**.

Tenant will not, directly or indirectly, create or permit to be created or to remain, and will promptly discharge, at its expense, any mechanic's, supplier's or vendor's lien, encumbrance or charge on the Premises or any part hereof.  The existence of any mechanic's, supplier's or vendor's lien, or any right in respect thereof, shall not constitute a violation of this Section 23 if payment is not yet due upon the contract or for the goods or services in respect of which any such lien has arisen or, if Tenant is protesting or challenging such lien in good faith and has, within thirty (30) days after Tenant receives actual notice of such lien, bonded over such lien.  Nothing contained in this Lease shall be construed as constituting the consent or request of Landlord, expressed or implied, of any contractor, subcontractor, laborer, materialman or vendor to or for the performance of any labor or services or the furnishing of any materials for any construction, alteration, addition, repair or demolition of or to the Premises or any part thereof, and any such contractor, subcontractor, laborer, materialman or vendor shall look solely to Tenant and Tenant's interest in the Premises to secure the payment of any bills for any labor, services, or materials furnished. Notice is hereby given that Landlord will not be liable for any labor, services or materials furnished or to be furnished to Tenant, or to anyone holding the Premises or any part thereof through or under Tenant, and that no mechanic's or other liens for any such labor, services or materials shall attach to or affect the interest of Landlord in and to the Premises.  If Tenant has not removed any such lien or other encumbrance described above within thirty (30) days after written notice thereof to Tenant, Landlord may, but shall not be obligated to, pay the amount of such lien or other encumbrance or discharge the same by deposit, and the amount so paid or deposited shall constitute additional Rent and be collectible upon demand with interest at the Default Rate.  Landlord hereby consents to the granting of a lien or security interest on the fixtures, furnishings, trade fixtures, furniture, computers, telephone systems, machinery, equipment and other of Tenant's Personal Property installed or placed on the Premises by Tenant in connection with any customary credit facility that Tenant has or may have during the Term hereof, and Tenant shall give Landlord written notice of any such lien.

24.    **TENANT'S DEFAULT**.

Each of the following events shall be deemed to be an "**Event of Default**" under this Lease: (i) failure to pay Rent or any other monetary obligation as and when due, and such failure continues for three (3) business days after Tenant's receipt of Landlord's written notice thereof; (ii) Tenant abandons the Premises; (iii) [Guarantor] or Tenant becomes insolvent, makes an assignment for the benefit of creditors, or institutes a proceeding under state or federal bankruptcy laws (or

37

successor laws) or [Guarantor] or Tenant shall be adjudged bankrupt or insolvent in proceedings filed against [Guarantor] or Tenant; (iv) a writ of attachment or execution is levied on this Lease, or a receiver is appointed with authority to take possession of the Premises, which attachment, execution or receiver is not removed within thirty (30) days of filing or appointment of a receiver; (v) [Guarantor] or Tenant shall be liquidated or dissolved; (vi) Tenant shall violate Section 23 hereof; (vii) the estate or interest of Tenant in the Premises or any part thereof shall be levied upon or attached in any proceeding relating to more than One Hundred Thousand and No/100 Dollars ($100,000.00), and the same shall not be vacated, discharged or stayed pending appeal (or bonded or otherwise similarly secured payment) within the earlier of sixty (60) days after commencement thereof or thirty (30) days after receipt by Tenant of notice thereof from Landlord or any earlier period provided by Law for obtaining any stay pending appeal or to prevent foreclosure or sale; provided, however, that such notice shall be in lieu of and not in addition to any notice required under applicable Law; (viii) Tenant fails to maintain any insurance required by this Lease; (ix) failure by Tenant to perform any other covenant, agreement or undertaking of the Tenant contained in this Lease if the failure to perform is not cured within thirty (30) days after Tenant's receipt of Landlord's written notice thereof; provided, however, if the breach cannot reasonably be cured within thirty (30) days, the same shall not result in an Event of Default if Tenant commences to cure the breach within thirty (30) days of receipt of Landlord's written notice and diligently and in good faith continues to prosecute the cure of said breach to completion, provided such breach is cured within sixty (60) days after Tenant's receipt of Landlord's written notice thereof; [(x) to the extent required under the Guaranty, Guarantor fails to deliver the financial statements required to be delivered by Guarantor to Landlord; and (xi) an event of default beyond all applicable notice and cure periods by Guarantor under the Guaranty].

25. **REMEDIES OF LANDLORD**.

A. From and after the occurrence of any Event of Default, Landlord shall have the option to pursue any one or more of the following remedies as well as any other remedy available at Law or in equity for such Event of Default: (i) terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord; (ii) using lawful means, enter upon and take possession of the Premises without terminating this Lease and without being liable for prosecution or claim for damages, and relet, upon reasonable terms, all or a portion of the Premises (if Landlord elects to enter and relet the Premises, Landlord may at any time thereafter elect to terminate this Lease); (iii) sue periodically to recover damages during the period corresponding to the portion of the Term for which suit is instituted, and if Landlord elects to sue and is successful in such suit, Landlord shall be entitled to recover all costs and expenses of such suit, including reasonable attorneys' fees, together with interest at the Default Rate; (iv) re-enter the Premises or any portion thereof and attempt to cure any default of Tenant, or make any such payment or perform such act for the account of and at the expense of Tenant, in which event Tenant shall, upon demand, reimburse Landlord as additional Rent for all reasonable costs and expenses which Landlord incurs to cure such default, together with interest at the Default Rate accruing from the date such costs and expenses were incurred, and Tenant agrees that no such entry or action by Landlord shall constitute an

38

actual or constructive eviction or repossession, without Landlord's express intention to do so as expressed in writing, and no such entry shall be deemed an eviction of Tenant; (v) to the extent permitted by applicable Law, accelerate and recover from Tenant all Rent and other monetary sums scheduled to become due and owing under this Lease after the date of such breach for the entire Term and any Renewal Term that has been exercised; and (vi) enforce the provisions of this Lease by a suit or suits in equity or at law for the specific performance of any covenant or agreement contained herein, or for the enforcement of any other appropriate legal or equitable remedy.  Tenant shall reimburse Landlord for any out-of-pocket expenses which Landlord actually incurs in complying with the terms of this Lease on behalf of Tenant, together with interest at the Default Rate.

B.      If Landlord elects to terminate this Lease, Landlord shall be entitled to recover from Tenant all Rent accrued and unpaid for the period up to and including such termination date, as well as all other additional Rent payable by Tenant, or for which Tenant is liable or for which Tenant has agreed to indemnify Landlord, which may be then owing and unpaid, and all costs and expenses, including court costs and reasonable attorneys' fees, incurred by Landlord in the enforcement of its rights and remedies hereunder, together with interest at the Default Rate.  In addition, Landlord shall be entitled to recover as damages for loss of the bargain and not as a penalty the lesser of (i) the sum of (1) the aggregate sum which at the time of such termination represents the present value of the aggregate Rent which would have been payable after the termination date had this Lease not been terminated for the remainder of the Term or Renewal Term, as applicable, during which such termination occurred, such present value to be computed on the basis of the rate of U.S. Treasury Bills with the closest maturity date correlating with the amount of time left in the Term or Renewal Term, as applicable, had this Lease not been terminated, and (2) any damages in addition thereto, including without limitation reasonable attorneys' fees and court costs, which Landlord sustains as a result of the breach of any of the covenants of this Lease other than for the payment of Rent, and interest at the Default Rate or (ii) the greatest amount permitted by applicable Law.

C.      Unless required by applicable Law, Landlord shall have no obligation to mitigate damages upon the occurrence of an Event of Default.  However, if Landlord is required by applicable Law to mitigate Tenant's damages, Landlord's obligation shall be satisfied in full if Landlord undertakes to lease the Premises (the "**Repossessed Premises**") to another tenant (a "**Substitute Tenant**") in accordance with the following criteria:  (1) Landlord shall have no obligation to solicit or entertain negotiations with any other prospective tenants for such Repossessed Premises until Landlord obtains full and complete possession of such Repossessed Premises including, without limitation, the final and unappealable legal right to relet such Repossessed Premises free of any claim of Tenant; (2) Landlord shall not be obligated to lease or show such Repossessed Premises, on a priority

39

basis, or offer such Repossessed Premises to a prospective tenant when other premises in the applicable Building or any other building owned by Landlord suitable for that prospective tenant's use are (or will be) available; (3) Landlord shall not be obligated to lease such Repossessed Premises to a Substitute Tenant for a rent less than the current fair market rent then prevailing for similar uses in Comparable Buildings for such Repossessed Premises, nor shall Landlord be obligated to enter into a new lease under other terms and conditions that are unacceptable to Landlord under Landlord's then current leasing policies for comparable space in the applicable Building or for a building belonging to Landlord in the vicinity; (4) Landlord shall not be obligated to enter into a lease with a Substitute Tenant whose use would: (i) violate any restriction, covenant, or requirement contained in the lease of another tenant of the applicable Building; or (ii) adversely affect the reputation of the applicable Building; and (5) Landlord shall not be obligated to enter into a lease with any proposed Substitute Tenant which does not have, in Landlord's reasonable opinion, sufficient financial resources to operate such Repossessed Premises in a first-class manner and to fulfill all of the obligations in connection with the lease thereof as and when the same become due. No reletting shall be construed as an election on the part of Landlord to terminate this Lease unless a written notice of such intention is given to Tenant by Landlord. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for such previous default and/or exercise its rights under Section 25.A and Section 25.B.

D.      Pursuit of any of the above stated remedies by Landlord after an Event of Default shall not preclude pursuit of any other remedy provided in this Lease or at Law or in equity, nor shall pursuit of any remedy constitute forfeiture or waiver of any remedy of Landlord or payment due to Landlord. No waiver by Landlord of any violation or breach of any of the terms, provisions and covenants herein contained shall be deemed or construed to constitute a waiver of any other violation or breach of any of the terms, provisions and covenants herein contained. Forbearance by Landlord to enforce one or more of the remedies herein provided upon an Event of Default shall not be deemed or construed to constitute a waiver of any other violation or default. Once an Event of Default occurs, Landlord shall not be obligated to accept any cure of such Event of Default, and such Event of Default shall continue unless and until Landlord states in writing, in its sole and absolute discretion, that no Event of Default exists under this Lease.

26.     **SUBORDINATION/ATTORNMENT**.

A.      Landlord Mortgage. Landlord may mortgage its fee interest in the Premises or any portion thereof, at any time, and from time to time, in accordance with the terms hereof. Notwithstanding anything to the contrary contained herein, Landlord and Tenant agree that this Lease shall be subordinate to

40

any Landlord Mortgage and the rights of any Landlord Mortgagee; provided, however, in the event of a foreclosure under any such Landlord Mortgage, or conveyance or assignment in lieu of foreclosure or by deed in lieu of foreclosure, such Landlord Mortgagee and its successors and assigns shall not disturb the occupancy or other rights of Tenant under the terms of this Lease so long as no Event of Default exists hereunder. The foregoing shall be self-operative and not require any additional documentation, provided, however, if requested by Landlord, Tenant shall, promptly and in no event later than fifteen (15) days after a request from Landlord, enter into a reasonable and customary subordination, non-disturbance and attornment agreement ("**SNDA**") with Landlord Mortgagee to effectuate the subordination, non-disturbance and attornment rights contemplated by this Section 26.A. [Tenant shall deliver an SNDA to Landlord on the Commencement Date in the form attached hereto as **Exhibit F**, which SNDA shall be effective and binding upon Tenant once executed and delivered by the applicable Landlord Mortgagee.]

B.      For the purposes of this Lease, the following definitions shall apply:

"**Landlord Mortgage**" shall mean any financing obtained by Landlord, as evidenced by any mortgage, deed of trust, assignment of leases and rents, financing statement or other instruments, and secured by the interest of Landlord in the Premises or any portion thereof, including any extensions, modifications, amendments, replacements, supplements, renewals, refinancings and consolidations thereof.

"**Landlord Mortgagee**" shall mean the mortgagee (and its successors and assigns) under any Landlord Mortgage.

27.     **ESTOPPEL CERTIFICATE**.

A.      At any time, and from time to time, Tenant shall, promptly and in no event later than fifteen (15) days after a request from Landlord, execute, acknowledge and deliver to Landlord a certificate in the form attached hereto as **Exhibit D** or such other form as may be supplied by Landlord certifying:  (i) that Tenant has accepted the Premises; (ii) that this Lease is in full force and effect and has not been modified (or if modified, setting forth all modifications); (iii) the commencement and expiration dates of the Term, including the terms of any extension options of Tenant; (iv) the date to which the rentals have been paid under this Lease and the amount thereof then payable; (v) whether there are then any existing defaults by Landlord in the performance of its obligations under this Lease, and, if there are any such defaults, specifying the nature and extent thereof; (vi) that Tenant is not in default under this Lease beyond any grace or cure periods, except as to defaults specified in the certificate; (vii) the capacity of the person executing such certificate, and that such person is duly authorized to execute the same on behalf of Tenant; (viii) that Landlord has no actual involvement in the management or control of decision making related to the operational

41

aspects or the day-to-day operations of the Premises; and (ix) any other information reasonably requested by Landlord.

B.     At any time, and from time to time, Tenant shall, at Landlord's request, use commercially reasonable efforts to obtain estoppel certificates, in a form requested by Landlord or any Landlord Mortgagee, from any applicable counterparties under any applicable declarations, covenants, conditions and restrictions, reciprocal easement agreements or other encumbrances.

28.     **HAZARDOUS MATERIALS**.

Notwithstanding anything contained herein to the contrary:

A.     Tenant covenants and agrees that it shall not cause, conduct, authorize or allow (i) the presence, generation, transportation, storage, treatment, or usage at the Premises, or any portion thereof, of any Hazardous Material in violation of or as would give rise to liability under Environmental Laws; (ii) a Release or threat of Release of any Hazardous Material on, under, about or in the Premises; or (iii) any violation of or liability under any Environmental Law at or with respect to the Premises or activities conducted thereon. For avoidance of doubt, nothing in this Section 28.A shall prohibit Tenant from using at the Premises (I) cleaning materials, pesticides, and other common household and office products, and/or (II) materials in connection with any fuel tanks, generators or the like on the Premises, solely to the extent, with respect to each of the preceding clauses (I) and (II), that any such use thereof is in compliance with Environmental Laws.

B.     Tenant shall, at its own cost, comply and ensure that the Premises and all operations and activities at the Premises comply with all Environmental Laws and the terms of this Lease with respect to Hazardous Materials. Tenant shall, at its own cost, obtain all permits, licenses and authorizations required under Environmental Laws for the operations and activities conducted at the Premises. At Landlord's request, Tenant shall commission and provide to Landlord, or Landlord may commission, in each event, at Tenant's sole cost and expense, a Phase I site assessment, and, if recommended by the Phase I site assessment, a Phase II site assessment, for purposes of confirming the environmental condition of the Premises and Tenant's compliance with the terms of the Lease with respect to environmental matters.

C.     Tenant shall promptly provide Landlord with written notice of any actual or potential violation of Environmental Laws, any Release of Hazardous Materials in or around the Premises that could impact the Premises or require any investigation, remediation or other response action under Environmental Law, and any claim or threat of a claim asserting any liability under Environmental Laws relating to the Premises, and copies of

all reports, site assessments, and material communications, permits or agreements to, from or with any governmental authority or other third party relating to such violation, Release or claim; and

D.  Landlord and Landlord's Representatives, including such environmental consultants as Landlord may designate, shall have the right upon reasonable prior notice, and subject to Section 15 hereof, to enter the Premises and/or conduct appropriate tests and investigations for the purpose of assessing the condition of the Premises or ascertaining that Tenant complies with the terms of this Lease and with all applicable Environmental Laws that relate in any way to the Premises.

E.  If the presence, Release, threat of Release, presence or placement on, in or around the Premises, or the generation, transportation, storage, use, treatment, or disposal at or around the Premises of any Hazardous Material by Tenant, Tenant's Representatives, or by any third party other than Landlord or Landlord's Representatives: (i) gives rise to any liability or obligation (including, but not limited to, any investigatory, remedial, removal, reporting, or other response action) under any Environmental Law, (ii) causes or threatens to cause any adverse effect on public health or occupational safety and health, (iii) pollutes or threatens to pollute the environment, or endanger human health, or (iv) otherwise violates Environmental Law, Tenant shall promptly take any and all remedial and removal actions required by Environmental Laws or otherwise necessary to clean up the Premises to comply with all environmental standards applicable to the Premises given its use at the time of the remediation and mitigate exposure to liability arising from the Hazardous Material.

F.  Tenant shall promptly notify Landlord upon Tenant becoming aware of: (i) any enforcement action, investigation, cleanup, notice of violation, or other regulatory action taken or threatened against either party or otherwise related to the Premises by any governmental authority with respect to the presence of any Hazardous Material at the Premises, or the migration thereof from or to other property, (ii) any demands or claims made or threatened by any governmental authority or other person against either party hereto or otherwise relating to any actual or alleged violation of or liability under Environmental Laws or relating to any loss or injury resulting from any Hazardous Material or based on Environmental Laws, (iii) any Release of Hazardous Materials, unlawful discharge, or non-routine, improper or unlawful disposal or transportation of any Hazardous Material on or from the Premises, and (iv) any matters where Tenant is required by Environmental Law to give a notice to any governmental authority respecting any Hazardous Materials in, at, on, under or about the Premises, and Tenant shall thereafter keep Landlord reasonably apprised with respect to the status and Tenant's actions to resolve such matters, and shall furnish Landlord with such other documents and information as Landlord may reasonably request with respect thereto. At such times as Landlord may

43

reasonably request, Tenant shall provide Landlord with a written list identifying any Hazardous Material then actually known by Tenant to be used, stored, or maintained in, on or upon the Premises. In such case, Tenant shall if requested by Landlord provide Landlord with information with respect to the use and approximate quantity of each such material, a copy of any Material Safety Data Sheet issued by the manufacturer therefor, written information concerning the removal, transportation, and disposal of the same, and such other information as the Landlord may reasonably require or as may be required by Environmental Laws.

G.      Tenant shall indemnify, defend and hold Landlord and the Landlord Indemnified Parties harmless, in the manner specified in Section 21, from and against any and all liability, claim, expense, cause of action, fines, judgments, settlements, investigation, monitoring and remediation costs, penalties, losses and damages (including reasonable attorney's, consultant's and contractor's fees) resulting or arising from (i) the breach by Tenant of its covenants and agreements set forth in this Section 28, (ii) the presence, Release, placement on, in or around the Premises, or the generation, transportation, storage, use, treatment or disposal at or around the Premises of any Hazardous Materials before or during the Term and any Renewal Term, as applicable, by Tenant or any third party other than Landlord or Landlord's Representatives, (iii) any violation of or obligation under Environmental Law before or during the Term and any Renewal Term, as applicable, by Tenant or any third party other than Landlord or Landlord's Representatives, and (iv) claims by governmental authorities or other third parties associated with Hazardous Materials or violations of or obligations under Environmental Laws by Tenant or any third party other than Landlord or Landlord's Representatives, or Hazardous Materials present at, on, under or about the Premises before or during the Term and any Renewal Term, as applicable, including, without limitation those that were discovered during the Term and any Renewal Term, as applicable, which were caused prior to the Term by Tenant or its agents, representatives, employees, contractors, subcontractors, licensees or invitees or any third party other than Landlord or Landlord's Representatives. The foregoing indemnity obligations shall survive the expiration or earlier termination of this Lease.

H.      Without limitation to the foregoing, Tenant shall, at its sole cost and expense, comply with all Environmental Laws relating to the operation and use of all aboveground and underground storage tanks ("**Tanks**") at any time located at the Premises, such compliance to include without limitation ensuring that all Tanks are equipped with leak detection systems and otherwise meet all applicable construction standards and technical requirements, are subject to regular inspections and tightness tests to confirm Tank integrity, and are covered by pollution insurance policies or other financial assurance mechanisms to the extent required under Environmental Laws. Tenant shall upon request provide Landlord copies of inspection reports, insurance policies, and other documentation

44

reasonably necessary to confirm the compliance status of such Tanks. In the event of any spills, releases or evidence of leakage from or associated with the use of the Tanks, Tenant shall report the same to the appropriate regulatory agency and shall conduct testing of environmental media to confirm the nature and extent of contamination, complete all remedial and corrective actions required under Environmental Laws with respect to such spill, release or leakage, and upon completion of work provide Landlord a copy of a No Further Action letter or the equivalent determination from the applicable regulatory agency ("**NFA**") with respect to the remedial work.

I.  Upon the expiration or earlier termination of the Lease, at Landlord's request, Tenant, at its sole expense, shall remove from the Premises all Tanks in accordance with all Environmental Laws and applicable commercial guidelines, perform post-removal testing of soil and groundwater to confirm the presence or absence of contamination associated with such Tanks, and to the extent that such removal involves any excavation or remedial work at the Premises, Tenant shall perform such remediation and restore the Premises to the same grade level as immediately prior to excavation using clean fill soil, and Tenant shall obtain and provide Landlord a copy of a NFA with respect to the Tank removal and remedial work, as applicable.

29.  **PRESS RELEASES**.

Except for any announcement intended solely for internal distribution by Landlord or Tenant or any disclosure required by legal, accounting or regulatory requirements beyond the reasonable control of the disclosing party, all media releases or public announcements (including, but not limited to, promotional or marketing material) by Landlord or Tenant or either party's employees or agents relating to this Lease or its subject matter, or including the name, trade name, trade mark, or symbol of Tenant or an Affiliate of Tenant, or Landlord or an Affiliate of Landlord, shall be coordinated with and approved in writing by the other party prior to the release thereof; provided, that nothing herein is intended to require Tenant's consent to the identification of Tenant or the particulars of this Lease in connection with any marketing of the Premises or any portion thereof by Landlord.

30.  **HOLDING OVER**.

Except as set forth below, if Tenant continues to occupy the Premises or any portion thereof after the expiration or other termination of this Lease or the termination of Tenant's right of possession with respect to the Premises, such occupancy shall be that of a tenancy at sufferance. Tenant shall, throughout the entire holdover period, be subject to all the terms and provisions of this Lease (other than provisions relating to length of the Term) and shall pay for its use and occupancy an amount (on a per month basis without reduction for any partial months during any such holdover) equal to (i) one hundred percent (100%) of the additional Rent due under this Lease for the holdover period, and (ii) two hundred percent (200%) of the monthly Base Rent due in the month immediately prior to the expiration or earlier termination of the Term. Except as set forth below, no holding over by Tenant or payments of money by Tenant to Landlord after the expiration

of the Term shall be construed to extend the Term or prevent Landlord from recovery of immediate possession of the Premises by summary proceedings or otherwise. In the event that Tenant continues to occupy the Premises or any portion thereof after the expiration or termination of this Lease, such occupancy shall be that of a tenancy at sufferance and Tenant shall be liable to Landlord for all direct and consequential damages which Landlord may suffer by reason of any holding over by Tenant.

31. **FINANCIAL COVENANTS**.

A. Tenant has delivered to Landlord certain financial statements and other information concerning the Tenant in connection with this Lease (collectively, the "**Financial Information**"). The Financial Information is true, correct and complete in all material respects; there have been no amendments to the Financial Information since the date such Financial Information was prepared or delivered to Landlord. Tenant understands that Landlord is relying upon the Financial Information and Tenant represents that such reliance is reasonable. All financial statements included in the Financial Information were prepared in accordance with GAAP and fairly present as of the date of such financial statements the financial condition of each individual or entity to which they pertain. No change has occurred with respect to the financial condition of any of the Tenant Parties and/or any of the Properties as reflected in the Financial Information which has not been disclosed in writing to Landlord or has had, or could reasonably be expected to result in, a Material Adverse Effect.

B. If at any time, and from time to time, during the Term, [Tenant's/Guarantor's] Net Leverage Ratio exceeds 2.50 to 1.00, then within thirty (30) days after Tenant's receipt of notice from Landlord (the "**Leverage Notice**"), (i) this Lease shall be amended (by written instrument reasonably acceptable to Landlord)to increase the then-applicable Base Rent by five percent (5%) (and which Base Rent, as so increased, shall continue to increase by two percent (2%) each year during the Term and each Renewal Term), which rent increase shall be effective as of the first day of [Tenant's/Guarantor's] fiscal quarter immediately after [Tenant's/Guarantor's] Net Leverage Ratio exceeds 2.50 to 1.00 and (ii) Tenant shall deliver to Landlord cash or, at Tenant's election, an irrevocable standby letter of credit in form and substance reasonably acceptable to Landlord (the "**Letter of Credit**") in an amount equal to twelve (12) times the Base Rent payable during the month of the date of the Leverage Notice (the "**Security Deposit**"). Upon Tenant's failure to timely pay Base Rent or any other sums due under this Lease, Landlord may, without limiting any other rights Landlord may have herein, draw on such Security Deposit to satisfy any such unpaid monetary obligation of Tenant, and Tenant shall, immediately upon written notice from Landlord thereof, deposit with landlord an amount in cash sufficient to replenish the Security Deposit to the same amount prior to such draw on the Security Deposit. Landlord shall retain the Security Deposit until the Net Leverage Ratio no longer exceeds

46

2.50 to 1.00 for two consecutive fiscal quarters of [Tenant/Guarantor], at which time, provided no Event of Default has occurred, (I) Landlord shall return the Security Deposit to Tenant (except to the extent the Security Deposit has been applied in accordance with the terms of this Lease) and (II) the Lease shall be amended (by written instrument reasonably acceptable to Landlord) to adjust the then-applicable Base Rent to be equal to the Base Rent amount that would have been in effect if a Leverage Notice had not been provided. The Letter of Credit shall be issued (the following collectively, the "**LC Issuer Requirements**"): by a commercial bank (a) with a net worth of at least Ten Billion Dollars ($10,000,000,000), (b) that is chartered under the laws of the United States, any State thereof or the District of Columbia, and which is insured by the Federal Deposit Insurance Corporation, (c) whose long-term, unsecured and unsubordinated debt obligations are rated in the highest category by at least two of S&P, Fitch, and Moody's (the "**Bank Rating Agencies**") or their respective successors (which shall mean A from Fitch, A-2 from Moody's and A from Standard & Poor's), (d) which has a short term deposit rating in the highest category from at least two Bank Rating Agencies (which shall mean F1 from Fitch, P-1 from Moody's and A-1 from S&P), and (e) which is not insolvent and is not placed into receivership or conservatorship by the Federal Deposit Insurance Corporation, or any successor or similar entity, and for which no trustee, receiver or liquidator is appointed. If at any time following the delivery of the Letter of Credit by Tenant pursuant to this Section 31.B the LC Issuer Requirements are not satisfied, then Tenant shall, no later than ten (10) business days thereafter, deliver to Landlord a replacement Letter of Credit which meets the LC Issuer Requirements in the amount of the Security Deposit.  If Tenant fails to deliver a replacement Letter of Credit from an institution that satisfies the LC Issuer Requirements to Landlord within such ten (10) business day period, Landlord, at its option, upon the delivery of written notice to Tenant may draw upon the Letter of Credit and instruct the Letter of Credit issuer to deliver the full amount of the Letter of Credit to Landlord as a cash Security Deposit.  It is Tenant's responsibility to maintain and renew the Letter of Credit such that it is in effect at all times until the return of the Letter of Credit to Tenant in accordance herewith. Tenant shall renew such Letter of Credit no later than thirty (30) days prior to any expiration date thereof or replace such Letter of Credit with a replacement Letter of Credit which otherwise meets the LC Issuer Requirements. If Tenant has not renewed the Letter of Credit (and delivered the original of such renewal documentation to Landlord) or delivered a satisfactory replacement Letter of Credit to Landlord at least thirty (30) days prior to the expiration date of the Letter of Credit, Landlord, at its option, may draw upon the Letter of Credit and instruct the Letter of Credit issuer to deliver the full amount of the Letter of Credit to Landlord as a cash Security Deposit.  For each Property, upon the 5 year anniversary of such Property's lease, this clause will become null and void.

C.  Within forty-five (45) days after the end of each calendar quarter, [Tenant/Guarantor] shall deliver to Landlord complete financial statements of the [Tenant/Guarantor], and, within ninety (90) days after the end of each calendar year, [Tenant/Guarantor] shall deliver to Landlord complete audited financial statements, in each case including a balance sheet, and profit and loss statement. [Tenant/Guarantor] shall also provide unaudited financial statements, certified by [Tenant's/Guarantor's] chief financial officer, in each case including top-line gross receipts report basis showing unit-level EBITDAR, statement of changes in financial condition, income statement with respect to the Property, annual EBITDA projections for the then-current fiscal year of Tenant and all other related schedules for the fiscal period then ended.

D.  Beginning with [Tenant's/Guarantor's] fiscal year 2022, and at all times thereafter during the Term, [Tenant's/Guarantor's] audits shall be performed by a "Big 4" accounting firm.

32.  **QUIET ENJOYMENT**.

So long as Tenant is not in default under this Lease, Landlord shall not take any action to disturb in any material respect Tenant's quiet enjoyment of the Premises (subject, however, to the exceptions, reservations and conditions of this Lease). Except to the extent expressly set forth in this Section 32, Tenant hereby waives any right or defense it may have at law or in equity relating to Tenant's quiet enjoyment of the premises.

33.  **NOTICES**.

Any notice, demand, request, or other communication that any party hereto may be required or may desire to give hereunder shall be in writing and shall be deemed properly given (a) if hand delivered, when delivered; (b) if mailed by United States Certified Mail (postage prepaid, return receipt requested), three (3) business days after mailing; (c) if by Federal Express or other nationally recognized overnight courier service, on the next business day after delivered to such courier service for delivery on the next business day; or (d) if by facsimile or e-mail transmission, on the day of transmission so long as a copy is sent on the same day (or prior thereto) by Federal Express or other nationally recognized overnight courier service for delivery on the next business day, to the addresses set forth in Section 2 hereof, or at such other address as the party to be served with notice has furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice. Attorneys for either party hereto may provide notice of behalf of such party, provided that all other requirements of this Section 33 are satisfied.

34.  **PERSONAL LIABILITY**.

Notwithstanding anything to the contrary provided in this Lease, it is specifically understood and agreed, such agreement being a primary consideration for the execution of this Lease by the parties, that (i) there shall be absolutely no personal liability on the part of the direct and indirect members, partners, shareholders, officers, directors, employees and agents of either party, and its successors or assigns, with respect to any of the terms, covenants and conditions of

48

this Lease, (ii) each waives all claims, demands and causes of action against the direct and indirect members, partners, shareholders, officers, directors, employees and agents of the other and its successors or assigns in the event of any breach by the other of any of the terms, covenants and conditions of this Lease to be performed by Landlord or Tenant, and (iii) Tenant shall look solely to Landlord's interest in the Premises for the satisfaction of each and every remedy of Tenant in the event of any breach by Landlord of any of the terms, covenants and conditions of this Lease to be performed by Landlord, or any other matter in connection with this Lease or the Premises, such exculpation of liability to be absolute and without any exception whatsoever. Notwithstanding anything to the contrary provided in this Lease, nothing in this <u>Section 34</u> or otherwise in the Lease shall limit the obligations of Guarantor under the Guaranty. No breach by Landlord of any provision of this Lease shall give rise to a right of Tenant to terminate this Lease, it being understood and agreed that Tenant's sole remedy for any such breach shall be a claim for actual damages (if any). Furthermore, Tenant hereby knowingly, voluntarily and intentionally waives any right it may have to seek punitive, consequential, special and indirect damages from Landlord and any of such Landlord's direct and indirect members, partners, shareholders, officers, directors, employees and agents of Landlord and its successors or assigns with respect to any matter arising out of or in connection with this Lease or any document contemplated herein or related hereto. The waiver by Tenant of any right it may have to seek punitive, consequential, special and indirect damages has been negotiated by the parties hereto and is an essential aspect of their bargain. Except as otherwise set forth in this Lease, Landlord hereby knowingly, voluntarily and intentionally waives any right it may have to seek punitive, consequential, special and indirect damages from and any of such Tenant's direct and indirect members, partners, shareholders, officers, directors, employees and agents of Tenant and its successors or assigns with respect to any matter arising out of or in connection with this Lease or any document contemplated herein or related hereto.

35.    **<u>ENTIRE AGREEMENT</u>**.

This Lease represents the entire agreement and understanding between Landlord and Tenant with respect to the subject matter herein, and there are no representations, understandings, stipulations, agreements or promises not incorporated in writing herein.

36.    **<u>AMENDMENTS</u>**.

No amendments or modifications of this Lease shall be effective unless such amendment or modification is in writing and executed and delivered by and between Tenant and Landlord, nor shall any custom, practice or course of dealing between the parties be construed to waive the right to require specific performance by the other party in compliance with this Lease.

37.    **<u>LEGAL INTERPRETATION</u>**.

Each of Landlord and Tenant hereby agree that the State of [_____][5] has a substantial relationship to the parties and to the underlying transaction embodied hereby, and in all respects (including, without limiting the foregoing, matters of construction, validity and performance), this Lease and the obligations arising hereunder shall be governed by, and construed in accordance with, the laws of the State of [_____] applicable to contracts made and performed therein and all

---

[5] <u>Note to Draft</u>: Lease to be governed by laws of the state where the most properties are located.

applicable law of the United States of America; except that, at all times, the provisions for the creation of the leasehold estate created by this Lease, enforcement of Landlord's rights and remedies with respect to right of re-entry and repossession, surrender, delivery, ejectment, dispossession, eviction or other in-rem proceeding or action regarding the Premises pursuant to Section 25 hereunder shall be governed by and construed according to the Laws of the State in which the Premises is located, it being understood that, to the fullest extent permitted by law of such State where the Premises is located, the law of the State of [__] shall govern the validity and enforceability of this Lease, and the obligations arising hereunder. To the fullest extent permitted by law, Tenant and Landlord hereby unconditionally and irrevocably waive any claim to assert that the law of any other jurisdiction governs this Lease. Words of any gender shall be construed to include any other gender, and words in the singular number shall be construed to include the plural, unless the context otherwise requires. The headings of the sections have been inserted for convenience only and are not to be considered in any way in the construction or interpretation of this Lease. Except as otherwise herein expressly provided, the terms of this Lease shall apply to, inure to the benefit of, and be binding upon, the parties and their respective assigns, successors and legal representatives. Any legal suit, action or proceeding against Tenant arising out of or relating to this Lease may be instituted in any federal court in the Northern District of Illinois or state court sitting in Cook County, State of Illinois, and Landlord and Tenant each waives any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding in such federal district or county and state, and Landlord and Tenant each hereby expressly and irrevocably submits to the jurisdiction of any such court in any suit, action or proceeding. In this Lease, the words "include", "includes" or "including" mean "include without limitation", "includes without limitation" and "including without limitation", respectively, and the words following "include", "includes" or "including" shall not be considered to set forth an exhaustive list.

38. **OPTION TO RENEW**.

   A. Tenant shall have the right, at its election made in its sole discretion, to extend the Term (the "**Renewal Option**") for the additional periods set forth in Section 1.E (each, a "**Renewal Term**"), provided that each of the following occurs:

      1. Landlord receives irrevocable written notice of exercise of the Renewal Option (the "**Renewal Notice**"), not less than twelve (12) full months but not greater than eighteen (18) full months prior to the expiration of the then existing Term (or Renewal Term, as case may be); and

      2. There is no uncured Event of Default beyond any applicable notice and cure period at the time that Tenant delivers the Renewal Notice or at the time Tenant delivers its Renewal Notice.

   B. The Renewal Term shall be upon the same terms and conditions as in this Lease except Base Rent for the first year of the applicable Renewal Term shall be equal to one hundred two percent (102%) of the Base Rent for the year immediately preceding the first year of the applicable Renewal Term.

50

The Base Rent shall increase by two percent (2%) annually during each Renewal Term.

C. If Tenant is entitled to and properly exercises its Renewal Option, Landlord and Tenant shall execute an amendment (the "**Renewal Amendment**") to reflect changes in the Base Rent, the Term, the Expiration Date and other appropriate terms; provided that an otherwise valid exercise of the Renewal Option shall be fully effective whether or not the Renewal Amendment is executed. During any validly exercised Renewal Term, references to the Term in this Lease shall mean and refer to the Term as extended by the Renewal Term.

39. **AUTHORITY TO ENTER INTO LEASE**.

Each of Tenant and Landlord represents and warrants (a) that the individual executing this Lease on its behalf is duly authorized to execute and deliver this Lease on behalf of the corporation, limited liability company or partnership, as the case may be, and (b) that this Lease is binding on the corporation, limited liability company and the partnership in accordance with its terms.

40. **PARTIES BOUND**.

The preparation and submission of a draft of this Lease by either party to the other party shall not constitute an offer, nor shall either party be bound to any terms of this Lease or the entirety of this Lease, until both parties have fully executed a final document. Until such time as described in the previous sentence, either party is free to terminate negotiations without penalty or any further obligation to the other party.

41. **COUNTERPARTS; ELECTRONIC SIGNATURES**.

This Lease may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become a binding agreement when one or more counterparts have been signed by each of the parties and delivered to the other party. Signatures to this Lease, any amendment hereof and any notice given hereunder, delivered electronically via .pdf, .jpeg, .TIF, .TIFF or similar electronic format shall be deemed an original signature and fully effective as such for all purposes. Each party agrees to deliver promptly an executed original of this Lease (and any amendment hereto) with its actual signature to the other party, but a failure to do so shall not affect the enforceability of this Lease (or any amendment hereto), it being expressly agreed that each party to this Lease shall be bound by its own electronically transmitted signature and shall accept the electronically transmitted signature of the other party to this Lease.

42. **SEVERABILITY**.

If any term or other provision of this Lease is invalid, illegal, or incapable of being enforced by any rule of law or public policy, all of the other conditions and provisions of this Lease will nevertheless remain in full force and effect. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Lease so as to reflect the original intent of the parties as closely as possible

51

in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

43.    <u>**WAIVER OF JURY TRIAL; CONSEQUENTIAL DAMAGES**</u>.

LANDLORD AND TENANT HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY. THIS WAIVER BY THE PARTIES HERETO OF ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

44.    <u>**MEMORANDUM OF LEASE**</u>. This Lease shall not be recorded, either independently or as an exhibit, schedule, annex, or addendum to any other document. However, at Tenant's or Landlord's election, a Memorandum of Lease in the form annexed hereto as **Exhibit E,** shall be executed, acknowledged and delivered for recording in the county in which the Premises is located by both parties with the costs of recording the Memorandum of Lease to be borne by Tenant. Tenant shall execute, acknowledge and deliver to Landlord a release of the Memorandum of Lease in recordable form within five (5) days following the expiration or earlier termination of this Lease in accordance with its terms. If Tenant fails to so execute, acknowledge and deliver the release within such five (5) day period, Landlord shall hereby be deemed to be Tenant's attorney-in-fact for the sole purpose of executing and recording the release on behalf of Tenant. Tenant shall pay any and all recording and other costs, fees and taxes in connection with the execution and recordation of the Memorandum of Lease.

45.    <u>**BROKERS**</u>. Tenant warrants that it has had no dealings with any broker or agent in connection with this Lease. Tenant covenants and agrees to pay, hold harmless and indemnify Landlord and Landlord Mortgagee for any compensation, commissions and charges claimed by any other broker or agent with respect to this Lease, based on Tenant's actions. Landlord covenants and agrees to pay, hold harmless and indemnify Tenant for any compensation, commissions and charges claimed by any broker or agent with respect to this Lease, based on Landlord's actions.

46.    <u>**RIGHT OF FIRST REFUSAL TO PURCHASE**</u>.

Provided that no Event of Default has occurred and is continuing under this Lease, commencing and effective from and after the date that is six (6) years after the Effective Date, Tenant shall, during the Term, have a right of first refusal ("**Right of First Refusal**") to purchase the Property from Landlord pursuant to the terms of this <u>Section 46</u>. The Right of First Refusal is subject to the following terms and conditions:

        A.    If Landlord receives a bona fide written offer from a third party to purchase the Property, and Landlord desires to accept such offer, Landlord shall give

52

Tenant written notice thereof, including the stated purchase price and other material economic terms (if any), which notice may include the applicable letter of intent, purchase and sale agreement or a similar document reflecting the material terms of such offer from such third party ("**Landlord's Notice**").

B. Tenant may then deliver to Landlord written notice of its election ("**Tenant's Purchase Election**") to purchase the Property on the terms described in Landlord's Notice on or before the date that is ten (10) business days after delivery by Landlord to Tenant of Landlord's Notice (the "**Exercise Period**").

C. Upon Landlord's receipt of Tenant's Purchase Election, the parties shall negotiate reasonably and in good faith for a period of fifteen (15) days (the "**Negotiation Period**") in order to finalize and execute a mutually acceptable purchase and sale agreement setting forth such terms (the "**Contract**"), it being agreed that, if Landlord's Notice included a purchase and sale agreement negotiated by Landlord with the applicable third party, then Tenant shall be required to accept such purchase and sale agreement (with solely ministerial changes to reflect Tenant (or its designee) as purchaser) as the Contract. In the event a Contract is not executed by the parties prior to the expiration of the Negotiation Period, then Tenant shall be deemed to have waived the Right of First Refusal to purchase the Property under the terms of Landlord's Notice and Landlord shall thereafter have the right to enter into a purchase and sale agreement with a third party for the Property on terms and conditions of the Landlord's Notice or any other terms and conditions, subject to Section 46.E, and consummate the sale of the Property pursuant thereto.

D. If Tenant does not deliver a Tenant's Purchase Election prior to the expiration of the Exercise Period, then Tenant shall be deemed to have waived the Right of First Refusal to purchase the Property under the terms of Landlord's Notice, and Landlord shall thereafter have the right to enter into a purchase and sale agreement with a third party for the Property on terms and conditions of the Landlord's Notice or any other terms and conditions, subject to Section 46.E, and consummate the sale of the Property pursuant thereto.

E. In the event that Tenant declines or waives (or is deemed to have waived) its Right of First Refusal to purchase the Property pursuant to this Section 46, Landlord shall have the right to sell the Property and Tenant shall not have a further Right of First Refusal unless (i) there shall be a material decrease in the purchase price from the purchase price provided in the initial Landlord's Notice or (ii) the other material economic terms of such sale (taken as a whole) are materially more favorable to the third-party purchaser as compared to those set forth in the initial Landlord's Notice. For the purposes of this Section 46.E, a "**material decrease**" shall mean a

decrease of ten (10%) percent or more of the purchase price for the Property in the Landlord's Notice. Notwithstanding the foregoing, Landlord shall re-institute the procedure set forth in this <u>Article 46</u> if Landlord fails to (x) execute and deliver a bona fide contract with a third party for the proposed sale within one hundred eighty (180) days after Tenant declines or waives (or is deemed to have waived) its Right of First Refusal to purchase the Property or (y) consummate the proposed sale pursuant to such contract.

F. Tenant's Right of First Refusal pursuant to this <u>Article 46</u> shall be a one-time right, and, accordingly, if Tenant declines or waives (or is deemed to have waived) its Right of First Refusal to purchase the Property pursuant to this <u>Article 46</u> and the sale of the Property by Landlord is subsequently consummated pursuant to this <u>Article 46</u>, then, thereafter, the terms and conditions of this <u>Article 46</u> shall automatically be of no further force or effect.

G. Notwithstanding anything herein to the contrary, Tenant's right to purchase the Property pursuant to this <u>Article 46</u> is and shall be subject and subordinate to any Landlord Mortgage and shall not be applicable to any foreclosure sale, transfer by deed-in-lieu of foreclosure or similar transfer of the Property or to any subsequent transfer or sale of the Property by any Landlord Mortgagee or its nominee, in each case, whether such transfer or sale affects the Property or the ownership interests in Landlord.

47. **[GUARANTY**. Simultaneously with the execution of this Lease, Tenant shall deliver to Landlord a fully executed copy of the Unconditional Guaranty of Payment and Performance attached hereto as **Exhibit G** (the "**Guaranty**") signed by the Guarantor named in <u>Section 2</u> hereof.]

48. <u>**REIT PROTECTION**</u>. <u>The parties hereto intend that Rent and other amounts paid by Tenant hereunder will qualify as "rents from real property" within the meaning of Section 856(d) of the Code, or any similar or successor provision thereto and this Lease shall be interpreted consistent with this intent</u>.

A. Anything contained in this Lease to the contrary notwithstanding, Tenant shall not without Landlord's advance written consent (which consent shall not be unreasonably withheld) (i) sublet, assign or enter into a management arrangement for the Leased Property on any basis such that the rental or other amounts to be paid by the subtenant, assignee or manager thereunder would be based, in whole or in part, on either (x) the income or profits derived by the business activities of the subtenant, assignee or manager or (y) any other formula such that any portion of any amount received by Landlord would fail to qualify as "rents from real property" within the meaning of Section 856(d) of the Code, or any similar or successor provision thereto; (ii) furnish or render any services to the subtenant, assignee or manager or manage or operate the Leased Property so subleased, assigned or managed; (iii) sublet, assign or enter into a management

54

arrangement for the Leased Property to any Person (other than a "taxable REIT subsidiary" (within the meaning of Section 856(l) of the Code) of OSREC) in which Landlord or OSREC owns an interest, directly or indirectly (by applying constructive ownership rules set forth in Section 856(d)(5) of the Code); or (iv) sublet, assign or enter into a management arrangement for the Leased Property in any other manner which could cause any portion of the amounts received by Landlord pursuant to this Lease or any sublease to fail to qualify as "rents from real property" within the meaning of Section 856(d) of the Code, or any similar or successor provision thereto, or which could cause any other income of Landlord to fail to qualify as income described in Section 856(c)(2) of the Code. The requirements of this Section 48(A) shall likewise apply to any further subleasing by any subtenant.

B.      Anything contained in this Lease to the contrary notwithstanding, the parties acknowledge and agree that Landlord, in its sole discretion, may assign this Lease or any interest herein to another Person (including without limitation, a "taxable REIT subsidiary" (within the meaning of Section 856(l) of the Code)) in order to maintain Landlord's status as a "real estate investment trust" (within the meaning of Section 856(a) of the Code); provided, however, Landlord shall be required to (i) comply with any applicable legal requirements related to such transfer and (ii) give Tenant notice of any such assignment; and provided, further, that any such assignment shall be subject to all of the rights of Tenant hereunder.

C.      Anything contained in this Lease to the contrary notwithstanding, upon request of Landlord, Tenant shall cooperate with Landlord in good faith and at no cost or expense to Tenant, and provide such documentation and/or information as may be in Tenant's possession or under Tenant's control and otherwise readily available to Tenant as shall be reasonably requested by Landlord in connection with verification of OSREC's "real estate investment trust" (within the meaning of Section 856(a) of the Code) compliance requirements. Anything contained in this Lease to the contrary notwithstanding, Tenant shall take such reasonable action as may be requested by Landlord from time to time in order to ensure compliance with the Internal Revenue Service requirement that Rent allocable for purposes of Section 856 of the Code to personal property, if any, at the beginning and end of a calendar year does not exceed fifteen percent (15%) of the total Rent due hereunder as long as such compliance does not (i) increase Tenant's monetary obligations under this Lease or (ii) materially and adversely increase Tenant's nonmonetary obligations under this Lease or (iii) materially diminish Tenant's rights under this Lease.

D.      Tenant acknowledges that Landlord's direct or indirect parent intends to qualify as a "real estate investment trust" (within the meaning of Section 856(a) of the Code). Tenant agrees that it will not knowingly or intentionally take or omit to take any action, or permit any status or

55

condition to exist at the Leased Property, which Tenant actually knows (acting in good faith) would or could result in the Rent payable under this Lease not qualifying as "rents from real property" within the meaning of Section 856(d) of the Code.

49. **LOCAL LAW PROVISIONS**.[6]

**[Signatures on following page]**

---

[6] Note to Draft: Local law provisions to be added if applicable to the Premises based on the Master Lease.

**IT WITNESS WHEREOF,** the undersigned have executed this Lease Agreement effective as of the date first written above.

<div style="margin-left:40%">

LANDLORD:

[LANDLORD ENTITY],
a Delaware limited liability company

By:_____
Name: _____
Title: _____

</div>

STATE OF _____ )
                                )     SS.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of _____ 20\_\_\_ by _____ the _____ of _____, a Delaware limited liability company, on behalf of such company. This is an acknowledgement, and no oath or affirmation was administered to the signer of this instrument.

_____
Notary Public

TENANT:

[●],
a [●]

By:_____

Name: _____

Title: _____


STATE OF _____ )
                        )        SS.
COUNTY OF _____ )

      The foregoing instrument was acknowledged before me this _____ day of _____ 2021 by _____ the _____ of _____, a_____ limited liability company, on behalf of such company.  This is an acknowledgement, and no oath or affirmation was administered to the signer of this instrument.


_____

Notary Public

# EXHIBIT A
## TO
## LEASE AGREEMENT

### BASE RENT SCHEDULE[7]

| Lease Year | Annual Base Rent | Monthly Base Rent |
|---|---|---|
| **Initial Term** | | |
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

---

[7] <u>Note to Draft</u>: To be updated in accordance with the Master Lease.

**EXHIBIT B**
**TO**
**LEASE AGREEMENT**

**PREMISES**

Address:

Square Footage of Building:

Legal Description:

Case 23-90147 Doc 436 Filed 04/18/24 in TXSB Main Document Page 227 of 349

<u>**EXHIBIT C**</u>
<u>**TO**</u>
<u>**LEASE AGREEMENT**</u>

**GENERAL REQUIREMENTS AND CONDITIONS**

All provisions of this Exhibit are expressly subject to the provisions in the Lease above governing any work performed by Tenant (or an Affiliate of Tenant, as the case may be) on its own behalf, including Alterations or any casualty or condemnation restoration ("**Tenant's Work**"). In the event of any conflict between the Lease and this Exhibit, the Lease shall control.

Tenant's Work will be performed by Tenant in substantial accordance with final Plans approved by Landlord (where such approval is provided for in the Lease). Tenant's contractor(s) shall secure and pay for all necessary permits, inspections, certificates, legal approvals, certificates of occupancy and/or fees required by public authorities and/or utility companies with respect to Tenant's Work.

A. General Requirements

    1. All Tenant's Work shall be completed in a good and workmanlike manner and in accordance with the Plans as approved by Landlord, the terms of the General Construction Contract and the budget applicable to such Tenant's Work.

    2. Tenant and Tenant's contractors shall provide all insurance required by Landlord as set forth in this Lease, or as is otherwise maintained in the ordinary course by prudent and reputable contractors and/or property owners, prior to the start of any construction work within the Premises. Landlord and Landlord Mortgagee shall each be named as an additional insured in all such insurance.

    3. Tenant shall, at all times, keep or cause to be kept the Premises and the surrounding area free from accumulations of waste materials and/or rubbish caused by it or its contractors' employees or workers. Tenant and/or its contractors shall provide dumpsters and maintenance of said dumpsters during the construction period in a secure, neat and orderly condition and shall remove and empty the same on a regular basis to avoid unsightly, obstructive or hazardous accumulations or conditions.

B. Construction Procedures

    1. When submitting construction plans and specifications (preliminary, completed or final), Tenant or Tenant's appointed representative shall issue Tenant's plans, specifications and supporting documents electronically via emails to Landlord's construction coordinator.

    2. Once the applicable Plans are approved by Landlord, except for (A) changes required by governmental authorities having jurisdiction over the Premises or (B) interior changes requested by Tenant, and in each case which would not lessen the value of the Premises, Tenant shall not amend, modify or supplement the applicable

General Construction Contract in any respect, except pursuant to change orders approved by Landlord, and shall not attempt to terminate, whether by legal proceedings or otherwise, the applicable General Construction Contract without the prior written consent of Landlord, which shall not be unreasonably withheld, conditioned or delayed.

3.   Not later than ninety (90) days after the Final Completion of the applicable Tenant's Work, Tenant shall deliver or cause to be delivered to Landlord (with a copy to Landlord's consultant) each of the following (1) a certificate addressed to Landlord, signed by a duly authorized officer of Tenant and the applicable Architect or General Contractor (but only if such General Contractor is a design-builder for the applicable Tenant's Work), stating that the Tenant's Work (and any equipment therein) including all "punch list" items have been completed and installed in accordance with the applicable Plans therefor; (2) a complete release of liens for the Premises signed by the General Contractor and all subcontractors of the Tenant's Work and Tenant shall, if a release is not obtainable, in lieu of such release cause such lien to be removed of record by bond or otherwise so that such lienor has no recourse for recovery from or collection out of the Premises; (3) evidence of receipt of a certificate of occupancy, if available, or comparable instruments, by all governmental authorities whose approval is required of the applicable completed Tenant's Work for the occupancy thereof and the intended uses thereof; (4) if applicable, a volume containing all warranties and indemnities from the applicable contractor or manufacturer for the applicable Tenant's Work or equipment therein (excepting therefrom any of Tenant's Personal Property), each of which shall be enforceable by Landlord and all in customary form for the jurisdiction in which the Premises is situated; (5) final as-built Plans and, in the event that the Tenant's Work has modified the footprint of the Building, an as-built ALTA-ACSM Land Title Survey for the Premises indicating the applicable Tenant's Work thereon, together with a surveyor's certification in a customary form as reasonably satisfactory to Landlord; and (6) a title commitment dated no earlier than the date that is thirty (30) days after Final Completion and which title commitment shall not disclose any mechanics' liens affecting the Property, except that with respect to any bona fide dispute with the applicable General Contractor or any such subcontractor that has resulted in a lien, Tenant shall, if a release is not obtainable, in lieu of such release cause such lien to be removed of record by bond or otherwise so that such lienor has no recourse for recovery from or collection out of the Premises.

4.   Tenant hereby agrees to indemnify, save harmless, pay, protect and defend Landlord from and against any and all liabilities, losses, damages, penalties, costs, expenses (including Landlord's reasonable counsel fees and costs of suit), causes of action, suits, claims, demands or judgments of any nature whatsoever under this Lease or Landlord's ownership of the Premises arising from or in connection with (a) any General Construction Contract, if any, and any and all construction contracts or architect's agreement or resulting from the failure of Tenant to discharge Tenant's obligations thereunder or resulting from the failure of Tenant to perform its obligations under this Lease with respect to any instance of Tenant's Work, and (b) construction and completion of Tenant's Work, whether by reason

of any act or omission of Tenant, the General Contractor, Architect or by any other contractor, subcontractor or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable.

5.      Tenant's Work shall comply in all respects with applicable Law.

**EXHIBIT D**
**TO**
**LEASE AGREEMENT**

**FORM ESTOPPEL CERTIFICATE**
**ESTOPPEL CERTIFICATE**

This ESTOPPEL CERTIFICATE (this "Estoppel") is made as of _____, by [_____], a [_____] ("Tenant"), based upon the following facts and understandings of Tenant:

**RECITALS**

A.     Tenant is the tenant under that certain Lease Agreement (the "Lease"), dated as of _____, 2021, between Tenant and [LANDLORD ENTITY], a Delaware limited liability company, as landlord ("Landlord") of certain real property commonly known as _____, and as more particularly described in the Lease (the "Property").

B.     [[●], a [●] ("Guarantor") is the guarantor under that certain Unconditional Guaranty of Payment and Performance, dated as of _____, 2021, by Guarantor in favor of Landlord (the "Guaranty", and together with the Lease, collectively, the "Agreements").]

C.     Landlord has requested that Tenant provide this Estoppel pursuant to Section 27 of the Lease and Section XX of the Guaranty.

D.     [IF APPLICABLE] Landlord has agreed to convey the Property to _____, a _____ ("Purchaser"). As a condition to Purchaser purchasing the Property, Purchaser has required that Tenant furnish certain assurances to, and make certain agreements with, Purchaser, as set forth below.

E.     [IF APPLICABLE] [Landlord] [Purchaser], as borrower or as co-borrower with one or more other co-borrower(s), has applied to _____, a _____ (together with its successors and assigns, "Lender") for a loan ("Loan"), which will be secured by, among other things, a mortgage, encumbering the Property. As a condition to making the Loan, Lender has required that Tenant furnish certain assurances to, and make certain agreements with, Lender, as set forth below.

F.     Capitalized terms used but not otherwise defined herein shall have the definitions given such terms pursuant to the terms of the Lease.

THEREFORE, [as a material inducement to Lender to make the Loan and Purchaser to purchase the Property], Tenant warrants and represents to, and agrees with, Landlord [Lender] and [Purchaser] as follows:

1.     **ESTOPPEL.**

Tenant and Guarantor each warrants and represents to Landlord [Lender] and [Purchaser], as of the date hereof, that:

1.1 <u>Agreements Effective</u>.  Attached hereto as <u>Exhibit A-1</u> is a true, complete and accurate copy of the Lease. Attached hereto as <u>Exhibit A-2</u> is a true, complete and accurate copy of the Guaranty. The Agreements have been duly executed and delivered by Tenant and are in full force and effect, the obligations of Tenant thereunder are valid and binding, and there have been no modifications or additions to the Agreements, written or oral, other than those, if any, which are attached on <u>Exhibit A-1</u> and <u>Exhibit A-2</u> attached hereto and made a part hereof. There are no other promises, agreements, understandings or commitments between Landlord and Tenant relating to the Property, and Tenant has not given Landlord any notice of termination under the Lease.

1.2 <u>Possession</u>.  Except as set forth in <u>Exhibit B</u> attached hereto and made a part hereof, Tenant is in full and complete possession of the Property and has accepted the Property, including any tenant improvements or other work of Landlord performed thereon pursuant to the terms and provisions of the Lease, and the Property is in compliance with the Lease. There are no contributions, credits, free rent, rent abatements, deductions, concessions, rebates, unpaid or unreimbursed construction allowances, offsets or other sums due to Tenant from Landlord under the Lease, except _____.

1.3 <u>Minimum Rent</u>.  The current *monthly* Base Rent under the Lease is $_____, subject to any escalation and/or additional Rent charges provided in the Lease, and such Base Rent is current as of the date hereof.

1.4 <u>Additional Rent</u>.  The current *monthly* additional Rent under the Lease is $_____, and such additional Rent is current within thirty (30) days as of the date hereof.

1.5 <u>Rental Payment Commencement Date</u>.  The Base Rent stated in <u>Section 1.3</u> above began on _____, 2021.

1.6 <u>Rentable Area</u>.  The rentable area of the Building located upon the Premises is _____ square feet.

1.7 <u>Commencement Date</u>.  The Term of the Lease commenced on _____, 2021.

1.8 <u>Expiration Date</u>.  The Term of the Lease will expire on _____ (unless sooner terminated or extended in accordance with the Lease).

1.9 <u>Options to Renew or Extend</u>.  Tenant has no option to renew or extend the Term of the Lease, except as follows: _____ (if none, write "None").

1.10 <u>No Default</u>.  There exists no breach, default, or event or condition which, with the giving of notice or the passage of time or both, would constitute a breach or default

under the Agreements by Tenant or, to Tenant's knowledge, Landlord, except as follows: _____(if none, write "None"). Tenant has no existing claims, defenses or offsets against Rent due or to become due under the Lease, except as follows: _____(if none, write "None").

1.11 <u>Entire Agreement</u>. The Agreements constitute the entire agreement between Landlord and Tenant with respect to the Property, and Tenant claims no rights of any kind whatsoever with respect to the Property, other than as set forth in the Lease, except as follows: _____(if none, write "None").

1.12 <u>No Deposits or Prepaid Rent</u>. No deposits, including security deposits, or prepayments of Rent have been made in connection with the Lease, except: _____ (if none, write "None"). None of the Rent has been paid more than one (1) month in advance.

1.13 <u>No Purchase Option or Preferential Right to Purchase</u>. Tenant does not have any option or preferential right to purchase all or any part of the Property, except as follows: _____.

1.14 <u>Authority</u>. The undersigned representatives of Tenant are each duly authorized and fully qualified to execute this instrument on behalf of Tenant thereby binding Tenant.

1.15 <u>Financial Condition; Bankruptcy</u>. There are no voluntary or involuntary actions pending against Tenant under the bankruptcy laws of the United States or any state thereof.

2. **<u>HEIRS, SUCCESSORS AND ASSIGNS</u>**. The covenants herein shall be binding upon, and inure to the benefit of, the heirs, successors and assigns of the parties hereto. Whenever necessary or appropriate to give logical meaning to a provision of this Estoppel, the term "Landlord" shall be deemed to mean the then current owner of the Property and the landlord's interest in the Lease.

**[Signature Page to Follow]**

IN WITNESS WHEREOF, Tenant has executed this instrument as of the date first listed above.

**TENANT:**

[_____],
a [_____]

By:_____
Name: _____
Title: _____

**[GUARANTOR:**

[_____],
a [_____]

By:_____
Name: _____
Title: _____]

**Exhibit A-1**

**LEASE AND AMENDMENTS (IF ANY)**

**[Attached]**

**Exhibit A-2**

**GUARANTY AND AMENDMENTS (IF ANY)**

**[Attached]**

**Exhibit B**

**SUBLEASES (IF ANY)**

**[Attached]**

**EXHIBIT E**
**TO**
**LEASE AGREEMENT**

**FORM OF MEMORANDUM OF LEASE**

RECORD AND RETURN TO:

_____

_____

_____

**MEMORANDUM OF LEASE AGREEMENT**

THIS MEMORANDUM OF LEASE AGREEMENT (this "**Memorandum**") is made as of this ____ day of _____, 2021, by and between [LANDLORD ENTITY], a Delaware limited liability company ("**Landlord**"), and [_____], a [_____] ("**Tenant**").

1.      Memorandum of Lease of Premises.  This Memorandum is recorded in connection with, and as evidence of, that certain Master Lease Agreement (the "**Lease**") dated as of _____ _____, 2021, as may be amended from time to time, by and between Landlord and Tenant for that certain real property and the improvements thereon described on Exhibit A attached hereto and made a part hereof (the "**Premises**").  The Lease is incorporated by reference into this Memorandum.  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Lease.

2.      Lease Term and Certain Other Provisions.  The initial Term of the Lease commenced on _____, 20__ and expires on _____, 20__. Tenant has [_____] options to extend the initial Term of the Lease pursuant to the applicable provisions thereof for an additional term of [.] years each.

3.      Subordination.  The Lease shall be subordinate at all times to any Landlord Mortgage and the rights of any Landlord Mortgagee; provided, however, in the event of a foreclosure under any such Landlord Mortgage, or conveyance or assignment in lieu of foreclosure or by deed in lieu of foreclosure, such Landlord Mortgagee and its successors and assigns shall not disturb the occupancy or other rights of Tenant under the terms of the Lease so long as no Event of Default exists thereunder.

4.      Purpose of Memorandum; Conflicting Provisions.  The purpose of this Memorandum is to make the Lease a matter of public record.  If a provision of this Memorandum conflicts with a provision in the Lease, the provision in the Lease will control.

5.      Counterparts.  This Memorandum may be executed in multiple counterparts, each of which shall be deemed an original instrument, and all of which, taken together, shall constitute

one and the same instrument.  The signature of a party hereto to any counterpart hereof shall be deemed a signature to, and may be appended to, any other counterpart hereof

**[Signature Pages Follow]**

IN WITNESS WHEREOF, Landlord and Tenant have duly executed this Memorandum of Lease Agreement as of the day and year first above written.

<div style="text-align:center">

LANDLORD:

[LANDLORD ENTITY], a Delaware
limited liability company

</div>

By:_____
Name: _____
Title: _____

STATE OF _____ )
COUNTY OF _____ )

     I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that _____, whose name as _____ of _____, a Delaware limited liability company, is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of said instrument, he, as such [officer] and with full authority, executed the same voluntarily for and as the act of said [corporation], acting in its capacity as _____ of said limited liability company as aforesaid.

     Given under my hand and official seal, this _____ day of _____, 20___.

_____
Notary Public

AFFIX SEAL

My commission expires: _____

**EXHIBIT A**
**Legal Description of Premises**

**[EXHIBIT F
TO
LEASE AGREEMENT**


**FORM OF SNDA][8]**

---

[8]     To be determined based on final form of Master Lease SNDA exhibit.

**EXHIBIT G**
**TO**
**LEASE AGREEMENT**[9]

**FORM OF GUARANTY**

**UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE**

THIS **UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE** (this "**Guaranty**") is made as of [●], 2021 by [●], a [●] ("**Guarantor**"), to [●], a Delaware limited liability company ("**Landlord**").

**R E C I T A L S**

A.      Landlord has been requested by [●], a [●] ("**Tenant**"), to enter into that certain Lease Agreement, dated as of the date hereof (the "**Lease**"), for the Premises (as defined in the Lease).

B.      Tenant is a subsidiary of Guarantor and Guarantor will derive substantial economic benefit from the execution and delivery of the Lease.

C.      Guarantor acknowledges that Landlord would not enter into the Lease unless this Guaranty accompanied the execution and delivery of the Lease.

D.      Guarantor hereby acknowledges receipt of a copy of the Lease.

**NOW, THEREFORE**, in consideration of the execution and delivery of the Lease and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor covenants and agrees as follows:

1.      **DEFINITIONS.**  Defined terms used in this Guaranty and not otherwise defined herein have the meanings assigned to them in the Lease.

2.      **COVENANTS OF GUARANTOR**.

A.      Guarantor absolutely, unconditionally and irrevocably guarantees, as a primary obligor and not merely as a surety: (i) the full and prompt payment of all Base Rent, Additional Rent and all other sums and charges of every type and nature payable by Tenant under the Lease, whether due by acceleration or otherwise, including costs and expenses of collection (collectively, the "**Monetary Obligations**"), and (ii) the full, timely and complete performance of all covenants, terms, conditions, obligations, indemnities and agreements to be performed by Tenant under the Lease, including any indemnities or other obligations of Tenant that survive the expiration or earlier termination of the Lease (all of the obligations described in clauses (i) and (ii) are collectively referred to herein as the "**Obligations**").  If

---

[9] Note to Draft: To be removed if Mountain Express Oil Company is the Tenant.

Tenant defaults under the Lease, Guarantor will promptly pay and perform all of the Obligations and pay to Landlord, when and as due, all Monetary Obligations payable by Tenant under the Lease, together with all damages, costs and expenses to which Landlord is entitled pursuant to any or all of the Lease and this Guaranty.

B. Guarantor agrees with Landlord that (i) any action, suit or proceeding of any kind or nature whatsoever (an "**Action**") commenced by Landlord against Guarantor to collect Base Rent, Additional Rent and any other sums and charges due under the Lease for any month or months shall not prejudice in any way Landlord's rights to collect any such amounts due for any subsequent month or months throughout the Lease Term in any subsequent Action, (ii) Landlord may, at its option, without prior notice or demand, join Guarantor in any Action against Tenant in connection with or based upon either or both of the Lease and any of the Obligations, (iii) Landlord may seek and obtain recovery against Guarantor in an Action (to the extent related to or based upon either or both of the Lease and any of the Obligations) against Tenant or in any independent Action (to the extent related to or based upon either or both of the Lease and any of the Obligations) against Guarantor without Landlord first asserting, prosecuting, or exhausting any remedy or claim against Tenant or against any security of Tenant held by Landlord under the Lease, (iv) Landlord may (but shall not be required to) exercise its rights against each of Guarantor and Tenant concurrently, and (v) Guarantor will be conclusively bound by a judgment entered in any Action (to the extent related to or based upon either or both of the Lease and any of the Obligations) in favor of Landlord against Tenant, as if Guarantor were a party to such Action, irrespective of whether or not Guarantor is entered as a party or participates in such Action.

C. Guarantor agrees that, in the event of the rejection or disaffirmance of the Lease by Tenant or Tenant's trustee in bankruptcy, pursuant to bankruptcy law or any other law affecting creditors' rights, Guarantor will, if Landlord so requests, assume all obligations and liabilities of Tenant under the Lease, to the same extent as if Guarantor was a party to such document and there had been no such rejection or disaffirmance, and Guarantor will confirm such assumption, in writing, at the request of Landlord upon or after such rejection or disaffirmance. Guarantor, upon such assumption, shall have all rights of Tenant under the Lease to the fullest extent permitted by law.

3. **<u>GUARANTOR'S OBLIGATIONS UNCONDITIONAL</u>.**

A. This Guaranty is an absolute and unconditional guaranty of payment and of performance, and not of collection, and shall be enforceable against Guarantor without the necessity of the commencement by Landlord of any Action against Tenant, and without the necessity of any notice of nonpayment, nonperformance or nonobservance, or any notice of acceptance of this Guaranty, or of any other notice or demand to which Guarantor might otherwise be entitled, all of which Guarantor hereby expressly waives in advance. The obligations of Guarantor hereunder are independent of, and may exceed, the obligations of Tenant.

B.      This Guaranty shall apply notwithstanding any extension or renewal of the Lease, or any holdover following the expiration or termination of the Lease Term or any renewal or extension of the Lease Term.

C.      This Guaranty is a continuing guarantee and will remain in full force and effect notwithstanding, and the liability of Guarantor hereunder shall be absolute and unconditional irrespective of any or all of the following: (i) any renewals, extensions, modifications, alterations or amendments of the Lease (regardless of whether Guarantor consented to or had notice of same); (ii) any releases or discharges of Tenant other than the full release and complete discharge of all of the Obligations; (iii) Landlord's failure or delay to assert any claim or demand or to enforce any of its rights against Tenant; (iv) any extension of time that may be granted by Landlord to Tenant; (v) any assignment or transfer of all or any part of Tenant's interest under the Lease (whether by Tenant, by operation of law, or otherwise); (vi) any subletting, concession, franchising, licensing or permitting of the Premises or any portion thereof; (vii) any changed or different use of the Premises (or any portion thereof); (viii) any other dealings or matters occurring between Landlord and Tenant; (ix) the taking by Landlord of any additional guarantees, or the receipt by Landlord of any collateral, from Tenant or any other persons or entities; (x) the release by Landlord of any other guarantor; (xi) Landlord's release of any security provided under the Lease; (xii) Landlord's failure to perfect any Landlord's lien or other lien or security interest available under any applicable statutes, ordinances, rules, regulations, codes, orders, requirements, directives, binding written interpretations and binding written policies, rulings, and decrees of all local, municipal, state and federal governments, departments, agencies, commissions, boards or political subdivisions ("**Laws**"); (xiii) any assumption by any person of any or all of Tenant's obligations under the Lease, or Tenant's assignment of any or all of its rights and interests under the Lease; (xiv) the power or authority or lack thereof of Tenant to execute, acknowledge or deliver the Lease; (xv) the existence, non-existence or lapse at any time of Tenant as a legal entity or the existence, non-existence or termination of any corporate, ownership, business or other relationship between Tenant and Guarantor; (xvi) any sale or assignment by Landlord of either or both of this Guaranty and the Lease (including, but not limited to, any direct or collateral assignment by Landlord to any mortgagee); (xvii) the solvency or lack of solvency of Tenant at any time or from time to time; or (xviii) any other cause, whether similar or dissimilar to any of the foregoing, that might constitute a legal or equitable discharge of Guarantor (whether or not Guarantor shall have knowledge or notice thereof). Without in any way limiting the generality of the foregoing, Guarantor specifically agrees that (A) if Tenant's obligations under the Lease are modified or amended with the express written consent of Landlord, this Guaranty shall extend to such obligations as so amended or modified without notice to, consideration to, or the consent of, Guarantor, and (B) this Guaranty shall be applicable to any obligations of Tenant arising in connection with a termination of the Lease, whether voluntary or otherwise. Guarantor hereby consents, prospectively, to Landlord's taking or entering into any or all of the foregoing actions or omissions.

D.  Guarantor hereby expressly agrees that the validity of this Guaranty and the obligations of Guarantor hereunder shall in no way be terminated, affected, diminished or impaired by reason of the assertion or the failure to assert by Landlord against Tenant, of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease or by relief of Tenant from any of Tenant's obligations under the Lease or otherwise by (i) the release or discharge of Tenant in any state or federal creditors' proceedings, receivership, bankruptcy or other proceeding; (ii) the impairment, limitation or modification of the liability of Tenant or the estate of Tenant in bankruptcy, or of any remedy for the enforcement of Tenant's liability under the Lease, resulting from the operation of any present or future provision of the United States Bankruptcy Code (11 U.S.C. § 101 et seq., as amended), or from other statute, or from the order of any court; or (iii) the rejection, disaffirmance or other termination of the Lease in any such proceeding. This Guaranty shall continue to be effective if at any time the payment of any amount due under the Lease or this Guaranty is rescinded or must otherwise be returned by Landlord for any reason, including, without limitation, the insolvency, bankruptcy, liquidation or reorganization of Tenant, Guarantor or otherwise, all as though such payment had not been made, and, in such event, Guarantor shall pay to Landlord an amount equal to any such payment that has been rescinded or returned.

**4.  <u>WAIVERS OF GUARANTOR.</u>**

A.  Without limitation of the foregoing, Guarantor waives (i) notice of acceptance of this Guaranty, protest, demand and dishonor, presentment, and demands of any kind now or hereafter provided for by any statute or rule of law or equity, (ii) notice of any actions taken by Landlord or Tenant under the Lease or any other agreement or instrument relating thereto, (iii) notice of any and all defaults by Tenant in the payment of Base Rent, Additional Rent or any other charges or amounts, or of any other defaults by Tenant under the Lease, (iv) all other notices, demands and protests, and all other formalities of every kind in connection with the enforcement of the Obligations, omission of or delay in which, but for the provisions of this <u>Section 4</u>, might constitute grounds for relieving Guarantor of its obligations hereunder, (v) any requirement that Landlord protect, secure, perfect, insure or proceed against any security interest or lien, or any property subject thereto, or exhaust any right or take any action against Tenant or any other person or entity (including any additional guarantor or Guarantor) or against any collateral, and (vi) the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty.

B.  GUARANTOR HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY PERSON OR ENTITY WITH RESPECT TO ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH: (A) THIS GUARANTY; (B) THE LEASE; (C) ANY LIABILITY OR OBLIGATION OF TENANT IN ANY MANNER RELATED TO THE PREMISES OR ANY PORTION THEREOF; (D) ANY CLAIM OF INJURY OR DAMAGE IN ANY WAY RELATED TO THE LEASE AND/OR THE PREMISES (OR ANY PORTION THEREOF); (E) ANY

ACT OR OMISSION OF TENANT, ITS AGENTS, EMPLOYEES, CONTRACTORS, SUPPLIERS, SERVANTS, CUSTOMERS, CONCESSIONAIRES, FRANCHISEES, PERMITTEES OR LICENSEES; OR (F) ANY ASPECT OF THE USE OR OCCUPANCY OF, OR THE CONDUCT OF BUSINESS IN, ON OR FROM THE PREMISES (OR ANY PORTION THEREOF). GUARANTOR SHALL NOT IMPOSE ANY COUNTERCLAIM OR COUNTERCLAIMS OR CLAIMS FOR SET-OFF, RECOUPMENT OR DEDUCTION OF RENT IN ANY ACTION BROUGHT BY LANDLORD AGAINST GUARANTOR UNDER THIS GUARANTY, EXCEPT TO THE EXTENT ANY SUCH COUNTERCLAIM OR COUNTERCLAIMS OR CLAIMS FOR SET-OFF, RECOUPMENT OR DEDUCTION OF RENT IN ANY ACTION ARE MANDATORY PURSUANT TO APPLICABLE LAWS. GUARANTOR HEREBY WAIVES, BOTH WITH RESPECT TO THE LEASE AND WITH RESPECT TO THIS GUARANTY, ANY AND ALL RIGHTS WHICH ARE WAIVED BY TENANT UNDER THE LEASE, IN THE SAME MANNER AS IF ALL SUCH WAIVERS WERE FULLY RESTATED HEREIN. THE LIABILITY OF GUARANTOR UNDER THIS GUARANTY IS PRIMARY AND UNCONDITIONAL.

C.   Guarantor expressly waives any and all rights to defenses arising by reason of (i) any "one-action" or "anti-deficiency" law or any other law that may prevent Landlord from bringing any action, including a claim for deficiency, against Guarantor before or after Landlord's commencement or completion of any action against Tenant; (ii) ANY ELECTION OF REMEDIES BY LANDLORD (INCLUDING, WITHOUT LIMITATION, ANY TERMINATION OF THE LEASE) THAT DESTROYS OR OTHERWISE ADVERSELY AFFECTS GUARANTOR'S SUBROGATION RIGHTS OR GUARANTOR'S RIGHTS TO PROCEED AGAINST TENANT FOR REIMBURSEMENT; (iii) any disability, insolvency, bankruptcy, lack of authority or power, death, insanity, minority, dissolution, or other defense of Tenant, of any other guarantor (or any other Guarantor), or of any other person or entity, or by reason of the cessation of Tenant's liability from any cause whatsoever; (iv) any right to claim discharge of any or all of the Obligations on the basis of unjustified impairment of any collateral for the Obligations; (v) any change in the relationship between Guarantor and Tenant or any termination of such relationship; (vi) any irregularity, defect or unauthorized action by any or all of Tenant, any other guarantor (or Guarantor) or surety, or any of their respective officers, directors or other agents in executing and delivering any instrument or agreements relating to the Obligations or in carrying out or attempting to carry out the terms of any such agreements; (vii) any assignment, endorsement or transfer, in whole or in part, of the Obligations, whether made with or without notice to or consent of Guarantor; (viii) the recovery from Tenant or any other Person (including without limitation any other guarantor) becoming barred by any statute of limitations or being otherwise prevented; (ix) the benefits of any and all applicable statutes, laws, rules or regulations which may require the prior or concurrent joinder of any other party to any action on this Guaranty; (x) any release or other reduction of the Obligations arising as a result of the expansion, release, substitution, deletion, addition, or replacement (whether or

not in accordance with the terms of the Lease) of the Premises or any portion thereof; or (xi) any neglect, delay, omission, failure or refusal of Landlord to take or prosecute any action for the collection or enforcement of any of the Obligations or to foreclose or take or prosecute any action in connection with any lien or right of security (including perfection thereof) existing or to exist in connection with, or as security for, any of the Obligations, it being the intention hereof that Guarantor shall remain liable as a principal on the Obligations notwithstanding any act, omission or event that might, but for the provisions hereof, otherwise operate as a legal or equitable discharge of Guarantor. Guarantor hereby waives all defenses of a surety to which it may be entitled by statute or otherwise.

5. **SUBORDINATION AND SUBROGATION**. Guarantor shall not be subrogated, and hereby subordinates and postpones any claim or right against Tenant by way of subrogation or otherwise, to any of the rights of Landlord under the Lease or otherwise, or in the Premises (or any portion thereof), which may arise by any of the provisions of this Guaranty or by reason of the performance by Guarantor of any of its Obligations hereunder. Guarantor shall look solely to Tenant for any recoupment of any payments made or costs or expenses incurred by Guarantor pursuant to this Guaranty. If any amount shall be paid to Guarantor on account of such subrogation rights at any time when all of the Obligations shall not have been paid and performed in full, Guarantor shall immediately deliver the payment to Landlord for credit against the then outstanding balance of the Obligations, whether matured or unmatured.

6. **REPRESENTATIONS AND WARRANTIES OF GUARANTOR.** Guarantor represents and warrants that:

A. Guarantor is a company formed under the laws of the State of [____]; has all requisite power and authority to enter into and perform its obligations under this Guaranty; and this Guaranty is valid and binding upon and enforceable against Guarantor without the requirement of further action or condition.

B. The execution, delivery and performance by Guarantor of this Guaranty does not and will not (i) contravene any applicable Laws, the organizational documents of Guarantor, if applicable, any order, writ, injunction, decree applicable to Guarantor, or any contractual restriction binding on or affecting Guarantor or any of its properties or assets, nor (ii) result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of its properties or assets.

C. No approval, consent, exemption, authorization or other action by, or notice to, or filing with, any governmental authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, Guarantor of this Guaranty or any other instrument or agreement required hereunder.

D. There is no action, suit or proceeding pending or, to Guarantor's knowledge, threatened against or otherwise affecting Guarantor before any court or other governmental authority or any arbitrator that may materially adversely affect Guarantor's ability to perform its obligations under this Guaranty.

E.      Guarantor's principal place of business is 5333 Bells Ferry Road, Suite 201, Acworth, Georgia 30102.

F.      Tenant is directly or indirectly owned and controlled by Guarantor.

G.      Guarantor has derived or expects to derive financial and other advantages and benefits directly or indirectly, from the making of the Lease and the payment and performance of the Obligations. Guarantor hereby acknowledges that Landlord will be relying upon Guarantor's guarantee, representations, warranties and covenants contained herein.

7.      **FINANCIAL STATEMENTS**. Within forty-five (45) days after the end of each calendar quarter, Guarantor shall deliver to Landlord complete financial statements of the Guarantor, and, within ninety (90) days after the end of each calendar year, Guarantor shall deliver to Landlord complete audited financial statements, in each case including a balance sheet, profit and loss statement, top-line gross receipts report showing unit-level EBITDAR, statement of changes in financial condition, income statement with respect to the Property, annual EBITDA projections for the then-current fiscal year of Tenant and all other related schedules for the fiscal period then ended.

8.      **NOTICES.**   Any consents, notices, demands, requests, approvals or other communications given under this Guaranty shall be in writing and shall be given as provided in the Lease, as follows or to such other addresses as either Landlord or Guarantor (as applicable) may designate by notice given to the other in accordance with the provisions of this Section 8:

If to Guarantor:                                       If to Landlord:

[●]                                                   c/o Oak Street Real Estate Capital, LLC
[●]                                                   30 N. LaSalle Street, Suite 4140
[●]                                                   Chicago, Illinois 60602
Attn: [●]                                             Attn: Michael Reiter
Email: [●]                                            Email: Michael.reiter@blueowl.com

With a copy to:                                       With a copy to:

[●]                                                   Kirkland & Ellis LLP
[●]                                                   300 North LaSalle Street
[●]                                                   Chicago, IL 60654
Attn: [●]                                             Attn: David A. Rosenberg, Esq.
Email: [●]                                            Email: david.rosenberg@kirkland.com

9.      **CONSENT TO JURISDICTION**.  Guarantor hereby (a) consents and submits to the jurisdiction of the courts of the State of Illinois and the federal courts sitting in the State of Illinois with respect to any dispute arising, directly or indirectly, out of this Guaranty, (b) waives any objections which the undersigned may have to the laying of venue in any such suit, action or proceeding in either such court, (c) agrees to join Landlord in any petition for removal to either such court, and (d) irrevocably designates and appoints Tenant as its authorized agent to accept

and acknowledge on its behalf service of process with respect to any disputes arising, directly or indirectly, out of this Guaranty. The undersigned hereby acknowledges and agrees that Landlord may obtain personal jurisdiction and perfect service of process through Tenant as the undersigned agent, or by any other means now or hereafter permitted by Applicable Law.

10. **ESTOPPEL CERTIFICATE**. Guarantor shall, from time to time within fifteen (15) days after receipt of Landlord's request, execute, acknowledge and deliver to Landlord an estoppel certificate in the form attached to the Lease as Exhibit D. Such certificate may be relied upon by Landlord and any prospective purchaser, landlord or lender of all or a portion of the Premises (or any portion thereof).

11. **MISCELLANEOUS**.

A. Guarantor further agrees that Landlord may, without notice, assign this Guaranty in whole or in part. If Landlord disposes of its interest in the Lease, "**Landlord**," as used in this Guaranty, shall mean Landlord's successors and assigns.

B. Guarantor promises to pay all costs of collection or enforcement incurred by Landlord in exercising any remedies provided for in the Lease or this Guaranty whether at law or in equity; provided, however, if any legal action or proceeding is commenced to interpret or enforce the terms of, or obligations arising out of, this Guaranty, or to recover damages for the breach thereof, the party prevailing in any such action or proceedings shall be entitled to recover from the non-prevailing party all attorneys' fees and reasonable costs and expenses incurred by the prevailing party. As used herein, "attorneys' fees" shall mean the fees and expenses of counsel to the parties hereto, which may include printing, photocopying, duplicating and other expenses, air freight charges, and fees billed for law clerks, paralegals, librarians and others not admitted to the bar but performing services under the supervision of an attorney. The term "attorneys' fees" shall also include, without limitation, all such fees and expenses incurred with respect to appeals, arbitrations and bankruptcy proceedings.

C. If any portion of this Guaranty shall be deemed invalid, unenforceable or illegal for any reason, such invalidity, unenforceability or illegality shall not affect the balance of this Guaranty, which shall remain in full force and effect to the maximum permitted extent.

D. The provisions, covenants and guaranties of this Guaranty shall be binding upon Guarantor and its heirs, successors, legal representatives and assigns (it being understood that Guarantor shall not have the right to assign its obligations under this Guaranty without the prior written consent of Landlord in Landlord's sole and absolute discretion), and shall inure to the benefit of Landlord and its successors and assigns, and shall not be deemed waived or modified unless such waiver or modification is specifically set forth in writing, executed by Landlord or its successors and assigns, and delivered to Guarantor.

E.      Whenever the words "include", "includes", or "including" are used in this Guaranty, they shall be deemed to be followed by the words "without limitation", and, whenever the circumstances or the context requires, the singular shall be construed as the plural, the masculine shall be construed as the feminine and/or the neuter and <u>vice</u> <u>versa</u>.  This Guaranty shall be interpreted and enforced without the aid of any canon, custom or rule of law requiring or suggesting construction against the party drafting or causing the drafting of the provision in question.

F.      Each of the rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law or in the Lease or this Guaranty.

G.      The provisions of this Guaranty shall be governed by and interpreted solely in accordance with the internal laws of the State of Illinois, without giving effect to the principles of conflicts of law.

I.      The Recitals set forth above are hereby incorporated by this reference and made a part of this Guaranty.  Guarantor hereby represents and warrants that the Recitals are true and correct.

SIGNATURE PAGE TO FOLLOW

IN WITNESS WHEREOF, the undersigned has executed this Unconditional Guaranty of Payment and Performance effective as of the date first written above.

**GUARANTOR:**

[●], a [●]

By:_____

Name: _____

Its: _____

**FIRST AMENDMENT TO**
**AMENDED AND RESTATED MASTER LEASE AGREEMENT**
**(OAK TRUST)**

This First Amendment to Amended and Restated Master Lease Agreement (Oak Trust) (the "Amendment") is made and entered into as of January 16, 2023 (the "Effective Date"), by and between the entities listed as Landlord on the signature page hereto ("Landlord"), and the entities listed as Tenant on the signature page hereto ("Tenant"), and acknowledged and agreed to by Mountain Express Oil Company, a Georgia Corporation ("Mountain Express"), as guarantor of the Master Lease (as defined below), Turjo Wadud, an individual residing in the State of Georgia, and Lamar Frady, an individual residing in the State of Georgia (together, the "MEX Principals").

RECITALS:

A.     Landlord and Tenant entered into that certain Amended and Restated Master Lease Agreement (Oak Trust) dated as of January 1, 2023 (as amended from time to time, the "Master Lease"), with respect to the properties more particularly described therein (individually and/or collectively, as the context may require, the "Properties"). All capitalized terms not otherwise defined herein have the meanings assigned to such terms in the Master Lease.

B.     Landlord and Tenant now desire to amend the Master Lease upon the terms and conditions contained herein.

AGREEMENT:

NOW, THEREFORE, for Ten and No/100 Dollars and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.     **Additional Advance**. Within one (1) business day after the Effective Date, Landlord will fund One Million Six Hundred Fifty-Five Thousand Four Hundred Twenty-Seven and 10/100 Dollars ($1,655,427.10) (the "Additional Advance") into an escrow account (the "Escrow Account") held by Old Republic Title Insurance Company ("Escrow Agent"), pursuant to an escrow agreement entered into between Landlord and Escrow Agent. Upon request by Tenant, Landlord shall provide to Tenant reasonable evidence that the Additional Advance has been deposited into the Escrow Account. The fee of Five Hundred and No/100 Dollars ($500.00) charged by the Escrow Agent to maintain the Escrow Account shall be paid from the Additional Advance. Landlord and Tenant hereby acknowledge and agree that such Additional Advance shall be deemed to be added to the purchase price paid by Landlord for the Properties and shall be allocated proportionately among the Properties in proportion to the applicable purchase price previously paid by the applicable Landlord for the applicable Properties.

2.     **Base Rent**. As of the Effective Date, Exhibit A of the Master Lease is hereby deleted and replaced in its entirety with Exhibit A attached hereto, reflecting (i) an increase in the Base Rent to take into account the Additional Advance, and (ii) a ten percent (10%) increase in the Base Rent commencing as of April 1, 2023. As of the Effective Date, Exhibit B-2 of the Master Lease is hereby deleted and replaced in its entirety with Exhibit B-2 attached hereto, reflecting (x) an increase in the Allocated Base Rent to take into account the Additional Advance, and (y) a ten

percent (10%) increase in the Allocated Base Rent commencing as of April 1, 2023. However, if, and only if, the New Capital Requirement (as defined below) is satisfied in the required timeframes set forth in Section 6 below, then (A) such ten percent (10%) Base Rent increase described in the foregoing clauses (ii) and (y) shall be null and void, (B) Landlord shall credit back to Tenant the incremental Base Rent reflecting such ten percent (10%) increase to the extent actually paid by Tenant prior to the New Capital Requirement being satisfied (which credit may, at Landlord's election, be in the form of a cash payment by Landlord to Tenant or in the form of an offset by Tenant against Base Rent payable to Landlord on the next succeeding Base Rent payment dates), and (C) the columns on Exhibit A and Exhibit B-2 of the Master Lease setting forth amounts of Base Rent and Allocated Base Rent that do not reflect such ten percent (10%) increase shall thereafter be applicable.

3. **Disbursements from Escrow Account**. The Additional Advance shall be disbursed from the Escrow Account as follows:

(a) Provided that no new or additional Event of Default (i.e., excluding (x) Events of Default that exist as of the Effective Date and (y) Events of Default that occur after the Effective Date but that are caused solely by events that occurred or conditions that existed prior to the Effective Date) (a "Prospective Event of Default") has occurred and is continuing:

(i) On the Effective Date, Landlord shall direct Escrow Agent to disburse (A) a portion of the Additional Advance equal to Seven Thousand and No/100 Dollars ($7,000.00) from the Escrow Account to Landlord to be applied to the Base Rent that was due and payable by Tenant to Landlord on October 1, 2022, and (B) a portion of the Additional Advance equal to Eight Hundred Fifty-Nine Thousand Four Hundred Ninety-Five and No/100 Dollars ($859,495.00) from the Escrow Account to Landlord to be applied to the Base Rent that was due and payable by Tenant to Landlord on January 1, 2023 under the Master Lease.

(ii) On or before February 1, 2023, Landlord shall direct Escrow Agent to disburse a portion of the Additional Advance equal to Eight Hundred Eighty-Seven Thousand Four Hundred Seventeen and 42/100 Dollars ($887,417.42) from the Escrow Account to Landlord to be applied to the Base Rent due and payable by Tenant to Landlord on February 1, 2023 under the Master Lease.

(iii) On or before March 1, 2023, Landlord shall direct Escrow Agent to disburse a portion of the Additional Advance equal to Eight Hundred Eighty-Seven Thousand Four Hundred Seventeen and 42/100 Dollars ($887,417.42) from the Escrow Account to Landlord to be applied to the Base Rent due and payable by Tenant to Landlord on March 1, 2023 under the Master Lease.

(b) If a Prospective Event of Default has occurred and is continuing, Landlord shall have the right, in its sole and absolute discretion, to direct Escrow Agent to disburse any remaining Additional Advance from the Escrow Account to Landlord. If Landlord elects to cause any such portion of the Additional Advance to be disbursed from the Escrow

2

Account pursuant to this Section 3(b), Landlord shall notify Tenant thereof promptly thereafter.

(c) Unless a Prospective Event of Default has occurred and is continuing, it shall not be an Event of Default under the Lease (including for purposes of this Section 3) if Tenant fails to pay Base Rent on the Effective Date, February 1, 2023 or March 1, 2023 if such failure results from the Landlord's or Escrow Agent's failure to disburse the Additional Advance and apply it to Base Rent.

4. **Cooperation**. Upon the occurrence of any Event of Default, Tenant, Mountain Express and the MEX Principals shall cooperate with Landlord in all respects, at the sole cost and expense of Mountain Express, to transfer operation of all or any portion of the Sites (as determined by Landlord) to a replacement operator designated by Landlord. Without limitation of the foregoing, within ten (10) days after the Effective Date, Tenant, Mountain Express and the MEX Principals shall deliver to Landlord executed pledge agreements, in form and substance reasonably satisfactory to Landlord, pledging in favor of Landlord (x) one hundred percent (100%) of the equity interests in each Tenant (and any other entity that owns assets used in the operation of the Properties) and (y) all of the operating assets used in the operation of the Properties (collectively, the "Pledges"), which Pledges shall be enforceable by Landlord upon the occurrence of any Event of Default; provided, however, that, if delivery of such Pledges is prohibited by the express terms and conditions of the credit documents evidencing and securing the indebtedness of Mountain Express as of the Effective Date, then Tenant, Mountain Express and MEX Principals shall not be so required to deliver such Pledges so long as such prohibition remains in effect; provided, further, that Tenant, Mountain Express and MEX Principals shall use good faith, best efforts to cause the applicable lenders with respect to such credit documents to modify or waive such prohibitions to permit the Pledges to be provided to Landlord. Notwithstanding the foregoing, but without limitation of any other provisions of the Master Lease, the foregoing obligations of Mountain Express and the MEX Principals to so cooperate with such transfer of operations shall not apply (a) to any Event of Default caused solely by the failure of Mountain Express and/or Tenant, as applicable, to comply with financial covenants set forth in Section 31(B) of the Master Lease, financial reporting requirements in Sections 31(C) and 31(D) of the Master Lease or notice requirements under Section 33 the Master Lease nor (b) to any Event of Default first occurring after September 30, 2024.

5. **Cooperation Regarding Amendments**. Prior to March 31, 2023, Landlord and Tenant agree to negotiate in good faith with respect to amendments to certain reporting, financial and audit covenants contained in Section 31 of the Master Lease to reflect the current circumstances in and condition of the Mountain Express business, provided that, for the avoidance of doubt, the foregoing shall not require Landlord to agree to any such amendments that it in good faith does not approve.

6. **New Capital Requirement**. The MEX Principals shall (and, to the extent the MEX Principals do not have sufficient capital to do so, shall use their best efforts to cause one or more third parties to) contribute at least Ten Million and No/100 Dollars ($10,000,000.00) in new capital into Mountain Express, in the form of a cash contribution to be structured as subordinated debt and/or equity, in the amounts and within the timeframes as follows (the "New Capital Requirement"): (i) no later than March 31, 2023, Two Million and No/100 Dollars

($2,000,000.00); (ii) no later than June 30, 2023, an additional Two Million and No/100 Dollars ($2,000,000.00); and (iii) no later than September 30, 2023, an additional Six Million and No/100 Dollars ($6,000,000.00). The failure to satisfy the New Capital Requirement shall constitute an Event of Default but shall not constitute a direct claim or liability against the MEX Principals.

7. **Costs**. On the Effective Date, Mountain Express will pay or reimburse (as applicable) Landlord's reasonable and documented costs and expenses (including, without limitation, reasonable attorney's fees and other legal costs) incurred in connection with the transaction contemplated by this Amendment (which amount may be funded by Landlord and certain of its affiliates as part of the Additional Advance and capitalized into the Master Lease as described above).

8. **Intentionally Deleted**.

9. **Representations and Warranties**. As of the Effective Date, each of Tenant and Mountain Express each represents and warrants to Landlord as follows:

(a) Each of Tenant and Mountain Express is duly organized, validly existing, and in good standing under the laws of their state of organization and are duly qualified as a foreign entities and are currently in good standing in each state in which such qualification is required for the conduct of each of Tenant's and Mountain Express's business as it is currently being conducted (including, as applicable, the state where the Property is located).

(b) Each of Tenant and Mountain Express has the full authority and due capacity to execute, deliver, and perform this Amendment and all documents, instruments and agreements executed in connection herewith to which they are a party. Such execution, delivery, and performance has been duly authorized as required under the organizational documents of each of Tenant and Mountain Express, and the individuals and entities executing this Amendment on behalf of each of Tenant and Mountain Express have been duly authorized and empowered to bind each such party by such execution.

(c) This Amendment has been duly executed and delivered to Landlord by each of Tenant and Mountain Express and is valid, binding, and enforceable against each of them in accordance with its terms.

(d) Neither the execution and delivery of this Amendment nor the performance of its terms and compliance with its conditions will conflict with or result in a breach of any of the terms, conditions or provisions of or constitute a violation or default under any organizational document of either of Tenant or Mountain Express or, to the actual knowledge of Tenant or Mountain Express, applicable law, regulation, judgment, writ, order or decree to which either of Tenant or Mountain Express or any property of either of Tenant or Mountain Express is subject. Any breach of the representations and warranties set forth in this Section 9(d) shall be subject to the notice and cure period set forth in Section 24(ix) of the Master Lease.

(e) To the actual knowledge of Tenant or Mountain Express, each of Tenant and Mountain Express is in compliance in all material respects with all federal, state and

4

local laws, rules, and regulations applicable to their respective properties, operations, businesses, and finances. Any breach of the representations and warranties set forth in this Section 9(e) shall be subject to the notice and cure periods set forth in Section 24(ix) of the Master Lease.

10. **Landlord Release**. As of the Effective Date, each of Tenant, Mountain Express and the MEX Principals and their respective past, present and future employees, agents, attorneys, representatives, successors and assigns, and all persons or entities claiming by, through or under any of them (and their respective successors and assigns, collectively, the "MEX Releasing Parties"), hereby:

(a) acknowledges, agrees and affirms that none of them possesses any claims, defenses, offsets, rights of recoupment or counterclaims of any kind or nature against or with respect to the enforcement or administration of the Master Lease or the Guaranty, or any knowledge of any facts or circumstances that might give rise to or be the basis of any such claims, defenses, offsets, rights of recoupment or counterclaims;

(b) remises, releases, acquits and forever discharges Landlord, and its predecessors in interest, affiliates, subsidiaries and assigns, and all of their respective past, present and future shareholders, members, directors, managers, officers, employees, attorneys, advisers, consultants, servicers, representatives or agents (collectively, the "Landlord Released Parties") from any and all manner of debts, accounts, bonds, warranties, representations, controversies, liabilities, obligations, expenses, damages, judgments, executions, actions, claims, demands and causes of action of any nature whatsoever, whether at law or in equity, whether known or unknown, that any of the MEX Releasing Parties now have or may hereafter have by reason of any act, omission, matter, cause or thing, from the beginning of the world to and including the date this Amendment is executed and delivered by all parties hereto, except for those arising from any act or omission that constituted actual fraud, willful misconduct or gross negligence by such Landlord Released Party (all of the foregoing released claims are referred to as the "MEX Released Claims");

(c) agrees that it is the intention of each of the MEX Releasing Parties that the foregoing release shall be effective with respect to all matters, past and present, known and unknown, suspected and unsuspected, and each of the MEX Releasing Parties realizes and acknowledges that factual matters now unknown to it may have given or may hereafter give rise to losses, damages, liabilities, costs and expenses which are presently unknown, unanticipated and unsuspected, and that each of the MEX Releasing Parties further agrees that the waivers and releases in this Amendment have been negotiated and agreed upon in light of that realization and that each of the MEX Releasing Parties nevertheless hereby intends to release, discharge and acquit the Landlord Released Parties from any such unknown losses, damages, liabilities, costs and expenses;

(d) agrees, jointly and severally, to indemnify the Landlord Released Parties for, hold the Landlord Released Parties harmless from and against, and undertake the defense of the Landlord Released Parties with respect to, all MEX Released Claims that

5

each of the Releasing Parties may assert with respect to any of the MEX Released Claims, despite the existence of the releases granted by the MEX Releasing Parties herein;

(e)     acknowledges that Landlord is specifically relying upon each of the MEX Releasing Parties' acknowledgements and agreements in this Section in executing this Amendment, and that in the absence of such agreements Landlord would be unwilling to agree to the modifications provided for in this Amendment; and

(f)     agrees that all releases and discharges by each of the MEX Releasing Parties in this Amendment shall have the same effect as if each released or discharged matter had been the subject of a legal proceeding, adjudicated to final judgment from which no appeal could be taken and therein dismissed with prejudice.

11.     **<u>Intentionally Deleted</u>**.

12.     **<u>Ratification</u>**.     Each of Tenant and Mountain Express hereby expressly, unconditionally, irrevocably and unequivocally (i) ratifies each of their obligations under the Master Lease and the Guaranty (the "<u>Ratifying Parties Obligations</u>") and confirms that such Ratifying Parties Obligations, and all waivers, covenants and agreements by each of Tenant and Mountain Express in the Master Lease and the Guaranty, remain in full force and effect for the benefit of Landlord, (ii) reaffirms its continuing absolute liability for the payment and performance of all of the Ratifying Parties Obligations, and (iii) confirms that such Ratifying Parties Obligations have not been modified or amended and that each of Tenant's and Mountain Express's liabilities under such Ratifying Parties Obligations have not been limited, impaired or affected in any manner by any existing or previous event, fact or circumstance, in each case subject to the terms of this Amendment, including without limitation Section 5(a) hereof.

13.     **<u>Miscellaneous</u>**.  The provisions of this Amendment shall govern and control in the event of any conflict between this Amendment and the provisions of the Master Lease.  The parties hereto, and each of them, agree to execute from time to time, any and all documents reasonably requested by the others to carry out the intent of this Amendment.  Wherever possible, each provision of this Amendment shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Amendment shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Amendment.  This Amendment shall be governed by the laws of the State of North Carolina. EACH OF THE PARTIES HERETO, BY ACCEPTANCE OF THIS AMENDMENT, HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THIS AMENDMENT.  This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Time is of the essence with respect to all agreements and obligations of each of Tenant, Mountain Express and the MEX Principals contained herein.  This Amendment is solely for the benefit of the parties hereto and no persons other than the parties hereto and the Landlord Released Parties shall be entitled to claim or receive any benefit by reason of this Amendment.

6

14. **Counterparts**. This Amendment may be executed in counterparts, each of which shall constitute an original, but all together shall constitute one and the same instrument. Signatures to this Amendment delivered electronically via .pdf, .jpeg, .TIF, .TIFF, DocuSign or similar electronic format shall be deemed an original signature and fully effective as such for all purposes.

15. **Survival**. The provisions of Sections 4, 10, 12, 13, 14 and 15 of this Amendment shall survive the expiration or earlier termination of the Master Lease.

<div align="center">[SIGNATURE PAGES ON FOLLOWING PAGE]</div>

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date first set forth above.

<div style="text-align: right;">

**LANDLORD:**

**MOUNTAIN DATX002 LLC**
**MOUNTAIN DATX004 LLC**
**MOUNTAIN DATX005 LLC**
**MOUNTAIN IRTX001 LLC**
**MOUNTAIN METX001 LLC**
**MOUNTAIN PORTFOLIO OWNER LLC**
**MOUNTAIN PORTFOLIO OWNER AR LLC**
**MOUNTAIN PORTFOLIO OWNER LA LLC**
**MOUNTAIN PORTFOLIO OWNER NC LLC,**
each a Delaware limited liability company

By: _____
Name: Michael Reiter
Title: Authorized Representative

</div>

8

DocuSign Envelope ID: CDF0E1D5-3079-44AB-BBD6-A636230A3A9E

**TENANT:**

**MEX RE-NE-IN LLC**
**MEX RE-NE-OH LLC**
**MEX RE-SW-AR LLC**
**MEX RE-SW-LA LLC**,
each a Wyoming limited liability company

By: Mountain Express Oil Company,
a Georgia corporation, its manager

By: _____ *Turjo Wadud* _____
Name: Turjo Wadud
       4778CF62B6E7485...
Title:       CEO

**WEST HILL RANCH GROUP LLC**,
a Delaware limited liability company

By: Mountain Express Oil Company,
its sole member

By: _____ *Turjo Wadud* _____
Name:   Turjo Wadud 4778CF62B6E7485...
Title:     CEO

9

**GUARANTOR:**

**MOUNTAIN EXPRESS OIL COMPANY,**
a Georgia corporation

By: _____

Name: _____

Title: _____ CEO _____

**Solely for purposes of acknowledging and agreeing to Section 4 and Section 9 of this Amendment:**

**MEX PRINCIPALS:**

_____
Turjo Wadud

_____
Lamar Frady

**Exhibit A**

**EXHIBIT A**
**TO**
**LEASE AGREEMENT**

**BASE RENT SCHEDULE**

| Lease Year | Annual Base Rent (with 10% Increase) | Monthly Base Rent (with 10% Increase) | Annual Base Rent (without 10% Increase) | Monthly Base Rent (without 10% Increase) |
|---|---|---|---|---|
| **Initial Term** | | | | |
| 1* | $ 11,448,006.65 | $ 954,000.55 | $ 10,649,009.00 | $ 887,417.42 |
| 2 | $ 11,953,004.97 | $ 996,083.75 | $ 10,866,368.16 | $ 905,530.68 |
| 3 | $ 12,192,065.07 | $ 1,016,005.42 | $ 11,083,695.52 | $ 923,641.29 |
| 4 | $ 12,435,906.37 | $ 1,036,325.53 | $ 11,305,369.43 | $ 942,114.12 |
| 5 | $ 12,684,624.50 | $ 1,057,052.04 | $ 11,531,476.82 | $ 960,956.40 |
| 6 | $ 12,938,316.99 | $ 1,078,193.08 | $ 11,762,106.35 | $ 980,175.53 |
| 7 | $ 13,197,083.33 | $ 1,099,756.94 | $ 11,997,348.48 | $ 999,779.04 |
| 8 | $ 13,461,025.00 | $ 1,121,752.08 | $ 12,237,295.45 | $ 1,019,774.62 |
| 9 | $ 13,730,245.50 | $ 1,144,187.12 | $ 12,482,041.36 | $ 1,040,170.11 |
| 10 | $ 14,004,850.41 | $ 1,167,070.87 | $ 12,731,682.19 | $ 1,060,973.52 |
| 11 | $ 14,284,947.41 | $ 1,190,412.28 | $ 12,986,315.83 | $ 1,082,192.99 |
| 12 | $ 14,570,646.36 | $ 1,214,220.53 | $ 13,246,042.15 | $ 1,103,836.85 |
| 13 | $ 14,862,059.29 | $ 1,238,504.94 | $ 13,510,962.99 | $ 1,125,913.58 |
| 14 | $ 15,159,300.48 | $ 1,263,275.04 | $ 13,781,182.25 | $ 1,148,431.85 |
| 15 | $ 15,462,486.49 | $ 1,288,540.54 | $ 14,056,805.90 | $ 1,171,400.49 |
| 16 | $ 15,771,736.22 | $ 1,314,311.35 | $ 14,337,942.01 | $ 1,194,828.50 |
| 17 | $ 16,087,170.94 | $ 1,340,597.58 | $ 14,624,700.85 | $ 1,218,725.07 |
| 18 | $ 16,408,914.36 | $ 1,367,409.53 | $ 14,917,194.87 | $ 1,243,099.57 |
| 19 | $ 16,737,092.65 | $ 1,394,757.72 | $ 15,215,538.77 | $ 1,267,961.56 |
| 20 | $ 17,071,834.50 | $ 1,422,652.87 | $ 15,519,849.54 | $ 1,293,320.80 |
| 21 | $ 17,413,271.19 | $ 1,451,105.93 | $ 15,830,246.54 | $ 1,319,187.21 |
| 22 | $ 17,761,536.61 | $ 1,480,128.05 | $ 16,146,851.47 | $ 1,345,570.96 |
| 23 | $ 18,116,767.34 | $ 1,509,730.61 | $ 16,469,788.50 | $ 1,372,482.37 |
| 24 | $ 18,479,102.69 | $ 1,539,925.22 | $ 16,799,184.27 | $ 1,399,932.02 |
| 25 | $ 18,848,684.75 | $ 1,570,723.73 | $ 17,135,167.95 | $ 1,427,930.66 |
| **Option 1** | | | | |
| 26 | $ 19,225,658.44 | $ 1,602,138.20 | $ 17,477,871.31 | $ 1,456,489.28 |
| 27 | $ 19,610,171.61 | $ 1,634,180.97 | $ 17,827,428.74 | $ 1,485,619.06 |
| 28 | $ 20,002,375.04 | $ 1,666,864.59 | $ 18,183,977.31 | $ 1,515,331.44 |
| 29 | $ 20,402,422.54 | $ 1,700,201.88 | $ 18,547,656.86 | $ 1,545,638.07 |
| 30 | $ 20,810,470.99 | $ 1,734,205.92 | $ 18,918,609.99 | $ 1,576,550.83 |

|  | Option 2 | | | | | |
|---|---|---|---|---|---|---|
| 31 | $ | 21,226,680.41 | $ | 1,768,890.03 | $ | 19,296,982.19 | $ | 1,608,081.85 |
| 32 | $ | 21,651,214.02 | $ | 1,804,267.84 | $ | 19,682,921.84 | $ | 1,640,243.49 |
| 33 | $ | 22,084,238.30 | $ | 1,840,353.19 | $ | 20,076,580.27 | $ | 1,673,048.36 |
| 34 | $ | 22,525,923.07 | $ | 1,877,160.26 | $ | 20,478,111.88 | $ | 1,706,509.32 |
| 35 | $ | 22,976,441.53 | $ | 1,914,703.46 | $ | 20,887,674.12 | $ | 1,740,639.51 |
|  | Option 3 | | | | | |
| 36 | $ | 23,435,970.36 | $ | 1,952,997.53 | $ | 21,305,427.60 | $ | 1,775,452.30 |
| 37 | $ | 23,904,689.77 | $ | 1,992,057.48 | $ | 21,731,536.15 | $ | 1,810,961.35 |
| 38 | $ | 24,382,783.56 | $ | 2,031,898.63 | $ | 22,166,166.87 | $ | 1,847,180.57 |
| 39 | $ | 24,870,439.23 | $ | 2,072,536.60 | $ | 22,609,490.21 | $ | 1,884,124.18 |
| 40 | $ | 25,367,848.02 | $ | 2,113,987.33 | $ | 23,061,680.02 | $ | 1,921,806.67 |
|  | Option 4 | | | | | |
| 41 | $ | 25,875,204.98 | $ | 2,156,267.08 | $ | 23,522,913.62 | $ | 1,960,242.80 |
| 42 | $ | 26,392,709.08 | $ | 2,199,392.42 | $ | 23,993,371.89 | $ | 1,999,447.66 |
| 43 | $ | 26,920,563.26 | $ | 2,243,380.27 | $ | 24,473,239.33 | $ | 2,039,436.61 |
| 44 | $ | 27,458,974.52 | $ | 2,288,247.88 | $ | 24,962,704.11 | $ | 2,080,225.34 |
| 45 | $ | 28,008,154.01 | $ | 2,334,012.83 | $ | 25,461,958.20 | $ | 2,121,829.85 |

*Includes January prorated rent increase & 10% April rent increase for those months indicted

12

**Exhibit B-2**

**EXHIBIT B-2**
**TO**
**AMENDED AND RESTATED MASTER LEASE AGREEMENT**

**ALLOCATED BASE RENT**

| Property Address: | City | State | Allocated Base Rent (with 10% Increase) | Allocated Base Rent (without 10% Increase) |
|---|---|---|---|---|
| 17013 State Road 37 | Harlan | IN | $ 237,363.07 | $ 220,796.65 |
| 8717 US Hwy 24 | Fort Wayne | IN | $ 265,830.34 | $ 247,277.08 |
| 4832 South Calhoun Road | Fort Wayne | IN | $ 113,451.72 | $ 105,533.52 |
| 143 West Tully Street | Convoy | OH | $ 125,965.66 | $ 117,174.06 |
| 5777 Ottawa Road | Lima | OH | $ 215,754.52 | $ 200,696.23 |
| 602 East Perry Street | Paulding | OH | $ 137,062.44 | $ 127,496.35 |
| 204 West East Main Street | Deshler | OH | $ 123,435.51 | $ 114,820.50 |
| 305 East Main Street | McComb | OH | $ 194,604.10 | $ 181,021.98 |
| 203 US Highway 62 | Alpena | AR | $ 81,741.53 | $ 76,036.50 |
| 330 East Main Street | Gassville | AR | $ 85,817.29 | $ 79,827.79 |
| 901 South College Street | Mountain Home | AR | $ 93,968.80 | $ 87,410.38 |
| 1508 Highway 62 | Mountain Home | AR | $ 73,929.67 | $ 68,769.85 |
| 700 US 64 East | Wynne | AR | $ 84,911.57 | $ 78,985.28 |
| 702 Central Boulevard | Bull Shoals | AR | $ 67,929.25 | $ 63,188.22 |
| 6132 AR-5 | Midway | AR | $ 81,515.10 | $ 75,825.87 |
| 703 East Main Street | Flippin | AR | $ 81,741.53 | $ 76,036.50 |
| 1580 South College Street | Mountain Home | AR | $ 84,911.57 | $ 78,985.28 |
| 433 Albemarle Road | Troy | NC | $ 58,917.31 | $ 54,805.26 |
| 6555 Highway 52 North | Welcome | NC | $ 142,607.28 | $ 132,654.21 |
| 511 East Main Street | Biscoe | NC | $ 121,700.41 | $ 113,206.50 |
| 512 West Main Street | Locust | NC | $ 166,397.57 | $ 154,784.08 |
| 481 US Highway 1 South | Rockingham | NC | $ 406,431.32 | $ 378,065.02 |
| 3233 Wow Road | Randleman | NC | $ 159,984.19 | $ 148,818.32 |
| 530 North Main Street | Troy | NC | $ 148,771.73 | $ 138,388.42 |
| 1634 Zoo Parkway | Asheboro | NC | $ 128,012.42 | $ 119,077.97 |
| 103 South Main Street | Candor | NC | $ 105,115.46 | $ 97,779.07 |
| 527 Old Liberty Road | Asheboro | NC | $ 99,864.65 | $ 92,894.74 |
| 231 South Main Street | Star | NC | $ 127,703.81 | $ 118,790.90 |
| 2655 North Church Street | Haw River | NC | $ 105,167.26 | $ 97,827.25 |
| 434 Little River Road | Seagrove | NC | $ 197,582.74 | $ 183,792.73 |
| 11126 N NC Highway 150 | Winston-Salem | NC | $ 121,593.52 | $ 113,107.07 |
| 100 Highway 52 South | Albemarle | NC | $ 198,254.14 | $ 184,417.27 |

| | | | | |
|---|---|---|---|---|
| 515 East Main Street (109 Hillview Extension) | Candor | NC | $ 105,617.22 | $ 98,245.82 |
| 713 Main Street | Oakboro | NC | $ 129,526.77 | $ 120,486.63 |
| 4416 South NC 150 | Lexington | NC | $ 270,242.87 | $ 251,381.64 |
| 7039 Jordan Road | Ramseur | NC | $ 151,773.02 | $ 141,180.23 |
| 2003 North Fayetteville Street | Asheboro | NC | $ 226,187.78 | $ 210,401.32 |
| 315 Randolph Street | Thomasville | NC | $ 196,622.52 | $ 182,899.52 |
| 800 Bryan Road | Thomasville | NC | $ 194,051.38 | $ 180,507.84 |
| 1011 Liberty Road | Archdale | NC | $ 215,905.13 | $ 200,836.33 |
| 2271 Main Street | Ellerbe | NC | $ 199,362.75 | $ 185,448.50 |
| 402 West Swannanoa Street | Liberty | NC | $ 219,440.05 | $ 204,124.54 |
| 1050 Albemarle Road | Troy | NC | $ 170,149.29 | $ 158,273.96 |
| 100 West NC Highway 705 | Robbins | NC | $ 196,951.62 | $ 183,205.66 |
| 11765 Crossett Road | Bastrop | LA | $ 228,724.69 | $ 212,761.17 |
| 433 Highway 577 South | Delhi | LA | $ 377,642.09 | $ 351,285.09 |
| 1601 Farmville Highway/I-20 | Ruston | LA | $ 127,706.41 | $ 118,793.32 |
| 200 South Main Street | Junction City | LA | $ 149,039.84 | $ 138,637.81 |
| 24605 Highway 2 | Homer | LA | $ 136,696.42 | $ 127,155.89 |
| 1208 Broadway Street | Delhi | LA | $ 52,993.25 | $ 49,294.66 |
| 4243 W. Pioneer Drive | Irving | TX | $ 894,676.62 | $ 832,233.91 |
| 110110 Harry Hines Blvd | Dallas | TX | $ 399,057.47 | $ 371,205.81 |
| 8620 Lake June Rd | Dallas | TX | $ 816,445.53 | $ 759,462.85 |
| 5001 South Buckner Blvd | Dallas | TX | $ 775,578.24 | $ 721,447.84 |
| 2600 East Highway 30 | Mesquite | TX | $ 775,578.24 | $ 721,447.84 |

14